Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois  60601-6636
Telephone:     (312) 861-2000
Facsimile:     (312) 861-2200

Proposed Counsel to the Debtors and Debtors in Possession

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

Proposed Counsel to Debtor Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-_____ |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

# DEBTORS' MEMORANDUM ON REINSTATEMENT
# IN SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT

# INTRODUCTION AND OVERVIEW

After extensive negotiations, Charter has reached consensus with, and received executed plan support agreements from, key bondholders and the company's primary stockholder on the terms of a prearranged plan of reorganization (the "Plan"). See Doody Decl. ¶¶ 7-8, 35-36. This Plan will strengthen the company's balance sheet by reducing the debt of Charter's holding companies by approximately $8 billion and eliminating more than $830 million in annual interest expense. It will also result in $2 billion in equity investments and reflects commitments to refinance approximately $1.2 billion in existing debt and raise $267 million in new debt. The Plan will allow Charter to emerge quickly and efficiently from chapter 11 as a stronger and more financially sound company in the dynamic and competitive communications industry. See id. ¶ 9.

In light of current credit market conditions and the complexity of Charter's business and capital structure, the Plan is an impressive achievement. Affecting only the junior entities in Charter's capital structure, the Plan will maximize value for the estates and leave Charter's operations intact. See id. ¶ 37. It also will ensure that the senior portion of Charter's capital structure remains in place, leaving unimpaired approximately $11.8 billion in senior debt instruments. See id. ¶¶ 37-52. Because it improves the credit profile of all entities within Charter's capital structure, dramatically reduces annual interest expense, and results in an influx of additional investment, the Plan offers substantial benefits to both the estates and their creditors.

Notwithstanding the significant support the Plan has received from key stakeholders, Charter anticipates that certain senior creditors (the "Objecting Creditors") will seek to use the restructuring of claims of holding company creditors as an opportunity to increase dramatically the pricing of certain debt instruments to be reinstated under the Plan. The Objecting Creditors

will not be prejudiced by reinstatement because their rights are unaffected under the Plan and, indeed, their credit will be more secure after Charter completes its restructuring. See id. ¶¶ 45, 49-52. Nonetheless, the Objecting Creditors will effectively take the position that, when capital markets are constrained, a lender may force a debtor to renegotiate and pay materially higher interest rates on loans that are outstanding and performing — to the substantial detriment of the debtor's estates and their other creditors.

The estates and their other creditors will be substantially harmed if the Objecting Creditors are permitted to block reinstatement. Support for the prearranged Plan is contingent on reinstatement. Moreover, because the credit markets are not functioning properly, refinancing more than $11 billion in debt might not be possible and certainly would be prohibitively expensive. Charter has estimated that the interest on new financing, if reinstatement is not permitted, would increase Charter's annual interest expense by more than $500 million — more than double the current annual interest expense on the senior debt instruments. In other words, if reinstatement is not permitted, more than half a billion dollars will flow out of the estates every year and into the pockets of Charter's senior creditors. Accordingly, if the Objecting Creditors prevail in their attempt to force a renegotiation of the pricing for reinstated debt instruments, causing Charter to incur significant additional interest expense, the Plan would no longer be feasible and could not be consummated. In this event, Charter's junior creditors would likely be wiped out and Charter would be forced into extended chapter 11 proceedings. See id. ¶¶ 6, 30-32.

The Bankruptcy Code does not require such an inequitable result. Nor does it allow creditors to escape their existing contractual obligations. The mere filing of a chapter 11 case does not bestow an unjustified windfall on unimpaired creditors at the expense of the estates and

their other creditors.  Where, as here, money already has been loaned under a credit agreement, the debtor has agreed to continue to perform under that agreement and has not defaulted (or any default is cured or excused), and the lender's rights are unaltered by the plan of reorganization, the credit agreement may be reinstated and the lender required to honor the pricing and other terms to which it freely contracted.

Because reinstatement is expected to be a significant and disputed issue at Plan confirmation, this memorandum sets forth a brief explanation why reinstatement of the relevant credit facilities and indentures is warranted and appropriate in these chapter 11 cases.  The memorandum first identifies the specific debt instruments to be reinstated.  It then demonstrates that the requirements of section 1124 have been satisfied and that there are no impediments to reinstatement.

