UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 Cases |
| CHARTER COMMUNICATIONS, INC. | 09-11435(JMP) |
| Debtors. | (Jointly Administered) |
| JPMORGAN CHASE BANK, N.A.,<br>as Administrative Agent, | |
| Plaintiff, | Adversary Proceeding<br>No. 09-_____ |
| -against- | |
| CHARTER COMMUNICATIONS OPERATING,<br>LLC and CCO HOLDINGS, LLC, | |
| Defendants. | |

## COMPLAINT

Plaintiff JPMorgan Chase Bank, N.A. ("JPMorgan" or "Plaintiff"), for itself

and as Administrative Agent for the prepetition first-lien secured Prepetition Lenders (the

"Prepetition Lenders") to Charter Communications Operating, LLC ("CCO"), for its

complaint against Defendants CCO and CCO Holdings, LLC ("CCO Holdings" and

collectively with "CCO," "Defendants"), respectfully alleges, with knowledge as to its

own actions and events occurring in its presence and upon information and belief as to all

other matters, as follows:

## NATURE OF THIS ACTION

1.   This is an adversary proceeding for a declaratory judgment that there

have been Events of Default under the Prepetition Credit Agreement (as defined below).

Because the plan of reorganization proposed in the Defendants' bankruptcy cases (the "Plan") purports to leave the Prepetition Lenders' legal, contractual and equitable rights under Prepetition Credit Agreement unimpaired under Section 1124 of the Bankruptcy Code, the disputes between Plaintiff and Defendants over the Events of Default are ripe for adjudication.

2.     Plaintiff JPMorgan acts for itself and for the benefit of other Prepetition Lenders party to an Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated as of March 6, 2007 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement," a copy of which is annexed hereto as Exhibit A), among CCO, as Borrower, CCO Holdings, the several Prepetition Lenders from time to time party thereto, JPMorgan, as Administrative Agent, and certain other parties.  JPMorgan, as Administrative Agent, is authorized to bring this action for the benefit of the Prepetition Lenders under the Prepetition Credit Agreement.

3.     Defendants CCO and CCO Holdings, together with their affiliates (collectively, "Charter"), are one of the largest providers of broadband communications in the United States.

4.     From and after March 18, 1999, CCO borrowed a total of over $8.2 billion from the Prepetition Lenders under the Prepetition Credit Agreement.  CCO Holdings guaranteed CCO's obligations under the Prepetition Credit Agreement, and undertook various other obligations under the Prepetition Credit Agreement.

5.     While CCO is the Borrower under the Prepetition Credit Agreement, CCO's business is fundamentally affected by the financial condition of its several affiliates, as described further in paragraph 33 below.  Because of the close

interrelationship between CCO and its affiliates, Plaintiff specifically negotiated for—and Defendants agreed to—the inclusion of Defaults and Events of Default in the Prepetition Credit Agreement based upon the financial condition of certain affiliates, defined as "Designated Holding Companies" in the Prepetition Credit Agreement.

6.    Accordingly, the parties agreed that a Default and an Event of Default under the Prepetition Credit Agreement would occur if any of the Designated Holding Companies "shall be unable to . . . pay its debts as they become due." Prepetition Credit Agreement, § 8(g)(v).

7.    Relatedly, the parties agreed to restrict Defendants' right to upstream monies to Designated Holding Companies through dividends, distributions and/or repayment of intercompany indebtedness. Specifically, Sections 7.6 and 7.8 of the Prepetition Credit Agreement only allow Defendants to upstream monies to enable an interest or principal payment on debt if, among other conditions, "no Default or Event of Default shall have occurred and be continuing."

8.    Section 5.2 of the Prepetition Credit Agreement specifies conditions precedent that must be met for CCO to request additional extensions of credit from the Prepetition Lenders: "No Default or Event of Default shall have occurred and be continuing on such date [of the borrowing request]," and "[e]ach of the representations and warranties made by any Loan Party [including Defendants] . . . shall be true and correct in all material respects on and as of such date as if made on and as of such date . . . ."

