UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11435


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHARTER COMMUNICATIONS, INC., et al.


        Debtors.

- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        March 30, 2009

        10:02 AM



B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2    HEARING re Introduction by Paul M. Basta, Partner, Kirkland &

3    Ellis LLP

4

5    HEARING re Debtors' Motion for Entry of an Order Directing

6    Joint Administration of Related Chapter 11 Cases

7

8    HEARING re Debtors' Motion for Entry of an Order Establishing

9    Certain Notice, Case Management and Administrative Procedures

10

11   HEARING re Debtors' Application for Entry of an Order

12   Authorizing and Approving the Retention of Kurtzman Carson

13   Consultants LLC as Notice and Claims Agent for the Debtors

14

15   HEARING re Debtors' Motion for Entry of an Order Authorizing

16   the Debtors to (A) Prepare a List of Creditors in Lieu of

17   Submitting a Formatted Mailing Matrix, (B) File a Consolidated

18   List of the Debtors' 80 Largest Unsecured Creditors, and (C)

19   Mail Initial Notices

20

21   HEARING re Debtors' Motion for Entry of Interim and Final

22   Orders (I) Authorizing Debtors to Use Cash Collateral, (II)

23   Granting Adequate Protection to Adequate Protection Parties and

24   (III) Scheduling a Final Hearing

25

1

2  HEARING re Debtors' Motion for Entry of Interim and Final

3  Orders Authorizing Debtors to Enter Into DIP Surety Bond

4  Program

5

6  HEARING re Debtors' Motion for Entry of Interim and Final

7  Orders (A) Authorizing, But Not Directing, the Debtors to

8  Continue Their Existing Cash Management System, Bank Accounts

9  and Business Forms, (B) Granting Post-Petition Intercompany

10  Claims Administrative Expense Priority, (C) Authorizing

11  Continued Investment of Excess Funds in Investment Accounts and

12  (D) Authorizing Continued Intercompany Arrangements and

13  Historical Practices

14

15  HEARING re Debtors' Motion for Entry of Interim and Final

16  Orders Establishing Notification and Hearing Procedures for

17  Transfers of Common Stock

18

19  Hearing Re Debtors' Motion for Entry of Interim and Final

20  Orders Authorizing, But Not Directing, the Debtors to (A) Pay

21  Certain Pre-Petition Compensation and Reimbursable Employee

22  Expenses, (B) Pay and Honor Employee Medical and Other Benefits

23  and (C) Continue Employee Wages and Benefits Programs

24

25

1

2 Hearing re Debtors' Motion for Entry of Interim and Final

3 Orders Authorizing, but not Directing, Debtors to Pay Pre-

4 Petition Claims of Shippers, Warehousemen and Miscellaneous

5 Lien Claimants

6

7 HEARING re Debtors' Motion for Entry of an Order Authorizing,

8 But Not Directing, Debtors to Honor Certain Pre-Petition

9 Obligations to Customers and to Otherwise Continue Certain

10 Customer Programs and Practices in the Ordinary Course of

11 Business

12

13 HEARING re Debtors' Motion for Entry of Interim and Final

14 Orders Authorizing, But Not Directing, Debtors to (A) Maintain

15 Pre-Petition Insurance Policies, (B) Enter Into New Insurance

16 Policies, (C) Maintain Premium Financing Agreements and (D)

17 Enter Into New Premium Financing Agreements

18

19 HEARING re Debtors' Motion for Entry of Interim and Final

20 Orders (A) Authorizing, But Not Directing, the Debtors to Remit

21 and Pay Certain Taxes and Fees and (B) Authorizing and

22 Directing Banks and Other Financial Institutions to Honor

23 Related Checks and Electronic Payment Requests

24

25

1

2    HEARING re Joint Motion for Scheduling Conference

3

4    HEARING re Debtors' Application for Entry of an Order

5    Authorizing the Employment and Retention of Kirkland & Ellis

6    LLP as Attorneys for the Debtors and Debtors In Possession

7    Effective Nunc Pro Tunc to the Petition Date

8

9    HEARING re Debtors' Application for Entry of an Order

10    Authorizing the Employment and Retention of AlixPartners, LLP

11    as Their Restructuring Advisor Nunc Pro Tunc to the Petition

12    Date

13

14    HEARING re Debtors' Application for an Order Authorizing the

15    Employment and Retention of Curtis, Mallet-Prevost, Colt &

16    Mosle LLP as Conflicts Counsel for the Debtors, Nunc Pro Tunc

17    to the Petition Date

18

19    HEARING re Debtors' Application for Entry of an Order

20    Authorizing the Employment and Retention of Friend Hudak and

21    Harris, LLP as Special Telecommunications Counsel to the

22    Debtors

23

24

25

1

2     HEARING re Debtors' Application for an Order Authorizing the

3     Employment and Retention of Duff & Phelps, LLC as Valuation

4     Consultants for the Debtors and Debtors-in-Possession Nunc Pro

5     Tunc to the Petition Date

6

7     HEARING re Debtors' Motion for Entry of an Order Determining

8     Adequate Assurance of Payment for Future Utility Services

9

10    HEARING re Debtors' Motion for Entry of an Order Authorizing

11    the Retention and Compensation of Certain Professionals

12    Utilized in the Ordinary Course of Business

13

14    HEARING re Debtors' Motion for Entry of an Order Establishing

15    Procedures for Interim Compensation and Reimbursement of

16    Expenses for Professionals

17

18    HEARING re Debtors' Motion for Entry of an Order Approving

19    Procedures for the Sale, Transfer or Abandonment of De Minimis

20    Assets

21

22    HEARING re Debtors' Motion for Entry of an Order Authorizing

23    Payment of Pre-Petition Claims of Trade Creditors in the

24    Ordinary Course of Business

25

1

2  HEARING re Debtors' Motion for Entry of an Order Granting

3  Adequate Protection to Second Lien Secured Parties

4

5  HEARING re Debtors' Motion for an Order (I) Approving the

6  Disclosure Statement, (II) Establishing a Record Date for

7  Voting on the Plan of Reorganization and the Rights Offering,

8  (III) Approving Solicitation Packages and Procedures for the

9  Distribution Thereof, (IV) Approving the Rights Offering

10  Procedures and Rights Exercise Form, (V) Approving the Forms of

11  Ballots and Manner of Notice, (VI) Approving the Commitment

12  Agreements, (VII) Approving the Commitment Fees, (VIII)

13  Establishing Procedures for Voting on the Plan and (IX)

14  Establishing Notice and Objection Procedures for Confirmation

15  of the Plan

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Lisa Bar-Leib

1

2    A P P E A R A N C E S :

3    KIRKLAND & ELLIS LLP

4        Attorneys for Debtors

5        Citigroup Center

6        153 East 53rd Street

7        New York, NY 10022

8

9    BY:  STEPHEN E. HESSLER, ESQ.

10        RICHARD M. CIERI, ESQ.

11        BRIAN S. LENNON, ESQ. (TELEPHONICALLY)

12

13   KIRKLAND & ELLIS LLP

14        Attorneys for Debtors

15        200 East Randolph Drive

16        Chicago, IL 60601

17

18   BY:  RAY C. SCHROCK, ESQ.

19        PAUL M. BASTA, ESQ.

20        TODD F. MAYNES, ESQ.

21

22

23

24

25

1

2   KIRKLAND & ELLIS LLP

3       Attorneys for Debtors

4       655 Fifteenth Street

5       Washington, DC 20005

6

7   BY:  JEFFREY S. POWELL, ESQ.

8       DANIEL T. DONOVAN, ESQ.

9

10   TOGUT, SEGAL & SEGAL LLP

11       Attorneys for Affiliated Debtor, Charter Investment, Inc.

12       One Penn Plaza

13       New York, NY 10119

14

15   BY:  ALBERT TOGUT, ESQ.

16       FRANK OSWALD, ESQ.

17

18   U.S. DEPARTMENT OF JUSTICE

19       Office of the United States Trustee

20       33 Whitehall Street

21       21st Floor

22       New York, NY 10004

23

24   BY:  PAUL SCHWARTZBERG, ESQ.

25       TRACY HOPE DAVIS, AUST

1

2    ARNALL, GOLDEN & GREGORY, LLP

3         Attorneys for Verizon Communications Inc.

4         171 17th Street NW

5         Suite 2100

6         Atlanta, GA 30363

7

8    BY:  DARRYL S. LADDIN, ESQ.

9         (TELEPHONICALLY)

10

11   BINGHAM MCCUTCHEN LLP

12        Attorneys for GECC, Pre-Petition Lender

13        399 Park Avenue

14        New York, NY 10022

15

16   BY:  SCOTT K. SEAMON, ESQ.

17

18   BINGHAM MCCUTCHEN LLP

19        Attorneys for Travelers Casualty & Surety of America

20        One State Street

21        Hartford, CT 06103

22

23   BY:  JONATHAN ALTER, ESQ.

24

25

1

2 BROWN RUDNICK LLP

3     Seven Times Square

4     New York, NY 10036

5

6 BY: DANIEL J. SAVAL, ESQ.

7

8 COVINGTON & BURLING LLP

9     Attorneys for Wilmington Trust Company

10     The New York Times Building

11     620 Eighth Avenue

12     New York, NY 10016

13

14 BY: SUSAN P. JOHNSTON, ESQ.

15

16 FAEGRE & BENSON LLP

17     Attorneys for US Bank, N.A.

18     2200 Wells Fargo Center

19     90 South Seventh Street

20     Minneapolis, MN 55402

21

22 BY: MICHAEL B. FISCO, ESQ.

23     (TELEPHONICALLY)

24

25

1

2    GOLDBERG SEGALLA LLP

3         Attorneys for Mastec North America

4         665 Main Street

5         Suite 400

6         Buffalo, NY 14203

7

8    BY:  BRUCE W. HOOVER, ESQ.

9         (TELEPHONICALLY)

10

11   KRAMER LEVIN NAFTALIS & FRANKEL LLP

12        Attorneys for First Lien Lender Group

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  GEORGE Z. NOVOD, ESQ.

17        KENNETH H. ECKSTEIN, ESQ.

18

19

20

21

22

23

24

25

1

2    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

3        Attorneys for the Unofficial Committee of CCH I and CCH II

4         Noteholders

5        1285 Avenue of the Americas

6        New York, NY 10019

7

8    BY:  ALAN W. KORNBERG, ESQ.

9        DIANE MEYERS, ESQ.

10

11   SIMPSON THACHER & BARTLETT LLP

12        Attorneys for JPMorgan Chase Bank, as Agent

13        425 Lexington Avenue

14        New York, NY 10017

15

16   BY:  PETER PANTALEO, ESQ.

17        GEORGE WANG, ESQ.

18        BRUCE D. ANGIOLILLO, ESQ.

19

20   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

21        Attorneys for Paul G. Allen

22        Four Times Square

23        New York, NY 10036

24

25   BY:  JAY M. GOFFMAN, ESQ.

WHITE & CASE LLP

      Attorneys for Charter Communications, Inc.

      Convertible Senior Noteholders

      1155 Avenue of the Americas

      New York, NY 10036


BY:  GERARD UZZI, ESQ.

P R O C E E D I N G S

1

2 THE COURT: Be seated, please. Let's proceed.

3 MR. BASTA: Good morning, Your Honor. Paul Basta

4 from Kirkland & Ellis. We're proposed counsel to Charter --

5 THE COURT: Good morning.

6 MR. BASTA: -- and its affiliated debtors. I'm

7 joined today by my partners, Rick Cieri, Ray Schrock, Steve

8 Hessler as well as my litigation partners Jeffrey Powell and

9 Daniel Donovan. We have filed pro hac vice applications for

10 Mssrs. Schrock, Powell and Donovan as they are out-of-towners.

11 THE COURT: Those will all be approved in due course

12 but let's deem that they are approved as of this moment.

13 MR. BASTA: Thank you, Your Honor. We also happen to

14 be working with Mr. Togut who is proposed counsel to one of the

15 debtors

16 MR. TOGUT: Your Honor.

17 THE COURT: Good morning.

18 MR. BASTA: -- Charter Investment, Inc. We're joined

19 today by many people who have been working very hard to bring

20 this case to the Court in an organized way. I would like to

21 introduce Neil Smit. Neil is the chief executive officer of

22 the company and member of the board. We also have Eloise

23 Schmitz who is the company's chief financial officer. Greg

24 Doody is the company's chief restructuring officer and the

25 declarant on our first day declaration. Greer Racklin is the

company's general counsel.  Our proposed financial advisor is Lazard Freres and we have Jim Millstein and Steve Goldstein who are leading the Lazard team.

We'd like to thank the Court and chambers for accommodating us on such short notice and for dealing with a truckload of paper that we delivered to the Court.  We'd also like to thank the Office of the United States Trustee.  We've been working hard with them and I think we only may have one or two issues open with that office on our first day relief.

I've coordinated with counsel for the various parties on the course of today and a recommended approach.  And if it's acceptable to the Court, what I'd like to do is to spend some time giving the Court an overview of the case and where we are and where we want to be going.  I think Mr. Kornberg and Mr. Goffman would like to make some short statements regarding the proceeding.  And I think Mr. Pantaleo, who represents our lenders and who are opposing reinstatement under our plan, would like to be heard for some time.  And then after that, we would then proceed to our first day relief which we hope will be routine.

THE COURT:  That order of proceeding is fine with me.

MR. BASTA:  Thank you, Your Honor.  Your Honor, this is the most extraordinary company and case I've ever seen. Charter, on the one hand, it's enormous.  Its assets are performing.  It generates tremendous income, its management is

1    world class.  Its business isn't founded on any speculative

2    technology.  And the cable business in this economy is not an

3    extremist.  It's doing fine.  There is a lot of demand for the

4    cable and telecommunication services that the company provides.

5    And so, many of the usual suspects that bring a company into

6    Chapter 11 are just not present in this situation.

7         The company has 21.7 billion dollars of debt and with

8    that debt load is certainly one of the largest companies to

9    ever commence Chapter 11.  And with more than 2.3 billion

10   dollars of EBITDA, Charter comes into this case with stronger

11   operations and more EBITDA than WorldCom, Calpine or Adelphia

12   had at the time of their filing.  We believe this is the

13   largest pre-arranged case ever filed.

14        After months of effort and painful negotiations, we

15   filed on the petition date our plan and disclosure statement

16   and the dozens and dozens of documents it takes to effectuate

17   confirmation.  The company, the Paul Weiss team led by Mr.

18   Kornberg, who represents our bondholders, the Skadden team, who

19   represents Mr. Allen, our largest stockholder, and all of the

20   financial advisors have been working around the clock to

21   accomplish this filing.  And we stand ready to proceed directly

22   to a disclosure statement hearing, a confirmation hearing and

23   an exit from Chapter 11 that will preserve the value of this

24   terrific enterprise.

25        My presentation will cover Charter and its business,

1   the circumstances that led to the filing, the plan and the

2   capital structure, and you have to take them in tandem, and

3   we'll spend some time on it. It'll be -- it's a bit complex.

4   It'll take some time to get through it but I think that

5   exercise will be worthwhile. We'll touch upon reinstatement

6   which is probably the key issue in the case, and I know Mr.

7   Pantaleo plans on covering it as well. And then I'll turn to

8   the timeline of the next steps.

9           So let's begin with Charter. It really is a

10  fantastic company. It's based in St. Louis and it employs

11  16,500 people. It's the fourth largest cable operator in the

12  country. It operates in twenty-seven states. It has five a

13  half million customers including 9,000 schools. And it

14  provides all of the services that you would expect from a world

15  class cable operator.

