UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11435-jmp

- - - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

CHARTER COMMUNICATIONS, et al.,

Debtors.

- - - - - - - - - - - - - - - - - - - - - -x

U.S. Bankruptcy Court

One Bowling Green

New York, New York

April 15, 2009

9:45 AM

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

ECRO: K. SLINGER

HEARING re Motion Filed by the Debtors for an Order Authorizing Payment of Prepetition Claims of Trade Creditors in the Ordinary Course of Business

FINAL HEARING re Motion Filed by the Debtors (A) Authorizing, but not Directing, the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Continued Investment of Excess Funds in Investment Accounts and (D) Authorizing Continued Intercompany Arrangements and Historical Practices

FINAL HEARING re Motion Filed by the Debtors (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Adequate Protection Parties

HEARING re Motion Filed by the Debtors for an Order Granting Adequate Protection to Second Lien Secured Parties

HEARING re Motion Filed by the Debtors for an Order Granting Adequate Protection to Third Lien Secured Parties

FINAL HEARING re Motion Filed by the Debtors for Authorizing Debtors to Enter into DIP Surety Bond Program

FINAL HEARING re Motion Filed by the Debtors for an Order Establishing Notification and Hearing Procedures for Transfers of Common Stock

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Kirkland & Ellis LLP as Attorneys for the Debtors and Debtors In Possession Effective Nunc Pro Tunc to the Petition Date

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Lazard Freres & Co. LLC as Financial Advisor & Investment Banker to the Debtors

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Togut, Segal & Segal, LLP as Bankruptcy Counsel to the Debtors, Nunc Pro Tunc to the Petition Date

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of AlixPartners, LLP as Their Restructuring Advisor Nunc Pro Tunc to the Petition Date

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Curtis, Mallet-Prevost, Colt & Mosle LLP as Conflicts Counsel for the Debtors Nunc Pro Tunc to the Petition Date

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Davis Wright Tremaine LLP as Special Regulatory Counsel to the Debtors

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Friend, Hudak & Harris, LLP as Special Telecommunications Counsel to the Debtors

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Duff & Phelps, LLC as Valuation Consultants for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date

HEARING re Motion Filed by the Debtors for an Order Authorizing the Employment and Retention of Financial Balloting Group LLC as Voting and Subscription Agent to the Debtors

HEARING re Motion Filed by the Debtors for an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals

HEARING re Motion Filed by the Debtors for an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business

HEARING re Motion Filed by the Debtors for an Order Determining Adequate Assurance and Payment for Future Utility Services

FINAL HEARING re Motion Filed by the Debtors to Authorize, but Not Direct, the Debtors to (A) Pay Certain Prepetition Compensation and Reimbursable Employee Expenses, (B) Pay and Honor Employee Medical and Other Benefits and (C) Continue Employee Wages and Benefits Programs

HEARING re Motion Filed by the Debtors for an Order Authorizing, but Not Directing, the Debtors to Pay Prepetition Claims of Shippers, Warehousemen and Miscellaneous Lien Claimants

FINAL HEARING re Motion Filed by the Debtors Authorizing, but Not Directing, Debtors to (A) Maintain Prepetition Insurance Policies, (B) Enter into New Insurance Policies, (C) Maintain Premium Financing Agreement and (D) Enter into New Premium Financing Agreements

FINAL HEARING re Motion Filed by the Debtors (A) Authorizing, but Not Directing, the Debtors to Remit and Pay Certain Taxes and Fees and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests

HEARING re Motion Filed by the Debtors for an Order (I) Authorizing and Approving Expedited Procedures for the Rejection of Executory Contracts and Unexpired Leases of Personal and Non-Residential Real Property and (II) Authorizing the Debtors to Reject Certain Unexpired Leases of Non-Residential Real Property

HEARING re Motion Filed by the Debtors for an Order Approving Procedures for the Sale, Transfer or Abandonment of De Minimis Assets

Transcribed By: Clara Rubin

A P P E A R A N C E S :

KIRKLAND & ELLIS LLP

Attorneys for Debtors

Citigroup Center

153 East 53rd Street

New York, NY 10022

BY: STEPHEN E. HESSLER, ESQ.

RICHARD M. CIERI, ESQ.

KIRKLAND & ELLIS LLP

Attorneys for Debtors

200 East Randolph Drive

Chicago, IL 60601

BY: RAY C. SCHROCK, ESQ.

TOGUT, SEGAL & SEGAL LLP

Attorneys for Affiliated Debtor, Charter Investment, Inc.

One Penn Plaza

New York, NY 10119

BY: ALBERT TOGUT, ESQ.

BROWN RUDNICK LLP
Seven Times Square
New York, NY 10036

BY: DANIEL J. SAVAL, ESQ.

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
Conflicts Counsel
101 Park Avenue
New York, NY 10178

BY: LYNN P. HARRISON 3RD, ESQ.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for First Lien Lender Group
1177 Avenue of the Americas
New York, NY 10036

BY: GEORGE Z. NOVOD, ESQ.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
Attorneys for the Crossover Committee
1285 Avenue of the Americas
New York, NY 10019

BY: DIANE MEYERS, ESQ.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Paul G. Allen
300 South Grand Avenue
Los Angeles, CA 90071

BY: KURT RAMLO, ESQ.

WHITE & CASE LLP
Attorneys for Law Debenture Trust Company of New York
1155 Avenue of the Americas
New York, NY 10036

BY: DWIGHT A. HEALY, ESQ.

