**BROWN RUDNICK LLP**
Edward S. Weisfelner (EW-5581)
David J. Molton (DM-1106)
May Orenstein (MO-2948)
Daniel J. Saval (DS-2437)
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

-and-

Andrew P. Strehle (AS-1770)
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200

*Counsel to Wells Fargo Bank, N.A.,*
*solely in its capacities as successor*
*Administrative Agent and Collateral Agent*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT COURT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | ) |
| et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**OBJECTION OF WELLS FARGO BANK, N.A., AS SUCCESSOR ADMINISRATIVE AGENT AND COLLATERAL AGENT, TO DEBTORS' DISCLOSURE STATEMENT PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE WITH RESPECT TO THE DEBTORS' JOINT PLAN OF REORGANIZATION**

Wells Fargo Bank, N.A., in its capacities as successor Administrative Agent and successor Collateral Agent (collectively, the "Third Lien Agent") for the third lien pre-petition secured lenders to CCO Holdings, LLC (the "Third Lien Lenders" and, together with the Third Lien Agent, the "Third Lien Secured Parties"), by and through its undersigned counsel, hereby

submits this Objection to the Debtors' Disclosure Statement pursuant to Chapter 11 of the Bankruptcy Code [Docket No. 38] (the "<u>Disclosure Statement</u>") with Respect to the Debtors' Joint Plan of Reorganization [Docket No. 37] (the "<u>Plan</u>"). In support of this Objection, the Third Lien Agent respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

1. The centerpiece (and lynchpin) of the Plan is the Debtors' proposal to reinstate approximately $11.8 billion in senior debt – including the debt under the Third Lien Credit Agreement.[1] Notably, the Debtors acknowledge that, if that debt cannot be reinstated, the Debtors' annual interest expenses will increase by more than $500 million – as the senior debt will need to be repriced to market levels. <u>See</u> *Debtors' Memorandum on Reinstatement in Support of Approval of Disclosure Statement*, dated March 27, 2009 [Docket No. 3], at 2. Indeed, the Debtors candidly concede that if they are unable to reinstate debt in the manner they envision, the Plan will be unfeasible. <u>See</u> <u>id.</u> Yet, the Disclosure Statement – while purporting to apprise creditors of the risks associated with the proposed Plan – fails to reveal a raft of obstacles to effecting the proposed reinstatement. Because the Disclosure Statement does not adequately apprise creditors of the risks and obstacles presented by the reinstatement scheme that is so central to the Plan, it should not be approved in its current form.

<u>**Change Of Control/Feasibility.**</u>

2. Of particular concern is the feasibility of the Plan. As set forth in greater detail below, each of the instruments governing the debt proposed to be reinstated has a "Change of

---

[1] As used herein, "Third Lien Credit Agreement" means that certain $350,000,000 Credit Agreement, dated as of March 6, 2007, by and among CCO Holdings, LLC, as Borrower, Bank of America, N.A., as original Administrative Agent, the Lenders that are party thereto (the "<u>Lenders</u>"), and the other parties thereto, as amended, supplemented and modified from time to time.

Control" provision triggered where a "person" or a group acting as a "person" (as that term is defined by Section 13(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act")) acquires more than 35% of the "voting power" of the Debtors (unless Paul Allen – the Debtors' present primary shareholder – has a greater percentage). And notwithstanding the insertion in Charter Communication, Inc.'s ("CCI") Amended and Restated Certificate of Incorporation of a self-styled "savings clause" that appears to be specifically designed to preclude any Change of Control, a Change of Control will nonetheless occur on or prior to the effective date of the Plan under the provisions of the Third Lien Credit Agreement and the other reinstated debt instruments, permitting (and thus effectively ensuring) the contractual acceleration of some $11.8 billion in senior debt on or shortly after the effective date of the Plan.

3. As the Court is aware, a committee (the "Crossover Committee") – holding a majority of the 11% Senior Secured Notes due 2015 issued by CCH I, LLC and CCH I Capital Corporation (the "CCH I Notes") and the 10.25% Senior Notes due 2010 and 2013 issued by CCH II, LLC and CCH II Capital Corp. (the "CCH II Notes") – negotiated the terms of the Plan with the Debtors prior to the filing. Under the Plan, as agreed to between the Debtors and the Crossover Committee, the holders of the CCH I Notes will receive substantially all of the new equity in the Debtors through (i) distribution of new common stock on account of their note claims, and (ii) participation in a rights offering (described in greater detail below) to acquire additional shares of such new common stock. Thus, the members of the Crossover Committee, through their holdings of CCH I Notes and their role as backstop parties to the rights offering, will collectively acquire a majority of the new common stock issued under the Plan.

4. The Plan provides that the new Board shall be comprised of eleven directors, and that each holder of 10% of the voting power of the reorganized Debtors shall have the right to

appoint one director.  As explained more fully below, the director appointment scheme set forth in the Plan reflects an arrangement among the members of the Crossover Committee to appoint a majority of the board.  By entering into this arrangement (among other collective activities described herein), the members of the Crossover Committee are collectively acting as a "group" within the meaning of the Exchange Act (and thus the Third Lien Credit Agreement), and the existence of this group will trigger a Change of Control on or prior to the effective date of the Plan under the terms of the Third Lien Credit Agreement (and under the debt instruments of the other purportedly "reinstated" debt holders).

