| | |
|---|---|
| Peter V. Pantaleo (PP-5932)<br>Morris J. Massel (MM-3838)<br>SIMPSON THACHER & BARTLETT LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Tel. (212) 455-2000<br>Fax (212) 455-2502 | Hearing Date: May 5, 2009 @ 9:00 a.m. |

Peter V. Pantaleo (PP-5932)  
Morris J. Massel (MM-3838)  
SIMPSON THACHER & BARTLETT LLP  
425 Lexington Avenue  
New York, New York 10017  
Tel. (212) 455-2000  
Fax (212) 455-2502  

Hearing Date: May 5, 2009 @ 9:00 a.m.

Counsel to JPMorgan Chase Bank, N.A.,  
as Administrative Agent

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CHARTER COMMUNICATIONS, INC., et al.,<br><br>                Debtors. | Chapter 11<br><br>Case No. 09-11435 (JMP)<br><br>Jointly Administered |

**RESERVATION OF RIGHTS OF JPMORGAN CHASE BANK, N.A. TO DEBTORS' MOTION FOR AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) ESTABLISHING A RECORD DATE FOR VOTING ON THE PLAN OF REORGANIZATION AND THE RIGHTS OFFERING, (III) APPROVING SOLICITATION PACKAGES AND PROCEDURES FOR THE DISTRIBUTION THEREOF, (IV) APPROVING THE RIGHTS OFFERING PROCEDURES AND RIGHTS EXERCISE FORM, (V) APPROVING THE FORMS OF BALLOTS AND MANNER OF NOTICE, (VI) APPROVING THE COMMITMENT AGREEMENTS, (VII) APPROVING THE COMMITMENT FEES, (VIII) ESTABLISHING PROCEDURES FOR VOTING ON THE PLAN, AND (IX) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PLAN**

JPMorgan Chase Bank, N.A. ("JPM"), as the administrative agent (the "Administrative Agent") under that certain $8,000,000,000 Amended and Restated Credit Agreement, dated as of March 6, 2007 (as amended, the "Credit Agreement") by and among Charter Communications Operating LLC, as borrower, CCO Holdings, LLC, as guarantor, and the lenders from time to time party thereto (collectively, the "Lenders"), hereby files this reservation of rights (the "Reservation of Rights") with respect to the motion of the above-

captioned debtors and debtors in possession (collectively, the "Debtors") for an order (i) approving the disclosure statement (the "Disclosure Statement"), (ii) establishing a record date for voting on the plan of reorganization (the "Plan") and the rights offering, (iii) approving solicitation packages and procedures for the distribution thereof, (iv) approving the rights offering procedures and rights exercise form, (v) approving the forms of ballots and manner of notice, (vi) approving the commitment agreements, (vii) approving the commitment fees, (viii) establishing procedures for voting on the plan, and (ix) establishing notice and objection procedures for confirmation of the plan, and in support thereof, respectfully represents as follows:

## RESERVATION OF RIGHTS

1. Pursuant to the Plan, the Debtors seek to unimpair the claims of the Lenders and reinstate their claims pursuant to Section 1124 of the Bankruptcy Code. Although the Administrative Agent does not believe that the Plan can be confirmed, the Administrative Agent only seeks to supplement the Disclosure Statement with information which adequately describes the Administrative Agent's views of (a) the issued raised in the complaint filed by the Administrative Agent before this Court in which JPM alleged that multiple events of default had occurred under the Credit Agreement,[1] and (b) confirmation and potential post confirmation issues raised by the Plan. Prior to filing this Reservation of Rights, the Administrative Agent submitted a statement to the Debtors, in the form annexed hereto as Exhibit A (the "Statement"), for inclusion in the Disclosure Statement, which summarizes these views. We understand that the Debtors have agreed to include the Statement in the proposed Disclosure Statement (subject to their right to expressly note that they disagree with the Administrative Agent's views). The

---

[1] *See* Complaint, Docket No. 1, Adv. Pro. 09-01132 (JMP) (Bankr. S.D.N.Y. Mar. 27, 2009).

inclusion of the Statement in the Disclosure Statement resolves the Administrative Agent's concerns regarding adequacy of disclosure.

2. The Debtors' inclusion of the Statement in the Disclosure Statement is without prejudice to the rights of the Administrative Agent and the Lenders to raise any objections or to seek discovery in connection with the Plan, including without limitation, in respect of the issues raised therein, which rights are expressly preserved hereby.

## **CONCLUSION**

WHEREFORE, JPM respectfully requests the inclusion of the Statement in the Disclosure Statement, and requests such other and further relief as is just and proper.

