UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11540

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHARTER INVESTMENT, INC.,


      Debtor.


- - - - - - - - - - - - - - - - - - -x


           United States Bankruptcy Court

           One Bowling Green

           New York, New York


           April 27, 2009

           11:02 AM


B E F O R E:

HON. JAMES PECK

U.S. BANKRUPTCY JUDGE

1

2     A P P E A R A N C E S :

3     KIRKLAND & ELLIS LLP

4          Attorneys for Debtors other than Charter Investment, Inc.

5          655 Fifteenth Street, N.W.

6          Washington, DC 20005

7

8     BY:   JEFFREY POWELL, ESQ.

9          DANIEL T. DONOVAN, ESQ.

10

11    TOGUT SEGAL & SEGAL LLP

12         Attorneys for Debtor Charter Investment, Inc.

13         1 Penn Plaza

14         Suite 3335

15         New York, NY 10119

16

17    BY:   RICHARD K. MILIN, ESQ.

18         BRIAN F. MOORE, ESQ.

19

20

21

22

23

24

25

SIMPSON THACHER & BARTLETT LLP

     Attorneys for JPMorgan Chase

     425 Lexington Ave

     New York, NY 10017-3954

BY:  BRYCE L. FRIEDMAN, ESQ.

     GEORGE WANG, ESQ.

     STEVE FITZGERALD, ESQ.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

     Attorneys for Paul Allen and Vulcan Inc.

     Four Times Square

     New York, NY 10036

BY:  ROBERT E. ZIMET, ESQ.

PAUL WEISS RIFKIND WHARTON & GARRISON LLP

     Attorneys for Crossover Committee

     1285 Avenue of the Americas

     New York, NY 10019-6064

BY:  ANDREW J. EHRLICH, ESQ.

```
 1
 2    BROWN RUDNICK BERLACK ISRAELS LLP
 3          Attorneys for Wells Fargo, Agent for the Third Lien
 4          Holders
 5          Seven Times Square
 6          New York, NY 10036
 7
 8    BY:   DANIEL SAVAL, ESQ.
 9
10    ROPES & GRAY LLP
11          Attorneys for Official Committee of Unsecured Creditors
12          1211 Avenue of the Americas
13          New York, NY 10036
14
15    BY:   DAVID S. ELKIND, ESQ.
16          RUSSELL L. LIPPMAN, ESQ.
17
18    SONNENSCHEIN NATH & ROSENTHAL LLP
19          Attorneys for Lazard Ltd.
20          1211 Avenue of the Americas
21          New York, NY 10020
22
23    BY:   ARTHUR H. RUEGGER, ESQ.
24
25
```

1　　　　　　　　P R O C E E D I N G S

2　　　　THE COURT:  First of all, let me find out who's here.

3　　This is being recorded.  Let me just check that the sound's

4　　picking up.  I received the correspondence from counsel for

5　　JPMorgan Chase and the response from Kirkland & Ellis and the

6　　five page rejoinder from Simpson Thacher that I received this

7　　morning.  I haven't received any papers from other parties who

8　　are involved in this dispute, including Paul Allen and Vulcan,

9　　although I see Paul Allen's counsel.  And this is an

10　　opportunity for others who are affected by this, including

11　　lawyers who represent KPMG, Lazard, Duff & Phelps.  If I'm

12　　leaving anybody out -- anybody I've left out to -- to talk

13　　about the issues.

14　　　　　　And let me be clear on a couple of points.  Point one,

15　　I opted to do this informal conference in a somewhat more

16　　formal way because it was obvious to me from the correspondence

17　　that this was a shot across the bow of the debtor.  That's how

18　　I took it.  And I take the response back as being a validation,

19　　and I took it the right way.  I'm not used to receiving single

20　　spaced letters at this level of acrimony without having a

21　　single item of particularized discovery to deal with.  I view

22　　this as thematic rather than specific.  If I'm wrong in that

23　　you can tell me.

24　　　　　　For that reason it seemed to me that everybody needed

25　　to be held to not a loose informal conference standard but a

1    tight informal conference standard, which is the reason that

2    I'm doing something unusual.  Ordinary they wouldn't be

3    recorded.  This is being recorded.  Not for record purposes in

4    a formal sense, but for the use of the Court and the parties so

5    to the extent that people say something there's no

6    misunderstanding as to what was said.  I assume, because you're

7    all here, there's no objection to doing it this way.

8              MALE SPEAKER:  Not from Charter, Your Honor.

9              THE COURT:  And because the communications I've

10   received have all been designated as highly confidential I'm

11   going to treat what we talk about today not necessarily as

12   highly confidential, because we're just talking about

13   discovery, but to the extent that there are references to

14   documents that may themselves be confidential, just because

15   it's being recorded doesn't mean that it's out for public

16   consumption, and we can appropriately seal, if that's

17   necessary, aspects of this record.  That may not be necessary,

18   but I recognize that as a possibility.

19             Now, for those litigators who may not routinely

20   practice in the bankruptcy court, and for those who do,

21   ordinarily motion practice relating to discovery does not occur

22   absent as a gating process, this kind of an informal

23   conference.  I deal what we're talking about today as a prelude

24   to motion practice, should that be necessary, and/or as a means

25   to minimize or suppress that motion practice by helping you

1   resolve your differences.  I'm making no rulings today.  And as

2   far as I can tell, based upon what I've read, I'm not capable

3   of making rulings.  I can give you some feedback and guidance.

4   But to the extent I do that it doesn't necessarily determine

5   how I'm going to rule to the extent this ripens into a full-

6   blown litigated matter.

7        I think it makes sense to hear from JPMorgan Chase

8   first, because they initiated this process.  And what I'd like

9   to have a clearer sense of, and I did read this morning's

10  correspondence, is what you really hope to accomplish today

11  with this conference and where you see this going, because to

12  the extent that this is just going to be a procedural gate that

13  we need to go through to get to motion practice, I'm going to

14  give you the permission to file a motion pretty quickly, I

15  think.  This looks like a real dispute.  The problem I have

16  with it is that I'm not going to be able to resolve it so

17  easily without reference to particular documents.  So to talk

18  about generically isn't that helpful to me.

19       So, my first question is based upon the exchange of

20  correspondence what's really the crux of the dispute, and is

21  there a possibility today to avoid a motion practice by

22  bringing the parties closer together or trying to facilitate

23  some understanding, because if there's just going to be motion

24  practice let's find that out sooner rather than later.

