Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Counsel to the Debtors and Debtors in Possession
(Other than Charter Investment, Inc.)

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:     (212) 594-5000
Facsimile:      (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) ) Chapter 11 |
| CHARTER COMMUNICATIONS, INC., et al., | ) ) Case No. 09-11435 (JMP) |
| Debtors. | ) ) ) ) Jointly Administered ) |

# NOTICE OF FILING OF (I) EXHIBITS A THROUGH F TO THE DEBTORS' DISCLOSURE STATEMENT TO CHAPTER 11 OF THE BANKRUPTCY CODE WITH RESPECT TO THE DEBTORS' JOINT PLAN OF REORGANIZATION, (II) REVISED RIGHTS OFFERING PROCEDURES, AND (III) ERRATA SHEETS

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"),[1] hereby file, as **Schedule 1** hereto, revised **Exhibits A**

---

[1] The Debtors in these cases include: Ausable Cable TV, Inc.; Hometown TV, Inc.; Plattsburgh Cablevision, Inc.; Charter Communications Entertainment I, LLC; Falcon First Cable of New York, Inc.; Charter Communications, Inc.; Charter Communications Holding Company, LLC; CCHC, LLC; Charter Communications Holdings, LLC; CCH I Holdings, LLC; CCH I, LLC; CCH II, LLC; CCO Holdings, LLC; Charter Communications Operating, LLC; American Cable Entertainment Company, LLC; Athens Cablevision, Inc.; Cable Equities Colorado, LLC; Cable Equities of Colorado Management Corp.; CC 10, LLC; CC Fiberlink, LLC; CC Michigan, LLC; CC Systems, LLC; CC V Holdings, LLC; CC VI Fiberlink, LLC; CC VI Operating, LLC; CC VII Fiberlink, LLC; CC VIII Fiberlink, LLC; CC VIII Holdings, LLC; CC VIII Leasing of Wisconsin, LLC; CC VIII Operating, LLC; CC VIII, LLC; CCH I Capital Corp.; CCH I Holdings Capital Corp.; CCH II Capital Corp.; CCO Fiberlink, LLC; CCO Holdings Capital Corp.; CCO NR Holdings, LLC; CCO Purchasing, LLC; Charter Advertising of Saint Louis, LLC; Charter Cable Leasing of Wisconsin, LLC; Charter Cable Operating Company, L.L.C.; Charter Cable Partners, L.L.C.; Charter Communications Entertainment, LLC; Charter Communications Entertainment I, DST; Charter Communications Entertainment II, LLC; Charter Communications Holdings Capital Corporation; Charter Communications Operating Capital Corp.; Charter Communications Properties LLC; Charter Communications V, LLC; Charter Communications Ventures, LLC; Charter Communications VI, LLC; Charter Communications VII, LLC; Charter Communications, LLC; Charter Distribution, LLC; Charter Fiberlink – Alabama, LLC; Charter Fiberlink AR-CCVII, LLC; Charter Fiberlink AZ-CCVII, LLC; Charter Fiberlink CA-CCO, LLC; Charter Fiberlink CA-CCVII, LLC; Charter Fiberlink CC VIII, LLC; Charter Fiberlink CCO, LLC; Charter Fiberlink CT-CCO, LLC; Charter Fiberlink – Georgia, LLC; Charter Fiberlink ID-CCVII, LLC; Charter Fiberlink – Illinois, LLC; Charter Fiberlink IN-CCO, LLC; Charter Fiberlink KS-CCO, LLC; Charter Fiberlink LA-CCO, LLC; Charter Fiberlink MA-CCO, LLC; Charter Fiberlink – Michigan, LLC; Charter Fiberlink – Missouri, LLC; Charter Fiberlink MS-CCVI, LLC; Charter Fiberlink NC-CCO, LLC; Charter Fiberlink NC-CCVII, LLC; Charter Fiberlink – Nebraska, LLC; Charter Fiberlink NH-CCO, LLC; Charter Fiberlink NM-CCO, LLC; Charter Fiberlink NV-CCVII, LLC; Charter Fiberlink NY-CCO, LLC; Charter Fiberlink NY-CCVII, LLC; Charter Fiberlink OH-CCO, LLC; Charter Fiberlink OK-CCVII, LLC; Charter Fiberlink OR-CCVII, LLC; Charter Fiberlink SC-CCO, LLC; Charter Fiberlink SC-CCVII, LLC; Charter Fiberlink – Tennessee, LLC; Charter Fiberlink TX-CCO, LLC; Charter Fiberlink UT-CCVII, LLC; Charter Fiberlink VA-CCO, LLC; Charter Fiberlink VT-CCO, LLC; Charter Fiberlink WA-CCVII, LLC; Charter Fiberlink – Wisconsin, LLC; Charter Fiberlink WV-CCO, LLC; Charter Gateway, LLC; Charter Helicon, LLC; Charter Investment, Inc.; Charter RMG, LLC; Charter Stores FCN, LLC; Charter Video Electronics, Inc.; Dalton Cablevision, Inc.; Enstar Communications Corporation; Falcon Cable Communications, LLC; Falcon Cable Media, a California Limited Partnership; Falcon Cable Systems Company II, L.P.; Falcon Cablevision, a California Limited Partnership; Falcon Community Cable, L.P.; Falcon Community Ventures I, LP; Falcon First Cable of the Southeast, Inc.; Falcon First, Inc.; Falcon Telecable, a California Limited Partnership; Falcon Video Communications, L.P.; Helicon Partners I, L.P.; HPI Acquisition Co., L.L.C.; Interlink Communications Partners, LLC; Long Beach, LLC; Marcus Cable Associates, L.L.C.; Marcus Cable of Alabama, L.L.C.; Marcus Cable, Inc.; Midwest Cable Communications, Inc.; Pacific Microwave; Peachtree Cable TV, L.P.; Peachtree Cable T.V., LLC; Renaissance Media LLC; Rifkin Acquisition Partners, LLC; Robin Media Group, Inc.; Scottsboro TV Cable, Inc.; Tennessee, LLC; The Helicon Group, L.P.; Tioga Cable Company, Inc.; and Vista Broadband Communications, LLC.

**through F** to the Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code With Respect to the Debtors' Joint Plan of Reorganization, filed on May 7, 2009 [Docket No. 319].

 **PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file, as **Schedule 2** hereto, revised **Exhibits F** (Rights Offering Procedures) and **G** (Rights Exercise Form) to the Disclosure Statement Order,[2] which contain certain clarifying changes, and accompanying errata sheets indicating such changes.

---

2 Order (I) Approving the Disclosure Statement, (II) Establishing a Record Date for Voting on the Plan of Reorganization and the Rights Offering, (III) Approving Solicitation Packages and Procedures for the Distribution Thereof, (IV) Approving the Rights Offering Procedures and Rights Exercise Form, (V) Approving the Forms of Ballots and Manner of Notice, (VI) Approving the Commitment Agreements, (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan, and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan, entered on May 7, 2009 [Docket No. 323] (the "Disclosure Statement Order").

K&E 14663437.4

New York, New York
Dated: May 20, 2009

/s/ *Paul M. Basta*
Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors
and Debtors in Possession
Other than Charter Investment, Inc.

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258

Counsel to the Debtor and Debtor in
Possession Charter Investment, Inc.

K&E 14663437.4

# SCHEDULE 1

## Disclosure Statement Exhibits A through F

# EXHIBIT A

## Joint Plan of Reorganization

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

   - and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Telephone:      (312) 861-2000
Facsimile:      (312) 861-2200

Counsel to the Debtors and Debtors in Possession
(other than Charter Investment, Inc.)

   - and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:      (212) 594-5000
Facsimile:      (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., et al., | ) | Case No. 09-11435 (JMP) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Dated:  May 7, 2009

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................1

ARTICLE I.   DEFINITIONS AND INTERPRETATION .................................................1
    A.    Defined Terms ...............................................................................................1
    B.    Rules of Interpretation ...............................................................................17
    C.    Computation of Time ..................................................................................18

ARTICLE II.   ADMINISTRATIVE AND PRIORITY CLAIMS.........................................19
    A.    Administrative Expense Claims ..................................................................19
    B.    Professional Compensation and Reimbursement Claims .............................19
    C.    Priority Tax Claims ....................................................................................19

ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS..................................20
    A.    CCI ............................................................................................................20
    B.    CII .............................................................................................................20
    C.    Holdco, Enstar Communications Corporation, and Charter Gateway, LLC....20
    D.    CCHC ........................................................................................................21
    E.    CCH and Charter Communications Holdings Capital Corp. ........................21
    F.    CIH and CCH I Holdings Capital Corp. ......................................................21
    G.    CCH I and CCH I Capital Corp. .................................................................21
    H.    CCH II and CCH II Capital Corp. ..............................................................22
    I.    CCOH and CCO Holdings Capital Corp. ....................................................22
    J.    CCO (and its direct and indirect subsidiaries) ...........................................23

ARTICLE IV.   TREATMENT OF CLAIMS AND INTERESTS..........................................24
    A.    CCI ............................................................................................................24
    B.    CII .............................................................................................................25
    C.    Holdco, Enstar Communications Corporation, and Charter Gateway, LLC....27
    D.    CCHC ........................................................................................................28
    E.    CCH and Charter Communications Holdings Capital Corp. ........................30
    F.    CIH and CCH I Holdings Capital Corp. ......................................................31
    G.    CCH I and CCH I Capital Corp. .................................................................33
    H.    CCH II and CCH II Capital Corp. ..............................................................35
    I.    CCOH and CCO Holdings Capital Corp. ....................................................38
    J.    CCO (and its direct and indirect subsidiaries) ...........................................39

ARTICLE V.   IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS;
ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION .....................42
    A.    Classes Entitled to Vote .............................................................................42
    B.    Classes Not Entitled to Vote; Deemed to Accept.........................................42
    C.    Classes Not Entitled to Vote; Deemed to Reject..........................................43
    D.    Nonconsensual Confirmation .....................................................................44

ARTICLE VI.   PROVISIONS FOR IMPLEMENTATION OF THE PLAN..........................45
    A.    Sources of Consideration for Plan Distributions.........................................45
    B.    Reorganized Company Equity Interests ......................................................46
    C.    CII Settlement Claim .................................................................................47
    D.    Section 1145 Exemption .............................................................................48
    E.    Corporate Existence ...................................................................................48
    F.    Vesting of Assets in the Reorganized Debtors .............................................48
    G.    Discharge of Debtors .................................................................................48
    H.    Restructuring Transactions .........................................................................49
    I.    Corporate Action .......................................................................................49

J.     Post-Effective Date Governance ................................................................49

K.    Limited Liability Company Agreement .....................................................49

L.    Effectuating Documents; Further Transactions..........................................49

M.   Exemption from Certain Transfer Taxes and Recording Fees ..................49

N.    Board Representation .................................................................................50

O.    Senior Management ....................................................................................50

P.    Management Incentive Plan and VCP ........................................................50

Q.    Employee and Retiree Benefits .................................................................51

R.    Creation of Professional Fee Escrow Account...........................................51

S.    Preservation of Rights of Action ...............................................................51

**ARTICLE VII.   TREATMENT OF EXECUTORY CONTRACTS..........................52**

A.    Assumption and Rejection of Executory Contracts ..................................52

B.    Indemnification Obligations......................................................................52

C.    Cure of Defaults for Assumed Executory Contracts .................................53

D.    Claims Based on Rejection or Repudiation of Executory Contracts..........54

E.    Reservation of Rights.................................................................................54

F.    Nonoccurrence of Effective Date ..............................................................54

**ARTICLE VIII.   PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES ...........55**

A.    Allowance of Claims and Interests............................................................55

B.    Claims and Interests Administration Responsibilities...............................55

C.    Estimation of Claims and Interests............................................................55

D.    Adjustment to Claims and Interests Without Objection ...........................55

E.    Disallowance of Claims or Interests .........................................................55

F.    Offer of Judgment .....................................................................................55

G.    Amendments to Claims .............................................................................56

**ARTICLE IX.   PROVISIONS GOVERNING DISTRIBUTIONS ..............................57**

A.    Distributions on Account of Claims and Interests Allowed As of the Effective Date ..................57

B.    Distributions on Account of Claims and Interests Allowed After the Effective Date.............57

C.    Delivery of Distributions ..........................................................................57

D.    Claims Paid or Payable by Third Parties ...................................................59

E.    Allocation Between Principal and Accrued Interest .................................59

**ARTICLE X.   EFFECT OF PLAN CONFIRMATION..............................................60**

A.    Discharge of Claims and Termination of Interests ...................................60

B.    Compromise and Settlement of Claims and Controversies.......................60

C.    CCO Credit Facility...................................................................................60

**D.    Releases by the Debtors .............................................................................60**

**E.    Third Party Releases..................................................................................61**

**F.    Injunction...................................................................................................61**

**G.    Exculpation ................................................................................................61**

H.    Protection Against Discriminatory Treatment ..........................................62

**I.    Setoffs and Recoupment ............................................................................62**

**J.    Release of Liens ........................................................................................62**

K.    Document Retention ..................................................................................62

L.    Reimbursement or Contribution ................................................................62

**ARTICLE XI.   ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS...................................................................................................63**

A.    Professional Claims...................................................................................63

B.    Other Administrative Expense Claims ......................................................64

**ARTICLE XII.   CONDITIONS PRECEDENT TO EFFECTIVE DATE .....................65**

A.    Conditions Precedent to Effective Date ....................................................65

ii

|   | B. | Waiver of Conditions Precedent | 65 |
|   | C. | Effect of Non-Occurrence of Conditions to the Effective Date | 65 |

**ARTICLE XIII.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ...... 67

|   | A. | Modification or Amendments | 67 |
|   | B. | Effect of Confirmation on Modifications | 67 |
|   | C. | Revocation or Withdrawal of Plan | 67 |

**ARTICLE XIV.  RETENTION OF JURISDICTION** .......................................................... **68**

**ARTICLE XV.  MISCELLANEOUS PROVISIONS** ......................................................... **70**

|   | A. | Immediate Binding Effect | 70 |
|   | B. | Additional Documents | 70 |
|   | C. | Payment of Statutory Fees | 70 |
|   | D. | Reservation of Rights | 70 |
|   | E. | Successors and Assigns | 70 |
|   | F. | Service of Documents | 70 |
|   | G. | Term of Injunctions or Stays | 71 |
|   | H. | Entire Agreement | 72 |
|   | I. | Governing Law | 72 |
|   | J. | Exhibits | 72 |
|   | K. | Nonseverability of Plan Provisions upon Confirmation | 72 |
|   | L. | Closing of Chapter 11 Cases | 72 |
|   | M. | Waiver or Estoppel | 72 |
|   | N. | Conflicts | 72 |

# INTRODUCTION

Charter Communications, Inc. and the other debtors in the above-captioned chapter 11 cases (collectively, the "Debtors")[1] propose the following joint plan of reorganization (the "Plan") for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in ARTICLE I.A of the Plan.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

A.  **Defined Terms.** As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires. Any term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.  "Accrued Professional Compensation" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses. To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.  "Administrative Expense Claim" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of retained Professionals in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.  "Affiliate" is as defined in section 101(2) of the Bankruptcy Code.

4.  "Allen Entities" means (a) Mr. Allen, (b) any Entity controlled by Mr. Allen, (c) any trust in which Mr. Allen is the grantor, (d) the estate, spouse, immediate family members and heirs of Mr. Allen, and (e) any trust created as a result of the death of Mr. Allen; provided, however, the Debtors (other than CII) shall not be Allen Entities. For the purpose of this definition, "controlled" means the direct or indirect ownership of at least fifty percent (50%) of the voting power and economic interest of such Entity.

5.  "Allen Fee Reimbursement" means up to $20 million for the actual out-of-pocket fees and expenses of the CII Settlement Claim Parties in connection with the proposed restructuring, without further Bankruptcy Court approval and after submission of documentation by Mr. Allen to the Reorganized Debtors (other than Reorganized CII).

6.  "Allen Management Receivable" means $25 million for amounts owing to CII under the Management Agreement and predecessor agreements, which shall constitute payment in full thereunder.

---

[1]   A full list of the Debtors in these Chapter 11 Cases is attached as Exhibit 1 to the Plan Supplement.

7.    "Allowed" means, with respect to any Claim against any Debtor, except as otherwise provided herein, any Claim listed by such Debtor in its books and records as liquidated in amount and not disputed or contingent; provided, that to the extent that a Claim is a Disputed Claim, the determination of whether such Claim shall be allowed and/or the amount of any such Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated, as the case may be, if the Chapter 11 Cases had not been commenced; and provided, further, the Debtors or Reorganized Debtors in their discretion may bring any objection or other motion with respect to a Disputed Claim for resolution. For the purpose of determining the amount in which a Claim is Allowed, the Debtors or Reorganized Debtors may, at their option, deduct therefrom an amount equal to the amount of any claim which the Debtors or Reorganized Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to applicable law.

8.    "Amended and Restated Bylaws" means the bylaws of the Reorganized Company, attached as Exhibit 2 to the Plan Supplement.

9.    "Amended and Restated Certificate of Incorporation" means the certificate of incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement.

10.   "Annex C" means the list of Rollover Commitment Parties and related aggregate commitment amounts set forth in Annex C to the Term Sheet (and attached as Exhibit 4 to the Plan Supplement).

11.   "Annex D" means the list of New CCH II Notes Commitment Parties and aggregate commitment amounts set forth in Annex D to the Term Sheet (and attached as Exhibit 5 to the Plan Supplement).

12.   "Annex E" means the list of Equity Backstop Parties and aggregate commitment amounts set forth in Annex E to the Term Sheet (and attached as Exhibit 6 to the Plan Supplement).

13.   "Authorized Class B Holders" means any of: (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; and (c) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist exclusively of Mr. Allen or such other Persons referred to in clause (b) above or a combination thereof.

14.   "Available Cash" means, as of any date of determination, all Cash and cash equivalents on the consolidated balance sheet of the Reorganized Company and its consolidated subsidiaries, excluding any Cash collateral securing letters of credit and segregated Cash that may be used only as required by contract, statute or regulation (other than funds set aside to satisfy Specified Fees and Expenses), after giving effect to the use of proceeds described in clauses (a) through (e) of ARTICLE VI.A.1, minus the Fee Payment Threshold; provided, that if the Overallotment Option is exercised, the Cash proceeds of the Overallotment Option shall be deemed to be included on the balance sheet of the Reorganized Company as of the Effective Date, regardless of the actual date of funding thereof.

15.   "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

16.   "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

17.   "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075.

18.   "Board of Directors" means the Reorganized Company's board of directors.

19.   "Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

20.   "Cash" means legal tender of the United States of America.

21.　"Causes of Action" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

22.　"CC VIII" means CC VIII, LLC.

23.　"CC VIII Preferred Units" means the Class A preferred units of CC VIII.

24.　"CCH" means Charter Communications Holdings, LLC.

25.　"CCH Notes" means:

(a)　the 9.625% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due November 15, 2009 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(b)　the 9.92% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2011 issued pursuant to the Indenture, dated as of March 17, 1999, among CCH and Charter Communications Holdings Capital Corp., as issuers, Marcus Cable Holdings, LLC, as guarantor, and Harris Trust and Savings Bank, as trustee;

(c)　the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2009 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(d)　the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(e)　the 10.25% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(f)　the 10.75% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due October 1, 2009 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(g)　the 11.125% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(h)　the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(i)　the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

3

(j)      the 12.125% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2012 issued pursuant to the Indenture, dated as of January 14, 2002, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee; and

(k)      the 13.50% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee.

26.      "CCH Notes Claim" means any Claim against CCH and/or Charter Communications Holdings Capital Corp. by Holders of CCH Notes on account of CCH Notes.

27.      "CCH Warrants" means those Warrants to be issued to Holders of CCH Notes Claims, which shall be in the form set forth in Exhibit 7 to the Plan Supplement.

28.      "CCH I" means CCH I, LLC.

29.      "CCH I Notes" means the 11.00% Senior Secured Notes of CCH I and CCH I Capital Corp. due 2015 issued pursuant to the Indenture, dated as of September 28, 2005, among CCH I and CCH I Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee.

30.      "CCH I Notes Claim" means any Claim against a Debtor by Holders of CCH I Notes on account of CCH I Notes.

31.      "CCH II" means CCH II, LLC.

32.      "CCH II Notes" means:

(a)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Indenture, dated as of September 23, 2003, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(b)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the First Supplemental Indenture, dated as of January 30, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(c)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Second Supplemental Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(d)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee; and

(e)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the First Supplemental Indenture, dated as of July 2, 2008, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee.

33.      "CCH II Notes Claim" means any Claim against a Debtor by Holders of CCH II Notes on account of CCH II Notes.

34.      "CCHC" means CCHC, LLC.

35. "CCHC Note" means the 14% Subordinated Accreting Note, dated as of October 31, 2005, issued by CCHC in favor of CII.

36. "CCI" means Charter Communications, Inc.

37. "CCI-CII Exchange Agreement" means the exchange agreement, dated as of November 12, 1999, by and among CCI, CII, Vulcan Cable III Inc. and Mr. Allen.

38. "CCI Notes" means:

(a)    the 5.875% Convertible Senior Notes of CCI due 2009 issued pursuant to the Indenture, dated as of November 22, 2004, among CCI and Wells Fargo Bank, N.A., as trustee; and

(b)    the 6.50% Convertible Senior Notes of CCI due 2027 issued pursuant to the Indenture, dated as of October 2, 2007, among CCI and The Bank of New York Trust Company, N.A., as trustee.

39. "CCI Notes Claim" means any Claim against CCI by Holders of CCI Notes on account of CCI Notes.

40. "CCO" means Charter Communications Operating, LLC.

41. "CCO Credit Facility" means the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated on March 6, 2007, among CCO, CCOH, the several banks and other financial institutions or entities from time to time parties thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A. and Bank of America, N.A., as syndication agents, Citicorp North America, Inc., Deutsche Bank Securities Inc., General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as revolving facility co-documentation agents, and Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as term facility co-documentation agents.

42. "CCO Credit Facility Claim" means any Claim against CCO and any other obligors under the CCO Credit Facility by Holders of the obligations under the CCO Credit Facility.

43. "CCO Notes" means:

(a)    the 8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2012 and the 8 3/8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2014 issued pursuant to the Indenture, dated as of April 27, 2004, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wells Fargo Bank, N.A., as trustee; and

(b)    the 10.875% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due September 15, 2014 issued pursuant to the Indenture, dated as of March 19, 2008, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wilmington Trust Company, as trustee.

44. "CCO Notes Claim" means any Claim against CCO, Charter Communications Operating Capital Corp., and any other obligors under the CCO Notes by Holders of CCO Notes on account of the CCO Notes.

45. "CCO Swap Agreements" means interest rate swaps entered into under ISDA Master Agreements with counterparties who were at the time of the relevant transaction lenders or affiliates of lenders under the CCO Credit Facility and which constitute Specified Hedge Agreements under the CCO Credit Facility and that share in the collateral pledged to the CCO Credit Facility lenders.

46. "CCO Swap Agreements Claim" means any Claim against CCO by counterparties to CCO Swap Agreements on account of CCO Swap Agreements.

47.　"CCOH" means CCO Holdings, LLC.

48.　"CCOH Credit Facility" means the Credit Agreement, dated as of March 6, 2007, among CCOH, the several banks and other financial institutions or entities from time to time parties thereto, Bank of America, N.A., as administrative agent, Banc of America Securities LLC and J.P. Morgan Securities Inc., as co-syndication agents, and Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc., as co-documentation agents.

49.　"CCOH Credit Facility Claim" means any Claim against CCOH and any other obligors under the CCOH Credit Facility by Holders of the obligations under the CCOH Credit Facility.

50.　"CCOH Notes" means the 8.75% Senior Notes of CCOH and CCO Holdings Capital Corp. due November 15, 2013 issued pursuant to the Indenture, dated as of November 10, 2003, among CCOH and CCO Holdings Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee.

51.　"CCOH Notes Claim" means any Claim against CCOH and/or CCO Holdings Capital Corp. by Holders of CCOH Notes on account of CCOH Notes Claims.

52.　"CEO" means the Reorganized Company's Chief Executive Officer.

53.　"Certificate" means any instrument evidencing a Claim or an Interest.

54.　"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases for all of the Debtors.

55.　"CIH" means CCH I Holdings, LLC.

56.　"CIH Notes" means the following notes issued pursuant to the Indenture, dated as of September 28, 2005, among CIH and CCH I Holdings Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee:

(a)　9.920% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due April 1, 2014;

(b)　10.00% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

(c)　11.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014;

(d)　11.75% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

(e)　12.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2015; and

(f)　13.50% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014.

57.　"CIH Notes Claim" means any Claim against a Debtor by Holders of CIH Notes on account of CIH Notes.

58.　"CIH Warrants" means those Warrants issued to Holders of CIH Notes Claims, the terms of which shall be set forth on Exhibit 8 to the Plan Supplement.

59.    "<u>CII</u>" means Charter Investment, Inc.

60.    "<u>CII Settlement Claim</u>" means any Claim or Interest held by a CII Settlement Claim Party on the Effective Date against or in a Debtor (other than CII), which

(a)    includes:

(i)    28,467,421 shares of Class A Common Stock of CCI (unless disposed of prior to the Effective Date, subject to the restrictions on transfer in any order of the Bankruptcy Court);

(ii)    10,000 vested options to acquire shares of Class A Common Stock of CCI;

(iii)    50,000 shares of Class B Common Stock of CCI;

(iv)    324,300,479 Class A Common Units of Holdco;

(v)    14,831,552 Class C Common Units of Holdco;

(vi)    rights under the CCI-CII Exchange Agreement;

(vii)    all Interests with respect to 7,282,183 CC VIII Preferred Units;

(viii)    the CCHC Note;

(ix)    accrued and unpaid management fees owing to CII under the Management Agreement;

(x)    rights under a letter agreement, dated as of September 21, 1999, by and among Vulcan Ventures Inc. (an entity controlled by Mr. Allen), CCI, CII, and Holdco, which would have granted Vulcan Ventures Inc. exclusive rights for carriage of up to eight digital channels of each of the Debtors' (other than CII) cable systems ;

(xi)    rights under that certain consulting agreement, dated as of March 10, 1999, by and among Vulcan Inc. (an entity controlled by Mr. Allen), CCI, and CCH, which provides for payment of a fee to Vulcan Inc. for assistance with acquisitions made by CCI or CCH; and

(xii)    any other Claim or Interest held by a CII Settlement Claim Party, including any rejection damages Claims, other than Claims and Executory Contracts specifically or categorically listed in clause (b) of this definition; but

(b)    excludes:

(i)    $70,650,000 principal amount of 9.920% Senior Discount Notes due 2014 (CUSIP No. 12501BAP9), $25,982,000 principal amount of 10.000% Senior Discount Notes due 2014 (CUSIP No. 12501BAQ7), and $55,140,000 principal amount of 11.750% Senior Discount Notes due 2014 (CUSIP No. 12501BAR5), issued by CIH and CCH I Holdings Capital Corp.;

(ii)    $47,278,000 principal amount of 11.000% Senior Notes due 2015 (CUSIP No. 12502BAE3), issued by CCH I and CCH I Capital Corp.;

(iii)    any Executory Contract to which Digeo, Inc., Digeo Interactive, LLC, or any of their subsidiaries is a party;

(iv)    the Indemnification Agreement by and between Mr. Allen and CCI, dated as of September 15, 2008; the Indemnification Agreement by and between Jo Allen Patton and CCI, dated as of

7

September 15, 2008; and the Indemnification Agreement by and between W. Lance Conn and CCI, dated as of September 15, 2008;

(v)     any Executory Contract between the Debtors (other than CII) and a CII Settlement Party that the Debtors assume, in consultation the Requisite Holders, which assumed Executory Contracts (if any) shall be listed on an Exhibit to the Plan Supplement; and

(vi)     any payment due for goods or services provided by a CII Settlement Party to the Debtors (other than CII) between February 11, 2009 and the Effective Date.

61.     "CII Settlement Claim Party" means: (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; (c) any trust in which Mr. Allen is the grantor or which is created as a result of his death; (d) CII; and (e) any other Allen Entity which Mr. Allen or any of the other persons or Entities identified in clauses (a) through (d) of this definition, unilaterally or together with any other Allen Entity (directly or through agents), can legally bind to a settlement, compromise and release of Claims and Interests against the applicable Debtors under the Plan without authorization, consent or approval of any other person or Entity; provided, however, that in no event shall "CII Settlement Claim Party" include any public company, including without limitation, any Entity that has securities listed, quoted or traded on any securities exchange.

62.     "CII Settlement Claim Warrants" means those warrants issued to Mr. Allen (or his designees) to purchase shares of New Class A Stock in an aggregate amount equal to 4% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of warrants and equity-based awards provided for by the Plan, the remaining terms of which are set forth on Exhibit 9 to the Plan Supplement.

