UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11435(JMP)

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHARTER COMMUNICATIONS, INC., et al.,


      Debtors.


- - - - - - - - - - - - - - - - - - - - -x


          U.S. Bankruptcy Court

          One Bowling Green

          New York, New York


          June 17, 2009

          10:02 AM



B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2   HEARING re Debtors' Motion for Entry of an Order Extending Time

3   to File Notices of Removal of Actions [Docket No. 441].

4

5   HEARING re Motion for Relief from Stay for Limited Purpose of

6   Liquidating Claim [Docket No. 432].

7

8   HEARING re Goodell Class Plaintiffs' Motion for Class

9   Certification and for Class Treatment of Their Proof of Claim

10  [Docket No. 413].

11

12  HEARING re Goodell Class Plaintiffs' Motion for Estimation

13  [Docket No. 414].

14

15  HEARING re Motion of Q Investments for Order Directing the

16  Appointment of an Official Committee of Equity Security Holders

17  [Docket No. 445].

18

19

20

21

22

23

24  Transcribed By:  Clara Rubin

25

APPEARANCES:

KIRKLAND & ELLIS LLP

        Attorneys for Debtors

        Citigroup Center

        153 East 53rd Street

        New York, NY 10022


BY:    STEPHEN E. HESSLER, ESQ.

        PAUL BASTA, ESQ.


KIRKLAND & ELLIS LLP

        Attorneys for Debtors

        555 California Street

        San Francisco, CA 94104


BY:    MARK MCKANE, ESQ.


KIRKLAND & ELLIS LLP

        Attorneys for Debtors

        200 East Randolph Drive

        Chicago, IL 60601


BY:    RAY C. SCHROCK, ESQ. (TELEPHONICALLY)

1

2     AXLEY BRYNELSON, LLP

3           Attorneys for Goodell Class Plaintiffs

4           2 East Mifflin Street

5           Suite 200

6           Madison, WI 53703

7

8     BY:   DAVID M. PELLETIER, ESQ.

9

10    BRACEWELL & GIULIANI

11          Attorneys for Q Investments

12          Goodwin Square

13          225 Asylum Street

14          Suite 2600

15          Hartford, CT 06103

16

17    BY:   EVAN D. FLASCHEN, ESQ.

18

19    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

20          Conflicts Counsel

21          101 Park Avenue

22          New York, NY 10178

23

24    BY:   CHRISTINA M. MANTHEI, ESQ.

25

```
 1
 2    GINGRAS, CATES & LUEBKE, S.C.
 3         8150 Excelsior Drive
 4         Madison, WI 53701
 5
 6    BY:   HEATH P. STRAKA, ESQ.
 7
 8
 9    PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
10         Attorneys for the Crossover Committee
11         1285 Avenue of the Americas
12         New York, NY 10019
13
14    BY:   DIANE MEYERS, ESQ.
15
16
17    ROPES & GRAY LLP
18         Attorneys for Official Committee of Unsecured Creditors
19         1211 Avenue of the Americas
20         New York, NY 10036
21
22    BY:   DAVID S. ELKIND, ESQ.
23
24
25
```

```
1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for Paul G. Allen

4         300 South Grand Avenue

5         Los Angeles, CA 90071

6

7    BY:   KURT RAMLO, ESQ.

8

9

10   WHITE & CASE LLP

11        Attorneys for Law Debenture Trust Company of New York

12        1155 Avenue of the Americas

13        New York, NY 10036

14

15   BY:   DWIGHT A. HEALY, ESQ.

16        GERARD UZZI, ESQ.

17

18

19   ARNALL GOLDEN GREGORY LLP

20        Attorneys for Creditor Verizon Communications Inc.

21        171 17th Street NW

22        Suite 2100

23        Atlanta, GA 30363

24

25   BY:   DARRYL SCOTT LADDIN, ESQ. (TELEPHONICALLY)
```

1

2    SAUTER SULLIVAN LLC

3        Attorneys for Creditor, Haus

4        3415 Hampton Avenue

5        St. Louis, MO 63139

6

7    BY:   CHRISTOPHER K. GELDMACHER, ESQ. (TELEPHONICALLY)

8

9

10   Q INVESTMENTS, L.P.

11   BY:   SCOTT MCCARTY (TELEPHONICALLY)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  Be seated, please.  Good morning.

3          MR. HESSLER:  Good morning, Your Honor.  Steve Hessler

4    of Kirkland & Ellis on behalf of the debtors.  Your Honor,

5    today is the debtors' monthly omnibus hearing.  There are five

6    motions on today's agenda, although only one of which was filed

7    by the debtors.  With Your Honor's permission, we propose to

8    proceed in the order of the filed agenda.

9          THE COURT:  That make the most sense.

10         MR. HESSLER:  Your Honor, the first motion on the

11   agenda today is the debtors' request for an extension of their

12   removal deadline.  Section 1452 and Rule 9027 together provide

13   a debtor ninety days from the petition date to remove

14   prepetition civil actions to federal district court.  The

15   removal deadline in this case is June 25th.  The debtors are

16   party to numerous actions nationwide and are still completing

17   their analysis of whether any of these actions will be removed.

18   The debtors therefore propose to extend the removal deadline to

19   the later of, for prepetition actions, the plan confirmation

20   date or thirty days after entry of any order terminating the

21   automatic stay in any particular case and for postpetition

22   actions, the time periods set forth in Rule 9027(a)(3).  As set

23   forth in our motion, the debtors believe cause exists for this

24   extension and that it's consistent with relief in similar cases

25   in this district.

1    We note, Your Honor, that no party has objected to our

2    removal extension, and we would request that the proposed order

3    be entered.

4    THE COURT:  The motion's granted.

5    MR. HESSLER:  Thank you, Your Honor.  Your Honor, the

6    second motion on the agenda is the motion by Robert and Kerry

7    Haws to lift the automatic stay.  I'm happy to cede the podium

8    to the movant, but I don't know if their counsel is making an

9    appearance today.

10    THE COURT:  Is there anyone here on behalf of the Haws

11    plaintiffs?

12    Is there anyone on the telephone in reference to this

13    matter?

14    I hear no response.  It appears that this motion is

15    not being prosecuted.

16    MR. HESSLER:  Your Honor, some very basic background

17    on it.

18    THE COURT:  I read the motion and I read the

19    responses.  The motion fails to meet any of the requirements of

20    the Sonnax case and fails to allege cause for relief from stay.

21    The motion would have been denied if it had been prosecuted.

22    And you can submit an order denying the motion.

23    MR. HESSLER:  Thank you, Your Honor.  We will do so.

24    For the next items on the agenda, numbers 3 and 4, I

25    believe opposing counsel is here today, Your Honor.

1          THE COURT:  Okay.

2          MR. PELLETIER:  Good morning, Your Honor.  David

3    Pelletier of Axley Brynelson on behalf of the Goodell class

4    plaintiffs.  As Your Honor is aware, we filed our motions for

5    certification and estimation.  Debtors requested a briefing

6    schedule as to whether the Court should exercise its

7    discretion.  The Court encouraged the parties to enter into a

8    stipulation, which we have attempted to do and have not been

9    able to do, although I believe we are very close.  And we filed

10   a motion on Monday of this week requesting that your Court

11   enter an order effectively incorporating the stipulation with

12   our changes.  It was a stipulation proposed by debtors with

13   some minor changes, and I'd like to discuss those changes, Your

14   Honor.

15         THE COURT:  The problem is a stipulation means the

16   parties have agreed to the language.  And so --

17         MR. PELLETIER:  Yes.

18         THE COURT:  -- if there is to be an order approving a

19   stipulation, that's one thing.  If there is an argument about

20   drafting, that's something that I don't typically become

21   involved in, certainly not in the midst of a crowded courtroom.

