FILED UNDER SEAL AND SUBJECT TO THE
CONFIDENTIALITY AGREEMENT AND
STIPULATED PROTECTIVE ORDER

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip S. Kaufman
Jeffrey S. Trachtman
Joel M. Taylor
Gordon Z. Novod
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for the First Lien Lender Group

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
In re                                              : Chapter 11
                                                   :
CHARTER COMMUNICATIONS, INC., et al.,              : Case No. 09-11435(JMP)
                                                   :
                           Debtors.                : (Jointly Administered)
                                                   :
                                                   :
---------------------------------------------------------------- x

# MEMORANDUM OF LAW OF THE FIRST LIEN LENDER GROUP IN OPPOSITION TO CONFIRMATION OF DEBTORS' JOINT PLAN OF REORGANIZATION AND JOINDER TO THE OBJECTION FILED BY JPMORGAN CHASE BANK N.A. AS FIRST LIEN AGENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ........................................................................................................................ 4

    I.      The First Lien Credit Agreement Claims Are Impaired Under
           Section 1124(1) of the Bankruptcy Code ........................................................ 4

          A.     The Plan Creates an Event of Default Under Section 8(k)(ii)
                of the First Lien Credit Agreement. ..................................................... 6

          B.     The Debtors Have Defaulted Under Section 10.5 of the
                First Lien Credit Agreement. ............................................................. 12

RESERVATION OF RIGHTS ........................................................................................... 13

CONCLUSION ................................................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

*Alumax, Inc. v. Commissioner,*
   165 F.3d 822 (11th Cir. 1999) ................................................................................................ 9

*American International Group, Inc. v. Greenberg,*
   965 A.2d 763 (Del. Ch. 2009) .............................................................................................. 10

*In re Appraisal of Metromedia Int'l Group, Inc.,*
   No. 3351-CC, 2009 Del. Ch. LEXIS 92 (Del. Ch. May 28, 2009) ................................... 7-8

*In re Barrington Oaks Gen. P'ship,*
   15 B.R. 952 (Bankr. D. Utah 1981) ....................................................................................... 7

*In re Dairy Mart Convenience Stores, No. C.A. 14713,*
   1999 WL 350473 (Del. Ch. May 24, 1999) ......................................................................... 11

*Di Pierre v. Taddeo (In re Taddeo),*
   685 F.2d 24 (2d Cir. 1982) ..................................................................................................... 6

*Downtown Athletic Club of New York City, Inc. v. Caspi Dev. Corp.*
*(In re Downtown Athletic Club of New York City, Inc.),*
   No. 98B 41419 JLG,, 1998 WL 898226 (Bankr. S.D.N.Y. Dec. 21, 1998) ........................... 6

*In re Elijah,*
   41 B.R. 348 (Bankr. W.D. Mo. 1984) .................................................................................... 6

*FCS Advisors, Inc. v. Fair Finance Co.,*
   No. 07 Civ. 6456 (DC), 2009 WL 1403869, *amended,*
   No. 07 Civ. 6456 (DC), 2009 WL 1616518 (S.D.N.Y. June 9, 2009) ................................. 12

*Hermes Consol., Inc. v. United States,*
   14 Cl. Ct. 398 (Cl. Ct. 1998) ........................................................................................... 11-12

*Int'l Ins. Co. v. Johns,*
   685 F. Supp. 1230 (S.D. Fla. 1988), *aff'd,*
   874 F.2d 1447 (11th Cir. 1989) .............................................................................................. 7

*Law Debenture Trust Co. of New York v. Petrohawk Energy Corp.,*
   No. Civ. A 2422-VCS, 2007 WL 2248150 (Del. Ch. Aug. 1, 2007) ..................................... 8

*McMullin v. Beran,*
   765 A.2d 910 (Del. 2000) .................................................................................................... 12

*Ronnen Ajax Electric Motor Corp.*,
   88 N.Y.2d 582 (1996) ........................................................................................... 12

*Savin Business Machines Corp. v. Rapifax Corp.*,
   No. 5331, 1978 WL 2498 (Del. Ch. 1978) ........................................................... 11

