Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and Debtors in Possession
(Other than Charter Investment, Inc.)

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:    (212) 594-5000
Facsimile:    (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**NOTICE OF EXHIBITS 23 AND 25,**
**AND AMENDED AND RESTATED EXHIBITS 3 AND 24 TO**
**THE SUPPLEMENT TO DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[1] hereby file the attached **Exhibits 23[2] and 25**, and the amended and restated **Exhibits 3 and 24** to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code filed on March 27, 2009 [Docket No. 37].

---

[1]   The Debtors in these cases include:  Ausable Cable TV, Inc.; Hometown TV, Inc.; Plattsburgh Cablevision, Inc.; Charter Communications Entertainment I, LLC; Falcon First Cable of New York, Inc.; Charter Communications, Inc.; Charter Communications Holding Company, LLC; CCHC, LLC; Charter Communications Holdings, LLC; CCH I Holdings, LLC; CCH I, LLC; CCH II, LLC; CCO Holdings, LLC; Charter Communications Operating, LLC; American Cable Entertainment Company, LLC; Athens Cablevision, Inc.; Cable Equities Colorado, LLC; Cable Equities of Colorado Management Corp.; CC 10, LLC; CC Fiberlink, LLC; CC Michigan, LLC; CC Systems, LLC; CC V Holdings, LLC; CC VI Fiberlink, LLC; CC VI Operating, LLC; CC VII Fiberlink, LLC; CC VIII Fiberlink, LLC; CC VIII Holdings, LLC; CC VIII Leasing of Wisconsin, LLC; CC VIII Operating, LLC; CC VIII, LLC; CCH I Capital Corp.; CCH I Holdings Capital Corp.; CCH II Capital Corp.; CCO Fiberlink, LLC; CCO Holdings Capital Corp.; CCO NR Holdings, LLC; CCO Purchasing, LLC; Charter Advertising of Saint Louis, LLC; Charter Cable Leasing of Wisconsin, LLC; Charter Cable Operating Company, L.L.C.; Charter Cable Partners, L.L.C.; Charter Communications Entertainment, LLC; Charter Communications Entertainment I, DST; Charter Communications Entertainment II, LLC; Charter Communications Holdings Capital Corporation; Charter Communications Operating Capital Corp.; Charter Communications Properties LLC; Charter Communications V, LLC; Charter Communications Ventures, LLC; Charter Communications VI, LLC; Charter Communications VII, LLC; Charter Communications, LLC; Charter Distribution, LLC; Charter Fiberlink – Alabama, LLC; Charter Fiberlink AR-CCVII, LLC; Charter Fiberlink AZ-CCVII, LLC; Charter Fiberlink CA-CCO, LLC; Charter Fiberlink CA-CCVII, LLC; Charter Fiberlink CC VIII, LLC; Charter Fiberlink CCO, LLC; Charter Fiberlink CT-CCO, LLC; Charter Fiberlink – Georgia, LLC; Charter Fiberlink ID-CCVII, LLC; Charter Fiberlink – Illinois, LLC; Charter Fiberlink IN-CCO, LLC; Charter Fiberlink KS-CCO, LLC; Charter Fiberlink LA-CCO, LLC; Charter Fiberlink MA-CCO, LLC; Charter Fiberlink – Michigan, LLC; Charter Fiberlink – Missouri, LLC; Charter Fiberlink MS-CCVI, LLC; Charter Fiberlink NC-CCO, LLC; Charter Fiberlink NC-CCVII, LLC; Charter Fiberlink – Nebraska, LLC; Charter Fiberlink NH-CCO, LLC; Charter Fiberlink NM-CCO, LLC; Charter Fiberlink NV-CCVII, LLC; Charter Fiberlink NY-CCO, LLC; Charter Fiberlink NY-CCVII, LLC; Charter Fiberlink OH-CCO, LLC; Charter Fiberlink OK-CCVII, LLC; Charter Fiberlink OR-CCVII, LLC; Charter Fiberlink SC-CCO, LLC; Charter Fiberlink SC-CCVII, LLC; Charter Fiberlink – Tennessee, LLC; Charter Fiberlink TX-CCO, LLC; Charter Fiberlink UT-CCVII, LLC; Charter Fiberlink VA-CCO, LLC; Charter Fiberlink VT-CCO, LLC; Charter Fiberlink WA-CCVII, LLC; Charter Fiberlink – Wisconsin, LLC; Charter Fiberlink WV-CCO, LLC; Charter Fiberlink, LLC; Charter Gateway, LLC; Charter Helicon, LLC; Charter Investment, Inc.; Charter RMG, LLC; Charter Stores FCN, LLC; Charter Video Electronics, Inc.; Dalton Cablevision, Inc.; Enstar Communications Corporation; Falcon Cable Communications, LLC; Falcon Cable Media, a California Limited Partnership; Falcon Cable Systems Company II, L.P.; Falcon Cablevision, a California Limited Partnership; Falcon Community Cable, L.P.; Falcon Community Ventures I, LP; Falcon First Cable of the Southeast, Inc.; Falcon First, Inc.; Falcon Telecable, a California Limited Partnership; Falcon Video Communications, L.P.; Helicon Partners I, L.P.; HPI Acquisition Co., L.L.C.; Interlink Communications Partners, LLC; Long Beach, LLC; Marcus Cable Associates, L.L.C.; Marcus Cable of Alabama, L.L.C.; Marcus Cable, Inc.; Midwest Cable Communications, Inc.; Pacific Microwave; Peachtree Cable TV, L.P.; Peachtree Cable T.V., LLC; Renaissance Media LLC; Rifkin Acquisition Partners, LLC; Robin Media Group, Inc.; Scottsboro TV Cable, Inc.; Tennessee, LLC; The Helicon Group, L.P.; Tioga Cable Company, Inc.; and Vista Broadband Communications, LLC.

[2]   This Exhibit contains the identity and affiliations of any individual proposed to serve as a new board member or officer of the Debtors after confirmation of the Plan.

New York, New York
Dated: July 16, 2009

/s/ *Paul M. Basta*
Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

Counsel to the Debtors
and Debtors in Possession
Other than Charter Investment, Inc.

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone: (212) 594-5000
Facsimile: (212) 967-4258

Counsel to the Debtor and Debtor in
Possession Charter Investment, Inc.

K&E 15230299.

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

   - and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Counsel to the Debtors and Debtors in Possession
(Other than Charter Investment, Inc.)

   - and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**EXHIBITS 23 AND 25, AND AMENDED AND RESTATED EXHIBITS 3 AND 24**
**TO THE SUPPLEMENT TO DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**Amended and Restated Exhibit 3**

**Amended and Restated Certificate of Incorporation, including Exhibit A to Certificate
(New Preferred Stock)**

# AMENDED AND RESTATED
## CERTIFICATE OF INCORPORATION

### OF

## CHARTER COMMUNICATIONS, INC.

The undersigned, [Name of Officer], certifies that [he/she] is the [Title of Officer] of Charter Communications, Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), and does hereby further certify as follows:

(1)     The name of the Corporation is Charter Communications, Inc. The original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on July 22, 1999.

(2)     The Corporation, Charter Investment, Inc. and certain of the Corporation's direct and indirect subsidiaries filed a joint plan of reorganization (the "Joint Plan") which, pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), was confirmed by an order, entered [•], 2009, of the United States Bankruptcy Court for the Southern District of New York, a court having jurisdiction of a proceeding under the Bankruptcy Code, and that such order provides for the making and filing of this Amended and Restated Certificate of Incorporation.

(3)     This Amended and Restated Certificate of Incorporation amends and, as amended, restates in its entirety the Certificate of Incorporation and has been duly proposed by resolutions adopted and declared advisable by the Board of Directors of the Corporation and duly executed and acknowledged by the officers of the Corporation in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware.

(4)     The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

### FIRST: NAME

The name of the corporation is Charter Communications, Inc. (the "Corporation").

### SECOND:  REGISTERED OFFICE

The registered office of the Corporation is located at 2711 Centerville Road, Suite 400, City of Wilmington, New Castle County, State of Delaware.  The name of its registered agent at such address is Corporation Service Company.

THIRD: PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware as set forth in Title 8 of the Delaware Code (the "GCL").

FOURTH: CAPITAL STOCK

(a)     AUTHORIZED CAPITAL STOCK.

(i)     The total number of shares of stock that the Corporation shall have authority to issue is [•] shares, consisting of: (1) [•] shares of Class A Common Stock, par value $.001 per share ("Class A Common Stock"); (2) [•] shares of Class B Common Stock, par value $.001 per share ("Class B Common Stock"); and (3) [•] shares of Preferred Stock, par value $.001 per share ("Preferred Stock"), issuable in one or more series as hereinafter provided, of which [•] shares of Preferred Stock will be 15% Series A Pay-In-Kind Preferred Stock on the terms set forth on <u>Exhibit A</u> attached hereto, which is incorporated herein by reference. Except as otherwise provided in this Certificate of Incorporation, Class A Common Stock and Class B Common Stock shall be identical in all respects and shall have equal rights and privileges. Class A Common Stock and Class B Common Stock are herein sometimes collectively or individually referred to as the "Common Stock."

(ii)     The number of authorized shares of Class A Common Stock or Preferred Stock may be increased or decreased (but the number of authorized shares of Class A Common Stock may not be decreased below (1) the number of shares thereof then outstanding plus (2) the number of shares of Class A Common Stock issuable upon the conversion of Class B Common Stock and the exercise of outstanding options, warrants, exchange rights, conversion rights or similar rights for Class A Common Stock plus (3) the number of shares of Class A Common Stock issuable by the Corporation upon the exchange of Membership Units pursuant to that certain Exchange Agreement, dated as of the effective date of the Joint Plan (as amended from time to time, the "Exchange Agreement"), entered into by and among the Corporation, Charter Communications Holding Company, LLC, a Delaware limited liability company ("Holdco"), Paul G. Allen ("Mr. Allen") and one or more entities controlled by Mr. Allen, and the number of authorized shares of Preferred Stock may not be decreased below the number of shares thereof then outstanding) by the affirmative vote of the holders of a majority of the voting power of the Common Stock together with any other class of capital stock of the Corporation entitled to vote generally in the election of directors irrespective of the provisions of Section 242(b)(2) of the GCL or any corresponding provision hereinafter enacted. "Membership Units" shall mean limited liability company interests in Holdco or any successor entity thereto, issued under a Limited Liability Company Agreement as amended from time to time.

(iii)     The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purposes of issuance upon conversion of the outstanding shares of Class B Common Stock and upon exchange of Membership Units pursuant to the Exchange Agreement, such number of shares of Class A Common Stock that shall be issuable (1) upon the conversion of all such outstanding shares of

2

Class B Common Stock and (2) upon the exchange of Membership Units pursuant to the Exchange Agreement; provided, however, that nothing contained herein shall be construed to preclude the Corporation from satisfying its obligations in respect of the conversion of the outstanding shares of Class B Common Stock and/or the exchange of Membership Units pursuant to the Exchange Agreement by delivery of shares of Class A Common Stock which are held in the treasury of the Corporation. All shares of Class A Common Stock issued upon conversion of shares of Class B Common Stock and/or exchange of Membership Units pursuant to the Exchange Agreement shall, upon issue, be validly issued, fully paid and non-assessable.

        (iv)    Notwithstanding anything to the contrary in this Certificate of Incorporation, the Corporation shall not issue nonvoting equity securities to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)). The prohibition on the issuance of nonvoting equity securities is included in this Certificate of Incorporation in compliance with Section 1123(a)(6) of the Bankruptcy Code (11 U.S.C. § 1123(a)(6)).

    (b)    COMMON STOCK VOTING RIGHTS AND DIRECTORS; DIVIDENDS AND DISTRIBUTIONS; SPLITS; OPTIONS; MERGERS; LIQUIDATION; PREEMPTIVE RIGHTS; CONVERSION.

        (i)    Common Stock Voting Rights and Directors.

           (A)    The holders of shares of Common Stock shall have the following voting rights and powers:

              (1)    Each holder of Class A Common Stock shall be entitled, with respect to each share of Class A Common Stock held by such holder on the applicable record date, to one (1) vote in person or by proxy on all matters submitted to a vote of the holders of Class A Common Stock, whether voting separately as a class or otherwise; provided, however, that the votes attributable to each share of Class A Common Stock held by any holder (other than an Authorized Class B Holder, as defined in Clause (b)(viii)(B) of this Article FOURTH) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder (other than an Authorized Class B Holder) included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) with such holder, so that no "person" or "group" (other than an Authorized Class B Holder) is or becomes the holder or "beneficial owner" (as such term is used in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as such term is used in Section 13(d) of the Exchange Act) such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition), directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation; provided, further that (i) a majority of the Disinterested Board Members shall have the authority (x) to determine the application of the immediately preceding proviso and make any necessary adjustments to the number of votes attributable to each share of Class A

Common Stock pursuant to such proviso, which determination and/or adjustment if made in good faith shall be conclusive and binding on the Corporation and its stockholders, and (y) to waive such proviso with respect to any "person" or "group" (a "Relevant Interested Stockholder") and (ii) in no event shall such proviso continue to be applicable from and after September 15, 2014; provided, further that for purposes of clause (i)(y) of the immediately preceding proviso, reference to an "Interested Stockholder" in the definition of Disinterested Board Members shall instead be deemed to refer to the "Relevant Interested Stockholder" to whom such waiver would apply.  For the avoidance of doubt, nothing herein shall reduce the voting rights attributable to any shares of capital stock held from time to time by any Authorized Class B Holder.

(2)     Each holder of Class B Common Stock shall be entitled, with respect to each share of Class B Common Stock held by such holder on the applicable record date, to a number of votes per share in person or by proxy on all matters submitted to a vote of the holders of Class B Common Stock, whether voting separately as a class or otherwise, such that shares of Class B Common Stock, in the aggregate, constitute at all times during which shares of Class B Common Stock are outstanding 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of the Corporation.  For purposes of this clause (2), any determination "on a fully diluted basis" shall be determined in the same manner as under the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated on March 6, 2007, among Charter Communications Operating, LLC, CCO Holdings, LLC, the several banks and other financial institutions or entities from time to time parties thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A. and Bank of America, N.A., as syndication agents, Citicorp North America, Inc., Deutsche Bank Securities Inc., General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as revolving facility co-documentation agents, and Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as term facility co-documentation agents, as the same may be amended, supplemented or modified from time to time.

(B)     The number of directors which shall constitute the whole Board of Directors shall be fixed by, or in the manner provided in, the Bylaws of the Corporation.

(1)     In all elections of directors, the holders of Class B Common Stock voting together as a separate class shall be entitled to elect thirty-five percent (35%) of the members of the Board of Directors (rounded up to the next whole number).

(2)     The holders of Class A Common Stock voting together as a separate class (or if any holders of shares of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of shares of Preferred Stock), shall be entitled to elect each other member of the Board of Directors not elected by holders of Class B Common Stock pursuant to Clause (b)(i)(B)(1) of this Article FOURTH (and except for any member of the Board of Directors elected separately by the holders of one or more series of Preferred Stock); provided, however, that at such time as all outstanding shares of Class B Common Stock

have been converted into shares of Class A Common Stock in accordance with Clause (b)(viii) of this Article FOURTH, the holders of Class A Common Stock (or if any holders of shares of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of shares of Preferred Stock) shall be entitled to elect all members of the Board of Directors (other than any member of the Board of Directors elected separately by the holders of one or more series of Preferred Stock).

(3) Any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause of a member of the Board of Directors elected by the holders of Class A Common Stock voting separately as a class (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock) or, if prior to the Company's first annual meeting of stockholders after the Effective Date, appointed by a holder of Class A Common Stock pursuant to the Joint Plan, shall be filled by majority vote of the remaining director or directors so elected or so appointed by the holders of Class A Common Stock, even if less than a quorum, or if there are no such directors or such directors fail to fill such vacancies within thirty (30) days, by the vote of the holders of Class A Common Stock, voting separately as a class (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock). Any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause of a member of the Board of Directors elected by the holders of Class B Common Stock voting separately as a class or, if prior to the Company's first annual meeting of stockholders after the Effective Date, appointed by the holders of Class B Common Stock pursuant to the Joint Plan, shall be filled by majority vote of the remaining director or directors so elected or so appointed by the holders of Class B Common Stock, even if less than a quorum, or if there are no such directors or such directors fail to fill such vacancies within thirty (30) days, by the vote of the holders of Class B Common Stock voting separately as a class; provided, however, that at such time as all outstanding shares of Class B Common Stock have been converted into shares of Class A Common Stock in accordance with Clause (b)(viii) of this Article FOURTH, any such vacancies shall be filled by majority vote of the remaining directors then in office, although less than a quorum, or by a sole remaining director, or if there are no such directors or such directors fail to fill such vacancies within thirty (30) days, by the holders of Class A Common Stock (or if any holders of shares of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, together as one class with such holders of Preferred Stock). The foregoing provisions of this Clause (b)(i)(B)(3) of this Article FOURTH shall not apply to any members of the Board of Directors elected by one or more series of Preferred Stock voting as a separate class.

(4) If the number of directors to be appointed to the initial Board of Directors pursuant to Article VI.N. of the Joint Plan yields less than eleven (11) individuals, the remaining directors on the initial Board of Directors (the "Gap Directors") shall be filled on or after the 31st day after the Effective Date by majority vote of the entire Board of Directors. If, prior to the Company's first annual meeting of

stockholders after the Effective Date, there are any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause of a Gap Director, such vacancies shall be filled by majority vote of the remaining members of the entire Board of Directors.

(C)     Except as otherwise required by applicable law, and Clauses (b)(i)(A) and (b)(i)(E) of this Article FOURTH notwithstanding, the Corporation shall not, without the prior affirmative vote of holders of at least a majority of the voting power of the outstanding Class B Common Stock voting as a separate class, amend, modify or repeal, or agree to amend, modify or repeal, in each case including by merger, consolidation or otherwise, Clauses (a)(i), (a)(ii), (a)(iii), (b)(i)(A), (b)(i)(B)(1), (b)(i)(B)(3), this (b)(i)(C), (b)(i)(D), (b)(ii), (b)(iii), (b)(v), (b)(vi) or (b)(viii) of this Article FOURTH, Clause (a) or (b) of Article FIFTH, Article SIXTH, Article EIGHTH, Article NINTH or Article TENTH.

(D)     Except as otherwise required by applicable law, and Clauses (b)(i)(A) and (b)(i)(E) of this Article FOURTH notwithstanding, the Corporation shall not, without the prior affirmative vote of holders of at least a majority of the voting power of the outstanding Class A Common Stock voting as a separate class, amend, modify or repeal, or agree to amend, modify or repeal, in each case including by merger, consolidation or otherwise, Clauses (a)(i), (a)(ii), (b)(i)(A), (b)(i)(B), (b)(i)(C), this (b)(i)(D), (b)(ii), (b)(iii), (b)(v), (b)(vi) or (b)(viii) of this Article FOURTH, Clause (a) or (c) of Article FIFTH, Article SIXTH, Article EIGHTH, Article NINTH or Article TENTH.

(E)     Except as otherwise provided in this Certificate of Incorporation (including without limitation Clauses (b)(i)(B), (b)(i)(C) and (b)(i)(D) of this Article FOURTH, Article FIFTH and Article EIGHTH of this Certificate of Incorporation) or required by applicable law, the holders of shares of Common Stock shall vote together as one class on all matters submitted to a vote of stockholders of the Corporation (or if any holders of shares of any series of Preferred Stock are entitled to vote together with the holders of Common Stock, as one class with such holders of such series of Preferred Stock).

(ii)     Dividends and Distributions.

(A)     Subject to the preferences applicable to any series of Preferred Stock outstanding at any time, the holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, property or shares of stock of the Corporation as may be declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor; provided, however, that, subject to the provisions of this Clause (b)(ii) of this Article FOURTH, the Corporation shall not pay dividends or make distributions to any holders of any class of Common Stock unless simultaneously with such dividend or distribution, as the case may be, the Corporation makes the same dividend or distribution with respect to each outstanding share of Common Stock regardless of class.

(B)     In the case of dividends or other distributions on Common Stock payable in Class A Common Stock or Class B Common Stock, including without limitation distributions pursuant to stock splits or divisions of Class A Common Stock or Class B Common

6

Stock, only shares of Class A Common Stock shall be distributed with respect to Class A Common Stock and only shares of Class B Common Stock shall be distributed with respect to Class B Common Stock. In the case of any such dividend or distribution payable in shares of Class A Common Stock or Class B Common Stock, each class of Common Stock shall receive a dividend or distribution in shares of its class of Common Stock and the number of shares of each class of Common Stock payable per share of such class of Common Stock shall be equal in number.

(iii)    Stock Splits.

The Corporation shall not in any manner subdivide (by any stock split, stock dividend, reclassification, recapitalization or otherwise) or combine (by reverse stock split, reclassification, recapitalization or otherwise) the outstanding shares of one class of Common Stock unless the outstanding shares of all classes of Common Stock shall be proportionately subdivided or combined.

(iv)    Options, Rights or Warrants.

The Corporation shall have the power to create and issue, whether or not in connection with the issue and sale of any shares of stock or other securities of the Corporation, options, exchange rights, warrants, convertible rights, and similar rights permitting the holders thereof to purchase from the Corporation any shares of its capital stock of any class or classes at the time authorized, such options, exchange rights, warrants, convertible rights and similar rights to have such terms and conditions, and to be evidenced by or in such instrument or instruments, consistent with the terms and provisions of this Certificate of Incorporation and as shall be approved by the Board of Directors.

(v)    Mergers, Consolidation, Etc.

In the event that the Corporation shall enter into any consolidation, merger, combination or other transaction (in each case other than incident to an exchange of Membership Units, Common Stock and/or other securities for Common Stock pursuant to the Exchange Agreement) in which shares of Common Stock are exchanged for or converted into other stock or securities, cash and/or any other property, then, and in such event, the shares of each class of Common Stock shall be exchanged for or converted into the same kind and amount of stock, securities, cash and/or any other property, as the case may be, into which or for which each share of any other class of Common Stock is exchanged or converted; provided, however, that if shares of Common Stock are exchanged for or converted into shares of capital stock, such shares received upon such exchange or conversion may differ, but only in a manner substantially similar to the manner in which Class A Common Stock and Class B Common Stock differ, and, in any event, and without limitation, the conversion rights and obligations of the holders of Class B Common Stock and the other relative rights and treatment accorded to the Class A Common Stock and Class B Common Stock in this Clause (b) of this Article FOURTH shall be preserved. To the fullest extent permitted by law, any construction, calculation or interpretation made by the Board of Directors in determining the application of the provisions of this Clause (b)(v) of this Article FOURTH in good faith shall be conclusive and binding on the Corporation and its

stockholders.

