**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

**REORGANIZING DEBTORS' MEMORANDUM OF LAW**
**(A) IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN OF**
**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES**
**BANKRUPTCY CODE AND (B) IN RESPONSE TO OBJECTIONS THERETO**

---

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
M. Catherine Peshkin
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in*
*Possession*
*(other than Charter Investment, Inc.)*

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

*Counsel to Debtor and Debtor in Possession*
*Charter Investment, Inc.*

July 16, 2009

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................v

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND .........................................................................................................4

    I.     Voting Status.........................................................................................7

    II.    Modifications to the Plan. ....................................................................8

ARGUMENT ............................................................................................................10

    I.     The Plan Satisfies Each Requirement for Confirmation.........................11

        A.    The Plan Complies with Section 1129(A)(1) of the Bankruptcy Code. .................................................................................................12

            1.    The Plan Satisfies the Classification Requirements of Section 1122..............................................................................12

            2.    The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(A)(1)-(A)(7)......................................................18

        B.    The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)). .........................................21

            1.    The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125..................................22

            2.    The Debtors Have Complied with the Plan Acceptance Requirements of Section 1126......................................................23

        C.    The Plan Has Been Proposed in Good Faith and Not by any Means Forbidden by Law (Section 1129(a)(3)). ....................................................26

        D.    The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)). .........................................31

        E.    Post-Emergence Directors and Officers Will Have Been Disclosed Before Confirmation and Their Appointment Is Consistent with Public Policy (Section 1129(a)(5)). ............................................................32

F.        The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (Section 1129(a)(6))............................................................34

G.        The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7))...........................................................................35

H.        Acceptance by Impaired Classes (Section 1129(a)(8)).............................44

I.         The Plan Complies with Statutorily Mandated Treatment of Administrative And Priority Tax Claims (Section 1129(a)(9)). ...............45

J.         At Least One Impaired Class of Claims Has Accepted the Plan, Excluding The Acceptances of Insiders (Section 1129(a)(10)).................47

K.        The Plan Is Feasible (Section 1129(a)(11)). ..............................................52

        1.       The Debtors Have Restructured Existing Debt.............................53

        2.       The Debtors Have Significant Earnings. ......................................54

        3.       The Debtors Have Ample Availability of Credit and New Capital. ........................................................................................56

        4.       The Plan Preserves Assets. ..........................................................57

        5.       The Plan Has Been Scrutinized and Validated by Key Stakeholders And Independent Third Parties. ..............................57

L.        The Plan Provides for Payment of all Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).................................................................................58

M.      The Plan Provides for Payment of Retiree Benefits (Section 1129(a)(13)). .................................................................................58

N.        The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code...............................................................59

        1.       The Plan Is Fair and Equitable with Respect to Impaired Classes that Have Not Voted to Accept the Plan..........................60

        2.       The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that Have Not Voted to Accept the Plan. ..........66

O.        The Principal Purpose of the Plan Is Not Avoidance of Taxes (Section 1129(d)). ....................................................................................69

K&E 15004216.

II.   The Discretionary Contents of the Plan Are Appropriate and Should Be Approved..................................................................................................70

   A.   The CII Settlement Should Be Approved. .................................................71

        1.   Key Terms of the CII Settlement ....................................................72

        2.   Context and Purpose of the CII Settlement....................................74

        3.   Process and Fairness ......................................................................76

        4.   The CII Settlement Is Fair and Equitable and Satisfies the Iridium Factors.................................................................................77

             a.   The Benefits of the CII Settlement Outweigh the Likelihood of Success on the Merits.................................78

             b.   Even If the Likelihood of Protracted Litigation Is Low, There Is Little Chance of Success in Litigation......................................................................79

             c.   The CII Settlement Is in the Paramount Interests of Creditors...................................................................79

             d.   The CII Settlement Is a Multiparty Settlement Supported by Most Creditor Constituencies. ....................80

             e.   The Settling Parties Were Advised by Experienced, Independent Attorneys and Advisors and the CII Settlement Is the Product of Arm's-Length Bargaining.......................................................................81

             f.   The Releases of the Directors and Officers Are Appropriate and Justified...................................................81

        5.   The Objections to the CII Settlement Are Unfounded and Should Be Overruled.....................................................................81

   B.   The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should Be Approved.........................................................85

   C.   The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved.......................................................86

        1.   The Debtors' Releases ....................................................................86

        2.   Third Party Releases ......................................................................88

K&E 15004216.

3.     Injunction .................................................................................94

4.     Exculpation ..............................................................................94

CONCLUSION.....................................................................................................99

K&E 15004216.

# TABLE OF AUTHORITIES

**Cases**

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*,
    701 F.2d 1071 (2d Cir. 1983)............................................................. 27

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999).................................................................. 27, 79

*Boston Post Rd. L.P. v. FDIC (In re Boston Post Road, L.P.)*,
    21 F.3d 477 (2d Cir. 1994)........................................................... 13, 59

*Fin. Sec. Assurance, Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*,
    116 F.3d 790 (5th Cir. 1997) ......................................................... 26, 27

*Frito-Lay, Inc., v. LTV Steel Co. (In re Chateaugay Corp.)*,
    10 F.3d 944 (2d Cir. 1993)................................................................ 13

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. III (In re Briscoe
    Enters., Ltd. II)*,
    994 F.2d 1160 (5th Cir. 1993) ....................................................... 11, 26

*In re 11,111, Inc.*,
    117 B.R. 471 (Bankr. D. Minn. 1990) .................................................. 14

*In re 500 Fifth Ave. Assocs.*,
    148 B.R. 1010 (Bankr. S.D.N.Y. 1993)............................................... 13, 18

*In re Adelphia Commc'ns. Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007).................................................. 35, 87

*In re Ambanc La Mesa Ltd. P'ship*,
    115 F.3d 650 (9th Cir. 1997) ............................................................ 59

*In re Apex Oil Co.*,
    118 B.R. 683 (Bankr. E.D. Mo. 1990) .................................................. 33

*In re Armstrong World Indus., Inc.*,
    348 B.R. 111 (D. Del. 2006)............................................................. 11

*In re Avia Energy Dev., L.L.C.*,
    No. 05-39339, 2007 WL 2238039 (Bankr. N.D. Tex. Aug. 2, 2007)............................ 14

*In re Aztec Co.*,
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................ 67

K&E 15004216.

*In re Bally Total Fitness of Greater New York, Inc.*,
 No. 07-12395(BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) . 11, 13, 27, 87

*In re Bd. of Directors of Telecom Argentina, S.A.*,
 528 F.3d 162 (2d Cir. 2008) .................................................................................... 26

*In re Best Products Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ............................ 77

*In re Boston Post Road Ltd.*,
 21 F.3d 477 (2d Cir. 1994) ...................................................................................... 18

*In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ................................ 67

*In re Calpine Corp.*,
 No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) ......................................... passim

*In re Captran Creditors' Trust*,
 128 B.R. 469 (M.D. Fla. 1991) ................................................................................ 95

*In re Chateaugay Corp.*,
 89 F.3d 942 (2d Cir. 1996) ............................................................................... 13, 14

*In re Coram Healthcare Corp.*,
 315 B.R. 321 (Bankr. D. Del. 2004) ........................................................................ 17

*In re Dragone*,
 324 B.R. 445 (Bankr. D. Conn. 2005) ...................................................................... 27

*In re Drexel Burnham Lambert Group, Inc.*,
 138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................ 12, 13

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y.
 1992) ................................................................................................................. 13, 15

*In re El Charro, Inc.*,
 No. 05-60294, 2007 WL 2174911 (Bankr. D. Kan. July 26, 2007) ................................ 11

*In re Enron*,
 No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) ...................................................... 51

*In re FitzSimmons*,
 725 F.2d 1208 (9th Cir. 1984) ................................................................................ 27

*In re Gibson Group, Inc.*,
 66 F.3d 1436 (6th Cir. 1995) .................................................................................. 27

*In re Global Crossing Ltd.*,
No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002)............................................. 17

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007) ........................................................... 27

*In re Greate Bay Hotel & Casino, Inc.*,
251 B.R. 213 (Bankr. D.N.J. 2000) ................................................................ 14

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. Aug. 31, 2007) ........................................... 13

*In re Ionosphere Clubs, Inc.*,
98 B.R. 174 (Bankr. S.D.N.Y. 1989) ............................................................. 13

*In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007). ................................. 78

*In re Jartran, Inc.*,
44 B.R. 331 (Bankr. N.D. Ill. 1984) ............................................................... 97

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)........................................................................ 13

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986)................................................... 21, 66, 67

*In re Johns-Manville Corp.*,
78 B.R. 407 (S.D.N.Y. 1987)......................................................................... 21

*In re Kaiser Aluminum Corp.*,
No. 02-10429, 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006) .................... 13

*In re Kent Terminal Corp.*,
166 B.R. 555 (Bankr. S.D.N.Y. 1994)........................................................... 11

*In re Madison Hotel Assocs.*,
749 F.2d 410 (7th Cir.1984) .................................................................... 26, 27

*In re Mirant Corp.*,
No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ...... 12, 13

*In re Momentum Mfg. Corp.*,
25 F.3d 1132 (2d Cir. 1994).......................................................................... 22

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) ...................................... 87, 98

vii

*In re Piper Aircraft Corp.*,
  244 F.3d 1289 (11th Cir. 2001) ............................................................ 27

*In re Pub. Serv. Co. of New Hampshire*,
  88 B.R. 521 (Bankr. D.N.H. 1988) ........................................................ 97

*In re Simplot*,
  No. 06-00002, 2007 WL 2479664 (Bankr. D. Id. Aug. 28, 2007)................... 12

*In re Source Enters., Inc.*,
  No. 06-11707 (AJG), 2007 WL 2903954 (Bankr. S.D.N.Y. Oct. 1, 2007).............. 27

*In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *10 (Bankr. S.D.N.Y.
  May 25, 2005) ................................................................................ 86

*In re Sun Country Dev., Inc.*,
  764 F.2d 406 (5th Cir. 1985) .............................................................. 26

*In re Sylvan I-30 Enters.*,
  No. 05-86708-HDH-11, 2006 WL 2539718 (Bankr. N.D. Tex. Sept. 1,
  2006) ............................................................................................ 11

*In re Tower Automotive, Inc.*,
  No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) ...................................... 17

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984).................................................... 21

*In re Winn-Dixie Stores, Inc.*,
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ................................................ 96

*In re WorldCom, Inc.*,
  No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) .......... 31, 53, 67, 96

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999) .................................................. passim

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993)............................................................ 59

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (2d Cir. 1988)........................................... 12, 21, 26, 52

*Koelbl v. Glessing*,
  751 F.2d 137 (2d Cir. 1984)............................................................ 26

*McCormick v. Banc One Leasing Corp.,*
   49 F.3d 1524 (11th Cir. 1995) ........................................................................... 27

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
   354 B.R. 1 (D. Conn. 2006) ......................................................................... 26, 52

*Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.),*
   222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ..................................................... 65

*Official Comm. Of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon
   Corp.),*
   200 F.3d 154 (3d Cir. 1999) .............................................................................. 26

*Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.),* 68 F.3d 26, 33
   (2d Cir. 1995) .................................................................................................... 74

*See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,*
   390 U.S. 414 (1968) ........................................................................................... 77

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.),*
   326 B.R. 497 (S.D.N.Y. 2005) ......................................................................... 95

**Statutes**

11 U.S.C. § 1103 .......................................................................................................... 96

11 U.S.C. § 1107(a) ....................................................................................................... 4

11 U.S.C. § 1108 ............................................................................................................ 4

11 U.S.C. § 1122 ......................................................................................... 12, 13, 14, 18

11 U.S.C. § 1123 ......................................................................................................... 12

11 U.S.C. § 1123(a) ..................................................................................... 18, 19, 20, 21

11 U.S.C. § 1123(a)(1) ........................................................................................... 18, 19

11 U.S.C. § 1123(a)(2) ........................................................................................... 19, 21, 22

11 U.S.C. § 1123(a)(3) ..................................................................................... 19, 26, 27, 28

11 U.S.C. § 1123(a)(4) .............................................................................................. 19

11 U.S.C. § 1123(a)(5) .............................................................................................. 19

11 U.S.C. § 1123(a)(6) .............................................................................................. 20

K&E 15004216.

11 U.S.C. § 1123(a)(7) .................................................................................. 20

11 U.S.C. § 1123(b)(3)(A) ......................................................................... 70, 87

11 U.S.C. § 1123(b)(3)(B) ............................................................................ 70

11 U.S.C. § 1123(b)(5) ................................................................................. 70

11 U.S.C. § 1123(b)(6) ................................................................................. 70

11 U.S.C. § 1125 ................................................................................ 5, 21, 22

11 U.S.C. § 1125(b) ..................................................................................... 22

11 U.S.C. § 1125(c) ..................................................................................... 23

11 U.S.C. § 1126 .............................................................................. 21, 23, 24

11 U.S.C. § 1126(c) ..................................................................................... 24

11 U.S.C. § 1126(f) ...................................................................................... 24

11 U.S.C. § 1126(g) ..................................................................................... 24

11 U.S.C. § 1127(a) ....................................................................................... 9

11 U.S.C. § 1129 ............................................................................... 4, 10, 11

11 U.S.C. § 1129(a) ...................................................................................... 11

11 U.S.C. § 1129(a)(1) ................................................................................. 12

11 U.S.C. § 1129(a)(10) ............................................................................... 47

11 U.S.C. § 1129(a)(11) ............................................................................... 52

11 U.S.C. § 1129(a)(12) ............................................................................... 58

11 U.S.C. § 1129(a)(13) ............................................................................... 58

11 U.S.C. § 1129(a)(2) ................................................................................. 21

11 U.S.C. § 1129(a)(3) ..................................................................... 26, 31, 96

11 U.S.C. § 1129(a)(4) ................................................................................. 31

11 U.S.C. § 1129(a)(5) ................................................................................. 32

K&E 15004216.

11 U.S.C. § 1129(a)(6) ....................................................................................... 34

11 U.S.C. § 1129(a)(7) ....................................................................................... 35

11 U.S.C. § 1129(a)(8) ....................................................................................... 44

11 U.S.C. § 1129(a)(9) ....................................................................................... 45

11 U.S.C. § 1129(b) ...................................................................................... 8, 26

11 U.S.C. § 1129(b)(2)(B) .......................................................................... 60, 61

11 U.S.C. § 1129(b)(2)(C) ................................................................................ 61

28 U.S.C. § 1930 ............................................................................................... 58

**Other Authorities**

H.R. Rep. No. 595, 95th Cong., lst Sess. 412 (1977) ............................... 12, 21

S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978) ............................ 12, 21, 45

**Rules**

Fed. R. Bankr. P. 2002 ...................................................................................... 10

Fed. R. Bankr. P. 3017 ................................................................................... 5, 21

Fed. R. Bankr. P. 3018 ...................................................................................... 21

K&E 15004216.

## PRELIMINARY STATEMENT

The Court should confirm the Plan.[1]  The Plan will result in a significant deleveraging of the company and satisfies each of the requirements for confirmation set forth in the Bankruptcy Code.

Charter Communications, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or the "Company") comprise one of the largest providers of broadband entertainment and communications services in the United States, with operations in 27 states.  The Company is operationally sound but significantly over-levered.  Recognizing the need to delever its balance sheet and to enhance its strong competitive position, several months before commencing these cases the Company proactively organized its major creditor constituencies, including a committee representing holders of the Company's fulcrum securities, and conducted extensive negotiations with the goal of consensually restructuring its balance sheet.  The result of these negotiations was the pre-arranged plan of reorganization that the Debtors filed on the first day of these cases and now seek to confirm.

The Plan enjoys the support of the Debtors' primary stakeholders and the Creditors' Committee and is exactly what the Bankruptcy Code was intended to foster — it preserves the Debtors as a going concern and maximizes value.  The Plan effects a complex corporate reorganization that provides for the satisfaction of creditor claims, reinstates the senior portion of the Debtors' capital structure, provides for additional equity contributions in the form of the CCH I Rights Offering, and enables the Debtors to emerge from chapter 11 with a feasible

---

[1]   The "Plan" refers to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, the latest version of which was filed on July 15, 2009 [Docket No. 615]. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

balance sheet and well-positioned to succeed.

Significantly, the Plan is the product of arm's-length negotiations between multiple sophisticated constituencies with conflicting and, in some instances, seemingly irreconcilable interests. Notwithstanding significant obstacles, after lengthy negotiations with their fulcrum constituencies, the Debtors[2] reached an agreement for a pre-arranged chapter 11 plan premised upon a global settlement (the "CII Settlement") with Paul G. Allen, the Debtors' largest shareholder, and supported by the members of the Unofficial Cross-over Committee representing the interests of Holders of CCH I Notes and CCH II Notes.[3] The CII Settlement forms the basis for the Plan, which:

- cancels approximately $8 billion of debt at various holding companies;

- reduces Charter's annual interest expense by more than $830 million;

- raises approximately $1.6 billion in additional equity through a rights offering; and

- refinances approximately $1.467 billion in senior holding company debt instruments.

The rights offering and new money commitments made possible by the CII Settlement are major components of the Plan.

The Plan enjoys the support of the Debtors, the Unofficial Cross-over Committee, and the Creditors' Committee. The Debtors' senior secured lenders, led by JP Morgan, the agent under the Debtors' senior credit facility, and joined by certain second and third lien lenders at CCO and

---

[2]   Where the CII Settlement is discussed herein, the terms "Debtors" and the "Company" do not include Debtor Charter Investment, Inc. ("CII").

[3]   The "Unofficial Cross-over Committee" includes certain holders of approximately 73% (approximately $2.9 billion in principal amount) of the CCH I, LLC notes and certain holders of approximately 52% (approximately $1.3 billion in principal amount) of the CCH II, LLC notes.

CCOH, are attempting to reprice their debt instruments by opposing the proposed reinstatement.[4] In addition, certain holders of CCI Convertible Notes (collectively, the "CCI Noteholders"), a structurally subordinated group of creditors at the parent public company, Charter Communications, Inc., voted as a class to reject the Plan and are objecting to Confirmation on the grounds they are entitled to a par recovery, notwithstanding that classes of senior noteholders are receiving significantly lower distributions.

The CCI Noteholders' objections reflect the classic strategy of an out-of-the-money (and/or vulture) investor seeking to extort holdup value from the Debtors' estates: object on every conceivable ground, no matter how spurious, with the hope that perhaps one argument may be salient — or that the sheer volume of complaints will generate the (mis)impression the plan must somehow be unconfirmable. The Debtors have analyzed each and every argument the CCI Noteholders have posed and determined that they are without merit. The Court should overrule the CCI Noteholders' objection and confirm the Plan.

Many of the CCI Noteholders' objections attempt to raise the specter of a conspiracy theory fraught with insider preference. In this regard, the CCI Noteholders' objections to the Plan are based largely upon the argument that the Plan should not be confirmed (and the Debtors' directors breached their duties in approving the Plan and CII Settlement upon which it is premised) because alternative plan structures may exist under which Paul Allen could have received less value.[5] But this position is based upon the faulty premise that the consideration Mr.

---

[4] The Debtors are addressing the reinstatement of the JP Morgan facility and related issues in a separate brief filed under seal on July 14, 2009.

[5] *See* Objection of Law Debenture Trust Company Of New York To The Debtors' Joint Plan Of Reorganization Pursuant To Chapter 11 Of The United States Bankruptcy Code [Docket No. 581]. In
(Continued…)

Allen is receiving under the CII Settlement is on account of his equity interests in the Debtors. Moreover, the CCI Noteholders overlook the fact that such alternative plan structures also would have left the Debtors' estates generally — and CCI's estate specifically — with substantially less value. This misapprehends the fundamental policy of bankruptcy. That policy is not to ensure that entities that hold equity end up with nothing — it is to maximize value for creditors. This Plan does just that, consistent with the Debtors' fiduciary duties, their Plan exclusivity rights and the policies and statutory framework of the Bankruptcy Code. As explained below, the Plan satisfies all applicable requirements of sections 1129 of the Bankruptcy Code and should be confirmed.

## BACKGROUND

On March 27, 2009 (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these chapter 11 cases (the "Chapter 11 Cases").

Also on the Petition Date, the Debtors filed (a) the Plan [Docket No. 36], (b) their Plan Supplement [Docket No. 37], (c) their Disclosure Statement [Docket No. 38], which Plan and related documents were subsequently updated and revised, (d) a memorandum in support of reinstatement [Docket No. 3], and (e) a motion to approve the Disclosure Statement and establish voting procedures [Docket No. 30].

---

addition, R2 Investments, L.P., a substantial CCI Noteholder, joined the CCI Noteholders' objection in its capacity as an equity holder of CCI. *See* Objection of R2 Investments, L.P. to Confirmation of
(Continued…)

K&E 15004216.

On the Petition Date, JPMorgan Chase Bank, N.A., the administrative agent under the Debtors' prepetition senior credit facility, filed an adversary complaint opposing the reinstatement of such credit facility.[6]

On March 30, 2009, the Court approved the Debtors' request for procedural consolidation and joint administration of the Chapter 11 Cases [Docket No. 64]. On April 10, 2009, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the official committee of unsecured creditors (the "Creditors' Committee").

On May 4, 2009, the Debtors filed an amended and restated Exhibit 19 to the Plan Supplement describing Rights Offering procedures [Docket No. 298].

On May 7, 2009, the Debtors filed updated versions of the Plan [Docket No. 320] and Disclosure Statement [Docket No. 319].

