SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Robert E. Zimet
Jay M. Goffman
Susan L. Saltzstein
Jeremy A. Berman

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
(213) 687-5000
Kurt Ramlo

Attorneys for Paul G. Allen

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 Cases |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) |

## BRIEF OF PAUL G. ALLEN IN SUPPORT OF CONFIRMATION

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................4

FACTS ......................................................................................................................2

ARGUMENT ...............................................................................................................8

I.  THE CII SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR
    AND EQUITABLE AND FALLS WELL ABOVE THE LOWEST POINT IN
    THE RANGE OF REASONABLENESS ...............................................................8

    A.  Absent the CII Settlement, The Plan Would Not Be Feasible ..............................10

    B.  The Settlement Was Negotiated At Arm's Length ................................................11

II. THE CII SETTLEMENT IS IN THE BEST INTERESTS OF THE DEBTORS'
    ESTATES AND SATISFIES THE SECOND CIRCUIT IRIDIUM TEST ....................12

    A.  The CII Settlement Benefits Are Enormous Whereas The Likelihood Of
        Future Litigation Or Any Success Thereunder Is Minimal ...................................13

    B.  The CII Settlement Has The Overwhelming Support Of, And Is In The
        Paramount Interest Of Creditors ........................................................................14

    C.  The CII Settlement Is The Product Of Extensive Arm's-Length
        Negotiations Among Parties, Each Of Whom Was Represented By
        Independent, Experienced And Sophisticated Professionals ................................15

    D.  The Releases Are Appropriately Tailored And Satisfy The Strict
        Requirements For Approval Under Second Circuit Law .......................................19

    E.  The CII Settlement Comports With The Priority Scheme Of The
        Bankruptcy Code ...............................................................................................21

III. THE RELEASES ARISE IN UNIQUE AND UNUSUAL CIRCUMSTANCES
     AND SHOULD BE APPROVED BECAUSE THEY PLAY AN IMPORTANT
     PART IN THE PLAN, ARE GRANTED IN CONSIDERATION FOR
     SUBSTANTIAL CONSIDERATION FROM THE CII SETTLEMENT CLAIM
     PARTIES, AND PROTECT THE ESTATE AGAINST INDEMNIFICATION
     CLAIMS ..........................................................................................................22

    A.  The Third Party Releases Play An Important Part In The Plan And They
        Have Been Offered In Exchange For Substantial Consideration From The
        CII Settlement Claim Parties ..............................................................................22

i

B. Unique And Unusual Circumstances Justify Approval Of The Third Party Releases...................................................................................................25

    1. The CII Settlement Parties' Agreement To Forbear From Exercising Exchange Rights To Facilitate Reorganization Is Unique......................................................................................................25

    2. The Identity Of Interest Between The Debtors And The Debtor Releasees Is Unique, As Debtors' Indemnification Obligations May Affect Distributions To Creditors And Disturb Bankruptcy Code's Priority Scheme........................................................................................26

C. The Third Party Releases Are Binding On Non-Consenting Creditors And Equity Holders ....................................................................................27

CONCLUSION..............................................................................................................28

# TABLE OF CASES AND AUTHORITIES

**CASES**                                                                          **PAGE(S)**

*In re Adelphia Commc'ns Corp.,*
   327 B.R. 143 (Bankr. S.D.N.Y. 2005)..................................................8, 9, 12

*In re Adelphia Commc'ns Corp.,*
   368 B.R. 140 (Bankr. S.D.N.Y. 2007)......................................................8, 18

*In re Bush Indus.,*
   315 B.R. 292 (Bankr. W.D.N.Y. 2004) ........................................................12

*In re Calpine Corp.,*
   No. 05-60200, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ...............18

*Cartalemi v. Karta Corp. (In re Karta Corp.),*
   342 B.R. 45 (S.D.N.Y. 2006)...........................................................23, 24, 25

*Celardo v. GNY Automobile Dealers Health & Welfare Trust,*
   318 F.3d 142 (2d Cir. 2003)........................................................................19

*Cosoff v. Rodman (In re W.T. Grant Co.),*
   699 F.2d 599 (2d Cir. 1983)...........................................................................9

*In re Delta Air Lines, Inc.,*
   370 B.R. 537 (Bankr. S.D.N.Y.), aff'd, 374 B.R. 516 (S.D.N.Y. 2007),
   aff'd sub nom. *Ad Hoc Comm. of Kenton County Bondholders v. Delta
   Air Lines, Inc.,* 309 F. App'x 455 (2d Cir. 2009) ...............................................8

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
   Network, Inc.),*
   416 F.3d 136 (2d Cir. 2005)........................................11, 18, 20, 22, 24, 26

*In re Granite Broad. Corp.,*
   369 B.R. 120 (Bankr. S.D.N.Y. 2007)......................................................8, 11

*Greer v. Gaston & Snow (In re Gaston & Snow),*
   No. 93-8517, 1996 U.S. Dist. LEXIS 17774 (S.D.N.Y. Nov. 25, 1996) .........22

*Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.),*
   190 B.R. 157 (S.D.N.Y. 1995)......................................................................25

*In re Lee Way Holding Co.,*
   120 B.R. 881 (Bankr. S.D. Ohio 1990)...........................................................13

*Mello v. K-Mart Corp.,*
    792 F.2d 1228 (1st Cir. 1986)................................................................19

*Menard-Sanford v. Mabey (In re A.H. Robins Co.),*
    880 F.2d 694 (4th Cir. 1989) ...........................................................22

*In re Mid-State Raceway, Inc.,*
    No. 04-65746, 2006 WL 4050809 (Bankr. N.D.N.Y. Feb. 10, 2006) ..............18

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),*
    478 F.3d 452 (2d Cir. 2007).........................................8, 12, 20, 21, 26

*Nellis v. Shugrue,*
    165 B.R. 115 (S.D.N.Y. 1994)............................................................8

*O'Connell v. Packles (In re Hilsen),*
    404 B.R. 58 (Bankr. E.D.N.Y. 2009) ....................................................12

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.,*
    390 U.S. 414 (1968)...................................................................8, 12

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),*
    330 B.R. 394 (Bankr. S.D.N.Y. 2005)..............................20, 23, 24, 25

*Sec. & Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),*
    960 F.2d 285 (2d Cir. 1992)........................................................22, 24, 26

*In re Spiegel, Inc.,*
    No. 03-11540, 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006)
    aff'd, 269 Fed. App'x 56 (2d. Cir. 2008) cert. denied, *Stupakoff v. Otto
    (GmbH & Co. KG),* 129 S.Ct. 146 (2008) .............................11, 18, 25, 26

