Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street NW
Washington, D.C. 20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Counsel to the Debtors and Debtors in Possession (except Charter Investment, Inc.)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., et al., <br> Debtors. | Case No. 09-11435 (JMP) <br> Jointly Administered |
| JPMORGAN CHASE BANK, N.A., <br> as Administrative Agent, <br> Plaintiff, <br> -against- <br> CHARTER COMMUNICATIONS <br> OPERATING, LLC and CCO HOLDINGS, LLC, <br> Defendants. | Adversary Proceeding <br> Case No. 09-01132 (JMP) |

**DEBTORS' TRIAL BRIEF ON REINSTATEMENT**
**IN SUPPORT OF PLAN CONFIRMATION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .............................................................................................................1

ARGUMENT: Reinstatement Is Proper Because There Has Been No Non-Curable
Default Under The Relevant Credit Agreements............................................................................8

I. The DHCs Were Able To Pay Their Debts As They Became Due. ..................................9

    A. Section 8(g)(v) Does Not Impose A Prospective Requirement That
       DHCs Be Able To Pay Debts As They Would Become Due. ............................10

    B. The DHCs Were Not Unable To Pay Their Debts As They Became
       Due Because Of Any Lack Of Surplus. ..............................................................19

         1. CCH I Had Adequate Surplus........................................................21

         2. Charter's Calculation Of Surplus Was Reasonable. ......................26

         3. Even If Charter Lacked Surplus, The DHCs Would Have
            Been Able To Pay Their Debts As They Became Due.................29

II. There Has Been No Change Of Control And Plan Confirmation Will Not
    Cause A Change of Control. .........................................................................................31

    A. The Paul Allen Group's Voting Stake In CCI Is Sufficient To
       Prevent A Change-Of-Control Default. ..............................................................33

    B. No Person Or § 13(d) "Group" Will Have Voting Power Greater
       Than Or Equal To The Voting Power Of The Paul Allen Group. ......................35

    C. Under CCI's Certificate Of Incorporation There Can Be No Change
       Of Control So Long As The Paul Allen Group Retains At Least 35%
       Voting Power. .....................................................................................................44

III. There Is No Cross-Acceleration Of CCO's Debt Merely Because CCO Is A
    Solvent Debtor. .............................................................................................................45

CONCLUSION...............................................................................................................................51

## TABLE OF AUTHORITIES

**Cases**

*British Printing & Comm. Corp. v. Harcourt Brace Jovanovich, Inc.,*
  664 F. Supp. 1519 (S.D.N.Y. 1987)............................................................................. 27, 28

*Butner v. U.S.,*
  440 U.S. 48 (1979)............................................................................................................. 2

*Cinicola v. Scharffenberger,*
  248 F.3d 110 (3d Cir. 2001)............................................................................................... 2

*Duggan v. Sansberry,*
  327 U.S. 499 (1946).......................................................................................................... 50

*Filmvideo Releasing Corporation v. Hastings,*
  446 F. Supp. 725,
  *aff'd* 594 F.2d 852 (2d Cir. 1978)................................................................................... 16

*Galli v. Metz,*
  973 F.2d 145 (2d Cir. 1992)............................................................................................. 13

*Gerlach v. The Horn & Hardart Co.,*
  683 F.Supp. 342 (S.D.N.Y. 1988)................................................................................... 13

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
  286 F.3d 613 (2d Cir. 2002)............................................................................................. 38

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
  Case No. 00 CV 1115 (LAK) (S.D.N.Y. Feb. 23, 2001)...................................... 38, 39, 40

*Hubco, Inc. v. Rappaport,*
  628 F. Supp. 345 (D.N.J. 1985)....................................................................................... 38

*In re C.A.F. Bindery, Inc.,*
  199 B.R. 828 (Bankr. S.D.N.Y. 1996).............................................................................. 46

*In re Charter Communications,*
  No. 09-11435 (Bankr. S.D.N.Y. July 7, 2009) ...................................................... 2, 30, 49

*In re Chicago, Milwaukee, St. Paul & Pac. RR Co.,*
  791 F.2d 524 (7th Cir. 1986) ........................................................................................... 48

*In re East Hampton Sand & Gravel Co.,*
  25 B.R. 193 (Bankr. E.D.N.Y. 1982)............................................................................... 46

ii

*In re Enron Corp.*,
   306 B.R. 465 (Bankr. S.D.N.Y. 2004) .............................................................................. 46

*In re Forest Hills Assocs.*,
   40 B.R. 410 (Bankr. S.D.N.Y. 1984) ............................................................................... 8, 9

*In re Gencarelli*,
   501 F.3d 1 (1st Cir. 2007) ................................................................................................. 48

*In re Gillette Assocs., Ltd.*,
   101 B.R. 866 (Bankr. N.D. Ohio 19890 ............................................................................. 9

*In re Kizzac Mgmt. Corp.*,
   44 B.R. 496 (Bankr. S.D.N.Y. 1984) ................................................................... 1, 7, 8, 48

*In re Kopel*,
   232 B.R. 57 (Bankr. E.D.N.Y. 1999) .......................................................................... 46, 49

*In re Madison Hotel Assocs.*,
   749 F.2d 410 (7th Cir. 1984) .............................................................................. 1, 7, 8, 46

*In re Manville Forest Prods. Corp.*,
   43 B.R. 293 (Bankr. S.D.N.Y. 1984) ................................................................... 47, 48, 49

*In re Mirant Corp.*,
   2005 Bankr. LEXIS 909 (Bankr. N.D.Tex. 2005) ......................................................... 7, 47

*In re NextWave Personal Communications Inc.*,
   244 B.R. 253 (Bankr. S.D.N.Y. 2000) ................................................................................. 1

*In re REPH Acquisition Co.*,
   134 B.R. 194 (N.D. Tex. 1991) .......................................................................................... 40

*In re SGL Carbon Corp.*,
   200 F.3d 154 (3d Cir. 1999) .......................................................................................... 7, 49

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982) ........................................................................................... 8, 48

*In re TS Indus., Inc.*,
   117 B.R. 682 (Bankr. D. Utah 1990) ................................................................................ 40

*In re U.I.P. Engineered Prods. Corp.*,
   831 F.2d 54 (4th Cir. 1987) ...................................................................................... 7, 49, 50

*In re Vermont Elec. Gen. & Trans. Coop.*,
   240 B.R. 476 (Bankr. D. Vt. 1999) ..................................................................................... 2

*Klang v. Smith's Food & Drug Ctrs., Inc.*,
    702 A.2d 150 (Del. 1997) ........................................................................................ 3, 27

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005)........................................................................................ 12

*Levner v. Prince Alwaleed*,
    61 F.3d 8 (2d Cir. 1995)............................................................................................. 45

*Levy v. Southbrook Int'l Investments, Ltd.*,
    263 F.3d 10 (2d Cir. 2001).......................................................................................... 45

*Litzler v. CC Invs., L.D.C.*,
    411 F. Supp. 2d 411 (S.D.N.Y. 2006).................................................................. 38, 39, 40

*Miller v. American Tel. & Tel. Co.*,
    507 F.2d 759 (3d Cir. 1974)........................................................................................ 29

*Morales v. Quintel Entertainment, Inc.*,
    249 F.3d 115 (2d Cir. 2001)........................................................................................ 37

*Morris v. Standard Gas & Elec. Co.*,
    63 A.2d 577 (Del. Ch. 1949)............................................................................. 27, 28, 29

*PaineWebber, Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996)........................................................................................ 12

*Providence & Worcester Co. v. Baker*,
    378 A.2d 121 (Del. 1977) ...................................................................................... 44, 45

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959)........................................................................................ 48

*Sagusa, Inc. v. Magellan Petro. Corp.*,
    1993 WL 512487 (Del. Ch. Dec. 1, 1993),
    *aff'd*, 650 A.2d 1306 (Del. 1994)................................................................................. 44

*Schaffer ex rel. Lasersight, Inc. v. CC Inv. LDC*,
    2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ............................................................. 39

*Summit Inv. & Dev. Corp. v. Leroux*,
    69 F.3d 608 (1st Cir.1995).......................................................................................... 46

*Tele-Pac, Inc. v. Grainger*,
    168 A.D.2d 11 (N.Y. 1991) ........................................................................................ 16

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)........................................................................................ 29

iv

*Weinberger v. UOP, Inc.*,
    457 A.2d 701 (Del. 1983) ............................................................................................... 28

*Williams v. Geier*,
    1987 WL 11285 (Del. Ch. May 20, 1987),
    *aff'd*, 671 A.2d 1368 (Del. 1996)..................................................................................... 45

**Statutes**

11 U.S.C. § 1102........................................................................................................... 6, 40

11 U.S.C. § 1124....................................................................................................... 1, 8, 48

11 U.S.C. § 1124(2).................................................................................................... 7, 8, 46

11 U.S.C. § 1124(d)........................................................................................................... 30

11 U.S.C. § 365(e)............................................................................................................. 46

11 U.S.C. § 365(e)(1)................................................................................................ 7, 46, 47

**Other Authorities**

17 C.F.R. § 240.13d-5.................................................................................................. 32, 37

*Great Southwest Overseas Fin. Corp. N.V.*, March 16, 1972
    SEC No Action Letter, *available at* 1972 SEC No-Act. LEXIS 1486. ........................... 41

S. Rep. 95-589 (1978),
    *reprinted in* 1978 U.S.C.C.A.N. 5787, 5906 ................................................................ 1, 9

## PRELIMINARY STATEMENT

The Court should approve reinstatement. The Bankruptcy Code provides debtors with a safe harbor in stormy economic times such as these, in which credit is less readily available and long-term corporate borrowing rates have become substantially less favorable. For companies such as Charter, the "'intervention of bankruptcy ... represent[s] a temporary crisis which the plan of reorganization is intended to clear away.'" *In re NextWave Personal Communications Inc.*, 244 B.R. 253, 268 (Bankr. S.D.N.Y. 2000) (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 120, *reprinted in* 1978 U.S.C.C.A.N 5787, 5906). The Bankruptcy Code prevents unaffected creditors from taking advantage of this "temporary crisis" to the detriment of the company and other creditors. Thus, one of the tools Congress provided debtors seeking to restructure was the right, under 11 U.S.C. § 1124, to "cure the default of an accelerated loan and reinstate the original terms of the loan agreement, without impairing the creditor's claim." *In re Madison Hotel Assocs.*, 749 F.2d 410, 420 (7th Cir. 1984). Such a creditor "receives the complete benefit of its original bargain with the debtor" and is "'not impaired' for purposes of Chapter 11 analysis." *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984).

In this case, after extensive negotiations, Charter reached consensus with noteholders on the Unofficial Cross-Over Committee and the company's primary stockholder on the terms of a prearranged plan of reorganization ("Plan") that will strengthen the company's balance sheet by reducing the debt of Charter's holding companies and obtaining a substantial equity investment. It is undisputed that the Plan would allow Charter to emerge from Chapter 11 as a stronger, more financially sound company. One important component of the Plan is the reinstatement of the senior debt instruments (which have approximately $11.8 billion funded) pursuant to § 1124. The evidence will show that Charter is entitled to reinstate that debt.

