ROPES & GRAY LLP
David S. Elkind (DE 4054)
Keith H. Wofford (KW 2225)
Mark R. Somerstein (MS 9721)
Russell L. Lippman (RL 2492)
Nila W. Williams (NW 5969)
Dana L. Myers (DM 0218)
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

Counsel to the Official
Committee of Unsecured Creditors

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | 09-11435 (JMP) |
| Debtors. | (Jointly Administered) |
| JPMORGAN CHASE BANK, N.A., as Administrative Agent, | |
| Plaintiff, | Adversary Proceeding No. 09-01132 (JMP) |
| -against- | |
| CHARTER COMMUNICATIONS OPERATING, LLC and CCO HOLDINGS, LLC, | |
| Defendants. | |

**POST-TRIAL MEMORANDUM OF LAW SUBMITTED ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF <u>REINSTATEMENT UNDER DEBTORS' CHAPTER 11 PLAN AND CONFIRMATION</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

I.     JPMORGAN'S CLAIM THAT IT WAS ENTITLED TO DECLARE AN EVENT OF DEFAULT UNDER SECTION 8(g)(v) OF THE CREDIT AGREEMENT ON THE BASIS OF FINANCIAL PROJECTIONS AS TO WHAT MIGHT OCCUR IN THE FUTURE IS WITHOUT MERIT ..........................................................................6

II.    JPMORGAN'S CLAIM THAT THERE WAS AN EVENT OF DEFAULT AT THE TIME OF THE NOVEMBER 5, 2008 DRAW REQUEST BECAUSE CHARTER'S BOARD OF DIRECTORS ALLEGEDLY ERRED IN DETERMINING THE EXISTENCE OF "SURPLUS" AND DECLARING A DIVIDEND TO A DESIGNATED HOLDING COMPANY ON NOVEMBER 14, 2008 IS WITHOUT MERIT ...................12

    A.    The Applicable Standard for Review of a Board's "Surplus" Determination and JPMorgan's Burden of Proof .....................................................................14

    B.    JPMorgan's Claim That the Board's Determination of "Surplus" Was in Bad Faith or Was Even in Error Is Without Merit ..........................................................16

III.    EVEN IF THERE WERE AN EVENT OF DEFAULT AT THE TIME OF THE NOVEMBER, 2008, OR FEBRUARY, 2009, DRAWS, THE DEBTORS WOULD BE ENTITLED TO CURE THE DEFAULT UNDER SECTION 1124(2) .......................19

IV.    JPMORGAN'S CLAIM THAT THE PAUL ALLEN GROUP WILL NOT HAVE EQUITY INTERESTS WITH 35% OF THE VOTING POWER FOR THE MANAGEMENT OF CCO IS WITHOUT MERIT ...........................................21

V.    JPMORGAN'S CLAIM THAT THERE WILL BE A BREACH OF THE CREDIT AGREEMENT BECAUSE A SECTION 13(d) "GROUP" WILL EXIST WITH MORE THAN 35% OF THE VOTING CONTROL IS WITHOUT MERIT ....................25

    A.    Membership on the Crossover Committee Does Not Make Individual Members a Section 13(d) "Group" or Give Rise to a Breach of Section 8(k)(ii) of the Credit Agreement ..............................................................................26

    B.    JPMorgan's Claim That Certain Members of the Crossover Committee Will Be a Section 13(d) "Group" After the Effective Date of the Plan is Without Merit ..........30

        1.    Franklin Advisors, Inc. ...................................................................35

        2.    Oaktree Capital Management .........................................................37

        3.    Crestview Partners ........................................................................38

        4.    Apollo Management ......................................................................38

C.     If There Were a Section 13(d) "Group" with More Voting Power Than the Paul Allen Group, the Reorganized Debtors' Certificate of Incorporation Would Cure Any Default ................................................................................... 39

VI.   JPMORGAN'S CLAIM THAT THERE ARE "CROSS DEFAULTS" UNDER SECTION 8(F) OF THE CREDIT AGREEMENT WHICH CANNOT BE CURED UNDER SECTION 1124(2) OF THE BANKRUPTCY CODE ARE WITHOUT MERIT ............. 39

VII.   THE CLAIM OF THE CCI NOTEHOLDERS THAT THEY SHOULD RECEIVE ADDITIONAL RECOVERIES UNDER THE PLAN SHOULD BE REJECTED ........... 44

A.     The Plan Complies With Section 1129(a)(7) of the Bankruptcy Code ..................... 45

B.     The CCI Noteholders' Objections Based Upon Section 1129(b) Are Without Merit ...................................................................................................... 48

VIII. THE SETTLEMENT WITH PAUL ALLEN SHOULD BE APPROVED ........................ 49

CONCLUSION ................................................................................................................... 54

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ..................................................................14

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
    341 B.R. 451 (Bankr. S.D.N.Y. 2006) ..................................................47

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*,
    No. 00 CV 1115 (LAK) ...........................................................32, 33, 34

*Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*,
    553 F.3d 1351 (11th Cir. 2008) ......................................................29, 30

*In re Adelphia Comm. Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y.2005) ..................................................53

*In re Akron Thermal, Ltd P'ship*,
    2008 WL 1886171 (Bankr. N.D. Ohio Apr. 25, 2008) ...........................15

*In re Bob Richards*,
    473 F.2d 265 ............................................................................47

*In re Emerging Commc'ns, Inc. S'holders Litig.*,
    2004 WL 1305745 (Del. Ch. May 3, 2004, revised June 4, 2004) ...........14

*In re Enron Corp.*,
    306 B.R. 465 (Bankr. S.D.N.Y. 2004) ..................................................43

*In re F.W. Rest. Assocs., Inc.*,
    190 B.R. 143 (Bankr. D. Conn. 1995) ..................................................15

*In re Gillette Assocs.*,
    101 B.R. 866 (Bankr. N.D. Ohio 1989) ................................................20

*In re Greektown Holdings, LLC*,
    2009 Bankr. LEXIS 1231 (Bankr. E.D. Mich. May 13, 2009) ...............15

*In re Hilsen*,
    404 B.R. 58 (Bankr. E.D.N.Y. 2009) ..................................................53

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ............................................................53

*In re Kings Terrace Nursing Home and Health Related Facility,*
  1995 WL 65531 (Bankr. S.D.N.Y. Jan. 25, 1995) .................................................15

*In re Liberty Warehouse Assocs. L.P.,*
  220 B.R. 546 (Bankr. S.D.N.Y. 1998) ..................................................................20

*In re Mirant Corp.,*
  2005 Bankr. LEXIS 909 (Bankr. N.D. Texas May 24, 2005) ........................ passim

*In re NextWave Personal Communications, Inc.,*
  244 B.R. 253 (Bankr. S.D.N.Y. 2000) ..................................................................43

*In re Plitt Amusement Co. of Washington,*
  233 B.R. 837 (Bankr. C.D. Cal. 1999) .............................................................40, 44

*In re Prudential Lines, Inc.,*
  928 F.2d 565 (2d Cir. 1991) ............................................................................47, 48

*In re Stone Barn Manhattan LLC,*
  405 B.R. 68 (Bankr. S.D.N.Y. 2009) ...............................................................52, 53

*In re Taddeo,*
  685 F.2d 24 (2d Cir. 1982) ...................................................................................20

*In re Village Rathskeller, Inc.,*
  147 B.R. 665 (Bankr. S.D.N.Y. 1992) .............................................................40, 44

*Inv. Exch. Group, LLC v. Colorado Capital Bank (In re The 1031 Tax Group, LLC),*
  2007 WL 2455176 (Bankr. S.D.N.Y. Aug. 23, 2007) ...........................................30

*Klang v. Smith's Food & Drug Ctrs, Inc.,*
  702 A.2d 150 (Del. 1997) .....................................................................................14

*Litzler v. CC Invs., L.D.C.,*
  411 F. Supp. 2d 411 (S.D.N.Y. 2006) .............................................................31, 32

*Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.,*
  223 F. Supp. 2d 435 (S.D.N.Y. 2001) ..................................................................34

*Morris v. Standard Gas & Elec. Co.,*
  63 A.2d 577 (Del. Ch. 1949) ................................................................................14

*Nat'l Home Prods., Inc. v. Gray,*
  416 F. Supp. 1293 (D. Del. 1976) .........................................................................33

*Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.),*
  222 B.R. 417 (Bankr. S.D.N.Y. 1998) ..................................................................47

*Portsmouth Square, Inc. v. S'holders Protective Comm.*,
    770 F. 2d 866 (9th Cir. 1985) ........................................................................31, 32

*Quigley Corp. v. Karkus*,
    No. 09-1725, 2009 U.S. Dist. LEXIS 41296 (E.D. Pa. May 15, 2009) ..................................32

*Rosenberg v. XM Ventures*,
    274 F.3d 137 (3d Cir. 2001).................................................................................29

*Ryan v. Gifford*,
    2009 WL 18143 (Del. Ch. Jan. 2, 2009) .............................................................14

*Scott v. Multi-Amp Corp.*,
    386 F. Supp. 44 (D.N.J. 1974) ..........................................................................31

*Summit Inv. & Dev. Corp. v. Leroux*,
    69 F.3d 608 (1st Cir.1995).................................................................................43

*Texasgulf, Inc. v. Canada Dev. Corp.*,
    366 F. Supp. 374 (S.D. Tex. 1973) ...................................................................33

*Transcon Lines v. A.G. Becker Inc.*,
    470 F. Supp. 356 (S.D.N.Y. 1979).................................................................29, 31

## <u>STATUTES</u>

11 U.S.C. § 548........................................................................................................12

11 U.S.C. § 1123(b) ..................................................................................................1

15 U.S.C. § 78m(d) ..................................................................................................29

11 U.S.C. § 365........................................................................................................15, 16

11 U.S.C. § 546(e) ...................................................................................................47

11 U.S.C. § 1123......................................................................................................1

11 U.S.C. § 1124...................................................................................... passim

11 U.S.C. § 1129(a) ................................................................................. passim

11 U.S.C. § 1129(b) .................................................................................44, 48, 49

N.Y. Debtor and Creditor Law §§ 274-275 ...............................................12

N.Y. Debtor and Creditor Law §§ 278-279 ...............................................12

Section 13(d) of the Securities Exchange Act of 1934 ...............................21

Section 14(d) of the Securities Exchange Act of 1934 ...................................................................21

**OTHER AUTHORITIES**

SEC Rule 13d-5, 17 C.F.R. § 240.13d-5 ...............................................................................29, 31

H. Rep. No. 95-595 .......................................................................................................................43

Federal Rule of Bankruptcy Procedure 9019 ........................................................................52, 53

The Official Committee of Unsecured Creditors (the "**Committee**") submits this Post-Trial Memorandum of Law (i) in support of confirmation of the Debtors' proposed pre-negotiated Joint Plan of Reorganization (as amended, the "**Plan**"), (ii) in further support of reinstatement of the Debtors' senior secured credit facilities and other senior debt, pursuant to sections 1123 and 1124 of the Bankruptcy Code, 11 U.S.C. §§ 1123(b)(1) and (5) and 1124(2), (iii) in opposition to the claims of JPMorgan Chase Bank, N.A. ("**JPMorgan**"), as administrative agent for the secured lenders pursuant to an Amended and Restated Credit Agreement dated as of March 18, 1999, as amended and restated as of March 6, 2007 (the "**Credit Agreement**"), and certain other objecting parties,[1] that there are or will be events of default under their applicable credit agreements that preclude reinstatement, and (iv) in opposition to the objections to confirmation of the holders of the Charter Communications, Inc. 6.50% Convertible Senior Notes due 2027 (the "**CCI Notes**").

## PRELIMINARY STATEMENT[2]

Debtor Charter Communications, Inc. ("**CCI**") and its debtor affiliates (together, "**Charter**" or the "**Debtors**") seek confirmation of a chapter 11 Plan which, the Committee believes, will maximize recoveries to creditors and enable the Debtors to emerge from chapter 11 as significantly de-levered entities. That Plan has already won the overwhelming approval of creditors. The Plan will reduce the debt of Charter's holding companies by approximately $8 billion, eliminate more than $830 million in annual interest expense, and raise approximately $1.6 billion of new equity capital through a rights offering to Charter's noteholders. The

---

[1] Wilmington Trust Company, as Second Lien Indenture Trustee, Wells Fargo Bank, N.A., as Third Lien Agent, and the First Lien Lender Group have also asserted that there were or will be breaches of the provisions of their credit agreements, which are similar to the Credit Agreement governing the First Lien Secured Debt, based upon arguments the same as those made by JPMorgan.

[2] Capitalized terms used but not defined herein have the meanings set forth in the Memorandum of Law of Official Committee of Unsecured Creditors in Support of Reinstatement under the Debtors' Chapter 11 Plan, dated July 14, 2009 (the "**Committee's Pre-Trial Brief**"), filed with this Court.

Committee strongly supports confirmation of the Plan and reinstatement of the Debtors' senior debt pursuant to section 1124(2) of the Bankruptcy Code, which is a lynchpin of the Plan. The Committee joins in the positions argued by the Debtors and submits that confirmation and reinstatement should also be approved for the additional reasons set forth below.

