**BROWN RUDNICK LLP**
Edward S. Weisfelner
David J. Molton
May Orenstein
Daniel J. Saval
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
(212) 209-4800

-and-

Andrew P. Strehle
Caleb B. Piron
One Financial Center
Boston, Massachusetts 02111
(617) 856-8200

*Counsel to Wells Fargo Bank, N.A.,
solely in its capacities as successor
Administrative Agent and Collateral Agent*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., ) | |
| et al., ) | Case No. 09-11435 (JMP) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**POST-TRIAL BRIEF OF WELLS FARGO BANK, N.A., AS SUCCESSOR ADMINISRATIVE AGENT AND COLLATERAL AGENT, IN FURTHER SUPPORT OF ITS OBJECTION TO CONFIRMATION OF THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO <u>CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>**

Wells Fargo Bank, N.A., in its capacities as successor Administrative Agent and successor Collateral Agent (collectively, the "Third Lien Agent") for the third lien pre-petition secured lenders (the "Third Lien Lenders" and, together with the Third Lien Agent, the "Third Lien Secured Parties") to CCO Holdings, LLC ("CCOH"), by and through its undersigned counsel, hereby submits this post-trial brief in further support of its Objection to confirmation of the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 320] (the "Plan"),[1] and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The confirmation hearing has provided further compelling evidence of what was evident from the terms of the Plan itself – that the restructuring of these Debtors pursuant to the Plan is the means by which Apollo Management Holdings, L.P. ("Apollo"), Oaktree Capital Management, L.P. ("Oaktree"), Crestview Partners, L.P. ("Crestview") and Franklin Resources, Inc. ("Franklin") have jointly pursued a strategy to acquire control of the Debtors. Specifically, the evidence has shown that these firms (i) agreed among themselves to acquire the lion's share of the new equity distributed under the Plan, pursuant to the Rights Offering that they engineered; (ii) agreed to the mechanics for the appointment and election of directors to the new Board; (iii) with respect to Apollo, Oaktree and Crestview, agreed to deliver Jeffrey Marcus (managing director of Crestview) a Board seat; and (iv) took steps to cover up their takeover scheme.

2. Based on the applicable legal standards (discussed below), the evidence elicited at the confirmation hearing – both direct and circumstantial – overwhelmingly supports a finding

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Plan.

2

that, as of the Effective Date of the Plan, Apollo, Oaktree, Crestview and Franklin will constitute a "person" within the meaning of Section 13(d)(3) of the Exchange Act with beneficial ownership of more than 35% of the voting stock of the reorganized company. Accordingly, the evidentiary record compels the conclusion that the Plan is not feasible because it will trigger a Change of Control under the CCOH Credit Facility as well as the other secured loan agreements proposed to be reinstated, resulting in the acceleration of some $11.8 billion in senior debt shortly after the Debtors' emergence from Chapter 11. The Debtors, therefore, are unable to sustain their burden of establishing that the Plan meets the feasibility requirement of 11 U.S.C. § 1129(a)(11).[2]

**THE EVIDENCE FIRMLY ESTABLISHES
THE EXISTENCE OF A 13(D) GROUP**

**I.　Applicable Legal Authority.**

3.　Section 13(d)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the "Exchange Act") provides that "when two or more persons act as a partnership, limited partnership, syndicate, or other group for purposes of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person.'" See 15 U.S.C. § 78m(d). The legislative history confirms that the purpose of the provision was to prevent evasion of the disclosure requirements of Section 13(d):

---

[2]　In its Objection to confirmation of the Plan filed on July 13, 2009 [Docket No. 584], the Third Lien Agent asserted objections to the Plan on other grounds, including that (i) the Plan was not proposed in good faith; (ii) the Debtors cannot establish that the CII Settlement meets the standards for approval of a compromise pursuant to Fed. R. Bankr. P. 9019; (iii) the third party releases in the Plan are unsustainable; and (iv) the CCOH Credit Facility cannot be reinstated if incurable defaults exist under the CCO Credit Facility. The Third Lien Agent maintains that the Plan should not be confirmed based on those objections as well, and submits that the evidence elicited at the confirmation hearing further supports those objections. The Third Lien Agent has focused exclusivity on the Change of Control issue in this post-trial brief because, in light of the

