FOX ROTHSCHILD LLP
100 Park Avenue, 15th Floor
New York, New York 10017
(212) 878-7900
Fred Stevens

    -and-

FOX ROTHSCHILD LLP
Citizens Bank Center
919 North Market Street, Suite 1300
Wilmington, Delaware 19899
(302) 654-7444
Jeffrey M. Schlerf (DE No. 3047)
Joshua T. Klein (PA No. 88823)

*Counsel to R$^2$ Investments, LDC, as Equity Interest
  Holder in Charter Communications, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | |
| | : | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | : | |
| <u>et al.</u>, | : | Case No. 09-11435 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |

--------------------------------------------------------x

## POST-TRIAL BRIEF OF R$^2$ INVESTMENTS, LDC REGARDING CONFIRMATION OF THE DEBTORS' JOINT PLAN OF REORGANIZATION

# TABLE OF CONTENTS

I.  Introduction ......................................................................................................... 1

II.  Preliminary Statement .......................................................................................... 1

III.  Background............................................................................................................ 4

IV.  Argument............................................................................................................... 4

    A.  The Debtors' Methods of Valuation are Fundamentally Flawed.......................... 5

        1.  The Enterprise Valuation is Defective. ...................................................... 6

        2.  The Non-Insider CCI Stakeholders Bear the Economic
            Consequences of the Flawed and Limited Valuation Approach. ............... 8

        3.  There is Substantial Value in CCI Which Should Not be for the
            Sole Benefit of Allen as a Shareholder. .................................................. 8

    B.  The Plan is Not Fair and Equitable Due to the Allen Entities' Recoveries
        on Account of Their Equity Interests. ................................................................ 12

    C.  The Debtors Do Not Satisfy the Best Interests Test and their Liquidation
        Analysis is Deficient.......................................................................................... 16

    D.  The Plan has not been Proposed in Good Faith as Required by Section
        1129(a)(3) of the Bankruptcy Code................................................................... 22

        1.  Delaware Corporate Law Provides the Applicable Standard of
            Review................................................................................................... 25

        2.  The Plan Transaction Does not Meet the Entire Fairness Standard. ........ 27

            a.  CCI Failed To Negotiate with Allen at Arm's-Length................. 27

            b.  The Board Failed to Achieve Best Value for CCI ...................... 29

            c.  Third Party Releases also Fail the Entire Fairness Standard. ....... 29

    E.  The Third Party Releases are Not Warranted Under Second Circuit
        Precedent and Implicate Fiduciary Duties. ........................................................ 30

    F.  The Plan Involves *"De Facto"* Substantive Consolidation................................ 33

    G.  The Gerrymandering of Voting Classes and Artificial Impairment is
        Impermissible..................................................................................................... 35

H.     The "Settlement" is Improper Under Bankruptcy Rule 9019. ............................ 38

I.      $R^2$ Investments Joins in Law Debenture's Post-Trial Brief. ................................ 42

V.    Conclusion ............................................................................................... 43

WM1A 936381v1 09/18/09

# TABLE OF AUTHORITIES

## CASES

In re 599 Consumer Electronics, Inc.,
195 B.R. 244 (S.D.N.Y. 1996) ...................................................................... 34

ACC Bondholder Group v. Adelphia Communications. (In re Adelphia
Communications),
361 B.R. 337 (S.D.N.Y. 2007) ............................................. 17, 18, 21, 34, 35

In re Adelphia Communications Corp.,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................... 16

Aronson v. Lewis,
473 A.2d 805 (Del. 1984) .............................................................................. 26

In re Augie/Restivo Baking Co.,
860 F.2d 515 (2d Cir. 1988) ..................................................................... 34, 35

Bank of America National Trust & Saving Associate v. 203 N. LaSalle Street
Partnership,
526 U.S. 434 (1999) ........................................................... 13, 14, 15, 16

In re Barney & Carey Co.,
170 B.R. 17 (Bankr. D. Mass. 1994) ............................................................. 37

In re Best Products Co., Inc.,
177 B.R. 791 (Bankr. S.D.N.Y. 1995) ........................................................... 40

In re Bonner Mall Partnership,
2 F.3d 899 (9th Cir. 1993) ............................................................................. 23

In re Bush Industrial, Inc.,
315 B.R. 292 (Bankr. W.D.N.Y. 2004) .......................................................... 25

In re Century Glove, Inc., Civ. A. 90-400-SLR,
1993 WL 239489 (D. Del. Feb. 10, 1993) ..................................................... 22

In re Coltex Loop Central Three Partners, L.P.,
138 F.3d 39 (2d Cir. 1998) ............................................................................ 14

In re Cooper,
147 B.R. 678 (Bankr. D.N.J. 1992) ............................................................... 34

WM1A 936381v1 09/18/09

In re Coram Healthcare Corp.,
    271 B.R. 228 (Del. Bankr. 2001)................................................................23, 25

In re Crowthers McCall Pattern, Inc.,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................................................ 17

In re Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia),
    416 F.3d, 141 (2d Cir. 2005)H .................................................................... 32

In re E. System, Inc.,
    118 B.R. 223 (Bankr. S.D.N.Y. 1990) .......................................................... 5

In re El Comandante Management Co., LLC,
    2006 Bankr. LEXIS 3820 (Bankr. D.P.R. Mar. 3, 2006)................................. 37

Federal Deposit Insurance Corp. v. Colonial Realty Co.,
    966 F.2d 57 (2d Cir. 1992)........................................................................ 34

Fischer v. Pereira (In re 47-49 Charles Street, Inc.),
    209 B.R. 618 (Bankr. S.D.N.Y. 1997) .......................................................... 40

In re Fugazy,
    150 B.R. 103 (Bankr. S.D.N.Y. 1993) .......................................................... 40

In re Fur Creations by Varriale, Ltd.,
    188 B.R. 754 (Bankr. S.D.N.Y. 1995) .......................................................... 4

In re Future Energy Corp.,
    83 B.R. 470 (Bankr. S.D. Ohio 1988)........................................................... 17

Gantler v. Stephens,
    965 A.2d 695 (Del. 2009)........................................................................28, 30

In re Hoosier Hi-Reach, Inc.,
    64 B.R. 34 (Bankr. S.D. Ind. 1986) ............................................................. 23

International Telecharge, Inc. v. Bomarko, Inc.,
    766 A.2d 437 (Del. 2000)........................................................................... 27

In re Ionosphere Clubs, Inc.,
    156 B.R. 414 (Bankr. S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1994) ....................... 40

In re Johnston,
    21 F.3d 323 (9th Cir. 1994) ........................................................................ 14

WM1A 936381v1 09/18/09

In re Justice,
972 F.2d 951 (8th Cir. 1992) ........................................................................... 14

Kahn v. Tremont Corp.,
694 A.2d 422 (Del. 1997) ............................................................................... 26

Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),
843 F.2d 636 (2d Cir. 1988) ....................................................................... 17, 22

In re Kemp,
134 B.R. 413 (Bankr. E.D. Cal. 1991) .............................................................. 23

In re Kent Terminal Corp.,
166 B.R. 555 (Bankr. S.D.N.Y. 1994) ............................................................... 4

In re Loral Space and Commc'ns Inc.,
2008 WL. 4293781 ..................................................................................... 26, 29

Lyondell Chemical Co. v. Ryan,
970 A.2d 235 (Del. 2009) ............................................................................... 29

In re Madison Hotel Associates,
749 F.2d 410 (7th Cir. 1984) .......................................................................... 23

Miller v. McDonald,
385 B.R. 576 (Bankr. D. Del. 2008) ................................................................. 28

In re Modern Steel Treating Co.,
130 B.R. 60 (Bankr. N.D. Ill. 1991) ................................................................. 38

Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating
LLC),
478 F.3d 452 (2d Cir. 2007) ........................................................................... 13

In re Natural Land Corp.,
825 F.2d 296 (11th Cir. 1987) ........................................................................ 23

In re Ne. Dairy Cooperative Federation, Inc.,
73 B.R. 239 (Bankr. N.D.N.Y. 1987) ............................................................... 5

Oliver v. Boston University,
2006 WL. 3742598 (Del. Ch.) ........................................................................ 26

In re One Times Square Associate Ltd. Partnership,
165 B.R. 773 (S.D.N.Y. 1994) ....................................................................... 36

WM1A 936381v1 09/18/09

Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III
    Joint Venture),
    995 F.2d 1274 (5th Cir. 1991), cert. denied, 121 L. Ed. 2d 37, 113 S. Ct. 72
    (1992) ........................................................................................................................ 36

In re Primedia, Inc. Derivative Litigation,
    2006 WL. 3365544 (Del. Ch. 2006) ........................................................................ 25

Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
    Anderson,
    390 U.S. 414 (1968)............................................................................................. 39, 40

Rhodes v. SilkRoad Equity, LLC,
    2009 Del. Ch. LEXIS 50 (March 24, 2009) ............................................................. 26

Ryan v. Loui (In re Corey),
    892 F.2d 829 (9th Cir. 1989) ................................................................................... 23

In re Shoen,
    193  B.R. 302 (Bankr. D. Ariz. 1996) ...................................................................... 22

Sinclair Oil Corp. v. Levin,
    280 A.2d 717 (Del. 1975)..................................................................................... 25, 26

In re Sun Country Development, Inc.,
    764 F.2d 406 (5th Cir. 1985) ................................................................................... 22

Tooley v. AXA Finance, Inc.,
    2005 WL. 1252378 (Del. Ch. May 13, 2005) .......................................................... 27

Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.),
    917 F.2d 1210 (9th Cir. 1990) ................................................................................. 23

In re VIP Motor Lodge, Inc.,
    133 B.R. 41 (Bankr. D. Del. 1991) .......................................................................... 23

Valeant,
    921 A.2d at 748......................................................................................... 26, 27, 29

Wayne County Employees' Retirement System v. Corti,
    2009 Del. Ch. LEXIS 126 (July 24, 2009) ............................................................... 26

Weinberger v. UOP, Inc.,
    457 A.2d 701 (Del. 1983)......................................................................................... 26

In re Zaleha,
    162 B.R. 309 (Bankr. D. Idaho 1993) .................................................................... 17

## STATUTES

11 U.S.C. § 1123(a)(4) ............................................................................................... 37

11 U.S.C. § 1129(a) ................................................................................... 4, 16, 21, 38

11 U.S.C. § 1129(b)(2)(C)(ii) ..................................................................................... 13

26 C.F.R. § 1.1502-1 ................................................................................................... 10

26 C.F.R. § 301.7701-2 ............................................................................................... 10

26 U.S.C. § 1366 ......................................................................................................... 10

26 U.S.C. §§ 1501, 1502 ............................................................................................. 10

26 U.S.C. § 382(k)(1) .................................................................................................... 9

