Alan W. Kornberg
Daniel J. Leffell
Andrew J. Ehrlich
Diane Meyers
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

*Counsel for the Crossover Committee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re

CHARTER COMMUNICATIONS, INC., et al.,

Debtors.

Chapter 11

Case No. 09-11435
(Joint Administration)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**POST-TRIAL MEMORANDUM OF LAW SUBMITTED BY THE**
**CROSSOVER COMMITTEE IN SUPPORT OF CONFIRMATION**

# Table of Contents

**Page**

Table of Authorities ............................................................................................................... iii

Preliminary Statement ........................................................................................................... 1

Background .............................................................................................................................. 6

    A.    Initiation of Restructuring Negotiations ........................................................... 7

    B.    Members of the *Ad Hoc* Committee ................................................................ 8

        1.    Franklin Advisors, Inc. .............................................................................. 9

        2.    Apollo Management, L.P. ........................................................................ 10

        3.    Oaktree Capital Management, L.P. ......................................................... 11

        4.    Crestview Partners, Inc. .......................................................................... 12

        5.    Other Committee Members ...................................................................... 13

    C.    Negotiation of the Restructuring Plan .............................................................. 14

    D.    Change of Control: The Operative Provisions ................................................ 16

Argument ................................................................................................................................ 17

    I.    THERE IS NO CHANGE OF CONTROL DEFAULT UNDER SECTION 8(k)(i) OF THE CREDIT AGREEMENT BECAUSE THE PAUL ALLEN GROUP AT ALL TIMES MAINTAINS VOTING POWER IN EXCESS OF 38% ............................................................................................................ 17

        A.    The Relevant Covenants Specify Voting Control, not "Economic" or "Operational" Control .......................................................................... 18

        B.    The Paul Allen Group Has the Requisite Voting Power Over CCO, the Borrower Under the Credit Agreement ....................................................... 19

II.    THERE IS NO CHANGE OF CONTROL DEFAULT UNDER SECTION 8(k)(ii) OF THE CREDIT AGREEMENT BECAUSE AT NO POINT IN TIME DID THE CROSSOVER COMMITTEE CONSTITUTE A SECTION 13(d) GROUP ................................................................. 22

    A.    There is no Change of Control Default Resulting from the Conduct of the Crossover Committee During the Bankruptcy Process ................................... 22

        1.    The Members of the Crossover Committee Are Not Shareholders Who Are Capable of Exercising Voting Power .......................................... 23

        2.    The Conduct of the Crossover Committee During Restructuring Negotiations Does Not Give Rise to A Section 13(d) Group. ..................... 24

    B.    The Confirmation of the Plan and Charter's Emergence from Chapter 11 Proceedings Will Not Cause A Default Under Section 8(k)(ii) ..................... 30

    C.    A Default Based On A Purported Change of Control  In The Future Is Entirely Speculative And Unprecedented .................................................. 37

III.    PROFESSOR GOMPERS'S TESTIMONY CONTRADICTS THE UNDISPUTED EVIDENCE, AND SHOULD BE AFFORDED NO WEIGHT .......................................................................................................... 40

Conclusion ............................................................................................................... 45

# Table of Authorities

**Page(s)**

## CASES

CSX Corp. v. Children's Inv Fund Mgmt. (UK) LLP,
562 F. Supp. 2d 511(S.D.N.Y. 2008) ............................................................27

Curacao Trading Co. v. Federal Ins. Co.,
50 F. Supp. 441 (S.D.N.Y. 1942)................................................................21

Daubert v. Merrell Dow Pharm., Inc.,
509 U.S. 579 (1993) .................................................................................43

Hallwood Realty Partners v. Gotham Partners,
No. 00-cv-1115(LAK), slip op. (S.D.N.Y. Fe. 23, 2001)............................26

Hemispherx Biopharma, Inc. v. Johannesburg Consol. Invs.,
553 F.3d 1351 (11th Cir. 2008)..................................................................24

In re Iridium Operating, LLC,
373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................................44

Litzler v. CC Invs., LDC,
411 F. Supp. 2d 414 (S.D.N.Y. 2006) ........................................................44

Lippe v. Bairnco Corp.,
288 B.R. 678 (S.D.N.Y. 2003)....................................................................44

Nimely v. City of N.Y.,
414 F.3d 381 (2d Cir. 2005).......................................................................43

Portsmouth Square, Inc. v. S'holders Protective Comm.,
770 F.2d 866 (9th Cir. 1985) .....................................................................29

Rosenberg v. XM Ventures,
274 F.3d 137 (3d Cir. 2001).......................................................................24

Sure-Trip, Inc. v. Westinghouse Engineering,
47 F.3d 526 (2d Cir. 1995) ........................................................................22

Transcon Lines v. A.G. Becker Inc.,
470 F. Supp. 356 (S.D.N.Y. 1979)........................................................24, 25

In re TS Indus., Inc.,
117 B.R. 682 (Bankr. D. Utah 1990)...........................................................25

## STATUTES

11 U.S.C. § 1124 ..................................................................................................... 1, 6

15 U.S.C. § 78m(d) ................................................................................................... *passim*

## OTHER AUTHORITIES

17 C.F.R. § 240.13d-3(a) (2009) ............................................................................... 24

17 C.F.R. § 240.13d-5 ................................................................................................ 22

Federal Rule of Evidence 702 .................................................................................... 43

Certain holders of the 11% Senior Secured Notes due 2015 issued by CCH I, LLC and CCH I Capital Corporation, and the 10.25% Senior Notes due 2010 and 2013 of CCH II, LLC and CCH II Capital Corporation (collectively the "Noteholders," the "Crossover Committee," or the "Committee"), by and through their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, hereby submit this memorandum of law in support of confirmation of the proposed Plan of Reorganization (the "Plan") of Charter Communications, Inc. ("CCI") and its debtor affiliates (together, the "Debtors" or "Charter"). This Memorandum addresses strictly the arguments of those parties (collectively the "Objectors")[1] who contest confirmation on the basis that certain pre-petition debts may not be reinstated under Section 1124 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), due to an alleged "change of control."[2]

## Preliminary Statement

The trial in this matter has now demonstrated that there has not been a change-of-control default under any of Charter's debt instruments. Any objection to confirmation of the Plan on this basis should be rejected.

In advance of trial, the Objectors advertised lurid tales of "collusion" and "conspiracy" in furtherance of a "takeover" of Charter. The evidence at trial, however, proved these to be empty assertions. Instead, the uncontested evidence developed at trial demonstrated this restructuring to be extraordinary only in that the diverse members of the Crossover

---

[1]   Such parties include Wells Fargo Bank, N.A., as Third Lien Agent; Wilmington Trust Company, as Second Lien Indenture Trustee; the First Lien Lender Group; and JPMorganChase Bank, N.A, as Administrative Agent.

[2]   With respect to other objections to the proposed Plan, the Crossover Committee hereby adopts and incorporates by reference in their entirety the Memoranda concurrently submitted by the Debtors and by the Official Committee of Unsecured Creditors.

Committee—at Charter's insistence and over their own objections—were able to negotiate so complex a pre-arranged reorganization plan in so short a time. That plan massively de-levers the Company and infuses billions in new capital at a time when capital is scarce. Indeed, the objecting senior debtholders—who are being paid every cent they are owed under their various credit facilities and indentures, plus default interest during the course of this chapter 11 case— will, by their own admission, obtain a more creditworthy borrower should the Plan be confirmed and the senior debt be reinstated.

The change-of-control inquiry is a straightforward one. Under the relevant covenants, found in Section 8(k) of the Charter Communications Operating, LLC ("CCO") Credit Agreement: (i) the Paul Allen Group ("Allen") must maintain a minimum of 35% voting control over CCI; and (ii) no person or "group," as that term is defined by Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, may have greater voting control than does the Allen. There is no evidence or precedent supporting a default under either provision, nor under the corresponding provisions of Charter's other debt instruments.

*First*, there cannot be a default under Section 8(k)(i) of the Credit Agreement, which requires that the Paul Allen Group maintain in excess of 35% voting control of Charter, because Allen has and will continue to maintain the requisite level of voting power. Unless and until the Plan is confirmed, Allen will maintain 91% voting control of CCI. If the Plan is confirmed, he will maintain at least 38% of CCI's voting power. And, as we explain in detail below, any argument that Allen's voting interest causes a default because it is not held in CCO, the borrower under the Credit Agreement, does not survive scrutiny. Most significantly, Section 8(k) requires Allen to maintain his voting interest in "the management of the Borrower," which here is undisputedly CCI.

*Second,* the evidence establishes that there is no default under Section 8(k)(ii) of the Credit Agreement, which requires that no Section 13(d) group have more voting power than does the Paul Allen Group. No court has ever found a Section 13(d) group on facts analogous to those established at trial here. This is true whether one assesses the conduct of the Crossover Committee during the restructuring negotiations, at the point of emergence, or at some point in the future. At no point in the past did the conduct of the Noteholders cause a default, and any assertion of some future default is irrelevant speculation.

To the extent that the Objectors contend that the Crossover Committee constituted a Section 13(d) group by virtue of their conduct during the restructuring negotiations, that assertion is belied by the plain language of the change-of-control covenants. Those provisions state that a default can occur only upon "the consummation of any transaction . . . the result of which is that any 'person' or 'group'" has the "power" to vote equity interests greater than that of Allen. But prior to Plan confirmation, the Noteholders have no voting power, and thus cannot be a group that violates Section 8(k)(ii). Not surprisingly, no case has ever found that a creditors' committee of this kind constituted a Section 13(d) group on the basis of negotiations in furtherance of a consensual plan of reorganization. Such a finding would fundamentally contradict the policy underlying the Bankruptcy Code, which encourages creditors to organize and negotiate with debtors, as was the case here, and would have broad ramifications for creditors and debtors seeking to develop consensual, pre-arranged plans of reorganization.

