**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

### REORGANIZING DEBTORS' POST-TRIAL BRIEF IN SUPPORT OF CONFIRMATION OF THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

---

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
M. Catherine Peshkin
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Counsel to the Debtors and Debtors in
Possession
(other than Charter Investment, Inc.)*

September 18, 2009

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

*Counsel to Debtor and Debtor in Possession
Charter Investment, Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................v

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................7

LEGAL STANDARD.............................................................................................................8

ARGUMENT ........................................................................................................................10

    I.     The Plan Has Been Proposed in Good Faith and the Court Should Approve
        the CII Settlement. ....................................................................................................10

        A.     The Plan Has Been Proposed in Good Faith...............................................10

        B.     The CII Settlement Should Be Approved. ..................................................13

                1.     The Evidence Confirms that the CII Settlement Is Fair and
                      Equitable and Satisfies the *Iridium* Factors. ...................................13

                      a.     The Benefits of the CII Settlement Outweigh the
                            Likelihood of Success on the Merits..................................14

                      b.     The CCI Noteholders Are Wrong About the Tax
                            Aspects of the Settlement...................................................18

                      c.     The Value of the Releases Does Not Increase the
                            Settlement Cost. ................................................................22

                      d.     Even If the Likelihood of Protracted Litigation Is
                            Low, There Is Little Chance of Success in
                            Litigation..........................................................................22

                      e.     The CII Settlement Is in the Paramount Interests of
                            Creditors...........................................................................23

                      f.     The CII Settlement Is a Multiparty Settlement
                            Supported by the "Fulcrum" Noteholders..........................24

                      g.     Experienced, Independent Attorneys and Advisors
                            Advised the Settling Parties. .............................................24

h. The Releases of the Directors and Officers Are Appropriate and Justified...................................................25

i. The CII Settlement Is the Product of Good Faith, Arms' Length Bargaining. ..................................................25

2. The CII Settlement Is Both Fair and Entirely Fair.........................26

a. The Evidence Confirms that the CII Settlement Is a Product of Fair Dealing...................................................29

i. The Timing and Initiation of the CII Settlement Were Fair. .............................................29

ii. The Structure of the CII Settlement Was Fair. ......................................................................30

iii. The CII Settlement Was Negotiated at Arms' Length........................................................31

iv. The Directors Were Informed and Involved and All Appropriate Disclosures Were Made. .................................................................36

v. The CII Settlement Was Approved Unanimously by the Independent Directors, the Unofficial Cross-over Committee, and the Creditors' Committee......................................37

b. Fair Price ..........................................................................39

II. The Evidence Shows that the Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)). ...................................................41

A. The Liquidation Analysis Assumptions Are Reasonable. .........................42

B. The CCI Noteholders' Objections Are Unfounded. ..................................44

1. The CCI Noteholders' Assumptions and Methodology Are Flawed..........................................................................44

2. There Is No Basis for the CCI Noteholders' Proposed Add-ons. ................................................................................47

a. Preferences ($25.8 Million) ................................................48

b. Fraudulent Transfers ($169.4 Million) ..............................51

ii

|  |  |  |  | i. | The Holdco Debt Repurchases Are Not Avoidable Transfers. ($134 Million) | 51 |

i. The Holdco Debt Repurchases Are Not Avoidable Transfers. ($134 Million) .................51

ii. The November/January Interest Payments Also Should Not Be Included in the Liquidation Analysis. ..............................................56

(A) January (February) 2009 Interest Payment -- ($27 million) ...........................56

(B) November 2008 Interest Payment ($8.4 Million) ..............................................58

iii. There Is No Basis to Award Partial Credit for Fraudulent Transfers. ........................................58

c. Programming Contracts ("TBD") .......................................59

d. Worthless Stock Options ($37 Million) .............................60

e. Other Intercompany Receivables ($119 Million) ..............61

III. The Debtors Have Met their Burden to Show that the Plan Satisfies the Requirements for "Cram Down" under Section 1129(b) .......................................62

A. The Plan Complies with the Absolute Priority Rule. ...................................62

1. The Plan Does Not Violate Section 1129(b) Because No Junior Claimholder of CCI Is Receiving a Recovery Under the Plan. ...........................................................................64

2. The Plan Does Not Violate Section 1129(b) Because the NOLs May Be Utilized by the Debtors that Generated the NOLs. ........................................................................................65

3. The Plan Does Not Violate the Absolute Priority Rule Because the Debtors That Generated the NOLs Own the NOLs Under Bankruptcy Law. ......................................................66

4. The Plan Does Not Implicate *LaSalle* Because Mr. Allen Is Not Recovering on Account of his Equity Interest. ......................68

5. The Plan Does Not Violate the Absolute Priority Rule Because, As Demonstrated by The Debtors' Valuation, No Senior Claimholder of CCI Is Receiving More Than Payment in Full. ..........................................................................71

K&E 15588356.

a.      Lazard Properly Applied Accepted Methodologies to Determine the Enterprise Value of the Reorganized Debtors is Between $14.1 - $16.6 Billion. ..............................................72

      i.      Discounted Cash Flow Analysis ...........................72

      ii.     Comparable Company Analysis ...........................73

      iii.    Precedent Transactions Analysis ..........................74

b.      The CCI Noteholders' Challenge to the Debtors' Valuation is Inapposite. ....................................................74

B.      The Plan Does Not Unfairly Discriminate Against the CCI Noteholders; Separate Classification Is Proper. ................................76

IV.     The Court Should Overrule the CCI Noteholders' Objection That the Plan Does Not Satisfy Section 1129(a)(10). .................................................81

V.      The Evidence Shows that the Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved. ........................................87

A.      The Debtors' Releases ............................................................88

B.      Third Party Release ................................................................89

     1.      Substantial Consideration ............................................90

     2.      Identity of Interest ......................................................91

     3.      Unusual Circumstances ...............................................91

     4.      Essential to the Consensual Plan Process ......................92

     5.      Fair, Equitable, and Reasonable...................................93

C.      Injunction ..............................................................................93

D.      Exculpation ...........................................................................94

CONCLUSION.......................................................................................................96

K&E 15588356.

# TABLE OF AUTHORITIES

**Cases**

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*,
701 F.2d 1071 (2d Cir. 1983).................................................................... 11

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)................................................................... 11, 23, 68

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
269 F.3d 726 (6th Cir. 2001) ............................................................... 60

*BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) .................................. 64

*Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106 (1939).................... 71

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156 (Del. 1995).......... 29, 30, 31

*Contemporary Indus. Corp. v. Frost*,
564 F.3d 981 (8th Cir. 2009) ............................................................... 55

*Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*,
No. 01-6209, 2002 WL 31412465 (S.D.N.Y. Oct. 24, 2002).................. 53

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber
Network, Inc.)*,
416 F.3d 136 (2d Cir. 2005).......................................................... 6, 89, 91

*Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*,
341 B.R. 451 (Bankr. S.D.N.Y. 2006) ........................................... 55, 85

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd P'ship (In re T-H New Orleans
Ltd. P'ship)*, 116 F.3d 790 (5th Cir. 1997) .......................................... 12

*Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 328 B.R.
471 (E.D. Va. 2005).......................................................................... 43

*In re 375 Park Ave. Assocs., Inc.*,
182 B.R. 690 (Bankr. S.D.N.Y. 1995).................................................. 53

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...... 88

*In re Advanced Telecommunication Network, Inc.*,
490 F.3d 1325 (11th Cir. 2007) .......................................................... 52

*In re Allegheny Int'l, Inc.*,
118 B.R. 282 (Bankr. W.D. Pa. 1990) ................................................. 23

*In re Armstrong World Indus., Inc.*, 348 B.R. 111 (D. Del. 2006) ............................................... 77

*In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438
    (Bankr. S.D.N.Y. Sept. 17, 2007) ................................................ 12, 88, 94, 95

*In re Bd. of Directors of Telecom Argentina, S.A.*,
    528 F.3d 162 (2d Cir. 2008)........................................................................ 11

*In re Best Products Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ......................................................... 13

*In re BMW Group I, Ltd.*
    168 B.R. 731 (Bankr. W.D. Okla. 1994) .................................................... 22

*In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990)...................................... 76

*In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) ............................ 88, 94, 95

*In re Chateaugay Corp.*,
    150 B.R. 529 (Bankr. S.D.N.Y. 1993), *aff'd*, 170 B.R. 551 (S.D.N.Y.
    1994) ......................................................................................................... 83

*In re Coram Healthcare Corp.*,
    315 B.R. 321 (Bankr. D. Del. 2004) .......................................................... 80

*In re DJK Residential LLC*,
    No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008)................................. 88, 94, 95

*In re Downtown Athletic Club of N. Y. City, Inc.*, No. 98-41419, 1998 WL 898226
    (Bankr. S.D.N.Y. Dec. 21, 1998)............................................................... 85

*In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714 (Bankr. S.D.N.Y.
    1992) ......................................................................................................... 79

*In re Enron*,
    No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) ................................. 6, 86, 87

*In re Exide Techs., Inc.*,
    299 B.R. 732 (Bankr. D. Del. 2003) .......................................................... 61

*In re General Growth Props., Inc.*, 409 B.R. 43 (Bankr. S.D.N.Y. 2009) ................................. 33

*In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001)...................................... 8

*In re Global Crossing Ltd.*,
    No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002)........................................ 80

*In re Goddard*, 212 B.R. 233 (D.N.J. 1997) ................................................................. 9

*In re Granite Broadcasting Corp.*, 369 B.R. 120 (Bankr. S.D.N.Y. 2007) ............................ 11, 71

*In re Gulfstar Indus., Inc.*, 236 B.R. 75 (M.D. Fla. 1999) ............................................................. 8

*In re Image Worldwide, Ltd.*,
    139 F.3d 574 (7th Cir. 1998) .............................................................................................. 53

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ........................................................................... 13, 53

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ................................................................................................ 14

*In re Jumer's Castle Lodge, Inc.*,
    338 B.R. 344 (C.D. Ill. 2006) ............................................................................................. 53

*In re L & J Anaheim Assocs.*, 995 F.2d 940 (9th Cir.1993) ......................................................... 85

*In re Lason, Inc.*,
    300 B.R. 227 (Bankr. D. Del. 2003) .................................................................................. 43

*In re Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651 (Bankr. D. Del.
    2003) .................................................................................................................................... 9

*In re M. Fabrikant & Sons, Inc.*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) ................................................................................ 52

*In re Mirant*, 334 B.R. 800 (N.D. Tex. 2005) .............................................................................. 73

*In re Movie Gallery*,
    No. 07-33849 (Bankr. E.D. Va. Apr. 10, 2008) ................................................................ 88

*In re Oneida Ltd.*, 351 B.R. 79 (Bankr. S.D.N.Y. 2006) .................................................. 83, 88, 95

*In re Petrella*, 230 B.R. 829 (Bankr. N.D. Ohio 1999) ................................................................. 8

*In re Prudential Lines, Inc.*, 107 B.R. 832 (Bankr. S.D.N.Y. 1989) ..................................... 64, 66

*In re Prudential Lines, Inc.*, 928 F.2d 565 (2d Cir. 1991) ........................................................... 65

*In re PWS Holding Corp.*, 228 F.3d 224 (3d Cir. 2000) .............................................................. 68

*In re QSI Holdings, Inc.*,
    571 F.3d 545 (6th Cir. 2009) .............................................................................................. 55

*In re Resorts Int'l Inc.*,
    45 B.R. 412 (Bankr. D.N.J. 1990) ..................................................................................... 86

*In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) ............................................ 86

K&E 15588356.

*In re Sierra-Cal*,
  210 B.R. 168 (Bankr. E.D. Cal. 1997) ............................................................ 43

*In re Source Enters., Inc.*, No. 06-11707, 2007 WL 2903954 (Bankr. S.D.N.Y.
  Oct. 1, 2007) ................................................................................................ 11, 95

*In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094 (Bankr. S.D.N.Y. May 25,
  2005) ................................................................................................................ 88

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982) .......................................................................... 83, 85

*In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007) ...................... 88

*In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. Oct.
  31, 2003) .......................................................................................................... 76

*In re Zenith Elecs. Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ............................ passim

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
  263 B.R. 406 (S.D.N.Y. 2001) .......................................................................... 52

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986) ......................... 28

*Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110 (Del. 1994) ................................ 9

*Kahn v. Tremont Corp.*, 694 A.2d 422 (Del. 1997) ...................................................... 37

*Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ...................................... 11

*Kelly v. Robinson*, 479 U.S. 36 (1986). ........................................................................ 64

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003) ............................................ 72

*Loop Corp. v. U.S. Trustee*, 379 F.3d 511 (8th Cir. 2004) ......................................... 64

*Maytag Corp. v. Navistar Int'l Transp. Corp.*,
  219 F.3d 587, 590-91 (7th Cir. 2000) ............................................................. 64

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*,
  354 B.R. 1 (D. Conn. 2006) ............................................................................. 11

*Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*,
  222 B.R. 417, 425 (Bankr. S.D.N.Y. 1998) ..................................................... 65

*NL Indus., Inc. v. MAXXAM, Inc. (In re MAXXAM, Inc.)*,
  659 A.2d 760 (Del. Ch. 1995) .......................................................................... 35

*Nordberg v. Cont'l IL Nat'l Bank & Trust Co.of Chicago) (In re Topcor Inc.)*, No.
02-10322, 2002 WL 31688702 (5th Cir. Oct. 28, 2002) .................................................... 53

*Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386 (Del. Ch. 1999) ............................... 22, 27

*Peltz v. Hatten*, 279 B.R. 710 (D. Del. 2002) ...................................................................... 73

*Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
390 U.S. 414 (1968) .................................................................................................... 13

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),* 330 B.R. 394
(Bankr. S.D.N.Y. 2005) .............................................................................................. 91

*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del. 1985) ........................................................ 32

*SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert
Group, Inc.),*
960 F.2d 285 (2d Cir. 1992) ........................................................................................ 89

*Thorpe v. Cerbco, Inc.*, No. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993) .................. 27

*U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) ............................................................. 64

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ...................................................... 27, 39

**Statutes**

11 U.S.C. § 1123(b) ........................................................................................................... 13

11 U.S.C. § 1129(a)(10) ..................................................................................................... 81

11 U.S.C. § 1129(a)(3) ....................................................................................................... 10

11 U.S.C. § 1129(a)(5) ......................................................................................................... 8

11 U.S.C. § 1129(a)(7) .................................................................................................. 41, 64

11 U.S.C. § 1129(b)(1) ....................................................................................................... 76

11 U.S.C. § 1129(b)(2)(B) ...................................................................................... 62, 63, 64

11 U.S.C. § 510(b) ............................................................................................................. 61

11 U.S.C. § 541(a)(2) ......................................................................................................... 66

11 U.S.C. § 546(e) ............................................................................................................. 55

11 U.S.C. § 547(b)(2) ......................................................................................................... 52

K&E 15588356.

**Other Authorities**

124 Cong. Rec. H 11,103 (Sept. 28, 1978); S 17,420 (Oct. 6, 1978) ........................................... 65

**Rules**

Fed. R. Bankr. P. 9019 ................................................................................................................ 13

K&E 15588356.

## PRELIMINARY STATEMENT[1]

The Court should confirm the Plan and overrule any outstanding objections. Among other benefits to the Debtors' estates and their stakeholders, under the Plan, the Debtors will reduce their debt by eight billion dollars, eliminate hundreds of millions of dollars of interest payments a year, and raise almost three billion dollars of new investment in the Debtors' business. With billions of dollars of value at stake, the Debtors painstakingly presented evidence on every disputed component of section 1129 of the Bankruptcy Code. On the other hand, the CCI Noteholders, who are the principal objecting parties to the Plan on issues other than reinstatement,[2] have not rebutted the Debtors' case and have not carried their burden as objectors to the Plan. Their arguments continue to suffer the same flaws outlined by the Debtors during opening statements. The Plan remains in the best interests of the estates, the best way to maximize the value of these estates and fully complies with the provisions of the Bankruptcy Code. The Debtors respectfully urge the Court to confirm the Plan.

---

[1]   The "Plan" refers to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, the latest version of which was filed on July 15, 2009 [Docket No. 615].

Capitalized terms used in this brief version but not defined herein shall have the meaning ascribed to them in the Reorganizing Debtors' Memorandum of Law (A) In Suport of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto, filed on July 16, 2009 [Docket No. 634] (the "Confirmation Brief").

As in the Confirmation Brief, where the CII Settlement is discussed herein, the terms "Debtors" and the "Company" do not include Debtor Charter Investment, Inc. ("CII").

Transcript citations contained herein are to the corrected final version of the official daily transcripts prepared by Veritext Reporting Co. Due to pagination changes between the uncorrected and corrected versions of the final transcripts, the parties have provided the Court with a complete set of the corrected final transcripts.

[2]   In addition, R2 Investments, L.P. ("R2 Investments"), a substantial CCI Noteholder, generally has joined the CCI Noteholders' objections in its capacity as an equity holder of CCI. *See, e.g.,* Objection of R2 Investments, L.P. to Confirmation of the Debtors' Joint Plan of Reorganization [Docket No.

(Continued…)

*First*, the evidence demonstrates that the Plan has been proposed in good faith and not by any means forbidden by law as required by section 1129(a)(3) of the Bankruptcy Code and that the CII Settlement is both procedurally and substantively fair. From a procedural perspective, Charter proposed the initial draft of the Plan to the Unofficial Cross-over Committee and Mr. Allen. Charter dictated the timing of the initial proposal. Mr. Allen did not limit or inhibit alternative plan structures. The fulcrum constituencies in the Debtors' capital structure were present at the negotiating table. Charter, the Unofficial Cross-over Committee, and Mr. Allen each were represented by separate counsel and advisors. Charter's Board of Directors was fully informed during the entire process and actively considered the Plan and the CII Settlement independent of Mr. Allen. Of nine members on Charter's Board, five are independent. Charter's independent Board members actively considered the Plan and the CII Settlement and met separately on their own and with Charter's counsel and advisors. Charter's Board and the Unofficial Cross-over Committee unanimously approved the Plan and the CII Settlement. The Creditors' Committee is in favor of the CII Settlement.

In addition, from a substantive perspective, Charter receives billions of dollars of benefits from the preservation and enhancements of tax attributes and reinstatement as well as a 30% interest in Debtor CC VIII, which is worth $150 million. Mr. Allen receives $375 million in return. Substantive fairness cannot be disputed. Indeed, as Mr. Goldstein testified:

> If you just look at the order of magnitude between the two gives and gets, if you will, between Paul Allen and the company, Paul was getting, you know, in the order of magnitude of a few hundred million dollars and the

---

579]. For clarity, where appropriate, the term "<u>CCI Noteholders</u>" or the "<u>CCI Noteholder Objection</u>" incorporates R2 Investments.

company was getting billions of dollars of benefit. This was . . . not even a close call."

(8/24/09 Tr. 17:15-17:21 (Goldstein)).

By contrast, the CCI Noteholders' theory to the case—the CCI Board should have threatened to liquidate CCI—is nonsensical. It ignores that CCI serves as manager of all of the Debtors and, thus, as a fiduciary to all of the Debtors and their creditors. It also overlooks that, due to market conditions and a loss of tax attributes, a liquidation would have yielded less value to all constituents.

*Second*, the Debtors have satisfied the best interests of creditors test, and the Court should overrule the CCI Noteholders' objections on this issue.

- The CCI Noteholders' expert, Edward McDonough, conducted no analysis on the key components of the Debtors' liquidation analysis and in fact never reached the conclusion that the Plan fails the best interest test. Indeed, Mr. McDonough's analysis of liquidation recoveries is premised entirely on "potential recoveries." *See* 09/01/09 Tr. 180:22-181:8 (McDonough). The CCI Noteholders failed to present any evidence to rebut the Debtors' case on best interests.

- The Debtors valued avoidance actions. Mr. McDonough did not.

- Charter demonstrated that the debt repurchases were valid and not fraudulent transfers. Mr. McDonough presented no evidence to the contrary and actually sought to prove the Debtors were solvent, thereby eliminating any potential fraudulent transfer case.

- The Debtors proved that the CCI Noteholders will receive the full recovery on account of the intercompany claims owed from CCO *before making the January interest payment*. That is, the Plan provides a recovery to CCI and Holdco on account of intercompany claims, examined before making the January interest payment, plus a significant premium.

- The Debtors demonstrated that the Liquidation Analysis fully accounts for the intercompany claim due and owing from CCO and that the amount of the intercompany claim was not reduced by claims paid under this Court's trade order.

*Third*, the Debtors have satisfied the "cram down" requirements of section 1129(b) of the Bankruptcy Code with respect to the CCI Noteholders, who are the lone objectors to the Plan on this basis. The CCI Noteholders argue that Mr. Allen is receiving a recovery on account of his old equity and CCI has been deprived of the NOL asset, each in violation of section 1129(b). However, the terms of the Plan itself conclusively demonstrate that Mr. Allen is not receiving any recovery on account of his equity. Mr. Allen is receiving a distribution under the Plan only on account of his claims held as a creditor of the Debtors and his interests in CC VIII, as well as in exchange for his necessary future cooperation to allow the Debtors to maximize their tax attributes and reinstate their senior, secured debt.

The CCI Noteholders' assertions that CCI has been deprived of the value of the NOLs are equally unfounded. The CCI Noteholders have no right to the value of the NOLs. The CCI Noteholders are last in line unsecured creditors as the unsecured creditors of the parent company in the Debtors' capital structure. There is no requirement that the CCI Noteholders receive the value of the reorganized entity. Instead, section 1129 only requires that the CCI Noteholders receive more than what they would receive in a liquidation and no junior class at CCI receive a recovery. *See* 11 U.S.C. §§ 1129(a)(7), 1129(b). The NOL is not an asset that has any value in a liquidation. The NOL requires a reorganization and the prospects of future income to realize its value. And in a reorganization there is insufficient value to reach the CCI Noteholders in the Debtors' capital structure.

Tax law does not change this outcome. The CCI Noteholders asked numerous witnesses whether the public disclosures of CCI report the NOL (as belonging to CCI). They do, but so what? Solely for federal income tax purposes, limited liability companies are disregarded and the losses of disregarded entities pass up through the Charter entity to CCI as the parent

4

company. But that rule applies solely for federal tax purposes. The mere fact that CCH, CCH II, and CCO may be disregarded for federal income tax calculations does not mean that those entities do not exist for commercial law or bankruptcy purposes. They do exist for commercial law purposes, and the losses they realized properly belong to them. And those losses only have value to the extent that Charter is able to reorganize and Charter earns taxable income in the future.

*Fourth*, the Debtors' plan classification is proper. The CCI Noteholders objected to the separate classification of their claims from Class A-3 General Unsecured Claims, arguing that Class A-3 CCI General Unsecured Claims was a gerrymandered class.[3] This is incorrect. The CCI Notes Indenture confirms that the Holders of Class A-4 CCI Notes Claims have vastly different rights from those of unsecured litigation, trade claims, severance claims and other creditors in Class A-3 CCI General Unsecured Claims. The convertible CCI Notes were issued in conjunction with the Holdco Mirror Note, which provides the CCI Noteholders with an alternative source of recovery and an equity upside that general unsecured claims do not enjoy. Further, Class A-3 CCI General Unsecured Claims are covered under the Management Agreement and the Mutual Services Agreement referenced therein, whereas the CCI Notes Claims are not. Indeed, the notion that the CCI Notes would be covered by the Management Agreement is contrary to every disclosure of the Debtors concerning the CCI Notes, the terms of the Management Agreement itself, and any legitimate expectation of a CCI Noteholder. In addition, Mr. Doody testified that Class A-3 CCI General Unsecured Claims was not

---

[3] These points likewise apply to Class C-3, General Unsecured Claims of Holdco.

K&E 15588356.

gerrymandered, and no evidence rebuts this conclusion. The Debtors have satisfied section 1129(a)(1) of the Bankruptcy Code.

