KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip S. Kaufman
Jeffrey S. Trachtman
Joel M. Taylor
David Blabey
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for the First Lien Lender Group

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
In re                                          :    Chapter 11
                                               :
CHARTER COMMUNICATIONS, INC., et al.,          :    Case No. 09-11435(JMP)
                                               :
                          Debtors.             :    (Jointly Administered)
                                               :
                                               :
---------------------------------------------------------------- x


# POST TRIAL BRIEF
# OF THE FIRST LIEN LENDER GROUP

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

THE FACTS ................................................................................................................................... 3

ARGUMENT ................................................................................................................................ 12

I.     Confirmation of the Plan will Create an Event of Default under
Section 8(k)(ii) of the First Lien Credit Agreement. ......................................................... 12

     A.     If the Plan is confirmed, the Apollo Group will have a greater
percentage of the "ordinary voting power for the management"
of CCI than Allen. ................................................................................................. 12

     B.     The Apollo Group is acting as a "group" within the meaning of
Section 8(k)(ii). ..................................................................................................... 16

          1.     Apollo, Oaktree and Crestview are acting together for the
purpose of acquiring CCI's equity. ........................................................... 17

          2.     Apollo, Oaktree and Crestview are acting together to vote
their equity securities. .............................................................................. 20

II.     The Debtors Have Defaulted Under Section 10.5 of the First Lien
Credit Agreement. ............................................................................................................. 23

CONCLUSION ............................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Bender v. Jordan,*
439 F. Supp. 2d 139 (D.D.C. 2006)......................................................................................20

*CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP,*
562 F. Supp. 2d 511 (S.D.N.Y.), *aff'd,* 292 Fed. Appx. 133 (2d Cir. 2008) ....................17, 21

*Citizens First Bancorp, Inc. v. Harreld,*
559 F. Supp. 867 (W.D. Ky. 1982)........................................................................................21

*Consedine v. Portville Central School District,*
12 N.Y.3d 286....................................................................................................................14

*In re Delta Air Lines, Inc.,*
381 B.R. 57 (Bankr. S.D.N.Y), *aff'd,* No. 08 Civ. 2411 (RMB),
2008 WL 4444001 (S.D.N.Y. Sept. 29, 2008) ..............................................................13 n.13

*Great Southwest Overseas Fin. Corp. N.V.,* SEC No Action Letter,
Fed. Sec. L. Rep. P 78, 714, 1972 WL 7493 (Apr. 17, 1972), .........................................18, 19

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.,*
Case No. 00 CV 1115 (LAK), 2001 WL 46978 (S.D.N.Y. Jan. 19, 2001),
*aff'd,* 286 F.3d 613 (2d Cir. 2002)................................................................................18 n.16

*Hubco, Inc. v. Rappaport,*
628 F. Supp. 345 (D.N.J. 1985)......................................................................................18 n.16

*Jacobs v. Pabst Brewing Co.,*
549 F. Supp. 1050 (D. Del. 1982)..........................................................................................21

*Litzler v. CC Investments, L.D.C.,*
411 F. Supp. 2d 411 (S.D.N.Y. 2006) .............................................................................18 n.16

*MCI Communications Corp.,* SEC No Acton Letter,
1978 S.E.C. No-Act. LEXIS 1764 (Aug. 21, 1978)................................................................19

*Morales v. Freund,*
163 F.3d 763 (2d Cir. 1999) ..................................................................................................23

*Morales v. Quintel Entm't, Inc.,*
249 F.3d 115 (2d Cir. 2001) ....................................................................... 17, 20, 22 & n.18

KL3 2740515.1

# TABLE OF AUTHORITIES

Page

*Rainbow Navigation, Inc. v. Yonge,*
  Civ. A. No. 9432, 1989 WL 40805 (Del. Ch. Apr. 24, 1989) .................................................14

*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007) .................................................................19 n.17, 20 n.17, 22, 23

*S.E.C. v. First City Financial Corp., Ltd.,*
  688 F. Supp. 705 (D.D.C. 1988), *aff'd*, 890 F.2d 1215 (D. D. Cir. 1989) ..............................22

*Savin Business Machines Corp. v. Rapifax Corp.,*
  No. 5331, 1978 WL 2498 (Del. Ch. Feb. 15, 1978) ........................................................13 n.12

*Schaffer ex rel Lasersight Inc. v. CC Investments, LDC,*
  No. 99 Civ. 2821 (VM), 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ..... 18, 20, 22 & n.18

*Schaffer ex rel Triton Energy Corp. v. Soros,*
  No. 92 Civ. 1233 (LMM), 1994 WL 592891 (S.D.N.Y. Oct. 31, 1994)................................17

*Seilon, Inc. v. Lamb,*
  No. C83-314, 1983 WL 1354 (N.D. Ohio July 27, 1983) ......................................................23

*Tanscon Lines v. A.G. Becker, Inc.,*
  470 F. Supp. 356 (S.D.N.Y. 1979) .......................................................................................23

*Wellman v. Dickinson,*
  682 F.2d 355 (2d Cir. 1982) ..........................................................................................21, 22

## STATUTES AND RULES

15 U.S.C. 78m(d)(6), S.E.C. Act of 1934 § 13(d) .................................................... *passim*

15 U.S.C. 78n(d)(8), S.E.C. Act of 1934 § 14(d) ..........................................................................12

17 C.F.R. § 240.13d-5(b)(1) .......................................................................................................17

## OTHER

American Heritage Dictionary (3d ed. 1994) .......................................................................13 n.13

Black's Law Dictionary (9th ed. 2009)..............................................................................13 n.13

Webster's Ninth New Collegiate Dictionary (9th ed. 1991)...................................................13 n.13

KL3 2740515.1

## PRELIMINARY STATEMENT

The First Lien Lender Group joins in and adopts in full the post-trial brief submitted by JPMorgan Chase Bank, N.A., as Administrative Agent for prepetition first-lien secured lenders (the "Lenders") to Charter Communications Operating, LLC ("CCO") under the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated as of March 6, 2007 (the "Credit Agreement") (the "JPMorgan Brief").[1]  As the JPMorgan Brief demonstrates, the evidence admitted at trial proves that the Plan not only fails to cure multiple prepetition defaults under the Credit Agreement, but also triggers additional defaults that bar reinstatement here.  The First Lien Lender Group submits this separate brief to elaborate on a few of the central issues in dispute.[2]

Confirmation of the Plan will create an event of default under Section 8(k)(ii) of the Credit Agreement because, among other things, it will result in a "group" under Section 13(d) of the Exchange Act – consisting of Apollo, Oaktree and Crestview (the "Apollo Group") – that has the power to vote equity securities having more than 35% of "the ordinary voting power for the management" of CCI and more than the Paul Allen Group.[3]  The Debtors' own financial advisor, Stephen Goldstein, confirmed in his testimony that the ordinary voting power for the management of a company is properly measured as a percentage of directors that a shareholder has the power to elect.  Here, if the Plan is confirmed, the Apollo Group will receive

---

[1]  Terms not defined herein have the meanings assigned in the JPMorgan Brief or in the Memorandum of Law of the First Lien Lender Group in Opposition to Confirmation of Debtors' Joint Plan of Reorganization and Joinder to the Objection Filed by JPMorgan Chase Bank N.A. as Lien Agent (the "First Lien Confirmation Objection").

