EXHIBIT JPX 158

**From:** Anuj Aggarwal

**Sent:** Tue, 03 Feb 2009 17:16:36 GMT

**To:** Barry Volpert; Tom Murphy; Robert Delaney; Richard DeMartini; Bob Hurst; Quentin Chu; Adam Klein; Alex Binderow; Alex Rose; Evelyn Pellicone; Heather Walker; Alexandra Leonard

**CC:** Jeffrey Marcus; Brian Cassidy; Harold Kim

**Subject:** Charter Investment Commitee Memo

---

All,

Find attached the memo to update the Investment Committee on the restructuring process of Charter. We are scheduled to have the IC meeting tomorrow beginning at 9:30AM. Let us know if you have any questions before the meeting.

Regards,

Anuj Aggarwal
Crestview Partners
667 Madison Avenue, 10th Floor
New York, NY 10065
Tel: 212-906-0746
Fax: 212-906-0793
aaggarwal@crestview.com

**HIGHLY CONFIDENTIAL**

# CONFIDENTIAL MEMORANDUM

**To:** Investment Committee

**From:** Jeff Marcus, Barry Volpert, Bob Delaney, Brian Cassidy, Anuj Aggarwal, Harold Kim

**Date:** February 4, 2009

**Re:** Charter Communications Update

The purpose of this memorandum is to update the Investment Committee on the restructuring process and to request preliminary approval to proceed with the following non-binding commitments:

1. **Fund I to invest $35 million as part of its pro rata share in the proposed $1.0 billion rights offering**
2. **Fund II to provide an equity commitment of $250 million as part of a backstop to the rights offering up to an effective purchase multiple of 6.25x 2009e EBITDA (after paying for the underlying detachable investment rights)**

We will seek final Investment Committee approval once terms are finalized and we have completed our due diligence within the next two weeks.

## I. Situation Overview

Over the past several weeks, Crestview has been working as part of an ad hoc group ("Committee") of large CCH I bondholders to formulate a restructuring plan for Charter Communications, Inc. ("Charter" or the "Company") that is acceptable to the Company and Vulcan/Paul Allen and maximizes the value recovery to CCH I bondholders. The Committee currently holds 78% of the CCH I, 52% of the CCH II and 62% of the CIH bonds; the Committee members include Oaktree, Apollo, Fidelity, Capital Research, Western Asset Management, Franklin Resources, AIG, Contrarian Capital, MFC Global, Lord Abbett and Crestview. All of the members hold at least $100 million of combined face value of CCH I and CCH II bonds with a weighting towards the CCH I bonds.

The Committee has engaged UBS, Houlihan Lokey and Paul Weiss (together, the "Advisors") to assist with the restructuring process. The Advisors have held initial discussions with the Company and Paul Allen (who owns a majority stake in Charter's voting shares) to discuss and try to reach a mutually-agreeable pre-packaged restructuring deal. As part of the current proposal, the Committee members through a combination of rolling existing CCH II bonds into new 13.0%-13.5% senior notes due 2016 ("New Notes"), buying $300 million of New Notes and committing $1.0 billion in an equity rights offering would refinance/cash out the existing CCH II bonds and ensure that the CCH I bonds are the fulcrum security and convert into the equity of the Company.

Pursuant to ongoing discussions, our Advisors have proposed the following tentative restructuring plan:

- Company is reorganized at 6.0x 2009e EBITDA
- Senior secured debt at CCO and CCOH is reinstated
- CCH II 2010 and 2013 notes are refinanced through a combination of $1.5 billion of New Notes and $1.0 billion of cash
- All debt junior to the CCH I bonds is completely impaired
- Pre-rights offering equity value is allocated amongst CCH I, CCI and Vulcan (Paul Allen)
- CCH II bondholders in the Committee roll their approximate $1.2 billion into New Notes
- Committee members and Vulcan participate in a $1.0 billion equity rights offering
  - o Equity issued at a 25% discount to plan valuation with pro rata participation rights based on ownership of CCH I bonds
  - o Committee members have the right to sell the detachable rights to parties outside the group. However, equity backstop parties within the Committee receive a right of first refusal ("ROFR")
  - o Backstop parties will receive commitment fees in an amount to be determined
- Up to $300 million of New Notes are issued to interested Committee members, proceeds of which are used as part of the cash consideration to the CCH II bondholders outside of the group

CHARTER-e 00133064

Our Advisors have presented the restructuring plan and a preliminary, non-binding term sheet to the Company. In order to participate directly in the negotiations with the Company, gain access to non-public information and perform due diligence on the rights offering opportunity, many of the Committee members (all except AIG, Contrarian, and Capital Research) have signed a non-disclosure agreement with the Company and have agreed to become restricted until February 17th. Charter will be hosting a due diligence session for the restricted members of the Committee this Wednesday in New York with a follow-up session planned in St. Louis as early as next week. Paul Allen's advisors will also be in New York on Thursday and Friday with the intent of negotiating an agreement with the Committee. The goal is to get all parties to agree to a restructuring plan prior to the Company's board meeting on February 10th, which is a few days before the 30-day grace period for missing junior interest payments on January 15th expires.

## II. Crestview Investment Summary

Crestview currently holds $138 million face of CCH I bonds. In July 2006, we made our initial investment in the CCH I bonds, purchasing $100 million face at an average purchase price of 86.7. Over the span of a few months in 2008, we purchased an incremental $38 million of CCH I bonds at an average purchase price of 66.6. The blended purchase price for the entire investment is 82.1 including fees. Through the expiration of our Deutsche Bank loan in June, we will have received $19.5 million in net interest payments lowering our cost basis to 68.0. We have invested a total of $74.9 million in equity ($55.4 million net of interest payments received) and currently have a $40 million outstanding term loan (L +150bps) with Deutsche Bank.

The table below summarizes Crestview's current investment in the CCH I bonds.

| Investment Cost Basis ($ millions) | |
|---|---|
| **Investment Summary** | |
| Face Value of Notes Purchased | $138.0 |
| Purchase Price (excludes accrued interest paid on purchase) | $112.0 |
| Blended Average Note Purchase Price (w/o fees) | 81.1 |
| Add: Transaction Fees | 0.9 |
| Blended Average Note Purchase Price (w/ fees) | 82.1 |
| Less: Net Interest Received[1] | (14.1) |
| Net Basis of Note Position | 68.0 |
| | |
| Total Equity Invested | $74.9 |
| Term Loan from Deutsche Bank | $40.0 |

(1) Includes all interest payments due on Deutsche Bank Term Loan until maturity in June 2009. Includes $3.3 million of repayment of Dune credit facility in April 2008

## III. Summary of Key Events and Next Steps

- 12/12/08 – Charter announced a plan to initiate discussions with bondholders and rationalize its capital structure
- End of January – Large CCH I bondholders, including Crestview, formed an ad hoc group and hired Paul Weiss, UBS and Houlihan Lokey to represent its interests
- 1/15/09 – Charter announced that two of its subsidiaries, CCH I Holdings ("CIH") and Charter Holdings, did not make scheduled interest payments of $74 million due on January 15, 2009. Charter has a 30-day grace period to make the payment
- Mid-January – The Advisors held initial meetings with the Company and presented the Committee with a range of potential restructuring scenarios
- 1/26/09 – Majority of Committee members (including Crestview) signed a confidentiality agreement with the Company and became restricted
- 1/27/09 – Management presentation with restricted Committee members. Charter requested Committee members to submit a term sheet discussing the proposed restructuring plan
- 1/30/09 – Advisors sent the Company a preliminary term sheet proposing a 6.0x restructuring plan with a $1.0 billion rights offering

2

CHARTER-e 00133065

- 2/4/09 – Planned due diligence session with Company management in New York
- 2/5/09-2/6/09 – Planned negotiations with Vulcan/Paul Allen to reach a tentative agreement on the proposed restructuring plan
- 2/10/09 – Charter board meeting to discuss and vote on a restructuring plan

## IV. Proposed Restructuring Plan

Listed below are the key terms of the proposed restructuring plan:

- Company is reorganized at 6.0x 2009e EBITDA
- Senior secured debt at CCO and CCOH is reinstated
- CCH II 2010 and 2013 notes are refinanced through a combination of $1.5 billion of new CCH II 13.0-13.5% notes due 2016 and $1.0 billion of cash
- All debt junior to CCH I bonds is completely impaired
- Pre-rights offering equity value is allocated amongst CCH I, CCI and Vulcan (Paul Allen)
- CCH II bondholders in the Committee roll their approximate $1.2 billion into New Notes
- Committee members and Vulcan participate in a $1.0 billion equity rights offering
  - o Equity issued at a 25% discount to plan valuation with pro rata participation rights based on pre-offering equity ownership
  - o Committee members have the right to sell the detached rights to a party outside the group. However, equity backstop parties within the Committee are granted a ROFR
  - o Backstop parties will receive commitment fees in an amount to be determined
- Up to $300 million of New Notes are issued to interested Committee members, proceeds of which are used as part of the cash consideration to CCH II bondholders outside of the group

Other Model Assumptions
- Paul Allen receives 5% ownership stake for hold-up value for reinstatement of bank debt
- All debt junior to the CCH I bonds receive 1.5% warrants as a tip
- Management receives 3.5% warrants

The table on the following page shows the capital structure of Charter pre and post-restructuring:

3

CHARTER-e 00133066

## Pro Forma Capital Structure

$ In millions

| | Status Quo | | Restructuring | | | |
| | | | Pre-Offering | | Post-Offering | |
| Issue | Amount | 2009e EBITDA Multiple [1] | Amount | Cum. 2009e EBITDA Multiple [1] | Amount | Cum. 2009e EBITDA Multiple [1] |
|---|---|---|---|---|---|---|
| Charter Operating (CCO) | $10,526 | 4.30x | $10,526 | 4.30x | $10,526 | 4.30x |
| CCO Holdings | 1,150 | 4.77x | 1,150 | 4.77x | 1,150 | 4.77x |
| CCH II | | | | | | |
| 10.25% senior notes due 9/15/2010 | $1,860 | | 1,860 | | 0 | |
| 10.25% senior notes due 10/1/2013 | 614 | | 614 | | 0 | |
| New 13.0%-13.5% senior notes due 2016 | 0 | | 0 | | 1,504 | |
| Total CCH II | $2,474 | 5.78x | 2,474 | 5.78x | 1,504 | 5.38x |
| CCH I | $3,987 | 7.40x | 0 | 5.78x | 0 | 5.38x |
| CIH | $2,534 | 8.44x | 0 | 5.78x | 0 | 5.38x |
| CCH | 441 | 8.62x | 0 | 5.78x | 0 | 5.38x |
| CCHC | 72 | 8.65x | 0 | 5.78x | 0 | 5.38x |
| CCI | 482 | 8.84x | 0 | 5.78x | 0 | 5.38x |
| Total Debt | $21,666 | 8.84x | $14,150 | 5.78x | $13,180 | 5.38x |
| Payables to CCI creditors | 0 | 8.84x | 147 | 5.84x | 0 | 5.38x |
| Excess cash | $500 | (0.20x) | $300 [2] | (0.12x) | $183 | (0.07x) |
| Operating cash | 400 | | 400 | | 400 | |
| Total cash | $900 | | $700 | | $583 | |
| Net debt [1] | $21,166 | 8.64x | $13,997 | 5.71x | $12,997 | 5.30x |
| Pre-money equity | | | $703 | | $703 | |
| Rights offering equity | | | 0 | | 1,000 | |
| Equity value | | | $703 | 6.00x | $1,703 | 6.00x |
| Enterprise value | | | $14,700 | 6.00x | $14,700 | 6.00x |
| 2009e EBITDA [3] | $2,450 | | $2,450 | | $2,450 | |

(1) In accordance with our Advisors, net debt and all leverage ratios based on excess cash

(2) Assumes restructuring fees of $200 million

(3) Based on Advisors' downside operating case

As can be seen in the table above, the new plan would reduce the Company's leverage from 8.6x 2009e EBITDA to 5.3x and leave the Company with approximately $600 million of cash on its balance sheet to run the business. As part of the restructuring, the CCH I bonds would be converted to equity and all debt junior to the CCH I bonds would be almost entirely impaired (except for a small tip).

