EXHIBIT Tr. 7/28

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 09-11435-jmp; Adv. Case No. 1-09-01132
- - - - - - - - - - - - - - - - - - - - - - -x
In the Matter of:
CHARTER COMMUNICATIONS, INC., et al.,
      Debtors.
- - - - - - - - - - - - - - - - - - - - - - -x
JPMORGAN CHASE BANK, N.A.,
as Administrative Agent,
                Plaintiff,
      -against-
CHARTER COMMUNICATIONS OPERATING, LLC
and CCO HOLDINGS, LLC,
                Defendants.
- - - - - - - - - - - - - - - - - - - - - - -x

        U.S. Bankruptcy Court
        One Bowling Green
        New York, New York

        July 28, 2009
        9:37 AM

B E F O R E:
HON. JAMES M. PECK
U.S. BANKRUPTCY JUDGE

| | |
|---|---|
| 1  1 billion uncommitted incremental term loan facility to fund | 1  but -- |
| 2  SVF requirements in fiscal year '09 and fiscal year '10; | 2  Q. Okay. |
| 3  (2) refinance the 2.2 billion dollars of CCH II notes that | 3  A. -- if it's too loud, I apologize. Can -- |
| 4  mature in September 2010; and (3) secure an additional | 4  MR. ANGIOLILLO: Your Honor, it just causes a |
| 5  approximately 500 million of capital to fund operating losses | 5  distortion. |
| 6  generated through fiscal year '12, after which point we | 6  THE WITNESS: Okay, can you hear me now? |
| 7  estimate the Company will break even under our base case | 7  MR. ANGIOLILLO: Perfect. |
| 8  assumptions." | 8  THE WITNESS: Okay, so I can keep it at that distance. |
| 9  Now, does that describe the factors that you believed were | 9  BY MR. LEFFELL: |
| 10  achievable? | 10  Q. Now, on the first page I'd like to focus on the second |
| 11  A. Yes, it's a good summary. | 11  paragraph, and in particular about ten lines from the bottom |
| 12  Q. And if those factors were achieved, as you thought was | 12  there's a sentence that begins "Management has been |
| 13  possible, then you expected the CIH notes could be redeemed at | 13  proactively". Do you see that? |
| 14  par, correct? | 14  A. Yes. |
| 15  A. Correct. | 15  Q. It says, "Management has been proactively managing the |
| 16  Q. Now, if that's the case, why did you say that you had | 16  capital structure to address/extend the maturities. And to the |
| 17  based your investment thesis on the premise that CIH would be | 17  extent the Company is successful in refinancing the full 1.9 |
| 18  the fulcrum security in a potential 2010 restructuring? | 18  billion dollars, our securities are likely to trade up |
| 19  A. Well, I think we were trying to give the senior partners | 19  significantly. However, by September 2010, to the extent the |
| 20  comfort that, should a downside scenario materialize, that we | 20  current credit environment persists and Charter is unable to |
| 21  would still receive value for the securities we bought. And we | 21  refinance the maturities, perpetuating a restructuring |
| 22  were just trying to base -- be prudent in our investment | 22  scenario, our securities would finance down to a reasonable |
