KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Philip S. Kaufman
Jeffrey S. Trachtman
Joel M. Taylor
David Blabey
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100

Attorneys for the First Lien Lender Group

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
In re                                         :  Chapter 11
                                              :
CHARTER COMMUNICATIONS, INC., et al.,         :  Case No. 09-11435(JMP)
                                              :
                    Debtors.                  :  (Jointly Administered)
                                              :
                                              :
---------------------------------------------------------------x

# THE FIRST LIEN LENDER GROUP'S
# PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The First Lien Lender Group herein adopts and incorporates the Proposed Findings of Fact and Conclusions of Law of JPMorgan Chase Bank, N.A., as Administrative Agent, and supplements it with additional proposed findings of fact and conclusions of law:

## PROPOSED FINDINGS OF FACT[1]

1. Jeffrey Marcus, a partner at Crestview Partners, L.P. ("Crestview"), is a long-time cable entrepreneur. In 1998 he sold his company, Marcus Cable, to Charter. The legacy Marcus Cable systems represent approximately twenty percent of Charter's current footprint. (Trial Tr. 14-15, July 29, 2009 (Marcus); JPX 22, at CHARTER-e 00779580).

2. In 2005, Mr. Marcus met with senior people at Apollo Management Holdings, L.P. ("Apollo"), including one of its current partners, Eric Zinterhofer, to discuss Crestview's efforts to raise equity for the purchase of a cable company other than Charter. During those conversations Mr. Marcus and Mr. Zinterhofer discovered that they both had an interest in Charter. (Trial Tr. 21, July 29, 2009 (Marcus)).

3. In 2006, Crestview made an initial investment in Charter's CCH I notes to be used as currency to purchase cable television systems that Charter was divesting to raise capital. After establishing a position in the debt, Crestview obtained financing and made a written proposal to the company to buy 650,000 Charter subscribers for roughly two billion dollars. Charter turned down Crestview's proposal. (Trial Tr. 16-17, July 29, 2009 (Marcus); JPX 193, at CHARTER 00050300).

4. In 2007, Apollo and Crestview made a joint bid to acquire a controlling interest in Charter from Paul Allen in a proposed $1 billion take-private transaction in which Crestview was to invest $200 million along side an $800 million investment by Apollo. As part of the proposed transaction Mr. Marcus was to join Charter's board as its Chairman. (Trial Tr. 16-17, July 29, 2009 (Marcus); JPX 193, at CHARTER 00050300).

5. After it became apparent that Allen was not seriously interested and discussions related to the transaction concluded, Messrs. Zinterhofer and Marcus continued to "informally discuss" Charter. (Trial Tr. 21-22, July 29, 2009 (Marcus)).

6. On Friday, December 12, Charter announced that it intended to pursue a restructuring.

---

[1] References to trial testimony are designated with the page numbers, date, and witness name (e.g. Trial Tr. ___, August ___, (Witness)). Trial Exhibits are referenced by the trial exhibit numbers (e.g. JPX___). Plan Supplement documents are referenced by their Supplement exhibit number (e.g. Plan Supp. Exh.___).

KL3 2740285.1

7. That same day Mr. Marcus called Mr. Zinterhofer, and Barry Volpert (the founding partner of Crestview) called his contact at Oaktree Capital Management, L.P. ("Oaktree"). Mr. Zinterhofer called the head of Oaktree's Distressed Opportunities Group, Robert Karsh, that same day. The three firms stayed in "regular contact" over the following weekend. (Trial Tr. 45-46, July 28, 2009 (Zinterhofer); JPX 273, at CHARTER-e 00121294; JPX 193, at CHARTER 00050298).

