WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)
Dwight A. Healy (DH-9305)
Karen M. Asner (KA-5950)
Andrew Hammond (AH-0415)
Gregory M. Starner (GS-1719)

*Counsel for Law Debenture Trust Company*
*of New York as Indenture Trustee*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) | Case No. 09-11435 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| - against - | ) | No. 09-1132 (JMP) |
| | ) | |
| CHARTER COMMUNICATIONS OPERATING, LLC and CCO HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
## POST TRIAL BRIEF IN FURTHER SUPPORT OF ITS OBJECTION
## TO CONFIRMATION OF THE DEBTORS' JOINT PLAN OF REORGANIZATION

TO:    THE HONORABLE JAMES M. PECK,
           United States Bankruptcy Judge:

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS ..........................................................................................8

I.  CCI NOTEHOLDER ASSETS HAVE BEEN SYSTEMICALLY DEPLETED
    TO MAXIMIZE "ENTERPRISE" VALUE...........................................................9

    A.  The October Tender Offer ....................................................................9

    B.  The November Interest Payment ........................................................11

    C.  The Beginning Of The Restructuring Negotiations ...............................12

    D.  Commencement of the Restructuring Process .....................................14

    E.  The Exchange Agreement....................................................................17

    F.  The Debtors Adopt The Role Of Mediator And Fail To Negotiate For CCI.........19

    G.  The Debtors' Negotiations with Mr. Allen............................................22

    H.  Management Threatens To Leave The Company If They Don't Receive
        An Executive Compensation Package ..................................................23

    I.  Making The January Interest Payment .................................................25

    J.  Everyone Benefits From The Settlement Except The CCI Noteholders ...............26

II.  THE DEBTORS' VALUATION IS NOT CREDIBLE ...................................................28

III.  BY PARTICIPATING IN THE PLAN, MR. ALLEN AVOIDS A LARGE TAX
      LIABILITY...................................................................................................31

LEGAL ARGUMENT.......................................................................................................33

IV.  THE DEBTORS BEAR THE BURDEN OF PROVING COMPLIANCE WITH
     EACH OF THE REQUIREMENTS UNDER § 1129(A).................................................33

    A.  The Debtors Bear the Burden to Demonstrate that the Plan is Proposed in
        Good Faith ...........................................................................................33

    B.  The Debtors Cannot Meet their Burden of Proof Because of Tactical
        Litigation Positions they Have Taken in these Proceedings...................33

V.      THE DEBTORS' PLAN GERRYMANDERS AN ARTIFICIAL IMPAIRED
        ACCEPTING CLASS AT CCI.......................................................................36

        A.      The Debtors have Failed to Offer a Legitimate Reason Supported by
                Credible Proof for the Separate Classification of the CCI Notes Claims
                from the CCI General Unsecured Claims .............................................36
                1.      The Separate Classification of Unsecured Notes from  Non-Priority
                        General Unsecured Claims is Improper Absent Circumstances Not
                        Present Here ...............................................................................37
                2.      The Mirror Note Does Not Provide a Legitimate Reason for
                        Separate Classification.................................................................39
                3.      The Management Agreement Does Not Provide  a Legitimate
                        Reason For Separate Classification ...........................................40
                4.      The Debtors' Proffered Reasons for Separate  Classification are
                        Contrived, Not "Legitimate".......................................................41

        B.      The Debtors Artificially Impaired the CCI General Unsecured Claims
                Class to Achieve a Cram Down of the CCI Notes Claims ....................42

VI.     THE PLAN UNFAIRLY DISCRIMINATES AGAINST HOLDERS OF CCI
        NOTES CLAIMS..................................................................................47

VII.    THE PLAN IS NOT FAIR AND EQUITABLE ...............................................50

        A.      The CCI Settlement Compensates Paul Allen for His Equity Interests and,
                Thus, Violates the Absolute Priority Rule ............................................50

        B.      The Plan Siphons Substantial Value from CCI for the Benefit  of Junior
                Stakeholders and Creditors of Other Debtors .......................................52
                1.      CCI is Not Receiving Value for its Net Operating Losses .......................53
                2.      CCI's Participation in the Plan is Worth No Less than $180
                        Million.........................................................................................55
                3.      Holdco is Not Receiving Value for its Trademarks and
                        Programming Contracts ..............................................................56
                4.      The Lazard Valuation Is Not Sufficient to Justify CCI's Treatment .........56
                5.      The Plan Violates the Supreme Court's Ruling in LaSalle.......................58

VIII.   THE PLAN FAILS THE BEST INTERESTS OF CREDITORS TEST UNDER
        SECTION 1129(A)(7) OF THE BANKRUPTCY CODE................................61

        A.      The Debtors Overvalue the Consideration the Holders of CCI Notes
                Claims Will Receive Under the Plan ....................................................63

        B.      The Debtors' Liquidation Value Fails to Account for Numerous Potential
                Sources of Recovery at CCI and Holdco ..............................................64

        C.      Impact of Potential Recoveries on Liquidation Analysis and Best Interest
                of Creditors Test .............................................................................71

IX.   THE DEBTORS' NON-ORDINARY COURSE VOTES WITH RESPECT TO
      THE HOLDCO NOTES CLAIMS AND CCH NOTES CLAIMS ARE VOID ..............74

X.    THE CCH PLAN HAS NOT BEEN ACCEPTED BY A LEGITIMATE
      IMPAIRED CLASS AND IS, THUS, UNCONFIRMABLE...........................................77

XI.   THE HOLDCO PLAN IS NOT CONFIRMABLE ..........................................................80

XII.  DISTRIBUTIONS UNDER THE PLAN ARE BASED ON AN  IMPROPER
      AND FLAWED SUBSTANTIVE CONSOLIDATION ....................................................81

XIII. SECTION 1129(A)(10) OF THE BANKRUPTCY CODE IS A DEBTOR BY
      DEBTOR TEST .................................................................................................................83

XIV.  THE RELEASES PROPOSED UNDER THE PLAN ARE IMPROPER .......................85

XV.   THE PLAN IS NOT PROPOSED IN GOOD FAITH—THE ALLEN
      SETTLEMENT IS NOT FAIR AND DOES NOT SATISFY RULE 9019....................86

      A.    The Allen Settlement Is Not Entirely Fair ..............................................................86
            1.    The Debtors Bear the Burden to Demonstrate that the Plan is
                  Proposed in Good Faith and the Allen Settlement Is Entirely Fair............86
            2.    The Process Leading to the Formulation of the Plan and the Allen
                  Settlement Was Not Fair.............................................................................88
            3.    The Price of the Allen Settlement Is Not Fair...........................................97

      B.    The Allen Settlement Does Not Satisfy Rule 9019 ............................................103

      C.    The Debtors Breached Their Fiduciary Duties In Connection With
            Negotiating The Terms Of The Plan....................................................................104
            1.    The Board Breached Fiduciary Duties to CCI By Failing to
                  Negotiate for CCI's Interests .................................................................104
            2.    Other Actions Evidencing the Debtors' Lack of Good Faith .................107

CONCLUSION......................................................................................................................114

**CASES**

ACC Bondholder Group v. Adelphia Commc'ns Corp.
(In re Adelphia Commc'ns Corp.), 361 B.R. 337 (S.D.N.Y. 2007),
order aff'd, 544 F.3d 420 (2d Cir. 2008) ......................................................61, 77, 81

Allied Irish Banks, P.L.C. v. Bank of Am., N.A., No. 03 Civ. 3748(DAB),
2006 WL 278138 (S.D.N.Y. Feb. 2, 2006)................................................................85

Apple Computer, Inc. v. Exponential Tech., Inc., No. 16315, 1999 WL 39547
(Del. Ch. Jan. 21, 1999) ..........................................................................................74

Ashmore v. Metrica Corp., No. Civ.A. 2811-CC, 2007 WL 1464541
(Del. Ch. May 11, 2007) ..........................................................................................34

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,
526 U.S. 434 (1999)..................................................................................................58

Bank Brussels Lambert v. Coan (In re Arochem Corp.), 176 F.3d 610 (2d Cir. 1999)...................62

BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp. 2d 123 (S.D.N.Y. 1999),
aff'd, 205 F.3d 1321 (2d Cir. 2000).........................................................................85

Boston Post Rd. Ltd. P'ship v. F.D.I.C. (In re Boston Post Rd. Ltd. P'ship),
21 F.3d 477 (2d Cir. 1994).............................................................................36, 37, 42

Boyer v. Wilmington Materials, Inc., 754 A.2d 881 (Del. Ch. 1999) .............................93

Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.),
388 B.R. 548 (Bankr. D. Del. 2008) ........................................................................95

Chesapeake Corp. v. Shore, 771 A.2d 293, 301 (Del. Ch. 2000) ...................................91

Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.,
259 F.3d 1186 (9th Cir. 2001) .................................................................................34

Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.
(In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) .....................84

Edgar v. MITE Corp., 457 U.S. 624 (1982) ....................................................................85

Gans v. MDR Liquidating Corp., No. 9630, 1998 WL 294006 (Del. Ch. May 22, 1998)............112

Gesoff v. IIC Indus Inc., 902 A.2d 1130 (Del. Ch. 2006) ..............................................86

GPX XLI L.L.C. v. Loral Space & Commc'ns Inc. (In re Loral Space & Commc'ns Inc.),
C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781 (Del. Ch. Sept. 19, 2008).....................86

HBE Leasing Corp. v. Frank, 48 F.3d 623 (2d Cir. 1995)...................................................67

HMG/Courtland Props., Inc. v. Gray, 749 A.2d 94 (Del. Ch. 1999)...................................96

In re Armstrong World Indus., Inc., 348 B.R. 111 (D. Del. 2006)....................................48

In re Adelphia Commc'ns Corp., 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007), order aff'd, 544
F.3d 420 (2d Cir. 2008)..............................................................................................78

In re Balco Equities Ltd., 323 B.R. 85 (Bankr. S.D.N.Y. 2005) ........................................67

In re Bush Indus., Inc., 315 B.R. 292 (Bankr. W.D.N.Y. 2004)..........................................85

In re Buttonwood Partners, Ltd., 111 B.R. 57 (Bankr. S.D.N.Y. 1990).....................48, 50

In re Calpine Corp., No. 05-60200 (BRL), slip op. (Bankr. S.D.N.Y. Dec. 19, 2007) ...................38

In re Coram Healthcare Corp., 271 B.R. 228 (Bankr. D. Del. 2001) ...............................85

In re Daly, 167 B.R. 734 (Bankr. D. Mass. 1994) ............................................................44

In re Digex, Inc. S'holders Litig., 789 A.2d 1176 (Del. Ch. 2000) ................................101

In re Dow Corning Corp., 244 B.R. 696 (E.D. Mich. 1999) ......................................48, 49

In re Enron Corp., No. 01-16034, slip op. (AJG) (Bankr. S.D.N.Y. July 15, 2004) ......................83

In re Frascella Enters., Inc., 360 B.R. 435 (Bankr. E.D. Pa. 2007) ...............................39

In re Fur Creations by Varriale, Ltd., 188 B.R. 754 (Bankr. S.D.N.Y. 1995).....................33, 42, 45

In re Future Energy Corp., 83 B.R. 470 (Bankr. S.D Ohio 1988) ....................................61

In re Global Crossing Ltd.
No. 02-40188 (REG), slip op. (Bankr. S.D.N.Y. Dec. 26, 2002) ........................38, 39

In re I.R.C.C., Inc., 105 B.R. 237 (Bankr. S.D.N.Y. 1989) ..............................................82

In re Kent Terminal Corp., 166 B.R. 555 (Bankr. S.D.N.Y. 1994).................................33

In re Lernout & Hauspie Speech Prods., N.V., 301 B.R. 651 (Bankr. D. Del. 2003),
order aff'd, 308 B.R. 672 (D. Del. 2004)...................................................................48

In re Leslie Fay Cos., 168 B.R. 294 (Bankr. S.D.N.Y. 1994) ..........................................73

In re Leslie Fay Cos., 207 B.R. 764 (Bankr. S.D.N.Y. 1997) ..........................................82

In re Mirant Corp., 354 B.R. 113 (Bankr. N.D. Tex. 2006),
   aff'd, 308 F. App'x 824 (5th Cir. 2009) ................................................................56

In re Lettick Typografic, Inc., 103 B.R. 32 (Bankr. D. Conn. 1989)................................................42

In re Nat'l Auto Credit, Inc. S'holders Litig., No. Civ.A. 19028,
   2003 WL 139768 (Del. Ch. Jan. 10, 2003)....................................................109, 110

In re Ne. Dairy Coop. Fed'n, Inc., 73 B.R. 239 (Bankr. N.D.N.Y. 1987).......................................33

In re Owens Corning, 419 F.3d 195 (3d Cir. 2007)........................................................84

In re Prudential Energy Co., 58 B.R. 857 (Bankr. S.D.N.Y. 1986)....................................63

In re Pure Res., Inc., S'holders Litig., 808 A.2d 421 (Del. Ch. 2002).......................................89, 90

In re PWS Holding Corp., 228 F.3d 224 (3d Cir. 2000)....................................................59, 60

In re Remsen Partners, Ltd., 294 B.R. 557 (Bankr. S.D.N.Y. 2003)....................................73

In re Rusty Jones, Inc., 110 B.R. 362 (Bankr. N.D. Ill. 1990)........................................61

In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850 (Bankr. S.D. Tex. 2001) .....................48, 49

In re SGPA, Inc., No. 01-01-02609, slip op. (Bankr. M.D. Pa. Sept. 28, 2001) .............................83

In re Tele-Commc'ns, Inc. S'holders Litig., No. Civ.A. 16470,
   2005 WL 3642727 (Del. Ch. Jan. 10, 2006)....................................................93, 100

In re Tower Automotive, Inc., No. 05-10578 (ALG),
   slip op. (Bankr. S.D.N.Y. July 12, 2007)....................................................38

In re Vebeliunas, 231 B.R. 181 (Bankr. S.D.N.Y. 1999) ................................................62

In re WorldCom, Inc., 401 B.R. 637 (Bankr. S.D.N.Y. 2009) ......................................67

In re Zaleha, 162 B.R. 309 (Bankr. D. Idaho 1993) ..............................................61

In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999)....................................88, 89

Int'l Telecharge, Inc. v. Bomarko, Inc., 766 A.2d 437 (Del. 2000) ............................86, 89

Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110 (Del. 1994) .......................................85, 86, 88

Kahn v. Tremont Corp., 694 A.2d 422 (Del. 1997)................................................86, 87, 88, 97, 102

Kosseff v. Ciocia, No. Civ.A. 188-N, 2006 WL 2337593 (Del. Ch. Aug. 3, 2006).......................88

Michelson v. Duncan, 407 A.2d 211 (Del. 1979)....................................................74

Motorola, Inc. v. Official Comm. of Unsecured Creditors
(In re Iridium Operating LLC), 478 F.3d 452 (2d Cir. 2007)............................................50, 102

N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,
930 A.2d 92 (Del. 2007) ...................................................................................................106

NL Indus., Inc. v. Maxxam, Inc. (In re Maxxam, Inc.), No. CIV.A. 12111 ....................................93

Official Comm. of Unsecured Creditors of High Strength Steel, Inc. v.
Lozanski (In re High Strength Steel), Inc., 269 B.R. 560 (Bankr. D. Del. 2001)....................107

Oliver v. Boston Univ. No. Civ.A. 16570-NC, 2006 WL 1064169
(Del. Ch. Apr. 14, 2006) ...............................................................................................96, 100

Plaza Equities LLC v. Pauker (In re Copperfield Invs., LLC),
401 B.R. 87 (Bankr. E.D.N.Y. 2009)......................................................................................102

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
Anderson, 390 U.S. 414 (1968) ............................................................................................51

Rhodes v. SilkRoad Equity, LLC, C.A. No. 2133-VCN,
2009 WL 1124476 (Del. Ch. Apr. 15, 2009) ....................................................................86, 96

Rothenberg v. Santa Fe Pac. Corp., Civ. A. No. 11749,
1995 WL 523599 (Del. Ch. Sept. 5, 1995) .............................................................................109

S.E.C. v. Bank of Am. Corp.
09 Civ. 6829 (JSR), 2009 WL 2842940 (S.D.N.Y. Aug. 25, 2009) .........................................34

S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373 (E.D. Tex. 2000) ...........56

Solomon v. Armstrong, 747 A.2d 1098 (Del. Ch. 1999)....................................................................73

Solow v. Stone, 994 F. Supp. 173 (S.D.N.Y. 1998) ........................................................................85

Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.),
860 F.2d 515 (2d Cir. 1988)...............................................................................81, 83, 112

Valeant Pharms Int'l v. Jerney, 921 A.2d 732 (Del. Ch. 2007).............................................86, 89, 96

Weinberger v. UOP, Inc., 457 A.2d 701 (Del. 1983) ...................................................86, 88, 96, 101

Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc.
(In re Windsor on the River Assocs., Ltd.), 7 F.3d 127 (8th Cir. 1993)......................................46

## STATUTES AND RULES

Fed. R. Bankr. P. 9019.........................................................................................................73, 85, 102

26 C.F.R. § 1.1502-1 ...........................................................................................54

26 C.F.R. § 301.7701-2 .......................................................................................54

11 U.S.C. § 327 ...................................................................................................62

11 U.S.C. § 363(b) ..............................................................................................73

11 U.S.C. § 546(e) ..........................................................................................66, 67

11 U.S.C. § 1129(a) ........................................................................................33, 82

11 U.S.C. § 1129(b) ........................................................................................49, 81

11 U.S.C. § 1129(a)(3) .........................................................................................85

11 U.S.C. § 1129(a)(7) .........................................................................................61

11 U.S.C. § 1129(a)(10) .................................................................46, 47, 78, 79, 80, et. al

11 U.S.C. § 1129(b)(1) .................................................................................47, 48, 49

11 U.S.C. § 1129(b)(2)(B)(ii) ......................................................................52, 58, 59, 79

26 U.S.C. § 382(k)(1) ...........................................................................................53

26 U.S.C. §§ 701, 703(a)(2)(D) ...............................................................................54

26 U.S.C. § 1366 .................................................................................................54

26 U.S.C. § 1501, 1502 ........................................................................................54

The Law Debenture Trust Company of New York (the "Trustee"), as the Trustee with respect to the $479 million in aggregate principal amount of 6.50% Convertible Senior Notes due 2027 (the "CCI Notes") issued by Debtor Charter Communications, Inc. ("CCI"), files this post-hearing brief in opposition to the Joint Plan of Reorganization [Docket No. 273] (the "Plan") filed by CCI and its affiliated debtors, as debtors and debtors in possession (collectively with CCI, the "Debtors"). For the reasons set forth more fully below, the Trustee requests that the Court enter an order denying confirmation of the Plan.

## PRELIMINARY STATEMENT

The Court may confirm the Plan only if it is prepared to do what no other court has ever done – cram down approximately $500 million of notes receiving approximately 30 cents on the dollar using an "impaired" accepting class comprised of an undisclosed portion of approximately $2 million of random pari passu general unsecured claims (approximately half of which are claims of the Debtors' former CFO) that are only impaired to the extent the Debtors elect to merely pay such creditors in cash in full on the Effective Date. If that were all, it would be bad enough. Yet, what the Debtors have not yet explained to the Court (and apparently never intended to explain, at least not in any meaningful way) is that to confirm the Plan, the Court will also have to recognize an "impaired" accepting class that not only received no votes, but for which no creditors even exist. The circumstances surrounding this imaginary impaired class, are more fully, set forth in Section VII, hereof. The Trustee's Objection and this Brief sets out many more infirmities in detail.

So why are the Debtors asking this Court to do such extraordinary things? Not because the Debtors are not capable of providing a fair distribution to CCI Noteholders. The record is clear that there is plenty of value available to go around, particularly if one considers the relative size of the CCI Noteholders Claims and where the market has moved since this deal was first

priced in February. The unfortunate answer is that rather than provide the CCI Noteholders with a fair distribution, the Debtors' controlling shareholder, management and the Plan's sponsors conspired to divvy up every last penny among themselves. This is not what the bankruptcy process is supposed to be.

Perhaps the Debtors' actions throughout this process should come as no surprise. Simply, the Plan is the product of massive conflicts of interest and self-dealing and a negotiation process where no one was looking out for CCI. At its core, the Plan is premised on a settlement between Paul Allen, the controlling shareholder of CCI, and the Debtors (the "Allen Settlement") that permits a select few of investors, management and Paul Allen to take advantage of extreme market dislocations (which are no longer present) to line their own pockets at the expense of disenfranchised stakeholders. Given that the foundation for the Plan rests on an interested transaction, the Debtors must demonstrate that the Plan and the Allen Settlement that underlies it is entirely fair. Regardless of the standard of review, the Debtors cannot meet their burden.

The process that led to the Allen Settlement was flawed from its inception. At the outset of restructuring negotiations, Mr. Millstein, the Company's long time financial advisor, informed the entire CCI Board, including Mr. Allen and his representatives, that Mr. Allen should be compensated to participate in a restructuring. By contrast, Mr. Millstein failed to advise the Board that by participating in the restructuring, Mr. Allen would also avoid a "large" potential tax liability or that CCI was just as essential as Mr. Allen to the restructuring. The process went down hill from there.

Having been advised that the Company would need to strike a deal with its controlling shareholder to arrive at a consensual plan of reorganization, the Company remarkably decided that it was not necessary to appoint a special committee equipped with its own advisors or even

to delegate negotiating authority to independent directors as it had done in the past. Rather, the Company allowed its conflicted management to negotiate directly with the party that controls them, without the benefit of a process designed to ensure that robust, arm's-length negotiations would occur. In approaching the negotiations, no one from management ever considered the potential consequences that would result to Mr. Allen in connection with alternative forms of restructuring.

After receiving Mr. Millstein's advice, Mr. Allen sought to extract value from the Debtors and holders of the fulcrum securities at CCH I and CCH II (the "Crossover Committee") for his participation in the Plan, which would allow for the reinstatement of the Company's credit facility and the preservation of valuable net operating losses ("NOLs") held by CCI. However, Mr. Allen could not create this value alone. The testimony was uniform that CCI's participation was equally necessary to create the value that would be generated from reinstating the credit facility and preserving the NOLs.

At a critical juncture in the negotiations, when it was time to decide how the value that would be generated from the preservation of NOLs and reinstatement of the credit facility would be divided, Mr. Allen and his advisors bargained aggressively. He leveraged his position as a controlling shareholder and told the Crossover Committee that he would fire the Board if the Board would not accede to his demands and then take action to minimize his potential tax exposure in a restructuring. Unlike Mr. Allen and his advisors, the Debtors and their advisors sat by idly, viewing themselves as mediators in the negotiation between Mr. Allen and the bondholders. The Debtors did not seek to obtain any value for CCI and its stakeholders during these negotiations. Thus, when the pie was being divided between Mr. Allen and the Crossover Committee, management wasn't even at the table. Rather than negotiate for CCI, management

was seeking to advance their own pecuniary interests by threatening to leave the Company if the Crossover Committee didn't agree to reward them with a lucrative compensation package.

The result was predictable. Mr. Allen kept the whole pie for himself leaving not even a crumb for CCI and its stakeholders. If the Plan is confirmed, Mr. Allen will receive more than $200 million just to participate. CCI, which was equally necessary to generate the value for which Mr. Allen is receiving compensation, will receive nothing for its participation in the Plan. Under these circumstances, where CCI and Mr. Allen were both necessary to create the value but Mr. Allen receives all the compensation, the Allen Settlement cannot be entirely fair.

This result is even more egregious when one considers that the NOLs that are being preserved and ultimately transferred under the Plan are property of CCI's estate. On the Effective Date, these NOLs will be transferred to the Reorganized CCI and will provide significant benefits to the reorganized Company and the Crossover Committee. The NOLs will be available to shelter the taxable income that the reorganized companies are expected to generate after the Effective Date. This tax shield will result in a huge windfall to the future equity holders of CCI, and that is why the Crossover Committee was willing to pay to keep these tax attributes in place. Yet because CCI's fiduciaries abdicated their responsibilities and failed to negotiate on CCI's behalf to obtain compensation for CCI's participation, CCI and its stakeholders will receive no compensation for the NOLs under the Plan. All such value will be paid to Mr. Allen.

In addition to the unfairness of the Allen Settlement and the failure of CCI's fiduciaries to negotiate on behalf of CCI, in the months leading up to the filing, management and the Board systematically siphoned off assets that otherwise would have been available to distribute to CCI and its creditors. Early on in the restructuring process, Lazard LLC ("Lazard"), the Company's

financial advisor, concluded that the only way that funds would be distributed to CCI and its creditors was through intercompany accounts that Holdco had at CCO, a solvent entity. Yet in the months leading up to the filing, after management and the Board had received valuations reflecting that CCI and Holdco were insolvent, Holdco's intercompany accounts were depleted through a series of transfers that benefited junior entities in the capital structure and their creditors while providing Holdco no value in return. Prior to authorizing the transfers, CCI's management and Board were expressly warned that such transfers would negatively impact the ability of the Company to service the CCI Notes. Nevertheless the Board authorized these transfers to delay the bankruptcy filing. These transfers have dramatically diminished the assets that are available to pay CCI and its creditors. All told, more than $200 million of assets was siphoned away from CCI and its creditors. As demonstrated at the hearing, Holdco, and thus CCI and its creditors, is receiving virtually no compensation for these transfers under the Plan.

In seeking confirmation of this Plan, the Debtors have advanced numerous positions that are simply indefensible. For example, the Debtors' approach to valuing the Allen Settlement at the confirmation hearing is hopelessly riddled with inconsistencies. In assessing the value that Mr. Allen provided to the estate, the Debtors include the value resulting from the preservation of NOLs and reinstatement of the bank debt that Mr. Allen did not destroy. By contrast, the Debtors fail to account for the substantial tax liability that Mr. Allen avoided—and which the CCI estate (which receives no benefit from the settlement) could have inflicted on Mr. Allen—as value that Mr. Allen receives in connection with the Plan. Moreover, the Debtors ascribe all of the value of the preservation of the NOLs and reinstatement of the bank debt to Mr. Allen. However, Mr. Allen could not have provided that value if CCI and Holdco did not participate in

the process.  Unlike Mr. Allen, who receives hundreds of millions of dollars for his participation, CCI and Holdco receive nothing.

The inconsistencies in the Debtors' approach to the NOLs that were allocated to Mr. Allen pursuant to the Holdco LLC Agreement are even more disturbing.  The Debtors argued in their opening statement that by claiming title to the NOLs that were allocated to CCI pursuant to the Holdco LLC Agreement, the CCI Noteholders were attempting to "steal" the assets of CCO. By contrast, the Debtors do not claim that Mr. Allen stole the NOLs that were allocated to him pursuant to the same agreement, and no one has asked Mr. Allen to return the almost $9 billion of NOLs that he has received from the Charter operating companies over the years or to provide compensation for their use.  If the Debtors are correct and the NOLs do not belong to CCI, Mr. Allen should be required to return the billions of dollars of NOLs that he stole from CCO. Presumably, this would also entail Mr. Allen writing a large check to the U.S. Treasury.

Even more troubling is the Debtors' attempt to walk away from their securities filings, which clearly state that CCI owns the NOLs.  Remarkably, the Debtors went so far as to have their General Counsel, Gregory Doody, testify under oath that when their 10-K says that CCI owns the NOLs, that is not what they meant to say.  Notably, no corrective filings were made on this point.

Perhaps the most egregious inconsistencies concern the competing valuations that the Debtors have submitted in this proceeding.  The Debtors have presented the Court with two valuations of the Charter enterprise that rely on different assumptions, apply different weighting methodologies and reach valuation conclusions that differ by more than $5 billion.  In support of their efforts to reinstate the bank debt, the Debtors offered the expert testimony of Bruce Den Uyl.  Mr. Den Uyl prepared a valuation using fundamentally different assumptions than those

used in the valuation submitted by Lazard that was attached to the Disclosure Statement. Mr. Den Uyl valued Charter's assets at a range of $20.6 to $21.4 billion as of November 14 and concluded that Charter's stock had "positive value" during that time frame. By contrast, Lazard concluded that the value of Charter after giving effect to the restructuring would be $15.4 billion. Not only is Lazard's valuation inconsistent with the valuation methodology used by Mr. Den Uyl, it is inconsistent with the advice that Lazard previously provided to the Company in November. Moreover, it strains credulity to suggest that the Debtors lost more than $5 billion in value between November 2008 and March 2009 due to a decline in the market, but that the Debtors did not recover that value between March and September during which time the credit markets recovered and the share prices of its peers enjoyed more than a 30% increase. Furthermore, the Debtors' own CFO testified that nothing material had changed with respect to the Debtors' financial condition between November and March. That the Debtors are even willing to submit these two contrasting valuations to the Court in the same proceeding is remarkable.

The Debtors' Liquidation Analysis is likewise flawed. In addition to being premised on an unreliable valuation, the Debtors' Liquidation Analysis fails to account for substantial recoveries that may be recovered from causes of action and other sources that the Debtors now acknowledge would be available to the holders of CCI Notes Claims in a liquidation.

Furthermore, it is uncontroverted that the Plan initially proposed by the Debtors provided the holders of CCI Notes Claims with less consideration than they would receive in a liquidation. Although the Plan was modified to increase distributions to holders of CCI Notes Claims, that the Debtors would file a Plan that so clearly sought to minimize the recoveries to CCI's creditors speaks volumes as to the Debtors' intentions in this proceeding. Nor have the Debtors ever

corrected or updated their Liquidation Analysis, which still contains fatal flaws. Properly accounting for the different claims and sources of recoveries, it is clear that the holders of CCI Notes Claims would receive more (in cash) in a liquidation than they would (largely in non-cash consideration) under the Plan. The Debtors conscious disregard for the assets and value available to CCI's creditors, and their failure to properly analyze and include all available sources of recovery, prevents the Debtors from meeting their burden of satisfying the best interests of creditors test.

## STATEMENT OF FACTS

The Law Debenture Trust Company of New York is the indenture trustee with respect to approximately $500 million in outstanding convertible notes issued by CCI—the CCI Notes.[1] Holders of CCI Notes have direct claims against CCI, whose assets include (i) billions in NOLs,[2] (ii) a 54% equity interest in Holdco, and (iii) approximately $500 million in indebtedness owed by Holdco to CCI under the Holdco Notes, which mirror the terms of the CCI Notes.[3] Among other things, Holdco's assets include direct intercompany claims against Charter CCO,[4] a solvent entity.[5] Thus, CCI's ability to recover as a creditor of Holdco in this proceeding is tied directly to Holdco's intercompany accounts.[6] As discussed below, in the months leading up to the filing, management and the Board approved a series of transactions that exhausted Holdco's intercompany accounts with CCO to the detriment of CCI and its stakeholders.

---

[1] LDTX 239 (CCI's 2008 10-K) at 65.
[2] LDTX 444 (CCH's 2007 10-K) at 13 ("As of December 31, 2007, Charter had approximately $7.9 billion of federal tax net operating losses, resulting in a gross deferred tax asset of approximately $2.8 billion, expiring in the years 2008 through 2027"), 1 (defining "Charter" as Charter Communications, Inc.).
[3] JPX 266 (Disclosure Statement) at 14.
[4] JPX 266 (Disclosure Statement), Ex. E at 6; July 21 Tr. 69:19 – 70:4.
[5] Aug. 17 Tr. 102:15-16 (Doody).
[6] JPX (Disclosure Statement), Ex. E at 6.

