SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Robert E. Zimet
Jay M. Goffman
Susan L. Saltzstein
Jeremy A. Berman


     - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071
(213) 687-5000
Kurt Ramlo


Attorneys for Paul G. Allen


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Cases |
| | ) | |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) | Case No. 09-11435 (JMP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |


**POST-TRIAL BRIEF OF PAUL G. ALLEN**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................iv

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND FACTS .....................................................................................................4

    A.     Mr. Allen Made Significant Investments in and Contributions to Charter and Provided Financial Guarantees Without Compensation..................................4

    B.     The Exchange Agreement and the Tax Allocation Provisions of the LLC Agreement ......................................................................................................6

    C.     The Independence of Charter's Directors...............................................................8

    D.     Charter's Management and Board of Directors Authorized the Interest Payment at the November 14, 2008 Board of Directors Meeting .........................9

    E.     Discounted Cash Flow Calculations Prepared By a Junior Vulcan Analyst in December and Based on Wall Street Estimates Do Not Undermine Charter's Conclusions Regarding Surplus in November .....................................10

    F.     In December 2008, Charter Determines To Pursue a Restructuring to Preserve Enterprise Value ...................................................................................12

    G.    Lazard and Charter's Board Determine Mr. Allen's Participation is Essential to the Plan ........................................................................................14

    H.    The Negotiations Among Charter, Mr. Allen and the Crossover Committee Were Vigorous.................................................................................17

    I.     The Negotiation of the Releases .......................................................................20

    J.     Charter's Board Approved the CII Settlement Because it was Fair and Necessary to a Successful Restructuring.............................................................21

    K.    The Independent Directors Did Their Jobs .......................................................23

    L.     Charter will Realize Substantial Benefits as a Result of the CII Settlement.........26

         1.     The CII Settlement Permits the Reinstatement of Billions Dollars of Bank Debt at Favorable Interest Rates ................................................28

         2.     The CII Settlement Preserves Charter's Valuable NOLs..........................29

i

|   | 3. | The CII Settlement Results in a Significant Post-Restructuring Step-Up in Tax Basis | 30 |
|---|---|---|---|
|   | 4. | The CII Settlement Allows Charter to Acquire Mr. Allen's Valuable CC VIII Interests | 31 |
|   | 5. | The CII Settlement Facilitates a $1.6 Billion New Money Investment into Charter through the Rights Offering | 32 |
|   | 6. | The CII Settlement Eliminates the Management Agreement Obligation | 32 |
|   | 7. | The CII Settlement Prevents Free-Fall Bankruptcy | 33 |
| M. | | The Consideration Mr. Allen Receives for Providing Valuable Benefits to Charter | 34 |
|   | 1. | Mr. Allen Does Not Recover on Account of his Equity Interests in CCI or Holdco | 35 |
|   | 2. | The $150 Million Mr. Allen Stands to Receive Is Fair Value for His Interest in CC VIII, a Solvent Operating Entity | 36 |
|   | 3. | Mr. Allen Was Entitled to Recovery of $25 Million for the Management Receivable Owed by CCO, a Solvent Entity | 37 |
|   | 4. | The Remaining $180 Million Is Fair Consideration for the Value Created for the Debtors By Mr. Allen | 37 |
|   | 5. | Reimbursement for Advisor Fees Is Not Consideration | 37 |
|   | 6. | LDT's Tax Liability Theory Has No Support in the Record and Should Not Be Considered When Evaluating the Settlement | 38 |

| ARGUMENT | | | 39 |
|---|---|---|---|
| I. | | JPMorgan Bears the Burden of Proving Its Claim of a Pre-Petition Default Due to Alleged Lack of Ability to Pay Debts As They Come Due | 39 |
| II. | | The CII Settlement is in the Best Interest of the Debtors' Estates | 42 |
|   | A. | Absent the CII Settlement, The Plan Would Not Be Feasible | 43 |
|   | B. | Mr. Allen's Participation in the CII Settlement Agreement Does Not Violate Any Fiduciary Duties | 44 |
|   | C. | The CII Settlement Is Within the Range of Reasonableness | 50 |
|   | D. | The Settlement Is Fair Under an Entire Fairness Standard | 54 |

III.      The CII Settlement Does Not Provide Mr. Allen With a Distribution On Account of His Equity Interests in CCI or Holdco ...................................................................... 60

IV.      The Releases Of The CII Settlement Parties Are Appropriate Under the Circumstances .............................................................................................................. 64

      A.      The Releases in Favor of the CII Settlement Party Are Integral to the Plan and are Justified by the Unique Circumstances of the Case................................. 64

      B.      The Debtor Releases Are Allowable.................................................................. 69

CONCLUSION...................................................................................................................... 70

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page(s)**

*In re Adelphia Communications Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007), *aff'd*, 544 F.3d 420 (2d Cir. 2008) ................................................................................. 69

*In re Adelphia Communications Corp.*, 327 B.R. 143 (Bankr. S.D.N.Y.), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y.), *and aff'd*, 337 B.R. 475 (S.D.N.Y.), *aff'd*, 224 F. App'x 14 (2d Cir. 2006)........................................ 42, 48, 51, 52

*Andreae v. Andreae*, No. 11,905, 1992 Del. Ch. LEXIS 44 (Del. Ch. Mar. 3, 1992) ................. 56

*Applebaum v. Avaya, Inc.*, 805 A.2d 209 (Del. Ch. 2002), *aff'd*, 812 A.2d 880 (Del. 2002) ...................................................................................................... 59

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ................................................................ 56

*Ash v. McCall*, No. Civ.A. 17132, 2000 WL 1370341 (Del. Ch. Sept 15, 2000)........................ 49

*Bank of America National Trust & Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999) ................................................................. 63

*Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114 (Del. 2006)........................................ 47

*In re Best Payphones, Inc.*, No. 01-B-15472, 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) ......................................................................................... 40

*Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000) ......................................................................... 50

*In re Calpine Corp.*, No. 05-60200, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) ......... 69

*Cartalemi v. Karta Corp.* (In re Karta Corp.), 342 B.R. 45 (S.D.N.Y. 2006)....................... 66, 68

*Cede & Co v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ........................................................ 60

*Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995) ................................................................................. 57, 58, 59, 60

*Cosoff v. Rodman* (In re W.T. Grant Co.), 699 F.2d 599 (2d Cir. 1983) .................................... 50

*In re Cysive, Inc. S'Holders Litig.*, 836 A.2d 531 (Del. Ch. 2003)............................................. 56

*Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (In re Metromedia Fiber Network, Inc.), 416 F.3d 136 (2d Cir. 2005) ......................................................... 55, 65

iv

*Emerson Radio Corp. v. International Jensen*, Nos. 15130, 14992, 1996 Del. Ch. LEXIS 100 (Del. Ch. Aug. 20, 1996)...............................................................................46

*In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004).............................................................................................................................53

*In re Frederick's of Hollywood, Inc. Shareholders Litigation*, No. 15944, 1998 Del. Ch. LEXIS 111 (Del. Ch. July 9, 1998) ..............................................................46

*Gentile v. Rossette*, No. Civ. A. 20213-NC, 2005 WL 2810683 (Del. Ch. Oct. 20, 2005), *rev'd on other grounds*, 906 A.2d 91 (Del. 2006) ..............................................49

*In re Granite Broadcasting Corp.*, 369 B.R. 120 (Bankr. S.D.N.Y. 2007) .......................4, 55, 58

*In re Greektown Holdings, L.L.C.*, No. 08-53104-wsd, 2009 WL 1653461 (Bankr. E.D. Mich. May 13, 2009) ..............................................................................................41

*Grobow v. Perot*, 526 A.2d 914 (Del. Ch. 1987), *aff'd*, 539 A.2d 180 (Del. 1988) ....................56

*Hunnicutt Co. v. TJX Cos.* (In re Ames Department Stores, Inc.), 190 B.R. 157 (S.D.N.Y. 1995) ................................................................................................................68

*Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986)...........................................44

*Kahn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110 (Del. 1994) .................................60

*Kahn v. Lynch Communication Systems, Inc.*, No. 8748, 1995 WL 301403 (Del. Ch. Apr. 17, 1995), *aff'd*, 669 A.2d 79 (Del. 1995).......................................................................60

*Kahn v. Seabord Corp.*, 625 A.2d 269 (Del. Ch. 1993)................................................................49

*In re Kings Terrace Nursing Home & Health Related Facility v. New York Department of Social Services* (In re Kings Terrace Nursing Home & Health Related Facility), Bankr. No. 91 B 11478, Adv. No. 94/8912A, 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995), *aff'd*, 184 B.R. 200 (S.D.N.Y. 1995) ..........................................................41

*In re Lionel L.L.C.*, No. 04-17324, 2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31, 2008) ............40

*In re Mal Dunn Associates*, No. 07-36299 (Bankr. S.D.N.Y. filed Aug. 24, 2007)......................65

*In re Mal Dunn Associates*, 406 B.R. 622 (Bankr. S.D.N.Y. 2009) ........................................65, 66

*Marvel Entmt. Group, Inc. v. Mafco Holdings, Inc.* (In re Marvel Entertainment Group, Inc.), 273 B.R. 58 (D. Del. 2002).....................................................................................48

*In re Mid-State Raceway, Inc.*, No. 04-65746, 2006 WL 4050809 (Bankr. N.D.N.Y. Feb. 10, 2006) ..............................................................................................................................70

*In re Millivision, Inc.*, 328 B.R. 1 (Bankr. D. Mass. 2005).........................................................42

*Motorola, Inc. v. Official Committee of Unsecured Creditors* (In re Iridium Operating LLC), 478 F.3d 452 (2d Cir. 2007) .......................................................... 51, 62

*Nellis v. Shugrue*, 165 B.R. 115 (S.D.N.Y. 1994) ....................................................... 42

*Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993) ......................................................... 59

*Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386 (Del. Ch. 1999) .................... 4, 44, 45, 56

*Official Committee of Unsecured Creditors of International Distribution Centers, Inc. v. James Talcott, Inc.* (In re International Distribution Centers, Inc.), 103 B.R. 420 (S.D.N.Y. 1989) ............................................................................................. 43

*Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163 (Del. Ch. 2002) .................... 50

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) .................................................................... 42

*Rand v. Western Airlines, Inc.*, C.A. No. 8632, 1994 WL 89006 (Del. Ch. Feb. 25, 1994) ......... 56

*Rosenberg v. XO Communications, Inc.*, 330 B.R. 394 (Bankr. S.D.N.Y. 2005) ...... 28, 66, 67, 64

*Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106 (Del. Ch. 1948) ................................ 50

*Schreiber v. Bryan*, 396 A.2d 512 (Del. Ch. 1978) ................................................... 48

*SEC v. Drexel Burnham Lambert Group, Inc.* (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285 (2d Cir. 1992) ..................................................................... 64

*Solomon v. Duncan* (In re Jerome Duncan, Inc.), No. 08-1702, 2009 U.S. App. LEXIS 10854 (6th Cir. 2009) ......................................................................... 54

*Solomon v. Pathe Communications Corp.*, No. 12563, 1995 Del. Ch. LEXIS 46 (Del. Ch. 1995), *aff'd*, 672 A.2d 35 (Del. 1996) ........................................................... 46

*In re Spiegel, Inc.*, No. 03-11540, 2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006), *aff'd*, No. 03-11540, 2007 WL 656902 (S.D.N.Y. Feb. 28, 2007), *aff'd*, 269 F. App'x 56 (2d Cir. 2008), *cert. denied sub nom. Stupakoff v. Otto (GmbH & Co. KG)*, 129 S. Ct. 146 (2008) ............................................................... 55, 68, 69

*Stein v. Orloff*, No. 7276, 1985 Del. Ch. LEXIS 418 (Del. Ch. May, 30 1985) ............... 56

*In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988) .......................................... 51

*Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996) .............................................. 46

*Thorpe v. CERBCO, Inc.*, No. 11713, 1993 Del. Ch. LEXIS 257 (Del. Ch. Oct. 29, 1993) ........ 44

*Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985) .............................. 59

*In re Urban Communicators PCS Ltd. Partnership*, 379 B.R. 232 (Bankr. S.D.N.Y. 2007), *aff'd in part, rev'd in part on other grounds sub nom. Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008) ................................................................................40

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) .................................... 55, 57, 59

*In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999) ...................... 55, 56

**Statutes**

Del. Code Ann. tit. 8, § 144(a)(1) (2006) .................................................................47

11 U.S.C. § 1123(b)(3)(A) .......................................................................................69

11 U.S.C. § 1129 ......................................................................................................40

11 U.S.C. § 1129(a)(11) ...........................................................................................43

11 U.S.C. § 1129(b)(2)(B) ........................................................................................61

11 U.S.C. § 503(b)(3)(D) ..........................................................................................38

**Other Authorities**

Andrew G.T. Moore, *The "Interested" Director or Officer Transaction*, 4 Del. J. Corp. L. 674 (1979) ..............................................................................................................55

Charles M. Nathan & K.L. Shapiro, *Legal Standard of Fairness of Merger Terms under Delaware Law*, 2 Del. J. Corp. L. 44 (1977) ...........................................................55

In addition to creating the mammoth value which enables Charter's Joint Plan of Reorganization (as modified) (the "Plan"), Paul Allen and his representatives have played a unique role in this bankruptcy. As a director and controlling shareholder of Charter,[1] evidence has been sought from Mr. Allen and his representatives relating to reinstatement issues. Also, the CCI Noteholders have suggested that Mr. Allen and his representatives have ignored their fiduciary obligations in those same capacities. For this reason, Mr. Allen believes that it is useful to share his perspective on these issues and why, he believes, the "Plan" should be confirmed.

## PRELIMINARY STATEMENT

The foundation of Charter's Plan is the reinstatement of approximately $11.8 billion in below-market secured debt and the preservation of the Debtors' net operating losses ("NOLs") that together have a cash value to Charter measured in billions. The CII Settlement is the cornerstone to this foundation, for without the participation and agreement of the CII Settlement Parties, Charter's Plan collapses. It is undisputed that Mr. Allen's participation in the Plan (if approved) creates billions of dollars of value to Charter. After investing and losing more than $8 billion in the Charter enterprise, Mr. Allen was perfectly entitled to have said "enough," to have resigned from Charter's Board and to have assumed no post-reorganization obligations. Mr. Allen was not required to participate in the Plan (with or without consideration), morally or legally. And Delaware's fiduciary concepts are not to the contrary.

Never acknowledging the enormous benefits of the CII Settlement to Charter, the CCI Noteholders mischaracterizes the Plan as an insider transaction, purportedly designed for the

---

[1] Unless the context indicates otherwise, the terms "Charter" and the "Debtors" refer to each of the debtors and debtors in possession other than Charter Investment, Inc. ("CII").

primary purpose of protecting Mr. Allen from potential tax liabilities, and allegedly foisted by him upon a compliant board of directors. But the theory conjured by the CCI Noteholders in advance of the trial about Charter management's supposed motives for proposing the Plan and Mr. Allen's acquiescence in the proposal is wholly contradicted by the now well-developed record. The evidence shows that the Plan was conceived, structured and initiated by Charter management, with the assistance of its financial and legal advisors, Lazard Freres & Co. ("Lazard") and Kirkland & Ellis ("Kirkland"), without any instigation from and not at the direction of Mr. Allen or Mr. Allen's representatives. The Plan was designed to address Charter's need to shed significant debt and create a sustainable capital structure in the face of unprecedented conditions in the credit market, and to preserve the company's valuable tax attributes. Because the Plan accomplishes these goals, it was energetically endorsed by Charter's management and enjoyed the unanimous, unbiased support of its independent directors, along with members of an *ad hoc* bondholder committee and the Creditors Committee. In short, the evidence demonstrates that the Plan was conceived and structured to benefit the enterprise, not Mr. Allen, whose extensive equity interests – and more than $8 billion cash investment – will be eliminated under the Plan. Any compensation Mr. Allen receives will be for his commitment to undertake actions that will create value to Charter and for a claim against a solvent entity, *not* for his equity interests in the company.

As the evidence demonstrates, the CII Settlement confers benefits on Charter totaling more than $3 billion, consisting of:

- Up to $2 billion in interest expense savings;

- $1.14 billion in value attributable to NOL preservation;

- A step-up in basis premised on Mr. Allen engaging in post-reorganization taxable exchange(s) of his interests in Charter Communications Holding Company

("Holdco") for stock of reorganized Charter, which could result in additional tax savings with a net present value of approximately $500 million; and

- Mr. Allen's CII's Class A Preferred Units of CC VIII, LLC ("CC VIII") one of the Debtors' operating subsidiaries.

(*See* Vulcan Demonstrative 3.) By comparison, Mr. Allen will receive only approximately $180 million worth of consideration, consisting of a note ($85 million), stock in the reorganized Charter ($60 million, most of which is subject to a 5-year lock-up)[2] and warrants ($35 million), plus a release designed to insulate Mr. Allen and the Vulcan entities from nuisance suits. (*Id.*) The disparity in the benefits Charter will receive compared to the consideration it will provide to Mr. Allen makes the CII Settlement unquestionably fair to Charter.[3]

Mr. Allen's negotiation for and receipt of the consideration described above does not constitute a breach of fiduciary duty or violate any reasonable measure of fairness. For Charter to realize these tremendously valuable benefits, Mr. Allen must agree to retain a 35% voting interest; to designate directors to serve on Charter's Board; and to retain a 1% interest in Holdco (the limited liability partnership that owns Charter's assets). None of these courses of action is without risk and cost to Mr. Allen. In any event, the CCI Noteholders' subjective view that the settlement does not inflict enough financial harm on Mr. Allen when compared against the consideration to be provided to Mr. Allen is irrelevant and ignores altogether the *value* of Mr. Allen's contributions to Charter.

No concept of fiduciary duty or any concept of fairness requires Mr. Allen to assume those roles and obligations. As a matter of well-established law, a director or controlling

---

[2] This does not take into account any discount taken for the diminished value due to the lock up.

