**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CHARTER COMMUNICATIONS, INC., *et al.*,<br><div align="center">Debtors.</div> | Chapter 11<br><br>Case No. 09-11435 (JMP)<br>Jointly Administered |
| JPMORGAN CHASE BANK, N.A.,<br>as Administrative Agent,<br><div align="center">Plaintiff,</div><br>-against-<br><br>CHARTER COMMUNICATIONS<br>OPERATING, LLC and CCO HOLDINGS, LLC,<br><div align="center">Defendants.</div> | Adversary Proceeding<br>Case No. 09-01132 (JMP) |

<div align="center">

**DEBTORS' POST-TRIAL BRIEF ON REINSTATEMENT**
**IN SUPPORT OF PLAN CONFIRMATION**

</div>

Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900


        - and -

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street NW
Washington, D.C.  20005
Telephone:     (202) 879-5000
Facsimile:     (202) 879-5200

Counsel to the Debtors and Debtors in
Possession (except Charter Investment,
Inc.)

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

Counsel to Debtor and Debtor in
Possession Charter Investment, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iv

PRELIMINARY STATEMENT ............................................................................. 1

LEGAL STANDARDS .......................................................................................... 8

ARGUMENT ........................................................................................................ 11

    I.     Section 8(g)(v) Does Not Impose A Prospective Obligation.......................... 11

          A.     A Plain Reading of Section 8(g)(v) Demonstrates That "The Ability To Pay Debts" Requirement Is Not Prospective.................................. 12

          B.     JPMorgan's Construction Of Section 8(g)(v) Is Contrary To Other Provisions In The Credit Agreement. ................................................. 15

          C.     JPMorgan's Course of Conduct Is Inconsistent With Its Construction Of Section 8(g)(v). ............................................................................... 17

                   1.     JPMorgan's Course of Conduct In Monitoring The Credit Agreement Demonstrates That Section 8(g)(v) Is Not Prospective.................................................................................... 17

                   2.     The Other Bank Lenders' Conduct In Monitoring The Credit Agreement Also Demonstrates That Section 8(g)(v) Is Not Prospective. ................................................................... 20

                   3.     JPMorgan Adopted Its Prospective Interpretation of Section 8(g)(v) Only After It Determined Charter Intended To Reinstate And The Lenders Wanted Better Pricing....................... 21

          D.     The Cases JPMorgan Relies Upon Arise In A Different Context, Interpret Different Language, And Are Irrelevant To The Present Controversy........................................................................................... 24

    II.    The DHCs Were Able To Pay, And In Fact Paid, Their Debts As They Became Due.................................................................................................... 26

          A.     The Credit Agreement Does Not Require The Designated Holding Companies To Have Surplus. ............................................................. 27

          B.     CCH I Had Adequate Surplus For The November 17 Dividend It Declared. .............................................................................................. 28

                    1.     Charter's Analysis Of Surplus Demonstrated More Than Sufficient Surplus at CCH I To Declare The Dividend. ............... 29

2. Contemporaneous Third Party Valuations Likewise Indicated Sufficient Surplus at CCH I To Declare The Dividend.................................................34

3. Expert Testimony Confirms CCH I Had Sufficient Surplus To Declare The Dividend.............................................................36

C. The Decision By Charter's Board That CCH I Had Adequate Surplus To Declare A Dividend Was A Proper Exercise Of Business Judgment And Should Be Accorded Deference Under Delaware Law. ..............................................................41

D. CCH and CIH Were Able To Pay Their Debts As They Became Due Via Intercompany Notes And Payables, Regardless Of Surplus. .......................46

E. Even If The DHCs Were Unable To Pay Their Debts As They Became Due, Such A Default Is *Ipso Facto* And Would Be Cured, If Necessary, By The Plan. ..................................................47

III. There Has Been No Change Of Control And Plan Confirmation Will Not Cause A Change of Control. ..........................................49

A. Section 8(k)(i): The Paul Allen Group's 35% Voting Stake In CCI Is Sufficient To Prevent A Change-Of-Control Default. ...................50

1. The Plan Complies With Section 8(k)(i). ...................50

2. JPMorgan's Allegations Of Default Under Section 8(k)(i) Do Not Comport With The Language And History Of The Agreement. ..............................................52

B. Section 8(k)(ii): No Section 13(d) "Group" Will Have Voting Power Greater Than The Paul Allen Group. ...................54

1. There Can Be No Section 13(d) Group With More Voting Power Than Paul Allen's 91% Prior To Confirmation. ................54

2. There Will Be No Section 13(d) Group With More Voting Power Than The Paul Allen Group After Confirmation. ...............55

3. Under CCI's Amended Certificate Of Incorporation, There Can Be No Change Of Control Default Pursuant To Section 8(k)(ii). ..............................................64

C. There Is No Economic Interest Requirement In The Reinstated Debt. .............66

IV. There Is No Cross-Acceleration Of CCO's Debt Merely Because CCO Is A Solvent Debtor. ..............................................66

CONCLUSION............................................................................................................71

# TABLE OF AUTHORITIES

**Cases**

*Education Assistance Corp. v. Zellner*,
   827 F.2d 1222 (8th Cir. 1987) ......................................................................... 10

*Enercomp, Inc. v. McCorhill Pub., Inc.*,
   873 F.2d 536 (2d Cir. 1989) ............................................................................ 11

*Galli v. Metz*,
   973 F.2d 145 (2d Cir. 1992) ............................................................................ 16

*Gerlach v. The Horn & Hardart Co.*,
   683 F. Supp. 342 (S.D.N.Y. 1988) ................................................................... 16

*In re Bally Total Fitness of Greater New York, Inc.*,
   No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ................... 8

*In re Best Payphones, Inc.*,
   No. 01-B-15472 (SMB), 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) ................. 9

*In re C.A.F. Bindery, Inc.*,
   199 B.R. 828 (Bankr. S.D.N.Y. 1996) ............................................................... 69

*In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*,
   791 F.2d 524 (7th Cir. 1986) ........................................................................... 68

*In re City of Bridgeport*,
   129 B.R. 332 (Bankr. D. Conn. 1991) ........................................................... 24, 25

*In re Diamond Manufacturing Co.*,
   164 B.R. 189 (Bankr.S.D.Ga.1994) ................................................................... 10

*In re East Hampton Sand & Gravel Co.*,
   25 B.R. 193 (Bankr. E.D.N.Y. 1982) ................................................................. 67

*In re Enron Corp.*,
   306 B.R. 465 (Bankr. S.D.N.Y. 2004) ............................................................... 69

*In re F.W. Rest. Assocs., Inc.*
   190 B.R. 143 (Bankr. D. Conn. 1995) ............................................................... 10

*In re Food Mgmt. Group, LLC*,
   372 B.R. 171 (Bankr. S.D.N.Y. 2007) ............................................................... 11

*In re Gencarelli*,
   501 F.3d 1 (1st Cir. 2007) ............................................................................... 68

*In re General Growth Props., Inc.*,
409 B.R. 43 (Bankr. S.D.N.Y. 2009) ................................................................. 71

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ................................................................... 8

*In re Goddard*,
212 B.R. 233 7 (D.N.J. 1997) ........................................................................... 8

*In re Greektown Holdings, L.L.C.*,
No. 08-53104, 2009 WL 1653461 (Bankr. E.D. Mich. May 13, 2009) ............ 10

*In re Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of Soc. Servs.*,
No. 91B 11478, 1995 WL 65531 (Bankr. S.D.N.Y. Jan. 27, 1995) ................. 10

*In re Kopel*,
232 B.R. 57 (Bankr. E.D.N.Y. 1999) ............................................................... 67

*In re Lernout & Hauspie Speech Prod., N.V.*,
301 B.R. 651 (Bankr. D. Del. 2003) ................................................................. 8

*In re Liljeberg Enterprises, Inc.*,
304 F.3d 410 (5th Cir. 2002) ........................................................................... 67

*In re Madison Hotel Assocs.*,
749 F.2d 410 (7th Cir. 1984) ........................................................................... 68

*In re Mirant Corp.*,
No. 03-45590-DML-11, 2005 Bankr. LEXIS 909
(Bankr. N.D. Tex. May 24, 2005) ..................................................................... 70

*In re Mirant Corp.*,
No. 03-46590, 2005 Bankr. LEXIS 909,
314 B.R. 347 (Bankr. N.D. Tex. Sept. 1, 2004) ............................................... 48

*In re Rachels Indus., Inc.*,
109 B.R. 797 (Bankr. W.D. Tenn. 1990) .......................................................... 10

*In re Town of Westlake*,
211 B.R. 860 (Bankr. N.D. Tex. 1997) ...................................................... 24, 25

*In re U.I.P Engineered Prods. Corp.*,
831 F.2d 54 (4th Cir. 1987) ............................................................................. 71

*Klang v. Smith's Food & Drug Centers, Inc.*,
702 A.2d 150 (Del. 1997) ........................................................... 4, 27, 41, 42

v

*LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*,
    424 F.3d 195 (2d Cir. 2005).............................................................. 13

*Levy v. Southbrook Int'l Invs., Ltd.*,
    263 F.3d 10 (2d Cir. 2001)................................................................ 65

*Litzler v. CC Invs., L.D.C.*,
    411 F. Supp. 2d 411 (S.D.N.Y. 2006).............................................. 62

*Mercury Partners LLC v. Pacific Medical Bldgs., L.P.*,
    No. 02 CIV. 6005 (HBP), 2007 WL 2197830 (S.D.N.Y. July 31, 2007)..................... 9, 11

*Morales v. Quintel Entertainment, Inc.*,
    249 F.3d 115 (2d Cir. 2001)............................................................. 60

*Morris v. Standard Gas & Elec. Co.*,
    63 A.2d 577 (Del. Ch. 1949)................................................... 4, 41, 42

*PaineWebber, Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996)............................................................ 13

*Pereira v. Farace*,
    413 F.3d 330 (2d Cir. 2005)....................................................... 25, 26

*Providence & Worcester Co. v. Baker*,
    378 A.2d 121 (Del. 1977) ............................................................... 65

*Raleigh v. Illinois Dep't of Revenue*,
    530 U.S. 15 (2000)............................................................................ 9

*Ruskin v. Griffiths*,
    269 F.2d 827 (2d Cir. 1959)............................................................ 68

*Sagusa, Inc. v. Magellan Petroleum. Corp.*,
    No. 12,977, 1993 WL 512487 (Del. Ch. Dec. 1, 1993),
    *aff'd*, 650 A.2d 1306 (Del. 1994).................................................... 65

*Schaffer ex rel. Lasersight, Inc. v. CC Invs. LDC*,
    No. 99 CIV 2821 (VM), 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) ................ 62

*Summit Inv. & Dev. Corp. v. Leroux*,
    69 F.3d 608 (1st Cir.1995)............................................................. 69

*Vestron v. National Geographic Soc'y*,
    750 F. Supp. 586 (S.D.N.Y. 1990)................................................... 25

*Williams v. Geier*,
    No., 380,1994, 1987 WL 11285 (Del. Ch. May 20, 1987),
    *aff'd*, 671 A.2d 1368 (Del. 1996) .................................................................................. 65

**Statutes and Regulations**

11 U.S.C. § 101 .................................................................................................................. 24

11 U.S.C. § 1124 ............................................................................................................... 9, 67

11 U.S.C. § 1129 .................................................................................................................. 9

11 U.S.C. § 365 ............................................................................................................. passim

**Other Authorities**

15 U.S.C. § 78m(d) ............................................................................................................ 50

*Cable TV Investor: Deals & Finance* (Oct. 31, 2008) .................................................... 35

*Great Southwest Overseas Fin. Corp. N.V.*, March 16, 1972 SEC No Action Letter,
    *available at* 1972 SEC No-Act. LEXIS 1486 .............................................................. 57

H.R. Rep. No. 1011, 100th Cong., 2d Sess. 2 (1988) .................................................... 24

U.S. Code Cong. & Admin. News 1988 ......................................................................... 24

## PRELIMINARY STATEMENT

Debtors Charter Communications, Inc. and its affiliates (collectively, "Charter") seek confirmation of their Plan of Reorganization. The Plan will reduce Charter's debt by approximately $8 billion, reduce Charter's annual interest expense by hundreds of millions of dollars, raise $1.6 billion in new equity through a rights offering and permit Charter to be free cash flow positive on the first day of emergence. As a central part of the Plan, Charter seeks to reinstate the approximately $11.8 billion of senior debt. Since the Credit Agreement was executed in March 2007, Charter has made all of its principal and interest payments to JPMorgan and the other objecting senior creditors ("JPMorgan"), including during these cases. If the Plan is approved, Charter will emerge from bankruptcy as a more efficient and less leveraged company, and have a better borrower profile for JPMorgan.

After 16 days of trial, the evidence demonstrates that there is no obstacle to reinstatement and the Court should approve Charter's Plan. JPMorgan has received everything to which they are entitled under the Credit Agreement and other relevant senior debt instruments and should not be permitted to use Charter's bankruptcy to opportunistically renegotiate the terms to which they contractually agreed. Because the Plan puts JPMorgan in the same legal position it occupied before the chapter 11 cases were filed, and makes Charter a substantially better credit for JPMorgan, without altering its rights, it has no grounds to complain about being required to honor the terms of its agreements. Indeed, the evidence shows that there are no non-curable defaults under the Credit Agreement and other relevant senior debt instruments that would prevent reinstatement.

Fundamentally, JPMorgan has argued that the Credit Agreement and other relevant senior debt instruments should not be reinstated due to the existence of certain defaults. These alleged defaults are: (i) that Charter's Designated Holding Companies (the "DHCs") were unable to pay

their debts as they become due in violation of Section 8(g)(v) of the Credit Agreement; (ii) the consummation of Charter's Plan will cause a "change of control" to occur in violation of Section 8(k) of the Credit Agreement; and (iii) an acceleration of the DHCs' debt caused by Charter's bankruptcy filing has, in turn, caused a cross-acceleration default of the Credit Agreement. None of these defaults exist or will exist following a consummation of Charter's Plan.

*Section 8(g)(v)*.  Section 8(g)(v) of the Credit Agreement provides for an Event of Default if Charter's DHCs "shall be unable to . . . pay its debts as they become due."  Here, Charter paid all of its debts as they became due before the filing of these chapter 11 cases, and thus satisfied Section 8(g)(v).  JPMorgan acknowledges that Charter paid all of its debts as they became due, yet argues that Charter was not "able" to pay such debts as they became due and would not be able to pay their debts in the future.  JPMorgan's arguments are at odds with Section 8(g)(v) itself and the evidence presented at trial.

A plain reading of Section 8(g)(v) demonstrates that it is not prospective, but instead requires *only* that the DHCs be able to pay their debts on the day they become due.  JPMorgan's conduct in monitoring the Credit Agreement and dealings with Charter over many years confirms that Section 8(g)(v) is not prospective.  And, if Section 8(g)(v) is not prospective, the undisputed evidence is that Charter in fact paid all of their debts as they became due and, therefore, there is no pre-petition default under Section (8)(g)(v).  Even if Section 8(g)(v) is viewed prospectively, it could not reasonably apply more than a few weeks prospectively because of the limitations within the Credit Agreement itself on the movement of funds from Charter Communications Operating, LLC ("CCO")—the only source of operational funds—to the DHCs.  CX 101, § 7.6(b) (limiting transfers from CCO to the DHCs to 15 business days before their debts are due).

If the Court were to find Section 8(g)(v) contained a prospective obligation, the Court's order necessarily would have to delineate what that obligation is—how far into the future it extends and what the parameters are to evaluate such a prospective default. However, there is no evidence that would support any such prospective standard. JPMorgan—as agent for the banks—never told the Borrower that Section 8(g)(v) was prospective before this dispute, never created any documents memorializing its prospective interpretation of Section 8(g)(v) before anticipating this litigation, did not create a requirement in the Credit Agreement that Charter provide the forward-looking financial information necessary to permit JPMorgan to determine a prospective default, never conducted a forward-looking analysis itself, and never asked Charter to provide an analysis of the DHCs' ability to pay their debts in the future. Moreover, the bank witnesses, the proponents of the prospective theory, can not even agree on the prospective standard to apply, and JPMorgan's corporate representative testified that Section 8(g)(v) is "not specific intentionally" and requires "the use of judgment." 8/25/2009 Tr. 30:7-23 (Kurinskas). That is an untenable position.

JPMorgan also argues that Charter was not "able" *to pay* its debts as they became due pursuant to Section 8(g)(v) because CCH I did not have sufficient surplus to declare a dividend to CIH to make its interest payment on November 17, 2008. This is a red herring. Surplus is irrelevant. The Credit Agreement does not require the DHCs to have surplus, or to pay its debts as they become due *only* with dividends. Charter has many methods available to pay its debts as they become due from internal and external sources, including dividends, intercompany notes, intercompany accounts, debt-for-debt exchanges, debt-for-equity exchanges, capital raising transactions, among others. The Court should not accept JPMorgan's invitation to conflate surplus with an inability to pay debts as they become due.

Charter does not need to use dividends (or therefore have surplus) to make its payments as they become due under Section 8(g)(v). And only dividends require surplus—under Delaware law, not the Credit Agreement—and Charter had sufficient intercompany notes and accounts available to pay CCH and CIH's debts through the filing of these cases. Against that background, JPMorgan's challenge to the November dividend is misplaced for several reasons.

- *First,* the evidence shows that CCH I had more than sufficient surplus to make a $62.8 million dividend on November 17, 2008. Charter's surplus calculation of $2.8 billion at CCH I, downside sensitivity analyses still showing $1 billion of surplus at CCH I, contemporary valuations of Charter by third parties, advice from Charter's financial advisor, as well as expert testimony, support the Board's determination that CCH I in fact had sufficient surplus to declare the dividend.

