**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**CONFIRMING DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT**
**TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Charter Communications, Inc., its direct and indirect subsidiaries and debtor affiliate, as

debtors and debtors in possession (collectively, the "Debtors"), having:[1]

  a. on March 27, 2009 (the "Petition Date"), commenced these chapter 11 cases
     (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under
     chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532
     (the "Bankruptcy Code");

  b. continued to operate their businesses and manage their properties as debtors in
     possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

  c. filed, on the Petition Date, the Debtors' Joint Plan of Reorganization Pursuant to
     Chapter 11 of the United States Bankruptcy Code [Docket No. 36] and the Debtors'
     Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to
     the Debtors' Joint Plan of Reorganization [Docket No. 38], which Plan and related
     documents were subsequently amended;

  d. filed, on the Petition Date, the Supplement to Debtors' Joint Plan of Reorganization
     Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 37] (as
     amended, the "Plan Supplement"), and with amendments to exhibits to the Plan
     Supplement filed thereafter;

  e. filed, on the Petition Date, the Debtors' Memorandum on Reinstatement in Support of
     Approval of Disclosure Statement [Docket No. 3] (the "Reinstatement Brief");

---

[1] Unless otherwise noted, capitalized terms not defined in the Findings of Fact, Conclusions of Law, and Order
Confirming Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code
(the "Confirmation Order"), shall have the meanings ascribed to them in the Debtors' Joint Plan of
Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated July 15, 2009 [Docket No.
615] (as the same may have been subsequently modified, supplemented, and amended, the "Plan"). The rules
of interpretation set forth in Article I.B of the Plan shall apply to the Confirmation Order.

f.    filed, on the Petition Date, the Debtors' Motion for an Order (I) Approving the Disclosure Statement, (II) Establishing a Record Date for Voting on the Plan of Reorganization and the Rights Offering, (III) Approving Solicitation Packages and Procedures for the Distribution Thereof, (IV) Approving the Rights Offering Procedures and Rights Exercise Form, (V) Approving the Forms of Ballots and Manner of Notice, (VI) Approving the Commitment Agreements, (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan [Docket No. 30] (the "<u>Disclosure Statement Motion</u>");

g.    filed, on May 4, 2009, the Notice of Amended and Restated Exhibit 19 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 298];

h.    filed, on May 7, 2009, the amended Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 320] and the amended Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the Debtors' Joint Plan of Reorganization (the "<u>Disclosure Statement</u>") [Docket No. 319];

i.    distributed solicitation materials beginning on or about May 12, 2009 (the "<u>Solicitation Date</u>"), consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and the Order (I) Approving the Disclosure Statement, (II) Establishing a Record Date for Voting on the Plan of Reorganization and the Rights Offering, (III) Approving Solicitation Packages and Procedures for the Distribution Thereof, (IV) Approving the Rights Offering Procedures and Rights Exercise Form, (V) Approving the Forms of Ballots and Manner of Notice, (VI) Approving the Commitment Agreements, (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan entered on May 7, 2009 [Docket No. 323] (the "<u>Disclosure Statement Order</u>"), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "<u>Solicitation Procedures</u>") and related notices, forms, Ballots, and Master Ballots (collectively, the "<u>Solicitation Packages</u>"), as evidenced by the Affidavit of Service of Leanne V. Rehder Scott re: Solicitation Packages [Docket No. 396] (the "<u>KCC Affidavit</u>") and the Affidavit of Service of Financial Balloting Group LLC of Solicitation Packages and Related Documents on Holders of Publicly Held Notes and Common Stock, and Certain Other Parties [Docket No. 393] (the "<u>FBG Affidavit</u>");

j.    filed, on May 19, 2009, the Notice of Amended and Restated Exhibits 1 and 12 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 385];

k.    published, on or about June 15, 2009, notice of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>") in The Wall Street Journal, USA Today, and The St-Louis Post-Dispatch, consistent with the Disclosure Statement Order, as evidenced by the Affidavit of Publication in The Wall Street Journal of Erin Ostenson, the Affidavit of Publication in USA Today National Edition of Antoinette Chase, and the Affidavit of Publication in The St-Louis Post-Dispatch of Tanya L. Lemons [Docket No.626] (collectively, the "<u>Publication Affidavits</u>");

l.    filed, on July 15, 2009, Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Code [Docket No. 615],

to which the most recent version of the Plan, dated July 15, 2009, was attached as Exhibit A thereto;

m. filed, on July 16, 2009, the Certification of Jane Sullivan with respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 621], and the Affidavit of Christopher R. Schepper Regarding Votes Accepting or Rejecting the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 622] (collectively, the "Voting Certifications") each detailing the results of the Plan voting process;

n. filed, on July 16, 2009, the Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto [Docket No. 634] (the "Plan Confirmation Brief"), the Affidavit of Gregory L. Doody in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 636] (the "Doody Affidavit"), the Declaration of Thomas Degnan in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 635] (the "Degnan Declaration"), and the Declaration of Christopher Temple in Support of the Debtors' Joint Plan of Reorganization [Docket No. 639] (the "Temple Declaration");

o. filed, on July 16, 2009, the Notice of Exhibits 23 and 25 and Amended and Restated Exhibits 3 and 24 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 632];

p. filed, on July 18, 2009, the Debtors' Trial Brief on Reinstatement in Support of Plan Confirmation [Docket No. 664] (the "Reinstatement Trial Brief"),

q. filed, on August 18, 2009, the Amended Certificate of Service of James Sean McGuire [Docket No. 756] (the "McGuire Certificate");

r. submitted, on August 18, 2009, the Declaration of Barry Folse (the "Folse Declaration");

s. submitted, on August 22, 2009, the Declaration of Stephen Goldstein (the "Goldstein Declaration"); and

t. filed, on September 18, 2009, Reorganizing Debtors' Post-Trial Brief in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 841], and Debtors' Post-Trial Brief on Reinstatement in Support of Plan Confirmation [Docket No. 848] (together, the "Post-Trial Briefs").

This Court having:

u. entered the Disclosure Statement Order on May 7, 2009 [Docket No. 323];

v. set July 20, 2009, at 9:30 a.m., prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

w. reviewed the Plan, the Disclosure Statement, the Plan Confirmation Brief, the Reinstatement Brief, the Reinstatement Trial Brief, the Doody Affidavit, the Degnan Declaration, the Temple Declaration, the Voting Certifications, the McGuire Certification, the Folse Declaration, the Goldstein Declaration, the Post-Trial Briefs, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases and on the docket of the adversary proceeding captioned <u>JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC and CCO Holdings, LLC</u>, Adv. Proc. No. 09-01132 (JMP) (the "<u>Adversary Proceeding</u>");

x. heard the statements, arguments, and objections made by counsel in respect of Confirmation;

y. considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

z. overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn, unless otherwise indicated; and

aa. taken judicial notice of the papers and pleadings filed in the Chapter 11 Cases and Adversary Proceeding.

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following Findings of Fact, Conclusions of Law, and Order:[2]

---

[2] The findings of fact and the conclusions of law set forth herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation and to judgment in the Adversary Proceeding are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

# I. **FINDINGS OF FACT AND CONCLUSIONS OF LAW**[3]

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

## A. **Jurisdiction and Venue.**

1.      Beginning on the Petition Date, the Debtors commenced the Chapter 11 Cases. Venue in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan and adjudication of the Adversary Proceeding are core proceedings under 28 U.S.C. § 157(b)(2). The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

## B. **Eligibility for Relief.**

2.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

## C. **Commencement and Joint Administration of the Chapter 11 Cases.**

3.      On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. By prior order of the Bankruptcy Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 64]. The Debtors have operated their businesses and managed their properties as debtors in possession

---

[3]     The Debtors' Proposed Findings of Fact and Conclusions of Law on Contested Issues are attached hereto as **Exhibit A**.

K&E 14897490.18

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

**D.     Plan Supplement.**

4.     On the Petition Date, the Debtors filed the Plan Supplement. On May 4, 2009, May 19, 2009 and July 16, 2009, the Debtors filed certain amendments to the Plan Supplement. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required. The Debtors are authorized to modify the Plan Supplement following entry of the Confirmation Order in accordance with the terms of the Plan.

**E.     Modifications to the Plan.**

5.     Any modifications to the Plan described or set forth herein constitute technical changes or changes with respect to particular Claims by agreement with Holders of such Claims, and do not materially or adversely affect or change the treatment of any other Claims or Interests. Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

**F.     Judicial Notice.**

6.     The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of the Chapter 11 Cases and all related adversary proceedings and appeals maintained by the clerk of the applicable court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the applicable court

K&E 14897490.18

during the pendency of the Chapter 11 Cases. Any resolutions of objections to Confirmation explained on the record at the Confirmation Hearing are hereby incorporated by reference. All unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

**G.     Disclosure Statement Order.**

7.     On May 7, 2009, the Bankruptcy Court entered the Disclosure Statement Order, which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017; (b) fixed April 17, 2009, as the Record Date (as defined in the Disclosure Statement Order); (c) fixed June 15, 2009 at 5:00 p.m. prevailing Eastern Time, as the deadline for voting to accept or reject the Plan (the "Voting Deadline"); (d) fixed July 13, 2009 at 4:00 p.m. prevailing Eastern Time, as the deadline for objecting to the Plan; (e) fixed July 20, 2009, at 10:00 a.m. prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing; (e) approved the Solicitation Procedures and the Solicitation Package; (f) approved the form and method of notice of the Confirmation Hearing Notice set forth therein; (g) approved the procedures associated with the Rights Offering, including approval of the Rights Exercise Form (as defined in the Disclosure Statement Order); and (h) approved the Commitment Agreements (as defined in the Disclosure Statement Order) and the Commitment Fees.

**H.     Transmittal and Mailing of Materials; Notice.**

8.     As evidenced by the KCC Affidavit, the McGuire Certification, and the FBG Affidavit, due, adequate, and sufficient notice of the Disclosure Statement, Plan, Plan Supplement, and Confirmation Hearing, together with all deadlines for voting on or objecting to the Plan, has been given to: (a) all known Holders of Claims and Interests; (b) parties that requested notice in accordance with Bankruptcy Rule 2002; (c) all counterparties to unexpired

leases and executory contracts with the Debtors; and (d) all taxing authorities listed on the Debtors' Schedules or Claims Register, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rules 2002(b), 3017, and 3020(b), and no other or further notice is or shall be required. Adequate and sufficient notice of the Confirmation Hearing, as may be continued from time to time, and any applicable bar dates and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Rules and Disclosure Statement Order, and no other or further notice is or shall be required.

9. The Debtors published the Confirmation Hearing Notice once each in The Wall Street Journal, USA Today, and The St. Louis Post-Dispatch, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rule 2002(l), as evidenced by the Publication Affidavits.

**I. Solicitation.**

10. Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. Specifically, the Solicitation Packages approved by the Bankruptcy Court in the Disclosure Statement Order (including the Disclosure Statement, the Plan, the Ballots, the Master Ballots, and the related notices) were transmitted to and served on all Holders of Claims or Interests in Classes that were entitled to vote to accept or reject the Plan and relevant portions of the Solicitation Packages were transmitted to and served on other parties in interest in the Chapter 11 Cases, all in compliance with section 1125 of the Bankruptcy Code, the Disclosure Statement Order, the Solicitation Procedures and the Bankruptcy Rules. The Rights Exercise Form and related notices were transmitted to and served on CCH I Note Holders that certified they were eligible to

participate in the Rights Offering. Transmittal and service was adequate and sufficient, and no further notice is or shall be required. In addition, Holders of Claims or Interests in Classes that were not entitled to vote to accept or reject the Plan were provided with certain non-voting materials approved by the Bankruptcy Court in compliance with the Disclosure Statement Order. Pursuant to the Disclosure Statement Order, the Debtors were excused from distributing Solicitation Packages to those entities at addresses from which Disclosure Statement Hearing notices were returned as undeliverable by the United States Postal Service unless the Debtors were able, using reasonable efforts, to obtain an accurate address for such entities before the Solicitation Date, and failure to distribute Solicitation Packages to such entities does not constitute inadequate notice of the Confirmation Hearing, the Voting Deadline, or a violation of Bankruptcy Rule 3017(d). All procedures used to distribute Solicitation Packages to Holders of Claims and Interests were fair, and conducted in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

**J.      Voting Certifications.**

11.      Prior to the Confirmation Hearing, the Debtors filed the Voting Certifications. On August 18, 2009, the Debtors filed the McGuire Certification. All procedures used to tabulate the Ballots, the Master Ballots, and the Rights Exercise Form were fair and conducted in accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

12.      As set forth in the Plan and Disclosure Statement, Holders of Claims in Classes A-3, A-4, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 (collectively, the "Voting Classes") are eligible to vote on the Plan pursuant to the Solicitation Procedures. In addition, Holders of Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2,

E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of Equity Interests in Classes I-6 and J-7 are Unimpaired and deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan. Holders of Claims in Classes A-5, C-5, D-4, E-5, F-5, G-5, and H-5 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6 (collectively, the "Deemed Rejecting Classes") are deemed to reject the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

13. As evidenced by the Voting Certifications, the McGuire Certification, or otherwise, Holders of Claims in Class A-4 (together with the Deemed Rejecting Classes, the "Rejecting Classes") voted to reject the Plan. As further evidenced by the Voting Certifications and McGuire Certification, all other Voting Classes, specifically Holders of Claims in Classes A-3, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan (the "Impaired Accepting Classes").

**K.      Bankruptcy Rule 3016.**

14. The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a). The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

**L.      Burden of Proof.**

15. The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation. Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by clear and convincing evidence. Each of the witnesses who testified on behalf of the Debtors and the CII Settlement Party were credible, reliable and qualified to testify as to the topics addressed in his or her testimony.

**M.**     **Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

16.     The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**1.     Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

17.     The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

**(i)     Sections 1122 and 1123(a)(1)—Proper Classification.**

18.     The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.   Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Articles III, IV, and V of the Plan provide for the separate classification of Claims and Interests into 58 Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Expense Claims and Priority Tax Claims, which are addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).   Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

19.     In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.   Accordingly, the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code have been satisfied.

K&E 14897490.18

### (ii)     Section 1123(a)(2)—Specification of Unimpaired Classes.

20.     Article IV of the Plan specifies that Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of Equity Interests in Classes I-6 and J-7 are Unimpaired under the Plan.  Additionally, Article II of the Plan specifies that Administrative Expense Claims and Priority Tax Claims are Unimpaired, although these Claims are not classified under the Plan.  Accordingly, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

### (iii)     Section 1123(a)(3)—Specification of Treatment of Impaired Classes.

21.     Article IV of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes A-3, A-4, A-5, B-3, B-4, C-3, C-4, C-5, D-3, D-4, E-3, E-4, E-5, F-3, F-4, F-5, G-3, G-4, G-5, H-3, H-4, H-5, I-5, J-2, and J-6 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6.  Accordingly, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

### (iv)     Section 1123(a)(4)—No Discrimination.

22.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article IV of the Plan uniformly provides for the same treatment of each Claim or Interest in a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.  Accordingly, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

### (v)     Section 1123(a)(5)—Adequate Means for Plan Implementation.

23.     Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article VI and various other provisions of the Plan specifically provide in detail adequate and proper means for the Plan's implementation, including but not limited to:   (a) the sources of consideration for distributions under the Plan, including the Net Proceeds, and for the payment of Specified Fees

K&E 14897490.18

and Expenses; (b) the authorization and issuance of new equity in the Reorganized Company consisting of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants, and the execution of related documents; (c) the satisfaction of the CII Settlement Claim; (d) the issuance of new debt; (e) the issuance of 100,000 shares of Class A Voting Stock in CII; (f) the reinstatement of certain prepetition debt; (g) the continuation of the corporate existence of the Debtors and the vesting of assets in the each of the Reorganized Debtors; (h) the discharge of the Debtors; (i) the consummation of certain restructuring transactions; (j) the authority of the Reorganized Debtors to enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan; (k) the adoption and filing of the Amended and Restated Certificate of Incorporation of the Reorganized Company, the adoption of the Amended and Restated Bylaws of the Reorganized Company, and the entry into the Reorganized Holdco LLC Agreement and the Reorganized Holdco Exchange Agreement; (l) the appointment of officers and directors of the Reorganized Company; (m) the adoption, implementation, and amendment of the Management Incentive Plan and the granting of awards thereunder; (n) the creation of the Professional Fee Escrow Account to reserve an amount necessary to pay all of the Accrued Professional Compensation; (o) the maintenance of Causes of Action and the preservation of all Causes of Action not expressly settled or released; (p) the grant of the Third Party Releases; and (q) the general authority for all corporate action necessary to effectuate the Plan. Moreover, the Reorganized Debtors will have, immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. Accordingly, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

K&E 14897490.18

**(vi)     Section 1123(a)(6)—Voting Power of Equity Securities.**

24.     Article IV(a)(iv) of the Amended and Restated Certificate of Incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement, prohibits the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

**(vii)     Section 1123(a)(7)—Selection of Officers and Directors.**

25.     The identity and affiliations of the members of the initial Board of Directors of the Reorganized Company, to the extent known, are listed in Exhibit 23 to the Plan Supplement. The Amended and Restated Certificate of Incorporation of the Reorganized Company describes the manner of the selection of the remaining members of the initial Board of Directors of the Reorganized Company. Pursuant to Article VI.O of the Plan, the CEO and the COO of the Reorganized Company shall be the same as the CEO and COO of CCI on the Petition Date. Article VI.O of the Plan further describes the manner of selection of additional officers of the Reorganized Company.   The selection of the initial directors and officers of the Reorganized Company was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.   Accordingly, the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

**(viii)     Section 1123(b)—Discretionary Contents of the Plan.**

26.     The Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code.   As set forth below, such discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.   Thus, section 1123(b) of the Bankruptcy Code is satisfied.

K&E 14897490.18

### (a) Section 1123(b)(1)-(2)—Claims and Executory Contracts.

27. Pursuant to sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code, Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and Article VII of the Plan provides for the assumption, assumption and assignment, or rejection of the Executory Contracts of the Debtors not previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Bankruptcy Court.

### (b) Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action.

28. **Compromise and Settlement**. Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, the payment and provision of other consideration in satisfaction of the CII Settlement Claim, and any other compromise and settlement provisions of the Plan constitute a good faith compromise of all Claims, Interests, or Causes of Action relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such an Allowed Claim or Interest. The compromise and settlement of such Claims, Interests, or Causes of Action embodied in the Plan is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and is fair, equitable, and reasonable.

29. In reaching an ultimate decision on substantive fairness, the Court considered the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that

support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

30. **CII Settlement**. The Plan is premised upon the CII Settlement, which has facilitated the implementation of the Debtors' primary restructuring goals including: (a) reinstatement of the Debtors' Senior Debt (as defined below); (b) preservation and enhanced utilization of the Debtors' net operating losses ("NOLs") and other tax attributes; (c) discharge of roughly $8 billion of holding company debt; (d) reduction of more than $800 million in annual interest expense; (e) raising of approximately $1.6 billion in equity investments through a rights offering and up to $267 million in new notes; and (f) exchange of approximately $1.5 billion of CCH II Notes for New CCH II Notes, with extended maturities.

31. The CII Settlement is a cornerstone of the Debtors' Plan, as it directly accomplishes three of the key goals briefly described above. First, under the CII Settlement, Paul G. Allen ("Mr. Allen") makes possible—by remaining a CCI stockholder with the requisite voting power specified in the Senior Debt and agreeing to appoint 4 of 11 board members—the Debtors' reinstatement of nearly $12 billion of Senior Debt, saving the Debtors substantial annual interest expense. Second, the CII Settlement—through forbearance of prepetition exchange rights and maintenance of a 1% interest in Holdco—allows the Debtors to preserve approximately $2.85 billion of NOLs that will qualify for substantially enhanced utilization (with resulting benefits expected by the Debtors of approximately $1.14 billion in future cash savings). Third, the Debtors will enjoy a stepped-up basis in a significant portion of their assets when CII's interest in Holdco is diluted and if and to the extent of any taxable exchange of CII's Holdco interest for CCI common stock after the Debtors emerge from bankruptcy. That stepped-

up basis will provide tax benefits over the life of the Holdco assets equal to approximately 35% of the amount of the step up.

32. Nothing explicitly requires Mr. Allen to remain a stockholder with 35% voting power in CCI to preserve the Debtors' reinstatement rights or to cause CII to remain a member of Holdco to preserve the Debtors' tax benefits. Any endeavors by the Debtors to compel Mr. Allen to do so have limited chances of success. Given that the consideration for the CII Settlement includes the CII Settlement Parties' voluntary assumption of duties they are not required to assume and the forbearance from actions they are legally entitled to take, there is little chance of success in litigation. Accordingly, even if there is a low likelihood of protracted litigation, there is little chance of success in litigation. Thus, absent the CII Settlement, the Debtors would be unable to reinstate the Senior Debt, preserve the NOLs and other tax attributes to the extent permitted by the CII Settlement, or benefit from the stepped-up basis to the extent CII exercises its exchange rights after the Effective Date.

33. The consideration received by the CII Settlement Parties under the CII Settlement is in exchange for, among other things, Mr. Allen's cooperation and participation to facilitate the reinstatement of the Senior Debt and the preservation and enhancement of the Debtors' tax attributes. The CII Settlement does not provide any CII Settlement Party with any consideration or distribution on account of its existing equity interests in CCI or Holdco.

34. The releases required by the CII Settlement are appropriate and justified because, among other reasons set forth below, they were essential to the formulation of the Plan and supported by substantial consideration.

35. In the fall of 2008, the Debtors engaged financial and legal advisors with respect to a potential restructuring. After internal analysis and discussions with their advisors, the

K&E 14897490.18

independent directors of the Debtors together with the management of the Debtors formulated and proposed a restructuring transaction that ultimately became the basis of the Plan and the CII Settlement.

36.     During the negotiations of the Plan and CII Settlement, the Debtors' legal and financial advisors reported to the independent directors of CCI and its management—and not to Mr. Allen or his affiliated directors.  CCI's independent directors, who constitute a majority of the Board of Directors, met at least nine times with respect to the Debtors' restructuring, and at least four times with respect to the CII Settlement.  The independent directors regularly met with the legal and financial advisors.  Mr. Allen and his affiliated directors did not hinder any efforts by CCI's Board of Directors or management to independently review the Plan and CII Settlement or to pursue alternative restructuring transactions, and Mr. Allen and his affiliated directors regularly recused themselves from key decisions during the restructuring process and later with respect to the CII Settlement negotiations.  Accordingly, CCI's Board of Directors was not required to form a special committee with respect to the CII Settlement.  Although CCI's Board of Directors and management considered alternative transactions, none were viable.

37.     The CII Settlement Parties and the Debtors arrived at the CII Settlement after weeks of intensive arm's-length and good-faith negotiations during which the parties were separately represented by sophisticated legal and financial advisors.  The Crossover Committee, which also retained its own financial and legal advisors, consented to the terms of the CII Settlement only after intensive arm's-length and good-faith negotiations with the Debtors and advisors to Mr. Allen.  The final decision of CCI's Board of Directors on the Plan and on the CII Settlement was a unanimous decision.

K&E 14897490.18

38.     The CII Settlement is supported by other parties in interest.  Specifically, the Creditors' Committee independently reviewed the Plan, including the CII Settlement, and has pledged its support thereof.  Moreover, the CII Settlement was negotiated between the Debtors, CII, Mr. Allen and certain of his affiliates, and the Crossover Committee.

39.     Law Debenture Trust Company of New York, as Indenture Trustee (the "CCI Indenture Trustee") for the 6.50% Convertible Senior Notes due 2027 (the "CCI Notes") issued by CCI, has alleged that CCI's Board of Directors has breached its fiduciary duties in proposing, negotiating, and seeking to confirm the Plan with respect to the CII Settlement.  The CII Settlement, however, is fair and equitable, a necessary component to the feasibility of the Plan, falls well above the lowest point in the range of reasonableness, is in the best interests of the Debtors, their Estates, and their Creditors, does not violate the absolute priority rule, and is an essential element of the Plan.  Neither the Board of Directors of CCI nor Mr. Allen has breached any duty to the Debtors or their stakeholders.  The CII Settlement is not subject to an "entire fairness" standard; however, even if it were subject to such standard, the CII Settlement satisfies the "entire fairness" standard.

40.     Pursuant to Bankruptcy Rule 9019, the Debtors are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating to the CII Settlement and to perform their obligations thereunder.

41.     **Releases by the Debtors**.  The releases and discharges of Claims and Causes of Action by the Debtors described in Article X.D of the Plan (the "Debtor Releases") pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment.  Pursuing any such claims against the Debtor Releasees (as defined herein) is not in

the best interest of the Debtors' estates' various constituencies as the costs involved likely would outweigh any potential benefit from pursuing such claims.

42.     **Third Party Releases**.  The circumstances of these Chapter 11 Cases are unique and truly unusual and they render the releases of Claims and Causes of Action by Holders of Claims and Interests described in Article X.E of the Plan (the "Third Party Release") important to the success of the Plan.

43.     As part of the Plan and CII Settlement, the CII Settlement Claim Parties have agreed to forbear with respect to certain exchange rights agreed to by the Debtors 10 years ago, the exercise of which would have resulted in the CII Settlement Claim Parties bearing no tax liability for any proposed restructuring.  Nevertheless, the CII Settlement Claims Parties agreed to forbear from exercising their historic right and agreed to maintain the existing Holdco structure to facilitate the Debtors' preservation of approximately $2.85 billion of tax attributes with enhanced utilization (with resulting benefits expected by the Debtors of approximately $1.14 billion in future cash savings).  In addition, the CII Settlement Claim Parties agreed to retain 35% voting power of CCI and appoint 4 of 11 board members to facilitate savings of several hundred million dollars annually in interest expense through reinstatement of the CCO Credit Facility Claims and other Senior Debt.  As described above, the CII Settlement will also provide the Debtors with the ability to achieve a step up in the tax basis on a significant portion of their assets when CII's interest in Holdco is diluted and to the extent CII exercises its exchange rights after the Effective Date, thus providing greater flexibility for any future asset sales.  Significantly, Mr. Allen is the only individual in existence whose continued participation as a CCI stockholder enables the Debtors to reinstate the Senior Debt.

K&E 14897490.18

44.     In consideration for entry into the CII Settlement, the CII Settlement Claim Parties required that the Third Party Releases be included in the Plan.

45.     The CII Settlement is a linchpin of the Debtors' Plan, without which the Debtors' restructuring goals would have been unobtainable, the Plan would not be confirmable or feasible, and the substantial recoveries by the many parties in interest in these cases, including the fulcrum creditors and trade creditors, would fail to exist.  These facts are unprecedented and justify the approval of the Third Party Releases.

46.     There is an identity of interest between the Debtors and the beneficiaries of the Third Party Releases (other than the Crossover Committee members).  These beneficiaries have the right to seek indemnity, contribution or other reimbursement from the Debtors with respect to certain activities relating to the negotiation and consummation of the Plan.  The Third Party Releases appropriately relieve the Debtors from these potential expenses.  They also preserve the priority scheme of the Bankruptcy Code by preventing the assertion of general unsecured claims by the Debtors' officers and directors, which claims would be the direct result of claims by parties in interest whose direct claims against the Debtors based on the same facts and circumstances would be subject to subordination under section 510(b) of the Bankruptcy Code.

47.     In summary, the Third Party Releases are:  (a) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (b) in the best interests of the Debtors and all Holders of Claims; (c) fair, equitable and reasonable; (d) given and made after due notice and opportunity for hearing; (e) being exchanged for substantial consideration by the CII Settlement Claim Parties in the form of preservation of valuable tax attributes and the ability to reinstate indebtedness at markedly favorable interest rates, with such consideration conferring

well in excess of $1 billion in value on the Debtors and their estates; (f) being exchanged for substantial consideration by the Crossover Committee in the form of significant financing commitments to the Debtors, including through the Exchange and the Rights Offering; (g) necessary to the Plan because the enjoined claims would indirectly impact the Debtors' reorganization as many of the Debtor Releasees are beneficiaries of indemnity obligations (including, significantly Mr. Allen, in his capacity as a director of Debtor CCI) such that there is an identity of interest between the Debtors and other Debtor Releasees; (h) is required under the CII Settlement, an essential component of the Plan, which was negotiated at arm's-length and in good faith with multiple creditor constituencies and which has been accepted by nearly all Classes of Claims entitled to vote; and (i) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Releases against any of the Debtor Releasees.

48. **Injunction**. The injunction provisions set forth in Article X.F of the Plan are essential to the Plan and are necessary to preserve and enforce the Debtor Releases, the Third Party Releases, and the exculpation provisions in Article X of the Plan, and are narrowly tailored to achieve that purpose.

49. **Exculpation**. The exculpation provisions set forth in Article X.G of the Plan are essential to the Plan. The record in the Chapter 11 Cases fully supports the Exculpation and the Exculpation provisions set forth in Article X.G of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation. The Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the Exculpation shall not apply to any

K&E 14897490.18

acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

50.     Each of the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates, and their Creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions contained in Article X of the Plan.

51.     **Preservation of Claims and Causes of Action**.  Article VI.S of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

**2.     Section 1129(a)(2)—Compliance of the Debtors and Others With the Applicable Provisions of the Bankruptcy Code.**

52.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code,

including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

53.     Votes to accept or reject the Plan were solicited by the Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents after the Court approved the adequacy of the Disclosure Statement pursuant to section 1125(a) of the Bankruptcy Code.

54.     The Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article X.G of the Plan.

55.     The Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

K&E 14897490.18

### 3. Section 1129(a)(3)—Proposal of Plan in Good Faith.

56. The Debtors have proposed the Plan in good faith and not by any means forbidden by law. This is demonstrated by the reasons set forth above under the heading "CII Settlement," in addition to the following. In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation. The Debtors' good faith is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

57. The Plan is the product of arm's-length negotiations between, among other Entities, the Debtors, and each party who signed a Plan Support Agreement. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests. Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources. Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

### 4. Section 1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable.

58. The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy

K&E 14897490.18

the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code are satisfied.

**5. Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

59. The Plan complies with the requirements of section 1129(a)(5) of the Bankruptcy Code because, in the Disclosure Statement, the Plan, and the Plan Supplement, the Debtors have disclosed (a) the identity and affiliations of each proposed director, the CEO, the COO, and the CFO and the manner in which additional officers and directors of the Reorganized Company will be chosen following Confirmation and (b) the identity of and nature of any compensation for any insider who will be employed or retained by the Reorganized Company. The method of appointment of directors and officers of the Debtors was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy. Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied.

**6. Section 1129(a)(6)—Approval of Rate Changes.**

60. The Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission and therefore will not require governmental regulatory approval. Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter 11 Cases.

**7. Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.**

61. The liquidation analysis attached as Exhibit E to the Disclosure Statement (as amended and restated, the "Liquidation Analysis") and the other evidence related thereto in support of the Plan that was proffered or adduced at or prior to, or in affidavits in connection with, the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and

appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, Holders of Allowed Claims in every Class will recover as much or more under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

62.    Specifically, the Liquidation Analysis properly:  (a) utilized a distressed sale ("Distressed Sale") assumption; (b) excluded preference recoveries against trade vendors under the foregoing assumption; (c) concluded that executory contracts would likely be assumed in a Distressed Sale; (d) accounted for CCI's and Holdco's entitlement to a portion of the Litigation Settlement Fund Proceeds; (e) ascribed no value to CCI or Holdco for contracts held at CCI and Holdco, including programming, media and sales contracts; (f) excluded value for worthless stock options issued by CCI for CCO's benefit; (g) excluded the (i) $74 million interest payment made by Holdco, (ii) $8.4 million capital contribution by Holdco to CCH, (iii) $9 million of assets listed on Holdco's schedules in the form of cash, security deposits and accounts receivable, and (iv) $176 million of Holdco's repurchase of affiliates' notes; and (h) accounted for the Debtors' intercompany payables and receivables at all times.  Accordingly, the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

**8.     Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class.**

63.    Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 (Classes of Claims) and Classes I-6 and J-7 (Classes of Interests) are each Classes of Unimpaired Claims or Interests that are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

K&E 14897490.18

64.     Because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code. Thus, although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below. As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**9.      Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

65.     The treatment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims under Articles II and IV of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code are satisfied.

**10.     Section 1129(a)(10)—Acceptance By At Least One Impaired Class.**

66.     As set forth in the Voting Certifications, the Impaired Accepting Classes have voted to accept the Plan. Specifically, Holders of Claims in Classes A-3, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan. (Schepper Decl.¶¶ 15, 16; Sullivan Decl., Ex. A). Excluding Insider votes, 11 Impaired Classes (A-3, A-4, B-3, B-4, C-3, C-4, F-4, G-4, H-4, J-2, and J-6) voted to accept the Plan. See id. Pursuant to the Disclosure Statement Order, Classes for which no votes were cast were deemed to accept the Plan. See Disclosure Statement, Ex. E  7(h). As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code). Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

K&E 14897490.18

**11.** **Section 1129(a)(11)—Feasibility of the Plan.**

67.     The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan except as provided in the Plan; and (e) establishes that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.  Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

**12.** **Section 1129(a)(12)—Payment of Bankruptcy Fees.**

68.     Article XV.C of the Plan provides that all fees payable pursuant to section 1930 of the United States Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  Accordingly, the requirements of section 1129(a)(12) of the Bankruptcy Code have been satisfied.

**13.** **Section 1129(a)(13)—Retiree Benefits.**

69.     Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to section 1114 of the Bankruptcy Code.  Article VI.Q of the Plan provides that, on and after the Effective Date, all retiree benefits, if any, shall continue to be paid in accordance with applicable

K&E 14897490.18

law.  Accordingly, the requirements of section 1129(a)(13) of the Bankruptcy Code have been satisfied.

**14.**     **Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Class.**

70.     Notwithstanding the fact that the Rejecting Classes have voted not to accept the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because: (a) the Impaired Accepting Classes have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. Accordingly, the Plan is fair and equitable towards all Holders of Claims in the Rejecting Classes.  As a result, the Plans satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

**15.**     **Section 1129(c)—Only One Plan.**

71.     Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**16.**     **Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes.**

72.     No governmental unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

K&E 14897490.18

**N.      Satisfaction of Confirmation Requirements.**

73.      Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**O.      Good Faith.**

74.      The Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business and maximizing the value of each of the Debtors and the recovery to stakeholders.   The Plan gives effect to many of the Debtors' restructuring initiatives, including debt reinstatement, debt reduction, and the CII Settlement. Accordingly, the Debtors, the Creditors' Committee, and each party who signed a Plan Support Agreement (and all of their respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, Affiliates, and representatives) have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby (including, without limitation, the entry into and performance under the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants); and (b) take the actions authorized and directed or contemplated by the Confirmation Order.   Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**P.      Disclosure: Agreements and Other Documents.**

75.      The Debtors have disclosed all material facts regarding: (a) the adoption of the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws of Reorganized CCI or similar constituent documents; (b) the selection of directors and officers for the Reorganized Debtors; (c) the distribution of Cash; (d) the issuance of new equity in the

K&E 14897490.18

Reorganized Company consisting of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants; (e) the issuance of the New CCH II Notes; (f) the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors; (g) the Management Incentive Plan; (h) the Rights Offering; (i) securities registration exemptions; (j) the exemption under section 1146(a) of the Bankruptcy Code; (k) the adoption of the Reorganized Holdco LLC Agreement and the entry into the Reorganized Holdco Exchange Agreement; and (l) the adoption, execution, and delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing.

### Q. Transfers by Debtors; Vesting of Assets.

76. Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness that is Unimpaired by the Plan). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### R. Conditions to Effective Date.

77. Entry of the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Requisite Holders and Mr. Allen, shall satisfy the conditions to the Effective Date as set forth in Article XII.A.1-3 of the Plan, subject to the condition in Article XII.A.1-3 of

the Plan that the Confirmation Order shall not have been stayed or modified or vacated on appeal.

**S.      Likelihood of Satisfaction of Conditions Precedent to Consummation.**

78.      Each of the conditions precedent to the Effective Date, as set forth in Article XII.A of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied, provided, however, that no waiver of the conditions precedent to the Effective Date shall have occurred without the consent of the Requisite Holders and Mr. Allen.

**T.      Implementation.**

79.      All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents (including, without limitation, the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws of Reorganized CCI, the entry into and performance under the Equity Registration Rights Agreement, the New CCH II Notes, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco LLC Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants), have been negotiated in good faith, at arm's length, and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon completion of documentation and execution be valid, binding, and enforceable documents and agreements not in conflict with any federal or state law.

**U.      Issuance of New Common Stock, Preferred Stock, and Warrants.**

80.      The issuance of New Common Stock, Preferred Stock, and Warrants is an essential element of the Plan, and is in the best interests of the Debtors, their Estates, and their

K&E 14897490.18

Creditors. The Reorganized Company's equity interests shall consist of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants.

## V. The CCI Notes Claim.

81. Notwithstanding any other provision to the contrary, the distributions provided in Article IV.A.4 of the Plan to the Holders of CCI Notes Claim shall constitute the sole recovery that such Holders shall receive under the Plan on account of their Claims.

## W. Reorganized Holdco.

82. The retention of the current partnership structure in the form of Reorganized Holdco is an essential element of the Plan, and is in the best interests of the Debtors, their Estates, and their Creditors. The Debtors are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating thereto and perform their obligations thereunder.

## X. Reinstatement.

83. The CCO Credit Facility Claims, the CCO Notes Claims, the CCOH Credit Facility Claims, and the CCOH Notes Claims are Unimpaired in accordance with section 1124 of the Bankruptcy Code.

### 1. No Event of Default Under the CCO Credit Facility.

84. Section 8(k)(i) of the CCO Credit Facility provides that it shall be an Event of Default if "the Paul Allen Group[4] shall cease to have the power, directly or indirectly, to vote or

---

[4]    Under the CCO Credit Facility, the "Paul Allen Group" includes (a) Mr. Allen, (b) his estate, spouse, immediate family members and heirs and (c) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist entirely of Mr. Allen or such other persons referred to in clause (b) above or a combination thereof.

K&E 14897490.18

direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO] . . . ."

85.     The Paul Allen Group will not, at any time before, or upon consummation of, the Plan, cease to have the requisite voting power required by section 8(k)(i) of the CCO Credit Facility.   Accordingly, there is no Event of Default under section 8(k)(i) of the CCO Credit Facility, and if the Debtors perform in accordance with the terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8(k)(i) of the CCO Credit Facility.

86.     Section 8(k)(ii) of the CCO Credit Facility provides that it shall be an Event of Default under the following additional circumstances:   "the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Exchange Act), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO], unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO] than such 'person' or 'group.'"

87.     The consummation of the Plan constitutes a "consummation of a transaction" for purposes of section 8(k)(ii) of the CCO Credit Facility.   The Rights Offering and the execution of the Plan Support Agreements did not constitute the "consummation of a transaction" under section 8(k)(ii) of the CCO Credit Facility.   There has been no other act or event that constitutes the "consummation of a transaction" under section 8(k)(ii) of the CCO Credit Facility.

K&E 14897490.18

88.     Upon consummation of the Plan, the Crossover Committee shall cease to exist.

89.     Upon consummation of the Plan, no Noteholder that had formerly been a member of the Crossover Committee will have the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of CCO.

90.     Upon consummation of the Plan, no Noteholder that had formerly been a member of the Crossover Committee will have an agreement with any other member of the Crossover Committee or any other party to a Plan Support Agreement to act together for the purpose of acquiring, holding, voting or disposing of equity securities of the Debtors, and no such persons, or any combination thereof, will constitute a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of such equity securities, or otherwise constitute a "group" as such term is used in Section 13(d) or 14(d) of the Exchange Act, as provided in the CCO Credit Facility.  No such agreement, partnership, limited partnership, syndicate, other group, or "group" will exist upon consummation of the Plan.

91.     Even if a "person" or "group" as such term is used in Section 13(d) or 14(d) of the Exchange Act (other than Mr. Allen and certain affiliated and related persons) held or beneficially owned more than 34.9% of the combined voting power of the capital stock of the Reorganized Company, the "scaled voting" provisions in the Amended and Restated Certificate of Incorporation of the Reorganized Company would reduce such voting power so that no "person" or "group" (other than an Authorized Class B Holder) is or becomes the holder or beneficial owner (as such term is used in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as such term is used in Section 13(d) of the Exchange Act) such "person" shall be deemed to have beneficial

ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition), directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the [Reorganized Company] absent a waiver of such provision by a majority of disinterested members of the Board of Directors of Reorganized CCI.

92.     Accordingly, there is no Event of Default under section 8(k)(ii) of the CCO Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8(k)(ii) of the CCO Credit Facility.

**2.     No Change of Control Under the Other Senior Debt Instruments.**

93.     The indentures for the CCO and CCOH Notes and the CCOH Credit Facility define a "Change of Control" in relevant part as:

> "* * *
>
> (3)     the consummation of any transaction . . . the result of which is that any "person" [(as such term is used in Section 13(d)(3) of the Exchange Act)] other than Paul G. Allen or any of the Related Parties[5] becomes the Beneficial Owner[6], directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than number of shares, unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Company or such Parent, as the case may be, measured by voting power rather than number of shares, than such person;

---

[5]    A "Related Party" of Mr. Allen includes (i) the spouse or an immediate family member, estate or heir of Mr. Allen, or (ii) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding an 80% or more controlling interest of which consist of Mr. Allen and/or such other Persons referred to in the immediately preceding clause (i).

[6]    "Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as such term is used in Section 13d(3) of the Exchange Act) such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

(4)     after the Issue Date, the first day on which a majority of the members of the Board of Directors of CCI are not Continuing Directors[7] . . . .”

94.     The consummation of the Plan constitutes a "consummation of a transaction" for purposes of the indentures' Change of Control provisions quoted above.  The Rights Offering and the execution of the Plan Support Agreements did not constitute the "consummation of a transaction" under those Change of Control provisions.  There has been no other act or event that constitutes the "consummation of a transaction" under those Change of Control provisions.

95.     Paragraph 88 above is hereby incorporated by reference

96.     Upon consummation of the Plan, no Noteholder that had formerly been a member of the Crossover Committee will be the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than number of shares.

97.     Paragraphs 90 and 91 above are hereby incorporated by reference.

98.     Each member of the current Board of Directors of CCI is a Continuing Director. If a majority of the current Board of Directors of CCI approves the initial directors of Reorganized CCI before consummation of the Plan, the initial Board of Directors of Reorganized CCI as of the Effective Date will be composed entirely of Continuing Directors.

99.     Thus, the occurrence of any or all of the following:  (a) the commencement of the Chapter 11 Cases; (b) the filing, prosecution and confirmation of the Plan; (c) the consummation of the Plan; (d) the transactions contemplated by or resulting from the Plan, including, without

---

[7]     A "Continuing Director" is any member of the Board of Directors of CCI who:  (1) was a member of such Board of Directors on the [applicable] Issue Date; or (2) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election or whose election or appointment was previously so approved.

limitation, the issuance of the New Common Stock and the appointment of the initial Board of Directors of Reorganized CCI; (e) any other effect of the Chapter 11 Cases; and (f) the emergence of the Debtors from the Chapter 11 Cases, will not constitute a "change of control" under, and within the meaning of, the indenture for the CCO Notes or the CCOH Notes or the CCOH Credit Facility.

100.    Accordingly, there is no Change of Control under the indentures for the CCO and CCOH Notes and the CCOH Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Change of Control under the CCO and CCOH Notes and the CCOH Credit Facility.

**3.    No Misrepresentation Regarding Ability to Pay Debts As They Become Due.**

101.    None of the Debtors' "Designated Holding Companies" (as defined in the CCO Credit Facility) were unable to pay their debts as they become due at any time before the Petition Date.  Accordingly, there was no Event of Default under section 8(g)(v) of the CCO Credit Facility.  In any event, any default arising from a breach of section 8(g)(v) of the CCO Credit Facility would relate to the financial condition of CCO or of a Debtor and thus would constitute an ipso facto default that need not be cured under section 1124 of the Bankruptcy Code.

102.    Because no Event of Default had occurred under section 8(g)(v) of the CCO Credit Facility, there was no Event of Default under section 8(b) of the CCO Credit Facility in connection with the borrowing requests made by the Debtors in October and November of 2008 and in February 2009.  In any event, any default arising from a breach of section 8(b) with respect to section 8(g)(v) of the CCO Credit Facility would relate to the financial condition of CCO or of a Debtor and thus would constitute an ipso facto default that need not be cured under section 1124 of the Bankruptcy Code.

K&E 14897490.18

### 4. No Cross-Acceleration.

103. The alleged default caused by the commencement of these Chapter 11 Cases by the Debtors that constitute Designated Holding Companies relates to the commencement of a case under the Bankruptcy Code or relates to the financial condition of CCO and therefore constitutes an ipso facto default of CCO that need not be cured under section 1142 of the Bankruptcy Code. Accordingly, there is no Event of Default under section 8 of the CCO Credit Facility, including (but not limited to) section 8(f) or 8(g) of the CCO Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8 of the CCO Credit Facility.

### 5. No Other Event of Default.

104. Upon emergence, no Event of Default shall have occurred and be continuing under any of the debt instruments being reinstated by the Debtors.

### Y. Retention of Jurisdiction.

105. The Bankruptcy Court properly may retain jurisdiction over the matters set forth in Article XIV and other applicable provisions of the Plan.

106. The Plan shall neither confer nor deny jurisdiction for determining any disputes relating to or arising from Class J-2: CCO Swap Agreements Claims.

<p align="center">* * * * *</p>

K&E 14897490.18

## II.   ORDER

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.    Order.**

107.    This Confirmation Order shall confirm the Plan.  A copy of the Plan is attached hereto as **Exhibit B**.

**B.    Objections.**

108.    To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been withdrawn, waived, or settled prior to entry of the Confirmation Order or otherwise resolved as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits.

**C.    Findings of Fact and Conclusions of Law.**

109.    The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.   All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation and to judgment in the Adversary Proceeding are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following constitute findings of fact or conclusions of law, they are adopted as such.  To the extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

**D.    Confirmation of the Plan.**

110.    The Plan and Plan Supplement (as such may be amended by the Confirmation Order or in accordance with the Plan) and each of their provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the

Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to in such papers), and the execution, delivery, and performance thereof by the Reorganized Debtors, are authorized and approved as finalized, executed, and delivered. Without further order or authorization of the Bankruptcy Court, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan. As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby.

111.    The terms of the Plan, the Plan Supplement, and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order. The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date of the Plan.

### E.    **Plan Classification Controlling.**

112.    The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on the Plan: (a) were set forth on the Ballots solely for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of such Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the

actual classification of such Claim or Interest under the Plan for distribution purposes; and

(d) shall not be binding on the Debtors and Reorganized Debtors except for voting purposes.

## F. Compromise and Settlement.

113.    On or after the Effective Date, the Reorganized Debtors are authorized and directed to make all distributions on account of the CII Settlement Claim.  The Debtors may compromise and settle Claims against them and Causes of Action against other Entities in accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court.

## G. The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.

114.    The following releases, injunctions, exculpations, and related provisions set forth in Article X of the Plan are hereby approved and authorized in their entirety:

### 1. Releases by the Debtors.

**On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including:  (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the obligations of the Holders of Claims party to Plan Support Agreements to provide the support necessary for the Effective Date of the Plan; and (3) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "Debtor Releasees" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or**

Entity other than a Releasing Party from any causes of action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

2.     **Third Party Releases.**

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, and provided further that the foregoing "Third Party Release" shall not impair the rights (a) to which an Allowed Unimpaired Claim entitles the Holder of such Allowed Unimpaired Claim or (b) of a Holder of a General Unsecured Claim as to any General Unsecured Claim. Notwithstanding anything in the Plan to the contrary, the Releasing Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or

K&E 14897490.18

any of its agencies or any state and local authority against the Released Parties. This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

### 3. Injunction.

**From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.**

### 4. Exculpation.

**The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.**

## H. <u>Release of Liens.</u>

115. Except as otherwise provided in the Plan (including as to reinstated debt) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

K&E 14897490.18

## I.    Maintenance of Causes of Action.

116.    The provisions of Article VI.S of the Plan are hereby approved in their entirety. Subject to the releases set forth in Article X.D and Article X.E of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

117.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

## J.    Post-Confirmation Notices, Professional Compensation, and Bar Dates.

### 1.    Notice of Entry of the Confirmation Order.

118.    In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order

expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty (20) days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

119.    The Notice of Confirmation shall have the effect of an order of the Bankruptcy Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and recording officers, and shall be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law.

### 2.    Professional Compensation.

120.    All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than 45 days after the Effective Date.   After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

121.    On the Effective Date, the Reorganized Debtors (other than Reorganized CII) shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.   The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.   Such funds shall not be considered property of the Reorganized Debtors.   The remaining amount of Professional Compensation and

Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than Reorganized CII) from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order. When all Claims by Professional have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors (other than Reorganized CII).

122. To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors (other than CII). If a Professional does not provide an estimate, the Reorganized Debtors (other than Reorganized CII) may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional. The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

123. Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional or other fees and expenses incurred by that Reorganized Debtor after the Effective Date pursuant to the Plan. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

K&E 14897490.18

124.     Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise  required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

125.     Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date; provided, however, that the foregoing fees and expenses authorized under Article XI.A.7 of the Plan will not be paid if they relate to or arise from any post-trial motions or any other fees and expenses incurred after entry of the Confirmation Order, including (but not limited to) any appeal of the Confirmation Order.  Notwithstanding the foregoing, to the extent any fees or expenses of the indenture trustees, the administrative agents, and the collateral trustees are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims), the indenture trustees, the administrative agents, and the collateral trustees may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts.  The contractual indemnification obligations of the Debtors (other than CII) to these Professionals shall be reinstated as unsecured obligations of the Reorganized Debtors (other than Reorganized CII).  All disputes related to the fees and expenses of the indenture trustees, administrative agents, and

collateral trustees (and their counsel, agents, and advisors) shall be subject to the jurisdiction of and decided by the Bankruptcy Court. Notwithstanding anything to the contrary herein, Article XI.A.7 of the Plan will not apply to Claims rendered Unimpaired by the Plan.

126. The Debtors (other than CII) shall promptly pay the unpaid, reasonable, documented out-of-pocket fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC, the legal and financial advisors engaged by the Crossover Committee, without Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., or UBS Securities LLC having to file fee applications to receive payment for such fees and expenses.

127. The Debtors (other than CII) shall pay the unpaid, reasonable, documented out-of-pocket fees and expenses incurred by the members of the Crossover Committee in connection with the negotiation of the Plan, as well as their due diligence review and the approval and consummation of the transactions contemplated by the Plan, without such members of the Crossover Committee having to file fee applications to receive payment for such fees and expenses.

128. The Debtors (other than CII) shall pay the unpaid reasonable, documented out-of-pocket fees incurred by the members of the Creditors' Committee.

### 3. Other Administrative Expense Claims.

129. All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable. The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed

K&E 14897490.18

amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

## K. **Exemption from Securities Laws.**

130. The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 (as amended, and including the rules and regulations promulgated thereunder) and applicable state securities laws, and no other non-bankruptcy law applies to the solicitation.

131. Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan (including any Securities issued or issuable pursuant to the terms of the Warrants or any other Securities distributed pursuant to the Plan) and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan (including any Securities issued or issuable pursuant to the terms of the Warrants or any other Securities contemplated by the Plan) and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and (b) applicable regulatory approval.

132. Notwithstanding the foregoing, (a) shares of New Class A Stock issued to Eligible CCH I Notes Claim Holders pursuant to the Rights Offering, (b) New CCH II Notes issued to Rollover Commitment Parties, and (c) Securities issued to CII Settlement Claim Parties in connection with the CII Settlement shall be issued pursuant to the exemption provided under

section 4(2) of the Securities Act. The holders of such equity and debt securities and certain other affiliates of the Reorganized Company shall receive registration rights as set forth in the Equity Registration Rights Agreement and the Debt Registration Rights Agreement, respectively.

**L.** **Exemptions from Taxation.**

133. Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate federal, state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**M.** **Retention of Jurisdiction.**

134. Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising

K&E 14897490.18

out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of

the Bankruptcy Code, including jurisdiction to:

bb. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

cc. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

dd. Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

ee. Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

ff. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

gg. Adjudicate, decide or resolve any and all matters related to Causes of Action;

hh. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

ii. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

jj. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

kk. Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

ll. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

mm. Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such

orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

nn. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

oo. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

pp. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

qq. Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

rr. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

ss. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

tt. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

uu. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

vv. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

ww. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

xx. Hear and determine all disputes arising from or relating to the causes of action raised in, could have been raised in, or derived from the Adversary Proceeding;

yy. Enforce all orders previously entered by the Bankruptcy Court; and

zz. Hear any other matter not inconsistent with the Bankruptcy Code.

## N. **References to Plan Provisions.**

135. The failure specifically to include or to refer to any particular article, section, or

provision of the Plan, Plan Supplement, or any related document in the Confirmation Order shall

K&E 14897490.18

not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed in their entirety.

**O.**      **Treatment of Executory Contracts.**

136.      The Executory Contract provisions of Article VIII of the Plan shall be, and hereby are, approved in their entirety.

**P.**      **Procedures for Resolving Claims and Disputes.**

137.      The Claims resolution procedures contained in Article VIII of the Plan shall be, and hereby are, approved in their entirety.

**Q.**      **Provisions Governing Distributions.**

138.      The distribution provisions of Article IX of the Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Plan, the Reorganized Debtors shall make all distributions required under the Plan.

**R.**      **Reinstatement of Certain Credit Facilities and Indentures.**

139.      Except to the extent that a Holder of an Allowed Claim against the applicable Debtors and the applicable Debtors agree to less favorable treatment to such Holder, each Allowed Claim against the Debtors for each of the credit facilities and indentures listed below (the "Senior Debt") shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code:

| Senior Debt | Principal Amount Outstanding |
|---|---:|
| First Lien Credit Facility | |
|    Term Loan Facility maturing 2014 | $6.9 billion |
|    Revolving Credit Facility maturing 2013[8] | $1.3 billion |
| 8.00% senior second lien notes due 2012 | $1.1 billion |
| 8⅜% senior second lien notes due 2014 | $770 million |
| 10.875% senior second lien notes due 2014 | $546 million |
| Junior Credit Facility maturing 2014 | $350 million |
| 8¾% senior notes due 2013 | $800 million |
| **Total** | **$11.8 billion** |

## S.    New Common Stock, Preferred Stock, and Warrants and New CCH II Notes.

140.    In accordance with the terms of Article VI.B of the Plan, the Reorganized Debtors shall issue, deliver or execute, as the case may be, all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, including, without limitation, the New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants, and New CCH II Notes each of which shall be distributed as provided in the Plan.  Upon issuance, (a) all shares of New Class A Stock, New Class B Stock, New Preferred Stock and any such securities delivered upon the exercise of the Warrants and upon the exchange of equity interests in Reorganized Holdco under the Reorganized Holdco Exchange Agreement are deemed validly issued, fully paid, and non-assessable, and (b) all of the New CCH II Notes shall be deemed duly authorized and validly issued in exchange for CCH I Notes and CCH II Notes.

---

[8]    Excluding letter of credit obligations, which do not need to be collateralized with cash.

K&E 14897490.18

**T.    CII Settlement Claim.**

141.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, on the Effective Date, the following consideration shall be transferred by the Debtors (other than CII) to Mr. Allen (or his designees which, in the case of New Class B Stock, shall be limited to Authorized Class B Holders) on account of the CII Settlement Claim:  (a) shares of New Class B Stock representing, as of the Effective Date, (i) 2% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan, and (ii) 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of Reorganized CCI; (b) the CII Settlement Claim Warrants; (c) $85 million principal amount of New CCH II Notes, which shall be refinancing indebtedness of the CCH I Notes and deemed transferred from Holders of CCH I Notes Claims automatically and without further action by any party; (d) Cash in the amount of $25 million on account of the Allen Management Receivable; (e) $150 million in Cash; and (f) Cash of up to $20 million on account of the Allen Fee Reimbursement under the terms set forth in the Plan.  In addition, on the Effective Date, CII shall retain a 1% direct equity interest in Reorganized Holdco, including the right to exchange such interest into New Class A Stock representing 1% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan, pursuant to the Reorganized Holdco Exchange Agreement, and Mr. Allen shall retain all of the Interests in Reorganized CII.  Furthermore, on the Effective Date, the 7,282,183 CC VIII Preferred Units held by the CII shall be deemed transferred, automatically and without further action by any party, to Reorganized CCI.  CCH I Claims and CIH Claims held by CII shall be treated identically to similar Claims held by Persons other than CII.

K&E 14897490.18

## U.    Retention of Partnership Structure in Form of Reorganized Holdco.

142.    The Holdco LLC Agreement shall be in effect and govern Holdco for the period up to and including the Effective Date.  At the Effective Date, the Holdco LLC Agreement shall be amended and restated and the Reorganized Holdco LLC Agreement shall be in effect as of the day immediately following the Effective Date for federal, state, local and foreign income tax purposes.  Reorganized Holdco shall effect a "closing of the books" as of the Effective Date, and the provisions of the Holdco LLC Agreement, taking into account each member's Percentage Interest (as defined in the Holdco LLC Agreement) immediately before the transactions contemplated by this Plan, shall govern with respect to allocations of items of income, gain, loss, credit and deduction for the period up to and including the Effective Date, including any items of income, gain, loss, credit and deduction arising on the Effective Date and/or arising as a result of the transactions effective as of the Effective Date as contemplated by this Plan.  Reorganized Holdco shall not make the election under section 108(i) of the U.S. Internal Revenue Code of 1986, as amended (or any similar election under state or local law), with respect to any cancellation of indebtedness income relating to the consummation of the Plan.  Notwithstanding anything to the contrary in the Reorganized Holdco LLC Agreement, in the event of any dispute, challenge, audit or examination of Holdco's tax affairs for any period prior to or including the Effective Date, the consent of Mr. Allen shall be required to settle any such dispute and Mr. Allen and CII shall be entitled to participate alongside Reorganized CCI in any such examinations, judicial determinations, and administrative proceedings, with respect to any portion of the dispute relating to the period prior to and including the Effective Date.

## V.    Management Incentive Plan and VCP.

143.    The Reorganized Company shall be deemed to have adopted the Management Incentive Plan and VCP on the Effective Date.

**W.     Other Essential Documents and Agreements.**

144.    The Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of the Reorganized Company, the Reorganized Holdco LLC Agreement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants and the transactions contemplated by each of the foregoing are approved in their entirety and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, the Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of the Reorganized Company, the Reorganized Holdco LLC Agreement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of the Bankruptcy Court, or other act or action under applicable law, regulation, order or rule.  The Debtors, and after the Effective Date, the Reorganized Debtors, are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, securities and certificates relating to such agreements and perform their obligations thereunder, including, without limitation, pay all fees due thereunder or in connection therewith.

145.    On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and

K&E 14897490.18

all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## X.    Return of Deposits.

146.    All utilities, including any Person who received a deposit or other form of adequate assurance of performance pursuant to section 366 of the Bankruptcy Code during these Chapter 11 Cases (collectively, the "Deposits"), including, without limitation, gas, electric, telephone, trash and sewer services, shall return such Deposits to the Debtors and/or the Reorganized Debtors, as applicable, either by setoff against postpetition indebtedness or by cash refund, within 45 days following the Effective Date and as of the Effective Date, such utilities are not entitled to make requests for or receive Deposits.

## Y.    Governing Law.

147.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

K&E 14897490.18

## Z.    Effectiveness of All Actions.

148.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, members, or stockholders of Reorganized Debtors or the other Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members, or stockholders.

## AA.    Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.

149.    Pursuant to section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law and any comparable provision of the business corporation laws of any other state, each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions and to perform such acts as may be necessary, desirable or appropriate to comply with or implement the Plan, the Plan Supplement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Holdco LLC Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants, any other Plan documents, including the election or appointment, as the case may be, of directors and officers of the Reorganized Company as contemplated in the Plan, and all documents, instruments, securities and agreements related thereto and all annexes, exhibits, and schedules appended thereto, and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms without the need for any stockholder or board of directors' approval. Each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions, to perform all acts, to make, execute, and deliver all instruments and documents,

and to pay all fees and expenses as set forth in the documents relating to the Plan and including without limitation, Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Holdco LLC Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants, and that may be required or necessary for its performance thereunder without the need for any stockholder or board of directors' approval. On the Effective Date, the appropriate officers of the Reorganized Company and members of the Board of Directors of the Reorganized Company are authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors. Subject to the terms of this Confirmation Order, each of the Debtors, the Reorganized Debtors, and the officers and directors thereof are authorized to take any such actions without further corporate action or action of the directors or stockholders of the Debtors or the Reorganized Debtors. On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

150. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and

K&E 14897490.18

any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**BB.    Modifications or Amendments.**

151.    Except as otherwise specifically provided in the Plan, and subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII.A of the Plan.  Entry of the Confirmation Order means that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127 of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**CC.    Ownership and Control.**

152.    The Consummation of the Plan shall not constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement, including, but not limited to, any credit agreement, indenture or other evidence of indebtedness, employment, severance, or termination, or insurance agreements, in effect on the Effective Date and to which either of the Debtors is a party or under any applicable law of any applicable

K&E 14897490.18

governmental unit, other than a change of control for purposes of section 382 of the U.S. Internal Revenue Code of 1986, as amended, on the Effective Date. Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to selectively waive this provision of the Plan.

**DD.**     **<u>Effect of Conflict Between Plan and Confirmation Order.</u>**

153.     If there is any direct conflict between the terms of the Plan or the Plan Supplement and the terms of the Confirmation Order, the terms of the Confirmation Order shall control.

**EE.**     **<u>Immediate Binding Effect.</u>**

154.     Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests accepted or rejected or are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

**FF.**     **<u>Payment of Statutory Fees.</u>**

155.     All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**GG. Reservation of Rights.**

156.    Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**HH. Injunctions and Automatic Stay.**

157.    Unless otherwise provided in the Plan or herein, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105, 362, or 525 of the Bankruptcy Code or otherwise, or any order of the Court, and extant on the date of this Confirmation Order (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or herein shall remain in full force and effect in accordance with their terms. This Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, Interests, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, or liabilities released pursuant to the Plan.

**II. Nonseverability of Plan Provisions upon Confirmation.**

158.    Each term and provision of the Plan, as it heretofore may have been altered or interpreted by the Bankruptcy Court is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) nonseverable and mutually dependent.

K&E 14897490.18

**JJ.** **Waiver or Estoppel.**

159.     Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

**KK.** **Authorization to Consummate.**

160.     The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article XII.B of the Plan.

**LL.** **Compliance with Other Laws.**

161.     No provision in the Plan or this Order relieves the Reorganized Debtors from their obligations to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission (the "FCC").   No transfer of control to the Reorganized Debtors of any federal license or authorization issued by the FCC shall take place prior to the issuance of FCC regulatory approval for such transfer of control pursuant to applicable FCC regulations.   The FCC's rights and powers to take any action pursuant to its regulatory authority over the transfer of control to the Reorganized Debtors, including, but not limited to, imposing any regulatory conditions on such transfer, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

**MM.    Resolution of Certain of JPMorgan Chase Bank, N.A.'s Objection.**

162.    Notwithstanding any language in the Plan to the contrary, this Confirmation Order shall not create rights of setoff in violation of section 2.15(d) the CCO Credit Facility.

163.    Notwithstanding any language in the Plan to the contrary, this Confirmation Order shall not alter the choice of law and choice of forum provisions contained in section 10.12 of the CCO Credit Facility.

164.    The Plan and this Confirmation Order shall not be deemed to alter any rights and obligations set forth in section 560 of the Bankruptcy Code.

**NN.    Resolution of Calyon New York Branch Objection.**

165.    On July 13, 2009, Calyon New York Branch ("Calyon") filed its Limited Objection of Calyon New York Branch to Confirmation of Debtors' Joint Plan of Reorganization (the "Calyon Objection") [Docket No. 569].  The Debtors and Calyon have resolved the Calyon Objection as follows: (a) Calyon is allowed a claim as a CCO Swap Agreements Claim (as defined in the Plan) in the amount of $22,754,646.00, plus amounts accrued since March 30, 2009, including interest, costs, expenses and fees; (b) Calyon is allowed a claim as a CCO Credit Facility Claim (as defined in the Plan) in the amount of $32,625,750.47, plus amounts accrued since April 30, 2009, including interest, costs, expenses and fees; and (c) Allowance of Calyon's claims does not prejudice any other claims or defenses Calyon may have against the Debtors.

**OO.    Resolution of Tax Claimants Objections.**

166.    Notwithstanding any language in the Plan to the contrary or any finding of fact contained hereunder that the terms of the Plan comply with the required provisions of the Bankruptcy Code, the rights of any Priority Tax Claimant and/or Administrative Tax Claimant (collectively, "Tax Claimant") under the Plan shall be as provided for under the Bankruptcy Code, or as subsequently agreed to by the Reorganized Debtors and any Tax Claimant in writing,

and the Plan shall not be interpreted or construed to impair or abrogate the rights of any Tax Claimant in any manner.

**PP.** **Resolution of Rembrandt Technologies, L.P. and Rembrandt Technologies, LLC Objection.**

167.    Notwithstanding any provision to the contrary in the Plan or otherwise, the multi-district litigation proceeding in the United States District Court for the District of Delaware commenced by Rembrandt Technologies, L.P. and Rembrandt Technologies, LLC against the Debtors CCI and CCO shall not be barred from resuming after the Effective Date of the Plan.

**QQ.** **Resolution of Verizon Communications Inc. Objection.**

168.    Prior to the Petition Date, Verizon Communications Inc.; Verizon Business Global LLC; Verizon Services Corp.; Verizon South Inc.; Verizon Virginia, Inc.; and MCI Communications Corporation (collectively, "Verizon") and certain of the Debtors were adversaries in three lawsuits related to certain patents filed in the Eastern District of Texas, the Eastern District of Virginia, and the Southern District of New York, in which Verizon claims that the Debtors infringed upon, beginning prior to the Petition Date and continuing unabated to the present date, certain patents held by Verizon (collectively, the "Verizon Patent Cases"); and Verizon has asserted contingent prepetition claims against the Debtors for damages (the "Verizon Prepetition Claims"), postpetition claims against the Debtors for damages related to alleged continued infringement on Verizon's patents (the "Verizon Postpetition Claims," and collectively, the "Verizon Claims"), and post-Effective Date claims against the Debtors for damages related to any continued infringement on Verizon's patents (the "Verizon Post Effective Date Claims").   The Verizon Claims shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code upon confirmation of the Plan.   The Verizon Post Effective Date Claims are not subject to the Plan and payments on

account thereof, if any, shall be made in the ordinary course of business.  In addition, certain of the Debtors brought (1) counterclaims against Verizon or certain of its entities in the Eastern District of Texas for declarations of non-infringement and invalidity of certain patents owned by Verizon or certain of its entities; (2) claims against Verizon or certain of its entities in the Eastern District of Virginia for infringement of certain patents owned by certain of the Debtors; and (3) claims against Verizon or certain of its entities in the Southern District of New York for declarations of non-infringement of certain patents owned by Verizon or certain of its entities (collectively, the "Debtor Patent Claims").  Verizon and the Debtors maintain and do not waive any rights regarding the prosecution or defense of the Verizon Claims, the Verizon Post Effective Date Claims, or the Debtor Patent Claims.

**RR.** **Resolution of HSBC Objection.**

169.    On July 10, 2009, HSBC Bank, USA, National Association ("HSBC") filed its Limited Objection of HSBC Bank USA, National Association, as Indenture Trustee to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Dated May 7, 2009 (the "HSBC Objection") [Docket No. 558].  The Debtors and HSBC have resolved the HSBC Objection as follows:  (a) HSBC, in its capacity as indenture trustee shall be paid default interest from May 15, 2009 until the date of actual payment as Post-Petition Interest pursuant to Article I.A.152(e) of the Plan; (b) HSBC's reasonable indenture trustee fees and expenses, as provided for under the governing indenture, shall be paid pursuant to Article XI.7 of the Plan; and (c) if HSBC and the Debtors cannot agree on the requisite cure amount to reinstate the CCOH Notes pursuant to Article IV.I.2 of the Plan, such disagreement will be determined by the Court, with notice and objection rights to applicable parties.

K&E 14897490.18

**SS.**   **Secured Tax Claims.**

170.    Interest on Secured Claims shall accrue from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such Claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date, or to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law.

**TT.**   **No Fractional Shares; No Fractional Notes.**

171.    No fractional shares of New Common Stock, New CCH II Notes, New Preferred Stock and Warrants ("New Securities") shall be issued or distributed under the Plan.   Each Person entitled to receive New Common Stock, New CCH II Notes, New Preferred Stock and Warrants shall receive the total number of whole shares of New Common Stock, New Preferred Stock or Warrants or their *pro rata* share in principal amount of New CCH II Notes, whichever is relevant, to which such Person is entitled.   New CCH II Notes shall be issued in increments of $1.00.   Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of New Securities, the actual distribution of such New Securities shall be rounded to the next higher or lower whole number as follows: (a) fractions one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number. Notwithstanding the foregoing, (a) if the Person is entitled to New Common Stock and rounding to the next lower whole number would result in such Person receiving zero shares of New Common Stock, New Preferred Stock or Warrants such Person shall receive one (1) share of New Common Stock, New Preferred Stock or Warrants, as applicable; and (b) if the Person is entitled to a *pro rata* share in principal amount of New CCH II Notes and rounding to the next lower whole number would result in such Person

receiving zero dollars worth of New CCH II Notes, such Person shall receive a New CCH II Note in the principal amount of $1.00 (One Dollar). If two or more Persons are entitled to fractional entitlements and the aggregate amount of New Securities that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole New Securities which remain to be allocated, the Disbursing Agent shall allocate the remaining whole New Securities to such holders by random lot or such other impartial method as the Disbursing Agent deems fair. Upon the allocation of all of the whole New Securities authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect. The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph. Distributions of New Securities on account of other securities shall be made to the record owner of such securities. For purposes of this paragraph, "Person" shall mean such record owner.

**UU.**     **Effect of Non-Occurrence of Conditions to the Effective Date.**

       172.     Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 180 days after Confirmation, or by such later date established by Bankruptcy Court order. If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section

1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

**VV.** **Adversary Proceeding.**

173.    For the reasons stated above to the extent relevant to the Adversary Proceeding, judgment for CCO and CCOH shall be entered in the Adversary Proceeding.

**WW.** **Final Confirmation Order.**

174.    This Confirmation Order is a final order and the period in which an appeal must be filed shall commence upon the entry hereof.

IT IS SO ORDERED.

Dated:  New York, New York
            _____, 2009

_____
UNITED STATES BANKRUPTCY JUDGE

## Exhibit A

**Debtors' Proposed Findings of Fact and
Conclusions of Law on Contested Issues**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CHARTER COMMUNICATIONS, INC., *et al.*,<br><div align=center>Debtors.</div> | Chapter 11<br><br>Case No. 09-11435 (JMP)<br>Jointly Administered |
| JPMORGAN CHASE BANK, N.A.,<br>as Administrative Agent,<br><div align=center>Plaintiff,</div><br>-against-<br><br>CHARTER COMMUNICATIONS<br>OPERATING, LLC and CCO HOLDINGS, LLC,<br><div align=center>Defendants.</div> | Adversary Proceeding<br>Case No. 09-01132 (JMP) |

<div align=center>

**DEBTORS' PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW ON CONTESTED ISSUES**

</div>

Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
601 Lexington Avenue
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
KIRKLAND & ELLIS LLP
655 15th Street NW
Washington, D.C.  20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

Counsel to the Debtors and Debtors in
Possession (except Charter Investment,
Inc.)

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:     (212) 594-5000
Facsimile:     (212) 967-4258

Counsel to Debtor and Debtor in
Possession Charter Investment, Inc.

# TABLE OF CONTENTS

Page

DEBTORS' PROPOSED FINDINGS OF FACT ON CONTESTED ISSUES .......................11

I.      WITNESSES CALLED AT TRIAL..............................................................11

II.     CHARTER BACKGROUND ....................................................................16

        A.      Charter's Corporate Structure ..............................................16

        B.      Charter's Management and Directors .....................................17

        C.      Charter's Business .............................................................19

III.    CHARTER'S RELATIONSHIP WITH JPMORGAN................................21

IV.     TERMS OF THE CREDIT AGREEMENT................................................23

        A.      The 2007 Credit Agreement ................................................23

        B.      The 2006 Credit Agreement Accordion Provision ..................26

        C.      Proposed Representation For Second Lien Notes....................26

V.      SECTION 8(G)(V) DOES NOT IMPOSE A PROSPECTIVE
        REQUIREMENT ....................................................................................26

        A.      A Prospective Construction Is Inconsistent With The Plain Language
                Of The Credit Agreement ...................................................26

        B.      JPMorgan and Lenders Cannot Articulate or Support Prospective
                Construction of Credit Agreement........................................28

        C.      A Prospective Construction Is Inconsistent With JPMorgan's And
                Lenders' Administration of Credit Agreement........................29

VI.     CHARTER WAS ABLE TO, AND IN FACT, PAID ALL OF ITS DEBTS
        AS THEY BECAME DUE ......................................................................30

        A.      Charter, CCO and All of the DHCs Paid Their Debts As They Became
                Due Before Filing for Bankruptcy........................................30

        B.      JPMorgan Concedes Charter Has Not Made Any Payment Defaults ...........30

        C.      JPMorgan Has Not Suffered Any Economic Loss ....................31

VII.    CHARTER'S REVOLVER DRAWS IN OCTOBER AND NOVEMBER
        2008.....................................................................................................31

i

A.  Charter Made Draws On Its Revolver In October and On November 5, 2008 Due To Concerns Re Bank Liquidity ..................32

B.  Charter Was Not Contingency Planning For Bankruptcy In October 2008 ..................33

C.  Changes To The Language In Charter's November 6, 10-Q Is Not An Admission That Charter Could Not Pay Its Debts As They Came Due ..................33

VIII.  CHARTER WAS ABLE TO PAY ITS NOVEMBER AND JANUARY INTEREST PAYMENTS THROUGH INTERCOMPANY ACCOUNTS ALONE ..................35

A.  Intercompany Notes And Payables ..................35

B.  JPMorgan And The Lenders Were Aware That Intercompany Loans Were Used to Provide Flexibility ..................36

C.  As Of November 5, 2008, CCH And CIH Were Able To Pay Their Debts Through March 27, 2009 With Intercompany Notes And Accounts ..................36

IX.  CCH I HAD ADEQUATE SURPLUS TO MAKE ITS $63 MILLION DIVIDEND TO CIH ON NOVEMBER 17, 2008 ..................37

A.  Charter's July Long Range Plan ..................37

B.  The November Interest Payments ..................39

C.  November 14, 2008 Board Presentation ..................39

i.  Duff & Phelps's valuation of charter as of October 1, 2008 ..................40

ii.  Management's use of the Duff & Phelps valuation in its surplus calculation ..................42

iii.  Charter management's sensitivity analysis ..................43

iv.  Precedent transactions further supported a finding of surplus at CCH I ..................44

v.  Private market multiples were a better indication of value ..................45

D.  The Charter Board Properly Determined that CCH I Had More Than Sufficient Surplus ..................46

E.  Contemporaneous Valuations of Charter Also Indicated Surplus At CCH I ..................47

F.     Valuation Experts ..................................................................48

      *i.*     *Den Uyl's DCF analysis* ........................................48

      *ii.*     *Den Uyl's other analyses* ....................................49

      *iii.*     *JPMorgan expert's methodology is flawed* ............50

G.     Vulcan's Later-Performed Analyses Do Not Support JPMorgan's Argument ..................................................................51

      *i.*     *Vulcan business plan analysis* ...............................51

      *ii.*     *Miller Buckfire analysis used for negotiations* .........53

X.     **CHARTER PROPERLY MADE ITS JANUARY INTEREST PAYMENTS** ...........53

A.     The January 14 Board Meeting ..........................................53

B.     Charter Could Have Made the Interest Payment .............................54

C.     Charter Made The January Interest Payments Within The Grace Period ..................................................................56

D.     Taking Advantage Of The Grace Period Was Not A Default .................57

E.     Making The Interest Payment Was The Right Decision ....................57

F.     KPMG's Going Concern Opinion Was Based Mostly On Charter's Declared Intent To File For Bankruptcy ..................................58

XI.     **CHARTER HAD OTHER OPTIONS FOR ADDRESSING NOVEMBER 2008 AND JANUARY 2009 INTEREST PAYMENTS** ..................................59

A.     Mr. Hooker Testified That Charter Had The Ability To Resolve Future Debts ..................................................................59

B.     Charter Has A History Of Extending Maturities ...........................59

C.     Banks Including JPMorgan Were Pitching To Charter In November And December 2008 ..................................................................59

      *i.*     *JPMorgan pitches* ................................................59

      *ii.*     *Deutsche Bank pitches* .........................................60

      *iii.*     *Citibank pitches* .................................................61

      *iv.*     *Credit Suisse First Boston pitches* ..........................62

D.       **Charter Had Other Options Beyond Traditional Financing Transactions** .................................................................................62

E.       **Charter's Lenders Agree It Is Impossible To Predict The Future**.................62

XII.    **JPMORGAN CLAIM OF A SECTION 8(G)(V) DEFAULT IS A NEGOTIATING TACTIC** ..........................................................................63

XIII.   **CHANGE OF CONTROL** ....................................................................................69

A.       **Paul Allen Will Maintain 35% Voting Power In Compliance With Section 8(k)(i) Of The 2007 Credit Agreement** ...................................69

       *i.       Paul Allen has more than 35% of the voting power of CCI* ...................70

       *ii.      CCI is the "Management of the Borrower" under the 2007 Credit Agreement* ........................................................................70

       *iii.     The 2007 Credit Agreement does not contain economic interest or "economic control" requirements* ........................................72

B.       **Apollo, Oaktree, Crestview, and Franklin will not control Charter's Board** ...........................................................................................73

C.       **Paul Allen will have more voting power than any other "person" or 13(d) "group" in Compliance with Section 8(k)(ii) of the Credit Agreement and the Indentures** .................................................75

       *i.       No person or 13(d) group will have more voting power pre-confirmation* .................................................................76

       *ii.      No person or entity will have more than Paul Allen post-confirmation and upon the effective date of the plan* ...........................80

              a.      There is no evidence whatsoever that Franklin is or will be part of any 13(d) group ...................................................80

              b.      The trial evidence does not prove that Apollo, Crestview and Oaktree are a 13(d) group .......................................81

D.       **Even If A Prohibited Group Formed, The Savings Clause Would Reduce Its Power To 34.9%** .................................................................84

XIV.   **CROSS ACCELERATION** ..................................................................................85

XV.    **BENEFITS TO JPMORGAN OF A REORGANIZED CHARTER** ........................86

XVI.   **DEVELOPMENT OF THE PLAN OF REORGANIZATION, INCLUDING THE CII SETTLEMENT** .....................................................................87

**A.** **Charter Initiates Restructuring Discussions and Begins Contingency Bankruptcy Planning** ........................................................................87

    *i.*     *Charter begins contingency bankruptcy planning in December 2008* ........................................................................87

    *ii.*     *Charter develops primary goals for a restructuring without interference from Mr. Allen* ........................................................87

    *iii.*     *Lazard identifies Mr. Allen's voluntary participation as essential to its efforts to maximize value* ..................................89

    *iv.*     *Based on its advisors input, Charter believes it was, and is, necessary to compensate Mr. Allen for his voluntary participation in the restructuring* ..........................................90

    *v.*     *Charter issues a press release announcing its interest in negotiating a restructuring and encourages the fulcrum securities to organize* ........................................................91

    *vi.*     *Charter, the Crossover Committee and Mr. Allen retain separate advisors* ........................................................................91

    *vii.*     *Charter and the Allen Group assemble their negotiating teams* ..............92

        a.     Lazard and Kirkland report to a core set of Charter management ........................................................................92

        b.     Miller Buckfire and Skadden report to Lance Conn who was Mr. Allen's agent for negotiating the CII Settlement ............92

    *viii.*     *Lazard has initial discussions on why Charter wanted to restructure in December 2009* ........................................93

**B.** **The Negotiations for the Plan, Including CII Settlement, Were Fair** ............93

    *i.*     *Charter's management and its advisors developed an initial deal structure* ........................................................................93

    *ii.*     *Charter's advisors treated Mr. Allen and Vulcan like any other stakeholder* ........................................................................94

    *iii.*     *Charter, the Crossover Committee and Vulcan engaged in round-the-clock, contentious, three-sided negotiations to reach the term sheet agreement and CII Settlement* ..........................................94

        a.     The February 4 Meeting ................................................95

        b.     The Allen Group did not threaten to "fire the board" ....................95

c.      Through CII, Mr. Allen has a long-standing right to exchange his interests in Holdco for CCI common stock..............96

d.      CII sends an exchange notice to Charter on February 5 ...............96

e.      Charter's response to the February 5 exchange notice shows that Charter did not place Mr. Allen's interests ahead of its constituents ........................................................97

f.      Differences among members of the Crossover Committee complicated the negotiations.........................................98

g.      Threatening a potential liquidation would not have maximized value ...........................................................98

h.      The final push for a term sheet agreement on February 10-11, 2009..............................................................99

iv.      *Charter's informed and engaged board of directors oversaw the restructuring negotiations and plan development* ..................100

v.      *To address any potential conflicts, all of Charter's independent directors reviewed and assessed the Paul Allen negotiations and settlement separate from the Vulcan directors*........................101

a.      Charter's independent directors had a history of meeting separately from the Vulcan directors ...........................102

b.      Charter used a special committee for a litigation with Mr. Allen...............................................................102

c.      The independent directors considered the reorganization too important for only a subset of them to consider the issue....................................................................102

vi.      *Lazard, Kirkland and Charter management recommend the term sheet to Charter's board*.........................................103

a.      No fairness opinion ...................................................103

vii.      *The Charter board, including all of the independent directors, vote to approve the term sheet, including the CII Settlement*...............104

viii.      *The new shareholders of Charter, pending confirmation of the Plan, approve the term sheet overwhelmingly* ........................104

C.      **The Terms of CII Settlement Are Substantively Fair From Charter's Perspective** .......................................................105

i.     *The CII Settlement facilitates reinstatement of senior bank debt, which saves Charter hundreds of millions of dollars, if not billions* ..................................................................................................105

ii.    *The CII Settlement enables Charter to preserve tax attributes worth over $1.14 billion* ...............................................................106

iii.   *The CII Settlement enables a significant post-restructuring step-up in tax basis* .........................................................................107

iv.    *Through the CII Settlement, Charter acquires the remaining 30% interest in Debtor CCVIII for $150 million* ................................107

v.     *The CII Settlement resolves the management agreement obligation* ...........................................................................................108

vi.    *The CII Settlement enables the $1.6 billion Rights Offering* ..............108

vii.   *The CII Settlement avoids a free-fall bankruptcy* ................................108

viii.  *Remaining benefits for Charter from the CII Settlement* ....................109

ix.    *At most, Mr. Allen is receiving $375 millions of dollars in benefit* .......109

       a.     Mr. Allen's continued participation ............................................109

       b.     CCVIII Interest .........................................................................110

       c.     Mr. Allen is receiving the same treatment as other creditors for his CCO receivable and CCH I note claims .........................111

       d.     Advisor fees ..............................................................................111

x.     *Any weighing of the relative "gives" and "gets" confirms the CII settlement is objectively fair* ................................................................112

D.     **The Terms Of The CII Settlement Are Substantively Fair From CII's Perspective** ..........................................................................................113

E.     **The terms of the CII settlement are on the low end of fair from Mr. Allen's perspective** ...................................................................................113

i.     *Mr. Allen is receiving considerably less for his continued participation in Charter than he received for a similar tax arrangement with DreamWorks* .................................................................113

ii.    *Mr. Allen's continued participation is not without costs* ......................113

|     |      | iii. | Mr. Allen is not receiving significant tax mitigation in addition to the consideration described in the Disclosure Statement ....................114 |

|     | F. | Mr. Allen Did Not Have Any Inappropriate Influence In The Development Of The Plan, The Settlement Or The Negotiation Process .........................................................................................114 |

|     | G. | The Plan Has Been Proposed In Good Faith ........................115 |

XVII. THE CCI NOTEHOLDERS ARE RECEIVING A SIGNIFICANT RECOVERY ...............................................................................115

|     | A. | The CCI Noteholders' Ability To Secure A Recovery ................115 |

|     | B. | The CCI Noteholders Were On Notice Of Their Position In Charter's Capital Structure When They Purchased The Notes ...................116 |

|     | C. | Charter Negotiated A Recovery For The CCI Noteholders Greater Than The Existing Intercompany Receivable With CCO ............116 |

XVIII. THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS ...................................................................117

|     | A. | Unimpaired Classes And Voting Results ...........................117 |

|     | B. | Charter's Liquidation Analysis Is Reasonable ....................117 |

|     | C. | The CCI Noteholders' Increased Recovery Removes Any Doubt That The Plan Is In The Best Interest Of Creditors ....................118 |

|     | D. | The CCI Noteholders' Assumptions And Methodology In Mr. McDonough's Liquidation And Valuation Analyses Are Flawed ................119 |

|     |      | i. | Flaws and deficiencies in Mr. McDonough's liquidation analysis ......119 |

|     |      | ii. | Flaws and deficiencies in Mr. McDonough's valuation analysis .........120 |

|     | E. | The CCI Noteholders' Remaining Objections Are Unfounded ....................121 |

|     |      | i. | Lazard's value of the New Preferred Stock is accurate .........................121 |

|     |      | ii. | No material preference recovery exists ..................................................122 |

|     |      |      | a. | A distressed buyer will likely not pursue preferences, especially preferences against insiders ........................122 |

|     |      |      | b. | Even if that assumption is incorrect, the potential recovery for preferences is at most de minimus ...........................122 |

| | | | |
|---|---|---|---|
| | c. | Even if that assumption is incorrect, the potential recovery for non-insider preferences against insiders is at most *de minimus* | 125 |
| | ***iii.*** | **The 2008 Holdco debt repurchases are not fraudulent transfers** | 125 |
| | a. | Second quarter 2008 note repurchase | 125 |
| | b. | Mid-April 2008 note repurchase | 126 |
| | c. | October 2008 tender offer | 126 |
| | ***iv.*** | **The November and January interest payments are not fraudulent transfers** | 127 |
| | a. | Mr. McDonough performed no independent analysis of fraudulent transfers | 128 |
| | ***v.*** | ***The value of programming agreements*** | 128 |
| | ***vi.*** | ***Worthless stock options*** | 129 |
| | ***vii.*** | ***Fluctuation in intercompany receivables*** | 129 |
| | ***viii.*** | ***The CCVIII litigation recovery*** | 129 |
| | ***ix.*** | ***Intellectual property*** | 129 |
| **XIX.** | **THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE** | | 130 |
| | A. | **The Plan Complies With The Absolute Priority Rule** | 130 |
| | ***i.*** | ***The Plan does not deprive CCI of tax assets*** | 130 |
| | ***ii.*** | ***Mr. Allen is not recovering on account of his equity interest*** | 130 |
| | B. | **The Plan Does Not Unfairly Discriminate Or Gerrymander Against The CCI Noteholders; Separate Classification Is Proper** | 131 |
| | C. | **The Debtors' Valuation Is Appropriate** | 133 |
| | ***i.*** | ***Lazard followed its standard valuation methodology*** | 133 |
| | ***ii.*** | **Lazard's is the only valuation offered for its purpose** | 134 |
| | ***iii.*** | ***Lazard's valuation is for a different purpose and has different assumptions than Duff & Phelps's Valuation*** | 135 |

**XX.  THE PLAN PROPERLY CLASSIFIES CLAIMS** ......................................135

    **A.  The Plan's Classification Of Claims Follows The Debtors' Capital Structure** ......................................135

    **B.  The Evidence Does Not Support The CCI Noteholders' Objections Regarding Plan Classification** ..............................136

**XXI.  THE PLAN SATISFIES SECTION 1129(A)(10)** ...........................136

**XXII.  THE PLAN'S RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE APPROPRIATE** ..............................137

    **A.  The Debtors' Releases** ...........................................137

    **B.  Third Party Releases** ...........................................137

    **C.  Injunction** .....................................................138

    **D.  Exculpation** ...................................................139

**XXIII.  THE PLAN IS FEASIBLE** ...........................................139

**XXIV.  THE PLAN SATISFIES SECTION 1129(A)(5) OF THE BANKRUPTCY CODE** 141

**DEBTORS' PROPOSED CONCLUSIONS OF LAW ON CONTESTED ISSUES** ...........144

**I.  BURDEN OF PROOF** ....................................................144

**II.  PAROL EVIDENCE AND CONTRACT CONSTRUCTION** ..................145

**III.  RELEVANCE OF BANKRUPTCY CODE PROVISION DEFINING INSOLVENCY FOR MUNICIPALITIES** ..............................146

**IV.  BUSINESS JUDGMENT AND THE DECLARATION OF DIVIDENDS** .............147

**V.  THE ENFORCEABILITY OF ISPO FACTO DEFAULTS** .......................148

**VI.  PREREQUISITES FOR A GROUP UNDER § 13(D) OF THE EXCHANGE ACT** ..............................................149

**DEBTORS' PROPOSED FINDINGS OF FACT ON CONTESTED ISSUES**

## I. WITNESSES CALLED AT TRIAL

1. <u>Fred Bliss (by Deposition)</u>. Fred Bliss is a Managing Director at Duff & Phelps. Mr. Bliss was a Principal at Kane Reece. (9/1/09 Tr. 10:2-9 (Bliss).) Mr. Bliss specializes in asset appraisals requiring the identification and valuation of tangible and intangible assets of business properties. Mr. Bliss is experienced in the valuation of business enterprises and their equity interests. Over the last few years, Mr. Bliss has managed and conducted worldwide appraisal engagements for business assets totaling over $600 billion. (JPX 124 at D&P-CTR00012.)

2. <u>Lance Conn</u>. Lance Conn was Executive Vice President for Investment Management for Vulcan, Inc. and President of Vulcan Capital from June 2004 to May 2009. He managed Mr. Allen's portfolio, including Charter. (9/2/09 Tr. 11:9-24; 118:9-11 (Conn).) Mr. Conn has served on Charter Communication Inc.'s Board of Directors since 2004. (9/2/09 Tr. 12:18-20 (Conn).) Mr. Conn was Mr. Allen's agent for negotiating the CII settlement. (9/2/09 Tr. 19:4 (Conn).)

3. <u>Tom Degnan (by Declaration and Deposition)</u>. Tom Degnan is an officer of Charter Communications Inc., where he has worked since September 1999. His principal functions at Charter are director of its Tax Department and Corporate Treasurer. (Degnan Decl. ¶ 1.) Mr. Degnan has been involved in tax planning for Charter and its affiliated entities since at least January 2007 and is familiar with the tax position of Charter and Holdco and the tax aspects of the CII Settlement and the Plan. (Degnan Decl. ¶¶ 2, 5.)

4. <u>Bruce Den Uyl</u>. Bruce Den Uyl is a Managing Director and Co-Leader of the Financial Services Advisory Group at AlixPartners. (8/3/2009 Tr. 79:19-24 (Den Uyl).) Mr. Den Uyl was qualified by the Court in this proceeding as an expert in valuation and surplus analysis. (8/3/2009 Tr. 81:3-10 (Den Uyl).)

5. <u>Matthew Derdeyn (by Deposition)</u>. Matthew Derdeyn has worked at Charter since July 2008. He is currently Vice President of Corporate Finance. (09/01/09 Tr. 231:23-232:2 (Derdeyn).)

6. <u>Gregory Doody (Live, by Declaration and by Deposition)</u>. Mr. Doody is Charter's Chief Restructuring Officer and General Counsel. (8/17/09 Tr. 12:14-15 (Doody).) Prior to coming to work for Charter, Mr. Doody served as Executive Vice President, General Counsel and Secretary of Calpine Corporation from July 2006 through August 2008. Calpine Corporation filed for bankruptcy reorganization in December 2005. From July 2003 through July 2006, Mr. Doody held various positions at HealthSouth Corporation, including Executive Vice President, General Counsel and Secretary. (JPX 347 at 8.) He oversaw the legal activities of Health South, including negotiations with the Department of Justice, and provided legal support for the balance sheet and accounting restructuring the company undertook. (8/17/09 Tr. 13:1-12 (Doody).)

7.    Eric Federman (by Deposition).  Eric Federman is a Managing Director in the Media
      Telecom Group of Credit Suisse First Boston.  Mr. Federman is responsible for Credit
      Suisse First Boston's relationship with Charter on the investment banking side.  (8/18/09
      Tr. 12:23 (Dep. Tr. 11:17-14:2) (Federman).)

8.    Barry Folse (by Declaration and Live).  Barry Folse is a Managing Director in the
      Information Management Services Group at AlixPartners.  (7/30/09 Folse Decl. ¶ 1.)  Mr.
      Folse has been employed by AlixPartners since 2001 and has performed multiple
      engagements involving the assessment of preference payment claims and negotiation and
      collection of receivables.  (7/30/09 Folse Decl. ¶ 4.)  In this matter, Mr. Folse performed
      an analysis of potential preference claims against the vendors of CCI and Holdco, and an
      analysis of potential preferences to insiders of Charter.  (7/30/09 Folse Decl. ¶ 5.)

9.    Stephen Goldstein (by Declaration and Live).  Stephen Goldstein is a Managing Director
      in the Restructuring Group of Lazard.  (8/21/09 Goldstein Decl. ¶ 1.) Mr. Goldstein's
      work at Lazard has included preparing, and/or assisting various management teams in
      preparing valuations and hypothetical liquidation analyses.  (8/21/09 Goldstein Decl.
      ¶ 4.)  He was personally involved in facilitating negotiations with CII, Paul Allen and
      certain of his affiliates, and the Unofficial Cross-over Committee that led to the CII
      Settlement, preparation of and advising with respect to the Reorganized Debtors'
      Valuation attached as Exhibit D to the Debtors' Disclosure Statement, preparation of and
      advising with respect to certain aspects of the Liquidation Analysis attached as Exhibit E
      to the Debtors' Disclosure Statement, calculation of a fully diluted voting and beneficial
      ownership analysis for the Debtors post-restructuring, and structuring the New Preferred
      Stock proposed to be provided to the Holders of Allowed Class A-4 CCI Notes Claims
      under the Plan. (8/21/09 Goldstein Decl. ¶ 6.)

10.   Paul Gompers. Paul Gompers is a professor in the MBA program at Harvard Business
      School.   Professor  Gompers  testified  regarding  whether  the  proposed  plan  of
      restructuring would effect a change of control at Charter in an "economic" sense.
      (8/24/09 Tr. 263:19-24 (Gompers).)  Professor Gompers testified he was not offering an
      opinion on credibility of any witness (8/24/09 Tr. 232:2-6 (Gompers)) nor was he in a
      position to testify as to the thought processes of the bondholders in negotiating the plan
      and entering into these transactions.  (8/24/09  Tr. 283:19-284:1 (Gompers).)  Professor
      Gompers specifically disclaimed that he was not offering an opinion on whether there has
      been a default of 8(k), (8/24/09 Tr. 232:15-18, 270:8-10 (Gompers)) nor was he offering
      an opinion on whether Franklin, Apollo, Crestview and Oaktree constitute a 13(d) group.
      (8/24/09  Tr. 270:2-7 (Gompers).)

11.   Peter Hooker (by Deposition).  Peter Hooker is a Managing Director in JPMorgan's
      Syndicated and Leveraged Finance Group.  His group is responsible for originating,
      structuring, and distributing leverage loans and high yield securities.  Mr. Hooker was the
      primary JPMorgan contact person with Charter from 1999 through the end of 2008.
      (7/31/09 Tr. 31:2-16 (Hooker).)  There was nobody at JPMorgan who was more involved
      in working directly with Charter than Mr. Hooker.  (7/31/09 Tr. 31:22-32:1 (Hooker).)

12.   Kevin Howard (by Deposition).  Kevin Howard has been Vice President, Controller and Chief Accounting Officer of Charter since April 2006.  Prior to that he served as Vice President of Finance from April 2003 until April 2006 and as Director of Financial Reporting since joining Charter in April 2002.  Mr. Howard began his career at Arthur Anderson LLP in 1993 where he held a number of positions in the audit division prior to leaving in April 2002.  (JPX 347 at 8.)

13.   Rajive Johri. Rajive Johri is an independent Board member of Charter Communications, Inc.  He also serves on the Audit Committee of CCI.  Mr. Johri has been a Charter Board member and member of the Audit Committee since 2006. (8/31/09 Tr. 156:7-17 (Johri).) Mr. Johri joined Charter's Board after being approached by a search firm that specialized in the recruitment for technology/telecommunication companies that was in search of a board member for Charter. (8/31/09 Tr. 213:3-8 (Johri).)  Mr. Johri did not have any personal relationship with Paul Allen before he became a Board member. (8/31/09 Tr. 213:9-11 (Johri).)  Until 1999, Mr. Johri was an executive vice president at JPMorgan in their credit card business.  Mr. Johri then became President of First National Bank of Omaha. (8/31/09 Tr. 213:12-214:2 (Johri).)  Mr. Johri is currently a board member of ConAgra Foods and a member of ConAgra's audit and governance committees. (8/31/09 Tr. 214:3-8 (Johri).)

14.   Ann Kurinskas (by Deposition and Live).  Ann Kurinskas has spent nearly 30 years at JPM, with 20 years in Special Credits. (8/25/09 Tr. 6:4-6; 6:23-25 (Kurinskas).)  Ms. Kurinskas first became involved with Charter in 2003.  (8-25-09 Tr. 7:1-3 (Kurinskas).)

15.   Kenneth Liang.  Kenneth Liang is a Managing Director in the Distressed Debt Opportunities Group at Oaktree Capital Management where he has worked since the firm started in 1995.  Mr. Liang oversees the restructuring and the reorganization of different portfolio companies that Oaktree has invested in. (7/29/09 Tr. 161:14-162:8 (Liang).) Mr. Liang was not involved in the actual decision to invest in Charter, but has been involved in Charter on and off  through the time that the distressed group has held Charter. (7/29/09 Tr. 164:12-16 (Liang).)

16.   Jeffrey Marcus.  Jeffrey Marcus is a Managing Director at Crestview Partners where he has worked for five years.  Mr. Marcus heads the media and telecommunications practice at Crestview.   (7/29/09 Tr. 13:23-14:16 (Marcus).)  Mr. Marcus was involved in Crestview's initial decision to purchase Charter bonds in 2006.  (7/29/09 Tr. 16:4-9 (Marcus).)

17.   Edward McDonough.  Edward McDonough is a Managing Director at Alvarez & Marsal. (9/1/09 Tr. 64:24-25 (McDonough).)  He has testified approximately seventy times. (9/1/09 Tr. 148:12-14 (McDonough).)  Mr. McDonough is not an expert in the cable industry.   (09/01/09 Tr. 68:25-69:10 (McDonough).)  He has never valued a cable company, and did not do so in this case either.  (09/01/09 Tr. 149:3-7 (McDonough).) Mr. McDonough's analysis of liquidation recoveries in this matter is premised entirely on "potential recoveries." (09/01/09 Tr. 180:22-181:8 (McDonough).)

18.     David Merritt.  David Merritt has been a director of Charter since July 2003.  He is the chairman of the audit committee and also is a member of the compensation committee.  Mr. Merritt is also an independent member of the Board.  (7/22/09 Tr. 163:7-16 (Merritt).)  Mr. Merritt was with KPMG for 24 years, the last 14 as an audit partner.  He was the partner in charge of the Century City office in Los Angeles and the partner in charge of the national media and entertainment practice for approximately ten years.  (7/22/09 Tr. 209:20-210:19 (Merritt).) Mr. Merritt is also a director of the Calpine Corporation and Outdoor Network Holdings.  (7/22/09 Tr. 211:5-6 (Merritt).)

19.     James Millstein.  James Millstein is currently Chief Restructuring Officer of the United States Department of Treasury.  Prior to that Mr. Millstein was Managing Director and Global Co-head of the restructuring group at Lazard where he worked from 2000 to 2009.  (7/21/09 Tr. 29:12-30:2 (Millstein).)  Mr. Milstein was lead advisor on 60-75 restructurings during his time at Lazard.  (7/21/09 Tr. 30:3-5 (Millstein).)  He has advised Charter since fall 2002.  (7/21/09 Tr. 30:20-24 (Millstein).)  Mr. Milstein oversaw the Lazard valuation prepared in connection with the disclosure statement.  (7/21/09 Tr. 82:20-83:19 (Millstein).)

20.     Malcolm Morris (by Deposition). Malcolm Morris is a Managing Director in the Media Telecom Investment Banking group at Deutsche Bank.  (8/18/09 Tr. 75:12 (Dep. Tr. 8:5-18) (Morris).)

21.     Marc Nathanson (by Deposition).  Marc Nathanson is a former Board member of Charter.  He is a thirty year cable operator with forty years experience in the cable industry.  (9/1/09 Tr. 238:12-20 (Nathanson).)  Mr. Nathanson resigned from Charter to pursue political opportunities in the fall of 2008. (8/3/09 Tr. 74:21-75:8 (Schmitz).)

22.     Jose Ojea-Quintana (by Deposition).  Jose Ojea-Quintana is a banker at Citigroup.  He assumed responsibility for Charter in mid-2006.  (8/18/09 Tr. 13:24 (Dep. Tr. 10:5-13, 12:12-16) (Ojea-Quintana).)

23.     Michael Pace (by Deposition).  Michael Pace is a Senior Analyst in the Credit Research Group at JPMorgan.  He has followed Charter since he started at JPMorgan in approximately 2002.  Mr. Pace is familiar with Charter's capital structure. (8/18/09 Tr. 15:12 (Dep. Tr. 21:7-25:3, 27:10-14) (Pace).)

24.     Tina Ruyter (by Deposition).  Tina Ruyter is a Credit Risk Manager at JPMorgan.  Ms. Ruyter works in a team that covers technology, and media and telecom companies, from a credit risk management perspective. (7/31/09 Tr. 11:13-21 (Ruyter).)  Ms. Ruyter has a mainstay of twenty-five to thirty clients that she is responsible for understanding their business — the performance of the business against their plans, against their capital structure, and integrating that with JPMorgan's credit exposure to those clients.  (7/31/09 Tr. 11:22-12:3 (Ruyter).)

25.     Christopher Schepper (by Declaration).  Christopher Schepper is a Senior Managing Consultant at Kurtzman Carson Consultants LLC.  Mr. Schepper worked with the Debtors, their advisors and Financial Balloting Group to solicit votes to accept or reject

the Debtors' Plan of Reorganization and to tabulate the ballots of creditors voting to accept or reject the Plan.  (7/16/09 Schepper Aff. ¶¶ 1, 3.)

26. <u>Eloise Schmitz</u>.  Eloise Schmitz has been Charter's Executive Vice President and Chief Financial Officer since July 2008.  Ms. Schmitz has been employed in several management positions with Charter since July 1998, when she joined as Vice President, Finance & Acquisitions and Assistant Secretary.  Prior to joining Charter, Ms. Schmitz served as Vice President, Group Manager of the Franchise and Communications Group for Mercantile Bank, now US Bank from 1992 to 1998.  (JPX 347 at 7.)

27. <u>Neil Smit</u>.  Neil Smit has been Charter's President and Chief Executive Officer since August 2005.  Mr. Smit is a member of Charter's Board of Directors. (7/21/09 Tr. 187:8-11 (Smit).)  Mr. Smit is also a Board member of the National Cable Telephone Association, Cable Labs and CSPAN. (7/21/09 Tr. 187:12-14 (Smit).)  Before joining Charter, Mr. Smit was in charge of AOL's Access business, which is its subscription business, with about 20 million subscribers.  Prior to AOL, Mr. Smit was a regional president for Nabisco in Latin America.  Before that Mr. Smit was with Pillsbury in charge of Pillsbury Mexico and then Argentina. (7/21/09 Tr. 187:15-23 (Smit).)

28. <u>Jane Sullivan (by Declaration)</u>.  Jane Sullivan is Executive Director of Financial Balloting Group LLC.  She was engaged to assist the Debtors with the distribution of Solicitation Packages on, and the tabulation of ballots from, holders in the Securities Voting Classes in connection with the Debtors' Plan of Reorganization.  (7/13/09 Sullivan Aff. ¶ 1.)

29. <u>Carlyn Taylor</u>.  Carlyn Taylor of FTI was admitted as JPMorgan's expert in valuation and insolvency analysis, but not as an expert in the high yield credit markets, taxes or legal issues.  (8/31/2009 Tr. 18:11-20 (Taylor).)

30. <u>Christopher Temple (by Declaration and Deposition)</u>.  Christopher Temple is Executive Vice President of Vulcan Inc.  He is responsible for supervising the business of Charter Investment, Inc.  (7/16/09 Temple Decl. ¶ 1.)

31. <u>Christine Villaluz</u>.  Christine Villaluz is a Fixed Income Analyst at Franklin Advisors, Inc.  Ms. Villaluz focuses on the cable, satellite and wireline telecom sectors. As part of her work, she makes buy, sell and hold recommendations in the companies that she follows. (7/23/09 Tr. 10:1-17 (Villaluz).)

32. <u>Fred Zagar (by Deposition)</u>.  Fred Zagar works in Bank of America's Special Assets Group. (8/18/09 Tr. 13:24 (Dep. Tr. 17:9-19) (Zagar).)

33. <u>Eric Zinterhofer</u>.  Eric Zinterhofer is a Senior Partner in the Private Equity Group at Apollo Management.  He oversees media and telecommunications investing on behalf of the private equity fund.  (7/28/09 Tr. 26:14-25 (Zinterhofer).) Mr. Zinterhofer oversaw Apollo's investment in Charter.  (7/28/09 Tr. 27:24-28:2 (Zinterhofer).)

## II.    CHARTER BACKGROUND

### A.    Charter's Corporate Structure

34.    Charter Communications, Inc. ("CCI") is a holding company whose principal asset as of February 28, 2009 is its 54% equity interest (53% for accounting purposes) in Charter Communications Holding Company, LLC ("Holdco"). (CX 211 at 14.)

35.    CCI is the managing member of Holdco and the manager of its subsidiaries.  CCI's only business is to act as the managing member of Holdco and its subsidiaries.  (CX 211 at 14.)

36.    As the managing member of HoldCo, CCI controls the affairs of Holdco and its limited liability company subsidiaries.  (CX 211 at 14.)

37.    CCI owes fiduciary duties to the subsidiaries it manages.   (8/17/09 Tr. 39:16-21 (Doody).)

38.    In SEC filings, Charter is not uniformly used to mean "CCI."   (8/17/09 Tr. 40:9-12 (Doody).)

39.    Holdco is the direct parent and sole owner of CCHC, LLC ("CCHC").  (CX 211 at 16; CX 420 at 7.)

40.    CCHC is the direct parent and sole owner of Charter Communications Holdings, LLC ("CCH"). (CX 211 at 16; CX 420 at 7.)

41.    CCH is the direct parent of CCH I Holdings, LLC ("CIH"). (CX 211 at 16.)

42.    CIH is the direct parent of CCH I, LLC ("CCH I"). (CX 211 at 16.)

43.    CCH I is the direct parent of CCH II, LLC ("CCH II"). (CX 211 at 16.)

44.    CCH II is the direct parent of CCO Holdings, LLC ("CCOH"). (CX 211 at 16.)

45.    CCOH is the direct parent of Charter Communications Operating, LLC ("CCO"). (CX 211 at 16.)

46.    CCH, including its direct and indirect subsidiaries CIH, CCH I, CCH II, CCOH, and CCO, through the operating subsidiaries of CCO, operate Charter's business.  (CX 211 at 14.)

47.    Charter Communications Holdings Capital Corp. ("Charter Capital") is a wholly owned subsidiary of CCH. (CX 211 at 14.)

48.    Charter Capital was formed and exists solely as co-issuer of debt issued by its parent company, CCH.  (CX 211 at 15.)

49.    CCH I Holdings Capital Corp. is a wholly owned subsidiary of CIH. (CX 211 at 14.)

50. CCH I Holdings Capital Corp. was formed and exists solely as co-issuer of debt issued by its parent company, CIH. (CX 211 at 15.)

51. CCH I Capital Corp. is a wholly owned subsidiary of CCH I. (CX 211 at 14.)

52. CCH I Capital Corp. was formed and exists solely as co-issuer of debt issued by its parent company, CCH I. (CX 211 at 15.)

53. CCH II Capital Corp. is a wholly owned subsidiary of CCH II. (CX 211 at 14.)

54. CCH II Capital Corp. was formed and exists solely as co-issuer of debt issued by its parent company, CCH II. (CX 211 at 15.)

55. CCO Holdings Capital Corp. is a wholly owned subsidiary of CCOH. (CX 211 at 1.)

56. CCO Holdings Capital Corp. was formed and exists solely as co-issuer of debt issued by its parent company, CCOH. (CX 211 at 15.)

57. Charter Communications Operating Capital Corp. is a wholly owned subsidiary of CCO. (CX 211 at 14.)

58. Charter Communications Operating Capital Corp. was formed and exists solely as co-issuer of debt issued by its parent company, CCO. (CX 211 at 15.)

59. Paul Allen owns 100% of Charter Investment, Inc. ("CII") and controls CCI through a voting interest of approximately 91.1% as of February 28, 2009. (CX 211 at 15.)

60. Mr. Allen, through CII, holds approximately 46% of Holdco's membership units as of February 28, 2009. (CX 211 at 15.)

61. Mr. Allen, through CII, holds a note issued by CCHC exchangeable into Holdco membership units as of February 28, 2009. (CX 211 at 15.)

62. Mr. Allen indirectly owns, through CII, 30% of the Class A preferred membership interests of CC VIII, LLC ("CC VIII"), an indirect subsidiary of CCO. (CX 211 at 15.)

B.    **Charter's Management and Directors**

63. In addition to Mr. Smit, Ms. Schmitz, Mr. Doody and Mr. Howard, Charter's executive officers are Executive Vice President and Chief Operating Officer Michael Lovett, Executive Vice President and Chief Technology Officer Marwan Fawaz, Executive Vice President and Chief Marketing Officer Ted Schremp, President, East Operations Joshua Jamison and President, West Operations Steven Apodaca. (JPX 347 at 7-8.)

64. Charter's Board of Directors consists of nine members: Paul Allen, Lance Conn, Rajive Johri, Robert May, David Merritt, Jo Allen Patton, Neil Smit, John Tory and Larry Wangberg. (JPX 347 at 3.)

65.    Charter's Board of Directors has five independent directors:  Rajive Johri, Robert May, David Merritt, John Tory and Larry Wangberg.  (7/22/09 Tr. 117:14-18 (Smit).)

66.    Robert May was elected to Charter's Board of Directors in October 2004 and was Charter's Interim President and Chief Executive Officer from January until August 2005. Since March 2001, Mr. May has been a private investor and principal of RPM Systems, which provides strategic business consulting services.  Mr. May served as Chief Executive Officer and a director of Calpine Corporation, a power company, from December 2005 to August 2008. Calpine filed for Chapter 11 bankruptcy reorganization in December 2005.  He served on the Board of Directors of HealthSouth Corporation, a national provider of healthcare services, from October 2002 until October 2005, and was its Chairman from July 2004 until October 2005. Mr. May also served as HealthSouth Corporation's Interim Chief Executive Officer from March 2003 until May 2004, and as Interim President of its Outpatient and Diagnostic Division from August 2003 to January 2004. From March 1999 to March 2001, Mr. May served on the Board of Directors and was Chief Executive of PNV Inc., a national telecommunications company. Prior to his employment at PNV Inc., Mr. May was Chief Operating Officer and a member of the Board of Directors of Cablevision Systems Corporation from October 1996 to February 1998, and from 1973 to 1993 he held several senior executive positions with Federal Express Corporation, including President, Business Logistics Services. (JPX 347 at 4.)

67.    Mr. May has considerable governance experience, operating experience and restructuring experience.  (7/22/09 Tr. 166:25-167:7 (Merritt).)

68.    John H. Tory has been a director of Charter since December 2001. Mr. Tory served as the Chief Executive Officer of Rogers Cable Inc., Canada's largest broadband cable operator, from 1999 until 2003. From 1995 to 1999, Mr. Tory was President and Chief Executive Officer of Rogers Media Inc., a broadcasting and publishing company. Prior to joining Rogers, Mr. Tory was a Managing Partner and member of the executive committee at Tory Tory DesLauriers & Binnington, one of Canada's largest law firms. Mr. Tory serves on the Board of Directors of Rogers Telecommunications Limited and Cara Operations Limited and is Chairman of Cara Operations' Audit Committee. From March 2005 to October 2007, Mr. Tory served as, a Member of the Provincial Parliament and as Leader of Her Majesty's Loyal Opposition. (JPX 347 at 5.)

69.    Larry W. Wangberg has been a director of Charter since January 2002. Since July 2002, Mr. Wangberg has been an independent business consultant. From August 1997 to May 2004, Mr. Wangberg was a director of TechTV L.L.C., a cable television network then-controlled by Paul Allen. He also served as its Chairman and Chief Executive Officer from August 1997 through July 2002. Prior to joining TechTV L.L.C., Mr. Wangberg was Chairman and Chief Executive Officer of StarSight Telecast Inc., an interactive navigation and program guide company which later merged with Gemstar International, from 1994 to 1997. Mr. Wangberg was Chairman and Chief Executive Officer of Times Mirror Cable Television and Senior Vice President of its corporate parent, Times Mirror Co., from 1983 to 1994. (JPX 347 at 5.)

70.     Mr. Wangberg brings considerable cable experience to the Charter Board.  (7/22/09 Tr. 165:24-166:7 (Merritt).)

**C.     Charter's Business**

71.     Charter is a broadband communications company operating in the United States.  (CX 420 at 7.)

72.     Charter has three lines of products: telephone, internet and video.  Charter serves both residential customers as well as commercial business. (7/21/09 Tr. 188:6-13 (Smit).)

73.     Charter has approximately 16,500 employees. (7/21/09 Tr. 188:14-16 (Smit).)

74.     Charter's product mix is different today than from five years ago.  The telephone product has been rolled out much more widely and the other products have been upgraded. Charter offers many more HD channels on the video side, more basic channels, and advanced services.  The Internet speeds have been upgraded significantly and Charter is offering to a wider range of customers on the commercial side. (7/21/09 Tr. 188:17-24 (Smit).)

75.     Charter's triple play is a bundle of its telephone, internet and video products.  The triple play provides more savings to the customers who buy all three products.  The triple play offers customers convenience as well as a discounted offering for buying all three.  The triple play also reduces churn for Charter and thus provides Charter with a higher retention rate for these customers. (7/21/09 Tr. 188:25-189:13 (Smit).)

76.     Charter is organized into two divisions:  West and East.  Charter is then further organized into Key Market Areas. (7/21/09 Tr. 189:14-20 (Smit).)

77.     Charter operates in 27 states. (7/21/09 Tr. 189:21-23 (Smit).)

78.     CCI is the public parent company. (7/21/09 Tr. 190:3-7 (Smit).)

79.     CCI has a board of directors. (7/21/09 Tr. 190:8-9 (Smit).)

80.     CCI has a management team. (7/21/09 Tr. 190:10-11 (Smit).)

81.     Mr. Smit is the head of the CCI management team. (7/21/09 Tr. 190:12-14 (Smit).)

82.     The management of CCI is employed by CCI. (7/21/09 Tr. 190:15-17 (Smit).)

83.     CCO does not have a board of directors. (7/21/09 Tr. 190: 18-20 (Smit).)

84.     CCO is not a public company.  Mr. Smit does not believe that CCO has any warrants or options issued. (7/22/09 Tr. 147:8-12 (Smit).)

85.     Mr. Smit and his management team at CCI manage CCO. (7/21/09 Tr. 191:6-10 (Smit).)

86. The management of the borrower, CCO, as used in Section 8(k) of the Credit Agreement, is CCI. (7/21/09 Tr. 191:16-23 (Smit).)

87. CCO is an LLC. Within the LLC Agreement there is an operating agreement. The operating agreement calls for the management by CCI. And then there's a management agreement that dictates what services are provided and how those services are provided. (7/21/09 Tr. 190:24-191:5 (Smit).)

88. Under the terms of that Management Agreement CCO retains CCI to act as "Manager" of CCO. (CX 305 at 1.) By the Management Agreement, CCI "provide[s] its management services and functions" to CCO, such as financial and administrative services, financial reporting, and a variety of other tasks and functions for CCO. (CX 305 at 2-3.)

89. The Management Agreement provides that all payments made under the agreement are payable only at cost and does not provide for payment of interest on overdue payments. (CX 305 ¶ 3; see also 8/17/09 Tr. 94:14-195:17 (Doody).) The Management Agreement also states that "in connection with the determination and calculation of the Reimbursement Management Fee, the Manager (and CCHC, CCO Holdings and CII) shall not be entitled to make a profit or take a mark-up or premium in excess of the actual Expenses incurred, paid or accrued by the Manager (and CCHC, CCO Holdings or CII). (CX 305 at 4.)

90. CCOH does not have a board of directors. (7/21/09 Tr. 191:24-192:3 (Smit).)

91. CCOH is managed by CCI. (7/21/09 Tr. 192:4-9 (Smit).)

92. CCOH does not have any employees. (7/21/09 Tr. 192: 12-13 (Smit).)

93. Management of CCO does not flow directly down the corporate chain but instead goes from CCI around to CCO. (7/21/09 Tr. 192:23-193:1 (Smit).)

94. Charter entities are interrelated. For example, Holdco maintains programming contracts and those programming contracts are incorporated into the video services that CCO then provides to customers. (7/21/09 Tr. 193: 5-11 (Smit).)

95. When Mr. Smit joined Charter in 2005, Charter had fairly significant near-term debt walls or maturities that were coming due. The business did not have financial flexibility because of certain covenants and loans that were coming due in the business. (7/21/09 Tr. 193:12-24 (Smit).)

96. Since arriving at Charter, Mr. Smit instituted several major initiatives. First, he put in place a new management team. Second, he rationalized the portfolio of assets. Third, he launched a number of new products such as telephone and drove the growth of Charter's products via marketing capabilities. Fourth, he spent a significant amount of time building the infrastructure of the business. (7/21/09 Tr. 193:25-194:16 (Smit).)

97. Since Mr. Smit has been CEO, Charter "has performed quite well" and achieved notable growth and progress. (7/22/09 Tr. 174:8-20 (Merritt).)

98. Through the first three quarters of 2008, in light of the economy, Charter was "at or above" the targeted level on several metrics, including EBITDA. (7/22/09 Tr. 173:23-174:4 (Merritt).)

99. Charter finished 2008 "very strongly." Revenue was up noticeably from 2007 while slightly off budget; but Charter met or exceeded its budget on EBITDA, which was a "key metric" for the company. (7/22/09 Tr. 193:23-194:4 (Merritt).)

100. Given this performance, the Board believed it was in Charter's interest to maintain liquidity and stay viable so the company could continue to grow and the enterprise value could grow as well. (7/21/09 Tr. 174:9-175:2 (Merritt).)

101. Mr. Smit expects to be CEO upon emergence from bankruptcy. Mr. Smit does not expect any real changes to his management team. (7/21/09 Tr. 235:2-8 (Smit).)

102. If the plan is confirmed, Charter will be free cash flow positive on the day it emerges from Chapter 11. (8/25/09 Tr. 126:14-25 (Kurinskas).)

103. After the restructuring, Charter will have positive income against which to apply its NOLs. (8/17/09 Tr. 38:15-39:1 (Doody).)

## III. CHARTER'S RELATIONSHIP WITH JPMORGAN

104. The first iteration of Charter's credit agreement with JPMorgan was in 1999. (7/31/09 Tr. 60:2-3 (Schmitz).)

105. The 1999 credit agreement has been amended and restated five or six times since 1999, including in 2004 and 2006. (7/31/09 Tr. 60:4-6 (Schmitz); 33:8-19 (Hooker).)

106. In Spring 2003, Charter did a major amendment and restatement of the CCO credit agreement which substantially enhanced Charter's financial flexibility by permitting a corporate reorganization that allowed for the development of intermediate holding companies. (7/1/09 Tr. 32:2-18 (Millstein).)

107. Charter then used these holding companies to engage in various financing transactions and exchange offers down the road. (7/1/09 Tr. 32:18-22 (Millstein).)

108. Ms. Schmitz was the primary point of contact for the Credit Agreement at Charter (7/31/09 Tr. 59:9-13 (Schmitz).)

109. Peter Hooker and Ann Kurinskas were primarily involved in the negotiations of the Credit Agreement for JPMorgan. (7/31/09 Tr. 59:14-15 (Schmitz).)

110. In her role as a special credits executive monitoring Charter, Ms. Kurinskas reviewed the 2004, 2006 and 2007 amendments to the credit agreement. (8/25/09 Tr. 62:2-5 (Kurinskas).) In each of those agreements, the amount of borrowing made available to Charter increased, and the maturities — the date when those loans were due — was pushed out further into the future. (8/25/09 Tr. 62:6-15 (Kurinskas).)

111. In her special credits role, Ms. Kurinskas reviewed and signed off on changes to the default terms or events of default specified in the credit agreement. If there was going to be a covenant deleted from the credit agreement, Ms. Kurinskas would have been involved in reviewing the change. (8/25/09 Tr. 70:14-23 (Kurinskas).)

112. JPMorgan has participated in at least the following transactions with Charter since April 1998:

- April 1998:                $2.8 Billion Marcus Cable acquisition

- March 1999:                $3.0 Billion high yield notes issuance proceeds

- April 1999:                $4.1 Billion CCO senior secured credit facilities

- July 1999:                 $1.25 Billion CCVIII senior secured credit facilities

- September 1999:            $1.2 Billion CCVI senior secured credit facilities

- December 1999:             $900 Million CCVIII senior secured credit facilities

- March 2000:                $600 Million CCO incremental credit facility

- December 2000:             $1.45 Billion CCVIII senior credit facilities

- March 2001:                $300 Million CCO incremental credit facility

- September 2001:            $1.25 Billion CCVII amendment

- December 2001:             $6.45 Billion CCO and CCVIII amendments

- January 2002:              $900 Million high yield notes issuance proceeds

- May 2003:                  $5.2 Billion senior credit facilities amendment

- November 2003:             $500 Million high yield notes issuance proceeds

- April 2004:                $6.5 Billion CCO senior secured credit facilities

- April 2004:                $1.5 Billion 2nd Lien high yield notes issuance proceeds

- August 2005:               $300 Million high yield notes issuance proceeds

- January 2006:              $450 Million high yield notes issuance notes issuance proceeds

- April 2006:                $6.85 Billion CCO senior secured credit facilities

- February 2007:        $8.0 Billion CCO senior secured credit facilities

- February 2007:        $350 Million CCOH senior secured credit facility

(CX 102 at JPM-CH 00028315.)

113.    JPMorgan was the lead underwriter in March of 2008 for $500 million in notes that were issued by CCO. (8/25/09 Tr. 59:8-11 (Kurinskas).)

114.    CX 134 is the offering memorandum dated March 11, 2008 for CCO, the borrower under the 2007 Credit Agreement.  The offering memorandum states "We have a history of net losses and expect to continue to experience net losses.  Consequently, we may not have the ability to finance future operations.  (CX 134 at JPM-CH 00032247; 8/25/09 Tr. 59:8-11; 59:24-60:12 (Kurinskas).)

115.    Since Ms. Kurinskas started following Charter in 2003, there was never a point in time that on a consolidated basis Charter generated positive free cash flow after its interest payments.  (8/25/09 Tr. 61:4-10 (Kurinskas).)

116.    There has never been a point in time since 2003 where special credits review was no longer necessary.  (8/25/09 Tr. 58:18-21 (Kurinskas).)

117.    JPMorgan was comfortable in extending the credit on the terms set forth in its agreements with Charter despite the fact that Charter was a distressed client.  (8/25/09 Tr. 62:16-21 (Kurinskas).)

118.    JPMorgan  was comfortable with the terms of the 2007 Credit Agreement despite Charter's history of net losses.  When JPMorgan executed the 2007 credit  agreement, provided that there was compliance with the credit agreement, JPMorgan was comfortable with the terms through the maturity date.  (8/25/09 Tr. 62:22-63:11 (Kurinskas).)

## IV.    TERMS OF THE CREDIT AGREEMENT

### A.    The 2007 Credit Agreement

119.    CCO is the borrower under the Amended and Restated Credit Agreement dated as of March 18, 1999 as Amended and Restated as of March 6, 2007 (the "Credit Agreement"). (CX 101 at JPM-CH 0005938.)

120.    The Designated Holding Companies under the Credit Agreement are CCH, CIH, CCH I, CCH II and CCOH.  (CX 101 at JPM-CH 00005945.)

121.    Holdco and CCI are not Designated Holding Companies under the Credit Agreement (7/31/09 Tr. 60:7-9 (Schmitz); CX 101 at JPM-CH 00005945.)

122.    Section 4.21 of the Credit Agreement is titled "Solvency."  It requires that CCO and its Subsidiaries, taken as a whole, are, and after giving effect to the financing transactions,

referred to in the credit agreement will be and will continue to be solvent. (CX 101 at JPM-CH 00005982.)

123. The Credit Agreement does not have any solvency requirement for the Designated Holding Companies. (7/31/09 Tr. 55:11-13 (Hooker).)

124. The Credit Agreement does not require the DHCs to have surplus at any time. There is no reference to surplus in the Credit Agreement. (7/31/09 Tr. 62:2-6 (Schmitz); 7/31/09 Tr. 54:2-6 (Hooker); 7/18/09 Tr. 14:25 (Dep. Tr. 37:7-13) (Kurinskas).)

125. There is also no explicit default that references a violation of Delaware surplus law. (8/25/09 Tr. 120:4-7 (Kurinskas).)

126. The Credit Agreement requires Charter to provide financial information to JPMorgan. (7/31/09 Tr. 62:16-18 (Schmitz).)

127. The Credit Agreement requires Charter to provide a compliance certificate on a quarterly basis to JPMorgan. (7/31/09 Tr. 63:23-25 (Schmitz).)

128. The Compliance certificate is Exhibit B to the Credit Agreement. JPMorgan created the format of the compliance certificate. (7/31/09 Tr. 63:3-9 (Schmitz); CX 188.)

129. As a general matter, the compliance certificate goes through the calculation of different financial ratios. The financial information provided in the compliance certificate is historic, not forward-looking. (7/31/09 Tr. 63:10-22 (Schmitz).)

130. JPMorgan did not require Charter to calculate surplus at Designated Holding Companies or disclose any information regarding the solvency of Designated Holding Companies as part of the compliance certificate. (7/31/09 Tr. 65:19-66:2 (Schmitz); CX 188.)

131. Wholly apart from the compliance certificate, JPMorgan never asked Charter to provide an analysis of the levels of surplus at any of the Designated Holding Companies. (7/31/09 Tr. 66:3-6 (Schmitz).)

132. Wholly apart from the compliance certificate, JPMorgan never asked Charter to provide an analysis of Charter's Designated Holding Companies' abilities to pay debts into the future. (7/31/09 Tr. 66:7-11 (Schmitz).)

133. Section 8 of the Credit Agreement is titled "Events of Default." (CX 101 at JPM-CH 00006000.)

134. Section 8(g)(v) of the Credit Agreement states that an event of default will occur if "any Designated Holding Company, the Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." (CX 101 at JPM-CH 00006002.)

135. Section 8(g)(v) does not require a method of payment of a debt, does not say "inability to pay debt as it becomes due through a dividend distribution where surplus exists," and

JPMorgan is not contending here that the credit agreement sets forth a particular method by which the Charter Board needs to evaluate surplus to arrive at a judgment that surplus existed for a dividend payment. (8/25/09 Tr. 120:8-18 (Kurinskas).)

136. Ms. Schmitz has never understood this provision to be forward looking. Charter has worked with JPMorgan for many years on many transactions and circumstances. In the context of all of those years and many conversations, there was never a discussion of this provision being prospective. None of Charter's advisors, underwriters of any of the high-yield offerings or underwriters on the credit agreement side ever raised this as a prospective covenant or representation. (7/31/09 Tr. 66:24-57:23 (Schmitz).)

137. Section 8(a) of the Credit Agreement says that an event of default will occur if CCO shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable under the Credit Agreement or under any other Loan Document within five days after such interest or other amount becomes due. (CX 101 at JPM-CH 00006000.)

138. Under Section 8(a) it is not an event of default for the borrower to be up to 5 days late on interest payments. (7/31/09 Tr. 51:15-18 (Hooker).)

139. Section 7.6(b) of the Credit Agreement states that each distribution to any Qualified Parent Company or any Affiliate of the Borrower for the purpose of enabling such Person to make interest payments shall be made no earlier than 15 Business Days prior to the date the relevant interest payment is due. (CX 101 at JPM-CH 00005993-4.)

140. Section 8(k)(i) of the Credit Agreement states that an event of default will occur if the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower. (CX 101 at JPM-CH 00006003.)

141. Section 8(k)(ii) of the Credit Agreement states that an event of default will occur on the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of the Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or group." (CX 101 at JPM-CH 00006003.)

142. Section 8(k)(iv) of the Credit Agreement requires that CCO be a "Wholly Owned Subsidiary" (i.e., 100% held by) CCOH. (CX 101 at JPM-CH 00006003 (§ 8(k)(iv).)

143. Section 7.8(d) of the Credit Agreement states that CCO generally cannot "Amend, modify, waive or otherwise change … any of the terms of the Management Fee

Agreement" that is in effect between CCO (i.e., "the Borrower") and CCI. (CX 101 at JPM-CH 00005997 (§ 7.8(d)).)

**B.  The 2006 Credit Agreement Accordion Provision**

144.  The 2006 Credit Agreement included a provision that an event of default will occur if the parent companies and the Borrower have aggregate undefeased indebtedness in excess of 500 million dollars on the date that is three months prior to a final maturity of such indebtedness. (CX 389 at CTR-00037718; 7/31/09 Tr. 34:12-18 (Hooker).)

145.  Ms. Schmitz explained that the provision required Charter to defease or make the cash available at the entity at the maturity date and JPMorgan wanted it defeased three months prior to its stated maturity. That provision applied to all the designated holding companies for debt in excess of 500 million dollars. (7/31/09 Tr. 70:17-71:1 (Schmitz).)

146.  The provision was removed upon entry into the 2007 Credit Agreement. (7/31/09 Tr. 35:4-6 (Hooker).) Ms. Schmitz stated that "the lenders collectively, JPMorgan and the lenders, were comfortable that it was not required and it was entirely too onerous a provision for the company to live under with the maturities coming due inside the credit agreement and requiring to defease them." (7/31/09 Tr. 71:14-72:1 (Schmitz).)

147.  Mr. Hooker testified that he does not believe that the 2007 credit agreement contains an accordion event of default, which is an event of default that is triggered if debt remains outstanding a certain period of time prior to its final maturity. (7/31/09 Tr. 37:5-11 (Hooker).)

**C.  Proposed Representation For Second Lien Notes**

148.  In 2008 Charter issued Second Lien Notes. (7/31/09 Tr. 67:24-68:9 (Schmitz).)

149.  Peter Hooker of JPMorgan led the issuance of the Second Lien Notes in March 2008. (7/31/09 Tr.68:10-15 (Schmitz).)

150.  The draft purchase agreement for the Second Lien Notes proposed having a representation from Charter that it can and will be able to meet payments as they come due for the various holding companies, with no indication of time. Ms. Schmitz spoke with Mr. Hooker about that representation because she was uncomfortable making that representation without any context of time. Mr. Hooker understood Ms. Schmitz's position, and the representation was removed as to all entities except CCO and CCOH. (7/31/09 Tr. 68:16-69:23 (Schmitz).)

**V.  SECTION 8(G)(V) DOES NOT IMPOSE A PROSPECTIVE REQUIREMENT**

**A.  A Prospective Construction Is Inconsistent With The Plain Language Of The Credit Agreement**

151.  Ms. Kurinskas agreed that Section 8(g)(v) does not contain the phrase "pay debts as they would become due," as used in JPMorgan's complaint. (8/25/09 Tr. 113:24-114:5

(Kurinskas).)  Ms. Kurinskas agreed that the borrower does not have to make a representation that the designated holding companies are able to pay debts as they would become due.  "The word 'would' does not appear in the language." (8/25/09 Tr. 114:2-24 (Kurinskas).)

152.  Ms. Kurinskas agreed that section 8(g)(v) does not provide any term that indicates how far forward someone should look for a default. (8/25/09 Tr. 113:16-114:1 (Kurinskas).)

153.  Although the language "shall be unable to pay debts as they become due" is found in other JPMorgan credit agreements, in her twenty-nine years at JPMorgan, Ms. Kurinskas had never called a default based on an inability to pay a future debt, nor was she aware of anyone else at JPMorgan, who had called a default based on a clause like 8(g)(v). (8/25/09 Tr. 115:22-116:24 (Kurinskas).)

154.  Ms. Kurinskas could not identify for the Court any document at JPMorgan that articulates the prospective understanding of  8(g)(v) that she testified to on her direct examination. (8/25/09 Tr. 117:18-24 (Kurinskas).)

155.  Prior to February 5, 2009, Ms. Kurinskas never had a conversation with any other lender that's a party to this  credit agreement in which they articulated a belief that an event of default could occur under the agreement due to the inability of a designated holding company to pay debts due in the future. (8/25/09 Tr. 118:13-20 (Kurinskas).)

156.  Mr. Hooker cannot identify any document that articulates that section 8(g)(v) applies to prospective debts. (7/31/09 Tr. 49:18-24 (Hooker).)

157.  Mr. Hooker cannot identify a single analyst report that suggests that Charter had in its credit agreement an event of default for the inability to pay debts in the future. (7/31/09 Tr. 50:5-8 (Hooker).)

158.  Mr. Pace could not recall ever writing in a public research report that it was his belief in reviewing Charter's credit agreements that there was an event of default if Charter's Designated Holding Companies did not have the present ability to pay debts that were coming due in the future. (8/18/09 Tr. 15:12 (Dep. Tr. 58:3-23, 72;8-19) (Pace).)

159.  Mr. Zagar was involved in the negotiation and approval of the 2007 Credit Agreement but does not recall any discussion of a term that would be used to measure the prospective application of 8(g)(v). (8/18/09 Tr. 12:12 (Dep. Tr. 148:14-25) (Zagar).)

160.  In 37 years that Mr. Zagar has been involved with loans and borrowers who are in financial difficulty, this situation is the only time he can recall a loan called into default based upon a prospective application of an inability to pay debts. (8/18/09 Tr. 12:12 (Dep. Tr. 154:5-13) (Zagar).)

161.  Deutsche Bank cannot point to any other document that supports its understanding that 8(g)(v) has a prospective component to it. (8/18/09 Tr. 75:12 (Dep. Tr. 230:15-25) (Morris).)

162. From 1997 to February 4th, 2009, Mr. Ojea-Quintana had never personally seen a default called for a failure to be able to pay a debt in the future. (8/18/09 Tr. 13:24 (Dep. Tr. 95:23-96:4) (Ojea-Quintana).)

## B. JPMorgan and Lenders Cannot Articulate or Support Prospective Construction of Credit Agreement

163. Ms. Kurinskas agreed Section 8(g)(v) does not specify a particular period of time that a designated holding company must be able to pay its debts as they become due. (8/25/09 Tr. 30:3-9 (Kurinskas).)

164. During her deposition, Ms. Kurinskas testified that "the company's auditors would generally look out four or five quarters." (8/18/09 Tr. 14:25 (Dep. Tr. 44:14-45:7 (Kurinskas).)

165. At trial, Ms. Kurinskas testified that "8(g)(v) is *not specific intentionally.*" (8/25/09 Tr. 30:3-9 (Kurinskas)(emphasis added).)

166. Under JPMorgan's view, it intentionally has a nonspecific term in the default terms of the credit agreement that gives it the unilateral right to determine that some debt coming due in the future represents a default because, in JPMorgan's unilateral view, the borrower will not be able to pay that debt in the future, based on facts available to JP Morgan at the time. (8/25/09 Tr. 119:7-14 (Kurinskas).)

167. Mr. Hooker does not know how prospective the debts can be under Section 8(g)(v) and is not sure where one would actually determine how far into the future 8(g)(v) would apply. (7/31/09 Tr. 49:12-17 (Hooker).)

168. Citibank's view of "pay its debts as they come due" is that it related to the foreseeable future. (8/18/09 Tr. 13:24 (Dep. Tr. 88:24-89:11) (Ojea-Quintana).)

169. Bank of America's construction of the alleged prospective element of 8(g)(v) is that it would look forward over the time a public accountant would use — 12 months and a day, 13 months, 14 months. (8/18/09 Tr. 12:12 (Dep. Tr. 144:12-23) (Zagar).)

170. Mr. Federman was not aware whether Credit Suisse First Boston has a position as to how far in the future any alleged prospective element of 8(g)(v) is measured. (8/18/09 Tr. 12:23 (Dep. Tr. 207:3-210:3 (Federman).)

171. For its part, Deutsche Bank measures the alleged prospective element of 8(g)(v) to be in a six to 12-month time frame. (8/18/09 Tr. 75:12 (Dep. Tr. 221:24-222:6) (Morris).)

172. In interpreting the Credit Agreement, Ms. Taylor looked outside the agreement to the solvency test and the audit standard in adopting a reference period of "a year or more" as the forward-looking period for which she maintains the borrower is required to be able to pay its debts out into the future. (8/31/2009 Tr. 18:25-20:1 (Taylor).)

### C. A Prospective Construction Is Inconsistent With JPMorgan's And Lenders' Administration of Credit Agreement

173. Charter disclosed in its 2007 Form 10-Q filed in November 2007 that "cash flows from operating activities and amounts available under the Company's credit facilities may not be sufficient to … satisfy its interest and principal repayment obligations in 2009, and will not be sufficient to fund such needs in 2010 and beyond." (CX 265 at 8.)

174. Charter disclosed in its 2007 Form 10-K filed in February 2008 that it would have insufficient funds to meet its cash needs after the second or third quarter of 2009 and that there could "be no assurance that [the DHCs] will not become insolvent or will be permitted to make distributions in the future … in amounts needed to service our indebtedness." (CX 194 at 23.)

175. Charter disclosed in May 2008 that "credit facilities will not be sufficient to fund projected cash needs in 2010 … and thereafter" and that "[n]o assurances can be given that the Company will not experience liquidity problems." (JPX 30 at 8, 24.)

176. In April 2008, Ms. Ruyter advised senior credit officers that Charter was going to absorb its available liquidity in the third quarter 2010. (7/31/09 Tr. 13:2-25 (Ruyter); CX 388 at JPM-CH 00018920) Notwithstanding the fact that JPMorgan's forecast showed that Charter was no longer going to have cash balance for available revolving capacity as of the third quarter 2010, Ms. Ruyter did not recommend to anyone that Charter was in default of the credit agreement. (7/31/09 Tr. 14:1-6 (Ruyter).)

177. When Ms. Kurinskas learned in May of 2008 or earlier that Charter did not have the ability internally to satisfy maturities that will come due in 2010, she did not recommend that JPMorgan call an event of default under the credit agreement. (8/18/09 Tr. 14:25 (Dep. Tr. 123:5-11) (Kurinskas).)

178. Mr. Pace does not recall anyone ever coming to him and saying that Charter's not having enough liquidity to cover 2010 maturities represented a Default or Event of Default in 2008. (8/18/09 Tr. 15:12 (Dep. Tr. 97:16-21) (Pace).)

179. From mid-2006 to February 5, 2009 Charter always had a funding gap — an inability to satisfy its known future obligations based in existing resources. Despite that future potential that Charter would not be able to pay its debts as they came due, Citibank never called a default. (8/18/09 Tr. 13:24 (Dep. Tr. 77:4-78:5) (Ojea-Quintana).)

180. Citibank's view was that just because there's a point in the future that the projections say Charter would not be able to pay its debts without refinancing or something else, that would not be a default. (8/18/09 Tr. 13:24 (Dep. Tr. 80:22-81:3) (Ojea-Quintana).)

181. Credit Suisse First Boston did not believe at any point between 2003 and the end of 2008 that Charter's refinancing risk placed it in default of the Credit Agreement. (8/18/09 Tr. 12:23 (Dep. Tr. 113:7-12) (Federman).)

182. In the fall of 2008, it was not surprising to Credit Suisse First Boston that there was always a point in the future where Charter would be unable to pay its debts absent refinancing or otherwise dealing with them. (8/18/09 Tr. 12:23 (Dep. Tr. 112:6-13) (Federman).)

## VI. CHARTER WAS ABLE TO, AND IN FACT, PAID ALL OF ITS DEBTS AS THEY BECAME DUE

### A. Charter, CCO and All of the DHCs Paid Their Debts As They Became Due Before Filing for Bankruptcy

183. Through November 5, 2008 (and until the Petition Date), Charter and its subsidiaries in fact paid all of their debts that had become due. (7/21/09 Tr. 204:14-16 (Smit).)

184. CCO and the DHCs paid all of their debts as they became due from November 5, 2008 through March 27, 2009 the date of the bankruptcy filing — almost five months. (7/31/09 Tr. 104:13-19 (Schmitz).)

185. Charter never missed a payment to JPMorgan under its credit agreement. (7/21/09 Tr. 222:7-9 (Smit).)

186. Mr. Hooker is not aware of any monies that Charter owed JPMorgan that it had not paid as of February 5, 2009. (7/31/09 Tr. 48:19-22 (Hooker).)

187. Before the bankruptcy filing, JPM was paid everything that was owed to it. (8/17/09 Tr. at 20:20-22 (Doody).)

188. Mr. Hooker was not aware of any loss as of February 5, 2009 that JPMorgan had suffered because of some act or non-act by Charter. (7/31/09 Tr. 48:23-49:1 (Hooker).)

189. Charter also never missed any of its payments to its bondholders as they became due up until the time Charter filed for bankruptcy. (7/21/09 Tr. 222:10-13 (Smit).)

190. Ms. Taylor conceded that as of November 5, 2008, CCH and CIH had paid all their debts that had become due. (8/31/2009 Tr. 84:19-85:2 (Taylor).) Similarly, Ms. Taylor conceded that CCH and CIH paid all of their debts that had become due as of November 17, 2008. (8/31/2009 Tr. 85:3-19 (Taylor).) Ms. Taylor agreed that "if we start in November, there's no dispute in this case that CIH and CCH could pay their debts in November, December; and the next payment is January 15th." (8/31/2009 Tr. 88:13-16 (Taylor).)

### B. JPMorgan Concedes Charter Has Not Made Any Payment Defaults

191. None of Charter's alleged defaults were payment defaults. (8/18/09 Tr. 14:25 (Dep. Tr. 19:16-20:2) (Kurinskas).)

### C. JPMorgan Has Not Suffered Any Economic Loss

192. JPMorgan has not suffered any actual monetary loss as a result of any of the alleged prepetition defaults. Ms. Kurinskas confirmed, "Up to this point in time, the company's been paying according to the contractual terms. The monetary loss that we would suffer would be to the extent that the breaches under the contract don't enable us to renegotiate the terms." Ms. Kurinskas agreed that, absent a finding of a breach of Section 8(g)(v) to then allow the banks to renegotiate, there would be no monetary loss, and that if the Court determines, using the Bankruptcy Code, that reinstatement is proper here, that loss does not exist. (8/25/09 Tr. 124:12-125:17 (Kurinskas).)

193. If the plan is confirmed, there will be no debt left at the entities at which JPM alleges an inability to pay debts as they become due: CCH and CIH. (8/17/09 Tr. 23:11-24:5 (Doody).)

194. Ms. Kurinskas has no reason to doubt that, for the Designated Holding Companies whose debt has not been eliminated, they will be able to satisfy those obligations if the plan is confirmed. (8/25/09 Tr. 113: 5-15 (Kurinskas).)

195. Charter made a draw request on February 3, 2009. Only one lender, MetLife, funded the request for $350,000. (7/31/09 Tr. 126:5-15 (Schmitz).) JPMorgan did not fund the February 3, 2009 draw request. (8/25/09 Tr. 112:19-20 (Kurinskas).)

196. The alleged "misrepresentation" default is in reality a derivative claim that is premised on the claim of a default under Section 8(g)(v). (8/25/09 Tr. 23:25-24:8 (Kurinskas).)

## VII. CHARTER'S REVOLVER DRAWS IN OCTOBER AND NOVEMBER 2008

197. Through the first three quarters of 2008, Charter was ahead of target on EBITDA. (7/21/09 Tr. 202:11-15 (Smit).)

198. As of October 2008, Charter expected to achieve its plan for EBITDA for 2008. (7/21/09 Tr. 202:16-18 (Smit).)

199. During the October 27 audit committee meeting, the committee received a report from the lead audit partner for KPMG that, as of that time, it was likely that KPMG "would be in a position to render an unqualified opinion, absent a substantial future decline in the performance of Charter or some other material event." KPMG believed it would be rendering an unqualified opinion. (7/22/09 Tr. 178:3-24 (Merritt).)

200. According to the minutes from the October 27, 2008 Audit Committee meeting, Mr. Carlson, the lead audit partner at KPMG, noted that KPMG would review, among other things, the Company's operating plan, the Company's recent experience in achieving its plans, and the results of the remainder of the year. "[Mr. Carlson] noted that the financial markets upheaval and the economy did not change those considerations, but were additional factors to consider when reviewing the Company's plans." (JPX 50 at CTR-00039897-A.)

**A.      Charter Made Draws On Its Revolver In October and On November 5, 2008 Due To Concerns Re Bank Liquidity**

201.    There was a considerable sense of crisis and panic in September and October 2008 around the stability of the banking systems.  (7/21/09 Tr. 34:25-35:2 (Millstein).)

202.    Like many other companies around the world, Lehman's collapse prompted Charter to ask Lazard whether it was prudent to draw on its revolvers to ensure itself of having access to capital before any other banks collapsed.  (7/21/09 Tr. 34:13-24 (Millstein).)

203.     "In light of the Lehman bankruptcy and the instability that it caused in the interbank loan market and the credit markets generally, [Lazard] advised Charter, in particular, to draw its revolving credit agreement to assure itself it would have access to the funds available thereunder."  (7/21/09 Tr. 35:6-10 (Millstein).)

204.    This advice included the November 5 revolver draw; the rationale remained the same (7/1/09 Tr. 36:22-37:8 (Millstein).)

205.    In October and November 2008, Mr. Johri also personally advised Charter management to draw down its revolver. (8/31/09 Tr. 215:20-23 (Johri).)

206.    In his business, Mr. Johri was seeing his customers drawing down their lines of credit because there was a heightened risk of bank failure at that point in time, and companies were protecting their cash flows and liquidity by drawing on their lines. (8/31/09 Tr. 215:20-216:6 (Johri).)

207.    Mr. Johri's advice had nothing to do with any surplus analysis. (8/31/09 Tr. 216:7-9 (Johri).)

208.    During the October 27 audit committee meeting, the committee received a report from management regarding its decision to draw down on a substantial portion of its remaining revolver capacity.  According to the audit committee minutes, Ms. Schmitz "discussed the draw down of most of the revolver financing and the Company's investment strategy given the current financial environment and uncertainty."  (JPX 50 at CTR-00039897-A; 7/22/09 Tr. 176:2-13 (Merritt).)

209.    Mr. Merritt agreed that it made good business sense to draw down the revolver to avoid counterparty risk if the banks might be unable to or chose not to fund their revolver commitments.  (7/22/09 Tr. 176:14-25 (Merritt).)

210.    The audit committee approved these decisions even though Charter experienced a negative carry and management was "fully authorized to continue" to draw the revolver as it deemed appropriate to mitigate the counterparty risk.  (7/22/09 Tr. 177:4-20 (Merritt).)

211.    The decision to make the draws in October and November 5, 2008 were not related to making the November 17 interest payments. The decision to make the draws in October

and November 5, 2008 were not related to any surplus analyses the company was conducting. (7/21/09 Tr. 204:17-24 (Smit).)

212. Charter made its revolver draws because it was concerned about the state of the financial markets. Charter wanted to make sure it had liquidity to run the business. (7/21/09 Tr. 204:6-13 (Smit).)

213. Charter's drawdown of its revolver in October was not part of some larger scheme to file for bankruptcy. (7/21/09 Tr. 35:11-19 (Millstein).)

**B.      Charter Was Not Contingency Planning For Bankruptcy In October 2008**

214. Charter had not begun contingency planning for a restructuring as of the October 28, 2008 Board meeting. (9/2/09 Tr. 136:11-13 (Conn); 721/09 Tr. 35:11-19 (Millstein).)

215. No one expressed a view at the October 28 Board meeting that Charter was insolvent or unable to satisfy its obligations or pay its debts. (9/2/09 Tr. 136:7-16 (Conn).)

216. Instead, Charter began bankruptcy planning in December 2008. (7/21/09 Tr. 203:25-204:5 (Smit).)

**C.      Changes To The Language In Charter's November 6, 10-Q Is Not An Admission That Charter Could Not Pay Its Debts As They Came Due**

217. Charter provides the "no assurance" risk disclosure in its filings because Charter has been "very highly leveraged" so the Board takes "great pains" to make full disclosure about "the risks embodied" that leverage, including "whether there would be adequate surplus at different subsidiary levels to make distributions in the future, should those be needed to fund our obligations." (7/22/09 Tr. 181:3-9 (Merritt).)

218. The audit committee reviews the draft risk disclosures in the filings, including in the third quarter of 2008. (7/22/09 Tr. 181:13-19 (Merritt).)

219. In the third quarter of 2008 10-Q, Charter revised its risk disclosure regarding surplus. (CX 171 at 38; 7/22/09 Tr. 183:11-17 (Merritt).)

220. The risk disclosure in the November 6, 2008 10-Q was made due to the economic environment and Charter's additional diligence across the overall balance sheet. As a result, Charter thought it was important to strengthen its risk factors disclosures to make sure they were current for the current economic times. (7/31/09 Tr. 108:21-109:10 (Schmitz).)

221. Mr. Merritt testified that "the risks had risen to a level that [Charter] should strengthen and enhance the risk disclosure." (7/22/09 Tr. 238:25-239:1 (Merritt).)

222. Management consulted with counsel and other advisors and then recommended the revised risk disclosures and Mr. Merritt agreed with the suggestion. (7/22/09 Tr. 183:12-18 (Merritt).)

223. This disclosure did not mean that CIH or CCH I lacked surplus at that time, but rather this was a forward-looking risk factor. (7/31/09 Tr. 109:11-16 (Schmitz); 722/09 Tr. 184:4-13 (Merritt).)

224. If Charter had ever reached that determination, that conclusion would not belong in the risk factors, which "are forward-looking." (7/22/09 Tr. 184:4-13 (Merritt).)

225. A potential lack of surplus would be different than an inability to pay debts as they come due. (8/17/09 Tr. 22:5-8 (Doody).)

226. After the filing of the 3rd quarter 10-Q: nobody from JPMorgan contacted Ms. Schmitz to discuss the disclosure; nobody from JPMorgan contacted Ms. Schmitz to tell her Charter was in default or suggested that the disclosure was a default under the credit agreement; and nobody from JPMorgan asked for any additional information related to the disclosure. (7/31/09 Tr. 110:5-15 (Schmitz).)

227. JPMorgan's Credit Surveillance Reports ("CSR") are quarterly internal reports prepared for the senior people in credit risk management on credit exposure that JPMorgan has to clients that are below a certain credit grade, internally. (8/25/09 Tr. 32:11-17 (Kurinskas).)

228. Financial information in the CSR reports comes from the 10-Q, the company provided to JPMorgan and the company's compliance certificate. (7/31/09 Tr. 14:24-15:10 (Ruyter).)

229. The November 24, 2008 CSR includes a section to "comment on any defaults," and makes no reference to the language that was used by Charter three weeks earlier in the November 6, 2008 10-Q. Nowhere in this CSR is that November 6, 2008 public filing referenced. Nowhere in this CSR does it mention that there had been a change in language about the 10-Q or about the ability of the company to have surplus at CIH. (8/25/09 Tr. 88:20-89:16 (Kurinskas).)

230. ***Ms. Kurinskas had never seen that change in risk factor language in the 10-Q until after she had issued the February 5, 2009 default letter***. (8/25/09 Tr. 89:17-21 (Kurinskas) (emphasis added).)

231. Ms. Kurinskas agreed that, contrary to JPMorgan's trial brief, the November 6, 2008 10-Q language does not contain any explicit conclusion that Charter does not have surplus and the 10-Q "does not explicitly say that the DHCs were insolvent." (8/25/09 Tr. 90:10-91:5 (Kurinskas).)

232. Credit Suisse First Boston does not believe that Charter's statements in its November 6, 2008 10-Q are the basis for an event of default. (8/18/09 Tr. 12:23 (Dep. Tr. 218:16-219:5) (Federman).)

233. In the risk disclosures regarding surplus in the third quarter 2008 10-Q, CIH is the only Charter subsidiary that is referenced by name. (7/22/09 Tr. 262:10-17 (Merritt).)

234. It was CCH I, not CIH, that declared a dividend on November 15. (7/22/09 Tr. 262:18-20 (Merritt).)

235. CIH is above CCH I in Charter's capital structure and has $2.5 billion more in debt than CCH I. (7/22/09 Tr. 262:21-263:10, at 264:1-5 (Merritt).)

## VIII. CHARTER WAS ABLE TO PAY ITS NOVEMBER AND JANUARY INTEREST PAYMENTS THROUGH INTERCOMPANY ACCOUNTS ALONE

### A. Intercompany Notes And Payables

236. Dividend payments were not the only mechanism Charter could use to move money to the DHCs. Charter could raise money from external sources and use intercompany loans and accounts to fund those interest payments. (8/25/09 Tr. 120:19-121:7 (Kurinskas); 7/31/09 Tr. 81:22-82:3 (Schmitz).) External sources and the intercompany loans have nothing to do with surplus. (8/25/09 Tr. 121:2-121:4 (Kurinskas).) Ms. Kurinskas testified, "I believe an intercompany loan could be repaid regardless of whether there was surplus." (8/25/09 Tr. 121:14-16 (Kurinskas).)

237. Historically, Charter has analyzed or paid debts in the past as they became due through dividends, intercompany notes or accounts, and refinancings. (7/21/09 Tr. 205:4-11 (Smit).)

238. Intercompany notes between CCO and various DHCs are documented in accordance with the Credit Agreement. There is documentation attached to the credit agreement providing for how such notes must occur. (7/31/09 Tr. 82:22-83:4 (Schmitz).)

239. Intercompany notes were typically created through capital raises throughout the capital structure. The proceeds of those transactions have been generally loaned to CCO to pay down the revolver. (7/31/09 Tr. 83:5-14 (Schmitz).)

240. The use of dividends preserves the most flexibility for the company. (7/31/09 Tr. 82:8-21 (Schmitz).)

241. Intercompany notes were created so the company would have flexibility to move money through the organization without being strictly reliant upon making distributions. (7/31/09 Tr. 83:15-18 (Schmitz).)

242. Intercompany payables are payables created between Holdco and CCO in the ordinary course, mostly relating to obligations that have been incurred by Holdco through the management agreement that are reimbursable or due from CCO. (7/31/09 Tr. 84:10-16 (Schmitz).)

243. Intercompany payables change over time if a particular payable resulted from an accrual or other accounting treatments. (7/31/09 Tr. 84:17-24 (Schmitz).)

### B. JPMorgan And The Lenders Were Aware That Intercompany Loans Were Used to Provide Flexibility

244. JPMorgan was aware of intercompany notes as a method to pay debts at the DHCs. It has been publicly discussed on most conference calls. In January 2006, Charter did a bond offering at CCH II. The primary purpose of the bond offering was to contribute those funds to CCO as an intercompany loan so that the company would be able to make interest payments without having to make distributions. JPMorgan was the financial advisor on the transaction. (7/31/09 Tr. 83:19-84:9 (Schmitz).)

245. The fact that Charter used an intercompany loan in November to pay interest at one of its intermediate holding companies would have been no surprise to a JPMorgan salesperson (8/25/09 Tr. 121:21-123:14 (Kurinskas).) A JPMorgan Sales Force document, provided "Question: How does Charter provide additional support for servicing interest at each intermediate Holdco?" And the answer that JPMorgan's sales desk was going to use to potential investors was, "In order to provide additional support for servicing interest on various tranches of debt at intermediate holding companies, several intercompany loans were set up between CCO and various entities." (CX 110 at JPM-CH 00029446.)

246. Mr. Hooker was aware of Charter's use of intercompany notes to service interest at its intermediate holding companies and believed that the use of intercompany notes for such a purpose was appropriate. (7/31/09 Tr. 39:5-11 (Hooker).)

247. Mr. Pace knew that Charter intercompany loans were set up in order to provide additional support for servicing interest on various tranches of debt at Charter's intermediate holding companies. (8/18/09 Tr. 15:12 (Dep. Tr. 88:12-18) (Pace).)

248. Bank of America was aware that Charter moved money through its holding company structure through intercompany loans. (8/18/09 Tr. 12:12 (Dep. Tr. 152:10-22) (Zagar).)

### C. As Of November 5, 2008, CCH And CIH Were Able To Pay Their Debts Through March 27, 2009 With Intercompany Notes And Accounts

249. At trial, Charter's CFO Eloise Schmitz testified that even if there had been insufficient surplus for a dividend, Charter would have been able to make its November interest payments by using "amounts of intercompany loans and intercompany payables in excess of that amount." (7/31/2009 Tr. at 100 (Schmitz).)

250. Charter's expert, Bruce Den Uyl also analyzed Charter's ability to use intercompany transfers to make its November 2008 and January 2009 interest payments. (8/3/09 Tr. 120:11-120:14 (Den Uyl).)

251. C Demo 32 is Mr. Den Uyl's demonstrative of the Debtors' balance sheet as of October 31, 2009 - which would have been the most recent balance sheet prior to the November 2008 distribution. (C Demo 32; 8/3/09 Tr. 120:19-121:5 (Den Uyl).) According to that balance sheet, in November 2008 Charter had a beginning balance of $134 million with additions each month of approximately $3 million. (C Demo 32.)

252. The monthly additions are for certain intercompany accounts that are going to increase because they have both depreciation and option expenses of Holdco. (C Demo 32; 8/3/09 Tr. 121:9-21 (Den Uyl).)

253. Assuming that Charter had elected to pay its November interest payments of $71 million using intercompany transfers, Charter would have had a balance of $66 million in intercompany loans and payables after making the November interest payments. (C Demo 32.)

254. Assuming that Charter had made the November interest payment using intercompany transfers, and carrying the remaining balance forward to January 2009 and accounting for additions, Charter would have also had a positive balance of intercompany loans and payables had it elected to make the January 2009 interest payment using intercompany transfers as well. (C Demo 32.)

255. Accordingly, Mr. Den Uyl concluded that Charter was able to make both its November 2008 and January 2009 payments via intercompany transfers alone, even apart from using surplus to make a dividend. (8/3/2009 Tr. 120:15-121:21 (Den Uyl); C Demo 32.)

256. Although JPMorgan's expert Ms. Taylor challenged Charter's ability to pay CCH and CIH's interest payments in November and January in her expert report before trial, when she was under oath at trial, Ms. Taylor testified that she could not say whether Mr. Den Uyl's intercompany analysis was "necessarily appropriate or not." (8/31/09 Tr. 53:9-54:1 (Taylor).)

IX. **CCH I HAD ADEQUATE SURPLUS TO MAKE ITS $63 MILLION DIVIDEND TO CIH ON NOVEMBER 17, 2008**

A. **Charter's July Long Range Plan**

257. The five year projections are known as the Long Range Plan at Charter. (7/21/09 Tr. 197:18-20 (Smit); 8/31/09 Tr. 214:14-16 (Johri).)

258. The Debtors' Long Range Plan begins with the bottoms-up plan on the annual planning cycle. The different functional heads will discuss the initiatives that they think should be in the plan for the next year. The field people then go into the field and they plan their business around those initiatives, and determine what kind of results they think they can achieve. The divisions then review it for consistency and then it comes to corporate and then it goes to the Board for approval. Once the annual plan is done that becomes the basis to generate a five year planning cycle in a similar manner. Management builds it up and extends over the years making certain assumptions regarding competition, pricing, new productions, capital expenditures. (7/21/09 Tr. 196:21-197:17 (Smit).)

259. The purpose of the Long Range Plan is to help Charter plan on a longer term basis. It also helps the business look at the capital needs of the business over time, so it can begin to address those issues on a longer range view. (7/21/09 Tr. 197:21-198:3 (Smit).)

260. The Long Range Plan is presented to the Charter Board to make sure the Board is involved in the process and so it can exercise its fiduciary duty.  (7/21/09 Tr. 198:4-15 (Smit).)

261. Under the normal cycle, the budget is developed over the fall and is presented to the Board in early December and once the Board approves the budget, that information is "used to update the five-year plan.  (7/22/09 Tr. 192:23-193:4 (Merritt).)

262. Since Mr. Smit has arrived, the annual plan has been finalized in December/January and updated in July. (7/21/09 Tr. 198:16-19 (Smit).)

263. CX 216 is the presentation to the Charter Board related to the July 2008 Long Range Plan. (7/21/09 Tr. 198:20-199:2 (Smit).)

264. The revenue projections in the July Long Range Plan were lower than the January 2008 Long Range Plan. (7/21/09 Tr. 199:3-7 (Smit).)

265. The EBITDA projections in the July Long Range Plan were lower than the January 2008 Long Range Plan. (7/21/09 Tr. 199:8-10 (Smit).)

266. The July Long Range Plan had more conservative projections for revenue and EBITDA compared to the January Long Range Plan. (7/21/09 Tr. 199:11-14 (Smit).)

267. The July Long Range Plan projected 2008 EBITDA to be $2.311 billion.  Charter beat that EBITDA projection for 2008. (7/21/09 Tr. 200:8-13 (Smit).)

268. The presentation to the Board also presented potential Risks and Opportunities to the Long Range Plan. (7/21/09 Tr. 199:15-200:7 (Smit).)

269. The Board approved the July Long Range Plan. (7/21/09 Tr. 200:14-17 (Smit).)

270. Mr. Bliss believed Charter's projections in the July Long Range Plan were moving up to more industry normal projections.  (9/1/09 Tr. 16:5-9 (Bliss).)

271. In November 2008, KPMG performed an independent and detailed analysis of Charter's July 2008 LRP to gain comfort that the LRP used in the October 1, 2008 FAS 142 assessment was reasonable, reflected an actual expectation of future operating results, and was reviewed by management.  (CX 107 at KPMG-Charter 11248-49.)  KPMG concluded that "management has appropriately considered the competitive and economic factors facing the Company during the next five years" and "considered the July 2008 LRP to be reasonable and serves as a sufficient source for Company's annual franchise valuation subject to SFAS 142."  (CX 107 at KPMG-Charter 00011264.)

272. Ms. Taylor acknowledged that KPMG performed a detailed analysis on the assumptions in Charter's July long-range plan just days after Charter made its dividend from CCH I to CIH on November 17, 2008, and that KPMG concluded that the "July LRP was a reasonable forecast of anticipated results over the next five years."  (8/31/2009 Tr. 118:10-120:1 (Taylor); CX 143 at KPMG 0000112).)

273. Ms. Taylor also acknowledged that KPMG reviewed the assumptions as to capital expenditures that were used in the July LRP on the same day that Charter made its dividend from CCH I to CIH, and that KPMG determined, after meeting with Marwan Farwaz, the EVP and chief technical officer for the Company, that the July 2008 LRP "included a reasonable forecast of anticipated capital expenditures over the next five years." (8/31/2009 Tr. 123:15-124:12 (Taylor); CX 380 at KPMG 0000129.)

274. As of October 28 or November 14, 2008 Charter had not created a new long range plan. (7/31/09 Tr. 94:6-8 (Schmitz).)

275. As of late October and early November 2008, Charter management's best projections for Charter was the July Long Range Plan. (7/31/09 Tr. 94:12-14 (Schmitz).)

276. Charter completed its long-range plan for 2009 in late December 2008. (7/31/09 Tr. 91:20-23 (Schmitz).)

277. The Long Range Plan is about projections. (8/31/09 Tr. 214:14-16 (Johri).) The Long Term Plan is a quarterly presentation given to the Board regarding the strategic alternatives for the company. It relates to balance sheet items and liquidity. (7/31/09 Tr. 93:23-94:5 (Schmitz).) At the October Board meeting, the Board requested Charter management update the Long Term Plan, not the Long Range Plan. (8/31/09 Tr. 215:3-16 (Johri).)

278. The Board did not give any instructions in October or November to management to redo immediately the long-range plan. (7/22/09 Tr. 192:17-22 (Merritt).)

**B.     The November Interest Payments**

279. In November 2008, Mr. Merritt was aware "that management was continually looking into the future regarding liquidity," which included assessing surplus, intercompany transactions and whether additional debt could be raised. Charter management's efforts "were not "limited to surplus"; it was "an overall analysis of all the different means that [Charter] would have available to maintain [its] liquidity." (7/22/09 Tr. 232:25-233:12 (Merritt).)

280. Charter had approximately $71 million of interest payments due on November 15, 2008, including $8.4 million due from CCH and $62.8 million due from CIH. (CX 225 at 3; CX 117 at CTR-00002347-48; CX 174 at CTR-00002351-53; 7/22/09 Tr. 28:22-25; 30:22-31:3 (Smit).)

**C.     November 14, 2008 Board Presentation**

281. The purpose of the November 14, 2008 meeting was to discuss the November payments around CCH and CIH. (7/21/09 Tr. 206:8-12 (Smit); 7/21/09 Tr. 35:24-36:2 (Millstein).)

282. The November Board meeting was not the first time that Charter held a Board meeting to consider whether to make interest payments. (9/2/09 Tr. 136:25-137: 2 (Conn).)

283. CX 225 was distributed to the Board in advance of the November 14, 2008 Board meeting. (7/21/09 Tr. 206:13-17 (Smit).)

284. Before the meeting, Mr. Smit received from his finance team different alternatives for making the payments, received analysis around that, and had discussions with Mr. Millstein regarding his expectations of multiples at that point and precedent transactions. (7/21/09 Tr. 206:18-207:1 (Smit).)

285. Mr. Smit spoke with Mr. Millstein because he thought it was important. Mr. Smit told Millstein that he was going to ask him at the Board meeting regarding precedent transactions and what he felt was reasonable for the business. (7/21/09 Tr. 207:2-7 (Smit).)

286. Mr. Smit, Ms. Schmitz and Mr. Millstein made the presentation to the Board. (7/21/09 Tr. 208:23-209:1 (Smit).)

287. Management proposed to the Board to pay the CCH interest payment through a repayment of an intercompany note from CCO to Holdco and then down from Holdco to CCH. (7/21/09 Tr. 208:7-14 (Smit).)

288. Management proposed to the Board to pay the CIH interest payment through a distribution from CCH I to CIH. (7/21/09 Tr. 208:15-17 (Smit).)

289. Management was comfortable recommending the dividend from CCH I because it had looked at surplus "through a number of different lenses" and felt that given all those lenses that it looked through, it was comfortable in saying that there was a surplus and the distribution should be made. (7/21/09 Tr. 209:2-9 (Smit).)

### *i.* *Duff & Phelps's valuation of charter as of October 1, 2008*

290. Charter had an annual asset valuation as part of the audit process, which "was normally done in the October time frame, as of October 1 or September 30." (7/22/09 Tr. 186:1-6 (Merritt); 9/1/09 Tr.13:4-6 (Bliss).)

291. Duff & Phelps is a valuation firm that Charter has used for FAS 142 work and solvency work. Duff & Phelps is a well-regarded valuation firm that works with many cable companies, including Comcast and Cablevision and several other cable companies. (7/31/09 Tr. 88:3-12 (Schmitz).)

292. Mr. Bliss has prepared 40-50 FAS 142 valuations in his career at Duff & Phelps and Kane Reece. Mr. Bliss has also prepared discounted cash flows (DCFs) in connection with solvency opinions. (9/1/09 Tr. 10:14-11:6 (Bliss).)

293. The majority of Mr. Bliss' work is in the cable industry. (9/1/09 Tr. 11:7-9 (Bliss).)

294. Mr. Bliss began working on Charter matters in 2001 and has been valuing Charter since that time. (9/1/09 Tr. 11:13-17 (Bliss).)

295.  In addition to Charter, Mr. Bliss does FAS 142 valuations for other cable companies including Comcast, Cablevision, Insight, Cox and Bresnan Communications. (9/1/09 Tr. 20:9-14 (Bliss).)

296.  Mr. Bliss uses the information and trends he learns from his work with other cable companies and his cable expertise in his work on Charter's FAS 142 valuations. (9/1/09 Tr. 26:7-12 (Bliss).)

297.  The same valuation team had been working on valuing Charter's assets for a number of years.  (7/22/09 Tr. 187:7-9 (Merritt).)  That Duff & Phelps team did "a considerable amount" of valuation work in the cable industry.  (7/22/09 Tr. at 187:10-13 (Merritt).)

298.  Duff & Phelps performed a FAS 142 analysis for Charter as of October 1, 2008.  (9/1/09 Tr. 12:1-6 (Bliss).)

299.  Duff & Phelps also conducted FAS 142 analyses for Charter as of December 31, 2007, October 1, 2008 and December 31, 2008. (9/1/09 Tr.11:18-12:6 (Bliss).)

300.  In performing a FAS 142 analysis, Duff & Phelps attempts to determine the fair value of assets. (9/1/09 Tr.14:6-12 (Bliss).)

301.  Duff & Phelps used Charter's projections from its July Long Range Plan in conducting its FAS 142 "as of October 1, 2008."  (CX 225 at 4; 7/31/09 Tr. 91:20-23 (Schmitz).)

302.  Mr. Bliss developed Charter's projections for 2013 to 2018 for use in Duff & Phelps's DCF for the October 1, 2008 valuation.  (9/1/09 Tr. 17:21-25 (Bliss).)

303.  Mr. Bliss developed the projections for 2013 to 2018 by looking at the trends that Charter was showing in the previous four years, giving consideration to trends shown by Kagan and using his experience working with other cable operators to gauge industry trends. (9/1/09 Tr. 18:9-20 (Bliss).)

304.  Mr. Bliss generated the capital expenditure projections from 2013 to 2018. Mr.  Bliss developed these capital expenditure projections by looking at metrics of basic cost and revenue.  With the reduction of customer growth or success-based revenue, Charter's capital expenditures will be declining. (9/1/09 Tr. 19:13-23 (Bliss).)

305.  Duff & Phelps considered the income approach, the market approach and the cost approach in connection with its October 1, 2008 appraisal and applied them where they could be applied. (9/1/09 Tr.14:13-19 (Bliss).)

306.  In performing a FAS 142 analysis, Duff & Phelps develops a DCF model and values the whole business.  It then tests the DCF model against the market to see if the DCF model makes sense from the market participant standpoint.  (9/1/09 Tr.13:13-14:2 (Bliss).)

307.  The total asset value of Charter "as of October 1, 2008" that Duff & Phelps calculated was $21.585 billion. (9/1/09 Tr. 27:1-15 (Bliss).) This number did not include current

assets such as cash, accounts receivable and prepaid expenses. (8/31/09 Tr. 110:25-111:20 (Taylor).)

308. To arrive at this conclusion, Duff & Phelps followed the same procedures it did for its December 31, 2007 and December 31, 2008 FAS 142 valuations for Charter. (9/1/09 Tr. 27:5-9 (Bliss).)

309. KPMG independently reviewed Duff & Phelps's October 1, 2008 SFAS 142 report and concluded that the methodologies and assumptions, as well as the values estimated by Duff & Phelps were reasonable. (CX 160 at KPMG 0000299; 7/31/09 Tr. 91:7-19, 195:2-5 (Schmitz).)

310. KPMG's valuation group independently reviewed the qualifications of the Duff & Phelps personnel that performed the valuation for Charter and found that they were qualified to perform that valuation. (CX 160 at KPMG 0000299; 8/3/2009 Tr. 85:11-19 (Den Uyl).)

311. KPMG told Ms. Schmitz that they were comfortable with Duff and Phelps's work (7/31/09 Tr. 91:16-19 (Schmitz); 8/3/2009 Tr. 85:11-15 (Den Uyl).)

### ii. Management's use of the Duff & Phelps valuation in its surplus calculation

312. Management conducted its surplus analysis using the Duff & Phelps valuation. (CX 225 at 4; 7/31/09 Tr. 87:3-6 (Schmitz).)

313. Charter used the Duff & Phelps valuation in its surplus calculation because it was the most recent information Charter had and the July long-range plan was the most recent and best information Charter had. (7/21/09 Tr. 211:23-212:12 (Smit).)

314. As part of their analysis in advance of the November interest payments, Ms. Schmitz compared the FAS 142 valuation to prior solvency valuations from Duff & Phelps. Charter determined they were not materially different. Ms. Schmitz concluded that the valuation methodology that Duff & Phelps went through for solvency and for 142 work were not materially different. (7/31/09 Tr. 89:6-15 (Schmitz).)

315. CX 277 is dated October 25, 2008 and contains a surplus calculation. The surplus calculation is a waterfall analysis that begins with Duff & Phelps's fair value of cable assets that Charter had received. Charter then added other non-cable assets, or current assets of the company, to get to a total fair saleable value of all of the assets of the company. That approximated $22.454 billion. Then there are adjustments made to each of the liabilities. Charter was trying to establish what surplus — difference between the value of the assets less the liabilities — was at each of the different entities. (7/31/09 Tr. 86:8-87:17 (Schmitz).)

316. That surplus analysis indicated a $2.8 billion surplus at CCH I. (7/21/09 Tr. 209:17-210:4 (Smit).)

317.    Mr. Smit told the Board that the Duff & Phelps valuation was prepared as a fair saleable value of assets, that it was used for annual franchise analysis and was not a solvency opinion. (7/21/09 Tr. 211:14-22 (Smit).)  Mr. Smit also explained that the Duff & Phelps valuation was a draft report and while the process was "near final," it "was not a finalized report."  Mr. Merritt was nonetheless comfortable with the valuation.  (7/22/09 Tr. 188:16-25 (Merritt).)

318.    Mr. Smit was comfortable relying on the valuation that used the July long-range plan not only because it was the best information Charter had at the time but also because Charter ran sensitivities to it and wanted to be sure it was being cognizant of the some of the other factors in the marketplace. (7/21/09 Tr. 212:13-21 (Smit).)  Moreover, there was not new information for the company to have any different kind of five-year plan. (7/31/09 Tr. 91:24-92:12 (Schmitz).)

319.    Mr. Bliss believes that if he would have finished his calculations into a report "as of October 1, 2008," the $21.585 billion conclusion would not have changed. (9/1/09 Tr. 27:12-15 (Bliss).)

320.    Since doing his work "as of December 31, 2008" for Charter, Mr. Bliss has not come upon any reason to raise questions regarding Duff & Phelps's October 1, 2008 valuation. (9/1/09 Tr. 27:16-19 (Bliss).)

321.    Based on his efforts in reviewing financial statements, Mr. Merritt knows Duff & Phelps uses "a fairly rigorous, lengthy process" that can take weeks, sometimes months. (7/22/09 Tr. 186:11-13 (Merritt).)

322.    Duff & Phelps's valuation was a "rigorous effort to value the assets of" Charter.  Mr. Merritt was "comfortable that it was performed by an outside party with cable knowledge and was relevant and timely information."  (7/22/09 Tr. 188:11-15 (Merritt).)

323.    In Mr. Den Uyl's expert opinion, it was reasonable for Charter management to use the Duff & Phelps valuation as the starting point for its surplus calculation because it was a contemporaneous valuation around the November 2008 time period.  (8/3/2009 87:7-14 (Den Uyl).)

### iii.    *Charter management's sensitivity analysis*

324.    Charter's management also presented a sensitivity analysis to Duff & Phelps's DCF analysis, based on multiples of projected cash flow as a way of testing the reasonableness of the DCF and the assumptions contained therein.  (7/21/09 Tr. 38:3-17 (Millstein); CX 225 at 5.)

325.    Charter conducted the sensitivity analysis because it was unclear what the economic impact would be on the 2009 budget or 2009 results.  Given that it was difficult in November to understand what the 2009 budget would be, Charter sensitized the results for 2009 to give the Board perspective of what various outcomes would look like. (7/31/09 Tr. 102:8-17 (Schmitz).)

326. In conducting the sensitivity analysis, Charter took a range of EBITDA growth rates from 7-8% and then used the EBITDA multiples from 8.5 down to 7.75 to determine the implied enterprise value first and then what that implied CCH I surplus would be. (7/21/09 Tr. 213:9-22 (Smit).)

327. Charter management told the Board that the sensitivity analysis still indicate that CCH I has about $1 billion surplus using an 8 times multiple and 2009 EBITDA growth rate between 7-8%. (7/21/09 Tr. 213:23-214:5 (Smit).)

328. The results of the implied enterprise value and CCH I surplus sensitivity analysis presented to the Board are contained in CX 225. (CX 225 at 5.) Even using a 7.75 times multiple and 2009 EBITDA growth rate between 7-8%, the sensitivity analysis showed a surplus at CCH I of between $366 and $544 million. (CX 225 at 5.)

329. Through the first quarter of 2009, Charter EBITDA growth rate over first quarter 2008 was 13.2%. (7/21/09 Tr. 214:11-14 (Smit).)

330. Ms. Taylor conceded that Charter exceeded the EBITDA projection for 2008 compared to the July long-range plan. (8/31/2009 Tr. 116:13-19 (Taylor).) Ms. Taylor also conceded that Charter exceeded the July long-range plan for the first and second quarter of 2009. (8/31/2009 Tr. 117:17-21 (Taylor).)

### iv. Precedent transactions further supported a finding of surplus at CCH I

331. A third valuation approach is to assess precedent transactions. Charter's management asked Mr. Millstein to provide input on what precedent transaction implied regarding Charter's value. (7/21/09 Tr. 38:22-39:8 (Millstein).)

332. Before the Board meeting, Mr. Smit and Ms. Schmitz asked Mr. Millstein to discuss the implications for Charter's value based on precedent transactions and the implied multiples that been obtained in those transactions. (7/21/09 Tr. 39:18-22 (Millstein).)

333. At the Board meeting, Mr. Millstein provided his views on precedent transactions and whether the multiples that were implied by Duff & Phelps's discounted cash flow analysis were reasonable based on where precedent transactions had previously taken place. (7/21/09 Tr. 86:12-19 (Millstein).)

334. Mr. Millstein advised Charter's Board that the company could be sold in a change of control transaction with the range of multiples of 7.75 to 8.5 that are reflected on page 5 of the Board presentation. (7/21/09 Tr. 39:24-40:1 (Millstein); CX 225 at 5.)

335. To reach that conclusion, Lazard relied upon a database that included transactions for cable companies with more than a million subscribers to reach a size that was at least within a range of Charter's size. (7/21/09 Tr. 40:2-14 (Millstein).)

336. The median implied multiple for those precedent transactions was in the 8 to 9 range. (7/21/09 Tr. 40:16-19 (Millstein).)

337. According to Mr. Millstein, this analysis shows that Charter's value when "fairly valued by a strategic acquirer [in] a change of control transaction referring back to the precedents, was eight." (7/21/09 Tr. at 142:12-15 (Millstein).)

338. As of the November meeting, Mr. Millstein "thought in a change of control transaction the company would trade for an eight multiple." (7/21/09 Tr. 141:13-14 (Millstein).)

339. Mr. Millstein continues to believe that "in regular way financing markets, this company will trade for more than eight." (7/21/09 Tr. 142:3-5 (Millstein).)

340. Before the November Board meeting, Ms. Schmitz also considered sales by Charter of some of its own cable assets. (7/31/09 Tr. 96:19-97:2 (Schmitz).)

341. Charter sold a small cable system in Minnesota for about 9.5 times in November 2008. (7/31/09 Tr. 97:13-21 (Schmitz).)

### v. *Private market multiples were a better indication of value*

342. In November 2008, Mr. Millstein advised the Board that the public trading prices for comparable companies of Charter "were not a fair reflection of value" in the context of this review of surplus. (7/21/09 Tr. 42:13 (Millstein).)

343. In September and October 2008, the "public markers were extremely unbalanced;" there was tremendous pressure on most market participants to sell if they could which created a surplus of sellers and an absence of buyer and had a significant impact on valuations. (7/21/09 Tr. 41:14-25 (Millstein).)

344. Publicly traded comparable cable companies, like Comcast, Time Warner, Cablevision and MediaCom, had fallen considerably during the credit crisis in September and October 2008. (7/21/09 Tr. 41:3-8 (Millstein).)

345. Mr. Millstein's view was that as a result the market was "not a fair reflection of the value of the company." (7/21/09 Tr. 131:20-24 (Millstein).)

346. Mr. Bliss's view is that equity prices are very volatile, especially in the cable industry. The underlying value of a cable companies' assets do not change day-to-day just because the stock market went up or down. The value of a cable company's assets are related to the underlying cash flows. (9/1/09 Tr. 25:12-26:1 (Bliss).)

347. Mr. Bliss's feeling is that the value of the assets of these cable companies was not exhibiting the volatility that the equity prices were. (9/1/09 Tr. 25:12-26:1 (Bliss).)

348. Most of Duff & Phelps's clients through this period all said they were not changing their long-range plans. (9/1/09 Tr. 25:12-26:1 (Bliss).)

349. Mr. Morris of Deutsche Bank testified that did not think that the debt and equity markets were functioning in a traditional fashion in November 2008. (8/18/09 Tr. 75:12 (Dep. Tr. 127:16-128:2) (Morris).)

350. Mr. Nathanson also testified that it was his opinion at the time of the November 14, 2008 Board Meeting, based on his thirty years of experience as a cable operator that "in turbulent financial periods, over the last forty years in the cable business, that the public markets do not properly reflect the value of cable systems necessarily." (9/1/2009 Tr. 238:3 - 21 (Nathanson).)

351. Ms. Schmitz also felt that given the dislocation in the markets, it was difficult to rely on public market multiples to give any indication on the market value of Charter's assets. (7/31/09 Tr. 97:3-14 (Schmitz).)

**D.** **The Charter Board Properly Determined that CCH I Had More Than Sufficient Surplus**

352. The Board determined that CCH I had enough surplus to make a distribution of $63 million to CIH. (8/31/09 Tr. 169:13-19 (Johri).)

353. The Board determined it was in Holdco's best interest to make an $8 million capital contribution to CCH. CCH then used the $8 million contribution from Holdco to make its November interest payment. (8/31/09 Tr. 169:20-170:6 (Johri).)

354. Both decisions were unanimous. (7/21/09 Tr. 214:22-215:4 (Smit).)

355. Mr. Merritt was comfortable the Board had all the data necessary to decide whether to declare a dividend, with three or four relevant pieces of information and the work product two different outside, independent advisors which supported the decision as well as a significant margin for error. (7/22/09 Tr. 195:11-20 (Merritt).)

356. Mr. Merritt considered management's recommendation that surplus existed to be "important" because he was aware that "a great deal of effort had been applied" to the surplus analysis by management and Charter's advisors. (7/22/09 Tr. 191:6-22 (Merritt).)

357. Mr. Merritt considered management's sensitivities because they addressed the "margin of error" and given the unusual recent events in the capital markets, Mr. Merritt considered it "prudent" to know "how much margin of error" Charter had. (7/22/09 Tr. 193:9-17 (Merritt).)

358. Mr. Merritt also considered Mr. Millstein's views on the full value of Charter based on precedent transactions as well was Mr. Millstein's explanation why current trading multiples were not necessarily reflective of that value. (7/22/09 Tr. 194:7-19 (Merritt).)

359. Mr. Merritt "strongly consider[ed] the advice of our financial advisor, both as an expert in the capital markets, but also a group that had been with [Charter] for five or six years and had quite a bit of knowledge of" Charter was well as its competitors. As a result, Mr. Merritt "placed important value on Lazard's view." (7/22/09 Tr. 195:3-10 (Merritt).)

360. Based on Mr. Millstein's advice in the midst of one of the worst credit markets in history, Mr. Johri concluded that the current market conditions and stock prices of Charter's peers

were not reflective of the true value of the company or Charter's competitors. (8/31/09 Tr. 169:3-7 (Johri).)

361.    Mr. Johri believed that multiples reflected in previous market transactions were more appropriate indicators of value than the stock market prices in November 2008. (8/31/09 Tr. 169:8-12 (Johri).)

362.    Mr. Marc Nathanson, who was a member of the Charter Board of Directors in the fall of 2008, testified that in deciding to approve the resolution allowing CCH I to make a distribution in November 2008, he relied on the commentary of the audit committee, management and Jim Millstein of Lazard. (9/1/2009 Tr. 236:11-19 (Nathanson).)

363.    As a Board member, Mr. Conn voted to make the November interest payments because he was convinced by management's recommendation that it was the right thing to do. (9/2/09 Tr. 137: 3-22 (Conn).)

364.    Mr. Temple, who also attended the November 14, 2008 Board meeting, similarly had no concerns about the surplus analysis performed by Charter management. (9/1/09 Tr. 46:10-12 (Temple).)

365.    The Board properly exercised its business judgment in declaring a dividend. (7/22/09 Tr. 195:21-23 (Merritt).)

366.    If Charter had concluded that CCH I did not have surplus, it still would have been able to pay the November interest payments through the use of intercompany notes and accounts. So while Charter did determine that there was surplus and the payment was made through a distribution, if Charter had not so determined, it would certainly have had the ability to use those other vehicles to pay the interest. (7/31/09 Tr. 101:15-102:2 (Schmitz).)

## E. Contemporaneous Valuations of Charter Also Indicated Surplus At CCH I

367.    Project Cosmos was an initiative to see if Charter could monetize its NOLs. The idea was to partner with a strategic partner that could possibly invest in the company and in exchange get access to Charter's future NOLs. (7/21/09 Tr. 200:14-23 (Smit).)

368.    Project Cosmos lasted from the summer of 2008 through the early fall of 2008. (7/21/09 Tr. 200:22-24 (Smit).)

369.    The potential partners for were Comcast, Time Warner and other peers. (7/21/09 Tr. 201:2-5 (Smit).)

370.    Charter provided its July Long Range Plan to some of these potential partners. (7/21/09 Tr. 201:6-12 (Smit).)

371.    The potential partners made financial presentations to Charter. During these presentations these potential partners assigned potential EBITDA values to Charter's assets. In those presentations, the partners valued Charter with exit multiples of the business within 8.5-9.5 range. (7/21/09 Tr. 201:14-202:8 (Smit).)

372. On October 31, 2008, SNL Kagan, a prominent cable industry analyst valued Charter's cable assets at $21.9 billion—in line with the Duff & Phelps analysis at that time. *See* CX 292 at 15 (citing *Cable TV Investor: Deals & Finance*, at 13 (Oct. 31, 2008) (CX 191 at 13).) Moreover, SNL Kagan valued Charter's cable assets at $21.9 billion while recognizing that the stock market was punishing stock valuations of Charter and its peers. (CX 191 at 13 (noting that recent market gyrations provide "a rare opportunity to buy cable stocks at a deep discount".)

## F. Valuation Experts

### i. Den Uyl's DCF analysis

373. Bruce Den Uyl is a managing director and co-leader of the financial services advisory group at AlixPartners. (8/3/2009 Tr. 79:21-24 (Den Uyl).) Mr. Den Uyl was qualified by the Court in this proceeding as an expert in valuation and surplus analysis. (8/3/2009 Tr. 81:2-10 (Den Uyl).)

374. In Mr. Den Uyl's expert opinion, CCH I had adequate surplus at November 17, 2008. (8/3/2009 Tr. 80:11-15 (Den Uyl).)

375. In Mr. Den Uyl's expert opinion, the company and the Board, at the time, had adequate reason to believe that CCH I did have surplus. (8/3/2009 Tr. 93:5-9 (Den Uyl).)

376. In the course of his review in this matter in order to determine whether surplus existed at CCH I sufficient for the dividend in November 2008, Mr. Den Uyl reviewed a number of documents related to the valuation of the company to see what the value of the assets would be at the time, and conducted three of his own discounted cash flow valuations. (8/3/2009 Tr. 83:12-19 (Den Uyl).)

377. Mr. Den Uyl identified and reviewed contemporaneous evidence of surplus at CCH I as of November 17, 2008, including: the Duff & Phelps draft valuation as of October 1, 2008; various market transactions with respect to cable companies or cable systems; the public market valuation of Charter at the time; testimony of members of the Board of Directors with experience in the cable industry that had various valuation indicia; transactions and other evidence of value reviewed by management; and the comments of Mr. James Millstein of Lazard Freres, who commented on the various analyses that had been done at the time. (8/3/2009 Tr. 84:4-17 (Den Uyl).)

378. Mr. Den Uyl ran several sensitivity analyses to determine whether or not Charter would still have surplus based on some lower projections than were in the July long-range plan. (8/3/2009 Tr. 101:25-102:6 (Den Uyl).) Charter still showed surplus even under those sensitivity calculations. (8/3/2009 Tr. 101:21-25 (Den Uyl).)

379. Mr. Den Uyl explained that the use of a tax step-up basis is reasonable because in the cable industry, as well as other industries, there are a number of asset transactions and one of the things that people try to do is to take advantage of the tax shield resulting from the transaction. (8/3/2009 Tr. 94:18-23 (Den Uyl).)

380. Mr. Den Uyl concluded that the enterprise value of Charter exclusive of NOLs under his "no tax step-up" methodology, however, was "[j]ust a little under twenty billion dollars," which yields "more than adequate surplus." (8/3/2009 Tr. 106:21-107:1 (Den Uyl); C Demo 24.)

381. Mr. Den Uyl concluded that the enterprise value for Charter under his November sensitivity case — i.e., excluding the tax step-up and using lower projections than the July LRP — was $19.2 billion, which yields "adequate surplus." (8/3/2009 Tr. 110:13-20 (Den Uyl); C Demo 22.)

382. Mr. Den Uyl concluded that the enterprise value of his downside case DCF — i.e., excluding the tax step-up and lowering the July LRP by 300 basis points — was "a little over nineteen billion dollars," which still yields a surplus. (8/3/2009 Tr. 111:24-112:5 (Den Uyl).)

383. Mr. Den Uyl considered a range of transaction precedent multiples for the sale of cable companies or cable system transactions (as opposed to the sale of just their stock). (8/3/2009 Tr. 117:3-119:5 (Den Uyl); C Demo 29.) These precedent transactions revealed both mean and median ranges tightly banded around multiples of 9.3 and 11.4, with the average being 10.3 and the median 10.1. (8/3/2009 Tr. 119:8-15 (Den Uyl).) Mr. Den Uyl concluded that using these ranges of multiples, there would be "significant surplus." (8/3/2009 Tr. 120:2-5 (Den Uyl).)

### ii. Den Uyl's other analyses

384. Mr. Den Uyl looked at Charter's ability to pay its debts as they became due in November 2008 and January 2009 using intercompany balances, even apart from using surplus to make a dividend. (8/3/2009 Tr. 120:15-121:5 (Den Uyl); C Demo 34.) Mr. Den Uyl's analysis showed that Charter had the ability to make the interest payments due in November and January using only the intercompany accounts. (8/3/2009 Tr. 120:6-121:21 (Den Uyl).) Even assuming that Charter did use a dividend payment to make its November interest payment, Mr. Den Uyl's analysis shows that there were intercompany balances available to make the January interest payment. 8/3/2009 Tr. at 120:10-122:4 (Den Uyl).)

385. In addition to conducting three of his own DCF calculations and considering precedent transaction multiples in determining a valuation for Charter, Mr. Den Uyl also considered the contemporaneous valuations for Charter issued by third party analysts, including Wall Street equity analysts (including JPMorgan) and telecom industry analysts like Kagan during the fall of 2008. (8/3/2009 Tr. 121:8-15 (Den Uyl).) These third party valuations that Mr. Den Uyl considered indicated values for Charter between $19.4 billion and $23 billion. (8/3/2009 Tr. 122:20-123:7 (Den Uyl); C Demo 33; CX 394 at CTR-00042457; CX 330 at 15; CX 341 at 2, 9.)

386. Mr. Den Uyl also considered and discussed in his testimony an internal JPMorgan DCF calculation of Charter that valued Charter at $22.8 billion. (8/3/2009 Tr. 125:11-126:11 (Den Uyl); CX 123 at JPM-CH 00018654.)

387. Mr. Den Uyl also considered and discussed in his testimony a DCF valuation performed by Kagan at the end of October 2008 that valued Charter at $21.9 billion. (8/3/2009 Tr. 126:23-127:9 (Den Uyl); CX 191 at 13.) Mr. Den Uyl contacted Kagan to confirm that their figure was in fact a DCF analysis rather than a book value figure for Charter, and Kagan so confirmed. (8/3/2009 Tr. 127:10-21 (Den Uyl).)

### iii. JPMorgan expert's methodology is flawed

388. Ms. Carlyn Taylor, the expert for JPMorgan, did not prepare her own surplus calculation. (8/3/2009 Tr. 93:13-15 (Den Uyl).); 8/31/09 Tr. 104:23-105:1 (Taylor).)

389. Ms. Taylor did not offer a specific valuation figure, but rather reviewed the valuation work of others performed under various valuation approaches and assessed that work against the surplus break-even amount. (8/31/2009 Tr. 52:19-53:8; 104:23-105:1 (Taylor).) Although Ms. Taylor indicated that she is able to generate a discounted cash flow valuation for Charter, and that she in fact started out to do so in this case, she never completed her own valuation. (8/31/2009 Tr. 104:9-105:24 (Taylor).)

390. Rather than including either the higher stepped-up amortization and depreciation as Mr. Den Uyl suggested would be reasonable, or even just the existing levels of depreciation and amortization that Charter previously showed on its books, Mr. Taylor took both types out. (8/3/2009 Tr. 95:15-25 (Den Uyl); C Demo 15.)

391. If one adjusted Ms. Taylor's analysis to include the existing depreciation that Charter had and the buyer would get if they bought the company in a stock transaction, her figure would increase by $200 million. (8/3/2009 Tr. 97:19-98:2 (Den Uyl).)

392. Ms. Taylor also excluded any value for NOLs. (8/3/2009 Tr. 98:3-7 (Den Uyl).) The value of Charter's NOLs as calculated by different Wall Street equity analysts is between "a little over a billion dollars for JPMorgan up to two billion dollars through a Lehman Brothers' calculation." (8/3/2009 Tr. 98:8-99:1 (Den Uyl).)

393. When Mr. Den Uyl corrected for certain of the errors he identified in Ms. Taylor's report — i.e., the fact that she completely took out the amortization, that she did not consider the existing depreciation of the company, and the omission of any value for NOLs — Charter's valuation was $19.76 billion. (8/3/2009 Tr. 99:8-21 (Den Uyl).) This corrected value shows a surplus at CCH I. (8/3/2009 Tr. 99:22-24 (Den Uyl).) When the additional $900 million that Ms. Taylor had subtracted for capital expenses is added back in, that valuation amount increases to be in the $20.6 billion range. (8/3/2009 Tr. 100:4-7 (Den Uyl).)

394. Ms. Taylor did not list a single JPMorgan document in the list of documents she relied upon in her report, nor does she recall relying on any JPMorgan documents in her analysis. (8/31/2009 Tr. 77:6-14; 78:4-7 (Taylor).) Ms. Taylor also confirmed that she did not receive any surplus analyses performed by JPMorgan in the course of her work, and that she is not aware of JPMorgan ever conducting a surplus analysis of Charter. (8/31/2009 Tr. 77:16-23 (Taylor).) She also confirmed that she did not receive any

analyses from JPMorgan about Charter's ability to pay its debts as they become due. (8/31/2009 Tr. 77:24-78:3 (Taylor).)

395. Ms. Taylor did not review or rely upon any analyst reports that were explicitly about Charter. (8/31/2009 Tr. 79:13-15 (Taylor).)

396. Ms. Taylor acknowledged that Kagan, a prominent cable industry analyst that she had referred to in her report as "one of the best sources" for data and metrics in the industry, published a private market valuation of Charter's assets at $21.89 billion. (8/31/2009 Tr. 143:4-145:3 (Taylor); CX 191 at 13.)

397. Ms. Taylor also acknowledged that a Citibank analyst report dated November 7, 2008 presented a DCF value for Charter of $19.5 billion. (8/31/2009 Tr. 142:4-143:16 (Taylor); CX 252 at CS_00017545.)

398. Ms. Taylor acknowledged that a Morgan Stanley analyst report dated November 25, 2008 presented a DCF value of Charter's assets of $22.184 billion, though she disagreed with the context of that value. (8/31/2009 Tr. 150L:9-152:24 (Taylor); CX 341 at 9.)

### G. Vulcan's Later-Performed Analyses Do Not Support JPMorgan's Argument

#### i. Vulcan business plan analysis

399. Consistent with its efforts in other years, after the November 14th Board meeting, Mr. Conn told Mr. Allen that Vulcan was planning to assess Charter's budget and long-range plan. (9/2/09 Tr. 96:18-22 (Conn).)

400. Mr. Conn thought it prudent to be prepared to respond to management's recommendations. To do so, Vulcan tried to understand Charter's business plan and long-range plan, including the surplus issue. (9/2/09 Tr. 98:12-18 (Conn).)

401. Mr. Conn directed Chris Temple to have the Vulcan investment team develop "our own version of an operating plan … with our own forecasts based on our own understanding of the business." (9/2/09 Tr. 98:22-99:2 (Conn).)

402. Anchi Chern, a junior analyst at Vulcan, was given this task. (9/2/09 Tr. 99:15-22, 100:21-101:10 (Conn).)

403. The assignment was much broader than simply "an investigation into the surplus issue." Mr. Conn wanted "an independent view of the business's operating plan, because everything cascades from that." (9/2/09 Tr. 100:3-8 (Conn).)

404. This project was "a good test project" for Mr. Chern so Mr. Temple suggested it was "Paul's special request" to "light a fire" under him. (9/2/09 Tr. 100:21-101:10 (Conn); JPX 84.)

405. It is inappropriate to describe JPX 84, Mr. Chern's work product, as Vulcan's internal valuation. (9/2/09 Tr. 137:23-138:5 (Conn).) "Any sort of Vulcan analysis of Charter

starts with the company's operating plan and having a point of view about it [a]nd that's the fundamental piece that's missing" in Mr. Chern's work. (9/2/09 Tr. 138:20-23 (Conn).)

406. Mr. Chern's efforts were based solely on the Wall Street projections. (JPX 84 at VUL 00003073; 9/2/09 Tr. 102:24-103:2 (Conn).) Mr. Chern's work product was not useful to Vulcan "because it relied on Wall Street estimates [and] it wasn't an independent view of the company's business. Wall Street estimates had typically been lower than the company's plan [and] [f]or some time the company had been outperforming" those estimates. (9/2/09 Tr.103:13-17 (Conn).)

407. Mr. Conn did not ask Mr. Chern to do any follow-up work because he concluded that they "either mis-communicated" or Mr. Chern was "not given enough instruction" and "probably was going to be incapable of learning [Charter's business] that quickly." (9/2/09 Tr. 103:18-25 (Conn).)

408. The prior Charter team had been more senior and had been performing analyses of Charter for four years whereas this was Mr. Chern's first Charter effort. (9/2/09 Tr. 138:9-13, 25-139:2 (Conn).)

409. Mr. Chern's work product differed qualitatively from the work product Vulcan's Charter team had produced in the past. (9/2/09 Tr. 138:9-13 (Conn).) Mr. Conn wanted an independent analysis — an internal "judgment based on what [Vulcan] knew about the asset to actually have an internal view on the results." (9/2/09 Tr. 139:6-10 (Conn).)

410. As a result, Mr. Conn concluded, given that he knew more than Mr. Chern about Charter's individual line items, he would make his own assessment as to what he thought of their likelihood of success in the forecasts. (9/2/09 Tr. 103:20-104:3 (Conn).)

411. Mr. Conn did not rely on Mr. Chern's effort. Instead, he decided to rely on his own judgment and management's work because he did not have a team that was, as of late 2008, prepared to pull all of the necessary analysis together. (9/2/09 Tr. 105:7-18 (Conn).)

412. JPX 111 is document labeled Surplus Forecast-Constant Fair Value dated December 22, 2008. JPX 111 is not accurate to the extent that any one suggests that, based on December projections, CCI I did not have surplus on November 15, 2008. (9/2/09 Tr. 113:6-12 (Conn).)

413. Neither Mr. Conn nor Mr. Chern believe it is accurate. (9/2/09 Tr. 113:11-14 (Conn).)

414. The EBITDA number that was the input at the top of the right-hand column to calculate surplus on a pro-forma basis as of November 15, 2008 was from the December 2008 long-range plan, which was not in existence as of November 14, 2008 when the Charter Board met. (9/2/09 Tr. 139:14-25 (Conn).)

415. Mr. Chern prepared JPX 111 and explained to Mr. Conn how he prepared it after the fact. (9/2/09 Tr. 111:6-9, 12-20 (Conn).)

416. In preparing the right-hand column on JPX 111, Mr. Chern "took the model he received from the company, which may or may not have been accurate and he plugged in a number, and this was the result." (9/2/09 Tr. 113:22-23 (Conn).)

417. After Mr. Chern prepared JPX 111, he realized that pieces of the analysis were incorrect, because there were amounts that he had not included, perhaps the model had been changed or there were things he didn't take account of. (9/2/09 Tr. 113:23-114:2 (Conn).)

### ii. *Miller Buckfire analysis used for negotiations*

418. Miller Buckfire did not value Charter at five to six times 2009 projected EBITDA. Mr. Conn recalled the valuation multiple range being from six to eight. (9/2/09 Tr. 108:2-6, 110:9-16 (Conn).)

419. Miller Buckfire may have taken a negotiating position in discussions about a potential Vulcan new money investment that the enterprise multiple of projected 2008 cash flow was between five and six times, but in doing so, "they probably would have been negotiating" and "wouldn't have been putting what they thought the true value was." (9/2/09 Tr. 110:15-16 (Conn).)

## X. CHARTER PROPERLY MADE ITS JANUARY INTEREST PAYMENTS

### A. The January 14 Board Meeting

420. Charter had approximately $73.7 million of interest payments due on January 15, 2009, including $13 million due from CCH and $60.7 million due from CIH. (CX 401 at 2; CX 135 at CTR-00002264.)

421. Charter held a Board meeting on January 14 to determine whether to make its January interest payments. (7/21/09 Tr. 219:15-17 (Smit).)

422. The discussions revolved around the status of the discussions with the bondholders and with Vulcan. There was a legal conversation with the advisors whether to make the payment and consequences of not making the payment. (7/21/09 Tr. 219:18-24 (Smit).)

423. At the January meeting, Charter discussed making the payments using intercompany accounts. (7/21/09 Tr. 219:25-220:6 (Smit).)

424. Management recommended that Charter not make the payments and utilize the 30 day grace period, to further engage in conversations with the bondholders. (7/21/09 Tr. 220:9-18 (Smit).)

425. It was also Mr. Millstein's view that Charter should exercise the grace period and not make the interest payments on January 15. (7/21/09 Tr. 57:12-16 (Millstein).)

426. Mr. Millstein believed that use of the grace period would help the Crossover Committee to realize that Charter is serious. (7/21/09 Tr. 57:17-21 (Millstein).)

427. "Without prejudging the Board's determination on" Charter's ability to make the January 15 interest payments, Mr. Millstein told the bondholders that "there were risks that [Charter] could not find legal means to move the money to the relevant payor/obligor on the interest payments due down the road." (7/21/09 Tr. 59:13-17 (Millstein).)

428. The Board decided to utilize the grace period and not make the January interest payment. (7/21/09 Tr. 220:9-18 (Smit).)

429. The Board so decided because they felt there was opportunity in further conversation with the bondholders and that there was no real penalty or we wouldn't be defaulting by not making the payment at that time. (7/21/09 Tr. 220:19-23 (Smit).)

430. The use of the grace period had the intended effect. (7/21/09 Tr. 57:17-21 (Millstein).)

431. After Charter used the grace period, it received "a much more serious level of engagement" with the Crossover Committee and the parties reached a deal before the grace period expired. (7/21/09 Tr. 57:22-24 (Millstein).)

### B. Charter Could Have Made the Interest Payment

432. Charter management's recommendation to take the grace period did not relate in any way to the Credit Agreement. (7/31/09 Tr. 122:12-15 (Schmitz); 7/22/09 Tr. 196:4-8 (Merritt).)

433. Charter had not made any determination at that time whether surplus existed at any entity. (7/21/09 Tr. 220:24-221:2 (Smit); 7/21/09 Tr. 58:24-59:3 (Millstein).)

434. Management did not make a presentation regarding surplus calculation during the January meeting and the Board was not asked to declare a dividend. (7/22/09 Tr. 196:25-197:6 (Merritt).)

435. At the time of the January meeting, Charter had the ability to make the January interest payments. (7/21/09 Tr. 221:8-10 (Smit); 7/31/09 Tr. 121:4-7 (Schmitz); 8/17/09 Tr. 15:13-14 (Doody).)

436. Charter's legal advisor, Kirkland & Ellis LLP, made a presentation at that Board meeting regarding the ways in which Charter could make the interest payments. (8/17/09 Tr. at 15:18-22 (Doody).)

437. Before issuing the press release, Ms. Schmitz contacted JPMorgan and told JPMorgan that Charter was electing to take the grace period, that it was continuing conversations with bondholders, and that those conversations had not proceeded far enough for Charter to feel comfortable making the interest payment. (7/31/09 Tr. 125:11-17 (Schmitz).)

438. Mr. Hooker does not recall at any point in time in his conversation with Ms. Schmitz her saying that Charter was unable to make its January 15, 2009 interest payment. (7/31/09 Tr. 48:15-18 (Hooker).)

439. Based on this disclosure to JPMorgan, nobody from JPMorgan requested any additional information regarding the DHC surplus levels or ability to pay debts in the future. (7/31/09 Tr. 126:1-4(Schmitz).)

440. KPMG was not at the meeting and was not involved in the presentation to the Board (JPX 141A at CTR-00040815A; 8/17/09 Tr. 16:19-24 (Doody).)

441. Neither Mr. Smit nor Ms. Schmitz ever told KPMG that Charter did not make the January interest payment due to a lack of surplus. (7/21/09 Tr. 221:11-13 (Smit); 7/31/09 Tr. 122:16-19 (Schmitz).)

442. The statement in KPMG's work papers that "Certain interest payments at CIH and CCH were not made on their stated due date of January 15th, 2009 due to lack of surplus at CIH and CCH I being at break-even" is incorrect. (8/17/09 Tr. 17:7-15 (Doody).)

443. No one at Charter had the ability to review and/or revise KPMG's work papers. (8/17/09 Tr. 17:16-19 (Doody).)

444. Mr. Smit never told any of the Noteholders that Charter did not make the January interest payment due to a lack of surplus. (7/21/09 Tr. 221:14-16 (Smit).)

445. Mr. Millstein told the Crossover Committee members "all the good and valid reasons that [Charter] had for being concerned about making the payment, and that [Charter] needed more time to explore opportunities to comfort ourselves that we had the ability to do it." (7/21/09 Tr. 58:4-7 (Millstein).)

446. Mr. Doody's draft declaration (JPX 194) was shared with JPMorgan's counsel as a courtesy because of the ongoing negotiations and the possibility that a free fall bankruptcy could occur. (8/17/09 Tr. 18:15-24 (Doody).)

447. The statement in paragraph 8 of the draft declaration that "First Charter determined, in exercising its fiduciary duty then in compliance of applicable law, that it could not make two interest payments for junior entities in its capital structure which were due on January 15th in the amount of seventy-four million dollars" is incorrect. (8/17/09 Tr. 19:13-24 (Doody).)  This statement was not an admission by Charter of an inability to pay its debts as they became due. (8/17/09 Tr. 19:22-24 (Doody).)  In fact, Mr. Doody had never seen this draft declaration before the motion to dismiss hearing. (8/17/09 Tr. 19:25-20:5 (Doody).)

448. Although during his deposition, Mr. Temple suggested that he believed that Charter may have been unable to make the January interest payment, he later clarified:  "Start with one qualification in that I actually believed that that decision was reached at the January 14th board meeting which I did not participate in.  I had a child that morning so I got that day off.  So some of this is I guess second-hand. But the management and its advisors and Vulcan and its advisors and the board had all concluded that the company had adequate liquidity to make the January payment but ultimately determined not to, at the advice of a variety of business and legal advisors to facilitate an out-of-court restructuring. (9/1/09 Tr. 241:20-242:18 (Temple).)

## C. Charter Made The January Interest Payments Within The Grace Period

449.     Based on advice it received, as reflected in a presentation to the Board (CX 401), on February 13, 2009, CIH and CCH made interest payments totaling approximately $75 million, which included the $73.7 million that was due on January 15, as well as an additional $1.4 million in interest that accrued on the January 15 payments. (CX 135.)

450.     To enable these interest payments, CCO repaid $73 million of intercompany payables due to Holdco. (CX 135 at CTR-00002269; 7/21/09 Tr. 221:17-23 (Smit).)

451.     Holdco then made a capital contribution of $73 million to CCH. (CX 135 at CTR-00002273; 7/21/09 Tr. 221:17-23 (Smit).)

452.     CCH then paid $13.2 million in interest due on its bonds within the grace period permitted for its January 15 interest payments. (CX 135 at CTR-00002277.)

453.     CCH also made a capital contribution of $59.8 to CIH. (CX 135 at CTR-00002281; 7/21/09 Tr. 221:17-23 (Smit); 7/22/09 Tr. 257:4-15 (Merritt).)

454.     CIH then paid $61.9 million in interest due on its bonds within the grace period permitted for its January 15 interest payments. (CX 135 at CTR-00002285.)

455.     None of these transactions on February 13, 2009 required surplus. (7/21/09 Tr. 221:17-222:1 (Smit).)

456.     When Charter made the January interest payment, Charter paid out the full amount of the interest payment. Charter paid by paying the agent for the bonds, which is the method of payment required. (7/31/09 Tr. 123:10-15 (Schmitz).)

457.     To further ensure that the Crossover Committee was committed to the proposed plan, Charter secured a commitment from the Crossover Committee to place their portion of the pending interest payment in escrow which would return to Charter if the plan failed. (7/21/09 Tr. 68:15-22 (Millstein).)

458.     Charter negotiated placing a portion of the January interest payment in escrow because the Board wanted evidence of the Crossover Committee's commitment to the plan. (8/17/09 Tr. 43:24-44:7 (Doody).)

459.     "In the exercise of our business judgment . . . we thought for the twenty-six odd million that wasn't put in escrow that . . . we were getting reasonably equivalent value for that. And continuing to negotiate what turned out to be a very successful plan of reorganization." (8/17/09 Tr. 130:3-7 (Doody).)

460.     The escrow backstop was a protection for the CCI Noteholders. (8/17/09 Tr. 271:3-10 (Doody).)

461.     None of the escrowed amounts were either retained or recorded on Charter's books. (7/31/09 Tr. 123:25-124:2 (Schmitz).)

462. If the plan does not succeed, the interest payment funds in escrow return to Holdco. (8/17/09 Tr. 75:8-10 (Doody).)

463. The Plan is designed so that the CCI Noteholders receive the full recovery on account of the intercompany claims owed from CCO before making the January interest payment. That is, the Plan provides a recovery to CCI and Holdco on account of intercompany claims, examined before making the January interest payment, plus a significant premium. (8/17/09 Tr. 269:1-11 (Doody); CX 159 at CTR 323.)

## D. Taking Advantage Of The Grace Period Was Not A Default

464. Neither Mr. Hooker nor Mr. Van Lith suggested that there was any default under the Credit Agreement at this time. (7/31/09 Tr. 125:23-25 (Schmitz).)

465. Nobody from JPMorgan suggested that the nonpayment of the January 15 interest payment was a default under the Credit Agreement. (7/31/09 Tr. 1225:18-22 (Schmitz).)

466. Instead, in a January 27, 2009 memo to the Senior Secured First Lien Lenders, JPMorgan specifically informed the Secured First Lien Lenders that "Failure to make the bond payment will <u>not</u> give rise to an Event of Default under the senior secured credit agreement unless the bonds are accelerated as a result thereof. (7/31/09 Tr. 23:2-9 (Ruyter); CX 127)(emphasis in original.)

467. Deutsche Bank similarly noted that Charter's failure to make the January 15 interest payment on January 15 was not a default. In an email Deutsche Bank Director Anca Trifan explained that "Charter has bond pmts due Jan 15 and rumors are that they will not make the payments - this will not result in a default under the CA unless the bondholders call a default." (CX 179 at DB-CH 00012363.)

## E. Making The Interest Payment Was The Right Decision

468. The November and February interest payments made with Holdco funds "continued maintaining the viability of the enterprise while a consensual plan of reorganization was negotiated." (8/17/09 Tr. 75:2-4 (Doody).)

469. Without making the interest payments in February, the prearranged plan would not have been possible. (8/17/09 Tr. 74:24-75:4 (Doody).)

470. Mr. Merritt concluded that making the January 15 interest payment was in the best interests of Charter because it allowed for the 3-4 week due diligence period that was part of the term sheet agreement and the removal of the due diligence out that was part of the term sheet. (7/22/09 Tr. 267:12-24 (Merritt).)

471. The entire restructuring may have fallen apart if Charter had not made the January 15 interest payment before the grace period expired. (7/22/09 Tr. 267:19-268:6 (Merritt).)

472. Mr. Johri believed that making the February interest payments was a better risk than going for a free fall bankruptcy. (8/31/09 Tr. 180:23-181:4 (Johri).)

473.	Charter's Board was concerned that "a protracted Chapter 11 could take management's attention from the marketplace" and could cause turnover with Charter's "top-flight management team", could hurt Charter's value and could be a significant cost. Overall, "the board was very concerned that a freefall would diminish value materially." (7/22/09 Tr. 202:3-23(Merritt).)

F.	**KPMG's Going Concern Opinion Was Based Mostly On Charter's Declared Intent To File For Bankruptcy**

474.	KPMG does not share it work papers with Charter's audit chair. (7/22/09 Tr. 235:12 (Merritt).)

475.	Mr. Merritt first learned that KPMG would be issuing a going concern opinion for Charter during the regularly scheduled audit committee meeting on February 23, 2009. (7/22/09 Tr. 197:13-17 (Merritt).)

476.	This was after Charter announced it had reached a term sheet agreement with certain bondholders and the Vulcan-Allen group. (7/22/09 Tr. 197:18-21(Merritt).)

477.	In the accountant's report that is contained in Charter's 2008 10-K, CX 217, KPMG concluded that there was substantial doubt as to Charter's ability to continue as a going concern. (7/22/09 Tr. 198:2-6 (Merritt).)

478.	Three different considerations led to the conclusion of substantial doubt; one of those was a ***potential*** lack of surplus. (7/22/09 Tr. 239:7-12 (Merritt); (CX 217 at F-2)(emphasis added.)

479.	In a work paper memorandum documenting Charter's surplus position at various entities in 2008 and prospectively for 2009, formally completed on February 14, 2009, KPMG explained that "[t]he determination of whether an entity has surplus at any particular point in time requires a substantial amount of estimates," including estimates of the fair value of assets, estimates of liabilities, and estimates of the fair value of intangible cable assets. (JPX 142 at KPMG 755.)

480.	KPMG further explained that "[t]he other complex factor regarding surplus estimates relates to timing and availability of data." Indeed, "[g]iven the lag in data, on a retrospective basis, management has the ability to develop a surplus estimate at a point in time. However, an estimate prepared retrospectively is not indicative of the estimate which could have been prepared on that specific date. For example, a surplus estimate made on October 1, 2008 prior to the closing of the Q3 financial statements and in the absence of a valuation study will be different from the retrospective surplus estimate for October 1, 2008 that can be prepared in December 2008, after the closing of the financial statements and when a draft valuation study is available." (JPX 142 at KPMG 755-56.)

## XI. CHARTER HAD OTHER OPTIONS FOR ADDRESSING NOVEMBER 2008 AND JANUARY 2009 INTEREST PAYMENTS

### A. Mr. Hooker Testified That Charter Had The Ability To Resolve Future Debts

481. Mr. Hooker testified that the ability of Charter to move its obligations would take it outside the scope of 8(g)(v). (7/31/09 Tr. 53:7-10 (Hooker).) It is a question of is there some type of strategic transaction, debt for debt exchange, debt for equity exchange that could be accomplished to resolve the forthcoming debt. (7/31/09 Tr. 54:19-23 (Hooker).)

482. Ms. Kurinskas's understanding is "there has to be an impediment to the company's ability to pay their debts in the future." (8/25/09 Tr. 29:3-5 (Kurinskas).)

483. Prior to February 5, 2009 Ms. Kurinskas was informed that JPMorgan had ongoing discussions with Charter and that they did have the ability to resolve or otherwise restructure future debts. (7/31/09 Tr. 54:24-55:6 (Hooker).)

### B. Charter Has A History Of Extending Maturities

484. There were numerous ways that Charter's subsidiaries could pay their debts that did not involve surplus: intercompany loans, raising capital, exchange offers, and asset sales. (8/17/09 Tr. 22:12-22 (Doody).)

485. Since its retention in 2002, Lazard has worked with Charter to extend maturities through refinancings and exchange offers in order to increase the runway that Charter had to grow into its capital structure. (7/21/09 Tr. 33:15-17 (Millstein).)

486. Charter has used refinancings or exchanges to pay its debts or extend its debts at DHCs. (7/31/09 Tr. 84:25-85:2 (Schmitz).)

487. There have been a significant amount of refinancings, in the form of raising new high-yield issuances to replenish the revolver so the revolver has the liquidity then to repay maturities. Charter has also used exchanges extensively through the capital structure that allows Charter to exchange debt that has a stated maturity date to a different note with a longer maturity date. (7/31/09 Tr. 85:3-15 (Schmitz).)

488. An exchange allows Charter to address the principal and potentially change the cash interest requirements without raising new funds. (7/31/09 Tr. 85:16-23 (Schmitz).)

### C. Banks Including JPMorgan Were Pitching To Charter In November And December 2008

#### i. JPMorgan pitches

489. JPMorgan's strategy as of November 24, 2008 was to pitch potential debt for debt exchanges to Charter to push out near term maturities and also to continue to investigate

opportunities to reduce exposure. (7/31/09 Tr. 21:11-19 (Ruyter); CX 123 at JPM-CH 00018655)

490. CX 244 is a November 10, 2008 Presentation from JPMorgan to Charter. The purpose of the November 10, 2008 presentation to Charter was to discuss with Charter a 2010 senior note exchange. (7/31/09 Tr. 41:18-25 (Hooker).)

491. In this November 10, 2008 Presentation to Charter, JPMorgan states that "JPMorgan believes Charter has several financing options available in today's dislocated market." and that "the current market environment provides an opportunity for Charter to extend optionality and capture discounts." (7/31/09 Tr. 111:20-112:6 (Schmitz); CX 244 at CTR-00034320.)

492. It was also Mr. Hooker's personal belief on or about November 10, 2008 that "Charter has several financing options available in today's dislocated markets" and that "the current market environment provides an opportunity for Charter to one extend optionality and two, capture discounts." (7/31/09 Tr. 42:6-14 (Hooker); CX 122 at JPM-CH 00025808.)

493. During the November 10, 2008 meeting discussing this presentation, no one from JPMorgan told Ms. Schmitz that the disclosure in the third quarter 10Q regarding the risk factor of surplus meant that Charter would not be able to engage in financing transactions; no one from JPMorgan requested an analysis of the Designated Holding Companies' surplus levels in order to engage in financing transactions; and no one from JPMorgan requested an analysis of the Designated Holding Companies' ability to pay its future debts. (7/31/09 Tr. 112:7-19 (Schmitz).)

494. In the November 24, 2008 CSR, JPMorgan reiterated its internal strategy with respect to Charter: "JPMorgan continues to pitch potential debt-for-debt exchange to the company in order to push out near-term maturities. We also continue to investigate opportunities to reduce exposure." (CX 123 at JPM-CH 00018655; 8/25/09 Tr. 88:9-19 (Kurinskas).)

### ii. *Deutsche Bank pitches*

495. In a November 20, 2008 outline of possible scenarios or ideas to consider for Charter, Deutsche Bank suggested that Charter consider one of the two following short term alternatives to extend near term 2010 maturities: 1) exchange $500 million of 10.25% CCH II notes due 2010 for new, 12% area CCOH Senior Notes due 2014; 2) issue $500 million of incremental term loan at CCO to buyback 10.25% senior notes due 2010 at CCH II. (CX 172 at DB-CH 00004518; 8/18/09 Tr. 75:12 (Dep. Tr. 125:10-127:2) (Morris).)

496. On November 26, 2008 Malcolm Morris of Deutsche Bank informed Ms. Schmitz that Deutsche Bank believed it had a convincing "3 step plan" for Charter to manage its 2010 maturities and to grow in to into its capital structure and was keen to discuss it with Ms. Schmitz (CX 173 at DB-CH 00014799; 8/18/09 Tr. 75:12 (Dep. Tr. 133:22-135:11) (Morris).)

497. A December 2, 2008 Deutsche Bank presentation entitled "Charter discussion materials" identifies several recommendations with respect to Charter's 2010 maturities including exchanging notes at CCOH and/or CCO along with an asset sale to repay debt and an unsecured term loan at CCOH and/or negotiating an equity investment from Paul Allen. (CX 404 at DB-CH 00004535.)

498. That same presentation noted that despite the extension of maturities, debt holders should be open to an exchange of new CCOH notes for CCH II 2010 maturities given the opportunity to move up in the capital structure. (CX 404 at DB-CH 00004551.)

499. Deutsche Bank wanted to continue to pitch ideas to Charter after the announcement of the hiring of Lazard and felt that Charter had possibilities available to explore to deal with the 2010 maturities. (8/18/09 Tr. 75:12 (Dep. Tr. 145:20-23; 153:25-154:4) (Morris).)

500. Deutsche Bank believed that the three step plan it presented to Charter in December was still a possibility after Charter announced the hiring of Lazard. (8/18/09 Tr. 75:12 (Dep. Tr. 145:20-23; 154:13-21) (Morris).)

501. In addition to meeting with the company to discuss a path for Charter to pursue, Deutsche Bank also approached one of Charter's independent directors, Bob May, to discuss a path for Charter to pursue to address its 2010 maturities and clear the runway for the company to grow into its capital structure (CX 176 at DB-CH 00009507; 8/18/09 Tr. 75:12 (Dep. Tr. 158:4-159:8, 160:2-161:7) (Morris).)

### iii. Citibank pitches

502. CX 248 is a December 8, 2008 Citibank Presentation. (CX 248 at CITI-CH 00002502) CX 248 states that the "current environment continues to provide Charter a unique opportunity to manage its capital structure." Citibank's presentation was mostly around entering into transactions that would extend maturities and reduce cash interest. (7/31/09 Tr. 113:7-25 (Schmitz).)

503. Citibank's presentation proposed debt-for-debt exchanges related to debts at CCH and CIH. Citibank was proposing entering into an exchange for approximately half of the outstanding notes at CIH and about 30% of the outstandings at CCH and exchange those into new CCH I notes. (7/31/09 Tr. 114:13-25 (Schmitz); CX 248 at CITI-CH 00002509.)

504. From September 5 to December 2008, Citibank's view was that there was always at least a possibility that Charter would be able to refinance its debt. (8/18/09 Tr. 13:24 (Dep. Tr. 70:12-18) (Ojea-Quintana).)

505. There was never a point where Mr. Ojea-Quintana became aware that Citibank viewed it as impossible that Charter that Charter could refinance its 2010 obligations. (8/18/09 Tr. 13:24 (Dep. Tr. 69:11-16) (Ojea-Quintana).)

506. On February 12, 2009, Mr. Federman of Credit Suisse First Boston informed Ms. Schmitz that the market is "ridiculously strong right now" for new high yield issuance. (CX 271 at CS_00013757.)

507. There was no point in time before Charter filed for bankruptcy that Credit Suisse First Boston came to the view that Charter would not be able to refinance its 2010 obligations. (8/18/09 Tr. 12:23 (Dep. Tr. 63:7-11) (Federman).)

508. Mr. Federman never advised anyone else at Credit Suisse First Boston that it would be impossible for Charter to refinance its debt prior to maturity. (8/18/09 Tr. 12:23 (Dep. Tr. 65:20-25) (Federman).)

509. Through March 2009, it was never a foregone conclusion for Credit Suisse First Boston that Charter could not grow, refinance debt when market windows allowed and maintain access to capital. (8/18/09 Tr. 12:23 (Dep. Tr. 106:4-15) (Federman).)

## D.    Charter Had Other Options Beyond Traditional Financing Transactions

510. Mr. Thomas Degnan, Vice President of Financing and Corporate Treasurer at Charter, testified that at any point in time, there were several methods by which the Company could have made its interest payments, including: selling the corporate headquarters building, which had previously been valued at between $40 and 45 million; intercompany account balances, which at the dates Mr. Degnan referenced were over $10 million; equity contributions at the partnership level; and tax allocations that are allowable under the Code to accelerate tax write-offs. (9/1/2009 Tr. 230:19-231:11 (Degnan).)

511. In December 2008, Deutsche Bank saw many opportunities for Charter. It believed that Paul Allen could put capital into the company, the company could cut capital expenditures, the company could sell assets, and other people could invest in the company. (8/18/09 Tr. 75:12 (Dep. Tr. 102:14-21) (Morris).)

512. Deutsche Bank believed that an asset sale could have helped push out liquidity constraints to 2013. (CX 404 at DB-CH 00004548; 8/18/09 Tr. 75:12 (Dep. Tr. 143:21-24) (Morris).)

513. Charter had also sold assets and used proceeds to fund its obligations. (7/22/09 Tr. 185:16-17 (Merritt).)

514. This alternative did not require a surplus determination. (7/22/09 Tr. 185:21-25 (Merritt).)

## E.    Charter's Lenders Agree It Is Impossible To Predict The Future

515. Citibank agrees that nobody can say with any degree of certainty when and under what terms Charter could have refinanced its 2010 bonds until you get really close to 2010 at least. (8/18/09 Tr. 13:24 (Dep. Tr. 98:18-23) (Ojea-Quintana).)

516. Bank of America can not say for certain whether on February 4 or 5, 2009, Charter would have been able to pay all its future debts within a 12 month and a day period. (8/18/09 Tr. 12:12 (Dep. Tr. 145:5-13) (Zagar).)

517. Bank of America agreed that the only way to know if Charter paid its debts in the 12 month and a day period is to see what came due and what cash was on hand or look at projected cash flows. Charter's projections showed that Charter would make it through the first quarter of 2010 before it ran out money. (8/18/09 Tr. 12:12 (Dep. Tr. 145:15-146:7) (Zagar).)

518. Credit Suisse First Boston's view was that it would be impossible to prospectively determine the likelihood of refinancing 2010 maturities in the first quarter of 2009 by predicting what the market would look like. (8/18/09 Tr. 12:23 (Dep. Tr. 65:6-16) (Federman).)

519. In November 2008, Deutsche Bank was preparing financing options for Charter based on the possibility that market conditions would normalize. (8/18/09 Tr. 75:12 (Dep. Tr. 128:3-13) (Morris); CX 172 at DB-CH 00004518.)

520. Deutsche Bank's view was that markets began to move towards normalization in January, February and March 2009 depending on the market. (8/18/09 Tr. 75:12 (Dep. Tr. 129:3-7) (Morris).)

521. The statement in the Doody declaration that Charter's normal refinancing options were "no longer available to it" was true as of the date of the declaration, not necessarily throughout the end of 2008. (8/17/09 Tr. 89:17-25 (Doody).)

## XII. JPMORGAN CLAIM OF A SECTION 8(G)(V) DEFAULT IS A NEGOTIATING TACTIC

522. JPMorgan knew on December 11, 2008, the day before Charter's press release, about Charter's announcement of the retention of Lazard to enter into discussions with bondholders. (8/25/09 Tr. 91:10-23 (Kurinskas).)

523. Ms. Schmitz contacted Mr. Hooker and Mr. Van Lith of JPMorgan before issuing the press release. (7/31/09 Tr. 115:20-116:4 (Schmitz).)

524. Ms. Schmitz told Mr. Hooker and Mr. Van Lith that Charter was initiating conversations with the bondholders on the junior part of the capital structure and Charter did not have any reason to believe that it would need to ask for any amendments or do anything with the senior part of the capital structure. (7/31/09 Tr. 117:2-10 (Schmitz).)

525. During the conversation or soon thereafter, no one from JPMorgan asked to be involved in the negotiations with the bondholders. (7/31/09 Tr. 117:17-20 (Schmitz).)

526. Christian Walsh, credit executive in client credit management, remarked in a December 11, 2008 email, "Been waiting for this" (CX-124 at JPM-CH 00030013; 8/25/09 Tr. 92:5-18 (Kurinskas).)

527.     The CEO of JPMorgan, Jamie Dimon, was also informed on December 11, the day before the public press release. In an e-mail from Mr. Casey to Mr. Dimon on December 11, 2008, Mr. Dimon is told that Charter is going to announce tomorrow morning that they have hired Lazard to pursue a restructuring. (CX-146) The CEO of JPMorgan was aware of this information before the public. (8/25/09 Tr. 93:13-94:12 (Kurinskas).)

528.     After December 11, 2008, JPMorgan was not "banging on the door, wanting to be let in to [Charter's] negotiations but being told you're not welcome." To the contrary, JPMorgan's counsel was speaking with Charter's counsel. (8/25/09 Tr. 95:7-13 (Kurinskas).)

529.     JPMorgan's approach was to take a wait-and-see approach, to sit back and see what Lazard could do in negotiating a deal between the bondholders and the company. On December 11, 2008 Patrick Daniello, who is in charge of the special credits group and Ms. Kurinskas's direct supervisor, wrote "Let's see, though, is [sic] Lazard can negotiate a deal between the company bonds and what that looks like. Please keep me posted, Tina. Thanks." (CX 416 at JPM-CH 00025221; 8/25/09 Tr. 95:18-97:8 (Kurinskas).)

530.     In her mid-December conversation with Jim Millstein, Ms. Kurinskas was told "that the goal would be to get to the point of a prearranged Chapter 11 with the bonds." (8/25/09 Tr. 17: 8-11 (Kurinskas).)

531.     After Ms. Kurinskas's conversation with Mr. Millstein in December 2008, Ms. Kurinskas did not ask someone at JPMorgan to do an analysis to determine whether or not the holding companies would have the ability to make their interest payments that were due in January or April of 2009. (8/25/09 Tr. 97:12-20 (Kurinskas).)

532.     In December 2008 and January 2009, Ms. Schmitz spoke to Mr. Hooker and Ms. Kurinskas three to four times. Mr. Hooker and Ms. Kurinskas had called to get an indication of what should be communicated to lenders as they were calling JPMorgan as agent. In those discussions, Ms. Schmitz repeated that again the discussions with the bondholders were at the junior part of the capital structure and Charter did not anticipate asking the lenders for any amendments and therefore there would be nothing for them to do. (7/31/09 Tr. 117:2-118:9 (Schmitz).)

533.     During these conversations, neither Mr. Hooker nor Ms. Kurinskas challenged Ms. Schmitz's assertion that there would be nothing for the lenders under the Credit Agreement to do. (7/31/09 Tr. 118:15-18 (Schmitz).)

534.     During these conversations, neither Mr. Hooker nor Ms. Kurinskas suggested that the bondholder negotiations would create a default under the Credit Agreement. (8/25/09 Tr. 117:21-24 (Schmitz).)

535.     On January 6, 2009, Mr. Hooker sent Ms. Schmitz an email with JPMorgan's "proposed script" in response to inquiries regarding Charter's announcement of pending negotiations with bondholders. One of JPMorgan's "recommended response[s]" to these inquires was that "Nothing that is currently contemplated has an impact on CCO, the bank debt borrower." (CX 126.)

536. Even in January 2009, nobody from JPMorgan asked for an analysis of how the Designated Holding Companies were going to pay their debts in the future. (7/31/09 Tr. 120:2-5 (Schmitz).)

537. In a January 13, 2009 memo to CCO's Senior Secured First Lien Lenders, JPMorgan states "At the present time, the Company has not advised that a default or Event of Default exists nor is JPM independently aware of the same." (CX 127) That statement was truthful. Thus, after the 10-Q was issued November 6th, after the press release was issued December 12th, after the conversation with Mr. Millstein on December 16, 2008, by January 13 2009 JPMorgan was not independently aware of a default or event of default. (8/25/09 Tr. 99:6-100:3 (Kurinskas).)

538. In a January 31, 2008 "Classified Credit Summary" Citibank notes that "the committee and our counsel, STB, suspect that the Company will file for bankruptcy and may seek a plan of reorganization whereby the bank group would be reinstated (i.e. we would be forced [to] stay committed under the terms of the existing bank facility)." Citibank also notes that "we would intend to defend against such action by arguing that we are impaired… Ultimately we may reach a settlement whereby the facility would continue in effect but under revised terms and conditions (including pricing)." (CX 259 at CITI-CH 00000875.)

539. FTI was retained in late January 2009 as the financial advisor to JPMorgan and the lending group for the purposes of the credit agreement. (8/31/2009 Tr. 62:7-17 (Taylor).) Ms. Taylor and her colleagues at FTI performed "deep covenant and credit agreement analysis" on behalf of JPMorgan and the lending group. (8/31/2009 Tr. 64:11-25 (Taylor).) By the time Ms. Taylor and FTI were retained by JPMorgan and the lending group in late January, however, "this case was pretty much going down a particular track." (8/31/2009 Tr. 65:7-19 (Taylor).) Ms. Taylor and her colleagues at FTI were also part of discussions with JPMorgan (including Ms. Kurinskas) and the steering committee on February 5, 2009 discussing whether to call a default. (8/31/2009 Tr. 72:25-73:10 (Taylor).)

540. By early February, and before issuing a notice of default, Charter's counsel had conversations with Simpson Thatcher and indicated that the company would be in a position to file prior to the expiration of the thirty day grace period in the middle of February for the January interest payments. (8/25/09 Tr. 21:17-22:1 (Kurinskas).)

541. By February 2nd, 2009, JPMorgan was "aware that a bankruptcy was coming up shortly." (8/25/09 Tr.100:21-101: 6 (Kurinskas).)

542. On Monday, February 2, 2009, JPMorgan believed that a filing was likely in mid-February 2009; understood that Charter's goal was to convert bond debt at junior Holdco levels and reinstate bank debt under existing contract; and the bank group wanted pricing increased to market. (CX 156 at JPM-CH 00048763; 8/25/09 Tr. 101:23-102:12 (Kurinskas); 7/31/09 Tr. 25:13-19 (Ruyter).)

543. In addition, JPMorgan believed there was "likely bankruptcy litigation over the issue of impairment." (8/25/09 Tr. 102:15-17 (Kurinskas).) That was JPMorgan's understanding *three days before* it issued a default notice. (8/25/09 Tr. 102:18-22 (Kurinskas)(emphasis added).) The reference to bankruptcy litigation over issue of impairment was referring to reinstatement, and ultimately to the litigation that was filed by JPMorgan. (8/25/09 Tr. 102:23-103:8 (Kurinskas).)

544. As of February 2, 2008 members of the bank group were concerned that reinstatement of the bank debt in the context of a bankruptcy would not allow the group to increase the pricing of the existing credit agreement to the 2009 market price. (8/18/09 Tr. 14:25 (Dep. Tr. 216:4-18 (Kurinskas).)

545. On February 5, 2009 at 9:01 a.m. Ms. Kurinskas prepared an email for her superiors at JPMorgan. The email confirms that "The company's stated intention is to reinstate the bank debt under its current contract." It further provides "The lenders under the facility want to negotiate an improvement in the pricing in the facility. Current pricing is below market at L plus 200 for the revolving credit and 6.5 billion of term loan, with 500 million of term loan B2 priced at L plus 500 because it was issued in 2008)." (CX 157) Ms. Kurinskas confirmed that nowhere in this e-mail on February 5th at 9:01 a.m. for senior management does she indicate that JPMorgan was going to claim that there had been a default or event of default under the credit facility. (8/25/09 Tr. 104:15-19 (Kurinskas).)

546. On February 5th at 11:46 p.m the default letter was sent to Charter. (CX 408 at CTR-00050151) It was prepared by and sent by JPMorgan's lawyers, but signed by Ms. Kurinskas. (8/25/09 Tr. 105:9-17 (Kurinskas).)

547. When she signed the February 5, 2009 default letter, Ms. Kurinskas knew that Charter was going to seek to reinstate its CCO credit facility, knew that JPMorgan and the other banks wanted to renegotiate an improvement in the pricing on the facility, and believed that litigation was likely over the issue of impairment as it related to reinstatement. (8/25/09 Tr. 105:19-106:6(Kurinskas).)

548. Ms. Kurinskas claimed in this case, "[i]t was February when we sent our default notice and we were looking ahead till April, so it was only a matter of a couple of months that we were looking forward to the point when the company wasn't going to be able to pay its debts." (8/25/09 Tr. 30:19-23 (Kurinskas).)

549. Ms. Kurinskas did not do anything herself to assess the ability of the designated holding companies to pay debts as they were coming due in the future before sending the February 5, 2009 letter, "Other than the knowledge that the company had not made two payments in January and were about to seek bankruptcy protection, no." (8/25/09 Tr. 112:6-12 (Kurinskas).)

550. Ms. Kurinskas did not do any analysis about the external raising of funds prior to sending the February 5, 2009 default letter. (8/25/09 Tr. 109: 21-23 (Kurinskas).)

551.   Prior to sending the February 5, 2009 letter, Ms. Kurinskas, had never had a conversation with anyone at Charter about section 8(g)(v).  (8/25/09 Tr. 107:6-9 (Kurinskas).)

552.   Prior to sending the February 5, 2009 default letter, Ms. Kurinskas never asked Charter to provide her with any details about the ability or inability of its DHCs to pay their debts due in the future.  Ms. Kurinskas testified, "given the conversation with Mr. Millstein and the preparation for the bankruptcy filing, I did not make that phone call."  Ms. Kurinskas never called Mrs. Schmitz, Mr. Smit or anyone at Charter to ask them whether the DHCs had the ability to pay debts in the future, and was not aware of anyone else who called Charter and asked those questions either. (8/25/09 Tr.111:16-112:5 (Kurinskas).)

553.   Prior to sending the February 5, 2009 default letter alleging a default under section 8(g)(v), Ms. Kurinskas did not consult with anyone at JPMorgan regarding the designated holding companies' ability to access funding to meet their future debt obligations.  Ms. Kurinskas testified, "with the bankruptcy about a week away, it did not seem a fruitful use of time."  (8/25/09 Tr. 109:21-110: 7 (Kurinskas).)

554.   Prior to sending the default letter, Ms. Kurinskas did not consult with anyone from the leveraged finance side of JPMorgan.  (8/25/09 Tr.110:5-7 (Kurinskas).)

555.   Prior to sending the February 5, 2009 default letter, Ms. Kurinskas did not consult with Peter Hooker.  (8/25/09 Tr. 110:8-9 (Kurinskas).)

556.   Mr. Hooker was not consulted by anyone on JPMorgan's decision to send the February 5 default letter.  (7/31/09 Tr. 45:21-46:4 (Hooker).)

557.   There was never a point in time between the offering in March 2008 and January 13, 2009 when either Ms. Kurinskas or Ms. Ruyter informed Mr. Hooker that they believed that there had been a default or event of default under the credit agreement.  (7/31/09 Tr. 44:9-13 (Hooker).)

558.   There was never a point in time where Mr. Hooker independently came to a conclusion that there had been a default or event of default under the credit agreement.  (7/31/09 Tr. 45:12-16 (Hooker).)

559.   At no point after November 24, 2008 was Ms. Ruyter asked for her view as to the ability of Charter to refinance its notes that were due in 2010.  (7/31/09 Tr. 20:22-25 (Ruyter).) Indeed, there was never a point in time where Ms. Ruyter was asked her view as to the ability of Charter's designated holding companies to pay or refinance debts that they had coming due in the future.  (7/31/09 Tr. 21:6-10 (Ruyter).)  This includes in any Credit Surveillance Report meetings.  (7/31/09 Tr. 27:12-16 (Ruyter).)

560.   At no point in time in her work at Credit Risk Management was Ms. Ruyter asked to model or analyze the ability of Charter's designated holding companies to pay debts that were coming due in the future.  (7/31/09 Tr. 27:1-5 (Ruyter).)  Nor did she ever attempt

to make such an assessment during her independent review of Charter's compliance with the credit agreement. (7/31/09 Tr. 27:17-21 (Ruyter).)

561. Ms. Ruyter was never asked to do an analysis of Charter's compliance with Section 8(g)(v) at any time between when she took on Charter as a client and February 5, 2009. (7/31/09 Tr. 26:22-25 (Ruyter).)

562. There was never a point in time from spring 2007 until February 5, 2009 that Ms Kurinskas told Ms. Ruyter that she believed that there was a default or event of default for Charter. (7/31/09 Tr. 12:13-19 (Ruyter).) Nor was there ever a point in time from spring 2007 until the time she stopped following Charter that Ms Ruyter told Ms. Kurinskas that there was a default or event of default for Charter (7/31/09 Tr. 12:8-12 (Ruyter).)

563. Prior to seeing the February 5, 2009 letter, Ms. Ruyter never heard anyone articulate that there was a violation of Section 8(g)(v). (7/31/09 Tr. 26:11-17 (Ruyter).)

564. There was never a point in time where Mr. Pace recommended to someone else at JPMorgan that he believed Charter was in default under the Credit Agreement. (8/18/09 Tr. 15:12 (Dep. Tr. 57:22-58:2) (Pace).)

565. There was never a point in time in 2008 or 2009 where any of Mr. Pace's published research informed investors that it was his belief that Charter was in default under its Credit Agreement. (8/18/09 Tr. 15:12 (Dep. Tr. 58:13-18) (Pace).)

566. In a January 29, 2009 published research report, Mr. Pace recommended that Charter bank debt represented the most attractive relative value in the Charter capital structure (CX 204; 8/18/09 Tr. 15:12 (Dep. Tr. 135:23-137:22 (Pace).)

567. As of January 29, 2009, Mr. Pace did not believe that there were any defaults that existed in the credit agreement that stood underneath the bank debt (CX 204; (8/18/09 Tr. 15:12 (Dep. Tr. 137:18-22) (Pace).)

568. Citibank was aware of the market disruption in September through November 2008 and was aware of the December 2008 retention of Lazard but did not call a default in 2008. (8/18/09 Tr. 13:24 (Dep. Tr. 124:19-125:23) (Ojea-Quintana).)

569. Mr. Ojea-Quintana had not heard from anyone that a decision had been made to call Charter into default prior to February 5, 2009. (8/18/09 Tr. 13:24 (Dep. Tr. 52:15-19) (Ojea-Quintana).)

570. Prior to seeing JPMorgan's February 5, 2009 notice of default, Bank of America had not independently reached the conclusion that Charter was in default. (8/18/09 Tr. 12:12 (Dep. Tr. 95:4-96:12) (Zagar).)

571. As of February 4, 2009 Bank of America was aware of the refinancing risk at Charter, Charter's engagement of Lazard, the dislocation of the financial markets, Charter's missing of the January 15 interest payment and the significant risk of restructuring and

bankruptcy at Charter, but did not view that information as sufficient to call a default. (8/18/09 Tr. 12:12 (Dep. Tr. 96:6-107:2) (Zagar).)

572. Bank of America's internal Scheduled Exposure Report indicates that Charter was in compliance with the covenants under the 2007 Credit Agreement as of February 18, 2009 (CX 283 at BOA/CHARTER/HC 07001; 8/18/09 Tr. 12:12 (Dep. Tr. 172:17-185:15 (Zagar).)

573. Credit Suisse First Boston did not believe that the announcement of Lazard being retained was necessarily the basis for an event of default (8/18/09 Tr. 12:23 (Dep. Tr. 218:24-219:10) (Federman).)

574. It was Ms. Kurinskas's judgment as of 11 p.m. February 5, 2009 that Charter's designated holding companies were not going to be able to pay debts coming due in the future, because "on February 5 the company had, through counsel, had told us they were planning to file in about a week. So it seemed unlikely at that point in time that they'd be able to access the capital markets to raise an external source of financing." (8/25/09 Tr. 108:25-109:13 (Kurinskas).)

575. Prior to declaring a default under the CCO credit agreement on February 5, Ms. Kurinskas had not personally been involved in a situation in which JPMorgan declared a default under provision similar to section 8(g)(v). Per Ms. Kurinskas's direct testimony, "it's, again, frequently not necessary on the eve of a company filing for bankruptcy to need to declare an event of default….I have seen that provision raised with companies before in the context of putting the company on notice that if they did try to borrow, they should think very carefully about whether they can make all of their reps including that type of provision. ***And I know that that provision has been used in circumstances as a negotiating point in order to get a company to enter into a dialogue.***" (8/25/09 Tr. 36:5-23 (Kurinskas).)(emphasis added)

576. The first time Ms. Schmitz heard from JPMorgan that it was alleging that Charter was in default of the credit agreement was on February 5. (7/31/09 Tr. 126:19-24 (Schmitz).)

577. Ms. Schmitz sent a reply to JPMorgan's letter alleging default. Ms. Schmitz sent the letter because she did not believe that there were any violations of the credit agreement. Ms. Schmitz explained that the companies, in general, continue to operate well and were performing well, and the companies continue to pay and meet all of their obligations as required. (7/31/09 Tr. 126-26-128:13 (Schmitz); JPX 187.)

## XIII.  CHANGE OF CONTROL

### A.  Paul Allen Will Maintain 35% Voting Power In Compliance With Section 8(k)(i) Of The 2007 Credit Agreement

578. Section 8(k)(i) of the first lien Credit Agreement provides for an Event of Default if "the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of

the ordinary voting power for the management of the Borrower." (CX 101 at JPM-CH 00006003.)

579. The Credit Agreement defines the "Borrower" as Charter Communications Operating, LLC ("CCO"). (CX 101 at JPM-CH 00005938, 00005941) The Credit Agreement also defines "Equity Interests" to include "any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation …, and any and all warrants, rights or options to purchase any of the foregoing." (CX 101 at JPM-CH 00005946.)

580. Under the Credit Agreement, Allen's voting power must be determined on a fully-diluted basis, meaning it is determined by combining the voting power of the total capital stock of the company including warrants, rights or options. (CX 101 at JPM-CH 00006003 (§ 8(k)(i).); 8/21/09 Goldstein Decl. ¶ 36; 8/24/09 Tr. 254:21-24 (Gompers).)

*i.*     ***Paul Allen has more than 35% of the voting power of CCI***

581. Section 8(k)(iii) of the JPMorgan Credit Agreement requires that Paul Allen have at least 35 percent of the voting power for the management of the Borrower determined on a fully diluted basis. (CX 101 at JPM-CH 00006003 (§ 8(k)(i).); 8/24/09 Tr. 254:15-24 (Gompers).)

582. Through the entities he owns and controls, Paul Allen currently owns 91% of CCI's voting power. (8/24/09 Tr. 236:25-237:5 (Gompers).) Allen will continue to own 91% of CCI voting power unless and until Debtors' plan of reorganization is confirmed and effective and there is an exchange of debt for equity. (8/24/09 Tr. 237:6-19 (Gompers).)

583. Upon the Effective Date of the Plan, Allen will own equity interest giving him a 38.4% voting power in CCI on a fully-diluted basis. (Goldstein Decl. 4 at ¶ 37; 8/24/09 Tr. 20:17-24 (Goldstein), 254:25-255:9 (Gompers).) Paul Allen's voting power based on beneficial ownership will be 39.8 percent. (Goldstein Decl. at ¶ 40; 8/24/09 Tr. 21:12-22:3 (Goldstein).)

584. JPMorgan's own "control" expert, Professor Paul Gompers, does not dispute that Allen will have greater than 35% voting power in CCI upon the effective date of the Debtors' Plan. (8/24/09 Tr. 255:6-9 (Gompers).) Nor does JPMorgan's control expert dispute that Paul Allen will have the right to select four of the eleven CCI directors at exit, and shall have the right to select 35 percent of all directors in all elections going forward. (CX 406 at 4; 8/24/09 Tr. 255:10-256:16 (Gompers).)

*ii.*     ***CCI is the "Management of the Borrower" under the 2007 Credit Agreement***

585. During the trial, the parties presented conflicting theories and arguments concerning what constitutes the "management of the Borrower" under § 8(k) of the JPMorgan Credit Agreement.

586. Although this term is undefined, the plain language of Section 8(k) expressly distinguished between "Equity Interests in the Borrower" (i.e., CCO), and "Equity Interests … for the management of the Borrower." (CX 101 at JPM-CH 00006003.)

587. Prior versions of the first lien credit agreement administered by JPMorgan shed light on the appropriate interpretation of "the management of the Borrower." The 2002 Credit Agreement required that the Paul Allen Group maintain a voting power "in the management of the Borrower" of 51%, but that requirement was lowered to 35%. (Compare CX 398 at JPM-CH 00008067 (2002 Credit Agreement § 8(j), with CX 101 at JPM-CH 00006003 (§ 8(k).); see also 8/24/09 Tr. 265:19-266:19 (Gompers).) This change was made to enable Charter to engage in deleveraging transactions that, by necessity, would have reduced Paul Allen's relative equity stake in Charter. (7/31/09 Tr. 75:4-24 (Schmitz).)

588. In 2008, Charter had discussions with several of their advisors regarding strategic alternatives. Some of those advisors were JPMorgan, Bank of America, Citibank, Morgan Stanley, Credit Suisse and Deutsche Bank. These advisors were the same people who Ms. Schmitz negotiated with regarding the 2007 Credit Agreement. (7/31/09 76:16-77:9 (Schmitz).)

589. Neither JPMorgan nor any of the other financial advisors during these strategic alternative discussions ever told Ms. Schmitz that Mr. Allen had to maintain a majority of the control over the CCI Board in order not to trigger a change of control. (7/31/09 78:20-24 (Schmitz).)

590. Neither JPMorgan nor any of the other financial advisors during these strategic alternative discussions ever told Schmitz that Mr. Allen had to maintain 51% voting control. (7/31/09 Tr. 78:25-79:3 (Schmitz).)

591. In addition, the JPMorgan Credit Agreement requires that CCO be a "Wholly Owned Subsidiary of CCOH" (i.e., 100% held by CCOH). (CX 101 at JPM-CH 00006003 (§ 8(k)(iv).) Thus, on its face, the Credit Agreement contemplates that Paul Allen's 35% "Equity Interests" will be held at some entity above CCO, not directly in JPMorgan's "Borrower."

592. Providing additional insight, JPMorgan's Credit Agreement specifically cites to and states that CCO generally cannot "[a]mend, modify, waive or otherwise change … any of the terms of the Management Fee Agreement" that is in effect between CCO (i.e., "the Borrower") and CCI (CX 101 at JPM-CH 00005997 (§ 7.8(d).).)

593. Under the terms of that Management Fee Agreement incorporated by JPMorgan's Credit Agreement, CCO retained CCI to act as "Manager" of CCO. (CX 305 at 1) Specifically, by that agreement, CCI "provide[s] its management services and functions" to CCO, such as financial and administrative services, financial reporting, and a variety of other tasks and functions for CCO. (CX 305 at 2-3.)

594. Besides this management agreement between CCI and CCO, CCO and CCOH are parties to the LLC Agreement that governs CCO. (JPX 7) Section 4 of this LLC Agreement

relating to "Management" of CCO provides that the powers of CCO shall at all times be exercised by CCI "as the Company's manager," and the business, property and affairs of CCO shall at all times be managed by CCI. (JPX 7 at CTR-0007241; 7/21/09 Tr. (Smit) at 191:16-193:1; 7/22/09 Tr. 58:4-10 (Smith).)

595.    Pursuant to CCOH's LLC Agreement, CCI is also the Manager of CCOH, which owns 100% of the equity of CCO. (JPX 8; 7/21/09 Tr. 191:16-193:4 (Smit); 7/22/09 Tr. 56:21-57:3 (Smit); 7/22/09 Tr. 58:4-10 (Smit).) As such, CCI manages and makes decisions for CCO and CCOH. (JPX 8; 7/22/09 Tr. 54:24, 56:21-57:3, 58:4-10 (Smit).)

596.    Neither CCO nor CCOH has a Board of Directors, but both rely upon CCI and its owners, Board, and managers to direct the functions of CCO and CCOH. (7/21/09 Tr. 190:18-23 (Smit); 7/22/09 Tr. 56:21-57:3 (Smit).)

><ins>iii.</ins>     ***The 2007 Credit Agreement does not contain economic interest or "economic control" requirements***

597.    In considering whether there has been a default of § 8(k) of the Credit Agreement, Sections 8(k)(i) and 8(k)(ii) do not expressly require that Paul Allen maintain a certain economic interest or majority control over Charter. (CX 101 at JPM-CH 00006003; 7/31/09 Tr. 74:17-75:24 (Schmitz).) Even JPM's change of control "expert" does not dispute this. (8/24/09 Tr. 256:17-19 (Gompers).)

598.    Rather, as JPMorgan's "change of control" expert and Ann Kurinskas, the JPMorgan special credits manager who worked on the Charter account, both conceded, Section 8(k) does not require Allen "control" CCO or CCI's Board, (8/24/09 Tr. 265:1-7 (Gompers).); nor does it require that Paul Allen must appoint a majority of CCI's Board seats. (8/24/09 Tr. 265:8-10 (Gompers); see also 8/25/09 Tr. at 77:2-7 (Kurinskas).)

599.    As with voting power, prior versions of the JPMorgan Credit Agreement did require that the Paul Allen Group maintain a certain economic interest in CCI. (CX 398 at JPM-CH 00008067 (§ 8(j)(2).); 7/31/09 Tr. 74:17-75:3 (Schmitz).)

600.    The 2002 Credit Agreement required that Allen maintain a 25% economic interest in Charter, (CX 398 at JPM-CH 00008067 (§ 8(j)(2).); 7/31/09 Tr. 74:2-16 (Schmitz); 8/24/09 Tr. 258:5-11 (Gompers)) and prior to 2002, the Credit Agreement required that Allen maintain a 51% economic interest in Charter. (CX 185 at 61 (§ 8(j)(2).); 7/31/09 Tr. 74:2-16 (Schmitz).)

601.    The requirement that Allen own a certain economic interest was eliminated in the 2004 Credit Agreement, and was also left out of the 2006 and 2007 Credit Agreements, because it was in both Charter's and JPMorgan's interest for Charter to delever, and an economic interest requirement for Paul Allen could limit Charter's ability to do so. (CX 101; CX 149; CX 165; 7/31/09 Tr. 75:4-24 (Schmitz).)

602.    Notwithstanding the lack of any economic interest requirement in the contract, JPMorgan's "control" expert, Paul Gompers, testified regarding whether the proposed

plan of restructuring would impact the "control" of Charter in an "economic" sense. (8/24/09 Tr. 263:21-24 (Gompers).)

603.    Professor Gompers disclaimed any intention to equate his opinion regarding "economic control" to there being any agreement to acquire, hold or dispose of Charter securities, stating, "The process of acquiring securities is not control. Control happens once you acquire the securities." (8/24/09 Tr. 263:25-264:6 (Gompers).)

604.    Professor Gompers further stated he was not offering an opinion on credibility of any witness (8/24/09 Tr. 232:2-6 (Gompers).) nor was he in a position to testify as to the thought processes of the bondholders in negotiating the plan and entering into these transactions. (8/24/09 Tr. 283:19-:284:1 (Gompers).) Professor Gompers specifically stated that he was not offering an opinion on whether there has been a default of 8(k), (8/24/09 Tr. 232:15-18, 270:8-11 (Gompers)) nor was he offering an opinion on whether Franklin, Apollo, Crestview and Oaktree constitute a 13(d) group. (8/24/09 Tr. 238:5-11, 270:2-7 (Gompers).)

605.    In reaching his opinion regarding the "control" of Charter, Professor Gompers further acknowledged he hadn't reviewed the Management Fee Agreement between CCO and CCI that makes CCI the "management" of CCO, (8/24/09 Tr. 259:12-17 (Gompers); see CX 305), nor did Professor Gompers review the LLC Agreement between CCO and CCOH which clearly provides that CCI is its "manager." (8/24/09 Tr. 261:8-12 (Gompers); JPX 7.)

606.    Moreover, inconsistent with the Credit Agreement's requirement that Paul Allen maintain a voting power of just 35% over the management of CCO, Professor Gompers testified that the only way that Allen could economically "control" CCO would be to own at least 51% of the voting interest at CCI and thereby have the ability to appoint a majority of the Board. (8/24/09 Tr. 265:11-14 (Gompers).) Neither requirement finds support in the text of § 8(k) of the Credit Agreement. (CX 101 at JPM-CH 00006003.)

**B.      Apollo, Oaktree, Crestview, and Franklin will not control Charter's Board**

607.    Charter created a mechanism to "fill the gap" where no prior mechanism existed because it was "concerned about the post-effective date composition of the Board. Most particularly, we needed a — this is going to be a large public company when it comes out so we needed a functioning audit committee with the appropriate experience on it. And we weren't actually sure that that was going to happen. So there's the mechanism — the way that the ownership shook out suggested there might be two, maybe three — we've called them gap directors in the certificate but there may be gap directors coming out of bankruptcy. And we wanted very soon after that to be able to select the appropriate board at that point." (8/17/09 Tr. 45:15-25 (Doody).)

608.    Debtors' Amended Certificate of Incorporation provides that the Board of Directors of New Charter will consist of 11 members. At the annual shareholders' meeting and thereafter, seven are designated as putative New Class A Shareholders and four will have been selected by the putative Class B shareholder (Paul Allen). (CX 406, Ex. 3.)

609.    Eight of the directors who will serve on the New Charter Board have been disclosed; one
        more will be selected by Franklin within 30 days. (CX 406, Ex. 23 (Identity and
        Affiliation of Proposed New Board Members and Officers).)

610.    Mr. Smit's contract requires him to be on the Board; as such, Mr. Smit will serve as a
        Class A director. (7/22/09 Tr. at 139:21-140:13 (Smit); 8/24/09 Tr. at 266:25-267:6
        (Gompers).) Mr. Smit's Board seat is not based on any votes by any entities such as
        Apollo, Oaktree, or Franklin. (7/21/9 Tr. 234:16-18 (Smit).)

611.    For example, since the restructuring, Charter management has been rolling out a national
        backbone to get efficiencies in its data movement, extended the telephone product,
        launched new Internet speeds, and consolidated the billing system. The noteholders have
        not had any influence on these business initiatives. (7/21/09 Tr. 235:10-21 (Smit).)

612.    In addition, the Class A shareholders who are projected to have 10% of the voting power
        of New Charter determined on an undiluted basis were able to select a Class A Director
        for each 10% of voting power they held. (CX 407 at 50 (Article VI, Section N of Notice
        of Immaterial Modifications to Debtors' Joint Plan of Reorganization).)

613.    Apollo has selected 2 Board members, Mr. Eric Zinterhofer and Mr. Darren Glatt, both
        employees of Apollo. (CX 406, Ex. 23.)

614.    Oaktree has selected 1 Board member, Mr. Bruce Karsh, an employee of Oaktree. (CX
        406, Ex. 23.)

615.    Franklin Advisors will also be able to select one Board member within 30 days of the
        Effective Date of the plan. (CX 406, Ex. 23; 7/23/09 Tr. 50:22-26; 52:11-53:3
        (Villaluz).) Franklin requested 30 days after the Effective Date to select a director
        because such a period is required under Franklin's internal code of compliance. (7/23/09
        Tr. 139:13-20 (Villaluz); 8/24/09 Tr. 267:23-268:2 (Gompers).) Nevertheless, Franklin
        will not select a Franklin employee, Mr. Jeff Marcus of Crestview nor anyone else
        affiliated with a member of the Ad Hoc Committee to serve as its Board representative.
        (7/23/09 Tr. 51:20-52:5 (Villaluz); 8/24/09 Tr. (Gompers) at 267:17-22.)

616.    Under the plan, after 31 days, the eight Class A and Class B directors listed in the
        amended disclosure statement at confirmation and the additional independent Class A
        director to be selected by Franklin will by majority vote then select the remaining two
        "gap" directors to complete New Charter's Board. (CX 406, Ex. 23; 8/24/09 Tr. 268:3-
        10 (Gompers).)

617.    At this time, Mr. Jeff Marcus of Crestview has not been nominated to serve as a director
        on the Board of New Charter (CX 406, Ex. 23), nor does the evidence indicate that any
        agreement was reached to appoint him to the Board. (7/29/09 Tr. 42:7-9 (Marcus).)

618.    Christine Villaluz, the representative of Franklin Advisors during the negotiations,
        testified that Mr. Marcus is not being considered for appointment by Franklin. (7/23/09
        Tr. 52:2-5 (Villaluz); see also 8/24/09 Tr. 267:20-22 (Gompers).) In addition, Mr.
        Marcus testified that no agreement was made between him or any of the other

bondholders (7/29/09 Tr. 42:7-9 (Marcus)) and other bondholders representatives who testified denied any agreement or commitment to support Marcus for a Board seat. (7/28/09 Tr. 51:21-52:14 (Zinterhofer).)

619. JPMorgan argued that Article 4(b)(1)(A)(3) of the Certificate of Incorporation (CX 406) may not apply to the selection of gap directors by the initial Board because it refers to vacancies on the Board of Directors elected by the holders of Class A common stock. (8/17/09 Tr. 48:6-11 (Doody).)

620. Mr. Doody stated his view that it was appropriate for the new Board members to fill remaining vacancies: "when these people are going to be serving on the Board, they're going to be serving in their individual capacity, exercising their fiduciary duties. So to me, the best way to do it is to have the entire Board get together, knowing that now they owe duties to this new enterprise, and to choose a Board that's appropriate in all respects, including having the appropriate qualifications and independence of audit committee members." (8/17/09 Tr. at 251:13-20 (Doody).) "I think it's a much better practice, though, to have the board — the board that's going to ultimately have to determine as a group whether they have audit committee financial expertise and whether there is — whether the independence requirements are met, not only for the audit committee, but for all the members. So having them acting as the body that's eventually going to have to make these determinations seemed like the best way to do it, in my view." (8/17/09 Tr. at 252:4-12 (Doody).)

621. In sum, the "gap" directors will be appointed by Apollo's and Oaktree's three directors, the CEO of Charter Neil Smit, Franklin's independent director, and Paul Allen's four directors. (CX 406, Ex. 23; 8/24/09 Tr. 268:3-14 (Gompers).)

## C. Paul Allen will have more voting power than any other "person" or 13(d) "group" in Compliance with Section 8(k)(ii) of the Credit Agreement and the Indentures

622. JPMorgan and the other holders of debt to be reinstated under Debtors' plan of restructuring also contend the plan of restructuring will effect a breach of Section 8(k)(ii) of the Credit Agreement and the similar "Change of Control" provisions of the Indentures.

623. Section 8(k)(ii) of the JPMorgan Credit Agreement provides that an "Event of Default" includes:

> the consummation of any transaction … the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power … for the management of the Borrower, unless the Paul Allen Group has the

power directly or indirectly to vote or direct the voting of Equity interests having a greater percentage."

(CX 101 at JPM-CH 00006003.)

624. As JPMorgan's witnesses admit, Section 8(k)(ii) sets forth a bright line test. (8/24/09 Tr. 235:20-22 (Gompers).) For there to be a default of this section, there must be [1] the consummation of a transaction [2] the result of which is that a 13(d) group [3] has the power to vote or direct the voting of Equity Interest [4] having more than 35% of the voting power of the management of the Borrower unless Allen has the power to vote a greater percentage. (CX 101 at JPM-CH 00006003; 8/24/09 Tr. 235:23-236:24 (Gompers).) Unless each of these four elements is established, there is no default under Credit Agreement § 8(k)(ii). (8/24/09 Tr. 236:9-24 (Gompers).)

625. The Indentures and other credit agreements that Debtors proposed to reinstate under its plan of restructuring contain similar provisions. For example, the Credit Agreement of CCOH administered by Wells Fargo defines a "Change of Control" as:

> the consummation of any transaction … the result of which is that any 'person' (as defined above) other than Paul G. Allen and Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than the number of shares unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Company or such Parent, as the case may be, measured by voting power rather than the number of shares, than such person.

(CX 414 at 4 (CCOH Third Lien Indenture dated Nov. 10, 2003); cf. CX 412 at 5 (CCO 2nd Lien Indenture dated Apr. 27. 2004); CX 413 at 7 (COO Second Lien Indenture dated Mar. 19, 2008.)

626. "Beneficial Owner" in the Indentures to be reinstated "has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular 'person' (as such term is used in Section 13(d)(3) of the Exchange Act), such 'person' shall be deemed to have beneficial ownership of all securities that such 'person' has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition." (E.g., CX 414 at 1-2 (CCOH Third Lien Indentures).)

### i. No person or 13(d) group will have more voting power pre-confirmation

627. Under Section 8(k) of the Credit Agreement and the "Change of Control" provisions of the other reinstated debts, there is no event of default unless a "transaction" is "consummat[ed]" that, upon consummation, "results" in a "person" or "group" having more than 35% voting power prior to the Effective Date of the plan. (CX 101 at JPM-CH 00006003.)

628. Section 8(k) concerns voting power, (8/24/09 Tr. 284:6-8 (Gompers)) and Paul Allen currently owns 91% of CCI's voting interest. (8/24/09 Tr. 236:25-237:5 (Gompers).)

629. Before the Effective Date of the proposed plan and a debt for equity exchange actually occurs, JPMorgan's "control" expert agreed that there is no scenario in which anyone can own a greater voting power than Allen. (8/24/09 Tr. 236:25-237:5 (Gompers).) Paul Allen has 91% of the voting power of Debtors, and will continue to hold such power until the Plan is confirmed and the proposed exchange of debt for equity occurs. (8/24/09 Tr. 237:6-19 (Gompers).)

630. As Professor Gompers further agreed, the only time that any person or any hypothetical 13(d) group could have a greater voting power in CCI than Paul Allen is after the exchange of debt for equity. (8/24/09 Tr. 284:9-285:14(Gompers).) Before the plan takes effect, while Allen will have 91% of Debtors' voting power, the CCH I bondholders who will exchange their notes for equity will not actually have that equity and associated voting power unless and until the reorganization is complete and the CCH I notes are exchanged for Class A shares. (8/24/09 Tr. 285:2-12 (Gompers).)

631. Even if that were not the case, the evidence at trial did not show that the CCH I bondholders entered into agreements to acquire, hold or dispose of equity securities through the negotiation of Debtors' plan or reorganization. That the members of the Ad Hoc Committee entered into plan support agreements with Charter to support Charter's plan of restructuring — a plan which would, by operation of the Bankruptcy Code result in an exchange of the debt securities they acquired being swapped for equity — does not prove that members of the Ad Hoc Committee of bondholders agreed to acquire equity securities in Charter.

632. The members of the Ad Hoc Committee — and the firms Apollo, Oaktree, Crestview and Franklin, in particular — each made their own independent decisions to purchase Charter debt securities based on their own independent due diligence, as even JPMorgan's change of control expert, Professor Gompers, agreed. (7/23/09 Tr. 14:18-15:4(Villaluz); 7/29/09 Tr. 19:25-20:11 (Marcus), 7/29/09 Tr. 166:1-4 (Liang), 7/28/09 Tr. 42:7-13 (Zinterhofer).)

633. Upon reviewing the documents and records provided by JPMorgan's counsel, JPMorgan's own expert testified that these firms did not work together because of any prior collaboration. (8/24/09 Tr. 233:6-23 (Gompers).) In fact, Professor Gompers couldn't identify a single transaction where Apollo, Oaktree, Crestview, and Franklin previously collaborated. (8/24 Tr. 234:19-22 (Gompers).)

634. Rather, the process that resulted in the formation of the Ad Hoc Committee and, ultimately, the members of that Committee agreeing to plan support agreements with Charter was begun by Charter. (7/21/09 Tr. 49:18-50:22 (Millstein); 7/29/09 Tr. 26:21-27:11 (Liang).) In conjunction with Charter's issuance of its December 12, 2008 press release disclosing the potential restructuring to investors, Jim Millstein and Lazard began contacting major holders of Charter debt securities and encouraging them to organize an

ad hoc committee of bondholders that Charter could negotiate a restructuring with. (7/21/09 Tr. 52:1-53:21 (Millstein); 7/29/09 Tr. 167:7-24 (Liang).)

635.  Consistent with the way that restructurings commonly are conducted, Charter then paid the fees of the Ad Hoc Committee's legal and financial advisors. (7/23/09 Tr. 18:1-10 (Villaluz); 7/28/09 Tr. 45:17-24 (Zinterhofer); 7/29/09 Tr. 167:14-24 (Liang).)

636.  The goal of the various noteholders in entering into negotiations with Charter was to convince Charter not file for Chapter 11, and the members of the Ad Hoc Committee as evidenced by the Committee's structuring of their advisors' financial incentives to advance that goal. (7/28/09 Tr. 45:13-24 (Zinterhofer); 7/23/09 Tr. 19:10-24 (Villaluz); 7/29/09 Tr. 28:14-29:1 (Liang); JPX 119 at CHARTER-e 00090802 ("Since the best outcome for us is to delay a restructuring until 2010, why don't we propose that they get a bonus if the company continues to pay interest on the 11s through the next three coupons?").)

637.  Debtors' financial advisors, Lazard, initially developed and provided a basic outline or "strawman" for the restructuring framework which included proposals for an equity rights offering. (Goldstein Decl. at Ex. A; 7/21/09 Tr. 49:18-22; (Millstein); 8/24/09 Tr. 52:6-20; 54:9-15 (Goldstein); 7/29/09 Tr. 167:14-24; 176:11-14 (Liang).)

638.  Debtors and the Ad Hoc Committee considered multiple potential restructuring alternatives, including those that would not concern CCH I bondholders, and those that would not include a Rights Offering. (LDT 115; 7/23/09 Tr. 40:10-12 (Villaluz); 7/29/09 32:9-33:9 (Marcus).)

639.  Individual noteholders retained their own independent restructuring advisors to assist them, separate and apart from those funded by the Debtors. (7/28/09 Tr. 49:13-16 (Zinterhofer), 7/23/09 Tr. 40:18-41:2 (Villaluz).) Apollo retained Akin Gump to advise it. (7/23/09 Tr. 49:13-16 (Zinterhofer).) Franklin retained Jones Day. (7/23/09 Tr. 40:18-41:2 (Villaluz).) Oaktree retained Bruce Bennett of Hennigan, Bennett & Dorman (7/29/09 Tr. 174:24-175:9 (Liang).)

640.  Franklin's independent restructuring counsel developed an alternative debt security in place of a rights offering. (7/23/09 Tr. 40:10-41:2 (Villaluz).) Crestview's preference was also that there be no rights offering. (7/29/09 Tr. 36:15-24 (Marcus).) Oaktree wanted a smaller rights offering because of the dilutive effect. (7/29/09 Tr. 180:9:16 (Liang).)

641.  Ultimately, the members of the Ad Hoc Committee concluded that a simple exchange offer without an additional capital infusion would not fix the problems with Charter's capital structure. (7/29/09 Tr. 38:17-39:9 (Marcus).) The size and scope of the proposed rights offering increased over time because of Charter's anticipated cash needs — including, among others, the need to provide payment to the CCH II Noteholders, the need to cover interest rate swaps and the need to provide additional cash to fund the Allen settlement. (7/29/09 Tr. 36:1-24 (Marcus); 7/29/09 Tr. 179:3- 181:10 (Liang).)

642.    The ultimate size of the rights offering was not the result of any party advocating a larger rights offering in order to get more equity.  (7/29/09 Tr. 180:17-20 (Liang).)

643.    In the end, each member of the Ad Hoc Committee separately and individually entered into a plan support agreement with the Debtors.  (7/23/09 Tr. 169:23-170:12 (Villaluz).)

644.    Once the rights offering occurred, each member of the ad hoc committee decided individually whether to exercise their rights — some did (e.g., Apollo), some did not (e.g. Franklin, which only partially exercised its rights).  (7/28/09 Tr. 163:21-23 (Zinterhofer), 7/23/09 Tr. 157:22-24 (Villaluz).)

645.    Although JPMorgan placed significant emphasis on a proposed 2007 "take-private" transaction of Charter between Apollo, Crestview, and Vulcan in December 2007, the evidence relating to this prior proposal fails to support JPMorgan's theory that the investment in Charter debt securities by those (or other) firms was part of a "distressed to own" strategy.   In fact, a careful review of the investment memorandum and circumstances surrounding this proposed transaction dispels, rather than supports, that notion.  (JPX 22.)

646.    In particular, the December 3, 2007 internal Apollo memorandum outlines two potential investment strategies: a "Debt Thesis," and an "Equity Thesis."  (JPX 22 at CHARTER-E 00779578-80)   The Equity Thesis outlines a typical private equity-style investment, whereby Apollo and Crestview would have directly purchased equity in Charter to "take" the company "private" (i.e., so it would no longer be a publicly traded entity).  (JPX 22 at CHARTER-E 00779578-80.)    Such a "take-private" transaction is fundamentally different from a "distressed to own" scenario, where an investor purchases debt securities of a company in hopes that it will become the "fulcrum security" in a restructuring.  (7/28/09 Tr. 29:24-30:14 (Zinterhofer) (noting a take private transaction is a direct equity investment); 7/23/09 Tr. 15:5-11 (Villaluz).)

647.    In fact, this contemporaneous memorandum prepared more than a year before Charter announced it was examining potential restructuring options — and similarly well before the banking industry issues that began in the fall of 2008 — describes the Debt Thesis as follows:

>    Indeed, the base case for the bond thesis is that a restructuring of Charter is highly unlikely (or else we would not be interested in the equity as well), and that a distress for control opportunity will not materialize.  Rather, we would earn an attractive return on capital as the bonds trade back to par over time.

(JPX 22 at CHARTER-E 00779579.)

648.    Thereafter, both Apollo and Crestview subsequently purchased Charter bonds for their high-yield component, and there is no evidence that either firm was contemplating a debt-for-equity exchange as anything more than a downside scenario at that time.  (7/28/09 Tr. 32:25-33:15 (Zinterhofer); 7/29/09 Tr. 16:12-17:8 (Marcus); JPX 22 at CHARTER-e 00779579 (Apollo's Dec. 3, 2007 Investment Proposal).)

### ii. No person or entity will have more than Paul Allen post-confirmation and upon the effective date of the plan

649. On a fully-diluted basis, Paul Allen will have voting power of 38.4%, while Apollo, the entity with the second most voting power in the reorganized entity, will have just 18.9%. (8/24/09 Goldstein Decl. ¶¶ 37-38 & Ex. D.) On a beneficial ownership basis, Paul Allen will have more than 39.8% voting power, and no other shareholder will have beneficial ownership equal to or power in excess of Mr. Allen. (8/24/09 Goldstein Decl. ¶¶ 40-41.)

650. In determining whether a "group" of equity holders may have voting power equal to or in excess of that of Paul Allen, both the Credit Agreement and Indentures look to Section 13(d) of the Securities Exchange Act. (CX 101 at JPM-CH 00006003, see also, e.g., CX 414 at 1-2.)

651. Section 13(d) of the Securities Act has a specific definition; to be a "group," § 13(d) requires that parties must act together for the purpose of acquiring, holding, or disposing of securities. (8/24/09 Tr. 238:12-20 (Gompers).)

### a. There is no evidence whatsoever that Franklin is or will be part of any 13(d) group

652. On a fully diluted basis, Paul Allen will have voting power of 38.4%, while a hypothetical 13(d) group of Apollo, Oaktree, and Crestview will have a voting power of just 35.3% prior to application of the savings clause. (8/24/09 Goldstein Decl. ¶¶ 37-38.)

653. On a beneficial ownership basis, Paul Allen will have 39.8% voting power, while a hypothetical 13(d) group of Apollo, Oaktree, and Crestview will have voting power of just 37.6% prior to application of the savings clause. (8/24/09 Goldstein Decl. ¶¶ 40-41.)

654. JPM's "control" expert, Professor Paul Gompers agreed that based on the latest voting estimates, which neither he nor any other witness disputed, the only so-called group — 13(d) or otherwise — that could own a greater voting interest than Allen is one that will consist of Apollo, Crestview, Oaktree and with support of Franklin. (8/24/09 Tr. 240:12-18 (Gompers).)

655. Franklin Advisors is the entity that owns the CCH I bonds. (7/23/09 Tr. 12:15-19 (Villaluz); 8/24/09 Tr. 245:22-24 (Gompers).)

656. Franklin Advisors is a mutual fund — not a private equity firm. (7/23/09 Tr. 63:7-64:14 (Villaluz); 8/24/09 Tr. 245:25-246:1 (Gompers).)

657. These mutual funds are not loan-to-own funds. (8/24/09 Tr. 246:2-250:5 (Gompers).)

658. Franklin's mutual funds do not have loan-to-own strategies. (8/24/09 Tr. 246:2-250:5 (Gompers).)

659. Franklin Advisors is a passive debt investor. (7/23/09 Tr. 63:7-22 (Villaluz).)

660. It's not Franklin's intention or the normal operation of its mutual funds to become active managers in the companies in which they own a stake. (7/23/09 Tr. 63:16-19 (Villaluz); 8/24/09 Tr. 246:2-250:5 (Gompers).)

661. Franklin Advisors typically do not become actively involved in their investments. (7/23/09 Tr. 63:7-22 (Villaluz); 8/24/09 Tr. 246:2-250:5 (Gompers).)

662. Franklin Advisors does not seek representation on the boards it invests in. (7/23/09 Tr. 63:16-19 (Villaluz); 8/24/09 Tr. 246:2-250:5 (Gompers).)

663. Although, under the terms of Debtors' plan of restructuring, Franklin is entitled to appoint a director to New Charter's Board of Directors, Franklin Advisors will not appoint a Franklin employee as its representative. (7/23/09 Tr. 51:20-22 (Villaluz).)

664. Franklin will appoint an independent director, and will not give any instructions to that director on how to vote. (7/23/09 Tr. 53:4-17 (Villaluz).)

665. In addition, if the plan of restructuring is confirmed and Franklin acquires equity in New Charter, Franklin intends to file a Form 13(g) with the Securities & Exchange Commission. (7/23/09 Tr. 61:6-13 (Villaluz); 8/24/09 Tr. 251:8-20 (Gompers).)

666. SEC Form 13(g) is different from a Form 13(d), in that Form 13(g) signifies the holder of the securities is a passive investor. (7/23/09 Tr. 61:10-11 (Villaluz).)

667. JPM's own expert on private equity firms distinguished between Franklin and the other firms in his analysis and testimony. (8/24/09 Tr. 246:2-250:5 (Gompers).) Based on his review of the materials produced in discovery, Professor Gompers testified he was not aware of any formal or informal agreement between Franklin and Apollo or Oaktree after confirmation. (8/24/09 Tr. 241:4-17, 250:16-251:1 (Gompers).)

668. According to Gompers, whatever steps that Franklin took in connection with the bankruptcy — like supporting a backstop fee or rights offering — don't amount to an agreement to hold or dispose of Charter's securities, (8/24/09 Tr. 241:9-14 (Gompers)) nor do they amount to any agreement with Apollo, Oaktree and Crestview to hold, dispose, or vote Charter securities. (8/24/09 Tr. 241:15-17, 50:23-251:1 (Gompers).)

      b.    <u>The trial evidence does not prove that Apollo, Crestview and Oaktree are a 13(d) group</u>

       ***i.***    ***No agreements to acquire***

669. Representatives of Apollo, Oaktree, and Crestview all testified that there are no agreements by or between them to acquire, hold, vote, or dispose of Charter equity securities. (7/28/09 Tr. 57:5-8, 65:11-67:16, 73:15-74:22 (Zinterhofer); 7/29/09 Tr. 54:14-55:10 (Marcus); 7/29/09 Tr. 188:2-19 (Liang).)

670. Representatives from Apollo, Oaktree, and Crestview further testified, and witnesses from JPMorgan did not dispute, that each of those firms acquired Charter securities

independently and not pursuant to any agreements between them. (7/29/09 Tr. 19:21-20:11 (Marcus); 7/29/09 Tr. 166:1-16 (Liang); 7/28/09 Tr. 42:7-10 (Zinterhofer); 8/24/09 Tr. 233:18-234:18 (Gompers).)

671.   In fact, each had differing views on a rights offering, generally, which the firms agreed to with the company as the only feasible way to protect their investment and maximize their return, not out of a desire to acquire "control" of the company. (7/29/09 Tr. 36:1-24, 38:6-39:13 (Marcus), 7/29/09 Tr. 180:9-181:10 (Liang), 7/28/09 Tr. 149:23-150:22 (Zinterhofer).)

### ii.   No agreement to hold or vote

672.   The testimony of the Apollo, Crestview, and Oaktree representatives, as well as contemporaneous documents prepared at the time of the negotiations, support a finding that there are no agreements among the Noteholders regarding the voting or management of the company after confirmation. (7/28/09 Tr. 74:7-12 (Zinterhofer); 7/23/09 Tr. 59:10-14 (Villaluz); JPX 237 at CHARTER-e 00098447 (noting Charter will be "a public company" requiring Apollo "to use [its] powers of persuasion as opposed to any particular control rights at times.").)

673.   When they enter into agreements to hold or vote equity securities, Apollo and other investors regularly enter into formal written shareholder agreements. (7/28/09 Tr. 69:25-72:10 (Zinterhofer); 7/29/09 Tr. 190:9-191:12 (Liang).) There is no such written agreement here. (7/28/09 Tr. 57:5-8, 65:11-67:16, 73:15-74:22 (Zinterhofer); 7/29/09 Tr. 54:15-55:10 (Marcus); 7/29/09 Tr. 188:2-19 (Liang).)

674.   Private communications among the bondholders at the time of the negotiations support a finding of no agreements regarding the holding or voting of securities. One internal e-mail at Apollo told senior partners "this will be a public company board, and we will have to use our powers of persuasion as opposed to any particular control rights at times." (JPX 237 at CHARTER-e 00098447; 7/28/09 Tr. 69:4-14 (Zinterhofer).)

675.   Each testified that no one has any right to constrain what any others do with respect to their shares. (7/29/09 Tr. 188:11-19 (Liang); 7/28/09 Tr. 74:4-15 (Zinterhofer); 7/29/09 Tr. 54:24-55:10 (Marcus); 7/23/09 Tr. 60:3-11 (Villaluz).)

676.   In fact, after reviewing the documents produced in discovery, JPMorgan's "control" expert Professor Gompers was also not able to identify, nor was he aware of, any agreement among Apollo, Oaktree, and Crestview to hold or dispose of Charter securities. (8/24/09 Tr. 241:4-17 (Gompers).)

677.   Professor Gompers further testified he does not contend that these entities have reached any agreement regarding any aspect of Charter's post-restructuring operations. (8/24/09 Tr. 244:14-17 (Gompers).)

678.   Contemporaneous documents created at Crestview further support a finding of no agreements among these entities, and undermine the inferences that JPMorgan asked the Court to draw with others. While several internal Crestview documents dated from early

February 2009 make reference to a purported "agreement" to appoint Jeff Marcus to the Board of New Charter (e.g., JPX 170 at CHARTER-e 00144027), as Mr. Marcus testified at trial, and as supported by subsequent internal documents created by Crestview, no such agreement was made. (7/29/09 Tr. 42:4-45:13 (Marcus); *see also* CX 375 at CHARTER-e 00795952(noting a Board seat for Crestview "was not a condition of the approval.").)

679. Debtors' plan of restructuring does not provide Crestview a seat on New Charter's Board of Directors, notwithstanding Crestview's status as an "excess backstop party." Consistent with the absence of any agreement between Crestview and other members of the Ad Hoc Committee, Crestview's Investment Committee and senior partners pressed Mr. Marcus to have the plan amended "to make sure we had a board seat if we don't get filled on our backstop," notwithstanding the view of other parties that Mr. Marcus was qualified to and should likely be on the Board of New Charter. (JPX 239 at CHARTER-e 00087741; CX 374 at CHARTER-e 00145716; CX 375 at CHARTER-e 00795952; 7/29/09 Tr. 45:24-50:9 (Marcus); *see also* 7/28/09 Tr. 51:21-52:14 (Zinterhofer).)

680. Mr. Marcus thereafter sought to have the plan amended so as to guarantee a Board seat for every excess backstop party, but was not able to obtain support for that proposal. (7/29/09 Tr. 45:24-48:13 (Marcus).) Mr. Marcus similarly sought to have the ownership threshold for a guaranteed Board seat lowered from 10% to 6% or 8% but similarly was unable to obtain support from other parties. (7/28/09 Tr. 52:3-14 (Zinterhofer).)

681. Ms. Kurinskas, as a veteran in restructuring, is experienced with ad hoc committees that are formed amongst creditors, and agreed it is not unusual in a restructuring for a committee of creditors who formed such a group to share counsel and financial advisors. (8/25/09 Tr. 79:18-80:9 (Kurinskas).)

### iii.     No agreement to dispose or exit

682. Each of the bondholders similarly denied any agreement — written or unwritten, formal or informal — to vote or dispose of Charter securities. (7/29/09 Tr. 188:2-19 (Liang), 7/29/09 Tr. 54:15-23 (Marcus); 7/28/09 Tr. 74:7-15 (Zinterhofer); 7/23/09 Tr. 59:10-60:11 (Villaluz).)

683. The private equity firms bought their Charter debt securities at different times and in different amounts, so they will have different ideas on what constitutes a profit and an appropriate holding period. (7/28/09 Tr. 66:2-13 (Zinterhofer).)

684. Oaktree has no specific timeline or timeframe to sell Charter stock. (7/29/09 Tr. 184:6-13 (Liang).)

685. Apollo has no clear exit strategy, and doesn't know anything about anyone else's exit strategy. (7/28/09 Tr. 74:16-22 (Zinterhofer).)

686. Franklin is not certain what it will do in terms of an exit strategy. (7/23/09 Tr. 112:2-16, 144:11-22 (Villaluz).)

687. Crestview has no interest in exiting — it is focused on an entrance strategy. (7/29/09 Tr. 55:11-56:3 (Marcus).)

688. Professor Gompers similarly agreed with this testimony. Professor Gompers testified that although these firms may have considered a private sale as an exit for Charter, that does not mean they have agreed upon a private sale as an exit strategy. (8/24/09 Tr. 244:18-245:21 (Gompers).)

689. Professor Gompers noted that the prospect of a private sale is a mere aspiration at this point, and doesn't reflect any agreement on an exit strategy. (8/24/09 Tr. 244:23-245:1 (Gompers).) There has been no private sale proposed and there appears to be no plan for a private sale. (8/24/09 Tr. 245:2-21 (Gompers).)

690. Professor Gompers saw no evidence that there was either formal or informal agreements in place between any of the parties. (8/24/09 Tr. 222:13-21 (Gompers).)

### D. Even If A Prohibited Group Formed, The Savings Clause Would Reduce Its Power To 34.9%

691. Even if a 13(d) group formed that nominally possesses more voting power than the Paul Allen Group, a Savings Clause in New Charter's Amended Certificate of Incorporation, which will be approved in conjunction with the Debtors' plan of reorganization, will scale back the voting power of any such 13(d) group and prevent the type of change of control default that JPMorgan and the opponents of the plan allege. (See CX 406, Ex. 3 at 3 (CCI Am. Cert. of Inc. Article IV(b)(i)(A)(1)).)

692. New Charter's Amended Certificate of Incorporation provides:

> that the votes attributable to each share of Class A Common Stock held by any holder (other than an authorized Class B Holder) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder[s] (other than an authorized Class B Holder) included in any 'person' or 'group' (as such terms are used in Sections 13(d) and 14(d) of the … Exchange Act …) with such holder, so that no 'person' or 'group' (other than an authorized Class B Holder) is or becomes the holder or 'beneficial owner' (as such term is used in Rule 13d-3 and Rule 13d-5 under the Exchange Act … directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation ….

(*Id.*)

693. The effect of this Savings Clause will be to "automatically reduce[]" the voting power of any "person" or "group" who acquires more voting power than Paul Allen. (*Id.*)

694. Moreover, on its face, the Savings Clause provides for its enforcement by the Disinterested Directors. (*Id.*)

695. Article 4(b)(1)(A)(4) of the Certificate of Incorporation, if it determined "that a group or person, again, defined under the securities laws, has more than that [35%] vote, they would be ratably reduced such that they don't have that vote any longer." A group of directors is not able to simply waive this clause. (8/17/09 Tr. at 50:8-14 (Doody).)

## XIV.  CROSS ACCELERATION

696. Charter is "a highly integrated" group of companies with transactions throughout that affect other entities. (7/22/09 Tr. 211:14-20 (Merritt).)

697. JPMorgan admitted that CCO's business is fundamentally affected by the financial condition of its affiliates. To the extent that there's a default at one of its affiliates, that could have an impact on CCO.  (8/25/09 Tr. 64:9-12 (Kurinskas).)

698. JPMorgan admitted that CCO is fundamentally affected by the financial well-being of the designated holding companies, because CCO is the sole source of operational cash flow for the repayment of debt by CCO's parent  companies.  And because of the relationship between CCO at the bottom and the holding companies, including designated holding companies above, JPMorgan specifically negotiated defaults and events of defaults specifically linking the financial condition of the designated holding companies and the financial condition of CCO.  Those links can be found in section 8 of the 2007 credit agreement, and include clauses 8(f) and 8(g). (8/25/09 Tr. 64:16-65:9 (Kurinskas); CX 101 at JPM-CH 00006001-2.)

699. The March 11, 2008 Offering Memorandum for CCO confirms that "Any default  under our or our parent companies' debt could adversely affect our growth, our financial condition, our results of  operations, and our and our parent companies' ability to make payments on our and our parent companies' debt, including the notes, and our credit facilities, and could force us to seek the protection of the bankruptcy laws." (CX 134 at JPM-CH 00032234; 8/25/09 Tr. 65:17-66:3 (Kurinskas).)  What is stated in the offering memorandum is consistent with Ms. Kurinskas's understanding of the relationships between these companies. (8/25/09 Tr. 66:19-22 (Kurinskas).)

700. The March 11, 2008 Offering Memorandum for CCO also provides that "[b]ecause Charter is our sole manager, and because we are wholly owned by Charter Holdings, CIH, CCH I, CCH II and CCO Holdings, their financial or liquidity problems could cause serious disruption of our business and could have a material adverse affect on our operations and results."  (CX 134 at JPM-CH 00032236; 8/25/09 Tr. 67:6-12 (Kurinskas).)  That is consistent with Ms. Kurinskas's experience and understanding of the various Charter entities. (8/25/09 Tr. 67: 13-15 (Kurinskas).)

701. The March 11, 2008 Offering Memorandum for CCO, provides "Charter is our sole manager."  (CX 134 at JPM-CH 00032236.)  The "our" in that clause is CCO, the borrower under the 2007 credit agreement.   "Charter" is defined as Charter

Communications, Inc., or CCI. Thus, CCI is the sole manager of CCO. (CX 134 at 00032236; 8/25/09 Tr. 67:16-68-20 (Kurinskas).)

702. The triggering event in this case that set forth a default in section 8(f) was the DHCs' filing of a Chapter 11 petition on March 27, 2009, in that it caused an acceleration of the debt. And an acceleration of the debt by the designated holding companies, as we've seen before and in the offering memorandum, could have a negative effect on CCO. (8/25/09 Tr. 70:6-13 (Kurinskas).)

703. In Mr. Doody's experience "when you're looking at whether or not to file an entity in an integrated business like this that you should err on the side of filing rather than the other way and to avoid any unforeseen consequences, to name a few reasons." (8/17/09 Tr. 45:2-6 (Doody).)

704. In reaching the decision to file CCO for bankruptcy, the directors relied on the management team and its advisors. (7/22/09 Tr. 210:8-16 (Merritt).)

705. Mr. Millstein believed that whether CCO was solvent or not "might turn on its existing bank credit agreements remaining reinstated." (7/21/09 Tr. 174:10-13 (Millstein).)

## XV.    BENEFITS TO JPMORGAN OF A REORGANIZED CHARTER

706. Ms. Kurinskas agreed that from 2003 through March 27, 2009, JPMorgan wanted Charter to de-lever. "I think everyone wanted Charter to de-lever." (8/25/09 Tr. 78:2-4 (Kurinskas).)

707. JPMorgan would be happy with Charter reducing its leverage. (8/25/09 Tr. 125:18-24 (Kurinskas).) Throughout 2008, JPMorgan's strategy, internally, as to Charter, was to reduce JPMorgan's credit exposure and help Charter restructure its maturities. (8/25/09 Tr. 126:6-9 (Kurinskas).) And one of the benchmarks for upgrading Charter's credit rating was Charter getting to a positive free cash flow position. (8/25/09 Tr. 126:10-13 (Kurinskas).)

708. Ms. Kurinskas agreed that if the plan is confirmed, Charter would be free cash flow positive on the day it emerges from Chapter 11, which would be the first day Ms. Kurinskas had ever seen that to be true for Charter. (8/25/09 Tr. 126:14-25 (Kurinskas).) And the eight billion dollar reduction of debt would result in Charter being substantially less leveraged as compared to the day JPMorgan agreed to the terms of the 2007 credit agreement. (8/25/09 Tr. 127:12-15 (Kurinskas).)

709. Ms. Ruyter testified that retiring debt at a discount would help JPMorgan because to the extent Charter remained financially healthy and sound, they would be able to refinance or better able to refinance which would help both Charter and JPMorgan. (7/31/09 Tr. 19:10-16 (Ruyter).)

XVI. **DEVELOPMENT OF THE PLAN OF REORGANIZATION, INCLUDING THE CII SETTLEMENT**

A. **Charter Initiates Restructuring Discussions and Begins Contingency Bankruptcy Planning**

*i.* *Charter begins contingency bankruptcy planning in December 2008*

710. At the December 10 Board meeting the Board determined it was "in the best interest of the company and subsidiaries taken as a whole to begin contingency … bankruptcy activities with the company's advisors." (7/22/09 Tr. 199:18-200:5 (Merritt); 9/10/2008 Tr. 8:23-9:18 (Millstein); JPX 86 at CTR-00040068.)

711. By that Board meeting, Charter's management and advisors were starting to be concerned that the credit market crisis would "substantially impair[]" Charter's ability to effectuate the plan to reduce the outstanding CCH II bonds. (7/21/09 Tr. 43:23-44:1 (Millstein); 8/24/09 Tr. 11:9-12:20 (Goldstein); Goldstein Decl. ¶ 9; 7/22/09 Tr. 85:18-86:3 (Smit); JPX 86 at CTR-00040067-68.)

712. There were two reasons for the request: First, the financial markets were "worsening" as the perceived breakdown in the banking system "became more of a global phenomena" and second, it appeared "more problematic" that the financings that Charter needed to accomplished would occur." (7/21/09 Tr. 42:21-43:6 (Millstein).)

713. In connection with the 2008 audit, based on earlier conversations over the years with Charter's auditors at KPMG, Charter believed that the CCH II bond maturity in September of 2010 was "outside the window that the auditors would focus on" for evaluating Charter as a going concern. (7/21/09 Tr. 43:13-16 (Millstein).)

714. Given "the turmoil in the credit markets," however, Charter's advisors thought that Charter's auditors may want to see progress in reducing the amount of outstanding CCH II bonds that would mature in September 2010 before they provided a clean audit opinion for 2008. (7/21/09 Tr. 43:20-23 (Millstein); JPX 86 at CTR-00040067.)

715. There was no formal authorization to begin planning and preparation before December. (7/22/09 Tr. 200:19-201:1 (Merritt).)

716. At the start of restructuring discussions in December, an in-court restructuring was not a foregone conclusion. (7/21/09 Tr. 44:15-17 (Millstein); 7/22/09 Tr. 201:5-7 (Merritt).) It was possible that an out-of-court exchange offer "could actually be consummated without resorting to Chapter 11." (7/21/09 Tr. 45:5-7 (Millstein).)

*ii.* *Charter develops primary goals for a restructuring without interference from Mr. Allen*

717. The Board of Directors understood that they had "obligations to act in the best interest of the overall company," including securing its highest overall value and considering the best interests of all the constituencies. (7/22/09 Tr. 241:18-20 (Merritt).)

718. Charter management "proposed the reorganization strategy, not Paul Allen." (Goldstein Decl. ¶ 9; 9/10/09 Tr. 8:23-9:1 (Millstein).)  Mr. Allen and Vulcan did not exert any influence on Charter management's decision that Lazard should evaluate a potential restructuring.  9/10/09 Tr. 9:2-9:5 (Millstein).)

719. "[T]he primary goal was to get the debt level down to a level where Charter's cash flow from operations exceeded its fixed charges, that is, its interest costs and its capital expenditures." (7/21/09 Tr. 45:14-17 (Millstein); Goldstein Decl. ¶ 9; *see also* 7/21/09 Tr. 218:11-23 (Smit).)

720. After solving for the debt level, the second objective was "how to equitably allocate the remaining value of the enterprise … among the various boxes and creditor constituencies." (7/21/09 Tr. 46:4-7 (Millstein).)  In other words, Charter wanted to "devise a plan that would withstand scrutiny and could pass muster under the Bankruptcy Code if, and in the event that recourse to the bankruptcy court were necessary in order to effectuate the [P]lan." (7/21/09 Tr. 46:10-14 (Millstein).)

721. A fundamental predicate for the Plan is not impairing the holders of the CCO credit agreement for two reasons.  (7/21/09 Tr. 47:8-11 (Millstein).)  First, "the possibility of actually refinancing ten million dollars worth of debt in the credit markets as they existed in the winter of 2008-2009 was remote." (7/21/09 Tr. 47:12-15 (Millstein).  Second, "if there was actually capacity in the market to do a refinancing, the cost … would be a substantial increase" over the existing credit provisions.  (7/21/09 Tr. 47:16-19 (Millstein).)

722. Charter's advisors also focused on a structure for a transaction that avoids the dissipation of NOLs.  (7/21/09 Tr. 48:12-14 (Millstein); 8/21/09 Goldstein Decl. ¶ 16).)  Charter has run substantial operating losses as a tax matter for many years and accumulated a sizable amount of net operating losses (NOLs), which have significant value.  (7/21/09 Tr. 48:2-6 (Millstein).)  These NOLs enable Charter to optimize its net after-tax income available for distribution to creditors and to shareholders after the consummation of this transaction.  (7/21/09 Tr. 48:7-12 (Millstein).)

723. The impetus for the restructuring efforts did not originate with Mr. Allen.  (See e.g., 8/21/09 Goldstein Decl. ¶ 9.)  Management, not Mr. Allen, decided to use the December Board meeting for the purpose of discussing restructuring alternatives.  (9/10/09 Tr. 8:18-9:1 (Millstein).)

724. Charter's tax objectives were to maximize the value of the significant NOL assets for the Reorganized Company and to hopefully obtain an increase in the basis of Charter's assets.  A plan of reorganization that achieves substantial reduction of debt would make the NOLs valuable because the NOLs are only of value if Charter generates future taxable income or sells assets at a gain.  (8/21/09 Goldstein Decl. ¶ 16.)

### iii. *Lazard identifies Mr. Allen's voluntary participation as essential to its efforts to maximize value*

725. Mr. Millstein identified for the Charter Board at the December meeting that, if Charter wanted to reinstate its debt, it was going to need to have Vulcan remain a 35% or more shareholder of the company and to avoid having any other shareholder have more, and that there were substantial tax savings that could be effectuated — that might otherwise be lost — if Vulcan agreed to work with Charter on the restructuring.  (9/10/2008 Tr. 9:19-11:4 (Millstein).)

726. Paul Allen's participation in the transaction "was critical," both for "optimizing the tax structure so as to preserve as much of the NOL[s] as possible" as well as "avoiding a change of control that could trigger the acceleration of the bank debt."  (7/21/09 Tr. 62:1-6 (Millstein); 8/24/09 Tr. 155:5-23 (Goldstein).)

727. Mr. Millstein told the Board that the best way to maximize value and to maximize the amount of value distributable to creditors involved working with Paul Allen and Vulcan.  (9/10/2008 Tr. 11:18-23 (Millstein).)

728. With specific respect to its negotiations with Paul Allen's representatives, Charter would require a compromise that (i) preserved and maximized the NOL tax attributes, and (ii) ensured that no change of control would take place so that the existing credit agreement and certain other debt instruments could remain in place and be reinstated.  (8/21/09 Goldstein Decl. ¶ 15.)

729. Securing an agreement that ensured Paul Allen's cooperation with Charter going forward was fundamental and valuable. These two issues alone were worth billions of dollars to Charter.  It was his cooperation, not Mr. Allen's old equity, that held value.  (8/21/09 Goldstein Decl. ¶ 15.)

730. Lazard understood from Charter's tax professionals and advisors that having Paul Allen agree to have CII be a member of Reorganized Holdco would result in the Reorganized Company's ability to both retain and utilize a substantially larger portion of the tax attributes (including approximately $2.85 billion of net operating losses) after emergence, than would be the case if CII ceased to be a member of Reorganized Holdco.  (8/21/09 Goldstein Decl. ¶ 16.)

731. If Mr. Allen did not participate with Charter post-restructuring, there would be a significant effect on the estate.  (9/2/09 Tr. 68:14-17 (Conn).)

732. If Mr. Allen elected not to take a new voting stake and if he chose not to hold an interest in Holdco, Charter would not have the essential elements necessary to reinstate the bank debt and preserve its NOLs.  (9/2/09 Tr. 68:18-24 (Conn).)

733. On reinstatement Mr. Allen was the only person on earth whose participation would count, as Mr. Allen is directly mentioned in the credit agreements.  (8/24/09 Tr. 14:7-10 (Goldstein).)

734. To protect its tax position and reinstate its senior bank debt, Charter needed to keep the entirety of its corporate structure in place, not just CCI. (9/10/09 Tr. 38:12-17 (Millstein).)

735. While the Debtors would zealously attempt to compel Mr. Allen to remain a member of Holdco, if necessary, the Debtors believe that such endeavors have a limited chance of success and that the mutually beneficial compromise embodied in the CII Settlement is the most prudent and certain means of achieving the CII Settlement's benefits. (7/16/09 Doody Decl. ¶ 33.)

736. This tax issue and structure was fundamental to Charter since its first proposal and it remains so under the Plan. (8/21/09 Goldstein Decl. ¶ 16.)

737. Although alternative transactions were considered, none were viable. (7/21/09 Tr. 217:6-17 (Smit); 8/17/09 Tr. 25:3-12 (Doody).)

> ### iv. Based on its advisors input, Charter believes it was, and is, necessary to compensate Mr. Allen for his voluntary participation in the restructuring

738. The December 9-10, 2008, Board of Directors meeting was the first time that Mr. Millstein identified to the Board the fact that Paul Allen's participation was actually a source of significant value for the estate. (9/10/2008 Tr. 20:16-25 (Millstein).)

739. Mr. Allen was not obligated to continue to hold any interest, voting or otherwise in Charter. (8/21/09 Goldstein Decl. ¶¶ 17-18.) Mr. Allen does not have any obligation to remain a 35 percent voting holder of Charter. (9/2/09 Tr. 148:24-149:1 (Conn).)

740. Mr. Allen did have assets for which he could legitimately demand to be compensated. (8/31/09 Tr. 224:24-225:7 (Johri).)

741. Mr. Millstein testified that he thought that Mr. Allen's participation in the restructuring conferred substantial benefits on the creditors for which he thought the creditors needed his cooperation and should be prepared to pay for it. (9/10/2008 Tr. 21:23-22:7 (Millstein).) "… [T]hese are values that are created by his ongoing participation, not by his previous partic -- not by his previous investment. This is created by his willingness to remain a thirty-five percent shareholder from a voting point of view and have his name continue to be associated with this company, with its hopefully with its ups but could be with its future downs as well. It is a -- it's a burden to be a director and an owner of a public company. So I think he -- I think the benefits he's conferring on people by his continued participation is real and substantial, and I think he's entitled to compensation for it." (9/10/09 Tr. 23:4-23:16 (Millstein).)

742. I think it's perfectly obvious that a guy who is contributing billions of dollars, conferring billions of dollars of value on third parties who are not widows and orphans, is going to expect to be paid for the privilege of giving that benefit to other people." (9/10/09 Tr. 61:4-61:8 (Millstein).)

743. Mr. Allen's group considered what the appearance would be but there isn't anything that prevents a controlling shareholder from exercising his rights or participating going forward and being compensated for doing so. (9/2/09 Tr. 175:8-22 (Conn).)

### v. Charter issues a press release announcing its interest in negotiating a restructuring and encourages the fulcrum securities to organize

744. The Board authorized Charter to retain Lazard as a financial advisor in connection with the restructuring, approved the issuance of a press release announcing the intent to pursue recapitalization, contact certain bondholders to sign confidentiality agreements and begin reviewing diligence information and undertake discussions with Vulcan and other parties regarding the circumstances if they might make an investment, and begin contingency bankruptcy planning activities. (7/21/09 Tr. 216:1-10 (Smit); 9/10/09 Tr. 62:3-62:15 (Millstein); Doody Decl. ¶ 7.)

745. On December 12, Charter issued a press release announcing Lazard's retention and Charter's intent to consider "a recapitalization transaction." In doing so, Charter was basically inviting its bondholders to a dialogue over a possible restructuring of the company. (CX 311; 7/21/09 Tr. 44:4-12 (Millstein); 7/21/09 Tr. 217:6-19 (Smit).)

746. Through Lazard, Charter organized what it considered to be holders of its fulcrum securities, the CCH I Notes and CCH II Notes. (7/16/09 Doody Decl. ¶ 32; 8/17/09 Tr. 25:13-24 (Doody).) Shortly thereafter, the Crossover Committee consisting of holders of the CCH I Notes and CCH II Notes formed. (7/16/09 Doody Decl. ¶ 32.)

747. There is nothing unusual about having noteholders form an ad hoc committee or retain common advisors to minimize the expenses attending with a multiple party negotiation; it is standard operating procedure. (7/21/09 Tr. 52:14-53:6 (Millstein).)

748. The size of the holdings and at which entities the notes were held gave Lazard and Charter comfort that any deal Charter reached with the Crossover Committee "would be one that would probably universally be accepted across" the constituencies in Charter's capital structure. (7/21/09 Tr. 53:13-21 (Millstein).)

### vi. Charter, the Crossover Committee and Mr. Allen retain separate advisors

749. All parties involved in the CII Settlement were represented by independent and sophisticated counsel and financial advisors. Charter has been represented by Lazard Freres & Co. LLC for many years and engaged Kirkland & Ellis LLP to assist with evaluating restructuring alternatives. (7/16/09 Doody Decl. ¶ 32.)

750. The independent directors chose Kirkland to play a role with regard to this restructuring rather than Charter's other outside counsel at Gibson Dunn. (9/2/09 Tr. 135:25-136:6 (Conn).)

751. Mr. Allen and the Vulcan directors did not steer Charter to select Kirkland or Lazard. (9/2/09 Tr. 140:12-14 (Conn).)

752. The Crossover Committee of holders of the CCH I Notes and CCH II Notes engaged Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC as advisors. (7/16/09 Doody Decl. ¶ 32.)

753. Mr. Allen retained Miller Buckfire and Skadden Arps to represent his interest in the Charter restructuring. (9/2/09 Tr. 24:12-17 (Conn).)

754. Each participant in the negotiations also had its own tax advisor. (8/17/09 Tr. 28:16-23 (Doody).)

### vii.    *Charter and the Allen Group assemble their negotiating teams*

#### a.    Lazard and Kirkland report to a core set of Charter management

755. The primary interface with the bondholders' representatives and Mr. Allen's representatives was Lazard, represented primarily by Mr. Millstein. (7/21/09 Tr. 217:20-218:1 (Smit).) Mr. Millstein reported directly to the CFO, Eloise Schmitz, the CEO, Neil Smit, and the Board. (7/21/09 Tr. 48:19-20 (Millstein).)

756. The members of management involved in the day-to-day of the restructuring or recapitalizing discussions were Neil Smit, Eloise Schmitz and Greg Doody. (7/21/09 Tr. 49:7-11 (Millstein); 8/17/09 Tr. 24:12-21 (Doody).)

757. Mr. Smit's role during the negotiations was to set the strategy, ensure that Charter stayed true to the strategy and executing on the strategies. (7/21/09 Tr. 218:5-10 (Smit).) Mr. Smit set the goals for Lazard. (7/21/09 Tr. 216:20-217:5 (Smit).)

758. Mr. Doody was the chief negotiator in the value creation plan; he is not a participant and was not employed by Charter at the time of the negotiations. (8/17/09 Tr. 43:10-18 (Doody).)

759. During the negotiations, Mr. Millstein spoke with members of this management group "almost daily." (7/21/09 Tr. 49:12-14 (Millstein).)

#### b.    Miller Buckfire and Skadden report to Lance Conn who was Mr. Allen's agent for negotiating the CII Settlement

760. Mr. Millstein, along with his team at Lazard, primarily interacted in negotiations with personnel from Miller Buckfire that were ultimately reporting to Lance Conn. Mr. Millstein understood that Mr. Conn was the person at Vulcan overseeing the negotiations for Mr. Allen. (9/10/2008 Tr. 28:11-13 (Millstein).)

761. Mr. Conn was Mr. Allen's agent for negotiating the CII settlement. (9/2/09 Tr. 19:4 (Conn).) Mr. Conn was responsible for negotiating the core commercial bargain between Vulcan and the bondholders that is contained in the Plan. (9/2/09 Tr. 19:20-23 (Conn).)

762. Mr. Conn's "exercise of any authority on Mr. Allen's behalf, with respect to some of the key terms of this provision, was ordinary course" for him. (9/2/09 Tr. 172:21-24

(Conn).) He kept fairly close tabs on the key issues and relied on his advisors and representatives to keep him informed on those issues about which he was not personally involved. (9/2/09 Tr. 20:21-23 (Conn).)

### viii. *Lazard has initial discussions on why Charter wanted to restructure in December 2009*

763. Mr. Millstein spoke to JPM in December, explaining that Charter did not plan to impair the banks and therefore Charter will not need the banks' consent or approval for the potential transaction. (7/21/09 Tr. 58:15-23 (Millstein).)

764. Mr. Millstein explained to Ms. Kurinskas that the banks would not be included in Charter's discussions with the noteholders. (7/21/09 Tr. 58:17-18 (Millstein).)

765. The noteholders uniformly wanted to know why Charter was initiating restructuring discussion in December 2008; they had not expected Lazard to be raising these issues for Charter until 2010. (7/21/09 Tr. 51:9-16 (Millstein).)

766. Bruce Karsh, one of the three principal owners of Oaktree Capital Management, visited Mr. Millstein in an attempt to persuade him that it "was an inopportune time to go forward with these discussions." (7/21/09 Tr. 51:23-25 (Millstein).)

767. Lazard also used December to allow this committee to organize themselves, have them retain legal and financial advisors and give due diligence access to those advisors so that Charter "could actually engage in a dialogue with an informed, well-advised committee of noteholders." (7/21/09 Tr. 49:24-50:10 (Millstein).)

### B. The Negotiations for the Plan, Including CII Settlement, Were Fair

### i. *Charter's management and its advisors developed an initial deal structure*

768. Charter instructed its advisors — Lazard and Kirkland & Ellis — to consider all potentially viable restructuring options. (8/17/09 Tr. 25:10-12 (Doody).)

769. The Debtors proposed the reorganization strategy, not Paul Allen, his affiliates or representatives. (8/21/09 Goldstein Decl. ¶ 9.)

770. Charter distributed a stawman proposal to the advisors of the Crossover Committee shortly after the Charter Board meeting in early January. (7/21/09 Tr. 54:18-21 (Millstein); 8/21/09 Goldstein Decl. Ex. A (January 7, 2009 Lazard Presentation).)

771. The strawman proposal was distributed to members of the Crossover Committee and Mr. Allen in order to focus them on the company's key goals and to commence a dialogue over the terms of the restructuring. (8/24/09 Tr. 54:12-54:15 (Goldstein).)

772. The strawman proposal allowed Charter to give the bondholders a quick lesson in the levers by which value would be allocated across the capital structure so the parties could accelerate the recapitalization conversations. (7/21/09 Tr. 46:19-23 (Millstein).)

773. Charter management, Lazard and Kirkland originated and designed the strawman proposal. (9/2/09 Tr.141:10-11 (Conn).) Mr. Allen and his advisors had no input in the development of the strawman proposal, prior to its circulation to the Board of Directors. (8/21/09 Goldstein Decl. ¶ ¶ 10-11; 9/02/09 Tr. 141:4-14 (Conn); 9/10/09 Tr. 25:24-26:7(Millstein).)

774. The terms of the strawman proposal, as initially presented to Mr. Allen, were to "avoid a change of control and maintain the bank debt in place and to reduce the company's leverage to a level where their capital structure was sustainable." (9/10/09 Tr. 27:4-27:17 (Millstein).) After the strawman proposal to Mr. Allen and the Crossover Committee, all three parties began negotiating towards an appropriate structure. (7/21/09 Tr. 72:21-73:9 (Millstein).)

ii. *Charter's advisors treated Mr. Allen and Vulcan like any other stakeholder*

775. Mr. Smit made sure the negotiations were at arm's length through his instructions to Lazard. (7/21/09 Tr. 223:12-19 (Smit).)

776. As Charter's lead negotiator, Mr. Millstein "had to treat Vulcan as … another constituency whose participation in the plan needed to be obtained and who had interests that had to be compromised." (7/21/09 Tr. 55:5-8 (Millstein).)

777. Mr. Smit never gave any instructions that Mr. Allen should get preferential treatment. (7/21/09 Tr. 223:20-224:1 (Smit).)

778. Mr. Millstein did not receive any instructions or suggestions that the Paul Allen group should be treated differently or receive any preferential treatment in the negotiations. (7/21/09 Tr. 55: 9-12 (Millstein).)

iii. *Charter, the Crossover Committee and Vulcan engaged in round-the-clock, contentious, three-sided negotiations to reach the term sheet agreement and CII Settlement*

779. Charter made sure the negotiations were at arm's length through Mr. Smit's instructions to Lazard, and meetings with the independent Board members. (7/21/09 Tr. 223:12-19 (Smit); 8/17/09 Tr. 26:18-19 (Doody).)

780. "Ultimately, the[] [restructuring negotiations with the crossover committee and Paul Allen/Vulcan] were successful because we have a prearranged plan. But along the way, they were fairly contentious." (8/17/09 Tr. 26:15-17 (Doody).)

a.     The February 4 Meeting

781.    During Vulcan's meeting with the Crossover Committee on February 4, the negotiations focused on the elements of consideration for Mr. Allen.  (9/2/09 Tr. 62:24-25 (Conn).)

782.    Messrs. Zinterhofer, Lang and Marcus and Ms. Villaluz attended and participated in the February 4 meeting for the Crossover Committee.  (9/2/09 Tr. 93:1-12 (Conn).)

783.    Mr. Conn took an aggressive approach in those negotiations knowing that he had aggressive sophisticated counterparties on the other side.  (9/2/09 Tr. 63:21-22 (Conn).)  Mr. Conn believed, however, he could defend everything Vulcan asked for in its proposal.  (9/2/09 Tr. 64:3-4 (Conn).)

784.    During the negotiations, the committee's negotiators did not suggest that Mr. Allen did not deserve compensation for his participation going forward and their negotiations efforts indicated the opposite.  (9/2/09 Tr. 74:23-72:2 (Conn).)

785.    The Crossover Committee offered equity to Mr. Allen in consideration for his cooperation and participation in the restructuring.  (9/2/09 Tr. 72:16-23 (Conn).)  During the February 4 negotiations, the committee's negotiators initially offered Mr. Allen 1%-2% of Charter's new equity.  (9/2/09 Tr. 72:24-73:1 (Conn).)

786.    The Crossover Committee members understood that the equity Mr. Allen would receive would come out of their own equity.  (See, e.g., 7/29/09 Tr. 208:12-212:17 (Liang).)

787.    Vulcan and the committee's negotiators walked away from the negotiating table on February 4th because they were not close to an agreement.  (9/2/09 Tr. 37:11-12 (Conn).)

b.     The Allen Group did not threaten to "fire the board"

788.    During the February 4 meeting, the bondholder negotiators argued that Mr. Allen had a huge tax liability that he could not avoid and as a result Mr. Allen needed the bondholders more than they needed Mr. Allen's continued participation and Mr. Allen should accept a smaller amount of equity in a deal.  (9/2/09 Tr. 143:10-21 (Conn).)

789.    Mr. Conn was careful not to disclose anything about Mr. Allen's tax position.  (9/2/09 Tr. 143:24-25 (Conn).)  No one from Vulcan shared the details of Mr. Allen's tax position with UBS.  (9/2/09 Tr. 144:8-11 (Conn).)

790.    Mr. Conn rejected bondholders' argument, responding "first by saying they were completely wrong, that they hadn't studied the issue at all, and there was information that they couldn't know" and "that Mr. Allen had a variety of solutions to any alleged tax problem that didn't even require a restructuring agreement with the bondholder[s] of the company.  In other words, he had options that were independent of an agreement."  (9/2/09 Tr. 144:1-7 (Conn).)

791.    Vulcan did not threaten the Crossover Committee that Mr. Allen would fire the Board if he did not receive sufficient value out of the Plan.  (9/2/09 Tr. 64:8-14 (Conn).)  There

was never an intent to fire the Board and Mr. Conn viewed any suggestion otherwise as silly. (9/2/09 Tr. 67:15-17 (Conn).)

792. Mr. Conn did not tell them that Mr. Allen would fire the board and he is not aware of anyone on Mr. Allen's side telling the Crossover Committee that he would (9/2/09 Tr. 64:17-23 (Conn).)

793. Mr. Conn explained that, during the negotiations, the Crossover Committee was playing out the scenarios of what would happen with CII's exchange agreement right and trying to have Vulcan acknowledge that Vulcan did not have viable exchange rights. (9/2/09 Tr. 65:9-13 (Conn).)

794. In playing out those scenarios, the committee's negotiators suggested that if Mr. Allen tried to exercise his exchange rights the Charter board could refuse to honor the rights or file for bankruptcy. (9/2/09 Tr. 65:13-15 (Conn).) They then questioned the Vulcan negotiators about how Mr. Allen would respond to Charter's failure to honor his exchange rights, asking whether he would fire the board. That was the full extent of the exchange between the negotiators on this topic. (9/2/09 Tr. 65:15-17 (Conn).)

     c.    <u>Through CII, Mr. Allen has a long-standing right to exchange his interests in Holdco for CCI common stock</u>

795. There was an Exchange Agreement between CCI and CII created in conjunction with Charter's IPO in 1999. (9/2/02 Tr. 35:12-14, 126:24-127:1 (Conn).)

796. Under the Exchange Agreement, through CII, Mr. Allen had the right to exchange his interest in Holdco for CCI class B common stock. (9/2/02 Tr. 35:15-17, 126:13-20 (Conn); 7/22/09 Tr. 205:18-24 (Merritt).)

797. The CCI-CII exchange agreement was disclosed in Charter's public filings on a continual basis from 1999 through 2008. (9/2/09 Tr. 128:6-9 (Conn); Vulcan 2 at 73; Vulcan 3 at 103; Vulcan 4 at 44; LDT 239 at 46-47.) The exchange agreement was also disclosed in the 2004 and 2007 prospectuses for the original CCI convertible note and the current version of those notes. (9/2/09 Tr. 128:18-129:8 (Conn); Vulcan 6 at 38, 92.)

798. In its 2006 10-K, Charter disclosed that if Mr. Allen exchanged his Holdco units under the exchange agreement, the transaction would result in an ownership change for income tax purposes which would result in a material limitation on Charter's use of a substantial amount of its net operating losses carried forward. (9/2/09 Tr. 130:23-131:6, (Conn); JPX 17 at 30.)

799. The purpose of the exchange agreement was to provide a path to liquidity because the Holdco units are illiquid. (9/2/09 Tr. 130:5-10 (Conn).)

     d.    <u>CII sends an exchange notice to Charter on February 5</u>

800. On February 5, 2009 Mr. Allen sent an exchange notice. (CX 119; 8/17/09 Tr. 29:22-25 (Doody).)

801. Mr. Allen had a long standing contractual right to a pre-bankruptcy tax free exchange, which entailed exchanging the Holdco interest for a CCI interest. (8/17/09 Tr. at 29:3-14 (Doody).)

802. CII sent the exchange notice in order to reserve its rights under a longstanding agreement. (9/2/02 Tr. 36:19-20 (Conn).) When CII sent the exchange notice, it was not CII's intent to follow through to effectuate the exchange. (9/2/02 Tr. 37:1-4, 37:11-12, 150:17 (Conn); *see also* 8/31/09 Tr 219:17-220:8 (Johri).)

803. Mr. Conn contacted Charter board members to underscore what CII's intent was and "to make sure that no one thought this was some kind of threat or that we were trying to hold — hold the company's feet to the fire." (9/2/09 Tr. 150:24-151:2 (Conn).)

804. Mr. Conn had several conversations with Neil Smit about the Exchange Notice. (9/2/02 Tr. 41:9 (Conn).)

805. Giving the exchange notice on February 5th ensured that Mr. Allen preserved his right to exercise, if necessary, before the grace period expired for the January interest payment on February 12th. (9/2/09 Tr. 40:17-13 (Conn); 8/17/09 Tr. 30:5-16 (Doody).)

806. The exercise of Mr. Allen's exchange rights had the potential of resulting in adverse tax consequences for Charter because an exchange would limit CII's ability use its NOLs. (7/22/09 Tr. 206:9-11 (Merritt); 9/2/09 Tr. 36:2-11 (Conn).)

     e.      <u>Charter's response to the February 5 exchange notice shows that Charter did not place Mr. Allen's interests ahead of its constituents</u>

807. On February 6, Mr. Smit called a telephonic Board meeting to discuss Mr. Allen's potential exercise of his exchange rights. (CX 382.) Mr. Smit explained to the Board "if this exchange were to be consummated, there would be significant negative tax consequences to the company due to the ownership change caused by the exchange." (CX 382.)

808. The Board took the issue "very seriously." (7/22/09 Tr. 207:22-24, 21 (Merritt).)

809. Mr. Conn explained to the Charter Board both before the meeting and during the meeting that the purpose of the notice was to prod the bondholders to come to the table to negotiate. (9/2/09 Tr. 36:21-25, 150:14-19 (Conn).)

810. Because the exchange potentially represented the loss of an asset that could have value to the company in excess of a billion dollars, however, the independent directors discussed with Lazard and Kirkland certain countermeasures that the independents could take to negate or mitigate the effect of an exchange. (7/22/09 Tr. 207:21-25 (Merritt).)

811. Mr. Merritt concluded from a fiduciary standpoint that there would be "no choice but to take any and all appropriate measure to mitigate the impact; … the directors could not stand by and watch a billion dollars of value go away." (7/22/09 Tr. 208:5-8 (Merritt).)

812. Mr. Allen's exercise of his exchange rights required ministerial acts by the company before it could close so Mr. Allen needed Charter's assistance. (7/21/09 Tr. 173:6-12 (Millstein).)

813. Charter's options for responding to the exchange notice included filing for bankruptcy and refusing to honor CII's exchange right. (9/2/09 Tr. 42:16-19 (Conn).) If CCI had refused to honor CII's exchange right, Mr. Conn believed that CII would have had to compel CCI to do so. (9/2/09 Tr. 42:18-20 (Conn).)

814. During the negotiations, the company, including Mr. Smit, warned Mr. Allen's group that it would file for bankruptcy if Mr. Allen attempted to close on the exchange of his Holdco units for CCI stock. (7/21/09 Tr. 173:13-17 (Millstein); 7/21/09 Tr. 226:7-18 (Smit).)

815. Ultimately, Mr. Allen withdrew his exchange notice as part of the final negotiations that led to the plan. (7/21/09 Tr. 226:7-18 (Smit); 8/21/09 Goldstein Decl. ¶ 17.)

816. Mr. Allen agreed to "forbear from making that exchange and doing it in a taxable way post effective date." (8/17/09 Tr. 282:1-6 (Doody).)

817. While Mr. Allen did not initially agree to the tax structure of the Plan and the CII Settlement as proposed by the Company, he was persuaded to concede as part of the negotiations. (8/17/09 Tr. 26:24-29:14 (Doody).)

> f.  Differences among members of the Crossover Committee complicated the negotiations

818. The Crossover Committee "is a diverse group of institutional investors" including private equity funds, distressed funds for control and non-control purposes, and institutional money managers. They have different investment objectives, they have different investment philosophies, and they have different limitations on what they can own. (7/21/09 Tr. 59:24-60:10 (Millstein).)

819. These differences, especially the ownership limitations and "varying appetites for more debt or more equity being part of the forms of consideration," dictated different responses during the negotiations. (7/21/09 Tr. 60:17-20 (Millstein).)

820. Members of Apollo, Oaktree, Crestview and Franklin told Mr. Millstein of differences among them with regard to essential elements of the plan. (7/21/09 Tr. 118:8-14 (Millstein).)

> g.  Threatening a potential liquidation would not have maximized value

821. The CCI Noteholders' theory that Charter should have threatened to liquidate was an unreasonable position because it would have destroyed value in the enterprise, not maximized it. (8/17/09 Tr. 30:17-31:3 (Doody).)

822. Lazard did not believe liquidating Charter, or other alternative structures, would have maximized value, and did not recommend liquidation or other alternatives to Charter for that reason. (8/21/09 Goldstein Decl. ¶ 20.)

823. Mr. Goldstein explained that liquidating the Company to maximize Mr. Allen's tax liabilities would not have been an exercise of sound business judgment or his fiduciary duty. (8/24/09 Tr. 154:7-14 (Goldstein).)

824. The liquidation of CCI would be inconsistent with Charter's interest in preserving the bank debt as well as preserving the NOLs. (7/21/09 Tr. 71:19-72:1 (Millstein).)

825. If Charter needed to sell assets, December 2008 "would be about the worst time to try to do that, if you were looking to receive full value." (7/22/09 Tr. 200:16-201:51 (Merritt).)

826. The CCI Noteholders' theory that Charter should have threatened to liquidate was an unreasonable position because it would have destroyed value in the enterprise, not maximized it. (8/17/09 Tr. 30:17-31:3 (Doody).)

h. <u>The final push for a term sheet agreement on February 10-11, 2009</u>

827. As the deadline of the grace period approached, the negotiations were "near non-stop." (8/21/09 Goldstein Decl. ¶ 12.)

828. By February 10, Charter's negotiating team made substantial progress on the fundamental issues important to the company, including reinstating the bank debt and reducing the debt levels to where Charter would be free cash flow positive on a levered basis based on the company's business plan and some sensitivities to the plan. (7/21/09 Tr. 61:8-23 (Millstein).)

829. Fundamental differences remained, however, between the Crossover Committee and Vulcan regarding the potential consideration for Paul Allen's continued participation with Charter. (7/21/09 Tr. 61:24-62:1 (Millstein).)

830. At the February 10 meeting, the bondholders made a presentation to the Board. The bondholders told the Board that they were committed to the transaction, that they'd discussed the pro forma transaction such as the structure and they felt it would be positive for the company. (7/21/09 Tr. 228:18-229:9 (Smit); CX 255 at CTR-0064503-05.)

831. Mr. Millstein attempted to mediate the differences between the Crossover Committee and Vulcan while protecting against proposed resolutions that encroached on Charter's key objectives that could not be violated, like its proposed debt level, ability to reinstate the bank debt and preservation of its tax assets. (7/21/09 Tr. 63:20-64:14, 170:20:171:2 (Millstein).)

832. During these negotiations, Charter would review and decide whether it supported any proposed deal that Vulcan and the Crossover Committee reached regarding Mr. Allen's consideration for the value he was creating. (9/2/09 Tr. 63:6-10, 13-15 (Conn).)

833. Charter had its own "guardrails and constraints" over what it viewed was an appropriate agreement to reach regarding Mr. Allen's consideration. (9/2/09 Tr. 63:15-17 (Conn).) For example, Charter talked Paul Allen down from debt levels and forms of consideration that were inconsistent with the Board's goals for the transaction. (7/21/09 Tr. 169:24-170:2 (Millstein).)

834. On February 11, 2009, the parties reached the CII Settlement and Charter entered into separate Plan support agreements and commitment letters with each of the parties that would achieve these goals. This agreement was reflected in a final term sheet on February 11, 2009. (CX 226 at Charter-e 00545292; 8/21/09 Goldstein Decl. ¶ 19.)

835. The CII Settlement was the product of negotiations between three different sophisticated and well-represented parties, which Mr. Goldstein believed contributed to make the process arm's length, good faith and fair. (8/21/09 Goldstein Decl. ¶ 19.)

### iv. *Charter's informed and engaged board of directors oversaw the restructuring negotiations and plan development*

836. The Charter Board was "very actively involved, monitoring and participating in some cases in the negotiations of important transaction elements." (7/21/09 Tr. 66:2-12 (Millstein).)

837. Between early January, when the strawman was circulated, and the term sheet agreement on February 11, Charter's Board held formal meetings and informal update calls at least once a week. (7/21/09 Tr. 65:22-25 (Millstein).)

838. Mr. Smit kept the Board informed through Board meetings and telephone calls. (7/21/09 Tr. 218:24-219:3 (Smit).)

839. Although Mr. Allen was the chairman of the Board, he generally called each Board meeting to order and then turned the meeting over to Mr. Smit. (9/2/09 Tr. 135:6-12 (Conn).)

840. In evaluating the settlement, "the board was given all of the component pieces" and "had the details" regarding the settlement. (7/22/09 Tr. 253:11-17 (Merritt).) The directors "were given detail of cash transferred, expenses reimbursed;" "the information presented did list out the monetary components." (7/22/09 Tr. 253:21-24 (Merritt).)

841. Based on Mr. Millstein's experience representing companies as a lawyer and a banker, the Charter Board was "a very actively engaged board" and "was practically a model of corporate governance." (7/21/09 Tr. 66:11-12 (Millstein).) The Board members prepared themselves to understand the nature of the deals that were being proposed and they monitored the progress being made to the proposed Plan. (7/21/09 Tr. 66:13-19 (Millstein).)

*v.* ***To address any potential conflicts, all of Charter's independent directors reviewed and assessed the Paul Allen negotiations and settlement separate from the Vulcan directors***

842. Charter's directors recognized that a potential conflict existed in negotiating with Charter's controlling shareholder. (7/22/09 Tr. 245:7-9 (Merritt).)

843. Since December 2008, the independent directors met separately and had telephonic conversations where they were advised by the advisors and legal counsel on their responsibilities. They gave direction to the advisors and seriously considered after February 5 filing for freefall bankruptcy without a settlement with Mr. Allen. (8/31/09 Tr. 217:1-11 (Johri); 7/22/09 Tr. 168:10-13 (Merritt); 7/21/09 Tr. 158:14-25 (Millstein); *see* minutes reflecting independent directors met separately, CX 250 at CTR-0064498; CX 254 at CTR-0064502.)

844. Whether or not the Board had formally created a special committee, the independent directors participated in separate calls to review the transaction and met at the end of each Board meeting with Kirkland and Lazard "to review the state of play." (7/21/09 Tr. 159:25-160:8 (Millstein); *see also* 8/31/09 Tr. 191:6-8 (Johri); 8/17/09 Tr. 175:21-176:2 (Doody).)

845. The independent directors "[r]eceived consultation and advice from Lazard as financial advisor and Kirkland & Ellis as legal advisor" regarding the Plan. (7/22/09 Tr. 248:20-23 (Merritt).)

846. These independent directors separately reviewed matters implicating Vulcan's relationship with Charter involved in the recapitalization. (7/21/09 Tr. 158:16-20 (Millstein); 8/31/09 Tr. 189:5-10 (Johri).)

847. The independent directors have brought their expertise to bear and have been "very focused on ensuring … there have been good governance practices in place." (9/2/09 Tr. 134:1-6 (Conn).)

848. The independent directors relied on Lazard's advice in connection with their evaluation of the elements of a plan that involved the controlling shareholder. (7/21/09 Tr. 158:7-9 (Millstein).)

849. Lazard's practice was to brief the full Board, and then have separate discussions with all of the independent members of the Board in executive session outside the presence of Mr. Allen or his representatives and advisors. (8/21/09 Goldstein Decl. ¶ 13.)

850. During these meetings, all of the independent directors participated and discussed the Allen settlement and whether to approve it while the Vulcan directors had recused themselves. (7/22/09 Tr. 208:22-209:5 (Merritt).)

<u>Charter's independent directors had a history of meeting separately from the Vulcan directors</u>

851.   The independent directors have been meeting independent of the entire Board since 2007 to evaluate different options to delever the company. (8/31/09 Tr. 222:2-19 (Johri).)

852.   The independent directors have been very active and engaged in their duties and Board activities since at least 2004 when Mr. Conn joined the Board.  (9/2/09 Tr. 133:22-134:1 (Conn).)

853.   It was custom and practice in the Charter Board room regarding issues specifically relating to the company's relationship with Vulcan, that Lazard could be relied upon. (7/21/09 Tr. 162:2-8 (Millstein).)

b.   <u>Charter used a special committee for a litigation with Mr. Allen</u>

854.   Mr. Merritt testified that he recalled only one instance in which Charter formed a special committee to deal with conflicts between Charter and Mr. Allen.  Mr. Merritt served on that committee.  (7/22/09 Tr. 245:14-17 (Merritt).)

855.   That special committee was in connection with a litigation between Mr. Allen and Charter regarding CCVIII and was ultimately resolved through mediation in the Delaware Court of Chancery.  (7/22/09 Tr. 245:21-23 (Merritt); 9/2/09 Tr. 124:12-21 (Conn).)

856.   The advisors for that special committee included Lazard so the advisors were "not entirely" separate from the advisors for the company. (7/22/09 Tr. 246:13-17 (Merritt).)

c.   <u>The independent directors considered the reorganization too important for only a subset of them to consider the issue</u>

857.   As chair of the audit committee, Mr. Merritt considered and rejected the idea of delegating the Allen settlement to the audit committee.  (7/22/09 Tr. 171:16-18 (Merritt).)

858.   "It was in the interest of the company that all [of] the independents be fully informed and make decisions."  Mr. Merritt did not "see how creating an even smaller group would be helpful."  (7/22/09 Tr. 266:6-16 (Merritt).)

859.    "The restructuring negotiations and the Allen interest negotiations were so pervasive to the entire company and so material, that it did not seem appropriate to delegate that to a committee.  That was a matter that all independents needed to be fully informed of." (7/22/09 Tr. 171:20-24 (Merritt).)

860.   Given the fact that "all the independents were engaged and knowledgeable," Mr. Merritt does not believe a special committee of some smaller group of directors would have enhanced the process and "[i]t only could have shrunk the group dealing with these issues."  (7/22/09 Tr. 172:2-4, 172:7-15 (Merritt).)

861. The formation of a special committee would not have enhanced or changed in any way the evaluation of the Allen settlement. (7/22/09 Tr. 172:5-7 (Merritt).)

862. The absence of a special committee did not impact in any way the exercise of the independent directors' business judgment. (7/22/09 Tr. 172:16-18 (Merritt).)

### vi. Lazard, Kirkland and Charter management recommend the term sheet to Charter's board

863. Lazard recommended to Charter's Board, including its independent directors, that the CII Settlement be accepted, as it was in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests. The Settlement allowed Charter to go forward with a plan of reorganization that reduced its debt by more than $8 billion, preserved its tax attributes worth more than $1 billion, avoided a change of control event of default that could jeopardize the existing bank facility (thus avoiding re-pricing of that facility which could have cost hundreds of millions of dollars per year), and allowed for a Plan of Reorganization that benefited creditors. (8/21/09 Goldstein Decl. ¶ 32.)

864. Mr. Millstein believes the proposed transaction provides the highest value reasonably available to Charter under the circumstances. (9/10/2008 Tr. at 43:16-19 (Millstein).)

865. Charter management and Kirkland also recommended the Allen settlement for approval. (7/22/09 Tr. 209:20-22 (Merritt).)

### a. No fairness opinion

866. Lazard was not asked to provide a formal fairness opinion about the consideration exchanged by the parties to the CII Settlement. Nor in Lazard's view is it standard to get a fairness opinion for a settlement incorporated in a plan of reorganization that is presented to a bankruptcy court for approval. However, Lazard along with other Company advisors had numerous discussions about the settlement terms with Charter's Board, including all of its independent directors, on almost a real-time basis as the negotiations took place. This included briefing by the tax advisors on the significant tax issues involved in these discussions. At the conclusion of the negotiations, Lazard recommended that the final proposed terms be accepted. (8/21/09 Goldstein Decl. ¶ 23.)

867. Mr. Goldstein personally believed that was the correct decision for Charter because the CII Settlement was on its face obviously reasonable and fair in its terms and in the process by which it was achieved, and the CII Settlement is the linchpin to the Plan. The Plan also permits the capital structure to be significantly de-levered, and provides for a substantial equity infusion of $1.6 billion into Charter via the Rights Offering. The quantum of consideration Charter is receiving is substantially more than what Charter is providing. (8/21/09 Goldstein Decl. ¶ 23.)

868. Lazard would not have recommended that Charter proceed with and agree to the CII Settlement if the terms were unfair or unreasonable, or not the best negotiated option available for Charter. (8/21/09 Goldstein Decl. ¶ 32.)

869. The proposed term sheet and plan of reorganization, which includes the CII Settlement, met the criteria and goals that the Board set at the start of the restructuring process. ((7/21/09 Tr. 233:6-13 (Smit); 7/22/09 Tr. 213:3-6 (Merritt).)

870. The Board discussed the fairness to Charter of the Allen settlement. The major issues discussed were the values that he was to receive for his different contributions. (7/21/09 Tr. 232:10-18 (Smit).)

871. The independent directors unanimously approved the transaction. (8/17/09 Tr. 175:121-176:2 (Doody).) During the restructuring, the majority of the CCI Board was comprised of independent directors. (7/16/09 Doody Decl. ¶ 16.)

872. The independent directors voted to approve the Allen settlement because it met their objectives of maximizing overall enterprise value, preserved the NOLs and preserved reinstatement of the credit line. (8/31/09 Tr. 218:11-16 (Johri).)

873. The independent directors discussed whether it was fair for Paul Allen to receive consideration as part of the Plan. (8/31/09 Tr. 224:5-19 (Johri).)

874. Mr. Johri has no doubts as to the reasonableness of the compensation that is being paid to Mr. Allen as part of the settlement to be approved pursuant to the Plan. (8/31/09 Tr. 225:8-12 (Johri).)

875. The key factors to Mr. Merritt in approving the Allen settlement were securing the benefits of the bank debt reinstatement, preservation of the NOLs and avoidance of a free-fall bankruptcy. (7/22/09 Tr. 209:16-19 (Merritt).)

876. Independent of Charter management's recommendation, Mr. Merritt found the Crossover Committee's willingness to accept the Allen settlement as "an important fact" because this separate set of noteholders had no interest of providing "one dollar of value beyond what was necessary and fair." (7/22/09 Tr. 209:25-210:3 (Merritt).)

877. Regarding the final call on the final part of the meeting, Mr. Merritt gave his views and his 'intention to vote for the plan." (7/22/09 Tr. 259:3-6 (Merritt).)

878. The Charter Board took comfort in approving the Allen Settlement from the fact that Paul Allen's consideration was the result of a "hotly contested" "tug of war" between Vulcan and the Crossover Committee. (7/21/09 Tr. 72:15-20 (Millstein).)

*viii.* ***The new shareholders of Charter, pending confirmation of the Plan, approve the term sheet overwhelmingly***

879. Prior to the Petition Date, through substantial arm's length negotiations, the Debtors reached agreement with each of the Holders of approximately 73% (approximately $2.9 billion in principal amount) of the CCH I Notes and Holders of approximately 52%

(approximately $1.3 billion in principal amount) of the CCH II Notes. (7/16/09 Doody Decl. ¶ 27.)

**C.     The Terms of CII Settlement Are Substantively Fair From Charter's Perspective**

880.    Through his participation and cooperation in the Plan, Mr. Allen is creating tremendous value for Charter. (9/2/09 Tr. 148:16-23 (Conn).)

881.    The benefits to Charter from the CII Settlement far exceed the value Charter will provide to Mr. Allen. (8/24/09 Tr. 17:15-21 (Goldstein; *see also* 8/21/09 Goldstein Decl. ¶ 22; 9/10/09 Tr. 24:19-25:7 (Millstein); 9/2/09 Tr. 149:16–21 (Conn); 7/22/09 Tr. 203:12-18 (Merritt); see also Vulcan Demo. 3 (illustrating total value received to Debtors is approximately $3 billion, and Mr. Allen's total value received is approximately $375 million).)

882.    A complete description of the consideration provided by the CII Settlement Claim Parties and the Debtors is set forth in Articles I.A.60 and VI.C of the Plan. (8/21/09 Goldstein Decl. ¶ 21.)

> ### *i.     The CII Settlement facilitates reinstatement of senior bank debt, which saves Charter hundreds of millions of dollars, if not billions*

883.    The CII Settlement facilitates the Debtors' reinstatement of approximately $11.8 billion of debt at their current favorable interest rates and thereby avoids potentially hundreds of millions of dollars in incremental interest expense, even assuming availability of replacement financing. (8/21/09 Goldstein Decl. ¶25; 8/24/09 Tr. 16:18-17:3 (Goldstein); 8/17/09 Tr. 34:22-24 (Doody); *see also* 9/10/09 Tr. 12:6-11 (Millstein); 7/22/09 Tr. 268:18-23 (Merritt).)

884.    The value of reinstating the bank debt is "sort of incalculable" because Charter will be in bankruptcy "for a long time until the bank debt market fully recovers and there's capacity in the market to actual refinance debt of this magnitude." (7/21/09 Tr. 73:20-25 (Millstein).)

885.    Were there even capacity in the market to refinance the bank debt, the incremental pricing for new debt over the contractually agreed pricing in the current credit agreement would be "350 to 600 basis points of incremental interest." (7/21/09 Tr. 74:17-22 (Millstein).)

886.    Re-pricing of the CCO Credit Agreement would have cost the Debtors hundreds of millions of dollars in annual interest expense on a best case scenario because a significant majority of Charter's outstanding debt bears an interest rate of Libor +200 basis points (9/10/09 Tr. 12:2-4(Millstein)), while the prevailing rate at the time of the negotiations in December of 2008 had increased to an estimated Libor +1200 basis points (9/10/09 Tr. 11:24-12:11 (Millstein)), even assuming that any financial institution could or would provide financing at that time. (7/22/09 Tr. 268:18-23 (Merritt); 8/21/09 Goldstein Decl. ¶ 25.)

887. The value of reinstating the debt was potentially billions of dollars at the time of the negotiation. "On the preservation of the ability to reinstate the debt…[f]rankly at the time we were negotiating this when there was even more severe dislocation of the credit markets, that was up to billions of dollars." (8/24/09 Tr. 16:18-22 (Goldstein).)

> ### ii. The CII Settlement enables Charter to preserve tax attributes worth over $1.14 billion

888. The Settlement preserves essential assets of the Debtors in the form of NOLs and other tax attributes expected to result in approximately $1.14 billion in cash tax savings per Charter's tax personnel and advisors. That outcome would not have been possible without Mr. Allen's cooperation. Indeed, the benefits to Charter from these tax savings alone justify the CII Settlement without even considering the benefit to the Debtors of reinstating the debt in question. (8/21/09 Goldstein Decl. ¶ 24; 7/15/09 Degnan Decl. ¶¶ 8-9).)

889. Mr. Millstein identified the tax benefits that Mr. Allen's continued participation with Charter provides to Charter going forward as (1) $3 billion of discharge of indebtedness income that results from the plan that will not be allocated to the Company because it would be allocated to Vulcan; and (2) that by virtue of Mr. Allen exchanging his partnership interest for stock of the public company immediately following consummation of the plan, the Company will be entitled to revalue its assets for tax purposes and therefore step up the tax basis of its assets from approximately $8 billion to $14 billion, after giving effect to all of these transactions, thereby creating six billion dollars of incremental tax basis in Charter's assets, which Charter may then use to depreciate and shelter income over time. (9/10/2008 Tr. 13:1-14:5 (Millstein).)

890. Mr. Millstein testified that he was not aware of anyone else that could provide Charter with the benefit of the step-up in basis that he identified as a benefit of this Plan. (9/10/2008 Tr. 14:6-16 (Millstein).)

891. Absent an exception, a debtor will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. A partnership that realizes CODI allocates such CODI to its partners. (7/15/09 Degnan Decl. ¶ 3.)

892. Under Internal Revenue Code § 108(a), a debtor is not required to include any amount of CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. (7/15/09 Degnan Decl. ¶ 4.)

893. Instead, under IRC § 108(b), a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income. The principal tax attribute that it must reduce is its NOLs. (7/15/09 Degnan Decl. ¶ 4.)

894. When a partnership realizes CODI, both the determination of whether the CODI can be excluded from income under IRC § 108(a) and the reduction of NOLs under IRC § 108(b) occur at the partner level. (7/15/09 Degnan Decl. ¶ 4.)

895.    If CII is a member of Holdco when Holdco realizes CODI, then a proportionate amount of the CODI that Holdco will realize as a result of the consummation of the Plan should be allocated to CII.    If CII is not a member of Holdco at such time, then such CODI potentially could be allocated to Charter.   (7/15/09 Degnan Decl. ¶ 7.)

896.    Based on the assumption that at least $6 billion of CODI will be realized, CII should have approximately $2.85 billion in CODI allocated to it.   (7/15/09 Degnan Decl. ¶ 8.)

897.    If CII were not a partner in Holdco when the CODI is realized, there is a material risk that this CODI would all be allocated to CCI, thereby causing Charter to reduce its NOLs by an additional $2.85 billion.   (7/15/09 Degnan Decl. ¶ 8.)

898.    Based on a combined federal and state tax rate of 40%, $2.85 billion of NOLs if and when used by Charter would generate approximately $1.14 billion of future cash savings.   (7/15/09 Degnan Decl. ¶ 9.)

899.    Because CII continues as a partner in Holdco, there is also a chance that CII will in the future recognize taxable gain when it exchanges its interest in Holdco for an interest in Charter, or otherwise disposes of its interest in a taxable transaction.  If and when that occurs, Charter may also benefit from an increase in the tax basis of its assets. (7/15/09 Degnan Decl. ¶ 10.)

###    iii.    The CII Settlement enables a significant post-restructuring step-up in tax basis

900.    Because CII continues as a partner in Holdco, there is also a chance that CII will in the future recognize taxable gain when it exchanges its interest in Holdco for an interest in Charter, or otherwise disposes of its interest in a taxable transaction.  If and when that occurs, Charter may also benefit from an increase in the tax basis of its assets. (7/15/09 Degnan Decl. ¶ 9.)

901.    The gain [Mr. Allen] triggers should provide CCI with a step up in the tax basis of the assets of the partnership.   To the extent the step-up is allocated to depreciable or amortizable assets, CCI would get additional tax deductions in future tax years.   The Company has estimated the potential step up at ~$3 billion, which would enable ~$500 million of additional annual tax deductions between 2010 and 2013, with the remaining balance utilized thereafter.  (LDT 235 at 14.)

902.    The net present value of the tax benefit Mr. Allen provides in the step up in basis is "about $500 million." (9/2/09 Tr. 152:19, 176:24-177:2 (Conn).)

###    iv.    Through the CII Settlement, Charter acquires the remaining 30% interest in Debtor CCVIII for $150 million

903.    The CII Settlement provides for the transfer of CII's 30% interest in the preferred units of Debtor CC VIII, LLC to the Reorganized Company on the Effective Date.  As to this last component, the CC VIII Preferred Units held by CII were estimated to be worth in a range of $135 to $165 million dollars to Charter.  (8/21/09 Goldstein Decl. ¶ 26.)

904. Charter viewed CCVIII as "a valuable asset" that was better for Charter to recover and reconsolidate. (7/22/09 Tr. 203:12-18 (Merritt).)

905. Mr. Merritt believed the 30% interest in CCVIII is "potentially worth $100 to 200 million or more based on the operating results of the company." (7/22/09 Tr. 269:4-10 (Merritt).)

906. Charter wanted to consolidate CCVIII because these were "some of the choice assets in the company," the separate ownership created an overhang because of the different reporting, and Charter "wanted to capture all the upside of those assets" if they could buy Mr. Allen out." (9/2/09 Tr. 146:10-20 (Conn).)

### v. The CII Settlement resolves the management agreement obligation

907. The Settlement eliminates significant obligations of the Debtors to Mr. Allen, including certain consulting fees under the Management Agreement and a consulting agreement dated as of March 10, 1999 by and among Vulcan, Inc. (an entity controlled by Mr. Allen), CCI and CCH. (8/21/09 Goldstein Decl. ¶ 27; CX 407 - Ex. A at 47.)

908. This management receivable was valued at $25-30 million, based on a $14 million receivable that has accrued interest at a rate of 10 percent annually since December 31, 2000. (9/2/09 Tr. 145:8 (Conn); see also VDX 3 (citing Charter 2002 Form 10-K).)

### vi. The CII Settlement enables the $1.6 billion Rights Offering

909. As part of the global settlement underlying the Plan, the CII Settlement made possible the Rights Offering, which infused more than $1.6 billion of equity capital into the Reorganized Company at a time when equity capital and debt financing were not readily available. Without the CII Settlement, the Plan and its constituent Rights Offering would not have been possible. (8/21/09 Goldstein Decl. ¶ 28.)

910. 873. [W]ithout the CII Settlement, this plan would not be possible at all and therefore the rights offering couldn't happen. . . . the CII Settlement is one of the bases for the plan and which allows the rights offering to happen, allows the debtors to raise this money. (8/17/09 Tr. 34:7–34:12 (Doody).)

### vii. The CII Settlement avoids a free-fall bankruptcy

911. There was "great concern" within Charter's board "about the fact that a protracted Chapter 11 could take management's attention from the marketplace. The cable industry is a highly, highly competitive business. So to perform well, we couldn't afford our management team to be diverted for months, if not years. We were very concerned about -- we felt we had a top-flight management team. Very concerned that a protracted bankruptcy would cause turnover and that would hurt our value. Very concerned about the costs of a protracted bankruptcy, the fees and the like." (7/22/09 Tr. 202:5, 202:9-17 (Merritt).)

912. "And in the case of a freefall, if that led to the need to sell assets or the entire assets of the company, this would not -- would be about the worst time to try to do that, if you

were seeking to receive full value. The multiples at that moment were at a very low point in their normal cycle. So the board was very concerned that a freefall would diminish value materially." (7/22/09 Tr. 202:17-23 (Merritt).)

913. "If [Charter] had gone for a freefall bankruptcy, everyone would have suffered much more. (8/31/09 Tr. 181:3-4 (Johri).)

914. The avoided costs of an extended bankruptcy will be considerable. (7/21/09 Tr. 74:1-5 (Millstein).)

### viii. Remaining benefits for Charter from the CII Settlement

915. The CII Settlement also compromises numerous contract claims.(8/21/09 Goldstein Decl. ¶ 27.)

### ix. At most, Mr. Allen is receiving $375 millions of dollars in benefit

916. Over the course of about a decade, Mr. Allen has invested more than $8 billion in Charter stock (9/2/09 Tr. 125:10-12 (Conn); CX 720 Ex. A at 25 (Art. IV(A(6)).)

917. In connection with the purchase of certain cable systems by Charter, Mr. Allen personally guaranteed the systems' sellers that if the price of Charter stock declined, and the seller wished to sell its Charter stock, Mr. Allen would acquire that stock at the original deal price. (Vulcan 1 at 116-118, 121-25 (describing the Rifkin Acquisition Partners put option: "Mr. Allen will grant the exchanging holders the right to put their shares of Class A common stock to him at a price equal to the public offering price plus interest at a rate of 4.5% per year. This put right terminates on the second anniversary of this offering, or earlier in specified circumstances").)

918. These put options were also "uncollared" -- which increased Mr. Allen's downside risk. Mr. Conn explained "if the value of the stock dropped, the sellers could put the shares to him. I don't believe there was any sort of collar on it. I think it was completely uncapped liability all the way down to zero (9/2/09 Tr. 122:21-123:6 (Conn).) These put rights were ultimately exercised at a cost to Mr. Allen of billions of dollars. (9/2/09 Tr. 123:10-11 (Conn).)

919. Mr. Allen is not receiving any consideration for his interest in common equity units of CCI and Holdco. (Goldstein Decl. ¶ 15; 9/2/09 Tr. 125:13-17 (Conn); 8/17/09 Tr. 32:13-15 (Doody).)

### a. Mr. Allen's continued participation

920. Mr. Allen agreed to retain a 35 percent voting interest in Charter in order to facilitate reinstatement of the debt. (9/2/09 Tr. 145:19-24 (Conn); CX 407 - Ex. A at 47.)

921. Mr. Allen will receive new Class B shares representing 2% of the equity value. (9/2/09 Tr. 72:24-73:1 (Conn); CX 211 at 27.) Mr. Allen's Class B shares are entitled to 35% of

the voting power of CCI determined on a fully-diluted basis. (CX 406, Ex. 3 at 4 (Am. Cert. of Inc. ART. IV(b)(i)(A)(2)).)

922. In addition to his Class B shares, Mr. Allen will retain 1% of the shares of reorganized Holdco, which are exchangeable for a further 1% of Class A shares. (9/2/09 Tr. 145:15-146:7 (Conn); CX 211 at 27.)

923. Mr. Allen agreed for CII to remain a member of Holdco during and through the negotiation and to hold a 1% interest in Holdco, which is the mechanism by which the NOLs are preserved and also creates the opportunity for "a very huge step up in basis" for the company if Mr. Allen exchanges his Holdco interest. (9/2/09 Tr. 145:25-146:4 (Conn).) This step up in basis is a "big tax benefit" for Charter. (9/2/09 Tr. 146:4 (Conn).)

924. Mr. Allen will receive $85 million in new CCH II Notes. (CX 211 at 27 (Disclosure Statement); see also VDX 3.)

925. Mr. Allen will receive warrants equal to 4% of the equity value of a reorganized Charter. (8/24/09 Tr.15:8-10 (Goldstein); CX 211 at 27.)

926. Some of Mr. Allen's consideration is in the form of restricted equity that is not transferable for five years. Due to the lack of liquidity, the value of this portion of Mr. Allen's consideration would ordinarily be discounted. (8/24/09 Tr. 15:19-16:1 (Goldstein).)

927. The CCI Noteholders are not correct that Mr. Allen is receiving $209 million for avoiding a change of control. (9/2/09 Tr. 77:8-78:13 (Conn); LDT Ex. 215 at VUL-W_00000057) Vulcan's Charter restructuring negotiation tracker used a change of control label to account for the consideration Mr. Allen is receiving for his overall participation in the plan, including change of control and NOLs. (*Id.*; see also 9/2/09 Tr. 78:6-13 (Conn).)

b. CCVIII Interest

928. Mr. Allen is receiving $150 million for his CCVIII interests. (9/2/09 Tr. 83:21-23 (Conn).)

929. Mr. Allen's CCVIII interests arose out of a put option Mr. Allen provided the sellers as part of Charter's acquisition of other cable companies. (9/2/09 Tr. 122:14-123:4, 21-24 (Conn).)

930. Through CCI, Mr. Allen invested $728 million to acquire his CCVIII interests. (9/2/09 Tr. 125:2-9, 126:9-12 (Conn); *see also* VDX 1.)

931. Charter wanted to purchase Mr. Allen's CCVIII interests and Mr. Allen wanted compensation for those interests. (9/2/09 Tr. 69:5-9, 79:3-7 (Conn).)

932. The idea that Charter would acquire CCVIII originated with Charter, not with Mr. Allen. (9/2/09 Tr. 79:3-79:7 (Conn)(stating "[t]he company asked to reconsolidate [the CC VIII interest] to eliminate the overhang. And we at Vulcan were willing to entertain the discussion around the right value.").)

933. Charter wanted to consolidate CCVIII because these were "some of the choice assets in the company, the separate ownership created an overhang because of the different reporting, and Charter wanted to capture all of the upside of those assets if they could by buying Mr. Allen out." (9/2/09 Tr. 146:10-20 (Conn).)

934. The value Mr. Allen receives for his CCVIII interests "was separate and apart from the value that was being provided to him through the rights. So in other words, he had a senior interest in the capital structure that he was being compensated for, like every other creditor, in accordance with -- actually in that -- at that time, a range of values. So he got different amounts in respect of the CC VIII interest, depending upon where we valued the CC VIII interest. But in all events, he got value for that." (9/10/09 Tr. 46:5-46:16 (Millstein).)

    c.    <u>Mr. Allen is receiving the same treatment as other creditors for his CCO receivable and CCH I note claims</u>

935. Mr. Allen is receiving the same recovery as — and not being treated any differently from — any other holder of CCH I notes. (9/2/09 Tr. 125:19-25 (Conn).) Under the proposed plan, Paul Allen will receive Class A shares for CCH I notes he holds. (9/2/09 Tr. 147:6-15 (Conn).); CX 211 at 8-9.)

936. Mr. Allen is also receiving a full recovery of CII's intercompany receivable against CCO, which is the same recovery as other general unsecured creditors at CCO. (9/2/09 Tr. 52:12-17 (Conn); CX 407 at 41.)

    d.    <u>Advisor fees</u>

937. Mr. Allen is being reimbursed for $20 million of his advisor fees. (9/2/09 Tr. 85:23-25 (Conn).) He is the only party capping its reimbursement for advisor fees. (9/2/09 Tr. 58:2-3 (Conn).)

938. Mr. Conn does not expect that $20 million will cover all of Vulcan's expenses in this transaction. (9/2/09 Tr. 148:11-14 (Conn).)

939. The CII Noteholders are wrong to suggest that Mr. Allen's reimbursement for fees under the CCVIII settlement was part of this CII settlement. As explained in its 2008 10-K, Charter reimbursed Vulcan approximately $3 million in fees "pursuant to indemnification provisions in the October 2005 settlement with Mr. Allen regarding the CCVIII interest," not the pending settlement that is part of the Plan. (LDT 239 at F41; 9/2/09 Tr. 85:1-6 (Conn).)

940. With respect to LDT 212, Mr. Conn believed that Mr. Allen had already agreed to cap his fees as part of the term sheet before he received Mr. Smit's email regarding advisor fees. (9/2/09 Tr. 56:21-23 (Conn).)

941. Mr. Conn thought Mr. Smit had a misunderstanding regarding the size of the agreed cap on advisor fees based on a discussion he and Mr. Smit had months before. (9/2/09 Tr. 58:7-8, 15 (Conn).)

        *x.*     *Any weighing of the relative "gives" and "gets" confirms the CII settlement is objectively fair.*

942. According to Mr. Goldstein, the terms of the Settlement were on their face within any range of reasonableness when you compare the value that Charter was achieving by the settlement with Mr. Allen — in excess of a billion dollars of NOLs, a minimum of hundreds of millions (if not billions) of dollars in saved interest expense, and the CC VIII value — against what it was giving up to Mr. Allen for his cooperation necessary to achieve the Plan. (8/21/09 Goldstein Decl. ¶ 22.)

943. "If you just look at the order of magnitude between the two gives and gets, if you will, between Paul Allen and the company, Paul was getting, you know, in the order of magnitude of a few hundred million dollars and the company was getting billions of dollars of benefit. This was . . . not even a close call." (8/24/09 Tr. 17:15-17:21 (Goldstein).)

944. Mr. Millstein assessed the benefits being conferred by Mr. Allen through his continued participation in the restructuring as "saving the company hundreds of millions of dollars on an annual basis of avoided interest costs" and preserving "at least 3 billion dollars more of the NOL than would otherwise have been possible," as well as permitting "through the post-reorganization exchanges, the step-up in basis that creates another six billion dollars of shelter", as compared to the $180 million of value that Mr. Allen received for his continued participation. (9/10/2008 Tr. at 24:9-17 (Millstein).)

945. "180 million on this side of the ledger, and billions of dollars of value to the estate on the other side of the ledger, this seemed like a pretty fair trade, to me. So that kind of compensation is -- I felt, was quite reasonable." (9/10/09 Tr. 25:10-25:15 (Millstein).)

946. The settlement with Mr. Allen was fair and beneficial to Charter because it enabled a Plan that achieves the original objectives for the restructuring and recapitalization. Charter reduced the debt by $8 billion, cut out hundreds of millions of dollars of interest payments a year, attracted almost $3 billion of new investment and were achieving free cash flow positive results on day one and had enough liquidity to operate the business going forward. (7/21/09 Tr. 232:19-233:13 (Smit).)

947. The compensation that Allen is receiving of $180 million is objectively fair when compared to the $2-$3 billion in value he is creating for Charter; it is undeniably a "fairly small percentage." (9/2/09 Tr. 149:8-21 (Conn).)

**D. The Terms Of The CII Settlement Are Substantively Fair From CII's Perspective**

948. The CII Settlement embodied in the Plan is an integral part of CII's and the Debtors' restructuring efforts. The Plan provides for a settlement and compromise of legal, contractual and equitable rights, Interests, Claims and remedies of CII against the Debtors other than CII, and for CII to provide other consideration to Debtors other than CII, in exchange for the consideration described in the Plan. (08/24/09 Temple Decl. ¶ 31.)

949. The CII Settlement is fair and equitable, reasonable, and in the best interests of CII's Estate. The CII Settlement resolves significant potential claims by and against CII reasonably, expeditiously and without substantial litigation risk. (08/24/09 Temple Decl. ¶ 32.)

950. CII's Impaired Creditors voted overwhelmingly in favor of the Plan. (08/24/09 Temple Decl. ¶ 32.)

**E. The terms of the CII settlement are on the low end of fair from Mr. Allen's perspective**

> ***i. Mr. Allen is receiving considerably less for his continued participation in Charter than he received for a similar tax arrangement with DreamWorks***

951. This exchange is at the low end of fair for Mr. Allen based on other agreements Mr. Conn has negotiated for Mr. Allen, including his arrangement with DreamWorks in which he received 85 percent of the benefit of the step-up in tax basis that he provided them as part of their IPO. (9/2/09 Tr. 175:25-176:23 (Conn).)

952. Setting the reinstatement value and the NOL preservation that Mr. Allen is providing, "$180 million is fair compensation for the step-up that Mr. Allen intends to provide the company post-restructuring because it's NPV'd at about 500 million dollars, which means [Mr. Allen's] getting way less than fifty percent." There are precedent transactions that provide 70% and Mr. Allen had one with DreamWorks that was 85%. (9/2/09 Tr. 176:24-177:6 (Conn).)

> ***ii. Mr. Allen's continued participation is not without costs***

953. Mr. Allen's involvement with Charter is not without costs because Mr. Allen is accepting significant obligations. (9/2/09 Tr. 75:3-76:16 (Conn).) By continuing to participate with Charter, Mr. Allen is exposing himself to potential personal liability because his agents are sitting on the Board and he will employ a staff to monitor his Charter assets. (9/2/09 Tr. 75:18-22 (Conn).)

954. Mr. Allen had two senior individuals and a staff of four to five people in the media and communications group within Vulcan that worked on Charter. (9/2/09 Tr. 120:9-24 (Conn).)

955. Mr. Conn anticipates that Mr. Allen would need a similar level of support from Vulcan given the four representatives Mr. Allen would have on the Board. (9/2/09 Tr. 121:8-17 (Conn).)

956. In addition, by agreeing to accept one percent of Holdco, Mr. Allen is foreclosing other options with respect to tax planning. (9/2/09 Tr. 76:4-8 (Conn).)

### iii. Mr. Allen is not receiving significant tax mitigation in addition to the consideration described in the Disclosure Statement

957. Vulcan carefully considered the tax consequences of different restructuring alternatives as part of the negotiations. (9/2/09 Tr. 33:20-24 (Conn).)

958. Mr. Conn believed that while there were restructuring scenarios that could create the potential for large tax liabilities for Mr. Allen, they were hypothetical and unrealistic. (9/2/02 Tr. 34:8-12 (Conn).) Those scenarios were hypothetical to the point of being next to impossible. (9/2/09 Tr. 34:18-19 (Conn).)

959. Mr. Allen is not receiving additional tax mitigation benefits as part of the settlement. (9/2/09 Tr. 88:20-25 (Conn).) "[T]here is no incremental benefit from a tax point of view to Mr. Allen under this plan versus other alternatives he had open to him." (9/2/09 Tr. 90:7-12 (Conn).)

960. Charter and its advisors believed and continue to believe that Mr. Allen had alternatives to protect his tax position. (9/10/02 Tr. 16:14-18 (Millstein).)

961. The CCI Noteholders are not correct in using an email between Miller Buckfire's Ronen Bojmel and Paul Allen (LDT Ex. 218) to suggest that the Allen settlement included a tax mitigation benefit. As Mr. Conn explained, Mr. Bojmel is not in a position to know Mr. Allen's tax situation. (9/2/09 Tr. 90:9 (Conn).)

### F. Mr. Allen Did Not Have Any Inappropriate Influence In The Development Of The Plan, The Settlement Or The Negotiation Process

962. During the negotiations, Mr. Allen's typical role as chairman of the board was to call each board meeting to order and then turn the meeting over to Mr. Smit. (9/2/09 Tr. 135:6-135:12 (Smit).)

963. Mr. Allen did not direct or suggest to Charter manager that they initiate this restructuring effort. (8/21/09 S. Goldstein Decl. ¶ 9.)

964. Neither Paul Allen, nor anyone from Vulcan, suggested to Mr. Millstein before the December 9-10, 2008 Board of Directors meeting, that Mr. Allen should be compensated for his continued participation in the restructuring process. (9/10/2008 Tr. 21:1-4 (Millstein).)

965. Mr. Allen and his advisors did not orchestrate or dictate the strawman proposal. (9/2/09 Tr. 141:10-14 (Conn).)

966. Charter's subsequent proposals also originated with Charter and focused on Charter's priorities without input from Paul Allen, his affiliates or representatives. The proposals did not originate from Paul Allen, nor did Paul Allen dictate any particular plan structure to Charter. (8/21/09 Goldstein Decl. ¶ 11.)

967. Mr. Allen has not hindered any efforts to pursue alternative restructuring transactions. (7/16/09 Doody Decl. ¶ 17.)

968. Lazard's Mr. Goldstein never observed Paul Allen or any of his advisors pressure the Debtors into avoiding any alternative plan structures. (8/21/09 Goldstein Decl. ¶ 11.)

## G.     The Plan Has Been Proposed In Good Faith

969. The Debtors' Plan was proposed in good faith, with the legitimate and honest purposes of reorganizing Charter's ongoing business and maximizing the value of each of the Debtors and the recovery to creditors and shareholders. (7/16/09 Doody Decl. ¶ 14.)

970. The Plan is the product of arm's length negotiations between, among other entities, the Debtors, and each signatory to a Plan Support Agreement. The negotiating process that culminated in the Plan, as well as the Plan itself, provide further evidence of the Debtors' good faith. (7/16/09 Doody Decl. ¶ 14.)

971. Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources. (7/16/09 Doody Decl. ¶ 14.)

972. The Plan gives effect to many of the Debtors' restructuring initiatives, including debt reinstatement, debt reduction, and the CII Settlement. (7/16/09 Doody Decl. ¶ 15.)

## XVII. THE CCI NOTEHOLDERS ARE RECEIVING A SIGNIFICANT RECOVERY

## A.     The CCI Noteholders' Ability To Secure A Recovery

973. Under a straight waterfall analysis where value is distributed, the CCI noteholders would be out of the money and would not get a recovery. (7/21/09 Tr. 69:23-70:2 (Millstein).)

974. Intercompany accounts between Holdco and CCO, where CCO is an obligor to Holdco, in combination with the Holdco mirror note feature of the CCI convertible notes provide a path of distribution of value for those noteholders. (7/21/09 Tr. 69:19-70:4 (Millstein).)

975. By virtue of the intercompany account, the CCI noteholders are receiving a greater recovery than noteholders that are more senior in the capital structure. (7/21/09 Tr. 71:7-13 (Millstein).)

### B. The CCI Noteholders Were On Notice Of Their Position In Charter's Capital Structure When They Purchased The Notes

976. In its 10-Q before the CCI convertible notes were issued, Charter disclosed that "[a]s of June 30, 2003, our total debt was approximately $18.9 billion dollars, $17.5 billion of which would have been structurally senior" to the CCI notes. (CX 354 at 44; 8/17/09 Tr. at 55:11-56:6 (Doody).)

977. In that same filing, Charter also disclosed that "[i]n a liquidation, the lenders under all of our subsidiaries' credit facilities and the holders of the other debt instruments and all other creditors of our subsidiaries will have the right to be paid before us from any or our subsidiaries' assets." (CX 354 at 44; 8/17/09 Tr. at 56:7-14 (Doody).)

978. In the September 2007 exchange prospectus, Charted highlighted that "[b]ecause of our holding company structure, the New Notes are structurally subordinated in right of payment to all liabilities of Charter's subsidiaries." (CX 287 at 25; 8/17/09 Tr. at 56:20-25 (Doody).)

979. Before the exchange occurred for the current versions of the CCI notes, as of June 30, 2007, $19.2 billion of Charter's total consolidated debt of $19.6 billion was structurally senior to the notes. (CX 287 at 25; 8/17/09 Tr. at 57:10-15 (Doody).)

### C. Charter Negotiated A Recovery For The CCI Noteholders Greater Than The Existing Intercompany Receivable With CCO

980. Charter negotiated on behalf of CCI because its advisors understood the fiduciary duty to CCI and sought to maximize enterprise value, which flows to the benefit of CCI. (8/17/09 Tr. 41:21-24 (Doody).)

981. Mr. Millstein had to advocate with the Crossover Committee's advisors why these intercompany accounts should be respected "to permit arguably out-of-the-money creditors to receive a distribution." (7/21/09 Tr. 70:12-18 (Millstein).)

982. Charter and the Paul Allen group and the Crossover Committee met specifically to discuss the recovery to the CCI Noteholders. (8/17/09 Tr. 41:25-42:4 (Doody).)

983. "[B]ecause of CCI's unique relationship within the organization that it's the manager of all of the LLCs in the structure, we had to — we actually spent a lot of time on CCI's recovery." (8/17/09 Tr. 177:15-18 (Doody).)

984. Charter did not attempt to pick the pockets of CCI/Holdco: "No, absolutely not. These were…the claims that we fought the hardest to get a recovery for with the other parties that we were negotiating with." (8/17/09 Tr. 270:8-10 (Doody).)

985. The CCI noteholders would have recovered less in a freefall bankruptcy than under the proposed Plan. (8/31/09 Tr. 216:14-20 (Johri).)

# XVIII. THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND INTEREST HOLDERS

## A. Unimpaired Classes And Voting Results

986. Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, I-6, J-1, J-3, J-4, J-5, and J-7 are Unimpaired under the Plan. (CX 211 at 4-8.)

987. No votes were cast in each of Classes D-3, E-3, F-3, G-3, H-3, and I-5, although each Class contained creditors to whom ballots were sent. (*See* CX 702-Ex. E ¶7(h); *see also* KCC Voting Certification ¶ 15.)

988. Each of Classes A-3, B-3, C-3, C-4 (including insiders), D-3, E-3, E-4 (including insiders), F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan, but not unanimously. (*See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.)

989. Classes A-4, A-5, A-6, C-5, C-6, D-4, D-5, E-5, E-6, F-5, F-6, G-5, G-6, H-5, and H-6 voted to or were deemed to reject the Plan. (*See* KCC Voting Certification ¶ 15; FBG Voting Certification, Ex. A.)

## B. Charter's Liquidation Analysis Is Reasonable

990. To ensure that the plan met the best interest of the creditors' test, Charter performed a liquidation analysis. (8/17/09 Tr. at 63:22-24 (Doody); CX 220-Ex. E.)

991. The Debtors' liquidation analysis is premised on Charter management's belief that pursuit of a distressed sale on a going concern basis would yield the best recovery for creditors in a liquidation, as opposed to a wind down with piecemeal sale of its disaggregated assets. The Liquidation Analysis was prepared based on the assumption of a forced sale for cash. (8/21/09 Goldstein Decl. Ex. C at 7 (Note A.). CX 720 - Ex. E. at 7.)

992. Based on that assumption, Lazard working along with other professionals advised management that the appropriate method for capturing a range of liquidation value for a distressed sale is applying a discount of 10% for the high scenario and 20% for the low scenario to the midpoint of the estimated Enterprise Value of Charter that was calculated by Lazard. This would result in estimated net proceeds of approximately $12.3 billion to $13.8 billion, with a mid-point estimate of $13.1 billion. (8/21/09 Goldstein Decl. ¶ 34.)

993. The liquidation value assumption is that if the Plan that's before the Court does not work then there is an orderly process of a forced distressed sale for cash as of September 30, 2009. That assumption of a distressed, orderly, going concern sale was a very conservative assumption to make. A liquidation and a free fall type of situation could clearly be much, much worse in Lazard's view. (8/24/09 Tr. 19:1-13 (Goldstein).)

994. Mr. McDonough did not analyze or refute the issue of whether a distressed sale would lead to a greater recovery in liquidation than a sale of individual assets.  (9/1/09 Tr. 152:21-153:12 (McDonough).)

995. In its liquidation analysis, Charter did not offset any payments made under the Court's trade order from the intercompany balance between CCO and Holdco.  (8/17/09 Tr. 68:14-17 (Doody); CX 720-Ex. E. at 10 (Note L).)

996. On the spreadsheet showing the intercompany balance due to Holdco and CCI from CCO, the column regarding first and second day motion relief shows reductions made under the first and second day orders other than the trade order.  (8/17/09 Tr. 69:19-25 (Doody); LDT 267 at CTR-W_C01431.)

997. Had Charter offset payments made under the trade order, the amount of net third-party liabilities reflected on page 3 of the spreadsheet showing the intercompany balance due to Holdco and CCI from CCO (LDT 267) would have been $600,000 different.  (8/17/09 Tr. 72:16-20 (Doody).)

998. Charter did not assign any value to its NOLs in a liquidation.  (8/17/09 Tr. 67:4-6 (Doody).)

999. This liquidation analysis confirms that each class of creditors will receive equal to or more under the [P]lan than they would in the hypothetical liquidation."  (8/17/09 Tr. 99:2-3 (Doody).)

1000. Recovery to the CCI Noteholders will be $162.5 million, whereas under a liquidation scenario it would be $92 million plus any litigation proceeds determined to be due to CCI or Holdco.  (8/17/09 Tr. 52:17-53:1 (Doody); C Demo 34; CX 720 - Ex. E at 6.)

C.    The CCI Noteholders' Increased Recovery Removes Any Doubt That The Plan Is In The Best Interest Of Creditors

1001. Charter met with the CCI Noteholders numerous times to discuss their concerns.  (8/17/09 Tr. 50:18-21 (Doody).)

1002. Charter designed the Plan so that the CCI Noteholders receive the full recovery on account of intercompany claims owed from CCO before making the January 2009 interest payment, plus a premium.  (8/17/09 Tr. 269;1-11 (Doody); CX 159 at CTR-00000323.)

1003. The margin between recoveries under the original Plan and a liquidation was approximately $13.5 million.  (*See* CX 211 at 35 (CCI Noteholders' recovery under initial Plan is approximately $96.5 million or 19.4% of $497.5 million); CX 720-Ex.E at 6 (CCI Noteholders' recovery under liquidation is approximately $83 million); 8/31/09 Tr. 180:23-181:4 (Johri).)

1004. Charter increased the CCI Noteholders' recovery because: "It wasn't that we had any doubts as to our arguments or the assumptions we made but we didn't want this to derail

this multi-billion dollar restructuring that we've undertaken that we think maximizes the value of the estates. We wanted to make sure that their recoveries would be in their best interest in any event." (8/17/09 Tr. 53:4-9 (Doody).)

1005. Specifically, the Debtors improved the Plan treatment of the Class A-4 CCI Notes Claims by approximately $66 million and to specify that the Holders of such Claims are entitled to that portion of the proceeds of a litigation settlement (the "Litigation Settlement Fund Proceeds"), if any, the Court ultimately determines are allocable to CCI or Holdco. (8/17/09 Tr. 50:22-53:1 (Doody); C Demo 34.)

1006. Furthermore, the Debtors have modified the value of the New Preferred Stock to respond to the CCI Noteholders' complaints regarding term and liquidity. (8/17/09 Tr. 50:18-52:12 (Doody); C Demo 34.)

1007. After increasing the preferred stock by $66 million and including an undetermined amount of litigation settlement fund proceeds, the recovery is now 32.7%. The litigation settlement fund consists of approximately $26 million currently in escrow. (8/17/09 Tr. 50:22-51:14 (Doody); C Demo 34.)

**D.     The CCI Noteholders' Assumptions And Methodology In Mr. McDonough's Liquidation And Valuation Analyses Are Flawed**

*i.     Flaws and deficiencies in Mr. McDonough's liquidation analysis*

1008. Mr. McDonough had no basis to disagree with the assumption in the liquidation analysis of a forced sale for cash of a going concern discounted by a range of ten to twenty percent, has not analyzed what discount one should apply to arrive at a going concern value in a distressed or forced sale for cash, and has not analyzed whether Charter would have a greater value if sold on a going concern basis versus sold on an individual asset basis. (09/01/09 Tr. 179:9-180:16 (McDonough).)

1009. Mr. McDonough's analysis of liquidation recoveries is premised entirely on "potential recoveries." (09/01/09 Tr. 180:22-181:8 (McDonough).)

1010. Mr. McDonough admits that the potential recovery for insider preferences could be between $0 and $22.4 million. Mr. McDonough admits that the potential recovery for the November 2008 and January 2009 interest payments could be between $0 and $90 million and $0 and $35 million. (9/1/09 Tr. 186:22-24, 190:9-16 (McDonough).)

1011. With regard to his demonstrative listing potential recoveries, the only numbers where McDonough identified an opinion as to actual recovery were the stipulated $9 million Holdco recovery figure, the $3.4 million figure for preference actions, and the insider payments up to $9 million identified by AlixPartners. (9/1/09 Tr. 189:8-17 (McDonough).) As to the rest of his figures, Mr. McDonough testified: "**The rest of them they kind of smell like they're probably there.**" (9/1/09 Tr. 189:19-20 (McDonough) (emphasis added).)

1012. Mr. McDonough has not performed the analysis to give his expert opinion that the amounts on the LDT's demonstrative 24 represents an actual recovery. (9/1/09 Tr. 198:25-199:3 (McDonough).)

1013. With regard to the intercompany receivable from CCO, listed as $119 million, Mr. McDonough admitted that Law Debenture Trust Exhibit 267, the same document cited by McDonough as the source of his intercompany number for his report, contains deductions leading to a net number of $19.5 million, but he did not include those deductions for his testimony. (9/1/09 Tr. 192:13-194:17 (McDonough).)

1014. Mr. McDonough did not account for any costs or expenses in his review of the liquidation analysis. (9/1/09 Tr. 132:25-133:9 (McDonough).)

### ii. Flaws and deficiencies in Mr. McDonough's valuation analysis

1015. Mr. McDonough did not express any opinion as to the ultimate value of Charter as of any date. (9/1/09 Tr. 100:24-101:4 (McDonough).)

1016. Mr. McDonough's opinion that Lazard's valuation in the Disclosure Statement was low was based on his "eyeball[ing]" other valuations. (9/1/09 Tr. 151:15-25, 152:13-16 (McDonough).)

1017. Of the various valuations cited by Mr. McDonough, "[t]he only one that was done for purposes of a disclosure statement was Mr. Goldstein." (9/1/09 Tr. 165:5-9 (McDonough).)

1018. In his trial testimony, Mr. McDonough applied a control premium only to the comparable sales approach, but in his report, he applied a control premium to the entire valuation. (9/1/09 Tr. 168:6-18 (McDonough).)

1019. With regard to multiples of four comparable companies, in his report Mr. McDonough simply assumed that multiples would increase but had not calculated it. For purposes of his trial testimony, "I didn't put a number on it," (9/1/09 Tr. 172:22-174:6 (McDonough).)

1020. Mr. McDonough agreed he has no idea "what the impact would have been, positive or negative" of doing an entity-by-entity basis valuation or an asset-based valuation as compared to the enterprise valuation that was done. (9/1/09 Tr. 175:17-176:5 (McDonough).)

1021. Mr. McDonough agreed that, notwithstanding his demonstrative exhibits, he is not expressing an opinion that the debts in this case should be substantively consolidated among the debtors. (9/1/09 Tr. 178:13-179:7 (McDonough).)

1022. Mr. McDonough agreed that, notwithstanding his demonstrative exhibits, he is not expressing an opinion that in calculating the weighted average cost of capital, or WACC, in its valuation. Lazard should have been based on the actual capital structure and cost of debt under the plan. (9/1/09 Tr. 176:7-177:22 (McDonough).)

### E. The CCI Noteholders' Remaining Objections Are Unfounded

#### *i.* *Lazard's value of the New Preferred Stock is accurate*

1023. Under the Plan, as amended and revised, the Reorganized Debtors will issue New Preferred Stock in the face amount of $138 million to the Holders of Allowed Class A-4 CCI Notes Claims. The terms of the New Preferred Stock are outlined on Exhibit A to the Amended and Restated Certificate of Incorporation. (8/21/09 Goldstein Decl. ¶ 43, Ex. E; CX 164 at Ex. A.)

1024. Mr. Goldstein testified as to why the terms of the New Preferred Stock, and its characteristics support a value equivalent to the $138 million face amount of the instrument. (8/21/09 Goldstein Decl. ¶ 44.)

1025. Upon issuance, the New Preferred Stock will be a liquid security, freely tradable, and the Reorganized Debtors are obligated to list the New Preferred Stock on a public exchange. (8/21/09 Goldstein Decl. ¶ 45.)

1026. The New Preferred Stock has an attractive place in Charter's capital structure and benefits from several valuable protections. The New Preferred Stock has a mandatory redemption provision after five years, a time period that was specifically designed to require repayment of the New Preferred Stock two full years prior to the maturity of the New CCH II Notes. (8/21/09 Goldstein Decl. ¶ 46.)

1027. The New Preferred Stock also contains a liquidation preference, which means that the New Preferred Stock ranks senior to the Class A Common Stock upon a variety of corporate events, including a change of control transaction or a liquidation. This senior position relative to the Class A Common Stock affords the New Preferred Stock the benefit of the approximately $1.66 billion of common equity that has been invested junior to the New Preferred Stock in the Rights Offering. (8/21/09 Goldstein Decl. ¶ 47.)

1028. The dividend rate of the New Preferred Stock has been set at an attractive rate of 15% for the first three years of the instrument's life, increasing from 15% to 17% in the fourth year, and to 19% in the fifth year. This increase in dividend rate in year 4 was designed to encourage the Debtors to retire the New Preferred Stock prior to the increase in rate (i.e. within the three years after issuance). The dividend rate is also attractively set relative to the yield on other securities within the Debtors' capital structure (e.g., the New CCH II Notes) as well as the yield on other publicly traded securities available to investors in the cable industry. (8/21/09 Goldstein Decl. ¶ 48.)

1029. With regard to his discount to the preferred stock used in his trial testimony, Mr. McDonough agreed that he did not actually apply a minority discount in either his first or second report. (09/01/09 Tr. 201:22-202:5 (McDonough).)

### ii. *No material preference recovery exists*

#### a. A distressed buyer will likely not pursue preferences, especially preferences against insiders

1030. Charter also prepared an initial assessment of all preference and avoidance actions — "we looked at all avoidance actions including, you know, potential fraudulent conveyances and preferences. We interviewed members of management, our advisors. We reviewed documents, including public filings to determine if we thought there were any avoidance actions that could net recoveries to the estates." Charter concluded that there was no significant value here. (8/17/09 Tr. 67:14-25 (Doody).)

1031. With respect to preferences, Charter concluded that a distressed sale buyer would be unlikely to pursue preferences — "to avoid disruption to the business, among other reasons, [a distressed sale buyer] would not want us pursuing preference actions." (8/17/09 Tr. — 76:19-77:2 (Doody).)

1032. A financial buyer would generally want all the executory contracts because they are purchasing the company without any other operational support to go around these contracts. (8/18/09 Tr. 66:18-24 (Folse).)

1033. In Mr. Folse's experience, a buyer does not normally want suits being brought against vendors because vendor relationships are key to whatever the purchaser is buying. (8/18/09 Tr. 66:9-13 (Folse).)

1034. Mr. Folse has never seen a case where the payment of employee salaries were recovered as preferences. (8/18/09 Tr. 63:21-23 (Folse).)

1035. Mr. Folse has never seen a case where a buyer allowed its management team to be pursued for preferences. (8/18/09 Tr. 66:5-8 (Folse).)

#### b. Even if that assumption is incorrect, the potential recovery for preferences is at most *de minimis*

1036. Nevertheless, the Debtors asked Mr. Folse and AlixPartners to perform an analysis of potential preference payment claims against the vendors of Charter Communications, Inc. and Charter Communications Holding Company, LLC. (7/30/09 Folse Decl. ¶ 5; CX 303 at 1.)

1037. That analysis is CX 303, the Charter Communications Preference Payment Claims Initial Assessment (the "Preference Assessment"). (7/30/09 Folse Decl. ¶ 6.)

1038. The Preference Assessment is an initial assessment of potential preference payment claims based on payments to vendors made directly by the Debtor entities Charter Communications, Inc. and Charter Communications Holding Company, LLC or related to a contract entered into by one of those two entities regardless of the entity actually making the payment to the vendor. (7/30/09 Folse Decl. ¶ 7; CX 303 at 1.)

1039. The Preference Assessment was prepared by AlixPartners using a generally accepted procedure that AlixPartners has used in numerous other preference assessments. (7/30/09 Folse Decl. ¶ 8.)  It is also consistent with Mr. Folse's personal experience.  (8/18/09 Tr. 58:19-59:1 (Folse).)

1040. The Preference Assessment is the final analysis that AlixPartners would engage in prior to initiating a potential collection action.  (8/18/09 Tr. 68:1-6 (Folse).)  Mr. Folse would not typically look at the specific circumstances surrounding each individual payment during a Phase I analysis.  (8/18/09 Tr. 60:20-61:2 (Folse).)

1041. This is also referred to as a Phase I analysis.  The next step after the Phase I analysis is Phase II which would be the actual recovery phase which would be a litigation or pre-litigation effort to get the money back.  (8/18/09 Tr. 61:15-24 (Folse).)

1042. Historically speaking, the Phase I analysis that AlixPartners does has been statistically significance when it comes to the ultimate realization of  preferences collections. (8/18/09 Tr. 27:9-17 (Folse).)

1043. In performing this engagement, Mr. Folse extracted a significant volume of electronic data from Charter's information systems. This included payment detail and payment invoice detail for non-intercompany disbursements posted to the Debtors' books and records within the approximate 12-month period prior to the petition date. (7/30/09 Folse Decl. ¶ 10; CX 303 at 2-3.)

1044. Mr. Folse approached the data collection from the GLID level which is a company identifier.  Charter's books and records track any payments based on who they were made on the benefit of.  There were two GLIDs that represented CCI and Holdco inside the Debtors books and records, and those were the two GLIDs that AlixPartners captured because those would have been payments made on behalf of CCI or Holdco.  (8/18/09 Tr. 55:25-56:9 (Folse).)

1045. Mr. Folse identified and excluded from the larger universe of total vendor payments certain categories of payments such as employee benefits payments, payments to professionals providing restructuring services, tax authority payments and payments to vendors of less than $10,000.  These are typical exclusions for this type of analysis. (7/30/09 Folse Decl. ¶ 11; CX 303 at 3-4.)

1046. The amount excluded for payments to professionals was all under retainer or made by CCO and not by CCI or Holdco.  (8/18/09 Tr. 31:14-19 (Folse).)

1047. The top 27 vendors in the remaining group were then analyzed to serve as the basis for the overall preference estimates.  (7/30/09 Folse Decl. ¶ 11; CX 303 at 3-4.)

1048. These 27 vendors represent over eighty percent of the preference payments once potential executory contracts are eliminated. (CX 303 at CTR-W_C01493-94.) Based on Mr. Folse's experience, the population of eighty percent of the value is statistically significant.  (8/18/09 Tr. 59:16-23 (Folse).)

1049. For the top 27 vendors, Mr. Folse then performed a new value analysis and initial assessment of the maximum net preference value. (7/30/09 Folse Decl. ¶ 12.)  Mr. Folse next performed an ordinary course of business analysis to identify any payments potentially not made in the ordinary course. (7/30/09 Folse Decl. ¶ 13; CX 303 at 5-6.)  Mr. Folse then assigned each vendor a letter grade based on the results of the ordinary course of business analysis.  Each letter grade was then attributed a certain percentage range of recovery. (7/30/09 Folse Decl. ¶ 14; CX 303 at 5-7.)

1050. Upon assigning a grade to each vendor, the corresponding recovery percentages were then applied to the High Case Ordinary Course Value. (7/30/09 Folse Decl. ¶ 16.)  Mr. Folse and AlixPartners concluded that if even no executory contracts are assumed, potential recoveries on account of preferences to non-insiders would be in the range of approximately $9.6 million to $18.9 million.  (7/30/09 Folse Decl. ¶ 17, CX 303 at 2.)  Conversely, if all executory contracts are assumed by the buyer, such as would be more likely in a distressed 363 sale process, the range of potential recoveries would be $3.3 million to $6.6 million.  (7/30/09 Folse Decl. ¶ 18; CX 303 at 2.)

1051. Neither of these potential recovery ranges account for the potential costs associated with any recoveries.  Mr. Folse's experience is that any preference recoveries would need to be reduced approximately 25% to 45% to account for recovery costs. (7/30/09 Folse Decl. ¶ 19.)

1052. Mr. Folse has never been involved in a case where there are no costs incurred in recovering preferences.  (8/18/09 Tr. 63:18-20 (Folse).)

1053. CCO would have a recoupment argument for any recoveries that were ultimately obtained, "because CCO is the one that made the payments to begin with.  (8/17/09 Tr. 78:10-12 (Doody).)

1054. Mr. Folse has never seen a case where all or even a substantial percentage of transfers made in the 90-day preference period were recovered as preferences. (7/30/09 Folse Decl. ¶ 20.)

1055. Mr. Folse has never been involved in a distressed 363 sale where none of the contracts were assumed.  (8/18/09 Tr. 60:9-12 (Folse).)

1056. Mr. McDonough has not analyzed preferences, but simply adopted the number by Mr. Folse of AlixPartners.  (09/01/09 Tr. 184:12-15 (McDonough).)  Mr. McDonough has not conducted a new value analysis, an ordinary course of business analysis or analyzed any potential defenses to preference claims.  (09/01/09 Tr. 185:3-9 (McDonough).)

1057. Mr. McDonough did not perform any risk adjustment to payments identified as potential preferences. (09/01/09 Tr. 154:3-8 (McDonough).)

      c.     <u>Even if that assumption is incorrect, the potential recovery for non-insider preferences against insiders is at most *de minimus*</u>

1058. In addition to the Preference Assessment, AlixPartners also conducted an analysis of preferences to insiders. This analysis was performed by reviewing the nature and timing of all transactions with insiders during the 12-month period prior to the petition to identify transactions that were potentially outside the ordinary course of business. (7/30/09 Folse Decl. ¶¶ 21-22.)

1059. Although most insider transactions appeared to be made in the ordinary course, as a result of this analysis, AlixPartners identified one insider transaction potentially outside the ordinary course. Specifically, certain executive bonuses for fiscal year 2008 were paid in January of 2009 whereas in past years such annual bonuses generally were paid in March. (7/30/09 Folse Decl. ¶ 23.)

1060. Mr. Folse informed Debtors' counsel that he could never conceive of recoveries for insider payments exceeding 80%. (8/18/09 Tr. 65:3-10 (Folse).)

1061. Based on AlixPartners' analysis, before reductions related to recovery costs, potential recoveries relating to insider transactions likely would not exceed $9 million i.e., 80% of the bonus payments. (7/30/09 Folse Decl. ¶ 24.)

1062. Mr. McDonough simply reviewed the listing of insider payments and did not analyze any defenses to the insider payments. (09/01/09 Tr. 186:25-187:8 (McDonough).)

1063. Mr. McDonough agreed that with regard to insider payments, the $22.4 million potential recovery he identified could be between a range of zero to $22.4 million. (09/01/09 Tr. 186:22-24 (McDonough).)

### *iii.* **The 2008 Holdco debt repurchases are not fraudulent transfers**

      a.     <u>Second quarter 2008 note repurchase</u>

1064. In the second quarter 2008, Charter repurchased $45 million in CCI convertible notes. (7/31/09 Tr. 128:20-22 (Schmitz).)

1065. Charter repurchased these notes because they were maturities that were coming due inside the audit window and from a liquidity perspective being able to cancel or reduce the debt early at a discount improves liquidity. (7/31/09 Tr. 128:23-129:5 (Schmitz).)

1066. Charter purchased these notes from two institutions, Wolverine and Polygon. (7/31/09 Tr. 129:6-11 (Schmitz).)

1067. Charter paid less than face value for the notes. (7/31/09 Tr. 129:12-14 (Schmitz).)

1068. Charter received an indication from JPMorgan of the market value of the notes, and then Charter negotiated with those parties a slight premium above the market value. (7/31/09 Tr. 129:15-22 (Schmitz).)

1069. Charter funded these repurchases through intercompany loans. CCO repaid part of the intercompany loan to Holdco to fund the repurchase of the notes. (7/31/09 Tr. 129:23-130:2 (Schmitz).)

1070. Charter cancelled the notes upon repurchase. (7/31/09 Tr. 130:3-5 (Schmitz).)

      b.    <u>Mid-April 2008 note repurchase</u>

1071. Holdco repurchased a set of CCH notes in mid-April 2008. (7/31/09 Tr. 130:6-11, 132:1-3 (Schmitz).)

1072. These purchases were from institutional holders. (7/31/09 Tr. 130:12-14 (Schmitz).)

1073. Charter purchased these notes because they were maturing inside the audit window, so being able to purchase them at a discount improved liquidity. (7/31/09 Tr. 130:15-19 (Schmitz).)

1074. When Holdco purchased the CCH notes, paying a slight premium, they were left open and held by Holdco. (7/31/09 Tr. 129:12-14, 131:2-5 (Schmitz).)

1075. When Charter purchased the notes, Charter projected that Holdco's funds used to repurchase those notes would be replenished before the CCH notes matured. (7/31/09 Tr. 130:20-23 (Schmitz).)

1076. Holdco did in fact receive interest payments on the CCH notes before Charter filed for bankruptcy. (7/31/09 Tr. 130:24-131:1 (Schmitz).)

      c.    <u>October 2008 tender offer</u>

1077. Charter engaged in a public tender offer of CCH notes in October 2008. (7/31/09 Tr. 131:6-9 (Schmitz).)

1078. Charter prioritized the tender to purchase notes maturing inside the audit window. It was an opportunistic transaction to retire debt at a discount and improve liquidity during the audit window. (7/31/09 Tr. 131:10-18 (Schmitz); 8/17/09 Tr. 113:11-14 (Doody); LDT 36 at CTR-W_C00669.)

1079. The financial institution Citigroup handled the tender offer. (7/31/09 Tr. 131:19-21 (Schmitz).)

1080. Citigroup advised the company on appropriate pricing. (7/31/09 Tr. 132:4-6 (Schmitz).)

1081. Charter funded the tender with the intercompany loan. (7/31/09 Tr. 131:22-132:3 (Schmitz); LDT 36 49 at CTR-00002289.)

1082. Holdco had sufficient funds to pay the CCI convertible note payments even after the tender offer at that time. (7/31/09 Tr. 132:7-10 (Schmitz).)

1083. Charter evaluated whether Holdco received reasonably equivalent value for the debt exchanges and concluded that it did. (8/17/09 Tr. 75:22-76:1 (Doody).)

1084. Charter also concluded that the debt repurchases were subject to the Section 546(e) defense to potential avoidance actions, which deals with security settlement payments. (8/17/09 Tr. 76:8-18 (Doody).)

1085. The payment of a slight premium was necessary "to induce a holder to exchange their paper." (7/31/09 Tr. 114:4-9 (Schmitz).)

1086. At the time Holdco made these repurchases in spring and fall of 2008, Charter did not believe it would be filing for bankruptcy. (7/21/09 Tr. 34:9-24, 203:25-204:5 (Millstein).)

1087. Holdco voted the CCH notes it held in favor of the Plan. (8/17/09 Tr. 62:14-15 (Doody).)

> ### iv. *The November and January interest payments are not fraudulent transfers*

1088. The November and February interest payments made with Holdco funds "continued maintaining the viability of the enterprise while a consensual plan of reorganization was negotiated." (8/17/09 Tr. 75:2-4 (Doody).)

1089. Without making the interest payments in February, the prearranged plan would not have been possible. (8/17/09 Tr. 264:19-22 (Doody).)

1090. Mr. Merritt concluded that making the January 15 interest payment was in the best interests of Charter because it allowed for the 3-4 week due diligence period that was part of the term sheet agreement and the removal of the due diligence out that was part of the term sheet. (7/22/09 Tr. 265:18-266:5 (Merritt).)

1091. The entire restructuring may have fallen apart if Charter had not made the January 15 interest payment before the grace period expired. (7/22/09 Tr. 267:12-24 (Merritt).)

1092. Mr. Johri believed that making the February interest payments was a better risk than going for a free fall bankruptcy. (8/31/09 Tr. 180:23-181:4 (Johri).)

1093. Charter's Board was concerned that "a protracted Chapter 11 proceeding could take management's attention from the marketplace and could cause turnover with Charter's "top-flight management team", could hurt Charter's value and could be a significant cost. Overall, "the board was very concerned that a freefall would diminish value materially." (7/22/09 Tr. 202:3-17, 22-23 (Merritt).)

1094. Charter also secured a commitment from the Crossover Committee to place their portion of the pending January 2009 interest payment in escrow which would return to Charter if the Plan failed. (7/21/09 Tr. 68:15-22 (Millstein).)

1095. The escrow backstop was a protection for the CCI Noteholders. (8/17/09 Tr. 271:3-10 (Doody).)

1096. None of the escrowed amounts were either retained or recorded on Charter's books. (7/31/09 Tr. 123:25-124:2 (Schmitz).)

1097. If the plan does not succeed, the interest payment funds in escrow return to Holdco. (8/17/09 Tr. 75:8-10 (Doody).)

1098. "In the exercise of our business judgment . . . we thought for the twenty-six odd million that wasn't put in escrow that . . . we were getting reasonably equivalent value for that. And continuing to negotiate what turned out to be a very successful plan of reorganization." (8/17/09 Tr. 130:3-7 (Doody).)

1099. Mr. Doody explained that if the money that was placed in escrow was placed into Charter's accounts, the CCI Noteholders would not necessarily receive a greater recovery under a liquidation analysis than under the plan: "Your intercompany balance may have gone up, but that doesn't mean you [sic] recoveries would have gone up. You're not recovering under the liquidation analysis, you're recovering under the plan . . . .If this had been a freefall bankruptcy we don't know what would have happened. Granted, your intercompany balance would go back up, but whether you'd get a recovery or not I think that's questionable." (8/17/09 Tr. 130:20-131:3 (Doody).)

1100. The Plan is designed so that the CCI Noteholders receive the full recovery on account of the intercompany claims owed from CCO before making the January interest payment. That is, the Plan provides a recovery to CCI and Holdco on account of intercompany claims, examined before making the January interest payment, plus a significant premium. (8/17/09 Tr. 269:1-11 (Doody); CX 159 at CTR 323.)

      a.    <u>Mr. McDonough performed no independent analysis of fraudulent transfers</u>

1101. Mr. McDonough did not perform an independent analysis of fraudulent conveyances. (9/01/09 Tr. 153:18-20 (McDonough).)

1102. With regard to the tender offers cited as potential recoveries by Mr. McDonough, he did not prepare an independent analysis of fraudulent conveyance issues, has not looked at defenses, has not done any analysis of the true economics of what was acquired, and has not determined that those are voidable transactions. (9/01/09 Tr. 187:20-189:7.)

1103. Mr. McDonough agreed that the ninety-nine million and the thirty-five million listed regarding bond repurchases could be as low as zero. (9/01/09 Tr. 190:9-16 (McDonough).)

      *v.*    ***The value of programming agreements***

1104. There are no cable customers at the CCI or Holdco level. They are generally in the subsidiaries of CCO. (7/31/09 Tr. 133:1-7 (Schmitz).)

1105. The value of Charter's programming contracts are generally at market. (7/31/09 Tr. 134:9-11 (Schmitz); 8/17/09 Tr. 166:3-22 (Doody).)

1106. The programming contracts held at CCI or Holdco do not have value apart of the cable systems and subscribers. (7/31/09 Tr. 134:1-15 (Schmitz).)

1107. The sports programming agreement used at trial has a Most Favored Nation claim that is not transferable. If there was a distressed sale, that provision would have been eliminated. (8/17/09 Tr. 273:11-25 (Doody); LTD 466 at CTR-00019151.)

1108. Mr. McDonough has not valued the programming contracts or intellectual property in this case. (9/01/09 Tr. 190:23-25 (McDonough).)

### vi. Worthless stock options

1109. The Debtors still recognize and treat the intercompany account balance as it relates to the worthless stock options. (8/17/09 Tr. 74:1-4 (Doody); 9/1/09 Tr. 227:1-228:19 (Howard).)

1110. In its liquidation analysis, the Debtors assume that no distributions would be made on behalf of the worthless stock options in a chapter 7 liquidation because the equity is now worthless and has been forfeited. (8/17/09 Tr. 74:1-9 (Doody).)

1111. Charter reasonably believes that a chapter 7 trustee "would be hard-pressed to make a distribution" for a portion of an account receivable created on account of "equity that was once granted [but] has been forfeited." (8/17/09 Tr. 74:13-15 (Doody).)

### vii. Fluctuation in intercompany receivables

1112. Fluctuations in the intercompany account balances from February 13, 2009, to the Petition Date were due to ordinary course transactions. (7/31/09 Tr. 135:5-21 (Schmitz); 8/17/09 Tr. 68:14-69:9, 71:1-72:24 (Doody).)

### viii. The CCVIII litigation recovery

1113. The Debtors escrowed $26.4 million, which represents all of the Litigation Settlement Fund Proceeds remaining after repayment of costs and expenses relating to two underlying litigations, i.e., the malpractice litigation and the original litigation which gave rise to the malpractice claims. (8/17/09 Tr. 149:19-150:1, 151:19-22 (Doody).)

1114. The $5.69 million paid to Bartlit Beck does not reflect the total cost and expenses in handling the litigation; CCO advanced considerable costs and expenses for the litigation beyond what was paid to Bartlit Beck. (8/17/09 Tr. 291:1-7 (Doody).)

### ix. Intellectual property

1115. The patent listed on schedule B-22 is still pending. (8/17/09 Tr. 259:8-10 (Doody).)

1116. Mr. McDonough has not valued any intellectual property in this case. (9/01/09 Tr. 190:23-25 (McDonough).)

## XIX. THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENTS OF SECTION 1129(B) OF THE BANKRUPTCY CODE

### A. The Plan Complies With The Absolute Priority Rule

#### i. The Plan does not deprive CCI of tax assets

1117. The operating losses are generated by entities other than CCI. They are a function of the debt and interest expense, as well as depreciation expense at the cable system level. (7/21/09 Tr. 166:19-25 (Millstein).)

1118. CCI does not own Charter's NOLs. (8/17/09 Tr. 36:1-3 (Doody).) The NOLs have no value by themselves and CCI cannot use them on its own. (8/17/09 Tr. 37:9-14 (Doody).) This is because CCI does not have operations so it does not generate income that the NOLs could shield. (8/17/09 Tr. 37:16-24, 280:12-15 (Doody).)

1119. CCI is the tax filer, but CCI itself generates losses only through its subsidiaries. (7/21/09 Tr. 166:25-167:2 (Millstein).)

1120. "[CCI] can't create the value by themselves, period." (9/2/09 Tr. 162:19-20 (Conn).)

1121. After the restructuring, Charter will have positive income that will allow it to reverse the valuation allowance that has been used against the asset. (8/17/09 Tr. 38:15-39:1 (Doody).)

1122. CCI will not be able to do this on its own because it does not generate income. Thus, CCI could not have used the NOLs as leverage to obtain a greater recovery. (8/17/09 Tr. 39:2-13 (Doody).)

1123. The preservation of NOLs would benefit the entire Charter enterprise; the benefits of the restructuring plan flow to the enterprise. (9/2/09 Tr. 160:3-6 (Conn).)

1124. Charter disclosed the Holdco LLC Agreement with Mr. Allen, including the provision allocating annual tax losses between CCI and CII, beginning with its 1999 Form 424B4 Prospectus. (Vulcan 1 at 224-225; 9/2/09 Tr. 130:11-132:4 (Conn).)

1125. Mr. Conn rejected the notion that "belonging" or ownership was the right way to think about NOLs. (9/2/09 Tr. 32:4-7 (Conn).)

#### ii. Mr. Allen is not recovering on account of his equity interest

1126. Except for Class E-4 CCH Notes Claims, no Holder of a Claim or Interest junior to a non-accepting Impaired Class of Claims will receive property or a distribution under the Plan on account of that Claim or Interest. (7/16/09 Doody Decl. ¶ 28.)

1127. As for Class E-4 CCH Notes Claims, the Plan provides that a junior Class (Class E-6 Interests in CCH and Charter Communications Holdings Capital Corp.) will receive property under the Plan. Pursuant to the Plan, however, the Interests in certain Debtors, including Class E-6, are being reinstated for substantial new value in the aggregate amount of approximately $42 million. (7/16/09 Doody Decl. ¶ 28.)

1128. Mr. Allen is not receiving any recovery on account of his equity. (8/17/09 Tr. 32:13-21 (Doody); 9/2/09 Tr. 125:13-17 (Conn).)

1129. Under the Plan, Mr. Allen's equity interest is being cancelled. (CX 707 at 26.)

1130. Mr. Allen did not control the Plan progress. Charter negotiated in good faith and at arm's length with both Mr. Allen and the ad hoc Crossover Committee. (*See* 7/21/09 Tr. 226:19-227:4 (Smit); 7/22/09 Tr. 209:23-210:10 (Merritt); 8/17/09 Tr. 26:12-27:8 (Doody); 7/28/09 Tr. 131:25-132:9 (Zinterhofer); 7/29/09 Tr. 112:8-18 (Marcus); 7/29/09 Tr. 208:12-209:10 (Liang).)

1131. Since at least 2007, Charter pursued different restructuring and delevering opportunities with outsiders, including strategic partners, but "nothing came of it." (8/31/09 Tr. 222:7-19 (Johri).)

1132. During the six weeks between the February press release announcing the term sheet agreement and Charter's filing for bankruptcy on March 27, 2009, no one approached Charter or its advisors suggesting a better deal than the one incorporated in the Plan. (8/17/09 Tr. 79:25-80:11 (Doody).)

1133. After Charter issued its December 12, 2008, press release announcing its restructuring initiatives, neither Mr. Goldstein nor, to the best of his knowledge, anyone at Lazard, ever received any indication of interest from any party in pursuing any alternative transaction or plan structure. (8/21/09 Goldstein Decl. ¶ 20.)

1134. Likewise, during the nearly five months since filing for bankruptcy, no one approached Charter or its advisors suggesting a better deal than the one incorporated in the Plan. (8/17/09 Tr. 80:12-15 (Doody).)

1135. After the Petition Date and the filing of the Plan, neither Mr. Goldstein nor, to the best of his knowledge, anyone at Lazard, ever received any indication of interest from any party in pursuing any alternative transaction or plan structure. (8/21/09 Goldstein Decl. ¶ 20.)

### B. The Plan Does Not Unfairly Discriminate Or Gerrymander Against The CCI Noteholders; Separate Classification Is Proper

1136. The Plan provides for either the reinstatement or payment in full for Holders of General Unsecured Claims against CCI (Class A-3) but only a 32.7% recovery for Holders of CCI Notes Claims (Class A-4) under the Plan as modified. (7/16/09 Doody Decl. ¶ 30).

1137. Simply put, these Claims are not similarly situated. Although they both contain unsecured Claims, the sources of recovery for such Claims are different. (7/16/09 Doody Decl. ¶ 30.)

1138. The A-3 claims are utility claims, trade claims, severance claims, litigation claims, and contract claims. The class is not comprised of primarily one severance claim. (8/17/09 Tr. 54:1-8 (Doody).)

1139. Classes A-3 and C-3 are significantly larger than $1 million if litigation claims and claims paid pursuant to first day orders are included in the analysis. (*See* LDT 267 at 2-3; 8/17/09 Tr. 69:22-73:8 (Doody).) For example, aggregate litigation claims at CCI and Holdco total approximately $25-55 million. (LDT 267 at 2-3.)

1140. The A-3 claims differ from the CCI Noteholders claims because the latter claims based on an interest in securities with a convertible feature whereas the former are unsecured claims. (8/17/09 Tr. 54:11-15 (Doody).)

1141. The higher recoveries attributed to Class A-3 CCI General Unsecured Claims and Class C-3 Holdco General Unsecured Claims reflect the effect of the Management Agreement, which provides for payment by a solvent entity of certain obligations at CCI and Holdco. (7/16/09 Doody Decl. ¶ 30; 8/17/09 Tr. 54:17-19 (Doody).)

1142. "The sources of recovery are different; the claims are different: One's a security; as we talked about before, the A-4 class are a security with an equity conversation feature and the general unsecured claims are not. They're just, like they said, general unsecured claims." (8/17/09 Tr. 201:9-13 (Doody).)

1143. The Management Agreement does not provide for reimbursement for liability for the CCI notes. (CX 305; 8/17/09 Tr. 54:20-55:1 (Doody).)

1144. The public disclosures do not support the CCI Noteholders' management agreement argument. Charter's 10-Q filed on June 30, 2003 states "Charter Communications Inc.'s public notes are structurally subordinated to all liabilities of our subsidiaries." (8/17/09 Tr. 55:21-23 (Doody); CX 354 at 44.) It also states "In a liquidation the lenders under all of our subsidiaries credit facilities and the holders of the other debt instruments, and all other creditors of our subsidiaries will have the right to be paid before us from any of our subsidiaries' assets." (8/17/09 Tr. 56:10-14 (Doody); CX 354 at 44.)

1145. Since the CCI Noteholders have argued for a par recovery from proceeds of the Management Agreement, the trading prices for the CCI notes have been near the plan recovery rates, not at par. (8/17/09 Tr. 204:19-205:10 (Doody).)

1146. The plain language of the Management Agreement indicated that it applies to reimbursement of expenses CCI incurs in managing CCO, which would not include the CCI notes. (CX 305; 8/17/09 Tr. 203:5-24 (Doody).)

1147. If CCI does not pay a creditor, it is not entitled to reimbursement. (8/17/09 Tr. 279:25-280:5 (Doody).)

1148. With regard to his line item for management services receivable, Mr. McDonough is not expressing an opinion that he has listed the right number, rather "my opinions are this is what I've picked up." (9/01/09 Tr. 196:8-12 (McDonough).)

### C. The Debtors' Valuation Is Appropriate

#### i. *Lazard followed its standard valuation methodology*

1149. Jim Millstein led the Lazard team that prepared the valuation. During his time at Lazard, Mr. Millstein was the lead advisor on 60 to 75 restructuring engagements. (7/21/09 Tr. 30:3-5 (Millstein).) He has over 25 years of restructuring experience. (7/21/09 Tr. 96:11-13 (Millstein).) In the cable area, Lazard has represented UPC, a European cable operation; U-Cable; UZI, a German cable operator, NTL, Adelphia, and Charter. (7/21/09 Tr. 30:6-13 (Millstein).)

1150. The only formal valuation Lazard performed was the valuation prepared for the disclosure statement in this case. (7/21/09 Tr. 31:13-16 (Millstein); CX 720 - Ex. D.)

1151. Lazard's valuation is as of September 30, 2009. (7/21/09 Tr. 83:19-23 (Millstein); (CX 720-Ex. D at 1).)

1152. Lazard employed three primary methodologies: discounted cash flow, a comparable company approach and precedent transactions. (7/21/09 Tr. 84:5-7 (Millstein).)

1153. The valuation is for this Plan, in which there is no change of control. (7/21/09 Tr. 153:7-13 (Millstein).)

1154. As a result, Lazard did not include a control premium in its valuation. (7/21/09 Tr. 153:14-17 (Millstein).)

1155. For each of the three methodologies, Lazard develops a range of values and then weighs the different results in a series of judgment calls. (7/21/09 Tr. 84:12-20 (Millstein).)

1156. Charter's range of valuation of 14.1 to 16.6 is Lazard's judgment as to where the reorganized company would be valued on these different methodologies. (7/21/09 Tr. 93:1-9 (Millstein).)

1157. Lazard's precedent transaction analysis for the valuation indicated implied multiples for the cable assets in a range of 7.7 to 8.5. (7/21/09 Tr. 109:9-12 (Millstein); CX 720 - Ex. Dat 6-7.)

1158. These precedent transactions include a change of control premium. (7/21/09 Tr. 87:14-17 (Millstein); CX 720-Ex. Dat. 6)

1159. In its weighting, Lazard gave minimal reliance on precedent transactions in valuing Charter. (7/21/09 Tr. 111:4-8 (Millstein).)

1160. Lazard used the debtors' forecasted cash flow through 2013 and discounted that amount to present value. (7/21/09 Tr. 87:25-88:3 (Millstein).)

1161. For the cash flows after 2013, Lazard then used both a terminal value approach and a perpetuity growth approach. (7/21/09 Tr. 88:4-13 (Millstein).)

1162. The discount rates Lazard used were based in part on the weighted average cost of capital. (7/21/09 Tr. 155:1-4 (Millstein).)

1163. Lazard performed the DCF both ways as a way of checking on the reasonableness of the output of either alternative. (7/21/09 Tr. 89:1-6 (Millstein).)

1164. Lazard included a present value of $649 million for the projected tax benefits based on an analysis prepared by Ernst & Young. (7/21/09 Tr. 106:4-20 (Millstein).)

1165. In addition, Lazard ran sensitivities to Charter's growth rates to assess the impact on the valuation if Charter is hindered by greater competition in the future. (7/21/09 Tr. 89:8-90:4 (Millstein).)

1166. Lazard identified the larger cable providers — Comcast, Time Warner, Cablevision and MediaCom — and removed the value for the non-cable related assets and operations for Comcast and Cablevisions. (7/21/09 Tr. 90:9-16 (Millstein).)

1167. Lazard then identified a range of implied EBITDA multiples for those companies of five to six times 2009 projected EBITDA. (7/21/09 Tr. 107:25-108:3 (Millstein); CX 720 - Ex. D at 4-5.)

1168. For Cablevision and MediaCom, Lazard adjusted the overall valuation to reflect the market value of the debt, rather than the book value because their debt had traded at important discounts. (7/21/09 Tr. 91:22-92:7 (Millstein).)

### *ii.* **Lazard's is the only valuation offered for its purpose**

1169. The valuation attached to the Disclosure statement, provides: "Lazard has estimated the value of the Reorganized Debtors (other than Charter Investment Inc.) as of the date of this Disclosure Statement. Lazard has undertaken this valuation analysis to determine the value available for distribution to holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such holders thereunder. The estimated total value available for distribution to holders of Allowed Claims' ('Enterprise Value') consists of the estimated value of Reorganized Debtors' operations on a going concern basis." (CX 720-Ex. D at 1.)

1170. Mr. McDonough is not aware of anyone else other than Lazard that has performed a valuation in this matter for the purpose set forth in paragraph 1 of the valuation. (9/01/09 Tr. 161:23-163:4 (McDonough).)

1171. Mr. McDonough agrees that there are no other valuations that have been done that use the same assumptions that Lazard sets forth in the Disclosure Statement, no other valuation

that he cited in his reports or on direct exam that is a valuation based upon a reorganization as of September 30, 2009, and no other valuations in this case using the projections provided by debtors' management for 2009 to 2013 that were attached to the Disclosure Statement other than what was done by Lazard. (9/01/09 Tr. 163:1-24 (McDonough).)

### iii. Lazard's valuation is for a different purpose and has different assumptions than Duff & Phelps's Valuation

1172. Lazard's valuation as of September 30, 2009, was different from Duff & Phelps's valuation as of October 1, 2008. (Compare CX 720-Ex. D to CX 225.)

1173. Regarding market prices, "market conditions were substantially different in November" 2008 than they were in March 2009. (7/21/09 Tr. 132:16-19 (Millstein).) A month and a half after Lehman collapsed in to bankruptcy is a different market environment. (7/21/09 Tr. 133:4-6 (Millstein).)

1174. The comparable company analysis, "which is totally a reflection of the trading prices of a company stock and its debt securities if you're doing it on a market basis," "significantly depends upon current market conditions." (7/21/09 Tr. 132:23-133:4 (Millstein).)

1175. Lazard's DCF did not assume an asset sale and therefore did not get the step up with respect to depreciation and amortization as did the Duff & Phelps DCF. (9/1/09 Tr. 23:11-16 (Bliss).)

1176. Lazard's viewpoint was an equity transaction on a non-control basis whereas Duff & Phelps' was an asset transaction on a controlled basis. (9/1/09 Tr. 23:17-21 (Bliss).)

1177. Lazard was basically looking at what would be the value of the equity and the holders on the day you have emergence and the holders, on the day of emergence, would be in a control position. They viewed the equity on a non-control basis. (9/1/09 Tr. 23:22-24:2 (Bliss).)

## XX. THE PLAN PROPERLY CLASSIFIES CLAIMS

### A. The Plan's Classification Of Claims Follows The Debtors' Capital Structure

1178. Each Class differs from each other in legal or factual nature based upon relevant criteria. Valid business, factual, and legal reasons exist for classifying separately the various Classes of Claims and Interests created under the Plan. (7/16/09 Doody Decl. ¶¶ 6, 9.)

1179. The Plan's classification scheme follows the Debtors' capital structure. For each Debtor, secured debt is classified separately from unsecured debt, general unsecured Claims are classified separately from unsecured note Claims and unsecured note Claims are classified separately from Interests. (7/16/09 Doody Decl. ¶ 7.)

1180. In addition, the Plan properly recognizes contractual subordination provisions present in certain bond indentures. For example, the CCO Notes Claims (Class J-3) are secured by

a second-priority lien on substantially all of CCO's and certain of its subsidiaries' assets that secure the obligations under the CCO Credit Facility. These CCO Notes Claims are junior to the CCO Credit Facility Claims (Class J-1), which are secured by a first priority lien on the same assets. (7/16/09 Doody Decl. ¶ 8.)

### B. The Evidence Does Not Support The CCI Noteholders' Objections Regarding Plan Classification

1181. The CCI Notes are, by their terms, convertible into equity and structurally subordinated to the debt at all of the other Charter subsidiaries. (*See* 8/17/09 Tr. 55:15-57:9 (Doody); *see also* CX 287, Exh. 4.7; 9/1/09 Tr. 157:23-159:7 (McDonough) (CCI Noteholders expert witness admitting that it was his understanding that CCI was structurally subordinated to the debt of all of the Company's other subsidiaries); CX 287 at 25.)

1182. The CCI Notes were issued in conjunction with the Holdco Mirror Note, which provides CCI and Holders of CCI Notes with an alternative source of recovery against Holdco that is unavailable to general unsecured creditors of CCI. (CX 287.)

## XXI. THE PLAN SATISFIES SECTION 1129(A)(10)

1183. 10 Impaired Classes of Claims voted to accept the Plan, not counting Insider votes. Excluding Insider votes, Impaired Classes A-3, A-4, B-3, B-4, C-3, F-4, G-4, H-4, J-2, and J-6 voted to accept the Plan. (*See* Schepper Decl. ¶ 15; Sullivan Decl., Ex. A.)

1184. Pursuant to the Disclosure Statement Order, Classes for which no votes were cast are deemed to accept the Plan. (CX 702 Ex. E ¶ 7(h).) Although ballots were mailed to creditors in Classes D-3, E-3, F-3, G-3, H-3, and I-5, no votes were cast in such Classes. (*See* Schepper Decl. at 2-3; Amended Certificate of Service of James Sean McGuire re: Solicitation Packages at ¶¶ 3-24; Schepper Decl. ¶ 15.)

1185. The initial classification of the A-3 and C-3 claims as unimpaired was an error that Charter corrected. (8/17/09 Tr. 59:5-8 (Doody); CX 709 at 25.) Nothing has changed "as far the distributions" to the A-3 and C-3 classes between the initial classification and the correction. (8/17/09 Tr. 59:16-19 (Doody).)

1186. "All of the general unsecured claims classes [at Holdco] are treated the same way." (8/17/09 Tr. at 60:7-8 (Doody).)

1187. The reinstatement option in the general unsecured classes, including Classes A-3 and C-3 is not intended as a loophole to designate Classes as Impaired while treating them as Unimpaired, nor will it be used as such. Charter has not made any final decisions regarding specific claims, but does not plan to reinstate all Claims in either Class A-3 or C-3. (8/17/09 Tr. 59:20-60:15 (Doody).)

1188. The Management Agreement explicitly provides that all such payments are payable only at cost and does not provide for payment of interest on overdue payments. (CX 305 ¶ 3; *see also* 8/17/09 Tr. 94:14-195:17 (Doody).)

## XXII. THE PLAN'S RELEASE, EXCULPATION AND INJUNCTION PROVISIONS ARE APPROPRIATE

1189. The Plan contains a release of the Debtors' members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives from third party claims. (See Plan at X.D and X.E.)

### A. The Debtors' Releases

1190. The Debtors' Releases are in the best interests of the Debtors' estates because they are an integral part of the consensual Plan that provides substantial value to the estates. (7/16/09 Doody Decl. ¶ 36; *see also* 7/21/09 Tr. 73:10-16 (Milstein); 7/22/09 Tr. 268:15-269:10 (Merritt).)

1191. The Releases are limited in scope and Charter does not believe that there are any valuable Claims against the Released Parties. (7/16/09 Doody Decl. ¶ 36.)

1192. The Debtors' release of Claims and Causes of Action is also a component of the consensual Plan process. (7/16/09 Doody Decl. ¶ 36.)

1193. "In addition, most if not all of the release parties have indemnification obligations from the debtors…. [E]ventually people would look back to the debtors." (8/17/09 Tr. 63:4-9 (Doody).)

### B. Third Party Releases

1194. The Third Party Releases constitute a good faith settlement and compromise of claims released by the Third Party Releases, given in exchange for good and valuable consideration. (7/16/09 Doody Decl. ¶ 37.) The Third Party Releases were contentiously negotiated. (9/2/09 Tr. 177:7-25 (Conn).

1195. Mr. Allen and all of the directors, including Mr. Conn and Ms. Patton, are receiving releases. (9/2/09 Tr. 86:9-16 (Conn).)

1196. The release for Mr. Allen first appeared in a term sheet prepared by Miller Buckfire in response to the strawman proposal and remained in all the proposals exchanged between the Vulcan team, the bondholders, the Crossover Committee and the company from that point on. (9/10/2008 Tr. 42:4-21 (Millstein); 9/2/09 Tr. 177:15-19 (Conn).) Initially, the proposal was opposed by some members of the Crossover Committee (9/2/09 Tr. 177:7-25 (Conn).)

1197. Mr. Allen's release is a valuable piece of consideration because he is a public figure and a deep pocket individual who attracts a lot of nuisance lawsuits. (9/2/09 Tr. 86:17-20, 88:15-17 (Conn).)

1198. The release is not valuable because there are any identified known or potential liabilities; "it's really a concern about the nuisance factor." (9/2/09 Tr. 151:20-22 (Conn).) "You

never know how many crazy nuisance lawsuits you're going to get." (9/2/09 Tr. 166:8-9 (Conn).)

1199. It was important for Mr. Allen to secure a release as part of a reorganization plan. (9/2/09 Tr. 88:18-19 (Conn).)

1200. Mr. Allen's release is an essential element the Plan and it is unknown whether Mr. Allen would go forward without a release. (9/2/09 Tr. 87:1, 11-14, 20-25 (Conn) (noting that if the release "weren't included it would cause — you'd have to reconsider the overall plan.").)

1201. Substantial consideration is being exchanged in return for the Third Party Releases. (7/16/09 Doody Decl. ¶ 38.) For example, the CII Settlement provides substantial consideration by the CII Settlement Claim Parties in the form of preservation of valuable tax attributes and the ability to reinstate indebtedness at markedly favorable interest rates. (7/16/09 Doody Decl. ¶ 39; 8/17/09 Tr. 34:19-24 (Doody).)

1202. The aggregate consideration provided by the CII Settlement Claim Parties confers well in excess of $1 billion in value on the Debtors and their estates. (8/17/09 Tr. 282:22-283:1 (Doody); 9/2/09 Tr. 152:6-9, 152:13-24 (Conn).)

1203. Because many of the Debtor Releasees are beneficiaries of indemnity obligations (including, significantly, Mr. Allen, in his capacity as a director of Debtor CCI), the enjoined claims would indirectly impact the Debtors' reorganization. (7/16/09 Doody Decl. ¶ 38.) "In addition, most if not all of the release parties have indemnification obligations from the debtors…. [E]ventually people would look back to the debtors." (8/17/09 Tr. 63:4-9 (Doody).)

1204. Given that Mr. Allen's unique ability to provide value to debtors through his continued participation and has agreed to do so in exchange for, among other things, the Third Party Releases, and given that this is one of the largest prearranged cases ever, these Chapter 11 Cases involve the type of truly unusual circumstances that warrant nonconsensual third party releases. (7/16/09 Doody Decl. ¶ 38; 8/17/09 Tr. 282:22-283:1 (Doody); 9/2/09 Tr. 152:6-9, 13-19 (Conn); 8/17/09 Tr. 63:10-12 (Doody).)

1205. The Third Party Release is in the best interests of the Debtors and all Holders of Claims. (8/17/09 Tr. 63:3-6 (Doody).)

## C. Injunction

1206. The Plan and the CII Settlement on which it is based would not have materialized if the negotiating parties had not known they would be protected from liability, other than for willful misconduct or gross negligence, in connection therewith. (7/16/09 Doody Decl. ¶ 43.)

1207. The Plan's injunction is necessary to effectuate the Plan Releases and to protect the Reorganized Debtors from any potential litigation from prepetition creditors as they

implement the provisions of the Plan after the Effective Date. (7/16/09 Doody Decl. ¶ 42.)

1208. Any such litigation would hinder the efforts of the Reorganized Debtors to effectively fulfill their responsibilities as contemplated in the Plan and thereby to maximize value for all Holders of Claims and Interests. (7/16/09 Doody Decl. ¶ 42.)

### D. Exculpation

1209. The scope of the exculpation contained in Article X.G of the Plan is appropriately limited to the Exculpated Parties' participation in these Chapter 11 Cases, has no effect on liability that results from gross negligence or willful misconduct, and does not apply to any acts or omissions expressly set forth in and preserved by the Plan. (8/17/09 Tr. 242:11-14 (Doody).)

1210. The Exculpated Parties played a critical role in the formulation of the Plan and the Exculpation Provision played a role in bringing these parties to the table. (7/16/09 Doody Decl. ¶ 44.)

## XXIII. THE PLAN IS FEASIBLE

1211. The Debtors sought chapter 11 protection primarily because of their large debt burden. As such, the Plan is essentially a balance sheet restructuring, which substantially reduces leverage and interest expense but protects the strength of the Debtors' operations by largely preserving the Debtors' prepetition corporate structure and business relationships. (7/16/09 Doody Decl. ¶ 20.)

1212. As of the Petition Date, the Debtors' total funded debt obligations were approximately $21.7 billion and consisted of, among other things, amounts under the secured credit facilities and secured and unsecured notes payable. While the Debtors' operations and cash flow before debt service have been strong, this debt burden, combined with the recent deteriorating capital market conditions, compelled the Debtors to commence the Chapter 11 Cases. (7/16/09 Doody Decl. ¶ 21.)

1213. The Plan cancels approximately $8 billion of debt at various holding companies and reduces annual interest expense by more than $830 million. Accordingly, the Plan's contemplated debt reduction along with the Debtors' strong earnings are more than sufficient to ensure that the Plan is feasible. (7/16/09 Doody Decl. ¶ 22.)

1214. The Debtors' operations have remained strong both prior to the Petition Date and during the Chapter 11 Cases. Unlike many companies entering chapter 11, the Debtors commenced the Chapter 11 Cases at a time when their business is continuing to grow. The Debtors are operationally sound and by all accounts heading in the right direction as a functioning business. (8/21/09 Goldstein Decl. ¶ 50.)

1215. Prior to the Petition Date, the Debtors generated significant positive cash flow before debt service and achieved upward, favorable trends as an operating enterprise. Furthermore, from 2006 to 2008, the Debtors drove pro forma revenue from

approximately $5.5 billion to $6.5 billion, and pro forma adjusted EBITDA grew from $1.9 billion to $2.3 billion. The Debtors have experienced ten consecutive quarters of double-digit adjusted EBITDA growth on a pro forma basis through the first quarter of 2009. The Debtors' post-emergence adjusted EBITDA is projected to grow from approximately $2.5 billion in 2009 to nearly $3.3 billion in 2013. (8/21/09 Goldstein Decl. ¶ 51.)

1216. In addition, as of March 27, 2009, the Debtors had approximately $860 million in cash and cash equivalents on hand. The Debtors' strong cash flow from operations has been sufficient to maintain operations during the Chapter 11 Cases without the need for debtor-in-possession financing. The Debtors have also been able to pay their trade vendors in the ordinary course of business with cash from operations. (8/21/09 Goldstein Decl. ¶ 51.)

1217. The Debtors have thoroughly analyzed their ability to meet their obligations under the Plan post-Confirmation, and submit that Confirmation is not likely to be followed by liquidation or the need for further reorganization. (7/16/09 Doody Decl. ¶ 21.)

1218. The Reorganized Debtors will have, immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan. (7/16/09 Doody Decl. ¶ 11.)

1219. The Debtors also have sufficient access to credit. In particular, the Debtors seek to reinstate approximately $11.8 billion in outstanding senior debt instruments under the Plan. The specific credit facilities and indentures to be reinstated are:

|  | Principal Amount Outstanding |
|---|---|
| First Lien Credit Facility |  |
| Term Loan Facility maturing 2014 | $6.9 billion |
| Revolving Credit Facility maturing 2013[1] | $1.3 billion |
| 8.00% senior second lien notes due 2012 | $1.1 billion |
| 8⅜% senior second lien notes due 2014 | $770 million |
| 10.875% senior second lien notes due 2014 | $546 million |
| Junior Credit Facility maturing 2014 | $350 million |
| 8¾% senior notes due 2013 | $800 million |
| **Total** | **$11.8 billion** |

(7/16/09 Doody Decl. ¶ 23)

---

[1]    Excluding letter of credit obligations.

1220. The two credit facilities the Debtors seek to reinstate were negotiated in March 2007 and March 2008. Under the First Lien Credit Facility, the Debtors secured $7 billion in term loans that mature in March 2014 and a $1.5 billion revolving credit facility that matures in March 2013. Under the Junior Credit Facility, the Debtors secured a $350 million term loan that matures on September 16, 2014. (7/16/09 Doody Decl. ¶ 24.)

1221. The senior notes and senior second lien notes are reflected in three indentures dated as of March 2008, April 2004, and November 2003. The reinstated facilities and notes above are essential to the Debtors' business and fundamental to the Plan. (7/16/09 Doody Decl. ¶ 24.)

1222. With regard to feasibility, Lazard assisted the Debtors in analyzing their ability to meet their obligations under the Plan post Confirmation, and based upon this analysis, I believe the Plan is feasible, and Confirmation is not likely to be followed by liquidation or the need for further reorganization. (8/21/09 Goldstein Decl. ¶ 49.)

1223. In addition, the Plan will result in $1.6 billion in equity investments and reflects commitments to refinance approximately $1.467 billion in existing debt. (7/16/09 Doody Decl. ¶ 25.)

## XXIV. THE PLAN SATISFIES SECTION 1129(A)(5) OF THE BANKRUPTCY CODE

1224. The appointment or continuance of the proposed directors and officers is consistent with the interests of creditors and equity security holders and with public policy. (7/16/09 Doody Decl. ¶ 19.)

1225. The directors and officers who have been identified to date and the process by which the remaining directors and officers will be selected will ensure that (a) the Reorganized Debtors' directors and officers have experience in the Reorganized Debtors' business and industry and experience in financial and management matters; (b) their appointment does not perpetuate incompetence, lack of discretion, inexperience, or affiliations with groups inimical to the best interests of the debtor, and (c) the control of the Reorganized Debtors by the proposed individuals will be beneficial. (7/16/09 Doody Decl. ¶ 19; 8/24/09 Tr. 65:13-19 (Goldstein); *see also* 8/17/09 Tr. 45:7-50:14 (Doody); 7/22/09 Tr. 59:7-14 (Smit).)

1226. Charter created a mechanism to "fill the gap" where no prior mechanism existed because it was "concerned about the post-effective date composition of the Board. Most particularly, we needed a — this is going to be a large public company when it comes out so we needed a functioning audit committee with the appropriate experience on it. And we weren't actually sure that that was going to happen. So there's the mechanism — the way that the ownership shook out suggested there might be two, maybe three — we've called them gap directors in the certificate but there may be gap directors coming out of bankruptcy. And we wanted very soon after that to be able to select the appropriate board at that point." (8/17/09 Tr. 45:15-25 (Doody).)

1227. Debtors' Amended Certificate of Incorporation provides that the Board of Directors of New Charter will consist of 11 members. At the annual shareholders' meeting and

thereafter, seven are designated as putative New Class A Shareholders and four will have been selected by the putative Class B shareholder (Paul Allen).  (CX 406, Ex. 3.)

1228. Eight of the directors who will serve on the New Charter Board have been disclosed; one more will be selected by Franklin within 30 days.  (CX 406, Ex. 23 (Identity and Affiliation of Proposed New Board Members and Officers).)

1229. Mr. Smit's contract requires him to be on the Board; as such, Mr. Smit will serve as a Class A director.  (7/22/09 Tr. at 138:3-20 (Smit); 8/24/09  Tr. at 266:25-267:6 (Gompers).)  Mr. Smit's Board seat is not based on any votes by any entities such as Apollo, Oaktree, or Franklin. (7/21/9 Tr. 234:14-16 (Smit).)

1230. In addition, the Class A shareholders who are projected to have 10% of the voting power of New Charter determined on an undiluted basis were able to select a Class A Director for each 10% of voting power they held.  (CX 407 at 50 (Article VI, Section N of Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization).)

1231. Apollo has selected 2 Board members, Mr. Eric Zinterhofer and Mr. Darren Glatt, both employees of Apollo.  (CX 406, Ex. 23.)

1232. Oaktree has selected 1 Board member, Mr. Bruce Karsh, an employee of Oaktree.  (CX 406, Ex. 23.)

1233. Franklin Advisors will also be able to select one Board member within 30 days of the Effective Date of the plan.  (CX 406, Ex. 23; 7/23/09 Tr. 50:20-24; 52:9-53:1 (Villaluz).)  Franklin requested 30 days after the Effective Date to select a director because such a period is required under Franklin's internal code of compliance.  (7/23/09 Tr. 139:3-10 (Villaluz); 8/24/09 Tr. 267:23-268:2 (Gompers).)  Nevertheless, Franklin will not select a Franklin employee, Mr. Jeff Marcus of Crestview nor anyone else affiliated with a member of the Ad Hoc Committee to serve as its Board representative.  (7/23/09 Tr. 51:18-52:3 (Villaluz); 8/24/09 Tr. (Gompers) at 267:17-22.)

1234. Under the plan, after 31 days, the eight Class A and Class B directors listed in the amended disclosure statement at confirmation and the additional independent Class A director to be selected by Franklin will by majority vote then select the remaining two "gap" directors to complete New Charter's Board.  (CX 406, Ex. 23; 8/24/09 Tr. 268:3-10 (Gompers).)

1235. The proposed directors and officers of the Reorganized Debtors are competent, have relevant and solid business and industry experience, and will give the Reorganized Debtors both continuity and fresh insights into running the business.  (7/16/09 Doody Decl. ¶ 19.)

1236. Mr. Doody stated his view that it was appropriate for the new Board members to fill remaining vacancies:  "when these people are going to be serving on the Board, they're going to be serving in their individual capacity, exercising their fiduciary duties. So to me, the best way to do it is to have the entire Board get together, knowing that now they owe duties to this new enterprise, and to choose a Board that's appropriate in all respects,

including having the appropriate qualifications and independence of audit committee members."  (8/17/09 Tr. at 251:13-20 (Doody).)  "I think it's a much better practice, though, to have the board — the board that's going to ultimately have to determine as a group whether they have audit committee financial expertise and whether there is — whether the independence requirements are met, not only for the audit committee, but for all the members.  So having them acting as the body that's eventually going to have to make these determinations seemed like the best way to do it, in my view."  (8/17/09 Tr. at 252:4-12 (Doody).)

1237. Exhibit 23 to the Plan Supplement discloses the identity of all Insiders to be employed or retained by the Reorganized Company as directors or officers, and the nature of any compensation for such Insiders in compliance with section 1129(a)(5)(B) of the Bankruptcy Code.  (CX 406 at Ex. 23.)

## DEBTORS' PROPOSED CONCLUSIONS OF LAW ON CONTESTED ISSUES

## I. BURDEN OF PROOF

1. "Under New York law, the burden of proof in an action for breach of contract is on the plaintiff to prove the elements of its complaint by a preponderance of the evidence." *Mercury Partners LLC v. Pacific Medi. Bldgs., L.P.*, No.02-6005 (HBP), 2007 WL 2197830, at *8 (S.D.N.Y. Jul. 31, 2007) (citing *Enercomp, Inc. v. McCorhill Pub., Inc.*, 873 F.2d 536, 542 (2d Cir. 1989).)

2. As the plaintiff in an adversary proceeding that is styled as a "state law breach of contract action" that JPMorgan contends "was commenced in a bankruptcy case solely because CCO has filed for Chapter 11," JPMorgan has the burden of proving any prepetition breach of the Credit Agreement. *See, e.g., In re Food Mgmt. Group, LLC*, 372 B.R. 171, 190 (Bankr. S.D.N.Y. 2007).

3. Nothing about the bankruptcy context of this matter changes that burden of proof. *See Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000).

4. As the proponent of its confirmation Plan, Charter bears the burden of establishing compliance with 11 U.S.C. § 1129. *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 598-99 (Bankr. D. Del. 2001); *In re Gulfstar Indus., Inc.*, 236 B.R. 75, 77 (M.D. Fla. 1999); *In re Petrella*, 230 B.R. 829, 832 (Bankr. N.D. Ohio 1999) ("A Debtor seeking reorganization under Chapters 11, 12 or 13 has the burden of establishing that the plan complies with the statutory requirements for confirmation.")

5. Creditors objecting to the proposed plan bear the burden of producing evidence to support their objection. *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 656 (Bankr. D. Del. 2003) aff'd, 308 B.R. 672 (D.Del. 2004) *In re Goddard*, 212 B.R. 233, 239 n. 7 (D.N.J. 1997); *Genesis Health Ventures, Inc.*, 266 B.R. 591, 599 (Banker, D.Del. 2001).

6. The statute permitting reinstatement — 11 U.S.C. § 1124 — does not impose any burden on a debtor beyond the requirements set forth in § 1129. It simply defines what it means to be unimpaired. 11 U.S.C. § 1124.

7. Taken together, §§ 1124 and 1129 demonstrate that Charter's burden is to prove confirmation standards, while it remains JPMorgan's burden of proving a default resulting in impairment. *See* 11 U.S.C. §§ 1124, 1129.

8. Only if JPMorgan proves a default would the burden shift back to Charter to prove that such a default was either *ipso facto* or would be cured by the Plan under § 1124(2). *See In re Kings Terrace Nursing Home & Health Related Facility v. New York State Dep't of Soc. Servs.*, Bnkr. No. 91 B 11478, Adv No. 94/8912A 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 27, 1995) aff'd, 184 B.R. 200 (S.D.N.Y. 1995); *In re Greektown Holdings, L.L.C.*, S. No. 08-53104, 2009 WL 1653461, at *2 (Bankr. E.D.Mich. May 13, 2009); *In re F.W. Rest. Assoc., Inc.* 190 B.R. 143, 147 (Bankr. D. Conn. 1995); *In re Rachels Indus., Inc.*, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990).

9.     Under § 365, absent proof by the objector that a default exists, the burden of proof does not shift to the debtor.  *In re Kings Terrace Nursing Home & Health Related Facility*, 1995 WL 65531, at *9 *(Bankr. S.D.N.Y. 1995).

## II.     PAROL EVIDENCE AND CONTRACT CONSTRUCTION

10.    "The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous.  Under New York law, the meaning of a contract that is unambiguous is a question of law for the court to decide."  *Revson v. Cinque & Cinque*, 221 F.3d 59, 66 (2d Cir. 2000).

11.    If a court determines that the terms of a contract are clear and unambiguous, then it will not look beyond the four corners of the agreement to determine its meaning.  *Chevron TCI, Inc. v. Talleyrand Assocs., LLC*, No. 03-4043 (AJK), 2003 WL 22977498, at *5 (S.D.N.Y. Dec. 19, 2003); *Mun. Capital Appreciation Partners I., L.P. v. Page,* 181 F. Supp. 2d 379, 391 (S.D.N.Y. 2002) (parol evidence rule bars introduction of extrinsic evidence of meaning of complete agreement where terms are clear and unambiguous).

12.    Contract language is unambiguous when the meaning is precise and definite, and "there is no reasonable basis for a difference of opinion."  *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (internal quotation marks and citations omitted).

13.    A contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir. 1987); *see also Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000).

14.    Where the language of a contract is ambiguous, a court may consider extrinsic or parol evidence to determine its meaning.  *Burger King Corp.v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990).

15.    "[C]ourts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties and the subject matter of the instrument and parol evidence may be admissible to clear up any ambiguity in the language employed."  *Korff v. Corbett*, 18 A.D.3d 248, 251 (N.Y. App. Div. 2005) (internal quotation marks and citation omitted).

16.    Extrinsic or parol evidence that courts may consider when interpreting ambiguous contracts includes, among other things:

(i)     Drafting history and conduct during negotiations.  *See, e.g., RJE Corp. v. Northville Indus. Corp.*, 198 F. Supp. 2d 249, 267 (E.D.N.Y. 2002).

(ii)    Testimony of parties to the contract or key players in the negotiations.  *See, e.g., Lion Foods Ltd. v. Daarnhouwer (New York) Inc.*, 654 F. Supp. 79, 81 (S.D.N.Y. 1987).

(iii) Prior dealings between the parties. *See, e.g., Fin. Techs. Int'l, Inc. v. Smith*, 247 F. Supp. 2d 397, 406 (S.D.N.Y. 2002) (prior employment agreement between the parties); *Lion Foods Ltd. v. Daarnhouwer* , 654 F. Supp. 79, 81 (S.D.N.Y. 1987) (prior dealings between the plaintiff's agent and defendant in an earlier, unrelated contract).

(iv) Trade custom and usage in the industry. *See, e.g., In re Avon Sec. Litig.*, No. 97-2287 (LMM), 2004 WL 3761563, at *8 (S.D.N.Y. Mar. 29, 2004).

(v) And most importantly, the parties' conduct or performance during the course of the contract, before the dispute arose. *Fed. Ins. Co. v. Am. Ins. Co.*, 258 A.D. 2d 39, 44 (N.Y. App. Div. 1999).

17. "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling influence." *Fed. Ins. Co. v. Am. Ins. Co.*, 258 A.D. 2d 39, 44 (N.Y. App. Div. 1999) (internal quotation marks and citations omitted); *see also In re Avon Sec. Litig.*, No. 97-2287 (LMM), 2004 WL 3761563, at *5 (S.D.N.Y. Mar. 29, 2004) ("[T]he parties' course of performance under the contract is considered to be the most persuasive evidence of the agreed intention of the parties."). Indeed, "[i]t is hornbook law that where there is ambiguity in a contract the intent of the parties may be ascertained by reference to their subsequent course of conduct." *Factors Etc., Inc. v. Creative Card Co.*, 444 F. Supp. 279, 281-82 (S.D.N.Y. 1977).

18. Although courts may consider post-contract performance and dealings, they do not consider a party's post-contract *interpretation* of a contract. *See Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 379 (S.D.N.Y. 2006) , aff'd 284 F. App't 882 (2d. Cir. 2008)(rejecting statements by party employees as "nothing more than *post hac* interpretations . . . not probative as an aid to the interpretation of the contract.'").

19. In interpreting a contract under New York law, "words and phrases ... should be given their plain meaning," and the contract "should be construed so as to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (citing *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.2003).

20. An interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'" *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992).

## III. RELEVANCE OF BANKRUPTCY CODE PROVISION DEFINING INSOLVENCY FOR MUNICIPALITIES

21. The Bankruptcy Code provision that defines insolvency for municipalities, 11 U.S.C. § 101(32)(c)(ii), states that the term "insolvent" means with reference to a municipality, financial condition such that the municipality is . . . unable to pay its debts as they become due. 11 U.S.C. § 101(32)(c)(ii).

22.    Courts recognize that municipal bankruptcies present a unique situation in which the public cannot afford to wait until the municipal debtor is, in fact, unable to pay its debts. In *In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991), the court observed: "Cities cannot go out of business," and "Chapter 9 was intended to enable a financially distressed city to 'continue to provide its residents with essential services.'" *Id*. at 336-37 (quoting *Chatman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608 (1979). Thus, given that statutory purpose, construing the Bankruptcy Code such that "a city would not be able to seek chapter 9 protection unless and until it was actually not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-delivery of services." *Id*.

23.    In assessing whether a company is "unable to pay its debts as they fall due," other courts "look[] solely at whether the corporation *has been* paying bills on a timely basis." *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (emphasis added & internal quotation marks and citations omitted); *see also Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F. Supp. 586, 592 (S.D.N.Y. 1990) ("[I]f insolvency is equated with the inability to meet debts as they become due, then Vestron is likely to prevail, since it has not failed to meet its debt obligations.").

24.    The municipality provisions in the Bankruptcy Code have only been interpreted to mean that if "the maturity of the debt is *imminent* and the inability to meet it *certain*," then the debtor is "unable to meet debts as they mature within the meaning of the statute." *In re Town of Westlake*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997) (internal quotations omitted); *see also Bridgeport*, 129 B.R. 332, 337 (Bankr. D.Conn. 1991). Both *Westlake* and *Bridgeport* state that "[m]ere possibility or even speculative probability" of an inability to pay "is not enough." *Westlake*, 211 B.R. at 866; *see Bridgeport*, 129 B.R. at 337.

## IV.    **BUSINESS JUDGMENT AND THE DECLARATION OF DIVIDENDS**

25.    Under Delaware law, Surplus is the excess, if any, of the net assets of a corporation over its capital. DEL. CODE ANN. tit. 8, § 154 (2009).

26.    In *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150 (Del. 1997), the Delaware Supreme Court explained that Delaware law "does not require any particular method of calculating surplus, but simply prescribes factors that any such calculation must include." *Id*. at 154. *Klang v. Smith's Food & Drug Centers, Inc.*, 702 A.2d 150 at 154 (Del. 1997).

27.    "Corporations may revalue assets to show surplus, but perfection in that process is not required." Klang v. Smith's Food & Drug Ctrs., Inc., 702 A.2d 150, 152 (Del. 1997).

28.    The *Klang* court held that, "[d]irectors have reasonable latitude to depart from the balance sheet to calculate surplus, so long as they evaluate assets and liabilities in good faith, on the basis of acceptable data, by methods that they reasonably believe reflect present values, and arrive at a determination of the surplus that is not so far off the mark

as to constitute actual or constructive fraud." *Klang v. Smith's Food & Drug Ctrs., Inc.,* 702 A.2d 150, 152 (Del. 1997).

29.    "In the absence of bad faith or fraud on the part of the board, courts will not 'substitute [our] concepts of wisdom for that of the directors.'" *Klang v. Smith's Food & Drug Ctrs., Inc.,* 702 A.2d 150, 152 (Del. 1997), (quoting *Morris v. Standard Gas & Elec. Co.,* 63 A.2d 577, 583 (Del. Ch. 1949).)

30.    In *Morris,* the court observed that "[t]he numerous and varied standards applied in the legal, accounting and business fields have mapped a wavering course for one required to resolve a substantial problem of valuation," but that Delaware law "permits … no one objective standard of value," and thus that "the directors must be given reasonable latitude in ascertaining value." *Morris v. Standard Gas & Elec. Co.,* 63 A.2d 577, 585 (Del. Ch. 1949).

31.    Where there is no charge of fraud or bad faith, a court will refuse to substitute "either plaintiff's or its own opinion of value for that reached by the directors." *Morris v. Standard Gas & Elec. Co.,* 63 A.2d 577, 581, 585 (Del. Ch. 1949).

32.    The business judgment rule "expresses the unanimous decision of American courts to eschew intervention in corporate decision-making if the judgment of directors and officers in [sic] uninfluenced by personal considerations and is exercised in good faith." *Miller v. American Tel. & Tel. Co.,* 507 F.2d 759, 762 (3d Cir. 1974)..

## V.    <u>THE ENFORCEABILITY OF ISPO FACTO DEFAULTS</u>

33.    It is a well-recognized principle that *ipso facto* defaults are unenforceable. *See, e.g.,* In re *Kopel,* 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999) ("[C]ertain contractual provisions, such as those expressly rendered unenforceable by the Bankruptcy Code, *see, e.g.,* 11 U.S.C. § 365(e)(1), or those that are designed to thwart bankruptcy policies, are vulnerable."); *In re East Hampton Sand & Gravel Co.,* 25 B.R. 193, 199 (Bankr. E.D.N.Y. 1982) ("The present case involves a substantive default, and invokes none of the federal policy considerations which arise in the *ipso facto* termination clauses ….").

34.    "*Ipso facto,* or bankruptcy, clauses, 'automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.'" *In re C.A.F. Bindery, Inc.,* 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) (quoting legislative history). *Ipso facto* clauses are generally unenforceable pursuant to section 365(e) of the Bankruptcy Code because the automatic termination of a debtor's contractual rights deters rehabilitation and causes a forfeiture of assets. *See, e.g., Summit Inv. & Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995) ("[The Bankruptcy Code] invalidate[s] contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights 'frequently hampers rehabilitation efforts' by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most.") (internal quotation marks and emphasis omitted); *In re Enron Corp.,* 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004).

35. Under section 365(e) of the Bankruptcy Code, a contract may not be terminated because of a contractual provision that is conditioned upon: (1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2) the commencement of a bankruptcy case; or (3) the appointment of or taking possession by a trustee in a bankruptcy case. 11 U.S.C. § 365(e)(1).

36. Where JPMorgan alleges that "CCO's business is fundamentally affected by the financial condition of its several affiliates," Compl. ¶ 5, and that "[b]ecause of this relationship between CCO and its affiliates" JPMorgan "negotiated Defaults and Events of Default specifically linked to the … Designated Holding Companies," *Id.* at ¶ 34, an event of default based on the financial condition of CCO's affiliates is likewise conditioned upon "the … financial condition of the debtor," CCO and as such, is an unenforceable *ipso facto* clause. *See, e.g., In re Mirant Corp.*, 2005 Bankr. LEXIS 909, *28 n.27 (Bankr. N.D.Tex. 2005) ("Arguably, enforcing the cross defaults against MAG would be tantamount to enforcing an *ipso facto* clause, as MAG's default on other bond and bank debt was an inevitable result of MAG's chapter 11 filing") (emphasis added).

37. Whether a specific Debtor is solvent makes no difference with respect to acceleration of its debt. In *In re Manville Forest Prods. Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984) the debtor at issue was solvent. *See id.* at 300 ("In the case at hand, MFPC is a concededly solvent corporation with sufficient assets to pay all its creditors, plus interest."). Thus, the creditors argued, to reinstate its obligations a solvent debtor was required to pay interest, not just on the missed payments, but "on the entire accelerated debt from the time of default until the time of payment under a reorganization plan." *Id.* at 298. The bankruptcy court rejected that argument and the district court affirmed. *See id.* at 299; *In re Manville Forest Prods. Corp.*, 60 B.R. 403, 404 (S.D.N.Y. 1986). While the "defaults accelerated the entire outstanding loans, the debt reinstatement cured this and deaccelerated the debt." 60 B.R. at 404. By "'returning to pre-default conditions,'" the "'consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code.'" *Id.* (quoting *In re Taddeo*, 685 F.2d 24, 26-27 (2d. Cir. 1982).).

38. In the context of reinstatement, as long as non-*ipso facto* defaults are cured, a creditor receives the complete benefit of its original bargain with the debtor" and is "not impaired for purposes of Chapter 11 analysis. *In re Kizzac Mgmt. Corp.*, 44 B.R. at 501.

39. Solvent debtors are entitled to bankruptcy protection when faced with financial distress. *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154, 163 (3d. Cir. 1999). Courts have observed that it is "clearly sound business practice … to seek Chapter 11 protection for … wholly-owned subsidiaries when those subsidiaries were crucial to [the parents'] own reorganization plan," *In re U.I.P. Engineered Prods. Corp.*, 831 F.2d 56, (4th Cir. 1987).

## VI.    PREREQUISITES FOR A GROUP UNDER § 13(D) OF THE EXCHANGE ACT

40. Section 13(d) of the 1934 Securities Exchange Act provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of

such agreement, of all equity securities of that issuer beneficially owned by any such persons." 17 C.F.R. § 240.13d-5 (b)(1).

41.    A prerequisite for there being a "group" of beneficial owners is that the individual "persons" in that group are, themselves, beneficial owners.  *Hemispherex Biopharma, Inc. v. Johannesburg Consol. Inv.*, 553 F.3d 1351 (11th Cir. 2008); *Rosenberg v. XM Ventures*, 274 F.3d 137 (3d Cir. 2001); *Litzler v. CC Invs., LDC*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006).

42.    Collaborative activity in support of restructuring at a time when an entity has no equity interest has not been treated by the SEC as constituting a § 13(d) "group" within the meaning of the 1934 Act.  The SEC has disclaimed § 13(d) "group" treatment for such activities.  *See, e.g.*, *Great Southwest Overseas Fin. Corp. N.V.*, March 16, 1972 SEC No Action Letter, *available at* 1972 SEC No-Act. LEXIS 1486.

43.    Activity and communication between parties short of agreements for the purposes specified in 13D is not prohibited.  *See*, *e.g.*, *Litzler v. CC Investments, LDC*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006)

44.    "Private offerings of securities generally involve common purchase agreements with subscribers," and went on to explain that considerations such as cost savings justified the kind of cooperative activity the investors displayed and that "[m]ore than such cooperative activity has to be alleged and proved to show that the investors were motivated by 'a desire to affect control,' or by some other indicia of concerted activity." *Litzler v. CC Investments, LDC*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006) at 415-16 (citation omitted); *see also Schaffer ex rel. Lasersight, Inc. v. CC Inv. LDC*, 99-2821 (VM), 2002 WL 31869391, *5 (S.D.N.Y. Dec. 20, 2002) ("The Court does not interpret these details by themselves as sufficient evidence of agreement, however, because each event can be explained by a manifestation of desire on the part of [the issuer] to treat the Series B Preferred shareholders in certain ways as a class rather than of a decision by Defendants to further some common objective.").

45.    It is "quite obviously not enough" that the defendants have a "common purpose of making money on their investments."  *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, Case No. 00 CV 1115 (LAK) (S.D.N.Y. Feb. 23, 2001) (bench decision), *aff'd,* 286 F.3d 613 (2d Cir. 2002).

46.    "General allegations of parallel investments by institutional investors do not suffice to plead a group." *Litzler v. CC Investments, L.D.C.*, 411 F.Supp.2d  411, 420 (S.D.N.Y. 2006)

47.    Courts have observed, "the authors of the Code encouraged workouts" and "incentives to use 'prepackaged plans' are 'written all through the new Act.'"  *In re TS Indus., Inc.*, 117 B.R. 682, 688 (Bankr. D. Utah 1990) (quoting *In re Colonial Ford, Inc.*, 24 B.R. 1014 (Bnkr. D.Utah 1982).); *see also In re REPH Acquisition Co.*, 134 B.R. 194, 196 & n.1 (N.D. Tex. 1991).

48. Scaled voting provisions are well-recognized under Delaware law. *See Providence & Worcester Co. v. Baker*, 378 A.2d 121, 121 (Del. 1977) (upholding provision that reduced the votes per share based on the number of shares held); *Sagusa, Inc. v. Magellan Petroleum. Corp.*, No. 12,977, 1993 WL 512487 (Del. Ch. Dec. 1, 1993), *aff'd*, 650 A.2d 1306 (Del. 1994); *Williams v. Geier*, No. 8456, 1987 WL 11285 (Del. Ch. May 20, 1987), *aff'd*, 671 A.2d 1368 (Del. 1996); *see also Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 17-18 (2d Cir. 2001) (enforcing a conversion cap).

49. "There is nothing in the *Providence & Worcester* decision to suggest that its holding should be limited to voting restrictions contained in an original certificate of incorporation." *Williams v. Geier*, No. 8456, 1987 WL 11285 (Del. Ch. May 20, 1987), *aff'd*, 671 A.2d 1368 (Del. 1996), at *4. A scaled voting restriction in this context operates much like a conversion cap. *See, e.g.*, *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 17-18 (2d Cir. 2001) ("[T]he conversion cap effectuates a clear prohibition on [the warrant holder's] ability to convert shares to the extent that conversion would result in it owning in excess of 4.9% of [the company's] outstanding common stock."). Indeed, just as a conversion cap can preclude beneficial ownership in excess of the cap, so too a scaled voting restriction. *See id*. at 15-16; *cf. Levner v. Prince Alwaleed*, 61 F.3d 8, 9 (2d Cir. 1995) (holding no beneficial ownership because, under a standstill agreement, the "stock was not 'presently convertible'").

50. Even if they were acting as a "Group," the Noteholders activities prior to the Effective Date are consistent with the policies and purposes of the Bankruptcy Code and therefore fall within the spirit of the 13(d)d exemption. *See Litzler v. CC Invs., LDC*, 411 F. Supp. 2d 411, 415-16 (S.D.N.Y. 2006) (looking to the exemption as a basis to ignore communications and conduct for efficiency that is not directed at seizing control of a company).

New York, New York                    /s/  *Paul M. Basta*
Dated:  September 18, 2009            _____
                                     Richard M. Cieri
                                     Paul M. Basta
                                     Stephen E. Hessler
                                     KIRKLAND & ELLIS LLP
                                     601 Lexington Avenue
                                     New York, New York  10022
                                     Telephone:     (212) 446-4800
                                     Facsimile:     (212) 446-4900

                                          - and -

                                     Ray C. Schrock
                                     KIRKLAND & ELLIS LLP
                                     300 North LaSalle
                                     Chicago, Illinois  60654
                                     Telephone:     (312) 862-2000
                                     Facsimile:     (312) 862-2200

                                     Counsel to the Debtors
                                     and Debtors in Possession
                                     Other than Charter Investment, Inc.

                                          - and -

                                     Albert Togut
                                     Frank A. Oswald
                                     TOGUT, SEGAL & SEGAL LLP
                                     One Penn Plaza
                                     New York, New York  10119
                                     Telephone:     (212) 594-5000
                                     Facsimile:     (212) 967-4258

                                     Counsel to the Debtor and Debtor in
                                     Possession Charter Investment, Inc.

## Exhibit B

**Debtors' Joint Plan of Reorganization Pursuant to
Chapter 11 of the United States Bankruptcy Code**

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

    - and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Counsel to the Debtors and Debtors in Possession

(other than Charter Investment, Inc.)

    - and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:        (212) 594-5000
Facsimile:        (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., <u>et al.</u>, | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**<u>PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE</u>**

Dated:  July 15, 2009

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................................1

ARTICLE I.    DEFINITIONS AND INTERPRETATION ................................................................1
    A.    Defined Terms ..................................................................................................................1
    B.    Rules of Interpretation ...................................................................................................17
    C.    Computation of Time .....................................................................................................18

ARTICLE II.    ADMINISTRATIVE AND PRIORITY CLAIMS ....................................................19
    A.    Administrative Expense Claims ....................................................................................19
    B.    Professional Compensation and Reimbursement Claims...............................................19
    C.    Priority Tax Claims .......................................................................................................19

ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS .............................................20
    **A.**    **CCI** ..............................................................................................................................20
    **B.**    **CII** ..............................................................................................................................20
    **C.**    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**...........20
    **D.**    **CCHC**.........................................................................................................................21
    **E.**    **CCH and Charter Communications Holdings Capital Corp.**...............................21
    **F.**    **CIH and CCH I Holdings Capital Corp.**................................................................21
    **G.**    **CCH I and CCH I Capital Corp.**.............................................................................21
    **H.**    **CCH II and CCH II Capital Corp.**..........................................................................22
    **I.**    **CCOH and CCO Holdings Capital Corp.**..............................................................22
    **J.**    **CCO (and its direct and indirect subsidiaries)**......................................................23

ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.......................................................24
    **A.**    **CCI** ..............................................................................................................................24
    **B.**    **CII** ..............................................................................................................................25
    **C.**    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**...........27
    **D.**    **CCHC**.........................................................................................................................28
    **E.**    **CCH and Charter Communications Holdings Capital Corp.**...............................30
    **F.**    **CIH and CCH I Holdings Capital Corp.**................................................................31
    **G.**    **CCH I and CCH I Capital Corp.**.............................................................................33
    **H.**    **CCH II and CCH II Capital Corp.**..........................................................................35
    **I.**    **CCOH and CCO Holdings Capital Corp.**..............................................................38
    **J.**    **CCO (and its direct and indirect subsidiaries)**......................................................39

ARTICLE V.    IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS;
    ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION ...................42
    A.    Classes Entitled to Vote ................................................................................................42
    B.    Classes Not Entitled to Vote; Deemed to Accept..........................................................42
    C.    Classes Not Entitled to Vote; Deemed to Reject...........................................................43
    D.    Nonconsensual Confirmation.........................................................................................44

ARTICLE VI.    PROVISIONS FOR IMPLEMENTATION OF THE PLAN.......................................45
    A.    Sources of Consideration for Plan Distributions ...........................................................45
    B.    Reorganized Company Equity Interests.........................................................................46
    C.    CII Settlement Claim .....................................................................................................47
    D.    Section 1145 Exemption ................................................................................................48
    E.    Corporate Existence ......................................................................................................48
    F.    Vesting of Assets in the Reorganized Debtors ..............................................................48
    G.    Discharge of Debtors.....................................................................................................48
    H.    Restructuring Transactions.............................................................................................49
    I.    Corporate Action...........................................................................................................49

|   | J. | Post-Effective Date Governance | 49 |
|---|---|---|---|
|   | K. | Limited Liability Company Agreement | 49 |
|   | L. | Effectuating Documents; Further Transactions | 49 |
|   | M. | Exemption from Certain Transfer Taxes and Recording Fees | 49 |
|   | N. | Board Representation | 50 |
|   | O. | Senior Management | 50 |
|   | P. | Management Incentive Plan and VCP | 50 |
|   | Q. | Employee and Retiree Benefits | 51 |
|   | R. | Creation of Professional Fee Escrow Account | 51 |
|   | S. | Preservation of Rights of Action | 51 |

**ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS ....................................52**
|   | A. | Assumption and Rejection of Executory Contracts | 52 |
|---|---|---|---|
|   | B. | Indemnification Obligations | 52 |
|   | C. | Cure of Defaults for Assumed Executory Contracts | 53 |
|   | D. | Claims Based on Rejection or Repudiation of Executory Contracts | 54 |
|   | E. | Reservation of Rights | 54 |
|   | F. | Nonoccurrence of Effective Date | 54 |

**ARTICLE VIII. PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES .................55**
|   | A. | Allowance of Claims and Interests | 55 |
|---|---|---|---|
|   | B. | Claims and Interests Administration Responsibilities | 55 |
|   | C. | Estimation of Claims and Interests | 55 |
|   | D. | Adjustment to Claims and Interests Without Objection | 55 |
|   | E. | Disallowance of Claims or Interests | 55 |
|   | F. | Offer of Judgment | 55 |
|   | G. | Amendments to Claims | 56 |

**ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS ...................................57**
|   | A. | Distributions on Account of Claims and Interests Allowed As of the Effective Date | 57 |
|---|---|---|---|
|   | B. | Distributions on Account of Claims and Interests Allowed After the Effective Date | 57 |
|   | C. | Delivery of Distributions | 57 |
|   | D. | Claims Paid or Payable by Third Parties | 59 |
|   | E. | Allocation Between Principal and Accrued Interest | 59 |

**ARTICLE X. EFFECT OF PLAN CONFIRMATION ..........................................60**
|   | A. | Discharge of Claims and Termination of Interests | 60 |
|---|---|---|---|
|   | B. | Compromise and Settlement of Claims and Controversies | 60 |
|   | C. | CCO Credit Facility | 60 |
|   | **D.** | **Releases by the Debtors** | 60 |
|   | **E.** | **Third Party Releases** | 61 |
|   | **F.** | **Injunction** | 61 |
|   | **G.** | **Exculpation** | 61 |
|   | H. | Protection Against Discriminatory Treatment | 62 |
|   | **I.** | **Setoffs and Recoupment** | 62 |
|   | **J.** | **Release of Liens** | 62 |
|   | K. | Document Retention | 62 |
|   | L. | Reimbursement or Contribution | 62 |

**ARTICLE XI. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS ..........................................................................63**
|   | A. | Professional Claims | 63 |
|---|---|---|---|
|   | B. | Other Administrative Expense Claims | 64 |

**ARTICLE XII. CONDITIONS PRECEDENT TO EFFECTIVE DATE .........................65**
|   | A. | Conditions Precedent to Effective Date | 65 |

|   |   |   |   |
|---|---|---|---|
| B. | Waiver of Conditions Precedent | .................................................................................. | 65 |
| C. | Effect of Non-Occurrence of Conditions to the Effective Date | ...................................... | 65 |

**ARTICLE XIII.  MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ....................... **67**
| A. | Modification or Amendments | .................................................................................... | 67 |
| B. | Effect of Confirmation on Modifications | .................................................................... | 67 |
| C. | Revocation or Withdrawal of Plan | ............................................................................. | 67 |

**ARTICLE XIV.  RETENTION OF JURISDICTION** ...................................................................... **68**

**ARTICLE XV.  MISCELLANEOUS PROVISIONS** ..................................................................... **70**
| A. | Immediate Binding Effect | ....................................................................................... | 70 |
| B. | Additional Documents | ............................................................................................ | 70 |
| C. | Payment of Statutory Fees | ...................................................................................... | 70 |
| D. | Reservation of Rights | ............................................................................................. | 70 |
| E. | Successors and Assigns | ........................................................................................... | 70 |
| F. | Service of Documents | ............................................................................................. | 70 |
| G. | Term of Injunctions or Stays | .................................................................................... | 71 |
| H. | Entire Agreement | .................................................................................................. | 72 |
| I. | Governing Law | ..................................................................................................... | 72 |
| J. | Exhibits | .............................................................................................................. | 72 |
| K. | Nonseverability of Plan Provisions upon Confirmation | ............................................... | 72 |
| L. | Closing of Chapter 11 Cases | ................................................................................... | 72 |
| M. | Waiver or Estoppel | ................................................................................................ | 72 |
| N. | Conflicts | ............................................................................................................. | 72 |

K&E: 15083729

# INTRODUCTION

Charter Communications, Inc. and the other debtors in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>")[1] propose the following joint plan of reorganization (the "<u>Plan</u>") for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in ARTICLE I.A of the Plan.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

# ARTICLE I.

# DEFINITIONS AND INTERPRETATION

A.      <u>Defined Terms</u>. As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires. Any term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.      "<u>Accrued Professional Compensation</u>" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses. To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.      "<u>Administrative Expense Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of retained Professionals in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.      "<u>Affiliate</u>" is as defined in section 101(2) of the Bankruptcy Code.

4.      "<u>Allen Entities</u>" means (a) Mr. Allen, (b) any Entity controlled by Mr. Allen, (c) any trust in which Mr. Allen is the grantor, (d) the estate, spouse, immediate family members and heirs of Mr. Allen, and (e) any trust created as a result of the death of Mr. Allen; <u>provided</u>, <u>however</u>, the Debtors (other than CII) shall not be Allen Entities. For the purpose of this definition, "controlled" means the direct or indirect ownership of at least fifty percent (50%) of the voting power and economic interest of such Entity.

5.      "<u>Allen Fee Reimbursement</u>" means up to $20 million for the actual out-of-pocket fees and expenses of the CII Settlement Claim Parties in connection with the proposed restructuring, without further Bankruptcy Court approval and after submission of documentation by Mr. Allen to the Reorganized Debtors (other than Reorganized CII).

6.      "<u>Allen Management Receivable</u>" means $25 million for amounts owing to CII under the Management Agreement and predecessor agreements, which shall constitute payment in full thereunder.

---

[1]      A full list of the Debtors in these Chapter 11 Cases is attached as Exhibit 1 to the Plan Supplement.

K&E: 15083729

7. "<u>Allowed</u>" means, with respect to any Claim against any Debtor, except as otherwise provided herein, any Claim listed by such Debtor in its books and records as liquidated in amount and not disputed or contingent; <u>provided</u>, that to the extent that a Claim is a Disputed Claim, the determination of whether such Claim shall be allowed and/or the amount of any such Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated, as the case may be, if the Chapter 11 Cases had not been commenced; and <u>provided</u>, <u>further</u>, the Debtors or Reorganized Debtors in their discretion may bring any objection or other motion with respect to a Disputed Claim for resolution. For the purpose of determining the amount in which a Claim is Allowed, the Debtors or Reorganized Debtors may, at their option, deduct therefrom an amount equal to the amount of any claim which the Debtors or Reorganized Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to applicable law.

8. "<u>Amended and Restated Bylaws</u>" means the bylaws of the Reorganized Company, attached as Exhibit 2 to the Plan Supplement.

9. "<u>Amended and Restated Certificate of Incorporation</u>" means the certificate of incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement.

10. "<u>Annex C</u>" means the list of Rollover Commitment Parties and related aggregate commitment amounts set forth in Annex C to the Term Sheet (and attached as Exhibit 4 to the Plan Supplement).

11. "<u>Annex D</u>" means the list of New CCH II Notes Commitment Parties and aggregate commitment amounts set forth in Annex D to the Term Sheet (and attached as Exhibit 5 to the Plan Supplement).

12. "<u>Annex E</u>" means the list of Equity Backstop Parties and aggregate commitment amounts set forth in Annex E to the Term Sheet (and attached as Exhibit 6 to the Plan Supplement).

13. "<u>Authorized Class B Holders</u>" means any of: (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; and (c) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist exclusively of Mr. Allen or such other Persons referred to in clause (b) above or a combination thereof.

14. "<u>Available Cash</u>" means, as of any date of determination, all Cash and cash equivalents on the consolidated balance sheet of the Reorganized Company and its consolidated subsidiaries, excluding any Cash collateral securing letters of credit and segregated Cash that may be used only as required by contract, statute or regulation (other than funds set aside to satisfy Specified Fees and Expenses), after giving effect to the use of proceeds described in clauses (a) through (e) of ARTICLE VI.A.1, minus the Fee Payment Threshold; <u>provided</u>, that if the Overallotment Option is exercised, the Cash proceeds of the Overallotment Option shall be deemed to be included on the balance sheet of the Reorganized Company as of the Effective Date, regardless of the actual date of funding thereof.

15. "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

16. "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

17. "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075.

18. "<u>Board of Directors</u>" means the Reorganized Company's board of directors.

19. "<u>Business Day</u>" means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

20. "<u>Cash</u>" means legal tender of the United States of America.

2

21. "Causes of Action" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

22. "CC VIII" means CC VIII, LLC.

23. "CC VIII Preferred Units" means the Class A preferred units of CC VIII.

24. "CCH" means Charter Communications Holdings, LLC.

25. "CCH Notes" means:

(a)    the 9.625% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due November 15, 2009 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(b)    the 9.92% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2011 issued pursuant to the Indenture, dated as of March 17, 1999, among CCH and Charter Communications Holdings Capital Corp., as issuers, Marcus Cable Holdings, LLC, as guarantor, and Harris Trust and Savings Bank, as trustee;

(c)    the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2009 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(d)    the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(e)    the 10.25% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(f)    the 10.75% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due October 1, 2009 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(g)    the 11.125% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(h)    the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(i)    the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

K&E: 15083729

(j)　　the 12.125% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2012 issued pursuant to the Indenture, dated as of January 14, 2002, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee; and

(k)　　the 13.50% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee.

26.　　"<u>CCH Notes Claim</u>" means any Claim against CCH and/or Charter Communications Holdings Capital Corp. by Holders of CCH Notes on account of CCH Notes.

27.　　"<u>CCH Warrants</u>" means those Warrants to be issued to Holders of CCH Notes Claims, which shall be in the form set forth in Exhibit 7 to the Plan Supplement.

28.　　"<u>CCH I</u>" means CCH I, LLC.

29.　　"<u>CCH I Notes</u>" means the 11.00% Senior Secured Notes of CCH I and CCH I Capital Corp. due 2015 issued pursuant to the Indenture, dated as of September 28, 2005, among CCH I and CCH I Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee.

30.　　"<u>CCH I Notes Claim</u>" means any Claim against a Debtor by Holders of CCH I Notes on account of CCH I Notes.

31.　　"<u>CCH II</u>" means CCH II, LLC.

32.　　"<u>CCH II Notes</u>" means:

(a)　　the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Indenture, dated as of September 23, 2003, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(b)　　the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the First Supplemental Indenture, dated as of January 30, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(c)　　the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Second Supplemental Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(d)　　the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee; and

(e)　　the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the First Supplemental Indenture, dated as of July 2, 2008, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee.

33.　　"<u>CCH II Notes Claim</u>" means any Claim against a Debtor by Holders of CCH II Notes on account of CCH II Notes.

34.　　"<u>CCHC</u>" means CCHC, LLC.

35.     "CCHC Note" means the 14% Subordinated Accreting Note, dated as of October 31, 2005, issued by CCHC in favor of CII.

36.     "CCI" means Charter Communications, Inc.

37.     "CCI-CII Exchange Agreement" means the exchange agreement, dated as of November 12, 1999, by and among CCI, CII, Vulcan Cable III Inc. and Mr. Allen.

38.     "CCI Notes" means:

        (a)     the 5.875% Convertible Senior Notes of CCI due 2009 issued pursuant to the Indenture, dated as of November 22, 2004, among CCI and Wells Fargo Bank, N.A., as trustee; and

        (b)     the 6.50% Convertible Senior Notes of CCI due 2027 issued pursuant to the Indenture, dated as of October 2, 2007, among CCI and The Bank of New York Trust Company, N.A., as trustee.

39.     "CCI Notes Claim" means any Claim against CCI by Holders of CCI Notes on account of CCI Notes.

40.     "CCO" means Charter Communications Operating, LLC.

41.     "CCO Credit Facility" means the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated on March 6, 2007, among CCO, CCOH, the several banks and other financial institutions or entities from time to time parties thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A. and Bank of America, N.A., as syndication agents, Citicorp North America, Inc., Deutsche Bank Securities Inc., General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as revolving facility co-documentation agents, and Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as term facility co-documentation agents.

42.     "CCO Credit Facility Claim" means any Claim against CCO and any other obligors under the CCO Credit Facility by Holders of the obligations under the CCO Credit Facility.

43.     "CCO Notes" means:

        (a)     the 8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2012 and the 8 3/8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2014 issued pursuant to the Indenture, dated as of April 27, 2004, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wells Fargo Bank, N.A., as trustee; and

        (b)     the 10.875% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due September 15, 2014 issued pursuant to the Indenture, dated as of March 19, 2008, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wilmington Trust Company, as trustee.

44.     "CCO Notes Claim" means any Claim against CCO, Charter Communications Operating Capital Corp., and any other obligors under the CCO Notes by Holders of CCO Notes on account of the CCO Notes.

45.     "CCO Swap Agreements" means interest rate swaps entered into under ISDA Master Agreements with counterparties who were at the time of the relevant transaction lenders or affiliates of lenders under the CCO Credit Facility and which constitute Specified Hedge Agreements under the CCO Credit Facility and that share in the collateral pledged to the CCO Credit Facility lenders.

46.     "CCO Swap Agreements Claim" means any Claim against CCO by counterparties to CCO Swap Agreements on account of CCO Swap Agreements.

47. "CCOH" means CCO Holdings, LLC.

48. "CCOH Credit Facility" means the Credit Agreement, dated as of March 6, 2007, among CCOH, the several banks and other financial institutions or entities from time to time parties thereto, Bank of America, N.A., as administrative agent, Banc of America Securities LLC and J.P. Morgan Securities Inc., as co-syndication agents, and Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc., as co-documentation agents.

49. "CCOH Credit Facility Claim" means any Claim against CCOH and any other obligors under the CCOH Credit Facility by Holders of the obligations under the CCOH Credit Facility.

50. "CCOH Notes" means the 8.75% Senior Notes of CCOH and CCO Holdings Capital Corp. due November 15, 2013 issued pursuant to the Indenture, dated as of November 10, 2003, among CCOH and CCO Holdings Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee.

51. "CCOH Notes Claim" means any Claim against CCOH and/or CCO Holdings Capital Corp. by Holders of CCOH Notes on account of CCOH Notes Claims.

52. "CEO" means the Reorganized Company's Chief Executive Officer.

53. "Certificate" means any instrument evidencing a Claim or an Interest.

54. "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases for all of the Debtors.

55. "CIH" means CCH I Holdings, LLC.

56. "CIH Notes" means the following notes issued pursuant to the Indenture, dated as of September 28, 2005, among CIH and CCH I Holdings Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee:

> (a) 9.920% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due April 1, 2014;

> (b) 10.00% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

> (c) 11.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014;

> (d) 11.75% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

> (e) 12.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2015; and

> (f) 13.50% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014.

57. "CIH Notes Claim" means any Claim against a Debtor by Holders of CIH Notes on account of CIH Notes.

58. "CIH Warrants" means those Warrants issued to Holders of CIH Notes Claims, the terms of which shall be set forth on Exhibit 8 to the Plan Supplement.

K&E: 15083729

59.     "CII" means Charter Investment, Inc.

60.     "CII Settlement Claim" means any Claim or Interest held by a CII Settlement Claim Party on the Effective Date against or in a Debtor (other than CII), which

(a)     includes:

(i)     28,467,421 shares of Class A Common Stock of CCI (unless disposed of prior to the Effective Date, subject to the restrictions on transfer in any order of the Bankruptcy Court);

(ii)    10,000 vested options to acquire shares of Class A Common Stock of CCI;

(iii)   50,000 shares of Class B Common Stock of CCI;

(iv)    324,300,479 Class A Common Units of Holdco;

(v)     14,831,552 Class C Common Units of Holdco;

(vi)    rights under the CCI-CII Exchange Agreement;

(vii)   all Interests with respect to 7,282,183 CC VIII Preferred Units;

(viii)  the CCHC Note;

(ix)    accrued and unpaid management fees owing to CII under the Management Agreement;

(x)     rights under a letter agreement, dated as of September 21, 1999, by and among Vulcan Ventures Inc. (an entity controlled by Mr. Allen), CCI, CII, and Holdco, which would have granted Vulcan Ventures Inc. exclusive rights for carriage of up to eight digital channels of each of the Debtors' (other than CII) cable systems ;

(xi)    rights under that certain consulting agreement, dated as of March 10, 1999, by and among Vulcan Inc. (an entity controlled by Mr. Allen), CCI, and CCH, which provides for payment of a fee to Vulcan Inc. for assistance with acquisitions made by CCI or CCH; and

(xii)   any other Claim or Interest held by a CII Settlement Claim Party, including any rejection damages Claims, other than Claims and Executory Contracts specifically or categorically listed in clause (b) of this definition; but

(b)     excludes:

(i)     $70,650,000 principal amount of 9.920% Senior Discount Notes due 2014 (CUSIP No. 12501BAP9), $25,982,000 principal amount of 10.000% Senior Discount Notes due 2014 (CUSIP No. 12501BAQ7), and $55,140,000 principal amount of 11.750% Senior Discount Notes due 2014 (CUSIP No. 12501BAR5), issued by CIH and CCH I Holdings Capital Corp.;

(ii)    $47,278,000 principal amount of 11.000% Senior Notes due 2015 (CUSIP No. 12502BAE3), issued by CCH I and CCH I Capital Corp.;

(iii)   any Executory Contract to which Digeo, Inc., Digeo Interactive, LLC, or any of their subsidiaries is a party;

(iv)    the Indemnification Agreement by and between Mr. Allen and CCI, dated as of September 15, 2008; the Indemnification Agreement by and between Jo Allen Patton and CCI, dated as of

K&E: 15083729

September 15, 2008; and the Indemnification Agreement by and between W. Lance Conn and CCI, dated as of September 15, 2008;

          (v)      any Executory Contract between the Debtors (other than CII) and a CII Settlement Party that the Debtors assume, in consultation the Requisite Holders, which assumed Executory Contracts (if any) shall be listed on an Exhibit to the Plan Supplement; and

          (vi)      any payment due for goods or services provided by a CII Settlement Party to the Debtors (other than CII) between February 11, 2009 and the Effective Date.

61.      "CII Settlement Claim Party" means:  (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; (c) any trust in which Mr. Allen is the grantor or which is created as a result of his death; (d) CII; and (e) any other Allen Entity which Mr. Allen or any of the other persons or Entities identified in clauses (a) through (d) of this definition, unilaterally or together with any other Allen Entity (directly or through agents), can legally bind to a settlement, compromise and release of Claims and Interests against the applicable Debtors under the Plan without authorization, consent or approval of any other person or Entity; provided, however, that in no event shall "CII Settlement Claim Party" include any public company, including without limitation, any Entity that has securities listed, quoted or traded on any securities exchange.

62.      "CII Settlement Claim Warrants" means those warrants issued to Mr. Allen (or his designees) to purchase shares of New Class A Stock in an aggregate amount equal to 4% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of warrants and equity-based awards provided for by the Plan, the remaining terms of which are set forth on Exhibit 9 to the Plan Supplement.

63.      "CII Shareholder Claim" means any Claim against CII held by Mr. Allen.

64.      "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

65.      "Claims Register" means the official register of Claims and Interests maintained by the Notice, Claims and Solicitation Agent.

66.      "Class" means any group of substantially similar Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

67.      "Collateral" means any property or interest in property of the estates of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

68.      "Commitment Fees" means the aggregate of the Equity Backstop Fee, the Rollover Fee, and the New CCH II Notes Commitment Fee.

69.      "Commitment Letters" means the letters executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the New CCH II Notes Commitment Parties, on the other hand (attached as Exhibit 10 to the Plan Supplement).

70.      "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

71.      "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

72.      "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

73. "<u>Confirmation Hearing Notice</u>" means the notice of the Confirmation Hearing that sets forth in detail the voting and objection deadlines with respect to the Plan.

74. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

75. "<u>COO</u>" means the Reorganized Company's Chief Operating Officer.

76. "<u>Creditor</u>" means any Holder of a Claim.

77. "<u>Creditors' Committee</u>" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the United States Trustee for the Southern District of New York on April 10, 2009 [Docket No. 136], with such additions and changes as may occur from time to time.

78. "<u>Crossover Committee</u>" means the members of the unofficial committee of unaffiliated holders of CCH I Notes and CCH II Notes.

79. "<u>Cure</u>" means the payment of Cash by the Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the applicable Executory Contract may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract of the Debtors and (b) permit the Debtors to assume such Executory Contract under section 365(a) of the Bankruptcy Code.

80. "<u>Cure Bar Date</u>" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption of the applicable Executory Contract, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract.

81. "<u>D&O Liability Insurance Policies</u>" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Petition Date.

82. "<u>Debt Registration Rights Agreement</u>" means the registration rights agreement between Reorganized CCH II, on the one hand, and certain holders of New CCH II Notes, on the other hand, attached as Exhibit 11 to the Plan Supplement.

83. "<u>Debtor</u>" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

84. "<u>Disclosure Statement</u>" means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

85. "<u>Disputed Claim</u>" means any Claim against or Interest in any Reorganized Debtor which such Reorganized Debtor believes is unliquidated, disputed or contingent, and which has not been allowed by Final Order of a court of competent jurisdiction or by agreement with such Reorganized Debtor.

86. "<u>Distribution Agent</u>" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors to make or to facilitate distributions pursuant to the Plan.

87. "<u>Distribution Date</u>" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten days after the Effective Date, without further Bankruptcy Court order.

88. "<u>Effective Date</u>" means the date that all conditions to the effectiveness of the Plan have been satisfied or waived.

K&E: 15083729

89. "<u>Eligible CCH I Notes Claim Holder</u>" means each Holder of a CCH I Notes Claim on the Rights Offering Record Date and any transferee of such Holder's Rights as permitted under the Rights Offering Documents, in each case that is a qualified institutional buyer as defined in Rule 144A under the Securities Act or an accredited investor as defined in Rule 501 under the Securities Act and who has timely delivered an investor certificate certifying to that effect.

90. "<u>Employment Agreements</u>" means the employment agreements attached as Exhibit 12 to the Plan Supplement.

91. "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

92. "<u>Equity Backstop</u>" means the obligations, several and not joint, of the Equity Backstop Parties (in the respective amounts set forth on Annex E), as described in ARTICLE IV.G.4(c)(iii) of the Plan and the Commitment Letters.

93. "<u>Equity Backstop Fee</u>" means the aggregate Equity Backstop commitment fee for the use of capital set forth in the Commitment Letters.

94. "<u>Equity Backstop Parties</u>" means the members of the Crossover Committee who have agreed, pursuant to their respective Commitment Letters, to provide the Equity Backstop.

95. "<u>Equity Registration Rights Agreement</u>" means the registration rights agreement between Reorganized CCI, on the one hand, and certain holders of New Common Stock, on the other hand, attached as Exhibit 13 to the Plan Supplement.

96. "<u>Estate</u>" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

97. "<u>Excess Backstop</u>" means the obligations, several and not joint, of the Excess Backstop Parties, as described in ARTICLE IV.G.4(c)(iv) of the Plan, the Commitment Letters, and the Excess Backstop Agreement.

98. "<u>Excess Backstop Agreement</u>" means the excess backstop agreement executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the Excess Backstop Parties, on the other hand (attached as Exhibit 14 to the Plan Supplement).

99. "<u>Excess Backstop Party</u>" means each Equity Backstop Party who committed to an Equity Backstop in excess of the dollar amount corresponding to its Pro Rata Participation Amount, the aggregate of which is set forth on Annex E.

100. "<u>Exchange</u>" means the exchange by existing Holders of CCH II Notes for New CCH II Notes, as described in ARTICLE IV.A.4(c)(i).

101. "<u>Exchange Cutback</u>" means, with respect to any existing Holder of CCH II Notes electing to participate in the Exchange, the potential reduction of such Holder's participation in the Exchange, as described in the treatment section for Class H-4 of the Plan.

102. "<u>Executory Contract</u>" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

103. "<u>Exculpated Parties</u>" means the Debtors, each party who signed a Plan Support Agreement, and the Creditors' Committee, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives.

104. "<u>Federal Judgment Rate</u>" means the federal judgment rate in effect on the Petition Date.

105.    "Fees" means the reasonable fees, costs or charges provided for under the applicable agreement.

106.    "Fee Payment Threshold" means $600 million minus the sum of (i) any Cash payment of interest made during the Chapter 11 Cases on the CCH II Notes that are exchanged for New CCH II Notes pursuant to the Exchange and (ii) any prepayment of indebtedness for borrowed money or Cash redemption payment for New Preferred Stock after the Effective Date.

107.    "File" means to file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of a Proof of Claim or Interest, to file with the Notice, Claims and Solicitation Agent.

108.    "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

109.    "General Unsecured Claim" means any and all Claims against any of the Debtors that are not a/an (a) Administrative Expense Claim; (b) Professional Compensation and Reimbursement Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; (e) Secured Claim; (f) Section 510(b) Claim; (g) CCI Notes Claim; (h) CII Settlement Claim; (i) CII Shareholder Claim; (j) Holdco Notes Claim; (k) CCH Notes Claim; (l) CIH Notes Claim; (m) CCH I Notes Claim; (n) CCH II Notes Claim; (o) CCOH Credit Facility Claim; (p) CCOH Notes Claim; (q) CCO Credit Facility Claim; (r) CCO Swap Agreements Claim; (s) CCO Notes Claim; or (t) Interest.

110.    "Holdco" means Charter Communications Holding Company, LLC.

111.    "Holdco LLC Agreement" means the Amended and Restated Limited Liability Company Agreement for Holdco, a Delaware limited liability company, made and entered into effective as of August 31, 2001.

112.    "Holdco Notes" means:

        (a)    the 5.875% Mirror Convertible Senior Note of Holdco due November 16, 2009 issued pursuant to the Holdco Mirror Notes Agreement, dated as of November 22, 2004, between CCI and Holdco; and

        (b)    the 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco.

113.    "Holdco Notes Claim" means any Claim against Holdco by the Holder of Holdco Notes on account of Holdco Notes.

114.    "Holder" means an Entity holding a Claim or Interest, as applicable.

115.    "Impaired" means Claims in an Impaired Class.

116.    "Impaired Class" means an Impaired Class within the meaning of section 1124 of the Bankruptcy Code.

117.    "Incentive Program" means the Charter Communications, Inc. Incentive Program under the 2001 Stock Incentive Plan to provide incentives to certain management employees.

118.    "Indemnification Obligation" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, or employees of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

119.    "Interest" means any (a) equity Security in a Debtor, including all issued, unissued, authorized or outstanding shares of stock together with any Warrants, equity-based awards or contractual rights to purchase or acquire such equity Securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company or similar interest in a Debtor.

120.    "Interim Compensation Order" means the order entered pursuant to the Debtors' Motion for an Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, Filed on or about the Petition Date.

121.    "Key Executives" means the Chief Financial Officer, Chief Marketing Officer, Chief Technology Officer, General Counsel & Corporate Secretary, Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division.

122.    "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

123.    "Litigation Settlement Fund Proceeds" means the $26,428,089 in litigation settlement proceeds (after fees and expenses) being held in escrow pursuant to the February 10, 2009 Escrow Agreement by and among CCI, Holdco, CCH, CC V Holdings, LLC, CCO, and Wilmington Trust FSB (as escrow agent).

124.    "Local Bankruptcy Rules" means the Local Bankruptcy Rules for the Southern District of New York.

125.    "Lock-Up Agreement" means the lock-up agreement between the Reorganized Company and Mr. Allen (attached as Exhibit 15 to the Plan Supplement).

126.    "Management Agreement" means the Amended and Restated Management Agreement, dated as of June 19, 2003, between CCO and CCI.

127.    "Management Incentive Plan" means the stock incentive plan, attached as Exhibit 25 to the Plan Supplement, adopted by the CCI Board of Directors in 2009, that provides for grants of various awards, including but not limited to: nonqualified stock options, incentive stock options, stock appreciation rights, dividend equivalent rights, performance units and performance shares, share awards, phantom stock, restricted stock units and restricted stock, cash payments or any combination of the above.  The Management Incentive Plan will include, among other things, an allocation of equity-based awards representing no less than 3% of the fully diluted New Common Stock outstanding on the Effective Date, after giving effect to the Rights Offering and the issuance of warrants, 50% of which will be distributed as determined by the Board of Directors no later than one month after the Effective Date.

128.    "Mr. Allen" means Paul G. Allen.

129.    "Mutual Services Agreement" means the Second Amended and Restated Mutual Services Agreement, dated as of June 19, 2003, between CCI and Holdco.

130.    "Net Proceeds" means the aggregate total Cash proceeds from the issuance of New CCH II Notes pursuant to the New CCH II Notes Commitment (if any), the Rights Offering and the Overallotment Option (if exercised).

131.    "New CCH II Notes" means the new 13.5% Senior Notes of CCH II and CCH II Capital Corp. to be issued pursuant to a new indenture in the form of Exhibit 16 to the Plan Supplement.

132.     "New CCH II Notes Commitment" means the agreement by a New CCH II Notes Commitment Party in its Commitment Letter.

133.     "New CCH II Notes Commitment Fee" means the Fee payable to the New CCH II Commitment Parties with respect to the New CCH II Notes Commitment, as set forth in the Commitment Letters.

134.     "New CCH II Notes Commitment Parties" means the members of the Crossover Committee listed on Annex D.

135.     "New Class A Stock" means the new Class A common stock, par value $.001 per share, of the Reorganized Company.

136.     "New Class B Stock" means the new Class B common stock, par value $.001 per share, of the Reorganized Company.

137.     "New Common Stock" means, collectively, the New Class A Stock and New Class B Stock.

138.     "New Preferred Stock" means the Reorganized Company's Series A 15% Pay-in-Kind Preferred Stock, the terms of which are set forth on Exhibit A to the Amended and Restated Certificate of Incorporation.

139.     "New Value Consideration" means consideration contributed (directly or indirectly) by CCI in exchange for Interests in certain Debtors remaining in place.

140.     "New Value Interest" means interests in certain Reorganized Debtors purchased for Cash or other consideration, as provided for in the Plan.

141.     "Non-Released Parties" means those Entities (other than Releasing Parties) identified in the Plan Supplement as Non-Released Parties.

142.     "Notice, Claims and Solicitation Agent" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' notice, claims and solicitation agent.

143.     "Overallotment Option" means the option offered to the Excess Backstop Parties to purchase additional shares of New Class A Stock pursuant to the Excess Backstop Agreement in an aggregate amount equal to $400 million less the aggregate dollar amount of shares purchased pursuant to the Excess Backstop.

144.     "Per Share Purchase Price" means the Cash payment per share, reflecting a discount of 25% to the Plan Value minus the Warrant Value per share, to be paid by each participant in the Rights Offering and the Overallotment Option.

145.     "Periodic Distribution Date" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediately preceding Periodic Distribution Date.

146.     "Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

147.     "Petition Date" means the date on which the Debtors Filed their voluntary petitions commencing these Chapter 11 Cases in the Bankruptcy Court.

148.     "Plan" means this joint plan of reorganization, including the exhibits hereto or contained in the Plan Supplement.

K&E: 15083729

149.    "Plan Support Agreement" means restructuring agreements, dated as of February 11, 2009, between certain Debtors (other than CII), on the one hand, and certain Holders of Claims, on the other hand.

150.    "Plan Supplement" means the compilation of documents and forms of documents and exhibits to the Plan Filed herewith, as supplemented or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

151.    "Plan Value" means $665 million.

152.    "Post-Petition Interest" means with respect to:

   (a)    the CCO Credit Facility, accrued and unpaid interest pursuant to the CCO Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

   (b)    the CCO Swap Agreements, accrued and unpaid interest pursuant to the applicable ISDA Master Agreements from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

   (c)    the CCO Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

   (d)    the CCOH Credit Facility, accrued and unpaid interest pursuant to the CCOH Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

   (e)    the CCOH Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

   (f)    the CCH II Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

   (g)    Secured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such Claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date; and

   (h)    General Unsecured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date, to the extent entitled thereto.

153.    "Priority Non-Tax Claims" means any and all Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

154.    "Priority Tax Claims" mean any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

155.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in that particular Class and in other Classes entitled to share in the same recovery as such Allowed Claims under the Plan.

156. "Pro Rata Participation Amount" means, with respect to each Eligible CCH I Notes Claim Holder, an amount expressed in shares of New Class A Stock equal to the product of (a) the aggregate number of shares of New Class A Stock underlying Rights offered to all Eligible CCH I Notes Claim Holders multiplied by (b) a fraction, the numerator of which is the principal amount of CCH I Notes Claims held by such Eligible CCH I Notes Claim Holder, and the denominator of which is the principal amount of CCH I Notes Claims held by all Eligible CCH I Notes Claim Holders.

157. "Professional" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

158. "Professional Compensation and Reimbursement Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

159. "Professional Fee Escrow Account" means an interest-bearing account in an amount equal to any Professional fee reserve amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Professionals in the Chapter 11 Cases.

160. "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

161. "Rejection Damages Claim" means any Claim on account of the rejection of an Executory Contract pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

162. "Releasing Parties" means (a) the Debtors, (b) the parties who signed Plan Support Agreements with a Debtor, and (c) any statutory committees appointed in the Chapter 11 Cases.

163. "Reorganized CCH I" means CCH I after the Effective Date.

164. "Reorganized CCH II" means CCH II after the Effective Date.

165. "Reorganized CCO" means CCO after the Effective Date.

166. "Reorganized CII" means CII after the Effective Date.

167. "Reorganized Company" or "Reorganized CCI" means CCI after the Effective Date.

168. "Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

169. "Reorganized Holdco" means Holdco after the Effective Date.

170. "Reorganized Holdco Exchange Agreement" means the exchange agreement among CCI, CII, Holdco and Mr. Allen, attached as Exhibit 17 to the Plan Supplement.

171. "Reorganized Holdco LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of Reorganized Holdco, attached as Exhibit 18 to the Plan Supplement.

172. "Requisite Holders" means the members of the Crossover Committee holding a majority in principal amount of the CCH I Notes held by all members of the Crossover Committee.

173. "Rights" means the rights to purchase New Class A Stock, as described in ARTICLE G.4(c)(ii).

K&E: 15083729

174.    "Rights Offering" means the transaction described in ARTICLE IV.G.4(c), the terms of which are set forth in the Rights Offering Documents, including without limitation the issuance of shares to certain Holders of CCH I Notes Claims who are not Eligible CCH I Notes Claim Holders.

175.    "Rights Offering Amount" means an amount equal to (a) $1.623 billion minus (b) the excess, if any, of $450 million over the amount of the CCO Swap Agreements Claims.

176.    "Rights Offering Documents" means the documents evidencing the offer and procedures for the Rights Offering, which procedures shall be approved in connection with the Bankruptcy Court's approval of the Disclosure Statement and are attached as Exhibit 19 to the Plan Supplement.

177.    "Rights Offering Record Date" means April 17, 2009, 12 days prior to the date for which the Disclosure Statement hearing was originally scheduled.

178.    "Rollover Commitment" means the commitment of the Rollover Commitment Parties.

179.    "Rollover Commitment Parties" means the members of the Crossover Committee listed on Annex C.

180.    "Rollover Fee" means an aggregate commitment fee for the use of capital, payable in Cash, in an amount equal to 1.5% of the principal amount plus interest on CCH II Notes exchanged by such Holder pursuant to the Exchange, as consideration for participating in the Exchange.

181.    "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

182.    "Section 510(b) Claims" means any Claim arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

183.    "Secured Claim" means, with respect to any Claim against any Debtor—other than CCO Credit Facility Claims, CCO Swap Agreements Claims, CCO Notes Claims, CCOH Credit Facility Claims, and CCH I Notes Claims—that portion, which, pursuant to section 506 of the Bankruptcy Code is (a) secured by a valid, perfected, and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).

184.    "Securities Act" means the Securities Act of 1933, as amended.

185.    "Security" means any instrument that qualifies under section 2(a)(1) of the Securities Act.

186.    "Servicer" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

187.    "Specified Fees and Expenses" means the Allen Management Receivable, the Allen Fee Reimbursement, the Commitment Fees, and payments due under the VCP.

188.    "Target Amount" means $1.477 billion, plus accrued but unpaid interest to the Petition Date plus Post-Petition Interest on exchanged CCH II Notes, but excluding any call premiums or any prepayment penalties.

189.    "Term Sheet" means the term sheet attached to the Plan Support Agreements and the Commitment Letters, to which CCI, among others, is a party, dated as of February 11, 2009.

K&E: 15083729

190.    "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

191.    "Unimpaired" has the meaning set forth in section 1124 of the Bankruptcy Code.

192.    "VCP" means the Value Creation Plan adopted by CCI on March 12, 2009 and attached as Exhibit 20 to the Plan Supplement.

193.    "Warrant Value" means $53 million, subject to update upon Confirmation and with the consent of the Requisite Holders.

194.    "Warrants" means, collectively, the CIH Warrants, the CCH Warrants and the CII Settlement Claim Warrants.

B.    Rules of Interpretation.  For purposes of the Plan:

1.    whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender;

2.    unless otherwise specified, any reference in the Plan or Plan Supplement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, except that any contract, instrument, release, indenture, or other agreement or document attached as an exhibit to the Plan Supplement shall be in the form attached, subject to technical amendments prior to the Effective Date to correct ambiguities, inconsistencies or errors, as applicable;

3.    unless otherwise specified, any reference in the Plan to an existing document or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented in accordance with its terms;

4.    any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

5.    unless otherwise specified, all references in the Plan to ARTICLES are references to ARTICLES of the Plan;

6.    unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement;

7.    the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

8.    subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

9.    captions and headings of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

17

10.     unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

11.     any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

12.     all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

13.     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and

14.     any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order.

C.     <u>Computation of Time</u>:  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

K&E: 15083729

# ARTICLE II.

## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III. Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim designated in this ARTICLE II.

A.      Administrative Expense Claims.  Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of the Distribution Date under the Plan, the date such Administrative Expense Claim is Allowed, and the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

B.      Professional Compensation and Reimbursement Claims.  Except as provided in ARTICLE II.A hereof, all Entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

C.      Priority Tax Claims.  Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; or (2) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court.

K&E: 15083729

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim or Interest designated in this ARTICLE III.

A.    **CCI**

1.    **Class A-1** shall consist of all Priority Non-Tax Claims that may exist against CCI.

2.    **Class A-2** shall consist of all Secured Claims that may exist against CCI.

3.    **Class A-3** shall consist of all General Unsecured Claims that may exist against CCI.

4.    **Class A-4** shall consist of CCI Notes Claims.

5.    **Class A-5** shall consist of all Section 510(b) Claims that may exist against CCI other than all 510(b) Claims against CCI held by any CII Settlement Claim Party.

6.    **Class A-6** shall consist of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

B.    **CII**

1.    **Class B-1** shall consist of all Priority Non-Tax Claims that may exist against CII.

2.    **Class B-2** shall consist of all Secured Claims that may exist against CII.

3.    **Class B-3** shall consist of all General Unsecured Claims that may exist against CII.

4.    **Class B-4** shall consist of CII Shareholder Claims.

C.    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**

1.    **Class C-1** shall consist of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

2.    **Class C-2** shall consist of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

3.    **Class C-3** shall consist of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

4.    **Class C-4** shall consist of Holdco Notes Claims.

5.    **Class C-5** shall consist of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

6.    **Class C-6** shall consist of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

K&E: 15083729

D.      **CCHC**

    1.      **Class D-1** shall consist of all Priority Non-Tax Claims that may exist against CCHC.

    2.      **Class D-2** shall consist of all Secured Claims that may exist against CCHC.

    3.      **Class D-3** shall consist of all General Unsecured Claims that may exist against CCHC.

    4.      **Class D-4** shall consist of all Section 510(b) Claims that may exist against CCHC.

    5.      **Class D-5** shall consist of all Interests in CCHC.

E.      **CCH and Charter Communications Holdings Capital Corp.**

    1.      **Class E-1** shall consist of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    2.      **Class E-2** shall consist of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    3.      **Class E-3** shall consist of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    4.      **Class E-4** shall consist of CCH Notes Claims.

    5.      **Class E-5** shall consist of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    6.      **Class E-6** shall consist of all Interests in CCH and Charter Communications Holdings Capital Corp.

F.      **CIH and CCH I Holdings Capital Corp.**

    1.      **Class F-1** shall consist of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

    2.      **Class F-2** shall consist of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    3.      **Class F-3** shall consist of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    4.      **Class F-4** shall consist of CIH Notes Claims.

    5.      **Class F-5** shall consist of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

    6.      **Class F-6** shall consist of all Interests in CIH and CCH I Holdings Capital Corp.

G.      **CCH I and CCH I Capital Corp.**

    1.      **Class G-1** shall consist of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

K&E: 15083729

2. **Class G-2** shall consist of all Secured Claims that may exist against CCH I and CCH I Capital Corp.

3. **Class G-3** shall consist of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

4. **Class G-4** shall consist of CCH I Notes Claims.

5. **Class G-5** shall consist of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

6. **Class G-6** shall consist of all Interests in CCH I and CCH I Capital Corp.

H. **CCH II and CCH II Capital Corp.**

1. **Class H-1** shall consist of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

2. **Class H-2** shall consist of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

3. **Class H-3** shall consist of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

4. **Class H-4** shall consist of CCH II Notes Claims.

5. **Class H-5** shall consist of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

6. **Class H-6** shall consist of all Interests in CCH II and CCH II Capital Corp.

I. **CCOH and CCO Holdings Capital Corp.**

1. **Class I-1** shall consist of CCOH Credit Facility Claims.

2. **Class I-2** shall consist of CCOH Notes Claims.

3. **Class I-3** shall consist of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

4. **Class I-4** shall consist of all Secured Claims that may exist against CCOH and CCO Holdings Capital Corp.

5. **Class I-5** shall consist of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

6. **Class I-6** shall consist of all Interests in CCOH and CCO Holdings Capital Corp.

**J.      CCO (and its direct and indirect subsidiaries)**

The classifications set forth in Classes J-4 to J-9 shall be deemed to apply to CCO and each of its direct and indirect subsidiaries.[2]

      1.     **Class J-1** shall consist of CCO Credit Facility Claims.

      2.     **Class J-2** shall consist of CCO Swap Agreements Claims.

      3.     **Class J-3** shall consist of CCO Notes Claims.

      4.     **Class J-4** shall consist of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

      5.     **Class J-5** shall consist of all Secured Claims that may exist against CCO and its direct and indirect subsidiaries.

      6.     **Class J-6** shall consist of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries.

      7.     **Class J-7** shall consist of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

---

[2]    For the avoidance of doubt, Classes J-4 to J-7 shall apply to the Debtors listed on Exhibit 21 to the Plan Supplement.

K&E: 15083729

# ARTICLE IV.

## TREATMENT OF CLAIMS AND INTERESTS

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below. For the avoidance of doubt, notwithstanding any other provision of the Plan, (a) CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan and (b) the Debtors other than CII shall not be liable for any payment or distributions on account of Claims, Interest of amounts to be paid or owing by or other obligations of any kind of CII under or in connection with the Plan (other than the CII Settlement Claim).

## A.   CCI

### 1.   Class A-1:  Priority Non-Tax Claims

(a)   <u>Classification</u>.  Class A-1 consists of all Priority Non-Tax Claims that may exist against CCI.

(b)   <u>Impairment and Voting</u>.   Class A-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)   <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 2.   Class A-2:  Secured Claims

(a)   <u>Classification</u>.  Class A-2 consists of all Secured Claims that may exist against CCI.

(b)   <u>Impairment and Voting</u>.  Class A-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)   <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCI shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCI shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3.   Class A-3:  General Unsecured Claims

(a)   <u>Classification</u>.  Class A-3 consists of all General Unsecured Claims that may exist against CCI other than all General Unsecured Claims against CCI held by any CII Settlement Claim Party.

(b)   <u>Impairment and Voting</u>.  Class A-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCI is entitled to vote to accept or reject the Plan.

(c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCI shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

  **4.** **Class A-4:  CCI Notes Claims**

  (a) <u>Classification</u>.  Class A-4 consists of all CCI Notes Claims.

  (b) <u>Impairment and Voting</u>.  Class A-4 is Impaired by the Plan.  Each Holder of an Allowed CCI Notes Claim is entitled to vote to accept or reject the Plan.

  (c) <u>Distributions</u>.  The CCI Notes Claims shall be deemed Allowed in the aggregate amount of $497,489,463.  On the Distribution Date, each Holder of an Allowed CCI Notes Claim shall receive its Pro Rata share of (i) New Preferred Stock and (ii) Cash in an aggregate amount equal to (A) $24,549,331 and (B) Litigation Settlement Fund Proceeds in an aggregate amount, if any, that the Bankruptcy Court determines is owned by CCI and Holdco.

  **5.** **Class A-5:  Section 510(b) Claims**

  (a) <u>Classification</u>.  Class A-5 consists of all Section 510(b) Claims that may exist against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party.

  (b) <u>Impairment and Voting</u>.  Class A-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

  (c) <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

  **6.** **Class A-6:  Interests**

  (a) <u>Classification</u>.  Class A-6 consists of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

  (b) <u>Impairment and Voting</u>.  Class A-6 is Impaired by the Plan.  Each Holder of an Interest in CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

  (c) <u>Distributions</u>.  Interests in CCI, whether represented by stock, preferred share purchase rights or otherwise, shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

**B.** **CII**

  **1.** **Class B-1:  Priority Non-Tax Claims**

  (a) <u>Classification</u>.  Class B-1 consists of all Priority Non-Tax Claims that may exist against CII.

  (b) <u>Impairment and Voting</u>.  Class B-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

K&E: 15083729

(c)     Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date under the Plan, the date such Priority Non-Tax Claim is Allowed, and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.     Class B-2:  Secured Claims**

(a)     Classification.  Class B-2 consists of all Secured Claims that may exist against CII.

(b)     Impairment and Voting.  Class B-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of CII, (i) each Allowed Secured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CII shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CII shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.     Class B-3:  General Unsecured Claims**

(a)     Classification.  Class B-3 consists of all General Unsecured Claims that may exist against CII.

(b)     Impairment and Voting.  Class B-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CII is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the applicable Debtors, (i) each Allowed General Unsecured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CII shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.     Class B-4:  CII Shareholder Claims**

(a)     Classification.  Class B-4 consists of CII Shareholder Claims.

(b)     Impairment and Voting.  Class B-4 is Impaired by the Plan.  The Holder of an Allowed CII Shareholder Claim is entitled to vote to accept or reject the Plan.

(c)     Distributions.  The Holder of Allowed CII Shareholder Claims shall receive 100,000 newly issued shares of Class A Voting Common Stock of Reorganized CII on the Effective Date.

K&E: 15083729

## C.    Holdco, Enstar Communications Corporation, and Charter Gateway, LLC

### 1.    Class C-1:  Priority Non-Tax Claims

(a)    Classification.  Class C-1 consists of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 2.    Class C-2:  Secured Claims

(a)    Classification.  Class C-2 consists of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3.    Class C-3:  General Unsecured Claims

(a)    Classification.  Class C-3 consists of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of

an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.      Class C-4:  Holdco Notes Claims**

(a)      _Classification_.  Class C-4 consists of Holdco Notes Claims.

(b)      _Impairment and Voting_.  Class C-4 is Impaired by the Plan.  Each Holder of an Allowed Holdco Notes Claim is entitled to vote to accept or reject the Plan.

(c)      _Distributions_.  The Holdco Notes Claims shall be Allowed in the aggregate amount of $497,489,463.  The aggregate amount distributed under the Plan on account of Class C-4 Allowed Holdco Notes Claims shall be Cash in an amount equal to (i) $19,549,331 and (ii) Litigation Settlement Fund Proceeds in an aggregate amount, if any, that the Bankruptcy Court determines is owned by Holdco, which consideration shall be distributed as set forth in Class A-4 as CCI is the sole Holder of Holdco Notes Claims.

**5.      Class C-5:  Section 510(b) Claims**

(a)      _Classification_.  Class C-5 consists of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)      _Impairment and Voting_.  Class C-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      _Distributions_.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

**6.      Class C-6:  Interests**

(a)      _Classification_.  Class C-6 consists of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

(b)      _Impairment and Voting_.  Class C-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      _Distributions_.  Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

**D.      CCHC**

**1.      Class D-1:  Priority Non-Tax Claims**

(a)      _Classification_.  Class D-1 consists of all Priority Non-Tax Claims that may exist against CCHC.

(b)      _Impairment and Voting_.  Class D-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      _Distributions_.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the

Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2. Class D-2: Secured Claims**

    (a)    <u>Classification</u>. Class D-2 consists of all Secured Claims that may exist against CCHC.

    (b)    <u>Impairment and Voting</u>. Class D-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

    (c)    <u>Distributions</u>. Except to the extent that a Holder of an Allowed Secured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCHC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCHC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3. Class D-3: General Unsecured Claims**

    (a)    <u>Classification</u>. Class D-3 consists of all General Unsecured Claims that may exist against CCHC other than all General Unsecured Claims against CCHC held by any CII Settlement Claim Party.

    (b)    <u>Impairment and Voting</u>. Class D-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCHC is entitled to vote to accept or reject the Plan.

    (c)    <u>Distributions</u>. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCHC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4. Class D-4: Section 510(b) Claims**

    (a)    <u>Classification</u>. Class D-4 consists of all Section 510(b) Claims that may exist against CCHC.

    (b)    <u>Impairment and Voting</u>. Class D-4 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

    (c)    <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

**5. Class D-5: Interests**

    (a)    <u>Classification</u>. Class D-5 consists of all Interests in CCHC.

K&E: 15083729

(b) <u>Impairment and Voting</u>.  Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>.  Interests in CCHC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

**E.** **CCH and Charter Communications Holdings Capital Corp.**

**1.** **Class E-1:  Priority Non-Tax Claims**

(a) <u>Classification</u>.  Class E-1 consists of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b) <u>Impairment and Voting</u>.  Class E-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.** **Class E-2:  Secured Claims**

(a) <u>Classification</u>.  Class E-2 consists of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b) <u>Impairment and Voting</u>.  Class E-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.** **Class E-3:  General Unsecured Claims**

(a) <u>Classification</u>.  Class E-3 consists of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

K&E: 15083729

(b)     <u>Impairment and Voting</u>.  Class E-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4.    Class E-4:  CCH Notes Claims

(a)     <u>Classification</u>.  Class E-4 consists of CCH Notes Claims.

(b)     <u>Impairment and Voting</u>.  Class E-4 is Impaired by the Plan.  Each Holder of an Allowed CCH Notes Claim is entitled to vote to accept or reject the Plan.

(c)     <u>Distributions</u>.  CCH Notes Claims shall be Allowed in the aggregate amount of $599,379,759.  On the Distribution Date, each Holder of an Allowed CCH Notes Claim shall receive its Pro Rata share of the CCH Warrants.

### 5.    Class E-5:  Section 510(b) Claims

(a)     <u>Classification</u>.  Class E-5 consists of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>.  Class E-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

### 6.    Class E-6:  Interests

(a)     <u>Classification</u>.  Class E-6 consists of all Interests in CCH and Charter Communications Holdings Capital Corp.

(b)     <u>Impairment and Voting</u>.  Class E-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     <u>Distributions</u>.  Interests in CCH and Charter Communications Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $1,533,180 to be contributed by CCI from the Rights Offering.

### F.    <u>CIH and CCH I Holdings Capital Corp.</u>

### 1.    Class F-1:  Priority Non-Tax Claims

(a)     <u>Classification</u>.  Class F-1 consists of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

K&E: 15083729

(b)    <u>Impairment and Voting</u>.  Class F-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.    Class F-2:  Secured Claims**

(a)    <u>Classification</u>.  Class F-2 consists of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class F-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.    Class F-3:  General Unsecured Claims**

(a)    <u>Classification</u>.  Class F-3 consists of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class F-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.    Class F-4:  CIH Notes Claims**

(a)    <u>Classification</u>.  Class F-4 consists of CIH Notes Claims.

(b)    <u>Impairment and Voting</u>.  Class F-4 is Impaired by the Plan.  Each Holder of an Allowed CIH Notes Claim is entitled to vote to accept or reject the Plan.

(c)      Distributions.  CIH Notes Claims shall be Allowed in the aggregate amount of $2,625,060,226.  On the Distribution Date, each Holder of CIH Notes Claim shall receive its Pro Rata share of the CIH Warrants.

**5.      Class F-5:  Section 510(b) Claims**

(a)      Classification.  Class F-5 consists of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)      Impairment and Voting.  Class F-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      Distributions.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

**6.      Class F-6:  Interests**

(a)      Classification.  Class F-6 consists of all Interests in CIH and CCH I Holdings Capital Corp.

(b)      Impairment and Voting.  Class F-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      Distributions.  Interests in CIH and CCH I Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $8,932,440 to be contributed by CCI from the Rights Offering.

**G.      CCH I and CCH I Capital Corp.**

**1.      Class G-1:  Priority Non-Tax Claims**

(a)      Classification.  Class G-1 consists of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

(b)      Impairment and Voting.  Class G-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.      Class G-2:  Secured Claims**

(a)      Classification.  Class G-2 consists of all Secured Claims that may exist against CCH I and CCH I Capital Corp. (but excluding any Secured Claim that is also a CCH I Notes Claim).

K&E: 15083729

(b)    Impairment and Voting.  Class G-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3.    Class G-3:  General Unsecured Claims

(a)    Classification.  Class G-3 consists of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

(b)    Impairment and Voting.  Class G-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4.    Class G-4:  CCH I Notes Claims

(a)    Classification.  Class G-4 consists of CCH I Notes Claims.

(b)    Impairment and Voting.  Class G-4 is Impaired by the Plan.  Each Holder of an Allowed CCH I Notes Claim is entitled to vote to accept or reject the Plan.

(c)    Distributions.

(i)    The CCH I Notes Claims shall be Allowed in the aggregate amount of $4,170,040,378.  On the Distribution Date, each Holder of a CCH I Notes Claim shall receive its Pro Rata share of New Class A Stock in an aggregate amount to all such Holders equal to 100% of the New Class A Stock outstanding as of the Effective Date, prior to giving effect to the Rights Offering, the issuance of Warrants and any other distributions of New Class A Stock contemplated by the Plan, which New Class A Stock (prior to such effects) shall be deemed to have an aggregate value equal to the Plan Value minus the Warrant Value minus 3% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of Warrants and equity-based awards provided for by the Plan.

Each Eligible CCH I Notes Claim Holder shall also receive Rights pursuant to the Rights Offering, as set forth below.

(ii)    Rights Offering.  Each Eligible CCH I Notes Claim Holder shall be offered pursuant to the Rights Offering Documents the right to purchase shares of New Class A Stock, according to that Holder's Pro Rata Participation Amount, for a Cash payment of the product of the Per Share Purchase Price multiplied by such Pro Rata Participation Amount.

34

(iii) Equity Backstop by Members of the Crossover Committee. Pursuant to the Commitment Letters, the Equity Backstop Parties have, severally and not jointly, committed to purchase their respective Pro Rata Participation Amount in the Rights Offering.

(iv) Excess Backstop by the Excess Backstop Parties. Pursuant to the Commitment Letters and the Excess Backstop Agreements, the Excess Backstop Parties have, severally and not jointly, committed to purchase shares of New Class A Stock underlying Rights not exercised by Eligible CCH I Notes Claim Holders other than the Equity Backstop Parties.

(v) Overallotment Option. Pursuant to the Commitment Letters and Excess Backstop Agreements, each Excess Backstop Party shall be offered the Overallotment Option.

Each Holder of CCH I Notes Claims that affirmatively represents it is not an Eligible CCH I Notes Claim Holder on a timely submitted investor certification shall receive an amount of New Class A Stock equal to the value of the Rights that such Holder would have been offered if it were an accredited investor or qualified institutional buyer participating in the Rights Offering.

5. **Class G-5: Section 510(b) Claims**

(a) Classification. Class G-5 consists of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

(b) Impairment and Voting. Class G-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) Distributions. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6. **Class G-6: Interests**

(a) Classification. Class G-6 consists of all Interests in CCH I and CCH I Capital Corp.

(b) Impairment and Voting. Class G-6 is Impaired by the Plan. Each Holder of an Allowed Interest against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) Distributions. Interests in CCH I and CCH I Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $12,000,000 to be contributed by CCI from the Rights Offering.

H. **CCH II and CCH II Capital Corp.**

1. **Class H-1: Priority Non-Tax Claims**

(a) Classification. Class H-1 consists of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

(b) Impairment and Voting. Class H-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) Distributions. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition

K&E: 15083729

Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

### 2. Class H-2: Secured Claims

(a) Classification. Class H-2 consists of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

(b) Impairment and Voting. Class H-2 is Unimpaired by the Plan. Each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) Distributions. Except to the extent that a Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 3. Class H-3: General Unsecured Claims

(a) Classification. Class H-3 consists of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

(b) Impairment and Voting. Class H-3 is Impaired by the Plan. Each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. is entitled to vote to accept or reject the Plan.

(c) Distributions. Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4. Class H-4: CCH II Notes Claims

(a) Classification. Class H-4 consists of CCH II Notes Claims.

(b) Impairment and Voting. Class H-4 is Impaired by the Plan. Each Holder of an Allowed CCH II Notes Claim is entitled to vote to accept or reject the Plan.

(c) Distributions. The CCH II Notes Claims shall be Allowed in the aggregate amount of $2,586,033,908, plus Post-Petition Interest. Each Holder of CCH II Notes Claims shall be paid in full in Cash in an amount equal to the Allowed amount of its Claim plus Post-Petition Interest, on the Distribution Date, unless such Holder is a Rollover Commitment Party or elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange by noting such election on such Holder's ballot. Each Holder of an Allowed CCH II Notes Claim that elects to exchange as set forth above or is a Rollover Commitment Party, shall receive the New CCH II Notes as set forth below in a principal amount equal to the Allowed amount of its CCH II Notes Claim plus Post-Petition

Interest, subject to the Exchange Cutback set forth below; provided that the applicable Debtors may pay Post-Petition Interest in Cash if the applicable Debtors elect such option on or before the Effective Date by filing a notice of such election with the Court on or before the Effective Date. No partial Exchange of CCH II Notes shall be allowed.

(i) <u>Exchange</u>. CCH II shall effectuate the Exchange pursuant to the Plan. The aggregate principal amount of the New CCH II Notes shall be equal to the sum of (x) the Target Amount and (y) $85 million. Each Holder of an Allowed CCH II Notes Claim that elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange, and each Rollover Commitment Party, in each case subject to the Exchange Cutback, shall be entitled to receive (A) New CCH II Notes with a principal amount equal to the Allowed principal amount of the CCH II Notes held by such Holder or Rollover Commitment Party, (B) New CCH II Notes with a principal amount equal to the accrued but unpaid interest on such CCH II Notes held by such Holder or Rollover Commitment Party to the Petition Date, and (C) New CCH II Notes with a principal amount equal to Post-Petition Interest on such CCH II Notes. No Holder or Rollover Commitment Party shall be entitled to receive any amounts for any call premiums or prepayment penalty with respect to the CCH II Notes.

<u>Rollover Commitment</u>. Pursuant to the Commitment Letters, the Rollover Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex C), committed to exchange on the Effective Date an aggregate of $1.21 billion in principal amount of CCH II Notes, plus accrued but unpaid interest to the Petition Date, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties, for New CCH II Notes pursuant to the Exchange, subject to the Exchange Cutback.

<u>Exchange Cutback</u>. Notwithstanding the foregoing, if the aggregate principal amount of New CCH II Notes to be issued to Holders of CCH II Notes Claims (including the Rollover Commitment Parties) electing to participate in the Exchange would exceed the Target Amount, then each participating Holder (including the Rollover Commitment Parties) shall receive its pro rata portion of the Target Amount of New CCH II Notes in the same proportion that the Allowed amount of CCH II Notes sought to be exchanged by such Holder bears to the total Allowed amount of CCH II Notes sought to be exchanged, and the remainder of such Holder's Allowed CCH II Notes Claims shall be paid in full in Cash on the Distribution Date.

(ii) <u>New CCH II Notes Commitment</u>. Pursuant to the Commitment Letters, the New CCH II Notes Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex D), committed to purchase additional New CCH II Notes in an aggregate principal amount of $267 million. If the aggregate principal amount of New CCH II Notes to be issued to Holders (including the Rollover Commitment Parties) electing to participate in the Exchange is less than the Target Amount, then the New CCH II Notes Commitment shall be funded up to the extent of such shortfall.

5. **Class H-5: Section 510(b) Claims**

(a) <u>Classification</u>. Class H-5 consists of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

(b) <u>Impairment and Voting</u>. Class H-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6. **Class H-6: Interests**

(a) <u>Classification</u>. Class H-6 consists of all Interests in CCH II and CCH II Capital Corp.

(b)    Impairment and Voting.  Class H-6 is Impaired by the Plan.  Each Holder of an Interest against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    Distributions.  Interests in CCH II and CCH II Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $15,000,000 to be contributed by CCI from the Rights Offering.

## I.    CCOH and CCO Holdings Capital Corp.

**1.    Class I-1:  CCOH Credit Facility Claims**

(a)    Classification.  Class I-1 consists of CCOH Credit Facility Claims.

(b)    Impairment and Voting.  Class I-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Each Allowed CCOH Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**2.    Class I-2:  CCOH Notes Claims**

(a)    Classification.  Class I-2 consists of CCOH Notes Claims.

(b)    Impairment and Voting.  Class I-2 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Each Allowed CCOH Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**3.    Class I-3:  Priority Non-Tax Claims**

(a)    Classification.  Class I-3 consists of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)    Impairment and Voting.  Class I-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**4.    Class I-4:  Secured Claims**

(a)    Classification.  Class I-4 consists of all Secured Claims (but excluding CCOH Credit Facility Claims) that may exist against CCOH and CCO Holdings Capital Corp.

K&E: 15083729

(b)     Impairment and Voting.  Class I-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

### 5.     Class I-5:  General Unsecured Claims

(a)     Classification.  Class I-5 consists of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)     Impairment and Voting.  Class I-5 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 6.     Class I-6:  Interests

(a)     Classification.  Class I-6 consists of all Interests in CCOH and CCO Holdings Capital Corp.

(b)     Impairment and Voting.  Class I-6 is Unimpaired by the Plan.  Each Holder of an Allowed Interest against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Interests in CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

## J.     CCO (and its direct and indirect subsidiaries)

### 1.     Class J-1:  CCO Credit Facility Claims

(a)     Classification.  Class J-1 consists of CCO Credit Facility Claims.

(b)     Impairment and Voting.  Class J-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCO Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Each Allowed CCO Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  The Debtors shall waive and/or abjure any

K&E: 15083729

right to require any lender to make loans (whether term, incremental term, revolving, or swingline loans) under the CCO Credit Facility, other than loans outstanding as of the Effective Date.

2. **Class J-2: CCO Swap Agreements Claims**

(a) <u>Classification</u>. Class J-2 consists of CCO Swap Agreements Claims.

(b) <u>Impairment and Voting</u>. Class J-2 is Impaired by the Plan. Each Holder of an Allowed CCO Swap Agreements Claim against CCO is entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, the Debtors reserve their right to argue the proposed distribution to each Holder of an Allowed CCO Swap Agreements Claim renders Class J-2 Unimpaired, not entitled to vote to accept or reject the Plan, and deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. CCO Swap Agreements Claims shall be Allowed in the aggregate amount determined by the Bankruptcy Court, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties. Each Holder of an Allowed CCO Swap Agreements Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such CCO Swap Agreements Claim becomes an Allowed CCO Swap Agreements Claim, or as soon thereafter as is practicable.

3. **Class J-3: CCO Notes Claims**

(a) <u>Classification</u>. Class J-3 consists of CCO Notes Claims.

(b) <u>Impairment and Voting</u>. Class J-3 is Unimpaired by the Plan. Each Holder of an Allowed CCO Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Each Allowed CCO Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

4. **Class J-4: Priority Non-Tax Claims**

(a) <u>Classification</u>. Class J-4 consists of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

(b) <u>Impairment and Voting</u>. Class J-4 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

5. **Class J-5: Secured Claims**

(a) <u>Classification</u>. Class J-5 consists of all Secured Claims (but excluding CCO Credit Facility Claims, CCO Notes Claims and CCO Swap Agreements Claims) that may exist against CCO and its direct and indirect subsidiaries.

40

(b)     Impairment and Voting.  Class J-5 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

6.     **Class J-6:  General Unsecured Claims**

(a)     Classification.  Class J-6 consists of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries other than all General Unsecured Claims against CCO and its direct and indirect subsidiaries held by any CII Settlement Claim Party.

(b)     Impairment and Voting.  Class J-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

7.     **Class J-7:  Interests (other than CC VIII Preferred Units held by a CII Settlement Claim Party)**

(a)     Classification.  Class J-7 consists of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

(b)     Impairment and Voting.  Class J-7 is Unimpaired by the Plan.  Each Holder of an Allowed Interest against CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)     Distributions.  Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

K&E: 15083729

# ARTICLE V.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION

A.    <u>Classes Entitled to Vote</u>.  The following Classes are Impaired by the Plan and thus are entitled to vote to accept or reject the Plan.

**Class A-3** (General Unsecured Claims against CCI)
**Class A-4** (CCI Notes Claims)

**Class B-3** (General Unsecured Claims against CII)
**Class B-4** (CII Shareholder Claims)

**Class C-3** (General Unsecured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-4** (Holdco Notes Claims)

**Class D-3** (General Unsecured Claims against CCHC)

**Class E-3** (General Unsecured Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-4** (CCH Notes Claims)

**Class F-3** (General Unsecured Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-4** (CIH Notes Claims)

**Class G-3** (General Unsecured Claims against CCH I and CCH I Capital Corp.)
**Class G-4** (CCH I Notes Claims)

**Class H-3** (General Unsecured Claims against CCH II and CCH II Capital Corp.)
**Class H-4** (CCH II Notes Claims)

**Class I-5** (General Unsecured Claims against CCOH and CCO Holdings Capital Corp.)

**Class J-2** (CCO Swap Agreements Claims)
**Class J-6** (General Unsecured Claims against CCO and its direct and indirect subsidiaries)


B.    <u>Classes Not Entitled to Vote; Deemed to Accept</u>.  The following Classes are Unimpaired by the Plan—and thus not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have accepted the Plan.

**Class A-1** (Priority Non-Tax Claims against CCI)
**Class A-2** (Secured Claims against CCI)

**Class B-1** (Priority Non-Tax Claims against CII)
**Class B-2** (Secured Claims against CII)

**Class C-1** (Priority Non-Tax Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-2** (Secured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)

**Class D-1** (Priority Non-Tax Claims against CCHC)
**Class D-2** (Secured Claims against CCHC)

**Class E-1** (Priority Non-Tax Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-2** (Secured Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class F-1** (Priority Non-Tax Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-2** (Secured Claims against CIH and CCH I Holdings Capital Corp.

**Class G-1** (Priority Non-Tax Claims against CCH I and CCH I Capital Corp.)
**Class G-2** (Secured Claims against CCH I and CCH I Capital Corp.)

**Class H-1** (Priority Non-Tax Claims against CCH II and CCH II Capital Corp.)
**Class H-2** (Secured Claims against CCH II and CCH II Capital Corp.)

**Class I-1** (CCOH Credit Facility Claims)
**Class I-2** (CCOH Notes Claims)
**Class I-3** (Priority Non-Tax Claims against CCOH and CCO Holdings Capital Corp.)
**Class I-4** (Secured Claims against CCOH and CCO Holdings Capital Corp.)
**Class I-6** (Interests in CCOH and CCO Holdings Capital Corp.)

**Class J-1** (CCO Credit Facility Claims)
**Class J-3** (CCO Notes Claims)
**Class J-4** (Priority Non-Tax Claims against CCO and its direct and indirect subsidiaries)
**Class J-5** (Secured Claims against CCO and its direct and indirect subsidiaries)
**Class J-7** (Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party))


C.    <u>Classes Not Entitled to Vote; Deemed to Reject</u>.  The following Classes are Impaired by the Plan—but not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have rejected the Plan.

**Class A-5** (Section 510(b) Claims against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party)
**Class A-6** (Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party)

**Class C-5** (Section 510(b) Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-6** (Interests in Holdco, Enstar Communications Corporation, and Charter Gateway LLC other than all Interests in Holdco held by any CII Settlement Claim Party)

**Class D-4** (Section 510(b) Claims against CCHC)
**Class D-5** (Interests in CCHC)

**Class E-5** (Section 510(b) Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-6** (Interests in CCH and Charter Communications Holdings Capital Corp.)

**Class F-5** (Section 510(b) Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-6** (Interests in CIH and CCH I Holdings Capital Corp.)

**Class G-5** (Section 510(b) Claims against CCH I and CCH I Capital Corp.)
**Class G-6** (Interests in CCH I and CCH I Capital Corp.)

**Class H-5** (Section 510(b) Claims against CCH II and CCH II Capital Corp.)
**Class H-6** (Interests in CCH II and CCH II Capital Corp.)

43

D.      <u>Nonconsensual Confirmation</u>.  Except as otherwise specifically provided in the Plan, if any Impaired Class shall not accept the Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan (subject to the Plan Support Agreements and conditions to the Effective Date set forth below) or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

K&E: 15083729

## ARTICLE VI.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.      Sources of Consideration for Plan Distributions.  Cash Distributions under the Plan shall be funded from: (1) operations, (2) the New CCH II Notes Commitment (as described in ARTICLE IV.H.4 above), and (3) the Rights Offering (as described in ARTICLE IV.G.4 above).

1.      Use of Net Proceeds.  CCI shall utilize the Net Proceeds as follows:  (a) to pay the expenses of the Rights Offering; (b) to contribute to CCH II an amount sufficient to fund the Cash payments due on the CCH II Notes Claims; (c) to contribute to CCO to pay the CCO Swap Agreements Claims; (d) to contribute, as necessary, to Holdco, CCHC, CCH, CIH, CCH I, and CCH II in consideration for New Value Interests; (e) to pay Administrative Expense Claims and to make other payments as needed to confirm the Plan and to cause the Effective Date to occur; and (f) to pay the fees and expenses described in ARTICLE VI.A.2 below in the manner and order provided therein. Subject to ARTICLE VI.A.2 below, plus Professional Fees, the remaining Net Proceeds, if any, will be contributed to CCO on the Effective Date to fund CCO's working capital requirements following the Effective Date.

2.      Specified Fees and Expenses.

(a)      Allen Management Receivable.   As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Management Receivable, in Cash, as provided in clause (d) below.

(b)      Allen Fee Reimbursement.  As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Fee Reimbursement, in Cash, as provided in clause (d) below.

(c)      Other Fees and Expenses.

Each participating Holder (including the Rollover Commitment Parties) shall receive from the Debtors (other than CII) the Rollover Fee for the use of capital, in Cash, as provided in clause (d) below.

Each New CCH II Notes Commitment Party shall receive from the Debtors (other than CII) the New CCH II Notes Commitment Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such New CCH II Notes Commitment Party shall not have terminated its Commitment Letter with respect to the New CCH II Notes Commitment on or prior to the Effective Date.

Each Equity Backstop Party shall receive from the Debtors (other than CII) the Equity Backstop Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such Equity Backstop Party shall not have terminated its Commitment Letter with respect to the Equity Backstop on or prior to the Effective Date.

(d)      Priority of Payments.  On the Effective Date, the Allen Management Receivable shall be paid in Cash to the extent of Available Cash.  If the Allen Management Receivable is not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 30 days after the end of the first calendar quarter following the Effective Date to the extent of Available Cash on the last day of such calendar quarter, and within 20 days after the end of each following calendar quarter to the extent of Available Cash on the last day of each such following calendar quarter, until the Allen Management Receivable is paid in full.

On the Effective Date (or when the Overallotment Option is received by the Reorganized Company), following payment of the Allen Management Receivable in full, the Commitment Fees, the Allen Fee Reimbursement, and the VCP shall be paid in Cash to the extent of any remaining Available Cash; provided, however, that, if there is not sufficient Available Cash for payment of the Commitment Fees, the Allen Fee Reimbursement, and the VCP in full on the Effective Date, then payment of such fees on such date shall be reduced pro rata based on the amount of each such fee in proportion to the total amount of the Commitment Fees, the Allen

Fee Reimbursement, and the VCP. If the Commitment Fees, the Allen Fee Reimbursement, and the VCP are not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 20 days after the end of the first calendar quarter following the Effective Date in which the Allen Management Receivable is paid in full in Cash if there is Available Cash on the last day of such calendar quarter; provided, however, that, in the discretion of the Board of Directors, the Allen Fee Reimbursement, the Commitment Fees, and the VCP on a pari passu basis may be paid regardless of sufficient Available Cash. For the avoidance of doubt, in no event shall the Commitment Fees (or any portion thereof), the Allen Fee Reimbursement (or any portion thereof) or the VCP (or any portion thereof) be paid unless and until the Allen Management Receivable has been paid in full.

If all Specified Fees and Expenses have not been paid in full on the Effective Date, Cash in the full amount of the unpaid portion of the Specified Fees and Expenses shall be retained by CCI pending payment, subject to the good faith determination of the Reorganized Company to contribute all or any portion of such retained amount to direct or indirect subsidiaries. If such amounts are contributed, alternative arrangements for actual funding by the Reorganized Company shall be made by the Reorganized Company.

B.     Reorganized Company Equity Interests. The Reorganized Company's equity interests shall consist of New Class A Stock, New Class B Stock, New Preferred Stock and Warrants.

1.     New Class A Stock. Shares of New Class A Stock shall be issued to (a) participants in the Rights Offering, (b) Equity Backstop Parties upon the exercise of the Overallotment Option (if exercised), (c) Holders of Claims with respect to CCH I Notes, (d) the Allen Entities upon exchange of their Reorganized Holdco equity pursuant to the Reorganized Holdco Exchange Agreement, (e) holders of Warrants upon exercise of such Warrants, and (f) holders of equity-based awards issued under the Management Incentive Plan.

CCI shall cause the New Class A Stock to be listed on the NASDAQ Global Select Market as promptly as practicable but in no event prior to the later of (x) the 46th day following the Effective Date, and (y) October 15, 2009 (unless Mr. Allen and the Reorganized Company agree to an earlier date), and the Reorganized Company shall maintain such listing thereafter.

2.     New Class B Stock. The New Class B Stock issued to Mr. Allen or other Authorized Class B Holders shall be identical to the New Class A Stock except with respect to certain voting, transfer and conversion rights. Each share of New Class B Stock shall be entitled to a number of votes such that the aggregate number of votes attributable to the shares of New Class B Stock held by the Authorized Class B Holders shall equal 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of the Reorganized Company. Subject to the Lock-Up Agreement, each holder of New Class B Stock shall have the right to convert its shares of New Class B Stock into shares of New Class A Stock on a one-for-one basis. In addition, on or after January 1, 2011, Reorganized CCI shall have the right to cause shares of New Class B Stock to convert into shares of New Class A Stock on a one-for-one basis pursuant to and in accordance with the provisions of the Amended and Restated Certificate of Incorporation. New Class B Stock shall be subject to restrictions on conversion and transfer pursuant to the Lock-Up Agreement.

3.     New Preferred Stock. Shares of New Preferred Stock shall be issued to Holders of CCI Notes Claims. The New Preferred Stock shall be listed on an exchange contemporaneously with the New Class A Stock.

4.     Warrants. Warrants to be issued pursuant to the Plan consist solely of CIH Warrants, CCH Warrants and CII Settlement Claim Warrants.

5.     Registration Rights. Holders of New Common Stock shall be entitled to registration rights pursuant to the Equity Registration Rights Agreement.

6.     Post-Confirmation Restrictions. For a period of at least six (6) months following the Effective Date, the Reorganized Company, Reorganized Holdco, Reorganized CCO and each of their respective direct and indirect subsidiaries shall not negotiate, enter into agreements, understandings or arrangements or consummate transactions in the aggregate in excess of $500 million in total value to the extent that such transactions shall occur at a price in excess of 110% of either the value implied by the Plan or the appraised values, if any such appraisal is

obtained pursuant to ARTICLE VI.C.2. Any transactions occurring at a price that implies a value of 110% or lower than both of such value implied by the Plan and such appraised values (if obtained) shall not be subject to restriction and shall not be taken into account in determining whether the $500 million limitation has been exceeded.

C.    CII Settlement Claim.    Notwithstanding anything to the contrary herein, on the Effective Date, the following consideration shall be transferred by the Debtors (other than CII) to Mr. Allen (or his designees which, in the case of New Class B Stock, shall be limited to Authorized Class B Holders) on account of the CII Settlement Claim:  (a) shares of New Class B Stock representing, as of the Effective Date, (i) 2% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan, and (ii) 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of Reorganized CCI; (b) the CII Settlement Claim Warrants; (c) $85 million principal amount of New CCH II Notes, which shall be deemed transferred from Holders of CCH I Notes Claims automatically and without further action by any party; (d) Cash in the amount of $25 million on account of the Allen Management Receivable; (e) $150 million in Cash; and (f) Cash of up to $20 million on account of the Allen Fee Reimbursement.  In addition, on the Effective Date, CII shall retain a 1% direct equity interest in Reorganized Holdco, including the right to exchange such interest into New Class A Stock, pursuant to the Reorganized Holdco Exchange Agreement, and Mr. Allen shall retain all of the Interests in Reorganized CII. Furthermore, on the Effective Date, the 7,282,183 CC VIII Preferred Units held by the CII shall be deemed transferred, automatically and without further action by any party, to Reorganized CCI.

1.    Bankruptcy Rule 9019.    The treatment set forth above and the rights and obligations accorded elsewhere in this Plan on account of the CII Settlement Claim shall constitute the compromise and settlement under Bankruptcy Rule 9019 by and among the Debtors (other than CII), on the one hand, and the CII Settlement Claim Parties, on the other hand, that fully resolves any and all legal, contractual and equitable rights, claims and remedies between such parties in exchange for the consideration to be given to such parties.  For the avoidance of doubt, CCH I Claims and CIH Claims held by CII shall be treated identically to similar Claims held by Persons other than CII.

2.    Independent Appraisal.    Within 30 days after the Effective Date, at Mr. Allen's request, Reorganized CCI, Reorganized Holdco and Reorganized CCO shall obtain (at their expense) an independent appraisal of the fair market value of Reorganized Holdco's and Reorganized CCO's (and their respective subsidiaries') tangible and intangible assets as of the Effective Date that will include a reasonable allocation of value on an asset-by-asset basis, including any and all below market financing arrangements as may be appropriate.  The appraisal firm and scope of the appraisal shall be reasonably acceptable to Mr. Allen and Reorganized CCI, Reorganized Holdco and Reorganized CCO, but shall at all times be retained by and act under the direction of Reorganized CCI, Reorganized Holdco and Reorganized CCO, consulting with Mr. Allen.

3.    Retained Interest; Preservation of Exchange Right.    As partial consideration for the settlement and compromise of the CII Settlement Claim, CII will retain a 1% equity interest in Reorganized Holdco and shall hold such interest pursuant to and in accordance with the Reorganized Holdco LLC Agreement.  After the Effective Date, CII or its transferee that is an Allen Entity shall have the right to exchange all or a portion of their Reorganized Holdco equity for New Class A Stock pursuant to the terms of the Reorganized Holdco Exchange Agreement.

There shall be no restrictions on the Allen Entities' ability to liquidate or sell CII following consummation of the Plan; provided, that CII shall have transferred all interests in Reorganized Holdco to one or more Allen Entities (or to Reorganized CCI pursuant to the Reorganized Holdco Exchange Agreement) prior to or as part of such liquidation or sale as provided in the Reorganized Holdco LLC Agreement.

4.    Other Matters.    The Parties agree to use reasonable best efforts to ensure that Plan Confirmation and the Effective Date occur in the same calendar year.  The Debtors shall not seek to schedule, and shall use all commercially reasonable efforts to avoid scheduling the hearing to confirm the Plan during the month of December.

5.    Post-Effective Date Lock-Up Agreement.    Shares of New Class B Stock received by Mr. Allen under the Plan shall be subject to restrictions on transfer and conversion as set forth in the Lock-Up Agreement.

K&E: 15083729

For the avoidance of doubt, notwithstanding any other provision of the Plan, CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan.

D.      <u>Section 1145 Exemption</u>.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.  In addition, except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (c) applicable regulatory approval.  Notwithstanding the foregoing, shares of New Class A Stock issued to Eligible CCH I Notes Claim Holders pursuant to the Rights Offering and New CCH II Notes issued to Rollover Commitment Parties and New CCH II Note Commitment Parties shall be issued pursuant to the exemption provided under section 4(2) of the Securities Act.  The holders of such equity and debt securities and certain other affiliates of the Reorganized Company shall receive registration rights as set forth in the Equity Registration Rights Agreement and the Debt Registration Rights Agreement, respectively.

E.      <u>Corporate Existence</u>.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

F.      <u>Vesting of Assets in the Reorganized Debtors</u>.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness that is Unimpaired by the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.      <u>Discharge of Debtors</u>.  Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date:  (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

K&E: 15083729

H.     Restructuring Transactions.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) certain transactions in conjunction with the Effective Date in accordance with Exhibit 22 to the Plan Supplement; (2) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (3) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (4) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate.

I.     Corporate Action.  Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or any other Entity.  Without limiting the foregoing, such actions may include:  the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws; the adoption of the Reorganized Holdco LLC Agreement; the appointment of officers and (as applicable) directors for the Reorganized Debtors; and the adoption, implementation, and amendment of the Management Incentive Plan.

J.     Post-Effective Date Governance.  The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized CCI shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.  On and as of the Effective Date, the Rights Agreement between CCI and Mellon Investor Services LLC, dated as of August 14, 2007, as amended thereafter, shall be automatically terminated.

K.     Limited Liability Company Agreement.  The Holdco LLC Agreement shall be in effect and govern Holdco for the period up to and including the Effective Date.  At the Effective Date, the Holdco LLC Agreement shall be amended and restated and the Reorganized Holdco LLC Agreement shall be in effect as of the day immediately following the Effective Date for federal, state, local and foreign income tax purposes.  Reorganized Holdco shall effect a "closing of the books" as of the Effective Date, and the provisions of the Holdco LLC Agreement, taking into account each member's Percentage Interest (as defined in the Holdco LLC Agreement) immediately before the transactions contemplated by this Plan, shall govern with respect to allocations of items of income, gain, loss, credit and deduction for the period up to and including the Effective Date, including any items of income, gain, loss, credit and deduction arising on the Effective Date and/or arising as a result of the transactions effective as of the Effective Date as contemplated by this Plan.  Reorganized Holdco shall not make the election under section 108(i) of the U.S. Internal Revenue Code of 1986, as amended (or any similar election under state or local law), with respect to any cancellation of indebtedness income relating to the consummation of the Plan.  Notwithstanding anything to the contrary in the Reorganized Holdco LLC Agreement, in the event of any dispute, challenge, audit or examination of Holdco's tax affairs for any period prior to or including the Effective Date, the consent of Mr. Allen shall be required to settle any such dispute and Mr. Allen and CII shall be entitled to participate alongside Reorganized CCI in any such examinations, judicial determinations, and administrative proceedings, with respect to any portion of the dispute relating to the period prior to and including the Effective Date.

L.     Effectuating Documents; Further Transactions.  On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors or managers, as applicable, thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

M.     Exemption from Certain Transfer Taxes and Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation

49

of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.     Board Representation.  The Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws shall provide that the Board of Directors shall be fixed at 11 members.  Each projected holder of 10% or more of the voting power of the Reorganized Company on the Effective Date (determined on an undiluted basis and giving effect to the Overallotment Option) based on such holder's pro rata share of New Class A Stock (i) to be received in respect of its CCH I Notes Claims, (ii) to be purchased pursuant to its exercise of Rights and (iii) to be purchased pursuant to the exercise by such holder of its Overallotment Option, if any, on or prior to the date that is five business days prior to the commencement of the Confirmation Hearing, shall have the right to appoint one member of the initial Board of Directors upon emergence for each 10% of the voting power attributable to such holder's New Class A Stock.  Mr. Allen shall have the right to appoint four (4) of the eleven (11) members of the initial Board of Directors, and  Neil Smit, the President and Chief Executive Officer of the Reorganized Company, will also serve on the Reorganized Company's Board of Directors.  The identity of these members will be disclosed on Exhibit 23 to the Plan Supplement prior to the hearing on Confirmation of the Plan.  Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.  Starting at such first annual meeting of stockholders and so long as shares of New Class B Stock are outstanding, holders of New Class B Stock shall have the right to elect 35% of the members of the Board of Directors (rounded up to the next whole number), and all other members of the Board of Directors shall be elected by majority vote of New Class A Stock and New Preferred Stock, voting together as a single class.

The members of the Board of Directors elected by holders of New Class B Stock shall have no less than proportionate representation on each committee of the Board of Directors, except for any committee (1) required by applicable stock exchange rules to be comprised solely of independent directors or (2) formed solely for the purpose of reviewing, recommending and/or authorizing any transaction in which holders of Class B Stock or their affiliates (other than Reorganized CCI or its subsidiaries) are interested parties.  In addition, CCI's current Chief Executive Officer and Chief Operating Officer will continue in their same positions.

O.     Senior Management.  The CEO and the COO of the Reorganized Company shall be the same as the CEO and COO of CCI on the date hereof.  The CEO and COO shall receive Cash and bonus compensation and benefits on substantially the same terms as (but not less economically favorable than) those contained in their respective employment agreements in effect on the date hereof.  The CEO shall receive (1) long-term incentive compensation having substantially the same value as the long-term incentive compensation contained in his employment agreement in effect on the date hereof, and (2) a waiver with respect to the retention bonus clawback provision contained in his employment agreement in effect on the date hereof.

Key Executives of the Reorganized Debtors shall be determined by the Board of Directors in consultation with the CEO.  The Reorganized Debtors shall provide Key Executives with Cash and bonus compensation and benefits consistent with (but not less economically favorable than) such Key Executives' respective employment agreements in effect on the date hereof.

P.     Management Incentive Plan and VCP.  The Reorganized Company shall be deemed to have adopted the Management Incentive Plan and VCP on the Effective Date.

K&E: 15083729

Q.     Employee and Retiree Benefits.  Except with respect to any rejected employment agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.     Creation of Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

S.     Preservation of Rights of Action.  Subject to the releases set forth in ARTICLE X.D and ARTICLE X.E below, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Further, subject to the releases set forth in ARTICLE X.D and ARTICLE X.D below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

51

# ARTICLE VII.

## TREATMENT OF EXECUTORY CONTRACTS

A.    <u>Assumption and Rejection of Executory Contracts</u>.  With the exception of Executory Contracts between a Debtor (other than CII) and a CII Settlement Claim Party, which shall be deemed rejected unless set forth in clause (b) of the definition of "CII Settlement Claim," each of the Debtors' Executory Contracts, including the Management Agreement, the Mutual Services Agreement, and the Employment Agreements (subject to the conditions in ARTICLES VI.O and VII.A), shall be deemed assumed as of the Effective Date, unless listed on Exhibit 24 to the Plan Supplement and mutually agreed to by the Debtors, the Requisite Holders, and Mr. Allen.

The Employment Agreements of the CEO and COO shall be modified as set forth in ARTICLE VI.O and be deemed assumed as of the Effective Date.

The Employment Agreements of the Chief Financial Officer, Chief Restructuring Officer, General Counsel and Corporate Secretary, Chief Marketing Officer, and Chief Technology Officer as of the Petition Date shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements, to the extent applicable, to:  (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan; and (iii) include an acknowledgement that, contingent upon the VCP becoming effective as set forth in the Plan, no awards will be granted in 2009 under the Incentive Program in place as of the Petition Date.

The Employment Agreements of the Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements to: (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; and (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan.

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such Executory Contracts in the Plan are effective as of the Effective Date.  Each such Executory Contract assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, to alter, amend, modify or supplement the Exhibit of Executory Contracts identified in the Plan Supplement.

B.    <u>Indemnification Obligations</u>.  Notwithstanding anything to the contrary herein, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of such Debtor at any time prior to the Effective Date, respectively, against any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

K&E: 15083729

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors and officers who were directors or officers of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the Respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors' or officers' rights.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

C.      Cure of Defaults for Assumed Executory Contracts.  With respect to each of the Debtors' Executory Contracts to be assumed, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract may be conditioned upon the disposition of all issues with respect to Cure.  Any provisions or terms of the Debtors' Executory Contracts to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  Except with respect to Executory Contracts in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Notice, Claims and Solicitation Agent on or before the Cure Bar Date.  The Cure Bar Date shall not apply to any franchise or Executory Contract with a state or local franchise authority.  Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the applicable Debtor of the amount listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment); or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract.  Any counterparty to an Executory Contract that fails to object timely to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption.  The Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, either to reject or nullify the assumption of any Executory Contract no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption.  Any Proof of Claim Filed with respect to an Executory Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.      Claims Based on Rejection or Repudiation of Executory Contracts.    Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be Filed with the Notice, Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation.  Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.      Reservation of Rights.    Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that any Reorganized Debtor has any liability thereunder.   If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.      Nonoccurrence of Effective Date.    In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

K&E: 15083729

# ARTICLE VIII.

## PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES

A.      Allowance of Claims and Interests.  After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

B.      Claims and Interests Administration Responsibilities.  Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.      Estimation of Claims and Interests.  Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      Adjustment to Claims and Interests Without Objection.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended or superseded during such prior calendar quarter.

E.      Disallowance of Claims or Interests.  Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

F.      Offer of Judgment.  The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

K&E: 15083729

G.       <u>Amendments to Claims</u>.  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

K&E: 15083729

# ARTICLE IX.

## PROVISIONS GOVERNING DISTRIBUTIONS

A.     <u>Distributions on Account of Claims and Interests Allowed As of the Effective Date</u>.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; <u>provided</u>, <u>however</u>, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date.

B.     <u>Distributions on Account of Claims and Interests Allowed After the Effective Date</u>.

1.     <u>Payments and Distributions on Disputed Claims</u>.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; <u>provided</u>, <u>however</u>, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

2.     <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

C.     <u>Delivery of Distributions</u>.

1.     <u>Record Date for Distributions</u>.  On the Effective Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded Certificate is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.     <u>Distribution Agent</u>.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

3.     <u>Delivery of Distributions in General</u>.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the

Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.  **Compliance Matters.** In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.  **Undeliverable Distributions.** If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

6.  **Reversion.** Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

7.  **Manner of Payment Pursuant to the Plan.** Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

8.  **Surrender of Cancelled Instruments or Securities.** On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

D.     <u>Claims Paid or Payable by Third Parties</u>.

    1.     <u>Claims Paid by Third Parties</u>. The Notice, Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

    2.     <u>Claims Payable by Third Parties</u>. No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice, Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.     <u>Allocation Between Principal and Accrued Interest</u>. Except as otherwise provided in the Plan (<u>e.g.</u>, in Class H-4), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.  <u>Discharge of Claims and Termination of Interests</u>.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.  <u>Compromise and Settlement of Claims and Controversies</u>.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

C.  <u>CCO Credit Facility</u>.  Without reservation or qualification, the Debtors (1) irrevocably waive and abjure any right to engage in any additional borrowing under the reinstated CCO Credit Facility, and (2) commit to Cash collateralize, if required by section 1124 of the Bankruptcy Code, by the Effective Date, any letters of credit issued pursuant to the CCO Credit Facility that remain outstanding as of the Effective Date.

**D.  <u>Releases by the Debtors</u>.  On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including:  (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the obligations of the Holders of Claims party to Plan Support Agreements to provide the support necessary for the Effective Date of the Plan; and (3) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "<u>Debtor Releasees</u>" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would**

have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; **provided**, **however**, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Releasing Party from any causes of action expressly set forth in and preserved by the Plan. Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

E.     **Third Party Releases**.  On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; **provided**, that the foregoing "**Third Party Release**" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, and provided further that the foregoing "Third Party Release" shall not impair the rights (a) to which an Allowed Unimpaired Claim entitles the Holder of such Allowed Unimpaired Claim or (b) of a Holder of a General Unsecured Claim as to any General Unsecured Claim.  Notwithstanding anything in the Plan to the contrary, the Releasing Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.    This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

F.     **Injunction**.    From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

G.     **Exculpation**.  The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; **provided**, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; **provided**, **further**, that each Exculpated Party shall be entitled to rely upon

the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; **provided further**, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

H.     Protection Against Discriminatory Treatment.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.     **Setoffs and Recoupment.  The Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against such claimant.**

**In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

J.     **Release of Liens**.  Except as otherwise provided in the Plan (including as to reinstated debt) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

K.     Document Retention.  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified or supplemented by the Reorganized Debtors in the ordinary course of business.

L.     Reimbursement or Contribution.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date: (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K&E: 15083729

## ARTICLE XI.

### ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS

A.     Professional Claims.

1.     <u>Final Fee Applications</u>.  All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.     <u>Payment of Interim Amounts</u>.  Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

3.     <u>Professional Fee Escrow Account</u>.  On the Effective Date, the Reorganized Debtors (other than Reorganized CII) shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than Reorganized CII) from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Claims by Professional have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors (other than Reorganized CII).

4.     <u>Professional Fee Reserve Amount</u>.  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors (other than CII).  If a Professional does not provide an estimate, the Reorganized Debtors (other than Reorganized CII) may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.     <u>Post-Effective Date Fees and Expenses</u>.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional or other fees and expenses incurred by that Reorganized Debtor after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.     <u>Substantial Contribution Compensation and Expenses</u>.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

7.     <u>Indenture Trustee, Administrative Agent, and Collateral Trustee Fees, and Indemnification Obligations</u>.  Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date.  Notwithstanding the foregoing, to the extent any fees or expenses of the indenture trustees, the administrative agents, and the collateral trustees are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims),

63

the indenture trustees, the administrative agents, and the collateral trustees may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts. The contractual indemnification obligations of the Debtors (other than CII) to these Professionals shall be reinstated as unsecured obligations of the Reorganized Debtors (other than Reorganized CII). All disputes related to the fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) shall be subject to the jurisdiction of and decided by the Bankruptcy Court. Notwithstanding anything to the contrary herein, this Article XI.A.7 will not apply to Claims rendered Unimpaired by the Plan.

       8.    <u>Other Fees</u>. The Debtors (other than CII) shall promptly pay the reasonable, documented out-of-pocket fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC, the legal and financial advisors engaged by the Crossover Committee, without Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., or UBS Securities LLC having to file fee applications to receive payment for such fees and expenses.

       The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees and expenses incurred by the members of the Crossover Committee in connection with the negotiation of the Plan, as well as their due diligence review and the approval and consummation of the transactions contemplated by the Plan, without such members of the Crossover Committee having to file fee applications to receive payment for such fees and expenses.

       The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees incurred by the members of the Creditors' Committee.

B.    <u>Other Administrative Expense Claims</u>. All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable. The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

# ARTICLE XII.

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

A.      <u>Conditions Precedent to Effective Date</u>.  The following shall be satisfied or waived as conditions precedent to the Effective Date.

1.      The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Requisite Holders and Mr. Allen, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The final version of the Plan, the Plan Supplement and all of the documents and exhibits contained therein shall have been Filed and approved in form and substance reasonably acceptable to the Debtors, the Requisite Holders and Mr. Allen.

3.      The Bankruptcy Court shall enter the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Requisite Holders and Mr. Allen, and such order shall not have been stayed or modified or vacated on appeal.

4.      All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

5.      All consents, approvals and waivers necessary in connection with the transactions contemplated herein with respect to Franchises (as defined in the Communications Act of 1934, as amended, 47 U.S.C. Sections 151 et seq.) or similar authorizations for the provision of cable television service in areas serving no less than 80% of CCI's individual basic subscribers in the aggregate at such time shall have been obtained, unless the condition set forth in this clause shall have been waived by the Requisite Holders and Mr. Allen.

6.      The Confirmation Date shall have occurred.

7.      The Debtors shall have received the funds contemplated by the Commitment Letters and the New CCH II Notes Commitment Parties shall have fulfilled all of the obligations under the Commitment Letters.

B.      <u>Waiver of Conditions Precedent</u>.  The Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite Holders and Mr. Allen, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, the Requisite Holders or Mr. Allen to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.      <u>Effect of Non-Occurrence of Conditions to the Effective Date</u>.  Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 180 days after Confirmation, or by such later date established by Bankruptcy Court order.  If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests or Causes of

Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

K&E: 15083729

# ARTICLE XIII.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      <u>Modification or Amendments</u>.  Except as otherwise specifically provided in the Plan, and subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, subject to the terms of the Plan Support Agreement and conditions to the Effective Date.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the Debtors' private website at http://www.kccllc.net/charter.  The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.      <u>Effect of Confirmation on Modifications</u>.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      <u>Revocation or Withdrawal of Plan</u>.  Subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void with the exception of the Plan Support Agreements; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

K&E: 15083729

**ARTICLE XIV.**

**RETENTION OF JURISDICTION**

A.      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

K&E: 15083729

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

K&E: 15083729

**ARTICLE XV.**

**MISCELLANEOUS PROVISIONS**

A.      Immediate Binding Effect.  Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

B.      Additional Documents.  On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      Payment of Statutory Fees.  All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.      Reservation of Rights.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.      Successors and Assigns.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

F.      Service of Documents.

        1.      After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Charter Communications, Inc.<br>12405 Powerscourt Drive, Suite 100<br>St. Louis, Missouri 63131-3660<br>Attn.:   Gregory L. Doody, Esq. | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.:   Richard M. Cieri, Esq.<br>          Paul M. Basta, Esq.<br>          Stephen E. Hessler, Esq.<br><br>- and -<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.:   Ray C. Schrock, Esq. |
| **Counsel to CII** | **United States Trustee** |
| Togut, Segal & Segal, LLP<br>One Penn Plaza<br>New York, New York 10119<br>Attn.:   Albert Togut, Esq.<br>       Frank Oswald, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:   Paul K. Schwartzberg, Esq. |
| **Counsel to the Agent for the Debtors' Prepetition First Lien Facility** | **Counsel to the Crossover Committee** |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:   Peter V. Pantaleo, Esq. | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attn.:   Alan W. Kornberg, Esq.<br>       Kenneth M. Schneider, Esq. |
| **Counsel to the Creditors' Committee** | |
| Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036-8704<br>Attn.:   Mark R. Somerstein, Esq.<br>       Keith H. Wofford, Esq. | |

2.        After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

3.        In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

G.    <u>Term of Injunctions or Stays</u>. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in

the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.     <u>Entire Agreement</u>. On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.     <u>Governing Law</u>. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

J.     <u>Exhibits</u>. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date. After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/charter or the Bankruptcy Court's website at www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.     <u>Nonseverability of Plan Provisions upon Confirmation</u>. If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) nonseverable and mutually dependent.

L.     <u>Closing of Chapter 11 Cases</u>. The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.     <u>Waiver or Estoppel</u>. **Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

N.     <u>Conflicts</u>. Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

K&E: 15083729

New York, New York
Dated: July 15, 2009

CHARTER COMMUNICATIONS, INC. (for itself and all other Debtors, except CII)

By: _/s/ Neil Smit_
Name: Neil Smit
Title: Chief Executive Officer, President and Director


CHARTER INVESTMENT, INC.

By: _/s/ William L. McGrath_
Name: William L. McGrath
Title: Vice President

K&E: 15083729