## AGREEMENTS TO BE REINSTATED

Charter seeks to reinstate approximately $11.8 billion in senior debt instruments under the Plan.  The specific credit facilities and indentures to be reinstated are:

|  | Principal Amount Outstanding |
|---|---:|
| First Lien Credit Facility |  |
| Term Loan Facility maturing 2014 | $6.9 billion |
| Revolving Credit Facility maturing 2013 | $1.3 billion |
| 8.00% senior second lien notes due 2012 | $1.1 billion |
| 8⅜% senior second lien notes due 2014 | $770 million |
| 10.875% senior second lien notes due 2014 | $546 million |
| Junior Credit Facility maturing 2014 | $350 million |
| 8¾% senior notes due 2013 | $800 million |
| **Total** | **$11.8 billion** |

Doody Decl. ¶ 49.

3

The two credit facilities to be reinstated were negotiated in March 2007 and March 2008. Under the First Lien Credit Facility, Charter secured $7 billion in term loans that mature in March 2014 and a $1.5 billion revolving credit facility that matures in March 2013. See Doody Decl. ¶¶ 22-25. Under the Junior Credit Facility, Charter secured a $350 million term loan that matures on September 16, 2014. See id. ¶ 26. The senior notes and senior second lien notes are reflected in three indentures dated as of March 2008, April 2004, and November 2003.

With respect to the four senior notes, the Junior Credit Facility, and the term loan under the First Lien Credit Facility, funds already have been extended and the only material obligation remaining is Charter's repayment of the debt and its compliance with certain covenants. With respect to the revolver under the First Lien Credit Facility, Charter has borrowed in an amount of $1.3 billion. See id. ¶ 23. Under the terms of the Plan, however, Charter has made a binding commitment to irrevocably waive any right to engage in additional borrowing under the facility and, if required by the Court, will cash collateralize any letters of credit under the facility that remain outstanding. See id. ¶ 52.

**ANALYSIS**

**I.  The Agreements Are Subject To Reinstatement.**

The Plan satisfies the requirements for reinstatement under section 1124 of the Bankruptcy Code because it provides that the Objecting Creditors will receive the complete benefit of their bargain with Charter. In particular, under the terms of the Plan, no defaults will exist upon reinstatement because the only defaults that have occurred are those resulting from the filing of the chapter 11 cases or the financial condition of the company, which are excused from cure under the Bankruptcy Code. See 11 U.S.C. § 365(b)(2), 11 U.S.C. § 1124(2)(A). Accordingly, the Objecting Creditors' claims are unimpaired and the credit facilities and indentures are properly subject to reinstatement.

4

## A. Section 1124 Permits A Party To Cure And Reinstate The Existing Terms Of A Loan Agreement.

As long as a plan cures or provides compensation for any defaults, and does not otherwise alter a creditor's legal, equitable, or contractual rights, section 1124 permits the plan "to reinstate the original maturity of the" creditor's "claim or interest as it existed before the default without impairing such claim or interest." In re NextWave Personal Communications, Inc., 244 B.R. 253, 269 (Bankr. S.D.N.Y. 2000) (quoting 7 Collier on Bankruptcy ¶ 1124.03[2] at 1124-10 (15th ed. rev. 1999)); see also In re Madison Hotel Assocs., 749 F.2d 410, 419-20 (7th Cir. 1984). As courts have recognized, the concept of reinstatement "appears throughout the Bankruptcy Code and is globally intended to permit a debtor" to put debt "back on track and effect a reorganization." In re NextWave, 244 B.R. at 268.

Section 1124 prevents a creditor from exercising contractual rights of acceleration to terminate a contract as a result of a chapter 11 filing when it otherwise receives "the complete benefit of its original bargain with the debtor." In re Kizzac Mgmt. Corp., 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984); see also In re Taddeo, 685 F.2d 24 (2d Cir. 1982) (when a debtor cures a default, "the consequences" of the default are "nullified"). Congress designed section 1124 to prevent creditors from assuming a blocking position to extract improper windfalls at the expense of the debtor's estates. In re Mirant Corp., 303 B.R. 319, 331 (N.D. Tex. 2003) (citing section 1124 as one of "the numerous expressions by Congress that a bankruptcy filing should not adversely affect the conduct of a debtor's business"). Instead, because the "intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away," as long as the holder of a claim is restored to his original position, the claimant is in a better position than "others who receive less or get nothing at all" and "has no

5

K&E 14401245.

cause to complain." S. Rep. No. 989, 95th Cong., 2d Sess. 120, reprinted in 1978 U.S.C.C.A.N. 5787, 5906; see Nextwave, 244 B.R. at 268-69; Kizzac, 44 B.R. at 501.