9.    Section 5.2 of the Prepetition Credit Agreement further provides that "[e]ach borrowing by and issuance of a Letter of Credit on behalf of the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of

such extension of credit that the conditions contained in this Section 5.2 have been satisfied."

10. From October 2 through November 5, 2008, CCO borrowed additional funds totaling $750 million from the Prepetition Lenders in four separate borrowing requests. On each such borrowing date, CCO obtained additional credit based on its representations to the Prepetition Lenders under Section 5.2(b), among other things, that "[n]o Default or Event of Default shall have occurred and be continuing on such date," and based on similar representations by CCO Holdings under Sections 5.2(a) and 4.7 of the Prepetition Credit Agreement.

11. However, these representations were false at the time they were made.

12. These representations were false because, at the time of such borrowings, two Designated Holding Companies, namely, Charter Communications Holdings, LLC ("Charter Holdings") and CCH I Holdings, LLC ("CIH"), had become unable to pay their debts as they would become due. Accordingly, under Section 8(g)(v) of the Prepetition Credit Agreement, there were Defaults and Events of Default under the Prepetition Credit Agreement.

13. Moreover, these Defaults and Events of Default are continuing.

14. Defendants' inaccurate representations are also Defaults and Events of Default under Section 8(b) of the Prepetition Credit Agreement, which provides that there is a Default and Event of Default if "any representation or warranty made or deemed made by any Loan Party herein [including Defendants] . . . shall prove to have been inaccurate in any material respect on or as of the date made or deemed made." These Defaults and Events of Default are continuing.

15. Section 7.6 prohibits Defendants from paying dividends or making any other distribution in respect of equity for the payment of interest or repayment of principal upon debt if a Default or Event of Default has occurred and is continuing. On November 17, 2008, notwithstanding the existence of Defaults and Events of Default under Sections 8(g)(v) and Section 8(b), Defendants each paid dividends to enable CIH to pay interest on CIH's debt obligations. These dividends violated Defendants' negative covenant in Section 7.6, constituting Defaults and Events of Default under Section 8(c) of the Prepetition Credit Agreement, which provides that it is a Default and Event of Default if "any Loan Party shall default in the observance or performance of any agreement contained in . . . Section 7." These Defaults and Events of Default are continuing.

16. Under Section 7.8 of the Prepetition Credit Agreement, Defendants are prohibited from prepaying intercompany indebtedness with limited exceptions. On November 17, 2008, CCO made an intercompany transfer to Charter Holdings styled as the prepayment of intercompany indebtedness. Again, on or about February 4, 2009, CCO made an intercompany transfer to CCO Holdings styled as the prepayment of intercompany indebtedness. These intercompany transfers did not meet any of the exceptions permitted in Section 7.8 and, thus, were additional Defaults and Events of Default under Section 8(c) of the Prepetition Credit Agreement. These Defaults and Events of Default are continuing.

17. Under Section 5.2 of the Prepetition Credit Agreement, CCO is prohibited from obtaining any additional extension of credit if a Default or Event of Default has occurred and is continuing. Nevertheless, CCO submitted a borrowing request on or about February 3, 2009, which the Prepetition Lenders properly rejected.

## THE PARTIES

18. Plaintiff JPMorgan is a national banking association, with its designated main office in Columbus, Ohio. JPMorgan brings this action in its capacity as Administrative Agent for the Prepetition Lenders.

19. Defendant CCO is a limited liability company organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. CCO is an operating subsidiary of its ultimate parent, Charter Communications, Inc. ("CCI" and collectively with all of its subsidiaries, "Charter"). Charter is one of the largest providers of broadband communications in the United States.

20. Defendant CCO Holdings is a limited liability company organized under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri. CCO Holdings is the parent of CCO.

21. On March 27, 2009 (the "Petition Date"), Defendants filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Defendants continue in possession of their property and manage their business as debtors-in-possession under §§ 1107 and 1108 of the Bankruptcy Code.