16          It has done well over the last two years. And I have

17  a few visuals. And I'd like to start with one. Jonathan, if

18  you could put the one -- we have extra copies if people can't

19  see it. Can you see that, Your Honor?

20          THE COURT: I can.

21          MR. BASTA: As this chart indicates, between 2006 and

22  2007, Charter revenue increased 10.7 percent and then from 2007

23  to 2008, it increased another eight and a half percent to 6.5

24  billion dollars. On the adjusted EBITDA, on 2006 -- it grew

25  from 2006 to 2007 by 11.7 percent and then by another 10.3

1 percent in 2008. And it experienced an increased margin during

2 that same time period.

3 We have 700 million dollars in cash and we don't need

4 a DIP financing. And we've worked out a consensual order for

5 the use of cash collateral with Mr. Pantaleo's clients that Mr.

6 Schrock will present later today.

7 So what's the problem? The problem is too much debt.

8 With 21.7 billion dollars of debt, Charter is about 8.9 times

9 levered compared to its EBITDA. And many of its peers have

10 debt about 4.2 times EBITDA which means that Charter each year

11 is paying hundreds of millions of dollars of interest expense

12 that is just too much. In fact, the proposed plan that we

13 presented reduces our annual interest expense by 830 million

14 dollars and this is money that can be reinvested into the

15 business.

16 The secondary problem is the dysfunctionality in the

17 credit markets. In these markets, Charter has limited ability

18 to access the creditor markets to deal with its debt and to

19 ease maturities.

20 So how did the company deal with its leverage

21 problem? In November of '08, the company hired Kirkland and it

22 hired its longtime financial advisor, Lazard, to help explore

23 deleveraging transactions. And the company and Kirkland and

24 Lazard sat down and brainstormed about what the path forward

25 was. And in December, we organized certain of our holding

1    company bondholders -- there are two legal entities that I'm

2    going to spend some time with later in the presentation, CCH I

3    and CCH II.  And those bondholders hired Mr. Kornberg and his

4    team and they hired UBS and Houlihan Lokey as financial

5    advisors.  And throughout this whole process, we've been

6    working very closely with Mr. Goffman and his team at Skadden

7    who represent Paul Allen.  They're also working with Miller

8    Buckfire.  And in the beginning of the process, it was mostly

9    due diligence, getting the bondholders up to speed with the

10   financial situation.  And on January 15th, Your Honor, interest

11   payments were due on certain of the holding company debt.  And

12   the company determined not to make those interest payments and

13   to make use of the thirty-day grace period under the bond debt

14   to negotiate with the creditors on the terms of a

15   restructuring.  And from January 15th to February 13th, during

16   that grace period, were really spent a tremendous amount of

17   time, we're working round the clock on trying to get to a

18   framework for a restructuring.

19        At the same time, we were preparing for Chapter 11.

20   We got all of our papers ready and we were ready to file on

21   February 13th should a deal not come together.  And in that

22   regard, we reached out to Mr. Pantaleo, who represents the

23   banks, and we had negotiated cash collateral order at that

24   time.  And after several very late nights and having to listen

25   to Mr. Cieri and Mr. Millstein go on and on at board meetings,

1    we reached an agreement in principle with Mr. Kornberg's

2    clients as well as with Mr. Goffman's client, Mr. Allen, on the

3    structure for a plan.  And we executed plan support agreements

4    that detail the various commitments associated with that.  And

5    with that agreement in place, we determined to make the coupon

6    payment on the bonds and to proceed to take the transaction

7    from an agreement in principle term sheet stage to a fully

8    documented transaction.  And it also became clear after we made

9    the coupon payment that Mr. Pantaleo's clients would be

10   opposing reinstatement of the debt.  So Mr. Powell and Mr.

11   Donovan, our litigators, reached out to the Simpson litigators

12   pre-filing to start to try to work through scheduling and

13   discovery issues.  And as of yesterday, we have delivered to

14   Simpson Thacher's litigators 2200 documents and 40,000 pages of

15   documents in connection with what's probably going to be an

16   upcoming litigation on reinstatement.

17          So after more than a month and a half work, we filed

18   on the petition date a plan, the disclosure statement, a motion

19   to approve the disclosure statement, which we're going to seek

20   to have heard in hopefully about thirty days, if it's

21   acceptable to the Court, all of the corporate documents

22   necessary to emerge, including the bylaws, certificates of

23   incorporation, warrant agreements, registration rights

24   agreement, a certificate of designation for preferred stock,

25   equity financing documents evidencing equity commitments of up

1    to two billion and at least 1.6 billion dollars of new equity,

2    new debt documents evidencing refinancing of up to a billion

3    and a half of debt at CCH II.  We also reached agreement on

4    post-effective date compensation for senior management.  It was

5    like the corporate lawyers had found the oasis in the desert.

6    They were very happy to have a deal to work on.

7            So with that in place, we now want to seek to

8    implement the plan.  And you can't really understand the plan

9    without understanding the capital structure.  And the capital

10   structure can give you a bit of a headache.  So with that, I'm

11   going to use two visuals to help walk through this.  Can Your

12   Honor see those?

13           THE COURT:  I can see them but I can't read them.

14           MR. BASTA:  Okay.  Let me -- that would be a problem.

15   Can I hand up?

16           THE COURT:  Oh, please.  Thank you.

17           MR. BASTA:  I'm still going to refer to the pictures

18   because I think the way the boxes work together is going to

19   turn out to be significant.  So what you see, Your Honor, is

20   that through a series of exchange offers, Charter has various

21   levels of debt at various legal entities coming up from the

22   assets.  And all of these names -- we have acronyms for all of

23   these names that we're very comfortable with and I'm going to

24   try to introduce them to the Court so the Court can get

25   comfortable with them.  This green box is Charter

1  Communications Operating LLC.  And we refer to it as CCO.  And

2  CCO is essentially the operating company.  It owns the assets.

3  The debt at CCO is there's 6.9 billion dollars of first lien

4  term debt.  And there's 1.3 billion dollars out on a revolver.

5  The revolver is just about to leave, Your Honor.  And there's

6  about 2.4 billion dollars of second lien debt at CCO.  So the

7  total debt at CCO is 10.7 billion dollars.  Most of the trade

8  is at CCO.  Now we're going to get into this later but it's

9  some trade that are up at the top two companies that get paid

10  to a management agreement but most of the debt is down here at

11  CCO.  And we will be filing -- we have filed and seek at a

12  second day hearing with the support of the banks and the

13  bondholders and Mr. Allen a motion to pay all the trades in the

14  ordinary course of this.  But that's not being heard today.

15          In a very traditional form of corporate finance, what

16  is interesting is that the average coupon on the CCO debt is

17  6.29 percent.  And as you go further away from the asset at

18  each different level of debt, you see that the interest rate is

19  increasing straight up the chain.  And that's to compensate

20  holders so that the farther you are away from the assets, it

21  reflects a basic bankruptcy risk that you're less likely to get

22  paid in full.

23          Our plan, you'll see, conforms to this basic

24  corporate finance doctrine.  The entities that are closest to

25  the assets are going to get paid in full and the entities that

1   are farther away from the assets are going to get equity or

2   awards depending on valuation.

3           CCO is solvent.  We don't believe there's any

4   question about that.  And if you turn to our tree in slide

5   here, you can see that under our proposed plan, all of the

6   creditors of CCO are unimpaired to reinstatement.

7           If Your Honor has any questions, please interrupt.

8           The next entity up is CCO Holdings LLC.  And that has

9   1.5 billion dollars of debt.  Here, there's a 350 million

10  dollar facility secured by the stock in CCO, and there's 800

11  million dollars of senior notes.  CCOH is also solvent.  And

12  under our proposed plan, if you go to CCOH, that debt is

13  unimpaired.

14          So now, things start to get interesting.  We get to

15  CCH II, which is 2.5 billion dollars.  Now Mr. Kornberg's

16  clients own 1.3 billion dollars of this 2.5 billion dollars of

17  debt.  And CCH II is interesting because it has some debtor

18  that is maturing in 2010 and it was important to us to come up

19  with a plan that dealt with that impending maturity.  So what

20  the plan provides is that Mr. Kornberg's clients have committed

21  to taking new notes that mature in 2016 from CCH II and any of

22  the holders who are not in Mr. Kornberg's group have the option

23  of either taking those new notes or getting paid in cash in

24  full.

25          The next box is CCH I and there's four billion

1  dollars of debt at CCH I.  And Mr. Kornberg's clients have 2.9

2  billion or seventy-three percent of the debt at CCH I.  Now all

3  of the financial advisors have gotten together and we believe

4  our plan value for this enterprise is 15.4 billion dollars.

5  That makes CCH I the fulcrum entity that, as part of the plan,

6  is going to get the equity in the reorganized enterprise

7  subject to dilution for equity that's granted to other people

8  and including management shares.

9      We then get to CCH I Holdings, which is called CIH in

10  our terminology, and CIH has 2.5 billion dollars.  And the

11  creditors there are going to get warrants.  And you have CC --

12  Charter Communications Holdings, which is CCH, which has 440

13  million dollars of debtor and the creditors there are also

14  going to get warrants.

15      The next entity is called CCHC and there's only one

16  liability at CCHC and that's a seventy-five million dollar note

17  to Mr. Allen.  And as part of the overall settlement under the

18  plan of Mr. Allen's claim, and we have many claims that are

19  being settled, but this claim is not getting a distribution at

20  this point.

21      You then have to take the next two boxes together and

22  we need to think about them together, Your Honor.  We have

23  Charter Communications, Inc., which is the top company, the

24  public company.  And you have Charter Communications Holding

25  Company LLC or Holdco, which is right below it.  And CCI, which

1    is the top company, has 482 million dollars of convertible

2    notes out there.  And CCO -- I mean -- excuse me, Your Honor.

3    Holdco here is obligated to 482 million dollars on mirror notes

4    to CCI.  And so, to think about it simply, when we make a

5    distribution, we may be making distributions to Holdco but the

6    creditors that are getting the benefit of that distribution are

7    the convertible notes up at CCI.  And based upon intercompany

8    claims that these entities have against the solvent, CCO, under

9    the plan, we're providing to give those creditors seventy-two

10   million dollars in preferred stock and some cash.

11        You then get to the equity ownership. Paul Allen

12   controls the voting control at CCI and is our largest

13   stockholder.  And under a settlement agreement of Mr. Allen's

14   various claims and interests in the Charter enterprise, Mr.

15   Allen will end up with thirty-five percent voting control of

16   CCI and various other forms of consideration.  This was an

17   important structuring aspect for the company and for Mr.

18   Kornberg's clients as part of our transaction because our

19   credit agreement at CCO has a requirement that Mr. Allen have

20   thirty-five percent voting control or as a change of control

21   and so the plan has been structured to ensure that Mr. Allen's

22   voting control continues.

23        This third slide, Your Honor, is a snapshot of what

24   we look like after we've given effect to the plan.  And we

25   think the plan is a remarkable achievement given what's

1    happening in the market these days.  We are eliminating 8.2

2    billion dollars of debt.  All the debt CCH I up is eliminated.

3    Our annual interest expense savings is 830 million dollars.  We

4    have equity commitments of at least 1.6 billion and up to two

5    billion dollars from Mr. Kornberg's clients to invest equity as

6    part of the plan.  And Mr. Kornberg's clients have also

7    committed to take between 1.2 and 1.5 billion dollars of new

8    debt at CCH II.  Given the status of the credit and equity

9    markets, we think these commitments reflect the strength of

10   this company and the remarkable nature of this deal.

11          Our plan provides to pay the trade in full and, of

12   course, the plan provides for the reinstatement of the CCO and

13   the CCOH debt at 6.29 percent and 7.28 percent interest rates

14   and that the 11.9 billion of debt to be reinstated.

15          Before I turn to reinstatement, let me just pause and

16   see if the Court has any questions regarding the plan.

17          THE COURT:  I don't.

18          MR. BASTA:  Okay.

19          THE COURT:  At least not yet.

20          MR. BASTA:  So where are we with JPMorgan and our

21   lenders?  And it's a bad news/good news situation.  The bad

22   news is we expect them to object to reinstatement.  And while

23   this is certainly not the confirmation hearing, I think it

24   would be helpful to outline for the Court just our views on

25   reinstatement.

1          THE COURT:  I'm interested in that.  I read your

2     confirmation brief that was filed as a first day --

3          MR. BASTA:  Well, never too soon to start, Your

4     Honor.

5          THE COURT:  Never too soon to start confirmation or

6     litigation because I also read the papers filed by JPMorgan

7     Chase on Friday.  So one thing that makes this case perhaps the

8     most unusual case I've seen -- I keep saying that about

9     virtually every case that gets assigned to me -- is that this

10     is previewing on day 1, a contested confirmation hearing on or

11     before day 130.  So I'll hear what you have to say.

12          MR. BASTA:  Thank you, Your Honor.  We think the

13     facts, the law and the equities support reinstatement in this

14     instance.  And let me outline the facts.  We never missed a

15     payment on CCO or CCOH debt.  We never violated any financial

16     covenants.  We have not started this case with a forbearance

17     and a waiver agreement in place with Mr. Pantaleo's clients.

18     No waiver or forbearance was ever requested.  No waiver or

19     forbearance was ever needed.  As set forth in Mr. Doody's

20     declaration, we don't believe that there are any defaults that

21     preclude reinstatement of the debt and the only defaults that

22     exist are ipso facto defaults.  We don't think there's anything

23     from a default perspective that blocks reinstatement.

24          We think the law clearly allows for reinstatement and

25     the Court referenced we did file our informational brief on

1    reinstatement.  In sum, Section 1124 requires that the legal,

2    equitable and contractual rights of the lenders remain

3    unaltered.  And as the legislative history makes clear in the

4    Senate report, and I'm quoting, "Because the intervention of

5    bankruptcy and the defaults represent a temporary crisis which

6    the plan of reorganization is intended to clear away, as long

7    as the holder of a claim is restored to his original position,

8    the claimant is in a better position than others who received

9    less or get nothing at all and has no cause to complain.

10         Here, the legal contractual and equitable rights of

11   the lenders will remain unaltered.  We've taken steps to ensure

12   that there will not be a change of control.  We are going to

13   comply with all of our covenants including financial covenants.

14   And therefore, we think reinstatement is appropriate.

15         We think the equities overwhelmingly favor

16   reinstatement.  If I could go up to the visual.  CCO and CCOH

17   creditors are the ones closest to the assets.  They have the

18   lowest interest rate because they are closest to the assets and

19   have taken the least amount of risk.  They deserve to get paid

20   in full.  They don't deserve to get paid more than in full.

21   Their credit is being dramatically improved by this plan even

22   though their covenants don't require us to improve their

23   credit.  We are reducing 8.2 billion dollars of debt and saving

24   interest of 830 million dollar a year.  They bargained for Mr.

25   Allen having thirty-five percent voting control.  Mr. Allen has

1    thirty-five percent voting control.

2          If reinstatement is not achieved, the junior

3    creditors and the capital structure are likely to be wiped out.

4    There are no functioning credit markets at the moment.  And if

5    we have to reprice this debt at market, the numbers are

6    staggering.  Because we're repricing 11.9 billion dollars of

7    debt, each hundred base point increase in pricing of this debt

8    increases our annual interest expense by 120 million dollars.