U.S. DEPARTMENT OF JUSTICE

Office of the United States Trustee

33 Whitehall Street

21st Floor

New York, NY 10004

BY: BRIAN S. MASUMOTO, ESQ.

ARNALL GOLDEN GREGORY LLP

Attorneys for Creditor Verizon Communications Inc.

171 17th Street NW

Suite 2100

Atlanta, GA 30363

BY: FRANK N. WHITE, ESQ. (TELEPHONICALLY)

BABSON CAPITAL MANAGEMENT LLC

Interested Party

340 Madison Avenue

18th Floor

New York, NY 10017

BY: JOSEPH GALZERANO (TELEPHONICALLY)

GLENN TREW, IN PRO PER (TELEPHONICALLY)

        Representing Creditor Oak Hill Advisors


DENNIS PRIETO, IN PRO PER (TELEPHONICALLY)

        Interested Party

P R O C E E D I N G S

THE COURT: Please be seated. Good morning.

UNIDENTIFIED SPEAKER: Good morning, Your Honor.

MR. SCHROCK: Good morning, Your Honor. Ray Schrock and Steve Hessler, as well as my partner, Rick Cieri, on behalf of the debtors. Would you like to take appearances before we get started?

THE COURT: I don't think that's necessary. Let's just proceed.

MR. SCHROCK: Okay. Very good.

THE COURT: And if anybody is speaking, they can identify themselves for the record at that time.

MR. SCHROCK: Okay. Very good, Your Honor. Your Honor, I'm pleased to report that the company has made a nice transition into Chapter 11. Its operations appear to be stabilized, pending relief, obviously second-day relief -- that's some of the second-day relief we're seeking today -- and that everything appears to be going as planned. So the company is doing quite well today.

THE COURT: Good.

MR. SCHROCK: Your Honor, in terms of the order of matters, I'd just like to follow the agenda that we filed yesterday.

THE COURT: Okay.

MR. SCHROCK: I'm pleased to report that I believe

we've resolved all matters, save one issue that we have with the U.S. Trustee's Office just on the investment guidelines, and I'll be happy to address that in turn. And, accordingly, I'd like to move rather expeditiously, with Your Honor's permission, through the agenda.

THE COURT: That's fine.

MR. SCHROCK: Okay. Your Honor, the first matter on the agenda is the debtors' motion to pay its prepetition trade claims. This motion seeks authority to pay the debtors' prepetition trade claims. I'm pleased to report that we have resolved the lone objection to this relief sought in the motion with language in the proposed order, which I'll explain. It essentially holds in abeyance the issue of the effect on their company claims until -- in the context of client confirmation.

I'd just like to give you a brief explanation, and then I do have a proffer, if Your Honor would like one, from Greg Doody in support of the relief.

UNIDENTIFED SPEAKER (TELEPHONICALLY): I have a lot of trouble hearing it.

THE COURT: I'm just going to make a comment to whoever is currently speaking; you know who you are. It's audible in the courtroom. Please mute your phone.

MR. SCHROCK: Your Honor, this motion is very important to the debtors and their businesses. It's one of the critical aspects of our restructuring that the debtors maintain

their valuable trade relationships with their businesses as they embark upon this prearranged plan, which is primarily, in our view, a balance sheet restructuring. The claims affected by this motion run the gamut from service providers to providers of goods. Importantly, the debtors' unsecured creditors and secured creditors either support the relief directly or have not objected. And, in fact, CCO, which is the operating debtor, and its subsidiaries, senior secured lenders, even though they have a dispute with us on reinstatement, have agreed to consent to the use of cash collateral for this motion for this purpose.

Most or nearly all of these claims are either directly obligated by CCO and its subsidiaries, which are solvent, we believe, according to our valuation, by billions of dollars, or indirectly obligated through the management agreement that we attached to the motion. By paying these claims, one of the critical things that we think is important for the Court to consider is that we avoid the unnecessary cost of paying interest on these claims during the pendency of the case that we otherwise would think would be due. And at this time, I'd like to read a brief proffer from Greg Doody, our chief restructuring officer, into the record in support of the motion.

THE COURT: That's fine. Let me just ask you if there's any objection that anyone has to proceeding by means of

a proffer? I hear no objection, and you may proceed in that manner.

MR. SCHROCK: Thank you, Your Honor. Your Honor, if called to testify, Mr. Doody is present in the courtroom here today. Greg Doody is the chief restructuring officer and senior counsel at Charter. Mr. Doody would further testify regarding his background and experience, as he did in his declaration in support of the first-day pleadings, which is at docket number 2. We would also submit Mr. Doody's testimony in his first-day declaration to his testimony in support of this motion. Mr. Doody would testify that Charter is seeking authority to pay prepetition trade payables. These prepetition payables are debts incurred by Charter for goods and services to operate Charter's business in the normal course that are critical to the operation of Charter's businesses.

The authority to pay these trade payables is critical to Charter's restructuring efforts for several reasons. First, paying the debtors' trade payables is consistent with the debtors' obligation to maximize creditor recoveries by avoiding any destabilization of the debtors' businesses. The debtors have been able to maintain trade credit terms with nearly all of their vendors. Should this relief be denied, the debtors would likely experience a severe contraction in trade credit that would affect cash flows not only during these cases but after emergence. Moreover, the debtors could receive negative

publicity for failing to pay such trade payables in a timely fashion that could also negatively impact the businesses.