**Cross-Defaults.**

5.      The Disclosure Statement likewise fails to alert creditors to other potential bars to reinstatement.  Notably, it fails to address the existence of potential defaults arising under certain cross-default provisions linked to other debt instruments.  Specifically, in its Complaint against Charter Communications Operating, LLC ("CCO") and CCO Holdings, LLC ("CCOH"), Adv. Pro. No. 09-00132 (the "Adversary Proceeding"), JPMorgan Chase Bank, N.A. ("JPMorgan"), as first lien agent, has alleged the occurrence of a default under the Credit Agreement governing the first lien loan facility (the "First Lien Credit Agreement") based on the inability of one or more parent entities of CCO to pay its debts when due.  If JPMorgan is successful in establishing the existence of such defaults (or any defaults under the First Lien Credit Agreement), this will also establish the existence of a cross-default under the Third Lien Credit Agreement (and other debt instruments) – by dint of the fact that the first lien debt cannot be reinstated and therefore remains accelerated.  Creditors voting on the Plan are not provided with *any* information with respect to this additional hurdle to reinstatement.

**Non-Debtor Third Party Releases And Injunction.**

6.    The Disclosure Statement similarly fails to alert creditors to the implications of broad, sweeping third party releases provided for under the Plan.  Under the terms of the Plan, all holders of claims – *including holders of debt to be reinstated* – are deemed to provide a full discharge and release to, among other parties, the Debtors' officers, directors, attorneys and advisors, for any cause of action arising through the effective date of the Plan, including any prepetition claims.  Yet despite this plain infringement on the legal and equitable rights of debt holders – rights which, under the Bankruptcy Code, must be left unaltered as a condition to reinstatement – the Disclosure Statement fails to inform creditors that the Plan releases may themselves be a bar to the debt reinstatement that is the *sine qua non* of the Plan.  And, putting aside the reinstatement hurdle, the Disclosure Statement fails to address how such broad and sweeping third party releases could pass muster under applicable Second Circuit law.

\*      \*      \*

7.    In short, while confirmation of the Plan is entirely predicated on the Debtors' ability to reinstate $11.8 billion of debt, the Disclosure Statement fails to even identify, much less provide adequate disclosure of, the legal challenges to which reinstatement of debt is subject.  Indeed, the only references to reinstatement issues to be found in the proposed Disclosure Statement are generic and obtuse risk disclosures that do not provide creditors with the information they need to make an informed decision as to whether to vote for or against the Plan.  What little information is provided is self-evidently insufficient to meet the "adequate disclosure" standard of Section 1125 of the Bankruptcy Code.  The Disclosure Statement should

not be approved.[2]

**BACKGROUND**

8.     On March 27, 2009, Charter Communications, Inc. and certain of its affiliates (collectively, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to manage and operate their businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. On the Petition Date, the Debtors also filed the Disclosure Statement and the Plan.

9.     The Plan is the product of extensive pre-petition negotiations among the Debtors, the Crossover Committee, and Paul Allen, currently the Debtors' majority shareholder. None of the lenders to be "reinstated" was invited to participate in these negotiations. Key features of the Plan include (i) the reinstatement of all funded debt issued by CCO and CCOH (including the debt under the Third Lien Credit Agreement); (ii) the exchange of existing CCH II Notes for new notes (with a higher interest rate); (iii) the exchange of all of the CCH I Notes for a new class of

---

[2]     Case law provides that, apart from information deficiencies, a disclosure statement may be denied where the plan is facially unconfirmable. See, e.g., In re Main St. AC, Inc., 234 B.R 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement . . . if the plan could not possibly be confirmed."); In re Filex, Inc., 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990) (holding that the court will not approve a disclosure statement for an admittedly unconfirmable plan); In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If the Court can determine from a reading of the plan that it does not comply with § 1129 of the Bankruptcy Code, then it is incumbent upon the Court to decline approval of the disclosure statement and prevent diminution of the estate."). Consistent with the foregoing authority, and based on the infirmities with the Plan discussed herein, the Third Lien Agent believes it has grounds to request that the Disclosure Statement not be approved because the Plan is facially unconfirmable. However, because the Court has indicated that issues relating to reinstatement will be decided at the confirmation trial to be scheduled for late July, the Third Lien Agent does not expressly seek denial of the Disclosure Statement on this ground. That being said, the Third Lien Agent will be prepared to directly address issues relating to confirmation of the Plan at the Disclosure Statement hearing.

common stock ("New Class A Stock") to be issued by reorganized CCI;[3] and (iv) a rights offering, further described below, of additional shares of New Class A Stock, to be "backstopped" by the members of the Crossover Committee.