Dated: New York, New York
     April 27, 2009

SIMPSON THACHER & BARTLETT LLP

/s/ Peter V. Pantaleo
Peter V. Pantaleo (PP-5932)
Morris J. Massel (MM-3838)

425 Lexington Avenue
New York, New York 10017
Tel. (212) 455-2000
Fax (212) 455-2502

Counsel to JPMorgan Chase Bank, N.A.,
as Administrative Agent

**EXHIBIT A**

**JPMORGAN CHASE BANK, N.A. DISCLOSURE STATEMENT INSERT**

JPMorgan Chase Bank, N.A. ("JPM") is the administrative agent (the "Administrative Agent") under that certain $8,000,000,000 Amended and Restated Credit Agreement, dated as of March 6, 2007 (as amended, the "Credit Agreement") by and among Charter Communications Operating LLC ("CCO" or "Borrower"), as borrower, CCO Holdings, LLC ("CCOH"), as guarantor, and the lenders from time to time party thereto (collectively, the "Lenders").

JPM believes the Plan cannot be confirmed and, as a result, should not be proposed. Specifically JPM contends the following with respect to the Plan:

**A. The Plan Cannot Be Confirmed Because It Fails to Give Effect to the Cross Acceleration Default.**

Pursuant to the Credit Agreement, it is an Event of Default[1] if the Indebtedness of any Designated Holding Company ("DHC") is accelerated (among other events). The Plan cannot be confirmed because its treatment of the Credit Agreement obligations as unimpaired under Section 1124 of the Bankruptcy Code assumes that the cross acceleration Event of Default under the Credit Agreement is not enforceable. However, this Event of Default is enforceable both as a matter of law and equity. CCO is solvent; all of its creditors will be paid in full; and there are no overriding bankruptcy policies which would render cross acceleration unenforceable. To the contrary, when a debtor is solvent "the bankruptcy rule is that where there is a contractual provision, valid under state law…the bankruptcy court will enforce the contractual provision." *Gencarelli v. UPS Capital Bus. Credit,* 501 F.3d 1, 7 (1st Cir., 2007) (internal quotation marks and italics omitted) (citing *Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp.*, 679 F.2d 264, 269 (1st Cir. 1982)). Moreover, because the Plan does not "cure" this Event of Default, it cannot satisfy the standards for unimpairment under Section 1124 and thus the Plan cannot be confirmed.

**B. Pre-Petition, the Debtors Made Certain Misrepresentations in Connection With $750 Million of Borrowings That Are Neither Cured Nor Curable by the Plan.**

On or about October 1, 2008 (if not earlier), at least two of the DHCs, Charter Communications Holdings, LLC ("Charter Holdings") and CCH I Holdings, LLC ("CIH"), had become unable to pay their debts as they came due. This was an Event of Default under the Credit Agreement. This Event of Default was evidenced by, among other things, the fact that in the fourth quarter of 2008 the Debtors discontinued their historical practice of paying interest on Charter Holdings' debt via dividend payments up from CCO. The Debtors discontinued their practice because certain of the DHCs had become insolvent or otherwise financially distressed and laws, such as the Delaware Limited Liability Company Act, fraudulent transfer laws and

---

[1] Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meanings ascribed to them in Credit Agreement.

fiduciary duty laws, prohibited such dividends in those circumstances. Those same circumstances establish that at least Charter Holdings and CIH had become unable to pay their debts as they would become due.

From October 2 through November 5, 2008, CCO borrowed funds totaling $750 million from the Lenders in four separate borrowing requests. Each time CCO represented under the Credit Agreement that no Default or Event of Default had occurred and was continuing. These representations were false when made because, as discussed above, by this time at least Charter Holdings and CIH had become unable to pay their debts as they would become due. These false representations gave rise to additional Events of Default.

These (and other) Events of Default are set forth in detail in an adversary proceeding commenced by JPM in the bankruptcy case. See Complaint, Docket No. 1, Adv. Pro. 09-01132 (JMP) (Bankr. S.D.N.Y. Mar. 27, 2009). These Events of Default are continuing and cannot be cured. Because the Plan does not "cure" these Events of Default it cannot satisfy the standards for unimpairment under Section 1124 and thus the Plan cannot be confirmed.

    **C.**    **Consummation of the Plan Would Create a New Event of Default Under the Credit Agreement Because a "Group," Other Than the Paul Allen Group, Would Have the Power to Vote More Than 35% of the Ordinary Voting Power**.