25       MR. FRIEDMAN:  Good morning, Your Honor.  For the

1  record, Bryce Friedman from Simpson Thacher for JPMorgan.  I

2  appreciate you hearing us in this fashion today.  I think it is

3  a productive way to proceed.  We are not here simply as a

4  procedural hurdle because we want to file a motion tomorrow and

5  we're asking for permission.  We truly believe and, hence, the

6  detail provided in our letter, that feedback or guidance from

7  the Court on some of these issues would be useful.  I think

8  we've seen some constructiveness come out of this process

9  already with the debtor having narrowed some of its claims, and

10  we think there are some further ways to go and this conference

11  may help that process.

12       As an aside, I don't want you to take from the

13  acrimonious nature of our letters anything other than that

14  we're working cooperatively to try and deal with these issues,

15  but there, frankly, seems to be some legal disputes that we're

16  here asking for Your Honor's help on.

17       The debtor served a privilege log, a revised privilege

18  log with 2,600 or so entries on it.  We thought it would be

19  most productive to try and get some high-level feedback from

20  the Court before proceeding directly to a motion practice

21  situation in which we ask the Court to review potentially

22  hundreds of privileged documents.  That just doesn't seem like

23  the best use of anybody's time at the moment.

24       THE COURT:  I'll certainly confess that it wouldn't be

25  a good use of my time.

1          MR. FRIEDMAN:  So what we're hoping that we can

2     accomplish is some feedback and guidance that the debtor and we

3     will take back, and maybe we can narrow the issues.

4          Let me try and explain what we think the four global

5     issues are that we can accomplish today, and then let me

6     present Your Honor with a specific document that sort of raises

7     all of those issues, and that will help, I think, facilitate

8     the conversation.  And I gather that this is going to be

9     somewhat of a conversation, and we think that's appropriate.

10          First of all, there's a remaining issue with respect

11     to the question of whether financial advice provided by KPMG

12     and Lazard can be withheld as privileged.  And we view that as

13     sort of a global issue that affects hundreds of entries on the

14     privilege log.  It includes KPMG's and Lazard's communications

15     with the debtor and KPMG's and Lazard's work product.  Charter

16     has withdrawn, and I think this is one issue that we may be

17     able to resolve today.  Charter, as I understand it, has

18     withdrawn its objection, based on accountant-client privilege,

19     for these purposes, and I assume that what comes along with

20     that is a withdrawal of the instruction to KPMG that it

21     shouldn't produce any information to JPMorgan.  So that's sort

22     of issue number one that I think, again, with this specific

23     document I'll present I think we can work through some of those

24     issues.

25          The second issue, I think, is the Vulcan issue.  We

1    view Vulcan, based on the information that's been provided to

2    us to this point for these purposes, as effectively a stranger

3    to Charter, and there has been sort of a grand assertion of a

4    common interest privilege with respect to all communications

5    involving an attorney and Vulcan, and, frankly, we do not see

6    any information to establish that that would be privileged and

7    don't believe it is at this point.  Again, that affects

8    multitudes of documents on the log, and rather than do it one

9    by one we thought we could have a conversation about it.

10       The third issue is Paul Allen.  Obviously Paul Allen

11   is the chairman of Charter, and clearly privileged

12   communications were made to Paul Allen.  However, we have

13   before us, and at issue, a plan in which Paul Allen is going to

14   receive certain releases and give up certain claims and receive

15   certain payments and purports to have certain claims against

16   Charter, and, clearly, conversation in which they're discussing

17   that adverse situation and those claims, in our view, is

18   probably not subject to properly being withheld on the grounds

19   of privilege.

20       The fourth issue is a very procedural one and this may

21   just be (skip in audio), and that's really the form of the log.

22   I mean, we've made a request to the debtor that they provide

23   certain information in connection with its log, which we

24   detailed in our letter, that would allow us and, if necessary,

25   the Court, to better assess whether or not the information

being withheld in the log is privileged. For example, we ask

who the person is employed by. Who ask who the two in CC was.

And we provided a list of five or six categories in our letter,

none of which I think are particularly unreasonable, but to

this point the debtor hasn't provided. So I think that those

are sort of the four things that we think we could touch on

today that would be particularly productive.

Now, if you'll allow me I'd like to just pass up, and

I've got some extra copies here, and I just want to look at the

second page. And if we walk through this this is a copy of the

executive summary of Charter's November 14, 2008 board meeting.

(skip in audio) self ready, I think, as we sort of just touch

on the bullet points here it will illustrate the information

that we think is being improperly withheld on the basis of

blanket claims of privilege.

So, on November 14th Charter's management convened the

special telephonic board meeting, and the directors attended

the meeting, and that included Paul Allen along with members of

senior management, as well as Lazard, as well as Vulcan, and

Mr. Donovan's partner, Mr. Cieri, was there because he'd been

retained the day before. And the reason they convened this

meeting was because two of the debtors, CCH and CIH, had

interest payments on bonds due a couple later, and management

needed to talk to the directors about it. At the meeting

management told the directors that CC wouldn't make the

1    interest payment, and we can see that in the first couple of

2    bullet points. And instead of CCH making the payment a company

3    above it called Holdco would send the money down the corporate

4    structure to allow CCH to pay the interest payment. This left

5    Holdco out of cash to make its April interest payments

6    etcetera. This left them unable to pay their interest payment.

7    Now, what management also told the directors, if you look at

8    the third bullet point, and this is where we're getting into

9    the privilege issues, it says that CIH interest payments

10   require distributions from CCH I to CIH, which require CCH I to

11   have a financial (skip in audio). What's being said here is

12   that this means that CCH I can only dividend money up if it has

13   a surplus. Now, the financial (skip in audio) that a dividend

14   in this circumstance would be inappropriate. The bullet point

15   towards the bottom indicates that JPMorgan would claim that the

16   dividend is inappropriate and that CCO is in default under the

17   credit agreement. All of this is the reason that Charter

18   called the meeting, and all of this is the illegal dividend

19   issue that was the subject of the letter. But now Lazard was

20   at this meeting. Lazard gave financial advice. Financial

21   advice at this meeting on the surplus and the illegal dividend

22   issues. And that is reflected in the bullet point that talks

23   about financial advisors. It's reflected in the bullet point

24   that talks about valuation. And at this point Lazard had not

25   yet been retained in the case, had been working on this issue

1    with the debtor for years, and Lazard's financial advice at

2    that meeting was to ignore the information available to

3    management, and, quote, "the company's CCH subsidiary did not

4    have an adequate surplus at this time".  This is pure financial

5    advice, and advice that is at issue in the case, yet Charter

6    has not produced a shred of paper to support this financial

7    advice on the ground of privilege.  There's no legal advice

8    here.  This is pure financial advice.  And we think it

9    absolutely should be produced, and there's no valid privilege

10   objection.