63.     "CII Shareholder Claim" means any Claim against CII held by Mr. Allen.

64.     "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

65.     "Claims Register" means the official register of Claims and Interests maintained by the Notice, Claims and Solicitation Agent.

66.     "Class" means any group of substantially similar Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

67.     "Collateral" means any property or interest in property of the estates of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

68.     "Commitment Fees" means the aggregate of the Equity Backstop Fee, the Rollover Fee, and the New CCH II Notes Commitment Fee.

69.     "Commitment Letters" means the letters executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the New CCH II Notes Commitment Parties, on the other hand (attached as Exhibit 10 to the Plan Supplement).

70.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

71.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

72.     "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

73. "Confirmation Hearing Notice" means the notice of the Confirmation Hearing that sets forth in detail the voting and objection deadlines with respect to the Plan.

74. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

75. "COO" means the Reorganized Company's Chief Operating Officer.

76. "Creditor" means any Holder of a Claim.

77. "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the United States Trustee for the Southern District of New York on April 10, 2009 [Docket No. 136], with such additions and changes as may occur from time to time.

78. "Crossover Committee" means the members of the unofficial committee of unaffiliated holders of CCH I Notes and CCH II Notes.

79. "Cure" means the payment of Cash by the Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the applicable Executory Contract may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract of the Debtors and (b) permit the Debtors to assume such Executory Contract under section 365(a) of the Bankruptcy Code.

80. "Cure Bar Date" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption of the applicable Executory Contract, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract.

81. "D&O Liability Insurance Policies" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Petition Date.

82. "Debt Registration Rights Agreement" means the registration rights agreement between Reorganized CCH II, on the one hand, and certain holders of New CCH II Notes, on the other hand, attached as Exhibit 11 to the Plan Supplement.

83. "Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

84. "Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

85. "Disputed Claim" means any Claim against or Interest in any Reorganized Debtor which such Reorganized Debtor believes is unliquidated, disputed or contingent, and which has not been allowed by Final Order of a court of competent jurisdiction or by agreement with such Reorganized Debtor.

86. "Distribution Agent" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors to make or to facilitate distributions pursuant to the Plan.

87. "Distribution Date" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten days after the Effective Date, without further Bankruptcy Court order.

88. "Effective Date" means the date that all conditions to the effectiveness of the Plan have been satisfied or waived.

89.     "Eligible CCH I Notes Claim Holder" means each Holder of a CCH I Notes Claim on the Rights Offering Record Date and any transferee of such Holder's Rights as permitted under the Rights Offering Documents, in each case that is a qualified institutional buyer as defined in Rule 144A under the Securities Act or an accredited investor as defined in Rule 501 under the Securities Act and who has timely delivered an investor certificate certifying to that effect.

90.     "Employment Agreements" means the employment agreements attached as Exhibit 12 to the Plan Supplement.

91.     "Entity" has the meaning set forth in section 101(15) of the Bankruptcy Code.

92.     "Equity Backstop" means the obligations, several and not joint, of the Equity Backstop Parties (in the respective amounts set forth on Annex E), as described in ARTICLE IV.G.4(c)(iii) of the Plan and the Commitment Letters.

93.     "Equity Backstop Fee" means the aggregate Equity Backstop commitment fee for the use of capital set forth in the Commitment Letters.

94.     "Equity Backstop Parties" means the members of the Crossover Committee who have agreed, pursuant to their respective Commitment Letters, to provide the Equity Backstop.

95.     "Equity Registration Rights Agreement" means the registration rights agreement between Reorganized CCI, on the one hand, and certain holders of New Common Stock, on the other hand, attached as Exhibit 13 to the Plan Supplement.

96.     "Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

97.     "Excess Backstop" means the obligations, several and not joint, of the Excess Backstop Parties, as described in ARTICLE IV.G.4(c)(iv) of the Plan, the Commitment Letters, and the Excess Backstop Agreement.

98.     "Excess Backstop Agreement" means the excess backstop agreement executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the Excess Backstop Parties, on the other hand (attached as Exhibit 14 to the Plan Supplement).

99.     "Excess Backstop Party" means each Equity Backstop Party who committed to an Equity Backstop in excess of the dollar amount corresponding to its Pro Rata Participation Amount, the aggregate of which is set forth on Annex E.

100.    "Exchange" means the exchange by existing Holders of CCH II Notes for New CCH II Notes, as described in ARTICLE IV.A.4(c)(i).

101.    "Exchange Cutback" means, with respect to any existing Holder of CCH II Notes electing to participate in the Exchange, the potential reduction of such Holder's participation in the Exchange, as described in the treatment section for Class H-4 of the Plan.

102.    "Executory Contract" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

103.    "Exculpated Parties" means the Debtors, each party who signed a Plan Support Agreement, and the Creditors' Committee, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives.

104.    "Federal Judgment Rate" means the federal judgment rate in effect on the Petition Date.

105.    "Fees" means the reasonable fees, costs or charges provided for under the applicable agreement.

106.    "Fee Payment Threshold" means $600 million minus the sum of (i) any Cash payment of interest made during the Chapter 11 Cases on the CCH II Notes that are exchanged for New CCH II Notes pursuant to the Exchange and (ii) any prepayment of indebtedness for borrowed money or Cash redemption payment for New Preferred Stock after the Effective Date.

107.    "File" means to file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of a Proof of Claim or Interest, to file with the Notice, Claims and Solicitation Agent.

108.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

109.    "General Unsecured Claim" means any and all Claims against any of the Debtors that are not a/an (a) Administrative Expense Claim; (b) Professional Compensation and Reimbursement Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; (e) Secured Claim; (f) Section 510(b) Claim; (g) CCI Notes Claim; (h) CII Settlement Claim; (i) CII Shareholder Claim; (j) Holdco Notes Claim; (k) CCH Notes Claim; (l) CIH Notes Claim; (m) CCH I Notes Claim; (n) CCH II Notes Claim; (o) CCOH Credit Facility Claim; (p) CCOH Notes Claim; (q) CCO Credit Facility Claim; (r) CCO Swap Agreements Claim; (s) CCO Notes Claim; or (t) Interest.

110.    "Holdco" means Charter Communications Holding Company, LLC.

111.    "Holdco LLC Agreement" means the Amended and Restated Limited Liability Company Agreement for Holdco, a Delaware limited liability company, made and entered into effective as of August 31, 2001.

112.    "Holdco Notes" means:

        (a)    the 5.875% Mirror Convertible Senior Note of Holdco due November 16, 2009 issued pursuant to the Holdco Mirror Notes Agreement, dated as of November 22, 2004, between CCI and Holdco; and

        (b)    the 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco.

113.    "Holdco Notes Claim" means any Claim against Holdco by the Holder of Holdco Notes on account of Holdco Notes.

114.    "Holder" means an Entity holding a Claim or Interest, as applicable.

115.    "Impaired" means Claims in an Impaired Class.

116.    "Impaired Class" means an Impaired Class within the meaning of section 1124 of the Bankruptcy Code.

117.    "Incentive Program" means the Charter Communications, Inc. Incentive Program under the 2001 Stock Incentive Plan to provide incentives to certain management employees.

11

118. "Indemnification Obligation" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, or employees of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

119. "Interest" means any (a) equity Security in a Debtor, including all issued, unissued, authorized or outstanding shares of stock together with any Warrants, equity-based awards or contractual rights to purchase or acquire such equity Securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company or similar interest in a Debtor.

120. "Interim Compensation Order" means the order entered pursuant to the Debtors' Motion for an Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, Filed on or about the Petition Date.

121. "Key Executives" means the Chief Financial Officer, Chief Marketing Officer, Chief Technology Officer, General Counsel & Corporate Secretary, Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division.

122. "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

123. "Local Bankruptcy Rules" means the Local Bankruptcy Rules for the Southern District of New York.

124. "Lock-Up Agreement" means the lock-up agreement between the Reorganized Company and Mr. Allen (attached as Exhibit 15 to the Plan Supplement).

125. "Management Agreement" means the Amended and Restated Management Agreement, dated as of June 19, 2003, between CCO and CCI.

126. "Management Incentive Plan" means the stock incentive plan, attached as Exhibit 25 to the Plan Supplement, adopted by the CCI Board of Directors in 2009, that provides for grants of various awards, including but not limited to: nonqualified stock options, incentive stock options, stock appreciation rights, dividend equivalent rights, performance units and performance shares, share awards, phantom stock, restricted stock units and restricted stock, cash payments or any combination of the above. Under the Management Incentive Plan, the maximum number of shares that may be granted to participants, subject to adjustment under certain circumstances, will equal no less than three percent (3%) of the fully diluted New Class A Stock on the Effective Date.

127. "Mr. Allen" means Paul G. Allen.

128. "Mutual Services Agreement" means the Second Amended and Restated Mutual Services Agreement, dated as of June 19, 2003, between CCI and Holdco.

129. "Net Proceeds" means the aggregate total Cash proceeds from the issuance of New CCH II Notes pursuant to the New CCH II Notes Commitment (if any), the Rights Offering and the Overallotment Option (if exercised).

130. "New CCH II Notes" means the new 13.5% Senior Notes of CCH II and CCH II Capital Corp. to be issued pursuant to a new indenture in the form of Exhibit 16 to the Plan Supplement.

131. "New CCH II Notes Commitment" means the agreement by a New CCH II Notes Commitment Party in its Commitment Letter.

12

132. "New CCH II Notes Commitment Fee" means the Fee payable to the New CCH II Commitment Parties with respect to the New CCH II Notes Commitment, as set forth in the Commitment Letters.

133. "New CCH II Notes Commitment Parties" means the members of the Crossover Committee listed on Annex D.

134. "New Class A Stock" means the new Class A common stock, par value $.001 per share, of the Reorganized Company.

135. "New Class B Stock" means the new Class B common stock, par value $.001 per share, of the Reorganized Company.

136. "New Common Stock" means, collectively, the New Class A Stock and New Class B Stock.

137. "New Preferred Stock" means the Reorganized Company's Series A 15% Pay-in-Kind Preferred Stock, the terms of which are set forth on Exhibit A to the Amended and Restated Certificate of Incorporation.

138. "New Value Consideration" means consideration contributed (directly or indirectly) by CCI in exchange for Interests in certain Debtors remaining in place.

139. "New Value Interest" means interests in certain Reorganized Debtors purchased for Cash or other consideration, as provided for in the Plan.

140. "Non-Released Parties" means those Entities (other than Releasing Parties) identified in the Plan Supplement as Non-Released Parties.

141. "Notice, Claims and Solicitation Agent" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' notice, claims and solicitation agent.

142. "Overallotment Option" means the option offered to the Excess Backstop Parties to purchase additional shares of New Class A Stock pursuant to the Excess Backstop Agreement in an aggregate amount equal to $400 million less the aggregate dollar amount of shares purchased pursuant to the Excess Backstop.

143. "Per Share Purchase Price" means the Cash payment per share, reflecting a discount of 25% to the Plan Value minus the Warrant Value per share, to be paid by each participant in the Rights Offering and the Overallotment Option.

144. "Periodic Distribution Date" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediately preceding Periodic Distribution Date.

145. "Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

146. "Petition Date" means the date on which the Debtors Filed their voluntary petitions commencing these Chapter 11 Cases in the Bankruptcy Court.

147. "Plan" means this joint plan of reorganization, including the exhibits hereto or contained in the Plan Supplement.

148. "Plan Support Agreement" means restructuring agreements, dated as of February 11, 2009, between certain Debtors (other than CII), on the one hand, and certain Holders of Claims, on the other hand.

13

149. "Plan Supplement" means the compilation of documents and forms of documents and exhibits to the Plan Filed herewith, as supplemented or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

150. "Plan Value" means $665 million.

151. "Post-Petition Interest" means with respect to:

(a) the CCO Credit Facility, accrued and unpaid interest pursuant to the CCO Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(b) the CCO Swap Agreements, accrued and unpaid interest pursuant to the applicable ISDA Master Agreements from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

(c) the CCO Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(d) the CCOH Credit Facility, accrued and unpaid interest pursuant to the CCOH Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(e) the CCOH Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(f) the CCH II Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

(g) Secured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such Claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date; and

(h) General Unsecured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date, to the extent entitled thereto.

152. "Priority Non-Tax Claims" means any and all Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

153. "Priority Tax Claims" mean any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

154. "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in that particular Class and in other Classes entitled to share in the same recovery as such Allowed Claims under the Plan.

155. "Pro Rata Participation Amount" means, with respect to each Eligible CCH I Notes Claim Holder, an amount expressed in shares of New Class A Stock equal to the product of (a) the aggregate number of shares of New Class A Stock underlying Rights offered to all Eligible CCH I Notes Claim Holders multiplied by (b) a fraction, the numerator of which is the principal amount of CCH I Notes Claims held by such Eligible CCH I Notes

Claim Holder, and the denominator of which is the principal amount of CCH I Notes Claims held by all Eligible CCH I Notes Claim Holders.

156.    "Professional" means an Entity:    (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

157.    "Professional Compensation and Reimbursement Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

158.    "Professional Fee Escrow Account" means an interest-bearing account in an amount equal to any Professional fee reserve amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Professionals in the Chapter 11 Cases.

159.    "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

160.    "Rejection Damages Claim" means any Claim on account of the rejection of an Executory Contract pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

161.    "Releasing Parties" means (a) the Debtors, (b) the parties who signed Plan Support Agreements with a Debtor, and (c) any statutory committees appointed in the Chapter 11 Cases.

162.    "Reorganized CCH I" means CCH I after the Effective Date.

163.    "Reorganized CCH II" means CCH II after the Effective Date.

164.    "Reorganized CCO" means CCO after the Effective Date.

165.    "Reorganized CII" means CII after the Effective Date.

166.    "Reorganized Company" or "Reorganized CCI" means CCI after the Effective Date.

167.    "Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

168.    "Reorganized Holdco" means Holdco after the Effective Date.

169.    "Reorganized Holdco Exchange Agreement" means the exchange agreement among CCI, CII, Holdco and Mr. Allen, attached as Exhibit 17 to the Plan Supplement.

170.    "Reorganized Holdco LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of Reorganized Holdco, attached as Exhibit 18 to the Plan Supplement.

171.    "Requisite Holders" means the members of the Crossover Committee holding a majority in principal amount of the CCH I Notes held by all members of the Crossover Committee.

172.    "Rights" means the rights to purchase New Class A Stock, as described in ARTICLE G.4(c)(ii).

173.    "Rights Offering" means the transaction described in ARTICLE VI.G.4(c), the terms of which are set forth in the Rights Offering Documents, including without limitation the issuance of shares to certain Holders of CCH I Notes Claims who are not Eligible CCH I Notes Claim Holders.

174. "<u>Rights Offering Amount</u>" means an amount equal to (a) $1.623 billion minus (b) the excess, if any, of $450 million over the amount of the CCO Swap Agreements Claims.

175. "<u>Rights Offering Documents</u>" means the documents evidencing the offer and procedures for the Rights Offering, which procedures shall be approved in connection with the Bankruptcy Court's approval of the Disclosure Statement and are attached as Exhibit 19 to the Plan Supplement.

176. "<u>Rights Offering Record Date</u>" means April 17, 2009, 12 days prior to the date for which the Disclosure Statement hearing was originally scheduled.

177. "<u>Rollover Commitment</u>" means the commitment of the Rollover Commitment Parties.

178. "<u>Rollover Commitment Parties</u>" means the members of the Crossover Committee listed on Annex C.

179. "<u>Rollover Fee</u>" means an aggregate commitment fee for the use of capital, payable in Cash, in an amount equal to 1.5% of the principal amount plus interest on CCH II Notes exchanged by such Holder pursuant to the Exchange, as consideration for participating in the Exchange.

180. "<u>Schedules</u>" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

181. "<u>Section 510(b) Claims</u>" means any Claim arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

182. "<u>Secured Claim</u>" means, with respect to any Claim against any Debtor—other than CCO Credit Facility Claims, CCO Swap Agreements Claims, CCO Notes Claims, CCOH Credit Facility Claims, and CCH I Notes Claims—that portion, which, pursuant to section 506 of the Bankruptcy Code is (a) secured by a valid, perfected, and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).

183. "<u>Securities Act</u>" means the Securities Act of 1933, as amended.

184. "<u>Security</u>" means any instrument that qualifies under section 2(a)(1) of the Securities Act.

185. "<u>Servicer</u>" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

186. "<u>Specified Fees and Expenses</u>" means the Allen Management Receivable, the Allen Fee Reimbursement, the Commitment Fees, and payments due under the VCP.

187. "<u>Target Amount</u>" means $1.477 billion, plus accrued but unpaid interest to the Petition Date plus Post-Petition Interest on exchanged CCH II Notes, but excluding any call premiums or any prepayment penalties.

188. "<u>Term Sheet</u>" means the term sheet attached to the Plan Support Agreements and the Commitment Letters, to which CCI, among others, is a party, dated as of February 11, 2009.

189. "<u>Unclaimed Distribution</u>" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular

distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

190. "Unimpaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

191. "VCP" means the Value Creation Plan adopted by CCI on March 12, 2009 and attached as Exhibit 20 to the Plan Supplement.

192. "Warrant Value" means $53 million, subject to update upon Confirmation and with the consent of the Requisite Holders.

193. "Warrants" means, collectively, the CIH Warrants, the CCH Warrants and the CII Settlement Claim Warrants.

B.    Rules of Interpretation.  For purposes of the Plan:

1.    whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender;

2.    unless otherwise specified, any reference in the Plan or Plan Supplement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, except that any contract, instrument, release, indenture, or other agreement or document attached as an exhibit to the Plan Supplement shall be in the form attached, subject to technical amendments prior to the Effective Date to correct ambiguities, inconsistencies or errors, as applicable;

3.    unless otherwise specified, any reference in the Plan to an existing document or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented in accordance with its terms;

4.    any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

5.    unless otherwise specified, all references in the Plan to ARTICLES are references to ARTICLES of the Plan;

6.    unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement;

7.    the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

8.    subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

9.    captions and headings of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

10.    unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

11.    any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

12.    all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

13.    all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and

14.    any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order.

C.    <u>Computation of Time</u>:  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

## ARTICLE II.

### ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III. Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim designated in this ARTICLE II.

A.     <u>Administrative Expense Claims</u>.   Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of the Distribution Date under the Plan, the date such Administrative Expense Claim is Allowed, and the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

B.     <u>Professional Compensation and Reimbursement Claims</u>. Except as provided in ARTICLE II.A hereof, all Entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the applicable Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

C.     <u>Priority Tax Claims</u>. Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (2) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim or Interest designated in this ARTICLE III.

A.  **CCI**

    1.    **Class A-1** shall consist of all Priority Non-Tax Claims that may exist against CCI.

    2.    **Class A-2** shall consist of all Secured Claims that may exist against CCI.

    3.    **Class A-3** shall consist of all General Unsecured Claims that may exist against CCI.

    4.    **Class A-4** shall consist of CCI Notes Claims.

    5.    **Class A-5** shall consist of all Section 510(b) Claims that may exist against CCI other than all 510(b) Claims against CCI held by any CII Settlement Claim Party.

    6.    **Class A-6** shall consist of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

B.  **CII**

    1.    **Class B-1** shall consist of all Priority Non-Tax Claims that may exist against CII.

    2.    **Class B-2** shall consist of all Secured Claims that may exist against CII.

    3.    **Class B-3** shall consist of all General Unsecured Claims that may exist against CII.

    4.    **Class B-4** shall consist of CII Shareholder Claims.

C.  **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**

    1.    **Class C-1** shall consist of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

    2.    **Class C-2** shall consist of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

    3.    **Class C-3** shall consist of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

    4.    **Class C-4** shall consist of Holdco Notes Claims.

    5.    **Class C-5** shall consist of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

    6.    **Class C-6** shall consist of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

**D.     CCHC**

    1.     **Class D-1** shall consist of all Priority Non-Tax Claims that may exist against CCHC.

    2.     **Class D-2** shall consist of all Secured Claims that may exist against CCHC.

    3.     **Class D-3** shall consist of all General Unsecured Claims that may exist against CCHC.

    4.     **Class D-4** shall consist of all Section 510(b) Claims that may exist against CCHC.

    5.     **Class D-5** shall consist of all Interests in CCHC.

**E.     CCH and Charter Communications Holdings Capital Corp.**

    1.     **Class E-1** shall consist of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    2.     **Class E-2** shall consist of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    3.     **Class E-3** shall consist of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    4.     **Class E-4** shall consist of CCH Notes Claims.

    5.     **Class E-5** shall consist of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    6.     **Class E-6** shall consist of all Interests in CCH and Charter Communications Holdings Capital Corp.

**F.     CIH and CCH I Holdings Capital Corp.**

    1.     **Class F-1** shall consist of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

    2.     **Class F-2** shall consist of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    3.     **Class F-3** shall consist of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    4.     **Class F-4** shall consist of CIH Notes Claims.

    5.     **Class F-5** shall consist of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

    6.     **Class F-6** shall consist of all Interests in CIH and CCH I Holdings Capital Corp.

**G.     CCH I and CCH I Capital Corp.**

    1.     **Class G-1** shall consist of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

2. **Class G-2** shall consist of all Secured Claims that may exist against CCH I and CCH I Capital Corp.

3. **Class G-3** shall consist of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

4. **Class G-4** shall consist of CCH I Notes Claims.

5. **Class G-5** shall consist of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

6. **Class G-6** shall consist of all Interests in CCH I and CCH I Capital Corp.

**H.** <u>**CCH II and CCH II Capital Corp.**</u>

1. **Class H-1** shall consist of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

2. **Class H-2** shall consist of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

3. **Class H-3** shall consist of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

4. **Class H-4** shall consist of CCH II Notes Claims.

5. **Class H-5** shall consist of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

6. **Class H-6** shall consist of all Interests in CCH II and CCH II Capital Corp.

**I.** <u>**CCOH and CCO Holdings Capital Corp.**</u>

1. **Class I-1** shall consist of CCOH Credit Facility Claims.

2. **Class I-2** shall consist of CCOH Notes Claims.

3. **Class I-3** shall consist of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

4. **Class I-4** shall consist of all Secured Claims that may exist against CCOH and CCO Holdings Capital Corp.

5. **Class I-5** shall consist of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

6. **Class I-6** shall consist of all Interests in CCOH and CCO Holdings Capital Corp.

**J.      CCO (and its direct and indirect subsidiaries)**

The classifications set forth in Classes J-4 to J-9 shall be deemed to apply to CCO and each of its direct and indirect subsidiaries.[2]

1.      **Class J-1** shall consist of CCO Credit Facility Claims.

2.      **Class J-2** shall consist of CCO Swap Agreements Claims.

3.      **Class J-3** shall consist of CCO Notes Claims.

4.      **Class J-4** shall consist of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

5.      **Class J-5** shall consist of all Secured Claims that may exist against CCO and its direct and indirect subsidiaries.

6.      **Class J-6** shall consist of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries.

7.      **Class J-7** shall consist of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

---

[2]   For the avoidance of doubt, Classes J-4 to J-7 shall apply to the Debtors listed on Exhibit 21 to the Plan Supplement.

## ARTICLE IV.

## TREATMENT OF CLAIMS AND INTERESTS

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below. For the avoidance of doubt, notwithstanding any other provision of the Plan, (a) CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan and (b) the Debtors other than CII shall not be liable for any payment or distributions on account of Claims, Interest or amounts to be paid or owing by or other obligations of any kind of CII under or in connection with the Plan (other than the CII Settlement Claim).

A.      CCI

1.      **Class A-1: Priority Non-Tax Claims**

(a)      Classification. Class A-1 consists of all Priority Non-Tax Claims that may exist against CCI.

(b)      Impairment and Voting. Class A-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.      **Class A-2: Secured Claims**

(a)      Classification. Class A-2 consists of all Secured Claims that may exist against CCI.

(b)      Impairment and Voting. Class A-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions. Except to the extent that a Holder of an Allowed Secured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCI shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCI shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.      **Class A-3: General Unsecured Claims**

(a)      Classification. Class A-3 consists of all General Unsecured Claims that may exist against CCI other than all General Unsecured Claims against CCI held by any CII Settlement Claim Party.

(b)      Impairment and Voting. Class A-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCI is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCI shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.    **Class A-4:  CCI Notes Claims**

(a)    Classification.  Class A-4 consists of all CCI Notes Claims.

(b)    Impairment and Voting.  Class A-4 is Impaired by the Plan.  Each Holder of an Allowed CCI Notes Claim is entitled to vote to accept or reject the Plan.

(c)    Distributions.  The CCI Notes Claims shall be deemed Allowed in the aggregate amount of $497,489,463.  On the Distribution Date, each Holder of an Allowed CCI Notes Claim shall receive its Pro Rata share of (i) New Preferred Stock and (ii) Cash in an aggregate amount equal to $24,549,331.

5.    **Class A-5:  Section 510(b) Claims**

(a)    Classification.  Class A-5 consists of all Section 510(b) Claims that may exist against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party.

(b)    Impairment and Voting.  Class A-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.    **Class A-6:  Interests**

(a)    Classification.  Class A-6 consists of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

(b)    Impairment and Voting.  Class A-6 is Impaired by the Plan.  Each Holder of an Interest in CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Interests in CCI, whether represented by stock, preferred share purchase rights or otherwise, shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

**B.    CII**

1.    **Class B-1:  Priority Non-Tax Claims**

(a)    Classification.  Class B-1 consists of all Priority Non-Tax Claims that may exist against CII.

(b)    Impairment and Voting.  Class B-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the

Distribution Date under the Plan, the date such Priority Non-Tax Claim is Allowed, and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2. **Class B-2: Secured Claims**

(a) <u>Classification</u>. Class B-2 consists of all Secured Claims that may exist against CII.

(b) <u>Impairment and Voting</u>. Class B-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of CII, (i) each Allowed Secured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CII shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CII shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3. **Class B-3: General Unsecured Claims**

(a) <u>Classification</u>. Class B-3 consists of all General Unsecured Claims that may exist against CII.

(b) <u>Impairment and Voting</u>. Class B-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CII is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the applicable Debtors, (i) each Allowed General Unsecured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CII shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4. **Class B-4: CII Shareholder Claims**

(a) <u>Classification</u>. Class B-4 consists of CII Shareholder Claims.

(b) <u>Impairment and Voting</u>. Class B-4 is Impaired by the Plan. The Holder of an Allowed CII Shareholder Claim is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. The Holder of Allowed CII Shareholder Claims shall receive 100,000 newly issued shares of Class A Voting Common Stock of Reorganized CII on the Effective Date.

### C. Holdco, Enstar Communications Corporation, and Charter Gateway, LLC

1. **Class C-1: Priority Non-Tax Claims**

   (a)     Classification. Class C-1 consists of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

   (b)     Impairment and Voting. Class C-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

   (c)     Distributions. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2. **Class C-2: Secured Claims**

   (a)     Classification. Class C-2 consists of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

   (b)     Impairment and Voting. Class C-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

   (c)     Distributions. Except to the extent that a Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3. **Class C-3: General Unsecured Claims**

   (a)     Classification. Class C-3 consists of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

   (b)     Impairment and Voting. Class C-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is entitled to vote to accept or reject the Plan.

   (c)     Distributions. Except to the extent that a Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of

an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4. Class C-4: Holdco Notes Claims

(a) <u>Classification</u>. Class C-4 consists of Holdco Notes Claims.

(b) <u>Impairment and Voting</u>. Class C-4 is Impaired by the Plan. Each Holder of an Allowed Holdco Notes Claim is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. The Holdco Notes Claims shall be Allowed in the aggregate amount of $497,489,463. The aggregate amount distributed under the Plan on account of Class C-4 Allowed Holdco Notes Claims shall be consideration equal to $19,549,331, which consideration shall be distributed as set forth in Class A-4 as CCI is the sole Holder of Holdco Notes Claims.

### 5. Class C-5: Section 510(b) Claims

(a) <u>Classification</u>. Class C-5 consists of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b) <u>Impairment and Voting</u>. Class C-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

### 6. Class C-6: Interests

(a) <u>Classification</u>. Class C-6 consists of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

(b) <u>Impairment and Voting</u>. Class C-6 is Impaired by the Plan. Each Holder of an Allowed Interest against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

## D. CCHC

### 1. Class D-1: Priority Non-Tax Claims

(a) <u>Classification</u>. Class D-1 consists of all Priority Non-Tax Claims that may exist against CCHC.

(b) <u>Impairment and Voting</u>. Class D-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax

Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 2. Class D-2: Secured Claims

(a)    Classification. Class D-2 consists of all Secured Claims that may exist against CCHC.

(b)    Impairment and Voting. Class D-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions. Except to the extent that a Holder of an Allowed Secured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCHC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCHC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3. Class D-3: General Unsecured Claims

(a)    Classification. Class D-3 consists of all General Unsecured Claims that may exist against CCHC other than all General Unsecured Claims against CCHC held by any CII Settlement Claim Party.