22         As I read your papers, this seems to be about venue of

23   the underlying action in the Western District of Wisconsin and

24   some concerns that the wording of the existing stipulation may

25   be designed to give the plaintiff class some kind of tactical

1  advantage with respect to that issue.

2      I have no idea whether or not the wording does or

3  doesn't, but I guess a question that I have for the debtors is

4  why we're even spending time on this.  Why can't this just be

5  resolved with some drafting, a sentence that says,

6  notwithstanding anything set forth in this stipulation, there's

7  absolutely no advantage to the plaintiff class with respect to

8  venue?

9      MR. PELLETIER:  Your Honor, and we absolutely agree

10 that that would be a more than acceptable clause to put in the

11 stipulation.  We --

12     THE COURT:  I'm not trying to draft your stipulation.

13 I just want to know why this hasn't been resolved before we got

14 to court today.  What's going on here?  Why is this a problem?

15     MR. PELLETIER:  May I address that, Your Honor, or

16 would you like to hear from the debtors?

17     THE COURT:  I'd like to hear from the debtors,

18 actually, because I've read your papers.

19     MR. MCKANE:  Good morning, Your Honor.  Mark McKane,

20 Kirkland & Ellis, for the debtors.  We did not move to have

21 this application or the stipulation submitted, and we were not

22 done negotiating.  We'd like to get this issue resolved, and we

23 can address the venue issue.  We don't think it's appropriate

24 for it to be in front of you today, and we only filed the

25 opposition to simply flag the issue that we want to get

1    resolved.  I think we could do this right now outside the

2    Court's presence.

3         THE COURT:  I think that that's what should happen.  I

4    don't think we should spend any more time publicly drafting a

5    document that can be better drafted in private.  And if, in

6    fact, the only issue here is making clear that the debtors have

7    reserved any and all rights with respect to challenging venue,

8    it seems to me that it's pretty easy to write words that say

9    just that.

10         MR. MCKANE:  Understood, Your Honor.  It's a drafting

11   exercise that we should accomplish now.

12         THE COURT:  Let's push this off to either the end of

13   the calendar to give the parties sufficient time to try to work

14   out language, or at least to deal with the principle as to how

15   it will be resolved.  And if it can't be resolved, you can

16   report at the end of the calendar to me.

17         MR. MCKANE:  Thank you, Your Honor.

18         THE COURT:  Okay.

19         MR. HESSLER:  Your Honor, the next item on the agenda

20   is the Q Investments equity committee motion.

21         THE COURT:  Okay.

22         MR. FLASCHEN:  Your Honor, good morning.  Evan

23   Flaschen of Bracewell & Giuliani for Q Investments, which

24   manages a number of funds, including R2 Investments, which is

25   the owners of the Charter shares.  If I can start by noting I

1    seldom make it to court these days, so I appreciate the

2    opportunity to appear before you.

3         THE COURT:  I appreciate the opportunity to see you.

4         MR. FLASCHEN:  The question here is what's

5    Q Investment's doing in front of this Court, but I want to

6    start with what I'm doing here.

7         THE COURT:  Yeah, what are you doing here?

8         MR. FLASCHEN:  I've been a bankruptcy lawyer since

9    1982.

10        THE COURT:  I think I remember when you started.

11        MR. FLASCHEN:  I have headed the restructuring

12   practice first at Hebb & Gitlin and at Bingham McCutchen, which

13   acquired Hebb & Gitlin, and now Bracewell & Giuliani since

14   1992.  I don't want to say I have a perfect memory, but in my

15   memory I do not recall a single time in that twenty-seven years

16   I've ever represented an equity committee, ever sought or

17   interviewed to represent an equity committee, ever sent a

18   letter to the United States Trustee or filed a motion with the

19   Court for an equity committee, neither I or my team.

20        So when Q Investments called, and they're not a

21   current client, I don't know them very well, I said sounds

22   interesting, you got the wrong guy, let me give you the names

23   of the usual suspects.  Their response was tell him we don't

24   want one of the usual suspects, this is not the usual

25   situation.

1          What I'd like to walk through with you is some

2     valuation issues and then the Paul Allen releases and then come

3     back to what appears to be the primary objection, or one of the

4     most significant ones, is why'd you wait so long, how come

5     you're here now, why weren't you here at the beginning of the

6     case?

7          THE COURT:  Well, that's only one of the many

8     objections --

9          MR. FLASCHEN:  Yes.

10          THE COURT:  -- that have been lodged.

11          MR. FLASCHEN:  I think it's the primary objection of

12     the United States Trustee, I should clarify.  Valuation, first

13     question is why do we not have any witnesses, why don't we have

14     any experts?  One of the reasons Q's motion is unusual:

15     They're not your normal shareholder seeking appointment of the

16     committee.  They're not the classic mom-and-pop who's held

17     those shares for ten years in rose-colored glasses.  They're

18     not the classic hedge fund investor who bought 20 million

19     shares yesterday for 1 cent, screaming bloody murder today and

20     hoping to settle tomorrow for 5 cents.  They've been a

21     shareholder of Charter since 1999, on and off, and more than 75

22     percent of the shares they own today were acquired prepetition,

23     unfortunately at market prices.

24          So they're already looking at a loss of more than 14

25     million dollars.  For them to mount an evidentiary hearing

1   today would require an expert financial advisor.  You're

2   talking three-, four-, five hundred thousand dollars just to

3   get a witness to testify.  I know in the Oneida case they had

4   days of testimony on valuation.  They don't want to throw more

5   good money after bad.  They think the principles speak for

6   themselves and they're willing to try this without the evidence

7   to back this up, because the only matters I will refer to on

8   valuation are already in the public record.

9         The first item is Charter's first-day affidavit.

10  Mr. Doody, who I believe is in court today, he starts by saying

11  this Charter's no ordinary bear.  Unlike many companies

12  entering Chapter 11, Charter comes before this Court at a time

13  when its business is continuing to grow.  Charter has had nine

14  consecutive quarters of double-digit adjusted EBITDA, cash flow

15  growth, on a pro forma basis, and 700 million dollars of cash.

16        To refer to some of the authorities cited in our

17  pleading, this is the classic situation of overleverage, not

18  poor operations.  This is, in fact, improving operations

19  continuing to improve.

20        Next item we refer to is Charter's May 7th press

21  release announcing it's first-quarter results.  This is a

22  quarter when the public knew Charter was negotiating, was going

23  to be filing a Chapter 11 plan, management was focused on

24  negotiations.  One would expect performance to be relatively

25  poor during this first quarter.

1    According to Charter's own press release for the first

2    quarter, revenues grew 6 1/2 percent; adjusted EBITDA grew 13.2

3    percent.  Their margin of 37.1 percent, pretty nice cash flow

4    margin, increased more than 200 basis points.  Their average

5    monthly revenue per basic video customer, ARPU, which I hope

6    Your Honor knows what it is because I'm not quite sure,

7    increased 9.9 percent.  RGUs increased.  Commercial revenues

8    increased 16 percent.  I could go on.  The point is a

9    remarkable first quarter in a time when you would think any

10   company would be suffering due to diversion of management

11   attention, due to the time of year, due to the fact that they

12   filed for Chapter 11.

13   We also have the position of the convertible

14   noteholders who filed a pleading yesterday.  And we've already

15   seen one objection saying, well, what do you expect, Q holds

16   little under 10 percent of the convertible notes.  Of course

17   they filed saying they agree with our valuation.

18   Respectfully, Your Honor, I think recent events in

19   Chrysler and General Motors have established quite clearly that

20   no one pulls the strings of Tom Moreah (ph.).  They filed that

21   objection; it stands on their own.  We did not tell them to

22   file it.  We did not review it.  The convert's (sic) filed

23   their own objection on their own -- I'm sorry, statement on

24   their own terms.  They haven't objected to our committee;

25   they've taken no position.  They wanted to make it clear they

1   too agree that this is a solvent entity.