*In re Smith*,
   123 B.R. 863 (Bankr. C.D. Cal. 1991) ................................................................... 7

*Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*,
   324 F.3d 197 (3d Cir. 2003) ................................................................................... 6

*Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*,
   92 B.R. 38 (S.D.N.Y. 1988) ................................................................................... 7

*In re Woodbrook Assocs.*,
   19 F.3d 312 (7th Cir. 1994) .................................................................................... 7

## STATUTES & RULES

8 Del. Code § 141(a) ..................................................................................................... 10

11 U.S.C. § 1124(1) ........................................................................................................ 6

11 U.S.C § 1124(a) ......................................................................................................... 6

Del. Gen. Corp. Law § 242 ........................................................................................... 12

Del. Gen. Corp. Law § 251 ........................................................................................... 12

Del. Gen. Corp. Law § 271 ........................................................................................... 12

Del. Gen. Corp. Law § 275 ........................................................................................... 12

## MISCELLANEOUS

Harvey I. Seferstein, Barbara Arnold & George S. Cary, "Hart-Scott Rodino Act
   Compliance & Enforcement: Recent Developments", Practicing Law Institute,
   Dec. 1, 1987 .......................................................................................................... 11

Jennifer Arlen & Eric Talley, *Unregulable Defenses and the Perils of Shareholder
   Choice*, 152 U. Pa. L. Rev., 577 (Dec. 2003) ........................................................ 7

Jeffrey T. Sheffield & Christian E. Kimball, "Tax Strategies for Corporate Acquisitions, Dispositions, Spin-Offs, Joint Ventures, Financings, Reorganizations & Restructurings 2008," Practicing Law Institute, Oct-Dec. 2008 ............................................. 11

*Handbook of Loan Syndication & Trading* (Allison Taylor & Alicia Sansone, eds. McGraw-Hill 2007) ............................................................................. 7

KL3 2728238.9

The First Lien Lender Group,[1] by and through its undersigned counsel, respectfully submits this memorandum of law in support of its objection to confirmation of the Joint Plan of Reorganization (the "Plan") of Charter Communications, Inc. ("CCI") and its debtor affiliates (together the "Debtors" or "Charter").

## PRELIMINARY STATEMENT

The First Lien Lender Group hereby joins the confirmation objection submitted by JPMorgan Chase Bank N.A., as administrative agent under the First Lien Credit Agreement, and adopts both the fact presentation and each of the grounds set forth in the memorandum of law submitted in support of that objection (the "JPMorgan Brief").[2]

The Plan effects a total change of control of Charter as both a business matter and under the applicable terms of the governing agreements. Lenders and bondholders funded a company controlled by Paul Allen, but the Plan effectuates a leveraged buyout through which Charter will be acquired and subsequently controlled by a group of private equity funds: Apollo, Oaktree, Crestview, and Franklin (together, the "Takeover Group"). According to the Debtors, under the Plan those entities are to receive equity distributions representing more than a      equity interest and a      "voting interest" in Charter. This transaction effectuates a change of control under any meaningful definition of that term.

Even if the Court were to find that the "group" acting jointly to acquire and control Charter is limited to Apollo, Oaktree, and Crestview (the "Apollo Group"), this core group itself will acquire more than 35% of the "ordinary voting power for the management of the

---

[1] The First Lien Lender Group is comprised of 29 unaffiliated lenders holding $1,939,324,828.04 of loans under the First Lien Credit Agreement listed in the Amended Verified Statement of Kramer Levin Naftalis & Frankel LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, Dkt. No. 591.

[2] Terms not defined herein have the meanings assigned in the JPMorgan Brief.

Borrower" under the Plan, thereby creating an Event of Default under Section 8(k)(ii). This memorandum elaborates on this particular ground for finding a change of control.