(vi)     Liquidation Rights.

In the event of any dissolution, liquidation or winding-up of the affairs of the Corporation, whether voluntary or involuntary, after payment or provision for payment of the debts and other liabilities of the Corporation and after making provision for the holders of any series of Preferred Stock entitled thereto, the remaining assets and funds of the Corporation, if any, shall be divided among and paid ratably to the holders of the shares of Class A Common Stock and Class B Common Stock treated as a single class.

(vii)    No Preemptive Rights.

The holders of shares of Common Stock are not entitled to any preemptive right to subscribe for, purchase or receive any part of any new or additional issue of stock of any class, whether now or hereafter authorized, or of bonds, debentures or other securities convertible into or exchangeable for stock.

(viii)   Conversion of Class B Common Stock.

(A)     Subject to the Lock-Up Agreement, each holder of a share of Class B Common Stock shall have the right to convert such share into one (1) fully paid and non-assessable share of Class A Common Stock, at any time and from time to time.

(B)     Shares of Class B Common Stock shall at all times be held only by Authorized Class B Holders (as hereinafter defined).  In that regard, each share of Class B Common Stock Transferred (as hereinafter defined) to one or more persons or entities other than Authorized Class B Holders shall automatically convert into one (1) fully paid and non-assessable share of Class A Common Stock upon such Transfer.  "Authorized Class B Holders" shall mean any of (1) Mr. Allen, (2) his estate, spouse, immediate family members and heirs and (3) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist exclusively of Mr. Allen or such other persons or entities referred to in clause (2) above or a combination thereof.  "Transfer" shall mean any sale, assignment, gift, pledge, hypothecation, mortgage, exchange or other disposition.

(C)     At any time on or after January 1, 2011 and until September 15, 2014, a majority of the Disinterested Board Members (as hereinafter defined) shall have the right to cause each share of Class B Common Stock held by such holder to automatically convert into one (1) fully paid and non-assessable share of Class A Common Stock.  At any time on or after September 15, 2014, a majority of the members of the Board of Directors (excluding members of the Board of Directors elected by the holders of Class B Common Stock pursuant to Clause (b)(i)(B)(1) of this Article FOURTH) shall have the right to cause each share of Class B Common Stock held by such holder to automatically convert into one (1) fully paid and non-assessable share of Class A Common Stock.  "Disinterested Board Members" shall mean all members of the Board of Directors other than any member (1) elected by the holders of Class B Common Stock pursuant to Clause (b)(i)(B)(1) of this Article FOURTH, (2) who is an Interested

Stockholder or an Affiliate or Associate or representative of an Interested Stockholder (as such terms are defined in Clause (b) of Article EIGHTH), or (3) nominated or appointed to the Board of Directors by an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder or whose nomination or appointment was authorized or approved by an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder, except for purposes of this clause (3) only, any member that would qualify as an "Independent director" within the meaning of NASDAQ Marketplace Rule 4200(a)(15) (or any successor provision), whether or not applicable, including the requirements in clauses (C) through (G) thereof (or any successor provisions), with respect to the Company and any Interested Stockholder or any Affiliate or Associate of any Interested Stockholder.

(D)     As promptly as practicable following the surrender by a holder of a certificate representing shares of Class B Common Stock to be converted pursuant to Clause (b)(viii)(A) of this Article FOURTH or a certificate formerly representing shares of Class B Common Stock that have been converted pursuant to Clause (b)(viii)(B) or (C) of this Article FOURTH, and the payment in cash of any amount required by the provisions of Clause (b)(viii)(G) of this Article FOURTH, the Corporation shall deliver or cause to be delivered at the office of the transfer agent a certificate or certificates representing the number of shares of Class A Common Stock issuable upon such conversion, issued in such name or names as such holder may direct.  Such conversion shall be deemed to have been effected (1) immediately prior to the close of business of the Corporation on the date of the surrender of the certificate or certificates representing shares of Class B Common Stock in the case of a conversion under Clause (b)(viii)(A) of this Article FOURTH, (2) immediately prior to the close of business of the Corporation on the date of Transfer in the case of an automatic conversion under Clause (b)(viii)(B) of this Article FOURTH and (3) immediately prior to the close of business of the Corporation on the date of the determination by the Board of Directors in the case of conversion under Clause (b)(viii)(C) of this Article FOURTH.  At the close of business of the Corporation on the date any such conversion is made or deemed to be effected, all rights of the holder of such shares of Class B Common Stock as a holder thereof shall cease, and the person or persons in whose name or names the certificate or certificates representing the shares of Class A Common Stock are to be issued shall be treated for all purposes as having become the record holder or holders of such shares of Class A Common Stock as of such date; provided, however, that if any such conversion is made or deemed to be effected on any date when the stock transfer books of the Corporation shall be closed, the person or persons in whose name or names the certificate or certificates representing shares of Class A Common Stock are to be issued shall be deemed the record holder or holders thereof for all purposes upon the opening of business of the Corporation on the next succeeding day on which the stock transfer books are open.

(E)     In the event of a recapitalization, reorganization, reclassification or other event as a result of which the shares of Class A Common Stock are exchanged for or converted into other stock or securities, cash and/or any other property, then a holder of Class B Common Stock shall be entitled to receive upon conversion the same kind and amount of such stock, security, cash and/or other property that such holder would have received if such conversion had occurred immediately prior to the record date or effective date of such event.

(F)     No adjustments in respect of dividends (other than dividends paid

in stock or securities of the Corporation) shall be made upon the conversion of any shares of Class B Common Stock except as otherwise provided herein; provided, however, that if a share of Class B Common Stock shall be converted subsequent to the record date for the payment of a dividend or other distribution on shares of Class B Common Stock but prior to such payment, then the registered holder of such share at the close of business on such record date shall be entitled to receive the dividend or other distribution payable on such shares on such date notwithstanding the conversion thereof or the default in payment of the dividend or distribution due on such date.

(G)     The issuance of certificates for shares of Class A Common Stock upon conversion of Class B Common Stock and/or exchange of Membership Units pursuant to the Exchange Agreement shall be made without charge to the holders of such shares for any transfer or other similar tax in respect of such issuance; provided, however, that if any such certificate is to be issued in a name other than that of the holder of the share or shares of Class B Common Stock converted and/or Membership Units exchanged, then the person or persons requesting the issuance thereof shall pay to the Corporation the amount of any tax that may be payable in respect of any transfer involved in such issuance or shall establish to the satisfaction of the Corporation that such tax has been paid or is not payable.

(H)     Shares of Class B Common Stock that are converted into shares of Class A Common Stock as provided herein shall be retired and not available for reissue by the Corporation.

(c)     PREFERRED STOCK.

The Board of Directors is hereby expressly granted authority from time to time to issue Preferred Stock in one or more series and with respect to any such series, subject to the terms and conditions of this Certificate of Incorporation, to fix by resolution or resolutions the numbers of shares, designations, powers, preferences and relative, participating, optional or other special rights of such series and any qualifications, limitations or restrictions thereof, including but without limiting the generality of the foregoing, the following:

(i)     entitling the holders thereof to cumulative, non-cumulative or partially cumulative dividends, or to no dividends;

(ii)     entitling the holders thereof to receive dividends payable on a parity with, junior to, or in preference to, the dividends payable on any other class or series of capital stock of the Corporation;

(iii)     entitling the holders thereof to rights upon the voluntary or involuntary liquidation, dissolution or winding up of, or upon any other distribution of the assets of, the Corporation, on a parity with, junior to or in preference to, the rights of any other class or series of capital stock of the Corporation;

(iv)     providing for the conversion or exchange, at the option of the holder or of the Corporation or both, or upon the happening of a specified event, of the shares of Preferred

Stock into shares of any other class or classes or series of capital stock of the Corporation or of any series of the same or any other class or classes, including provision for adjustment of the conversion or exchange rate in such events as the Board of Directors shall determine, or providing for no conversion;

(v)     providing for the redemption, in whole or in part, of the shares of Preferred Stock at the option of the Corporation or the holder thereof, or upon the happening of a specified event, in cash, bonds or other property, at such price or prices (which amount may vary under different conditions and at different redemption dates), within such period or periods, and under such conditions as the Board of Directors shall so provide, including provisions for the creation of a sinking fund for the redemption thereof, or providing for no redemption;

(vi)     providing for voting rights or having limited voting rights or enjoying general, special or multiple voting rights; and

(vii)     specifying the number of shares constituting that series and the distinctive designation of that series.

FIFTH:  REMOVAL OF DIRECTORS

(a)     REMOVAL FOR CAUSE.

Any director may be removed from office for cause by the affirmative vote of a majority of the voting power of the outstanding shares of Class A Common Stock and Class B Common Stock (and any series of Preferred Stock then entitled to vote at an election of directors), voting together as one class.

(b)     CLASS B COMMON REMOVAL WITHOUT CAUSE.

Any director elected by the vote of the holders of Class B Common Stock voting separately as a class may be removed from office at any time, without cause, solely by the affirmative vote of a majority of the voting power of the outstanding shares of Class B Common Stock, voting as a separate class.

(c)     CLASS A COMMON REMOVAL WITHOUT CAUSE.

Any director elected by the vote of the holders of Class A Common Stock voting separately as a class (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock) may be removed from office at any time, without cause, solely by the affirmative vote of a majority of the voting power of the outstanding shares of Class A Common Stock, voting separately as a class (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock).

SIXTH: BYLAWS

The Board of Directors may from time to time adopt, make, amend, supplement or repeal the Bylaws, except as provided in this Certificate of Incorporation or in the Bylaws. Unless and except to the extent that the Bylaws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

## SEVENTH: DIRECTOR EXCULPATION

No director of the Corporation shall have any personal liability to the Corporation or its stockholders for monetary damages for any breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the GCL as the same exists or hereafter may be amended. No amendment, alteration or repeal of this Article SEVENTH shall eliminate or reduce the effect thereof in respect of any matter occurring, or any cause of action, suit or claim that, but for this Article SEVENTH would accrue or arise, prior to such amendment, alteration or repeal.

## EIGHTH: CERTAIN BUSINESS COMBINATIONS

(a)     REQUIREMENTS TO EFFECT CERTAIN BUSINESS COMBINATIONS.

In addition to any affirmative vote required by law or this Certificate of Incorporation or the Bylaws, a Business Combination (as hereinafter defined) involving as a party, or proposed by or on behalf of, an Interested Stockholder (as hereinafter defined) or an Affiliate (as hereinafter defined) or Associate (as hereinafter defined) of an Interested Stockholder or a person who upon consummation of such Business Combination would become an Affiliate or Associate of an Interested Stockholder shall, except as otherwise prohibited by applicable law, as in effect from time to time, require both of the following conditions to be satisfied:

(i)     a majority of the Continuing Directors (as hereinafter defined) shall have determined (after consultation with their outside legal and financial advisors) that such Business Combination, including without limitation, the consideration to be received in connection therewith, is fair to the Corporation and its stockholders (other than any stockholder that is an Interested Stockholder in respect of such Business Combination and the Affiliates and Associates (if any) of such Interested Stockholder); and

(ii)     holders of not less than a majority of the votes entitled to be cast by the holders of all of the then outstanding shares of Voting Stock (as hereinafter defined), voting together as a single class, excluding Voting Stock Beneficially Owned (as hereinafter defined) by any Interested Stockholder or any Affiliate or Associate of such Interested Stockholder, shall have approved such transaction. Such affirmative vote shall be required notwithstanding the fact that no vote may be required, or that a lesser percentage affirmative vote, or the vote of any other class of stockholders, may otherwise be required, by law or otherwise.

(b)     CERTAIN DEFINED TERMS.

For purposes of this Article EIGHTH, the following definitions shall apply:

(i)    "Business Combination" shall mean:

(A)    any merger or consolidation of the Corporation or any Subsidiary (as hereinafter defined) with (A) any Interested Stockholder or (B) any other company (whether or not itself an Interested Stockholder) which is or after such merger or consolidation would be an Affiliate or Associate of an Interested Stockholder; or

(B)    any (1) sale, lease, exchange, mortgage, pledge, transfer or other disposition or hypothecation of assets of the Corporation or of any Subsidiary (whether or not in connection with the dissolution of the Corporation) to or for the benefit of, or (2) purchase by the Corporation or any Subsidiary from, or (3) issuance by the Corporation or any Subsidiary of securities to, or (4) investment, loan, advance, guarantee, participation or other extension of credit by the Corporation or any Subsidiary to, from, in or with or (5) establishment of a partnership, joint venture or other joint enterprise with or for the benefit of, in each case, any Interested Stockholder or any Affiliate or Associate of any Interested Stockholder which transaction, alone or taken together with any related transaction or transactions, has an aggregate fair market value and/or involves aggregate commitments of $50,000,000 or more or any arrangement, whether as employee, consultant or otherwise (other than service as a director), pursuant to which any Interested Stockholder or any Affiliate or Associate thereof shall, directly or indirectly, attain any control over or responsibility for the management of any aspect of the business or affairs of the Corporation or any Subsidiary which involves assets which have an aggregate fair market value of $50,000,000 or more; or

(C)    any (1) reclassification of securities (including any reverse stock split), or (2) recapitalization of the Corporation (including any change to or exchange of securities of the Corporation), or (3) merger or consolidation of the Corporation with any of its Subsidiaries or (4) other transaction (whether or not with or otherwise involving as a party an Interested Stockholder) that, in each case, has the effect, directly or indirectly, of increasing the proportionate share of any class or series of capital stock, or any securities convertible into or exchangeable for capital stock or other equity securities, of the Corporation or any Subsidiary Beneficially Owned by any Interested Stockholder or any Affiliate or Associate of any Interested Stockholder; or

(D)    any agreement, contract or other arrangement providing for any one or more of the actions specified in the foregoing Clauses (b)(i)(A), (b)(i)(B) and (b)(i)(C) of this Article EIGHTH.

Notwithstanding anything to the contrary in this Certificate of Incorporation, in no event shall a "Business Combination" include any exchange of Membership Units pursuant to the Exchange Agreement, any other transaction expressly contemplated by the Joint Plan (including, without limitation, the issuance of any securities pursuant thereto, including securities issued or issuable from time to time upon exercise, conversion or exchange thereof, and the payment of specified fees and expenses, and the assumption and performance of any executory contracts, thereunder) or any conversion of Class B Common Stock into Class A Common Stock under Clause (b)(viii) of Article FOURTH of this Certificate of Incorporation.

13

(ii)     "Affiliate" in respect of a person shall mean any person (other than an Exempt Person) controlling, controlled by or under common control with such person.

(iii)     "Associate" in respect of an individual shall mean (A) any corporation or other organization of which such person is an officer or partner or otherwise participates in a material way in the management or policy-making thereof or is the Beneficial Owner of ten percent (10%) or more of any class of voting equity security, (B) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as a trustee or in a similar fiduciary capacity and (C) any parent or lineal descendant of such person or the spouse of such person or any relative of such person who has the same home as such person or who is a director, officer, partner, limited liability company member, trustee or other fiduciary of any organization of which such person is also a director, officer, partner, limited liability company member, trustee or other fiduciary or substantial beneficiary. The term "Associate" in respect of any company means (A) any director, officer or trustee of such company or in the case of a limited liability company any manager or managing member or in the case of a partnership any general partner, (B) any other person who participates in a material way in the management or policy-making of such company and (C) any person who is the Beneficial Owner of ten percent (10%) or more of any class of equity security of such company. In no event shall an "Associate" include an Exempt Person.

(iv)     A person shall be a "Beneficial Owner" of any capital stock or other securities of the Corporation: (A) which such person or any of its Affiliates or Associates owns or has the economic benefit of ownership of, directly or indirectly; (B) which such person or any of its Affiliates or Associates has, directly or indirectly, (1) the right to acquire (whether such right is exercisable immediately or subject only to the passage of time), pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise, or (2) the right to vote pursuant to any agreement, arrangement or understanding; or (C) which any other person with which such person or any of its Affiliates or Associates has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of capital stock, owns or has the economic benefit of ownership of.  For the purposes of determining whether a person is an "Interested Stockholder", the number of shares of capital stock of the Corporation deemed to be outstanding shall include shares deemed beneficially owned by such person through application of this Clause (b)(iii) of this Article EIGHTH, but shall not include any other shares of capital stock that may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(v)     "Continuing Director" with respect to an Interested Stockholder shall mean any member of the Board of Directors (while such person is a member of the Board of Directors) who is not an Affiliate or Associate or representative of such Interested Stockholder (including any person nominated to the Board of Directors by such Interested Stockholder or an Affiliate or Associate of such Interested Stockholder).

(vi)     "Interested Stockholder" shall mean any person (other than (A) the Corporation or any Subsidiary, (B) any profit-sharing, employee stock ownership or other employee benefit plan of the Corporation or any Subsidiary or (C) any trustee or fiduciary with

respect to any such plan or holding Voting Stock for the purpose of funding any such plan or funding other employee benefits for employees of the Corporation or any Subsidiary when acting in such capacity (the persons and entities described in the foregoing clauses (A)-(C) being referred to herein as "Exempt Persons")) who is, or has announced or publicly disclosed a plan or intention to become, the Beneficial Owner of Voting Stock representing ten percent (10%) or more of the votes entitled to be cast by the holders of all then outstanding shares of Voting Stock.

(vii) "Subsidiary" shall mean any corporation, partnership, joint venture or other legal entity of which the Corporation (either alone or through or together with any other Subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies.

(viii) "Voting Stock" shall mean all shares of capital stock of the Corporation entitled generally to vote on the election of any director of the Corporation (without reference to any terms of any Preferred Stock providing for special voting rights or restrictions with respect to particular matters), including, without limitation, shares of Class A Common Stock and shares of Class B Common Stock.

(c) CERTAIN DETERMINATIONS.

A majority of the Continuing Directors shall have the power and duty to determine for the purposes of this Article EIGHTH, on the basis of information known to them after reasonable inquiry, all questions arising under this Article EIGHTH, including without limitation, (i) whether a person is an Interested Stockholder, (ii) the number of shares of capital stock or other securities Beneficially Owned by any person, (iii) whether a person is an Affiliate or Associate of another person, (iv) whether a Business Combination is proposed by or on behalf of an Interested Stockholder or an Affiliate or Associate of an Interested Stockholder or a person who upon consummation of such Business Combination would become an Affiliate or Associate of such Interested Stockholder, (v) whether the assets that are the subject of any Business Combination have, or the consideration to be received for the issuance or transfer of securities by the Corporation or any Subsidiary in any Business Combination has, an aggregate fair market value of $[•] or more, and (vi) the application of any other term used in this Article EIGHTH. Any such determination made in good faith shall be binding and conclusive on the Corporation, all of its stockholders and all other parties.

(d) AMENDMENT OF THIS ARTICLE.

Notwithstanding anything to the contrary in this Certificate of Incorporation, and in addition to the requirements of Clauses (b)(i)(C) and (b)(i)(D) of Article FOURTH, any proposal to alter, amend or repeal, or to adopt any provision inconsistent with, this Article EIGHTH, including in each case by merger, consolidation or otherwise, shall require the affirmative vote of the holders of not less than a majority of the votes entitled to be cast by the holders of all of the then outstanding shares of Voting Stock, voting together as a single class, excluding Voting Stock beneficially owned by any Interested Stockholder.

NINTH:  TRADING RESTRICTIONS

(a)    RIGHT TO IMPOSE TRADING RESTRICTIONS

(i)    In the event that both (1) the Equity Value (as hereinafter defined) of the Corporation has decreased by at least 35% (such equity value, the "Trigger Price") from the Emergence Date Equity Value (as hereinafter defined) and (2) an "owner shift" of at least 25 percentage points has occurred during the relevant "testing period" with respect to the Corporation's equity for purposes of Section 382 of the Internal Revenue Code of 1986, as amended, and the Treasury regulations thereunder (collectively, "Section 382"), as reasonably determined by the Corporation (in consultation with outside counsel) in accordance with Section 382 (Clauses (a)(i)(1) and (a)(i)(2) of this Article NINTH are collectively referred to herein as the "Trigger Provisions"), then the Board of Directors shall meet on an expedited basis to determine whether to impose restrictions on the trading of the Corporation's stock in accordance with this Article NINTH and to determine the specific terms of such restrictions.  Unless otherwise defined herein, all terms used in this Article NINTH (including but not limited to "5% shareholder," "testing period," "ownership change," and "owner shift") are intended to have the meanings ascribed to them under Section 382 and shall be construed accordingly.

(ii)    The Board of Directors' ability to impose trading restrictions pursuant to this Article NINTH shall terminate on the fifth anniversary of the Emergence Date (as hereinafter defined); provided, however, that any trading restrictions imposed by the Board of Directors pursuant to this Article NINTH prior to such fifth anniversary shall remain in full force and effect until the Trigger Provisions are no longer satisfied.

(b)    CERTAIN DEFINED TERMS

(i)    "Emergence Date Equity Value" shall mean the Corporation's equity value on the date on which the Corporation emerges from chapter 11 bankruptcy protection (the "Emergence Date"), which equity value the Corporation shall announce via press release and the filing of a Current Report on Form 8-K with the Securities and Exchange Commission promptly after it is determined, but in no event later than thirty (30) days after the Emergence Date.  Such equity value shall be determined by the Corporation in good faith based on the valuation of the Corporation's total enterprise as determined and approved in connection with the Joint Plan.

(ii)    "Equity Value" as of any date shall mean the Corporation's then equity value (adjusted for any extraordinary dividends, as determined in good faith by the Board of Directors) calculated as follows:  (1) for any class of stock that is publicly traded for at least 30 calendar days prior to such determination, the value determined using the [rolling average closing trading price of such stock][1] during the previous 30 calendar days, plus (2) for any class of stock that is not publicly traded for at least 30 calendar days prior to such determination, the fair market value of such stock, as reasonably determined by the Board of Directors after consultation with an investment banking firm of nationally recognized standing.

---

[1]    Consider using volume-weighted average price.

(c)     PROCEDURE TO IMPOSE TRADING RESTRICTIONS

Except as provided in this Article NINTH, after the Emergence Date, the Corporation shall not impose any trading restrictions on transfers of the Corporation's stock.

If the Board of Directors determines to impose trading restrictions on transfers of the Corporation's stock pursuant to this Article NINTH, which shall require the affirmative vote of at least two thirds (2/3) of all directors, then the Corporation shall promptly announce the imposition and terms of such trading restrictions by means of a press release and the filing of a Current Report on Form 8-K with the Securities and Exchange Commission. The terms of such restrictions, including the form of any notice or application documentation that may be associated with such restrictions, shall also be described by the Corporation in each quarterly and annual report filed by the Corporation with the Securities and Exchange Commission.