On May 7, 2009, the Court entered the order approving the Disclosure Statement [Docket No. 323] (the "Disclosure Statement Order") which, among other things, (a) approved the solicitation procedures and related notices, forms, Ballots, and Master Ballots (collectively, the "Solicitation Packages"), (b) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (c) fixed April 17, 2009, as the Fed. R. Bankr. P. Record Date; (d) fixed June 15, 2009, at 5:00 p.m. prevailing Eastern Time,

---

the Debtors' Joint Plan of Reorganization [Docket No. 579]. These objections are referred to collectively herein as the "CCI Noteholder Objection."

[6] *See* Adversary Proceeding No. 09-01132 [Docket No. 1]. Pursuant to the Court's Memorandum Decision So Ordering That the Complaint Sets Forth a Core Proceeding, a Cause of Action That Impacts These Bankruptcy Cases Directly re: Complaint by JPMorgan Chase Bank, NA Against Charter Communications Operating LLC and CCO Holdings, LLC, the reinstatement issue will be considered in connection with Confirmation [Docket No. 45].

as the deadline for voting to accept or reject the Plan (the "Voting Deadline"); (e) fixed July 13, 2009, at 4:00 p.m. prevailing Eastern Time, as the deadline for objecting to the Plan; (f) fixed July 20, 2009, at 10:00 a.m. prevailing Eastern Time, as the date and time for the commencement of the hearing to confirm the Plan (the "Confirmation Hearing"); and (g) approved the form and method of notice for the Confirmation Hearing.

On July 15, 2009, the Debtors filed certain immaterial modifications to the Plan [Docket No. 615]. Contemporaneously herewith, the Debtors filed certain exhibits to the Plan Supplement.

Contemporaneously herewith, the Debtors filed (a) the voting certifications of their Court-appointed solicitation agents, Financial Balloting Group LLC and Kurtzman Carson Consultants LLC (collectively, the "Voting Certifications"),[7] (b) the Affidavit of Gregory L. Doody in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Doody Affidavit"), and (c) the Affidavit of Thomas M. Degnan in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Degnan Affidavit"), each of which is incorporated herein by reference.[8]

---

[7] Affidavit of Jane Sullivan of Financial Balloting Group LLC with Respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "FBG Voting Certification"); Affidavit of Christopher R. Schepper Regarding Votes Accepting or Rejecting the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "KCC Voting Certification").

[8] Mr. Doody (the Debtors' Chief Restructuring Officer and General Counsel), Mr. Degnan (the Director of the Debtors' tax department and Corporate Treasurer), and other officers and advisors will be available at the Confirmation Hearing to testify in support of the Plan.

The Debtors also are filing the proposed Confirmation Order contemporaneously herewith.[9]

I.     **Voting Status.**

On or about May 12, 2009, the Debtors, through their solicitation agents, distributed Solicitation Packages consistent with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order as evidenced by the *Affidavit of Service of Financial Balloting Group LLC of Solicitation Packages and Related Documents on Holders of Publicly Held Notes and Common Stock, and Certain Other Parties* [Docket No. 393] (the "FBG Solicitation Affidavit") and the *Affidavit of Service of Leanne V. Rehder Scott re: Solicitation Packages* [Docket No. 396] (the "KCC Solicitation Affidavit").

Holders of Claims and Interests in the Priority Non-Tax Claims and Secured Claims Classes at each Debtor are Unimpaired and deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.[10]  The following additional Classes of Claims and Interests also are Unimpaired:

| Class | Description |
|---|---|
| I-1 | CCOH Credit Facility Claims |
| I-2 | CCOH Notes Claims |
| I-6 | CCOH and CCO Holdings Capital Corp. Interests |
| J-1 | CCO Credit Facility Claims |
| J-3 | CCO Notes Claims |
| J-7 | CCO and its direct and indirect subsidiaries' Interests[11] |

---

[9]   Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code.

[10]  These Classes are Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-3, I-4, J-4, and J-5.

[11]  Class J-7 Interests does not include CC VIII Preferred Units held by CCI Settlement Claim Parties.

K&E 15004216.

In addition, Holders of Section 510(b) Claims and Interests at each Debtor[12] other than CII, CCOH, and CCO are Impaired and deemed to reject the Plan and, therefore, also are not entitled to vote to accept or reject the Plan.[13]

Creditors in General Unsecured Claims Classes at each Debtor[14] as well as the following Classes (collectively, the "Accepting Classes") voted to or were deemed to accept the Plan.[15]

| Class | Description |
|-------|-------------|
| B-4 | CII Shareholder Claims |
| C-4 | Holdco Notes Claims |
| F-4 | CIH Notes Claims |
| G-4 | CCH I Notes Claims |
| H-4 | CCH II Notes Claims |
| J-2 | CCO Swap Agreements Claims |

Excluding Insiders, creditors in Classes A-4 (CCI Notes Claims) and E-4 (CCH Notes Claims) (collectively, the "Rejecting Classes") voted to reject the Plan. As discussed below, the Debtors satisfy the "cram down" requirements under section 1129(b) of the Bankruptcy Code with respect to the Rejecting Classes.

## II. Modifications to the Plan.

The Debtors have made certain non-material modifications (the "Non-material Modifications") to the Plan to address concerns raised by particular Holders of Claims or Interests. For example, in response to certain of the concerns identified by the

---

[12] Classes A-5 and A-6 consist of all Section 510(b) Claims and Interests in CCI, respectively, other than all such Claims against CCI held by any CII Settlement Claim Party.

[13] These Classes are designated as Classes A-5, C-5, D-4, E-5, F-5, G-5, and H-5 and Holders of Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6.

[14] These Classes are designated as Classes A-3, B-3, C-3, D-3, E-3, F-3, G-3, H-3, I-5, and J-6.

[15] Pursuant to the Disclosure Statement Order, Classes for which no votes are cast are deemed to accept the Plan. See Disclosure Statement Order, Exhibit E ¶ 7(h). No votes were cast in Classes D-3, E-3, F-3, G-3, H-3, and I-5. See KCC Voting Certification ¶ 15. Thus, such Classes are deemed to have accepted to the Plan.

CCI Noteholders, the Debtors believed it was appropriate to adjust the Plan treatment of the Class A-4 CCI Notes Claims. In particular, the Debtors propose to improve the Plan treatment of the Class A-4 CCI Notes Claims by approximately $66 million and to specify that the Holders of such Claims are entitled to that portion of the proceeds of a litigation settlement (the "<u>Litigation Settlement Fund Proceeds</u>"), if any, the Court ultimately determines are allocable to CCI or Holdco. The Debtors also are making certain modifications to the terms of the New Preferred Stock to be issued in favor of the Holders of Allowed Class A-4 CCI Notes Claims. Specifically, the New Preferred Stock will now be traded on a public exchange and will mature in 5 years instead of 7 years. A summary of all of the Non-material Modifications is set forth below. None of these modifications adversely affects the treatment of those Classes of Claims that voted to accept the Plan.[16]

---

[16] Section 1127(a) of the Bankruptcy Code permits a plan proponent to modify the plan before confirmation:

> The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of the title. After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan.

K&E 15004216.

| **Non-material Modifications** | |
|---|---|
| Priority Tax Claims | • Cash treatment will include, pursuant to section 511 of the Bankruptcy Code, interest at rate determined by applicable nonbankruptcy law. |
| CCH II Notes Claims | • Allowed amount increased $10.36 million (not including Post-Petition Interest).<br>• Debtors may pay Post-Petition Interest in cash if Debtors elect and file notice with Court on or before Effective Date. |
| New Class B Stock Voting Power | • Determination made on fully diluted basis. |
| CII Settlement Claim - Amount of New Class B Stock | • Determination made on fully diluted basis. |
| Projected Holder of 10+% Voting Power re Board Representation | • Determination made on undiluted basis. |

On or about July 15, 2009, the Debtors filed and served on the Bankruptcy Rule 2002 notice list and all Plan objectors a "blackline" version of the Plan highlighting changes to the version of the Plan that was distributed with the Disclosure Statement and Solicitation Packages.[17] As the Debtors continue to work toward resolution of objections, certain additional modifications may be stated and explained on the record during the Confirmation Hearing.

## ARGUMENT

In this Memorandum, the Debtors present their "case in chief" that the Plan should be confirmed because it satisfies section 1129 of the Bankruptcy Code. The Debtors also address each of the outstanding objections to Confirmation.[18] The Debtors will file the Doody Affidavit contemporaneously herewith and will reference the affidavit and declaration as needed throughout the Memorandum. Debtor CII will submit a separate declaration (the

---

[17] *See* Affidavit of Service of Matthew R. Jenks [Docket No. 623].

[18] The Debtors are filing under separate cover a chart summarizing the objections to the Plan and whether such objections have been resolved or remain outstanding.

K&E 15004216.

"CII Declaration") concerning its satisfaction of confirmation requirements. In addition, the Debtors will adduce further evidence in support of the Plan through testimony at the Confirmation Hearing.

## I. The Plan Satisfies Each Requirement for Confirmation.

To confirm the Plan, the Court must find the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[19] The Debtors submit that the Plan complies with all relevant sections of the Bankruptcy Code, Bankruptcy Rules, and applicable non-bankruptcy law. In particular, the Plan fully complies with all of the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code. This Memorandum addresses each requirement individually as well as the permissive elements of the Plan, including the CII Settlement.

---

[19] *See In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *In re Kent Terminal Corp.*, 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994) ("Notwithstanding this time-sensitive evidentiary burden, the final burden of proof at . . . confirmation hearing[] remains a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. III (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("[t]he combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("In the context of a cramdown, the debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence."); *In re El Charro, Inc.*, No. 05-60294, 2007 WL 2174911, *4 n.4 (Bankr. D. Kan. July 26, 2007) (preponderance of evidence applies to valuation and every element governing confirmation); *In re Sylvan I-30 Enters.*, No. 05-86708, 2006 WL 2539718, at *6 (Bankr. N.D. Tex. Sept. 1, 2006) (applying preponderance of evidence standard to confirmation in context of feasibility).

K&E 15004216.

## A.     The Plan Complies with Section 1129(A)(1) of the Bankruptcy Code.

Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code,[20] including, principally, rules governing classification of claims and interests and the contents of a plan of reorganization.[21] Accordingly, determining whether the Plan complies with section 1129(a)(1) requires applying sections 1122 and 1123 of the Bankruptcy Code. As explained below, the Plan complies with sections 1122 and 1123 in all respects.[22]

### 1.     The Plan Satisfies the Classification Requirements of Section 1122.[23]

The Plan satisfies section 1122's classification requirements, which provide:

(a)     Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b)     A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount

---

[20]   11 U.S.C. § 1129(a)(1).

[21]   *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 648-49 (2d Cir. 1988) (suggesting that Congress intended the phrase "'applicable provisions' in this subsection to mean provisions of Chapter 11 . . . such as section 1122 and 1123."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) (noting that "[t]he legislative history of § 1129(a)(1) explains that this provision embodies the requirements of §§ 1122 and 1123, respectively, governing classification of claims and the contents of the Plan"); *see also In re Simplot*, No. 06-00002, 2007 WL 2479664, at *14 (Bankr. D. Id. Aug. 28, 2007) (section 1129(a)(1) requires compliance with section 1122 in classifying claims); *In re Mirant Corp.*, No. 03-46590DML11, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007) (objective of 1129(a)(1) is to assure compliance with the sections of the Bankruptcy Code governing classification and the contents of a plan reorganization); S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978); H.R. Rep. No. 595, 95th Cong, lst Sess. 412 (1977).

[22]   *See* Doody Affidavit ¶¶ 13-16.

[23]   *See* CCI Noteholder Objection; Objections to Confirmation of Charter Communications Operating, LLC's Joint Plan of Reorganization and Pre-Trial Brief of JPMorgan Chase Bank, N.A. (the "JPMorgan Objection").

K&E 15004216.

that the court approves as reasonable and necessary for administrative convenience.[24]

The Second Circuit has recognized that under section 1122 of the Bankruptcy Code, plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[25] Courts have identified grounds justifying separate classification, including: (a) where members of a class possess different legal rights;[26] and (b) where there are good business reasons for separate classification.[27]

---

[24] 11 U.S.C. § 1122.

[25] *See Boston Post Road L.P. v. FDIC (In re Boston Post Road, L.P.)*, 21 F.3d 477, 483 (2d Cir. 1994) (finding that courts cannot prohibit separate classification of substantially similar claims); *Frito-Lay, Inc., v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956-57 (2d Cir. 1993) (finding separate classification appropriate because classification scheme had a rational basis; separate classification based on bankruptcy court-approved settlement); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1018 (Bankr. S.D.N.Y. 1993) (Although discretion is not unlimited, "the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case . . . ."); *Drexel*, 138 B.R. at 757 ("Courts have found that the Bankruptcy Code only prohibits the identical classification of dissimilar claims. It does not require that similar classes be grouped together . . . ."); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("a debtor may place claimants of the same rank in different classes and thereby provide different treatment for each respective class"); *see also In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) (recognizing that separate classes of claims must be reasonable and allowing a plan proponent to group similar claims in different classes); *In re Heritage Org., L.L.C.*, 375 B.R. 230, 303 (Bankr. N.D. Tex. Aug. 31, 2007) ("the only express prohibition on separate classification is that it may not be done to gerrymander an affirmative vote on a reorganization plan.").

[26] *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992); *see also Heritage*, 375 B.R. at 299 n.86 (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate); *Mirant Corp.*, 2007 WL 1258932, at *7 (permitting separate classification because holders of claims had different legal interests in the debtor's estate); *In re Kaiser Aluminum Corp.*, No. 02-10429, 2006 WL 616243, at *5 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of creditors' legal rights).

[27] *See In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996) (finding that debtor must have a legitimate business reason supported by credible proof to justify separate classification of unsecured claims); *Bally Total Fitness*, 2007 WL 2779438, at *3 (same); *see also Heritage*, 375 B.R. at 303 (recognizing separate classification of claims of equal rank and priority for valid business reasons, including where a particular group of claimants have non-creditor interests that may affect its voting on the plan); *In re Avia Energy Dev., L.L.C.*, No. 05-39339, 2007 WL 2238039, at *2 (Bankr. N.D.

(Continued…)

K&E 15004216.

The Plan's classification of Claims and Interests into 58 Classes satisfies the requirements of section 1122 because each Class differs from the others in a legal or factual nature or based on other relevant criteria.[28] Notwithstanding the size of the Chapter 11 Cases and the Debtors' extraordinarily complex capital structure, including various tranches of secured debt and 26 series of unsecured notes, the Debtors crafted a classification scheme under the Plan that fits squarely within section 1122's flexible standard.[29]

Described generally, the Plan's classification scheme follows the Debtors' capital structure. For each Debtor, secured debt is classified separately from unsecured debt, general unsecured Claims are classified separately from unsecured note Claims and unsecured note Claims are classified separately from Interests.[30]

The Plan also recognizes subordination and security provisions present in certain bond indentures. For example, the CCO Notes Claims (Class J-3) are secured by a second-priority lien on substantially all of CCO's and certain of its subsidiaries' assets that secure the obligations under the CCO Credit Facility. These CCO Notes Claims are junior to the CCO Credit Facility Claims (Class J-1) which are secured by a first priority lien on the same assets.

---

Tex. Aug. 2, 2007) (permitting separate classification based on valid business, factual, and legal reasons).

28    *See* Doody Affidavit ¶¶ 6-9.

29    *See Chateaugay*, 89 F.3d at 949-50 ("Congress gave reorganizing debtors considerable flexibility in their treatment of general unsecured creditors to position themselves for future economic viability."); *In re Great Bay Hotel & Casino, Inc.*, 251 B.R. 213, 224 (Bankr. D.N.J. 2000) (separate classification of similar claims permitted when classification "promotes the rehabilitative goals of Chapter 11"); *In re 11,111, Inc.*, 117 B.R. 471, 476 (Bankr. D. Minn. 1990) (same).

30    *See* Plan, Art. IV.

The CCI Noteholders object to the separate classification of their Class A-4 CCI Notes Claims on account of their convertible senior notes[31] from the Class A-3 CCI General Unsecured Claims, arguing that such classification was designed to gerrymander affirmative votes at CCI.[32] This objection is unfounded and should be rejected. As an initial matter, separate classification of the Class A-4 CCI Notes Claims from the Class A-3 CCI General Unsecured Claims is warranted because the CCI Noteholders have different legal rights under the CCI Notes Indenture than the unsecured litigation, severance, trade, and other creditors that make up the Class A-3 CCI General Unsecured Claims.[33] Indeed, as is evident from the CCI Notes Indenture, the CCI Notes are, by their terms, convertible into equity. Moreover, the CCI Notes were issued in conjunction with the Holdco Mirror Note, which provides CCI and, by virtue of the fact that other claims at CCI generally are subject to the Management Agreement, Holders of CCI Notes with an alternative source of recovery against Holdco that is unavailable to general unsecured creditors of CCI.[34]

---

[31] *See* 6.50% Convertible Senior Notes due 2027 Indenture, dated October 2, 2007 between CCI and The Bank of New York Trust Company, N.A. (the "CCI Notes Indenture").

[32] The CCI Noteholders also argue that Class C-3 Holdco General Unsecured Claims is gerrymandered and should be classified together with Class C-4 Holdco Notes Claims. *See* CCI Noteholder Objection ¶ 98. This argument fails for the same reason as discussed herein with respect to the Class A-3 CCI General Unsecured Claims and Class A-4 CCI Notes Claims. The Debtors respond to the CCI Noteholders' argument that Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims are artificially impaired in the discussion of section 1129(a)(10) below.

[33] *See Drexel*, 138 B.R. at 715 (separate classification of similar classes was rational where members of each class "own[ed] distinct securities and possess[ed] different legal rights").

[34] *See* 5.875% Mirror Convertible Senior Note of Holdco due November 16, 2009 issued pursuant to the Holdco Mirror Notes Agreement, dated as of November 22, 2004, between CCI and Holdco; and 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco.

K&E 15004216.

By contrast, most of the Class A-3 CCI General Unsecured Claims are covered under the management services agreement between CCI and CCO on behalf of itself and certain specified operating subsidiaries.[35]  Pursuant to the Management Agreement, which will be assumed under Article VII.A of the Plan, CCI provides certain management services to CCO and the operating entities in return for reimbursement at cost for all expenses associated with CCI's duties as manager, including for costs incurred to pay employees and third party providers such as vendors, attorneys, consultants, and other advisors.[36]  In addition, pursuant to the Management Agreement, CCO agreed to bear any and all expenses associated with litigation directly or indirectly resulting from the services provided by CCI.[37]  Therefore, CCO, a solvent entity, will cover the vast majority of the expenses incurred by CCI in the ordinary course of business.  As the CCI Noteholders acknowledge, these are exactly the types of expenses that make up the Class A-3 CCI General Unsecured Claims.[38]  Accordingly, the legal rights and payment expectations of the Class A-3 CCI General Unsecured Claims and the Class A-4 CCI Notes Claims differ substantially.

The impact of the Management Agreement cannot be overstated.  Holders purchased the CCI Notes with full knowledge that general unsecured claims at CCI would be paid through the

---

[35]  *See* Management Agreement, dated as of June 19, 2003, between CCI and CCO on behalf of CCO and certain specified operating subsidiaries (as amended or modified from time to time, the "Management Agreement").  The Management Agreement also obligates CCO to reimburse Holdco for any services provided by Holdco.  *Id.* at ¶ 3.  A copy of the Management Agreement is attached hereto as **Exhibit A**.

[36]  *See* Management Agreement ¶ 3(a)(i)-(ii).

[37]  *See id.* ¶ 5.

[38]  *See* CCI Noteholder Objection ¶ 21 (describing the holders of CCI General Unsecured Claims as "a hodgepodge of former employees, litigation claimants, rejection damage claimants, and insignificant trade creditors").

Management Agreement. It was set forth in the Company's SEC disclosures.[39] General unsecured creditors would enjoy the backstop of the Management Agreement and the CCI Notes Claims would enjoy the benefit of the equity upside of the convertible notes feature. The equity upside did not work out. That does not mean that the CCI Notes can *ex post facto* change the deal through an unfair discrimination argument and seek the benefit of the Management Agreement.

In any event, separate classification of complex debt instrument claims (and particularly convertible notes claims) from general unsecured claims is routine in chapter 11 plans approved in this and other districts.[40] The single asset real estate unsecured deficiency claim cases the CCI Noteholders cite are not in the least similar and do not hold otherwise.[41]

In each instance of separate classification, including those described above, the Plan classifies Claims based upon their different rights and attributes. As such, valid business, factual, and legal reasons exist for classifying separately the various Classes of Claims and

---

[39] The Management Agreement was in existence and publicly disclosed well before the issuance of the CCI Notes on November 22, 2004 and October 2, 2007. *See* Charter Communications, Inc., Amendment No. 1 to Form S-4, Exchange Offer Prospectus, dated as of September 14, 2007, Ex. 10-31, available at http://www.sec.gov/Archives/edgar/data/1091667/000095012307012605/y38890a1sv4za.htm. (incorporating the Management Agreement by reference); Charter Communications, Inc., SEC Form 10-Q, dated as of August 5, 2003, available at http://www.sec.gov/Archives/edgar/data/1091667/000095012303008915/y88762e10vq.htm.

[40] *See, e.g., In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) (order confirming chapter 11 plan separately classifying convertible unsecured notes claims from general unsecured claims); *In re Tower Automotive, Inc.,* No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) (same); *In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002) (order confirming chapter 11 plan separately classifying unsecured notes claims from general unsecured claims); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

K&E 15004216.

Interests created under the Plan. Additionally, each of the Claims or Interests in each particular Class is substantially similar to the other Claims or Interests in such Class. Accordingly, the Plan satisfies section 1122 of the Bankruptcy Code.