*In re Stone Barn Manhattan LLC,*
    405 B.R. 68 (Bankr. S.D.N.Y. 2009)..................................................8, 13

*United States v. Orellana,*
    405 F.3d 360 (5th Cir. 2005) ...........................................................19

## AUTHORITIES

11 U.S.C. § 510(b) ...........................................................................26

11 U.S.C. § 1123(b)(3) .....................................................................18

11 U.S.C. § 1123(b)(3)(a)..............................................................11, 18

11 U.S.C. § 1129(a)(3) ...............................................................................................12

11 U.S.C. § 1129(b)(2) ..............................................................................................20

26 U.S.C. § 108 ........................................................................................................16

26 U.S.C. § 382(1)(6) .................................................................................................9

Fed. R. Bankr. P. 9019 ...............................................................................11, 19, 21, 26

Fed. R. Bankr. P. 9019(a) ……………………………………………………………..8

Paul G. Allen ("Mr. Allen"), by and through his undersigned counsel, hereby submits this brief in support of confirmation of the Debtors' Joint Plan of Reorganization, specifically with regard to the CII Settlement (defined below) and the third party releases (the "Third Party Releases") and in support thereof respectfully sets forth as follows:

## PRELIMINARY STATEMENT

The Debtors' Joint Plan of Reorganization (the "Plan") is a remarkable memorialization of the Debtors' intensive prepetition negotiations with key creditors and equity holders, resulting in a pre-arranged balance sheet restructuring that leaves billions of dollars in senior debt unimpaired and facilitates substantial distributions to many of the Debtors' constituencies. Although the Debtors were operationally very sound prepetition (and remain so), their ability to service more than $21 billion in debt was strained due, in large part, to deteriorating credit market conditions. Against this backdrop of debt servicing challenges, the Debtors commenced prepetition negotiations with their key creditors and equity holders, endeavoring to leave their senior capital structure and operations intact.

After several months of negotiations, often conducted around the clock, the Debtors reached agreement on the terms of the Plan with a significant percentage of their noteholders, including the majority of their fulcrum creditors and with their majority shareholder, Mr. Allen. Significantly, Mr. Allen agreed to support the financial restructuring of the Debtors by agreeing to forbear from exercising certain prepetition exchange rights, and, despite having his existing equity completely wiped out, to hold for several years post-emergence a minimum voting stake in reorganized CCI to permit reinstatement of valuable debt instruments. As a result, the Debtors were able to preserve of several billion dollars in value for its creditors and other stakeholders.

These agreements to forbear and the compromise and settlement of the rights, interests and claims against the Debtors (other than Charter Investment, Inc. ("CII")) of Mr. Allen and certain of his affiliates (the "CII Settlement Claim Parties") are embodied in a settlement agreement (the "CII Settlement") that is the linchpin of the Plan.

The CII Settlement is a necessary prerequisite to the Debtors' accomplishment of their primary restructuring goals: (1) avoiding a change of control that could foreclose their reinstatement of nearly $12 billion in extremely valuable, attractively priced senior debt; and (2) preservation of their net operating losses (the "NOLs") by maintaining the existing organizational structure, avoiding a pre-bankruptcy "section 382 ownership change" and allocating a significant portion of their cancellation of debt income (the "COD Income") to CII. But for the CII Settlement Claim Parties' commitment to certain restructuring obligations that facilitated the Debtors' primary restructuring goals, the Plan would not be feasible. Accordingly, absent the CII Settlement, distribution of substantial value to the many creditors under the Plan would be impossible – including payment in full to trade creditors, significant recovery to creditors, including recoveries even to more junior noteholders.

Because of the CII Settlement, the Debtors will preserve approximately $2.85 billion[1] in tax attributes, will be able to qualify for substantially enhanced use of such tax attributes, and will save several hundred million dollars annually in interest expense through reinstatement of their senior debt. As such, the Plan and the CII Settlement embodied therein are in the best interests of the Debtors' estates and are in the paramount interest of creditors. Moreover, the Debtor Releases and the Third Party Releases under the Plan, which are required

---

[1]  Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy code and (B) In Response to Objections Thereto, [Docket No. 634] (the "K & E Brief") at 57.

under the CII Settlement, satisfy the strict Second Circuit standard for approval of non-debtor releases. The identity of interest arising from the Debtors' indemnification obligations of Mr. Allen in addition to the substantial contributions by the CII Settlement Claim Parties, the overwhelming approval of the releases by the fulcrum creditors, the importance of the tax benefits achieved by the Debtors from the CII Settlement, and the crucial need for reinstatement of the senior debt in light of current credit market conditions, all support a finding of rare, unique and unusual circumstances justifying approval of the releases.

## FACTS

Charter Communications, Inc. ("CCI"), the ultimate parent of each of the debtors and debtors in possession other than CII (the "Debtors" or "Charter"), commenced the above-captioned cases on March 27, 2009 (the "Petition Date") after lengthy negotiations with key bondholders and stakeholders which resulted in the pre-arranged Plan that raises approximately $3.5 billion of capital and debt financing.[2]  Discussions commenced in December 2008, and the Debtors ultimately reached agreement on the terms of the pre-arranged Plan with Mr. Allen, through negotiations with Vulcan, Inc., and separately with each member of an ad hoc committee of noteholders (the "Unofficial Crossover Committee") comprised of holders of approximately 73% of the notes issued by CCH I, LLC (the "CCH I Notes") and holders of approximately 52% of the notes issued by CCH II, LLC (the "CCH II Notes").[3]

During the prepetition negotiations and at all times relevant hereto, Mr. Allen has owned 100% of CII as well as a 7% common equity interest and a 91% voting interest in CCI.[4] Through his wholly-owned subsidiary, CII, Mr. Allen also owns a 46% common equity interest

---

[2] Declaration of Gregory L. Doody In Support of First Day Pleadings (the "Doody First Day Decl.") at 4.

[3] Debtors' Disclosure Statement (the "D/S") at 21.

[4] D/S at 15.

in Charter Communications Holding Company, LLC ("Holdco"). The remaining 54% common equity interest in Holdco is held by CCI, Holdco's managing member. CII's equity in Holdco has been exchangeable, since 1999, for shares of CCI's Class B common stock on a one-to-one basis, which shares are, in turn, convertible into CCI's Class A common stock on a one-to-one basis. This exchange right, which includes the right to cause such exchange on a taxable or tax-free basis and the right to exchange CII's Holdco equity directly or indirectly by exchanging CII stock for CCI Class B common stock in a tax-free transaction, is the product of an exchange agreement between Mr. Allen, CII and the Debtors that was negotiated at arms' length over ten years ago (the "Pre-Existing Exchange Agreement"). The Pre-Existing Exchange Agreement has been publicly filed since 1999, and the exchange rights contained therein were integral, inseparable parts of Mr. Allen's initial investment in the Debtors as a public enterprise.