Nonetheless, some of those senior creditors have filed objections (for simplicity, the objecting senior creditors will be referred to hereinafter as "JPMorgan"), seeking to block reinstatement and obtain better economics on their debt instruments. Yet, JPMorgan concedes that they were "paid everything that [they] were due" under the Credit Agreement. 5/5/09 Hearing Tr. at 47 (Ex. A). "It is undisputed that, notwithstanding the alleged technical defaults under § 8(g)(v), at all relevant times the Debtors were current on their monetary obligations under the Credit Agreement." *In re Charter Communications*, No. 09-11435, slip op. at 5 (Bankr. S.D.N.Y. July 7, 2009).

Instead, the ostensible basis for JPMorgan's objection is that various purported technical defaults, which allegedly cannot be cured, preclude reinstatement, including:

- that Charter's Designated Holding Companies ("DHCs") could not pay their debts as they became due;
- that there has been, or will be, a change of control;
- that CCO's debt has been cross-accelerated based on the decision to seek bankruptcy for the entire Charter enterprise because CCO is solvent.

In fact, discovery has confirmed that JPMorgan's reinstatement objections are a thinly-veiled effort to extract a better deal for themselves than those entered over the past two years, by increasing Charter's interest expense by hundreds of millions of dollars. *See, e.g.*, Richards Dep. Tr. at 120 (Ex. B). The Bankruptcy Code does not contemplate such an improper windfall at the expense of the estates and their other creditors. *See, e.g.*, *Butner v. U.S.*, 440 U.S. 48, 55 (1979); *Cinicola v. Scharffenberger*, 248 F.3d 110, 210 n.10 (3d Cir. 2001) ("It is not intended, however, that any non-debtor party should acquire greater rights in a case under the act than he has outside the act."); *In re Vermont Elec. Gen. & Trans. Coop.*, 240 B.R. 476, 486 (Bankr. D. Vt. 1999). Reinstatement exists precisely to prevent JPMorgan from leveraging its position and transforming its secured claims into super-secured, value-draining claims. As set forth below,

2

there are no non-curable defaults that preclude reinstatement, and the Court should confirm Charter's Plan.

*First*, the DHCs were able to pay their debts as they became due. As such, there has been no default under Section 8(g)(v) of JPMorgan's 2007 Credit Agreement. As fully addressed in the pending motion to dismiss JPMorgan's adversary proceeding, Section 8(g)(v) is not inherently "forward-looking," as JPMorgan would have it, but instead addresses the *ability* of the debtor to pay its debts on a date certain—the day they become due—not some amorphous, undefined date in the future. Indeed, under JPMorgan's reading, Charter would have been in default on day one of the agreement because none of the DHCs had any sustainable ability to pay their debts absent a transfer of funds from CCO, which could not occur more than 15 business days before the debt was due. Yet JPMorgan never asserted a default until its opportunistic bid to block reinstatement. If the Court agrees that Section 8(g)(v) is not "forward-looking," there is no further analysis required, because it is undisputed that the DHCs paid their debts as they became due.

Nor were the DHCs unable to pay their debts as they became due because of any lack of "surplus." To be sure, in many instances funds were upstreamed from CCO to the DHCs through dividends for the DHCs to make their interest payments, and, as a matter of Delaware law, a company is supposed to have adequate surplus before paying such dividends. But that poses no obstacle to reinstatement. As an initial matter, the evidence will show that there was, in fact, ample surplus to support the payment of dividends in November 2008. Moreover, to the extent that it is disputed, under Delaware law, courts may not second-guess the directors' reasonable judgment in determining surplus, absent a claim of fraud or bad faith. *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150 (Del. 1997). Here the directors exercised

reasonable judgment. In any event, even if the directors were erroneous in their determination that a dividend could be paid, the DHCs would still have been "able" to pay their debts as they became due, because funds could have been provided through, among other means, repayment of an inter-company note or payables. Indeed, JPMorgan alleges no harm from its asserted non-monetary default. A technical violation of Delaware law on surplus is not itself a default under the credit agreement and, thus, there has been no default for inability to pay debts as they become due.

*Second*, there is no change of control that would constitute a default under the relevant credit agreements so as to preclude reinstatement. JPMorgan has suggested there is a change of control under Sections 8(k)(i) and 8(k)(ii) of the Credit Agreement. Under Section 8(k)(i), JPMorgan asserts that confirmation of the plan will result in an event of default either because the Paul Allen Group lacks a sufficient equity interest or because its voting stake in reorganized Charter is insufficient to ensure its continued 35% voting power over CCO. The plain language of the Credit Agreement however speaks not to whether the Paul Allen Group retains a certain equity interest but rather whether the Paul Allen Group has the requisite voting power. Indeed, the issue of the Paul Allen Group's equity ownership is absent from the Credit Agreement and hence is irrelevant to the change of control inquiry. Consistent with section 8(k)(i) of the Credit Agreement, the Paul Allen Group will own at least 35% of the voting power of all of the outstanding capital stock in CCI upon confirmation of the plan and will have the right to appoint four of the eleven directors of CCI's board of directors. Furthermore, as a consequence of its stock ownership of reorganized CCI, the Paul Allen Group will also control at least 35% of the voting power of the management of CCO. CCO is a limited liability company whose sole manager is CCI. Consequently, the Paul Allen Group's ability to appoint in excess of 35% of the

4

directors of CCI results in the "power . . . to vote or direct the voting of Equity Interests having at least 35% . . . of the ordinary voting power for the management of [CCO]."

The plain terms of the Credit Agreement are consistent with this result. Section 8(k)(iv) requires CCO to remain a direct wholly-owned subsidiary of CCO Holdings, LLC ("CCOH"). The Paul Allen Group could not directly own 35% of the voting control of CCO, or indeed any equity interest in CCO, because section 8(k) of the Credit Agreement requires that the Paul Allen Group's ownership interest be indirectly held through a higher-tier entity. CCO has long been managed by CCI, and does not have its own board. Thus, given the requirements of the Credit Agreement, JPMorgan cannot be heard to complain when it is getting precisely what it bargained for in the Credit Agreement.

Moreover, in accordance with section 8(k)(ii) of the Credit Agreement, no person or § 13(d) "group" will have voting power greater than the Paul Allen Group upon "the consummation of any transaction"—here measured at the time that the plan is confirmed and becomes effective. *See* Credit Agreement § 8(k)(ii) (Ex. C). At present, the Paul Allen Group has 91% voting power over CCI and thus CCO (which is directly governed by CCI pursuant to a management agreement). That will not change until this Court approves Charter's Plan. Because confirmation is not some mere contingency, but involves a wholly independent judicial act, the noteholders will have no beneficial entitlement to equity until consummation of a Plan. At that point, the Paul Allen Group will still retain at least 35% voting control over CCI (and with it, CCO), and no other "person" or "group," as those terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, will have equal or greater voting power.

To be sure, upon confirmation and the effective date, the aggregate of voting power in the hands of various individual noteholders may exceed 35%, but that is of no effect because

5

JPMorgan cannot prove that those noteholders will constitute a § 13(d) group upon consummation of the Plan—i.e., the effective date. The noteholders' alleged status as a § 13(d) group at present is irrelevant under the plain terms of the Credit Agreement, and, in any event, no such group exists. Charter has worked closely with the noteholders in order to facilitate a prepackaged bankruptcy proceeding. But it was Charter who organized the noteholders for purposes of achieving restructuring. The noteholders did not organize themselves into a "group *for the purpose of acquiring, holding, or disposing of securities*." Securities Exchange Act § 13(d)(3) (emphasis added). To the extent any of the noteholders function as a group, it is for the different purpose of advancing the interests of their creditor class—a function recognized by, indeed encouraged by, the Bankruptcy Code, and which reaches far short of resulting in a § 13(d) group. *See, e.g.*, 11 U.S.C. § 1102. Even if the noteholders could be considered a § 13(d) "group" during these bankruptcy proceedings, the evidence will show that the holders have no agreement to function as a § 13(d) "group" following consummation of the Plan. Until a Plan is confirmed and becomes effective, it is indisputable that no entity holds 35% or more voting power in CCI, other than the Paul Allen Group. And even post-confirmation, there would be no § 13(d) "group" with a fully diluted voting share greater than or equal to that of the Paul Allen Group.

In any event, were any "person" or § 13(d) "group" to purport to obtain more than 35% voting power in Charter, the scaled voting provision in CCI's certificate of incorporation would operate to reduce that person or group's voting power to less than 35%. CCI Cert. of Inc. Art. IV(b)(i)(A)(1). Thus, there can be no change of control, as that term is defined in the relevant debt instruments, so long as the Paul Allen Group retains at least 35% voting power, as it unquestionably does and will continue to following confirmation.

6

*Third*, there is no cross-acceleration of CCO's debt due to Charter's decision to seek Chapter 11 protection for the entire corporate enterprise. Such a default is an *ipso facto* default because it is linked to the "financial condition of the debtor." 11 U.S.C. § 365(e)(1); *see also Madison Hotel*, 749 F.2d at 420; *Kizzac*, 44 B.R. at 421; *In re Mirant Corp.*, 2005 Bankr. LEXIS 909, *28 n.27 (Bankr. N.D.Tex. 2005). In this case, JPMorgan has specifically alleged that the financial condition of CCO and Charter's other affiliates is intertwined. *See* Compl. ¶ 5. Thus, a default arising from the decision to seek bankruptcy for one of Charter's affiliates is an *ipso facto* default. It makes no difference that CCO itself is solvent. Even solvent debtors are entitled to bankruptcy protection when faced with financial distress. *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d Cir. 1999). Moreover, it was "clearly Congress' intention to allow a parent and its subsidiaries 'to be reorganized in a single proceeding, thereby effectuating its general policy that the entire administration of an estate should be centralized in a single reorganization court." *In re U.I.P. Engineered Prods. Corp.*, 831 F.2d 54, 56 (4th Cir. 1987). In sum, regardless of the debtor's solvency, there is "no doubt that section 1124(2) embodies Congress' intent to allow the Chapter 11 debtor to cure the default of an accelerated loan and reinstate the original terms of the loan agreement, without impairing the creditors' claim." *Madison Hotel*, 749 F.2d at 420.

To the extent JPMorgan believes that CCO should not be in bankruptcy, its remedy is not to have the Court ignore the Bankruptcy Code and enforce *ipso facto* defaults, but to seek to dissolve these proceedings. No court has ever suggested that a solvent debtor is less forgiven of *ipso facto* defaults than an insolvent debtor. Fundamentally, JPMorgan has not alleged a bad faith bankruptcy filing and there is no serious claim that CCO is not properly before this Court.

As such, the alleged *ipso facto* defaults are no obstacle to reinstatement and, thus, Charter's Plan should be confirmed.

## ARGUMENT:
### Reinstatement Is Proper Because There Has Been No Non-Curable Default Under The Relevant Credit Agreements.

Section 1124 permits a party to cure and reinstate when the creditor otherwise receives "the complete benefit of its original bargain with the debtor." *Kizzac*, 44 B.R. at 501; *see generally* Debtors' Memorandum on Reinstatement in Support of Approval of Disclosure Statement (filed Mar. 27, 2009). Section 1124 undoubtedly applies to credit agreements and other financial instruments. Because, "[f]requently, interest rates on long-term loans are substantially less than the current market rate," section 1124 "promotes the economic efficiency of reorganization by allowing the chapter 11 debtor to reinstate the original terms of an accelerated long-term loan at this lower interest rate." *Madison Hotel*, 749 F.2d at 420-21. Thus it is "clear that Code section 1124(2) provides the debtor in distress with the statutory tools necessary to effect a total healing of the scars of contractual default, by placing the parties into the same position they were in immediately before the default occurred." *In re Forest Hills Assocs.*, 40 B.R. 410 (Bankr. S.D.N.Y. 1984). That "healing" is accomplished by curing any defaults, other than *ipso facto* defaults, which need not be cured. "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions.... This is the concept of 'cure' used throughout the Bankruptcy Code." *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982).