The cornerstone of the Plan is the reinstatement of the Debtors' outstanding senior secured debt and other senior debt aggregating approximately $11.8 billion under section 1124(2) of the Bankruptcy Code. Without reinstatement of the senior debt, the Debtors could not confirm their Plan. Indeed, the Debtors would be required to incur as much as $500 million of additional interest expense each year on their $11.8 billion of senior debt, with the result that the recoveries to unsecured creditors would be largely eroded and these cases would in all likelihood be thrown into protracted chapter 11 proceedings.

The objections to the Plan come from parties which are to be paid everything to which they are entitled, and, in some instances, considerably more, and who seek a windfall at the expense of creditors. The senior lenders have received everything to which they were entitled under their credit agreements, including interest at a default rate during these proceedings even though the Debtors have at all times been current on their debt, and will likewise receive the full benefit of their respective credit agreements if their debt is reinstated pursuant to section 1124(2) of the Bankruptcy Code. Indeed, following the effective date of the Plan, the senior lenders will be far better off than they have been at any time in the past. The reorganized Charter entities will be carrying approximately $8 billion less debt than they had prior to chapter 11, their cash flow and EBITDA will be better than ever, and the creditworthiness of the Debtors will be vastly improved. Likewise, the holders of the CCI Notes (the "**CCI Noteholders**"), which are structurally subordinated to all other debt in these cases, will be receiving recoveries of at least

$162.5 million of preferred stock or 32.7% on their claims, even though they would receive value of only about $92 million or 18.4 % upon a liquidation as required by section 1129(a)(7) of the Bankruptcy Code.  The claims which these parties assert in opposition to confirmation are without merit.

JPMorgan and the other objecting senior lenders contend that their debt cannot be reinstated under section 1124(2) of the Bankruptcy Code because there supposedly were pre-petition events of default or will be events of default upon the effectiveness of the Plan.  As we shall describe, their claims are contradicted by the language of the credit agreements, the applicable law, the trial testimony of their own representatives, and the trial record.  Specifically:

1.     JPMorgan argues that, even if the Debtors and the Designated Holding Companies were current on all of their obligations, it was entitled under section 8(g)(v) of its Credit Agreement to declare an event of default at any time on the basis of projections that the Designated Holding Companies might not be able to meet their obligations at some time months or even a year in the future.  JPMorgan's claim is based upon a misreading of section 8(g)(v), which states that there is an event of default only if a Designated Holding Company "*shall be* unable to . . . pay its debts *as they become due*." (emphasis added)  The provision gives rise to an event of default only if one of the Designated Holding Companies is, *in fact*, unable to pay its debts as they come due.  It cannot be invoked to conjure up an event of default simply because the lending banks, utilizing ever-changing projections or spreadsheet analyses of the availability of "surplus" to pay dividends in the future and the future availability of other funds which can be transferred, loaned or provided to the Designated Holding Companies, project that the holding companies "may," "might," or "would" in the future be unable to pay debts.

Indeed, the lenders' own representatives testified that they have never heard of a situation, ever, in which a lender has ever declared an event of default on the basis of projections as to what might or might not occur in the future. The trial record further shows that the banks understood throughout 2007 and 2008 that Charter would run out of funding in the future in the absence of new sources of cash or a restructuring, but never considered that that gave rise to an event of default under the Credit Agreement.

2.      Next, JPMorgan contends that there was an event of default at the time that Charter Communications Operating, LLC ("**CCO**"), the borrower, drew down a $250 million revolving credit advance on November 5, 2008, because on November 14, 2008, two weeks later, the Charter Board authorized a dividend to be paid by CCH I, LLC ("**CCH I**") to CCH I Holdings, LLC ("**CIH**") to enable it to make an interest payment. JPMorgan contends that the "surplus" determination was in error. That claim, too, is misplaced. Under Delaware law, a "surplus" determination by a Board is subject to the "business judgment" rule, and may only be set aside on the basis of a showing of "bad faith" by the Board and the lack of any reasonable basis for the Board's determination. Moreover, the cases make clear that JPMorgan, as the party asserting the claim in opposition to reinstatement, has the burden of proof to establish such a default. Here, as we shall describe, there was more than sufficient basis for the Board's determination. The Board's determination was supported by the variety of evidence which it considered, a Duff & Phelps valuation, advice from James Millstein of Lazard, and the Board's own sensitized analyses. The Board's determination is further corroborated by a plethora of contemporaneous independent valuations, including valuations prepared by JPMorgan itself, and by other analysts, which show that the

Charter entities had more than sufficient value to support the "surplus" determination. As we shall describe, there was not only a sufficient basis for the Board's determination, but the contemporaneous evidence of value indicates that it was correct.

3.    JPMorgan also contends that, upon the effective date of the Plan, there will be defaults under the "change of control" provision of the Credit Agreement or that there will be "cross defaults" under section 8(f) of the Credit Agreement. Those contentions, too, are refuted by the language of the Credit Agreement, the applicable law, and the trial record.

Also dissatisfied because they are not getting more are the holders of the CCI Notes. The principal claim of those holders is that they are entitled to receive more on account of their claims against CCI, which claims, as they are against a non-operating parent entity, are structurally junior to the claims against other Charter entities, including other outstanding debt in excess of $19 billion. During the course of these proceedings, the Debtors, in an effort to resolve or deflect further claims, contributed an additional $66 million of preferred stock to the recoveries of the CCI Noteholders and agreed to list the stock following the effective date of the Plan. The Committee believes that the CCI Noteholders are receiving everything which they are entitled to receive on account of their claims, and very possibly *more*.

Finally, the Committee believes that the settlement with Mr. Allen should be approved. Without Mr. Allen's agreement to retain a 35% voting interest in the reorganized entities, the Debtors would be unable to reinstate their $11.8 billion of senior debt and would be unable to confirm the Plan, which the creditors and the Committee strongly support. While the payments to Mr. Allen are without doubt substantial, the Committee believes that the benefits to the Debtors and to the creditors far outweigh the costs. The benefits that the Debtors will receive

include the following: (i) the ability to reinstate their senior debt, which will result in interest savings of as much as $500 million per year for the remaining terms of the credit agreements; (ii) preservation of the Debtors' Net Operating Losses ("**NOLs**"), which have been valued at more than $2.8 billion and are likely to result in savings to the Debtors of more than $1.2 billion; (iii) the preservation of other tax benefits which will result from the abilities of the Debtors to "step up" the tax bases of their assets; and (iv) the transfer to the Debtors of CII's preferred stock interests in CC VIII, LLC ("**CC VIII**"), which alone will have a value to the Debtors of approximately $135-165 million. Moreover, in the absence of the settlement, it is very possible that these proceedings would devolve into a freefall chapter 11 which would yield far lower benefits for creditors, many more months (or years) of proceedings, and tens of millions of dollars of additional administrative expense.

In short, for the reasons stated below and for the additional reasons stated by the Debtors, the Committee supports confirmation of the chapter 11 Plan, reinstatement of the senior debt, and approval of the settlement with Mr. Allen.

## I.

### JPMORGAN'S CLAIM THAT IT WAS ENTITLED TO DECLARE AN EVENT OF DEFAULT UNDER SECTION 8(g)(v) OF THE CREDIT AGREEMENT ON THE BASIS OF FINANCIAL PROJECTIONS AS TO WHAT MIGHT OCCUR IN THE FUTURE IS WITHOUT MERIT

Recognizing that CCO, as the Borrower, made all payments due under the Credit Agreement, and that the Designated Holding Companies likewise made all payments of principal and interest due on their debt through March 27, 2009 (the "**Petition Date**"), including the interest payments due on their debt in November, 2008, and January, 2009, JPMorgan nonetheless claims that the lenders were entitled to declare an event of default in 2008 or early 2009 under section 8(g)(v) of the Credit Agreement on the basis of financial projections as to

what might or might not happen in the future.[3]  JPMorgan argues that the multi-billion dollar credit facility could be declared in default at any time under section 8(g)(v) if JPMorgan or its financial advisors could project, on the basis of ever-changing projections of "surplus," cash flow, available cash, enterprise value, and the like, that the Designated Holding Companies might not have sufficient cash to pay their obligations four months, six months, or even a year into the future.

JPMorgan's interpretation of the Credit Agreement is not only at odds with the language of the agreement, as we shall show, but is also shown to be completely unfounded by the testimony of the lenders' own representatives.  Not a single one of the lenders' representatives who testified in discovery or at the trial of this proceeding could identify an instance in which a lender had *ever* declared an event of default on the basis of financial projections as to what might or might not occur in the future.  8/25/09 Tr. 116 (Ann Kurinskas); 8/18/09 Tr. 12 (Dep. Tr. 154) (Fred Zagar); 8/18/09 Tr. 13 (Dep. Tr. 95-96) (Jose Ojea-Quintana)  JPMorgan's own witness, Ann Kurinskas, who was responsible for sending the February 5, 2009 notice of default, herself testified that, in her 29 years at JPMorgan, she never heard of a situation in which a bank had declared an event of default based upon projections as to whether the borrower or its affiliates might or might not be able to pay their obligations at some time in the future.  8/25/09 Tr. 116 (Kurinskas).

Because financial projections are based upon highly subjective judgments, changing calculations, rapidly fluctuating market conditions, and assumptions and variables which are constantly changing with market conditions, under JPMorgan's theory, "surplus" and projected cash could be projected to be *insufficient* at one point in time to enable a company to meet its

---

[3] The Credit Agreement was admitted at trial as Charter Exhibit 101.

obligations and *sufficient* at a later point in time. Under JPMorgan's interpretation, the lenders could declare an event of default on the basis of "projections" of what *might* be the case in the future, only to find that those projections were erroneous and that the Designated Holding Company *was*, in fact, able to pay its debts as they came due and, in fact, paid its debts.

JPMorgan's contention that section 8(g)(v) of the Credit Agreement entitles it to declare an event of default on the basis of predictions of what might or might not occur in the future is completely at odds with the language of the Credit Agreement. Under section 8(g)(v), there is an event of default only if a Designated Holding Company "*shall be* unable to . . . pay its debts *as they become due*" (emphasis added). The provision gives rise to an event of default only if one of the Designated Holding Companies is, *in fact*, unable to pay its debts "as they become due." It cannot be invoked to conjure up an event of default simply because the lending banks, utilizing ever-changing projections or spreadsheet analyses, project that the holding companies "may," "might," or "would" in the future be unable to pay their debts. Indeed, the preamble to Article 8 of the Credit Agreement, which lists the many events of default set forth in sections 8(a)-(m), including 8(g)(v), specifically states that there shall be an event of default only if the many listed events "*shall occur* and be continuing. . . ." (emphasis added).

Moreover, under section 7.6(b) of the Credit Agreement, the provision that authorizes dividends to be upstreamed for the purpose of enabling the Designated Holding Companies to pay their debt obligations, dividends may not be upstreamed more than 15 days prior to the date an interest payment is due. Since the payment of a dividend (which is only one of the means by which money can be upstreamed to a Designated Holding Company) is dependent upon the availability of "surplus" *at the time the dividend is paid*, the Board of Directors is required to make the determination whether "surplus" exists *at that time*; "surplus" cannot be based upon a

projection of what "surplus" might or might not be months or a year into the future when the Designated Holding Companies are to make payments of principal or interest and a dividend payment may have to be made.

Under the Credit Agreement, there were many possible means by which funds could be provided to the Designated Holding Companies to enable them to pay their obligations. As shown in the Committee's Pre-Trial Memorandum (at pp. 12, 15-16), the funds needed by the Designated Holding Companies to meet their obligations could come from (i) dividends, (ii) the repayment by affiliates of intercompany notes or loans, (iii) the repayment by affiliates of intercompany accounts, (iv) the downstreaming of funds from parent companies of the Designated Holding Companies, (v) loans from affiliates, (vi) issuance of new debt, (vii) infusions of new capital, (viii) sales of assets, (ix) a restructuring or refinancing of existing debt, or (ix) any other possible sources of funding or liquidity not specifically prohibited by the Credit Agreement or relevant indentures. JPMorgan's interpretation of the Credit Agreement would entitle it to declare an event of default on the basis of highly speculative projections as to whether *any* of such means of funding or liquidity might or might not occur at a future time.[4] Indeed, the numerous variables that go into the calculation of "surplus" alone, including assumptions about multiples, future cash flow and expenses, financial projections, discount

---

[4] The ability of the operating companies to distribute cash upstream through dividends (only one of the means available to distribute cash to the Designated Holding Companies) is dependent upon calculations of "surplus," which, in turn, are based upon constantly changing assumptions about, and calculations of, "enterprise value," the appropriate "multiples" to be used in valuing the business, financial projections to be used, determinations of the appropriate discount rates for discounting cash flow, and a multitude of other fluctuating variables. Predictions of the future availability of cash to the Designated Holding Companies are also dependent upon predictions about the cash flow of those companies' affiliates and their available cash, and the future ability of affiliates to provide cash through loans, capital infusions, or the payment of intercompany loans or accounts; the ability of the Debtors to raise cash through asset sales, third party investments, loans, or other strategic transactions; and the ability of the companies to restructure their debts in the future. As is apparent, such predictions are dependent upon highly subjective judgments and dramatically fluctuating variables.

factors, and the marketplace, can change significantly, particularly in volatile markets such as those prevailing now.