3

> This provision would prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than…[5] percent of a class of securities at the time they agreed to act in concert….This provision is designed to obtain full disclosure of the identity of any person or group obtaining the benefits of ownership by reason of any contract, understanding, relationship, agreement or other arrangement.

Morales v. Quintel Entm't, Inc., 249 F.3d 115, 123 (2d Cir. 2001); see also Gaf Corp. v. Milstein, 453 F.2d 709, 718 (2d Cir. 1971), cert. denied, 92 S. Ct. 1610 (1972) ("The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of potential changes in control resulting from new aggregations of stockholdings and was not intended to be restricted to only individual stockholders who made future purchases and whose actions were, therefore, more apparent.").

4. The rules promulgated by the Securities and Exchange Commission ("SEC") under Section 13(d) of the Exchange Act, including Rule 13d-5 ("Acquisition of Securities") and Rule 13d-3 ("Determination of Beneficial Ownership"), are intended to provide a "broad definition…in order to obtain disclosure from all those persons who have the ability to change or influence control." See SEC Filing and Disclosure Requirements Relating to Beneficial Ownership, Exchange Act Release Nos. 33-5925, 34-14692, 43 Fed. Reg. 18,483, 18,489 (Apr. 28, 1978)). Rule 13d-5 provides: "When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the [Exchange] Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons." See 17 C.F.R. § 240.13d-5(b)(1).

---

voluminous evidence introduced on this issue, the Third Lien Agent believes it would be helpful

5. The Second Circuit has held that a court evaluating an allegation of the existence of a group must "determine whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between the [alleged group members]" for the purpose of acquiring, holding or disposing of securities. See Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982) ("Wellman"); see also Morales v. Quintel, 249 F.3d at 124 ("we must examine the record to determine whether sufficient evidence supports an inference that such an agreement or understanding exists"); Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 286 F.3d 613, 618 (2d Cir. 2002) ("Hallwood") ("…a complex factual finding such as that required here cannot be reduced to a checklist"); Roth v. Jennings, 489 F.3d 499, 508 (2d Cir. 2007) ("The formation of such a group may be formal or informal and may be proved by direct or circumstantial evidence."); CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 562 F. Supp. 2d 511, 554 (S.D.N.Y. 2008) ("CSX") ("Each case presents the issue whether the trier of fact is persuaded by a preponderance of the evidence that the [alleged members] before it formed a group. Each turns on its own facts.").

6. An agreement or understanding to act together "need not be unconditional in order to support a finding that the actors constituted a group" within the meaning of Section 13(d). See Roth, 489 F.3d at 508; Wellman, 682 F.2d at 363. Nor need the group "be committed to acquisition, holding, or disposition on any specific set of terms," but rather they need only have "combined to further a common objective…[and] the concerted action of the group's members need not be expressly memorialized in writing." See Wellman, 682 F.2d at 363; see also Corenco Corp. v. Schiavone & Sons, Inc., 488 F.2d 207, 217 (2d Cir. 1973); Morales v. Freund, 163 F.3d 763, 767 n.5 (2d Cir. 1999); Hallwood, 286 F.3d at 617; Roth, 489 F.3d at 508.

---

to the Court to synthesize the key evidence in a concise manner.

Moreover, where the group takes steps to cover up its activities, the Court is entitled to rely on circumstantial evidence as proof of the requisite agreement. See CSX, 562 F. Supp. at 553 (noting that likelihood that agreement could be proved circumstantially was "perhaps greater than usual because the parties went to considerable lengths to cover their tracks").