26 U.S.C. §§ 701, 703(a)(2)(D) .................................................................................. 11

WM1A 936381v1 09/18/09

# I.   Introduction

On July 13, 2009, R[2] Investments, LDC (the "R[2] Investments"), in its capacity as the holder of approximately 18,550,336 shares of Class A Common Stock[1] issued by Charter Communications, Inc. ("CCI"), the lead debtor and debtor in possession in the above-captioned case (collectively, the "Debtors"), filed its objection (the "Objection") to the confirmation of Debtors' May 7, 2009 Joint Plan of Reorganizations Pursuant to Chapter 11 of the United States Bankruptcy Code (as amended, the "Plan").[2]

# II.   Preliminary Statement

After twenty (20) days of trial on the Debtors' Plan, it has become even more abundantly clear that the Plan presents myriad problems and is patently unconfirmable.  Under the ruse of a "settlement" (the "CII Settlement"), the Debtors have proposed a plan which is designed with one primary objective in mind – to preserve tax attributes which disproportionately benefit Paul G. Allen and affiliated persons ("Allen Entities") at the cost of not maximizing value for most other economic stakeholders other than the preferred bondholders on the "Crossover Committee."  As detailed herein, some of the chief inconsistencies with the Bankruptcy Code include: (i) flawed valuation methodology designed in an effort to support the unlawful recovery scheme pursuant to the CCI Settlement; (ii) numerous instances of a lack of good faith in proposing and soliciting support for the Plan via Allen's interests as both an economic stakeholder as well as a controlling shareholder and position as a fiduciary;  (iii) violation of the absolute priority rule whereby the equity interests owned or controlled by Allen (i.e., CII) are

---

[1]   R[2] Investments is also a creditor of CCI and it or its associate, affiliated or related entities holds approximately $49.96 million in face value of an aggregate $479 million in principal amount of 6.50% Convertible Senior Notes due 2027 (the "CCI Notes") issued by CCI.  The interests of the holders of the CCI Notes are being represented by Law Debenture Trust Company of New York ("Law Debenture"), the Indenture Trustee with respect to the CCI Notes.  In addition, as set forth in R[2] Investments, LDC's Statement Regarding Ownership of Securities and Claims Against the Debtors filed on July 21, 2009, R[2] Investments has other holdings in the Debtors.  R[2] Investments submits this objection solely with respect to its own equity interest in CCI.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Plan.

receiving distributions from the debtor Charter Communications Holding Company, LLC ("Holdco") ahead of senior classes of claims including the CCI estate's dominant unsecured claim against Holdco pursuant to the "Holdco Notes"; (iv) the manufacturing of an apparent "new value exception" to the absolute priority rule to attempt to support Allen's retention of an equity interest in the reorganized company, but without a LaSalle "market test."; (v) the granting of improper releases of potentially significant claims against non-debtor third parties; (vi) a failure to analyze and evaluate (or even disclose) significant intercompany claims that are being released; (vii) voting class gerrymandering, whereby holders of some general unsecured claims against CCI (Class A-3) are improperly separated from holders of CCI Notes claims (Class A-4), in order to provide the Debtors with an accepting voting class – and a subsequent manufactured "impairment" of Class A-3 – in an improper attempt to meet the "cram-down" requirements as to CCI; (viii) bad faith and discriminatory treatment whereby certain interest holders (i.e., the Allen Entities) are receiving preferential treatment to holders of similarly situated interests including $R^2$ Investments' equity interests; (ix) subtle application of "partial" *de facto* substantive consolidation; (x) impermissible use of Fed. R. Bankr. P. 9019 to approve a favorable deal with one insider – Allen – in an attempt to circumvent the express legal requirements for plan confirmation at the expense of most other stakeholders in the cases except certain chosen bondholders given the right to new equity at a bargain price.

Critically, the record at trial demonstrates that the Debtors have drastically undervalued their assets for purposes of seeking confirmation of this ill conceived Plan. As discussed in more detail below, the Debtors are seeking approval of a Plan based on a stale and out-of-date valuation of the Debtors on an enterprise basis. Specifically, this valuation is based on EBITDA multipliers that are too low and ignores the restoration and uptick in values in the cable industry

in 2009 as the market recovered from the financial collapse in the fall of 2009. In fact, the Debtors and other Plan proponents attempt to walk a line which cannot be walked regarding valuation: arguing for purposes of the JP Morgan adversary proceeding that enterprise value sustained itself in late 2008 (i.e., during the financial crisis), but then for purposes of confirmation diminished in early 2009 as the financial markets and economy began to stabilize and then recover. Furthermore, its valuation is stuck in time in early 2009, ignoring the marked improvement in market value as the year progressed. The valuation is solely enterprise based, presuming "partial" substantive consolidation of the Debtors' assets. Contrary to the Debtors' valuation, $R^2$ Investments believes and the record at trial has shown that CCI shareholder value actually exists if appropriate valuation methods are utilized.

The Debtors, under the control of the Allen Entities, who will continue to be in control of the Debtors if the Plan is confirmed, are unfairly manipulating the plan confirmation process by forcing through a plan laden with Bankruptcy Code violations. The Plan fails to maximize value for all constituencies in the form of a "restructuring" of a company.[3] Rather, the Plan works primarily to maximize disproportionately benefits to one controlling shareholder by preserving tax attributes for his personal gain – with a chosen group of creditors consisting of well-heeled of a few bondholders gaining the right to buy the new equity in the "reorganized" company at a discount. No matter how determined the Plan proponents or how much hyperbole is offered to suggest the downside of failing to confirm the Plan, there is no avoiding that the Plan is simply unconfirmable as a matter of law and fact.

Importantly, the proponents of the Plan have not made a record of the supposed cataclysmic consequences if this Court does not confirm this Plan – because they cannot in good

---

[3] The bankruptcy was commenced shortly after the debtor Charter Communications Operating, LLC ("CCO") was purportedly in technical default under its $8.5 billion credit facility with JP Morgan because two designated affiliates of CCO were alleged to be unable to pay their debts when due.

faith do so.  This is a healthy company with sustained earnings in a competitive position within its industry.  As such, unlike many other debtors in this era, it is able to negotiate at a less frantic pace a consensual reorganization.

## III.  Background

To this point in these proceedings, this Court has heard and seen through testimony, documentary evidence, pleadings and argument over an intensive period of weeks and months an exhaustive recitation of the background of these cases.  Moreover, the parties in support of and against the Plan will provide an ample recitation in their submissions.  Accordingly, $R^2$ Investments will refrain from repeating that history and context *ad nauseum* in this Brief.[4]

## IV.  Argument

The objections of $R^2$ Investments to confirmation of the Plans should be sustained. Section 1129(a) of the Bankruptcy Code provides that a court shall confirm a plan of reorganization only if all of the requirements of sections 1129(a)(1)-(13) are met.  See 11 U.S.C. § 1129(a).  As the proponent of a chapter 11 plan, "[t]he Debtor bears the burden of proving compliance with each of the requirements of 11 U.S.C. § 1129(a)," In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (citation omitted), and must prove each of the requisite elements of section 1129(a) by a preponderance of the evidence.  In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994).  If all of the requirements of section 1129(a) are not met, the Court may still confirm the Plan, but only if the requirements of section 1129(b) are satisfied.  See 11 U.S.C. § 1129(b) (allowing confirmation of plan that is "fair and equitable," but only where debtor has otherwise satisfied all of the requirements of 1129(a) except for obtaining approval of all impaired classes).

---

[4]  $R^2$ does incorporate by reference the Statement of Facts set forth in Law Debenture's post-trial brief.

The Bankruptcy Court has an independent duty to determine whether the debtor has met its evidentiary burden under sections 1129(a) and (b) prior to entering an order confirming a chapter 11 plan.  See In re Ne. Dairy Coop. Fed'n., Inc., 73 B.R. 239, 248 (Bankr. N.D.N.Y. 1987).  The Court's duty in this regard exists even in the absence of a valid plan objection.  See In re E. Sys., Inc., 118 B.R. 223, 224 (Bankr. S.D.N.Y. 1990), superseded by statute on other grounds, Fed. R. Bankr. P. 3018(a).

As set forth below, the Plan before this Court – which incorporates a "settlement" under the auspices of Bankruptcy Rule 9019 – cannot be confirmed because it fails to satisfy many of the requirements of sections 1129(a) and (b) of the Bankruptcy Code.

**A.      The Debtors' Methods of Valuation are Fundamentally Flawed.**

The valuation employed by the Debtors to obtain confirmation of the Plan does not withstand scrutiny, as it significantly and intentionally undervalues the Debtors' assets in order to pay the Debtors' creditors and interests holders less than they are entitled to recover.  As first demonstrated by $R^2$ Investments in its motion for appointment of an official committee of equity holders [DE 445], and as proven through the remaining record in this proceeding, the Debtors' undervaluation of their assets is substantial.  On an enterprise basis, they neglected to adopt appropriate practices and assumptions.  Cleverly, the Debtors play a timing game, wherein they use optimistic assumptions at the peak of the 2008 financial crisis but then for purposes of a valuation for confirmation a few months later they ignore dramatically improved market conditions.  At the debtor entity level, under the guise of a "settlement" and through the use of faulty arguments regarding the allocation of value, the Debtors grossly underestimate the value of CCI's assets.  What this all means is that the Debtors' Plan misappropriates value from some economic stakeholders to others – most particularly to Allen and the four members of the

Crossover Committee. And in misappropriating value to the detriment of significant economic stakeholders, the Plan also hopelessly fails the "fair and equitable" and "best interests" tests.

## 1. The Enterprise Valuation is Defective.

The Debtor's valuation analysis is fundamentally flawed and, as a result, the value of the entire enterprise is significantly understated. First, in his valuation analysis attached to the Disclosure Statement the Debtors' expert at Lazard, Stephen Goldstein, placed minimum reliance upon "precedent transactions," also identified as the "market transaction approach." Yet, only a few months earlier, such a method was used by Bruce Den Uyl of AlixPartners LLP in connection with his capital surplus analysis. Den Uyl Trial Tr., Aug. 3, 2009, 165:13-16; McDonough Trial Tr., Sept. 1, 2009, 75:1-25; 76:1-15. Edward M. McDonough of Alvarez & Marsal testified there were at least six transactions in the time frame that would have provided good comparables. Id. At 76:1-10. Nevertheless, according to Goldstein, the Debtors were never actually valued against an open market – only in terms of the deal with Allen. Goldstein Trial Tr., Aug. 24, 2009, 73:16-18. The Debtors failed to explain this inconsistency at trial.

Second, the EBIDTA multiples used by Goldstein were too low to begin with. The Debtors' valuation is based on adjusted EBITDA multiples of between 5.34 – 6.29, which was derived in January and February of this year during the tail end of the worst financial crisis since the Great Depression. Ex. D. to Disclosure Statement. Moreover, Goldstein did not take into account the significant improvements of the public markets beginning in March 2009. For example, in a peer group of companies, there has been on average a thirty two percent (32%) increase in stock prices. McDonough Trial Tr., Sept. 1, 2009, 85:18-25, 86:1-10. Indeed, James Millstein (formerly of Lazard) admitted in his testimony that the March valuation attached to the Disclosure Statement did not account for the improvement of the markets. Millstein Trial Tr., July 21, 2009, 154:20-24. Such an increase would warrant a corresponding increase in the

6

EBITDA multiples used to value Charter. Millstein Trial Tr., July 21, 2009, 85:18-25, 86:1-3. In fact, Den Uyl testified that he believed that as of November 14, 2008, when the public markets were at there worst, their actual value of the Debtor was in excess of $21 billion. Den Uyl Trial Tr., Aug. 3, 2009, 140:7-25.