Additionally, the Objectors' contentions that the Noteholders' activities during the restructuring negotiations manifested a supposed long-held desire to jointly seize control of Charter are flatly contradicted by the trial record. What the evidence proved is that the Noteholders bought the Notes independently, without knowledge of one another's purchases, and

each in quantities that could not conceivably yield the holder control of Charter; deeply resistant to participating in any restructuring negotiations in December 2008; and aggressively pushed back against the Company's overtures. Left with no choice, however, and with substantial value at risk, the Noteholders grudgingly accepted the Company's invitation to organize. In the negotiations that ensued, as the trial record demonstrated, the Committee was often divided over key issues, among them whether or not a rights offering should be part of a restructuring plan, and if so, its appropriate size. In short, the facts developed at trial are simply inconsistent with the Objectors' allegations of a takeover plot.

The Objectors' contention that the Noteholders will constitute a Section 13(d) group upon Plan confirmation—and would at that point trigger a change-of-control default—is also contradicted by the evidence. The touchstone of a Section 13(d) group is an agreement to acquire, hold, or dispose of shares, and the undisputed evidence establishes the lack of any such agreement among the Noteholders post-confirmation in this case. Even if the Noteholders' separate plan support agreements with Charter were somehow deemed to be agreements among them to "acquire" Charter stock, those agreements will terminate by their own terms upon confirmation and cannot constitute the basis for finding a Section 13(d) group *thereafter*. Moreover, each and every Noteholder witness who testified offered sworn testimony that his or her institution did not have any agreements—formal or informal, written or unwritten—with any other party as to the acquisition holding, voting or disposition of its Charter equity securities, should it be issued any. The testimony was clear and unequivocal in the face of lengthy cross-examination.

In order to reject this testimony, the Court must either conclude (1) that the Noteholder witnesses took the stand and gave false testimony—a serious charge for which the

Objectors have not provided support—or else (2) draw the inference that because the Noteholders functioned with some degree of cooperation during the restructuring negotiations, some sort of implied or constructive agreement should be assumed where no actual agreement exists. With respect to the first inference—that the Noteholder witnesses lied—the Objectors attempt to portray a conspiracy and coverup on the part of the Crossover Committee, largely by cherry-picking stray words and phrases out of lengthy memos or casual e-mails. The Noteholder witnesses, on cross-examination by counsel for the Objectors, made clear why these smattering of documents did not sustain an inference that there is any kind of "cover-up." And, the second inference—that the Crossover Committee *must* have agreements stretching into the future because of past conduct—has no support under the law or logic. There is no case in which a Section 13(d) group is constituted on such flimsy inferences. Indeed, as the Noteholders testified, they have no comfort that post-emergence, they will see eye-to-eye with one another about corporate governance.

The Court should also reject the Objectors' argument that there will be a change-of-control default at some point after emergence. At trial, the Objectors made much of the fact that at the first shareholder meeting, to be held no sooner than a year after confirmation, the Class A shareholders (who will initially include the members of the Crossover Committee who obtain equity under the Plan) will elect seven directors, and the Paul Allen Group will elect four. This uncontroversial feature of the Plan is of no consequence for purposes of this case, however, because (a) it is entirely unclear who the Class A shareholders will be in a year's time, and (b) even if the members of the Crossover Committee maintained a majority of the voting power for the Class A shares, there is no evidence of any agreement to act in concert at the first shareholder meeting. Any supposed default under Section 8(k)(ii) on this basis is purely speculative.

*Third*, and finally, it bears mention that the testimony of JPMorgan's purported expert, Professor Gompers, is of no relevance and should be accorded no weight. Professor Gompers's opinion about how private equity firms operate, as a general matter, is not relevant to the Court's inquiry in this matter, and is often inaccurate. Moreover, although Professor Gompers purported not to opine on witness credibility, the bulk of his testimony was devoted to espousing a rendition of the underlying facts that was, in numerous respects, inconsistent with the undisputed sworn testimony of the Noteholder witnesses who personally experienced the events at issue. For both of these reasons, Professor Gompers's testimony should be afforded no weight.

*      *      *

The objecting senior lenders have protested that the Crossover Committee is attempting a "takeover of Charter" on the lenders' dime. Not so. Under Section 1124, a debtor is entitled to reinstate debts without impairing a creditor's claim. That is precisely the case here, and as we demonstrate below, no aspect of the Crossover Committee's conduct has impaired the Objectors' rights. To the contrary, the members of the Crossover Committee are making substantial investments in Charter to assist in putting the company on surer financial footing, and are suffering substantial impairments to many of their holdings. The objecting senior lenders should not be permitted to use Charter's chapter 11 filing as an opportunity to receive a windfall under a lending agreement with which Charter has complied fully. The Plan should therefore be confirmed, and the senior debt reinstated.

### Background

We set forth below certain facts from the trial record relevant to resolving the change-of-control objections.

**A.      Initiation of Restructuring Negotiations**

As the Court is by now well aware, Charter is a leading provider of broadband and cable television services in the United States.  On December 10, 2008, Charter—which had been highly leveraged for many years—contacted its longtime financial advisor, Lazard Frères LLC ("Lazard"), to initiate discussions with Charter's bondholders about potential restructuring options.  (Tr. 216 (7/21/09) (Millstein).)  Two days later, the Company issued a press release announcing its retention of Lazard for this purpose.   All of the Noteholder witnesses who testified at trial, including representatives of Franklin, Apollo, Oaktree and Crestview, stated that the announcement took them entirely by surprise, and that the development was both unwelcome and seemingly unnecessary.  (*See*, *e.g.*, Tr. 44-45 (7/29/09) (Zinterhofer); Tr. 17-19 (7/23/09) (Villaluz) ("I thought it was the worst time to come to market with that kind of press release.").)

For instance, Jeffrey Marcus of Crestview recalled that he was "incredulous" upon learning of the announcement: "We knew the company very well, including its balance sheet, including its liquidity, and we felt that there was sufficient liquidity to take the company through the 2010 maturities and the CCH II bonds, and we didn't feel there was any reason whatsoever that the company needed to do this."  (Tr. 24 (7/29/2009).)  Eric Zinterhofer of Apollo testified that, "Everything [Apollo] had talked about had been in terms of a possible restructuring in 2010 should 1.9 billion of debt not be refinanced. But something that soon was pretty shocking to us." (Tr. 44 (7/28/09).)  Indeed, just a few weeks earlier, Franklin Advisors— the largest single holder of Charter debt—had arranged a meeting with Charter's most senior management to urge that Charter address the company's substantial leverage, in light of deteriorating market conditions, so as to *avoid* the very possibility of bankruptcy.  (Tr. 17 (7/23/09) (Villaluz) ("[T]he reason for having the meeting was to encourage them or to really try to get them to recognize the gravity of the situation and think of alternatives, something a little

more dramatic than what they've been doing in the past. So equity, asset sales, and things of that nature.")

At that time, the Company requested, through Lazard, that the bondholders form a committee in order to facilitate negotiations over Charter's restructuring options. (*Id.* at 98.) Initial discussions between the Noteholders and Lazard focused in large part on why the Company felt a restructuring was necessary at that time, with the Noteholder representatives pushing back strongly against a restructuring initiative. (*Id.* at 105.) As Mr. Marcus explained, Crestview and the other Noteholders "argued about [the proposed restructuring] quite a bit" with Mr. Millstein and his colleagues, but "Mr. Millstein basically said the train is leaving the station, you need to get on and there's not going to be a lot of discussion about it." (Tr. 27 (7/29/09).)

Faced with these circumstances, the Noteholders acceded to the Company's request, and formed an *ad hoc* committee of unaffiliated holders of 11% senior secured notes due 2015 issued by CCH I, LLC and CCH I Capital Corporation, and the 10.25% Senior Notes due 2010 of CCH II, LLC and CCH II Capital Corporation. The Committee then hired legal and financial advisors at the Company's urging, and at the Company's expense. (Tr. 48 (7/28/09) (Zinterhofer); Tr. 27, 172 (7/29/09) (Liang).). Notably, several of the Noteholders also retained their own legal advisors. (Tr. 40 (7/23/09) (Villaluz) (discussing Franklin's separate retention of Jones Day to represent its individual interests); Tr. 39, 92, 109 (7/28/09) (Zinterhofer) (same re: Apollo's retention of Akin, Gump, Straus, Hauer & Feld LLP); Tr. 175 (7/29/09) (Liang) (same re: Oaktree's retention of Hennigan, Bennett & Dorman LLP).)

### B.     Members of the *Ad Hoc* Committee

The entities that came together to form the Crossover Committee represented a wide range of entities, including an insurance company (AIG), mutual fund managers (such as

Fidelity Investments and Franklin), hedge funds (such as Contrarian Capital Management LLC), and other fixed income asset managers (such as Western Asset Management Co.).

Objectors principally focus their change-of-control allegations on the conduct of four of the Noteholders. Objectors contend that Apollo, Oaktree and Crestview, "with support from Franklin" (a concept that the Objectors never explained) developed a scheme "to jointly control Charter post-restructuring . . . and all of this is typical of syndicated private equity relationships." (Tr. 108, 7/20/09.) The actual evidence at trial, however, told a very different story: the testimony revealed four very different firms who independently invested in Charter at different points in time, in different levels of the capital structure, for different reasons—but none with the goal of taking joint control of the company.

### 1. Franklin Advisors, Inc.

Franklin Advisors Inc. ("Franklin"), is one of three large mutual fund families beneath the Franklin Templeton umbrella, in addition to Templeton Investments and the Franklin Mutual Series. (Tr. 57 (7/23/09) (Villaluz).) A firewall restricts the flow of information between Franklin Advisors Inc. and the other two entities. (*Id.*) Franklin is essentially a passive, fixed income operation. (*See* Tr. 14, 58 (7/23/09) (Villaluz).) Unlike Franklin Mutual, which often has taken control positions and board seats in entities in which it invested, and was described at trial by analyst Christine Villaluz as a "deep value shop," the guiding philosophy behind Franklin Advisors' investments is to invest for current interest income. (*Id.* at 57-58.) As Ms. Villaluz, the Franklin analyst responsible for Charter, and its principal representative on the Committee, stated at trial, "We invested in the company as a going concern. We wanted to earn interest income and essentially clip a coupon and hopefully receive par upon maturity." (*Id.* at 14.) Franklin does not adopt a private equity-style "loan-to-own" strategy; in point of fact, such an approach would be "counterintuitive to [Franklin's] investment objective." (*Id.* at 15.) As

Ms. Villaluz explained, a desire to obtain the fulcrum security in a restructuring had nothing to do with Franklin's investment decisions concerning Charter: "We wanted to invest in the company as a going concern. We wanted to earn our coupon." (*Id.* at 15, 59.)