*Fifth*, the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code. The CCI Noteholders have argued that there is no impaired, accepting, non-insider class at CCI, Holdco or CCH. However, at CCI and Holdco, the Debtors have impaired, accepting classes of non-insiders at Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims, respectively. The CCI Noteholders have not controverted this evidence. Further, at CCH, where no Holders of Claims voted in the General Unsecured Claims Class (Class E-3), according to the voting procedures approved by this Court and not objected to by the CCI Noteholders, such a class is deemed to have accepted the Plan. Moreover, even if the Class A-3 CCI General Unsecured Claims, Class C-3 Holdco General Unsecured Claims, and Class E-3 CCH General Unsecured Claims were disregarded (and they should not be), section 1129(a)(10) is a per plan requirement, not a per debtor requirement, where an integrated plan is proposed. *See In re Enron,* No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) at 138. The Debtors have numerous impaired, accepting classes of non-insiders under the Plan. The Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code.

*Sixth and finally*, the Debtors have satisfied their burden under *In re Metromedia* to obtain approval of the third party releases.[4] The evidence shows the third party releases are being provided to parties and their representatives that have provided substantial consideration under the terms of the Plan. Specifically, the record demonstrates that the Rights Offering

---

[4] *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142-43 (2d Cir. 2005).

K&E 15588356.

consideration, the commitments therefor and the consideration provided by the CII Settlement Parties are substantial. The Debtors also have indemnification exposure to many of the beneficiaries of the third party releases. This identity of interest further justifies the releases. This case also presents the truly unusual circumstances justifying the third party releases. The third party releases are an integral component of the Plan, which is prearranged. The parties would not have contributed the substantial value under the Plan in the form of, among other things, the Rights Offering and the CII Settlement, absent these releases. The Debtors have carried their burden. The objectors have not.

In sum, for all of the foregoing reasons and as further explained herein, the Debtors—on behalf of their estates, their stakeholders who overwhelming voted in favor of the Plan and many of whom have contributed significant value under this Plan, as well the Debtors' Board, management and over 16,000 employees—respectfully request that the Court confirm the Plan and overrule any objections.

## BACKGROUND

The hearing to consider confirmation of the Plan commenced on July 20, 2009. After the development of an extensive evidentiary record, including weeks of testimony from more than two dozen witnesses, the Debtors have satisfied their burden to show that the Plan satisfies each requirement for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. Notably, it is undisputed that the Plan satisfies most of the confirmation requirements.[5] Other than reinstatement, which is addressed in a separate brief, the only disputed issues remaining are:

---

[5] It is undisputed that the Plan satisfies the following confirmation requirements: sections 1123, 1129(a)(2), 1129(a)(4), 1129(a)(6), 1129(a)(8)-(9), 1129(a)(11)-(13), and 1129(d) of the Bankruptcy Code.

- whether the Plan was proposed in good faith as required by section 1129(a)(3);

- whether the Plan satisfies the best interests test of section 1129(a)(7);

- whether the Plan satisfies the "cram down" requirements of section 1129(b);

- whether the Plan satisfies section 1129(a)(10)'s requirement that at least one impaired class of claims has accepted the Plan, excluding the acceptances of insiders; and

- whether the release, exculpation and injunction provisions in the Plan are appropriate.[6]

## LEGAL STANDARD

As the proponent of its confirmation Plan, Charter bears the burden of establishing compliance with 11 U.S.C. § 1129 by a preponderance of the evidence. *See In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001); *In re Gulfstar Indus., Inc.*, 236 B.R. 75, 77 (M.D. Fla. 1999); *In re Petrella*, 230 B.R. 829, 832 (Bankr. N.D. Ohio 1999) ("A Debtor

---

[6] To the extent the issue of whether the Plan satisfies section 1129(a)(5)'s requirement to identify the directors of the Reorganized Debtors may be still in dispute, the Debtors have disclosed the identity of all known directors and the process for identifying the remaining directors in the future. Thus, the Debtors comply with section 1129(a)(5):

> The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed in subsection (a)(5)(A)(i), because the debtor *at this point* has no particular individuals whom it proposes should serve, after confirmation, as a director, officer, or voting trustee, other than those whom it has already identified on the record. Though it is a fair presumption that board composition will change drastically if the promised equity infusion comes about, it will do so pursuant to the company's own system of corporate governance (its articles of incorporation and by-laws) and in accordance with applicable state and federal law. If there were indeed individuals whom the corporation intended to have serve as a director, subsection (a)(5)(A)(i) would compel their disclosure. The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).

*See In re Am. Solar King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988).

K&E 15588356.

seeking reorganization under Chapters 11, 12 or 13 has the burden of establishing that the plan complies with the statutory requirements for confirmation."). However, creditors objecting to the proposed plan bear the burden of producing evidence to support their objection. *In re Lernout & Hauspie Speech Products, N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003); *In re Goddard*, 212 B.R. 233, 239 n. 7 (D.N.J. 1997); *Genesis Health Ventures*, 266 B.R. at 599. As set forth in the Debtors' brief in support of reinstatement, JP Morgan has the burden of establishing a prepetition default under the Credit Agreement.

The Debtors also bear the burden of proof as to the approval of the CII Settlement. The CCI Noteholders urge the Court to apply an "entire fairness" review to the CII Settlement and the good faith plan proposal requirement under section 1129(a)(3). The entire fairness standard applies to transactions with a controlling shareholder that, unlike Paul Allen, will remain the majority shareholder after the transaction,[7] and thus should not apply here. However, to the extent the Court applies entire fairness, the CCI Noteholders would shoulder the burden of persuading the Court that the CII Settlement is unfair. Specifically, under Delaware law, the burden of proof in connection with the entire fairness of a transaction with a controlling shareholder shifts to the challenging party when the transaction is approved by an "independent committee of directors or an informed majority of minority shareholders." *Kahn v. Lynch Comm'ns*, 638 A.2d at 1115-17. In the context of this case, the evidence is clear that the majority independent directors and a majority of the future shareholders of the Reorganized

---

[7] *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1116-17 (Del. 1994) (entire fairness standard is applied to interested party mergers because, by definition, they have no business purpose).

K&E 15588356.

Company, the Holders of CCH I Notes, voted to approve the CII Settlement and the Plan.[8]  *See* 7/22/09 Tr. at 163:24-167:5 (Merritt); 8/31/09 Tr. at 216:21-217:11 (Johri).  Thus, the burden of proving that the CII Settlement and the Plan are unfair would shift to the CCI Noteholders.  The CCI Noteholders have not met this burden.

The Debtors have met their affirmative burden to confirm the Plan.  It is apparent from examination of the record in these cases that the CCI Noteholders, R2 Investments, and the other remaining objectors have utterly failed to carry their burden of presenting evidence in support of their objections.  In fact, they have not presented any evidence whatsoever as their witness, Mr. McDonough, testified that he reached absolutely no conclusions and the CCI Noteholders' cross-examination of Charter witnesses actually proved Charter's case.

## ARGUMENT

I.      **The Plan Has Been Proposed in Good Faith and the Court Should Approve the CII Settlement.[9]**

A.      **The Plan Has Been Proposed in Good Faith.**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."[10]   In the context of section 1129(a)(3), the good faith requirement mandates that "the plan was proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be

---

[8]     98.51% in dollar amount and 89.17% in number of the CCH I Notes Claims voted to accept the Plan. FBG Voting Certification, Ex. A.

[9]     Because the CCI Noteholders' section 1129(a)(3) good faith objections are intertwined with their objections to the CII Settlement, the Debtors respond to the bulk of such objections in connection with the CII Settlement discussion in section II. below.

[10]    11 U.S.C. § 1129(a)(3).

K&E 15588356.

effected.'"[11]  Generally, courts do not permit disgruntled creditor groups to use the "good faith requirement" to challenge plans which nonetheless discriminate against such creditors as long as the plans otherwise satisfy relevant provisions of the Bankruptcy Code.[12]

The fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[13]  To determine whether the plan seeks relief consistent with the Bankruptcy Code, courts look to the reorganization plan itself.[14]  Where a plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable chance of success, the good faith requirement of section 1129(a)(3) generally is satisfied.[15]

---

[11]  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)); *see also In re Bd. of Directors of Telecom Argentina, S.A.*, 528 F.3d 162, 174 (2d Cir. 2008) (affirming lower court finding of good faith over creditor argument that the debtor was not seeking to "promote a necessary restructuring but, instead, to enrich its shareholders" where it was undeniable that the debtor was in poor financial health when it filed); *see also Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 7 (D. Conn. 2006) ("Good faith is 'generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'") (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir.1984)); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (holding good faith requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code).

[12]  *Zenith*, 241 B.R. at 107.

[13]  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors."); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank (In re B.D. Int'l Disc. Corp.)*, 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start.").

[14]  *See In re Granite Broadcasting Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (looking at plan itself to determine whether such plan "will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code").

[15]  *See In re Source Enters., Inc.*, No. 06-11707, 2007 WL 2903954, at *6 (Bankr. S.D.N.Y. Oct. 1, 2007) (finding that the good faith requirement satisfied when plan filed with legitimate and honest purposes of maximizing value of the estate and effectuating equitable distribution); *In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395, 2007 WL 2779438, at *5 (Bankr. S.D.N.Y. Sept. 17,

(Continued…)

Mr. Smit, Mr. Merritt, and Mr. Johri all testified that they supported the Plan because they believed it maximized value. *See* 7/21/09 Tr. at 46:24-47:4 (Smit) ("maximiz[ing] value to the extent possible so it could provide greater recoveries to the creditors' losses. . . .was. . . .the goal of these exercises, generally"); 7/22/09 Tr. at 243:6-11, 269:11-19 (Merritt) ("The objective of the board was to maximize the overall enterprise value."); 8/31/09 Tr. at 157:15-17 (Johri) (same). Mr. Conn, Mr. Doody, and Mr. Goldstein also testified that the Plan was not structured so as to enable Mr. Allen to receive a recovery on account of his equity. *See* 8/17/09 Tr. at 32:13-18 (Doody) (noting that Mr. Allen did not receive a recovery on account of his equity and that the Company did not ascribe any value to his equity interest); 8/24/09 Tr. at 14:25-16:5 (Goldstein) (describing the various claims on which Mr. Allen recovered and stating that he did not recover based on his old equity); 9/2/09 Tr. at 83:24-84:3, 125:13-17 (Conn) (noting that Mr. Allen is not getting in anything on account of his equity interest in CCI and Holdco). This evidence supports good faith and demonstrates that the Plan has not been proposed by any means forbidden by law as required by section 1129(a)(3) of the Bankruptcy Code. It also demonstrates that the CII Settlement is entirely fair.

The CCI Noteholders have attacked the Plan by arguing the CII Settlement was submitted in bad faith and was not otherwise fair. The CCI Noteholders would have the Debtors pursue a path of liquidation to the detriment of other stakeholders. They argue for this course even though the CII Settlement allows the CCI Noteholders to recover well in excess of what they

---

2007) (good faith requirement satisfied when the plan was proposed with legitimate and honest purpose of reorganizing the debtor); *see also Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) ("A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design and indeed may not be confirmable.").

K&E 15588356.

would recover in a chapter 7 liquidation and despite that fact such a course would have destroyed the Debtors' substantial tax attributes and realized less value. Because Charter designed the Plan to maximize value and not to benefit Mr. Allen as an insider, it has been proposed in good faith.

**B.      The CII Settlement Should Be Approved.**

The Debtors have demonstrated that the CII Settlement satisfies (1) the "*Iridium* factors" used by courts in the Second Circuit to evaluate the appropriateness of proposed settlements and (2) although the Debtors do not concede it applies, the heightened "entire fairness" standard used by Delaware Courts in situations where a controlling shareholder stands on both sides of a transaction.

**1.      The Evidence Confirms that the CII Settlement Is Fair and Equitable and Satisfies the *Iridium* Factors.**

When evaluating plan settlements pursuant to section 1123(b) of the Bankruptcy Code, courts in the Second Circuit typically apply the standard used to evaluate settlements under Bankruptcy Rule 9019, i.e., the settlement must be "fair and equitable" and in the best interests of the estate.[16]    In the Second Circuit, courts consider the so-called "*Iridium* factors" in evaluating whether a settlement satisfies such standards.[17]  *In re Iridium Operating LLC*, 478

---

[16] *See Prot. Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414 (1968); *In re Best Products Co.,* 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994) ("[W]hether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same. The settlement must be 'fair and equitable,' … and be in the best interest of the estate.") (internal citations omitted).

[17] The "*Iridium* factors" are:

(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency
(Continued…)

F.3d 452, 462 (2d Cir. 2007). In *Iridium*, the Second Circuit confirmed that plan settlements must conform to the absolute priority rule. *See id.* at 463 ("[T]he Supreme Court has held that a settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule.") (citing *TMT Trailer Ferry*, 390 U.S. at 424). As discussed in section III.A, the Plan and the CII Settlement conform to the absolute priority rule. The evidence adduced in support of the Confirmation Brief and at the Confirmation Hearing confirms that the CII Settlement satisifies the "*Iridium* factors" and thus is fair and equitable and in the best interests of the Debtors' estates and should be approved.

<blockquote>

a. **The Benefits of the CII Settlement Outweigh the Likelihood of Success on the Merits.**

</blockquote>

The benefits of the principal components of the CII Settlement outweigh its costs as well as the probability of success on the merits.

*First*, the CII Settlement preserves the tax structure that optimizes the value of the Reorganized Company's tax attributes. *See* 7/21/09 Tr. at 73:10-16 (Millstein). Indeed, it is uncontroverted that the benefits of the NOL preservation of the CII Settlement alone amount to approximately $1.14 billion in cash tax savings.[18]  Over the course of many years, the Debtors

---

and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

*Id.*

[18]  *See* Degnan Affidavit ¶ 9; *see also* 8/24/09 Tr. at 16:12-17 (Goldstein) (noting that future cash tax savings associated with the preservation of the NOLs themselves are valued over $1 billion). Carlyn Taylor's testimony regarding limitations on the ownership and use of NOLs does not suggest otherwise. Ms. Taylor was not admitted as an expert on tax issues. *See* 8/31/09 Tr. at 18:14-20 (Taylor). And, in any event, Ms. Taylor's analysis did not address the effects of the proposed

(Continued…)

accumulated NOLs of sizable proportions, which carry with them significant value. 7/21/09 Tr. at 47:24-48:6 (Millstein) ("We have run substantial operating losses as a tax matter for many years. So Charter has an accumulated net operating loss of quite sizable proportions. And in a context of the transaction we're engaged in that is before the Court as well as on a go-forward basis, the NOL has significant value."); *see also* 7/22/09 Tr. at 75:13-74:20 (Smit) (the Company accumulated over $8.7 billion of NOLs as of December 31, 2008). Upon emergence and with the benefit of its delevered capital structure, the Reorganized Company will have substantial income against which to apply the NOLs. The CII Settlement is structured to capture the tremendous tax savings attributable to these NOLs. As described below, the Debtors could not have preserved the NOLs without Mr. Allen's cooperation.

*Second*, by maintaining Mr. Allen's voting control consistent with the change of control requirements under the credit facility and various indentures, the CII Settlement facilitates the Debtors' reinstatement of debt at their current favorable interest rates and thereby avoids potentially hundreds of millions of dollars in incremental annual interest expense, even assuming the availability of replacement financing.[19]

---

restructuring or the IRS ruling increasing the Reorganized Company's annual limit on application of NOLs. *Id.* at 55:1-24. *See also* CX 415.

[19] *See* 8/24/09 Tr. at 14:7-10, 16:18-17:3 (Goldstein) (noting that Company would save hundreds of millions of dollars by reinstating its bank debt and, with the dislocations in the credit markets, that number was even higher when the Plan was being negotiated); *see also* 7/21/09 Tr. at 71:18-72:8 (Millstein) (reinstatement of the bank debt requires the existence of CCI); Goldstein Affidavit ¶ 25. Moreover, the Debtors likely would be unable to obtain new debt commitments of $12 billion as the cost of raising such debt or refinancing current debt would be prohibitively high, even in the improving markets. *See* 7/21/09 Tr. at 73:17-75:2 (Millstein) (acknowledging that reinstating the bank debt is essential to the Plan and noting that it would be a long time before the credit markets recovered and that, in any event, the cost of refinancing the debt would be extemely high).

K&E 15588356.

Third, the CII Settlement provides for the transfer of CII's 30% interest in the preferred units of Debtor CC VIII to the Reorganized Company on the Effective Date. As to this last component, Lazard estimates the CC VIII Preferred Units held by CII to be worth approximately $150 million.[20] These three benefits alone translate into billions of dollars of value and vastly exceed the settlement cost of $375 million as quantified by Lazard.

---

[20] *See* Goldstein Affidavit ¶ 26 (CII's CC VIII Preferred Units range from $135 to $165 million); 8/24/09 Tr. at 17:4-6 (Goldstein).

K&E 15588356.

**Summary of Material Terms of the CII Settlement**[21]

| Key Settlement Benefits | Key Settlement Costs | |
|---|---|---|
| • $1.14 billion cash tax savings associated with preservation of $2.8 billion NOL | Claim and Sale Consideration[24] | |
| • Hundreds of millions of dollars for preservation of reinstatement ability[22] | • $150 million for CC VIII Preferred Unit | |
| | • $25 million Allen Management Receivable | |
| • $135-165 million CC VIII Preferred Interest | **Total Claim and Sale: $175 mm** | |
| • $1.6 billion infusion of new capital through the Rights Offering[23] | Settlement Consideration | |
| | • $85 million New CCH II Notes | |
| • Step-up in tax basis | • $60 million 3% Common Equity | |
| | • $35 million 4% Warrants | |
| | • $20 million capped fee reimbursement | |
| | **Total Settlement: $180 mm** | |
| **Grand Total: ~ $3.5 billion +** | **Grand Total: $375 million** | |

Notably, these values are uncontroverted, although the CCI Noteholders ignore that

Mr. Allen is really only receiving $180 million on account of the consideration he is providing

---

[21] *See* Goldstein Affidavit, Exh. B; *see also* CDX 39 (Summary of Material Terms of the CII Settlement); VDX 3 (CII Settlement: "Gives" and "Gets").

[22] "On the preservation of the ability to reinstate the debt, this -- I think we've been conservative in putting hundreds of millions of dollars, frankly at the time we were negotiating this when there was even more severe dislocation of the credit markets, that was up to billions of dollars. Every hundred basis points of increase in the debt would be a 500 million dollar expense to the company. And so once you start talking about potentially several hundred basis points, you very quickly get into the billions of dollars." 8/24/09 Tr. 16:18-17:3 (Goldstein).

[23] "[W]ithout the CII Settlement, this plan would not be possible at all and therefore the rights offering couldn't happen. . . . the CII Settlement is one of the bases for the plan and which allows the rights offering to happen, allows the debtors to raise this money." 8/17/09 Tr. 34:7 – 34:12 (Doody).

K&E 15588356.

pursuant to the CII Settlement as he would be entitled to payment of the remaining $175 million in return for CC VIII ($150 million) and the Allen Management Receivable ($25 million) in any event. But even if the full $375 million were pure settlement consideration, it would still be reasonable. 9/10/09 Tr. 61:4-61:8 (Millstein) ("I think it's perfectly obvious that a guy who is contributing billions of dollars, conferring billions of dollars of value on third parties who are not widows and orphans, is going to expect to be paid for the privilege of giving that benefit to other people.").

The CCI Noteholders also argue that the valuation of settlement costs should be increased to include (i) Mr. Allen's alleged tax exposure absent the settlement and (ii) the value of the releases provided to Mr. Allen. *See* 8/24/09 Tr. at 163:4-165:22 (Goldstein) (refuting the CCI Noteholders' proposed increase of settlement costs to reflect Mr. Allen's alleged tax exposure and the value of the release). But, as discussed below, there is no basis to include either of these items.

        b.       **The CCI Noteholders Are Wrong About the Tax Aspects of the Settlement.**

There is no support for the CCI Noteholders' contention that Mr. Allen is avoiding $1-$1.5 billion of tax liabilities as a result of the CII Settlement. In fact, that range is nothing more than a hypothetical number used by counsel for the CCI Noteholders for discussion purposes in cross-examining Mr. Goldstein. *See* 8/24/09 Tr. at 151:13-155:2 (Goldstein). Mr. Allen is in the best position to evaluate his own tax position and, as Mr. Conn testified, "[t]here is *no*

---

[24]  Even without the CII Settlement, the Debtors would have been obligated to pay the $25 million Allen Management Receivable, and, to the extent they wished to purchase the remainder of Mr. Allen's CC VIII preferred units, approximately $150 million.

*incremental benefit* from a tax point of view to Mr. Allen under this plan versus other alternatives he had open to him."[25]  This dovetails with the Debtors' and their advisors' general belief during negotiations that although it was theoretically possible Mr. Allen could experience potentially a $1 billion tax liability in the event of a liquidation,[26] Mr. Allen "had multiple ways of protecting [himself] without" Charter.  9/10/09 Tr. at 16:14-18 (Millstein).  Moreover, other speculations regarding Mr. Allen's tax situation, e.g., by the Unofficial Cross-Over Committee's financial advisor, UBS, are just that—mere speculations reached without the benefit of any real information or insight regarding Mr. Allen's tax position.[27]  Furthermore, to the extent Mr. Allen's tax position was a weakness, he would not be required to disclose it—even as a controlling shareholder—in the context of good faith arms' length negotiations, regardless of the applicable standard of review.[28]

In any event, the CCI Noteholders' tax arguments overlook the truly extraordinary tax (and other) benefits associated with the CII Settlement and completely misjudge the Debtors' options.  As a direct consequence of the CII Settlement, upon emergence from chapter 11, Charter will be in an excellent position from a tax perspective.  Charter will exit from bankruptcy

---

[25]  9/2/09 Tr. at 90:7-12 (Conn) (emphasis added).  *See also* 9/2/09 Tr. at 34:8-22, 88:20-90:12 (Conn) (Mr. Allen did not believe his tax liabilities would have been significant outside of a scenario that was "hypothetical to the point of being next to impossible.").

[26]  *See* 8/24/09 Tr. at 151:13-152:16 (Goldstein) (noting the Company believed that Mr. Allen might have had a large tax liability in a chapter 7 liquidation).

[27]  *See* LDX 279; 7/28/09 Tr. at 225:7-11 (Zinterhofer); *see also* 9/2/09 Tr. at 143:24-144:11 (Conn) (Mr. Allen had a "variety of solutions to any alleged tax problem that didn't even require a restructuring agreement" and no one at Vulcan provided UBS with any details regarding Mr. Allen's tax situation).

[28]  *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) (finding that controlling shareholder had no duty to disclose weakness known to controlling shareholder but unknown to independent committee of directors regarding an illiquidity discount).

19

with approximately $6 billion of NOLs and an enhanced ability to utilize them, and with a significant potential for a stepped up tax basis in its assets providing more tax shelter in the future.

Importantly, this highly favorable tax outcome is possible only because Paul Allen and CII agreed to work consensually with Charter in formulating and effecting a restructuring plan. Without Mr. Allen's participation, all of the $6 to $7 billion of debt cancellation that will occur as part of the restructuring would be allocated to CCI and would result in the reduction of Charter's NOLs dollar for dollar. But by ensuring that CII and Mr. Allen continue as a partner of Holdco during and after the bankruptcy restructuring, approximately 46% of that debt cancellation will be allocated to CII—with the result being that approximately $3 billion of extra NOLs will be retained by Charter.

If the Plan is confirmed, Charter expects Mr. Allen will exchange his interest in Reorganized Holdco for equity in Reorganized CCI by December 31, 2009. Upon such an exchange, Charter will realize an increase in the tax basis of its assets in the amount of approximately $2.5 billion. That extra tax basis can be expected to generate future tax savings of approximately $1 billion. Again, that highly advantageous tax outcome would not be possible without Mr. Allen. If he were to simply withdraw from Holdco without going through a taxable exchange, that $2.5 billion increase in tax basis would not be available to Charter.