[2]  In addition to the arguments on the merits, the First Lien Lender Group adopts the comprehensive argument on burden of proof provided in the JPMorgan Brief.  For the reasons set forth therein, the First Lien Lender Group believes it is clear that the Debtors bear the burden of proof on each of the issues in dispute in this case.

[3]  As explained in the JPMorgan Brief, the Paul Allen Group will actually have *zero* voting power for the management of CCO, which is the "borrower" under the Credit Agreement.  But there is a change of control here even if the "borrower" is construed to be CCI.

KL3 2740515.1

a majority of CCI's Class A Stock, giving it the power to elect seven of eleven members of CCI's board of directors, or 64%. Moreover, as shown below, the Apollo Group will have the ability immediately upon confirmation to appoint or replace – merely by written consent – no less than five of the nine initial members of CCI's Board of Directors. This effects a change of control both under the technical terms of Section 8(k)(ii) and as a matter of substantive reality.

To avoid this conclusion, the members of the Crossover Committee have argued, against overwhelming evidence, that they have acted not as a group intent on acquiring and controlling Charter, but merely as individual investors seeking to protect their separate investments in the company. The record evidence is to the contrary – particularly with respect to the Apollo Group. These parties did not just act defensively to protect a passive investment; they affirmatively invested over $1 billion to effectuate a leveraged buyout and even agreed to backstop the funding necessary to cash out CCH II bondholders and ensure their takeover of Charter.

In particular, the evidence adduced at trial shows that on February 5, 2009, during a meeting at the offices of Paul Weiss Rifkand, Wharton & Garrison L.L.P. ("Paul Weiss"), the members of the Apollo Group agreed to act together both to *acquire* and to *vote* CCI equity securities and thus constitute a Section 13(d) "group." At that meeting, Apollo, Oaktree and Crestview agreed among themselves to a formula for allocating the amount of CCI equity that each would acquire in the rights offering. As part of that discussion, Apollo and Oaktree agreed to put a Crestview representative on Charter's board of directors, though under the negotiated backstop allocation formula Crestview would not acquire sufficient equity to have the right to appoint a director. This agreement will now likely be implemented through the common action of holders of a majority of Class A stock – acting *post*-confirmation. (Point I, below).

2

In addition, the Debtors are in default under Section 10.5 of the Credit Agreement due to their continuing refusal to pay the costs and expenses incurred by the First Lien Lender Group since February 28, 2009. The Plan cannot be confirmed unless this default is cured. (Point II, below).

For these reasons and those discussed in the JP Morgan Brief, confirmation must be denied.

## THE FACTS

The JPMorgan Brief marshals the record evidence demonstrating that the members of the Takeover Group have acted and continue to act together to acquire CCI equity for their common purpose of controlling CCI post-reorganization. We incorporate that presentation herein and supplement it with additional facts showing that the members of the Apollo Group are acting together for the purpose of *voting*, as well as acquiring, CCI equity.

The first contact between members of the Apollo Group reflected in the record occurred in 2005, when Jeffrey Marcus, a partner at Crestview, met with senior people at Apollo, including Eric Zinterhofer, to discuss Crestview's efforts to raise equity for the purchase of a cable company other than Charter. (Trial Tr. 21, July 29, 2009 (Marcus)). At some point during those conversations they "discovered that [they] both had – an interest" in Charter. (*Id.*).[4] In 2007, Apollo and Crestview made a joint bid to acquire a controlling interest in Charter from Allen in a proposed $1 billion take private transaction in which Crestview was to invest $200 million alongside an $800 million investment by Apollo. (Trial Tr. 60-63, July 29, 2009

---

[4]    In 2006, Crestview made an initial investment in Charter's CCH I bonds to use as currency to purchase cable television systems that Charter was divesting to raise capital. (Trial Tr. 16-17, July 29, 2009 (Marcus); JPX 193, CHARTER 00050300). After establishing a position in the debt, Crestview obtained financing and made a written proposal to the company to buy 650,000 Charter subscribers for roughly $2 billion. (*Id.*) Charter turned down Crestview's proposal. (*Id.*)

(Marcus); JPX 22, at CHARTER-e 00779580). The proposed transaction contemplated that Mr. Marcus would join Charter's board as its Chairman. (*Id.*).[5] After it became apparent that Allen was not seriously interested and discussions related to the transaction concluded, Messrs. Zinterhofer and Marcus continued to "informally discuss" Charter. (Trial Tr. 21-22, July 29, 2009 (Marcus)). Sometime between September and December 2008, Mr. Marcus told Mr. Zinterhofer that Crestview was buying additional CCH I notes. (Trial Tr. 42-44, July 28, 2009 (Zinterhofer)).[6]

On Friday, December 12, when Charter announced its intention to pursue a restructuring, Mr. Marcus called Mr. Zinterhofer, and Barry Volpert (the founding partner of Crestview) called his contact at Oaktree, "knowing that Oaktree was a large holder of the debt." (Trial Tr. 25, July 29, 2009 (Marcus)). Crestview had a "longstanding relationship" with Oaktree. (JPX 193, at CHARTER-e 00050298). Mr. Zinterhofer called the head of Oaktree's Distressed Opportunities Group, Robert Karsh, that same day. (Trial Tr. 45-46, July 28, 2009 (Zinterhofer)). The three firms stayed in "regular contact" over the following weekend. (JPX 273, at CHARTER-e 00121294). A topic of common concern that they discussed was the possibility that the holders of CCH II notes, which are one class senior to the CCH I notes, would argue that they hold the fulcrum security in a restructuring. (*Id.* at CHARTER-e 00121293). Addressing that concern, Marc Rowan, one of the founding partners of Apollo, suggested to Mr. Zinterhofer that he consider using a rights offering underwritten by Apollo, Oaktree and

---

5    Mr. Marcus is a long-time cable entrepreneur who sold one of his former companies, Marcus Cable, to Charter in 1998. (JPX 22, at CHARTER-e 00779580). The legacy Marcus Cable systems represent approximately 20% of Charter's current footprint. (JPX 22, at CHARTER-e 00779580; Trial Tr. 14-15, July 29, 2009 (Marcus)).