The proposed restructuring plan would make the CCH II bondholders outside of the Committee whole through the issuance of $300 million of New Notes and a $1.0 billion rights offering supported by the Committee. The CCH II bondholders inside the group would also agree to roll their existing $1.2 billion of CCH II bonds into New Notes. Crestview has the opportunity to invest up to $35 million in the proposed $1.0 billion equity rights offering which is pro rata for its 3.5%[1] ownership stake in the CCH I bonds. Additionally, Committee members ("Backstop Members") will have the opportunity to make additional equity commitments and backstop the rights offering in case not all CCH I bondholders commit to invest their pro rata share. The members that do not want to invest their pro rata share will be able to sell their detachable rights to members outside of the group, but the Backstop Members will have a ROFR on all sales. We have received preliminary indications from UBS that many of the mutual fund Committee members have firm structural issues that will prevent them from investing their pro rata share of equity. Apollo and Oaktree have expressed the strongest interest in participating in the backstop. In fact, Apollo has indicated to UBS that it would be willing to backstop the entire $1.0 billion rights offering. We believe that there might be a real opportunity for Crestview to invest $150 million to $250 million of capital over and above our pro rata share and together with Apollo and Oaktree control over 50% of the Company. Both Apollo and Oaktree recognize the value of the deep cable experience and Charter knowledge that Jeff Marcus brings to the table and have indicated that they would let Crestview take more than its pro rata share of the equity backstop.

---

[1] There are $3,987 million of CCH I notes outstanding, of which Crestview owns $138 million

4

It is currently contemplated that the rights offering would be priced at a 25% discount to the plan valuation, or 5.9x 2009e EBITDA. Based on this discount rate, our pro rata share of S35 million and an additional investment of $250 million (assuming we need to pay a 20% fee for the detachable rights) would give Crestview a 15.9% equity ownership stake in the reorganized Company. Crestview would also receive an additional 0.9% ownership through the equitization of its CCH I bond holdings. As such, Crestview's pro forma ownership (post new money) would be approximately 16.8% as summarized in the left table below. The right table shows Crestview's pro forma ownership at various detachable right fees and backstop amounts.

| Crestview Equity Ownership | |
|---|---|
| Ownership from rights offering: | |
| Pro rata | 2.3% |
| Backstop assuming 20% fee on detachable rights | 13.6% |
| **Total** | **15.9%** |
| Ownership from existing CCH I bonds [1] | 0.9% |
| **Total Crestview ownership** | **16.8%** |

1. Based on Crestview's $138 million investment in CCH I notes

| Pro Forma Crestview Ownership Sensitivities | | | | | | | |
|---|---|---|---|---|---|---|---|
| % Fee on Detachable Rights | Implied 2009e EBITDA Multiple | Size of Backstop Including Fees | | | | | |
| | | $100 | $150 | $200 | $250 | $300 | $350 |
| 0% | 5.93x | 9.7% | 13.0% | 16.3% | 19.6% | 22.8% | 26.1% |
| 5% | 5.96x | 9.4% | 12.6% | 15.7% | 18.8% | 21.9% | 25.0% |
| 10% | 5.99x | 9.2% | 12.1% | 15.1% | 18.1% | 21.1% | 24.0% |
| 15% | 6.02x | 8.9% | 11.7% | 14.6% | 17.4% | 20.3% | 23.1% |
| 20% | 6.05x | 8.7% | 11.4% | 14.1% | 16.8% | 19.6% | 22.3% |
| 25% | 6.08x | 8.4% | 11.1% | 13.7% | 16.3% | 18.9% | 21.5% |
| 30% | 6.12x | 8.2% | 10.8% | 13.3% | 15.8% | 18.3% | 20.8% |
| 35% | 6.15x | 8.0% | 10.5% | 12.9% | 15.3% | 17.7% | 20.2% |
| 40% | 6.18x | 7.8% | 10.2% | 12.6% | 14.9% | 17.2% | 19.6% |
| 45% | 6.21x | 7.7% | 10.0% | 12.2% | 14.5% | 16.7% | 19.0% |
| 50% | 6.24x | 7.6% | 9.7% | 11.9% | 14.1% | 16.3% | 18.5% |

Our Advisors prepared a downside operating scenario, which we used as the basis for our returns analysis. It projects '08-'13 revenue and EBITDA CAGRs of 5.2% and 5.5%, respectively, and capex to be held constant at $1.2 billion per annum. We understand this forecast to be more conservative than Management's plan, which we hear assumes a 7.2% EBITDA CAGR and capex of approximately $1.1 billion per annum.

| Financial Summary of Downside Operating Case | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | For the year ended December 31 | | | | | '08-'13 |
| | 2008e | 2009e | 2010e | 2011e | 2012e | 2013e | CAGR |
| **Key Financials** | | | | | | | |
| Revenue | $6,505 | $6,930 | $7,321 | $7,689 | $8,046 | $8,393 | 5.2% |
| % growth | | 6.5% | 5.6% | 5.0% | 4.6% | 4.3% | |
| EBITDA | 2,305 | 2,450 | 2,593 | 2,736 | 2,885 | 3,013 | 5.5% |
| % growth | | 6.3% | 5.8% | 5.5% | 5.4% | 4.4% | |
| % margin | 35.4% | 35.4% | 35.4% | 35.6% | 35.9% | 35.9% | |
| Net interest expense [1] | | (874) | (865) | (851) | (834) | (814) | |
| Income taxes | | 0 | 0 | 0 | 0 | 0 | |
| Working capital | | 0 | 0 | 0 | 0 | 0 | |
| Capex | | (1,246) | (1,227) | (1,222) | (1,215) | (1,217) | |
| Bank amortization | | (70) | (70) | (70) | (70) | (70) | |
| FCF (post bank amort.) | | $260 | $431 | $593 | $766 | $912 | |
| Cumulative FCF (post bank amort.) | | 260 | 690 | 1,283 | 2,049 | 2,961 | |
| Total debt | $13,180 | $13,093 | $13,023 | $12,953 | $12,883 | $12,813 | |
| Excess cash | $183 | $443 | $873 | $1,466 | $2,232 | $3,144 | |
| Operating cash | 400 | 400 | 400 | 400 | 400 | 400 | |
| Total cash | $583 | $843 | $1,273 | $1,866 | $2,632 | $3,544 | |
| Net debt | 12,597 | 12,250 | 11,750 | 11,087 | 10,251 | 9,269 | |
| **Credit Statistics** | | | | | | | |
| Total leverage | | 5.34x | 5.02x | 4.73x | 4.47x | 4.25x | |
| Net leverage | | 5.00x | 4.53x | 4.05x | 3.55x | 3.08x | |
| Net leverage based on excess cash [2] | | 5.16x | 4.69x | 4.20x | 3.69x | 3.21x | |

(1) Assumes 13.25% interest rate on CCH II New Notes
(2) Net leverage based on excess cash as defined by our Advisors

Despite the expected negative economic climate for 2009 and beyond, we believe that this forecast is conservative given the resiliency of the cable sector to economic downturns, Charter's underpenetration of advanced services relative to its peers and Charter's recent financial performance (Charter has achieved double-digit EBITDA growth for the past nine quarters; please refer to Exhibit A for the Company's historical operating performance).

5

CHARTER-e 00133068

## V. Returns Analysis

### Value Recovery of CCH I Bonds

The table below shows the value recovery of Crestview's CCH I bond holdings at the end of 2013 (which is derived from the 0.9% equity ownership we would receive post-reorganization) at various exit multiples and EBITDA CAGR assumptions. The shaded area indicates the EBITDA CAGRs and trailing exit multiples at which Crestview would get full recovery on its CCH I bond investment based on its net cost basis of 68.0.

**Crestview CCH I Bond Recovery Sensitivities - @ 12/31/13 [1]**

| '09-'13e EBITDA CAGR | LTM Exit Multiple | | | | | |
|---|---|---|---|---|---|---|
| | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| 0.0% | 18.4% | 25.8% | 33.2% | 40.6% | 48.0% | 55.4% |
| 1.0% | 24.9% | 32.7% | 40.5% | 48.2% | 56.0% | 63.8% |
| 2.0% | 31.7% | 39.8% | 48.0% | 56.2% | 64.3% | 72.5% |
| 3.0% | 38.6% | 47.2% | 55.8% | 64.4% | 73.0% | 81.5% |
| 4.0% | 45.8% | 54.8% | 63.9% | 72.9% | 81.9% | 90.9% |
| 5.0% | 53.3% | 62.7% | 72.2% | 81.6% | 91.1% | 100.6% |
| 5.5% | 57.0% | 66.7% | 76.4% | 86.1% | 95.8% | 105.4% |
| 6.0% | 61.0% | 70.9% | 80.8% | 90.7% | 100.6% | 110.6% |
| 7.0% | 68.9% | 79.3% | 89.7% | 100.1% | 110.5% | 120.9% |
| 8.0% | 77.1% | 88.0% | 98.9% | 109.8% | 120.7% | 131.6% |
| 9.0% | 85.6% | 97.0% | 108.4% | 119.8% | 131.2% | 142.6% |
| 10.0% | 94.3% | 106.3% | 118.2% | 130.1% | 142.0% | 154.0% |

(1) Calculation based on our $138 million position in CCH I notes and 0.9% pro forma equity ownership

As can be seen in the table above, at an EBITDA CAGR of 5.5%, Crestview would receive full recovery of its initial investment in $138 million face of the bonds at exit multiples greater than 6.5x.

### Returns on Pro Rata Share of Rights Offering

The table below shows the projected returns on our $35 million pro rata share investment based on a range of EBITDA CAGRs and trailing exit multiples.

*Assuming 25% Rights Offering Discount*

| '09-'13e EBITDA CAGR | LTM Exit Multiple | | | | | | | LTM Exit Multiple | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x | | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| 0.0% | 13.0% | 21.3% | 27.9% | 33.4% | 38.2% | 42.5% | | 1.8x | 2.5x | 3.2x | 3.9x | 4.7x | 5.4x |
| 1.0% | 20.4% | 27.5% | 33.4% | 38.4% | 42.8% | 46.8% | | 2.4x | 3.2x | 3.9x | 4.7x | 5.4x | 6.2x |
| 2.0% | 26.6% | 32.9% | 38.2% | 42.9% | 47.0% | 50.8% | | 3.1x | 3.9x | 4.7x | 5.5x | 6.2x | 7.0x |
| 3.0% | 32.1% | 37.8% | 42.7% | 47.1% | 51.0% | 54.6% | | 3.7x | 4.6x | 5.4x | 6.2x | 7.1x | 7.9x |
| 4.0% | 36.9% | 42.2% | 46.8% | 51.0% | 54.7% | 58.1% | | 4.4x | 5.3x | 6.2x | 7.1x | 7.9x | 8.8x |
| 5.0% | 41.3% | 46.3% | 50.7% | 54.6% | 58.2% | 61.5% | | 5.2x | 6.1x | 7.0x | 7.9x | 8.8x | 9.8x |
| 5.5% | 43.4% | 48.2% | 52.4% | 56.3% | 59.9% | 63.1% | | 5.5x | 6.5x | 7.4x | 8.3x | 9.3x | 10.2x |
| 6.0% | 45.4% | 50.1% | 54.3% | 58.1% | 61.6% | 64.8% | | 5.9x | 6.9x | 7.8x | 8.8x | 9.8x | 10.7x |
| 7.0% | 49.2% | 53.7% | 57.7% | 61.4% | 64.8% | 67.9% | | 6.7x | 7.7x | 8.7x | 9.7x | 10.7x | 11.7x |
| 8.0% | 52.8% | 57.1% | 61.0% | 64.6% | 67.9% | 70.9% | | 7.5x | 8.5x | 9.6x | 10.7x | 11.7x | 12.8x |
| 9.0% | 56.2% | 60.3% | 64.1% | 67.6% | 70.8% | 73.9% | | 8.3x | 9.4x | 10.5x | 11.6x | 12.7x | 13.8x |
| 10.0% | 59.4% | 63.4% | 67.1% | 70.5% | 73.7% | 76.7% | | 9.2x | 10.3x | 11.5x | 12.6x | 13.6x | 14.9x |

As illustrated above, the rights offering investment is projected to generate very attractive returns assuming positive EBITDA growth and at least a 6.0x trailing exit multiple. Assuming a 5.5% EBITDA CAGR and 7.0x LTM exit multiple, the projected IRR and ROI are 52.4% and 7.4x, respectively.