| 23  judgment by looking at that downside scenario. | 23  level in the context of cable valuations. This instills |
| 24  Q. Okay. I would like to turn now to the next document in | 24  confidence that, should such a scenario materialize, we would |
| 25  the book, which is Charter Exhibit 368. Do you recognize | 25  be positioned in the fulcrum securities or to generate a cash |
| 38 | 40 |
| 1  Charter Exhibit 368, Mr. Zinterhofer? | 1  recovery through a Comcast/Time Warner cable purchase." Do you |
| 2  A. Yes. | 2  see that? |
| 3  Q. And did you have any role in preparing it? | 3  A. Yes, I see it. |
| 4  A. I oversaw the preparation of this memo as well. | 4  Q. And does that accurately reflect your views about the |
| 5  Q. And what was its purpose? | 5  Charter Investment in -- or as of September 29th, 2008? |
| 6  A. Again, I believe this was an update to the group in the | 6  A. Yes. |
| 7  late September time frame in light of changing market | 7  Q. Now, what were the possibilities that you were |
| 8  conditions as regarded Charter. | 8  anticipating as described in that passage? |
| 9  Q. And when you say "update to the group", what group are you | 9  A. Well, in the first instance, we were still cautiously |
| 10  referring to? | 10  optimistic that the company could get through 2010 and |
| 11  A. The senior partners. | 11  refinance their capital structure, although at this point, |
| 12  Q. Okay. Now, did this document go to the senior partners? | 12  getting into that September time frame with the credit crunch, |
| 13  A. Yes. | 13  you know, just really getting going, we were increasingly |
| 14  Q. Okay. | 14  concerned that that might not happen. |
| 15  MR. LEFFELL: Your Honor, I would move Charter Exhibit | 15  And so we were looking at 2010, really at two scenarios: |
| 16  368 into evidence. | 16  One is a restructuring, which would have involved a |
| 17  THE COURT: Any objection? | 17  deleveraging of the company; and the second scenario would have |
| 18  It's admitted. | 18  been, as part of a distressed process, a sale to a strategic |
| 19  (Update to senior partners in late September 2008 in light of | 19  buyer, such as Comcast or Timer Warner. |
| 20  changing market conditions re: Charter was hereby received into | 20  Q. Okay. And did you -- or did Apollo have any preference -- |
| 21  evidence as Charter Exhibit 368, as of this date.) | 21  in the event the company did not make it through 2010, did |
| 22  MR. LEFFELL: Okay. | 22  Apollo have any preference as between the restructuring or the |
| 23  Q. Now, Mr. Angiolillo would like you to move away from the | 23  sale to Comcast or Time Warner Cable? |
| 24  microphone a little bit. | 24  A. Well, we were focused on maximizing value. So I think the |
| 25  A. Okay. Sorry. I wanted to make sure I was being heard, | 25  Comcast/Time Warner option, we felt, would generate par for our |
| 39 | 41 |