8. The three firms discussed their common concern that the holders of CCH II notes, which are one class senior to the CCH I notes, would argue that they hold the fulcrum security in a restructuring. To address that concern, Marc Rowan, one of the founding partners of Apollo, suggested to Mr. Zinterhofer that he consider using a rights offering underwritten by Apollo, Oaktree and Crestview to pay off the CCH II debt, and advised him that the "key [was] to get Oak Tree and Crest on board." The following day, Monday, December 15, Mr. Rowan sent an e-mail to Mr. Karsh letting him know that he had "urged Eric to get aligned with [him]" and expressing his view that "this may be a great opportunity notwithstanding that it is coming a year too soon." (JPX 99, at CHARTER-e 00819783; JPX 308, at CHARTER-e 00077156; JPX 273, at CHARTER-e 00121293).

9. Apollo, Oaktree and Crestview each invested in the CCH I bonds with the expectation that they would be the fulcrum security in a restructuring. Apollo and Oaktree expected Charter to undergo a restructuring in 2010. (Trial Tr. 40-41, July 28, 2009 (Zinterhofer); Trial Tr. 18, July 29, 2009 (Marcus); Trial Tr. 204-205, July 29, 2009 (Liang); JPX 28, at CHARTER-e 00779690; JPX 193, at CHARTER 00050300; JPX 159, at CHARTER-e, at 00818774 & 00818774).

10. By mid-January 2009, Apollo and Oaktree were aligned as to the desirability of a rights offering. The two funds were "pushing hard" for a rights offering in their discussions with the larger group of bondholders that came to constitute the Crossover Committee. (Trial Tr. 99-100, July 23, 2009 (Villaluz)).

11. As for Crestview, its "preference would have been to have no rights offering" out of concern that its "voice" would be diluted due to limitations on the amount that it could invest. Crestview "want[ed] to have a seat at the table," but "compared to some of the bigger institutions in the credit it was small." (Trial Tr. 36, July 29, 2009 (Marcus)).

12. Crestview had limited resources to commit to a rights offering. At the time, it had two funds under management totaling approximately $4 billion. Fund I, from which it made its initial investment in Charter, was approximately $1.5 billion in size. The maximum amount that Crestview could invest in any single investment as a matter of firm policy was ten percent, or $150 million. Crestview needed approval of the advisory committee of the limited partners of Fund II to commit additional capital to a rights offering. At that time, no capital had yet been committed from Fund II in any investment due to the limited partners' concerns about valuations and the weak economy. Charter would be the first ever investment by Fund II, and, according to Mr. Marcus, sentiment among the limited partners "at the time was pretty negative." (Trial Tr. 36, 60, 7/29/2009 (Marcus); JPX 193, at CHARTER 00050297).

13. On January 30, 2009, the Crossover Committee sent Charter a preliminary term sheet for a proposed Chapter 11 plan of reorganization contemplating a $1 billion rights offering. (JPX 158, at CHARTER-e 00133065 & 133085-103).

14. The preliminary term sheet included a draft provision governing how CCI's initial directors upon emergence from bankruptcy would be selected. The provision stated in relevant part: "Each holder of [__]% or more of the voting power of the New Common Stock on the Effective Date shall have the right to nominate one member of the Board for each [__]% of voting power, for a total of [__] nominees." (JPX 158 at CHARTER-e 00133096).

15. On February 4, Mr. Marcus submitted a memorandum to Crestview's investment committee attaching a copy of the preliminary term sheet, in which he recommended making a commitment to invest $285 million in a $1 billion rights offering. As reflected in that memo, Mr. Marcus expected that Crestview "would get one board seat" at the level of commitment he recommended. (JPX 158 at CHARTER-e 00133064, 00133071-72).

16. The following day, February 5, there was an "all hands" meeting of the Crossover Committee at Paul Weiss's offices. At that meeting, the Committee decided to give Apollo, Oaktree and Crestview the right to invest $400 million of equity in Charter over and above the rights offering as consideration for their commitment to backstop the rights offering. (JPX 170, at CHARTER-e 00144028).

17. Apollo, Oaktree and Crestview agreed to subscribe for any rights not exercised by any other noteholder in the rights offering – the so-called "Excess Backstop." (Trial Tr. 42-43, July 29, 2009 (Marcus)).