8

## I. CCI NOTEHOLDER ASSETS HAVE BEEN SYSTEMICALLY DEPLETED TO MAXIMIZE "ENTERPRISE" VALUE

### A. The October Tender Offer

In the fall of 2008, following the Lehman Brothers bankruptcy filing on September 15, the credit markets collapsed.[7] Shortly after the Lehman bankruptcy filing, management discussed with CCI's Board the disruptions in the credit market.[8] Based on these discussions, the Company decided to draw down on its credit facility to preserve liquidity.[9] Notwithstanding the Company's concerns about the credit markets, and its own liquidity,[10] Ms. Schmitz, CCI's CFO, proposed that the Company have Holdco engage in a tender offer in October to purchase $100 million of CCH bonds that were due in 2009 and 2010.[11]

Management approved the use of Holdco's funds for the tender offer, despite being expressly warned that doing so would be detrimental to the CCI Noteholders and that the Company should not proceed as planned. Ms. Sturgeon, the Company's Director of Finance and Acquisitions, cautioned Ms. Schmitz, the CFO, that the "[b]ottom line is that you are giving up your ability to service the [CCI Notes] if you tender for bonds when over leverage."[12] Ms. Sturgeon further advised Ms. Schmitz that it would be "most prudent" to wait for fourth quarter numbers before conducting the transactions.[13]

Before the tender offer was completed,[14] the Company also received a Duff & Phelps valuation that reflected a large negative surplus at CCI, Holdco, and CCH as of October 1.[15] By

---

[7] July 21 Tr. 118:23-119:2 (Millstein).
[8] JPX 38 (9/24/2008 board Minutes) at 1.
[9] July 31 Tr. 103:12-24 (Schmitz).
[10] Aug. 3 Tr. 44:6-10 (Schmitz).
[11] JPX 38 (9/24/2008 board Minutes) at 2.
[12] LDTX 34 (9/19/08 email from Derdeyn to Sturgeon, Schmitz) at 1; Aug. 3 Tr. 36:14-24 (Schmitz).
[13] LDTX 34 (9/19/08 email from Derdeyn to Sturgeon, Schmitz) at 1.
[14] LDTX 478 (11/3/08 CCI's 8-K) (showing that the tender offer was completed in two tranches, one on October 14 and one on October 29).

the Company's own definition of insolvency,[16] this meant that CCH was insolvent as of October 1. CCH's inability to tender for its notes was a bright red flag that Holdco would never recoup its $99 million investment in CCH debt.[17]

Notwithstanding Ms. Sturgeon's recommendation and the red flags raised by the valuation, senior management determined to move forward with the tender offer transaction, which was completed on October 31.[18] Thus, in the midst of one of the worst credit markets in modern history and management's desire to maintain liquidity by drawing on their credit facilities, Holdco paid $99 million in cash to purchase approximately $102 million of notes[19] of an insolvent entity. To pay what was essentially par for the notes, management caused CCO to repay approximately $100 million on the valid intercompany loan owing from CCO to Holdco, and Holdco then used those funds to purchase CCH notes.

The Debtors' only explanation for this remarkable transaction, which conferred no tangible benefit on Holdco or CCI, was that it was an "opportunistic" way to capture a $6 million discount and marginally improve liquidity during the 18-month audit window.[20] Nowhere in the record is a suggestion that Holdco or CCI was in the business of investing in distressed debt.

---

[15] JPX 43 (10/2/2008 Duff and Phelps engagement letter) (committing to provide the valuation before October 15); July 31 Tr. 88:18 – 22 (Schmitz) (testifying that the Company received the Duff & Phelps valuation in mid-October); CX 277 (10/25/2008 Email from Derdeyn to Derdeyn) at final page.

[16] LDTX 239 (CCI's 2008 10-K) at 25 (stating that "[g]enerally…an entity would be considered insolvent if: *the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all its assets*; the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; *or* it could not pay its debts as they became due).

[17] Indeed, management recognized that the economic conditions, the ongoing credit crunch and the decline in cable valuations limited the strategic and financial options available to the Company. JPX 57 (10/28/08 Long Term Plan Update) at 2.

[18] LDTX 478 (11/3/08 CCI's 8-K). At the same time it was conducting the tender offer, Charter raised its "access to capital risk" to an "overall high" rating (Aug. 31 Tr. 163:2-5 (Johri); JPX 50 (10/28/2008 email from Derdeyn to Sturgeon) at 3.

[19] JPX 266 (Disclosure Statement) at 21

[20] July 31 Tr. 128:24 – 129:5; JPX 38 (9/24/09 board minutes) at 2.

Under the Plan, Holdco, which still holds the CCH Notes it purchased in the October 2008 tender offer,[21] will recover approximately $408,000 on this $99 million investment.[22]

## B.    The November Interest Payment

Just two weeks later, on November 14, management convened a special meeting of the Board of Directors to discuss certain interest payments that were coming due on November 17, including interest payments on CCH notes.[23]   At this Board meeting, the Board considered whether Holdco should fund the $8.4 million interest payment owed by CCH.[24]   In making this decision, the Board was advised that the $8.4 million that was to be used to fund the interest payment for CCH was intended to be used to pay the holders of the CCI Notes and that such funds would need to be replaced.[25]   Upon the recommendation of management, and with the approval of the Board,[26] the Company again caused CCO to repay a portion of the valid intercompany loan due from CCO to Holdco, this time in the amount of approximately $8.4 million.[27] Holdco then made a capital contribution to CCH so that CCH could make its interest payments.[28]

At the time of the November interest payment, the Board again knew or turned a blind eye to the fact that Holdco's capital contribution would not yield any benefit for Holdco.  The material that was presented to the Board, including an analysis of the Duff & Phelps valuation, indicated that CCH had a negative surplus of $187 million at the time.[29]   Moreover, the use of

---

[21] Aug. 3 Tr. 39:6-10 (Schmitz).
[22]   JPX 266 (Disclosure Statement) at 6, 21.  The Disclosure Statement indicates a recovery 0.4% on the $102 principal amount of CCH Notes purchased in the October tender offer.
[23] LDTX 80 (11/14/2008 board minutes) at 1-2.
[24] Aug. 3 Tr. 47:22 – 48:18 (Schmitz).
[25] CX 225 at 1 (Nov. 14, 2008 Telephonic Board Meeting Book)  2-3.
[26] LDTX  80 (11/14/2008 board minutes) at 2-4.
[27] Aug. 3 Tr. 47:22 – 48:18 (Schmitz).
[28] Aug. 3 Tr. 47:22 – 48:18 (Schmitz); LDTX 80 (11/14/2008 board minutes) at 3-4.
[29] CX 225 (11/14/2008 board presentation) at 4.

Holdco's funds to make the CCH interest payment demonstrates that CCH could not service its debt by any other means.[30]  Nevertheless, the Board decided to make a capital contribution to an entity that had no means of making payments on the notes absent further capital contributions from Holdco.[31]  Holdco received nothing in exchange for this capital contribution.[32]  As the Company's General Counsel and CRO described it, the money simply "came out of Holdco's pocket."[33]

### C.    The Beginning Of The Restructuring Negotiations

By the time the Board authorized the November 14 interest payment, Charter had already begun preparations for restructuring.  The Board discussed contingency planning for a potential restructuring at the October 28 Board meeting.[34]  By November 13, the Company had retained Kirkland & Ellis to advise it in connection with a potential restructuring,[35] and had begun a search for a financial advisor to assist in connection with restructuring efforts.  The Company ultimately decided to retain its long-time advisor Lazard as the Company's restructuring financial advisors on December 10.[36]  Lazard's retention was authorized by the whole Board, including Mr. Allen and Mr. Allen's representative on the Board.[37]

---

[30] This was not the normal method of making interest payments on behalf of the designated holding companies, and indeed, up until that point, no designated holding company had made an interest payment in this manner going back at least to the beginning of 2008.  July 22 Tr. 18:1-13 (Smit).  At the same November 14 meeting, the Company determined that it had sufficient surplus at the CCH I level to upstream funds to CIH so that CIH could make its interest payment.  LDTX 80 at 2-3.  The obvious negative inference is that the Company could not make such a determination with respect to CIH, which sits above CCH I in the capital structure, and it therefore had to take the highly unusual step of having Holdco fund the CCH interest payment.

[31] JPX 76 (11/14/2008 board minutes) at 3-4.

[32] JPX 266 (Disclosure Statement) at 5.

[33] Aug. 17 Tr. 121: 15-16 (Doody).

[34] July 22 Tr. 23:6-24:10 (Smit); JPX 58 (10/28/2008 board minutes) at 4.

[35] Debtors' Application for Order Authorizing Retention of Kirkland and Ellis [Docket No. 34], Ex. 1 (Retention Letter) of Ex. A at 1.

[36] JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 8.

[37] Sept. 2 Tr. 156:24-157:1 (Conn).

At the board meeting where the Debtors retained Lazard to provide advice in connection with the financial restructuring, it became clear to all that the restructuring efforts would focus on preserving CCI's NOLs and reinstating the CCO credit facility.[38]  Mr. Millstein advised the full Board, including Mr. Allen and Mr. Conn sitting in their capacities as fiduciaries of the Company, that to accomplish these objectives the Company would need Mr. Allen's participation and that Mr. Allen should be compensated for such participation.[39]  In this regard, Mr. Conn, Mr. Allen's representative in the restructuring negotiations,[40] testified as follows:

> Q. At what point in the process of hiring Miller Buckfire and engaging with counsel…did you on Mr. Allen's behalf, determine that some form of compensation was appropriate for Mr. Allen?  Date it please.
>
> A. The moment that it crystallized for me was when Mr. Millstein was speaking to the board  I'm guessing this would have been that December meeting and he said that Paul Allen's cooperation in any potential restructuring is the central element of this and the Company should be prepared to compensate him for that.  That's when it sort of hit me how much value there was to be created by the actions Mr. Allen could take to effectuate the Exchange.[41]

There was no mention of the fact that the Company could take action to prevent Mr. Allen from effectuating the Exchange or of the significant downside that Mr. Allen would suffer if he failed to participate.  Indeed, that was not something the Company focused on during

---

[38] Sept. 2 Tr. 174:5-10, 174:13-20 (Conn); JPX 266 (Disclosure Statement) at 28.

[39] Sept. 10 Tr. 11:5-23 (Millstein).

[40] Sept. 2 Tr. 171:12-172:4 (Conn).

[41] Sept. 2 Tr. 174:5-10, 174:13-20 (Conn).  While both Mr. Conn and Mr. Millstein recognized that this discussion with the Board took place in December, conveniently, neither could fix a precise date on the conversation. Sept. 2 Tr. 174:11-20 (Conn); Sept. 10 Tr. 57:7 – 59:8 (Millstein).  A review of the minutes reflects that Mr. Millstein must have provided this advice at the December 10 Board Meeting.  CCI held two Board meetings in December 2008 – one that spanned December 9 and 10, and the second on December 22.  JPX 86 (12/9/2008 – 12/10/2008 board minutes); JPX 113 (12/22/2008 board minutes). The December 22 minutes do not reflect that Mr. Millstein provided any advice to the Board.  JPX 113 (12/22/2008 board minutes).  By contrast, the December 10 minutes reflect that Mr. Millstein advised the Board on several occasions, including with respect to financial and strategic options available to the Company.  JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 7-8.

[41] JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 8.

the restructuring process.[42]   Accordingly, this downside was not used as leverage against Mr. Allen in the negotiations, despite Mr. Allen's assertions that the negotiations were "arm's-length."[43]

Having just been advised that the prospective candidate for financial advisor would advocate a restructuring that contemplated material compensation to Mr. Allen personally, Mr. Allen and Mr. Conn, along with the full board, approved the retention of Lazard.[44]   While the Debtors have gone to great lengths to suggest that the independent directors were advised of information relating to the Allen Settlement separate and apart from the full Board,[45] no effort was made to exclude Mr. Allen and his representatives from the portion of the December Board meeting where the Company's financial advisor expressed his view that the Company should pay the controlling shareholder, Mr. Allen, for not taking action that would destroy assets of the estate.[46]

## D.   Commencement of the Restructuring Process

After Mr. Millstein advised the Board that the Company should compensate Mr. Allen, the Debtors knew they would be negotiating with their controlling shareholder in connection with the restructuring.[47]   In fact, it was a crystallizing moment for Mr. Conn.[48]   Thus, there was an obvious conflict between the Company and Mr. Allen with respect to the amount of compensation Mr. Allen should receive for his participation, if any.[49]   When faced with such

---

[42] Aug. 17 Tr. 243:1-6 (Doody).
[43] See Aug. 17 Tr. 243:1-6 (Doody).
[44] JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 8.
[45] July 21 Tr. 158:13 – 159:2 (Millstein); July 22 Tr. 165:15-20 (Merritt); Aug. 31 Tr. 189:5-10 (Johri).
[46]  Sept. 10 Tr. 63:1-12 (Millstein); CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at ¶ 33 (discussing the Mr. Allen's "extraordinary ability" to deprive the Debtors of approximately $3 billion in value).
[47] Sept. 10 Tr. 20:1-15 (Millstein).
[48] Sept. 2 Tr. 174:5-10, 174:13-20 (Conn).
[48] JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 8.
[49] July 22 Tr. 245:7-9 (Merritt) (recognizing the potential conflict in negotiating with Mr. Allen).

issues in the past, the Company appointed a special committee of independent directors to negotiate with Mr. Allen, which then retained its own legal counsel.[50] CCI did not follow such well-accepted and established practices here.[51]

Instead, the independent directors caucused informally with the Company's counsel and the Company's financial advisors following board meetings to discuss the restructuring process.[52] No minutes were kept at these informal sessions, and the Debtors have produced no documentation showing the content of these discussions.[53] And unlike in past situations,[54] the independent directors did not retain their own legal advisors to counsel them in connection with the restructuring process. Rather, the independent directors relied on Kirkland & Ellis, who also owed duties to CCI and its subsidiaries, to advise them.[55] Likewise, the independent directors did not retain independent financial advisors to advise them in connection with the restructuring process.[56] Rather the independent directors relied on Lazard, whose retention was approved by Mr. Allen and whose initial advice was what put Mr. Allen on notice that he could extract value from the Company in the first place.[57] Equally important, there was no resolution of the Board that authorized the independent directors to take any action with respect to the negotiations.[58] In fact, Mr. Allen, as controlling shareholder, retained the right to remove the independent directors if they didn't do what he wanted and threatened to do so when they didn't. As the independent

---

[50] July 22 Tr. 121:14-19 (Smit).
[51] July 22 Tr. 123:15 – 124:23 (Smit).
[52] July 21 Tr. 65:7-18 (Millstein).
[53] The Board minutes do not reflect the content of any of these discussions. See e.g., JPX 155 (1/23/09 board minutes); CX 250 (1/30/09 board minutes); CX 254A (2/6/09 board minutes).
[54] July 22 Tr. 121:14-19 (Smit).
[55] July 22 Tr. 124:14-16 (Smit).
[56] Aug. 31 Tr. 192:7-13 (Johri).
[57] July 21 Tr. 157:14 – 158:2 (Millstein).
[58] JPX 86 (12/9/2008 – 12/10/2008 board minutes); JPX 129 (1/6/09 board minutes); JPX 133 (1/9/09 board minutes); JPX 141 (1/14/09 board minutes); JPX 155 (1/23/09 board minutes); CX 250 (1/30/09 board minutes); CX 254A (2/6/09 board minutes); CX 255 (2/10/09-2/11/09 board minutes).

directors were not authorized to take any actions, and in fact did not participate in any of the negotiations,[59] management was left to negotiate directly with the controlling shareholder.[60]

Following the retention of Lazard, the Debtors contacted who they perceived to be the fulcrum security holders at the CCH I and CCH II level of the capital structure.[61] After contacting the bondholders, a three-way negotiation ensued between Charter, Mr. Allen's interests, and the CCH I and CCH II bondholders, which had formed a group referred to as the crossover committee (the "Crossover Committee").[62]

The Debtors' primary objectives in the restructuring negotiations focused on reducing debt to a level that could be sustained with operating income and to obtain a significant levered positive free cash flow.[63] Another objective of the restructuring was to ensure that management received a lucrative compensation package.[64] To facilitate the restructuring discussions with the Crossover Committee and Mr. Allen, the Debtors prepared a "straw man" which outlined, among other things, the debt capacity that the Debtors thought they could sustain as a starting point for the negotiations.[65] The "straw man" was an attempt to "draw [Mr. Allen and the Crossover Committee] a picture and just start the negotiations."[66]

After negotiations commenced, the Debtors considered how to fund interest payments owed by CCH and CIH that were due on January 15.[67] The Board determined, in exercising its

---

[59] July 22 Tr. 244: 7 (Merritt); August 31 Tr. 192:14-17
[60] Aug. 31 Tr. 196:19-21 (Johri) (testifying that management was responsible for negotiating with Vulcan).
[61] JPX 266 (Disclosure Statement) at 21.
[62] July 21 Tr. 52:14 – 53:21 (Millstein) (describing the formation of the Crossover Committee); July 21 Tr. 210:5-10 (Merritt) (describing a "three-way negotiation").
[63] July 22 99:25 – 100:5 (Smit) (testifying that the Company generally set his position around trying to deleverage the Company, obtain new investment so the Company would be free cash flow positive, and retaining enough liquidity to operate the business effectively going forward).
[64] CX Declaration 6 (Goldstein Declaration) Ex. A ("straw man" proposal) at 1.
[65] July 21 Tr. 53:22 – 54:15 (Millstein).
[66] Aug. 24 Tr. 54:12-13 (Goldstein).
[67] JPX 266 (Disclosure Statement) at 21.

fiduciary duties,[68] that it should not make the $74 million of interest payments ("January Interest Payment") due on those notes at the time.[69]  CCH and CIH had a 30-day grace period available to them under the applicable indentures, and CCI's Board and management decided to take advantage of that grace period.[70]  As a result, the interest payment would have to be made by February 13, or the bonds' trustee would be able to accelerate the Debtors' obligations under the notes, resulting in cross-defaults on other debt obligations of the Company.[71]

### E.    The Exchange Agreement

While the Debtors and Mr. Allen were in discussions with the Crossover Committee regarding the January Interest Payment, the conflict between CCI and Mr. Allen was further sharpened.[72]  Mr. Allen had certain rights under an exchange agreement with the Company pursuant to which he could exchange his equity interests in Holdco for equity interests in CCI (the "Exchange Agreement").[73]    Management, the Board and Mr. Allen understood that Mr. Allen's consummation of an exchange under that agreement would severely impair the CCI's valuable NOLs.[74]  Nevertheless, on or about January 20, Mr. Allen demanded that the Company agree to honor his exchange rights.[75]  However, the Exchange Agreement contained a notice provision providing that the closing of the exchange could not be consummated until ten

---

[68] Significantly, the Debtors have failed to identify what fiduciary duties they were exercising here.  Mr. Millstein contends that the grace period was taken advantage of "to help focus the minds of our counterparty bondholders." July 21 Tr. 57:17-19 (Millstein).

[69] JPX 266 (Disclosure Statement) at 21.

[70] JPX 266 (Disclosure Statement) at 21.

[71] JPX 266 (Disclosure Statement) at 21.

[72] There can be no dispute that Mr. Allen's threat to exercise his exchange rights constituted a conflict of interest. The Debtors disclose in their 10-K that if Mr. Allen were to exercise his rights under the Exchange Agreement, that would represent a conflict between Mr. Allen and CCI.  LDTX 239 (CCI's 2008 10-K) at 31.

[73] LDTX 355 (2/6/09 email from Smit to Board re "Exchange").

[74] July 21 Tr. 172:16-21 (Millstein); Sept. 2 Tr. 35:19-36:1 (Conn); July 21 Tr. 224:9-16 (Smit); LDTX 355 (Smit email to Board re "Exchange").

[75] LDTX 128 (1/20/09 email from Kornberg).

business days after Mr. Allen delivered a notice of exchange.[76]  Accordingly, it was recognized by those involved that Mr. Allen would not be able to consummate the exchange because the Debtors could refuse to take the ministerial acts necessary to consummate the exchange or otherwise file for bankruptcy protection.[77]  On January 28, the Debtors agreed that the closing of the exchange would be set for February 12, a day before the January Interest Payment was due.[78]

On February 5, Mr. Allen delivered a formal written notice that he intended to exercise his exchange rights and that the closing of the exchange would be set for February 12 pursuant to the January 28 agreement.[79]  Mr. Smit, CCI's CEO, sent an email to the full Board, including Mr. Allen and his Vulcan representatives, calling a board meeting on February 6 to discuss the "implications of the exchange notice and the steps we might take in response on a board call later today."[80]  Not only did Mr. Allen and Mr. Conn both attend, but it appears that both Mr. Allen and Mr. Conn were present during the Board's discussion of the exchange notice and its implications to the Company.[81]  As with the December 10 meeting where Mr. Millstein advised the Board that Mr. Allen should receive compensation, Mr. Allen and his board representatives,

---

[76] July 21 Tr. 173:7-10 (Millstein); CX 137 (11/12/1999 Exchange Agreement) at 12.
[77] Sept. 10 Tr: 51:22-52:4 (Millstein); Sept. 2 Tr. 43:7-20 (Conn) (recognizing that the Company could have prevented the consummation of the exchange either by filing for bankruptcy or simply not honoring the right). Contrary to the testimony of Mr. Millstein and Mr. Conn, Mr. Merritt testified that the Debtors took the exchange notice very seriously.[77]  However, the Board's conduct in connection with the exchange notice suggests otherwise.
[78] CX 119 (2/5/09 letter re "Exercise of Exchange Option"); Sept. 10 Tr. 47:25-48:16 (Millstein).
[79] CX 119 (2/5/09 letter re "Exercise of Exchange Option").
[80] LDTX 355 (2/6/09 email from Rajive to Smit re board meeting).
[81] CX 254 (2/6/09 board minutes) at 1; Sept. 10 Tr. 34:9-35:2 (Millstein).  The minutes of the February 6 board meeting produced in discovery by the Debtors were almost entirely redacted, making it impossible to determine what was discussed regarding the exchange agreement (or anything else).  Just before the last day of trial the Debtors produced for the first time an unredacted version of the February 6, 09 board minutes that revealed the Board discussed, with Mr. Allen and his representatives present, the implications of Mr. Allen's threat to exercise his exchange rights.  Sept. 10 Tr. 29:20-34:4 (Millstein).  The Debtors have acknowledged that the board minutes were improperly redacted (Sept. 10 Tr. 31:6-13 (McKane)) but have not offered any explanation for producing the unredacted document just before the last day of the trial, to use in their rebuttal case no less.  The Debtors' improper redaction of the board minutes is another example of the Debtors' overly broad assertions of privilege in these proceedings.  Still more improper is the Debtors' attempt to affirmatively use the previously-redacted document on their rebuttal case, underscoring how they have repeatedly attempted to present testimony and evidence during these proceedings that was shielded under a claim of privilege during discovery.  See infra section IV.B.

NEWYORK 7308402 (2K)                    18

who clearly had interests in conflict with the Company regarding the exchange, were not excused from these discussions concerning the exchange notice. Following the discussion, Mr. Allen's representatives made it clear that he was not going to waive his rights under the Exchange Agreement and that he would pursue those rights if he could not achieve a deal with the Crossover Committee that was to his liking.[82]

### F. The Debtors Adopt The Role Of Mediator And Fail To Negotiate For CCI

On February 5, Mr. Millstein forwarded an email to Mr. Smit advising that there was one outstanding issue in the negotiations between Mr. Allen and to Crossoover Committee "(and it is a big one) what do we give Paul for [change of control]?"[83] At this time, notwithstanding these conflicts and the significant value that was being allocated between Mr. Allen and the Crossover Committee, the Debtors' advisors adopted the role of "mediator" in an effort to broker a deal between Mr. Allen and the Crossover Committee.[84] As Mr. Millstein explained, once the Company had reached its objectives of a plan that would leave the Debtors with a levered free cash flow, the rest of the deal was about "mediating between [Mr. Allen and the Crossover Committee] to try to get them to closure…."[85] Ms. Villaluz, a member of the Crossover Committee, testified that "the substance or the basic tenets of the [Crossover Committee's] term sheet seemed to meet the Company's needs. But then the Company wanted us to – or wanted our committee to also get a deal with Vulcan in the same amount of time."[86] Management's attitude was that it was important that the bondholders and Mr. Allen just "make a deal and move on."[87] Simply, so long as the Company achieved its objectives of developing the Company and

---

[82] Sept. 10 Tr. 50:24 – 51:10 (Millstein).
[83] LDTX 162 (2/5/09 email from Millstein to Smit re CoC).
[84] July 21 Tr. 168:4-11 (Millstein); Sept. 10 Tr. 53:9-13 (Millstein).
[85] July 21 Tr. 168:12–169:2 (Millstein).
[86] July 23 Tr. 29:6-11 (Villaluz).
[87] Aug. 24 Tr. 160:9-10 (Goldstein).

compensating management, it made no difference to the Company's fiduciaries if the Crossover Committee and Mr. Allen disenfranchised stakeholders in the process.

The currency that Mr. Allen brought to the table in the negotiations with the Crossover Committee was his ability to deprive the estate of substantial value by allowing a change of control.[88] Mr. Allen's participation in the restructuring was necessary to reinstate the Debtors' credit facility and to preserve NOLs, and he could thus deprive the estate of value if he refused to participate in the restructuring.[89] Like Mr. Allen, CCI's participation in the restructuring process was equally necessary to reinstate the credit facility and to preserve NOLs.[90] However, unlike Mr. Allen, CCI had little downside to refusing to participate in the restructuring.[91] Whereas Mr. Allen would suffer "a large tax liability" in connection with a free-fall restructuring,[92] CCI would suffer virtually no downside in a liquidation because the assets that CCI would receive in a liquidation would be based on claims that Holdco held against CCO,[93] a solvent entity.[94] Thus, there was no downside to CCI requesting compensation for its participation in a Plan that would transfer value to the Crossover Committee.[95] Nevertheless, no attempt was made by

---

[88] CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at ¶ 33
[89] July 21 Tr. 172.:9-14 (Millstein).
[90] July 21 Tr. 165: 4-13 (Millstein).
[91] While Mr. Millstein testified that it would have been "silly" to threaten to liquidate CCI, the point is that it would only be silly if you were not seeking to advocate for CCI's interests. July 21 Tr. 17:13-72:8 (Millstein). It is beyond dispute that CCI would have received less under the Plan that was initially proposed than they would have in a liquidation. Under those circumstances, an advocate for CCI certainly would have attempted to use a liquidation as leverage. It should not matter to CCI's creditors whether value is achieved for other constituencies, if none of that value ultimately flows to CCI.
[92] Aug. 31 Tr. 217:12-13 (Johri); Sept. 2 Tr. 186:13-17 (Temple).
[93] See July 21 Tr. 70:22 – 71:3 (Millstein) (recognizing the validity of the intercompany claims); JPX 266 (Disclosure Statement), Ex. E at 6.
[94] With respect to CCO's solvency, when asked if he could conceive of a scenario in which a claim against CCO might not be paid, Mr. Conn identified "nuclear holocaust" as the only such scenario he could think of. Sept. 2 Tr. 165:24-166:6 (Conn).
[95] Sept. 10 Tr. 22:23-23:3 (Millstein).

management or its advisors to obtain for CCI and its stakeholders any of the money that Mr. Allen was attempting to extract from the Crossover Committee.[96]

The evidence revealed that Mr. Millstein found it acceptable that Mr. Allen and the Crossover Committee were dividing up the value of the Company with no input from CCI's representatives. As Mr. Millstein testified, the Debtors left the allocation of "excess value, over and above the reinstated debt" to the Crossover Committee and Mr. Allen to carve up amongst themselves.[97] In his words, Mr. Millstein was just a "passenger on the Vulcan negotiations."[98]

By contrast, having been advised by Mr. Millstein that he should be paid for his participation, Mr. Allen bargained aggressively to extract value from the deal,[99] notwithstanding the significant tax liability he could face if an agreement was not reached. Mr. Allen's representatives went so far as to tell the Crossover Committee that he would fire the Board if the Board did not act in accordance with his wishes. As Mr. Marcus of Crestview testified:

> Q. Now, during negotiations related to the restructuring, Mr. Allen's representatives told the crossover committee that he'd fire the board if the board didn't make the interest payment that was due in January, right?
>
> A. I believe that was said at some point.[100]
>
> ***
>
> Q. If you look halfway down the page -- it says, "Vulcan claimed that we misread Paul's tax situation and that there was a way around the one billion dollar tax liability. If they did not reach an agreement with us, they would fire the board and make the interest payment and then make the exchange." Do you see that?
>
> A. I do.
>
> Q. And that was said during that meeting, right?

---

[96] July 21 Tr. 175:19-176:2 (Millstein).
[97] July 21 Tr. 72:16-19 (Millstein).
[98] July 21 Tr. 177:14 – 178:3 (Millstein).
[99] July 21 Tr. 169:13-16 (Millstein).
[100] July 29 Tr. 121:5-15 (Marcus).

A. I can't recall if it was said from advisor to advisor or if it was said directly by Lance Conn.[101]

Notwithstanding Mr. Marcus's recollection of the threats issued by Mr. Allen's representatives during negotiations, and the multiple contemporaneous emails[102] that corroborate Mr. Marcus's recollection, Mr. Conn attempted to deny that Mr. Allen's representatives ever made such threats.[103] While Mr. Allen and Mr. Conn may not want to acknowledge such threats, the evidence demonstrates that these threats, as reported by the Debtors' own witness, Mr. Marcus, were made, and that Mr. Allen leveraged his position as a controlling shareholder to extract value from his own fiduciaries.

### G.    The Debtors' Negotiations with Mr. Allen

Unlike the negotiations between Mr. Allen and the Crossover Committee, there is virtually no documentary evidence to suggest that any meaningful negotiations took place between the Debtors and Mr. Allen.[104] Rather, CCI's fiduciaries candidly admitted that they did not focus on Mr. Allen's downside to obtain value for CCI.[105] The only documented instances of "negotiations" between Mr. Allen and the Debtors related to whether Mr. Allen would contribute the balance of the January Interest Payment that was not put in escrow and the payment of Mr. Allen's professional fees.  It is not surprising that Mr. Allen, as the controlling shareholder, easily prevailed on both deal points without any resistance from management.

In connection with the January Interest Payment that was due, the Crossover Committee agreed to deposit the portion of the $75 million payment that would be paid to them into an

---

[101] July 29 Tr. 119:24-120:3 (Marcus).
[102] LDTX 156 (2/5/09 email from Cassidy to Crestview re Allen negotiations); LDTX 158 (2/4/09 Email from McCafferty to MFC re Allen); LDTX 186 (2/9/09 email from McCafferty to MFC re CHTR Update).
[103] Sept. 2 Tr. 64:6-65:15 (Conn).
[104] If such documentary evidence exists, the Debtors buried it under a claim of privilege.
[105] Aug. 17 Tr. 243:1-6 (Doody).

escrow account.[106]  CCI approached Mr. Allen about contributing the balance of the January Interest Payment that was to be made to CCH and CIH bondholders.[107]  Mr. Allen did not concede a dollar.[108]  Instead, with Mr. Allen present for all Board discussions and presiding over the Board's vote, CCI ultimately caused Holdco to make the full payment on February 13, draining $75 million from Holdco's coffers.[109]

CCI likewise caved on efforts to limit Mr. Allen's fees.  On February 11, Mr. Smit wrote to Mr. Conn seeking to limit the amount of legal and financial advisory fees that CCI would be required to reimburse Mr. Allen in connection with negotiating the plan and term sheet to $5 million.[110]  Lance Conn, a CCI director and President of Vulcan Capital (an Allen-owned investment company) quickly rejected this suggestion.[111]  Mr. Smit then asked if they could compromise.[112]  Mr. Conn again refused, noting that this issue had already been brought to the attention of Mr. Allen.[113]  After Mr. Conn made a pointed reference to the status of Mr. Smit's own compensation negotiations,[114] Mr. Smit ultimately agreed to meet Mr. Allen's demand, increasing the cap on Mr. Allen's fees to $20 million.[115]  Mr. Smit's passive acquiescence to Mr. Conn again illustrates the profound defects in the process that led to the Allen Settlement.