[3] Mr. Allen is also receiving $150 million for his 30% interest in the preferred stock of CC VIII (valued by Lazard at between $135 million and $165 million) and $25 million on account of a pre-existing account receivable related to management services previously provided by CII. But Mr. Allen is simply receiving fair value for those assets and there is no evidence to the contrary.

shareholder is not obligated to undertake continuing duties and be exposed to future costs and risks for the benefit of the corporation or the minority shareholders. *See Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) ("[Majority shareholder and sole secured creditor's] refusal to . . . assume further financial obligations on behalf of [the controlled company] without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties."). It was, therefore, perfectly appropriate in these circumstances for Mr. Allen to negotiate and reach agreement on the consideration he was to receive in exchange for his valuable contribution, which was consistent with the recommendation that Charter's well-respected and experienced financial advisor had given to Charter's Board.

Mr. Allen did not dictate the terms of this compensation, but bargained at arms-length with highly sophisticated parties, each represented by separate counsel and financial advisors.[4] This "market check" as a consequence of negotiations with the Crossover Committee, whose members had obvious economic incentives to resist compensating Mr. Allen and who indeed pushed back against Mr. Allen's requests, further underscores the fairness of the CII Settlement.

## **BACKGROUND FACTS**

A.     **Mr. Allen Made Significant Investments in and Contributions to Charter and Provided Financial Guarantees Without Compensation[5]**

The history of Mr. Allen's investment in Charter tells a story not of a "controlling shareholder acting for his own benefit" (LDT Objection at 9), as the CCI Noteholders maintain, but rather of Mr. Allen's enormous monetary contributions to Charter since 1998. The

---

[4]     *See In re Granite Broad. Corp.*, 369 B.R. 120, 140-41 (Bankr. S.D.N.Y. 2007) ("'People who must back their beliefs with their purses are more likely to assess the value . . . accurately than are people who simply seek to make an argument.'") (citation omitted).

[5]     Capitalized terms not defined herein have the meaning ascribed to them in the Plan.

undisputed fact is that Mr. Allen has expended billions of his personal wealth in an effort to create a profitable cable enterprise for the benefit of Charter. (Conn 9/2/09 Tr. at 122:14-125:12.) Over the course of about a decade, Mr. Allen has invested more than $8 billion in Charter securities and has acted generously to enable it to pursue an expansion of its business operations without fair compensation in return. (*See generally* Vulcan Demonstrative 1; Conn 9/2/09 Tr. at 122:14-123:20; *id.* at 125:10-12.)

For example, as Charter grew, it sought to expand its cable business through acquisitions. Charter acquired a series of cable companies, including the Rifkin, Falcon and Bresnan systems, using Charter stock as purchase price currency. (VX 1 at 116-18, 121-25; Conn 9/2/09 Tr. at 122:14-24.) To entice the sellers of these systems to accept Charter equity and make these acquisitions possible, Mr. Allen personally guaranteed that if the price of Charter stock declined, and the seller wished to sell its Charter stock, Mr. Allen would acquire that stock at the original deal price even if it had become worthless. (VX 1 at 118 (describing the Rifkin Acquisition Partners put option: "Mr. Allen will grant the exchanging holders the right to put their shares of Class A common stock to him at a price equal to the public offering price plus interest at a rate of 4.5% per year. This put right terminates on the second anniversary of this offering, or earlier in specified circumstances"); *see also* Conn 9/2/09 Tr. at 80:22-81:2, 122:24-123:20).) These put options greatly increased Mr. Allen's downside risk without providing him with any upside potential. (Conn 9/2/09 Tr. at 123:2-5 ("[I]f the value of the stock dropped, the sellers could put the shares to him. I don't believe there was any sort of collar on it.")) Indeed, all of these put rights were ultimately exercised, and Mr. Allen honored his promise to purchase Charter's stock at a cost to him of billions of dollars. (Conn 9/2/09 Tr. at 123:10-11 ("I'm pretty sure that every one of them was exercised, when the stock dropped over time"); *see id.* at 123:18-

19 (" I don't know the specific numbers, but it was billions of dollars"); *see also* Vulcan Demonstrative 1.))

What is extraordinary about these put arrangements is that Mr. Allen provided these guarantees, benefiting Charter and all its constituencies, for no incremental compensation. This alone puts the lie to any suggestion that Mr. Allen sought to simply use Charter "for his own benefit."  (LTD Objection at 9.)

B.    **The Exchange Agreement and the Tax Allocation Provisions of the LLC Agreement**

Throughout the confirmation hearing, the CCI Noteholders insinuated that there was something improper about the Exchange Agreement, the tax loss allocation provisions of the LLC agreement between CCI and CII, and Mr. Allen's exercise of his rights under the Exchange Agreement.  (*See, e.g.*, Schmitz 8/3/09 Tr. at 15:6-7 ("Now, has any Charter entity ever sought compensation from Mr. Allen or from CII for the inappropriate use of the NOLs?"); Conn 9/2/09 Tr. at 155:7-11 ("And none of the Charter entities have ever asked Mr. Allen to return the NOLs that were allocated to him, right?"  . . .  "Okay, and no Charter entity has ever sought compensation from Mr. Allen for such use, right?").)  However, as the evidence demonstrates, these were long-standing agreements entered into *before* Charter went public and *before* the CCI Noteholders ever acquired these interests and were part of (and priced into) the "deal" assumed by Charter's investors and creditors.  (VX 7 Exhibit 10.13, Exhibit A; VX 1 at 223-27.)

The Exchange Agreement was an "inducement" for a significant investment by Mr. Allen at the time of Charter's initial public offering in November 1999.  (CX 137 at 1.)  At that time, Charter and Mr. Allen entered into an agreement pursuant to which Mr. Allen received the right to exchange Membership Units issued by Holdco (the limited liability company in which CII and CCI are partners and which control Charter's operations) for common stock in

Charter on a tax-free basis. (Conn 9/2/09 Tr. at 126:13-128:9; CX 137.) A form of the Exchange Agreement was filed by Charter, along with its initial public offering documents on October 18, 1999, and the existence of the agreement was disclosed in Charter's final IPO document and in every subsequent Form 10-K of Charter. (*See generally* Vulcan Demonstrative 4; *see also* Conn 9/2/09 Tr. at 127:6-128:9.)[6] Further, Charter has consistently disclosed the risk of limiting its NOLs if Mr. Allen exercised his exchange right. (*See, e.g.*, JPX 17 at 30). Charter additionally disclosed the Holdco LLC Agreement with Mr. Allen, including the provision allocating annual tax losses between CCI and CII, beginning with its IPO prospectus in 1999. (VX 1 at 224-225; Conn 9/2/09 Tr. at 130:11-132:4.)

Specifically, the 2007 prospectus used in connection with the issuance of the CCI Notes, as well as the prospectus issued in 2004 for the convertible notes for which the 2007 Notes were exchanged, described the Exchange Agreement and the tax consequences to Charter associated with it. (VX 6 at 38, 92 (2007 prospectus); VX 5 at 64 (2004 Prospectus).) The 2007 prospectus states:

> [I]f Mr. Allen were to elect to exchange his Charter Holdco membership units for our Class B common stock pursuant to our existing exchange agreement with him, such a transaction would result in an ownership change for income tax purposes, as discussed above. See "- Risks Related to Our Business - For tax purposes, there is a significant risk that we will experience an ownership change resulting in a material limitation on the use of a substantial amount of our existing net operating loss carry forwards."

(VX 6 at 38.) *See also* (2004 Prospectus, VX 5 at 64.) The CCI Noteholders were thus on notice of the Exchange Agreement and its potential tax consequences when they invested in their convertible notes. (Conn 9/2/09 Tr. at 129:5-8; VX 6 at 38, 92.)

---

[6]     VX 2 at 73 (1999 10-K); VX 3 at 103 (2001 10-K); VX 4 at 44 (2002 10-K); CX 286 at 44 (2003 10-K); JPX 17 at 44 (2006 10-K); CX 194 at 29, 43 (2007 10-K); LDX 239 at 46-47 (2008 10-K).

**C.     The Independence of Charter's Directors**

It is not disputed that the majority of Charter's board members are independent and have absolutely no affiliation with Mr. Allen.  (Doody Aff. ¶ 16.)  Only three of Charter's directors – Paul Allen, Jo Allen Patton and Lance Conn – are Vulcan "representatives."  As demonstrated by their respective backgrounds, Charter historically recruited its independent board members because of their strong business acumen and their ability to provide strong, independent leadership to Charter (the "Independent Directors.").

- Rajive Johri worked for 16 years at Citibank prior to joining JP Morgan in 1999, where he served as executive vice president.  Thereafter, Mr. Johri became President and director of First National Bank of Omaha.  (Johri 8/31/09 Tr. at 213:18 – 214:2.)  Mr. Johri also serves on the board of directors of ConAgra Foods and Boys Town.  (Johri 8/31/09 Tr. at 214:5-8.)  Underscoring his independence, Mr. Johri was recruited by an agency in 2006 for a spot on Charter's board.  (Johri 8/31/09 Tr. at 213:5-8)

- Bob May served temporarily as president of Charter.  Having served as the CEO of Calpine Corporation during its restructuring, Mr. May's turnaround experience is significant.  Mr. May also served on the board of directors of HealthSouth. (Merritt 7/22/09 Tr. at 164:19-165:17.)

- David Merritt worked at KPMG for 24 years, 14 of which he was an audit partner. Mr. Merritt spent 10 years as the partner-in-charge of KPMG's national media and telecommunications practice and led the Century City office in Los Angeles. After leaving KPMG, Mr. Merritt became the executive vice president and CFO of a private entertainment company in the film/television production and management business.  Aside from his substantial business experience, Mr. Merritt served on the boards of the Calpine Corporation and Outdoor Network Holding, and recently joined the board of a private company.  (Merritt 7/22/09 Tr. at 208:22 – 209:13.)

- John Tory is an attorney who previously served as CEO of Canadian cable-giant Rogers Cable Inc.  (CX 286 – Charter Form 10-K for year ended 2003 at 92). More recently, Mr. Tory led the Independent Directors in connection with their 2007 discussions with an outside investor in an effort to delever the company. (Johri 8/31/09 Tr. at 223:12-16.)

- Larry Wangberg has decades of considerable cable experience.  Mr. Wangberg was formerly the CEO of both a cable company and a cable-related technology company.  (Merritt 7/22/09 Tr. at 164:8-14.)

Throughout the years, the Charter Independent Directors have manifested their autonomy from Mr. Allen. The independent board members met in executive sessions that excluded Mr. Allen and his employees.[7] (Johri 8/31/09 Tr. at 189:11-190:3 (stating that the independent board members met outside of board meetings "for over two years").) When an issue arose between Mr. Allen and the company in 2005, the Independent Directors formed a litigation committee to address the matter which ultimately was resolved under the supervision of a Delaware Vice Chancellor. (Conn 9/2/09 Tr. at 124:12-21.) Likewise, in late 2007, the Independent Directors retained Kirkland, not Charter's counsel, Gibson, Dunn & Crutcher, to evaluate proposed strategic transactions that may have involved Vulcan. (Conn 9/2/09 Tr. at 135:18-136:6; Johri 8/31/09 Tr. at 221:17-223:4.) As discussed below, the Independent Directors similarly manifested independence in evaluating the CII Settlement and the Plan.

### D. Charter's Management and Board of Directors Authorized the Interest Payment at the November 14, 2008 Board of Directors Meeting

In November 2008, when the country was in the throes of significant economic uncertainty, Charter management prudently raised with the Board its recommendation regarding payment of interest on outstanding indebtedness. Charter held a special meeting of its board of directors on November 14, 2008 to discuss, among other subjects, "the November payments around CCH and CIH." (Smit 7/21/09 Tr. at 206:9-10.) The Board resolved to make the CIH interest payments through surplus distributions through various subsidiaries (CCO to CCOH to CCH II to CCH I to CIH), and to cause Holdco to make a capital contribution to fund the CCH payment through repayment of an intercompany note. (CX 114 at 3-4; Smit 7/21/09 Tr. at 214:23-215:2.) While recognizing that adverse parties may "claim peer and Charter debt market

---

[7] *See* minutes reflecting that independent directors met separately, JPX 086 (December 10, 2008 Minutes) at 8; JPX 129 (January 6, 2009 Minutes) at 4; CX 250 (January 30, 2009 Minutes) at 2; CX 254 (February 6, 2009 Minutes) at 3.

valuations indicate lack of surplus at CCH I" (CX 225 at 2), after careful deliberation and extensive discussion, Charter's Board determined that CCH I had a financial surplus adequate to pay an upward dividend to CIH.  (CX 114 at 2.)

At the November 14, 2008 board meeting, Mr. Smit described how Charter's management had considered, among other things, the FAS 142 valuation analysis from Duff & Phelps as well as advice from Lazard, in order to perform its own analysis.  (CX 114 at 2.) Charter's management took into account company performance and market activities before making its recommendations regarding surplus and the November interest payments.  (Conn 9/2/09 Tr. at 137:8-15.)  Mr. Conn voted with the rest of the Charter board that it was in the best interests of the company to make the November interest payments.  (CX 114 at 3-4.)  Mr. Conn was "convinced by the recommendation [of Charter management] that it was the right thing to do."  (Conn 9/2/09 Tr. at 137:16-22.)  Mr. Temple, who also attended the November 14, 2008 board meeting, was comfortable with the surplus analysis performed by Charter management. (Temple 9/1/09 44:10-12.)

### E.    Discounted Cash Flow Calculations Prepared By a Junior Vulcan Analyst in December and Based on Wall Street Estimates Do Not Undermine Charter's Conclusions Regarding Surplus in November

As part of a regular practice of monitoring Charter's operations and to enable Mr. Allen to make effective, informed decisions as a director, employees of Vulcan Inc. and Vulcan Capital, the entities through which Mr. Allen manages his investments, historically would perform their own independent analysis of Charter's numbers.  (Conn 9/2/09 Tr. at 96:13-98:18.) For example, Vulcan annually reviewed Charter's budget and long-range plan to obtain an understanding of Charter management's analyses and to be prepared to respond to their recommendations.  (*Id.*)

In contrast to this thorough independent assessment, in December 2008, a junior analyst employed by Vulcan, Anchi Chern, was asked to prepare a discounted cash flow analysis. Mr. Chern had never before performed such work for Vulcan. (Conn 9/2/09 Tr. at 100:21-101:10.) In order to motivate Mr. Chern to create a high-quality analysis, Mr. Temple told him that Mr. Allen had made a "special request" for the work to be done. (JPX 299; Conn 9/2/09 Tr. at 100:21-24.) However, Mr. Chern's work-product was not useful because it merely "relied on Wall Street estimates, it wasn't an independent view of the company's business." (Conn 9/2/09 Tr. at 103:10-17.) Furthermore, Mr. Conn took issue with the fact that the document was missing a "fundamental piece," a viewpoint on Charter's operating plan. (Conn 9/2/09 Tr. at 138:17-139:2.)

Mr. Conn concluded that Mr. Chern's work was not a "useful piece of analysis." (Conn 9/2/09 Tr. at 103:17.) For this reason, Mr. Conn did not rely on the spreadsheet and instead decided to rely on his own judgment and Charter management's work. (Conn 9/2/09 Tr. at 105:12-18.) As Mr. Conn testified,

> I probably spent five minutes looking at this document when it was created. And I, you know, didn't rely on it. So like I think I said to you at the deposition, I decided to rely on my own judgment and management's work because I didn't have a team that was, at the moment, prepared to pull all this stuff together. They didn't have the background in it.

(*Id.*) Later in December 2008, Mr. Chern prepared a document he titled "Surplus Forecast— Constant Fair Value." (JPX 111.) Mr. Conn did not see the document until shortly before his deposition on June 30, 2009. (Conn 9/2/09 Tr. at 111:12-18.) JPMorgan Chase highlights the date listed on Mr. Chern's document, November 15, 2008, to suggest CCH I did not have surplus as of November 15, 2008. (Conn 9/2/09 at 114:3-26.) However, the document was prepared on December 22, 2008 and was based on the EBITDA forecast from Charter's *December* long-range

plan, which was not created until well after the November 14, 2008 board meeting.  (JPX 111; Conn 9/2/09 Tr. at 139:14-140:2.)

### F.    In December 2008, Charter Determines To Pursue a Restructuring to Preserve Enterprise Value

At the December 2008 board meeting, the Board began to engage in serious discussions about a restructuring.  (*See generally* JPX 86.)

Historically, Charter has carried a substantial debt load that it would refinance as principal became due, effectively pushing back its debt maturities.  (Ruyter 7/31/09 Tr. at 21:3-21:10; Schmitz 7/31/09 Tr. at 84:6-84:21.)  The dislocation of the credit markets in the Fall of 2008 made obtaining credit extremely difficult and exacerbated the problems caused by Charter's debt burden and complex capital structure.  (Kurinskas 8/25/09 Tr. at 109:1-14; JPX 56 at 3, Charter October 28, 2008 board minutes describing the restricted credit market; Goldstein 8/24/09 Tr. at 28:16-20.)  In order to reduce its debt load in the face of worsening economic conditions, declining cable company valuations and an inability to access new capital, Charter proposed a reorganization.  (JPX 86 at 7-8; Goldstein Decl. ¶ 9; Goldstein 8/24/09 Tr. at 11:9-12:20; Smit 7/22/09 Tr. at 84:16-86:3.)

The impetus for the restructuring efforts did not originate with Mr. Allen.  (*See e.g.,* Goldstein Decl. ¶ 9.)  It was management driven, as management and its advisors "recognized that the possibility of being able to raise new third-party bank debt financing seemed remote in that environment."  (Millstein 9/10/09 Tr. at 9:6-18.)  Management, not Mr. Allen, decided to use the December board meeting for the purpose of discussing restructuring alternatives.  (Millstein 9/10/09 Tr. at 8:18-9:1.)  Moreover, Charter's pre-petition consideration of restructuring alternatives was undertaken without pressure from or the imposition of outcomes by Mr. Allen.  (Goldstein Decl. ¶ 9-11.)  According to Mr. Goldstein, Charter "proposed the

reorganization strategy, not Paul Allen."  (Goldstein Decl. ¶ 9.)  Similarly, Mr. Millstein testified

that Charter management "determined that we would use the December board meeting to discuss

restructuring alternatives."  (Millstein 9/10/09 Tr. at 8:18-9:1.)  Thus, it was management, not Mr.

Allen, who decided to use the December board meeting for that purpose.  (Millstein 9/10/09 Tr.

at 8:23-9:1.)