- *Second,* the Board's determination to declare the dividend must be considered under Delaware law. Under Delaware law, JPMorgan must prove the Board acted in bad faith or committed fraud in making its surplus determination in order to overturn the Board's business judgment. *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150 (Del. 1997); *Morris v. Standard Gas & Elec. Co.*, 63 A.2d 577, 583 (Del. Ch. 1949). Here, JPMorgan does not come close to proving bad faith or fraud. And JPMorgan could not prove it in any event, because the Board's deliberations were well-informed and thorough. The Board reviewed and considered the draft valuation of Charter's cable assets conducted by Duff & Phelps in October 2008, Charter's surplus calculation showing $2.8 billion of surplus at CCH I, a sensitivity analysis using lower growth rates and EBITDA multiples that still implied more than $1 billion of surplus at CCH I, recent transactions in the marketplace, and public and private values of peer companies. In addition, the Board was advised by Lazard on the reasonableness of the range of valuation multiples and used the Board's own expertise and experience to determine there was surplus.

- *Third,* Charter was able to pay its debts as they became due by using intercompany notes and payables alone. In other words, Charter was "able" to pay its debts with intercompany notes and payables alone and therefore Charter did not need to use dividends in order to be "able" to pay CCH and CIH's debts as they became due. Unless the Court adopts a prospective interpretation of Section 8(g)(v) that looks more than four months in advance, the Court need not give any consideration to whether the only option available to Charter to pay its debts was through dividends.

- *Fourth*, Charter had other means to satisfy its debts as they become due in the future through external sources—sources JPMorgan has helped Charter access

over the years.  For example, Charter could raise new liquidity through capital market transactions, conduct debt-for-debt exchanges, debt-for-equity exchanges, or otherwise extend the maturity of debts as they become due.  In addition, Paul Allen or others could make capital contributions.  JPMorgan, Citibank and Deutsche Bank were offering such solutions to Charter during this timeframe.

Finally, even if the Court found that the DHCs were not able to pay debts as they became due, that finding should not prevent confirmation of the Plan, because such a default (i) would be *ipso facto*, and (ii) is not ongoing, but cured, because that debt would be eliminated by the Plan. Whether the DHCs are able to pay debts as they become due is clearly a default related to financial conditions and therefore *ipso facto*.  While JPMorgan argues that the making of a representation for borrowing is not an *ipso facto* default, such representations occurred only in November 2008 and February 2009.  And even if the Court rules that Section 8(g)(v) is prospective, there is no reasonable basis to conclude an inability to pay debts as they become due as far back as November 5, 2008.  To the extent that the Court believes that the Debtors are required to cure any default as a result of any draw, although the Debtors strongly disagree with such a conclusion, the Debtors should be afforded the opportunity to cure any such default if required to confirm the Plan.

In sum, in order to find that JPMorgan's alleged default of Section 8(g)(v) blocks reinstatement, the Court would have to find *all* of the following:  (i) Section 8(g)(v) is prospective; (ii) Section 8(g)(v) is more than four months prospective; (iii) as of November 5, 2008, Charter's DHCs were unable to pay their debts (measured against some standard, yet undefined) more than four months in the future even though Charter could have used intercompany notes and payables to make such payments, (iv) that CCH I lacked $62.8 million in surplus in November, even reviewing the dividend declaration under the deferential Delaware business judgment rule; (v) Charter was foreclosed from satisfying its future debts through *any*

*other external means* including debt-for-debt exchanges, debt-for-equity exchanges, maturity extensions—although JPMorgan, Citibank and Deutsche Bank, among others, were offering such solutions during this timeframe—not to mention other capital market transactions, including investments from Paul Allen or others; and (vi) such a default is not *ipso facto* and could not be cured. Charter submits that *none* of these findings can be supported consistent with the terms of the Credit Agreement, the evidence presented at trial or the Bankruptcy Code, much less all of them.

*"Change of Control."* There has been no "change in control" default under Section 8(k) of the Credit Agreement or other senior debt instruments. To the contrary, the evidence demonstrated that the Plan does not violate either Section 8(k)(i) or Section 8(k)(ii); and JPMorgan's arguments about control and board composition are simply irrelevant to the requirements of these provisions.

Section 8(k)(i) requires that Paul Allen have at least 35% of the voting power for the management of the borrower CCO. There is no dispute that Paul Allen will have more than 35% voting power of Charter Communication, Inc. ("CCI") at exit. Trial testimony, the Management Agreement between CCO and CCI, and the LLC Agreement between CCO and CCOH all establish that CCI is the manager of and provides the management for CCO. The Court's examination of Section 8(k)(i) need go no further.

JPMorgan has argued at length that Paul Allen will not control CCI's board of directors at exit. But, as JPMorgan's control expert Professor Paul Gompers admitted, the only way that Paul Allen could control CCI's board is if he had at least 51% of CCI or appointed a majority of CCI's directors. Yet, Professor Gompers acknowledged, *neither* is required by Section 8(k)(i). Section 8(k)(i) does not require that Paul Allen control CCI's board (or CCO), and it does not

require that he appoint a majority of CCI's board. It requires only that Paul Allen have at least 35% of the voting power of the management of CCO—which Paul Allen plainly will satisfy at exit.

Section 8(k)(ii) sets forth a bright line test. For there to be a default, there must be the consummation of a transaction *the result of which* a group—as defined by Securities Exchange Act Section 13(d)—has the power to vote at least 35% of CCI *and* owns more than Paul Allen. There has been no default of Section 8(k)(ii). There is no dispute that Paul Allen will continue to own 91% of CCI until confirmation and the exchange of debt-for-equity. Before that time, as Professor Gompers acknowledged, there is no scenario in which anyone could own a greater voting interest than Paul Allen. And at that time—at confirmation—there has been no evidence of any Section 13(d) group.

Section 13(d) has a defined meaning: an agreement or understanding to acquire, hold or dispose of an issuer's securities. Representatives of Apollo, Oaktree, Crestview and Franklin— *all of whom must be included* in a hypothetical Section 13(d) group—testified that there was no agreement to acquire, hold or dispose Charter securities at exit. Professor Gompers offered no evidence to the contrary. He could not—and did not—opine that any Section 13(d) group will exist or that any default under Section 8(k) of the Credit Agreement has occurred. While he opined repeatedly about control in the context of private equity investments, he admitted that he did not equate control to an agreement to acquire, hold or dispose of Charter securities. And he admitted that he was unaware of any formal or informal agreement among the firms to acquire, hold, dispose or vote Charter securities at exit. Because JPM failed to present any evidence of a Section 13(d) group at exit, much less one that will own more than Paul Allen, it failed to prove a default of Section 8(k)(ii) of the Credit Agreement.

*Ipso Facto*.  JPMorgan has failed to identify any defaults by the DHCs that are not *ipso facto* defaults.  JPMorgan argues that any acceleration of the DHCs' debt cross-accelerates CCO's debt under the Credit Agreement, and that such a cross-acceleration default is not *ipso facto* because CCO is a solvent debtor.  Yet, the evidence at trial established that these cross-acceleration provisions were negotiated precisely because JPMorgan believed a default by a DHC would have an impact on CCO's financial condition.  *See* 8/25/2009 Tr. 64:5–65:13 (Kurinskas).  In other words, given Charter's integrated structure and the interrelationship between the DHCs and CCO, JPMorgan's witnesses testified that CCO's business is fundamentally affected by the financial condition of the DHCs.  *See id*.  Thus, a default conditioned on DHCs seeking bankruptcy protection is nothing more than a stalking horse for CCO's financial condition and, as such, is *ipso facto*.

## LEGAL STANDARDS

As the proponent of its confirmation Plan, Charter bears the burden of establishing compliance with 11 U.S.C. § 1129.  *E.g., In re Bally Total Fitness of Greater New York, Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the plan, have the burden of proving the satisfaction of the elements of Sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence."); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001).

This does not mean, however, that the debtor bears the burden of proof or even production on *all* issues that weigh on confirmation.  Importantly, JPMorgan, as an objector to the Plan, bears the burden of producing evidence to support its objection.  *In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003); *In re Genesis Health Ventures, Inc.*, 266 B.R. at 599; *In re Goddard*, 212 B.R. 233, 239 n.7 (D.N.J. 1997).  Thus, where a creditor's objection, as here, is that the occurrence of pre-petition defaults precludes

reinstatement because it is impaired under 11 U.S.C. § 1124, the creditor must establish the existence of any such defaults in the first instance. *See, e.g.*, *In re Best Payphones, Inc.*, No. 01-B-15472 (SMB), 2007 WL 1388103 (Bankr. S.D.N.Y. May 8, 2007) ("Under New York law, a party claiming a breach of contract must prove . . . breach by the other party.") (citations omitted).

Moreover, because the basis for JPMorgan's objection is the assertion of defaults under a contract, JPMorgan bears the ultimate burden of proof as to those alleged defaults. Nothing about the bankruptcy context changes the burden of proof. *See Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000). "Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence." *Mercury Partners LLC v. Pacific Medical Bldgs., L.P.*, No. 02 CIV. 6005 (HBP), 2007 WL 2197830, at *8 (S.D.N.Y. July 31, 2007); *see also Best Payphones, Inc.*, 2007 WL 1388103, at *5 ("Under New York law, a party claiming a breach of contract must prove . . . 'breach by the other party.'") (citations omitted).

While 11 U.S.C. § 1124 defines what it means to be impaired, it imposes no burden on a debtor beyond the requirements set forth in 11 U.S.C. § 1129, and expressly permits reinstatement. Taken together, §§ 1124 and 1129 demonstrate that Charter's burden is merely to prove confirmation standards, while the burden of proving a default resulting in impairment begins and ends with JPMorgan. If *and only if* JPMorgan proves a default would the burden *then* shift back to Charter to prove that such a default was either *ipso facto* or would be cured by the Plan under § 1124(2).

This is precisely how courts have approached burdens of proof in the analogous context of contract assumption. *See In re Kings Terrace Nursing Home & Health Related Facility v.*

*New York State Dep't of Soc. Servs.*, No. 91B 11478, 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 27, 1995); *In re Greektown Holdings, L.L.C.*, No. 08-53104, 2009 WL 1653461, at *2 (Bankr. E.D. Mich. May 13, 2009); *In re F.W. Rest. Assocs., Inc.* 190 B.R. 143, 147 (Bankr. D. Conn. 1995); *In re Rachels Indus., Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). As this Court explained in *Kings Terrace*, a party opposing assumption:

> has the burden of coming forward with all alleged defaults and demonstrating that those defaults have been properly noticed on the debtor. 11 U.S.C. § 365; *In re Diamond Manufacturing Co.*, 164 B.R. 189, 199 (Bankr.S.D.Ga.1994). Once defaults are properly established, the burden then shifts to the debtor to prove that the defaults have either been cured or will be cured promptly and that there exists adequate assurance of future performance. *Id.* Absent proof by the nonbankrupt that a default exists, the burden of proof does not shift to the debtor, especially where, like here, the debtor has no knowledge of any defaults. *Diamond Manufacturing*, 164 B.R. at 199-200.

1995 WL 65531, at *9. The Bankruptcy Court for the Eastern District of Michigan recently explained and applied this precise burden-shifting analysis when rejecting a non-debtor's objection to contract assumption on the basis of the debtors' allegedly incurable, non-monetary defaults. *See Greektown Holdings,* 2009 WL 1653461, at *1-5. Because the objector failed to meet its "burden of establishing evidence of a default," the debtor bore no burden of proof as to cure. *Id.* at *2, 4-5; *cf. F.W. Restaurant Assocs.,* 190 B.R. at 147 (shifting burden to prove cure to debtor after objector established default).

There is no reason why the approach should be any different in the context of reinstatement. In both the assumption and reinstatement contexts, the proponent seeks to maintain the status quo while the objector cries foul. Indeed, the party making an affirmative claims bears the burden of persuasion. *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1226 (8th Cir. 1987) (analogizing plan objections and burden shifting to that in civil litigation, and explaining that the party making an affirmative claim (*i.e.* contract default) bears the burden of persuasion). Applying these principles to reinstatement, it is JPMorgan who bears the burden

of proving a default, while Charter bears the burden of proving the cure of any default established by JPMorgan. Any alternative would be senseless because the burden on a debtor to *disprove* all defaults in the first instance could never be met.

In addition, as the plaintiff in this adversary proceeding, JPMorgan has the burden of proving any prepetition breach of the Credit Agreement asserted in its adversary proceeding. *See*, *e.g.*, *In re Food Mgmt. Group, LLC*, 372 B.R. 171, 190 (Bankr. S.D.N.Y. 2007); *Mercury Partners LLC*, 2007 WL 2197830, at *8 (citing *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2d Cir. 1989)).

In any event, regardless of who has the ultimate burden of persuasion, the evidence demonstrates that there are no obstacles to reinstatement and the Court should approve Charter's Plan.

**ARGUMENT**

**I.      Section 8(g)(v) Does Not Impose A Prospective Obligation.**

JPMorgan's argument that Charter was in default of the Credit Agreement in November 2008 because two DHCs (namely, CCH and CIH) were unable to pay their debts as they become due requires the Court to find that Section 8(g)(v) is prospective as a matter of law. Based on the plain language of Section 8(g)(v), the interaction of Section 8(g)(v) with other provisions in the Credit Agreement, and JPMorgan's course of conduct over many years, the Court should find that Section 8(g)(v) is *not* prospective. If the Court determines that Section 8(g)(v) is not prospective, the unrebutted evidence established Charter in fact paid all of its debts as they became due, and, thus, there is no pre-petition default under Section 8(g)(v).

If the Court were to find Section 8(g)(v) contained a prospective obligation, the Court's order necessarily would have to delineate what that obligation is—how far into the future it extends and what the parameters are to evaluate such a prospective default. However, JPMorgan

provided no evidence that would support any such prospective standard for Section 8(g)(v). Indeed, the bank witnesses, the proponents of the prospective theory, can not even agree on the prospective standard to apply, and JPMorgan's corporate representative testified that Section 8(g)(v) is "not specific intentionally." 8/25/2009 Tr. 30:7-23 (Kurinskas). JPMorgan asks this Court to adopt a prospective forward-looking standard that is undefined in the Credit Agreement, unsupported by the trial evidence and unsupported in the caselaw; and then apply this amorphous standard to find a prepetition default. This is not a fair or proper way to interpret a 68-page, single-spaced Credit Agreement negotiated by sophisticated parties and amended numerous times over nine years.

**A.      A Plain Reading of Section 8(g)(v) Demonstrates That "The Ability To Pay Debts" Requirement Is Not Prospective.**

Section 8(g)(v) provides that it shall be an Event of Default if "any Designated Holding Company, the Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." Section 8(g)(v) does not contain a single word about being able to pay debts in the future—be it three months, six months, a year, "near term" (whatever that means), 18 months (as JPMorgan argued at the motion to dismiss hearing), or otherwise, just as it does not require DHCs to be able to pay debts "as they *would* become due." Section 8(g)(v) simply provides for a default if a DHC is unable to pay its debts on the day "they become due."

Section 8(g)(v) provides three related, but distinct, events of default: if "any Designated Holding Company, the Borrower or any of its Subsidiaries [1] shall generally not, or [2] shall be unable to, or [3] shall admit in writing its inability to, pay its debts as they become due." CX 101, § 8(g)(v). Properly interpreted, this provision provides for defaults if a DHC is (1) unreliable in paying debts generally as they become due, (2) actually *unable* to pay its debts

when they become due (whether or not it actually pays a given debt), or (3) unequivocally going to be unable to pay debts and admits so in writing. As such, there has been no default because no DHC was generally unreliable in paying its debts, was actually unable to pay, or unequivocally declared an inability to pay.

JPMorgan's reading of Section 8(g)(v) would render the third clause superfluous. Under its construction, there would be no need for a default based on a DHC "admit[ting] in writing" that it is unable to pay its debts as they become due, because that future inability to pay would itself be a default under the second clause. *Id.* The default would have occurred before the DHC could put pen to paper. An interpretation that renders one of 8(g)(v)'s clauses meaningless is impermissible. *See* MTD Opp. 23 (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)).

In addition to lacking any textual basis for its argument, JPMorgan provides the Court no basis for determining how and when a default should be called for a perceived inability to pay future debts and, of course, none is to be found in the Credit Agreement. Even JPMorgan's witnesses and the various banks objecting to confirmation cannot agree amongst themselves as to how far into the future such a prospective obligation should extend. JPMorgan's Peter Hooker, a negotiator of the Credit Agreement, testified he is not sure where one would look to determine how far in the future Section 8(g)(v) should apply. 7/31/2009 Tr. 49:5–50:8 (Hooker). JPMorgan's Ann Kurinskas testified it could be 4 to 5 quarters into the future. 8/18/2009 Tr. 14:25 (Dep. Tr. 44-45 (Kurinskas)). Citibank's representative testified that there was no "specific period" of time to apply, Deutche Bank's representative testified it would look 6-12 months into the future, and CSFB's representative testified he did not know how far into the

future Section 8(g)(v) would apply.  8/18/2009 Tr. 13:24 (Dep. Tr. 88-89 (Ojea-Quintana));

8/18/2009 Tr. 75:12 (Dep. Tr. 221-22 (Morris)); 8/18/2009 Tr. 12:12 (Dep. Tr. 144 (Zagar));

8/18/2009 Tr. 12:23 (Dep. Tr. 209-10 (Federman)).