Section 1124 undoubtedly applies to credit agreements and other financial instruments. As courts have recognized, because "interest rates on long-term loans are [frequently] substantially less than the current market rate," section 1124 "promotes the economic efficiency of reorganization by allowing the chapter 11 debtor to reinstate the original terms of an accelerated long-term loan at this lower interest rate." Madison Hotel, 749 F.2d at 420-21; see also In re Tobacco Row Phase IA Develop., L.P., 338 B.R. 684, 687 (Bankr. E.D. Va. 2005) (permitting reinstatement of cash flow note upon cure of defaults); In re Lennington, 288 B.R. 802, 804 (Bankr. C.D. Ill. 2003) (permitting reinstatement of residential mortgage); In re Liberty Warehouse Assocs. Ltd. P'ship, 220 B.R. 546, 550 (Bankr. S.D.N.Y. 1998) (a debtor may "cure a default under an accelerated [loan] obligation and reinstate its original terms, but not where the underlying claim has matured by its own terms"). As long as a creditor is returned to the same position it was in immediately prior to the default, it is given the full benefit of its original bargain and should not be heard to complain. See In re Gillette Assocs. Ltd., 101 B.R. 866, 875 (N.D. Ohio 1989) (plan permitted to modify loan agreements because bondholders would receive "full repayment of all sums due and owing" and thus had "little cause to complain").

B. **Charter Is Entitled To Reinstate The Credit Facilities And Indentures.**

This case is controlled by these well-settled principles and, indeed, is a pristine example of the type of reinstatement contemplated under the Bankruptcy Code. Because the Plan puts the Objecting Creditors in the same position they occupied before the chapter 11 cases were filed, without altering their rights, they have no grounds to complain about being required to honor the terms of their agreements.

6

Before filing these chapter 11 cases, Charter complied with its payment obligations under both the credit facilities and the indentures. See Doody Decl. ¶ 51. It never missed a payment and timely complied with its other obligations, including obligations to file annual budgets and annual and quarterly compliance certificates. See id. In short, before filing its petition, Charter had not defaulted under any of the debt instruments it is seeking to reinstate.

Although the Objecting Creditors may attempt to conjure up supposed defaults in an attempt to escape their contractual obligations, the evidence will show that no defaults have occurred (other than *ipso facto* defaults), or that, if any immaterial defaults have occurred, they have been or will be appropriately cured. Charter has already taken steps to ensure that its senior creditors are not disadvantaged by the reorganization process. For example, because it negotiated a consensual prearranged Plan, confirmation is expected to occur over a relatively short time frame. See id. ¶¶ 43-44 (noting that the parties have agreed that the Plan must be confirmed within 130 days after the petition date). Moreover, as long as these chapter 11 cases remain pending, Charter has agreed to pay interest at a higher negotiated default interest rate. See id. ¶ 52. In addition, because the Plan provides for a settlement of all claims of Charter's primary shareholder (and his related entities), allowing that shareholder to continue to hold in excess of 35% of the voting control of Charter, the Plan prevents a change of control (as defined in the reinstated debt instruments) from occurring and enables Charter to remain in compliance with the material provisions of its credit facilities and indentures. See id. ¶ 41.

The only events of default that have occurred are defaults under certain *ipso facto* provisions as a result of Charter's filing for chapter 11 protection. But it is well settled that defaults occurring under an *ipso facto* clause do not preclude reinstatement. See NextWave, 244 B.R. at 269. As the legislative history makes clear, reinstatement "consists of curing any default

7

(*other than a default under an ipso facto or bankruptcy clause*) and reinstatement of the maturity of the claim or interest." H. Rep. No. 95-595, at 408 (emphasis added).

Because the Objecting Creditors are left in the same position under the agreements as they were before the chapter 11 filing, their claims are unimpaired and the credit facilities and indentures are properly reinstated under the terms of the Plan. Reinstatement will achieve an equitable result by permitting Charter to emerge swiftly from chapter 11 and ensuring that the Objecting Creditors are not permitted to benefit at the expense of the estates and Charter's other creditors.