## JURISDICTION AND VENUE

22. Plaintiff brings this adversary proceeding pursuant to 28 U.S.C. §§ 157(c)(1), 2201 and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

23. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

24. This is not a core proceeding within the meaning of 28 U.S.C. § 157(b)(1) and (b)(2). Plaintiff does not consent to the entry of final orders or judgment by the bankruptcy judge.

25. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).


## FACTUAL ALLEGATIONS

### Charter

26. Charter is one of the largest providers of broadband communications in the United States.

27. CCO and CCO Holdings are indirect subsidiaries of CCI. As set forth in an organizational chart annexed hereto as Exhibit B, Charter is organized as follows:

    a.   defendant CCO is a direct subsidiary of CCO Holdings;

    b.   defendant CCO Holdings is a direct subsidiary of CCH II, LLC ("CCH II");

    c.   non-party CCH II is a direct subsidiary of CCH I, LLC ("CCH I");

    d.   non-party CCH I is a direct subsidiary of CIH;

    e.   non-party CIH is a direct subsidiary of Charter Holdings;

    f.   non-party Charter Holdings is a direct subsidiary of CCHC, LLC ("CCHC");

    g.   non-party CCHC is a direct subsidiary of Charter Communications Holding Company, LLC ("Charter Holdco"); and

    h.   non-party Charter Holdco is a direct subsidiary of CCI.

28. CCO Holdings, CCH II, CCH I, CIH and Charter Holdings are "Designated Holding Companies," as that term is defined in the Prepetition Credit Agreement.

**CCO's Borrowings Under The Prepetition Credit Agreement**

29. Under the Prepetition Credit Agreement, the Prepetition Lenders provided or made available to CCO the following funds in accordance with the terms and conditions of the Prepetition Credit Agreement:

    a.   a $6.5 billion term loan with a final maturity of March 6, 2014;

    b.   a $1.5 billion revolving credit facility that matures March 6, 2013, including the availability of letters of credit aggregating to $350 million; and

    c.   $500 million of incremental term loan financing.

30. CCO Holdings guaranteed CCO's obligations under the Prepetition Credit Agreement, and undertook various other obligations as specified in the Prepetition Credit Agreement.

31. CCO borrowed approximately $8.2 billion in funded and outstanding loans under the Prepetition Credit Agreement. CCO used these funds for general purposes, including the repayment of other indebtedness.

32. CCO also obtained approximately $149 million in issued but undrawn letters of credit under the Prepetition Credit Agreement.

## Central Terms Of The Prepetition Credit Agreement

33. CCO is fundamentally affected by the financial well-being of its affiliates. For example, certain of the Designated Holding Companies serve as the manager for and provide management services to CCO. CCO thus relies upon employees, officers and services of certain Designated Holding Companies in connection with its business and operations. CCO obtains access to critical programming content through contracts between its affiliates and cable content providers. In addition, CCO is the sole source of operational cash flow for repayment of debt by CCO's parents.

34. Because of this relationship between CCO and its affiliates, Plaintiff negotiated Defaults and Events of Default specifically linked to the financial condition of Designated Holding Companies. Defendants agreed to such provisions. The parties agreed that it would be a Default and Event of Default under Sections 8(f) and 8(g) of the Prepetition Credit Agreement if any Designated Holding Company (i) filed for bankruptcy, (ii) had its debt accelerated, or (iii) "shall be unable to . . . pay its debts as they become due." These and other bargained-for provisions give the Prepetition Lenders the specific, clear and express right, in the event that a Designated Holding Company becomes financially unstable, to: (i) accelerate CCO's outstanding obligations, or alternatively, (ii) negotiate a waiver or amendment with CCO and remain as a Lender in the credit.

35. These cross-default/cross-acceleration provisions are *not* "boilerplate" terms found in all credit agreements. Instead, Plaintiff bargained for and obtained these provisions as a central and necessary premise of this deal because of the relationship between CCO and its parent entities.