9    The company anticipates that repricing our debt to market at

10   this time could cost as much as 500 million dollars a year in

11   additional interest savings.  So what would happen, Your Honor,

12   is that value that right now is going to our CCH II and CCH I

13   holders.  If we fail to reinstate would be captured by parties

14   lower in the capital structure and it would not be able to go

15   to them.  And we don't think it's consistent with our fiduciary

16   duty to maximize value to allow creditors and credit is being

17   improved and whose bargain is not being changed to capture that

18   value.

19         There's a lot of talk in Washington about getting

20   lenders to lend.  We're not asking our lenders to lend.  We're

21   just not asking them to reprice the debt when we're living up

22   to our bargain.

23         And we don't know for sure what the banks are going

24   to say about reinstatement but we can tell from their

25   activities prior to the case and in connection with the case.

1   On the petition date, the banks commenced an adversary

2   proceeding against the company.  And they designated the

3   proceeding as noncore.

4           THE COURT:  I noticed that.

5           MR. BASTA:  And that -- the page -- paragraph 24 of

6   the complaint says the plaintiffs do not consent to the entry

7   of final orders or judgments by the bankruptcy judge.  Let's

8   put the complaint into a little bit of context.  Our CCO credit

9   agreement has two terms.  The borrower is CCO and some but not

10  all of the holding companies are called designated holding

11  companies.  And there are different requirements for the

12  borrowers than there are for the holding companies.  That's the

13  structure of the loan agreement.  If I can hand up a copy of

14  the credit agreement, Your Honor.

15          THE COURT:  Please do.  Thank you.

16          MR. BASTA:  Your Honor --

17          THE COURT:  This copy is marked in certain respects.

18  Did you intend for me to see a marked copy?

19          MR. BASTA:  Yes.  I did intend for that to be marked,

20  Your Honor.  If you turn, Your Honor, to page 22 of the credit

21  agreement --

22          THE COURT:  Page 22 of 114 at the top?

23          MR. BASTA:  Yes.  22.  At page 22, it says it's page

24  36 of 114.

25          THE COURT:  Okay.  Well, that's confusing.

1           MR. BASTA:  Sorry about that.  Should be tabbed, Your

2     Honor.

3           THE COURT:  It is and it's also highlighted.

4           MR. BASTA:  Highlighted, yes.  There's a -- we didn't

5     want to make any mistakes about that.  So there's a definition

6     of solvency.  It's a pretty standard, I guess, definition.  And

7     if you turn to the next tab, Your Honor, which is 4.21, there's

8     a representation but the representation is that CCO and its

9     subsidiaries have to be solvent.  There's no representation

10    that any of the holding companies have to be solvent.  None.

11          So the complaint then focuses on the next tab, which

12    is 8.3G, and I've highlighted it there as well, there's a

13    requirement that "The designated holding company, the borrower

14    or any of its subsidiaries shall generally not or shall be

15    unable to or shall remit in writing its inability to pay its

16    debts as they become due."  And that's what the complaint

17    focuses on.

18          I'm going to hand up a copy of the complaint, if

19    that's okay, Your Honor.

20          THE COURT:  You may approach.  Thank you.

21          MR. BASTA:  I would like to focus the Court on

22    paragraphs 89 and 90 beginning with paragraph 90.  Paragraph 90

23    says "At least two designated holding companies, specifically,

24    CIH and CCH were unable to pay their debts as they would become

25    due soon after October 1st, 2008."  They say that they would be

1    unable to pay their debts as being would but complicated.  The

2    only liabilities at CIH -- at CCH are its bond items.  So the

3    only liabilities there are the payments of the bonds and the

4    payment of the bonds at maturity.  And the banks don't allege

5    that CCH missed a bond payment they allege that CIH and CCH are

6    unable to pay those payments as they would in the future become

7    due.  But if you turn to the previous paragraph, which is

8    paragraph 89, that actually quotes the credit agreement.  And

9    the word "would" doesn't appear in the credit agreement.  What

10   the credit agreement says is that the designated holding

11   companies "shall be unable to".  It doesn't -- "as they become

12   due not as the liabilities would become due".  And of course it

13   doesn't say "would become due" because CIH and CCH were never

14   sitting there with 2.5 billion and 440 million dollars,

15   respectively, to pay off their debt as they would become due.

16   There is no solvency test.  And therefore, what the credit

17   agreement is asking us is whether those companies have, in

18   fact, made the interest payments and they have, in fact, made

19   those interest payments.  It's not a hypothetical test.  The

20   banks inserted in paragraph 90 the word "would" into the

21   complaint because they would like it to be in the credit

22   agreement but it is not.

23        So what's the point?  The point is we could have a

24   noncore proceeding in the district court and spend millions of

25   dollars of litigation regarding whether or not CIH and CCH were

1    solvent in the fall of '08 but we respect that the credit

2    agreement does not impose a solvency requirement upon those

3    entities.  The drafters knew when to use the word "solvent" and

4    the language of the credit agreement doesn't require that kind

5    of an endeavor.  And that is our view.  We think we'd be fine.

6    We think we would win a test of whether they had the ability to

7    pay their debts as they become due at that point in time.  But

8    we don't want to get on a frolic in a detour.

9         There's a second example of the bank's behavior.  On

10   March 16th, CCI filed a 10K and the auditors gave it a going

11   concern opinion.  The banks quickly shot us a notice of default

12   saying it was a default under the credit agreement for there to

13   be a going concern qualifier.  But if you read 6.1 of the

14   credit agreement, it's not a default because it's a default if

15   CCO gets its a going concern qualifier not if CCI gets a going

16   concern qualifier.

17        Taking these things together, we understand the banks

18   have to kick the tires and do their work and that's why we're

19   cooperating with them in terms of the discovery to try to get

20   this resolved quickly.  To give Your Honor a sense of timing

21   and the impact of timing, we've agreed under our cash

22   collateral order to pay the bank's default interest during the

23   pendency of the case.  That reflects the fact that CCO is

24   solvent.  Each month of the case, the default interest number

25   alone is twenty million dollars plus.  Twenty million dollars

1    plus a month.  And that's just a default increment.  And so, we

2    understand the need to have a fair timeline and a fair process

3    to get this resolved.  But we don't want to engage in a process

4    that brings in facts and circumstances that are not necessarily

5    germane to the reinstatement inquiry.

6          And with that, Your Honor, let me turn to timing.

7    Our plan support agreement provides for proposed confirmation

8    like 130 days after the petition date.  That was negotiating,

9    trying to come up with a fair amount of time to resolve the

10   issue.  We're seeking to get a disclosure statement hearing in

11   about thirty days.  Mr. Powell and Mr. Donovan have been

12   working with the Simpson litigators on a litigation schedule.

13   And I don't think there has been quite agreement yet.  We filed

14   yesterday a motion for a proposed litigation schedule that we

15   would propose be heard Friday.  We think it makes sense to have

16   a few days for everybody to digest the filing.

17          THE COURT:  Let me just comment on that ministerial

18   question of my availability.

19          MR. BASTA:  Okay.

20          THE COURT:  I'm going to be in Washington, D.C. on

21   Friday and so, unless it's by phone, we can't do it on Friday.

22   I could do it on either Thursday morning or the following

23   Monday.  And I'm indifferent as to which day it is.

24          MR. BASTA:  I think Monday works great.

25          THE COURT:  Fine.  It'll be the following Monday at

ten.

　　　　　MR. BASTA:  Great.

　　　　　THE COURT:  That's a week from today.

　　　　　MR. BASTA:  Great.  So I mentioned that the bank's

opposition to reinstatement was the bad news.  What is the good

news?  I think the good news is that has not stopped us from

reaching a consensual arrangement with the banks on cash

collateral.  And we will continue to work with the banks and

try to find agreements where we can.  Mr. Schrock's going to be

presenting the cash collateral order as part of his

presentation.  But at this point, unless Your Honor has any

questions, I'm done with my presentation.

　　　　　THE COURT:  No, that's fine.  Thank you.  I'd like to

make something clear, however, 'cause I'm going to be hearing,

I'm sure, other preemptive arguments based upon legal positions

and facts that are not yet fully developed and that I'm only

really hearing about it for the first time.

　　　　　One of the things that has become obvious to me from

my accelerated investment of time in these documents over the

weekend and on Friday is that it is apparent that a tremendous

amount of effort  has gone into the development of a

comprehensive restructuring for these companies.  It's

extremely complicated.  The presentation that was just made

with the colored charts, I found to be helpful, particularly,

since I had done some reading in advance.

1        But when it comes to the preemptive identification of

2   confirmation type objections and discussing litigation which

3   has really only just been filed even though the parties have

4   informally been comparing notes on the litigation for some

5   number of weeks or months, I find myself in the difficult

6   position of hearing arguments that I'm really not yet ready to

7   hear.  I'm perfectly prepared to have everybody who needs to

8   speak and to counter any of the arguments that have been made

9   by the debtor particularly as it relates to defaults and the

10  legal entitlement to reinstate debt which appears to be the

11  principal issue in this case at this moment.

12       But this is an issue that should be either resolved

13  by the parties themselves after everybody's had a chance to

14  assess the relative risk on a go forward basis.  Or it will be

15  resolved after the record has been fully developed and I've had

16  a chance to understand the facts, not just looking at

17  highlighted sections but actually understand the facts and the

18  full context of the documents themselves.  And for that reason,

19  why I am anxious to hear what everybody is prepared to tell me,

20  I want it to be very clearly understood that if I don't ask a

21  question, it doesn't mean that I don't have questions.  If I

22  don't ask a question, it doesn't mean that I fully understand

23  everything that you've said or agree with everything you've

24  said.  What it means is I am interested on day 1 to get what

25  amounts to a preview of coming attractions, which is what I

1    view this as.  And I also recognize that this is a somewhat

2    public event in which parties are previewing for parties in

3    interest and for the business press, issues of significance in

4    this very significant case.

5            So you're free to put on your show.  I was actually

6    pleased to see that a cable company had something as quaint as

7    charts as opposed to streaming video.  And I'm confident that

8    if we get to confirmation, I'll see streaming video.

9            So with that, I'm anxious to hear what everybody has

10   to say.  But I just wanted to make it clear that this is day 1

11   of a very, very complicated case.  And I treat the remaining

12   legal issue, and there may be other issues as well, of

13   reinstatement as a serious question which is not to be decided

14   by the expression on my face on day 1.  So no one should take

15   any comfort or feel any concern because of how I behave today.

16   I'm just learning.  Who's next?

17           MR. KORNBERG:  Good morning, Your Honor.  Alan

18   Kornberg of Paul, Weiss, Rifkind, Wharton & Garrison on behalf

19   of the unofficial committee of CCH I and CCH II noteholders.

20   Those are the gray and dark blue boxes that was pointed out

21   earlier.

22           THE COURT:  Was there any negotiation over the color

23   of the boxes?

24           MR. KORNBERG:  Your Honor, I regret to inform the

25   Court that we were not consulted on colors but I think they'll

1    do for today's purposes.

2         A few words about our committee. We represent eleven

3    institutions that hold more than seventy percent of the CCH I

4    notes which was identified, again, as the fulcrum security in

5    this case and more than fifty percent of each tranche of the

6    CCCH II notes. In dollar amounts, that's more than 2.9 billion

7    of CCH I notes and 1.2 billion of CCH II notes.

8         Our unofficial committee was formed in December at

9    the request of the company which announced that it was to

10    engage in restructuring transactions. And as you can see from

11    the volume of paper that was filed, we have been very hard at

12    work. In addition to Paul Weiss, the unofficial committee is

13    advised by Houlihan Lokey and UBS. The pre-petition efforts by

14    the company, Mr. Allen's interest and the committee I think

15    have been extraordinary. As Mr. Basta mentioned, we've not

16    only agreed upon a plan and a disclosure statement, but

17    virtually all of the documents to implement what is a very

18    complicated restructuring.

19         So needless to say, I rise in support of the company

20    this morning. As Mr. Basta described it, this plan, which

21    truly is prearranged will substantially deleverage charter and

22    significantly facilitate the investment of almost 1.9 billion

23    dollars of absolutely fresh capital.

24         The committee members' support of Charter's

25    restructuring is evidenced by more than words. Specifically,

1    various members of the committee have made various different

2    commitments including agreeing to exchange their CCH I notes

3    for common equity, to exchange 1.23 billion dollars of CCH II

4    notes for new notes.  If necessary, to purchase an additional

5    267 million dollars of CCH II notes and, very significantly, to

6    provide a backstop of at least 1.6 billion which could go to

7    two billion, backstopping a rights offering for the common

8    stock to be issued by the reorganized company.

9            Your Honor, I think everyone would agree that in

10   these capital under current conditions, that is an

11   extraordinary amount of money to raise.  But the debtors, I

12   think, have achieved something else which is very important.

13   And that is, a goal which is specifically contemplated by the

14   Bankruptcy Code.  They identify their problems.  They reached

15   out to significant creditors.  They fully negotiated a

16   comprehensive restructuring before filing in order to

17   facilitate the shortest possible stay in Chapter 11 and thereby

18   preserve maximum value for all interest parties.

19           I'm not going to argue confirmation today but I will

20   say that the plan that has been filed is in our view fair to

21   everyone, fully financed and feasible.  Creditor distributions

22   have been fairly allocated and respect the relative positions

23   held in Charter's capital structure.  Creditors that are

24   holding claims that will be reinstated, in our view again, are

25   getting the full benefit of their pre-petition bargain.

1    Moreover, their claims will be the obligations of a company

2    that will emerge from Chapter 11 with more than eight billion

3    dollars less debt.

4            As you've heard this morning and will hear for the

5    weeks to come, there are significant disputes as to whether

6    Charter is properly invoking its right under Section 1124 of

7    the Bankruptcy Code to reinstate its bank debt and other

8    obligations.  While we believe very strongly that reinstatement

9    is entirely proper, we agree that today is not the day to

10   decide that issue.  But we do have concerns.  And our concerns

11   relate to timing.  We have done everything possible to expedite

12   this case and these matters.  Your Honor, as Mr. Basta

13   mentioned, discovery -- and I've never seen this happen before

14   even in a pre-arranged case, discovery began well in advance of

15   the Chapter 11 filing.  In fact, Our committee members have

16   been fully cooperative with that process.  Last week we

17   produced several thousand pages of documents to Mr. Pantaleo

18   and his colleagues.  We expect that we will be producing more

19   documents this week.

20           So what we would ask the Court today is not to permit

21   those who oppose reinstatement to derail a fair and efficient

22   process toward confirmation.  We, too, noted with some concern

23   the noncore jurisdiction allegation and the complaint that was

24   filed on Friday and wondered if that's not a signal that the

25   banks and others will take every opportunity available to delay

1      these proceedings.

2            We believe, Your Honor, that the parties can be given

3      a full and fair opportunity to be heard within the restraints

4      of the financing commitments executed by various members of the

5      unofficial committee.  Specifically, those commitments provide

6      a termination right if, among other things, Charter does not

7      emerge from Chapter 11 within 150 days of the commencement of

8      these cases.  And so, that would take us to the end of August.

9            Therefore, Your Honor, we hope that all parties will

10     cooperate in doing everything possible to keep these cases on

11     track and to keep alive the billions of dollars of financing

12     commitments that we have worked very hard to line up.  Thank

13     you.