Second, these payments are due from CCO or its subsidiaries in nearly all instances. CCO and its subsidiaries, as evidenced by the debtors' valuation attached as Exhibit D to its disclosure statement, are solvent by billions of dollars. Those companies are either obligated, directly or indirectly, through the management agreement to make the payments sought for approval. CCO, its subsidiaries and the creditors in these cases wish to avoid the payment of interest on these claims, which would only reduce recoveries.

Third, the secured and unsecured creditors of the debtors either support the relief sought or have no objection. Even our banks with whom we have an issue on reinstatement support the relief. The relief in continuation of the debtors' normal-course operations are critical to the debtors' plan and going-concern strategy.

Fourth, the debtors have agreed to defer the issue of the effect on intercompany balances to the confirmation hearing. This avoids any potential harm to creditors by paying these claims early in the cases and disrupting arguments as to the best interests of creditors or other confirmation issues.

For all of these reasons, the debtors have determined, in their sound business judgment, among others, that the payments would either preserve or enhance the value of the

debtors' estates. This would be the sum and substance of Mr. Doody's testimony.

THE COURT: All right. Is there anyone who wishes to cross-examine with respect to the substance of the proffer? I hear no one interested in doing that, and I accept the proffer in support of the relief requested.

MR. SCHROCK: Okay. Your Honor, I don't have anything else. We'd ask for the Court's approval of the motion.

THE COURT: I approve it.

MR. SCHROCK: Thank you, Your Honor. Your Honor, the next motion is the debtors' cash management motion. The relief sought is routine, and I'll just cut to the chase and just address the U.S. Trustee's objection. I think the trustee has two objections to the debtors' relief, and they deal with investment funds that the debtors currently hold outside of our prepetition lender bank group. Specifically, there's about 350 million dollars held by Fidelity and State Street that are held in money market accounts. These are accounts designed to hold principal at a dollar. They are very safe investments. These funds are obviously very critical to the debtors' operations and plan and ongoing strategy. And it's also critical, we think, and important to the debtors that we keep these funds outside of the current lender group. We realize we have an arrangement on cash collateral, but, you know, frankly, the debtors feel more comfortable keeping these funds where they

are.

Now, the U.S. Trustee has objected to -- you know,
that it's not an authorized depository. But with all due
respect to the U.S. Trustee's Office, there's a list of banks
that would include a number of smaller institutions: Bank of
Puerto Rico, a number of banks where the debtors would not
traditionally prefer to hold funds. And there's many of the
banks that are in the debtors' prepetition lender group. And
the debtors, frankly, would prefer to keep the funds where they
are and in safe investments.

The debtors submit that they can meet the cause
standard for relief from 345(b) and that relief has been
routinely granted by this court and other courts within the
district, including, I believe, in the Sirva cases, Musicland,
any number of cases where we've gotten relief from 345(b) in
other instances. In fact, there's weighing in favor of cause
the sophistication of the debtors' businesses -- obviously, we
rely on our first-day affidavit for that factor -- the size of
the debtors' business operations, the bank ratings. These
funds are held in money market accounts, which are rated A1 by
Moody's. In fact, a great majority of the funds are through
the money market account already invested in treasuries.

As to the amount of money that's at issue, if we were
to put these funds in treasuries, I think the return, which is
at historic lows, is about .08 percent annually, whereas in the

money market funds, we're at -- we're at least up to a quarter percent. It rounds out to about a million --

THE COURT: That's pretty pathetic.

MR. SCHROCK: It is pretty pathetic. I agree, Judge. But it is a million dollars; it's real money to the estate. And we think that the debtors are in the best position to judge where this is, especially with the sophisticated parties in these cases that are watching over our shoulder. We think this is a reasonable request, and it's consistent with precedent in this district. And, again, the U.S. Trustee's Office has consented to this relief in any number of instances. It must be the current environment, I'm presuming, why they're not consenting in this instance. But if it is necessary, Judge, I do have a proffer from Greg Doody in support of the cause standard, but I think at this point I'll just let the U.S. Trustee speak.

THE COURT: Mr. Masumoto, let me hear from you.

MR. MASUMOTO: Good morning, Your Honor. Brian Masumoto for the Office of the United States Trustee. Your Honor, as indicated by counsel, I believe he has summarized our position accurately, although I would like to also point out that part of our objection includes not just merely where the funds are at the present time but the scope of the investment guidelines, which, I believe, as indicated in our papers, provides for the investment and corporate unsecured bonds that

had less than a ninety-day maturity. So some -- so their -- the potential for their investment in funds other than the current money market funds is built into the order, which, if approved by the Court, will give them that discretion to do down the road. And it may be into funds that have less than the current level of protection that currently exist.

THE COURT: But what's the real concern here? I mean, as counsel pointed out, there have been any number of other instances in which relief from the guidelines has been both permitted by the Court and ultimately accepted by your office. Why the hard-line position here?

MR. MASUMOTO: Part of the reason, Your Honor, is, as indicated by counsel, and as I believe everyone is aware, the current financial circumstances dictate a greater degree of caution on the part of the U.S. Trustee. From our standpoint, whatever standards that were applied for establishing cause should be reviewed in light of the current financial conditions of the financial institutions. I think the papers are replete with the circumstances in which many banks --

THE COURT: We're talking about the newspapers?

MR. MASUMOTO: Yes, Your Honor. I mean, the -- in the press, in newspapers and on the Internet, on the news, there are repeated reports of financial institutions that are suffering due to certain collaterali -- that the swaps, the credit default swaps, and other types of obligations which,

frankly, don't have to appear on the books; in fact, don't appear on the books until they have to be recognized. And these types of investments are certainly not entirely transparent, and it appears to be the source of a great deal of the uncertainty and insecurity on the part of the public as well as other financial institutions. And, accordingly, from our standpoint, we do ask that stricter guide -- that a stricter -- well, I -- Your Honor, I'm not saying a stricter standard. I believe that the cause standard is as exists, but I think we cannot turn a blind eye to the current financial situation.