10.     Under the Plan, holders of CCH I Notes can elect to participate in a $1.623 billion rights offering (the "Rights Offering") to acquire, in addition to the shares of New Class A Stock to be received by them in exchange for CCH I Notes, their *pro rata* share of an additional issuance of shares of New Class A Stock.  The rights associated with the Rights Offering are independently transferable through the expiration date of the Rights Offering.  See "Rights Offering Procedures" (Exh. 19 to *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 37]), at 5.[4]  Pursuant to Commitment Letters signed on or about February 11, 2009, members of the Crossover Committee have agreed to subscribe for their respective *pro rata* portions of the Rights Offering (the "Backstop Parties").  See Commitment Letters (Exh. 10 to *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 37]).  Moreover, certain of the Backstop Parties have agreed to subscribe *pro rata* for any rights that are not purchased by other holders of CCH I Notes.

11.     Under the Third Lien Credit Agreement, upon the occurrence of a "Change of Control," each Third Lien Lender has the right to require the Borrower to repay all or any part of

---

[3]     The Plan also provides for the issuance of New Class B Stock to be distributed to Paul Allen. New Class A Stock and New Class B Stock are collectively referred to herein as the "New Common Stock."

[4]     The Rights Offering commences on the later of (i) the date an approved Disclosure Statement is made publicly available, and (ii) 2 business days following the date on which participating holders must return their Investor Certificates, and the Rights Offering expires 20 business days after the commencement date.  See "Rights Offering Procedures" at 3.

its loans.  See Third Lien Credit Agreement § 6.16, at 56-57.[5]  A "Change of Control" is defined as the occurrence of, among other events, "the consummation of any transaction, including any merger or consolidation, the result of which is that any 'person' (as defined [in Section 13(d)(3) of the Exchange Act]) other than Paul. G. Allen and Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Borrower or a Parent . . . unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Borrower or such Parent, as the case may be . . . than such person").  See Third Lien Credit Agreement at 7.[6]  Each of the other debt instruments proposed to be reinstated has a virtually identical Change of Control provision.

12.     Under the Plan, Paul Allen will receive shares of New Class B Stock representing 35% of the combined voting power of the capital stock of reorganized CCI.  See Plan at Art. VI, ¶ C.[7]  Thus, were a "person" (or a group acting as a "person"), under the proposed Plan or otherwise, to acquire more than 35% of the Voting Stock of Charter Communications, Inc. (thus exceeding Mr. Allen's or a Related Party's share), a Change of Control would occur, effectively resulting in the likely acceleration of some $11.8 billion in senior debt on or shortly after the effective date of the Plan.

---

[5]     Provisions of the Third Lien Credit Agreement referenced herein are attached hereto as Exhibit A.

[6]     "Voting Stock" is defined in the Third Lien Credit Agreement as the "Capital Stock of [a] Person that is at the time entitled to vote in the election of the board of directors or comparable governing body of such Person," and "Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act.  See Third Lien Credit Agreement at 3, 28.

[7]     Although Paul Allen's New Class B Stock will represent 35% of the voting power of all New Common Stock, that stock will only constitute 2% of the equity value in reorganized CCI.  See Plan Art. VI, ¶ C.

13.     Since a "Change of Control" under the purportedly "reinstated" credit agreements would be the death knell of their proposed Plan, the Debtors, the Crossover Committee and Paul Allen – in an evident attempt to preclude the occurrence of such a Change of Control – have included a so-called "savings clause" in the Amended and Restated Certificate of Incorporation for CCI (the "COI") (attached as Exh. 3 to *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 37]).  The COI provides, in pertinent part, that:

> [T]he votes attributable to each share of Class A Common Stock held by any holder (other than an Authorized Class B Holder, as defined in Clause (b)(viii)(B) of this Article FOURTH) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder (other than an Authorized Class B Holder) included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) with such holder, so that no "person" or "group" (other than an Authorized Class B Holder) is or becomes the holder, directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation . . . .

COI ¶ 4(b)(i)(A)(1).  However, as discussed herein, the savings clause is ineffective to preclude the occurrence of a Change of Control under the terms of the proposed Plan.

14.     In addition, the Plan provides for broad, sweeping and non-consensual third-party releases:

> On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan.

<u>See</u> Plan, Article X, ¶ E; <u>see</u> <u>also</u> <u>id.</u>, ¶ F ("From and after the Effective Date, all Entities are

permanently enjoined from commencing and continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.").  The term "Debtor Releasees" is broadly defined to include each Debtor's "respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives."  See id., ¶ D.  Thus, under the Plan, all holders of claims – including debt to be reinstated – will involuntarily release all claims held against a myriad of non-Debtor third parties which "aris[e] from or [are] related in any way to the Debtors."