Under the Credit Agreement, it is an Event of Default if the Paul Allen Group ceases to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of CCO. It also is an Event of Default if a transaction is consummated through which a "person" or "group" other than the Paul Allen Group has the power to vote or direct the voting of Equity Interests having more than 35% of the ordinary voting power for the management of CCO, unless the Paul Allen Group has a greater voting percentage. The Securities Exchange Act of 1934 defines a "group" as when two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer. A group is deemed to have been formed if persons agree to act "in concert" or "in furtherance of a common objective," and their agreement to act together relates to the acquisition, holding, voting or disposing of equity securities of an issuer. *See, e.g.*, *Wellman v. Dickinson*, 682 F.2d 355, 263 (2d Cir. 1982).

The Plan's Class B shares give the Paul Allen Group 35% voting control over Charter Communications Inc. ("<u>CCI</u>"). It gives the Paul Allen Group voting no control over CCO's equity shares. CCO remains under the control of its parent affiliates, ultimately CCI. The noteholders constituting the Crossover Committee will retain the vast majority of the voting interests in CCI. Consequently, under the Plan, the majority of CCI's directors are selected by the noteholders constituting the Crossover Committee, not the Paul Allen Group. Under this structure the Paul Allen Group therefore has no voting control over CCO.

In addition, there is ample evidence that that noteholders in these cases constitute a "group." This evidence includes (without limitation):

- the formation of a self-appointed "Committee" by this group of bondholders;
- the retention of common counsel to represent the group and each member thereof;
- the group's retention of common financial advisors;
- the commitment to execute, and actual execution, by each group member of identical Plan Support Agreements and Commitment Letters incorporating identical Plan-related term sheets;
- the group's commitment to purchase reorganized equity under the Rights Offering;
- the ability of the majority of the group to bind each member to the group's determination of whether the Plan, Disclosure Statement and Confirmation Order are acceptable and thus binding on all of the members of that Committee;
- the ability of the majority of the group to modify the obligations of individual Committee members under the Restructuring Agreement and related Term Sheet;
- the ability of the majority of the group to waive certain deadlines under a member's Restructuring Agreement; and
- the coordination of all group activities with the Allen Entities (thus creating another group).

Consequently, the restructuring transactions described in the Plan create new Events of Default. The Paul Allen Group has no equity voting power over CCO. All of the equity voting control over CCO has been transferred to the noteholder group. Because nothing in the Plan "cures" these Events of Default, the Lenders' Obligations cannot be rendered unimpaired under the Plan and thus the Plan cannot be confirmed.[2]

      **D.**      **The Plan's Releases and Injunctions Impair the Lenders.**

The Plan provides that:

> the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents.

---

[2] The "savings clause" in the Amended and Restated Certificate of Incorporation for CCI which purports to reduce the voting power of the non Paul Allen Class A shares to 34.9% fixes nothing. It only operates after the fact that a "group" Event of Default under the Credit Agreement is established.

*See* Plan, Article X, E.  In addition, the Plan seeks to permanently enjoin all entities from commencing or continuing any Cause of Action released or to be released pursuant to the Plan. *See* Plan, Article X, F.

These Plan provisions would release and enjoin the Lenders from prosecuting any claims or causes of action the Lenders have against the Debtors pursuant to the Credit Agreement.  Section 1124 requires that the Plan preserve all of the Lenders legal, equitable and contractual rights.  Because the Plan releases and prevents the Lenders from prosecuting claims they may have arising under the Credit Agreement, the Debtors cannot satisfy the standards for unimpairment under Section 1124 and thus the Plan cannot be confirmed.

### E. The Lenders Appeal Rights Are Preserved Under the Plan and Any Reversal on Appeal May Give Rise to Plan Defaults and Losses for Non CCO Creditors.

The Plan, if confirmed, would by law preserve all of the Lenders' legal, equitable and contractual rights.  *See* 11 U.S.C § 1124.  The right to appeal is among the Lender rights the Plan would expressly preserve.  Accordingly, in the event the Lenders pursue any appeal after confirmation of any adverse ruling of any of the above issues, the reversal on appeal of such an order would permit the Lenders to accelerate and demand immediate payment of all Obligations under the Credit Agreement.  If the Obligations are accelerated after the Plan becomes effective, the consequences and potential economic losses to other holders of claims against the Debtors, other than CCO, and to those who acquire interests in reorganized CCI under the Plan, would be material and may give rise to post consummation Plan defaults.

The aggregate principal amount of the Obligations as of the Petition Date is approximately $8,246,604,237, plus Letters of Credit in the face amount of approximately $140,074,350, plus accrued and unpaid interest thereon and fees and expenses.