11        If you look at the disclosure statement it says that

12   "Lazard reviewed certain internal financial and operating data

13   of the debtors, which data were prepared and provided to Lazard

14   by the management of the debtors, met with and discussed the

15   debtors' operations and future prospects with senior management

16   and conducted some other studies, analyses, inquiries,

17   investigations as it deemed appropriate."

18        Nothing to do with legal advice.  I think it is pretty

19   much black letter law that there's no privileges for

20   communications and work product leading to financial advice.

21   All of Lazard's financial advice and communications with

22   management regarding their financial advice should be produced

23   and are not properly withheld on the basis of privilege, even

24   if that financial advice to the company was rendered at the

25   request of counsel.  Providing financial advice because counsel

1    asked you to provide financial advice doesn't turn that

2    financial advice into privileged information.

3           Now, Charter claims, I think, that Lazard for -- well,

4    let me back up a second.  We've gotten seven e-mails that

5    involve Lazard, and on their log there's more than 600 or so

6    that have been deemed privilege.  I think they're suggesting

7    that all that Lazard did was to act as an interpreter for

8    Kirkland & Ellis.  Now, clearly, prior to Kirkland & Ellis's

9    retention they weren't acting as an interpreter, and prior to

10   Kirkland & Ellis's retention they were providing financial

11   advice, and I think it's pretty clear that the appropriate

12   guidance to Charter at the end of this conversation could be

13   that the financial advice, the work product and the

14   communications behind it and leading to it, provided by Lazard,

15   really in (skip in audio) piece of the dispute in the adversary

16   and the main case, it's not privileged, and it should be

17   produced.

18          Now, there may be more document by document issues

19   associated with the post-restructuring process.  According to

20   Lazard's retention application it was retained for purposes of,

21   effectively, this case towards the end of November, but let me

22   be clear.  Financial advice, even after that point, is not

23   privileged, and even if that advice was provided by Lazard at

24   counsel request.  And in connection with this let me deal with

25   what I think are a few sleights of hand that the debtor

1    utilizes to argue that certain of the material that is post-

2    restructuring is privileged.

3         There's all kinds of entry which talks about Lazard

4    communications, which, and I'm quoting now, reflects legal

5    advice.  All kinds of business documents and decisions reflect

6    legal advice.  The no smoking sign on the wall reflects legal

7    advice.  That doesn't make it privilege.  Only communications

8    conveying legal advice or seeking legal advice are privilege.

9    Communications, documents that reflect legal advice, which is,

10   in this day and age, almost every document, are not, by their

11   nature, privilege.  So we think we would ask the Court for some

12   guidance on the dozens of documents that have been withheld on

13   the grounds that they reflect legal advice that Lazard prepared

14   and were actually financial advice as well as the hundreds of

15   documents that Lazard prepared regarding debt restructuring.

16   Now, financial (skip in audio) advice that Lazard prepared.

17        Now, the analysis for KPMG, I think, is easier, but

18   not too much different.  KPMG was retained to audit Charter and

19   opine on compliance with JPM's credit agreement, not to provide

20   legal advice to Charter or to support its attorneys.  KPMG was

21   referring these same -- reviewing many of these (skip in audio)

22   you were looking at a moment ago at the same time of Lazard.

23   We're guessing, based on some things we've seen, that KPMG even

24   brought in a special valuation unit to look at these issues and

25   it's no coincidence, in our view, that Charter filed for

1  bankruptcy a few days before they couldn't get KPMG to come to

2  a conclusion that would have helped it with respect to our

3  credit agreement.  Again, communications with KPMG, in our

4  view, there's no basis to suggest that they're privileged.

5  This is audit work and not legal work.

6       Now, I think I'd be remiss if I didn't mention the

7  last bullet point on this executive summary and how it may

8  affect the privilege claims that the debtor is making.  It says

9  consequences of not making a distribution and interest payments

10  would likely far exceed the amount of distribution and payment.

11  This is extremely carefully worded, but surefooted compliance

12  with the applicable law here appears to become secondary to

13  other concerns, including avoiding a one billion dollar tax

14  liability for Paul Allen that we mentioned in our papers and is

15  something, again, that I think that the debtor has withheld on

16  the ground of privilege, in our view, inappropriately, because

17  this is a conversation about the financial consequences of the

18  course it took with respect to the surplus issue.

19       So the first issue, I think, is Lazard and KPMG, and

20  it all, sort of, is illustrated by what you see here on this

21  PowerPoint.  I mean, it is, basically, we have been deprived on

22  the ground of privilege, the backup, and the communications

23  leading to the financial advice that is really the heart of the

24  dispute between the parties.

25       My second issue is the Vulcan issue, and I really

1  don't have too much to say about it other than at this same

2  meeting Misters McGrath and Temple of Vulcan were present.

3  Mr. McGrath and Temple of Vulcan are not directors of Charter.

4  They appear to be officers of Vulcan.  As far as we can tell

5  Vulcan has no -- oh, and I should say that we received minutes

6  of this meeting that are heavily redacted, improperly, in our

7  view, because Mr. McGrath and Temple were there.  I mean, I

8  can't even speculate as to what claim of privilege the debtors

9  are making with respect to Vulcan in this circumstance.  Vulcan

10 is not Charter.  Charter is not Vulcan.  The fact that

11 Paul Allen owns Charter doesn't make Vulcan Charter.  As you

12 saw in our papers, the debtor's contention, in our view, that

13 any agent of Paul Allen can be present at a meeting goes way

14 too far.  Charter's put nothing before us, and maybe we'll hear

15 it today.  I would suggest that there's some kind of common

16 interest or anything else that would protect communications

17 made to, or in the presence of, Vulcan.