(b)    Impairment and Voting. Class D-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCHC is entitled to vote to accept or reject the Plan.

(c)    Distributions. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCHC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4. Class D-4: Section 510(b) Claims

(a)    Classification. Class D-4 consists of all Section 510(b) Claims that may exist against CCHC.

(b)    Impairment and Voting. Class D-4 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions. Section 510(b) Claims shall be cancelled, released and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

### 5. Class D-5: Interests

(a)    Classification. Class D-5 consists of all Interests in CCHC.

(b)     Impairment and Voting.  Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Interests in CCHC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

## E.     CCH and Charter Communications Holdings Capital Corp.

### 1.     Class E-1:  Priority Non-Tax Claims

(a)     Classification.  Class E-1 consists of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)     Impairment and Voting.  Class E-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 2.     Class E-2:  Secured Claims

(a)     Classification.  Class E-2 consists of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)     Impairment and Voting.  Class E-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3.     Class E-3:  General Unsecured Claims

(a)     Classification.  Class E-3 consists of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b) <u>Impairment and Voting</u>. Class E-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.   **Class E-4: CCH Notes Claims**

(a) <u>Classification</u>. Class E-4 consists of CCH Notes Claims.

(b) <u>Impairment and Voting</u>. Class E-4 is Impaired by the Plan. Each Holder of an Allowed CCH Notes Claim is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. CCH Notes Claims shall be Allowed in the aggregate amount of $599,379,759. On the Distribution Date, each Holder of an Allowed CCH Notes Claim shall receive its Pro Rata share of the CCH Warrants.

5.   **Class E-5: Section 510(b) Claims**

(a) <u>Classification</u>. Class E-5 consists of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b) <u>Impairment and Voting</u>. Class E-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.   **Class E-6: Interests**

(a) <u>Classification</u>. Class E-6 consists of all Interests in CCH and Charter Communications Holdings Capital Corp.

(b) <u>Impairment and Voting</u>. Class E-6 is Impaired by the Plan. Each Holder of an Allowed Interest against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Interests in CCH and Charter Communications Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $1,533,180 to be contributed by CCI from the Rights Offering.

F.   <u>**CIH and CCH I Holdings Capital Corp.**</u>

1.   **Class F-1: Priority Non-Tax Claims**

(a) <u>Classification</u>. Class F-1 consists of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>. Class F-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided, however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.     Class F-2: Secured Claims**

(a)     <u>Classification</u>. Class F-2 consists of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>. Class F-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.     Class F-3: General Unsecured Claims**

(a)     <u>Classification</u>. Class F-3 consists of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>. Class F-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.     Class F-4: CIH Notes Claims**

(a)     <u>Classification</u>. Class F-4 consists of CIH Notes Claims.

(b)     <u>Impairment and Voting</u>. Class F-4 is Impaired by the Plan. Each Holder of an Allowed CIH Notes Claim is entitled to vote to accept or reject the Plan.

(c)    Distributions.    CIH Notes Claims shall be Allowed in the aggregate amount of $2,625,060,226. On the Distribution Date, each Holder of CIH Notes Claim shall receive its Pro Rata share of the CIH Warrants.

5.    **Class F-5: Section 510(b) Claims**

(a)    Classification.    Class F-5 consists of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)    Impairment and Voting.    Class F-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.    Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.    **Class F-6: Interests**

(a)    Classification.    Class F-6 consists of all Interests in CIH and CCH I Holdings Capital Corp.

(b)    Impairment and Voting.    Class F-6 is Impaired by the Plan. Each Holder of an Allowed Interest against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.    Interests in CIH and CCH I Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $8,932,440 to be contributed by CCI from the Rights Offering.

G.    **CCH I and CCH I Capital Corp.**

1.    **Class G-1: Priority Non-Tax Claims**

(a)    Classification.    Class G-1 consists of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

(b)    Impairment and Voting.    Class G-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.    Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.    **Class G-2: Secured Claims**

(a)    Classification.    Class G-2 consists of all Secured Claims that may exist against CCH I and CCH I Capital Corp. (but excluding any Secured Claim that is also a CCH I Notes Claim).

(b) <u>Impairment and Voting</u>. Class G-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.    **Class G-3: General Unsecured Claims**

(a) <u>Classification</u>. Class G-3 consists of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

(b) <u>Impairment and Voting</u>. Class G-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.    **Class G-4: CCH I Notes Claims**

(a) <u>Classification</u>. Class G-4 consists of CCH I Notes Claims.

(b) <u>Impairment and Voting</u>. Class G-4 is Impaired by the Plan. Each Holder of an Allowed CCH I Notes Claim is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>.

(i)    The CCH I Notes Claims shall be Allowed in the aggregate amount of $4,170,040,378. On the Distribution Date, each Holder of a CCH I Notes Claim shall receive its Pro Rata share of New Class A Stock in an aggregate amount to all such Holders equal to 100% of the New Class A Stock outstanding as of the Effective Date, prior to giving effect to the Rights Offering, the issuance of Warrants and any other distributions of New Class A Stock contemplated by the Plan, which New Class A Stock (prior to such effects) shall be deemed to have an aggregate value equal to the Plan Value minus the Warrant Value minus 3% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of Warrants and equity-based awards provided for by the Plan.

Each Eligible CCH I Notes Claim Holder shall also receive Rights pursuant to the Rights Offering, as set forth below.

(ii)    <u>Rights Offering</u>. Each Eligible CCH I Notes Claim Holder shall be offered pursuant to the Rights Offering Documents the right to purchase shares of New Class A Stock, according to that Holder's Pro Rata Participation Amount, for a Cash payment of the product of the Per Share Purchase Price multiplied by such Pro Rata Participation Amount.

(iii) <u>Equity Backstop by Members of the Crossover Committee</u>. Pursuant to the Commitment Letters, the Equity Backstop Parties have, severally and not jointly, committed to purchase their respective Pro Rata Participation Amount in the Rights Offering.

(iv) <u>Excess Backstop by the Excess Backstop Parties</u>. Pursuant to the Commitment Letters and the Excess Backstop Agreements, the Excess Backstop Parties have, severally and not jointly, committed to purchase shares of New Class A Stock underlying Rights not exercised by Eligible CCH I Notes Claim Holders other than the Equity Backstop Parties.

(v) <u>Overallotment Option</u>. Pursuant to the Commitment Letters and Excess Backstop Agreements, each Excess Backstop Party shall be offered the Overallotment Option.

Each Holder of CCH I Notes Claims that affirmatively represents it is not an Eligible CCH I Notes Claim Holder on a timely submitted investor certification shall receive an amount of New Class A Stock equal to the value of the Rights that such Holder would have been offered if it were an accredited investor or qualified institutional buyer participating in the Rights Offering.

5. **Class G-5: Section 510(b) Claims**

(a) <u>Classification</u>. Class G-5 consists of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

(b) <u>Impairment and Voting</u>. Class G-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6. **Class G-6: Interests**

(a) <u>Classification</u>. Class G-6 consists of all Interests in CCH I and CCH I Capital Corp.

(b) <u>Impairment and Voting</u>. Class G-6 is Impaired by the Plan. Each Holder of an Allowed Interest against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Interests in CCH I and CCH I Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $12,000,000 to be contributed by CCI from the Rights Offering.

H. **<u>CCH II and CCH II Capital Corp.</u>**

1. **Class H-1: Priority Non-Tax Claims**

(a) <u>Classification</u>. Class H-1 consists of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

(b) <u>Impairment and Voting</u>. Class H-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition

Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.   **Class H-2: Secured Claims**

   (a)   Classification.  Class H-2 consists of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

   (b)   Impairment and Voting.  Class H-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

   (c)   Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.   **Class H-3: General Unsecured Claims**

   (a)   Classification.  Class H-3 consists of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

   (b)   Impairment and Voting.  Class H-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. is entitled to vote to accept or reject the Plan.

   (c)   Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.   **Class H-4: CCH II Notes Claims**

   (a)   Classification.  Class H-4 consists of CCH II Notes Claims.

   (b)   Impairment and Voting.  Class H-4 is Impaired by the Plan.  Each Holder of an Allowed CCH II Notes Claim is entitled to vote to accept or reject the Plan.

   (c)   Distributions.  The CCH II Notes Claims shall be Allowed in the aggregate amount of $2,575,678,701, plus Post-Petition Interest.  Each Holder of CCH II Notes Claims shall be paid in full in Cash in an amount equal to the Allowed amount of its Claim plus Post-Petition Interest, on the Distribution Date, unless such Holder is a Rollover Commitment Party or elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange by noting such election on such Holder's ballot.  Each Holder of an Allowed CCH II Notes Claim that elects to exchange as set forth above or is a Rollover Commitment Party, shall receive the New CCH II Notes as set

forth below in a principal amount equal to the Allowed amount of its CCH II Notes Claim plus Post-Petition Interest, subject to the Exchange Cutback set forth below. No partial Exchange of CCH II Notes shall be allowed.

(i)    Exchange.  CCH II shall effectuate the Exchange pursuant to the Plan. The aggregate principal amount of the New CCH II Notes shall be equal to the sum of (x) the Target Amount and (y) $85 million. Each Holder of an Allowed CCH II Notes Claim that elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange, and each Rollover Commitment Party, in each case subject to the Exchange Cutback, shall be entitled to receive (A) New CCH II Notes with a principal amount equal to the Allowed principal amount of the CCH II Notes held by such Holder or Rollover Commitment Party, (B) New CCH II Notes with a principal amount equal to the accrued but unpaid interest on such CCH II Notes held by such Holder or Rollover Commitment Party to the Petition Date, and (C) New CCH II Notes with a principal amount equal to Post-Petition Interest on such CCH II Notes. No Holder or Rollover Commitment Party shall be entitled to receive any amounts for any call premiums or prepayment penalty with respect to the CCH II Notes.

Rollover Commitment.  Pursuant to the Commitment Letters, the Rollover Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex C), committed to exchange on the Effective Date an aggregate of $1.21 billion in principal amount of CCH II Notes, plus accrued but unpaid interest to the Petition Date, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties, for New CCH II Notes pursuant to the Exchange, subject to the Exchange Cutback.

Exchange Cutback.  Notwithstanding the foregoing, if the aggregate principal amount of New CCH II Notes to be issued to Holders of CCH II Notes Claims (including the Rollover Commitment Parties) electing to participate in the Exchange would exceed the Target Amount, then each participating Holder (including the Rollover Commitment Parties) shall receive its pro rata portion of the Target Amount of New CCH II Notes in the same proportion that the Allowed amount of CCH II Notes sought to be exchanged by such Holder bears to the total Allowed amount of CCH II Notes sought to be exchanged, and the remainder of such Holder's Allowed CCH II Notes Claims shall be paid in full in Cash on the Distribution Date.

(ii)    New CCH II Notes Commitment.  Pursuant to the Commitment Letters, the New CCH II Notes Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex D), committed to purchase additional New CCH II Notes in an aggregate principal amount of $267 million. If the aggregate principal amount of New CCH II Notes to be issued to Holders (including the Rollover Commitment Parties) electing to participate in the Exchange is less than the Target Amount, then the New CCH II Notes Commitment shall be funded up to the extent of such shortfall.

5.    **Class H-5: Section 510(b) Claims**

(a)    Classification.  Class H-5 consists of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

(b)    Impairment and Voting.  Class H-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.    **Class H-6: Interests**

(a)    Classification.  Class H-6 consists of all Interests in CCH II and CCH II Capital Corp.

(b)    Impairment and Voting.  Class H-6 is Impaired by the Plan. Each Holder of an Allowed Interest against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Interests in CCH II and CCH II Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $15,000,000 to be contributed by CCI from the Rights Offering.

**I.     CCOH and CCO Holdings Capital Corp.**

**1.     Class I-1:  CCOH Credit Facility Claims**

(a)     <u>Classification</u>. Class I-1 consists of CCOH Credit Facility Claims.

(b)     <u>Impairment and Voting</u>. Class I-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>.  Each Allowed CCOH Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**2.     Class I-2:  CCOH Notes Claims**

(a)     <u>Classification</u>. Class I-2 consists of CCOH Notes Claims.

(b)     <u>Impairment and Voting</u>. Class I-2 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>.  Each Allowed CCOH Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**3.     Class I-3:  Priority Non-Tax Claims**

(a)     <u>Classification</u>. Class I-3 consists of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>. Class I-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided, however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**4.     Class I-4:  Secured Claims**

(a)     <u>Classification</u>. Class I-4 consists of all Secured Claims (but excluding CCOH Credit Facility Claims) that may exist against CCOH and CCO Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>. Class I-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

5.    **Class I-5:  General Unsecured Claims**

(a)    Classification.  Class I-5 consists of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)    Impairment and Voting.  Class I-5 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

6.    **Class I-6:  Interests**

(a)    Classification.  Class I-6 consists of all Interests in CCOH and CCO Holdings Capital Corp.

(b)    Impairment and Voting.  Class I-6 is Unimpaired by the Plan.  Each Holder of an Allowed Interest against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Interests in CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

J.    **CCO (and its direct and indirect subsidiaries)**

1.    **Class J-1:  CCO Credit Facility Claims**

(a)    Classification.  Class J-1 consists of CCO Credit Facility Claims.

(b)    Impairment and Voting.  Class J-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCO Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Each Allowed CCO Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  The Debtors shall waive and/or abjure any right to require any lender to make loans (whether term, incremental term, revolving, or swingline loans) under the CCO Credit Facility, other than loans outstanding as of the Effective Date.

2.    **Class J-2:  CCO Swap Agreements Claims**

(a)     Classification. Class J-2 consists of CCO Swap Agreements Claims.

(b)     Impairment and Voting. Class J-2 is Impaired by the Plan. Each Holder of an Allowed CCO Swap Agreements Claim against CCO is entitled to vote to accept or reject the Plan; provided, however, the Debtors reserve their right to argue the proposed distribution to each Holder of an Allowed CCO Swap Agreements Claim renders Class J-2 Unimpaired, not entitled to vote to accept or reject the Plan, and deemed conclusively to have accepted the Plan.

(c)     Distributions. CCO Swap Agreements Claims shall be Allowed in the aggregate amount determined by the Bankruptcy Court, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties. Each Holder of an Allowed CCO Swap Agreements Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such CCO Swap Agreements Claim becomes an Allowed CCO Swap Agreements Claim, or as soon thereafter as is practicable.

### 3.     Class J-3: CCO Notes Claims

(a)     Classification. Class J-3 consists of CCO Notes Claims.

(b)     Impairment and Voting. Class J-3 is Unimpaired by the Plan. Each Holder of an Allowed CCO Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions. Each Allowed CCO Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

### 4.     Class J-4: Priority Non-Tax Claims

(a)     Classification. Class J-4 consists of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

(b)     Impairment and Voting. Class J-4 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 5.     Class J-5: Secured Claims

(a)     Classification. Class J-5 consists of all Secured Claims (but excluding CCO Credit Facility Claims, CCO Notes Claims and CCO Swap Agreements Claims) that may exist against CCO and its direct and indirect subsidiaries.

(b)     Impairment and Voting. Class J-5 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions. Except to the extent that a Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such

Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

6. **Class J-6: General Unsecured Claims**

(a) <u>Classification</u>. Class J-6 consists of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries other than all General Unsecured Claims against CCO and its direct and indirect subsidiaries held by any CII Settlement Claim Party.

(b) <u>Impairment and Voting</u>. Class J-6 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

7. **Class J-7: Interests (other than CC VIII Preferred Units held by a CII Settlement Claim Party)**

(a) <u>Classification</u>. Class J-7 consists of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

(b) <u>Impairment and Voting</u>. Class J-7 is Unimpaired by the Plan. Each Holder of an Allowed Interest against CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

# ARTICLE V.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION

A.  <u>Classes Entitled to Vote</u>.  The following Classes are Impaired by the Plan and thus are entitled to vote to accept or reject the Plan.

**Class A-3** (General Unsecured Claims against CCI)
**Class A-4** (CCI Notes Claims)

**Class B-3** (General Unsecured Claims against CII)
**Class B-4** (CII Shareholder Claims)

**Class C-3** (General Unsecured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-4** (Holdco Notes Claims)

**Class D-3** (General Unsecured Claims against CCHC)

**Class E-3** (General Unsecured Claims against CCH and Charter Communications Holdings Capital Corp.)
**Class E-4** (CCH Notes Claims)

**Class F-3** (General Unsecured Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-4** (CIH Notes Claims)

**Class G-3** (General Unsecured Claims against CCH I and CCH I Capital Corp.)
**Class G-4** (CCH I Notes Claims)

**Class H-3** (General Unsecured Claims against CCH II and CCH II Capital Corp.)
**Class H-4** (CCH II Notes Claims)

**Class I-5** (General Unsecured Claims against CCOH and CCO Holdings Capital Corp.)

**Class J-2** (CCO Swap Agreements Claims)
**Class J-6** (General Unsecured Claims against CCO and its direct and indirect subsidiaries)

B.  <u>Classes Not Entitled to Vote; Deemed to Accept</u>.  The following Classes are Unimpaired by the Plan—and thus not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have accepted the Plan.

**Class A-1** (Priority Non-Tax Claims against CCI)
**Class A-2** (Secured Claims against CCI)

**Class B-1** (Priority Non-Tax Claims against CII)
**Class B-2** (Secured Claims against CII)

**Class C-1** (Priority Non-Tax Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-2** (Secured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)

**Class D-1** (Priority Non-Tax Claims against CCHC)
**Class D-2** (Secured Claims against CCHC)

Class E-1 (Priority Non-Tax Claims against CCH and Charter Communications Holdings Capital Corp.)

Class E-2 (Secured Claims against CCH and Charter Communications Holdings Capital Corp.)

Class F-1 (Priority Non-Tax Claims against CIH and CCH I Holdings Capital Corp.)
Class F-2 (Secured Claims against CIH and CCH I Holdings Capital Corp.

Class G-1 (Priority Non-Tax Claims against CCH I and CCH I Capital Corp.)
Class G-2 (Secured Claims against CCH I and CCH I Capital Corp.)

Class H-1 (Priority Non-Tax Claims against CCH II and CCH II Capital Corp.)
Class H-2 (Secured Claims against CCH II and CCH II Capital Corp.)

Class I-1 (CCOH Credit Facility Claims)
Class I-2 (CCOH Notes Claims)
Class I-3 (Priority Non-Tax Claims against CCOH and CCO Holdings Capital Corp.)
Class I-4 (Secured Claims against CCOH and CCO Holdings Capital Corp.)
Class I-6 (Interests in CCOH and CCO Holdings Capital Corp.)

Class J-1 (CCO Credit Facility Claims)
Class J-3 (CCO Notes Claims)
Class J-4 (Priority Non-Tax Claims against CCO and its direct and indirect subsidiaries)
Class J-5 (Secured Claims against CCO and its direct and indirect subsidiaries)
Class J-7 (Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party))

C.      Classes Not Entitled to Vote; Deemed to Reject. The following Classes are Impaired by the Plan—but not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have rejected the Plan.

Class A-5 (Section 510(b) Claims against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party)
Class A-6 (Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party)

Class C-5 (Section 510(b) Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
Class C-6 (Interests in Holdco, Enstar Communications Corporation, and Charter Gateway LLC other than all Interests in Holdco held by any CII Settlement Claim Party)

Class D-4 (Section 510(b) Claims against CCHC)
Class D-5 (Interests in CCHC)

Class E-5 (Section 510(b) Claims against CCH and Charter Communications Holdings Capital Corp.)

Class E-6 (Interests in CCH and Charter Communications Holdings Capital Corp.)

Class F-5 (Section 510(b) Claims against CIH and CCH I Holdings Capital Corp.)
Class F-6 (Interests in CIH and CCH I Holdings Capital Corp.)

Class G-5 (Section 510(b) Claims against CCH I and CCH I Capital Corp.)
Class G-6 (Interests in CCH I and CCH I Capital Corp.)

Class H-5 (Section 510(b) Claims against CCH II and CCH II Capital Corp.)
Class H-6 (Interests in CCH II and CCH II Capital Corp.)

D.     <u>Nonconsensual Confirmation</u>.  Except as otherwise specifically provided in the Plan, if any Impaired Class shall not accept the Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan (subject to the Plan Support Agreements and conditions to the Effective Date set forth below) or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

# ARTICLE VI.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.     Sources of Consideration for Plan Distributions.  Cash Distributions under the Plan shall be funded from: (1) operations, (2) the New CCH II Notes Commitment (as described in ARTICLE IV.H.4 above), and (3) the Rights Offering (as described in ARTICLE IV.G.4 above).

1.     Use of Net Proceeds.  CCI shall utilize the Net Proceeds as follows: (a) to pay the expenses of the Rights Offering; (b) to contribute to CCH II an amount sufficient to fund the Cash payments due on the CCH II Notes Claims; (c) to contribute to CCO to pay the CCO Swap Agreements Claims; (d) to contribute, as necessary, to Holdco, CCHC, CCH, CIH, CCH I, and CCH II in consideration for New Value Interests; (e) to pay Administrative Expense Claims and to make other payments as needed to confirm the Plan and to cause the Effective Date to occur; and (f) to pay the fees and expenses described in ARTICLE VI.A.2 below in the manner and order provided therein. Subject to ARTICLE VI.A.2 below, plus Professional Fees, the remaining Net Proceeds, if any, will be contributed to CCO on the Effective Date to fund CCO's working capital requirements following the Effective Date.

2.     Specified Fees and Expenses.

(a)     Allen Management Receivable.  As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Management Receivable, in Cash, as provided in clause (d) below.

(b)     Allen Fee Reimbursement.  As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Fee Reimbursement, in Cash, as provided in clause (d) below.

(c)     Other Fees and Expenses.

Each participating Holder (including the Rollover Commitment Parties) shall receive from the Debtors (other than CII) the Rollover Fee for the use of capital, in Cash, as provided in clause (d) below.

Each New CCH II Notes Commitment Party shall receive from the Debtors (other than CII) the New CCH II Notes Commitment Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such New CCH II Notes Commitment Party shall not have terminated its Commitment Letter with respect to the New CCH II Notes Commitment on or prior to the Effective Date.

Each Equity Backstop Party shall receive from the Debtors (other than CII) the Equity Backstop Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such Equity Backstop Party shall not have terminated its Commitment Letter with respect to the Equity Backstop on or prior to the Effective Date.

(d)     Priority of Payments.  On the Effective Date, the Allen Management Receivable shall be paid in Cash to the extent of Available Cash.  If the Allen Management Receivable is not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 30 days after the end of the first calendar quarter following the Effective Date to the extent of Available Cash on the last day of such calendar quarter, and within 20 days after the end of each following calendar quarter to the extent of Available Cash on the last day of each such following calendar quarter, until the Allen Management Receivable is paid in full.

On the Effective Date (or when the Overallotment Option is received by the Reorganized Company), following payment of the Allen Management Receivable in full, the Commitment Fees, the Allen Fee Reimbursement, and the VCP shall be paid in Cash to the extent of any remaining Available Cash; provided, however, that, if there is not sufficient Available Cash for payment of the Commitment Fees, the Allen Fee Reimbursement, and the VCP in full on the Effective Date, then payment of such fees on such date shall be reduced pro rata based on the amount of each such fee in proportion to the total amount of the Commitment Fees, the Allen

Fee Reimbursement, and the VCP. If the Commitment Fees, the Allen Fee Reimbursement, and the VCP are not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 20 days after the end of the first calendar quarter following the Effective Date in which the Allen Management Receivable is paid in full in Cash if there is Available Cash on the last day of such calendar quarter; provided, however, that, in the discretion of the Board of Directors, the Allen Fee Reimbursement, the Commitment Fees, and the VCP on a pari passu basis may be paid regardless of sufficient Available Cash. For the avoidance of doubt, in no event shall the Commitment Fees (or any portion thereof), the Allen Fee Reimbursement (or any portion thereof) or the VCP (or any portion thereof) be paid unless and until the Allen Management Receivable has been paid in full.

If all Specified Fees and Expenses have not been paid in full on the Effective Date, Cash in the full amount of the unpaid portion of the Specified Fees and Expenses shall be retained by CCI pending payment, subject to the good faith determination of the Reorganized Company to contribute all or any portion of such retained amount to direct or indirect subsidiaries. If such amounts are contributed, alternative arrangements for actual funding by the Reorganized Company shall be made by the Reorganized Company.

B.    Reorganized Company Equity Interests.  The Reorganized Company's equity interests shall consist of New Class A Stock, New Class B Stock, New Preferred Stock and Warrants.

1.    New Class A Stock.  Shares of New Class A Stock shall be issued to (a) participants in the Rights Offering, (b) Equity Backstop Parties upon the exercise of the Overallotment Option (if exercised), (c) Holders of Claims with respect to CCH I Notes, (d) the Allen Entities upon exchange of their Reorganized Holdco equity pursuant to the Reorganized Holdco Exchange Agreement, (e) holders of Warrants upon exercise of such Warrants, and (f) holders of equity-based awards issued under the Management Incentive Plan.

CCI shall cause the New Class A Stock to be listed on the NASDAQ Global Select Market as promptly as practicable but in no event prior to the later of (x) the 46th day following the Effective Date, and (y) October 15, 2009 (unless Mr. Allen and the Reorganized Company agree to an earlier date), and the Reorganized Company shall maintain such listing thereafter.

2.    New Class B Stock.  The New Class B Stock issued to Mr. Allen or other Authorized Class B Holders shall be identical to the New Class A Stock except with respect to certain voting, transfer and conversion rights.  Each share of New Class B Stock shall be entitled to a number of votes such that the aggregate number of votes attributable to the shares of New Class B Stock held by the Authorized Class B Holders shall equal 35% of the combined voting power of the capital stock of the Reorganized Company.  Subject to the Lock-Up Agreement, each holder of New Class B Stock shall have the right to convert its shares of New Class B Stock into shares of New Class A Stock on a one-for-one basis.  In addition, on or after January 1, 2011, Reorganized CCI shall have the right to cause shares of New Class B Stock to convert into shares of New Class A Stock on a one-for-one basis pursuant to and in accordance with the provisions of the Amended and Restated Certificate of Incorporation.  New Class B Stock shall be subject to restrictions on conversion and transfer pursuant to the Lock-Up Agreement.

3.    New Preferred Stock.  Shares of New Preferred Stock shall be issued to Holders of CCI Notes Claims.  The New Preferred Stock will not be publicly listed or traded.

4.    Warrants.  Warrants to be issued pursuant to the Plan consist solely of CIH Warrants, CCH Warrants and CII Settlement Claim Warrants.

5.    Registration Rights.  Holders of New Common Stock shall be entitled to registration rights pursuant to the Equity Registration Rights Agreement.

6.    Post-Confirmation Restrictions.  For a period of at least six (6) months following the Effective Date, the Reorganized Company, Reorganized Holdco, Reorganized CCO and each of their respective direct and indirect subsidiaries shall not negotiate, enter into agreements, understandings or arrangements or consummate transactions in the aggregate in excess of $500 million in total value to the extent that such transactions shall occur at a price in excess of 110% of either the value implied by the Plan or the appraised values, if any such appraisal is obtained pursuant to ARTICLE VI.C.2.  Any transactions occurring at a price that implies a value of 110% or lower

than both of such value implied by the Plan and such appraised values (if obtained) shall not be subject to restriction and shall not be taken into account in determining whether the $500 million limitation has been exceeded.

C.     CII Settlement Claim.     Notwithstanding anything to the contrary herein, on the Effective Date, the following consideration shall be transferred by the Debtors (other than CII) to Mr. Allen (or his designees which, in the case of New Class B Stock, shall be limited to Authorized Class B Holders) on account of the CII Settlement Claim: (a) shares of New Class B Stock representing, as of the Effective Date, (i) 2% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan, and (ii) 35% of the combined voting power of the capital stock of Reorganized CCI; (b) the CII Settlement Claim Warrants; (c) $85 million principal amount of New CCH II Notes, which shall be deemed transferred from Holders of CCH I Notes Claims automatically and without further action by any party; (d) Cash in the amount of $25 million on account of the Allen Management Receivable; (e) $150 million in Cash; and (f) Cash of up to $20 million on account of the Allen Fee Reimbursement.  In addition, on the Effective Date, CII shall retain a 1% direct equity interest in Reorganized Holdco, including the right to exchange such interest into New Class A Stock, pursuant to the Reorganized Holdco Exchange Agreement, and Mr. Allen shall retain all of the Interests in Reorganized CII.  Furthermore, on the Effective Date, the 7,282,183 CC VIII Preferred Units held by the CII shall be deemed transferred, automatically and without further action by any party, to Reorganized CCI.