2           THE COURT:  I read your papers.  It was, at least in

3   my view, a preview of coming attractions in reference to

4   confirmation.

5           MR. FLASCHEN:  Thank you.  Another part of the

6   objections is that there's 8 billion dollars of debt being

7   eliminated.  So it must be insolvent.  The debt's being

8   eliminated, as the debtor acknowledges, for debt services

9   reasons:  not enough cash flow to pay the interest, not because

10  of valuation issues.  And let's not forget this 8 billion of

11  debt is being converted both into equity and into a rights

12  offering.  The lower the valuation of that equity, both the

13  greater opportunity for appreciation of the shares this 8

14  billion is getting and the cheaper the price of the rights

15  offering.  It's based on the valuation.

16          So it is in the interest of the creditors who are

17  getting the stock for as low a valuation of this debtor as

18  possible, therefore as low a valuation of the new equity as

19  possible, because it's only upside from there for them.

20          So the standard, depending on which case you read, it

21  is either is this debtor hopelessly insolvent or is there a

22  legitimate dispute?  Respectfully submit there is a legitimate

23  dispute based on the debtors' own public filings given the

24  growth.  And recall, the debtors' valuation must have preceded

25  the signing of the plan support agreement; it's February 15th.

So we're talking January, maybe December, at the absolute nadir
of the current financial crisis. There's hardly roses growing
in the garden today, but we have the green chutes that have
been referred to. Things are better. The equity markets have
opened up again. I'm in another case where they're rushing to
sell 2 billion dollars of equity because there's money
available again. We have DIP financings. Money is out there
again. Is everything better? Of course not. Is everything
better than December and January when this valuation was done?
Absolutely.

So all we submit, yes, there is a legitimate dispute.
I'm not going to sit here today and say I'm a valuation expert
and absolutely categorically just a solvent debtor. What I'm
going to say is after I told Q they got the wrong guy, they
walk me through their valuation. I said you know, I think you
have a point there, but even then, I said, I needed to consult
to the financial advisor, I can't do this on my own. They
agreed.

We talked to one of the Big Three, Chapman (ph.)
Capital, whose first response was why do you want us to talk
about equity. They took a look at it, and I don't mean in
terms of testifying what their view of valuation is, other than
to say they are prepared to seek representation of this equity
committee if it's formed, which probably gives an indication of
their view of valuation. And they certainly confirmed the

1    industry statistics that Q Investments put forward.

2        The next point that attracted me to this unusual

3    situation, they told me please read the plan disclosure

4    statement, tell me what you think about the releases of Paul

5    Allen.  Paul Allen, prepetition, owned 52 percent of the stock

6    and, if I read it correctly, 91 percent of the voting control.

7    The disclosure statement describes a 9019 settlement with Paul

8    Allen.  He gives up some disputed claims he has against the

9    estate, in exchange for which he gets 35 percent voting

10   control, not a coincidental number; warrants for more equity;

11   175 million dollars in cash; the estate is paying him 175

12   million dollars, and the estate is giving him 85 million

13   dollars in new notes; and up to 20 million dollars for his fees

14   and expenses.  I wish I was sitting by the phone when he

15   called.

16       That's a pretty good deal.  And, yet, it's not simply

17   in exchange for these disputed claims.  Referring to the

18   debtors' disclosure statement, in small print -- I'm on page

19   28, I believe:  "The settlement was motivated in part" --

20   that's their words, and then I'll paraphrase -- in order to

21   preserve very substantial net operating losses and, even more

22   critically, in order to preserve the absence of a change of

23   control, because, as I'm sure you're aware, there's a big

24   dispute in this case about whether this secured debt is

25   properly reinstated.  And one of the arguments the secured

1    lenders have is -- would have had under their contract is

2    change of control, you can't fix that.  So the debtors said

3    we're not going to have a change of control.  That's where the

4    35 percent in stock comes in because, under their contract, if

5    Paul Allen still owns 35 percent there's no change of control.

6         It also provides for full releases.  And this is where

7    we come in.  Doesn't just release all his disputed contract

8    claims, management claims, whatever it is; he adds some debt.

9    I'm not questioning any of that at the moment; I don't know

10   enough.  But he's also getting releases as an officer, a

11   director, as a controlling shareholder.  And most importantly,

12   those releases are not only binding on creditors, they're

13   binding on shareholders, shareholders who are getting nothing

14   under the plan, who are deemed to reject the plan and, I'm

15   confident, would vote against it even if they had a vote.  They

16   are forced to release Paul Allen.

17        So they're getting nothing; Paul Allen is getting all

18   these things.  The response is he's not getting any of that

19   because he's a shareholder; he's getting that to settle his

20   disputed claims.  So since he's getting nothing on account of

21   his shares, you should not get anything on account of your

22   shares.  Okay, then why are you getting a release from

23   shareholders?  If you acknowledge he's not getting anything as

24   a shareholder, why does he get a release as a shareholder?  We

25   get no benefits from the settlement, however good it may be,

1    and we're getting no recovery at all.

2         And this is a live issue.  There's already -- I think

3    it was attached to someone's pleading; maybe -- it may have

4    been ours.  There's a class action lawsuit filed against

5    Mr. Allen.  In fact, I know Your Honor would have seen it

6    because various of the moms-and-pops with rosy glasses wrote

7    letters to this Court and they were attached to the debtors'

8    pleadings.

9         So there's already a class action against Mr. Allen.

10   I guess that class action would be dismissed with prejudice

11   because of this release, even though creditors are getting

12   nothing.

13        Responding to the objections, I'm only going to cover

14   three of what you correctly characterize as the many points:

15   one, that the settlement's been fully vetted; two, the added

16   expense of an equity committee; and three, what are we doing

17   here so late?

18        Fully vetted.  When I did what I normally do, and when

19   I talk to clients I say I always represent the good guys, the

20   creditors, we were involved in Klein (ph.) Corporation the

21   first time it filed Chapter 11.

22        THE COURT:  You can't possibly mean what you just

23   said.  The room is filled with good people.  And there's no

24   bias here --

25        MR. FLASCHEN:  Of course not.

1          THE COURT:  -- in favor of creditors, shareholders --

2          MR. FLASCHEN:  Well, Your Honor, I did not mean to

3    imply --

4          THE COURT:  -- debtors --

5          MR. FLASCHEN:  -- good guys in the Court's eyes as

6    opposed to the connotation --

7          THE COURT:  I understand good guys in your eyes

8    because they pay fees without court approval.

9          MR. FLASCHEN:  That doesn't hurt, Your Honor.  In

10   Klein, we represented unsecured creditors.  The objective was

11   to reinstate the secured debt.  The challenge was to not

12   trigger a change-in-control provision.  Absolutely we

13   negotiated heavily with the existing shareholders, but the

14   negotiation there as, I submit, the negotiation here, was how

15   much do you have to give the guy for him to be willing to play

16   ball and keep the voting control to avoid triggering the change

17   in control?  Not an improper motive.  Change in control is

18   important here.  Net operating losses are very important here,

19   including to us the shareholders if we have a crack at this.

20   But the motivation isn't we don't want a release or negotiating

21   a release.  The motivation isn't we're negotiating how many

22   shares you get.  The motivation is how much will it cost us?

23   So it benefits us as creditors because we get the benefit of

24   the reinstatement of the secured debt; we get the benefit of

25   the net operating losses.

1       That was not from the perspective of the shareholders,

2   nor should it have been; they're creditors.  In the normal

3   case, and I think Judge Gropper mentions this in Oneida, at

4   least you have management.  There are fiduciary duties to

5   shareholders, even insolvent companies.  Management presumably

6   negotiate for the benefit of the shareholders.  Respectfully,

7   management is Paul Allen; 91 percent voting control.  '

8       I don't mean, again, anything improper or

9   inappropriate or under-the-table, nothing like that.  I'm

10  pointing out the inherent conflict of interest, as appeared in

11  Oneida, with management and a board negotiating with creditors

12  when the largest party involved is Paul Allen and you need to

13  give Paul Allen a recovery and you give nothing to other

14  shareholders.  That at least needs to be aired to see whether

15  that was appropriate.