There can be no serious dispute that the members of the Apollo Group are acting as a "group" to take over Charter and control it after emerging from bankruptcy; the overwhelming evidence of this joint action (and efforts to cover it up) clearly emerged in the documents and deposition testimony obtained in discovery and is summarized in the JPMorgan Brief. That is why these parties and their sophisticated legal team structured the distribution of rights under the Plan to entitle them to purchase               of the overall voting stock of CCI, creating the impression of compliance with Section 8(k)(ii).

But this impression is illusory, because under the Charter Plan all stock is not created equal. Instead, 65% of the common stock is denominated as new CCI Class A shares, to be owned by the former bondholders and empowered to act as a class to elect seven of eleven CCI directors, and the other 35% is to be issued as Class B shares, owned by Mr. Allen, and empowered to elect the remaining four directors. This clever construct permits the Apollo Group to acquire              the only stock that matters in asserting control over Charter – the Class A shares. The Apollo Group would thereby assume complete actual control of Charter – without which these sophisticated parties obviously would not invest           in a leveraged buyout – while claiming to "control"            of the total common stock.

This gambit fails because the Credit Agreement does not tie change of control to a percentage of voting stock ownership (as does, for example, the Third Lien Credit Agreement). Instead, Section 8(k)(ii) is triggered by a person or group having the power to vote securities having more than 35% of the "ordinary voting power for the management of the Borrower." It

appears that the Debtors have erroneously construed that phrase to be equivalent to a percentage-of-voting-stock threshold, which is plainly wrong. "Voting power for the management" of a company is exercised through the election of directors. Where, as here, one class of stock has the sole power to elect seven of eleven directors (or 64% of the board), ownership of

that class of stock obviously exceeds 35% "of the ordinary voting power for the management of the Borrower."

We demonstrate below that the Debtors' reading of Section 8(k)(ii) containing a percentage-of-voting-stock threshold is inconsistent with the plain language of the contract and offends basic principles of Delaware corporate law. The proposed Plan will vest control of more than 35% of the Charter board in the Apollo Group, creating an Event of Default under Section 8(k)(ii) that precludes reinstatement of the First Lien Credit Agreement and bars the Plan's confirmation.

The Debtors had the chance to negotiate a fully consensual plan by reaching an appropriate accommodation with their bank lenders, as they did with every other major constituency, but chose to completely freeze the banks out of the plan negotiation process. Their "all or nothing" strategy in the face of an unambiguous Event of Default is a cynical roll of the dice, gambling on the momentum of the confirmation process to persuade the Court to ignore the reality of the transaction and the obvious impairment of the banks' rights to enforce their change of control covenants and other Credit Agreement defaults. If the Debtors are not prepared to honor their contractual obligations, they should go back to the drawing board and start fresh with a new plan. This is a healthy company with many options. Reinstating the First Lien Credit Agreement while transferring control of the company to new owners is not, however, one of them.

## ARGUMENT

### I. The First Lien Credit Agreement Claims Are Impaired Under Section 1124(1) of the Bankruptcy Code.

Although the Plan purports (at 39) to reinstate and render unimpaired the First Lien Credit Agreement claims, it will in fact create an Event of Default by effectuating transactions that will result in a change of control under Section 8(k)(ii) of the Credit Agreement. The First Lien Credit Agreement claims are thus impaired as a matter of law.

Under Section 1124(1) of the Bankruptcy Code, a class of claims is "impaired" "unless, with respect to each claim or interest of such class, the plan . . . leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Impairment is defined "in the broadest possible terms," *Di Pierre v. Taddeo (In re Taddeo)*, 685 F.2d 24, 28 (2d Cir. 1982), to maximize creditor participation in the confirmation process, *see In re Elijah*, 41 B.R. 348, 351 (Bankr. W.D. Mo. 1984). Indeed, the Bankruptcy Code "creates a presumption of impairment so as to enable a creditor to vote on acceptance of the plan." *Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.)*, 324 F.3d 197, 203 (3d Cir. 2003) (quotation and citations omitted). As this Court has emphasized, because Section 1124(a) "focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment." *Downtown Athletic Club of New York City, Inc. v. Caspi Dev. Corp. (In re Downtown Athletic Club of New York City, Inc.)*, No. 98B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998). Among other things, it has been recognized that the sale of mortgaged property to a new obligor alters the lending bank's rights under its loan documents

and constitutes impairment. *See In re Barrington Oaks Gen. P'ship*, 15 B.R. 952, 956 (Bankr. D. Utah 1981).[3]