(d)     PRINCIPAL TERMS OF TRADING RESTRICTIONS

If the Board of Directors determines to impose trading restrictions on transfers of the Corporation's stock in accordance with this Article NINTH, the principal terms of such trading restrictions shall be the terms set forth in this Clause (d) of Article NINTH. The Board of Directors shall have the authority in its sole discretion to determine and establish the definitive and ancillary terms of such trading restrictions so long as such terms are consistent with the following provisions of this Article NINTH:

(i)     Any acquisition of the Corporation's stock by a person or entity that is not a 5% shareholder of the Corporation will be null and void ab initio as to the purchaser to the extent such acquisition causes such person or entity to become a 5% shareholder of the Corporation unless the acquisition of such stock (1) was previously approved in writing by the Board of Directors, (2) is a Permitted Acquisition or (3) is covered by Clause (d)(v) of this Article NINTH. "Permitted Acquisition" shall mean an acquisition that will not result in an increase in an "owner shift" for purposes of Section 382 in excess of any "owner shift" that would have occurred if the seller had sold the same amount of stock through general public market transactions (e.g., because the stock is purchased from another 5% shareholder whose stock acquisition had caused an owner shift).

(ii)     Any acquisition of the Corporation's stock by a 5% shareholder of the Corporation will be null and void ab initio as to the purchaser unless the acquisition of such stock (1) was previously approved in writing by the Corporation's Board of Directors, (2) is a Permitted Acquisition or (3) is covered by Clause (d)(v) of this Article NINTH.

(iii)     Any person or entity seeking to use the "Permitted Acquisition" exception in the case of Clause (d)(i) or (d)(ii) of this Article NINTH shall either (1) contemporaneously with such transaction, notify the Corporation in writing of such transaction, represent in writing to the Corporation that such transaction is a Permitted Acquisition, and acknowledge in writing that if such transaction is not a Permitted Acquisition such person or entity will be subject to the consequences set forth in this Article NINTH or (2) prior to such transaction, notify the Corporation of its intent to engage in a Permitted Acquisition and provide relevant factual information sufficient to establish that the acquisition will qualify as a Permitted Acquisition,

and within 10 business days of such notice, the Corporation shall indicate whether such proposed transaction will qualify as a Permitted Acquisition. For the avoidance of doubt, any transaction covered by Clause (d)(v) of this Article NINTH shall not be subject to the restrictions and procedures of this Article NINTH.

(iv)    The Corporation shall announce by press release and the filing of a Current Report on Form 8-K with the Securities and Exchange Commission if its Board of Directors determines that trading restrictions are no longer required or if the Trigger Provisions are no longer satisfied; provided, however, that if trading restrictions shall be imposed following a decline in the Corporation's equity value, any increase in the value of the Corporation's stock shall not result in the lapse of such trading restrictions unless such increase (determined using the same methodology set forth in the definition of Equity Value above ) is at least 10% greater than the Trigger Price.

(v)    Notwithstanding the foregoing, the Board of Directors shall have no authority pursuant to this Article NINTH to restrict or otherwise limit in any manner (1) the disposition of shares of capital stock of the Corporation by any stockholder of the Corporation, (2) any issuance by the Corporation of Common Stock pursuant to the Exchange Agreement or the CII Settlement Claim Warrants (as defined in the Joint Plan), (3) any conversion of Class B Common Stock into Class A Common Stock, (4) any distributions upon, or adjustments to, any Membership Units, Class B Common Stock, or warrants (or any shares issuable upon exchange, conversion, or exercise thereof) to which the holder of such interest is otherwise entitled, or (5) any acquisition of Common Stock pursuant to or in connection with clause (2), (3), or (4) above.

(e)    REQUIREMENT TO PROVIDE INFORMATION REGARDING SHARE OWNERSHIP

All stockholders of the Corporation that have filed or would be required to file a Schedule 13D or 13G with the Securities and Exchange Commission with respect to the Corporation shall be required to provide information to the Corporation regarding such stockholder's ownership of the Corporation's stock, including the dates of the acquisition and disposition of such stock and the amounts of such acquisitions and dispositions, to the extent requested by the Corporation. Such information shall be provided within five business days of the Corporation's request, and, at the stockholder's request, the Corporation shall execute a standard confidentiality agreement with respect to such information.

## TENTH:  AMENDMENT, ETC.

Subject in each instance to Clauses (b)(i)(C), (b)(i)(D) and (b)(i)(E) of Article FOURTH and Article EIGHTH of this Certificate of Incorporation, the Corporation reserves the right at any time, and from time to time, to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner now or hereafter authorized by the laws of the State of Delaware.  All rights, preferences and privileges herein conferred are granted subject to this reservation.

(Remainder of this Page Intentionally Left Blank)

IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation, which restates, integrates and further amends the provisions of the Certificate of Incorporation of the Corporation, and which was duly adopted in accordance with Sections 242, 245 and 303 of the General Corporation Law of the State of Delaware, has been signed on [•], 2009.

CHARTER COMMUNICATIONS, INC.

By: _____
Name:
Title:

TERMS OF

SERIES A 15% PAY-IN-KIND PREFERRED STOCK

OF

CHARTER COMMUNICATIONS, INC.

# CERTIFICATE OF DESIGNATION, POWERS, PREFERENCES AND RIGHTS

## OF

## SERIES A 15% PAY-IN-KIND PREFERRED STOCK

## OF

## CHARTER COMMUNICATIONS, INC.

(PURSUANT TO SECTION 151(g) OF THE
GENERAL CORPORATION LAW OF THE STATE OF DELAWARE)

The undersigned, [ ], the [ ] of Charter Communications, Inc. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "DGCL"), certifies that, pursuant to the authority expressly granted to and vested in the Board of Directors of the Corporation (the "Board of Directors") by the Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), which authorizes the issuance, by the Corporation, of up to [ ] shares of preferred stock, par value $.001 per share (the "Preferred Stock"), the Board of Directors on [ ], 2009 duly adopted the following resolutions:

RESOLVED, that pursuant to clause (c) of Article Fourth of the Certificate of Incorporation, the Board of Directors hereby creates and provides for the issuance of a series of Preferred Stock, par value $.001 per share and with a liquidation preference of $1,000 per share, of the Corporation and hereby fixes the number, voting powers, designations, preferences, and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, and other matters relating to, said series as follows (capitalized terms used herein but not defined in Section 1 through 12 below have the meanings ascribed to them in Section 13):

Section 1.     Designation. [ ] shares of the Preferred Stock of the Corporation are hereby constituted as a series of Preferred Stock, par value $.001 per share and with a liquidation preference of $1,000 per share (the "Liquidation Preference"), designated as "Series A 15% Pay-in-Kind Preferred Stock" (the "Series A PIK Preferred Stock"), no shares of which have been issued by the Corporation prior to [ ], 2009 (the "Issue Date").

Section 2.     Ranking. The Series A PIK Preferred Stock shall rank senior as to dividends over the Common Stock and any other series or class of the Corporation's stock created after the date hereof that by its terms ranks junior as to dividends to the Series A PIK Preferred Stock, when and if issued ("Junior Dividend Stock"), and senior as to distributions of assets upon liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, over the Common Stock and any other series or class of the Corporation's stock issued after the date hereof that by its terms ranks junior as to liquidation, dissolution and winding up to the Series A PIK Preferred Stock, when and if issued ("Junior Liquidation Stock"). The Common Stock and any other series or class of the Corporation's stock that is both Junior Dividend Stock and Junior Liquidation Stock is referred to herein as "Junior Stock". The Series A PIK Preferred Stock shall be junior as to dividends to any series or class of the Corporation's stock issued after the date hereof that by its terms ranks senior as to dividends to the Series A PIK Preferred Stock, when and if issued ("Senior Dividend Stock"), and junior as to distributions of assets upon liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, to any series or class of the Corporation's stock issued after the date hereof that by its terms ranks senior as to liquidation, dissolution and winding up to the Series A PIK Preferred Stock, when and if issued ("Senior Liquidation Stock" and collectively with the Senior Dividend Stock, "Senior Stock"). The Series A PIK

Preferred Stock shall rank pari passu with respect to dividends with any series or class of the Corporation's stock issued after the date hereof that by its terms ranks pari passu as to dividends with the Series A PIK Preferred Stock, when and if issued ("Parity Dividend Stock"), and pari passu as to distributions of assets upon liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, to any series or class of the Corporation's stock issued after the date hereof that by its terms ranks pari passu as to liquidation, dissolution and winding up with the Series A PIK Preferred Stock, when and if issued ("Parity Liquidation Stock" and collectively with the Parity Dividend Stock, "Parity Stock").

Section 3.    Dividends.

(a)    Each holder of Series A PIK Preferred Stock shall be entitled to receive dividends when, as and if declared by the Board of Directors or a duly authorized committee thereof out of funds of the Corporation legally available therefor, at an annual rate equal to the Applicable Dividend Rate on the Liquidation Preference of Series A PIK Preferred Stock (the "Annual Dividend Amount"), payable at the option of the Corporation (i) through the issuance of additional shares of Series A PIK Preferred Stock having an aggregate Liquidation Preference equal to the amount of the dividend to be paid, (ii) in cash, or (iii) in a combination of (i) and (ii) above. Such dividends shall be cumulative and shall accrue (whether or not earned or declared, whether or not there are funds legally available for the payment thereof and whether or not restricted by the terms of any of the Corporation's indebtedness outstanding at any time) from the date such shares are issued and shall be payable semi-annually in arrears on January 15 and July 15 of each year (each, a "Dividend Payment Date") commencing January 15, 2010. The Series A PIK Preferred Stock paid as dividends shall have all rights granted hereunder, including the payment of dividends. The Corporation shall elect the form of such payment by giving notice at least 15 days prior to the applicable Dividend Payment Date. The first such notice may indicate the form of payment for all future dividend payments, subject to later modifications by the Corporation. If no notice is given, the Corporation shall be deemed to have elected a payment through the issuance of shares of Series A Preferred Stock.

(b)    The dividend payment period for any dividend payable on a Dividend Payment Date shall be the period beginning on the immediately preceding Dividend Payment Date (or on the Issue Date in the case of the first dividend payment period) and ending on the day preceding such applicable Dividend Payment Date. If any date on which a payment of a dividend or any other amount is due in respect of the Series A PIK Preferred Stock is not a Business Day, such payment shall be made on the next day that is a Business Day.

(c)    The amount of dividends payable per share of Series A PIK Preferred Stock for each dividend payment period will be computed by dividing the Annual Dividend Amount by two; provided, however, that the amount of dividends payable for the first dividend payment period and for any dividend payment period shorter than a full semi-annual dividend period will be computed on the basis of a 360-day year of twelve 30-day months. All dividends paid in additional shares of Series A PIK Preferred Stock shall be deemed issued on the applicable Dividend Payment Date and will thereupon be duly authorized, validly issued, fully paid and nonassessable and free and clear of all liens, charges and other encumbrances created by the Corporation.

(d)    Dividends payable on any Dividend Payment Date shall be payable to the holders of record of the Series A PIK Preferred Stock as they appear on the stock transfer books of the Corporation at the close of business on the first day of the calendar month in which the related Dividend Payment Date falls, or such other date that the Board of Directors designates that is not more than 30 nor less than 10 days prior to the Dividend Payment Date. Dividends paid on the shares of Series A PIK Preferred Stock

2

in an amount less than accumulated and unpaid dividends payable thereon shall be allocated pro rata on a share-by-share basis among all such shares at the time outstanding.

(e)     In order to pay dividends on any Dividend Payment Date, or such other date as is fixed by the Board of Directors or a duly authorized committee thereof pursuant to the terms and conditions set forth in Section 3(f) hereof, in shares of Series A PIK Preferred Stock, the shares of Series A PIK Preferred Stock to be paid as a dividend shall have been duly authorized, validly issued, fully paid and non-assessable.

(f)     Accrued but unpaid dividends for any past dividend periods not paid on the relevant Dividend Payment Date may be declared by the Board of Directors and paid on any date fixed by the Board of Directors, whether or not a regular Dividend Payment Date, to Holders of record on the books of the Corporation on such record date as may be fixed by the Board of Directors, which record date shall be no more than 60 days prior to the payment date thereof.

Section 4.     Optional and Mandatory Redemption.  The Corporation may redeem the Series A PIK Preferred Stock in whole or in part on at least 15 days prior written notice (of the anticipated date of redemption, which notice shall not obligate the Corporation to redeem any Series A Preferred Stock) to each holder of record if the Board of Directors approves such redemption, payable at the Corporation's option (i) in cash; (ii) through the issuance of shares of Common Stock; or (iii) in a combination of (i) and (ii) above (the "Redemption Payment") based on the provisions set forth below; provided, however, that any Redemption Payment made during the first six months following the Issue Date shall be payable solely in cash.  All outstanding shares of the Series A PIK Preferred Stock shall be mandatorily redeemed by the Corporation on the fifth anniversary of the Issue Date, and the Corporation shall pay the Redemption Payment based on the provisions set forth below.

(a)     Common Stock Redemption.  If the Corporation elects to pay the optional or mandatory Redemption Payment, in whole or in part, in shares of Common Stock, the number of shares of Common Stock to be delivered by the Corporation with respect to the shares of Series A PIK Preferred Stock being redeemed in shares of Common Stock, shall be equal to (1) the Liquidation Preference of the shares being redeemed and any other accrued and unpaid dividends whether or not declared (the "Accreted Value"), divided by (2) the Market Price of a share of Common Stock.  Notwithstanding the foregoing, in no event shall any Redemption Payment made in shares of Common Stock exceed 20% of the total fully diluted Common Stock of the Corporation at the time of such Redemption Payment.

(b)     Cash Redemption.  If the Corporation elects to pay the optional or mandatory Redemption Payment, in whole or in part, in cash, the amount of cash payable with respect to the Series A PIK Preferred Stock being redeemed in cash shall be the Accreted Value of the shares of Series A PIK Preferred Stock being redeemed in cash.

If the Corporation elects to deliver Common Stock in payment, in whole or in part, of the optional or mandatory Redemption Payment, the Corporation will, at its option (i) pay cash based on the Market Price for all fractional shares of Common Stock, or (ii) pay any fractional shares of Common Stock by delivery of a whole share of Common Stock.

Section 5.     Procedure For Redemption.

(a)     In the event of redemption of the Series A PIK Preferred Stock pursuant to Section 4, notice of such redemption shall be given by hand or by nationally recognized "overnight courier" for delivery at the earliest time offered by such overnight courier (which may not necessarily be the next day) to each holder of record of the shares to be redeemed at such holder's address as the same appears on the stock transfer books of the Corporation at least 15 but not more than 60 days before the date fixed for

redemption, provided, however, that no failure to give such notice nor any defect therein shall affect the validity of the redemption of any share of Series A PIK Preferred Stock to be redeemed except as to the holder to whom the Corporation has failed to give said notice or except as to the holder whose notice was defective. Each such notice shall state: (i) the redemption date; (ii) the number of shares of Series A PIK Preferred Stock to be redeemed and, if less than all the shares held by such holder are to be redeemed, the number of shares to be redeemed from such holder; (iii) the Redemption Payment (including the method of payment (i.e., cash, Common Stock or a combination thereof)), as applicable; (iv) if not all of the shares of the Series A PIK Preferred Stock are held through the Depository Trust Company ("DTC"), the place or places where certificates for such shares are to be surrendered for payment of the Redemption Payment, as applicable; (v) the specific provision hereof pursuant to which such redemption is to be made; and (vi) that dividends on the shares to be redeemed will cease to accrue on such redemption date. Each such notice shall be effective upon delivery if given by hand or upon deposit with a nationally recognized overnight courier if given by such a courier.

(b)     Notice having been given as aforesaid, from and after the redemption date (unless default shall be made by the Corporation in providing money or shares of Common Stock for the payment of the Redemption Payment of the shares called for redemption), dividends on the shares of Series A PIK Preferred Stock called for redemption shall cease to accrue, and such shares shall no longer be deemed to be outstanding and shall have the status of authorized but unissued shares of Series A PIK Preferred Stock, unclassified as to series, and shall not be reissued as shares of Series A PIK Preferred Stock, and all rights of the holders thereof attendant to their ownership of Series A PIK Preferred Stock as stockholders of the Corporation (except the right to receive from the Corporation the Redemption Payment) shall cease. Upon surrender in accordance with said notice of the certificates for any shares so redeemed (properly endorsed or assigned for transfer, if the Board of Directors of the Corporation shall require and the notice shall so state), such shares shall be redeemed by the Corporation, and the Corporation shall make the required Redemption Payment.

(c)     If a notice of redemption shall have been given, and if, prior to the redemption date, the Corporation shall have irrevocably deposited the aggregate Redemption Payment of the shares of Series A PIK Preferred Stock to be redeemed in trust for the pro rata benefit of the holders of the shares of Series A PIK Preferred Stock to be redeemed, so as to be and to continue to be available therefor, with a bank or trust company that is organized under the laws of the United States of America or any state thereof, has capital and surplus of not less than $250,000,000 and has, or, if it has no publicly traded debt securities rated by a nationally recognized rating agency, is the subsidiary of a bank holding company that has, publicly traded debt securities rated at least "A" or the equivalent thereof by Standard & Poor's Corporation or "A-2" or the equivalent by Moody's Investor Service Inc., then upon making such deposit, all rights of holders of the shares so called for redemption shall cease, except (i) as otherwise set forth herein and (ii) for the right of holders of such shares to receive the Redemption Payment against delivery of such shares, but without interest after the actual redemption date, and such shares shall cease to be outstanding. Any funds so deposited that are unclaimed by holders of shares at the end of three years from such redemption date shall be repaid to the Corporation upon its request, after which repayment the holders of shares of Series A PIK Preferred Stock so called for redemption shall thereafter be entitled to look only to the Corporation for payment of the Redemption Payment.

Section 6.     No Conversion or Exchange Rights.

The holders of the shares of the Series A PIK Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Corporation.

Section 7.    Liquidation Rights.

(a)    In the case of the liquidation, bankruptcy, dissolution or winding up of the Corporation, in each case, whether voluntary or involuntary, holders of outstanding shares of Series A PIK Preferred Stock shall be entitled to receive, from the net assets of the Corporation available for distribution to stockholders, an amount in cash equal to the Liquidation Preference, plus any accrued and unpaid dividends to the payment date, as set forth herein, before any payment or distribution is made to the holders of Common Stock or any other Junior Liquidation Stock, but the holders of the shares of the Series A PIK Preferred Stock will not be entitled to receive the liquidation preference of such shares until the liquidation preference of any Senior Liquidation Stock has been paid in full.

(b)    The holders of Series A PIK Preferred Stock and any Parity Liquidation Stock shall share ratably in any liquidation, distribution or winding up of the Corporation (after payment of the liquidation preference of the Senior Liquidation Stock) in which the net assets or the proceeds thereof are not sufficient to pay in full the aggregate of the amounts payable thereon, in the same ratio that the respective amounts which would be payable on such distribution if the amounts to which the holders of all the outstanding shares of Series A PIK Preferred Stock and Parity Liquidation Stock are entitled were paid in full, bear to each other.

(c)    A Change of Control, as defined below, shall be considered a liquidation, dissolution or winding up of the Corporation for the purpose of this Section 7; provided that the Corporation shall be able to pay the Liquidation Preference, plus any accrued and unpaid dividends to the payment date, by making a Redemption Payment, and such Redemption Payment shall be made pursuant to the procedures set forth in Section 4 hereof. For purposes hereof, a "Change of Control" shall mean (i) a sale or transfer of all or substantially all of the Corporation's property or assets or (ii) a consolidation or merger of the Corporation with another corporation, other than a consolidation or merger in which the capital stock of the Corporation outstanding immediately prior to such consolidation or merger is converted into or exchanged for capital stock of the surviving or transferee Person constituting a majority of the outstanding voting power of such surviving or transferee Person immediately after giving effect to such consolidation or merger.

Section 8.    Additional Classes or Series of Stock.

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Corporation, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof. Any such class or series of stock may rank prior to or on a parity with or junior to the Series A PIK Preferred Stock as to dividends or upon liquidation or otherwise.

Section 9.    Voting Rights; Amendments.

(a)    Holders of Series A PIK Preferred Stock are entitled to one vote per whole share of Series A PIK Preferred Stock and shall vote together with holders of shares of the Common Stock as a single class and not as a separate class on all matters pursuant to which the holders of shares of Common Stock are entitled to vote pursuant to the DGCL.

(b)    So long as any Series A PIK Preferred Stock is outstanding, in addition to any other vote of stockholders of the Corporation required under applicable law or the Certificate of Incorporation, the affirmative vote or consent of the holders of at least 50.1% of the outstanding shares of the Series A PIK Preferred Stock will be required for any amendment of the Certificate of Incorporation if the amendment would specifically alter or change the powers, preferences or rights of the shares of the Series A PIK Preferred Stock so as to affect them adversely.

(c)     Except as set forth in this Section 9, the Series A PIK Preferred Stock shall not have any other voting powers, either general or special.

Section 10.     <u>Registration, Transfer and Exchanges</u>.  The Corporation will keep with the registrar and transfer agent of the Series A PIK Preferred Stock a register in which the Corporation will provide for the registration and transfer of shares of Series A PIK Preferred Stock.  Any holder of shares of Series A PIK Preferred Stock may, at its option, in person or by duly authorized attorney, surrender the certificate representing the same for exchange at the registrar and transfer agent (duly endorsed or accompanied, if so required by the Corporation, by a written instrument of transfer duly executed by such holder or his or her duly authorized attorney) and, within a reasonable time thereafter and without expense (other than transfer taxes, if any), receive in exchange therefor one or more duly executed certificate or certificates dated as of the date to which dividends have been paid on the shares of Series A PIK Preferred Stock so surrendered, or if no dividend has yet been so paid, then dated the date hereof, and registered in such name or names, all as may be designated by such holder, for the same aggregate number of shares of Series A PIK Preferred Stock as represented by the certificate or certificates so surrendered.  The Corporation covenants and agrees to take and cause to be taken all action reasonably necessary to effect such registrations, transfers and exchanges.  Each share of Series A PIK Preferred Stock issued in exchange for any share shall carry the same rights to unpaid dividends and redemption payments which were carried by the share so exchanged, so that neither gain nor loss of any such right shall result from any such transfer or exchange.

The Corporation and any agent of the Corporation may treat the person in whose name any share of Series A PIK Preferred Stock is registered as the owner of such share for the purpose of receiving payment of dividends, and amounts payable on redemption and liquidation in respect of such share and for all other purposes.

Section 11.     <u>Form</u>.