    **2.**    **The Plan Satisfies the Seven Mandatory Plan Requirements of Sections 1123(A)(1)-(A)(7).[42]**

The Plan meets the seven mandatory requirements of section 1123(a), which require that a plan:

(1)    designate classes of claims and interests;

(2)    specify unimpaired classes of claims and interests;

(3)    specify treatment of impaired classes of claims and interests;

(4)    provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim agrees to a less favorable treatment of such particular claim or interest;

(5)    provide adequate means for the plan's implementation;

(6)    provide for the prohibition of nonvoting equity securities and provide an appropriate distribution of voting power among the classes of securities; and

(7)    contain only provisions that are consistent with the interests of the creditors and equity security holders and with public policy with respect to the manner of selection of the reorganized company's officers and directors.[43]

Articles III, IV, and V of the Plan satisfy the <u>first three requirements</u> of section 1123(a) by: (a) designating Classes of Claims and Interests, as required by section 1123(a)(1); (b) specifying the Classes of Claims and Interests that are Unimpaired under the Plan, as required

---

[41]    CCI Noteholder Objection ¶¶ 21-28 (citing *In re Boston Post Road Ltd.,* 21 F.3d 477, 482-83 (2d Cir. 1994) and *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010 (Bankr. S.D.N.Y. 1993)).

[42]    *See* Doody Affidavit ¶¶ 10-13.

by section 1123(a)(2) ; and (c) specifying the treatment of each Class of Claims and Interests that is Impaired, as required by section 1123(a)(3).  The Plan also satisfies section 1123(a)(4)—the <u>fourth</u> mandatory requirement—because the treatment of each Claim or Interest within a Class is the same as the treatment of each other Claim or Interest in that Class, unless the Holder of a Claim consents to less favorable treatment on account of its Claim or Interest.

Article VI and various other provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the <u>fifth</u> requirement of section 1123(a).[44]  The provisions of Article VI of the Plan relate to, among other things: (a) the sources of consideration for distributions under the Plan, including the use of Net Proceeds and the payment of Specified Fees and Expenses; (b) the authorization and issuance of new equity in the Reorganized Company consisting of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants, and the execution of related documents; (c) the satisfaction of the CII Settlement Claim; (d) the continuation of the corporate existence of the Debtors and the vesting of assets in the each of the Reorganized Debtors; (e) the discharge of the Debtors; (f) the consummation of certain restructuring transactions; (g) the authorization of the Reorganized Debtors to take corporate action; (h) the authorization of the Reorganized Debtors to enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan; (i) the adoption of the Reorganized Holdco LLC

---

[43]   *See* 11 U.S.C. § 1123(a)(1)-(7).

[44]   11 U.S.C. § 1123(a)(5).  Section 1123(a)(5) specifies that adequate means for implementation of a plan may include: (i) retention by the debtor of all or part of its property; (ii) the transfer of property of the estate to one or more entities; (iii) cancellation or modification of any indenture; (iv) curing or waiving of any default; (v) amendment of the debtor's charter; or (vi) issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.

K&E 15004216.

Agreement; (j) the appointment of officers and directors of the Reorganized Company; (k) the adoption of the Management Incentive Plan and the VCP; (l) the creation of the Professional Fee Escrow Account to reserve an amount necessary to pay all of the Accrued Professional Compensation; (m) the maintenance of Causes of Action and the preservation of all Causes of Action not expressly settled or released; and (n) the general authority for all corporate action necessary to effectuate the Plan. Moreover, the Reorganized Debtors will have, immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan.

The <u>sixth</u> requirement of section 1123(a)—i.e., that a plan prohibit the issuance of nonvoting equity securities—is also met.[45] In particular, Article IV(a)(iv) of the Amended and Restated Certificate of Incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement, prohibits the issuance of non-voting equity securities.[46]

Finally, the Plan fulfills section 1123(a)'s <u>seventh</u> element, which requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan . . ."[47] The manner of selecting the officers and directors of the Reorganized Debtors pursuant to Article VI.O of the Plan is consistent with Delaware corporate law, the Bankruptcy Code, and the interests of creditors, equity security holders, and public

---

[45] 11 U.S.C. § 1123(a)(6).

[46] *See* Plan Supplement Ex. 3, Art. IV(a)(iv).

[47] 11 U.S.C. § 1123(a)(7) .

K&E 15004216.

policy.[48]   Indeed, the Debtors undertook painstaking efforts to incorporate "best practices" corporate governance into all of their governing documents including the Amended and Restated Bylaws and the Amended and Restated Certificate of Incorporation.[49]   Therefore, the Court should find that the Plan satisfies the requirements of section 1123(a)(7).

Moreover, no party objected to the Plan on the basis that it does not satisfy section 1123(a).   Accordingly, the Plan satisfies the mandatory plan requirements set forth in section 1123(a) of the Bankruptcy Code.

### B.    The Debtors Have Complied Fully with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

The Debtors have satisfied section 1129(a)(2)  of the Bankruptcy Code, which requires that the proponent of a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.   The legislative history to section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.[50]   The Debtors have complied with these provisions, including sections 1125 and 1126, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their solicitation agents as

---

[48]   *Id.  See also* Plan, Art. VI.O.

[49]   *See* Plan Supplement Exs. 2 and 3, respectively.

[50]   *See In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd, Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984); s*ee also* H.R. Rep. No. 95-595, at 412 (1977); S. Rep. No. 95-989, at 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

K&E 15004216.

pursuant to the Disclosure Statement Order.[51]  Moreover, no party objected to the Plan on the basis that it did not satisfy section 1129(a)(2).

> ### 1. The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125.

Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[52]  The purpose of section 1125 is to ensure that parties in interest are fully informed regarding the condition of the debtor so that they may make an informed decision whether to approve or reject the plan.[53]

Here, the Debtors have satisfied section 1125 of the Bankruptcy Code.  Prior to the Debtors' solicitation of votes on the Plan, the Court approved the Disclosure Statement as containing adequate information.[54]  In addition, the Disclosure Statement Order specifies in great detail the content of the various Solicitation Packages to be provided to Holders of Claims and Interests and the timing and method of delivery of the Solicitation Packages.[55]  Through their solicitation agents, Kurtzman Carson Consultants LLC and the Financial Balloting Group LLC,

---

[51]   *See* KCC Solicitation Affidavit ¶ 3; FBG Voting Certification ¶ 6.

[52]   11 U.S.C. § 1125(b).

[53]   *See In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a Debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[54]   *See* Disclosure Statement Order ¶ 10.

[55]   *Id.* ¶ 9.

the Debtors complied in all respects with the content and delivery requirements of the Disclosure Statement Order.[56]

The Debtors also have satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a Claim or Interest in a particular Class. Here, the Debtors transmitted the same Disclosure Statement to all parties entitled to vote on the Plan.[57]

### 2. The Debtors Have Complied with the Plan Acceptance Requirements of Section 1126.

Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[58] As set forth in the Plan, the Disclosure Statement, the Disclosure Statement Order, and the Voting Certifications, in accordance with section 1126, the Debtors solicited acceptances and rejections of the Plan from the Holders of all Allowed Claims in each Impaired Class entitled to receive distributions under the Plan: Classes A-3, A-4, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 (the "Voting Classes").[59]

In addition, Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, I-6, J-1, J-3, J-4, J-5, and J-7 are Unimpaired (the

---

[56] *See* KCC Solicitation Affidavit ¶ 3; FBG Voting Certification ¶ 6.

[57] *Id.*

[58] *See* 11 U.S.C. § 1126.

[59] *See* Plan, Art. IV; Disclosure Statement at 34-55; Disclosure Statement Order ¶ 3; KCC Voting Certification ¶ 11; FBG Voting Certification ¶ 2.

K&E 15004216.

Unimpaired Classes") under the Plan.[60]  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are not entitled to vote on the Plan and are conclusively deemed to have accepted the Plan.  Holders of Claims or Interests in Classes A-5, A-6, C-5, C-6, D-4, D-5, E-5, E-6, F-5, F-6, G-5, G-6, H-5, and H-6 are Impaired under the Plan and will not receive any distributions or retain any property under the Plan (the "Deemed Rejecting Classes").[61]  Accordingly, pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Deemed Rejecting Classes are not entitled to vote on the Plan and are deemed to have rejected the Plan.

With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by a class of claims:[62]

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.[63]

Pursuant to the Disclosure Statement Order, if no votes to accept or reject the Plan are received with respect to a particular Class, such Class shall be deemed to have voted to accept the Plan.[64]

The Voting Certifications detail the results of the voting process in accordance with section 1126 of the Bankruptcy Code as summarized below:[65]

---

[60]  *See* Plan, Art. IV.

[61]  *See* Plan, Art. IV.

[62]  No Classes of Interests were entitled to vote on the Plan.  *See* Plan, Art. IV.

[63]  11 U.S.C. § 1126(c).

[64]  *See* Disclosure Statement Order, Exhibit E ¶7(h).

24

| Class | Claim/Interest | % of Claim Amount Accepting | % of Voting Creditors Accepting | Accept/Reject Determination[66] |
|---|---|---|---|---|
| A-3 | General Unsecured Claims Against CCI | 99.99% | 93.33% | Accept |
| A-4 | CCI Notes Claims | 17.55% | 28.57% | Reject |
| B-3 | General Unsecured Claims Against CII | 100% | 80% | Accept |
| B-4 | CII Shareholder Claims | 100% | 100% | Accept |
| C-3 | General Unsecured Claims Against Holdco, Enstar Communications Corporation, and Charter Gateway LLC | 99.99% | 96.67% | Accept |
| C-4 | Holdco Notes Claims | 100% | 100% | Accept |
| D-3 | General Unsecured Claims Against CCHC | 0% | 0% | Accept* |
| E-3 | General Unsecured Claims Against CCH and Charter Communications Holdings Capital Corp. | 0% | 0% | Accept* |
| E-4 | CCH Notes Claims | 68.67% | 56.99% | Accept |
| F-3 | General Unsecured Claims Against CIH and CCH I Holdings Capital Corp. | 0% | 0% | Accept* |
| F-4 | CIH Notes Claims | 94.50% | 59.47% | Accept |
| G-3 | General Unsecured Claims Against CCH I and CCH I Capital Corp. | 0% | 0% | Accept* |
| G-4 | CCH I Notes Claims | 98.51% | 89.17% | Accept |
| H-3 | General Unsecured Claims Against CCH II and CCH II Capital Corp. | 0% | 0% | Accept* |
| H-4 | CCH II Notes Claims | 99.70% | 99.55% | Accept |
| I-5 | General Unsecured Claims Against CCOH and CCO Holdings Capital Corp. | 0% | 0% | Accept* |
| J-2 | CCO Swap Agreements Claims | 82.11% | 77.27% | Accept |
| J-6 | General Unsecured Claims Against CCO and its Direct and Indirect Subsidiaries | 100% | 96.14% | Accept |

Class A-4 CCI Notes Claims (and, excluding Insiders, Class E-4 CCH Notes Claims) voted to reject the Plan. Nevertheless, as discussed more fully below, multiple Impaired Classes have

---

[65]  *See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.

[66]  Classes marked with a "*" designate Classes for which no votes were cast. Pursuant to the Disclosure Statement Order, all such Classes are deemed to have accepted the Plan. Disclosure Statement Order, Exhibit E ¶ 7(h).

K&E 15004216.

accepted the Plan and the Debtors have met the requirements of section 1129(b) to "cram down"

any rejecting Classes.

### C. The Plan Has Been Proposed in Good Faith and Not by any Means Forbidden by Law (Section 1129(a)(3)).[67]

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be

"proposed in good faith and not by any means forbidden by law."[68]  In the context of

section 1129(a)(3), the good faith requirement mandates that "the plan was proposed with

'honesty and good intentions' and with 'a basis for expecting that a reorganization can be

effected.'"[69]  Generally, courts do not permit disgruntled creditor groups to use the "good faith

---

[67] *See* CCI Noteholder Objection § IX; Limited Objection Of Calyon New York Branch To Confirmation Of Debtors' Joint Plan Of Reorganization [Docket No. 569]; Objection of Wells Fargo Bank, N.A., as Successor Administrative Agent and Collateral Agent, to Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 584] (the "Wells Fargo Objection").  Because the CCI Noteholders' 1129(a)(3) good faith objections are intertwined with their objections to the CII Settlement, the Debtors respond to the bulk of such objections in connection with the CII Settlement discussion in section II. below.

[68] 11 U.S.C. § 1129(a)(3).

[69] *Johns-Manville*, 843 F.2d at 649 (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)); *see also In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 174 (2d Cir. 2008) (affirming lower court finding of good faith over creditor argument that the debtor was not seeking to "promote a necessary restructuring but, instead, to enrich its shareholders" where it was undeniable that the debtor was in poor financial health when it filed); *Official Comm. Of Unsecured Creditors v. Nucor Corp. (In re SGL Carbon Corp.)*, 200 F.3d 154, 165 (3d Cir. 1999) (finding good faith requires "some relation" between the chapter 11 plan and the "reorganization-related purposes" of chapter 11); *Fin. Sec. Assurance, Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.)*, 116 F.3d 790, 802 (5th Cir. 1997) (good faith inquiry involves a totality of circumstances analysis, "keeping in mind the purpose of the [Code] is to give debtors a reasonable opportunity to make a fresh start"); *Briscoe*, 994 F.2d at 1167 ("This Court has held that, 'Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied.'") (quoting *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985)); *see also Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006) ("Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'") (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (holding good faith requires that the plan

(Continued…)

requirement" to challenge plans which nonetheless discriminate against such creditors as long as the plans otherwise satisfy relevant provisions of the Bankruptcy Code.[70]

The fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[71] To determine whether the plan seeks relief consistent with the Bankruptcy Code, courts look to the reorganization plan itself.[72] Thus, where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable chance of success, the good faith requirement of section 1129(a)(3) generally is satisfied.[73]

---

be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code).

[70] *Zenith*, 241 B.R. at 107.

[71] *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors."); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start."); *see also In re Gibson Group, Inc.*, 66 F.3d 1436, 1442 (6th Cir. 1995) (chapter 11 gives debtor opportunity to reorganize to provide creditors with going-concern value rather than a "more meager satisfaction through liquidation"); *In re FitzSimmons*, 725 F.2d 1208, 1210 (9th Cir. 1984) ("Chapter 11 seeks to preserve a foundering business as a going concern, because the assets of a business are often more valuable when so maintained than they would be when liquidated.").

[72] *See In re Granite Broad. Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (looking at the plan itself to determine whether such plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code"); *see also In re Piper Aircraft Corp.*, 244 F.3d 1289, 1300 (11th Cir. 2001) (focus of good faith inquiry is on the plan itself) (citing *McCormick v. Banc One Leasing Corp.*, 49 F.3d 1524, 1526 (11th Cir. 1995)); *Madison Hotel Assocs.*, 749 F.2d at 425 (same); *In re Dragone*, 324 B.R. 445, 448 n.4 (Bankr. D. Conn. 2005) (same).

[73] *See In re Source Enters., Inc.*, No. 06-11707 (AJG), 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding that the good faith requirement satisfied when plan filed with legitimate and honest purposes of maximizing value of the estate and effectuating equitable distribution); *Bally Total Fitness*, 2007 WL 2779438, at *5 (good faith requirement satisfied when the plan was proposed with legitimate and honest purpose of reorganizing the debtor); *see also T-H New Orleans*, 116 F.3d at 802 ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.").

27

Here, the Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing Charter's ongoing business and maximizing the value of each of the Debtors and the recovery to stakeholders.[74] The Plan gives effect to many of the Debtors' restructuring initiatives, including debt reinstatement, debt reduction, and the CII Settlement. Moreover, using the Debtors' comprehensive business plan as the platform, the Plan provides a blueprint for enabling the Debtors to emerge from chapter 11 as a going concern. Therefore, the Plan has been proposed in good faith as interpreted under the Bankruptcy Code. Additionally, the Plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

Notably, certain parties objecting to the Plan argue that bankruptcy courts have ruled that section 1129(a)(3) incorporates the so-called entire fairness standard of Delaware law with respect to transactions between a controlling shareholder and its corporation and, accordingly, that the entire fairness standard applies here.[75] To the extent that the Court finds that the entire fairness standard applies in these Chapter 11 Cases, the Debtors believe the Plan would meet this heightened standard as well.

Indeed, in *In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999), one court ruled that the following factors support a finding that a plan was proposed in good faith notwithstanding the heightened entire fairness standard: (i) the debtors and the shareholder were represented by separate counsel and professionals during the restructuring negotiations; (ii) there was a special independent board committee to negotiate with the shareholder; and (iii) the

---

[74] *See* Doody Affidavit ¶¶ 14-17.

[75] Both the CCI Noteholders and R$^2$ Investments, L.P. have objected to the Plan on this basis.

shareholder did not impede the debtor's efforts to pursue alternative restructuring transactions.[76]

In addition, the *Zenith* court found significant the involvement of a major bondholder group with its own set of professionals in negotiating the plan, which involvement countered any undue influence the shareholder may have had over the debtor.  As testimony at the Confirmation Hearing will establish, as in *Zenith,* the Debtors and Paul Allen retained separate professionals and conducted exhaustive arm's-length, good-faith negotiations.  The majority of the CCI board of directors was comprised of independent directors and these independent directors conferred separately in executive sessions at CCI board meetings.  In addition, Paul Allen recused himself from CCI board votes where appropriate.  And although Mr. Allen participated in the Board vote regarding the decision to commence the Chapter 11 Cases and seek approval of the Plan, the independent directors voted unanimously in favor as well.[77]  Moreover, the Unofficial Cross-over Committee was fully involved in the negotiations and formulation of the CII Settlement and the Plan.  As testimony at the Confirmation hearing will further show, the ongoing negotiations between the parties ultimately protected substantial value for the Debtors.

Finally, Paul Allen has not hindered any efforts to pursue alternative restructuring transactions.  Although alternative transactions were considered, none were viable.

Nonetheless, the CCI Noteholders attack the Plan alleging it was not proposed in good faith.  As discussed in more detail herein and in section II.A below regarding the CII Settlement, there is no basis for the CCI Noteholders' assertions.  The process associated with the

---

[76]  *Zenith*, 241 B.R. at 109 (finding controlling shareholder's position as a significant creditor and shareholder did not unduly influence the plan process even though the plan awarded the debtor's controlling shareholder 100% of the stock in the reorganized debtor).

formulation and negotiation of the Plan and the CII Settlement was entirely fair and the CCI Noteholders cannot credibly argue otherwise. In fact, the Creditors' Committee has supported the Plan.

Indeed, the CCI Noteholders' good faith objection appears to be premised entirely upon the notion that because the CII Settlement involves the Debtors' controlling shareholder and the CCI Noteholders are not recovering in full under the Plan, the only possible explanation is a conspiracy. But the uncontroverted facts reveal just the opposite. The Debtors have gone to great lengths to implement a process that ensures the fairness of the CII Settlement and Plan processes. By way of example, the Debtors made sure that their majority independent board members conferred separately at the board meetings related to the CII Settlement and Plan. They also involved multiple other parties with competing agendas (and economic stakes) in the arm's-length negotiations. And each party was represented by independent, sophisticated advisors. Accordingly, there is no basis upon which to attack the Plan process. Moreover, given that the CCI Noteholders have no possibility of recovering on account of the CCI's equity in its subsidiaries and are slated to recover more than they would in a chapter 7 liquidation, the CCI Noteholders' attempts to hold up the Plan are just that and do not reflect a lack of good faith in proposing the Plan.

In a nutshell, the Debtors and Paul Allen took appropriate measures with respect to the Plan process which would satisfy the entire fairness standard if it were to apply in this case.

---

[77] The CCI Noteholders argue that the negotiation process was not fair because they are displeased with the results. Notably, this is not the standard for evaluating process or fairness.

Therefore, the Plan has been proposed in good faith and not by any means forbidden by law and satisfies section 1129(a)(3) of the Bankruptcy Code.

> **D.** **The Plan Provides for Bankruptcy Court Approval of Certain Administrative Payments (Section 1129(a)(4)).**

Section 1129(a)(4) of the Bankruptcy Code requires that certain professional fees and expenses paid by the plan proponent, by the debtor, or by a person issuing securities or acquiring property under the Plan, be subject to approval of the Court as reasonable.[78] Here, all payments made or to be made by the Debtors for services or for costs or expenses in connection with the Chapter 11 Cases prior to the Effective Date, including all Professional Compensation and Reimbursement Claims, have been approved by, or are subject to approval of the Court as reasonable. In particular, Article II.B of the Plan provides for the payment of only <u>Allowed</u> Professional Compensation and Reimbursement Claims.[79] In addition, Article II.B of the Plan provides that all final requests for payment of Professional Compensation and Reimbursement Claims shall be filed no later than 90 days after the Effective Date for determination by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Court orders.[80] Because the Court will determine the <u>Allowed</u> amounts of such Professional Compensation and Reimbursement Claims, it is undisputed that the Plan complies fully with the requirements of section 1129(a)(4) of the Bankruptcy Code.

---

[78] *See, e.g.*, *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 760 (Bankr. S.D.N.Y. 1992); *In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988) (holding that requirements of section 1129(a)(4) were satisfied where the plan provided for payment of only "allowed" administrative expenses).

[79] *See* Plan Art. II.B.

[80] *Id.*

K&E 15004216.

### E. Post-Emergence Directors and Officers Will Have Been Disclosed Before Confirmation and Their Appointment Is Consistent with Public Policy (Section 1129(a)(5)).