Additionally, CII holds a $75 million accreting note issued by Holdco's direct subsidiary CCHC, LLC ("CCHC") which is exchangeable at CII's option, at any time, for Class A common units of Holdco.[5] CII also owns 30% of the Class A preferred membership interests of CC VIII, LLC ("CC VIII"), an indirect operating subsidiary of Charter Communications Operating, LLC ("CCO").[6] Moreover, directly or indirectly, the CII Settlement Claim Parties have claims for (i) accrued and unpaid management fees owing to CII under a management agreement; (ii) rights under a letter agreement granting an affiliate of Mr. Allen exclusive rights for carriage up to eight digital channels of the Debtors' cable systems; and (iii) rights under a consulting agreement which provides for payment of a fee to an affiliate of Mr. Allen.

---

[5]    D/S at 17. The Holdco Class A common units are exchangeable for shares of CCI's Class B common stock, which shares are, in turn, convertible into CCI's Class A common stock. Id.. Mr. Allen would hold, directly and indirectly, a common equity interest in CCI of approximately 52% on an as-exchanged basis as of February 28, 2009. D/S at 24.

[6]    D/S at 16.

Although Charter's business was operationally sound and continued to grow, Charter was significantly overleveraged and faced substantial prepetition challenges to sustaining its capital structure and servicing its debt.[7]  Consequently, Charter undertook prepetition negotiations with members of the Unofficial Crossover Committee and separately with the CII Settlement Claim Parties to structure the Plan to provide for a balance sheet restructuring that, among other things, proposes the reinstatement of nearly $12 billion of senior debt at CCO and CCO Holdings, LLC ("CCOH"), including more than $8 billion in debt under the amended and restated CCO credit facility, dated March 6, 2007 (the "CCO Credit Facility").[8]  The Debtors are unable to replace their extremely valuable senior debt on comparable economic and other terms, if at all, which underscores the importance of reinstatement of such debt to the Debtors and their estates.[9]

Reinstatement of their senior debt, including the CCO Credit Facility, may be predicated upon the absence of a default thereunder.  Specifically, the CCO Credit Facility provides that the failure of Mr. Allen or an entity affiliated with Mr. Allen to maintain a 35% direct or indirect voting power over the management of the borrower would result in a change of control default which could, in turn, foreclose reinstatement of the facility.[10]  As such, if Mr. Allen maintains, either directly or indirectly, at least 35% voting power in CCI, Charter should remain in compliance with the provisions of its debt instruments and reinstatement should not be foreclosed.[11]

---

[7]   Doody First Day Decl. at 3, 14.

[8]   Doody First Day Decl. at 20.

[9]   Id.; D/S at 86.

[10]   Doody First Day Decl. at 17.

[11]   Id.

Also key to the Debtors' reorganization is preservation of their NOLs. As of December 31, 2009, the Debtors had approximately $8.7 billion of federal NOLs, resulting in a gross deferred tax asset of several billion dollars and state NOLS resulting in a gross deferred tax asset of approximately $325 million, both expiring over the next 20 years.[12] Presently, the Debtors' NOLs are not limited under section 382 of the U.S. Internal Revenue Code of 1986, as amended (the 'IRC") and, accordingly, the Debtors would expect that the NOLs could be freely used to offset substantially all of the Debtors' expected future taxable income. [13]

Under the Plan, the Debtors' prepetition indebtedness will be reduced by approximately $8 billion, resulting in an estimated $6 billion of COD Income which is excluded from income but must be used by the Debtors to reduce their NOLs.[14] Because of the Debtors' organizational structure, most of the COD Income will be generated under the Plan at Holdco and its subsidiaries. Under the IRC and the Holdco organizational documents, any COD Income will be allocated to Holdco's members – CCI and CII – ███████████████████

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████
████████████████████████████████████

---

[12]    Doody First Day Decl. at 33; D/S at 80.

[13]    D/S at 80.

[14]    D/S at 80, 102-03; Section 108(a)(1)(A) of the IRC; section 108(b) of the IRC.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████



████████████████████████████████████████

████████████████████████████████████

████████████████████████ the Debtors were motivated to

maintain the current Holdco structure. Thus, the Debtors sought Mr. Allen's forbearance from

exercising rights under the Pre-Existing Exchange Agreement under which CII could exchange

CII's Holdco equity for CCI Class B common stock. In early February 2009, Mr. Allen sent

Charter notice of his intent to exercise the exchange rights. However, after days of intensive

negotiations, Mr. Allen agreed to forebear and the Debtors, the Unofficial Crossover Committee

and Mr. Allen reached agreement on the terms of the CII Settlement and the Plan.

The CII Settlement is the cornerstone of the Debtors' Plan, the structure of which

was proposed by the Debtors, as it accomplishes, among other things, the two aforementioned

key aspects of the Debtors' reorganization. First, the CII Settlement allows the Debtors to

preserve the NOLs and other tax attributes which results in approximately $2.85 billion in tax

benefits to the Debtors in the form of higher NOLs with enhanced utilization.[16] Second, the CII

Settlement is a necessary prerequisite to the Debtors' reinstatement of nearly $12 billion of senior

debt, thereby saving the Debtors several hundred million dollars annually in interest expense.

Specifically, the CII Settlement provides for (i) cancellation of all but 1% of CII's

46% common equity interest in Holdco; (ii) reduction of Mr. Allen's voting interest in CCI from

91% to 35%; (iii) the transfer to the Reorganized Company of CII's 30% preferred equity interest

in CC VIII, which entity is valued at roughly 20% of the Total Enterprise Value on a going

concern basis;[17] (iv) elimination of substantial obligations, including amounts due under a

---

[16] K&E Brief at 72.