Before these Chapter 11 cases were filed, it is undisputed that Charter complied with its payment obligations under the credit facilities. The evidence will show that it never missed a payment and that it timely complied with its other obligations. Moreover, Charter's Plan will cure non-*ipso facto* defaults associated with bankruptcy, if any. In short, before filing its

8

petition, Charter had not defaulted under any of the debt instruments it is seeking to reinstate, and JPMorgan will be put in the same position it would have been in had Charter not entered bankruptcy. Thus, they are "rightfully categorized as unimpaired" and their debts may be reinstated because they will be "given the full benefit of [their] original bargain." *Forest Hills*, 40 B.R. 410; *see also In re Gillette Assocs., Ltd.*, 101 B.R. 866, 875 (Bankr. N.D. Ohio 1989). "The holder of a claim or interest who under the plan is restored to his original position, when others receive less or nothing at all, is fortunate indeed, and has no cause to complain." S. Rep. 95-589, at 120 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5906.

Here, the only events of default that have occurred are under certain *ipso facto* provisions as a result of Charter's filing for Chapter 11 protection. Nonetheless, JPMorgan asserts two highly technical events of default under the credit facilities—even though they assert no economic harm from these alleged technical defaults—and claim that, in this case, defaults under an *ipso facto* clause should preclude reinstatement merely because CCO is solvent. Each argument is without merit. Because there are no impediments to reinstatement the Court should confirm Charter's Plan.

**I.    The DHCs Were Able To Pay Their Debts As They Became Due.**

JPMorgan's argument that the DHCs were not "able" to pay their debts as they became due—despite the fact that they *actually paid their debts*, and despite the fact that the creditors were not economically harmed by the alleged default—is largely predicated on an untenable reading of Section 8(g)(v) of the 2007 Credit Agreement. As detailed in the motion to dismiss JPMorgan's adversary complaint, it is only Charter's interpretation of that provision that gives each clause of Section 8(g)(v) meaning; is consistent with the other terms of the Credit Agreement; and is consistent with JPMorgan's own course of conduct. Recognizing the weakness of its position, JPMorgan further asserts that, regardless of how interpreted, there was

9

a default under the Credit Agreement because Charter lacked sufficient surplus to make the dividend payments that were issued in November 2008. Thus, the DHCs were not "able"—so they argue—to make their interest payments, even though they, in fact made them. However, the evidence will show that there was sufficient surplus and that, regardless of the Monday-morning quarterbacking JPMorgan would engage in, Charter's directors exercised reasonable business judgment in declaring a dividend. Absent a credible allegation of fraud or bad faith, that should be the end of the matter. But, regardless of whether there was sufficient surplus to issue a dividend, the DHCs would have been able to make their November and January interest payments without the use of surplus.

A.   **Section 8(g)(v) Does Not Impose A Prospective Requirement That DHCs Be Able To Pay Debts As They Would Become Due.**

The crux of JPMorgan's argument that there has been an event of default under the Credit Agreement is that the DHCs lacked sufficient funds on hand to pay their debts "as they *would* become due" at some unspecified point in the future. Compl. ¶¶ 12, 43-45, 90, 92. That future-oriented, "prospective" interpretation of the credit agreement is inconsistent with the plain language of the agreement, inconsistent with JPMorgan's own actions, inconsistent with JPMorgan's witnesses' testimony, and simply untenable.[1] At various points in this proceeding, JPMorgan has asserted—without any case citation whatsoever—that "caselaw makes plain that an entity is 'unable to … pay its debts as they become due' where it is reasonably certain that it will not be able to pay its debt [sic] as they become due in the near future." MTD Opp. 26. Yet,

---

[1]   Ironically, after inserting the word "would" into the language of Section 8(g)(v) more than ten times in the Complaint, *see* Compl. ¶¶ 12, 42-45, 48, 57, 59, 81, 90, 92, JPMorgan not only failed to defend it, but actually objected to questions of its witnesses using the same formulation. *See* Hooker Dep. Tr. at 193 (Ex. E) ("I object to the form of the question. You keep putting 'would' in there, suggesting different language than what's actually in the contract.") (quoting counsel for JPMorgan).

Section 8(g)(v) says not a single word about being "reasonably certain" to be able to pay debts in the "near term," just as it does not require DHCs to be able to pay debts "as they *would* become due." It simply provides for a default if a DHC is unable to pay its debts on the day "they become due." JPMorgan's undefined future-oriented approach to any ability to pay leaves the parties and the Court with no certainty as to when an event of default has occurred. Tellingly, JPMorgan concedes that Section 8(g)(v) does not contain any particular time frame. *See* Kurinskas Dep. Tr. at 45 (Ex. F) █████████████████████████ ███████████████████████ Hooker Dep. Tr. at 187-88 (Ex. E) █████████████████ ████████████████████████████████████████████████████████

████████████████████████ And JPMorgan agrees that DHCs need not "have enough money sitting around to pay every debt that will ever mature," MTD Opp. 26, but at the same time argues that a DHC must have a "reasonable way" to pay debts "due in the near term" (as opposed to just on the day "they become due," as provided in Section 8(g)(v)). JPMorgan provides no metric for determining what is the "near term," and, of course, none is to be found in the Credit Agreement or the caselaw. Even the various banks objecting to confirmation cannot agree amongst themselves as to how far into the future such a prospective obligation should extend. *See, e.g.*, Quintana Dep. Tr. at 89 (Ex. G) ██████████████████████ ████████████████████████ Morris Dep. Tr. at 22 (Ex. H) ████████████ Zagar Dep. Tr. at 114 ██████████████████████████████Kurinskas Dep. Tr. at 44 (Ex. F) ████████████Federman Dep. Tr. at 209 (Ex. J) ██████████ This is no way to read a contract—particularly one that is 68 pages long and was negotiated between sophisticated parties. Unless the debt has come due and the debtor is unable to pay it, parties will be

embroiled in needless speculation about whether the debtor may or may not be able to pay future debts.

As explained in the motion to dismiss, Section 8(g)(v) provides three related, but distinct, events of default: if "any Designated Holding Company, the Borrower or any of its Subsidiaries [1] shall generally not, or [2] shall be unable to, or [3] shall admit in writing its inability to, pay its debts as they become due." Credit Agreement § 8(g)(v) (Ex. C). Properly interpreted, this provision provides for defaults if a DHC is (1) unreliable in paying debts generally as they become due, (2) actually unable to pay its debts when they become due, or (3) unequivocally going to be unable to pay debts and admits so in writing. As such, there has been no default because no DHC was generally unreliable in paying its debts, was actually unable to pay, or unequivocally declared an inability to pay. JPMorgan's reading of 8(g)(v) would render the third clause superfluous. Under its construction, there could never be a default based on a DHC "admit[ting] in writing" that it is unable to pay its debts as they become due, because that future inability to pay would itself be a default under the second clause. The default would have occurred before the DHC could put pen to paper. As JPMorgan concedes, an interpretation that renders one of 8(g)(v)'s clauses meaningless is impermissible. *See* MTD Opp. 23 (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)).

Moreover, under JPMorgan's circular reading of Section 8(g)(v), DHC defaults become a self-fulfilling prophesy that Charter is helpless to avoid, Section 7.6 notwithstanding. If, at any moment in time, a DHC did not have sufficient funds on hand to pay debts becoming due in the "near term" (whatever that means, *see* Part III.B, *supra*), there would be a default under 8(g)(v) according to JPMorgan. Such a default would thus preclude CCO from moving funds to a DHC.

12

*See* Credit Agreement § 7.6(b)(i) (Ex. C). And the DHC, in turn, would not be able to pay its debts when they actually became due. Yet, the whole point of Section 7.6 was to permit the movement of funds to the DHCs (whether by distribution or note prepayment, *see* Credit Agreement § 7.8 (Ex. C)), to pay their debts as they became due. If CCO is already in default under Section 8(g)(v) of the Credit Agreement whenever a DHC does not have sufficient funds on hand to meet a forthcoming debt obligation, then Section 7.6 is meaningless, because CCO will never be able to move funds to the DHC for it to pay that debt. A court must "arrive at a construction" that gives "fair meaning to all of the language employed by the parties." *Gerlach v. The Horn & Hardart Co.*, 683 F.Supp. 342, 344 (S.D.N.Y. 1988). Because JPMorgan's interpretation of 8(g)(v) would essentially render Section 7.6 "superfluous or meaningless," it is untenable. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

JPMorgan's construction is also inconsistent with Section 4.21, because it would effectively impose solvency obligations on the DHCs that the parties did not contemplate. JPMorgan admits that the 2007 Credit Agreement does not have any solvency requirement for the DHCs. *See* Hooker Dep. Tr. at 214 (Ex. E); Kurinskas Dep. Tr. at 38 (Ex. F). The parties specifically negotiated about whether to include such a requirement in a separate 2008 purchase agreement. *See* Hooker Dep. Tr. at 74-76 (Ex E); *see also* CX109 (Ex. K). Thus, the parties knew how to negotiate a forward-looking solvency requirement of the type that JPMorgan now seeks to bootstrap on to Section 8(g)(v), and excluded the DHCs from such a requirement in the Credit Agreement. See Section 4.21.

Likewise, in the 2006 credit agreement the parties included an explicitly prospective "accordion" term that required DHC debts be defeased—*i.e.*, that the company have the money on hand to pay—no later than three months before debt was due. *See* 2006 Credit Agreement

(CX 149), Section 8(m) (Ex. L) ("DHC debt and/or indebtedness of the borrower or any of its subsidiaries (excluding any such debt that has been defeased in accordance with its terms and debt under this agreement) in an aggregate amount in excess of $500 million shall remain outstanding on the date that is three months prior to the stated maturity of such indebtedness."); *see also* Kurinskas Dep. Tr. at 114-15 (Ex. F). That provision was in addition to Section 8(g)(v), and would have been rendered superfluous under JPMorgan's interpretation. Moreover, the parties intentionally removed that provision in negotiating the 2007 Credit Agreement at issue. *See* Hooker Dep. Tr. at 61-63 (Ex. E); Kurinskas Dep. Tr. at 115 (Ex. F); CX105 (Ex. M). In sum, the parties could have provided for a default if a DHC "shall fail to have sufficient funds on hand to pay all of its debts coming due within a given 3-month period," or "18-month period." They did not. To the contrary, the Credit Agreement only allows CCO to transfer funds to the DHCs to make debt payments 15 business days before the debt is due; and thus, as a practical matter, a DHC would never be able to pay its debts more than 15 business days before they become due. Credit Agreement § 7.6(b)(iii) (Ex. C). JPMorgan has no answer to this limitation, instead stubbornly arguing that ability to pay debts as they become due requires sufficient assets on hand to pay the next *eighteen months* worth of debts. *See* 5/5/2009 Hearing Tr. at 52-54 (Ex. A) (arguing "there's an eighteen-month forward looking period for purposes of determining ability to pay debts when they become due").