The lenders' own testimony shows JPMorgan's interpretation of the Credit Agreement to be unfounded. As noted above, the lender and JPMorgan witnesses who testified at trial (and in discovery) could not identify even a single instance in which a bank had ever declared an event of default based upon the language of section 8(g)(v) based upon financial projections of what might occur in the future. Likewise, in 2007 and 2008, representatives of JPMorgan and the other lenders knew that Charter would run out of cash in 2009, 2010, or 2011 without new sources of cash or a restructuring of their obligations, yet *none* of the lenders believed or ever asserted that Charter's possible inability to pay debts in the future without additional funding or a restructuring of debt constituted an event of default under section 8(g)(v) of the Credit Agreement or under any other provision. 8/25/09 Tr. 59-63 (Kurinskas); 7/31/09 Tr. 52-53 (Peter Hooker); 7/31/09 Tr. 11-12 (Tina Ruyter); 8/18/09 Tr. 15 (Dep. Tr. 97:16-21) (Michael Pace); 8/18/09 Tr. 13 (Dep. Tr. 77:4-78:5, 80:22-81:3) (Ojea-Quintana); 8/18/09 Tr. 12 (Dep. Tr. 112:6-13) (Eric Federman). Rather, it was understood by all that projections of a future lack of cash to meet obligations months into the future could not give rise to an event of default because the Designated Holding Companies could pay their obligations with cash or liquidity obtained through any appropriate means.

Equally telling are the wholly inconsistent and unsubstantiated efforts of JPMorgan and the lender representatives to give meaning to their interpretation of the Credit Agreement. JPMorgan's witnesses at trial argued that the lenders could declare an event of default based upon projections about what might or might not be the case months or up to a year into the future. 8/31/09 Tr. 81-83 (Carlyn Taylor); 8/25/09 Tr. 30 (Kurinskas) (Agreement specifies no

time limit within which prospective default could be projected); 8/18/09 Tr. 12 (Dep. Tr. 144:12-23) (Zagar) (Lenders can declare default based upon projections of what might occur up to 14 months into the future).  But the language of section 8(g)(v) says nothing of the sort.  It makes no reference to the right to declare an event of default based upon what "might" occur or what might occur within any specified time.

In support of its position, JPMorgan argues that the Debtors' and Committee's interpretation of section 8(g)(v) would make that language redundant with other provisions of the Credit Agreement relating to actual non-payment of obligations.  But that is simply not true.  In addition to the language of section 8(g)(v) which is at issue with JPMorgan's claim, section 8(g)(v) provides that there will be an event of default if any of the Designated Holding Companies "shall generally not" pay its debts when they become due, and section 8(f) makes it an event of default if any of the Designated Holding Companies "other than Holdings" shall default in the payment of an obligation relating to any Indebtedness (or debt issue) in excess of $200 million.  Section 8(f) further provides that, for an event of default to occur under that provision as a result of a Designated Holding Company's failure to make an interest payment relating to a debt issue in excess of $200 million, there must also be an acceleration of that debt.  As the contract provisions show, the section 8(g)(v) language at issue in this case can apply even when there is *no* event of default under the "general failure to pay debts" provision of section 8(g)(v) and *no* event of default under section 8(f).  There is no redundancy whatsoever in the provisions.

JPMorgan also contends that its contract interpretation is supported by the standards or analyses utilized in providing "going concern" opinions or the language of unrelated statutes or

provisions. However, other provisions are based upon language which is different from section 8(g)(v) and are based upon very different policies or statutory purposes.[5]

In sum, section 8(g)(v) gives rise to an event of default only if one of the Designated Holding Companies is, *in fact*, unable to pay its debts at the time they come due. It cannot be invoked to create an "event of default" on the basis of a claim that a Designated Holding Company "might be," "will probably be," is "reasonably certain," or even "likely to be" unable to pay its debts at some point in the future.

## II.

### JPMORGAN'S CLAIM THAT THERE WAS AN EVENT OF DEFAULT AT THE TIME OF THE NOVEMBER 5, 2008 DRAW REQUEST BECAUSE CHARTER'S BOARD OF DIRECTORS ALLEGEDLY ERRED IN DETERMINING THE EXISTENCE OF "SURPLUS" AND DECLARING A DIVIDEND TO A DESIGNATED HOLDING COMPANY ON NOVEMBER 14, 2008 IS WITHOUT MERIT

Next, JPMorgan argues that there was an event of default at the time of the November 5, 2008 draw request by CCO because, according to JPMorgan, Charter's Board improperly determined that CCH I had "surplus" at a Board meeting on November 14, 2008, and improperly

---

[5] JPMorgan argues that it is appropriate to use projections as the basis for declaring an event of default because projections are used to determine future ability to pay debts in other contexts, such as "going concern" opinions in financial statements or under fraudulent conveyance laws. However, the analogy to "going concern" opinions, fraudulent conveyance statutes, or other bases for prognostication is misplaced because these other guidelines or statutes utilize different language, have different policies and purposes, or have different consequences from the provisions of the Credit Agreement. For example, the language of the Credit Agreement provides that there is an event of default only if a Designated Holding Company "shall" in fact "be unable to pay its debts" "as they become due." By contrast, fraudulent conveyance statutes have very different language and purposes. Unlike the Credit Agreement, fraudulent conveyance statutes focus on transfers made by a company without receiving "reasonably equivalent value" in return, and whether those transfers leave the company, *at the time the transfer is made*, with "unreasonably small capital" or with insufficient assets to pay its debts in the future. *See, e.g.*, 11 U.S.C. § 548; N.Y. Debtor and Creditor Law §§ 274-275 (McKinney's 2008). The very focus of fraudulent conveyance statutes is on the financial condition of a company *at the time the transfer is made* or *immediately after the transfer is made*. Indeed, state fraudulent conveyance statutes expressly give creditors the right to seek injunctive relief to enjoin a challenged transaction *before* it is carried out, as well as the right to sue at any time after a fraudulent transfer is made. N.Y. Debtor and Creditor Law §§ 278-279 The purpose of fraudulent conveyance statutes is to permit creditors to address the financial condition of a company at the time of the challenged transfer, whereas the Credit Agreement, by its terms, provides that there shall be an event of default only if a Designated Holding Company "shall be unable. . . to pay its debts as they become due." Similarly, the purpose of accounting provisions relating to "going concern" provisions is to enable auditors to warn investors about potential "risks" in the future, not to terminate credit agreements.

12

approved a dividend paid on that basis on November 15, 2008, to CIH, one of the Designated Holding Companies, to enable CIH to make an interest payment on its debt.

On November 5, 2008, CCO made a request for and received a $250 million draw on its revolving credit facility under the Credit Agreement.  Approximately two weeks later, on November 15, 2008, funds were transferred up from CCO, the operating company, to CCH II, from CCH II to CCH I, and from CCH II to CIH, respectively, to enable CIH to make a $62,812,000 interest payment on its debt, which CIH, in fact, made on November 17, 2008. 7/31/09 Tr. 100 (Eloise Schmitz).  On November 14, 2008, the CCI Board held a special meeting at which it reviewed the Debtors' financial condition and determined, unanimously, with input from Lazard, that there was adequate "surplus" to make the dividend distribution from CCH I to CIH.  Charter Exhibit 225; 7/31/09 Tr. 85-100 (Schmitz); 7/21/09 Tr. 207-214 (Neil Smit); 7/22/09 Tr. 186-95 (David Merritt).  JPMorgan argues that the dividend payment of $62,812,000 from CCH I to CIH was improper because CCH I allegedly lacked "surplus" to make the dividend payment under Delaware law and because the Board's determination that there was adequate "surplus" was in error.[6]

As we shall describe, JPMorgan's claim should be rejected both on the law and on the facts, and it completely ignores the applicable standard by which a Board's determination of "surplus" may be reviewed under Delaware law.

---

[6] On November 17, 2008, CIH and CCH each made interest payments on their debt of $62,812,000, and $7,871,000. The payment by CIH was made with funds dividended up from CCO through CCH II and CCH I.  The payment by CCH in the amount of $7,871,000 was made, in part, with funds transferred from CCO to Holdco, a parent company of the Designated Holding Companies, as a repayment of one of its intercompany notes and, in part, with cash on hand at Holdco which amounts together were then transferred downstream from Holdco to CCH.  JPMorgan does not concern itself with the CCH payment, but argues that CIH relied on a purportedly illegal dividend from CCH I in order to make its interest payment.

**A.     The Applicable Standard for Review of a Board's "Surplus" Determination
        And JPMorgan's Burden of Proof**

The applicable standard for judicial review of a Board's determination of the adequacy of "surplus" is well established under Delaware law.  As the Delaware courts have held, a Board's determination of "surplus," like other Board determinations, is subject to the "business judgment" standard and will only be set aside on the basis of a showing of "bad faith" or "fraud" on the part of the Board.  As the Delaware Supreme Court wrote in *Klang v. Smith's Food & Drug Ctrs, Inc.* in rejecting a plaintiff's challenge to a Board's determination of "surplus" —

> In the absence of bad faith or fraud on the part of the board, courts will not "substitute [our] concepts of wisdom for that of the directors." [cit. om.]  Here, plaintiff does not argue that the SFD Board acted in bad faith.  Nor has he met his burden of showing that the methods and data that underlay the board's analysis are unreliable or that its determination of surplus is so far off the mark as to constitute actual or constructive fraud.

702 A.2d 150, 156 (Del. 1997).

As the Delaware Courts have emphasized, Delaware law reflects a strong policy favoring application of the "business judgment" standard to the review of Board determinations.  Unless a Board's determination is made in bad faith and without rational support, its judgment cannot be challenged on the basis of conflicting expert views, hindsight, or differences of judgment.  *See, e.g., Brehm v. Eisner,* 746 A.2d 244, 260-62 (Del. 2000) (upholding Board's business judgment) ("It is the essence of the business judgment rule that a court will not apply 20/20 hindsight to second guess a board's decision, except 'in rare cases [where] a transaction may be so egregious on its face that the board approval cannot meet the test of business judgment.'"); *See also  Ryan v. Gifford*, 2009 WL 18143, at *6 (Del. Ch. Jan. 2, 2009); *In re Emerging Commc'ns, Inc. S'holders Litig.,* 2004 WL 1305745, at *15 (Del. Ch. May 3, 2004, revised June 4, 2004) (rejecting expert claim that management projections were utilized by Board in bad faith); *Morris*

*v. Standard Gas & Elec. Co.*, 63 A.2d 577, 585 (Del. Ch. 1949) (Absent fraud or "bad faith," the courts will refuse to substitute "either plaintiff's or its own opinion of value for that reached by the directors.").  Under Delaware law, JPMorgan cannot second-guess the Board's determination of "surplus" on the basis of the conflicting opinions of experts.  Rather, JPMorgan must establish that the Board's determination was not rational, lacked any reasonable support, and was made in bad faith.

Moreover, under section 1124(2) of the Bankruptcy Code, it is JPMorgan's burden of proof to establish that the Charter Board acted in bad faith and that there was a breach of the Credit Agreement.  In context of the assumption of executory contracts under section 365 of the Bankruptcy Code, in which the applicable principles governing the effect of defaults and the debtor's obligations to "cure" any such defaults are substantially identical to the legal principles governing reinstatement under section 1124(2), the Courts have repeatedly held that the creditor opposing assumption has the burden of proving that there was a breach of the agreement which the debtor must "cure."  *See, e.g.*, *In re F.W. Rest. Assocs., Inc.*, 190 B.R. 143, 147 (Bankr. D. Conn. 1995) ("Under a strict section 365(b)(1) analysis, the [creditor] bears the evidentiary burden of establishing the Debtor's default under the [agreement to be assumed].  If that burden is met, the Debtor-in-Possession then bears the burden of proof on the issues of prompt cure and adequate assurance of future performance."); *In re Kings Terrace Nursing Home and Health Related Facility,* 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 25, 1995) (creditor opposing assumption under section 365 has burden of proof of events of default precluding assumption; debtor has burden of establishing cure and adequate assurance after defaults have been proven); *In re Akron Thermal, Ltd P'ship,* 2008 WL 1886171, at *18 (Bankr. N.D. Ohio Apr. 25, 2008) (same); *In re Greektown Holdings, LLC,* 2009 Bankr. LEXIS 1231, at *4 (Bankr. E.D. Mich.

May 13, 2009) (same).  Under sections 365 and 1124(2) of the Bankruptcy Code, the applicable

legal issues are identical.  Accordingly, under each of these provisions, the creditor should have

the burden of proving an event of default, and the Debtor has the burden of proving that it has or

will "cure" any such default required for assumption of the executory contract or reinstatement

of the debt.

Here, as we shall describe, JPMorgan cannot carry its burden of proof.  The Charter

Board's determination that there was "surplus" to make the November 15, 2008 dividend

payment to CIH was not only a proper exercise of business judgment, but was supported by more

than sufficient evidence.