7. As explained below, the evidence overwhelmingly establishes the existence of a Section 13(d) group pursuant to the legal standards outlined above.

## II. The Evidence Overwhelmingly Supports A Finding That Apollo, Oaktree, Crestview and Franklin Will Constitute a Section 13(d) Group Upon Emergence.

### A. Apollo, Oaktree, Crestview and Franklin Have Entered Into An Agreement With Each Other To Acquire A Majority Of The New Equity Of The Reorganized Debtors.

8. At the center of the Plan is the Rights Offering, pursuant to which holders of CCH I Notes were afforded the right to acquire $1.623 billion in New Class A Stock – over 80% of the New Class A Stock issued under the Plan. Apollo, Oaktree, Crestview and Franklin have committed to acquire substantially all of the stock sold under the Rights Offering: See July 23, 2009 Transcript at 106:25, 107:1-3 (testimony of Christine Villaluz of Franklin) ("Q. Okay. So of the 1.6 billion plus rights offering, all but about 60 million of the 1.6 billion was coming from you and Oaktree and Apollo and Crestview. Is that correct? A. On the basis of what you've represented, yes."). The Rights Offering ensured that the CCH I Notes would be the "fulcrum" security in the restructuring – i.e., the security that would be converted into equity. As Christine Villaluz of Franklin testified at trial:

> Q. And you needed the new money because you all agreed and understood that without the rights offering there was no way to ensure that the CCH I bonds were going to be the fulcrum security?
>
> A. Yes.

> Q. And you understood that by making this new money investment that it was going to help preserve Franklin's position in the CCH I bonds. Is that correct?
>
> A. Yes.

July 23, 2009 Transcript at 105:1-5. The evidence further reflects that these firms agreed to the amount of equity that each firm would commit to acquire in the Rights Offering. As Kenneth Liang of Oaktree testified:

> Q. Well, didn't you discuss among those four holders the amounts that they were going to commit to invest in the rights offering? That was my question, the amount that they would commit to invest, not that they would have the option to invest.
>
> A. Right. The company wanted certainty in the rights offering, so they wanted to make sure that more of the significant holders would provide a commitment to take up their rights. So there was that discussion.

July 29, 2009 Transcript at 206:23-25; 207:1-6.

9. Moreover, the evidence has also revealed that Franklin sold a portion of its Rights to Apollo. See July 23, 2009 Transcript (testimony of Christine Villaluz) at 157:2-4. Notably, as a result of that transaction, Apollo's undiluted voting percentage rose just above 20% -- giving it just enough voting power to elect two directors, while Franklin's undiluted voting percentage remained just over 10% -- preserving Franklin's power to appoint a director. See JPX 354 (chart entitled "Pro Forma Equity Ownership / Voting - Fully Diluted Basis on Emergence"). The circumstances of the transaction provide additional compelling evidence that Apollo, Oaktree, Crestview and Franklin worked together, in a calculated manner, to allocate the new equity amongst themselves. The evidence thus overwhelmingly points to the existence of an agreement among Apollo, Oaktree, Crestview and Franklin to acquire securities within the meaning of Section 13(d)(3) of the Exchange Act.

7

### B. Apollo, Oaktree, Crestview and Franklin Have Entered Into An Agreement Governing The Mechanism of Director Appointments.