Third, Goldstein's discounted cash flow analysis used an inappropriately low EBITDA growth rate factor. In fact, the rate used by Goldstein (7%) was substantially lower that the rate used by Den Uyl a few months earlier in the midst of the financial crisis (10.75%). McDonough Trial Tr., Sept. 1, 2009, 93:23-5; 94:1-2. Moreover, McDonough testified that the growth rate used by Den Uyl was more appropriate, and in fact supported by Charter's CFO's testimony that the first quarter EBITDA growth rate was originally over 10%. McDonough Trial Tr., Sept. 1, 2009, 96:17-25, 97:1-12; Schmitz Trial Tr., July 31, 2009, 99:12-16. Indeed, Goldstein even testified that the Debtors have experienced nine quarters of double-digit EBITDA growth.[5] Goldstein Trial Tr., Aug. 24, 2009, 114: 10-18. In short, the Debtors' EBITDA assumptions for purposes of plan confirmation are indefensible – other than to hide value otherwise inuring to stakeholders besides the Allen Entities and the Crossover Committee.

Fourth, Goldstein's DCF analysis did not account for the debt structure and associated cost of debt contemplated under the Plan. Ex. D to Disclosure Statement and Goldstein Trial Tr., Aug. 24, 2009, 102:14-21. In contrast, McDonough testified that when he adjusted the weighted average cost of capital accordingly, he found Debtor's value in the range of $21 billion to $24.4 billion. McDonough Trial Tr., Sept. 1, 2009, 94:6-18.

Furthermore, Lazard's valuation inexplicably failed to include a "control premium" to account for the acquisition of a controlling interest in the company. Ex. D to Disclosure Statement and Goldstein Trial Tr., Aug. 24, 2009, 79:10-14. On the other hand, in Den Uyl's

---

[5] This exceeds Charter's peer group.

analysis for purposes of the issue of surplus capital in November 2008, he applied a 40% control premium. Den Uyl, Trial Tr, Aug. 3, 2009, 114:22-25. McDonough's testimony was that application of a control premium is necessary because the comparable transactions only involved a transfer of minority interests, whenever this transaction involves a majority interest transfer. McDonough Trial Tr., Sept. 1, 2009, 84:12-22.

2.      **The Non-Insider CCI Stakeholders Bear the Economic Consequences of the Flawed and Limited Valuation Approach.**

The faulty overall "enterprise" valuation is used by the Plan proponents to effectuate a partial *de facto* substantive consolidation of the Debtors' assets but otherwise adhere to "corporate separateness." R[2] Investments is a equityholder of the debtor CCI, and indirectly thru CCI's large claim, a stakeholder in Holdco. If you examine value on an individual debtor basis rather than in the aggregate, under the Plan CCI's value is not flowing to its non-insider constituents. Rather, under the Plan it goes to a) Allen, on account of his CCI equity interest; and b) the Crossover Committee, made up of four bondholders of an entirely different estate. A debtor-by-debtor analysis was not done by the Plan proponents as to any of the Debtors. Doody Trial Tr., Aug. 17, 2009, 177:7-13. A valuation of CCI is particularly necessary because of the Plan's broad release of all intercompany claims and third party claims, CCI's substantial NOL and various other assets of CCI which will be siphoned away from non-insider CCI stakeholders under this Plan.

3.      **There is Substantial Value in CCI Which Should Not be for the Sole Benefit of Allen as a Shareholder.**

The Plan provides for recoveries to creditors of CCI in a very modest aggregate amount, failing to account for significant additional value attributable to that debtor even under conservative estimates. First, the Plan does not account for the value of CCI's NOLs, which are substantial. Secondly, the Plan fails to account for Holdco's going concern assets, including the

company's intellectual property and programming contracts. Thirdly, the Debtors' witnesses at trial conceded that they did a half-hearted analysis of other sources of CCI recoveries, assuming negligible returns.

NOLs:  The record is clear that the NOLs allocated to CCI belong to CCI and not the overall Charter enterprise.  First, the Debtors admit in their SEC filings that the NOLs belong to CCI.  LDTX 239 at 30, F-36 (Charter Communications Inc. 10-K for the year ended December 31, 2008); LDTX 444 at 1, 13 (Charter Communications Holdings LLC 10-K for the year ended December 31, 2007).  The accuracy of these filings was confirmed by the Debtors' CEO.  Smit Trial Tr., July 22, 2009, 73:5-76:9.  The testimony elicited in the trial conclusively supports that CCI owns the NOLs.  Millstein Trial Tr., July 21, 2009, 167:15-18; Conn Trial Tr., Sept. 2, 2009, 154:5-11.  In addition, CCI sought and received a ruling from the Internal Revenue Service concerning the favorable treatment of the NOLs based on the representation that CCI was a "loss corporation" that held the NOLs.  JPX 345 (April 6, 2009 Letter Request to the IRS); CX 415 (IRS Letter Ruling dated July 21, 2009).  A "loss corporation" is "a corporation entitled to use a net operating loss carryover or having a net operating loss for the taxable year in which the ownership change occurs."  26 U.S.C. § 382(k)(1).  The fact is the Debtors have not produced any credible evidence that the NOLs belong to any party other than CCI.  The testimony of the Debtors' CRO and General Counsel, Gregory Doody, was not credible when he asserted that while the Debtors' 10-K says that CCI owns the NOLs, that is not what was intended to be said.  Any suggestion that CCI is not the rightful owner of the NOLs is also contrary to the Debtors' course of dealings with respect to the allocation of NOLs to Allen.

NOLs were appropriately "passed through" to CII and CCI as partners of Holdco, resulting in more than $8 billion of losses being allocated to each of CCI and CII as of December

31, 2007.  LDTX 417 (Analysis of Book and Tax Losses Allocated to Allen Entities and CCI); LDTX 239 at F-36 (discussing how taxable income, gains and losses are passed through to CCI and CII).  Because CII, as a subchapter S corporation, is a flow through entity for tax purposes, the losses allocated to CII were available to Allen to offset his personal income.  26 U.S.C. § 1366; Conn Trial Tr., Sept. 2, 2009, 31:24-32:15 (recognizing that CII is an S corporation and the NOLs allocated to CII passed through to Allen).  No one has suggested that Allen's use of the NOLs was improper, nor have the Debtors ever asked Allen to give those NOLs back to Charter or to compensate Charter for his use of such NOLs.  Conn Trial Tr., Sept. 2, 2009, 31:24-32:15, 154:5-155:9.  If, as the Debtors' assert, the NOLs belong to the Charter operating companies, it must follow that the NOLs were not properly allocated to CII and Allen.  For consistency sake, that would have to be true.

Notwithstanding all of the above, the Debtors claim that CCI does not own the NOLs because (a) case law indicates that the estate of a parent holding company does not own or lay exclusive claim to the NOLs of a consolidated enterprise, (b) where a loss corporation cannot use its own NOLs, nothing prevents its affiliates from using them, (c) CCI did not generate the losses, and (d) CCI will not generate the income that the net operating losses will offset.  Debtors' Pretrial Brief at 64-66.  But the Debtors' litigation position is premised on the faulty assumption that the Charter companies are members of an affiliated group of corporations filing a consolidated U.S. Corporate Income Tax Return (Form 1120).  See 26 U.S.C. §§ 1501, 1502; 26 C.F.R. § 1.1502-1.  This is not the case.  The Charter operating companies that generated the NOLs are disregarded entities for tax purposes and the NOLs, therefore, flow through to the operating companies' owner Charter Holdco.  See 26 C.F.R. § 301.7701-2.  This is consistent with the consolidated financial statements filed for the operating companies with the Securities

Exchange Commission which reflect deferred tax assets of only $119 million (not the $8 billion the Debtors now claim) as of December 31, 2007, primarily relating to state-level NOL carryforwards. LDTX 444 (Annual Report of Charter Communications Holdings, LLC) at F-44. Charter Holdco is a partnership for U.S. tax purposes which is neither subject to taxation nor allowed to deduct NOLs for purposes of computing its partnership taxable income for allocation to its partners. See 26 U.S.C. §§ 701, 703(a)(2)(D). Charter Holdco, therefore, properly allocated the NOLs to CCI and CII pursuant to the Amended and Restated Limited Liability Agreement for Charter Holdco. JPX 13.

So how valuable are these attributes to the economic stakeholders of CCI? CCI expects to be able to retain the ability to use $4 billion or more of its existing NOLs after emerging from bankruptcy. LDTX 233 at 7 (PricewaterhouseCoopers, "Project Missouri M&A Tax Due Diligence" dated March 3, 2009). The Debtors' advisors have estimated the value of preserving the NOLs at approximately $1.14 billion. Goldstein Declaration, dated Aug. 21, 2009 at Exhibit B. Yet, this substantial value is not factored into recoveries to non-insiders of CCI under this Plan. Rather, Allen as the controlling shareholder of CCI, is the recipient of the windfall.

Holdco's Intellectual Property and Programming Contracts

Holdco owns the company's trademarks and programming contracts. See LDTX 252 at Exhibits B-27 and G-1 through G-11 (Charter Communications Holding Company, LLC Summary of Schedules). These assets are valuable and part and parcel of Holdco's going concern value. Without the benefit of Holdco's trademarks, the Debtors would be forced to establish a new mark at a considerable expense. Likewise, the Charter enterprise could not deliver cable programming to its customers without Holdco's programming contracts. The CCI estate is the dominant creditor of the Holdco estate via the Holdco Note. Yet, as with CCI's

NOLs, the value of this debtor programming contracts and trademarks is siphoned away to non-stakeholders of Holdco without compensation.

Other Potential CCI Recoveries

Section IV.C. below describes the various intercompany transfers and other potential sources of recovery belonging exclusively to the CCI or Holdco estates.

In summary, the Plan is unconfirmable because it both inadequately and unfairly values at the overall enterprise and CCI levels and misappropriates substantial values to certain preferred parties.

**B.** **The Plan is Not Fair and Equitable Due to the Allen Entities' Recoveries on Account of Their Equity Interests.**

The Plan, through the CII Settlement embodied therein, allocates substantial value to the Allen Entities on account of equity interests yet other CCI shareholders receive nothing and certain creditor classes are not paid in full. Among other things, under the terms of the CII Settlement the Allen Entities are receiving the following: (i) the distributions afforded to holders of similar claims; (ii) $175 million in cash; (iii) $85 million in notes; (iv) up to $20 million in restructuring fees and expenses; (v) retention of equity in Holdco; (vi) 2% of the equity value and 35% of the voting power for the Reorganized Company; (vii) 7-year warrants to purchase up to 4% of New Class A Stock in the Reorganized Company; and (viii) complete releases of all claims by the Debtors and the holders of any claims or interests in the Debtors including, but not limited to, breach of fiduciary duty claims. Yet, the only discernible "benefits" offered by Allen are perhaps a $2 million "new value" contribution, "permitting" the preservation of the existing Credit Facility and the maintenance of certain tax attributes. Again, these benefits, while technically applying to the Debtors, in reality will inure directly to the Allen Entities via new equity in the reorganized company. As explained, the value of those tax benefits is huge.