Franklin was the largest single holder of CCH I notes, at a face value of over $900 million as of December 2008. (Tr. 57 (7/23/09) (Villaluz).) Franklin had acquired its CCH I notes in 2005, as one of the originating investing entities that created the debt-for-debt exchange from CCH to CCH I. (*Id.*) Franklin also had substantial investments throughout the Company's capital structure, at levels above and below what would eventually become the fulcrum security; Franklin owned securities at the CCO, CCOH, CCH II, CIH and CCH levels. (*Id.*) All in all, Franklin's total exposure to Charter totaled more than $2.2 billion dollars. (*Id.* at 15.) At no point prior to December 2008 did Franklin, in amassing its stake in numerous portions of the Company's capital structure, make its investments in coordination with other investment entities. (*Id.* at 14.)

Franklin has indicated that it is a "passive" investor in Charter, and that if it is issued equity securities, Franklin's portfolio manager and compliance department have determined to file an SEC Form 13(g), which "indicates a passive investment." (*Id.* at 61.)

### 2. Apollo Management, L.P.

Apollo Management, L.P. ("Apollo") is an investment firm that engages in a wide array of investment strategies, including among them private equity investments, as well as investing in liquid securities for yield. (Tr. 27, 76-77 (7/28/09) (Zinterhofer).) Apollo first invested in Charter Communications at the CIH level in December 2007, with an eye toward getting an attractive yield on the securities. At that time, Apollo saw a restructuring as "highly unlikely." (*Id.* at 28.) The company later acquired CCH I debt securities, as well as additional other Charter debt securities, over the course of 2008. (*Id.*)

Apollo, in consultation with Crestview Partners, had previously looked into a take-private transaction involving Charter. After presenting the potential take-private transaction and a potential bond investment to its investment committee, Apollo elected in 2007 to make an investment in CIH bonds, in large part because of the attractive yield. (*Id.* at 30; *see also* JPX 22.) At the time that Apollo made this first investment, it concluded in an internal memorandum that Charter "has adequate liquidity," and that in 2010, when Charter's next large maturity came due, "refinancing is likely." (JPX 22.) Apollo concluded in 2007, when it invested in CIH, that the "base case" was that "a distressed-for-control opportunity will *not* materialize." (*Id.*) (emphasis added).

Indeed, as late as September 2008, Apollo did not view a restructuring of Charter as likely, but rather as a downside case. (Tr. 41 (7/28/09) (Zinterhofer).) Even at this time, Apollo concluded, internally, that "We believe the Company is on a solid trajectory to grow into its highly leveraged capital structure." (CX 368.) And far from orchestrating a scenario in which CCH I became the component of the capital structure to become the fulcrum security, Apollo's assumption in its worst-case modeling was that, in the unlikely event of a restructuring, the CIH bonds would be the fulcrum. (JPX 22 at 3; JPX 28 at 3; Tr. 38 (7/28/09) (Zinterhofer).) Indeed, Apollo made a substantial investment in CIH bonds—a level below the fulcrum security, which was substantially impaired—on this basis. (*Id.*)

### 3. Oaktree Capital Management

Oaktree Capital Management ("Oaktree") was another member of the Crossover Committee. A diverse investment management firm with a focus on fixed income, Oaktree maintains several investment groups that pursue a range of strategies. Oaktree's distressed debt group was the principal Oaktree strategy involved in the investment in CCH I notes, and had held Charter securities for three to five years prior to the restructuring. (Tr. 164 (7/29/09)

(Liang).)  The distressed debt group is an "investment fund" that focuses on purchasing debt instruments at a discount for investment purposes.  (*Id.* at 163-64.)  Mr. Liang explained the objectives of the distressed debt group as follows:

> Well, basically the goal of our strategy is to maximize the invested capital, or maximize profit.  We're able to buy securities; most of the time it's going to be a debt instrument.  So we don't have any intent or desire to gain control of the situation.  We don't have to – we can buy a lot, we can buy a little.  It's really a pure investment fund that's just focused on returns and not anything else.

(*Id.* 163-64.)  Mr. Liang further testified at trial that Oaktree "would have been happy if we continued to collect the interest and eventually collect par."  (*Id.* at 169)  Oaktree's investments in Charter, acquired within the past five years, were not concentrated on the eventual fulcrum security, but rather were distributed up and down the capital structure.  (*See* JPX 362; Tr. 165-66 (7/29/09) (Liang) (showing Oaktree holdings $215 million of CCH II bonds and additional significant holdings in CCO, CIH and CCH).)

Notably, Oaktree also maintains a separate private equity group that focuses on private equity and distress to control situations.  Mr. Liang explained that to the extent obtaining equity through a "distress to control" strategy is the objective of an investment, that investment would be made through the private equity group at Oaktree, not the distressed debt group.  (*Id.* at 164.)

### 4. Crestview Partners, L.P.

Crestview Partners, L.P. ("Crestview"), a private equity firm, made its principal investment in Charter securities in 2006.  (Tr. 16 (7/29/09) (Marcus).)  Its investment was strictly in the CCH I bonds.  (*Id.*)  Crestview's Charter investment was spearheaded by cable industry veteran Jeffrey Marcus.  Crestview had a unique investment rationale.  Crestview sought to own Charter debt not only because the bonds themselves represented a good investment with a

favorable yield, but also as part of a potential bid to purchase and operate certain Charter cable systems, in which Crestview would use its acquired debt as currency.  (*Id.* at 16-17.)  A Crestview investment committee memo explains that, "Our original investment thesis is that, given the notes' liquidity, pricing and position in the capital structure, an investment in the notes would generate an attractive risk-adjusted return and could facilitate future asset purchases." (JPX 243.)  Crestview had also seen value in its Charter holdings as a potential fulcrum security in the event of a restructuring, but only as a worst-case scenario.  (Tr. 19 (7/29/09) (Marcus).  Crestview saw this possibility as, at best, remote.  Mr. Marcus testified at trial:  "[Q]uite honestly, we never felt that this company would enter into a restructuring because we always felt that Paul Allen, given his resources, would step in and not allow that to happen."  (*Id.* at 19.)  Crestview did not enter into its Charter investment as a "loan to own" situation; not only did Crestview not foresee a restructuring, but Crestview has *never* employed a "loan to own" strategy with respect to *any* investment it has pursued.  (*Id.* at 20.)

### 5.  Other Committee Members

The remaining Committee members were entities with significant investments (in excess of $100 million in combined face value of CCH I and/or CCH II notes).[3]  These entities included mutual funds, hedge funds, private equity firms and other asset management firms with varying investment strategies, organizational structures, approaches, concerns and positions across Charter's complex capital structure.  Some of the Committee members that were primarily fixed income investors, because of internal restrictions, were unable or unprepared to hold equity

---

[3]  The remaining committee members included: AIG Global Investment Corp., Capital Research & Management Company, Contrarian Capital Management, Fidelity Management & Research Company, Lord, Abbett & Co., LLC; MFC Global Investment Management (U.S.), LLC; and Western Asset Management Company.  (Tr. 21-23 (7/23/09) (Villaluz).)

securities.  (Tr. 33 (7/29/09) (Marcus).)   This difference was one among many that at times fueled tensions among the Committee members as negotiations ensued.

## C.    Negotiation of the Restructuring Plan

Each of the Noteholders' participation in the Crossover Committee was motivated by a desire to preserve and maximize to the extent possible the value of its investments—which, in light of Charter's December 12 announcement, were in some considerable jeopardy.   As Christine Villaluz testified:

> Q.    What was Franklin's purpose, Ms. Villaluz, in participating in the *ad hoc* committee?
> A.    The purpose is to protect value.  Franklin has interests in all the layers of Charter's capital structure, and I wanted to protect value, to the extent possible, particularly in light of what was going on in the capital markets.

(Tr. 25 (7/23/09).)   Ken Liang of Oaktree testified that, "We wanted to be involved to make sure the restructuring, to the extent a restructuring had to be done, that it was done in what we thought would be a fair and equitable way."   (Tr. 173 (7/29/09); *see also* Tr. 105-6 (7/23/09) (Villaluz); Tr. 112 (7/29/09) (Marcus).)   The Company and the Noteholders grappled with the Company's suggestion that it might not make an interest payment that would soon come due, a decision that surprised Noteholder representatives like Eric Zinterhofer.   As Mr. Zinterhofer recalled at trial, "[B]lindsided is probably how I would describe it. There's nothing in, unfortunately, in any of our memos that anticipated this or our thought process.  We thought the company had enough liquidity to get through at least another year and a half… [S]omething that soon was pretty shocking to us."  (Tr. 44 (7/23/09).)

Assisted by its legal and financial advisers, the Committee began work on negotiating a comprehensive plan of reorganization.  The weeks of negotiations that ensued were hardly consistent with the Objectors' portrayal of a "Takeover Group" acting single-mindedly to

pursue control of Charter's equity. As Christine Villaluz recalled on the stand, "There were a lot of [issues debated among committee members] . . . First and foremost was just what the appropriate capital structure and how much leverage the company could support[…] The second is there was some concern in terms of feasibility. And with respect to feasibility, in order to meet those needs, it was likely that new money of some form was required in order to satisfy those tests." (Tr. 28 (7/23/09).)