Incredibly, the CCI Noteholders assert that Charter could have obtained those tax benefits from Mr. Allen, by engaging in a form of Russian Roulette. Specifically, they argue that CCI could have threatened to liquidate CCI or otherwise leave Mr. Allen with a large potential tax liability, and thereby force him to negotiate with CCI without receiving any separate

consideration. The CCI Noteholders also argue Charter could have threatened to obtain a permanent injunction precluding Mr. Allen from disposing of his Holdco shares.

Such brinksmanship would have been unjustifiably risky for CCI. Mr. Allen's tax advisers had formulated a variety of possible strategies to deal with any potential tax liability. *See* 9/2/09 Tr. at 143:24-144:7 (Conn). Moreover, Mr. Allen could have taken independent steps to ensure that CCI did not obtain any increase in tax basis of its assets. Had Mr. Allen taken any of those actions, CCI would not have been able to receive any tax benefits from the restructuring, without imposing any material tax burden on itself. Furthermore, liquidating the Company to potentially maximize Mr. Allen's tax liabilities would not have been an exercise of sound business judgment or fiduciary duty as it would have resulted in substantially less value for all parties. *See* 8/24/09 Tr. at 181:16-182-7 (Goldstein) ("Liquidation is not typically recommended to try to maximize value for an enterprise, which we worked very hard to do.").

Finally, the fact that the Debtors were able to obtain interim and final orders restricting the transfer of CCI equity (which is publicly traded) during the pendency of the chapter 11 cases, does not mean they also could have obtained an injunction barring Mr. Allen from disposing of his Holdco interests (which are not publicly traded) on a permanent basis. This simply would not have been a viable strategy. Temporary NOL trading orders are relatively commonplace relief in major chapter 11 cases. But an indefinite trading ban would involve truly extraordinary relief, and the Debtors could not have responsibly staked the success of their restructuring on the court's willingness to issue an unprecedented permanent injunction. It was apparent that this was not a viable strategy from the outset. Accordingly, there is no reason to increase the settlement cost to factor in avoidance of improbable tax liabilities.

K&E 15588356.

c.      **The Value of the Releases Does Not Increase the Settlement Cost.**

Similarly, the Debtors do not believe the CII Settlement costs should be increased to reflect the proposed releases of the CII Settlement Claim Parties, especially in light of the fact that many of the CII Settlement Claim Parties are the beneficiaries of indemnification obligations from the Debtors.  7/16/09 Doody Decl. ¶ 38.  Indeed, absent the releases, claims against the CII Settlement Claim Parties likely would pass through to the Debtors.  Thus, the Debtors are the ultimate beneficiaries of such releases.  Accordingly, the releases should not be included as a cost of the CII Settlement.

d.      **Even If the Likelihood of Protracted Litigation Is Low, There Is Little Chance of Success in Litigation.**

The Debtors believe there would be little chance of succeeding in litigation on the claims being compromised by the CII Settlement given that a substantial component of the consideration for the CII Settlement involves the CII Settlement Claim Parties' cooperation on an ongoing basis.  7/16/09 Doody Decl. ¶ 32.  Indeed, consistent with the absolute priority rule, the Plan will extinguish Mr. Allen's equity interests in CCI and, through CII, Holdco.  *See* CX 189, Art. IV.  As such, no fiduciary duty or other legal construct could possibly obligate Mr. Allen to participate on a going forward basis in the structure or governance of the Reorganized Company.[29]   Yet, Mr. Allen's going forward cooperation "critical" both for

---

[29]   *See, e.g., Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) (controlling shareholder's refusal to "waive its preemptive rights or to assume further financial obligations on behalf of [company] without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties"); *see also* 9/2/09 Tr. at 148:24 - 149:2 (Conn) (confirming that Mr. Allen had no obligation to remain a 35% voting holder of Reorganized CCI); *cf. In re BMW Group I, Ltd.* 168 B.R. 731, 737 (Bankr. W.D. Okla. 1994) (old equity does not retain any interest in the post-bankruptcy business on account of its earlier interest in the pre-bankruptcy debtor because, upon
(Continued…)

K&E 15588356.

"optimizing the tax structure so as to preserve as much of the NOL[s] as possible" as well as "avoiding a change of control that could trigger the acceleration of the bank debt." 7/21/09 Tr. at 62:2-6 (Millstein). Because the Debtors likely would not be able to compel Mr. Allen to provide such cooperation, this factor weighs in favor of approving the CII Settlement.

     e.  **The CII Settlement Is in the Paramount Interests of Creditors.**

  The CII Settlement is the linchpin of the Plan and therefore is manifestly in the paramount interest of creditors. The Plan accomplishes the fundamental purpose of chapter 11 insofar as that it preserves the Debtors as a going concern and maximizes value available to satisfy creditors.[30] Specifically, under the Plan, and as a direct consequence of the CII Settlement, the Debtors will reinstate the senior portion of their capital structure and provide significant returns to most creditor constituencies. *See* CX 211 at 34-55. Moreover, the Plan provides for significant infusions of new capital from certain Holders of CCH I Notes, who agreed to backstop the $1.6 billion Rights Offering and purchase up to $267 million in New CCH II Notes. *See* CX 211 at 8, 24-25.

  As noted above, the CII Settlement also incentivizes Mr. Allen to refrain from withdrawing from Holdco or otherwise taking actions that could be deemed to cause a "change of control" event of default under the indebtedness the Debtors are seeking to reinstate. The

---

filing, the bankruptcy estate owns all interests, legal and equitable, of the pre-bankruptcy debtor); *In re Allegheny Int'l, Inc.*, 118 B.R. 282, 307 (Bankr. W.D. Pa. 1990) (because present equity holders will not hold equity in reorganized company, it is not unfair to exclude present equity holders from participation in the committee overseeing the reorganized debtor).

[30] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 453 (basic purposes of chapter 11 are "preserving going concerns" and "maximizing property available to satisfy creditors.").

K&E 15588356.

resulting benefits are substantial and maximize value for the Debtors and their constituents.  *See* 9/2/09 Tr. at 148:15-23, 160:3-6 (Conn); 9/10/08 Tr. at 20:5-15 (Millstein).

<div align="center">

f.    **The CII Settlement Is a Multiparty Settlement Supported by the "Fulcrum" Noteholders.**

</div>

The CII Settlement is a multiparty settlement that was negotiated at arms' length between the Debtors, CII, Paul Allen and certain of his affiliates, and the Unofficial Cross-over Committee.  *See* 7/16/09 Doody Decl. ¶ 16.  The Plan, which is premised upon the CII Settlement, is supported by nearly all of the Debtors' creditor constituencies.  *Id*.  Indeed, the Creditors' Committee independently reviewed the Plan, including the CII Settlement, and has pledged its support therefor.  *See* 7/20/09 Tr. at 88:16-89:5 (Elkind).

<div align="center">

g.    **Experienced, Independent Attorneys and Advisors Advised the Settling Parties.**

</div>

Experienced, independent attorneys and financial advisors at all times advised the settlement parties.  Specifically, each of the following parties was represented by its own independent counsel and financial advisors: (i) the Debtors other than CII were represented by Kirkland & Ellis LLP ("K&E") and their financial advisor, Lazard LLC ("Lazard"),[31] (ii) CII, Paul Allen, and certain other affiliates including CII were represented by Skadden, Arps, Slate, Meagher & Flom LLP and Miller Buckfire, and (iii) the Unofficial Cross-over Committee was represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard &

---

[31] The Debtors' Board was composed of a majority of independent directors at all relevant times.  *See* 7/21/09 Tr. at 65:10-18, 158:14-25 (Millstein); 7/21/09 Tr. at 223:13-17, 225:20-25, 226:1-4, 7/22/09 Tr. at 120:9-20 (Smit); 7/22/09 Tr. at 163:24-167:5 (Merritt) (independent Board members met after and in between Board meetings); 8/31/09 Tr. at 185:17-24, 189:5-190:1, 193:8-15, 216:21-217:11, 221:17-224:4 (Johri) (same); 9/2/09 Tr. at 133:20-134:6, 134:19-135:5 (Conn) (same); Goldstein Affidavit ¶ 12.  Accordingly, the involvement of non-independent directors in the Board's
<div align="right">(Continued…)</div>

Zukin Capital, Inc., and UBS Securities LLC. *See* Doody Decl. ¶ 32; *see also* 8/17/09 Tr. at 25:25-26:28, 64:4-6, 223:22-24 (Doody). In addition, CII is represented by Togut, Segal & Segal LLP. Accordingly, this factor supports the CII Settlement.

> h. **The Releases of the Directors and Officers Are Appropriate and Justified.**

Although the CII Settlement does not independently release directors and officers, it requires that the Plan provide for such releases. 7/16/09 Doody Decl. ¶ 39. These releases, which are discussed in more detail below, are appropriate and justified because they were essential to the formulation of the Plan[32] and were provided in return for substantial and unique consideration from Paul Allen. *See* 8/17/09 Tr. at 63:3-9 (Doody). Indeed, the substantial consideration, represented by the difference between the benefits of the CII Settlement and its costs, is easily valued in the range of billions of dollars.[33] Accordingly, it is clear that substantial consideration supports the releases.

> i. **The CII Settlement Is the Product of Good Faith, Arms' Length Bargaining.**

Moreover, the CII Settlement negotiations were conducted at arms' length and in good faith. The testimony of each of the settlement parties overwhelmingly demonstrates that, through its advisors, the Company bargained at arms' length with Mr. Allen and the Unofficial

---

determination to appoint K&E and Lazard does not call into question the independence of K&E or Lazard.

[32] *See* 9/2/09 Tr. at 86:9-88:19 (Conn); *see also* 8/17/09 Tr. at 62:18-63-6 (Doody).

[33] *See* Goldstein Affidavit ¶ 22-30; Doody Decl. ¶ 34; *see also* 8/17/09 Tr. at 240:21-24 (Doody); 9/2/09 Tr. at 175:25-176:13 (Conn).

K&E 15588356.

Cross-over Committee regarding the details of the Plan and the CII Settlement.[34]  These protracted negotiations occurred throughout January 2009 with a goal of reaching a deal prior to the February 13, 2009 deadline for making overdue interest payments on certain subsidiaries' notes for junior entities in the capital structure.  *See* 7/21/09 Tr. at 61:5-63:16 (Millstein) (noting that substantial progress was made in negotiations leading up to the February 13 grace period expiration).  As the deadline neared, the parties negotiated around the clock to reach a deal.  *See* Goldstein Decl. ¶ 12 ("As the expiration of the grace period approached, the negotiations were "near non-stop.").  Indeed, as late as February 10, the Company did not know whether a deal would come together.  7/21/09 Tr. at 230:1-231:7 (Smit).  By February 10, however, Charter's negotiating team had made substantial progress on the fundamental issues important to the company, including reinstating the bank debt and reducing the debt levels to where Charter would be free cash flow positive on a levered basis based on the Company's business plan and some sensitivities to the plan.  7/21/09 Tr. 61:8-23 (Millstein).  And, on February 11, 2009, after nearly giving up on the possibility of reaching an acceptable deal, the parties finally reached the CII Settlement.  *See* 7/21/09 Tr. at 66:21-67:14 (Millstein) ("exhausted management team and advisor set" presented the term sheet to the Board on February 11).  Indeed, there can be no dispute that the CII Settlement was hard fought and negotiated at arms' length.

## 2.    The CII Settlement Is Both Fair and Entirely Fair.

In addition to satisfying the fair and equitable standard pursuant to *Iridium*, the CII Settlement also would pass muster under an "entire fairness" review although, as noted above,

---

[34]   *See* 7/21/09 Tr. at 55:9, 72:13-73:10 (Millstein); 7/21/09 Tr. at 222:17-21, 223:10-24, 227:11-22 (Smit); 7/22/09 Tr. at 171:1-12, 264:23-265:11 (Merritt); 7/23/09 Tr. at 23:25-24:5 (Villaluz); (Continued…)

K&E 15588356.

the Debtors dispute that entire fairness applies to the CII Settlement. Entire fairness is a Delaware law concept applied in connection with transactions between a controlling shareholder that remains a controlling or majority shareholder and its corporation. *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (adopting the entire fairness standard when a controlling shareholder stands on both sides of a transaction). The entire fairness standard is comprised of two fundamental aspects—fair dealing and fair price. *Id.* Fair dealing is concerned with questions regarding process, i.e., (1) when the transaction was timed, (2) how it was initiated, (3) structured, (4) negotiated, (5) disclosed to directors, and (6) how the approvals of directors and stockholders were obtained. *Id.* Fair price "relates to the economic and financial considerations of the proposed [transaction], including . . . assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the consideration]." *Id.* While fair dealing and fair price are separate concepts, "[a]ll aspects of the issue must be examined as a whole since the question is one of entire fairness." *Id.* Case law regarding entire fairness is clear: a controlling shareholder (particularly a controlling shareholder like Mr. Allen, who will not be a majority shareholder upon emergence) has no obligation to assume further financial obligations on behalf of the controlled company without adequate compensation[35] or to act altruistically.[36]

---

8/17/09 Tr. at 26:3-19, 28:18-29:14 (Doody); 8/24/09 Tr. at 13:15-19 (Goldstein); 8/31/09 Tr. at 197:8-14, 217:12-218:1 (Johri).

[35] *Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) (ruling that alternative restructuring transaction structure proposed by controlling shareholder nonetheless was entirely fair because, among other things, controlling shareholder had no obligation to assume further financial obligations on behalf of the company without adequate compensation).

[36] *Thorpe v. Cerbco, Inc.*, No. 11713, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993) ("Controlling shareholders, while not allowed to use their control over corporate property or process to exploit the

(Continued…)

K&E 15588356.

Although courts generally do not apply the entire fairness standard to Rule 9019 settlements, *Zenith* considered entire fairness in connection with a determination of whether a Plan that provided for the Debtors' controlling shareholder to retain 100% of the equity of the reorganized debtor was proposed in good faith pursuant to section 1129(a)(3) of the Bankruptcy Code. *Zenith,* 241 B.R. at 109 (finding controlling shareholder's position as a significant creditor and shareholder did not unduly influence the plan process even though the plan awarded the debtor's controlling shareholder 100% of the stock in the reorganized debtor). The *Zenith* court ruled that the following factors supported a finding that the plan was proposed in good faith under the heightened entire fairness standard: (i) the debtors and the shareholder were represented by separate counsel and professionals during the restructuring negotiations; (ii) there was a special independent board committee to negotiate with the shareholder; and (iii) the shareholder did not impede the debtor's efforts to pursue alternative restructuring transactions. *Id.* In addition, the *Zenith* court found significant the involvement of a major bondholder group with its own set of professionals in negotiating the plan, which involvement countered any undue influence the controlling shareholder may have had over the debtor. *Id.* The evidence demonstrates that all of these factors are present here. Moreover, as discussed in further detail below, the CII Settlement satisfies the other factors that courts have found relevant to the entire fairness of a transaction.

---

minority, are not required to act altruistically towards them."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Delaware law does not require controlling shareholders to sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders).

K&E 15588356.

a. **The Evidence Confirms that the CII Settlement Is a Product of Fair Dealing.**

As the testimony given at the Confirmation Hearing shows, the procedural fairness of the CII Settlement satisfies the *Weinberger* factors for fair dealing. Specifically, the timing, method of initiation, structure, negotiations, disclosures, and approval process of the CII Settlement all reflect fair dealing.

i. **The Timing and Initiation of the CII Settlement Were Fair.**

Under Delaware law, the timing of a transaction is suspect when "a fiduciary manipulate[s] the timing of [the] transaction to benefit itself at the stockholder's expense." *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172 (Del. 1995). Here, it is undisputed that the timing of the restructuring and the CII Settlement were not manipulated by Mr. Allen. Indeed, the testimony of Jim Millstein and Greg Doody adduced at the Confirmation Hearing shows conclusively that the timing of the CII Settlement was dictated by the Company, acting independently through its majority independent Board, in response to the Company's need to reduce its debt burden, preserve its bank debt and become cash flow positive. *See* 7/21/09 Tr. at 45:8-46:3 (Millstein) (prior to commencing negotiations, the Board and Lazard developed goals they thought should be achieved or at least targeted in any type of larger restructuring effort); 8/17/09 Tr. at 44:8-24, 126:14-25 (Doody).

Moreover, it is uncontroverted that the Company, not Mr. Allen, initiated the restructuring process and the CII Settlement discussions and proposed the Plan structure, including the tax structure. *See* 8/24/09 Tr. at 12:21-13:1 (Goldstein) (Mr. Allen did not propose the Plan); 9/2/09 Tr. at 141:10-14 (Conn) (the Company and its advisors, not Mr. Allen, originated and designed the Plan); Goldstein Affidavit ¶¶ 10-11 (same). In December 2008, the Company, together with Lazard and K&E, began to work in earnest to formulate a restructuring

29

proposal for the Company. *See* 7/21/09 Tr. at 44:4-12 (Millstein). At the same time, the Company organized what it considered to be the holders of its fulcrum securities, the CCH I Notes and CCH II Notes, and created a strawman proposal outlining the general terms of a plan of reorganization (the "Strawman"). 7/21/09 Tr. at 49:15-50:22, 61:24-62:6 (Millstein) (discussing the genesis of the Strawman proposal by the Company and the fundamental differences with Mr. Allen at the outset of negotiations); 7/28/09 Tr. at 209:4-6 (Zinterhofer) (the Company proposed the Strawman in January 2009); 7/29/09 Tr. at 176:11-14 (Liang) (same); 8/17/09 Tr. at 26:24-29:14, 29:18-30:16 (Doody) (Company put together the Strawman to organize the bondholders). Notably, the testimony is uncontroverted that the Company proposed the tax structure in the Strawman, not Mr. Allen. *See* 8/17/09 Tr. at 26:24-29:14 (Doody). And in fact, Mr. Allen was initially opposed to the tax structure proposed in the Strawman. *See* 8/17/09 Tr. at 26:24-29:14 (Doody). But the Company and its advisors drove the Plan process and ultimately obtained buy-in regarding the resulting Plan structure from multiple constituencies. *See* 8/17/09 Tr. at 26:24-29:14 (Doody); KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A. Accordingly, the evidence confirms the fairness of the timing and initiation of the CII Settlement.

### ii. The Structure of the CII Settlement Was Fair.

Courts have noted that transactions structured to inhibit competing bids indicate that such transaction may not be entirely fair.[37] Here, the CII Settlement was in no way structured to limit or inhibit alternative plan structures and the evidence does not indicate otherwise. Indeed, the

---

[37] *See Cinerama*, 663 A.2d at 1173 (affirming finding that structure of merger was fair because the "transaction was not 'locked up' by any device except its very high price").

K&E 15588356.

February 11, 2009 Restructuring Agreement between CCI, CII, and Paul Allen provided a fiduciary out for CCI in the event a better transaction emerged. *See* LDT 397 § 8(a)(ii). Nonetheless, no other party has proposed an alternate plan structure. In fact, no other deal or alternative has emerged since the Company started examining delevering/restructuring alternatives in 2007.[38] The Company, with the assistance of its counsel and financial advisors, introduced the only proposal considered thus far—the Plan and the CII Settlement.

Moreover, Mr. Allen did not impede the Debtors' efforts to pursue alternative structures. CX Declaration 6 ¶ 11 (Goldstein). Indeed, the fact that no Plan without the CII Settlement was ever proposed to the Board does not indicate unfairness. The evidence demonstrates that, although alternative transactions were considered, none were viable. *See* 8/17/09 Tr. at 25:3-12 (Doody) (Charter and its advisors investigated all viable options for a restructuring). In addition, the evidence shows that the Company and its advisors recognized early on that any Plan that did not provide for the reinstatement of the Company's prepetition debt likely would not maximize value and that Mr. Allen's cooperation was necessary for reinstatement. *See* 7/21/09 Tr. at 62:7-22 (Millstein) (any plan relied on reinstatement and Mr. Allen's cooperation); 7/22/09 Tr. at 203:10-18 (Merritt) (Paul Allen was "key to maintaining the bank arrangement.").

### iii.     The CII Settlement Was Negotiated at Arms' Length.

"[A]rm's-length negotiation provides 'strong evidence that the transaction meets the test of fairness.'" *Cinerama*, 633 A.2d at 1172 (quoting *Weinberger*, 457 A.2d at 709-10 n.7). Here, it cannot be denied that the CII Settlement was a product of arms' length negotiations. As

---

[38]  *See* 7/22/09 Tr. at 267:17-25 (Merritt); 8/17/09 Tr. at 79:25-80:15 (Doody) (no better deals have been offered to Charter); Goldstein Affidavit ¶ 20 (same); 8/31/09 Tr. 222:7-19 (Johri) (Since at least
(Continued…)

noted above, the Debtors, CII and Paul Allen, and the Unofficial Cross-over Committee retained separate professionals and conducted exhaustive arms' length, good-faith negotiations.[39] In addition, the testimony has shown that these ongoing negotiations between the parties ultimately protected substantial value for the Debtors. *See* 7/21/09 Tr. at 227:13-24 (Smit); 7/22/09 Tr. at 172:19-24 (Merritt).

Moreover, courts are also more likely to find that arms' length bargaining occurred where the controlling shareholder is forced to make concessions during negotiations.[40] Here, the Company and the Unofficial Cross-over Committee forced Mr. Allen to make significant concessions during their negotiations. As noted above, Mr. Allen did not initially agree to the tax structure of the Plan and the CII Settlement as proposed by the Company, but was persuaded to concede as part of the negotiations. *See* 8/17/09 Tr. at 26:24-29:14 (Doody) (Plan proposes different tax structure than one originally preferred by Paul Allen).

While the CCI Noteholders have argued that the CII Settlement is unfair for a number of reasons, the only thing they have been able to show after the evidentiary record was developed is that they did not receive a seat at the negotiating table when the CII Settlement and the Plan were negotiated. This is not bad faith. Although the CCI Noteholders would have the Court believe

---

2007, Charter pursued different restructuring and delevering opportunities with outsiders, including strategic partners, but "nothing came of it.").

[39] *See* 7/21/09 Tr. at 54:22-55:8 (Vulcan retained its own financial and legal advisors), 73:4-9:10 (Millstein) (negotiations were at arms' length); 7/21/09 Tr. at 223:10-224:12, 227:11-22 (Smit) (the settlement parties had separate counsel and advisors and conducted arms' length negotiations) ; 7/22/09 Tr. at 171:1-12, 264:23-265:11 (Merritt) (same) ; 7/23/09 Tr. at 23:25-24:5 (Villaluz) (same); 8/17/09 Tr. at 26:3-19, 28:18-29:14 (Doody) (same) ; 8/24/09 Tr. at 13:15-19 (Goldstein) (same); 8/31/09 Tr. at 197:8-14, 217:12-218:1 (Johri) (same).

[40] *See Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 938 (Del. 1985) (finding that negotiations were arms' length because controlling shareholder did not dominate negotiations as indicated by the significant concessions that it made on the price of acquiring the company in which it owned a majority share).