6    Apollo, Oaktree and Crestview each invested in the CCH I bonds with the expectation that those bonds would be the fulcrum security in a restructuring. (JPX 193, at CHARTER-e 00050300); Trial Tr. 18, July 29, 2009 (Marcus); Trial Tr. 40-41, July 28, 2009 (Zinterhofer); JPX 159, at CHARTER-e, at 00818774, Trial Tr. 204-205, July 29, 2009 (Liang)).

Crestview to pay off the CCH II debt, and advised him that the "key [was] to get Oak Tree and Crest on board." (JPX 308, at CHARTER-e 00077156). The following day, Monday, December 15, Mr. Rowan sent an e-mail to Mr. Karsh letting him know that he had "urged Eric to get aligned with [him]" and expressing his view that "this may be a great opportunity notwithstanding that it is coming a year too soon." (JPX 99, at CHARTER-e 00819783).

By mid-January 2009, Apollo and Oaktree were aligned as to the desirability of a rights offering. According to Christine Villaluz of Franklin, those two firms were "pushing hard" for a rights offering in their discussions with the larger group of bondholders that came to constitute the Crossover Committee. (Trial Tr. 99-100, July 23, 2009 (Villaluz)). As for Crestview, its "preference would have been to have no rights offering" out of concern that its "voice" would be diluted due to limitations on the amount that it could invest. (Trial Tr. 36, July 29, 2009 (Marcus)). Crestview "want[ed] to have a seat at the table," but "compared to some of the bigger institutions in the credit it was small." (*Id.* at 36).[7]

On January 30, 2009, the Crossover Committee sent Charter a preliminary term sheet for a proposed Chapter 11 plan of reorganization contemplating a $1 billion dollar rights offering. (JPX 158, at CHARTER-e 00133065, 133085-103). The preliminary term sheet included a draft provision governing how CCI's initial directors would be selected. That provision, which tied the right to nominate a director to the amount of equity the holder would have in the reorganized company, stated in relevant part: "Each holder of [___]% or more of the

---

[7]     Crestview had limited resources to commit to a rights offering. At the time, it had two funds under management totaling approximately $4 billion. (Trial Tr. 36, July 29, 2009 (Marcus)). Fund I, from which it made its initial investment in Charter, was approximately $1.5 billion in size. (Trial Tr. 60, July 29, 2009 (Marcus)). The maximum amount that Crestview could commit to any single investment as a matter of firm policy was ten percent, or $150 million. (*Id.*). Crestview needed approval of the advisory committee of the limited partners of Fund II to commit additional capital to a rights offering. At that time, no capital had yet been committed from Fund II in any investment due to the limited partners' concerns about valuations and the weak economy. (JPX 193, at CHARTER-e 00050297). Charter would be the first ever investment by Fund II, and, according to Mr. Marcus, sentiment among the limited partners "at the time was pretty negative." (Trial Tr. 38, July 29, 2009 (Marcus)).

KL3 2740515.1

voting power of the New Common Stock on the Effective Date shall have the right to nominate one member of the Board for each [   ]% of voting power, for a total of [   ] nominees." *Id.* at CHARTER-e 00133096).

On February 4, Mr. Marcus submitted a memorandum to Crestview's investment committee, attaching a copy of the preliminary term sheet, in which he recommended making a commitment to invest $285 million in a $1 billion rights offering. (*Id.* at CHARTER-e 00133064). As reflected in that memo, Mr. Marcus expected that Crestview "would get one board seat" at the level of commitment he recommended. (*Id.* at CHARTER-e 00133071-72).

The following day, February 5, there was an "all hands" meeting of the Crossover Committee at Paul Weiss's offices. The Committee decided at that meeting to give Apollo, Oaktree and Crestview the right to invest $400 million of equity in Charter over and above the rights offering as consideration for their commitment to backstop the rights offering. (JPX 170, at CHARTER-e 00144028). Apollo, Oaktree and Crestview agreed to subscribe for any rights not exercised by any other noteholder in the rights offering – the so-called "Excess Backstop." (Trial Tr. 42-43, July 29, 2009 (Marcus)). Apollo had initially agreed to backstop the entire amount of the offering, but then worked out with Oaktree and Crestview a "formula that provide[d] for a proportionate split" based on the firms' maximum equity commitments. (JPX 170, at CHARTER-e 00144027; Trial Tr. 42-43, July 29, 2009 (Marcus)).

One important consideration for Crestview in deciding how much to commit to the backstop was that board representation was going to be based on a "10% ownership" threshold. (JPX 170, at CHARTER-e 00144028). According to Mr. Marcus, when they were talking about the issue of a ten percent threshold, he "did the math in [his] head" and realized there was a good possibility that Crestview would not have ten percent and therefore, under the

6

formula, would not be entitled to a board seat. (Trial Tr. 43, July 29, 2009 (Marcus)). When he came to that realization, he got up out of his chair and walked over to Mr. Zinterhofer to express his concern, and then walked to the other side of the table, where Robert O'Leary and Ken Liang of Oaktree were sitting, and expressed the same concern to them. (Trial Tr. 43-44, July 29, 2009 (Marcus)).

At 7:22 p.m., while the meeting at Paul Weiss's offices was still ongoing, Brian Cassidy, a principal at Crestview who attended the meeting, sent a one-sentence e-mail to Mr. Volpert and another Crestview partner, Robert Delaney, reporting that "Apollo and Oaktree agreed to put Jeff on the board even if we end up under 10%." (JPX 170, at CHARTER-e 00144028).

At 8:42 p.m., shortly after the meeting concluded, Mr. Marcus sent an e-mail to Messrs. Volpert and Delaney confirming that "Our agreement with Apollo and Oak Tree is based on our maximum equity commitments . . . $250mm for Crestview and Oak Tree and the balance for Apollo. Apollo has agreed to backstop the entire amount but we've all agreed to a formula that provides for a proportionate split . . . They have also agreed to put me on the board even though we will own less than 10%." (*Id.* at CHARTER-e 00144027).