### Total Returns for Fund I Investment

The table below shows the combined returns on our Fund I investment in the CCH I bonds and pro rata participation in the Right Offering based on a range of EBITDA CAGRs and trailing exit multiples

-6-

| '08-'13e EBITDA CAGR | LTM Exit Multiple | | | | | | LTM Exit Multiple | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| 0.0% | (6.9%) | (1.1%) | 3.4% | 7.1% | 10.2% | 12.9% | 0.7x | 0.9x | 1.2x | 1.4x | 1.7x | 1.9x |
| 1.0% | (1.7%) | 3.1% | 7.0% | 10.3% | 13.2% | 15.7% | 0.9x | 1.2x | 1.4x | 1.7x | 1.9x | 2.2x |
| 2.0% | 2.5% | 6.7% | 10.2% | 13.2% | 15.9% | 18.2% | 1.1x | 1.4x | 1.7x | 1.9x | 2.2x | 2.4x |
| 3.0% | 6.2% | 9.9% | 13.1% | 15.9% | 18.3% | 20.5% | 1.4x | 1.6x | 1.9x | 2.2x | 2.4x | 2.7x |
| 4.0% | 9.4% | 12.8% | 15.7% | 18.3% | 20.6% | 22.7% | 1.6x | 1.9x | 2.2x | 2.4x | 2.7x | 3.0x |
| 5.0% | 12.2% | 15.4% | 18.1% | 20.6% | 22.8% | 24.8% | 1.8x | 2.1x | 2.4x | 2.7x | 3.0x | 3.3x |
| 5.5% | 13.5% | 16.6% | 19.2% | 21.6% | 23.8% | 25.8% | 1.9x | 2.2x | 2.6x | 2.9x | 3.2x | 3.5x |
| 6.0% | 14.8% | 17.8% | 20.4% | 22.7% | 24.8% | 26.7% | 2.1x | 2.4x | 2.7x | 3.0x | 3.3x | 3.6x |
| 7.0% | 17.2% | 20.0% | 22.5% | 24.7% | 26.7% | 28.6% | 2.3x | 2.6x | 3.0x | 3.3x | 3.6x | 4.0x |
| 8.0% | 19.4% | 22.1% | 24.5% | 26.6% | 28.6% | 30.4% | 2.6x | 2.9x | 3.3x | 3.6x | 4.0x | 4.3x |
| 9.0% | 21.5% | 24.1% | 26.3% | 28.4% | 30.3% | 32.1% | 2.8x | 3.2x | 3.6x | 3.9x | 4.3x | 4.6x |
| 10.0% | 23.5% | 25.9% | 28.1% | 30.2% | 32.0% | 33.7% | 3.1x | 3.5x | 3.9x | 4.3x | 4.6x | 5.0x |

(1) Based on total investment of $150 million from Fund I (includes capital call for pro rata investment and repayment of Deutsche Bank loan)

Assuming a modest 5.5% EBITDA CAGR and 7.0x LTM exit multiple, the projected IRR and ROI are 19.2% and 2.6x, respectively.

## Returns on Crestview Fund II Equity Backstop

The table below illustrates the potential returns on the equity backstop investment based on a range of prices for the detachable rights (calculated as a percentage fee of the face value of the underlying investment rights) and LTM exit multiples. The sensitivities are based on the downside operating case.

| % Fee on Detachable Rights | Implied 2009a EBITDA Multiple | LTM Exit Multiple | | | | | | LTM Exit Multiple | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| 0% | 5.93x | 43.4% | 48.2% | 52.4% | 56.3% | 59.9% | 63.1% | 5.5x | 6.5x | 7.4x | 8.3x | 9.3x | 10.2x |
| 5% | 5.96x | 41.9% | 46.7% | 50.9% | 54.7% | 58.2% | 61.5% | 5.3x | 6.2x | 7.1x | 7.9x | 8.8x | 9.7x |
| 10% | 5.99x | 40.5% | 45.2% | 49.4% | 53.2% | 56.7% | 59.9% | 5.0x | 5.9x | 6.7x | 7.6x | 8.4x | 9.3x |
| 15% | 6.02x | 39.2% | 43.9% | 48.0% | 51.8% | 55.2% | 58.4% | 4.8x | 5.6x | 6.4x | 7.3x | 8.1x | 8.9x |
| 20% | 6.05x | 38.0% | 42.6% | 46.7% | 50.4% | 53.8% | 57.0% | 4.6x | 5.4x | 6.2x | 7.0x | 7.7x | 8.5x |
| 25% | 6.08x | 36.8% | 41.4% | 45.4% | 49.1% | 52.5% | 55.6% | 4.4x | 5.2x | 5.9x | 6.7x | 7.4x | 8.2x |
| 30% | 6.12x | 35.7% | 40.2% | 44.3% | 47.9% | 51.3% | 54.4% | 4.3x | 5.0x | 5.7x | 6.4x | 7.1x | 7.9x |
| 35% | 6.15x | 34.6% | 39.1% | 43.1% | 45.7% | 50.1% | 53.1% | 4.1x | 4.8x | 5.5x. | 6.2x | 6.9x | 7.6x |
| 40% | 6.18x | 33.6% | 38.0% | 42.0% | 45.6% | 48.9% | 52.0% | 4.0x | 4.6x | 5.3x | 6.0x | 6.6x | 7.3x |
| 45% | 6.21x | 32.8% | 37.0% | 41.0% | 44.6% | 47.8% | 50.9% | 3.8x | 4.5x | 5.1x | 5.8x | 6.4x | 7.0x |
| 50% | 6.24x | 31.6% | 36.0% | 40.0% | 43.5% | 46.8% | 49.6% | 3.7x | 4.3x | 4.9x | 5.6x | 6.2x | 6.8x |

Even when assuming we pay an expensive 50% fee for the detachable rights – or a 6.24x 2009e EBITDA effective purchase multiple – projected returns are still in excess of 31% at LTM exit multiples of 6x or greater.

## VI. Investment Highlights

- *Very Compelling Projected Returns*
  - Pro rata investment returns for a 5.5% EBITDA CAGR case are in excess of 40% for exit multiples ≥ 6.0x
  - Backstop investment returns are in excess of 30% for detachable right fees up to 50% of face
- *Attractive Valuation Relative to Historical Industry Averages*
  - Public cable companies have historically traded in the 8-10x EBITDA multiple range
  - Private transactions have historically been completed in the 10-12x EBITDA multiple range
- *Attractive Exit Alternatives*
  - Charter is an attractive acquisition candidate for both Time Warner and Comcast (assuming the subscriber cap is adjusted or removed) given its attractive markets and size as well as smaller strategics and private equity firms who would be interested in certain systems and regions
  - Synergies from programming and high speed internet (HSI) savings could be worth 1x of EBITDA in a merger scenario
  - We believe that in a normalized market a strategic would pay 7-8x for this asset

CHARTER-e 00133070

- *Appropriately Levered and Reasonably Priced Capital Structure*
  - Pro forma for the rights offering, the Company will be levered at 5.3x 2009e EBITDA with a 12% equity cushion at 6.0x
  - The average cost of the debt would be approximately 7%
- *Resiliency of Cable Sector in Economic Downturns*
  - Cable companies have historically fared well even in economic downturns
  - With 2009 earnings visibility nonexistent in most sectors, cable seems to be one of the safer potential investment areas
- *Significant Tax Attributes*
  - Pro forma for the restructuring, Charter will have $3.1 billion of basis step-up and $4.9 billion in NOLs
  - Charter will not pay any taxes in the near future
  - This tax basis step-up could be worth 1.5x of EBITDA to a strategic in a merger scenario
- *Familiarity with the Company*
  - Marcus Cable still comprises 20% of Charter
  - We invested in the CCH I bonds over 2.5 years ago and have followed the Company closely since
- *Strong Management Team*
  - Charter's performance has turned around and is closing the gap with its peers in the industry since Neil Smit (President & CEO) came to the Company in 2005
  - We will have the opportunity to conduct more diligence on senior and regional management over the next two weeks
- *Higher Growth Potential Relative to its Peers*
  - Charter lags its peers in terms of HSI, phone and advanced services penetration due to later deployment
  - Current EBITDA margin of 35.2% (2008 3QYTD) is significantly lower than the large MSOs (~38.8%) and even trails OneLink (36.9%)
- *Manageable Telco Competition*
  - Charter only overlaps with Verizon in 20% of its territories
  - Charter overlaps with AT&T in 64% of its territories but U-Verse is less of a threat given its fiber to the node strategy and slowing deployment (AT&T is now going to focus on wireless more than video)
  - To date, Telcos have built out video in only 14-17% of Charter's market by homes passed
- *Impressive Recent Financial Performance*
  - Charter has experienced double-digit EBITDA growth for the last 9 quarters

---

## VII. Risks and Mitigants

| Risks | Mitigants |
|---|---|
| - **Investment Concentration** | - Assuming we will need to pay off the DB loan in June with equity, we are asking for preliminary approval to invest a combined $400 million of equity in Charter, or $380 million net of interest payments received (Fund I - $150 million; Fund II - $250 million)<br>- We will most likely be able to exit our investment in stages after the company goes public<br>- We will still be at or under the 10% investment threshold for both Fund I and Fund II |
| - **Minority Ownership Position** | - Even with a $250 million equity investment out of Fund II, Crestview would own no more than 15% of the Company<br>- We would get one board seat<br>- Committee members find Jeff Marcus's cable industry experience valuable and would likely seek his guidance on business strategy, giving Crestview greater influence on the Company |

8

CHARTER-e 00133071

- **Fund Cross-Ownership Complications**

- **Plan Valuation at Premium to Current Comps**

- **Significant Leverage**

- Together with Apollo and Oaktree (who we have very good relationships with), we would control more than 50% of the Company
- We are hopeful that we will be able to negotiate the right to change management if it does not perform well
- There could be potential conflicts of interest between the two fund investments (different bases, appearance that Fund II investment is fortifying the Fund I investment through increased ownership and control, etc.)
- We plan on having discussions with our larger LPs, specifically the ones that are only investors in one of the two funds
- Preliminary discussions with Wellcome Trust indicate that they would be entirely comfortable with a Fund II investment in Charter equity
- The large, public MSOs are currently trading at 5-6x EBITDA
- However, private market multiples are still at 8-10x EBITDA
- There would be approximately ~2.5x of synergies and tax savings in a merger scenario with another larger MSO
- Post-restructuring, the Company will be levered at 5.3x
- However, the Company is expected to generate substantial free cash flow even in a low-growth scenario ($2.8 billion over the next 4.5 years)
- Fixed coverage ratio in 2009 is expected to be 1.4x
- The restructured Company would be free cash flow break-even at approximately $2.19 billion of EBITDA, or 11% lower than 2009e EBITDA of $2.45 billion

## VIII. Recommendation

At this time, we recommend that Crestview Fund I make a non-binding commitment to invest $35 million in the rights offering (its pro rata share) and Crestview Fund II to make a non-binding commitment of $250 million up to an effective purchase price (after the paying for the detachable rights) of 6.25x 2009e EBITDA. We plan on coming back to the Investment Committee to seek final approval for these commitments once terms are finalized and our due diligence is completed within the next two weeks.

## IX. Key Due Diligence Items

1) Analyze feasibility of management projections

2) Assess quality of senior and regional management teams

3) Verify tax attributes – NOLs, basis step-up

4) Review bank agreements – maturities, events of default, etc.