| | |
|---|---|
| 1  securities. I don't think at this point in time we had | 1  in Charter debt? |
| 2  analyzed what our return on investment could be should a | 2  A. I may have had a sense at that point that Crestview had |
| 3  restructuring occur down the road. But I think what we were | 3  purchased some bonds, because Jeff had alluded to it to me, but |
| 4  attempting to do is reassure our partners that in either | 4  beyond that, nothing else. |
| 5  scenario we would be okay from a return on investment, or IRR | 5  Q. Okay. Did you have any sense of how much Crestview held? |
| 6  standpoint. | 6  A. I would have -- not really, but it would have -- I would |
| 7  Q. Okay. Now, as of September 29th, 2008, had you made any | 7  have guessed it would have been a small amount given their fund |
| 8  purchases of Charter securities as part of any agreement or | 8  is not that large. |
| 9  collaboration or joint strategy with any other investor? | 9  Q. Okay. Now, going back to your conversation with |
| 10  A. No. | 10  Mr. Millstein, what was your reaction when he told you about |
| 11  Q. And as of September 29th, did you know of anyone else that | 11  Charter's intentions with respect to the interest payment? |
| 12  had a significant position in Charter bonds? | 12  A. Shot, blindsided is probably how I would describe it. |
| 13  A. Other than what I said earlier about the mutual funds, no. | 13  There's nothing in, unfortunately, in any of our memos that |
| 14  Q. Now, from the time of this memo in late September 2008 up | 14  anticipated this or our thought process. We thought the |
| 15  until mid-December 2008, did Apollo purchase any additional | 15  company had enough liquidity to get through at least another |
| 16  Charter securities? | 16  year and a half. Everything we had talked about had been in |
| 17  A. Yes. We bought some CCH I class of securities, and then | 17  terms of a possible restructuring in 2010 should 1.9 billion of |
| 18  in the December time frame we bought some CCH II debt | 18  debt not be refinanced. But something that soon was pretty |
| 19  securities. | 19  shocking to us. |
| 20  Q. And what was the rationale for those purchases? | 20  Q. Well, did you view it as a positive opportunity for your |
| 21  A. We continued to be attracted to the yield on CCH I and | 21  firm? |
| 22  felt like there was enough downside protection should a | 22  A. No. It was very negative because an important part of our |
| 23  restructuring materialize. And with regards to CCH II, we felt | 23  thesis is that we were going to de-risk the investment by |
| 24  that it was very likely that those securities would receive par | 24  continuing to receive coupons on our debt and de-risk the |
| 25  and just generate at a very attractive yield to maturity. | 25  principal amount of our investment. And we talked a lot about |
| 42 | 44 |
| 1  Q. Did you contemplate that they would receive par even in | 1  that with our partners. Obviously, you know, those coupons |
| 2  the event of a restructuring? | 2  being cut off a year and a half earlier had a material impact |
| 3  A. Yes. That was our view. | 3  on our investment. |
| 4  Q. Okay. Now, did there come a time when you learned about a | 4  Q. Okay. Now, did you take any action in response to |
| 5  proposed restructuring of Charter? | 5  Mr. Millstein's comment about organizing a committee? |
| 6  A. Yes. | 6  A. Well, what I remember is me and one of my partners, Jim |
| 7  Q. And when was that? | 7  Zelter, had a telephone conversation with Oaktree, who we found |
| 8  A. It was approximately the second week of December of 2008. | 8  out was a significant holder. And then from there, I remember |
| 9  Q. And how did you learn about it? | 9  a call being organized among a, you know, bigger group of |
| 10  A. Through a telephone conversation with Jim Millstein of | 10  people which included a bunch of different people who actually |
| 11  Lazard. | 11  became part of the ad hoc committee. And, you know, I think |
| 12  Q. And what did Mr. Millstein tell you in that conversation? | 12  from there we started to get more organized. |
| 13  A. He told us, me, that the company was unwilling to make its | 13  Q. Okay. Now, what was discussed on that larger call? |
| 14  January interest payment and basically said you're going to | 14  A. A lot of it was just, again, I think the shock that I |
| 15  need to get an ad hoc committee organized to start putting | 15  described was shared by a lot of people. And so a large part |
| 16  forth a restructuring plan as quickly as possible. | 16  of the call was devoted to how do we convince the company not |
| 17  Q. Did he give you any names to contact in connection with | 17  to do this right now. And then a portion of the call was also, |
| 18  forming an ad hoc committee? | 18  I think, devoted to trying to think about how to get advisors |
| 19  A. I don't recall exactly, but I think he did have a sense of | 19  hired and organized, because one of the things that Jim |
| 20  some of the other large holders -- | 20  Millstein had tasked us with was going out and getting |
| 21  Q. Okay. | 21  advisors. |
| 22  A. -- that may have given us guidance on that front. | 22  Q. Did he say anything to you regarding the compensation for |
| 23  Q. Okay. Now, before the time that you spoke to | 23  advisors? |
| 24  Mr. Millstein, what was the extent of your knowledge about | 24  A. Yeah. He told us the company would reimburse us. |
| 25  other investors or other firms that own significant positions | 25  Q. Okay. Now, after this call among bondholders, did anyone |
| 43 | 45 |