18. Apollo had initially agreed to backstop the entire amount of the offering, but then worked out with Oaktree and Crestview a "formula that provide[d] for a proportionate split" based on the firms' maximum equity commitments. (Trial Tr. 42-43, July 29, 2009 (Marcus); JPX 170, at CHARTER-e 00144027).

19. One important consideration for Crestview in deciding how much to commit to the backstop was the fact that board representation was going to be based on a "10% ownership" threshold. (JPX 170, at CHARTER-e 00144028).

20. According to Mr. Marcus, when they were talking about the issue of a ten percent threshold at the February 5 meeting, he "did the math in [his] head" and realized there was a good possibility that Crestview would not have ten percent and therefore, under the formula, would not be entitled to a board seat. When he came to that realization, he got up out of his chair and walked over to Mr. Zinterhofer to express his concern, and then walked to the other side of the table, where Robert O'Leary and Ken Liang of Oaktree were sitting, and expressed the same concern to them. (Trial Tr. 43-44, July 29, 2009 (Marcus)).

21. At 7:22 p.m., while the February 5 meeting was still ongoing, Brian Cassidy, a principal at Crestview who attended the meeting, sent a one-sentence e-mail to Mr. Volpert and another Crestview partner, Robert Delaney, reporting that "Apollo and Oaktree agreed to put Jeff on the board even if we end up under 10%." (JPX 170, at CHARTER-e 00144028).

22. At 8:42 p.m., shortly after the meeting concluded, Mr. Marcus sent an e-mail to Messrs. Volpert and Delaney reconfirming that "Our agreement with Apollo and Oak Tree is based on our maximum equity commitments . . . $250mm for Crestview and Oak Tree and the balance for Apollo. Apollo has agreed to backstop the entire amount but we've all agreed to a formula that provides for a proportionate split . . . They have also agreed to put me on the board even though we will own less than 10%." (JPX 170, at CHARTER-e 00144027).

23. At trial, Mr. Marcus denied that Apollo and Oaktree had promised him a seat on the board. He testified that he told Messrs. Volpert and Delaney that they had because he was "tired" and "hungry" and knew that Mr. Volpert was "very, very anxious" about the issue, and that if he didn't "assuage [him] on the point [he] would probably be on the phone with him for an hour." (Trial Tr. 44-45, July 29, 2009 (Marcus)).

24. Neither Mr. Liang nor Mr. Zinterhofer testified at trial about what occurred at the February 5 meeting. (Trial Tr. 51-52, July 28, 2009 (Zinterhofer)).

25. On February 10, Messrs. Marcus, Delaney and Cassidy submitted a memorandum to Crestview's investment committee recommending that it invest up to $225 million in a $1.623 billion rights offering. In that memorandum Mr. Marcus and his colleagues reconfimed to the investment committee that "They have committed to a board seat for Jeff as part of the transaction." (JPX 193, at CHARTER 00050301 & 00050311)

26. The next day, Apollo, Oaktree and Crestview all executed Commitment Letters obligating them to provide Charter with financing in connection with a plan of reorganization incorporating the terms and conditions of a final term sheet on which the Crossover Committee had reached consensus. (Trial Tr. 195 July 29, 2009 (Liang); Plan Supp. Exh.10).

27. On Friday, March 6, a memorandum was distributed to the members of Crestview's investment committee seeking approval to remove a due diligence condition on Crestview's $225 million commitment. In the executive summary of the memo, Messrs. Marcus and Cassidy stated that, "We view this as an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest U.S. cable company . . ." (JPX 234, at CHARTER-e 00114533).

28. At a meeting of Crestview's deal team the following Sunday, March 8, Mr. Delaney gave Mr. Cassidy certain changes and edits that should be made to the memo. Based on those instructions, Mr. Cassidy revised all of the Crestview investment committee memoranda "to make it crystal clear that [Crestview] is not a 'controlling' group with Oaktree and Apollo." (Trial Tr. 156-57, July 29, 2009 (Marcus)).

-5-

29. Revised copies of the memoranda were sent to Crestview's CFO, Evelyn Pellicone, at 11:27 p.m. on March 11, the night before the due diligence condition expired in Crestview's Commitment Letter. (JPX 243, at CHARTER-e 00713301).