### H.    Management Threatens To Leave The Company If They Don't Receive An Executive Compensation Package

While management failed to negotiate with the Crossover Committee or Mr. Allen to obtain value for CCI, management did not hesitate to negotiate aggressively with the Crossover

---

[106] Aug. 31 Tr. 179:20-23 (Johri).
[107] LDTX 179 (2/8/09 email from Temple to Bosacco re "Charter – Issues List"); Sept. 2 Tr. 45:21-24 (Conn).
[108] Sept. 2 Tr. 45:25-46:3 (Conn).
[109] CX 255 (2/10/09-2/11/09 board minutes) at 9-10.
[110] LDTX 212 (2/11/09 emails between Conn and Smit).
[111] LDTX 212 (2/11/09 emails between Conn and Smit).
[112] LDTX 212 (2/11/09 emails between Conn and Smit).
[113] LDTX 212 (2/11/09 emails between Conn and Smit).
[114] LDTX 212 (2/11/09 emails between Conn and Smit).
[115] JPX 266 (Disclosure Statement) at 28.

Committee to advance their own interests and accomplish a primary objective of the restructuring – obtaining compensation for management.[116]   In the days leading up to the execution of the term sheet, management threatened to leave the Company if the Crossover Committee would not agree to an executive compensation package.[117]   As one member of the Crossover Committee put it:

> In the category of seemingly everyone is greedy, Neil Smit told our advisors today that he wants a retention package for him and the senior management team of $44 mm or he'll leave the Company in two weeks.[118]

For its part, the Board protected management in its compensation negotiations with the Crossover Committee, reserving "the right to terminate the restructuring agreement if an RVP [Restructuring Value Plan] agreement [that would compensate management] were not reached" within the thirty day due diligence window that was made available to the Crossover Committee.[119]

Ultimately, Mr. Smit obtained the compensation he was seeking.   Under the RVP that was ultimately agreed to with the Crossover Committee, Mr. Smit will receive $6 million for a successful restructuring of CCI with an annual target award under the Cash Incentive Program ("CIP") of $2.5 million per year for each of the three years following CCI's emergence from bankruptcy.[120]   To put Mr. Smit's compensation in context, if the Plan is approved, not including the CIP, Mr. Smit will receive more than _twelve_ times the value that Holdco will recover in

---

[116] CX Declaration (Goldstein Declaration), Ex. A ("straw man" proposal) at 1.
[117] July 29 Tr. 136:20 – 137:2 (Marcus).
[118] LDTX 201 (2/10 email from Van Duzer to Soveiro).
[119] CX 255 (2/10/09-2/11/09 board minutes) at 8.
[120] JPX 266 (Disclosure Statement) at 22; July 22 Tr. 106:22 – 107:10 (Smit).

connection with Mr. Smit's decision to use $99 million of Holdco's funds to purchase CCH bonds in October.[121]

### I.       Making The January Interest Payment

As the expiration of the grace period drew near, the negotiations became more tense. CCH and CIH were past due on interest payments totaling $75 million,[122] and the Company needed to make these payments to reach a deal with the Crossover Committee.[123]  Ultimately, at the eleventh hour, the parties reached a settlement that required the Company to make the January Interest Payment within the grace period.[124]  Once again, it was CCI and Holdco that were forced to shoulder the burden for the benefit of these other stakeholders.  To fund the January Interest Payment, CCI's Board of Directors approved a transfer of $75 million of Holdco's funds to CCH to allow CCH and CIH to make their interest payments.[125]  This was done at a time when the Debtors had abandoned all pretense that CCH was solvent – at that point, the bankruptcy filing was a certainty.[126]  Mr. Smit testified that at the time he authorized the transfer, he was focused on "maximizing enterprise value," and he did not understand whether or how the CCI Noteholders were going to receive a distribution under the Plan.[127]

Pursuant to an agreement with the Crossover Committee, $48 million of the January Interest Payment that was owed to members of the Crossover Committee was deposited in an escrow account, to be returned to Holdco if the Plan is not approved.[128]  This, according to the

---

[121] Under the Plan, the recovery on the CCH notes is 0.4%.  As discussed above, Holdco purchased CCH notes in the principal amount of $102 million for $99 million cash.  Therefore, Holdco will recover approximately $408,000 on this $99 million investment.
[122] CX 255 (2/10/09-2/11/09 board Minutes) at 9.
[123] CX 255 (2/10/09-2/11/09 board minutes) at 2; July 22 Tr. 267:6-20 (Merritt); Aug. 3 Tr. 56:20-23 (Schmitz).
[124] CX 255 (2/10/09-2/11/09 board minutes) at 4, 9.
[125] CX 255 (2/10/09-2/11/09 board Minutes) at 9-10; Aug. 3 Tr. 53:21 – 54:2 (Schmitz).
[126] Aug. 3 Tr. 55:21-24 (Schmitz).
[127] July 22 Tr. 97:5-21 (Smit).
[128] JPX 266 (Disclosure Statement ) at 21-22.

Debtors' counsel, was done to protect the CCI Noteholders.[129]  The CCI Noteholders received no protection, however, with respect to the $27 million balance that was not placed in escrow. Nevertheless, in order to consummate a deal with the Crossover Committee, CCI's Board put aside its fiduciary concerns and transferred the full $75 million so that CCH and CIH could make their interest payments, further depleting Holdco's assets at a time when the bankruptcy filing was imminent.

### J.      Everyone Benefits From The Settlement Except The CCI Noteholders

Under the proposed Allen Settlement, Mr. Allen would receive more than $404 million[130] of consideration for agreeing to refrain from depriving the estate of value[131] and for giving up his interests in CC VIII, which he obtained from the Company due to a scrivener's error.[132]   The $404 million of value received by Mr. Allen does not include the value of tax mitigation,[133] nor does it account for the substantial value that Mr. Allen will receive as a result of the releases that he and the Vulcan directors will receive under the Plan.[134]

By contrast, the Allen Settlement does not provide any value to CCI, but instead adversely impacts the recoveries of CCI creditors, as the agreement expressly provides for the transfer of $75 million of cash that would otherwise have been available to CCI's creditors to bondholders at the CIH and CCH levels so that the Debtors could make the January Interest Payment within the thirty day grace period and the parties could reach an agreement on the restructuring.[135]

---

[129] July 20 Tr. 38:6-10 (Basta); See also Aug. 17 Tr. 129:18-25.
[130] Sept. 2 Tr. 85:11-86:4 (Conn);  LDTX 215 (2/11/09 email from Temple to Chern).
[131] CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at ¶ 33
[132] LDTX 488(11/4/05 CCI 8-K), Item 1.01 at 1.
[133] LDTX 218 (2/12/09 email from Bojmel to Allen).
[134] JPX 266 (Disclosure Statement) at 96-97; Sept. 2 Tr. 88:13-18 (Conn) (testifying that Vulcan never fixed a value on the release).
[135] CX 255 (2/10/09-2/11/09 board minutes) at 9-10.

Likewise, the Crossover Committee obtained substantial value in connection with the settlement that led to the Plan. The Crossover Committee agreed to invest $1.6 billion in a rights offering that the Debtors made available to them based on Lazard's valuation.[136] As described below, Lazard's valuation upon which the Plan is predicated substantially undervalued the reorganized Company at $15.4 billion,[137] which is about $6 billion less than the value at which the Debtors' own expert values the enterprise.[138] Moreover, the Lazard valuation does not account for the reinstatement of the below market debt that the Plan is founded on,[139] and which Mr. Allen will account for when the Debtors obtain a valuation of these assets for him.[140] By the bondholders' own calculation back in March, they will receive substantial returns on their investments. Crestview projects a 52% internal rate of return on its investment in the rights offering.[141] Likewise, Apollo projected that a new money investment of $400 million would earn an internal rate of return of 40.3%.[142] And as discussed above, management accomplished its goal and will receive a substantial executive compensation package.[143] Thus, everyone who had a seat at the negotiating table was able to extract substantial consideration in connection with the restructuring. The only one left out was CCI who got nothing.

---

[136] JPX 266 (Disclosure Statement) at 8.
[137] JPX 266 (Disclosure Statement), Ex. D at 1.
[138] CX 292 (Expert Report of R. Bruce Den Uyl) at 19.
[139] Sept. 1 Tr. 91:18-22 (McDonough).
[140] JPX 266 (Disclosure Statement) at 32; Sept. 2 Tr. 86:5-9 (Conn).
[141] JPX 158 (2/3/09 Crestview Investment Committee Memo) at 6 (assuming a 5.5% EBITDA CAGR and 7.0x LTM exit multiple).
[142] JPX 154 (1/23/09 Apollo Investment Memo) at 12.
[143] See supra Section I.H.

## II. THE DEBTORS' VALUATION IS NOT CREDIBLE

To satisfy their evidentiary burden with respect to confirmation, the Debtors have submitted two valuations, one prepared by Lazard and one prepared by Mr. Den Uyl of AlixPartners.[144]

As an initial matter, the Lazard valuation does not present an accurate valuation of the Company as of the Effective Date. Lazard's valuation was prepared at a trough in the market,[145] and there have been substantial improvements in the market which would have a material impact on Lazard's valuation. Indeed, the average stock prices of comparable companies have improved more than 32% and the S&P 500 is up almost 26% since Lazard prepared its valuation.[146] The Debtors have made no attempt to update the valuation or present this Court with a valuation that takes into account the improvement in the market since March.

Furthermore, Lazard's valuation is predicated on assumptions that are wholly inconsistent with the assumptions relied on by Mr. Den Uyl (the Debtors' own expert) and advice Lazard has previously provided to the Company. In preparing its valuation, Lazard relied predominantly on analysis of comparable companies and discounted cash flow, and only gave minimal weight to precedent transactions "as a result of the significant limitations as to the usefulness of this methodology."[147] The decision to abandon the precedent transactions methodology in March was consistent with producing a valuation that met Apollo's desire for a valuation in the "6ish" multiple range.[148] However, only a few months before, when the

---

[144] CX 292; JPX 266, Ex. E.
[145] Sept. 1 Tr. 83:8-19 (McDonough).
[146] Sept. 1 Tr. 77:21-23; 85:15-86:9 (McDonoough).
[147] JDX 266 (Disclosure Statement), Ex. D at 3; CX 144 (4/09 Project Gateway Valuation of Charter Communications).
[148] JPX 308 (12/15/2008 email from Rowan to Zinterhofer and Glatt). At the same time, Apollo was projecting an internal rate of return of 40.3% on its new money investment. JPX 234 (3/6/09 Apollo Investment Committee Memo) at 38.

Company needed to arrive at a value that showed there was surplus so that interest payments could be made, Lazard advised the Board that neither current trading prices nor multiples reflected in peers' share prices were reflective of the Company's value and instead precedent transactions were more appropriate indicators of value.[149]

After Lazard prepared its valuation, the Debtors once again needed a "high" valuation to justify their decision to make the interest payments in November. The Debtors changed course and retained an expert to opine that "those knowledgeable in the cable industry rely more heavily on precedent transactions and DCF analysis" in assessing the Company's value.[150] Indeed, in presenting his "high" valuation, Mr. Den Uyl concluded that Charter's stock had positive value.[151]

As the Trustee's expert explained, placing minimal weight on precedent transactions significantly decreased Lazard's valuation because the range of values on the precedent transactions are significantly higher than the comparable companies and DCF analysis given they include control premiums.[152] The Debtors have failed to offer any rational explanation as to why precedent transactions were an appropriate indicator of value when the credit markets were frozen in November 2008, but not when the markets began to thaw in March 2009. Lazard's

_____

[149] CX 114 (11/14/08 board minutes) at 2. In addition to giving precedent transactions only minimal weight as discussed above, Lazard normalized the transactions for the drop in the S&P 500 index. JDX 266 (Disclosure Statement), Ex. D at 6. Mr. Den Uyl did not normalize the transactions in his precedent transactions analysis (nor did Lazard suggest that precedent transactions needed to be normalized in their previous advice to the Board). September 1 Tr. 87:2-15 (McDonough). Adjusting Lazard's precedent transaction analysis to use actual multiples similar to how Mr. Den Uyl did his analysis increases the Lazard valuation by approximately $5 billion. Sept. 1 Tr. 87:16-19, 89:2-18 (McDonough); LDT Demo 10.
[150] CX 292 (Expert of R. Bruce Den Uyl ) at 19 ("[T]hose knowledgeable in industry valuations rely more heavily on the DCF [discounted case flow] and market transactions [i.e., precedent transactions] in assessing cable company values").
[151] Aug. 3 Tr. 124:6-23 (Den Uyl).
[152] Sept. 1 Tr. 75:8-22 (McDonough).

approach is even more indefensible given that the Debtors' CFO testified that there were no changes in the Debtors' financial condition between November 2008 and March 2009.[153]

In addition to the inconsistency in weighting, the Lazard valuation relies on a comparable companies analysis that does not include a control premium and uses multiples that were calculated at historic lows in the market.[154] In contrast, the Debtors' expert Mr. Den Uyl applied a control premium of 40% in his comparable companies analysis.[155] Applying Mr. Den Uyl's control premium to Lazard's comparable companies analysis would increase Lazard's valuation by more than $5 billion.[156] Accounting for the 32% increase in the comparable companies stock prices since Lazard prepared its valuation would further increase Lazard's valuation.[157]

Lazard's DCF analysis is similarly flawed. As an initial matter, Lazard did not use the Company's actual cost of debt under the proposed Plan.[158] Adjusting Lazard's valuation to incorporate the below-market cost of debt—as will be done when the Company obtains a valuation for Mr. Allen after the Effective Date[159]—would increase Lazard's valuation by approximately $7 billion.[160] The assumptions underlying Lazard's DCF analysis are also inconsistent with the DCF analysis prepared by Mr. Den Uyl. Lazard used a lower EBITDA growth rate and perpetuity growth rate.[161] It is clear from the record that Mr. Den Uyl's EBITDA growth rate of 10.75% was much closer to the Company's actual performance than Lazard's 7% rate.[162] Lazard also excluded Mediacom from its weighted average cost of capital

---

[153] July 31 Tr. 159:20-160:10 (Schmitz).
[154] Sept. 1 Tr. 83:8-23 (McDonough).
[155] CX 292 (Expert of R. Bruce Den Uyl ) at 18; September 1 Tr. 84:6-10 (McDonough).
[156] LDT Demo 9; Sept. 1 Tr. 84:22-85:10 (McDonough).
[157] Sept. 1 Tr. 85:15-86:9 (McDonough).
[158] Sept. 1 Tr. 91:15-22 (McDonough).
[159] JPX 266 (Disclosure Statement) at 32.
[160] Sept. 1 Tr. 93:23-94:22 (McDonough); LDT Demo 11.
[161] Sept. 1 Tr. 95:18-96:8 (McDonough).
[162] July 31 Tr. 99:17-25 (Schmitz); July 21 Tr. 200:7-11; 214:11-14 (Smit).

("WACC") calculation, whereas Mr. Den Uyl included Mediacom in his WACC calculations.[163]

Adjusting Lazard's DCF analysis to include Mr. Den Uyl's assumptions would increase Lazard's

DCF valuation by approximately $7 billion.[164]

In sum, the Debtors would have this Court believe that the value of the enterprise was approximately $21 billion on November 14 (excluding additional value sufficient to put public equity in the money) but only $15.4 billion on September 30, after the Company eliminates more than $8 million in debt service obligations.[165]   That the Debtors are simultaneously putting forward two made-to-order valuations of the same Company that rely on fundamentally different assumptions speaks not only to the Debtors' credibility, but also to the substantial flaws in the Lazard valuation.  Simply put, the Debtors' valuations cannot both be right.

## III.   BY PARTICIPATING IN THE PLAN, MR. ALLEN AVOIDS A LARGE TAX LIABILITY

It is clear from the record that the proposed Plan shields Mr. Allen from significant potential tax liability.  Alternative plan structures could expose Mr. Allen to more than $1 billion in additional tax liability.  For example, a liquidation involving the sale of Holdco's operating subsidiaries or of their assets would likely result in a taxable gain to Holdco (which gain would be passed through to its members CCI and CII and then to CII's owner, Mr. Allen) of approximately $10.2 billion.[166]   After taking account of the special tax allocations provided for in

_____

[163] Id.
[164] Sept. 1 Tr. 96:24:97:7 (McDonough); LDT Demo 12.
[165] CX 292 (Expert of R. Bruce Den Uyl) at 19; JPX 266 (Disclosure Statement), Ex. D at 1.
[166] This calculation is done on the basis that the debt of the subsidiaries of Holdco that are disregarded for U.S. federal income tax purposes would be treated as non-recourse debt of Holdco for U.S. federal income tax purposes. Assuming that Holdco's basis in its assets was originally equal to at least the amount of its outstanding $21.7 billion of debt and the original capital of CCI and CII (calculated at $7.1 billion under the Capital Account Analysis in LDTX 411) which implies a tax basis remaining after depreciation of approximately $12.8 billion at the end of 2007 and $11.5 billion estimated for year-end 2008 ($28.8 billion minus $17.3 of allocated losses through 2008 (per LDTX 417) equals $11.5 billion).  The $11.5 billion of basis would be subtracted from the $21.7 billion of deemed sale proceeds resulting in a gain of $10.2 billion.

Holdco Limited Liability Company Agreement,[167] $7.6 billion of the $10.2 billion would be allocated to CII, a Subchapter S corporation owned 100 percent by Mr. Allen.[168] Of the $7.6 billion allocated to CII, approximately $4.9 billion would flow through to Mr. Allen after accounting for CII's suspended losses.[169] The $4.9 billion of income to Mr. Allen would result in a federal tax liability of approximately $1.7 billion applying a 35 percent tax rate.

This calculation is consistent with the testimony at trial that Mr. Allen would suffer "a large tax liability" in connection with a free fall restructuring.[170] No Plan proponent presented any analysis of how Mr. Allen could avoid this liability, and perfunctory statements that there was no such liability, with any attendant analysis or communication shielded by privilege, must be given no weight.[171]

---

[167] JPX 4 (Amended and Restated Limited Liability Company Agreement for Charter Communications Holding Company, LLC) at §§ 6.4.2 and 6.7.1.
[168] JPX (Disclosure Statement) at 16.
[169] LDTX 110 (Charter Investment Inc./Vulcan Cable III Inc., Estimated Tax Attributes As of Dec. 31, 2008).
[170] Aug. 31 Tr. 217:12-17 (Johri); Sept. 2 Tr. 186:13-17 (Temple). The bondholders also recognized that Mr. Allen had a significant potential tax liability. LDTX 132 (recognizing that Mr. Allen would get a tax bill for about $1.5 billion if Charter files for bankruptcy but Vulcan does not), 133 (recognizing that Mr. Allen had a potential negative tax liability of more than $1 billion), 169 (noting in the course of negotiations that Vulcan's tax ask was roughly $1 billion and if you took into consideration the tax liability he was avoiding it was over $2 billion ask).
[171] See supra Section IV.B.

## LEGAL ARGUMENT

## IV.  THE DEBTORS BEAR THE BURDEN OF PROVING COMPLIANCE WITH EACH OF THE REQUIREMENTS UNDER § 1129(A)

### A.  The Debtors Bear the Burden to Demonstrate that the Plan is Proposed in Good Faith

As the proponent of a chapter 11 plan, "[t]he Debtor bears the burden of proving compliance with each of the requirements of 11 U.S.C. § 1129(a)," In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (citation omitted), and must prove each of the requisite elements of section 1129(a) by a preponderance of the evidence. In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994). Moreover, the Bankruptcy Court has an independent duty to determine whether the debtor has met its evidentiary burden under sections 1129(a) and (b) prior to entering an order confirming a chapter 11 plan. See In re Ne. Dairy Coop. Fed'n, Inc., 73 B.R. 239, 248 (Bankr. N.D.N.Y. 1987).

### B.  The Debtors Cannot Meet their Burden of Proof Because of Tactical Litigation Positions they Have Taken in these Proceedings

In addition to bearing the burden of proof to establish good faith, the Debtors also need to overcome the hurdle imposed by their broad assertion of privilege during discovery. As noted in previous filings, the Debtors made broad privilege assertions during discovery, precluding the Trustee's efforts to obtain information concerning, among other things, (i) negotiations that transpired between Mr. Allen on the one hand, and the Debtors on the other, (ii) Mr. Allen's tax position, and (iii) advice that was presented to the Board.[172] Nevertheless, during the course of this proceeding the Debtors have repeatedly attempted to slide in through the back door evidence they could not get in through the front. The record is replete with witnesses attempting to offer

---

[172] See, e.g., Sept. 10 Tr. 52:5-9 (Millstein); Law Debenture Trust Company of New York's Motion in Limine to Preclude Testimony on Subjects Over Which The Debtors Asserted Attorney-Client and Common Interest Privilege During Fact Discovery, filed July 17, 09 [Docket # 648] (filed under seal).

testimony as to "advice" they received or relied on in making decisions that was shielded under a claim of privilege during discovery. Any "evidence" which is based on advice of counsel or otherwise relies on communications with counsel that have been withheld should be disregarded and is entitled to no weight in connection with these proceedings. <u>See</u>, <u>e.g.</u>, <u>S.E.C.</u> v. <u>Bank of Am. Corp.</u>, 09 Civ. 6829 (JSR), 2009 WL 2842940, at *2 (S.D.N.Y. Aug. 25, 2009) (stressing that sworn testimony of officers that "they 'relied entirely on counsel' . . . would seem to be either a flat waiver of privilege or, if privilege is maintained, then entitled to no weight whatever, since the statement cannot be tested"), <u>subsequent determination</u>, 2009 WL 2916822 (S.D.N.Y. Sept. 14, 2009); <u>Ashmore</u> v. <u>Metrica Corp.</u>, No. Civ.A. 2811-CC, 2007 WL 1464541, at *1 (Del. Ch. May 11, 2007) (stating that "defendants, having asserted privilege with respect to this advice during discovery, will not be allowed to rely at trial upon the fact that advice was given"); <u>Columbia Pictures Television, Inc.</u> v. <u>Krypton Broad. of Birmingham, Inc.</u>, 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming preclusion of testimony where "[a defendant] sought to argue that he continued his infringing activities based upon the advice of his attorney, while at the same time refusing to answer questions regarding relevant communications with counsel until the 'eleventh hour'").

In this action, the Debtors repeatedly attempted to support their actions by reference to advice received from counsel, but they have neither waived privilege with respect to such advice, nor endeavored to produce any of the underlying privileged materials. For example, Mr. Smit, Mr. Doody and Mr. Johri all testified that the Board relied on advice of counsel in deciding not to appoint a special committee.[173] Yet the Debtors have never waived privilege with respect to such advice, and indeed, objected at trial when any inquiry was made into the substance of the

---

[173] July 22 Tr. 122:2-15 (Smit); Aug. 17 Tr. 220:18-221:21 (Doody); Aug. 31 Tr. 191:16-192:13 (Johri).

advice that was provided to the board.[174]  Mr. Johri testified that the board relied on counsel regarding the fairness of the Allen Settlement, but the Debtors have never waived privilege regarding such advice, nor have they produced any materials related to such advice.[175] Mr. Doody also submitted a declaration to the Court stating that he relied on advice of counsel with respect to information contained in his declaration.[176]  Again, that advice has never been produced.  Mr. Doody also testified that the value of intellectual property not included in the Liquidation Analysis was determined based on the advice of counsel.[177]  Yet when questioned, counsel asserted privilege.[178]  Mr. Millstein offered testimony at trial that similarly was based on advice that he received from the Debtors' tax counsel.[179]  Once again, the Debtors shielded that advice under a claim of privilege.  Similarly, board members testified that they relied on advice of counsel in making decisions to approve certain transfers.[180]  Yet the Debtors have failed to produce such advice.

The Debtors were not alone in this strategy.  Mr. Allen's representative, Mr. Conn, attempted to testify as to matters concerning potential tax liability that Mr. Allen could face in connection with the restructuring even though Vulcan has asserted privilege with respect to that advice.[181]

Simply put, this is another example of the Debtors trying to have it both ways.  The Debtors' attempt to introduce conclusory statements to demonstrate that the actions and belief of

---

[174] July 22 Tr. 122:16-20 (Smit); Aug. 17 Tr. 221:6-14 (Doody).
[175] Aug. 31 Tr. 202:6-20 (Johri).
[176] CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at 2 ("All matters set forth in this affidavit are based on…as to matters involving United States bankruptcy law or rules or other applicable laws, my reliance on the advice of counsel to the Debtors").
[177] Aug. 17 Tr. 160:20-161:18 (Doody).
[178] Aug. 17 Tr. 161:19- 163:2 (Doody).
[179] Sept. 10 Tr. at 63:15-64:8 (Millstein).
[180] July 22 Tr. 191:3-22 (Merritt).
[181] Sept. 2 Tr. 34:2-35:3; 159:2-5 (Conn).

witnesses were reasonable because they relied on advice of counsel cannot be credited unless the Debtors waive privilege with respect to such advice, which they have not done at any point in these proceedings.

## V.  THE DEBTORS' PLAN GERRYMANDERS AN ARTIFICIAL IMPAIRED ACCEPTING CLASS AT CCI

### A.  The Debtors have Failed to Offer a Legitimate Reason Supported by Credible Proof for the Separate Classification of the CCI Notes Claims from the CCI General Unsecured Claims

The Second Circuit prohibits a debtor from separately classify similar unsecured claims without a legitimate reason supported by credible proof (apart from the need to create an assenting class).  See Boston Post Rd. Ltd. P'ship v. F.D.I.C. (In re Boston Post Rd. Ltd. P'ship), 21 F.3d 477, 482-83 (2d Cir. 1994).  Thus, the Debtors must prove that the Plan's separate classification of CCI Notes Claims from General Unsecured Claims is proper.  There is nothing in the record that even suggests much less supports the proposition that the Debtors needed to separately classify the Notes Claims from the General Unsecured Claims.  To the contrary, the Debtors clearly could have classified General Unsecured Claims together with the CCI Notes – the Debtors were not prevented from doing so and no party could have challenged credibly the appropriateness of such classification given that the claims share the same priority.

The Debtors' justifications for separate classification are neither legitimate nor supported by credible proof.  The Debtors argue that the Plan's classification is appropriate because the holders of CCI notes can exchange such notes for equity and posit that the CCI Notes enjoy the sole benefit of the Mirror Note.  The Debtors also argue that CCI General Unsecured Claims are reimbursable under the Management Agreement.  Other than the fact that the CCI Notes are indeed convertible into equity, which is not relevant to the inquiry, the Debtors are simply wrong.  There is no distinction between the legal rights of the CCI Noteholders, on the one hand,

and all other general unsecured claims of CCI, on the other hand. Both groups enjoy the same priority and character of claim against CCI.

As described below, the Plan's separate classification of CCI Notes Claims and General Unsecured Creditors renders the Plan unconfirmable because (i) absent circumstances not present here, courts do not permit unsecured notes claims to be separately classified from other unsecured claims, (ii) the CCI Noteholders are not parties to, nor third-party beneficiaries of, the Mirror Note, and (iii) CCI's general unsecured creditors are not parties to, nor third-party beneficiaries of, the Management Agreement.

## 1. The Separate Classification of Unsecured Notes from Non-Priority General Unsecured Claims is Improper Absent Circumstances Not Present Here

The Debtors contend that CCI Noteholders' ability to convert their notes into equity is a legitimate reason to separately classify their claims from other unsecured creditors. The Second Circuit, however, has held that the existence of different origins or different rights outside of bankruptcy is not a legitimate reason to classify non-priority unsecured claims separately. Boston Post Rd., 21 F.3d at 483 (holding that the different origins of unsecured deficiency claims and general unsecured trade claims, which enjoy similar rights and privileges within the Bankruptcy Code, do not justify separate classification).

As described in the Trustee's Objection, the Second Circuit's decision in Boston Post Road is controlling on this issue. The Debtors ignore Boston Post Road and instead contend that claims arising under complex debt instruments are routinely classified separately from general unsecured claims in complex chapter 11 plans in this district.[182] In support of this proposition,

---

[182] See Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto ("Debtors' Pretrial Brief") [Docket No. 634] (filed under seal) at 17, n.40.

the Debtors cite three unpublished orders (not decisions).  None of the orders address the relevant question – whether a nominal amount of general unsecured claims may be separately classified from substantially larger claims arising under debt instruments (whether or not complex) to effect a cramdown of such debt instrument claims.

First, none of the three unpublished confirmation orders the Debtors cite approve a plan that provided the holders of notes claims with a recovery that was less than, much less materially less than, the recoveries provided to the general unsecured creditors.[183]  Second, neither Calpine nor Tower Automotive even involved a cramdown of a separately classified class of dissenting creditors (as each unsecured notes class and general unsecured class in those cases voted to approve the plan),[184] and in Global Crossing, the dissenting class of notes did not contest the plan's separate classification.[185]

Third, in Calpine, separate classification was utilized to give effect to contractual subordination agreements,[186] and in Global Crossing, unsecured notes claims were separately classified from general unsecured claims because the notes claims were receiving distributions

---

[183] In both Calpine and Tower Automotive, the classes of general unsecured claims and the classes of notes claims received identical recoveries, i.e., their pro rata share of a certain pool of assets.  See Debtors' Sixth Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, In re Calpine Corp., No. 05-60200 (BRL) at 35-41 (Bankr. S.D.N.Y. Dec. 19, 2007); In re Tower Automotive, Inc., No. 05-10578 (ALG), slip op. at 16 (Bankr. S.D.N.Y. July 12, 2007); First Amended Joint Plan of Tower Automotive, Inc. and Its Debtor Subsidiaries Under Chapter 11 of the Bankruptcy Code With Technical Modifications, In re Tower Automotive, Inc., No. 05-10578 (ALG) at 20-21 (Bankr. S.D.N.Y. July 9, 2007).  The notes claim classes in Global Crossing received slightly greater recoveries than the general unsecured claims but only because the court found it proper to allow the notes claims to receive distributions on a non-consolidated basis while the general unsecured claims were deemed consolidated.  In re Global Crossing Ltd., No. 02-40188 (REG), slip op., at 9, 33-34 (Bankr. S.D.N.Y. Dec. 26, 2002).

[184] In re Calpine Corp., No. 05-60200 (BRL), slip op. at 8 (Bankr. S.D.N.Y. Dec. 19, 2007); In re Tower Automotive, Inc., No. 05-10578 (ALG), slip op. at 16 (Bankr. S.D.N.Y. July 12, 2007).