> Prior to formulating a restructuring plan, Charter retained its long-term financial

advisor Lazard.  (Doody Aff. ¶ 32.)  The Independent Directors, not the Vulcan directors on the

Charter board, selected Kirkland to represent Charter in the restructuring process.  (Conn 9/2/09

Tr. at 140:3-14.)  Indeed, Vulcan retained its own legal and financial advisors.  (Doody 8/17/09

Tr. at 26:3-8.)

> In preliminary meetings with its advisors in December 2008, Charter management,

together with its advisors, identified its primary restructuring goals:

> (i) reduce its debt load of in excess of $21 billion to a manageable level; (ii)
> provide for necessary liquidity upon emergence, including having the Company
> free cash flow positive from day one; (iii) preserve the Company's significant tax
> attributes – namely, the NOLs and tax basis in assets, and (iv) reinstate the current
> outstanding debt at CCO and CCOH.

(Goldstein Decl. ¶ 9; *see also* Smit 7/21/09 Tr. at 218:9-21.)

> Thereafter, Charter organized what it considered to be holders of its fulcrum

securities, the CCH I Notes and CCH II Notes.  (Doody Affidavit ¶ 32.)  These bondholders

were "holding billions of dollars of debt across five or six different boxes of the capital

structure."  (Millstein 9/10/09 Tr. at 62:3-62:15; Doody Decl. ¶ 7.)  Charter urged these holders

to form an ad hoc committee (the "Crossover Committee"), retain advisors, and begin diligence

on the company (Doody Decl. ¶ 7; Millstein 9/10/09 Tr. at 62:3-15.)  Also, in December 2008,

Charter began discussions with Mr. Allen and key bondholder constituencies about a prearranged

reorganization that would delever the company. (Doody Decl. ¶ 7; *see also* Goldstein Decl. ¶ 10.)

Members of Charter's management, with the assistance of their financial and legal advisors, formulated a "strawman" proposal. (Goldstein Decl. Ex. A (January 7, 2009 Lazard Presentation); Millstein 7/21/09 Tr. at 45:8-46:23.) The proposal was distributed to members of the Crossover Committee and Mr. Allen in order to focus them on the company's key levers and to start the negotiations over the terms of the restructuring. (*See* Goldstein 8/24/09 Tr. at 54:12-15.) Mr. Allen and his representatives and advisors did not dictate the terms of the strawman proposal. (Goldstein Decl. ¶ 10, 11; Conn 9/02/09 at 141:4-14; Millstein 9/10/09 at 25:24-26:7.) Notably, Mr. Allen initially opposed the tax structure in the strawman proposed by Charter. (Doody 8/17/09 Tr. at 26:24-29.)

The terms of the strawman proposal, as conceived by Charter and Lazard and as they presented it to Mr. Allen, were: "to avoid a change of control and maintain the bank debt in place and to reduce the company's leverage to a level where their capital structure was sustainable." (Millstein 9/10/09 Tr. at 26:20-23.) The initial strawman proposal also contemplated a rights offering. (Millstein 9/10/09 Tr. at 27:4-17).

### G. Lazard and Charter's Board Determine Mr. Allen's Participation is Essential to the Plan

Charter's advisors realized that in order to accomplish their restructuring goals, Mr. Allen's participation and cooperation was critical because of the terms of Charter's debt instruments and Mr. Allen's unique relationship with Charter and ability to prevent a change of control.. (Goldstein 8/24/09 Tr. at 13:20-14:10, 155:5-156:23; Millstein 7/21/09 Tr. at 61:5-62:6.) Charter is a party to multiple debt instruments, including the CCO Credit Agreement, each of which contain change of control provisions that require Mr. Allen to maintain a certain

voting stake in the Company.[8]  In addition, CII's retention of an ownership interest in Holdco

provides a means for preserving the Debtors' valuable NOLs, *i.e.*, tax losses that can be used to

offset future taxable income and reduce taxes.[9]  According to Mr. Millstein of Lazard:

> Vulcan's participation in the transaction was critical, both from a point of view of
> optimizing the tax structure so as to preserve as much of the NOL as possible and
> from the point of view of avoiding a change of control that could trigger the
> acceleration of the bank debt.

(Millstein 7/21/09 Tr. at 62:1-6.)

Lazard explained to the board during an early December meeting that Mr. Allen

would likely need to be compensated for his continued participation in the proposed plan

structure.  (Millstein 9/10/09 Tr. at 21:5-23:16; Millstein 9/10/09 Tr. at 61:4-61:8.)  Mr. Millstein

amplified during trial that:

> And so, you know, I think as – in a commercial setting, this isn't a charitable act.
> And I don't think his – and these are values that are created by his ongoing
> participation, not by his previous partic – not by his previous investment.  This is
> created by his willingness to remain a thirty-five percent shareholder from a
> voting point of view and have his name continue to be associated with this
> company, with its hopefully with its ups but could be with its future downs as
> well.  It is a – it's a burden to be a director and an owner of a public company. So
> I think he – I think the benefits he's conferring on people by his continued
> participation is real and substantial, and I think he's entitled to compensation for it.

(Millstein 9/10/09 Tr. at 23:4-16.)  Mr. Millstein also testified that Mr. Allen is a "highly public

figure."  (Millstein 9/10/09 Tr. at 22:20-21.)  As such, he attracts many "nuisance lawsuits."

(Conn 9/2/09 Tr. at 88:14-17.)  Furthermore, Mr. Allen incurred costs in the reorganization

---

[8] CX 396, JPM/Bank of America $350M Credit Agreement, dated 3/6/07; CX 101, JPM $8B Credit Agreement,
dated 3/18/99 (amended and restated 2007); WTX 001, Wells Fargo 8% Senior Second Lien Notes due 2012 and 8-
3/8% Senior Second Lien Notes due 2014, dated April 27, 2004; WTX 002, Wilmington Trust Company 10.875%
Senior Second Lien Notes due 2014, dated March 19, 2008.)

[9] CII ownership of a Holdco partnership interest ensures that CII will be allocated a share of any cancellation of
indebtedness income ("COD Income") that were to be realized in any restructuring.  Any COD Income allocated to
CCI in a restructuring would reduce its NOLs by a corresponding amount in 2010, so Charter had a strong interest in
minimizing the amount of COD Income allocated to it by ensuring a share of the COD Income would be allocated to
CII.  (*See generally* Degnan Decl.)

because it is a "burden to be a director and an owner of a public company." (Millstein 9/10/09 Tr. at 22:8-23:13.) Retaining a 35% voting interest and designating individuals to sit on Charter's board as his representatives subjects Mr. Allen to litigation risk and exposes him to the prospect that he and key employees of Vulcan who would serve as his designees would become embroiled in expensive and time-consuming Charter-related disputes. As Mr. Conn testified, Mr. Allen was "exposing himself to potential personal liability because his agents were sitting on the board. He's got to employ people who are going to monitor the asset. Those are costs." (Conn 9/2/09 Tr. at 75:19-22); *see also* Goldstein Decl. ¶ 18 ("We were also aware that Mr. Allen was not obligated to continue to hold any interest, voting or otherwise in Charter.").)

Lazard's advice to the board that it should consider the need to remunerate Mr. Allen was hardly breaking news. It was "perfectly obvious" to Mr. Millstein that Mr. Allen should seek compensation for remaining a controlling shareholder post-confirmation in light of the tremendous value he was creating not only for the Company, but also for its creditors, including sophisticated distressed debt investment firms such as Apollo, Crestview and Oaktree.

> I think it's perfectly obvious that a guy who is contributing billions of dollars, conferring billions of dollars of value on third parties who are not widows and orphans, is going to expect to be paid for the privilege of giving that benefit to other people.

(Millstein 9/10/09 Tr. at 61:4-8; *see also id.* at 21:15-23:16.)

Mr. Allen's representative in the negotiations, Mr. Conn, accepted Mr. Millstein's view that Mr. Allen was preserving and creating tremendous value and should be compensated in arriving at his own view that compensation for Mr. Allen was appropriate. Mr. Conn testified:

> I think the moment it crystallized for me was when Mr. Millstein was speaking to the board – I'm guessing this would have been that December meeting – and he said that Paul Allen's cooperation in any potential restructuring is the central element of this, and the company should be prepared to compensate him for that.

(Conn 9/2/09 Tr. at 174:5-13.)

### H. The Negotiations Among Charter, Mr. Allen and the Crossover Committee Were Vigorous

The members of the Crossover Committee, like Mr. Allen, were critical to the success of the Plan. (Millstein 7/21/09 Tr. at 44:9-44:14.) Charter invited Mr. Allen and the Crossover Committee to participate in three-way negotiations. (Millstein 7/21/09 Tr. at 44:2-14, 54:22-55:8.) After Charter's management provided the strawman proposal to Mr. Allen's advisors and the Crossover Committee's advisors, all three parties began negotiations towards an appropriate structure that accomplished the company's main objectives of reinstatement of its senior debt, and NOL preservation for the benefit of all of Charter's stakeholders. As an additional benefit, Charter could receive a step up in basis when CII's interest in Holdco is diluted and premised on Mr. Allen's engagement in post-reorganization taxable exchange(s) of Mr. Allen's interests in Holdco for stock of reorganized Charter, which could result in additional tax savings to Charter with a net present value of approximately $500 million (Millstein 7/21/09 Tr. at 49:18-50:22, 54:18-56:22, 72:22-73:10.)

To resolve the issue of Mr. Allen's compensation for his valuable assets and his prospective cooperation (*i.e.*, his maintenance of a 35% voting interest; his placement of designees on the Charter board; his retention of ownership of a 1% interest in Holdco; and the prospect that Mr. Allen would engage in one or more taxable exchanges), the Debtors, Mr. Allen and the Crossover Committee engaged in intensive arm's-length, good-faith and at times contentious negotiations during which the parties were separately represented by sophisticated legal and financial advisors. (Doody Aff. ¶ 32; Doody 8/17/09 Tr. at 25:25-26:19, 26:12-19; Merritt 7/22/09 171:1-9.) In these arm's length negotiations, Mr. Allen was represented by Skadden Arps and Miller Buckfire; Charter was represented by Kirkland and Lazard; and the

Crossover Committee was represented by Paul Weiss, UBS, and Houlihan Lokey. (Doody 8/17/09 Tr. at 25:3-26:11.) CII was separately represented by the law firm of Togut Segal & Segal. (*Id.* at 223:22-224:1.) As the deadline of the grace period approached, the negotiations were "near non-stop." (Goldstein Decl. ¶ 12.) Under their careful watch and supervision, Charter's management and advisors encouraged the Crossover Committee and Mr. Allen to negotiate around the "margins" of the settlement, but there was continuous interaction with the company and its advisors as it was a three-legged negotiation. (Millstein 7/21/09 Tr. at 160:2-11, 167:19-168:23, 170:18-19; Smit 7/21/09 Tr. at 227:11-22; *see also* Merritt 7/22/09 Tr. at 208:11-15; Goldstein 8/24/09 Tr. at 160:2-11.) Mr. Millstein testified that "[i]t's true that we were mediating, but it's also true that we were pushing back on the parties . . ." (Millstein 7/21/09 Tr. at 170:18-19.) Moreover, from Mr. Smit's perspective:

> there was a lot of discussion over the terms of an agreement, what form it would take both from a financial perspective and a legal perspective. A lot of negotiating happened between the parties. I think from a business perspective, as I said, I want to insure that we were achieving the desired strategic results from a cash flow perspective and from a leverage perspective. And it was, you know, fairly intense negotiations going on between all parties.

(Smit 7/21/09 Tr. at 227:15-22; *see also* Merritt 7/22/09 Tr. at 208:11-15 (stating "it was management that was responsible to bring back the best possible deal. But the fact that the bondholders were part of this three-way negotiation and really had as great an interest as Charter did to settle those matters . . .").) Among other things, the negotiations between and among Charter, Mr. Allen and the Crossover Committee resulted in an increase in the size of the rights offering, leading to the injection of $1.6 billion in new money in reorganized Charter. (*See, e.g.*, Zinterhofer 7/28/09 Tr. at 47:14-22; Marcus 7/29/09 Tr. at 35:23-36:14.)

After an in-person meeting between representatives of the Crossover Committee and representatives of Mr. Allen on February 4, 2009, it was clear that Mr. Allen and the

Crossover Committee were far from reaching an agreement.  (Conn 9/2/09 Tr. at 37:11-12

("[W]e both walked away from the table on February 4th cause we weren't anywhere close to an

agreement.").)  The Crossover Committee members understood that the equity Mr. Allen would

receive would come out of their own equity.  (*See, e.g.*, Liang 7/29/09 Tr. at 209:22-210:9.)  In

order both to preserve this longstanding exchange right and to bring the Crossover Committee

back to the negotiating table, Mr. Allen gave notice on February 5, 2009 that he would exercise

his rights under the Exchange Agreement.  (JPX 325 – Exercise of Exchange Option; *see also*

Conn 9/2/09 Tr. at 36:19-20 (stating "I think we were exercising our rights to protect ourselves

under the notice provision of that agreement"); Johri 8/31/09 at 188:25-189:4. (stating that Mr.

Allen may have been preserving his contractual rights in giving notice); Johri 8/31/09 at 218:5-7

(stating "I believe there was a certain time period by which he had to give a notice for that

conversion, and I think that was expiring on February 5th).)  Mr. Conn, however, was

> careful to explain to some of the board members prior to the board meeting at
> which we were going to discuss the issue that our intent was not to follow through
> with the exchange, but we were primarily giving notice primarily to bring the
> bondholders to the table.  We had just sat with them the day before and had a
> tumultuous meeting.

(Conn 9/2/09 Tr. at 150:15-20; *see also* Johri 8/31/09 Tr. at 219:17-220:8 (stating that Mr.

Allen's exercise of his exchange right was "negotiating").)

During the February 4, 2009 meetings, representatives of the Crossover

Committee alluded to a purported tax liability to Mr. Allen.  Mr. Conn responded that this was

incorrect and that Mr. Allen had, in fact, "a variety of solutions to an alleged tax problem that

didn't even require a restructuring agreement with the bondholders or the company."  (Conn

9/2/09 Tr. at 144:3-6.)  Vulcan never made a threat to the Crossover Committee that it would fire

Charter's board if his negotiation demands were not met.  (*Id.* at 64:8-14, 64:17-23.)

Representatives of the Crossover Committee did suggest that Charter's board could refuse to

cooperate with Mr. Allen's exercise of the exchange right or file for bankruptcy. (Conn 9/2/09 Tr. at 65:13-15.) The Crossover Committee representatives posited whether Mr. Allen would fire the board in response to such actions. That was the entire exchange on the topic. (Conn 9/2/09 Tr. at 65:15-17.)

## I.      The Negotiation of the Releases

From the outset, the Allen parties sought protection of the third party releases that were ultimately incorporated in the Plan. (Millstein 9/10/09 Tr. at 42:4-25.) The Plan contains a release of the Debtors' members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives from third party claims (the "Third Party Release"). (*See* Plan at X.D and X.E.) The Third Party Release was negotiated openly and initially the proposal was opposed by some members of the Crossover Committee. (Conn. 9/2/09 Tr. at 177:7-25, "I remember that there was vigorous debate about it among the parties."). Mr. Allen's advisors proposed the Third Party Release in favor of Mr. Allen from the inception of negotiations when they responded to the earliest iterations of the company's strawman proposal. (Millstein 9/10/09 Tr. at 42:4-25 ("it was part of their term sheet from the beginning"); Conn 9/2/09 Tr. at 86:9-88:17, (Third Party release was essential to the plan).)

Mr. Allen's insistence on the Third Party Release as a component of the CII Settlement was justified. Foremost, Mr. Allen is creating extraordinary value through the unique contributions he is making. Furthermore, Mr. Allen is also concerned about his exposure to frivolous lawsuits. (Millstein 9/10/09 Tr. at 42:4-25, ("it was part of their term sheet from the beginning"); Conn 9/2/09 Tr. at 86:9-88:17 (Third Party release was essential to the plan), 88:16-17 (stating Mr. Allen is "a public figure and he's . . . a deep-pocket[ed] individual who attracts a lot of nuisance lawsuits").)

Ultimately, Charter determined that Mr. Allen's unique contribution to the restructuring – his one-of-a-kind ability to create billions of dollars of value through certain forms of cooperation – was fair consideration for the Third Party Release.

**J.    Charter's Board Approved the CII Settlement Because it was Fair and Necessary to a Successful Restructuring**

Eventually, the parties reached an agreement that became the CII Settlement. Although Mr. Allen's representatives sought 12% of the equity of reorganized Charter from the Crossover Committee for Mr. Allen's cooperation on a going forward basis, they eventually settled on 2% of the equity, 4% warrants, plus an $85 million note.  (CX 211, Disclosure Statement at 27.)  Mr. Allen did not obtain all the consideration he had sought, but the parties reached a fair compromise that enabled Charter to achieve its objectives, yet compensated Mr. Allen for his continued participation.  (Liang 7/29/09 Tr. at 209:5-212:15; Millstein 7/21/09 Tr. at 72:20-72:21.)

Charter's board unanimously approved the CII Settlement as a critical component of the Plan because (i) it was fair; and (ii) the CII Settlement is the mechanism by which Charter achieved its goal of reinstating its debt and preserving the use of its NOLs.  (Smit 7/21/09 Tr. 232:24-233:11; Johri 8/31/09 218:11-16 ("[The CII Settlement] met our objectives of maximizing the overall enterprise value.  It preserved the NOLs and it preserved our reinstatement of the credit line").)  Charter's financial advisor echoed this sentiment: the structure that was ultimately agreed to in the CII Settlement "maximize[ed] value to Charter and its creditors."  (Goldstein Decl. ¶ 20; *see also* Millstein 9/10/09 Tr. at 43:8-15, stating that the CII Settlement is a "critical component of the plan, and the plan is based on the settlement becoming effective because it's a settlement that gives Charter the tax benefits and the ability to reinstate the bank debt").)