JPMorgan gives no coherent way to read Section 8(g)(v), much less how to apply it.  In

light of this morass, JPMorgan takes the remarkable position that Section "8(g)(5) is *not specific

intentionally*."  8/25/2009 Tr. 30 (Kurinskas); *see id.* at 113–14, 119.  As evidenced by the

disagreement among the lenders themselves, JPMorgan's interpretation would leave the

borrower in the dark as to whether or when to report that a default has occurred, and yet,

JPMorgan contends that it was Charter's responsibility to report a default.  *See* 8/25/2009 Tr. 10-

11 (Kurinskas).  This is no way to read a contract.  And Charter never would have entered an

agreement that gave the other party such broad, unchecked, unilateral discretion.  Unless the debt

has come due and the debtor is unable to pay it, the parties will be embroiled in needless

speculation about whether the debtor may or may not be able to pay future debts.

JPMorgan and Charter knew how to draft a forward-looking requirement in a credit

agreement if the parties wanted to so agree.  In Section 8(m) of the 2006 Credit Agreement, the

parties included an explicitly prospective "accordion" term that required DHC debts be

defeased—*i.e.*, the DHC have the money on hand to pay—no later than three months before the

debt was due.  See CX 149, Section 8(m) ("DHC debt and/or indebtedness of the borrower or

any of its subsidiaries (excluding any such debt that has been defeased in accordance with its

terms and debt under this agreement) in an aggregate amount in excess of $500 million shall

remain outstanding on the date that is three months prior to the stated maturity of such

indebtedness."); see also 7/31/2009 Tr. at 69–70 (Schmitz); 8/18/2009 Tr. at 14:25 (Dep. Tr. at

114–15 (Kurinskas)).  However, the parties intentionally removed that provision in negotiating

the 2007 Credit Agreement at issue. See 7/31/2009 Tr. at 33–34 (Hooker); *id*. at 70 (Schmitz); see also 8/18/2009 Tr. at 14:25 (Dep. Tr. at 115 (Kurinskas)); CX 101, CX 105 at 3. Yet, JPMorgan's prospective approach would effectively require Charter to defease debts six months to a year in advance to avoid a default under its interpretation.

**B.      JPMorgan's Construction Of Section 8(g)(v) Is Contrary To Other Provisions In The Credit Agreement.**

A "prospective" interpretation of Section 8(g)(v) would also conflict with other provisions of the Credit Agreement. For example, while the Credit Agreement requires the Borrower CCO to remain solvent, the Credit Agreement imposes no solvency requirement on the DHCs themselves. *See* 7/31/2009 Tr. 60–62, 65 (Schmitz); *id*. at 54 (Hooker); 8/25/2009 Tr. 82-23; *see also* CX 101, § 4.21. Far from imposing a solvency requirement, the Credit Agreement does not require that Charter disclose any information from which JPMorgan could have determined a future inability to pay by a DHC—and JPMorgan never requested such information from Charter. *See* 7/31/2009 Tr. 63, 65 (Schmitz); 8/18/2009 Tr. 14:25 (Dep. Tr. 53 (Kurinskas)); *see also* CX 101, CX 188.

Under JPMorgan's reading of Section 8(g)(v), DHC defaults become a self-fulfilling prophesy that Charter is helpless to avoid, Section 7.6 (which addresses upstreaming funds for paying DHC debts) notwithstanding. If, at any moment in time, a DHC did not have sufficient funds on hand to pay debts becoming due at some unspecified time in the future, there would be a default under Section 8(g)(v) according to JPMorgan. Such a default would thus preclude CCO from moving funds to a DHC. *See* CX 101, § 7.6(b)(i). And the DHC, in turn, would not be able to pay its debts when they actually become due. Yet, the whole point of Section 7.6 was to permit the movement of funds to the DHCs to pay their debts as they became due. If CCO is already in default under Section 8(g)(v) of the Credit Agreement whenever a DHC does not have

sufficient funds on hand to meet a forthcoming debt obligation, then Section 7.6 is meaningless, because CCO will never be able to move funds to the DHC for it to pay that debt. A court must "arrive at a construction" that gives "fair meaning to all of the language employed by the parties." *Gerlach v. The Horn & Hardart Co.*, 683 F. Supp. 342, 344 (S.D.N.Y. 1988). Because JPMorgan's interpretation of 8(g)(v) would essentially render Section 7.6 "superfluous or meaningless," it is untenable. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992). Ann Kurinskas' testimony that Section 7.6 is intended to prevent money from being parked at a DHC proves the point. The DHCs never have had and never were permitted to pay their debts as "they would become" due. They were permitted only to pay their debts when they became due.

Moreover, the Credit Agreement was drafted such that the DHCs would not necessarily remain solvent because, as the Credit Agreement plainly states, CCO may only transfer funds to the DHCs 15 business days before their debts are due. 7/31/2009 Tr. 71–72 (Schmitz); *see also* 7/31/2009 Tr. 49–51 (Hooker); 8/25/2009 Tr. 64-65 (Kurinskas); CX 101, § 7.6(b)(iii). Given the limitations of Section 7.6, to the extent Section 8(g)(v) applies prospectively, it could not apply more than 15 days in advance. Again, CCO is concededly "the sole source of operational cash flow for the repayment of debt by CCO's parent companies." 8/25/2009 Tr. 64 (Kurinskas). Absent an ability to transfer funds on a longer-term basis, it was inevitable that the DHCs would become insolvent. Thus, if Section 8(g)(v) is prospective, it cannot be more forward-looking than Charter's ability to upstream funds via dividend.

Charter and JPMorgan specifically negotiated whether to include a forward-looking solvency requirement in a March 2008 purchase agreement for Second Lien Notes. In the draft purchase agreement, JPMorgan proposed a provision requiring the DHCs to represent they will be able to make payments as they become due in the future. 7/31/2009 Tr. 68:16–69:13

(Schmitz).  During those negotiations, Charter's CFO Eloise Schmitz contacted JPMorgan's Peter Hooker and told him she was uncomfortable making such a forward-looking representation without any context of time.  *Id.*  Hooker said he understood Schmitz's position and the executed Purchase Agreement did not include the forward-looking provision.  *See* 7/31/2009 Tr. 67, 69 (Schmitz).  Again, with its "prospective" interpretation of Section 8(g)(v), JPMorgan seeks to reclaim that which it specifically ceded at the negotiating table.

C.     **JPMorgan's Course of Conduct Is Inconsistent With Its Construction Of Section 8(g)(v).**

JPMorgan's prospective construction is inconsistent with its own course of conduct prior to this proceeding, as well as the course of conduct by the other bank lenders.  JPMorgan's post-hoc interpretation of Section 8(g)(v) is nothing more than a litigating position.   Indeed, JPMorgan did not adopt its prospective theory of Section 8(g)(v) until after it knew there would be litigation over reinstatement and determined that the banks wanted to increase the pricing of the credit facility.

1.     **JPMorgan's Course of Conduct In Monitoring The Credit Agreement Demonstrates That Section 8(g)(v) Is Not Prospective.**

JPMorgan's course of conduct under the Credit Agreement confirms that Section 8(g)(v) is not prospective.  To put JPMorgan's conduct for years before this dispute in perspective, JPMorgan—as agent for numerous banks—has never told the Borrower that Section 8(g)(v) was prospective, never memorialized its prospective interpretation of Section 8(g)(v) before anticipating this litigation, did not create a requirement in the Credit Agreement that Charter provide the forward-looking financial information necessary to permit JPMorgan to determine a prospective default, never conducted a forward-looking analysis itself, and never asked Charter to provide an analysis of the DHCs ability to pay their debts in the future.  JPMorgan's argument

now that Section 8(g)(v) is prospective is contradicted by its actions for years before this litigation and is simply not credible.

*First,* JPMorgan never told the Borrower before this dispute that its position was that Section 8(g)(v) was prospective, although JPMorgan claims that it was Charter's responsibility to report such defaults. As Charter's CFO Eloise Schmitz testified, the first time anyone from JPMorgan suggested that Section 8(g)(v) was prospective was when she received JPMorgan's February 5, 2009 default letter—although Schmitz has worked with JPMorgan for over nine years on the Credit Agreement, including through numerous refinancing transactions and strategic alternative discussions. 7/31/2009 Tr. 67:3–68:23 (Schmitz).

*Second,* JPMorgan's witnesses could not identify a single pre-litigation document that articulates a "prospective" approach to Section 8(g)(v), and no JPMorgan witness recalls having asserted a default for an inability to pay debts that would become due in the future, despite the common inclusion of language such as Section 8(g)(v) in other credit agreements. *See* 7/31/2009 Tr. 49–50 (Hooker); 8/25/2009 Tr. 116–17 (Kurinskas); 8/18/2009 Tr. 14:25 (Kurinskas Dep. at 46:20–47:5; 48:22–49:6; 49:14–49:19; 49:24–49:25). JPMorgan is asking this Court to find that Section 8(g)(v) is prospective, yet it did not provide the Court a single document memorializing this interpretation or provide an instance under another credit agreement containing this common language where a forward-looking default was called.

*Third*, the Compliance Certificate that JPMorgan created and attached to the Credit Agreement did not require Charter to provide the financial information JPMorgan needed to determine a default on a prospective basis. 7/31/2009 Tr. 63:19–22 (Schmitz). Instead, the Compliance Certificate, Exhibit B to the Credit Agreement, requires the disclosure only of

historical financial information, not prospective information.  CX 101 at JPM-CH 00006041; 7/31/2009 Tr. 62:16–63:25 (Schmitz); CX 188.

*Fourth,* JPMorgan never did *any* analysis of Charter's compliance with Section 8(g)(v) on a forward-looking basis.  As JPMorgan's credit risk manager for Charter, Tina Ruyter's role was to track Charter's performance and integrate that into JPMorgan's credit/risk exposure analyses.  7/31/2009 Tr. 11:22–12:3 (Ruyter).  Yet, there was never a time in which Ruyter was asked to model or analyze the DHCs ability to pay debts that were coming due in the future. *See* 7/31/2009 Tr. 26 (Ruyter) ("Q. Was there ever a point in time in your work in credit risk management where you were asked to model or analyze the ability of Charter's designated holding companies to pay debts that were coming due in the future?  A. No.").

Nor did JPMorgan ever request from Charter an analysis of the DHCs' ability to pay future debts.  *See* 7/31/2009 Tr. 111–12 (Schmitz).  Even after Charter disclosed in its third quarter Form 10-Q (filed November 6, 2008) that it was uncertain whether the Company will have, at the relevant times, sufficient surplus at CIH and its parents to make distributions to make interest payments, JPMorgan did not request *any* information from Charter about the DHCs ability to pay debts in the future.  8/3/2009 Tr. 77:8–12 (Schmitz).  Again, after Charter disclosed on December 12, 2008 that it had retained Lazard as its financial advisor for restructuring and after Charter disclosed on January 15, 2009 that it was not making its January interest payments to further negotiate with its bondholders regarding a restructuring, JPMorgan did not request *any* information from Charter about the DHCs ability to pay debts in the future. 8/3/2009 Tr. 116:23–117:1 (Schmitz).  Even as of January 13, 2009—*after* the release Charter's third quarter Form 10-Q and *after* Charter's announcement of its retention of Lazard as its restructuring financial advisor—JPMorgan told the other banks under the Credit Agreement that it was of the view that

there had been no default under the Credit Agreement. *See* CX 127; 7/31/2009 Tr. 43–44 (Hooker); 8/25/2009 Tr. 98–99 (Kurinskas).

<blockquote>

**2.     The Other Bank Lenders' Conduct In Monitoring The Credit Agreement Also Demonstrates That Section 8(g)(v) Is Not Prospective.**
</blockquote>

The actions of the other Bank lenders likewise undermine any prospective interpretation of Section 8(g)(v). Bank of America's witness testified that in his 37 years of experience dealing with distressed financial work-outs he had never known Bank of America to assert a default for a prospective or perceived inability to pay debts as they would become due in the future, as opposed to an actual failure to pay debts as they became due. *See* 8/18/2009 Tr. 12:12 (Dep. Tr. 153–54 (Zagar)). Credit Suisse's witness conceded that he would have thought that there was only a default under Section 8(g)(v) if a payment had been missed or had come due without refinancing it. *See* 8/18/2009 Tr. 12:23 (Dep. Tr. 63, 112–13 (Federman)). Likewise, Citibank's witness said that Section 8(g)(v) only applied "as the actual maturities come due." 8/18/2009 Tr. 13:24 (Dep. Tr. 88–89 (Ojea-Quintana)). Deutsche Bank's witness, Malcolm Morris, did not believe Charter was in default as of December 2008. *See* 8/18/2009 Tr. 75:12 (Dep. Tr. 105 (Morris)). Even as late as February 18, 2009, Bank of America had determined that Charter was in compliance with its covenants and was expected to remain in compliance—despite the fact that Charter had engaged Lazard, that Lazard was attempting to negotiate with bondholders, and the fact that financial markets had been severely dislocated. *See* 8/18/2009 Tr. 12:12 (Dep. Tr. 105–06, 179–80, 183, 185 (Zagar)). Simply put, sophisticated banks had Charter under extra scrutiny for years and yet, there is only one person at one bank—Kurinskas—who claims there was a default, in a letter that was only written after JPMorgan recognized that it would be litigating the issue of reinstatement. *See* CX 156; 7/31/2009 Tr. 23–25 (Ruyter).

### 3. JPMorgan Adopted Its Prospective Interpretation of Section 8(g)(v) Only After It Determined Charter Intended To Reinstate And The Lenders Wanted Better Pricing.

The evidence presented at trial revealed the real motive of JPMorgan's adoption of its prospective approach to Section 8(g)(v)—to gain better pricing on the credit facility. At trial, Kurinskas testified that JPMorgan has used terms such as Section 8(g)(v) in such "circumstances as a negotiating point in order to get a company to enter into a dialogue." 8/25/2009 Tr. 36:5-23 (Kurinskas). And that is exactly what JPMorgan is trying through this litigation. JPMorgan's assertion of a default under Section 8(g)(v) was nothing more than a strategic maneuver calculated to preemptively and defensively thwart reinstatement and to create added leverage in opposing confirmation of Charter's Plan.

JPMorgan's internal documents did not memorialize any default or understanding that Section 8(g)(v) was prospective before JPMorgan decided to oppose reinstatement. However, JPMorgan's internal communications disclose that, as it became clear that Charter intended to reinstate the bank debt, JPMorgan wanted to find ways to increase the pricing on the bank debt. On February 2, 2009, JPMorgan recognized that Charter intended to "reinstate [the] bank debt under [the] existing contract." CX 156 at JPM-CH 00048763. Kurinskas noted that the "[b]ank group wants pricing increased to market" and therefore bankruptcy litigation over the issue of impairment was "likely"—but did not mention any default. *Id*. On the morning of February 5, 2009, Kurinskas again noted internally that Charter's "intention is to reinstate the bank debt under its current contract." Kurinskas went on to state that the "Lenders under the facility want to negotiate an improvement in the pricing on the facility"—but again did not mention any default. *Id*. At this point, JPMorgan had not yet declared a Section 8(g)(v) default—or even mentioned such a potential default in its internal communications or communications with the other Lenders.



At the same time, Citibank noted that that they needed to "scrub the credit agreement" to find defaults to support their desire to renegotiate the pricing on the credit facility. CX 259 at CITI-CH 00000875; 8/18/2009 Tr. 13:24 (Ojea-Quintana Dep. at 149:22–150:17).

On February 5, 2008 at 11:46 pm, JPMorgan declared a default under Section 8(g)(v)—a default that allegedly occurred more than three months before in November 2008. CX 408. Before this time, JPMorgan could not identify a single document memorializing this "prospective" interpretation. The evidence proves that JPMorgan only adopted this prospective interpretation once its litigating position became clear. *See* CX 156; 7/31/2009 Tr. 23–25 (Ruyter); 8/18/2009 Tr. 14:25 (Dep. Tr. 211-15 (Kurinskas)).

Even when JPMorgan declared the default, JPMorgan took no steps consistent with a prospective analysis of the DHCs' ability to pay debts as they would become due in the future.

Prior to calling a default, Kurinskas—the JPMorgan official responsible for declaring a default and who signed the February 5, 2009 letter claiming a default—never asked *anyone* "to do an analysis to determine whether or not the holding companies would have the ability to make their interest payments that were due in April or January of '09." 8/25/2009 Tr. 97, 110 (Kurinskas). Similarly, prior to calling the default, Kurinskas made no inquiries about a DHC's ability to engage in a transaction that would permit it to obtain the funds required to meet future debt payments. *See* 7/31/2009 Tr. 54 (Hooker); 8/25/2009 Tr. 109–10 (Kurinskas); 8/18/2009 Tr. 14:25 (Dep. Tr. 40 (Kurinskas)). While no one at JPMorgan was more involved in working directly with Charter than Peter Hooker (a managing director in JPMorgan's syndicated leverage finance group), JPMorgan never asked him whether he believed Charter had defaulted under the Credit Agreement before calling the default. 7/31/2009 Tr. 46 (Hooker); 8/25/2009 Tr. 110 (Kurinskas). And, prior to signing the February 5, 2009 default letter, *Kurinskas never had a conversation with anyone at Charter about Section 8(g)(v).* 8/25/2009 Tr. 107. She did no independent assessment of the ability of the DHCs to pay debts as they were coming due in the future prior to signing the February 5, 2009 letter. *Id.* at 112.