## II. There Are No Impediments To Reinstatement.

Because Charter has satisfied the requirements of section 1124, there are no impediments to reinstatement. Charter nonetheless anticipates that the Objecting Creditors may contend that, under section 365(e)(2), they are not prevented from terminating or modifying the credit facilities and indentures in response to Charter's chapter 11 petition. But this carve out to the ordinary rule that a contract may not be terminated merely because a debtor seeks chapter 11 protection, which was designed to protect creditors from being forced to extend *new* or *additional* credit, does not trump section 1124 and is not relevant here. See In re Teligent, Inc., 268 B.R. 723, 737 (Bankr. S.D.N.Y. 2001) (section 365 is "intended to deal with a specific fear: forcing a lender to extend *new* cash or *new* credit") (emphasis in original). By its terms, section 365(e)(2) does not apply to non-executory contracts where debt financing has already been extended and the only remaining material obligation is the repayment of the debt. Read in harmony, section 365 and section 1124 serve complementary purposes — a credit agreement may be reinstated, and the contractual obligations honored, provided that the creditor is under no obligation to extend new or additional credit and that its rights are otherwise unaffected by the plan of reorganization.

8

## A. Section 365 By Its Terms Does Not Apply To Non-Executory Contracts.

"Executory contracts" within the meaning of the Bankruptcy Code are those contracts "'on which performance remains due to some extent on both sides.'" NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 n.6 (1984) (quoting H.R. Rep. No. 95-595, at 347 (1977)). A contract is executory only if it is executory as to both parties. See id. To determine whether a contract satisfies this requirement, courts examine the contract "as of the petition date." In re Penn Traffic Company, 524 F.3d 373, 381 (2d Cir. 2008).

In assessing "how much performance must be outstanding" for a contract to remain executory, the Second Circuit has applied the "Countryman test." See id. at 379. That test provides that an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are *so far underperformed* that the failure of either to complete performance would constitute a material breach excusing performance of the other." Id. (emphasis added) (quoting Vernon Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973)). A contract is executory only if "*both sides* are still obligated to render *substantial performance*." In re Calpine Corp., No. 05-60200, 2008 WL 3154763, at *3 (Bankr. S.D.N.Y. Aug. 4, 2008) (emphasis added) (citing In re Riodizio, Inc., 204 B.R. 417, 421 (Bankr. S.D.N.Y. 1997)); see also In re C & S Grain Co., 47 F.3d 233, 237 (7th Cir. 1995) (a contract is executory if the "obligations of each party remain substantially underperformed").

In addition to the Countryman test, courts in this Circuit also apply a "functional" test. That test considers whether assuming or rejecting a contract would benefit the estates and their creditors, regardless of whether material performance obligations remain outstanding. In re Bradlee Stores, Inc., Nos. 00-16033, et al., 2001 WL 1112308, at *6 (Bankr. S.D.N.Y. Sept. 20, 2001) (describing "functional" test); Calpine, 2008 WL 3154763, at *5 (contract not executory because rejection would not produce any benefits); In re Drexel Burnham Lambert Group, Inc.,

9

138 B.R. 687, 696 (S.D.N.Y. 1992). Courts have emphasized that the concept of an "executory contract" should be defined in light of the purposes for which a debtor may exercise its rights under section 365 of the Code. In re Bluman, 125 B.R. 359, 363 (E.D.N.Y. 1991). These purposes include, among other things, taking advantage of contracts that will benefit the estates and promoting the debtor's fresh start. Id.

Under both the Countryman test and the functional test, a "contract is not executory where the only obligation of a party to a contract is the payment of money." In re Leibinger-Roberts, Inc., 105 B.R. 208, 212 (Bankr. E.D.N.Y. 1989) (citation omitted); In re Digicon, 71 Fed. Appx. 442 (5th Cir. 2003) (a "contract is not executory if the only performance required by one side is the payment of money"); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046 (4th Cir. 1985). As courts in this Circuit have held, "obligations for the payment of money only" are "insufficient" to render an agreement executory. In re Chateaugay Corp., 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989). It is well established that a credit agreement is not executory after funds have been loaned and the only remaining material obligation is the borrower's obligation to repay the debt. See Calpine, 2008 WL 3154763, at *4 (loan agreement not executory); In re Keblish, 180 B.R. 176, 178 (E.D. Tex. 1995) (a "note is not an executory contract if the only performance that remains is repayment," even if lender has remaining obligations to refinance); In re Braley, 39 B.R. 133, 135 (D. Vt. 1984) (loan contracts are not executory if the "duty to pay off the debt is the only performance that remains outstanding"); In re Adolphsen, 38 B.R. 776, 778 (D. Minn. 1983) ("a promissory note is not executory").