36. Another central aspect of the Prepetition Credit Agreement is the restriction upon Defendants' ability to upstream monies to its parents through dividends, distributions or repayment of intercompany indebtedness. The Prepetition Credit Agreement expressly cuts off Defendants' ability to upstream monies to make interest or principal payments on debt if a Default or Event of Default has occurred and is continuing. Thus, for example, if any Designated Holding Company is unable to pay its debts as they become due, the Prepetition Credit Agreement prohibits Defendants from making any further dividends or otherwise upstreaming monies to pay interest or to repay principal on debt.

37. Section 8 of the Prepetition Credit Agreement specifies a number of events or conditions that are Defaults and Events of Default thereunder, including if:

    a. "*any Designated Holding Company*, the Borrower or any of its Subsidiaries shall generally not, or *shall be unable to*, or shall admit in writing its inability to, *pay its debts as they become due*," Prepetition Credit Agreement, § 8(g)(v) (emphasis added);

    b. "*any representation or warranty made or deemed made by any Loan Party herein* [including Defendants] . . . *shall prove to have been inaccurate* in any material respect on or as of the date made or deemed made," *id.* § 8(b) (emphasis added); or

    c. "any Loan Party shall *default in the observance* or performance *of* any agreement contained in . . . *Section 7* [which specifies negative covenants]." *Id.* § 8(c) (emphasis added).

**Conditions Precedent To Each Extension Of Credit**

38. Under the Prepetition Credit Agreement, CCO is entitled to obtain additional credit from the Prepetition Lenders subject to conditions precedent specified in Section 5.2 of the Prepetition Credit Agreement. One such condition precedent is that: "No Default or Event of Default shall have occurred and be continuing on such date."

39. Under the Prepetition Credit Agreement, each time CCO borrows funds from the Prepetition Lenders or requests the issuance of a Letter of Credit thereunder, Defendants must represent to Prepetition Lenders that there are no continuing Defaults or Events of Default.

40. Each borrowing by CCO is deemed under Section 5.2 of the Prepetition Credit Agreement to constitute a representation and warranty by CCO of no Default or Event of Default, including, among other things, that each of the Designated Holding Companies is able to pay its debts as they become due. Additionally, under Sections 5.2(a) and 4.7, both CCO and CCO Holdings represent as of each borrowing that no Default or Event of Default has occurred and is continuing.


**CCO Obtained An Additional $750 Million From The
Prepetition Lenders In October And November 2008 Based
Upon Representations Of No Default Or Event Of Default**

41. From October 2, 2008 through November 5, 2008, CCO borrowed $750 million from the Prepetition Lenders under the Prepetition Credit Agreement. On each borrowing date, Defendants represented that there was no Default or Event of Default existing and continuing as of each such date.

42. Specifically, on October 2, 2008, Defendants represented that there was no Default or Event of Default as of that date, including that no Designated Holding

Company had become unable to pay its debts as they would become due. Based upon this and other of Defendants' representations and warranties, the Prepetition Lenders provided an additional $100 million of credit.

43. Again, on October 3, 2008, Defendants represented that there was no Default or Event of Default as of that date, including that no Designated Holding Company had become unable to pay its debts as they would become due. Based upon this and other of Defendants' representations and warranties, the Prepetition Lenders provided an additional $200 million of credit.

44. A third time, on October 14, 2008, Defendants represented that there was no Default or Event of Default as of that date, including that no Designated Holding Company had become unable to pay its debts as they would become due. Based upon this and other of Defendants' representations and warranties, the Prepetition Lenders provided an additional $200 million of credit.

45. A fourth time, on November 5, 2008, Defendants represented that there was no Default or Event of Default as of that date, including that no Designated Holding Company had become unable to pay its debts as they would become due. Based upon this and other of Defendants' representations and warranties, the Prepetition Lenders provided an additional $250 million of credit.