14           THE COURT:  Thank you.  Mr. Goffman, good morning.

15           MR. GOFFMAN:  Good morning, Your Honor.  Jay Goffman

16     of Skadden Arps on behalf of Paul Allen.  Your Honor, my firm

17     and the Miller Buckfire firm represent Paul Allen in his

18     capacity as the majority shareholder of this company.  We're

19     here today to express our admiration for what the debtors

20     achieved here.  It's truly an extraordinary event.  To take a

21     company of this size, with this much debt, this complexity, and

22     be able to enter on day 1 with a fully pre-negotiated, fully

23     funded plan of reorganization.

24           I want to commend all the parties for the cooperative

25     spirit over the last several months.  We've all worked hard.

1    We've all worked around the clock.  But it's been with a spirit

2    collegiality in trying to achieve something very special here.

3    And I want to commend everybody for that.

4            We're particularly pleased with this plan of

5    reorganization.  It provides billions of dollars of value to

6    the lenders.  It makes sure the trade creditors are paid in

7    full.  It takes care of all the customers.  It takes care of

8    all the employees.  That's very important to us.

9            Despite the complexity of the company, despite the

10   complexity of the capital structure, this really is a very

11   simple case, Your Honor.  You've got a fully pre-negotiated

12   fully funded plan where all parties that are impaired have

13   participated in the process and agreed upon.  All that's

14   required is for Your Honor to determine that the banks can be

15   reinstated.  We're not going to make that argument today.

16   That's a confirmation issue.  I'm sure my friend, Mr. Pantaleo,

17   will have very creative arguments to raise in objection to

18   that.  But it's truly a one-issue case.  And it's a

19   confirmation issue.  Can the banks be reinstated?  To me, there

20   can't be anything more core to Chapter 11 than whether or not

21   you can confirm a plan and reinstate bank debt.  I appreciate

22   the creativity of the arguments to try to make it otherwise.

23   But I believe that's the sole issue here.

24           We would urge Your Honor to try to keep this on a

25   fast track towards confirmation.  As Your Honor has heard,

1    there are financing commitments that do expire at certain

2    times.  And just the incremental default interest is over

3    twenty million dollars every single month.  We're here to

4    support the debtor.  We're here to support the plan.  And we

5    look forward to confirmation of this case.

6              THE COURT:  Thank you.

7              MR. PANTALEO:  Hi.  Good morning, Your Honor.

8              THE COURT:  Good morning.

9              MR. PANTALEO:  Peter Pantaleo, Simpson Thacher &

10   Bartlett for JPMorgan as agent for the first lien lenders.  I

11   have in the courtroom with me today -- oops.  That's not a good

12   way to start.

13             THE COURT:  That's government property, Mr. Pantaleo.

14   I'm sorry about that.

15             MR. PANTALEO:  It's okay.

16             THE COURT:  It's a bad way to start, Mr. Pantaleo.

17             MR. PANTALEO:  Good morning, Your Honor.

18             THE COURT:  Good morning's always good.

19             MR. PANTALEO:  Peter Pantaleo, Simpson Thacher &

20   Bartlett for JPMorgan as agent.  I have with me in the

21   courtroom today my partners, Mr. George Wang and Mr. Bruce

22   Angiolillo.

23             Your Honor, I appreciate the opportunity to make a

24   short presentation with respect to our issues regarding this

25   plan.  I fully understand Your Honor's observation and, you

1    know, we regard this as sort of an unusual situation for us.  I

2    mean, typically, when you're the senior secured lender, you

3    don't start off a case being the last person everyone has

4    spoken to, but that's effectively the situation we're in now.

5    This is a pre-negotiated plan among certain parties but it was

6    not negotiated with us.  In fact, decisively and determinately

7    so not negotiated with us.  And as a result, from our

8    perspective, it raises several issues that we think they are

9    directly on confirmation.  And they are directly, therefore, on

10   how we think this Court should evaluate this plan and its

11   prospects.

12          I'm going to just talk about three issues.  There

13   actually are several more than just these three, Your Honor.

14   But I think, for purposes of today and giving the Court an

15   overview as to some of the more significant issues, I'm just

16   going to talk about these three basically.  And what I'd like

17   to do, Your Honor, is start with the first issue, cross-

18   acceleration.  And the starting point for this discussion is

19   the chart you have up on the screen.  It's an inverted

20   corporate organization chart.  It starts with the operating

21   company at the very top, Your Honor, CCO.  And the banks are at

22   the top CCO level.  CCO, as Your Honor heard through Mr.

23   Basta's presentation, is the operating company.  And the

24   companies in red beneath it are various holding companies that

25   I'll refer to in our credit agreement as the designated holding

1    companies, or DHCs.  We've got a guaranty claim against the

2    uppermost one, CCO Holdings LLC.  It's economically irrelevant

3    to us because of the solvency of our primary borrower.  We

4    have, however, no recourse direct against the other designated

5    holding companies.

6         And then you heard, I think, Mr. Kornberg mentioned

7    that his client is, in both places, CCH II and CCH I, they call

8    themselves the fulcrum security because they straddle the

9    enterprise value line that you see on the chart.

10        The key point, Your Honor, in this slide, and I think

11   from our perspective is that our borrower, CCO, is solvent.

12   It's solvent based on the plan valuation of 15.4 billion

13   dollars.  It's even solvent based upon the liquidation analysis

14   in the company's plan.  And I think the solvency helps explain

15   what this dispute between the lenders is about and what it's

16   not about.  It's not about the business, which we think is a

17   perfectly good business.  It's not about vendors or customers

18   or employees.  And it's certainly not about any creditors of

19   CCO, all of whom get paid under all circumstances regardless of

20   the outcome of this dispute.  Instead, Your Honor, this dispute

21   is over the allocation of value as between my client, the first

22   lien lenders and the shareholders of CCO and those creditors

23   who take through the shareholders, Mr. Kornberg's clients, and

24   others in the case.

25        The disagreement, Your Honor, is, in part, over the

1  enforceability of a provision in our loan document which puts

2  our borrower, CCO, in default if certain of the designated

3  holding companies' obligations are accelerated.  Now this is a

4  unique provision in Charter's capital structure.  You won't

5  find this upstream cross-acceleration in any other indenture or

6  in any other loan agreement.  This provision was specifically

7  bargained for back when the agreements were being negotiated in

8  2004 and thereafter.  And it was supposed to do precisely what

9  the plan today tries to avoid having happen which is to give

10  the lenders a seat at the table if the designated holding

11  companies got into financial difficult.  Now, CCO conceded this

12  point to us in the context of negotiating the credit agreement.

13  It was, in fact, a specifically bargained-for provision.  And

14  now, as a solvent entity, Your Honor, it's filed in bankruptcy

15  to effectively try to win back the point that it conceded in

16  negotiations to us.  And it's doing this, Your Honor, not for

17  any creditors of CCO; it's doing this for its equity holders.

18      Now, Your Honor, cross-acceleration provisions are

19  not per se unenforceable as ipso facto clauses.  Ipso facto

20  clauses arise because of the bankruptcy.  And this is the

21  opposite of that.  In fact, it's because of the default to

22  cross-acceleration that we have a bankruptcy here.  They're

23  using the bankruptcy to try to invalidate our rights as a

24  result of cross-acceleration.

25      And the cases, Your Honor, we think, make clear that

1    when you have a bargained-for cross-acceleration provision,

2    it's fully enforceable unless there is some overriding federal

3    policy that says otherwise.  So what's the federal policy?

4    Well, here, Your Honor, given CCO solvency, we think the

5    overriding federal policy favors enforceability.  You have up,

6    on the screen, one of the -- several cases that come out of the

7    circuit courts that, I think, make the policy, as the First

8    Circuit said, perfectly clear.  When the debtor is solvent, the

9    bankruptcy rule is that where there is a contractual provision

10   valid under state law, the bankruptcy court will enforce the

11   contractual provision.  And that's what we have here.  And it's

12   the rule in the Second Circuit under Westfield, and the Sixth

13   Circuit.  In fact, it's fairly uniform -- it's a fairly uniform

14   principle of bankruptcy jurisprudence.

15         The principle, Your Honor, that a solvent debtor has

16   to live by its contract led Judge Posner, in the Milwaukee Road

17   (sic) case, to uphold the district court's decision not to

18   permit deacceleration of long-term bonds under the act.  These

19   were five percent, hundred-year bonds.  In doing so, Judge

20   Posner rejected the arguments that the debtors make here about

21   the fact that what we're looking for is a windfall and says,

22   "What the debtors describe as a windfall gain to the debenture

23   holders is simply the coming to pass of one of the

24   contingencies for which they or their predecessors bargained."

25         Now, I'm not saying, Your Honor, that a solvent

1    debtor, under the code, like CCO, can deaccelerate an otherwise

2    unimpaired debt.  This was an act case, and there are some

3    differences between the statute at that time and the Code.  But

4    what I am saying, Your Honor, is that otherwise valid contract

5    rights which do not contravene the words of the statute need to

6    be fully enforced against a solvent debtor even if, as was the

7    case here, doing so means the debtor cannot avail itself of

8    1124 of the Code.

9         And, moreover, Your Honor, giving effect to our

10   contract rights is actually consistent with the policies of

11   1124.  The idea behind 1124 was to leave us no worse off than

12   if CCO had not filed bankruptcy.  But absent CCO's filing, our

13   cross-acceleration rights would unquestionably put us in the

14   position of being able to reprice our debt either because we'd

15   be refinanced and we'd be able to reinvest at market rates or,

16   alternatively, there'd be a negotiation over a waiver and an

17   amendment and, in that context, an opportunity to reprice the

18   facility.  But here, Your Honor, the point of the plan and this

19   bankruptcy is precisely to leave us worse off than if no

20   bankruptcy had commenced.  And that's not an impairment, Your

21   Honor, whether you're solvent or not.

22        Further, Your Honor, there's nothing about this plan

23   that cures any of this.  We have a new capital structure.  We

24   have new owners, a revenue board, all without our participation

25   in the restructuring process.  Exactly the opposite of what we

1 had bargained for in the context of this credit agreement.

2 Before the bankruptcy, Mr. Allen owned half the company and

3 controlled over ninety percent of the parent-level votes.  And

4 now the bondholders are the owners.  Paul Allen has a two

5 percent economic interest and a minority voting position at the

6 parent level.  There is nothing about this that resembles our

7 pre-default circumstances.  And it doesn't even matter if we're

8 relatively better or worse off.  It's just different.  Your

9 Honor, the point is they propose to make it different without

10 giving effect to our rights.  That's the cross-acceleration.

11 That's the first issue.

12 We also have an issue with respect to the change of

13 control, which is a separate issue, and this is a default that

14 we think happens on the way out of bankruptcy, really, to

15 confirm this plan.  And to the credit agreement, Your Honor, as

16 you see up on the screen, a change of default arises if that

17 Paul Allen Group ceases to have the power, directly or

18 indirectly, to vote, a director voting of equity interests

19 having at least thirty-five percent of the ordinary voting

20 power for the management of the borrower.

21 Now, today Mr. Allen controls the ultimate parent

22 board, fully controls it, has over ninety percent of the voting

23 power.  So, by definition, he controls more than thirty-five

24 percent.  He controls completely the management -- the voting

25 power for the management of the subsidiaries, including our

1    borrower, Charter Opera -- CCO.  However, under the plan, if,

2    in fact, the plan is confirmed, Mr. Allen is reduced to four of

3    eleven directors.  He's reduced to a thirty-five percent

4    minority voting interest at the parent.  And this means, to us,

5    that as a minority parent company shareholder, he actually has

6    zero, zero, control over the management of our borrower, CCO.

7         Now, we think discovery will, in fact, make it clear

8    that leaving Mr. Allen with effectively zero control was the

9    intent of the parties when they negotiated this plan.  But

10   whether it's intentional or not, Your Honor, it's just one more

11   breach that we think establishes why it is that they can't

12   simply say that we're unimpaired and confirm a plan that

13   provides for what this plan provides.

14        There's also a separate change of control default

15   that would be an issue here, and that's if any person or group

16   has more of the ordinary voting power for the management of CCO

17   than a Paul Allen Group.  And here we think we have a default

18   too, Your Honor.  And, again, we think this is going to be the

19   subject of further discovery.  But the default relates to the

20   various group activities that we think are evident just by

21   reading the transaction documents today without taking any

22   discovery at all.  The formation of the committee, the fact

23   that they signed the same agreements that depend on each other

24   for existence, the fact that requisite holdings can waive the

25   rights that are binding on individual members, common counsel,

1    et cetera, et cetera, we think is manifest indicia of group

2    activity in connection with the acquisition of reorganized

3    stock.

4         But away from the credit agreement, you know, the

5    important point here is that, as a result of these changes, our

6    risk is changing under the plan.  And I would call Your Honor's

7    attention to the Barrington Oaks case.  Barrington Oaks, as

8    Your Honor may recall, is a decision that was written years ago

9    by Judge Mabey.  And in that case you had a debtor which sought

10   to render a lender unimpaired under a plan.  The lender had a

11   lien on the property, and the debtor purported to have a

12   successor take title to the property, keep the lien in place

13   and perform.  And the issue in that case is the enforceability

14   of a due-on-sale provision.  If it was enforceable, then the

15   lender couldn't be unimpaired; you had to proceed under 1129.

16   If it wasn't, the debtor argued it wasn't, that 1124 would

17   govern.  And what Judge Mabey said, after analyzing in his

18   typically exhaustive way the policies behind both 1124 and

19   1129, is that it didn't matter whether or not the due-on-sale

20   clause was enforceable.  The point that did matter, which is

21   one of our points here, is that when you change owners, you

22   change risk, and that change entitles the lenders to 1129

23   protection.

24        And that's basically what we're debating here, Your

25   Honor.  What we're debating here is very simple.  The general

1    principle in the statute, the general principle in Chapter 11,

2    is the standard of fair and equitable under 1129.  And as Judge

3    Mabey writes in his decision, that standard is in the statute

4    to enforce the essential commercial bargain that debt comes

5    ahead of equity.  And what the parties would like to do here is

6    they'd like to get away from that standard.  They'd like to get

7    away from the standard of debt coming ahead of equity and argue

8    instead for a theory of reinstatement in order to provide not a

9    recovery for unsecured creditors who won't otherwise get paid,

10   which is the policy behind reinstatement; the court's saying

11   that you shouldn't complain if you're getting a bargain in a

12   circumstance where others are not getting paid.  That's not the

13   issue here.  Here, reinstatement is being sought, in our view,

14   Your Honor, in order to provide a windfall for equity holders.

15   And they're doing it on the premise that Your Honor will

16   declare as unenforceable valid and enforceable provisions under

17   our credit agreement that was intended to give us the rights

18   to, among other things, in these circumstances, reprice the

19   debt.  It's premised on the belief that, in fact, they can

20   effect all sorts of fundamental corporate changes, ownership

21   and control, without having to confront the consequences to the

22   lenders and the standards of fair and equitable under 1129.