For example, even with respect to the money market funds, unfortunately these money market funds do not appear to be part of the temporary Treasury guarantee. Counsel has indicated that these funds were deposited after September 18th, 2008. Had it been prior to that date, and if the respected money market funds had elected to participate in the guaranteed program, they would have been protected as if they were an FDIC-insured deposit account. Unfortunately, these do not qualify.

But, again, those options were available. There are -- there could -- they're certainly money market fund investments that might have been eligible. As I said, unfortunately, at this point, the debtor can't avail themselves of that protection since they deposited the funds after the

effective date of the temporary program. But, nevertheless, with respect to the FDIC-protected bank accounts, as Your Honor is aware, that amount has been elevated to 250,000 dollars. However, that increased protection is only temporary. That protection will expire, unless extended, on December -- at the end of December 31st, 2009.

So, again, the very nature of the current circumstances dictate caution with respect to these funds. Even the United States government has recognized the circumstances by increasing the protection on FDIC accounts. And so to the extent that the accounts here are not so protected that if the amounts in some of the -- I know we were focusing on the two largest accounts of 350,000 -- or 350 million dollars. However, if they have any smaller accounts that exceed the FDIC protection, we would ask that they be moved into accounts that are so protected.

Now, with respect to those banks, again, the list of authorized depositories is not a fixed list, and it is a simple matter for any bank, wherever located, to apply for and to qualify as an authorized depository. The U.S. Trustee's Web site has the applicable forms, and they're easily accessible by any bank or debtor to apply for status as an authorized depository. The mere designation of authorized depository simply indicates that these banks will participate in the program and the policy of posting collateral to protect

bankruptcy estate funds, which means that the debtors' accounts will be thereby protected against any sort of bank defaults or insolvency.

So, again, accordingly, notwithstanding our -- the U.S. Trustee's failure to object or to pursue appeal in prior rulings where variations from the, well, 345 standard were approved by the Court, I think, again, the current environment has created a situation that is entirely different from that which existed at the time that's mentioned in the earlier cases.

Again, there are cert -- there are a number of opportunities for the bank to protect these funds, and we do ask the Court to make every effort to require the company to do so. Particularly, as I said, the current guidelines will not only ask that the Court allow the funds to remain in the money market but allow them the discretion to invest in other types of funds which may, in fact, be even less secure.

I would note, as indicated in our papers, we did anticipate -- or we had projected that the organizational meeting for the formation of the committee was scheduled for April 10th, 2009. That did take place --

UNIDENTIFIED SPEAKER (TELEPHONICALLY): (Sneezes).

MR. MASUMOTO: I'm sorry. That did take place, and my understanding --

THE COURT: That was somebody at a remote location

sneezing or coughing.

MR. MASUMOTO: Okay.

THE COURT: Once again, if you're on the phone, please mute your lines.

MR. MASUMOTO: I've been advised by counsel for the debtor that they currently -- they have been in communication with the committee -- with at least certain committee members who are apparently today interviewing counsel for the unsecured creditors' committee. So I don't know if there's anyone here on behalf of the committee today. Typically, as Your Honor knows, on the -- on interim orders we generally do have a preference for allowing the committee to weigh in. So I don't know what the position of the committee is or would be with respect to this order, but I do know that currently it appears they do not have yet counsel representing them.

So under the circumstances, again, we ask Your Honor, one, to certainly, at a minimum, eliminate the discretion to invest in these secured -- unsecured debts with maturity dates of less than ninety days. But we also ask the Court to require the debtor to move funds into accounts that are protected under Section 345(b).

THE COURT: All right. Thank you. Let me just -- before we hear from counsel for the debtor again, as a follow-up to your comment about the committee, is there anyone in court who either represents the committee or is a member of the

committee? Apparently not.

MR. SCHROCK: Your Honor, just a very brief response. First, Your Honor, you know, as to the newspaper articles, many of the banks that are in the headlines are, in fact, on the list of all the highest depositories for the U.S. Trustee. So I submit that, to our knowledge, Fidelity and State Street, where the funds are held, are not among those banks that have been talked about. And it's something the debtors and their unsecured creditors have been monitoring very carefully. I think that the unsecured creditors in this case were investing a lot of money under the plan and who have been very involved in the cases have provided their consent to the relief and support it. They signed off on all of these first-day motions, including with respect to this relief.

I'd also say that it's just not feasible to move this money around in 250,000 dollar increments to make sure it's insured. And, in fact, I just don't think that's the standard required under 345(b). Nor do I think that someone has to be an authorized depository under the U.S. Trustee guidelines to comply with 345(b). The debtors are a sophisticated business operation. These funds are extremely important to us. We have every incentive to make sure that they're protected, and we'd ask that our investment guidelines be approved.

THE COURT: Let me ask you a question about --

MR. SCHROCK: Sure.

THE COURT: -- this money in particular, the 350 million dollars at State Street and Fidelity. Is this money simply being parked or is it money which is used in the ordinary course of operations to fund payroll or to fund other operating accounts? What's the money doing, other than sitting there?