**ARGUMENT**

A.    **The Disclosure Statement Cannot Be Approved**
      **Because It Provides Inadequate Disclosure On**
      **Critical Issues That Prohibit Creditors From**
      **Evaluating The Plan And The Treatment Of Their Claims.**

15.    The purpose of a disclosure statement is to provide "adequate information" to parties in interest about the terms of a proposed plan, allowing for both an informed vote and knowledgeable participation in the confirmation process.  See 11 U.S.C. § 1125(a)(1); Kunica v. St. Jean Fin., Inc., 233 B.R. 46, 54 (S.D.N.Y. 1999).  The Debtors are obliged to engage in full and fair disclosure, and the Disclosure Statement must contain information adequate to allow a "hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan."  Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.), 25 F.3d 1132, 1136 (2d Cir. 1994).  Notably, to be approved, a proposed Disclosure Statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan.  See In re McLean Indus., Inc., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance

or rejection of a proposed plan"); In re Adana Mortg. Bankers, Inc., 14 B.R. 29, 31 (Bankr. N.D. Ga. 1981) (rejecting debtor's proposed disclosure statement which failed to provide relevant financial information and "did not provide any information relevant to the risks of the creditors under the terms and provisions of debtor's plan"); In re New Haven Radio, Inc., 18 B.R. 977, 979 (Bankr. D. Conn. 1982) (disclosure statement should "provide the 'hypothetical investor' with the kind of information to evaluate the risk of acceptance of the plan").

16.     As noted, the cornerstone of the Plan is the purported reinstatement of $11.8 billion of senior debt pursuant to Section 1124 of the Bankruptcy Code. By its terms, Section 1124 of the Bankruptcy Code requires that, to render a claim unimpaired, the plan must "not otherwise alter the legal, equitable or contractual rights to which such claim entitles the holder of such claim or interest." Subject to very limited exceptions not applicable here, Section 1124 further requires that if any defaults have occurred under the relevant debt instrument, such debt instruments can only be reinstated if those defaults are cured.

17.     There is no reference in the Disclosure Statement to the implications of the Change of Control, the cascade of cross-defaults possible under the relevant credit agreements, and the broad-sweeping third-party releases – all of which bear critically on the Debtors' ability to satisfy the requirements of Section 1124 so as to enable the reinstatement of Debtors' $11.8 billion in debt. With respect to reinstatement, the Disclosure Statement merely states:

> The Debtors will seek under the Plan to reinstate and render unimpaired certain classes of Claims based on notes and credit facilities pursuant to section 1124 of the Bankruptcy Code. The creditor banks and/or other interested parties are expected to challenge reinstatement and unimpairment. These parties are expected to contend, among other things, that the Debtors have purportedly defaulted on their obligations under the notes, indentures and credit facilities and, therefore, reinstatement and unimpairment is not permitted under section 1124. The Debtors maintain that no events of default have occurred that would

> prevent reinstatement and unimpairment. Because the Plan is contingent on reinstatement and unimpairment, failure to reinstate the credit facilities, indentures and certain notes would require the Debtors to revise or abandon the Plan. Moreover, if reinstatement and unimpairment does not occur and current capital market conditions persist, the Debtors may not be able to secure adequate new financing and the cost of any such new financing would likely be materially higher.

Disclosure Statement at 68. This cursory paragraph hardly provides information adequate to allow creditors to make an informed decision as to whether to vote to accept the Plan, rendering the Disclosure Statement objectionable.

   B.   **The Disclosure Statement Fails To Provide Adequate Disclosure Of The Risks Of A Change Of Control And The Feasibility Of The Plan In Light Thereof**

18.   A Change of Control occurs under the Third Lien Credit Agreement in the event that a "person" – a term assigned the meaning set forth in Section 13(d)(3) of the Exchange Act – becomes, as a result of the "consummation of any transaction," the direct or indirect beneficial owner of "more than 35% of the Voting Stock of the Borrower or a Parent . . . unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Borrower or such Parent, as the case may be . . . than such person." See Third Lien Credit Agreement § 1.1, at 7-8. If a "Change of Control" occurs under the Third Lien Credit Agreement, *each* Third Lien Lender has the right to require the Borrower to repay its third lien debt (within 30 days after a Change of Control notice is issued). See Third Lien Credit Agreement § 6.16, at 56-57. As noted above, each of the other debt instruments proposed to be reinstated has a virtually identical Change of Control provision.[8]

19.   The effectiveness of the Plan, the related exchange of all of the CCH I Notes

---

[8]     In the case of the First Lien Credit Agreement, a Change of Control triggers an Event of Default. In all other cases, the debt holders have a repayment right.

shares for New Class A Stock, and the issuance of additional New Class A Stock pursuant to the Rights Offering each constitute the "consummation" of a "transaction" fulfilling the transaction consummation requirement of the Change of Control provision. Based on the debt holdings reported in the Rule 2019 Statement filed by counsel to the Crossover Committee, the members of the Crossover Committee will become the Beneficial Owners of, in the aggregate, well in excess of 35% of the balance of the outstanding Voting Stock of CCI. See *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 33] (disclosing that members of Crossover Committee collectively hold $2.9 billion -- or approximately 73% -- of the CCH I Notes).[9] Section 13(d)(3) of the Exchange Act provides that "[w]hen two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person.'" Thus, a determination of whether a Change of Control will occur rests upon whether members of the Crossover Committee (representing 35% or more of the Voting Stock) will, upon becoming Beneficial Owners of the New Class A Stock, be acting as a "group" within the meaning of Section 13(d)(3) of the Exchange Act.