18        Now, the related issue is Paul Allen himself.  Page 26

19 of the disclosure statement describes at length the

20 consideration Paul Allen is receiving for giving up claims

21 against Charter.  The claims must be pretty good ones because

22 Paul Allen seems to be doing quite well.  But Charter's

23 claiming that information about these claims and the settlement

24 leading to these claims is somehow privileged.  It's really

25 impossible for us to, and a Court, to analyze the releases that

1    are -- be giving, and what's going on in the plan if Charter's

2    going to hide behind a privilege for that information.  And

3    while there certainly may be a common interest with Mr. Allen

4    in connection with certain issues related to Charter, clearly

5    his disputes with Charter, there's no common interest for

6    Paul Allen.

7        I mentioned when I started, and this is the last

8    issue, which is the log entries, we have a list of five or six

9    things that we're asking that Charter do, which is provide a

10   job title so we can tell if people are lawyers.  For people not

11   employed by the debtor tell us who they're employed by.

12   Identify the twos in the CCs.  If they're redacted give us the

13   Bates numbers, and if they're asserting common interest tell us

14   what it is.  These are sort of common things that we do in

15   litigation in this district all the time, and I don't think

16   they're particularly burdensome with respect to the items that

17   we ask for.

18        So I know that's a lot.  I think those are the four

19   issues, I think, that we could use some help from the Court on

20   today and hopefully avoid motion practice.  And I'll turn the

21   floor over.  Thank you for listening, Your Honor.

22        THE COURT:  Thank you.

23        MR. DONOVAN:  Thank you, Your Honor.  Well, I think

24   when you started you hit it on the head on two issues.  One is

25   it is difficult to frame these issues because what JPMorgan is

1   asking for is so broad.  But I am going to provide the legal

2   basis, which is all they ask for.  And, two, I think this is

3   helpful, because I think what Mr. Friedman's presentation has

4   shown is that JPMorgan's misunderstanding of the facts, their

5   arguments have gotten ahead of the facts.  So I do think this

6   is helpful, so, hopefully, we can educate them on those facts

7   as they've been presented in this presentation.

8          So, first, what JPMorgan has started this process

9   requesting is a broad order.  And I understand no rulings

10  today, but on that there should be no privilege at all that can

11  be asserted by Charter related to Lazard, Duff & Phelps,

12  Paul Allen, Vulcan and KPMG.

13         First, with respect to blanket privileges Charter is

14  not asserting blanket privileges with respect to Lazard, Duff &

15  Phelps, Paul Allen or Vulcan.  And I told Mr. Friedman that.

16  He knows that.  Indeed, with respect to Duff & Phelps, Your

17  Honor, we're asserting no privileges, because as the facts will

18  be developed it'll be understood Duff & Phelps is a third-party

19  valuation service.  They conduct, especially in the cable

20  industry, they're especially well known for doing what's called

21  valuations of the fair saleable assets of the cable assets.

22  They're retained on an outside basis.  There's no privilege.

23  We're not asserting any.

24         So that left us with KPMG, where early last week, and

25  I informed Mr. Friedman that basically to avoid this and other

1   mischaracterizations of the documents that occurred Charter was

2   considering withdrawing, waiving the accountant-client

3   privilege.  We now have.  We are not going to maintain that in

4   this process, precisely to avoid the mischaracterizations of

5   documents that occurred.  And I will get to the one with

6   respect to KPMG.

7            So against that background, Your Honor, I'd like to

8   walk through each of these, starting with Lazard.  JPMorgan

9   argues in their letter this morning that it's kind of refined.

10  They're not now saying you can't assert any privilege with

11  respect to Lazard.  They're saying with respect to financial

12  advice.  I think that's a bit of a red herring, because we

13  agree on pure financial advice.  We have produced those

14  documents, and the relevant time frame for Your Honor that the

15  parties agreed for the production, at this point, is August 1,

16  2008 forward.  And that's important when you get into how much

17  information has Charter produced from Lazard from August 1st to

18  February 28th.  And with respect to that, since there are no

19  specific documents alleged, there is case law in this circuit,

20  especially in the bankruptcy context, that you can't have a

21  privilege with a financial advisor.  To be sure it is document

22  by document specific, because it is not a broad privilege.  But

23  starting with the Second Circuit case in Koval, which I know

24  Your Honor is aware of, including the Calvin Klein case from

25  this district in which Wachtell was using Lazard as a financial

1    advisor, Judge Rakoff found that it could apply.  We're not

2    saying it applies everywhere.  But it could apply.  And,

3    indeed, in the bankruptcy contest, the Tri-State case that we

4    cite, which is the Middle District of Georgia in the Bankruptcy

5    Court found that the financial advisor is needed, in fact, to

6    interpret and the work product consult with counsel.

7         So that takes us to, I think it addresses the issue

8    that's been raised today.  It is could there be a privilege

9    with respect to Lazard, and there can't be.  Now, with respect

10   to Mr. Friedman's arguments that Charter is taking a broad view

11   in trying to assert pure financial advice, that's simply not

12   true.  And I would like to go back to this document that

13   Mr. Friedman showed because I think it highlights two points.

14   One, JPMorgan's misunderstanding of the facts and their

15   misunderstanding of what's been produced to them.  What was

16   provided to you is a November 14, 2008 telephonic board meeting

17   presentation.  And if you look at page 1, the executive

18   summary, it says it's to discuss considerations around November

19   CCH and CIH interest payments.  Without getting into the weeks

20   those are two separate payments by two separate entities in the

21   chain of companies between CCI, the parent company, and CCO,

22   the operating company.

23        What Mr. Friedman said before was he was mixing two

24   points, is he kept saying that there needed to be surplus at

25   this company at the top called Holdco.  As the agreement

provides that's simply not true, because as the facts will

provide Holdco was able to pay that not through a dividend but

through another method sanctioned by the credit agreement.

What is required in this circumstances would be a surplus at

CCH I, and that is the first sub-bullet under the second

bullet, if you see it.  And, in fact, the facts as provided

here provide that the valuation at CCH I is 2.8 billion

dollars.  And, in fact, the next bullet that Mr. Friedman

referred to, financial advisors, what they did is they did

analyze this.  They sensitized it to make sure they were in a

good condition, and, in fact, the financial advisors said it

was reasonable.  And the minutes provide that, and we did not

redact that.  That information has been provided to JPMorgan.

And as we proceed, Your Honor, through this document,

we go to page 4 of this document.  It's really 4 and 5.  This

presentation analyzes the surplus at CCH I, which was important

for this payment, and if you look at the far right column this

shows that there was a 2.8 billion dollar surplus at CCH I.