1.     Bankruptcy Rule 9019.     The treatment set forth above and the rights and obligations accorded elsewhere in this Plan on account of the CII Settlement Claim shall constitute the compromise and settlement under Bankruptcy Rule 9019 by and among the Debtors (other than CII), on the one hand, and the CII Settlement Claim Parties, on the other hand, that fully resolves any and all legal, contractual and equitable rights, claims and remedies between such parties in exchange for the consideration to be given to such parties.  For the avoidance of doubt, CCH I Claims and CIH Claims held by CII shall be treated identically to similar Claims held by Persons other than CII.

2.     Independent Appraisal.     Within 30 days after the Effective Date, at Mr. Allen's request, Reorganized CCI, Reorganized Holdco and Reorganized CCO shall obtain (at their expense) an independent appraisal of the fair market value of Reorganized Holdco's and Reorganized CCO's (and their respective subsidiaries') tangible and intangible assets as of the Effective Date that will include a reasonable allocation of value on an asset-by-asset basis, including any and all below market financing arrangements as may be appropriate.  The appraisal firm and scope of the appraisal shall be reasonably acceptable to Mr. Allen and Reorganized CCI, Reorganized Holdco and Reorganized CCO, but shall at all times be retained by and act under the direction of Reorganized CCI, Reorganized Holdco and Reorganized CCO, consulting with Mr. Allen.

3.     Retained Interest; Preservation of Exchange Right.     As partial consideration for the settlement and compromise of the CII Settlement Claim, CII will retain a 1% equity interest in Reorganized Holdco and shall hold such interest pursuant to and in accordance with the Reorganized Holdco LLC Agreement.  After the Effective Date, CII or its transferee that is an Allen Entity shall have the right to exchange all or a portion of their Reorganized Holdco equity for New Class A Stock pursuant to the terms of the Reorganized Holdco Exchange Agreement.

There shall be no restrictions on the Allen Entities' ability to liquidate or sell CII following consummation of the Plan; provided, that CII shall have transferred all interests in Reorganized Holdco to one or more Allen Entities (or to Reorganized CCI pursuant to the Reorganized Holdco Exchange Agreement) prior to or as part of such liquidation or sale as provided in the Reorganized Holdco LLC Agreement.

4.     Other Matters.     The Parties agree to use reasonable best efforts to ensure that Plan Confirmation and the Effective Date occur in the same calendar year.  The Debtors shall not seek to schedule, and shall use all commercially reasonable efforts to avoid scheduling the hearing to confirm the Plan during the month of December.

5.     Post-Effective Date Lock-Up Agreement.     Shares of New Class B Stock received by Mr. Allen under the Plan shall be subject to restrictions on transfer and conversion as set forth in the Lock-Up Agreement.

For the avoidance of doubt, notwithstanding any other provision of the Plan, CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan.

D.      Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.  In addition, except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (c) applicable regulatory approval.  Notwithstanding the foregoing, shares of New Class A Stock issued to Eligible CCH I Notes Claim Holders pursuant to the Rights Offering and New CCH II Notes issued to Rollover Commitment Parties and New CCH II Note Commitment Parties shall be issued pursuant to the exemption provided under section 4(2) of the Securities Act.  The holders of such equity and debt securities and certain other affiliates of the Reorganized Company shall receive registration rights as set forth in the Equity Registration Rights Agreement and the Debt Registration Rights Agreement, respectively.

E.      Corporate Existence.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

F.      Vesting of Assets in the Reorganized Debtors.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness that is Unimpaired by the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      Discharge of Debtors.  Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date:  (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

H.     Restructuring Transactions.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) certain transactions in conjunction with the Effective Date in accordance with Exhibit 22 to the Plan Supplement; (2) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (3) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (4) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate.

I.     Corporate Action.  Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or any other Entity.  Without limiting the foregoing, such actions may include:  the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws; the adoption of the Reorganized Holdco LLC Agreement; the appointment of officers and (as applicable) directors for the Reorganized Debtors; and the adoption, implementation, and amendment of the Management Incentive Plan.

J.     Post-Effective Date Governance.  The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized CCI shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.  On and as of the Effective Date, the Rights Agreement between CCI and Mellon Investor Services LLC, dated as of August 14, 2007, as amended thereafter, shall be automatically terminated.

K.     Limited Liability Company Agreement.  The Holdco LLC Agreement shall be in effect and govern Holdco for the period up to and including the Effective Date.  At the Effective Date, the Holdco LLC Agreement shall be amended and restated and the Reorganized Holdco LLC Agreement shall be in effect as of the day immediately following the Effective Date for federal, state, local and foreign income tax purposes.  Reorganized Holdco shall effect a "closing of the books" as of the Effective Date, and the provisions of the Holdco LLC Agreement, taking into account each member's Percentage Interest (as defined in the Holdco LLC Agreement) immediately before the transactions contemplated by this Plan, shall govern with respect to allocations of items of income, gain, loss, credit and deduction for the period up to and including the Effective Date, including any items of income, gain, loss, credit and deduction arising on the Effective Date and/or arising as a result of the transactions effective as of the Effective Date as contemplated by this Plan.  Reorganized Holdco shall not make the election under section 108(i) of the U.S. Internal Revenue Code of 1986, as amended (or any similar election under state or local law), with respect to any cancellation of indebtedness income relating to the consummation of the Plan.  Notwithstanding anything to the contrary in the Reorganized Holdco LLC Agreement, in the event of any dispute, challenge, audit or examination of Holdco's tax affairs for any period prior to or including the Effective Date, the consent of Mr. Allen shall be required to settle any such dispute and Mr. Allen and CII shall be entitled to participate alongside Reorganized CCI in any such examinations, judicial determinations, and administrative proceedings, with respect to any portion of the dispute relating to the period prior to and including the Effective Date.

L.     Effectuating Documents; Further Transactions.  On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors or managers, as applicable, thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

M.     Exemption from Certain Transfer Taxes and Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation

of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.     Board Representation.  The Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws shall provide that the Board of Directors shall be fixed at 11 members.  Each projected holder of 10% or more of the voting power of the Reorganized Company on the Effective Date (and giving effect to the Overallotment Option) based on such holder's pro rata share of New Class A Stock (i) to be received in respect of its CCH I Notes Claims, (ii) to be purchased pursuant to its exercise of Rights and (iii) to be purchased pursuant to the exercise by such holder of its Overallotment Option, if any, on or prior to the date that is five business days prior to the commencement of the Confirmation Hearing, shall have the right to appoint one member of the initial Board of Directors upon emergence for each 10% of the voting power attributable to such holder's New Class A Stock.  Mr. Allen shall have the right to appoint four (4) of the eleven (11) members of the initial Board of Directors, and Neil Smit, the President and Chief Executive Officer of the Reorganized Company, will also serve on the Reorganized Company's Board of Directors.  The identity of these members will be disclosed on Exhibit 23 to the Plan Supplement prior to the hearing on Confirmation of the Plan.  Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.  Starting at such first annual meeting of stockholders and so long as shares of New Class B Stock are outstanding, holders of New Class B Stock shall have the right to elect 35% of the members of the Board of Directors (rounded up to the next whole number), and all other members of the Board of Directors shall be elected by majority vote of New Class A Stock and New Preferred Stock, voting together as a single class.

The members of the Board of Directors elected by holders of New Class B Stock shall have no less than proportionate representation on each committee of the Board of Directors, except for any committee (1) required by applicable stock exchange rules to be comprised solely of independent directors or (2) formed solely for the purpose of reviewing, recommending and/or authorizing any transaction in which holders of Class B Stock or their affiliates (other than Reorganized CCI or its subsidiaries) are interested parties.  In addition, CCI's current Chief Executive Officer and Chief Operating Officer will continue in their same positions.

O.     Senior Management.  The CEO and the COO of the Reorganized Company shall be the same as the CEO and COO of CCI on the date hereof.  The CEO and COO shall receive Cash and bonus compensation and benefits on substantially the same terms as (but not less economically favorable than) those contained in their respective employment agreements in effect on the date hereof.  The CEO shall receive (1) long-term incentive compensation having substantially the same value as the long-term incentive compensation contained in his employment agreement in effect on the date hereof, and (2) a waiver with respect to the retention bonus clawback provision contained in his employment agreement in effect on the date hereof.

Key Executives of the Reorganized Debtors shall be determined by the Board of Directors in consultation with the CEO.  The Reorganized Debtors shall provide Key Executives with Cash and bonus compensation and benefits consistent with (but not less economically favorable than) such Key Executives' respective employment agreements in effect on the date hereof.

P.     Management Incentive Plan and VCP.  The Reorganized Company shall be deemed to have adopted the Management Incentive Plan and VCP on the Effective Date.

Q.      Employee and Retiree Benefits.  Except with respect to any rejected employment agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.      Creation of Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

S.      Preservation of Rights of Action.  Subject to the releases set forth in ARTICLE X.D and ARTICLE X.E below, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Further, subject to the releases set forth in ARTICLE X.D and ARTICLE X.D below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

## ARTICLE VII.

### TREATMENT OF EXECUTORY CONTRACTS

A.     <u>Assumption and Rejection of Executory Contracts</u>.  With the exception of Executory Contracts between a Debtor (other than CII) and a CII Settlement Claim Party, which shall be deemed rejected unless set forth in clause (b) of the definition of "CII Settlement Claim," each of the Debtors' Executory Contracts, including the Management Agreement, the Mutual Services Agreement, and the Employment Agreements (subject to the conditions in ARTICLES VI.O and VII.A), shall be deemed assumed as of the Effective Date, unless listed on Exhibit 24 to the Plan Supplement and mutually agreed to by the Debtors, the Requisite Holders, and Mr. Allen.

The Employment Agreements of the CEO and COO shall be modified as set forth in ARTICLE VI.O and be deemed assumed as of the Effective Date.

The Employment Agreements of the Chief Financial Officer, Chief Restructuring Officer, General Counsel and Corporate Secretary, Chief Marketing Officer, and Chief Technology Officer as of the Petition Date shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements, to the extent applicable, to:  (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan; and (iii) include an acknowledgement that, contingent upon the VCP becoming effective as set forth in the Plan, no awards will be granted in 2009 under the Incentive Program in place as of the Petition Date.

The Employment Agreements of the Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements to: (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; and (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan.

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such Executory Contracts in the Plan are effective as of the Effective Date.  Each such Executory Contract assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, to alter, amend, modify or supplement the Exhibit of Executory Contracts identified in the Plan Supplement.

B.     <u>Indemnification Obligations</u>.  Notwithstanding anything to the contrary herein, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of such Debtor at any time prior to the Effective Date, respectively, against any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors and officers who were directors or officers of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the Respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors' or officers' rights.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

C.    <u>Cure of Defaults for Assumed Executory Contracts</u>.  With respect to each of the Debtors' Executory Contracts to be assumed, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract may be conditioned upon the disposition of all issues with respect to Cure.  Any provisions or terms of the Debtors' Executory Contracts to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  Except with respect to Executory Contracts in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Notice, Claims and Solicitation Agent on or before the Cure Bar Date.  The Cure Bar Date shall not apply to any franchise or Executory Contract with a state or local franchise authority.  Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the applicable Debtor of the amount listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract.  Any counterparty to an Executory Contract that fails to object timely to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption.  The Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, either to reject or nullify the assumption of any Executory Contract no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption.  Any Proof of Claim Filed with respect to an Executory Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.     Claims Based on Rejection or Repudiation of Executory Contracts.  Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be Filed with the Notice, Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation.  Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.     Reservation of Rights.  Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.     Nonoccurrence of Effective Date.  In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES

A.     <u>Allowance of Claims and Interests</u>. After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

B.     <u>Claims and Interests Administration Responsibilities</u>. Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.     <u>Estimation of Claims and Interests</u>. Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.     <u>Adjustment to Claims and Interests Without Objection</u>. Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Beginning on the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended or superseded during such prior calendar quarter.

E.     <u>Disallowance of Claims or Interests</u>. Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court. All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

F.     <u>Offer of Judgment</u>. The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

G.     <u>Amendments to Claims</u>.  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

# ARTICLE IX.

## PROVISIONS GOVERNING DISTRIBUTIONS

A. <u>Distributions on Account of Claims and Interests Allowed As of the Effective Date</u>.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; <u>provided, however</u>, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date.

B. <u>Distributions on Account of Claims and Interests Allowed After the Effective Date</u>.

1. <u>Payments and Distributions on Disputed Claims</u>.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; <u>provided, however</u>, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

2. <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

C. <u>Delivery of Distributions</u>.

1. <u>Record Date for Distributions</u>.  On the Effective Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded Certificate is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2. <u>Distribution Agent</u>.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

3. <u>Delivery of Distributions in General</u>.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the

Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4. <u>Compliance Matters</u>. In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5. <u>Undeliverable Distributions</u>. If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

6. <u>Reversion</u>. Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

7. <u>Manner of Payment Pursuant to the Plan</u>. Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

8. <u>Surrender of Cancelled Instruments or Securities</u>. On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

D.    Claims Paid or Payable by Third Parties.

1.    Claims Paid by Third Parties.  The Notice, Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.    Claims Payable by Third Parties.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice, Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.    Allocation Between Principal and Accrued Interest.  Except as otherwise provided in the Plan (e.g., in Class H-4), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.      <u>Discharge of Claims and Termination of Interests</u>.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      <u>Compromise and Settlement of Claims and Controversies</u>.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

C.      <u>CCO Credit Facility</u>.  Without reservation or qualification, the Debtors (1) irrevocably waive and abjure any right to engage in any additional borrowing under the reinstated CCO Credit Facility, and (2) commit to Cash collateralize, if required by section 1124 of the Bankruptcy Code, by the Effective Date, any letters of credit issued pursuant to the CCO Credit Facility that remain outstanding as of the Effective Date.

**D.      <u>Releases by the Debtors</u>.  On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including:  (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the obligations of the Holders of Claims party to Plan Support Agreements to provide the support necessary for the Effective Date of the Plan; and (3) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "<u>Debtor Releasees</u>" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would**

have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Releasing Party from any causes of action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

E.　　Third Party Releases. On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, and provided further that the foregoing "Third Party Release" shall not impair the rights (a) to which an Allowed Unimpaired Claim entitles the Holder of such Allowed Unimpaired Claim or (b) of a Holder of a General Unsecured Claim as to any General Unsecured Claim. Notwithstanding anything in the Plan to the contrary, the Releasing Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is: (1) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

F.　　Injunction. From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

G.　　Exculpation. The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon

the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

H.    Protection Against Discriminatory Treatment.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.    **Setoffs and Recoupment.  The Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against such claimant.**

**In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

J.    **Release of Liens.  Except as otherwise provided in the Plan (including as to reinstated debt) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

K.    Document Retention.  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified or supplemented by the Reorganized Debtors in the ordinary course of business.

L.    Reimbursement or Contribution.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date: (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

# ARTICLE XI.

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS

A.    Professional Claims.

1.    Final Fee Applications.  All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.    Payment of Interim Amounts.  Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

3.    Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors (other than Reorganized CII) shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than Reorganized CII) from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Claims by Professional have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors (other than Reorganized CII).

4.    Professional Fee Reserve Amount.  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors (other than CII).  If a Professional does not provide an estimate, the Reorganized Debtors (other than Reorganized CII) may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.    Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional or other fees and expenses incurred by that Reorganized Debtor after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.    Substantial Contribution Compensation and Expenses.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

7.    Indenture Trustee, Administrative Agent, and Collateral Trustee Fees, and Indemnification Obligations.  Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date. Notwithstanding the foregoing, to the extent any fees or expenses of the indenture trustees, the administrative agents, and the collateral trustees are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims),

the indenture trustees, the administrative agents, and the collateral trustees may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts. The contractual indemnification obligations of the Debtors (other than CII) to these Professionals shall be reinstated as unsecured obligations of the Reorganized Debtors (other than Reorganized CII). All disputes related to the fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) shall be subject to the jurisdiction of and decided by the Bankruptcy Court. Notwithstanding anything to the contrary herein, this Article XI.A.7 will not apply to Claims rendered Unimpaired by the Plan.

8. <u>Other Fees</u>. The Debtors (other than CII) shall promptly pay the reasonable, documented out-of-pocket fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC, the legal and financial advisors engaged by the Crossover Committee, without Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., or UBS Securities LLC having to file fee applications to receive payment for such fees and expenses.

The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees and expenses incurred by the members of the Crossover Committee in connection with the negotiation of the Plan, as well as their due diligence review and the approval and consummation of the transactions contemplated by the Plan, without such members of the Crossover Committee having to file fee applications to receive payment for such fees and expenses.

The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees incurred by the members of the Creditors' Committee.

B. <u>Other Administrative Expense Claims</u>. All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable. The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

**ARTICLE XII.**

**CONDITIONS PRECEDENT TO EFFECTIVE DATE**

A.    Conditions Precedent to Effective Date.  The following shall be satisfied or waived as conditions precedent to the Effective Date.

1.    The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Requisite Holders and Mr. Allen, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.    The final version of the Plan, the Plan Supplement and all of the documents and exhibits contained therein shall have been Filed and approved in form and substance reasonably acceptable to the Debtors, the Requisite Holders and Mr. Allen.

3.    The Bankruptcy Court shall enter the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Requisite Holders and Mr. Allen, and such order shall not have been stayed or modified or vacated on appeal.

4.    All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

5.    All consents, approvals and waivers necessary in connection with the transactions contemplated herein with respect to Franchises (as defined in the Communications Act of 1934, as amended, 47 U.S.C. Sections 151 et seq.) or similar authorizations for the provision of cable television service in areas serving no less than 80% of CCI's individual basic subscribers in the aggregate at such time shall have been obtained, unless the condition set forth in this clause shall have been waived by the Requisite Holders and Mr. Allen.

6.    The Confirmation Date shall have occurred.

7.    The Debtors shall have received the funds contemplated by the Commitment Letters and the New CCH II Notes Commitment Parties shall have fulfilled all of the obligations under the Commitment Letters.

B.    Waiver of Conditions Precedent.  The Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite Holders and Mr. Allen, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, the Requisite Holders or Mr. Allen to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.    Effect of Non-Occurrence of Conditions to the Effective Date.  Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 180 days after Confirmation, or by such later date established by Bankruptcy Court order.  If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party-in-interest before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests or Causes of

Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

## ARTICLE XIII.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.     Modification or Amendments.  Except as otherwise specifically provided in the Plan, and subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, subject to the terms of the Plan Support Agreement and conditions to the Effective Date.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the Debtors' private website at http://www.kccllc.net/charter.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.     Effect of Confirmation on Modifications.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.     Revocation or Withdrawal of Plan.  Subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void with the exception of the Plan Support Agreements; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

**ARTICLE XIV.**

**RETENTION OF JURISDICTION**

A.      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.      Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16. Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23. Enforce all orders previously entered by the Bankruptcy Court; and

24. Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XV.

## MISCELLANEOUS PROVISIONS

A.     Immediate Binding Effect.  Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

B.     Additional Documents.  On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     Payment of Statutory Fees.  All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.     Reservation of Rights.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.     Successors and Assigns.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

F.     Service of Documents.

1.     After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Charter Communications, Inc.<br>12405 Powerscourt Drive, Suite 100<br>St. Louis, Missouri 63131-3660<br>Attn.: Gregory L. Doody, Esq. | Kirkland & Ellis LLP<br>153 East 53rd Street<br>New York, New York 10022-4611<br>Attn.: Richard M. Cieri, Esq.<br>Paul M. Basta, Esq.<br>Stephen E. Hessler, Esq.<br><br>- and -<br><br>Kirkland & Ellis LLP<br>200 East Randolph Street<br>Chicago, Illinois 60601-6636<br>Attn.: Ray C. Schrock, Esq. |
| Counsel to CII | United States Trustee |
| Togut, Segal & Segal, LLP<br>One Penn Plaza<br>New York, New York 10119<br>Attn.: Albert Togut, Esq.<br>Frank Oswald, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.: Paul K. Schwartzberg, Esq. |
| Counsel to the Agent for the Debtors' Prepetition First Lien Facility | Counsel to the Crossover Committee |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.: Peter V. Pantaleo, Esq. | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attn.: Alan W. Kornberg, Esq.<br>Kenneth M. Schneider, Esq. |
| Counsel to the Creditors' Committee | |
| Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036-8704<br>Attn.: Mark R. Somerstein, Esq.<br>Keith H. Wofford, Esq. | |

2.	After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

3.	In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

G.	Term of Injunctions or Stays. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in

the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.     Entire Agreement.  On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     Governing Law.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

J.     Exhibits.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/charter or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.     Nonseverability of Plan Provisions upon Confirmation.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) nonseverable and mutually dependent.

L.     Closing of Chapter 11 Cases.  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.     Waiver or Estoppel.  **Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

N.     Conflicts.  Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

New York, New York
Dated: May 7, 2009

CHARTER COMMUNICATIONS, INC. (for itself and all other Debtors, except CII)

By: /s/ Neil Smit
Name: Neil Smit
Title: President and Chief Executive Officer

CHARTER INVESTMENT, INC.

By: /s/ William McGrath
Name: William McGrath
Title: Vice President

# EXHIBIT B

## Disclosure Statement Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) Case No. 09-11435 (JMP) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## ORDER (I) APPROVING THE DISCLOSURE STATEMENT, (II) ESTABLISHING A RECORD DATE FOR VOTING ON THE PLAN OF REORGANIZATION AND THE RIGHTS OFFERING, (III) APPROVING SOLICITATION PACKAGES AND PROCEDURES FOR THE DISTRIBUTION THEREOF, (IV) APPROVING THE RIGHTS OFFERING PROCEDURES AND RIGHTS EXERCISE FORM, (V) APPROVING THE FORMS OF BALLOTS AND MANNER OF NOTICE, (VI) APPROVING THE COMMITMENT AGREEMENTS, (VII) APPROVING THE COMMITMENT FEES, (VIII) ESTABLISHING PROCEDURES FOR VOTING ON THE PLAN AND (IX) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PLAN

Upon the Motion of the above-captioned debtors (collectively, the "<u>Debtors</u>" or

"<u>Charter</u>"),[1] for the entry of an order (the "<u>Disclosure Statement Order</u>") (a) approving the

---

[1]     The Debtors in these cases include:  Ausable Cable TV, Inc.; Hometown TV, Inc.; Plattsburgh Cablevision, Inc.; Charter Communications Entertainment I, LLC; Falcon First Cable of New York, Inc.; Charter Communications, Inc.; Charter Communications Holding Company, LLC; CCHC, LLC; Charter Communications Holdings, LLC; CCH I Holdings, LLC; CCH I, LLC; CCH II, LLC; CCO Holdings, LLC; Charter Communications Operating, LLC; American Cable Entertainment Company, LLC; Athens Cablevision, Inc.; Cable Equities Colorado, LLC; Cable Equities of Colorado Management Corp.; CC 10, LLC; CC Fiberlink, LLC; CC Michigan, LLC; CC Systems, LLC; CC V Holdings, LLC; CC VI Fiberlink, LLC; CC VI Operating, LLC; CC VII Fiberlink, LLC; CC VIII Fiberlink, LLC; CC VIII Holdings, LLC; CC VIII Leasing of Wisconsin, LLC; CC VIII Operating, LLC; CC VIII, LLC; CCH I Capital Corp.; CCH I Holdings Capital Corp.; CCH II Capital Corp.;  CCO Fiberlink, LLC; CCO Holdings Capital Corp.; CCO NR Holdings, LLC; CCO Purchasing, LLC; Charter Advertising of Saint Louis, LLC; Charter Cable Leasing of Wisconsin, LLC; Charter Cable Operating Company, L.L.C.; Charter Cable Partners, L.L.C.; Charter Communications Entertainment, LLC; Charter Communications Entertainment I, DST; Charter Communications Entertainment II, LLC; Charter Communications Holdings Capital Corporation; Charter Communications Operating Capital Corp.; Charter Communications Properties LLC; Charter Communications V, LLC; Charter Communications Ventures, LLC; Charter Communications VI, LLC; Charter Communications VII, LLC; Charter Communications, LLC; Charter Distribution, LLC; Charter Fiberlink – Alabama, LLC; Charter Fiberlink AR-CCVII, LLC; Charter Fiberlink AZ-CCVII, LLC; Charter Fiberlink CA-CCO, LLC; Charter Fiberlink CA-CCVII, LLC; Charter Fiberlink CC VIII, LLC; Charter Fiberlink CCO, LLC; Charter Fiberlink CT-CCO, LLC; Charter Fiberlink – Georgia, LLC; Charter Fiberlink ID-CCVII, LLC; Charter Fiberlink – Illinois, LLC; Charter Fiberlink IN-CCO, LLC; Charter Fiberlink KS-CCO, LLC; Charter Fiberlink LA-CCO, LLC; Charter Fiberlink MA-CCO, LLC; Charter Fiberlink – Michigan, LLC; Charter Fiberlink – Missouri, LLC; Charter Fiberlink MS-
(Continued...)

Disclosure Statement, (b) establishing a Record Date for voting on the Plan of Reorganization and the Rights Offering, (c) approving Solicitation Packages and Solicitation Procedures, (d) approving the Rights Offering Procedures and Rights Exercise Form, (e) approving the Forms of Ballots and manner of notice, (f) approving the Commitment Agreements, (g) approving the Commitment Fees, (h) establishing procedures for voting on the Plan and (i) scheduling a hearing and establishing notice and objection procedures for the Confirmation of the Plan, all as more fully set forth in the Motion[2]; and the Bankruptcy Court having jurisdiction to consider the Motion; and the relief requested therein being a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334; and venue being proper before this Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Debtors having filed with this Bankruptcy Court the Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code (the "Disclosure Statement"), dated March 27, 2009 and the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan"), dated March 27, 2009; and the Bankruptcy Court having reviewed the Disclosure Statement, the Motion, the papers in support thereof, and

---

CCVI, LLC; Charter Fiberlink NC-CCO, LLC; Charter Fiberlink NC-CCVII, LLC; Charter Fiberlink – Nebraska, LLC; Charter Fiberlink NH-CCO, LLC; Charter Fiberlink NM-CCO, LLC; Charter Fiberlink NV-CCVII, LLC; Charter Fiberlink NY-CCO, LLC; Charter Fiberlink NY-CCVII, LLC; Charter Fiberlink OH-CCO, LLC; Charter Fiberlink OK-CCVII, LLC; Charter Fiberlink OR-CCVII, LLC; Charter Fiberlink SC-CCO, LLC; Charter Fiberlink SC-CCVII, LLC; Charter Fiberlink – Tennessee, LLC; Charter Fiberlink TX-CCO, LLC; Charter Fiberlink UT-CCVII, LLC; Charter Fiberlink VA-CCO, LLC; Charter Fiberlink VT-CCO, LLC; Charter Fiberlink WA-CCVII, LLC; Charter Fiberlink – Wisconsin, LLC; Charter Fiberlink WV-CCO, LLC; Charter Fiberlink, LLC; Charter Gateway, LLC; Charter Helicon, LLC; Charter Investment, Inc.; Charter RMG, LLC; Charter Stores FCN, LLC; Charter Video Electronics, Inc.; Dalton Cablevision, Inc.; Enstar Communications Corporation; Falcon Cable Communications, LLC; Falcon Cable Media, a California Limited Partnership; Falcon Cable Systems Company II, L.P.; Falcon Cablevision, a California Limited Partnership; Falcon Community Cable, L.P.; Falcon Community Ventures I, LP; Falcon First Cable of the Southeast, Inc.; Falcon First, Inc.; Falcon Telecable, a California Limited Partnership; Falcon Video Communications, L.P.; Helicon Partners I, L.P.; HPI Acquisition Co., L.L.C.; Interlink Communications Partners, LLC; Long Beach, LLC; Marcus Cable Associates, L.L.C.; Marcus Cable of Alabama, L.L.C.; Marcus Cable, Inc.; Midwest Cable Communications, Inc.; Pacific Microwave; Peachtree Cable TV, L.P.; Peachtree Cable T.V., LLC; Renaissance Media LLC; Rifkin Acquisition Partners, LLC; Robin Media Group, Inc.; Scottsboro TV Cable, Inc.; Tennessee, LLC; The Helicon Group, L.P.; Tioga Cable Company, Inc.; and Vista Broadband Communications, LLC.

the responses thereto, if any; and the Bankruptcy Court having found and determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and that the relief requested in the Motion is in the best interests of the Debtors, their estates, and creditors; and upon all of the proceedings had before the Bankruptcy Court; and after due deliberation and sufficient cause appearing therefor; it is hereby ORDERED

1.      The motion is granted.

2.      The Solicitation Procedures are incorporated herein by reference and form an integral and indivisible part of this Order, provide a fair and equitable voting process and are consistent with section 1126 of the Bankruptcy Code.

3.      Ballots will be provided to holders of claims and interests in Classes A-3, A-4, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 because these claims and interests are classified as being impaired by, and entitled to vote under, the Plan.