16      And, again, the class action lawsuit claims it wasn't

17  claimed people breached their duties.  I'm not going to comment

18  on that.  I don't know enough to know.  It sure does look like

19  something that needs to be investigated and could not fairly,

20  impartially have been vetted by existing management and the

21  board.

22      Item 2, expense.  Paul Allen is getting up to 20

23  million dollars; one shareholder for his fees and expenses.  If

24  the equity committee is 10 percent of that, 15 percent of that,

25  I submit, in the context of this case, in the context of how

1   much they're willing to pay to one shareholder for his fees, it

2   is not a burden to this estate such that it would outweigh the

3   other issues.

4        All right, timing.  I had one other point.  They do

5   mention the United States Trustee is objecting to the releases

6   and they can take care of shareholders.  We greatly respect the

7   United States Trustee's views.  They're up against Kirkland &

8   Ellis; Skadden Arps for Paul Allen; Paul Weiss.  Are they going

9   to be able to -- while all being funded by the estate, the

10  United States Trustee, going to have the time and ability to

11  conduct the discovery about the background of the settlements,

12  take the depositions of the parties, what was the motivations

13  of the board, did people talk about releases, did people talk

14  about shareholder recoveries?  Is the U.S. Trustee going to be

15  able to engage a financial advisor to value the settlement?  Is

16  the settlement, from shareholders' point of view, fair value,

17  what -- his claims that were waived in exchange for all this

18  recovery he's receiving?

19       U.S. Trustee has tried and, remarkably well before the

20  deadline, U.S. Trustee's already filed an objection, which we

21  interpreted as a signal.  And they, in that objection, refer to

22  our motion.  It's a real big issue here, and we think it should

23  be properly vetted by the shareholders who have the most to

24  lose by it, because not only are we getting nothing under the

25  plan, the lawsuits filed against Mr. Allen will go away as well

1    for no consideration.

2            Timing.  Today's June 18th (sic).  This case was filed

3    March 27th.  What are we doing here -- excuse my math -- ten

4    weeks, eleven weeks, after the filing date?  Well, let's back

5    up.  We sent our letter May 18th; so, seven weeks after the

6    filing date.  Add to that the ten days.  U.S. Trustee rightly

7    requested for other parties to comment, who then requested an

8    additional four days, getting us to Friday.  We filed our

9    motion on the following Monday.  Your Honor was kind enough to

10   give us short notice, but here we are.

11           So it is a month after we filed -- we sent our letter,

12   but it's seven weeks after the petition date.  This isn't like

13   the John --

14           THE COURT:  But wasn't it also after the approval of a

15   disclosure statement?

16           MR. FLASCHEN:  Yes.  But it's not Johns Manville --

17           THE COURT:  How do you explain that delay?

18           MR. FLASCHEN:  Yes, I do.  Yes, Your Honor.  Why May

19   18th?  Why not April 18th?  Two things, two quite specific

20   things:  a May 7th press release in which the debtor says we've

21   had this great first quarter notwithstanding everything that

22   was happening, increasing growth, increasing revenues,

23   increasing everything; second item, the debtors' valuation was

24   a peer group of companies and compares the valuation of Charter

25   to that peer group of companies.

1     Q Investments looked in The Wall Street Journal from

2  March 9th until May 18th, the day we filed -- we sent our

3  letter.  The average stock price increase for that peer group

4  of companies was 67.6 percent.  This is an improving market.

5  It is a market in which the stock of companies like Charter --

6  the companies that they selected are like Charter -- is

7  increasing in value -- again, I'm terrible with math -- 400

8  percent a year, if that one period continues.  You add those

9  two things; Q said you know what, it's still going to cost us

10  some money to get in front of the Court; although, Your Honor,

11  I will say, we agreed to a cap, because this is one we actually

12  believe in.  We're not doing this, as you said, for the fees.

13  We're doing this -- first time I've ever done it -- because, by

14  goodness, I think they have a legitimate grounds to argue.  And

15  they said we'll still pay the fee cap at least to get in front

16  of the U.S. Trustee, and now in front of the Court, to present

17  our arguments.

18        Even so, seven weeks, okay, we know why you did it

19  then, but the confirmation's July 20th.  Even if you filed it

20  as fast as you reasonably should have filed it, you can't slow

21  down confirmation of plan support agreements that die on July

22  20th.  These plan support agreements, for the creditors, are

23  predicated on getting this stock and getting this rights

24  offering at a valuation based on January numbers.  The more you

25  go past July and the more apparent it is the stock is worth

1    still more, I think it makes what they're recovering more

2    suspect, but it also certainly makes them motivated not to walk

3    away from a plan support agreement when they are getting stock

4    at such low values.

5        Second, most telling of all, the plan support

6    agreements, as I read the disclosure statement, say that the

7    effective date should occur within 150 days, but if there is a

8    delay in government consent or approvals the effective date can

9    occur as late as December 15th, 2009.  If they're willing to

10   wait till December 15th, 2009 for an effective date, for

11   whatever reason, respectfully submit that the relatively short

12   delay an equity committee would want in a July 20th

13   confirmation date would still give this company plenty of time

14   to emerge, months before December 15th.

15       THE COURT:  Let me ask for a clarification as to that

16   last point, because the papers in opposition to your motion

17   have talked about the risk associated with appointing a

18   committee this late in a case, which is heading toward

19   confirmation within weeks.  This is the first I've heard you

20   confirm that the appointment of a committee would carry with it

21   some necessary delay.  How much delay would be involved if a

22   committee were appointed and if your client were on the

23   committee?  And there are serious questions as to whether your

24   client would qualify as a member, but let's just say for the

25   sake of discussion that most lawyers don't seek to appoint

1  equity committees without at least the hope of someday

2  representing that committee.  How much of a delay are we

3  talking about?

4        MR. FLASCHEN:  Let me talk about the factors that go

5  into that and then make a prediction.  Were this Court to

6  approve today formation of the committee, the U.S. Trustee

7  still has to form it.  They still have -- the U.S. Trustee

8  still has to wrestle with issues like is Q eligible?  They make

9  a big deal of that.  That's not today's issue; that's the U.S.

10  Trustee's issue.  We think Q is eligible, and we're happy to

11  explain to the U.S. Trustee why they should be appointed.  But,

12  in any event --

13        THE COURT:  No, that's just a shot at your client.

14  That's --

15        MR. FLASCHEN:  But that takes -- my point is that

16  takes a few days, committee to be appointed, to hire whoever

17  they hire as counsel and financial advisor.  Then you need to

18  be ready for a valuation fight.  So you need a financial

19  advisor to get going quickly.  And you need to test the

20  releases, which is discovery and depositions.  And with the

21  most cooperative debtors and shareholders in the world, and I

22  question that's what we would be up against, it would be a

23  challenge to be ready by July 20th.

24        I'm no litigator, as you could probably tell by

25  today's appearance.  I would be naive to say that it'll take

1    one month, because, you know what, that's August and I might

2    not be able to find Paul Allen or directors or managers or Q or

3    whoever else it is.  That's a tough month.

4         So could it take until early/mid-September?  It could.

5    I would hope to do it sooner.  I would hope the committee does

6    it sooner, whoever their counsel is.  Does early September give

7    them plenty of time to emerge prior to their own December 15th

8    drop-dead date?  Absolutely.

9         THE COURT:  Okay.  I understand what you're saying.

10   What you're saying is that the appointment of a committee will

11   cost millions of dollars and will involve perhaps several

12   months of delay.

13        MR. FLASCHEN:  That is one of the things I'm saying,

14   yes, Your Honor, and I'm saying, respectfully, both of those

15   things are well worth it.