Here, the Plan materially impairs the rights of the First Lien Lenders. Section 8(k) is a negotiated term of the contract protecting the lenders' commercial expectations. Change of control provisions are standard in financing agreements, and serve the "important, legitimate . . . purpose of protecting third-party interests." Jennifer Arlen & Eric Talley, *Unregulable Defenses and the Perils of Shareholder Choice*, 152 U. PA. L. REV., 577, 615 (Dec. 2003). They derive from "the fundamental principle that a lender wants to 'know its customer,' including who ultimately controls that customer." THE HANDBOOK OF LOAN SYNDICATIONS & TRADING 258 (Allison Taylor and Alicia Sansone, eds., McGraw-Hill 2007). In light of their importance, change of control provisions are routinely enforced by the courts in a variety of different contexts. *See e.g. Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 92 B.R. 38, 53 (S.D.N.Y. 1988) (change of control clause "was part of the bargained-for consideration" and court could not "simply excise that provision and expect that the agreement resting upon it will not fall"); *Int'l Ins. Co. v. Johns*, 685 F. Supp. 1230, 1238-39 (S.D. Fla. 1988) (upholding change-of-control clause in executive compensation contracts even where executives were not harmed by change of control), *aff'd*, 874 F.2d 1447 (11th Cir. 1989); *Lillis v. AT&T Corp.*, 904 A.2d 325, 333-34 (Del. Ch. 2006) (upholding change-of-control provisions ensuring indemnification to plaintiff ex-directors); *In re Appraisal of Metromedia Int'l Group, Inc.*, No.

---

[3] *See also In re Woodbrook Assocs.*, 19 F.3d 312, 321 n.10 (7th Cir. 1994) ("A class is impaired if there is 'any alteration of a creditor's rights, no matter how minor.'") (citing *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 130 (8th Cir. 1993)); *In re Smith*, 123 B.R. 863, 866 (Bankr. C.D. Cal. 1991) ("[T]he great weight of authority and reason lead me to the conclusion that if a plan alters *any* of a claimant's rights *in any respect*, a plan does not leave that claim 'unimpaired.'") (emphasis in original).

3351-CC, 2009 Del. Ch. LEXIS 92 at *2-4 (Del. Ch. May 28, 2008) (enforcing the change-of-control provisions of a certificate of designation governing preferred shares).

Borrowers are entitled to structure transactions to avoid triggering a change of control provision, but the resulting transaction must actually preserve the bargained-for substantive rights of the potentially affected parties. In *Law Debenture Trust Co. of New York v. Petrohawk Energy Corp.*, No. Civ. A 2422-VCS, 2007 WL 2248150 (Del. Ch. Aug. 1, 2007), the court found that no change of control had actually occurred because the substantive provisions requiring continuity in stockholders and directors had been honored. The court rejected challenges based on "entirely technical" arguments about corporate procedural irregularities that had "no substantive or equitable basis" and did not implicate rights that the objecting noteholders even had standing to enforce. *See id.* at *11. Here, in contrast, there clearly is a change in control, and the objections of the First Lien Lenders are based not on the failure to observe corporate niceties but on the substantive reality that the Plan would shift complete control from Mr. Allen to the Apollo Group in violation of Section 8(k)(ii). It is the Debtors that are engaging in hyper-technical arguments in an unsuccessful effort to create fig leaf compliance with the Credit Agreement, while gutting the lenders' substantive rights by vesting all meaningful voting power in the class of stock that will be dominated by the acquiring investors.

A. **The Plan Creates an Event of Default Under Section 8(k)(ii) of the First Lien Credit Agreement.**

Section 8(k)(ii) defines as an Event of Default "the consummation of any transaction . . . the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% . . . of the ordinary voting power for the management of the

Borrower." (Exh. 1 at § 8(k)(ii).)[4] The Debtors have attempted to structure around Section 8(k)(ii) by limiting the amount of equity distributed to members of the Apollo Group to less than 35% of the reorganized company's total voting stock. Their strategy fails for at least two reasons.