(a)     The Series A PIK Preferred Stock shall initially be issued in the form of one or more permanent global shares of Preferred Stock in definitive, fully registered form with the global legend (the "<u>Global Shares Legend</u>") as set forth on the form of Preferred Stock certificate attached hereto as Exhibit A (each, a "<u>Global Preferred Share</u>"), which is hereby incorporated in and expressly made a part of this Certificate of Designation.  The Global Preferred Share may have notations, legends or endorsements required by law, stock exchange rules, agreements to which the Corporation is subject, if any, or usage (<u>provided</u> that any such notation, legend or endorsement is in a form acceptable to the Corporation).  The Global Preferred Share shall be deposited on behalf of the holders of the Series A PIK Preferred Stock represented thereby with the Registrar, at its New York office, as custodian for the Depositary, and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Corporation and countersigned and registered by the Registrar as hereinafter provided.  The aggregate number of shares represented by each Global Preferred Share may from time to time be increased or decreased by adjustments made on the records of the Registrar and the Depositary or its nominee in a manner not inconsistent with this Certificate of Designation.  This <u>Section 11</u> shall apply only to a Global Preferred Share deposited with or on behalf of the Depositary.  The Corporation shall execute and the Registrar shall, in accordance with this <u>Section 11</u>, countersign and deliver initially one or more Global Preferred Shares that (i) shall be registered in the name of Cede & Co. or other nominee of the Depositary and (ii) shall be delivered by the Registrar to Cede & Co., or be delivered pursuant to instructions received from Cede & Co. or be held by the Registrar as custodian for the Depositary pursuant to an agreement between the Depositary and the Registrar.  Members of, or participants in, the Depositary ("<u>Agent Members</u>") shall have no rights under this Certificate of Designation with respect to any Global Preferred Share held on their behalf by the Depositary or by the Registrar as the custodian of the Depositary or under such Global Preferred Share, and the Depositary may be treated by the Corporation,

the Registrar and any agent of the Corporation or the Registrar as the absolute owner of such Global Preferred Share for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Corporation, the Registrar or any agent of the Corporation or the Registrar from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Preferred Share. Unless otherwise required by applicable law, owners of beneficial interests in Global Preferred Shares shall not be entitled to receive physical delivery of certificated shares of Preferred Stock, unless (x) the Depositary is unwilling or unable to continue as Depositary for the Global Preferred Shares and the Corporation does not appoint a qualified replacement for the Depositary within 90 days, (y) the Depositary ceases to be a "clearing agency" registered under the Exchange Act of 1934, as amended, or (z) the Corporation decides to discontinue the use of book-entry transfer through the Depositary (or any successor Depositary). In any such case, the Global Preferred Shares shall be exchanged in whole for definitive shares of Series A PIK Preferred Stock in registered form, with the same terms and of an equal aggregate Liquidation Preference. Definitive shares of Preferred Stock shall be registered in the name or names of the Person or Person specified by the Depositary. To the extent required by law, the Corporation will issue Series A PIK Preferred Stock in certificate form to beneficial owners upon their written request. Such certificates shall be substantially in the form of Exhibit A hereto except for references to the Depositary and its nominee, and may have such other modifications as deemed necessary or advisable by the Corporation.

(b)      (i)      An Officer shall sign the Global Preferred Shares for the Corporation, in accordance with the Corporation's bylaws and applicable law, by manual or facsimile signature.

(ii)      If an Officer whose signature is on a Global Preferred Share no longer holds that office at the time the Transfer Agent authenticates the Global Preferred Share, the Global Preferred Share shall be valid nevertheless.

Section 12.      Transfer Agent and Registrar. The duly appointed Transfer Agent and Registrar for the Series A PIK Preferred Stock shall be BNY Mellon Shareowner Services. The Corporation may, in its sole discretion, remove the Transfer Agent and Registrar in accordance with the agreement between the Corporation and the Transfer Agent and Registrar; provided that the Corporation shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal.

Section 13.      Definitions. The following terms shall have the following meanings, terms defined in the singular to have a correlative meaning when used in the plural and vice versa:

"Applicable Dividend Rate" means (i) 15% per annum from the Issue Date through the third anniversary of the Issue Date, (ii) 17% per annum from the day immediately following the third anniversary of the Issue Date through the fourth anniversary of the Issue Date, and (iii) 19% per annum from the day immediately following the fourth anniversary of the Issue Date through the fifth anniversary of the Issue Date.

"Business Day" shall mean any day other than a Saturday, Sunday or any day on which banking institutions are authorized to close in New York, New York.

"Common Stock" means shares of the Class A Common Stock, par value $.001 per share, of the Corporation or any other shares of capital stock of the Corporation into which the Common Stock is reclassified or changed.

"Depositary" means DTC or its successor depositary.

"Market Price" means, when used with respect to any security as of any date, the volume weighted average price of such security on the twenty (20) consecutive Trading Days immediately preceding (but not including) such date as reported for consolidated transactions with respect to securities listed on the principal national securities exchange on which such security is listed or admitted to trading; or, if such security has not been listed or admitted to trading on a national securities exchange for a minimum of twenty (20) consecutive Trading Days immediately preceding (but not including) such date, the volume weighted average price of such security on the twenty (20) consecutive Trading Days immediately preceding (but not including) such date in the over-the-counter market, as reported by the National Association of Securities Dealers, Inc. Automated Quotations System or such other system then in use; or, if such security has not been quoted by any such organization for a minimum of twenty (20) consecutive Trading Days immediately preceding (but not including) such date, the volume weighted average price of such security as of the twenty (20) consecutive Trading Days immediately preceding (but not including) such date furnished by a New York Stock Exchange member firm selected by the Corporation; or, if no New York Stock Exchange member firm has furnished such prices for the twenty (20) consecutive Trading Days immediately preceding (but not including) such date, such price as determined by the Board of Directors acting reasonably and in good faith, evidenced by a resolution of such Board of Directors, which resolution shall be conclusive evidence of the Board of Directors' approval and determination of such matters.

"Officer" means the Chairman, any Vice Chairman, the Chief Executive Officer, the President, the Chief Operating Officer, any Vice President, the Chief Financial Officer, the Treasurer, or the Secretary of the Corporation.

"Person" shall mean any individual, corporation, general partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

"Registrar" shall mean the party described in Section 12 hereof.

"Trading Day" shall mean a day on which the Common Stock was traded on the Corporation's principal national securities exchange or quotation system or in the over-the-counter market and was not suspended from trading on any national or regional securities exchange or association of over-the-counter market at the close of business on such day.

"Transfer Agent" shall mean the party described in Section 12 hereof.

Section 14.    Miscellaneous.

(a)    The Series A PIK Preferred Stock is not entitled to any preemptive or subscription rights in respect of any securities of the Corporation.

(b)    If any shares of Common Stock are listed on a national securities exchange, the Company shall use its commercially reasonable efforts to list the Series A PIK Preferred Stock on such exchange.

(c)    Whenever possible, each provision hereof shall be interpreted in a manner as to be effective and valid under applicable law, but if any provision hereof is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating or otherwise adversely affecting the remaining provisions hereof. If a court of competent jurisdiction should determine that a provision hereof would be valid or enforceable if a period of time were extended or shortened or a particular percentage were increased or decreased, then such court may make such change as shall be necessary to render the provision in question effective and valid under applicable law.

(d)     The headings of the various subdivisions hereof are for convenience of reference only and shall not affect the interpretation of any of the provisions hereof.

(e)     If any of the voting powers, preferences and relative, participating, optional and other special rights of the Series A PIK Preferred Stock and qualifications, limitations and restrictions thereof set forth herein is invalid, unlawful or incapable of being enforced by reason of any rule of law or public policy, all other voting powers, preferences and relative, participating, optional and other special rights of Series A PIK Preferred Stock and qualifications, limitations and restrictions thereof set forth herein which can be given effect without the invalid, unlawful or unenforceable voting powers, preferences and relative, participating, optional and other special rights of Series A PIK Preferred Stock and qualifications, limitations and restrictions thereof shall, nevertheless, remain in full force and effect, and no voting powers, preferences and relative, participating, optional or other special rights of Series A PIK Preferred Stock and qualifications, limitations and restrictions thereof herein set forth shall be deemed dependent upon any other such voting powers, preferences and relative, participating, optional or other special rights of Series A PIK Preferred Stock and qualifications, limitations and restrictions thereof unless so expressed herein.

(f)     If any of the Series A PIK Preferred Stock certificates shall be mutilated, lost, stolen or destroyed, the Corporation shall issue, in exchange and in substitution for and upon cancellation of the mutilated Series A PIK Preferred Stock certificate, or in lieu of and substitution for the Series A PIK Preferred Stock certificate lost, stolen or destroyed, a new Series A PIK Preferred Stock certificate of like tenor and representing an equivalent amount of shares of Series A PIK Preferred Stock, but only upon receipt of evidence of such loss, theft or destruction of such Series A PIK Preferred Stock certificate and indemnity, if requested, satisfactory to the Corporation and the Transfer Agent.

(g)     RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SERIES A PIK PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE CORPORATION AND THE HOLDER (AND ALL SUCH OTHERS).

IN WITNESS WHEREOF, CHARTER COMMUNICATIONS, INC. has caused this Certificate to be signed by its [ ], as of the [ ] day of [ ] 2009.

CHARTER COMMUNICATIONS, INC.

By:_____
      Name:      [ ]
      Title:     [ ]

## FORM OF SERIES A 15% PAY-IN-KIND PREFERRED STOCK

Number: _____
Shares _____
CUSIP NO.:

### SERIES A 15% PAY-IN-KIND PREFERRED STOCK

### (PAR VALUE $.001 PER SHARE)

### (LIQUIDATION PREFERENCE $1,000 PER SHARE)

### OF

### CHARTER COMMUNICATIONS, INC.

FACE OF SECURITY

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL IN AS MUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. HAS AN INTEREST HEREIN. TRANSFERS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS IN WHOLE, BUT NOT IN PART, TO NOMINEES OF DTC OR TO A SUCCESSOR THEREOF OR SUCH SUCCESSOR'S NOMINEE AND TRANSFERS OF PORTIONS OF THIS GLOBAL SECURITY SHALL BE LIMITED TO TRANSFERS MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE CERTIFICATE OF DESIGNATIONS REFERRED TO BELOW.

Charter Communications, Inc., a Delaware corporation (the "Corporation"), hereby certifies that Cede & Co. or registered assigns (the "Holder") is the registered owner of _____ fully paid and non-assessable shares of preferred stock of the Corporation designated the Series A 15% Pay-in-Kind Preferred Stock, par value $.001 per share and liquidation preference $1,000 per share (the "Series A PIK Preferred Stock"). The shares of Series A PIK Preferred Stock are transferable on the books and records of the Registrar, in person or by a duly authorized attorney, upon surrender of this certificate duly endorsed and in proper form for transfer. The designation, rights, privileges, restrictions, preferences and other terms and provisions of the Preferred Stock represented hereby are issued and shall in all respects be subject to the provisions of the Certificate of Designation of the Corporation dated [ ], 2009, as the same may be amended from time to time in accordance with its terms (the "Certificate Of Designation"). Capitalized terms used but not defined herein shall have the respective meanings given to them in the Certificate of Designation. The Corporation will provide a copy of the Certificate of Designation to a Holder without charge upon written request to the Corporation at its principal place of business.

Upon receipt of this certificate, the Holder is bound by the Certificate of Designation and is entitled to the benefits thereunder.

Unless the Transfer Agent's Certificate of Authentication hereon has been properly executed, the shares of Preferred Stock evidenced hereby shall not be entitled to any benefit under the Certificate of Designation or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, Charter Communications, Inc. has executed this certificate as of the date set forth below.

CHARTER COMMUNICATIONS, INC.

By:_____
     Name:
     Title:

Dated:

# ASSIGNMENT

FOR VALUE RECEIVED, the undersigned assigns and transfers the shares of Series A PIK Preferred Stock evidenced hereby to:

_____

(Insert assignee's social security or tax identification number)

_____

_____

(Insert address and zip code of assignee)

and irrevocably appoints:

_____

as agent to transfer the shares of Preferred Stock evidenced hereby on the books of the Transfer Agent and Registrar.  The agent may substitute another to act for him or her.

Date:_____

Signature:_____
        (Sign exactly as your name appears on the other side of this Preferred Stock Certificate)

Signature Guarantee:_____[1]

---

[1]  Signature must be guaranteed by an "eligible guarantor institution" (i.e., a bank, stockbroker, savings and loan association or credit union) meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities and Exchange Act of 1934, as amended.

## SCHEDULE OF EXCHANGES FOR GLOBAL SECURITY

The initial number of shares of Series A PIK Preferred Stock represented by this Global Preferred Share shall be _____. The following exchanges of a part of this Global Preferred Share have been made:

| Date Of Exchange | Amount Of Increase In The Number Of Shares Represented By This Global Preferred Share | Number Of Shares Represented By Global Preferred Share Following Such Increase Or Decrease |
|---|---|---|
| | | |

Signature Of Authorized
Officer Of Registrar: _____

**Exhibit 23**

**Identity and Affiliation of Proposed New Board Members and Officers**

List of Directors and Officers of Reorganized Company

# LIST OF DIRECTORS AND OFFICERS

## Board of Directors of the Reorganized Company[1]

W. Lance Conn

Darren Glatt

Bruce A. Karsh

John D. Markley, Jr.

Bill McGrath

Neil Smit

Christopher M. Temple

Eric L. Zinterhofer

## Officers of the Reorganized Company

| | |
|---|---|
| Neil Smit | President and Chief Executive Officer |
| Michael J. Lovett | Executive Vice President and Chief Operating Officer |
| Eloise E. Schmitz | Executive Vice President and Chief Financial Officer |
| Grier C. Raclin | Executive Vice President and Chief Administrative Officer |
| Marwan Fawaz | Executive Vice President and Chief Technology Officer |
| Ted W. Schremp | Executive Vice President and Chief Marketing Officer |
| Gregory L. Doody | Chief Restructuring Officer and General Counsel |
| Joshua L. Jamison | President, East Operations |
| Steven E. Apodaca | President, West Operations |
| Kevin D. Howard | Vice President, Controller and Chief Accounting Officer |

---

[1] A ninth member of the Board of Directors of the Reorganized Company may be appointed by Franklin Advisers, Inc. in accordance with section VI.N of the Amended Plan no later than thirty (30) days after the Effective Date. The remaining directors of the initial Board of Directors of the Reorganized Company will be appointed by majority vote of the members of the entire Board of Directors on or after the thirty-first (31st) day after the Effective Date.

**Summary Biographical Information for the Members of the**
**Board of Directors of the Reorganized Company**

**W. Lance Conn**. From July 2004 to May 2009, Mr. Conn served as Executive Vice President, Investment Management for Vulcan Inc., the investment and project management company that oversees a diverse multi-billion dollar portfolio across diverse industry sectors and investment asset classes. Prior to joining Vulcan Inc., Mr. Conn was employed by America Online, Inc., an interactive online services company, from March 1996 to May 2003. From 1997 to 2000, Mr. Conn served in various senior business development roles at America Online. In 2000, Mr. Conn began supervising all of America Online's European investments, alliances and business initiatives. In 2002, he became Senior Vice President of America Online U.S. where he led a company-wide effort to restructure and optimize America Online's operations. From September 1994 until February 1996, Mr. Conn was an attorney with the Shaw Pittman law firm in Washington, D.C. Mr. Conn is a director at Plains All American Pipeline, L.P., Plains GP Holdings, L.P. and Vulcan Energy Corp.

**Darren Glatt**. Principal at Apollo Management, L.P. and has been with Apollo since 2006. Prior to Apollo, Mr. Glatt was a member of the Media Group at Apax Partners from 2004 to 2006, a member of the Media Group at the Cypress Group from 2000 to 2002 and a member of the Mergers & Acquisitions Group at Bear, Stearns & Co. from 1998 to 2000.

**Bruce A. Karsh**. President and co-founder of Oaktree Capital Management, LLC, an investment advisory firm with over $60 billion of assets under management, and has been with Oaktree since 1995. From 1987 through 1995, Mr. Karsh was with The TCW Group, Inc. where he established the TCW Special Credits group of funds and had primary portfolio management responsibility for their operation. Mr. Karsh is a director of Liberman Broadcasting, Inc.

**John D. Markley, Jr**. Since 1996, Mr. Markley has been affiliated with Columbia Capital, a communications, media and technology investment firm, where he has served in a number of capacities including portfolio company executive, general partner and venture partner. Prior to joining Columbia Capital, Mr. Markley served at the Federal Communications Commission where he developed U.S. Government wireless communications and spectrum auction policy. He also held positions in corporate finance for Kidder, Peabody & Co. in both New York City and Hong Kong. Mr. Markley is a director of Telecom Transport Management, Inc., Broadsoft Inc., and Millennial Media, Inc.

**Bill McGrath**. Since October 2007, Mr. McGrath has served as the Executive Vice President and General Counsel of Vulcan Inc. Prior to joining Vulcan, Mr. McGrath held senior legal positions with a number of private and public technology companies. He has also worked for two national law firms, in Washington, D.C. and Seattle. Earlier, he worked for the Judiciary Committee of the U.S. House of Representatives, and also served as a law clerk for a judge in the U.S. Court of Appeals for the Ninth Circuit. Mr. McGrath is a director of TowerCo LLC.

**Neil Smit**. President and Chief Executive Officer of Charter since August 2005. Mr. Smit had previously worked at Time Warner, Inc. since 2000, most recently serving as the President of Time Warner's America Online Access Business. Mr. Smit also served at America Online ("AOL") as Executive Vice President, Member Development, Chief Operating Officer of AOL

Local and Chief Operating Officer of MapQuest. Prior to that Mr. Smit was a Regional President with Nabisco and was with Pillsbury in a number of management positions.

**Christopher M. Temple**.    Since September 2008, Mr. Temple has been affiliated with Vulcan, Inc., most recently as Executive Vice President, Investment Management, responsible for managing its diverse multi-billion dollar investment portfolio.  Prior to joining Vulcan, Mr. Temple served as a managing director at Tailwind Capital, a New York-based private equity firm. Prior to Tailwind, Mr. Temple was a managing director at both Friend Skoler & Company and Thayer Capital Partners.  Additionally, he was a licensed CPA, serving clients in the energy sector with KPMG in Houston, Texas.  Mr. Temple is a director of Plains All American GP LLC, the managing general partner of Plains All American Pipeline, L.P., PAA/Vulcan Gas Storage, LLC, Vulcan Energy Corp., Rose City Radio Corporation and Vulcan Sports Media, Inc.

**Eric L. Zinterhofer**.  Senior partner at Apollo Management, L.P. and has been with Apollo since 1998.  From 1994 to 1996, Mr. Zinterhofer was a member of the Corporate Finance Department at Morgan Stanley Dean Witter & Co.  From 1993 to 1994, Mr. Zinterhofer was a member of the Structured Equity Group at J.P. Morgan Investment Management.  Mr. Zinterhofer is a director of Affinion Group, Inc., Central European Media Enterprises Ltd., Dish TV India Ltd., IPCS Inc. and Unity Media GmbH.

## Amended and Restated Exhibit 24

## Schedule of Executory Contracts and Unexpired Leases to be Rejected

## Schedule of Rejected Executory Contracts and Unexpired Leases[1]

Pursuant to Art. VII(A) of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 320] (the "Plan"), the following leases shall be deemed rejected as of the Effective Date.[2]

| Contract ID | Rejecting Debtor Entity | Counterparty Name and Address | Agreement Description | Dated |
|---|---|---|---|---|
| SC 0001 | Charter Communications, LLC | Marjo Investments, LLC<br>6001 Live Oak Parkway<br>Norcross, GA 30093 | Real Property Lease | 4/30/1998 (Lease)<br><br>7/16/1999 (Amendment)<br>12/1/2005<br><br>(Judgment re: Lease) |
| SC 0001 (Sublease) | Charter Communications, LLC | Dan Atkins or Laura Beth Burfitt<br>Discover Church Ministries, Inc.<br>505 South Main Street<br>Mauldin, SC 29662 | Real Property Sublease | 2/17/2006 |
| CA 0050 | Falcon Telecable, a California Limited Partnership | Clarence Taylor Westbrook, Kathryn Mae Westbrook and Sara May Twigg<br>11801 Oceanview Dr.<br>Smith River, CA 95567 | Real Property Lease | 5/1/1989 |
| CA 0107 | Falcon Cablevision, a California Limited Partnership | USDA Forest Service<br>P.O. Box 894183<br>Los Angeles, CA 90189-4183 | Real Property Lease | 9/18/1996 |

---

1  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.

2  Pursuant to Article VII.A of the Plan, executory contracts and unexpired leases shall be deemed assumed unless listed on Exhibit 24 to the Plan Supplement and mutually agreed to by the Debtors, the Requisite Holders, and Mr. Allen.

Pursuant to the Order (I) Authorizing and Approving Expedited Procedures for the Rejection of Executory Contracts and Unexpired Leases of Personal and Non-Residential Real Property and (II) Authorizing the Debtors to Reject Certain Unexpired Leases of Non-Residential Real Property [Docket No. 186], the following leases have been rejected as of April 30, 2009.

| Contract ID | Rejecting Debtor Entity | Counterparty Name and Address | Agreement Description | Dated |
|---|---|---|---|---|
| CA 0207 | Charter Communications Operating, LLC | CIP Real Estate Property Services ITF Gateway Pointe MacArthur Blvd, Suite 300 Irvine, CA 19762 | Commercial Lease | 12/7/2006 |
| CA 0212 | Charter Communications Properties, LLC | PS Business Parks, LP 4200 N. Freeway Blvd, Suite 1A, Sacramento, CA 95834 | Commercial Lease | 8/16/2007 |
| MO 0198 | Charter Communications Entertainment I, LLC | Stifel Bank & Trust 955 Executive Parkway, Suite 216 St. Louis, MO 63141 | Commercial Lease | 5/29/2008 |
| LA 0086 | Charter Communications Operating LLC | Equity One 1600 NE Miami Gardens Drive, North Miami Beach, FL 33179 | Commercial Lease | 12/30/2008 |
| TN 0170 | Charter Communications, LLC | Wolfe Realty Investors, LLC 3021 Highway 45 By Pass, Suite 101 Jackson, TN 38305 | Commercial Lease | 12/6/2007 |

2

## Exhibit 25

## Management Incentive Program

**CHARTER COMMUNICATIONS, INC**.

**2009 STOCK INCENTIVE PLAN**

# CHARTER COMMUNICATIONS, INC.
## 2009 STOCK INCENTIVE PLAN

1.     Purpose.

The purpose of this Plan is to strengthen Charter Communications, Inc., a Delaware corporation (the "Company"), by providing an incentive to the employees, officers, consultants and directors of the Company, its Subsidiaries and Affiliates and thereby encouraging them to devote their abilities and industry to the success of the Company's business enterprise.  It is intended that this purpose be achieved by extending to employees (including future employees who have received a written offer of employment), officers, consultants and directors of the Company, its Subsidiaries and Affiliates an added long-term incentive for high levels of performance and unusual efforts through the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Dividend Equivalent Rights, Performance Units and Performance Shares, Share Awards, Phantom Stock, Restricted Stock Units and Restricted Stock (as each term is herein defined).