The Debtors have complied with all the elements of section 1129(a)(5) of the Bankruptcy Code. In particular, section 1129(a)(5)(A) requires that prior to Confirmation, the proponent of a plan must disclose the identities and affiliations of the proposed officers and directors of the reorganized debtors and that the appointment or continuance of such officers and directors must be consistent with the interests of creditors and equity security holders and with public policy.[81] In addition, section 1129(a)(5)(B) requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the "nature of any compensation for such insider."[82]

The Plan satisfies section 1129(a)(5)(A)(i) of the Bankruptcy Code because the Debtors will have disclosed the identities and affiliations of all Persons proposed to serve as directors of the Reorganized Company at or prior to the Confirmation Hearing. The Debtors also have disclosed the process by which the remaining members of the initial Board will be selected. In addition, the Debtors have disclosed the identities and affiliations of the Reorganized Debtors'

---

[81] 11 U.S.C. § 1129(a)(5)(A)(i) (section 11 U.S.C. § 1129(a)(5)(A)(i) provides that "[T]he proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; 11 U.S.C. § 1129(a)(5)(A)(ii) (section 11 U.S.C. § 1129(a)(5)(A)(ii) provides that the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy).

[82] 11 U.S.C. § 1129(a)(5)(b); *see Drexel*, 138 B.R. at 760 (Section 1129(a)(5)(B) requires a plan to disclose the identity of any "insider" to be employed or retained by the reorganized debtor); *In re Texaco, Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988) (finding requirements of section 1129(a)(5)(B) satisfied where the plan discloses debtors' existing officers and directors who will continue to serve after plan confirmation); *see also In re Apex Oil Co.*, 118 B.R. 683, 704-05 (Bankr.
(Continued…)

CEO and COO and the manner in which additional officers of the Reorganized Company will be determined following Confirmation.[83]

The proposed directors and officers of the Reorganized Debtors and the process by which they will be selected also comply with section 1129(a)(5)(A)(ii), which requires that the Court find the appointment or continuance of the proposed directors and officers is "consistent with the interests of creditors and equity security holders and with public policy."[84] This section asks the Court to ensure that the post-confirmation governance of the Reorganized Debtors is in "good hands," which has been interpreted by courts to mean that the proposed directors and officers have experience in the Reorganized Debtors' business and industry[85] and experience in financial and management matters;[86] that their appointment does not "perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor"[87] and that the Debtors and creditors' committee believe control of the Reorganized Debtors by the proposed individuals will be beneficial.[88] The "public policy requirement would enable [the court] to disapprove plans in which demonstrated incompetence or malevolence is a hallmark of the proposed management."[89] Here, the proposed directors and officers of the Reorganized

---

E.D. Mo. 1990) (finding section 1129 (a)(5)(B) satisfied where plan fully disclosed that certain insiders will be employed by reorganized debtor and the terms of employment of such insiders).

[83]   *See* Plan, Art. VI.N-O.

[84]   11 U.S.C. § 1129(a)(5)(A)(ii).

[85]   *See Drexel*, 138 B.R. at 760; *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984).

[86]   *See In re Stratford Assocs. Ltd. P'ship*, 145 B.R. 689, 696 (Bankr. D. Kan. 1992).

[87]   *See In re Beyond.com Corp.*, 289 B.R. 138, 145 (Bankr. N.D. Cal. 2003).

[88]   *See Apex Oil*, 118 B.R. at 704-05.

[89]   COLLIER ON BANKRUPTCY, 15th Rev. Ed. (2007), ¶ 1129.03[5][b].

K&E 15004216.

Debtors are competent, have relevant and solid business and industry experience, and will give the Reorganized Debtors both continuity and fresh insights into running the business.[90]  No one, including the Creditors' Committee, has suggested otherwise.  Therefore, section 1129(a)(5)(A)(ii)'s requirements are satisfied.

Finally, Exhibit 23 to the Plan Supplement also will disclose the identity of all Insiders to be employed or retained by the Reorganized Company, as directors or officers, and the nature of any compensation for such Insiders in compliance with section 1129(a)(5)(B) of the Bankruptcy Code.[91]  Therefore, section 1129(a)(5)(B)'s requirements are satisfied.  Moreover, no party objected to the Plan on the basis that it does not satisfy section 1129(a)(5). Accordingly, the Debtors will have satisfied the requirements of section 1129(a)(5) of the Bankruptcy Code.

### F. The Plan Does Not Require Governmental Regulatory Approval of Rate Changes (Section 1129(a)(6)).

Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.[92]  The Plan does not provide for any rate changes and no party has argued otherwise.  Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

---

[90]  *See* Doody Affidavit ¶ 19.

[91]  *See* Disclosure Statement at 57.

[92]  11 U.S.C. § 1129(a)(6).

K&E 15004216.

### G. The Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).

Section 1129(a)(7) of the Bankruptcy Code — the best interests of creditors test — requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class:

     (i)     has accepted the plan; or

     (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.[93]

The "best interests" test applies if a class of claims or interests does not vote unanimously to accept a plan, even if the class as a whole votes to accept the plan.[94] The best interests test is generally satisfied by a liquidation/recovery analysis showing that the class will receive no less under the plan than under a chapter 7 liquidation.[95]

Here, the Plan satisfies the best interests test with respect to all Classes of Claims and Interests that did not unanimously accept the Plan. First, the best interests test is satisfied pursuant to section 1129(a)(7)(i) with respect to all Classes that are Unimpaired under the Plan

---

[93]  11 U.S.C. § 1129(a)(7)(A).

[94]  *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

[95]  *See In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (Section 1129(a)(7) satisfied when impaired holder of claim would receive "no less that such holder would receive in a hypothetical chapter 7 liquidation").

K&E 15004216.

and are conclusively deemed to have accepted the Plan.[96]  Furthermore, Classes for which no votes were cast are deemed to have voted to accept the Plan.[97]

With respect to the Classes that voted to accept the Plan, but not unanimously,[98] or that voted to or were deemed to reject the Plan,[99] the Plan satisfies the best interests test pursuant to section 1129(a)(7)(ii) because it provides such parties with recoveries no less than they would receive in a hypothetical chapter 7 liquidation.  Notably, all impaired creditor constituencies are projected to receive a higher recovery under the Plan proposed by the Debtors than in a chapter 7 liquidation.

To assist the Court in making the findings required under section 1129(a)(7), the Debtors prepared (a) the analysis of estimated recoveries to creditors under the Plan, which analysis is set forth in the Disclosure Statement (the "Plan Distribution Analysis"),[100] and (b) the liquidation analysis attached to the Disclosure Statement as Exhibit E (the "Liquidation Analysis"). Moreover, as noted above, the Debtors have immaterially modified the Plan to enhance the treatment of Class A-4 CCI Notes Claims by approximately $66 million to exceed recoveries to that Class in a liquidation.

---

[96]  Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, I-6, J-1, J-3, J-4, J-5, and J-7.

[97]  Classes D-3, E-3, F-3, G-3, H-3, and I-5.  *See* Disclosure Statement Order, Exhibit E, at ¶7(h).

[98]  Classes A-3, B-3, C-3, D-3, E-3, E-4 (includes insiders), F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan.  *See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.

[99]  Classes A-4, A-5, A-6, C-5, C-6, D-4, D-5, E-5, E-6, F-5, F-6, G-5, G-6, H-5, and H-6 voted to or were deemed to reject the Plan.  *See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.

[100]  *See* Disclosure Statement at 4-8.

K&E 15004216.

As made clear by the Liquidation Analysis and as testimony at the Confirmation Hearing will show, the Holders of Allowed Claims in <u>every</u> <u>Class</u> are projected to recover as much or more under the Plan than they would in a chapter 7 liquidation. This is especially so after the increased Plan treatment. Set forth below is a chart detailing the results of the Debtors' analysis regarding certain significant theories of recovery identified by the Debtors and the CCI Noteholders. As evident from the chart, notwithstanding the CCI Noteholders' assertions that they are entitled to a par recovery and the proposed Plan treatment of their Claims fails to satisfy section 1129(a)(7), the Plan affords the CCI Noteholders recovery well in excess of liquidation value.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| **Preferences** | The Debtors' liquidation analysis is premised on a distressed going concern sale (a "<u>Distressed Sale</u>") — which is a significantly more creditor-friendly assumption than a typical hypothetical chapter 7 liquidation. In the Debtors' business judgment, preference actions would neither be sought nor recovered against any trade vendors or employees in a Distressed Sale scenario as those relationships would be critical to any going concern sale, and thus the value to be obtained from that sale. | No response. | In light of the Distressed Sale assumption, preference recoveries against trade vendors and employees are properly excluded from the Debtors' liquidation analysis. |
| **Preferences (Cont.)** | Out of abundance of caution and consistent with the Debtors' agreement with the CCI Noteholders' counsel on the record at the Disclosure Statement hearing, the Debtors worked with their financial advisor, AlixPartners, to perform a preference | The Debtors' schedules show that CCI made $24.7 million in potential preference payments and Holdco made $198 million in potential preference payments. | The CCI Noteholders' objection on this point is nothing more than a recitation of the information presented in the Debtors' schedules.<br><br>The A&M Report submitted in support of the CCI Noteholders' objection presents ***no*** |

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | recovery analysis with the hope that providing such analysis would resolve the concerns of the CCI Noteholders. | | *analysis* on preference or avoidance action payments.<br><br>Based upon the AlixPartners analysis,[101] if no executory contracts are assumed in connection with the Distressed Sale, potential recoveries on account of preferences to non-insiders equal $9.6 million to $18.9 million.<br><br>In a Distressed Sale, however, all executory contracts likely will be assumed. In this scenario, the range drops to $3.3 million to $6.6 million.<br><br>Analysis of potential preferences to insiders indicates that potential recoveries likely would not exceed $9 million.<br><br>Any preference recoveries would be reduced by approximately 25% to 45% of recovery costs, depending on the firm retained.<br><br>Moreover, the Debtors believe that to the extent that CCI or Holdco successfully prosecuted avoidance actions against the interests of CCO's sale, which amounts CCO had previously paid to CCI or Holdco under the Management Agreement, CCO would recoup such preference amounts from |

---

[101] The Debtors produced this analysis several weeks ago to the CCI Noteholders and have included it on the list of trial exhibits for the Confirmation Hearing.

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | | | any amounts due to CCI or Holdco due under the Management Agreement. As with all preferences, any recoveries obtained would increase the claims against CCI and Holdco accordingly. |
| **Litigation Settlement Fund Proceeds** | The Debtors have properly escrowed all amounts remaining after repayment of costs and expenses relating to the Litigation Settlement Fund Proceeds, which equal approximately $26.4 million. | CCI and Holdco are entitled to a portion of the Litigation Settlement Fund Proceeds. | The escrow agreement for the Litigation Settlement Fund Proceeds prohibits distribution of funds until a court determines the corporate owner(s) of these funds. The Debtors took this step prepetition to protect the rights of all parties to the proceeds. Only costs and expenses relating to the underlying litigation, which were funded by CCO and CII, were deducted from the settlement proceeds before placing the funds into escrow.<br><br>After considering the CCI Noteholders' position, the Debtors have modified the Plan treatment for Classes A-4 and C-4 to provide that those Classes shall receive whatever proceeds the Court determines to be owned by CCI or Holdco. This should resolve the CCI Noteholders' objection on this point. |
| **Programming Contracts** | The Debtors' liquidation analysis assumes that all executory contracts will be assumed, and the cure will be paid by CCO, so that maximum value may be obtained for all of the Debtors' estates, including CCI and Holdco, which benefit from the payment in full of all intercompany amounts. As such contracts are either not above market or can be replaced by a new buyer, | The Debtors' liquidation analysis ascribes no value to CCI or Holdco for contracts held at CCI and Holdco, including programming, media and sales contracts. Further, CCO misappropriated incentives due to CCI and Holdco under programming agreements and those incentives are properly recoverable as avoidable transfers. | None of the contracts held at CCI and Holdco contain above-market terms. Despite conducting extensive discovery the CCI Noteholders have not produced any evidence to the contrary, including in A&M's report. Given these terms, CCI and Holdco would be incentivized to cooperate with the assumption of such contracts at no cost to their estates so as to allow |

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | wishing to maximize the value of the sale, CCI and Holdco are incentivized to cooperate with the assumption of its executory contracts. | | the sale to close and allow CCO to repay its obligations to Holdco and CCI in full.<br><br>The additional argument regarding incentives simply lacks merit. First, the Management Agreement provides that CCO pays Holdco at cost. Accordingly, when Holdco receives a discount, that discount is passed through to CCO under the Management Agreement, consistent with the Management Agreement's terms. The Management Agreement is a proper, arm's-length agreement. This fact is undisputed, and a primary source of recovery upon which the CCI Noteholders rely in making a number of their arguments. The CCI Noteholders cannot have it both ways, i.e., seek to recover all amounts due under the Management Agreement on the one hand and then seek to avoid amounts due to CCO on account of the Management Agreement on the other hand.<br><br>Moreover, to the extent that Holdco did recover incentives passed through to CCO, CCO would recoup the amounts due to Holdco dollar-for-dollar, resulting in no benefit to Holdco. |
| **Worthless Stock Options** | The Debtors modified their liquidation analysis prior to the Disclosure Statement hearing to correct an accounting entry relating to compromise of a portion of an intercompany | The Debtors understated the intercompany receivable due from CCO to Holdco by $38 million. | This entry relates to stock options issued by CCI a few years ago for the benefit of CCO. At the time of issuing these stock options, an accounting entry was created to charge back the stock |

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | receivable relating to forfeited and worthless stock options previously issued to Charter employees. | | options to CCO. However, the stock options will be written off under the Plan and are worthless. Moreover, most employees have forfeited these options.<br><br>The Debtors concluded that the nature of this receivable would be highly suspect and subject to compromise in a chapter 7 liquidation given the receivable arises from worthless and forfeited stock options.<br><br>Furthermore, the Debtors believe that this claim would be subject to subordination under section 510(b) of the Bankruptcy Code. |
| **Holdco Interest Payments** | The Debtors believe that potential fraudulent conveyance claims related to the coupon payments will not succeed and will yield nothing in a liquidation.<br><br>The Debtors took diligent and extraordinary steps to ensure that CCI (by virtue of the Mirror Notes) would not be prejudiced if the key parties in interest needed time to memorialize the terms of a prearranged plan and thus made the CIH Notes January interest payment.<br><br>First, the Debtors insisted that certain members of the Unofficial Cross-over Committee backstop the interest payment by not less than $48 million.<br><br>Second, when Debtors structured the Plan at the time Holdco would make | The Debtors' liquidation analysis fails to take into account that the $74 million interest payment made by Holdco should be recoverable as a preference, fraudulent transfer, fraud, or otherwise. | Neither CCI Noteholders nor the A&M Report disclose broadly or in any detail whatsoever why this payment would be recoverable under any of the aforementioned theories. That is because no such grounds exist.<br><br>First, the interest payment is not recoverable as a preference as it was a payment on account of an antecedent debt of another Debtor.<br><br>Second, the interest payment is not recoverable as a fraudulent conveyance as Holdco, having duly considered the benefits it would be receiving if it made this payment, received adequate consideration in the form of the preferred stock under the Plan, the protection of the interest payment backstop escrow, |

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | that interest payment, the Debtors increased the recovery to Holdco by the amount of the interest payment, $72 million, even though no corresponding intercompany receivable existed after making the payment. | | the assurance that the enterprise would remain intact and by providing Holdco and its affiliates with needed time to ensure a soft landing into chapter 11.<br><br>There are no facts supporting actual fraud or any other theory of recovery for the interest payment. |
| **Holdco Interest Payments (Cont.)** | The Debtors did not include in their liquidation analysis a recovery for the $8.4 million capital contribution by Holdco to CCH for an interest payment made on November 11, 2008 because Holdco received the benefit of time to work toward a consensual restructuring that would maximize the value of its enterprise and avoid an unplanned chapter 11 filing. The Plan fulfills this promise by paying Holdco more than liquidation value for its claims. | The Debtors' liquidation analysis fails to include the recovery of this $8.4 million payment as a preference or fraudulent conveyance. | The CCI Noteholders provide no support nor analysis for its position.<br><br>First, the payment is not a preference because the payment was not on account of a debt owed by Holdco.<br><br>Second, the payment is not a fraudulent conveyance for the reasons stated by the Debtors. |
| **Other Holdco Assets** | The Debtors liquidation analysis did not include $9 million of assets listed on the Holdco's schedules, which come in the form of cash, security deposits and accounts receivable. | The Debtors' liquidation analysis fails to include $9 million of Holdco assets. | Having considered the CCI Noteholders' objection, the Debtors have modified the value of the New Preferred Stock to account for this issue.<br><br>The Debtors note, however, that if Holdco prosecuted avoidance actions as the CCI Noteholders contemplate, up to $5.8 million of this may be forfeited as that amount relates to security deposits and accounts |

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | | | receivable due from third parties. |
| **Debt Repurchases** | The Debtors analyzed whether Holdco's purchase of approximately $176 million during 2008 to repurchase notes by its affiliates were avoidable transfers. The Debtors analyzed these transfers and concluded that they were not avoidable preferences because they were not transfers on account of Holdco's debt. Moreover, the transfers were not recoverable as fraudulent transfers because they are subject tothe safe harbor protections under section 546(e) of the Bankruptcy Code.[102] | The Debtors' liquidation analysis fails to take into account $176 million of Holdco's repurchase of its affiliates' notes as preferences or fraudulent transfers. | Neither the CCI Noteholders nor the A&M Report provides any support for the notion that these transfers are recoverable as avoidance actions.<br><br>The payments are not recoverable as preferences or fraudulent transfers for the reasons stated by the Debtors. |
| **Intercompany Receivables** | The Debtors properly accounted for their intercompany payables and receivables at all times. | The Debtors have an unexplained reduction in the receivable due to Holdco from CCO for the period February 13, 2009 to the Petition Date. At February 13, 2009, Holdco had a remaining $177 million accrued payable due from CCO. This amount was dramatically | As the CCI Noteholders are aware, the Debtors continued to operate their business from February 13, 2009 to the Petition Date. The changes to intercompany receivable were due to ordinary course transactions. The CCI Noteholders did not state one fact in support of |

---

[102] Section 546(e) of the Bankruptcy Code provides an exception to certain fraudulent transfer sections of the Bankruptcy Code with respect to transfers made to settle securities transactions. 11 U.S.C. § 546(e); *see also Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006). In *Enron*, the court found that a debtor's above-market repurchases of notes issued by an affiliated trust were not subject to avoidance because transfers of cash to complete a securities transaction are settlement payments and repurchasing notes constitutes completing a securities transaction, absent indicators of actual fraud. The court found that the price of the repurchase did not change the outcome because "a divergence in the price paid from the market value, by itself, is ordinarily not sufficient to take a particular transaction out of the realm of one 'normally regarded' as part of the settlement process unless the disparity between the payment made for the security and the market value was large enough to be said to involve outright illegality or transparent manipulation sufficient to warrant rejection of section 546(e) protection." *Id.* at 459 (internal quotations and citations omitted).

K&E 15004216.

| Source of Recovery | Debtors' Position | CCI Noteholder Objection | Comments |
|---|---|---|---|
| | | reduced by the Petition Date. | this argument other than its mere suspicion. The objection should be overruled. |

As set forth above, the Debtors disagree with the CCI Noteholders' position that the projected recoveries to Holders of Class A-4 CCI Notes Claims under the Plan do not exceed such Holders' recoveries in a liquidation. In sum, here is the math that confirms the Debtors' position:

| **Value to CCI Noteholders Under Plan** | **Value to CCI Noteholders in a Liquidation** |
|---|---|
| • $138 million in New Preferred Stock; <br><br> • Approximately $24.5 million in Cash; and <br><br> • Litigation Settlement Fund Proceeds owned by CCI or Holdco. | • $83 million as set forth in the Liquidation Analysis; <br><br> • $9 million of Other Holdco Assets; and <br><br> • Litigation Settlement Fund Proceeds owned by CCI or Holdco. |
| **Total**: $162.5 million in value plus any Litigation Settlement Fund Proceeds <br><br> **Recovery Percentage (excluding Litigation Settlement Fund Proceeds):  32.7%** | **Total:** $92 million plus any Litigation Settlement Fund Proceeds <br><br> **Recovery Percentage (excluding Litigation Settlement Fund Proceeds):  18.4%** |

### H.  Acceptance by Impaired Classes (Section 1129(a)(8)).

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[103]  Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims in that class actually vote to

K&E 15004216.

accept the plan.[104]  Pursuant to section 1126(d), a class of interests accepts a plan if holders of at least two-thirds in amount of the allowed interests in that class actually vote to accept the plan.[105] A class that is not impaired under a plan, and each holder of a claim or interest in such a class, is conclusively presumed to have accepted the plan.[106]  On the other hand, a class is deemed to have rejected a plan if the plan provides that the claims or interests of that class do not receive or retain any property under the plan on account of such claims or interests.[107]

As set forth above and evidenced in the Voting Certifications, 17 of the 18 Voting Classes voted to accept the Plan.[108]  Thus, section 1129(a)(8) of the Bankruptcy Code has not been satisfied.  Nevertheless, as discussed more fully below, the Debtors meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" any rejecting Classes.

## I.    The Plan Complies with Statutorily Mandated Treatment of Administrative And Priority Tax Claims (Section 1129(a)(9)).

Unless the Holder of a claim entitled to priority under section 507(a) of the Bankruptcy Code agrees to different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires a plan to provide as follows:

> (A)    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of [the Bankruptcy Code], on the effective date of the

---

[103]  11 U.S.C. § 1129(a)(8).

[104]  11 U.S.C. § 1126(c).