[17] See Plan Liquidation Analysis at Note E.

management agreement and a consulting agreement with CII; and (ii) relinquishment, for the benefit of the Debtors, of the CII Settlement Claim Parties' exclusive option to market and sell rights for carriage of up to eight digital channels.[18]

In consideration for the CII Settlement Claim Parties' compromise of claims and interests and Mr. Allen's forbearance from exercising the longstanding exchange rights under the Pre-Existing Exchange Agreement, the CII Settlement Claim Parties will receive the following consideration: (i) shares of New Class B Stock representing 2% of the Reorganized Company's equity value as well as 35% voting power in Reorganized CCI; (ii) a 1% equity interest directly in Reorganized Holdco which includes an exchange right for the New Class A Stock in Reorganized CCI; (iii) warrants to purchase New Class A Stock equal to 4% of Reorganized CCI's equity value; (iv) $85 million in principal amount of New CCH II Notes; (v) cash, including $25 million for payment in full for management fees due and owing by COO to CII and $20 million for reimbursement for actual, out-of-pocket expenses incurred in connection with the CII Settlement; and (vi) releases under the Plan.[19]

## ARGUMENT

**I. THE CII SETTLEMENT SHOULD BE APPROVED BECAUSE IT IS FAIR AND EQUITABLE AND FALLS WELL ABOVE THE LOWEST POINT IN THE RANGE OF REASONABLENESS**

The CII Settlement is in the best interests of the Debtors' estates and falls well above the lowest point in the range of reasonableness. Absent the CII Settlement, the Debtors would be unable to accomplish their two primary reorganization goals and the Plan would not be feasible. Bankruptcy Rule 9019 provides, in relevant part, that "[o]n motion by the trustee and

---

[18] D/S at 27-28.

[19] Id.

after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Approval of settlements that are part of a plan of reorganization is evaluated under the same standards of approval as pre-confirmation settlements under Bankruptcy Rule 9019. See In re Granite Broad. Corp., 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007); In re Delta Air Lines, Inc., 370 B.R. 537, 551 (Bankr. S.D.N.Y.), aff'd, 374 B.R. 516 (S.D.N.Y. 2007), aff'd sub nom. Ad Hoc Comm. of Kenton County Bondholders v. Delta Air Lines, Inc., 309 F. App'x 455 (2d Cir. 2009); In re Adelphia Commc'ns Corp., 368 B.R. 140, 224-25 (Bankr. S.D.N.Y. 2007).

In determining whether to approve a proposed settlement, courts ascertain whether the proposed settlement is fair and equitable, reasonable, and in the best interests of a debtor's estate. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc., 390 U.S. 414, 424 (1968); Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461-65 (2d Cir. 2007); In re Adelphia Commc'ns Corp., 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) ("The settlement need not be the best that the debtor could have obtained." (citing In re Penn Cent. Transp. Co., 596 F.2d 1102, 1114 (3d Cir. 1979); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."); see also In re Stone Barn Manhattan LLC, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009).

In general, compromises in the bankruptcy context should only be approved if they fall above "'the lowest point in the range of reasonableness.'" Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983). Ultimately, the decision to accept or reject a settlement lies within the sound discretion of the bankruptcy court. Adelphia Commc'ns, 327 B.R. at 159.

## A.    Absent the CII Settlement, The Plan Would Not Be Feasible

The Debtors' Plan is premised upon the CII Settlement which has facilitated the implementation of the Debtors' primary restructuring goals while also facilitating the (i) cancellation of roughly $8 billion of holding company debt; (ii) reduction of more than $800 million in annual interest expense; (iii) raising approximately $1.6 billion in equity investments through a rights offering and $267 million in new notes and; and (iv) refinancing of more than one billion dollars in senior debt, extending maturities by 6 years.[20]

The Debtors proposed the CII Settlement for two primary reasons. First, the Debtors sought to preserve at least 35% of Mr. Allen's voting interest in Charter to prevent a change of control under the CCO Credit Facility and other senior debt facilities that could foreclose reinstatement of the senior debt. Second, the Debtors sought to incentivize Mr. Allen to cause CII to remain a member of Holdco through the Effective Date and to forbear from exercise of his longstanding exchange right under the Pre-Existing Exchange Agreement to ensure allocation of approximately $2.85 billion of COD Income to CII to prevent a pre-bankruptcy section 382 ownership change and, thus, to retain a larger portion of the NOLs for the Reorganized Company post-Effective Date, along with the ability to use more of the NOL every year because of the application of section 382(1)(6) of the IRC.

It is only through Mr. Allen's agreement to the terms of the CII Settlement that the cornerstones of the Debtors' Plan could be effectuated.[21]  Absent the CII Settlement, ███████

████████████████████████████████████████████████████████████████████

---

[20]    Doody First Day Decl. at 4.

[21]    See Millstein Dep. Tr. at 205:8-21 (Debtors' financial advisor testifying that "the structure of the plan is contingent upon [Mr. Allen] retaining a 35% voting stake in the company.  In the absence of his willingness to so retain that interest, the plan could fail, so the structure depended upon his willingness to be a participa[nt] in the equity of the company going forward").

████████████████████████████████████████████

██████████ but the Plan would not be feasible because the Debtors would likely be unable to reinstate their senior debt and preserve the favorable terms and interest rates thereunder.[23]

### B.    The Settlement Was Negotiated At Arm's Length

Mr. Allen's agreement to the terms of the CII Settlement was obtained at arms' length after intensive negotiations between and among the Debtors, members of the Unofficial Crossover Committee and the CII Settlement Claim Parties during which all parties were separately represented by sophisticated legal and financial advisors. The Debtors' management engaged "a full complement of advisors . . . that reported to management, not to Mr. Allen."[24] The Debtors' independent directors selected and retained their restructuring counsel and financial advisors.

A majority of the directors on the board are independent directors. During negotiations, the Debtors' financial advisor reported to a group of independent members of the board of directors and final decisions on the deal points reflected in the Plan term sheet were made by unanimous decision of the Debtors' board of directors on the recommendation of a group of independent directors.[25] Regularly, Mr. Allen and his affiliated entities recused themselves from key decisions.[26] Because Mr. Allen was the controlling shareholder of the company, the Debtors' financial advisor presented an independent review of Mr. Allen's distributions under the Plan to the independent directors to assure them that such distributions

---

[22]   K&E Brief at 72.

[23]   Id. at 75; D/S at 28, 97.

[24]   See Merrit Dep. Tr. at 184:24 – 185:10.

[25]   Millstein Dep. Tr. at 155:16-24.

[26]   Merritt Dep. Tr. at 185:14-22.

were fair.[27] The arm's-length nature of the negotiations of the CII Settlement and Plan terms, and their exposure to a "market test" are also evidenced by members of the Unofficial Crossover Committee's active negotiation in, and ultimate support of the CII Settlement and Plan.

The foregoing illustrates that the CII Settlement is fair, reasonable and falls well above the lowest point in the range of reasonableness. Moreover, the CII Settlement is in the best interest of the Debtors' estates, evidenced not only by the Debtors' exercise of their business judgment, but also by the active involvement and support of the Unofficial Crossover Committee.[28]

## II.  THE CII SETTLEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND SATISFIES THE SECOND CIRCUIT <u>IRIDIUM</u> TEST

In evaluating whether a settlement is within the best interests of the Debtors' estates, the Second Circuit also applies the multi-factor test set forth in <u>Iridium</u>. 478 F.3d at 462 (following test originally articulated in <u>TMT Trailer Ferry</u>, 390 U.S. at 424-25). Specifically, the Second Circuit considers: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its

---

[27]  Millstein Dep. Tr. at 219:16-25.