Finally, JPMorgan's construction is inconsistent with its own course of conduct and its interpretation of defaults under the Credit Agreement prior to this proceeding. JPMorgan's post-hoc interpretation of 8(g)(v) is nothing more than a litigating position—not the view that the company had in conducting business with Charter. Indeed, JPMorgan did not issue a notice of default until *after the banks knew that there would be litigation over the issue of reinstatement.*

14

*See* CX156 (Ex. N); Kurinskas Dep. Tr. at 211-15 (Ex. F). JPMorgan's assertion of default is clearly a strategic maneuver calculated to preemptively and defensively thwart reinstatement and to create added leverage in opposing confirmation. ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *See* Kurinskas Dep. Tr. at 52 (Ex. F); Hooker Dep. Tr. at 189 (Ex. E). ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮ *See* Kurinskas Dep. Tr. at 53 (Ex. F). ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Hooker Dep. Tr. at 192 (Ex. E). ▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Kurinskas Dep. Tr. at 47-48 (Ex. F). ▮▮▮▮▮

▮▮▮▮▮▮▮

▮▮▮▮▮ despite the frequency with which clauses similar to Section 8(g)(v) are included in credit agreements. *See id.* at 49, 133-34. The same is true of the other banks asserting a default. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮ *See* Zagar Dep. Tr. at 153-54 (Ex. I). ▮▮▮▮

▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *See* Federman Dep. Tr. at 114-15 (Ex. J).

The evidence further shows a course of conduct between the parties that demonstrates they both understood Section 8(g)(v)'s second clause to apply only when a DHC was unable to

pay debts on the date they become due, and not that a DHC must be able, at all times, to pay some future debts at a future time uncertain.[2] For example:

- As counsel for JPMorgan conceded, "everyone understood all along that the DHCs were holding companies that by and large didn't have a lot of cash or liquid assets on hand. They depended upon the ability to upstream money through the corporate structure in order to make their interest and [principal] payments. That was well understood, and that's undisputed." 5/5/2009 Hearing Tr. at 47 (Ex. A); *see also* Compl. ¶ 33.

- Charter disclosed in November 2007 that "cash flows from operating activities and amounts available under the Company's credit facilities may not be sufficient to ... satisfy its interest and principal repayment obligations in 2009, and will not be sufficient to fund such needs in 2010 and beyond." Charter Communications, Inc., Quarterly Report (Form 10-Q), at 8 (Nov. 8, 2007) (Ex. O).

- Charter disclosed in February 2008 that it would have insufficient funds to meet its cash needs after the second or third quarter of 2009 and that there could "be no assurance that [the DHCs] will not become insolvent or will be permitted to make distributions in the future ... in amounts needed to service our indebtedness." Charter Communications, Inc., Annual Report (Form 10-K), at 22-23 (Feb. 27, 2008) (Ex. P).

- Charter disclosed in May 2008 that "credit facilities will not be sufficient to fund projected cash needs in 2010 ... and thereafter." Charter Communications, Inc., Quarterly Report (Form 10-Q), at 8, 24 (May 12, 2008) (Ex. Q). "No assurances can be given that the Company will not experience liquidity problems ..." *Id.*

- Thereafter, in October and November 2008, JPMorgan lent $750 million to Charter under the Credit Agreement. *See* Compl. ¶ 41.

- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ruyter Dep. Tr. at 147-51.

- On November 10, 2008, five days after Charter's third quarter 10Q disclosure regarding surplus, JPMorgan sought to extend additional financing options to Charter, representing that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JPM-CH

---

[2] The parties' course of conduct may inform the proper construction of the contract if the Court is uncertain as to the plain meaning articulated by Charter. *See Tele-Pac, Inc. v. Grainger*, 168 A.D.2d 11, 22 (N.Y. 1991) (citing *Filmvideo Releasing Corporation v. Hastings*, 446 F. Supp. 725, 728-729, *aff'd* 594 F.2d 852 (2d Cir. 1978)).

00025808 (Ex. S); *see also* Ruyter Dep. Tr. at 83-84 (Ex. R); Hooker Dep. Tr. at 205-06 (Ex. E).

-  DB-CH 00014799 (Ex. T).

- JPM-CH 00035418 (Ex. U).

The parties knew from the beginning that the DHCs would never have sufficient funds to be able to pay their debts as they became due absent transfers from CCO; yet, under JPMorgan's construct, Charter would have been in default on day one of the agreement precisely because the DHCs were not able to pay debts on their own. Obviously, the parties did not negotiate default terms that would be triggered at the outset, and JPMorgan never once behaved as though they had. JPMorgan knew all along that the DHCs did not and could not satisfy the kind of solvency test that it now seeks to retroactively impose. Far from asserting a default, it continued to make additional funds available under the Credit Agreement, sought to make other financing available to Charter, and disclaimed knowledge of any default having occurred.

Moreover, JPMorgan never took the most basic actions that would have been expected if it believed Section 8(g)(v) applied prospectively as it opportunistically now advocates. ▮ ▮ *see, e.g.*, Kurinskas Dep. Tr. at 12, 136 (Ex. F), JPMorgan never did ▮ *See* Ruyter Dep. Tr. at 147 (Ex. R). It never modeled or analyzed ▮ ▮ *Id.* at 148. No one so much as asked for ▮ ▮ *See id.* at 151. ▮ ▮ *Id.* at 150. No one at JPMorgan ever suggested ▮

17

█████████████████████████ Pace Dep. Tr. at 96-97 (Ex. V). ████

████████████████████████████████████████████████████████

████████████████ *Id.* at 57. ████████████████████████████

████████████████ *id.* at 57-58,███████████████████████████

████████████████ *id.* at 58, 72; *see also* Casey Dep. Tr. at 138, 193, 212 (Ex. W). ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ *See* Hooker Dep. Tr. at 25,

161-64 (Ex. E).

Likewise, the other banks were not aware of any default despite their own in-depth

analysis of Charter. *See* Zagar Dep. Tr. at 96, 107-08, 183 (Ex. I). ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ *Id.* at 221. ███████████████████████████████

████████████████████████████████████████████████████ *See*

Zagar Dep. Tr. at 183 (Ex. I). Simply put, the most sophisticated banks in the world had Charter

under extra scrutiny for years and yet,████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See*

CX156 (Ex. N); Kurinskas Dep. Tr. at 57, 211-15 (Ex. F); *see also* Ruyter Dep. Tr. at 146-47

(Ex. R)███████████████████████████████████

Even then, JPMorgan did none of the analysis in support of its determination of default that its own interpretation should have required. 

*See* Kurinskas Dep. Tr. at 40 (Ex. F).

*Id.*

*id.* at 53,

Ruyter Dep. Tr. at 148 (Ex. R),

Kurinskas Dep. Tr. at 36 (Ex. F),

*see* Hooker Dep. Tr. at 210-11 (Ex. E). That course of conduct belies JPMorgan's current, litigation-driven, interpretation of Section 8(g)(v).

In sum, the parties' course of conduct only serves to confirm the plain meaning of clause two of Section 8(g)(v): that there was no default unless a DHC was unable to pay its debts on the day they became due. Because that never happened there has been no default and, thus, there is no bar to reinstatement.[3]

## B. The DHCs Were Not Unable To Pay Their Debts As They Became Due Because Of Any Lack Of Surplus.

JPMorgan will also argue that the DHCs were unable to pay their debts as they became due because CCH I lacked sufficient surplus to make a dividend payment to CIH on November 17, 2008. As such, the November 2008 dividend payment contravened Delaware law, so the

---

[3] Debtors' fully-briefed and argued motion to dismiss JPMorgan's adversary proceeding for failure to state a claim remains pending before the Court. Should the Court grant that motion before trial or otherwise rule that Section 8(g)(v) does not apply in the "prospective" manner urged by JPMorgan, it would reduce the remaining issues that must otherwise be resolved at trial and streamline the presentation of evidence.

argument goes, and notwithstanding the fact that all of the DHCs made their November debt payments, they were not really "able" to, resulting in a default.

There are three fundamental flaws with this argument. *First*, there was sufficient surplus to permit the payment of the dividend from CCH I to CIH. The information available to Charter's board (collected from several outside sources), demonstrates this, as does the review by Charter's expert Den Uyl. Charter properly used Duff & Phelps' initial valuation of Charter's assets███████████and tested that data over the course of several weeks, running numerous sensitivity studies. Using the Duff & Phelps initial valuation as a starting point, along with internal Charter financial data, Charter determined that CCH I had██████████████ surplus available and, even based on down-side sensitivities, CCH I had approximately██████ of surplus available████████████████████Charter compared its analysis with real-world private transactions for cable assets, including its own sale of certain cable systems in Minnesota. And Charter received confirmation that its approach was reasonable from its outside financial advisor, James Millstein. JPMorgan's arguments to the contrary are predicated on an unreliable, post-hoc expert report that made no effort to actually calculate surplus and commits fundamental errors. *Second*, regardless of whether the Court agrees with the directors' surplus determination, so long as it was the product of reasonable business judgment, it should not be disturbed. Here there is no allegation of fraud or bad faith on the part of Charter's directors. *Third*, even if there was technically not sufficient surplus to issue a dividend from CCH I to CIH in November, the DHCs would have still been "able" to pay their debts as they became due either through prepayment of an intercompany note, intercompany accounts, or other unassailable means. The "surplus" issue is, thus, largely a red herring, and poses no obstacle to reinstatement.

20

1.     **CCH I Had Adequate Surplus.**

In analyzing CCH I's surplus for making a dividend payment on November 17, 2008, Charter management and its Board looked at, among other things, various indicia of the value of Charter's assets, assessed the reasonableness of those indicia, sought third-party input and advice, and evaluated the components and value of miscellaneous assets as well as the value of its liabilities. Some of the more significant indications of value that Charter considered included the contemporaneous valuation conducted by Duff & Phelps, recent transactions in the marketplace, current trading values of peer companies, sensitivities around various valuation metrics and drivers and an assessment of reasonableness of a range of valuation multiples by Charter's investment banker, Lazard. *See* Den Uyl Rep. at 8 (Ex. X).

Charter's surplus analysis in late October and early November 2008 relied, in part, on a third-party valuation firm, Duff & Phelps, and its contemporaneous analysis of the value of Charter's assets done in the normal course in connection with Charter's audited financial statements. Duff & Phelps (and a predecessor, Kane Reece) had served as Charter's primary outside valuation firm since at least 2002 performing numerous SFAS 142 related valuations for the Company as well as providing several solvency opinions to Charter. *See* Bliss Dep. Tr. at 13-15; Den Uyl Report at 9. Duff & Phelps also performs valuations for many other leading cable companies as well, such as Cablevision and Comcast, including valuations related to SFAS 142, that provide them insight into the non-public projections of the other leading cable companies.[4]  In addition to Duff & Phelps' direct valuation and cable industry experience,

---

[4] SFAS 142 is a FASB accounting standard that involves testing the value of certain assets of a company on an annual basis to assess whether certain assets have been impaired and need to be written down in value.

Dep. Ex. 21 (KPMG 000299) (Ex. Y).