**B.      JPMorgan's Claim That the Board's Determination of "Surplus"
         Was in Bad Faith or Was Even in Error Is Without Merit_____**

While JPMorgan asks this Court for a determination that there was an event of default at

the time of the November 5, 2008 draw of $250 million on the basis of the supposedly

"improper" dividend payment, we note at the outset that the November 5, 2008 draw occurred

nearly *two weeks before* the November 14, 2008 Board meeting and the November 15, 2008

dividend payment.  Moreover, any contention by JPMorgan that the Debtors were unable to pay

their debts as they became due at the time of the November 5, 2008 draw is incorrect, because,

even if CCH I did not have adequate "surplus" to make the dividend payment (which we believe

it clearly did), the Debtors could have provided the funds to CIH to enable it to make its interest

payment through the payment of intercompany accounts, notes, or loans.  At trial, Charter's

CFO, Ms. Schmitz, testified that even if there had been insufficient surplus for a dividend,

Charter would have been able to make its November interest payments by using "amounts of

intercompany loans and intercompany payables in excess of that amount."  7/31/2009 Tr. at 100

(Schmitz).

In any event, JPMorgan's underlying claim — that the Board's "surplus" determination on November 14, 2008 was in error and that the November 15, 2008 dividend payment was "improper" — is wrong and should be rejected, both on the law and the facts.

JPMorgan cannot meet its burden of showing bad faith by Charter's Board. To the contrary, the record shows that Charter's Board properly determined that there was sufficient surplus to support the $62,812,000 dividend distribution from CCH I to CIH and had more than sufficient evidence to support its conclusion.

At its special meeting on November 14, 2008, Charter's Board considered the distribution of funds to both CIH and CCH to enable them to make their forthcoming interest payments of $62,812,000 and $7,871,000, respectively. Although the distribution to CCH was ultimately made through the payment of an intercompany account and funds on hand at Charter Communications Holding Company, LLC ("**Holdco**"), the Board had before it, and considered, a variety of inputs indicating that there was more than sufficient "surplus" to enable it to make distributions to both of the Designated Holding Companies through the payment of dividends. Charter Exhibit 225; 7/31/09 Tr. 85-100 (Schmitz); 7/21/09 Tr. 207-214 (Smit); 7/22/09 Tr. 186-95 (Merritt); 7/21/09 Tr. 36-42 (James Millstein). First, the Board considered a draft Duff & Phelps analysis prepared in connection with Charter's annual franchise impairment valuation on October 1, 2008, which showed a total enterprise value for Charter of $21.6 billion, and which indicated a surplus at the CCH I level of approximately $2.839 *billion* to support the proposed dividend to CIH of only $62,812,000. *Id.* Second, the Board "sensitized" the financial projections which had been utilized to assume substantially lower levels of assumed EBITDA growth, and even on that basis, concluded that there was likely to be more than $1 billion of

surplus in CCH I.[7] *Id.*; 7/21/09 Tr. 209-14 (Smit); 7/22/09 Tr. 190-92 (Merritt). Finally, the Board sought and obtained the input of James Millstein, a Managing Director of Lazard and Charter's long time advisor, who was intimately familiar with Charter's business and an expert in valuation. *Id.* Mr. Millstein confirmed the reasonableness of multiples utilized in the Duff & Phelps analysis. 7/21/09 Tr. 39-42 (Millstein); Smit Tr. 207; 7/22/09 Tr. 194-95 (Merritt).

Moreover, any claim by JPMorgan that the Charter Board's determination was in "bad faith," was unreasonable, or was even in error, is disproven by a variety of other contemporaneous, independent valuations of Charter done by JPMorgan, itself, and by other analysts of other lenders and investment banking firms. The enterprise valuation and sensitized analysis utilized by Charter's Board were either lower than, or equivalent to, contemporaneous enterprise valuations prepared by JPMorgan and by various other disinterested analysts, all of which valuations support the Board's determination and indicate that there was more than sufficient value to provide the "surplus" at CCH I for the dividend. *See* Charter Demonstrative Exhibit 33; 8/3/09 Tr. 122-25 (Bruce Den Uyl), citing JPMorgan equity analyst valuation dated as of October 6, 2008 (showing enterprise valuation in excess of $21 billion); Bank of America analyst valuation dated as of October 20, 2008 (showing enterprise valuation in excess of $21 billion); Morgan Stanley analyst valuation (showing enterprise valuation in excess of $23 billion); JPMorgan internal discounted cash flow valuation, Charter Exhibit 123 (using conservative zero percent terminal growth rate and nonetheless concluding as follows: "The base case DCF March '08, using conservative zero percent terminal growth rate and management projections, values Charter at 22.8 billion dollars.").

---

[7] Although the Board considered lower growth forecasts, the trial record shows that the company's actual EBITDA for 2009 has met or exceeded the forecasts and is up more than 10% versus 2008. Schmitz Tr. 99; Smit Tr. 200, 214.

While it is always easy to second-guess a Board's judgment months after the fact, particularly on the basis of subjective valuations prepared in volatile markets, the record before the Board at the time of the November, 2008 dividend distribution, and the trial record before the Court, show that there were more than sufficient grounds for the Board to conclude that there was adequate "surplus" for the dividend from CCH I to CIH.

## III.

### EVEN IF THERE WERE AN EVENT OF DEFAULT AT THE TIME OF THE NOVEMBER, 2008, OR FEBRUARY, 2009, DRAWS, THE DEBTORS WOULD BE ENTITLED TO CURE THE DEFAULT UNDER SECTION 1124(2)

JPMorgan argues that there were events of default under section 8(g)(v) of the credit agreement at the times of the November 5, 2008, and February 3, 2009, draws under the Credit Agreement. On November 5, 2008, CCO drew down $250 million under the Credit Agreement; based on the February 3, 2009 request, the banks advanced CCO only $350,000. As described above, JPMorgan contends that those draws were improper because there were events of default at the time of the draws, making CCO's implied representation, under section 5.2 of the Credit Agreement, at the time of each of the draws that there were no events of default untrue. For the reasons set forth above, JPMorgan's claims that there were events of default at the times of the draw requests should be rejected. But even if such claims were correct, the Debtors would have the absolute right, under section 1124(2) of the Bankruptcy Code, to cure any such defaults by repaying any draw which was received at the time of an existing event of default.

Section 1124(2)(A) of the Bankruptcy Code provides that a class of claims is unimpaired (and thus may be reinstated) if:

> (2) Notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default –

(A) [the plan] *cures any such default* that occurred before
or after the commencement of the case under this title  . . .

11 U.S.C. § 1124(2)(A) (emphasis added).

Under section 1124(2), "a debtor can cure its prepetition default under a note or other debt instrument." *In re Liberty Warehouse Assocs.*, L.P., 220 B.R. 546, 548 (Bankr. S.D.N.Y. 1998). "Congress carved out a small exception to impairment in section 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby "impair" a creditor's claim." *In re Taddeo*, 685 F.2d 24, 29-30 (2d Cir. 1982). Courts have made clear that "the concept of curing defaults under [section] 1124 necessarily includes the power not only to 'deaccelerate' and reinstate the original terms of the debt, but also to restore the relative position of the parties to their pre-default state." *In re Gillette Assocs.*, 101 B.R. 866, 875.

Accordingly, even if there was a default under the Credit Agreement at the time of any of the Debtors' draw requests (which there was not), such default would not preclude reinstatement because the Debtors would be able to cure the default by simply paying back the amount of the draw. This would "effect a total healing of the scars of contractual default by placing the parties into the same position as they were immediately before the default occurred" and the lenders would be "rightfully categorized as unimpaired." *In re Gillette Assocs.*, 101 B.R. at 875 (Bankr. N.D. Ohio 1989).

# IV.

## JPMORGAN'S CLAIM THAT THE PAUL ALLEN GROUP WILL NOT HAVE EQUITY INTERESTS WITH 35% OF THE VOTING POWER FOR THE MANAGEMENT OF CCO IS WITHOUT MERIT

In opposition to reinstatement, JPMorgan makes several arguments that the Plan will result in a breach of the "change of control" provisions of the Credit Agreement. The first of JPMorgan's arguments is that the Plan will result in a breach of section 8(k)(i) of the Credit Agreement because the Paul Allen Group will supposedly cease to have Equity Interests which will give it "at least 35% . . . of the ordinary voting power for the management of [CCO]."[8] Under JPMorgan's view, the Paul Allen Group would cease to have 35% of the voting power for the management of CCO unless it had a *majority* of the voting power of the shares of CCI. JPMorgan argues that, because CCO is a wholly-owned subsidiary of CCI, the equity interests of CCI (with respect to which the Paul Allen Group will have 35% of the voting power) do not have "voting power for the management of [CCO]," and the reference to "Equity Interests having at

---

[8] Section 8(k) states, in pertinent part, that it is an event of default if:

> (k)(i) the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower; (ii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group"; (iii) a Specified Change of Control shall occur; or (iv) the Borrower shall cease to be a direct Wholly Owned Subsidiary of Holdings (other than in connection with an issuance or sale of Equity Interests in the Borrower to CCH; provided that (x) such Equity Interests are contributed to Holdings on the date of such issuance and (y) no DHC Default shall have occurred and be continuing or result therefrom) . . . .

least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO]" in section 8(k)(i) must mean the Equity Interests of CCO. Accordingly, JPMorgan contends that the Credit Agreement requires that the Paul Allen Group have more than 50% of the voting shares of CCI.

The trial record and language of the Credit Agreement both squarely contradict JPMorgan's claim.

At the outset, the trial record establishes that the equity interests of CCI have "voting power" for the management of all of the Charter entities, including CCO. CCO and its immediate parent entities have no separate Boards or other managements of their own; the Board and other management of CCI serve as the management for CCO and all of the other Charter entities. 7/21/09 Tr. 190-92 (Smit). The Board of CCI is elected by the shareholders of CCI. Under the Plan and the Certificate of Incorporation for reorganized CCI, the Paul Allen Group will have more than 35% of the voting power of the shares of CCI and will also control four of the eleven positions on the CCI Board, which is more than 35% of the seats on the Board. The shareholders of CCI have ultimate power over the CCI Board and can direct the Board to take any action which they may deem appropriate. Accordingly, the equity of CCI clearly has and will have "voting power for the management of" CCO and for each of the other Charter entities, and the Paul Allen Group will control 35% of that "voting power."

JPMorgan asserts that the reference to "Equity Interests" in section 8(k)(i) of the Credit Agreement means the Equity Interests of CCO. But the language of section 8(k)(i), quoted in footnote 8 above, makes clear that this is not so. Thus:

(1) Subsections 8(k)(i)-(ii), the provisions relevant here, each speak of "Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting

power for the management of the Borrower."[9]  By contrast, subsection 8(k)(iv), which addresses a possible sale of CCO to an affiliate of CCI, refers to "Equity Interests in the Borrower."  If the Credit Agreement had intended the reference to "Equity Interests" in subsections 8(k)(i)-(ii) to mean "Equity Interests in the Borrower," then the agreement would have referred in subsections (i)-(ii) to "Equity Interests in the Borrower," just as it did in subsection (iv).

(2)  If subsections 8(k)(i)-(ii) meant the phrase "Equity Interests" to refer to "Equity Interests in the Borrower," then the reference to such interests being "determined on a fully diluted basis" in subsections (i)-(ii) would have little meaning.  As the trial record shows, options and warrants are held only for the stock of CCI, not for the equity interests of CCO, which is required under subsection 8(k)(iv) to remain a wholly-owned subsidiary of either CCO Holdings, LLC (referred to as "Holdings") or Charter Communications Holdings, LLC (referred to as "CCH").  7/22/09 Tr. 145 (Smit).

(3)  If subsections 8(k)(i)-(ii) meant to refer  to the equity interests of CCO, then the reference in subsections (i)-(ii) "35%" of the "voting power" of such shares as the basis for determining an event of default would also have little meaning.  Since CCO is a wholly-owned subsidiary of CCI (and is required to remain a wholly-owned subsidiary pursuant to section 8(k)(iv)), neither the Paul Allen Group nor a section 13(d) "group" could ever have 35% of the "voting power" of the equity interests of CCO; the Paul Allen Group or a section 13(d) "group" would either have *no* voting power of the CCO equity

---

[9] Section 1.1 of the Credit Agreement defines the generic term "Equity Interests" as follows:

> [A]ny and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all classes of membership interests in a limited liability company, any and all classes of partnership interests in a partnership and any and all other equivalent ownership interests in a Person, and any and all warrants, rights or options to purchase any of the foregoing.

(if it held less than 50% of the voting shares of CCI) or 100% of the voting power of the CCO equity (if it held more than 50% of the voting shares of CCI). Accordingly, JPMorgan's interpretation of the Credit Agreement language would make the reference to the 35% figure in subsections 8(k)(i)-(ii) meaningless.

(4) Since CCI is a public company and CCO is not, and since a section 13(d) "group" can exist only with respect to publicly traded equity, a section 13(d) "group" having the power *to vote* or to direct the voting of the "Equity Interests," as referred to in subsections 8(k)(i)-(iii), can exist only at the level of CCI ownership, not in the ownership of CCO equity.