10. There is also compelling evidence that Apollo, Oaktree, Crestview and Franklin engineered the mechanism for the appointment and election of directors that would ensure their joint control over the reorganized company. The Plan provides that each holder of 10% or more of the voting power of reorganized CCI (through its ownership of New Class A Stock) will have the absolute and unconditional right to appoint one Board member. The evidence establishes that this Plan provision required the agreement of Apollo, Oaktree, Crestview and Franklin. See July 23, 2009 Transcript at 120:24-25, 121:1-12 (testimony of Christine Villaluz) (establishing that Franklin, Apollo, Oaktree and Crestview, as holders of the majority in principal amount of the CCH I Notes, were required to find the plan reasonably acceptable); id. at 136:23-25; 137:1-4 (testimony of Christine Villaluz) ("Q. And to [amend the director appointment provisions in the Certificate of Incorporation], because you [and] Apollo, and Crestview and Oaktree are the 'defined requisite holders' you had to approve that, and you did approve that change? …. Q. I'm sorry. The question is you approved it? A. Yes."); JPX 218 (Plan Term Sheet) (requiring that the Plan be reasonably acceptable to, inter alia, members of Crossover Committee holding a majority in principal amount of the CCH I Notes held by all members of the Committee). Based on the results of the Rights Offering, Apollo will select two directors, each of Oaktree and Franklin will select one director, and no other CCH I Noteholder will have the right to appoint a director. See JPX 354.

11. Moreover, the evidence also reflects that Apollo, Oaktree, Crestview and Franklin structured the shareholder voting provisions of the Amended and Restated Certificate of Incorporation (the "Certificate") in a manner that ensured they would control the election of 7 of

8

the 11 directors. The Certificate provides that Class A shareholders and Class B shareholders (Paul Allen) will vote as separate classes, with Class A shareholders entitled to vote for 7 directors, and Class B shareholders entitled to vote for 4 directors. See Certificate, Art. IV(b)(i)(B) (see *Amended and Restated Exhibit 3 to the Supplement to Debtors' Joint Plan of Reorganization* dated July 16, 2009 [Docket No. 632]). Apollo, Oaktree, Crestview and Franklin will hold over 75% of the Class A voting power. See Debtors' Demonstrative Chart entitled "Actual Voting Power on Effective Date." Therefore, Apollo, Oaktree, Crestview and Franklin will have the power to appoint all 7 of the Class A directors.

12. The manner in which Apollo, Oaktree, Crestview and Franklin engineered the mechanism for populating the Board provides compelling evidence of an agreement by these firms to jointly control the reorganized company. Indeed, Dr. Paul A. Gompers, JPMorgan's expert on the subject of private equity investment strategies and practices, testified that the allocation of board seats under the Plan documents is "exactly analogous" to agreements in other syndicated leveraged buyout transactions he has studied. See August 24, 2009 Transcript at 210:9-25, 211:1.

### C. The Evidence Establishes An Agreement Among Apollo, Oaktree and Crestview to Appoint Jeffrey Marcus To The Board.

13. The evidence at trial has further established the existence of an agreement among Apollo, Oaktree and Crestview to appoint Jeffrey Marcus – managing director of Crestview – to the new Board.[3] A number of e-mails and internal Crestview memoranda have been introduced into the factual record, unequivocally referencing the existence of this agreement. See, e.g., JPX 170 (e-mail from Jeffrey Marcus to Barry Volpert et al.) ("They [Apollo and Oaktree] have also

---

[3] Based on the results of the Rights Offering, Crestview will not have sufficient holdings of New Class A Stock to confer on it a right to appoint a director.

agreed to put me on the board even though we will own less than 10%."); JPX 169 (e-mail from Brian Cassidy to Barry Volpert and Robert Delaney, cc: Jeffrey Marcus) ("Apollo and Oaktree agreed to put Jeff on the board even if we end up under 10%."); JPX 234 (Crestview Investment Committee Memorandum at p.2) ("As part of the transaction, Jeff would most likely become chairman of the company.").

14. In the face of this evidence, Mr. Marcus's testimony that repeated references to his promised board seat were merely "hopeful aspirational" statements is not credible. See July 29, 2009 Transcript at 90:11-15. Indeed, the evidence reflects that Barry Volpert, the managing partner of Crestview, considered it critical that Crestview obtain Board representation as part of its investment – and specifically the decision to commit to invest up to $250 million in the Rights Offering. See July 29, 2009 Transcript at 49:22-25 (testimony of Jeffrey Marcus) ("Mr. Cassidy was upset because Mr. Volpert was being so adamant about the board seat. And at one point I think he even went so far as to say to Mr. Cassidy that if we didn't get a board seat that we would pull our commitment."); CX 375 (e-mail from Brian Cassidy to Jeffrey Marcus dated March 10, 2009) ( "Barry [Volpert] stopped by and wanted to make sure that we were making progress on the board seat. He placed huge importance on this (especially after his conversation with Mooley.) We have until Thursday morning to get it changed.").