The Second Circuit has made it clear that settlements which are proposed as part of a plan are not an excuse for non compliance with the absolute priority rule. <u>Motorola, Inc.</u> v. <u>Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)</u>, 478 F.3d 452, 463 (2d Cir. 2007) ("a settlement presented for approval as part of a plan of reorganization . . . may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule" (citing <u>Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424 (1968))). The Debtors admitted that distributions to Allen and/or his affiliates under the CCI Settlement are on account of his equity interests, including (i) his shares of Class A Common Stock of CCI; (ii) his vested options to acquire shares of Class A Common Stock of CCI; and (iii) his shares of Class B Common Stock of CCI. <u>See</u> Disclosure Statement at 26-27. The Debtors then retreated from this position—arguing that compensation to Allen under the CII Settlement was exclusively on account of his contractual rights under the Exchange Agreement and not existing equity rights. Debtors' Pretrial Brief at 63 n.151. Nevertheless, it is clear that distributions to Allen under the CII Settlement are exclusively on account of his equity interests.

This entire scheme "negotiated" with Allen, designed to preserve tax attributes which will inure to the benefit primarily of Allen, is violative of the United States Supreme Court's decision in <u>Bank of America Nat. Trust & Saving Assoc. v. 203 N. LaSalle Street P'ship</u>., 526 U.S. 434 (1999) regarding the so-called "new value exemption." The absolute priority rule is one of the most fundamental precepts of bankruptcy law. Simply put, holders of claims or interests with lower priority in a debtor's capital structure may not receive consideration from the estate until or unless all creditors with greater relative seniority are paid in full. <u>See</u> 11 U.S.C. § 1129(b)(2)(C)(ii). Among the central tenets of this rule is that holders of junior classes cannot

recover from a debtor unless all structurally superior classes are fully reimbursed for their allowed claims. See e.g., In re Coltex Loop Cent. Three Partners, L.P., 138 F. 3d 39, 42 (2d Cir. 1998) (finding that a fair and equitable plan must provide that "the holders of any claim or interest that is junior to the claims of [the unsecured creditor] class will no receive or retain [property] under the plan"); In re Johnston, 21 F.3d 323, 329 (9th Cir. 1994); In re Justice, 972 F.2d 951, 954 (8th Cir. 1992). Here, the Plan allows the Allen Entities to "leap ahead" of senior creditors[6] and equally situated interests holders like R$^2$ Investments in terms of recoveries under the Plan, which is the exact *opposite* of what the absolute priority rule requires.

The undiscernable "value" that Allen and the Allen Entities are providing is wholly inadequate for recognizing the "new value exception" to the absolute priority rule. According to the United States Supreme Court in LaSalle Street Partnership, "the best way to determine value is exposure to the market." 526 U.S. at 458 (1999). As such, the Supreme Court held: "plans providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall within the prohibition of § 1129(b)(2)(B)(ii)." Id. at 458. Therefore, a plan proponent must conduct a market test "when some form of market valuation [is] available to test the adequacy of an old equity holder's proposed contribution." Id. at 451, 458 ("An old equity holder simply cannot take property under a plan if creditors are no paid in full"). The plan in LaSalle violated the absolute priority rule because it allowed old equity claimants to retain an interest in the debtor notwithstanding that creditors were not paid in full.

Like in LaSalle, here there has been no market test, yet Allen and affiliates, as existing equity holders, are retaining equity under this Plan while creditors are not paid in full and other equityholders are wiped out. Moreover, pursuant to the terms of CII Settlement, Allen would

---

[6]  Again, R$^2$ objects to confirming the Plan in its position as a shareholder of CCI. Nevertheless, it has standing to raise any issues regarding the confirmability of a plan for CCI (and indirectly Holdco).

possess the power to dictate who can buy into new equity. A case applying <u>LaSalle</u> in a similar circumstance found such an opportunity without a "market test" to be in breach of the absolute priority rule. In <u>In re Global Ocean Carriers Ltd.</u>, the largest shareholder, through his control of the debtor, retained an exclusive right to determine the owners of the debtor and the price to be paid for such ownership. 251 B.R. 31, 49 (Bankr. D. Del. 2000). Relying on <u>LaSalle</u>, the Court in <u>Global Ocean Carriers</u> held that the plan violated the absolute priority rule because it allowed the "existing controlling shareholder to determine, without the benefit of a public auction or competing plans, who will own the equity of the [debtor]." <u>Id</u>. The Court further held that to avoid this result the debtors in that case had to subject the "'exclusive opportunity' to determine who will own the [debtor] to the market place test." <u>Id</u>. Just as in <u>Global Ocean Carriers,</u> the Plan in the instant case violates the absolute priority rule because it gives the Allen Entities comparable exclusive rights without the benefit of a market test.

As argued herein, the CII Settlement as embodied in the Plan translates into blatant uneven treatment of $R^2$ Investments and the other CCI equity holders (other than Allen). The interests of $R^2$ Investments and other equity holders, except for Allen, are being wiped out under the pretense of the new value exception. Astonishingly, Allen is obtaining and retaining significant other benefits under the Plan on account of the same equity interests. Conn testified that during Plan and CII Settlement negotiations, Vulcan (representing Allen's interests) valued the consideration being received by Allen as being approximately $404 million. Conn Trial Tr., Sept. 2, 2009, 84:1-25, 86:1-8. <u>See</u> Charter Restructuring - Summary of Vulcan Terms dated Feb. 12, 2009, LDT 217 and <u>see</u> Charter Restructure Negotiation Tracker, Feb. 10, 2009, LDT 217. Approximately $40 million of this value is attributable to Allen retaining 2% of his equity interest in CCI, while the other shareholders of CCI, including $R^2$ Investments, are receiving

nothing. Conn Trial Tr., Sept. 2, 2009, 75:2-21. Interestingly, Conn testified that although the value Allen was retaining via his CCI equity was significant, he was exposing himself to potential personal liability because his agents were sitting on the board. Conn Trial Tr., Sept. 2, 2009, 75:14-24. However, this assertion rings hollow when one considers that the current Plan provides Allen with a total release of any potential personal liability. Even though the benefits Allen is obtaining under the Plan appear to have been fully vetted, at the same time, there was no evidence presented as to any valuation being attributed to the consideration being *given* by Allen. Accordingly, the Debtors clearly fail to meet the requirements of LaSalle and the absolute priority rule.

     **C.**     **The Debtors Do Not Satisfy the Best Interests Test and their Liquidation Analysis is Deficient.**

Section 1129(a)(7)(A) of the Bankruptcy Code, also known as the "best interests" test, requires, in relevant part, that:

> With respect to each impaired class of claims or interests
>
> (A) each holder of a claim or interest of such class (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

See 11 U.S.C. 1129(a)(7)(A); In re Adelphia Communications Corp., 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007).

In determining whether the "best interests" standard is met, courts must "measure what is to be received by rejecting creditors in the impaired classes under the plan against what would be received by them in the event of liquidation under chapter 7." Id. ("In doing so, the court must take into consideration the applicable rules of distribution of the estate under chapter 7, as well

16

as the probable costs incident to such liquidation."); <u>see also</u> <u>Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>, 843 F.2d 636, 649 (2d Cir. 1988) (the debtor must show that a dissenting creditor will receive no less under the plan than it would have received in a chapter 7 liquidation).

A plan proponent has the burden of establishing by a preponderance of the evidence that its plan meets the "best interests" test.  Id.; <u>see also</u> <u>ACC Bondholder Group v. Adelphia Communications. (In re Adelphia Communications)</u>, 361 B.R. 337, 365 (S.D.N.Y. 2007) ("That burden is met by showing that creditors will receive at least as much under the [p]lan as they would receive in a liquidation of the [d]ebtor's assets under chapter 7").  To carry their burden, the Debtors must present evidence and assign recovery values to any potential causes of action, including actions to avoid preferences or fraudulent transfers.  <u>In re Zaleha</u>, 162 B.R. 309, 316 (Bankr. D. Idaho 1993) (declining to confirm the debtor's plan of reorganization, which did not value potential causes of action); <u>In re Future Energy Corp.</u>, 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988) ("In ascertaining what creditors would receive in a hypothetical Chapter 7 liquidation, the Court is required to assign a value to possible recoveries in actions to avoid preferential or fraudulent transfers.") (citation omitted).

Fundamental to passage of the "best interests" test is a liquidation analysis.  <u>See In re Crowthers McCall Pattern, Inc.</u>, 120 B.R. 279, 301 (Bankr. S.D.N.Y. 1990).  A liquidation analysis must show "that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated."  <u>Adelphia Communications</u>, 361 B.R. at 367.  Further, a liquidation analysis must be based on evidence and not mere assumptions or assertions."  <u>Id</u>. (noting, however, that "the valuation of a hypothetical chapter 7 liquidation is, by nature, 'inherently speculative' and 'is often replete with assumptions and judgments'").  Otherwise, the

"best interests" test cannot be met. The test is designed to "protect individual creditors even in the face of majority support for a plan." Id.

The Debtors presented no expert testimony in support of their Liquidation Analysis attached to their Disclosure Statement, which was neither sworn to nor signed. While the record indicates that the Liquidation Analysis was prepared by the Debtors' management with assistance from their professionals, the Debtors only presented the testimony of Doody to support the Liquidation Analysis. Doody Aug. 17 Tr. 99:4-16. Doody's testimony, however, lacked credibility and is entitled to no weight because he did not have personal knowledge regarding significant parts of the document and relied upon the advice of counsel for which privilege was not waived. Specifically, Doody had no personal knowledge regarding the intercompany loans and receivables included in the Liquidation Analysis. It is clear that Doody was not competent to testify in order that the Debtors meet their burden under the "best interests" test.

Indeed, it is remarkable that the Liquidation Analysis failed to include any recovery analysis for CCI. The Debtors did offer a preliminary analysis of certain preference and insider payments, which is described below, but this was not even included in the Liquidation Analysis. While surprising, this is consistent with this case's theme of attempting to circumvent bankruptcy law via a "settlement." Moreover, given the "Allen influence", those preparing the analysis could not be relied upon to independently identify and pursue potential inter-debtor claims and/or causes of actions anyhow.

The only expert testimony in the record, and the only evidence entitled to any weight, is that of Law Debenture's expert McDonough, who testified that the Debtors substantially undervalued the assets available to CCI for distribution by systematically ignoring or excluding

obvious potential sources of recovery. McDonough Trial Tr., Sept. 1, 2009, 65:6-13; see also Liquidation Analysis, Plan Ex. E ("The Liquidation Analysis *assumes* that there are no recoveries from the pursuit of any potential preferences, fraudulent conveyances, or other causes of action . . . .") (emphasis added).