The notion of a rights offering for raising necessary cash was particularly controversial. Some institutions, like Oaktree, reluctantly acquiesced to the extent that such an offering would make such a deal feasible. Others, like Franklin and Crestview, were extremely critical of this proposal. (Tr. 32, 47 (7/23/09) (Villaluz); Tr. 47 (7/28/09) (Zinterhofer); Tr. 36, 178-9 (7/29/09) (Liang).) Although the Objectors characterize the larger holders of CCH I notes, like Apollo and Oaktree, as acting in lockstep, the facts were very different. Ms. Villaluz, for instance, testified that Apollo and Oaktree differed in their approaches to such key issues as how much leverage the company should maintain, and how to approach the critical negotiations with the Paul Allen Group. (Tr. 162-63 (7/23/09) (Villaluz).) Members of the Committee also disagreed sharply about the scope of a compensation plan that Charter's management and Board had advanced at the eleventh hour, (Tr. 52-53 (7/28/09) (Marcus)), as well as about a proposed escrow of interest payments. (JPX 333.) Other examples abounded. The Committee's financial advisors, UBS and Houlihan Lokey, served as consensus-building agents, negotiating and balancing the varying views. (Tr. 86 (7/29/09) (Marcus).)

After weeks of grueling negotiations, the Committee reached agreement with the Company and with the Paul Allen Group on a proposed Restructuring Plan. On February 11, 2009, each restricted Noteholder committed to the Plan by signing a separate Plan Support

Agreement with Charter—not with each other—under which each party agreed with the Company to vote for and support the restructuring plan. (*See* Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the Debtors' Joint Plan of Reorganization at 25; *see also* Commitment Letters, *Supplement to Debtors Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Docket #37, Ex. 10.) Aside from commitments necessary in order to facilitate the escrow of the interest payment due on January 15, 2009, no Noteholder made any commitment or agreement with any other Noteholder. Significantly, the Noteholders remain free, even today, to transfer their shares without the approval of or notice to the other Committee members, so long as the Company approves and the transferee assumes the obligations of the plan support agreements. And, under the Plan, once the effective date occurs and equity vests in the Noteholders, the Restructuring Agreement and any rights or obligations that may accompany it terminate by its own terms. At the moment the individual Noteholders receive equity, the Committee simply ceases to exist.

### D.   Change of Control: The Operative Provisions

As the Court is well aware, certain of Charter's senior lending instruments feature covenants concerning change of control. Most notably, Section 8(k) of the Credit Agreement provides in relevant part as follows:

> (i) the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower; (ii) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having

16

a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group", (iii) a Specified Change of Control shall occur; or (iv) the Borrower shall cease to be a direct Wholly Owned Subsidiary of Holdings (other than in connection with an issuance or sale of Equity Interests in the Borrower to CCH; *provided* that (x) such Equity Interests are contributed to Holdings on the date of such issuance and (y) no DHC Default shall have occurred and be continuing or result therefrom) . . . .

(CX 101 at 66 (§ 8(k)).  The Second and Third Lien Indentures also contain change-of-control covenants.  They similarly define a "change of control" as "the consummation of any transaction, including any merger or consolidation, the result of which is that any "person" (as such term is used in Section 13(d)(3) of the Exchange Act) other than Paul G. Allen and Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Borrower or a Parent, measured by voting power rather than the number of shares, unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Borrower or such Parent, as the case may be, measured by voting power rather than the number of shares, than such person."  (Third Lien Indenture, at 6; *see also* Indenture dated March 19, 2008, at 6; Second Lien Note dated Apr. 27, 2004, at 6-7.)

## Argument

## I.

### THERE IS NO CHANGE OF CONTROL DEFAULT UNDER SECTION 8(k)(i) OF THE CREDIT AGREEMENT BECAUSE THE PAUL ALLEN GROUP AT ALL TIMES MAINTAINS VOTING POWER IN EXCESS OF 38%

As explained above, the CCO Credit Agreement provides that a change-of-control default may occur under two circumstances.  The first, set forth in Section 8(k)(i), requires that the Paul Allen Group maintain at least 35% of the ordinary voting power of Charter.  Unless and until the Court confirms the Plan, the Paul Allen Group in fact maintains a 91% voting share in Charter.  (Tr. 236-37 (8/24/09).)  And, if the Court confirms the Plan, the Paul Allen Group will

still maintain a 38.4% voting share in CCI, on a fully diluted basis (the method of calculating voting power prescribed by the CCO Credit Agreement), and 39.8% of CCI's voting power based on beneficial ownership (as provided by the other debt instruments). It is thus clear that Section 8(k)(i) is satisfied, and there cannot be a default under that covenant. In response to these undisputed facts, the Objectors assert two purported grounds for default, neither of which has merit.

A.     **The Relevant Covenants Specify Voting Control, Not "Economic" or "Operational" Control**

The Objectors attempt to divert attention from the actual language and the requirements of the Charter loan documents (the CCO Credit Agreement, Second Lien Notes, and Third Lien Credit Agreement) by focusing on the Paul Allen Group's economic stake in the proposed new Charter, or on its ability to dictate the strategic and operational direction of the company post-restructuring. (Tr. 113-14, 116, 139-40, 145, 154-55 (7/20/09); Tr. 226-27 (8/24/09).)[4] This is a distraction and is totally irrelevant to the legal questions before the Court. The change-of-control provisions in the Charter loan documents are unambiguous with regard to how "control" is to be defined, and they do not require economic, or operational control. (*See* Credit Agreement § 8(k); Second Lien § 1.01; Third Lien §§ 8.1(c); 6.16; 1.1 (defining "Change of Control").)

Although the covenants are clear on their face that they do not require Allen to hold any particular economic interest, the history of those agreements makes it even clearer. Change-of-control provisions in previous incarnations of the CCO Credit Agreement *did* require that the Paul Allen Group have both a certain percentage of voting power, and a certain

---

[4]     For instance, the Objectors make much of the fact that Paul Allen's economic interest, should the Plan be confirmed, will be a few percent of the outstanding shares. (Tr. 113, 139-41 (7/20/09).) This is, of course, irrelevant under the various debt instruments.

percentage of economic interest. That equity interest requirement was expressly reduced, and, ultimately, removed in order to provide Charter with greater flexibility in de-levering its balance sheet. Over the course of several years, the Paul Allen Group equity percentage requirement was reduced from 51%, to 24%, and finally to 0% in 2004. (CX 398 §8(j)(2); Tr. 74 (7/31/09) (Schmitz); Tr. 258 (8/24/09) (Gompers).) Charter's CFO, Eloise Schmitz, explained at trial why these changes were made:

> Charter's a highly levered company. As I think you've heard, JPMorgan and all of our advisors were looking for ways for Charter to have an ability to de-lever the balance sheet. That deleveraging can come in many different forms that are, you know, not clear at any one point in time. The provision in the credit agreement regarding change of control can limit the company's ability to delever in many circumstances. So the language had evolved so that the language would not prohibit the company from deleveraging. Any deleveraging transaction would reduce Paul Allen's economic and voting interests. And the lenders were not trying to limit the amount of the delevering that may take place. So we negotiated at thirty-five percent voting control which was consistent with all the other indentures in the capital structure.

(Tr. 72-75 (8/24/09).)

The Court should therefore disregard any suggestion that Allen's economic or managerial control (or even his personal involvement as a director, as has been suggested) in any way causes a default under Section 8(k)(i). As the negotiating history of the contract makes clear, the Objectors knew how to negotiate for Allen's economic or managerial involvement. These sophisticated senior lenders relinquished those requirements, however, and the covenant as it now stands—which requires only voting power—is indisputably satisfied by the Plan.

B. **The Paul Allen Group Has the Requisite Voting Power Over CCO, the Borrower Under the Credit Agreement**

The Objectors also argue, under Section 8(k)(i), that because the borrower under the Credit Agreement is CCO, and the Paul Allen Group's voting interests are in CCO's parent,

CCI, that a default results because the Paul Allen Group does not have the requisite control over CCO, the borrower. This objection has no merit under the plain language of the relevant agreements.

Section 8(k)(i) requires Allen to maintain "Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower." It is clear that the management of the Borrower (defined in the Credit Agreement as CCO) is CCI. As Charter's CEO Neil Smit explained, CCO has no separate board of directors, is wholly owned by CCI, and is managed by the managers of CCI. (Tr. 190-91 (7/21/09).) It is undisputed that under the Plan, the Paul Allen Group will have in excess of 35% voting control of the Board of Directors of CCI. Because that Board directs the affairs of the management of CCI, which is also the management of CCO, there can be no dispute that the Paul Allen Group's 38% interest in CCI grants the requisite "voting power for the management of the Borrower."

This simple analysis should dispose of the Objectors' argument. However, reading the CCO Credit Agreement in context makes the fallacy of this argument even more plain. For example, Section 8(k) requires Allen's voting power to be determined on a "fully diluted basis." But because CCO is a private company, wholly owned by CCI, it would make no sense to conceive of voting power in its equity on a "fully diluted basis." What is more, CCO is *required*, under § 8(k)(iv) of the CCO Credit Agreement to remain a wholly-owned subsidiary of either CCO Holdings, LCC, or Charter Communications Holdings, LLC. The Objectors cannot be heard simultaneously to insist on the one hand that the Credit Agreement requires CCO to be a wholly owned indirect subsidiary of CCI, but on the other hand that the Paul Allen Group voting power requirement must pertain to an interest directly in CCO—particularly when the latter proposition is nonsensical. Such a reading of the Credit Agreement would be absurd,

and violates basic principles of contract interpretation.  *Curacao Trading Co.* v. *Federal Ins. Co.*, 50 F. Supp. 441, 444 (S.D.N.Y. 1942) ("The rule is that 'the court will, if possible, give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable.'") (quoting *Williston on Contracts*, § 619).