K&E 15588356.

that being left out of the Plan process constituted *per se* evidence of procedural bad faith, this contention is unavailing. It is abundantly clear that asking the CCI Noteholders to the bargaining table would have been futile.[41] The CCI Noteholders were out of the money based upon a waterfall distribution scheme and their only source of recovery was the intercompany receivable and any other Holdco assets. *See* 7/21/09 Tr. at 69:22-70:4 (Millstein); 8/17/09 Tr. at 41:19-42:16 (Doody) (CCI Noteholders are $6 billion dollars out of the money). Recognizing that the CCI Noteholders were entitled to recover through a substantial intercompany claim, the Debtors accounted for such claim in negotiating the Plan.[42]

The CCI Noteholders' strategy of threatening liquidation is neither viable nor realistic. Boards of billion-dollar companies simply do not threaten to liquidate for the benefit of one constituency at the expense of other stakeholders.[43] CCI owed duties as manager to other entities and could not act exclusively in its own self-interest.[44] The CCI Noteholders' tactic is precluded by CCI's duties to the LLC subsidiaries it manages pursuant to the Management Agreements.[45]

---

[41]  *See Zenith*, 241 B.R. at 109 (Bankr. D. Del. 1999) (finding that "asking the minority shareholders for input into the financial restructuring of the company would have been futile" when there was no equity in the company).

[42]  *See* 7/21/09 Tr. at 70:12-18 (Millstein) (the Company and its advisors educated the bondholders' advisors regarding various intercompany accounts to make sure they understood the intercompany accounts ultimately would have to be respected, "in whole or in part, in order to permit arguably out-of-the-money creditors to receive a distribution.").

[43]  *Cf. In re General Growth Props., Inc.*, 409 B.R. 43, 61 (Bankr. S.D.N.Y. 2009) (consideration of financial circumstances of corporate group rather than individual debtors was appropriate in determination regarding good faith of chapter 11 filing).

[44]  *See* 7/22/09 Tr. at 263:12-22 (Merritt) (CCI, as manager, owed duties to the LLCs); 8/17/09 Tr. at 39:14-40:4 (Doody) (same), 177:6-25 (the Debtors spent significant time on the CCI Noteholders' recovery).

[45]  At the time they acquired their notes, the CCI Noteholders were aware of the corporate structure of the Company and that CCI was the manager of the LLC and therefore owed duties to the LLC. *See* Charter Form S-4 filed on September 14, 2007 (the "<u>CCI Notes Exchange Offer</u>"), CX 287 at Ex. 10-

(Continued…)

Thus, CCI could not threaten to destroy the value of the NOLs without (i) breaching its fiduciary duties or (ii) resigning as a manager and thereby destroying the enterprise, which also would have destroyed the NOLs. Indeed, there is no obligation, under the Bankruptcy Code or otherwise, to destroy an asset or cause harm to another constituency to generate leverage.

Notwithstanding the CCI Noteholders' lack of leverage, the Company made sure that the Plan provided for distributions to the CCI Noteholders on account of CCI's intercompany receivable and the CCI Noteholders recovered in excess of liquidation value based on a liquidation analysis that was conservatively drawn to their benefit. *See* 7/21/09 Tr. at 70:12-71:12 (the CCI Noteholders receive more under the Plan than they are expected to receive in a liquidation), 174:17-175:13 (same) (Millstein). As Mr. Millstein testified, this required substantial negotiations with the other CII Settlement Claim Parties. 7/21/09 Tr. at 69:12-71:12 (Millstein). Indeed, the CCI Noteholders are slated to receive distributions well in excess of what they are projected to recover in a chapter 7 liquidation. *See* 8/17/09 Tr. at 51:1-17, 52:17-53-9 (Doody) (remarking on the $66+ million increase to the CCI Noteholders' Plan recoveries). They are as well situated as they can possibly be—they should not be able to derail confirmation or credibly assert that they were harmed because they were not included in the prepetition negotiations. Notably, the CCI Noteholders' argument that they have substantial leverage because withdrawal of CCI from Holdco could have the same negative effect as withdrawal of CII from Holdco is misplaced because (1) CCI has duties to the rest of the enterprise as manager to the LLC and (2) the CCI Noteholders, as creditors, do not actually have the legal ability to

---

31 (incorporating the Management Agreement by reference); Charter Communications, Inc., SEC Form 10-Q, dated as of August 5, 2003, CX 354.

withdraw from Holdco.  *See* 8/17/09 Tr. at 39:14-40:4, 177:6-25, 179:8-22, 270:3-271:10 (Doody) ("CCI is the manager of each of the LLCs that are depicted in that demonstrative that you showed me.  Yes.  So they're the manager and owe duties to each of the LLCs in the chain.").

Furthermore, contrary to the CCI Noteholders' assertions, the Debtors have spent an inordinate amount of time on the CCI Noteholders' issues since their chapter 11 filing and met and conferred with them on several occasions.  Ultimately, the Debtors increased the CCI Noteholders' recoveries by $66 million, or approximately 14%, which amount provides an ample cushion and shows that the CCI Noteholders are recovering well in excess of what they would recover under a hypothetical chapter 7 liquidation.  *See* 8/17/09 Tr. at 50:18-52:12, 53:2-9 (Doody).

Case law suggests that, while arms' length bargaining with all parties at the table may be an indicator of entire fairness,[46] failure to include a party that is obviously out of the money does not indicate otherwise.[47]  The evidence shows that the CII Settlement was negotiated at arms' length and is fair.[48]

---

[46] *See NL Indus., Inc. v. MAXXAM, Inc. (In re MAXXAM, Inc.)*, 659 A.2d 760, 775-76 (Del. Ch. 1995) (finding that settlement where controlled entity did not look for alternatives to settlement, did not bargain for a lower price with controlling shareholder, and where all parties affected by settlement were not at the bargaining table was not entirely fair).

[47] *See* 7/21/09 Tr. at 69:9-70:5, 174:15-175:11 (Millstein); 7/21/09 Tr. at 93:12-20 (Smit).  *See also Zenith*, 241 B.R. at 109 (finding that just because minority shareholders were not at the bargaining table did not render plan of reorganization unfair under the entire fairness standard because there was no equity in the company which rendered asking minority shareholders for input on the restructuring futile).

[48] In addition, the CCI Noteholders' contention that they are the only constituency that was not part of the negotiations and that was not paid in full is not correct.  The Holders of CCH Notes were not involved in the negotiations and are only recovering 0.4% of their claims.  Notably, they too voted to reject the Plan, excluding Insiders.  *See* FBG Voting Certification, Ex. A; Plan, Art. IV.E.4.

K&E 15588356.

### iv. The Directors Were Informed and Involved and All Appropriate Disclosures Were Made.

The Charter Board was heavily involved and engaged in the settlement process. Mr. Millstein testified that, based on his experience representing companies as a lawyer and a banker, the Charter Board was "a very actively engaged board" and "was practically a model of corporate governance." 7/21/09 Tr. 66:12-13 (Millstein). Moreover, the process used by the independent directors to evaluate the settlement was sound. As Mr. Johri described in his colloquy with the Court, the independent directors met separately and frequently to discuss what the Company could get from Mr. Allen, the consequences of not reaching a settlement, and the fairness of the CII Settlement. 8/31/09 Tr. at 224:5-19 (Johri).

In addition, the directors were informed as to what Mr. Allen would be giving up and what he would be getting in return in connection with the CII Settlement.[49] Here, all information necessary to make an informed decision with respect to the CII Settlement was disclosed to the directors, and in particular, the independent directors, of the Company.[50] To the extent the CCI Noteholders argue that the CII Settlement was not entirely fair because Mr. Allen did not make a full disclosure regarding his tax position, this argument is misplaced. Although entire fairness generally requires a controlling shareholder to "disclose fully all material facts and

---

[49] *See* 8/31/09 Tr. at 218:11-16, 224:5-19, 224:24-225:7, 225:8-12 (Johri) (noting Mr. Allen had assets that could legitimately demand compensation and that the independent directors had no doubt that the CII Settlement was reasonable).

[50] *See* 7/22/09 Tr. at 171:19-172:4, 266:6-16 (Merritt) (all of the independent directors were fully informed about the CII Settlement due to its importance); 8/31/09 Tr. at 191:6-8, 218:11-16, 224:5-19, 224:24-225:7, 225:8-12 (Johri) (discussing importance and various pieces of consideration in the CII Settlement).

K&E 15588356.

circumstances surrounding the transaction,"[51] even in an entire fairness analysis, "the normal standards of arms' length bargaining do not mandate a disclosure of weakness."[52] And, in any event, as Mr. Conn testified, other strategies were available to Mr. Allen, except perhaps under hypothetical situations that were next to impossible. 9/2/09 Tr. at 34:8-22, 88:20-90:12 (Conn).

<blockquote>
v.  **The CII Settlement Was Approved Unanimously by the Independent Directors, the Unofficial Cross-over Committee, and the Creditors' Committee.**
</blockquote>

The unanimous approval of the CII Settlement by the Company's independent directors and its future shareholders, i.e., the Unofficial Cross-over Committee, also supports the entire fairness of the CII Settlement and would shift the burden to the CCI Noteholders and other objecting parties to prove that it is unfair. Indeed, as a general matter, the evidence shows that the process for evaluating and approving the CII Settlement was conducted in a fair and equitable manner. After the creation of the Strawman, the Company led the Plan and the CII Settlement negotiations and its directors and officers were heavily involved in the process at all times.[53] As noted above, the majority of the CCI Board was comprised of independent directors and these independent directors conferred separately in executive sessions at and outside of CCI board meetings.[54] Notably, the Board determined not to appoint an official independent

---

[51] *Kahn v. Tremont Corp.*, 694 A.2d 422, 431 (Del. 1997) (citations omitted).

[52] *Id.* at 432 (finding that controlling shareholder had no duty to disclose weakness known to controlling shareholder but unknown to independent committee of directors regarding an illiquidity discount).

[53] *See* 7/21/09 Tr. at 49:12-14, 65:19, 66:11-12 (Millstein) (management was kept up to date and involved on a daily basis and noting that the Board was very engaged and was "practically a model of corporate governance"); 7/22/09 Tr. at 100:17-23 (Smit) (management checked in frequently on the status of negotiations); 8/31/09 Tr. at 157:15-24 (Johri) (the Board was focused on enhancing the value of the Company).

[54] The minutes of the Board meetings reflect the independent directors' efforts to meet separately. *See, e.g.,* LDX 91 at 8; LDX 114 at 4; LDX 142 at 2; CX 254 at 3; *see also* 7/21/09 Tr. at 65:10-18,

(Continued…)

K&E 15588356.

committee because they deemed the CII Settlement and restructuring process sufficiently important to include all independent directors rather than delegating the matter to a subcommittee.  *See* 7/22/09 Tr. at 169:20-171:12, 264:12-22 (Merritt).  In fact, the five independent directors acted as a *de facto* committee.  *Id.* at 169:16-171:12 ("[G]iven that all five independents were very actively part of this, talking and meeting and evaluating, I don't believe that a special committee of some smaller number of people would have added to it.  It only could have shrunk the group dealing with these issues.  The five acted, in effect, as a committee…").  Indeed, this determination weighs in favor of—not against—a finding that the CII Settlement is entirely fair.

The fact that Mr. Allen and certain of his affiliates were directors of CCI does not suggest otherwise.  As noted above, the majority of directors were independent.  And, as a general matter, Mr. Allen recused himself from CCI board votes where appropriate.  *See* 7/22/09 Tr. at 208:25-209:2 (Merritt) (the Vulcan directors recused themselves during discussions regarding the CII Settlement).  Even though Mr. Allen did vote on the Board's decision to commence the chapter 11 cases and seek approval of the Plan and CII Settlement, the independent directors voted unanimously in favor as well.  *See* 7/21/09 Tr. at 233:14-17 (Smit).  The evidence shows that Mr. Allen did not exercise control over Charter's negotiations or the Plan approval process.

Notably, the involvement of the Unofficial Cross-over Committee, who had no incentive to allow old equity to retain control of the process or to recover on account of its equity, as a

---

158:16-159:2 (Millstein); 7/22/09 Tr. at 165:15-168:23 (Merritt) (independent Board members met after and in between Board meetings); 8/31/09 Tr. at 185:17-24, 189:5-190:1, 193:8-15, 216:21-217:11, 221:17-224:4 (Johri) (same); 9/2/09 Tr. at 133:20-134:6, 134:19-135:5 (Conn) (noting that the independent Board has functioned over a course of years); Goldstein Affidavit ¶ 12.

party to the CII Settlement and in the arms' length, good faith negotiation and formulation of the CII Settlement and the Plan further reflects the fairness of the CII Settlement.[55]  In addition, the Creditors' Committee, who owes duties to all creditors, fully supports the Plan.  7/20/09 Tr. at 88:16-89:5 (Elkind).   Both the participation of the Unofficial Cross-Over Committee and ratification by the Creditors' Committee further counter any argument that the CII Settlement is anything other than entirely fair because of Mr. Allen's status as a controlling shareholder.[56]

b.   **Fair Price**

Not only was the CII Settlement a product of fair dealing, it also yielded a fair price. Courts have noted that "in a non-fraudulent transaction . . . price may be the preponderant consideration outweighing other features of the merger."   *Weinberger*, 457 A.2d at 711. Notably, no party adverse to the Debtors has argued that the CII Settlement was fraudulent in any way and no evidence would support such an argument.  In fact, the CII Settlement and the Plan are intended to and do maximize the value of the enterprise.  *See* 7/21/09 Tr. at 46:24-47:23 (Millstein); 7/22/09 Tr. at 83:25-84:10 (Smit); 8/17/09 Tr. at 28:7-11, 31:6-25, 41:19-24 (Doody); 8/24/09 Tr. at 155:15-23 (Goldstein); 8/31/09 Tr. at 157:15-17 (Johri).  As discussed in detail in section I.B.1(a) above, the value of consideration received from Mr. Allen far exceeds the cost of the CII Settlement.  And, as Mr. Conn testified, the value of consideration Mr. Allen is receiving is far less than he has received in similar transactions.  9/2/09 Tr. 175:25-176:23

---

[55]   *See* 7/21/09 Tr. at 226:17-227:2 (Smit) (the Unofficial Cross-over Committee members were also heavily involved in the Plan negotiations); 7/22/09 Tr. at 208:5-17 (Merritt) (same); 8/17/09 Tr. at 26:12-27:8 (Doody) (same); 7/28/09 Tr. at 131:25-132:9 (Zinterhofer) (same); 7/29/09 Tr. at 112:8-18 (Marcus) (same); 7/29/09 Tr. at 208:10-209:8 (Liang) (same).

[56]   *See Zenith*, 241 B.R. at 109 (finding that any undue influence which the controlling shareholder may have had over the debtor was countered by the bondholders' participation in negotiating the plan).

K&E 15588356.

(Conn) (This exchange is at the low end of fair for Mr. Allen based on other agreements Mr. Conn has negotiated for Mr. Allen, including his arrangement with DreamWorks in which he received 85% of the benefit of the step-up in tax basis that he provided them as part of their IPO.); *id.* at 176:24-177:6 (with respect to the reinstatement value and the NOL preservation that Mr. Allen is providing, "$180 million is fair compensation for the step-up that Mr. Allen intends to provide the company post-restructuring because it's NPV'd at about 500 million dollars, which means [Mr. Allen's] getting way less than fifty percent." There are precedent transactions that provide 70% and Mr. Allen had one with DreamWorks that was 85%.).

Moreover, it is uncontroverted that the CII Settlement and the Plan represent the best deal available for the Company, not just because of the substantial consideration received in connection with the CII Settlement, but also in light of the fact that no other deal or alternative has emerged since the Company began to examine delevering/restructuring alternatives in 2007.[57]  Indeed, the Debtors and their advisors testified credibly that they did not receive expressions of interest in alternative transactions either before or after the Petition Date, notwithstanding the indisputably public nature of these cases.[58]

Notwithstanding the substantial evidence supporting the fair dealing and fair price associated with the CII Settlement, the CCI Noteholders call into question the fact that the Company did not obtain a formal fairness opinion before the CII Settlement was approved.  But this does not detract from the fairness—or even entire fairness—of the CII Settlement.  A

---

[57]  *See* 7/22/09 Tr. at 267:17-25 (Merritt); 8/17/09 Tr. at 79:25-80:15 (Doody); Goldstein Affidavit ¶ 20.

[58]  *See* 7/21/09 Tr. at 138:9-142:10 (Millstein); 8/17/09 Tr. at 25:3-9; 79:25-80:5, 283:2-7 (Doody) (noting that the Company's bankruptcy is widely known and the issuance of press releases in December 2008 and February 2009 announcing commencement and status of restructuring efforts).

K&E 15588356.

fairness opinion would not have been feasible, because, among other things, the Company's financial advisors were negotiating and briefing the Company regarding the CII Settlement on a real time basis. 8/24/09 Tr. at 177:18-24 (Goldstein); *see also* 7/21/09 Tr. at 60:22-67:10, 178:15-21, 232:4-18 (Millstein) (although no formal fairness opinion was given, Lazard determined the CII Settlement to be fair and presented their recommendation to the Company's board, which considered the settlement's fairness). Moreover, while they did not issue a formal fairness opinion, the Company's advisors ultimately recommended that the Board approve the CII Settlement because they believed the CII Settlement was fair on its face. *See, e.g.,* Goldstein Affidavit ¶ 23; *see also* 7/21/09 Tr. at 72:9-74:7 (Millstein) (noting that he recommended the settlement to the board because it accomplished all the Company's goals); *cf.* 8/31/09 Tr. at 202:6-203:5 (Johri) (noting that a fairness opinion was not requested, but the settlement was the best achievable deal for the Company). In any event, courts have held that the lack of a formal fairness opinion does not mandate a finding of unfairness with respect to transactions like the CII Settlement that are subject to Court approval because "[t]he Court is the ultimate arbiter of the fairness of a transaction."[59]

## II. The Evidence Shows that the Plan Is in the Best Interests of Creditors and Interest Holders (Section 1129(a)(7)).

The Plan satisfies the "best interests" test under section 1129(a)(7) of the Bankruptcy Code with respect to all Classes of Claims and Interests.[60] The Plan provides the CCI Noteholders more than what they would receive in a chapter 7 liquidation.

---

[59] *See, e.g., Zenith*, 241 B.R. at 109 (plan objector's argument that plan was not fair because the independent committee of directors did not obtain a formal fairness opinion was not dispositive).

[60] 11 U.S.C. § 1129(a)(7)(A) provides that best interests test is satisfied for a class if each holder of a claim or interest of such class:

(Continued…)

The following chart, from the Confirmation Brief, sets forth the key points of the Debtors' Liquidation Analysis.

| Value to CCI Noteholders Under Plan | Value to CCI Noteholders in a Liquidation |
|---|---|
| • $138 million in New Preferred Stock;<br><br>• Approximately $24.5 million in Cash; and<br><br>• Litigation Settlement Fund Proceeds owned by CCI or Holdco. | • $83 million as set forth in the Liquidation Analysis;<br><br>• $9 million of Other Holdco Assets; and<br><br>• Litigation Settlement Fund Proceeds owned by CCI or Holdco. |
| **Total**: $162.5 million in value plus any Litigation Settlement Fund Proceeds<br><br>**Recovery Percentage (excluding Litigation Settlement Fund Proceeds): 32.7%** | **Total:** $92 million plus any Litigation Settlement Fund Proceeds<br><br>**Recovery Percentage (excluding Litigation Settlement Fund Proceeds): 18.4%** |

## A. The Liquidation Analysis Assumptions Are Reasonable.

The Liquidation Analysis assumes a distressed going concern sale (a "Distressed Sale") rather than a piecemeal liquidation of assets on a fairly compressed timeline after a debtor has ceased operating. *See* CX Declaration 6 at ¶ 34 (Goldstein). As Mr. Goldstein testified, the Distressed Sale assumption, which values the enterprise at a discount of 10-20% of the midpoint of the Plan value, is a conservative assumption expected to result in a *higher* liquidation value than a typical hypothetical chapter 7 liquidation where assets are sold piecemeal and otherwise not as a going concern enterprise. 8/24/09 Tr. at 18:4-19:13 (Goldstein); *see also* 8/17/09 Tr. at 64:15-65:4 (Doody) "([W]e assumed it would be a distress sale as a going concern, so we took

_____

      (i)      has accepted the plan; or

      (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

K&E 15588356.

the conservative approach that would be most beneficial to creditors rather than the normal disaster scenario.").  Notably, such piecemeal asset sales typically yield a small fraction of going concern value,[61] and are less favorable to creditors.  *See* 8/24/09 Tr. at 18:4-19:13, 128:11-14 (Goldstein) (piecemeal asset sale would have yielded much less value to creditors than distressed sale).

Moreover, the Distressed Sale assumption is particularly reasonable with respect to CCI. CCI is a holding company with no significant assets other than equity in an insolvent subsidiary and intercompany claims against Holdco pursuant to the Mirror Note and no real value separate from the ongoing business operations (i.e., what good is a contract without subscribers?).  *See* 7/31/09 Tr. at 134:11-15, 132:7-133:14 (Schmitz) (CCI has no cable, telephone, or internet customers; CCI's programming contracts have no value apart from CCO's cable systems and customers).  Thus, given CCI's bleak financial condition, it is nearly impossible to conceive that a chapter 7 trustee would decline an offer to purchase the Charter enterprise as a going concern in favor of liquidating CCI's assets separately.  Accordingly, for all of these reasons, the Distressed Sale assumption is reasonable and credible.

---

[61] *See, e.g.*, *In re Lason, Inc.*, 300 B.R. 227, 233 (Bankr. D. Del. 2003) ("A liquidation 'contemplates valuation according to the depressed prices that one typically receives in distress sales.'") (citing *In re Sierra-Cal*, 210 B.R. 168, 171-172 (Bankr. E.D. Cal. 1997)); *Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 328 B.R. 471, 477 (E.D. Va. 2005) ("[T]he assumption being that a going concern could wait for a better offer and presumably a higher price. As such, there is value to being a going concern.").

K&E 15588356.

### B. The CCI Noteholders' Objections Are Unfounded.

#### 1. The CCI Noteholders' Assumptions and Methodology Are Flawed.

The CCI Noteholders' objections to the Debtors' Liquidation Analysis and Valuation Analysis are based in large part on a report by Edward McDonough (the "A&M Report")[62] that contains no independent analysis.[63] The A&M Report simply—and inappropriately—adds to the Debtors' Liquidation Analysis without performing any ground-up analysis of liquidation value or analyzing whether the Debtors' assumption of a Distressed Sale would lead to a greater recovery in liquidation than a sale of the Debtors' individual assets. *See* 9/1/09 Tr. at 152:21-155:5, 180:12-16 (McDonough) (admitting that he did not perform independent analysis and did not analyze whether Charter would have greater value in going concern sale versus piecemeal sale). What is more, the A&M Report includes no analysis regarding the add-ons it proposes—it is essentially a recitation of the Debtors' schedules without any regard to whether any particular add-on would be applicable in a Distressed Sale scenario; was already incorporated into the Distressed Sale assumption (e.g., programming contracts); or overlapped with other proposed add-ons (e.g., worthless stock options and the intercompany balance). Simply put, the A&M Report offers no independent analysis, let alone any analysis, on liquidation value, fraudulent conveyances, preferences, programming contracts, intellectual property, costs incurred in a liquidation or otherwise. *See* 9/1/09 Tr. at 153:18-154:12, 180:17-21, 190:23-25 (McDonough) (admitting he performed no independent analysis on liquidation value, fraudulent conveyances,

---

[62] *See* CX 282; CX 294.

[63] *See* 9/1/09 Tr. at 150:22-152:16 (McDonough); *see also* 9/1/09 70:14-17 (McDonough):

       ("Q. Now, did you prepare your own independent valuation?

       A. No, I did not.").

preferences, programming contracts, intellectual property , costs incurred in a liquidation or otherwise). Mr. McDonough's "it doesn't smell right" methodology[64] is not credible and does not discredit the Debtors' analysis.