At trial, Mr. Marcus did not deny that Apollo, Oaktree and Crestview had agreed to a formula for allocating the backstop. (*Id.*; Trial Tr. 42-43, July 29, 2009 (Marcus)). He did deny, however, that Apollo and Oaktree had promised him a seat on the board. He testified, in effect, that he lied to Messrs. Volpert and Delaney, because he was "tired" and "hungry" and knew that Mr. Volpert was "very, very anxious" about the issue, and that if he didn't "assuage [him] on the point [he] would probably be on the phone with him for an hour." (Trial Tr. 44-45,

7

July 29, 2009 (Marcus)). But Mr. Marcus's supposed fatigue does not explain why Mr. Cassidy wrote an e-mail an hour earlier contemporaneously reporting the existence of an agreement.[8]

On February 10, after Mr. Marcus was presumably rested and fed, Messrs. Marcus, Delaney and Cassidy submitted a memorandum to Crestview's investment committee recommending that it invest up to $225 million in a $1.623 billion dollars rights offering. (JPX 193, at CHARTER-e 00050311). The memo reflects that, based on the amounts of the non-binding commitments made for the rights offering "together with Apollo and Oaktree, [we] would control approximately 60% of Charter's equity post-restructuring." (*Id.* at CHARTER-e 00050304). Mr. Marcus and his colleagues also reconfirmed to Crestview's investment committee that Apollo and Oaktree had committed to a board seat for Mr. Marcus:

- "They have committed to a board seat for Jeff as part of the transaction." (JPX 193, at CHARTER-e 00050301);

- "Risks: Minority Ownership Position: Mitigants: We would get one board seat." (*Id.* at CHARTER-e 00050311).

The next day, Apollo, Oaktree and Crestview all executed Commitment Letters obligating them to provide Charter with financing in connection with a plan of reorganization incorporating the terms and conditions of a final term sheet on which the Crossover Committee had reached consensus (the "Term Sheet"). (Plan Supp. Exh. 10; Trial Tr. 195, July 29, 2009 (Liang)).[9]

---

[8]     Neither Mr. Liang nor Mr. Zinterhofer testified at trial about what occurred at the February 5 meeting. Mr. Zinterhofer testified only as to two telephone conversations that he had with Mr. Marcus regarding his interest in serving on the board. (Trial Tr. 51-52, July 28, 2009 (Zinterhofer)). Mr. Zinterhofer further testified that his support for Mr. Marcus's membership on the board, which he admitted at deposition, is now conditioned on whether the board might need some audit committee members. (Trial Tr. 239, July 28, 2009 (Zinterhofer)).

[9]     Six other members of the Crossover Committee also executed Commitment Letters: Capital Research & Management Holdings, L.P., Fidelity Management & Research Company, Franklin Advisers, Inc. ("Franklin"), Lord, Abbett & Co. LLC, MFC Global Investment Managment (U.S.), LLC, and Western Asset Managment Company. (Plan Supp. Exh.10)

8

On Friday, March 6, a memorandum was distributed to the members of Crestview's investment committee seeking approval to remove a due diligence condition on Crestview's $225 million commitment. In the executive summary of the memo, Messrs. Marcus and Cassidy stated: "We view this as an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest U.S. cable company . . . ." (JPX 234, at CHARTER-e 00114533).

At a meeting of Crestview's deal team the following Sunday, March 8, Mr. Delaney gave Mr. Cassidy certain changes and edits that should be made to the memo. (Trial Tr. 156, July 29, 2009 (Marcus)).[10] Based on those instructions, Mr. Cassidy revised all of the Crestview investment committee memoranda "to make it crystal clear that [Crestview] is not a 'controlling' group with Oaktree and Apollo." (Trial Tr. 156-57, July 29, 2009 (Marcus)). Revised copies of the memoranda were sent to Crestview's CFO, Evelyn Pellicone, at 11:27 p.m. on March 11, the night before the due diligence condition expired in Crestview's Commitment Letter. (JPX 243, at CHARTER-e 00713301). Mr. Marcus confirmed at trial that the revised versions of the memos sent to Ms. Pellicone "should be the versions of the memos that incorporate all of the final changes." (Trial Tr. 158, July 29, 2009 (Marcus)).[11] The revised version of the February 10 memo contained the identical representation that Apollo and Oaktree had agreed to give Crestview a seat on Charter's post-restructuring board:

---

[10] According to Mr. Marcus, at the March 8 meeting Mr. Volpert asked him and Mr. Cassidy to see if they could negotiate an amendment to the term sheet lowering the voting power threshold for the appointment of directors from 10% to 8% in order to "guarantee" Crestview a seat on the board. (Trial Tr. 45-47, July 29, 2009 (Marcus)). Mr. Marcus testified that although he called Mr. Zinterhofer to achieve that change, Mr. Zinterhofer "didn't seem very enthusiastic." (*Id.* at 48).

[11] Mr. Marcus testified that the originally distributed versions of the investment committee memoranda were "works in progress" that were "in the process of becoming finalized." (Trial Tr. 107, July 29, 2009 (Marcus)).

9

- "They have committed to a board seat for Jeff as part of the transaction." (JPX 243, at CHARTER-e 0713303);

- "Risks: Minority Ownership Position: Mitigants: We would get one board seat." (*Id.* at CHARTER-e 00713313).

The Debtors filed a plan of reorganization shortly after the due diligence conditions lapsed in the Commitment Letters. The 10% voting power threshold agreed to at the February 5, 2009 meeting was incorporated into Article VI(N) of the Plan. Under CCI's proposed amended and restated Certificate of Incorporation to become effective under the Plan, Class A shareholders have the power to elect seven of eleven members of CCI's board of directors. The remaining four directors are electable by Class B shareholders.

On July 16, 2009, the Debtors disclosed the identities of all but two members of CCI's initial board of directors. They include four Allen appointees and five "Class A" appointees: (i) two Apollo appointees, (ii) one Oaktree appointee, (iii) Neil Smit, and (iv) an unamed Franklin appointee (Trial Tr. 233, July 21, 2009 (Smit)). The remaining two "Class A" seats were originally to have been filled by vote of the other Class A directors or stockholders, but this was changed on the eve of confirmation to provide that the so-called "Gap Directors" are to be selected by a majority vote of the entire Board. *See* Article IV(b)(i)(B)(4) of CCI's proposed amended and restated Certificate of Incorporation (the "Certificate of Incorporation") (Trial Tr. 233-34, July 21, 2009 (Smit)).