## X. Exhibits

Exhibit A – Historical Operating Performance

Exhibit B – Rights Offering Returns Analysis Model Summary

Exhibit C – Comparable Company Analysis

Exhibit D – Precedent Transaction Analysis

Exhibit E – Merger Synergy and Tax Benefit Analysis

Exhibit F – Preliminary Term Sheet

9

# Exhibit A – Charter Communications Historical Operating Performance

| FYE Dec 31, | | 2006A | | | | | 2007A | | | | | 2008A | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Q1 | Q2 | Q3 | Q4 | 2006A | Q1 | Q2 | Q3 | Q4 | 2007A | Q1 | Q2 | Q3 | 2008YTD |
| Revenue | | $1,287 | $1,349 | $1,372 | $1,400 | $5,408 | $1,415 | $1,490 | $1,517 | $1,548 | $5,971 | $1,549 | $1,623 | $1,636 | $4,823 |
| | % growth | 8.1% | 9.1% | 10.9% | 11.7% | 10.0% | 10.0% | 10.5% | 10.6% | 10.6% | 10.4% | 10.3% | 8.9% | 7.8% | 9.0% |
| Adj. EBITDA | | 438 | 486 | 462 | 500 | $1,886 | 493 | 537 | 508 | 563 | $2,101 | 545 | 591 | 563 | $1,699 |
| | % margins | 34.0% | 36.0% | 33.7% | 35.7% | 34.8% | 34.8% | 36.0% | 33.5% | 36.4% | 35.2% | 34.8% | 36.4% | 34.4% | 35.2% |
| | % growth | (0.6%) | 4.7% | 6.9% | 10.3% | 5.2% | 12.6% | 10.5% | 10.0% | 12.6% | 11.4% | 10.3% | 10.1% | 10.8% | 10.5% |
| Capex | | 241 | 298 | 236 | 308 | $1,103 | 298 | 281 | 311 | 354 | $1,244 | 334 | 316 | 288 | $938 |
| | % revenue | 18.7% | 22.1% | 18.7% | 22.0% | 20.4% | 21.0% | 18.9% | 20.3% | 22.9% | 20.8% | 21.4% | 19.5% | 17.6% | 19.4% |
| Total ARPU | | $78.65 | $82.60 | $84.47 | $86.92 | $86.22 | $88.72 | $93.01 | $95.45 | $98.13 | $96.13 | $100.16 | $104.35 | $106.07 | $106.07 |
| | % growth | 9.7% | 10.0% | 12.6% | 13.2% | 13.0% | 12.3% | 12.6% | 13.0% | 12.9% | 12.9% | 13.4% | 12.2% | 11.1% | 11.1% |

Source: Company filings

CHARTER-e 00133073

Exhibit B – Rights Offering Returns Analysis Model Summary – 6.0x Reorg. Multiple; $1.0Bn Rights Offering; 25% Discount; 5.93x 2009e EBITDA

## Crestview Investment in Rights Offering

| | $mm |
|---|---|
| Pro Rata Investment from Fund I | $35 |
| **Investment from Fund II** [1] | |
| Fees to Detachable Rights Holders | $42 |
| Equity Backstop Investment | $238 |
| **Total Equity Investment** | **$250** |

## Sources & Uses

| Sources | $mm | % |
|---|---|---|
| Rights Offering: | | |
| Crestview pro rata amount | $35 | 3% |
| Crestview backstop [4] | 708 | 71% |
| Other CCH I participants | 767 | 76% |
| Proceeds from rights offering | $1,003 | 100% |
| CCH II new 13.3% notes | 300 | |
| Existing cash | 117 | |
| **Total sources** | **$1,417** | |

| Uses | $mm | % |
|---|---|---|
| Repurchase of CCH II notes | $1,270 | 90% |
| Payables to CGI creditors | 147 | 10% |
| **Total uses** | **$1,417** | **100%** |

## Capitalization at 6.0x Reorganization @ 3/31/09

### Pre-Rights Offering

| Debt Summary | $mm | 2009e EBITDA Multiple |
|---|---|---|
| CCO debt | 10,528 | 4.30x |
| CCOH debt | 1,150 | 4.77x |
| CCH II debt | 2,474 | 5.79x |
| **Total debt** | **$14,150** | **5.78x** |
| Payables to CGI creditors | $147 | 5.84x |
| Excess cash [6] | $300 | (0.12x) |
| **Net debt** | **$13,997** | **5.71x** |

| Pre-Rights Offering Equity | | % Own. |
|---|---|---|
| CCH I bondholders | $649 | 77.6% |
| Vulcan - CCH I | 120 | 17.1% |
| Vulcan - Bank debt reinstatement | 35 | 5.0% |
| **Total equity value** | **$703** | **100.0%** |

| Total enterprise value | $14,700 | 6.06x |
|---|---|---|

### Post-Rights Offering

| Debt Summary | $mm | 2009e EBITDA Multiple |
|---|---|---|
| CCO debt | 10,528 | 4.30x |
| CCOH debt | 1,150 | 4.77x |
| CCH II new notes | 1,604 | 5.30x |
| **Total debt** | **$13,180** | **5.38x** |
| Payables to CGI creditors | 50 | 5.39x |
| Excess cash [6] | $180 | (0.07x) |
| **Net debt** | **$12,997** | **5.39x** |

| Post-Rights Offering Equity | | % Own. |
|---|---|---|
| CCH I holders - pre-money equity | $456 | 26.9% |
| CCH I holders - rights offering equity | 1,115 | 65.5% |
| Vulcan | 130 | 7.6% |
| **Total equity value** | **$1,700** | **100.0%** |

| Total enterprise value | $14,700 | 6.06x |
|---|---|---|

## Crestview Equity Ownership

| | |
|---|---|
| Ownership from existing CCH I bonds [4] | 0.6% |

| Crestview ownership from rights offering: | |
|---|---|
| Pro rata | 2.3% |
| Backstop assuming 20% fee on detachable rights | 13.6% |
| Total | 15.9% |

| **Total Crestview ownership** | **16.6%** |
|---|---|

**Notes**
1. Assuming 20% fees and total $250 million Fund II investment, equity backstop is $200 million
2. Net of $200 million in restructuring fees. Excludes $400 million of maintenance cash required
3. Includes cash payout to CGI creditors of $147 million
4. Based on Crestview's $135 million investment in CCH I notes ($3,987 million total outstanding)
5. Assumes that debt maturities are refinanced at existing terms
6. Pro forma for rights offering. Includes $400 million of maintenance cash required
7. Interest coverage ratio defined as EBITDA divided by gross interest expense
8. Fixed charge coverage ratio defined as EBITDA less capex divided by gross interest expense

## Financial Summary

| | | For the year ended December 31 | | | | | | '08-'13 CAGR |
|---|---|---|---|---|---|---|---|---|
| | | 2008a | 2009e | 2010e | 2011e | 2012e | 2013e | |
| **Key Financials:** | | | | | | | | |
| Revenue | | $6,535 | $6,850 | $7,331 | $7,689 | $8,046 | $8,393 | 5.2% |
| % growth | | | 6.0% | 5.0% | 4.6% | 4.3% | | |
| EBITDA | | 2,395 | 2,440 | 2,590 | 2,738 | 2,885 | 3,013 | 5.5% |
| % growth | | | 6.3% | 5.8% | 5.9% | 5.4% | 4.4% | |
| % margin | | 36.4% | 35.4% | 35.4% | 35.8% | 35.9% | 35.9% | |
| Net interest expense | | (974) | (898) | (891) | (834) | (814) | | |
| Income taxes | | 0 | 0 | 0 | 0 | 0 | | |
| Working capital | | 0 | 0 | 0 | 0 | 0 | | |
| Capex | | (1,249) | (1,227) | (1,322) | (1,215) | (1,257) | | |
| Basic amortization | | (70) | (70) | (70) | (70) | (70) | | |
| FCF (post bank assort.) | | $290 | $431 | $563 | $768 | $912 | | |
| Cumulative FCF (post bank amort.) | | 290 | 680 | 1,283 | 2,049 | 2,961 | | |
| **Debt Capitalization Summary:** [5] | | | | | | | | |
| CCO debt | $10,528 | $10,450 | $10,388 | $10,388 | $10,229 | $10,169 | |
| CCOH debt | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | 1,150 | |
| CCH II new notes | 1,504 [2] | 1,504 | 1,504 | 1,504 | 1,504 | 1,604 | |
| Total debt | $13,180 | $13,085 | $13,023 | $12,953 | $12,883 | $12,813 | |
| Net debt | 12,357 | 12,290 | 11,750 | 11,087 | 10,321 | 9,260 | |
| **Credit Statistics** | | | | | | | | |
| Interest coverage ratio [7] | | 2.80x | 3.00x | 3.21x | 3.46x | 3.70x | |
| Fixed charge coverage ratio [8] | | 1.50x | 1.50x | 1.70x | 2.00x | 2.21x | |
| FCF (post bank amort.) as % of net debt | | 2.1% | 3.7% | 5.3% | 7.5% | 9.8% | |
| Total leverage (through CCOH) | | 4.73x | 4.44x | 4.18x | 3.64x | 3.76x | |
| Net leverage (through CCOH) | | 4.33x | 3.95x | 3.50x | 3.03x | 2.58x | |
| Total leverage | | 5.34x | 5.05x | 4.73x | 4.47x | 4.26x | |
| Net leverage | | 5.00x | 4.63x | 4.06x | 3.65x | 3.08x | |

### Valuation @ Exit (12/31/13)

| | |
|---|---|
| FY2013e EBITDA | $3,013 |
| Exit multiple | 7.0x |
| Total enterprise value | $21,091 |
| Net debt @ 12/31/13 | (9,260) |
| Equity value | $11,822 |
| Less warrants: | |
| Management (3.5%) | (354) |
| Junior debt (1.5%) | (152) |
| Equity value adj. for warrants | $11,315 |

### Return on Pro Rata

| | |
|---|---|
| Crestview equity @ 2.3% ownership | $256 |
| Initial rights offering investment (incl. pro rata) | 35 |
| IRR | 52.4% |
| ROI | 7.4x |

### Return on Backstop

| | |
|---|---|
| Crestview equity @ 13.6% ownership | $1,544 |
| Initial rights offering investment (incl. pro rata) | 250 |
| IRR | 45.1% |
| ROI | 6.2x |

### Assumptions

| | |
|---|---|
| Reorganization multiple | 6.0x |
| Rights offering discount | 25.0% |

| Warrants | |
|---|---|
| Junior debt | 1.5% |
| Management | 3.5% |
| Total | 5.0% |
| Vulcan pre-money equity for bank reinstatement | 5.0% |
| % fee on detachable rights | 20.0% |