**Page 50**

1 credit.
2 Q. And who were those?
3 A. Ourselves, Franklin, Oaktree, Fidelity, Crestview. Cap Re
4 (ph.) was very involved in certain issues.
5 Q. Okay. And during the course of the restructuring, did you
6 feel that you were working together towards a common goal with
7 the other members of the committee?
8 A. Yes.
9 Q. And what was that goal?
10 A. To consummate a restructuring plan.
11 Q. Now, going back to the time in December when you first
12 learned about Charter's plans with respect to the interest
13 payment, after you heard of that from Mr. Millstein did you
14 purchase any additional Charter bonds?
15 A. We bought some CCH I and, I believe, some CCH II.
16 Q. And why is that?
17 A. Again, we were still attracted to those securities and we
18 felt that, should a restructuring materialize, which looked
19 very likely at that point, that they would still generate
20 value.
21 Q. Did you discuss these purchases with anyone else on the
22 committee?
23 A. No.
24 Q. Did you know whether any other members of the committee
25 were making further purchase of Charter bonds?

**Page 51**

1 A. No.
2 Q. Okay. Now, during the course of the restructuring, did
3 you have any communications with any other committee member
4 regarding appointment of directors?
5 A. Yes.
6 Q. And who did you have communications with on that subject?
7 A. I recall talking to Jeff Marcus about it.
8 Q. Okay. Tell the Court in your own words, to the best of
9 your recollection, the substance of those communications.
10 A. Sure. Jeff had called me. He was concerned that
11 Crestview would not get a director because they would be less
12 than ten percent of the vote, potentially, post-restructuring.
13 And so he was calling to ask for me to be supportive about him
14 becoming a director should that occur. And, you know, I told
15 Jeff I think he's very experienced and, you know, very
16 qualified guy.
17 As an aside, for those who don't know, Jeff Marcus owned
18 Marcus Cable, which we sold to Charter; it's now about twenty
19 percent of Charter's footprint. And Jeff is a very well-
20 respected and knowledgeable cable entrepreneur.
21 Q. Now, when you had this conversation with him, did you
22 consider yourself to be making a commitment to him to support
23 him for a board position?
24 A. No.
25 Q. Do you think you said anything that would lead him to

**Page 52**

1 understand that you were making a commitment?
2 A. No.
3 Q. And did the subject of Crestview's representation on the
4 board come up again after that communication?
5 A. Well, Jeff called me at some point and asked for my
6 support in modifying the plan. As I recall, he was trying to
7 lower the voting threshold from something like ten to six, or
8 some lower number that would -- that Crestview would be -- that
9 they could get a board seat. And I basically said that's a
10 nonstarter, you know, we're not going to do particular things
11 for one party in a plan at this point that's been, you know,
12 been a very tough process in getting everybody to agree on.
13 Q. Did you ever pursue that request with anyone else?
14 A. No.
15 Q. Now, are you familiar with the term "RVP" in connection
16 with the Charter restructuring?
17 A. Yes.
18 Q. And what does it refer to?
19 A. The restructuring value plan.
20 Q. And in layman's terms, what is the restructuring value
21 plan?
22 A. It's an incentive plan for management to consummate the
23 restructuring.
24 Q. And did you have any role in negotiating the RVP?
25 A. Yes.

**Page 53**

1 Q. Tell the Court, in your own words, how those negotiations
2 began and progressed.
3 A. Well, it's another little subchapter in the history of
4 this deal. But, basically, right around -- we had a deadline
5 around February 12th or so, which is when the board was, you
6 know, either going to make the interest payment, or not, that
7 was due in January. And the -- what we needed to do was
8 consummate and sign this term sheet, the restructuring term
9 sheet, by then.
10 About a day or two -- probably two days before that,
11 management basically blindsided us with their request on the
12 RVP, which didn't go over very well with a lot of the committee
13 members. And we were basically in frantic negotiations to try
14 to resolve that in connection with signing the term sheet.
15 Q. And why did you feel you needed to resolve that in
16 connection with signing the term sheet?
17 A. Well, our -- what we were told was that the board was
18 extremely supportive of management and felt management was
19 critical to the plan and, unless management's RVP was resolved,
20 they weren't going to sign the term sheet.
21 Q. And if management didn't sign the term sheet, what did you
22 anticipate would happen?
23 A. We anticipated they wouldn't make the interest payment and
24 the company would be in a freefall bankruptcy potentially.
25 Q. I'm going to change subjects now to other deals involving