30. Mr. Marcus confirmed at trial that the revised versions of the memos sent to Ms. Pellicone "should be the versions of the memos that incorporate all of the final changes." Mr. Marcus testified that the originally distributed versions of the investment committee memoranda were "works in progress" that "were in the process of being finalized." (Trial Tr. 158 (Marcus) July 29, 2009). (Trial Tr. 107 July 29, 2009 (Marcus)).

31. The revised version of the February 10 memo continues to include the identical representations that "They have committed to a board seat for Jeff as part of the transaction." (JPX 243, at CHARTER-e 0713303).

32. The Debtors filed a plan of reorganization shortly after the due diligence conditions lapsed in the Commitment Letters.

33. On July 16, 2009, the Debtors disclosed the identities of all but two members of CCI's initial board of directors. They include four Allen appointees and five "Class A" appointees: (i) two Apollo appointees, (ii) one Oaktree appointee, (iii) Neil Smit, and (iv) an unamed Franklin appointee. The remaining two "Class A" seats were originally to have been filled by vote of the other Class A directors or stockholders, but this was changed on the eve of confirmation to provide that the so-called "Gap Directors" are to be selected by a majority vote of the entire Board. *See* Article IV(b)(i)(B)(4) of CCI's proposed amended and restated Certificate of Incorporation (the "Certificate of Incorporation") (Trial Tr. 233-34, July 21, 2009 (Smit)).

34. Under CCI's proposed amended and restated Certificate of Incorporation Class A shareholders have the power to elect seven of eleven members of CCI's board of directors. The remaining four directors are electable by Class B shareholders. (CX 406).

35. Art. V(c) of the Certificate of Incorporation empowers the owners of a majority of the Class A shares to remove a director elected by Class A without cause at any time. (CX 406).

36. Neil Smit admitted at trial that the Class A shareholders "can remove me from my seat at any time" and that while he will "be on the board as of confirmation, whether or not I stay is another question." (Trial Tr. 65, 136 July 22, 2009 (Smit)).

37. Art. IV(b)(i)(B)(3) of the Certificate of Incorporation provides that vacancies created by the removal of a director appointed by a holder of Class A Common Stock pursuant to the Plan shall be filled by majority vote of the remaining directors so appointed, or by vote of holders of Class A stock. (CX 406).

38. Section 2.10 of CCI's By-Laws empowers the holders of stock having enough votes to authorize action at an Annual Meeting or special stockholder meeting to act by written consent without prior notice, meeting, or vote. (Plan Supp. Exh. 2) (CX 406).

KL3 2740285.1

39. At trial, Stephen Goldstein, the Lazard banker who performed the Debtors' voting power calculations, testified that voting power for the management of a company is properly measured as a percentage of all directors a shareholder has the power to elect. (Trial Tr. 64-69 August 24, 2009 (Goldstein)).

40. Mr. Goldstein also acknowledged that the members of the Apollo Group will recieve more than 50% of the new Class A Stock to be issued by CCI, giving them the power to elect seven members of Charter's eleven-member board in a hypothetical vote of shareholders. (Trial Tr. 68-69, August 24, 2009 (Goldstein)).

KL3 2740285.1

## **PROPOSED CONCLUSION OF LAW**

1. Apollo, Oaktree and Crestview constitute a "group" as defined in Section 13(d) of the Exchange Act and under the Plan will have more than the requisite voting power to trigger a default under Section 8(k)(ii) of the Credit Facility.

Dated: NewYork, New York
       September 18, 2009

                      KRAMER LEVIN NAFTALIS & FRANKEL LLP

                      By: /s/ Kenneth H. Eckstein
                           Kenneth H. Eckstein
                           Philip S. Kaufman
                           Jeffrey S. Trachtman
                           Joel M. Taylor
                           David Blabey

                           1177 Avenue of the Americas
                           New York, New York 10036
                           (212) 715-9100

                           *Attorneys for the First Lien Lender Group*