[185] See Joint Memorandum of Law of the Debtors and the Official Committee of Unsecured Creditors in Response to the Objection of the Ad Hoc Committee of Noteholders of Global Crossing North America, Inc. to Debtors' Joint Plan of Reorganization, In re Global Crossing Ltd., No. 02-40188 (REG) at 35-36 (Bankr. S.D.N.Y. Dec. 3, 2002).

[186] In re Calpine Corp., No. 05-60200 (BRL), slip op. at 11 (Bankr. S.D.N.Y. Dec. 19, 2007); Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto, In re Calpine Corp., No. 05-60200 (BRL) at 13-14 (Bankr. S.D.N.Y. Dec. 13, 2007).

on a non-consolidated basis while the general unsecured claims were subject to "deemed consolidation" for voting and distribution purposes.[187] Deemed consolidation and separate classification for all general unsecured claims was justified in <u>Global Crossing</u> due to a "web of intercompany transactions that reflect both transfers of funds and assets indiscriminately throughout the Global Crossing group of companies in a manner intended to serve the interests of the whole enterprise."[188] Even assuming that these are legitimate reasons to separately classify notes claims from general unsecured claims, none of these reasons exist here.

Accordingly, the nature and origin of the CCI Notes Claims do not provide a legitimate reason for classifying those claims separately from CCI's General Unsecured Claims. <u>See</u> <u>In re Frascella Enters., Inc.</u>, 360 B.R. 435, 443 (Bankr. E.D. Pa. 2007) ("Unsecured claims, whether trade, tort, unsecured notes, or deficiency claims of secured creditors, are generally included in a single class because they are of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims.") (internal quotes and citations omitted).

2.   **The Mirror Note Does Not Provide a Legitimate Reason for Separate Classification**

The Mirror Note does not provide the CCI Noteholders with different legal rights vis-à-vis CCI than the CCI General Unsecured Claims. The Debtors have not pointed to a single provision in the Mirror Note that provides any support for this contention. Simply, none exists. The Mirror Notes are not security for the CCI Noteholders. Nor are the CCI Noteholders third-party beneficiaries of the Mirror Note. In fact, if the CCI Noteholders (or the Trustee on their behalf) had such rights, the Trustee would have voted the Mirror Note against the Plan, rendering the Plan unconfirmable. Once again, the Debtors cannot have it both ways. The Debtors cannot

---

[187] <u>In re Global Crossing Ltd.</u>, No. 02-40188 (REG), slip op. at 9, 33-34 (Bankr. S.D.N.Y. Dec. 26, 2002).
[188] Joint Memorandum of Law of the Debtors and the Official Committee of Unsecured Creditors in Support of Confirmation of Joint Plan of Reorganization, <u>In re Global Crossing Ltd.</u>, No. 02-40188 (REG) at 54 (Dec. 2, 2002).

take contradictory positions that the Mirror Note is for the sole benefit of CCI Noteholders and then completely ignore the purported beneficiaries' wishes with respect to the vote of such Mirror Note.

**3.      The Management Agreement Does Not Provide
a Legitimate Reason For Separate Classification**

The Management Agreement does not provide the CCI General Unsecured Creditors with different legal rights vis-à-vis CCI than the CCI Noteholders.  The Management Agreement does not grant CCI's creditors any rights whatsoever nor makes them third-party beneficiaries to the agreement.[189]  The only parties to the Management Agreement are CCI, CII, and CCO.[190]  The Debtors have not pointed to any portion of the Management Agreement (and indeed no portion exists) that contemplates recoveries for or provide rights to any other parties, including CCI's unsecured creditors.

In fact, the language of the Management Agreement supports classifying the CCI Notes and General Unsecured Claims together, not separately.  The Debtors point to section 3(a) of the Management Agreement, which provides for the reimbursement to CCI of certain liabilities as the justification for separately classifying the CCI General Unsecured Claims.[191]  Standing alone, section 3(a) is no basis for separate classification.   Nevertheless, in manufacturing their argument, the Debtors apparently failed to continue reading the remainder of section 3(a), which provides for the reimbursement to CCI of liabilities resulting from the incurrence of the CCI

---

[189] See Aug. 17 Tr. 209:21-23 (Doody) ("Q. But they're [CCI's general unsecured creditors] not third-party beneficiaries under the management agreement either, right?  A. No, they aren't.").
[190] LDTX 332 (6/19/2003 Amended and Restated Management Agreement) at 1.
[191] Section 3(a) of the Management Agreement states that the "'Reimbursement Management Fee' shall be equal to all expenses, costs, losses, liabilities, taxes, imposts, charges or damages incurred, paid or accrued by the Manager (without duplication and including, without limitation, all expenses, costs, losses, liabilities, taxes, imposts, charges or damages actually incurred, paid or accrued pursuant to the Mutual Services Agreements by any of the parties thereto) . . . in connection with: (i) its duties hereunder . . . ."  LDTX 332 (6/19/2003 Amended and Restated Management Agreement) at 4.

Notes.[192]   On its face, the Management Agreement makes no distinction between General Unsecured Claims and CCI Note Claims.  Thus, to the extent the Management Agreement is relevant at all, it supports classifying General Unsecured Claims and CCI Notes Claims together in a single class.

### 4.     The Debtors' Proffered Reasons for Separate Classification are Contrived, Not "Legitimate"

The Debtors' claim that the Management Agreement and Mirror Note justify separate classification are clearly contrived and belied by their own Plan.  The Plan classifies notes claims separately from general unsecured claims at <u>each</u> <u>and</u> <u>every</u> Debtor throughout the capital structure.[193]  But, the only Debtors that are parties to either the Management Agreement or the Mirror Note are CCI, Holdco, CII, and CCO.[194]  Thus, if such agreements were the basis for separate classification, why then provide the same classification scheme for all Debtors?  Obviously,  to obtain an impaired, non-insider accepting class. [195]  For instance, at CCH, the Plan separately classifies notes claims—CCH's largest and only legitimate claims—from the general unsecured claims.   The Debtors' Management Agreement and Mirror Note theory does not justify separate classification at CCH and was only thought of after the fact with respect to CCI because creditors of CCI objected to the classification.

The Second Circuit prohibits gerrymandering.  In the Second Circuit's own words:

> [A]pproving a plan that aims to disenfranchise the overwhelmingly largest
> creditor through artificial classification is simply inconsistent with the principles

---

[192] Section 3(a)(iv) of the Management Agreement states that CCI shall be reimbursed for, among other things, all expenses it incurs in connection with "financing."   LDTX 332 (6/19/2003 Amended and Restated Management Agreement) at 4.

[193] CX 189 (Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States' Bankruptcy Code dated 5/7/90) ("Amended Joint Plan of Reorganization") at 20-24.

[194] LDTX 332 (6/19/2003 Amended and Restated Management Agreement) at 1.

[195] As described below in section X INFRA, the general unsecured claims class at CCH did not actually contain any creditors and cannot be used to satisfy the requirements of section 1129(a)(10).

underlying the Bankruptcy Code. A key premise of the Code is that creditors holding greater debt should have a comparably greater voice in reorganization.

\* \* \*

Chapter 11 is far better served by allowing those creditors with the largest unsecured claims to have a significant degree of input and participation in the reorganization process, since they stand to gain or lose the most from the reorganization of the debtor. This Court thus holds that separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims.

Boston Post Rd., 21 F.3d at 483.

Here, the Debtors have disenfranchised the CCI Noteholders and in doing so have prevented CCI's largest creditor (by approximately no less than 250 times) from having the degree of input and participation in the reorganization process that the Bankruptcy Code requires. Boston Post Road is directly on point. The Court must deny confirmation.

**B.      The Debtors Artificially Impaired the CCI General Unsecured Claims Class to Achieve a Cram Down of the CCI Notes Claims**

The Debtors have failed to establish that their decision to impair certain CCI General Unsecured Claims by withholding a nominal amount of postpetition interest was "necessary for economical or other justifiable reasons and not just to achieve a 'cram down'" of the CCI Notes Claims. In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995).[196] To the contrary, the evidence in these cases has established that the artificial impairment of CCI General Unsecured Claims was manufactured to facilitate a cram down at CCI.

The Debtors' prior filings reflect their understanding that CCI General Unsecured Claims are not truly impaired under the Plan. On March 27, 2009, the Debtors filed their initial plan of

---

[196] In Fur Creations, this Court held that "[a]llowing an 'artificially impaired' class to satisfy the 11 U.S.C. § 1129(a)(10) requirement would nullify the protection it was designed to provide [to dissenting creditors] . . . and would promote 'side dealing' between debtor and selected creditors." 188 B.R. at 760 (citing Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.), 7 F.3d 127, 132 (8th Cir. 1993); In re Lettick Typografic, Inc., 103 B.R. 32, 39 (Bankr. D. Conn. 1989)).

reorganization, which —like their current Plan—provided for holders of CCI General Unsecured Claims to be reinstated or paid in full in cash at the Debtors' option.[197]   Under the terms of that initial plan, the Debtors classified holders of CCI General Unsecured Claims as <u>unimpaired</u> and, thus, non-voting.[198]   Had the Debtors maintained this initial voting designation, which designation is consistent substantively with economic reality of the distributions being made to holders of CCI General Unsecured Claims, there would be no legitimate argument that the Plan is not confirmable.[199]

The Debtors' current treatment of CCI General Unsecured Claims remains unchanged from the treatment first proposed last March.  On May 1, 2009—a mere 4 days prior to the hearing on the Disclosure Statement and only after the Trustee appeared in these cases and voiced initial concerns with the Plan—the Debtors modified the voting designation of all General Unsecured Claims (who the Debtors estimate will receive a 100% distribution under the Plan) to designate them as impaired and authorized to vote for or against the Plan.[200]   Not surprisingly, holders of CCI General Unsecured Claims whose votes were assured through payment in full voted unanimously to accept the Plan.  Had the Debtors offered to pay the CCI Noteholders in full absent postpetition interest, undoubtedly the CCI Noteholders would likewise have voted unanimously to accept the Plan.

---

[197] CX 707 ((Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States' Bankruptcy Code dated 3/27/09) ("Original Joint Plan of Reorganization); Aug. 17 Tr. 189:3-18 (Doody).
[198] Id.
[199] Specifically, holders of CCI Notes Claims voted overwhelmingly to reject the Plan.  CX Declaration 4 (Sullivan Declaration), Ex. A (reflecting rejecting votes of 82.45% in amount and 71.43% in number for the Class).  Absent the approval of this Class, which would have been the only impaired Class eligible to vote under the Debtors' original plan of reorganization, the Plan would have been unconfirmable.  <u>See</u> 11 U.S.C. § 1129(a)(10) (requiring acceptance of at least one impaired class as prerequisite to plan confirmation).
[200] <u>See</u> Amended Joint Plan of Reorganization at 24-25 [Docket No. 273]; <u>compare with</u> Original Joint Plan of Reorganization at 25; <u>see also</u> Aug. 17 Tr. 189:3-18 (Doody).

The Debtors have argued that the voting status of CCI General Unsecured Claims was reclassified as "impaired" on the eve of solicitation only to accurately reflect the fact that holders of such claims are not entitled to receive postpetition interest under the Plan. This type of slight of hand has been condemned by courts.[201] The Debtors' redesignation—which was filed with this Court only after the Debtors learned of the CCI Noteholders' potential opposition to the Plan—standing alone provides sufficient grounds for concluding that the "impairment" of the approximately $2 million in CCI General Unsecured Claims has been manufactured by the Debtors for the sole purpose of cramming down the nearly $500 million in CCI Notes Claims that voted to reject the Plan.[202]

The Debtors claim that the Plan does not provide for postpetition interest to the holders of CCI General Unsecured Claims because CCI is not entitled to reimbursement from CCO under the Management Agreement for any interest it pays its creditors.[203] Once again, the Debtors' interpretation ignores the plain language of the Management Agreement. The Management Agreement provides for CCI to be reimbursed for all costs, including interest obligations it incurs in fulfilling its obligations as Manager to CCO. Specifically, the Management Agreement provides that the "Reimbursement Management Fee" (i.e., the amount CCO is required to pay CCI) "shall be equal to **all expenses**, **costs**, **losses**, **liabilities**, **taxes**, **imposts**, **charges or**

---

[201] See Objection of Law Debenture Trust Company of New York to the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 575] (filed under seal) ("LDT Objection") at 25-26 (discussing In re Daly, 167 B.R. 734, 286-87 (Bankr. D. Mass. 1994) (holding that a last minute amendment to plan that impaired class was a clear attempt to gerrymander an accepting class and such artificially impaired class could not be used to satisfy the requirements of section 1129(a)(10))).

[202] The record clearly reflects that the Debtors did not anticipate the need to cram down the CCI Noteholders at the onset of these cases. Indeed, at the first-day hearing, Debtors' counsel introduced stressed that this was a "one issue case" dealing solely with the issue of reinstating the Debtors' existing bank debt. This expectation was echoed by the Debtors' financial advisor, Mr. Millstein, who stressed that he thought the CCI Noteholders would "thank their lucky stars" that they were receiving anything under the Plan. See July 21, Tr. 175:5-10 (Millstein).

[203] Debtors' Pretrial Brief at 50.

**damages incurred, paid or accrued** by the Manager [CCI] . . . ."[204]  Just as CCI is not entitled

to make a profit on the reimbursement it receives from CCO,[205] CCI is not required to bear any

loss (whether relating to interest, taxes, or any other liability).[206]  CCI is therefore clearly entitled

to reimbursement for any liability CCI incurs as Manager of the enterprise, including any interest

CCI may owe pursuant to contracts it has entered into with third-parties on behalf of the

operating companies.[207]  Moreover, even if the Debtors' interpretation of the Management

Agreement is correct—which it is not—nothing inside or outside the Management Agreement

prevents CCI from paying postpetition interest if it otherwise elects to do so.

The Debtors' response also misses the point: the question before this Court is not whether

CCI is capable of being reimbursed for the payment of interest, but whether CCI is capable of

paying such postpetition interest.[208]  In that regard, the Debtors have provided no evidence

whatsoever regarding the amount of interest, if any, that they intend to withhold in connection

with their cash distributions to holders of CCI General Unsecured Claims. Additionally, given

---

[204] LDTX 332 (6/19/2003 Amended and Restated Management Agreement) Section 3(a) (emphasis added).

[205] Id.

[206] See July 20 Tr. 40:14-19 (Basta) (classifying the Management Agreement as an "essentially pass-through mechanism.").

[207] The Debtors failed to provide this Court with the exact text of the Management Agreement contained above. Notwithstanding this undoubtedly purposeful omission, the Debtors raised a cryptic argument in a footnote (again, providing no actual quote to the Management Agreement itself) that because "the Management Agreement does provide for interest on certain other overdue payments," "the agreement's silence regarding interest payable on ordinary reimbursements indicates that no such interest is payable." Debtors' Pretrial Brief at 50, n.119 (citing doctrine of *expressio unius*). The Debtors are referring to a provision in the Management Agreement that relates to the payment of interest on a single, deferred inter-company debt, i.e., the Deferred Management Fee. The provision in question merely states that interest on this debt will accrue at the rate of 10% per annum. LDTX 332 at 5 ("Such deferred Existing Management Fee will bear interest (without duplication) at the rate of ten percent (10%) per annum . . . ."). Simply because the Debtors set a rate of interest on certain intercompany debt—as is logical—it does not follow that the Agreement must be read to preclude CCI from recovering interest on myriad claims whose rates of interest are logically not set specifically forth in the Agreement. The Debtors have failed to explain how interest is not a "liability" covered under the Management Agreement or how such liabilities would otherwise be covered by CCI given the Debtors' representations that it is a pass-through entity with few assets of its own. The reference to a rate of interest on the deferred Existing Management Fee does nothing to change the meaning of the terms used elsewhere in the Management Agreement, which are broader and whose reference unambiguously includes all manner of obligations, including interest.

[208] See Fur Creations, 188 B.R. at 760.

that the Debtors are retaining the exclusive right to determine which claims are reinstated and which claims are paid in cash, the true extent of the impairment for the CCI General Unsecured Claims class is known only to the Debtors. Even if the Debtors were to pay all CCI General Unsecured Claims in full on the Effective Date, any interest owing on approximately $2 million dollars of claims over a 6-month period would be normal given the Debtors' multi-billion dollar enterprise. The Debtors failed to present any evidence at the confirmation hearing that they ever considered whether CCI is capable of making the interest payment or should make the interest payment. On this point, the Debtors' General Counsel and Chief Restructuring Officer—who was the only witness that testified regarding the impairment of the CCI General Unsecured Claims—was unable to explain the basis for withholding interest to such creditors, noting only that, "they're not getting it, that's what makes them impaired."[209] The record, however, is clear that CCI's estate is capable of paying any postpetition interest that may be owed to holders of CCI General Unsecured Claims.[210]

The Debtors' mere option to retain postpetition interest, moreover, cannot create an impaired class because the withholding of interest arises solely from the debtor's exercise of discretion. See Windsor on the River, 7 F.3d at 132 ("[W]e hold that, for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion."). Notably, in Windsor, the Eighth Circuit rejected a debtor's

---

[209] See Aug. 17 Tr. 192:8-25, 193:1-22 (Doody) ("Q. So the impairment doesn't relate at all to whether CCI could be reimbursed for those claims under the management agreement, is that your testimony? A. I don't know if technically you can – I don't know if you can join those two, that because it relates to the management agreement that that somehow – and they're not – because they're not getting it, that's what makes them impaired. Now, I don't know if it's – I don't think it's because – just because it's not under the management agreement, that wouldn't make a whole lot of sense, but . . . ."); see also id. at 195:22-25 (Doody) ("If we don't provide for them getting the interest whether they were entitled to it or not, they are impaired . . . .").

[210] See CX 407 (Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization) at 3 (describing unilateral increase of $66 million in additional New Preferred Stock to be distributed to holders of CCI Notes as an "immaterial modification"); see also Aug. 17 Tr. 192:8-193:22 (Doody).

attempt to cram down approximately $9.9 million in secured claims through the affirmative vote of a single class of trade creditors, who held claims of approximately $13,000 and had been designated "impaired" only as a result of the debtor's decision to withhold payment in full for 60 days after the effective date.  Id. 132-33.  In rejecting this blatant artificial impairment, the Eighth Circuit stressed that, "[t]he only purpose to be served by the delay in payment . . . [was] to ensure approval by at least one 'impaired' class as required by section 1129(a)(10)."  Id. at 133.  Accordingly, the court held than no legitimate impaired class had voted in favor of the plan, concluded that confirmation of the plan had been improper, and, thus, reversed the bankruptcy court's confirmation order.  Id.

As in Windsor, the record here is devoid of any evidence that the Debtors are withholding interest with respect to the CII General Unsecured Claims for an economic or other justifiable reason.  While it is not the Trustee's burden to prove the contrary, the evidence has shown that (i) the interest that may be due to such creditors is nominal; (ii) CCI has sufficient assets to pay such claims directly; (iii) the decision to impair or reinstate a claim will be solely within the Debtors' control and (iv) the Debtors have retained the authority and discretion to reinstate and, thus, unimpair all holders of CCI General Unsecured Claims.  Given that the Debtors have presented no legitimate reason for impairing the CCI General Unsecured Class, the class of CCI General Unsecured Claims cannot be used to satisfy section 1129(a)(10)'s requirement that an impaired class vote to approve the plan at CCI.

## VI.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST HOLDERS OF CCI NOTES CLAIMS

Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an impaired class only if, *inter alia*, "the plan does not discriminate unfairly." 11 U.S.C. § 1129(b)(1).  The Debtors have failed to meet their burden to demonstrate that the Plan does not

discriminate unfairly against holders of CCI Notes Claims by providing them with a mere 32.7% recovery (at the Debtors' valuation) while reinstating or paying CCI General Unsecured Claims in full. In re Armstrong World Indus., Inc., 348 B.R. 111, 120 n.15 (D. Del. 2006) (stating the debtor must demonstrate compliance with section 1129(b)(1) by a preponderance of the evidence). Specifically, the Debtors have failed to show—as they are required—that: "(i) there is a reasonable basis for discrimination, (ii) the debtor cannot consummate the plan without the discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale." In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (applying the above "four-factor" test) (citations omitted); see also In re Dow Corning Corp., 244 B.R. 696, 701 (E.D. Mich. 1999) (advocating the more stringent "Markell test", which requires a debtor to overcome a rebuttable presumption that the plan unfairly discriminates).[211]

In their Response and at trial, the Debtors have attempted to deflect their burden by positing that 1129(b)(1) is not implicated because the CCI General Unsecured Claims and the CCI Notes Claims are not "similarly situated" as they benefit from different sources of recovery.[212] The premise of the Debtors' argument is flawed. Neither the Mirror Note nor the Management Agreement affords the holders of CCI General Unsecured Claims or the holders of CCI Notes Claims distinct or special entitlements. The holders of CCI Notes and the holders of

---

[211] Many courts have criticized the four-factor test as being inaccurate and redundant and have adopted the Markell test, which they believe more accurately gauges whether a proposed plan unfairly discriminates. See LDT Objection at 29-29; see also Dow Corning, 244 B.R. at 707-03; Armstrong World Indus., 348 B.R. at 121-22; In re Sentry Operating Co. of Tex., Inc., 264 B.R. 850, 863-64 (Bankr. S.D. Tex. 2001). Regardless of what test this Court chooses to apply, however, the Debtors' failure to demonstrate a reasonable basis for the discrimination and to prove that the plan could not be consummated if the CCI General Unsecured Claims were given the same recovery as the CCI Notes Claims renders the Plan unconfirmable. See In re Lernout & Hauspie Speech Prods., N.V., 301 B.R. 651, 660 (Bankr. D. Del. 2003) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."), order aff'd, 308 B.R. 672 (D. Del. 2004).
[212] Debtors' Pretrial Brief at 68.

CCI General Unsecured Claims may only recover against CCI's estate and thus are similarly situated.[213]   As a result, the CCI Notes Claims and the CCI General Unsecured Claims are unquestionably "similarly situated."

In any event, the requirements of 1129(b)(1) and the corresponding four-factor and Markell tests cannot be circumvented by irrelevant differences in the legal origins of classes of claims.   Rather, a debtor must show that its plan does not unfairly discriminate whenever a dissenting class is receiving a materially less favorable recovery than another class of creditors that is entitled to the same priority level under the Bankruptcy Code as the dissenting class.[214]

The Debtors' sole attempt to satisfy the "four-factor" test is relegated to a footnote in their Response which states "the Management Agreement constitute[s] a  good faith, reasonable basis for disparate treatment" and "the Debtors would not be able to consummate the Plan if it provided for a par recovery to the CCI Noteholders."[215]   As described above, the Management Agreement does not provide a reasonable basis for disparate treatment.   Nor does any reasonable basis exist.   For instance, while some courts have held that providing essential creditors to a reorganized debtor with greater recoveries than non-essential creditors is a reasonable basis for disparate treatment, the CCI General Unsecured Claims class is entirely composed of non-essential creditors, such as former employees, litigation claimants, and rejection damages claimants.   Indeed, the Debtors have paid all essential creditors pursuant to their first-day critical trade vendor order.[216]

---

[213] See supra A.2 and A. 3.

[214] See Sentry Operating, 264 B.R. at 865 ("The 'does not discriminate unfairly' requirement in § 1129(b) protects each class of creditors against involuntary loss of their equal distribution rights *vis a vis* other creditors of equal rank."); see also Dow Corning, 244 B.R. at 702 ("the purpose to be served by the unfair discrimination provision of § 1129(b)(1) is . . . to provide for equal treatment for all creditors holding the same priority level . . . .") (footnote omitted).

[215] Debtors' Pretrial Brief at 68, n.165.

[216] Order Authorizing Payment of Prepetition Claims of Trade Creditors in the Ordinary Course [Docket No. 172].

The Debtors' inability to obtain an impaired, accepting class absent the disparate treatment, moreover, cannot satisfy this requirement as it would sanction the type of gerrymandering that the Second Circuit prohibited in <u>Boston Post Road</u>.

The Debtors have also failed to demonstrate that the proposed disparate treatment was arrived at by good faith bargaining.[217] The record is clear that the holders of CCI Notes—CCI's largest creditors by almost 250 times—were excluded from the negotiating table while the Debtors grossly preferred a much smaller group of former employees and non-essential creditors in an effort to simply garner votes.[218]

Finally, the Debtors have failed to identify any case law approving a plan that provided creditors entitled to equal priority under the Bankruptcy Code with such grossly disparate treatment as is proposed in this case. Indeed, courts uniformly reject plans on the basis of unfair discrimination that propose to provide disparate treatment of 50% or more to similarly situated creditors.[219]

## VII.   THE PLAN IS NOT FAIR AND EQUITABLE

### A.   The CCI Settlement Compensates Paul Allen for His Equity Interests and, Thus, Violates the Absolute Priority Rule

As originally noted in the Trustee's Objection, the CII Settlement violates the absolute priority rule by transferring massive value to Mr. Allen on account of his junior interests while dissenting senior creditors are paid less than full. <u>Motorola, Inc.</u> v. <u>Official Comm. of Unsecured Creditors</u> (<u>In re Iridium Operating LLC</u>), 478 F.3d 452, 463 (2d Cir. 2007) ("a settlement presented for approval as part of a plan of reorganization . . . may only be approved if it, too, is

---

[217] <u>See</u> <u>Buttonwood Partners</u>, 111 B.R. at 63 (finding discriminatory provision in plan that provided secured creditors with slightly different interest rates had been arrived at through good faith bargaining where the party receiving the lower interest rate was actively involved in negotiations).
[218] <u>See</u> sections I.C and I.F supra.
[219] <u>See</u> LDT Objection at 29-30 (collecting cases).

'fair and equitable' in the sense of conforming to the absolute priority rule") (citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968)).

The Debtors admit that distributions to Mr. Allen and/or his affiliates under the CCI Settlement are on account of his equity interests, including (i) his shares of Class A Common Stock of CCI; (ii) his vested options to acquire shares of Class A Common Stock of CCI; and (iii) his shares of Class B Common Stock of CCI.[220]  The Debtors retreated from this position—arguing that compensation to Mr. Allen under the CII Settlement was exclusively on account of his contractual rights—only after the Trustee objected to such distributions as being improper under the absolute priority rule.[221]  Notwithstanding their representations to the contrary, it is clear that distributions to Mr. Allen under the CII Settlement are exclusively on account of his equity interests.

The testimony in these cases has established that the two main sources of consideration provided by Mr. Allen in exchange for the New Class B Stock (and other consideration he is receiving under the Plan) are his agreements to (i) preserve existing NOLs and (ii) facilitate the reinstatement of the Debtors' existing bank debt.[222]  The Debtors have argued that distributions to Mr. Allen in connection with the foregoing are based on, among other things, his contractual rights under the Exchange Agreement, not his existing equity interests.[223]  As such, they contend that there is no nexus between Mr. Allen's equity interests and distributions under the Plan.  This argument is misleading and incorrect.

---

[220] See JPX 266 (Disclosure Statement) at 26-27. XV
[221] Debtors' INFRA Pretrial Brief at 63, n.151.
[222] See I.A.3.
[223] See INFRA XV A.3..

51

The Exchange Agreement provides Mr. Allen with the right to effectuate an equity exchange.[224] The Debtors have made clear that they seek to avoid the legal consequences of that equity exchange, i.e., the loss of NOLs and the inability to reinstate the Debtors' existing bank debt. Neither of the aforementioned effects, however, is caused by the Exchange Agreement itself, but rather by the volume of equity that Mr. Allen owns and would be authorized to exchange thereunder. Stated differently, absent Mr. Allen's equity holdings, the Exchange Agreement is irrelevant. Thus, the Debtors' desire to prevent the effects of an equity exchange (and to make a corresponding payment to ensure that that exchange is not effectuated) can be viewed only as being inextricably tied to, or "on account of," Mr. Allen's equity holdings.

The Debtors are compensating Mr. Allen for his controlling equity interest and the damage he could cause to the estates as a result thereof. Any such distribution, even if expedient under the circumstances, violates the absolute priority rule where, as here, senior, dissenting creditors have rejected the Plan and are not being paid in full.[225]

### B. The Plan Siphons Substantial Value from CCI for the Benefit of Junior Stakeholders and Creditors of Other Debtors

The Plan is neither fair nor equitable because it: (i) fails to account for CCI's value as a going concern, including the value of the Company's NOLs; (ii) fails to account for Holdco's value as a going concern, including the Company's trademarks and programming contracts, (iii) provides Mr. Allen with $180 million of consideration for his participation in the Plan while failing to compensate CCI for its participation in the Plan, which was just as necessary, and (iv) provides a multi-billion dollar windfall to the Crossover Committee and Mr. Allen by relying on a deficient valuation report.

---

[224] LDTX 355 (2/6/09 email from Smit to Board re Board meeting today).
[225] See 11 U.S.C. § 1129(b)(2)(B)(ii).

52

### 1.    <u>CCI is Not Receiving Value for its Net Operating Losses</u>

The record is clear that the NOLs allocated to CCI belong to CCI and not the Charter enterprise.  First, the Debtors admit in their SEC filings that the NOLs belong to CCI.[226]  The accuracy of these filings was confirmed by the Debtors' CEO.[227]  Second, the testimony elicited in the trial conclusively supports that CCI owns the NOLs.[228]  In addition, CCI sought and received a ruling from the Internal Revenue Service concerning the favorable treatment of the NOLs under the Internal Revenue Code based on the representation that CCI was a "loss corporation" that held the NOLs.[229]

In contrast, the Debtors have not produced any credible evidence that the NOLs belong to any party other than CCI.  The testimony of the Debtors' CRO and General Counsel, Gregory Doody, was completely implausible when he tried to assert that when the Debtors' 10-K says that CCI owns the NOLs, that is not what they meant to say.[230]  Any suggestion that CCI is not the rightful owner of the NOLs is also contrary to the Debtors' course of dealings with respect to the allocation of NOLs to Mr. Allen.

NOLs were appropriately "passed through" to CII and CCI as partners of Holdco, resulting in more than $8 billion of losses being allocated to each of CCI and CII as of December 31, 2007.[231]  Because CII, as a subchapter S corporation, is a flow through entity for tax

---

[226] LDTX 239 (CCI's 2008 10-K) at 30, F-36; LDTX 444  (CCH's 2007 10-K) at 1, 13.

[227] July 22 Tr. 73:5-76:9 (Smit).

[228] July 21 Tr. 167:15-18 (Millstein); Sept. 2 Tr. 154:3-19 (Conn).

[229] JPX 345 (4/6/09 Letter Request to the IRS); CX 415 (7/21/09 IRS Letter Ruling).  A "loss corporation" is "a corporation entitled to use a net operating loss carryover or having a net operating loss for the taxable year in which the ownership change occurs."  26 U.S.C. § 382(k)(1).

[230] Aug. 17 Tr. 40:5-41:14 (Doody).

[231] LDTX 417 (Analysis of Book and Tax Losses Allocated to Allen Entities and CCI); LDTX 239 (CCI's 2008 10-K) at F-36 (discussing how taxable income, gains and losses are passed through to CCI and CII).

purposes, the losses allocated to CII were available to Mr. Allen to offset his personal income.[232] No one has suggested that Mr. Allen's use of the NOLs was improper, nor have the Debtors ever asked Mr. Allen to give those NOLs back to Charter or to compensate Charter for his use of such NOLs.[233] If, as the Debtors' assert, the NOLs belong to the Charter operating companies, it must follow that the NOLs were not properly allocated to CII and Mr. Allen. In that event, Mr. Allen should be writing a large check to either the United States Treasury or the Charter enterprise, or perhaps both.