Moreover, the CII Settlement has the added benefit of achieving a step-up in tax basis when CII's interest in Holdco is diluted and premised on Mr. Allen engaging in post-reorganization taxable exchange(s) of his Holdco interests for stock of reorganized Charter. In the words of Mr. Millstein:

> Q. Separate and apart from that benefit, is there an additional tax benefit that Mr. Allen's participation in this plan provides Charter?
>
> A. Yes. It is contemplated that immediately following consummation of the plan that a set of transactions will occur involving Mr. Allen whereby he will exchange his partnership interest for stock of the public company, the reorganized public company. And the effect of that, and a couple of other things going on that I'm not particularly expert in, but the effect of all of these transactions is that the company will be entitled to revalue its assets for tax purposes and therefore step up the tax basis of its assets from approximately eight billion dollars to fourteen billion dollars after giving effect to all of these transactions, thereby creating six billion dollars of incremental tax basis in Charter's assets, which Charter may then use to depreciate and shelter income over time. So that is another significant pocket of value created by the tax structure that this plan is based upon which in the absence of Mr. Allen's participation would not be achievable.

(Millstein 9/10/09 Tr. at 13:11-14:5.)

Charter's management team presented the final terms of the CII Settlement to Charter's Board, and the Board unanimously voted to approve it. (Smit 7/21/09 Tr. at 233:12-15.) Mr. Johri had no doubt about the reasonableness of the compensation to Mr. Allen and believed that "Mr. Allen did have assets for which he could legitimately demand to be compensated." (Johri 8/31/09 Tr. at 225:4-6; *see also* Merritt 7/22/09 Tr. at 207:23-208:1 ("It's unimaginable, with all of those different interests and different issues, that it could have been done outside of Allen.")) Moreover, Mr. Smit testified that the CII Settlement was fair because

> I think [the settlement with Mr. Allen] achieved the original objectives we set out for the restructuring and recapitalization. We'd reduced our debt by eight billion dollars, we had cut out hundreds of millions of dollars of interest payments a year, we had attracted almost three billion dollars of new investment in the business, and we were achieving free cash flow positive results on day one, and we had enough liquidity to operate the business, going forward.

(Smit 7/21/09 Tr. at 233:4-11.)

In evaluating the consideration paid to Mr. Allen, the management team, the Board, and their financial advisors "took our comfort from the fact that the bondholders weren't giving anything away." (Millstein 7/21/09 Tr. at 72:20-21.)

### K.     The Independent Directors Did Their Jobs

The Noteholders accuse Charter's Board of rolling over to accommodate Mr. Allen's demands. (LDT Objection at 16, ¶ 15 (stating "CCI's officers and directors completely abdicated their fiduciary responsibility to negotiate to maximize the value of CCI for its stakeholders. For the most part, management and its advisors stood idly by and adopted the role of mediator while Mr. Allen negotiated key components of the Plan with the Crossover Committee").) The evidence reveals otherwise – the Charter Board functioned independently and designed a plan to maximize the value of the enterprise. (Merritt 7/22/09 Tr. at 241:16-17 (stating "[t]he objective of the board was to maximize the overall enterprise value"); *see also* Johri 8/31/09 Tr. at 157:15-17.)

Manifesting their independence and continuing a practice in which they had been engaging for years, throughout this process, the Independent Directors met among themselves, separate and apart from Mr. Allen or his representatives, including at the conclusion of board meetings to confer with Charter's legal and financial advisors. (Smit 7/21/09 Tr. at 223:10-24; Merritt 7/22/09 Tr. at 166:21-167:5.) Mr. Millstein testified that "from the December board meeting through the execution of the term sheet," the Independent Directors "met separately at the conclusion of the regular board meetings to review matters implicating Vulcan's relationship to the company involved in the recapitalization." (Millstein 7/21/2009 Tr. at 158:14-25.) Independent Director Johri also stated that the Independent Directors "started the process of meeting independently and had telephonic conversations where we were advised by the advisors

23

and the legal counsel on, one, what our responsibilities were, two, as the steps were being taken and different stages of negotiations, and we gave direction to the advisors to move in that direction." (Johri 8/31/09 Tr. at 217:1-9.) Independent Director Merritt testified:

> Q. And what steps did the independent directors of Charter take in analyzing the Vulcan-Allen settlement?
>
> A. The independent directors spoke regularly for a long time, but effective December, at every meeting, met separately in private session, just the independents, with counsel and with our financial advisor.
>
> Q. And how frequently do you recall the independent directors meeting separately to discuss the restructuring?
>
> A. Well, at each meeting, and starting in January the meetings were quite frequent, as often as once a week. And then in February, as often as almost daily. And then between meetings, in January, the directors – individual directors, were speaking to each other about the issues, or at least to the extent I participated. There were frequent calls."

(Merritt 7/22/09 Tr. at 166:15-167:3.) According to Mr. Goldstein, "[Lazard's] practice was to brief the full Board, and then have separate discussions with all of the independent members of the Board in executive session outside the presence of Mr. Allen or his representatives and advisors."(Goldstein Decl. ¶ 13; *see also* Johri 8/31/09 Tr. at 217:1-9.)[10] The formation of a smaller sub-set of Charter's independent board members was considered and rejected in favor of delegation to the entirety of Charter's independent board members. As Mr. Merritt testified:

> A. The restructuring negotiations and the Allen interest negotiations were so pervasive to the entire company and so material, that it did not seem appropriate to delegate that to a committee. That was a matter that all independents needed to be fully informed of . . . .
>
> Q. Would the formation of a special committee have enhanced or changed in any way the evaluation of the Allen settlement?

---

[10] *See* minutes reflecting that independent directors met separately, JPX 086 (December 10, 2008 Minutes) at 8; JPX 129 (January 6, 2009 Minutes) at 4; CX 250 (January 30, 2009 Minutes) at 2; CX 254 (February 6, 2009 Minutes) at 3.

A.  I don't think it would have changed.  Again, given that all five independents were very actively part of this, talking and meeting and evaluating, I don't believe that a special committee of some smaller number of people would have added to it. It only could have shrunk the group dealing with these issues.  The five acted, in effect, as a committee . . . .

(Merritt 7/22/2009 Tr. at 170:2-19.)  These independent board members acted as a de facto committee throughout the process.

Mr. Allen, in turn, respected the parameters of the negotiations.  There is absolutely no evidence that Mr. Allen controlled, dictated or influenced either the process or deliberations of the Independent Directors concerning the restructuring (*see* LDT Objections at 9 (stating that Mr. Allen "abused his position as controlling shareholder"), because Mr. Allen did not do so.  Neither Mr. Allen nor any of his affiliated directors hindered any efforts by the Independent Directors or Charter's management to independently review the CII Settlement terms or to pursue alternative restructuring transactions.  Although Mr. Allen functioned as the chairman of the board, during this time period, his role typically was to call each board meeting to order and then turn the meeting over to Mr. Smit.  (Conn 9/2/09 Tr. at 135:6-12.)  Mr. Allen respected the Independent Directors' need to determine the process by which they would ensure independence, including their practice to meet separately as they deemed appropriate.  If, as the CCI Noteholders suggest, Mr. Allen was dictating the process, one would have expected a stream of documents and emails from Seattle reflecting his involvement.  The absence of any evidence supporting the CCI Noteholders' theory is striking.  Neither Charter's Board nor its advisors acted as Mr. Allen's dupe.

In sum, Charter consistently has benefited from having independent board members, not beholden to Mr. Allen.  (Millstein 7/21/09 Tr. at 65:7-18.)  Mr. Millstein testified as follows:

Q. And how would you – well, let me say this, do you understand that Law Debenture Trust has argued that the Charter board was not engaged in the negotiation process?

A. I mean, whether they – I don't know what they've argued, but nothing could be further from the truth. This is – I've represented a lot of companies, both as a lawyer and a banker, and this process was one that evinced a very engaged board, very actively involved, monitoring and participating in some cases in the negotiations of important transaction elements and I mean, I think this was practically a model of corporate governance, a very actively engaged board. They prepared themselves to authorize us to engage in these transactions. They prepared themselves to understand the nature of the deals that were being proposed, and they monitored the progress – the management team – that we made in moving towards the deal that's now before the Court very actively. And, you know, there were some – there were some heated conversations.

(Millstein 7/21/09 Tr. at 66:3-20.)  Charter's management has also acted independently of Mr.

Allen.  (Millstein 9/10/09 Tr. at 9:2-5 (stating that Mr. Allen and the Vulcan team did not exert

any influence on Charter management's decision that Lazard should evaluate a potential

restructuring).)

## L.     Charter will Realize Substantial Benefits as a Result of the CII Settlement

The CII Settlement confers benefits on Charter that far exceed the value that

Charter will provide to Mr. Allen.  For example, Mr. Goldstein of Lazard testified:

If you just look at the order of magnitude between the two gives and gets, if you will, between Paul Allen and the company, Paul was getting, you know, in the order of magnitude of a few hundred million dollars and the company was getting billions of  dollars of benefit.  This was . . . not even a close call.

(Goldstein 8/24/09 Tr. at 17:15-21; *see also* Goldstein Decl. ¶ 22.)

According to Mr. Millstein:

[C]ertainly at the time, you know, this transaction was negotiated, we all thought it was saving the company hundreds of millions of dollars on an annual basis of avoided interest costs and preserved at least 3 billion dollars more of the NOL than would otherwise have been possible.  And that permits, through the post-reorganization exchanges, the step-up in basis that creates another six billion dollars of shelter. And, you know, and it shouldn't be lost on anybody here that the effect of this reorganization is actually to create a company that's going to generate taxable income.  So these NOLs are no longer of sort of hypothetical

value, and the tax basis and the assets that creates – the incremental tax basis and the assets, it creates more shelter from future depreciation deductions. These are no – this isn't a hypothetical exercise anymore where we sort of have a balance sheet item called, you know, tax attributes. We're actually going to use these things on a go-forward basis because we've knocked six billion dollars' worth of debt off the balance sheet, the interest costs are vastly reduced and the company should be generating positive net income from a tax – possible – positive taxable income, something that it hasn't generated the entire time I've been there.

(Millstein 9/10/09 Tr. at 24:10-25:7.) Mr. Conn similarly testified:

I think [the CII Settlement] is fair, I mean, just looking at the numbers here, 180 million versus 2 to 3 billion dollars. That's . . . just as a percentage, a fairly small percentage. But also, because . . . to my understanding, Mr. Allen's participation, cooperation is the linchpin of creating this value.

(Conn 9/2/09 Tr. at 149:16-21.) Moreover, Mr. Merritt stated:

the Paul Allen interests were key to maintaining the bank arrangement. Continued cooperation within our tax planning and our tax structure was key to not impairing or losing material amounts of NOLs. The Allen group had a number of other assets and interests in the company that would be beneficial to reconsolidate and get control of all of those to simplify the structure.

(Merritt 7/22/09 Tr. at 201:19-25; *see also* Vulcan Demonstrative 3 (illustrating total value received to Debtors is approximately $3 billion, and Mr. Allen's total value received is approximately $375 million); Millstein 9/10/09 Tr. at 23:17-24:17, 35:17-37:6.)

Mr. Allen is the only individual on earth with the ability to create such unprecedented value for this estate. (Goldstein 8/24/09 Tr. at 14:7 – 9 ("On the reinstatement Paul was the only person on earth that could give it to us"; Millstein 9/10/09 Tr. at 14:19-21 ("it's clear that only he – among the constituents in the deal today, only he can do this for us."); Merritt 7/22/09 Tr. at 207:17-20 ("It was probably unlikely if not impossible to achieve a prearrangement without cooperation from the Allen interests, because of the issues of the bank arrangement and the tax structuring.").)

1.   **The CII Settlement Permits the Reinstatement of Billions Dollars of Bank Debt at Favorable Interest Rates**

Roughly $11.8 billion of Charter's senior debt under the debt instruments will be reinstated (if the Plan were to be confirmed) through Mr. Allen's continued ownership of a minimum of 35% voting interest in Charter, consistent with the change of control requirements under the credit facility.  (Goldstein Decl. ¶ 25.)  The value of the reinstatement cannot be overstated.  As Mr. Goldstein testified:

> On the preservation of the ability to reinstate the debt, this – I think we've been conservative in putting hundreds of millions of dollars, frankly at the time we were negotiating this when there was even more severe dislocation of the credit markets, that was up to billions of dollars.  Every hundred basis points of increase in the debt would be a 500 million dollar expense to the company.  And so once you start talking about potentially several hundred basis points, you very quickly get into the billions of dollars.[11]

(Goldstein 8/24/09 Tr. at 16:18-17:1.)  Mr. Millstein testified that the reinstatement would "sav[e] the company hundreds of millions of dollars on an annual basis of avoided interest costs" and emphasized that "it would have been extremely expensive to try to replace the Charter bank debt at that point in time if in fact there was any bank debt financing available, which there wasn't.  But even assuming it were available, you would have been paying through the nose for the privilege of refinancing this bank debt."  (Millstein 9/10/09 Tr. at 24:12-13, 12:6-11; *see also* Doody 8/17 Tr. at 34:22-24 (estimating the value of reinstatement to be "somewhere in the hundreds of millions of dollars"); Merritt 7/22/09 Tr. at 266:24-267:4 ("There are a number of pockets of value [that Mr. Allen was contributing to Charter].  Obviously, a large item was the

---

[11]   The amount of savings to Charter was about $1 billion to $2 billion at the time when the CII Settlement was entered.  That amount may have decreased to approximately $500 million due to the fluctuation of market interest rates.  However, the fairness of the CII Settlement should be evaluated based on the facts that existed contemporaneous with the settlement negotiations, rather than based on subsequent events.  *Cf. Rosenberg v. XO Communs., Inc.*, 330 B.R. 394, 399 and n. 29 (Bankr. S.D.N.Y. 2005) (court decided the case based on the facts that existed at the time when the investor agreement was entered without considering the subsequent change in market values).

continuation of the bank arrangement, and interference with that could potentially increase interest expense nine figures, hundreds of millions of dollars. So that was one. And that would go on for a series of years. So that could be a very large number").)

Any re-pricing of the CCO Credit Agreement would have been very expensive for the Debtors because a substantial majority of Charter's outstanding debt under the CCO Credit Agreement bears an interest rate of Libor +200 basis points (LDX 239, 2008 10-K at F24-25), whereas the prevailing rate at the time of the negotiations in December of 2008 had increased to an estimated Libor +1200 basis points, assuming that any financial institution could or would provide financing at that time. (Millstein 9/10/09 Tr. at 12:2-11; Merritt 7/22/09 Tr. at 266:24-267:4; Goldstein Decl. ¶ 25.) Thus, re-negotiation of the CCO Credit Agreement would have cost the Debtors hundreds of millions of dollars in annual interest expense on a best case scenario. (Merritt 7/22/09 Tr. at 266:24-267:4; Goldstein Decl. ¶ 25 (discussing value of reinstatement).)

### 2. The CII Settlement Preserves Charter's Valuable NOLs

NOLs are net operating losses that can be used to offset taxable income and thereby reduce taxes. Charter accumulated these NOLs through years of generating losses (at the operating company level). (Millstein 7/21/09 Tr. at 48:2-4.) Charter cannot utilize its NOLs now because it is not able to generate positive net income due to its heavy debt load. (Millstein 9/10/09 Tr. at 25:1-7.) However, reorganized Charter is projected to generate positive taxable income after its de-leveraging through the bankruptcy process and anticipates that it will be able to utilize its NOLs to reduce its future taxable income. (Millstein 9/10/2009 Tr. at 24:9-25:23.)

The CII Settlement preserves approximately $2.85 billion of NOLs. (Degnan Decl. ¶ 8.) As part of the CII Settlement, Mr. Allen has agreed to forebear from exercising his rights under the Exchange Agreement and also agreed to retain a 1% equity ownership in Holdco.

(CX 211 at 27.) As a result of a tax allocation provision in the Holdco LLC agreement entered into in connection with the Plan, CII would be allocated approximately $2.85 billion of the Debtors' $6 billion cancellation of indebtedness income ("COD") based on CII's percentage ownership of Holdco. (Degnan Decl. ¶ 7-8; LDX 475.) Without the CII Settlement, this $2.85 billion of COD income may have been allocated 100% to Charter and, if so, would have reduced Charter's NOLs by the same amount. (Degnan Decl. ¶ 7.) Based on a combined federal and state tax rate of 40%, preservation of the $2.85 billion of NOLs would generate approximately $1.14 billion of future cash savings for Charter. (Degnan Decl. ¶¶ 8-9.)

Charter's management and its advisors understood that Mr. Allen's participation in the restructuring through his ownership of CII (and CII's ownership of Holdco) was key to the preservation of NOLs. (Johri 8/31/09 Tr. at 184:21–24; Merritt 7/22/09 Tr. at 201:6-22; Millstein 7/21/09 Tr. at 73:11–17; Goldstein 8/24/09 Tr. at 16:9–17; Smit 7/21/09 Tr. at 222:17-223:2.) According to Mr. Goldstein, "[t]his tax issue and structure was fundamental to the Company since its first proposal and it remains so under the Plan." (Goldstein Decl. ¶ 16.)

### 3. The CII Settlement Results in a Significant Post-Restructuring Step-Up in Tax Basis

The CII Settlement has the added benefit of achieving a step-up in tax basis in billions of dollars when CII's interest in Holdco is diluted, premised on Mr. Allen engaging in post-reorganization taxable exchange. (Millstein 9/10/09 Tr. at 13:11-14:5; *see also* Conn 9/2/09 Tr. at 152:18–19.) The CII Settlement includes one or more post-confirmation taxable exchanges of Mr. Allen's Holdco units for CCI stock. (Millstein 9/10/09 Tr. at 13:11-14:5.) A stepped-up basis allows post-restructuring Charter to take additional depreciation and amortization deduction over the years, which will reduce its future taxable income and tax

liability. Mr. Conn testified that the net present value of the step-up in tax basis is approximately

$500 million:

> I actually think 180 million is fair compensation for the step-up that Mr. Allen
> intends to provide the company post-restructuring because it's NPV'd at about 500
> million dollars, which means he's getting way less than fifty percent.

(Conn 9/2/09 Tr. at 176:24 – 177:2.)

The Crossover Committee also recognized that the step-up in basis provided

benefits. For example, a March 6, 2009 Apollo internal memo stated:

> The gain [Mr. Allen] triggers should provide CCI with a step up in the tax basis of
> the assets of the partnership. To the extent the step-up is allocated to depreciable
> or amortizable assets, CCI would get additional tax deductions in future tax years.
> The Company has estimated the potential step up at ~$3 billion, which would
> enable ~$500 million of additional annual tax deductions between 2010 and 2013,
> with the remaining balance utilized thereafter.