Likewise, Kurinskas' assertion at trial that, in calling a default in February 2009, she relied on Millstein's representations *the preceding December* that Charter might not be able to make debt payments in April 2009, is not credible, particularly given that she (i) never followed up after that conversation to ask anyone at JPMorgan to do any analysis of Charter's ability to pay its debts in April and (ii) waited nearly two months to come to the conclusion there was a default (on the eve of anticipated reinstatement litigation). *See* 8/25/2009 Tr. 30, 97 (Kurinskas). Her sole basis for asserting that Charter's DHCs might not be able to pay debts coming due in the future was because Charter, "through counsel, had told us they were planning to file [for

bankruptcy] in about a week." *Id.* at 109. At bottom, Kurinskas did not consult with *anyone* other than lawyers in assessing the DHCs' ability to pay prior to signing the default letter. *See* 8/18/2009 Tr. 14:25 (Dep. Tr. 40 (Kurinskas)). Indeed, it was the lawyers who actually prepared and sent the letter. 8/25/2009 Tr. 105.

     **D.**     **The Cases JPMorgan Relies Upon Arise In A Different Context, Interpret Different Language, And Are Irrelevant To The Present Controversy.**

JPMorgan relies upon the Bankruptcy Code provision that defines insolvency for municipalities (and only municipalities), 11 U.S.C. § 101(32)(C)(ii), and argues that because courts had interpreted such language regarding municipalities as forward-looking in the unique context of municipal bankruptcies, this Court should likewise treat Section 8(g)(v) in the Credit Agreement as forward-looking. *See* 7/20/2009 Tr. 123 (JPMorgan opening statement). In making this argument, JPMorgan relies on two cases applying the Bankruptcy Code's test for insolvency for municipalities seeking chapter 9 protection as support of its prospective interpretation of Section 8(g)(v). *See In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991); *In re Town of Westlake*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997).

*First*, these cases have never been cited as authority for contract interpretation, and have never been cited outside of the chapter 9 or municipality context for the proposition upon which JPMorgan would have this court rely. Both *City of Bridgeport and Town of Westlake* make clear that municipal bankruptcies present a unique situation, wholly unrelated to that before the Court, in which the public cannot afford to wait until the municipal debtor is, in fact, unable to pay its debts. As the court in *In re City of Bridgeport*, 129 B.R. at 337, observed: "Cities cannot go out of business," and "Chapter 9 is intended to enable a financially distressed city to 'continue to provide its residents with essential services.'" *Id.* at 336-37 (quoting H.R. Rep. No. 1011, 100th Cong., 2d Sess. 2 (1988), U.S. Code Cong. & Admin. News 1988, pp. 4115, 4116). Given that

statutory purpose of chapter 9, construing the Bankruptcy Code such that "a city would not be able to seek chapter 9 protection unless and until it was actually not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-delivery of services." *In re City of Bridgeport*, 129 B.R. at 336-37. Cases involving the provisions of the Bankruptcy Code addressing municipalities are, thus, of no value to interpreting these parties' contract.

*Second*, read closely, *City of Bridgeport* and *Town of Westlake* actually undermine JPMorgan here. These cases hold only that if "the maturity of the debt is *imminent* and the inability to meet it *certain*," then the debtor is "unable to meet debts as they mature within the meaning of the statute." *Westlake*, 211 B.R. at 865 (internal quotations omitted); *see also Bridgeport*, 129 B.R. at 337. Indeed, both cases make clear that "[m]ere possibility or even speculative probability" of an inability to pay "is not enough." *Westlake*, 211 B.R. at 866; *see Bridgeport*, 129 B.R. at 337. And even if these cases did provide the standard applicable here, and they do not, JPMorgan has clearly failed to present any evidence showing a certainty that the DHCs would be unable to pay "imminent" future debts prepetition. This is hardly surprising given that all DHCs actually met all relevant maturities prepetition. 7/21/09 Tr. at 222:7-9 (Smit).

*Third*, cases outside the chapter 9 context support Charter's position that the ability to pay debts as they come due is not forward-looking. *See, e.g., see also Vestron v. National Geographic Soc'y*, 750 F. Supp. 586, 592 (S.D.N.Y. 1990); *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005). In *Vestron*, unlike here, the contract at issue contained an express clause permitting termination for insolvency. In assessing whether *Vestron* was in fact insolvent, the court examined caselaw regarding the definition of insolvency, which included "the inability to pay one's debts in the ordinary course of business as the debts mature," the inability "to meet

25

obligations as they fall due," and "an inability to pay debts as they become due." *Vestron*, 750 F.Supp. at 592 (citing cases). Just as Charter urges here, the court in *Vestron* concluded that an inability to pay debts as they come due concerned only past and present ability to pay, with no bearing on any future ability to pay debts. *See id.* ("[I]f insolvency is equated with the inability to meet debts as they become due, then Vestron is likely to prevail, since it has not failed to meet its debt obligations."). Similarly, the court in *Pereira* held that the Delaware law test of insolvency—an inability to pay debts as they fall due—concerned "solely [] whether the corporation *has been* paying bills on a timely basis," thereby rejecting the contrary suggestion of a need to show the forward-looking ability to pay debts. *Pereira*, 413 F.3d at 343 (emphasis added). It is beyond dispute that Charter, including the DHCs, satisfy this test because it never missed a payment to JPMorgan under its credit agreement. 7/21/09 Tr. at 222:7-13 (Smit). Cases involving the provisions of the Bankruptcy Code addressing municipalities are simply of no value to interpreting these parties' contract.

## II. The DHCs Were Able To Pay, And In Fact Paid, Their Debts As They Became Due.

Charter and its DHCs paid all of their debts as they became due before filing its chapter 11 cases on March 27, 2009. Although Charter and its DHCs in fact paid all of their debts as they became due, JPMorgan argues that Charter was not "able" to make such payments and therefore was in default of Section (8)(g)(v). Specifically, JPMorgan contends that CCH I lacked sufficient surplus to make a dividend payment to CIH on November 17, 2008, and that, as such, the November 2008 dividend payment contravened Delaware law (so the argument goes) JPMorgan's argument regarding surplus would have this Court ignore the fact that the DHCs made every payment as they became due. JPMorgan's argument on surplus boils down to this: Charter was unable to make payments that it indisputably in fact made.

There are three fundamental flaws with JPMorgan's argument.  *First*, *there is no requirement in the Credit Agreement that the DHCs have surplus* (or be solvent).  Instead, the Credit Agreement is silent as to surplus and only requires the Borrower CCO, not the DHCs, be solvent.  *Second*, CCH I in fact had sufficient surplus to declare the $62.8 million dividend from CCH I to CIH on November 17, 2008.  Charter's surplus calculations using the Duff & Phelps valuation, third-party valuations of Charter's assets at that time, as well as expert testimony, all support a finding that CCH I had sufficient surplus to declare the dividend.  *Third*, Charter's Board exercised reasonable business judgment in declaring a dividend under Delaware law and that decision should not be disturbed.  *See Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150, 154 (De. 1997) ; *Morris v. Standard Gas & Elec. Co.*, 63 A.3d 577, 583-84 (Del. Ch. 1949)..  That is particularly true where, as here, there is no proof of fraud or bad faith on the part of Charter's directors, as required under Delaware law to overturn a board's surplus determination. Charter's Board did exactly what it was supposed to in assessing whether to declare a dividend.  *Fourth*, while much time was spent at trial on the issue of adequate surplus, it is a red herring.  *Surplus is irrelevant.*  This is because whether or not there was sufficient surplus to support CCH I paying a dividend in November 2008, the DHCs were otherwise *able* to make the November 2008 and January 2009 interest payments through the use of intercompany notes and payables.

### A.  The Credit Agreement Does Not Require The Designated Holding Companies To Have Surplus.

There is no requirement in the Credit Agreement that the DHCs have surplus at all.  It is not an event of default for a DHC to lack surplus (or to be insolvent).  Surplus is simply required by Delaware law at the time a dividend (or distribution) is declared.  And dividends (or distributions) are merely one of the many methods by which Charter's DHCs have been able to

make interest payments in the past. Charter has used several methods to move funds from CCO to the DHCs to enable the DHCs to make debt payments over the years. *See* 7/31/2009 Tr. 37–38 (Hooker); 8/25/2009 Tr. 121 (Kurinskas). These include payments from CCO such as: intercompany notes and intercompany payments payables, as well as many other methods. *See* CX101, §§ 7.6, 7.8; CX 110 at JPM-CH 00029446; CX 305; 7/31/2009 Tr. 37–39 (Hooker); *id*. at 81 (Schmitz). The other payment methods other than dividends of making interest payments do not require surplus—including the payment of intercompany notes and payables. *See* 7/21/2009 Tr. 205:14-16 (Smit) ("Q. Based on your understanding, does the use of an intercompany account require surplus? A. No."); 8/25/2009 Tr. 121 (Kurinskas) ("I believe an intercompany loan could be repaid regardless of whether there was surplus"). The Court should not accept JPMorgan's invitation to conflate surplus with an inability to pay debts as they become due.

### B.    CCH I Had Adequate Surplus For The November 17 Dividend It Declared.

CCH I made a dividend payment to CIH of $62.8 million on November 17, 2008.[1] Under Delaware law, in order to declare the dividend, the Board needed to decide, exercising its reasonable business judgment, that the fair value of CCH I's assets exceeded its liabilities by the amount of the dividend, here $62.8 million, as of November 17, 2008. *See* CX 117, CX 174. The evidence demonstrates that CCH I had substantially more than $62.8 million in surplus in November 17, 2008.

---

[1]   The $8.4 million CCH interest payment due on November 17, 2008 was funded via an intercompany note from CCO due to Holdco, and a capital contribution in the same amount from Holdco to CCH—none of which required surplus. *See* 7/22/2009 Tr. 27-30 (Smit); *id*. at 188-89 (Merritt); 8/3/2009 Tr. 47-48 (Schmitz).

1.      **Charter's Analysis Of Surplus Demonstrated More Than Sufficient Surplus at CCH I To Declare The Dividend.**

In analyzing CCH I's surplus for making a dividend payment on November 17, 2008, Charter management and its Board looked at various indicia of the value of Charter's assets, assessed the reasonableness of those indicia, sought third-party input and advice, and evaluated the components and value of other assets as well as the value of its liabilities. Some of the indications of value that Charter considered included the valuation conducted by Duff & Phelps in October 2008, current trading values of peer companies, precedent market transactions, sensitivities around various valuation metrics and drivers, and an assessment of the reasonableness of a range of valuation multiples by Charter's investment banker, Lazard.

In its surplus calculation, Charter used the Duff & Phelps valuation of Charter's cable assets "as of October 1, 2008." The valuation was created by Duff & Phelps in the normal course of business in connection with Charter's audited financial statements as it has for several years. *See* 7/31/2009 Tr. 87-89 (Schmitz). Duff & Phelps (and a predecessor, Kane Reece) has served as Charter's primary outside valuation firm since at least 2002, performing numerous SFAS 142 related valuations for the Company as well as providing several solvency opinions to Charter. *See id.*; CX 292 at 9. Duff & Phelps also performs valuations for other cable companies, such as Cablevision and Comcast, that provided them insight into the non-public projections of other leading cable companies.[2] *See* 7/31/2009 Tr. 88 (Schmitz).

In order to value Charter's assets, Duff & Phelps prepared a Discounted Cash Flow ("DCF") analysis. As the Court is well aware, a DCF involves projecting the expected future

---

[2]   SFAS 142 is a FASB accounting standard that involves testing the fair value of certain assets of a company on an annual basis to assess whether certain assets have been impaired and need to be written down in value.

cash flows of a business and discounting them to their present value equivalent. Duff & Phelps utilized Charter's July 2008 Long Range Plan forecast ("July LRP") as the basis for its DCF analysis of the Company, as it was "the best information that the company had about the forward forecast for the company" and was "consistent with how we have operated in the past." 7/31/2009 Tr. 92-93 (Schmitz). As Schmitz explained at trial, Charter's July LRP is a five-year model that is typically generated off of the budget. 8/31/2009 Tr. 91:24–92:13 (Schmitz). In January of each year, the executive management team generates the five-year plan (or LRP) from the budget, and then refreshes that five-year plan in July to adjust for any changes through the course of the year. *Id.* And then that July LRP is what is typically used by Duff & Phelps for their October valuation. *Id.* Ms. Schmitz confirmed that the schedule followed in 2008 of doing the budget in December of the prior year, then the January LRP in January, and refreshing the LRP in July, is the typical schedule for Charter. *Id.* Moreover, Duff & Phelps itself generated its own EBITDA and capital expenditure projections for Charter from 2013-2018 based on trends in Charter's projections, Duff & Phelps' industry knowledge and their expertise working with other leading cable companies. 9/1/2009 Tr. 11:7-12; 18:1-20 (Bliss).

The Duff & Phelps valuation concluded a value of Charter's cable assets of $21.6 billion (not including more than $1 billion in other assets such as cash). CX 249; *see also* 7/31/2009 Tr. 87–89 (Schmitz); 9/1/2009 Tr. 27 (Bliss).[3] To have sufficient surplus at CCH I, Charter only needed to be valued at $18.7 billion. *See* 8/3/2009 Tr. 164 (Den Uyl). Using the Duff & Phelps

---

[3] JPMorgan challenges the use of Duff & Phelp's valuation as of October 1, 2008 because it was a draft. Fred Bliss of Duff & Phelps, however, testified that he did not believe the numbers would have changed even if he finalized the calculations into a report. Moreover, Bliss testified that even since doing his work for his valuation "as of December 31, 2008" for Charter, he has not seen any reason to question his October valuation. 9/1/2009 Tr. 27 (Bliss).

valuation in its surplus waterfall calculation, Charter calculated that CCH I had surplus of approximately $2.8 billion. 7/31/2009 Tr. 95–96 (Schmitz); CX 224; CX 277; *see also* CX 292 at 10-11.

In addition to its surplus calculation, Charter analyzed various downside sensitivities to consider the prospect the long-range projections might be lower in the future due to the downturn in the economy. In "order to provide additional diligence and sensitivities around that surplus calculation, [Charter] sensitized the two variables … on the valuation that Duff & Phelps had done." 7/31/2009 Tr. 98 (Schmitz). Specifically, Charter's sensitivity analysis lowered the estimated EBITDA growth rate for 2009 from 10% to 7%, and lowered the implied EBITDA multiple from 8.5x to 7.75x. *See* 7/21/2009 Tr. 213 (Smit); 7/31/2009 Tr. 97-99 (Schmitz). (In fact, rather than performing to these lower sensitivities, Charter actually exceeded the projections in the July LRP through June of 2009. 8/3/2009 Tr. 109:13 - 17 (Den Uyl); 8/31/2009 Tr. 117:11-16 (Taylor).) Charter's sensitivity analysis still indicated that CCH I had more than sufficient surplus (*i.e.*, more than $ 1 billion based on the downside sensitivity) to make the $62.8 million dividend payment on November 17, 2008. *See* CX 114, CX 225; 7/21/2009 Tr. 213 (Smit); 7/31/2009 Tr. 97-99 (Schmitz); CX 292 at 10-11.

Charter also sought advice from James Millstein of Lazard, who confirmed that a multiple of 7.75x to 8.5x was reasonable in light of market conditions and precedent transactions. *See* 7/21/2009 Tr. 38-40 (Millstein); *see also id.* at 136-37. Using an EBITDA multiple of 8, CCH I showed a surplus of approximately $1 billion—well in excess of the $62.8 million dividend authorized by the Board. CX 225; *see also* 7/21/2009 Tr. 36-38 (Smit).

JPMorgan's expert, Carlyn Taylor, criticizes Charter's July LRP and Duff & Phelps' projections from 2013-2018 as being too optimistic to use to generate a fair valuation of

Charter's assets. Taylor provides the Court, however, no basis for her criticism other than her experience and the fact that Charter subsequently lowered its projections at the end of December 2008. Her criticisms are rebutted by the contemporaneous review of the projections by KPMG. Indeed, KPMG's valuation specialists independently reviewed Charter's July LRP and concluded that the July LRP was reasonable and an appropriate forecast for Duff & Phelps to use in its valuation. *See* CX 143 at KPMG 0000127, CX 380 at KPMG 0000134-36; 7/31/2009 Tr. 92–93 (Schmitz). Specifically, KPMG concluded—on November 22, 2008—"that the July 2008 LRP was a reasonable forecast of anticipated results over the next five years" based upon "inquiries of management, review of industry trends and corroboration with analyst reports." CX 143 at 2. *In fact, Charter beat the EBITDA goals set in the July LRP for 2008 and year-to-date in 2009. See* 7/21/2009 Tr. 200 (Smit); 7/31/2009 Tr. 100 (Schmitz); *see also* CX 292 at 16 n.50. Moreover, her criticism of Duff & Phelps' projections has no basis. Duff & Phelps are experts in the cable industry, have knowledge of the projections of other leading cable companies and had no reason to create projections for Charter other than in good faith. And KPMG independently reviewed Duff & Phelps' October 1, 2008 FAS 142 work and concluded that the methodologies and assumptions, as well as the values it estimated, were reasonable. *See* CX 160 at KPMG 0000299; 7/31/2009 Tr. 91, 195 (Schmitz).