### B.     Charter's Credit Facilities And Indentures Are Not Executory.

Applying these settled rules, it is clear that the credit facilities and indentures that Charter seeks to reinstate are no longer executory. They have been substantially performed because the funds have already been loaned and, at this juncture, the only remaining material obligation is

10

Charter's repayment of the debt. See Calpine, 2008 WL 3154763, at *4 ("a note is not usually an executory contract if the only performance that remains due is repayment"). Because the Objecting Creditors' lending obligations have been substantially performed, any future failure of non-performance on their behalf would not excuse Charter's repayment obligations. See In re Union Fin. Servs. Group, 325 B.R. 816, 822 (E.D. Mo. 2004) (promissory note not executory because only remaining obligation was borrower's obligation to make payment and any non-performance by lender would not excuse payment under note). Accordingly, the agreements are not "so far underperformed" to remain executory within the meaning of the Bankruptcy Code. See In re Hudson Valley Care Centers, Inc., No. 05-16436, 2007 WL 2261585, at *4 (N.D.N.Y. Aug. 2, 2007) (contract not executory where only remaining material obligation involved the collection and distribution of payments).

Because the Junior Credit Facility and senior notes are in the nature of term loans, there are no remaining material obligations except the one-sided repayment of the debt. Accordingly, none of these debt instruments are executory. To be sure, the First Lien Credit Facility is distinguishable from these other agreements insofar as it also grants Charter a right to access a revolving line of credit. But that does not render the First Lien Credit Facility executory because Charter has irrevocably waived its right to secure any additional loans under the revolver.

Under the First Lien Credit Facility, the Objecting Creditors have no material remaining performance obligations *unless* Charter seeks to access and draw more funds from its revolving line of credit. See First Lien Credit Facility § 2.1(b). Nor is there any obligation that Charter borrow or repay loans in the ordinary course under the revolver until its termination date. The Objecting Creditors' obligations are thus entirely derivative of Charter's right (but not obligation) to require additional performance. Because Charter is not obligated to draw on its

11

revolving line of credit, it is significant that Charter has irrevocably waived its right to access additional funds as a term of the Plan:

> Without reservation or qualification, the Debtors (1) irrevocably waive and abjure any right to engage in any additional borrowing under the reinstated CCO Credit Facility, and (2) commit to Cash collateralize, if required by section 1124 of the Bankruptcy Code, by the Effective Date, any letters of credit issued pursuant to the CCO Credit Facility that remain outstanding as of the Effective Date.

Plan, Article X.C. Because Charter has waived its right to access more funds, it has extinguished any unfulfilled lending obligations that the Objecting Creditors might otherwise owe under the Agreement. In other words, Charter's commitment is an "affirmative action" that affects the existence of the Objecting Creditors' "outstanding performance obligations" and renders the contract effectively a one-sided agreement. Penn Traffic, 524 F.3d at 381, 383 (recognizing that debtors may take affirmative action to terminate outstanding performance obligations); see also In re United Airline, Inc., 368 F.3d 720, 724-75 (7th Cir. 2004) (alleged "financial accommodation" feature of contract can be carved off or abjured and the rest of the contract assumed).

Charter's self-imposed restriction is permitted under well-settled New York law, which governs the parties' rights and obligations under the Agreement. See First Lien Credit Facility § 10.11. New York law provides that a party may, without effecting a modification of the underlying agreement, "waive a condition in a contract … inserted for [its] benefit" and "no consideration is necessary for the waiver to be effective." Gould v. Bantam Books, Inc., No. 83-cv-5121, 1984 WL 684, at *4 (S.D.N.Y. 1984) (waiver does not result in a modification); see also Bigda v. Fischbach Corp., 898 F. Supp. 1004, 1013 (S.D.N.Y. 1995). Indeed, Charter's waiver of rights, as effectuated by the Plan, is especially appropriate because it does not harm the Objecting Creditors, but rather provides them with additional protections. See In re Laufenberg,

No. 03-12989-12, 2004 WL 2192428, at *3 (Bankr. D. Kan. June 3, 2004) (holding that, under a plan of reorganization, debtors may waive leasehold rights because counterparties' rights under the lease would not be reduced); In re Brumm, 344 B.R. 795, 801 (Bankr. N.D. W. Va. 2006) (creditors may not complain when their rights are unchanged and debtor voluntarily waives right).