46. In addition, CCO obtained a Letter of Credit in the amount of $3.5 million on November 17, 2008. In so doing, Defendants made the same representations and warranties under Section 5.2 of the Prepetition Credit Agreement, including representing that there was no Default or Event of Default as of that date. The Prepetition

Lenders issued this Letter of Credit in reliance upon Defendants' representations and warranties.

**Defendants' Representations Were False**

47. Defendants' representations to the Prepetition Lenders were false. At the time they were made, two Designated Holding Companies, namely, Charter Holdings and CIH, had become unable to pay their debts as they would become due. The inability of any Designated Holding Company to pay its debts as they become due is expressly defined as a Default and Event of Default under Section 8(g)(v) of the Prepetition Credit Agreement.

48. That Charter Holdings and CIH were unable to pay their debts as they would become due is confirmed by the fact that Defendants abruptly discontinued their consistent historical practice of paying interest on Charter Holdings debt via dividend payments from CCO up through its chain of parent entities to Charter Holdings.

49. Prior to and through October 1, 2008, Defendants consistently made CCH interest payments through a "daisy chain" of dividends first (i) from CCO to CCO Holdings, then (ii) from CCO Holdings to CCH II, then (iii) from CCH II to CCH I, then (iv) from CCH I to CIH, and finally (v) from CIH to Charter Holdings.

50. This is how interest payments were made on five series of Charter Holdings notes on January 15, 2008.

51. This is how interest payments were made on three series of Charter Holdings notes on April 1, 2008.

52. This is how interest payments were made on five series of Charter Holdings notes on May 15, 2008.

53. This is how interest payments were made on five series of Charter Holdings notes on July 15, 2008.

54. And this is how interest payments were made on three series of Charter Holdings notes on October 1, 2008.

55. But soon after October 1, 2008 (if not earlier), Defendants and other Charter affiliates determined that CIH could not properly continue to make dividends upwards to Charter Holdings. They determined that applicable laws, such as the Delaware Limited Liability Company Act, fraudulent transfer laws and fiduciary duty laws, prohibited dividends because CIH and Charter Holdings could not pay their debts as they would become due.

56. Artfully, Defendants re-styled the November 17, 2008 interest payment on Charter Holdings debt. Rather than making a dividend or distribution, (i) CCO transferred funds to Charter Holdco as a so-called prepayment of an intercompany obligation and (ii) Charter Holdco then made the interest payment to Charter Holdings' debtholders.

57. Because Charter Holdings and/or CIH were unable to pay their debts as they would become due, there were Defaults and Events of Default under Section 8(g)(v) existing soon after October 1, 2008 (if not earlier).

58. However, Defendants did not inform the Prepetition Lenders that applicable laws and fiduciary duties prevented additional dividends or distributions and, to this day, have failed to "promptly give notice to the Prepetition Lenders … of (a) the occurrence of any Default or Event of Default" as required under Section 6.7 of the Prepetition Credit Agreement. Neither did Defendants inform the Prepetition Lenders of a

substantial charge on account of impairment of intangible assets that would have to be taken at year end. Defendants were analyzing these impairment issues in 2008 and formally announced an impairment charge of $1.5 billion relating to the valuation of its franchises (as reflected in "Goodwill and Other Intangible Assets") on February 12, 2009.

59. Despite the fact that Designated Holding Companies were, soon after October 1, 2008 (if not earlier), unable to pay their debts as they would become due, which constituted Defaults and Events of Default under Section 8(g)(v), Defendants made repeated representations and warranties that there were no existing Defaults or Events of Defaults.

60. In addition to the continuing Defaults and Events of Default under Section 8(g)(v), Defendants' false representations of no default were themselves Defaults and Events of Default under Section 8(b) of the Prepetition Credit Agreement.