23        Finally, Your Honor, just one last default, and this

24   is the complaint that parties referenced before.  And by the

25   way, just to be clear in terms of process, Your Honor, and I

1    don't want to spend a lot of time talking about process before

2    bankruptcy, but I want to mention a few words.  I got involved

3    in this case in January, and within weeks I tried to contact

4    each of the lawyers in the case, suggesting, you know, that

5    there should be a line of communication here, 'cause we saw

6    what was happening.  After the K came out, after they had cut

7    their deal, we were excluded from those negotiations.  We had

8    suggested in a letter that we be included in negotiations, then

9    we'd be prepared to negotiate something.  Mr. Basta mentioned

10   how his litigators contacted us to provide for discovery.  What

11   happened, at least as we recall it, Your Honor, is that no one

12   was contacting us.  In fact, we had tried to talk about

13   discovery and we were unsuccessful.  And so what we did was, at

14   the end of February, we gave them the complaint.  We gave them

15   the complaint that we filed in this court last week.  And we

16   did it for two purposes:  one, to try to at least get some

17   discovery going, 'cause we were told that without a complaint

18   there wouldn't be a discovery, and we were proposing at that

19   point to file it in federal court; and second, in our minds we

20   were trying to get a conversation going about how to really

21   make this a pre-negotiated plan.  That's been the process.  And

22   to the extent there's been any discovery, it only started, Your

23   Honor, it only started after we gave them the complaint.  And

24   it started because, in exchange for our agreeing not to file

25   it, they said they would give us documents.  That's the scope

1  of how it is that we got to working hard and working together

2  with respect to at least starting this process so that we

3  wouldn't lengthen it unnecessarily here.  And, Your Honor,

4  you'll hear more about this in the scheduling, but as of -- at

5  least as of Thursday, when they filed, a box and a half of

6  documents was all we got.

7          In any event, back to the complaint.

8          THE COURT:  Friday.  They filed Friday.

9          MR. PANTALEO:  Friday.  A box and a half of -- no,

10  they filed Friday?

11          UNIDENTIFIED SPEAKER:  Friday, yes.

12          MR. PANTALEO:  Friday.  A box and a -- even worse,

13  Friday.  Even worse.  Anyway, back to the complaint, Your

14  Honor, the complaint basically alleges, to keep it simple,

15  three things happened in the fourth quarter of 2008, Your

16  Honor.  Two designated holding companies were shut off of

17  dividends and distributions because, we believe, the company

18  had realized that they were insolvent, that CCH I was insolvent

19  and they could no longer, in the exercise of their fiduciary

20  duties, and consistent with state law principles, continue to

21  fund dividends and distributions up to those holding companies.

22  Bondholders were then organized.

23          The third thing that happened is that CCO, in the

24  fourth quarter, borrowed about 750 million dollars from the

25  lenders.  Now, we don't have a quarrel with the decisions that

1    were made with respect to the dividends and the distributions

2    and them organizing the bondholders.  We had a big issue with

3    the fact that, while all this was going on, they were borrowing

4    money from us.  And we think, Your Honor, again, and I think

5    the discovery will show, that the circumstances, at the time,

6    known to the company were such that the company should have

7    known that it could not make representations and warranties to

8    us sufficient to permit them to borrow up to 750 million

9    dollars.  This is a matter of discovery.  We were confident

10   based upon what we've seen so far that, in fact, this is a

11   valid claim.

12          Now, a word about core versus noncore.  This is a

13   pre-petition default in the context of a credit agreement

14   that's to be reinstated.  We think, Your Honor, Orion governs

15   here.  Orion involved the assumption of a contract under 365,

16   not a reinstatement of a financial contract under 1124.  But

17   the Second Circuit made it clear in Orion that, to the extent

18   that you are assuming a contract, even though part of

19   assumption is to make determinations about the cure of

20   defaults, if there is a dispute about a pre-petition default,

21   then it has to be adjudicated as a noncore proceeding in a

22   separate adversary proceeding.  And that's exactly what we

23   think is the case here, Your Honor, and that's why we filed

24   this as a declaratory action, as a separate litigation.

25          Your Honor, so these are some of our issues.

1   There'll be others in this case.  And we think discovery and

2   testimony would help flesh these issues out.  The only thing, I

3   think -- you know, we want to be clear -- we'd like Your Honor

4   to understand clearly is that while the parties, sort of,

5   postured this as a pre-negotiated plan, you know, what it

6   really is, is that certain parties, certain parties, negotiated

7   among themselves to try to carve up a windfall at our expense

8   that, fortunately for us, Your Honor, we don't think the law

9   entitles them to have and, we think, the cases make it clear

10  they shouldn't expect to receive.  And obviously, Your Honor,

11  we look forward to further opportunity to explore these issues

12  and certain other issues with the Court in connection with

13  this -- with these proceedings.  Thank you.

14       THE COURT:  Thank you, Mr. Pantaleo.  Is there anyone

15  else who wishes to make a speech?  Mr. Eckstein, good morning.

16       MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

17  Eckstein of Kramer Levin.  I'll rise to just briefly address

18  the Court.  My firm represents thirty-three holders of first

19  lien bank debt with aggregate holdings approximating two

20  billion dollars.  I wanted to rise today to advise the Court

21  that we endorse the comments made by Mr. Pantaleo.  We believe

22  that, while the efforts that have been presented by the debtor

23  today are impressive and represent a great deal of effort, we

24  share the view that, unfortunately, those efforts were

25  undertaken without the inclusion of the lenders.  And to that

1 extent, we do not believe it is fair to present this case as a

2 pre-negotiated case, that it, in fact, is a case that was

3 negotiated with some of the parties.

4        I believe Mr. Pantaleo has laid out clearly and

5 effectively several very important issues relating to cross-

6 acceleration and defaults that result from both pre-petition

7 activity, as well as the filing, as well as a very fundamental

8 change of control that has taken place.  It is important to

9 underscore the fact, Your Honor, that we are going from a

10 situation where the current equity holder, who controls ninety-

11 one percent of the vote in this company, is being reduced down

12 to a two percent holding in a reorganized company.  And the

13 fact that he is being retained with paper that suggests he can

14 vote thirty-five percent of the equity of this company does not

15 avoid the clear fact, in our view, Your Honor, that this case

16 is resulting in a fundamental change of control, which is an

17 event of default under the credit agreement.

18        I believe, Your Honor, these are issues that are

19 appropriate for discovery and for a disclosure statement

20 hearing and confirmation hearing.  And I, therefore, will not

21 attempt to repeat, other than to say that we share the views

22 expressed by Mr. Pantaleo.  We would hope, Your Honor, to be

23 able to participate in the process as it unfolds.  We

24 understand that the timetable is quick, and we are prepared to

25 participate.  I would, Your Honor, like to reserve my

1     opportunity to address a very brief limited objection we've

2     raised to cash collateral when that issue was presented by the

3     debtor.

4          But I did rise today, Your Honor, to indicate that my

5     group does share the positions articulated by the agent, and we

6     intend to participate in this process as it unfolds.  Thank

7     you, Your Honor.

8          THE COURT:  Thank you.

9          MR. UZZI:  Good morning, Your Honor.  Gerard Uzzi

10    from White & Case.  My firm has been retained by holders of

11    Charter Communication Inc. convertible senior notes.  The group

12    holds approximately sixty percent of the outstanding issue.

13    And if you'll recall, Your Honor, I couldn't see it from the

14    back of the courtroom, but from the old Char -- just so Your

15    Honor knows, Charter Communications Inc. is the top holding

16    company of Charter Communications, of the enterprise.

17         Your Honor, I wasn't intending on rising today.  And

18    I rise, and I will be brief, solely because of the statements

19    made that essentially this is a one-issue case.  I do

20    understand and appreciate that reinstatement is the big issue

21    out there, but I do think that there are more issues that will

22    need to be addressed before this case comes to a conclusion.

23         As debtors' counsel alluded to in his presentation,

24    my clients actually received distributions through recoveries,

25    directly or indirectly, on intercompany claims.  Those

1   intercompany claims, Your Honor, from at least what we can

2   glean from the public record, have been substantially

3   compromised prior to the filing and will also be compromised in

4   the filing and then be paid off with preferred stock of dubious

5   terms.

6          Your Honor, we've heard a lot of, also, statements

7   regarding the designated holding companies and the need to keep

8   the capital structure in place for the reinstatement, the

9   issues regarding change of control.  But we also believe that

10  there's another issue out there:  that this capital structure

11  is being kept in place for the benefit of the controlling

12  shareholder to the detriment of my particular clients, that is,

13  there's tax reasons that keep this capital structure and the

14  corporate structure in place for the benefit of the existing

15  shareholders.

16         Your Honor, we're just getting started today, and I

17  just -- in the spirit of your request of a review of the events

18  to come is why I rise.  We need to do our homework; we will.

19  We're not looking to slow down this process, provided we do get

20  a fair opportunity to have our issues heard.

21         Toward that end, we did reach out to -- I did reach

22  out to debtors' counsel last week; they did reach out to me.

23  And we did trade voicemails.  I'm hoping that we can engage in

24  a dialogue with them that will resolve our concerns and resolve

25  them prior to confirmation.  But in the event we can't, Your

1    Honor, then there may be more issues than reinstatement at

2    confirmation.

3            THE COURT:  Fine.  Thank you, Mr. Uzzi.  And --

4            MR. UZZI:  Thank you.

5            THE COURT:  -- just to state what I think is an

6    obvious point, with the beginning of a case that the parties

7    who have brought it to court believe is a one-issue case and

8    they've teed it up as a one-issue case, it's up to the parties-

9    in-interest who were not involved in the negotiations to

10   identify any issues that parties may not have foreseen or

11   identified or may not have thought to be real issues for

12   confirmation.

13           So we're at the start of something that's obviously

14   been very well thought about in advance and is being managed

15   not only for my consumption but for public consumption.  I

16   accept this as, to some extent, a PR event right now.  This is,

17   however, first-days in a very important case, and we have yet

18   to hear the first motion.  What happens next, Mr. Basta?

19           MR. BASTA:  Your Honor, I think it's going to be

20   about forty-five minutes to an hour to get through the first-

21   day stuff.  Maybe -- that might be a conservative estimate.  I

22   don't know if Your Honor wants to plow through or whether we

23   should take a short break.  Whatever is acceptable to the

24   Court.

25           THE COURT:  Well, we've been here for almost an hour

1    and a half, and some longer because of the need to get seats.

2    I think it probably is a good idea to take a fifteen-minute

3    break.  And if your aggressive estimate -- everything is being

4    aggressively estimated in this case -- of forty-five minutes

5    turns out to be right, then we'll be able to break at

6    lunchtime, about 12:30.  So let's take a break until twenty

7    minutes to the hour.

8              MR. BASTA:  Thank you, Your Honor.

9              THE COURT:  We're adjourned.

10        (Recess from 11:25 a.m. until 11:41 a.m.)

11             THE COURT:  Be seated, please.  Good morning.

12             MR. SCHROCK:  Good morning, Your Honor.  Ray Schrock

13   of Kirkland & Ellis, on behalf of the debtors.  Your Honor, as

14   far as going through the first-day motions, we'd propose to

15   just go in the order presented in the amended agenda we filed

16   yesterday.

17             THE COURT:  That's fine.

18             MR. SCHROCK:  Okay.  Thanks.  Your Honor, first, a

19   couple of perfunctory matters just as to service of all of the

20   motions.  We have filed affidavits of service with the Court,

21   noting that we filed the notice of the hearing and the motion

22   with the core bankruptcy and a 2002 list by overnight mail and

23   e-mail.  We also served the amended agenda yesterday as well as

24   the perfunctory motion yesterday, the consolidated creditors'

25   matrix.  We did file that yesterday as well, along with

1    service.

2         Your Honor, we did file a declaration of Greg Doody

3    in support of all of the first-day motions.  Rather than submit

4    an offer of proof in support of all the first-day motions, I'd

5    like to move to submit that declaration into evidence.

6         THE COURT:  I've read that declaration.  I assume

7    that other parties interested in the case have read it as well.

8    Is there any objection to my accepting that declaration in

9    support of the first-day relief?

10        MR. PANTALEO:  No objection, Your Honor.

11        THE COURT:  It's accepted.

12   (Debtors' exhibit, Declaration of Greg Doody, was hereby

13   received into evidence as of this date.)

14        MR. SCHROCK:  Thank you, Your Honor.  Your Honor, the

15   first motion is the debtors' motion for a joint administration

16   of the cases for procedural purposes.  This is a very routine

17   motion.  We do have 130 debtors here.  The motions in the cases

18   largely affect all of the debtors.  We have a joint plan.  And

19   the joint admin, again, is only for procedural procedures.  We

20   ask that it be approved.

21        THE COURT:  Joint administration is ordered.

22        MR. SCHROCK:  Okay.  Thank you.  Your Honor, the next

23   matter on the agenda is the debtors' motion for a case

24   management order.  Again, very typical and very necessary for a

25   case of this size and complexity.  Provides for a very typical

1    notice procedure.  Note -- something we could note here, Judge,

2    if Your Honor is willing to entertain it, is that we do request

3    that the Court set the first four omnibus hearings.  And we

4    need to set a second-day hearing as well as -- at this time.

5    If we could get a disclosure statement hearing, it may be

6    appropriate to deal with that here.

7         THE COURT:  Well, since we're talking about

8    scheduling, let me tell you what my calendar looks like over

9    the next few months.  I understood, as a result of a telephone

10   call placed to my chambers today, that there was a desire for

11   omnibus hearing dates to be set during the third week of each

12   month.

13        MR. SCHROCK:  That's correct, Your Honor.

14        THE COURT:  Partly because of my travel schedule, I

15   can provide an omnibus hearing date on Wednesday, April 15 at

16   9:45 a.m. with the understanding that I need to leave by

17   lunchtime to get to the airport.

18        MR. SCHROCK:  Very well.

19        THE COURT:  If that doesn't work because of

20   anticipated burdens of time, we're going to have to figure out

21   another day that works after I get back.

22        MR. SCHROCK:  Okay.  Very well.  Your Honor, may I

23   have just a moment to confer?

24        THE COURT:  Sure.

25        MR. SCHROCK:  Okay.  Judge, Wednesday, April 15th at

1    9:45 would work just fine.

2            THE COURT:  At 9:45.  And I'm just starting fifteen

3    minutes early so that I don't have the pressure as I'm looking

4    at the clock that I have to get out of here.

5            MR. SCHROCK:  Certainly.

6            THE COURT:  I assume that that'll work.

7            MR. SCHROCK:  Yes, that would work just fine, Your

8    Honor.

9            THE COURT:  Wednesday, May 20th at 10.

10           MR. SCHROCK:  Okay.

11           THE COURT:  And Wednesday, June 17 at 10.

12           MR. SCHROCK:  June 17th.  And, Your Honor, for all of

13   the motions, I assume we can hand those up at the end of the --

14   can we hand up all of the orders at the end --

15           THE COURT:  Oh, yes.  At the end.

16           MR. SCHROCK:  -- of the hearing?  Okay.

17           THE COURT:  Those are, at least, some initial omnibus

18   hearing dates.  If you need a date in July -- I noticed that in

19   the proposed scheduling motion relating to the litigation that

20   the date July 23 appears.  I have no idea if that's simply

21   picked out of the air or if it reflects some discussion with

22   counsel for JPMorgan Chase, because that motion indicated that

23   meet-and-confer efforts have proven to be unsuccessful.  I'm

24   assuming that there's no agreement on dates.

25           MR. SCHROCK:  That's correct, Your Honor.

1          THE COURT:  And as a result, that date is simply a

2     date that I remember, that I'll probably be told to forget at

3     some point.  So --

4          MR. SCHROCK:  We hope not.

5          THE COURT:  Well, it's out there.  I don't know if

6     that's going to be a date that's just for the trial.  I don't

7     know if we're talking about a one-day trial or if we're talking

8     about a ten-day trial.  That's something that I'm going to want

9     to talk with you all about on Monday.  But remember that we

10    have a hearing set for next Monday at 10 AM.