MR. SCHROCK: Your Honor, I believe that the money right now is simply sitting there, and we're using it as a backup for liquidity and also to make a simple return on our investment. But I think the company strategy here is to hold it in prime -- you know, very much liquid assets so if they were to need to use it, they could have access to the funds. But right now they are not. And I'll just confer with Mr. Doody, who nodded his head that that is, in fact, correct.

THE COURT: I saw him nod his head as well, and I confirm on the record that he nodded his head. Okay.

MR. SCHROCK: Your Honor, I don't have anything further. We'd ask that we be granted leave from 345(b).

THE COURT: Is there anyone else who has any position on this? And I'm particularly interested in knowing if the crossover committee has any issue one way or the other.

MS. MEYERS: Good morning, Your Honor. Diane Meyers of Paul, Weiss, Rifkind, Wharton & Garrison, on behalf of the crossover committee. And it's our posi -- we support the debtor in this motion. We defer to the debtor's business

judgment. In terms of its cash, we believe that it's probably more appropriate for the company, if the money is being parked in order to fund the plan or for other business purposes, that they be earning interest on the money. We also think that it is unrealistic, considering the magnitude of the funds, for all of these funds to be moved into accounts of 250,000 dollars merely to be insured by the FDIC. In the best of all worlds, we would love for the money to be insured by the FDIC. It seems highly impracticable under the circumstances.

THE COURT: All right. Thank you.

MS. MEYERS: Thank you.

THE COURT: Is there anyone else who wishes to be heard with respect to this issue? I'm going to overrule the U.S. Trustee objection and approve the final order relating to the cash management of the debtor. As to the money we're discussing, the 350 million dollars at State Street and at Fidelity, I think it would be highly desirable if that were completely and utterly secure. That's true of all funds for all of us, not just in Chapter 11 cases. Regrettably, given the current state of the global financial system, some risk, even in institutions that appear externally to be relatively risk-free, is an element of life in 2009.

I'm mindful of the policy of the U.S. Trustee's Office, and I'm grateful that the U.S. Trustee, in cases large and small, steps forward to protect the interests of estate

property. And this is an example of that policing of Chapter 11 cases. Whether or not funds are insured and whether or not they're in an authorized depository does not necessarily protect parties-in-interest from risk. I'm mindful of other cases pending in the Southern District Bankruptcy Court where monies were thought to be secure in attorney escrow accounts and, in fact, were not secure.

I mention that only by way of example to point out that sources of assurance that we all accepted as true in the recent past are not necessarily true and abiding today. The nineteen largest institutions in the United States are to be exposed with stress tests within the next day or two. My understanding is that certain information relating to those stress tests will become public. We live in an age when financial risk is regrettably an aspect of our daily lives.

The circumstances of this bankruptcy case are somewhat unusual, not just because it seems even now to be a single-issue case but because it's also an extraordinarily large case involving a very successful and well-managed business. This is not a situation in which unsecured creditors are exposed to any appreciable risk. In fact, I just approved the motion of the debtors for an order authorizing the payment of prepetition claims. Accordingly, this is not a situation in which unsecured creditors are at any risk that's appreciable if they're not going to receive full payment of their claims.

Additionally, the fact that the crossover committee, through counsel, has supported this relief, and the crossover committee represents, as was pointed out on day one, the fulcrum interest in this bankruptcy, they are in fact performing a function comparable to what a creditors' committee would be performing if a creditors' committee had retained sophisticated counsel. I view their support for this relief as significant. But even if they said nothing, I would be inclined, given the representation confirmed by Mr. Doody's nod of the head, that this money is simply being parked to earn interest as a standby liquidity facility as reason enough to defer to the debtors' business judgment.

For these reason, I both praise the U.S. Trustee's Office for their diligence but overrule their objection.

MR. SCHROCK: Thank you, Your Honor. Your Honor, the next matter on the agenda is the debtors' motion for a final order on the use of cash collateral. I am pleased to report that we have modified the order with the agreement of first lien lenders to not have a lien on proceeds of avoidance actions for use of cash collateral. There were no objections, and we'd ask that the order be approved.

THE COURT: It's approved.

MR. SCHROCK: Okay. Your Honor, the next motion is the debtors' motion to provide adequate protection to our second lien lenders, a very standard package of default

interest and replacement liens on the existing collateral package. We ask that it be approved.

THE COURT: It's approved.

MR. SCHROCK: All right. Your Honor, likewise, next motion is the debtors' motion to provide adequate protection to CCOH third lien lenders, substantially same as the adequate protection package provided to the seconds. Again, there are no objections. We ask that it be approved.

THE COURT: That motion is approved as well.

MR. SCHROCK: Thank you, Your Honor. Your Honor, the next motion is the debtors' motion for a final order to approve the surety bond facility. This motion seeks authority to use the full amount of the facility up to 150 million. It does include a roll-up of the prior facility, but, again, CCO is an obligor, the solvent debtor on that facility. We have no objections. We ask that it be approved.

THE COURT: Approved.

MR. SCHROCK: Okay. Your Honor, the next motion is the debtors' NOL preservation motion. We did serve out the interim order as required under the interim order, and we have no objections received. We ask that it be approved.

THE COURT: It's approved.

MR. SCHROCK: Your Honor, the next motion is the debtors' application to retain Kirkland & Ellis as debtors' counsel. There were no objections filed, but there was a

statement filed by Law Debenture Company, which is the indentured trustee to the CCI -- the ultimate parent notes, and I'd like to address that statement briefly. Your Honor, I will take the high road on responding to the statement, but we honestly --

THE COURT: You're almost suggesting that you could choose not to take the high road.