20. It is the position of the Third Lien Agent that, as further explained below, the mechanism under the Plan for constituting the eleven-member Board of Directors of reorganized CCI requires (and demonstrates) the existence of an arrangement among members of the Crossover Committee with respect to the constitution of the Board of reorganized CCI, and that such arrangement, in and of itself, establishes that the requisite percentage of member-participants are a "group" for purposes of the Third Lien Credit Agreement. Moreover, even

---

[9]     Through their backstop of the Rights Offering, the Crossover Committee members will likely beneficially own a percentage of New Class A Stock well in excess of their current percentage of CCH I Notes.

beyond the existence of the arrangement as to Board composition, the Third Lien Agent believes that the members of the Crossover Committee have acted as a "group" within the meaning of Section 13(d)(3) with respect to a range of activities, such as their formation of a self-appointed "Committee," retention of common counsel, and the execution of Restructuring Agreements and Commitment Letters with respect to the Plan and the Rights Offering. The Third Lien Agent believes that discovery in these proceedings will further reveal the scope of these and other group activities.[10]

21.    As noted, the Plan confers the unconditional right to appoint one director upon each shareholder with holdings of New Common Stock representing at least 10% of the voting power represented by all such shares, with Paul Allen entitled to appoint four of the eleven directors.  See Plan, Art. VI ¶ N  ("Each holder of 10% or more of the voting power of the [New Class A Stock] on the Effective Date shall have the right to appoint one member of the initial Board of Directors for each 10% of the voting power attributable to such holder's Class A Stock").  Upon information and belief, each of the 10%-plus shareholders is a member of the Crossover Committee, the result being that each member of the Crossover Committee will appoint at least one director.  Notably, in any election of directors held outside of Chapter 11 (whether by ballot at a meeting or written consent), *no 10% shareholder would have the voting power to unilaterally cause the election to the board of its nominee*.[11]  The Plan itself thus

_____

[10]    Although a Change of Control is demonstrated by the agreement, as set forth in the Plan provisions, for the constitution of the first post-effective date board, the Third Lien Agent reserves all rights with respect to the occurrence of a Change of Control based on other actions contemplated by the Plan or otherwise.

[11]    Under applicable Delaware law, were an election to be held at a meeting, each member of the board would be elected "by a plurality of the votes of the shares present[.]"  See Del. G.C.L. § 216(3); see also Del. G.C.L. § 216(4) (making § 216 applicable to class or series voting).  Thus, at a meeting held for the election of members of the Board of CCI, whichever shareholder(s) who (individually or as part of a coalition) controlled at least a plurality of all votes entitled to be cast

incorporates an agreement among the members of the Crossover Committee to exercise their voting power in concert to constitute a board of their choosing (including representation of minority holders owning as little as 10% of the Voting Stock).

22.     Moreover, the votes of the members of the Crossover Committee in favor of the Plan are a necessary precursor to achieving confirmation of the Plan (as such votes are necessary to cause the class of CCH I Noteholders and CCH II Noteholders to accept the Plan).   And, through Restructuring Agreements they signed on or about February 11, 2009, the members of the Crossover Committee bound themselves to support and vote for the Plan.   The Restructuring Agreements are themselves evidence of Crossover Committee members acting as a "group," as they are intended to facilitate confirmation of a Plan that in turn reflects their arrangement with respect to composition of the Board.

23.     The existence of such arrangements among beneficial owners of Voting Stock requires that they be deemed to constitute a "group" within the meaning of Section 13(d)(3) of the Exchange Act and the Third Lien Credit Agreement.   Section 13(d)(3) and case law thereunder provide that a group exists where there is an agreement to use voting power to effect a change in corporate control.   See Jacobs v. Pabst Brewing Co., 549 F. Supp. 1050, 1066  (D. Del. 1982); Bayly Corp. v. Marantette, No. 82-1354, 1982 U.S. Dist. LEXIS 15284, at *34

---

for the seven members of the Board to be elected by holders of New Class A Stock would have the power to elect the entire seven-member slate of their choosing.  Although Del. G.C.L. § 303 permits the board of a Chapter 11 debtor to be reconstituted without a shareholder vote or the solicitation of shareholder consents (as would otherwise be required under Delaware corporate law), that a formal election will not have taken place upon the effective date of the Plan does not alter the fact that the appointment of the controlling majority of a post-emergence Board is the product of an arrangement among the members of the Crossover Committee.  Therefore, although Del. G.C.L. § 303 exempts the Chapter 11 debtor from compliance with the formalities of elections and written consents to constitute its board, it does not alter that a Change of Control under the Third Lien Credit Agreement will have occurred prior to or upon the effectiveness of the Plan.

(S.D.N.Y. Oct. 19, 1982) (shareholders acted as "group" in establishing slate of insurgent board nominees); Int'l Banknote Co. v. Muller, 713 F. Supp. 612, 619 (S.D.N.Y. 1989) (formation of group evidenced by discussions concerning proxy context to elect proposed slate of directors at annual meeting) (Wood, J.); SEC v. First City Fin. Corp., Ltd., 688 F. Supp. 705, 721 (D.D.C. 1988) (any relationship that, as a factual matter, confers on a person a significant ability to affect how voting power or investment power will be exercised evidences the existence of a group).