More than sufficient to make that.  And if you turn to the next

page, Your Honor, this, I think, nails it on the head, is the

company was so, kind of, diligent they actually sensitized

those numbers.  They say well, what happens if our growth rate

is lower than we're currently projecting?  What happens if

multiples go down?  And it goes through all these scenarios and

shows if you look at the lower box underneath the dotted lines

1  it shows CCH I had surplus even at the lowest growth rate in

2  the lowest multiple.

3      And important for our purposes is the question would

4  be is the backup for this produced?  You bet it is.  It's been

5  produced by company individuals who did these calculations and

6  created this chart.  So I think the recurring theme here is

7  JPMorgan's arguments are getting ahead of the facts, especially

8  with respect to Lazard and their involvement.

9      Now, with respect to has the company claimed privilege

10  over communications including Kirkland & Ellis, Lazard and the

11  company, yes, we have.  Was it on a blanket basis?  No.  But it

12  shouldn't be surprising, especially in a complex high value

13  bankruptcy case like this, that there was a lot of

14  communication, starting in November, especially.  And that

15  communication involved legal advice and Lazard acting as either

16  interpreter or its work product that they're within, and that

17  is not a waiver under settled case law to include Lazard,

18  especially on a case that was prearranged with creditors,

19  Mr. Allen and Charter within a short period of time.  To be

20  sure, the parties were working hard, so I don't think the

21  number of documents should in any way change the analysis.

22      So with respect to Lazard, Your Honor, I don't think,

23  at this point, there may be disputes on individual documents,

24  but on the law Charter can assert the privilege, even when

25  Lazard is involved, either under attorney-client or work

1    product, and to the extent there's a challenge that's a

2    document by document analysis.

3         We then turn to attorney-client and work product with

4    respect to KPMG.  And, Your Honor, this is a much smaller

5    issue, especially with respect to KPMG.  There are documents

6    that we have claimed attorney-client or work product over, and

7    it's primarily attorney-client, in which KPMG was consulted by

8    lawyers, and they are within the privilege.  And, again,

9    JPMorgan's original argument was there can be no privilege with

10    respect to KPMG.  And that's simply not true.  Again, the

11    Second Circuit seminal case of Koval is, indeed, regarding

12    accountants.  So there can be a privilege.  And I know Your

13    Honor has addressed this is one case in which an audit

14    committee was using accountants.

15         And, to be sure, it has to be a document by document

16    analysis, because most documents with accountants are not

17    privilege.  We agree with that.  But we don't think that an

18    argument can be made under settled case law that there can be

19    no privilege with respect to KPMG.

20         So, Your Honor, that brings us to Mr. Allen and the

21    common interest privilege.  Here, again, I think it's critical,

22    and I think we're going to have to do this document by

23    document, but JPMorgan argues that Charter is withholding

24    communications with Paul Allen.  We have produced lots of

25    communications with Paul Allen.  And we've even produced

documents that include Paul Allen's counsel.  But there is a

common interest agreement between Charter and Mr. Allen in this

matter, and that protects certain communications that are

already privileged, because, as Your Honor well knows, the

common interest privilege is kind of a misnomer.  It's actually

an exception to the waiver of attorney-client privilege.  So

when both parties' attorneys are communicating with a common

legal interest it's protected.  And the only argument, at least

in the letter that JPMorgan fronted, was that Mr. Allen and

Charter were adverse.  We're not sure on what grounds they're

arguing that, at what point.  But even assuming that's so, even

assuming that's so, Your Honor, we cite in our letter the

Mortgage and Realty case and the Megan-Racine case.  And those

cases recognize that the common interest privilege does not

require a complete unity of interest.  And Megan-Racine says

even where a later lawsuit is foreseeable between codefendants,

that tends to not prevent them from sharing confidential

information for the purpose of the common interest privilege.

So, again, Your Honor, the privilege can apply, and

any challenge is going to need to be on a document by document

basis.

And, finally, Your Honor, Vulcan is in no different

position.  Vulcan also has -- is party to a common interest

agreement with Mr. Allen and Charter.  And with that those same

documents, again, protect the waiver of the attorney-client

privilege when those individuals are present.

So on all these, Your Honor, there are multiple
categories where these can be privileged, and it'll be a
document by document discussion which we still have yet to have
whether those need to be raised with the Court.

I do have on the supplemental log, Your Honor, the
request for titles and individual employers.  They already have
that information on organization charts we produced.  We're
trying to do JPMorgan's work for it, and we're going to give
them a letter where these titles came, but they have that
information.  They can do that themselves.  But we are in
process of doing that and providing this additional information
they've asked for.  But I believe they have most, if not all,
of that information.

THE COURT:  So you're saying the form of log issue is
not an issue?

MR. DONOVAN:  I don't think it is, Your Honor.

THE COURT:  You're agreeing to supplement the log.

MR. DONOVAN:  Well, I don't think we -- we basically
told them we'd do a letter form on these titles.  What he asked
for is titles.  Who people are employed by, and, I think, two
in CC.  The two in CC we'll have to supplement the log on for
the documents.

THE COURT:  All right.  But as to this fourth issue,
it's off the table?

1      MR. DONOVAN:  Yes, Your Honor.

2      THE COURT:  Okay.

3      MR. DONOVAN:  Okay.  While we have this conference,

4  Your Honor, I want to inform, we are filing a request for an

5  informal discovery conference and would request time this week.

6  I'm happy to raise these issues now and see if we can just

7  resolve them.  Otherwise we would request time with you this

8  week because we also have concerns.  We're going to do it in a

9  short letter, just identifying the issues that we have with

10 JPMorgan's production.

11     THE COURT:  I'm happy with short letters.  Anything

12 less than nine pages.

13     MR. DONOVAN:  It will be.  But, I guess if I could

14 just preview.  One is that JPMorgan, there's a data room

15 similar to what you heard before that we've requested direct

16 access to.  Charter historically had access to that data room.

17 The access was severed.  We've asked for direct access back to

18 that.  It's called an intra-link site.  Again, it has

19 information related to the credit agreement.  We requested that

20 over a week and a half ago, and even if they're going to

21 produce the documents or have produced it's much easier for

22 financial advisors to look right at the data room.  We'd ask

23 that that be done today, if possible.

24     Also, Your Honor, another issue is both parties have

25 requested 30(b)(6) depositions on document production.

1   JPMorgan requested a deposition of Charter back on March 26th.

2   We gave them a date for that deposition on March 29th and it,

3   in fact, happened on April 9th.  That deposition went for about

4   eight hours in St. Louis on the document production.