4.      The Ballots, including the Master Ballots, annexed to this Order as **Exhibit A** and **Exhibit B**, respectively (a) are consistent with Official Form No. 14, (b) adequately address the particular needs of these chapter 11 cases, (c) are appropriate for each Class of Claims or Equity Interests entitled to vote to accept or reject the Plan, and (d) comply with Bankruptcy Rule 3017(d). The appropriate Ballots and Master Ballots shall be distributed to holders of Claims or Equity Interests for those Classes entitled to vote to accept or reject the Plan.

5.      Ballots need not be provided to Holders of Claims in Classes A-5, C-5, D-4, E-5, F-5, G-5, and H-5 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6 because these classes are classified as being impaired by the Plan and are conclusively presumed to reject the Plan in accordance with section 1126(g) of the Bankruptcy Code.

_____

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

6.     Ballots need not be provided to Holders of Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of Equity Interests in Classes I-6 and J-7 because these classes are classified as unimpaired by the Plan and are deemed to have accepted the Plan in accordance with section 1126(f) of the Bankruptcy Code.

7.     Pursuant to Bankruptcy Rule 3018(a), the record date for purposes of determining which Holders of Claims and Equity Interests are entitled to receive Solicitation Packages and, where applicable, vote on the Plan shall be April 17, 2009 (the "Record Date"), 12 days prior to the date the Disclosure Statement Hearing was originally scheduled to commence. The Debtors shall specify the Record Date in the Confirmation Hearing Notice. Only Holders of Claims as of the Record Date shall be entitled to vote to accept or reject the Plan, and where applicable, make any election set forth on the Ballot or participate in the Rights Offering.

8.     The period during which the Debtors may solicit votes to accept or reject the Plan, as established by this Order, provides sufficient time for (a) creditors to make informed decisions to accept or reject the Plan and submit timely Ballots to the Voting and Claims Agent or the Securities Voting Agent, as applicable, and (b) Nominees for Beneficial Owners of the Claims in Classes A-4, E-4, F-4, G-4 and H-4 to distribute the Ballots to Beneficial Owners, for such Beneficial Owners to complete and timely submit such Ballots to the Nominees and for the Nominees to complete and timely submit Master Ballots to the Securities Voting Agent.

9.     The contents of the Solicitation Packages, including the Confirmation Hearing Notice annexed to this Order as **Exhibit C**, comply with Bankruptcy Rules 2002 and 3017, constitute sufficient notice to all interested parties in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules and are thus hereby approved.

10. The Disclosure Statement is hereby approved pursuant to section 1125 of the Bankruptcy Code, as providing Holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

11. The Disclosure Statement (including all applicable exhibits thereto) provides Holders of Claims, Holders of Equity Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article X of the Plan (including the third-party release set forth in Article X.E of the Plan), in satisfaction of the requirements of Bankruptcy Rule 3016(c).

12. The Disclosure Statement Hearing Notice, attached hereto as **Exhibit D** and incorporated by reference herein, filed by the Debtors and served upon parties in interest in these chapter 11 cases on March 27, 2009, constitutes adequate and sufficient notice of the hearing to consider approval of the Disclosure Statement, the manner in which a copy of the Disclosure Statement (and exhibits thereto, including the Plan) could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and is hereby approved.

13. The Solicitation Procedures, annexed hereto as **Exhibit E** and incorporated by reference herein, set forth procedures for the Debtors to solicit, receive and tabulate votes to accept the Plan and are hereby approved. ~~provided, however, that the Debtors reserve the right to amend or supplement the Solicitation and Voting Procedures set forth in the Motion where, in the Debtors' best judgment, doing so would better facilitate the solicitation process.~~ *JMP 5/7/09*

14. The Rights Offering Procedures, annexed hereto as **Exhibit F** and incorporated by reference herein, will allow the Debtors to transmit to Eligible Holders the materials necessary to

participate in the Rights Offering efficiently, afford such Eligible Holders a fair and reasonable opportunity to subscribe for the Class A Common Stock, and are thus hereby approved.

15.    The Rights Exercise Form, annexed hereto as **Exhibit G** and incorporated by reference herein, clearly states the Rights that Eligible Holders will be able to exercise in connection with the Rights Offering and, accordingly, is hereby approved.

16.    The Rights Offering and Solicitation Timeline is established (subject to modification as needed).

(a)    **Record Date**

- April 17, 2009, 12 days prior to the originally scheduled commencement of the Disclosure Statement Hearing, as the Record Date for purposes of determining which creditors are entitled to vote on the Plan and to participate in the Rights Offering.

(b)    **Questionnaire Distribution Date**

- April 17, 2009, 12 days prior to the originally scheduled commencement of the Disclosure Statement Hearing, as the date the Debtors distribute a questionnaire (the "Questionnaire") to each Holder of a CCH I Notes Claim seeking affirmation from such Holder that the Holder is either a Qualified Institutional Buyer ("QIB"), an accredited investor ("Accredited Investor") or neither (the "Questionnaire Distribution Date").

- Pursuant to the Questionnaire, Holders of CCH I Notes Claim will have to declare themselves as a QIB, an Accredited Investor, or neither. If the Holder of a CCH I Notes Claim declares as an Eligible Holder, copies of the Rights Offering Procedures and Rights Exercise Form will be sent to them. If the Holder certifies as "neither" (a "Non-Eligible Holder"), the Non-Eligible Holder of a CCH I Notes Claim is entitled to receive Common Stock in an amount equivalent the value of their rights as per the Plan. A Holder that does not fill out a Questionnaire receives no distribution with respect to the Rights Offering.

(c)    **Disclosure Statement Hearing Date**

- May 5, 2009, as the date on which the hearing to consider approval of the Disclosure Statement will commence (the "Disclosure Statement Hearing Date").

**(d)** **Questionnaire Deadline**

- May 11, 2009, 24 days following the Questionnaire Distribution Date, as the deadline for return of the Questionnaires to the Securities Voting Agent (the "Questionnaire Deadline")

**(e)** **Solicitation Date**

- 7 days following the entry of the Disclosure Statement Order, as the date the Debtors will distribute Solicitation Packages and the Disclosure Statement to the Solicitation Parties (the "Solicitation Date").

**(f)** **Rights Offering Commencement Date**

- May 13, 2009, 2 business days following the Questionnaire Deadline, as the date on which the Debtors will launch the Rights Offering (the "Rights Offering Commencement Date").

**(g)** **Rights Offering Distribution Period**

- The period from May 13, 2009 through June 11, 2009, the 20 business day period following the Rights Offering Commencement Date, will be the period during which the Debtors will distribute copies of the Rights Offering Procedures and Rights Exercise Form to Eligible Holders of CCH I Notes Claims who return a Questionnaire to the Debtors (the "Rights Offering Period").

- The Rights Offering Period is subject to the Right of First Refusal (as defined herein).

- Eligible Holders of CCH I Notes Claims will be entitled to transfer or exercise their Rights during the Rights Offering Period only.

**(h)** **CCH II Exchange Election Deadline**

- June 8, 2009, as the deadline by which all CCH II Exchange elections must be properly executed, completed, and delivered so that they are **actually effected** by the Nominee holding the CCH II Notes.

**(i)** **Expiration Date and Extension Expiration Date**

- June 11, 2009, 20 business days following the Rights Offering Commencement Date, as the deadline for eligible Holders of CCH I Notes to elect to participate in the Rights Offering (the "Expiration Date"), which date is subject to an extension of up to 5 business days following the notification of the non exercise of the applicable Right of First Refusal to allow the completion of necessary documentation, under certain circumstances (as detailed in the Rights Offering Procedures) (the "Extension Expiration Date").

All Rights Offering exercise forms and payments are due from Eligible Holders seeking to exercise their rights pursuant to the Rights Offering (with the exception of the members of the Crossover Committee) on or before the Expiration Date or Extension Expiration Date, as appropriate.

**(j)** **Voting Deadline**

- 5 p.m. (Prevailing Eastern Time) on June 15, 2009, 41 days following the Disclosure Statement Hearing Date, as the deadline by which all Ballots and Master Ballots must be properly executed, completed, and delivered so that they are **actually received** by the Voting and Claims Agent or Securities Voting Agent, as applicable (the "Voting Deadline").

**(k)** **Rights and Transfers Settlement Date**

- Any transfers of Rights prior to the Expiration Date shall be subject to the Backstop Parties' right of first refusal (the "Right of First Refusal"), as detailed in the Rights Offering Procedures.

- June 18, 2009, 25 business days following the Rights Offering Commencement Date, as the date in which the final rights and trades settle.

**(l)** **Unexercised Rights Notice Date**

- Five business days after the date on which Rights can no longer be exercised, as the date on which notice is given to the Backstop Parties concerning their unexercised rights.

**(m)** **Committee Funding Deadline**

- The later of (a) July 27, 2009 and (b) the date that is two business days following the Court's entry of an Order confirming the Plan, as the deadline for the participating members of the Crossover Committee to fund all three of the Commitment Agreements.

17. The Debtors are authorized to distribute the Solicitation Packages without the Plan Supplement and are directed to file the Plan Supplement with the Bankruptcy Court and serve the Plan Supplement on (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the Official Committee of Unsecured Creditors; (c) counsel to the agent under the Debtors' prepetition first lien credit facility; (d) counsel to the agent under the Debtors' prepetition junior credit facility; (e) the counterparties to those certain interest rate swap

agreements with CCO; (f) counsel to the unofficial committee of unaffiliated holders of those certain CCH I and CCH II notes issuances; (g) counsel to the unofficial committee of unaffiliated holders of those certain CCH II note issuances; (h) the indenture trustees for those indentures to which a Debtor is a party; (i) counsel to Vulcan Inc.; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the Federal Communications Commission; (m) the Office of the Attorney General in all of the states in which the Debtors operate; and (n) any applicable state public utilities commissions required to receive notice under the Bankruptcy Rules or Local Rules. Debtors simultaneously shall make available for viewing the Plan Supplement at www.kccllc.net/charter.

18.     With respect to Holders of Claims and Equity Interests not entitled to vote to accept or reject the Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code, the Debtors shall mail the appropriate Notice of Non-Voting Status, substantially in the forms of **Exhibit H** and **Exhibit I**, respectively, annexed to this Order; provided, however, that the Notices of Non-Voting Status shall provide that a copy of the Plan and Disclosure Statement may be viewed at www.kccllc.net/charter, or obtained free of charge by contacting the Voting and Claims Agent at (866) 967-0266.

19.     With respect to Holders of Disputed Claims, the Debtors shall mail the Disputed Claim Notice substantially in the form of **Exhibit J**, annexed to this Order; provided, however, that the Disputed Claim Notice shall provide that a copy of the Plan and Disclosure Statement may be viewed at www.kccllc.net/charter, or obtained free of charge by contacting the Voting and Claims Agent at (866) 967-0266.

20.     With respect to counterparties to executory contracts or unexpired leases with one or more of the Debtors that have not been assumed or rejected as of the Record Date, the Debtors

shall mail the Notice to Contract-Lease Parties substantially in the form **Exhibit K**, annexed to this Order; provided, however, that the Notice to Contract-Lease Parties shall provide that a copy of the Plan and Disclosure Statement may be viewed at www.kccllc.net/charter, or obtained free of charge by contacting the Voting and Claims Agent at (866) 967-0266.

21.     With respect to Holders of Charter's publicly traded common stock as reflected in the records maintained by the Debtors' transfer agent(s) as of the close of business on the Record Date, the Debtors shall mail the Notice to Holders of Charter's publicly traded common stock substantially in the form **Exhibit L**, annexed to this Order; provided, however, that the Publicly Traded Stockholder Notice shall provide that a copy of the Plan and Disclosure Statement may be viewed at www.kccllc.net/charter, or obtained free of charge by contacting the Voting and Claims Agent at (866) 967-0266.

22.     With respect to entities at addresses from which Disclosure Statement Hearing Notices were returned as undeliverable by the United States Postal Service, the Debtors are excused from distributing Solicitation Packages to those entities unless the Debtors are able, using reasonable efforts, to obtain an accurate address for such entities before the Solicitation Date, and failure to distribute Solicitation Packages to such entities will not constitute inadequate notice of the Confirmation Hearing, the Voting Deadline, or a violation of Bankruptcy Rule 3017(d).

23.     The Confirmation Hearing will be held on **July 20, 2009 at 10:00 a.m. (prevailing Eastern Time)**; provided, however, that the Confirmation Hearing may be adjourned from time to time by the Court or the Debtors without further notice to parties other than an announcement in Court at the Confirmation Hearing or any adjourned Confirmation Hearing; provided, further, however, that notice of any such adjournments will be set forth on

(a) the Court's website at www.nysb.uscourts.gov for registered users of the Public Access to Court Electronic Records (PACER) System and (b) the Voting and Claims Agent's website at www.kccllc.net/charter. Objections, if any, to confirmation of the Plan or proposed modifications to the Plan, if any, must (a) be in writing, (b) state the name and address of the objecting party and the amount and nature of the claim or interest of such party, (c) state with particularity the basis and nature of any objection to the confirmation of the Plan, and (d) be filed, together with proof of service, with the Court and served so that they are received no later than **July 13, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Confirmation Objection Deadline") by the following parties (collectively, the "Notice Parties").

| |
|---|
| **Kirkland & Ellis LLP**<br>Attn: Stephen E. Hessler<br>Citigroup Center<br>153 East 53rd Street<br>New York, New York 10022-4611<br>***Counsel to the Debtors*** |
| **Simpson Thacher & Bartlett LLP**<br>Attn: Peter V. Pantaleo<br>425 Lexington Avenue<br>New York, New York 10017-3954<br>***Counsel to the Agent for the Debtors' Prepetition First Lien Facility*** |

| **Nixon Peabody LLP**<br>Attn: Michelle Ross<br>437 Madison Avenue<br>New York, New York 10022<br>*Counsel to the Agent for the Debtors' Prepetition Junior Facility and Certain of the Lenders Thereunder* |
| --- |
| **Brown Rudnick LLP**<br>Attn: Daniel J. Saval<br>7 Times Square<br>New York, New York 10036<br>*Counsel to the Agent for the Debtors' Prepetition Junior Facility and Certain of the Lenders Thereunder* |
| **Paul, Weiss, Rifkind, Wharton & Garrison LLP**<br>Attn: Alan W. Kornberg<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>*Counsel to the Agent for the Debtors' Unofficial Committee of Unaffiliated Holders of Those Certain CCH I and CCH II Notes Issuances*<br><br>**Kasowitz, Benson, Torres & Friedman LLP**<br>Attn: David S. Rosner<br>1633 Broadway<br>New York, New York 10019<br>*Counsel to the Unofficial Committee of Unaffiliated Holders of Those Certain CCH II Note Issuances*<br><br>**Skadden, Arps, Slate, Meagher & Flom LLP**<br>Attn: Jay M. Goffman<br>4 Times Square<br>New York, New York 10036<br>*Counsel to Vulcan, Inc.*<br><br>**Togut, Segal & Segal, LLP**<br>Attn: Albert Togut<br>Attn: Frank Oswald<br>One Penn Plaza<br>New York, New York 10119<br>*Counsel to Charter Investment, Inc.*<br><br>**Ropes & Gray LLC**<br>Attn: Mark R. Somerstein<br>Attn: Keith Wofford<br>1211 Avenue of the Americas<br>New York, New York 10036-8704 |
| **The Office of the United States Trustee for the Southern District of New York**<br>Attn: Paul Schwartzberg<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004 |

24.     The Confirmation Hearing Notice, substantially in the form annexed hereto as **Exhibit C** and incorporated herein by reference, setting forth (a) the Voting Deadline, (b) the deadline for exercising Rights, (c) the time fixed for filing objections to confirmation of the Plan, and the manner in which such objections shall be filed, and (d) the time, date, and place for the Confirmation Hearing, provides adequate notice of the Confirmation Hearing and, accordingly, is hereby approved.

25.     In the event that multiple objections to confirmation of the Plan are filed by the Confirmation Objection Deadline, the Debtors and any other party in interest are authorized to file a single, omnibus reply to such objections.

26.     The certification of Ballots shall be filed no later than one (1) calendar day prior to the Confirmation Hearing.

27.     The Debtors are authorized to make non-substantive changes to the Disclosure Statement, Plan, Ballots, Master Ballots, Confirmation Hearing Notice, Rights Exercise Form, and related documents by filing an errata sheet with the Court. These non-substantive changes shall include, changes to correct typographical and grammatical errors and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package prior to their distribution.

28.     The Debtors are authorized to (a) enter into the Commitment Agreements, annexed hereto as **Exhibit M** and incorporated by reference herein, (b) effectuate the transactions contemplated thereunder, and (c) pay the Commitment Fees; provided however that the Commitment Fees are not deemed earned until entry of the Confirmation Order and not payable until the effective date of the Plan.

29.     The Debtors are authorized to take or refrain from taking any action necessary or appropriate to implement the terms of, and the relief granted in, this Order without seeking further order of the Court.

30.     All time periods set forth herein shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

32.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable upon its entry.

Dated: New York, New York                    _s/ James M. Peck_
      May 7, 2009                        United States Bankruptcy Judge

**EXHIBIT E to DISCLOSURE STATEMENT ORDER**

**SOLICITATION PROCEDURES**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## CHARTER COMMUNICATIONS, INC.
## SOLICITATION AND TABULATION PROCEDURES

The following procedures (the "<u>Solicitation Procedures</u>") are adopted with respect to (a) the distribution of Ballots and other solicitation materials with respect to the Plan and (b) the return and tabulation of Ballots and Master Ballots.[1]

**1.     Definitions**

   (a)     **Plan** means the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated May 7, 2009.

   (b)     **Ballot** means a form of ballot approved by the Court in the Disclosure Statement Order.

   (c)     **Beneficial Owner** means a beneficial owner of Charter Communications, Inc. Notes, Charter Communications Holdings, LLC Notes, CCH I Holdings, LLC Notes, CCH I, LLC Notes, or CCH II, LLC Notes (collectively, the "<u>Notes</u>") for whom a Nominee acts.

   (d)     **Confirmation Hearing** means the hearing on the confirmation of the Plan, as such hearing may be adjourned from time to time.

   (e)     **Confirmation Hearing Notice** means a notice of the Confirmation Hearing, substantially in the form attached to the Disclosure Statement Order as **Exhibit B**.

   (f)     **Confirmation Objection Deadline** means, July 13, 2009 at 4:00 p.m. (prevailing Eastern Time).

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

(g)     **Disclosure Statement** means the Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code With Respect to the Debtors' Joint Plan of Reorganization approved by the Court in the Disclosure Statement Order.

(h)     **Disclosure Statement Order** means the Order (I) Approving the Disclosure Statement; (II) Establishing a Record Date for Voting on the Plan of Reorganization; (III) Approving Solicitation Packages and Procedures for the Distribution Thereof; (IV) Approving the Rights Offering Procedures and Rights Offering Forms; (V) Approving the Forms of Ballots and Manners of Notice; (VI) Approving the Commitment Agreement; (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan; and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan.

(i)     **Master Ballot** means a form of ballot, approved by the Court in the Disclosure Statement Order, submitted by a Nominee on behalf of one of more Beneficial Owners.

(j)     **Nominees** means the brokers, banks, dealers, or nominees for Beneficial Owners of the Notes as identified in the Plan, for purposes of soliciting votes on the Plan.

(k)     **Notice of Non-Voting Status (Unimpaired Classes)** means the notice of non-voting status that the Holders of Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of Equity Interests in Classes I-6 and J-7 (collectively, the "Non-Voting Status-Unimpaired Classes") who are deemed to accept the Plan will receive in lieu of the Solicitation Materials. A copy of the Notice of Non-Voting Status-Unimpaired Classes is attached to the Disclosure Statement Order substantially in the form of **Exhibit H**.

(l)     **Notice of Non-Voting Status (Impaired Classes)** means the notice the Holders of Claims in Classes A-5, C-5, D-4, E-5, F-5, G-5 and H-5 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6 (collectively, the "Non-Voting Status-Impaired Classes") who are deemed to reject the Plan will receive in lieu of the Solicitation Materials. A copy of the Notice of Non-Voting Status-Impaired Classes is attached to the Disclosure Statement Order substantially in the form of **Exhibit I**.

(m)     **Record Amount** means the principal amount of Notes held as of the Record Date

(n)     **Record Date** means April 17, 2009, the date set for purposes of determining which Holders of Claims and Equity Interests are entitled to receive Solicitation Materials and, where applicable, vote on the Plan or participate in the Rights Offering.

(o)     **Securities Voting Agent** means the Debtors' securities voting agent, Financial Balloting Group LLC.

(p)     **Solicitation Materials** means, and will consist of: (i) the Disclosure Statement Order (together with a copy of these Solicitation Procedures); (ii) the Disclosure Statement (together with the Plan); (iii) a form of Ballot and/or Master Ballot, as appropriate, together with a return envelope; and (iv) the Rights Offering Procedures and a Rights Exercise Form, together with a return envelope, if applicable.

(q)     **Solicitation Packages** means, and will consist of, all of the following:

      (i)      the Confirmation Hearing Notice; and

      (ii)     either

- the Solicitation Materials; or
- a Notice of Non-Voting Status and the Disclosure Statement Order;

(r)     **Solicitation Date** means the date by which the Debtors will complete distribution of the Solicitation Packages, which shall be no later than seven (7) days after the Disclosure Statement Order is entered.

(s)     **Tabulation Rules** means the rules set forth herein for the temporary allowance of Claims solely for the purposes of voting to accept or reject the Plan.

(t)     **Voting and Claims Agent** means the Debtors' voting and claims agent, Kurtzman Carson Consultants LLC.

(u)     **Voting Deadline** means **June 15, 2009 at 5:00 p.m. (prevailing Eastern Time),** the date set by the Court as the deadline for receipt of Ballots and Master Ballots by the Securities Voting Agent or Voting and Claims Agent, as applicable.

2.      **Publication of Confirmation Hearing Notice:**

(a)     The Debtors shall use their reasonable best efforts to publish a notice substantially in the form of the Confirmation Hearing Notice not less than twenty-five (25) calendar days before the Confirmation Objection Deadline once each in the national editions of The Wall Street Journal and USA Today and The St. Louis Post-Dispatch.

(b)     Additionally, the Confirmation Hearing Notice will be posted electronically at www.kccllc.net/charter.

3.      **Distribution of Solicitation Packages and Solicitation Materials:**

(a)     **Timing of Distribution.**  The Debtors will distribute the Solicitation Materials and Solicitation Packages to all applicable parties by the Solicitation Date.

(b)     **Solicitation Packages.**  The Debtors shall distribute Solicitation Packages to (i) all persons or entities that filed proofs of Claim on or before the Record Date,

3

except to the extent a Claim was paid pursuant to, or expunged by, a prior order of the Bankruptcy Court, (ii) all persons or entities listed in the Debtors' Schedules as holding liquidated, noncontingent, and undisputed Claims in an amount greater than zero, (iii) the registered holders of the Debtors' debt and equity securities, including options to purchase such securities, as of the Record Date, and (iv) all other known creditors of the Debtors as of the Record Date.

(c)     **Duplicate Claims.**  With respect to any creditor who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors), which are classified under the Plan in the same Class, the Debtors shall provide to such creditor only one Solicitation Package and one Ballot for voting their Claims with respect to that class.

(d)     **Other Solicitation Materials.**  The Debtors will distribute (i) the Disclosure Statement Order, together with these Solicitation Procedures, (ii) the Confirmation Hearing Notice and (iii) the Disclosure Statement, together with the Plan to the following parties by the Solicitation Date: (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Creditors' Committee; (iii) counsel to the agent under the Debtor's prepetition first lien credit facility; (iv) counsel to the agent under the Debtor's prepetition junior credit facility; (v) the counterparties to those certain interest rate swap agreements with CCO; (vi) counsel to the unofficial committee of unaffiliated holders of those certain CCH I and CCH II notes issuances; (vii) counsel to the unofficial committee of unaffiliated holders of those certain CCH II note issuances; (viii) the indenture trustees for those indentures to which a Debtor is a party; (ix) counsel to Vulcan Inc.; (x) counsel to Charter Investments, Inc.; (xi) the Internal Revenue Service; (xii) the Securities and Exchange Commission; (xiii) the Federal Communications Commission; (xiv) the Office of the Attorney General in all of the states in which the Debtors operate; and (xv) any applicable state public utilities commissions required to receive notice under the Bankruptcy Rules or Local Rules, (xvi) all landlords and other parties to Executory Contracts and/or Unexpired Leases, (xvii) all administrative creditors of the Debtors; (xviii) all parties who have submitted a written demand against the Debtors and (ix) all other parties in interest that have filed requests for notice pursuant to Bankruptcy Rule 2002 in the Debtors' chapter 11 cases.

(e)     **Procedures for Nominees**.  Each Nominee shall (i) forward the Solicitation Package to each Beneficial Owner for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may timely return the completed beneficial owner ballot to the Nominee, (ii) upon receipt of the Ballots, summarize the individual votes of its respective Beneficial Owners on the Master Ballot, and (iii) submit the Master Ballot to the Securities Voting Agent by the Voting Deadline or follow the procedures outlined below with respect to prevalidation.

(f)     **Notices of Non-Voting Status.**  The Debtors shall mail the appropriate Notice of Non-Voting Status to the Holders of Claims not entitled to accept or reject the

Plan pursuant to sections 1126(f) or 1126(g) of the Bankruptcy Code and the Notices of Non-Voting Status shall provide that a copy of the Plan and Disclosure Statement may be viewed at www.kccllc.net/charter or obtained free of charge by contacting the Voting and Claims Agent at (866) 967-0266.

4. **Determination of Amount of Claims for Voting Purposes.** Solely for purposes of voting to accept or reject the Plan, and not for the purpose of making distributions on account of a Claim, and without prejudice to the rights of the Debtors or any other party in interest in any other context, each Claim within a Class of Claims entitled to vote to accept or reject the Plan shall be temporarily allowed in an amount equal to the amount of such Claim as set forth in a timely filed proof of Claim, or, if no proof of Claim was filed, the amount of such Claim as set forth in the Schedules, in accordance with, and subject to, the Tabulation Rules described below:

(a) General Tabulation Rules.

(i) A Claim for which a proof of Claim has been timely filed and asserts both a liquidated and unliquidated amount shall be temporarily allowed for voting purposes, subject to the other Tabulation Rules, only in the liquidated amount of such Claim;

(ii) A Claim that is not contingent, unliquidated or disputed, for which a proof of Claim has been timely filed, which is not listed on the Schedules and for which no objection to such Claim has been filed on or before the Voting Deadline shall be temporarily allowed for voting purposes in the amount set forth in the proof of Claim;

(iii) A Claim that by its terms is contingent, unliquidated or disputed, based on a timely filed proof of Claim or listed as such on the Schedules, shall, subject to the claimant's right to file a motion pursuant to Bankruptcy Rule 3018(a), be temporarily allowed for voting purposes only in an amount equal to one dollar ($1.00);

(iv) If the Debtors have served and filed an objection to a Claim at least ten (10) calendar days prior to the Voting Deadline, such Claim shall, subject to the claimant's right to file a motion pursuant to Bankruptcy Rule 3018(a), be temporarily allowed for voting purposes only in an amount equal to the greater of (a) the undisputed amount of such Claim, if any, as set forth in such objection or (b) one dollar ($1.00);

(v) Notwithstanding any other Tabulation Rule, a Claim that has been estimated or otherwise allowed for voting purposes by order of the Court shall be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court; and

(vi) A Claim for which the Claim Holder identifies a Claim amount on its Ballot that is different than the amount otherwise calculated in accordance with the Tabulation Rules shall be temporarily allowed for voting

purposes in the amount calculated in accordance with the Tabulation Rules.

(b) <u>Allowed Claims</u>. Notwithstanding any other Tabulation Rule, a Claim that is deemed allowed in accordance with the Plan shall be allowed for voting purposes in the deemed allowed amount set forth in the Plan.

(c) <u>Rejection Damages Claims.</u> Any Claim filed as a protective Claim for rejection damages related to an executory contract or an unexpired lease that the Debtors **have not rejected** as of the Voting Deadline shall be temporarily disallowed for voting purposes, and to the extent that such Claim is solely for rejection damages, any related Ballot shall not be counted as having voted for or against the Plan.

5. **Return of Ballots By Voting Deadline:** For a vote to accept or reject the Plan to be counted, all required information on the Ballot must be completed, the Ballot must be executed and the completed Ballot must be returned as directed on the Ballot so that it (or the Master Ballot) is actually received by the Securities Voting Agent or the Voting and Claims Agent, as applicable, **no later than 5:00 p.m. (prevailing Eastern Time) on June 15, 2009** at Charter Ballot Processing, c/o Financial Balloting Group LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017 or at Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, Los Angeles, CA 90245, Attn: Charter Communications, Inc., as applicable.

6. **Ballots Excluded:** A Ballot or Master Ballot will not be counted if any of the following applies to the Ballot or Master Ballot, subject to the Debtors' right to waive such defects in accordance with these Solicitation Procedures:

(a) The Ballot and Master Ballot is received by the Securities Voting Agent or Voting and Claims Agent, as applicable, after the Voting Deadline.