16        THE COURT:  All right, why don't you proceed?

17        MR. FLASCHEN:  That's all I have to say, Your Honor.

18   Thank you.

19        THE COURT:  Oh, okay.  Let's hear from those who

20   disagree.

21        MR. HESSLER:  Your Honor, again for the record, Steve

22   Hessler of Kirkland & Ellis on behalf of the debtors.  Your

23   Honor, as we set forth in the response objection we filed

24   yesterday, the debtors oppose Q Investments' motion for the

25   appointment of an official equity committee.  As we noted,

there have been two requests for an official committee in this case. The first request was made within a week of the petition date. The U.S. Trustee denied that request. The second request was made almost two weeks after this Court approved the debtors' disclosure statement. The U.S. Trustee denied that request as well. The second request is obviously the request that the equity committee motion brings before this Court.

The debtors assert the governing legal standard and the circumstances of this case demonstrate the U.S. Trustee properly exercised her discretion in both instances. Your Honor, we have to begin with the relevant legal standard. The analysis -- or under Section 1102, an equity committee is merited only where it is, quote, "necessary" to assure the, quote, "adequate representation of equity securityholders".

It is well-settled in this district that equityholders seeking appointment of an official committee bear the burden of satisfying at least two factors. The first factor, Your Honor, is that there is a substantial likelihood of equityholders receiving a meaningful distribution in the case. The second standard is that equityholders must show they are, quote, "unable to represent their interests without an official committee". Q Investments did not satisfy these factors before the U.S. Trustee, and the equity committee motion has not satisfied these factors before this Court.

Importantly, Your Honor, an appointment of an equity

1    committee here would be unprecedented.  As this Court is aware,

2    the debtors' disclosure statement was approved six weeks ago,

3    almost six weeks ago, on May 7th.  Voting on the debtors' plan

4    concluded two days ago on Monday, June 15th.  Confirmation

5    hearings begin in a little over one month on July 20th.

6    Appointing an equity committee in these circumstances would not

7    just be exceptional, it is, as far as we can tell, without

8    precedent.

9         The equity committee motion cited twenty-six cases in

10   support where an equity committee was appointed, and in all

11   twenty-six of those cases the equity committee appointed was

12   appointed before the approval of the disclosure statement.  The

13   debtors searched, and we were also unable to find any case

14   where an equity committee was appointed after a disclosure

15   statement had been approved, much less after plan voting had

16   concluded.

17        Under this district's application of Section 1102, the

18   equityholders seeking appointment of a committee must establish

19   there is a substantial likelihood they will receive a

20   meaningful distribution in the case.  The equity committee

21   motion has not established any likelihood that they will

22   receive any distribution in these cases.

23        Your Honor, under the debtors' plan, over 8 billion

24   dollars of indebtedness that is senior to CCI equity interests

25   will be eliminated.  The plan provides, therefore, that equity

1    interests in CCI will not be receiving any distribution on

2    account of these interests.

3           Your Honor, in determining whether to appoint an

4    equity committee, courts in this district look to whether the

5    appointment would lead to unwarranted costs and the potential

6    for undue delay.  Mr. Flaschen addressed both of these points.

7    In their papers they conceded the appointment of an equity

8    committee would lead to additional costs and didn't address

9    delay as directly as Mr. Flaschen did today, but let's take

10   both of these in order.

11          In their motion, Q Investments noted, or argued, that

12   Charter has plenty of cash to pay for counsel.  This, of

13   course, is not the standard.  Whether the debtors have the

14   ability to pay professional fees, if that was the standard, an

15   equity committee would be appointed in every case where a

16   debtor was not administratively insolvent.

17          With regard to delay, in the motion Q Investments

18   argued that the debtors' reasons for wanting to exit Chapter 11

19   are unclear.  We disagree strongly.  We believe the reasons are

20   abundantly clear, as set forth in the disclosure statement and

21   in the many hearings that we've had before this Court thus far

22   in these cases.

23          The Court has approved a fast-track reinstatement,

24   discovery and litigation schedule, specifically tied to a July

25   20th confirmation hearing date.  The restructuring agreements

1    in support of the debtors' plan require the plan be confirmed

2    with 130 days after the petition date and that the plan become

3    effective within 150 days after the petition date.  Pursuant to

4    these agreements, members of the crossover committee have

5    agreed to invest up to 2 billion dollars in reorganized

6    Charter.  And, again, voting on the plan has concluded.

7    There's absolutely no support whatsoever for Q Investments'

8    assertions that the parties to the plan support agreements will

9    maintain their obligations if these cases are delayed beyond

10   the contractual dates.

11        We would note for the Court also, Your Honor, that the

12   debtors are paying 20 million dollars per month in default

13   interest.  So it is vastly overly simplistic and economically

14   unrealistic to say that the debtors can remain in bankruptcy

15   while another committee is appointed to perform similar

16   functions that are presently being performed by the official

17   committee of unsecured creditors, and also performing the

18   oversight function on certain issues raised by the equity

19   committee that the U.S. Trustee's Office is currently pursuing

20   in this case.

21        Mr. Flaschen just indicated before the Court that the

22   delay involved here could be up to the middle of September

23   before an equity committee can be constituted, before financial

24   advisors could be retained, before additional diligence into

25   issues that have been vetted carefully by multiple

1    constituencies in this case can be fully pursued, and before

2    litigation that is set to go before this Court in approximately

3    four weeks would have to be pushed approximately another two

4    months.  Your Honor, a critical part of the standard in this

5    district for whether to appoint a committee is there's a

6    balancing test that examines whether the cost of the additional

7    committee significantly outweighs the concern for adequate

8    representation of equityholders.  Again, equityholders have

9    already filed two requests with the United States Trustee in

10   this case.  We've responded to both those requests, as have our

11   key constituencies done so.  There's a motion before this Court

12   that we have responded to and that we are arguing.

13        The equity committee motion is brought by a major firm

14   on behalf of a sophisticated client that owns nearly 5 percent

15   of CCI common stock and who purchased 4 million shares on

16   multiple occasions after the petition date.  It's highly

17   evident that equity is adequately represented in these

18   proceedings, Your Honor.

19        I want to address the last point that Mr. Flaschen

20   brought up, which was why the motion -- why the Q Investments

21   motion was brought so late in this case.

22        THE COURT:  Let me -- before you move on, let me

23   just --

24        MR. HESSLER:  Certainly.

25        THE COURT:  -- react to something you just said.  You

1    said the fact that Q Investments acquired significant equity

2    postpetition and has retained well-respected counsel is

3    evidence that equity is well-represented in this case; I think

4    that's what you said.  I don't understand that argument.  What

5    is the evidence that equity is well-represented in this case?

6    Because, just because some equityholder hires a lawyer to move

7    for appointment of a committee, and that firm is obviously

8    charging at high hourly rates for services that are being

9    performed, for purposes of obtaining a committee, does not

10   necessarily mean that if the committee is not formed that

11   equity is adequately represented.  I just want to understand

12   your point.

13        MR. HESSLER:  Understood, Your Honor.  To clarify, I

14   was indicating, with that chain of events that have happened in

15   this case, that there have been two requests and that we are

16   now arguing a motion, that equity has not been silent in this

17   case.  To expand on it a bit is the issues that are being

18   identified by Q Investments that are critical to equityholders

19   as a group; for instance, the Allen settlement; for instance,

20   releases.  These are issues that, as we set forth in our

21   papers, have already been closely scrutinized by multiple

22   parties, are still being closely scrutinized by multiple

23   parties.  All equityholders in this case, including the movant

24   here, had the opportunity to object to these issues at the

25   disclosure statement hearing and still retained the opportunity

1    to object to any of these issues at confirmation.

2         And again we would note, to the extent that releases

3    were brought up by Mr. Flaschen, the United States Trustee has

4    already filed an objection to the plans' nondebtor releases.