First, as set forth in the JPMorgan Brief, the actual controlling "group" includes Franklin and thus controls more than 35% of the voting power even measured as a percentage of all voting stock of CCI.

Second, as we explain further herein, the Debtors have misconstrued Section 8(k)(ii), causing them incorrectly to calculate the "voting power" attributable to the shares of new Class A Common Stock to be distributed to the Apollo Group under the Plan. Their method of calculation fails to account for the fact that

the "ordinary voting power for the management of the Borrower."

Voting power can be assessed only in reference to that over which the vote has power. *See Alumax, Inc. v. Commissioner*, 165 F.3d 822, 824 (11th Cir. 1999) (phrase "80 percent of the voting power" has no plain meaning because it "does not answer the question 'Power to do what?'"; "historical judicial and IRS interpretation is that voting power means the power to control the corporation's business through the election of the board of directors"). Section 8(k)(ii) defines the relevant voting power as "the ordinary voting power for the management of the Borrower," which the Debtors contend refers to CCI. CCI is managed by its

---

[4] References to "Exh." are to the Exhibits to the Declaration of Joel M. Taylor in Support of Memorandum of Law of the First Lien Lender Group in Opposition to Confirmation of Debtors' Joint Plan of Reorganization and Joinder to the Objection Filed by JPMorgan Chase Bank, N.A., as First Lien Agent.

Board of Directors.[5] Read in that context, the phrase "ordinary voting power for the management of the Borrower" clearly refers to "voting power" exercisable in the election of CCI's Board of Directors.

Under the Plan, the power to elect directors is vested in two classes of stock, voting as blocs. Class A Common Stock, to be issued to the holders of CCH I Notes, has the power voting together as a separate class to elect seven of eleven directors, or 64% of the Board. *See* Amended and Restated Articles of Incorporation of Charter Communications, Inc. ("New CCI Certificate of Incorporation"), Article Fourth, Clause (b)(i)(B)(1) & (2) (Exh. 4); Debtors' Disclosure Statement, 57 (Exh. 5). Class B Common Stock, to be issued to Paul Allen, is empowered to elect four directors. *Id.*[6]

The mechanisms carefully created and put into place to ensure that the Apollo Group will control CCI's board confirm that the meaningful measure of "ordinary voting power

---

[5] CCI's New Bylaws contain identical language. (Exh. 3 at Article III, Section 3.1.) "It is well settled that stockholders of a corporation subject to the [Delaware General Corporations Law] may not directly manage the business affairs of the corporation, at least without specific authorization in either the statute or the certificate of incorporation." *American International Group, Inc. v. Greenberg*, 965 A.2d 763, 808 (Del. Ch. 2009). *See also* 8 Del. Code § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[6] These provisions will govern appointments after the first year of operation of the reorganized company. The Plan provides for the Apollo Group effectively to control the initial board of directors because each projected 10% holder will be entitled to one board seat each, Paul Allen will appoint four directors, current Charter CEO Neil Smit will take one seat, and the remaining three seats will be filled by the Class A shareholders either directly or through a majority vote of the three Class A-appointed directors ; New CCI Certificate of Incorporation at Article Fourth, Clause (b)(i)(B)(3) (Exh. 4).

for the management of the Borrower" is the power to elect directors. It is not surprising that the distribution of effective voting power relates much more closely to the parties' respective *economic* interests than to the misleading percentages derived from treating all common stock as equally important and powerful. In fact, Mr. Allen will have virtually no remaining economic interest, and his complete inability to direct the affairs of either CCO or CCI is consistent with that reality. The company will be run by the parties that are buying it.