2.     Definitions.

For purposes of the Plan:

"Affiliate" means, with respect to any person or entity, any entity, directly or indirectly, controlled by, controlling or under common control with such person or entity.

"Agreement" means the written agreement or other instrument evidencing the grant of an Option or Award and setting forth the terms and conditions thereof.  An Agreement may be in the form of an agreement to be agreed to by both the Optionee or Grantee and the Company (or an authorized representative of the Company) or certificates, notices or similar instruments as approved by the Committee.

"Award" means a grant of Restricted Stock, a Restricted Stock Unit, Phantom Stock, a Stock Appreciation Right, a Performance Award, a Dividend Equivalent Right, a Share Award or any or all of them.

"Board" means the Board of Directors of the Company.

"Cause" means:

(a)     in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes a definition of "Cause" (or similar term), the term "Cause" as used in this Plan or any Agreement shall have the meaning set forth in such employment agreement during the period that such employment agreement remains in effect; and

(b)     in all other cases, the Participant (i) has committed any crime; (ii) has committed any act of fraud knowing material misrepresentation or concealment, embezzlement or gross dishonesty; (iii) has committed any act of sex discrimination or sexual harassment under

the provisions of any Federal, state or local law, resulting in any of the above cases in a material financial loss to the Company or damage to the reputation of the Company; (iv) has refused to comply with the lawful directives of the Board or of the Participant's supervisors; (v) has breached any fiduciary duty to the Company or has engaged in conduct which constitutes gross negligence or willful misconduct; (vi) fails to adhere in any material respect to (x) the Company's Code of Conduct in effect from time to time or (y) any written Company policy, if such policy is material to the effective performance by Participant of Participant's duties; (vii) Participant's conviction of, the entering of a guilty plea or plea or nolo contendere or no contest (or the equivalent), or entering into any pretrial diversion program or agreement or suspended imposition of sentence, with respect to either a felony or a crime that adversely affects or could reasonably be expected to adversely affect the Company or its business reputation; or the institution of criminal charges against Participant which are not dismissed within sixty (60) days after institution, for fraud, embezzlement, any felony offense involving dishonesty or constituting a breach of trust, or any felony (including without limitation a crime in any jurisdiction other than the United States or any state thereof in which Company does business which would constitute such a felony under the laws of the United States or any state thereof); (viii) Participant's admission of liability of, or finding of liability, for a knowing and deliberate violation of any "Securities Laws" (as used herein, the term "Securities Laws" means any federal or state law, rule or regulation governing generally the issuance or exchange of securities, including without limitation the Securities Act of 1933, the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder); or (ix) Participant's illegal possession or use of any controlled substance, or excessive use of alcohol at a work function, in connection with Participant's duties, or on Company premises; "excessive" meaning either repeated unprofessional use or any single event of consumption giving rise to significant intoxication or unprofessional behavior.

"Change in Capitalization" means any increase or reduction in the number of Shares, or any change (including, but not limited to, in the case of a spin-off, dividend or other distribution in respect of Shares, a change in value) in the Shares or exchange of Shares for a different number or kind of shares or other securities of the Company or another corporation, by reason of a reclassification, recapitalization, merger, consolidation, reorganization, spin-off, split-up, issuance of warrants or rights or debentures, stock dividend, stock split or reverse stock split, property dividend, cash dividend (other than regular, quarterly dividends), combination or exchange of Shares, repurchase of Shares, change in corporate structure or otherwise.

A "Change in Control" means:

(a)    in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or a Subsidiary, which employment agreement includes a definition of "Change in Control" (or similar term), the term "Change in Control" as used in this Plan or any Agreement shall have the meaning set forth in such employment agreement during the period that such employment agreement remains in effect; and

(b)    in all other cases, the occurrence of any of the following:

(i)     an acquisition of any voting securities of the Company by any "Person" or "Group" (as those terms are used for purposes of Section 13(d) or 14(d) of the Exchange Act), immediately after which such Person has "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of fifty percent (50%) or more of the combined voting power of the Company's then outstanding voting securities; provided, however, in determining whether a Change in Control has occurred pursuant to this definition, Shares or voting securities which are acquired in a "Non-Control Acquisition" (as hereinafter defined) shall not constitute an acquisition which would cause a Change in Control. A "Non-Control Acquisition" shall mean an acquisition by (i) an employee benefit plan (or a trust forming a part thereof) maintained by (A) the Company or (B) any Subsidiary or Affiliate of the Company, (ii) the Company or any Subsidiary of the Company, (iii) an underwriter acquiring such voting securities in connection with a public offering of such securities; or (iv) any Person in connection with a "Non-Control Transaction" (as hereinafter defined);

(ii)     The individuals who, as of June 30, 2009 are members of the Board (the "Incumbent Board"), cease for any reason to constitute at least one half of the members of the Board or, following a Merger which results in a Parent Corporation (as defined in paragraph (iii)(A)(l) below), the board of directors of the Parent Corporation; provided, however, that if the election, or nomination for election by the Company's common stockholders, of any new director was approved by a vote of at least one half of the Incumbent Board, such new director shall, for purposes of this Plan, be considered as a member of the Incumbent Board; provided further, however, that no individual shall be considered a member of the Incumbent Board if such individual initially assumed office as a result of either an actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board (a "Proxy Contest") including by reason of any agreement intended to avoid or settle any Proxy Contest; or

(iii)     The consummation of:

(A)     A merger, consolidation, reorganization or similar transaction involving the Company or in which securities of the Company are issued (a "Merger"), unless such Merger is a "Non-Control Transaction." A "Non-Control Transaction" shall mean a Merger where:

(1)     the stockholders of the Company, immediately before such Merger own directly or indirectly immediately following such Merger more than fifty percent (50%) of the combined voting power of the outstanding voting securities of (x) the corporation resulting from such Merger (the "Surviving Corporation"), or (y) if any Person or Group, directly or indirectly, owns fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation (such Person or Group shall be defined as a "Parent Corporation"), the Parent Corporation;

(2)     the individuals who were members of the Incumbent Board immediately prior to the execution of the agreement

4

providing for such Merger constitute at least a majority of the members of the board of directors of (x) the Surviving Corporation, or (y) the Parent Corporation, if the Parent Corporation, directly or indirectly, owns fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation; and

(3) no Person other than (a) the Company, (b) any Subsidiary of the Company, (c) any employee benefit plan (or any trust forming a part thereof) that, immediately prior to such Merger was maintained by the Company or any Subsidiary or Affiliate of the Company, or (d) any Person who, immediately prior to such Merger had Beneficial Ownership of fifty percent (50%) or more of the then outstanding voting securities or Shares, has Beneficial Ownership of fifty percent (50%) or more of the combined voting power of the outstanding voting securities or common stock of (x) the Surviving Corporation, or (y) the Parent Corporation, if the Parent Corporation, directly or indirectly, owns fifty percent (50%) or more of the combined voting power of the then outstanding voting securities of the Surviving Corporation.

(B) A complete liquidation or dissolution of the Company (other than where assets of the Company are transferred to or remain with Subsidiaries of the Company); or

(C) The sale or other disposition of all or substantially all of the assets of the Company, directly or indirectly, to any Person (other than a transfer to a Subsidiary of the Company, including, without limitation, the Allen Entities, if and only if the Allen Entities are Affiliates (individually or collectively) of the Company immediately prior to such sale or other disposition, or under conditions that would constitute a Non-Control Transaction with the disposition of assets being regarded as a Merger for this purpose or the distribution to the Company's stockholders of the stock of a Subsidiary or Affiliate of the Company or any other assets).

Notwithstanding the foregoing, for 409A Awards that are settled or distributed upon a "Change in Control," the foregoing definition shall only apply to the extent the applicable event otherwise constituting a "Change in Control" would also constitute a "change in control event" under Code Section 409A.

Unless otherwise provided in an employment agreement between a Participant and the Company, notwithstanding the foregoing a Change in Control shall not be deemed to occur solely because any Person (the "Subject Person") acquired Beneficial Ownership of more than the permitted amount of the then outstanding Shares or voting securities as a result of the acquisition of Shares or voting securities by the Company which, by reducing the number of Shares or voting securities then outstanding, increases the proportional number of Shares Beneficially Owned by the Subject Persons, provided that if a Change in Control would occur (but for the operation of this sentence) as a result of the acquisition of Shares or voting securities by the Company, and after such share acquisition by the Company, the Subject Person becomes

the Beneficial Owner of any additional Shares or voting securities which increases the percentage of the then outstanding Shares or voting securities Beneficially Owned by the Subject Person, then a Change in Control shall occur.

Unless otherwise provided in an employment agreement between the Participants and the Company, if a Participant's employment is terminated (A) by the Company without Cause within the thirty (30) day period immediately preceding a Change in Control or (B) by the Company without Cause preceding a Change in Control at the written request of a third party (or such third party's agent) who has indicated an intention or taken steps reasonably calculated to effect a Change in Control, such termination shall be deemed to have occurred after a Change in Control for purposes of this Plan provided a Change in Control shall actually have occurred.

"Code" means the Internal Revenue Code of 1986, as amended. Reference to a specific section of the Code or regulation thereunder shall include such section or regulation, any valid regulation or other guidance promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

"Committee" means at least one committee, as described in Section 3.1, appointed by the Board from time to time to administer the Plan and to perform the functions set forth herein.

"Company" means Charter Communications, Inc., a Delaware Corporation.

"Director" means a director of the Company.

"Disability" means:

(a)     in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes a definition of "Disability" (or similar term), the term "Disability" as used in this Plan or any Agreement shall have the meaning set forth in such employment agreement during the period that such employment agreement remains in effect; or

(b)     in all other cases, the term "Disability" as used in this Plan or any Agreement shall mean a physical or mental infirmity which impairs the Participant's ability to perform substantially his or her duties, and for which the Participant is also receiving benefits under the Company's long-term disability plan, if any, then in effect.

Notwithstanding the foregoing, for 409A Awards that are settled or distributed upon a "Disability," "Disability" shall mean that a Participant is disabled under Treasury Regulation Section 1.409A-3(i)(4)(i).

"Division" means any of the operating units or divisions of the Company or Subsidiary designated as a Division by the Committee in its discretion.

"Dividend Equivalent Right" means a right to receive all or some portion of the dividends that are or would be payable with respect to Shares, payable in either cash or Shares.

"Eligible Individual" means any of the following individuals who is designated by the Committee in its discretion as eligible to receive Options or Awards subject to the conditions set forth herein: (a) any director, officer or employee of the Company or a Subsidiary or Affiliate of the Company, (b) any individual to whom the Company, or a Subsidiary or an Affiliate of the Company, has extended a formal offer of employment, so long as the grant of any Option or Award shall not become effective until the individual commences employment or (c) any consultant or advisor of the Company or a Subsidiary. Notwithstanding the foregoing, the eligibility and/or participation of those employees represented by a collective bargaining representative shall be governed solely by the results of good faith negotiations between the Company and such employees' representative and/or by the express terms of any collective bargaining agreement resulting therefrom.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fair Market Value" on any date means the average of the high and low sales prices of the Shares on such date on the principal national securities exchange on which such Shares are listed or admitted to trading, or if there were no reported transaction for such date, the opening transaction price as reported by such exchange for the first trading date following the date by which such value is being determined on the next preceding date, or if such Shares are not so listed or admitted to trading, the average of the high and low sales price per Share on such date as quoted on the National Association of Securities Dealers Automated Quotation System or such other market in which such prices are regularly quoted or, if there have been no regularly quoted or reported high and low sales prices with respect to Shares on such date, the Fair Market Value shall be the value established by the Board or the Committee in good faith. Notwithstanding the foregoing, Fair Market Value relating to the exercise price or base price of any Non-409A Option or SAR may be determined in any manner permitted by Code Section 409A.

"Good Reason" means the occurrence after a Change in Control of any of the events or conditions described in subsections (1) through (8) hereof, so long as, in the case of events or conditions described in subsections (2) through (8) hereof, the Participant provides notice of the existence of such breach within ninety (90) days of the Participant's knowledge of such breach, and the Company does not remedy such breach within ninety (90) days of receipt of such notice:

(1) in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason" (or similar term), the term "Good Reason" as used in this Plan or any Agreement shall have the meaning set forth in such employment agreement during the period that such employment agreement remains in effect;

(2) a change in the Participant's status, title, position or responsibilities (including reporting responsibilities) which represents an adverse change

from his status, title, position or responsibilities as in effect at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter; the assignment to the Participant of any duties or responsibilities which are inconsistent with his status, title, position or responsibilities as in effect at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter; or any removal of the Participant from or failure to reappoint or reelect him to any of such offices or positions, except in connection with the termination of his employment for Disability, Cause, as a result of his death or by the Participant other than for Good Reason;

(3)     a reduction in the Participant's base salary or any failure to pay the Participant any compensation or benefits to which he is entitled within five (5) days of notice thereof;

(4)     the Company's or any Subsidiary's requiring the Participant to be based at any place more than fifty (50) miles from the Participant's principal place of employment, except for reasonably required travel on the Company's business which is not materially greater than such travel requirements prior to the Change in Control or relocation pursuant to a voluntary change in position;

(5)     the failure by the Company, any Subsidiary or an Affiliate to provide the Participant with compensation and benefits, in the aggregate, at least equal (in terms of benefit levels and/or reward opportunities) to those provided for under each other employee benefit plan, program and practice in which the Participant was participating at any time within ninety (90) days preceding the date of a Change in Control or at any time thereafter;

(6)     the insolvency or the filing (by any party, including the Company) of a petition for bankruptcy of the Company or Subsidiary, which petition is not dismissed within sixty (60) days;

(7)     any purported termination of the Participant's employment for Cause by the Company which does not comply with the terms of such definition; or

(8)     the failure of the Company or Successor to obtain an agreement from any Successors and Assigns to assume and agree to perform this Plan, as contemplated in Section 16 hereof.

Any event or condition described in subsections (1) through (8) hereof which occurs prior to a Change in Control but which the Participant reasonably demonstrates (A) was at the request of a third party, or (B) otherwise arose in connection with, or in anticipation of, a Change in Control which actually occurs, shall constitute Good Reason for purposes of the Plan notwithstanding that it occurred prior to the Change in Control.

"Grantee" means a person to whom an Award has been granted under the Plan.

"Incentive Stock Option" or "ISO" means any Option designated as an incentive stock option within the meaning of Code Section 422 and qualifying thereunder.

"Nonemployee Director" means a director of the Company who is a "non-employee director" under Rule 16b-3 of the Exchange Act.

"Nonqualified Stock Option" means an Option which is not an incentive stock option as defined under Code Section 422.

"Option" means a Nonqualified Stock Option or an ISO.

"Optionee" means a person to whom an Option has been granted under the Plan.

"Outside Director" means a director of the Company who is an "outside director" within the meaning of Code Section 162(m) and the regulations promulgated thereunder.

"Participant" means any Eligible Individual to whom Options and/or Awards have been granted from time to time by the Committee and any authorized transferee of such individual.

"Performance Awards" means Performance Units, Performance Shares or either or both of them.

"Performance-Based Compensation" means any Option or Award that is intended to constitute "performance based compensation" within the meaning of Code Section 162(m)(4)(C) and the regulations promulgated thereunder.

"Performance Cycle" means the time period specified by the Committee in its discretion at the time Performance Awards are granted during which the performance of the Company, a Subsidiary or a Division will be measured.

"Performance Objectives" has the meaning set forth in Section 10.

"Performance Shares" means Shares issued or transferred to an Eligible Individual under Section 10.

"Performance Units" means Performance Units granted to an Eligible Individual under Section 10.

"Phantom Stock" means a right granted to an Eligible Individual under Section 11 representing a number of hypothetical Shares.

"Plan" means this Charter Communications, Inc. 2009 Stock Incentive Plan, as amended from time to time.

"Restricted Stock" means Shares issued or transferred to an Eligible Individual pursuant to Section 9.

"Restricted Stock Unit" means an Award granted to an Eligible Individual pursuant to Section 9 pursuant to which Shares or cash in lieu thereof may be issued in the future.

"Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) with the sum of the employee's age and years of service equaling 70 or more, and (iii) following one or more years of service from the date of grant. For the purposes of this definition, "years of service" shall include years of service with the Company, as well as any years of service with an Affiliate or Subsidiary but only during such time as those entities are Affiliates or Subsidiaries.

"Share Award" means an Award of Shares granted pursuant to Section 11.

"Shares" means the Class A Common Stock, par value $.01 per share, of the Company and any other securities into which such shares are changed or for which such shares are exchanged.

"Stock Appreciation Right" or "SAR" means a right to receive all or some portion of the increase in the value of the Shares as provided in Section 7 hereof.

"Subsidiary" means any entity, whether or not incorporated, in which the Company, directly or indirectly, (i) owns thirty-five percent (35%) or more of the outstanding equity or other ownership interests, (ii) owns thirty-five percent (35%) or more of the outstanding voting power, or (iii) has sole management responsibility. With respect to the grant and administration of Incentive Stock Options, "Subsidiary" shall have the meaning set forth in Code Section 424(f).

"Successors and Assigns" for purposes of the Plan, shall mean a corporation or other entity acquiring all or substantially all the assets and business of the Company or a Subsidiary whether by operation of law or otherwise, and any affiliate of such Successors and Assigns.

"Ten Percent Holder" means an employee (together with persons whose stock ownership is attributed to the employee pursuant to Code Section 424(d)) who, at the time an Option is granted, owns stock representing more than ten percent of the voting power of all classes of stock of the Company.

"409A Awards" means Awards that constitute a deferral of compensation under Code Section 409A and regulations thereunder. "Non-409A Awards" means Awards other than 409A Awards. Although the Committee retains authority under the Plan to grant Options, SARs and Restricted Stock units on terms that will qualify those Awards as 409A Awards, Options, SARs exercisable for Stock, and Restricted Stock units are intended to be designed to qualify as Non-409A Awards unless otherwise expressly specified by the Committee.

3.    Administration.

3.1.    The Plan shall be administered by the Committee, which shall hold meetings at such times as may be necessary for the proper administration of the Plan. The Committee shall keep minutes of its meetings. If the Committee consists of more than one (1) member, a quorum shall consist of not fewer than two (2) members of the Committee and a majority of a quorum may authorize any action. Any decision or determination reduced to writing and signed by all of the members of the Committee shall be as fully effective as if made

by a majority vote at a meeting duly called and held. The Committee shall consist of one (1) or more Directors and may consist of the entire Board; provided, however, (A) if the Committee consists of less than the entire Board, then with respect to any Option or Award to an Eligible Individual who is subject to Section 16 of the Exchange Act, the Committee shall consist of at least two (2) Directors, each of whom shall be a Nonemployee Director and (B) to the extent necessary for any Option or Award intended to qualify as Performance-Based Compensation to so qualify, the Committee shall consist of at least two (2) Directors, each of whom shall be an Outside Director. For purposes of the preceding sentence, if one or more members of the Committee is not a Nonemployee Director and an Outside Director but recuses himself or herself or abstains from voting with respect to a particular action taken by the Committee, then the Committee, with respect to that action, shall be deemed to consist only of the members of the Committee who have not recused themselves or abstained from voting.

3.2. Subject to applicable law, the Committee may delegate its authority under the Plan to any other person or persons, including but not limited to, a subcommittee comprised of one or more member(s) of the Committee, pursuant to such conditions or limitations as the Committee may establish, and may grant authority to officers or subcommittee members to grant Awards and/or execute agreements or other documents on behalf of the Committee; provided that (i) the Committee may not authorize any such officer or subcommittee member to designate himself or herself as a recipient of any Option or Award and (ii) the resolution authorizing any officer or subcommittee member to grant Options or Awards shall specify the total number of Options or Awards such officer may grant. In the event that the Committee's authority is delegated to officers or subcommittee members in accordance with the foregoing, all provisions of the Plan relating to the Committee shall be interpreted in a manner consistent with the foregoing by treating any such reference as a reference to such individual for such purpose. Any action undertaken in accordance with the Committee's delegation of authority hereunder shall have the same force and effect as if such action was undertaken directly by the Committee and shall be deemed for all purposes of the Plan to have been taken by the Committee.

3.3. No member of the Committee or the Board or any person designated pursuant to Section 3.2 shall be liable for any action, failure to act, determination or interpretation made in good faith with respect to this Plan or any transaction hereunder. The Company hereby agrees to indemnify each member of the Committee for all costs and expenses and, to the extent permitted by applicable law, any liability incurred in connection with defending against, responding to, negotiating for the settlement of or otherwise dealing with any claim, cause of action or dispute of any kind arising in connection with any actions in administering this Plan or in authorizing or denying authorization to any transaction hereunder.

3.4. Subject to the express terms and conditions set forth herein, the Committee shall have the power and the discretion from time to time to:

(a) determine those Eligible Individuals to whom Options shall be granted under the Plan and the number of such Options to be granted and to prescribe the terms and conditions (which need not be identical) of each such Option, (including, but not limited to, the exercise or purchase price (if any), the duration of each Option, any restriction or limitation, any vesting schedule or acceleration thereof, or any forfeiture restrictions or waiver thereof, regarding any Option and the Shares relating thereto, based on such factors, if any, as the

Committee shall determine, in its sole discretion), and make any amendment or modification to any Option Agreement consistent with the terms of the Plan;

(b)  select those Eligible Individuals to whom Awards shall be granted under the Plan and to determine the number of Shares in respect of which each Award is granted, the terms and conditions (which need not be identical) of each such Award (including, but not limited to, the exercise or purchase price (if any), the duration of each Award, any restriction or limitation, any vesting schedule or acceleration thereof, or any forfeiture restrictions or waiver thereof, regarding any Award and the Shares relating thereto, based on such factors, if any, as the Committee shall determine, in its sole discretion), and make any amendment or modification to any Agreement consistent with the terms of the Plan;

(c)  to construe and interpret the Plan and the Options and Awards granted hereunder and to establish, amend and revoke rules and regulations for the administration of the Plan, including, but not limited to, correcting any defect or supplying any omission, or reconciling any inconsistency in the Plan or in any Agreement, in the manner and to the extent it shall deem necessary or advisable, including so that the Plan and the operation of the Plan complies with Rule 16b-3 under the Exchange Act, the Code to the extent applicable and other applicable law, and otherwise to make the Plan fully effective. All decisions and determinations by the Committee in the exercise of this power shall be final, binding and conclusive upon the Company, its Subsidiaries, the Optionees and Grantees, and all other persons having any interest therein;

(d)  to determine the duration and purposes for leaves of absence which may be granted to an Optionee or Grantee on an individual basis without constituting a termination of employment or service for purposes of the Plan;

(e)  to exercise its discretion with respect to the powers and rights granted to it as set forth in the Plan;

(f)  generally, to exercise such powers and to perform such acts as are deemed necessary or advisable to promote the best interests of the Company with respect to the Plan;

(g)  engage an agent to (i) maintain records of Participants and holdings under the Plan, (ii) execute sales transactions in Shares at the direction of an Optionee or Grantee, (iii) deliver sales proceeds as directed by an Optionee or Grantee, (iv) hold Shares owned without restriction at the direction of the Optionee or Grantee and (v) engage in such other activities as the Committee determines from time to time necessary to administer the Plan; and

(h)  generally, to exercise such powers and to perform such acts as are deemed necessary or advisable to promote the best interests of the Company with respect to the Plan.