[105]  11 U.S.C. § 1126(d).

[106]  11 U.S.C. § 1126(f); *see In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir. 1992) (an unimpaired class is presumed to have accepted the plan); *see also* S. Rep. No. 989, 95th Cong. 2d Sess. 123 (1978) (Section 1126(f) of the Bankruptcy Code "provides that no acceptances are required from any class whose claims or interests are unimpaired under the Plan or in the order confirming the Plan.").

[107]  *See* 11 U.S.C. § 1126(g).

[108]  *See* Section B.2 above; KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.

plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B)     with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of [the Bankruptcy Code], each holder of a claim of such class will receive:

      (i)     if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

      (ii)     if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C)     with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

      (i)     of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

      (ii)     over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

      (iii)     in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)).[109]

The Plan provides for no less favorable treatment for administrative and priority tax claims than that required by section 1129(a)(9).  Specifically, Article II.A of the Plan provides that each Holder of an Allowed Administrative Expense Claim will receive payment in full in cash on the later of (a)  the Distribution Date, (b) the date such Administrative Expense Claim is Allowed after the Distribution Date, or as soon as reasonably practicable after such Claim is Allowed, or (c) the date such Allowed Administrative Expense Claim becomes due and payable,

---

[109]  11 U.S.C. § 1129(a)(9).

K&E 15004216.

or as soon thereafter as is practicable, or upon such other terms as may be agreed upon by such Holder.[110]

In addition, Article II.C of the Plan provides that each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such Claim: (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim; or (2) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court.[111]

For the reasons set forth above, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code. Moreover, as set forth on the Objection Chart, although a number of taxing authorities objected to the Plan asserting that it did not satisfy section 1129(a)(9), the Debtors have resolved all tax-related objections to the Plan consensually by clarifying Article II.C of the Plan as part of the Non-material Modifications and by inserting certain requested clarifications into the Confirmation Order.

### J. At Least One Impaired Class of Claims Has Accepted the Plan, Excluding The Acceptances of Insiders (Section 1129(a)(10)).[112]

Section 1129(a)(10) of the Bankruptcy Code is an alternative requirement to section 1129(a)(8)'s requirement that each class of claims or interests must either accept a plan or be unimpaired under the plan. Section 1129(a)(10) provides that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by

---

[110] *See* Plan, Art. II.A.

[111] *See* Plan, Art. II.C.

[112] *See* CCI Noteholder Objection.

any Insider.[113]    Here, 11 Impaired Classes of Claims voted to accept the Plan, not counting

Insider votes.[114]    Moreover, pursuant to the Disclosure Statement Order, Classes for which no

votes were cast are deemed to accept the Plan.[115]    Therefore, the Plan satisfies the requirements

of section 1129(a)(10).

The CCI Noteholders argue that the Plan does not satisfy section 1129(a)(10) because

Class A-3 General Unsecured Claims and Class C-3 General Unsecured Claims are artificially

Impaired and therefore should not be considered for purposes of determining whether there are

Impaired accepting Classes of Claims at CCI or Holdco.[116]    As an initial matter, both Classes are

Impaired.    Moreover, even if they were Unimpaired, the Plan satisfies section 1129(a)(10)

because it contains at least one Impaired accepting Class of Claims and section 1129(a)(10)

requires only one Impaired accepting Class of Claims per Plan, as set forth below.

The CCI Noteholders' argument that Class A-3 General Unsecured Claims and Class C-3

General Unsecured Claims are artificially Impaired rests almost entirely on the Debtors' change

to the Plan prior to the Disclosure Statement hearing to reflect that the Classes were Impaired

---

[113]  11 U.S.C. § 1129(a)(10).  This is a per plan requirement, not a per debtor requirement.  *See, e.g., In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. Jul 15, 2004) (order confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 1-01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (joint chapter 11 plan of reorganization complied with section 1129(a)(10) because at least one class of impaired creditors accepted the plan, notwithstanding the fact that each debtor entity did not have an accepting impaired class).

[114]  Impaired Classes A-3, A-4, B-3, B-4, C-3, C-4, F-4, G-4, H-4, J-2, and J-6 voted to accept the Plan. *See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.  Although no Impaired Class at CCHC (Class D-3) or CCH (Class E-3 or E-4) voted to accept the Plan after excluding Insider votes, section 1129(a)(10) requires one Impaired accepting Class per plan, not per debtor.

[115]  Pursuant to the Disclosure Statement Order, Classes for which no votes are cast are deemed to accept the Plan.  *See* Disclosure Statement, Ex. E ¶ 7(h).  No votes were cast in Classes D-3, E-3, F-3, G-3, H-3, and I-5; thus, such Classes are deemed to have accepted the Plan.  *See* KCC Voting Certification, at ¶ 15.

K&E 15004216.

rather than Unimpaired.[117] Notably, the CCI Noteholders acknowledge that the Plan *treatment* of these Classes did not change — only the legal description — but in support of their argument they cite exclusively to cases that stand for the proposition that a change of plan treatment made to artificially impair a class is impermissible. These cases are inapplicable here, where the Debtors' amendment to the Disclosure Statement merely reflected that the Plan treatment of such Classes, which had never provided for payment of postpetition interest, had rendered Class A-3 and Class C-3 Impaired all along.[118]

The CCI Noteholders also argue that failure to pay postpetition interest does not constitute sufficient impairment for purposes of section 1129(a)(10) because they assume that such treatment was engineered to gerrymander acceptances and that the aggregate amount of postpetition interest payable would be relatively small. But the assumption that the Plan treatment was engineered to gerrymander acceptances is not correct — the CCI Noteholders are assuming their conclusion and then trying to use it to prove their assumptions. As noted above, the Plan treatment for Class A-3 and Class C-3 reflect that the Claims in such Classes are of the type that are reimbursable by a solvent entity under the Management Agreement. The Management Agreement explicitly provides that all such payments are payable only at cost and

---

[116] CCI Noteholder Objection ¶¶ 29-36, 101.

[117] *See* CCI Noteholder Objection ¶¶ 31-32.

[118] *See, e.g., In re Valley View Shopping Ctr, L.P.*, 260 B.R. 10, 33 (Bankr. D. Kan. 2001) (payment in full without postpetition interest constitutes impairment); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 896 (Bankr. S.D. Fla. 2000) (same); *In re Crosscreek Apts., Ltd.*, 213 B.R. 521, 536 (Bankr. E.D. Tenn. 1997) (same); *In re Seasons Apts., Ltd. P'ship*, 215 B.R. 953, 959 (Bankr. W.D. La. 1997) (same); *In re Park Forest Dev. Corp.*, 197 B.R. 388, 395 (Bankr. N.D. Ga. 1996) (same).

K&E 15004216.

does not provide for payment of interest on overdue payments.[119]   The Plan's reflection of the effect of the Management Agreement does not render Class A-3 or Class C-3 Unimpaired, nor does it indicate, as the CCI Noteholders would have the Court believe, that there is value at CCI or Holdco in excess of what is currently slated to be distributed to the CCI Noteholders.   Given that the Plan treatment of Class A-3 and C-3 reflect the effect of the Management Agreement, the CCI Noteholders' assumption that such Classes are artificially Impaired fails, and a relatively low amount of postpetition interest payable cannot be used to support it.   As noted above, for the same reason the Plan does not unfairly discriminate between Class A-3 and Class A-4, on the one hand, and Class C-3 and Class C-4, on the other, it cannot have been designed to gerrymander votes.   The CCI Noteholders are bound in all respects by the terms of the Management Agreement that governs the intercompany relationships and was in place well before they acquired the CCI Notes.

Notably, however, even if Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims were Unimpaired, the Plan nonetheless would satisfy section 1129(a)(10).   As noted above, section 1129(a)(10) is a per-plan requirement, not a per-debtor requirement.   As the *Enron* court noted:   "The plain language and inherent fundamental policy behind section 1129(a)(10) of the Bankruptcy Code provides that an affirmative vote of one impaired class under a plan is sufficient to satisfy section 1129(a)(10) of the

---

[119] *See* Management Agreement ¶ 3.  Notably, the Management Agreement does provide for interest on certain other overdue payments.  *Id.*  Accordingly, the agreement's silence regarding interest payable on ordinary reimbursements indicates that no such interest is payable.  *See generally IBM Poughkeepsie Employees Fed. Credit Union v. Cumis Ins. Soc., Inc.*, 590 F.Supp. 769, 773 n.19 (S.D.N.Y. 1984) ("Under the doctrine of *expressio unius est exclusio alterius,* when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred.").

Bankruptcy Code."[120]  Notably, even though *Enron* involved substantive consolidation, the court recognized that the per-plan requirement obtains even without substantive consolidation or joint plans:[121]

> In addition, the Court notes that at least one court has confirmed a chapter 11 plan (without requiring either substantive consolidation or the filing of separate plans) where it appears that impaired classes of certain (but not all) of the jointly administered debtors vote only for the one plan before the court. *See, e.g., In re Resorts Int'l Inc.*, 145 B.R. 412, 416 (Bankr. D. N.J. 1990). <u>It is quite common for debtors with a complex corporate structure to file a joint chapter 11 plan pursuant to which the corporate form is preserved, **or** in which a "deemed consolidation" is proposed and approved. In such circumstances, all debtors are treated as a single legal entity for voting and distribution purposes.</u> *See, e.g., In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001).

Moreover, *In re SGPA, Inc.*, a case involving a joint plan of reorganization for non-substantively consolidated debtors, is particularly on point.[122]  Like Charter, *SGPA* involved a financial restructuring in which most creditor groups were to be paid in full.  The *SGPA* debtors also were jointly administered but not substantively consolidated.  The court ruled that under such circumstances it is not necessary to have an impaired class of creditors of each debtor vote to accept the plan.[123]  Thus, even if Class A-3 and Class A-4 were not Impaired accepting classes at CCI and Holdco, the existence of nine other Impaired accepting Classes under the Plan would satisfy section 1129(a)(10).

---

[120]  *See In re Enron*, No. 01-16034 (Bankr. S.D.N.Y. Jul 15, 2004) at 138.

[121]  *Id.* (emphasis added).

[122]  *In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001).

[123]  *Id.* at 16-17 ("I agree with Debtors' position that in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

K&E 15004216.

### K. The Plan Is Feasible (Section 1129(a)(11)).[124]

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that the plan is feasible as a condition precedent to confirmation. Specifically, the Bankruptcy Court must determine that:

> [c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[125]

To demonstrate that a plan is feasible, it is not necessary that success be guaranteed.[126] Rather, only a reasonable assurance of success is required.[127] As demonstrated below, the Plan is feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

In evaluating feasibility, courts have identified the following probative factors:

---

[124] Certain parties objecting to the reinstatement of their debt have argued that the Plan is not feasible because of "change of control" related issues. *See* Wells Fargo Objection; Objection of Wilmington Trust Company, as Indenture Trustee for the Second Lien Notes, to Confirmation of the Debtors' First Amended Joint Plan of Reorganization [Docket No. 588]. The Debtors will respond to these objections in connection with the reinstatement briefing and arguments.

[125] 11 U.S.C. § 1129(a)(11).

[126] *See Johns-Manville*, 843 F.2d at 649 ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed.").

[127] *See Texaco*, 84 B.R. at 910; *In re Prudential Energy Co.*, 58 B.R. 857, 862-63 (Bankr. S.D.N.Y. 1986); *see also Briscoe*, 994 F.2d at 1166 ("Only a reasonable assurance of commercial viability is required."); *Mercury Capital*, 354 B.R. at 9 (A "'relatively low threshold of proof' will satisfy the feasibility requirement." (quoting *In re Brotby*, 303 B.R. 177, 191-92 (B.A.P. 9th Cir. 2003))); *In re Eddington Thread Mfg. Co.*, 181 B.R. 826, 832-33 (Bankr. E.D. Pa. 1995) (finding plan is feasible "so long as there is a reasonable prospect for success and a reasonable assurance that the proponents can comply with the terms of the plan."); *The Mut. Life Ins. Co. of N.Y. v. Patrician St. Joseph Partners L.P. (In re Patrician St. Joseph Partners L.P.)*, 169 B.R. 669, 674 (Bankr. D. Ariz. 1994) ("A plan meets this feasibility standard if the plan offers a reasonable prospect of success and is workable").

K&E 15004216.

- the prospective earnings of the business or its earning power;

- the soundness and adequacy of the capital structure and working capital for the business which the debtor will engage in post-confirmation;

- the prospective availability of credit;

- whether the debtor will have the ability to meet its requirements for capital expenditures;

- economic and market conditions;

- the ability of management, and the likelihood that the same management will continue; and

- any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[128]

In these Chapter 11 Cases, these factors strongly indicate that the Plan is feasible. As noted above, the Debtors sought chapter 11 protection primarily because of their large debt burden. The Plan is essentially a balance sheet restructuring which substantially reduces leverage and interest expense but protects the strength of the Debtors' operations by largely preserving the Debtors' prepetition corporate structure and business relationships. As set forth in more detail below, the Debtors have thoroughly analyzed their ability to meet their obligations under the Plan post-Confirmation, and submit that Confirmation is not likely to be followed by liquidation or the need for further reorganization.

### 1. The Debtors Have Restructured Existing Debt.

The primary objective for the Chapter 11 Cases, as effectuated through the Plan, is to restructure the Debtors' debt obligations. As of the Petition Date, the Debtors' total funded debt

---

[128] *See, e.g.*, *WorldCom*, 2003 WL 23861928, at *58; *In re Leslie Fay Cos.*, 207 B.R. 764, 789 (Bankr. S.D.N.Y. 1997); *Texaco*, 84 B.R. at 910; *Prudential Energy*, 58 B.R. at 862-63; *see also In re U.S.*

(Continued…)

obligations were approximately $21.7 billion and consisted of, among other things, amounts under the secured credit facilities and secured and unsecured notes payable. While the Debtors' operations and cash flow before debt service have been strong, this debt burden, combined with the recent deteriorating capital market conditions, compelled the Debtors to commence the Chapter 11 Cases.

The Plan cancels approximately $8 billion of debt at various holding companies and reduces annual interest expense by more than $830 million. Moreover, as illustrated by the chart below, the Debtors' leverage ratios upon emergence from chapter 11 will be in line with those of other high-yield cable providers.

| Ratio | Debtors (prepetition) | Debtors (post-emergence) | Cablevision Systems Corp. | Mediacom Communications |
|---|---|---|---|---|
| Leverage[129] | 8.9 | 5.5 | 5.0 | 6.3 |

Accordingly, the Debtors believe that the Plan's contemplated debt reduction along with the Debtors' strong earnings are more than sufficient to meet the requirements of feasibility set forth in section 1129(a)(11) of the Bankruptcy Code.

## 2. The Debtors Have Strong Operations.

As noted above, the Debtors' operations have remained strong both prior to the Petition Date and during the Chapter 11 Cases. Unlike many companies entering chapter 11, the Debtors commenced the Chapter 11 Cases at a time when their business is continuing to grow. The Debtors are operationally sound and by all accounts heading in the right direction as a functioning business. Prior to the Petition Date, the Debtors generated significant positive cash

---

*Truck Co.*, 800 F.2d 581, 589 (6th Cir. 1986); *In re Repurchase Corp.*, 332 B.R. 336, 342 (Bankr. N.D. Ill. 2005).

K&E 15004216.

flow before debt service and achieved upward, favorable trends as an operating enterprise. Furthermore, from 2006 to 2008, the Debtors drove pro forma[130] revenue from approximately $5.5 billion to $6.5 billion, and pro forma adjusted EBITDA grew from $1.9 billion to $2.3 billion.[131] Indeed, the Debtors have experienced ten consecutive quarters of double-digit adjusted EBITDA growth on a pro forma basis through the first quarter of 2009. In addition, as of March 27, 2009, the Debtors had approximately $860 million in cash and cash equivalents on hand. Significantly, the Debtors' strong cash flow from operations has been sufficient to maintain operations during the Chapter 11 Cases without the need for debtor-in-possession financing. Notably, the Debtors have also been able to pay their trade vendors in the ordinary course of business with cash from operations.[132] In addition, the Debtors' post-emergence adjusted EBITDA is projected to grow from approximately $2.5 billion in 2009 to nearly $3.3 billion in 2013.[133] Therefore, this factor strongly indicates that the Plan is feasible.

---

[129] Leverage ratios are calculated as debt divided by estimated 2009 Adjusted EBITDA.

[130] The reference to "pro forma," as the term is used in this Memorandum, means that 2007 and 2008 financials have been adjusted to reflect certain acquisitions and divestitures as if they occurred on January 1, 2007. Results prior to January 1, 2007, have been adjusted for 2006 and 2007 acquisitions and divestitures but do not reflect adjustments for 2008 M&A activity.

[131] "Adjusted EBITDA," as the term is used in this Memorandum, means income from operations before depreciation and amortization, impairment charges, stock compensation expense, and other operating (income) expenses, such as special charges and (gain) loss on sale or retirement of assets.

[132] See Order Authorizing Payment of Prepetition Claims of Trade Creditors in the Ordinary Course of Business [Docket No. 172] (allowing the Debtors to pay trade vendors in the ordinary course of business).

[133] See Disclosure Statement, Ex. C at 2.

### 3. The Debtors Have Ample Availability of Credit and New Capital.

The Debtors also have sufficient access to capital. In particular, the Debtors seek to reinstate approximately $11.8 billion in outstanding senior debt instruments under the Plan. The specific credit facilities and indentures to be reinstated are:

|  | Principal Amount Outstanding |
|---|---|
| First Lien Credit Facility | |
| Term Loan Facility maturing 2014 | $6.9 billion |
| Revolving Credit Facility maturing 2013 | $1.3 billion[134] |
| 8.00% senior second lien notes due 2012 | $1.1 billion |
| 8⅜% senior second lien notes due 2014 | $770 million |
| 10.875% senior second lien notes due 2014 | $546 million |
| Junior Credit Facility maturing 2014 | $350 million |
| 8¾% senior notes due 2013 | $800 million |
| **Total** | **$11.8 billion** |

The two credit facilities the Debtors seek to reinstate were negotiated in March 2007 and March 2008. Under the First Lien Credit Facility, the Debtors secured $7 billion in term loans that mature in March 2014 and a $1.5 billion revolving credit facility that matures in March 2013. Under the Junior Credit Facility, the Debtors secured a $350 million term loan that matures on September 16, 2014. The senior notes and senior second lien notes are reflected in three indentures dated as of March 2008, April 2004, and November 2003. The reinstated facilities and notes above are essential to the Debtors' business and fundamental to the Plan.

In addition, the Plan will result in $1.6 billion in equity investments and reflects commitments to refinance approximately $1.467 billion in existing debt. In light of current

---

[134] Excluding letter of credit obligations.

K&E 15004216.

credit market conditions and the complexity of the Debtors' business and capital structure, the Plan is an impressive achievement. In short, the Plan will maximize the value of the Debtors' estates and leave their historically strong operations largely intact. Accordingly, this factor weighs in favor of feasibility.

### 4. The Plan Preserves Assets.

Prior to and during the Chapter 11 Cases, the Debtors have worked diligently to preserve their assets. In particular, the Debtors have provided for the preservation of their net operating losses ("NOLs") by ensuring that an "ownership change" of CCI does not occur prior to the Effective Date.[135] Moreover, by virtue of the CII Settlement discussed in further detail below, the Debtors are preserving approximately $2.85 billion of NOLs, which will result in approximately $1.14 billion in future cash tax savings.[136] Accordingly, the Plan provides for the preservation of very valuable assets.

### 5. The Plan Has Been Scrutinized and Validated by Key Stakeholders And Independent Third Parties.

The Debtors' key stakeholders have scrutinized the Plan. Prior to the Petition Date, through substantial arm's-length negotiations, the Debtors reached agreement with each of the Holders of approximately 73% (approximately $2.9 billion in principal amount) of the CCH I Notes, Holders of approximately 52% (approximately $1.3 billion in principal amount) of the CCH II Notes, and separately with Mr. Allen on the terms of a consensual, prearranged Plan.

---

[135] *See* Final Order Establishing Notification and Hearing Procedures for Transfers of Common Stock [Docket No. 201] and Order Amending Final Order Establishing Notification and Hearing Procedures for Transfers of Common Stock [Docket No. 401] (collectively, the "NOL Orders").

[136] *See* Degnan Affidavit ¶ 8-9.

The in-depth involvement of the key stakeholders in the Plan process weighs in favor of feasibility.

For all of the foregoing reasons, the Debtors submit that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. Moreover, although certain parties objecting to the reinstatement of their debt also have objected to the Plan on feasibility grounds, these objections will be mooted if the Court approves the proposed reinstatement.

### L.    The Plan Provides for Payment of all Fees Under 28 U.S.C. § 1930 (Section 1129(a)(12)).

Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[137]   Article XV.C of the Plan provides that such fees will be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever comes first.[138]   Moreover, no party has argued otherwise.  Therefore, the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

### M.    The Plan Provides for Payment of Retiree Benefits (Section 1129(a)(13)).

Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue to be paid post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.[139]   Article IV.Q of the Plan provides that on or after the Effective Date of the Plan, the payment of all retiree benefits, as defined in section 1114 of the Bankruptcy Code, will continue to be paid in accordance with applicable law.[140]   No party has objected to the Plan on

---

[137]  11 U.S.C. § 1129(a)(12).

[138]  Plan, Art. XV.C.

[139]  11 U.S.C. § 1129(a)(13).