[28]  The Law Debenture Trust Company of New York, as Trustee with respect to the $479 million in aggregate principal amount of 6.5% Convertible Senior Notes due 2027 issued by CCI argues in its objection to the Plan (the "LDTC Objection") that the appropriateness of the CII Settlement should be evaluated under the "entire fairness" standard in order to determine whether the Plan (and the CII Settlement) was negotiated in good faith under 1129(a)(3). No such requirement exists in the Second Circuit. <u>See Spiegel</u>, 2006 WL 2577825 at *3, 9 (approving settlement and releases of *majority shareholder with sole voting power* pursuant to Code section 1123(b)(3)(A) and the standards set forth in Rule 9019 and <u>Metromedia</u>); In re Granite Broadcasting Corp., 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (holding that a plan did meet the good faith standard of 1129(a)(3) despite the interim CEO and controlling shareholder having "negotiate[ed] a severance package for himself while simultaneously arranging financing for [the debtors]," with no discussion of the entire fairness doctrine); In re Bush Indus., 315 B.R. 292, 303-04 (Bankr. W.D.N.Y. 2004) (holding that "section 1129(a)(3) commands only that the debtor strive in good faith and by proper means to effect a plan that satisfies the requirements of the Bankruptcy Code" in a case in which a debtor's CEO and controlling shareholder had negotiated, prior to the bankruptcy filing, a prepackaged plan which included a "golden parachute" for himself). Nonetheless, the facts support a finding that the entire fairness standard has been met. <u>See</u> LDTC Objection at 58.

attendant expense, inconvenience, and delay, including the difficulty in collecting on the

judgment; (3) the paramount interest of the creditors, including each affected class's relative

benefits and the degree to which creditors either do not object to or affirmatively support the

proposed settlement; (4) whether other parties in interest support the settlement; (5) the

competency and experience of counsel supporting, and the experience and knowledge of the

bankruptcy judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained

by officers and directors; and (7) the extent to which the settlement is the product of

arm's- length bargaining. <u>Iridium</u>, 478 F.3d at 462.

     The bankruptcy court need not determine that all of the foregoing factors favor

approval of a compromise, and the proposed compromise need not be the best agreement that the

debtor could have achieved under the circumstances. <u>See</u> <u>In re Adelphia Commc'ns</u>, 327 B.R. at

159-60; <u>see also</u> <u>O'Connell v. Packles (In re Hilsen)</u>, 404 B.R. 58, 70 (Bankr. E.D.N.Y. 2009)

("It is not the court's task to determine whether the settlement proposed by the parties is the best

possible, or fairest, or most appropriate resolution of the dispute."). Instead, the court's proper

"role is to determine whether the settlement as a whole is fair and equitable." <u>In re Lee Way</u>

<u>Holding Co.</u>, 120 B.R. 881, 890 (Bankr. S.D. Ohio 1990). To that end, courts should not

substitute their own judgment for that of the debtor, but rather should "'canvass the issues,'"

<u>Stone Barn Manhattan</u>, 405 B.R. at 75 (citation omitted), to affirm that the proposed settlement

falls above "'the lowest point in the range of reasonableness,'" <u>id.</u> (quoting <u>In re Teltronics</u>

<u>Servs., Inc.</u>, 762 F.2d 185, 189 (2d Cir. 1985)).

    A.    **The CII Settlement Benefits Are Enormous Whereas The Likelihood Of Future Litigation Or Any Success Thereunder Is Minimal**

    The benefits to the Debtors' estates are enormous for the reasons set forth above.

Quite simply, without the CII Settlement, the Plan would lack feasibility and be unconfirmable.

The CII Settlement Claim Parties' entry into the CII Settlement has not only facilitated the Debtors' preservation of billions of dollars in tax attributes and made reinstatement of nearly $12 billion in debt possible — without which the Plan would fail — but the CII Settlement has paved the way for a substantial recovery to the estates' creditors.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Thus, the Debtors would likely be disinclined to commence complex and protracted litigation, as their estates would face virtually insurmountable obstacles in any future litigation seeking to compel the same. As such, the CII Settlement has conferred an extraordinary benefit on the Debtors' estates which weighs heavily in favor of finding that the CII Settlement is in the estates' best interests.

**B.     The CII Settlement Has The Overwhelming Support Of, And Is In The Paramount Interest Of Creditors**

Most creditor constituencies are receiving substantial recoveries under the Debtors' Plan. Because of the CII Settlement, the Debtors were able to propose a Plan that reinstates billions of dollars in senior debt, pays all trade creditors in full, and distributes substantial economic value in the form of equity in the Reorganized Company to CCH I noteholders — creditors of the "fulcrum" debtor.[29] Additionally, the CCH II Noteholders will receive a par recovery which would not be possible without reinstatement of the senior debt under the Plan. By incentivizing Mr. Allen to refrain from actions triggering Charter's loss of extremely valuable tax attributes and favorable senior debt terms, the Debtors have proposed a

---

[29]     Doody First Day Decl. at 17.

balance sheet restructuring that will maximize value for their constituencies which is in the paramount interest of creditors.

The Debtors have secured overwhelming support for the CII Settlement from many of their key constituencies. The Unofficial Crossover Committee, consisting of approximately 73% of the CCH I Notes and approximately 52% of the CCH II Notes, support the CII Settlement.[30] The holders of CCH II Notes on the Unofficial Crossover Committee, who have committed to receive new debt instruments under the Plan, support the CII Settlement. Moreover, certain supporting members of the Unofficial Crossover Committee have committed to backstopping a Rights Offering which the Debtors expect to generate up to $2 billion. As the record of the confirmation hearing will show, only those senior creditors who are objecting to reinstatement of the senior debt (presumably to extract hundreds of millions more in interest from the Debtors) and the CCI Noteholders are not supporting the CII Settlement. These facts weigh heavily in favor of approving the CII Settlement.

### C. The CII Settlement Is The Product Of Extensive Arm's-Length Negotiations Among Parties, Each Of Whom Was Represented By Independent, Experienced And Sophisticated Professionals

Each party involved in negotiating the CII Settlement was represented by independent, experienced, and sophisticated professionals. The Debtors were represented by their restructuring counsel and long-time financial advisors. Mr. Allen was represented by his own experienced restructuring counsel and financial advisors and CII was separately represented throughout the Chapter 11 cases by independent restructuring counsel. Also party to the negotiations was a newly formed Unofficial Crossover Committee, consisting of CCH I

---

[30] Doody First Day Decl. at 16-17.