    The Duff & Phelps analysis indicated an enterprise value of Charter of $21.6 billion. Duff & Phelps prepared a Discounted Cash Flow ("DCF") analysis in connection with its valuation of Charter. As the Court is well aware, a DCF involves projecting the expected future cash flows of a business and discounting them to their present value equivalent. Duff & Phelps utilized Charter's July 2008 Long Range Plan forecast ("July LRP") as the basis for its DCF analysis of the Company, as it was the Company's available operating forecast at the time. KPMG 0000127 (Ex. Z); Derdeyn Dep. Tr. at 62 (Ex. AA).[5] While Duff & Phelps felt that the July LRP was reasonable and deemed it the appropriate forecast to use for D&P's valuation, *see* KPMG 0000127 (Ex. Z), Duff & Phelps used a conservative discount rate of ███ in determining the present value of the July LRP projected cash flows. *See* Den Uyl Rep. at 10 (Ex. X). By contrast, in its own analysis, JPMorgan gives a less conservative discount rate of ███ to ███ *See id.*; JPM-CH 01233849 (Ex. BB). Charter management determined that the Duff & Phelps value implied a multiple of approximately ██████████████ and that this implied multiple was within the range of recent market based data points that Charter had observed. *See* Derdeyn Dep. Tr. at 62-65 (Ex. AA).

    Charter, thus, determined that CCH I had a surplus ██████████████ In addition to this base case, Charter management ran various downside sensitivity tests on the surplus calculation which all still indicated that CCH I had a surplus. *See* Den Uyl Rep. at 10-11

---

[5] ████████████████████████████████████████████████
████████████████████████████████████████ *See* Den Uyl Rep. at 16 n.50
(Ex. X).

(Ex. X); Nov. 14 board presentation (Ex. CC). These sensitivities all represent lower values than the base case enterprise value ███████████ that Charter used for its surplus analysis as the Company was trying to test whether there was a surplus even at lower levels of value. In addition to the base surplus figure ███████████ these sensitivities were also presented to Charter's Board of Directors at their November 14, 2008 meeting. *See* Derdeyn Dep. Ex. 7 (Ex. DD); 11/14/08 Board Minutes (Ex. EE).

There were several other contemporaneous third-party indications of value that supported Charter's assessment that it had surplus at November 17, 2008. James Millstein, at the time a Managing Director with investment banking firm Lazard and a long time advisor to Charter, ███

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

█████████████████████████████ In his response to the board, Mr. Millstein noted that

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ Millstein Dep. Tr. at

79-80 (Ex. FF); 11/14/08 Board Minutes (Ex. EE). He went on to tell the board that ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ Millstein Dep. Tr. at 75-76 (Ex. FF). Mr. Millstein told

the board that ██████████████████████████████████████████████

*Id.* at 76. █████████████████████████████ *See, e.g.*, Johri Dep. Tr. at 83-84 █

█████████████████████████████████████████

Charter also relied on valuations of other cable firms and their valuations of Charter.  In the fall of 2008, Charter was in discussions with several other cable firms about structuring transactions whereby Charter and the other firm would contribute various assets to a partnership.

████████████████████████████████████████████

████████████████████████████████████████ *See*

Derdeyn Dep. Tr. at 63-64 (Ex. AA); Sturgeon Dep. Tr. at 124 (Ex. RR); CTR-00060801 (Ex. JJ). ████████████████████████████████████

██████████████████████████████████████████

████████ *See* Derdeyn Dep. Tr. at 64.

Likewise, discovery has shown that J.P. Morgan itself conducted near-contemporaneous measurements of the value of Charter's assets.  This analysis supported the case for surplus at CCH I, one of the DHCs.  In fact, the value that Charter used for its surplus calculation was actually slightly below the midpoint of J.P. Morgan's valuation indications per its Q3 2008 Credit Surveillance Report.[6] ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ JPM-CH 00018654 (Ex. KK). ████████████████

████████████████████████████████████████████

---

[6] This Credit Surveillance Report utilized Charter's results as of 9/30/08 and appeared to use market data from the November 6 through 20th timeframe.

█████████████████████████████████

█████████ *See* Den Uyl Rep. at 15 (citing *Cable TV Investor: Deals & Finance*, at 13 (Oct. 31, 2008) (Ex. LL)). Other investment banks likewise valued Charter in this same range, and often even higher. *See* Nov. 25, 2008 Morgan Stanley Research Report (Ex. MM) (valuing Charter's cable operations of approximately $22.1 billion based on 2008 estimates).

Den Uyl's independent analysis and calculations confirm the reasonableness of Charter's assessment of surplus. ████████████████████████████

████████████████████████████████

████████████████████ *See* Den Uyl Rep. at 16 (Ex. X). After ascertaining a range of enterprise values█████████████████████even using this methodology, he conducted downside sensitivity analyses that further lowered the growth rate from Charter's sensitivity forecast. *See id.* Based on his analysis, he found CCH I would have a surplus████

████████████████████████████

By contrast, JPMorgan's expert, Carlyn Taylor of FTI, did not conduct her own independent surplus calculation. *See* Den Uyl Rep. at 19 (Ex. X). ████████████████

████████████████████████████████ Each assertion is predicated on erroneous assumptions. Indeed, Taylor's approach is rife with errors. Specifically she:

- mischaracterizes Charter's historical growth by focusing on a period that occurred in large part under the watch of prior management (2003 to 2007), rather than the period exclusively under current management (2005 to 2008), ████████████ ████████████████████████ *See* Den Uyl Rep. at 27-28 (Ex. X).

- mischaracterizes Charter's historical growth by not reflecting pro forma numbers to adjust for asset sales████████████████████████████ ████████████████████████████ ████████████████████████

- does not even discuss the contemporaneous valuations by JPMorgan, Morgan Stanley, and SNL Kagan, which were at substantially the same level as Duff & Phelps's valuation.

- purports to rely on Kagan's industry average projections, while ignoring relevant differences (e.g., service penetration) and Kagan's valuation of Charter's assets at $21.8 billion as of October 31, 2008. *See id.*

- gives no value to Charter's Net Operating Losses, whereas Wall Street analysis placed an average value of $1.7 billion and ██████████████████████ ████████████

- erroneously assumes that DHCs must have sufficient liquidity today to be able to pay debts as they would become due in the future. *See* Den Uyl Rep. at 34 (Ex. X).

When corrected for some of her more significant errors, Taylor's own methodology yields a surplus ████████████████ for CCH I in November 2008. *See* Den Uyl Rep. at 25.[7]

In sum, Charter's determination that it had sufficient surplus to make a ██████████ ████████ was supported by the information available to the board, consistent with JPMorgan's contemporaneous assessment, and is supported by JPMorgan's own expert—once her most egregious errors are corrected. Thus, there is no basis for asserting that the DHCs were unable to pay their debts as they became due.

### 2. Charter's Calculation Of Surplus Was Reasonable.

Although, as set forth above, Charter believes that it had adequate surplus to issue the challenged dividend, the real question for the Court under Delaware law is not, retrospectively, whether Charter's determination was accurate, but whether, at the time, Charter's surplus calculation was a reasonable exercise of the Board's discretion. As the Delaware Supreme Court



explained in *Klang*, 702 A.2d at 154, Delaware law "does not require any particular method of calculating surplus, but simply prescribes factors that any such calculation must include." As such, "[c]orporations may revalue assets to show surplus, but perfection in that process is not required." *Id.* at 152. Rather, "Directors have *reasonable latitude* to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they *reasonably* believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark as to constitute actual or constructive fraud." *Id.* (emphasis added). Thus, in *Klang*, the court "defer[red] to the board's determination of surplus," holding that "[i]n the absence of bad faith or fraud on the part of the board, courts will not 'substitute [our] concepts of wisdom for that of the directors.'" *Id.* at 156 (quoting *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 583 (Del. Ch. 1949)). Likewise in *Morris*, the court observed that "[t]he numerous and varied standards applied in the legal, accounting and business fields have mapped a wavering course for one required to resolve a substantial problem of valuation," but that Delaware law "permits ... no one objective standard of value," and thus that "the directors must be given reasonable latitude in ascertaining value." 63 A.2d at 581, 585. As such the court refused to substitute "either plaintiff's or its own opinion of value for that reached by the directors where there was no charge of fraud or bad faith." *Id.*

Here, there is no allegation of bad faith or fraud on the part of Charter's directors. Instead, JPMorgan's expert simply disagrees with the methodology used by Charter in assessing surplus. But Charter was not required to use the methodology now advocated by JPMorgan's expert, so long as it had a reasonable basis for its own methodology. *See, e.g.*, *British Printing & Comm. Corp. v. Harcourt Brace Jovanovich, Inc.*, 664 F. Supp. 1519, 1531-32 (S.D.N.Y. 1987) (rejecting the argument that "the assets were valued too aggressively" by the board); *cf.*

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) (authorizing "proof of value by any techniques or methods which are generally considered acceptable in the financial community"). As Den Uyl's expert report confirms, Charter plainly had reasonable grounds for calculating surplus in the manner that it did, relying in part on the analysis of the value of Charter's asset performed by Duff & Phelps, and on the outside assessment of its financial advisor, Lazard. ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ *See* Bliss Dep. Tr. at 132 (Ex. QQ). Such "statements made by the accountants merely constituted a caveat for their own protection and did not purport to go further." *Morris*, 63 A.2d at 584. The board was aware that███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ *See* Den Uyl Rep. at 10-11 (Ex. X). Thereafter, Charter utilized other third-party indications of value for comparison. *See id.* at 12-13. Specifically, Charter relied on its long-time financial advisor, James Millstein, *see id.* at 12, the value estimates of other cable firms, *see id.* at 12-13, and its own recent sale of a non-core cable system, *see id.* at 13. The board was entitled to rely on such outside advice, *see, e.g., British Printing & Comm. Corp.*, 664 F. Supp. at 1532, and did so. *See* Johri Dep. Tr. at 83-84 (Ex. GG); Nathanson Dep. Tr. at 59-60 (Ex. HH); Merritt Dep. Tr. at 106-07 (Ex. II).[8] While JPMorgan is free to disagree with Charter's assessment of surplus, given the traditional deference to the Board under Delaware law such

---

[8]████████████████████████████████████████████

████████████████████████████

disagreement is no basis for finding that the DHCs were somehow unable to pay their debts as they became due because, under a different methodology for calculating surplus, no dividend could have issued. *See Morris*, 63 A.2d at 584-85 ("Plaintiff's case comes down to a disagreement with the directors as to value under circumstances where the directors took great care to obtain data on the point in issue, and exercised an informed judgment on the matter."); *Cf. United States v. D'Amato*, 39 F.3d 1249, 1258 (2d Cir. 1994) ("Moreover, good-faith, unconflicted business decisions of management are protected from shareholder challenge by the business judgment rule."); *see also Miller v. American Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir. 1974) ("The sound business judgment rule ... expresses the unanimous decision of American courts to eschew intervention in corporate decision-making if the judgment of directors and officers i[s] uninfluenced by personal considerations and is exercised in good faith.").

### 3. Even If Charter Lacked Surplus, The DHCs Would Have Been Able To Pay Their Debts As They Became Due.

As JPMorgan has conceded, the 2007 Credit Agreement did not require the DHCs to maintain surplus. Hooker Dep. Tr. at 214 (Ex. E). Thus, it makes no difference whether they had sufficient surplus to permit a dividend, the question is whether they were *able* to pay their debts. *See, e.g.*, Casey Dep. Tr. at 99 (Ex. W) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Regardless of whether Charter was entitled to issue a dividend (as a matter of Delaware law), it had other means of upstreaming the funds necessary for the DHCs to make their interest payments. Thus, the DHCs were "able" to pay their debts as they became due and there was no default.