In addition to the language of section 8(k), the history of the Credit Agreement refutes JPMorgan's contention. Under JPMorgan's view of the agreement, the Paul Allen Group would not have 35% percent of the voting power for management of CCO unless it had more than 50% of the voting power of CCI stock. However, the Credit Agreement was specifically amended in 2004 to eliminate the very requirement for which JPMorgan argues. Prior to 2004, the Credit Agreement contained a provision which required that the Paul Allen Group have at least 51% of the voting power of the equity. In the 2004 amendment, that provision was amended to require, instead, that the Paul Allen Group have only 35% of the voting power. 7/31/09 Tr. 74-75 (Schmitz); 8/25/09 Tr. 71-72 (Kurinskas). Indeed, the very purpose of that amendment was to enable the Debtors to attract new sources of liquidity to assist their de-leveraging efforts. 7/31/09 Tr. 74-75 (Schmitz). JPMorgan's contention that there is a breach of the Credit Agreement unless the Paul Allen Group holds at least 51% of the voting power of shares of CCI would undo those changes to the agreement.

In short, the trial record, and both the language and history of the agreement, make clear that the reference to "Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower" means the stock which, in reality, controls the companies and their management.  That is the stock of CCI.[10]   Since the Paul Allen Group will have more than 35% of the voting power of the stock of CCI, there is no breach of section 8(k)(i) of the Credit Agreement.

**V.**

**JPMORGAN'S CLAIM THAT THERE WILL BE A BREACH OF**
**THE CREDIT AGREEMENT BECAUSE A SECTION 13(d) "GROUP" WILL EXIST**
**WITH MORE THAN 35% OF THE VOTING CONTROL IS WITHOUT MERIT**

Next, JPMorgan argues that, following the effective date of the Plan, there will be an event of default under section 8(k)(ii) of the Credit Agreement, *quoted* in fn. 8 above, because certain members of the Crossover Committee whose shareholdings will aggregate in excess of 35% of the voting rights of the equity of the Reorganized Debtors will allegedly constitute a "group" under section 13(d) of the Exchange Act.  JPMorgan alleges that there will be a section 13(d) "group" consisting of consisting of "Apollo, Oaktree, and Crestview, together with support from Franklin."

JPMorgan's contentions are belied by the trial evidence and applicable law.  In particular: (1) the participation of bondholders on a committee (such as the Crossover Committee) which negotiates a chapter 11 plan does not make those bondholders members of a section 13(d) "group" and does not constitute a breach of section 8(k)(ii);  (2) there is no evidence of any agreement by Apollo, Oaktree, Crestview, or Franklin to vote their shares together as a "group"

---

[10] The that the Credit Agreement referred in subsections (i)-(iii) to Equity Interests having 35% of the voting power, rather than specifically to the stock of CCI, was that CCO was an indirect subsidiary of Holdco, an LLC having both CCI and Charter Investment, Inc. ("**CII**"), as its members.  Accordingly, the Paul Allen Group formerly had "voting power" through <u>both</u> its ownership of CCI stock and through its ownership of CII.

or to act as a "group" when they become shareholders of the reorganized Debtors; (3) the claims of "common objectives," past business relationships, "parallel investments," behavior patterns of "private equity firms," and the like are insufficient as a matter of law to turn individual holders into members of a section 13(d) "group" in the absence of an agreement to vote their shares together after the Plan becomes effective; and (4) because Franklin cannot possibly be viewed as a member of any section 13(d) "group," there could be no violation of section 8(k)(ii) of the Credit Agreement even if other members of the Crossover Committee had acted as a "group" because the remaining members would not have more voting power than the Paul Allen Group. Moreover, even if there were to be a "group" violating the thresholds of the Credit Agreement, the provisions of reorganized CCI's Certificate of Incorporation would automatically reduce the voting power of any such "group" to assure compliance with the Credit Agreement.

**A.** **Membership on the Crossover Committee Does Not Make Individual Members a Section 13(d) "Group" or Give Rise To a Breach of Section 8(k)(ii) of the Credit Agreement**

As the trial record shows, the members of the Crossover Committee made their own individual decisions to purchase debt of the various Debtors, purchased most of their debt long before the Crossover Committee was formed, had no knowledge of the other members' holdings at the times of their purchases, and became members of the Crossover Committee only after the Debtors announced their desire to negotiate with bondholders and requested the formation of a bondholders' committee in December, 2008. The trial record establishes that the members of the Crossover Committee made their own individual decisions as to how much, if any, stock of the reorganized Debtors they wished to purchase pursuant to the "rights offering" provisions of the Plan. Most importantly, the record establishes, and JPMorgan's own expert has conceded, that there is <u>no</u> agreement or understanding among the members of the Crossover Committee as to

how they will vote their shares when the Plan becomes effective and they become shareholders of the reorganized CCI.

In order for there to be a breach of section 8(k)(ii) of the Credit Agreement, there must be a section 13(d) "group" with more than 35% of the "voting power" of the shareholders and more "voting power" than the Paul Allen Group.  *Two* requirements must be met: (a) there be a section 13(d) "group" *and* (b) the "group" must consist of persons who, *while they are shareholders with "voting power,"* are acting as a section 13(d) "group."  In the absence of an agreement among holders as to how they will vote the shares which they will receive under the Plan, membership of bondholders on a committee that negotiates a reorganization plan, such as the Crossover Committee, and agreements by some of those members to purchase shares under the chapter 11 Plan, (i) do not make those bondholders members of a section 13(d) "group" and (ii) do not give rise to an event of default under section 8(k)(ii) of the Credit Agreement.  Here, neither of the two requirements is met.

At the outset, the existence of the Crossover Committee or agreements of individual members to purchase shares cannot trigger a default under the Credit Agreement in the absence of an agreement as to how they will vote their shares when they become shareholders.  The focus of section 8(k)(ii) of the Credit Agreement is on the "*voting power*" held *by shareholders* and how that voting power is exercised — not on the actions of *bondholders* in negotiating their recoveries under the chapter 11 Plan.  The fact that bondholders are members of the Crossover Committee or have signed "plan support" or other agreements long before they became shareholders to support a chapter 11 plan or to acquire shares under the Plan does not mean that they have any agreement or understanding to vote or act together as stockholders after the Plan becomes effective.  No such agreement exists and no such agreement was proven at trial.

Nor does the existence of a bondholders' committee, or the existence of "plan support" agreements among individual bondholders to purchase shares of the reorganized Debtors under the chapter 11 Plan, convert individual bondholders into a "group" under section 13(d) of the Exchange Act.

As shown in the Committee's Pre-Trial Brief, the *sine qua non* of a section 13(d) "group" is an agreement or understanding among shareholders to vote, acquire, or dispose of shares *as a "group." See* cases discussed in Committee's Pre-Trial Brief, at pp. 31-33. Here, no such agreement exists. The individual members of the Crossover Committee made their own individual decisions on the Crossover Committee and made their own individual decisions whether and how much to purchase of the shares of the reorganized Debtors pursuant to the rights offering under the Plan. Participants are purchasing such shares individually and not as a "group," with no agreement among the holders to retain, dispose of, or vote the shares which they will receive as a "group."

Moreover, as the applicable cases and statutory provisions show, in order for persons to be members of a "group" under section 13(d) of the Exchange Act, they must be shareholders at the time of their "agreement" or there must be an agreement governing how they will vote or act *at the time that they are shareholders.* Section 13(d)(1) of the Exchange Act, and the applicable Securities and Exchange Commission ("**SEC**") regulations, establish that section 13(d) applies only to agreements by persons who are shareholders, not agreements by persons on bondholder committees who are not shareholders and have no agreements to vote or act together as a "group" once they become shareholders. Section 13(d)(1) provides, in pertinent part, that "[a]ny person who, *after* acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered . . . is directly or indirectly the beneficial owner of more than 5 per

centum of such class" shall file "within ten days after such acquisition" a report on Schedule 13D with the SEC containing the information set forth in the statute and the applicable SEC regulations. 15 U.S.C. § 78m(d)(1) (emphasis added). SEC Rule 13d-5(b)(1), the rule that interprets section 13(d)(3), further provides that, where a "group" exists, the effect is to aggregate the shares which the members of the group hold *"as of the date of such agreement"* to determine if the 5% reporting requirement of section 13(d) is met.[11] SEC Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1).

Applying these provisions, the Courts have held that, in order for persons to be members of a "group" requiring the aggregation of their shares for reporting purposes, they must be holders of shares at the time that they are alleged to have acted as a "group" or must have an agreement to vote or act together after they become shareholders. *See, e.g., Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.*, 553 F.3d 1351, 1366 (11th Cir. 2008) ( "[A] beneficial ownership interest in securities is necessary to become a member of a group within the meaning of section 13(d)(3) of the Exchange Act"); *Rosenberg v. XM Ventures*, 274 F.3d 137, 145, 147 (3d Cir. 2001) ("[E]ach member of a section 13(d) group must hold beneficial ownership of the shares of the issuing entity *prior to* becoming a section 13(d) group member;" "one who does not have beneficial ownership of the equity securities of an issuer cannot be a member of a group of individuals that do have beneficial ownership.") (emphasis added); *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 370-71, 373 (S.D.N.Y. 1979) (holding that "one who is not the beneficial owner of any shares of the subject company is not a member of a

---

[11] Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1) provides:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

group within the meaning of Section 13(d)(3)" and that a defendant that had a right to receive shares that was contingent upon a future event at the time of actions claimed to make him part of a "group" could not be part of a section 13(d) group). As the Court wrote in *Hemispherx*:

> [T]he purpose of section 13(d)(3) is to prevent a group of persons from colluding to structure their interests in a company in a pool that would enable each individual to avoid the reporting requirement and evade the purpose of the statute. . . . As the Court noted in *Rosenberg*, "[t]he implication is, of course, that each member of the [section 13(d)(3)] group must have something to 'pool.'" . . . . Therefore, the goal of section 13(d)(3) is to prevent persons *who already have attained beneficial ownership* of some amount of an issuer's securities from combining to control over five percent of a class of securities, yet ducking the reporting requirement in section 13(d)(1). That is what section 13(d)(3) is about. That is its purpose.

553 F.3d at 1364 (citations omitted) (emphasis added).

In sum, JPMorgan's contention that the actions of the Crossover Committee members prior to their becoming shareholders constitute a violation of section 8(k)(ii) should be rejected: *first,* because section 8(k)(ii) applies only to the actions of shareholders exercising "voting power;" *second,* because the individual members of the Crossover Committee acquired their shares individually and have no agreement to act as a "group" after they become shareholders; and, *third,* because there can be no "group" under section 13(d) unless the members of the "group" have an agreement to act as a "group" at the time they are shareholders.

**B.**  **JPMorgan's Claim That Certain Members of the Crossover Committee Will Be a Section 13(d) "Group" After the Effective Date of the Plan is Without Merit**

As the trial testimony shows, and as JPMorgan's own expert admitted, there are no agreements or understandings between *any* of the members of the Crossover Committee, let alone holders who will collectively hold more than 35% of the shareholder voting power, to vote their shares or act as a "group" when they become shareholders of the reorganized Debtors.

In order for there to be a "group" under section 13(d), there must be an agreement or understanding among shareholders to vote their shares or act as a "group." *See, e.g., Portsmouth Square, Inc. v. S'holders Protective Comm.*, 770 F. 2d 866, 872 (9th Cir. 1985) (rejecting claim that shareholders who joined together to pursue litigation claims against a company were a section 13(d) "group"); *Litzler v. CC Invs., L.D.C.,* 411 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2006) ("To establish the existence of such a group [under section 13(d)(3)], there must be evidence of an agreement. . . . General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'"); *Scott v. Multi-Amp Corp.*, 386 F. Supp. 44, 70 (D.N.J. 1974) (quoting *Texasgulf, Inc. v. Canada Dev. Corp.*, 366 F. Supp. 374, 403 (S.D. Tex. 1973) ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person. There must be agreement to act in concert."); *Transcon Lines*, 470 F. Supp. at 375 (same); SEC Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1), *quoted* in fn. 11 above, stating that a "group" exists only when two or more persons "*agree*" to act together, and that the effect of such a "group" finding is to aggregate the shares held by such persons "as of the date of such *agreement*." (emphasis added).

JPMorgan's own expert, Paul Gompers, conceded both at trial and in his pretrial deposition that there is no agreement or understanding among any members of the Crossover Committee as to as to how they will vote their shares or act after the Plan becomes effective:

> Q.   And you have seen nothing yourself to indicate that these parties had an agreement to hold or dispose of Charter securities, correct?
>
> A.   That would be correct.
>
> Q.   And you're not aware of any agreement among Apollo, Oaktree, Crestview and Franklin to hold or dispose of Charter securities?
>
> A.   That is correct.

> Q. And you don't contend that these particular bondholders have any agreement to vote their securities on any particular issue?
>
> A. That is correct. As I testified a couple of times, I don't see any formal or informal governance agreement post-transaction.
>
> Q. And you don't contend that these firms have reached any agreement regarding any aspect of Charter's operations after exit?
>
> A. That is correct.