15. The evidence reflects that Mr. Marcus, on behalf of Crestview, engaged in efforts to amend the director appointment provisions in the Plan, in an attempt to ensure that, as a backstop party to the Rights Offering, Crestview would be assured of a board seat. See July 29, 2009 Transcript at 50:4-8 ("What I meant was that we would do our best, meaning I would do Crestview's best, or I guess I would do my best, to try and either get the threshold lowered or get

the plan changed so that it would include excess backstop parties getting a board seat….") Although Apollo and Oaktree did not agree to this approach, the evidence reflects that they made a "side deal" with Crestview, committing to the appointment of Mr. Marcus to the Board. This agreement underscores these parties' early appreciation of the power they would have to designate the members of the "vacant" seats on the Board. Such an agreement is further proof of the existence of a 13(d) group.

### D. The Evidence Demonstrates Efforts To Cover Up The Existence Of The Group.

16. That Apollo, Oaktree, Crestview and Franklin will constitute a 13(d) group upon emergence is further buttressed by evidence that the parties took steps to cover up their group activities. That evidence includes an e-mail sent by Eric Zinterhofer of Apollo stating that information relating to his discussions with Oaktree on Charter is "something I would not want an e-mail trail on." See JPX 181 (e-mail from Eric Zinterhofer to Josh Harris dated February 8, 2009). Notably, this e-mail was sent shortly after Mr. Zinterhofer sent a prior e-mail stating: "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything in writing, just like we didn't in SpectraSite, but we have known each other a long time." See id. (e-mail from Eric Zinterhofer to Rick Press et al. dated February 8, 2009). Consistent with that e-mail, Kenneth Liang of Oaktree testified that Oaktree did not prepare any internal memoranda or any other writings concerning the restructuring, despite the fact that Apollo and Crestview prepared comprehensive internal memoranda. See July 29, 2009 Hearing Transcript at 215:14-23.

17. The evidence has also revealed that in Crestview's final investment committee memorandum concerning the Charter investment – for distribution to its investors, Crestview deleted references in the draft memorandum to (i) "team[ing] up with Apollo and Oaktree to buy

11

a controlling stake" in the company; (ii) the fact that "[t]ogether with Apollo and Oaktree, we would control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control"; and (iii) Crestview's belief that "given the change of control provisions in the Company's bank agreements, we would not be able to enter into a shareholders agreement." See JPX 234 (draft version of Crestview's Investment Committee Memorandum regarding the Charter investment); JPX 243 (final version of Crestview's Investment Committee Memorandum); July 29, 2009 Transcript at 98-106 (testimony of Jeffrey Marcus of Crestview).

18. Finally, the efforts of Apollo, Oaktree, Crestview and Franklin to mask their group status are evidenced by the eleventh-hour change to the Certificate, altering the manner in which the two vacancies on the initial Board are filled. As previously drafted, the Certificate provided the two vacant Board seats, as a result of there being no holders (other than Apollo, Oaktree and Franklin) having a power of appointment, would be filled by the vote of a majority of the directors appointed by holders of New Class A Stock – i.e., the directors appointed by Apollo, Oaktree and Franklin. See Ex. 3 to *Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 37], at ¶ 4(b)(i)(B)(3). Then, on July 16, 2009, just four days prior to the start of the confirmation trial, a revised Certificate was filed, providing that the vacant seats will be filled by a majority vote of the entire Board. See Certificate at ¶ 4(b)(i)(B)(4). Considering the overwhelming evidence of "group" activity, compounded with the other evidence of attempts to cover up such activity, the inference that must be drawn is that this change came about through efforts to defuse the argument that Apollo, Oaktree, Crestview and Franklin have engineered the Plan to control the Board. In sum, there is ample evidence for the Court to conclude that Apollo, Oaktree, Crestview and Franklin engaged in efforts to "cover their tracks."