McDonough testified as to the following categories of potential recovery:

| Potential Source of Recovery[7] | Potential Value |
|---|---|
| • Mirror Note Recovery of Charter Holdco Other Assets | $9,000,000 |
| • January Interest Payment | $27,000,000 |
| • November CCH Interest Payment | $8,400,000 |
| • October Tender Offer for CCH Notes | $99,000,000[8] |
| • Q2 2008 Repurchase of CCH Notes | $35,000,000 |
| • Preference Payments – CCI and Charter Holdco | $3,400,000 |
| • Insider Payments | $22,400,000 |
| • CCVIII Settlement | $28,000,000 |
| • Intercompany Receivable from CCO | $119,000,000 |

---

[7]  LDTX Demonstrative 24.

[8]  In October 2008, Holdco used nearly $99 million in cash to purchase $102 million in debt issued by its insolvent subsidiary, the debtor CCH. Doody Trial Tr., Aug. 17, 2009, 114:1-25, 115:1-14. Remarkably, that debt that was purchased by Holdco approximately nine months ago at close to par, yet unsecured creditors of CCH now stand to receive less than a penny on the dollar under the Plan. Interestingly, a mere one week after the note tender offer, in their released 10-Q for the third quarter of 2008, the Debtors amended language to reflect their belief that possible insolvency concerns might inhibit their ability to service their debts. The timing of these events is curious, to say the least. The Debtors' Chief Restructuring Officer, Doody, testified that there was no analysis done as to whether CCI or Holdco could recover amounts related to the October 2008 transaction. Doody Trial Tr., Aug. 17, 2009, 124: 6-17.

19

| | |
|---|---|
| • Management Services Agreement Receivable | $37,000,000 |
| • Other Assets (Programming Contracts, Intellectual Property, Real Estate, Litigation Claims) | Unvalued |
| Total Potential Recoveries Unaccounted for by Debtors: | $388,200,000 |

Each of these different sources of recovery present valid potential sources of recovery which must be valued to determine what could be recovered from CCI stakeholders in a liquidation. To fail to do so, and instead merely project 0% recoveries without any analysis, proves the Debtors did not meet their burden and the Plan fails the best interests of creditors' test.

Symptomatic of the lack of analysis by the Plan proponents is the Debtors' approach to potential preference payments, even with the prospect of objections to confirmation. The Debtors identified approximately $200.3 million in payments made by Holdco and CCI within the 90 day preference period prior to filing for bankruptcy. See CCI's Statement of Financial Affairs [Docket No. 139] at Attachment 3b and 3c; Holdco's Statement of Financial Affairs [Docket No. 5 in Case No. 09-11442] at Attachment 3b and 3c. Further, the Debtors identified approximately $22.4 million in payments made by CCI to insiders within one year immediately preceding the Debtors' bankruptcy filing. See CCI's Statement of Financial Affairs [Docket No. 139] at Attachment 3c. As the record indicates, the preference analysis that was conducted by AlixPartners for the Debtors was not thorough and failed to consider several factors. For example, despite discounting several of the preference claims based upon purported defenses to those claims, Barry Folse of AlixPartners testified that he did not conduct a detailed evaluation of the validity and strength of each preference claim. Folse Trial Tr., Aug. 18, 2009, 27:9-7. Further, Folse acknowledged that there may be circumstances in which the value transfer date is materially different than the invoice date and that those differences could change his assessment

of preference claims, yet he did not conduct an detailed assessment of each vendor to determine the timing of the payments in order to make a determination of the validity of a new value defenses that he discounted. Folse Trial Tr., Aug. 18, 2009, 40:19-25, 41:1-8. In analyzing the possibility of recovery under his ordinary course of business analysis, Folse assigned letter grades to each vendor based upon the likelihood of recovery. Folse, however, acknowledged that these grades were subjective and were assigned without the benefit of testimony and documents that might be gathered in a more in-depth analysis, which might provide the means to a more meaningful estimate of the value of the preference claims. Folse Trial Tr., Aug. 18, 2009, 42:4-12, 43:17-25, 44:1. Folse was instructed to limit his preference analysis to non-insiders yet, of the twenty-seven vendors he included a transfer to Allen. Id. This analysis of the transfer to Allen was flawed because Folse did not review the contract on which the payment was based, did not consider when the contract was entered into and did not even consider whether there were prior payments of a similar nature. Folse Trial Tr., Aug. 18, 2009, 45: 7-19. Despite his failure to consider these important factors, Folse assigned an arbitrary 80% recovery to the Allen transfer, which was determined through an arbitrary assignment determined by Debtor's counsel. Folse Trial Tr., Aug. 18, 2009, 50:2-5, 51:13-21. This effort is a prime example of how the investigation that was conducted by the Debtors was wholly inadequate.

For the above reasons, R$^2$ Investments submits that the Debtors have been unable to meet their burden that creditors and interest holders are receiving more under the Plan than they would if the case were a liquidation. See Adelphia Communications, 361 B.R. at 365 (stating that "[t]he Plan proponent bears the burden of showing that the plan complies with section 1129(a)(7)).

Furthermore, due to the "global settlement" component of the Plan, the Debtors also have to satisfy the "best interests" test with respect to the CII Settlement itself. "Whether a settlement included in a plan is in the best interests of the creditors requires an inquiry into whether a hypothetical chapter 7 trustee of the debtor's estate would have adopted the settlement as being in the best interests of the parties in interest." Id. Due to the myriad of issues that the CII Settlement raises with respect to the Plan and the resulting unfair treatment of creditors, unfair treatment of shareholders and the violation of numerous other provisions of the Bankruptcy Code, it is simply inconceivable that a chapter 7 trustee acting as a fiduciary of a bankruptcy estate would enter into such a settlement. Accordingly, $R^2$ Investments submits that the Debtors utterly fail on this portion of the "best interests" test as well.

**D. The Plan has not been Proposed in Good Faith as Required by Section 1129(a)(3) of the Bankruptcy Code.**

As amply reflected throughout this Brief, the objections raised by other interested parties and the record in this proceeding, the Plan has not been proposed in good faith as is required under section 1129(a)(3) of the Bankruptcy Code. The lack of good faith on the part of the Debtors and other Plan proponents was adequately demonstrated at trial.

Pursuant to section 1129(a)(3) of the Bankruptcy Code, a chapter 11 plan may be confirmed only if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although not defined in the Bankruptcy Code, "good faith" has been described by courts to include: (1) the Debtor's "legitimate hope of success," In re Century Glove, Inc., Civ. A. 90-400-SLR, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993) (quoting In re Sun Country Development, Inc., 764 F.2d 406, 408 (5th Cir. 1985)); see also, In re Shoen, 193 B.R. 302, 318 (Bankr. D. Ariz. 1996); (ii) a showing that the plan was proposed with "honesty and good intentions," see Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988); (iii)

the existence of "a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code," see In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984); Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.), 917 F.2d 1210, 1214 (9th Cir. 1990); Ryan v. Loui (In re Corey), 892 F.2d 829, 835 (9th Cir. 1989); and (iv) whether the debtor's bankruptcy filing was designed to abuse the judicial process and the purpose of the reorganization provisions of the Bankruptcy Code, see In re Natural Land Corp., 825 F.2d 296, 298 (11th Cir. 1987); In re VIP Motor Lodge, Inc., 133 B.R. 41, 44 (Bankr. D. Del. 1991) (finding of good faith where Debtors did not seek to use the bankruptcy process for dilatory purposes).  Ultimately, a court should consider the totality of the circumstances surrounding a plan to determine if it was proposed in good faith.  See Mann Farms, 917 F.2d at 1214; In re Coram Healthcare Corp., 271 B.R. 228 (Del. Bankr. 2001) (in evaluating totality of circumstances surrounding plan, court has considerable judicial discretion in finding good faith, with most important feature being inquiry into fundamental fairness of plan).

Furthermore, in analyzing a chapter 11 plan under the "good faith" requirement one primary objective of the Bankruptcy Code that is supposed to be advanced is the reorganization of the debtors and the maximization of the value of the estate.  See In re Bonner Mall P'ship, 2 F.3d 899, 916 (9th Cir. 1993).  Another objective is "the expeditious resolution of disputes and speedy payment to creditors." See In re Kemp, 134 B.R. 413, 415 (Bankr. E.D. Cal. 1991) (quoting In re Hoosier Hi-Reach, Inc., 64 B.R. 34, 38 (Bankr. S.D. Ind. 1986)).

When the totality of the circumstances are analyzed in these Chapter 11 cases, the Plan utterly fails the "good faith" requirement of section 1129(a)(3).  The Plan was not proposed with "honesty and good intentions" considering the questions surrounding the CII Settlement with the Allen Entities, which under the auspices of the Plan is being steamrolled over most creditors and

interest holders.  As explained herein, the Plan does not even describe what claims are really being "settled" under the CII Settlement in return for the Allen Entities receiving a huge windfall.  Furthermore, given the numerous inconsistencies with bankruptcy law, including the absence of value maximization for creditors and equityholders, breaches of the absolute priority rule and best interests test and the glaring unfair discrimination, the Plan will not "achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  Rather, the Plan is a culmination of a chapter 11 filing that was designed to "abuse the judicial process and purpose of the reorganization provisions of the Bankruptcy Code" by benefiting the Allen Entities at the expense of most other creditors and interest holders.  Brazenly, Allen and his affiliates do not seem to care that this Plan and the impact it has on creditors and interest holders reflects bad faith.  At trial, Conn of Volcan testified that if he and the Debtors "made decisions based on appearance, we'd be in a different place."  Conn Trial Tr., Sept. 2, 2009, 175:20-25; 176:1-6 (testimony of Conn in response to the Court's question: "[d]id you ever give consideration to appearance issues, here, because it appears unseemly for a person as wealthy as Allen and the control of a company so visible as Charter to be putting money in his pocket at a time when this company is being restructured?").

It is axiomatic that advocating a "restructuring" plan to benefit a privileged few, including oneself at the expense other parties, through one's fiduciary position for that sole purpose is bad faith under the Bankruptcy Code.  As discussed at length herein and testified to repeatedly at trial, the Plan was "enabled" by the utter disregard of corporate formalities by corporate fiduciaries in connection with an insider transaction disguised as a settlement.  This is clear evidence of bad faith on the part of the Plan's proponents.  The third party releases, which

render the Plan unconfirmable for other reasons set forth herein, also implicate the good faith requirement of section 1129(a)(3) and applicable Delaware law regarding fiduciary duties.

Quite simply, the conduct by the Debtors' insiders in negotiating, approving and then supporting this Plan established on the record at trial rises to the level of breaches of fiduciary duties by the officers and directors of the Debtors. Courts consistently have held that a breach of fiduciary duty on the part of a plan proponent, by itself, is sufficient to establish that a plan has been proposed by means forbidden by law, thus a lack of good faith. See, e.g., In re Coram Healthcare Corp., 271 B.R. 228, 235-40 (Bankr. D.Del. 2001) (denying confirmation where CEO of the debtor had actual conflict of interest); In re Bush Indus., Inc., 315 B.R. 292, 306 (Bankr. W.D.N.Y. 2004) (denying confirmation where board engaged in self dealing and thereby violated its fiduciary obligation to advance equally the interests of all creditors.) Here, the absence of good faith is compelling and makes the Plan unconfirmable.