Additionally, contrary to the Objectors' arguments, the term "Equity Interests" in Section 8(k)(i) cannot reasonably be read to require Equity Interests in CCO.  "Equity Interests" is a defined term that does not refer to any particular entity, but rather to equity holdings as a general matter.  (CCO Credit Agreement § 1.1)  Significantly, Section 8(k)(iv) of the CCO Credit Agreement, which immediately follows the change-of-control provisions, refers to "Equity Interests in the Borrower."  Thus, if JPMorgan had intended the reference to "Equity Interests" in Section 8(k)(i) to refer to Equity Interests in CCO, it could have so specified, as it did in the sections immediately following.  It did not, however.  The generic reference in Section 8(k)(i) to "Equity Interests having at least 35% . . . . of the voting power for the management of the Borrower" thus cannot reasonably be construed to require Allen to maintain Equity Interests in CCO, or to require a majority of the equity of CCI.  Indeed, basic principles of contract interpretation require individual terms to be read consistently with the context of the entire contract.  *See, e.g., Sure-Trip, Inc.* v. *Westinghouse Engineering*, 47 F.3d 526, 533 (2d Cir. 1995) ("Nonetheless, the intention of the parties is not derived from sentences or clauses read in isolation, but from the instrument as a whole . . . Not only should the entire contract be considered, but its parts must be reconciled, if possible.")

In light of all of the foregoing, Section 8(k)'s reference to "voting power" must be understood to refer to Allen's interests in CCI. So understood, it is undisputed that Section 8(k)(i) is satisfied, and confirmation of the Plan would not cause a default under that provision.

## II.

**THERE IS NO CHANGE OF CONTROL DEFAULT
UNDER SECTION 8(k)(ii) OF THE CREDIT AGREEMENT
BECAUSE AT NO POINT IN TIME DID THE CROSSOVER
COMMITTEE CONSTITUTE A SECTION 13(d) GROUP**

The Objectors' contention that confirmation of the Plan will cause a change-of-control default under Section 8(k)(ii) should also be rejected. In order to establish such a default, the members of the Crossover Committee must constitute a "group" as defined in § 13(d), 15 U.S.C. § 78m(d), which is to say that they must "agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities." 17 C.F.R. § 240.13d-5. There is simply no evidence in the record, nor any precedent, supporting the conclusion that the Committee constituted such a "group" during the course of the restructuring negotiations. Indeed, declaring that the Noteholders' conduct gives rise to a change-of-control default would substantially undercut the policies of the Code that promote consensual, prearranged restructuring plans. Nor is there any evidence suggesting that the Crossover Committee would constitute a § 13(d) group in the future, either at the point of emergence from these chapter 11 cases, or at some subsequent time.

A.      **There Is No Change of Control Default Resulting from the Conduct of the Crossover Committee During the Reorganization Process**

There can be no default under Section 8(k)(ii) based on the conduct of the Noteholders during the restructuring negotiations that preceded the filing of these chapter 11 cases. Section 8(k)(ii) requires the "consummation" of a "transaction" that gives voting power to a §13(d) group that exceeds the voting power of the Paul Allen Group, but to date no such

transaction has been consummated. Accordingly, the Noteholders do not have the "voting power" that could even give rise to the possibility of a change-of-control default.

### 1. The Members of the Crossover Committee Are Not Shareholders Who Are Capable of Exercising Voting Power

Section 8(k)(ii) of the credit facility states that an event of default will occur upon the "consummation of any transaction" resulting in any person or §13(d) "group" receiving greater voting power than that of the Paul Allen Group. The Crossover Committee's work in negotiating the terms of a proposed restructuring plan is not the "consummation" of a transaction as defined under Section 8(k)(ii).

Additionally, as explained in Part I, *supra*, the Paul Allen Group will maintain a 91% voting share in Charter unless and until the Plan is confirmed and Charter emerges from Chapter 11. (Tr. 236-37 (8/24/09).) Put simply, no individual Noteholder, nor any alleged "group" of Noteholders, has gained a voting share greater than that of the Paul Allen Group simply by participating in the negotiation of the Plan that has been proposed. As such, the Noteholders could not have constituted a § 13(d) group during the time period in which they were negotiating the terms of the restructuring; no Noteholder was the owner of any of the proposed new equity securities, nor will any Noteholder have either the right or the ability to acquire new equity in Charter unless the Plan is confirmed.[5]

Section 8(k)(ii) requires a "group" to be able to exercise voting power greater than that of Allen. But the members of the Crossover Committee cannot exercise any voting power unless and until they are issued equity securities. Not only is this the only sensible reading of Section 8(k)(ii), but it is black-letter interpretation of § 13(d). Numerous courts have

---

[5] To the extent any of the Noteholders owned equity in Charter prior to its chapter 11 filing, such equity is irrelevant to the change of control allegations advanced by the Objectors.

held that there can be no "group" unless each member actually owns beneficial interests in, or the rights to acquire, equity securities *at the time the purported group is formed*. *Hemispherx Biopharma, Inc.* v. *Johannesburg Consol. Invs.*, 553 F.3d 1351, 1366 (11th Cir. 2008) ("[A] beneficial ownership interest in securities is necessary to become a member of a group within the meaning of section 13(d)(3) of the Exchange Act."); *Rosenberg* v. *XM Ventures*, 274 F.3d 137, 147-148 (3d Cir. 2001) ("[E]ach member of a section 13(d) group must hold beneficial ownership of the shares of the issuing entity prior to becoming a section 13(d) group member."); *Transcon Lines* v. *A.G. Becker Inc.*, 470 F. Supp. 356, 372-74 (S.D.N.Y. 1979) (same).[6]

During the restructuring process, the Noteholders did have the opportunity to subscribe to a rights offering. Those rights however, are not automatic rights; rather, they are contingent upon Plan confirmation. The *possibility* that the Noteholders may receive equity in the reorganized Company if the Plan is confirmed is not sufficient to constitute "beneficial ownership" or a "right to acquire" beneficial ownership. *See, e.g.*, *Transcon*, 470 F. Supp. at 371 (a right to acquire cannot be contingent for beneficial ownership purposes). The Crossover Committee thus cannot be considered a § 13(d) group, because no transaction was consummated to give them any voting power in equity securities prior to Plan confirmation.

### 2. The Conduct of the Crossover Committee During Restructuring Negotiations Does Not Give Rise to A Section 13(d) Group.

The Objectors cite no case, nor are we aware of any, in which a creditors' committee—even one representing creditors who are awarded equity as part of a restructuring, or

---

[6] For a person to have "beneficial ownership" in equity securities, that person must directly or indirectly have the power to vote or invest in such securities. 17 C.F.R. § 240.13d-3(a) (2009). Under the definition of beneficial ownership, voting power includes the power "to vote, or direct the voting of such security" and investment power includes the power "to dispose, or to direct the disposition of, such security." *Id.* Unless and until the Court confirms the Plan and Charter emerges, none of the Noteholders will have the power to directly or indirectly vote any equity securities, or to direct the investment of any such securities.

who invest new money through an equity offering—was deemed to be a Section 13(d) group. This is unsurprising, not only for the more technical reasons set forth above, but because to do so would be to utterly frustrate the policies underlying the Bankruptcy Code. As one court observed:

> Plans that are negotiated between a debtor and its creditors prior to a Chapter 11 filing are preferable in most instances because they generally reflect a well thought-out reorganization attempt. In addition, pre-petition plans are attractive because they reduce the time and expense of litigation and, therefore, allow the debtor to commence its reorganized operations as soon as possible.

*See In re TS Indus., Inc.*, 117 B.R. 682, 688-689 (Bankr. D. Utah 1990). The Bankruptcy Code plainly favors circumstances, like those here, in which debtors and creditors work together to rehabilitate a company's financial condition.

There can be no doubt—as the Noteholder witnesses freely admitted at trial—that the members of the Crossover Committee were working towards a common purpose, in as cooperative a manner as possible, notwithstanding their often-conflicting views. There is nothing sinister about this cooperativeness, however, and in the context of a restructuring negotiation it is to be encouraged. What is more, establishment of a Section 13(d) group requires more than merely working together as parallel investors; it requires evidence of "collusion." Judge Kaplan's analysis from the trial court decision in *Hallwood*, cited in our pre-trial memorandum, is worth reiterating here:

> It is, in my judgment, very important not to overgeneralize the analysis. For example, every one of these defendants had a common purpose. They have all acted and they are acting today for the common purpose of making money on their investment . . . . That is quite obviously not enough. Rather, it is the plaintiffs' burden to show that it is more likely than not that the defendants acted *collusively* rather than independently to achieve that common objective.

*Hallwood Realty Partners* v. *Gotham Partners*, No. 00-cv-1115(LAK), slip op. at 613 (S.D.N.Y. Fe. 23, 2001) (emphasis added). Whatever the evidence of "common purpose" among the Noteholders that was adduced at trial, none of it could be remotely deemed "collusive."

Notwithstanding the Objectors' lurid allegations, the record here demonstrates the opposite of collusion. Each of the Noteholders, including Apollo, Oaktree, Crestview and Franklin, purchased their Charter securities separately, without consulting any other investor. (Tr. 14-15 (7/23/09) (Villaluz); Tr. 42 (7/28/09) (Zinterhofer); Tr. 20 (7/29/09) (Marcus); *id.* at 166 (Liang).) Indeed, Ms. Villaluz testified that she would not even have discussed Franklin's Charter investment with any other Noteholder prior to the formation of the Crossover Committee, because "[i]t's not anybody's business. Franklin invests on its own merit and its own actions." Similarly, Mr. Zinterhofer of Apollo testified that with the possible exception of publicly-reported mutual fund holdings, prior to the formation of the Crossover Committee he was unaware even of the identity of other large holders of Charter debt. (Tr. 42 (7/28/09) (Zinterhofer).) And, Mr. Liang of Oaktree observed that "we generally don't invest in partnership with other investors," and that the same held true for Charter. (Tr. 166 (7/29/09) (Liang).) As the court in *Litzler* v. *CC Invs., L.D.C.*, made clear, "[t]o establish the existence of such a group, there must be evidence of an agreement . . . . General allegations of parallel investments by institutional investors do not suffice to plead a 'group.'" 411 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2006).