Moreover, to underscore his lack of analysis, Mr. McDonough concedes that the CCI Noteholders' potential recovery from the additional sources he identified could be lower than the A&M Report indicates.[65] In fact, he repeatedly acknowledged it is just as likely to be zero.[66] Notably, Mr. McDonough's "bunt single" theory[67] that he only needed to identify a few flaws with the Debtors' Liquidation Analysis to illustrate that the Plan does not satisfy the best interests test reflects the weakness of his own analysis. Although the "bunt single" approach was

---

[64] *See* 9/1/09 Tr. at 189:19-22 (McDonough) ("The rest of them they kind of smell like they're probably there. Now, have I adjusted this to be a seventy percent or fifty percent recovery, no. My point is a simple one, you don't need a whole lot [to] get over the hurdle.").

[65] *See* 9/1/09 Tr. at 181:5-8 (McDonough)

("Q. Okay. And by potential recovery it means that the recovery could be the numbers represented on this chart, or it could be a number less than those numbers, correct?

A. Could be ten percent, twenty percent, correct.")

[66] *See* 9/1/09 Tr. at 186:22-24, 190:9-16 (McDonough)

(Concerning potential recovery for insider payments:

"Q. You agree that that 22.4 recovery -- potential recovery could be between a range of zero to 22.4 million, correct?

A. It could be between zero and 22.4, that's correct."

Concerning potential recovery for November 2008 and January 2009 interest payments:

Q. So then those numbers; the ninety-nine million and the thirty-five million, those could be as high as ninety-nine million and thirty-five million and as low as zero, correct?

A. In any analysis or in any preference or litigation you've got a range.

Q. And that range in this case is from zero to 135 -- or ninety-million and thirty-five million, correct?

A. For those two, yes.").

[67] *See* 9/1/09 Tr. at 146:16-147:8 (McDonough).

---

questionable in connection with the original version of the Plan, it falls completely flat under the Plan as modified, which provides for a much larger margin between Liquidation Analysis and Plan recoveries.[68]  Indeed, to discredit the Plan the Debtors actually seek to confirm, Mr. McDonough would need a bunt inside the park home run.

Mr. McDonough's methodology with respect to the New Preferred Stock to be distributed to the CCI Noteholders under the Plan was similarly lacking.  As with the rest of his opinion, Mr. McDonough performed no independent analysis but took what appear to be a series of result-oriented discounts off of Lazard's valuation of the New Preferred Stock.  As Mr. McDonough testified, in his first report, he discounted Lazard's valuation by 20% to account for lack of marketability because the stock was not publicly listed.  *See* 9/1/09 Tr. at 200:21-202:21 (McDonough).  At that time, he noted that the holders of the New Preferred Stock always would be in the minority but did not discount the value on that basis.  In a subsequent report, Mr. McDonough increased the marketability discount to 40%.  *Id.*  Although he did not apply a minority interest discount, he noted in a footnote that a minority interest discount could be in the 25-30% range.  *Id.*  After the Debtors improved the terms of the New Preferred Stock in response to the CCI Noteholders' concerns by, among other things, shortening the term and increasing marketability by agreeing to use reasonable efforts to list the New Preferred Stock publicly, Mr. McDonough returned to a 20% discount, this time exclusively for minority interest.  *Id.*  The flaws of this approach speak for themselves and Mr. McDonough did not defend it effectively at

---

[68]  The CCI Noteholders' projected percentage recovery under the current Plan is 32.7% and under the updated Liquidation Analysis (reflecting the Other Holdco Assets) is 18.4%.  The CCI Noteholders' projected percentage recovery under the initial Plan was 19.4% and under the initial Liquidation Analysis was 16%-17%.  *See* CX 706, Art IV.A.4; CX 720, Ex. E at 6; CX 407, Ex. A, Art. IV.A.4; Confirmation Brief at 44.

trial. Simply put, Mr. McDonough's analysis does nothing to call into question Lazard's valuation of the New Preferred Stock.

## 2. There Is No Basis for the CCI Noteholders' Proposed Add-ons.

As summarized in the following chart, which was presented during Mr. McDonough's testimony, Mr. McDonough suggests the following items as add-ons to the Debtors' Liquidation Analysis. *See* LDT Demo 024.



### Sources of Recovery for CCI Noteholders

| Description of Recovery | Amount | Potential Recovery in Chapter 7 Liquidation |
|---|---|---|
| Mirror Note Recovery of Charter Holdco Unsecured Claims (1) | $ 82,000,000 | $ 82,000,000 |
| Mirror Note Recovery of Charter Holdco Other Assets (2) | $ 9,000,000 | $ 91,000,000 |
| February Interest Payment | $ 27,000,000 | $ 118,000,000 |
| November CCH Interest Payment | $ 8,400,000 | $ 126,400,000 |
| October Tender Offer | $ 99,000,000 | $ 225,400,000 |
| Q2 Repurchase of CCH Notes | $ 35,000,000 | $ 260,400,000 |
| Preference Payments – CCI and Charter Holdco (3) | $ 3,400,000 | $ 263,800,000 |
| Insider Payments (4) | $ 22,400,000 | $ 286,200,000 |
| CCVIII Settlement | $ 28,000,000 | $ 314,200,000 |
| Intercompany Receivable From CCO | $ 119,000,000 | $ 433,200,000 |
| Management Services Agreement Receivable | $ 37,000,000 | $ 470,200,000 |
| Other Assets (Programming Contracts, Intellectual Property) | TBD | TBD |
| | | |
| Potential Additional Recoveries | | $ 470,200,000 |
| Fair Market Value of Recoveries Under the Plan as Modified | | $ 134,900,000 |
| **Difference/Shortfall** | | **$ 335,300,000** |

(1) As noted in the Debtors' Liquidation Analysis; (2) Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto, at 42; (3) AlixPartners' Preference Analysis dated June 8, 2009 projects a net recovery of preference payments between $3,400,000 and $18,900,000; payments to creditors in the 90 days prior to filing for CCI and Holdco totaled $200.3 million; (4) Mr. Folse's Declaration projects potential recoveries relating to insider transactions not to exceed $9,000,000; Folse Decl., at Para. 24 (LDTX 474)

LDT Demonstrative 24

The Court should attribute no weight to these items because Mr. McDonough did not testify that any of them are achievable. Nevertheless, as set forth below, the Debtors have ample reason to exclude these items from the liquidation recoveries.

The Debtors did not attribute any value to preference recoveries in the Liquidation

Analysis for a number of reasons.

- First, the Debtors assume, based upon the advice and experience of their advisors that, in a Distressed Sale, the purchaser would (a) assume all contracts such that trade claims would be paid and/or (b) waive preference claims to preserve the going concern value of the business. *See* 8/17/09 Tr. at 76:19-77:5 (Doody). Therefore, preference recoveries would be nonexistent or minimal. In a Distressed Sale scenario, a purchaser would likely insist on a waiver of preference actions against any trade vendors or employees, including insiders, in order to protect the ongoing value of the business as those relationships would be critical going forward. *See* 8/17/09 Tr. at 76:19-77:5 (Doody); 8/18/09 Tr. at 35:7-36:2 (Folse). Notably, contrary to the CCI Noteholders' assertions, the identity of the purchaser, i.e., strategic buyer or financial purchaser, does not change this assumption because a strategic buyer would want a waiver to maintain relationship with existing vendors and a financial purchaser would need to assume contracts to hit the ground running. *See* 8/18/09 Tr. at 66:14-67:25 (Folse).

- The Debtors also recognized that even if certain transfers might be recoverable, they would not inure to the benefit of CCI or Holdco's creditors. Specifically, to the extent that CCI or Holdco successfully prosecuted avoidance actions against the interests of CCO's sale, which amounts CCO had previously paid to CCI or Holdco under the Management Agreement, CCO would recoup such preference amounts from any amounts due to CCI or Holdco due under the Management Agreement. *See* 8/17/09 Tr. at 78:7-12, 79:9-12 (Doody).

Mr. Folse testified that he believed these assumptions were reasonable.[70]

Mr. McDonough did not address them at all.[71]     Accordingly, these assumptions are

---

[69] The dollar amounts listed in these sections represent Mr. McDonough's suggested add-ons.

[70] *See* CX Declaration 5 at ¶ 18 (Folse) (assumption of all executory contracts more likely in a Distressed Sale than in a piecemeal liquidation); 8/18/09 Tr. at 35:7-36:2, 66:14-67:25 (Folse).

[71] Mr. McDonough did make an oblique reference to an assumption that in a distressed going concern sale, the chapter 7 trustee would sell only CCO and its subsidiaries, but not CCI or Holdco. *See* 9/1/09 Tr. at 187:9-17 (McDonough). Apparently, Mr. McDonough assumes that there would be a separate chapter 7 trustee for CCI and Holdco who would be free to pursue avoidance actions without regard to the impact it would have on the sale price for CCO and its subsidiaries. This assumption goes beyond the hypothetical and oversimplifies the relationships between the various Debtors. Indeed, given that Holdco relies on intercompany claims against CCO for its recoveries, it seems

(Continued…)

uncontroverted and support the Debtors' determination that it would not be appropriate to include preference recoveries in the Liquidation Analysis.

In any event, out of an abundance of caution and to demonstrate that their preference assumptions do not obscure a substantial potential preference recovery, the Debtors asked their restructuring advisor, AlixPartners LLC, to perform a preference recovery analysis (the "AlixPartners Analysis"). *See* CX 303. As Barry Folse, a Managing Director with AlixPartners testified, the AlixPartners Analysis was conducted in accordance with AlixPartners' generally accepted preference analysis methodology and with the benefit of years of data compiled by AlixPartners in connection with actual preference recovery efforts. *See* 8/18/09 Tr. at 54:13-24, 58:19-59:1, 60:13-19 (Folse) (the methodologies used in the present analysis are the same as AlixPartners uses in all its preference analyses, including those done for White & Case in previous bankruptcy cases).

The AlixPartners Analysis indicates that, in the unlikely event that no executory contracts are assumed in connection with the Distressed Sale, potential recoveries on account of preferences to non-insiders would range from approximately $9.6 million to $18.9 million, before recovery costs. *See* 8/18/09 Tr. at 68:1-10 (Folse); CX Declaration 5 at ¶ 17 (Folse). In a going concern scenario such as the Distressed Sale, however, executory contracts likely would be assumed. In such event, the projected range would decline to $3.4 million to $6.6 million, before recovery costs. *See* 8/18/09 Tr. at 68:11-18 (Folse); CX Declaration 5 at ¶ 18 (Folse). But this gross $3.4 million to $6.6 million range assumes the unlikely scenario that a Distressed

---

doubtful that separate chapter 7 trustees would be appointed or that, even if they were, Holdco's chapter 7 trustee would pursue a strategy intended to reduce the source of its potential recovery in order to pursue avoidance actions that, if successful, would benefit CCO through recoupment.

K&E 15588356.

Sale purchaser would fail to insist on a waiver of preference actions against vital trade partners who do not have contracts but would be just as unhappy to be sued for a preference.[72] Moreover, as Mr. Folse testified, recovery costs for preference actions can range from 25% to 45% depending on the firm retained. *See* CX Declaration 5 at ¶ 19 (Folse); 8/18/09 Tr. at 63:18-20 (Folse). Any such recoveries would be subject to recoupment as discussed above and, as with all preferences, any recoveries obtained would increase the claims against CCI and Holdco accordingly. Accordingly, the AlixPartners Analysis confirms that non-insider preference recoveries, if any, would be *de minimis*.

AlixPartners also reviewed insider transfers in the one-year period prior to the Petition Date and determined that, of the approximately $22 million of transfers, approximately $11 million would be subject to an ordinary course defense. 8/18/09 Tr. at 47:16-48:9 (Folse) (of the $22 million of potential preference payments to insiders, approximately $11.7 million dollars was outside the ordinary course). Regarding the remainder, AlixPartners included $9 million as the highest possible recovery, before costs. Notably, as Mr. Folse testified, this represents approximately 80% of the $11 million and was intended as a conservative assumption most favorable to creditors. Mr. Folse testified that the 80% was the highest amount that could be recovered, before recovery costs.[73] As with the non-insider preference analysis, however, a

---

[72] As described above, contrary to the CCI Noteholders' assertions, the identity of the purchaser, i.e., strategic buyer or financial purchaser, does not change this assumption.

[73] *See* 8/18/09 Tr. at 65:3-10 (Folse)

("Q. Once and for all, sir, can you just explain to the Court how you determined that the potential recovery for insider payments would be no greater than nine million dollars?

A. I had a conversation with counsel and they posed the question to me that based on what I had -- what my experience had been in other cases, and based on my

(Continued…)

K&E 15588356.

Distressed Sale purchaser would be unlikely to pursue preference actions against employees. Moreover, any insider preference recoveries would be (i) subject to recovery costs ranging from 25% to 45%, (ii) subject to recoupment by CCO under the Management Agreement, and (iii) would increase the claims pool against CCI and Holdco accordingly. *See* 8/17/09 Tr. at 79:9-12; CX Declaration 5 at ¶ 19 (Folse) ("Based on my experience, any preference recoveries would need to be reduced approximately 25% to 45% to account for recovery costs"). Thus, insider preference recoveries, if any, also would be *de minimis*.

b.   **Fraudulent Transfers ($169.4 Million)**

i.   **The Holdco Debt Repurchases Are Not Avoidable Transfers. ($134 Million)**

The evidence also confirms that Holdco's repurchases of notes issued by certain affiliates for an aggregate amount of $176 million during 2008 (collectively, the "Debt Repurchases") were not avoidable transfers and should not be included in the Liquidation Analysis. It is uncontroverted that Holdco used (a) cash on hand and (b) repayments from CCO on intercompany obligations to purchase certain enterprise debt (specifically, CCH Notes) as part of a longstanding strategy to extend maturities and delever the Company. *See* 7/31/09 Tr. at 129:23-130:2, 132:1-3 (Schmitz). It is also uncontroverted that Holdco paid a slight premium to market (the "Slight Premium") and received the CCH Notes in return[74] and that the Debt Repurchases were effectuated through financial institutions or broker dealers. *See* 7/31/09 Tr. at 129:6-10, 130:9-14, 131:19-21 (Schmitz). As Ms. Schmitz explained, the Slight Premium was

_____

understanding of what these payments were related to, would I ever conceive that the recovery would exceed eighty percent, and I responded no.").

[74]   8/17/09 Tr. at 76:2-7 (Doody); 7/31/09 Tr. at 128:18-20 (Schmitz); 8/3/09 at 45:25-46:11 (Schmitz).

necessary to induce holders to participate in the exchange offer. 7/31/09 Tr. at 114:6-9

(Schmitz) ("[I]f they're offered a premium to where the debt is trading, those types of things

were typically -- are typically what would induce a holder to exchange their paper.").

Notably, the Debt Repurchases cannot be avoided as preferences as a matter of law

because they were not transfers on account of Holdco's debt.[75] Moreover, the Debt Repurchases

were not constructively fraudulent transfers because, at the time of the transfers, Holdco received

reasonably equivalent value in return.[76] And in any event, given Mr. McDonough's testimony as

to valuation, he could not possibly come to the conclusion that the Debt Repurchases are

fraudulent transfers because he believed the transferors to have been solvent. *See* 9/1/09 Tr. at

67:19-68:1, 97:1-13 (McDonough) (claiming that Lazard substantially undervalued Charter and

implying that Holdco and CCI are "in the money").

Determination of whether value is reasonably equivalent is largely factual and "depends

on all the circumstances surrounding the transaction." *Jackson v. Mishkin (In re Adler, Coleman*

*Clearing Corp.)*, 263 B.R. 406, 466 (S.D.N.Y. 2001). Reasonably equivalent value does not

require a dollar-for-dollar exchange.[77] In determining reasonably equivalent value, "courts will

---

[75] Section 547(b)(2) of the Bankruptcy Code provides that:

> (b) "Except as provided in subsections (c) and (i) of this section, the trustee may avoid
> any transfer of an interest of the debtor in property- . . .
>
> > (2) for or on account of an antecedent debt owed by the debtor before such
> > transfer was made;"

[76] There is no allegation of actual fraud with respect to the Debt Repurchases.

[77] *See In re Advanced Telecommunication Network, Inc.*, 490 F.3d 1325, 1336-37 (11th Cir. 2007) ("By
its terms and application, the concept of 'reasonably equivalent value' does not demand a precise
dollar-for-dollar exchange."). Notably, transactions that benefit a debtor indirectly, including
"transfers to third parties, particularly affiliates," may be supported by fair consideration. *In re M.*
*Fabrikant & Sons, Inc.*, 394 B.R. 721, 738 (Bankr. S.D.N.Y. 2008). Specifically, [i]ndirect benefits
(Continued…)

focus on whether the debtor received an 'economic benefit,' either directly or indirectly."[78]  Case law is clear that the reasonably equivalent value analysis is to be conducted *at the time of the transaction without the benefit of hindsight*.[79]

Here, the fact that Holdco paid only a Slight Premium to the market price at the time of the transfers on its own indicates that Holdco received reasonably equivalent value at the time of transfer.  Market prices of debt are generally considered sound reflectors of contemporaneous

---

may include synergy, increased access to capital, safeguarding a source of supply and protecting customer relationships."  *Id.*  Courts also have found indirect benefits from "a debtor corporation's guarantee of an affiliate's debt when the loan strengthened the corporate group as a whole," goodwill, or simply the "general relationship" between affiliates.  *See In re Image Worldwide, Ltd.*, 139 F.3d 574, 578-79 (7th Cir. 1998) (collecting cases).  In addition, forbearance, extensions of debt maturity, and even, in limited circumstances, the ability to avoid or postpone bankruptcy may constitute reasonably equivalent value.  *See, e.g., Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, No. 01-6209, 2002 WL 31412465, at * 6 (S.D.N.Y. Oct. 24, 2002) (finding debtor received reasonably equivalent value where "by agreeing to forbear and to extend the loans, [creditor] gave [debtor] 'breathing room' -an opportunity to avoid default, to facilitate its rehabilitation, and to avoid bankruptcy.").

[78]  *See In re 375 Park Ave. Assocs., Inc.*, 182 B.R. 690, 695-96 (Bankr. S.D.N.Y. 1995); *see also In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006) ("Thus, for purposes of § 548 and the IUTFA, 'indirect benefits' constitute 'value' and can include a wide range of intangibles such as: a corporation's goodwill or increased ability to borrow working capital; the general relationship between affiliates or "synergy" within a corporate group as a whole; and a corporation's ability to retain an important source of supply or an important customer.").

[79]  *See Nordberg v. Cont'l IL Nat'l Bank & Trust Co.of Chicago) (In re Topcor Inc.)*, No. 02-10322, 2002 WL 31688702, at *2 (5th Cir. Oct. 28, 2002) ("The determination of what constitutes a 'reasonably equivalent value' must be made as of the time of the transfer, without the benefit of hindsight as to what actually transpired after the transfer that might have affected the value."); *Jumer's Castle Lodge,* 338 B.R. at 354 ("Furthermore, whether *reasonably equivalent value* has been given is a question of fact that must be evaluated as of the date of the transaction, rather than through the 20/20 vision of hindsight."); *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ("Courts in this jurisdiction may consider postpetition events to some extent under certain circumstances, but reject the use of improper hindsight analysis in valuing a company's pre-bankruptcy assets. . . . Such value, however, must be determined as of the time of the alleged transfer and not at what [assets] turned out to be worth at some time after the bankruptcy intervened.") (internal quotations and citations omitted).

value.[80]   Moreover, as noted above, reasonably equivalent value does not require exact equivalence.  In any event, the evidence confirms that Holdco received reasonably equivalent value notwithstanding the Slight Premium because the Debt Repurchases enabled Holdco to maintain the viability of the enterprise and Holdco maintained the ability to recover on repurchased CCH Notes.[81]

The CCI Noteholders argue that projected recovery of 0.4% to Holders of Class E-4 CCH Notes under the Plan (as of an anticipated Effective Date at the end of September 2009) indicates that Holdco did not receive reasonably equivalent value in exchange for the Debt Repurchases in April, May and November 2008.[82]   But the projected recoveries of CCH Notes under the Plan have no bearing on whether Holdco received reasonably equivalent value at the time of the Debt Repurchases.  The CCI Noteholders' argument ignores the market prices at the time of trading and impermissibly relies on 20/20 hindsight.   Moreover, Mr. Millstein's testimony confirms that at the time Holdco made the Debt Repurchases in the Spring and Fall of 2008, Charter did not believe it would be filing for bankruptcy.  7/21/09 Tr. at 35:11-19, 203:22-204:5 (Millstein).

---

[80]  *Id.* at 292-93 ("[V]aluation judgments can only be made utilizing the best information that is available at the time about future cash flows and business prospects."); *id.* at 293 ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation.") (citing *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624 (3d Cir. 2007)).

[81]  *See also* 8/17/09 Tr. at 75:22-76:7, 263:4-13 (Doody) (Charter management determined Holdco received reasonably equivalent value in the form of keeping the enterprise viable and preseving the ability to recover on repurchased notes); 7/31/09 Tr. at 131:2-5 (Schmitz) (noting that Holdco received reasonably equivalent value in being able to recover on repurchased notes); 8/3/09 Tr. at 74:14-17 (Schmitz) (same).

[82]  Objection of Law Debenture Trust Company of New York To the Debtors Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "CCI Noteholders Objection") at ¶ 170.

K&E 15588356.

Notably, however, the Debt Repurchases would not be recoverable as fraudulent transfers under any circumstance because they constitute securities settlement payments of the type commonly made in the securities industry and thus are subject to the safe harbor under section 546(e) of the Bankruptcy Code. Section 546(e) of the Bankruptcy Code provides an exception to certain fraudulent transfer sections of the Bankruptcy Code with respect to transfers made to settle securities transactions. 11 U.S.C. § 546(e); s*ee also Enron Corp. v. Int'l Fin. Corp. (In re Enron Corp.)*, 341 B.R. 451, 458 (Bankr. S.D.N.Y. 2006).[83] The facts of *Enron* are strikingly similar to the Holdco Debt Repurchases. Indeed, at issue in *Enron* were Enron Corp.'s repurchases—at face value plus accrued interest (i.e., substantially above market)—of notes issued by an affiliated trust, in order to protect Enron's credit rating. The court found that the transfers were not subject to avoidance because transfers of cash to complete a securities transaction are settlement payments and repurchasing notes—even at substantially above market prices—constitutes completing a securities transaction, absent indicators of actual fraud. According to the court, "a divergence in the price paid from the market value, by itself, is ordinarily not sufficient to take a particular transaction out of the realm of one normally regarded as part of the settlement process unless the disparity between the payment made for the security and the market value was large enough to be said to involve outright illegality or transparent manipulation sufficient to warrant rejection of section 546(e) protection." *Id.* at 459 (internal quotations and citations omitted).

---

[83] *See also In re QSI Holdings, Inc.*, 571 F.3d 545 (6th Cir. 2009)*; Contemporary Indus. Corp. v. Frost,* 564 F.3d 981, 986 (8th Cir. 2009) (ruling that the plain language of the statute protects settlement payments made by or to a financial institution and does not require that the financial institution obtain a beneficial interest in the funds, i.e., transactions in which financial institutions are "mere conduits" are nonetheless subject to section 546(e)).

K&E 15588356.

Significantly, like the transaction at issue in *Enron*, the Debt Repurchases involved a debtor's repurchase of an affiliate's securities absent any alleged fraud or illegality, although only for a slight premium to the market price. Accordingly, even if the Debt Repurchases otherwise might be avoidable fraudulent transfers, they would not be avoidable as a result of the section 546(e) safe harbor.[84]

> ii. **The November/January Interest Payments Also Should Not Be Included in the Liquidation Analysis.**

According to the CCI Noteholders, Holdco received "no value"[85] in exchange for capital contributions to certain subsidiaries (i) in the amount of $74 million in February 2009 to fund their January 2009 bond interest payment and (ii) in the amount of $8 million in November 2008 to fund a similar interest payment. This dramatic and conclusory assertion ignores the fact that reasonably equivalent value may include indirect benefits and the evidence the Debtors presented regarding the benefits of these transfers. As with the Debt Repurchases, Holdco received reasonably equivalent value in exchange for the transfers. *See* notes 76-80, *supra*.