Notwithstanding this eleventh hour attempt to mask the Apollo Group's true level of voting power, a number of other provisions in the Certificate of Incorporation, as well as in CCI's proposed amended and restated By-Laws (the "By-Laws"), confirm the Apollo Group's ability to exercise voting control greater than that exercised by Allen (and to fulfill the promise to put Mr. Marcus on the board):

10

- Art. V(c) of the Certificate of Incorporation empowers the owners of a majority of the Class A shares to remove a director elected by Class A at any time, with or without cause. (*Id.*)

- Art. IV(b)(i)(B)(3) of the Certificate of Incorporation provides that vacancies created by the departure of a director elected by Class A stockholders are to be filled by a majority of remaining Class A-appointed directors or by vote of the Class A stockholders themselves. (*Id.*)

- Section 2.10 of CCI's By-Laws empowers the holders of stock having enough votes to authorize action at an Annual Meeting or special stockholder meeting to act by written consent without prior notice, meeting, or vote. (Plan Supp. Exh. 2) (CX 406).

As explained more fully at pp. 14-15, below, these provisions will empower the Apollo Group, immediately upon confirmation, to appoint or replace five of the nine original board members, and through those five votes to select the remaining two "Gap Directors."

At trial, Stephen Goldstein, the Lazard banker who performed the Debtors' voting power calculations, admitted that voting power for the management of a company is properly measured as a percentage of all directors a shareholder has the power to elect. (Trial Tr. 64-69, Aug. 24, 2009 (Goldstein)). He also acknowledged, as the proposed governing documents make clear, that the members of the Apollo Group will recieve more than 50% of the new Class A Stock to be issued by CCI, giving them the power to elect seven members of Charter's eleven-member board in a hypothetical vote of shareholders. (Trial Tr. 68-69, Aug. 24, 2009 (Goldstein)).

## I.    Confirmation of the Plan will Create an Event of Default under Section 8(k)(ii) of the First Lien Credit Agreement.

Section 8(k)(ii) defines as an Event of Default "the consummation of any transaction . . . the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% . . . *of the ordinary voting power for the management of the Borrower*, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage . . . *of the ordinary voting power for the management of the Borrower* than such 'person' or 'group' . . ." (JPX 2, at JPM-CH 00006003) (emphasis added). We show below that confirmation of the Plan will result in the Apollo Group having the power to vote equity securities having more than that required to trigger a default under Section 8(k)(ii).

### A.    If the Plan is confirmed, the Apollo Group will have a greater percentage of the "ordinary voting power for the management" of CCI than Allen.

We showed in the First Lien Confirmation Objection (at 7-11) that, because the "ordinary voting power for the management" of a company is exercised through the election of directors, the proper method of calculating the voting power of a "person" or "group" for purposes of Section 8(k)(ii) is the percentage of directors a person or group has the power to elect. As noted above, the Debtors' own witness, Mr. Goldstein, confirmed that this is the appropriate way to measure voting power for the management of a company. (Trial Tr. 64-69, August 24, 2009 (Goldstein)). He also acknowledged that the majority of new Class A Stock to be issued by CCI to the members of the Apollo Group would give the group the power to elect seven members of Charter's eleven-member board in a hypothetical vote of shareholders. (*Id.* at

68-69). That power, Mr. Goldstin conceded, is equivalent to 64% of the voting power for the management of the company. (*Id.* at 64-69).

In its pre-trial brief (at 9), the Crossover Committee argued that calculating voting power in this manner is "based completely upon speculation and conjecture" because "it is impossible to know now who will, at the time of the first election, be the parties who hold interests in Charter, and whether those parties will have any agreements." That completely misses the point. The Apollo Group's voting power *as of confirmation* is calculated based on the voting power attributable to its members' shares if those shares were voted in a hypothetical vote of shareholders. That is how voting power is customarily calculated.[12] And it is how Lazard performed its voting power calculations. (Trial Tr. 23-24, August 24, 2009 (Goldstein)) (under the Debtors' methodology voting power expressed as percentage of "shares outstanding that would vote upon emergence for matters submitted to a stockholder" vote).

It is irrelevant under Section 8(k)(ii) whether a person or group intends to hold their equity interests for any particular duration or to exercise their voting power at any particular time or in any particular way. For an event of default to occur, a "person" or "group" need only have the "power" to vote equity securities with the requisite voting power.[13] Reading any additional requirement into the Credit Agreement would violate the basic canon of contract

---

[12] Voting power is routinely calculated by the courts as the power attributable to shares if they were voted in a hypothetical vote of shareholders. *See, e.g., Savin Business Machines Corp. v. Rapifax Corp.*, No. 5331, 1978 WL 2498, at *1 (Del. Ch. Feb. 15, 1978) (voting power calculated based on shareholders' "right to elect" directors, and noting that present board composition reflected that voting power).

[13] It is a basic tenet of contract interpretation that words and phrases used in a contract should be given their plain meaning. *In re Delta Air Lines, Inc.*, 381 B.R. 57, 64 (Bankr. S.D.N.Y.) (collecting New York State court opinions) *aff'd*, No. 08 Civ. 2411 (RMB), 2008 WL 4444001 (S.D.N.Y. Sept. 29, 2008). A sound method of determining the plain meaning of words is to look at their dictionary definition. *Id.* The word "power" means the ability or capacity to act. American Heritage Dictionary 649 (3d ed. 1994) ("the ability or capacity to perform or act effectively."); Black's Law Dictionary 1208 (9th ed. 2009) ("The ability to act or not act; esp., a person's capacity for acting in such a manner as to control someone else's responses."); Webster's Ninth New Collegiate Dictionary 922 (9th ed. 1991) (the word "power" is derived from Old French word "poeir" meaning "to be able").

13

interpretation that "Courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *Consedine v. Portville Central School District*, 12 N.Y.3d 286, 293 (2009) (emphasis added) (citation and internal quotation marks omitted). Doing so here would defeat the purpose of Section 8(k)(ii) by allowing an otherwise violative transfer of voting power to occur, and persist indefinitely, until the members of the Apollo Group actually voted their securities. By then, actual change of control of the company would have already been effectuated through confirmation of the Plan.

There is no question that, on the Effective Date, the Apollo Group will instantly have the ability to exercise more than 35% of the voting power for the management of CCI *and* more voting power than Allen – both violations of Section 8(k)(ii). As it currently stands, five of the seven Class A directors will be appointed by operation of the Plan: (a) two Apollo appointees, (b) one Oaktree appointee, (c) Neil Smit, and (d) a yet-to-be-named appointee of Franklin.[14] However, through its majority control of the Class A stock, the Apollo Group would have the power to remove and replace the five Class A directors appointed under the Plan at any time acting unilaterally by written consent. (*See* Plan Supp. Exh. 2). ByLaws, Sec. 2.10; CX 406 Art. VI(C) (removal), Art. IV(b)(i)(B)(3) (filling vacancies)). Delaware state law would pose no impediment to such action. *Rainbow Navigation, Inc. v. Yonge*, Civ. A. No. 9432, 1989 WL 40805, at *4 (Del. Ch. Apr. 24, 1989) (majority shareholder acting by consent may remove and replace initial directors listed in certificate of incorporation).[15] And while the Plan (Article

---

[14] Ms. Villaluz confirmed at trial that Franklin, which is a member of the Takeover Group, intends to exercise its right to appoint a director. (Trial Tr. 50-51, July 23, 2009 (Villaluz)).