11

CHARTER-e 00133074

Exhibit C – Comparable Company Analysis

## COMPARABLE COMPANY DETAILS

| | Comcast | | | Charter | | Cablevision | | Mediacom | |
| | | | | | | | Cable (BV) | Cable (MV) | | |
| | Total | Cable Only | Book Value | Book Value | Mkt Value | Total | | | Book Value | Mkt Value |
|---|---|---|---|---|---|---|---|---|---|---|
| Current Stock Price | 15.70 | 15.70 | 19.66 | 9.15 | 9.15 | 18.08 | 18.08 | 18.08 | 6.49 | 6.49 |
| Equity Value | 44,590 | 44,590 | 19,297 | 116 | 116 | 5,573 | 5,573 | 5,573 | 298 | 298 |
| Enterprise Value | 70,602 | 62,031 | 36,597 | 20,850 | 12,276 | 17,101 | 12,300 | 11,039 | 3,653 | 3,399 |
| **EV / EBITDA (x)** | | | | | | | | | | |
| 2007A | 6.9 | 5.2 | 6.3 | 9.9 | 5.8 | 8.2 | 6.7 | 6.5 | 7.9 | 7.3 |
| 2008E | 5.4 | 4.7 | 5.6 | 9.0 | 5.3 | 7.2 | 6.1 | 5.9 | 7.2 | 6.7 |
| 2009E | 5.1 | 4.6 | 5.3 | 8.2 | 4.8 | 6.5 | 5.6 | 5.5 | 6.8 | 6.4 |
| **EBV / Basic Subs (X)** | | | | | | | | | | |
| 2007A | 2,517 | 2,577 | 2,762 | 3,908 | 2,752 | 3,476 | 3,038 | 2,816 | 2,747 | 2,567 |
| 2008E | 2,908 | 2,552 | 2,764 | 4,101 | 2,412 | 3,493 | 3,051 | 3,829 | 2,702 | 2,578 |
| 2009E | 2,943 | 2,584 | 2,788 | 4,206 | 2,473 | 3,544 | 3,048 | 3,866 | 2,644 | 2,571 |
| **EV / EBITDA-Capex (X)** | | | | | | | | | | |
| 2007A | 12.6 | 10.4 | 15.8 | 21.6 | 11.9 | 18.1 | 16.7 | 16.4 | 15.4 | 14.4 |
| 2008E | 9.9 | 8.4 | 13.4 | 19.5 | 11.5 | 13.2 | 9.9 | 9.6 | 15.7 | 15.4 |
| 2009E | 8.7 | 7.8 | 11.6 | 16.7 | 8.6 | 10.5 | 9.2 | 8.9 | 14.6 | 11.9 |
| **Operating Statistics (%)** | | | | | | | | | | |
| 2008-10 Revenue Growth | 6.3 | 5.3 | 6.5 | 6.6 | | 7.4 | 6.2 | | 2.3 | |
| 2008-10 EBITDA Growth | 6.2 | 6.0 | 7.6 | 9.7 | | 8.3 | 6.7 | | 3.6 | |
| 2008E EBITDA Margin | 35.4 | 39.3 | 39.2 | 35.6 | | 32.3 | 37.3 | | 30.0 | |
| 2008E (EBITDA-Capex) Margin | 22.3 | 22.9 | 15.9 | 16.5 | | 19.6 | 24.2 | | 15.7 | |
| **Credit Statistics (x)** | | | | | | | | | | |
| Total Debt / LTM EBITDA | 2.6 | 2.7 | 3.6 | 9.7 | | 5.6 | 4.6 | | 4.7 | |
| Total Debt / 2008E EBITDA | 2.6 | 2.8 | 3.5 | 9.3 | | 5.4 | 4.4 | | 4.7 | |
| Total Debt / 2009E EBITDA | 2.3 | 2.5 | 3.3 | 8.5 | | 4.9 | 4.1 | | 6.9 | |
| LTM EBITDA / Interest Expense | 3.3 | 3.2 | 2.1 | 1.4 | | 2.6 | 3.9 | | 2.3 | |
| (EBITDA-Capex) / Interest Expense | 3.3 | 3.0 | 2.9 | 6.5 | | 1.6 | 2.4 | | 1.3 | |

[1] Includes adjustment for publicly-traded minority interests of Charter and other minority interests.
[2] Values to include cash and cable television affiliates based on book keeping methods.

12

CHARTER-e 00133075

Exhibit C – Comparable Company Analysis (cont'd)

## CABLE INDUSTRY ESTIMATE CHANGES





CHARTER-e 00133076

Exhibit C – Comparable Company Analysis (cont'd)

## SUBSCRIBER PENETRATION BY PRODUCT









Source: Wall Street research
Note: Reflects most recent reported annual audited statistics

14

Exhibit C – Comparable Company Analysis (cont'd)

## FINANCIAL DRIVERS









Source:    Company filings, research
Note: English cable equivalents data for Comcast and Cablevision

15

Exhibit C – Comparable Company Analysis (cont'd)

## EBITDA AND CAPEX METRICS









Source: Wall Street research
Note: Reflects adjustments taken for General and Collection

16

Exhibit C – Comparable Company Analysis (cont'd)

## OPERATING FREE CASH FLOW METRICS





*Source: Wall Street research*
*Note: Reflects cable operations only for Comcast and Cablevision*

CHARTER-e 00133080

# Public and Private Multiple Disconnects

Recent downturn in public cable valuations has created a disconnect versus private multiples, although no recent meaningful M&A data points

**Public Valuation Multiples**



**Recent Private Market Multiples** [1]

| | Cox Going Private | Time Warner-Comcast-Adelphia | Cablevision / Cox | Insight Going Private | Comcast / Susquehanna | Cablevision / Charter | Comcast / Patriot Media | Proposed CVC Going Private | Insight |
|---|---|---|---|---|---|---|---|---|---|
| | 10.7 | 11.0 | ~10.5 | 12.0 | 10.6 | 8.0 | 10.5 | 11.7 | 10.1 – 11.0 |
| Date | Aug 2004 | Apr 2005 | Nov 2005 | Jul 2005 | Oct 2005 | Feb 2006 | Apr 2007 | May 2007 | Withdrawn |

Source: UBS and Wall Street research
Note:
1  Insight multiples reflect bid / ask of $2.75 billion and $3.0 billion in 2007 median pricing

18

CHARTER-e 00133081

# Effective Cable Transaction Multiples

Strategics have looked at effective multiples after tax benefits and synergies

| Buyer<br>Target | Comcast<br>Patriot Media | Comcast<br>Susquehanna | Cablridge<br>Charter | TWC/Comcast<br>Adelphia |
|---|---|---|---|---|
| **Transaction Overview** | | | | |
| TEV ($mm) | 493 | 775 | 750 | 17,800 |
| Subscribers (000s) | 81 | 226 | 240 | 5,017 |
| Tax feature | 754 Election | Partnership Redemption | Basis Step-Up | Basis Step-Up |
| Tax Value ($mm) | -80 | -100 | -128 | 3,400 |
| Synergies ($mm) | 15 - 20 | 25 - 30 | 9.3 | 65 |
| EBITDA ($mm) | 46.9 | 73.1 | 84.1 | 1,354 |
| Adj. EBITDA ($mm) | 66.9 | 100.6 | 93.4 | 68 |
| **Multiples** | | | | |
| EBITDA (x) | 10.5 | 10.6 | 9.0 | 13.0 |
| Subscribers ($) | 6,086 | 3,429 | 3,167 | 3,760 |
| **Adjusted Multiples** [4] | | | | |
| EBITDA (x) | 6.2 | 6.7 | 6.8 | 9.0 - 11.0 |
| Subscribers ($) | 5,099 | 2,987 | 2,666 | 2,790 - 2,900 |
| **Adjustment Difference** | | | | |
| EBITDA (x) | 4.3 | 3.9 | 2.2 | 3.0 |
| Subscribers ($) | 986 | 442 | 521 | 960 |

Note:
1. Patriot tax value is estimated by UBS
2. Patriot synergies estimated by Patriot management
3. Represents synergies and tax benefits per Comcast investor presentations
4. Comcast has a 70% partner in Susquehanna and assumed multiples on cash consideration: $2,794 per sub and 6.4x EBITDA
5. Cablridge tax step value estimated by UBS
6. Comcast synergies per Analyst presentation
7. Adelphia tax benefits and synergies per Comcast and Time Warner Cable investor presentations

19

CHARTER-e 00133082

# Synergy Opportunity

Strategic buyers should be well positioned to realize substantial synergies

| | |
|---|---|
| **Programming** | • Channel line-up comparison<br>• Approximately 20% programming benefits<br>• Structure may impact ability to realize savings |
| **Corporate Overhead** | • St. Louis corporate operations<br>• One time costs, severance and office space termination payments<br>• Approximately 10% G&A savings<br>• Approximately 50% Management fee savings |
| **Regional and District Level Savings** | • Contiguous properties should allow for regional overhead reduction<br>• District level to be evaluated<br>• Call center consolidation<br>  - Some interconnects already in place |
| **HSD Bandwidth and Billing** | • Potential savings based on better per sub prices<br>• Billing system TBD |
| **Insurance** | • Potential synergies based on better pricing |
| **Equipment** | • Pricing on STBs, switches, plant maintenance |
| **Potential Costs** | • Call center integration?<br>• STB integration?<br>• Branding<br>• Friction from integration, channel lineup changes, new programming, etc. |

20

CHARTER-e 00133083

# Illustrative Valuation Matrix

Meaningful range of valuation multiples between headline values and after-tax / synergy values

| | Charter Valuation | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Implied Enterprise Value | 15,000 | 16,500 | 18,000 | 19,500 | 21,000 | 22,500 | 24,000 | 25,500 |
| Tax Affected Enterprise Value[1] | 11,031 | 12,531 | 14,031 | 15,531 | 17,031 | 18,531 | 20,031 | 21,531 |
| **Multiples** | | | | | | | | |
| 2008 EBITDA: $2,303mm | 6.5 | 7.2 | 7.8 | 8.5 | 9.1 | 9.8 | 10.4 | 11.1 |
| 2009 EBITDA: $2,457mm | 6.1 | 6.7 | 7.3 | 7.9 | 8.5 | 9.2 | 9.8 | 10.4 |
| 2010 EBITDA: $2,648mm | 5.7 | 6.2 | 6.8 | 7.4 | 7.9 | 8.5 | 9.1 | 9.6 |
| 2008 Subscribers: 5,049,333 | 2,971 | 3,268 | 3,565 | 3,862 | 4,159 | 4,456 | 4,753 | 5,050 |
| **Tax Affected Multiples[1]** | | | | | | | | |
| 2008 EBITDA: $2,303mm | 4.8 | 5.4 | 6.1 | 6.7 | 7.4 | 8.0 | 8.7 | 9.4 |
| 2009 EBITDA: $2,457mm | 4.5 | 5.1 | 5.7 | 6.3 | 6.9 | 7.5 | 8.2 | 8.8 |
| 2010 EBITDA: $2,648mm | 4.2 | 4.7 | 5.3 | 5.9 | 6.4 | 7.0 | 7.6 | 8.1 |
| 2008 Subscribers: 5,049,333 | 2,185 | 2,482 | 2,779 | 3,076 | 3,373 | 3,670 | 3,967 | 4,264 |
| **Tax Affected & Margin Adjusted Multiples[2]** | | | | | | | | |
| 2008 EBITDA: $2,502mm | 4.4 | 5.0 | 5.6 | 6.2 | 6.8 | 7.4 | 8.0 | 8.6 |
| 2009 EBITDA: $2,683mm | 4.1 | 4.7 | 5.2 | 5.8 | 6.3 | 6.9 | 7.5 | 8.0 |
| 2010 EBITDA: $2,855mm | 3.9 | 4.4 | 4.9 | 5.4 | 6.0 | 6.5 | 7.0 | 7.5 |
| **Tax Affected & Synergy Adjusted Multiples[3]** | | | | | | | | |
| 2008 EBITDA: $2,738mm | 4.0 | 4.6 | 5.1 | 5.7 | 6.2 | 6.8 | 7.3 | 7.9 |
| 2009 EBITDA: $2,928mm | 3.8 | 4.3 | 4.8 | 5.3 | 5.8 | 6.3 | 6.8 | 7.4 |
| 2010 EBITDA: $3,140mm | 3.5 | 4.0 | 4.5 | 4.9 | 5.4 | 5.9 | 6.4 | 6.9 |

Notes:
1. Assumes taxes of 20% of TEV and 6% discount rate
2. Assumes average cable 2008 EBITDA margin for CVC/SA, CTC and TWC of 39.8%
3. Assumes cost side synergies of 75% programming expense savings, 10% G&A savings, and 50% Management fee savings

CHARTER-e 00133084

PWRW&G DRAFT 1/30/09
This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

Exhibit F – Preliminary Term Sheet

## THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.

## SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

## CHARTER COMMUNICATIONS, INC.

### TERM SHEET FOR PROPOSED JOINT CHAPTER 11 PLAN OF REORGANIZATION

This term sheet (this "Term Sheet") describes the principal terms of a proposed restructuring of Charter Communications, Inc. ("CCI"), together with its affiliates and subsidiaries that are expected to be debtors under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") (collectively, the "Debtors"). Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in Annex A. Certain tax and structuring matters relating to the proposed restructuring are described in Annex B.[2]

| | |
|---|---|
| **PLAN PROPONENTS:** | The Debtors. |
| **PLAN OF REORGANIZATION:** | The Debtors shall file a joint plan of reorganization (the "Plan") and related disclosure statement (the "Disclosure Statement") that incorporate, and are consistent with, this Term Sheet. |
| | The Plan and the Disclosure Statement shall be in form and substance reasonably acceptable to members of the unofficial committee of holders of CCH I Notes and CCH II Notes (the "Committee") holding a majority in principal amount of the CCH I Notes held by all members of the Committee (the "Requisite Noteholders"). |
| | The Plan shall address, among other things, (a) the Debtors' obligations under the CCO Credit Facility; (b) the Debtors' obligations under the CCO Notes; (c) the Debtors' obligations under the CCOH Credit Facility; (d) the Debtors' obligations under the CCOH Notes; (e) the Debtors' obligations under the CCH II Notes; (f) the Debtors' obligations under the CCH I Notes; (g) the Debtors' obligations under the CIH Notes; (h) the Debtors' obligations under the Charter Holdings Notes; (i) the Debtors' obligations under the CCHC Note; (j) the Debtors' obligations under the Charter Holdco Notes; (k) the Debtors' obligations under the CCI Notes; (l) the Debtors' other obligations, including intercompany obligations; (m) the Class A preferred units of CC |

---

[2]    We understand that the advisors to CCI and Paul Allen are preparing Annex B.