Despite their previous admissions and the inconsistency with respect to their treatment of Mr. Allen's NOLs, the Debtors claim that CCI does not own the NOLs.[234] The Debtors' litigation position is premised on the faulty assumption that the Charter companies are members of an affiliated group of corporations filing a consolidated U.S. Corporate Income Tax Return (Form 1120).[235] This is not the case. The Charter operating companies that generated the NOLs are disregarded entities for tax purposes and the NOLs, therefore, flow through to the operating companies' owner Charter Holdco.[236] This is consistent with the consolidated financial statements filed for the operating companies with the Securities Exchange Commission which reflect deferred tax assets of only $119 million (not the $8 billion the Debtors now claim) as of December 31, 2007, primarily relating to state-level NOL carryforwards.[237] Charter Holdco is a partnership for U.S. tax purposes which is neither subject to taxation nor allowed to deduct NOLs for purposes of computing its partnership taxable income for allocation to its partners.[238]

---

[232] 26 U.S.C. § 1366; Sept. 2 Tr. 31:24-32:15 (Conn) (recognizing that CII is an S corporation and the NOLs allocated to CII passed through to Mr. Allen).
[233] Sept. 2 Tr. 31:22-32:13, 154:13-155:17 (Conn).
[234] Debtors' Pretrial Brief at 64-66.
[235] See 26 U.S.C. §§ 1501, 1502; 26 C.F.R. § 1.1502-1.
[236] See 26 C.F.R. § 301.7701-2.
[237] LDTX 444 (CCH's 2007 10-K) at F-44.
[238] See 26 U.S.C. §§ 701, 703(a)(2)(D).

Charter Holdco, therefore, properly allocated the NOLs to CCI and CII pursuant to the Amended and Restated Limited Liability Agreement for Charter Holdco.[239]

Finally, it is uncontroverted that the NOLs have significant value to CCI. CCI expects to be able to retain the ability to use $4 billion or more of its existing NOLs after emerging from bankruptcy.[240] The Debtors' advisors have estimated the value of preserving the NOLs at approximately $1.14 billion.[241] Nevertheless, the current creditors of CCI are not receiving any benefit under the current Plan from the NOLs.

### 2. CCI's Participation in the Plan is Worth No Less than $180 Million

In describing the value being distributed to Mr. Allen in connection with the Allen Settlement, Mr. Conn testified that a distribution of $180 million is "at the low end of fair for Paul."[242]

Given that the testimony reflects that CCI is just as necessary as Paul Allen to the preservation of NOLs and existing bank financing,[243] even if the court were to conclude that CCI is not the rightful owner of the NOLs, it is simply not fair and equitable to compensate Mr. Allen $180 million for his participation in the Plan and not make any corresponding distribution to CCI's creditors for the preservation of this entity. Simply, the two positions are irreconcilable. Either the Allen Settlement is not fair and equitable as a consequence of overpaying Mr. Allen or the CCI treatment is not fair and equitable as a consequence of underpaying CCI.[244] The Debtors cannot have it both ways.

---

[239] JPX 13 (10/31/2005 Limited Liability Company Agreement of CCHC, LLC).
[240] LDTX 233 (3/3/09 PricewaterhouseCoopers, "Project Missouri M&A Tax Due Diligence" Report) at 7 .
[241] CX Declaration 6 (Goldstein Declaration), Ex. B.
[242] Sept. 2 Tr. 176:18-21 (Conn).
[243] See section I.A.3. infra.
[244] That is not to say that if Mr. Allen decided to relinquish his distributions, the CCI treatment would be fair and equitable. Mr. Allen sits in a fiduciary capacity and will still enjoy the benefit of a substantial tax mitigation.

### 3. Holdco is Not Receiving Value for its Trademarks and Programming Contracts

Holdco owns the Company's trademarks and the Company's programming contracts.[245] As described in section VIII B. below, these assets are valuable and part and parcel of Holdco's going concern value. Without the benefit of Holdco's trademarks, the Debtors would be forced to establish a new mark at a considerable expense. Likewise, the Charter enterprise could not deliver cable programming to its customers without Holdco's programming contracts. Similar to the value of CCI's NOLs, the value of Holdco's programming contracts and trademarks are being given to non-stakeholders of Holdco without paying Holdco's creditors in full in violation of the absolute priority rule.

### 4. The Lazard Valuation Is Not Sufficient to Justify CCI's Treatment

It is the Debtors' burden—not the Trustee's—to produce a valuation of the reorganized Debtors as of the Effective Date.[246] The Debtors have failed to meet this burden. Rather, the Debtors have relied on the out-dated Lazard valuation, which was as of March 23, 2009 and premised on public market multiples that have since risen as much as 40%.[247] Indeed, even Mr. Millstein suggested that the valuations be updated.[248] Given the moves in the market since its preparation, the Debtors cannot rely on a valuation as of March to justify a valuation as of September. Simply, there is no evidence in the record that justifies the disenfranchisement of the CCI Noteholders.

---

[245] See LDTX 252 (4/10/09 Charter Communications Holding Company, LLC Summary of Schedules), Exs. B-27 and G-1 through G-11.

[246] See S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373, 392 (E.D. Tex. 2000) ("Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date."); see also In re Mirant Corp., 354 B.R. 113, 129 (Bankr. N.D. Tex. 2006) (advising the parties "that it anticipated requiring a recalculation of value based on the changes in trends in commodity prices" because gas prices were running much higher than the estimates used in the debtor's valuation), aff'd, 308 F. App'x 824 (5th Cir. 09).

[247] See section II supra.

[248] July 21 Tr. 154:16 (Millstein) ("So we should revisit it in September and see who's right.").

Morever, the Debtors' conflicting valuation testimony demonstrates that the valuation contained in the Lazard valuation was never credible.[249]  Testimony from the Trustee's expert Mr. McDonough and the Debtors' own expert Mr. Den Uyl[250]—reveals that the Lazard valuation is based on flawed methodology and assumptions, including, among other things:

- Valuing the entire Charter enterprise despite dealing with debt on an entity-by-entity basis.[251]

- Relying upon Public Market Multiples at trough in the market.[252]

- Placing minimal weight on Precedent Transactions.[253]

- Normalizing Precedent Transactions to account for trough in market.[254]

- Using Mediacom for Comparable Company Analysis but excluding Mediacom when Calculating WACC, relying on comparable companies.[255]

- Failing to apply a Control Premium to arrive at value based on Comparable Companies Approach even though Mr. Den Uyl used 40% control premium.[256]

- Using the hypothetical cost of debt, not actual cost of debt, for the DCF analysis and therefore failing to capture the value of below-market bank debt to be reinstated under Plan.[257]

- Using pessimistic growth rates and EBIDTA in DCF analysis even though the Company has continued to achieve double-digit EBITDA and Mr. Den Uyl used significantly higher rates.[258]

- Excluding transactions with targets having less than one million subscribers from the precedent transaction analysis even though Mr. Den Uyl included such transactions.[259]

---

[249] See section II supra.
[250] In contrast, neither Mr. Goldstein nor Mr. Millstein was ever proffered as an expert.
[251] Sept. 1 Tr. 101:11-24 (McDonough).
[252] Aug. 3 Tr. 140:7-14 (Den Uyl).
[253] Aug. 3 Tr. 176:12-17 (Den Uyl); Sept. 1 Tr. 73:25 - 74:15 (McDonough).
[254] Sept. 1 Tr. 85:2-18 (McDonough).
[255] Sept. 1 Tr. 96:13-18 (McDonough).
[256] Sept. 1 Tr. 82:6-21 (McDonough).
[257] Sept. 1 Tr. 91:18-93:17 (McDonough).
[258] Sept. 1 Tr. 95:17-24 (McDonough).
[259] Aug. 3 Tr. 174:14-17 (Den Uyl).

In sum, the Debtors' valuation is outdated and is not and was not ever credible. Thus, the record is insufficient to permit confirmation of the Plan. Moreover, if confirmed, this Plan will provide the new owners of CCI—i.e., the Crossover Committee and Paul Allen—with a multi-billion dollar windfall, a result that is anything but fair and equitable.

### 5. The Plan Violates the Supreme Court's Ruling in LaSalle

In LaSalle, the Supreme Court did not limit its concerns to the nuances the Debtors seek to debate here, i.e., whether the equity distribution being made to a controlling shareholder was truly "on account of" that shareholder's controlling interest or "on account of" the consideration being provided by that shareholder in exchange for the equity distribution. See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 454 (1999) (describing various interpretations of the meaning of the term "on account of" and stating that the question of "[w]hich of these positions is ultimately entitled to prevail is not to be decided here . . . ."). The concern addressed by the Court in LaSalle was far simpler—the improper use of exclusivity to propose a plan that impairs senior creditors for the benefit of the insider. As noted by the Court, that exclusive opportunity should "be treated as an item of property in its own right . . . . Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interests extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection." Id. at 455-56. It is the maintenance of exclusivity and, in the case of CCI, the inability of the CCI Noteholders to compete for the control or ownership of the CCI estate that implicates LaSalle.

As an initial matter, although it did not conclusively resolve the issue, the Court in LaSalle rejected the argument that the phrase "on account of" as used in section 1129(b)(2)(B)(ii) of the Bankruptcy Code means in direct "exchange for"—as the Debtors seem

to suggest—and acknowledged that the better reading of the phrase is "because of," recognizing that all that is required to activate the absolute priority rule is "a causal relationship between holding the prior claim or interest and receiving or retaining property . . . ." Id. at 451. Indeed, the only decision cited by the Debtors for the proposition that the Plan does not violate LaSalle —which, as noted below, is readily distinguishable—recognized this flexible approach to determining whether there is a nexus between a distribution and existing equity holdings:

> Causation between the old equity's holdings and subsequent property substantial enough to disqualify a plan would presumably occur on this view of things whenever old equity's later property would come at a price that failed to provide the greatest possible addition to the bankruptcy estate, and it would always come at a price too low when the equity holders obtained or preserved an ownership interests for less than someone else would have paid.

In re PWS Holding Corp., 228 F.3d 224, 238 (3d Cir. 2000) (quoting LaSalle, 526 U.S. at 453) (footnote omitted). Notwithstanding the Debtors' assertions to the contrary, there is an undeniable nexus between Mr. Allen's equity holdings and the distributions he is receiving under the Plan.

The Debtors' reliance on the Third Circuit's decision in PWS Holding, is misplaced. In PWS Holding, the Third Circuit found that releases granted to the debtors' controlling shareholder under the plan were not barred under LaSalle because such releases were unlikely to have any value and that claims would be potentially costly to pursue (creating possible indemnification obligations, if successful). PWS Holding, 228 F.3d at 239, 242. Stated differently, because the releases had no value, the Third Circuit found no causal connection between providing a benefit to the controlling shareholder and the controlling shareholder's control over the debtors. Id.

Further, the Third Circuit's holding in <u>PWS Holding</u> was expressly limited to releases which have no value.  In its closing remarks on absolute priority, the court stressed that it was announcing an extremely narrow rule:

> This is not to say that a reorganization plan can transfer assets whenever the Trustee or the Debtor in Possession judges that to do so would be in the best interest of the reorganized entity.  Rather, **we announce a narrow rule** that, without direct evidence of causation, releasing potential claims against junior equity does not violate the absolute priority rule in the particular circumstance in which the estate's claims are of only marginal viability and could be costly for the reorganized entity to pursue."

<u>Id.</u> at 242 (emphasis added).

In <u>PWS Holding</u>, the court also relied heavily on the record, which it noted contained no evidence that the releases were sought out or in any way priced by existing equity.  <u>Id.</u> at 239. Here, the record is replete with evidence that Mr. Allen and parties acting on his behalf exercised extensive control over this negotiation process leading to the CII Settlement and, ultimately, sought out and set a price for the consideration he and his affiliates are receiving under the Plan.[260]  In fact, his absolute control was made clear to everyone when he threatened to fire the board if he did not get his way.[261]

Unlike <u>PWS Holding</u>, the Plan at issue here involves significant value flowing to Mr. Allen, including, among other things, cash, equity, notes and the mitigation of substantial tax liability that might not be achievable under a different plan construct.  It is this very ability of Paul Allen to control the plan construct and prevent, for instance, a liquidation of CCI that is squarely within <u>LaSalle</u>'s prohibitions.

---

[260] See supra section I.G.
[261] LDTX 186 (2/9/09 email from McCafferty re CHTR Update).

## VIII.   THE PLAN FAILS THE BEST INTERESTS OF CREDITORS TEST UNDER SECTION 1129(A)(7) OF THE BANKRUPTCY CODE

The Debtors bear the burden of establishing that the best interests of creditors test has been satisfied and the holders of CCI Notes Claims are receiving property under the Plan that has a present value equal to what such creditors would recover in a chapter 7 liquidation.  See, e.g., ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 364 (S.D.N.Y. 2007), order aff'd, 544 F.3d 420 (2d Cir. 2008).  To carry their burden, the Debtors need to present plausible, complete evidence as to the current value of their assets.  See, e.g., In re Rusty Jones, Inc., 110 B.R. 362, 373-74 (Bankr. N.D. Ill. 1990).  The Debtors must also present evidence and assign recovery values to any potential causes of action, including actions to avoid preferences or fraudulent transfers.  In re Zaleha, 162 B.R. 309, 316 (Bankr. D. Idaho 1993) (declining to confirm the debtor's plan of reorganization, which did not value potential causes of action); In re Future Energy Corp., 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988) ("In ascertaining what creditors would receive in a hypothetical Chapter 7 liquidation, the Court is required to assign a value to possible recoveries in actions to avoid preferential or fraudulent transfers.") (citation omitted).

Here, the Debtors have failed to present plausible, complete evidence necessary to demonstrate that the holders of CCI Notes Claims will receive more under the Plan than they could otherwise receive in a hypothetical liquidation.

The Debtors have presented no expert testimony in support of their Liquidation Analysis, which was neither sworn to nor signed.  While the record indicates that the Liquidation Analysis was prepared by the Debtors' management with their advisors Kirkland & Ellis, Lazard and

AlixPartners,[262] the Debtors only presented the testimony of Mr. Doody to support the Liquidation Analysis. Mr. Doody's testimony, however, lacked credibility and is entitled to no weight because he did not have personal knowledge regarding significant parts of the Liquidation Analysis and relied upon the advice of counsel for which privilege was not waived. Specifically, Mr. Doody had no personal knowledge regarding the intercompany loans and receivables included in the Liquidation Analysis,[263] and could not even distinguish between a receivable owing to Holdco from CCO and a payable owing from Holdco to CCO.[264] Remarkably, Mr. Doody also did not have an understanding regarding how subordination works in bankruptcy.[265] Simply, Mr. Doody's testimony regarding how recoveries to CCI's creditors were calculated cannot be credited.

The Debtors have failed to put forward any credible evidence that they ever analyzed the recoveries and claims available to CCI or the value of the consideration being provided to CCI Noteholders under the Plan. The only exception was a preliminary analysis of certain preference and insider payments which was not even included in their Liquidation Analysis. In any event, any analysis performed is tainted by irreconcilable conflicts of interest. The Debtors and their advisors cannot adequately represent the interests of CCI stakeholders in pursuing potential inter-debtor claims and/or causes of action as against other debtors that are also represented by those same advisors.[266] Their assessment of potential recoveries would therefore be entitled to no weight.

---

[262] Aug. 17 Tr. 99:4-16 (Doody).

[263] Aug. 17 Tr. 110:22-111:4 (Doody) ("I relied on Ms. Schmitz, who is the CFO, to provide the intercompany -- analysis of the intercompany loans and receivable").

[264] Aug. 17 Tr. at 105:5-108:5 (Doody).

[265] Aug. 17 Tr. at 102:20-104:21 (Doody).

[266] Section 327 of the Bankruptcy Code requires that professionals be "disinterested" and not hold or represent any interest adverse to the estate. See, e.g., Bank Brussels Lambert v. Coan (In re Arochem Corp.), 176 F.3d 610, 620-21 (2d Cir. 1999); In re Vebeliunas, 231 B.R. 181, 187 (Bankr. S.D.N.Y. 1999).

The only expert testimony in the record regarding the best interest of creditors test, and the only evidence entitled to any weight, is that of the Trustee's expert Edward McDonough, who testified that the Debtors substantially overvalued the consideration being provided to the CCI Noteholders and substantially undervalued the assets available to CCI for distribution by systematically ignoring or excluding obvious potential sources of recovery.

## A. The Debtors Overvalue the Consideration the Holders of CCI Notes Claims Will Receive Under the Plan

The best interest of creditors test requires an accurate valuation of the consideration flowing to creditors under the proposed plan, and here the Debtors have overvalued the consideration going to the holders of CCI Notes Claims under the Plan. See, e.g., In re Prudential Energy Co., 58 B.R. 857, 864, 868 (Bankr. S.D.N.Y. 1986) (chapter 11 debtors' joint plan of reorganization could not be confirmed over dissenting vote of debenture holders where value of new stock to be distributed to them under plan was speculative and unsupported by evidence). Specifically, the Debtors overvalue the New Preferred Stock that is being distributed to the CCI Notes Claims under the Plan at its face value, i.e., $138 million.

The New Preferred Stock that will be issued to the holders of CCI Notes Claims will be in a distinct minority position in the Company's capital structure. As the Trustee's expert Mr. McDonough explained, a discount should be applied in valuing securities that are in such a minority position.[267] Accordingly, Mr. McDonough testified that any proper valuation of the New Preferred Stock would require a discount of at least 20% to account for its minority position.[268] Such testimony is uncontroverted by any other expert testimony. That neither Mr.

---

[267] Sept. 1 Tr. 112:6-24 (McDonough).
[268] Sept. 1 Tr. 106:20-109:21 (McDonough); LDT Demo 19. This discount is prior to accounting for, among other things, the New Preferred Stock's dividend rate and liquidation preference, all of which would require additional

Allen nor the Crossover Committee, who together controlled who got what, opted to receive New Preferred Stock under the Plan further demonstrates that the Debtors' valuation of those securities is suspect at best.

If a 20% discount is applied to the face value of the New Preferred Stock to account for its minority position, the holders of CCI Notes would receive approximately $134.9 million under the Plan, i.e., $110.4 million on account of the New Preferred Stock (face value of $138 million discounted by 20%) and $24.5 million in cash.[269]

### B. The Debtors' Liquidation Value Fails to Account for Numerous Potential Sources of Recovery at CCI and Holdco

The Debtors' Liquidation Analysis fails to ascribe value to numerous sources of value that would be recovered by holders of CCI Notes Claims in the event of a liquidation of both CCI and Holdco. The Trustee identified the following categories of potential recovery which, if included, would materially increase the distributions available to CCI's creditors in a liquidation:

| Potential Source of Recovery[270] | Potential Value |
|---|---|
| • Mirror Note Recovery of Charter Holdco Other Assets[271] | $9,000,000 |
| • January Interest Payment | $27,000,000 |
| • November CCH Interest Payment | $8,400,000 |
| • October Tender Offer for CCH Notes | $99,000,000 |
| • Q2 2008 Repurchase of CCH Notes | $35,000,000 |
| • Preference Payments – CCI and Charter Holdco | $3,400,000 |
| • Insider Payments | $22,400,000 |

downward adjustments to reflect the actual value being provided under the Plan. Sept. 1 Tr. 106:20-109:21 (McDonough); LDTX Demonstrative 19.

[269] Sept. 1 Tr. 113:11-114:2 (McDonough); LDT Demo 23.

[270] LDT Demo 24.

[271] As discussed above, pursuant to Holdco's Mirror Note, any allocable value or recovery to Holdco is distributed to CCI on account of the seniority granted to CCI on the Mirror Note as a debt claim. See JPX 266 at Ex. E (Liquidation Analysis) at 11, Note N. As such, for purposes of the Liquidation Analysis, recoveries to Holdco are treated as recoveries to CCI and the holders of CCI Notes Claims.

- CCVIII Settlement      $28,000,000
- Intercompany Receivable from CCO      $119,000,000
- Management Services Agreement Receivable      $37,000,000
- Other Assets (Programming Contracts, Intellectual Property, Real Estate, Litigation Claims)      <u>Unvalued</u>

**Total Potential Recoveries Unaccounted for by Debtors:    $388,200,000**

Each of the different sources of recovery identified above present potential sources of recovery which must be valued to determine what the holders of CCI Note Claims would receive in a liquidation and, thus, must receive under the Plan. By failing to provide recoveries to CCI creditors that exceed the likely value of these claims (and effectively risk adjusting recoveries at 0% without any supporting analysis), the Debtors have failed to meet their burden.

**<u>Charter Holdco Other Assets ($9 Million)</u>.** The Debtors' Liquidation Analysis does not account for approximately $9 million, comprised of cash and cash equivalents, security deposits and accounts receivable, which the Debtors identified on their schedules as Holdco assets.[272] Although the Debtors acknowledged that these assets are property of Holdco,[273] they have not updated their Liquidation Analysis to include these funds. Accordingly, this $9 million amount must be included as part of any recovery flowing to the holders of CCI Notes Claims in a liquidation.

**<u>January Interest Payment ($27 Million)</u>.** On or about February 11, 2009, Holdco paid approximately $75 million to satisfy outstanding interest payments on certain of its subsidiaries' notes.[274] As discussed above, the funds for this transfer were obtained by compromising Holdco's valid intercompany receivable from CCO.[275]

Also as discussed above, the Debtors arranged for approximately $48 million of the interest payment to be placed in escrow. However, no such provision was made for the remaining $27 million that was transferred away from Holdco.[276]

---

[272] See LDTX 252 (Holdco Summary of Schedules) at Schedules B-1 and B-2 (listing $2,594,579 in cash and cash equivalents), B-3 (listing $2,841,865 in security deposits), and B-16 (listing $3,549,752 in accounts receivable).
[273] Debtors' Pretrial Brief at 42.
[274] LDTX 284 (9/14/07 CCI Form S-4/A) at 9-10.
[275] Supra at I.A, I.B, and I.I.
[276] The Debtors have failed to offer any legitimate explanation why $27 million of the $75 million transfer was not also included in the escrow to protect the recoveries of CCI's creditors, nor have they presented any analysis regarding whether the $27 million transfer would be recoverable pursuant to an action for avoidance of a constructively fraudulent transfer, actual fraud, breach of fiduciary duty or otherwise. Sept. 1 Tr. 121:8-19 (McDonough).

Without presenting any analysis or supporting documentation, the Debtors have asserted that Holdco received adequate consideration because the interest payment ensured that the Company was able to prepare for bankruptcy and Holdco was receiving more under the Plan than it would in a liquidation.[277]  Given that neither CCI nor Holdco are receiving any distribution under the Plan on account of their equity interests, the only conceivable benefit that either of these entities could have received from this transfer would have been improved recoveries against CCO over what would have been recovered against that entity in a free-fall bankruptcy.  The record, however, indicates that had the January Interest Payment not been made, Holdco would have made a full recovery on the intercompany receivable owed by the solvent CCO in a liquidation.[278]  There is no testimony to the contrary.  At best, some of the Debtors' witnesses claim that they do not actually know what would have happened in a free-fall bankruptcy in February.[279]  Such speculation is insufficient to establish that the funds were not recoverable.  The evidence demonstrates that valid claims against CCO would have been fully recoverable.  The $27 million balance could be recovered under a theory of fraudulent transfer, preference, breach of fiduciary duty or unjust enrichment.  The Debtors bear the burden and have not demonstrated that Holdco would have received less in a liquidation where this transfer was not made than it did under the Plan as a result of making the transfer.

**The April, October and November Transactions.**  As discussed above (supra Section I.A, I.B, and n.456), the Company effected three transactions between April and November of 2008 that drew down on valid intercompany receivables and reduced the assets of Holdco by approximately $142 million.  The Debtors have failed to offer any explanation or analysis regarding whether these transactions would be recoverable pursuant to an avoidance action, breach of fiduciary duty, unjust enrichment or otherwise.[280]

The record demonstrates that Holdco is not receiving reasonably equivalent value from the above-referenced transfers.  Indeed, Holdco will only recover 0.4% on the face value of the CCH notes it purchased in April and October for a total recovery of $140,000 and $408,000 on investments of $35 and $99 million, respectively.[281]

With respect to the April and October repurchase of CCH notes, the Debtors have suggested that those transactions are not avoidable because they are protected from

---

[277] Debtors' Pretrial Brief at 41-42.

[278] Sept. 2 Tr. 54:8-55:10 (Conn) (Vulcan was not concerned about its intercompany receivable against CCO because CCO was solvent and even if Company filed for bankruptcy CCO would be able to pay on that receivable); 165:13-21 (when asked whether he could conceive of a set of circumstances in which CCO would not pay its receivable, Conn identified a nuclear holocaust).

[279] Aug. 17 Tr. 130:14-131:10 (Doody, conceding that in a liquidation prior to payment of the January Interest Payment that Holdco's intercompany balance would have been larger but contending that no one knows what would have happened in a free fall bankruptcy with respect to Holdco's recovery on that intercompany balance)

[280] Sept. 1 Tr. 125:23-126:15 (November interest payment); 127:18-128:15 (October tender offer); 130:1-12 (April note repurchase) (McDonough).

[281] LDT Demo 26; JPX 266 at 6 (Disclosure Statement, showing the estimated recovery under the Plan for Class E-4, the CCH Notes Claims, is 0.4%).

avoidance under section 546(e) of the Bankruptcy Code, which generally insulates "settlement payments" made in connection with securities transactions.[282] However, the Debtors have not presented any analysis to support this conclusory assertion. Moreover, the Debtors' claim that section 546(e) would bar recoveries, even if true, does not account for other potential causes of action such as breach of fiduciary duty.[283]

**Preference Payments ($3.4 Million to $18.9 Million).** The Debtors identified approximately $200.3 million in payments made by Holdco and CCI within the 90 day preference period prior to filing for bankruptcy.[284] Although the Debtors did not include any recoveries related to preference payment in their Liquidation Analysis, the Debtors have projected that Holdco and CCI would recover between $3.4 million and $18.9 million from preference payments.[285] Thus, any analysis of what the holders of CCI Notes Claims would receive in a liquidation should at a minimum include the midpoint of the Debtors' own projected recoveries (i.e., approximately $11 million) from preference payments.

The Debtors' suggestion that it would be unlikely for a distressed buyer to pursue preference actions is without merit.[286] As the Debtors' Liquidation Analysis does not assume that either CCI or Holdco would be sold, there is no basis to assume that a chapter 7 trustee would not pursue preference payments to maximize the recoveries to CCI and Holdco's creditors in a liquidation.[287] Similarly, the Debtors have presented no analysis to support their suggestion that CCO could have a recoupment claim for any recoveries that were ultimately obtained by Holdco and CCI.

**Insider Payments ($22.4 Million).** The Debtors identified approximately $22.4 million in payments made by CCI to insiders within one year immediately preceding the Debtors' bankruptcy filing.[288] However, the Debtors did not include any recoveries related to insider payments in their Liquidation Analysis.

---

[282] Debtors' Pretrial Brief at 43.

[283] The Debtors also do not account for a cause of action based on a theory of collapsing the transaction. Multilateral transactions may be "collapsed" under certain circumstances and treated as phases of a single transaction for purposes of determining whether a fraudulent transfer has taken place. See, e.g., HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995).

[284] See CCI's Statement of Financial Affairs [Docket No. 139] at Attachment 3b and 3c; Holdco's Statement of Financial Affairs [Docket No. 5 in Case No. 09-11442] at Attachment 3b and 3c.

[285] CX Declaration 5 (Folse Declaration) at ¶ 17-18. The range of potential recoveries depends in part on whether certain executory contracts were assumed. Mr. Folse admitted during his testimony that a strategic acquirer of the Debtors' businesses would likely not want to assume vendor contracts. Aug. 18 Tr. 35:14-36:13 (Folse). To the extent no executory contracts are assumed, potential recoveries on the preferences to non-insiders would be in the range of $9.6 million to $18.9 million. CX Declaration 5 (Folse Declaration) at ¶ 17.

[286] Aug. 17 Tr. 76:19-77:5 (Doody).

[287] Sept. 1 Tr. 187:10-20 (McDonough, noting that CCI and Holdco are not being sold and therefore assuming that chapter 7 trustee would pursue claims). A chapter 7 trustee is required to maximize the recoveries of creditors in a liquidation. In re Balco Equities Ltd., 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005); In re WorldCom, Inc., 401 B.R. 637, 650 (Bankr. S.D.N.Y. 09).

[288] See CCI's Statement of Financial Affairs [Docket No. 139] at Attachment 3c.

Without providing any underlying analysis, the Debtors have projected recoveries not to exceed $9 million from insider payments.[289] Notwithstanding the Debtors' own projections, they did not include any recovery from insider payments in their Liquidation Analysis.[290] At a minimum, any analysis of what the holders of CCI Notes Claims would receive in a liquidation should include at least $9 million in recoveries from insider payments.

Similar to the recoveries from preference payments, the Debtors have suggested that it would be unlikely for a distressed buyer to pursue claims against management to recover on insider payments.[291] Again, there is no basis to suggest that a chapter 7 trustee would not seek to recover insider payments to maximize the recoveries to CCI and Holdco in a liquidation.[292]

**CCVIII Settlement ($28 Million).**  In February 2009, a litigation settlement agreement was executed between a certain law firm and four Charter entities: Holdco, CCI, CC V Holdings, LLC and Charter Communications Holding Company, LLC.[293]  The settlement agreement required the law firm to pay approximately $54 million to the four Charter entities, after accounting for the payment of approximately $5 million in attorneys fees.[294]  The Debtors' Liquidation Analysis does not provide for any recovery to CCI related to the CCVIII Settlement.

In connection with modifying the Plan on or about July 15, 2009, the Debtors modified the treatment of the CCI Notes Claims to include a distribution from the CCVIII settlement funds, in an amount, if any, that the Bankruptcy Court determines is owned by CCI and Holdco.[295]  However, any recovery is capped at $26 million,[296] and the Debtors failed to account for the remaining $28 million of the $54 million settlement amount.[297]

The only evidence put forward on this issue was the testimony of Mr. Doody, who admitted that he was not involved with the settlement and did not have any personal knowledge regarding the fees and expenses associated with the settlement.[298]  As such,

---

[289] CX Declaration 5 (Folse Declaration) at ¶ 24; Aug. 18 Tr. 48:10-23; 51:7-52:7 (Folse).

[290] Sept. 1 Tr. 132:15-17 (McDonough).

[291] Aug. 17 Tr. 78:16-24 (Doody).

[292] Sept. 1 Tr. 187:10-20 (McDonough noting that CCI and Holdco are not being sold and therefore assuming that chapter 7 trustee would pursue insider payment claims).

[293] CCI's Statement of Financial Affairs, Attachment 2; LDTX 429 (Mutual Release and Settlement Agreement).

[294] LDTX 429 (Mutual Release and Settlement Agreement) at 3.

[295] CX 407 (Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code) at 3.

[296] CX 407 at 3.  The "Litigation Settlement Fund Proceeds" are defined as "the $26,428,089 in litigation settlement proceeds (after fees and expenses) being held in escrow pursuant to the February 10, 09 Escrow Agreement by and among CCI, Holdco, CCH, CC V Holdings, CCO, and Wilmington Trust (as escrow agent)."

[297] Sept. 1 Tr. 135:16-36:3 (McDonough).  CCI and Holdco expressly reserved their right to pursue the total amount of the settlement amount in the escrow agreement.  LDTX 198 (Escrow Agreement) at 3-4 (reserving the right to commence any legal or other action to collect any of [sic] all of the Settlement Amount (including the Escrow Amount…)").