(JPX 235 at 14; See also JPX 243, Crestview March 9, 2009 Memorandum at 40-41.)

### 4. The CII Settlement Allows Charter to Acquire Mr. Allen's Valuable CC VIII Interests

The CII Settlement also provides for the transfer of CII's Class A Preferred Units

of CC VIII, one of the Debtors' operating subsidiaries, to the Debtors. Among CC VIII's assets

is a group of cable systems that generates cash and therefore has considerable value greater than

the value of other Charter cable systems to the reorganized company. Lazard valued the CC VIII

units in a range of $135 to $165 million, which will be captured by the reorganized company

through the CII Settlement's transfer of all CC VIII units to the reorganized Charter. (Goldstein

Decl. ¶ 26; Goldstein Decl. Ex. B.) Mr. Merritt testified:

> The company owns a group of our systems that . . . have operations and generate
> cash and have demonstrable value. So . . . that's a valuable asset. It would be
> better for Charter to recover that and reconsolidate the full amount.

(Merritt 7/22/09 Tr. at 203:14-18.)  Mr. Conn similarly testified that "[t]he company wanted to capture all the upside in those assets if they could by buying . . . Mr. Allen out." (Conn 9/2/09 Tr. at 146:18-20.)

5.      **The CII Settlement Facilitates a $1.6 Billion New Money Investment into Charter through the Rights Offering**

A further significant benefit of the CII Settlement is that it paves the way for the successful implementation of the rights offering, which will inject $1.6 billion of new money into reorganized Charter and allowed the company to arrange this financing at a time when equity, capital and debt financing were not readily available.  (Goldstein Decl. ¶ 28.)  The injection of cash in exchange for equity rather than debt is key in addressing the problems Charter has long faced from its highly leveraged capital structure.  Because the rights offering is predicated upon the reinstatement of the senior debt and preservation of Charter's NOLs, it is implicit that the rights offering would not occur in the absence of the CII Settlement that accomplished those twin prerequisites.  According to Mr. Doody, Charter's chief restructuring officer:

> [W]ithout the CII Settlement, this plan would not be possible at all and therefore the rights offering couldn't happen. . . . the CII Settlement is one of the bases for the plan and which allows the rights offering to happen, allows the debtors to raise this money.

(Doody 8/17/09 Tr. at 34:7–12.)

6.      **The CII Settlement Eliminates the Management Agreement Obligation**

The CII Settlement also eliminates Charter's obligation under a former management agreement with CII (CX 211, Disclosure Statement at 27; Goldstein Decl. ¶ 27) in which there is an outstanding management receivable valued at $30 million.  (Vulcan Demonstrative 3 (citing VX 4 Charter 2002 Form 10-K), based on a $14 million receivable that

has accrued interest at a rate of 10 percent, compounded annually, since December 31, 2001; Conn 9/2/09 Tr. at 147:16-20 (The CCO management receivable is "a historical agreement that we talked about earlier that had been sitting on the company's books for many years that Mr. Allen had never called on to collect.").) The Receivable would have been paid in full as a matter of course because it was a "historical agreement" that "Mr. Allen had never called on to collect." (Conn 9/2/09 Tr. at 147:16-148: 3)

The $25 million management receivable will be paid only to the extent the company has $600 million or more of cash, less certain interest payments and prepayment indebtedness, on the Effective Date. (Plan at Article VI.A.2.(a), (d).) Any unpaid portion of the fee will be paid within 20 days after the first calendar quarter following the Effective Date to the extent of Available Cash. *Id.*

### 7.    The CII Settlement Prevents Free-Fall Bankruptcy

The CII Settlement provides additional benefits to Charter that cannot be measured by conventional metrics. Once the parties were bound by the terms of the CII Settlement as the cornerstone to the Plan, the Debtors did not face the prospect of a free-fall chapter 11 proceeding and the attendant loss of value that would likely result. (Johri 8/31/09 at 178:20-178:24, 180:23-181:4 ("If [the Debtors] had gone for a freefall bankruptcy, everyone would have suffered much more").) For example, Mr. Merritt testified that:

> There was concern about the fact that a protracted Chapter 11 could take management's attention from the marketplace. The cable industry is a highly, highly competitive business. So to perform well, we couldn't afford our management team to be diverted for months, if not years. We were very concerned about – we felt we had a top-flight management team. Very concerned that a protracted bankruptcy would cause turnover and that would hurt our value. Very concerned about the costs of a protracted bankruptcy, the fees and the like. And in the case of a freefall, if that led to the need to sell assets or the entire assets of the company, this would not – would be about the worst time to try to do that, if you were seeking to receive full value. The multiples at that moment were at a

very low point in their normal cycle. So the board was very concerned that a
freefall would diminish value materially.

(Merritt 7/22/09 Tr. at 200:16-201:5.)  Lazard advised the board in November 2008 that one

result of a free-fall bankruptcy would be the incurrence of approximately $12.5 million a month

in fees and costs.  (JPX 60 at LAZ\CH 0000229.)

## M. The Consideration Mr. Allen Receives for Providing Valuable Benefits to Charter

In exchange for Mr. Allen's participation in the CII Settlement and his vast

contribution of value to the estate,  Mr. Allen will receive cash (in exchange for CCI, and the

outstanding management receivable and our capped legal fees), a note, equity in reorganized CCI

and Holdco, and a release of claims held by the Debtors and third parties.  (CX 211, Disclosure

Statement at 26-29.)  In exchange for his prospective cooperation, based on the value of what

Charter will receive compared to what it will pay out in the CII Settlement, an Independent

Director as well as Charter's advisors believe that the consideration Mr. Allen receives under the

CII Settlement is reasonable, fair and the best deal available to Charter.  (*See e.g.,* Johri 8/31/09

Tr. at 225:8-225:12.)  Indeed, Mr. Johri, an independent board member of Charter, had no doubt

about the reasonableness of the consideration paid to Mr. Allen:

> THE COURT:  As you sit here, sir, do you have any  doubts as to the
> reasonableness of the compensation that is being paid to Mr. Allen as part of the
> settlement to be approved, pursuant to this plan?
>
> [Mr. Johri]:  I, personally, don't, sir.

(Johri 8/31/09 Tr. at 225:8-12.)

Mr. Millstein expressed a similar thought.

> Q.  And just to close this out, did you believe there was anything inappropriate
> about Mr. Allen potentially receiving compensation for this continued
> participation?
> A.  Look, it's all about price.  It's all about the quid pro quo.
>  . . .

A.  So, anyway, 180 billion on – 180 million on this side of the ledger, and billions of dollars of value to the estate on the other side of the ledger, this seemed like a pretty fair trade, to me. So that kind of compensation is – I felt, was quite reasonable.

(Millstein 9/10/09 Tr. at 23:17-21, 25:10-15.)  Mr. Goldstein testified that "if you just look at the order of magnitude between the two gives and gets . . . Paul was getting . . . in the order of magnitude of a few hundred million dollars and the company was getting billions of dollars of benefit.  This was a – this was not even a close call."  (Goldstein 8/24/09 Tr. at 17:15-18:3.)  Mr. Goldstein also testified as to the fairness of the CII Settlement, communicating his belief that "the settlement was fair and the best deal available for the company" and that he would not have recommended that the company agree to the settlement if he felt otherwise.  (Goldstein 8/24/09 Tr. at 17:15-18:3.)

### 1. Mr. Allen Does Not Recover on Account of his Equity Interests in CCI or Holdco

Mr. Allen's recovery under the CII Settlement is not based on his equity interests in CCI or Holdco.  Rather, consideration to be provided under the CII Settlement is based on the value he creates by remaining in voting control of Charter and other participation in the Debtors' restructuring.  (Goldstein Decl. ¶ 15 ("It was his cooperation, not Mr. Allen's old equity, that held value.").)  Mr. Allen will not receive any consideration for billions in equity he held in Charter. (Conn 9/2/09 Tr. at 175:8-177:6 (CX 211, Exhibit A, Plan at Art. IV.A.6, VI.C.))  Specifically, Mr. Allen does not receive any consideration under the CII Settlement for his Class A Common Stock of CCI, vested CCI options or his Class B Common Stock of CCI. (*Id.*)  The Plan specifically provides that interests in CCI will be canceled, released and extinguished. (Plan Art. IV.A.6.; Doody 8/17/09 Tr. at 32:19-21.)  Mr. Allen's recovery for his notes will be the same as other noteholders. (Conn 9/2/09 Tr. at 125:22-25 (stating that Allen's recovery on his CIH notes is identical to other Noteholders.))  Rather than being compensated for his past

contributions, Mr. Allen will be compensated for his commitment to prospectively undertake actions that will substantially benefit Charter.

> ### 2. The $150 Million Mr. Allen Stands to Receive Is Fair Value for His Interest in CC VIII, a Solvent Operating Entity

Pursuant to the CII Settlement, Charter will acquire approximately 7.3 million CC VIII Class A Preferred Units owned by Mr. Allen which are currently valued between $135 to $165 million. (CX 211, Disclosure Statement at 27; Goldstein Decl. ¶ 26 and Exhibit B.) The $150 million of cash Mr. Allen receives under the CII Settlement is intended to compensate Mr. Allen for the transfer of his 30% interest in preferred stock in CC VIII to the Debtors. (*Id.*) The $150 million Mr. Allen will receive lies within the valuation range of CC VIII, and the compensation Mr. Allen will receive for turning this valuable asset over to the Debtors is fair. (Goldstein Decl. ¶ 26.) Mr. Millstein testified:

> [H]ere was value being – if you went to gives/gets thing, you would see that the value being provided to him in respect of his CC VIII interest was separate and apart from the value that was being provided to him through the rights. So in other words, he had a senior interest in the capital structure that he was being compensated for, like every other creditor, in accordance with – actually in that – at that time, a range of values. So he got different amounts in respect of the CC VIII interest, depending upon where we valued the CC VIII interest. But in all events, he got value for that."

(Millstein 9/10/09 Tr. at 46:5-16.) The impetus for Charter acquiring this asset in order to simplify the ownership structure originated with Charter, not with Mr. Allen. Merritt explained:

> Q. And in particular, the CC8 interests, why are those valuable for Charter?
>
> A. Well, those – that company owns a group of our systems that generate – have operations and generate cash and have demonstrable value. So to bring – you know, that's a valuable asset. It would be better for Charter to recover that and reconsolidate the full amount.

(Merritt 7/22/09 Tr. at 203:12-18; *see also* Conn 9/2/09 Tr. at 79:3-7 (stating "[t]he company asked to reconsolidate [the CC VIII interest] to eliminate the overhang. And we at Vulcan were willing to entertain the discussion around the right value").)

### 3. Mr. Allen Was Entitled to Recovery of $25 Million for the Management Receivable Owed by CCO, a Solvent Entity

As discussed above, the $25 million that Mr. Allen will receive on account of a valid account receivable is fair.

### 4. The Remaining $180 Million Is Fair Consideration for the Value Created for the Debtors By Mr. Allen

The remaining consideration received by the CII Settlement Party amounts to about $180 million, which is at the low end of a range of fair consideration for Mr. Allen given the approximately $2 billion to $3 billion Mr. Allen created for the Debtors. (Conn 9/2/09 Tr. at 176:11-14.) The $180 million consists of $85 million in new CCH II notes, approximately $60 million worth of CCI common stock and Holdco equity, and $35 million worth of warrants. (VDX3; Goldstein Decl. ¶ 29.) To Charter's financial advisor, it is a pretty fair trade. (Millstein 9/10/09 Tr. at 25:10-15 ("180 million on this side of the ledger, and billions of dollars of value to the estate on the other side of the ledger, this seemed like a pretty fair trade, to me.").) Mr. Conn shared the view. (Conn 9/2/09 Tr. at 176:11-18 (stating "[s]o the real exchange is two, three billion dollars of value [to Charter] for 180 million [to Mr. Allen].").) Furthermore, some of Mr. Allen's consideration is in the form of restricted equity that is not transferable for five years. Due to the lack of liquidity, the value of this portion of Mr. Allen's consideration would ordinarily be discounted. (Goldstein 8/24/09 Tr. at 15:19-16:1.)

### 5. Reimbursement for Advisor Fees Is Not Consideration

Mr. Allen's $20 million expense reimbursement pursuant to the CII Settlement (which is limited to actual, out-of-pocket fees) should not be viewed as "value received" because

the advisor fees incurred are mainly for the benefit of the Debtors. Indeed, measured under a conventional standard, there is no dispute that Mr. Allen is making a substantial contribution to this case and would otherwise be entitled to full reimbursement of his fees and expenses. (See 11 U.S.C. § 503(b)(3)(D).) If not for the restructuring and the Debtors' initiation of a dialogue with Mr. Allen to induce him to participate in the process, Mr. Allen would not have incurred these fees in connection with the restructuring. Moreover, Mr. Allen was the only party in the restructuring whose fees have been capped, and Mr. Allen's fees have exceeded that cap. (Conn 9/2/09 Tr. at 148:9-14.)[12]

The $20 million fee reimbursement will be paid once the Management Receivable is paid, and only to the extent there is any remaining cash in excess of a threshold of $600 million, less certain interest payments and prepayment indebtedness on the Effective Date. (Plan at Article VI.A.2.(b), (d).) Any unpaid portion of the fee will be paid within 20 days after the first calendar quarter following the Effective Date to the extent of Available Cash. *Id.*

### 6. LDT's Tax Liability Theory Has No Support in the Record and Should Not Be Considered When Evaluating the Settlement

There is no evidence supporting the CCI Noteholders' oft-repeated mantra that "Mr. Allen would be liable to taxing authorities for $1.5 billion in cash if alternative strategies were pursued." LDT Objection at 9. (LDT Obj. at 9; *see also id.* at 13, 15, 58-59, 65, 69, 73,

---

[12]    The CCI Noteholders make much ado over a single email exchange as evidence that Mr. Conn improperly raised a cap to which he and the Company had previously agreed. However, Mr. Allen and Charter had already agreed in the term sheet to cap the reimbursed fees at $20 million before the email exchange between Messrs. Conn and Smit about the advisor expenses took place. (Conn 9/2/09 Tr. at 56:19-59:14.) It was a misunderstanding on the part of Mr. Smit to raise the question of capping the advisor fees at $5 million. (*Id.*; *see also* Smit 7/22/09 Tr. at 112:20-113:3 ("I think at the end of the day Lance was right, they were capped at twenty million.").) The management compensation plan was mentioned only because it was the biggest open issue at that moment and required resolution. (Conn 9/2/09 Tr. at 59:15-60:5.)

81-82, 89.)  To the contrary, exercise of the exchange right was merely one of several tax strategies that were available to Mr. Allen.  As Mr. Millstein testified:

> So we had thought that actually that he needed Charter's – that he, from a tax planning point of view, that he, Mr. Allen, or the Vulcan entities, needed – as much as we needed his cooperation, he needed our cooperation in order to protect his tax position.  And we sort of even started banging the table at some point and suggested that across the table when we were negotiating something or another, and we were told no, Vulcan has lots of different ways to protect itself.

(Millstein 9/10/09 Tr. at 15:3-11; *see also id.* at 16:12-18; Conn 9/2/09 Tr. at 144:3-7 ("Mr. Allen had a variety of solutions to any alleged tax problem that didn't even require a restructuring agreement with the bondholders or the company.  In other words, he had options that were independent of an agreement.").)  Although the Crossover Committee guessed whether Mr. Allen had tax exposure as means of exercising leverage over him, the scenarios outlined by the advisors were at most "hypothetical to the point of being next to impossible."  (Conn 9/2/07 Tr. at 34:8-22.)  In any event, the CCI Noteholders have failed to provide any evidence whatsoever to support their speculation that Mr. Allen derived tax benefits that were not available under alternative structures.[13]

## ARGUMENT

### I.     JPMorgan Bears the Burden of Proving Its Claim of a Pre-Petition Default Due to Alleged Lack of Ability to Pay Debts As They Come Due

This Court requested briefing about who bears the burden of proof as to the question of whether an incurable pre-petition default precludes reinstatement of the CCO Credit Agreement under section 1124 of the Bankruptcy Code.  Mr. Allen respectfully submits that JPMorgan, as the party claiming that an "event of default" has occurred, bears the burden of

---

[13]    Mr. Bojmel in one of his emails also suggested that the consideration Mr. Allen received did not include the value of "tax mitigation." (LDX Ex.  218)  Nevertheless, he was not in a position to know about Mr. Allen's tax position either.  (Conn 9/2/09 Tr. at 89:23-90:12 (stating "I don't think Mr. Bojmel is in a position to know [Mr. Allen's tax position]").)

proving any default. Under New York State law, which governs the CCO Credit Agreement, it is axiomatic that the party claiming a default bears the burden of proving it. *See, e.g.*, *In re Best Payphones, Inc.*, No. 01-B-15472, 2007 WL 1388103, at *5 (Bankr. S.D.N.Y. May 8, 2007) ("Under New York law, a party claiming a breach of contract must prove . . . 'breach by the other party . . . .'" (citation omitted)); *see also In re Urban Communicators PCS Ltd. P'ship*, 379 B.R. 232, 249 n.45 (Bankr. S.D.N.Y. 2007) (a secured creditor "argued for a number of pre-bankruptcy alleged Events of Default . . . . The Court finds sufficient evidence in the record for one earlier Event of Default, but only one . . . . Though it had ample opportunity to do so, [the secured creditor] introduced insufficient evidence of any other Events of Default, and its reservations of rights to introduce further evidence as to these, after taking discovery, were not a satisfactory substitute for proof."), *aff'd in part, rev'd in part on other grounds sub nom. Urban Communicators PCS Ltd. P'Ship v. Gabriel Capital, L.P.*, 394 B.R. 325 (S.D.N.Y. 2008).