Taylor also criticizes Duff & Phelps' October valuation because they assume an asset sale and the subsequent tax step-up basis of the assets in its valuation. This criticism is misplaced. *First*, Taylor admitted that one way to sell Charter's assets is through an asset sale or a Section 338(h)(10) election in which the seller elects to treat the stock sale as an asset sale in order to get the tax step-up basis. Charter's expert Bruce Den Uyl testified that the use of a tax step-up basis is reasonable because "in the cable industry, as well as other industries, there are

number of asset transactions and one of the things that people … try to do is to take advantage of th[e] tax shield resulting from the transaction." 8/3/2009 Tr. 94:18-23 (Den Uyl). *Second*, Den Uyl ran DCFs without the tax step-up basis and demonstrated that CCH I would still have sufficient surplus in November 2008. 8/3/2009 Tr. 80:11-15 (Den Uyl). *Third*, Taylor's analysis is flawed because, when she took out the benefits of the tax step-up basis in Duff & Phelps' DCF, she failed to put back into her analysis Charter's existing basis for depreciation and amortization. 8/31/2009 Tr. 131:25-133:15 (Taylor). *This was a $1.4 billion mistake: $1.2 billion related to amortization and $200 million related to depreciation.* 8/3/2009 Tr. 97:12-18 (Den Uyl); 8/31/2009 Tr. 133:8-15 (Taylor). *Fourth*, Charter's CFO testified that she compared Duff & Phelps' valuations when it conducted FAS 142 valuations and solvency valuations and determined that Duff & Phelps' methodology appears to be the same on its FAS 142 and solvency work. 7/31/2009 Tr. 89:6–19 (Schmitz). Den Uyl confirmed that Duff & Phelps uses the same asset sale and tax step-up assumptions in its solvency and FAS 142 work. 8/3/2009 Tr. 88:15-89:6 (Den Uyl). Accordingly, any criticism that a FAS 142 valuation should not be used for surplus is misplaced.

JPMorgan's argument that Vulcan's surplus sensitivities in December 2008 undermines Charter's surplus calculations in November 2008 is incorrect. Lance Conn of Vulcan testified that the Vulcan sensitivities were conducted by a new junior analyst and the analysis was not done correctly. Conn explained that the work product was not useful "because it relied solely on Wall Street estimates and was not an independent view of the company's business. 9/2/2009 Tr. 103:13-17 (Conn). Conn explained that "Wall Street estimates had typically been lower than the company's plan [and] [f]or some time the company had been outperforming" those estimates. 9/2/2009 Tr. 103:13-17 (Conn). Further, Conn explained the document was missing a

"fundamental piece," a viewpoint on Charter's operating plan.  *Id*. at 138:17-139:2 (Conn).

Moreover, Vulcan's sensitivities were conducted in December 2008—after Charter's November

14, 2008 surplus determination and using information that did not exist as of November 14.

9/2/2009 Tr. 139:14-25 (Conn).   Charter generated surplus calculations in late January 2009

using Duff & Phelps's valuation "as of December 31, 2008."  CX 275.  Even using the valuation

by Duff & Phelps "as of December 31, 2008" based on the January 2009 Long Range Plan and

lower long-term projections by Duff & Phelps as the inputs for a surplus calculation for charter

as of November 14, 2008, CCH I still had $386.2 million in surplus.  CX 275.  Therefore, even

looking to later-created valuations and surplus calculations and applying them retrospectively to

November, CCH I still had sufficient surplus in November 2008 to declare the $62.8 million

dividend.

> ### 2.    Contemporaneous Third Party Valuations Likewise Indicated Sufficient Surplus at CCH I To Declare The Dividend.

There were also third-party indications of value that support Charter's determination that

it had sufficient surplus for CCH I to make a $62.8 million dividend in November 2008.

*Project Cosmos*: Project Cosmos was an initiative to partner with another cable company

that would invest in Charter. 7/21/2009 Tr. 200:24–201:1 (Smit); 9/1/2009 Tr. 232:4-9

(Derdeyn).   The potential strategic partners were Time Warner Cable and other cable

companies—entities that fully understood cable valuations.   After exchanging financial

information, including Charter's July LRP, the strategic partners made financial presentations to

Charter and provided investment proposals that valued Charter's assets based on EBITDA

multiples.   And in those presentations, the strategic partners—other large cable companies—

valued Charter with EBITDA multiples in the 8.5-9.5 range.  A forward multiple valuation in

this range is *at or even higher than* the value implied by the Duff & Phelps valuation in October 2008. This valuation range would indicate substantial surplus at CCH I in November 2008.

*SNL Kagan*: On October 31, 2008, SNL Kagan, "a prominent cable industry analyst" according to JPMorgan's expert, valued Charter's cable assets at $21.9 billion—in line with the Duff & Phelps analysis at that time. *See* CX 292 at 15 (citing *Cable TV Investor: Deals & Finance*, at 13 (Oct. 31, 2008) (CX 191 at 13)). SNL Kagan's contemporaneous valuation of Charter's "asset value" is unquestionably independent. Moreover, SNL Kagan valued Charter's cable assets at $21.9 billion while recognizing that the market was punishing stock valuations of Charter and its peers. (CX 191 at 13 (noting that recent market gyrations provide "a rare opportunity to buy cable stocks at a deep discount.").

*JPMorgan's Internal Valuations*: JPMorgan itself valued Charter's assets in November 2008. In its internal Credit Surveillance Report, JPMorgan stated that Charter's "market value based EV of the Company is $20.9 Bn (9.0x LTM 9/30/08 EBITDA of $2.3 [Bn].")." CX 123 at JPM-CH 00018654. Again, using JPMorgan's "market value based" valuation of Charter in Charter's surplus calculation would result in substantial surplus at CCH I in November 2008.

*Contemporaneous Analyst Valuations*: A number of Wall Street and industry analysts published DCF valuations for Charter using different projections and discount rates during this same timeframe. Although these analysts viewed Charter's future and its stock differently, they all valued the cash flows that Charter's assets could generate in a range between $19.4 billion and $23 billion. 8/3/2009 Tr. 122:20-123:7 (Den Uyl); C Demo 33. For example, on November 25, 2008, Morgan Stanley published a report that estimated the value of Charter's cable systems at $22.1 billion. CX 341 at 8-9. Other analyst reports show similar valuations.



These valuations by market participants confirm the reasonableness of Charter's use of Duff & Phelps' valuation of Charter's cable assets at $21.6 billion in November 2008.

### 3. Expert Testimony Confirms CCH I Had Sufficient Surplus To Declare The Dividend.

Both Charter and JPMorgan provided the Court expert testimony regarding valuation and surplus. And, as often happens in cases, the experts disagree. Charter's expert, Bruce Den Uyl, opined that based on his own independent DCF analyses, his precedent transaction analysis and public third-party valuations at the time, as well as his review of Charter's surplus calculations, that CCH I had sufficient surplus in November 2008 to declare the $62.8 million dividend. JPMorgan's expert opined that CCH I lacked surplus because Duff & Phelps' valuation was unreliable, public stock market multiples were lower than the private market multiples, and Lazard's Plan valuation "as of September 30, 2008" was significantly lower than Duff & Phelps' valuation as of October 1, 2008. Based on the independent valuation work of Den Uyl, as well

as the contemporaneous third-party valuations of Charter at the time relied upon by Den Uyl, Charter submits Den Uyl's opinions and analysis are more credible and should be relied upon by the Court.

Den Uyl conducted three DCF calculations from scratch, using different assumptions and excluding for the purpose of conservatism the tax step-up tax basis that Duff & Phelps used in its draft valuation, but JPMorgan criticized. 8/30/2009 Tr. 83:12-19 (Den Uyl); 8/3/2009 Tr. 106:21-107:1 (Den Uyl); 110:13-20 (Den Uyl); 111:24–112:5 (Den Uyl); C Demo 20, 22, & 25.[4] Even excluding the tax step-up, Den Uyl's DCF calculations indicated enterprise values for Charter of $19.932, $19.237, and $19.061 billion, respectively—each demonstrating the existence of adequate surplus at CCH I in November 2008 to make $62.8 million payment. C Demo 20, 22, and 25. Taking these various approaches into consideration and his other work, Den Uyl concluded that CCH I had adequate surplus at November 17, 2008. 8/30/2009 Tr. 80:11-15.

By contrast, JPMorgan's expert, Carlyn Taylor of FTI, *did not conduct her own independent valuation of Charter*—although she started one that JPMorgan chose not to present at trial. *See* JPX 272; CX 292 at 19. Rather than calculate her own valuation to use as a measure of surplus, Taylor only critiques the calculations that were done by Charter and others at the time, as well as those done by Den Uyl in connection with this litigation. 8/31/2009 Tr. 52:19–53:8; 104:23–105:1 (Taylor).

---

[4] Den Uyl considered a wide range of documents and analyses of both Charter's performance and projections and the overall financial climate in October and November of 2008—including internal valuation and surplus analyses performed by both Charter and JPMorgan, as well as third-party analyses issued by Wall Street and industry analysts. 8/30/2009 Tr. 83:2-19 (Den Uyl).

Putting aside that Taylor did not perform the very calculation that she suggested so many others had done incorrectly, Taylor's opinions are predicated upon a view that the DHCs were required to be able to pay their debts for 12 months or more into the future pursuant to solvency tests and audit standards. 8/31/2009 Tr. 18:25–20:1 (Taylor). Of course, neither the solvency test nor the audit window are referenced in Section 8(g)(v) and the DHCs are not required to be solvent by the plain terms of the Credit Agreement. CX 101, § 4.21.

Even under this standard looking well into the future, JPMorgan did not prove—and cannot prove—that CCH and CIH were foreclosed from satisfying its future debts through *any other external means* including debt-for-debt exchanges, debt-for-equity exchanges, maturity extensions, not to mention investments from Paul Allen or others. Charter has historically extended maturities on debts as their maturities approached. Moreover, JPMorgan, Citibank, and Deutsche Bank, among others, were offering such solutions during this timeframe. For example, on November 10, 2008, JPMorgan proposed additional financing options to Charter, representing that "Charter has several financing options available in today's dislocated market" and that the "current market environment provides an opportunity for Charter to: 1) Extend optionality 2) Capture discounts." CX 122; CX 244 at 1; *see also* 7/31/2009 Tr. 40-42 (Hooker); *id*. at 110 (Schmitz); JPX 69 at 38; CX 110; CX 173. Even later, on December 8, 2008, Citi proposed exchange transactions to extend maturities and reduce debt. CX 248; 7/31/2009 Tr. 112-114 (Schmitz).

At the same time, Taylor did recognize—as she must—that as of November 5, 2008, CCH and CIH had paid all their debts that had become due.[5] 8/31/2009 Tr. 84:19–85:2 (Taylor).

---

[5] In late October and early November of 2008, Charter, like many other companies, drew down on its revolvers to ensure it had adequate liquidity. 7/21/2009 Tr. 34:13-24 (Millstein).

(Continued…)

Though she now criticizes the method by which the Company made the November 17, 2008 interest payment, Taylor conceded at trial that CCH and CIH did in fact pay all of their debts that had become due as of November 17, 2008. (8/31/2009 Tr. 85:3–19 (Taylor).)

In criticizing Duff & Phelps' valuation in October 2008, Taylor points to Lazard's Plan valuation of $15.4 billion. 8/31/2009 Tr. 43:14–44:3 (Taylor). This is inapposite. The Lazard valuation was done on a different basis using different assumptions at a different time than the Duff & Phelps valuation used by Charter to calculate surplus in November 2008. *First*, Lazard's valuation was completed in March 2009 and was "as of September 30, 2009," whereas Duff & Phelps's valuation was completed in October 2008 and was "as of October 1, 2008"—a year earlier in time and contemporaneous with the surplus measurement. *Second*, Lazard's valuation was based on an equity, non-control transaction whereas Duff & Phelps's valuation was based on an asset sale, control transaction. *Third,* Lazard was valuing the equity of Charter after its bankruptcy, whereas Duff & Phelps was valuing Charter's assets well before its bankruptcy.

Lazard's determination of Plan value as of September 2009 does not undermine the Board's good faith determination of surplus in November 2008. Indeed, one of the many

---

Millstein testified that Lazard advised Charter "to draw its revolving credit agreement to assure itself it would have access to the funds available thereunder." 7/21/09 Tr. 35:6-10 (Millstein); *see also* JPX 50 at CTR-00039897-A; 7/22/09 Tr. 176:2-13 (Merritt). Charter Board member Rajive Johri also personally advised Charter management to draw down its revolver. 8/31/09 Tr. 215:20-23 (Johri). Mr. Johri explained that as the President of First National Bank of Omaha, he was seeing his customers drawing down their lines of credit at that time because there was a heightened risk of bank failure. 8/31/09 Tr. 215:20-216:6 (Johri). He made clear that his advice to Charter to draw down on their revolver at that time had nothing to do with any surplus analysis or upcoming interest payments. 8/31/09 Tr. 216:7-9 (Johri); *see also* 7/21/09 Tr. 204:17-24 (Smit) (confirming that the decision to draw down on the revolver had nothing was not related to the November 17 interest payments).

fundamental flaws in JPMorgan's prospective six months-to-eighteen months approach is that it assumes that everyone knew on November 5 , 2008 what we all know today. But the fact is that markets—credit markets and equity markets—change, as one of the lenders articulately explained. While the markets may have been essentially closed in November, it was entirely entirely unclear whether those markets would continue to be closed, and for how long, and how that translated into a surplus calculation at that time. Changes in business projections, interest rates and other financial data can lead to material changes in surplus calculations, and such changes can impact an ability to upstream funds via dividends and—under JPMorgan's theory— the ability to pay future debts. Thus, a future-oriented approach that necessarily rests on speculation about the availability of surplus far into the future, would create dramatic uncertainty in any lender-borrower relationship.

JPMorgan also argues that public stock market multiples of Charter's peers in November 2008 would indicate that CCH I lacked surplus. But the public credit and equity markets were severely dislocated at this time, 8/3/2009 Tr. 116:2-16 (Den Uyl), and their use to value Charter's cable assets—which have generated consistent and increasing cash flows and exceeded forecasts through the first two quarters of 2009—would not be appropriate. Millstein of Lazard, Board Members and public analysts all recognized the disconnect between public market multiples and private market multiples at that time. Millstein told the Board at the November 14 meeting that the "markets were severely dislocated ... [and] [a] more fair representation of market value would be to look at precedent transactions." C Demo 27; 8/3/2009 Tr. 116:2-16 (Den Uyl). In addition, former Charter Board member Marc Nathanson testified that his opinion was that "in turbulent financial periods over the last 40 years in the cable business that the public markets do not properly reflect the value of the cable systems necessarily." C Demo 27.

Moreover, industry and equity analysts—including an equity analyst Taylor relies upon in her expert report—noted that by October 2008 the public and private market valuations of Charter had substantially diverged.  CX 191 at 13; CX 289 at 3.

Taylor does not offer the Court an independent valuation of Charter.  Instead, Taylor only offers the Court criticisms of the experts and financial professionals that estimated the fair value of Charter's assets in October and November 2008:  Duff & Phelps, James Millstein of Lazard, SNL Kagan and equity analysts.  Yet, each of these experts and financial professionals that did value Charter at that time concluded that it had a value that would generate substantial surplus at CCH I.

### C. The Decision By Charter's Board That CCH I Had Adequate Surplus To Declare A Dividend Was A Proper Exercise Of Business Judgment And Should Be Accorded Deference Under Delaware Law.

Among other things, JPMorgan claims a pre-petition default resulted when the Charter Board declared a dividend from CCH I on November 17, 2008 because it lacked sufficient surplus under Delaware law to do so.  This claim is nothing more than a challenge to the Board's determination of surplus, and thus, like other Board determinations, it must be evaluated under the Delaware law standards for business judgment.  *See Klang v. Smith's Food & Drug Centers, Inc*., 702 A.2d 150, 159 (Del. 1997) (applying business judgment rule to Board's determination of surplus in declaring dividend and refusing to second-guess Board's decision); *Morris*, 63 A.2d at 583.  As the Delaware Supreme Court explained in *Klang*,

> directors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark to constitute actual or constructive fraud.

702 A.2d at 152.  That is precisely the case here.  The evidence in this case reflects a thorough and detailed consideration of surplus by Charter's Board.  Although JPMorgan disputes the

Board's determination, it has presented no evidence whatsoever to suggest bad faith, fraud or a lack of rational consideration. And "[i]n the absence of bad faith or fraud on the part of the board, courts will not substitute [their] concepts of wisdom for that of directors," *Klang*, 702 A.2d at 152. Thus, this Court need not resolve any dispute in the evidence related to the amount of surplus.

Under Delaware law, JPMorgan cannot second-guess the Board's determination of "surplus" on the basis of the conflicting opinions of experts. The question under Delaware law is not, retrospectively, whether Charter's determination was in fact accurate (although it was), but whether, at the time, Charter's determination of sufficient surplus for a $62.8 million dividend was a reasonable exercise of the Board's discretion. *See Klang*, 702 A.2d at 154; *Morris*, 63 A.2d at 583. Here, JPMorgan has not come close to proving that the Board has acted in bad faith or fraud.

It bears emphasis that the Court heard from five Charter Board Members, as well as James Millstein, regarding the Board's deliberations before declaring the November dividend. The Court heard from three independent directors: David Merritt, the chair of the Audit Committee and former partner of KPMG; Rajive Johri, the former President of the Bank of Omaha, former executive vice president of JPMorgan and a member of the Board of Directors of ConAgra; and, Marc Nathanson, a forty-year veteran of the cable industry. And Charter's Board had other independent directors at the time as well, such as: Larry Wangberg, former CEO of TechTV, StarSight Telecast, and Times Mirror Cable; John Tory, CEO of Rogers Cable, Inc.; and Robert May, former CEO and board member of Calpine Corporation. 7/22/2009 Tr. 165:9 - 168:7 (Merritt); CX 194 at CTR-00000465. The Court also heard from Neil Smit, the CEO and a board member, as well as Lance Conn, also a board member.