## III. Permitting Reinstatement Serves The Bankruptcy Code's Broader Purposes.

Permitting reinstatement and maintaining the pricing to which the Objecting Creditors' freely (and only recently) agreed is consistent with the Bankruptcy Code's broader purposes. Bankruptcy Courts in this Circuit exercise broad equitable authority to permit reinstatement and prevent unjustified windfalls to creditors. See 11 U.S.C. §§ 105, 1124; see also In re Rizzo-Cheverier, 364 B.R. 532, 536 (S.D.N.Y. 2007) (court has broad equitable authority to preserve rights provided in the Code). For example, where "there is no question as to the insolvency of" the debtors "and the fact that the recovery of other creditors would be diminished," courts have denied creditor requests to recover interest on loans at rates higher than provided in the negotiated loan agreement. In Northwest Airlines Corp., No. 05-17930, 2007 WL 3376895, at *6 (Bankr. S.D.N.Y. Nov. 9, 2007) (permitting reinstatement of loan made to debtors and denying bank's request for additional interest).

The fact that the credit facilities and indentures are no longer executory and subject to reinstatement is confirmed by the underlying purposes of section 365 and section 1124. Section 365 is "intended to deal with a specific fear: forcing a lender to extend *new* cash or *new* credit." In re Teligent, Inc., 268 B.R. 723, 737 (Bankr. S.D.N.Y. 2001) (emphasis in original); S. Rep. No. 95-989, at 58-59 (1978), reprinted in 1978 U.S.C.C.A.N. 5844-45 (a lender "should not be required to extend *new* credit to the debtor"). It protects creditors from being compelled "into the untenable position of having to extend straight cash to an insolvent debtor." In re

13

Cannonsburg Envtl. Assocs., 72 F.3d 1260, 1266 (6th Cir. 1996). Where, as here, loans have already been extended on terms and at rates to which the parties already agreed, however, there is no risk that the estates' creditors will be forced to extend new credit. In re East Texas Steel Facilities, Inc., 117 B.R. 235, 242 (Bankr. N.D. Tex. 1990) (section 365 "does not preclude the trustee from using existing financing"). In such circumstances, reinstatement serves to prevent creditors from seeking increases in the pricing of debt instruments unaffected by the reorganization process.

In contrast, barring reinstatement would turn the Bankruptcy Code on its head, by allowing the Objecting Creditors to receive an improper windfall at substantial cost to the estates and their other creditors. Because the cost of new financing in current market conditions is prohibitively expensive, preventing reinstatement would unravel Charter's consensual prearranged Plan and wipe out the junior creditors' rights to any recovery. It also would set a dangerous and unsettling precedent. Merely because Charter has exercised its right to file for chapter 11 protection, the Objecting Creditors should not be able to leverage their position and transform their secured claims into some heretofore unheard of super-secured, value-draining claims that permit them to suction value out of the estates and into their own pockets.

A filing under chapter 11 is not supposed to create a windfall opportunity for the benefit of senior creditors seeking to renegotiate the terms of debt financing they have already extended. See Mirant, 303 B.R. at 331 (parties should not be able to "take advantage" of a debtor's chapter 11 filing to obtain a "windfall"). Instead, as long as a debtor complies with other Code requirements to ensure that lenders' rights are not impaired, *see* 11 U.S.C. § 1124, a debtor may reinstate its loans and continue to perform under the bargained-for rates and terms to which the lenders voluntarily agreed.

14

## CONCLUSION

The credit facilities and indentures are properly subject to reinstatement under the terms of Charter's prearranged Plan. Accordingly, as part of confirmation, Charter will request that the Court hold that these agreements can be reinstated and that the pricing will be maintained.

Respectfully submitted,

| | |
|---|---|
| New York, New York<br>Dated: March 27, 2009 | /s/ *Paul M. Basta*<br>Richard M. Cieri<br>Paul M. Basta<br>Stephen E. Hessler<br>KIRKLAND & ELLIS LLP<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022-4611<br>Telephone: (212) 446-4800<br>Facsimile: (212) 446-4900<br><br>- and -<br><br>Ray C. Schrock<br>KIRKLAND & ELLIS LLP<br>200 East Randolph Drive<br>Chicago, Illinois 60601-6636<br>Telephone: (312) 861-2000<br>Facsimile: (312) 861-2200<br><br>Proposed Counsel to the Debtors<br>and Debtors in Possession |