**CCI Issued Revised SEC Disclosures The Day *After* CCO**
**Finished Borrowing $750 Million From The Prepetition Lenders**

61. In quarterly and annual SEC filings prior to the third quarter of 2008, CCI had represented that it believed its subsidiaries to be solvent: "*[W]e believe that our relevant subsidiaries currently have surplus and are not insolvent*."

    a.  This representation was made in CCI's Form 10-K for the fiscal year 2007, filed on February 27, 2008.

    b.  On May 12, 2008, CCI told its investors the same thing in its first quarter 2008 Form 10-Q: "*[W]e believe that our relevant subsidiaries currently have surplus and are not insolvent*." (emphasis added).

c. Again on August 5, 2008, CCI reaffirmed the solvency of its subsidiaries: "*[W]e believe that our relevant subsidiaries currently have surplus and are not insolvent*." (emphasis added).

62. However, in its Form 10-Q filed on November 6, 2008—the day after CCO finished borrowing $750 million under the Prepetition Credit Agreement—CCI withdrew this affirmative representation as to the solvency of its subsidiaries. Instead, it said: "Primarily in light of the economic environment, *it is uncertain whether the Company will have, at the relevant times, sufficient surplus at <u>CIH</u> and its parents*, or potentially its subsidiaries, *to make distributions, including for payments of interest and principal* on the debts of the parents of such entities, and *there can otherwise be no assurance that the Company's subsidiaries will not become insolvent* or will be permitted to make distributions in the future in compliance with these restrictions in amounts needed to service the Company's indebtedness." (all emphasis added).

63. This change in disclosure was not made until the day after CCO finished borrowing $750 million over the course of five weeks. Further, Defendants did not disclose this information to the Prepetition Lenders prior to making this SEC filing on November 6, 2008.

64. In sum, while CCO was making representations and warranties that induced the Prepetition Lenders to lend another $750 million, Defendants did not inform the Prepetition Lenders that they were in the process of revising CCI's SEC disclosures regarding the risk of CIH and its parents' insolvency.

**Defendants Also Made Restricted Payments In**
**Violation Of The Prepetition Credit Agreement**

65. In addition, Defendants were (and continue to be) in default under other provisions of the Prepetition Credit Agreement.

66. Section 8(c) of the Prepetition Credit Agreement makes it a Default and Event of Default if "any Loan Party shall default in the observance or performance of any agreement contained in . . . Section 7."

67. Section 7.6(b) of the Prepetition Credit Agreement prohibits Defendants from making dividends or other distributions on account of equity (defined in the Prepetition Credit Agreement as "Restricted Payments") to enable the payment of interest if a Default or Event of Default has occurred and is continuing.

68. As described above, there were continuing Defaults and Events of Default as of November 17, 2008.

69. Nevertheless, on November 17, 2008, CCO made Restricted Payments totaling $97.8 million to CCO Holdings to enable it and CIH to make interest payments to their respective debtholders. In addition, CCO Holdings on that same day made Restricted Payments to enable CIH to make interest payments.

70. Defendants thus breached Section 7.6(b) of the Prepetition Credit Agreement, which constitutes another Default and Event of Default under Section 8(c) of the Prepetition Credit Agreement.

**CCO Prepaid Intercompany Indebtedness In
Violation Of The Prepetition Credit Agreement**

71. As described above, it is a Default and Event of Default under Section 8(c) if "any Loan Party shall default in the observance or performance of any agreement contained in . . . Section 7."

72. Section 7.8 of the Prepetition Credit Agreement prohibits CCO from prepaying its intercompany indebtedness with limited exceptions set forth within Section 7.8 itself.

73. On November 17, 2008, CCO made an intercompany transfer of over $5 million to Charter Holdings styled as the prepayment of intercompany indebtedness.

74. Again, on or about February 4, 2009, CCO made an intercompany transfer of up to approximately $75 million to CCO Holdings styled as the prepayment of intercompany indebtedness.

75. The terms of the intercompany notes issued by CCO expressly prohibit the prepayment of such indebtedness if there is a continuing Default or Event of Default under the Prepetition Credit Agreement, as was the case on both November 17, 2008 and February 4, 2009.