11         MR. SCHROCK:  Yes, Your Honor.  And just, very

12    briefly, just to give you an overview, the genesis of that date

13    was looking at the dates in the lockup, namely that we would

14    have to have a confirmation order entered by 130 days from the

15    petition date.  We wanted to give ourselves some time for a

16    contested confirmation hearing.  So that's -- the third week in

17    July is roughly where that came in.  But we can discuss it on

18    Monday.

19         THE COURT:  All right, well, this actually gets to a

20    procedural question that was occurring to me during the

21    presentations that we had before the break, and that is what

22    the trial is.  And we'll talk more about this on Monday.  I'm

23    not certain, based upon what I've seen so far, whether or not

24    that is, in effect, trial of the adversary proceeding issues

25    after fully presenting whatever motion practice or responsive

1   pleadings may be appropriate in connection with that, or if

2   that's intended to be a trial within the main case of

3   confirmation issues that have been, in effect, teased out of

4   the adversary proceeding for purposes of separate litigation.

5   It's also unclear to me whether or not that's the confirmation

6   hearing and we're simply having an evidentiary battle over the

7   reinstatement issues that have already been discussed.  We'll

8   talk more about that on Monday.

9           MR. SCHROCK:  Sounds good.  Your Honor, could we also

10  get a date at this time for the disclosure statement hearing

11  motion that we have filed with the Court?

12          THE COURT:  What date do you want?

13          MR. SCHROCK:  Your Honor, the last week in April,

14  about thirty days out, works well for us.

15          THE COURT:  You're going to realize quickly that

16  I'm --

17          MR. SCHROCK:  I know you have a couple things going.

18          THE COURT:  -- completely dependent upon my courtroom

19  deputy for scheduling.  And --

20          MR. SCHROCK:  We can contact chambers.

21          THE COURT:  -- I'm going to have to -- I have days

22  that week.  It's just not clear to me whether or not --

23          MR. SCHROCK:  Okay.

24          THE COURT:  -- for something that I am anticipating

25  may result in some debate --

1          MR. SCHROCK:  All right.

2          THE COURT:  -- whether or not I have sufficient time

3     to allocate on particular days here.  So, yes, you will have

4     time that week.  Let me just confer with my courtroom deputy,

5     at a break, which day it's going to be.  And we'll let you

6     know, obviously.

7          MR. SCHROCK:  Very good.  Thanks, sir.  Your Honor,

8     if there are no issues with the case management order, then we

9     ask that it be approved.

10          THE COURT:  Were there any issues with the case

11     management order?  I'm asking that of the room.

12          MR. PANTALEO:  No, Your Honor.

13          THE COURT:  I'll approve it.

14          MR. SCHROCK:  Thank you, Your Honor.  Your Honor, the

15     next matter before the Court is the debtors' application to

16     retain KCC as claims and noticing agent.  I would like to note

17     for Your Honor that we did follow the Southern District of New

18     York protocol when retaining a claims agent.  We did get bids

19     from three parties; consulted.  And after consulting with

20     management and the parties, we found that KCC's pricing and

21     capabilities were superior.

22          THE COURT:  I'm sure they're pleased to hear that on

23     the public record, and that application is approved.

24          MR. SCHROCK:  Thank you.  Your Honor, the next motion

25     before the Court is the motion to file a consolidated creditor

1   list and legal formal mailing matrix for each debtor.  Again,

2   we do have 130 debtors.  We do have a consolidated creditor

3   matrix already prepared.  And on a related note, Your Honor may

4   have noticed we didn't file a motion to extend the date for

5   filing schedules and statements.  We do expect to file those in

6   the first fifteen days of the case.

7           THE COURT:  Okay.

8           MR. SCHROCK:  If there are no objections, we asked

9   that it be approved.

10          THE COURT:  That's approved.

11          MR. SCHROCK:  Okay.  Your Honor, the next motion

12  before the Court is the debtors' motion to use cash collateral.

13  Your Honor, even though we do have a dispute on reinstatement,

14  the debtors, the agent for the pre-petition lenders and the

15  steering committee for the first lien lenders come before the

16  Court with a consensual cash collateral order.  We think that

17  speaks well for all involved and the professionalism of the

18  parties involved.  And that's the way we're going to try and

19  run the rest of this case is to only bring matters before Your

20  Honor when we can't -- absolutely cannot work it out.

21          I'd like to just give you a very brief overview of

22  some of the key terms of the cash collateral motion and briefly

23  address the statement of Wilmington Trust and the limited

24  objection that was filed by the subgroup of lenders.  And then,

25  I suppose, they may want to get up and say a few words as well.

1    Your Honor, the intercreditor agreements that are with the

2    first lien lenders and the second lien lenders and the third

3    lien lenders are key documents, and we did recite the specific

4    provisions in the motion.  We do have second lien holders that

5    do have an interest in cash collateral, namely under Section

6    5.2 of the intercreditor.  Once the first lien lenders agree to

7    use cash collateral, the second lien creditors, they are deemed

8    to have consented.  And you'll notice that the Wilmington Trust

9    application is simply a reservation of rights.  It cannot

10   dispute and is deemed to have to consent to cash collateral.

11           The cash collateral order is very typical.  Cash can

12   be used for working capital and general corporate purposes.

13   There's an adequate protection package that notably is only

14   against what we refer to as the operating debtors; that's CCO,

15   the operating debtor, and its subsidiaries.  They're granted a

16   507(b) claim for diminution in value, adequate protection

17   liens.  A pretty standard package.  Also requires that we

18   maintain the cash management system in place and comply with

19   the covenants set forth in Section 7.1 of the credit agreement.

20   There's an EBITDA covenant that we have referenced in paragraph

21   9 of the order, and it does require that we make periodic

22   interest payments at the default rate.  We agreed to that

23   default rate, Your Honor, because we are seeking reinstatement,

24   and, frankly, we would like to avoid the capitalized interest.

25           Just a key number, Your Honor, that I think it is

1    relevant because it's a cost to the estate.  But of all the

2    reinstated debt that the debtors are seeking to reinstate, that

3    interest runs about twenty million dollars a month just for the

4    default rate component, and that's before you consider

5    capitalizing interest on the unsecured issuances where we won't

6    be making interest payments during the case.  So it is -- time

7    is of the essence for Your Honor.

8           We are seeking, as adequate protection, the ability

9    to make quarterly interest payments.  The next payment -- or,

10   sorry, make interest payments and make quarterly amortization

11   payments.  The next one is due on March 31st; it's 17.5

12   million.  And I believe it's about seventy million dollars a

13   year.  But that is part of the adequate protection package.

14          There is a carve-out, which we think is fairly

15   typical.  It's pipeline before default, plus twenty million.

16   And we are allowed to pay adequate protection to other parties

17   upon entry of a final order.  And that's been a bit of a

18   sticking point with some of the other junior lien holders.  But

19   this is the deal we have with the first lien holders.  Upon

20   entry of a final order, we are seeking a 506(c) waiver and a

21   lien on proceeds of avoidance actions of the CCO debtors.

22          Your Honor, very briefly, regarding the Wilmington

23   Trust statement, as I said earlier, they are not objecting to

24   cash collateral use.  That is very much governed by 5.2 of the

25   intercreditor.  And here we have a consensual order with the

1    first lien lenders. We struck a deal with them. There's many

2    things to fight about in this case, but we thought that entry

3    of a final order in getting them their adequate protection

4    package was simply the better way to go after consultation with

5    the first lien lender. So in that regard, we did file a motion

6    for adequate protection for the second liens and for the third

7    liens, but CCOH. And we're seeking to have those orders

8    entered upon entry of a final order.

9           I received some comments to the order from

10    Wilmington's counsel on the second lien adequate protection.

11    We're just making clear that the adequate protection would be

12    retroactive to the petition date. We thought that was the

13    deal, and we find those changes to be acceptable. But at this

14    time, Your Honor, we don't think there's any risk, real risk,

15    to the second lien parties, the third lien parties. We do have

16    over 700 million dollars in cash, and we do have orders on file

17    to be heard in the next 20 days.

18           Your Honor, there was also a limited objection filed

19    by the second lien -- what I'll refer to as the subgroup of

20    lenders.

21           MR. PANTALEO: First lien.

22           MR. SCHROCK: Sorry, first lien lenders. Thank you,

23    Mr. Pantaleo.

24           THE COURT: This is Mr. Eckstein's objection.

25           MR. SCHROCK: That's right. That objection focuses

1  on a provision in the credit agreement, Section 10.5(b) -- if

2  you still have that copy up there with you, Your Honor -- that

3  allows for the lenders to have one additional counsel.  We've

4  had a lot of conversations with Mr. Pantaleo and Mr. Eckstein

5  about this.  And Mr. Eckstein does represent roughly twenty

6  percent of the lenders, but certainly he doesn't represent all

7  of the lenders at this point.  And Mr. Pantaleo and Mr.

8  Eckstein have not been able to work out a deal on that point

9  for his representation of that group at this time.

10  We do -- I think the only noteworthy thing from the

11  debtors' perspective here is that it is not an objection to

12  cash collateral.  I do think that, because the second lien

13  lenders are alleging that it's a default not to pay it, that it

14  is something that the debtors care about.  We don't want to

15  have this be alleged as some kind of bar to reinstatement at a

16  future point.  So we can't have it both ways.  We can't have

17  the agent say don't pay him and then the second -- and then the

18  other group says pay us or it's a default.

19  So what I would suggest, Your Honor, is it's really

20  not an issue for today.  I think it's something that maybe Mr.

21  Pantaleo or Mr. Eckstein could continue to work on it.  But, if

22  at all to be heard before the Court, we think it's appropriate

23  for the final hearing on cash collateral.

24  THE COURT:  Okay.  I understand that to be the

25  debtors' position.  You've identified the statement of

1   Wilmington Trust and the objection filed by Kramer Levin as a

2   limited objection.  I just want to hear what, if anything,

3   Wilmington Trust and the first lien lender group wishes to say

4   on the subject of cash collateral.

5            MR. SCHROCK:  All right.  Thank you.

6            MS. JOHNSTON:  Susan Johnston, Your Honor, from

7   Covington & Burling LLP, on behalf of Wilmington Trust.  It is

8   correct that Wilmington Trust does not object to the debtors'

9   use of cash collateral.  Wilmington Trust also does not object

10  to the adequate protection being provided to the first lien

11  holders.  We are comforted by the debtors' agreement to

12  explicitly make the provision of adequate provision to the

13  second lien secured parties retroactive to the petition date.

14  And Mr. Pantaleo has indicated to me that he also agrees with

15  that.  And that gives us some comfort that our constituents

16  will not be damaged by any act that may occur during the

17  interim period when we are not receiving adequate protection.

18           We do believe that it is a violation of the

19  intercreditor agreement for the first lien secured parties to

20  receive the adequate protection that they're receiving when we

21  don't receive it.  But we're not damaged as of today, and we'd

22  just reserve our rights on that point until such time as we

23  actually need to address it.

24           THE COURT:  So you're reserving your rights under the

25  intercreditor agreement as between the first and the second?

1          MS. JOHNSTON:  That is correct, Your Honor.

2          THE COURT:  Okay.

3          MR. SAVAL:  Your Honor, Daniel Saval from Brown

4    Rudnick.  We represent Wells Fargo, the agent under the third

5    lien credit facility at the CCO Holdings, L level.  I'd also

6    just like to reserve the rights on behalf of Wells Fargo under

7    the intercreditor agreement.  We share the view of Wilmington

8    Trust that we do not believe it is all clear that the third

9    lien parties would have to wait till entry of the final order

10   to receive adequate protection.  That being said, we do not

11   object to use of cash collateral; we do not object to the

12   adequate protection package being provided to the first lien

13   lenders.  And we are working with debtors' counsel, which has

14   mentioned that a separate motion for providing adequate

15   protection to third lien parties has been filed and will be

16   heard.  Thank you.

17         THE COURT:  Okay.  Thank you.

18         MR. ECKSTEIN:  Your Honor, Kenneth Eckstein on behalf

19   of a group of first lien lenders.  Your Honor, we chose to file

20   this today even though, in many cases, this would be an issue

21   that I would agree with Mr. -- with Kirkland might be something

22   you could consider down the road.  But we chose to file it

23   today because of the unique pace that this case was following.

24   I think we already heard the company, and the noteholders have

25   already begun to provide discovery.  And there's a disclosure

1    statement hearing that is being requested for the end of April.

2        Your Honor, my group of first lien lenders represent

3    approximately twenty-five percent of the first liens, and we

4    believe that there's a very important role that we would expect

5    to play in this case.  Whether this case is going to be

6    litigated to conclusion or, alternatively, if there is going to

7    now be an opportunity for there to be a negotiated resolution,

8    either way, it is our expectation that we can play a very

9    useful and constructive role in this case.

10       We believe that the credit agreement in this case,

11   which is somewhat unusual because it expressly contemplates

12   that, in addition to counsel for the agent, there will be one

13   other firm of counsel to the lenders.  So we believe the credit

14   agreement in this case is clear in contemplating what our group

15   has proposed.  And our group organized in reliance upon the

16   fact that there was contemplation of precisely this arrangement

17   in the credit agreement.  Now, in fact, we've had discussions

18   with Mr. Basta and with Mr. Pantaleo about a structure for this

19   to work efficiently in the context of this case.  And, in fact,

20   in my limited objection, I laid out what I thought was the

21   scope of services as well as a proposed cap for purposes of

22   monthly reimbursement that we were willing to offer to the

23   company in order to accomplish this today.  In fact, the credit

24   agreement provides for no limitation on scope and no limitation

25   on monthly reimbursement.

1          THE COURT:  Is there an agreement as to that cap?

2          MR. ECKSTEIN:  Your Honor, I believe, and I don't

3     want to commit the company, but I believe this was the number

4     that the company had proposed to us, and we are willing to

5     accept it.  We also believe that the scope is consistent with

6     what the company had proposed to ensure that there would be an

7     efficient interaction between ourselves and agent's counsel.

8          Your Honor, we believe that this has been discussed

9     extensively.  And while I'm always amenable to trying to

10    resolve things, I don't believe that there are really any open

11    issues.  And in our view, we believe it's constructive to get

12    this issue behind us so that we can all focus on the substance.

13    So we thought it was appropriate to bring it to Your Honor's

14    attention this morning.

15         THE COURT:  I -- I'm not saying it's inappropriate.

16    It's not directly related to the use of cash collateral, unless

17    you're objecting.  But you're front and center, and I presume

18    you'll be able to talk with counsel and either agree to the

19    treatment of your fees or you won't.  Is there an agreement?

20    I'm looking at debtors' counsel.

21         MR. BASTA:  Your Honor, our perspective on this is

22    that if the lenders want to designate counsel --

23         THE COURT:  You're talking about all the lenders?

24         MR. BASTA:  All the lenders, in accordance with the

25    credit agreement, and that fits and satisfies 10.5 so that the

1   debtors are fulfilling their obligation under 10.5 and it's

2   within a limited scope parameters, as Mr. Eckstein has

3   articulated, the debtors would find that acceptable.  There was

4   one aspect of Mr. Eckstein's proposal where we wanted a hard

5   cap, and Mr. Eckstein has proposed, as I understand it, a soft

6   cap, meaning that if his fees go above the cap that he can come

7   back later in the case and seek amounts in excess of the cap.

8           THE COURT:  I understand that it was a carry

9   forward/carry back cap.

10          MR. ECKSTEIN:  Your Honor, it was a carry

11  forward/carry back cap, and we provided that, to the extent,

12  ultimately, the fees exceeded the carry forward/carry back, we

13  would have the right to request from the Court a reimbursement

14  of reasonable expenses consistent with the scope that was

15  articulated in our objection.