(Laughter)

MR. SCHROCK: I would not, Your Honor. The primary point of emphasis, I believe, in the statement was to emphasize that there could be an issue here with intercompany claims in the case. Our response to that is this case, like any complex case, has intercompany claims. I would note that the debtors' plan that's on file treats as unimpaired intercompany claims in the case. We don't think that there's a dispute here on intercompany claims. It's going to be a factual matter as to what those intercompany claims are, and then people will be paid accordingly.

The most of the Law Debenture's missive at the end of the motion, I believe, you know, we take for what it is, which is direct and indirect statements that they are unhappy with their treatment under the plan. We see that for what it is. We don't -- I don't feel the need to respond to each and every individual allegation. I will simply say that we disagree with those statements.

I'll end by stating that if intercompany claims ever did become an issue, Your Honor, we would deal with it, as we are required to do by our ethical obligations, as with the debtors' directors and officers. And we are very aware and cognizant and will abide by our fiduciary duties in these cases.

THE COURT: Is there anyone from White & Case who wishes to make a comment, or are you simply relying on the eight-page document that was filed in reference to the Kirkland & Ellis application?

MR. HEALY: Your Honor, Dwight Healy. I don't propose to elaborate on the statement. The purpose of the statement was to highlight for the Court and to record the fact that, although we have no objection to the retention of Kirkland & Ellis, we do think that there may come a point when there are potential issues that require focused consideration by Kirkland and/or the Court about the relationship and dealings between the debtor in the case. And I feel like I have nothing further to add on that.

THE COURT: All right. I treat the statement as, in effect, a warning shot and a reservation of rights and not truly an objection to the retention of Kirkland & Ellis as attorneys for the debtors. Does the U.S. Trustee have any comment?

MR. MASUMOTO: No, we do not, Your Honor.

THE COURT: The application authorizing the employment of Kirkland & Ellis is approved.

MR. SCHROCK: Thank you, Your Honor. Your Honor, the next application is the debtors' application to retain Lazard Freres as our investment bankers/financial advisors. Your Honor, very briefly, the terms provides for a monthly fee as well as a restructuring fee of sixteen million. I did want to note for the Court eight million -- under the terms of the engagement letter, eight million was paid before the cases were filed and in accordance with the engagement letter's terms, given that we've received acceptances on the plan. The remaining success fee is to be paid upon consummation of a plan of reorganization. There are no objections.

THE COURT: The engagement is approved.

MR. SCHROCK: Thank you, Your Honor. At this point I'm going to cede the podium to my partner, Steve Hessler.

MR. HESSLER: Good morning, Your Honor. Steve Hessler of Kirkland & Ellis on behalf of the debtors.

THE COURT: Good morning.

MR. HESSLER: The next seven items are all within section B of the agenda, and they're all additional retention applications. For efficiency's sake, I'll go ahead and list them upfront, and then we can talk about each of them individually as the Court desires. Item B3 is the application to retain Togut, Segal & Segal as counsel to the Debtor Charter

Investment, Inc. B4 is the retention of AlixPartners as the debtors' restructuring advisors. B5 is the retention of Curtis, Mallet-Prevost as the debtors' conflicts counsel. B6 is the retention of Davis Wright Tremaine as the debtors' special regulatory counsel for cable issues. B7 is the retention of Friend, Hudak & Harris as the debtors' special regulatory counsel for telephone issues. B8 is the retention of Duff & Phelps as the debtors' valuation consultant. And B9 is the retention of the Financial Balloting Group as the debtors' voting and subscription agent.

Your Honor, we have had extensive discussions both pre and postpetition with the U.S. Trustee's Office about these applications to clarify a number of issues. And per the U.S. Trustee's request, we have made a number of changes to both the applications and the orders. Various professionals also have filed supplemental declarations with the Court to account for updated conflicts checks and to clarify other disclosures requested by the trustee.

Lastly, Your Honor, the Trustee's Office did ask us to state on the record this morning that all professionals will advise the trustee and any statutory committees of any hourly rate increases that may come up before any such increase takes effect, and the various professionals have all agreed to do so, Your Honor.

THE COURT: What happens if an hourly rate is

decreased? Does anything happen then?

MR. HESSLER: We're happy to inform the --

THE COURT: Or --

MR. HESSLER: -- relevant parties as well.

THE COURT: -- or that happens never happens?

MR. HESSLER: Your Honor, the debtors believe there are no outstanding issues to any of these applications and would ask that the respective orders be entered.

THE COURT: Is there anyone who has anything to say with respect to any of the particular applications that have just been identified? It seems to be correct that these are in all respects without controversy, and I approve them all.

MR. HESSLER: Thank you, Your Honor. Your Honor, the next item is B10 on the agenda, which is the debtors' motion to establish procedures for interim compensation and reimbursement of expenses of retained professionals. The debtors assert the proposed procedures are consistent with Section 331, and these procedures are routinely employed in similar cases in this district. No objections were filed to this motion, Your Honor, and we would request that the proposed order be entered.

THE COURT: It's approved, and I will enter the order.

MR. HESSLER: Your Honor, the next item is B11 on the agenda, which is the debtors' motion for authority to employ ordinary-course professionals. Your Honor, the proposed OCPs provide services on a variety of specialized matters unrelated

to the Chapter 11 cases. Here as well, the proposed procedures are consistent with those commonly employed in this district. No objections were filed to this motion, and we would request that the order be entered, Your Honor.

THE COURT: This is approved as well.