24.     The concerted actions among the members of the Crossover Committee, including, among other things, their agreement to backstop the Rights Offering and the collective representation of their interests through a single law firm in negotiating the Plan and their rights as new equity holders, provides further evidence that the members constitute a "group."  See Schaffer v. CC Invs., LDC, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *6-7 (S.D.N.Y. Dec. 20, 2002) (group evidenced by, *inter alia*, mutual reliance on a single law firm to perform legal services in connection with a collective investment in an issuer and circulation of agreements among investors); see also 1978 SEC No-Act. LEXIS 1764 (Aug. 21, 1978) (the "MCI Communications Letter") (where joint actions may encompass matters which have a fundamental impact on corporate operations, such as ability to invest, incur additional debt, modify pension plans and many other matters that go well beyond the ministerial matters contemplated by SEC Rule 13d-5(b)(2), there is probative evidence of a group); 1972 SEC No-Act. LEXIS 1486 (March 16, 1972) (the "Paskus, Gordon & Hyman Letter") (opining that agreement by note holders to plan of refinancing and the receipt of warrants in connection therewith, where acceptance by each individual note holder dependent upon its acceptance by all other creditors, constitutes "group" and a "person" within the meaning of Section 13(d)). Therefore, the Disclosure Statement is deficient because it fails to advise creditors that the

members of the Crossover Committee constitute a "group" as a matter of law and fact, and that a Change of Control thus will occur on or prior to the effective date of the Plan.

25.     The Disclosure Statement similarly fails to apprise creditors that a Change of Control will occur upon the distribution of rights in connection with the Rights Offering (the "Rights").  As set forth in the "Rights Offering Procedures" (see Exhibit 19 to *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 37]), the Rights Offering shall commence prior to Plan confirmation (specifically, on the later of the date when the approved Disclosure Statement is made publicly available and the date two business days after Investor Certificates are required to be returned).  Moreover, as stated in the Disclosure Statement, the Rights will be independently transferable through the expiration date of the Rights Offering.  See Disclosure Statement at 25.

26.     The definition of "Beneficial Owner" in the Third Lien Credit Agreement provides that a "'person' shall be deemed to have beneficial ownership of all securities that such 'person' *has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence or a subsequent condition*" (emphasis supplied).   See Third Lien Credit Agreement at 3.  Because the Rights provide the exercising holders with the right to acquire New Class A Stock, such holders are the "Beneficial Owners" of the New Class A Stock (under the express and clear terms of the Third Lien Credit Agreement) when those Rights are distributed (and, per the definition of "Beneficial Owner," that the Rights may only be exercisable upon the occurrence of a subsequent condition – i.e., the confirmation of the Plan – does not change their status as Beneficial Owners of New Class A Stock).  In other words, the distribution of Rights will constitute the "consummation of a transaction" whereby a "person" –

*i.e.*, members of the Crossover Committee – becomes the "Beneficial Owner" of (*i.e.*, have the right to acquire) the New Class A Stock, thereby triggering a Change of Control.

27.    Finally, the "savings clause" included in the COI has no bearing on the fact that a Change of Control under the Third Lien Credit Agreement will actually occur upon the effective date of the Plan (or even sooner), by the constitution of a board *majority* composed of the several representatives of the *minority* shareholders who belong to the Crossover Committee. Notwithstanding the savings clause instituted upon the effective date of the Plan, the members of a "group" will have, in fact, constituted the Board in a manner that could only have been accomplished through the power to vote *in excess of 50% of New Class A Stock outstanding*. Furthermore, the group has, by agreeing to postpone an annual meeting until no earlier than twelve months after confirmation, entrenched their Board for at least an entire year. See Plan at Art. VI, ¶ N.

28.    In light of the foregoing, the Disclosure Statement is plainly deficient.  It fails entirely to alert creditors that the members of the Crossover Committee constitute a "group" and that, upon their acquisition of beneficial ownership of the New Class A Stock, a Change of Control will be triggered under each of the debt instruments to be reinstated.  As discussed herein, that Change of Control will occur as early as the distribution of Rights in connection with the Rights Offering, and will certainly occur upon the effective date of the Plan.  For the Disclosure Statement to accurately describe the risks that the Plan will not be feasible, it must disclose this information and inform creditors of the resulting likelihood that the reorganized Debtors may be obligated to pay the $11.8 billion in reinstated debt almost immediately after

emergence from Chapter 11.[12]  Indeed, as noted earlier, the Debtors have effectively conceded the infeasibility of the Plan if reinstatement can not be effectuated.

### C. The Disclosure Statement Fails To Provide Adequate Disclosure Of The Risk Of Cross-Defaults Under The Lenders' Respective Credit Agreements

29.    In its Complaint in the Adversary Proceeding, JPMorgan seeks a declaration that certain defaults have occurred under the First Lien Credit Agreement.  Those defaults arise out of provision in the First Lien Credit Agreement stating that an Event of Default occurs where any Designated Holding Company (defined to include certain parent entities of CCO) "shall be unable to . . . pay its debts as they become due."  See First Lien Credit Agreement § 8(g)(v).