5        Charter has requested a similar deposition of JPMorgan

6   on April 10th, so it's been seventeen days yet, and they still

7   have yet to provide us a date for that deposition.  We

8   requested that it would be at the end of this week, before

9   depositions on the merits start next week.  We've received no

10  date.  We'd ask that that be resolved today.

11       The pretty important issue on the merits, Judge, is

12  that JPMorgan has not yet produced, and, to date, is unwilling

13  to provide who they'll search or whether they'll search anyone,

14  any of the actual lenders that lended this credit agreement for

15  documents that we've requested.  JPMorgan to date has

16  questioned whether they have any obligation to do so.  First of

17  all, I think a matter of common sense would say JPMorgan, as

18  agent for the lenders, when they brought the complaint on

19  behalf of themselves and the lenders should have already

20  started that process.  But in case there's any ambiguity

21  there's a case in this district called JPMorgan Chase v.

22  Winnick which is 228 F.R.D. 505, which the Court goes through

23  the analysis and says there's no doubt that they have the duty

24  to collect that, and they need to collect from each of the

25  lenders and produce responsive documents.  To date, they are

1    not willing to do that.  We want to make sure that gets done.

2         And the fourth issue, Your Honor, is even within

3    JPMorgan itself JPMorgan has really limited who they'll search.

4    And especially based on the allegations in their complaint and

5    in their letters regarding the interpretation and meaning of

6    the credit agreement there are individuals that JPMorgan has

7    not searched that we think is critical.  And one is just, for

8    example, Jim Casey, who's the relationship manager for Charter

9    on high-yield debt offerings.  And why is that critical?  Well,

10   one reason is in the fourth quarter of 2008 a JPMorgan

11   representative made a presentation to the Charter Board of

12   Directors regarding the high-yield bond debt.  Since a lot of

13   the allegations in the complaint are geez, we didn't know the

14   financial status, what was going on within Charter, we think

15   those documents are going to be quite telling to rebut those.

16   But that's just, kind of, one example.  So those are four

17   issues that we're going to raise in a letter.  Maybe we can

18   resolve today, but we wanted to give you a heads-up that we're

19   filing that.

20        THE COURT:  Here I thought we had eliminated one and

21   we only have three.  Now I discover we have seven.  Let me just

22   deal with the last part of your presentation first.  The intra-

23   links, the 30(b)(6) designation, the duty to search syndicate

24   member documents and the identification of individuals for

25   deposition.

1           MR. FRIEDMAN:  Can I address those?  And I'll maybe

2      take some off the table if we need to.

3           THE COURT:  No.  No, you can't.

4           MR. FRIEDMAN:  Okay.

5           THE COURT:  I don't want to hear it.

6           MR. FRIEDMAN:  Okay.

7           THE COURT:  I want you to talk about it.  I want you

8      to not leave here until you've talked about each one to the

9      point of fatigue, and I want you to work it out.  If you can't

10     work it out there'll be a follow-up conference later this week,

11     which can be by telephone if the parties consent, or it can be

12     in this format if you think it's desirable.  But just in terms

13     of good practice, while I'm anxious to expedite I'm not anxious

14     to do so in a way that limits the ability of parties to present

15     their positions fully and defend against their positions and

16     also to have an opportunity to meet and confer.  And you're

17     going to meet and confer today on that.  So I'm not going to

18     address those four in the manner I just have.

19          Before going into the remaining three issues that --

20     this and subparts to the three issues -- but the remaining

21     issues that were identified in the original letter from

22     JPMorgan Chase, I simply want to ask, since there are a lot of

23     people in the room and I don't know everybody who's here.  Some

24     I do.  Some I don't.  If there's anyone who represents KPMG,

25     Lazard, Vulcan, Paul Allen, Duff & Phelps, who wishes to be

1 heard with respect to the informal discovery issues that are

2 being addressed right now, if the answer is no, that's fine.

3 If the answer is yes please identify yourselves, one at a time,

4 and tell me what you have to say.

5 MR. ZIMET: Your Honor, Robert Zimet. I represent

6 Mr. Allen and Vulcan. May I speak from here?

7 THE COURT: Yes. Well, why don't you come --

8 MR. ZIMET: Okay.

9 THE COURT: Why don't you come closer to the

10 microphone?

11 MR. ZIMET: I had hoped, maybe expected, not to have

12 to say anything today. And I don't, because counsel don't have

13 to say very much because counsel really did identify from

14 Vulcan and Mr. Allen's point of view why privilege is well

15 taken, why an analysis would have to be done on a document by

16 document basis. And I would only add that there has been --

17 I've represented Mr. Allen in connection with Charter matters

18 for about eight years, and they have had a joint defense

19 agreement, common interest agreement in place for that time and

20 then renewed one in connection with the issues that led to the

21 Chapter 11 filing. And it is, at times there may be tension.

22 The reason you have a joint defense agreement or a common

23 interest agreement with separate counsel is because there are

24 occasions when the interests may diverge, but the predominant

25 interest is one that is shared by Vulcan, and Mr. Allen as

1  significant investors and holders in Charter, and Charter

2  itself.  And an additional relevant consideration, I think,

3  that deals with the attorney work product privilege where, and

4  I believe many of the documents that have been withheld have

5  been withheld on that basis too, and that doesn't require --

6  the waiver rules are different.  If you're asserting a work

7  product privilege, and you've taken steps to secure the

8  confidentiality of that material where the interest is shared,

9  the fact that somebody may have access to that information who

10  would not technically fall within the same attorney-client

11  role, it's a different situation than when you're dealing with

12  the attorney-client privilege where any stranger to the

13  attorney-client relationship may invalidate the privilege.

14  When you're dealing with the work product immunity it's really

15  a matter of have you taken adequate steps to protect the

16  confidentiality of it and to preclude access to potential

17  adversaries.  And that applies here too.  And I think that's

18  what I had to say.

19        THE COURT:  Okay.

20        MR. ZIMET:  Thank you.

21        THE COURT:  Thank you.

22        MR. RUEGGER:  Good morning, Your Honor.

23  Arthur Ruegger from the Sonnenschein firm on behalf of Lazard.

24        THE COURT:  Why don't you speak up too?

25        MR. RUEGGER:  I'm sorry.

1    THE COURT:  You're somewhat distant from the

2  microphone.