(b) The Ballot (or a group of Ballots received from a single creditor or interest holder with respect to the Notes) partially rejects and partially accepts the Plan.

(c) The Ballot or Master Ballot is received by facsimile, e-mail or any other electronic means.

(d) The Ballot or Master Ballot is not timely received by the Securities Voting Agent or Voting and Claims Agent, as applicable, but is sent to the Debtors, any indenture trustee or the Debtors' financial or legal advisors.

7. **General Tabulation Procedures and Assumptions:**

The following tabulation procedures for Ballots and Master Ballots shall be utilized:

(a) Creditors (including Beneficial Holders of Claims in Voting Classes) must vote all of their Claims in a particular Class either to accept or reject the Plan and may not split their votes with respect to such Claims within a particular Class;

(b)     The method of delivery of the Ballots and Master Ballots to be sent to the Securities Voting Agent or Voting and Claims Agent, as applicable, is at the election and risk of each Holder of a Claim and (if applicable) Nominee, and will be deemed made only when the original executed Ballot or Master Ballot is actually received by the Securities Voting Agent or Voting and Claims Agent, as applicable;

(c)     If multiple Ballots are received from, or on behalf of, an individual Holder of a Claim with respect to the same Claim prior to the Voting Deadline, the latest dated Ballot timely received will be deemed to reflect the intent of such Holder and to supercede and revoke any prior Ballot with respect to such Claim;

(d)     If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, attorney-at-law, or other person acting in a fiduciary or representative capacity, such person shall be required to indicate such capacity when signing, and the Debtors may request proper evidence prior to accepting such Ballot;

(e)     The Debtors, in their sole discretion, subject to any contrary order of the Court, may waive any defect in any Ballot or Master Ballot at any time, whether before or after the Voting Deadline;

(f)     Any Holder of a Claim entitled to vote who has delivered a valid Ballot may withdraw such vote solely in accordance with Bankruptcy Rule 3018(a);

(g)     Subject to any contrary order of the Court, the Debtors reserve the absolute right to reject any and all Ballots or Master Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, not be in accordance with the provisions of this Order or the Bankruptcy Code;

(h)     If no votes to accept or reject the Plan are received with respect to a particular Class, such Class shall be deemed to have voted to accept the Plan;

(i)     Unless waived by the Debtors pursuant to section (f) above, or as ordered by the Court, any defects or irregularities in connection with the deliveries of the Ballots or Master Ballots must be cured by the Voting Deadline, and unless otherwise ordered by the Court, delivery of such Ballots or Master Ballots will not be deemed to have been made until such irregularities have been cured or waived; and

(j)     Except as may be provided by Local Bankruptcy Rule 3018-1(b) and unless otherwise ordered by the Court, with respect to a Ballot or Master Ballot received prior to the Voting Deadline, neither the Debtors, nor any other person or entity, will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots or Master Ballots nor will any of them incur liabilities for failure to provide such notification.

8.  **Additional Procedures for Master Ballots and Ballots cast by Nominees and Beneficial Owners:**

    (a)   <u>Tabulation Rules for Master Ballots and Ballots Cast by Nominees and Beneficial Owners</u>:

        (i)   With respect to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Owners, for purposes of voting, the amount that will be used to tabulate acceptance or rejection of the Plan will be the Record Amount and the following additional rules will apply to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Owners:

        (ii)   Votes cast by Beneficial Owners through Nominees will be applied against the positions held by such Nominees in the Notes as of the Record Date, as evidenced by the record and depository listings. Votes submitted by a Nominee will not be counted in excess of the Record Amount of such securities held by such Nominee.

        (iii)   If conflicting votes or "over-votes" are submitted by a Nominee, the Debtors will attempt to reconcile discrepancies with the Nominees.

        (iv)   If over-votes on a Master Ballot are not reconciled prior to the preparation of the vote certification, the Debtors will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in the Notes.

        (v)   For purposes of tabulating votes, each Nominee or Beneficial Owner will be deemed to have voted only the principal amount of its Notes, although the Securities Voting Agent may be asked to adjust such principal amount to reflect the claim amount, including prepetition interest.

        (vi)   A single Nominee may complete and deliver to the Securities Voting Agent multiple Master Ballots. Votes reflected on multiple Master Ballots will be counted, except to the extent they are duplicative of other Master Ballots. If two or more Master Ballots are inconsistent, the latest dated Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supercede and revoke any prior Master Ballot.

9.  **Transferred Claim Procedures:**

    (a)   **Pre-Record Date Transfers**. With respect to a transferred Claim, the transferee shall be entitled to receive a Solicitation Package and, if the Holder of such Claim is entitled to vote with respect to the Plan, cast a Ballot on account of such Claim only if (a) all actions necessary to effectuate the transfer of the Claim, pursuant to Bankruptcy Rule 3001(e), have been completed by the Record Date, or (b) the transferee files and the Court has docketed by the Record Date (i) the

8

documentation required by Bankruptcy Rule 3001(e), to evidence the transfer, and (ii) a sworn statement of the transferor supporting the validity of the transfer.

(b) **Post-Record Date Transfers.** In the event a Claim is transferred after the Record Date, the transferee of such Claim shall be bound by any vote and/or election to participate in the Rights Offering, as the case may be, made by the Holder of such Claim as of the Record Date.

## 10. 3018(a) Motions:

If any claimant or interest holder seeks to challenge the allowance of its Claim or Equity Interest for voting purposes in accordance with the Tabulation Rules, such claimant or interest holder must file with the Court (with a copy to chambers) a motion for an order pursuant to Bankruptcy Rule 3018(a) (a "3018 Motion") temporarily allowing such Claim or Equity Interest in a different amount for purposes of voting to accept or reject the Plan on or before June 18, 2009 or, if the Debtors file an objection to a Claim or Equity Interest after service of the Confirmation Hearing Notice, on or before ten (10) calendar days after service of notice of that objection. A hearing on any 3018 Motions filed will be held before the Court no later than **July 20, 2009 at 10:00 a.m. (prevailing Eastern Time)**. In accordance with Bankruptcy Rule 3018, as to any creditor filing such a motion, such creditor's Ballot should not be counted in an amount other than that provided by the Tabulation Procedures unless temporarily allowed by the Court in another amount for voting purposes.

# EXHIBIT C

## Reorganized Debtors' Financial Projections

**CHARTER COMMUNICATIONS, INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED BALANCE SHEET**
**(DOLLARS IN MILLIONS)**

| | Pro Forma December 31, 2009 | Pro Forma December 31, 2010 | Pro Forma December 31, 2011 | Pro Forma December 31, 2012 | Pro Forma December 31, 2013 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| CURRENT ASSETS: | | | | | |
| Cash and cash equivalents | $ 750 | $ 1,187 | $ 1,830 | $ 1,714 | $ 2,151 |
| Other current assets | 273 | 288 | 304 | 321 | 338 |
| Total current assets | 1,023 | 1,475 | 2,134 | 2,035 | 2,489 |
| INVESTMENT IN CABLE PROPERTIES | 12,266 | 12,150 | 12,007 | 11,786 | 11,602 |
| OTHER NONCURRENT ASSETS | 4,645 | 4,608 | 4,569 | 4,531 | 4,493 |
| Total assets | $ 17,934 | $ 18,233 | $ 18,710 | $ 18,352 | $ 18,584 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| CURRENT LIABILITIES | 1,216 | 1,255 | 1,281 | 1,292 | 1,309 |
| LONG-TERM DEBT | 13,460 | 13,390 | 13,320 | 12,150 | 11,280 |
| NOTE PAYABLE - RELATED PARTY | - | | | | |
| DEFERRED MANAGEMENT FEES - RELATED PARTY | - | | | | |
| OTHER LONG-TERM LIABILITIES | 773 | 1,149 | 1,500 | 1,841 | 2,141 |
| PREFERRED STOCK | 72 | 83 | 95 | 109 | 125 |
| SHAREHOLDERS' EQUITY | 2,413 | 2,356 | 2,514 | 2,960 | 3,729 |
| Total liabilities and shareholders' equity | $ 17,934 | $ 18,233 | $ 18,710 | $ 18,352 | $ 18,584 |

| | Pro Forma 2009 | Pro Forma 2010 | Pro Forma 2011 | Pro Forma 2012 | Pro Forma 2013 |
|---|---|---|---|---|---|
| REVENUES | $ 6,919 | $ 7,362 | $ 7,830 | $ 8,331 | $ 8,808 |
| OPERATING COSTS AND EXPENSES | 4,462 | 4,723 | 4,981 | 5,264 | 5,538 |
| Adjusted EBITDA | 2,457 | 2,639 | 2,849 | 3,067 | 3,270 |
| Adjusted EBITDA margin | 35.5% | 35.8% | 36.4% | 36.8% | 37.1% |
| Depreciation and amortization | 1,284 | 1,302 | 1,343 | 1,343 | 1,292 |
| Income from operations | 1,173 | 1,337 | 1,506 | 1,724 | 1,978 |
| OTHER INCOME (EXPENSES): | | | | | |
| Interest expense, net | (965) | (1,002) | (986) | (928) | (899) |
| Reorganization expenses | (166) | - | - | - | - |
| | (1,131) | (1,002) | (986) | (928) | (899) |
| Income before income taxes | 42 | 335 | 520 | 796 | 1,079 |
| Income tax expense | (176) | (392) | (362) | (350) | (310) |
| Consolidated net income (loss) | (134) | (57) | 158 | 446 | 769 |
| Noncontrolling interest | 13 | - | - | - | - |
| Net income (loss) to Charter Shareholders | $ (121) | $ (57) | $ 158 | $ 446 | $ 769 |

Adjusted EBITDA is a non-GAAP term.  See Exhibit F for the reconciliation of adjusted EBITDA to net cash flows from operating activities as defined by GAAP.

2

**CHARTER COMMUNICATIONS, INC. AND SUBSIDIARIES**
**UNAUDITED CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(DOLLARS IN MILLIONS)**

| | Pro Forma 2009 | Pro Forma 2010 | Pro Forma 2011 | Pro Forma 2012 | Pro Forma 2013 |
|---|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | | |
| Net income (loss) | $ (121) | $ (57) | $ 158 | $ 446 | $ 769 |
| Adjustments to reconcile net loss to net cash flows from operating activities: | | | | | |
| Depreciation and amortization | 1,284 | 1,302 | 1,343 | 1,343 | 1,292 |
| Noncash interest expense | 30 | 42 | 43 | 45 | 47 |
| Non controlling interests | (13) | - | - | - | - |
| Deferred income taxes | 170 | 386 | 356 | 344 | 301 |
| Changes in operating assets and liabilities, net of effects from dispositions | | | | | |
| Other current assets | (15) | (15) | (16) | (17) | (17) |
| Accounts payable, accrued expenses and other | (215) | 29 | 21 | 8 | 16 |
| Net cash flows from operating activities | 1,120 | 1,687 | 1,905 | 2,169 | 2,408 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | | |
| Purchases of property, plant and equipment | (1,173) | (1,180) | (1,192) | (1,115) | (1,101) |
| Net cash flows from investing activities | (1,173) | (1,180) | (1,192) | (1,115) | (1,101) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | | |
| Repayments of long-term debt | (1,056) | (70) | (70) | (1,170) | (870) |
| Proceeds from Rights offering | 1,629 | - | - | - | - |
| Payments for debt issuance costs | (82) | - | - | - | - |
| Other, net | (648) | - | - | - | - |
| Net cash flows from financing activities | (157) | (70) | (70) | (1,170) | (870) |
| **NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS** | (210) | 437 | 643 | (116) | 437 |
| CASH AND CASH EQUIVALENTS, beginning of period | 960 | 750 | 1,187 | 1,830 | 1,714 |
| CASH AND CASH EQUIVALENTS, end of period | $ 750 | $ 1,187 | $ 1,830 | $ 1,714 | $ 2,151 |
| **CASH PAID FOR INTEREST** | $ 1,019 | $ 923 | $ 950 | $ 911 | $ 876 |

# EXHIBIT D

## Reorganized Debtors' Valuation Analysis

## Valuation of the Reorganized Debtors

**THE VALUATION INFORMATION CONTAINED IN THIS SECTION WITH REGARD TO THE REORGANIZED DEBTORS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.**

1.　　Overview

Lazard has estimated the value of the Reorganized Debtors (other than Charter Investments, Inc.) as of the date of this Disclosure Statement. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution to holders of Allowed Claims (the "Enterprise Value") consists of the estimated value of the Reorganized Debtors' operations on a going concern basis. The valuation analysis assumes that the Reorganization takes place on September 30, 2009 (the "Assumed Effective Date") and is based on projections provided by the Debtors' management ("Projections") for 2009 – 2013 (the "Projection Period").

Based on these Projections and solely for purposes of the Plan, Lazard estimates that the Enterprise Value of the Reorganized Debtors falls within a range from approximately $14.1 - $16.6 billion, with a mid-point estimate of $15.4 billion as of the Assumed Effective Date. For purposes of this valuation, Lazard assumes that no material changes that would affect value occur between the date of the Disclosure Statement and the Assumed Effective Date. Based on an estimated net debt balance of approximately $13.4 billion projected as of the Assumed Effective Date, Lazard's mid-point estimate of Enterprise Value implies a value for the New Common Stock of the Reorganized Debtors (the "Equity Value") of approximately $2.0 billion. The Equity Value assumes that the Assumed Effective Date has occurred and that the Rights Offering has been consummated. Excluding any additional equity purchased in the Rights Offering, the pre-Rights Offering equity holders (excluding the ownership stake of Paul Allen) will have ownership of approximately 19.0% of this Equity Value, or approximately $379 million. These values do not give effect to the potentially dilutive impact of any shares issued upon exercise of any warrants or any shares issued upon exercise of options that may be granted under a long-term incentive plan which the Board of Directors of the Reorganized Debtors may authorize for management of the Reorganized Debtors. Lazard's estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED ENTERPRISE VALUE RANGE, AS OF THE ASSUMED EFFECTIVE DATE OF SEPTEMBER 30, 2009, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD CURRENTLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAS ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATES.

Lazard assumed that the Projections prepared by the management of the Debtors were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. Lazard's estimated Enterprise Value range assumes the Reorganized

Debtors will achieve their Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings and cash flow as projected. If the business performs at levels below those set forth in the Projections, such performance may have a materially negative impact on Enterprise Value. Conversely, if the business performs at levels above those set forth in the Projections, such performance may have materially positive impact on Enterprise Value.

In estimating the Enterprise Value and the value to New Common Stock of the Reorganized Debtors, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors, which data were prepared and provided to Lazard by the management of the Debtors and which relate to the Reorganized Debtors' business and its prospects; (c) met with and discussed the Debtors' operations and future prospects with the senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Although Lazard conducted a review and analysis of the Reorganized Debtors' business, operating assets and liabilities and the Reorganized Debtors' business plan, it assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Reorganized Debtors as well as publicly available information.

In addition, Lazard did not independently verify the Projections in connection with preparing estimates of Enterprise Value, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to holders of Allowed Claims thereunder.

Lazard's estimated Enterprise Value of the Reorganized Debtors does not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be when issued pursuant to the Plan or the prices at which they may trade in the future. The estimated Enterprise Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Lazard's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value range of the Reorganized Debtors set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtors, Lazard, nor any other person assumes responsibility for any differences between the Enterprise Value range and such actual outcomes. Actual market prices of such securities at issuance will depend upon, among other things, the operating performance of the Reorganized

Debtors, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in the Reorganized Debtors' industry and economic conditions generally, and other factors which generally influence the prices of securities.

### 2. Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard to arrive at its range of estimated Enterprise Values for the Reorganized Debtors. In performing the financial analyses described below and certain other relevant procedures, Lazard reviewed all significant assumptions with the management of the Debtors. Lazard's valuation analysis must be considered as a whole. For reasons discussed in detail below, Lazard's valuation analysis relies predominantly on the discounted cash flow analysis and the comparable company analysis; while a precedent transaction analysis was performed, Lazard's reliance on such methodology for purposes of determining the Enterprise Value was minimal. Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.

### a. Discounted Cash Flow Analysis

The discounted cash flow ("DCF") analysis is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Under this methodology, projected future cash flows are discounted by the business' weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business based on its capital structure. The enterprise value of the firm is determined by calculating the present value of the Reorganized Debtors' unlevered after-tax free cash flows based on the Projections plus an estimate for the value of the firm beyond the Projection Period known as the terminal value. The terminal value is derived by evaluating two (2) approaches: 1) applying a multiple to the Reorganized Debtors' projected EBITDA in the final year of the Projection Period, discounted back to the assumed date of emergence by the Discount Rate; and 2) dividing the projected unlevered free cash flow in the year following the final projected year by the Discount Rate minus a range of perpetual growth rates, discounted back to the assumed date of emergence by the Discount Rate.

To estimate the Discount Rate, Lazard used the cost of equity and the after-tax cost of debt for the Reorganized Debtors, assuming a targeted long-term debt-to-total capitalization ratio based on an assumed range of Reorganized Debtors' pro forma capitalization and the average leverage ratio of the Peer Group. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model," which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated what would be the Reorganized Debtors' blended cost of debt based on current capital markets conditions and the financing costs for comparable companies with leverage similar to the Reorganized Debtors' target capital structure. In determining the terminal multiple, Lazard used the 2009E EBITDA multiple range derived from the Comparable Company Analysis described above.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation still involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtors, which in turn affect its cost of capital and terminal multiples. Lazard calculated its DCF valuation on a range of Discount Rates, terminal value EBITDA multiples and perpetuity growth rates as indicated below:

Discounted Cash Flow Analysis Assumptions

| Discount Rate | Terminal Multiple | Perpetuity Growth Rate |
|:---:|:---:|:---:|
| 10.5% - 11.5% | 5.0x – 6.0x | 2.5% – 3.5% |

In applying the above methodology, Lazard utilized management's detailed Projections for the period beginning September 30, 2009, and ending December 31, 2013, to derive unlevered after-tax free cash flows. Free cash flow includes sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtors are assumed to be full taxpayers at the applicable regional corporate income tax rates (the effective tax rate is assumed to be 40%). These cash flows, along with the terminal value, are discounted back to the Assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

Lazard also applied DCF analyses to the value of deferred tax assets, including future NOL carryforwards. Based on analysis performed by Ernst & Young, Lazard assumes that the Debtors' existing NOL carryforwards are partially used to offset income resulting from the cancellation of debt in the Restructuring Transaction and will otherwise be significantly restricted, and that the Reorganized Debtors may generate additional NOL carryforwards in future. To value this benefit, Lazard discounts the annual tax benefit for a range of tax scenarios at the Discount Rate range used in the DCF analysis of the overall company. Further tax diligence will be required to confirm the underlying tax assumptions used in the valuation.

**b.** Comparable Company Analysis

The comparable company valuation analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company was determined by examining the trading prices for the equity securities of such company in the public markets and adding the aggregate amount of outstanding net debt for such company (at book value and at current market values) and minority interest less the market value of unconsolidated investments. Those enterprise values are commonly expressed as multiples of various measures of operating statistics, most commonly sales and earnings before interest, taxes, depreciation and amortization ("EBITDA"). In addition, each of the selected public company's operational performance, operating margins, profitability, leverage and business trends were examined. Based on these analyses, financial multiples and ratios are calculated to apply to the Reorganized Debtors' actual and projected operational performance. Lazard focused primarily on EBITDA multiples of the selected comparable companies to value the Reorganized Debtors, and also referenced the implied per subscriber value against those of the peers.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the Reorganized Debtors. Common criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, location, market presence and size and scale of operations. The selection of appropriate comparable companies is often difficult, a matter of judgment, and subject to limitations due to sample size and the availability of meaningful market-based information.

Lazard selected the following publicly traded companies (the "Peer Group") on the basis of general comparability to the Reorganized Debtors in one or more of the factors described above: Cablevision Systems Corp., Comcast Corporation, Mediacom Communications Corp. and Time Warner Cable Inc.

Lazard calculated market multiples for the Peer Group based on 2009 estimated EBITDA by dividing the enterprise value of each comparable company's cable assets as of March 23, 2009, by the projected 2009 EBITDA as estimated by equity research analysts. In determining the applicable EBITDA multiple ranges, Lazard considered a variety of factors, including both qualitative attributes and quantitative measures such as historical and projected revenue and EBITDA results, historical enterprise value/EBITDA trading multiples, EBITDA margins, financial distress impacting trading values, size, growth and similarity in business lines. Based on this analysis, Lazard's selected EBITDA multiple ranges for 2009 EBITDA are set forth in the table below.

| | Cable Enterprise Value/EBITDA Multiple | | |
| | Low | High | Peer Median |
| --- | --- | --- | --- |
| 2009E | 5.0x | 6.0x | 5.4x |

Lazard then applied the range of multiples described above to the Reorganized Debtors' 2009E income from operations before depreciation and amortization, impairment charges, stock compensation expense, and other operating expenses, such as special charges and loss on sale or retirement of assets ("Adjusted EBITDA") to determine a range of Enterprise Values.

### c. Precedent Transactions Analysis

The precedent transactions valuation analysis is based on the enterprise values of companies involved in public merger and acquisition transactions that have operating and financial characteristics similar to the Reorganized Debtors. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction. As in a comparable company valuation analysis, those enterprise values are commonly expressed as multiples of various measures of operating statistics, such as sales, EBITDA, and EBIT. Lazard reviewed industry-wide valuation multiples, considering prices paid as a multiple of sales and EBITDA, for companies in similar lines of business to the Reorganized Debtors. The derived multiples are then applied to the Reorganized Debtors' operating statistics to determine the Enterprise Value or value to a potential strategic buyer. Similar to the comparable company analysis, Lazard focused mainly

on EBITDA multiples in comparing the valuations of the Reorganized Debtors and the selected companies involved in relevant precedent transactions.

Unlike the comparable company analysis, the enterprise valuation derived using this methodology reflects a "control" premium (i.e., a premium paid to purchase a majority or controlling position in the assets of a company). Thus, this methodology generally produces higher valuations than the comparable public company analysis. In addition, other factors not directly related to a company's business operations can affect a valuation based on precedent transactions, including: (a) circumstances surrounding a merger transaction may introduce "diffusive quantitative results" into the analysis (e.g., a buyer may pay an additional premium for reasons that are not solely related to competitive bidding); (b) the market environment is not identical for transactions occurring at different periods of time; and (c) circumstances pertaining to the financial position of the company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived weakness in its bargaining leverage).

As with the comparable company analysis, because no precedent merger or acquisition used in any analysis will be identical to the target transaction, valuation conclusions cannot be based solely on quantitative results. The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations, and prospects of each target. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis. Furthermore, the data available for all the precedent transactions may have discrepancies due to varying sources of information. As described above, the precedent transactions analysis explains other aspects of value besides the inherent value of a company. As a result of the significant limitations as to the usefulness of this methodology, Lazard's reliance on the precedent transactions analysis in determining the Enterprise Value was minimal.

In deriving a range of Enterprise Values for the Reorganized Debtors under this methodology, Lazard calculated multiples of total transaction value ("Transaction Value") to the next fiscal year ("NFY") EBITDA of the acquired companies and applied these multiples to the 2009E Adjusted EBITDA for the Reorganized Debtors.

Lazard evaluated various merger and acquisition transactions that have occurred in the cable industry over the last six years. Many of the transactions that have occurred over the past six years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace. These considerations greatly reduce the relevance of the precedent transaction analysis.

Lazard calculated multiples of the target companies by dividing the disclosed purchase price of the target's equity, plus any debt assumed as part of the transaction less any cash on the target's balance sheet, by estimated NFY EBITDA. To normalize the multiples paid in prior transaction, Lazard recalculated the transaction multiples by adjusting the implied transaction equity values by the drop in the S&P 500 since the announcement date of each transaction. Based on this calculation and the qualitative factors described above, Lazard selected the EBITDA multiple ranges set forth in the table below:

|  | Enterprise Value/ EBITDA Multiple | | |
| --- | --- | --- | --- |
|  | Low | High | Adjusted Precedent Median |
| NFY EBITDA | 7.5x | 8.5x | 8.0x |

**d.** Other Assets/ Liabilities Valuation

Other restructuring costs and professional fees were taken into account when estimating beginning cash balance of the Reorganized Debtors upon emergence.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE REORGANIZED DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

# EXHIBIT E

## Liquidation Analysis

# CHARTER COMMUNICATIONS, INC.
## Liquidation Analysis

Pursuant to section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test", Holders of Allowed Claims and Allowed Equity Interests must either (a) accept the Plan, or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting Holders would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan meets the "best interest of creditors" test as set forth in section 1129(a)(7) of the Bankruptcy Code. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Plan.

The following Classes are impaired classes with respect to the Plan:

**Debtor: CCI**
Class A-4: CCI Note Claims
Class A-5: Section 510(b) Claims
Class A-6: Interests

**Debtor: CII**
Class B-4: CII Shareholder Claims

**Debtor: Holdco, Enstar Communications Corporation and Charter Gateway, LLC:**
Class C-4: Holdco Note Claims
Class C-5: Section 510(b) Claims
Class C-6: Interests

**Debtor: CCHC**
Class D-4: Section 510(b) Claims
Class D-5: Interests

**Debtor: CCH and Charter Communications Holdings Capital Corp**
Class E-4: CCHC Notes/Guarantee Claims
Class E-5: Section 510(b) Claims
Class E-6: Interests

**Debtor: CIH and CIH Holdings Capital Corp**
Class F-4: CIH Note Claims
Class F-5: Section 510(b) Claims
Class F-6: Interests

**Debtor: CCH I and CCH I Capital Corp**
Class G-4: CCH I Note Claims
Class G-5: Section 510(b) Claims
Class G-6: Interests

**Debtor: CCH II and CCH II Capital Corp**
Class H-4: CCH II Note Claims
Class H-5: Section 510(b) Claims
Class H-6: Interests

The Debtors believe that the holders of Allowed Claims in each impaired class will receive at least as much under the Plan as they would if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

The Plan proposes certain Allowed Claims shall be rendered unimpaired by (1) reinstatement in accordance with section 1124 of the Bankruptcy Code, (2) payment in full in cash, or (3) receipt of the collateral securing an Allowed Claim, thereby meeting the best interest test as set forth in Section 1129(a)(7). Accordingly, no effort has been made to separately address unimpaired Allowed Claims in this Liquidation Analysis, except as specifically discussed herein as it relates to CC VIII.

The Liquidation Analysis reflects the estimated cash proceeds, net of liquidation-related costs that would be realized if the Debtors were to be liquidated in accordance with chapter 7 of the Bankruptcy Code.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS, THEIR MANAGEMENT AND THEIR ADVISORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

The Liquidation Analysis was prepared by management of the Debtors, with the assistance of its professionals. Unless otherwise stated, the Liquidation Analysis is based on Charter's balance sheet as of December 31, 2008 and is predicated on the assumption that the Debtors would commence a chapter 7 liquidation on September 30, 2009.

It is also assumed that the liquidation of the Debtors would commence under the direction of a Court-appointed trustee and would continue for a period of eight months, during which time all of the Debtors' major assets would be sold or conveyed to their respective lien holders, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors.

Management believes the operating assets of the Debtors, held by CCO and its direct and indirect subsidiaries have greater value as a going concern than in an orderly wind-down, and that pursuit of a distressed sale on a going-concern basis would yield the best recovery for

creditors in a liquidation. Management estimates the distressed sale of those businesses could be completed in 6 months, including regulatory approvals needed to effectuate the sale. Thus, the Liquidation Analysis assumes a distressed sale on a going-concern basis for these assets. Net proceeds from the sale of these businesses would be available for distribution to creditors of the Debtors. There can be no assurances that the actual value realized in a sale of these operations would yield the results as assumed in the Liquidation Analysis.

The Liquidation Analysis assumes that liquidation proceeds would be distributed in accordance with Bankruptcy Code section 726. If the Debtors were liquidated pursuant to chapter 7 proceedings, the amount of liquidation value available to creditors would be reduced, first, by the costs of the liquidation, which include the fees and expenses of the trustee appointed to manage the liquidation, the fees and expenses of other professionals retained by the trustee to assist with the liquidation, and other asset disposition expenses; second, by claims under the carve-out for unpaid professional fees (the "Carve-Out"); third, by the claims of secured creditors to the extent of the value of their collateral except as described herein; and, fourth, by the priority and administrative costs and expenses of the chapter 7 estates, including unpaid operating expenses incurred during the Chapter 11 Cases and any accrued and unpaid professional fees and expenses in excess of the Carve-Out ultimately allowed in the chapter 7 cases.

Substantially all of the operations of the Debtors are owned directly or indirectly by CCO. As such, the Liquidation Analysis assumes that the value recovered from the going-concern sale of the operating assets would be used first to satisfy claims of CCO and its direct and indirect subsidiaries in accordance with section 726 of the Bankruptcy Code. Any value remaining would be distributable to the holders of the interests of CCO, i.e., CCOH, towards satisfaction of CCOH's claims in the same priority order. Any remaining value would be distributed up the chain of ownership in the same manner until exhausted.