5    And that issue will be litigated -- or that issue will be

6    presented before this Court and ruled on by this Court at

7    confirmation, pursuant to the United States Trustee's

8    objection, Your Honor.

9         THE COURT:  Okay.

10        MR. HESSLER:  Thank you very much, Your Honor.

11        MR. ELKIND:  Good morning, Your Honor.  David Elkind

12   from Ropes & Gray on behalf of the official committee of

13   unsecured creditors.  Your Honor, the creditors' committee

14   opposes the motion for formation of an equity committee,

15   believes the U.S. Trustee acted properly in twice denying the

16   request, and also joins in the -- we've submitted our own

17   objection, and we also join in the objection to the motion by

18   the debtors.

19        I'm going to be brief.  I think the issues are pretty

20   clear-cut here.  The law is very clear as set forth in the

21   Williams case -- the Williams Communication case and the other

22   cases cited in our papers as well as the debtors' papers that

23   there are two fundamental threshold issues that have to be met

24   for appointment of an equity committee, and they are, number

25   one, that there is a, quote, "substantial likelihood" that

1  equityholders will receive a, quote, "meaningful distribution"

2  in the case; and second of all, that equityholders are unable

3  to represent their interests in the bankruptcy case without an

4  official committee.  Neither of these requirements is met.

5      At the outset, Q Investments offers this Court no

6  evidence whatsoever that there is any, any conceivable recovery

7  for equityholders.  They have no valuation.  They have no

8  evidence.  The fact that the company is doing well speaks

9  nothing to the fact that an overleveraged company can be doing

10  perfectly well and yet have many different tranches of bonds

11  that have zero value, let alone equity that has no equity.

12      Here, not only is there no affirmative evidence that

13  there's any conceivable recovery available for equityholders,

14  but the evidence is quite clearly to the contrary.  The debtors

15  have attached as Exhibit B, I believe it is, to their motion

16  papers the records of trading in many, many of the issues of

17  debt of the various debtor holding company entities.  I think

18  it's Exhibit B to their papers.  And just looking at that

19  Exhibit B, which was compiled on May 29, which is a relatively

20  recent snapshot of where these notes are trading, it's apparent

21  that at least ten or twelve issues of debt at the levels of

22  CCH I and Charter Communication Holding are trading anywhere

23  between half a cent on the dollar and one and a half cents on

24  the dollar.

25      So the notion here that these companies are solvent or

1  conceivably could become solvent is simply preposterous. There

2  is a market, and the market clearly shows that there is no

3  support for any claim that there is any possibility of a

4  recovery for equityholders.

5          In addition, as counsel for the debtors noted, there

6  is a proposed elimination of 8 billion dollars' worth of debt.

7  That debt is not going to be eliminated if there is value there

8  for those debtholders.

9          As to the second threshold requirement that the

10  equityholders are unable to represent their interests in the

11  bankruptcy case without an equity committee, I think that is --

12  that requirement clearly is not met for the appointment of an

13  equity committee. All of the issues that counsel identifies,

14  ably identifies, are being vetted and examined by a variety of

15  other parties, not only including the U.S. Trustee but also

16  including our committee and others', and will continue to be

17  examined and vetted at the hearing on confirmation. Counsel

18  for any equityholder which chooses to raise any of the issues

19  on its own can do so. And so neither of these threshold

20  requirements are met.

21          Wholly apart from that, even if the threshold

22  requirements could conceivably be met here, which they cannot,

23  the Court would have to consider other issues such as delay,

24  expense, the timeliness of the request, and all of those

25  factors clearly mandate overwhelmingly against appointment of

1    an equity committee.  We have a disclosure statement hearing, a

2    disclosure statement that's already been approved.  We have a

3    confirmation process that must proceed in accordance with

4    schedules proposed.  We have very significant debt service

5    expenses that are incurred by reason of delays, delays which

6    counsel now concedes will occur if there were an equity

7    committee.

8         Simply put, we think there's no basis for this motion.

9    The basic requirements haven't been met.  And even if they

10   conceivably were met, there couldn't be a more compelling case

11   against the appointment of an equity committee given the

12   circumstances of this case.  Thank you, Your Honor.

13        THE COURT:  Thank you.

14        There are other objections that I've read.  And

15   anybody who wishes to speak, who has filed an objection, is

16   free to do so now.

17        MS. MEYERS:  Good morning, Your Honor.  Diane Meyers

18   of Paul Weiss on behalf of the crossover committee.  I'm not

19   going to repeat all the arguments that have been made by

20   counsel.  I just wanted to point out just a couple of other

21   factors which I believe weigh in favor of denying the motion

22   and not appointing an equity committee in this case.

23        Not only has the disclosure statement been approved

24   and the voting deadline under the plan passed, but the deadline

25   for subscribing to the rights offering has also already passed.

So, creditors have already subscribed to the rights offering.
I think, under these circumstances, that the delay in filing
the motion to request the appointment of this committee, I
think, is just -- it's not justifiable.

And I also think, in terms of the deadlines for the
financing commitments and other commitments under the plan
support agreements, et cetera, not only the outside date of
December 15th assumes that we have confirmation sometime in the
summer, because regulatory approvals -- some of that cannot
even be sought until after confirmation. So there's a few-
month delay between confirmation and closing in order to get
the regulatory approvals, which we can't seek prior to
confirmation.

If we move off confirmation, we're talking September,
and that's probably even hopeful; we're talking about not even
having a confirmation till the end of the year, moving this
whole thing off until next year. I think that that's -- and I
don't think Mr. Flaschen's client is in any position to
renegotiate contracts that have already been signed.

And I would also just point out, in terms of the Allen
settlement, not only is the U.S. Trustee and other parties
vetting the Paul Allen settlement, although Paul Allen was a
shareholder, we don't believe that the settlement agreement is
at the expense of shareholders. It was agreed to by creditors
who would otherwise -- who have agreed to certain consideration

1    being given to Allen.  It's not at the expense of other

2    shareholders.

3            And I would also point out that it's not only

4    bondholders that are getting -- that are converting their bonds

5    into equity that are being -- the debt is being eliminated,

6    there are additional bonds at least two levels above CCH I that

7    are being eliminated and are not getting the lion's share of

8    the equity.

9            And I would also point out that the CCH I bondholders

10   who are getting the equity are also participating in the rights

11   offering and putting in 2 billion dollars into this debtor.

12   Thank you, Your Honor.

13           THE COURT:  Thank you.

14           MR. UZZI:  Your Honor, Gerard Uzzi of White & Case on

15   behalf of Law Debenture.  Your Honor, we filed a reservation of

16   rights.  I think our paper speaks for itself.  I rise solely

17   because there was a reference made to one of my partners and

18   what we might be doing in other cases.  I don't think what my

19   firm does in any other case prior to this/after this bears any

20   relevance on the issues in this case, and I would ask Your

21   Honor to give no weight to that.

22           THE COURT:  I didn't give any weight to it.

23           MR. UZZI:  Thank you, Your Honor.

24           MR. FLASCHEN:  And, Your Honor, permit me to apologize

25   to White & Case.  The reference was only -- that group has made

1    up their own decision.  They were not dictated by a less-than-

2    ten-percent convertholder what they should do.

3        I won't respond to every point.  As you said, you've

4    read the papers.  The standard that's being invoked today, that

5    this Court must find there's a likely recovery for

6    shareholders, I refer the Court to Judge Gropper's, I think,

7    correct interpretation.  This cannot be a valuation hearing.

8    That's what confirmation is for.  Were you to find today either

9    it is likely solvent or likely insolvent, that would be

10   prejudging an issue for confirmation.  As Judge Gropper said,

11   you should find whether there is a legitimate dispute, and

12   therefore a party should be given the opportunity to pursue

13   that dispute.