Courts have recognized that the relevant measure of shareholder voting power is the power to appoint directors. *See Savin Business Machines Corp. v. Rapifax Corp.*, No. 5331, 1978 WL 2498, at *581 (Del. Ch. Feb. 15, 1978) (shareholders' relative "voting power" is reflected in their ability to elect directors of classified board); *In re Dairy Mart Convenience Stores*, No. C.A. 14713, 1999 WL 350473, at *14 (Del. Ch. May 24, 1999) (collapsing Class A stock electing 5 directors into Class B stock electing 2 directors would dilute the voting power of the Class A shareholders).[7] Those opinions are consistent with the hornbook principle that "[v]oting power is not merely the holding of voting stock shares. Rather, the ultimate expression of voting power is the ability to approve or disapprove of fundamental changes in the corporate structure, and the ability to elect the corporations' board of directors." *Hermes Consol., Inc. v. United States*, 14 Cl. Ct. 398, 405 (Cl. Ct. 1988) (quoting, L. Solomon, R. Stevenson, Jr. & D. Schwartz, Corporations Law and Policy ch. 3, at 26 (1982))

---

[7] A number of federal agencies charged with administering statutes that contain voting power thresholds have developed methods of calculating voting power where a company has more than one class of stock with unequal voting rights. *See* Jeffrey T. Sheffield & Christian E. Kimball, "Tax Strategies for Corporate Acquisitions, Dispositions, Spin-Offs, Joint Ventures, Financings, Reorganizations & Restructurings 2008," Practicing Law Institute, October-December 2008, at 71 (where corporation has multiple classes of stock with unequal voting power for election of directors shareholder's "voting power" is calculated under Internal Revenue Code as the percentage of directors a shareholder has the ability to elect); Harvey I. Saferstein, Barbara Arnold & George S. Cary, "Hart-Scott-Rodino Act Compliance and Enforcement: Recent Developments", Practicing Law Institute, December 1, 1987, at 26-27 (under pre-merger notification rules where corporation has multiple classes of stock with unequal voting rights for election of directors the percentage of "voting securities" owned or to be owned by a shareholder is calculated as sum the of the percentage of each class of stock held by shareholder multiplied by the number of directors electable by each class).

Redacted Pursuant to April 6, 2009
Confidentiality Agreement and
Stipulated Protective Order.

The Debtors' interpretation of Section 8(k)(ii) yields the absurd result that _____ of the "ordinary voting power for the management of the Borrower," though _____ of CCI's board of directors. That outcome does not reflect a commercially reasonable interpretation of the contract grounded in the actual meaning or purpose of the provision. *See FCS Advisors, Inc. v. Fair Finance Co.*, No. 07 Civ. 6456 (DC), 2009 WL 1403869, at *6 (S.D.N.Y. May 19, 2009) ("A court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'") (citation omitted) *amended* No. 07 Civ. 6456 (DC), 2009 WL 1616518 (S.D.N.Y. June 9, 2009).

Implicit in the Debtors' method of calculating voting power is an assumption that a company's stock has direct "voting power for the management" of that company, which is true under Delaware corporate law only in extraordinary circumstances involving fundamental corporate changes. *See, e.g.*, Del. Gen. Corp. Law § 242 (charter amendment); § 251 (merger); § 271 (sale of assets); § 275 (dissolution)). That assumption is inconsistent with the clear intent of the contract, which expressly provides that it is the "*ordinary* voting power for the management of the Borrower" that is to be assessed (emphasis added). It is also inconsistent with one of the fundamental principles of Delaware General Corporation Law, that the business affairs of a corporation are managed by or under the directors of its board of directors. *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000). Under New York law, it is "presumed that the parties had such law in contemplation when the contract was made and the law will be construed in light of such law." *Ronnen Ajax Electric Motor Corp.*, 88 N.Y.2d 582, 589 (1996) (principle that business is exclusively under direction of its board of directors presumed to have been contemplated by parties for purposes of interpreting voting agreement) (citation and quotation marks omitted).