Notwithstanding the foregoing, the participation of an Eligible Individual represented by a collective-bargaining representative shall also be governed by the results of good-faith collective bargaining and/or any collective bargaining agreement resulting therefrom.

4.  <u>Stock Subject to the Plan; Grant Limitations</u>.

4.1.    Awards under the Plan may be in the form of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Dividend Equivalent Rights, Performance Units and Performance Shares, Share Awards, Phantom Stock, Restricted Stock Units and Restricted Stock, cash payments and such other forms as the Committee in its discretion deems appropriate, including any combination of the above.   Unless otherwise determined by the Committee, no fractional Shares shall be issued under the Plan nor shall any right be exercised under the Plan with respect to a fractional Share.

4.2.    Subject to adjustment pursuant to Section 13, the maximum number of Shares that may be made the subject of Options and Awards granted under the Plan is [          ].[1]   The Company shall reserve for the purposes of the Plan, out of its authorized but unissued Shares or out of Shares held in the Company's treasury, or partly out of each, such number of Shares as shall be determined by the Board in its discretion.  The aggregate number of Shares subject to Options and/or Stock Appreciation Rights granted under this Plan during any calendar year to any one Participant shall not exceed [          ], which number shall be calculated and adjusted pursuant to Section 13 only to the extent that such calculation or adjustment will not affect the status of any Option and/or Award intended to qualify as "performance-based compensation" under Code Section 162(m).  The maximum number of Shares that may be granted under this Plan during any calendar year to any one Participant as Performance Shares or Performance Units (in either case, denominated in Shares) shall not exceed [          ], which number shall be calculated and adjusted pursuant to Section 13 only to the extent that such calculation or adjustment will not affect the status of any such Performance Shares or Performance Units intended to qualify as "performance-based compensation" under Code Section 162(m).  The aggregate number of Shares that may be issued pursuant to the exercise of Incentive Stock Options granted under this Plan shall not exceed [          ], which number shall be calculated and adjusted pursuant to Section 13 only to the extent that such calculation or adjustment will not affect the status of any Option intended to qualify as an Incentive Stock Option under Code Section 422. The maximum cash amount payable pursuant to an Award denominated in cash and granted in any calendar year to any Participant under this Plan that is intended to satisfy the requirements for "performance-based compensation" under Code Section 162(m) shall not exceed $[          ].

4.3.    Upon the granting of an Option or an Award, the number of Shares available under Section 4.2 for the granting of further Options and Awards shall be reduced as follows:  in connection with the granting of an Option or an Award (other than the granting of a Performance Unit denominated in dollars), the number of Shares shall be reduced by the number of Shares in respect of which the Option or Award is granted or denominated; provided, however, that (i) if any Option is exercised by tendering Shares, either actually or by attestation, to the Company as full or partial payment of the exercise price, the maximum number of Shares available under Section 4.2 shall be increased by the number of Shares so tendered and (ii) upon settlement of Stock Appreciation Rights, the maximum number of Shares available under

---

[1]    An amount representing no less than three percent (3%) of the fully diluted New Common Stock outstanding on the Effective Date, after giving effect to the Rights Offering and the issuance of warrants.

Section 4.2 shall be increased by the excess of (x) the number of Shares covered by portion of the Stock Appreciation Right exercised, over (y) the number of Shares delivered in connection with the settlement of the Stock Appreciation Right.

4.4. Whenever any outstanding Option or Award or portion thereof expires, is canceled, is settled in cash (including the settlement of tax withholding obligations using Shares) or is otherwise terminated for any reason without having been exercised or payment having been made by issuance of Shares in respect of the Option or Award, the Shares allocable to the expired, canceled, settled or otherwise terminated portion of the Option or Award may again be the subject of Options or Awards granted hereunder.

5. Option Grants for Eligible Individuals.

5.1. Authority of Committee. Subject to the provisions of the Plan, the Committee shall have full and final authority to select those Eligible Individuals who will receive Options, and the terms and conditions of the grant to such Eligible Individuals shall be set forth in an Agreement. An Award of Options may include Incentive Stock Options, Non-Qualified Stock Options, or a combination thereof; provided, however, that an Incentive Stock Option may only be granted to an employee of the Company or a Subsidiary and no Incentive Stock Option shall be granted more than ten years after the earlier of (i) the date this Plan is adopted by the Board or (ii) the date this Plan is approved by the Company's shareholders.

5.2. Exercise Price. Subject to Section 6.5, the purchase price or the manner in which the exercise price is to be determined for Shares under each Option shall be determined by the Committee in its discretion and set forth in the Agreement; provided, however, unless otherwise determined by the Committee, the exercise price per Share under each Option shall not be less than one hundred percent (100%) of the Fair Market Value of a Share on the date the Option is granted unless the Options are substituted for options issued by another company where the Company or a Subsidiary acquires (whether by purchase, merger, or otherwise) all or substantially all of outstanding capital stock or assets of another company or in the event of any reorganization or other transaction qualifying under Code Section 424.

5.3. Maximum Duration. Options granted hereunder shall be for such term as the Committee shall determine in its discretion, provided that an Option shall not be exercisable after the expiration of ten (10) years from the date it is granted. Unless the Committee provides otherwise in the Agreement or in an employment agreement between the Optionee and the Company, subject to the preceding sentence in this Section 5.3, an Option (i) may, upon the death, Disability or Retirement of the Optionee prior to the expiration of the Option, be exercised for up to two (2) years following the date of the Optionee's death, Disability or Retirement, as applicable, but in any event no later than the original expiration date, (ii) may, following the voluntary termination of service by the Optionee or a termination other than for Cause, be exercised for up to sixty (60) days following the date of termination, but in any event no later than the original expiration date, and (iii) shall, in the event of a termination of service for Cause, be terminated effective immediately prior to such termination, whether or not such Option was then exercisable and, provided further, that termination for this purpose is the later of (x) with respect to an Optionee who upon termination of employment as an employee remains an Eligible Individual shall occur only when the Optionee is no longer an Eligible Individual and (y) with

respect to an Optionee who is receiving severance payments shall occur when such payments cease, provided Optionee enters into a release in the form acceptable to the Company. The Committee may, in its discretion, subsequent to the granting of any Option, extend the term thereof, but in no event shall the term as so extended exceed the maximum term provided for in the first sentence hereof.

5.4.    Vesting.    Subject to Section 6.4 addressing the effect of a Change in Control, each Option shall entitle the Eligible Individual to purchase, in whole at any time or in part from time to time, twenty-five percent (25%) of the total number of Shares covered by the Option as of the first anniversary of the date of grant and an additional twenty-five percent (25%) of the total number of Shares covered by the Option after the expiration of each of the second, third and fourth anniversaries of the date of grant while the Optionee is an Eligible Individual; provided however, that Options (i) may become exercisable in such other installments (which need not be equal) and at such times as may be designated by the Committee in its discretion and set forth in the Agreement and (ii) unless the Committee provides otherwise in the Agreement or in an employment agreement between the Optionee and the Company, shall continue to vest only while the Optionee is an Eligible Individual.  Notwithstanding the foregoing, the vesting of any Option shall continue during the period the Optionee is receiving severance payments provided Optionee enters into a release in the form acceptable to the Company.   To the extent not exercised, installments shall accumulate and be exercisable, in whole or in part, at any time after becoming exercisable, but not later than the date the Option expires.  The Committee may, in its discretion permit the continued vesting or, accelerate the exercisability of any Option or portion thereof at any time.

5.5.    Option Repricing.  Notwithstanding anything contained in this Plan to the contrary, the Committee may, in its sole discretion, approve an Option repricing without stockholder approval.  For the purposes of the preceding sentence, an "Option repricing" shall include reducing the exercise price per share of any outstanding Option, permitting the cancellation, forfeiture or tender of outstanding Options in exchange for other Awards or for new Options with a lower exercise price per Share, by any other method repricing or replacing any outstanding Option, or taking any other action deemed to be a "repricing" under the rules of the national securities exchange or other market on which the Shares are listed or admitted to trading.

6.    Terms and Conditions Applicable to All Options.

6.1.    Non-Transferability.

(a)    No Option shall be transferable by the Optionee otherwise than by will or by the laws of descent and distribution or pursuant to a domestic relations order (within the meaning of Rule 16a-12 promulgated under the Exchange Act), and an Option shall be exercisable during the lifetime of such Optionee only by the Optionee or his or her guardian or legal representative.  Notwithstanding the foregoing, the Committee may, in its discretion, set forth in the Agreement evidencing an Option at the time of grant or thereafter, that the Option may be transferred to members of the Optionee's immediate family, to trusts solely for the benefit of such immediate family members and to partnerships in which such family members and/or trusts are the only partners, and for purposes of this Plan, a transferee of an Option shall

15

be deemed to be the Optionee. For this purpose, immediate family means the Optionee's spouse, parents, children, stepchildren and grandchildren and the spouses of such parents, children, stepchildren and grandchildren. The terms of an Option shall be final, binding and conclusive upon the beneficiaries, executors, administrators, heirs and successors of the Optionee.

(b) Notwithstanding anything to the contrary herein, including, without limitation, the provisions of Section 5.3, if an Option has been transferred in accordance with this Section 6.1, the Option shall be exercisable solely by the transferee. The Option shall remain subject to the provisions of the Plan, including that it shall be exercisable only to the extent that the Optionee or Optionee's estate would have been entitled to exercise it if the Optionee had not transferred the Option. Unless otherwise provided in the Optionee's Agreement, in the event of the death of the Optionee prior to the expiration of the right to exercise the transferred Option, the period during which the Option shall be exercisable shall terminate on the date one (1) year following the date of the Optionee's death. In the event of the death of the transferee prior to the expiration of the right to exercise the Option, the period during which the Option shall be exercisable by the executors, administrators, legatees and distributees of the transferee's estate, as the case may be, shall terminate on the date one (1) year following the date of the transferee's death. In no event, however, shall the Option be exercisable after the expiration of the Option period set forth in the terms and conditions of the Agreement. The Option shall be subject to such other rules as the Committee shall determine in its discretion.

6.2. Method of Exercise. The exercise of an Option shall be made only by a written notice delivered in person, electronically or by mail to the Company (or its designee) specifying the number of Shares to be exercised and, to the extent applicable, accompanied by payment therefor and otherwise in accordance with the Agreement pursuant to which the Option was granted; provided, however, that Options may not be exercised by an Optionee for six (6) months following a hardship distribution to the Optionee, to the extent such exercise is prohibited under Treasury Regulation § 1.401(k)-1(d)(3)(B)(2)(iv)(E)(2). The exercise price for any Shares purchased pursuant to the exercise of an Option shall be paid, in any of the following forms (or any combination thereof): (a) cash, (b) the transfer of Shares, either actually or by attestation, to the Company, such transfer to be upon such terms and conditions as determined by the Committee in its discretion, (c) withholding of Shares deliverable upon exercise or (d) a combination of any of the foregoing or such other methods as determined by the Committee in its discretion; provided, however, that the Committee may determine at any time in its discretion that the exercise price shall be paid only in cash. In addition, if Shares are regularly traded on an established securities market at the time of exercise, Options may be exercised through a registered broker-dealer pursuant to such "same day sale" procedures which are, from time to time, deemed acceptable by the Committee in its discretion. Any Shares transferred to or withheld by the Company as payment of the exercise price under an Option shall be valued at their Fair Market Value on the date of exercise of such Option. If requested by the Committee in its discretion, the Optionee shall deliver the Agreement evidencing the Option to the Company (or its designee) who shall endorse thereon a notation of such exercise and return such Agreement to the Optionee. Unless otherwise determined by the Committee in its discretion, no fractional Shares (or cash in lieu thereof) shall be issued upon exercise of an Option and the number of Shares that may be purchased upon exercise shall be rounded to the nearest number of whole Shares.

6.3.     Rights of Optionees.  No Optionee shall be deemed for any purpose to be the owner of any Shares subject to any Option unless and until (a) the Option shall have been exercised pursuant to the terms thereof, (b) the Company shall have issued and delivered Shares to the Optionee, and (c) the Optionee's name shall have been entered as a stockholder of record on the books of the Company.  Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such Shares, subject to such terms and conditions as may be set forth in the applicable Agreement.

6.4.     Effect of Change in Control.    Notwithstanding any other provision contained in this Plan, except as otherwise provided in an Agreement or employment agreement between the Optionee and the Company, in the event of a Change in Control, any unvested Options issued under this Plan to any Optionee shall vest and become fully exercisable, subject to the provisions of Section 12.2, upon (i) the termination by the Company, Subsidiary, or Affiliate of the Optionee's employment other than for Cause during the thirteen (13)  month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition) or (ii) the termination of the Optionee's employment for Good Reason, during the thirteen (13)  month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition).  Except as otherwise provided in an employment agreement between the Optionee and the Company, in the event of a Change in Control, the Committee may, in its discretion, do one or more of the following:  (i) shorten the period during which Options are exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionees); (ii) arrange to have the surviving or successor entity assume the Options or grant replacement options with appropriate adjustments in the Option prices and adjustments in the number and kind of securities issuable upon exercise so that the options or their replacements either (A) represent the right to purchase the shares of stock, securities or other property (including cash) as may be issuable or payable as a result of a Change in Control with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Options had such exercise occurred in full prior to such Change in Control, or (B) represent the right to purchase equity securities of such surviving or successor entity, but only if such equity securities are actively traded on an established securities market or (iii) cancel the Options upon the payment to the Optionee in cash and/or securities of the surviving or successor entity (but only if such securities are actively traded on an established securities market) with respect to each Option to the extent then exercisable (including any Options as to which the exercise has been accelerated in accordance with this Section 6.4), of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Change in Control.  The Committee may, in its discretion, also provide for one or more of the foregoing alternatives in any particular Option Agreement.

6.5.     ISOs.  Notwithstanding anything to the contrary in Section 5 and this Section 6, in the case of the grant of an Option intending to quality as an ISO: (i) if the Optionee is a Ten Percent Holder, the purchase price of such Option must be at least one hundred and ten percent (110%) of the Fair Market Value of the Shares on the date of grant and the Option must expire within a period of not more than five (5) years from the date of grant, and (ii) termination of employment will occur when the person to whom an ISO was granted ceases to be an employee (as determined in accordance with Code Section 3401(c) and the regulations

promulgated thereunder) of the Company and its Subsidiaries. Notwithstanding anything in Section 5 and this Section 6 to the contrary, Options designated as ISOs shall not be eligible for treatment under the Code as ISOs to the extent that either (a) the aggregate Fair Market Value of Shares (determined as of the time of grant) with respect to which such Options are exercisable for the first time by the Participant during any calendar year (under all plans of the Company and any Subsidiary) exceeds $100,000, taking Options into account in the order in which they were granted, or (b) such Options otherwise remain exercisable but are not exercised within three (3) months of termination of employment (or such other period of time provided in Code Section 422). Should any Option granted under this Plan be designated an "Incentive Stock Option," but fail, for any reason, to meet the requirements of the Code for such a designation, then such Option shall be deemed to be a Non-Qualified Stock Option and shall be valid as such according to its terms.

7. <u>Stock Appreciation Rights.</u>

The Committee may, in its discretion, either alone or in connection with the grant of an Option, grant Stock Appreciation Rights in accordance with the Plan, the terms and conditions of which shall be set forth in an Agreement. If granted in connection with an Option, a Stock Appreciation Right shall cover the same Shares covered by the Option (or such lesser number of Shares as the Committee may determine in its discretion) and shall, except as provided in this Section 7, be subject to the same terms and conditions as the related Option.

7.1. <u>Time of Grant</u>. A Stock Appreciation Right may be granted (a) at any time if unrelated to an Option, or (b) if related to an Option, either at the time of grant or at any time thereafter during the term of the Option.

7.2. <u>Stock Appreciation Right Related to an Option</u>.

(a) <u>Exercise</u>. A Stock Appreciation Right granted in connection with an Option shall be exercisable at such time or times and only to the extent that the related Options are exercisable, and will not be transferable except to the extent the related Option may be transferable.

(b) <u>Amount Payable</u>. Upon the exercise of a Stock Appreciation Right related to an Option, the Grantee shall be entitled to receive an amount determined by multiplying (i) the excess of the Fair Market Value of a Share on the date preceding the date of exercise of such Stock Appreciation Right over the per Share exercise price under the related Option, by (ii) the number of Shares as to which such Stock Appreciation Right is being exercised. Notwithstanding the foregoing, the Committee may, in its discretion, limit in any manner the amount payable with respect to any Stock Appreciation Right by including such a limit in the Agreement evidencing the Stock Appreciation Right at the time it is granted.

(c) <u>Treatment of Related Options and Stock Appreciation Rights Upon Exercise</u>. Upon the exercise of a Stock Appreciation Right granted in connection with an Option, the Option shall be canceled to the extent of the number of Shares as to which the Stock Appreciation Right is exercised, and upon the exercise of an Option granted in connection with a

Stock Appreciation Right, the Stock Appreciation Right shall be canceled to the extent of the number of Shares as to which the Option is exercised or surrendered.

7.3. <u>Stock Appreciation Right Unrelated to an Option</u> The Committee may, in its discretion, grant to Eligible Individuals Stock Appreciation Rights unrelated to Options. Stock Appreciation Rights unrelated to Options shall contain such terms and conditions as to exercisability (subject to Section 7.7), vesting and duration as the Committee shall determine in its discretion, but in no event shall they have a term of greater than ten (10) years. Unless the Committee provides otherwise in the Agreement or in an employment agreement between the Grantee and the Company, subject to the preceding sentence in this Section 7.3, a Stock Appreciation Right (i) may, upon the death, Disability or Retirement of the Grantee prior to the expiration of the Stock Appreciation Right, be exercised for up to two (2) years following the date of the Grantee's death, Disability or Retirement, but in any event no later than the expiration date, as applicable, (ii) may, following the voluntary termination of service by the Grantee or a termination other than for Cause, be exercised for up to sixty (60) days following the date of termination, but in any event no later than the expiration date, and (iii) shall, in the event of a termination of service for Cause, be terminated effective immediately prior to such termination, whether or not such Stock Appreciation Right was then exercisable. Upon exercise of a Stock Appreciation Right unrelated to an Option, the Grantee shall be entitled to receive an amount determined by multiplying (a) the excess of the Fair Market Value of a Share on the date preceding the date of exercise of such Stock Appreciation Right over the Fair Market Value of a Share on the date the Stock Appreciation Right was granted, by (b) the number of Shares as to which the Stock Appreciation Right is being exercised.

7.4. <u>Non-Transferability</u>. No Stock Appreciation Right shall be transferable by the Grantee otherwise than by will or by the laws of descent and distribution or pursuant to a domestic relations order (within the meaning of Rule 16a-12 promulgated under the Exchange Act), and such Stock Appreciation Right shall be exercisable during the lifetime of such Grantee only by the Grantee or his or her guardian or legal representative. The terms of such Stock Appreciation Right shall be final, binding and conclusive upon the beneficiaries, executors, administrators, heirs and successors of the Grantee.

7.5. <u>Method of Exercise</u>. Stock Appreciation Rights shall be exercised by a Grantee only by a written notice delivered in person, electronically or by mail to the Company (or its designee) specifying the number of Shares with respect to which the Stock Appreciation Right is being exercised. If requested by the Committee in its discretion, the Grantee shall deliver the Agreement evidencing the Stock Appreciation Right being exercised and the Agreement evidencing any related Option to the Company (or its designee) who shall endorse thereon a notation of such exercise and return such Agreement to the Grantee.

7.6. <u>Form of Payment</u>. Payment of the amount determined under Sections 7.2(b) or 7.3 may be made in the discretion of the Committee solely in whole Shares in a number determined at their Fair Market Value on the date preceding the date of exercise of the Stock Appreciation Right, or solely in cash, or in a combination of cash and Shares. If the Committee, in its discretion, decides to make full payment in Shares and the amount payable results in a fractional Share, payment for the fractional Share will be made in cash.

7.7. <u>Effect of Change in Control</u>. Notwithstanding any other provision contained in this Plan, except as otherwise provided in an Agreement or employment agreement between the Grantee and the Company, in the event of a Change in Control, any unvested Stock Appreciation Rights issued under this Plan to any Grantee shall vest and become fully exercisable, subject to the provisions of Section 12.2, upon (i) the termination by the Company, Subsidiary, or Affiliate of the Grantee's employment other than for Cause, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition) or (ii) the termination of the Grantee's employment for Good Reason, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition). Except as otherwise provided in an employment agreement between the Grantee and the Company, in the event of a Change in Control, the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which Stock Appreciate Rights are exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Grantees); (ii) arrange to have the surviving or successor entity assume the Stock Appreciation Rights or grant replacement Stock Appreciation Rights with appropriate adjustments so that the Stock Appreciation Rights or their replacements represent the right to receive cash as may be payable as a result of a Change in Control with respect to the amount of cash receivable upon the exercise of the Stock Appreciation Rights had such exercise occurred in full prior to such Change in Control, or (iii) cancel Stock Appreciation Rights upon the payment to the Grantees in cash and/or securities of the surviving or successor entity (but only if such securities are actively traded on an established securities market) with respect to each Stock Appreciation Rights to the extent then exercisable (including any Stock Appreciation Rights as to which the exercise has been accelerated in accordance with this Section 7.7), of an amount that is equal to the Fair Market Value of the Shares subject to the Stock Appreciation Right or portion thereof over the aggregate exercise price for such Shares under the Stock Appreciation Right or portion thereof surrendered at the effective time of the Change in Control. The Committee may, in its discretion, also provide for one or more of the foregoing alternatives in any particular Agreement.

8. <u>Dividend Equivalent Rights</u>.