[140]  Plan, Art. IV.Q.

the basis that it does not satisfy these requirements. In light of the foregoing, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

### N. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code.[141]

Because not all of the Impaired Classes have voted to accept the Plan, the Debtors seek to "cram down" the nonaccepting Classes pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that if a chapter 11 plan satisfies all applicable requirements of section 1129(a) other than section 1129(a)(8)'s requirement that all impaired classes accept the plan, the plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[142]

As discussed below, the Debtors meet the requirements of section 1129(b) of the Bankruptcy Code to "cram down" all of the non-accepting Impaired Classes of Claims and Interests.

---

[141] *See* CCI Noteholder Objection.

[142] *See* 11 U.S.C. § 1129(b)(1). *See also Boston Post Road*, 21 F.3d at 480 ("[i]f the debtor chooses to utilize the cramdown procedure (having failed to secure the vote of all the impaired classes), the plan must meet all of the statutory requirements enumerated in § 1129(b) (essentially that the plan is fair and equitable and does not discriminate unfairly against any impaired claims)"); *Zenith*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'"); *see also Liberty Nat'l Enters. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan [must satisfy] the 'cramdown' alternative . . . in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993) (the plan "must not 'discriminate unfairly' against and must be 'fair and equitable' with respect to all impaired classes that do not approve the plan.").

K&E 15004216.

1.    **The Plan Is Fair and Equitable with Respect to Impaired Classes that Have Not Voted to Accept the Plan.**

Sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests if the plan provides that no holder of any junior claim or interest will receive or retain under the plan on account of such junior claim or interest any property.[143]  This central tenet of bankruptcy law—the "absolute priority rule"—requires that if the holders of claims in a particular class receive less than full value for their claims, no holders of claims or interests in a junior class may receive any property under the plan.[144]  The corollary of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims.[145]

a.    **The Plan Complies with the Absolute Priority Rule**

The Plan satisfies the absolute priority rule with respect to all non-accepting Impaired Classes of Claims and Interests.  Section 1129(b)(2)(B) of the Bankruptcy Code provides that a class of unsecured claims satisfies the absolute priority rule where:

> (i)    the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
>
> (ii)    tithe holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property

---

[143]  *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

[144]  *See 203 N. LaSalle St. P'ship*, 526 U.S. at 441-42.

[145]  *See Granite Broadcasting*, 369 B.R. at 140 (citing *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003)).

included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.[146]

Classes A-4 and A-5 are Classes of Claims for which no junior Classes of Claims or Interests will receive any recovery. Accordingly, the "cram down" standards are satisfied with respect to these Classes. As for each of the following Classes of Claims — Classes C-5, D-4, E-4, E-5, F-5, G-5, and H-5 — the Plan provides that a junior Class of Interests will receive property under the Plan. Pursuant to the Plan, however, the Interests in certain Debtors, including Classes C-6, D-5, E-6, F-6, G-6, and H-6, are being reinstated for substantial new value in the aggregate amount of approximately $42 million.[147] Therefore, the Plan's treatment of Classes C-5, D-4, E-4, E-5, F-5, G-5, and H-5 satisfies the absolute priority rule.

Section 1129(b)(2)(C) of the Bankruptcy Code provides that a plan is "fair and equitable" with respect to a non-accepting class of *interests* when either:

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest, property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.[148]

---

[146] *See* 11 U.S.C. § 1129(b)(2)(B).

[147] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 442 (prepetition equity holder may recover under a plan without full payment to dissenting senior creditors if recovery is "necessary for successful reorganization of the restructured enterprise" and in return for contribution of value reasonably equivalent to the value of the new equity interests in the reorganized debtor). *See also* Doody Affidavit ¶ 28.

[148] *See* 11 U.S.C. § 1129(b)(2)(C).

Here, Classes A-6 (Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party), C-6 (Interests in Holdco, Enstar Communications Corporation, and Charter Gateway LLC other than all Interests in Holdco held by any CII Settlement Claim Party), D-5 (Interests in CCHC), E-6 (Interests in CCH and Charter Communications Holdings Capital Corp.), F-6 (Interests in CIH and CCH I Holdings Capital Corp.), G-6 (Interests in CCH I and CCH I Capital Corp.), and H-6 (Interests in CCH II and CCH II Capital Corp.) are comprised of Holders of Interests and no junior Interest will receive any distribution under the Plan. Thus the Plan is fair and equitable with respect to all non-accepting Classes of Interests.

Finally, under the proposed Plan, no Holders of Claims in senior Classes will receive more than 100% of their Allowed Claims. Accordingly, the Plan satisfies the requirements of sections 1129(b)(2)(B)(ii) and 1129(b)(2)(C)(ii) for all Classes of Claims and Interests and, therefore, is fair and equitable.

  b.  **The CCI Noteholders' Assertion that *LaSalle* Is Implicated Is Wrong.**

Notably, the CCI Noteholders argue that the Plan cannot be confirmed because it violates the absolute priority rule.[149] This argument is premised upon the incorrect notion that Paul Allen is recovering under the CII Settlement *on account of* his equity interests in the Debtors rather than on account of substantial settlement consideration, including, among other things, Mr. Allen's agreement not to take actions that deprive the Debtors of well in excess of $1 billion in value, the transfer of Mr. Allen's valuable interests in solvent Debtor CC VIII, LLC and the compromises of numerous contract claims. The absolute priority rule does not prohibit parties

---

[149] CCI Noteholder Objection at ¶¶ 45-60.

who happen to hold equity from recovering before other claims are paid in full.[150] It prohibits such parties from recovering *on account of* their equity before other claims are paid in full. Because Paul Allen is not recovering under the CII Settlement on account of his equity interests, the CII Settlement and distributions thereunder do not implicate the absolute priority rule.[151]

Notwithstanding the fact that Mr. Allen's recoveries under the Plan are not on account of his equity interests and no classes of claims or interests junior to the CCI Noteholders are recovering under the Plan, the CCI Noteholders urge the Court to adopt the position that Mr. Allen's "mere participation" in the Plan absent market testing clearly violates *LaSalle* and the absolute priority rule. As an initial matter, the absolute priority rule is satisfied and *LaSalle*'s market test requirement does not apply here because junior holders of claims and interests are not recovering and, in any event, Mr. Allen is not recovering on account of his equity.[152] Indeed, *PWS Holding*, a Third Circuit case confirming a reorganization plan featuring nonconsensual third party releases after *LaSalle,* is particularly instructive here. In *PWS Holding*, a heavily negotiated reorganization plan supported by multiple creditor groups provided for nonconsensual third party releases of the debtors' 83% equity owner in connection with claims the court determined were valueless and for which the debtors' estates were obligated to indemnify the

---

[150] *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (equity holder's recovery cannot be deemed to be "on account of" the equity interest "without some evidence of a causal relationship").

[151] Contrary to the CCI Noteholders' assertion, the Debtors have not admitted otherwise. *See* CCI Noteholder Objection ¶ 50 (citing Disclosure Statement at 26-27). As set forth in the Disclosure Statement, the CII Settlement was designed to preserve tax attributes and render the Plan possible. *See* Disclosure Statement at 28. Listing the various equity interests that Paul Allen agreed to compromise (particularly with respect to his agreement not to take actions with respect to these interests that would negatively impact the Debtors) does not mean that Paul Allen's settlement consideration is "on account of" his equity interests.

[152] *PWS Holding,* 228 F.3d at 239.

equity owner. A creditor challenged the plan, arguing the releases of the equity owner were improper because they were on account of the owner's equity interests. The Third Circuit disagreed, noting that there must be a causal relationship between a recovery on account of equity interests and the equity interests themselves. Because the equity owner's release was on account of the estate's indemnification obligation for defense costs for what was determined to be baseless litigation, there was no such causal relationship. Here, similarly, the fact of Paul Allen's equity ownership does not change the fact that the consideration the CII Settlement Claim Parties are receiving under CII Settlement is in return for forbearance of legal rights and compromise of claims, and not "on account of" their equity interests.

In any event, in light of the current state of the market and the involvement of the full universe of sophisticated industry and financial players in these high-profile Chapter 11 Cases, none of whom have *ever* mentioned anything about an alternative transaction, there is no basis to read *LaSalle* to require termination of the Debtors' exclusivity (and the attendant loss of the benefits of the CII Settlement, which requires confirmation by August 4, 2009). And as discussed above, in the business judgment of the Debtors' board of directors, the Plan provides substantially better recoveries to creditors than in a liquidation. Of course, the CCI Noteholders' objection is not really about the absolute priority rule, it is yet another swipe at the CII Settlement and Plan process, which as discussed above and below, is a product of arm's-length, good faith negotiations intended to preserve the Debtors' going concern value and maximize recoveries to creditors. The Plan does not violate the absolute priority rule.

c.      **The CCI Noteholders' Argument that CCI Is Being Deprived of Tax Assets Is Wrong**

The CCI Noteholders also argue that the Plan improperly fails to award going concern NOLs to CCI for the benefit of the CCI Noteholders and, what is more, that such failure

64

constitutes an improper *de facto* substantive consolidation of the Debtors' estates which can only be remedied by allowing the CCI Noteholders to recover on a consolidated basis (i.e., against solvent debtor CCO and its subsidiaries) notwithstanding their express bargain to restrict their recoveries to CCI and (by virtue of the Holdco Mirror Note) Holdco.[153] These arguments have no basis in fact or law and, given that they represent nothing more than an obvious attempt to make a grab for the two largest potential sources of recovery in these Chapter 11 Cases, they are not credible.

As an initial matter, the NOLs do not belong to the estate of Debtor parent holding company CCI. The CCI Noteholders offer no support for this proposition other than the assertion that "it is beyond dispute."[154] But established case law indicates that it is beyond dispute that the estate of a parent holding company does *not* own or lay exclusive claim to the NOLs of a consolidated enterprise.[155] And where a loss corporation cannot use its own NOLs, nothing prevents its affiliates from using them.[156] Under close scrutiny, the CCI Noteholders' tax arguments are completely bogus. CCI did not generate the losses. Accordingly, its estate

---

[153] *See* CCI Noteholder Objection ¶¶ 52-68, 105; *see also id.* at 102 ("If the substantive consolidation of the Debtors' assets is indeed warranted in these cases, the debt owed to CCI and its subsidiaries must also be viewed on a consolidated basis.").

[154] *See* CCI Noteholder Objection ¶ 55.

[155] *See Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."). The fact that the Debtors filed consolidated tax returns and subsidiaries other than CCI and Holdco are disregarded as a matter of tax law for that purpose does not change the analysis in bankruptcy regarding the proper allocation of tax attributes between affiliated debtors.

[156] *See Nisselson*, 222 B.R. at 425 ("While the group can agree among themselves to pay the entire refund to the loss corporation, *see Case v. New York Central R.R. Co.*, 256 N.Y.S.2d 607, 204 N.E.2d at 646-47, in the absence of such an agreement, the loss corporation that cannot use its NOL for its own benefit may not complain if another group member uses it for its benefit.").

does not own the NOLs. Moreover, CCI will not generate the income that the net operating losses will offset. If CCI just held the losses, what would it do with them? Without income from an operating company, the NOLs have no value to CCI.

Given that CCI does not own the NOLs, the CCI Noteholders' argument that the Plan effects a *de facto* substantive consolidation by improperly distributing CCI's NOLs to creditors of another debtor fails. The CCI Noteholders' equally farfetched argument that the Debtors' calculation of total enterprise value constitutes an impermissible substantive consolidation (that also, coincidentally, entitles the CCI Noteholders to recover from CCO) fails as well.[157] Calculation of going concern value on an enterprise basis is a required element of confirmation of a chapter 11 reorganization plan, whether or not distributions under such plan are to be made on a consolidated basis.[158] The Debtors' adherence to this standard does not entitle the CCI Noteholders to recover from solvent Debtors with whom they did not bargain.

> ## 2. The Plan Does Not Unfairly Discriminate with Respect to Impaired Classes that Have Not Voted to Accept the Plan.

The Plan also does not discriminate unfairly with respect to Impaired Classes that have rejected the Plan. Notably, the Bankruptcy Code does not set forth a standard for determining when "unfair discrimination" exists.[159] Rather, courts typically examine the facts and

---

[157] *See* CCI Noteholder Objection ¶ 105.

[158] *See generally Johns-Manville*, 68 B.R. at 636-37 (requiring establishment of consolidated debtors' going concern value to determine if plan satisfies fair and equitable test under section 1129(b) of the Bankruptcy Code)

[159] *See In re 203 N. LaSalle St. P'ship,* 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established").

K&E 15004216.

circumstances of the particular case to determine whether unfair discrimination exists.[160]   At a

minimum, however, the unfair discrimination standard prevents creditors and interest holders

with *similar* legal rights from receiving materially different treatment under a proposed plan

without compelling justifications for doing so.[161]   Courts in the Second Circuit have ruled that

"[u]nder section 1129(b) of the Bankruptcy Code, a plan unfairly discriminates where similarly

situated classes are treated differently without a reasonable basis for the disparate treatment."[162]

Here, the Plan's treatment of Claims and Interests is proper, for similarly situated Creditors will

receive substantially similar treatment irrespective of Class.

   The CCI Noteholders argue that Class A-3 CCI General Unsecured Claims and Class A-4

CCI Notes Claims are treated disparately under the Plan.[163]   Specifically, the Plan provides for

either the reinstatement or payment in full for Holders of General Unsecured Claims against CCI

---

[160]   *See Johns-Manville*, 68 B.R. at 636 ("The language and legislative history of the statute provides little
guidance in applying the 'unfair discrimination' standard."); *see, e.g.*, *In re Freymiller Trucking, Inc.*,
190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination
requires a court to "consider all aspects of the case and the totality of all the circumstances."); *In re
Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need
to consider the facts and circumstances of each case to give meaning to the proscription against unfair
discrimination.").

[161]   *WorldCom*, 2003 WL 23861928, at *59 (requiring a reasonable basis to justify disparate treatment).

[162]   *Id.   See also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess
whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan
without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of
discrimination is in direct proportion to its rationale" but also noting that the second prong assessing
whether the debtor cannot consummate the plan without discrimination, is not dispositive of the
question of unfair discrimination).

[163]   *See* CCI Noteholder Objection ¶ 37.  The CCI Noteholders make the same objection with respect to
Class C-3 Holdco General Unsecured Claims and Class C-4 Holdco Notes Claims.  *Id.* ¶¶ 97-100.
The only other Classes of Claims for which the Plan provides disparate treatment are Classes E-3 and
E-4.  While Class E-3 is projected to recover 100% and Class E-4 is projected to recover 0.4%, there
are no Holders of Claims in Class E-3.  *See* KCC Voting Certification ¶ 15.  Thus, there is no
discrimination against Class E-4.

67

(Class A-3) but only a 32.7% recovery for Holders of CCI Notes Claims (Class A-4) under the Plan as modified.[164]   But, as discussed above, these Classes are not similarly situated.[165] Although they both contain unsecured Claims, the sources of recovery for such Claims are different.   Indeed, the higher recoveries attributed to Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims merely reflect the effect of the Management Agreement, which provides for payment by a solvent entity of certain obligations at CCI and Holdco, and which was in place and publicly disclosed well before the CCI Noteholders acquired their Notes.[166]   Put another way, the CCI Noteholders participated in the issuance of the CCI Notes knowing that CCI and Holdco's ordinary course expenses would be paid by CCO. The Plan does not discriminate (much less unfairly discriminate) against Class A-4 CCI Notes Claims and Class C-4 Holdco Notes Claims.   Given the CCI Noteholders' longstanding awareness of the Management Agreement, it is disingenuous for them now to argue that Class A-3 CCI General Unsecured Claims and Class A-4 CCI Notes Claims (and the Class C-3 Holdco

---

[164]  Similarly, the Plan provides for either the reinstatement or payment in full for Holders of General Unsecured Claims against Holdco (Class C-3) but only a 3.9% recovery for Holders of Holdco Notes Claims (Class C-4).

[165]  To the extent such classes are considered similarly situated, the existence and effect of the Management Agreement constitute a good faith, reasonable basis for disparate treatment.  Moreover, as discussed herein, the Debtors would not be able to consummate the Plan if it provided for a par recovery to the CCI Noteholders.  Accordingly, the Plan would satisfy the "Buttonwood test" adopted by courts in the Second Circuit to evaluate unfair discrimination.  (No court in the Second Circuit has adopted the "Markell test" urged by the CCI Noteholders.  *See* CCI Noteholder Objection ¶ 40.).

[166]  The Management Agreement was dated June 19, 2003 and the CCI Notes were issued on November 22, 2004 and October 2, 2007.  *See* Plan, Art. I.A.38.  The Debtors disclosed the existence and general terms of the Management Agreement in their public filings.  *See* Charter Communications, Inc., Amendment No. 1 to Form S-4, Exchange Offer Prospectus, dated as of September 14, 2007, Ex. 10-31, available at http://www.sec.gov/Archives/edgar/data/1091667/000095012307012605/y38890a1sv4za.htm. (incorporating the Management Agreement by reference);  Charter Communications, Inc., SEC Form
(Continued…)

General Unsecured Claims and Class C-4 Holdco Notes Claims) should receive equal treatment under the Plan.

Moreover, while the CCI Notes have the benefit of the conversion feature and equity upside that general unsecured creditors do not enjoy, CCI General Unsecured Claims have downside protection under the Management Agreement. The CCI Notes cannot, through unfair discrimination arguments, change the deal and get the benefit of the Management Agreement.

Notwithstanding the CCI Noteholder Objection, the Plan meets all applicable requirements of section 1129(b) of the Bankruptcy Code. All non-accepting Impaired Classes of Claims and Interests have been treated fairly and equitably. In addition, the Plan does not discriminate against Class A-4 CCI Notes Claims or Class C-4 Holdco Note Claims, or among the other non-accepting Impaired Classes of Claims and Interests of equal priority. Accordingly, the Plan does not unfairly discriminate with respect to any non-accepting Impaired Classes of Claims and Interests and the cram down test is satisfied.

## O. The Principal Purpose of the Plan Is Not Avoidance of Taxes (Section 1129(d)).

Section 1129(d) of the Bankruptcy Code states that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[167] The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.[168] Moreover, no party that is a governmental unit, or any other entity, has requested that the Court decline to confirm the Plan

---

10-Q,    dated    as    of    August    5,    2003,    available    at http://www.sec.gov/Archives/edgar/data/1091667/000095012303008915/y88762e10vq.htm.

[167] 11 U.S.C. § 1129(d).

on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## II.     The Discretionary Contents of the Plan Are Appropriate and Should Be Approved.

Section 1123(b) of the Bankruptcy Code identifies various additional provisions that may be included in a chapter 11 plan. For example, a plan may impair or leave unimpaired any class of claims or interests and provide for the assumption or rejection of executory contracts and unexpired leases. A plan also may provide for (a) "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate" or (b) "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest."[169] Finally, a plan may "modify the rights of holders of secured claims . . . or . . . unsecured claims, or leave unaffected the rights of holders of any class of claims" and may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[170]

The Plan includes certain such additional provisions. For example, Article IV of the Plan leaves certain Classes of Claims and Interests Impaired, while leaving others Unimpaired.[171] The Plan also proposes treatment for executory contracts and unexpired leases.[172] The Plan is

---

[168]   *See* Doody Affidavit ¶ 31.

[169]   11 U.S.C. § 1123(b)(3)(A)-(B).

[170]   11 U.S.C. § 1123(b)(5)-(6).

[171]   The following Classes are Impaired: A-3, A-4, A-5, A-6, B-3, B-4, C-3, C-4, C-5, C-6, D-3, D-4, D-5, E-3, E-4, E-5, E-6, F-3, F-4, F-5, F-6, G-3, G-4, G-5, G-6, H-3, H-4, H-5, H-6, I-5, J-2, and J-6. The following Classes are Unimpaired: A-1, A-2, A-3, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, I-6, J-1, J-3, J-4, J-5, and J-7. *See* Plan, Art. IV.

[172]   *See* Plan, Art. VII (Treatment of Executory Contracts).

premised upon the CII Settlement and also provides a platform for settlement of Claims and Interests generally.[173]  Finally, the Plan seeks to implement release, exculpation, and injunction provisions.[174]  As discussed in further detail below, the CII Settlement and the proposed  release, exculpation, and injunction provisions are fair and equitable and are in the best interests of the Debtors and all parties in interest in these Chapter 11 Cases.

### A.  The CII Settlement Should Be Approved.[175]

The CII Settlement forms the basis for, and is an essential component of, the Plan.  The Debtors pursued the CII Settlement primarily to maximize the value of their tax attributes and preserve their ability to reinstate approximately $11.8 billion of debt with favorable interest rates.[176]  Set forth below are (a) a description of the key terms of the CII Settlement, (b) an explanation of the context and need for the CII Settlement, (c) a description of the process of negotiating and formulating the CII Settlement and the fairness thereof, and (d) a demonstration that the CII Settlement satisfies the "*Iridium* factors" used by courts in the Second Circuit to evaluate the appropriateness of proposed settlements.

---

[173]  *Id.* Art. X.B (Compromise and Settlement of Claims and Controversies).

[174]  *Id.* Art. X.D-G (Releases by the Debtors, Third Party Releases, Injunction, and Exculpation).

[175]  *See* CCI Noteholder Objection; Wells Fargo Objection.

[176]  The CII Settlement and the mutual compromise it embodies are discussed from CII's perspective in the CII Declaration.  The $11.8 billion does not include letter of credit obligations.