Noteholders and CCH II Noteholders, who were separately represented by sophisticated restructuring counsel.

The restructuring discussions began in December 2008 while the Debtors continued to explore other restructuring alternatives. After the Debtors determined that preservation of valuable tax attributes and avoidance of a change of control were key to value maximization under a plan and attracting new capital infusions to do so, the Debtors reached agreement with the Unofficial Crossover Committee and separately with Mr. Allen on a structure that eventually became the CII Settlement, a key element of which was preserving the partnership structure of Holdco, as noted above. Multi-parties negotiations continued until around-the-clock sessions concluded with a deal in mid-February. The negotiating parties' representation by separate sophisticated restructuring professionals and the active involvement of members of the Unofficial Crossover Committee in the negotiating process all weigh heavily in favor of approving the CII Settlement that was proposed by the Debtors.



---

[31] LDTC Objection at 9.

[32] To be sure, if the CII Settlement Claim Parties had pursued a taxable exchange of CII's Holdco equity for CCI Class B common stock prior to the bankruptcy, a tax liability of similar magnitude may have resulted. No third party, including the Debtors, could have compelled the CII Settlement Claim Parties to effect such a transaction and indeed, the CII Settlement Claim Parties would not have agreed to effect such a transaction because of, among other things, the resulting tax liability.





**D.     The Releases Are Appropriately Tailored And Satisfy The Strict Requirements For Approval Under Second Circuit Law**

The Debtor Releases comport with the Bankruptcy Code and Second Circuit law regarding settlement of claims belonging to the Debtors or the estates. See Plan at X.D. Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." As such, the Bankruptcy Code expressly authorizes the Debtors to compromise and settle claims that belong to the estate. See In re Calpine Corp., No. 05-60200, 2007 WL 4565223 at *9, 18 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving debtor releases under 1123(b)(3)(A) as representing valid exercise of debtors' business judgment); see also Adelphia Commc'ns, 368 B.R. at 263 n.289 ("Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own").

Unlike Third Party Releases which are held to the stricter Metromedia standard, courts routinely evaluate a debtor's compromise of its claims and estate claims under the standard set forth under Rule 9019. See Spiegel, 2006 WL 2577825 at *3, 8 (approving the debtors' release of its majority shareholder with sole voting power pursuant to section 1123(b)(3) of the Bankruptcy Code and Rule 9019); In re Mid-State Raceway, Inc., No. 04-65746, 2006 WL 4050809 at *11, 14-15 (Bankr. N.D.N.Y. Feb. 10, 2006) (approving debtor releases under 9019 standard and finding settlement the "linchpin" of the plan).

In consideration for inclusion of the Debtor Releases in the Plan, among other things, the Debtors were able to propose a Plan that reinstates billions of dollars in senior debt, pays all trade creditors full, and distributes substantial economic value to many creditors, including the CCH I noteholders — creditors of the "fulcrum" debtor. Thus, the CII Settlement paved the way for a substantial recovery to the estates' creditors. Through the negotiating process, the Debtors' financial advisor presented an independent review of Mr. Allen's distributions under

19

the Plan to a group of independent members of the board of directors to assure them that such distributions were fair.

As set forth in detail above, the CII Settlement (and the Debtor Releases required thereunder) was the product of extensive multi-party arms' length negotiations wherein the Debtors exercised their business judgment in arriving at the CII Settlement which represents concessions by all parties thereto that are in the best interests of the Debtors' estates. For the foregoing reasons, the 9019 standard has been met with respect to the Debtor Releases and the same should be approved as in the best interest if the Debtors' estates.

As set forth in greater detail below, the Third Party Releases, of which Mr. Allen and certain of his affiliated entities are beneficiaries, are appropriate and consistent with Second Circuit law, as they are in the best interests of the estates, are appropriately tailored,[38] and they arise under particularly unusual circumstances which render the release terms important to the success of the Plan.

---

[38] The United States Trustee (UST) argues in its objection to confirmation of the Plan (the "UST Objection") that the Third Party Releases are improper because they release non-debtors for "illegal activities." Courts have consistently, when examining the meaning of the word "illegal" turned to dictionaries for that meaning. E.g. United States v. Orellana, 405 F.3d 360, 365-66 (5th Cir. 2005) ("dictionaries are a principal source for ascertaining the ordinary meaning of statutory language[.] Black's Law Dictionary defines 'illegal' as 'forbidden by law; unlawful,' and defines 'unlawful' as 'not authorized by law; illegal.') (citations omitted); Celardo v. GNY Automobile Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2nd Cir. 2003) ("The dictionary definition of 'illegal' is 'contrary to or violating a law or rule or regulation or something else (as an established custom) having the force of law.'") (quoting Webster's Third New Int'l Dictionary 1126 (Philip Babcock Gove ed. 1981)); Mello v. K-Mart Corp., 792 F.2d 1228, 1233-34 (1st Cir. 1986) (The word 'illegal' does not only connote conduct to which some criminal penalty attaches, but also that which is 'contrary to or violating a law or rule or regulation or something else (as an established custom) having the force of law.' Tortious conduct falls within this definition.") (quoting Webster's Third New International Dictionary 1126 (1971)). On the basis of the circuit courts' definitions of illegal, it is clear that 'illegal' includes conduct, like tortuous activity and civil violations of securities laws, that is neither criminal nor necessarily immoral. See UST Objection at 14.

The Third Party Releases do not release parties from any criminal liability, as they expressly carve out claims by the United States Government or any of its agencies or any state and local authority. Given the aforementioned definition of "illegal" the Third Party Releases do, however, release certain parties from liability for non-criminal illegal acts as they release non-debtors from claims for breach of fiduciary duty and other civil violations which are permissible under Second Circuit law. Such releases are wholly consistent with Second Circuit law. See XO Commc'ns, 330 B.R. at 440 (holding "that the confirmation record supports the unique circumstances necessary, under Metromedia, for allowing the nondebtor releases concerning the breach of fiduciary duty type actions").

### E. The CII Settlement Comports With The Priority Scheme Of The Bankruptcy Code

In addition to the foregoing seven factors, "[t]he court must be certain that parties to a settlement have not employed a settlement as a means to avoid the priority strictures of the Bankruptcy Code." Iridium, 478 F.3d at 464. However, when the "factors weigh heavily in favor of approving a settlement, the bankruptcy court, in its discretion, could endorse a settlement that does not comply in some minor respects with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule." Id. at 464-65.