Specifically, Charter had the ability to make its November 2008 and January 2009 interest payments through intercompany loans and intercompany payables alone. *See, e.g.*, Den Uyl Rep. at 36, Table 17. Indeed, Charter always had many options to put liquidity at different

levels in the structure. For example, the company had previously █████████████████

███████████████████████████████████████████ *See*

Sturgeon Dep. Tr. at 14 (Ex. RR). The evidence will show that other options included█████

████████████████████████████████ JPMorgan cannot demonstrate that

these and other options were not available and thus cannot prevail in proving that the DHCs were

unable to pay their debts as they became due.

*    *    *

As the Court recognized at the hearing relating to JPMorgan's motion to dismiss, one has

to wonder about the relevance of fishing for prepetition defaults based upon a DHC's inability to

pay debts as they become due. As discussed in Section III below in the context of other cross-

acceleration provisions, any such default is an *ipso facto* default because it relates to the financial

condition of a debtor. And even if they were not *ipso facto*, JP Morgan has conceded that it

suffered no economic harm and accordingly there is no amount that needs to be cured under

§ 1124(d) of the Bankruptcy Code. *See In re Charter Communications*, No. 09-11435, slip op. at

5 (Bankr. S.D.N.Y. July 7, 2009); 5/5/09 Hearing Tr. at 47 (Ex. A).

The only circumstance in which JP Morgan could actually allege economic harm is if the

Debtors borrowed under the credit facility while in default. But this did not happen for two

reasons. First, as explained above, Section 8(g)(v) is not prospective. Second, the DHCs were,

in fact, able to pay their debts as they become due in October and November when they drew

under their revolver. As such there has been no non-*ipso facto* default, and there is no obstacle

to reinstatement.

**II.    There Has Been No Change Of Control And Plan Confirmation Will Not Cause A Change of Control.**

JPMorgan will strain mightily to assert that there has been a "change of control" over Charter in an effort to prove a default and preclude reinstatement. However, its efforts are entirely in vain. To be sure, both the CCO Credit Agreement, the Second Lien Notes, and the Third Lien Credit Agreement (collectively "Charter Credit Agreements") effectively provide for a default if a person or group, *as defined in §§ 13(d) and 14(d) of the 1934 Securities Exchange Act*, obtains more than 35% of the voting power of Charter upon consummation of any transaction, unless the Paul Allen Group has a greater percentage of the voting power. *See* Credit Agreement § 8(k) (Ex. C); Second Lien § 1.01 (Ex. SS); Third Lien §§ 8.1(c); 6.16; 1.1 (Ex. TT) (defining "Change of Control"). Specifically, § 8(k) of the CCO Credit Agreement provides, in relevant part, that an event of default occurs if:

> (i) the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, or (ii) the consummation of any transaction . . . the result of which is that any 'person' or 'group' (as such terms are used in section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such 'person' or 'group' ....

Thus, for a change of control to occur, either the Paul Allen Group's voting power must drop below 35%, or another person or § 13(d) group must obtain a greater voting share than the Paul Allen Group upon consummation of any transaction. But to be a "group" within the meaning of § 13(d) and, thus, the Charter Credit Agreements, two or more persons must "agree to act together *for the purpose of acquiring, holding, voting, or disposing* of securities." 17 C.F.R.

§ 240.13d-5 (emphasis added). And here, there neither has been, nor will be a "change of control" within the meaning of these provisions. As an initial matter, it makes no difference that the Paul Allen Group will have less than a 35% equity interest in a restructured Charter, as JPMorgan argued previously to the Court. The relevant credit agreements require 35% voting power but do not require that the Paul Allen Group maintain a certain equity interest. And because the Paul Allen Group's 35% voting power over CCI ensures 35% voting power over CCO pursuant to management and operating agreements, it retains the requisite voting power over CCO as the borrower under the CCO Credit Agreement.

Moreover, there is no person or § 13(d) "group" that will have voting power equal to or greater than the Paul Allen Group upon the plan's confirmation and effective date. As even JPMorgan's own expert on "control" agrees, ██████████████████████████

████████████████████████████████████████████████████

██████ *See* Gomper Dep. Tr. (Rough) at 28-33 (Ex. UU). And even upon Plan confirmation and effectiveness, and thereafter, as JPMorgan's own expert further effectively admits, no § 13(d) "group" will hold voting power greater than or equal to the Paul Allen Group. To be a "group" within the meaning of § 13(d) and, thus, the Charter Credit Agreements, two or more persons must "agree to act for the purpose of acquiring, holding, voting, or disposing of securities." 17 C.F.R. § 240.13d-5. But JPMorgan's "control" expert concedes that ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ Gompers Dep. Tr. (Rough) at 151 (Ex. UU). And the fact that the noteholders have agreed *with Charter* (not each other) to support its plan of restructuring does not create a § 13(d) "group" within the meaning of the Act. The question is

not whether there is a collection of noteholders who seek to gain "control" of Charter, but whether there will be a § 13(d) group upon the Plan's confirmation and effective date. Here there is no proof of an agreement among the various noteholders to "acquire" securities—nor could there be, given that the noteholders acted independently in acquiring the debt that may be mechanically converted into equity as part of a negotiated restructuring. Nor is their any proof of an agreement among them post-confirmation, once the Plan becomes effective, to "hold," "vote," or "dispose" of securities. Indeed, JPMorgan's expert offers no opinion on any of these critical elements. As such, there is no change of control. In any event, because of the "scaled voting" provision in CCI's articles of incorporation, there can be no change in control because any person or group, other than the Paul Allen Group, that purported to assume greater than 35% voting power would be automatically scaled back to 34.9% voting power.

### A. The Paul Allen Group's Voting Stake In CCI Is Sufficient To Prevent A Change-Of-Control Default.

The Paul Allen Group will have at least 35% voting power over the management of Charter, and thus the minimum voting power required by the Charter Credit Agreements, if the plan is confirmed and becomes effective. It makes no difference that the Paul Allen Group will have less than 35% of an equity interest in a restructured Charter because the Charter Credit Agreements do not contain an equity interest requirement. Further, the Paul Allen Group's 35% voting power over CCI—the sole manager of CCO—accords it 35% voting power over the management of CCO. The Charter Credit Agreements specifically allow for direct or indirect voting power. As has always been the case, the Paul Allen Group's voting power over CCO is and will continue to be indirectly through CCI, because CCO has no board of its own, but is managed directly by CCI pursuant to management and operating agreements. Indeed, Section

8(k)(iv) of the CCO Credit Agreement specifically provides that the Paul Allen Group's voting power over CCO will be indirect through a higher-tier affiliate.

JPMorgan has at times suggested that, notwithstanding the Paul Allen Group's 35% voting power, because the Paul Allen Group will retain a 3% or less equity interest, there is somehow a default under the CCO Credit Agreement. However, the Credit Agreement could not be clearer: it provides for a default if "the Paul Allen Group shall cease to have the power, directly or indirectly, *to vote or direct the voting* of the Equity Interests having at least 35% ... *of the ordinary voting power* for the management of the Borrower." Credit Agreement § 8(k) (Ex. C) (emphasis added). It says nothing about retaining a certain equity interest in Charter. Indeed, earlier change of control provisions in prior credit agreements required that the Paul Allen Group both have a certain percentage of voting power *and* a certain level of equity interests. The latter "equity" requirement was removed over time, precisely to provide Charter with greater flexibility in seeking and entering into deleveraging transactions. *See* Schmitz Dep. Tr. at 267-68 (Ex. VV); IM-0060096—IM0060181 (Ex. EEE). The creditors agreed that ██████████

████████████████████████████████████████████████████████████

██████████████████████ *See* Schmitz Dep. Tr. at 267 (Ex. VV). Thus, JPMorgan can hardly be heard to complain when they are getting precisely what they bargained for—that the Paul Allen Group maintain at least 35% voting control—no more, and no less.

At the first day hearing, JPMorgan suggested that because the Paul Allen Group will have the power to appoint only four of eleven of Charter's directors, it will not have voting control over CCO, as required by Section 8(k) of the Credit Agreement. *See* 3/30/09 Hearing Tr. at 50-51 (Ex. WW). Not so. There is no separate board for CCO; rather it is directly controlled by CCI pursuant to a management agreement. *See* CCO Operating Agreement § 4(a) (Ex. XX).

Thus, by virtue of its 35% voting power over CCI, the Paul Allen Group will retain "indirectly ... at least 35% ... of the ordinary voting power for the management of the Borrower," as it does at present. Credit Agreement § 8(k) (Ex. C).

**B.     No Person Or § 13(d) "Group" Will Have Voting Power Greater Than Or Equal To The Voting Power Of The Paul Allen Group.**

Both before and after confirmation, no "person" or § 13(d) "group" will have voting power over CCI—and hence CCO—that is greater than or equal to that of the Paul Allen Group. Prior to confirmation, no individual entity other than the Paul Allen Group will have more than 35%—and JPMorgan does not dispute this fact.     Rather, JPMorgan asserts that certain noteholders—in particular, Apollo, Oaktree, and Crestview together with "support from Franklin"—who would become eligible to convert their debt into equity if the Court confirms Charter's Plan (and it becomes effective), should be regarded as a § 13(d) "group," as defined in the 1934 Exchange Act, and that, together, they have more voting power than the Paul Allen Group. However, there is no § 13(d) group and, in any event, no such group with voting power equal to or greater than the Paul Allen Group.

As an initial matter, Section 8(k)(ii) of the Credit Agreement specifies that a change of control event requires "the consummation" of a transaction resulting in a person or a § 13(d) group having voting power greater than or equal to that of the Paul Allen Group.     Credit Agreement § 8(k)(ii) (Ex. C).  However, there will be no "consummation" unless and until the Plan is confirmed and becomes effective.  Thus, the only relevant period of time to assess whether a person or § 13(d) group has more voting power than the Paul Allen Group is post confirmation.  Indeed, even JPMorgan's own expert agrees with the difference between activities in the context of restructuring and activities post-restructuring:



Gompers Dep. Tr. (Rough) at 30, 32 (Ex. UU). Moreover, there is no evidence of a collaborative plan with the requisite 13(d) purpose going forward post-confirmation. As Professor Gompers continued, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████ Gompers Dep. Tr. (Rough) at 151 (Ex. UU). Thus, there is no shareholder agreement, no third-party beneficiary rights, and no enforcement rights. These noteholders regularly enter into formal written shareholder agreements when they make a joint investment to control a company—█████████████████████ *See* Zinterhofer Dep. Tr. at 61, 171-72 (Ex. ZZ). And these noteholders are sophisticated investors who know how to, and do, file 13(d) notices when appropriate. While there have been some discussions, there is no agreement—written or otherwise—████████████████████████████

███████████ see Gompers Dep. Tr. (Rough) at 151 (Ex. UU), and other than executive compensation, there have been no discussions between the noteholders about how Charter will be managed after emergence. The banks cannot point to any such agreements. *See, e.g.*, Morris Dep. Tr. at 236 (Ex. H). Rather, the noteholders themselves recognized ███████████████

████████████████████████████████████████████████████████████████████

██████████████████████ Zinterhofer Ex. 22 (Ex. FFF). Likewise, the JPMorgan analyst who follows Charter specifically conceded that ████████████████████

Tr. at 133-34 (Ex. V). Because there is no evidence of a § 13(d) group upon "consummation" of the Plan, there is no basis for finding a default under the Credit Agreement that would preclude reinstatement.