8/24/09 Tr. 243-44 (Paul A. Gompers).

Recognizing that there is no evidence of an agreement or understanding to vote or act together as shareholders, JPMorgan contends that certain members of the Crossover Committee should be considered to be a section 13(d) "group" because they may share common goals, may have common views, have invested together in the past, sometimes follow "loan-to-own" or "distressed-to-own" strategies, or may "cooperate" in the future. However, the cases make clear that the existence of a "group" must be established by proof of an agreement and cannot be established by assertions of common goals or objectives among the shareholders, business relationships, common views, "parallel investments," common investments in other companies, or the like. *See, e.g., Portsmouth*, 770 F.2d at 872 (rejecting claim that shareholders who each opposed a corporate transaction were a section 13(d) "group" because they joined together to pursue litigation claims against a company to stop the transaction); *Quigley Corp. v. Karkus*, No. 09-1725, 2009 U.S. Dist. LEXIS 41296, at *9-*10 (E.D. Pa. May 15, 2009), *quoting Scott*, 386 F. Supp. at 70 ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person. There must be agreement to act in concert."); *Litzler,* 411 F. Supp. 2d at 415 ("General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'"); *Hallwood Realty*

*Partners, L.P. v. Gotham Partners, L.P.*, No. 00 CV 1115 (LAK), at 612 -13 (S.D.N.Y. Feb. 23, 2001) (transcript of oral bench ruling) (rejecting claims that common objectives among shareholders, common goals, and past business dealings together establish a "group"), *aff'd,* 286 F.3d 613 (2d Cir. 2002); *Nat'l Home Prods., Inc. v. Gray*, 416 F. Supp. 1293, 1323 (D. Del. 1976) (rejecting claim that shareholders were a "group" simply because they shared common views and communicated with one another, where there was no evidence of an agreement to act as a "voting block" or to vote as a "cohesive block."); *Texasgulf*, 366 F. Supp. at 403 ("Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create a group which is deemed to be a statutory person.").

In *Hallwood*, for example, plaintiff made many of the same arguments made here to support its claim that the defendants, investors in Hallwood, had been acting as a section 13(d) "group" in opposing the management of the company, seeking to reverse corporate policies, and seeking to bring about a takeover of the company. Plaintiff asserted that the defendants had common goals and objectives, had common views of management, had shared their views with one another, and had a "common purpose." *Hallwood,* No. 00 CV 1115 (LAK), at 613-15. In rejecting the plaintiff's claims that these factors made the defendants a "group," the District Court wrote:

> [E]very one of these defendants had a common purpose. They have all acted and they are acting today for the common purpose of making money on their investments in Hallwood. That is quite obviously not enough. Rather, it is the plaintiff's burden in this case to show that it is more likely than not that the defendants acted collusively rather than independently to achieve that common objective. . . .
>
> The fact that several investors conclude that a stock is undervalued and buy it does not necessarily mean that they formed a group. Indeed, that's true even if they all know one another, speak on the phone every day, and even if one of their number was

the guy who first had the idea that the stock was undervalued and told everyone else. . . .

What one has to do instead or in addition, rather, is to draw back or focus on whether the inference of collusion really is justified in light of all the circumstances.

*Id.* As Judge Kaplan explained, even where defendants know each other, communicate, share a common view of the company and a common goal of maximizing their investments, and discuss their goals with each other, they are not a "group" in the absence of an agreement to vote and act together. *Id.* This is true even where each investor knows that it will benefit from maximizing the number of shares held by "like-minded investors." *Id.* at 616. *See also Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 449 (S.D.N.Y. 2001) (rejecting similar claims).[12]

Here, the trial record establishes that each of the members of the Crossover Committee will act in its own individual interest and that there are no agreements or understandings which convert any of those firms into members of a section 13(d) "group." The trial record establishes the following:

---

[12] In *Log On America*, the plaintiff alleged as follows:

Defendants acted together by express or tacit agreement as evidenced by the following facts, among others: (i) Promethean brought Citadel in as an investor [ ] on the day the Securities Purchase Agreement was signed, as Promethean indicated to Plaintiff it did not want on its own to purchase 50% of the Convertible Preferred Stock; (ii) Promethean and Citadel, in the past, have jointly invested in companies [ ] together through the purchase of Convertible Preferred Stock; (iii) Promethean and Citadel in each deal, upon information and belief, as well as in the instant transaction, used the same law firm to represent them; (iv) Marshall and Citadel have jointly invested together in other transactions; and (v) certain of the Defendants, as set forth above, have engaged in similar unlawful and fraudulent conduct in connection with similar transactions with other companies.

223 F. Supp. 2d at 449. The court found that these claims insufficiently alleged the agreement required to find a section 13(d) "group." *Id.*

1. <u>Franklin Advisors, Inc.</u>

The trial record establishes that Franklin Advisors, Inc. ("**Franklin**"), the largest holder of CCH I Notes, purchased its notes independently of any other firm, had a strong preference to receive notes rather than equity under the Plan, and has no agreement with any other member of the Crossover Committee as to how it will vote the shares that it will receive, as to whom it will designate as a director of CCI, or as to any other action which it may elect to take based upon its own individual judgment.

As of December 2008, Franklin was the largest holder of CCH I Notes. 7/23/09 Tr. 13 (Christine Villaluz). Between some time prior to 2004 and 2008, Franklin purchased more than $2.2 billion of notes of Charter entities across the capital structure, including debt of the parent entities of CCH I. *Id.* at 11-12. All of the purchases were made by Franklin funds for the purpose of generating income from the notes, and not with a restructuring or possible conversion of notes to equity in mind. *Id.* at 14-15, 50. Franklin did not discuss its purchases with other investment firms and did not know who the other holders of Charter debt were. *Id.* at 14-15. Franklin was surprised by the December 12, 2008 announcement that Charter was seeking to negotiate a restructuring with its noteholders, and Ms. Villaluz in fact had a "buy" rating on Charter debt at the time. *Id*. at 13-14, 17.

The formation of the Crossover Committee was at the initiative of Charter and its advisor, Lazard, not at the initiative of noteholders. 7/23/09 Tr. 18 (Villaluz); 7/21/09 Tr. 49-51 (Millstein). Lazard suggested that the noteholders form a committee so that the Debtors would have some group with which to negotiate. 7/23/09 Tr. 18 (Villaluz). Prior to the formation of the Crossover Committee, Ms. Villaluz had never met the representatives of Oaktree or Apollo. *Id.* at 29-31. As a member of the Committee, Ms. Villaluz favored distributions to CCH I holders in the form of an income producing note, rather than a distribution or rights offering of

equity, and proposed, as an alternative to the rights offering, a convertible note offering because of its preference for debt over equity. *Id*. at 32, 40-41; Charter Exhibit 364. Franklin ended up supporting the rights offering only because of the company's need for cash and the lack of support for its own proposals. 7/23/09 Tr. 34-35 (Villaluz). The Franklin fund which holds the CCH I Notes is a mutual fund, purchased the notes for income, does not pursue a "loan to own" investment strategy, and has no "control" positions among any of its top investments. *Id*. at 44-45, 58-59, 63-64.

Although Franklin, as the holder of more than 10% of the Class A shares of the reorganized CCI, will have the right to designate one of the 11 directors, Franklin intends to nominate an independent director who is not an employee of Franklin or the Debtors and has no affiliation with other members of the Crossover Committee. 7/23/09 Tr. 51-53 (Villaluz). Franklin has no agreements of any kind with any of the other Crossover Committee members or anyone else as to whom it will designate. *Id*. at 52-56. Franklin does not intend to give the independent director whom it designates instructions as to how to vote as a director and does not intend to reserve the right to remove its independent director if it disagrees with that person's votes. *Id.* at 53.

Franklin has no agreements with anyone as to how it will vote its shares of the reorganized CCI. 7/23/09 Tr. 59 (Villaluz). Franklin has no agreement with any other person or entity as to whether it will hold, sell, or transfer its Charter stock or securities, no agreement giving any other party any interest in or right of first refusal with respect to its securities, no agreement giving any other party "tag-along" rights should it elect to sell its shares, and no other agreement of any kind with respect to the retention or disposition of its shares. *Id*. at 59-60. Franklin considers itself a passive investor in Charter and intends to file a Form 13G with the

SEC stating that it is, and will remain, a passive investor following the receipt of its shares under the Plan. *Id.* at 61.

Indeed, the absence of Franklin from any section 13(d) "group" alone means that there can be no breach of section 8(k)(ii) of the Credit Agreement. Post-reorganization, the Paul Allen Group will hold 38.4% of the voting rights of all common shares of the reorganized CCI, determined on a fully diluted basis (*see* section 8(k)(ii) of the Credit Agreement), which is more than the 35.3% of the voting rights (also determined on a fully diluted basis) which Apollo, Crestview, and Oaktree will hold in the aggregate. *See* 8/21/09 Declaration of Stephen Goldstein ("**Goldstein Declar.**") ¶¶ 35-42; 8/24/09 Tr. 20-22 (Stephen Goldstein).

2.    Oaktree Capital Management

Oaktree Capital Management ("**Oaktree**") has held its Charter debt for 3-5 years. 7/29/09 Tr. 164 (Ken Liang). Oaktree purchased debt at virtually all levels of the Charter capital structure. *Id.* at 165. It made its purchases alone and without consulting any other party. *Id.* at 166, 168. Like others, Oaktree joined the Crossover Committee at the request of the Debtors and Lazard because of the Debtors' desire for a committee with which it could negotiate a Plan. *Id.* at 167. Oaktree has no agreement as to how it will vote the shares it will receive under the Plan, and has no agreement affecting whether or when it will sell its shares. *Id.* at 188-89. Oaktree expects to sell its shares when they reach an appropriate price providing it a profit on its investment. *Id.* Oaktree has no agreement giving it control over the actions of any other party. *Id.* at 188. Oaktree favored a smaller rights offering, not a larger one. *Id.* at 180. The idea of a rights offering was necessitated by the company's need for liquidity, and was never suggested by any party as a means for getting more equity. *Id.* at 180.

3.      Crestview Partners

Jeff Marcus, a managing director of Crestview, is an experienced cable operator who founded Marcus Cable which was sold to Charter in 1998.  7/29/09 Tr. 13-15 (Jeff Marcus). Crestview purchased CCH I notes in 2006 both for the interest income it expected to be generated on the notes and to use the notes as a means to make an offer to some cable systems from the company as part of a "spin off" which never materialized.  *Id*. at 18-9.  Crestview purchased Charter notes alone.  *Id*. at 19-20.  Like others, Crestview was surprised by the announcement of a Charter restructuring and joined the Crossover Committee at the request of the Debtors and Lazard.  *Id.* at 23, 27.  Crestview would have preferred that the Plan have no rights offering, but the offering was necessitated by the company's need for cash.  *Id*. 35-6, 38-9.  Crestview declined various opportunities to increase its commitment to the rights offering. *Id*. at 37-8.  Crestview does not expect to reach the threshold of 10% ownership entitling it to a director position on the Charter Board.  *Id*. at 42, 45.  Crestview has no agreement with any other party as to how it will vote its shares, or as to the retention or disposition of the shares it will receive.  *Id*. at 54-5.

4.      Apollo Management

Like the other members of the Crossover Committee, Apollo has no agreement with any other party as to how it will vote its shares when it becomes a shareholder of CCI.  7/28/09 Tr. 66, 69, 73-4 (Eric Zinterhofer).  Nor does Apollo have any agreement to hold its shares "jointly" with any other firm, to hold or retain its shares for any period of  time, to give any other party a right of first refusal on the sale of its shares or "tag along" rights.  *Id.*  Apollo is free to vote its shares, and to hold or sell its shares, as it deems appropriate in its own individual interest. Apollo became a member of the Crossover Committee at the request of Lazard and the Debtors.

*Id.* at 43.  When Apollo purchased its CCH I and CIH notes in 2007 and 2008, it purchased those notes individually and not in collaboration with any other party.  *Id.* at 28-42.

In short, there is no agreement among any members of the Crossover Committee, let alone firms that will be holders of more than 35% of the "voting power," to vote the shares that they will receive or to otherwise act as a shareholder "group."  Nor will there be a breach of the "control group" provision of the Credit Agreement.

## C.    If There Were a Section 13(d) "Group" with More Voting Power Than the Paul Allen Group, the Reorganized Debtors' Certificate Of Incorporation Would Cure Any Default

Finally, even if there were a section 13(d) group which acquired equity giving it more of the voting power than the Paul Allen Group, Article  IV(b)(i)(A)(1) of reorganized Charter's Amended Certificate of Incorporation provides that the voting power of any such "group" would be adjusted to a threshold below that of the Paul Allen Group, and it thereby assures that there will be no violation of section 8(k) of the Credit Agreement.  (*See* Charter Exhibit 406, Ex. 3 at 3 (CCI Amended Certificate of Incorporation Article IV(b)(i)(A)(1)).