### III. A Change Of Control Will Occur Even If Franklin Is Not Part Of The 13(d) Group.

19.     Throughout the confirmation hearing, the Debtors have attempted to establish that Franklin is not part of a 13(d) group. The Debtors further argue that, if only Apollo, Oaktree and Crestview comprise the group, a Change of Control cannot occur because Paul Allen's voting power on the Plan effective date -- 37.7% -- will exceed the purported voting power of Apollo, Oaktree and Crestview -- 37.1%. See, e.g., Debtors' Demonstrative Chart entitled "Actual Voting Power on Effective Date."[4]

20.     Even assuming that Franklin is not part of the 13(d) group (which is not the case), the Court should still find that a Change of Control will be triggered on the Plan Effective Date. As noted above, pursuant to the Certificate, Class A and Class B shareholders vote as separate classes for separate directors. 7 members of the Board will be elected by Class A shareholders, and 4 members will be elected by Class B shareholders (i.e., Paul Allen). The Debtors' calculation of voting power fails to account for the system of class voting, and is thus based on an improper "apples vs. oranges" comparison.

21.     Based on the results of the Rights Offering, Apollo, Oaktree and Crestview will jointly control approximately 60% of the Class A voting power. See Debtors' Demonstrative Chart entitled "Actual Voting Power on Effective Date." As such, Apollo, Oaktree and Crestview will have the power to appoint all 7 of the Class A directors, while Paul Allen will only have the power to appoint 4. It is therefore indisputable that, on the Effective Date, Apollo, Oaktree and Crestview will have greater voting power than Paul Allen. Therefore, even

---

[4] The Change of Control provisions in each of the relevant loan agreements provide that a Change of Control will not occur if Paul Allen holds greater voting power than any person or group, even if that person or group holds more than 35% voting power. See, e.g., WF 1 (CCOH Credit Facility) at p.7 (definition of "Change of Control").

assuming that Franklin is not part of the 13(d) group, a Change of Control under the CCOH Credit Facility and the other secured loan agreements will nevertheless occur on the Effective Date.

IV. **The So-Called "Savings Clause" In The Certificate Is Ineffective To Vitiate A Change Of Control.**

22. The Debtors have argued at the confirmation hearing that, even if a 13(d) group holding 35% voting power exists, the so-called "savings clause" in the Certificate nevertheless precludes the occurrence of a Change of Control. The Certificate provides, in pertinent part:

> [T]he votes attributable to each share of Class A Common Stock held by any holder (other than an Authorized Class B Holder, as defined in Clause (b)(viii)(B) of this Article FOURTH) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder (other than an Authorized Class B Holder) included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) with such holder, so that no "person" or "group" (other than an Authorized Class B Holder) is or becomes the holder, directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation . . . .

Certificate ¶4(b)(i)(A)(1).

23. Notwithstanding this provision, the Debtors have failed to make any showing that it would actually work to vitiate a Change of Control. First, the Board is designated as the sole party to implement the provision, and the Board can even waive its application. See Certificate ¶4(b)(i)(A)(1). The Debtors did not present any evidence at the confirmation hearing to establish how the Board, as a practical matter, would enforce the provision.[5] Indeed, if the Board is

---

5   The Debtors' evidence on the application of the savings clause was limited to the following testimony from their Chief Restructuring Officer, Gregory Doody:

controlled by a 13(d) group, it strains credulity that the Board could be relied upon to dilute the voting control of that group. Second, the Certificate specifically provides that a majority of "Disinterested Board Members" will decide its application, but the definition of "Disinterested Board Members" excludes, <u>inter</u> <u>alia</u>, Paul Allen's 4 directors and any director appointed by the "person" or "group" at issue.[6] Thus, it is possible there will be <u>no</u> directors eligible to enforce the provision, particularly where the 13(d) group has elected the entire slate of Class A directors. In short, the Debtors have not demonstrated that the savings clause is anything but illusory.