1. **Delaware Corporate Law Provides the Applicable Standard of Review.**

Delaware law is well established on the applicable standard of review that a court should employ where a controlling stockholder causes the controlled (Delaware) corporation to enter into a transaction that harms the controlled corporation, but, at the same time, confers a unique benefit upon the controlling stockholder.[9] The Delaware Supreme Court addressed this question long ago in Sinclair Oil Corp. v. Levin, 280 A.2d 717 (Del. 1975). See also In re Primedia, Inc. Derivative Litigation, 2006 WL 3365544, at * 8 (Del. Ch. 2006). The Court in Sinclair held that where a controlling entity or stockholder causes a corporation to enter into a self dealing

---

[9]   The record set forth herein proves that Allen, as the controlling shareholder, is benefiting at the expense of CCI from the terms of the disputed transaction.

transaction and controls the terms of the transaction, the business judgment rule is not applicable.[10] 280 A.2d at 720.

Rather, under Delaware law, in a transaction between a controlling shareholder and a corporation, the standard of "entire fairness" will apply. See Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997). Entire fairness requires the "demonstration of good faith and 'the most scrupulous inherent fairness of the bargain.' The two components of entire fairness are fair dealing and fair price." Rhodes v. SilkRoad Equity, LLC, 2009 Del. Ch. LEXIS 50, at * 5 (March 24, 2009) (citing Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983)). Fair dealing embraces questions of, among others, "when the transaction was timed and how it was initiated, structured, negotiated and disclosed. Fair price assures the transaction was substantively fair by examining the transactions 'economic and financial considerations.'" Id. Moreover, these two parts of entire fairness are not independent. Rather, "the fair dealing prong informs the Court as to the fairness of the price obtained through the process." Id. (quoting Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 746 (Del. Ch. 2007)).

Analyzing "fair dealing" or "fair process" must address whether the process that took place was an "effective proxy for arm's-length bargaining, such that a fair outcome equivalent to a market-tested deal resulted." In re Loral Space and Commc'ns Inc., 2008 WL 4293781, at * 22. (Del. Ch.); See also Valeant, 921 A.2d at 748 (finding unfair dealing where "it simply cannot be said that an independent board advised by independent experts would have employed a similar process."); See also Oliver v. Boston University, 2006 WL 3742598, at * 3 (Del. Ch.)

---

[10]     Directors of Delaware corporations are bound by the traditional fiduciary duties of care and loyalty. The appropriate starting place in evaluating a plaintiff's fiduciary duty claims, however, is with the well established presumption of the business judgment rule, which reflects and promotes the role of the board of directors, and not the Court, as the appropriate body to manage the business and affairs of the corporation. The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken is in the best interests of the company. Wayne County Employees' Retirement System v. Corti, 2009 Del. Ch. LEXIS 126 at *32 (July 24, 2009) (citing Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)).

(court found lack of fair process when no party negotiated on behalf of minority common stockholders).

### 2. The Plan Transaction Does not Meet the Entire Fairness Standard.

#### a. CCI Failed To Negotiate with Allen at Arm's-Length.

There is "fair process" when an agreement results from arm's-length negotiations. See Int'l Telecharge, Inc. v. Bomarko, Inc., 766 A.2d 437, 440 (Del. 2000); Valeant, 921 A.2d at 748 (absence of negotiated structure supported finding of unfair dealing). Moreover, where as here the entire fairness standard applies, the rule is that when a "stockholder asserts differential treatment, the motivations of the board are not relevant in determining whether differential treatment occurred, but rather, the end result of the board action is what is relevant." Tooley v. AXA Fin., Inc., 2005 WL 1252378, at * 6 (Del. Ch. May 13, 2005).

It is not disputed that Allen was a controlling shareholder and that such a controlling position presented a potential conflict of interest potential when negotiating transactions with CCI. See Merritt Trial Tr., July 22, 2009, 245:2-4. See CCI 2008 Form 10-K at 31-32, CX 217; See CCI 2008 Form 10-K at 23 and 31, LDT 239.

The Board appointed a special committee in the past in a transaction with Allen. See Smit Trial Tr., July 22, 2009, 12:3-9. Yet, in the matter now at issue when the board was confronted with the restructuring of the entire company, it did not appoint a special committee to negotiate a transaction with Allen. Merritt Trial Tr., July 22, 2008, 248:6-9. See Minutes of a Regular Meeting of the Board of Directors of Charter Communications, Inc., Dec. 9-10, 2008, at 8, JPM 304. Why? No excuse was offered at trial. Apparently, the only action taken was the holding of informal gatherings of the "independent" directors after Board meetings. Johri Trial Tr., Aug. 31, 2009, 191:12-25. Such loose formalities might be more expected of a small, family owned business rather than of a multi-billion dollar public company. Similarly, the Board made

a conscious decision to reject the corporate formality of the appointment of independent legal counsel as well as independent financial advisors in negotiations with CCI's Chairman and controlling shareholder, Allen. Merritt Trial Tr., July 22, 2009, 248: 19-24. Kirkland & Ellis and Lazard, which both had a long standing relationship with Charter, were the sole legal and financial advisors available for all Board members. Smit Trial Tr., July 22, 2009, 12:3-9.

Tragically in this scenario, instead of protecting those who were owed fiduciary duties, the point person representing the interests of the Company suffered from his own conflict of interest. The CEO of CCI, Mr. Neil Smit, was responsible for approving the final terms of the deal with Allen. Smit Dep. Tr. 275: 16-20 (Ex. 47); Smit Trial Tr., July 22, 2009, 127:13-20. While charged with negotiating on behalf of CCI, he was also negotiating a compensation package for himself which included an award of up to $6 million. See Minutes of Special Meeting of the Board of Directors of Charter Communications, Inc., January 6, 2009 3 JPM 129.[11]

Delaware law is clear that the fiduciary duties of officers such as Smit (and the rest of senior management) owed to the Company "are the same as those of directors.".[12] Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009). See also Miller v. McDonald, 385 B.R. 576, 591-93 (Bankr. D. Del. 2008) (confirming fiduciary duty imposed on officers such as general counsel). Smit failed to negotiate a cap on the amount of legal and financial fees that CCI would be required to reimburse Allen. Although Smit's initial proposal was to cap those fees at $5 million, eventually Smit acquiesced to the demand of Allen to increase the cap to $20 million.

---

[11]   In fact, while negotiating the restructuring, Charter's senior management team threatened to resign if the Crossover Committee did not agree to a compensation package. Goldstein Declaration 8/21/09, Ex. A ("straw man" proposal); Marcus Trial Tr., July 29, 2009, 136:20-22.
[12]   See commentary collected at http://www.delawarelitigation.com/2009/01/articles/delaware-supreme-court-updates/delaware-supreme-court-issues-major-ruling-on-shareholder-ratification-doctrine-and-duties-of-corporate-officers/.

See Emails between Conn and Smit dated Feb. 11, 2009, LDT 212. Clearly, the conflicted position in which Smit placed himself carried over to his participation in the acquiescence of CCI's Board in the ultimate "settlement" with Allen under the Plan.

### b. The Board Failed to Achieve Best Value for CCI

By failing to fulfill their fiduciary duty to aggressively negotiate a deal that would benefit CCI without regard to the advantage to Allen, the directors failed to fulfill their duty to obtain maximum value for the stakeholders of CCI. As this transaction was the product of an unfair process, and the price cannot be analyzed by reference to a reliable market or by comparison to precedent transactions, "the burden of persuading the Court of the fairness of the terms will be exceptionally difficult." Valeant, 921 A.2d at 748; see also In re Loral Space, 2008 WL 4293781, at * 22 (where there is no market check in the process used, thus not allowing for a comparison of the transaction with others, the Court may be left with no reasonable basis to conclude that the transaction was fair.); See generally Lyondell Chemical Co. v. Ryan, 970 A.2d 235, 239 (Del. 2009) (reiterating obligation of directors to maximize value).

In summary, the process leading to the "settlement" with Allen as well as the entire transaction demonstrates the embodying Plan is not proposed in good faith. Consequently, it cannot be confirmed by this Court.

### c. Third Party Releases also Fail the Entire Fairness Standard.

As explained in the next section of this Brief, the officers and directors approved a settlement within a Plan that released themselves of any liability as well as many types of other third parties without establishing the entire fairness of the releases and without a full analysis and disclosure of the value or scope of what was being released. It may be reasonably inferred that when the officers and directors approved the releases, they were motivated more so by their personal financial interest as opposed to the best interests of the shareholders. As previously

29

explained, the entire fairness standard applies to their approval of the releases and they will not be able to carry their burden to satisfy that standard. See Gantler v. Stephens, 965 A.2d at 708 (noting error of trial court in dismissing claims against officers and directors whose actions benefited them personally as compared to acting in best interest of the shareholders).

**E.** **The Third Party Releases are Not Warranted Under Second Circuit Precedent and Implicate Fiduciary Duties.**

In Article X(E) of the Plan, the Debtors seek to effectuate a release by creditors and equity holders of claims against not only against the Debtors, but also various third parties including the Debtors' present and former officers and directors, members, agents financial advisors, attorneys, employees, partners, affiliates and representatives – including, most notably, Allen and the Allen Entities. First, as detailed above, there has not yet been adequate disclosure or analysis of potential claims of each of the estates, even though there is evidence that debtors such as CCI and/or Holdco have potentially valuable claims. It is a fundamental precept of bankruptcy law that there be an investigation and disclosure of the Debtors' financial affairs and, until that is done, there is no way of knowing the intrinsic value of the claims underlying these releases. This requirement should not be excused under the guise of a prearranged plan which includes a "settlement."

The evidence adduced at trial reveals that the precepts under Delaware corporate law outlined in the preceding section of this Brief were flaunted and will continue to be, so long as the Debtors and their fiduciaries pursue their current Plan implementing the Allen "settlement." Yet, that settlement would be self-executing – releasing any claims arising from that conduct. Simply put, the Debtor's Board was hopelessly conflicted in approving the CII Settlement. See Joint Defense, Common Interest, and Information Sharing Agreement Between CCI and Vulcan and its Affiliates, January 6, 2009, LDT 113; See CCI 2008 Form 10-K at 23 and 31, LDT 239.

In addition to the testimony of Messrs. Merritt and Smit described previously, Rajive Johri, one of the purported "disinterested" directors, admitted in his trial testimony that the Debtor had no written policy to deal with conflicts arising with Allen. Johri Trial Tr., Aug. 31, 2009, 183:24-184:1. Indeed, Johri understood that the Debtors were involved in negotiations with its controlling shareholder, Allen, and that at some point in time the interests of Allen and the company diverged. Id. at 187:23-188:2. As discussed more below, on or about February 5, 2005, after Allen notified the Debtors that he would be exercising his exchange rights (and thereby potentially destroying the Debtors' NOLs), Johri knew that Allen's interest and the company's interest were diverse. Id. Yet the Board failed to appoint a special committee to negotiate with Allen, even though another Board Member, Conn of Vulcan, testified that at this point that he was representing Allen's interests and not those of the creditors. Conn Trial Tr., 87:112-16. See Minutes of a Regular Meeting of the Board of Directors of Charter Communications, Inc., Dec. 9-10, 2008, at 8, JPM 304.