The opinion in *CSX Corp.* v. *Children's Inv Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008), is not to the contrary. In *CSX*, defendants were found to have closely coordinated both increases and reductions in share purchases of CSX over a 10 month period of time. The CSX defendants deliberately coordinated their purchasing patterns over an extended

period of time while strategically avoiding a 13(d) filing so as not to notify CSX of the large economic position they were jointly amassing in preparation for a proxy fight. The facts here could not be more different. Here, the Noteholders accumulated their positions independently, and only came together when asked to by Charter, in order to negotiate a restructuring plan.

As recounted in more detail above, each of the Noteholders joined the Committee not out of some desire to obtain the equity of Charter, but to protect the value of their investments, which, even if the Plan is confirmed, will be substantially impaired. Of course, the Noteholder witnesses freely admitted that they wanted their holdings to be the fulcrum security. This was so, however, not because they had some longstanding scheme to obtain control of Charter's equity—indeed, Ms. Villaluz testified "[o]ur preference would have been to have just received a bond instrument and be on our very merry way" (Tr. 25 (7/23/09) (Villaluz))—but because they sought to protect the value of their investments. (Tr. 173 (7/29/09) (Liang) ("Q: Did Oaktree participate in the *ad hoc* committee out of a desire to get equity in Charter? A. No, it did not. It was primarily to—one, we were the largest and we wanted to be involved to make sure the restructuring, to the extent a restructuring had to be done, that it was done in what we thought would be a fair and equitable way.")) Crestview, in point of fact, sought to *limit* its equity exposure to Charter and rejected the opportunity to take additional rights available to it through the rights offering. (Tr. 38 (7/29/09) (Marcus).)

The Objectors make much of the rights offering as purported evidence that the Crossover Committee constitutes a § 13(d) group that sought to seize "joint control" of Charter. What the Objectors fail to note, however, is that the rights offering was first proposed to the Crossover Committee's advisers *by Lazard, on behalf of Charter*, as a means of de-levering the company. (Tr. 49 (7/21/09) (Millstein); Tr. 176 (7/29/09) (Liang); Tr. 52, 54 (8/24/09)

(Goldstein).)  The rights offering was thus hardly an initiative of the so-called "Takeover Group" in its purported pursuit of control of Charter.

Indeed, the proposal of a rights offering received mixed reactions, at best, from the Noteholders.  Franklin was intensely negative on the concept of a rights offering, because of the restrictions on its funds' ability to hold equity.  (Tr. 32 (7/23/09) (Villaluz).)  Indeed, Franklin went so far as to retain separate counsel to develop a potential alternative debt instrument that Franklin might receive, but ultimately abandoned that plan because there was concern that "introducing a debt security would potentially not meet the test for feasibility," and that the debt security conflicted with the desire to de-lever the company.  (*Id.* at 42.)  Similarly, Crestview's preference "would have been to have no rights offering," because of the dilutive effect and the limitations on Crestview's ability to invest.  (Tr. 36 (7/29/09) (Marcus).)  Oaktree was no more enthusiastic.  Mr. Liang testified that "[w]e had deployed a fair amount of capital into the Charter name and we were not looking specifically to deploy any more capital into the Charter name at this time.  So our initial reaction [to the rights offering proposal] was we weren't thrilled with it."  (*Id.* at 178-79.)

The evolution of the rights offering—a process that Mr. Marcus described as "death by a thousand cuts"—is also telling of the parties' motivations.  (*Id.* at 36.)  The parties' advisers had initially fixed the size of the rights offering at approximately $500 million.  However, Charter's additional cash needs, including the need to pay for the unwinding of $470 million of interest rate swaps, the Paul Allen settlement, and other obligations, caused the size of the rights offering ultimately to reach $1.6 billion.  (*Id.*)  Far from ballooning as a result of the Noteholders' demands for equity, the rights offering was the product of the "cash needs" of the company.  (*Id.*)  Even the parties like Franklin, who were initially resistant to the concept of a

rights offering, ended up participating because of "an economic decision to ensure a successful recapitalization of the company." (Tr. 35 (7/23/09) (Villaluz).)

In sum, this record is flatly inconsistent with the Objectors' repeated assertions that the Crossover Committee's participation in the restructuring process constituted the culmination of a scheme hatched to seize control of Charter's equity. Rather, it is consistent with a collection of independent investors who, when confronted with a risky and unfavorable set of circumstances, worked together as best they could to make the best of a bad situation. No precedent under Section 13(d) has ever found such investors to constitute a "group." *See*, *e.g.*, *Portsmouth Square, Inc.* v. *S'holders Protective Comm.*, 770 F.2d 866, 872 (9th Cir. 1985) (rejecting claim that shareholders who joined together to pursue litigation claims against a company were a section 13(d) "group").

Finally, it bears emphasis that the policy implications of declaring a creditor committee of this kind to be a Section 13(d) group would be profound. Mr. Liang, veteran of some 25-50 *ad hoc* creditor committees, testified at trial that there was nothing unusual, in his experience, about anything concerning this restructuring process—except for the fact that such a diverse group of stakeholders were able to navigate such a complicated deal. (Tr. 192-93 (7/2/9/09) (Liang).) All of the features that the Objectors point to as sinister evidence of a plot to gain "joint control"—including that creditors jockeyed over what security would become the fulcrum security, the inclusion of a rights offering to raise capital for a restructured company, or the fact that large bondholders would end up as large shareholders after a Chapter 11 proceeding—are all entirely commonplace. (*Id.* at 191-93.) It is thus unsurprising that the Objectors cite no authority for the proposition that a creditors' committee of this kind can

constitute a Section 13(d) group under the securities laws. This Court should decline their invitation to break new ground here.

**B.    Confirmation of the Plan and Charter's Emergence from Chapter 11 Will Not Cause a Default Under Section 8(k)(ii)**

The Objectors alternatively assert that upon Charter's emergence from chapter 11, should the Plan be confirmed, at least certain Noteholders will constitute a Section 13(d) group. While it is certainly true that at that time, the Noteholders will become the beneficial owners of the equity securities, and will have the attendant voting rights, there is no evidence in the record to suggest that the Noteholders have any agreements between and among them concerning the acquisition, holding, voting or disposition of their shares.

**1.    The Undisputed Testimony Establishes that the Noteholders Will Not Be Parties to Any Agreements Upon Emergence**

The touchstone of a Section 13(d) group is an agreement to acquire, hold or dispose of equity securities. 15 U.S.C. § 78m(d)(3). The trial record here establishes beyond any doubt that no such agreement will be in place when the Noteholders acquire their equity interests in Charter.

First, while Apollo, Oaktree, Crestview and Franklin have each agreed to acquire shares in the Rights Offering, those agreements are each with Charter, not with each other, and any of the Noteholders can sell its Rights or its shares without the consent of the other Noteholders. Moreover, even if these separate agreements with the Company were somehow deemed to amount to agreements among the Noteholders, those agreements will have been fully performed, and will terminate of their own accord, once the Noteholders acquire their voting rights—which is the earliest time at which a change-of-control default could occur.

Significantly, JPMorgan's own purported expert—upon whose supposed expert opinion JPMorgan placed great weight in its opening statement—was compelled to admit, based

on his review of the discovery and trial record, that there are no agreements as to the acquisition, holding, disposal or voting of securities post-emergence. That testimony is worth highlighting in full:

> Q. And you're not aware of any agreement among Apollo, Oaktree, Crestview and Franklin to hold or dispose of Charter securities?
>
> A. That is correct.
>
> Q. And you don't contend that these particular bondholders have any agreement to vote their securities on any particular issue?
>
> A. That is correct. As I testified a couple of times, I don't see any formal or informal governance agreement post-transaction.
>
> Q. And you don't contend that these firms have reached any agreement regarding any aspect of Charter's operations after exit?
>
> A. That is correct.

(Tr. 244 (8/24/09) (Gompers).) Professor Gompers reached this conclusion because it is the only conclusion that the undisputed evidence permits.

To be clear, each and every member of the Crossover Committee, when examined, denied the existence of an agreement—formal or informal, oral or written—between and among the Noteholders as to Charter's governance should the Plan be confirmed. Their testimony was clear, unequivocal, and did not waver under extensive cross-examination. For example, Ms. Villaluz, of Franklin, testified as follows:

> Q. Now, Ms. Villaluz, to your knowledge, does Franklin have any agreement, formal or informal, written or unwritten, with any other firm, relating to how Franklin will vote its equity securities of Charter upon emergence?
>
> A. No, we do not.
>
> Q. Does Franklin have any agreement, formal or informal, written or unwritten, with any other party with respect to the potential transfer of its equity securities in Charter should the plan be confirmed upon emergence?

> A. No, we do not.

(Tr. 59 (7/23/09).)  Mr. Zinterhofer of Apollo was equally clear on this point:

> Q. Does Apollo have any agreement with any bondholder that will be in effect at the time that Apollo acquires its Charter shares after confirmation of a plan?
>
> A. No.
>
> Q. Does Apollo have any informal understandings with any other bondholder relating to its Charter shares post-restructuring?
>
> A. No.
>
> Q. Is there anyone who can constrain or dictate how or when Apollo buys or disposes of Charter—of its Charter shares?
>
> A. No.
>
> Q. Is there anyone who can constrain how you vote your Charter shares?
>
> A. No.

(Tr. 73-74 (7/28/09).)  Mr. Marcus, of Crestview, also flatly denied the existence of any agreement concerning the voting or disposal of Crestview's Charter shares should the Plan be confirmed:

> Q. Now, Mr. Marcus, to your knowledge, does Crestview have any agreement with any other firm, formal or informal, relating to how Crestview will vote its Charter shares should the Court confirm the plan?
>
> A. No, we do not have any agreement.
>
> Q. And does Crestview have any agreement, formal or informal, with any other firm relating to Crestview's ability to dispose of its shares in Charter, should the plan be confirmed?
>
> A. No, we do not.