> (A) **January (February) 2009 Interest Payment -- ($27 million)[86]**

The February interest payment is not an avoidable transfer. Indeed, the evidence shows that Holdco received reasonably equivalent value in return for the interest payment because

---

[84] The CCI Noteholders will argue that even if the Debt Repurchases are not subject to section 546(e), the CCI Noteholders should be able to recover on another theory, such as breach of fiduciary duty. This contorted logic is simply too much of a stretch—there is no reason to believe that a chapter 7 trustee would pursue such a claim in connection with transfers that are subject to a statutory safe harbor, particularly when the maximum possible recovery would be limited to the Slight Premium.

[85] *See* CCI Noteholders Objection at ¶¶ 165, 167 (alleging that Holdco received "no value" and "nothing of value" for the February 2009 and November 2008 interest payments).

[86] The amount used by Mr. McDonough subtracts the escrowed amount, $48 million, from the total interest payment of $74 million.

K&E 15588356.

making the payment benefited Holdco directly and indirectly by helping to preserve the Charter enterprise and providing Holdco and its affiliates with necessary time and breathing room to ensure a soft landing into chapter 11.  8/3/09 Tr. at 55:1-17 (Schmitz) (the January interest payment was critically important to Company's ability to enter a "broader reorganization" and to "maximize the value" of the Company).  *In addition, in developing the Plan, the Debtors designed it so that the CCI Noteholders would receive more than if the $74 million interest payment had not been made—the distribution in the Plan is based on the Intercompany Balances <u>before</u> making the Interest Payment, and then adds a premium.*[87]  *This critical fact is one the CCI Noteholders would ask the Court to ignore.*  Accordingly, Holdco was able to obtain a higher recovery under the Plan than it would have if it had not made the interest payment.[88]  A freefall bankruptcy that would have resulted if the interest payment had not been made would have

---

[87] As further protection, $48 million of the interest payment was escrowed by the backstop parties and that $48 million is already included in the Liquidation Analysis.  *See* 8/17/09 Tr. at 100:23-102:9 (Doody).  As to the remaining $26 million that was not placed in escrow, Holdco received reasonably equivalent value in exchange for that amount as it formed the basis for Holdco's opportunity to reorganize successfully outside of a freefall bankruptcy.  *See* 8/17/09 Tr. at 74:17-75:7, 264:19-22 (Doody).  Notably, however, even if the CCI Noteholders were to receive all $26 million in a hypothetical liquidation they would still receive more under the Plan.  *See* 8/17/09 Tr. at 264:23-265:10 (Doody).

> ("Q.  Based on the value that the CCI noteholders are currently receiving under the plan, even if Charter were to ascribe all twenty-six million dollars from the February interest payments that are not covered by the escrow account, and we ascribe that to the CCI noteholders in a liquidation, would the noteholders receive more under the plan than under the liquidation?
>
> A.  Yes, they would.").

[88] The margin between recoveries under the original Plan and a liquidation was approximately $13.5 million.  *See* CX 211 at 35 (CCI Noteholders' recovery under initial Plan is approximately $96.5 million or 19.4% of $497.5 million); Liquidation Analysis at 6 (CCI Noteholders' recovery under liquidation is approximately $83 million); 8/31/09 Tr. at 180:23-181:4 (Johri) (creditors are receiving more value on account of the interest payments because the interest payments precluded Charter from entering a freefall bankruptcy that would have been detrimental to creditors' interests).

K&E 15588356.

destroyed value to the detriment of all parties in interest, including Holdco. 8/31/09 Tr. at 180:23-181:4 (Johri) (creditors are receiving more value as a result of the interest payments because they helped Charter to avoid a freefall bankruptcy that would have been detrimental to creditors' interests).

### (B)    November 2008 Interest Payment ($8.4 Million)

The $8.4 million November interest payment also is not a fraudulent transfer for similar reasons—namely, it afforded Holdco and its affiliates the benefit of time to work toward a consensual restructuring that would maximize the value of the enterprise and avoid an unplanned chapter 11 filing. 8/17/09 Tr. at 74:17-75:7, 119:18-120:10, 262:14-263:13 (Doody).

The CCI Noteholders' argument that the November interest payment constituted an intentional diversion of funds away from their potential use to fund the CCI Notes April interest payment is unconvincing. CCI Noteholders Objection at ¶ 167. Indeed, contrary to the CCI Noteholders' assertion, the Board's acknowledgment in the November 14 Board minutes that an alternate source of funding would be required to fund the CCI Notes April interest payment does not mean that the $8.4 million was somehow earmarked for CCI, that it would not have been used to fund a different obligation if not the $8.4 million November interest payment, or that alternate funding would not have been obtained to fund the April interest payment.

### iii.    There Is No Basis to Award Partial Credit for Fraudulent Transfers.

Recognizing there is no basis for avoiding or otherwise recovering the $176 million of Debt Repurchases or November/January interest payments, the CCI Noteholders urge the court to give them partial credit, i.e., some percentage to reflect "risk-adjusted" outcomes. 8/17/09 Tr. at 136:4-22. But where, as here, there is no real basis for the recovery sources they have itemized, there is no basis or analysis supporting a bold assertion for partial credit. The CCI

Noteholders' Plan recoveries should not be increased to account for highly improbable (and, in certain circumstances, impossible) outcomes.

c.     **Programming Contracts ("TBD")**[89]

In order to have incremental value in excess of the Distressed Sale value, the programming contracts held at CCI and Holdco would have to contain below-market terms.[90] Notably, the uncontroverted testimony adduced at the Confirmation Hearing indicates that such programming contracts did not have below-market terms.[91]   In addition, the evidence demonstrates that none of the programming contracts held at CCI or Holdco have value apart from the cable systems and subscribers at CCO.   7/31/09 Tr. at 134:11-15, 132:7-133:14 (Schmitz).   Accordingly, there is no basis to attribute independent value to the programming contracts.  And, in any event, it stands to reason that CCI and Holdco would be incentivized to cooperate with the assumption of the programming contracts at no cost to their estates to allow the Distressed Sale to close and allow CCO to repay its obligations to Holdco and CCI in full.  In the process, Holdco and CCI also would avoid rejection damage claims.

---

[89]   McDonough also lumps in intellectual property.  As addressed at the hearing, the Debtors have not attributed any value to CCI's lone patent, which has been pending for approximately 10 years.  *See* 8/17/09 Tr. at 258:18-259:24 (Doody); CCHC Summary of Schedules, LDT 252.

[90]   It is hard to fathom that anyone would pay a *premium* for a contract with terms worse than those available on the open market.

[91]   7/31/09 Tr. at 134:9-11 (Schmitz) (Debtors' programming contracts generally contain market rates); 8/17/09 Tr. at 166:8-24, 169:4-22 (Doody) (Debtors' programming contracts generally contain market rates).

K&E 15588356.

d. **Worthless Stock Options ($37 Million)[92]**

The worthless stock options are stock options issued by CCI in the past few years for employee benefits for the benefit of CCO which have been forfeited in most instances and are now worthless. The CCI Noteholders argue that the Debtors failed to include repayment of an approximately $38 million intercompany receivable related to forfeited worthless stock options in the Liquidation Analysis. CCI Noteholder Objection ¶¶ 51-52. The Debtors disagree that CCI would be entitled to recover on this receivable in a chapter 7 liquidation. Given that this receivable reflects nothing more than an accounting entry for worthless and forfeited stock options, the Debtors believe that a chapter 7 trustee would be unlikely to honor in a liquidation a receivable that is based upon a contingent right to equity that has been written off and is now worthless. 8/17/09 Tr. at 74:1-16 (Doody) (Indeed, a chapter 7 "trustee would be hard-pressed to make a distribution" for a portion of an account receivable created on account of "equity that was once granted but has been forfeited."). Moreover, a claim based upon the equity of an insider is ripe for recharacterization.[93] As such, the CCI Noteholders' recovery on account of the worthless stock options becomes more tenuous.

In any event, under the plain language of section 510(b) of the Bankruptcy Code, a claim on the worthless stock options likely would be subject to subordination to the level of CCI's

[92] 8/17/09 Tr. at 74:1-16 (Doody) (The Debtors still recognize and treat the intercompany account balance as it relates to the worthless stock options. However, the Debtors assume that no distributions would be made on behalf of the worthless stock options in a chapter 7 liquidation because the equity is now worthless and has been forfeited.).

[93] *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001) ("a bankruptcy court can consider whether to recharacterize a claim of debt as equity. Bankruptcy courts that have applied a recharaterization analysis have stated that their power to do so stems from the authority vested in the bankruptcy courts to use their equitable powers to test the validity of
(Continued…)

K&E 15588356.

equity, and thus unrecoverable under the Plan.[94]   A claim based upon the purchase or sale of equity will be subordinated to such a claim.   Here, the worthless stock option receivable claim represents a claim for damages arising from the purchase or sale of CCI stock; thus, such claim is subject to subordination to all claims or interests senior or equal to CCI stock.   Given those facts, the Debtors' assumption that any such claims likely would be subject to subordination is reasonable and there is no basis to include the worthless stock options in the Liquidation Analysis.

### e.   Other Intercompany Receivables ($119 Million)

The CCI Noteholders did not present any evidence to rebut the testimony of Ms. Schmitz that the Debtors properly accounted for their intercompany payables and receivables at all times. 7/31/09 Tr. at 135:5-21 (Schmitz) (Charter did not change how it recorded intercompany receivables or payables after February 13, 2009).   As the CCI Noteholders are aware, the Debtors continued to operate their business from February 13, 2009 to the Petition Date.   The changes to the intercompany receivable balance during that period were due to ordinary course

---

debts."); *see also In re Exide Techs., Inc.*, 299 B.R. 732 (Bankr. D. Del. 2003) (noting that courts consider 11 factors in deciding whether or not to recharacterize debt as equity).

[94]   8/17/09 Tr. at 74:1-16 (Doody).   Section 510(b) provides that claims for damages arising from the purchase or sale of a security of the debtor or of an affiliate of the debtor shall be subordinated to all claims or interests that are senior to or equal to the interest represented by such security:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by *such security*, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

transactions[95] and thus would not form the basis for an avoidance action. The CCI Noteholders were unable to demonstrate otherwise. Furthermore, the $119 million ignores payments made pursuant to non-trade orders and double counts all of the Worthless Stock Options.

### III. The Debtors Have Met their Burden to Show that the Plan Satisfies the Requirements for "Cram Down" under Section 1129(b).

The CCI Noteholders contend that the Plan does not satisfy section 1129(b) of the Bankruptcy Code because it (i) violates the absolute priority rule by depriving the CCI Noteholders of their entitlement to the Charter enterprise's NOLs and providing Mr. Allen with a recovery on account of his old equity without a market test and (ii) unfairly discriminates against their Claims. As set forth below, none of these contentions is correct—the Debtors have satisfied their burden with respect to cram down.[96]

### A. The Plan Complies with the Absolute Priority Rule.

The Plan satisfies the absolute priority rule with respect to all non-accepting Impaired Classes of Claims and Interests. Section 1129(b)(2)(B) of the Bankruptcy Code provides that a class of unsecured claims satisfies the absolute priority rule where:

> (i)    the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

> (ii)    the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in

---

[95]  7/31/09 Tr. at 135:20-21 (Schmitz) ("The changes were all ordinary course changes in the rules and payables"); 8/17/09 Tr. at 68:14-69:9, 71:1-72:24 (Doody) ("[W]e offset or reduced payments made on behalf of other first and second-day orders, but not the trade order.").

[96]  The Debtors addressed cram down in connection with all other classes in the Confirmation Brief. *See* Confirmation Brief at 59-69.

K&E 15588356.

which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.[97]

The CCI Noteholders' assertion that the Plan violates the absolute priority rule is not substantiated by the evidence or the law and should be overruled. The CCI Noteholders' primary argument on this issue is that because the NOLs are owned by CCI, and the Plan distributes equity and debt to holders of Claims at other Debtors, the Plan violates section 1129(b)(2)(B)(ii)'s prohibition that junior claim holders may not receive a recovery. This argument fails for at least three reasons.

- *First,* even if CCI owned the NOLs, section 1129(b)'s plain language requires that no CCI claimholder junior to the CCI Noteholders may receive a recovery. No CCI claimholder junior to the CCI Noteholders is receiving a recovery and thus the absolute priority rule is not violated. Section 1129(b) does not provide for analysis of reorganization value across debtors within an enterprise. Moreover, unsecured creditors are not entitled to reorganization value. That is not what the statute says. It only requires a distribution equal to or greater than liquidation value.

- *Second,* under *Prudential Lines* and its progeny, it is clear that the NOLs may be utilized by the entity that generates them; thus the absolute priority rule is not implicated because section 1129(b) does not purport to give a claimholder senior property rights than it would otherwise have.

- *Third*, the NOLs are not owned by CCI under section 541's notion of equitable title; thus the absolute priority rule is not violated.

The CCI Noteholders also argue that the Plan implicates and violates *LaSalle*.[98] As the Debtors' explain below, *LaSalle* is not implicated here because, among other things, Mr. Allen is not receiving a distribution on account of his equity interests under the Plan.

---

[97] *See* 11 U.S.C. § 1129(b)(2)(B).

[98] CCI Noteholder Objection ¶¶ 61-69.

1. **The Plan Does Not Violate Section 1129(b) Because No Junior Claimholder of CCI Is Receiving a Recovery Under the Plan.**

The initial focus of interpreting a statute is its plain language. *Kelly v. Robinson*, 479 U.S. 36, 43 (1986). A statute's plain language must be given full force and the inquiry must not go any further if the language is clear. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 566 (1994) ("[W]e have never required Congress to supply 'clearer textual guidance' when the apparent meaning of the Bankruptcy Code's text is itself clear, as it is here."); *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms.") (internal quotations and citations omitted).

The plain language of the Bankruptcy Code mandates that the only value that the Debtors are obligated to give to the CCI Noteholders are (1) what they would get in a hypothetical chapter 7 liquidation and (2) assurance that no junior *CCI* creditor is getting a recovery on account of its Claim or Interest.[99] In a hypothetical chapter 7 liquidation, the NOLs would not have any value.[100]

---

[99] *See* 11 U.S.C. § 1129(a)(7) (each class of impaired claims or interests that has not accepted the plan must "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date"); 11 U.S.C. § 1129(b)(2)(B)(ii).

[100] *See Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 518-19 (8th Cir. 2004) (affirming bankruptcy court's conversion of case from chapter 11 to chapter 7 despite the fact that the debtor's NOLs may have value in a chapter 11 but would have no value in a chapter 7 liquidation); *In re Prudential Lines, Inc.*, 107 B.R. 832, 841 (Bankr. S.D.N.Y. 1989) (where "the situation is so bleak that only liquidation is in the offing, then NOL carryovers would generally be worthless to a corporate debtor since there will be no future income to offset."); *see also Maytag Corp. v. Navistar Int'l Transp. Corp.*, 219 F.3d 587, 590-91 (7th Cir. 2000) ("Tax attributes cannot be sold or given away; only the company that generated the losses may use them. When the bankruptcy wrapped up, accumulated tax losses were a major asset of the estate. It would have been folly to throw them away, as a liquidation would have

(Continued…)

K&E 15588356.

The House and Senate Reports that form the legislative history provide:

> As long as senior creditors have not been paid more than in full, and classes of equal claims are being treated so that the dissenting class of impaired unsecured claims is not being discriminated against unfairly, the plan may be confirmed if the impaired class of unsecured claims receives less than 100 cents on the dollar (or nothing at all) *as long as no class junior to the dissenting class receives anything at all*.

124 Cong. Rec. H 11,103 (Sept. 28, 1978); S 17,420 (Oct. 6, 1978) (emphasis added).

Accordingly, the Plan does not violate section 1129(b)(2)(B)(ii) according to its plain and unambiguous terms.

> ### 2. The Plan Does Not Violate Section 1129(b) Because the NOLs May Be Utilized by the Debtors that Generated the NOLs.

Case law is clear: NOLs may be utilized by the entity that generates them. *In re Prudential Lines, Inc.*, 928 F.2d 565, 569-70 (2d Cir. 1991) (affirming order enjoining parent corporation from taking action that would affect debtor subsidiary's use of NOLs generated as a result of subsidiary's operations on the basis that the debtor subsidiary owned the NOLs); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them."). And where the loss corporation is unable to use its NOLs, it may not complain if they are used by an affiliate that can. *Id.* at 425 ("While the group can agree among themselves to pay the entire refund to the loss corporation, *see Case v. New York Central R.R. Co.,* 256 N.Y.S.2d 607, 204 N.E.2d at 646-

---

done."). Moreover, even though the Liquidation Analysis assumes a distressed going concerns sale of substantially all of the Debtors' assets, including, presumably, the equity interests in the LLC entities that generated the tax losses, the NOLs could not be transferred to the purchaser in such a sale because the sales of such interests would not be treated as stock sales under the tax laws.

K&E 15588356.

47, in the absence of such an agreement, the loss corporation that cannot use its NOL for its own benefit may not complain if another group member uses it for its benefit.").

The CCI Noteholders argue that the cases above apply only to ownership and allocation of NOLs between members of a group of corporations that files a consolidated tax return and not in the context of a pass-through LLC structure like the Charter enterprise. 7/20/09 Tr. at 183:24-184:18 (Uzzi). But the fact that such cases happened to involve corporations rather than LLCs, does not mean that the same logic would not apply in this case.

      **3.**      **The Plan Does Not Violate the Absolute Priority Rule Because the Debtors That Generated the NOLs Own the NOLs Under Bankruptcy Law.**

Bankruptcy law is clear: estate property includes "all legal *or equitable* interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(2) (emphasis added). Thus, even if CCI owned the Charter enterprise NOLs as a matter of tax law, the estates of the Debtors that hold the equitable interests in the NOLs, i.e., the LLCs that generated them or could use them, would be entitled to use the NOLs. Notably, however, the *Prudential Lines* bankruptcy court explicitly recognized the concept that ownership of tax attributes for bankruptcy purposes is different than for tax purposes:

> In Segal, however, the Court held that property of an estate is to be defined by <u>bankruptcy purposes</u>, not by the Fifth Amendment's Just-Compensation clause or a state taxing statute. The same reasoning applies to attempts to define estate property by the Internal Revenue Code: the purposes differ. To be sure, ability to use an NOL depends on compliance with the tax laws, just as a debtor's ability to utilize a mine depends on compliance with applicable state and local regulation. <u>But that dependence does not mean the absence of a property right</u>.

*See Prudential Lines*, 107 B.R.at 840 (emphasis added) (internal citations omitted) (finding that property of the estate should be defined under the Bankruptcy Code rather than the Internal Revenue Code).

K&E 15588356.

Indeed, *Prudential Lines* and its progeny indicate CCI does not own the NOLs at all for bankruptcy purposes. Such a result seems indisputable. CCI cannot realize any income or other benefit from the NOLs. CCI did not generate the NOLs. 7/21/09 Tr. at 166:19-21 (Smit) (operating losses were generated by the entities in the group). It cannot sell the NOLs. It cannot even use the NOLs because it is a holding company without income.[101] Severing CCI from the Charter enterprise would not yield any value to CCI's creditors on account of the NOLs. 9/2/09 Tr. 162:19-20 (Conn) ("[CCI] can't create the value by themselves, period."). Thus, it cannot be correct that CCI owns the Charter enterprise NOLs such that its structurally subordinated creditors are entitled to any distributions on account of them.[102]

In sum, CCI does not own the NOLs and the CCI Noteholders are not entitled to a distribution on account of them. The absolute priority rule prohibits recovery by junior interests on a per debtor basis and the simple fact is that the Plan does not provide for a distribution to any Holders of junior Claims or Interests against CCI. The NOLs will remain with the

---

[101] Indeed, if CCI were a taxpayer by itself, it would not be able to make its own income tax payments—they would have to be funded by an operating company.

[102] The fact that the Debtors that generated the NOLs also own such NOLs under bankruptcy law also supports the notion that entities within the enterprise may use such NOLs without violating the absolute priority rule, as discussed in the immediately preceding section. Accordingly, even if CCI did have some property right in the NOLs, as the Debtors that generated the NOLs also have property rights and may thus may use the NOLs, the Plan does not violate the absolute priority rule.

Additionally, the CCI Noteholders argue that CCI's balance sheet and public filings constitute an admission that CCI owns the NOLs. That the NOLs are on the consolidated CCI balance sheet is not surprising, particularly given the Company's LLC pass-through structure. But, as noted above, this does not affect which estate owns the NOLs. Accordingly, the public disclosures do not constitute an admission as to NOL ownership in bankruptcy.

Finally, the CCI Noteholders argue that the Debtors cannot approve of Mr. Allen's use of the NOLs allocated to CII pursuant to a written allocation agreement between CCI and CII and argue at the same time that the Company's NOLs do not belong to CCI. This argument is without merit and irrelevant to the issue of who owns the NOLs as a matter of bankruptcy law.

K&E 15588356.

Reorganized Company and the fulcrum security holders (that, incidentally, are much more senior in the enterprise capital structure) will receive the equity of the Reorganized Enterprise. That does not violate the absolute priority rule.

>    4.    **The Plan Does Not Implicate *LaSalle* Because Mr. Allen Is Not Recovering on Account of his Equity Interest.**

The CCI Noteholders argue that the Plan violates the absolute priority rule because Mr. Allen is obtaining a recovery "on account of" his equity interest in CCI. Thus, they say, *LaSalle* dictates that the Debtors' retention of control over the Plan process alone violates the absolute priority rule.[103] But the simple fact is that Mr. Allen's recoveries under the Plan are not on account of his equity. As discussed above, Mr. Allen is recovering on account of substantial settlement consideration, including cooperation essential to reinstatement and preservation of the NOLs, the transfer of his valuable interests in solvent Debtor CC VIII, LLC, and the compromise of numerous contract claims. *See also* 7/22/09 Tr. at 266:21-267:16 (Merritt); 8/17/09 Tr. at 33:23-34:18, 281:3-17, 283:14-284:2 (Doody); 8/24/09 Tr. at 14:25-16:5 (Goldstein); 9/2/09 Tr. at 78:16-22, 148:21-23 (Conn).

Notably, the absolute priority rule does not prohibit parties who happen to hold equity from recovering before other claims are paid in full. *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (equity holder's recovery cannot be deemed to be "on account of" the equity interest "without some evidence of a causal relationship"). It prohibits such parties from

---

[103] *See 203 N. LaSalle St. P'ship*, 526 U.S. at 448 .

recovering *on account of* their equity before other claims are paid in full.[104]   Where, as here, there is no recovery on account of equity, the absolute priority rule is not implicated.

The CCI Noteholders' remaining arguments on this topic are just as weak.  First, they argue that the Disclosure Statement description of the CII Settlement is an admission that Paul Allen's recovery is on account of equity.  Notably, however, they were unable to get any witnesses to confirm this assertion at the Confirmation Hearing.  That is because the Disclosure Statement is far from an admission—in effect, it lists Mr. Allen's equity as one of the interests extinguished under the Plan.  *See* CX 707 at 26.  Neither the Plan nor the Disclosure Statement states, as it would be incorrect, that Mr. Allen is receiving a distribution on account of his equity.

Second, the CCI Noteholders argue that Mr. Allen must be recovering on account of his prepetition equity interests because the purpose of the CII Settlement was to prevent Mr. Allen from exercising rights that he held under the exchange agreement on account of his prepetition equity interests.  This argument, however, misconstrues the nature of the CII Settlement.  The Debtors received the benefit of Mr. Allen agreeing to cooperate in the reorganization, which includes forbearance from exercising rights under his exchange agreement.  But this does not mean that Mr. Allen was recovering on account of his equity interest.  It simply means that the Debtors gave value to Mr. Allen for agreeing to cooperate to enhance the Debtors' tax attributes, which is unrefuted as absolutely necessary to allow the Debtors to preserve the NOL asset.