[15] Art. IV(b)(1)(B)(3) of the Certificate of Incorporation provides that any vacancy resulting from removal of a director appointed by a Class A Shareholder under the Plan shall be filled by majority vote of the remaining directors so elected or appointed, or, if there are no such directors or such directors fail to fill such vacancies within (footnote continued)

14

VI(N)) contemplates the initial directors serving for a year, that stated expectation is expressly "subject to" the ByLaws. Mr. Smit himself admitted at trial that the Class A shareholders "can remove me from my seat at any time" and that while he will "be on the board as of confirmation, whether or not I stay is another question." (Trial Tr. 65, 136, July 22, 2009 (Smit)). The same is true of Franklin's appointee. Combining its three existing appointees with its power to remove and replace Mr. Smit and the Franklin appointee, the Apollo Group would have the immediate power to select five directors, which is one more than Mr. Allen.

Thus, Section 8(k)(ii) is triggered even without considering the remaining two board vacancies, to be filled by "Gap Directors" appointed by a majority vote of the entire board pursuant to Article IV(b)(i)(B)(4) of CCI's Certificate of Incorporation. (CX 406). But even these appointments would be effectively controlled by the Apollo Group, through its ability to replace Mr. Smit and the Franklin appointee. And starting with the company's first annual meeting of stockholders after the Effective Date, the "Gap Director" provision is inoperative and the Apollo Group would simply have the power to direct the election of all seven Class A directors. (*Id.*)

Nor does the "scaled voting" provision in CCI's articles of incorporation prevent an event of default from occurring. The Debtors have argued that Art. IV(b)(i)(A)(1) of CCI's proposed amended and restated Certificate of Incorporation "prevents any 'person' or Section 13(d) 'group' from obtaining and voting as much as or more voting power than the Paul Allen Group." (CX 406). But as discussed in the First Lien Confirmation Objection (at 11), that is wrong because Art. IV(b)(i)(A)(1) purports only to reduce the votes attributable to shares of

---

30 days, by the vote of the holders of Class A Common Stock. Under that provision, the Apollo Group could unilaterally fill any vacancies by vote of its shares after removing all Class A directors – such that no directors would remain to vote in an election.

stock owned by any such person or group to no "more than 34.9% of the combined voting power of the capital stock of the Corporation." (CX 406). Under the Debtors' method of calculating "voting power," a person or group can hold more than 50% of the new Class A Stock, and thus have the power to elect seven of eleven members of CCI's board, while having less than 34.9% of the combined voting power of the capital stock of the corporation. That person or group – the Apollo Group here – nevertheless may control *more* than 35% of the type of "voting power" relevant here: the power to control Class A and hence appoint a majority of directors of CCI.

## B.  The Apollo Group is acting as a "group" within the meaning of Section 8(k)(ii).

To escape the reality that the Apollo Group is getting what it paid for – a change in control from Allen to itself – the Plan's proponents have argued that Apollo, Oaktree and Crestview are not, despite all appearances, a "group," but rather a loosely affiliated collection of independent creditors. Trial put this nonsense to rest. The evidence is overwhelming that the members of the Apollo Group have acted as a Section 13(d) group.

These three firms have acted together in at least two specific ways that meet the standard for "group" action. First, they have acted together for the purpose of acquiring Charter and thus presumptively will continue to exist upon confirmation as a group with collective power and control exceeding Allen's. This simple fact refutes the strange notion that the Apollo Group would pay more than a billion dollars to acquire Charter and then voluntarily give up the premium value that comes with control. Second, the members of the Apollo Group have agreed to act in concert to exercise their collective power to put Mr. Marcus on the Board, an agreement that now apparently will be honored only after confirmation. In addition to confirming the overall joint purpose and action of the Apollo Group, this specific agreement satisfies any

16

requirement that might exist that the group contemplate engaging in specific joint action post-confirmation.

## 1. Apollo, Oaktree and Crestview are acting together for the purpose of acquiring CCI's equity.

To be a "group" within the meaning of Section 13(d), and thus Section 8(k)(ii) of the Credit Agreement, two or more persons must "agree to act together for the purpose of acquiring, holding, voting, or disposing of equity securities." 17 C.F.R. § 240.13d-5(b)(1). There is no requirement that "the narrow object of acquiring, holding, voting, or disposing of securities must itself serve a broader purpose of seeking corporate control or otherwise exerting influence over corporate affairs." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 125 (2d Cir. 2001). "The existence of a group turns on 'whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between members for the purpose of acquiring, holding, or disposing of securities.'" *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 552 (S.D.N.Y.) (citation omitted), *aff'd*, 292 Fed. Appx. 133 (2d Cir. 2008).

There can be no doubt that Apollo, Oaktree and Crestview are acting together for the purpose of acquiring Charter equity. They collectively agreed to backstop a $1.6 billion rights offering, and agreed among themselves to a formula to divvy up the equity they committed to purchase. As consideration for that commitment, they collectively received an exclusive right to acquire an additional $400 million in equity above and beyond the rights offering. Far thinner evidence of concerted action has been held to support a finding that a Section 13(d) group was formed for the purpose of acquiring equity. *See, e.g., Schaffer ex rel Triton Energy Corp. v. Soros*, No. 92 Civ. 1233 (LMM), 1994 WL 592891, at *4 (S.D.N.Y. Oct. 31, 1994) (evidence that parties discussed acquisition of shares and were aware of each others' positions removed "all

17

reasonable questions" concerning their concerted activity).[16] The Apollo Group's receipt of a shared right to purchase additional equity further supports the conclusion that they are acting as a group. *See, e.g., Schaffer ex rel Lasersight Inc. v. CC Investments, LDC*, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at \*9-\*10 (S.D.N.Y. Dec. 20, 2002) (receipt of common benefit to be shared pro-rata among parties reasonably supports inference that they are acting by agreement).