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

VIII, LLC (the "CC VIII Preferred Units"); (n) the equity securities of Charter Holdco; and (o) the Debtors' other equity securities, including options, warrants and rights related thereto.

**DEFINITIVE DOCUMENTS:**

The transactions described in this Term Sheet are subject in all respects to, among other things, definitive documentation, including the Plan, the documents to be included in the supplement to the Plan, and the Disclosure Statement, all of which shall be in form and substance reasonably satisfactory to the Requisite Noteholders.

**PLAN FUNDING AND CAPITAL COMMITMENTS:**

The Plan will be funded with cash from operations, an exchange for new debt of CCH II, LLC, the purchase of additional debt of CCH II, LLC, if necessary, and the proceeds of a rights offering by CCI, as follows:

**Exchange for CCH II Notes**

CCH II, LLC shall effectuate an offer in conjunction with and pursuant to the Plan (the "Exchange") to existing holders of CCH II Notes to exchange CCH II Notes for new [13.0 - 13.5]% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 20[16]$^3$ to be issued pursuant to a new indenture substantially similar to the indenture pursuant to which the CCH II Notes were issued (the "New CCH II Notes"). CCH II Notes that are not exchanged in the Exchange shall be converted into the right to receive cash in the amount of outstanding principal plus accrued but unpaid interest and Post-Petition Interest, but excluding any call premiums or any prepayment penalties and without giving effect to any default interest rate (the aggregate amount to be paid in cash, the "Cash Amount").

The maximum principal amount of New CCH II Notes to be issued pursuant to the Plan shall be $1.5 billion (the "Target Amount").

**Rollover Commitment by Members of the Committee**

Certain members of the Committee (the "Rollover Commitment Parties") will, severally and not jointly, commit to exchange an aggregate of $[1.20 billion] in principal amount of CCH II Notes for New CCH II Notes pursuant to the Exchange, subject to the cutback described below (the "Rollover Commitment").

**Cutback in Exchange**

If the aggregate principal amount of New CCH II Notes to be issued to holders (including the Rollover Commitment Parties) electing to participate in the Exchange would exceed the Target Amount, then each participating holder (including the Rollover Commitment Parties) shall receive its pro rata portion of such Target Amount of New CCH II Notes in the same proportion that the principal amount of CCH II Notes sought to be exchanged by such holder bears to the total principal amount of CCH II Notes

---

$^3$     [Seven] year maturity.

CHARTER-e 00133086

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

sought to be exchanged, and the remainder of CCH II Notes shall
be converted into the right to receive cash.

**New Debt
Commitment by
Members of the
Committee**

Certain members of the Committee (the "New Debt Commitment
Parties") will, severally and not jointly, commit to purchase
additional New CCH II Notes (the "New Debt Commitment") in
an aggregate principal amount equal to $[300 million]. If the
aggregate principal amount of New CCH II Notes to be issued to
holders (including the Rollover Commitment Parties) electing to
participate in the Exchange is less than the Target Amount, then
the New Debt Commitment shall be funded to the extent of such
shortfall.

**Rights Offering**

CCI shall effectuate an offering in conjunction with and pursuant
to the Plan (the "Rights Offering") to existing holders of CCH I
Notes and entities controlled by Paul Allen (the "Allen Entities")
of rights to purchase shares of new Class A common stock of the
Reorganized Company (the "New Class A Stock"). The Rights
Offering to existing holders of CCH I Notes shall generate gross
proceeds in an amount equal to (a) $[1 billion] minus (b) the gross
proceeds, if any, of the Rights Offering to the Allen Entities [plus
(c) the amount, if any, by which the Target Amount exceeds the
principal amount of New CCH II Notes issued pursuant to the Plan
(whether pursuant to the Exchange or the New Debt
Commitment)].[4] The Rights Offering to the Allen Entities shall
generate gross proceeds, if any, in an amount up to $[100 million].

Each holder of CCH I Notes shall be offered the right (the
"Right") to purchase up to [___] shares of New Class A Stock for
each $[___] in principal amount of CCH I Notes held by such
holder on the Record Date, in exchange for a cash payment equal
to $[___] per share (the "Per Share Purchase Price").[5] The Allen
Entities shall be offered the Right to purchase up to [___] shares of
New Class A Stock, in exchange for a cash payment per share
equal to the Per Share Purchase Price.

The Rights received by the holders of CCH I Notes shall be
independently transferable (subject to compliance with applicable
securities law) up through the Record Date, subject to a right of
first refusal for members of the Committee who agree to provide
the Equity Backstop (as defined below) (the "Equity Backstop
Parties"). The Rights received by the Allen Entities shall not be
transferable. A Rights agent shall be appointed by CCI to
facilitate the Rights Offering. Fractional shares shall not be issued
and no compensation shall be paid in cash in respect of fractional

---

[4] To be deleted if the sum of the Rollover Commitment and the New Debt Commitment is equal to the Target Amount.
[5] Price per share to reflect a discount of [25]% to equity value based on a 2009 EBITDA multiple of 6.0.

24

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

shares. Unexercised Rights will expire without compensation at
5:00 p.m. on the expiration date chosen by CCI, which date shall
be reasonably satisfactory to the Requisite Noteholders. Shares of
New Class A Stock issued in connection with the Rights Offering
shall be issued on the Effective Date and the Plan shall expressly
require that the Rights Offering close on or prior to the Effective
Date.

**Equity Backstop by
Members of the
Committee**

The Equity Backstop Parties will, severally and not jointly, fully
backstop the Rights Offering so that if any holder of CCH I Notes
(or its transferee of Rights) elects not to participate, each Equity
Backstop Party will assume its pro rata portion of such refraining
party's right to participate in the Rights Offering in the same
proportion that the principal amount of CCH I Notes held by such
Equity Backstop Party bears to the total principal amount of CCH
I Notes held by all Equity Backstop Parties (the "Equity
Backstop"). Notwithstanding the foregoing, no Equity Backstop
Party shall assume any refraining party's right to participate in the
Rights Offering if and to the extent that such Equity Backstop
Party (or its affiliates) would then be entitled to purchase shares of
New Class A Stock that, together with any other shares of New
Class A Stock to be received by such Equity Backstop Party (or its
affiliates) pursuant to the Plan, would result in such Equity
Backstop Party (or its affiliates) having the power, directly or
indirectly, to vote or direct the voting of equity interests having
35% or more (determined on a fully diluted basis) of the ordinary
voting power for the management of the Reorganized Debtors.

**Use of Proceeds of
Rights Offering**

CCI shall utilize the proceeds of the Rights Offering (a) first, to
pay the expenses of the Rights Offering, (b) second, the net
proceeds will be contributed by CCI to CCH II in an amount
sufficient to fund the Cash Amount and (c) third, the remaining net
proceeds, if any, will [be contributed by CCI to CCO to][6] fund
CCO's working capital requirements at the Effective Date.

**Commitment Fees**

As consideration for participating in the Exchange, participating
holders (including the Rollover Commitment Parties) shall receive
[_____][7] from CCI on the [Effective Date], allocated to each
participating holder pro rata in the same proportion that the
principal amount of New CCH II Notes issued to such holder
pursuant to the Exchange bears to the total principal amount of
New CCH II Notes issued pursuant to the Exchange.

As consideration for the New Debt Commitment, the New Debt

---

[6]  Consider which entity will hold remaining net proceeds (if any).
[7]  Form and amount of consideration for commitment fees to be determined. Note that commitment fees will not
reduce the minimum working capital amount to be available at closing, as specified below under "Minimum Working
Capital."

25

CHARTER-e 00133088

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

Commitment Parties shall receive [_____] from CCI on the [Effective Date], allocated to each New Debt Commitment Party pro rata in proportion to its respective New Debt Commitment.

As consideration for the Equity Backstop, the Equity Backstop Parties shall receive [_____] from CCI on the [Effective Date], allocated to each Equity Backstop Party pro rata in proportion to its respective Equity Backstop.

**MINIMUM WORKING CAPITAL:**

By virtue of the Rights Offering, cash on the balance sheet and cash from operations, the initial unrestricted starting cash balance of the Reorganized Debtors will be $[_____]. There will be no availability for additional borrowing under the CCO Credit Facility.

**TREATMENT OF CLAIMS AND INTERESTS:**

**Administrative Expense Claims**

The allowed administrative expense claims shall be unimpaired. Except with respect to administrative expense claims that are professional fee claims and except to the extent that a holder of an allowed administrative expense claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Requisite Noteholders, each holder of an allowed administrative expense claim shall be paid in full in cash on the later of the initial distribution date under the Plan and the date such administrative expense claim is allowed, or as soon thereafter as is practicable; provided, however, that allowed administrative expense claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

**Priority Tax Claims**

The allowed priority tax claims shall be unimpaired. Except to the extent that a holder of an allowed priority tax claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Requisite Noteholders, each holder of an allowed priority tax claim shall, at the sole option of the Debtors, (a) be paid in full in cash plus Post-Petition Interest on the later of the initial distribution date under the Plan and the date such priority tax claim becomes an allowed priority tax claim, or as soon thereafter as is practicable, or (b) over a period through the sixth anniversary of the date of assessment of such allowed priority tax claim, receive deferred cash payments in an aggregate amount equal to such allowed priority tax claim plus Post-Petition Interest and interest on such aggregate amount over such period at the same rate as such Post-Petition Interest. All allowed priority

26

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

tax claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**Other Priority Claims**

The allowed other priority claims shall be unimpaired. Except to the extent that a holder of an allowed other priority claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Requisite Noteholders, each holder of an allowed other priority claim shall be paid in full in cash plus Post-Petition Interest on the later of the initial distribution date under the Plan and the date such other priority claim is allowed, or as soon thereafter as is practicable; provided, however, that other priority claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**CCO Credit Facility Claims**

The allowed CCO Credit Facility claims shall be unimpaired. The CCO Credit Facility Claims shall be allowed in the aggregate amount of $[*insert principal plus accrued interest*] plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties and without giving effect to any default interest rate. Each allowed CCO Credit Facility claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an allowed CCO Credit Facility claim to demand or to receive payment of such allowed CCO Credit Facility claim prior to the stated maturity of such allowed CCO Credit Facility claim from and after the occurrence of a default. The obligation of any lender to make loans (whether term loans or revolving loans) under the CCO Credit Facility, other than loans outstanding as of the Effective Date, shall be cancelled, released and extinguished.

**CCO Note Claims**

The allowed CCO Note claims shall be unimpaired. The CCO Note claims shall be allowed in the aggregate amount of $[*insert principal plus accrued interest*] plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties and without giving effect to any default interest rate. Each allowed CCO Note claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an allowed CCO Note claim to demand or to receive payment of such allowed CCO Note claim prior to the stated maturity of such allowed CCO Note claim from and after the occurrence of a default.

**CCOH Credit Facility**

The allowed CCOH Credit Facility claims shall be unimpaired.