[298] Aug. 17 Tr. 144:13-145:15, 147:2-17, 151:13-25 (Doody).

his testimony should be given no weight and the Debtors should be required to account for the remaining $28 million in their Liquidation Analysis.

**Intercompany Receivable from CCO ($119 Million).**  As of March 26, 2009, Holdco and CCI had an intercompany balance due from CCO in the amount of $132 million that was valid and owing.[299]  The Debtors only included $13 million in their Liquidation Analysis for recoveries to Holdco based on intercompany receivables (consisting of an "intercompany loan from CCO" in the amount of $13 million).[300]  The Debtors have offered no legitimate explanation regarding why the remaining $119 million is not included in the Liquidation Analysis as an asset of Holdco and CCI.

The Debtors bear the burden of explaining why the $132 million receivable that existed on March 26 was written down to $13 million in the Liquidation Analysis.  The Debtors' CRO and General Counsel, Mr. Doody, testified that the Debtors reduced the intercompany receivables owing to Holdco and CCI by $74.9 million for payments made under the first and second day motion relief granted in this action.[301]  However, the Debtors have not provided any basis to reduce the intercompany receivable by the payments made in connection with the first and second day motion relief.  Specifically, the Debtors have not presented any evidence that the $74.9 million of expenditures made in connection with the first and second day orders would have been made in a chapter 7 liquidation.[302]

Additionally, the Debtors have failed to establish the reliability of the document which forms the basis for Mr. Doody's testimony.  Mr. Doody relied on LDTX 267, but that document is designated as a "draft" and contains a total intercompany balance that is no where to be found in the Debtors' Liquidation Analysis.[303]

Similarly, the Debtors have not presented any evidence other than the testimony of Mr. Doody to support their assertion that there would be no recovery in a liquidation on the portion of the intercompany receivable related to stock options.[304]  Under GAAP accounting standards, it would not be appropriate to eliminate the portion of Holdco and CCI's intercompany receivable relating to stock options merely because such stock options have been forfeited or become worthless.[305]

---

[299] LDTX 273 (Analysis of Holdco and CCI's Intercompany Balance due from CCO); Aug. 3 Tr. 67:12-18 (Schmitz); Sept. 1 Tr. 136-37 (McDonough).

[300] JPX 266 (Disclosure Statement), Exh. E at 6, Note G (the Debtors included $13 million from intercompany loans owing from CCO).

[301] Aug. 17 Tr. 71:1-74:16 (Doody).

[302] Sept. 1 Tr. 205-206 (McDonough).

[303] LDTX 267.

[304] Mr. Doody testified that a chapter 7 trustee would "be hard pressed to make a distribution" based on the $48.2 million in stock options that had been forfeited.  Aug. 17 Tr. 71:25-74:16 (Doody).

[305] Sept. 1 Tr. 139-40 (McDonough).  The Debtors' Chief Accounting Officer Kevin Howard acknowledged that pursuant to GAAP the Debtors had recorded a payable in their financial statements related to the stock options and that if they did not believe they were going to have to pay that amount the financial statements would be erroneous. Sept. 1 Tr. 227:23-228:7 (Howard).

**Management Services Agreement Receivable ($37 Million).**  The Debtors' Liquidation Analysis reflects a $7 million receivable from CCO to Holdco on account of outstanding obligations under the Management Services Agreement.  It appears from the Debtors own disclosures that the amount of this receivable should be much higher.  Specifically, Note K to the Debtors' original Liquidation Analysis listed a "Management Services Agreement Receivable" in the amount of $44 million payable from CCO to Holdco, which had been "offset by $38 million from the voluntary forfeiture of stock options by various Charter employees[.]"[306]  The Debtors ultimately deleted this disclosure from the Liquidation Analysis, but fail to offer any explanation regarding how the $44 million accounted for in their Liquidation Analysis.

**Other Assets Which Have Not Been Properly Valued by the Debtors.**

Programming Contracts.  The Debtors assert that none of the programming contracts held at CCI and/or Holdco would have value in a liquidation.[307]  However, in the Disclosure Statement, the Debtors acknowledge that programming costs are their largest operating expense.[308]  The Debtors further expect programming costs to continue to increase and caution that there is no assurance that expiring programming contracts will be renewed on favorable or comparable terms.[309]  Thus, to the extent the programming contracts held by CCI and Holdco include below-market rates or have long terms, such contracts would have value which should be analyzed and potentially included in a Liquidation Analysis.[310]

The Debtors nonetheless assert, without presenting any evidence or analysis, that all the programming contracts are at market and would have no value in a liquidation.[311]  The Debtors' contention is belied by the fact that the Debtors have not rejected a single programming contract.[312]  Furthermore, the Trustee's expert Mr. McDonough identified at least five programming contracts that may have value based on their terms, and there may be many other contracts that have similar terms which would have value to a prospective buyer in a chapter 7 liquidation.[313]  The burden is on the Debtors to show they have properly assessed and accounted for those programming contracts, and they have failed to meet their burden.

Intellectual Property.  The Debtors have also failed to value any of the intellectual property held by Holdco and CCI.  The Debtors have not presented any evidence that they analyzed the potential value of such intellectual property in connection with preparing their Liquidation Analysis.  By contrast, the Plan provides Mr. Allen with the

---

[306] See LDTX 428 (Debtors' Original Disclosure Statement), Ex. E, Note K (listing $44 million payable).
[307] July 31 Tr. 134:12-15 (Schmitz).
[308] JPX 266 (Disclosure Statement) at 84.
[309] Id.
[310] Sept. 1 Tr. at 140-143 (McDonough); LDT Demo 28.  Mr. Doody acknowledged that having a contract with locked-in programming rates for several years could be valuable.  Aug. 17 Tr. 165-66 (Doody).
[311] Aug. 17 Tr. 166:5-24; 169:13-170:4 (Doody).
[312] Aug. 17 Tr. 172:15-17 (Doody).
[313] Sept. 1 Tr. 140:24-143:4 (McDonough); LDTX Demonstrative 28.

option to have the reorganized Company obtain an independent appraisal of the fair market value of Holdco's tangible and intangible assets, including intellectual property.[314]

Real Estate.   The Debtors' Liquidation Analysis assumes the sale of the Company's headquarters building, which belongs to Holdco, would generate $15 million in liquidation value.[315]   However, the evidence in the record reflects that the value of Holdco's headquarters is between $30 and $45 million.[316]   The Debtors offer no explanation for these inconsistencies.

Litigation Claims.   The Plan also includes broad releases, and the Debtors have made no attempt to analyze or value the potential causes of action which would be available to Holdco and CCI in a liquidation.[317]

## C.      Impact of Potential Recoveries on Liquidation Analysis and Best Interest of Creditors Test

The Debtors' Liquidation Analysis includes only the $82 million to $83 million that the holders of CCI Notes Claims would receive on account of the Holdco Mirror Note and otherwise ignores any additional value that could be recovered by CCI for the benefit of its creditors.  The Trustee's expert identified approximately $388 million in additional recoveries that the Debtors have not properly analyzed in connection with their Liquidation Analysis.  Of that amount, the Debtors now acknowledge that the CCI Noteholders would, at a minimum, be entitled to recover on (i) the $9 million in other Holdco assets that the Debtors acknowledge belong to Holdco, (ii) certain preference payments to non-insiders, which the Debtors have projected to be between $3.4 million and $18.9 million (taking the midpoint of the Debtors' projected recoveries would be approximately $11 million), and (iii) certain insider payments, which the Debtors have

---

[314] JPX 266 (Disclosure Statement) at 32.
[315] LDTX 310, Ex. E at 11 (Note M) (stating that the $15 million estimate is based on an "informal indication of estimated market value").
[316] Sept. 1 Tr. 230:7-231:13 (Debtors' Vice President of Finance and Treasurer Tom Degnan testified that the building was worth between $40 and $45 million)(McDonough); Sept. 1 Tr. 234-35 (Debtors' Vice President of Corporate Finance Matt Derdeyn)(McDonough); LDTX 252, Ex. A-1 (Holdco's Summary of Schedules).
[317] JPX 266 (Disclosure Statement) at 96-97.

projected to be $9 million. Thus, the starting point in calculating the recovery of the CCI Noteholders in a liquidation should be at least $111 million.

It is clear that even a small recovery from the claims and causes of action identified above would result in the holders of CCI Notes Claims receiving more (in cash) in a liquidation than they would (largely in non-cash consideration) under the Plan. The holders of CCI Notes Claims are receiving approximately $134.9 million in consideration under the Plan, after properly accounting for the actual value of the New Preferred Stock (see supra Section VIII.A). Assuming a starting recovery of $111 million as set forth above, and ascribing absolutely no value to the intellectual property, programming contracts, undervalued real estate and other litigation claims, a 6% recovery from the remaining sources of recovery would provide the CCI Noteholders with more in a liquidation than they would receive under the Plan.[318] Even using the Debtors' valuation of the consideration going to CCI Notes Claims under the Plan (i.e., $162.5 million), a recovery of approximately 14% would provide the CCI Noteholders with more in a liquidation than they would receive under the Plan. In other words, it would only require a very small recovery from the other identified sources to allow the holders of CCI Notes Claims to obtain more in a liquidation than under the Plan.

The Debtors have effectively risk adjusted significant potential recoveries at 100%, concluding that there will be $0 additional recoveries. This determination is simply not credible. The Debtors have not presented any evidence they evaluated the claims and potential sources of recovery identified by the Trustee. Indeed, the Debtors' management and advisors who sat in conflict as potential defendants with respect to certain claims, have displayed a conscious

---

[318] Sept. 1 Tr. 146:15-147:7 (McDonough) (testifying that there would only need to be about a 5% recovery on the additional recoveries for the CCI Noteholders to get more in a liquidation than under the plan, noting that the "hurdle is fairly low… it's a bunt single.")

disregard for the many transfers that have siphoned value away from CCI's creditors, and their failure to properly analyze whether CCI could recover on those transfers and the other sources of recovery, standing alone, prevents the Debtors from satisfying the best interest of creditors test, as well as provides a further example of the Plan's lack of good faith.

# IX.  THE DEBTORS' NON-ORDINARY COURSE VOTES WITH RESPECT TO THE HOLDCO NOTES CLAIMS AND CCH NOTES CLAIMS ARE VOID

In its Objection, the Trustee noted that CCI's vote with respect to the Mirror Note is outside the ordinary course of the Debtors' business, and requires Court approval under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 to be given any effect[319] and, given the inherent conflict raised by the intercompany claims at issue, must be shown to be entirely fair.[320]  Indeed, in response to the Trustee's objection to the Debtors' voting procedures,[321] the Debtors agreed that the propriety of CCI's vote of the Mirror Note would be reserved for confirmation.[322]

Yet, in their Pretrial Brief, the Debtors did not respond to the Trustee's arguments, did not request authority to vote the Mirror Note and did not provide any evidence at trial that any corporate oversight was exercised or official authorization provided for the casting of such vote. As a consequence, the vote cast by CCI with respect to the Mirror Note must be disregarded as, among other things, an ultra vires act rendering the Plan unconfirmable.[323]

---

[319] See, e.g., In re Remsen Partners, Ltd., 294 B.R. 557, 564 (Bankr. S.D.N.Y. 2003) (noting that a proposed compromise of a breach of contract claim held by the estate must receive "the informed independent judgment of the bankruptcy court", and finding that proposed settlement was not in the best interest of the estate where the settlement would likely not result in any distribution to unsecured creditors); In re Leslie Fay Cos., 168 B.R. 294, 304-05 (Bankr. S.D.N.Y. 1994) (postpetition agreement, which purported to settle significant prepetition claims of union and contained terms different from any similar agreement into which the parties had previously entered, fell outside of debtor's ordinary course of business, and was unenforceable absent notice and a hearing pursuant to section 363(b) and Bankruptcy Rule 9019).

[320] LDT Objection at 56-60.

[321] Objection of Law Debenture Trust Company of New York to the Debtors' Motion for Entry of an Order, Inter Alia, Approving the Disclosure Statement, Forms of Ballots and Master Ballots, and Establishing Procedures for Voting on the Plan [Docket No. 249] at 11-14.

[322] May § Tr. 84. 84: 17-22 (Disclosure Statement Hearing)  ("We have clarified… that the voting procedures that we seek approval of today will not affect the right of the CCI Noteholders to later come in and argue that vote should be disregarded or designated…").

[323] "As defined by decisional law, void acts are those acts that are not performed in the interest of the corporation, irrespective of whether or not they are authorized by a corporation's certificate of incorporation."  Solomon v. Armstrong, 747 A.2d 1098, 1114 (Del. Ch. 1999) (citing Michelson v. Duncan, 407 A.2d 211, 218-19 (Del. 1979)), aff'd, 746 A.2d 277 (Del. 2000). Void acts include *ultra vires* acts, which are "specifically prohibited by the corporation's charter, for which no implicit authority may be rationally surmised, *or those acts contrary to basic principles of fiduciary law*." Id. at 1114 n.45 (emphasis added).  Void acts, including those that are *ultra vires*, "are

Since filing the Objection, the Trustee has learned that Holdco's affirmative vote of its CCH Notes (which are scheduled to receive a distribution of less than 0.4% under the Plan) was necessary to cause the CCH Notes Claims Class to accept the CCH Plan. Said another way, absent such vote, the third-party public holders of CCH Notes actually voted to reject the CCH Plan. The Trustee is aware of no disclosure by the Debtors, whether in their Disclosure Statement or otherwise, that voting by Holdco of the CCH Notes might be necessary to cause the CCH Notes Claims to accept the CCH Plan. Instead, the Debtors first bury this fact in their Response with a casual and dismissive reference to votes of "insiders" and otherwise force everyone to parse through the voting certifications to figure out just what is going on.[324] Only after such parsing can the facts surrounding the CCH Plan revealed. Facts that the Debtors not only fail to highlight for this Court's attention, but deliberately try to sweep under the rug in the hope that no one, and particularly not this Court, noticed. The Trustee noticed. The facts are more fully described in section X hereof.

Like CCI's vote of the Mirror Note, Holdco's vote of the CCH Notes is a non-ordinary course transaction that (if given effect) would compromise a valid intercompany claim without any approval from this Court. For all of the reasons noted in the Objection, this vote must also be disregarded.

The record demonstrates that the Board did not adequately consider whether those votes were fair to CCI and Holdco. Indeed, the record is clear that other than voting to support the Plan generally, the Board did not meet or make any determination that the Mirror Note or CCH

---

legal nullities incapable of cure." Apple Computer, Inc. v. Exponential Tech., Inc., No. 16315, 1999 WL 39547, at *6 (Del. Ch. Jan. 21, 1999). The Trustee respectfully requests that this Supplemental Objection also be treated as a motion to set aside the Debtors' votes with respect to the Holdco Notes Claims and the CCH Notes Claims as *ultra vires* acts.

[324] Debtors' Pretrial Brief at 25 (stating "Class A-4 Notes Claims (and, excluding Insiders, Class E-4 CCH Notes Claims) voted to reject the Plan.").

Notes should be voted in favor of the Plan.[325]  Instead of scrutinizing these transactions and/or making any independent determination whatsoever regarding the vote of the Mirror Note or the CCH Notes, someone at the Debtors simply assumed that they were authorized to vote all of the securities that they held in favor of the Plan (regardless of the proposed treatment) because they were proponents of the Plan.  Indeed, Mr. Doody testified that "the board approved the plan of which we are proponents, so we assumed that, you know, we would be voting all interests that we could vote in favor of the plan."[326]

The record is clear, however, that the Board never considered the individual interests of any of the Debtors and only considered the Plan on an enterprise basis.  One can only speculate what might have happened if the Debtors had exercised even a modicum of appropriate corporate governance with respect to these cases, particularly after the concerns of the Trustee were communicated to Kirkland & Ellis.  Had the Board considered the propriety of voting the CCH Notes in favor of the Plan, perhaps the Board would have questioned whether it was entirely fair for Holdco to agree to accept $400K on a $100 million investment made merely a few months prior to bankruptcy.  Had the Board considered the propriety of voting the Mirror Note in favor of the Plan, perhaps the Board would have considered whether Holdco should have been compensated for the systematic invasion of its intercompany accounts for the benefit of the rest of the enterprise.  Perhaps the Board would have considered whether CCI, as a necessary party to accomplish the "Debtors'" own plan objectives, should have been provided compensation equal to that provided to its "partner", Mr. Allen.  The list can go on and on.

Mr. Doody was not permitted to simply "assume" how the Holdco Notes and CCH Notes should be voted.  The votes <u>needed</u> to be cast.  A fully informed decision <u>needed</u> to be made at

---

[325] Aug. 17 Tr. 207:24-209:2 (Doody); CX 255 (2/10/09-2/11/10 board minutes).
[326] <u>Id.</u>

the time the ballots were cast. Because casting such votes represents an action outside the ordinary course of business involving related parties, the Debtors were required to demonstrate to this Court that whatever decision was made with respect to such votes, such decision was entirely fair.

Even after the above issues were raised, the Debtors made no attempt to cure their corporate governance defects. The Debtors' absolute failure to appropriately cast and then present for this Court's review the votes by CCI with respect to the Mirror Notes and the votes of Holdco with respect to the CCH Notes is perhaps the climax of the complete corporate governance breakdown on the part of the Debtors that pervaded this entire process. Because the Debtors presented no evidence and sought no relief with respect to these insider votes, the record and for the reasons set forth in the Trustee's Objection, the Plan is fatally flawed and the Plan cannot be confirmed.

## X. THE CCH PLAN HAS NOT BEEN ACCEPTED BY A LEGITIMATE IMPAIRED CLASS AND IS, THUS, UNCONFIRMABLE

The record in these cases has clearly established that beginning in April 2008, and ending mere weeks prior to the filing of these chapter 11 cases, the Debtors repeatedly compromised Holdco's assets to, among other things, funnel massive amounts of funds to CCH for the benefit of that entity's subsidiaries and creditors. As described above in section [ ], these transfers resulted in the loss of approximately $169 million in Holdco assets.[327] Given the sheer volume of the aforementioned transfers, it is beyond dispute that Holdco's creditors and by extension, the CCI Noteholders, have a vested interest in Holdco's claims against CCH under the Plan, the vast

---

[327] Although Holdco transferred $75 million to CCH to effectuate the January Interest Payment, $48 million of this payment was deposited in escrow by members of the Crossover Committee to be returned to Holdco in the event that the Plan is not approved. See id. Notably, however, the Plan does not provide for Holdco's creditors to receive such payments in cash, but only provides for the recovery of such escrowed amounts in the event of liquidation. JPX 266 (Disclosure Statement) at 22, 35.

majority of which are currently in the form of the CCH Notes Claims held at Holdco. Holdco voted its CCH Notes in favor of the Plan. In the absence of such vote, the CCH Notes voted to reject the Plan. As set forth in Section IX, such vote should be disregarded.

Even if it is not disregarded, Holdco's vote with respect to its CCH Notes Claims is an insider vote that cannot be counted for purposes of delivering an impaired accepting class at CCH.[328] Accordingly, the Debtors' only other option for satisfying section 1129(a)(10) at CCH was to obtain the acceptance of holders of CCH General Unsecured Claims, which is the only other impaired class that is entitled to vote at that Debtor. However, the CCH General Unsecured Claims is not a legitimate accepting Class.

As an initial matter, no holder of CCH General Unsecured Claims cast a vote to accept or reject the Plan.[329] Rather, the Debtors relied on a provision in the "Voting Procedures Order" to contend that, in the absence of any votes with respect to any CCH General Unsecured Claim, that class would be deemed to accept the Plan.[330] Although deemed acceptance has been used by courts in Southern District of New York in the past to avoid the need to cram down the class where no votes were cast, see, e.g., In re Adelphia Commc'ns Corp., 368 B.R. 140, 260 (Bankr. S.D.N.Y. 2007), order aff'd, 544 F.3d 420 (2d Cir. 2008), the Trustee is aware of no decision where (as attempted here) a deemed accepting class with no votes has been used to satisfy Section 1129(a)(10) to cram down or otherwise drag along approximately $600 million in notes in a class that voted to reject the Plan excluding insider.

---

[328] See 11 U.S.C. § 1129(a)(10) (required impaired accepting class must be "determined without including any acceptance of the plan by an insider").

[329] See Debtors' Pretrial Brief at 25, n.66 (designating Class E-3 (the CCH General Unsecured Claims) as a class for which no votes were cast, but which was deemed to have accepted the Plan pursuant to Exhibit E ¶ 7(h) of the Disclosure Statement Order).

[330] Id.

Given that what these Debtors are asking this Court to do is unprecedented and of questionable legitimacy, it is astonishing that nowhere have the Debtors highlighted for this Court (not to mention parties in interest) in a single, coherent statement that (i) non-insiders holding CCH Notes Claims voted to reject the Plan and (ii) the only basis for cramming down or dragging along those creditors is the deemed accepted vote of a class where no votes were cast. Instead, one must tie together random facts and parse through the voting certifications and the Debtors' schedule to figure out what is really going on. And it is only upon such investigation that one discovers the full extent of the truth.

Specifically, upon examination of CCH's Schedules one discovers that only one creditor was scheduled as holding a general unsecured claim (other than a CCH Notes Claim) against CCH.[331] That creditor's claim against CCH, however, is based on a surety bond[332] which is being assumed under the Plan,[333] has previously been afforded super-priority administrative claim status[334] and, consequently, is not properly classified as a general unsecured claim for voting purposes. Stated differently, the reason why no creditors cast a vote in such class is that no creditors exist. The Debtors might as well created an impaired class of unicorns,[335] and when no unicorns voted, deemed the unicorn class to be their impaired accepting class for purposes of satisfying 1129(a)(10).

The offensiveness of the use of this imaginary class is exceeded only by the Debtors' lack of candor. The Trustee should not have been obligated to parse through the records to uncover

---

[331] See LDTX 479 (4/10/09 Charter Communications Holdings, LLC Schedules of Assets and Liabilities) at Ex. F-2.
[332] Id. (listing contingent, unliquidated claim held by Travelers Casualty and Surety Company of America as being based on surety bonds).
[333] See Amended Joint Plan of Reorganization at Article VII.A. (providing for deemed assumption of such executory contracts, unless listed on Exhibit 24 of the Debtors' Plan Supplement) and Plan Supplement at Exhibit 24 (not listing surety bonds held by Travelers Casualty and Surety Company of America as being rejected under the Plan).
[334] See Final Order Authorizing Debtors to Enter Into the Dip Surety Bond Program at ¶ 7 [Docket No. 194].
[335] Unicorns are mythical creatures that exist only in fairy tales. Merriam Webster, 10th ed. at 1291 (1993).

the truth on something as basic as whether 1129(a)(10) has been satisfied. More important, this Court should not be expected to make such an extraordinary ruling without at least having the Debtors explain just what they are asking for. The Debtors' conduct on this point is unconscionable and simply a further example of their lack of good faith.

Finally, even if the Court is prepared to accept an explanation regarding the Debtors' conduct, no explanation can solve the Plan's fundamental infirmities. Regardless of whether the class is deemed to have voted in favor of the Plan, if there are no creditors, there are no impaired creditors. No matter how it is analyzed, the CCH General Unsecured Claims Class is not an impaired accepting class. The CCH Plan per se is not confirmable.

## XI.    THE HOLDCO PLAN IS NOT CONFIRMABLE

In its Objection, the Trustee raised a number of infirmities with respect to the Holdco Plan.[336] The Debtors failed to address these infirmities in their reply or introduce any evidence with respect to the issues raised.

It is undisputed that Mr. Allen's wholly-owned subsidiary, CII, is retaining a direct equity interest in Holdco (although on a diluted basis) while CCI is receiving a mere 3.9% recovery on its Holdco Notes Claims.[337]  If CCI's vote on the Holdco Note is disregarded, see section XI, there can be no clearer violation of the absolute priority rule. To date, the Debtors have failed to provide any evidence or legal argument in support of this distribution to an existing equity holder while dissenting, impaired creditors are paid less than the full amount of their claims. See 11 U.S.C. § 1129(b)(2)(B)(ii).

Further, although CII (and, consequently, Paul Allen) is receiving a direct recovery on account of its equity interest in Holdco, CCI's creditors (to whom all residual value in Holdco

---

[336] LDT Objection at 56-62.
[337] See JPX 266 (Disclosure Statement) at 27; LDT Objection at 60.

should flow) are receiving nothing. On its face, this is discriminatory treatment for which the Debtors have provided no explanation, justification or support. Again, although this argument was raised in the Trustee's Objection, the Debtors have failed to offer any evidence justifying such disparate treatment. Thus, the Debtors have failed to meet their burden and the Plan is unconfirmable.

Finally, for the same reasons identified in the Objection[338] and further delineated in sections V and VI above with respect to the CCI Plan, the Holdco Plan also (i) artificially impairs Holdco General Unsecured Claims and (ii) unfairly discriminates in favor of such claims by reinstating or paying them in full while Holdco Notes Claims are scheduled to receive distributions of merely 3.9%. Here too, the Debtors' failed to respond. Having neither responded to the above objections nor presented any evidence in the record to support the Holdco Plan, the Debtors have failed to meet their burden to demonstrate that Holdco Plan satisfies the requirements of section 1129(b) and section 1129(a)(10). As such, the Holdco Plan is unconfirmable.

## XII. DISTRIBUTIONS UNDER THE PLAN ARE BASED ON AN IMPROPER AND FLAWED SUBSTANTIVE CONSOLIDATION

As discussed in the Trustee's Objection and noted in the A&M Report, the record in these cases makes clear that the Debtors only performed an enterprise valuation of their assets. Having never performed an entity by entity valuation, the Debtors ignored the value of assets held directly by CCI and/or Holdco on a stand-alone basis.[339] Notwithstanding this consolidated approach to asset valuation, the Debtors adhere to corporate separateness when determining how

---

[338] LDT Objection at 56-62.
[339] See Sept. 1 Tr. 101:11-24 (McDonough).

and in what priority value is to be distributed.[340]   As noted in the Objection, this one-sided substantive consolidation of only the asset side of the equation is flawed.  If the substantive consolidation of the Debtors' assets is indeed warranted in determining the Debtors' enterprise value, the debt owed to CCI and its subsidiaries must also be viewed on a consolidated basis in determining the minimum distributions such parties must receive for the Plan to be confirmable.

The record is clear that the Debtors' failure in this regard has harmed the CCI Noteholders.  Under full consolidation, aggregate recoveries on account of CCI Notes Claims would increase by an estimated $85 million on the low end of the Debtors' valuation to $214 million on the high end.[341]   The value of each of the Debtors' assets must be scrutinized on a stand-alone basis to determine appropriate distributions under the Plan[342]—the Debtors simply cannot effectuate a *de facto* consolidation of the assets of all of the Debtors under the Plan, while providing holders of CCI Notes Claims with less than they would receive in an express consolidation.  Either all of the Debtors' assets and liabilities must be substantively consolidated, or the Debtors must identify the specific assets that are available to CCI and provide holders of CCI Notes Claims with full recourse to those assets before any junior stakeholders receive any distribution under the Plan.  See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 520 (2d Cir. 1988) (stating that, where substantive consolidation is improper, "a creditor cannot be made to sacrifice the priority of its claims

---

[340] Sept. 1 Tr. 101:11-24 (McDonough).

[341] LDT Demo 29 (9/2/09 CCI Noteholders' Recovery if Debt Consolidated).

[342] See, e.g., ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 360 (S.D.N.Y. 2007) ("there is a substantial possibility that a reviewing court would find that the Bankruptcy Court erred as a matter of law in confirming the Plan without making a 'determination of what assets are subject to the payment of the respective claims.'  Thus, a reviewing court would likely find that the Bankruptcy Court's confirmation of the Plan violated Appellants' constitutional right to a fair distribution . . . .") (footnotes and citation omitted), order aff'd, 544 F.3d 420 (2d Cir. 2008).

against *its* debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than does the creditor itself").

## XIII.  SECTION 1129(A)(10) OF THE BANKRUPTCY CODE IS A DEBTOR BY DEBTOR TEST

Grasping at proverbial straws, the Debtors have asked this Court to adopt the extraordinary proposition that section 1129(a)(10) of the Bankruptcy Code can be satisfied by a single vote by *any* impaired class of creditors at *any* of the 131 separate legal entities involved in these chapter 11 cases, which are jointly administered for administrative convenience only. Specifically, the Debtors have argued that an impaired accepting class at any Debtors' estate in these cases may be used to satisfy the requirement of section 1129(a)(10) at CCI, Holdco, and CCH.  Debtors' Response at 50-51.  Yet absent substantive consolidation (which the Debtors have not sought here), each Debtor's plan must satisfy the requirements of section 1129(a), including the requirement that each plan be accepted by an impaired class.

The Debtors' argument that 1129(a)(10) is "a per-plan requirement, not a per-debtor requirement" ignores the reality that a jointly-administration plan of reorganization is purely a procedural tool that cannot affect the substantive rights of the stakeholders.  See In re Leslie Fay Cos., 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); In re I.R.C.C., Inc., 105 B.R. 237, 238 (Bankr. S.D.N.Y. 1989) ("Joint administration is distinguished from substantive consolidation because it is simply a procedural consolidation designed for administrative convenience and does not affect the substantive rights of the creditors of the different estates.").

The Debtors are attempting to subordinate the wishes of a dissenting creditor of one debtor to those of a creditor of another debtor.  The Second Circuit's decision in Augie/Restivo Baking expressly prohibits this very action.  In disagreeing with the bankruptcy court's rationale for consolidation of the estates, the Second Circuit in Augie/Resitvo Baking held:

a creditor cannot be made to sacrifice the priority of its claims against *its* debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than does the creditor itself. The rationale of the bankruptcy judge in the instant case would allow consolidation of two completely unrelated companies upon a finding that the creditors would be better off under some proposed plan involving the joint sale of their assets. The plan would then be **approved under "cram-down" provisions that would subordinate the wishes of the creditors of one debtor to those of the other. We do not read the bankruptcy code to allow such a result.**

860 F.2d at 520 (emphasis added).

The Debtors reliance on two unpublished decisions to support their argument that section 1129(a)(10) need not be satisfied for each debtor's plan, In re Enron Corp., No. 01-16034, slip op. (AJG) (Bankr. S.D.N.Y. July 15, 2004) and In re SGPA, Inc., No. 01-01-02609, slip op. (Bankr. M.D. Pa. Sept. 28, 2001), is misplaced.[343]   The Enron decision is irrelevant, as it was rendered in the context of a substantively consolidated case. The SGPA case is likewise inapposite.  First, it is not binding on this Court, was not reported, and has not been cited by any published decisions.  Second, the SGPA court found that allowing an accepting class of creditors at one debtor to satisfy section 1129(a)(10) at another debtor was warranted simply because the court had determined that substantive consolidation would not have had a negative impact on the class of creditors that voted to reject the plan.  See SGPA, at 17 ("[w]hile it is true that various corporations are affected by the Plan, the business of the Debtors remains the same.  Whether these debtors were substantively consolidated or jointly administered would have no adverse affect on the Subordinated Bondholders.").  Finally, as SGPA is inconsistent with the Third Circuit's subsequent decision in Owens Corning, the SPGA decision cannot be given any weight. Owens Corning clearly provides that the substantive consolidation of separate debtor estates

---

[343] Debtors' Pretrial Brief at 51.

cannot be effectuated absent proof that "(i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." In re Owens Corning, 419 F.3d 195, 204 (3d Cir. 2007) (footnotes omitted).