        The fact that JPMorgan's claim arises in the context of plan confirmation does not upset long-standing principles governing the burdens of proof regarding claims and defenses grounded in contract. The imposition of a burden on the debtor to establish the *absence* of a pre-petition default cannot be based on section 1129, under which the debtor must establish, by preponderance of the evidence, that the proposed plan meets certain enumerated requirements. *See* 11 U.S.C. § 1129; *see, e.g.*, *In re Lionel L.L.C.*, No. 04-17324, 2008 WL 905928, at *4 (Bankr. S.D.N.Y. Mar. 31, 2008). Debtors bear the burden of proving that a plan complies with section 1124, which states the criteria for determining whether a class of claims is impaired or unimpaired and therefore is a critical finding for the reinstatement of debt. However, any party opposing unimpairment on the basis of a default bears the burden of proving that the default has occurred.

Bankruptcy courts have applied the usual allocation of burden of proof in evaluating claims of default. For example, in the context of section 365, courts have consistently held that a nondebtor who objects to a debtor's assumption of an executory contract bears the burden of proof as to defaults that allegedly preclude assumption. *E.g.*, *In re Kings Terrace Nursing Home & Health Related Facility v. N.Y. State Dep't of Soc. Servs.* (In re Kings Terrace Nursing Home & Health Related Facility), Bankruptcy No. 91 B 11478, Adv. No. 94/8912A, 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 27, 1995), *aff'd*, 184 B.R. 200 (S.D.N.Y. 1995). Only if and when a default is established, the burden shifts to the debtor to prove that the defaults have been cured. *Id.* However, "*[a]bsent proof by the nonbankrupt that a default exists, the burden of proof does not shift to the debtor.*" *Id.* (emphasis added).

Here, JPMorgan's claims of pre-petition breach present a situation analogous to the one recently addressed in *In re Greektown Holdings, L.L.C.*, No. 08-53104-wsd, 2009 WL 1653461 (Bankr. E.D. Mich. May 13, 2009). In that case, debtor Greektown Casino, L.L.C. sought authority from the court to assume a development agreement with the City of Detroit and one of its agents. The City objected to assumption, claiming, like JPMorgan in the current confirmation and adversary proceedings, that Greektown was in default under various provisions and was incapable of curing two historic non-monetary defaults. *Id.* at *1. The court held:

> A debtor seeking to assume an executory contract has the burden of proving that requirements for assumption have been met. *A party who objects to assumption then has the burden of establishing evidence of a default.* If a default is established, then the burden shifts back to the debtor to provide satisfactory proof that the default has either been cured, or will promptly be cured, and that there is adequate assurance of future performance.

*Id.* at *2 (citations omitted) (emphasis added).

Case law applying section 502(b) of the Bankruptcy Code, which addresses the allowance of claims, has similarly held that "*[o]nce established . . . the burden of demonstrating*

that the default has been *cured* shifts to the estate representative." *In re Millivision, Inc.*, 328 B.R. 1, 6 n.7 (Bankr. D. Mass. 2005) (first emphasis added). The *Millivision* court also emphasized that the bankruptcy context does not change the burdens of persuasion that would apply outside of bankruptcy law, including the rule that a party who raises an affirmative defense bears the burden of proving its existence:

> It is well settled that if a party in interest objects to a bankruptcy claim, the objector bears the initial burden of production. If that burden is met, the burden of persuasion shifts to the claimant as it would lie under non-bankruptcy law. And, also consistent with non-bankruptcy law, a party who raises an affirmative defense (e.g., an offsetting claim, the failure to mitigate losses) bears the burden of demonstrating its existence.

*Id.* at *6 (citations omitted). Thus, imposing the burden of proving a default on JPMorgan is consistent with long-standing rules in contract cases as well as the practice followed in bankruptcy proceedings.

## II.    The CII Settlement is in the Best Interest of the Debtors' Estates

A settlement between a debtor and a third party is appropriate when the terms of the settlement are in the "best interests of the estate." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 158 (Bankr. S.D.N.Y.), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005), *and aff'd*, 337 B.R. 475 (S.D.N.Y.), *aff'd*, 224 F. App'x 14 (2d Cir. 2006); *see also Nellis v. Shugrue*, 165 B.R. 115, 121 (S.D.N.Y. 1994) ("The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it."). The best interests test will be met when a settlement is found to be "fair and equitable." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). This standard does not require the settlement to be the best that the debtor could have obtained nor does it oblige the court to conduct a mini-trial of the facts or the merits underlying the dispute as a predicate to a "best interests" finding. *Adelphia*, 327 B.R. at 159. Rather, the court need only

be apprised of the facts necessary for it to evaluate the settlement and arrive at an independent conclusion on the settlement's reasonableness. *Id.* In doing so, the court may rely upon "opinions of the trustee, the parties, and their attorneys." *Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc.* (In re Int'l Distrib. Ctrs., Inc.), 103 B.R. 420, 423 (S.D.N.Y. 1989).

Here, the CII Settlement is in the best interests of the estate because (a) without it the Plan is not feasible under section 1129(a)(11), (b) it does not implicate a breach of Mr. Allen's fiduciary duties or in any sense of fairness in equity, (c) it falls well above the lowest level in the range of reasonableness and (d) it satisfies the entire fairness standard, if that standard were found to be applicable.

### A. Absent the CII Settlement, The Plan Would Not Be Feasible

Here, the CII Settlement is unquestionably in the best interests of the estate, for without it, the Plan is not feasible and thus incapable of being confirmed. *See* 11 U.S.C. § 1129(a)(11). The CII Settlement is the vehicle by which the Debtors are implementing their primary restructuring goals of reinstatement and NOL preservation. In addition, the rights offering, by which the Debtors will raise approximately $1.6 billion in equity investments, is predicated on the CII Settlement. Equally important to feasibility is the bondholder commitment to backstop the rights offering, which similarly required the CII Settlement to be in place.

Absent the CII Settlement, the Debtors would not be able to replicate the monetary value and tax advantages that form the basis of their Plan and their post-reorganization operations, and creditors could not be paid in full. As the evidence demonstrates, there was no capacity in the capital markets to reprice the four debt instruments that are being reinstated as a result of the settlement. (Millstein 9/10/09 Tr. at 12:6-11 (stating "it would have been extremely expensive to try to replace the Charter bank debt at that point in time if in fact there was any

bank debt financing available, which there wasn't").) Equally evident from the record is that the Debtors' NOLs could not be as effectively monetized to benefit the company on a going concern basis absent the CII Settlement. (Millstein 9/10/09 Tr. at 24:10-21.) Without these primary by-products of the CII Settlement, the Debtors could be laden with additional COD income, suffer the loss of valuable tax attributes, all of which would significantly impact projected recoveries and operating assumptions.

B.    **Mr. Allen's Participation in the CII Settlement Agreement Does Not Violate Any Fiduciary Duties**

By virtue of his role as a co-founder of Microsoft, Mr. Allen is a rich man. Yet no one would suggest that he has a fiduciary obligation to fund Charter's business losses or underwrite its interest expenses in the future. Likewise, no conception of fiduciary duty "required" Mr. Allen to volunteer to remain a 35% voting holder in a new Charter, to designate four directors and to provide the staffing and support to make those roles meaningful and to bear the burdens and risks associated with them. *See Odyssey Partners L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) (["Majority shareholder and sole secured creditor's] refusal to . . . assume further financial obligations on behalf of [the controlled company] without adequate compensation cannot seriously be thought to have been a breach of its fiduciary duties."); *Thorpe v. CERBCO, Inc.*, No. 11713, 1993 Del. Ch. LEXIS 257, at *24 (Del. Ch. Oct. 29, 1993) ("Controlling shareholders, while not allowed to use their control over corporate property or process to exploit the minority, are not required to act altruistically towards them."); *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (Delaware law does not require a 69% shareholder to self-sacrifice and "does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders").

In accordance with these fundamental precepts of Delaware corporate law, Mr. Allen has no obligation to retain a 35% voting interest in CCI following the reorganization, and assume the duties and exposures associated with the maintenance of that 35% interest. Indeed, the Debtors recognized that Mr. Allen could not be compelled to retain his equity interests, notwithstanding the fact that they had the potential to provide value to the estate. (Goldstein Decl. ¶ 17.) In fact, the Debtors acknowledge that, even if they sought to compel Mr. Allen to retain his equity interest in Holdco, such litigation had little probability of success. (Debtors' Br. in Support of Confirmation at 79) ("[N]othing explicitly requires Mr. Allen to cause CII to remain a member of Holdco to preserve the Debtors' tax benefits. And although the Debtors would zealously attempt to compel Mr. Allen to do so, if necessary, the Debtors believe that such endeavors have a limited chances [sic] of success . . . .").)

Despite the massive creation of value by the Plan, the CCI Noteholders nonetheless challenge certain action as constituting breaches of fiduciary duty:

- Mr. Allen's receipt of value as part of the CII Settlement;

- Mr. Allen's notice to exercise his Exchange Right during negotiations;

- Mr. Allen's unwillingness to make an additional capital contribution for the January 15, 2009 interest payment;

- CII's receipt of tax losses pursuant to the tax allocation provisions of the Holdco LLC Agreement; and

- Mr. Allen's vote in favor of making the January 2009 interest payment within the 30-day grace period.

However, Mr. Allen is under no requirement to self-sacrifice, to make additional capital contributions, to provide funds, or to refrain from exercising his longstanding contractual rights, such as his exchange right and his rights under the tax allocation provision of the Holdco Agreement. *See Odyssey Partners*, 735 A.2d at 388-89, 410-15 (consistent with its fiduciary

duties, the controlling shareholder was permitted to exercise its contractual right to foreclose even if exercising such a right meant that the interests of minority shareholders would become worthless; furthermore, the majority shareholder in its capacity as a supplier was not obligated to provide better credit terms or otherwise assist the company survive a financial crisis); *Solomon v. Pathe Commc'ns Corp.*, No. 12563, 1995 Del. Ch. LEXIS 46, at *16 (Del. Ch. 1995) ("A controlling shareholder is not required to give up legal rights that it clearly possesses . . . ."), *aff'd*, 672 A.2d 35 (Del. 1996). Consequently, there is no merit to the contention that Mr. Allen is precluded from receiving consideration in any form under the CII Settlement. Likewise, there is nothing impermissible about Mr. Allen's exercising his exchange right or utilizing tax losses he was allocated through a longstanding and publicly disclosed agreement.

Mr. Allen's ability to assert his personal legal rights – as opposed to the corporation's rights – is well illustrated by the long line of cases recognizing the right of a majority shareholder to use his voting power as a *shareholder* to further his own interests. *See Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 440 (Del. 1996) ("[A] shareholder [is] entitled to vote entirely in his or her own self-interest."); *see also In re Frederick's of Hollywood, Inc. S'holders Litig.*, No. 15944, 1998 Del. Ch. LEXIS 111, at *20 n.19 (Del. Ch. July 9, 1998) ("Under Delaware Law, a majority shareholder is not obligated to vote its shares in favor of a transaction that it opposes."); *Emerson Radio Corp. v. Int'l Jensen, Inc.*, Nos. 15130, 14992, 1996 Del. Ch. LEXIS 100, at *54 (Del. Ch. Aug. 20, 1996) ("[A] majority stockholder is entitled to vote its shares as it chooses, including to further its own financial interest."). Consequentially, there is no merit to the contention that Mr. Allen is precluded from receiving consideration in any form under the CII Settlement merely because he is a director or controlling shareholder.

The mere fact Mr. Allen voted in favor of the CII Settlement is not grounds for disapproving of that transaction. Under section 144 of the Delaware General Corporation Law (the "DGCL"), an interested director's participation in the voting is not grounds for setting a transaction aside provided that "[t]he material facts as to the director's . . . relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors . . . and the board . . . in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors." Del. Code Ann. tit. 8, § 144(a)(1) (2006); *accord Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120-21 (Del. 2006) (applying section 144(a)(1) to uphold an interested transaction approved by a majority of disinterested directors). Here, the directors were clearly aware of Mr. Allen's relationships with Charter and Vulcan when they voted to approved the CII Settlement. In addition, a majority of the directors who voted in favor of the transaction were disinterested. (*See* Smit 7/22/09 Tr. at 115:23-24 (noting that five of Charter's board members are independent); *see also* Smit 7/21/09 Tr. at 233:12-15 (noting that the board unanimously approved the term sheet).) Thus, this transaction falls within the safe harbor provided by section 144 of the DGCL and Mr. Allen's participation in the vote provides no grounds for setting the transaction aside.

Although the CCI Noteholders make much ado over the notice to exercise under the Exchange Agreement as a negotiation tactic, there is nothing impermissible about a party using its leverage in the form of a long-standing publicly disclosed contractual right to achieve a settlement. Indeed, the *Adelphia* court expressly recognized that settlements are often the products of threats, leverage and bargaining power:

> [The objectors] argue that even if the Board could not be expected to stand up to the unfair pressure on Adelphia, I, as a reviewing court, should recognize the coercion and decline to approve the settlement for that reason. But fully under- standing the frustration of the stakeholders . . . in this regard, I think that the

argument stretches the "coercion" concept too far. It is really a double-entendre. Where coercion is unlawful – the stuff that makes RICO cases, for example – disapproval of any resulting settlement presumptively would be appropriate, and perhaps essential. *But where the "coercion" results from differences in bargaining power, as a consequence of law or fact . . . that is a wholly different kind of "coercion." As one of the banks' counsel aptly noted in argument on this motion, it is what we call "leverage."*

*Adelphia*, 327 B.R. at 166 (emphasis added).

        Furthermore, the CCI Noteholders' focus on the purported "unfairness" of Mr. Allen's potential exercise of his Exchange Right in 2009 reflects another fundamental misunderstanding of Delaware fiduciary duties. Mr. Allen had long held that contractual right, and it was specifically disclosed in the 2007 Prospectus provided to CCI Noteholders. (VX 6 at 38.) In fact, the 2007 Prospectus disclosed as risk factors that Mr. Allen could exercise his Exchange Right and that such exercise would limit the company's ability to utilize its NOLs, that Mr. Allen was not under any obligation to make any further capital contributions to Charter, and that there was an agreement between Mr. Allen and Charter regarding the allocation of tax losses. (*Id.* at 39). The CCI Noteholders cannot contend that the exercise or potential exercise in 2009 of these long fixed and disclosed contractual rights was a breach of fiduciary duty because whether the terms of a contract constitute a breach of fiduciary duty is evaluated at the time the contract terms are fixed, not later when the effects of that contract are felt by the corporation. *See Schreiber v. Bryan*, 396 A.2d 512, 516-17 (Del. Ch. 1978) (in assessing shareholder's standing to bring derivative claim, holding breach of fiduciary duty claim challenging a contract must look to the date the contract was approved, not when the consequences were felt); *Marvel Entmt. Group, Inc. v. Mafco Holdings, Inc.* (In re Marvel Entmt. Group, Inc.), 273 B.R. 58, 73 (D. Del. 2002) (in applying statute of limitations, holding that challenge to fairness of tax sharing agreement between corporation and controlling shareholder turned on adoption of agreement and

not the controlling shareholder's subsequent use of the corporation's NOLs pursuant to the agreement).

The Delaware Court of Chancery explained this principle in *Kahn v. Seabord Corp.*, 625 A.2d 269 (Del. Ch. 1993). In that case, a shareholder challenged a contract approved by the board of directors in 1986 that required the corporation to make payments to its controlling stockholder over a ten-year period. *Id.* at 270. The plaintiff argued that the payments made in accordance with the terms of the contract were themselves breaches of fiduciary duty, but the court held that those payments were "legal obligations, not wrongs." *Id.* at 271. The court explained that "the only liability matter to be litigated involved defendants 1986 actions in authorizing the creation of these contract rights and liabilities." *Id.*

Applying those principles here, any challenge to Mr. Allen's invocation of his contractual rights under the Exchange Agreement must turn on the initial adoption of the Exchange Agreement, not on the exercise of those legal rights years later. But the CCI Noteholders do not contend that the terms were unfair at the time the Exchange Agreement was entered into – they merely argue that, as it turned out years later, the terms of the contract became unfavorable to Charter. The CCI Noteholders cannot point to the results of a contract, years after it is approved, to demonstrate its unfairness; they must show the contract was unfair when it was approved. *See Ash v. McCall*, No. Civ. A. 17132, 2000 WL 1370341, at *8 (Del. Ch. Sept 15, 2000) (dismissing fiduciary duty complaint for "examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for [the company], so horribly that it must be a waste of corporate assets . . . . [T]he relevant time to measure whether the [defendants] committed 'waste' is *at the time they entered into and approved the transaction*." (emphasis added)); *cf. Gentile v. Rossette*, No. Civ. A. 20213-NC, 2005 WL 2810683, at *9 (Del.

Ch. Oct. 20, 2005) ("The Court's calculation of any damages must be based on conditions as of the merger date, i.e., what the 'shares would have been worth at the time of the Merger if [the directors] had not breached [their] fiduciary duties.'" (second alteration in original) (citation omitted)), *rev'd on other grounds*, 906 A.2d 91 (Del. 2006); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (calculating damages based on "what [plaintiffs'] shares would have been worth at the time of the Merger if [the defendant] had not breached his fiduciary duties"), *aff'd*, 766 A.2d 437 (Del. 2000).

Moreover, as the Exchange Agreement was entered into and disclosed long before the CCI Noteholders made their investment in Charter, they should not be heard to complain about the terms of that contract. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169-70 (Del. Ch. 2002) (dismissing claim challenging transaction as breach of fiduciary duties where plaintiff purchased its stock after the announcement of the transaction); *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 111 (Del. Ch. 1948) (stating that Delaware law does not permit investors to bring lawsuits "to attack a transaction which occurred prior to the purchase of the stock").

## C. The CII Settlement Is Within the Range of Reasonableness

A settlement should be approved as being in the best interests of the estate once it is found to fall above the lowest point in the range of reasonableness. *Cosoff v. Rodman* (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir. 1983). This Circuit utilizes seven factors to assist it to canvass the issues in order to determine whether a settlement is within reasonable parameters:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

(3)     the paramount interest of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

(4)     whether other parties in interest support the settlement;

(5)     the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy judge reviewing, the settlement;

(6)     the nature and breadth of releases to be obtained by officers and directors; and

(7)     the extent to which the settlement is the product of arm's- length bargaining.

*Motorola, Inc. v. Official Comm. of Unsecured Creditors* (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007); *Adelphia*, 327 B.R. at 159-60; *In re Texaco Inc.*, 84 B.R. 893, 901 (Bankr. S.D.N.Y. 1988).  Not all factors merit equal weight in determining the reasonableness of a settlement, and the court may place varying degrees of  reliance upon each of the factors, depending upon their relevance to the proposed settlement terms.  *See, e.g.*, *Adelphia*, 327 B.R. at 160.