The evidence shows that Charter's Board of Directors exercised reasonable business judgment and proper diligence before determining that there was sufficient surplus to warrant a dividend on November 17, 2008. Here the evidence of reasonable business judgment is overwhelming: the Board of Directors considered, among other things, various indicia of the value of Charter's assets, assessed the reasonableness of those indicia, sought third-party input and advice, and evaluated the components and value of miscellaneous assets as well as the value of its liabilities. Some of the more significant indications of value that Charter considered included

- the draft valuation of Charter's cable assets conducted by Duff & Phelps in October 2008,

- recent transactions in the marketplace,

- public values of peer companies,

- sensitivities around various valuation metrics and drivers,

- indications from other cable companies of exit multiple values through Project Cosmos,

- the Board's own expertise and experience in the cable industry and financial markets, and

- an assessment of reasonableness of a range of valuation multiples by Charter's investment banker, Lazard.

*See* CX 292 at 8; 9/1/2009 Tr. 236:7-19 (Nathanson); 8/31/2009 Tr. 168:14–169:19 (Johri); 7/21/2009 Tr. 209:2–215:4 (Smit); 9/2/2009 Tr. 137:8-22 (Conn).

Specifically, the Board considered management's surplus calculation of $2.8 billion at CCH I that used the Duff & Phelps October 1, 2008 SFAS 142 valuation, but understood that the Duff & Phelps valuation was not a solvency opinion. 7/21/2009 Tr. 211:14–212:1 (Smit). Instead, the Board was told and understood that the Duff valuation was based on the most up-to-

date, best information available.  *See* 7/21/2009 Tr. 209-212 (Smit); 7/22/2009 Tr. 186–89

(Merritt); 8/31/2009 Tr. 212:9–18; 214:9–19 (Johri); CX 114 at CTR-00040044.[6]



Moreover, the Board did not simply rely on this estimate, but considered the sensitivity

analysis done by management, reflecting lower growth and multiples, indicating approximately

$1 billion of surplus at CCH I based on a downside sensitivity.  *See* 7/21/2009 Tr. 209–210, 213–

14 (Smit); 7/22/2009 Tr. 191 (Merritt); CX 114 at CTR-00040044.  Even taking into account

lower growth rates and EBITDA multiples, CCH I had more than sufficient surplus to declare a

$62.8 million dividend.

---

[6]  JPMorgan argues that Charter should not have used the Duff & Phelps valuation because the engagement letter stated that the FAS 142 valuation was not a solvency opinion.  But Charter did not use the Duff & Phelps valuation as a solvency opinion and the Board was told expressly that it was not a solvency opinion.  7/21/2009 Tr. 211:14–212:1 (Smit).

**Implied EV and CCH I Surplus Sensitivity Analysis**
($ in millions)

- The D&P valuation is summarized below:
  - 2009 EBITDA: $2,543 million, 10% growth over 2008 forecast
  - 8.5x 2009 EBITDA
  - Total Fair Salable Value: $21,586 million
  - Implied surplus at CCH I: $2,840 million
- Given the potential reduction in 2009 EBIDTA growth versus the July LRP, the key valuation metrics were sensitized to indicate a potential range of valuations for the purpose of evaluating surplus

| Implied Enterprise Value and CCH I Surplus | | | |
|---|---|---|---|
| | **2009E EBITDA Growth Rates** | | |
| | **8.0%** | **7.5%** | **7.0%** |
| 2009E EBITDA | $2,489 | $2,477 | $2,466 |
| **2009E EBITDA MULTIPLE** | | | |
| **Implied Enterprise Value** — 8.50x | $21,150 | $21,060 | $20,960 |
| 8.25x | 20,530 | 20,440 | 20,340 |
| 8.00x | 19,910 | 19,820 | 19,730 |
| 7.75x | 19,290 | 19,200 | 19,110 |
| **CCH I Surplus 11/15/08** — 8.50x | $2,408 | $2,311 | $2,213 |
| 8.25x | 1,786 | 1,692 | 1,597 |
| 8.00x | 1,165 | 1,074 | 982 |
| 7.75x | 544 | 455 | 366 |

STRICTLY CONFIDENTIAL – Charter Communications, Inc.
Board of Directors meeting – November 14, 2008                                    5

Likewise, the Board reasonably considered advice from Charter's long-time financial advisor, Millstein, now Chief Restructuring Officer at the United States Department of Treasury, that he believed he could sell Charter at a multiple of 8x EBITDA or higher, which implied approximately $1 billion of surplus at CCH I.  7/21/2009 Tr. 136 (Millstein); *see id.* at 38; *see also* 7/21/2009 Tr. 213–14 (Smit); 7/22/2009 Tr. 192–93 (Merritt).  Millstein advised the Board and testified at trial that the multiple range of 7.75x to 8.5x was reasonable in light of market conditions and precedent transactions.  *See* 7/21/2009 Tr. 38–39 (Millstein); *see id.* at 136.  The Board also considered public market multiples, as well as advice from Millstein that those public multiples in late 2008 "were not a fair reflection of value in the sense of the valuations that they needed to consider in the context of this review of surplus."  *Id.* at 40–42 (Millstein); *see id.* at 214 (Smit).

In addition, the Board considered precedent transactions in the cable industry, presented by Millstein. *See* 7/21/2009 Tr. 38 (Millstein). Similarly, the Board considered Charter's sale of a small cable system in November 2008 for 9.4x 2008 EBITDA, which implied that Charter as a whole would sell at a higher multiple. 7/31/2009 Tr. 96–97 (Schmitz). And the Board was aware that, in the fall of 2008, Charter was in discussions with several other cable firms about structuring transactions whereby Charter and the other firm would contribute various assets to a partnership. Time Warner's proposal to Charter valued the assets that Time Warner was expecting to contribute at 9.5x EBITDA and also valued Charter's contributed assets at 8.5x to 9.5x. *See* CX 103 at CTR-00060801. Given the deference to the Board as a matter of Delaware law, and the reasonable diligence that was, in fact, undertaken by the Board, the Board's judgment to declare the $62.8 million dividend was reasonable and is entitled to substantial deference.

> **D.** **CCH and CIH Were Able To Pay Their Debts As They Became Due Via Intercompany Notes And Payables, Regardless Of Surplus.**

Although much time at trial was spent on the issue of surplus, the evidence presented proves that Charter had the ability to make its November 2008 and January 2009 interest payments using only intercompany loans and intercompany payables alone—and intercompany transfers do not require surplus. *See, e.g.*, 8/3/2009 Tr. 120–21, 132, 231–32 (Den Uyl); CX 292 at 35–36 (Table 16); 7/31/2009 Tr. 100–101 (Schmitz). Accordingly, in order to find that Charter was "able" to pay its debts as they become due, the Court does not even need to resolve any disputed surplus issues.

At trial, Charter's CFO Eloise Schmitz testified that even if there had been insufficient surplus for a dividend, Charter would have been able to make its November interest payments by using "amounts of intercompany loans and intercompany payables in excess of that amount."

7/31/2009 Tr. 101 (Schmitz). In addition, Charter's expert, Bruce Den Uyl analyzed Charter's ability to use intercompany transfers to make its November 2008 and January 2009 interest payments and concluded that Charter was able to make those payments via intercompany transfers alone. 8/3/2009 Tr. 120 (Den Uyl). And although JPMorgan's expert Taylor challenged Charter's ability to pay CCH and CIH's interest payments in November and January in her expert report before trial, when she was under oath at trial, Taylor testified that she could not say whether Den Uyl's intercompany analysis was "necessarily appropriate or not." 8/31/2009 Tr. 53:9–54:1 (Taylor). In sum, the evidence supports that CCH and CIH were able to make their interest payments in November and January even without regard to surplus.[7]

E. **Even If The DHCs Were Unable To Pay Their Debts As They Became Due, Such A Default Is *Ipso Facto* And Would Be Cured, If Necessary, By The Plan.**

At the end of the day, JPMorgan's attempt to show a lack of surplus is only to bolster its argument that a DHC was unable to pay its debts as they became due. But if a DHC's financial condition was such that it could not pay a debt as due, such a default would by its very nature be an *ipso facto* default because it relates to the financial condition of a debtor—whether or not Section 8(g)(v) is prospective. *See* 8/25/2009 Tr. 64–65 (Kurinskas). Indeed, it was "because of the relationship between CCO at the bottom and the holding companies, including designated

---

[7] Moreover, even if the Court were to accept that Section 8(g)(v) is somehow prospective, Charter was able to pay CCH and CIH's interest payments for the next four to five months from November 5, 2008 through intercompany accounts alone. 7/31/2009 Tr. 101:15–102:2, 121:1-14 (Schmitz). Moreover, JPMorgan did not establish that CCH and CIH could not, as of November 5, 2008, make its April interest payments (which was less than $50 million after accounting for intercompany accounts and notes)—more than five months into the future—through a combination of intercompany accounts, sale/leaseback of the headquarters building, debt-for-debt exchanges and/or investments by Paul Allen or others methods of payment.

holding companies above, [that] JPMorgan specifically negotiated defaults and events of defaults specifically linking the financial condition of the designated holding companies and the financial condition of CCO." *Id.* at 64–65; *see also* JPMorgan Compl. ¶¶ 5, 34. Because an event of default based on the financial condition of CCO's affiliates is likewise conditioned upon "the … financial condition of the debtor"—CCO—it is an unenforceable *ipso facto* clause. *See, e.g.*, *In re Mirant Corp.*, No. 03-46590, 2005 Bankr. LEXIS 909, 314 B.R. 347, 350 n.5 (Bankr. N.D. Tex. Sept. 1, 2004). In fact, JPMorgan's only basis for believing that Charter's DHCs were not going to pay debts coming due in the future was because Charter had revealed that it intended to file for bankruptcy. *See* 8/25/2009 Tr. 64–65 (Kurinskas). Tellingly, JPMorgan concedes that it has suffered no economic harm from the alleged breach of Section 8(g)(v) and accordingly, there is nothing that would need to be cured under § 1124(d) of the Bankruptcy Code. *See* 7/30/2009 Tr. 38 (Hooker); 8/25/2009 Tr. 124–25 (Kurinskas); *see also* 5/5/2009 Tr. 47.

Finally, the Plan eliminates the debt that the DHCs would have purportedly been unable to pay, thereby curing any default by the DHCs failure to be able to pay their debts in the future. Specifically, JPMorgan's argument is that CCH and CIH cannot pay debts as they become due in the future. But the Plan eliminates the debt of CCH and CIH completely, and thus cures any "default" from CCH's and CIH's inability to pay debts. To the extent that the Court believes that the Debtors are required to cure any default, although the Debtors strongly disagree with such a conclusion, the Debtors should be afforded the opportunity to cure any such default if required to confirm the plan.[8]

---

[8]    JPMorgan has also suggested that CCO's transfer of $75 million from its cash on hand to CCOH on February 3, 2009, for repayment of an outstanding intercompany note obligation was a default, because it occurred at a time when a DHC was unable to pay its debts as they became due. *See* CX 101, § 7.8(a)(ii). But the transfer was not itself a default, because as of

(Continued…)

## III. There Has Been No Change Of Control And Plan Confirmation Will Not Cause A Change of Control.

The question of whether the negotiation and confirmation of Charter's Plan creates a "change of control" default under the operative credit agreements begins, and ends, with the plain language of the contract. Section 8(k) of the CCO Credit Agreement provides, in relevant part, that an event of default occurs if:

> (i) the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, or
>
> (ii) the consummation of any transaction . . . the result of which is that any 'person' or 'group' (as such terms are used in section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such 'person' or 'group' ….

*See* CX 101 at 66 (Section 8(k)(i)); *see also* CX 413 at 6; CX 414 at 4-5.

In analyzing these provisions, two points deserve emphasis. *First*, the requirement of 35% voting power in Section 8(k)(i) was an express reduction from prior credit agreements, which had required a 51% voting power. *Second*, to be a "Section 13(d) group" under Section 8(k)(ii), two or more persons must agree to act together "for the purpose of *acquiring, holding,*

---

February 3, 2009, there was no underlying default based on a DHC's inability to pay debts as they became due. So too with the upstreaming of dividends on November 17, 2008, which JPMorgan alleged to be a default under Section 8(c) of the Credit Agreement in its adversary complaint. Compl. ¶ 15. Indeed, JPMorgan conceded that these defaults are all derivative of its assertion of a default under Section 8(g)(v). 8/18/2009 Tr. 14:25 (Dep. Tr. 85 (Kurinskas)). Even if the Court were to conclude otherwise, Charter is able to cure any alleged default by transferring $75 million from CCO to CCOH.

*or disposing* of equity securities." *See* 15 U.S.C. § 78m(d) (Exchange Act § 13(d)) (emphasis added); CX 101 at 66. In claiming a default of Section 8(k), JPMorgan couples a convoluted legal construction with factual innuendo (contradicted by all the witness testimony at trial) to suggest (i) that the plain language of Section 8(k)(i) includes a dormant (and inconsistent) term that requires Paul Allen to have 51% ownership of CCI despite the express language of 35%, and (ii) a group would exist and collectively hold greater than Mr. Allen. But JPMorgan's "control" expert did not agree, and in fact expressed *no opinion* that the Plan would result in a default under Section 8(k). 8/24/2009 Tr. 232, 270 (Gompers). As discussed below, neither the plain contract terms nor the evidence, including JPMorgan's own expert testimony, support a finding of a default of Section 8(k).

A. **Section 8(k)(i): The Paul Allen Group's 35% Voting Stake In CCI Is Sufficient To Prevent A Change-Of-Control Default.**

1. **The Plan Complies With Section 8(k)(i).**

Under the Plan, as required by Section 8(k)(i), the Paul Allen Group will have at least 35% voting power over the management of CCO, and thus the requisite voting power upon confirmation. Specifically, the Paul Allen Group will have 38.4% of Charter's voting power on a fully diluted basis, and 39.8% of Charter's voting power based on beneficial ownership. *See* 8/24/2009 Tr. 20–21 (Goldstein); Goldstein Decl. at ¶¶ 37, 40; *see also* 8/24/2009 Tr. 254–55 (Gompers).[9] Therefore, Charter's Plan will not result in a default under Section 8(k)(i).

*First,* the Paul Allen Group's voting power over CCI accords it 35% indirect voting power over CCO. The various credit agreements all specifically allow for direct *or indirect*

---

[9]     In addition, although not required by the Credit Agreement, the Paul Allen Group will have the right to select four of the eleven CCI directors upon confirmation. CX 406 at 4; *see also* 8/24/2009 Tr. 255-56 (Gompers).

voting power.  CX 101 at 66 (Section 8(k)(i)); CX 413 at 6; CX 414 at 4-5.  As has always been the case, the Paul Allen Group's voting power over CCO is and will continue to be indirectly through CCI.   By virtue of its 38.4% voting power over CCI on a fully-diluted basis, the Paul Allen Group will retain "indirectly … at least 35% … of the ordinary voting power for the management of the Borrower"—CCO—as it does at present.  CX 101, Section 8(k).

*Second,* it is inarguable that CCI constitutes the "management of the Borrower," *i.e.*, CCO.  There is no separate board for CCO (or CCOH, which wholly owns CCO, as required by the Credit Agreement).  *See* 7/21/2009 Tr. 190 (Smit); 7/22/2009 Tr. 55 (Smit); *see also* CX 211 at 14-16.  Rather, CCO is directly controlled by CCI pursuant to a management agreement.  *See* CX 169, § 4(a), CX 305; 7/21/2009 Tr. 191–93 (Smit).   Under the Management Agreement— which is  specifically referenced in the CCO Credit Agreement and effectively *required* by that agreement with JPMorgan, CX 101 at 60 (§ 7.8(d))—CCO retained CCI to act as the "manager" of CCO, and for CCI to "provide its management services and functions" to CCO.  CX 305 at 1-3.  The LLC Agreement between CCO and CCOH expressly provides that the powers of CCO shall at all times be exercised by CCI, and the business, property and affairs of CCO shall at all times be managed by CCI.  CX 169 at 6; 7/21/2009 Tr. 191 (Smit); 7/22/2009 Tr. 55–56 (Smit).  Indeed, this fact was later confirmed in a March 2008 CCO bond offering memorandum in which JPMorgan itself was the lead underwriter.  There, CCO represented with JPMorgan that "Charter *is our sole manager*." CX 134, *see also* 8/25/2009 Tr. 67:7-15 (Kurinskas).   "Charter" was defined as Charter Communications, Inc., or CCI in the memorandum.   (67:16–68:20 (Kurinskas)).

In sum, by virtue of its 35% voting power over CCI, the Paul Allen Group will retain "at least 35% … of the ordinary voting power for the management of the Borrower"—CCO—as it does at present. CX 101, Section 8(k). There will be no default of Section 8(k)(i).

### 2. JPMorgan's Allegations Of Default Under Section 8(k)(i) Do Not Comport With The Language And History Of The Agreement.

JPMorgan has argued repeatedly that the Paul Allen Group will not have 35% voting power over CCO because the Paul Allen Group will only appoint four of Charter's eleven directors at CCI. Charter's board is irrelevant, and does not establish a default of Section 8(k)(i). Section 8(k)(i) does not say—and cannot be read to require—that the Paul Allen Group effectively must have majority control over CCO or over an entity that owns CCO.