76. The intercompany transfers made on November 17, 2008 and February 4, 2009 did not comply with any of the exceptions permitted in Section 7.8.

77. CCO's violation of Section 7.8 thus constituted additional Defaults and Events of Default under Section 8(c) of the Prepetition Credit Agreement.

**CCO's Improper February 3, 2009 Borrowing Request**

78. On January 15, 2009, CCI announced that Charter Holdings and CIH had failed to make interest payments totaling $73.7 million due under certain outstanding bonds.

79. Then and thereafter, the Defendants repeatedly stated that they intended to shortly file petitions for bankruptcy for Defendants, CIH, Charter Holdings and other affiliates.

80. Nevertheless, on or about February 3, 2009, CCO submitted a request to the Prepetition Lenders seeking an extension of additional credit in the amount of $35,423,656.

81. As described above, in making this borrowing request, Defendants made a representation under Section 5.2 of the Prepetition Credit Agreement that there were no continuing Defaults under the Prepetition Credit Agreement. Thus, at the same time that they were openly announcing the intention of the various Charter affiliates (including CIH and Charter Holdings) to file for bankruptcy, Defendants represented, falsely, that CIH and Charter Holdings were each able to pay its debts as they would become due.

82. In light of the Defaults and Events of Default that existed as of that day (and are continuing), Plaintiff and other Prepetition Lenders declined to extend additional credit to CCO.

**Plaintiff Provided Formal Notice To CCO
Of The Occurrence Of Events Of Default**

83. On February 5, 2009, Plaintiff notified CCO by letter that one or more Defaults and Events of Default had occurred under the Prepetition Credit Agreement.

84. Thereafter, Defendants continued to deny the existence of the multiple Events of Default. In a letter dated February 9, 2009, CCO contended that "No Event of Default has occurred or is continuing" and otherwise asserted Defendants' non-existent right to continue to make dividends and prepayments of intercompany debt. In addition, Defendants have expressly asserted that Prepetition Lenders have breached the Prepetition Credit Agreement by failing to fund the full amount of CCO's February 3, 2009 draw request.

## COUNT I

(Declaratory Judgment)

(Section 8(b))

85. Plaintiff repeats and realleges all of the foregoing paragraphs in this Complaint as if fully set forth herein.

86. The Prepetition Lenders and Defendants are parties to the Prepetition Credit Agreement.

87. The Prepetition Credit Agreement is a valid contract enforceable in accordance with its terms.

88. The Prepetition Lenders have fully performed all of their obligations under the Prepetition Credit Agreement.

89. As set forth above, Section 8(g)(v) of the Prepetition Credit Agreement provides that it is a Default and Event of Default under the Prepetition Credit Agreement if "any Designated Holding Company, the Borrower or any of its Subsidiaries shall generally

not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due."

90. At least two Designated Holding Companies—specifically, CIH and Charter Holdings—were unable to pay their debts as they would become due soon after October 1, 2008 (if not earlier). Thus, Defaults and Events of Default under Section 8(g)(v) of the Prepetition Credit Agreement had occurred and have been continuing since that time.

91. Section 8(b) of the Prepetition Credit Agreement provides that it is a Default and Event of Default if "any representation or warranty made or deemed made by any Loan Party … under or in connection with this Agreement … shall prove to have been inaccurate in any material respect on or as of the date made or deemed made."

92. Defendants falsely represented on numerous occasions, as described above in paragraphs 38-60, that all Designated Holding Companies were able to pay their debts as they would become due when, in fact, at least two such Designated Holding Companies had become unable to do so. Defendants made these false representations in connection with up to $750 million in credit extensions as described above in paragraphs 41-46.

93. Defendants dispute that there is any Default or Event of Default under the Prepetition Credit Agreement.

94. There is an actual controversy, and a declaration will resolve a ripe legal dispute and clarify the legal relations between the parties.

95. Accordingly, this Court should issue a declaration that there is a Default and Event of Default under Section 8(b) of the Prepetition Credit Agreement.