16          THE COURT:  Would that be on the basis of your loan

17  agreement or on the basis of substantial contribution, or some

18  other basis?

19          MR. ECKSTEIN:  We would submit to the discretion of

20  the Court based upon the arrangement that was provided for in

21  the objection, Your Honor.  It was a reasonableness standard

22  that would be submitted to Your Honor.

23          MR. BASTA:  And our perspective, Your Honor, was we

24  were fine with the carry forward or carry back, but what we --

25          THE COURT:  You don't want to revisit this later.

1       MR. BASTA: And, you know, Simpson Thacher is a

2  qualified adversary. And we didn't -- our perspective in all

3  of this was not to have to -- we don't understand, necessarily,

4  the disparate interests that would be protected by additional

5  counsel. But our perspective is that if the lenders got

6  together and the credit agreement says what it says, we'd live

7  with it.

8       THE COURT: Well, I guess you live by the credit

9  agreement and you die by the credit agreement. So I'm not

10  interpreting provisions in the credit agreement that relate to

11  the reimbursement of counsel for the, quote, "lenders", close

12  quote, at this point. That's not before me. I understand the

13  legal argument that's being made, and I view that legal

14  argument as ancillary to the use of cash collateral. So I view

15  this as a platform for public negotiation, which is probably

16  the wrong thing to do in a packed courtroom. And I suggest

17  that the parties talk about this later. But I understand the

18  positions being articulated. Either you reach an agreement or

19  you don't.

20       MR. ECKSTEIN: Your Honor, we'll be happy to try to

21  resolve this. And if we need to come back to Your Honor, we

22  will, and reserve our rights, obviously, under the credit

23  agreement in full.

24       THE COURT: That's fine --

25       MR. ECKSTEIN: Okay. Thank you.

1          THE COURT:  -- including, I suppose, the right to

2     litigate it someplace else besides the bankruptcy court.

3          MR. ECKSTEIN:  Thank you, Your Honor.

4          MR. SCHROCK:  Thanks, Your Honor.  So with that, we'd

5     ask that the cash collateral order be approved.

6          THE COURT:  I'm prepared to do that.  I just want to

7     be sure that the Office of the United States Trustee, who's

8     been represented but quiet, is satisfied that the use of cash

9     collateral, as proposed, is satisfactory to that office.

10          MR. SCHWARTZBERG:  Good morning, Your Honor.  Paul

11     Schwartzberg from the U.S. trustee's office.  We had had one

12     question prior to this hearing regarding whether the liens were

13     attaching to avoidance actions.  We were advised that they were

14     not.

15          MR. SCHROCK:  They are.

16          MR. SCHWARTZBERG:  If that could be confirmed --

17          MR. SCHROCK:  That's confirmed.

18          THE COURT:  That's confirmed.  I think I must have

19     misheard counsel earlier because I heard something about

20     avoidance actions.  And it may be that the negative before the

21     lien on avoidance actions was left out, or I misheard it.  So

22     I'm glad for the clarification.

23          MR. SCHROCK:  Thanks, Your Honor.  We are seeking,

24     upon entry of the final order, a 506(c) waiver and a lien on

25     proceeds of avoidance actions.

1          THE COURT:  For the final order, you're seeking a

2     lien on avoidance actions?

3          MR. SCHROCK:  Proceeds there.

4          THE COURT:  Proceeds.

5          MR. SCHROCK:  Yes.

6          MR. SCHWARTZBERG:  Your Honor, today we're just

7     concerned with the interim order.  As long as it doesn't --

8          THE COURT:  Fine.

9          MR. SCHWARTZBERG:  Today, we have no objection.

10         THE COURT:  That's an extraordinary provision that

11    would not ordinarily be permitted absent good cause shown.  So

12    we'll address that at the final hearing.

13         MR. SCHROCK:  That's fine, Your Honor.  Your Honor,

14    if there's nothing further on cash management, I'll move to the

15    next motion.

16         THE COURT:  That's fine.

17         MR. SCHROCK:  Okay.

18         THE COURT:  Oh, let's be clear.  Cash collateral is

19    approved.

20         MR. SCHROCK:  Thank you, Your Honor.  And then we'll

21    also -- can we set the final DIP hearing just for that, the

22    date on the 15th?

23         THE COURT:  Yes.

24         MR. SCHROCK:  Or the final cash collateral motion,

25    Your Honor?  Your Honor, the next motion is the debtors' motion

1   to enter into a surety bonding facility.  Surety bonds are

2   critical to the debtors' business.  They're issued to

3   municipalities for franchise obligations and for utilities.  As

4   of the petition date, we had fifty-five million dollars in LCs,

5   outstanding security, sixty-five million dollars in bonds.

6   Surety:  Travelers.  Our surety asked for this order as a

7   condition to continue to issue those bonds.  The material terms

8   of the order are that this is a 150 million dollar facility, 20

9   million of which would be accessible under the interim period.

10  The terms of the facility are fairly consistent with the prior

11  eighty to a hundred percent of cash collateral or LCs securing

12  this obligation.

13          There is a new indemnity agreement that incorporates

14  the old indemnity agreements.  And we did clarify two things

15  that I wish to put on the record with the surety here today.

16  The first is that if there's any provision in an old indemnity

17  agreement previously issued relating to a default as a result

18  of the Chapter 11 filing, that will not be enforced.  The

19  second point simply being that as the surety has agreed that

20  its claims are subordinated to the claims of the first lien

21  lenders and the other secured parties in this case, given that

22  those first lien lenders and other parties are also subject to

23  the carve-out, likewise the surety's claims will be subject to

24  the carve-out in these cases.

25          And I don't believe there are any objections, Your

1  Honor.  That's right, yeah, except surety's counsel points out

2  they're not subject to the carve-out with respect to their cash

3  collateral that's out there, and that's fine.

4      MR. ALTER:  Otherwise -- Your Honor, Jonathan Alter

5  on behalf of Travelers.  I can confirm that.  Thank you, Judge.

6      THE COURT:  All right.  Are there any objections to

7  the surety bond motion?  Hearing none and recognizing this is a

8  necessary part of the business, I approve it.

9      MR. SCHROCK:  Okay.  Thank you, Your Honor.  Your

10 Honor, the debtor -- the next motion is the debtors' motion to

11 approve their cash management system.  It's a fairly detailed

12 system that we've set forth in the order.  I'd just rely on the

13 description of the cash management system in the motion and in

14 the order.  We did reach one accommodation with the U.S.

15 trustee's office that we did agree to use the DIP stamp legend

16 on existing cash -- check stock.  And, with that, I don't

17 believe there are any objections.

18     THE COURT:  Mr. Schwartzberg, is that acceptable to

19 you?

20     MR. SCHWARTZBERG:  Your Honor, I think there's one

21 petition.

22     MR. SCHROCK:  As well as on forms as well.  We'll put

23 the stamp on checks as well as forms.

24     MR. SCHWARTZBERG:  Yeah, that's acceptable, Your

25 Honor.  Our concern was that people out there wouldn't -- who

1    aren't as aware of today's filing, would be unaware that they

2    were dealing with a debtor-in-possession, and we wanted it on

3    the forms as well as checks.

4         THE COURT:  Hard to imagine that there's anybody who

5    isn't aware of Charter's current status.  But, okay.

6         MR. SCHROCK:  All right.  Your Honor, the next motion

7    is what we affectionately refer to as our NOL motion.  And I am

8    familiar with this Court's colloquy with some of my partners in

9    the Sirva case.

10        THE COURT:  Oh, the Kieselstein colloquy.

11        MR. SCHROCK:  Yes, that's -- that's right.  And, Your

12   Honor, I did enjoy reading the transcript and how, at one

13   point, Mr. Kieselstein said he'd like to channel his tax

14   partner, Mr. Maynes, for the proceedings.  And, instead, I

15   brought him with us here today in case --

16        THE COURT:  Oh, welcome to --

17        MR. SCHROCK:  -- we trip over --

18        THE COURT:  -- welcome to my courtroom.

19        MR. MAYNES:  Thank you.

20        THE COURT:  Are you going to say something?

21        MR. MAYNES:  Todd Maynes, Kirkland & Ellis, on behalf

22   of Charter.  He warned me I might need to do that, so --

23        THE COURT:  So far so good.

24        MR. SCHROCK:  Your Honor, we're seeking an interim

25   order that I believe is consistent with other orders entered in

1    this district and by this court.  This applies to stock trades,

2    not claims trading.  The company has over eight billion dollars

3    in NOLs.  Just to give Your Honor some of the figures here, six

4    billion of NOLs would translate into two billion dollars of tax

5    savings in the future years.  This company, obviously, as

6    you've heard today, does make money; they will be used.  The

7    company would lose its entire NOL if an ownership change were

8    to occur.  The only shareholder we're aware of at this time

9    that's over five percent that's going to be affected is Mr.

10   Allen.  Mr. Allen has not objected.  These tax savings, and I

11   think this is unique to this case, are critical to the plan and

12   the valuation that we have filed before the Court, and that's

13   in order to preserve the ability to confirm that plan.

14          So, in summary, Judge, this case is a unique one and

15   the strongest case we have seen for the restrictions set forth.

16   And they are just restrictions and an opportunity for parties

17   to trade after notice.

18          THE COURT:  Is there anyone who wishes to be heard on

19   this subject?  I'm not prepared to enter the interim relief

20   requested.  The reference to the Kieselstein colloquy from the

21   Sirva case was a reference to some concerns I had about a

22   similar order that was being requested in that case in February

23   of last year.  And it was, to some extent, informed by my

24   sensitivity to the whole issue of trading orders and

25   limitations upon the transfer of stock and claims associated

1    with the opinion in the United Airlines case by Judge

2    Easterbrook which, if I'm remembering it correctly, raised some

3    very serious issues as to the appropriateness of NOL trading

4    orders, particularly as it involved stock, as first-day orders

5    in large bankruptcy cases; that case was United Airlines.

6              We had a reasonably well-informed debate on the

7    subject.  There was a follow-up hearing, at which time

8    additional information was provided.  And I entered the order

9    without objection.  I think there's no need for your tax

10   partner to say anything further --

11             MR. SCHROCK:  Thank you, Judge.

12             THE COURT:  -- because he's likely to simply confuse

13   me.  And for that reason, I -- not just for that reason.

14   I'm --

15             MR. SCHROCK:  That's a good reason.

16             THE COURT:  I'm prepared to enter this order, and I

17   recognize the importance of preserving NOLs to the proposed

18   plan.  And I'm encouraged by the fact that Mr. Allen, who seems

19   to be particularly affected by this, is supporting restricting

20   his own interests in consideration for preserving NOLs for the

21   benefit of the reorganized company.

22             I noted that there was one other large holder noted

23   in the motion.  Is that holder consenting?  Does that holder

24   have notice?

25             MR. MAYNES:  I contacted that holder on Friday, Your

Honor, confirmed they do not have twenty million shares. And

so, therefore, they would not be subject to it. They have

twenty million if you combine their different funds together.

But for tax purposes, you don't have to combine them.

THE COURT: Fine.

MR. HESSLER: So they're fine, Your Honor.

THE COURT: Okay. Great. I approve it.

MR. SCHROCK: Thank you, Your Honor. I think, at

this time, I'm going to cede the podium to my partner, Mr.

Hessler, for the remainder of the motions.

MR. HESSLER: Good afternoon, Your Honor. Steve

Hessler of Kirkland & Ellis, on behalf of the debtors. The

five motions remaining to be heard today are set forth in

Section 2C of the agenda and all involve requests that the

debtors need to continue their operations without undue

disruption or delay. Your Honor, turning to item 2C(1) on the

agenda, which is the debtors' wages motion, the debtors' most

valuable asset is their approximately 16,500 highly skilled

employees. This motion seeks authority for the debtors to

honor their obligations to these individuals whose continued

hard work and dedication is critical to the debtors' successful

restructuring.

The debtors maintain, on behalf of their employees, a

wide array of customary wage and benefit programs.

Importantly, Your Honor, in the interim order before the Court

1    today, the debtors are not seeking any relief related to any

2    employee bonus programs, any severance programs, the debtors'

3    deferred compensation plan or any indemnification obligations

4    to directors and officers.  The debtors will, however, be

5    seeking approval for these items in a proposed final order at

6    their second-day hearing.  The debtors are seeking approval on

7    an interim basis, Your Honor, for the following:  first, the

8    authority to pay pre-petition wages, salaries and other cash

9    compensation and to continue to satisfy employee wage

10   obligations in the ordinary course; second, to reimburse

11   employees for our pre-petition business-related expenses, and

12   I'll be returning to this issue in a moment, Your Honor; third,

13   to pay sales commissions earned pre-petition by employees; and

14   fourth, to honor all pre-petition obligations related to the

15   debtors' union dues, independent contractor obligations,

16   medical insurance programs, vacation and leave time, workers'

17   comp obligations and retirement savings plans, and to continue

18   to provide these benefits in the ordinary course of business.

19         Your Honor, as the debtors believe the relief

20   requested in the interim order is well justified under the

21   Bankruptcy Code and consistent with established precedent in

22   this district, the debtors further believe that immediate and

23   irreparable harm will result if the relief requested on an

24   interim basis is not granted.  Because the debtors' employees

25   are their most important asset, they are critical to the

1　success of these Chapter 11 cases.  Suffice it to say, the

2　debtors' employees depend on their wages and benefits for their

3　families' livelihoods.  If the debtors' ability to honor their

4　pre-petition obligations to their employees is delayed or

5　disrupted, many employees will suffer material hardship and may

6　seek alternative employment, thus jeopardizing the debtors'

7　reorganization efforts.

8　　　　　　Finally, Your Honor, the debtors have had multiple

9　discussions with the U.S. trustee's office about the interim

10　wages order, and we have attempted to address all of the

11　trustee's issues.  One issue does remain for today.  The

12　trustee has requested a cap of 1,000 dollars per employee for

13　payment of reimbursable expenses between now and the second-day

14　hearing.  Your Honor, the debtors estimate that they will owe

15　approximately 1.4 million dollars to approximately 2,500

16　employees over the next twenty days.  This works out to a per-

17　employee average of approximately 560 dollars.  However, Your

18　Honor, the debtors do estimate that approximately 270 employees

19　will submit reimbursement claims greater than 1,000 dollars

20　within the next twenty days, and some employees already have

21　done so.

22　　　　　　Your Honor, we've provided copies of the debtors'

23　expense reimbursement policies to the U.S. trustee.  These

24　policies are Sarbanes-Oxley-complaint, and we believe they

25　properly limit reimbursable expenses only to reasonable

business-related items.  Expense reimbursements are made on a

daily basis as claims are processed.  Thus, all or most of the

1.4 million dollars that the debtors anticipate to come due

within the next 20 days would be paid within the next twenty

days.

Your Honor, these are obligations that employees

incurred personally on behalf of the debtors, and we think it

would send an ominous message to current employees that the

reimbursements may not be paid in full when due if, in fact, we

were subject to the 1,000 dollar cap proposed by the trustee.

THE COURT:  I'll hear what Mr. Schwartzberg has to

say about this.  Perhaps after that compelling argument, he

will relent.