MR. HESSLER: Your Honor, turning to the operational motions on the agenda, the next item is C1, the debtors' utilities motion, for which the debtors today are seeking entry of an interim order. Your Honor, the debtors have approximately 30,000 accounts with 1,500 utility providers and spend approximately 10 million dollars each month on utility costs. To provide adequate assurance of payment for postpetition services, the debtors propose to deposit approximately five million dollars, which is the aggregated -- excuse me, the estimated aggregate cost of two weeks' utility service, into a newly created, segregated, interest-bearing account.

Your Honor, under the proposed procedures, any utility provider that seeks additional adequate assurance may request such assurance pursuant to the procedures set forth in the motion. Two responses were filed to our utility motion. The first was a limited objection of Alabama Power Company, and the second was a request for adequate assurance by ANN Electric Cooperative. By consent of the parties, Your Honor, both responses are being adjourned to the next omnibus hearing and

with the expectation that all issues will be resolved before then.

I would note, Your Honor, that my colleagues from Curtis Mallet has a statement for the record.

THE COURT: Mr. Harrison? Good morning.

MR. HARRISON: Good morning, Your Honor. If it pleases the Court, Lynn Harrison of Curtis, Mallet-Prevost, Colt & Mosle, conflicts counsel on behalf of the debtors in these proceedings, Your Honor. For the record, we have been in negotiations with Verizon Communications Inc., which is a provider of various services, including interconnection services for the debtors, Your Honor. We hope to submit a stipulation addressing the assurances issue for Verizon without prejudice to the parties' rights as to any matter regarding the instant motion, including whether or not Verizon is a utility under Section 366. So, for all purposes, Your Honor, we're adjourning this application with respect to Verizon. And I believe counsel, Mr. Frank White, on behalf of Verizon is appearing by phone today, and I believe he's going to consent to the statements that I'm making on the record.

THE COURT: Mr. White, that's your cue to say that you consent, if you're on the phone.

MR. WHITE: Your Honor, Frank White for Verizon. And, indeed, I do consent to the adjournment. Thank you.

THE COURT: Fine.

MR. HARRISON: Thank you very much, Your Honor.

THE COURT: That worked, Mr. Harrison.

MR. HARRISON: Thank you.

MR. HESSLER: Your Honor, the debtors request that the interim order be entered.

THE COURT: I'll enter it.

MR. HESSLER: The next item, Your Honor, is C2 on the agenda, the debtors' wages motion. The majority of the relief sought in the proposed final order was already granted on an interim basis at the debtors' first-day hearing. Your Honor, one item to put on the record, we did learn from the company last night that our motion inadvertently omitted certain compensation to be paid to directors of the debtor. The motion does presently explain at paragraph 23 that each of the directors receives a retainer at the beginning of each quarter as well as payments for each in-person and telephonic board or committee meeting. The motion should have included that there are four board committees and the chairpersons of each committee also receive a quarterly retainer in amounts varying from 2,500 dollars for the compensation of benefits committee and the corporate governance committee, 5,000 dollars for the chairperson of the executive committee, and 6,250 dollars for the chairperson of the audit committee. The total amount of the committee chair retainers is 16,250 dollars per quarter, Your Honor. Rather than incur the expense of drafting and

filing an additional motion solely on this point, the debtors would propose to place this issue on the record and seek authority to include these payments under the general terms of the proposed final order. Otherwise, Your Honor, notably no objection was filed to the final order, and the debtors would request that the proposed order be entered.

THE COURT: Let me inquire if there is anyone present who objects to curing this oversight by means of including the authority to pay these directors' fees within the general provisions of the relief sought. I hear no objection to this. I'll note, however, that in terms of my own comfort level, even though the amounts are, in relative terms, modest, and I would prefer to avoid imposing any additional administrative burdens on the estate, I think it would be appropriate to do this by notice of proposed order as opposed to simply treating silence as consent to something that was never actually noticed. For that reason, I'm going to grant you the relief, but as it relates to these particular incremental directors' fees to individuals who, I assume, even in the current economic climate, will not be harmed by having to wait a few extra days, I suggest that that aspect of the relief be the subject of a separate notice of presentment.

MR. HESSLER: We will do so, Your Honor.

THE COURT: Fine.

MR. HESSLER: Your Honor, the next item is C3 on the

agenda, the debtors' shippers and lien claimants motion. The substantive relief sought in the proposed final order was already granted on an interim basis at the debtors' first-day hearing. On a final basis, the debtors are seeking authority to pay up to the remaining 400,000 dollars in accrued but unpaid shipping charges and up to 900,000 dollars in accrued but unpaid lien claimant claims that the debtors expect to come due after this hearing. These amounts are in addition to the amounts already authorized to be paid to shippers and lien claimants under the interim order, Your Honor. No objection was filed to the final order, and the debtors would request that the proposed order be entered.

THE COURT: I'll enter it.

MR. HESSLER: Your Honor, the next item is C4 on the agenda, the debtors' insurance motion. Here as well, the substantive relief in the proposed final order was already granted on an interim basis at the debtors' first-day hearing. On a final basis, the debtors seek authority to pay prepetition obligations for various insurance policy-related costs that the debtors estimate will not exceed an aggregate amount of 4.3 million dollars. No objection was filed to the final order, Your Honor, and we would ask that the Court enter the proposed order.

THE COURT: I will enter that proposed order as well.

MR. HESSLER: Your Honor, the next item is C5 on the

agenda, the debtors' taxes motion, through which the debtors seek to continue to collect and pay applicable taxes and fees. The taxes motion was already approved on an interim basis. No objection was filed to the final order, Your Honor, and the debtors request that the proposed order be entered.