30.    Under the Third Lien Credit Agreement, an Event of Default includes a "default under any . . . instrument under which there may be issued . . . any Indebtedness for money borrowed by the Borrower or any of its Restricted Subsidiaries . . . if that default . . . (2) results in the acceleration of such Indebtedness prior to its express maturity, and . . . the principal amount of such Indebtedness . . . aggregates $100 million or more."  See Third Lien Credit Agreement § 8.1(e), at 59-60.  CCO is a Restricted Subsidiary under the Third Lien Credit Agreement and the Borrower under the First Lien Credit Agreement.  Therefore, a default under

---

[12]    Under the Third Lien Credit Agreement – and the other debt instruments to be reinstated – a Change of Control also occurs on "the first day on which a majority of the members of the Board of Directors of CCI are not Continuing Directors."  The term "Continuing Directors" is defined to mean any member of the Board of Directors who (i) was a member of the Board of Directors of CCI on the Effective Date (March 6, 2007), or (ii) was nominated for election or elected to the Board of Directors of CCI with the approval of a majority of the Continuing Directors who were members of such Board of Directors of CCI at the time of such nomination or election or whose election or appointment was previously so approved.  Because the Plan provides for the appointment of a new 11-member Board of Directors for CCI, it is likely that a majority of new directors will not be members of the existing Board.  Therefore, a Change of Control will be triggered for this reason as well – unless a majority of the existing (and outgoing) directors approve the appointment of the new directors.  The Disclosure Statement likewise fails to apprise creditors of the risk of a Change of Control occurring based on the appointment of the new Board of Directors.

the First Lien Credit Agreement that results in an acceleration of the indebtedness thereunder triggers a cross-default under the Third Lien Credit Agreement.[13]

31.     If JPMorgan is successful in asserting the existence of one or more defaults in the Adversary Proceeding (or any other defaults under the First Lien Credit Agreement), then a cross-default will have occurred under the Third Lien Credit Agreement.  Specifically, because such a default would preclude reinstatement – or "deacceleration" – of the first lien debt, that default would result in the continued acceleration of that debt.[14]  Nowhere does the Disclosure Statement apprise creditors of the risks of a cascade of cross-defaults, including under the Third Lien Credit Agreement, if JPMorgan prevails in the Adversary Proceeding.  Those cross-defaults are incurable and, therefore, would preclude reinstatement of the various senior debt instruments.

**D.     The Disclosure Statement Fails To Provide Adequate Disclosure Of The Risk That The Plan's Improper Non-Debtor Release, Permanent Injunction And Exculpation Provisions Will Preclude Reinstatement Of The Debt**

32.     As noted above, under section 1124 of the Bankruptcy Code (and a large and settled body of case law), a claim is presumed impaired unless a plan leaves the legal, equitable, and contractual rights of the claimant unaltered.  The debtor bears the burden of demonstrating that the plan leaves such rights unaltered, and for purposes of the impairment analysis, *any* alteration of a creditor's legal, equitable, or contractual rights mandates a finding of impairment. See In re PPI Enterprises (U.S.), Inc., 324 F.3d 197, 202 (3d. Cir. 2003) ("If the debtor's Chapter

---

[13]     The other debt instruments proposed to be reinstated also contain cross-default provisions that would be similarly triggered.

[14]     Section 502(b) of the Bankruptcy Code operates to automatically accelerate all unmatured debt as of the petition date.  See In re Trace Int'l Holdings, Inc., 284 B.R. 32, 38-39 (Bankr. S.D.N.Y. 2002); In re Texaco, Inc., 73 B.R. 960, 966 (Bankr. S.D.N.Y. 1987).  To the extent reinstatement can be achieved under Section 1124, the reinstated debt is thereby "deaccelerated."  See In re 139-141 Owners Corp., 313 B.R. 364, 368 (S.D.N.Y. 2004); In re Taddeo, 685 F.2d 24, 26-27 (2d Cir. 1982).

11 reorganization plan does not leave the creditor's rights *entirely* '*unaltered*,' the creditor's claim will be labeled as impaired . . .") (emphasis supplied). The Disclosure Statement fails adequately to disclose the degree to which the Plan's Release, Permanent Injunction and Exculpation Provisions will deprive the Third Lien Secured Parties of their existing rights to pursue actions against non-Debtor third parties, altering their legal and equitable rights and thereby barring reinstatement as a matter of law.

33. Indeed, the Plan not only alters the rights of the Third Lien Secured Parties, but compromises them dramatically, leaving the Third Lien Secured Parties in a radically inferior position by providing for the release of claims that the Third Lien Secured Parties might have against various non-debtor third parties. Further, the Plan proposes to enjoin virtually all parties, including the Third Lien Secured Parties, from bringing potentially valuable claims against these non-Debtor third parties.

34. Paragraph E of Article X of the Plan provides for the following third party releases:

> On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan . . . .

Plan, Art. X, ¶ E. The term "Causes of Action" is defined in the Plan to include all actions arising from events prior to the Petition Date or during the course of the Chapter 11 cases. Moreover, "Debtor Releasees" is broadly defined to include each Debtor's "respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives," in addition to all parties who signed Plan Support Agreements with any Debtor,

and any statutory committees appointed the proceedings.  <u>See</u> Plan, Art. X, ¶ D.  Thus, under the Plan, all holders of claims, including debt to be reinstated, will involuntarily release claims held against a plethora of non-Debtor third parties which "aris[e] from or [are] related in any way to the Debtors."