3    MR. RUEGGER:  But I don't need to be heard for long,

4  Your Honor.

5    THE COURT:  That's great.

6    MR. RUEGGER:  I just do want to say that with all

7  respect to Mr. Friedman, I believe his arguments about

8  financial advice not being privileged paints with too broad a

9  brush, that the authorities are pretty well settled in this

10  circuit and elsewhere that when counsel to the debtor requests

11  financial advice from the financial advisors for the purpose of

12  rendering legal advice to the debtor, that that financial

13  advice that only goes to counsel, and, perhaps, to the debtor

14  also, is properly privileged.  The problem it presents to us is

15  we have to determine for each document or each piece of

16  financial advice did counsel request it.  What was the purpose

17  of it?  And so that's why, as Mr. Donovan pointed out for

18  Charter, it's a document by document issue.  But Mr. Donovan is

19  absolutely correct, and it's been Lazard's practice over the

20  years, and it has been observed by the course, that the advice

21  requested by counsel, brought only back to counsel to give that

22  legal advice, is privileged.  So if that issue requires further

23  briefing in front of Your Honor we're happy to participate, and

24  if the issue comes up on a document by document basis we're

25  happy to explain why we think certain documents will be

privileged.

THE COURT: Okay. That's it? Let me make a few comments, with the understanding that these are comments. I'm not prejudging anything.

First of all, as to the original request for this conference, my recollection of the original letter from JPMorgan Chase was that it was principally addressed to the notion of alleged stonewalling on the part of Charter and the suggestion that Charter was withholding from production significant quantities of otherwise discoverable material by asserting a blanket privilege of either attorney-client privilege, accountant-client privilege or common interest privilege.

I don't know whether or not there has been a change in position as a result of the passage of time, a misunderstanding of the position, or whether or not there has been a change in position as a result of the exchange of correspondence and the fact that we've a conference here today. But as I understand what I've heard Charter is not asserting on a blanket basis any privileges but, rather, is taking the position that these privileges and/or doctrines apply on a document specific basis which may, incidentally, apply to whole categories of documents, so that it may be that there are multiple types of documents that fit within a basket that would, in their view, be privileged and not subject to production. But when I use

1   the document specific label I'm merely referring to

2   identifiable material that you can categorize fairly as either

3   being or not being subject to an applicable privilege.

4          So, at least as to the assertions that got us to this

5   place in the first instance of blanket privilege, it's my

6   understanding that's not truly before me at this moment.  If I

7   have a misunderstanding on that we can readdress that.  I'm

8   going to go now to the various points that have been identified

9   that are still open and that may, indeed, become the subject of

10  motion practice.

11         As to the privilege applicable to either Lazard or

12  KPMG, it's my understanding that Charter does not assert, under

13  Missouri law or any other applicable law, that there is a

14  financial advisor or accountant privilege, and, instead, is

15  arguing that on a document by document or category of document

16  basis that where Lazard and KPMG have provided specific advice

17  in consultation with counsel or to support the work of counsel,

18  that the applicable case law here, including the Koval case,

19  might apply, and to the extent that these entities are acting

20  as interpreters of complex data to assist counsel in rendering

21  the advice of counsel (loud noise in audio) Charter, that such

22  information would be properly subject to a claim of privilege.

23         I agree to the extent that such a showing can be made

24  on a particularly document by document or category to document

25  basis, and, incidentally , I view this as intensely fact

1   specific and would require a showing that goes well beyond the

2   parsing of a document that by its very terms is labeled

3   executive summary.  And I think we recognize that executive

4   summaries are almost by definition somewhat misleading.  This

5   is complicated material, highly complex with top line headlines

6   in the executive summary.  Those who read executive summaries

7   and assume that they understand something are executives.

8   Those who actually understand what's going on are probably the

9   people who report to the executives.  And I suspect that

10  there's a lot more here than meets the eye on one page.  And so

11  I take no position for present purposes as to whether any

12  individual document, including this apparent PowerPoint that

13  was prepared in anticipation of the November 14, 2008 board

14  meeting, fits within any category.  Nor do I take any position

15  at this moment, although I recognize the materiality of the

16  information, as to whether information concerning financial

17  surplus and means to affect the distribution within the chain

18  of companies should be fairly withheld from production or

19  should be exposed to production.  This is a complicated subject

20  as to which everybody in the room knows more than I do, because

21  you've been spending time on this that preceded even the filing

22  date of this bankruptcy case.

23          I don't know whether or not what I've just said is

24  helpful or not, but it's certainly my view of the law, and I

25  was happy to be reminded of my decision in Soprano (ph.), which

1    I'd forgotten, and I reread.  It's very well written.  And very

2    helpful to me to be reminded of what I had written once before.

3    All kidding aside, I believe that this is probably a privilege

4    which under the facts of this case may be difficult to assert

5    on a broad basis, because the notion of KPMG as auditor and

6    Lazard as financial advisor working either independently, or in

7    conjunction with, or at the request of counsel, may turn out to

8    be a difficult proposition to support, particularly where

9    Lazard, and I'm focusing on Lazard in particular because of the

10   reference to the November board meeting PowerPoint, may have

11   been involved in significant activity to advise the board.  It

12   was not filtered through counsel nor designed to advise counsel

13   but rather designed to do what Lazard does, which is to provide

14   independent advice.  And I will admit to having years and years

15   ago been involved in advisory situations where Lazard was at

16   the table through Mr. Millstein.  It's happened.  It can't be

17   avoided if you've been in this practice long enough.  And I

18   know how Lazard conducts itself, and I know how counsel

19   generally conducts itself.  And there are certain instances

20   when there's clear connection and confidential advisory work

21   that goes on which might well be subject to a proper claim of

22   privilege, and then there are other examples where people run

23   free in their separate directions.  I don't know what the facts

24   are here.  And I suspect that the facts will determine the

25   outcome.

1        As to KPMG, really, the same proposition applies,

2   although it may be an even more challenging assertion given the

3   fact that they are at least categorized as being auditors.  I

4   don't know whether or not that audit function, which,

5   presumably, at least contributed to the implied surplus

6   calculation on page 4 of the document, is something that was

7   done independently or through counsel.  If it was done

8   independently it may become difficult to assert a privilege.

9   If it was done at the direction of and then through counsel, I

10  don't know.  But it's also my understanding that it hasn't been

11  redacted, and to the extent that it suits Charter's purposes I

12  suspect a lot of information will be presented that shows that

13  there's plenty of surplus there anyway.