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that ultimately will become Allowed Claims. Estimates for various classes of Claims are based solely upon the Debtors' review of their books and records and assume payment of certain prepetition claims pursuant to certain orders entered at the beginning of these chapter 11 cases, including, specifically, the Order Authorizing Payment of Prepetition Claims of Trade Creditors in the Ordinary Course of Business, dated as of April 15, 2009 [Docket No. 172] (the "Prepetition Trade Order"). No order or finding has been entered by the Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in this Liquidation Analysis. In preparing the Liquidation Analysis, the Debtors have projected amounts of Claims that are consistent with the estimated Claims reflected in the Plan with certain modifications as specifically discussed herein.

Liquidation would likely prompt certain other events to occur, including the rejection of remaining executory contracts and unexpired leases not assumed by the purchaser of the going-concern business. Such events would likely create a larger number of unsecured creditors and would subject the chapter 7 estates to additional damages claims for the rejection of those contracts under the Bankruptcy Code. Such claims would also increase the aggregate amount of unsecured claims against the Debtors, perhaps materially, and would dilute any potential

recoveries to holders of other unsecured claims. No attempt has been made to estimate additional unsecured claims that may result from such events.

The Liquidation Analysis assumes that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action and does not include the estimated costs of pursuing those actions. The Liquidation Analysis also estimates that there will be no Priority Non-Tax Claims and thus does not include dilution for those claims.

All dollar amounts and percentages contained in the Liquidation Analysis have been rounded to the nearest million and percent, respectively.

($ millions)

**Charter Communications, Inc., Et Al ("Debtors")**
**Liquidation Analysis**
**Estimated Recovery and Distribution to Various Claimants**
**Liquidation as of 9/30/2009**

| | Plan Impaired Claim Class | Note | Estimated Claims | Estimated Recovery Low | Estimated Recovery High | Estimated Recovery % Low | Estimated Recovery % High |
|---|---|---|---|---|---|---|---|
| Proceeds Available for Distribution | A | | | $12,285 | $13,820 | | |
| Less: | | | | | | | |
| Trustee Fees | | B, C | $50 | $0 | $0 | | |
| Transaction Fees | | D | 33 | 33 | 33 | | |
| Chapter 7 Estate Professional Fees | | B, C | 24 | 0 | 0 | | |
| Carve-out for Chapter 11 Professional Expenses | | B | 20 | 20 | 20 | | |
| Estimated Wind-down costs | | B, C | 45 | 0 | 0 | | |
| Net Proceeds Available for Distribution | | | | $12,232 | $13,767 | | |
| **Chapter 7 Administrative Claims** | | | | | | | |
| Unpaid Chapter 11 Professional Fees in Excess of Carve-Out | | | $14 | $14 | $14 | 100% | 100% |
| Accrued & Unpaid Post Petition Liabilities | | | 0 | 0 | 0 | NA | NA |
| Priority Tax Claims | | | 0 | 0 | 0 | NA | NA |
| *Total Chapter 7 Administrative Claims:* | | | *$14* | *$14* | *$14* | | |
| **CCO** | | | | | | | |
| Proceeds Available for Distribution | | | | $12,218 | $13,753 | | |
| Less: Required Distribution of CC VIII Value | | E | | 0 | 0 | | |
| Remaining Proceeds Available for Distribution | | | | $12,218 | $13,753 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 110 | 94 | | |
| Net Proceeds Available for Distribution | | | | $12,108 | $13,659 | | |
| Less Claims | | | | | | | |
| Secured Debt Claims | | | $11,150 | $11,150 | $11,150 | 100% | 100% |
| Unsecured Claims[(a)] | | F, G | 635 | 635 | 635 | 100% | 100% |
| *Total Claims* | | | *$11,786* | *$11,786* | *$11,786* | | |
| Equity Interests Remaining | | | | $323 | $1,873 | | |
| **CCOH** | | | | | | | |
| Equity Interests Available from CCO for Distribution | | | | $323 | $1,873 | | |
| Plus: Cash and Intercompany Loan from CCO | | G, H | | 314 | 314 | | |
| Total Proceeds for Distribution | | | | $637 | $2,188 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 6 | 15 | | |
| Net Proceeds Available for Distribution | | | | $631 | $2,173 | | |
| Less Claims | | | | | | | |
| Secured Debt Claims | | | $350 | $350 | $350 | 100% | 100% |
| Unsecured Claims[(a)] | | | 822 | 281 | 822 | 34% | 100% |
| *Total Claims* | | | *$1,172* | *$631* | *$1,172* | | |
| Equity Interests Remaining | | | | $0 | $1,001 | | |
| **CCH II** | | | | | | | |
| Equity Interest Available from CCOH for Distribution | | | | $0 | $1,001 | | |
| Plus: Cash and Intercompany Loan from CCO | | G, H | | 252 | 252 | | |
| Total Proceeds Available for Distribution | | | | $252 | $1,253 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 2 | 9 | | |
| Net Proceeds Available for Distribution | | | | $250 | $1,244 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | | H-4 | $2,570 | $250 | $1,244 | 10% | 48% |
| *Total Claims* | | | *$2,570* | *$250* | *$1,244* | | |
| Equity Interests Remaining | | H-6 | | $0 | $0 | | |
| **CCH I** | | | | | | | |
| Equity Interests Available from CCH II for Distribution | | | | $0 | $0 | | |
| Plus: Pro Rata Value of CC VIII | | E | | 0 | 0 | | |
| Plus: Cash | | H | | 4 | 4 | | |
| Total Proceeds Available for Distribution | | | | $4 | $4 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 0 | 0 | | |
| Net Proceeds Available for Distribution | | | | $4 | $4 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | | G-4 | $4,170 | $4 | $4 | 0% | 0% |
| *Total Claims* | | | *$4,170* | *$4* | *$4* | | |
| Equity Interests Remaining | | G-6 | | $0 | $0 | | |
| **CIH** | | | | | | | |
| Equity Interests available from CCH I for distribution | | | | $0 | $0 | | |
| Plus: Cash | | I | | 0 | 0 | | |
| Total Proceeds Available for Distribution | | | | $0 | $0 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 0 | 0 | | |
| Net Proceeds Available for Distribution | | | | $0 | $0 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | | F-4 | $2,625 | $0 | $0 | 0% | 0% |
| *Total Claims* | | | *$2,625* | *$0* | *$0* | | |
| Equity Interests Remaining | | F-6 | | $0 | $0 | | |

(a) Includes claims from unsecured debt, intercompany debt, guarantees of debt, rejection damages, general unsecured claims, and in the case of HoldCo and CCI the Mirror Note

($ millions)

Charter Communications, Inc., Et Al ("Debtors")
Liquidation Analysis
Estimated Recovery and Distribution to Various Claimants
Liquidation as of 9/30/2009

| | Plan Impaired Claim Class | Note | Estimated Claims | Estimated Recovery | | Estimated Recovery % | |
|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High |
| **CCH** | | | | | | | |
| Equity Interests Available from CIH for Distribution | | | | $0 | $0 | | |
| Plus: Cash | | H | | 0 | 0 | | |
| Total Proceeds Available for Distribution | | | | $0 | $0 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 0 | 0 | | |
| Net Proceeds Available for Distribution | | | | $0 | $0 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | E-4 | J | $7,940 | $0 | $0 | 0% | 0% |
| *Total Claims* | | | *$7,940* | *$0* | *$0* | | |
| Equity Interests Remaining | E-6 | | | $0 | $0 | | |
| **CCHC** | | | | | | | |
| Equity Interests Available from CCH for Distribution | | | | $0 | $0 | | |
| Plus: Cash | | | | 0 | 0 | | |
| Total Proceeds for Distribution | | | | $0 | $0 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 0 | 0 | | |
| Net Proceeds Available for Distribution | | | | $0 | $0 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | | | $77 | $0 | $0 | 0% | 0% |
| *Total Claims* | | | *$77* | *$0* | *$0* | | |
| Equity Interests Remaining | D-5 | | | $0 | $0 | | |
| **HOLDCO** | | | | | | | |
| Equity Interests Available from CCHC for Distribution | | | | $0 | $0 | | |
| Plus: Cash and Intercompany Loan from CCO | | G, H | | 14 | 14 | | |
| Plus: Return of Interest Payment Cash | | K | | 48 | 48 | | |
| Plus: CCO Management Services Agreement Receivable | | L | | 7 | 7 | | |
| Plus: Value of Other Assets | | M | | 15 | 15 | | |
| Total Proceeds Available for Distribution | | | | $84 | $84 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 1 | 1 | | |
| Net Proceeds Available for Distribution | | | | $83 | $83 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | C-4 | N | 497 | 83 | 83 | NA | NA |
| Value of Mirror Note Claim for Benefit of CCI | C-4 | N | (497) | (83) | (83) | NA | NA |
| *Total Claims* | | | *$0* | *$0* | *$0* | | |
| Equity Interests Remaining | C-6 | | | $0 | $0 | | |
| **CCI** | | | | | | | |
| Equity Interests Available from HOLDCO for Distribution | | | | $0 | $0 | | |
| Plus: Value of Mirror Note Claim against HOLDCO | | N | | 83 | 83 | | |
| Total Proceeds for Distribution | | | | $83 | $83 | | |
| Less: Pro Rata Share of Liquidation Expenses | | C | | 1 | 1 | | |
| Net Proceeds Available for Distribution | | | | $82 | $83 | | |
| Less Claims | | | | | | | |
| Unsecured Claims[(a)] | A-4 | N, O | $499 | $82 | $83 | 16% | 17% |
| *Total Claims* | | | *$499* | *$82* | *$83* | | |
| Equity Interests Remaining | A-6 | | | $0 | $0 | | |
| **Equity Interests Remaining for Distribution to Common Shareholders** | | | | $0 | $0 | | |
| **EQUITY INTERESTS** | | | Ownership % | | | | |
| Equity Interests available for distribution to CII | | | 7% | $0 | $0 | | |
| Plus: Pro Rata Value of CC VIII | | | | 0 | 0 | | |
| Plus: Distribution of Accreting Note Claims from CCHC | | | | 0 | 0 | | |
| Total Proceeds available for distribution to CII | B-4 | | | $0 | $0 | | |
| **Equity Interests available for distribution to Shareholders** | | | 93% | $0 | $0 | | |

(a) Includes claims from unsecured debt, intercompany debt, guarantees of debt, rejection damages, general unsecured claims, and in the case of HoldCo and CCI the Mirror Note

# NOTES TO LIQUIDATION ANALYSIS

*Organization and Ownership*

Charter Communications, Inc. ("CCI") is the direct or indirect parent entity for all of the Debtors' Subsidiaries and Affiliates other than Charter Investments, Inc. ("CII"). CCI is a holding company whose primary assets include the 54% controlling common equity interest (52% for accounting purposes) and a 100% voting interest in Charter Communications Holding Company, LLC ("Holdco"). CCI maintains a chain of holding companies ultimately resulting in its indirect ownership of CCO, which owns directly or indirectly substantially all of the operating assets of the Debtors.

CC VIII is an indirect subsidiary of CCO, which is subject to minority interests held by CII and CCH I. CII owns 30% of the CC VIII preferred membership interests, with CCH I directly owning the remaining 70% of these preferred interests. The common membership interests in CC VIII are indirectly owned by CCO through CC V. Direct and indirect holders of the CC VIII preferred and common interests are entitled to a distribution of value in accordance with the terms and conditions of the CC VIII Third Amended and Restated Limited Liability Agreement.

*Note A - Value of Going Concern Entities*

To maximize total liquidation value, the Liquidation Analysis assumes that the Debtors' operating assets are sold as a going concern that would be effectuated through a distressed sale. Given that the businesses would be sold pursuant to a forced sale for cash, management and its professionals believe the appropriate method for capturing a range of liquidation value is by applying a discount to the estimated Enterprise Value of the Company. A discount of 10% for the high scenario and 20% for the low scenario has been applied to the midpoint of the Debtors' Enterprise Value, which is assumed to include cash on the balance sheet as additional Working Capital required to operate the business. No value has been ascribed to the Debtors' tax attributes given the likelihood that no consideration would be paid for them in a distressed sale pursuant to Chapter 7 liquidation.

The net proceeds estimate assumes that post-petition liabilities of the businesses would be assumed by the respective purchasers. The net proceeds from the sale of these entities would be available for distribution first to the creditors of CCO and its direct and indirect subsidiaries. The estimated net proceeds available for distribution to the Debtors falls within a range from approximately $12.3 billion to $13.8 billion, with a mid-point estimate of $13.1 billion.

For purposes of maximizing the liquidation value, it is assumed that the going-concern sale transactions would be effected as a sale of the ownership interests in the Debtors' various legal entities, and that any proceeds would be sheltered from any material tax liabilities by the net operating losses of the Debtors. Alternative structures for the transaction, including a direct sale of assets, would likely generate certain un-estimated tax liabilities (such as sales tax) that would reduce the net proceeds available to be distributed to the Debtors.

*Note B – Trustee Fees and Wind Down Costs of Chapter 7 Estates*

Compensation for the Chapter 7 trustee will be limited to fee guidelines in Section 326(a) of the Bankruptcy Code. The debtors' management has assumed trustee fees will be $50 million, as the Debtors' principal assets, its operating entities, will be sold as going concern subject to a transaction fee, with buyer(s) to assume all post petition liabilities. The cost to operate the business during the sale process is assumed to be covered by cash flow from operations. Once the sale is complete, certain corporate and administrative functions would be required to oversee the distribution of proceeds, to maintain and close the accounting records and to prepare tax returns for the estates, among other things. These wind-down costs are estimated at $45 million with an additional $24 million estimated for professional fees of the Chapter 7 estates. In addition, the recovery available to creditors has been further reduced by $20 million for the Carve-Out for professional fees of the Chapter 11 estates.

*Note C – Pro Rata Allocation of Certain Liquidation Expenses*

Chapter 7 Trustee Fees, Estate Professional Fees and estimated wind down costs were allocated pro rata among the various Debtors whose estates hold distributable proceeds.

*Note D – Transaction Fees*

Transaction fees associated with the distressed sale of Charter as a going concern as assumed to be 0.25% of total distributable value, consistent with standard M&A (i.e. Mergers and Acquisitions) fees charged by investment banking firms for comparable transactions of this size.

*Note E – Value of CC VIII and its Subsidiaries*

Lazard has estimated the value of CC VIII to be approximately 20% of Total Enterprise Value based on the relationship of the growth of certain financial metrics (i.e. revenue, EBITDA, Revenue Generating Units) at CC VIII as compared to the overall enterprise. For purposes of the Liquidation Analysis, Lazard has applied this same approximate 20% of implied value to the proceeds from the distressed sale of the business as a going concern. Proceeds available to preferred and common interests are first reduced by the net intercompany loan balances between CC VIII and CCO (pro forma for the estimated September 30, 2009 balances), offset by the CCO payable to CC VIII (pro forma for the September 30, 2009 balance) for amounts owed pursuant to applicable legal arrangements between the entities. Remaining value at CC VIII is then used to retire CC VIII's pro rata share of CCO indebtedness on which CC VIII is a guarantor, and CC VIII's pro rata share of certain Chapter 7 Administrative and Priority claims.

CC VIII is an indirect subsidiary of CCO which is subject to minority interests held by CII and CCH I. CII owns 30% of the CC VIII preferred membership interests, with CCH I directly owning the remaining 70% of these preferred interests. The common membership interests in CC VIII are indirectly owned by CCO through CC V. Direct and indirect holders of the CC VIII preferred and common interests are entitled to a distribution of value in accordance with the terms and conditions of the CC VIII Third Amended and Restated Limited Liability

Agreement, which states that the proceeds from any dissolution of CC VIII must first be distributed to members having accrued and unpaid priority return on the preferred interests as of the date of distribution, pro rata in accordance with the respective and accrued and unpaid priority return; and second, to holders of membership units on a pro rata basis.

After taking into account the net intercompany loans between CCO and CC VIII (pro forma for the estimated September 30, 2009 balances), the CCO payable to CC VIII (pro forma for the estimated September 30, 2009 balances), and assigning CC VIII its pro rata share of CCO indebtedness and certain Chapter 7 Administrative and Priority claims, no value is estimated to be recovered by either the preferred or common membership interests in either the high or low case liquidation scenarios.

| | Estimated Recovery | |
| --- | --- | --- |
| | Low | High |
| **Charter Proceeds Available for Distribution** | **$12,285** | **$13,820** |
| Value of CC VIII as percentage of CCO | 20% | 20% |
| **CC VIII Proceeds Available for Distribution** | **$2,438** | **$2,743** |
| Less: Net Intercompany debt (CC VIII to CCO) | (1,536) | (1,536) |
| Plus: Receivable from Related Parties (CCO) | 775 | 775 |
| Less: Pro Rata Share of CCO Indebtedness | (2,113) | (2,113) |
| Less: Pro Rata share of Chapter 7 Priority Claims | (13) | (13) |
| **Residual Equity Interests** | **NA** | **NA** |

*Note F – Unsecured Claims at CCO*

Unsecured Claims for CCO are comprised of the following items:

| | |
| --- | --- |
| Intercompany Loans | $573 |
| Mgmt Services Agreement Payable to HoldCo | 7 |
| Deferred Management Fees | 14 |
| General Unsecured Claims | 42 |
| **Total Unsecured Claims** | **$635** |

*Note G – Intercompany Loans*

CCO is the direct borrower of unsecured loans from CCOH, CCH II and HoldCo. Amounts included in the Liquidation Analysis are estimates for the September 30, 2009 balances, the date at which the liquidation is estimated to begin, and in the amounts of $312 million for CCOH (inclusive of cash received by CCOH from CCO subsequent to December 31, 2008), $247 million for CCH II and $13 million for HoldCo, which includes accrued and unpaid interest. Value allocated from these claims is distributed pro rata to the various creditors (in this case, other Charter legal entities).

*Note H - Cash and Cash Equivalents*

Certain of the Debtors hold cash on their individual balance sheets, which is assumed to be distributed to creditors at the respective entity.

*Note I – Adjustment to December 31, 2008 CIH Balance Sheet Cash*

CIH December 31, 2008 balance sheet cash of $2 million was reduced to a zero balance because that cash was used as part of an overdue January 15, 2009 interest payment to CIH noteholders on February 13, 2009.

*Note J – Guarantees of Debt*

CCH is the guarantor of the CCH II 10.25% Senior Notes due 2013 and all debt at the CCH I and CIH entities. Amounts owing under the guarantee reflect the total amount of debt owed under the guarantee less the amount expected to be repaid to creditors at the respective entities in a liquidation scenario under the low recovery scenario.

*Note K – Return of Interest Payment Cash*

In accordance with the Escrow Agreement dated February 11, 2009 and in regards to the interest payments made by CCI on February 13, 2009 for the Overdue Payment Notes, the Ad-Hoc Holders agreed to deposit into an escrow account approximately $48 million received in respect of the January Interest Payment (the "Escrow Amount"). Under the Escrow Agreement, if the transactions contemplated by the Restructuring Agreements are not consummated on or prior to December 15, 2009 for any reason other than a material breach of the Restructuring Agreements by CCI or its direct or indirect subsidiaries, then CCI, Charter Holdings, CIH or their designee shall be entitled to receive the Escrow Amount.

*Note L – Management Services Agreement Receivable*

The Prepetition Trade Order contained the following reservation of rights:

This order shall not be construed to authorize any reduction or offset in any intercompany account owing to Charter Communications, Inc. based on payments of Trade Claims authorized by this order. All parties expressly and fully reserve and preserve all of their respective rights, arguments and legal positions concerning the appropriate treatment of such payments on the intercompany accounts of the Debtors, such issue, if not otherwise resolved by agreement or order, to be determined by the Court in the context of confirmation. Such rights, arguments and legal positions shall include the Debtors' right to assert that intercompany accounts may be offset or reduced by payments on account of Trade Claims as if such Trade Claims were paid pursuant to a plan of reorganization.

Prepetition Trade Order ¶ 4.

The Liquidation Analysis assumes that the Management Services Agreement Receivable is offset or reduced by payments made on account of the Trade Claims and that certain

intercompany claims arising pursuant to the Management Agreement would be disallowed or subject to recharacterization or subordination.

### Note M – Value of Certain Assets at HoldCo

HoldCo directly owns certain miscellaneous assets, including real property housing the Debtors' corporate headquarters located at 12405 Powerscourt Drive, St. Louis, MO. In late 2008, the Debtors received an informal indication of estimated market value of their headquarters building from their real estate advisor/broker of approximately $16 million. It is assumed that the property is sold separately from the going concern transaction. As such, the Liquidation Analysis assumes that the sale of the headquarters building will generate $15 million of liquidation value net of all closing related costs is available to pay claims of creditors of HoldCo.

### Note N – Mirror Note

HoldCo's Mirror Convertible Senior Note due 2027 ("Mirror Note") provides for an allowable unsecured claim at the HoldCo entity, under which any allocable value, up to the value of the claim, is distributed to CCI on account of the seniority granted to it as a debt claim, senior to the equity interests of CCI and Paul G. Allen and his controlled entities. Please refer to Charter's most recent 10-K for a full description of the Mirror Note.

### Note O – Unsecured Claims at CCI

Unsecured Claims at CCI include $1 million of estimated unpaid severance costs. In addition to Unsecured Claims at CCI listed herein, the Debtors believe that substantial additional Unsecured Claims at CCI would include, among other things, damages resulting from the Debtors' breach of that certain Exchange Agreement, dated as of November 12, 1999, among, *inter alia*, CCI and CII, in a chapter 7 liquidation. Such damages would depend upon a number of factors, including the ultimate value of the assets in a liquidation and the allocation of asset values.

# EXHIBIT F

## Reconciliation of Non-GAAP Measures

| | Pro Forma 2009 | | Pro Forma 2010 | | Pro Forma 2011 | | Pro Forma 2012 | | Pro Forma 2013 |
|---|---|---|---|---|---|---|---|---|---|
| Net cash flows from operating activities | $ | 1,120 | $ | 1,687 | $ | 1,905 | $ | 2,169 | $ | 2,408 |
| Less: Purchases of property, plant and equipment | | (1,173) | | (1,180) | | (1,192) | | (1,115) | | (1,101) |
| Free cash flow | | (53) | | 507 | | 713 | | 1,054 | | 1,307 |
| Interest on cash pay obligations (a) | | 935 | | 960 | | 943 | | 883 | | 852 |
| Purchases of property, plant and equipment | | 1,173 | | 1,180 | | 1,192 | | 1,115 | | 1,101 |
| Reorganization expenses | | 166 | | - | | - | | - | | - |
| Other, net | | 6 | | 6 | | 6 | | 6 | | 9 |
| Change in operating assets and liabilities | | 230 | | (14) | | (5) | | 9 | | 1 |
| Adjusted EBITDA | $ | 2,457 | $ | 2,639 | $ | 2,849 | $ | 3,067 | $ | 3,270 |

(a) Interest on cash pay obligations excludes accretion of original issue discounts on certain debt securities and amortization of deferred financing costs that are reflected as interest expense in our consolidated statements of operations.

The above schedules are presented in order to reconcile adjusted EBITDA and free cash flows, both non-GAAP measures, to the most directly comparable GAAP measures in accordance with Section 401(b) of the Sarbanes-Oxley Act.

Use of Non-GAAP Financial Metrics
The Debtors use certain measures that are not defined by Generally Accepted Accounting Principles ("GAAP") to evaluate various aspects of their business. Adjusted EBITDA and free cash flow are non-GAAP financial measures and should be considered in addition to, not as a substitute for, net cash flows from operating activities reported in accordance with GAAP. These terms, as defined by the Debtors, may not be comparable to similarly titled measures used by other companies.
Adjusted EBITDA is defined as income from operations before depreciation and amortization, impairment charges, stock compensation expense, and other operating expenses, such as special charges and loss on sale or retirement of assets. As such, it eliminates the significant non-cash depreciation and amortization expense that results from the capital-intensive nature of the Debtors' businesses as well as other non-cash or non-recurring items, and is unaffected by the Debtors' capital structure or investment activities. Adjusted EBITDA is a liquidity measure used by the Debtors' management and CCI's board of directors to measure the Debtors' ability to fund operations and their financing obligations. For this reason, it is a significant component of the Debtors' annual incentive compensation program. However, this measure is limited in that it does not reflect the periodic costs of certain capitalized tangible and intangible assets used in generating revenues and the cash cost of financing for the Debtors. The Debtors' management evaluates these costs through other financial measures.
Free cash flow is defined as net cash flows from operating activities, less capital expenditures and changes in accrued expenses related to capital expenditures.
The Debtors believe that Adjusted EBITDA and free cash flow provide information useful to investors in assessing the Debtors' ability to service their debt, fund operations, and make additional investments with internally generated funds. In addition, Adjusted EBITDA generally correlates to the leverage ratio calculation under the Debtors' credit facilities or outstanding notes to determine compliance with the covenants contained in the facilities and notes (all such documents have been previously filed with the United States Securities and Exchange Commission).

# SCHEDULE 2

**Rights Offering Procedures and Rights Exercise Form
and Accompanying Errata Sheets**

# EXHIBIT F

## Rights Offering Procedures

# RIGHTS OFFERING PROCEDURES

## 1.    Introduction

Charter Communications, Inc. ("CCI") shall effectuate an offering (the "Rights Offering") in conjunction with and pursuant to the Plan[1] to holders (the "Holders") of CCH I Notes Claims as of April 17, 2009 (the "Rights Offering Record Date") that certify that they are Accredited Investors or Qualified Institutional Buyers[2] (the "Eligible Holders") of rights (the "Rights") to purchase shares of new Class A common stock of the Reorganized Company, par value $.001 per share (the "New Class A Stock"), pro rata in proportion to the principal amount of CCH I Notes Claims held by such Eligible Holders to the principal amount of CCH I Notes Claims held by all Eligible Holders entitled to participate in the Rights Offering on the Rights Offering Record Date (the "Pro Rata Participation Amount"), in exchange for a cash payment per share reflecting a discount of 25% to the Plan Value (the "Per Share Purchase Price") upon the exercise of the Rights.

A Holder that is not an Eligible Holder and has certified the same will receive shares of New Class A Stock with a value equal to the value ("Rights Value") of the Rights such Holder would have received, as determined pursuant to the Plan, if it was an Accredited Investor or a Qualified Institutional Buyer and certified the same.

### *The Investor Certificate*

CCI has previously delivered to all Holders an Investor Certificate to determine which Holders are eligible to participate in the Rights Offering, or if not eligible, to receive their Rights Value. The Rights Offering Record Date will serve as the date for determining which Holders will be considered Eligible Holders permitted to participate in the Rights Offering and which Holders will receive Rights Value, and all such Holders are required to prove ownership of CCH I Notes Claims as of the Rights Offering Record Date.

All Holders that completed and returned an Investor Certificate evidencing that they are Eligible Holders have been mailed these Rights Offering Procedures and the Rights Exercise Form (as defined herein) (collectively, the "Rights Offering Documents").

---

[1]    All capitalized terms used, but not defined herein, shall have the meanings ascribed to them in the Joint Plan of Reorganization of CCI, Charter Investment, Inc. and CCI's direct and indirect subsidiaries filed pursuant to chapter 11 of the Bankruptcy Code (the "Plan").

[2]    "Accredited Investor" is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933 (the "Securities Act"). See 17 C.F.R. § 230.501. "Qualified Institutional Buyer" is defined in Rule 144A promulgated under the Securities Act of 1933. See 17 C.F.R. § 230.144.

All Holders that are not Eligible Holders (the "Non-Eligible Holders") have been required to certify in the Investor Certificate that they are not Accredited Investors or Qualified Institutional Buyers and to provide proof of ownership of a CCH I Notes Claim as of the Rights Offering Record Date in order to receive their Rights Value. Fractional shares shall not be issued and no compensation shall be paid in cash in respect of fractional shares.

A Holder that did not timely return the Investor Certificate has forfeited any and all rights that it may have had under the Rights Offering with respect to its CCH I Notes Claim.

### The Rights Exercise Form

The enclosed Rights exercise form (the "Rights Exercise Form") is being sent concurrently to each Eligible Holder entitling such holder to exercise its Rights. The Rights shall not be listed or quoted on any public or over-the-counter exchange or quotation system. Fractional shares shall not be issued upon exercise of the Rights and no compensation shall be paid in cash in respect of such fractional shares. In order to exercise its Rights, each Eligible Holder must have submitted proof of ownership of its CCH I Notes Claim as of the Rights Offering Record Date.