14       The standard that they invoke also implicitly would

15   require us, and they complain that we have not, shown up with

16   testimony.  Again, if Q Investments had paid one cent yesterday

17   and they wanted five cents tomorrow, the cost of mounting a

18   valuation fight for this hearing would be just added to the

19   penny shares.  They've already lost 14 million dollars.

20   They're already paying something to us; it's capped but they're

21   paying something.  For them to get a financial advisor to give

22   an expert opinion, who will then need to do the due diligence

23   to do the expert opinion, then will have to state an expert

24   opinion, which is an indemnity and liability issue.  Another

25   500,000 dollars, another 750,000 dollars, I don't know, just to

1    get up in front of you so we can present the evidence that they

2    say we have to present, that cannot be the standard that a

3    shareholder has to do all that in order to request the

4    appointment of a committee.

5            Objecting parties.  I noticed the U.S. Trustee's not

6    here.  I noticed the U.S. Trustee did not --

7            THE COURT:  The U.S. Trustee is here.

8            MR. FLASCHEN:  The U.S. Trustee has not stood up.  The

9    U.S. Trustee has not filed an objection.

10           THE COURT:  The U.S. Trustee --

11           MR. FLASCHEN:  Of course they oppose it.

12           THE COURT:  Excuse me.  Excuse me.  The U.S. Trustee

13   acted in a manner consistent with its responsibilities in the

14   case to consider requests for appointment of a committee and to

15   reject those requests.  In effect, the U.S. Trustee has already

16   spoken more loudly by its pre-motion conduct than anything that

17   could be said during the hearing.

18           MR. FLASCHEN:  Then I will limit the comment to the

19   fact that a one-paragraph letter saying request denied is not

20   nearly as forceful in a de novo hearing than an objection

21   setting forth the reasons for the denial.  We are still silent

22   on that, and this is a de novo hearing.

23           THE COURT:  Well, other parties-in-interest with

24   economics at stake have dedicated the resources necessary to

25   present the Court with everything the Court needs to consider

1    the question.

2         MR. FLASCHEN:  You've hit that on the head, Your

3    Honor.  And who is going to, with the economic stakes, present

4    those arguments on behalf of equityholders?  When one

5    equityholder is getting all this cash, all these notes, all

6    these shares, the others are not.

7         Question of delay.  If Your Honor's primary concern is

8    delay, we do not represent the committee, but Your Honor, I

9    imagine, would be free to say I will approve the appointment of

10   the committee on the condition that confirmation occur no later

11   than X.  And whether that date was September 15th or July 20th

12   or tomorrow, an equity committee would show up and do its best

13   job.

14        So the fact that I am being honest with you in saying

15   yeah, to put on a proper case it's going to take a little time

16   doesn't mean an equity committee couldn't show up July 20th, if

17   that was really needed.

18        The rights offering.  The time to subscribe to it has

19   closed.  I'm going to guess, it was slowly subscribed, given

20   the value of shares today, but the rights offering is based on

21   valuations from January.  I guess that's a pretty good guess.

22   I would also submit, if they opened up the rights offering to

23   shareholders -- this was not opened up to shareholders --

24   people like you would gladly subscribe for the rights at that

25   January valuation.  If they did an IPO, which has been done in

1    Chapter 11's, I think the market would pay more than what that

2    rights offering provides.

3         So, yes, yes, when they negotiated this in January,

4    was this rights offering -- was that money important?  Yes, it

5    was.  I'm not saying then they were trying to do something

6    inappropriate.  And the releases is a different issue from the

7    valuation, but we're six months later and just the stock price

8    of the peers they cite alone shows the difference.

9         So, again, if the standard is we have to show up with

10   experts, we have to pay for them, we lose.  We have not shown

11   up with experts.  We haven't spent the 500,000 dollars to do

12   that.  If the standard is Your Honor must find a likely

13   recovery for shareholders, then we can skip the confirmation

14   hearing because that's what the issue would be at confirmation

15   if equityholders pursued that issue.  If the issue is it's

16   never been done post-disclosure statement, the cases that talk

17   about that say it's because the equity committee should be

18   there in time to negotiate the plan.

19        This plan was carved in stone on February 15th, 2009,

20   six weeks before the Chapter 11 petition was filed.  So could

21   an equity committee have objected to a disclosure statement?

22   What would we object to?  As they admit, the issues we'd object

23   to, valuation recoveries are confirmation issues.

24        So we could have flagged them and they'd have said

25   okay they flagged them, that's a confirmation issue.  It was

1    not a disclosure statement issue.  Should we have shown up

2    earlier?  It would've been nice.  But I've given you two, I

3    think, pretty good motivations why Q overcame its, you know,

4    reluctance to send more money out of its own pocket because

5    first-quarter results and then the stock prices.  So, spending

6    2 million dollars or whatever it is, I don't know, I haven't

7    done an equity committee as you said.  I don't know if there'll

8    be an equity committee here; we will seek it.

9         But 20 million dollars for Paul Allen alone.  We are

10   looking at -- their own December valuations show that the

11   equity that the committee is getting is worth 2 billion

12   dollars.  If it takes an equity committee 2 million dollars to

13   challenge that valuation and if they settled okay, we'll give

14   you three billion to go away, you know, as I said, since -- Q's

15   lost a lot more than that.  That's not their motivation.  But

16   spending whatever it takes for an equity committee to challenge

17   such huge values, to challenge such fundamental releases -- as

18   you said, the U.S. Trustee doesn't need to get up.  There's

19   well-paid people here to defend their rights.  Well, where's

20   the well-paid people defending the rights on the shareholders

21   being forced to release litigation they've already commenced

22   for absolutely nothing when another shareholder is getting

23   much.  Thank you, Your Honor.

24        THE COURT:  Okay.  Anything more?

25        MR. HESSLER:  Your Honor, Steve Hessler of Kirkland &

1    Ellis on behalf of the debtors.  Three very discrete points and

2    quickly.  We understand that Q Investments does not want to pay

3    for experts to conduct an additional valuation, but that alone

4    is just not a basis for this Court to conclude that any alleged

5    improvements in cable markets overcomes the fact that the plan

6    proposes to extinguish 8 billion dollars in debt.

7            The second point, Your Honor, we've been talking about

8    the consequences of delay and the reinstatement litigation.  To

9    put a bit of a finer point on what those consequences could be

10   in this case, there have been dozens of depositions already.

11   Those depositions would potentially have to be redone or

12   reopened for the participation of an equity committee.

13   There've been hundreds of thousands of documents produced thus

14   far.  Additional document production would have to be

15   undergone.  Opening X reports in this litigation began within a

16   week; and, again, that would be delayed as well, Your Honor.

17           The third point that we just wanted to make sure we

18   did have on the record, the equity committee motion does

19   indicate Q Investments' willingness to serve on an equity

20   committee.  As we indicate in our motion, as a major holder of

21   CCI debt and equity, we do believe Q Investments has an

22   inherent conflict that would prevent it from serving on a

23   committee.  And if, in fact, the committee needed to start anew

24   on finding additional members and Q Investments couldn't, sort

25   of, marshal and pursue that effort, that would just lead to

1    additional delay in this case, Your Honor.  Thank you very

2    much.  We urge that the motion be denied.

3          THE COURT:  Okay.  Thank you.  I've listened to the

4    arguments presented, and prior to the argument I have spent

5    some time with the papers submitted both in support of the

6    proposition that an equity securityholders' committee is needed

7    and papers that have been submitted in opposition.  The

8    appointment of an equity securityholders' committee under

9    applicable precedent is the exception and not the rule.  And

10   the statutory standard which everybody recognizes is set forth

11   in Section 1102(a)(2) which reads, "On request of a party in

12   interest, the court may order the appointment of additional

13   committees of creditors or of equity security holders if

14   necessary to assure adequate representation of creditors who

15   are equity security holders."  The Williams Communications

16   case, which I'm quite familiar with, expands on this.  I'm also

17   familiar with Judge Gropper's decision last year, In re Oneida.