The Debtors' misconception of "voting power" also renders irrelevant the so-called "Savings Clause" contained in the New CCI Certificate of Incorporation. In general terms, Article FOURTH, Clause (b)(i)(A)(1) of the Certificate purports automatically to dilute the votes attributable to shares of stock owned by any person or group to no "more than 34.9% of the combined voting power of the capital stock of the Corporation." It states in relevant part:

> ... the votes attributable to each share of Class A Common Stock held by any holder (other than an Authorized Class B Holder, as defined in Clause (b)(viii)(B) of this Article FOURTH) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder (other than an Authorized Class B Holder) included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) with such holder, so that no "person" or "group" (other than an Authorized Class B Holder) is or becomes the holder, directly or indirectly, or more than *34.9% of the combined voting power of the capital stock of the Corporation.*

(Exh. 4) (emphasis added).

Assuming that the Savings Clause is applicable when Class A Common Stock is voted separately as a class,[8] it would in no way diminish the Apollo Group's voting power for the election of directors. Under the Plan the Apollo Group will only receive             of the "combined voting power of the capital stock of the Corporation," but that translates into             of Class A stock, which is sufficient to empower it to elect a majority of CCI's board of directors.

In short, the Apollo Group controls             the actual "ordinary voting power for the management of the Borrower," because its Class A holdings give it the power             to completely control the reorganized

---

8

company. This constitutes a change in control, breaching Section 8(k)(ii) of the Credit Agreement and rendering the First Lien Lenders impaired.

### B. The Debtors Have Defaulted Under Section 10.5 of the First Lien Credit Agreement.

Despite paying the costs and expenses incurred by the First Lien Lender Group through February 28, 2009, the Debtors have determined that they are no longer willing to reimburse the Group's further costs and expenses in connection with the enforcement and protection of its rights in these chapter 11 cases. The Debtors' refusal to pay such costs and expenses constitutes an additional default under the First Lien Credit Agreement.

Under section 10.5 of the First Lien Credit Agreement, CCO is obligated to pay or reimburse certain costs and expenses of the Lenders. Section 10.5 provides, in relevant part:

> [CCO] agrees . . . (b) *to pay or reimburse each Lender* and each Agent *for all its costs and expenses incurred in connection with the enforcement or preservation of any rights, privileges, powers or remedies under this Agreement*, the other Loan Documents and any such other documents, *including the fees and disbursements of* one firm of counsel selected by the Administrative Agent, together with any special or local counsel, to the Administrative Agent and not more than *one other firm of counsel to the Lenders*[.]

First Lien Credit Agreement § 10.5 (emphasis added) (Exh. 1). Kramer Levin Naftalis & Frankel LLP, the undersigned counsel, qualifies as that "one other firm of counsel to the Lenders" eligible for reimbursement under section 10.5. However, the Debtors have failed to satisfy that obligation to reimburse Kramer Levin under section 10.5 despite their receipt of regular invoices from Kramer Levin. At the outset of these chapter 11 cases, the Debtors expressed concern that another group of lenders might also retain counsel to represent them in these cases. That fear has by now proven to be baseless. With the exception of the agent's counsel, no other firm has appeared in these cases on behalf of any of the lenders.

- 12 -

The Debtors' refusal to the First Lien Lender Group's costs and expenses constitutes an ongoing default under the First Lien Credit Agreement. The failure to cure represents an independent event of default and precludes reinstatement of the First Lien Credit Agreement.

## RESERVATION OF RIGHTS

The First Lien Lender Group reserves all rights to object to confirmation of the Plan on any grounds whatsoever, regardless of whether such grounds are addressed herein. The First Lien Lender Group also reserves its right to assert the existence of any defaults under the First Lien Credit Agreement that preclude reinstatement, regardless of whether such defaults are addressed herein.

## CONCLUSION

For the foregoing reasons and those included in the JPMorgan Brief, confirmation of the Plan must be denied absent a settlement leading to acceptance of the Plan by two-thirds of the First Lien Lenders or the Debtors' satisfaction of section 1129(b) of the Bankruptcy Code with respect to the lenders' treatment.

Dated: New York, New York
July 14, 2009

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip S. Kaufman
Jeffrey S. Trachtman
Joel M. Taylor
Gordon Z. Novod

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for the First Lien Lender Group*