Dividend Equivalent Rights may be granted to Eligible Individuals in tandem with an Option or Award or as a separate Award. The terms and conditions applicable to each Dividend Equivalent Right shall be specified in the Agreement under which the Dividend Equivalent Right is granted. Amounts payable in respect of Dividend Equivalent Rights may be payable currently or deferred until the lapsing of restrictions on such Dividend Equivalent Rights or until the vesting, exercise, payment, settlement or other lapse of restrictions on the Option or Award to which the Dividend Equivalent Rights relate. In the event that the amount payable in respect of Dividend Equivalent Rights is to be deferred, the Committee shall, in its discretion, determine whether such amount is to be held in cash or reinvested in Shares or deemed (notionally) to be reinvested in Shares. If amounts payable in respect of Dividend Equivalent Rights are to be held in cash, there may be credited at the end of each year (or portion thereof) interest on the amount of the account at the beginning of the year at a rate per annum as the Committee may, in its discretion, determine. Dividend Equivalent Rights may be settled in cash or Shares or a combination thereof, in a single installment or multiple installments as the Committee, in its discretion, determines.

9. <u>Restricted Stock and Restricted Stock Units</u>.

9.1. <u>Grant</u>. The Committee may, in its discretion, grant Awards to Eligible Individuals of Restricted Stock and/or Restricted Stock Units, which shall be evidenced by an Agreement. Restricted Stock is a grant or issuance of Shares the retention, vesting and/or transferability of which is subject during specified periods of time to such conditions (including continued employment or performance conditions) and terms as the Committee deems appropriate. Restricted Stock Units are Awards denominated in units of Shares under which the issuance of Shares is subject to such conditions (including continued employment or performance conditions) and terms as the Committee deems appropriate. Each Agreement shall contain such restrictions, terms and conditions as the Committee may, in its discretion, determine and (without limiting the generality of the foregoing) such Agreements may require that an appropriate legend be placed on Share certificates of Restricted Stock. For example, the Committee may determine that some or all certificates representing Shares of Restricted Stock shall bear the following legend: "THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VESTING CONDITIONS AND CERTAIN RESTRICTIONS ON TRANSFER, SALE AND HYPOTHECATION AND CERTAIN REPURCHASE RIGHTS. A COMPLETE STATEMENT OF THE TERMS AND CONDITIONS GOVERNING SUCH RESTRICTIONS IS SET FORTH IN THE CHARTER COMMUNICATIONS, INC. 2009 STOCK INCENTIVE PLAN AND IN A RESTRICTED STOCK AWARD AGREEMENT. A COPY OF THE PLAN AND AWARD AGREEMENT ARE ON FILE AT THE CORPORATION'S PRINCIPAL OFFICE." Awards of Restricted Stock and Restricted Stock Units shall be subject to the terms and provisions set forth below in this Section 9.

9.2. <u>Rights of Grantee</u>. Shares of Restricted Stock granted pursuant to an Award hereunder shall be issued in the name of the Grantee as soon as reasonably practicable after the Award is granted provided that the Grantee, to the extent required by the Committee and in the manner specified by the Committee, has executed an Agreement evidencing the Award, the appropriate blank stock powers and, in the discretion of the Committee, an escrow agreement and any other documents which the Committee may, in its discretion, require as a condition to the issuance of such Shares. If a Grantee shall fail, to the extent required by the Committee, to execute the Agreement evidencing a Restricted Stock Award, or any documents which the Committee may, in its discretion, require within the time period prescribed by the Committee at the time the Award is granted, the Award shall be null and void. At the discretion of the Committee, Shares issued in connection with a Restricted Stock Award shall be deposited together with the stock powers with an escrow agent (which may be the Company) designated by the Committee. Unless the Committee in its discretion determines otherwise and as set forth in the Agreement, upon delivery of the Shares to the escrow agent, the Grantee shall have all of the rights of a stockholder with respect to such Shares, including the right to vote the Shares and to receive all dividends or other distributions paid or made with respect to the Shares. Participants shall have no rights as a stockholder with respect to Shares underlying Restricted Stock Units unless and until such Shares are reflected as issued and outstanding Shares on the Company's stock ledger.

9.3. <u>Non-Transferability</u>. Until all restrictions upon the Shares of Restricted Stock awarded to a Grantee shall have lapsed in the manner set forth in Section 9.4, such Shares shall not be sold, transferred or otherwise disposed of and shall not be pledged or otherwise

hypothecated. No Restricted Stock Unit shall be transferable by the Optionee otherwise than by will or by the laws of descent and distribution or pursuant to a domestic relations order (within the meaning of Rule 16a-12 promulgated under the Exchange Act).

9.4.    Lapse of Restrictions.

(a)    Generally.    Restrictions upon Shares of Restricted Stock awarded hereunder shall lapse, and Restricted Stock Units shall vest, at such time or times and on such terms and conditions as the Committee may determine in its discretion. The Agreement evidencing the Award shall set forth any such restrictions.

(b)    Effect of Change in Control.    Notwithstanding any other provision contained in this Plan, except as otherwise provided in an Agreement or employment agreement between the Grantee and the Company, in the event of a Change in Control, any restrictions with respect to Restricted Stock issued under this Plan to any Grantee shall lapse and Restricted Stock Units issued under this Plan to any Grantee shall vest, subject to the provisions of Section 12.2, upon (i) the termination by the Company, Subsidiary, or Affiliate of the Optionee's employment other than for Cause, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition) or (ii) the termination of the Optionee's employment for Good Reason, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition). Except as otherwise provided in an employment agreement between the Grantee and the Company, in the event of a Change in Control, the Committee may, in its discretion, do one or more of the following: (i) arrange to have the surviving or successor entity assume the Restricted Stock or Restricted Stock Units or grant replacement Restricted Stock or Restricted Stock Units with appropriate adjustments in the number and kind of securities so that the Restricted Stock or Restricted Stock Unit Award or its replacement either (x) represents the right to receive cash or Shares as may be payable as a result of a Change in Control with respect to the amount of cash or Shares receivable upon the lapse of the restrictions on the Restricted Stock or Restricted Stock Units had such lapse occurred prior to such Change in Control, or (y) represents the right to the equity securities of the surviving or successor entity, but only if such equity securities are actively traded on an established securities market, or (ii) cancel the Restricted Stock or Restricted Stock Unit Award upon the payment to the Grantees in cash and/or securities of the surviving or successor entity (but only if such securities are actively traded on an established securities market), with respect to each Restricted Stock and Restricted Stock Unit Award to the extent then lapsed (including any Restricted Stock and Restricted Stock Units as to which the lapse of restrictions has been accelerated in accordance with this Section 9.4(b)), of an amount that is equal to the Fair Market Value of the Shares subject to the Restricted Stock or Restricted Stock Unit Award surrendered at the effective time of the Change in Control. The Committee may, in its discretion, also provide for one or more of the foregoing alternatives in any particular Agreement.

9.5.    Treatment of Dividends.    At the time an Award of Shares of Restricted Stock is granted, the Committee may, in its discretion, determine that the payment to the Grantee of dividends, or a specified portion thereof, declared or paid on such Shares by the Company shall be (a) deferred until the lapsing of the restrictions imposed upon such Shares and (b) held by the Company for the account of the Grantee until such time. In the event that dividends are to

be deferred, the Committee shall, in its discretion, determine whether such dividends are to be reinvested in Shares (which shall be held as additional Shares of Restricted Stock) or held in cash, or, if such dividends are paid in Shares, whether the Shares shall be deposited with the Company and subject to the same restrictions on transferability and forfeitability as the Shares of Restricted Stock with respect to which they were paid. If deferred dividends are to be held in cash, there may be credited at the end of each year (or portion thereof) interest on the amount of the account at the beginning of the year at a rate per annum as the Committee may, in its discretion, determine. Payment of deferred dividends in respect of Shares of Restricted Stock (whether held in cash or as additional Shares of Restricted Stock), together with interest accrued thereon, if any, shall be made upon the lapsing of restrictions imposed on the Shares in respect of which the deferred dividends were paid, and any dividends deferred (together with any interest accrued thereon) in respect of any Shares of Restricted Stock shall be forfeited upon the forfeiture of such Shares. Shares underlying Restricted Stock Units shall be entitled to dividends or dividend equivalents only to the extent and under the terms provided by the Committee.

9.6. <u>Delivery of Shares</u>. Upon the lapse of the restrictions on Shares of Restricted Stock and upon the vesting of Restricted Stock Units, the Committee shall cause a stock certificate to be promptly delivered to the Grantee with respect to such Shares, free of the restrictions set forth in this Section 9. Notwithstanding the foregoing, the Committee may impose such additional restrictions as it may deem advisable, including, but not limited to, restrictions related to applicable federal securities laws, the requirements of any national securities exchange or system upon which Shares are then listed or traded, or any blue sky or state securities laws.

10. <u>Performance Awards</u>.

10.1. <u>Performance Units</u>. The Committee may, in its discretion, grant Awards of Performance Units to Eligible Individuals, the terms and conditions of which shall be set forth in an Agreement. Performance Units may be denominated in Shares or a specified dollar amount and, contingent upon the attainment of specified Performance Objectives within the Performance Cycle, represent the right to receive payment as provided in Section 10.3(c) of (i) in the case of Share-denominated Performance Units, the Fair Market Value of a Share on the date the Performance Unit was granted, the date the Performance Unit became vested or any other date specified by the Committee in its discretion, (ii) in the case of dollar-denominated Performance Units, the specified dollar amount or (iii) a percentage (which may be more than one hundred percent (100%)) of the amount described in clause (i) or (ii) depending on the level of Performance Objective attainment; provided, however, that, the Committee may, in its discretion, at the time a Performance Unit is granted specify a maximum amount payable in respect of a vested Performance Unit. Each Agreement shall specify the number of Performance Units to which it relates, the Performance Objectives which must be satisfied in order for the Performance Units to vest and the Performance Cycle within which such Performance Objectives must be satisfied.

(a) <u>Vesting and Forfeiture</u>. Subject to Sections 10.3(c) and 10.4, a Grantee shall become vested with respect to the Performance Units to the extent that the Performance Objectives set forth in the Agreement are satisfied for the Performance Cycle.

(b)     Payment of Awards.  Subject to Section 10.3(c), payment to Grantees in respect of vested Performance Units shall be made as soon as practicable after the last day of the Performance Cycle to which such Award relates unless the Agreement evidencing the Award provides for the deferral of payment, in which event the terms and conditions of the deferral shall be set forth in the Agreement.  Subject to Section 10.4, such payments may be made entirely in Shares valued at their Fair Market Value, entirely in cash, or in such combination of Shares and cash as the Committee shall, in its discretion, determine at any time prior to such payment; provided, however, that if the Committee in its discretion determines to make such payment entirely or partially in Shares of Restricted Stock, the Committee must determine the extent to which such payment will be in Shares of Restricted Stock and the terms of such Restricted Stock at the time the Award is granted.

10.2.    Performance Shares.  The Committee may, in its discretion, grant Awards of Performance Shares to Eligible Individuals, the terms and conditions of which shall be set forth in an Agreement.  Each Agreement may require that an appropriate legend be placed on Share certificates.  Awards of Performance Shares shall be subject to the following terms and provisions:

(a)     Rights of Grantee.  The Committee shall provide at the time an Award of Performance Shares is made the time or times at which the actual Shares represented by such Award shall be issued in the name of the Grantee; provided, however, that no Performance Shares shall be issued until the Grantee has, to the extent required by the Committee and in the manner specified by the Committee, executed an Agreement evidencing the Award, the appropriate blank stock powers and, in the discretion of the Committee, an escrow agreement and any other documents which the Committee may require as a condition to the issuance of such Performance Shares.  If a Grantee shall fail, to the extent required by the Committee, to execute the Agreement evidencing an Award of Performance Shares, the appropriate blank stock powers and, in the discretion of the Committee, an escrow agreement and any other documents which the Committee may require within the time period prescribed by the Committee at the time the Award is granted, the Award shall be null and void.  At the discretion of the Committee, Shares issued in connection with an Award of Performance Shares shall be deposited together with the stock powers with an escrow agent (which may be the Company) designated by the Committee.  Except as restricted by the terms of the Agreement, upon delivery of the Shares to the escrow agent, the Grantee shall have, in the discretion of the Committee, all of the rights of a stockholder with respect to such Shares, including the right to vote the Shares and to receive all dividends or other distributions paid or made with respect to the Shares.

(b)     Non-Transferability.  Until any restrictions upon the Performance Shares awarded to a Grantee shall have lapsed in the manner set forth in Sections 10.2(c) or 10.4, such Performance Shares shall not be sold, transferred or otherwise disposed of and shall not be pledged or otherwise hypothecated, nor shall they be delivered to the Grantee.  The Committee may, in its discretion, also impose such other restrictions and conditions on the Performance Shares, if any, as it deems appropriate.

(c)     Lapse of Restrictions.  Subject to Sections 10.3(c) and 10.4, restrictions upon Performance Shares awarded hereunder shall lapse and such Performance Shares shall become vested at such time or times and on such terms, conditions and satisfaction of

Performance Objectives as the Committee may, in its discretion, determine at the time an Award is granted.

(d)     Treatment of Dividends.  At the time the Award of Performance Shares is granted, the Committee may, in its discretion, determine that the payment to the Grantee of dividends, or a specified portion thereof, declared or paid on Shares represented by such Award which have been issued by the Company to the Grantee shall be (i) deferred until the lapsing of the restrictions imposed upon such Performance Shares and (ii) held by the Company for the account of the Grantee until such time.  In the event that dividends are to be deferred, the Committee shall determine whether such dividends are to be reinvested in Shares (which shall be held as additional Performance Shares) or held in cash or, if such dividends are paid in Shares, whether the Shares shall be deposited with the Company and subject to the same restrictions on transferability and forfeitability as the Performance Shares with respect to which they were paid. If deferred dividends are to be held in cash, there may be credited at the end of each year (or portion thereof) interest on the amount of the account at the beginning of the year at a rate per annum as the Committee may, in its discretion, determine.  Payment of deferred dividends in respect of Performance Shares (whether held in cash or in additional Performance Shares), together with interest accrued thereon, if any, shall be made upon the lapsing of restrictions imposed on the Performance Shares in respect of which the deferred dividends were paid, and any dividends deferred (together with any interest accrued thereon) in respect of any Performance Shares shall be forfeited upon the forfeiture of such Performance Shares.

(e)     Delivery of Shares.  Upon the lapse of the restrictions on Performance Shares awarded hereunder, the Committee shall cause a stock certificate to be delivered to the Grantee with respect to such Shares, free of all restrictions hereunder.

10.3.   Performance Objectives

(a)     Establishment.  Performance Objectives for Performance Awards may be based on and expressed in terms of one or more of the following business criteria: (i) revenue, (ii) net income, (iii) operating income, (iv) earnings, (v) net earnings, (vi) Share price, (vii) cash flow, (viii) EBITDA, (ix) total shareholder return, (x) total shareholder return relative to peers, (xi) financial returns (including, without limitation, return on assets, return on equity and return on investment), (xii) cost reduction targets, (xiii) customer satisfaction, (xiv) customer growth, (xv) employee satisfaction, (xvi) pre-tax profits, (xvii) net earnings, or (xiii) any combination of the foregoing.  Performance Objectives (and underlying business criteria, as applicable) may be in respect of: (i) the performance of the Company, (ii) the performance of any of its Subsidiaries, (iii) the performance of any of its Divisions, (iv) a per Share basis, (v) a per subscriber basis, or (vi) any combination of the foregoing.  Performance Objectives may be absolute or relative (to prior performance of the Company or to the performance of one or more other entities or external indices) and may be expressed in terms of a progression within a specified range.  The formula for determining Performance Objectives may include or exclude items to measure specific objectives, such as losses from discontinued operations, extraordinary, unusual or nonrecurring gains and losses, the cumulative effect of accounting changes, acquisitions or divestitures, core process redesigns, structural changes/outsourcing, and foreign exchange impacts.  The Performance Objectives with respect to a Performance Cycle shall be established in writing by the Committee by the earlier of (x) the date on which a quarter of the Performance Cycle has

elapsed or (y) the date which is ninety (90) days after the commencement of the Performance Cycle, and in any event while the performance relating to the Performance Objectives remain substantially uncertain.

(b)     Effect of Certain Events.  At the time of the granting of a Performance Award, or at any time thereafter, in either case to the extent permitted under Code Section 162(m) and the regulations thereunder without adversely affecting the treatment of the Performance Award as Performance-Based Compensation, the Committee may, in its discretion, provide for the manner in which performance will be measured against the Performance Objectives (or may adjust the Performance Objectives) to reflect the impact of specified corporate transactions, accounting or tax law changes and other extraordinary or nonrecurring events.

(c)     Determination of Performance.  Prior to the vesting, payment, settlement or lapsing of any restrictions with respect to any Performance Award that is intended to constitute Performance-Based Compensation made to a Grantee who is subject to Code Section 162(m), the Committee shall certify in writing that the applicable Performance Objectives have been satisfied to the extent necessary for such Award to qualify as Performance Based Compensation.

10.4.     Effect of Change in Control.  In the event of a Change in Control, unless otherwise determined by the Committee in its discretion and set forth in the Agreement evidencing the Award or in an employment agreement between the Grantee and the Company, and subject to the provisions of Section 12.2, upon (i) the termination by the Company, Subsidiary, or Affiliate of the Optionee's employment other than for Cause, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition) or (ii) the termination of the Optionee's employment for Good Reason, during the thirteen (13) month period following the Change in Control (taking into account the deemed termination provisions of the last paragraph of such definition).

(a)     With respect to Performance Units, the Grantee shall (i) become vested in all outstanding Performance Units as if all Performance Objectives had been satisfied at the maximum level and (ii) be entitled to receive in respect of all Performance Units which become vested as a result of a Change in Control a cash payment within ten (10) days after termination of employment.

(b)     With respect to Performance Shares, all restrictions shall lapse immediately on all outstanding Performance Shares as if all Performance Objectives had been satisfied at the maximum level.

(c)     The Agreements evidencing Performance Shares and Performance Units shall provide for the treatment of such Awards (or portions thereof), if any, which do not become vested as the result of a Change in Control, including, but not limited to, provisions for the adjustment of applicable Performance Objectives.

(d)     Notwithstanding the above, except as otherwise provided in an Agreement or employment agreement between the Grantee and the Company, the Committee may, in its discretion, do one or more of the following: (i) arrange to have the surviving or successor entity assume the Performance Units or Performance Shares or grant replacement Performance Units or Performance Shares, as applicable, with appropriate adjustments so that such Awards or their replacements either (x) represent the right to receive cash or Shares as may be payable as a result of a Change in Control with respect to the amount of cash or Shares receivable upon the vesting of the Performance Units or Performance Shares had such vesting occurred in full prior to such Change in Control, or (y) represent the right to receive equity securities of the surviving or successor entity, but only if such equity securities are actively traded on an established securities market, or (ii) cancel the Performance Units or Performance Shares upon the payment to the Grantees in cash with respect to each such Award to the extent then otherwise payable in cash and/or securities of the surviving or successor entity (but only if such securities are actively traded on an established securities market) or in Shares (including any Awards as to which vesting or lapse of restrictions has taken place in accordance with (a) and (b) of this Section 10), of an amount, with respect to Performance Units, that is equal to the amount of cash payable as if all Performance Objectives had been satisfied at the maximum level, and, with respect to Performance Shares, that is equal to the Fair Market Value of the Shares payable as if all Performance Objectives had been satisfied at the maximum level.

10.5.   Non-Transferability.  Until the vesting of Performance Units or the lapsing of any restrictions on Performance Shares, as the case may be, such Performance Units or Performance Shares shall not be sold, transferred or otherwise disposed of and shall not be pledged or otherwise hypothecated.

11.     Other Share Based Awards.

11.1.   Share Awards.  The Committee may, in its discretion, grant a Share Award to any Eligible Individual on such terms and conditions as the Committee may determine in its sole discretion.  Share Awards may be made as additional compensation for services rendered by the Eligible Individual or may be in lieu of cash or other compensation to which the Eligible Individual is entitled from the Company.

11.2.   Phantom Stock Awards.

(a)     Grant.  The Committee may, in its discretion, grant shares of Phantom Stock to any Eligible Individual.  Such Phantom Stock shall be subject to the terms and conditions established by the Committee in its discretion and set forth in the applicable Agreement.

(b)     Payment of Awards.  Upon the vesting of a Phantom Stock Award, the Grantee shall be entitled to receive a cash payment in respect of each share of Phantom Stock which shall be equal to the Fair Market Value of a Share as of the date the Phantom Stock Award was granted, or such other date as determined by the Committee in its discretion at the time the Phantom Stock Award was granted.  The Committee may, in its discretion, at the time a Phantom Stock Award is granted, provide a limitation on the amount payable in respect of each share of Phantom Stock.  In lieu of a cash payment, the Committee may, in its discretion, settle Phantom

Stock Awards with Shares having a Fair Market Value equal to the cash payment to which the Grantee has become entitled.

12. Effect of a Termination of Employment.

12.1. The Agreement evidencing the grant of each Option and each Award shall set forth the terms and conditions applicable to such Option or Award upon a termination or change in the status of the employment of the Optionee or Grantee by the Company, a Subsidiary or a Division (including a termination or change by reason of the sale of a Subsidiary or a Division), which shall be as the Committee may, in its discretion, determine at the time the Option or Award is granted or thereafter. In addition, such terms and conditions may be set forth in an employment agreement between the Eligible Individual and the Company.

12.2. Excise Tax Limitation.

(a) Notwithstanding anything contained in this Plan to the contrary, except as otherwise provided in an employment agreement between the Eligible Individual and the Company, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee or Grantee by the Company (within the meaning of Code Section 280G and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Plan or otherwise (the "Total Payments") is or will be subject to the excise tax imposed under Code Section 4999 (the "Excise Tax"), then the Total Payments shall be reduced (but not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee or Grantee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee or Grantee received the entire amount of such Total Payments. Unless the Optionee or Grantee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined). Any notice given by the Optionee or Grantee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Executive's rights and entitlements to any benefits or compensation.

(b) The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Optionee or Grantee from among the four largest accounting firms in the United States or at the Optionee's or Grantee's expense by an attorney selected by the Optionee or Grantee. Such accounting firm or attorney (the "Determining Party") shall provide its determination (the "Determination"), together with detailed supporting calculations and documentation to the Company and the Optionee or Grantee within ten (10) days of the termination of Optionee's or Grantee's employment. If the Determining Party determines that no Excise Tax is payable by the Optionee or Grantee with respect to the Total Payments, it shall furnish the Optionee or Grantee with an opinion reasonably acceptable to the Optionee or Grantee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the

Company and the Optionee or Grantee. If the Determining Party determines that an Excise Tax would be payable, the Company shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a), or to have such Determination reviewed by an accounting firm selected by the Company, at the Company's expense. If the Company's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Company, at the Company's expense, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee or Grantee.