## 1.     Key Terms of the CII Settlement

The CII Settlement provides for the transfer of multiple forms of consideration between the parties.  Specifically, the CII Settlement, among other things:[177]

(a)     enabled the Debtors to formulate and propose the Plan;

(b)     preserves essential assets of the Debtors in the form of NOLs and other tax attributes expected to result in approximately $1.14 billion in Cash tax savings as a result of Mr. Allen's agreement to remain a member of Holdco and thereby to accept approximately $2.85 billion of the approximately $6 billion of cancellation of debt income that the Debtors project will be generated as a result of the cancellation of indebtedness under the Plan, which would not have occurred if Mr. Allen converted his equity Interests in Holdco to CCI common stock pursuant to the CCI-CII Exchange Agreement[178] or converted the CCHC Note into Holdco membership units;[179]

(c)     facilitates the Debtors' reinstatement of approximately $11.8 billion of debt at favorable interest rates (and thereby avoid hundreds of millions in incremental interest expense) by preventing the change of control;[180]

(d)     eliminates significant obligations of the Debtors to CII Settlement Claim Parties, including certain consulting fees under the Management Agreement and a consulting agreement dated as of March 10, 1999 by and among Vulcan, Inc. (an entity controlled by Mr. Allen), CCI and CCH;

---

[177] The description of the consideration provided in the CII Settlement set forth herein is a summary.  To the extent that this summary and the description of the consideration provided by the CII Settlement Claim Parties and the Debtors set forth in Articles I.A.60 and VI.C of the Plan, respectively, are inconsistent, the terms of the Plan shall control in all respects.

[178] The CCHC Note is exchangeable at CII's option, at any time, for Class A common units of Holdco at a rate equal to the then-accreted value, divided by $2.00.  Holdco Class A common units are exchangeable for shares of CCI's Class B common stock, which shares are in turn convertible into CCI's Class A common stock.

[179] As noted above, if the CII Settlement Claim Parties converted their interest in Holdco into stock of CCI prior to the Effective Date, the Reorganized Company would have significantly less valuable tax attributes available after the Effective Date.  Further, because the CII Settlement Claim Parties refrained from such conversion, the Debtors will be able to apply section 382(l)(6) of the Internal Revenue Code to the restructuring, which will permit the Debtors to more liberally use such tax attributes.

[180] The Plan would not have been possible if Mr. Allen had not agreed to retain certain voting powers with respect equity interests in CCI.

K&E 15004216.

(e)        enables the Debtors to market and sell rights for carriage of up to eight digital channels of each of the Debtors' cable systems, which rights previously were subject to certain CII Settlement Claim Parties' exclusive option; and

(f)        provides for the transfer of CII's 30% interest in the preferred units of Debtor CC VIII, LLC to the Reorganized Company on the Effective Date.[181]

In addition, as a measure of their support for the CII Settlement and the Plan, certain Holders of CCH I Notes agreed to fully backstop the $1.6 billion Rights Offering and purchase an additional $267 million in New CCH II Notes.

In return, the CII Settlement Claim Parties will receive:

(a)        a retained 1% direct equity Interest in Reorganized Holdco, including the right to exchange such Interest for Reorganized CCI's New Class A Stock, pursuant to the Reorganized Holdco Exchange Agreement;[182]

(b)        shares of New Class B Stock representing 2% of the equity value of the Reorganized Company and 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of Reorganized CCI;[183]

(c)        warrants to purchase shares of New Class A Stock in an aggregate amount equal to 4% of the equity value of Reorganized CCI;

(d)        $85 million in principal amount of New CCH II Notes issued to holders of CCH I Notes Claims and deemed transferred to Mr. Allen or one of his affiliates on the Effective Date;

(e)        Cash in the aggregate amount of approximately $195 million, of which $25 million represents full payment of management fees owed by CCO to CII, and up to $20 million is to defray the CII Settlement Claim Parties' actual out of pocket professional fees and expenses associated with the CII Settlement and participation in the Chapter 11 Cases; and

---

[181] The value of CC VIII is approximately 20% of the Total Enterprise Value on a going concern basis (as defined in the Valuation Analysis) of the Debtors. *See* Liquidation Analysis, Note E.

[182] *See* Plan Supplement, Ex. 17.

[183] This 2% is measured after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan.

(f)     certain releases by the Debtors and third parties as discussed in more detail in section II.C hereof.

The consideration exchanged by the parties to the CII Settlement is more than fair and falls well above the lowest point in the range of reasonableness.[184]

## 2.      Context and Purpose of the CII Settlement

To understand the purpose and benefits of the CII Settlement, as well as its fundamental fairness, it is helpful to understand the context. Paul Allen is the controlling shareholder of CCI. CCI and Debtor CII, which Mr. Allen wholly owns, are members of Holdco. If the Plan proposed to extinguish Mr. Allen's equity interests, Mr. Allen would have no incentive to cause CII to remain a member of Holdco. Notably, however, the Debtors recognized that if CII were to remain a member of Holdco, a proportionate amount (approximately $2.85 billion) of the cancellation of debt income that will be generated by the consummation of the Plan (approximately $6 billion) would be allocated to the CII Settlement Claim Parties and CCI will receive a stepped up basis in those Holdco assets it receives from CII.[185] And the allocation of that cancellation of debt income to the CII Settlement Claim Parties would result in the Reorganized Company's ability to both retain and utilize a substantially larger portion of the tax attributes (including net operating losses) after emergence.

---

[184]  *See Resolution Trust Corp. v. Best Prods. Co. (In re Best Prods. Co.)*, 68 F.3d 26, 33 (2d Cir. 1995) (to be approved pursuant to Bankruptcy Rule 9019, a settlement merely has to be "within the range of reasonableness").

[185]  If the CII Settlement Claim Parties were to convert their interest in Holdco into stock of CCI prior to the Effective Date, all of the cancellation of debt income resulting from the consummation of the Plan would be allocated to the Reorganized Company, CII would inherit CII's built-in gain in its share of the Holdco assets, the Reorganized Company would undergo an "ownership change" under the Internal Revenue Code, and section 382(l)(6) would no longer be available to increase the amount of usable post-bankruptcy NOLs, all of which would result in the Reorganized Company having significantly less valuable tax attributes available after the Effective Date.

K&E 15004216.

In addition to the tax aspects of the CII Settlement, which are expected to generate $1.14 billion in cash tax savings, the CII Settlement impacts the Debtors' ability to reinstate certain indebtedness, including the CCO Credit Facility, which the Debtors expect will save them hundreds of millions in additional interest cost. Specifically, the lenders under the CCO Credit Facility argue that if Mr. Allen (and certain affiliates) cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of CCO, a change of control would occur. Accordingly, if the Plan were to extinguish Mr. Allen's Interests, Mr. Allen arguably would not retain such voting control and the resulting alleged event of default under the CCO Credit Facility (and certain other debt instruments with similar provisions) arguably would preclude the Debtors from reinstating their debt. Given that the interest rates under such debt are favorable and the annual impact from losing the benefit of such rates if reinstatement were not possible is estimated to be hundreds of millions of dollars, the Debtors believed it would be critical to structure a deal that would eliminate the risk associated with such an outcome.[186] Moreover, it is likely that, (1) given the current status of the credit markets, the Debtors would be unable to obtain new debt commitments of $12 billion as the cost of raising such debt or refinancing current debt would be prohibitively high and (2) even assuming the Debtors could cram-up their senior secured lenders and mark debt to market, such a plan would not be feasible.

---

[186] *See* Doody Affidavit ¶ 33.

### 3.    Process and Fairness

The terms of the CII Settlement, which benefit the Debtors, their estates, and all parties in interest, are fair on their own.  However, because the Debtors' controlling shareholder and his affiliates are principal parties to the CII Settlement, it is important to address the procedural fairness of the CII Settlement as well.[187]  As an initial matter, all parties involved in the CII Settlement were represented by independent and sophisticated counsel and financial advisors.  Specifically, the Company has been represented by Lazard LLC ("Lazard") for many years.  In addition, the Company engaged Kirkland & Ellis LLP ("K&E") to assist with evaluating restructuring alternatives.  At all times during the process, Paul Allen was represented by Skadden, Arps, Slate, Meagher & Flom LLP and Miller Buckfire.  In addition, CII is represented by Togut, Segal & Segal LLP.  In December 2008, the Company, together with Lazard and K&E, began to work in earnest to formulate a restructuring proposal for the Company.  At the same time, it organized what it considered to be the holders of its fulcrum securities, the CCH I Notes and CCH II Notes.  Shortly thereafter, the Unofficial Cross-over Committee consisting of holders of the CCH I Notes and CCH II Notes formed and engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC as advisors.  In addition, the decision to approve the CII Settlement was conducted in a fair and equitable manner.  Specifically, the independent members of the Board of Directors CII Settlement was unanimously approved by the Company's Board of Directors, a majority of whom were independent members.

---

[187]  *See id.* ¶ 32.

At the end of December 2008, the Company made a restructuring proposal to these parties that formed the basis of the current Plan including the elements of retention Holdco structure and reinstatement of indebtedness and thereafter all of the CII Settlement parties and their advisors engaged in protracted good-faith, arm's-length discussions throughout January 2009 with a goal of reaching a deal prior to the February 13, 2009 deadline for making overdue interest payments on certain subsidiaries' notes for junior entities in the capital structure. As the deadline neared, the parties negotiated around the clock to reach a deal, the key to which was an economic agreement between the Company and the Unofficial Cross-over Committee regarding the amount of consideration the Company was willing to provide in return for Mr. Allen's cooperation with respect to the tax attributes and change of control issues described above. Finally, on February 11, 2009, the parties reached the CII Settlement and the Company entered into separate Plan support agreements and commitment letters with each of the parties that would achieve these goals. Indeed, the Debtors' Board of Directors determined that no other transaction would generate greater value to their estates.

### 4. The CII Settlement Is Fair and Equitable and Satisfies the *Iridium* Factors.

When evaluating plan settlements pursuant to section 1123(b) of the Bankruptcy Code, courts in the Second Circuit typically consider the standards used in evaluating settlements under Bankruptcy Rule 9019, i.e., the settlement must be "fair and equitable" and in the best interests of the estate.[188] The Second Circuit recently set forth the list of so-called "*Iridium* factors" to consider in evaluating whether a settlement satisfies such standards:

---

[188] *See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414 (1968); *In re Best Products Co.,* 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[W]hether the claim is
(Continued…)

(1) the balance between the litigation's possibility of success and the settlement's future benefits;

(2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

(3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

(6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining."[189]

Application of these factors confirms that the CII Settlement is fair and equitable and in the best interests of the Debtors' estates and should be approved.

> a. **The Benefits of the CII Settlement Outweigh the Likelihood of Success on the Merits.**

As discussed above, the CII Settlement is designed to address the CII Settlement Claim Parties' extraordinary ability to deprive the Debtors and their estates of approximately $2.85 billion of NOLs and, potentially, the Debtors' ability to reinstate approximately $11.8 billion of indebtedness at favorable interest rates.[190] The benefits of the NOL preservation

---

compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same. The settlement must be 'fair and equitable,' … and be in the best interest of the estate.") (internal citations omitted).

[189] *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

[190] This $11.8 billion total does not include letter of credit obligations.

K&E 15004216.

and reinstatement aspects of the CII Settlement alone easily exceed $1 billion, assuming a reorganization would even be possible absent the CII Settlement. Moreover, nothing explicitly requires Mr. Allen to cause CII to remain a member of Holdco to preserve the Debtors' tax benefits. And although the Debtors would zealously attempt to compel Mr. Allen to do so, if necessary, the Debtors believe that such endeavors have a limited chances of success and that the mutually beneficial compromise embodied in the CII Settlement is the most prudent and certain means of achieving the CII Settlement's benefits.[191]

b. **Even If the Likelihood of Protracted Litigation Is Low, There Is Little Chance of Success in Litigation.**

As discussed above, the Debtors believe there is little chance of success in litigation given that the consideration for the CII Settlement involves the CII Settlement Claim Parties' forbearance from actions they are legally entitled to take. Accordingly, even if there is a low likelihood of protracted litigation, this factor does not weigh against the CII Settlement.

c. **The CII Settlement Is in the Paramount Interests of Creditors.**

The CII Settlement also is in the paramount interest of the creditors. As discussed above, the CII Settlement forms the underpinning of the Plan, which would not be possible without the CII Settlement. The Plan accomplishes the fundamental purpose of chapter 11 in that it preserves the Debtors as a going concern and maximizes value available to satisfy creditors.[192] Indeed, under the Plan, the Debtors are able to reinstate the senior portion of their capital structure and provide significant returns to most creditor constituencies. Moreover, the Plan

---

[191] *See* Doody Affidavit ¶ 33.

[192] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 453 (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors.").

K&E 15004216.

provides for significant infusions of new capital from certain Holders of CCH I Notes, who agreed to backstop the $1.6 billion Rights Offering and purchase $267 million in New CCH II Notes.

The CII Settlement also incentivizes Mr. Allen to refrain from withdrawing from Holdco or otherwise taking actions that could be deemed to cause a "change of control" event of default under the indebtedness the Debtors are seeking to reinstate. The resulting benefits are substantial and maximize value for the Debtors and their constituents. For all of these reasons, the CII Settlement is in the best interests of the Debtors, their estates, and all parties in interest.

        d.      **The CII Settlement Is a Multiparty Settlement Supported by the "Fulcrum" Noteholders.**

The CII Settlement also enjoys the support of other parties in interest. Indeed, the Creditors' Committee independently reviewed the Plan, including the CII Settlement, and has pledged its support therefor. Moreover, the CII Settlement was negotiated between the Debtors, CII, Paul Allen and certain of his affiliates, and the Unofficial Cross-over Committee, which represents holders of the CCH I Notes (the Debtors' "fulcrum" security) and certain other indebtedness in the Debtors' capital structure. All of these creditor constituencies support the CII Settlement. Moreover, the Plan, which is premised upon the CII Settlement, is supported by nearly all of the Debtors' creditor constituencies except the Holders of the CCI Notes and the parties opposing reinstatement.[193] And both of those groups are opposing the Plan because they are seeking higher recoveries, not because they are prejudiced by the CII Settlement. Because

---

[193] The objections to the CII Settlement are addressed in detail in section II.A.5 below.

K&E 15004216.

the CII Settlement is essential to the Plan and enjoys the support of the majority of the Debtors' creditors, it should be approved.

e.   **The Settling Parties Were Advised by Experienced, Independent Attorneys and Advisors and the CII Settlement Is the Product of Arm's-Length Bargaining.**

As discussed herein, the parties to the CII Settlement were advised at all times during the CII Settlement negotiations by experienced, independent attorneys and financial advisors. Specifically, each of the following parties was represented by its own independent counsel and financial advisors: (i) the Debtors other than CII, (ii) CII, Paul Allen, and certain other affiliates including CII, and (iii) the Unofficial Cross-over Committee.[194] Moreover, the negotiations were conducted at arms' length and in good faith. These factors support the CII Settlement.

f.   **The Releases of the Directors and Officers Are Appropriate and Justified.**

Although the CII Settlement does not independently release directors and officers, it requires that the Plan provide for such releases. These releases, which are discussed in more detail in Section II.C.2 below, are appropriate and justified because they were essential to the formulation of the Plan and are supported by substantial consideration.[195]

5.   **The Objections to the CII Settlement Are Unfounded and Should Be Overruled.**

As noted above, the CCI Noteholders object to both the CII Settlement and the Plan on the basis that, among other things, they were not proposed in good faith. According to the CCI Noteholders, the CII Settlement "shocks the conscience," is improper on its face, and

---

[194]  *See* Doody Affidavit ¶ 32.

[195]  *See* Doody Affidavit ¶ 34.

K&E 15004216.

renders the Plan unconfirmable.[196]  The first question one must ask is whether the views of the CCI Noteholders regarding the CII Settlement are even relevant.  The Debtors believe, and testimony at the Confirmation Hearing will support, that the Plan value is approximately $15.4 billion.  This means the CCI Noteholders are out of the money by $6.7 billion.  The CII Settlement would have to extract more than that amount in value for CCI Noteholders to receive the benefit of such value.  That is neither realistic nor possible.  The relevant views on the CII Settlement come from the Unofficial Cross-over Committee.  Their ox is being gored.  They support the CII Settlement.  Moreover, the CCI Noteholders misunderstand the settlement consideration.  According to the CCI Noteholders, the CII Settlement provides for Mr. Allen to contribute "mostly worthless or severely impaired Claims and Interests in exchange for approximately $400 million in consideration, expansive releases, and the ability to avoid and discharge a potential tax liability of a staggering $1.5 billion dollars."[197]  Notwithstanding the CCI Noteholders' attempt to recharacterize the CII Settlement as a massive outpouring of estate value in return for nothing, in actuality, the CII Settlement provides well in excess of $1 billion in value in the form of cash tax savings and interest cost reductions, the transfer of Mr. Allen's valuable interests in solvent Debtor CC VIII, LLC, and the compromises of numerous contract claims.  Moreover, as the CCI Noteholders acknowledge, Mr. Allen's potential $1.5 billion tax liability could only be incurred in a liquidation, and there is no question that directors of an

---

[196]  CCI Noteholder Objection ¶¶ 107-08.

[197]  *Id.* ¶ 107.

insolvent entity[198] have no obligation to liquidate in order to ensure that their sole shareholder is subject to maximum tax liability when that course does not maximize value.

In any event, the CCI Noteholders' focus on the benefits to Paul Allen under the CII Settlement is a red herring. What Paul Allen gets is irrelevant as long as the consideration the Debtors receive relative to what they provide is fair, equitable, and in the best interests of their creditors. The CII Settlement passes that test. As a result of the CII Settlement, the Debtors are able to preserve an equally "staggering" $1.14 billion of cash tax savings as well as hundreds of millions of interest cost, at a minimum. In return, the Debtors are paying out a substantially lower amount in cash and providing for releases for the CII Settlement Claim Parties which have been challenged largely on the inappropriate basis that they would prohibit parties from collaterally attacking the Plan.[199]

The CCI Noteholders also question the fairness of the negotiation process.[200] These objections are largely a function of form over substance. According to the CCI Noteholders, the process was not fair because the Debtors did not appoint a special independent committee of the CCI board of directors, notwithstanding that the board of directors is comprised of a majority of independent directors and the minutes of board meetings indicate that the independent directors conferred in separate executive sessions outside the presence of the Paul Allen-affilated directors

---

[198] *See, e.g.,* CCI Noteholder Objection ¶ 135 (acknowledging insolvency of CCI).

[199] *See, e.g.* Objection to Joint Plan of Reorganization [Docket No. 574], filed by Key Colony Fund, LP (the "Key Colony Objection") ¶ 21; CCI Noteholder Objection ¶ 174 ("In essence, Mr. Allen and the Crossover Committee struck a sweetheart deal in violation of fiduciary duties and, then, as part of that deal, released themselves from any culpability with respect to such actions.").

[200] CCI Noteholder Objection § IX.B.

K&E 15004216.

on multiple occasions to evaluate the restructuring process and proposed structure.[201]   The CCI

Noteholders also assert the process was not fair because the Debtors did not appoint separate

counsel for each Debtor.   Not only would this have been impractical, it overlooks the fact that

four parties with four agendas and four sets of sophisticated, disinterested advisors were fully

engaged in the negotiations and that addition of a fifth set to represent the interests of the CCI

Noteholders would not have changed the fact that the CCI Noteholders are not entitled to more

than they are recovering under the Plan.   Indeed, given that CCI and Holdco are hopelessly

insolvent, the CCI Noteholders would not have had any leverage to change the outcome of the

negotiations.

The CCI Noteholders make much of their assertion that the Debtors' directors failed to

adequately inform themselves.   But this argument too is based upon the faulty premise of

Mr. Allen's alleged $1.5 billion tax liability.   Moreover, as discussed above, the Debtors do not

agree that the CCI Noteholders' exercise of identifying "potential" recovery sources without

analyzing them somehow translates to a breach of duty by the Debtors' directors.   Finally, the

CCI Noteholders' assertion that the process is flawed because the Debtors' advisors never valued

line items of the settlement consideration should be dismissed out of hand.[202]   Valuation of

---

[201] *See* Board Minutes for December 10, 2008 ("the remaining, independent members of the Board and the Board's advisors continued a separate discussion of these matters," including a potential new money contribution from Vulcan); Board Minutes for January 30, 2009 (separate session of independent directors with Kirkland and Lazard to "further discuss the matters addressed in the discussions with the full Board."); Board Minutes for February 6, 2009 (After receiving presentation updates from Lazard and Kirkland, "the independent members of the Board then went into executive session with representatives from Kirkland … and Lazard to further discuss the matters addressed in the discussions with the full Board."   One of the key issues raised was Mr. Allen's exchange notice, which would have destroyed a large portion of Charter's NOLs.).   Copies of these Board Minutes are not attached hereto because they have been identified and produced as trial exhibits.

[202] CCI Noteholder Objection ¶ 143-44.

individual line items in the context of any complex settlement yields little, if any, insight, and the absence of an item-by-item valuation does not call into question the process or the settlement as a whole.

Finally, the CCI Noteholders take issue with certain interest and debt-related payments made between February 2008 and October 2009. These payments are irrelevant to the evaluation of the Plan and the CII Settlement. To the extent they would be avoidable (which the Debtors do not concede), they would only be relevant if they caused the Plan not to satisfy the best interests test under section 1129(a)(7). As discussed at length in section G above, the Plan as modified satisfies the best interests test with respect to the CCI Noteholders. Accordingly, these transfers do not weigh against approval of the Plan or the CII Settlement.

In sum, despite the CCI Noteholders' assertions to the contrary, the CII Settlement satisfies all of the *Iridium* factors and is a product of arm's-length negotiations, is fair and equitable, and in the best interest of creditors. Moreover, the CII Settlement is the cornerstone of the Plan. The Court should approve the CII Settlement and the Plan.