The absolute priority rule has not been violated. Although Mr. Allen will receive a 2% equity interest in CCI, CII will retain a 1% equity interest in Holdco, and both will receive other consideration under the Plan, such distributions are not "on account of" Mr. Allen's or CII's equity interests in the Debtors. See 11 U.S.C. 1129(b)(2). Rather, the receipt of equity in CCI and CII's retention of a 1% interest in Holdco is in consideration of the compromises embodied in the CII Settlement, including the CII Settlement Claim Parties' actions to facilitate the Debtors' retention of substantial tax attributes and avoidance of a change of control, their transfer to the Reorganized Company of CII's 30% preferred equity interest in CC VIII, and its relinquishment of other claims and rights set forth in detail above.[39]

Because the equity consideration received by Mr. Allen and CII under the Plan does not run afoul of the absolute priority rule, the CII Settlement is fair and equitable under

---

[39] Millstein Dep. Tr. at 223:21 – 224:11 (testifying that "the Holdco units, these common units, are technically not receiving a distribution under the plan, but as part of a settlement, Paul Allen or the Vulcan entities are retaining a 35 percent voting interest in consideration of all the stuff going on in the settlement").

Bankruptcy Rule 9019.[40]   In light of the foregoing, the CII Settlement should be authorized

under Bankruptcy Rule 9019 because the settlement terms are fair and equitable, fall well within

the range of reasonableness, and are in the best interests of the Debtors and their estates.

## III.   THE RELEASES ARISE IN UNIQUE AND UNUSUAL CIRCUMSTANCES AND SHOULD BE APPROVED BECAUSE THEY PLAY AN IMPORTANT PART IN THE PLAN, ARE GRANTED IN CONSIDERATION FOR SUBSTANTIAL CONSIDERATION FROM THE CII SETTLEMENT CLAIM PARTIES, AND PROTECT THE ESTATE AGAINST INDEMNIFICATION CLAIMS

Pursuant to confirmation of the Plan, the Debtors are seeking approval of the

Third Party Releases which provide that:

> On the Effective Date . . . the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors. . . . Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever . . .

See Plan at X.E. The Debtor Releasees include the Debtors' members, officers, directors, agents,

financial advisors, attorneys, employees, partners, affiliates and representatives. See Plan at X.D.

As such, Mr. Allen and CII's affiliates are beneficiaries of the Third Party Releases.

### A.   The Third Party Releases Play An Important Part In The Plan And They Have Been Offered In Exchange For Substantial Consideration From The CII Settlement Claim Parties

The Second Circuit has held that "[i]n bankruptcy cases, a court may enjoin a

creditor from suing a third party, provided the injunction plays an important part in the debtor's

reorganization plan." Sec. & Exch. Comm'n v. Drexel Burnham Lambert Group, Inc. (In re

Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992) (approving third party

---

[40]   Even if one were to view the equity distributions as a partial distribution on account of existing equity interests, such a deviation from the priority scheme would be justified because the foregoing Iridium factors weigh heavily in favor of approving the Settlement for the reasons set forth above.

releases as an important part of the plan where debtor personnel contributed more than a billion dollars to settlement fund). Although a specific test for determining importance to the reorganization plan has not been identified and the propriety of a release "is not a matter of factors and prongs," the Second Circuit has clarified the standard for approval of third party releases by requiring that such releases should be permitted "only in rare cases" and only where "truly unusual circumstances render the release terms important to success of the plan." <u>Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)</u>, 416 F.3d 136, 141-43 (2d Cir. 2005).[41]

Here, the importance of the Third Party Releases to the Plan is quite apparent. As noted above, the CII Settlement is the linchpin of the Debtors' Plan without which the Plan would fail. In consideration for entry into the CII Settlement, Mr. Allen required that the Third Party Releases be included in the Plan.[42] <u>See</u> <u>Greer v. Gaston & Snow (In re Gaston & Snow)</u>, No. 93-8517, 1996 U.S. Dist. LEXIS 17774, at * 14-15 (S.D.N.Y. Nov. 25, 1996) (citing <u>Drexel Burnham</u> and holding that injunction is properly issued in Second Circuit to induce parties related to debtor to agree to settlement). In consideration therefore, Mr. Allen agreed to, among other things, (i) a settlement of all claims that he and his related entities hold against the Debtors, including the $75 million accreting CCHC Note; (ii) forbearance from exercising exchange rights to allow the Debtors to take advantage of extremely valuable tax attributes and reinstate their senior debt facilities; (iii) a transfer of CII's 30% preferred equity interest in CC VIII to the

---

[41]    The Second Circuit noted nondebtor releases have been approved in four different types of circumstances, those where: (1) "the estate received substantial consideration," <u>Metromedia</u>, 416 F.3d at 141 (citing <u>Drexel</u>, 960 F.2d at 293), (2) "the enjoined claims were 'channeled' to a settlement fund rather than extinguished," <u>id.</u> (citing <u>MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 837 F.2d 89, 93-94 (2d Cir. 1988); <u>Menard-Sanford v. Mabey (In re A.H. Robins Co.)</u>, 880 F.2d 694, 701 (4th Cir. 1989)), (3) "the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution,'" <u>id.</u> (quoting <u>A.H. Robins</u>, <u>supra</u>), and (4) "the plan otherwise provided for the full payment of the enjoined claims," <u>id.</u> (quoting <u>A.H. Robins</u>, <u>supra</u>).

[42]    D/S at 97.

Reorganized Company; (iv) elimination of substantial obligations, including amounts due under a prior management agreement and a consulting agreement with an entity controlled by Mr. Allen; and (ii) relinquishment, for the benefit of the Debtors, of the CII Settlement Claim Parties' exclusive option to market and sell rights for carriage of up to eight digital channels..[43]

These contributions are not merely important to the Debtors' reorganization – they are the very cornerstone of the Debtors' Plan. In the absence of such Third Party Releases, the CII Settlement Claim Parties would not have reached the CII Settlement.[44] Without such commitments and compromises by the CII Settlement Claim Parties, the Plan would not be feasible and the substantial recoveries by the many parties in interest in these cases, including the fulcrum creditors and trade creditors, would fail to exist.[45] See Cartalemi v. Karta Corp. (In re Karta Corp.), 342 B.R. 45, 56 (S.D.N.Y. 2006) (finding releases "important" to plan where contributions to Plan were conditioned upon obtaining third party releases and plan would unravel absent such contributions).