Recognizing that it cannot prevail under the plain language of the Credit Agreement, because it lacks evidence of a § 13(d) group existing following consummation of the Plan, JPMorgan instead focuses on the activities of the individual noteholders in the months prior to the filing of the Plan. The thrust of JPMorgan's argument is "once a group, always a group." But there is no basis in law or logic for that bold leap. In any event, there is no evidence that the individual noteholders were acting as a § 13(d) group prior to Charter's entry into Chapter 11. To constitute a § 13(d) group, two or more persons must "agree to act together *for the purpose of acquiring, holding, voting or disposing of equity securities*." 17 C.F.R. § 240.13d-5(b)(1) (2009) (emphasis added). Absent "a common objective regarding one of the just-recited activities," there is no § 13(d) "group." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001). JPMorgan does not claim, ████████████████████████████████ ████████████████████████████ Gompers Dep. Tr. (rough) at 55-56 (Ex. UU). And the conversion of notes to equity would be the entirely mechanical result of a negotiated restructuring, should the Plan be confirmed and become effective. Whether the noteholders had any agreement as to restructuring is irrelevant to whether they had the requisite purpose required by § 13(d). Here, to the extent there was a "common objective," it was to protect their individual economic investments in Charter in the context of bankruptcy—not a purpose covered by § 13(d). At all times, each noteholder acted individually to protect that existing economic interest.

Nor will the evidence show that the noteholders are acting as a § 13(d) group today for the purposes of "holding, voting, or disposing" of Charter's securities. Rather, the evidence will show, and even JPMorgan's expert admits, ███████████████████████████

███████████████████████████████████████████████████████████████

███████████████ *See* Gompers Dep. Tr. (Rough) at 102. It was Charter that ██████████

███████████████████████████████████████████ and Charter that ████████████

███████████████████████████████████████████████████ *See, e.g.,*

CHARTER-e 00137827-00137828 (12/13/08 Volpert email) (Ex. AAA). Thus the noteholders' common activities in cooperation with Charter are not endemic of an agreement *among the noteholders themselves* to act together for the purpose of acquiring, holding, voting, or disposing of equity securities. To the contrary, the noteholders lacked agreement as to the requisite purpose needed to form a § 13(d) group. *See, e.g., Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, Case No. 00 CV 1115 (LAK) (S.D.N.Y. Feb. 23, 2001) (bench decision attached as Ex. D), *aff'd*, 286 F.3d 613 (2d Cir. 2002); *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2006) ("General allegations of parallel investments by institutional investors do not suffice to plead a group."); *Hubco, Inc. v. Rappaport*, 628 F. Supp. 345, 358 (D.N.J. 1985). While their interests may be aligned, each noteholder has its own separate, individual agreement with Charter to support the restructuring effort. *See, e.g.,* Exhibit 10 to Debtors' Joint Plan of Reorganization, filed March 27, 2009 (Ex. BBB). The evidence will show that each noteholder made a separate and independent investment decision to acquire notes. And various noteholders retained their own separate legal and financial advisors, ██████████████████

███████████████████████████████████████████████████████ *See,*

*e.g.,* Villaluz Dep. Tr. at 153-55 (Ex. CCC).

This case is much like *Litzler*, in which a company in need of capital approaches several potential investors with a preliminary term sheet for their consideration, and in which potential investors participated in common due diligence and conducted follow-up calls with the company collectively. *See* 411 F. Supp. 2d at 412. There, as here, a single counsel was engaged to act as a principal draftsman. *See id.* Based on those facts, the *Litzler* court rejected plaintiff's claim that a § 13(d) group had been formed for purposes of the 1934 Act. The court noted that "[p]rivate offerings of securities generally involve common purchase agreements with subscribers," and went on to explain that considerations such as cost savings justified the kind of cooperative activity the investors displayed and that "[m]ore than such cooperative activity has to be alleged and proved to show that the investors were motivated by 'a desire to affect control,' or by some other indicia of concerted activity." *Id.* at 415-16; *see also Schaffer ex rel. Lasersight, Inc. v. CC Inv. LDC*, 2002 WL 31869391, *5 (S.D.N.Y. Dec. 20, 2002) ("The Court does not interpret these details by themselves as sufficient evidence of agreement, however, because each event can be explained by a manifestation of desire on the part of [the issuer] to treat the Series B Preferred shareholders in certain ways as a class rather than of a decision by Defendants to further some common objective."). Likewise, in *Hallwood*, the plaintiff made many of the same arguments made here to support its claim that the defendants had been acting as a § 13(d) "group." Plaintiff asserted that the defendants had common goals and objectives, had common views of management, had shared their views with one another, and had a "common purpose." *Hallwood*, Case No. 00 CV 1115 (LAK), at 613-15 (attached as Ex. D). In rejecting the argument that these factors made the defendants a "group," the district court held it was "quite obviously not enough" that the defendants had a "common purpose of making money on their investments." The court held that even where defendants know each other,

communicate, share a common view of the company and a common goal of maximizing their investments, and discuss their goals with each other, they are not a "group" in the absence of an agreement with the purpose of acquiring, holding, voting, or disposing of securities. *Id.* This is true even where each investor knows that it will benefit from maximizing the number of shares held by "like-minded investors." *Id.* at 616. The noteholders will testify that, as in *Litzler* and *Hallwood*, each acted independently based on its own assessment of its needs and investment appetite.

Moreover, although JPMorgan may point to loose language in which some of the noteholders casually referred to themselves as a group, that all arises in the context of *restructuring*, in which classes of asset holders come together to support or oppose a plan all the time—none of which is sufficient to form a § 13(d) "group." JPMorgan's expert, Gompers, does not even address the language of § 13(d), instead vaguely asserting that ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Gompers Rep. at 57 (Ex. YY). But neither ████████████ nor even ████████████████████████████ are sufficient under § 13(d). Indeed, consensual, collaborative activity in the restructuring context is contemplated by the Bankruptcy Code itself, which provides for the creation of creditors' committees. *See* 11 U.S.C. 1102. As courts have observed, "the authors of the Code encouraged workouts" and "incentives to use prepackaged plans are written all through the new Act." *In re TS Indus., Inc.*, 117 B.R. 682, 688 (Bankr. D. Utah 1990); *see also In re REPH Acquisition Co.*, 134 B.R. 194, 196 & n.1 (N.D. Tex. 1991). Likewise, Gompers, asserts in his Report ████████████████████

████████████████████████████████████████████

██████████████████████████████████████ But again, none of these claims

makes them a § 13(d) "group." At most, Gompers alleges that ██████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████ Gompers Rep. at 51,

58 (emphasis added). Tellingly, despite these conclusory and vague assertions, JPMorgan's

expert expressly denies that ████████████████████████████████████████

███████████████████████████████████████ as required for a § 13(d) "group."

Gompers Dep. Tr. (Rough) at 151 (Ex. UU).

Such collaborative activity in and of itself has never been treated by the SEC as

constituting a § 13(d) "group" within the meaning of the 1934 Act. To the contrary, the SEC has

disclaimed § 13(d) "group" treatment for such activities. *See, e.g., Great Southwest Overseas

Fin. Corp. N.V.*, March 16, 1972 SEC No Action Letter, *available at* 1972 SEC No-Act. LEXIS

1486. There, as here, the holders of certain notes had agreed to a plan of refinancing and to the

receipt of new warrants in connection therewith. The SEC made clear that the relevant activity

was not whether they were acting in concert for purposes of the refinancing, but whether they

had the requisite purpose to form a § 13(d) group at the time of their receipt of new equity, *after*

confirmation: "The holders of the New Warrants would not be considered to be acting as a

group with respect to the common stock of [the company] either at the time the New Warrants

first became exercisable or thereafter, solely because they were acting as a group at the time of

the receipt of the New Warrants in the refinancing of [the company]." *Id.* at *6. So too here.

Any rights that the noteholders may obtain through Plan confirmation will not, in and of

themselves, involve the present acquisition of the underlying stock of Charter. Unless a group of

noteholders comes together *after* restructuring to function as a § 13(d) "group" with the requisite

purpose of "acquiring, holding, voting, or disposing of" securities, there can be no default under the Charter Credit Agreements. In the meantime, the activities of the noteholders as to restructuring do not make them a § 13(d) "group" at present. And there is no evidence of post-confirmation, post-effective date, agreements to "acquire, hold, vote, or dispose of" securities.

Even if the noteholders were treated as a § 13(d) "group" in the abstract, they do not collectively have voting power greater than or equal to that of the Paul Allen Group, which will retain 91% voting power unless the Plan is confirmed. The only time a conversion from debt to equity is even possible is after confirmation, upon the effective date of the Plan, when transactions may be "consummated," which would change that. Credit Agreement § 8(k)(ii) (Ex. C); Third Lien § 1.1 (Ex. TT) (defining "Change of Control," cl. (3)). Prior to that, the noteholders are not equity-holders in Charter and cannot be a § 13(d) "group" with more than 35% voting power. Contrary to Wells Fargo's arguments relating to the disclosure statement, prior to confirmation, the noteholders do not have equity rights subject to "a subsequent condition" of confirmation. They will have no equity or voting rights whatsoever unless the Plan is confirmed and become effective. Only upon confirmation and the effective date would there be the "consummation" of a transaction resulting in equity rights for the noteholders, subject (of course) to the "subsequent condition" of SEC and other regulatory approvals.

Even assuming that some of the noteholders constituted a § 13(d) "group," unquestionably not all of the noteholders do. For example, as JPMorgan's "control" expert conceded, based on his study of the evidence and the noteholders involved in this case:





Gompers Dep. Tr. (Rough) at 135.  Professor Gompers further agreed

*Id.* at 141.

*See* Villaluz Dep. Tr. at 209 (Ex. CCC).

*See id.*

This, among other distinctions, shows Franklin was not be part of any § 13(d) "group."

*See* Gompers Rep. at 4, 37, 39, 40, 55, 58, 60 (Ex. YY).  Again, mere "support" is not sufficient for inclusion in a § 13(d) "group."

The focus of JPMorgan's arguments therefore will presumably be placed on three of the other noteholders in particular:  Apollo, Oaktree, and Crestview.  These are the "excess backstop" noteholders.  But even taking these three noteholders as a "group," they would collectively have less voting power, fully diluted, than the voting power of the Paul Allen Group.  Thus, even accepting JPMorgan's approach, there would still be no change in control as defined under the Charter Credit Agreements.

**C.** **Under CCI's Certificate Of Incorporation There Can Be No Change Of Control So Long As The Paul Allen Group Retains At Least 35% Voting Power.**

Even if a § 13(d) "group" of shareholders acquired enough equity to superficially grant it more than the Paul Allen Group's voting power, a "scaled voting" provision in CCI's amended and restated Certificate of Incorporation prevents any "person" or § 13(d) "group" from obtaining and voting as much as or more voting power than the Paul Allen Group. Specifically, CCI's amended and restated Certificate of Incorporation structures the common stock voting rights and provides that each holder of Class A Common Stock shall be entitled to one vote per share except that that the votes attributable to each share of Class A Common Stock shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and any other holder included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) so that no "person" or "group" is or becomes the holder, either directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation, other than the Paul Allen Group, unless this restriction is waived by the disinterested board members. CCI Cert. of Inc. Art. IV(b)(i)(A)(1). These restrictions, thus, operate to prevent the very kind of change of control default under the Charter Credit Agreements asserted by JPMorgan. Simply put, given the operation of this scaled voting provision, so long as the Paul Allen Group maintains at least 35% voting power over Charter (which it does), there can be no change of control default.