## VI.

## JPMORGAN'S CLAIM THAT THERE ARE "CROSS DEFAULTS" UNDER SECTION 8(F) OF THE CREDIT AGREEMENT WHICH CANNOT BE CURED UNDER SECTION 1124(2) OF THE BANKRUPTCY CODE ARE WITHOUT MERIT

Finally, JPMorgan argues that the Credit Agreement cannot be assumed because there are "cross defaults" or a "cross acceleration" resulting from alleged defaults of the Designated Holding Companies under section 8(f) of the agreement.

Section 8(f) provides, in pertinent part, that there can be an event of default under the Credit Agreement if any of the Designated Holding Companies shall fail to pay any installment of principal on an outstanding issue of debt having a principal amount in excess of $200 million, or if there is a failure to make an interest payment or any other event of default which causes

such an issue of debt to be accelerated.[13]  JPMorgan claims that this provision has been breached either (i) because the indebtedness of the Designated Holding Companies has been "accelerated" as a result of the filing of their chapter 11 petitions, or (ii) because the Designated Holding Companies have failed to pay post-petition principal or interest on their pre-petition debt.

The applicable principles governing the enforceability of cross-default provisions in bankruptcy are well established.  Cross-default provisions are disfavored and will not be enforced to prevent reinstatement of a credit agreement or assumption of an executory contract where to do so would violate a policy underlying the Bankruptcy Code.  *In re Mirant Corp.*, 2005 Bankr. LEXIS 909, at *29 (Bankr. N.D. Texas May 24, 2005) (rejecting senior noteholders' claim that debtors' defaults on bank indebtedness and other bonds precluded reinstatement of senior notes under section 1124); *In re Plitt Amusement Co. of Washington*, 233 B.R. 837, 847-48 (Bankr. C.D. Cal. 1999) (cross-default provisions of a lease would be disregarded because they are impermissible restrictions on assumption and assignment). *Cf. also, In re Village Rathskeller, Inc.*, 147 B.R. 665, 672-73 (Bankr. S.D.N.Y. 1992) (citing *Queens Boulevard Wine & Liquor Corp. v. Blum*, 503 F. 2d 202 (2d Cir. 1974) (the bankruptcy court may refuse to enforce a provision of a lease "where enforcement would destroy the promising

---

[13] Section 8(f) of the Credit Agreement provides, in pertinent part, that it is an event of default if:

> [A]ny Designated Holding Company other than Holdings shall (i) default in making any payment of any principal of any Indebtedness (including, without duplication, any Guarantee Obligation in respect of Indebtedness) on the scheduled or original due date with respect thereto or (ii) default in making any payment of any interest on any such Indebtedness or default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, if such default or other event or condition, in each case with respect to this clause (ii), results in the acceleration of such Indebtedness prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) causes such Indebtedness to become payable; <u>provided</u>, that a default, event or condition described in clause (i) or (ii) of this paragraph (f) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clause (i) or (ii) of this paragraph (f) shall have occurred and be continuing with respect to such Indebtedness the outstanding aggregate principal amount of which exceeds $200,000,000.

possibility of reorganization for the debtor and would harm the landlord only to the extent of denying it a windfall."). JPMorgan's "cross-default" claims are baseless and should be rejected on multiple grounds.

First, section 1124(2) of the Bankruptcy Code provides that a credit agreement may be reinstated if the outstanding defaults are of a kind which are not required to be cured under section 365(b)(2) or if the defaults are in fact cured by the Debtors under their chapter 11 Plan. 11 U.S.C. § 1124(2)(A). Section 8(f) of the Credit Agreement provides that there can be an event of default if one of the Designated Holding Companies is in default of the payment of principal or interest on its debt. However, any such event of default by the Designated Holding Companies here will be cured by the Plan. Under the Plan, each of the Designated Holding Companies will get a discharge from its prepetition debt or new securities will be issued for old securities and the Designated Holding Companies will receive a discharge from all existing obligations. Indeed, after the effective date of the Plan, the Lenders will be in a *far better* position than they have been at any time prior to the filing of the chapter 11 petitions because the liabilities of the Designated Holding Companies will either be eliminated or reduced by billions of dollars, and because all defaults and prepetition obligations will be discharged.

The situation here is similar to that presented in *Mirant*, 2005 Bankr. LEXIS 909, at *29. There, as here, the debtors sought to reinstate certain senior debt under section 1124(2) of the Bankruptcy Code. The holders of the senior debt argued, among other things, that their debt could not be reinstated because their indenture contained a cross-default provision making defaults on other bank debt and bonds an event of default, even though the chapter 11 plan proposed to replace the other bank debt and bonds with new obligations and to discharge all

existing defaults. In rejecting the senior debtholders' claim and allowing reinstatement, the

Court wrote as follows:

> Movants have also asserted that MAG's default under its other bonds and its bank indebtedness constitutes an incurable default under section 501(3) of the Original Indenture. Movants argue that, as those creditors are impaired under the Plan, cure of the cross-defaults cannot be accomplished. However, it would be inconsistent with the purposes of Chapter 11 to allow such cross-defaults to defeat non-impairment of the Senior Notes. If the Plan is confirmed, the debt in default will be replaced by the obligations undertaken in the Plan. Thus, even if a cross-default could be asserted, confirmation of the Plan resolves and eliminates it.

*Id.* at *27-28. The Court further wrote:

> "Arguably, enforcing the cross-defaults against MAG would be tantamount to enforcing ipso facto clause, as MAG's default on other bond and bank debt was an inevitable result of MAG's chapter 11 filing."

*Id.* at n.27. Here, as in *Mirant*, JPMorgan's argument ignores the discharge provided by the

Plan. JPMorgan also ignores the purpose of the Credit Agreement provisions upon which they

purport to rely and the fact that, following the effective date of the Plan, the Designated Holding

Companies will have no prepetition debt, will have no defaults, and will be far *more*

creditworthy than they have ever been before.

JPMorgan's "cross default" or "cross acceleration" claim should also be rejected for other

reasons.

JPMorgan's claim that the senior secured debt cannot be reinstated because the filing of

the Designated Holding Companies' chapter 11 petitions caused an acceleration of their debt is

barred by the provisions of the Bankruptcy Code, which make clear that any such acceleration

caused by a chapter 11 filing is unenforceable to preclude reinstatement. Section 1124(2)(A)

expressly provides that debt may be reinstated under a chapter 11 plan "notwithstanding any

contractual provisions on applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment . . . after the occurrence of a default" if the plan

> cures any such default that occurred before or after the commencement of the case under this title, *other than a default of a kind specified in section 365(b)(2) of this title of a kind that section 365(b)(2) expressly does not require to be cured.* (emphasis added)

11 U.S.C. § 1124(2)(A).  Under section 365(b)(2), the acceleration of an entity's debt as a result of the filing of its chapter 11 petition is an *ipso facto* event which is not required to be cured.  *In re NextWave Personal Communications, Inc.*, 244 B.R. 253, 269 (Bankr. S.D.N.Y. 2000). Further, as the legislative history makes clear, reinstatement "consists of curing any default (other than a default under an *ipso facto* or bankruptcy clause) and reinstatement of the maturity of the claim or interest."  H. Rep. No. 95-595, at 408.  Such an *ipso facto* acceleration of the Designated Holding Companies' debt does not preclude reinstatement under the Plan.  *See, e.g., Mirant*, 2005 Bankr. LEXIS 909, at *29 fn. 27 (*quoted* at pp. 41-42 above); *Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir. 1995) ("[The Bankruptcy Code] invalidate[s] contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights 'frequently hampers rehabilitation efforts' by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most."); *In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004).

Moreover, even if the express provisions of the Bankruptcy Code did not bar JPMorgan's claims, their claims should be rejected because they violate fundamental, underlying policies of the Bankruptcy Code and because "cross default" provisions which violate such Bankruptcy Code policies will not be enforced.  *See* cases at p. 40 above.  If the filing of chapter 11 petitions by affiliates could give rise to "cross defaults" which could not be cured and which would preclude reinstatement, then reinstatement would be impossible in virtually every chapter 11

case involving affiliated debtors. Sections 1124(2) and 365(b)(2) embody strong policies against the use of *ipso facto* provisions to preclude the reinstatement of debt or assumption of executory contracts. *NextWave*, 244 B.R. at 269. Similarly, any contention that JPMorgan should be entitled to rely upon a "cross default" relating to debt of the Designated Holding Companies ignores the discharge and fresh start provisions of the Bankruptcy Code which enable the Debtors to eradicate the debt of the Designated Holding Companies and which will leave the Designated Holding Companies in a far sounder financial position than they have ever been in before. Where, as here, cross-default claims would serve to subvert the policies of the Bankruptcy Code in order to provide the objecting parties with a windfall, those provisions will not be enforced. *See, e.g., Mirant*, 2005 Bankr. LEXIS 909, at *29; *Plitt Amusement*, 233 B.R. at 847-48 (Cross-default provisions of a lease would be disregarded because they are impermissible restrictions on assumption and assignment); *Village Rathskeller, Inc.*, 147 B.R. at 672-73 (*quoted at p. 40 above*).

JPMorgan's claim that reinstatement is precluded because of a "cross default" or "cross acceleration" under section 8(f) should be rejected.

## VII.

### THE CLAIM OF THE CCI NOTEHOLDERS THAT THEY SHOULD RECEIVE ADDITIONAL RECOVERIES UNDER THE PLAN SHOULD BE REJECTED

The CCI Noteholders assert various objections to the Plan, claiming that they are entitled to more than they will receive. In particular, they claim (i) that they are not receiving everything to which they are entitled under section 1129(a)(7) of the Bankruptcy Code and (ii) that the Plan supposedly violates section 1129(b) because it allegedly does not comply with the "absolute priority rule" or provides value to Mr. Allen on account of his equity interests, and (iii) that the Plan classifies creditors of CCI improperly.

The Committee joins in the Debtors' responses to each of the CCI Noteholders' objections set forth in the Debtors' Pre-Trial Memorandum of Law in Support of Confirmation (the "**Debtors' Pre-Trial Brief**") and in the Debtors' Post-Trial Brief in Support of Confirmation (the "**Debtors' Post-Trial Brief**").  We shall not repeat all of those arguments here.  The Committee believes that the Plan complies with sections 1129(a)(7) and 1129(b).  Contrary to the claims of the CCI Noteholders, the Committee believes that the CCI Noteholders are receiving everything they are entitled to receive under the Plan, and very possibly *more*.

A.      **The Plan Complies With Section 1129(a)(7) of the Bankruptcy Code**

Since CCI is the ultimate parent company of the Debtors, the claims of the CCI Noteholders are structurally subordinated to the claims of all of the other creditors of the Debtors, including more than $19 billion of other outstanding debt.  The offering documents upon which the CCI Notes were issued and the Debtors' other filings with the SEC over the years clearly and expressly set forth the fact that the CCI Notes were structurally subordinated to all of those other claims.  8/17/09 Tr. 55-57 (Greg Doody).  Notwithstanding this fact, the holders of CCI Notes will receive, under the Plan, $162.5 million of CCI preferred stock, representing a recovery of approximately 32.7% on the face amount of the CCI Note claims, plus the right to receive such portion, if any, of the proceeds of a litigation settlement that the Court may determine should be allocated to CCI or Holdco.   *Id.* at 51-52.  Indeed, following the CCI Noteholders' assertion of their claims, the Debtors increased the distribution to them by $66 million.  *Id.* at 51, 58.

Pursuant to section 1129(a)(7) of the Bankruptcy Code, the CCI Noteholders are entitled to receive distributions  "of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive. . . if the debtor were liquidated under chapter 7 of this title on such date. . . ."  Clearly, they are receiving substantially *in excess* of that.  The Debtors'

liquidation analysis, prepared by Lazard, shows that, in a liquidation under chapter 7, the CCI

Noteholders would receive recoveries in the range of approximately $92 million or

approximately 18.4 % of their claims.   8/17/09 Tr. 52-53 (Doody).  Their recoveries under the

Plan will far exceed those amounts.  As set forth in the detailed responses to each of the CCI

Noteholders' claims in the Debtors' Post-Trial Brief, the proposed distribution to the CCI

Noteholders already compensates them for all of the amounts which they are due, and the

additional claims which the CCI Noteholders make are for amounts to which they are not

entitled.

At the trial, the CCI Noteholders failed to establish that they are entitled under section

1129(a)(7) to anything more than what will be paid to them under the Plan.  Among their

principal claims were the following:

1. <u>Claims Based Upon Lazard's Liquidation Calculation</u>.  The CCI Noteholders

argue that Lazard's valuation of the Debtors for liquidation purposes was incorrect.  Valuing the

Debtors on the basis of a distressed liquidation sale as a going concern in chapter 7, Lazard

arrived at an estimated enterprise value within a range of $12.285 to $13.820 billion.  Disclosure

Statement, Ex. E.  The CCI Noteholders' claim that the valuation is too low because non-

liquidation basis valuations of Charter are higher is misplaced because the Lazard valuation was

done on the basis of a distressed liquidation in chapter 7 calculated as of a different period.

Moreover, because CCI is structurally subordinated to the rights of the other Charter entities,

even a significant difference in Lazard's conclusion of enterprise value would make no

difference to the holders of CCI Notes.