## **CONCLUSION**

The factual record established at the confirmation hearing provides compelling evidence that Apollo, Oaktree, Crestview and Franklin will constitute a "person" within the meaning of

---

> Q. Sir, what is your understanding of how Article 4(b)(1)(A)(1) limits any entity or group as defined under the securities laws, other than Paul Allen, from having a thirty-five percent interest -- voting interest in Charter?
>
> A. Well, if it's determined that a group or person, again, defined under the securities laws, has more than that vote, they would be ratably reduced such that they don't have that vote any longer.
>
> Q. And can a group of directors from, say, the backstop parties simply waive the enforcement of that savings clause?
>
> A. No, they can't.

August 17, 2009 Transcript at 50:4-14. This testimony is merely a cursory regurgitation of the provision and, in any event, Mr. Doody's testimony that its enforcement can be waived is belied by the clear terms of the Certificate. <u>See</u> Certificate ¶ 4(b)(i)(A)(i) ("a majority of the Disinterested Board Members shall have the authority…to waive such proviso with respect to any 'person' or 'group'").

[6] The definition of "Disinterested Board Members" excludes members of the Board elected by the holders of Class B Common Stock as well as, <u>inter</u> <u>alia</u>, directors who are nominated or appointed to the Board by an "Interested Stockholder" (other than an "Independent director"). <u>See</u> Certificate ¶4(b)(viii)(C). For purposes of the "savings clause," the term "Interested Stockholder" refers to the "person" or "group" whose aggregate voting power exceeds 34.9%. <u>See</u> Certificate ¶4(b)(i)(A)(1).

15

Section 13(d)(3) of the Exchange Act upon the Effective Date of the Plan, thereby triggering a Change of Control under the CCOH Credit Facility and the Debtors' other secured loan agreements. Therefore, the Debtors cannot sustain their burden of establishing that the Plan, and specifically the reinstatement of senior secured debt under the Plan, meets the feasibility test of 11 U.S.C. § 1129(a)(11). For this reason, as well as the reasons set forth in the Third Lien Agent's Objection to confirmation of the Plan [Docket No. 584], the Plan should not be confirmed.

Dated: September 18, 2009         **BROWN RUDNICK LLP**
         New York, New York

　　　　　　　　　　　　　　　　　　/s/ Daniel J. Saval
　　　　　　　　　　　　　　　　　Edward S. Weisfelner
　　　　　　　　　　　　　　　　　David J. Molton
　　　　　　　　　　　　　　　　　May Orenstein
　　　　　　　　　　　　　　　　　Daniel J. Saval
　　　　　　　　　　　　　　　　　Seven Times Square
　　　　　　　　　　　　　　　　　New York, NY 10036
　　　　　　　　　　　　　　　　　Telephone: (212) 209-4800
　　　　　　　　　　　　　　　　　Facsimile: (212) 209-4801

　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　Andrew P. Strehle
　　　　　　　　　　　　　　　　　Caleb B. Piron
　　　　　　　　　　　　　　　　　One Financial Center
　　　　　　　　　　　　　　　　　Boston, MA 02111
　　　　　　　　　　　　　　　　　Telephone: (617) 856-8200
　　　　　　　　　　　　　　　　　Facsimile: (617) 856-8201

　　　　　　　　　　　　　　　　　*Counsel to Wells Fargo Bank, N.A.,*
　　　　　　　　　　　　　　　　　*solely in its capacities as successor*
　　　　　　　　　　　　　　　　　*Administrative Agent and Collateral Agent*

# 8224981