In fact, Johri admitted that as an independent director, he was concerned at that point about whether special counsel should have been appointed. Id. at 191:16-23. Yet, the Board relied on the advice of Debtors' counsel to not appoint special counsel. Id. at 192:10-12. And, the Debtors' management (upon whose counsel the Board relied) was controlled by Allen. Specifically, the Board completely abdicated its authority in negotiating the consideration to be given to the Allen Entities as part of the CII Settlement. See Emails between Conn and Smit dated Feb. 11, 2009, LDT 212. Johri acknowledged that the Debtors' management was taking the lead in negotiating with Vulcan and that Allen had a controlling interest in both the Debtors and Vulcan. Id. at 196:19-21; See CCI 2008 Form 10-K at 23 and 31, LDT 239.

Thus, clearly the path chosen by the Board for these cases was a rush to "seal the deal", regardless of any violation of their fiduciary duties pursuant to Delaware corporate law, with any resultant potential breach of fiduciary duty claims to be released or exculpated under the proposed Plan. This course of action is an abomination and should not be sanctioned by the Court.

The grant of third-party releases is extraordinary relief and justification must be demonstrated before it is given. See In re Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia), 416 F.3d, 141 (2d Cir. 2005) (non-debtor releases are proper only in rare circumstances where "'the injunction plays an important part in the [d]ebtor's reorganization plan'") (quoting In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 293 (2d Cir. 1992) (granting third party releases where estate was receiving a substantial contribution and benefit from parties being released); In re MacArhur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (granted third party releases where claims released were not extinguished but were transferred to a separate legal entity); Menard-Sanford v. Mabey (In re A.H.Robins Co.), 880 F.2d 694, 701 (4th Cir. 1989) (granted third party releases for claims that would have impacted the debtor's reorganization due to indemnity claims); see also In re Karta Corp., 342 B.R. 45 (S.D.N.Y. 2006) (followed restrictive standard set forth in Metromedia in granting third party releases).

Here, the Debtors utterly fail to meet their burden as set forth in the case law above. They seek to grant broad releases to third parties without (i) providing any disclosure, let alone assessment, of what claims are being released, or (ii) offering any substantive support or making any legitimate argument for why such releases are necessary, warranted or even lawful. The Debtors have attempted to show that the grant of releases to Allen and the Allen Entities is

necessary in order to confirm the Plan by preserving the Debtors' NOLs and ability to reinstate the secured debt. However, as the record at trial established, the Plan and the third party releases are nothing more than a "take it or leave it" deal by Allen. See Email from Glatt to Zinterhoffer re: "Charter Follow-up" dated Jan. 28, 2009, JPM 157. Lance Conn, a former employee of Vulcan and a board member, testified that the releases were "essential to the plan." Conn Trial Tr., Sept. 2, 2009, 86:10-25, 87:1-7. Furthermore, it appears nobody considered the possibility of a restructuring plan that did not provide such releases. Conn Trial Tr., Sept. 2, 2009, 87:15-25, 88:2-8. However, as Conn testified, despite the immense benefit being obtained under the Plan by Allen, the releases were not quantitatively valued. Conn Trial Tr., Sept. 2, 2009, 166:12-15. Apparently, there was concern over potential, speculative "nuisance" claims against Allen because he has "deep pockets," however, once again, there was no identification of such claims nor was an analysis done as to their value. Conn Trial Tr., Sept. 2, 2009, 167:2-4.

Granting third party releases is extraordinary relief. The all encompassing "blind" releases herein – which whitewash even the behind the scenes conduct by fiduciaries in negotiating the Plan and Allen "settlement" - are impermissible under the standards set forth in the Second Circuit, and accordingly, render the Plan unconfirmable.

### F. The Plan Involves *"De Facto"* Substantive Consolidation.

As argued in $R^2$ Investments' objection to confirmation, the Plan has the effect of "partially" effectuating the *de facto* substantive consolidation of the Debtors' estates. Notably, the Debtors artfully avoid specifically asking for substantive consolidation, partial or otherwise. However, by the release of intercompany claims and the other features of the CII Settlement, the Plan contemplates a consolidation of all debtors' assets but with otherwise strict adherence to corporate separateness in the distribution scheme. The effect of this is to siphon value from

certain estates, most especially CCI's, to the detriment of certain creditors and interest holders, including R² Investments.

The leading Second Circuit case on substantive consolidation is In re Augie/Restivo Baking Co., 860 F.2d 515 (2d Cir. 1988). In Augie/Restivo, the Court held that "the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." Id at 518. Substantive consolidation is an equitable remedy that should be used sparingly, and only when the movant demonstrates: "(i) [that] creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit, . . . ; or (ii) [that] the affairs of the debtors are so entangled that unraveling them would be impossible or prohibitively expensive." Id at 518-19. It is necessary to consider both of those "two critical factors." Id.; See also Federal Deposit Ins. Corp. v. Colonial Realty Co., 966 F. 2d 57, 61 (2d Cir. 1992) (substantive consolidation analysis under Augie/Restivo requires "a searching review of the record, on a case-by-case basis"); In re Cooper, 147 B.R. 678, 682 (Bankr. D.N.J. 1992) (factors cited in Augie/Restivo are "signposts to assist the court's judgment"); In re 599 Consumer Electronics, Inc., 195 B.R. 244, 248 (S.D.N.Y. 1996).

For examination of this issue within the specific context of intercompany claims, In re Adelphia Communications Corp., 361 B.R. at 359-360, is particularly instructive. In addressing a motion for a stay pending appeal of confirmation of a chapter 11 plan, the District Court analyzed a plan and settlement that similarly involved a complete release of intercompany claims. Significantly, the Court found that such releases likely constituted a *de facto* substantive consolidation of the debtors' estates because certain creditors would be unfairly treated as a result. The reviewing Court was specifically concerned that the Bankruptcy Court had not

analyzed whether (i) the effect of the plan was a *de facto* substantive consolidation and (ii) whether such consolidation was in fact warranted. Id.

Here, the Debtors do not so much as use the term "substantive consolidation" in the Plan. The Debtors seek this extraordinary equitable relief of substantive consolidation implicitly, yet do not specifically ask for it. Perhaps if they were more open about the siphoning of value from CCI's estate in the form of NOLs, intercompany and third party claims and valuable intellectual property and executory contracts – without reasonable consideration in exchange – then it would be even more difficult to defend. The Debtors cannot hide from making the requisite showings under Augie/Restivo and Adelphia. The Debtors have not met their burden.

### G. The Gerrymandering of Voting Classes and Artificial Impairment is Impermissible.

In order to effectuate a "cram down" under section 1129 of the Bankruptcy Code, as to each debtor (including CCI), the Debtors must obtain the acceptance of at least one voting impaired class. Unfortunately, as to CCI, the Debtors improperly "gerrymandered" unsecured claims by creating a separate class for the CCI Notes. $R^2$ Investments, via its substantial equity interests in CCI, is not directly impacted by such unlawful treatment. However, it does have standing to raise issues regarding cleverly designed provisions of the Plan which improperly work to obtain approval of a Chapter 11 plan which is otherwise unconfirmable. Moreover, as also described further below, the Plan discriminates between fellow equity class members, which does directly impact $R^2$ Investments.

Specifically, holders of claims in Class A-3 (General Unsecured Claims – totaling approximately $1 million) and Class A-4 (CCI Notes Claims – totaling approximately $479 million) are the only classes permitted to vote on the Plan for CCI. There is no discernable difference between Class A-3 and Class A-4. They are similarly situated as unsecured creditors.

35

However, Class A-3 claimants are receiving 100% of their respective claims, while Class A-4 claimants are receiving only a fraction of that percentage recovery. Why was this done? In order to confirm the Plan for CCI on a "cram down" basis, the Debtors have to deliver an impaired accepting class pursuant to section 1129(a)(10) of the Bankruptcy Code. When they constructed the Plan, the Debtors were well aware that Class A-4 could vote to reject the Plan and that they would need to create a separate class. The Debtors cleverly peeled off non-CCI Notes claims from the general unsecured pool, called them "General Unsecured Claims", and paid them 100% for their claims, versus a percentage recovery equal to only a fraction of that for the identically situated CCI Notes claims.[13]

But, the law is clear that classifying similarly situated claim separately for the purpose of manipulating the vote on a plan of reorganization is impermissible. In re One Times Square Assoc. Ltd. P'ship, 165 B.R. 773, 776 (S.D.N.Y. 1994) (affirming bankruptcy court's decision that gerrymandering is impermissible and denying confirmation of the debtor's plan on those grounds); Phoenix Mutual Life Insurance Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture), 995 F.2d 1274, 1279 (5th Cir. 1991), cert. denied, 121 L. Ed. 2d 37, 113 S. Ct. 72 (1992) ("Classification of claims. . . affects the integrity of the voting process, for if claims could be arbitrarily placed in separate classes, it would almost always be possible for the debtor to manipulate 'acceptance' by artful classification.") The Debtors have not offered any legitimate reason for why Class A-3 and Class A-4 are separate and indeed, no real explanation exists –

---

[13] To make matters worse, it was only after the Debtor filed their initial plan when they heard vocal plan objections by Class A-4 members that the Debtors changed the Plan by labeling Class A-3 as "impaired", thereby magically enabling them to vote. $R^2$ Investments disputes the basis for Class A-3 being "impaired."

except for the improper purpose of gerrymandering the vote and thereby stifling the will of overwhelming majority of economic stakeholders of the estate of CCI (and, in turn, Holdco[14]).

Treating holders of Class A-3 and Class A-4 claims differently violates section 1123(a)(4) of the Bankruptcy Code, which expressly requires the same treatment for claims of the same type. As a result, the Plan unfairly discriminates against Class A-4. Section 1123(a)(4) of the Bankruptcy Code requires the plan to "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4); see 7-1123 Collier on Bankruptcy, 15th Ed. Rev. P 1123.01[4]. Accordingly, "[a]bsent consent to accept less favorable treatment, all members of the class must receive equal value. In re Quigley Co., 377 B.R. 110, 117 (Bankr. S.D.N.Y. 2007) (noting that "[i]n addition, each member of the class must pay the same consideration for its distribution"). When a creditor objects to the classification of a particular class of claims, "[t]he burden is on the debtor to show that unequal treatment between classes having the same priority does not constitute unfair discrimination." In re El Comandante Mgmt. Co., LLC, 2006 Bankr. LEXIS 3820 (Bankr. D.P.R. Mar. 3, 2006); see also In re Barney & Carey Co., 170 B.R. 17, 25 (Bankr. D. Mass. 1994). Courts have held that some fair and reasonable differences in treatment are permissible under section 1123(a)(4) of the Bankruptcy Code, but the discrimination must be "fair and supported by a rational basis." Id. (citing Matter of LeBlanc, 622 F.2d 872 (5th Cir. 1980) (discrimination against unsecured insiders not unfair)). The Debtors have not met that requirement.