(Tr. 54 (7/29/09).)  Finally, Mr. Liang, of Oaktree, was entirely consistent with the other Noteholder witnesses:

> Q. Does Oaktree have any agreement, formal or informal, written or unwritten, with any other party relating to how it

votes its Charter securities should it be issued equity securities if the Court approves the plan?

A.     No, it does not.

Q.     And does Oaktree have any agreements, formal or informal, written or unwritten, with respect to how it disposes of its Charter equity securities should the Court approve the plan?

A.     No, it does not.

(*Id.* at 188.)

Each of the Noteholder witnesses also testified unequivocally that they had no agreements with any other parties as to the election of directors post-confirmation. It is undisputed that as a result of their equity interests, Apollo will have the right to appoint two directors to the initial board of directors, and Oaktree and Franklin will be able to appoint one director each. There is no suggestion anywhere in the record, however, that the parties with such rights reached any agreements as to how to exercise them.

Although the Objectors spent a great deal of time at trial focusing on language in Crestview internal documents referencing a supposed "agreement" between Crestview, Apollo and Oaktree to appoint Mr. Marcus to a board seat post-emergence, the record is clear that no such agreement exists. (Tr. 115, 118, 120, 135-136 (7/20/09); Tr. 177-179 (7/29/09) (Zinterhofer).) Mr. Marcus testified at trial that there is no agreement to appoint him to the board of directors and that his use of the term "agreement" was an overstatement made in an effort to assuage the anxiety of his Crestview colleagues about the Charter investment, which was a significant one for the firm. (Tr. 43-45 (7/29/09)(Marcus).) Indeed, subsequent Crestview internal documents support Mr. Marcus's testimony and demonstrate that neither Mr. Marcus nor Crestview management ever believed that there was an agreement to appoint Mr. Marcus to the Charter board. In fact, Crestview's founding partner instructed Mr. Marcus to request that the Committee amend the terms of the Restructuring Plan so that Crestview would be guaranteed a

board seat even if Crestview's holdings were below the 10 percent threshhold that guaranteed a seat. (Tr. 46-48 (7/29/09)(Marcus); Tr. 52 (7/28/09 (Zinterhofer).)  If there had been an agreement to place Mr. Marcus on the Board, such modifications (which the other members of the Crossover Committee rejected) would not have been necessary.

### 2.     There Is No Basis for Rejecting the Undisputed Testimony of the Noteholder Witnesses

In the face of this unequivocal testimony, the Objectors ask this Court to draw inferences that have no basis in the evidentiary record or in any precedent.  The Objectors in essence ask the Court to ignore the unequivocal sworn testimony of the Noteholder witnesses, and instead conclude that there *do* exist agreements related to the acquisition, voting, holding or disposal of Charter equity securities following Plan confirmation.  To reach such a result requires one of two inferences: either that the four Noteholder witnesses each came to trial, took the witness stand, swore an oath, and then lied about the existence of agreements, or that some sort of implied or constructive agreement should be found where no actual agreement exists.  Neither inference is supported by the record.

The Objectors premise their argument that the Noteholder witnesses lied on the witness stand primarily on a theory that some few documents show there to be a "cover-up" of a purported secret agreement (the terms of which are entirely unclear).  For instance, the Objectors point to the stray use of the word "control" or "partner" in certain e-mails.  But, as Mr. Zinterhofer and all of the other Noteholder witnesses explained, simply because certain members of the Crossover Committee might own a majority of Charter's Class A shares, it does not necessarily follow that there are agremeents to act in concert with respect to those shares.  (Tr. 80 (7/28/09) ("[S]ome subset . . . might own a majority of the equity securities, but I don't connote that with control.").)

One of the other principal ways that the Objectors sought to prove a cover-up was with reference to certain Crestview investment memoranda that were modified after review by a senior Crestview partner. Notwithstanding that the documents themselves nowhere refer to the existence of "internal" and "external" versions, and notwithstanding Mr. Marcus's repeated assertions that Crestview does not maintain "internal" and "external" versions of memos (Tr. 158 (7/29/09), the Objectors sought to establish the inference that the memos were altered to mask the existence of some secret agreement. But the contemporaneous documents show the very simple reason why the memos were edited: to make them more accurate. At the time, Brian Cassidy of Crestview explained to Mr. Marcus in an e-mail that he was instructed to make the changes to the memos by another Crestview partner, and that the changes were not "content-related. Just wanted to make it crystal clear that we are not a controlling group with Oaktree and Apollo, which is of course true; however, from a legal standpoint we do not want to leave any room for misinterpretation." (CX 374.)

Ironically, one of the phrases removed from a Crestview memo that the Objectors point to as purported evidence of a secret agreement is the following: "Crestview has developed a close working relationship with both Apollo and Oaktree and they recognize the value that Jeff Marcus brings to this transaction . . . . However, given the change of control provisions in the company's bank loan agreement, we would not be able to enter into a shareholder agreement." (JPX 243.) The very document the Objectors point to as evidence of a purported "coverup" makes abundantly clear that the Noteholders were aware of the change-of-control covenants, and would not take steps to violate them. As Mr. Zinterhofer made clear, also in a contemporaneous document written well before this litigation, even though Apollo "will control about 1/4 of the equity, and with Oaktree, Crestview and Franklin, will control about 40% of the vote," it is

nevertheless the case that "[t]hat being said, this will be a public company board, and we will have to use our powers of persuasion as opposed to any particular control rights at times." (JPX 237.) If there existed secret agreements between and among the Noteholders as to post-emergence governance, the use of "powers of persuasion" would be entirely unnecessary.

The Objectors have repeatedly confronted the Noteholder witnesses with the derisive observation that "what happens in bankruptcy, stays in bankruptcy," to suggest that because the parties cooperated during the restructuring process, they necessarily must have agreements to acquire, hold, or dispose of their securities post-confirmation. This inference makes no sense, and is not supported by the record. As Mr. Zinterhofer testified, the fact that parties were able to function effectively during the restructuring process, when the desire to preserve value in the face of a potentially devastating free-fall bankruptcy aligned certain economic incentives, is no guarantee that the parties will work together in the future. (Tr. 66 (7/28/09).) Indeed, as Mr. Zinterhofer explained:

> I really have no assurance of [post-confirmation cooperation] for, you know, a few reasons; one is all of those parties who bought their debt securities at different times, at different prices, their idea of what might represent a profit for them is going to be very different as a result, not to mention the fact that these organizations have different views on that and different views on profitability and holding periods and such. In addition, different parties may have different views on strategy for the business, what makes sense over the short term, over the long term. There's so many different decisions that can play into it. So, ultimately, I don't have a lot of assurance that we're going to be able to agree on everything.

(*Id.*) The Objectors' sarcastic comment that "what happens in bankruptcy stays in bankruptcy" is therefore correct  The incentives and context facing the Noteholders—should they become shareholders—will be entirely different than those they faced in the restructuring process.

### 3. Franklin Cannot Be Part of A Section 13(d) Group

Finally, even if—contrary to the weight of the evidence—the Objectors were able to prove the existence of a group among Apollo, Oaktree and Crestview, the evidence distinguishes Franklin as altogether different. And, without Franklin, the trio of Apollo, Oaktree and Crestview collectively possess only 34.9% of CCI's voting power, less than the Paul Allen Group's 38.4%. The three firms alone thus could not trigger a default under Section 8(k)(ii).

Franklin is altogether different because it proclaims itself to be a passive investor, and its compliance department has made the determination to advise the SEC of such. (Tr. 61 (7/23/09) (Villaluz).) What is more, Franklin will not appoint a Franklin employee to the Charter board; rather, it will appoint an independent person whom Franklin cannot remove and Franklin cannot constrain in his or her activities as director. (*Id.* at 51-53.) Even Professor Gompers, JPMorgan's expert, recognizes that Franklin is fundamentally different from Apollo, Oaktree, and Crestview, all of which have the ability to be active investors. (Tr. 249-50 (8/24/09) (Gompers).) Professor Gompers acknowledged, as he had to, that Franklin generally doesn't "have the intent to become actively involved." (*Id.* at 250.)

The inference the Objectors advance that there exists an agreement among Apollo, Oaktree and Crestview—an inference that the Crossover Committee emphatically rejects as fabricated for the purpose of this litigation—is even more farfetched with respect to Franklin. And Franklin's exclusion from the purported "group" is fatal to the Objectors' argument that upon emergence, the Noteholders will violate Section 8(k)(ii) of the CCO Credit Agreement.

### C. A Default Based on A Purported Change of Control in the Future Is Entirely Speculative, Unprecedented and Irrelevant

The Objectors have suggested at trial that there will be a change-of-control default at some point in the future, presumably at the first shareholder meeting following Plan

confirmation. The crux of this argument, it would appear, is that a default will ensue because the Class A shareholders will elect seven directors, and the Paul Allen Group will elect four. This argument is based on pure speculation, and asks the Court to declare a default now based on events that may or may not occur twelve months hence. Put simply, it is entirely unclear who the Class A shareholders will be at the first shareholder meeting, much less that there are any agreements between and among the hypothetical future shareholders as to how to vote their shares. Accordingly, this argument should be swiftly rejected.

The Objectors made much at trial over the fact that after the initial board of directors is constituted, the a majority of the subsequent board will be elected by a majority vote of the Class A shareholders. Indeed, the Court will recall that using demonstrative exhibits, counsel for the Objectors engaged in an extended exercise with various witnesses to prove the uncontested point that at the first shareholder meeting, the Class A shareholders will vote to elect seven directors, while the Paul Allen Group will continue to select four directors. (*E.g.*, Tr. 62-69 (8/24/09) (Goldstein).) The Objectors also took great pains to prove the mathematical point that seven is "bigger" than four. (*Id.*) As part of this line of argument, the Objectors also pointed out several times that at the point of emergence, the members of the Crossover Committee own a majority of the Class A shares. (*Id.*) The suggestion, thus, was plainly that the Crossover Committee would somehow control the seven Class A directors elected at the first shareholder meeting.