---

[104]  The CCI Noteholders urge the Court to find that *LaSalle* is implicated because the Plan provides that the Debtors' controlling shareholder "receives a benefit of value as a consequence of confirmation." CCI Noteholder Objection ¶ 61.  That is not the standard.  The standard is whether the shareholder receives value on account of its equity interest.  The fact that the CCI Noteholders have to misstate *Lasalle* in this way demonstrates the weakness of their position.

Moreover, contrary to the CCI Noteholders' assertions, the Plan does not violate *LaSalle* because Mr. Allen did not retain control of the Plan process. As noted above, the absolute priority rule does not create a *per se* unity of interest between debtors and "old equity" and the facts of this case confirm that there was no such unity. Indeed, the evidence is overwhelming that the Debtors negotiated in good faith and at arms' length, not just with Mr. Allen (who happens to be old equity), but also with third party lenders, who had no incentive to allow old equity to retain control of the process or to recover on account of its equity. *See* 7/21/09 Tr. at 226:15-227:24 (Smit) (describing negotiations); 7/22/09 Tr. at 208:1-209:22 (Merritt) (independent directors participated in discussions regarding the settlement with Mr. Allen); 8/17/09 Tr. at 26:12-27:8 (Doody) (Mr. Allen and the other parties engaged in arms' length negotiations); 7/28/09 Tr. at 131:25-132:9 (Zinterhofer) (discussing length of negotiations); 7/29/09 Tr. at 112:8-18 (Marcus) (negotiated, as part of the Unofficial Cross-over Committee, with Mr. Allen and management on behalf of bondholders); 7/29/09 Tr. at 208:12-210:8 (Liang) (in their negotiations with Mr. Allen, bondholders wanted to get the most possible value). Moreover, the evidence is clear that the Company acted for the benefit of the enterprise and not for equity. *See* 7/21/09 Tr. at 46:24-47:23 (Millstein) (the Debtors were trying to maximize value for the company); 7/22/09 Tr. at 82:21-24 (Smit) (the reorganized Debtors will emerge from chapter 11 with valuable tax attributes including NOL carryforwards); 8/17/09 Tr. at 28:7-11 (same), 31:6-25, 41:19-24 (Doody) (Charter will benefit from delevering and the new tax stucture); 8/24/09 Tr. at 155:15-23 (Goldstein) (Paul Allen's commitment and cooperation were needed to maximize value); 8/31/09 Tr. at 157:15-17 (Johri) (the Charter Board's goal during the

restructing was to maximize the value of Charter in its entirety). It cannot be disputed that Mr. Allen did not control the Plan process.[105]

     **5.     The Plan Does Not Violate the Absolute Priority Rule Because, As Demonstrated by The Debtors' Valuation, No Senior Claimholder of CCI Is Receiving More Than Payment in Full.**

A corollary of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims. *See In re Granite Broadcasting Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) (citing *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003)). The Debtors' valuation demonstrates that no claimholders senior to the CCI Noteholders will receive more than payment in full under the Plan; thus, on this basis also, the Plan does not violate the absolute priority rule.

---

[105] Finally, even if the Court found that Mr. Allen were somehow recovering on account of his equity interests, the compromise of legitimate creditor claims and transfer of CC VIII interests that, together, form the bulk of the consideration he is providing under the CII Settlement would be money and money's worth that would constitute new value. Although the Supreme Court has not expressly ratified the new value corollary to the absolute priority rule, many of its decisions rely on or interpret the Supreme Court's articulation of the standard for a new value contribution in *Case v. Los Angeles Lumber Prods. Co.*, 308 U.S. 106 (1939). In *Case*, the Court stated that "to accord 'the creditor his full right of priority against the corporate assets' where the debtor is insolvent, the stockholder's participation must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." The *Case* Court went on to rule that an old equity holder's promise to provide continuity of management and leverage their standing in the community on behalf of the reorganized debtors was intangible and speculative and would not satisfy the new value corollary to the extent it exists. *Id.* In so ruling, the Court noted that such value could not "possibly be translated into money's worth reasonably equivalent to the participation accorded the old stockholders. They have no place in the asset column of the balance sheet of the new company. They reflect merely vague hopes or possibilities." *Id.* The CII Settlement is not like *Case* or the myriad similar cases in which old equity argued, unsuccessfully, that continuity of management or standing in the community constituted new value. Here, the cooperation and other consideration provided by Paul Allen under the CII Settlement is not intangible and has a substantial place in the asset column of the balance sheet as, among other things, it preserves nearly $3 billion of NOLs resulting in more than $1 billion of cash tax savings, reduces hundreds of millions of interest costs, and increases Charter's ownership of CC VIII from 70% to 100%. *See* CX Declaration 2 ¶ 9; CX Declaration 3 ¶ 22.

a.   **Lazard Properly Applied Accepted Methodologies to Determine the Enterprise Value of the Reorganized Debtors is Between $14.1 - $16.6 Billion.**

The three most commonly employed and generally accepted valuation methodologies are (1) discounted cash flow, (2) comparable company, and (3) precedent transaction analyses. *See* 7/21/09 Tr. at 84:4-8 (Millstein). As explained in the Valuation Analysis attached to the Debtors' Disclosure Statement[106] and in the hearing testimony of Messrs. Jim Millstein and Steve Goldstein of Lazard, the Debtors' financial advisors properly applied these methodologies to determine the Enterprise Value[107] of the Reorganized Debtors is between $14.1 - $16.6 billion.

i.   **Discounted Cash Flow Analysis**

A discounted cash flow ("<u>DCF</u>") analysis is a standard valuation methodology of companies in bankruptcy.[108] A DCF analysis is conducted by estimating a company's cash flows over a projection period, and then applying a discount rate (known as the weighted average cost of capital, or "<u>WACC</u>") to determine the current value of those future cash flows. *See* 7/21/09 Tr. at 87:23-89:8 (Millstein). The WACC is calculated based on the company's expected cost of equity and cost of debt. In addition, the value of the company at the end of the measurement period is determined through the use of a terminal value and/or a perpetuity growth rate, and

---

[106]  *See* Exhibit D, Reorganized Debtors' Valuation Analysis, annexed to *Notice of Filing of (I) Exhibits A Through F to the Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the Debtors' Joint Plan of Reorganization, (II) Revised Rights Offering Procedures, and (III) Errata Sheets* [Docket No. 392] (the "<u>Valuation Analysis</u>"); *see also* 7/21/09 Tr. at 83:24-84:3 (Millstein).

[107]  "<u>Enterprise Value</u>" is the estimated total value of the Debtors available for distribution to holders of Allowed Claims and consists of the estimated value of the Reorganized Debtors' operations on a going concern basis. *Id.* at 1.

[108]  *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003) (quoting *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 1876 (7th Cir. 1993) ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method.").

K&E 15588356.

added to the discounted cash flow projections.  *Id.*  Using the former, terminal value approach, Lazard calculated an Enterprise Value of $15.4 - $18.2 billion; and using the latter, perpetuity growth approach, calculated an Enterprise Value of $14.4 - $17.9 billion.  *Id.* at 85:22-24.

## ii.    Comparable Company Analysis

A comparable company analysis ("CompCo") is a generally accepted valuation methodology that is conducted by observing the trading multiples of similar public companies, adjusting those multiples to account for a subject firm's specific opportunities and risks, and applying that multiple to an appropriate valuation metric.[109]  A key factor to this approach is the selection of companies with relatively similar business and operational characteristics, including: lines of business, risks, growth prospects, maturity, location, market presence, and size and scale of operations.  *See* Valuation Analysis at 5.  Based on general compatibility to the Debtors in one or more of these factors, Lazard selected the following publicly traded companies:  Cablevision Systems Corp., Comcast Corporation, Mediacom Communications Corp., and Time Warner Cable Inc.  *Id.*  Lazard calculated market multiples for this peer group based on 2009 estimated EBITDA and then applied the range of multiples to the Reorganized Debtors' 2009 estimated income from operations before depreciation and amortization, impairment charges, stock compensation expense, and other expenses, such as special charges and loss on sale or retirement of assets, to determine a range of Enterprise Values between $12.3 billion - $14.7 billion.  *Id.*; 7/21/09 Tr. at 87:24-25 (Millstein).

---

[109] *See*, *e.g.*, *Peltz v. Hatten*, 279 B.R. 710, 737 n.13 (D. Del. 2002) (noting "Court and commentators have commented approvingly regarding" DCF and CompCo); *In re Mirant*, 334 B.R. 800, 816 (N.D. Tex. 2005) (finding the comparable companies and DCF "methods of valuation the most likely to ensure that Mirant Group is valued based on the worth").

K&E 15588356.

### iii.     Precedent Transactions Analysis

A third valuation approach is a precedent transaction analysis. This is based on the enterprise value of companies involved in public merger and acquisition transactions that have operational and financial characteristics similar to the Reorganized Debtors. *See* Valuation Analysis at 5. Under this methodology, the enterprise value of such companies is determined by an analysis of the consideration paid and the debt assumed in the merger or acquisition transaction, and commonly expressed as multiples of various measures of operating statistics, such as sales, EBITDA, and EBIT. *Id.* Lazard reviewed industry-wide valuation multiples for companies in similar lines of business to the Reorganized Debtors and then applied those multiples to the Reorganized Debtors' operating statistics and determined the Enterprise Value to a potential strategic buyer to be between $18.4 billion - $20.9 billion. *Id.* at 6; 7/21/09 Tr. at 85:25-86:1 (Millstein).

Lazard evaluated various merger and acquisition transactions that have occurred in the cable industry over the last six years. *See* Valuation Analysis at 6. Many of these transactions were executed under different fundamental, credit and other market conditions from those prevailing earlier this year when Lazard was performing the valuation. *Id.* As a result, Lazard's reliance on the precedent transactions approach in determining the Enterprise Value was less than its reliance on DCF and CompCo methodologies. *Id.*; 8/24/09 Tr. at 84:10-16 (Goldstein).

### b.     The CCI Noteholders' Challenge to the Debtors' Valuation is Inapposite.

The only challenge to Lazard's valuation analyses came from the CCI Noteholders, on two grounds, in the form of a report and testimony (but not an actual competing valuation) by Mr. McDonough, neither of which is persuasive. First, the CCI Noteholders sought to undermine Lazard's overall valuation result, insofar as it was based to a greater extent on DCF

and CompCo methodologies than precedent transactions. *See, e.g.*, 8/24/09 Tr. at 81:22-82:22 (Goldstein). But as Mr. Goldstein testified, there have not recently been precedent transactions of similar size and scale in the cable industry. *Id.* at 84:10-16 (Goldstein). And to the extent different transactions could provide guidance for different purposes, Lazard justifiably relied on its judgment and expertise in determining that in early 2009 the most appropriate methodologies for calculating Enterprise Value were DCF and Compco. *Id.*

Second, the CCI Noteholders offered the very obvious observation that *assuming* Lazard had used different assumptions in performing its methodologies, and *assuming* Lazard used higher multiples in doing so, the result would have been a higher valuation. *Id.* This merely states the obvious, and proves no more than that if Lazard had relied on certain methodologies even less, and used even lower multiples in performing this analysis, the resulting valuation range would have been even lower. Asserting basic principles of mathematics does not impugn the Debtors' valuation.

In sum, the evidence before the Court demonstrates Lazard properly applied three generally accepted valuation methodologies. Lazard's conclusions reflect the application of their careful and detailed expertise on these issues and the prevalent financial conditions in the marketplace. In stark contract, the CCI Noteholders' arguments reflect (and are materially undermined by) the realities that their testifying expert's "valuation" consisted merely of "eyeballing the others valuations that were there," instead of performing a ground-up independent valuation, and spending all of eight days on an initial report. 9/1/09 Tr. at 152:8-9, 208:8-10 (McDonough). The CCI Noteholders have not presented any substantial justification for this Court to find anything other than that the Debtors' valuation methodology and conclusions are entirely appropriate.

K&E 15588356.

### B. The Plan Does Not Unfairly Discriminate Against the CCI Noteholders; Separate Classification Is Proper.

The CCI Noteholders also argue the Plan is not fair and equitable because it unfairly discriminates against them in contravention of section 1129(b)(1) of the Bankruptcy Code. According to the CCI Noteholders, the fact that Class A-3 General Unsecured Claims are projected to recover 100% while Class A-4 CCI Notes Claims are only slated to recover 32.7% is *a fortiori* evidence of unfair discrimination.[110]

The CCI Noteholders' unfair discrimination argument fails because the Plan does not discriminate between the CCI Noteholders and CCI's general unsecured creditors at all, much less unfairly discriminate. Discrimination occurs when *similarly situated* creditors are treated disparately.[111] Thus, logic dictates that disparate treatment of non-similarly situated creditors cannot be discrimination. As set forth below, the evidence conclusively demonstrates that the CCI Noteholders are not similarly situated to general unsecured creditors and thus that there is no discrimination.[112]

---

[110] *See* CCI Noteholder Objection ¶ 37. The CCI Noteholders make the same objections regarding unfair discrimination, artificial impairment, and gerrymandering with respect to Class C-3 Holdco General Unsecured Claims and Class C-4 Holdco Notes Claims. *Id.* ¶¶ 97-100. The Debtors' responses regarding Class A-3 CCI General Unsecured Claims and Class A-4 CCI Notes Claims apply equally to the Holdco-related objections.

[111] *In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *59 (Bankr. S.D.N.Y. Oct. 31, 2003) (unfair discrimination occurs "where similarly situated classes are treated differently without a reasonable basis for the disparate treatment.").

[112] However, to the extent such classes would be considered similarly situated, the existence and effect of the Management Agreement constitute a good faith, reasonable basis for disparate treatment. Moreover, the Debtors would not be able to consummate the Plan if it provided for a par recovery to the CCI Noteholders. Accordingly, the Plan would satisfy the "Buttonwood test" adopted by courts in the Second Circuit to evaluate unfair discrimination. *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (courts assess whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion

(Continued…)

K&E 15588356.

According to the CCI Noteholders, they are similarly situated to general unsecured creditors because both the CCI Noteholders and the general unsecured creditors have unsecured non-priority claims and the CCI Notes are not subordinated. But this interpretation of "similarly situated" is not correct—similarly situated does only not mean unsecured vs. secured, it means similar legal rights. The evidence is uncontroverted that the legal rights and payment expectations of the CCI Noteholders and the unsecured litigation, severance, trade, and other creditors that make up the Class A-3 CCI General Unsecured Claims differ substantially.[113] As is evident from the CCI Notes Indenture, the CCI Notes are convertible into equity and structurally subordinated to the debt at all other Charter subsidiaries.[114] Moreover, the CCI Notes were issued in conjunction with the Holdco Mirror Note, which provides CCI and Holders of CCI Notes with an alternative source of recovery against Holdco that is unavailable to general

---

to its rationale" but also noting that the second prong assessing whether the debtor cannot consummate the plan without discrimination, is not dispositive of the question of unfair discrimination); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (presumption of unfair discimination can be rebutted "by showing that, outside of bankruptcy, the dissenting class would similarly receive less than the class receiving a greater recovery, or that the alleged preferred class had infused new value into the reorganization which offset its gain.") (citing *In re Dow Corning Corp.,* 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999)).

[113] *See* 8/17/09 Tr. at 53:10-54:16 (Doody) (distinguishing the Class A-3 CCI General Unsecured Claims from the Class A-4 CCI Notes Claims). As the CCI Noteholders acknowledge, the type of claims subject to the Management Agreement are exactly the types of obligations that comprise the Class A-3 CCI General Unsecured Claims.*See* CCI Noteholder Objection ¶ 21 (describing the holders of CCI General Unsecured Claims as "a hodgepodge of former employees, litigation claimants, rejection damage claimants, and insignificant trade creditors").

[114] *See* 8/17/09 Tr. at 55:15-57:9 (Doody); *see also* 6.50% Convertible Senior Notes due 2027 Indenture, dated October 2, 2007 between CCI and The Bank of New York Trust Company, N.A. (the "CCI Notes Indenture"), CX 287, Exh. 4.7; 9/1/09 Tr. at 157:23-159:7 (McDonough) (CCI Notes were convertible and subordinated); CCI Notes Exchange Offer, CX 287 at 25 ("Because of our holding company structure, the New Notes are structurally subordinated in right of payment to all liabilities of Charter's subsidiaries.").

K&E 15588356.

unsecured creditors of CCI.[115]  It is uncontroverted that the types of claims classified as Class A-3 CCI General Unsecured Claims are covered under the Management Agreement pursuant to which CCI provides certain management services to CCO and other solvent operating entities in return for reimbursement at cost for all expenses associated with CCI's duties as manager.[116]  As a result of the Management Agreement, which is assumed under the Plan, the general unsecured claims for those expenses are passed through to CCO at cost and at the end of the day the Class A-3 CCI General Unsecured Claims will receive payment in full.[117]

The CCI Noteholders do not and cannot have a similar payment expectation.  Although they raised a "me too" claim for a par recovery from the proceeds of the Management Agreement for the first time in their Opening Statement, the trading prices for the CCI Notes, which are trading near plan recovery rates rather than at par, belie this argument.[118]  The market's failure to adopt this position is not surprising, given that the plain language of the Management Agreement and the Mutual Services Agreement referenced therein indicate that they apply to reimbursement for administrative expenses CCI incurs in managing CCO, which would not include the CCI

---

[115] *See* 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco, attached as Exh. 10.3 to the Charter Communications, Inc., SEC Form 8-K, dated as of October 5, 2007, CX306.

[116] *See* Management Agreement ¶¶ 3(a)(i)-(ii), 5 (including for costs to pay employees and third party providers such as vendors, attorneys, consultants, and other advisors, as well as related litigation claims); *see also* 8/17/09 Tr. at 54:20-55:7 (Doody).

[117] To be clear, the Debtors do not argue that CCI's general unsecured creditors are third party beneficiaries of the Management Agreement such that they would have direct legal rights against CCO, the Plan treatment of the Class A-3 CCI General Unsecured Creditors reflects that they will be recover 100% on their Claims as a result of the Management Agreement.  These creditors have legal rights against CCI and are correctly classified at CCI.

[118] *See* 8/24/09 Tr. at 204:19-205:10 (Goldstein).  The CCI Noteholders' new argument appears to be less a confirmation objection and more of an attempt to set the stage to angle for payment in full after

(Continued…)

K&E 15588356.

Notes.  *See* 8/17/09 Tr. at 203:5-24 (Doody).  Moreover, the evidence shows that Charter's

public disclosures do not support this position.[119]  Specifically, the CCI Notes Exchange Offer

clearly disclosed that the CCI Noteholders may not look to CCI affiliates for repayment[120] and

the Management Agreement was disclosed at the time the CCI Notes were issued.[121]  In sum, the

CCI Noteholders are not similarly situated to general unsecured creditors—there is no

discrimination.

For the same reason that the CCI Noteholders' unfair discrimination argument fails, so

does their objection to the separate classification of general unsecured claims at CCI from the

CCI Notes.  A plan proponent enjoys substantial flexibility in classifying *similar* claims in

different classes.[122]  As discussed above, there can be no question that the CCI Noteholders are

not similarly situated to CCI's general unsecured creditors; thus, there is a rational basis for the

separate classification.  Moreover, the CCI Noteholders' assertion that the Debtors' classification

of convertible notes claims separately from general unsecured claims is gerrymandering or

indicative of bad faith is itself untoward.  Chapter 11 plans *routinely* classify unsecured notes

---

confirmation as a result of assumption of the Management Agreement.  In either case, this argument
fails.

[119] The Management Agreement was dated June 19, 2003 and the CCI Notes were issued on November
22, 2004 and October 2, 2007.  *See* Plan, Art. I.A.38.  The Debtors disclosed the existence and
general terms of the Management Agreement in their public filings.  *See* CCI Notes Exchange Offer,
Ex. 10-31 (incorporating the Management Agreement by reference).

[120] *See* CCI Notes Exchange Offer, CX 287 at 28 ("If we do not fulfill our obligations to you under the
New Notes, you will not have any recourse against Charter Holdco, Mr. Allen or any of their or our
affiliates."); *see also* 8/17/09 Tr. at 202:16-24 (Doody).

[121] Confirmation Brief at 15-16.

[122] *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. S.D.N.Y. 1992) (separate
classification of similar classes was rational where members of each class "own[ed] distinct securities
and possess[ed] different legal rights").

K&E 15588356.

separately from general unsecured claims and this is all the more reasonable where, as here, the unsecured notes are convertible notes with an equity upside unavailable to general unsecured creditors.[123] There is no basis whatsoever to infer gerrymandering from such classification and the CCI Noteholders have furnished no evidence of actual intent. Instead, the uncontroverted evidence indicates that Plan's classification scheme was designed to follow the Debtors' capital structure and the separate classification of CCI Notes and Holdco Notes Claims from general unsecured claims was in no way intended to gerrymander votes. *See* 7/21/09 Tr. at 46:4-23 (Millstein); 8/17/09 Tr. at 53:18-54:19 (Doody).

The CCI Noteholders also argue, on equitable grounds, that it is not fair and equitable to allow a class of approximately $1 million (or $200,000 excluding the Company's ex-CFO's severance) to cram-down their $500 million claim. Although, as the Debtors argued in the Confirmation Brief, class size does not matter, the uncontroverted evidence indicates that Classes A-3 and C-3 are significantly larger than $1 million if litigation claims and claims paid pursuant to the first day orders are included in the analysis. *See* LDT 267 at 2-3; *see also* 8/17/09 Tr. at 69:22-73:8 (Doody). Specifically, aggregate litigation claims at CCI and Holdco total approximately $25-55 million (and potentially much more) and approximately $330 million of claims have been paid pursuant to first day orders, of which all but $600,000 were trade claims

---

[123] *See, e.g., In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007) (order confirming chapter 11 plan separately classifying convertible unsecured notes claims from general unsecured claims); *In re Tower Automotive, Inc.,* No. 05-10578 (Bankr. S.D.N.Y. July 12, 2007) (same); *In re Global Crossing Ltd.*, No. 02-40188 (Bankr. S.D.N.Y. Dec. 26, 2002) (order confirming chapter 11 plan separately classifying unsecured notes claims from general unsecured claims); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

K&E 15588356.

that were not paid pursuant to the Management Agreement.  *Id.*  Therefore, the classes are roughly equivalent in size.

## IV.  The Court Should Overrule the CCI Noteholders' Objection That the Plan Does Not Satisfy Section 1129(a)(10).

Section 1129(a)(10) of the Bankruptcy Code requires that if a class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding acceptance by any Insider.  11 U.S.C. § 1129(a)(10).  Here, 10[124] Impaired Classes of Claims voted to accept the Plan, not counting Insider votes.[125]  Moreover, pursuant to the Disclosure Statement Order, Classes for which no votes were cast are deemed to accept the Plan.[126]  Thus, even though Class A-4 CCI Notes Claims and, excluding Insider votes, Class C-4 Holdco Notes Claims and Class E-4 CCH Notes Claims, did not accept the Plan, each Debtor has at least one Impaired accepting Class.[127]  Therefore, the Plan satisfies the requirements of section 1129(a)(10).

The CCI Noteholders have argued that the Plan does not satisfy section 1129(a)(10) because Class A-3 General Unsecured Claims and Class C-3 General Unsecured Claims are artificially Impaired and therefore should not be considered for purposes of determining whether

---

[124] The Confirmation Brief incorrectly listed Class C-4 Holdco Notes Claims as an Impaired accepting Class after excluding Insider votes.  Confirmation Brief at 25, 36 n.98, 48 n.114.  Although Class C-4 Holdco Notes Claims was Impaired and voted to accept the Plan, it did not vote to accept the Plan excluding Insider votes.  Notwithstanding this error, Holdco satisfies all confirmation requirements and the overall confirmation voting results do not change.