Relying on a single 35-year-old SEC No-Action letter, *Great Southwest Overseas Fin. Corp. N.V.*, SEC No-Action Letter, Fed. Sec. L. Rep. P 78, 714, 1972 WL 7493 (Apr. 17, 1972), the Debtors argue that the Court should ignore overwhelming record evidence of joint action to acquire equity. They urge the Court to find that the members of the Apollo Group are acting in concert solely for the purposes of reorganization and that once the Plan is confirmed their existence as a group within the meaning of Section 13(d) will magically cease. But *Great Southwest* defeats the Debtors' argument, because it holds that parties acting in concert who *actually acquire stock*, as the Apollo Group will here, are acting as a "group" subject to Section 13(d). *Id.* at \*6.

The actual *result* in *Great Southwest* is plainly distinguishable, because the parties in that case were *not* acquiring stock, only warrants. The Commission's opinion was expressly predicated on its understanding that the holders of the warrants "acted in concert only for the purpose of the plan of refinancing" and that, apart from some ministerial agreements, there were

---

[16] The Debtors and the Crossover Committee cite several readily distinguishable cases in which parties that coordinated their activities in pursuit of parallel interests were found not to be a group. *Litzler v. CC Investments, L.D.C.*, 411 F. Supp. 2d 411 (S.D.N.Y. 2006); *Hubco, Inc. v. Rappaport*, 628 F. Supp. 345 (D.N.J. 1985); *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, Case No. 00 CV 1115 (LAK), 2001 WL 46978 (S.D.N.Y. Jan. 19, 2001), *aff'd*, 286 F.3d 613 (2d Cir. 2002). In none of those cases, in contrast to this one, did the alleged group members either (i) agree to the apportionment of a predetermined quantity of stock that they had collectively committed to acquire, or (ii) receive a common benefit to be shared among them as consideration for their equity acquisitions.

KL3 2740515.1

otherwise "no agreement or arrangement between the holders thereof with respect to the warrants of [sic] the underlying stock." *Id.* at *6. Here, in stark contrast, the record reflects that the Apollo Group negotiated detailed provisions to govern the structure of the post-confirmation board, their voting power to control that board, and many other matters -- and indeed, as discussed above, informally agreed that Jeffrey Marcus will be put on the board post-confirmation. Moreover, even assuming that the Apollo Group had made no specific agreements with respect to post-restructuring actions, it cannot be said that they are not a Section 13(d) group. That is because they will continue to have a unity of interest in their beneficial ownership of a controlling stake in Charter. *See MCI Communications Corp.*, SEC No Acton Letter, 1978 SEC No-Act. LEXIS 1764 (Aug. 21, 1978).

In *MCI Communications*, the SEC opined that it could not find that a Section 13(d) group did not exist where there was a "unity of interest" among a group of banks holding warrants representing the right to purchase 31% of MCI's common stock, because the banks had a significant incentive for a concerted disposition of the warrants to a new control group. Likewise here, the members of the Apollo Group have a unity of interest in a concerted disposition of their CCI stock. Together they will have a controlling interest in the company that will command a significant premium in a subsequent change of control transaction. It would be naïve to think that they would squander that value after investing as much as they have in the rights offering, on top of their considerable pre-petition investments in Charter's debt.[17]

---

[17]     In its pre-trial brief, the Crossover Committee asserted, without citing any authority, that "In order to become a Section 13(d) group, each member of the group must either actually own interests in, or have the right to acquire, equity securities at the time the purported group is formed" and that "the members of the Crossover Committee do not - and will not - own or have any right to acquire equity securities in reorganized Charter unless and until the Plan is confirmed." That misstates the law. In the Second Circuit, a person who does not beneficially own equity securities may nonetheless be a member of a Section 13(d) group. In *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007), the Second Circuit found that a Section 13(d) group existed where one party, who beneficially owned equity securities, loaned money to a second party, who did not, for the purpose of financing the acquisition of securities. (footnote continued)

The Debtors have also suggested that, because Charter initiated restructuring discussions with noteholders, common activities in cooperation with Charter are not "endemic" of an agreement among the noteholders themselves to act together for a Section 13(d) purpose. "Endemic" or not, once discussions began, Apollo, Oaktree and Crestview agreed to act together to acquire and vote CCI securities. Section 13(d) "provides for no exception for group activity having the support or acquiescence of the issuing company; an agreement prompted by communications initiated by the issuer is an agreement nonetheless." *CC Investments, LDC*, 2002 WL 31869391, at \*9-\*10 (preferred shareholders that agreed to terms of stock agreement effecting ultimate disposition of their preferred shares constituted a § 13(d) group though refinancing discussions were initiated by issuer); *See also Morales*, 249 F.3d at 127 (parties' agreement to lock-up provision insisted upon by issuer that governed holding and disposing of securities was sufficient basis to find existence of § 13(d) group). Moreover, there is no evidence that the Debtors initiated, or had any input into, the Apollo Group's agreements concerning the acquisition and voting of CCI's securities.

## 2. Apollo, Oaktree and Crestview are acting together to vote their equity securities.

The existence of a Section 13(d) group is further established by the agreement among members of the Apollo Group to put Mr. Marcus on the board, a promise that will now likely be honored only post-confirmation. Courts have consistently held that a Section 13(d) group is formed when two or more persons act together for the purpose of electing or removing directors. *See, e.g., Bender v. Jordan*, 439 F. Supp. 2d 139, 162-63 (D.D.C. 2006) (Section 13(d)

---

("Jennings apparently owned no MMI stock just prior to the May 2003 purchases he made with the loan from EMR"). *Id.* at 510. Even if the Crossover Committee's assertion were correct, because the members of the Apollo Group have a "unity of interest" extending beyond confirmation, they would qualify as a Section 13(d) group at confirmation when they would become beneficial owners of CCI stock.

20

group formed for purpose of voting securities where directors agreed to purchase shares on condition that holder of shares first vote in favor of certain directors in upcoming election); *Citizens First Bancorp, Inc. v. Harreld*, 559 F. Supp. 867, 872-73 (W.D. Ky. 1982) (Section 13(d) group formed for purpose of calling special stockholders meeting and voting shares to remove directors); *Jacobs v. Pabst Brewing Co.*, 549 F. Supp. 1050, 1065-66 (D. Del. 1982) (allegation that investment advisor notified management and insurgent shareholders that it could direct clients' votes in election of directors sufficient to establish Section 13(d) group).