27

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

| | |
|---|---|
| **Claims** | The CCOH Credit Facility Claims shall be allowed in the aggregate amount of $[*insert principal plus accrued interest*] plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties and without giving effect to any default interest rate. Each allowed CCOH Credit Facility claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an allowed CCOH Credit Facility claim to demand or to receive payment of such allowed CCOH Credit Facility claim prior to the stated maturity of such allowed CCOH Credit Facility claim from and after the occurrence of a default. |
| **CCOH Note Claims** | The allowed CCOH Note claims shall be unimpaired. The CCOH Note claims shall be allowed in the aggregate amount of $[*insert principal plus accrued interest*] plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties and without giving effect to any default interest rate. Each allowed CCOH Note claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an allowed CCOH Note claim to demand or to receive payment of such allowed CCOH Note claim prior to the stated maturity of such allowed CCOH Note claim from and after the occurrence of a default. |
| **Other Secured Claims** | The allowed other secured claims shall be unimpaired. Except to the extent that a holder of an allowed other secured claim and the Debtors agree to a different treatment, which shall be reasonably satisfactory to the Requisite Noteholders, at the sole option of the Debtors, (a) each allowed other secured claim shall be reinstated and rendered unimpaired in accordance with section 1124(2) of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an allowed other secured claim to demand or to receive payment of such allowed other secured claim prior to the stated maturity of such allowed other secured claim from and after the occurrence of a default, (b) each holder of an allowed other secured claim shall be paid in full in cash plus Post-Petition Interest on the later of the initial distribution date under the Plan and the date such other secured claim becomes an allowed other secured claim, or as soon thereafter as is practicable, or (c) each holder of an allowed other secured claim shall receive the collateral securing its allowed other secured claim plus Post-Petition Interest on the later of the initial distribution date under the Plan and the date such other secured claim becomes an allowed other secured claim, or as soon thereafter as is practicable. |

28

CHARTER-e 00133091

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

**General Unsecured Claims**  The allowed general unsecured claims shall be unimpaired. Each holder of an allowed general unsecured claim (which shall not include Unliquidated Claims, CCI claims or Charter Holdco claims) shall be paid in full in cash plus Post-Petition Interest on the later of the initial distribution date under the Plan and the date such general unsecured claim is allowed, or as soon thereafter as is practicable. To the extent insurance is available to satisfy an allowed general unsecured claim, such allowed general unsecured claim shall be paid in the ordinary course of business by the Reorganized Debtors to the extent of such insurance, without need for Bankruptcy Court approval, at such time as such claim becomes liquidated and proceeds of the insurance therefor become available. The Debtors shall not establish any disputed claims reserve for payment of general unsecured claims.

**Unliquidated Claims**  Holders of Unliquidated Claims shall be unimpaired. All Unliquidated Claims, solely to the extent and on the basis set forth in a timely and validly filed proof of claim, shall be liquidated, determined and satisfied in the ordinary course of business by the Reorganized Debtors, without need for Bankruptcy Court approval, including, where applicable, through access to available insurance. The Debtors shall not establish any disputed claims reserve for payment of Unliquidated Claims.

**CCH II Note Claims**  CCH II Note claims shall be impaired. The CCH II Note claims shall be allowed in the aggregate amount of $[insert principal plus accrued interest]. Holders of CCH II Note claims shall receive the New CCH II Notes and the Cash Amount pursuant to the Exchange.

**CCH I Note Claims**  CCH I Note claims shall be impaired. The CCH I Note claims shall be allowed in the aggregate amount of $[insert principal plus accrued interest]. Holders of CCH I Note claims shall receive an aggregate of [_____] shares of New Class A Stock on the initial distribution date under the Plan. Each holder of CCH I Note claims shall receive its pro rata portion of such New Class A Stock in the same proportion that the principal amount of CCH I Notes held by such holder bears to the total principal amount of CCH I Notes (whether or not held by members of the Committee). Holders of CCH I Note claims shall also receive Rights pursuant to the Rights Offering as described above.

**CIH Note Claims**  CIH Note claims shall be impaired. The CIH Note claims shall be allowed in the aggregate amount of $[insert principal plus accrued interest]. Holders of CIH Note claims shall receive [warrants to purchase an aggregate of [_____] shares of New Class A Stock] OR [an aggregate of [_____] shares of New Class A Stock] on the initial distribution date under the Plan. Each holder

29

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

of CIH Note claims shall receive its pro rata portion of such [warrants] *OR* [New Class A Stock] in the same proportion that the principal amount of CIH Notes held by such holder bears to the total principal amount of CIH Notes.

**Charter Holdings Note Claims**

Charter Holdings Note claims shall be impaired. The Charter Holdings Note claims shall be allowed in the aggregate amount of $[*insert principal plus accrued interest*]. Holders of Charter Holdings Note claims shall receive [warrants to purchase an aggregate of [_____] shares of New Class A Stock *OR* [an aggregate of [_____] shares of New Class A Stock] on the initial distribution date under the Plan. Each holder of Charter Holdings Note claims shall receive its pro rata portion of such [warrants] *OR* [New Class A Stock] in the same proportion that the principal amount of Charter Holdings Notes held by such holder bears to the total principal amount of Charter Holdings Notes.

**CCHC Note Claims**

CCHC Note claims shall be impaired. CCHC Note claims shall be cancelled, released and extinguished and the holder of the CCHC Note shall receive no distribution under the Plan on account of such claims.

**Charter Holdco Claims**

Charter Holdco claims shall be impaired. Charter Holdco claims (including, without limitation, claims in respect of the Charter Holdco Notes and amounts payable pursuant to the Second Amended and Restated Mutual Services Agreement, dated as of June 19, 2003, between CCI and Charter Holdco) shall be cancelled, released and extinguished and the holders of Charter Holdco claims shall receive no distribution under the Plan on account of such claims.

**CCI Claims**

CCI claims shall be impaired. Holders of CCI claims shall receive [warrants to purchase an aggregate of [_____] shares of New Class A Stock] *OR* [an aggregate of [_____] shares of New Class A Stock] *OR* [an aggregate of $[_____] in cash] plus an aggregate of $[_____] in cash if and only if the $[_____] interest payment due from CIH and Charter Holdings on January 15 is paid prior to February 15, in each case on the initial distribution date under the Plan. Each holder of CCI claims shall receive its pro rata portion of such [warrants] *OR* [New Class A Stock] *AND/OR* [cash] in the same proportion that the principal amount of CCI claims held by such holder bears to the total principal amount of CCI claims. CCI claims in respect of the CCI Notes and amounts payable pursuant to the Amended and Restated Management Agreement, dated as of June 19, 2003, between CCO and CCI, shall be cancelled, released and extinguished.

**Other Intercompany**

[Except as otherwise provided for in this Term Sheet and the Plan,

30

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

| | |
|---|---|
| **Claims** | all other intercompany claims shall be unimpaired and shall be reinstated upon the Effective Date.][8] |
| **CC VIII Preferred Units** | Interests in the CC VIII Preferred Units shall be impaired. Holders of CC VIII Preferred Units shall receive (a) in the case of holders of CCH I Notes, an aggregate of [_____] shares of New Class A Stock and (b) in the case of Charter Investment, Inc., an aggregate of [_____] shares of new Class B common stock of the Reorganized Company (the "New Class B Stock" and, together with the New Class A Stock, the "New Common Stock"), in each case on the initial distribution date under the Plan. Each holder of CC VIII Preferred Units shall receive its pro rata portion of such New Common Stock in the same proportion that the number of CC VIII Preferred Units held by such holder bears to the total number of CC VIII Preferred Units. |
| **Equity Securities of Charter Holdco** | Interests in the equity securities of Charter Holdco held by Charter Investment, Inc. and Vulcan Cable III Inc. shall be impaired. [Such interests shall be cancelled, released and extinguished and neither Charter Investment, Inc. nor Vulcan Cable III Inc. shall receive any distribution under the Plan on account of such interests.][9] |
| **Existing Common Stock and Preferred Share Purchase Rights** | Interests in the Class A common stock, Class B common stock and preferred share purchase rights of CCI outstanding immediately prior to the Effective Date shall be impaired. Such interests shall be cancelled, released and extinguished and holders of such interests shall receive no distribution under the Plan on account thereof. |
| **Other Common Equity Interests in CCI** | The other common equity interests in CCI, including options, warrants and rights related to equity interests, shall be impaired. Such interests shall be cancelled, released and extinguished and holders of such interests shall receive no distribution under the Plan on account thereof. |
| **Other Equity Interests in Surviving Debtor Subsidiaries** | Except as otherwise provided for in the Plan, all other equity interests in the subsidiaries of CCI shall be unimpaired. |
| **REORGANIZED COMPANY EQUITY INTERESTS:** | The Reorganized Company's equity interests shall consist of New Class A Stock [and] New Class B Stock [and warrants to purchase New Class A Stock]. |
| **New Class A Common Stock** | An aggregate of [_____] shares of New Class A Stock shall be issued to (a) participants in the Rights Offering upon the exercise of Rights, (b) holders of claims with respect to the CCH I Notes[, |

---

[8]      Intercompany claims to be discussed (including (i) loan to CCOH from CCO, (ii) loan to CCH II from CCO and (iii) loan to Charter Holdco from CCO).
[9]      Subject to applicable tax and structuring provisions of Annex B.

31

CHARTER-e 00133094

**This is Not a Proposal or Offer**
**Subject to Internal and Client Review and FRE 408**
**Confidential – For Discussion Purposes Only**

CIH Notes, Charter Holdings Notes and CCI,] and (c) holders of CCH I Notes with respect to their CC VIII Preferred Units, in each case in the respective amounts described above. Each share of New Class A Stock shall be entitled to one vote.

CCI shall cause the New Class A Stock to be listed on the NASDAQ Global Select Market [as of the Effective Date][10] and the Reorganized Company shall maintain such listing thereafter.

**New Class B Common Stock**  The New Class B Stock shall be identical to the New Class A Stock except with respect to certain voting, transfer and conversion rights. Each share of New Class B Stock shall be entitled to [ ] votes. Each share of New Class B Stock shall be convertible into one share of New Class A Stock at the option of the holder or, following [*insert last maturity date of indebtedness being reinstated pursuant to the Plan*] (the "Lock-Up Date"), the members of the Board of Directors (as defined below) nominated by stockholders other than the Allen Entities. New Class B Stock shall be subject to significant transfer restrictions. Certain restrictions on conversion and transfer of New Class B Stock are described below under "*POST-EFFECTIVE DATE LOCK-UP.*"

In consideration for the CC VIII Preferred Units held by Charter Investment, Inc., an aggregate of [ ] shares of New Class B Stock shall be issued to the Allen Entities. Such shares of New Class B Stock shall, together with any shares of New Class A Stock received by the Allen Entities pursuant to the Plan, result in the Allen Entities having the power, directly or indirectly, to vote or direct the voting of equity interests having 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Reorganized Debtors.

**[Warrants]**  [Warrants to purchase an aggregate of [ ] shares of New Class A Stock shall be issued to holders of claims with respect to the CIH Notes, Charter Holdings Notes and CCI in the respective amounts described above. The warrants shall have an exercise price of $[ ] per share and shall expire [ ] years after the date of issuance.]

**REGISTRATION RIGHTS:**  On the Effective Date, the Reorganized Company shall enter into a registration rights agreement with certain holders of New Common Stock,[11] in form and substance reasonably satisfactory to the Requisite Noteholders, pursuant to which such holders shall receive certain demand, shelf and "piggyback" registration rights with respect to the New Class A Stock.

**CONDITIONS TO**  The Plan shall contain various conditions precedent to

---

[10]  Subject to applicable tax and structuring provisions of Annex B.
[11]  To include holders of more than 10% of the New Common Stock.

CHARTER-e 00133095

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

**CONFIRMATION &
EFFECTIVE DATE:**

confirmation and to the Effective Date that must be satisfied or waived.