## XIV.   THE RELEASES PROPOSED UNDER THE PLAN ARE IMPROPER

The Plan provides numerous non-debtors, including Paul Allen, with blanket releases, which are improper under governing Second Circuit law.[344]  The Second Circuit has held that such releases are barred under the Bankruptcy Code.  See Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 143 (2d Cir. 2005) ("A nondebtor release in a plan of reorganization should not be approved absent the finding that *truly unusual circumstances render the release terms important to success of the plan.*" (emphasis added)).

There is no evidence of truly unusual circumstances.  To the contrary, the systematic abdication of fiduciary responsibilities has been well-documented throughout this Brief.[345]  Even if this Court were to determine that truly unusual circumstances exist sufficient to justify releases with respect to certain of the Debtors, as CCI has received no consideration from the Allen Settlement, CCI stakeholders should not be required to provide any non-debtor release.

---

[344] Article X.E of the Plan provides a "full discharge and release to the Debtor Releasees [defined to include the Allen Entities and the Crossover Committee] and their respective property from any and all Causes of Action . . . arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or Plan."  Amended Joint Plan of Reorganization at p. 60  Pursuant to Article X.D of the Plan, "Debtor Releases" is defined to include "each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives." "Releasing Parties," in turn, is defined as "(a) the Debtors, (b) the parties who singed Plan Support Agreements with a Debtor, and (c) any statutory committee appointed in the Chapter 11 Cases."  Amended Joint Plan of Reorganization at 15.  Similarly, Article X.G of the Plan provides for the "Exculpation" of those non-debtor parties in connection with their actions in these Cases.

[345] See infra XV C.2. at XV.

For the foreyoing reasons and for the reasons set forth in the Objection, the Plan's release of non-debtors runs contrary to <u>Metromedia</u> and renders the Plan unconfirmable.

## XV. THE PLAN IS NOT PROPOSED IN GOOD FAITH—THE ALLEN SETTLEMENT IS NOT FAIR AND DOES NOT SATISFY RULE 9019

### A. The Allen Settlement Is Not Entirely Fair

#### 1. The Debtors Bear the Burden to Demonstrate that the Plan is Proposed in Good Faith and the Allen Settlement Is Entirely Fair

Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A breach of fiduciary duty by a plan proponent mandates a finding that section 1129(a)(3) is not satisfied. <u>See, e.g.</u>, <u>In re Bush Indus., Inc.</u>, 315 B.R. 292, 305-06 (Bankr. W.D.N.Y. 2004); <u>In re Coram Healthcare Corp.</u>, 271 B.R. 228, 235-40 (Bankr. D. Del. 2001). As CCI is incorporated in Delaware, Delaware law governs the analysis of the legality of the settlement between the Debtors and Mr. Allen.[346]

A central element of the proposed plan is a transaction between the Debtors and Mr. Allen. As Mr. Allen is the controlling shareholder of CCI, the Debtors must prove that the Allen Settlement and the Plan are entirely fair. <u>Kahn</u> v. <u>Lynch Commc'n Sys., Inc.</u>, 638 A.2d 1110, 1117 (Del. 1994); <u>Kahn</u> v. <u>Tremont Corp.</u>, 694 A.2d 422, 428 (Del. 1997).[347] The entire

---

[346] <u>See, e.g.</u>, <u>Allied Irish Banks, P.L.C.</u> v. <u>Bank of Am., N.A.</u>, No. 03 Civ. 3748(DAB), 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) ("New York law generally applies the law of the state of incorporation to decide claims pertaining to the 'internal affairs' of a corporation") (citations omitted); <u>BBS Norwalk One, Inc.</u> v. <u>Raccolta, Inc.</u>, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999) (applying law of state of incorporation under internal affairs doctrine, which "recognizes that the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations") (citation omitted), <u>aff'd</u>, 205 F.3d 1321 (2d Cir. 2000); <u>Solow</u> v. <u>Stone</u>, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (applying Delaware law to breach of fiduciary duty claims under internal affairs doctrine), <u>aff'd</u>, 163 F.3d 151 (2d Cir. 1998); <u>see also Edgar</u> v. <u>MITE Corp.</u>, 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .") (citation omitted).

[347] As this transaction was not conducted by a special committee, the Debtors bear the burden of demonstrating the transaction's entire fairness to the Court's satisfaction. The Debtors' belated attempt to highlight the informal,

fairness standard has two aspects: fair dealing and fair price. Tremont, 694 A.2d at 430; Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983); Gesoff v. IIC Indus Inc., 902 A.2d 1130, 1144 (Del. Ch. 2006).

"Fair dealing" or "fair process" focuses on the conduct of the corporate representatives in entering into the transaction, including how it was initiated, negotiated, and structured, and how director approval was obtained. Tremont, 694 A.2d at 430-31; Int'l Telecharge, Inc. v. Bomarko, Inc., 766 A.2d 437, 440 (Del. 2000); Weinberger, 457 A.2d at 711. The question is whether the process that took place was an "effective proxy for arm's-length bargaining." GPX XLI L.L.C. v. Loral Space & Commc'ns Inc. (In re Loral Space & Commc'ns Inc.), C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008); see also Valeant Pharms Int'l v. Jerney, 921 A.2d 732, 748-49 (Del. Ch. 2007) (finding unfair dealing where "it simply cannot be said that an independent board advised by independent experts would have employed a similar process"). The "fair price" component of entire fairness review "assures the transaction was substantively fair." Rhodes v. SilkRoad Equity, LLC, C.A. No. 2133-VCN, 2009 WL 1124476, at *2 (Del. Ch. Apr. 15, 2009). "Fair price" engages all relevant factors of the transaction's economics and requires an examination of the financial metrics the corporate representatives relied upon when valuing the proposed transaction. See Tremont, 694 A.2d at 431, Weinberger, 457 A.2d at 711, 713.

---

undocumented conversations among the independent directors does not shift this burden of proof. The Debtors' representatives, who know perfectly well what constitutes a special committee under Delaware law, acknowledge that the Company made a conscious decision not to appoint one. July 22 Tr. 123:25-124:2 (Smit); July 22 Tr. 248:16-19 (Merritt); Aug. 17 Tr. 219:21-220:17 (Doody); Aug. 31 Tr. 191:12-15 (Johri). The limited discussions of the "assemblage," discussed in greater detail below, are no approximation of a special committee. Furthermore, based on the record here, even if the Company had appointed a special committee, the flaws in the process still would not shift the burden. See, e.g., Tremont, 694 A.2d at 428-29 (though the Board created a special committee with delegated authority, the failure of two committee members to adequately inform themselves and to participate in the negotiations prevented the burden from shifting); Lynch Commc'n, 638 A.2d at 1120-21 (though the Board created a special committee, burden did not shift because special committee acceded to controlling shareholder's ultimatum).

Taken together, these elements require the Debtors to "present evidence which demonstrates that the cumulative manner by which it discharged all of its fiduciary duties produced a fair transaction."  <u>Kahn</u> v. <u>Tremont Corp.</u>, 694 A.2d at 432.

## 2.    **The Process Leading to the Formulation of the Plan and the Allen Settlement Was Not Fair**

### a.    <u>The Debtors Failed to Appoint a Special Committee or Delegate Authority to Independent Directors</u>

In December of 2008, the Debtors' financial advisor advised the full board, including Mr. Allen, that Mr. Allen's participation in the restructuring process was a central element of the restructuring and that the Company should expect to compensate him.[348]   At that very moment, the Board should have recognized that they would be negotiating an interested transaction, and an extraordinary one at that—one that would ultimately transfer hundreds of millions of dollars from a bankrupt company to its controlling shareholder.  Yet the board put <u>no</u> measures in place to ensure that the Company's interactions with its controlling shareholder would be conducted and evaluated by individuals independent of Mr. Allen's control.  Rather, the board relied on management to negotiate directly with the controlling shareholder.[349]   The record is clear that the board treated the Allen Settlement as simply one more piece of the restructuring, with no recognition that the Company would one day be required to demonstrate the entire fairness of the Allen Settlement to this Court.[350]   As Mr. Smit testified, he analyzed the transaction from a business judgment perspective and on an enterprise basis.[351]

The appointment of a special committee of disinterested directors who can make judgments independent of the controlling shareholder's interests, and the delegation of decision-

---

[348] Aug. 31 Tr. 173:23-174:13 (Conn); Sept. 10 Tr. 60:6-16 (Millstein).
[349] Aug. 31 Tr. 197:2-5 (Johri).
[350] <u>See, e.g.</u>, July 21 Tr. 72:9-12 (Millstein).
[351] July 22 Tr. 127:25-128:4 (Smit).

making authority to such a committee, is standard corporate practice in interested transactions.[352] The Debtors are well aware of the conflicts that arise from negotiating a transaction with their controlling shareholder, Mr. Allen.[353] Indeed, the Debtors have employed special committees in the past that retained their own separate counsel to negotiate disputes with Mr. Allen.[354] The appointment of a special committee, complete with a delegation of decision-making authority, is proper in such circumstances to ensure that those entrusted with representing the Company's interests can make judgments independent of the controlling shareholder's interests.[355] Yet no special committee was ever appointed in connection with this transaction,[356] even after Mr. Allen gave notice of his intent to take action that would deprive the Company of the tax assets that were the cornerstone of the restructuring.[357]

The Debtors suggest that the appointment of a Special Committee was unnecessary because the independent directors would meet from time to time without the Allen-appointed directors to discuss the restructuring. Yet the "assemblage" of independent directors was never delegated authority to conduct or oversee negotiations with Mr. Allen, and the independent directors did not participate in any negotiations[358] or retain separate legal or financial advisors.[359] At best, this powerless assemblage did nothing more than engage in informal, undocumented conversations about the merits of the restructuring with the Company's counsel and financial

---

[352] See, e.g., Lynch Commc'n, 638 A.2d at 1117-18; Weinberger, 457 A.2d at 709 n.7; In re Zenith Elecs. Corp., 241 B.R. 92, 97 (Bankr. D. Del. 1999).

[353] July 22 Tr. 115:14-19 (Smit)

[354] LDTX 488 (11/4/05 CCI 8-K discussing the CC VIII Settlement).

[355] See, e.g., Kosseff v. Ciocia, No. Civ.A. 188-N, 2006 WL 2337593, at *8 (Del. Ch. Aug. 3, 2006) (finding a "reasonable possibility" that agreement was reached "at the expense of the corporation" where conflicted board "failed to appoint a special committee or independent directors to evaluate the [a]greement").

[356] July 22 Tr. 123:25-124:2 (Smit); July 22 Tr. 248:16-19 (Merritt); Aug. 17 Tr. 219:21-220:17 (Doody); Aug. 31 Tr. 191:12-15 (Johri).

[357] July 22 Tr. 207:18:25 (Merritt); JPX 266 (Disclosure Statement) at 28 .

[358] July 22 Tr. 111:1-8 (Merritt); Aug. 31 Tr. 192:18-20 (Johri).

[359] July 22 Tr. 124:7-125:2 (Smit); July 22 Tr. 248:24-249:4 (Merritt).

advisors.[360] These informal gatherings are no substitute for a special committee. Moreover, Mr. Allen retained his control over the board that gave him the power to fire the entire board to pursue his own interests.[361] This failure to establish and vest independent directors with authority to negotiate with the controlling shareholder flies in the face of basic corporate governance principles and undermines any contention that the process that led to the Allen Settlement was fair.[362]

        b.    <u>The Board's Delegation of the Negotiations to Vulcan and the Bondholders</u>

Whether an agreement was the product of robust arm's-length negotiations is a key indicator of fair process. <u>Int'l Telecharge</u>, 766 A.2d at 440 (lack of meaningful negotiations in a transaction with a CEO and controlling shareholder supported finding of unfair dealing); <u>Valeant</u>, 921 A.2d at 748 (fact that structure was not negotiated supported unfair dealing). The Allen Settlement is clearly not the product of an arm's-length negotiation.

In fact, the positions that the Debtors have taken in discovery demonstrate that the Process was flawed. The Debtors shielded communications between Mr. Allen and the Debtors regarding the restructuring, claiming a broad common interest privilege with their adversary in the negotiations.[363] That Mr. Allen and the Debtors shared a common interest is inconsistent with the notion that the Debtors engaged in an arm's-length negotiation with Mr. Allen. Moreover, the Debtors' decision to cloak the discussions that independent directors had with counsel during the restructuring negotiations renders it impossible for this court to know what really went on. <u>See</u>, <u>e.g.</u>, <u>In re Pure Res., Inc., S'holders Litig.</u>, 808 A.2d 421, 431 (Del. Ch.

---

[360] July 22 Tr. 124:7-23 (Smit); July 22 Tr. 248:20-23 (Merritt).
[361] LDTX 186 (02/09/09 Email from McCafferty to Calavritinos re CHTR Update).
[362] Contrary to the Debtors' brief in support of confirmation, the Allen Settlement is not analogous to the facts of <u>Zenith Electronics</u>, in which the board appointed a Special Committee to conduct negotiations and evaluate the controlling shareholder's restructuring proposal. 241 B.R. at 97.
[363] Sept. 10 Tr. 15:12-18:2 (Millstein).

2002).  As Delaware courts had held, the very nature of the special committee process as an integrity-ensuring device requires judicial access to communications between the independent directors and advisors.  Id. at n.8.  That the Debtors decided to conceal not only the communications between the independent directors and the Company's legal advisors, but also the communications between and among Mr. Allen and his advisors and the Company and its advisors is ample grounds to draw a negative inference.  Id. (citing Chesapeake Corp. v. Shore, 771 A.2d 293, 301 (Del. Ch. 2000) (refusing to give any weight to board's assertion that it sought alternatives to transaction where invocation of privilege prevented inquiry into facts)).  It is clear however that there were no real negotiations going on, as the Debtors did not introduce a single piece of documentary evidence at trial evidencing a negotiation between the Company and Mr. Allen.[364]  The fact that the documentary evidence is so limited is troubling, but it is consistent with the fact that the Debtors were simply not concerned with the amount of value Mr. Allen would extract from the estate in connection with the restructuring.[365]

The Debtors' goals in the restructuring negotiations were clear.  Provided certain baseline objectives were met—positive future cash flow, the preservation of the Company's NOLs, and the reinstatement of the credit facility—the advisors were content to allow the Crossover Committee to determine how much value Mr. Allen was going to take home.[366]  Yet CCI's participation was as necessary as Mr. Allen's to create the value that was being allocated between Mr. Allen and the Crossover Committee.[367]  That the Company's advisors served only

_____

[364] In the voluminous documentary record before the court, it seems the only two pieces of communication between Charter and Vulcan relating to their diverging interests are an email containing Vulcan's flat refusal to contribute to the January interest payment (LDTX 179) and an email containing Vulcan's flat refusal to accept a $5 million cap on the Company's reimbursement of Vulcan's advisors' fees (LDTX 212).
[365] See Section I.F.
[366] July 21 Tr. 72:9-20, 168:12 – 169:2 (Millstein); see also Aug. 24 Tr. 161:19-24 (Goldstein).
[367] July 21 Tr. 71:19-72:1; 165:3-17 (Millstein).

91

as mediators in the negotiation of the Allen Settlement,[368] leaving CCI's stakeholders unrepresented, seriously undermines any claim that the process leading to the settlement was fair.

c.     <u>Mr. Allen's Improper Use of Leverage with the Crossover Committee</u>

Though the Debtors attempt to use the negotiations with the Crossover Committee to demonstrate a fair process, even those negotiations were tainted as Mr. Allen threatened to exercise his power as controlling shareholder to advance his interests at the expense of the Debtors' estates.

Mr. Allen adopted and aggressively maintained the position that the Company should be prepared to compensate him for the threat to effectuate an exchange of his interest in Holdco for CCI Class B stock under an exchange agreement between CCI and CII.[369] Such an exchange would have significant negative tax consequences for CCI and the bondholders, as it would destroy the value of CCI's NOLs.[370]

Everyone at Charter knew that the exchange would never be consummated; to avoid the exchange, Charter would either file for freefall bankruptcy within the ten-day notice period under the Exchange Agreement or simply refuse to honor Mr. Allen's exchange rights.[371] However, to assist Mr. Allen's efforts to extract value from the bondholders, on January 28, 2009, Charter's management agreed to amend the exchange agreement's notice period so that the exchange would be effective on February 12, 2009, the day before the expiry of the grace period for the

---

[368] July 21 Tr. 168:4-11 (Millstein); Sept. 10 Tr. 53:9-13 (Millstein).
[369] Sept. 2 Tr. 174:5-20 (Conn); LDTX 356; LDTX 355.
[370] July 21 Tr. 224:10-14 (Smit).
[371] Sept. 10 Tr. 21:13-52:4 (Millstein); Sept. 2 Tr. 42:5-15 (Conn); <u>see also</u> JPX 194 at 15-16, draft declaration from Mr. Doody stating that Charter had to file for chapter 11 protection on the petition date to prevent any adverse tax consequences from the exchange.

January Interest Payment.[372]   Representatives of both Vulcan and Charter testified that the exchange notice was a means of putting additional pressure on the Crossover Committee[373] - that is, of extracting additional value from the bondholders for Mr. Allen's personal gain.   This is precisely what took place: Mr. Allen used the threat of the exchange to pressure the Crossover Committee to extract additional consideration, telling their advisors that "the price tag wasn't coming down"[374] and if the Board wouldn't agree to the exchange he would simply fire the board.[375]   Indeed, the price tag on Mr. Allen's participation in the restructuring went up after he served the exchange notice.[376]

The Board was complicit in Mr. Allen's use of his exchange rights to increase the pressure on the Crossover Committee for his own benefit, even though the bondholders were creditors of the Charter enterprise to whom fiduciary duties were owed.[377]   The Company's willingness to go along with this scheme to increase the leverage Mr. Allen could exert over the Crossover Committee belies the notion that the Vulcan-Crossover Committee negotiation was a fair and even-handed process.   It also demonstrates Mr. Allen's control over management and the significance of the Board's failure to appoint a special committee in this process.

Still more troubling was Vulcan's threat to the Crossover Committee that Mr. Allen would use his position as controlling shareholder to fire the Board if it did not accede to his demands and allow enough time for him to exercise his exchange rights.   The fact that Mr. Allen's representatives made this threat is evidenced by both the testimony and the contemporaneous documentary record.   The evidence shows that this threat was made at the

---

[372] JPX 335; Sept. 2 Tr. 37:19-38:11 (Conn).
[373] Sept. 2 Tr. 36:16-37:5 (Conn); Sept. 10 Tr. 52:10-53:3 (Millstein).
[374] LDTX 190.
[375] LDTX 186 (02/09/09 Email from McCafferty to Calavritinos re CHTR Update).
[376] On February 10, 09, with the clock running down on the exchange agreement's closing date, the "ask" Mr. Allen sent to the bondholders was *higher* than it had been the day prior to the delivery of the exchange notice.  LDTX 201.
[377] July 22 Tr. 69:1-4 (Smit); Sept. 2 Tr. 13:13-14:4 (Conn).

outset of the core negotiations on February 4[378] and repeated as the deadline for the exchange neared on February 9.[379] According to the representatives of Crestview, Mr. Allen's representatives threatened to fire the board, make the interest payment, and consummate the exchange if they did not reach an agreement.[380] Such threats to fire the board were an abuse of Mr. Allen's corporate governance position to advance his own pecuniary interests further demonstrates fatal flaws in process.

### d. The Board's Failure to Be Informed

The Board was required to conduct a careful inquiry into the fairness of the consideration it was bestowing upon its controlling shareholder, independent of whether the Crossover Committee had agreed to it. NL Indus., Inc. v. Maxxam, Inc. (In re Maxxam, Inc.), No. CIV.A. 12111, CIV.A. 12353, 1997 WL 187317, at *27 (Del. Ch. Apr. 4, 1997) (The quality of the Board's decision-making process is "critical to any analysis of fair dealing.") see also In re Tele-Commc'ns, Inc. S'holders Litig., No. Civ.A. 16470, 2005 WL 3642727, at *10-11 (Del. Ch. Jan. 10, 2006) (lack of diligent research and inadequately informed decision makers showed a lack of fair dealing); Boyer v. Wilmington Materials, Inc., 754 A.2d 881, 901-02 (Del. Ch. 1999) (finding unfair dealing where board approving the transaction failed to consider various items of value in approving the terms of an asset sale).

Yet when the Plan was proposed to the Board with the Allen Settlement as one of its core components, the Board did not receive any analysis of the potential legal claims that could be asserted against Mr. Allen that were being released as part of the plan.[381] Nor did the Board seek

---

[378] July 29 Tr. 119:24-120:3 (Marcus); LDTX 156 (02/05/09 Email from Cassidy to Crestview re Allen negotiations); LDTX 158 (02/05/09 Email from McCafferty to Calavritinos re Paul Allen).
[379] LDTX 186 (02/09/09 Email from McCafferty to Calavritinos re CHTR Update).
[380] July 29 Tr. 119:24-120:3 (Marcus); LDTX 156 (02/05/09 Email from Cassidy to Crestview re Allen negotiations).
[381] July 22 Tr. 251:6-10 (Merritt); Aug. 31 Tr. 206:12-15 (Johri).

or receive a valuation of the consideration that Mr. Allen would receive if the Allen Settlement is approved.[382]  Notably, though Vulcan and the Crossover Committee had a clear understanding of how much Mr. Allen was being paid for his CCVIII interests, and how much he was being paid for refraining from harming the estate,[383] the Board was never given this breakdown.[384]  The Board simply accepted, and the Debtors now ask the Court to simply accept, that the price the Crossover Committee was willing to pay Mr. Allen constitutes a fair price for the Charter enterprise and that no further analysis was necessary.[385]  But the amount of consideration that the Crossover Committee was willing to bestow on Mr. Allen is not a proxy for a fair price for the Charter enterprise, whose Board owes fiduciary duties to creditors that are taking a substantial haircut.

Furthermore, though management was responsible for the negotiations with Mr. Allen,[386] members of management did not understand the potential tax consequences for Mr. Allen in connection with the restructuring.[387]  If management's testimony is to be credited,[388] management failed to inform themselves of whether Mr. Allen's tax position would have compelled him to participate in a plan in any event, and unlike the Crossover Committee,[389] they failed to assess how much value Mr. Allen was receiving in tax mitigation over and above what

---

[382] July 22 Tr. 127:13-19 (Smit); Aug. 31 Tr. 203:14-19 (Johri).  The eleventh-hour line-by-line analyses of the items of consideration provided at the hearing relied entirely on post-filing materials, none of which were presented to the Board. Goldstein Declaration dated August 21, 09, Exhibit B; VDX 3.

[383] LDTX 217 (02/12/09 Email from Chem to Temple re Summary Vulcan Terms).

[384] Aug. 31 Tr. 205:5-7 (Johri); Aug. 24 Tr. 158:21-159:10 (Goldstein) (stating that the Company was looking at the settlement as a "package" rather than with a tally sheet).

[385] July 21 Tr. 72:9-73:9 (Millstein).

[386] Aug. 31 Tr. 197:2-5 (Johri).

[387]  July 22 Tr. 104:4-105:10 (Smit)

[388] Mr. Johri contradicted Mr. Smit's testimony insofar as Mr. Johri testified that he discussed the tax consequences of the Vulcan group with management.  Aug. 31 Tr. 220:16-21 (Johri).

[389] July 23 Tr. 154:3-156:2 (Villaluz).

the Debtors are affirmatively paying out.[390]  Indeed, management did not focus on the downside to Mr. Allen of other forms of restructuring, which prevented them from exerting any leverage over Mr. Allen in negotiations.[391]  The Board, in turn, never received an analysis or valuation of the tax consequences to Mr. Allen in connection with the restructuring.[392]

The Board never asked for and did not obtain a fairness opinion from any financial advisor assessing the terms of the Allen Settlement.[393]  The minutes of the February 9-10 Board meeting, in which the Allen Settlement was approved, do not reference any discussions concerning the fairness of that transaction or even its basic terms.[394]  The Debtors failed to present any contemporaneous documentary evidence reflecting what the Board considered in approving the Allen Settlement.  All of the documentary evidence that the Debtors have presented in connection with justifying the price of the Allen Settlement was generated for the purposes of this trial.[395]  In short, the Debtors presented <u>no</u> evidence of <u>any</u> analysis of the fairness of the terms of the Allen Settlement that would demonstrate the board's proper consideration of its terms, let alone the kind of careful, independent consideration that is required of a large public company entering into an interested transaction.[396]

---

[390] LDTX 132 (01/27/09 Email from McCafferty to Calavritinos re CHTR); LDTX 133 (01/28/09 Email from Glatt to Zinterhofer re points of leverage with Allen), LDTX 169 (02/08/09 Email from Powers to Glatt re Allen tax issues).

[391] July 22 Tr. 104:15-25 (Smit); Aug. 17 Tr. 243:1-6 (Doody).

[392] July 22 Tr. 104:4-105:10 (Smit); Aug. 31 Tr. 203:10-13 (Johri).

[393] July 22 Tr. 254:11-15 (Merritt); Aug. 31 Tr. 203:3-5 (Johri).

[394] CX 255.  The minutes of this crucial meeting also do not reference a discussion among the "assemblage" of independent directors.

[395] CX Declaration 6 (Goldstein Declaration), Ex. B.

[396] This failure to inform, in and of itself, constitutes a breach of fiduciary duty under Delaware law.  <u>See, e.g.,</u> <u>Bridgeport Holdings Inc. Liquidating Trust</u> v. <u>Boyer</u> (<u>In re Bridgeport Holdings, Inc.</u>), 388 B.R. 548, 565, 569 (Bankr. D. Del. 2008) (allegation that board had not fully and diligently informed itself before approving transaction adequately pleaded breach of fiduciary duties of care and good faith; allegation that officers and directors abdicated negotiations by delegating to restructuring advisor adequately pleaded breach of fiduciary duty of loyalty).

### 3.    The Price of the Allen Settlement Is Not Fair

The "fair price" aspect of entire fairness review "assures the transaction was substantively fair."  Rhodes v. SilkRoad Equity, LLC, C.A. No. 2133-VCN, 2009 WL 1124476, at *2 (Del. Ch. Apr. 15, 2009).  "Fair price" engages all relevant factors of the transaction's economics.  See Kahn v. Tremont Corp., 694 A.2d 422, 431 (Del. 1997), Weinberger v. UOP, Inc., 457 A.2d 701, 711, 713 (Del. 1983).  As this transaction was the product of an unfair process and the price cannot be analyzed by reference to a reliable market or by comparison to precedent transactions, "the burden of persuading the court of the fairness of the terms will be exceptionally difficult."  Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 748 (Del. Ch. 2007).  In particular, the absence of arm's-length negotiations severely undermines any suggestion that the price was fair.  See HMG/Courtland Props., Inc. v. Gray, 749 A.2d 94, 118 (Del. Ch. 1999) (finding the absence of a proper negotiator undercut Defendants' assertion that the price was fair); Oliver v. Boston Univ., No. Civ.A. 16570-NC, 2006 WL 1064169, at *27 (Del. Ch. Apr. 14, 2006) (failure to establish entire fairness where there was no representative negotiating on behalf of the minority shareholders).

On the last day of their affirmative case, the Debtors asked Lazard to disclose to the Court, for the first time, just how much consideration the Debtors propose to pay Mr. Allen if this settlement is approved.  Though Lazard never prepared a description of the consideration that Mr. Allen would receive at the time the Board actually approved the settlement,[397] Mr. Goldstein testified that at least $375 million[398] would be paid to Mr. Allen for agreeing not

---

[397] Aug. 24 Tr. 162:11-25 (Goldstein).
[398] CX Declaration 6 (Goldstein Declaration), Ex. B.  According to Mr. Goldstein, the $375 million is comprised of $85 million in new CCH II notes, $60 million in 3% common equity, $35 million in 4% warrants, $25 million on account of Mr. Allen's management receivable, and up to $20 million for the reimbursement of fees.  Id.; Aug. 24 Tr. 14:21-15:14 (Goldstein).

to deprive the estate of value[399] and for giving up his interests in CC VIII.[400]  The Debtors'

evidence falls far short of establishing that the price Mr. Allen received in connection with the

Allen Settlement was entirely fair.

a.    The Debtors Overstate the Value of the Consideration That Allen
Is Providing and Understate the Value Mr. Allen is Receiving

According to Vulcan estimates, Mr. Allen will receive $209 million for agreeing not to

destroy the value of the NOLs and for allowing the credit facility to be reinstated.[401]  Mr. Allen

will also receive $150 million[402] for his CCVIII interests which were obtained as a result of a

scrivener's error in documenting a transaction between Mr. Allen and CCI,[403] $25 million for an

intercompany receivable[404] and $20 million in fees incurred in connection with the

restructuring.[405]  Thus, Vulcan estimated that Mr. Allen will receive $404 million in connection

with the settlement.  This does not include the value of tax mitigation[406] or the value of the

releases that Mr. Allen will receive under the Plan.[407]

In their belated attempt to justify the price of the Allen Settlement, the Debtors have

included as value that the Debtors will receive from Mr. Allen two significant items of

consideration.  First, the Debtors claim that the estate will receive $1.14 billion from Mr. Allen's

participation in the restructuring from the preservation of NOLs.[408]  Second, the Debtors claim

---

[399] CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at ¶ 33 ("The CII Settlement is designed to address the CII Settlement Claim Parties' extraordinary ability to deprive the Debtors and their estates of approximately $3 billion of NOLs and, potentially, the Debtors' ability to reinstate approximately $11.8 billion of indebtedness at favorable interest rates").
[400] In the Company's view, Mr. Allen obtained his CC VIII interest from the Company due to a scrivener's error. LDTX 488 (11/4/05 CCI 8-K) Item 1.01 at 1.
[401] LTDX 215 ("Charter Restructure Negotiation Tracker"); Sept. 2 Tr. 76:24-77:10 (Conn).
[402] LTDX 215 ("Charter Restructure Negotiation Tracker"); Sept. 2 Tr. 78:17-19; 83:18-20 (Conn).
[403] LDTX 488 (11/4/05 CCI 8-K) Item 1.01 at 1.
[404] LTDX 215 ("Charter Restructure Negotiation Tracker"); Sept. 2 Tr. 51:21-24 (Conn).
[405] Sept. 2 Tr. 85:24-86:1 (Conn); LDTX 215 "Charter Restructure Negotiation Tracker").
[406] LDTX 218 (2/12/09 email from Bojmel to Allen re Hi).
[407] Sept. 2 Tr. 88:13-20 (Conn).
[408] CX Declaration 6 (Goldstein Declaration), Ex. B.

that the estate will receive between $1 and $2 billion from Mr. Allen's participation, which allows for the reinstatement of the credit facility.[409]

As an initial matter, the value that the Debtors ascribe to Mr. Allen's participation in the settlement is vastly overstated. First, the Debtors ascribe all of the value for the preservation of the NOLs and the reinstatement of the debt to Mr. Allen.[410] The Debtors fail to account for the fact that the participation of CCI and Holdco in the Plan is equally necessary to create this value. The Debtors' own financial advisors, Messrs. Goldstein and Millstein, recognize that the debt cannot be reinstated and the NOLs cannot be preserved without the participation of CCI.[411]

Second, as has been a common theme in this proceeding, the Debtors' valuation of the NOLs for purposes of the Allen Settlement is inconsistent with Lazard's estimate of the value of the NOLs. In this respect, Lazard valued the NOLs at $649 million in the valuation submitted to the Court in support of confirmation.[412] Yet Lazard walked away from this valuation in favor of a higher value when it came time to justify the Allen Settlement.[413] Similarly, with respect to the reinstatement of the credit facility, the Debtors have taken the position in the adversary proceeding with J.P. Morgan that Mr. Allen's participation was not necessary to reinstate the debt.[414] Yet for purposes of justifying the settlement, they have proceeded as if the debt could not be reinstated without his participation, and have made no risk adjustment to reflect this possibility.[415]

Third, if Debtors' theory that CCI does not own the NOLs is correct—which it is not, as discussed in Section VII.B.—then the Debtors have dramatically understated the value that is

---

[409] CX Declaration 6 (Goldstein Declaration), Ex. B; Aug. 24 Tr. 16:9-17:3 (Goldstein).
[410] Aug. 24 Tr. 14:4-14 (Goldstein); Sept. 10 Tr. 14:12-21 (Millstein).
[411] Aug. 24 Tr. 175:23-176:2 (Goldstein); July 21 Tr. 165:9-14 (Millstein).
[412] JPX 266 (Disclosure Statement), Ex. D at 9.
[413] CX Declaration 6 (Goldstein Declaration), Ex. B.
[414] JPX 266 (Disclosure Statement) at 74.
[415] Aug. 24 Tr. 14:4-10 (Goldstein).

being provided to Mr. Allen under the Plan. The Debtors claim that the NOLs are not owned by CCI and that CCI is effectively trying to "steal" the NOLs that belong to CCO.[416] Yet CCI has been allocated NOLs by virtue of its membership interest in Holdco, just as CII has. Once again, the Debtors cannot have it both ways: if the NOLs do not properly belong to CCI and their value really belongs at CCO, then CII's NOLs also belong to CCO. If the Debtors' flawed logic is applied, the Allen Settlement is providing Mr. Allen a huge windfall by allowing him to retain billions in suspended losses at CII[417] and NOLs[418] that have passed through to Mr. Allen without seeking any compensation in return.

        b.      <u>The Debtors' Failure to Produce Evidence Reflecting the Value that Will Be Transferred to Mr. Allen Precludes A Finding that the Price Is Fair</u>

The Debtors also advanced inconsistent positions in calculating the value that Mr. Allen is providing and the value Mr. Allen is receiving in connection with the settlement. In describing the value that Mr. Allen will contribute to the estate, the Debtors focused on value that Mr. Allen could deprive the estate of receiving, i.e., value derived from the preservation of NOLs and the reinstatement of the credit facility.[419] However, the Debtors simply ignored the value that the Debtors could deprive Mr. Allen of receiving by structuring the Plan in an alternative form.[420]

If the value that Mr. Allen could deprive the estate of receiving is excluded from the Debtors fair price analysis, Mr. Allen is receiving hundreds of millions of dollars of

---

[416] July 20 Tr. 36:7-10 (Basta) ("The CCI bondholders are trying to take advantage of the fact that the charter organization was set up as a partnership structure and not a corporate structure and they're trying to steal the assets of CCO").