A review of the CII Settlement favors a finding that it falls well above the lowest level in the range of reasonableness.  The two factors addressing litigation do not merit much consideration because there is no litigation pending among the parties to the CII Settlement. However, a review of the CII Settlement's benefits, as set forth above, clearly favors approval of the CII Settlement.  Chief among the CII Settlement's future benefits is a structure that maximizes the value of Charter's tax attributes and leaves its senior secured debt instruments unimpaired.  (Millstein 7/21/09 Tr. at 73:11-17; Merritt 7/22/09 Tr. at 201:6 – 25.)  These benefits alone enable Charter to avoid hundreds of millions of dollars in increased interest expense and capture in excess of one billion dollars in tax savings from the NOLs.  (Merritt

7/22/09 Tr. at 266:24-267:10.)  In addition, the consolidation of Mr. Allen's CC VIII interests adds value of approximately $100-200 million to Charter.  (Merritt, 7/22/09 Tr. at 267:10-12.)

The paramount interest of the creditors and each class's relative benefits also favor the CII Settlement.  Most creditor constituencies are receiving substantial recoveries under the Plan. (CX 211, Disclosure Statement 4-8.)  Because of the CII Settlement, Charter is able to propose a Plan that reinstates billions of dollars in senior debt, pays all trade creditors in full, and distributes substantial economic value in the form of equity in the Reorganized Company to noteholders under two indentures.  The favorable tax attributes that the CII Settlement preserves are also in the paramount interest of creditors, for it is clear that this was taken into account when members of the Crossover Committee committed to invest in the reorganization.  For example, a March 6, 2009 Apollo internal memo stated:

> The gain [Mr. Allen] triggers should provide CCI with a step up in the tax basis of the assets of the partnership.  To the extent the step-up is allocated to depreciable or amortizable assets, CCI would get additional tax deductions in future tax years. The Company has estimated the potential step up at ~$3 billion, which would enable ~$500 million of additional annual tax deductions between 2010 and 2013, with the remaining balance utilized thereafter.

(JPX 235 at 14; *See also* JPX 243 at 40-41.)

Only the senior creditors who are objecting to reinstatement of the senior debt (presumably to extract hundreds of millions a year more in interest from the Debtors) and the CCI Noteholders oppose the CII Settlement.  However, that fact alone is not a bar to its approval. *See Adelphia*, 327 B.R. at 165 (observing that this factor is more than a mere "counting exercise" of the number of creditors opposing a settlement in a case where the settlement's proponents are trying to maximize value for all stakeholders).  Charter secured overwhelming support for the CII Settlement from most of their key constituencies.  The Creditors Committee supports the CII Settlement.  The Crossover Committee supports the CII Settlement.  Certain supporting members

of the Crossover Committee have further evidenced their support with their commitment to backstop a Rights Offering which will generate up to $1.6 billion.

The competency of counsel supporting the CII Settlement is not subject to dispute. Several of the preeminent law firms in the country, all of which have highly sophisticated practices with national reputations represented Charter, Mr. Allen and the Crossover Committee in negotiating the CII Settlement. The combined experience of the bankruptcy counsel advising Charter, Mr. Allen and the Crossover Committee on this unprecedented transaction is truly multi-faceted and brings together a selection of experience from the creditor, equityholder and debtor perspective. *See In re Enron Corp.*, No. 01-16034, 2004 Bankr. LEXIS 2549, at *193 (Bankr. S.D.N.Y. July 15, 2004) (approving settlement and finding that parties were represented by attorneys who are "recognized as being knowledgeable and experienced in the field of complex chapter 11 bankruptcies"). These parties each also had the benefit of sophisticated financial advisors who also advised them regarding the settlement terms.

The record is unassailable regarding the arm's-length nature of the settlement negotiations. The Debtors gave no preferential treatment to Mr. Allen when they negotiated the terms of the settlement with him. (Smit 7/21/09 Tr. at 223:10-24.) The record also reflects that Mr. Allen's earlier counter-proposed terms were rejected by Charter and the Crossover Committee. (Liang 7/29/09 Tr. at 208:22-212:15.) Moreover, the Independent Directors met privately in separate sessions during and after board meetings since December 2008 to assess the Plan and settlement process. (Merritt 7/22/09 Tr. at 166:15 – 167:5.)[14] Although the CCI Noteholders assert that the Debtors were mere "bystanders" to negotiations between Mr. Allen

---

[14] Because all of the independent directors regularly met among themselves with advisors to assess the settlement process with Mr. Allen, the establishment of a special committee would have added no value. Rather, it would have reduced the number of independent directors who were addressing the restructuring issues. (Merritt 7/22/09 Tr. at 169:16-171:12.)

and the Crossover Committee, that assertion misconstrues the plain facts: the Debtors negotiated with Mr. Allen to arrive at a resolution with an appropriate structure that accomplished their main objectives of reinstatement and NOL preservation for the benefit of all their stakeholders. Thereafter, the Crossover Committee and Mr. Allen debated their remaining disputes among themselves under the watchful eye of the directors and advisors. (Millstein, 7/21/09 Tr. at 167:19-168:23); Goldstein, 8/24/09 Tr. at 160:2-11.)

The CCI Noteholders' subjective view that the settlement does not inflict enough financial harm on Mr. Allen when compared against the consideration to be provided to Mr. Allen is irrelevant and ignores altogether the *value* of Mr. Allen's contributions to Charter. Furthermore, the CCI Noteholders' "subjective view of the value of the consideration does not overcome an 'agreement that was reached through arm's length negotiations between well-represented parties.'" *Solomon v. Duncan* (In re Jerome Duncan, Inc.), No. 08-1702, 2009 U.S. App. LEXIS 10854, at *6 (6th Cir. 2009). As discussed at length above, the CII Settlement was the product of rigorous, arms' length negotiations among Charter, the Crossover Committee and Mr. Allen, all of which were well represented by their respective advisors. Under *Solomon*, therefore, comparing the consideration Mr. Allen receives in exchange for the tremendous value he creates in the reorganized Charter, through the CII Settlement, is entirely appropriate.

D.     **The Settlement Is Fair Under an Entire Fairness Standard**

Mr. Allen avers that the CII Settlement is not subject to an "entire fairness" standard, nonetheless if that standard were to apply, the CII Settlement satisfies all aspects of that standard.[15] The entire fairness standard is comprised of a two-part test: fair dealing and fair

---

[15]    Courts in the Third Circuit have applied the "entire fairness" standard to determine whether a transaction between the Debtor and a controlling shareholder has been negotiated in good faith. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 108-10 (Bankr. D. Del. 1999). The Second Circuit, however, has not adopted such a

*(cont'd)*

price; within these two parts, there are various subparts by which fair dealing and fair price are measured:

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (citing Andrew G.T. Moore, *The "Interested" Director or Officer Transaction*, 4 Del. J. Corp. L. 674, 676 (1979); Charles M. Nathan & K.L. Shapiro, *Legal Standard of Fairness of Merger Terms under Delaware Law*, 2 Del. J. Corp. L. 44, 46-47 (1977)).

In *In re Zenith Electronics Corp.*, 241 B.R. 92 (Bankr. D. Del. 1999), the court found that the controlling shareholder did not unduly influence the plan process that would preclude a finding that the plan was proposed in good faith because (i) the debtor and the shareholder were represented by separate counsel and professionals during the restructuring negotiations; (ii) there was a special independent board committee to negotiate with the shareholder; and (iii) the shareholder did not impede the debtor's efforts to pursue alternative restructuring transactions. *Id.* at 109. Here, Charter's Board implemented a process whereby not just a subset, but all of the independent board members acted together (separate and apart form Mr. Allen) functioning as a de facto special committee, thereby satisfying all of the determinative factors in *Zenith*.

---

*(cont'd from previous page)*

standard for approval of transactions with controlling shareholders since the *Zenith* decision. *See In re Spiegel Inc.*, No. 03-11540, 2006 WL 2577825 at *3, *7-9 (Bankr. S.D.N.Y. Aug. 16, 2006) (approving settlement and releases of majority shareholder with sole voting power pursuant to Code section 1123(b)(3)(A) and the standards set forth in Bankruptcy Rule 9019 and *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005); *Granite Broadcasting*, 369 B.R. at 137 (holding that a plan did meet the good faith standard of 1129(a)(3) despite the interim CEO and controlling shareholder having "negotiate[ed] a severance package for himself while simultaneously arranging financing for [the debtors]," with no discussion of the entire fairness doctrine).

Arm's length bargaining was present in the CII Settlement negotiations, as the Independent Directors were willing to use leverage over Mr. Allen to fight for the terms of a plan that was in Charter's best interest, albeit at the expense of Mr. Allen. For example, the Independent Directors "made it clear that we were seriously considering a freefall bankruptcy option, unless we had what we needed from [Mr. Allen] in the form of a settlement, including withdrawal of the exchange notice." (Johri 8/31/09 Tr. at 217:18-23.) Even if they were appointed by Mr. Allen, under Delaware law, board members are still deemed independent if they are not financially beholden to the controlling shareholder.[16] As the directors were independent, the CCI Noteholders cannot prove a lack of entire fairness.

In light of this arm's length bargaining by the Independent Directors, it does not matter that the board did not formally form a "special committee." *See Rand v. Western Airlines, Inc.*, C.A. No. 8632, 1994 WL 89006 at *4 (Del. Ch. Feb. 25, 1994) ("There is simply no support for the proposition that boards of directors must delegate their responsibilities to special committees.") The Independent Directors' control of the bargaining process here achieved the same purpose as a formal special committee, which is to "act[] as an effective proxy for arms-length bargaining." *In re Cysive, Inc. S'Holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003).

---

[16]  In *Odyssey Partners*, for example, the Delaware Supreme Court stated that "[t]he fact that [the director] was a former . . . officer and designee [of the controlling shareholder] is not, alone, a sufficient basis for a finding that he was controlled by [the controlling shareholder]." *Odyssey*, 735 A.2d at 408; *see Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (stating that "it is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election [because] [t]hat is the usual way a person becomes a corporate director"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Andreae v. Andreae*, No. 11,905, 1992 Del. Ch. LEXIS 44, at *13 (Del. Ch. Mar. 3, 1992) (stating that Delaware courts have consistently rejected the notion that a controlling shareholder's ability to appoint the majority of a board's directors creates a presumption that the controlling shareholder controls the board); *Stein v. Orloff*, No. 7276, 1985 Del. Ch. LEXIS 418, at *8 (Del. Ch. May 30, 1985) (stating that directors appointed by a controlling shareholder are not necessarily under the control of that controlling shareholder); *Grobow v. Perot*, 526 A.2d 914, 924 (Del. Ch. 1987) (stating that when no facts are pled that raise any doubt regarding the independence of directors, the complaint that a board is controlled by a majority shareholder is conclusory), *aff'd*, 539 A.2d 180 (Del. 1988).

Furthermore, as discussed at length above, the Independent Directors regularly met outside of the presence of Mr. Allen and his advisors, representatives and the other "Vulcan directors". They were fully informed, actively engaged and advised by Kirkland and Lazard – their independent advisors. (Millstein 7/21/09 Tr. at 65: 7-65:18). As such, they Independent Directors functioned precisely as envisioned, and acted with the purpose of facilitating arm's-length bargaining.

With respect to fair dealing, focusing on the *timing* of the transaction the timing was clearly dictated by Charter, not Mr. Allen, as it faced a potential going concern audit opinion as a result of upcoming debt maturities, particularly the 2010 maturity of $1.9 billion of CCH II notes. (Millstein 7/21/09 Tr. at 44:4-12.) Mr. Allen in no way dictated or controlled the timing of the transaction. (Goldstein ¶ 9-11.) Similarly, Charter, and not Mr. Allen, controlled how the transaction was *structured*. (Goldstein ¶ 11; Doody 8/17/09 Tr. at 26:24-29:14.) Also, Charter, not Mr. Allen, was the party that *initiated* the transaction. (Goldstein ¶ 9-11.) The Charter strawman proposal was designed to achieve certain corporate objectives – overall debt reduction, reinstatement of senior debt, preservation of NOL's and having sufficient liquidity upon emergence from bankruptcy. It was not designed to benefit Mr. Allen. (Goldstein Decl. ¶ 9-10; *see also* Smit 7/21/09 Tr. at 218:9-21.)

Additionally, the transaction was negotiated at an arm's length, which provides "'strong evidence that the transaction meets the test of fairness.'" *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1177 (Del. Ch. 1994) (quoting *Weinberger*, 457 A.2d at 709-10 & n.7), *aff'd*, 663 A.2d 1156 (Del. 1995). There were extensive three-way negotiations among Charter, the Crossover Committee and Mr. Allen focusing on the corporate structure, the capital structure and the tax structure and consideration to Mr. Allen. (Goldstein ¶ 12-17; Doody Aff. ¶ 14; Smit

7/21/09 Tr. at 226:21-227:22.) These negotiations were highly contentious, as well as lengthy. This arms-length bargaining process resulted in substantial value to Charter and extracted concessions from Mr. Allen. (Goldstein ¶ 12-17; Doody Aff. ¶ 14; Smit 7/21/09 Tr. at 227:11-22; Merritt 7/22/09 Tr. at 171:1-12.)

There is no dispute that all relevant aspects of the transaction were fully disclosed. Charter and the Crossover Committee were fully informed of all relevant aspects of the transaction and were advised by sophisticated legal and financial advisors. (Doody Aff. ¶ 32.) As far as other relevant constituents are concerned, they are the beneficiaries of a court approved disclosure statement.

Fair price is likewise not an issue. As explained above, the benefits that Charter received from the CII Settlement were much greater than what Charter relinquished. The Court should not accept the CCI Noteholders' invitation to speculate about whether Charter could have received even more from Mr. Allen because "[a] fair price does not mean the highest price financeable or the highest price that fiduciary could afford to pay." *Cinerama*, 663 A.2d at 1143. Had the parties (including the sophisticated bondholders) believed that Mr. Allen was not deserving of compensation for what he was bringing to the table or had they truly believed that Mr. Allen's allegedly perceived tax situation eliminated his bargaining power, they would not have agreed to compensate Mr. Allen $180 million for the value created by his participation in the restructuring. Nor would they have agreed to permit the funding of that participation through an equity rights offering. Indeed, the Crossover Committee not only agreed to compensate Mr. Allen $180 million for the value created by his participation in the restructuring, but also funded $150 million of this amount through an equity rights offering. *See In re Granite Broadcasting Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007).

In addition, the CCI Noteholders' focus on the different treatment that Mr. Allen received in the CII Settlement compared to other "shareholders" is similarly misplaced. Mr. Allen will not receive consideration on account of his equity holdings. (Plan Art. IV.A.6.; Doody 8/17/09 Tr. at 32:19-21.) Even within an entire fairness review, "[i]t is well established . . . that stockholders need not always be treated equally for all purposes." *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 957 (Del. 1985)). Here, the Independent Directors had ample grounds to treat Mr. Allen differently because he was bringing unique value to the transaction wholly separate and apart from his position as a shareholder. *See Applebaum v. Avaya, Inc.*, 805 A.2d 209, 214 (Del. Ch. 2002) ("[D]irectors acting consistently with their fiduciary duties may draw distinctions between groups of stockholders in defining the basic economic terms of transactions (subject to a requirement that all stockholders be treated fairly) . . . ."), *aff'd*, 812 A.2d 880 (Del. 2002). As discussed above, insofar as his equity interests are concerned, Mr. Allen received the same treatment as other holders.

In sum, while the Court must look to fair process and fair price, the ultimate decision on entire fairness is "not a bifurcated one but a single judgment that considers each of these aspects." *Cinerama*, 663 A.2d at 1140; *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) (same). While the Court should consider both aspects of the test, where, as here, the parties' dispute concerns the financial terms of a transaction, "price may predominate as a salient consideration." *Cinerama*, 663 A.2d at 1140. Thus, even if the CCI Noteholders were able to identify defects in the process that led the CII Settlement – and they have not – the indisputable value brought to Charter as a result of that transaction would more than outweigh any such process defects in the unitary entire fairness analysis.

The importance of fair price in the "entire fairness" analysis is best demonstrated by two famous Delaware cases, *Kahn v. Lynch Communication Systems, Inc.* and *Cinerama, Inc. v. Technicolor, Inc.*. In *Kahn*, 638 A.2d 1110 (Del. 1994), the Delaware Supreme Court determined that the special committee tasked with negotiating a cash-out merger with the controlling shareholder was unable to negotiate at arms'-length due to flaws in the process. 638 A.2d at 1117-18. The Delaware Supreme Court thereafter remanded the case to the Delaware Court of Chancery to determine whether the controlling shareholder could nevertheless establish entire fairness. On remand, the Court of Chancery found that even in "the absence of certain elements of fair dealing," the transaction as a whole was entirely fair because the price obtained for the minority shareholders in the merger was fair. *Kahn v. Lynch Commc'n Sys. Inc.*, No. 8748, 1995 WL 301403, at *1 (Del. Ch. Apr. 17, 1995), *aff'd*, 669 A.2d 79 (Del. 1995).

Similarly, in *Cede & Co. v. Technicolor, Inc.*, the Delaware Supreme Court held that the directors had breached their duty of care in approving a merger, and remanded the case to the Court of Chancery for further proceedings. *See* 634 A.2d 345, 371 (Del. 1993). On remand, the Court of Chancery held that despite the flawed process employed by the board, the entire fairness test was met because the price obtained for the shareholders was fair. *See Cinerama*, 663 A.2d at 1142-43.

Here, as in *Kahn* and *Cinerama*, even if the negotiation process was flawed – and it was not – the result obtain is indisputably fair, and that outcome should drive the Court's determination that the transaction is entirely fair.