*First*, as JPMorgan's own "control" expert Paul Gompers admitted, the only way that Allen could control CCI's board is if he owned at least 51% of CCI or appointed a majority of CCI's directors. 8/24/2009 Tr. 265 (Gompers). Yet, as Professor Gompers acknowledged, *neither* of those things are required by Section 8(k)(i). *Id.* Section 8(k)(i) does not require Paul Allen to control CCI's board (nor does it require he "control" CCO), and it does not require that he appoint a majority of CCI's board. *Id.* (Gompers). It requires only that Allen own at least 35% (not 51%) of the voting power of the management of CCO, *id.* at 266 (Gompers)—which Allen plainly will satisfy under the Plan at exit.

*Second,* JPMorgan's sole fact witness, Ms. Ann Kurinskas, similarly testified there is no language in 8(k)(i) that says that Mr. Allen must have majority control of CCI. She admitted Section 8(k)(i) does not require Mr. Allen to have a majority control of CCI, and Section 8(k)(i) does not require Mr. Allen to have a majority of board seats at CCI. 8/25/2009 Tr. 76:17-22, 77:1-6 (Kurinskas).

*Third,* the CCO Credit Agreement previously did require that the Paul Allen Group have 51% voting power over the management of CCO.  Over time, the parties specifically agreed to reduce that requirement to 35% in order to facilitate the very kind of deleveraging that JPMorgan now seeks to prevent.  *See* 7/31/2009 Tr. 73–75 (Schmitz); *see also* 8/25/2009 Tr. 71–72, 77–78 (Kurinskas) ("I think everyone wanted Charter to de-lever").



Thus, to adopt JPMorgan's current litigation position would be to wholly ignore the actual language of the contract, and instead revert back to a superseded version.

*Fourth*, the CCO Credit Agreement requires that CCO be a wholly-owned subsidiary of CCOH, meaning the Paul Allen Group cannot hold equity interests of CCO directly.  CX 101 at 66 of Section 8(k)(iv)).  Given this provision, to advance its "board control" theory, JPMorgan

has suggested that the Paul Allen Group could hold its equity interests at the CCOH level and thereby still give effect to the 35% provision in the contract. That is simply not correct. Even if the Paul Allen Group had 35% voting power over CCOH, under JPMorgan's theory, the Paul Allen Group would *still* be outvoted by the 65% majority voting interests at CCOH (or their hypothetical board representatives), leaving the Paul Allen Group with 0% voting power over 100% of the equity interests of CCO. As such, JPMorgan's own theory does not hold together.

To accept JPMorgan's theory requires one to interpret Section 8(k)(i) such that the 35% in the Credit Agreement is a nullity, and in fact should be read as 51%—the precise amount that was eliminated in 2004. Instead, Section 8(k)(i) must be read as Charter argues—consistent with the text, context, and historical evidence—establishing that Section 8(k)(i) is no bar to reinstatement.

### B. Section 8(k)(ii): No Section 13(d) "Group" Will Have Voting Power Greater Than The Paul Allen Group.

JPMorgan and other senior creditors also argue Charter's Plan will result in a default of Section 8(k)(ii) of the Credit Agreement, as well as the similar "Change of Control" provisions in the second and third lien indentures and credit agreement. To the contrary, because no person or Section 13(d) group can conceivably have more voting power than the 91% of the Paul Allen Group prior to the effective date, and no person or Section 13(d) group has been proven who will have more voting power than Allen *after* confirmation, there is also no default of Section 8(k)(ii) and the "Change of Control" provisions.

### 1. There Can Be No Section 13(d) Group With More Voting Power Than Paul Allen's 91% Prior To Confirmation.

Regardless of what has occurred among the bondholders to date, there is no current default of Section 8(k)(ii) or the "Change of Control" provisions. These provisions provide for a default only upon "the consummation" of a transaction "the result of which" is that a person or

54

Section 13(d) group has more voting power than the Paul Allen Group. CX 101, Section 8(k)(ii). Unless and until the plan is confirmed, there can be no default of these provisions. Prior to the effective date of the plan, the Paul Allen Group has (and will continue to retain) a 91% voting power over Charter, so nothing can "result" in a person with more voting power than the Paul Allen Group in default of Section 8(k)(ii). As JPMorgan's expert, Professor Gompers, said of the members of the *Ad Hoc* Committee:

> Until they actually have the equity interest that they're exchanging their CCH I notes for, they don't have that voting control. They're the [ad hoc] committee … They're running through the reorganization process, but as sort of defined equity interest, until the reorganization is complete and they have that equity, *they don't have those votes*.

8/24/2009 Tr. 285 (Gompers) (emphasis added). Thus, the only possible time when a Section 13(d) group can exist with more voting power than the Paul Allen Group is *after* confirmation of the plan "results" in a reduction of Paul Allen's voting power from 91%. *See* 8/24/2009 Tr. 237 (Gompers).

### 2. There Will Be No Section 13(d) Group With More Voting Power Than The Paul Allen Group After Confirmation.

JPMorgan presumably argues that, if the plan is confirmed, Apollo, Oaktree, and Crestview together "with support from Franklin" should be regarded as a Section 13(d) "group" as defined in the 1934 Exchange Act. JPMorgan asserts that a "13(d) group" of these *four* entities—taken together—would have more voting power than the Paul Allen Group post-confirmation, resulting in a default of Section 8(k)(ii). Nevertheless, the evidence at trial proved that without Franklin there is *no* hypothetical Section 13(d) group with voting power that will exceed the Paul Allen Group. In addition, while the evidence establishes that there will be no Section 13(d) group among any of the bondholders, Franklin unquestionably will not be part of any such group. Regardless, even if a Section 13(d) group formed with more voting power than

the Paul Allen Group, its voting power would automatically be reduced to 34.9% by the scaled-voting provision in Charter's amended Certificate of Incorporation, preventing any default of Section 8(k)(ii).

### a. Negotiating And Supporting A Restructuring Plan Does Not Make The Participants A Section 13(d) Group.

With no evidence of a Section 13(d) group upon consummation of the Plan, JPMorgan instead focuses on the collaborative activities of the noteholders in the months *prior* to the filing of the Plan, at a time when the noteholders lacked equity interest in Charter. This is the wrong time period for the reasons set forth above. Regardless, any activities by the noteholders as a part of the restructuring of Charter do not make them a Section 13(d) group upon confirmation.

It is undisputed by JPMorgan's expert Professor Gompers or otherwise that Apollo, Crestview, Oaktree and Franklin came together with other noteholders only after they each made an independent decision based on their own independent due diligence to purchase Charter debt and not because of any prior collaboration. *See* 8/24/2009 Tr. 233 (Gompers). In fact, it was Charter's restructuring advisor, Lazard, who formed the noteholders into an *ad hoc* committee of noteholders to negotiate a plan of restructuring with, 7/21/2009 Tr. 49–53 (Millstein); it was Charter that funded its advisors, 7/23/2009 Tr. 18 (Villaluz); 7/29/2009 Tr. 167 (Liang); and it was Charter that provided the outline for the plan of restructuring, including a proposal for an equity "rights offering." 7/21/2009 Tr. 49 (Millstein); 7/29/2009 Tr. 167, 176-77 (Liang). Members of the *ad hoc* committee even retained their *own* legal advisors besides those who did the work of the committee. 7/28/2009 Tr. 49 (Zinterhofer); 7/23/2009 Tr. 40 (Villaluz); 7/29/2009 Tr. 174 (Liang).

Contrary to JPMorgan's arguments, participating in restructuring activities like this has not been treated by the SEC as creating a Section 13(d) "group" within the meaning of the 1934

Act once a plan is confirmed. To the contrary, the SEC has disclaimed Section 13(d) "group" treatment for such activities. *See Great Southwest Overseas Fin. Corp. N.V.*, March 16, 1972 SEC No Action Letter, *available at* 1972 SEC No-Act. LEXIS 1486. There, as here, the holders of certain notes had agreed to a plan of refinancing and the receipt of new warrants in connection therewith. The SEC made clear that the relevant activity was not whether they were acting in concert for purposes of negotiating the refinancing, but whether they had the requisite purpose to form a Section 13(d) group at the time of their *receipt* of new equity, *after* confirmation: "The holders of the New Warrants would not be considered to be acting as a group with respect to the common stock of [the company] either at the time the New Warrants first became exercisable or thereafter, solely because they were acting as a group at the time of the receipt of the New Warrants in the refinancing of [the company]." *Id*. at *6.

The same holds true here. Under the plain language of Section 8(k)(ii), the relevant time period of a Section 13(d) group is at confirmation—not months before the filing of the Plan. Any rights that the noteholders will obtain through plan confirmation will not, in and of themselves, involve the present acquisition of the underlying stock of Charter. Unless a group of noteholders (then equity holders) come together *after* restructuring to function as a Section 13(d) "group" with the requisite purpose of "acquiring, holding, or disposing of" securities, there can be no default under Section 8(k)(ii) of the credit agreements.

### b. There Is No Evidence A Section 13(d) Group Will Have Greater Voting Power Than Allen Post-Restructuring.

Assuming Charter's Plan is "consummated" and becomes effective, the "result" will still be that Paul Allen Group's voting power will be greater than that of the three private equity firms—Apollo Oaktree, and Crestview—combined, whether measured on a fully diluted basis (38.4% vs. 35.3%), or on a beneficial ownership basis (39.8% vs. 37.6%). *See* 8/24/2009 Tr. 21–

22 (Goldstein); Goldstein Decl. ¶¶ 37-41. Thus, even at confirmation, only a hypothetical Section 13(d) group based on agreements with Franklin could have greater voting power than the Paul Allen Group. Although JPMorgan argues this is the case, the evidence at trial showed that Franklin is not part of a Section 13(d) group to "acquire, hold, or dispose of securities."

The vast bulk of Franklin's investment in Charter is held by passive mutual funds. 7/23/2009 Tr. 59, 63 (Villaluz). Franklin did not make any investments in Charter in coordination with any other investors. *See id*. at 14–15. Nor did Franklin invest in Charter with a view toward converting its debt holdings into equity holdings. *See id*. at 58–59, 142, 144; *see also* 8/24/2009 Tr. 249–50 (Gompers). Franklin initially opposed the rights offering, and retained its own separate counsel to advise it on alternatives. *See* 7/23/2009 Tr. 40–41 (Villaluz). Franklin has not entered any agreements, formal or informal, relating to how Franklin will vote its equity securities post-confirmation. *See id*. at 59.

Consistent therewith, Franklin will be entitled to select one director for Charter's new board, *see* CX 706 at 50; 7/23/2009 Tr. 50–51 (Villaluz), but rather than appoint one of its own employees, Franklin will appoint an *independent* director. *See* 7/23/2009 Tr. 51–53 (Villaluz). Franklin therefore requires an additional 30 days following confirmation to select its director and meet its code of compliance for selecting an independent and suitable candidate. *Id*. at 53, 139. Franklin will not give the director it appoints "any instructions as to how they should vote as a director," nor will it be able to "recall the director." *Id*. Thus, Franklin intends to file a Form 13(g) with the SEC upon confirmation, reflecting a passive investment in Charter. *See id*. at 61. Although Franklin has not yet selected its appointee, Christine Villaluz of Franklin testified that it would not be Jeffrey Marcus (of Crestview), nor "anyone who participated in the ad hoc committee." *Id*. at 51–52.

JPMorgan's "control" expert, Professor Gompers, concedes that Franklin is fundamentally different from the other three major noteholder entities. *See* 8/24/2009 Tr. 249–50 (Gompers). Gompers testified that taking over Charter was "not the reason that these Franklin funds pursued their initial investments. So the investment thesis initially was different." *Id*. at 250. Rather, when the Franklin funds "purchase the securities, they don't have the intent to become actively involved" and "don't seek board representation." *Id*. at 249. At most, Gompers contends that Franklin "supported" the same objectives as the other noteholders in restructuring. JPX 271 at 50.

Although JPMorgan contends that Franklin agreed to "acquire" equity through the debt-for-equity swap in the context of restructuring, as noted above, Franklin's actions *prior* to confirmation and as part of the restructuring are legally irrelevant. In fact, even Professor Gompers conceded:

> Whatever steps that Franklin took in bankruptcy, or in the restructuring [including] supporting a backstop fee or supporting or engaging in a rights offering … don't amount to an agreement to hold or dispose of Charter's securities [or] to an agreement with Apollo, Oaktree or Crestview to vote their securities.

8/24/2009 Tr. 241 (Gompers). At and after confirmation, Professor Gompers sees "nothing where there's formal or informal governance, shareholder or voting agreements after the [debt-for-equity] transaction," *Id*. at 250. And there is simply no evidence to support the notion that Franklin is part of a Section 13(d) group with Apollo, Crestview, and Oaktree. Absent Franklin's inclusion, there is no Section 13(d) group that would have greater voting control than the Paul Allen Group and can be no default of Section 8(k)(ii).[10]

---

[10] Counsel for the Second and Third Lien Notes have argued that Franklin is not necessary to establish a 13(d) group with more voting power than the Paul Allen Group under the
(Continued…)

      **c.**      **There Is No Evidence That *Any* Of The Noteholders Will Constitute A Section 13(d) Group Post-Confirmation.**

JPMorgan's "control" expert does not actually contend that *any* of the noteholders constitute a Section 13(d) group. *See* 8/24/2009 Tr. 270 (Gompers). Moreover, all of the noteholders' representatives who testified denied any agreements or understandings that would qualify those entities as a Section 13(d) group. Without such evidence, JPMorgan cannot establish the existence of a "group" whose voting power, if combined, would create a default under Section 8(k)(ii).

Section 13(d) of the Exchange Act—and the Credit Agreement that incorporates its principals, *see* CX 101 at 66—provides that a "group" of equity holders will be treated as a single "person" if they agree to work together "for purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d). Absent "a common objective regarding one of the just-recited activities," there is no Section 13(d) "group." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001). Nevertheless, JPMorgan's own expert does not claim that there was any agreement among the noteholders as to any Section 13(d) activity post-

---

"Change of Control" provisions in those Indentures. They argue that the appropriate standard for determining voting under the Indentures is an "undiluted" basis because of the definition of "Voting Stock." 7/20/2009 Tr. 160:5-15 (Haller). They are simply incorrect. Although the definition of Voting Stock refers specifically to "Capital Stock … that is at the time entitled to vote in an election," *e.g.*, CX 412 at 34, the definition of "Change of Control" is tied to the "Beneficial Owner … of the Voting Stock." *E.g.*, CX 412 at 5. "Beneficial Owner" is, in turn, expressly defined to provide that "in calculating the beneficial ownership of any particular 'person' (as such term is used in Section 13(d)(3) of the Exchange Act), such 'person' shall be deemed to have beneficial ownership of all securities that such 'person' *has the right to acquire* …" CX 412 at 8 (emphasis added). Thus, an appropriate calculation must include Voting Stock parties have "the right to acquire" through warrants, options, and other conversion rights. That gives the Paul Allen Group a 39.8% to 37.6% voting power edge over a hypothetical § 13(d) group of Apollo, Crestview, and Oaktree using the beneficial ownership calculation required by the Indentures. *See* 8/24/2009 Tr. 21-22 (Goldstein); Goldstein Decl. ¶ 37-41.

confirmation. To the contrary, after reviewing the scores of documents that counsel for JPMorgan selected for his review, Professor Gompers testified:

> Q. And you have seen nothing yourself to indicate that these parties had an agreement to hold or dispose of Charter securities, correct?
>
> A. That would be correct.
>
> Q. And you're not aware of any agreement among Apollo, Oaktree, Crestview and Franklin to hold or dispose of Charter securities?
>
> A. That is correct.
>
> Q. And you don't contend that these particular bondholders have any agreement to vote their securities on any particular issue?
>
> A. That is correct. As I testified a couple of times, *I don't see any formal or informal governance agreement post-transaction*.
>
> Q. And you don't contend that these firms have reached any agreement regarding any aspect of Charter's operations after exit?
>
> A. That is correct.

8/24/2009 Tr. 243–45 (Gompers) (emphasis added). Professor Gompers did not contend that there has been any default of Section 8(k). *Id*. at 236, 239. Rather, although Professor Gompers purportedly declined to qualify himself as "a mind-reader" who could presume to know the behavior of others, Professor Gompers did presume to testify about his perceptions of the noteholders' alleged intent to "control" Charter in the "economic sense." But given that Professor Gompers was not "equating control to an agreement to hold or dispose of securities" within the meaning of Section 13(d) of the Charter Credit Agreements, *id*. at 263–64, his opinions regarding "economic" control—whether correct or not—have no relevance to whether a default of Section 8(k) will occur.

In the face of JPMorgan's failure to present any relevant proof, the noteholders' representatives all denied any agreements that would establish a Section 13(d) group:

- Each of the noteholders testified that they made their own independent decision to purchase Charter debt, and did not buy Charter debt as part of any agreement with any other investor.[11]  *See* 7/23/2009 Tr. 14–15 (Villaluz); 7/28/2009 Tr. 42 (Zinterhofer); 7/29/2009 Tr. 166 (Liang); *id.* at 20 (Marcus).

- Each of the noteholders denied any agreement—written or unwritten, formal or informal—to vote or dispose of Charter securities.  *See* 7/23/2009 Tr. 59-60 (Villaluz); 7/28/2009 Tr. 73–74 (Zinterhofer); 7/29/2009 Tr. 188 (Liang); *id.* at 54 (Marcus).

- Each of the noteholders testified that no one has any right to constrain what any other noteholder may do with respect to its own shares.  *See* 7/23/2009 Tr. 60 (Villaluz); 7/28/2009 Tr. 73–74 (Zinterhofer); 7/29/2009 Tr. 188 (Liang); *id.* at 54–55 (Marcus).