## COUNT II

### (Declaratory Judgment)

### (Section 8(c))

96. Plaintiff repeats and realleges all of the foregoing paragraphs in this Complaint as if fully set forth herein.

97. The Prepetition Lenders and Defendants are parties to the Prepetition Credit Agreement.

98. The Prepetition Credit Agreement is a valid contract enforceable in accordance with its terms.

99. The Prepetition Lenders have fully performed all of their obligations under the Prepetition Credit Agreement.

100. Under Section 8(c), there is a Default and Event of Default if, as here, "any Loan Party shall default in the observance or performance of any agreement contained in … Section 7."

101. Section 7.6(b) of the Prepetition Credit Agreement prohibits, if there is a continuing Default or Event of Default, Defendants from paying any dividends or making any other distribution in respect of equity for the payment of interest or repayment of principal.

102. CCO violated Section 7.6(b) when CCO paid dividends or distributions notwithstanding the existence of continuing Defaults and Events of Default under Sections 8(g)(v) and 8(b).

103. CCO Holdings violated Section 7.6(b) when CCO Holdings paid dividends or distributions notwithstanding the existence of continuing Defaults and Events of Default under Sections 8(g)(v) and 8(b).

104. Defendants dispute that there is any Default or Event of Default under the Prepetition Credit Agreement.

105. There is an actual controversy, and a declaration will resolve a ripe legal dispute and clarify the legal relations between the parties.

106. Accordingly, this Court should issue a declaration that there is a Default and Event of Default under Section 8(c) of the Prepetition Credit Agreement due to violation of Section 7.6.

## COUNT III

(Declaratory Judgment)

(Section 8(c))

107. Plaintiff repeats and realleges all of the foregoing paragraphs in this Complaint as if fully set forth herein.

108. The Prepetition Lenders and Defendants are parties to the Prepetition Credit Agreement.

109. The Prepetition Credit Agreement is a valid contract enforceable in accordance with its terms.

110. The Prepetition Lenders have fully performed all of their obligations under the Prepetition Credit Agreement.

111.     Under Section 8(c), there is a Default and Event of Default if, as here, "any Loan Party shall default in the observance or performance of any agreement contained in ... Section 7."

112.     Section 7.8 prohibits prepayment of intercompany indebtedness by CCO except under specific conditions.

113.     CCO made prepayments of intercompany debt in November 2008 and again in February 2009 in violation of Section 7.8.

114.     Defendants dispute that there is any Default or Event of Default under the Prepetition Credit Agreement.

115.     There is an actual controversy, and a declaration will resolve a ripe legal dispute and clarify the legal relations between the parties.

116.     Accordingly, this Court should issue a declaration that there is a Default and Event of Default under Section 8(c) of the Prepetition Credit Agreement due to violation of Section 7.8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief from the District Court as follows:

A.     On Count I against Defendants, for a declaratory judgment that there are Defaults and Events of Defaults under Section 8(b) of the Prepetition Credit Agreement;

B.     On Count II, against Defendants, for a declaratory judgment that there are Defaults and Events of Defaults under Section 8(c) of the Prepetition Credit Agreement due to violation of Section 7.6;

C.     On Count III against Defendants, for a declaratory judgment that there are Defaults and Events of Defaults under Section 8(c) of the Prepetition Credit Agreement due to violation of Section 7.8; and

D.     Grant Plaintiff such other and further relief as this Court may deem just and proper.

Dated:     New York, New York
           March 27, 2009

SIMPSON THACHER & BARTLETT LLP

By:   /s Bruce D. Angiolillo
      Bruce D. Angiolillo
      Peter V. Pantaleo
      Bryce L. Friedman
      George S. Wang

425 Lexington Avenue
New York, New York  10017
(212) 455-2000
(212) 455-2502 (fax)

*Attorneys for Plaintiff JPMorgan Chase Bank, N.A., as Administrative Agent*