MR. SCHWARTZBERG:  Your Honor, first, we did request

a list of who's getting what over 1,000, and that list hasn't

been supplied to us except in a general basis:  267 people over

1,000.  We were advised to four people, one, including an

insider, who is getting in excess of actually 5,000.  But,

generally, we would prefer on the first day, subject to greater

notice, that the expense paid over 1,000 dollars be set forth

for a final hearing so that parties-in-interest, if they have a

desire, can object and also, hopefully, so, in the interim, the

debtor could provide us with the list of creditors who are

getting over 1,000.

THE COURT:  In another case that recently involved a

1  similar issue before me, your office consented to the following

2  elegant arrangement.  Instead of there being an arbitrary limit

3  upon the payment of expenses or a twenty-day period for going

4  to the right number actually due and owing, because these

5  expenses were almost always credit card expenses in which a

6  credit card bill was being paid, at least in that case -- I

7  don't know if it's true in the case of Charter -- the office

8  agreed, through another one of your representatives, to permit

9  payments on the due date of the bill so that if a credit card

10  statement was due for an amount, say, of 2,000 dollars instead

11  of 1,000 dollars sometime within the 20-day period, it would be

12  payable on that due date so as to avoid adverse impact on

13  credit scores and the like.  It seems to me that's not such a

14  bad approach.  Is that acceptable?

15           MS. HOPE DAVIS:  Yes.

16           MR. SCHWARTZBERG:  Yes, Your Honor.  That order could

17  be -- or the order could be noticed out to that -- or that we

18  actually received notice of part of the payment.

19           THE COURT:  That's fine.  I mean, the precedent is

20  Apex Silver Mines.

21           MR. SCHWARTZBERG:  That's acceptable, Your Honor.

22           THE COURT:  Okay.  Does that work for you, by the

23  way?

24           MR. HESSLER:  I think so, Your Honor.  Just two

25  points.  One, with reference to providing the list of

1    creditors, many of these expenses aren't filed yet.  This is an

2    estimate based on historical averages, what will be coming in

3    the next twenty days.  So we don't have a complete list to

4    provide, but we're happy to provide whatever information we do

5    have.

6         With regard to the proposed arrangement, I certainly

7    think it does work, Your Honor, as to credit cards.  As to cash

8    expenses, 'cause this is almost all travel-related, so as to

9    cash payments that employees have made, perhaps as long as the

10   non-credit card part of an expense --

11        THE COURT:  You don't have employees walking around

12   with suitcases filled with cash, do you?

13        MR. HESSLER:  No, absolutely not, Your Honor.  And I

14   would say maybe as long -- you know, we could -- if we can do

15   the credit card payment when due and then cash capped at 1,000

16   dollars per employee.

17        THE COURT:  That sounds fine, 'cause I can't imagine

18   there'll be cash expenses at that level.  That's not how people

19   behave.

20        MR. HESSLER:  We'll edit the order appropriately,

21   Your Honor, and tender it to you.

22        THE COURT:  Fine.

23        MR. HESSLER:  Your Honor, the next item is 2C(2) on

24   the agenda, the debtors' shippers and lien claimants motion.

25   The debtors use approximately 325 shippers and ten warehousemen

1    for the delivery and storage of various types of electronic

2    devices that transmit cable, Internet and telephone services to

3    the debtors' customers.  These parties may attempt to assert

4    liens on the debtors' goods based on state laws that permit the

5    retention of materials in transit or possession until

6    outstanding payments are made.  As of the petition date, the

7    debtors estimate they have approximately one million dollars in

8    accrued but unpaid shipping charges.  The debtors are seeking

9    authority on an interim basis to pay 600,000 dollars in charges

10   that the debtors expect will come due within the next twenty

11   days.

12           Your Honor, as to lien claimants, the debtors

13   routinely transact with contractors and vendors that install,

14   repair and provide parts for the debtors' telecommunications

15   networks and facilities.  Failure to pay for these pre-petition

16   services could result in the contractors asserting and

17   perfecting mechanics' liens against the debtors' locations or

18   goods or refusing to perform ongoing obligations.  As of the

19   petition date, the debtors estimate approximately 2.1 million

20   dollars of pre-petition lien claimant claims will be accrued

21   but unpaid.  The debtors are seeking authority on an interim

22   basis to pay 1.2 million dollars in claims that the debtors

23   expect will come due within the next 20 days.

24           Your Honor, as the debtor, the debtors, believe the

25   relief requested in the interim order is justified under the

1    Bankruptcy Code and consistent with established precedent in

2    this district, the debtors further believe that immediate and

3    irreparable harm will result if the relief requested on an

4    interim basis is not granted.  The timely payment of pre-

5    petition amounts owed to shippers and lien claimants is

6    necessary to preserve the debtors' ability to send and receive

7    equipment without interruption and, therefore, critical to the

8    survival of the debtors' businesses.

9           Lastly, Your Honor, the debtors have conferred with

10   the U.S. trustee's office about the interim relief requested,

11   and, to our knowledge, the trustee's office has no objections.

12          THE COURT:  Let's confirm that.

13          MR. SCHWARTZBERG:  No objection, Your Honor.

14          THE COURT:  Fine.  Is there anyone else who wishes to

15   be heard on this?  It's approved.

16          MR. SCHWARTZBERG:  Your Honor, the next item is 2C(3)

17   on the agenda, the debtors' customer programs motions.  As

18   described in our motion, the debtors have a number of ordinary

19   and customary customer programs that are designed to attract

20   new subscribers and retain and upgrade existing subscribers.

21   Through these programs, the debtors offer various promotions,

22   incentives, discounts and price guarantees to grow and engender

23   the goodwill of their customer base.  The proposed order, which

24   the debtors are asking the Court to enter on a final basis,

25   authorizes the debtors to honor the pre-petition obligations to

1   customers and to continue these programs in the ordinary course

2   of business.  The debtors believe the relief requested is

3   consistent and routinely granted in this district.  The debtors

4   further believe immediate and irreparable harm will result if

5   the requested relief is not granted.  The marketplace for cable

6   services is extremely competitive.  The debtors' customer

7   programs are even more needed following the debtors' Chapter 11

8   filings.  Requiring the debtors to discontinue their customer

9   programs for at least twenty days would exacerbate any customer

10  anxieties about the debtors' ability to continue to provide

11  uninterrupted and exceptional service.

12          Here as well, Your Honor, we have conferred with the

13  U.S. trustee's office about the relief, and, to our knowledge,

14  the trustee's office has no objections.

15          THE COURT:  Let's just confirm that.

16          MR. SCHWARTZBERG:  No objection, Your Honor.

17          THE COURT:  Fine.  That's approved.

18          MR. HESSLER:  Thank you, Your Honor.  Your Honor, the

19  next item is 2C(4) on the agenda, the debtors' insurance

20  motion.  As described in our motion, the debtors maintain a

21  comprehensive insurance program that provides coverage for the

22  standard range of potential liabilities.  Like many

23  corporations, the debtors finance two policies through premium

24  financing arrangements with third-party lenders that allow the

25  debtors to spread the cost of the policies over time and to

1  preserve cash flows.  Through this motion, the debtors are

2  seeking, on an interim basis, authority to:  maintain existing

3  insurance policies and pay any pre-petition obligations that

4  may come due; enter into new insurance policies, as needed;

5  maintain pre-petition premium financing arrangements and enter

6  into new PFAs, as needed.  Specifically, on an interim basis,

7  the debtors are seeking authority to pay 1.8 million dollars

8  that will come due within the next 20 days for deductibles,

9  financing and third-party administrator payments.

10       Your Honor, the debtors assert that the relief

11  requested in the interim order is consistent with precedent and

12  necessary to avoid immediate and irreparable harm.  First of

13  all, the debtors' insurance policies are essential to

14  safeguarding the value of their business, property and assets.

15  Second, many of the insurance policies are required by

16  statutes, regulations or contracts that govern the debtors'

17  operations.  And third, the U.S. trustee's guidelines for the

18  Southern District of New York require the debtors to maintain

19  coverage, insurance coverage, through their Chapter 11 cases.

20  Finally, Your Honor, the debtors have conferred with the U.S.

21  trustee's office about the interim relief requested, and, to

22  our knowledge, the U.S. trustee does not have any objections.

23       THE COURT:  Once again, I'm going to ask Mr.

24  Schwartzberg to confirm that.

25       MR. SCHWARTZBERG:  That's correct, Your Honor.  We

1   have no objection to the requested relief.

2          THE COURT:  The insurance motion is approved.

3          MR. HESSLER:  Your Honor, the final item on today's

4   agenda is number 2C(5), the debtors' taxes motion.  In the

5   ordinary course of business, the debtors collect sales taxes

6   from customers and incur taxes, such as use, franchise and

7   income taxes.  The debtors also collect regulatory fees and

8   other similar charges and assessments on behalf of various

9   governmental authorities, which the debtors then pay to these

10  authorities for licenses and permits required to conduct the

11  debtors' businesses.  Through this motion, which is proceeding

12  on interim and final basis, the debtors are seeking to continue

13  to collect and pay these taxes and fees without regard to

14  whether the obligations accrued or arose before or after the

15  petition date.

16         Your Honor, the debtors estimate that 4.3 million of

17  pre-petition taxes and fees owing to governmental authorities

18  will become due and payable within the first 20 days of these

19  Chapter 11 cases.  Thus, the debtors are seeking authority to

20  pay this amount in the proposed interim order.  The debtors

21  believe this request is supported by the Bankruptcy Code and is

22  similar to relief routinely granted in this district.  Further,

23  the debtors believe entry of the interim order is necessary to

24  avoid immediate and irreparable harm.  Most significantly, if

25  the debtors do not timely collect and remit applicable taxes

1  and fees, governmental authorities may suspend the debtors'

2  operations, file liens, seek to lift the automatic stay or

3  pursue other remedies that could harm the estates.

4        Finally, Your Honor, the U.S. trustee's office

5  requested, before the debtors filed the interim order, that we

6  insert language clarifying the 4.3 million dollars that we're

7  seeking to pay on an interim basis is for taxes and fees that

8  will become due and payable between the debtors' first and

9  second-day hearings.  We did update the order to reflect that.

10        And with that, Your Honor, I think we addressed all

11  of the U.S. trustee's concerns.

12        THE COURT:  Mr. Schwartzberg, one more time.

13        MR. SCHWARTZBERG:  That's correct, Your Honor.  We --

14  with the amended language, we have no objection.

15        THE COURT:  Fine.  It's approved.

16        MR. HESSLER:  Your Honor, one point of clarification

17  for the debtors and for other parties is we're just seeking

18  confirmation on the record that all of the orders entered today

19  on an interim basis will be heard on a final basis at the April

20  15th hearing.

21        THE COURT:  Yes.  It may be, however, that, for

22  purposes of Rule 6003, doing the math, that the orders on a

23  final basis may be entered the following day on the 16th which

24  would be twenty days.  But with that understanding, the answer

25  is yes.

1        MR. HESSLER:  Thank you, Your Honor.  With that, Your

2   Honor, we have nothing further for this morning.

3        THE COURT:  Fine.  Thank you very much.  And I'll see

4   at least some of you again on Monday morning.

5        MR. HESSLER:  Thank you, Your Honor.

6        THE COURT:  But before you all leave, there's still

7   an open question of the hearing date for the disclosure

8   statement.  And what I would like to do, while everybody is

9   present to hear it, is to -- I'm going to go off, I'm going to

10  confer, I'm going to come back.  Nobody needs to stand.  Stay

11  where you are.

12       MR. HESSLER:  Thank you, Your Honor.

13       (Off the record)

14       THE COURT:  Okay.  This is one of the few times I

15  need a gavel.  The 29th.  April 29 at 10 a.m.  And even though

16  I said 10 a.m. for the Monday hearing next week, I think it

17  would be more convenient for me if we did it at 11 a.m..  I

18  assume that's not going to mess up anybody's schedule.

19       MR. SCHROCK:  No, that's fine, Your Honor.  And just,

20  for objections, can we just -- I think the proposed order has a

21  week out for objections to be due on the disclosure statement.

22  Would that be --

23       THE COURT:  What date do you have in mind?  The 22nd?

24       MR. SCHROCK:  Yes.  Yeah, 22nd, 4:00?

25       THE COURT:  That's fine.

1          MR. SCHROCK:  Okay.

2          THE COURT:  Okay, now we really are adjourned.

3          ALL:  Thank you, Your Honor.

4      (Whereupon these proceedings were concluded at 12:34 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                            E X H I B I T S

5     PARTY      NO.   DESCRIPTION                        ID      EVID.

6     Debtor            Declaration of Greg Doody

7

8                            R U L I N G S

9     DESCRIPTION                                       PAGE    LINE

10    Order directing joint administration of related   63      21

11    Chapter 11 cases

12

13    Debtors' motion for entry of an order             68      13

14    establishing certain notice, case management

15    and administrative procedures granted

16

17    Debtors' application authorizing retention of     68      23

18    Kurtzman Carson Consultants LLC as notice and

19    claims agent to the debtors approved

20

21

22

23

24

25

I N D E X, cont'd


R U L I N G S

DESCRIPTION                                    PAGE    LINE

Debtors' motion for entry of an order          69      10

authorizing debtors to (a) prepare a list

of creditors in lieu of submitting formatted

mailing matrix; (b) file consolidated list of

debtors' 80 largest unsecured creditors; and

(c) mail initial notices granted


Debtors' motion for entry of an interim order  81      19

(i) authorizing operating debtors to use cash

collateral; (ii) granting adequate protection

to adequate protection parties; and(iii) scheduling

a final hearing pursuant to Bankruptcy Rules

4001(b) granted


Debtors' motion for entry of an interim order  83      8

authorizing debtors to enter into the DIP

surety bond program granted

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for entry of an interim order | 84 | 5 |
| (a)authorizing, but not directing debtors to | | |
| continue using their cash management system, bank | | |
| accounts and business forms; (b)granting post- | | |
| petition intercompany claims administrative expense | | |
| priority; (c)continued investment of excess funds | | |
| in investment accounts; and (d) authorizing | | |
| continued intercompany arrangements and historical | | |
| practices granted | | |
| | | |
| Debtors' motion for entry of interim order | 87 | 7 |
| establishing notification and hearing procedures | | |
| for transfers of common stock granted | | |
| | | |
| Debtors' motion for entry of an interim order | 92 | 22 |
| authorizing, but not directing, debtors to (a) pay | | |
| certain pre-petition compensation and reimbursable | | |
| employee expenses; (b) pay and honor employee medical | | |
| and other benefits; and (c) continue employee wages and | | |
| benefits programs granted | | |

I N D E X, cont'd

R U L I N G S

DESCRIPTION                                        PAGE    LINE

Debtors' motion for entry of an interim order      94      15

authorizing, but not directing, debtors to pay

pre-petition claims of shippers, warehousemen

and miscellaneous lien claimants


Debtors' motion for entry of an order              95      17

authorizing, but not directing, debtors to honor certain

pre-petition obligations to customers and to

otherwise continue certain customer programs and

practices in the ordinary course of business

granted


Debtors' motion for entry of an interim order      97      2

authorizing, but not directing, debtors to

(a)maintain pre-petition insurance policies;

(b)enter into new insurance policies;

(c)maintain premium financing agreements; and

(d)enter into new premium financing agreements

granted

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X, cont'd


R U L I N G S

DESCRIPTION                                    PAGE    LINE

Debtors' motion for entry of an interim order   98      15

(a)authorizing, but not directing, debtors to

remit and pay certain taxes and fees; and

(b)authorizing and directing banks and other

financial institutions to honor related checks

and electronic payment requests granted

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

LISA BAR-LEIB

Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  April 1, 2009