THE COURT: I approve it on a final basis and will enter the order.

MR. HESSLER: Your Honor, the next motion is C6 on the agenda, which requests two items of rejection-related relief. First, the debtors seek approval of expedited procedures for rejecting executory contracts and unexpired leases of personal and nonresidential real property. The debtors assert the proposed procedures are fair, efficient and consistent with rejection procedures commonly approved in this district. Second, Your Honor, the debtors seek to reject five unexpired leases, and the requisite details for all five leases are set forth in our motion.

Your Honor, a single response to our motion was untimely filed yesterday, the day after the objection deadline.

THE COURT: It's really a cure objection.

MR. HESSLER: Exactly. I was just going to note, Your Honor, that the response itself notes that this is a claims reconciliation issue and should not be a bar to the relief sought in the order before the Court today, which we would request the Court enter.

THE COURT: I'll enter it.

MR. HESSLER: Your Honor, the final item on today's agenda is C7, the debtors' motion for approval of procedures for the sale or abandonment of de minimis assets. The debtors do not presently know whether these procedures will be utilized but do feel it's prudent to put these in place as the debtors consider their options for disposing of unwanted or obsolete assets. No objection was filed to the order. The debtors request that the order be entered.

THE COURT: I approve it, and I'll enter the order.

MR. HESSLER: Thank you, Your Honor. Thank you, Your Honor.

THE COURT: Thank you.

MR. SCHROCK: Your Honor, Ray Schrock of Kirkland & Ellis on behalf of the debtors. Just one clarifying comment on the insurance motion, the debtors also did seek relief to pay amounts relating to the insurance policy, which in certain instances, for instance, we could have an automobile deductible or payments that arose prepetition related to payouts on an insurance policy that the debtors also sought relief to pay. So it wouldn't be included in that 4.3 million. And I just wished to correct that for the record and note that for Your Honor.

THE COURT: Thank you for the clarification.

MR. SCHROCK: Thank you.

THE COURT: Is there anything more for today?

MR. SCHROCK: Nothing, Your Honor.

THE COURT: Then we're adjourned.

MR. SCHROCK: Thank you.

THE COURT: Thank you.

IN UNISON: Thank you, Your Honor.

(Proceedings concluded at 10:32 AM)

# I N D E X

## R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for order authorizing payment of prepetition claims of trade creditors approved | 17 | 9 |
| Debtors' motion for final order re: debtors' cash management system approved | 27 | 14 |
| Debtors' motion for final order on use of cash collateral approved | 29 | 22 |
| Debtors' motion for order granting adequate protection to second lien secured parties approved | 30 | 3 |
| Debtors' motion for order granting adequate protection to third lien secured parties approved | 30 | 9 |
| Debtors' motion for final order authorizing debtors to enter into DIP surety bond program approved | 30 | 17 |
| Debtors' motion for final order establishing notification and hearing procedures for transfers of common stock approved | 30 | 22 |

| DESCRIPTION | PAGE | LINE |
| --- | --- | --- |
| Debtors' motion for order authorizing employment and retention of Kirkland & Ellis as attorneys for debtors and debtors-in-possession approved | 33 | 2 |
| Debtors' motion for order authorizing employment and retention of Lazard Freres as financial advisor and investment banker approved | 33 | 14 |
| Debtors' motion for order authorizing employment and retention of Togut, Segal & Segal as bankruptcy counsel approved | 35 | 12 |
| Debtors' motion for order authorizing employment and retention of AlixPartners as restructuring advisor approved | 35 | 12 |
| Debtors' motion for order authorizing employment and retention of Curtis, Mallet-Prevost, Colt & Mosle as conflicts counsel approved | 35 | 12 |
| Debtors' motion for order authorizing employment and retention of Davis Wright Tremaine as special regulatory counsel approved | 35 | 12 |

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for order authorizing employment and retention of Friend, Hudak & Harris as special telecommunications counsel approved | 35 | 12 |
| Debtors' motion for order authorizing employment and retention of Duff & Phelps as valuation consultants approved | 35 | 12 |
| Debtors' motion for order authorizing employment and retention of Financial Balloting Group as voting and subscription agent approved | 35 | 12 |
| Debtors' motion for order establishing procedures for interim compensation and reimbursement of expenses for professionals approved | 35 | 21 |
| Debtors' motion for order authorizing retention and compensation of certain ordinary-course professionals approved | 36 | 5 |
| Debtors' motion for interim order determining adequate assurance and payment for future utility services approved | 38 | 6 |
| Debtors' motion for final order on wages motion approved | 39 | 17 |

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for final order authorizing, but not directing, debtors to pay prepetition claims of shippers and lien claimants approved | 40 | 13 |
| Debtors' motion for final order authorizing, but not directing, debtors to pay prepetition obligations for various insurance policy-related costs approved | 40 | 24 |
| Debtors motion for final order authorizing, but not directing, debtors to continue to collect and pay applicable taxes and fees approved | 41 | 6 |
| Debtors' motion on two items of rejection-related relief approved | 42 | 1 |
| Debtors' motion for order approving procedures for sale, transfer or abandonment of de minimis assets | 42 | 10 |

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true and accurate record of the proceedings.

Clara Rubin Digitally signed by Clara Rubin
DN: cn=Clara Rubin, c=US
Reason: I am the author of this document
Date: 2009.04.16 16:47:34 -04'00'

CLARA RUBIN

Veritext LLC
200 Old Country Road
Suite 580
Mineola, NY 11501

Date: April 16, 2009