35.     Further, the Plan provides sweeping protections for the Exculpated Parties, defined to include "the Debtors and each party who signed a Plan Support Agreement, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives," against all pre-petition or post-petition liability in connection with the Debtors' restructuring.  Specifically, Paragraph G of Article X of the Plan provides, in pertinent part:

> The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct.

Plan, Art. X, ¶ G.

36.     Moreover, the Plan provides for a permanent injunction barring all Entities, defined with respect to Bankruptcy Code Section 101(15) and including virtually any party, including the Third Lien Secured Parties, from pursuing any Cause of Action released pursuant to the Plan, including all such Causes of Action against the released non-debtor third parties.  <u>See</u> 11 U.S.C. § 101(15).  Thus, the Plan provides, in part:

> From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

Plan, Art. X, ¶ F.

37.     These release, permanent injunction and exculpation provisions are non-consensual, overreaching and would bind all creditors, regardless of whether they vote in favor of the Plan.  At present, the Third Lien Secured Parties have unimpaired rights to pursue the Causes of Action against non-Debtor third parties.  Upon the effective date of the proposed Plan, however, the Third Lien Lenders would be forced to provide the contemplated releases and would forever be enjoined from pursuing the Causes of Action against the then-exculpated non-Debtor third parties.  Clearly, the consummation of any Plan, including these broad and improper release, permanent injunction and exculpation provisions, would substantially alter the Third Lien Secured Parties' legal and equitable rights and leave them impaired, thereby precluding reinstatement.  Yet the Disclosure Statement does nothing to disclose (much less adequately disclose) the implications of these Plan provisions on reinstatement.

38.     Aside from the impediment to reinstatement caused by the releases, the Debtors face the additional hurdle of establishing that the releases are permitted under the Second Circuit's stringent standards with respect to a Bankruptcy Court's power under Section 105 of the Code to approve third-party releases such as those provided for in the Plan.  See In re Adelphia Commc'ns Corp., 368 B.R. 140, 266 (Bankr. S.D.N.Y. 2007) (citing SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992)).  Indeed, surveying Second Circuit law on the permissibility of third party releases and injunctions, the Adelphia Court noted:

> Thus, in the Second Circuit, third-party releases or injunctions to prevent a creditor from suing a third party now are permissible under some circumstances, but not as a routine matter. They are permissible *if, but only if, there are unusual circumstances to justify enjoining a creditor from suing a non-debtor party*.

Adelphia, 368 B.R. at 267 (emphasis supplied); see also In re Metromedia Fiber Network, Inc., 416 F.3d 136, 143 (2d Cir. 2005) ("[a] nondebtor release in a plan should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan").  The Disclosure Statement is silent as to what kind of "unusual circumstances" exist in the present circumstances that would justify the releases and injunctions proposed by the Debtors, leaving creditors with no guidance regarding whether these provisions would pass muster under Second Circuit law.[15]   As such, the Disclosure Statement is deficient and should not be approved.

## RESERVATION OF RIGHTS

39.     The Third Lien Agent reserves all its rights to object to the Plan on any grounds whatsoever, regardless of whether those grounds are addressed herein.  The Third Lien Agent also reserves the right to assert the existence of defaults under the Third Lien Credit Agreement that preclude reinstatement under Section 1124 of the Bankruptcy Code, regardless of whether such defaults are addressed herein.

---

[15]     By way of illustration, the Adelphia Court found three categories of third-party releases (and exculpatory clauses) permissible under Second Circuit standards: (i) "Indemnified Persons" (people or entities that must be indemnified by the estate with respect to their services (e.g., by employment contracts, corporate bylaws, or retention or loan agreements)); (ii) "Unique Transactions" (there illustrated by the "substantial consideration" to the reorganization provided by the purchasers of substantially all of the Debtors' assets); and (iii) appropriately disclosed consensual releases.  Adelphia, 368 B.R. at 268.  The Disclosure Statement leaves creditors to guess which (if any) of these categories the Plan's releases and exculpatory clauses might fall into.  Indeed, neither the proposed Plan nor the Disclosure Statement shows or even discusses how any of these categories would be applicable here.

## CONCLUSION

For the reasons stated herein, the Third Lien Agent respectfully requests that this Court (a) sustain this Objection, (b) deny approval of the Disclosure Statement, and (c) grant the Third Lien Agent such other and further relief as is appropriate under the circumstances.

Dated: April 22, 2009
New York, New York

**BROWN RUDNICK LLP**

 _/s/ David J. Molton_____
Edward S. Weisfelner (EW-5581)
David J. Molton (DM-1106)
May Orenstein (MO-2948)
Daniel J. Saval (DS-2437)
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

  -and-

Andrew P. Strehle (AS-1770)
One Financial Center
Boston, MA 02111
Telephone:  (617) 856-8200
Facsimile:  (617) 856-8201

*Counsel to Wells Fargo Bank, N.A.,*
*solely in its capacities as successor*
*Administrative Agent and Collateral Agent*