14       As far as the Vulcan/Paul Allen common interest for a

15  joint defense privilege is concerned, I don't really know

16  enough to comment on this.  I would note for the information of

17  counsel that on Friday Chief Judge Bernstein, in a matter in

18  the Quigley bankruptcy, issued a decision which addresses the

19  common interest doctrine and other issues of privilege, which I

20  commend to counsel to review and which represents a case that,

21  while not binding on me is, nonetheless, in my judgment a

22  carefully prepared and well reasoned decision on these

23  subjects, the most recent articulation that anybody would look

24  to.

25       Whether or not the common interest privilege applies

1     either to Vulcan or to Paul Allen in this case I don't know,

2     but it certainly might.  And I'm not persuaded, but I am aware

3     of the fact that counsel for Vulcan came forward and said we've

4     been doing this for eight years.  The problem with common

5     interests, and joint defense agreements in general, is that

6     they are subject to potential mischief and abuse.  That's not

7     to say that there's any example of that here.  I know that when

8     I have been in the past, and not as a judge but as a lawyer,

9     involved in matters where similarly situated parties have

10    worked together to develop a common strategy, we attempted to

11    craft joint defense or common interest agreements and did so

12    with a hope and a prayer that they would work.  Happily, mostly

13    they're not tested.  This is a case where it may be tested.

14         In the end, it's a question of whether or not there's

15    legitimacy to the assertion and the reasonableness of the

16    positions being asserted now in terms of withholding documents

17    from production.  I know that Mr. Allen is a person who has

18    been closely associated with Charter for a very long time, that

19    he has economic interests that are affected by this that are

20    potentially adverse to that of the company and its creditors.

21    But it's also clear that in this restructuring context matters

22    were developed in consort with him.

23         I don't know enough yet to know which issues are

24    issues that would be subject to the categorization but they're

25    really adverse and that it's not appropriate to declare that

1   they're subject to a common interest, and which issues are

2   subject to the common interest agreement.  But I'm also aware

3   of the case law that indicates that the fact that one may have

4   adverse interest does not take away the ability to assert

5   legitimately that the common interest doctrine applies.  Again,

6   it's a case specific assessment that needs to be made, and I

7   can't do it thoughtfully on the basis of what's been presented

8   so far.

9           Now, let me make a more general comment, which is the

10  atmosphere of the case.  This is a very high-level, very

11  sophisticated, deep ticket, complex bankruptcy case being

12  handled by the best law firms around.  That's obvious.  And I

13  don't mean to suggest that people shouldn't be litigating this

14  as aggressively and zealously as the important subject matter

15  deserves.  But I sensed in the correspondence, I must tell you

16  this, and I know that there was a statement at the outset well,

17  I shouldn't think that you guys aren't working constructively

18  together.  I'm sure you are.  But I sensed in the

19  correspondence a posture on both sides.  To the extent you're

20  trying to gain advantage by doing that, you're not.  It's not

21  working.  That doesn't mean that these aren't entirely

22  legitimate disputes that, to the extent they can't be resolved

23  through the thoughtful activity of lawyers working

24  constructively to reach a good goal, will not end up in court

25  and be resolved as promptly as I can resolve them.  But for

1   this litigation to work it needs to have a somewhat more civil

2   spirit.  That's not to say that any cheap shots were landed or

3   that anybody attempted a cheap shot.  But I sense a tone in the

4   correspondence that, candidly, I don't like.  I don't like nine

5   page letters.  I don't like discovery disputes.  No judge does.

6   And lawyers don't like them either because in the end the

7   doctrines that we're talking about have meaning to the extent

8   they are applied and asserted in good faith.  My working

9   premise is that with the quality of the lawyers that we have

10  here this is being prosecuted on both sides, on all sides, in

11  the utmost good faith.  To the extent that a discovery dispute

12  is not resolved through your own efforts and ends up in front

13  of me, and I sense that there is extreme lawyering going on

14  here, the taking of a position that really isn't justified, it

15  will not serve your ultimate interests.  So please take that

16  into account.

17          What more can I do to be helpful?  As to the last four

18  points I think what I can probably do to be helpful is not let

19  you leave.  You'll stay here for a while longer and talk about

20  it.  Yes, sir?

21          MR. ELKIND:  Your Honor, David Elkind of Ropes & Gray.

22  We're counsel, proposed counsel for the creditors' committee,

23  the official committee of unsecured creditors.

24          THE COURT:  Do you have a position on any of this?

25          MR. ELKIND:  I'm sorry?

1        THE COURT:  Do you have a position?

2        MR. ELKIND:  No, not on this.  I'm not articulating a

3    position on this.  But we have a separate matter relating to

4    the protective order which we can address in a very short

5    letter to Your Honor.  We're talking with debtor's counsel, and

6    rather than engage in motion practice, which is unnecessary, I

7    think, we feel there ought to be, as regard the creditors'

8    committee, one or two tweaks in the protective order, which

9    we're going to ask for by letter.  And we'll copy all of the

10   parties on this, and we'd like to handle it that way.  I think

11   it's the most cost-effective.

12       THE COURT:  That's fine.  As you can probably tell I'm

13   interested in your working things out if you can.  If you

14   can't, I'm interested in having prompt hearings.  So hopefully

15   you'll work things out.

16       Now, as far as the last, the intra-links, the

17   30(b)(6), the production of documents within the syndicate and

18   identification of witnesses and by moving this process along,

19   hopefully you'll reach an agreement on that, and if you can't

20   reach an agreement on it, or if you think it may take some

21   number of days before you can reach an agreement on it, just,

22   please, before you leave, just tell my chambers' staff where

23   you stand.  And then in terms of scheduling I leave it to you

24   whether or not these matters are matters that are best heard in

25   person on the record or whether or not they can be effectively

1    heard on a telephone conference.  I'm sensing that this command

2    performance, having everybody show up in court, works well the

3    first time.  I'm not sure it works so well the second time.

4    And so I see no reason to have eye contact with each of you to

5    talk about what I view as relatively refined issues of dispute.

6    So I suggest that we might do that on a telephone conference,

7    unless you really want to come down here, which is fine.  I

8    also leave it to you whether you want to have it recorded.  We

9    can always have a court reporter present for purposes of

10   recording it.  I leave that to you as well.  As far as timing

11   on that I could do it later this week, on Wednesday, if you

12   need that time.  And we'll refine the time of day that is most

13   convenient for the most of you.  Okay?

14              MALE SPEAKER:  Thank you, Your Honor.

15              THE COURT:  Good luck with the rest of this.

16        (Proceedings Concluded at 12:10 PM)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

Hana Copperman

Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501

Date:  April 29, 2009