## 2.     The Equity Backstop

The Rights Offering will be backstopped by certain members of the Crossover Committee (the "Equity Backstop Parties").[3]    The Equity Backstop Parties have, severally and not jointly, agreed to exercise Rights according to their respective Pro Rata Participation Amounts (assuming that all Holders are Eligible Holders).   In addition, certain Equity Backstop Parties (the "Excess Backstop Parties") have each committed to a backstop amount in excess of its Pro Rata Participation Amount as set forth on Annex E to the Plan (the "Excess Backstop") pursuant to the Excess Backstop Agreement.  If any Eligible Holder of CCH I Notes Claims (or the transferee of its Rights), other than an Equity Backstop Party, fails to exercise any of its Rights, then each Excess Backstop Party will assume its pro rata portion of the unexercised Rights in the same proportion that the amount of its Excess Backstop bears to the total amount of all Excess Backstops.

Financial Balloting Group LLC, the Securities Voting Agent, has been designated as the "Subscription Agent" for the Rights Offering.

***Before exercising any Rights, Eligible Holders should read the Plan and the Disclosure Statement, including the section entitled "Risk Factors" and the section regarding the valuation of the Reorganized Debtors contained therein.***

---

[3]     The Equity Backstop Parties are members of the Committee listed on Annex E to the Plan.

3.    **Commencement/Expiration of the Rights Offering**

The Rights Offering shall commence on the later of (i) the day upon which the Disclosure Statement is made publicly available, including by posting the Disclosure Statement on CCI's website and announcing the same in a Current Report on Form 8-K and (ii) two Business Days following the day upon which the Investor Certificates are required to be returned by the Holders (as specified in the Investor Certificate) (the "Commencement Date"). The Rights Offering Documents will be sent to each Eligible Holder not later than the Commencement Date. The Rights Offering shall expire 20 Business Days after the Commencement Date (the "Initial Expiration Date"). Unexercised Rights will expire without compensation at 12:00 midnight New York City time on the Initial Expiration Date unless a Notice of Intention (as defined below) is delivered during the five Business Days prior to the Initial Expiration Date, in which case the Rights, if unexercised, shall expire at 5:00 p.m. New York City time on the date which shall be up to 10 Business Days (but no shorter than five Business Days following the notification of the non exercise of the applicable Right of First Refusal) following the Initial Expiration Date, in accordance with the Rights Offering Procedures (the "Extension Expiration Date" and, together with the Initial Expiration Date, the "Expiration Date"). Each Eligible Holder intending to participate in the Rights Offering must affirmatively make a binding election to exercise its Rights (or any portion thereof) and, except as provided in Section 4 below, submit payment for the shares of New Class A Stock underlying such Rights on or prior to the applicable Expiration Date in accordance with the provisions of Section 4 below.

As promptly as practicable following the Expiration Date, CCI shall deliver, or cause to be delivered, to each Eligible Holder that has exercised Rights or its bank, broker, agent, or other nominee specified in its Rights Exercise Form, a written statement confirming the number of shares of New Class A Stock such Eligible Holder has elected to purchase as well as (except in the case of the Equity Backstop Parties) the payment received in connection with the exercise of its Rights (or any portion thereof). Shares of New Class A Stock issued in connection with the Rights Offering shall be issued on the Effective Date pursuant to the exemption provided under section 4(2) of the Securities Act, and such shares will be issued directly to the Holder.

Each Eligible Holder that has exercised its Rights shall have the right to have the shares of New Class A Stock issuable upon exercise of such Rights registered with the Securities and Exchange Commission to the extent permitted in a registration rights agreement to be entered into between such Eligible Holder and CCI on the Effective Date in the form of Exhibit 13 to the Plan Supplement.

4.    **Exercise of Rights**

Each Eligible Holder may designate on its Rights Exercise Form whether it wishes to exercise its Rights. Each Eligible Holder, other than the Excess Backstop Parties, is entitled to participate in the Rights Offering solely to the extent of its Pro Rata Participation Amount. Each Eligible Holder may exercise all or any portion of its Rights pursuant to the procedures outlined below.

3

### *Payment for Shares Issuable Upon Exercise of Rights*

Except for the Equity Backstop Parties, each Eligible Holder must remit payment for the New Class A Stock deliverable for the Rights that it exercises by wire transfer or cashier's check as directed in the Rights Exercise Form on or prior to the applicable Expiration Date. If an Eligible Holder that elects to exercise its Rights fails to submit payment in accordance with the Rights Offering Procedures, then such Eligible Holder shall be deemed to have relinquished and waived its Rights, provided that CCI may pursue all remedies at equity and in law to compel payment or seek damages. In no event, however, shall any Eligible Holder be liable on any theory of liability for any special, indirect, consequential or punitive damages in connection with the Rights Offering. Each Equity Backstop Party that is not an Excess Backstop Party shall remit payment for the Rights that it exercises by wire transfer or cashier's check to an escrow account described below no later than two Business Days following the Confirmation Date. Each Excess Backstop Party shall remit payment for the Rights that it exercises by wire transfer or cashier's check to an escrow account described below on the later of (i) two Business Days following the Confirmation Date and (ii) fifteen Business Days following such Excess Backstop Party's receipt of the Excess Backstop Notice (as defined in the Excess Backstop Agreement).

### *Disputes, Waivers, and Extensions*

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Rights shall be addressed in good faith by CCI, in consultation with the Crossover Committee and the Creditors' Committee, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. CCI, in consultation with the Crossover Committee and the Creditors' Committee, may seek to waive any defect or irregularity, or permit a defect or irregularity to be cured, within such times as they may determine in good faith to be appropriate, or reject the purported exercise of any Rights. Subscription instructions shall be deemed not to have been properly completed until all irregularities have been waived or cured within such time as CCI determines in its discretion reasonably exercised in good faith. CCI will use commercially reasonable efforts prior to the expiration of the Rights Offering to give notice to any holder of Rights regarding any defect or irregularity in connection with any purported exercise of Rights by such holder and may permit such defect or irregularity to be cured within such time as it may determine in good faith, in consultation with the Crossover Committee and the Creditors' Committee, to be appropriate; provided, however, that none of CCI's officers, directors, employees, agents or advisors, or its or their respective affiliates, the Subscription Agent, or any member of the Crossover Committee (the "Exculpated Parties") shall incur any liability for failure to give such notification. Further, prior to the deadline therefor, CCI will use commercially reasonable efforts to give notice to any Non-Eligible Holder regarding any defect or irregularity in connection with any Investor Certificate, and may permit such defect or irregularity to be cured within such time as it may determine in good faith to be appropriate; provided, that none of the Exculpated Parties shall incur any liability for failure to give such notification, nor shall the deadline therefor be required to be extended.

4

CCI, following notice to the Crossover Committee and the Creditors' Committee, may extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Rights.

***Funds***

The payments made in accordance with the Rights Offering by persons other than the Equity Backstop Parties (the "Rights Offering Funds") shall be deposited with Wells Fargo Bank, N.A. and held in escrow pending the Effective Date in an account or accounts administered by the Subscription Agent (a) which shall not constitute property of the Debtors or the Debtors' Estates until the Effective Date, (b) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien or any cash collateral arrangements, (c) which will be maintained for the purpose of holding the funds for administration of the Rights Offering until the Effective Date, and (d) which will be held in an interest bearing account for the benefit of such persons, invested in cash, cash equivalents and short-term obligations of the United States Government. Interest thereon shall accrue from the Initial Expiration Date or later with respect to a Rights Offering participant that deposits money after the Initial Expiration Date pursuant to these Rights Offering Procedures (net of reasonable expenses incurred by CCI to establish and maintain the escrow account) and shall be paid to such persons on or about the Effective Date. The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by CCI on the Effective Date and shall not encumber or permit the Rights Offering Funds to be encumbered by any lien or similar encumbrance. The Rights Offering Funds of the Equity Backstop Parties shall be deposited with and held in escrow pending the Effective Date by an escrow agent mutually acceptable to the Equity Backstop Parties and CCI and pursuant to the terms of an escrow agreement mutually acceptable to the Equity Backstop Parties and CCI (the "Backstop Escrow Account").

***Waiver and Release***

Upon the Effective Date of the Plan, each Eligible Holder that participates in the Rights Offering (and each Non-Eligible Holder that elects to receive Rights Value) shall be deemed by virtue of such participation (or election), to have waived and released, to the fullest extent permitted under applicable law, all rights, claims, or causes of action against the Exculpated Parties arising out of or related to the receipt, delivery, disbursements, calculations, transmission, or segregation of cash, Rights and New Class A Stock in connection with the Rights Offering except to the extent such claims arise from bad faith, gross negligence, or willful misconduct.

5.      **Transfer and Revocation**

Subject to the Right of First Refusal set forth below, the Rights received by the Eligible Holders shall be independently transferable, but only pursuant to a bona fide binding purchase offer for cash from a third party that is an Accredited Investor or a Qualified Institutional Buyer (a "Third Party Purchaser"), up to the Expiration Date.

K&E 14550896.3

Once the Eligible Holder or its transferee has properly exercised its Rights, such exercise will not be permitted to be revoked.

6.      **Right of First Refusal**

If at any time during the period beginning on the Commencement Date and ending at 12:00 midnight New York City time on the Initial Expiration Date, any Eligible Holder (any such Eligible Holder, a "Selling Holder") desires to transfer any of its Rights pursuant to Section 5, then such Selling Holder shall promptly deliver written notice of its intention to transfer such Rights (a "Notice of Intention") in the form attached hereto as Exhibit A, accompanied by an executed Investor Certificate from the proposed Third Party Purchaser and a copy of the binding purchase offer or other documentation evidencing such proposed transfer, to the Subscription Agent, setting forth the number of shares of New Class A Stock issuable upon exercise of the Rights proposed to be transferred (the "Offered Securities"), the identity of the proposed transferee, and the offering price of the Offered Securities (the "Offer Price") and any other applicable terms and conditions. The Subscription Agent shall promptly (and in any event within one Business Day) forward a copy of such Notice of Intention to each Excess Backstop Party (other than the Selling Holder or Third Party Purchaser, if applicable).

Upon receipt of a Notice of Intention and subject to the limitations set forth herein, each of the Excess Backstop Parties shall have the right to purchase at the Offer Price for cash, all of the Offered Securities but not less than all. Any Excess Backstop Party wishing to exercise its rights hereunder shall deliver notice to the Subscription Agent (the "Notice of Exercise"), by 5:00 p.m. New York City time on or prior to the fifth Business Day following the date of receipt of the Notice of Intention by such Excess Backstop Party (the "Option Period"), setting forth the amount of Offered Securities such Excess Backstop Party wishes to purchase. A copy of such Notice of Exercise shall promptly (and in any event within one Business Day) be delivered by the Subscription Agent to the Selling Holder and the other Excess Backstop Parties. The rights of the Excess Backstop Parties shall terminate if unexercised prior to the expiration of the Option Period. If the aggregate number of shares of New Class A Stock issuable upon exercise of the Rights that the Excess Backstop Parties wish to purchase exceeds the number of shares of New Class A Stock issuable upon exercise of the Offered Securities, each Excess Backstop Party shall only have the right to purchase its Pro-Rata ROFR Amount (as defined below) of such Offered Securities or such lesser amount as is set forth in such Excess Backstop Party's Notice of Exercise; provided, that in no event shall any Excess Backstop Party receive less than its Pro-Rata ROFR Amount or such lesser amount as is set forth in such Excess Backstop Party's Notice of Exercise. "Pro-Rata ROFR Amount" shall mean, with respect to any Excess Backstop Party, the product obtained by multiplying (x) the total number of Offered Securities by (y) the proportion that such Excess Backstop Party's Excess Backstop bears to the total amount of Excess Backstops. To the extent that any Excess Backstop Party does not wish to purchase all of its Pro-Rata ROFR Amount of the Offered Securities, the other Excess Backstop Parties electing to exercise their rights to purchase the Offered Securities shall have the right to purchase the remaining Offered Securities on a pro rata basis (based on their respective Excess Backstops).

6

If the Excess Backstop Parties exercise their rights to purchase all of the Offered Securities in accordance with the procedures set forth above, then the Selling Holder shall sell such Offered Securities to the Excess Backstop Parties, and the Excess Backstop Parties shall be obligated to purchase all such Offered Securities from the Selling Holder within five Business Days after the expiration of the applicable Option Period, at the Offer Price and on the other terms and conditions specified in the Notice of Intention, pursuant to such documentation as the parties may reasonably agree to evidence the transfer of the Offered Securities, which shall contain customary representations and warranties of the Selling Holder relating to ownership or transfer of the Offered Securities but shall not contain any indemnification (other than for breaches of representations and warranties) or other continuing obligation of the Selling Holder or any releases of any kind.

If the Excess Backstop Parties do not elect to purchase all of the Offered Securities, then the Excess Backstop Parties shall be deemed to have waived and forfeited all rights in respect of such Offered Securities and the Selling Holder may transfer the Offered Securities to the Third Party Purchaser at the Offer Price (or a higher price) and on terms and conditions at least as favorable as specified in the Notice of Intention, at any time until the Expiration Date pursuant to such documentation as the parties may reasonably agree to evidence the transfer of the Offered Securities, and accompanied by an executed Rights Exercise Form.

The delivery of a Notice of Intention and of a Notice of Exercise shall be irrevocable. Any person who has failed to exercise its rights hereunder within the specified time period shall be deemed to have waived such person's rights on the day immediately following the last day of the applicable period.

If the date on which a Notice of Intention is delivered by the Selling Holder to the Subscription Agent with respect to any Offered Securities is less than five Business Days prior to the Initial Expiration Date, the applicable Expiration Date with respect to the exercise of such Offered Securities shall be the Extension Expiration Date. CCI shall allow any transferee of Rights five Business Days following the notification of the non exercise of the applicable Right of First Refusal to complete necessary documentation.

7. **Inquiries And Transmittal Of Documents; Subscription Agent**

The exercise instructions contained in the Rights Exercise Form should be carefully read and strictly followed. The instructions contained in the Investor Certificate should be carefully read and strictly followed.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number: (866) 734-9393.

The risk of non-delivery of all documents and payments is on the Eligible Holders electing to exercise their Rights and not CCI or the Subscription Agent.

K&E 14550896.3

# FORM OF NOTICE OF INTENTION

Financial Balloting Group, LLC
757 Third Avenue
Third Floor
New York, New York 10017
Attn: Charter Communications, Inc. Processing

Date: _____, 2009


      Please take notice that, pursuant to Sections 5 and 6 of the Rights Offering Procedures filed with the Supplement to the Charter Communications, Inc. Joint Plan of Reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, ____[insert name of transferor]___, who is a holder of Rights, has agreed, subject to certain conditions outlined herein, to transfer to _____ [insert name of transferee]___, _____ [insert number Rights to be transferred]____ Rights exercisable into shares of New Class A Stock at a price of $___ per Right.

      _____ [insert any other applicable terms and conditions to the transfer]___.


[Name of transferor]


By: _____
Name: _____
Title: _____

## EXHIBIT G

## Rights Exercise Form

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

**INSTRUCTIONS TO RIGHTS EXERCISE FORM IN**
**CONNECTION WITH DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**Class G-1: CCH I, LLC ("CCH I") Notes due 2015**

**Offer Available to Eligible Holders on April 17, 2009 (the "Record Date")**

**All Rights Exercise Forms must be received by the Subscription Agent no later than 12:00 midnight (New York City time) on June 11, 2009 (such time, as may be extended pursuant to the Rights Offering Procedures, the "Expiration Date").**

---

To Eligible Holders of CCH I Notes Claims:

On March 27, 2009, Charter Communications, Inc. ("CCI"), together with Charter Investment, Inc. and CCI's direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors"), filed the Debtors' joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code (the "Plan") and the accompanying Debtors' disclosure statement pursuant to chapter 11 of the Bankruptcy Code (the "Disclosure Statement"). Pursuant to the Plan, each holder of a CCH I Notes Claim as of April 17, 2009 that is (i) an Accredited Investor, as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act") or (ii) a Qualified Institutional Buyer, as defined in Rule 144A of the Securities Act (each such holder, an "Eligible Holder") has the right (the "Right") to subscribe for New Class A Stock based on such holder's Pro Rata Participation Amount (the "Rights Offering"). For a complete description of the Rights Offering see the accompanying Rights Offering Procedures (the "Rights Offering Procedures"). Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

You have received the attached Rights Exercise Form because you are a holder of a CCH I Notes Claim held for your account as of April 17, 2009 and you have certified that you are an Eligible Holder. Please utilize the attached Rights Exercise Form to execute your election.

**TO ELECT TO PARTICIPATE IN THE RIGHTS OFFERING YOU MUST FOLLOW THE INSTRUCTIONS BELOW:**

Unless you are an Equity Backstop Party, the payments made in connection with your exercise of Rights will be deposited with Wells Fargo Bank, N.A. and held in an account administered by Financial Balloting Group LLC (the "Subscription Agent"). The account will be maintained by the Subscription Agent for the purpose of holding the funds for the administration of the Rights Offering until the Effective Date. The Subscription Agent will not use such funds for any other purpose prior to the Effective Date and shall not encumber or permit such funds to be encumbered with any lien or similar encumbrance. If you are an Equity Backstop Party and not an Excess Backstop Party, the payments made in connection with

your exercise of Rights, which must be made no later than two Business Days following the Confirmation Date, will be deposited with and held in escrow pending the Effective Date by an escrow agent mutually acceptable to the Equity Backstop Parties and CCI and pursuant to the terms of an escrow agreement mutually acceptable to the Equity Backstop Parties and CCI (the "Backstop Escrow Account"). If you are an Excess Backstop Party, the payments made in connection with your Exercise of Rights, which must be made no later than the later of (i) two Business Days following the Confirmation Date and (ii) fifteen Business Days following your receipt of the Excess Backstop Notice, will be deposited in the Backstop Escrow Account.

Interest will be paid to Eligible Holders (other than Equity Backstop Parties) exercising Rights on account of amounts paid in connection with such exercise on the terms specified in the Rights Offering Procedures.

CCI will use commercially reasonable efforts to give notice to any holder of Rights regarding any defect or irregularity in connection with any purported exercise of Rights by such holder and may permit such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate; provided, however, that none or CCI, its officers, directors, employees, agents or advisors, or its or their respective affiliates or the Subscription Agent will incur any liability for failure to give such notification.

**Questions.** If you have any questions about this Rights Exercise Form or the exercise procedures described herein, please contact the Subscription Agent at (866)-734-9393.

**The Subscription Agent must receive your Rights Exercise Form and, unless you are an Equity Backstop Party, payment in full of your subscription price for the exercise of such Rights by the Expiration Date or the exercise shall be void and your Rights will terminate and be cancelled.**

To purchase Class A Stock pursuant to the Rights Offering:

1.      <u>Review</u> the Eligible principal amount of CCH I Notes Claims inserted in Item 1.

2.      <u>Review</u> the calculation in Item 2a.

3.      <u>Complete</u> Item 2b, indicating the amount of the Class A Stock that you wish to purchase.

4.      <u>Read and Complete</u> the certification in Item 3.

5.      <u>Read and Complete</u> a certification on Form W-9 (available at http://www.irs.gov/) or, in the case of a non-U.S. person, Form W-8BEN (or other appropriate Form W-8) regarding your tax status.

6.      <u>Return the Rights Exercise Form</u> either (i) in the pre-addressed envelope or (ii) in portable document format (a "pdf file") by electronic mail to processing@fbgllc.com (which pdf file shall be treated in all manner and respects as an original instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof) to the Subscription Agent on or before the Expiration Date.

7.      <u>Deliver the Full Payment for the Rights Exercised</u>, unless you are an Equity Backstop Party, to the Subscription Agent so that it is received by the Subscription Agent on or before the Expiration Date. Payment must be made by wire transfer or cashier's check. Cashier's checks may be made payable to "Charter Communications, Inc." or to the "Estate of Charter Communications, Inc." c/o Financial Balloting Group LLC, 757 Third Ave., 3rd Floor, New York, NY 10017.

(Wire Delivery Instructions appear on the following page.)

Wire Delivery Instructions:

Wells Fargo Bank.
San Francisco, CA
ABA Number: 121-000-248
Account Number:  0001038377
BNF: Corporate Trust Clearing
F/F/C: 23511000
Ref: Charter Communications Subscription Escrow
Special Instructions: Please note that payment is for the benefit of: Charter Communications, Inc.
Case Number 09-11435 (JMP) and also include your name and contact information.


*Before exercising any Rights you should read the Rights Offering Procedures, the Plan and the Disclosure Statement, including the section entitled "Risks Factors" and the valuation of the Reorganized Debtors contained therein.*

**RIGHTS EXERCISE FORM FOR RIGHTS OFFERING
IN CONNECTION WITH DEBTORS' JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

### Class G-1: CCH I Notes Claims

---

**EXPIRATION DATE**

The expiration date for the exercise of Rights is
12:00 midnight New York City time on June 11, 2009
(such time, as may be extended pursuant to the Rights Offering Procedures,
the "Expiration Date").
Please leave sufficient time for your Rights Exercise Form
to reach the Subscription Agent and be processed.

---

Please consult the Rights Offering Procedures for additional
information with respect to this Rights Exercise Form.

---

**Item 1. Amount of CCH I Notes Claims.** I certify, as authorized signatory of the undersigned holder, that as of the Record Date of April 17, 2009, the undersigned holder was the beneficial owner of CCH I Notes Claims in the following principal amount (to be inserted by Financial Balloting Group LLC):

$[merge field]

**Item 2. Rights.** Pursuant to the Plan and the accompanying Rights Offering Procedures, each Eligible Holder is entitled to participate in the Rights Offering based upon its "Pro Rata Participation Amount." To subscribe, fill out Items 2a, 2b, and 2c below and read and complete Item 3 below.

**2a. Calculation of the Maximum Amount of New Class A Stock.** The maximum amount of New Class A Stock for which the undersigned holder may subscribe is calculated as follows:

[merge field]          X          0.0227366505          =          [merge field]
(Insert Principal Amount from                                        (Maximum Amount of New Class A Stock)
Item 1 above)                                                        Round down to Nearest Whole Number

**2b. Exercise Amount.** By filling in the following blanks, you are indicating that the undersigned holder is interested in purchasing the amount of New Class A Stock specified below (specify an amount of New Class A Stock not greater than the maximum amount of New Class A Stock figure in Item 2a), on the terms of and subject to the conditions set forth in the Rights Offering Procedures.

_____          X          $18.75          =          $_____
(Indicate maximum amount of
New Class A Stock you elect to
purchase)

**Payment in full for the New Class A Stock that the undersigned holder has elected to purchase through the exercise of the Rights must be delivered to the Subscription Agent so that it is received by the Subscription Agent on or before the Expiration Date or such other date specified in the Rights Offering Procedures. Any failure to timely pay for the exercise of Rights will result in a revocation and forfeiture of such Rights.**

**Item 3. Certification.** I certify that (i) I am an authorized signatory of the holder, of the amount of CCH I Notes Claims listed under Item 1 above, (ii) I have received a copy of the Plan and the Disclosure Statement (ii) I understand that the exercise of rights is subject to all the terms and conditions set forth in the Disclosure Statement and Plan.

I also certify and represent for the benefit of the Debtors that (i) the undersigned holder is an "accredited investor" or a "qualified institutional buyer" as such terms are defined in Rule 501 of Regulation D or Rule 144A promulgated under the Securities Act, respectively; (ii) neither the undersigned holder nor any person acting on its behalf has made or will make offers or sales of the New Class A Stock (the "Securities") in the United States by means of any form of general solicitation or general advertising (within the meaning of Regulation D); and (iii) the undersigned holder has not and will not make offers of the Securities purchased hereunder except solely (a) to persons whom the undersigned holder reasonably believes to be "accredited investors" or "qualified institutional buyers" (as defined under Regulation D and Rule 144A promulgated under the Securities Act, respectively), (b) to persons permitted to purchase the Notes in offshore transactions in reliance upon Regulation S promulgated under the Securities Act and (c) pursuant to another permitted transaction under the Securities Act.

I understand that the New Class A Stock I receive pursuant to the exercise of Rights will not be "freely tradable" and will be issued in a "private placement" under the Securities Act. I understand that in order to have such New Class A Common Stock registered, I must execute a registration rights agreement, a form of which is available upon request from the Subscription Agent.

**I acknowledge that by executing this Rights Exercise Form that the undersigned holder will be bound to pay for the New Class A Stock that it has subscribed for and that the undersigned holder may be liable to CCI to the extent of any nonpayment.**

Date: _____, 2009

Name of Holder:_____

                              (Print or Type)

Federal Tax I.D. No.:_____

                              (Optional)

Signature:_____

Name of Person Signing:_____

Title:_____

Street Address:_____

City, State, Zip Code:_____

Telephone Number:_____

Fax:_____

E-Mail:_____

**PLEASE RETURN THIS RIGHTS EXERCISE FORM TO THE SUBSCRIPTION AGENT, FINANCIAL BALLOTING GROUP LLC, 757 THIRD AVE., 3RD FLOOR, NEW YORK, NY 10017 OR BY E-MAIL TO PROCESSING@FBGLLC.COM, ATTN: CHARTER COMMUNICATIONS, INC. PROCESSING, SO THAT IT IS RECEIVED BY THE EXPIRATION DATE**

# **Errata Sheets**

# Charter Communications, Inc. *et al.*

## Rights Offering Procedures - Errata Sheet

| PAGE | PARAGRAPH | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|---|
| 3 | 1st | 12 | time on the fifth Business Day following delivery by the transferor Holder of such Notice of Intention to the Subscription Agent **to** time on the Extension Expiration Date (defined below), which shall be up to 10 Business Days following the Initial Expiration Date, in accordance with the Rights Offering Procedures | Clarification |
| 5 | 2nd | 22 | Parties and CCI **to** Parties and CCI (the "Backstop Escrow Account") | Clarification |

# *Charter Communications, Inc. et al.*

## Rights Exercise Form - Errata Sheet

| PAGE | PARAGRAPH | LINE | CHANGE | REASON FOR CHANGE |
|------|-----------|------|--------|-------------------|
| 1 | Introductory Heading | 1 | Offer Available to Holders as of 5:00 p.m. New York City time **to** Offer Available to Eligible Holders | Clarification |
| 1 | 4th | 7 | Equity Backstop Party, the payments **to** Equity Backstop Party and not an Excess Backstop Party, the payments | Clarification |
| 1 | 4th | 8 | your exercise of Rights, will be deposited **to** your exercise of Rights, which must be made no later than two Business Days following the Confirmation Date, will be deposited | Clarification |
| 2 | 1st | 2 | the Equity Backstop Parties and CCI. **to** the Equity Backstop Parties and CCI (the "Backstop Escrow Account"). If you are an Excess Backstop Party, the payments made in connection with your Exercise of Rights, which must be made no later than the later of (i) two Business Days following the Confirmation Date and (ii) fifteen Business Days following your receipt of the Excess Backstop Notice, will be deposited with the Backstop Escrow Account. | Clarification |
| 2 | 7th | 1 | **Insert** the principal amount of CCH I notes Claims you hold in Item 1. **to** Review the Eligible principal amount of CCH I Notes Claims inserted in Item 1. | Clarification |

| 2 | 8th | 1 | **Complete** the calculation **to Review** the calculation | Clarification |
|---|---|---|---|---|
| 2 | 14th | 1 | Wire Delivery Instructions: **to** (Wire Delivery Instructions appear on the following page.) | Clarification |
| 2 | 14th | 2 | Insert: Wire Delivery Instructions: | Clarification |
| 2 | 14th | 3 | Wells Fargo Bank, N.A. **to** Wells Fargo Bank. | Typographical error |
| 2 | 14th | 4 | [address] **to** San Francisco, CA | Clarification |
| 2 | 14th | 6 | Routing Number: [xx] **to** ABA Number: 121-000-248 | Clarification; provide necessary information not previously available |
| 2 | 14th | 7, 8 | Account Number: [xx] Swift Code: [xx] **to** Account Number: 0001038377 BNF: Corporate Trust Clearing F/F/C: 23511000 Ref: Charter Communications Subscription Escrow | Provide necessary information not previously available |
| 4 | Introductory Heading | 11 | Insert: Please consult the Rights Offering Procedures for additional information with respect to this Rights Exercise Form. | Clarification |
| 4 | 1st | 4 | $_____ **to** $[merge field] | Clarification |
| 4 | 3rd | 1 | Delete footnote 1. | Clarification; no longer applicable |
| 4 | 3rd | 3 | _____ **to** [merge field] | Clarification |
| 4 | 3rd | 3 | [    ] **to** 0.0227366505 | Provide necessary information not previously available |
| 4 | 3rd | 3 | Delete footnote 2. | Clarification; no longer applicable |

| 4 | 3rd | 3 | _____ **to** [merge field] | Clarification |
| 5 | 1st | 1 | $[____] **to** $18.75 | Provide necessary information not previously available |
| 6 | 1st | 1 | Undersigned Holder: **to** Name of Holder: | Clarification |