18   Even that case which appointed a committee recognized that it

19   was the exception and not the rule for such committees to be

20   appointed.

21          This is a fact-intensive analysis, and the facts of

22   each circumstance presented may vary.  I recognize that this

23   request is being made late in the case.  I don't take

24   particular comfort from the fact that we're talking about a

25   request being made after approval of a disclosure statement.

1  While I recognize there's no case that has been decided or, for

2  that matter, that I'm aware of, that's ever been prosecuted in

3  which the request for approval of an appointment of a committee

4  such as this has been made after the disclosure statement has

5  already been approved and creditors have been solicited, I

6  don't view that fact alone as being dispositive.  And so while

7  I considered that argument, I don't think that argument is the

8  reason to deny this motion.  There are multiple other reasons

9  to deny the motion.

10  I noted papers filed by Paul Weiss on behalf of the

11  crossover committee which referenced the Iridium v. Motorola

12  decision.  And I'll admit that I'm sufficiently familiar with

13  that case that I took note of it.  I believe that what the

14  markets are communicating as to value may not be ultimately

15  determinative as to value, but it is evidence that I can

16  consider even in the absence of experts who are presented at

17  some expense to support the motion.  For that reason, the fact

18  that this is not an evidentiary hearing is not dispositive of

19  whether or not there is sufficient equity value notionally out

20  there that may require representation.

21  As the Paul Weiss papers note, the trading value of

22  the equity in this case even today is indicative of, at best,

23  option value.  In stating that, I don't mean in any respect to

24  foreclose the opportunity of parties-in-interest to appear and

25  be heard at the time of the confirmation hearing to challenge

1    the valuations on the basis of which this plan has been

2    promulgated.  Indeed, I assume there will be a full and fair

3    opportunity at that time to test the valuation propositions

4    that support the plan.

5          The limited response and reservation of rights filed

6    by Law Debenture Trust Company of New York on behalf of the CCI

7    noteholders represented by that indenture, among other things,

8    reserves rights with respect to valuation issues to be

9    presented at confirmation.  But those papers also do more.

10   Without really taking an active position as to whether or not

11   an equity committee should be supported, those papers also make

12   clear that the interest of the noteholders at the CCI level are

13   fully congruent with the interest that would be represented by

14   an equity committee, were such a committee to be appointed.  I

15   know from my experience this week in having participated in an

16   informal discovery conference, the counsel for the indentured

17   trustee is currently involved in active discovery relating to

18   many of the very same issues that an equity committee might be

19   pursuing.  Those issues include the Paul Allen releases.

20         I'm also aware, based upon my review of the papers

21   filed by the creditors committee, that while a different

22   constituency is represented by that committee, that the

23   committee is involved in an active review on behalf of its

24   constituency of all aspects of the plan including the releases.

25   The fact that the U.S. Trustee has already filed an objection

1   in reference to those releases demonstrates that that issue

2   will be fully developed at the time of the confirmation

3   hearing.

4          Among the things stated by Mr. Flaschen at the outset

5   of his presentation was the comment that he was appearing here

6   in a somewhat unusual setting for him professionally in that he

7   has not in the past sought to obtain an order authorizing the

8   appointment of a committee of equity securityholders.  When I

9   was in practice, I did that twice, and I know firsthand that it

10  is a tough job to prevail.  My batting average was 50 percent:

11  I succeeded in one case and I failed in another.  But in the

12  case in which I succeeded, the rather wise bankruptcy judge

13  said while I'm going to hold you to a substantial contribution

14  standard for any compensation that might be awarded to counsel

15  who might appear on behalf of the committee, you can have your

16  committee but you're not going to have a guaranteed payday for

17  representing that committee.  Based upon that standard, you

18  could say that my batting average is zero.

19         The costs to the estate associated with the

20  appointment of an equity securityholders' committee go beyond

21  that of mere expense, assuming that this were a committee that

22  would be entitled to seek compensation as the administrative

23  expense claim, although there's no assurance that if a

24  committee were appointed it would be represented by Bracewell

25  and Giuliani.  The comments made by counsel I view as candid

1    and compelling, but compelling in the direction of not

2    appointing the committee, to the extent that the appointment of

3    an equity securityholders' committee in this case, at this

4    point in the plan confirmation process, necessarily involves a

5    delay in confirmation of not less than sixty days.

6         And while nobody said it, it's probably likely that

7    there would be more than sixty days.  In a situation in which

8    the plan support agreements, by their terms, blow up at the

9    150-day mark of the case suggests to me that to appoint an

10   equity securityholders' committee, under these circumstances,

11   not only to fails to meet the standard that I announced at the

12   outset as set forth in section 1102(a)(2) inasmuch as it is not

13   necessary to assure adequate representation, but it also

14   represents an unnecessary threat to the viability of the plan

15   process itself.

16        I believe also that Mr. Flaschen in his opening

17   remarks, when he commented that he was submitting this motion,

18   and I wrote this down, quote, "without evidence to back up what

19   he was pressing for", mainly the proposition that there was

20   value in equity, largely based upon the perception of his

21   client that this industry sector had markedly improved since

22   the plan was negotiated, represents the kind of perception

23   that, while it may be true, is hardly evidence.  And it's also

24   a perception that does not do anything to prove the proposition

25   that there is any value in the equity.

1          Because there is no support for the proposition that

2     this company is anything other than hopelessly insolvent at the

3     equity level, and there is no support for the proposition that

4     the issues that might be vetted by a committee are not

5     currently being adequately addressed by others, the motion is

6     denied.

7          Now, what's happening in respect to the class action?

8          MR. HESSLER:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. MCKANE:  All right.  Your Honor, I'll allow

11     plaintiff's counsel to step forward if necessary, but what I

12     believe that I can represent is that we have reached at least

13     an agreement in principle as to language but that both sides

14     wanted to check with some of the counsel who would be

15     litigating the underlying matter and that we'll be submitting a

16     stipulation to you, if not today, very shortly.

17          THE COURT:  Fine.

18          MR. MCKANE:  Thank you.

19          THE COURT:  So we'll take it off calendar subject to

20     your working out final language.

21          MR. MCKANE:  That's right.  We'll submit a new motion

22     to approve a stipulation once the language has been buttoned

23     down, if necessary.

24          THE COURT:  Well, can't we just approve the

25     stipulation and be done with it?

1    MR. MCKANE:  I would like to.

2        THE COURT:  I mean -- to have to file yet another

3    motion in reference to what is really intended to be a pass-

4    through treatment --

5        MR. MCKANE:  We'll file a stip.  We apologize, Your

6    Honor.

7        THE COURT:  Fine.  Let's just do that.

8        MR. MCKANE: All right.  Thank you.

9        THE COURT:  I'm just trying to save trees.

10       MR. MCKANE:  Understood.  Thank you, Your Honor.

11       MR. HESSLER:  Thank you, Your Honor.

12       THE COURT:  Is there anything more?

13       MR. MCKANE:  No, Your Honor.

14       THE COURT:  Fine.  See you all next time.  We're

15   adjourned.

16     (Proceedings concluded at 11:12 AM)

17

18

19

20

21

22

23

24

25

1

2                           I N D E X

3

4                         R U L I N G S

5   DESCRIPTION                              PAGE      LINE

6   Debtors' motion for entry of an order       9         4

7   extending time to file notices of removal

8   of actions, granted

9

10  Motion for relief from stay for limited     9        22

11  purpose of liquidating claim, granted

12

13  Motion of Q Investments for order          53         6

14  directing the appointment of an official

15  committee of equity securityholders, denied

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Clara Rubin, certify that the foregoing transcript is a true

and accurate record of the proceedings.

_____

CLARA RUBIN

AAERT Certified Electronic Transcriber (CET**D-491)


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  June 18, 2009