13.     Adjustment Upon Changes in Capitalization.

(a)     In the event of a Change in Capitalization, the Committee shall conclusively determine the appropriate proportional adjustments to (i) the maximum number and class of Shares or other stock or securities with respect to which Options or Awards may be granted under the Plan, (ii) the maximum number and class of Shares or other stock or securities with respect to which Options or Awards may be granted to any Eligible Individual in any one calendar year period, (iii) the number and class of Shares or other stock or securities or other property (including cash) which are subject to outstanding Options or Awards granted under the Plan and the exercise price therefor, if applicable, (iv) for Stock Appreciation Rights unrelated to an Option, the Fair Market Value of a Share on the date the Stock Appreciation Right was granted, and (v) the Performance Objectives.

(b)     Any such adjustment in the Shares or other stock or securities subject to outstanding Options or Awards that are intended to qualify as Performance-Based Compensation shall be made in such a manner as not to adversely affect the treatment of the Options or Awards as Performance-Based Compensation.

(c)     Any adjustment pursuant to this Section 13 in respect of Options or Stock Appreciation Rights that are Non-409A Awards shall be made only to the extent consistent with Treasury Regulation Section 1.409A-1(b)(5)(v) or a successor provision.

(d)     If, by reason of a Change in Capitalization, a Grantee of an Award shall be entitled to, or an Optionee shall be entitled to exercise an Option with respect to, new, additional or different shares of stock or securities of the Company or any other corporation, such new, additional or different shares shall thereupon be subject to all of the conditions, restrictions and performance criteria which were applicable to the Shares subject to the Award or Option, as the case may be, prior to such Change in Capitalization.

14.     Effect of Certain Transactions.

Subject to Sections 6.4, 7.7, 9.4(b), and 10.4 or as otherwise provided in an Agreement or employment agreement between the Eligible Individual and the Company, in the event of (a) the liquidation or dissolution of the Company or (b) a merger or consolidation of the Company (a "Transaction") that does not constitute a Change in Control, the Plan and each Option and Award issued hereunder shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which Options and Awards are exercisable (provided they remain

exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionees or Grantees); (ii) accelerate the vesting schedule or the lapse of any restrictions with respect to Options and Awards, (iii) arrange to have the surviving or successor entity assume the Options and Awards or grant replacement Options and Awards with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or lapse of restrictions or adjustments so that the Options and Awards or their replacements represent the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Options and Awards had such exercise occurred in full prior to the Transaction, or (iv) with the prior written consent of the Optionee or Grantee (unless otherwise stated in the Agreement), cancel the Options and Awards upon the payment to the Grantees in cash (A) with respect to each Option and Award to the extent exercisable for or payable in Shares, of an amount that is equal to the Fair Market Value of the Shares subject to the Award or portion thereof over the aggregate exercise price for such Shares under the Award or portion thereof surrendered at the effective time of the Transaction, or (B) with respect to each Award to the extent not exercisable for or payable in Shares, of an amount that is equal to the cash value of the Award or portion thereof surrendered at the effective time of the Transaction. The Committee may, in its discretion, also provide for one or more of the following alternatives in any particular Agreement. The treatment of any Option or Award as provided in this Section 14 shall be conclusively presumed to be appropriate for purposes of Section 10.

15.     Interpretation.

Following the required registration of any equity security of the Company pursuant to Section 12 of the Exchange Act:

(a)     The Plan is intended to comply with Rule 16b-3 promulgated under the Exchange Act and the Committee shall interpret and administer the provisions of the Plan or any Agreement in a manner consistent therewith. Any provisions inconsistent with such Rule shall be inoperative and shall not affect the validity of the Plan.

(b)     Unless otherwise expressly stated in the relevant Agreement, each Option, Stock Appreciation Right and Performance Award granted under the Plan is intended to be Performance-Based Compensation. The Committee shall not be entitled to exercise any discretion otherwise authorized hereunder with respect to such Options or Awards if the ability to exercise such discretion or the exercise of such discretion itself would cause the compensation attributable to such Options or Awards to fail to qualify as Performance-Based Compensation.

16.     Successors; Binding Agreement.

This Plan shall be binding upon and shall inure to the benefit of the Company, its Successors and Assigns, and the Company shall require any Successors and Assigns to expressly assume and agree to comply with the terms of the Plan in the same manner and to the same extent that the Company would be required to perform it if no such succession or assignment had taken place.

17. Termination and Amendment of the Plan or Modification of Options and Awards.

17.1. **Plan Amendment or Termination.** The Plan shall terminate as of the tenth (10th) anniversary of the date of its adoption by the Board and no Option or Award may be granted thereafter. The Board may sooner terminate the Plan and the Board may at any time and from time to time amend, modify or suspend the Plan; provided, however, that:

(a) no such amendment, modification, suspension or termination shall impair or adversely alter in any material respect any Options or Awards theretofore granted under the Plan, except with the consent of the Optionee or Grantee, nor shall any amendment, modification, suspension or termination deprive any Optionee or Grantee of any Shares which he or she may have acquired through or as a result of the Plan; and

(b) to the extent necessary under any applicable law, regulation or exchange requirement, no amendment shall be effective unless approved by the stockholders of the Company in accordance with applicable law, regulation or exchange requirement.

17.2. **Modification of Options and Awards.** Subject to the provisions of the Plan, no modification of an Option or Award shall adversely alter or impair in any material respect any of the Participant's rights or the Company's obligations under the Option or Award without the consent of the Optionee or Grantee, as the case may be.

18. Non-Exclusivity of the Plan.

The adoption of the Plan by the Board shall not be construed as amending, modifying or rescinding any previously approved incentive arrangement or as creating any limitations on the power of the Board to adopt such other incentive arrangements as it may deem desirable, including, without limitation, the granting of stock options otherwise than under the Plan, and such arrangements may be either applicable generally or only in specific cases.

19. Regulations and Other Approvals; Governing Law; Jury Trial Waiver.

19.1. Except as to matters of federal law, the Plan and the rights of all persons claiming hereunder shall be construed and determined in accordance with the laws of the State of Delaware without giving effect to conflicts of laws principles thereof.

19.2. Unless otherwise specified in an applicable Agreement,[2] any suit, action or proceeding with respect to this Plan or any Award Agreement, or any judgment entered by any court of competent jurisdiction in respect of any thereof, shall be brought in any Court in St. Louis County, Missouri, and the Company and each Participant shall submit to the exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment. The Company and each Participant shall irrevocably waive any objections which he, she or it may have to the laying of the venue of any suit, action or proceeding arising out of or relating to this

---

[2] Form award Agreements provide for Arbitration in St. Louis, Missouri.

Plan or any Award Agreement brought in any Court in St. Louis County, Missouri, and shall further irrevocably waive any claim that any such suit, action or proceeding brought in any such court has been brought in any inconvenient forum. The Company and each Participant shall waive any right he, she or it may have to trial by jury in respect of any litigation based on, arising out of, under or in connection with this Plan or any Award Agreement or any course of conduct, course of dealing, verbal or written statement or action of any party to any Award Agreement or relating to this Plan in any way.

19.3. The obligation of the Company to sell or deliver Shares with respect to Options and Awards granted under the Plan shall be subject to all applicable laws, rules and regulations, including all applicable federal and state securities laws, and the obtaining of all such approvals by governmental agencies as may be deemed necessary or appropriate by the Committee in its discretion.

19.4. The Board may make such changes as may be necessary or appropriate to comply with the rules and regulations of any government authority.

19.5. Each Option and Award is subject to the requirement that, if at any time the Committee determines, in its discretion, that the listing, registration or qualification of Shares issuable pursuant to the Plan is required by any securities exchange or under any state or federal law, or the consent or approval of any governmental regulatory body is necessary or desirable as a condition of, or in connection with, the grant of an Option or Award or the issuance of Shares, no Options or Awards shall be granted or payment made or Shares issued, in whole or in part, unless listing, registration, qualification, consent or approval has been effected or obtained free of any conditions as acceptable to the Committee in its discretion.

19.6. Notwithstanding anything contained in the Plan or any Agreement to the contrary, in the event that the disposition of Shares acquired pursuant to the Plan is not covered by a then current registration statement under the Securities Act of 1933, as amended (the "Securities Act"), and is not otherwise exempt from such registration, such Shares shall be restricted against transfer to the extent required by the Securities Act and Rule 144 or other regulations thereunder. The Committee may, in its discretion, require any individual receiving Shares pursuant to an Option or Award granted under the Plan, as a condition precedent to receipt of such Shares, to represent and warrant to the Company in writing that the Shares acquired by such individual are acquired without a view to any distribution thereof and will not be sold or transferred other than pursuant to an effective registration thereof under said Act or pursuant to an exemption applicable under the Securities Act or the rules and regulations promulgated thereunder. The certificates evidencing any of such Shares shall be appropriately amended or have an appropriate legend placed thereon to reflect their status as restricted securities as aforesaid.

20. Miscellaneous.

20.1. Multiple Agreements. The terms of each Option or Award may differ from other Options or Awards granted under the Plan at the same time, or at some other time. The Committee may, in its discretion, also grant more than one Option or Award to a given

Eligible Individual during the term of the Plan, either in addition to, or in substitution for, one or more Options or Awards previously granted to that Eligible Individual.

20.2. Withholding of Taxes.

(a)     At such times as an Optionee or Grantee recognizes taxable income in connection with the receipt of Shares or cash hereunder (a "Taxable Event"), the Optionee or Grantee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "Withholding Taxes") prior to the issuance, or release from escrow, of such Shares or the payment of such cash.  The Company shall have the right to deduct from any payment of cash to an Optionee or Grantee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes.  In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee or Grantee may make a written election (the "Tax Election"), which may be accepted or rejected in the discretion of the Committee, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes.  Notwithstanding the foregoing, the Committee may, in its discretion, provide that an Optionee or Grantee shall not be entitled to exercise or receive an Award, as applicable, for which cash has not been provided by the Optionee or Grantee with respect to the Withholding Taxes applicable to such Award.

(b)     Notwithstanding the foregoing, if Options have been transferred pursuant to the provisions of Section 6.1 the Optionee shall provide the Company with funds sufficient to pay such tax withholding when such withholding is due.  Furthermore, if such Optionee does not satisfy the applicable tax withholding obligation, the transferee may provide the funds sufficient to enable the Company to pay the tax withholding.  However, if Options have been transferred, the Company shall have no right to retain or sell without notice, or to demand surrender from the transferee of, Shares in order to pay such tax withholding.

(c)     Required Consent to and Notification of Code Section 83(b) Election.  No election under Code Section 83(b) (to include in gross income in the year of transfer the amounts specified in Code Section 83(b) or under a similar provision of the laws of a jurisdiction outside the United States may be made unless expressly permitted by the terms of the Award document or by action of the Committee in writing prior to the making of such election. In any case in which a Participant is permitted to make such an election in connection with an Award, the Participant shall notify the Company of such election within ten (10) days of filing notice of the election with the Internal Revenue Service or other governmental authority, in addition to any filing and notification required pursuant to regulations issued under Code Section 83(b) or other applicable provision.

(d)     Requirement of Notification Upon Disqualifying Disposition Under Code Section 421(b).  If any Participant shall make any disposition of Shares delivered pursuant to the exercise of an ISO under the circumstances described in Code Section 421(b) (i.e., a disqualifying disposition), such Participant shall notify the Company of such disposition within ten (10) days thereof.

20.3. <u>Effective Date</u>. The effective date of this Plan shall be as determined by the Board in its discretion, subject only to the approval by the affirmative vote of the holders of a majority of the securities of the Company (i) pursuant to a written consent or (ii) present, or represented, and entitled to vote at a meeting of stockholders duly held, in either case in accordance with the applicable laws of the State of Delaware within twelve (12) months of the adoption of the Plan by the Board. If any Awards are granted under the Plan before the date of such shareholder approval, such Awards automatically shall be granted subject to such approval.

20.4. <u>Compliance with Code Section 162(m)</u>. It is the intent of the Company that Options and SARs granted to "covered employees" (within the meaning of Code Section 162(m)) and other Awards designated as awards of Performance-Based Compensation are intended to constitute qualified "performance-based compensation" within the meaning of Code Section 162(m) and the regulations thereunder. Accordingly, the terms of Sections 4.1, 5.2, 7 and 10 shall be interpreted in a manner consistent with Code Section 162(m) and the regulations thereunder. The foregoing notwithstanding, because the Committee cannot determine with certainty whether a given Participant will be in a covered employee with respect to a fiscal year that has not yet been completed, the term covered employee as used herein shall mean only a person designated by the Committee as likely to be a covered employee with respect to a specified fiscal year. If any provision of the Plan or any Agreement relating to an Award that is designated as intended to comply with Code Section 162(m) does not comply or is inconsistent with the requirements of Code Section 162(m) or regulations thereunder, such provision shall be construed or deemed amended to the extent necessary to conform to such requirements, and no provision shall be construed or deemed amended to the extent necessary to conform to such requirements, and no provision shall be deemed to confer upon the Committee or any other person discretion to increase the amount of compensation otherwise payable in connection with any such Award upon attainment of the applicable performance objectives.

20.5. <u>Certain Limitations on Awards to Ensure Compliance with Code Section 409A</u>. For purposes of this Plan, references to an Option or Award term or event (including any authority or right of the Company or a Participant) being "permitted" under Code Section 409A mean, for a 409A Award, that the term or event will not cause the Participant to be liable for payment of interest or a tax penalty under Code Section 409A and, for a Non-409A Award, that the term or event will not cause the Award to be treated as subject to Code Section 490A. Other provisions of the Plan notwithstanding, the terms of any 409A Award and any Non-409A Award, including any authority of the Company and rights of the Participant with respect to the Award, shall be limited to those terms permitted under Code Section 409A, and any terms not permitted under Code Section 409A shall be automatically modified and limited to the extent necessary to conform with Code Section 409A. For this purpose, other provisions of the Plan notwithstanding, the Company shall have no authority to accelerate distributions relating to 409A Awards in excess of authority permitted under Code Section 409A, and any distribution subject to Code Section 409A(a)(2)(A)(i)(separation from service) to a "specified employee" as defined under Code Section 409A(a)(2)(B)(i), shall not occur earlier than the earliest time permitted under Code Section 409A(a)(2)(B)(i). The Company shall have no liability to a Participant, or any other party, if an Award that is intended to be exempt from, or compliant with, Code Section 409A is not so exempt or compliant or for any action taken by the Committee or the Company and, in the event that any amount or benefit under the Plan becomes subject to

penalties under Section 409A, responsibility for payment of such penalties shall rest solely with the affected Participant(s) and not with the Company.

20.6. <u>Certain Limitations Relating to Accounting Treatment of Awards</u>. Other provisions of the Plan notwithstanding, the Committee's authority under the Plan is limited to the extent necessary to ensure that any Option or other Award of a type that the Committee has intended to be subject to fixed accounting with a measurement date at the date of grant or the date performance conditions are satisfied under FAS 123(R) shall not become subject to "variable" accounting solely due to the existence of such authority.

20.7. <u>Awards to Participants Outside the United States</u>. The Committee may modify the terms of any Award under the Plan made to or held by a Participant who is then resident or primarily employed outside of the United States in any manner deemed by the Committee to be necessary or appropriate in order that such Award shall conform to laws, regulations, and customs of the country in which the Participant is then resident or primarily employed, or so that the value and other benefits of the Award to the Participant, as affected by foreign tax laws and other restrictions applicable as a result of the Participant's residence or employment abroad shall be comparable to the value of such an Award to a Participant who is resident or primarily employed in the United States. An Award may be modified under this Section 20.7 in a manner that is inconsistent with the express terms of the Plan, so long as such modifications will not contravene any applicable law or regulation or result in actual liability under Section 16(b) for the Participant whose Award is modified.

20.8. <u>Payments in the Event of Forfeitures; Fractional Shares</u>. No fractional Shares shall be issued or delivered pursuant to the Plan or any Award. The Committee shall determine whether cash, other Awards or other property shall be issued or paid in lieu of such fractional Shares or whether such fractional Shares or any rights thereto shall be forfeited or otherwise eliminated.

20.9. <u>Right of Setoff</u>. The Company or any Subsidiary or Affiliate may, to the extent permitted by applicable law, deduct from and set off against any amounts the Company or a Subsidiary or Affiliate may owe to the Participant from time to time (including amounts payable in connection with any Award that are owed as wages, fringe benefits, or other compensation owed to the Participant), such amounts as may be owed by the Participant to the Company, although the Participant shall remain liable for any part of the Participant's payment obligation not satisfied through such deduction and setoff; provided, however, that no such setoff may be made if such setoff would result in the imposition of penalties under Code Section 409A. By accepting any Award granted hereunder, the Participant agrees to any deduction or setoff under this Section 20.9.

20.10. <u>Unfunded Status of Awards; Creation of Trusts</u>. To the extent that any Award is deferred compensation, the Plan is intended to constitute an "unfunded" plan for deferred compensation with respect to such Award. With respect to any payments not yet made to a Participant or obligation to deliver Stock pursuant to an Award, nothing contained in the Plan or any Agreement shall give any Participant the right to any specific assets or securities of the Company or any Subsidiary or Affiliate.

20.11. <u>Conditions and Restrictions Upon Securities Subject to Awards</u>. Each Participant to whom an Award is made under the Plan shall (i) enter into an Agreement with the Company that shall contain such provisions consistent with the provisions of the Plan, as may be approved by the Committee and (ii) to the extent the Award is made at a time prior to the date Shares are not listed for trading on an established securities exchange, enter into a "Stockholder's Agreement" that is substantially similar in all material respect to any stockholder's agreement entered into by any other employee of the Company or its Subsidiaries in connection with the Award of any equity-based compensation. The Committee may provide that the Shares issued upon exercise of an Option or Stock Appreciation Right or otherwise subject to or issued under an Award shall be subject to such further agreements, restrictions, conditions or limitations as the Committee in its discretion may specify prior to the exercise of such Option or Stock Appreciation Right or the grant, vesting or settlement of such Award, including without limitation, conditions on vesting or transferability, forfeiture or repurchase provisions and method of payment for the Shares issued upon exercise, vesting or settlement of such Award (including the actual or constructive surrender of Shares already owned by the Participant) or payment of taxes arising in connection with an Award. Without limiting the foregoing, such restrictions may address the timing and manner of any resales by the Participant or other subsequent transfers by the Participant of any Shares issued under an Award, including without limitation (i) restrictions under an insider trading policy or pursuant to applicable law, (ii) restrictions designed to delay and/or coordinate the timing and manner of sales by Participant and holders of other Company equity compensation arrangements, (iii) restrictions as to the use of a specified brokerage firm for such resales or other transfers and (iv) provisions requiring Shares to be sold on the open market or to the Company in order to satisfy tax withholding or other obligations.

20.12. <u>Compliance with Laws and Regulations</u>. This Plan, the grant, issuance, vesting, exercise and settlement of Options and Awards thereunder, and the obligation of the Company to sell, issue or deliver Shares under such Options and Awards, shall be subject to all applicable foreign, federal, state and local laws, rules and regulations, stock exchange rules and regulations, and to such approvals by any governmental or regulatory agency as may be required. The Company shall not be required to register in a Participant's name or deliver any Shares prior to the completion of any registration or qualification of such Shares under any foreign, federal, state or local law or any ruling or regulation of any government body which the Committee shall determine to be necessary or advisable. To the extent the Company is unable to or the Committee deems it infeasible to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, the Company and its Affiliates shall be relieved of any liability with respect to the failure to issue or sell such Shares as to which such requisite authority shall not have been obtained. No Option shall be exercisable and no Shares shall be issued and/or transferable under any Option or Award unless a registration statement with respect to the Shares underlying such Option or Award is effective and current or the Company has determined that such registration is unnecessary. References in this Plan to a particular law, rule or regulation shall be deemed to include all subsequent amendments, modifications and interpretations as well as any successor provision thereto.

20.13. <u>Deferral of Gains</u>. The Committee may, in an Agreement or otherwise, provide for the deferred delivery of Shares upon settlement, vesting or other events with respect

to an Award (other than an Option or Stock Appreciation Right). Notwithstanding anything herein to the contrary, in no event will any deferral of the delivery of Shares or any other payment with respect to any Award be allowed if the Committee determines, in its sole discretion, that the deferral would result in the imposition of the additional tax under Code Section 409A(a)(1)(B).

20.14. <u>No Effect on Employment or Service</u>. Nothing in the Plan shall interfere with or limit in any way the right of the Company to terminate any Participant's employment or service at any time, for any reason and with or without cause.

20.15. <u>Participation</u>. No person shall have the right to be selected to receive an Award under this Plan, or, having been so selected, to be selected to receive a future Award. The Committee's determination under the Plan (including, without limitation, determination of the Eligible Employees who shall be granted Awards, the form, amount and timing of such Awards, the terms and provisions of Awards and the Agreements and the establishment of Performance Objectives) need not be uniform and may be made by it selectively among Eligible Employees who receive or are eligible to receive Awards under the Plan, ether or not such Eligible Employees are similarly situated.

20.16. <u>No Rights as Stockholder</u>. No Participant (nor any beneficiary) shall have any of the rights or privileges of a stockholder of the Company with respect to any Shares issuable pursuant to an Award (or exercise thereof), unless and until certificates representing such Shares shall have been issued, recorded on the records of the Company or its transfer agents or registrars, and delivered to the Participant (or beneficiary).

20.17. <u>Gender and Number</u>. Except where otherwise indicated by the context, any masculine term used herein also shall include the feminine; the plural shall include the singular and the singular shall include the plural.

20.18. <u>Severability</u>. In the event any provision of the Plan or of any Award Agreement shall be held illegal or invalid for any reason, the illegality or invalidity shall not affect the remaining parts of the Plan or the Award Agreement, and the Plan and/or the Award Agreement shall be construed and enforced as if the illegal or invalid provision had not been included.

20.19. <u>Captions</u>. Captions are provided herein for convenience only, and shall not serve as a basis for interpretation or construction of the Plan.

20.20. <u>Other Benefits</u>. No Award granted or paid out under this Plan shall be deemed compensation for purposes of computing benefits under any retirement plan of the Company or its Affiliates nor affect any benefits under any other benefit plan now or subsequently in effect under which the availability or amount of benefits is related to the level of compensation.

20.21. <u>Costs</u>. The Company shall bear all expenses associated with administering this Plan, including expenses of issuing Shares pursuant to any Awards hereunder.

[End of Document]