**B.     The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should Be Approved.**

The Plan constitutes a good faith compromise and settlement pursuant to Bankruptcy Rule 9019(a) and section 363 of the Bankruptcy Code of all claims or controversies relating to the enforcement or termination of all contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account thereof.[203]     Such settlement, as reflected in the relative

---

[203]  Plan, Art. X.B (Compromise and Settlement of Claims and Controversies).

distributions and recoveries of Holders of Allowed Claims under the Plan, (a) will save the Debtors and their estates the costs and expenses of prosecuting various disputes, the outcome of which is likely to consume substantial resources of the Debtors' estates and require substantial time to adjudicate, and (b) has facilitated the creation and implementation of the Plan and benefits the Debtors' estates, creditors, and all parties in interest.[204]   The compromise or settlement of all such claims or controversies is fair, equitable, and reasonable and in the best interests of the Debtors, their Estates, and Holders of Claims and Interests.

C.    **The Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved.**

The Plan provides for the release of certain causes of action of the Debtors and their estates and releases by Holders of Claims and Interests, an injunction precluding Holders of Claims from asserting their prepetition claims against the Debtors, and the exculpation of Claims for certain parties.   These provisions are proper because, among other things, they are the product of arm's-length negotiations, are in exchange for substantial consideration, and have been critical to obtaining the support of various constituencies for the Plan.

1.    **The Debtors' Releases**

As set forth in Article X.D of the Plan, the release by the Debtors provides that the Debtors shall fully discharge and release all claims and causes of action against the Debtor Releasees arising from or related in any way to the Debtors.   The Debtor Releasees include (a) the Debtors; (b) the parties who signed Plan Support Agreements with a Debtor; (c) any statutory committees appointed in the Chapter 11 Cases ((a)-(c), collectively, the

---

[204]  *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *10 (Bankr. S.D.N.Y. May 25, 2005).

K&E 15004216.

"Releasing Parties"; and (d) for each of the Releasing Parties, their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, and representatives.

Section 1123(b)(3)(A) of the Bankruptcy Code specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[205]   Although a release may not qualify as a settlement under Bankruptcy Rule 9019, the rules governing the approval of a settlement are useful in evaluating plan releases.  In reviewing releases in a debtor's plan, courts  frequently use the "best interests of the estate" benchmark for approval of a settlement under Bankruptcy Rule 9019.[206]

The releases by the Debtors are limited solely to Claims or Causes of Action that belong to the Debtors.  It is well settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[207]   Indeed, courts in this District have approved similar debtor-release provisions in other chapter 11 cases.[208]  In this case, the Debtors do not believe that there are any valuable Claims against the Released Parties.[209]   Additionally, the Debtors' release of Claims

---

[205]  11 U.S.C. § 1123(b)(3)(A).

[206]  *See generally Bally Total Fitness*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *Spiegel*, 2005 WL 1278094, at *11 (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)).

[207]  *See In re Adelphia Comm'cns Corp.,* 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims is permissible).

[208]  *See, e.g., In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Tower Auto., Inc.*, Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. July 9, 2007); *see also In re Movie Gallery*, Case No. 07-33849 (DOT) (Bankr. E.D. Va. Apr. 10, 2008).

[209]  *See* Doody Affidavit ¶ 36.

K&E 15004216.

and Causes of Action is a component of their consensual Plan process.  Accordingly, the Debtors submit that Article X.D of the Plan is consistent with applicable law and represents a valid settlement of whatever Claims or Causes of Action the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code.  As set forth above, the Debtors' release of Claims and Causes of Action is well-considered, represents a valid exercise of the Debtors' business judgment, and should be approved.

### 2. Third Party Releases[210]

In addition to the Debtors' Releases, Article X.E of the Plan provides for the "Third Party Release," a release and discharge of the Debtor Releasees by Holders of Claims and Interests from any and all Causes of Action, "whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan."[211]  The Third Party Release does *not* release claims by governmental agencies in respect of securities laws, criminal laws, or otherwise, except to the extent such claims may otherwise be subject to the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.[212]  As set forth in further detail herein, the Third Party Release constitutes a good faith settlement and compromise of claims released by the Third Party Release, given in exchange for good and valuable

---

[210] *See* CCI Noteholder Objection; JPMorgan Objection; Wells Fargo Objection; Key Colony Objection; Objection of the United States Trustee to the Debtors' Joint Plan of Reorganization [Docket No. 475] (the "UST Objection"); Objection of the U.S. Securities and Exchange Commission to the Confirmation of the Debtors' Joint Plan of Reorganization [Docket No. 576] (the "SEC Objection").

[211] Plan, Art. X.E.

[212] *Id.*

consideration.  The Third Party Release is fair, equitable, and reasonable and in the best interests

of the Debtors and all Holders of Claims.

In the Second Circuit, a nonconsensual third party release is permissible where "truly

unusual circumstances render the release terms important to success of the plan," focusing on the

following factors:[213]

- the estate received substantial consideration;

- the enjoined claims were "channeled" to a settlement fund rather than
  extinguished;

- the enjoined claims would indirectly impact the reorganization "by way of
  indemnity or contribution;"

- the plan otherwise provided for the full payment of the enjoined claims*; or*

- the affected creditors consent.

Here, substantial consideration is being exchanged in return for the Third Party Release.[214]

Moreover, the enjoined claims would indirectly impact the Debtors' reorganization as many of

the Debtor Releasees are beneficiaries of indemnity obligations (including, significantly, Mr.

---

[213] *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416
F.3d 136, 142-43 (2d Cir. 2005); S*EC v. Drexel Burnham Lambert Group, Inc. (In re Drexel
Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir.1992) ("In bankruptcy cases, a court may
enjoin a creditor from suing a third party, provided the injunction plays an important part in the
debtor's reorganization plan."); *see also Rosenberg v. XO Comm'cns, Inc. (In re XO Comm'cns, Inc.),*
330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (non-consensual third party releases satisfied *Metromedia*
standard where substantial consideration was provided for the releases, there was an identity of
interest between the debtor and releasees "as a result of indemnification/contribution exposure of the
Debtor," and the release was necessary to the Plan process).

[214] Indeed, all of the objections to the Third Party Release fail to grasp the nature and extent of the
consideration under the CII Settlement provided in exchange for the Third Party Release.  *See* UST
Objection at 12-13; Key Colony Objection ¶ 20-21; CCI Noteholder Objection ¶ 174; SEC Objection
at 6-8; JPMorgan Objection at 33; Wells Fargo Objection ¶ 84.   As discussed herein, that
consideration is substantial and sufficient to warrant the Third Party Release.  These objections
should be overruled.

K&E 15004216.

Allen, in his capacity as a director of Debtor CCI).[215]   Indeed, given that the CII Settlement

Claim Parties have the unique ability to deprive the Debtors of well over $1 billion of value and

have agreed not to do so in exchange for, among other things, the Third Party Release, these

Chapter 11 Cases involve the type of truly unusual circumstances that warrant nonconsensual

third party releases.  Accordingly, the Court should approve the Third Party Release.

In particular, the Third Party Release is required under the CII Settlement, an essential

component of the Plan, which was negotiated at arm's-length and good faith with multiple

creditor constituencies and which has been accepted by nearly all Classes of Claims entitled to

vote.[216]   The CII Settlement involves the provision of substantial consideration by the

CII Settlement Claim Parties in the form of preservation of valuable tax attributes and the ability

to reinstate indebtedness at markedly favorable interest rates.  As discussed above, without the

CII Settlement, the Plan simply would not be possible.  Accordingly, the Third Party Release is

in the best interests of the Debtors and all Holders of Claims.

Moreover, the aggregate consideration provided by the CII Settlement Claim Parties

confers well in excess of $1 billion in value on the Debtors and their estates.  And because the

Debtors have indemnification obligations in respect of their directors, officers, agents, and

professionals, there is an identity of interest between the Debtors and the other Debtor Releasees

which, taken together with the substantial consideration provided under the CII Settlement for

the   Third   Party   Release,   justifies   nonconsensual   third   party   releases   under   these

---

[215]  *See* Doody Affidavit ¶ 38.

[216]  *See id.* ¶ 39.

circumstances.[217]  Although the U.S. Trustee questions the form of consideration provided by the CII Settlement Claim Parties on the basis that it is neither financial nor substantial,[218] the U.S. Trustee's objection overlooks black letter law indicating that forbearance from exercising a legal right constitutes consideration.[219]  Moreover, Paul Allen's forbearance and cooperation pursuant to the CII Settlement confers more than $1 billion in value on the Debtors.

Notably, the U.S. Trustee and the SEC argue that the Third Party Release is inappropriate with respect to any released parties that are not parties to the CII Settlement because such parties are not themselves providing consideration.  This argument implicitly admits that the CII Settlement itself represents adequate consideration for the release, but is founded on the mistaken belief that the law requires each released party to provide consideration for its release.  This is incorrect — as long as substantial consideration is received in exchange for the release, it does not matter who provides it.[220]  Ample consideration has been provided in return for the Third Party Release and it should be approved.

In addition, the Third Party Release is fair, equitable, and reasonable.  As an initial matter, the Third Party Release is the product of arm's- length negotiations in connection with

---

[217] *See id.* ¶¶ 39-40.   The  U.S.  Trustee  argues  that  indemnification  obligations  on  their  own  are insufficient to justify third party nonconsensual releases.  UST Objection at 14.  The Debtors do not agree but note that in this case, the Debtors' indemnification obligations are but one of many factors that support the Third Party Release.

[218] UST Objection at 12, 13 n.3; *see also* SEC Objection at 6-8.

[219] *See, e.g., Ferguson v. Lion Holding, Inc.*, 312 F.Supp.2d 484, 495 (S.D.N.Y. 2004) ("When consideration is forbearance, it must generally be to refrain from doing that which a party has a legal right to do.") (internal quotations omitted).

[220] *See, e.g., Metromedia*, 416 F.3d at 143 (holding that plan consideration need not flow to all releasing parties and that "[s]uch consideration has weight in equity, but it is not required.") (citing *Drexel*, 960 F.2d at 289, 293); *XO Comm'cns,* 330 B.R. at 440 (finding that provision of consideration by secured

(Continued…)

K&E 15004216.

the global settlement that forms the basis for the Plan.  Moreover, the Third Party Release is reasonable and consistent with public policy because it protects the Plan and insulates the Debtors from indirect liability while preserving government or regulatory enforcement actions.[221]  Indeed, the Third Party Release does not release parties from criminal or similar liability, and governmental entities tasked with enforcement are best suited to bring any such actions, if any exist.  The U.S. Trustee's objection that the Third Party Release is impermissible because the Debtors' indemnification obligations would not extend to illegal activities is misplaced because government claims and criminal conduct are not covered by the Third Party Release.  Ironically, although the SEC objects to the Third Party Release, the SEC fails to acknowledge that the Third Party Release carves out governmental enforcement actions.  In any event, the SEC's objection is based largely upon its assertion that substantial consideration was not provided in exchange for the release, while at the same time conceding that it did not fully understand the nature and extent of that consideration.  As noted herein, substantial consideration has been provided in return for the Third Party Release.  The SEC's objection should be overruled.

Moreover, the Third Party Release prevents third parties from seeking to collaterally attack the Plan and/or pursuing actions that would implicate the Debtors by virtue of their indemnification obligations.  By way of example, Key Colony Fund, LP ("Key Colony") objected to the proposed Third Party Release on the basis that it would improperly release Paul Allen from a pending state court action brought by Key Colony in February of 2009, after

---

lenders on behalf of released parties constituted substantial consideration of the sort that justifies nonconsensual third-party releases).

the announcement of the Debtors' financial restructuring and pre-arranged bankruptcy, seeking damages from Mr. Allen to compensate for the alleged decrease in value of the CCI Notes held by Key Colony.[222] But this is *exactly* the kind of collateral attack on the Plan that the Third Party Release is designed to prevent. Moreover, due to the Debtors' indemnity obligations in favor of Mr. Allen, the costs associated with such litigations would flow directly through to the Debtors' estates, enabling CCI Noteholders, who are out of the money under the Plan, to pursue alternate recoveries against Mr. Allen, who has already given substantial consideration under the CII Settlement and is not a guarantor under the CCI Notes. As such, the Court should overrule Key Colony's objection.

Moreover, the U.S. Trustee's argument that the Third Party Release improperly releases claims by Holders of Interests, whose Interests are being extinguished pursuant to the Plan is misplaced.[223] Without such a release, Holders of Interests could seek to collaterally attack such Plan treatment by bringing actions against the Debtor Releasees. By preserving governmental and regulatory enforcement actions, the Third Party Release ensures that the Debtor Releasees are not entitled to a free pass from wrongdoing but at the same time protects the Plan from collateral attack. Accordingly, the Third Party Release is appropriate and the objections thereto are unfounded. Because the Third Party Release eliminates such improper actions while still providing an avenue for remediation, if any is necessary, the Third Party Release is fair, equitable, reasonable, and consistent with public policy.

---

[221] *See* UST Objection at 14; Plan, Art. X.E.

[222] *See* Key Colony Objection.

[223] UST Objection at 13.

### 3. Injunction

Article X.F of the Plan enjoins all Entities from commencing or continuing any Causes of Action released pursuant to the Plan or Confirmation Order. The injunction is necessary to effectuate the Plan Releases and to protect the Reorganized Debtors from any potential litigation from prepetition creditors as they implement the provisions of the Plan after the Effective Date. Any such litigation would hinder the efforts of the Reorganized Debtors to effectively fulfill their responsibilities as contemplated in the Plan and thereby to maximize value for all Holders of Claims and Interests. The injunction is narrowly tailored to achieve its purpose and similar injunctions have been approved by courts in other chapter 11 cases.[224] To enable the Reorganized Debtors to comply with their obligations under the Plan and applicable related documents, the Debtors request that the Court approve the injunction provision contained in Article X.F of the Plan.

### 4. Exculpation

Under Article X.G of the Plan, the Debtors seek protection for the Exculpated Parties (which are the same as the Debtor Releasees)[225] from liability for actions taken or omitted pre- or postpetition in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Effective Date of the Plan, the

---

[224] *See, e.g., In re DJK Residential LLC*, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Bally Total Fitness of Greater New York, Inc.*, Case No. 07-12395, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan).

[225] Although the Debtor Releasees include any statutory committee appointed in these Chapter 11 Cases and the Exculpated Parties nominally include only the Creditors' Committee, these are one and the same because no other statutory committee has been appointed in these Chapter 11 Cases. *Compare* Plan, Art. I.161 *with* Plan, Art. I.A.103.

K&E 15004216.

Disclosure Statement, or any contract, instrument, release, or other agreement or document created or  from dissatisfied creditors or any other parties in interest with respect to the Exculpated Parties' participation in these Chapter 11 Cases (the "Exculpation Provision").  The scope of the exculpation contained in Article X.G of the Plan is appropriately limited to the Exculpated Parties' participation in these Chapter 11 Cases, has no effect on liability that results from gross negligence or willful misconduct, and does not apply to any acts or omissions expressly set forth in and preserved by the Plan.

There are a number of strong policy considerations, including the protection of statutory committees and their members, which weigh strongly in favor of exculpatory clauses such as the Exculpation Provision.  Notably, courts have ruled that exculpation provisions do not affect the liabilities of third parties, but merely set forth the appropriate standard of liability for the exculpated parties.[226]  Courts have found exculpation provisions appropriate where, as here, they do not extend to gross negligence and willful misconduct.[227]  Courts evaluate the appropriateness of exculpation provisions based upon a number of factors, including whether the Plan was proposed in good faith, whether liability is limited, and whether the exculpation provision was necessary for plan negotiations.[228]  For the reasons set forth below, the Exculpation Provision is appropriate and the Court should approve it.

---

[226] *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (the exculpation provision, "which is apparently a commonplace provision in Chapter 11 plans, does not affect the liability of [third] parties, but rather states the standard of liability under the Code").

[227] *See Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 501 (S.D.N.Y. 2005) (exculpation provision was appropriate where such provision excluded gross negligence and willful misconduct).

[228] *See, e.g., In re Captran Creditors' Trust*, 128 B.R. 469, 476 (M.D. Fla. 1991) (the factors used to evaluate the language of an exculpation provision "include, but are not limited to: how the

(Continued…)

As an initial matter, to confirm the Plan, the Court must find, among other things, that the Plan has been proposed in good faith and not by any means forbidden by law.[229]  Findings that the Plan was proposed and negotiated in good faith extend to the parties involved in the negotiations, i.e., the Debtors, the Creditors' Committee, and Plan Support Agreement signatories.  Thus, if the Court confirms the Plan, cause exists to approve the Exculpation Provisions.

Moreover, it is well established that the liability of statutory committees and their professionals retained under section 1103 of the Bankruptcy Code is limited to acts of gross negligence and willful misconduct.[230]  Finally, exculpation for participating in the plan process is appropriate where plan negotiation could not have occurred without protection from liability.[231]  As set forth in the Doody Affidavit, the Plan and the CII Settlement on which it is based would

---

exculpatory clause limits liability, intent of the parties, and the manner in which the exculpatory clause was made a part of the agreement").

[229]  11 U.S.C. §§ 1129(a)(3).

[230]  *See In re Calpine Corp.*, No. 05-60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) (exculpation provisions that do not relieve any party of liability for gross negligence or willful misconduct found to be appropriate); *Enron Corp.*, 326 B.R. at 501 (noting that the bankruptcy court had addressed the exculpation provision, finding it appropriate because it excluded gross negligence and willful misconduct); *PWS Holding*, 228 F.3d at 246-47 (holding that the appropriate standard of liability under section 1103 of the Bankruptcy Code is "willful misconduct or *ultra vires* acts," and approving an exculpation of the Creditors' Committee and its professionals subject only to liability for willful misconduct or gross negligence).

[231]  *See Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition"); *see also In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006) (holding exculpation provision was appropriate where beneficiaries expected such provision to be included in chapter 11 plan in exchange for participation in the chapter 11 cases); *WorldCom*, 2003 WL 23861928, at *28 (exculpation provision was appropriate when its inclusion in the plan was vital to the successful negotiation of the plan).

K&E 15004216.

not have materialized if the negotiating parties had not known they would be protected from liability, other than for willful misconduct or gross negligence, in connection therewith.[232]

The Exculpated Parties should be exculpated for acts in connection with the Chapter 11 Cases, other than those acts involving willful misconduct or gross negligence, as a matter of public policy. Indeed, failing to include an exculpation clause such as the Exculpation Provision in a plan of reorganization would chill the critical participation of the management and the advisors to debtors in possession, as well as essential creditor groups, in the process of trying to formulate and negotiate consensual chapter 11 plans. In light of the bankruptcy policy in favor of consensual chapter 11 plans and the negotiations that create them, it stands to reason that exculpation provisions are essential to the process and should be approved.[233]

The Exculpated Parties played a critical role in the formulation of the Plan and the Exculpation Provision played a role in bringing these parties to the table.[234] Moreover, the scope of the Exculpation Provision itself and the composition of the Exculpated Parties is entirely consistent with established practice in this and other jurisdictions.[235] Therefore, the Debtors

---

[232] *See* Doody Affidavit ¶ 43.

[233] *See In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984) ("the spirit of Chapter 11 [is] to promote consensual plans"); *see also Zenith*, 241 B.R. at 15 (stating that the Bankruptcy Code has an overall policy of fostering consensual plans of reorganization); *In re Homestead Partners, Ltd.*, 197 B.R. 706, 710 (Bankr. N.D. Ga. 1996) ("the development of consensual reorganizations lies at the heart of Chapter 11 policy"); *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. 521, 539-40 (Bankr. D.N.H. 1988) ("it is a 'strong policy' underlying chapter 11 of the Bankruptcy Code to foster consensual plans").

[234] *See* Doody Affidavit ¶ 44.

[235] *See, e.g.*, *In re DJK Residential LLC*, Case No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Source Enters., Inc.*, No. 06-11707, 2007 WL 2903954, at *13 (Bankr. S.D.N.Y. Oct. 1, 2007) (approved exculpation provision
(Continued…)

respectfully request that the Court approve the Exculpation Provision set forth in Article X.G of

the Plan.

because provision was in the best interests on the debtors' estates and the creditors); *In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395, 2007 WL 2779438, at *8 (Bankr. S.D.N.Y. Sept. 17, 2007) (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr. S.D.N.Y. 2006) (in overruling objection to exculpation clause court noted that exculpation language that "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptionable").

## CONCLUSION

For the reasons set forth herein, the Debtors submit that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and respectfully request that this Court confirm the Plan. With chapter 11's power to provide a fresh start, the Debtors are primed to lead the way among communications companies for years to come.

Dated: New York, New York
  July 16, 2009

         Respectfully submitted,

         By: /s/ *Paul M. Basta*
         Richard M. Cieri
         Paul M. Basta
         Stephen E. Hessler
         M. Catherine Peshkin
         KIRKLAND & ELLIS LLP
         601 Lexington Avenue
         New York, New York 10022
         Telephone: (212) 446-4800
         Facsimile: (212) 446-4900

         Ray C. Schrock
         KIRKLAND & ELLIS LLP
         300 N. LaSalle Street
         Chicago, Illinois 60654
         Telephone: (312) 862-2000
         Facsimile: (312) 862-2200

         *Counsel to the Debtors and Debtors in Possession*
         *(other than Charter Investment, Inc.)*

         Albert Togut
         Frank A. Oswald
         TOGUT, SEGAL & SEGAL LLP
         One Penn Plaza
         New York, New York 10119
         Telephone: (212) 594-5000
         Facsimile: (212) 967-4258

         *Counsel to Debtor and Debtor in Possession Charter*
         *Investment, Inc.*

K&E 15004216.