Contrary to the assertions by the UST and the SEC in their objections to confirmation, the fact that all parties have not consented to the Third Party Releases is not fatal to the Third Party Releases. Consent is not required under Metromedia and its progeny. See Karta, 342 B.R. at 56 (binding non-consenting equity holders to non-debtor releases); XO

---

[43] The UST and the SEC argue in their objections to confirmation that the Third Party Releases should not be approved because not all of the Releasees are contributing funds to the estate. Their assertion is factually incorrect as it relates to the CII Settlement Claim Parties. As set forth above, the CII Settlement Claim Parties are providing and facilitating several billion dollars worth of consideration to the Debtors' estates. Moreover, even if they were not, the absence of consideration by certain of such parties would not be fatal to the Third Party Releases. See XO Commc'ns, 330 B.R. at 439-40 (holding that absence of consideration by certain releasees is not fatal to releases for breach of fiduciary duty where unique circumstances such as identity of interest exist). UST Objection at 12; SEC Objection at 3.

[44] Id.

[45] D/S at 28, 97.

Commc'ns, 330 B.R. at 440 (allowing non-consensual non-debtor releases concerning breach of fiduciary duty actions).[46]

**B.  Unique And Unusual Circumstances Justify Approval Of The Third Party Releases**

Particularly "unusual" and "unique" circumstances exist in this case to justify approval of such releases under the standards set forth in <u>Metromedia</u> and its progeny. <u>Karta</u>, 342 B.R. at 55 (financial contribution alone not enough to satisfy the <u>Metromedia</u> and <u>Drexel</u> standards for approving non-debtor releases).

**1.  The CII Settlement Parties' Agreement To Forbear From Exercising Exchange Rights To Facilitate Reorganization Is Unique**

Here, the CII Settlement Claim Parties have agreed to forbear with respect to certain exchange rights agreed to by the Debtors 10 years ago, ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████ instead cooperated with the Debtors and members of the Unofficial Crossover Committee in supporting the CII Settlement and the Plan. Specifically, they agreed to forbear from exercising their historic right and agreed to maintain the existing Holdco structure to facilitate the Debtors' preservation of approximately $2.85 billion of tax attributes (with resulting benefits expected by the Debtors of $1.14 billion)[47] and several hundred million annually in interest savings through reinstating the CCO Credit Facility and other senior debt. These facts are unprecedented.

---

[46]  <u>See</u> UST Objection at 13; SEC Objection at 8.

[47]  K&E Brief at 72.

2. **The Identity Of Interest Between The Debtors And The Debtor Releasees Is Unique, As Debtors' Indemnification Obligations May Affect Distributions To Creditors And Disturb Bankruptcy Code's Priority Scheme**

Equally compelling to a finding of particularly unusual circumstances is the identity of interest between the CII Settlement Claim Parties and the Debtors which exists by virtue of Mr. Allen's right to indemnification under the Indemnification Agreement between CCI and Mr. Allen, dated September 15, 2008. Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.), 330 B.R. 394 (Bankr. S.D.N.Y. 2005) (finding unique circumstances justifying third party releases of claims due to identity of interest between debtor and releasees arising from debtor's exposure to indemnification claims); Karta, 342 B.R. at 56 (same). Where parties released under non-debtor releases have the right to seek indemnity or contribution from the debtor, such potential indemnity or contribution weighs in favor of granting the releases because "the outcome of [any] dispute has the potential to alter the distribution of the debtor's estate to creditors." Hunnicutt Co. v. TJX Cos. (In re Ames Dep't Stores, Inc.), 190 B.R. 157, 160-61 (S.D.N.Y. 1995); see also In re Spiegel, Inc., No. 03-11540, 2006 WL 2577825 at *8 (Bankr. S.D.N.Y. Aug. 16, 2006) aff'd, 269 Fed. App'x 56 (2d. Cir. 2008) cert. denied, Stupakoff v. Otto (GmbH & Co. KG), 129 S.Ct. 146 (2008) ("[C]ontribution claims would . . . impact[] both the allocation of the [d]ebtors' property among creditors (including, potentially, directors and officers' insurance policy proceeds) and alter[] the [d]ebtors' liabilities.").

Not only do the Third Party Releases alleviate the Debtors from the potentially exorbitant expenses arising under their indemnification obligations, but such releases ensure that the priority scheme of the Bankruptcy Code will not be disturbed by elevating securities claims from subordinated status under Code section 510(b) to the status of general unsecured claims. Preserving the Bankruptcy Code priority scheme is a key consideration in approval of settlements under Rule 9019. Iridium, 478 F.3d at 464. As such, avoiding departure from the

Code's priority scheme by preventing such improper elevation of subordinated securities claims should weigh heavily in favor of approving the Third Party Releases.

### C. The Third Party Releases Are Binding On Non-Consenting Creditors And Equity Holders

Contrary to the arguments of certain objectors to confirmation, the parties bound by the Third Party Releases should not be limited to only those parties receiving consideration under the Plan.[48] The Second Circuit has refuted an argument that, in order to be bound by a non-debtor release, a party must have received "good and sufficient consideration," finding that "[s]uch consideration has weight in equity, but it is not required," and noting that the complaining creditors in Drexel did not receive any such consideration. Metromedia, 416 F.3d at 143 (citing Drexel, 960 F.2d at 289, 293); see also Spiegel, 2006 WL 2577825 at * 16. Thus, other than those parties expressly carved out in the Plan, the Third Party Releases should be binding on all Holders of Claim and Interests.

In light of the foregoing, the Third Party Releases are appropriate under Second Circuit precedent. The identity of interest arising from the Debtors' indemnification obligations in conjunction with the substantial contributions by the CII Settlement Claim Parties, the overwhelming approval of the releases by the fulcrum creditors, the crucial need for reinstatement of the senior debt light of current credit market conditions, and the importance of the releases to the CII Settlement and, in turn, the Plan, all support a finding of rare, unique and unusual circumstances which justify approval of the Third Party Releases.

---

[48] See UST Objection at 13; SEC Objection at 7; LDTC Objection at 100.

## CONCLUSION

WHEREFORE, Mr. Allen respectfully requests that the Court approve the CII

Settlement and the Releases when confirming the Plan and grant such other and further relief as

is just and proper.

Respectfully submitted,

Dated: New York, New York
July 17, 2009

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Robert E. Zimet
Robert E. Zimet
Jay M. Goffman
Susan L. Saltzstein
Jeremy A. Berman
Four Times Square
New York, New York 10036
(212) 735-3000

By: /s/ Kurt Ramlo
Kurt Ramlo
300 South Grand Avenue
Los Angeles, California 90071
(213) 687-5000
*Attorneys for Paul G. Allen*