Delaware law has long recognized that such "voting restrictions contained in the certificate of incorporation" are valid and enforceable. *Providence & Worcester Co. v. Baker*, 378 A.2d 121, 121 (Del. 1977) (upholding provision that reduced the votes per share based on the number of shares held); *see also Sagusa, Inc. v. Magellan Petro. Corp.*, 1993 WL 512487 (Del. Ch. Dec. 1, 1993), *aff'd*, 650 A.2d 1306 (Del. 1994); *Williams v. Geier*, 1987 WL 11285

(Del. Ch. May 20, 1987), *aff'd*, 671 A.2d 1368 (Del. 1996). Nor does it make any difference whether the scaled voting provision was in the original articles of incorporation or subsequently added. "There is nothing in the *Providence & Worcester* decision to suggest that its holding should be limited to voting restrictions contained in an original certificate of incorporation." *Williams v. Geier*, 1987 WL 11285, at *4. A scaled voting restriction in this context operates much like a conversion cap. *See, e.g., Levy v. Southbrook Int'l Investments, Ltd.*, 263 F.3d 10, 17-18 (2d Cir. 2001) ("[T]he conversion cap effectuates a clear prohibition on [the warrant holder's] ability to convert shares to the extent that conversion would result in it owning in excess of 4.9% of [the company's] outstanding common stock."). Indeed, just as a conversion cap can preclude beneficial ownership in excess of the cap, so too a scaled voting restriction. *See id.* at 15-16; *cf. Levner v. Prince Alwaleed*, 61 F.3d 8, 9 (2d Cir. 1995) (holding no beneficial ownership because, under a standstill agreement, the "stock was not 'presently convertible'"). Thus, the plain effect of Article IV(b)(i)(A)(1) of CCI's Certificate of Incorporation will preclude any person or any "group" from asserting more than 35% voting power (other than the Paul Allen Group), thereby foreclosing the change of control defaults alleged by JPMorgan.

**III.     There Is No Cross-Acceleration Of CCO's Debt Merely Because CCO Is A Solvent Debtor.**

As illustrated by its presentation at the first day hearing, JPMorgan contends that because CCO is a solvent debtor, the cross-acceleration provisions in Section 8 of the Credit Agreement that are triggered if an affiliate files for bankruptcy must not be disregarded as *ipso facto* clauses but rather enforced against Charter, such that the entirety of CCO's debt is immediately due. *See* 3/30/09 Hearing Tr. at 46-49 (Ex. WW). But none of the cases cited by JPMorgan at the first day hearing actually support that remarkable proposition. To the contrary, they all reaffirm the well-recognized principle that *ipso facto* defaults are unenforceable. *See, e.g., In re Kopel*, 232

45

B.R. 57 (Bankr. E.D.N.Y. 1999) ("[C]ertain contractual provisions, such as those expressly rendered unenforceable by the Bankruptcy Code, *see, e.g.*, 11 U.S.C. § 365(e)(1), or those that are designed to thwart bankruptcy policies, are vulnerable."); *In re East Hampton Sand & Gravel Co.*, 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982) ("The present case involves a substantive default, and invokes none of the federal policy considerations that arise in the *ipso facto* termination clauses ...."). There is "no doubt that section 1124(2) embodies Congress' intent to allow the Chapter 11 debtor to cure the default of an accelerated loan and reinstate the original terms of the loan agreement, without impairing the creditors' claim," an objective that would be thwarted if *ipso facto* defaults were enforceable. *Madison Hotel*, 749 F.2d at 420.

Bankruptcy termination clauses such as those in Section 8 are commonly referred to as *ipso facto* clauses. "*Ipso facto*, or bankruptcy, clauses, 'automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.'" *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) (quoting legislative history) (emphasis omitted). *Ipso facto* clauses are generally unenforceable pursuant to section 365(e) of the Bankruptcy Code because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets. *See, e.g., Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995) ("[The Bankruptcy Code] invalidate[s] contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights 'frequently hampers rehabilitation efforts' by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most.") (internal quotation marks and emphasis omitted); *In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004). Under section 365(e) of the Bankruptcy Code, a contract may not be terminated because of a contractual provision that is conditioned upon: (1) the insolvency or financial condition of

the debtor at any time before the closing of the case; (2) the commencement of a bankruptcy case; or (3) the appointment of or taking possession by a trustee in a bankruptcy case. 11 U.S.C. § 365(e)(1). Here, JPMorgan specifically alleges that "CCO's business is fundamentally affected by the financial condition of its several affiliates," Compl. ¶ 5, and that "[b]ecause of this relationship between CCO and its affiliates" JPMorgan "negotiated Defaults and Events of Default specifically linked to the … Designated Holding Companies." *Id.* at ¶ 34. JPMorgan thus concedes, as it must, that an event of default based on the financial condition of CCO's affiliates is likewise conditioned upon "the … financial condition of the debtor," CCO. As such, it is an unenforceable *ipso facto* clause. *See, e.g., In re Mirant Corp.*, 2005 Bankr. LEXIS 909, *28 n.27 (Bankr. N.D.Tex. 2005) ("Arguably, enforcing the cross defaults against MAG would be tantamount to enforcing an *ipso facto* clause, as MAG's default on other bond and bank debt was an inevitable result of MAG's chapter 11 filing"). JPMorgan cannot have it both ways and link the financial condition of the DHCs to CCO for purposes of a default, but disconnect them for purposes of operation of the Bankruptcy Code. Recognizing this, JPMorgan instead argues that in this case the Court may enforce what would otherwise be an unenforceable contract provision merely because CCO is solvent.

But it makes no difference that CCO is itself solvent—a point vividly illustrated by a case cited JPMorgan at the first day hearing. *See In re Manville Forest Prods. Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984). There, as here, the debtor at issue was solvent. *See id.* at 300 ("In the case at hand, MFPC is a concededly solvent corporation with sufficient assets to pay all its creditors, plus interest."). Thus, the creditors argued, to reinstate its obligations a solvent debtor was required to pay interest, not just on the missed payments, but "on the entire accelerated debt from the time of default until the time of payment under a reorganization plan." *Id.* at 298. The

bankruptcy court rejected that argument and the district court affirmed. *See id.* at 299; *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986). While the "defaults accelerated the entire outstanding loans, the debt reinstatement cured this and deaccelerated the debt." 60 B.R. at 404. By "'returning to pre-default conditions,'" the "'consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code.'" *Id.* (quoting *In re Taddeo*, 685 F.2d at 26-27).

The Seventh Circuit's decision in *In re Chicago, Milwaukee, St. Paul & Pac. RR Co.*, 791 F.2d 524 (7th Cir. 1986), is not to the contrary. There the court was not addressing § 1124, through which a debtor seeks to reinstate debts, but rather a liquidation of debts. In that very different context, the court found that the debenture holders were entitled to the full payment of principal for which they had bargained in the event of a default, rather than just the net present value of the principal. *See id.* at 526. But in the context of reinstatement, as long as non-*ipso facto* defaults are cured, a creditor "receives the complete benefit of its original bargain with the debtor" and is thus "'not impaired' for purposes of Chapter 11 analysis." *In re Kizzac Mgmt. Corp.*, 44 B.R. at 501. Notably, the Seventh Circuit suggested that the outcome would have been different if the debtor has been unable to "honor its promise without hurting any other creditor." *Chicago, Milwaukee*, 791 F.2d at 527. Similar reservations appear in the other cases cited by Objecting Creditors, none of which involved *ipso facto* defaults. *See In re Gencarelli*, 501 F.3d 1, 6-7 (1st Cir. 2007) (allowing full recovery of fees by creditor in a solvent debtor case that are not recoverable from insolvent debtors because if the "inequities that would occur if secured creditors were able to cloak unreasonable fees and charges with first-priority status"); *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) (allowing creditor to recover higher interest rate from solvent debtor after default "where an estate was ample to pay all creditors and to pay interest

even after the petition was filed"). Here there is no dispute that enforcing cross-acceleration would devastate the other creditors of the Charter enterprise. *See* Federman Dep. Tr. at 128-31 (Ex. J). While those are creditors of other Charter entities, the Charter entities are all interrelated. JPMorgan alleged that "CCO's business is fundamentally affected by the financial condition of its several affiliates." Compl. ¶ 5; *see id.* at ¶ 34 (describing the close "relationship between CCO and its affiliates"). Indeed, as this Court recently observed, "[c]oncentrating attention on a single solvent entity within the corporate structure disregards relationships within the integrated corporate enterprise." *In re Charter Communications*, No. 09-11435, slip op. at 16 (Bankr. S.D.N.Y. July 7, 2009). Thus, enforcement of cross-acceleration would "impermissibly hamper the debtor's reorganization." *Kopel*, 232 B.R. at 64. Moreover, any technical, non-monetary default based on what would otherwise be treated as *ipso facto* clauses would, by definition, not be curable. Enforcement would, thus, plainly thwart the goals of the Bankruptcy Code.

At bottom, JPMorgan is left to argue that CCO should not be in bankruptcy at all. Yet, as *Manville Forest* illustrates, there is nothing improper about a solvent debtor seeking Chapter 11 protection. Solvent debtors are entitled to bankruptcy protection when faced with any financial distress. *See, e.g.*, *In re SGL Carbon Corp.*, 200 F.3d at 163. And as one court of appeals has observed, it is "clearly sound business practice ... to seek Chapter 11 protection for ... wholly-owned subsidiaries when those subsidiaries were crucial to [the parents'] own reorganization plan," *In re U.I.P. Engineered Prods. Corp.*, 831 F.2d at 56. In *U.I.P.*, the creditor moved to dismiss the bankruptcy cases filed by the corporate debtor's wholly owned subsidiaries because they were solvent. The bankruptcy court, the district court, and the Fourth Circuit unanimously rejected that argument. The court of appeals noted the "identity of interest" between the parent

49

and wholly-owned subsidiaries and held that it was "clearly Congress' intention to allow a parent and its subsidiaries 'to be reorganized in a single proceeding, thereby effectuating its general policy that the entire administration of an estate should be centralized in a single reorganization court.'" *Id.* at 56 (quoting *Duggan v. Sansberry*, 327 U.S. 499, 510-11 (1946)). Here, the decision to seek Chapter 11 protection for CCO in pursuing a Plan that would allow the entire Charter enterprise to emerge from bankruptcy stronger and more financially secure, was consistent with "Congress' intention." Despite this clear congressional policy, JPMorgan remains free to argue that CCO is improperly in bankruptcy; however, the remedy for such a claim would not be to enforce *ipso facto* defaults (as they seek), but rather to dissolve the CCO proceeding. They, of course, have not made such an argument, despite raising this solvency issue at the first day hearing. *See* 3/30/09 Hearing Tr. at 47-49 (Ex. WW). Because CCO has properly availed itself of Chapter 11 protections as part of restructuring the entire Charter enterprise, there is no basis for enforcing what are otherwise *ipso facto* defaults, and instead, the Court should grant reinstatement.

## CONCLUSION

For the foregoing reasons, reinstatement should be permitted.

Respectfully submitted,

New York, New York
Dated: July 14, 2009

/s/ Richard M. Cieri
Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, D.C. 20005
Telephone:  (202) 879-5000
Facsimile:  (202) 879-5200

Counsel to the Debtors and Debtors in
Possession (except Charter Investment, Inc.)