2. <u>Claims Based Upon Alleged Preference or Avoidance Actions</u>.  The CCI

Noteholders argue that they are entitled to added distributions on account of avoidance claims

which Holdco or CCI might have arising out of payment of trade claims, payments to management, or repurchases of debt in 2008. As Mr. Doody explained, and the analysis prepared by AlixPartners shows, it is unlikely that Holdco or CCI could recover anything more than a minimal amount on the basis of such claims. Charter Ex. 303; 8/17/09 Tr. 74-80 (Doody). Moreover, avoidance claims arising out of the repurchases of debt would be subject to the safe harbor provisions of section 546(e) of the Bankruptcy Code precluding the recovery of payments made to settle securities transactions. *See Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006). The expert propounded by the CCI Noteholders failed to present any expert opinion to rebut the Debtors' analysis and confirmed that he was not even in a position to render an opinion about the merit of any alleged avoidance claims or the recoveries that could be obtained. 9/1/09 Tr. 185-90 (Edward McDonough).

3.     Claims Based Upon NOLs.  The CCI Noteholders claim that NOLs generated through losses of the operating companies, including CCO, "belong" to CCI and that the CCI Noteholders should receive additional distributions under the Plan to compensate them for these NOLs. They are wrong for a variety of reasons.

First, the law is clear that NOLs belong to the operating entity which generated them, not to a parent corporation. *See, e.g., In re Prudential Lines, Inc.*, 928 F.2d 565, 569-70 (2d Cir. 1991) (Affirming order enjoining parent corporation from taking action what would affect debtor subsidiary's use of NOLs generated as a result of subsidiary's operations); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them.") As the Courts have made clear, the fact

that the parent files consolidated returns on behalf of a consolidated group, or that it is the party

which receives a refund from the IRS, does not mean that the parent is the owner of the NOLs:

> The fact that a subsidiary's NOL ultimately may be used to offset
> another corporation's income does not mean that the subsidiary loses
> any interest in its NOL.  The common parent acts as an agent on behalf
> of all the members of the consolidated group 'for the convenience and
> protection of [the] IRS only.'  *Jump v. Manchester Life & Casualty
> Management Corp.,* 579 F.2d 449, 452 (8th Cir. 1978); *accord In re
> Bob Richards, supra,* 473, F.2d at 265.  The corporations retain their
> separate identities and the property interests of the subsidiaries are not
> absorbed by the common parent.  *Wolter Constr. Co., Inc. v.
> Commissioner,* 634 F.2d 1029, 1038 (6th Cir. 1980).  It follows that a
> corporation does not lose any interest it had in the right to use its NOL
> to offset income because of its status in a group of affiliated
> corporations that file a consolidated tax return.

*Prudential Lines*, 928 F. 2d at 571.

Moreover, under section 1129(a)(7), the obligation of a Plan is to give the CCI

Noteholders, as a non-accepting class, the same value that they would receive in a chapter 7

liquidation.  In a chapter 7 liquidation of CCI, the NOLs would have no value since CCI is not an

operating company and does not produce any income of its own which against which the NOLs

could be utilized.  8/17/09 Tr. 37-41 (Doody).

**B.**     **The CCI Noteholders' Objections Based Upon Section 1129(b) Are Without Merit**

The CCI Noteholders also argue that the Plan does not comply with section 1129(b) of

the Bankruptcy Code because it supposedly violates the absolute priority rule by diverting

"value" from CCI to holders of claims against Charter subsidiaries and to Mr. Allen, and because

the Plan allegedly unfairly discriminates against the CCI Noteholders.  The principal allegations

in support of these claims are as follows: (i) that the NOLs generated by the operating companies

supposedly belong to CCI and are benefitting creditors of the subsidiaries instead; (ii) that Mr.

Allen is supposedly receiving "value" on account of his equity interests; and (iii) that Class A-3

creditors of CCI have been improperly classified as a separate class from the Class A-4 CCI

Noteholders. Because these claims are being addressed in detail by the Debtors in their Post-Trial Brief, we will address them only briefly here:

(i) The CCI Noteholders' claim that the value of the NOLs is being diverted to junior creditors is misplaced. As set forth at pp. 47-48 above, the NOLs generated by the operating subsidiaries do not belong to CCI, and there is therefore nothing being diverted away from CCI or the CCI Noteholders to which they are entitled. Nor is there any violation of section 1129(b) or the absolute priority rule because the CCI Noteholders are getting far in excess of what they would get in a liquidation, as required by section 1129(a)(7), and nothing is being diverted to junior creditors of CCI to pay them ahead of the holders of the CCI Notes.

(ii) The claim that Mr. Allen is receiving value on account of his equity in CCI under the proposed settlement is wrong. As the trial record shows, the consideration which he will be paid under the proposed settlement is to be paid entirely on account of his agreements under the proposed settlement, including his agreements to cooperate to enable the senior debt to be reinstated and to enable the Debtors' NOLs to be preserved, his transfer to the Debtors of his interests in CC VIII, his transfer of other rights to the Debtors, and the other consideration referred to below.

(iii) The Committee agrees that the Class A-3 and Class A-4 Claims against CCI were properly designated as separate classes under the Plan for the reasons set forth by the Debtors in their Post-Trial Brief.

**VIII.**

**THE SETTLEMENT WITH PAUL ALLEN SHOULD BE APPROVED**

The Committee has carefully reviewed the proposed settlement with Paul Allen. While the payments to Mr. Allen and his affiliates are substantial, the benefits to the Debtors and to creditors far outweigh the cost. The settlement is critical to the Debtors' chapter 11 Plan.

Without Mr. Allen's agreement to the settlement and the Plan, the Debtors would, in all likelihood, be unable to reinstate their $11.8 billion of secured debt, at a possible cost to the Debtors of more than $500 million per year; the Debtors would be unable to preserve their net operating losses and related tax attributes, which have been valued at more than $2.8 billion; and the Debtors would be unable to confirm their Plan, very possibly resulting in a freefall chapter 11 which would yield far lower benefits for creditors and many more months of chapter 11 proceedings at significant expense to the estate.

The cornerstone of the Plan is the reinstatement of the Debtors' more than $11.8 billion of secured debt at a saving to the Debtors of more than $500 million per year. Under section 8(k)(ii) of the Credit Agreement, and similar provisions of the other senior credit facilities, the senior debt cannot be reinstated pursuant to Bankruptcy Code section 1124(2) unless Mr. Allen agrees to maintain at least 35% of the voting power of CCI to avoid a change of "control." The proposed settlement enables the Debtors to reinstate their senior debt. Reinstatement of the senior debt will save the Debtors far in excess of the net amount to be paid to Mr. Allen, particularly when the "hard assets" which he is transferring to the Debtors, including his return of the CC VIII interests and his relinquishment of other rights, are taken into account. Given the enormous benefits that the Debtors' proposed Plan will bring to creditors and to the Debtors, the Committee would not want to place that Plan at risk. The Committee and its advisors believe that the consequences of jeopardizing the Plan could be protracted chapter 11 proceedings at an additional cost to the estate of tens of millions of dollars and a chapter 11 plan which is far less favorable than the Debtors' proposed Plan.

Second, the Committee believes that the negotiation with Mr. Allen was the product of an "arms-length" negotiation. Mr. Allen and the Debtors had their own separate representation and

advisors.  The settlement was reviewed and approved by the independent members of the CCI Board.  More importantly, the negotiation of the settlement was principally the result of an apparently heated negotiation between the Crossover Committee, representing bondholders, and representatives of Mr. Allen.  It is clear from the testimony regarding those negotiations that the Crossover Committee made every reasonable effort to maximize the benefits to the estate and to minimize the payments to Mr. Allen.  Moreover, since the settlement with Mr. Allen will be paid for largely by the equity to be purchased by members of the Crossover Committee pursuant to the rights offering, members of the Crossover Committee had every incentive to negotiate as low a settlement with Mr. Allen as they could.

Third, while the size of the payment to Mr. Allen is substantial, a portion of that payment is attributable to transfer of assets to the Debtors and the settlement of claims.  Pursuant to the settlement, CII, Mr. Allen's affiliate, will transfer to the Debtors its 30% ownership interest in the in CC VIII Class A Preferred Units, which has a value of $135-165 million.  Goldstein Declar. ¶¶ 26, 30; Goldstein Declar., Exhibit B.  The Committee agrees with Lazard's valuation of the CC VIII interest which is to be transferred by Mr. Allen to the Debtors.  In addition, Vulcan, Inc. ("**Vulcan**") will receive payment of a $25 million management fee receivable owed by CCO, the Debtors' solvent operating company; Mr. Allen will receive the same distribution as other creditors on account of his $47 million of CCH I Notes and $148 million of CCH I Holdings, LLC Notes; and up to $20 million is to be paid to Mr. Allen as a reimbursement of his expenses.  Goldstein Declar. ¶¶ 26-34; Goldstein Declar., Exhibit B.

When the foregoing distributions are taken into account, the Committee believes that approximately $185-210 million of the value to be paid to Mr. Allen is to be paid to him in consideration of his agreement to retain 35% percent of the voting power and to take no actions

which would trigger a loss of the Debtors' billions of dollars of NOLs. While that amount is very substantial, the benefits of the settlement to the Debtors far outweigh the cost. The Committee agrees that the benefit to the Debtors of reinstatement of the senior secured debt is, without doubt, an amount in the many hundreds of millions of dollars per year, and very likely $500 million per year, for the remaining terms of the credit agreements. Even a 3% increase of the interest rate under the senior credit facilities would cost the Debtors more than $300 million per year. Likewise, the Committee agrees with the assessment by Lazard that the preservation of the NOLs will have a benefit to the Debtors in terms of cash tax savings in excess of $1.14 billion. Viewed in this light, the net effect of the settlement with Mr. Allen is to save the Debtors, and indirectly their creditors, billions of dollars in debt service and tax savings alone, dwarfing the amounts to be paid to Mr. Allen.

Reinstatement of the senior secured debt is only possible with Mr. Allen's agreement to retain his involvement in Charter and not to trigger a change in control. He must agree to retain 35% of the voting power and to place four members on the CCI Board. Given that Mr. Allen will only have a 2% economic interest as a result of the Plan, there is every reason to believe that he would not agree to such terms in the absence of a substantial payment. By agreeing to maintain his voting power and to place nominees on the Board, Mr. Allen has undertaken substantial fiduciary duties to the Debtors over future years. He will be required to maintain the personnel and staff which he has maintained in the past to monitor Charter closely and to represent him properly on the Board. More importantly, by retaining such voting power and Board representation, Mr. Allen will be exposing himself to future litigation if business or legal issues should arise in future years. Because of Mr. Allen's substantial resources, he could well become a lightning rod for any future litigation.

The applicable standard for review of a proposed settlement pursuant to Bankruptcy Rule 9019 is well established.  A settlement should be approved if it is within the range of the Debtors' reasonable business judgment.  *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) (Settlement recommended by Debtors should be approved unless it is "below the lowest point in the range of reasonableness.").  Settlements are "favored in bankruptcy' because they minimize the costs of litigation and further the parties' interest in expediting the administration of a bankruptcy estate."  *In re Hilsen*, 404 B.R. 58, 69 (Bankr. E.D.N.Y. 2009) (citing *Inv. Exch. Group, LLC v. Colorado Capital Bank (In re The 1031 Tax Group, LLC)*, 2007 WL 2455176, at *3 (Bankr. S.D.N.Y. Aug. 23, 2007).  In determining whether a settlement is fair and equitable and should be approved pursuant to Bankruptcy Rule 9019, courts in this jurisdiction consider the factors articulated by the Second Circuit in *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).  Those factors are:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment; (3) the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining.

*Id*. at 462 (internal citations omitted).  This analysis does not require that the bankruptcy court "conduct a mini-trial to decide the numerous questions of law and fact raised."  *Stone Barn Manhattan*, 405 B.R. at 75; *see also, In re Adelphia Comm. Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005).  Rather, the bankruptcy court will "canvass the issues" raised by the parties and

decide whether a proposed settlement falls "below the lowest point in the range of reasonableness." *Stone Barn Manhattan*, 405 B.R. at 75.

The Committee believes that the proposed settlement with Mr. Allen should be approved because the benefits of the settlement far outweigh the costs, because the settlement is necessary to enable the chapter 11 Plan to be confirmed, and because the criteria for approval of a proposed settlement are met in this case.

## <u>CONCLUSION</u>

For the reasons stated above and in the Debtors' submissions to the Court, the Court should allow reinstatement and reject the claims of JPMorgan, the CCI Noteholders, and the other objecting parties.

Dated: New York, New York
      September 18, 2009

 

Respectfully submitted,

ROPES & GRAY LLP

By: */s/ David S. Elkind*
    David S. Elkind (DE 4054)
    Keith H. Wofford (KW 2225)
    Mark R. Somerstein (MS 9721)
    Russell L. Lippman (RL 2492)
    Nila W. Williams (NW 5969)
    Dana L. Myers (DM 0218)
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

Counsel to the Official Committee
of Unsecured Creditors