---

[14]    $R^2$ Investments holds 18,550,336 of Class A Common Stock issued by CCI and, thus, is a 4.7% percent shareholder of CCI, and opposes the Plan. Law Debenture, on behalf of the $479 million in CCI Notes also opposes the Plan. That leaves Classes A-1, A-2, A-3 and A-5, which in the aggregate have estimated claims totaling $1,019,317.

In ways more directly impacting $R^2$ Investments as an equity holder, the Plan clearly violates section 1123 (a)(4) in a second instance. Under the Plan, the Allen Entities obtain, *inter alia*, 2% of the equity and 35% of voting interest in the reorganized company, while the other Class A-6 members including $R^2$ Investments receive no equity interests in the reorganized company. See In re Modern Steel Treating Co., 130 B.R. 60, 64 (Bankr. N.D. Ill. 1991) (noting that a plan modification in which one claimant would acquire complete ownership, while another similarly situated claimant would lose all of their shares of the debtor would violate sections 1123(a)(4) and 1129(a)(7) of the Bankruptcy Code). Thus, $R^2$ Investments as a shareholder is on the direct receiving end of further discriminatory treatment under the Plan and the CII Settlement. For that reason and the infirmities regarding the absolute priority rule described below, the Plan is patently unconfirmable as to both shareholders and creditors of CCI.[15]

## H. The "Settlement" is Improper Under Bankruptcy Rule 9019.

Finally, anticipating that the Plan would run afoul of the strict requirements of section 1129, transparently the Debtors try to dress up Allen's favorable treatment and the huge transfer of value to the Crossover Committee as a "settlement and compromise." Allen or other Allen Entities own 7% of the equity in CCI with 90% of the voting interest, yet under the terms of the settlement they will retain 2% of the new equity and 35% voting interest in the reorganized company while all other equity interests are wiped out. Moreover, besides the lucrative benefits described previously, Allen retains his rights to convert his Holdco shares to new CCI Class A shares, as well as the discretion to decide who else will be a shareholder of CCI. Clearly, the Bankruptcy Code does not sanction such favored treatment under the guise of a "settlement."

---

[15] As Law Debenture argues in its Brief, even if this Court does not find that Class A-3 is artificially impaired, the Debtors would be asking this Court to break new ground. Specifically, the Debtors are asking this Court to find that Section 1129(a)(10) of the Bankruptcy Code can be satisfied by a vote of a lone impaired class of creditors of one debtor even though there are 130 other debtor entities under the Plan. $R^2$ Investments incorporates by reference Law Debenture's arguments in its post-trial brief.

Knowing that the special treatment of the Allen Entities under the Plan is violative of the Bankruptcy Code and even United States Supreme Court precedent, the Debtors try to couch such treatment as a permissible "settlement and compromise" under Fed. R. Bankr. P. 9019(a). Yet, remarkably, the Debtors utterly fail to disclose with any level of detail in either the Plan or the Disclosure Statement on what exactly is being settled and compromised by and between Allen and the Debtors. Fundamentally, the settlement cannot be used to subvert the Bankruptcy Code and the plan confirmation process and *significantly* benefit Allen and the other Allen Entities. While the settlement may entail preservation of the Debtors' favorable tax attributes, under the Plan as structured such benefits inure to these same stakeholders. The Debtors and the Allen Entities have still not fully explained and quantified the benefits to the estate, the benefits gained by the Allen Entities (though we know it is in excess of $404 million (Conn Trial Tr., Sept. 2, 2009, 84:1-25, 86:1-9; See Charter Restructuring - Summary of Vulcan Terms dated Feb. 12, 2009, LDT 217)) and by certain chosen classes of bondholders, or the costs borne by the other stakeholders. Conn testified vaguely that there were "hypothetical" restructuring scenarios which showed a resulting large tax bill for Allen. Conn Trial Tr., Sept. 2, 2009 34:6-20. See Charter Investment/Vuclan Cable III Inc. Estimated Tax Attributes, December 31, 2008, LDT 110 and See Email from Powers to Mensch and Steinberg re: Charter, dated Dec. 30, 2008, LDT 102. However, these scenarios were obviously not explored nor was a valuation done of the tax consequences to Allen. Doody Trial Tr., Aug. 17, 2009, 243:22-25.

Bankruptcy Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In a ruling on a motion pursuant to Bankruptcy Rule 9019(a), the court must find that the proposed settlement is fair and equitable and is in the best interests of the estate. Protective Comm. For

Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968); Fischer v. Pereira (In re 47-49 Charles Street, Inc.), 209 B.R. 618, 620 (Bankr. S.D.N.Y. 1997); In re Best Products Co., Inc., 177 B.R. 791, 794 n.4 (Bankr. S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same. The settlement must be fair and equitable and in the best interest of the estate.") aff'd, 68 F.3d 26 (2d Cir. 1995); In re Ionosphere Clubs, Inc., 156 B.R. 414 (Bankr. S.D.N.Y. 1993), aff'd 17 F.3d 600 (2d Cir. 1994); In re Fugazy, 150 B.R. 103 (Bankr. S.D.N.Y. 1993).

In order to reach such a decision, the Court must be apprised "of all facts necessary for an intelligent and objective opinion" of whether the claim will be successful, the likely expense, length and degree of complexity of the litigation, the potential difficulties of collecting on a judgment "and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." TMT Trailer Ferry, 390 U.S. at 424-425.

Here, there is not a requisite showing that the Court can approve the CII Settlement set forth in the Plan under these standards. Neither the Court nor the other parties have been provided with sufficient information regarding what claims the Debtors may have against the Allen Entities or vice-versa, precluding an intelligent and informed decision. The Disclosure Statement simply states that it is a "settlement and compromise of legal, contractual and equitable rights, Interests, Claims and remedies of Allen and certain persons and entities affiliated with Allen against the Debtors ...." See Disclosure Statement, at 26. Obviously, much more disclosure and evaluation of claims is necessary in order for the Court to be in a position to approve such a "global" settlement. As referenced above, there was no exploration (beyond

"hypothetical") of restructuring alternatives that may have resulted in negative consequences for Allen. Conn Trial Tr., Sept. 2, 2009 34:8-22. Meanwhile, Allen is to receive at least $404 million in consideration through the Plan, not including the value flowing from tax attribute preservation. Conn Trial Tr., Sept. 2, 2009, 84:1-25, 86:1-8; See Charter Restructuring - Summary of Vulcan Terms dated Feb. 12, 2009, LDT 217; Moody Trial Tr., Aug. 17, 2009, 243:22-25. Yet, again, no valuation was done as to what Allen was *giving* in return for these significant benefits. See Charter Restructuring - Summary of Vulcan Terms dated Feb. 12, 2009, LDT 217 and See Charter Restructure Negotiation Tracker, Feb. 10, 2009, LDT 217.

The Debtors and Allen may point to the Debtors' preserved tax attributes as a "greater good" than strict adherence to bankruptcy law. Putting aside such a preemption of bankruptcy law, the record shows that the Allen Entities actually benefit directly from such preservation. For instance, the CII Settlement will "permit" CII to remain a member of Holdco through the Effective Date, which will ensure that a proportionate amount of the cancellation of debt income generated by consummation of the Plan will be allocated to the CII parties to the CII Settlement. This will result in the retention of a larger portion of favorable tax attributes, including NOLs, which the Debtors estimated to be in excess of $8 billion. See CCI 2008 Form 10-K at page 46, CX 194.

The record shows that the CII Settlement and the retention of the favorable tax attributes was at the expense of the immense consideration the Plan provides to Allen and the Allen Entities. Allen held certain rights under the Exchange Agreement between CCI and CII. Conn Trial Tr., Sept. 2, 2009, 35:10-20; Millstein Trial Tr., July 1, 2009, 224:11-15. Conn testified that Allen knew that if he exercised his rights under the Exchange Agreement it would create "significant tax liability" for CCI and limit CCI's ability to use its NOLs. Conn Trial Tr., Sept.

2, 2009, 35:10-25, 36:1-9. Nevertheless, Allen did in fact give the requisite notice to CCI of his intention to exercise his rights under the Exchange Agreement while he was a fiduciary of CCI. Conn Trial Tr., Sept. 2, 2009, 35:12-25, 36:1-11; Charter Exhibit 116; Millstein, July 21, 2009, 224:19-25. The threat of exercise of Allen's rights was purely to exert leverage over CCI and the CCI bondholders. Conn Trial Tr., Sept. 2, 2009, 36:19-25, 37:1-5; Millstein Trial Tr., July 21, 2009, 224:11-15 (stating exercising such rights would "trigger an ownership shift that would destroy our NOLs"). Allen used this leverage to achieve the "settlement" that the Court is being asked to approve, which includes the significant benefits for Allen and the Allen Entities that have been outlined in this brief, and creates value for non-CCI entities while all interests of CCI's shareholders are being **wiped out**. Conn Trial Tr., Sept. 2, 2009, 162:1-25, 163: 1-7.

In short, the Debtors are hopeful that the Court will approve a settlement that would provide insiders with monumentally better treatment than most other creditors and interest holders, including hundreds of millions of dollars in payouts, complete releases, and control over the reorganized entity in concert with preferred bondholders (who buy into the company at a discount). There was not evidence adduced at trial that the CII Settlement is beneficial to anybody but the Allen Entities and certain chosen classes of creditors. And, it was extracted after improper leverage was exerted by the Allen Entities in a self-dealing transaction. This "restructuring" under the Plan cannot be approved under the auspices of Rule 9019.

## I.     R[2] Investments Joins in Law Debenture's Post-Trial Brief.

As its positions in many respects are aligned with those of Law Debenture, R[2] Investments incorporates by reference the arguments and record set forth in Law Debenture's post-trial brief.

## V.    Conclusion

For the foregoing reasons, R$^2$ Investments respectfully submits that the Debtors have failed to carry their necessary burden to confirm the Plan and requests that the Court enter an order denying confirmation of the Plan and granting R$^2$ Investments such other and further relief as is just.


Dated:    New York, New York
          September 18, 2009

                              FOX ROTHSCHILD LLP


                              By:   /s/ Fred Stevens
                              _____
                                    Fred Stevens
                                    100 Park Avenue, 15th Floor
                                    New York, New York 10017
                                    (212) 878-7900

                                    -and-

                                    Jeffrey M. Schlerf (DE No. 3047)
                                    Joshua T. Klein (PA No. 88823)
                                    Citizens Bank Center
                                    919 North Market Street, Suite 1600
                                    Wilmington, Delaware 19899
                                    (302) 654-7444

                                    *Counsel to* R$^2$ *Investments, LDC,, as Equity*
                                    *Interest Holder in Charter Communications, Inc.*

WM1A 936381v1 09/18/09