This argument, however, depends on two critical assumptions, neither of which have been proven.

*First*, it is entirely unclear who will constitute the Class A shareholders a year after confirmation, should the Plan be confirmed. Each and every one of the members of the

supposed "Takeover Group" testified at trial that they did not know how long they would hold their Charter equity securities, should they obtain any. Indeed, Ms. Villaluz testified that during the restructuring process, she and her portfolio managers considered selling Franklin's entire stake in Charter to a third party. (Tr. 60 (7/23/09).) She further testified that she expects Franklin to re-evaluate its position every three months or so, as is typical in Franklin's investment process. (*Id.*; *see also* Tr. 111-12 (7/23/09).) The other representatives of the Crossover Committee similarly testified that they had no concrete plans about whether to hold or dispose of their Charter shares. (Tr. 74, 249 (7/28/09) (Zinterhofer); Tr. 55-56 (7/29/09) (Marcus); *id.* 184 (Liang).) There is thus no record evidence to support the assertion that the members of the Crossover Committee will hold their shares at the first shareholder meeting.

*Second*, even if one were to assume that the members of the Crossover Committee maintained their interest in Charter for an entire year, such that they controlled more than 50% of the voting power of the Class A shares at the first shareholder meeting, there is no evidence they have agreed to act *together* in voting their shares at that meeting. To be clear, any default must be predicated on an agreement between and among at least 35% of the Class A shareholders to vote their shares together at the shareholder meeting. Otherwise, under the plain language of the change-of-control provisions, a default could not occur; obviously, by requiring Allen to maintain only 35% voting control of Charter, the debt instruments contemplate shareholders other than Allen maintaining up to 65% of the voting power of the company. So, the mere aggregate ownership alone cannot constitute a default under the CCO Credit Agreement. And, the Objectors have adduced no evidence whatsoever of any plan between and among the Crossover Committee to pool their aggregated voting power at the first shareholder meeting.

In contrast to this unwavering sworn testimony stands the entirely unsupported speculation by the Objectors that because the members of the Crossover Committee functioned collaboratively during the restructuring process, they will act together for all time, on all issues related to Charter. This assumption simply has no factual support, and there is no case law interpreting Section 13(d) in which a "group" has been found based on such speculative assumptions.

The lack of factual foundation for the Objectors' position that a change-of-control default might happen some time in the future is underscored by JPMorgan's own purported expert's admissions at trial. Professor Gompers very plainly opined that he had reviewed the record, including the testimony at trial, and found no evidence of an agreement with respect to post-reorganization activities.

Indeed, he stated quite candidly that "I'm unaware of any governance, voting or shareholder agreements between Franklin, Oaktree, Crestview or Apollo that is in force after the transaction." (Tr. 241 (8/24/09) (Gompers).) It would be entirely illogical to declare a default now based on the possibility of future conduct that even JPMorgan's own expert did not observe.

### III.

### PROFESSOR GOMPERS'S TESTIMONY
### CONTRADICTS THE UNDISPUTED EVIDENCE,
### AND SHOULD BE AFFORDED NO WEIGHT

Confronted with a factual record that demolishes its claim of a "group" within the meaning of the CCO Credit Agreement, JP Morgan attempted to support that contention by proffering its purported expert—who has never been involved in a restructuring (Tr. 271 (8/24/09) (Gompers))—to state "opinions" that are contrary to the record facts. That effort fails, first and foremost, because JP Morgan's expert did not offer any testimony whatsoever on the only question that is relevant to JP Morgan's "group" theory: whether any agreement exists

among Apollo, Oaktree, Crestview and Franklin such as to render them a 13(d) "group" once they have acquired their voting rights. In point of fact, Professor Gompers repeatedly disclaimed any opinion to the existence of a Section 13(d) group, stating, "I can't comment on 13(d). I'm not a lawyer." (*Id.* at 237.) It is thus entirely unclear for what purpose of Professor Gompers's supposed expertise is being offered.

But even if Professor Gompers had ventured any relevant opinion, his testimony would be entitled to little or no weight, because it was entirely based on hypotheses and assumptions that were contradicted by the record evidence. Gompers repeatedly protested that he was not making credibility judgments about any witness (*Id.* at 215, 232, 243, 260), but his opinions consisted entirely of stating that the factual evidence was wrong, and that the Court should accept his opinions instead of the evidence. The record is rife with examples of Professor Gompers testifying as to his rendition of the facts, even though the witnesses who were actually involved in the events at issue told an entirely different story.

For instance, Professor Gompers testified that, "in all of [his] experience . . . buying a security to collect the dividends of the interest" is "just not the strategy that private equity investment funds pursue" (*id.* at 203)—and that "they had all envisioned that a restructuring was very likely in the future" (*Id.* at 218-19). Yet Mr. Zinterhofer testified without contradiction—and the contemporaneous documents confirmed—that Apollo's initial investment in Charter was based precisely on the thesis of holding the Notes to maturity, and that a restructuring was considered unlikely. (Tr. 28, 40-42 (7/28/09) (Zinterhofer); JPX 22 at 2-3).) Similarly, Mr. Liang testified without contradiction that Oaktree would have been perfectly happy to have simply received the interest due under its Charter notes, and redeem at par. (Tr.

168 (7/29/09).) And Mr. Marcus testified that he was "incredulous" at the prospect of a Charter restructuring, which was the furthest thing from his mind. (*Id.* at 24.)

Similarly, Professor Gompers testified that he was "hard-pressed to have actually ever seen, and it is very rare, for there to be post-transaction governance agreements." (Tr. 209, 224, 275 (8/24/09).) This is another proposition that was flatly controverted by those with actual transaction experience. Mr. Zinterhofer, for instance, testified unequivocally that Apollo has entered into precisely such agreements, and he identified three transactions in which it did so, in writing. (Tr. 66-67, 69-71 (7/28/09).) Similarly, Mr. Liang testified that in his extensive restructuring experience (of which Professor Gompers admitted to having none), Oaktree had also entered into governance agreements such as shareholder agreements or voting agreements, and they were always in writing. (Tr. 190-91 (7/29/09).)

Yet again, Professor Gompers pretended that Apollo, Oaktree and Crestview are all "preferred partners" that "like to work" with each other:

> So, again, having studied the industry and worked in it, it's -- what we see is that the syndicate patterns generally tend to be very stable over time. That you have preferred partners that you like to work with. And that repeated relationship, working together with other firms, means that you worry that if you do something that undermines you [*sic*] co-investment or your syndicate partner, that your ability to be asked to the table in the future goes away.

(Tr. 211 (8/24/09).) As he stated elsewhere:

> They all found themselves around the table. They had worked together before and were comfortable.

(*Id.* at 233.) On the uncontroverted evidence, however, Apollo has never done another deal with Crestview or Mr. Marcus (Tr. 29 (7/28/09) (Zinterhofer)), and it has been involved in only two other investments with Oaktree, both of which were restructurings in which both had invested independently and neither firm chose the other as a "preferred partner" or any kind of partner.

(*Id.* at 53-55.)  In fact, Mr. Zinterhofer testified that of the seventeen private equity acquisitions Apollo had completed in the last three years, it engaged in only *one* with a partner.  (*Id.* at 72.)  Professor Gompers's assertions thus simply repeatedly ignore the unequivocal testimony of fact witnesses with firsthand knowledge of the transactions on which he purports to opine.

Perhaps most egregiously, Professor Gompers opined that:

And it would make absolutely no sense for the private equity firms to cede control, to give control, to somebody who had only a very small economic interest but would control the operations of the company.  It would just make no economic sense.

(Tr. 227 (8/24/09); *see also id.* 229.)  The Noteholders, however, explained quite cogently why this made perfect sense to them: the only available alternatives were much worse.  Tr. 42 (7/23/09) (Villaluz); Tr. 39-40, 183-84 (7/27/09).).  Professor Gompers never addressed this simple point, opining only in the abstract without reference to the actual alternatives available to the actors.  It is *that* opinion which "make[s] absolutely no sense."  The Court should therefore give it no weight.

Speculation and conjecture of the kind offered by Professor Gompers are not admissible "expert" testimony under the legal standard set forth in Federal Rule of Evidence 702 and the seminal Supreme Court case of *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  As the Second Circuit has made clear, "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert."  *Nimely* v. *City of N.Y.*, 414 F.3d 381 (2d Cir. 2005).  And, even though the testimony may be admitted, as this Court has previously held, "[t]he *Daubert* factors apply not only to the admissibility of evidence, but also apply to weight and credibility determinations."  *In re Iridium Operating, LLC*, 373 B.R. 283, 349 (Bankr. S.D.N.Y. 2007).

As we have demonstrated above, although Professor Gompers purports not to be rendering credibility determinations, one cannot credit his analysis (to the extent it is even relevant) unless one discredits the undisputed and unequivocal testimony of the Noteholder witnesses.  It is well settled law that "[e]xpert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties." *See Lippe* v. *Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003).

Professor Gompers's utter inability even to acknowledge the stark contrast between the sworn testimony of the Noteholder witnesses and his own characterization of the facts (much less to apply any methodology to explain why his "opinion" discredits those witnesses) renders his "opinion" unreliable under Daubert and the Federal Rules of Evidence. *See In re Iridium*, 373 B.R. at 350 (finding that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect") (quoting *In re Rezulin Products Liability Litig*., 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005)).

**Conclusion**

WHEREFORE, the Crossover Committee respectfully requests that this Court confirm the Debtors' proposed Plan, and reject all objections asserted on the basis that there has been a violation of certain "change of control" covenants.

Dated: September 18, 2009
New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Alan W. Kornberg
(A Member of the Firm)

Alan W. Kornberg (akornberg@paulweiss.com)
Daniel J. Leffell (dleffell@paulweiss.com)
Andrew J. Ehrlich (aehrlich@paulweiss.com)
Diane Meyers (dmeyers@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

*Counsel for the Crossover Committee*