[125] Excluding Insider votes, Impaired Classes A-3, A-4, B-3, B-4, C-3, F-4, G-4, H-4, J-2, and J-6 voted to accept the Plan.  *See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.

[126] *See* Disclosure Statement, Ex. E ¶ 7(h).  Although ballots were mailed to creditors in Classes D-3, E-3, F-3, G-3, H-3, and I-5, no votes were cast in such Classes.  *See* KCC Solicitation Affidavit at 2-3 [Docket No. 396]; Amended Certificate of Service of James Sean McGuire re: Solicitation Packages [Docket No. 756] at ¶¶ 3-24; KCC Voting Certification, at ¶ 15.  Thus, such Classes are deemed to have accepted the Plan.

K&E 15588356.

there are Impaired accepting Classes of Claims at CCI or Holdco. CCI Noteholder Objection ¶¶ 29-36, 101. Mr. Doody testified as to why these Classes are legitimately Impaired. *See* 8/17/09 Tr. at 59:20-60:4 (Doody) (noting that Classes A-3 and C-3 are impaired because they are reinstated or paid without postpetition interest). CCI presented no evidence to the contrary. Moreover, even if they were Unimpaired, the Plan satisfies section 1129(a)(10) because it contains at least one Impaired accepting Class of Claims and section 1129(a)(10) requires only one Impaired accepting Class of Claims per Plan, as set forth below.

In addition, the CCI Noteholders have not introduced any evidence that has challenged the legitimacy of Class A-3 CCI General Unsecured Claims, Class C-3 Holdco General Unsecured Claims, and Class E-3 CCH General Unsecured Claims. Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims were solicited in the Plan voting process and affirmatively voted to accept the Plan. *See* CX 725, Ex. A, C; CX Declaration 1 ¶ 15. And while no votes were received for Class E-3 CCH General Unsecured Claims, Holders of Claims in Class E-3 CCH General Unsecured Claims were named and solicited. *See* CX 725, Ex. E; CX Declaration 1 ¶ 15. If the CCI Noteholders truly believed these classes were illegitimate they should have objected to the Debtors' proposed solicitation procedures in their objection to the Disclosure Statement. At the time the Plan was solicited, the CCI Noteholders were informed of the Plan's Class structure and had ample opportunity to object to it, they cannot now invent Plan infirmities in an attempt to increase their recoveries.

---

[127] As apparent from notes 124-25 above, excluding Insiders, at least one Class at each of Debtors A, B, C, D, E, F, G, H, I and J voted to or was deemed to accept the Plan.

K&E 15588356.

Moreover, Class E-3 CCH General Unsecured Claims is not an artificial Class simply because Holders of Claims in Class E-3 did not vote.

The CCI Noteholders have not contravened the evidence that confirms that Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims are not artificially Impaired. Indeed, the CCI Noteholders' argument rests in significant part on the Debtors' change to the Plan prior to the Disclosure Statement hearing to reflect that these Classes were Impaired rather than Unimpaired. *See* CCI Noteholder Objection ¶¶ 31-32. But it is uncontroverted that the Plan *treatment* of these Classes did not change—only the legal description. Correcting a legal description cannot constitute artificial impairment.

Notably, Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims are Impaired, among other reasons, because Holders of Claims in such Classes are not receiving postpetition interest under the Plan. *See In re Oneida Ltd.*, 351 B.R. 79, 95-96 (Bankr. S.D.N.Y. 2006); *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982); *In re Chateaugay Corp.*, 150 B.R. 529, 543 (Bankr. S.D.N.Y. 1993), *aff'd*, 170 B.R. 551 (S.D.N.Y. 1994). The CCI Noteholders argue that the Plan's nonpayment of postpetition interest is illusory because the Plan treatment of Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims provide the Debtors the option to reinstate and unimpair Claims in such Classes or pay the Claims in full without postpetition interest. CCI Noteholder Objection ¶ 35. Thus, the CCI Noteholders argue, the Debtors can simply confirm the Plan and reinstate all Claims while retaining the benefit of classifying such Claims as Impaired. As Mr. Doody testified, however, the reinstatement option in the general unsecured classes, including Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims, is not intended as a loophole to designate Classes as Impaired while treating them as Unimpaired, nor

will it be used as such. Mr. Doody confirmed that the Debtors have not made any final decisions regarding specific claims, but do not plan to reinstate all Claims in either Class A-3 CCI General Unsecured Claims or Class C-3 Holdco General Unsecured Claims. *See* 8/17/09 Tr. at 59:20-60:15 (Doody).

The CCI Noteholders also argue that failure to pay postpetition interest does not constitute sufficient impairment for purposes of section 1129(a)(10) because they assume that such treatment must be engineered to gerrymander acceptances and because the Debtors easily would be able to pay postpetition interest given that the aggregate amount payable would be relatively small.[128] This assumption is not correct and is unsupported by any evidence. Moreover, even though the Plan treatment for Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims reflects that the Claims in such Classes are subject to reimbursement by a solvent entity (CCO) under the Management Agreement, the Management Agreement explicitly provides that all such payments are payable only at cost and does not provide for payment of interest on overdue payments. *See* Management Agreement ¶ 3. *See also* 8/17/09 Tr. at 194:14-195:17 (Doody) (noting that the Management Agreement only provides for payments at cost without interest). Indeed, in light of the fact that the Plan treatment of Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims merely reflects the effect of the Management Agreement, the CCI

---

[128] Notably, this argument is inconsistent with the CCI Noteholders' unfair discrimination arguments discussed above. Indeed, the CCI Noteholders cannot credibly argue both that the Plan both unfairly discriminates because it provides for full payment to CCI and Holdco's general unsecured creditors (but not Holders of CCI Notes Claims and Holdco Notes Claims) and artificially impairs CCI and Holdco's general unsecured creditors because it does not pay them more.

K&E 15588356.

Noteholders' assumption that such Classes are artificially Impaired fails, regardless of how much or how little postpetition interest would be payable.

In any event, even if the Plan did provide for the payment of postpetition interest to Holders of Claims in Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims, such Classes nonetheless would be impaired because they are not third-party beneficiaries of the Management Agreement[129] and because the Plan provides for payment of their claims instead of reinstatement of their contractual relationship.[130]  Thus, the treatment of such Classes under the Plan alters their legal rights and renders them Impaired as a matter of law.[131]

Notably, however, even if Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims were Unimpaired, the Plan nonetheless would satisfy section 1129(a)(10).  As noted in the Confirmation Brief, section 1129(a)(10) is a per-plan requirement, not a per-debtor requirement.[132]  The *Enron* court noted:  "The plain language and inherent

---

[129] *See* 8/17/09 Tr. at 209:15-23 (Doody) (noting that Holders of Class A-3 claims are not beneficiaries of the Management Agreement).

[130] For the same reasons, JPMorgan's attempt to reserve the right to argue that Classes J-2 (Description) and J-6 (Description) are not Impaired classes in the event their debt is not reinstated fails.  *See* JPMorgan's Objections to Confirmation of Charter Communications Operating, LLC's Joint Plan of Reorganization and Pre-Trial Brief of JPMorgan Chase Bank, N.A. [Filed Under Seal (Seal Order Granted - Docket No.741)] (the "JP Morgan Objection") at 34-35  Moreover, the Debtors dispute JPMorgan's reservation of rights.

[131] *See In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir.1993) (Because it focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment.); *Taddeo*, 685 F.2d at 28 (same); *In re Downtown Athletic Club of N. Y. City, Inc.*, No. 98-41419, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) (same).

[132] *See* Confirmation Brief at 50-51 (*citing In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) (order confirming joint chapter 11 plan where each debtor did not have an impaired accepting class) and *In re SGPA, Inc.*, No. 1-01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (joint chapter 11 plan of reorganization complied with section 1129(a)(10) because at least one class of impaired creditors

(Continued…)

K&E 15588356.

fundamental policy behind section 1129(a)(10) of the Bankruptcy Code provides that an affirmative vote of one impaired class under a plan is sufficient to satisfy section 1129(a)(10) of the Bankruptcy Code." *See In re Enron,* No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) at 138. Notably, even though *Enron* involved substantive consolidation, the court recognized that the per-plan requirement obtains even without substantive consolidation or joint plans:

> In addition, the Court notes that at least one court has confirmed a chapter 11 plan (without requiring either substantive consolidation or the filing of separate plans) where it appears that impaired classes of certain (but not all) of the jointly administered debtors vote only for the one plan before the court. *See, e.g., In re Resorts Int'l Inc.*, 145 B.R. 412, 416 (Bankr. D. N.J. 1990). <u>It is quite common for debtors with a complex corporate structure to file a joint chapter 11 plan pursuant to which the corporate form is preserved,</u> **or** <u>in which a "deemed consolidation" is proposed and approved. In such circumstances, all debtors are treated as a single legal entity for voting and distribution purposes.</u> *See*, *e.g.*, *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001).

*Id.* (emphasis added).

Moreover, *In re SGPA, Inc.*, a case involving a joint plan of reorganization for non-substantively consolidated debtors, is on point. *In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001). Like Charter, *SGPA* involved a financial restructuring in which most creditor groups were to be paid in full. The *SGPA* debtors also were jointly administered but not substantively consolidated. The court ruled that under such circumstances it is not necessary to have an impaired class of creditors of each debtor vote to accept the plan. *Id.* at 16-17 ("I agree with Debtors' position that in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan.").

---

accepted the plan, notwithstanding the fact that each debtor entity did not have an accepting impaired class)).

The CCI Noteholders have not refuted the *Enron* or *SGPA* opinions. And, while the *Enron* opinion was unquestionably *dicta*, it was not, as the CCI Noteholders assert, limited to the context of substantive consolidation.[133] Thus, even if Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims were not Impaired accepting classes at CCI and Holdco, the existence of eight other Impaired accepting Classes under the Plan would satisfy section 1129(a)(10).

## V. The Evidence Shows that the Plan's Release, Exculpation, and Injunction Provisions Are Appropriate and Should Be Approved.

The Debtor Release, Third Party Release, Exculpation Provision and Injunction provided for in the Plan, and described in greater detail in the Confirmation Brief, are all appropriate and should be approved. The evidence adduced at trial in support of confirmation supports the approval of these Plan provisions because, among other things, they are the product of arm's-length negotiations, are in exchange for substantial consideration, and have been critical to obtaining the support of various constituencies for the Plan. *See* 8/17/09 Tr. at 34:19-35:3, 62:18-21 (Doody) (noting that the third party releases were negotiated for value and listing various pieces of consideration provided by Mr. Allen as part of the Plan and the CII Settlement); Doody Decl. ¶ 34 (the third party releases were essential to the formulation of the Plan and are supported by substantial consideration); 9/2/09 177:17-25 (Conn) (the third party releases were negotiated through a "vigorous debate"); 9/10/09 42:4-25 (Millstein) (Mr. Allen's representatives required the third party releases from the beginning of negotiations).

---

[133] *See In re Enron,* No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) at 138. (noting 1129(a)(10) is a per plan requirement for "debtors with a complex corporate structure [that] file a joint chapter 11 plan pursuant to which the corporate form is preserved").

K&E 15588356.

## A.    The Debtors' Releases

The Debtors' Releases, set forth in Article X.D of the Plan, provide that the Debtors shall fully discharge and release all claims and causes of action against the Debtor Releasees arising from or related in any way to the Debtors.[134]   In reviewing releases in a debtor's plan, courts frequently use the "best interests of the estate" benchmark for approval of a settlement under Bankruptcy Rule 9019.[135]   It is well settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[136]   Indeed, courts in this District have approved similar debtor-release provisions in other chapter 11 cases.  *See, e.g.*, *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Tower Auto., Inc.*, No. 05-10578 (Bankr. S.D.N.Y. July 9, 2007); *see also In re Movie Gallery*, No. 07-33849 (Bankr. E.D. Va. Apr. 10, 2008).

The Debtors' Releases are in the best interests of the Debtors' estates because they are an integral part of the consensual Plan that provides substantial value to the estates,[137] are limited in

---

[134]   The Debtor Releasees include (a) the Debtors; (b) the parties who signed Plan Support Agreements with a Debtor; (c) any statutory committees appointed in the Chapter 11 Cases ((a)-(c), collectively, the "Releasing Parties"); and (d) for each of the Releasing Parties, their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates, and representatives.

[135]   *See generally Bally Total Fitness*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *In re Spiegel, Inc.*, No. 03-11540, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)).

[136]   *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *Oneida*, 351 B.R. at 94 (noting that a debtor's release of its own claims is permissible).

[137]   7/16/09 Doody Decl. ¶ 36*; see also* 7/21/09 Tr. at 73:11-17 (Milstein); 7/22/09 Tr. at 266:21-267:16 (Merritt).

K&E 15588356.

scope[138] and are procedurally efficient, given that most of the Debtor Releasees have indemnification rights, such that any claims by the Debtors against them would ultimately be asserted against the Debtors. Accordingly, the Debtors' Releases should be approved as consistent with applicable law, and as a valid exercise of the Debtors' business judgment.

## B. Third Party Release[139]

The evidentiary record also supports approval of the Third Party Release because it satisfies applicable law, is the product of arm's-length negotiations, is limited in scope and is integral to the consensual Plan process. In the Second Circuit, a nonconsensual third party release is permissible where "truly unusual circumstances render the release terms important to success of the plan," focusing on the following factors:[140]

- the estate received substantial consideration;

- the enjoined claims were "channeled" to a settlement fund rather than extinguished;

- the enjoined claims would indirectly impact the reorganization "by way of indemnity or contribution;"

---

[138] *See* Doody Decl. ¶ 36 (the releases by the Debtors are limited solely to Claims or Causes of Action that belong to the Debtors).

[139] *See* CCI Noteholder Objection at 98-100; JP Morgan Objection at 32-34; Objection of Wells Fargo Bank, N.A., as Successor Administrative Agent and Collateral Agent, to Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (Filed Under Seal) [Docket No. 584] at 41-46; Objection of Key Colony Fund, LP to Joint Plan of Reorganization [Docket No. 574] at 1-10; Objection of the United States Trustee to the Debtors' Joint Plan of Reorganization [Docket No. 475] at 1-15; Objection of the U.S. Securities and Exchange Commission to the Confirmation of the Debtors' Joint Plan of Reorganization [Docket No. 576] at 1-12.

[140] *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142-43 (2d Cir. 2005); S*EC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").

89

- the plan otherwise provided for the full payment of the enjoined claims; *or*

- the affected creditors consent.

The evidence adduced at trial clearly shows that this case involves truly unusual circumstances that renders the Third Party Release important to success of the Plan.

### 1.    Substantial Consideration

First, the Debtors' estates have received substantial consideration by the CII Settlement Claim Parties in the form of preservation and enhancement of valuable tax attributes and the ability to reinstate indebtedness at markedly favorable interest rates.  8/17/09 34:19-24 (Doody) (noting that the Debtors will receive "in excess of a billion dollars" from the NOLs and hundreds of millions of dollars from the reinstatement of the senior debt).  As discussed above, without the CII Settlement, the Plan and the $1.6 billion Rights Offering simply would not be possible.  The aggregate consideration provided by the CII Settlement Claim Parties confers billions of dollars in value on the Debtors and their estates.  *See* 8/17/09 Tr. at 34:19-24 (Doody).  Moreover, none of the parties that objected to the Third Party Release on the basis that Mr. Allen was not providing adequate consideration (or any) therefor presented any evidence to support their assertions.  Accordingly, the Third Party Release is in the best interests of the Debtors and all Holders of Claims.

Notably, the U.S. Trustee and the SEC argue that the Third Party Release is inappropriate with respect to any released parties that are not parties to the CII Settlement because such parties are not themselves providing consideration.  This argument implicitly admits that the CII Settlement itself represents adequate consideration for the release, but is founded on the mistaken belief that the law requires each released party to provide consideration for its release.  This is incorrect—as long as substantial consideration is received in exchange for the release, it does not

matter who provides it.[141]  Ample consideration has been provided in return for the Third Party

Release and it should be approved.

### 2.    Identity of Interest

The Third Party Release is also reasonable because the Debtors have indemnification

obligations in respect of their directors, officers, agents and professionals, which produces an

identity of interest between the Debtors and the other Debtor Releasees.[142]  That, taken together

with the substantial consideration provided under the CII Settlement for the Third Party Release,

justifies nonconsensual third party releases under these circumstances.[143]

### 3.    Unusual Circumstances

If there is a case that involves the type of truly unusual circumstances that warrant

nonconsensual third party releases, it is this one.  First, it is rare when a group, like the

CII Settlement Claim Parties, have the unique ability to provide the Debtors with well over

$1 billion of value.  *See* 9/2/09 Tr. at 152:6-9, 152:13-19 (Conn) ("It is rare, as far as I

understand, for one person to be able to create this kind of value through one of these plans.").

---

[141] *See, e.g., Metromedia*, 416 F.3d at 143 (holding that plan consideration need not flow to all releasing parties and that "[s]uch consideration has weight in equity, but it is not required.") (citing *Drexel*, 960 F.2d at 289, 293); *Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.),* 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding that provision of consideration by secured lenders on behalf of released parties constituted substantial consideration of the sort that justifies nonconsensual third-party releases).

[142] 8/17/09 Tr. at 63:3-9 (Doody) (noting that "most if not all of the release parties have indemnification obligations from the Debtors"); *see also XO Commc'ns,* 330 B.R. at 440 (non-consensual third party releases satisfied *Metromedia* standard where substantial consideration was provided for the releases, there was an identity of interest between the debtor and releasees "as a result of indemnification/contribution exposure of the Debtor," and the release was necessary to the Plan process).

[143] *See* Doody Decl. ¶¶ 39-40.  The U.S. Trustee argues that indemnification obligations on their own are insufficient to justify third party nonconsensual releases.  UST Objection at 14.  The Debtors do not
(Continued…)

Second, this is one of the largest prearranged cases ever. *See* 8/17/09 Tr. at 63:10-12 (Doody).

Third, the Plan is raising billions of dollars in equity and debt for the company during one of the

most terrible and uncertain times the credit markets have ever seen, through the considerable

contribution of the Released Parties. *See* 8/17/09 Tr. at 63:10-14 (Doody). Fourth, the success

of the Plan is highly dependent on the reinstatement of senior debt and the preservation of NOLs,

the success of which depends on the Released Parties' participation in the Plan. 8/17/09 Tr. at

63:10-16 (Doody). Finally, one of the key figures in this case, Mr. Allen, is a public figure who

attracts a significant amount of nuisance lawsuits and whose representatives negotiated for the

Third Party Release for this reason, among others.

Overall, given the unique manners in which value is being created, the magnitude of the

case, and the once-in-a-lifetime market conditions in which it is all transpiring makes these

chapter 11 cases involve the type of truly unusual circumstances that warrant nonconsensual

third party releases.

### 4.        Essential to the Consensual Plan Process

The Third Party Release is an integral part of the Plan and the Plan Process. Variations

of the Third Party Release were included in draft plans since the outset of negotiations over the

straw man between Vulcan, the bondholders and the Company. *See* 8/17/09 Tr. at 62:22-24

(Doody) (the releases existed in all versions of the Plan). Moreover, we know the substantial

contribution on the part of Mr. Allen was provided, in part, as consideration for the Third Party

Release, because Mr. Conn testified that the release is "an essential element of the plan. And I

---

agree but note that in this case, the Debtors' indemnification obligations are but one of many factors
that support the Third Party Release.

think if it weren't included it would cause -- you'd have to reconsider the overall plan."  9/2/09

Tr. at 87:23-25 (Conn).  Finally, the Third Party Release is required under the CII Settlement, an

essential component of the Plan, which was negotiated at arm's-length and good faith with

multiple creditor constituencies and which has been accepted by nearly all Classes of Claims

entitled to vote.  *See* Doody Decl. ¶ 39.

### 5. Fair, Equitable, and Reasonable

In addition, the Third Party Release is fair, equitable, and reasonable.  The Third Party

Release is reasonable and consistent with public policy because it protects the Plan and insulates

the Debtors from indirect liability while preserving government or regulatory enforcement

actions.  *See* UST Objection at 14; Plan, Art. X.E.  Indeed, the Third Party Release does not

release parties from criminal or similar liability, and governmental entities tasked with

enforcement are best suited to bring any such actions, if any exist.  *See* Plan, Art. X.E.

### C. Injunction

Article X.F of the Plan enjoins all Entities from commencing or continuing any Causes of

Action released pursuant to the Plan or Confirmation Order.  The injunction is necessary to

effectuate the Plan Releases and to protect the Reorganized Debtors from any potential litigation

from prepetition creditors as they implement the provisions of the Plan after the Effective Date.

Any such litigation would hinder the efforts of the Reorganized Debtors to effectively fulfill their

responsibilities as contemplated in the Plan and thereby to maximize value for all Holders of

Claims and Interests.  The injunction is narrowly tailored to achieve its purpose and similar

K&E 15588356.

injunctions have been approved by courts in other chapter 11 cases.[144] It is uncontroverted that the injunction will enable the Reorganized Debtors to comply with their obligations under the Plan and applicable related documents. Moreover, no party has objected to the injunction per se. Accordingly, the Debtors request that the Court approve the injunction provision contained in Article X.F of the Plan.

Also, the CCI Notes Exchange Offer Prospectus, filed on September 14, 2007 provides that purchasers of notes "will not have any recourse against Charter Holdco, Mr. Allen or any of their or our affiliates" if Charter Holdco does not fulfill their obligations under the CCI Notes Exchange. CX 287 at 41.

**D. Exculpation**

Finally, the evidentiary record shows that the Exculpation Provision, set forth under Article X.G of the Plan, should be approved . The scope of the exculpation contained in Article X.G of the Plan is appropriately limited to the Exculpated Parties' participation in these Chapter 11 Cases, has no effect on liability that results from gross negligence or willful misconduct and does not apply to any acts or omissions expressly set forth in and preserved by the Plan. Moreover, the evidence shows that the Exculpated Parties played a critical role in the formulation of the Plan and the Exculpation Provision played a role in bringing these parties to the table. *See* Doody Decl. ¶ 44. In addition, the scope of the Exculpation Provision itself and the composition of the Exculpated Parties is entirely consistent with established practice in this

---

[144] *See, e.g., In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *Bally*, 2007 WL 2779438, at *8 (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan).

and other jurisdictions.[145]  Accordingly, the Exculpation Provision set forth in Article X.G of the

Plan should be approved.

---

[145] *See, e.g.*, *In re DJK Residential LLC*, No. 08-10375 (Bankr. S.D.N.Y. May 7, 2008); *In re Calpine Corp.*, No. 05-60200 (Bankr. S.D.N.Y. Dec. 19, 2007); *In re Source Enters., Inc.*, No. 06-11707, 2007 WL 2903954, at *13 (Bankr. S.D.N.Y. Oct. 1, 2007) (approved exculpation provision because provision was in the best interests of the debtors' estates and the creditors); *Bally*, 2007 WL 2779438, at *8 (finding that the exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *Oneida.*, 351 B.R. at 94 n.22 (in overruling objection to exculpation clause court noted that exculpation language that "generally follows the text that has become standard in this district, is sufficiently narrow to be unexceptionable.").

K&E 15588356.

## CONCLUSION

For the reasons set forth herein, the Debtors submit that the Plan fully satisfies all applicable requirements of the Bankruptcy Code and respectfully request that this Court confirm the Plan.

Dated: New York, New York
      September 18, 2009

Respectfully submitted,

By: _____*/s/ Richard M. Cieri*_____
Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
M. Catherine Peshkin
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 N. LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession
(other than Charter Investment, Inc.)*

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York 10119
Telephone:    (212) 594-5000
Facsimile:    (212) 967-4258

*Counsel to Debtor and Debtor in Possession Charter
Investment, Inc.*

K&E 15588356.