The record makes clear that Apollo and Oaktree promised to put Mr. Marcus on the board even if Crestview had less than the ten percent ownership threshold – or, at minimum, had an informal "understanding" to that effect, which is sufficient to establish a Section 13(d) "group." *See CSX Corp.*, 502 F. Supp. 2d at 552. Any attempt to deny or fudge the existence of such an agreement or understanding is belied by Crestview's own documents: (a) Mr. Cassidy's contemporaneous e-mail reporting that "Apollo and Oaktree agreed to put Jeff on the board even if we end up under 10%" (JPX 170, at CHARTER-e 00144028), (b) Mr. Marcus's e-mail sent just an hour later reporting that "They have also agreed to put me on the board even though we will own less than 10%" (*id.* at CHARTER-e 00144021), (c) Messer. Marcus's and Cassidy's representations in the February 10 investment committee memorandum that "[t]hey have committed to a board seat for Jeff as part of the transaction" (JPX 193, at CHARTER-e 0050301), and (d) and the inclusion of that same representation in the final "corrected" version of the February 10 memo (JPX 243 at CHARTER-e 0713303).

Mr. Marcus's self-serving testimony to the contrary should not be credited. Courts give little or no evidentiary weight to an alleged group member's disavowal of an agreement to act for a Section 13(d) purpose. *See, e.g., Wellman v. Dickinson*, 682 F.2d 355, 364

21

(2d Cir. 1982) (lower court properly discredited testimony regarding substance of conversation concerning disposition of securities that was inconsistent with contemporaneous notes of the discussion); *S.E.C. v. First City Financial Corp., Ltd.*, 688 F. Supp. 705, 720 (D.D.C. 1988) (looking to objective evidence of parties' intent rather than self-serving testimony in assessing the existence of an informal understanding to acquire stock), *aff'd*, 890 F.2d 1215 (D.C. Cir. 1989); *Roth v. Jennings*, 489 F.3d 499, 511 (2d Cir. 2007) (members of Section 13(d) group cannot disclaim legal effect of their joint action); *Morales*, 249 F.3d at 125 (reasonable trier of fact could discredit two sworn statements by alleged group members that they never agreed to acquire stock where circumstantial evidence supported opposite conclusion).

The only evidence that Mr. Marcus, or any other witness, invoked to try to negate the clear import of Crestview's documents is a telephone call that Mr. Marcus purportedly made in March 2008 to Eric Zinterhofer in which he requested that the Term Sheet be amended to reduce the voting-power-threshold from ten percent to eight percent.[18] But even if Crestview had wanted to amend the Term Sheet to make the agreement to give it a board seat unnecessary, that hardly negates the agreement itself. Indeed, the existence of that agreement is confirmed by the subsequently created "final" version of the February 10 investment committee memo sent to Ms. Pelicon on the night before Crestview firmed up its commitment, in which Messrs. Marcus and Cassidy reiterated that Apollo and Oaktree had "committed to a board seat for Jeff as part of the transaction." (JPX 193, at CHARTER-e 00050301).

---

[18]     Apollo's refusal to change the voting power threshold is insufficient to establish the absence of a Section 13(d) group since its actions did not plainly frustrate the group's common purpose of securing representation on CCI's initial board of directors. *Morales*, 249 F.3d at 127 (lack of coordination among group members not sufficient to defeat claim that they were acting as a Section 13(d) group unless it "plainly frustrate[s] the purported purpose of the agreement"); *See also CC Investments, LDC*, 2002 WL 318691, at *10 ("Disagreement about certain issues does not foreclose the possibility of ultimate agreement at the end of the day as to those issues or, indeed, of agreement as to wholly separate issues . . . [P]arties can agree on a common objective and, thereby, form a group for purposes of the Act, yet they 'might not always march in lockstep.").

There is not a shred of evidence that any one of Apollo, Oaktree or Crestview has withdrawn the group's agreement. Mr. Zinterhofer's counsel-recommended qualification of his former support for Mr. Marcus's service on the board – that his support is now dependent on whether the board needs audit committee members – does not constitute withdrawal from a Section 13(d) group. To disassociate from a Section 13(d) group, a member must provide effective notice of withdrawal. *Tanscon Lines v. A.G. Becker, Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (participant in Section 13(d) group remains member of group until effective notice of withdrawal given); *Seilon, Inc. v. Lamb*, No. C83-314, 1983 WL 1354, at *14 (N.D. Ohio July 27, 1983) (member failed to clearly disassociate herself from Section 13(d) group and its activities). Merely conditioning an agreement does not constitute effective withdrawal from a group because an "agreement to act together for the purpose of acquiring, holding, or disposing of shares need not be unconditional in order to support a finding that the actors constituted a group within the meaning" of Section 13(d). *Roth*, 489 F.3d at 508; *Morales v. Freund*, 163 F.3d 763, 767 & n.5 (2d Cir. 1999) (same). Even a conditional agreement to put Mr. Marcus on the board is sufficient.

In short, the evidence is unmistakable that the members of the Apollo Group have acted, are acting, and for the foreseeable future will continue to act in concert to acquire and vote Charter equity – making them a "group" that will have greater voting power than that necessary to trigger a violation of Section § 8(k)(ii).

## II. The Debtors Have Defaulted Under Section 10.5 of the First Lien Credit Agreement.

The Debtors are in default under Section 10.5 of the First Lien Credit agreement due to their refusal to pay the costs and expenses incurred by the First Lien Lender Group since February 28, 2009. Section 10.5 provides, in relevant part:

[CCO] agrees . . . (b) *to pay or reimburse each Lender* and each

23

> Agent *for all its costs and expenses incurred in connection with the enforcement or preservation of any rights, privileges, powers or remedies under this Agreement,* the other Loan Documents and any such other documents, *including the fees and disbursements of* one firm of counsel selected by the Administrative Agent, together with any special or local counsel, to the Administrative Agent and not more than *one other firm of counsel to the Lenders*[.]

First Lien Credit Agreement § 10.5 (emphasis added) (Exh. 1). Kramer Levin Naftalis & Frankel LLP, the undersigned counsel, qualifies as that "one other firm of counsel to the Lenders" eligible for reimbursement under section 10.5. With the exception of the agent's counsel, no other firm has appeared in these cases on behalf of any of the Lenders. The Debtors' refusal to reimburse the First Lien Lender Group's costs and expenses constitutes an ongoing default under the First Lien Credit Agreement. The failure to cure represents an independent event of default and precludes reinstatement of the First Lien Credit Agreement.

## CONCLUSION

For the foregoing reasons and those described in all other submissions on behalf of the First Lien Lenders, confirmation of the Plan should be denied.

Dated:  NewYork, New York
September 18, 2009

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Philip S. Kaufman
Jeffrey S. Trachtman
Joel M. Taylor
David Blabey

1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

*Attorneys for the First Lien Lender Group*

KL3 2740515.1