Such conditions to the Effective Date shall include, without limitation, the following:

(a)     the Plan shall be in form and substance consistent with this Term Sheet, and shall be reasonably satisfactory to the Requisite Noteholders;

(b)     an order confirming the Plan, in form and substance reasonably satisfactory to the Requisite Noteholders, shall have been entered and shall not have been stayed or modified or vacated on appeal;

(c)     the Effective Date of the Plan shall have occurred on or before [_____], 2009; and

(d)     other conditions customary for transactions of the type described in this Term Sheet shall have been satisfied or waived by the Requisite Noteholders.

**BOARD
REPRESENTATION:**

[The Reorganized Company's board of directors (the "Board of Directors") shall consist of [   ] members. Each holder of [   ]% or more of the voting power of the New Common Stock on the Effective Date shall have the right to nominate one member of the Board for each [   ]% of voting power, for a total of [   ] nominees.]

Subject to the Reorganized Company's by-laws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.

**SENIOR
MANAGEMENT:**

The officers of the Reorganized Debtors shall be substantially the same as the officers of the Debtors on the date hereof.

**MANAGEMENT
INCENTIVE PLAN:**

The Plan shall provide for a management incentive plan, which shall include, among other things, an allocation of up to [   ]% of the fully diluted New Common Stock outstanding on the Effective Date to be distributed as determined by the Board of Directors.

**POST-EFFECTIVE
DATE
GOVERNANCE:**

The Plan shall provide that (a) the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan; and (b) on and as of the Effective Date, the Rights Agreement between CCI and Mellon Investor Services LLC, dated as of August 14, 2007, as amended thereafter, shall be terminated.

**POST-EFFECTIVE**

On the Effective Date, the Allen Entities shall enter into a lock-up

33

CHARTER-e 00133096

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

**DATE LOCK-UP:** agreement with the Reorganized Company, in form and substance reasonably satisfactory to the Requisite Noteholders, pursuant to which the Allen Entities shall agree not to, and not to permit [related persons or entities for purposes of the CCO Credit Facility, the CCO Notes, the CCOH Credit Facility or the CCOH Notes] to, transfer any New Common Stock or convert any New Class B Stock into New Class A Stock, in each case for a period commencing on the Effective Date and continuing until the Lock-Up Date.

**POST-EFFECTIVE DATE STANDSTILL:** The certificate of incorporation of the Reorganized Company shall, for a period commencing on the Effective Date and continuing until the Lock-Up Date unless approved by the Board of Directors, prohibit any person or group from acquiring any New Common Stock if and to the extent that such New Common Stock, together with any other shares of New Common Stock held by such person or group, would result in such person or group having the power, directly or indirectly, to vote or direct the voting of equity interests having 35% or more (determined on a fully diluted basis) of the ordinary voting power for the management of the Reorganized Debtors.

**RELATED PARTY TRANSACTIONS:** The certificate of incorporation of the Reorganized Company shall include provisions with respect to any business combination with or into any related party, requiring that the consideration received by the other stockholders in connection with such business combination is at fair value as determined by the unrelated members of the Board of Directors and approved by the vote of a majority of disinterested stockholders.

**FEES AND EXPENSES:** CCI shall pay the fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc. and UBS Securities LLC, the legal and financial advisors engaged by the Committee, subject to the terms of the engagement letters executed by CCI.

CCI shall pay the out-of-pocket fees and expenses incurred by the members of the Committee in connection with the negotiation of the proposed restructuring and their due diligence review.

**ADDITIONAL PROVISIONS:** The Plan shall contain other provisions customarily found in other similar plans of reorganization, as are reasonably acceptable to the Requisite Noteholders.

34

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

## ANNEX A

## DEFINED TERMS

"Bankruptcy Court" means the United States Bankruptcy Court for the District of [_____] or such other court of competent jurisdiction.

"CCH I Notes" means the 11.00% Senior Secured Notes of CCH I, LLC and CCH I Capital Corp. due 2015 issued pursuant to the Indenture, dated as of September 23, 2003, among CCH I, LLC and CCH I Capital Corp., as issuers, Charter Holdings, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee.

"CCH II Notes" means:

   (a) the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Indenture, dated as of September 23, 2003, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee; and

   (b) the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, Charter Holdings, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee.

"CCHC Note" means the 14% Subordinated Accreting Note, dated as of October 31, 2005, issued by CCHC, LLC in favor of Charter Investment, Inc.

"CCI Notes" means:

   (a) the 5.875% Convertible Senior Notes of CCI due 2009 issued pursuant to the Indenture, dated as of November 22, 2004, among CCI and Wells Fargo Bank, N.A., as trustee; and

   (b) the 6.50% Convertible Senior Notes of CCI due 2027 issued pursuant to the Indenture, dated as of October 2, 2007, among CCI and The Bank of New York Trust Company, N.A., as trustee.

"CCO" means Charter Communications Operating, LLC.

"CCO Credit Facility" means the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated on March 6, 2007, among CCO, CCO Holdings, LLC, the several banks and other financial institutions or entities from time to time parties thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A. and Bank of America, N.A., as syndication agents, Citicorp North America, Inc., Deutsche Bank Securities Inc., General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as revolving facility co-documentation agents, and Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as term facility co-documentation agents.

"CCO Notes" means:

   (a) the 8% Senior Second Lien Notes of CCO and CCOC due 2012 and the 8-3/8% Senior Second Lien Notes of CCO and CCOC due 2014 issued pursuant to the Indenture, dated as of April 27,

**This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only**

2004, among CCO and CCOC, as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wells Fargo Bank, N.A., as trustee; and

(b) the 10.875% Senior Second Lien Notes of CCO and CCOC due 2014 issued pursuant to the Indenture, dated as of March 19, 2008, among CCO and CCOC, as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wilmington Trust Company, as trustee.

"CCOC" means Charter Communication Operating Capital Corp.

"CCOH Credit Facility" means the Credit Agreement, dated as of March 6, 2007, among CCO Holdings, LLC, the several banks and other financial institutions or entities from time to time parties thereto, Bank of America, N.A., as administrative agent, Banc of America Securities LLC and J.P. Morgan Securities Inc., as co-syndication agents, and Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc., as co-documentation agents.

"CCOH Notes" means the 8.75% Senior Notes of CCO Holdings, LLC and CCO Holdings Capital Corp. due 2013 issued pursuant to the Indenture, dated as of November 10, 2003, among CCO Holdings, LLC and CCO Holdings Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee.

"Charter Holdco" means Charter Communications Holding Company, LLC.

"Charter Holdco Notes" means:

(a) the 5.875% Mirror Convertible Senior Note of Charter Holdco due 2009 issued pursuant to the Holdco Mirror Notes Agreement, dated as of November 22, 2004, among CCI and Charter Holdco; and

(b) the 6.50% Mirror Convertible Senior Note of Charter Holdco due 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, among CCI and Charter Holdco.

"Charter Holdings" means Charter Communications Holdings, LLC.

"Charter Holdings Notes" means:

(a) the 9.625% Senior Notes of Charter Holdings and Holdings Capital Corp due 2009 issued pursuant to the Indenture, dated as of May 15, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(b) the 10.00% Senior Notes of Charter Holdings and Holdings Capital Corp due 2009 issued pursuant to the Indenture, dated as of January 19, 2000, among Charter Holdings and Holdings Capital Corp, as issuers, and Harris Trust and Savings Bank, as trustee;

(c) the 10.75% Senior Notes of Charter Holdings and Holdings Capital Corp due 2009 issued pursuant to the Indenture, dated as of January 10, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

A-2

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

(d) the 11.75% Senior Discount Notes of Charter Holdings and Holdings Capital Corp due 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among Charter Holdings and Holdings Capital Corp, as issuers, and Harris Trust and Savings Bank, as trustee;

(e) the 10.25% Senior Notes of Charter Holdings and Holdings Capital Corp due 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among Charter Holdings and Holdings Capital Corp, as issuers, and Harris Trust and Savings Bank, as trustee;

(f) the 9.92% Senior Discount Notes of Charter Holdings and Holdings Capital Corp due 2011 issued pursuant to the Indenture, dated as of March 17, 1999, among Charter Holdings and Holdings Capital Corp, as issuers, Marcus Cable Holdings, LLC, as guarantor, and Harris Trust and Savings Bank, as trustee;

(g) the 11.125% Senior Notes of Charter Holdings and Holdings Capital Corp due 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(h) the 13.50% Senior Discount Notes of Charter Holdings and Holdings Capital Corp due 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(i) the 10.00% Senior Notes of Charter Holdings and Holdings Capital Corp due 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(j) the 11.75% Senior Discount Notes of Charter Holdings and Holdings Capital Corp due 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee; and

(k) the 12.125% Senior Discount Notes of Charter Holdings and Holdings Capital Corp due 2012 issued pursuant to the Indenture, dated as of January 14, 2002, among Charter Holdings and Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee.

"CIH" means CCH I Holdings, LLC.

"CIH Capital" means CCH I Holdings Capital Corporation.

"CIH Notes" means the following notes issued pursuant to the Indenture, dated as of September 28, 2005, among CIH and CIH Capital, as issuers, Charter Holdings, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee:

(a) 11.125% Senior Accreting Notes of CIH and CIH Capital due 2014;

(b) 9.920% Senior Accreting Notes of CIH and CIH Capital due 2014;

(c) 10.00% Senior Accreting Notes of CIH and CIH Capital due 2014;

(d) 11.75% Senior Accreting Notes of CIH and CIH Capital due 2014;

A-3

CHARTER-e 00133100

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

(e) 13.50% Senior Accreting Notes of CIH and CIH Capital due 2014; and

(f) 12.125% Senior Accreting Notes of CIH and CIH Capital due 2015.

"Effective Date" means the date that all conditions to the effectiveness of the Plan have been satisfied or waived as provided herein, which conditions shall be reasonably satisfactory to the Requisite Noteholders.

"Holdings Capital Corp" means Charter Communications Holdings Capital Corporation.

"Petition Date" means the date on which the Debtors file their voluntary petitions commencing cases in the Bankruptcy Court under chapter 11 of the Bankruptcy Code.

"Post-Petition Interest" means with respect to:

  (a) priority tax claims, (i) with respect to federal taxes, at a fixed annual rate equal to the federal statutory rate as provided in 26 U.S.C. § 6621; and (ii) with respect to state and local taxes, at the prime lending rate of interest as in effect for the period to which the priority tax claim pertains;

  (b) [the CCO Credit Facility, accrued and unpaid interest pursuant to the CCO Credit Facility from the Petition Date through the Effective Date at the applicable contractual rate;]

  (c) [the CCO Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date at the applicable contractual rate;]

  (d) [the CCOH Credit Facility, accrued and unpaid interest pursuant to the CCOH Credit Facility from the Petition Date through the Effective Date at the applicable contractual rate;]

  (e) [the CCOH Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date at the applicable contractual rate;]

  (f) [other secured claims, interest accruing on such claims from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the federal judgment rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date;]

  (g) [general unsecured claims, interest accruing from the Petition Date through the Effective Date at the legally required rate;] and

  (h) [the CCH II Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date at the applicable contractual rate].

For the avoidance of doubt, except as required under applicable non-bankruptcy law, Post-Petition Interest will not be paid on allowed administrative expense claims (including professional fee claims).

A-4

CHARTER-e 00133101

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

"Record Date" means a date approximately [three] business days prior to the date chosen by CCI on which the Rights Offering shall commence, which date shall be reasonably satisfactory to the Requisite Noteholders.

"Reorganized Company" means CCI after the Effective Date.

"Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

"Unliquidated Claim" means a timely and validly filed proof of claim asserting an unliquidated or contingent unsecured claim (which claim numbers shall be set forth in a schedule attached to the Plan) against one of the Debtors, solely to the extent and on the basis set forth in the proof of claim, and to the extent such claim has not been disallowed and remains unliquidated and/or contingent on and as of the Effective Date unless such claim has been disallowed by the Bankruptcy Court.

CHARTER-e 00133102

This is Not a Proposal or Offer
Subject to Internal and Client Review and FRE 408
Confidential – For Discussion Purposes Only

## ANNEX B

## TAX MATTERS

CHARTER-e 00133103