[417] LDTX 110 (CII/Vulcan Cable III Inc. Estimated Tax Attributes as of 12/31/08).

[418] LDTX 417 (K&E Summary of Holdco Loss Allocations) at 1. This figure represents only the allocations through 12/31/07.

[419] CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation at ¶ 33 ("The CII Settlement is designed to address the CII Settlement Claim Parties' extraordinary ability to deprive the Debtors and their estates of approximately $3 billion of NOLs and, potentially, the Debtors' ability to reinstate approximately $11.8 billion of indebtedness at favorable interest rates.").

[420] Sept. 2 Tr. 186:8-17 (Temple).

consideration more than he is providing according to Mr. Allen's own estimates, and the price is thus unfair.[421]

If it is appropriate to consider the value that Mr. Allen could deprive the estate of receiving, the price is equally unfair. It is clear that the estate could inflict a "large" tax liability on Mr. Allen in connection with the restructuring.[422] As Mr. Allen's financial advisor noted, his valuation of the settlement does not include the benefits of "tax mitigation."[423] Yet the Debtors and Mr. Allen have failed to present evidence regarding the size of that tax liability or the benefits of tax mitigation that Mr. Allen received in connection with the settlement. Indeed, Mr. Allen has asserted attorney client privilege to shield the amount of his massive potential tax liability from the Court.[424] The amount of Mr. Allen's potential tax liability is necessary to assess whether the consideration he is receiving under the settlement is fair. See In re Tele-Commc'ns, Inc. S'holders Litig., No. Civ.A. 16470, 2005 WL 3642727, at *14 (Del. Ch. Jan. 10, 2006) (emphasizing the importance of examining price in light of the premium received by the insider, even though price received by the Company was higher than market price and within the range of valuations); Oliver, 2006 WL 1064169, at *22 (fair price inquiry must examine the broader consequences of the transaction, not just the actual consideration received). Having failed to present evidence regarding the size of Mr. Allen's potential tax liability, and the benefits he is receiving from tax mitigation, the Debtors cannot demonstrate that the price of the Allen Settlement was fair.

---

[421] VDX 3 (CII Settlement: "Gives" and "Gets").
[422] Sept. 2 Tr. 186:8-17 (Temple).
[423] LDTX 218 (02/12/09 email from Bojmel to Allen).
[424] Sept. 2 Tr. 34:21-25 (Conn).

### c. The Price Is Not Fair Because CCI Did Not Receive The Same Consideration As Mr. Allen

The Debtors' claim that the price that Mr. Allen will receive in connection with the Allen Settlement is fair is also belied by the fact that those who were equally necessary to preserve value for the estate are receiving nothing for their participation in the Plan, while Mr. Allen is walking away with more than $200 million for his participation.

Courts have consistently stressed that the entire fairness standard requires the Court to examine all aspects of the challenged transaction.  Tremont, 694 A.2d at 432-33; see also Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983) ("[a]ll aspects of the issue must be examined as a whole"), In re Digex, Inc. S'holders Litig., 789 A.2d 1176, 1207 (Del. Ch. 2000) (examining fair process, fair price, and "any other relevant considerations" in analyzing entire fairness as a whole).  Thus in evaluating the Allen Settlement, the Court should examine the value that all relevant constituencies will receive, which will shed light on the fairness of the value of the transaction as a whole.

The Debtors claim that the $180 million Mr. Allen will receive to participate in the restructuring is a fair price because his participation allows the debt to be reinstated and the NOLs to be preserved.[425]  However, Mr. Allen's participation was not all that was required to preserve this value.  The participation of CCI and Holdco was equally necessary to reinstate the debt and preserve the NOLs.[426]  Assuming that $180 million is a fair price, or even the "low end of fair" as Mr. Conn claimed,[427] the fact remains that the price that Mr. Allen will receive in connection with the settlement is not fair because those equally necessary to reinstate the credit facility and preserve the NOLs are receiving nothing.  This is particularly true in the present

---

[425] LTDX 215 ("Charter Restructure Negotiation Tracker"); Sept. 2 Tr. 76:24-77:10.
[426] Aug. 24 Tr. 175:23-176:2 (Goldstein); July 21 Tr. 165:9-14 (Millstein).
[427] Sept. 2 Tr. 176:9-21 (Conn).

circumstances because, even under the Debtors' analysis, when the settlement agreement was reached, CCI would receive just as much in connection with a liquidation as they would under the Plan.[428]  On the other hand, Mr. Allen would suffer a "large" tax liability in connection with a free fall restructuring.[429]  Under these circumstances, it cannot be said that the price paid to Mr. Allen is fair.

## B.    The Allen Settlement Does Not Satisfy Rule 9019

The Allen Settlement cannot be approved under Rule 9019, which requires the Bankruptcy Court to ensure that a proposed settlement is fair, equitable, and adequately based on the facts and circumstances before the court.  See, e.g., Plaza Equities LLC v. Pauker (In re Copperfield Invs., LLC), 401 B.R. 87, 91 (Bankr. E.D.N.Y. 2009) (citing Fed. R. Bankr. P. 9019); Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452 (2d Cir. 2007).[430]

As is set out above, the Allen Settlement was negotiated and approved in connection with a process that disregarded basic principles of corporate governance in dealing with a controlling shareholder.  For the same reasons, the Allen Settlement does not satisfy Rule 9019 and cannot be approved.  A flawed process permitted Mr. Allen to extract substantial consideration from the Crossover Committee that the Board should have pursued on behalf of its creditors.  The Court cannot approve the transfer of all the value generated from the preservation of the NOLs and the

---

[428] See infra, FN 483. While Mr. Millstein testified that it would have been "silly" to threaten to liquidate CCI (July 21 Tr. 17:13-72:8), the point is that it would only be silly if one were not seeking to advocate for CCI's interests.  It is beyond dispute that CCI would have received less under the Plan that was initially proposed than they would have in a liquidation.   Under those circumstances, an advocate for CCI certainly would have attempted to use a liquidation as leverage.  It should not matter to CCI's creditors whether value is achieved for other constituencies, if none of that value ultimately flows to CCI.  JPX 266 (Disclosure Statement) at Ex. E.
[429] Sept. 2 Tr. 186:13-17 (Temple).
[430] A more detailed discussion of the applicable law and why the Allen Settlement does not satisfy section 9019 of the Bankruptcy Rules is set forth in the Trustee's Objection and is incorporated herein by reference.  See LDT Objection at 65-73.

reinstatement of the credit facility where CCI was just as necessary to preserve that value but is not receiving any consideration under the Plan.

## C. The Debtors Breached Their Fiduciary Duties In Connection With Negotiating The Terms Of The Plan

In addition to the fact that the Allen Settlement is not entirely fair, the Debtors engaged in other conduct that precludes a finding that the Plan was proposed in good faith.

### 1. The Board Breached Fiduciary Duties to CCI By Failing to Negotiate for CCI's Interests

At the outset of restructuring negotiations, the Company's management and financial advisors were primarily focused on reducing the Company's debt levels and obtaining levered positive free cash flow.[431] After securing these objectives, the Company's advisors saw their role as "mediating between [Mr. Allen and the bondholders] to try to get them to closure…"[432] According to Mr. Millstein, the Debtors left the allocation of "excess value, over and above the reinstated debt" to the Crossover Committee and Mr. Allen to carve up amongst themselves.[433]

It is undisputed that the preservation of the NOLs and ability to reinstate the bank debt were both valuable assets to the reorganized Company and were the cornerstone of the Debtors' restructuring proposal.[434] The Debtors recognize that CCI's $8.7 billion of NOLs have enormous value and that their preservation is critical to the Plan.[435] The Crossover Committee also recognized that CCI's NOLs were one of the "key sources of value in this transaction."[436]

---

[431] July 21 Tr. 216:22-217:7; 218:11-23 (Smit); CX Declaration 6 (Goldstein Declaration) at ¶ 9-10.
[432] July 21 Tr. 168:11-169:4 (Millstein).
[433] July 21 Tr. 72:9-20 (Millstein); see also Aug. 24 Tr. 161:19-24 (Goldstein).
[434] Sept. 10 Tr. 10:19-11:4 (Millstein).
[435] Declaration of Tom Degnan at ¶ 8-9; Aug. 24 Tr. 16:6-17 (Goldstein); July 21 Tr. 47:24-48:15 (Millstein); Sept. 10 Tr. 12:12-13:10 (Millstein).
[436] JPX 234 at 40 (Crestview Investment Committee Memorandum); see also July 29 Tr. 129:12-14 (Marcus).

Similarly, the ability to reinstate the bank debt was of significant value to the reorganized Company and the Crossover Committee.[437]

The Crossover Committee was willing to pay Mr. Allen hundreds of millions of dollars to preserve the Notes and reinstate the bank debt.[438] Indeed, by Vulcan's count, Mr. Allen was able to extract at least $209 million from the Crossover Committee for agreeing not to destroy the value of the NOLs and for allowing the credit facility to be reinstated.[439]

Like Mr. Allen, CCI's participation in the restructuring process was equally necessary to reinstate the credit facility and to preserve NOLs.[440] As Mr. Millstein explained, it was a "partnership."[441] However, no attempt was made by CCI's management or its advisors to obtain any compensation from the Crossover Committee for the benefit of CCI.[442] Indeed, the Debtors' management and their advisors stood idly by while Mr. Allen bargained aggressively to extract value from the Crossover Committee.[443] The only steps the Debtors took to police the negotiations between the Crossover Committee and Mr. Allen was to keep an eye out for developments that could result in an increase in the Company's debt levels or affect the preservation of the tax attributes.[444] Of course, management had other things on its mind when Mr. Allen and the Crossover Committee were dividing up the "excess value"[445] of the Company.

---

[437] Aug. 24 Tr. 16:9-17:3 (Goldstein); CX Declaration 6 (Goldstein Declaration), Exh. B; LDTX 132 (Email re CHTR).
[438] JPX 234 at 23 (Crestview Investment Committee Memorandum, listing key terms of proposed restructuring plan).
[439] LTDX 215 ("Charter Restructure Negotiation Tracker"); Sept. 2 Tr. 77:2-10 (Conn).
[440] July 21 Tr. 164:10-165:17 (Millstein).
[441] Sept. 10 Tr. 10:9-11:4 (Millstein).
[442] July 21 Tr. 175:18-176:1 (Millstein). Indeed, when Mr. Millstein advised the board that Mr. Allen would need to be compensated to preserve the Company's tax attributes and reinstate the bank debt (Sept. 10 Tr. 11:5-23), no one advised the board that CCI was also essential to the transaction and should also seek compensation. Instead, as discussed above, CCI's assets were repeatedly raided to allow the Company the breathing space to arrive at a settlement and a Plan that treats CCI unfairly and rewards handsomely the controlling shareholder.
[443] Aug. 24 Tr. 159:24-161:25 (Goldstein).
[444] July 21 Tr. 63:17-64:14 (Millstein).
[445] July 21 Tr. 72:9-20 (Millstein).

At the eleventh hour of the negotiations, management threatened to walk out unless they received a lucrative restructuring compensation package.[446]

That Mr. Allen is receiving compensation for the preservation of NOLs, and CCI is not, is particularly troubling given that the NOLs are property of CCI's estate.[447] Upon the effective date, CCI's NOLs will be transferred to the reorganized Company for the benefit of the Crossover Committee,[448] yet the Plan does not provide CCI's creditors with any consideration for this asset.

Even more troubling is the inconsistent position that the Debtors have asserted in this confirmation hearing with respect to the use of leverage. The Debtors on the one hand claim that it was entirely appropriate for Mr. Allen, the controlling shareholder, to use leverage to extract value from the Crossover Committee.[449] On the other hand, the Debtors claim that it would have been inappropriate for CCI to use the same leverage to extract value for its stakeholders in circumstances where its creditors would fare just as well in a liquidation. Once again, the Debtors cannot have it both ways.

If it was appropriate for Mr. Allen to use leverage to obtain value for his participation in the Plan, management and the board breached their fiduciary duties by failing to negotiate to obtain value for CCI's participation in the Plan which was equally necessary to reinstate the credit facility and preserve the NOLs. If, on the other hand, the Court finds that it was inappropriate for Mr. Allen to use leverage, then the Plan should not be confirmed because Mr. Allen as the controlling shareholder breached his fiduciary duties in connection with the

---

[446] July 29 Tr. 136:20-137:2 (Marcus).
[447] See discussion in section IV.B.1, supra.
[448] July 29 Tr. 127:9-18 (Marcus).
[449] Sept. 10 Tr. 21:23-24:7; 25:9-23 (Millstein) (justifying Mr. Allen's extraction of value on the grounds that Mr. Allen had something the Company needed, and therefore "they should expect to pay for it. There are -- you know, this isn't -- this is America. You know, there are no such things as a free lunch."); Sept. 2 Tr. 63:16-20 (Conn) (testifying that Mr. Allen did in fact aggressively negotiate his position).

negotiations that produced the Plan. Either way, the Plan cannot be confirmed under the present circumstances as it was not proposed in good faith.

2. <u>Other Actions Evidencing the Debtors' Lack of Good Faith</u>

CCI's Board and management had an obligation to protect the interests of CCI and its creditors in the months leading up to the bankruptcy, yet engaged in a series of transactions that benefitted other Charter entities to the detriment of CCI and its stakeholders.

a. <u>The Debtors Owed Fiduciary Duties to CCI's Creditors Prior to the Fall of 2008</u>

In the fall of 2008, Duff & Phelps prepared a valuation of Charter's assets for Charter's management. The Duff & Phelps valuation was presented to the Board for purposes of assessing whether certain entities in the capital structure had sufficient surplus so that CCH and CIH could make interest payments that were coming due.[450] Duff & Phelps valued the Company's assets at $21.6 billion as of September 30, 2008,[451] and concluded that CCI's liabilities exceeded its assets by $707 million as of that date.[452] Additionally, on October 24, 2008, Mr. Derdeyn, Charter's vice president of finance prepared a surplus analysis,[453] which reflected that CCH's liabilities exceeded its assets by $183.1 million as of October 25, 2008.[454] Based on these valuations, CCI was insolvent as of September 30, 2008, given that its liabilities exceeded its assets.[455] Given the magnitude of the shortfall, CCI was likely insolvent much earlier.

Because CCI was insolvent by September 2009, the directors owed fiduciary duties to CCI's creditors at least as of that date. <u>See</u>, <u>e.g.</u>, <u>N. Am. Catholic Educ. Programming Found., Inc.</u> v. <u>Gheewalla</u>, 930 A.2d 92, 101-02 (Del. 2007). Accordingly, CCI's board and management

---

[450] CX 225 at 1 (11/14/08 Telephonic Board Meeting Book).
[451] CX 225 at 4 (11/14/08 Telephonic Board Meeting Book).
[452] CX 225 at 4 (11/14/08 Telephonic Board Meeting Book).
[453] July 31 Tr. 174:18-21 (Schmitz); JPX 47 (Derdeyn surplus waterfall).
[454] JPX 47 (Derdeyn surplus waterfall); July 31 Tr. 174:22-175:15 (Schmitz).
[455] LDTX 239 (CCI's 2008 10-K) at 25.

had an obligation to protect the interests of CCI's creditors during this time and take action to preserve the assets of CCI's estate. Official Comm. of Unsecured Creditors of High Strength Steel, Inc. v. Lozanski (In re High Strength Steel), Inc., 269 B.R. 560, 569 (Bankr. D. Del. 2001) ("Under Delaware law, once a corporation becomes insolvent, its officers and directors owe unsecured creditors a fiduciary duty . . . requir[ing] that the controlling shareholder(s) and director(s) of the debtor maximize the value of the assets for payment of unsecured creditors.") (citations omitted).

Rather than protecting the interests of CCI's creditors, CCI's Board and management systematically raided Holdco and CCI's assets in a series of transactions that benefitted other entities in the capital structure to the detriment of CCI's stakeholders. In the months leading up to bankruptcy, CCI's board and management dissipated more than $200 million of Holdco's assets to pay obligations of other Debtors in the capital structure.

b.      Intercompany Transfers

In October 2008, the Debtors' management and Board authorized Holdco to purchase approximately $100 million of outstanding CCH Notes through a tender offer.[456]    At the time that management authorized this transfer, CCI's liabilities exceeded its assets.[457]  Significantly, when such tenders had been made in the past, CCH funded the tender offer.[458]   However, CCH did not have sufficient funds to tender for its notes.[459] While management was keenly aware that this transaction could have a substantial negative impact on the ability to service the CCI

_____

[456] July 31 Tr. 130:12-15; 131:3-9 (Schmitz); July 22 Tr. 89:16-21 (Smit).  This was not the first such transfer.  In April 2008, Holdco repurchased approximately $35 million principal amount of various CCH notes for approximately $35 million in cash.  Significantly, the Debtors did not use CCH's funds to pay for the CCH notes that were repurchased.  Under the Plan, Holdco will only receive a 0.4% distribution on account of such holdings for a total recovery of $140,000.
[457] CX 225 at 4 (11/14/08 Telephonic Board Meeting Book).
[458] JPX 266 (Disclosure Statement) at 20.
[459] Aug. 3 Tr. 35:18-37:9 (Schmitz).

Notes,[460] management funneled approximately $99 million of Holdco's cash out the door in exchange for $102 million of CCH Notes.[461] The notes that were purchased and held by Holdco as a result of the tender are receiving a 0.4% recovery under the Debtors' proposed plan.[462]

On November 14, 2008, management and the Board authorized a capital contribution[463] from Holdco to CCH in the amount of $8.4 million dollars so that CCH could pay interest due on outstanding CCH Notes.[464] Once again, management was advised that Holdco's cash would need to be replaced in order for CCI to pay interest on its convertible securities coming due in April.[465] At the time that management and the Board approved this transfer, they knew that a restructuring was imminent as the Company retained Kirkland & Ellis as restructuring advisors the day before.[466] Moreover, the Board was presented with the Duff & Phelps valuation reflecting that CCH, the entity that would receive the capital contribution from Holdco, had a negative surplus of $187 million and was thus insolvent.[467] Under the Plan, Holdco will receive no consideration on account of this capital contribution.[468]

In February of 2009, CCI's board and management once again abdicated their duties to CCI in order to "maximize value for the enterprise" to the detriment of CCI and its creditors. On February 11, 2009 – in connection with approving the restructuring agreement and the Allen Settlement – the Board approved the payment of approximately $75 million of overdue interest

---

[460] JPX 266 (Disclosure Statement) at 20; Aug. 3 Tr. 37:13-23 (Schmitz).
[461] Aug. 3 Tr. 32:12-18 (Schmitz).
[462] JPX 266 (Disclosure Statement) at 6, 21. As discussed below, the Debtors voted these notes to approve the plan, despite the fact that Holdco is receiving only a $400,000 return on a $102 million investment.
[463] LDTX 82 (Request for Electronic Funds Transfer dated Nov. 17, 2008). The transfer request for this payment noted: "book as CCHC [Holdco] making a capital contribution to CCH & then CCH paying its own bond interest."
[464] July 31 Tr. 100:1-8 (Schmitz); July 22 Tr. 90:1-15 (Smit); CX 225 (11/14/08 Telephonic Board Meeting Book) at 2.
[465] CX 225 (Nov. 14, 2008 Telephonic Board Meeting Book) at 3.
[466] Aug. 3 Tr. 21:4-7 (Schmitz).
[467] CX 225 at 4 (Nov. 14, 2008 Telephonic Board Meeting Book).
[468] JPX 266 (Disclosure Statement) at 6.

payments on CCH and CIH notes.[469]  To fund the January Interest Payment, Holdco made capital

contributions to CCH and CIH in the amount of $75 million.[470]  Holdco will receive no

distribution on account of this capital contribution under the Plan.[471]

> c.    Holdco Did Not Receive Reasonably Equivalent Value for the
>        Transfers and the Debtors Have Failed to Act in Good Faith with
>        Respect to Such Transfers

As the Debtors' own valuations show, each transfer of Holdco's assets referenced above

was made at time in which CCI was insolvent and therefore when CCI's directors owed fiduciary

duties to CCI's creditors.  The transfers did not provide Holdco with reasonably equivalent value

and the Debtors have offered no plausible explanation as to how anyone could have reasonably

believed that such transfers would be in Holdco's best interests.

The Board and management's dissipation of Holdco's assets without receiving reasonable

consideration in return amounts to corporate waste.  Under Delaware law, corporate waste is "an

exchange of corporate assets for consideration so disproportionately small as to lie beyond the

range at which any reasonable person might be willing to trade."  In re Nat'l Auto Credit, Inc.

S'holders Litig., No. Civ.A. 19028, 2003 WL 139768, at *13 (Del. Ch. Jan. 10, 2003) (plaintiffs

stated a claim for corporate waste where the board approved transaction with an insider that

transferred critical corporate property for disproportionately little value) (internal quotes and

citations omitted). Rothenberg v. Santa Fe Pac. Corp., Civ. A. No. 11749, 1995 WL 523599, at

*5-6 (Del. Ch. Sept. 5, 1995) (allegation that board's enhancement of terms of debt for equity

exchange was corporate waste insofar as it effectively distributed equity for no consideration met

corporate waste standard for purposes of demand futility).  In reviewing suspect transactions,

---

[469] CX 255 (2/10/09-2/11/09 Board Minutes) at 9.
[470] July 21 Tr. 221:20-24 (Smit); July 31 Tr. 122:1-7 (Schmitz).
[471] JPX 266 (Disclosure Statement) at 6 .

courts examine whether, under all of the circumstances, the transaction was actually worthwhile. See Nat'l Auto Credit, 2003 WL 139768, at *13.

Here, the Debtors have presented no credible evidence to show the transfers of Holdco's assets were for proportionate consideration and worthwhile at the time they were made. The board and management knew or should have known that CCH was insolvent when the Company dissipated Holdco's assets.[472] Yet CCI's board effectively *gifted* $99 million of Holdco's cash to other creditors, ultimately in exchange for the meager sum of $400,000 that Holdco will receive under the Plan.[473] Likewise, Holdco will receive no consideration under the Plan on account of its capital contributions of $8.4 million and $75 million.[474]

Perhaps most significant is the fact that the January Interest Payment was made as part of a deal struck between CCI, the Crossover Committee and Mr. Allen that contemplated a bankruptcy filing.[475] Thus, $75 million of Holdco's assets, which otherwise would have been available to CCI's creditors, were transferred to creditors at the CIH and CCH levels so that the Company could prepare for a pre-arranged bankruptcy. At the time that this payment was authorized, no consideration was given to how the transfer would impact CCI. Indeed, Mr. Smit testified that he did not consider whether or how the CCI Noteholders were going to receive a distribution under the plan.[476] However, Mr. Smit knew from Lazard's initial straw man that

---

[472] CX 225 at 4 (Nov. 14, 2008 Telephonic Board Meeting Book).

[473] JPX 266 (Disclosure Statement) at 6, 21. The Disclosure Statement indicates a recovery of 0.4% on the CCH Notes. Including the April purchase of CCH notes (see supra I.), the April and October purchases combined were for CCH notes in the principal amount of $137 million, of which Holdco would only recover $548,000 under the Plan (.04 x $137,000,000 = $548,000).

[474] JPX 266 (Disclosure Statement), Ex. E at 6.

[475] JPX 266 (Disclosure Statement) at 21; July 22 Tr. 93:11-25 (Smit).

[476] July 22 Tr. 97:16-25; 95:5-13 (Smit). Consistent with Mr. Smit's lack of regard for the interests of Holdco and CCI's creditors in connection with this transaction, nowhere in the resolution approving the February Interest Payment does the Board, in its capacity as the manager of Holdco, consider or conclude that the payment is in the best interest of Holdco. Indeed, the Board resolution only authorizes CCH and CIH to make the interest payments and authorizes the Company "in its capacity as Manager of CCH and CIH" to cause CCH and CIH to make the interest payments. CX 255(2/10/09-2/11/09 Board Minutes ) at 9. There is not a single reference to, much less

"the only path to value for CCH I and junior stakeholders [such as CCI and Holdco] is via intercompany claims."[477] Instead of preserving this asset for CCI and its creditors, the Board exhausted Holdco's intercompany accounts. By contract, Mr. Allen's intercompany receivables were not depleted and we will be paid in full for such claims under the Plan.[478]

The Debtors belatedly acknowledged that CCI needed to be protected in connection with the payment of the January Interest Payment and now claim that $48 million of the total transfer was placed in escrow for this reason.[479] The Debtors' belated explanation for the escrow agreement is at odds with sworn testimony that the funds were placed in escrow to ensure that the Crossover Committee had "skin in the game."[480] Regardless of the reason for the escrow, the fact remains that even if the escrow was implemented to protect CCI, $27 million of funds that would otherwise have been available to CCI remains unaccounted for. It defies logic to suggest that this transaction provided any benefit to CCI or Holdco because the transaction operated to reduce VALID intercompany receivable that Holdco held against CCO, a solvent entity. Accordingly, management and the board's decision to use Holdco's funds to make the January Interest Payment constitutes a breach of fiduciary duty to CCI's creditors and a waste of Holdco's assets.

Worse yet, the Debtors failed to give Holdco credit for funding the January Interest Payment in their Liquidation Analysis.[481] Had the Debtors included the full amount of the January Interest Payment in their Liquidation Analysis, the recovery the Debtors offered the CCI

---

approval of, Holdco's role in this transaction – including authority to make a capital contribution to fund the payments.
[477] CX Declaration 6 (Goldstein Declaration), Ex. A ("straw man" proposal) at 4.
[478] JPX 266 (Disclosure Statement) p. 27.
[479] Aug. 17 Tr. 129:1-6 (Doody).
[480] July 21 Tr. 67:14-68:22 (Millstein).
[481] The Debtors only accounted for the $48 million placed in escrow, leaving the $27 million balance unaccounted for. JPX 266 (Disclosure Statement), Ex. E at 6 (Liquidation Analysis).

112

Noteholders under the Plan as initially proposed would not have satisfied the best interest of creditors test.[482]  Indeed, CCI would have recovered $10 million more in a liquidation than they would have under the initial Plan under the Debtor's own analysis, even if the preferred stock that is being provided to the CCI Noteholders is valued at face.[483]

The Debtors' explanation that such transfers benefited the enterprise as a whole does not justify the transfers.  As the Second Circuit has made clear, actions taken for the benefit of multiple affiliated debtors do not relieve the officers and directors of individual debtors from their fiduciary duty to maximize the value of their individual debtor estates.  See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 520 (2d Cir. 1988); Gans v. MDR Liquidating Corp., No. 9630, 1998 WL 294006, at *3 (Del. Ch. May 22, 1998), (recognizing that under Delaware law, directors owing duties to two constituencies must uphold those duties, without compromise, to both groups; or if they cannot, they must relinquish that duty to another)  Here the officers and directors of the Charter enterprise created a complex capital structure in which intercompany claims could create conflicts among the various entities in the structure.  The Board and management's actions operated to minimize the recovery to CCI and its creditors rather than maximizing them, and the Debtors have failed to account for the benefits such transfers conferred on the Debtors' enterprise under the Plan.  The Debtors' failure to reimburse CCI's creditors for these transfers in the Plan demonstrates that the Plan was not proposed in good faith.

---

[482] Aug. 17 Tr. 130:14-133:14 (Doody).
[483] Under the Debtors' Liquidation Analysis, the CCI creditors would receive $82 million, not including the $27 million balance on the January Interest Payment.  JPX 266 at Ex. E, p. 6 (Disclosure Statement).  If the $27 million balance is included in the Liquidation Analysis, the CCI Noteholders would receive $109 million under the Plan. By contrast, the Debtors proposed to provide CCI Noteholders with a 19.4 percent recovery on approximately $497 million of Notes, which would yield a total recovery of approximately $96.4 million.  Id. at 5.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Court should enter an order denying confirmation of the Plan and awarding the Trustee such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         September 18, 2009

                                        WHITE & CASE LLP

                                        By:  /s/ Gerard Uzzi
                                             Gerard Uzzi (GU-2297)
                                             Dwight A. Healy (DH-9305)
                                             Karen M. Asner (KA-5950)
                                             Andrew Hammond (AH-0415)
                                             Gregory M. Starner (GS-1719)
                                        1155 Avenue of the Americas
                                        New York, NY 11036-2787
                                        (212) 819-8200

                                        *Counsel for Law Debenture Trust
                                        Company of New York as Indenture
                                        Trustee for the CCI Notes*