## III. The CII Settlement Does Not Provide Mr. Allen With a Distribution On Account of His Equity Interests in CCI or Holdco

In order to accomplish Charter's primary restructuring goals of reinstatement and preservation of NOLs, Mr. Allen must receive a voting interest in reorganized CCI and retain an

equity interest in reorganized Holdco. (Doody Aff. ¶ 33.) Specifically, the Plan's preservation of beneficial NOLs requires CII to remain a member of Holdco to ensure that CII will be allocated its pro rata share of COD income, thereby preserving approximately $2.85 billion of the Debtors' NOLs for future use against income. (Doody Aff. ¶¶ 26, 33; Degnan Decl. ¶¶ 7, 8.) Similarly, Mr. Allen will receive shares of CCI Class B common stock that have certain voting rights in order to remain in compliance with the change of control provisions in the Debtors' senior debt instruments. (Goldstein Decl. ¶ 25, Ex. A Art. V1.C.)

Mr. Allen is not receiving these interests on account of his interests in the Debtors. Rather, Mr. Allen is receiving consideration in exchange for providing substantial value, including his cooperation in the reinstatement of senior debt, the preservation of Charter's NOLs, the compromise of contractual claims, and the transfer of valuable assets. (Conn 9/2/09 Tr. at 78:16-22, 148:21-23; Merritt 7/22/09 Tr. at 266:21-267:16; Doody 8/17/09 Tr. at 33:1-8, 283:14-284:5; Goldstein 8/24/09 Tr. at 13:20-14:3.) In light of the Plan's purpose to preserve as much value as possible from the Debtors' NOLs and to reinstate senior debt instruments, the allocation of these equity interests in the reorganized company to Mr. Allen is a necessary element of the CII Settlement. These reasons justify Mr. Allen's receipt of equity interests and satisfy *Iridium*'s holding that a distribution made pursuant to a plan settlement remains subject to the absolute priority rule because Mr. Allen is not receiving a distribution "on account of" his equity interests. (Goldstein Decl. ¶ 30 ("Mr. Allen received no consideration for his prepetition equity ownership in CCI or Holdco"); *see also* Doody 8/17/09 Tr. at 32:13-32:15 (noting that the Mr. Allen group is not receiving any recovery on account of his equity interest under the Plan).)

The terms of the Plan clearly reflect that Mr. Allen is not receiving a distribution on account of his equity in Charter. CII's interests are being canceled and extinguished and that

holders of such interests shall receive no distribution on account of their prior interests. (CX 211, Ex. A, Plan Art. IV.A.6); *cf.* 11 U.S.C. § 1129(b)(2)(B). CII's existing 47% interest in Holdco is being terminated except for CII's retention of a 1% interest in Holdco. (Plan Art. VI.C, X.A.). As noted above, Charter negotiated for CII's retention of the 1% interest to ensure that approximately $2.85 billion of the Debtors' $6 billion COD generated under the Plan is allocated to CII and not to Charter.

The CCI Noteholders' argument that Mr. Allen will receive consideration for agreeing to forbear from exercising rights under the Exchange Agreement fundamentally misconstrues the nature of the bargain. It is his prospective cooperation – for agreeing to assume the responsibility of board designation going forward and for retaining an equity interest in Charter – that constitutes the bargain. That Mr. Allen also agreed to forgo the exercise of his rights under the Exchange Agreement does not reduce the bargain to one that is, as maintained by the CCI Noteholders, "on account of" equity.

Even if the Court determines that Mr. Allen's voting interests in reorganized CCI are "on account of" his interests, such a finding does not doom the CII Settlement. If the Court determines that the CII Settlement "deviates in some minor respect from the absolute priority rule," the CII Settlement can still be endorsed in the Court's discretion so long as the Court "clearly articulates" the reasons for approval. *Iridium*, 478 F.3d at 465. Here, the record is replete with reasons that support Mr. Allen's retention of 35% voting power in CCI and 1% equity interest in Holdco, for it is beyond cavil that (a) Mr. Allen must retain at least 35% continued voting power over CCI as a predicate to the reinstatement of $11.8 billion in senior debt, and (b) CII must remain a member of Holdco in order to ensure its receipt of its share of COD income and preserve the Debtors' valuable NOLs for future use. Implementing these two

primary goals of the Debtors' restructuring efforts is the means for creating value for the Debtors, facilitating significant recoveries to most creditor classes under the Plan, and substantially deleveraging the Debtors on a going forward basis. In sum, even if the Court determines there to be a "minor deviation" from the absolute priority rule, it is adequately justified by the tremendous benefits it brings to the estates.

Similarly, the fact that Mr. Allen is receiving minor equity interests through the CII Settlement does not render the transaction subject to a market testing requirement. *Cf. Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 458 (1999). Rather, the transaction is governed by the best interests test set forth above, and is not subject to *LaSalle's* market test. However, even if *LaSalle's* market test were to apply, it has been met. The record establishes that there was no capacity in the marketplace for the $11.8 billion in debt that is being reinstated through Mr. Allen's retention of his Class B shares. Even if there were, the Debtors could ill-afford to carry the additional debt load since their primary restructuring goal was to decrease their leverage, not add to it. (Millstein 7/21/09 Tr. at 218:12-21.) Moreover, there is no "market" that could monetize the Debtors' NOLs. The evidence demonstrates that CCI enjoys the NOLs only by virtue of and the extent of taxable income generated by the operating subsidiaries. The NOLs, in turn, only have value in relation to the Debtors' operating subsidiaries; they can not inure to CCI's benefit on a stand-alone basis. (Doody 8/17/09 Tr. at 230:8-20.)

The CCI Noteholders cannot credibly contend that Mr. Allen has been granted an "exclusive right" to participate in the restructuring that must be market tested. The CCI Noteholders' contention that there was not an appropriate mechanism for "market testing" or valuing the CII Settlement ignores the raft of testimony which highlights the extraordinary value

of the CII Settlement.  As for "market testing", Mr. Allen is uniquely situated to render the bank

debt unimpaired and provide value through preservation of the NOLs.  In any event, the

December 12, 2008 press release announcing Charter's intention to reorganize effectively put the

company in play.  Yet no outside party approached Charter or its advisors with any alternate

proposals, let alone comparable or better ones.  (Doody 8/17/09 Tr. at 80:12-15.)

## IV.    The Releases Of The CII Settlement Parties Are Appropriate Under the Circumstances

As part of confirmation of the Plan, the Debtors are seeking approval of  releases

in favor of certain third parties, including Mr. Allen (the "Release").  The Plan provides that:

> On the Effective Date . . . the Holders of Claims and Interests shall be deemed to
> provide a full discharge and release to the Debtor Releasees and their respective
> property from any and all Causes of Action, whether known or unknown, whether
> for tort, contract, violations of federal or state securities laws or otherwise, arising
> from or related in any way to the Debtors. . . .  Nothing in the Confirmation Order
> or the Plan shall affect a release of any claim by the United States Government or
> any of its agencies or any state and local authority whatsoever . . . .

(CX 211, Exhibit A, Plan Art at X.E.)

### A.    The Releases in Favor of the CII Settlement Party Are Integral to the Plan and are Justified by the Unique Circumstances of the Case

Due to his well-publicized wealth and his unique role in Charter's reorganization,

Mr. Allen may well become the focus of (misplaced and unsupportable) litigation over his role in

this restructuring.  The unique circumstances of Mr. Allen's ability to provide value yet attract

litigation over his role in that process justify a release in his favor.  "In bankruptcy cases, a court

may enjoin a creditor from suing a third party, provided the injunction plays an important part in

the debtor's reorganization plan."  *SEC v. Drexel Burnham Lambert Group, Inc.* (In re Drexel

Burnham Lambert Group, Inc.), 960 F.2d 285, 293 (2d Cir. 1992) (approving third party releases

as an important part of the plan where the debtor's personnel contributed more than a billion

dollars to a settlement fund).  A release in favor of a non-debtor is permissible provided that the

reviewing court makes a specific finding that unusual circumstances render the non-debtor release important to the plan's success. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141-43 (2d Cir. 2005).

Here, the importance of the Releases to the CII Settlement – and thus to the Plan - is quite apparent. As discussed above, the CII Settlement is the cornerstone of the Debtors' Plan. (Goldstein Decl. ¶ 28 ("Without the CII Settlement, the Plan and its constituent Rights Offering would not have been possible.").) Because an element of the CII Settlement requires a release in favor of Mr. Allen and the CII Settlement Party, it plays a critical and unique part in the Debtors' Plan. Moreover, consistent with the holding in *Metromedia*, the unusual circumstances of this case justify their approval in connection with confirmation of the Debtors' Plan.

The Debtors are reinstating four separate debt instruments, each of which contains a similar change-of-control provision that requires Mr. Allen's retention of voting power over the Debtors. As a consequence, Mr. Allen's "contribution" to the Plan in the form of his continued voting control of the Debtors is the *sine qua non* of the Plan, as it allows the reinstatement of $11.8 billion of debt and the attendant savings of hundreds of millions of dollars annually in saved interests costs. Mr. Allen's unique ability to render unimpaired and thereby reinstate about $11.8 billion in debt on a debtor's behalf, particularly when there is neither capacity nor appetite in the market to re-price that debt, presents circumstances unusual and unique enough to justify a release under *Metromedia* and *Drexel*.

Indeed, courts in this District have made findings of "unique" and "unusual" circumstances to justify nondebtor releases under *Metromedia's* mandate in far more mundane circumstances than those presented here. For example, the court in *In re Mal Dunn Associates, Inc.*, No. 07-36299 (Bankr. S.D.N.Y. filed Aug. 24, 2007) (CGM) approved an asset purchase

agreement and global settlement that formed the basis of a plan providing 100% recoveries to unsecured creditors and releases in favor of non-debtors and found that the non-debtor releases were "appropriate, reasonable and consistent with the terms and purposes of the Settlement Agreement."[17] *See In re Mal Dunn Assocs.*, 406 B.R. 622, 625-29 (Bankr. S.D.N.Y. 2009) (recounting terms of settlement). The settlement containing the releases in *Mal Dunn* "formed the backbone of the Debtor's chapter 11 plan" and provided for payment in full of allowed unsecured claims. *Id.* at 626.

The court in *Cartalemi v. Karta Corp.* (In re Karta Corp.), 342 B.R. 45, 55 (S.D.N.Y. 2006), upheld non-debtor releases granted in a plan that barred a creditor's prepetition state law claims against non-debtors because of the case's "unusual factors." *Id.* at 55. In *Karta*, the situation was deemed unique under *Drexel* and *Metromedia* solely because the non-debtors contributed $460,000 to the estate and because the debtors and non-debtors were part of a family-owned recycling and container rental business, which were dependent upon each other for their continued operation. *Id.* Additionally, in *Rosenberg v. XO Communications, Inc.* (In re XO Communications, Inc.), 330 B.R. 394 (Bankr. S.D.N.Y. 2005), the court confirmed a plan that contained third party releases. There, the court found that the substantial consideration provided by a class of lenders, the satisfaction of a condition precedent to an investor's commitment to

---

[17] *See* Findings of Fact and Conclusions of Law With Respect to Joint Motion of Debtor and Committee for Entry of Order (I) Pursuant to Bankruptcy Rule 9019(A), Approving Settlement Agreement Among Debtor, Committee and Dunn Parties, (II) Pursuant to Bankruptcy Code Sections 363(B), (F) and (M) and Bankruptcy Rules 2002 and 6004, Authorizing Transfer of Assets of Debtor Free and Clear of Liens, Claims and Encumbrances to Facilitate Consummation of Settlement Agreement, (III) Pursuant to Bankruptcy Code Section 365 and Bankruptcy Rule 6006, Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts, and Fixing Cure Amounts and (IV) Pursuant to Bankruptcy Code Section 105(A), Barring any Party Having Received Notice of Settlement Motion and Related Hearing from Asserting Estate Claims Releases Under Settlement Agreement, No. 07-36299 (CGM), at 13 (Bankr. S.D.N.Y. filed Oct. 26, 2007).

contribute new equity, and the fact that the estate was achieving its goal shortly after the market

meltdown that followed September 11, was unique enough to justify certain non-debtor releases:

> Regardless, the nondebtor releases under the Shareholder Stipulation are
> supported by the substantial consideration provided by the Senior Secured
> Lenders and the effect of the nondebtor released parties' consent had in relation to
> the Shareholder Stipulation. Such consent to the Shareholder Stipulation was
> essential, in part, because of indemnification/contribution exposure of the Debtor,
> evidencing the "identity of interest," as well. All of the aforementioned focused
> on trying to achieve a superior recovery under a proposed plan of reorganization
> in a rapidly declining market.

*Rosenberg*, 330 B.R. at 439.

The unusual and unique circumstances supporting the non-debtor releases in favor

of Mr. Allen dwarf the circumstances of these other cases. Mr. Allen's participation in the

restructuring through the CII Settlement contributes value to the Debtors, enables many creditor

classes to be paid in full, unimpairs senior debt, and is a predicate for a $1.6 billion rights

offering that is being backstopped by members of the Crossover Committee. This contribution

and these unique circumstances are more than adequate to satisfy both *Drexel* and *Metromedia*

and support approval of the third party releases in connection with confirmation of the Plan.

Significantly, Mr. Allen is a public figure who may attract lawsuits because of his "deep

pockets." Indeed, it is possible that disgruntled shareholders whose equity interests are being

canceled together with Mr. Allen's equity interests may target Mr. Allen because of his role in

the Plan. Under the circumstances where Mr. Allen is uniquely able to create value for the

Debtors, he is similarly uniquely positioned to be sued for his role in these cases, and therefore

the Third Party Release is appropriate under the circumstances.

Additional support for the Releases is the identity of interest between the CII

Settlement Claim Parties and the Debtors, which exists by virtue of Mr. Allen's rights under the

Indemnification Agreement. *See Rosenberg*, 330 B.R. at 439-40 (finding unique circumstances

justifying third party releases of claims due to identity of interest between debtor and releases arising from debtor's exposure to indemnification claims); *In re Karta, Corp.*, 342 B.R. at 56 (same). Where parties released under non-debtor releases have the right to seek indemnity or contribution from the debtor, such potential indemnity or contribution claims weigh in favor of granting the releases because "the outcome of [any] dispute has the potential to alter the distribution of the debtor's estate to creditors." *Hunnicutt Co. v. TJX Cos.* (In re Ames Dep't Stores, Inc.), 190 B.R. 157, 160-61 (S.D.N.Y. 1995); *see also In re Spiegel, Inc.*, No. 03-11540, 2006 WL 2577825, at *8 (Bankr. S.D.N.Y. Aug. 16, 2006), *aff'd*, 269 F. App'x 56 (2d Cir. 2008), *cert. denied sub nom. Stupakoff v. Otto (GmbH & Co. KG)*, 129 S. Ct. 146 (2008).

Not only do the Third Party Releases alleviate the Debtors from the potentially exorbitant expenses arising under their indemnification obligations, but such releases ensure that the priority scheme of the Bankruptcy Code will not be disturbed by elevating securities claims from subordinated status under Code section 510(b) to the status of general unsecured claims. Preserving the Bankruptcy Code priority scheme is a key consideration in approval of settlements under Rule 9019. *See Iridium*, 478 F.3d at 464-65. As such, avoiding departure from the Code's priority scheme by preventing such improper elevation of subordinated securities claims should weigh heavily in favor of approving the Third Party Releases.

Moreover, the fact that all creditors and shareholders have not consented to the Third Party Releases is not fatal to their approval. Creditor consent is not required under *Metromedia* and its progeny. *See Karta*, 342 B.R. at 56 (binding non-consenting equity holders to non-debtor releases); *Rosenberg*, 330 B.R. at 440 (allowing non-consensual non-debtor releases concerning breach of fiduciary duty actions). In addition, the parties bound by the Third Party Releases should not be limited to only those parties receiving consideration under the Plan.

There is no requirement in this Circuit that a party receive "good and sufficient consideration" to be bound by a release under a plan. *Metromedia*, 416 F.3d at 143 (citing *Drexel*, 960 F.2d at 289, 293); *see also Spiegel*, 2006 WL 2577825, at *16 (same). Thus, other than those parties expressly carved out in the Plan, the Third Party Releases should be binding on all Holders of Claims and Interests.

## B. The Debtor Releases Are Allowable

Pursuant to confirmation of the Plan, the Debtors are also seeking approval of the Debtor Releases which provide in relevant part:

> On the Effective Date . . . for the good and valuable consideration provided by each of the Debtor Releasees . . . each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "Debtor Releasees") . . . and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities law or otherwise, arising from or related in any way to the Debtors . . .

(CX 211, Ex. A, Plan at Art X.D.) Mr. Allen and CII's affiliates are also beneficiaries of the Debtor Releases.

The Bankruptcy Code authorizes the Debtors to compromise and settle claims that belong to the estate. *See* 11 U.S.C. § 1123(b)(3)(A); *In re Calpine Corp.*, No. 05-60200, 2007 WL 4565223, at *9, *18 (Bankr. S.D.N.Y. Dec. 19, 2007) (approving debtor releases under 1123(b)(3)(A) as valid exercise of debtors' business judgment); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289 (Bankr. S.D.N.Y. 2007) ("Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own"), *aff'd*, 544 F.3d 420 (2d Cir. 2008). Courts routinely evaluate a debtor's compromise of its claims and estate claims under the standard set forth under Rule 9019. *See Spiegel*, 2006 WL 2577825, at *3, *8 (approving the debtors' release of its majority shareholder with sole voting power pursuant to section 1123(b)(3)

of the Bankruptcy Code and Rule 9019); *In re Mid-State Raceway, Inc.*, No. 04-65746, 2006 WL 4050809, at *11, *14-15 (Bankr. N.D.N.Y. Feb. 10, 2006) (approving debtor releases under 9019 standard and finding settlement the "linchpin" of the plan).

As set forth above, the CII Settlement (and the Debtor Releases required thereunder) was the product of extensive multi-party arms' length negotiations wherein the Debtors exercised their business judgment in arriving at the CII Settlement, which represents concessions by all parties thereto and is in the best interests of the Debtors' estates. For the foregoing reasons, the Rule 9019 standard has been met with respect to the Debtor Releases and they should be approved as in the best interest of the Debtors' estates.

### CONCLUSION

Mr. Allen respectfully requests that the Court confirm the Plan and grant such other and further relief as is just and proper.

Dated: New York, New York
      September 18, 2009

By: *Susan L. Saltzstein*
Robert E. Zimet
Jay M. Goffman
Susan L. Saltzstein
Jeremy A. Berman
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

*Attorneys for Paul G. Allen*