- Each of the noteholders denied the existence of any agreements regarding the appointment of Board members.  *See e.g.*, 7/23/2009 Tr. 51–52 (Villaluz); 7/28/2009 Tr. 51–52 (Zinterhofer); 7/29/2009 Tr. 177–78 (Liang); *id.* at 54 (Marcus).

For this reason, the noteholders have "very little confidence" that any of them will "act in the same manner" post-restructuring, instead predicting "a lot of debates and probably a lot of disagreements and that we would vote our shares how we want to vote and not how somebody else would want to vote."  *Id.* at 188–89 (Liang); *see also* 7/28/2009 Tr. 66 (Zinterhofer) ("So, ultimately, I don't have a lot of assurance that we're going to be able to agree").  Even on the question of "exit strategy," each "bought their debt securities at different times, at different prices," so "their idea of what might represent a profit for them is going to be very different as a result, not to mention the fact that these organizations have different views on that and different views on profitability and holding periods and such."  7/28/2009 Tr. 66 (Zinterhofer).  In fact, contrary to JPMorgan's suggestion and innuendo that there are secret, unwritten agreements—

---

[11]  Of course, such "[g]eneral allegations of parallel investments by institutional investors do not suffice to plead a group."  *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411, 414-15 (S.D.N.Y. 2006); *see also Schaffer ex rel. Lasersight, Inc. v. CC Invs. LDC*, No. 99 CIV 2821 (VM), 2002 WL 31869391, at *5 (S.D.N.Y. Dec. 20, 2002).

notwithstanding that every witness denied such things and JPMorgan's *own* "control" expert Gompers similarly testified that, even given his extensive experience with private equity firms, he saw no evidence of such things, *supra*—they regularly enter into formal written shareholder agreements when they do make joint investments for control. *See* 7/28/2009 Tr. 67 (Zinterhofer). *Id.* Likewise, these noteholders are sophisticated investors who know how to, and do, file 13(d) notices when appropriate, and who understand the consequences of failing to make requisite filings with the SEC. Yet, as Franklin's witness testified, Franklin will be filing a 13(g) notice with the SEC, reflecting its passive investment, and not a 13(d) notice. *See* 7/23/2009 Tr. 61 (Villaluz). As such, the evidence at trial fails to establish that any of the noteholders will constitute a Section 13(d) "group" post-confirmation whose voting power should be combined for purposes of testing Section 8(k)(ii) and the related change of control provisions.

### d. While Irrelevant To Section 8(k), The Noteholders Will Not Control Charter's Board Post-Restructuring.

JPMorgan also argues that the composition of New Charter's board post-restructuring will somehow amount to an event of default. To the contrary, however, neither Section 8(k)(i) nor 8(k)(ii) of the credit agreement even contain any provisions regarding board composition.

Even if they did, the evidence at trial showed that the noteholders' representatives will fall well short of dominating Charter's board post-restructuring—even if you assume JPMorgan's argument that the private equity representatives would work together (which the evidence cited above contradicts). The Paul Allen Group has appointed four of the eleven prospective members of the new Charter board post-restructuring. CX 406, Ex. 3. Of the remaining seven, only three of those board members—the two representatives of Apollo and the one of Oaktree—will be appointees reporting to a former noteholder. *Id.* Franklin will appoint an independent director and not give him or her any instructions on how to vote, and that person

will not be anyone associated with any of the other member of the *ad hoc* committee. 7/23/2009 Tr. 51–53 (Villaluz). Charter CEO Neil Smit—who was first hired to run Charter by Paul Allen—will also serve on the Board. CX 406, Ex. 3. On or after the 31st day following confirmation, these individuals—of which Apollo and Oaktree will have only three of nine votes—will then select directors for the two remaining seats. CX 406 at 5-6; *see* 7/21/2009 Tr. 233–34 (Smit).

By its emphasis on a breakfast meeting in New York and a dinner meeting in St. Louis between Neil Smit and several negotiators from the *Ad Hoc* Committee, JPMorgan may have suggested that Neil Smit will continue to serve on the board of Charter as part of some side-agreement with the noteholders. Nothing could be farther from the truth. Since Mr. Smit was first hired to serve as CEO in 2005, Charter has achieved notable growth and progress operationally, 07/22/2009 Tr. 175:15–175:5 (Merritt), the debt structure he inherited notwithstanding. Thus, given that Mr. Smit's employment contract *required* that he have a seat on the board of directors, the plan of restructuring needed to name him to the board in order to retain him as CEO. 7/22/2009 Tr. 139:21–140:13 (Smit). Regarding his intended vote for the final two directors, Mr. Smit testified that "nothing's been determined" and his support for any candidate will be based on "what's best for the enterprise." *Id.* at 136 (Smit).

### 3. Under CCI's Amended Certificate Of Incorporation, There Can Be No Change Of Control Default Pursuant To Section 8(k)(ii).

Even if a Section 13(d) "group" did come to exist after confirmation, a "scaled voting" provision (or "savings clause") in CCI's amended and restated Certificate of Incorporation prevents any such Section 13(d) "group" from having more voting power than the Paul Allen Group. CX 406, Ex. 3 at 3. Specifically, it provides that each holder of Class A Common Stock shall be entitled to one vote per share—except that the votes attributable to each share of Class A

Common Stock shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by any "person" or Section 13(d) "group" so that no "person" or Section 13(d) "group" other than the Paul Allen Group is or becomes the holder of more than 34.9% voting power unless this restriction is waived by the disinterested board members. CCI Cert. of Inc. Art. IV(b)(i)(A)(1), CX 406, Ex. 3 at 3. These restrictions operate "automatically" to prevent the very kind of change of control default under the Charter Credit Agreements asserted by JPMorgan. *Id.*; *see also* 8/17/2009 Tr. 49–50 (Doody).

Scaled voting provisions are well-recognized under Delaware law. *See Providence & Worcester Co. v. Baker*, 378 A.2d 121, 124 (Del. 1977) (upholding provision that reduced the votes per share based on the number of shares held); *Sagusa, Inc. v. Magellan Petroleum Corp.*, No. 12,977, 1993 WL 512487 (Del. Ch. Dec. 1, 1993), *aff'd*, 650 A.2d 1306 (Del. 1994); *Williams v. Geier*, No. 380,1994, 1987 WL 11285 (Del. Ch. May 20, 1987), *aff'd*, 671 A.2d 1368 (Del. 1996); *see also Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 17-18 (2d Cir. 2001) (enforcing a conversion cap). Nevertheless, JPMorgan argues that this scaled voting provision would be ineffective if a person or Section 13(d) group emerged with greater voting control than the Paul Allen Group—although JPMorgan submitted no evidence to support that theory. To the contrary, on its face, this provision works "automatically," and the directors who might see their voting power reduced by it are expressly not empowered to waive its application. 8/17/2009 Tr. 50:8–14 (Doody). Rather, the provision provides for its governance and enforcement by the "Disinterested Directors." CCI Cert. of Inc. Art. IV(b)(i)(A)(1), CX 406, Ex. 3 at 3. Thus, Article IV(b)(i)(A)(1) of CCI's amended and restated Certificate of Incorporation will preclude any person or any Section 13(d) "group" from asserting more than 35% voting power (other than the Paul Allen Group), thereby foreclosing the change of control defaults asserted by JPMorgan.

C. **There Is No Economic Interest Requirement In The Reinstated Debt.**

Finally, JPMorgan and other creditors complain that Paul Allen will only retain a relatively small economic interest in Charter post-restructuring. To that end, JPMorgan claims it makes "no sense" to "cede" control of Charter to someone with minimal economic interest. This argument is totally irrelevant to whether there will be any event of default under any of the reinstated debt agreements, particularly in light of the text and history of Section 8(k).

On their face, none of Charter's debt agreements contain a requirement that Paul Allen maintain a certain level of economic interest. Rather, early versions of the CCO Credit Agreement did require the Paul Allen Group to maintain a certain economic interest—starting at a 51% economic interest in 1999, later reduced to 25%, and then eliminated entirely in 2004. *See* CX 185 (Section 8(j)); CX 398 (Section 8(j)); CX 149; 7/31/2009 Tr. 74 (Schmitz). As the parties specifically negotiated and agreed, Section 8(k) now only requires Paul Allen to have 35% voting power and 0% economic interest. As with the reduced voting power levels, these changes were made specifically to enable Charter to delever its debt by reducing Allen's equity interests. 7/31/2009 Tr. 74-75 (Schmitz). Because there are no "change of control" provisions relating to Paul Allen's economic interest—indeed, JPMorgan surrendered such clauses long ago—any complaint or claim of default on account of Paul Allen's more limited economic interest is Charter will fully comply with Section 8(k) and the "Change of Control" without merit provisions at confirmation, and the Plan creates no events of default.

IV. **There Is No Cross-Acceleration Of CCO's Debt Merely Because CCO Is A Solvent Debtor.**

JPMorgan continues to insist that, because CCO is a solvent debtor, the cross-acceleration provisions in Section 8 of the Credit Agreement that are triggered if an affiliate files for bankruptcy must not be disregarded as *ipso facto* clauses, but rather must be enforced against

Charter, such that the entirety of CCO's debt is immediately due. *See* 7/20/2009 Tr. 132–34 (JPMorgan opening statement); *see also* 3/30/2009 Tr. 46–49. But none of the cases cited by JPMorgan support that remarkable proposition. To the contrary, they all reaffirm the well-recognized principle that *ipso facto* defaults are generally unenforceable. *See, e.g.*, *In re Kopel*, 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999) ("[C]ertain contractual provisions, such as those expressly rendered unenforceable by the Bankruptcy Code, *see, e.g.*, 11 U.S.C. § 365(e)(1), or those that are designed to thwart bankruptcy policies, are vulnerable."); *In re East Hampton Sand & Gravel Co.*, 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982) ("The present case involves a substantive default, and invokes none of the federal policy considerations which arise in the *ipso facto* termination clauses …."). As the Fifth Circuit explained in *In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 445 (5th Cir. 2002) although "'cross-default provisions are inherently suspect,' they are not per se invalid in the bankruptcy context" and, thus, "'a court should carefully scrutinize the facts and circumstances surrounding the particular transaction to determine whether enforcement of the provision *would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization.*'" *Id*. at 445 (emphasis added) (quoting *In re Kopel*, 232 B.R. at 64). To be clear, the cross-acceleration provisions relied on by JPMorgan do not merely purport to link obligations under one agreement with another, but rather provide for cross-acceleration *based on the act of an affiliate initiating a case under Chapter 11*. As such, "careful[] scrutiny" demonstrates both that enforcement of cross-acceleration based on CCO and its affiliates seeking bankruptcy would both contravene overriding federal bankruptcy policy to permit reinstatement *and* ultimately thwart Charter's reorganization. There is "no doubt that section 1124(2) embodies Congress' intent to allow the Chapter 11 debtor to cure the default of an accelerated loan and reinstate the original terms of the

loan agreement, without impairing the creditors' claim," an objective that would be thwarted if *ipso facto* defaults were enforceable. *In re Madison Hotel Assocs.*, 749 F.2d 410, 420 (7th Cir. 1984). Indeed, in adopting § 365(b) of the Bankruptcy Code, which specifically identifies "the commencement of a case under this title" as an unenforceable *ipso facto* default, 11 U.S.C. § 365(b)(2)(B), Congress made clear that it did not want to punish parties for seeking the protections of bankruptcy; yet that is precisely what JPMorgan would do.

The Seventh Circuit's decision in *In re Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 791 F.2d 524 (7th Cir. 1986) (Posner, J.), is not to the contrary. There the debtor was a railroad that was liquidated. The liquidation produced enough value to pay all creditors in full. The question was from what point in time to calculate the creditors' claims. The Court did not consider reorganization principles, did not review Section 365(e), did not interpret the phrase "financial condition," and did not have occasion to consider Section 1124 of the Bankruptcy Code. The case did not even arise under Chapter 11. In that very different context, the court found that the debenture holders were entitled to the full payment of principal for which they had bargained in the event of a default, rather than just the net present value of the principal. *See id.* at 526. But in the context of reinstatement, as long as non-*ipso facto* defaults are cured, a creditor "receives the complete benefit of its original bargain with the debtor" and is thus "'not impaired' for purposes of Chapter 11 analysis." *In re Madison Hotel Assocs.*, 749 F.3d at 421. Notably, the Seventh Circuit suggested that the outcome would have been different if the debtor has been unable to "honor its promise without hurting any other creditor." *Chicago, Milwaukee*, 791 F.2d at 527. Similar reservations appear in the other cases cited by JPMorgan, none of which involved *ipso facto* defaults. *See In re Gencarelli*, 501 F.3d 1, 6-7 (1st Cir. 2007); *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959).

Here, there can be no doubt that the bankruptcy termination clauses in Section 8 are *ipso facto* clauses. "*Ipso facto*, or bankruptcy, clauses, 'automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.'" *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) (quoting legislative history) (emphasis omitted). *Ipso facto* clauses are generally unenforceable pursuant to Section 365(e) of the Bankruptcy Code because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets. *See, e.g., Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995) ("[The Bankruptcy Code] invalidate[s] contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights 'frequently hampers rehabilitation efforts' by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most.") (internal quotation marks and emphasis omitted); *In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004). Under section 365(e) of the Bankruptcy Code, a contract may not be terminated because of a contractual provision that is conditioned upon: (1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2) the commencement of a bankruptcy case; or (3) the appointment of or taking possession by a trustee in a bankruptcy case. 11 U.S.C. § 365(e)(1).

The cross-acceleration provisions relied on by JPMorgan fall squarely within the first category of *ipso facto* clauses. Charter is a "highly integrated entity," such that the financial condition of one affiliate affects the others. 7/22/2009 Tr. 209–11 (Merritt). As noted above, JPMorgan concedes that the defaults involving the DHCs are, in fact, conditioned on the financial condition of CCO. Kurinskas testified that "[t]o the extent that there's a default at one of [CCO's] affiliates, that could have an impact on CCO." 8/25/2009 Tr. 64 (Kurinskas).

Indeed, JPMorgan was the lead underwriter in March 2008 for notes issued by CCO in which the Offering Memorandum (CX 134) provided that, because CCI "is [CCO's] sole manager, and because we are wholly owned by Charter Holdings, CIH, CCH I, CCH II, and CCO Holdings, their financial liquidity problems could cause serious disruption of our business and could have a material adverse affect on our operations and results." *See* 8/25/2009 Tr. 67 (Kurinskas). That was what JPMorgan expected based on its experience and understanding of the various Charter entities. *Id.* Thus, it was "because of the relationship between CCO at the bottom and the holding companies, including designated holding companies above, [that] JPMorgan specifically negotiated defaults and events of defaults specifically linking the financial condition of the designated holding companies and the financial condition of CCO." *Id.* at 64–65; *see also* JPMorgan Compl. ¶¶ 5, 34. Because an event of default based on the financial condition of a DHC or upon a DHC seeking Chapter 11 protection is likewise conditioned upon "the … financial condition of [CCO,] the debtor," it is *ipso facto* and thus unenforceable. *See, e.g.*, *In re Mirant Corp.*, No. 03-45590-DML-11, 2005 Bankr. LEXIS 909, *28 n.27 (Bankr. N.D. Tex. May 24, 2005) ("Arguably, enforcing the cross-defaults against MAG would be tantamount to enforcing an *ipso facto* clause, as MAG's default on other bond and bank debt was an inevitable result of MAG's chapter 11 filing."). JPMorgan cannot have it both ways and link the financial condition of the DHCs to CCO for purposes of a default, but disconnect them for purposes of operation of the Bankruptcy Code.

Likewise, 11 U.S.C. § 365(b)(2)(B) provides that any default based on "the commencement of a case under this title" is unenforceable. Here, JPMorgan relies on the commencement of Chapter 11 cases by CCO's affiliates and asserts that because CCO was solvent it should not have also filed under Chapter 11. Yet, it makes no difference whether the

commencement of a Chapter 11 case is undertaken by CCO as the debtor, or by one or more of its affiliates. Subsection (B) does not refer only to the "debtor," unlike subsections (A) and (D), or the "trustee" of the debtor in subsection (C). A default predicated on *any* "commencement of a case" under the Bankruptcy Code is simply unenforceable, regardless of who commenced the case.

In any event, JPMorgan's argument that the Court may enforce what would otherwise be an unenforceable contract provision merely because CCO is solvent is without merit. However, as set forth in Charter's Trial Brief on Reinstatement, and not repeated herein, it simply makes no difference that CCO is itself solvent. CCO has properly availed itself of Chapter 11 protections as part of restructuring the entire Charter enterprise. *See, e.g.*, *In re U.I.P Engineered Prods. Corp.*, 831 F.2d 54, 56 (4th Cir. 1987); *In re General Growth Props., Inc.*, 409 B.R. 43, 63 (Bankr. S.D.N.Y. 2009) (holding, in a case involving an integrated corporate group, "that a judgment on an issue as sensitive and fact-specific as whether to file a Chapter 11 petition can be based in good faith on consideration of the interests of the group as well as the interests of the individual debtor."). Thus, there is no basis for enforcing what are otherwise *ipso facto* defaults, and instead, the Court should allow reinstatement and confirm the Plan.

## CONCLUSION

For the foregoing reasons, reinstatement should be permitted.

Respectfully submitted,

New York, New York
Dated:  September 18, 2009

/s/ *Paul M. Basta*
Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street NW
Washington, D.C.  20005
Telephone:     (202) 879-5000

*Counsel to the Debtors and Debtors in Possession (other than Charter Investment, Inc.)*

- and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:     (212) 594-5000
Facsimile:      (212) 967-4258

*Counsel to Debtor and Debtor in Possession Charter Investment, Inc.*