# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | ) |
| | ) 09-11435(JMP) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |
| JPMORGAN CHASE BANK, N.A., | ) |
| as Administrative Agent, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding |
| -against- | ) No. 09-01132 (JMP) |
| | ) |
| CHARTER COMMUNICATIONS OPERATING, | ) |
| LLC and CCO HOLDINGS, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**JPMORGAN CHASE BANK, N.A.'s, AS ADMINISTRATIVE AGENT, POST-TRIAL BRIEF IN SUPPORT OF ITS OBJECTIONS TO CONFIRMATION AND OF ENTRY OF JUDGMENT IN THE ADVERSARY PROCEEDING**

Peter V. Pantaleo
Bruce D. Angiolillo
Mary Elizabeth McGarry
Bryce L. Friedman
George S. Wang
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
(212) 455-2000
(212) 455-2502 (fax)
*Attorneys for JPMorgan Chase Bank, N.A.*

# Table of Contents

**Page**

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF PROOF ................................................................................ 10

I. THE TAKEOVER GROUP IS EXECUTING A SYNDICATED, LOAN-TO-OWN BUYOUT OF CCI SUBSIDIZED BY THE LENDERS' BELOW-MARKET DEBT, WHICH TRIGGERS A CHANGE-OF-CONTROL DEFAULT UNDER THE CREDIT AGREEMENT ................................................................ 10

    A. The Lenders Negotiated For Change-Of-Control Rights, Which Will Be Triggered Upon Consummation Of The Plan ....................................... 10

    B. Apollo, Oaktree And Crestview Targeted Charter For A Takeover .................. 11

    C. Apollo, Oaktree And Crestview Form A Loan-to-Own Group Shortly After Charter Announces Its Restructuring Efforts On December 12, 2008 ................ 15

    D. Apollo, Oaktree And Crestview Needed, Solicited And Obtained Franklin's Agreement To Execute The Loan-to-Own Strategy And Franklin Agreed To Support The Plan To Preserve Its $2.5 Billion Investment In Charter Debt Securities .................................................................................. 16

    E. The Takeover Group Acted As A 13(d) Group Negotiating And Agreeing On A Plan Pursuant To Which They Would Acquire A Majority Stake In CCI Equity Securities And Control Of The CCI Board ............................. 18

    F. The Takeover Group's Loan-To-Own Plan Is Premised On Depriving The Banks Of A Seat At The Negotiating Table In Order To Finance Outsized Returns On The Takeover Group's Investment, Generous Bonuses For Management And A $200 Million Payoff For Paul Allen ................................. 22

II. ON NOVEMBER 5, 2008 CCO BORROWS $250 MILLION AND FALSELY REPRESENTS THAT CIH AND CCH ARE ABLE TO PAY THEIR DEBTS AS THEY BECOME DUE ................................................................ 24

    A. Charter Cannot Move Funds Within Its Capital Structure Without Surplus ........ 24

    B. Charter Prepares For A Restructuring In The Wake Of A Decline In Its Valuation And The Collapse Of The Credit Markets ................................. 25

    C. Charter Deletes Surplus And Solvency Representations From Its Public Filings On The Same Day It Represents CIH And CCH Are Able To Pay Their Debts As They Become Due And Borrows $250 Million ......................... 27

D.      Seeking To Avoid A Free Fall Bankruptcy, Charter Ignores Lack Of Surplus At CCH I.................................................................................. 28

E.      Vulcan's Analysis Of Management's Presentation On November 14, 2008 Confirms That Charter Approved An Illegal Dividend....................................... 29

F.      Shortly After The $250 Million Borrowing Charter Admits That CCH I Lacks Surplus .................................................................................. 30

G.      KPMG Determines That It Cannot Give An Unqualified Audit Opinion Because Of The Lack Of Surplus And Charter Announces It Will File For Bankruptcy.................................................................................. 31

H.      Charter Hires An Expert—Den Uyl—To Rebut Its Own Expert—Lazard.......... 33

ARGUMENT ............................................................................................. 36

I.      CHARTER HAS THE BURDEN OF PROVING THAT EACH OF THE SECTION 1129(a) REQUIREMENTS FOR CONFIRMATION HAS BEEN MET, INCLUDING THE REQUIREMENT THAT THE LENDERS ARE NOT IMPAIRED.............................................................................................. 36

A.      Reinstatement Under Section 1124 ................................................... 36

B.      Section 1129 Places The Burden Squarely On Charter To Prove The Lenders Are Unimpaired Within The Meaning Of Section 1124 .................................... 37

C.      This Court Has Already Decided That The Issues Raised In The Adversary Proceeding Are Objections To The Plan ............................................ 40

II.     THE PLAN RESULTS IN A CHANGE-OF-CONTROL DEFAULT UNDER SECTIONS 8k(i) AND 8(k)(ii) OF THE CREDIT AGREEMENT, THEREBY IMPAIRING THE LENDERS' CONTRACTUAL RIGHTS........................................ 42

A.      The Plan Triggers A Change-Of-Control Default Under Section 8(k)(ii) Of The Credit Agreement Because The Takeover Group Will Acquire Greater Voting Power For The Management Of The Borrower Than Allen.................... 44

        1.      The Takeover Group Agreed To Act Together For The Common Objective Of Acquiring Equity Securities ................................ 45

        2.      The Takeover Group Is Executing A Loan-To-Own Strategy To Take Control Of Charter And Its Agreement Extends Post-Bankruptcy .......... 53

        3.      Members Of The Takeover Group Admit They Are Partners And Part Of A Group That Will Jointly Control Charter Post-Bankruptcy ............ 55

        4.      The Takeover Group Will Have The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of

The Borrower Than Paul Allen, Triggering A Change-of-Control Under Section 8(k)(ii) Of The Credit Agreement .................................... 56

      a.     The Takeover Group Will Have A Greater Voting Interest In CCI Equity Than Paul Allen ...................................................... 57

      b.     Because The Restructured CCI Will Have A Classified Board Of Directors, The Takeover Group Will Have The Voting Power, Independent Of Voting Percentages, To Elect A Majority Of The CCI Board And More Than Paul Allen............. 58

      c.     The So-Called Savings/Dilution Clause Is A Gimmick That Does Not Work ........................................................................ 61

    4.    The Takeover Group Tried To Cover Its Tracks And Obscure The Change-Of-Control With Gimmicks ...................................... 62

B.    The Plan Leaves Allen With Zero Votes For CCO's Management In Breach Of Section 8(k)(i) Of The Credit Agreement...................................................... 64

III.   THE CREDIT AGREEMENT CANNOT BE REINSTATED BECAUSE ON NOVEMBER 5, 2008, CCO BREACHED THE AGREEMENT BY BORROWING $250 MILLION BASED ON THE FALSE REPRESENTATION THAT CIH AND CCH WERE ABLE TO PAY THEIR DEBTS AS THEY BECOME DUE ................... 66

A.    Section 8(g)(v) Of The Credit Agreement Sets Forth A Forward/Looking Test .................................................................................................................. 67

B.    Charter's Attempt To Read The Section 8(g)(v) Cash Flow Insolvency Test Out Of The Contract Should Be Rejected ......................................................... 68

    1.    Sections 7.6 And The Cash Flow Insolvency Test Of Section 8(g)(v) Are Consistent ...................................................................... 69

    2.    Charter's Argument That The Lenders Are Trying To Impose A New Solvency Representation Requirement Is Wrong.................................... 69

    3.    Charter's Argument That the Cash Flow Test Is Too "Amorphous" To Be Enforced Should Be Rejected ........................................................ 70

C.    Charter Has Not Carried Its Burden To Prove That CCH And CIH Passed The Cash Flow Insolvency Test On November 5, 2008...................................... 71

    1.    CIH And CCH Had Virtually No Cash Or Liquid Assets ...................... 71

    2.    CCI And Holdco Had Insufficient Resources To Pay CIH And CCH's Debts And Had Obligations To CCI's Creditors...................................... 71

3. Charter Did Not Have Access To Any Viable Strategic Or Capital Markets Transactions To Allow It To Pay CIH and CCH's Debts .......... 72

4. As Of November 5, 2008, CCH And CIH Could Not Rely On Distributions From Subsidiaries Because Subsidiary CCH I Did Not Have Surplus ....................................................................................... 73

    a. Lazard's Valuation Demonstrates CCH I Did Not Have Surplus On November 5, 2008 And Thereafter ........................... 73

    b. The Public Market-Based Evidence Points To No Surplus.......... 75

    c. Charter's And The Lenders' Experts Agree That Precedent Transactions Should Be Given Only Minimal Weight In Valuing Charter......................................................................... 75

    d. Discounted Cash Flow Analyses Indicate No Surplus................. 76

    e. The Plan Process And Charter's Admissions Point To No Surplus And Are Directly Contrary To The Litigation Position Charter Is Taking Here ............................................................... 80

    f. The "Business Judgment Rule" Is A Red Herring; Business Judgment Is Not A Defense To A Breach of Contract................. 83

IV. THE CREDIT AGREEMENT CANNOT BE REINSTATED BECAUSE THE PLAN DOES NOT CURE DEFAULTS UNDER SECTION 8(f) OF THE CREDIT AGREEMENT AS REQUIRED BY SECTION 1124(2)(A) ........................................ 84

A. CCO Is In Breach Of Section 8(f) Of The Credit Agreement Because The DHCs' Debt Has Been Accelerated .................................................................. 86

B. Schmitz's Contention That The DHCs' Debt Has Not Been Accelerated Is Simply Wrong .................................................................................................... 86

C. The Cross-Acceleration Defaults Are Not *Ipso Facto* Defaults .......................... 87

D. The Plan Does Not Cure The DHC Cross-Defaults ........................................... 88

CONCLUSION ..................................................................................................... 90

# TABLE OF AUTHORITIES

## Cases

*Bistrian v. East Hampton Sand & Gravel, Inc. (In re East Hampton Sand & Gravel )*, 25 B.R. 193 (Bankr. S.D.N.Y. 1982)................................................................................ 87

*Cede & Co. v. Technicolor, Inc.*, No. Civ. A. 7129, 2003 WL 23700218 (Del. Ch. Dec. 31, 2003) .......................................................................................................................... 77

*Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir. 1986).................... 84, 85

*CSX Corp. v. Children's Inv. Fund Mgmt., (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008) ........................................................................................................................... 44

*Dempster v. Dempster*, 204 A.D.2d 1070,  613 N.Y.S.2d 78 (N.Y. App. Div., 4th Dept. 1994) .......................................................................................................................... 81

*Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1 (1st Cir. 2007)............................................... 85

*Gholl v. Emachines*, Civ. A. 19444-NC, 2004 WL 2847865 (Del. Ch. Nov. 24, 2004)........ 76, 77

*Great Sw. Corp.,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72CCH Dec.) ¶ 78,714 (Mar. 3, 1972) ...........................................................................................................48, 50, 51

*In re 7th Street & Beardsley P'ship*, 181 B.R. 426 (Bankr. D. Ariz. 1994) ................................ 36

*In re Acequia, Inc.*, 787 F.2d 1352 (9th Cir. 1986) ................................................................... 38

*In re Briscoe Enters., LTD., II*, 994 F.2d 1160, (5th Cir. 1993) ................................................ 38

*In re Cellular Info. Sys., Inc.*, 171 B.R. 926 (Bankr. S.D.N.Y. 1994)........................................ 38

*In re Charter Commc'ns*, No. 09-01132 , 2009 WL 2460713 (Bankr. S.D.N.Y. July 7, 2009) ...................................................................................................................... 37, 40

*In re Constar Int'l*, No. 08-13432 (D. Del. May 14, 2009) .................................................. 39, 40

*In re Dairy Mart Convenience Stores, Inc.*, No. 14716, 1999 WL 350473 (Del. Ch. May 24, 1999)........................................................................................................................ 58

*In re Downtown Athletic Club of N.Y. City, Inc.*, No. 98 B 41419 JLG, 1998 WL 898226 (Bankr. S.D.N.Y. Dec. 21, 1998)................................................................................ 36

*In re Fur Creations By Varriale, Ltd.*, 188 B.R. 754 (Bankr. S.D.N.Y. 1995) .......................... 39

*In re Iridium Operating LLC*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007) ....................................... 74

*In re Kizzac Mgmt. Corp.*, 44 B.R. 496 (Bankr. S.D.N.Y. 1984) ............................................... 37

*In re Midland Plaza Assocs.*, 247 B.R. 877 (Bankr. S.D. Fla. 2000) ............................................ 41

*In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994) ......................................................... 38

*In re Prudential Energy Co.*, 58 B.R. 857 (Bankr. S.D.N.Y. 1986) ................................38, 39, 40

*In re Taddeo*, 685 F.2d 24 (2d Cir. 1982) ............................................................. 36, 88

*In re Virginia Funk Haardt*, 65 B.R. 697 (Bankr. E.D. Pa. 1986) .............................................. 39

*Kopel v. Campanile (In re Kopel),* 232 B.R. 57 (Bankr. E.D.N.Y. 1999)................................... 88

*Lifemark Hosps., Inc. v. Liljeberg Enters., Inc. (In re Liljeberg Enters.),* 304 F.3d 410 (5th
    Cir. 2002) .................................................................................... 87

*Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.),*
    456 F.3d 668 (6th Cir. 2006) .................................................................. 85

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ......................................................... 44

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959)........................................................ 85

*Schaffer ex rel Lasersight, Inc. v. CC Invs., LDC,* No. 99 Civ. 2821 (VM), 2002 WL
    31869391 (S.D.N.Y. Dec. 20, 2002)........................................................... 46

*Sure-Snap Corp. v. St. Street Bank and Trust Co.*, 948 F.2d 869 (2d Cir. 1991) ....................... 41

*Wellman v. Dickinson*, 682 F.2d 355 (2d Cir. 1982)................................................... 44

## Statutes

11 U.S.C. § 1124 .......................................................................... passim

11 U.S.C. § 1129 ..........................................................................passim

15 U.S.C. § 78m(d)(3) ........................................................................ 44

11 U.S.C. § 365 ..........................................................................43, 87

# PRELIMINARY STATEMENT

After 16 trial days, Charter[1] has failed to carry its burden under 11 U.S.C. § 1129 (a) of proving that the Lenders[2] are unimpaired by the plan of reorganization (the "Plan"). The evidence overwhelmingly shows that the Plan is an illegitimate scheme to force senior Lenders to provide below-market financing for Charter's takeover by structurally junior creditors Apollo Management L.P., Crestview Partners L.P., Oaktree Capital Management L.P. and Franklin Advisors, Inc. (the "Takeover Group"). As Jim Millstein[3] said on the final day of testimony: "it's not like the value [of the below-market Credit Facility] is being conferred upon widows and orphans. It's being conferred upon you know, Oaktree and Apollo and Franklin and [Crestview]."[4] Indeed, the Plan is premised on allowing the Takeover Group to pick the senior Lenders' pockets through reinstatement of a Credit Agreement that has been materially breached. The Plan is not about creditors merely organizing themselves to rehabilitate a debtor and save their investment. It is, instead, a clear-eyed attempt to execute on a "great opportunity"[5] to buy Charter on the cheap by ignoring the Lenders' bargained-for contract rights. The plain language

---

[1] References to "Charter" are to the Debtors in this case including Charter Communications, Inc. ("CCI") and its affiliates.

[2] References to the "Lenders" are to the lenders under the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated as of March 6, 2007 (as amended, supplemented or otherwise modified from time to time) among Charter Communications Operating LLC ("CCO"), CCO Holdings, LLC ("CCOH"), the several Lenders from time to time party thereto, the Administrative Agent and certain other parties (the "Credit Agreement").

[3] Attached hereto as Appendix A is list identifying the individuals who testified who testified in this matter along with citations to where there testimony appears in the record.

[4] ¶ 7(d), (e). Unless otherwise noted all "¶" citations are to JPMorgan Chase Bank, N.A.'s Proposed Findings of Fact and Conclusions of Law.

[5] ¶ 26(e).

of the Credit Agreement demonstrates uncured or incurable defaults under four provisions of the Agreement, each of which impairs the Lenders and precludes reinstatement. Confirmation must be denied based on Charter's failure to prove by a preponderance of the evidence that all four of these defaults do not exist or need not be cured.

**Default 1: Change-Of-Control Default**
**A Group Will Have Greater Voting Power For Management Than Paul Allen**

The trial record is clear that the Plan transactions will violate the change-of-control covenant in Section 8(k)(ii) of the Credit Agreement by giving a "group"—the Takeover Group—more voting power than Paul Allen.

**There Is A Group Here**

There is overwhelming evidence that Apollo, Crestview, Oaktree and Franklin have acted and are acting together to *acquire* equity securities of Charter. That makes them a "group." Indeed, their concerted action is manifest in the uncontroverted fact that the four firms got together in a proverbial room and divvied up the rights to purchase $1.6 billion of Charter equity. This is concerted, not parallel, action to acquire equity securities. This is collective, not independent, action to acquire equity securities. This conduct *alone* satisfies the "group" requirement.

While there is no requirement that an actual agreement exist to support a finding of a "group," in fact there *is* an agreement among the members of the Takeover Group memorialized in commitment letters, restructuring agreements, and a term sheet to acquire equity securities by converting debt to equity and investing $1.6 billion of new money. These documents bind the Takeover Group to act together with respect to the acquisition of securities. In light of the foregoing, not a single witness denied the obvious: Apollo, Crestview, Oaktree and Franklin are acting together to *acquire* Charter equity securities. No other conclusion from

the record is reasonable, let alone possible. This concerted action to acquire equity securities is enough to get over the low bar of establishing the existence of a "group" under the Credit Agreement.

Throughout the trial, the Plan supporters attempted to create a smokescreen of factual disputes about the formation and motives of the Takeover Group, as well as whether its members have agreements to hold or dispose of securities in the future. Common sense and the overwhelming weight of the evidence demonstrate that Apollo, Oaktree and Crestview are not "coupon clippers" who just happened to find themselves in a restructuring. Rather, they are executing, with the support of Franklin, a loan-to-own strategy to take control of, and then sell Charter to a strategic acquirer. But the Court need not find these facts to conclude that there is a "group" within the meaning of the Credit Agreement. Putting aside holding and disposing of equity securities, Apollo, Crestview, Oaktree and Franklin's uncontroverted concerted action to acquire equity securities of Charter make them a "group" for purposes of the Credit Agreement.

### The Group Will Have More Voting Power Than Paul Allen

Because simple math shows that the Takeover Group will have, on consummation of the Plan transaction, a greater percentage of the combined Class A & B votes for members of the Board of CCI than Paul Allen (45% v. 38%), the change-of-control covenant is tripped under Charter's own reading of the Agreement (which ignores that the relevant "voting power" is for the management of the Borrower, not CCI). As demonstrated at trial and explained in more detail below, the change in control covenant is tripped because 7 is greater than 4. Specifically, the 7 Class A board seats to be appointed or elected by the Takeover Group after confirmation will give the Takeover Group 64% of the voting power for management, while Allen's 4 Class B board seats give him only 36% of the voting power. Therefore, because Allen will not have

more voting power than the Takeover Group under any reading of the Agreement, the change-of-control covenant will be tripped.

### Enforcing The Credit Agreement Is The Proper And Correct Chapter 11 Policy

In response to the indisputable factual record of a "group" having more voting power for management than Paul Allen, the Plan supporters argue that the Court should disregard settled rules of contract interpretation and close its eyes to the change-of-control breach because "what happens in bankruptcy stays in bankruptcy." The Group's members claim that because their agreement to acquire will be consummated on the effective date of the Plan, the Takeover Group will disappear on that date and not own more equity in Charter than Paul Allen. This argument makes a mockery of and effectively nullifies the change-of-control covenant. A simple example demonstrates the point. Suppose the Takeover Group's members entered into an agreement with each other outside the context of bankruptcy to acquire a controlling stake in CCI equity from Allen in a traditional leveraged buyout, but the agreement (as is typical of syndicated private equity deals) did not include any terms about post-acquisition conduct. Under Charter's argument, this would not constitute a change-of-control under Section 8(k)(ii) because the group would disappear after the acquisition was consummated. Nothing in the Credit Agreement or Section 13(d) implies such an absurd result.

In a further effort to convince the Court to ignore the Lenders' rights, Plan supporters insinuate that acknowledging the reality of a group here will somehow chill future Chapter 11 restructurings because the Credit Agreement incorporates Section 13(d) of the Exchange Act. But Apollo, Oaktree, Crestview and Franklin are not acting as mere creditors here. By agreeing with each other to invest more than $1 billion dollars of new money and divvying up the equity among themselves, insisting on and exercising rights of first refusal to

buy additional equity and an over-allotment option, demanding governance rights, board seats, and a classified board structure, the members of the Takeover Group are acting as controlling investors, and not mere creditors trying to minimize their investment losses in a restructuring. This case will have no precedential impact on "coupon-clipping" creditors who work together in a restructuring to protect their existing investments. In any event, a ruling that there is a Section 13(d) group here will not break new ground because Section 13(d) already applies to restructurings. Thirty-seven years ago, the SEC opined that creditors acting together to convert debt to equity in a restructuring are a group within the meaning of Section 13(d). *Great Sw. Corp.,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972).

The Lenders are asking this Court to respect and enforce the provisions of a heavily negotiated, multibillion dollar Credit Agreement and not break new ground or block any restructuring. This case was described by Charter's counsel in his opening as "truly unusual." It is, because no one has ever tried before to reinstate an $8 billion senior credit facility in the face of defaults and over the lenders' objections. To the extent there is a precedential effect on future restructurings of a "group" finding here, it will be entirely positive by deterring syndicates from assuming bankruptcy courts will just rubber stamp breaches of change-of-control and other covenants to enable the improper reinstatement of bank credit agreements.

### Default 2: Change-Of-Control Default
### Paul Allen Will Not Have 35% Of The Voting Power For Management Of CCO

The evidence at trial also demonstrated that the Plan transactions will violate the change-of-control covenant in Section 8(k)(i) of the Credit Agreement by leaving Paul Allen with less than 35% of the voting power for the management of CCO, the Borrower. Again, the default is manifest by reference to the uncontroverted facts and the plain language of the Credit Agreement.

## **Paul Allen Will Have Zero Voting Power**

Upon consummation of the Plan transactions, Allen will not have the power to vote or direct the voting of equity interests having 35% of the ordinary voting power for the *management of CCO*, as the contract requires. In fact, he will have the power to vote *none* of those equity interests, all 100 of which votes are held by CCO's parent, CCOH. The Plan supporters' response is to ignore the plain language of the Credit Agreement by arguing that Allen will have 35% of ordinary voting power for CCI's Board of Directors; CCI has been hired as *manager* of CCO (a limited liability company), and that is good enough. But the contract focus is on "Equity Interests"[6] with the voting power for "*management* of the Borrower," not "*manager* of the Borrower." CCOH, not Allen, has 100% of the equity interests that control selection of the "management of CCO," as well as the selection of the "manager." Whoever controls CCOH (here the Takeover Group) has the power to replace CCI with new CCO management. Allen cannot direct how CCOH votes any of its CCO interests. The Plan could have given Allen power to vote 35% of those interests directly or could have done so indirectly by giving Allen control over the CCI Board that would then flow down to the CCOH and CCO

---

[6]    "Equity interests" are defined under the Credit Agreement as

any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all classes of membership interests in a limited liability company, any and all classes of partnership interests in a partnership and any and all other equivalent ownership interests in a Person, and any and all warrants, rights or options to purchase any of the foregoing.

¶ 12(a).

levels. It does not. Allen will have zero power to vote equity interests with power to vote for the management of CCO and therefore the change-of-control covenant is breached by the Plan transactions.

**Default 3: Ability To Pay Default**
**On November 5, 2008, CCO Borrowed $250 Million Based On The Misrepresentation That CCH And CIH Shall Have The Ability To Pay Their Debts As They Become Due**

CCO borrowed $250 million from the Lenders on November 5, 2008 based on a false representation that two Designated Holding Companies ("DHCs")—CCH I Holdings LLC ("CIH") and Charter Communications Holdings LLC ("CCH")—were able to pay their debts as they become due. Sections 8(b) and 8(g)(v) of the Credit Agreement required CIH and CCH to be able to pay their debts as they become due in November 2008, January 2009 and April 2009, at a minimum. They were not. In fact, no witness testified that, as of November 5, 2008, CIH and CCH had the ability to pay their debts through April 2009. Charter's expert disclaimed any opinion that CIH and CCH were able to pay their debts when due through April 2009. Not surprisingly given that CIH and CCH filed for bankruptcy, the only affirmative testimony and evidence in the record demonstrates that by November 5, 2008 (at the latest), CIH and CCH were unable to pay their debts as they become due.

### CCH I Lacked Surplus

CIH and CCH are holding companies. They depend on distributions from subsidiaries, capital contributions from parents and the capital markets to pay their debts as they become due. The evidence is undisputed that on November 5, 2008, the capital markets were closed to CIH and CCH for the forseeable future and their parents did not have access to enough liquidity to provide capital for CIH and CCH to make interest payments through April 2009. The record is rife with admissions that the subsidiary CCH I, LLC ("CCH I") did not have enough surplus to allow CIH and CCH to pay their upcoming debts through April 2009.

7

Charter's expert did not offer a contrary opinion. Charter's auditor, KPMG, noted in its work papers that it could not provide an unqualified audit opinion for Charter's 2008 financials because CCH I did not have surplus to make a distribution to CIH and CCH for debt payments. The evidence is simply overwhelming that CCH I had no surplus as of November 5, 2008 and that CCO misrepresented that CIH and CCH had the ability to pay their debts as they become due when it borrowed $250 million from the Lenders, money that the Plan would effectively put in the Takeover Group's pockets. The valuation of $15.4 billion *sponsored by Charter* in support of the Plan—more than $3 billion less than the surplus break even point—requires the Court to conclude that there was no surplus at CCH I.

### Section 8(g)(v) Is Forward/Looking

Because Charter cannot carry its burden to show that CIH and CCH were able to pay their debts as they become due as of November 5, 2008, it is reduced to making the implausible argument that the Credit Agreement's Section 8(g)(v) test is not forward/looking as is every other test using such language, including the solvency test that appears in Section 109 of the Bankruptcy Code. Or that having filed for bankruptcy, the DHCs are able to pay their debts as they become due by discharging those debts—the opposite of paying them. Charter's position is that, notwithstanding the provision's actual words, Section 8(g)(v) is really an implied, retrospective and redundant payment default provision. As a matter of hornbook law, the Court must give effect to all the provisions of the Credit Agreement, including the second clause ("shall be unable to pay its debts as they become due") of Section 8(g)(v). The only conclusion that can be reached based on the plain language is that the relevant clause Section 8(g)(v) is forward/looking and CCO breached the Credit Agreement and impaired the Lenders on November 5, 2008, when it borrowed $250 million on the false representation that CIH and CCH

were able to pay their debts as they become due.[7]

### Default 4:  Cross-Acceleration Default
### The Acceleration Of The DHC Debt Is A Default Under The Credit Agreement

It is a default under Section 8(f) of the Credit Agreement when $200 million of debt of a DHC (other than CCOH) accelerates—a so-called cross-acceleration default.  Both sides testified that Section 8(f) was a specifically bargained-for provision.  Eloise Schmitz, Charter's CFO, acknowledged that the provision was unique among Charter's many debt documents.  The record is clear that when each of the DHCs filed for bankruptcy, as required by the Plan support agreements, more than $200 million of its debt accelerated.  Therefore, CCO is in default.

### These Are Not *Ipso Facto* Defaults

The Plan proponents hardly deny the cross-defaults, but instead argue they are *ipso facto* defaults that need not be cured.  They are wrong because the defaults do not arise from CCO's bankruptcy or financial condition, as it is undisputed that CCO is solvent and financially healthy.  Rather, CCO filed for bankruptcy to seek relief from the consequences of the cross-acceleration default.  Neither CCO's bankruptcy nor its financial condition triggered the default.  Thus, the cross-acceleration is not *ipso facto*.  Indeed, where, as here, the debtor that breached a contract is solvent, the default is by affiliates under different contracts, and the cross-acceleration default is specifically negotiated and not boilerplate, the case law requires enforcement of the contractual provision as written.

\*        \*        \*

---

[7]     CCO made an additional borrowing request on February 3, 2009 and a portion of that request was funded on February 5, 2009.  ¶¶ 128, 132.  For the same reasons, CCO's representation on February 5, 2009 that CIH and CCH were able to pay their debts as they become due was false.

The trial record is clear that the Credit Agreement cannot be reinstated and the Plan cannot be confirmed because Charter has not carried its burden of showing by a preponderance of the evidence that the Lenders are unimpaired. Indeed, the Lenders have affirmatively established impairment by showing four defaults that have not been or cannot be cured.

## STATEMENT OF PROOF

I. **THE TAKEOVER GROUP IS EXECUTING A SYNDICATED, LOAN-TO-OWN BUYOUT OF CCI SUBSIDIZED BY THE LENDERS' BELOW-MARKET DEBT, WHICH TRIGGERS A CHANGE-OF-CONTROL DEFAULT UNDER THE CREDIT AGREEMENT**

   A. **The Lenders Negotiated For Change-Of-Control Rights, Which Will Be Triggered Upon Consummation Of The Plan**

   Paul Allen is, and long has been, the controlling shareholder of CCI. ¶ 9(a). Through his control of CCI, Allen also controls CCO, the Borrower under the Credit Agreement. ¶ 9(b). The Credit Agreement sets forth the terms of a business deal that was based in large part on Paul Allen's status as the financial sponsor of CCO. ¶ 9. As JPMorgan Managing Director, Ann Kurinskas, testified, it is typical for lenders to require assurance that a financial sponsor of a borrower will remain involved in the company and a change-of-control clause provides lenders the right to negotiate new financial terms and other appropriate protections upon a specified change in the sponsor's role. ¶ 9(c), (d). Here, the Lenders negotiated for certain change-of-control Events of Default in Section 8(k) of the Credit Agreement. ¶ 10.

   Under Section 8(k)(i), it is an Event of Default if Allen "cease[s] to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% . . . of the ordinary voting power for the management of the Borrower." ¶ 14. In other words, Allen must retain 35% of the power, either directly or indirectly, to control the selection of the management of CCO.

Under Section 8(k)(ii), it is an Event of Default if any other "person" or "group," as those terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, has "the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% . . . of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage . . . of the ordinary voting power for the management of the Borrower than such 'person' or 'group.'" ¶ 12.

In connection with the proposed restructuring, the Takeover Group agreed to act together for the common purposes of acquiring equity securities of CCI and controlling CCI post-bankruptcy. ¶ 19-48. As a result of the consummation of the Plan, the Takeover Group will own approximately 70% of CCI equity, have the power to directly appoint 4 members of the initial CCI Board upon emergence from bankruptcy, have 45% of the voting interest of the combined Class A and Class B equity of CCI and have the voting power to elect 7 of the 11 members of the CCI Board at the first annual shareholders meeting. ¶ 49-57. In contrast, Allen will retain a mere 3% of the equity of CCI and 38% of the voting interest, and will have the power to appoint only 4 of the 11 members of the CCI Board. ¶ 49-57. Because upon the consummation of the Plan, (1) the Takeover Group will have voting power to elect more Board seats and have a greater equity voting percentage than Paul Allen and (2) Paul Allen will have no power to vote or direct the voting of *any* "equity interests" with "ordinary voting power for the management of the Borrower," the Plan will trigger a change-of-control default under Section 8(k) of the Credit Agreement.

## B.     Apollo, Oaktree And Crestview Targeted Charter For A Takeover

Apollo, Oaktree and Crestview are private equity firms whose investment strategy focuses on taking control of a target company at an attractive price, using their expertise to

improve the performance of the company or fixing its balance sheet, and opportunistically reselling the company at a much higher price to generate high returns on investment. ¶ 20. Eric Zinterhofer of Apollo, Jeff Marcus of Crestview and Ken Liang of Oaktree were not convincing when they attempted to portray themselves at trial as "coupon clipping" passive investors in Charter debt.

"Coupon clipping" is the antithesis of the basic investment strategy of private equity firms and the way they are compensated. As the record shows, private equity managers are compensated much more generously than mutual fund managers, earning as much as 2.5% of capital under management and 30% of the profits. ¶ 20(a)-(b). To demand that level of compensation, private equity firms engage in buyouts, loan-to-own takeovers and other active investment strategies to generate extremely high rates of return on investment, much higher than can be achieved by simply "clipping coupons." ¶ 20(c). Indeed, the contemporaneous record demonstrates that Apollo, Oaktree and Crestview were not mere passive investors in Charter debt; they were trying to actively position themselves in the fulcrum security to execute a loan-to-own strategy for an anticipated 2010 Charter restructuring. The opportunity just came a year and a half early.

In 1998, Jeff Marcus sold his private cable company, Marcus Cable, to Paul Allen. ¶ 25(a). Allen subsequently merged Marcus Cable into Charter, and the heritage Marcus Cable systems constitute approximately 20% of Charter cable systems today. ¶ 25(a). At the time, Allen asked Marcus to be the Chief Executive Officer of Charter, but he declined. ¶ 25(a). For years, Marcus has sought to get back into the cable business. Since the sale to Allen, Marcus has been frustrated "that [Charter] was having so many difficulties." ¶ 25(b). Marcus believed that if he had accepted Allen's offer to be the CEO, Charter would not have ended up in

bankruptcy: "look, this is a company that has been battered for many years and shouldn't be. And I've watched it. I've—it's been a sense of frustration for me, because had I—I can honestly say this to the representatives of Paul Allen—had I agreed to remain CEO, this wouldn't have happened." ¶ 25(b).

In 2005, Marcus, by that time at Crestview, met and developed a relationship with Zinterhofer and other senior people at Apollo in connection with a potential transaction that never came to fruition, and he and Zinterhofer began discussing Charter. ¶ 25(e). In 2006, Crestview acquired $100 million face amount of CCH I Notes in 2006 as "currency" for a potential acquisition of cable assets from Charter and also because "the deal team believed that, in a potential restructuring scenario, the Notes would be deemed the fulcrum security, giving Crestview an equity stake in the Company." ¶ 25(c).

In the fall of 2007, Apollo and Crestview met with Allen's representatives at Vulcan to discuss a potential take private transaction for Charter in which Crestview would invest $200 million alongside an $800 million investment by Apollo to acquire 51% of Charter equity. ¶ 25(e)-(f). As part of the contemplated transaction Marcus would join the Board, "ideally as Chairman." ¶ 25(e). In connection with the potential take private transaction, Apollo recognized that "any investment by Apollo required achieving sufficient control over Charter." ¶ 25(g).

Apollo's Investment Committee did not approve the take private transaction at that time. ¶ 25(h). Instead, Apollo decided to bide its time and invest in CIH Notes based "on the premise that CIH would be the fulcrum security in a potential 2010 restructuring." ¶ 25(i). By March 2008, Apollo's strategy evolved into accumulation positions in both CIH *and* CCH I

Notes, one of which it expected would be the fulcrum security, so that Apollo could "influence any outcome in a restructuring." ¶ 25(i).

By September 2008, Apollo viewed its investment in Charter debt to be headed toward a loan-to-own acquisition in 2010, with a potential exit through a sale to Comcast or Time Warner:

> By September 2010, to the extent the current credit environment persists and Charter's unable to refinance the maturities perpetuating a restructuring scenario, our securities would finance down to a reasonable level in the context of cable valuations. This instills confidence that, should such a scenario materialize, we would be positioned in the fulcrum securities or to generate a cash recovery through a Comcast/Time Warner cable purchase.

¶ 25(j).

After Charter's announcement on December 12, 2008 of a planned restructuring, Apollo accelerated its loan-to-own strategy and aggressively purchased additional CCH I debt, acquiring an additional 2% of the outstanding Notes. ¶ 25(k). By March 2009, Apollo held $886.1 million in Charter debt, with $477.9 million in CCH I Notes. ¶ 25(k). Similarly, Crestview purchased an additional $38 million face amount of CCH I Notes in September 2008, for a total of $138 million, as the economy collapsed and a potential restructuring in 2010 became increasingly likely. ¶ 25(m).

Oaktree also invested in Charter debt securities in anticipation of a 2010 restructuring.[8] ¶ 25(n). Oaktree sent an update letter to its investors in February 2009 wherein it

---

[8]      Oaktree produced virtually no documents detailing the investment thesis for its initial purchase of Charter debt or the reasons for its *$300 million* new money commitment in the current restructuring. Ken Liang's dubious explanation for Oaktree leaving virtually no paper trail relating to this massive financial commitment was, "[w]e spend a lot of time talking about issues." ¶ 47. In contrast, Apollo and Crestview created numerous memoranda, some exceeding 50 single-spaced pages, analyzing the deal and their prior investments in Charter debt. ¶ 44. The Apollo and Oaktree memoranda clearly show that the Takeover

told its investors that it had long anticipated a potential Charter restructuring in 2010. ¶ 25(n).

Specifically, Oaktree said it had always considered Charter to be "2010's business," but in

conjunction with a "like-minded group of holders" it had "developed a well-defined strategy to

accomplish [now] all that [it] could have accomplished" in 2010. ¶ 25(n). By December 2008,

Oaktree had accumulated a total of $981 million face value in Charter debt, with $577 million of

that debt in CCH I Notes. ¶ 25(n).

### C. Apollo, Oaktree And Crestview Form A Loan-to-Own Group Shortly After Charter Announces Its Restructuring Efforts On December 12, 2008

Upon Charter's announcement on December 12, 2008 that it had engaged Lazard

to advise on a possible restructuring, Apollo, Oaktree and Crestview quickly formed a group to

act together to acquire equity securities in CCI by making sure that their CCI bond holdings

would be the fulcrum security and converted into equity in a potential restructuring. ¶ 26.

Initially, Oaktree and Crestview believed that a restructuring was premature and sought to

convince Lazard to push it back to 2010. ¶ 26(d). By contrast, Apollo immediately saw the

restructuring as a golden opportunity. ¶26(c). On December 14—a mere two days after

Charter's press release—Marc Rowan, a founding partner of Apollo, suggested to Zinterhofer a

$2.54 billion dollar rights offering, underwritten by Apollo, Oaktree and Crestview, to pay off

the CCH II Notes and buy the company at "6-ish times" 2009 projected EBITDA. Rowan

advised Zinterhofer that "[k]ey is to get Oak Tree and Crest on board." ¶ 26(e).

Apollo succeeded in getting Oaktree and Crestview on board. Rowan emailed

Bruce Karsh of Oaktree on December 15, 2008 saying: "It seems that every few years we get

back together . . . 2009 seems like that time. Eric Zinterhofer is on point on Charter but I am

Group was "team[ing] up" to take control of CCI by acquiring a controlling equity position
in the restructuring. ¶¶ 26(g), 44.

hovering in the background. I have urged him to get aligned with you as this may be a great opportunity notwithstanding that it is coming a year too soon." ¶ 26(f). James Zelter of Apollo then set up a call with Zinterhofer and Karsh. On December 16, Barry Volpert, Crestview's founder, e-mailed Rowan saying that he "[s]poke to Eric [Zinterhofer]. We agree on an approach for now." ¶ 26(g).

The record is replete with admissions showing that Apollo, Oaktree and Crestview consciously agreed to work together to acquire the equity of CCI through the loan-to-own strategy. For example, Rowan instructed Zinterhofer to "[p]artner with Crestview and or Oaktree and buy lots of CCH I and be prepared to put in a bunch of new money." ¶ 26(g). Zinterhofer admitted on *direct* examination that he views the other members of the Takeover Group as "partners" and "co-investors in the transaction" who are "in the same boat" and will "work well together going forward." ¶ 41(a). For its part, Crestview characterized Apollo's plan to convert their CCH I debt into equity and invest additional equity via the rights offering as "an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest U.S. cable company." ¶ 40(d). Marcus candidly admitted at trial that *"[b]y teaming up, what we meant was that we would be part of a group."* ¶ 40(e).

**D.**  **Apollo, Oaktree And Crestview Needed, Solicited And Obtained Franklin's Agreement To Execute The Loan-to-Own Strategy And Franklin Agreed To Support The Plan To Preserve Its $2.5 Billion Investment In Charter Debt Securities**

Franklin is the largest holder of Charter debt securities. ¶ 28(a). At the time Charter issued the December 12, 2008 press release, Franklin held $2.2 billion face amount of Charter debt. ¶ 28(a). It currently holds $925 million face amount of CCH I Notes (23% of outstanding CCH I Notes), $1.028 billion face amount in CIH Notes, $497 million in CCH II Notes, and about $110 million in CCOH Notes. ¶ 28(a).

Apollo recognized that it would "certainly" need to get Franklin on board with the loan-to-own strategy because of the size of Franklin's CCH I holdings and because Franklin also held "close to a blocking position in CCH II Notes." ¶ 27(a). Crestview and Oaktree similarly recognized Franklin's importance to the takeover plan and each separately reached out to Franklin. ¶ 27(b). In addition to needing Franklin's cooperation, Apollo, Oaktree and Crestview needed Franklin with its deep pockets, to "step up" and commit to the rights offering "in order to consummate the restructuring plan" because they either could not or did not want to invest the full amount necessary to gain control of Charter on their own. ¶ 27(c).

Shortly after December 12, 2008 Franklin recognized that it needed the CCH I Notes to be the fulcrum security in order to protect as much of its investment as possible. ¶ 28(b). Almost $2 billion of Franklin's holdings are at the CCH I level or more junior. ¶ 28(b). If the fulcrum were senior to CCH I, most of Franklin's $2.2 billion investment could be wiped out. ¶ 28(b). As Christine Villaluz acknowledged, this was a "big problem" for Franklin. ¶ 28(b).

Villaluz recognized that Apollo was following a loan-to-own strategy, but she had "very limited" experience with restructurings and was "nervous and apprehensive" about working with Apollo and Oaktree. ¶ 28(c). Villaluz opposed the proposed rights offering initially, but Apollo and Oaktree were "pushing hard" for it. ¶ 35(c). Villaluz eventually agreed with Apollo and Oaktree that the rights offering was desirable and that it was in her and Franklin's economic interest to "work together" with the private equity firms. ¶ 35(c).

Ultimately, Franklin "got comfortable" with Apollo and the other private equity firms. ¶ 28(d). At one point late in the negotiations, Villaluz considered giving Apollo "her proxy" in discussions with Charter, but ultimately decided that because "we are a 23% of the

group" the direction of the process should include Franklin and not be "just them."  ¶ 28(d).

Franklin agreed to act in concert with the three private equity firms with the common objective

of acquiring equity securities of CCI by converting their CCH I debt to equity and committing,

together with Apollo, Oaktree and Crestview, almost $1.6 billion of new money to acquire

additional equity.  ¶ 28(e), 29-48.  Villaluz agreed that because "there was no alternative but a

free-fall bankruptcy and the possibility that [Franklin's] debt holdings would be wiped out,

[Franklin] agreed and supported a plan of reorganization that would cause [its] debt holdings in

Charter to be converted to acquire in the post-reorganized Charter an equity position."  ¶ 28(e).

### E. The Takeover Group Acted As A 13(d) Group Negotiating And Agreeing On A Plan Pursuant To Which They Would Acquire A Majority Stake In CCI Equity Securities And Control Of The CCI Board

Once Franklin joined, the Group participated in a three-way negotiation among

Lance Conn and other representatives of Allen, Charter's financial advisor, Lazard and

representatives of each member of the Group but no other bondholders.  ¶ 29(c).  According to

Lazard's Millstein, who was Charter's chief restructuring advisor, he was "just a passenger" in

the negotiations with Allen's representatives, which Apollo's Zinterhofer was "driving."  ¶ 29(c).

The Takeover Group negotiated and agreed on a Plan pursuant to which its

members will acquire equity securities in CCI by converting their CCH I Notes into equity and

committing collectively almost $1.6 billion dollars of new money to acquire additional equity

through a rights offering.  ¶ 29-48.  The members of the Takeover Group are coincidentally not

making parallel investments in the rights offering.  They negotiated and agreed amongst

themselves on the amount of their respective commitments.  They signed identical Restructuring

Agreements and Commitment Letters that bound them together in numerous ways, including

requiring all members of the Takeover Group to support the Plan.  ¶ 30-33.  They also agreed

amongst themselves to give Apollo, Oaktree and Crestview rights of first refusal to ensure that a

majority of the CCI equity acquired through the rights offering would remain within the Takeover Group. ¶ 36(a).

In addition to working together to pursue a common objective of acquiring CCI equity, the Takeover Group also collectively agreed on key terms regarding their control of Charter post-bankruptcy. Most significantly, the Takeover Group agreed to a classified structure for both the common equity and the Board of Directors of CCI. ¶ 39. The classified Board structure allows Allen nominally to retain a cosmetic 38% "voting interest" while ensuring that the Takeover Group will control a majority of the Board. Although clever, the Takeover Group's classified Board device is insufficient to avoid a change-of-control because the requirements in Section 8(k) of the Credit Agreement are not based on nominal voting interests but rather on "voting power for the management," *i.e.* the power to appoint or elect members of the Board of Directors. ¶ 50-51. Upon consummation of the Plan, Allen will receive Class B stock that represents less than a 2% economic interest in CCI, but nominally gives Allen a 38% voting interest in the combined equity of the company. ¶ 50(c).[9] Allen's Class B stock entitles him to appoint 4 members of the 11-person CCI Board. ¶ 51(e). The Takeover Group and all the other CCH I Noteholders and new equity investors will receive Class A equity. ¶ 51. The Class A equity will vote as a class for the other 7 members of the Board. ¶ 51(a). Because the Takeover Group (and, indeed, Apollo, Oaktree and Crestview, even without Franklin) will own a majority of the Class A equity, the Takeover Group will have the power to choose all 7 Class A directors constituting a majority of the Board. ¶ 51(b), (d). The Takeover Group's Class A

---

[9] Allen will also receive a small amount of Class A equity upon the consummation of the Plan, raising his voting percentage of the combined Class A and Class B shares from 35% to 38%. ¶ 50(c).

equity also has a nominal 45% interest in the combined equity of the company, which is greater than Allen's 38% voting interest. ¶ 50(b).[10]

Additionally, the Takeover Group agreed on an allocation of seats on the initial post-bankruptcy Board, the result of which is that Apollo gets 2 Board seats, Oaktree and Franklin each get 1 seat, and Allen gets 4 seats. ¶ 52(a), (d). Although Crestview's equity ownership will fall below the threshold for an automatic Board seat, the other members of the Takeover Group agreed to put Marcus on the Board anyway. ¶ 37. The Takeover Group, with whom Neil Smit—Charter's CEO—negotiated his compensation, also agreed to appoint Smit to serve on the Board as a Class A director. ¶ 52(b). As a Class A director, Smit would be subject to re-election by the Takeover Group and would therefore be incentivized to align himself with the Takeover Group, bringing the Takeover Group's representation on the initial Board to at least 6 directors. ¶ 52(b).

It is also worth noting that, under the original Plan filed with the Court in May 2009, the sitting Class A directors—*i.e.* the Takeover Group appointees and Smit—had the power to fill any vacancies on the Board after the Effective Date of the Plan. ¶ 53. This gave the Takeover Group *de facto* control over all 7 Class A seats on the initial Board. On the eve of the

---

[10] The Takeover Group and Charter have also inserted a so-called "dilution clause" into the proposed Amended and Restated Certificate of Incorporation that would go into effect at the first shareholders' meeting which will not be held until at least a year after consummation. ¶ 56. The dilution clause states that if any person or group owns stock with more than a 35% voting interest in "combined capital stock [*i.e.* Class A and B stock]," that person or group's voting interest will be reduced to 34.9%. ¶ 56. This is another gimmick designed to maintain the appearance of compliance with Section 8(k)(ii) of the Credit Agreement without threatening the Takeover Group's actual control. Even if triggered under the unlikely scenario that the Takeover Group would admit that they are a "group" and not waived by the then existing Board, the majority of which have been appointed by the Takeover Group, the dilution clause would have no practical effect on the election of directors due to the classified structure of the Board. The Takeover Group would still own a majority of Class A equity and, therefore, would still have the power to elect all seven Class A directors.

confirmation hearing, after the Lenders pointed this out, the Takeover Group and Charter amended the Plan to add a provision stating that vacancies on the Board on the 31st day after the Effective Date would be filled by majority vote of the entire Board rather than just the sitting Class A directors. ¶ 53. This gimmick fails too. Whether the Takeover Group will control 4, 5 or 7 of the initial Class A Board seats is of no moment. Because the Takeover Group will control at least 4 Board seats and Allen will control only 4 Board seats, Allen will not have *greater* voting power than the Takeover Group, thereby triggering a change-of-control.[11]

Without any doubt, the Takeover Group acted together to acquire securities that control CCI (and thus CCO). And the record reflects that the Takeover Group's control is not accidental. Indeed, before giving Zinterhofer the "go ahead" for participation in the rights offering with Oaktree, Crestview and Franklin, senior Apollo partner Harris demanded reassurance that the proposed investment was not like a "PIPE"—a private investment in public equity—in which Apollo would be a minority investor with no ability to control the company. ¶ 40(b). Zinterhofer explained to Harris that Apollo's new money investment was *not* a PIPE, that Apollo would *not* just be a minority investor, and that Apollo "expects to control ¼ of the equity and, with Crestview, Oaktree and Franklin, control about 40% of the vote." ¶ 40(b). According to Apollo senior partners Rowan and Zelter, "[c]ontrol of the company was given to investors who invested new money in the company via a rights offering." ¶ 40(a).

---

[11] As discussed in more detail below, despite the 11th hour amendment, the sitting Class A directors will still have the power to fill the vacant seats immediately after the Effective Date. *Infra* at n.31.

**F.**     **The Takeover Group's Loan-To-Own Plan Is Premised On Depriving The Banks Of A Seat At The Negotiating Table In Order To Finance Outsized Returns On The Takeover Group's Investment, Generous Bonuses For Management And A $200 Million Payoff For Paul Allen**

From the outset, the Takeover Group's loan-to-own strategy was premised on the reinstatement of the Lenders' below-market bank debt by hiding a change-of-control under the Credit Agreement. ¶ 7(c). It is undisputed that renegotiation of the bank debt to market interest rates would require payment of hundreds of millions of additional dollars in interest over the life of the Agreement, interest payments that Charter is plainly able to make post-restructuring. ¶¶ 172-173. As a result, the Takeover Group's overriding goal was to make sure the Lenders "do not have a voice in the restructuring since it would be more costly to replicate the Company's bank debt deal in the current environment." ¶ 173(a). Apollo and Crestview anticipate outsized *40.3%* and *52.4%* internal rates of return on their new money investments, respectively, based on the assumption that the bank debt will be reinstated. ¶ 173(b).

In order to keep the Lenders away from the negotiating table and capture the value of the below-market bank debt, the Takeover Group agreed to restructuring terms that provide a $375 million payoff to Allen, $209 million of which his representatives attributed to Allen's cooperation in avoiding the appearance of a "change in control." ¶ 7(c). Similarly, to secure management's cooperation in the loan-to-own buyout, the Takeover Group agreed to an extremely generous management incentive plan that will pay Smit and Schmitz hefty bonuses if the Plan is confirmed with reinstatement. ¶ 173(d),(e).

Because of the potential windfall from reinstating the below-market bank debt, the members of the Takeover Group took steps to cover their tracks, both by avoiding putting statements in writing that would memorialize a change-of-control and by scrubbing admissions out of documents after the fact. For example, in the midst of a discussion about a potential

relationship with Oaktree in connection with another transaction, Zinterhofer told his bosses that "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything is [sic] writing, just like we didn't in Spectrasite, but we have known each other a long time."[12]  ¶ 48.  Similarly, Crestview noted in one Investment Committee memo that "given the change-of-control provisions in the Company's bank agreements, we would not be able to enter into a shareholder agreement."  ¶ 46.  Moreover. the Takeover Group's counsel Paul Weiss admitted in their pre-hearing brief that the members of the Takeover Group considered entering into a written shareholders agreement but "affirmatively decided to forego any such agreements" because of the change-of-control provisions.  Takeover Group Pre-Hr'g. Br. at 7 [Docket # 645].  Crestview even went so far as to scrub clean three different Investment Committee memoranda of numerous references to Crestview, Apollo and Oaktree having joint control Charter before making external versions of those memoranda available to its limited partners.

*          *          *

Charter can afford to pay the Lenders a market rate of interest upon the outstanding amount of the bank debt under a different plan.  ¶ 7(b).  Using projections from Charter's disclosure statement, JPMorgan "modeled what the interest burden would look like if the debt were marked to market."  ¶ 172(a).  JPMorgan found that "the company has the ability to service the debt at the market rate and still have sufficient liquidity."  ¶ 172(a).  Under the Takeover Group's own projections, Charter will have $742 million dollars on the balance sheet

---

[12]  In 2003, Apollo and Oaktree implemented a loan-to-own strategy to acquire control of a company called Spectrasite through a restructuring.  As a result of the restructuring, Apollo and Oaktree acquired a controlling stake in the equity of Spectrasite, seats on the board and "the ability to exert significant influence over the management and policies of Spectrasite."  ¶ 24(d).  Spectrasite demonstrates that Apollo and Oaktree can execute and have executed a loan-to-own strategy without putting "anything in writing."  ¶ 24(e).

upon emergence from bankruptcy and will generate $2 billion in free cash flow through 2014. ¶ 173. With $742 million in cash on hand and $2 billion in free cash flow, CCO could easily pay the Lenders the interest implied if the revolving facility is reinstated at a current, fair market interest rate with little impact except to potentially decrease the Takeover Group's extraordinary projected IRRs by a few percentage points. ¶ 173.

Respecting the Lenders' express contractual rights and allowing a negotiation over a market rate of interest will not prevent Charter from reorganizing or from continuing operations. ¶ 175. It will, however, give the Lenders the benefit of their bargain, prevent the real and significant economic loss the Lenders, and keep the new equity holders of the company, the Takeover Group, from wrongfully capturing "the benefit of that economic deprivation." ¶ 175.

## II. ON NOVEMBER 5, 2008 CCO BORROWS $250 MILLION AND FALSELY REPRESENTS THAT CIH AND CCH ARE ABLE TO PAY THEIR DEBTS AS THEY BECOME DUE

### A. Charter Cannot Move Funds Within Its Capital Structure Without Surplus

Each time CCO borrows funds under the Credit Agreement it represents and warrants that every DHC is able to pay its debts as they become due. Specifically, Section 8(g)(v) of the Credit Agreement provides that an Event of Default occurs when "any [DHC] . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." ¶ 70. Section 5.2 of the Credit Agreement provides that CCO is deemed to have made all representations and warranties each time it borrows, including CCO's representation that no Event of Default under Section 8(g)(v) has occurred or is ongoing. ¶¶ 66, 68.

Charter relies primarily on distributions from CCO up through its capital structure to pay CIH and CCH's debts.  ¶¶ 77.  As a matter of Delaware corporate law, if any entity between CCO and CIH lacked surplus (*i.e.* if any entity's fair market value was less than its liabilities), no distribution could be made and CIH and CCH could not utilize distributions to pay their debts as they become due.  DEL. CODE ANN. tit. 6, § 18-607(a) (2009).

By November 5, 2008, CCH I lacked surplus and could no longer make distributions to CIH and CCH.  Without access to distributions, CIH and CCH could not pay their debts as they become due because in the fall 2008 they had insufficient alternative sources to meet $224 million of debts they had due between November 2008 and April 2009.  ¶ 145(c). This inability to pay is the reason Charter filed for bankruptcy.  Chris Temple, president of Allen's investment management firm Vulcan, Inc. ("Vulcan"), and a proposed new board member, admitted at trial:

> Q.   Do you have an understanding as to why Charter filed for bankruptcy?
> A.   Yes.
> Q.   And why did Charter file for bankruptcy?
> A.   An inability to make an interest payment.
> Q.   Well, when was the payment due, if you recall?
> A.    January 15th.

¶ 123(d).

### B.   Charter Prepares For A Restructuring In The Wake Of A Decline In Its Valuation And The Collapse Of The Credit Markets

In September 2008, the nation suffered several shocks to its financial system that resulted in a severe economic downturn.  ¶ 82.  These adverse economic conditions caused "cable valuations [to] drop[] to new lows."  ¶ 83.  In October 2008, Charter's public market valuation was 5.3 times the most recent EBITDA projections for 2009, which projections were in the process of being revised downward.  Charter's peers were trading at similarly low multiples. ¶ 84-85.

Charter also knew something others did not know—that CIH and CCH could no longer pay their debts as they become due because there was no way to move to them the $224 million they needed to make upcoming debt payments between November 2008 and April 2009. ¶ 90(b). CIH and CCH only had $2 million in cash or liquid assets between them. ¶ 90(a). While CCI (CIH and CCH's ultimate parent) had a $133 million intercompany receivable that it had been planning on using to pay CCI debts in April 2009, even if these funds were diverted for use by CIH and CCH they fell far short of the $224 million that CIH and CCH needed. ¶¶ 91(a)-(b)

Charter could not rely on strategic or capital market transactions to service CIH and CCH's debts, either. In 2007 and throughout 2008, Charter had sought private equity and strategic investors. No one was interested. ¶¶ 81(a)-(b). Refinancing or new debt issuances were also out of the question. As Millstein confirmed, the credit markets were "absolutely frozen" in the fall of 2008. ¶ 92(a). Schmitz also admitted during trial that by October 2008, Charter was aware it could not rely on capital markets transactions and, in fact, did not bother to pursue any transactions to address CIH and CCH's upcoming $224 million of payments. ¶¶ 92(b)-(d).

Charter's CEO, Smit, reported on this state of affairs during an October 28, 2008 meeting of the Board. Smit warned that the decrease in Charter's valuation restricted its ability to move funds within its capital structure to allow CIH and CCH to pay their debts as they become due. ¶ 87(e). Smit "reminded" the Board that in order to make a distribution a company needs to "have a financial surplus." ¶ 87(e). Lazard's Millstein told the Board that his analysis showed that "it did not appear that credit markets would improve significantly in the near future" and that Charter should consider contingency plans for a potential restructuring. ¶ 87(f).

Recognizing that CIH and CCH would soon default on $224 million of debts due from November 2008-April 2009, Charter began contingency planning for a restructuring including a potential bankruptcy filing by, among other things, formally retaining Lazard and Kirkland & Ellis as restructuring advisors. ¶¶ 87(g)-(h), 88.

### C. Charter Deletes Surplus And Solvency Representations From Its Public Filings On The Same Day It Represents CIH And CCH Are Able To Pay Their Debts As They Become Due And Borrows $250 Million

For years, in every one of its Form 10-K and 10-Q SEC filings, Charter affirmatively stated that it believed the DHCs had surplus and were not insolvent." ¶¶ 78-79. By late October and early November 2008, Charter management knew that Charter could no longer make this representation. ¶ 101. On November 5, 2008, Charter's management and audit committee approved the Form 10-Q for the third quarter of 2008 (to be filed November 6, 2008) deleting the representation "we believe that our relevant subsidiaries currently have surplus and are not insolvent." ¶ 101. Yet the same day, CCO borrowed $250 million. ¶ 102. Charter knew that CCH I needed surplus for CIH and CCH to be able to pay their debts as they become due and that it was "uncertain" as to whether CCH I had surplus. ¶ 101(b). Yet CCO went ahead and borrowed the money and represented that CIH and CCH were able to pay their debts as they become due. ¶¶ 102. As the trial record shows, this representation was false when made.

If Charter had obtained a valuation opinion or solvency opinion in November 2008, Charter would not have been "uncertain" as to whether or not CCH I had surplus. Charter would have seen that CCH I had a surplus *deficit* exceeding $3 billion. Indeed, when Lazard was finally asked to value Charter in connection with this bankruptcy case, Lazard concluded that Charter's fair market value is $15.4 billion—well below the $18.7 billion that would be required in order for CCH I to have surplus. ¶¶ 135(a), (c). Importantly, Charter has not introduced evidence of any event occurring between November 5, 2008 and March 27, 2009 that could

materially impact the value of Charter—much less explain how Charter could be worth over $18.7 billion in November but only $15.4 billion four months later. Indeed, Schmitz confirmed that there was no material change in the financial condition of Charter during this period. ¶¶ 136(b), (c). The evidence shows that, if anything, Charter's financial condition and the markets in March 2009 were better than they were in November 2008. ¶¶ 135(a), (c).

**D.  Seeking To Avoid A Free Fall Bankruptcy, Charter Ignores Lack Of Surplus At CCH I**

On November 14, 2008, a week after the filing of its Form 10-Q for the third quarter of 2008 deleting all representations as to surplus and solvency of the DHCs, Charter held a special meeting of the Board to discuss CCH's $8 million and CIH's $63 million upcoming interest payment, due on November 17, 2008. The Board was not normally asked to approve distributions to allow DHCs to pay interest, ¶ 109, and, in fact, the Board did not approve a distribution that would have allowed CCH to pay its $8 million interest payment. Instead, the Board resolved to fund CCH's interest payment by having CCO prepay an intercompany loan owed to Holdco. ¶ 111. Holdco then made a capital contribution to CCH that certain Holdco creditors allege was a fraudulent conveyance, enabling CCH to make its $8 million interest payment. ¶ 111.

Management told the Board during the special meeting that the only way to make CIH's upcoming $63 million November 17, 2008 interest payment was through a distribution from CCH I. ¶ 110. Management warned that if the Board failed to approve a distribution from CCH I to CIH it could trigger a "free fall" bankruptcy. ¶ 110. Management acknowledged that "[a]dverse parties may . . . claim peer and Charter debt market valuations indicate lack of surplus at CCH I." ¶ 110. But, according to management, the "consequences of not making the distribution and interest payment would likely far exceed amount of distribution and payment."

¶ 110. Based on this, the Board approved an "illegal dividend" because CCH I did not have surplus when it was made. ¶¶ 77(e), 110, 122(c).

Charter did not ask Lazard for a valuation opinion in November 2008. Millstein confirmed this fact vociferously during his testimony, stating repeatedly that Lazard did not provide Charter with a valuation opinion surplus opinion or a surplus opinion. ¶ 112. He even went out of his way to tell the Court that Charter's minutes misstated what he said at the November 14, 2008 special meeting of the Board. ¶ 112(a). Also contrary to the minutes of the November 14, 2008 meeting, Duff & Phelps denied that it provided Charter with a draft DCF that "indicated that CCH I had a financial surplus of $2.8 billion." ¶ 106(h). Although Charter had obtained solvency opinions in the past when it had concerns about surplus, Charter made no attempt to obtain an actual solvency opinion in November 2008. ¶¶ 102(b), 103. Schmitz testified that she knew Charter could not, in fact, get a solvency opinion because management did not have reliable projections—the existing July Long Range Plan was outdated and un-useable. ¶ 104. In short, Charter borrowed $250 million from the Lenders on November 5, 2008 based on a representation that was demonstrably false, namely that at that time CIH and CCH were able to pay their debts as they become due.

E.     **Vulcan's Analysis Of Management's Presentation On November 14, 2008 Confirms That Charter Approved An Illegal Dividend**

After the November 14, 2008 special meeting, Vulcan prepared its own analysis to assess the information management had provided to the Board. ¶ 114. Recognizing that the only available internal Charter projections were the outdated July Long Range Plan, Vulcan Vice President (and current President) Chris Temple instructed his subordinate to use the high and low end of the range of current Wall Street analyst projections. ¶ 114(c). Vulcan's internal DCF resulted in a range of values from $14-$18.2 billion, with a midpoint value of $16.1 billion—

consistent with Lazard's Valuation. Even at the high end of the range, Vulcan's valuation fell short of the $18.7 billion breakeven point required for CCH I to have surplus. ¶ 114(e).

After Vulcan received Charter management's revised projections in December, Vulcan performed the identical surplus analysis employed by Charter in November 2008, which used the Duff & Phelps model, but replaced the projected EBITDA number from the July Long Range Plan with the EBIDTA number projected in December for the January Long Range Plan. ¶ 115. This second Vulcan DCF analysis showed *negative* surplus at CCH I of $360 million. ¶ 115(a). Consistent with its DCFs and also with current market valuations, in December 2008, Vulcan advised Lazard that it was valuing Charter at a multiple of approximately 5 - 6 times projected EBITDA. This is billions of dollars below the surplus breakeven point. ¶ 116.

### F. Shortly After The $250 Million Borrowing Charter Admits That CCH I Lacks Surplus

On December 11, 2008, Schmitz had a discussion with Eric Federman of Credit Suisse. Federman memorialized that discussion contemporaneously in an email:

> Based on current valuations, they are not really solvent from cch2 on up. Since they have interest payments and maturities at those levels, they need to deal with it now. They have the liquidity to make these payments, but cannot make them under [D]elaware law due to multiples in the sector.

¶¶ 118. CCH I is one of the entities above CCH II that Schmitz said could not make a distribution under Delaware law because it was insolvent—*i.e.* lacked surplus.

On December 12, 2008, Charter announced publicly that it had retained Lazard to "initiate discussions with the Company's bondholders." ¶ 119. Beginning in December, Lazard approached CCH I and CCH II bondholders to commence restructuring negotiations. From the beginning, Charter and Lazard recognized that the fulcrum security would be that of either CCH I or CCH II, and hence approached those bondholders in particular. Lazard contacted major holders of CCH I and CCH II debt in December 2008 because Charter knew that, given the

decline in the value of Charter, either CCH I or CCH II debt would be the fulcrum security in a Chapter 11 restructuring. ¶ 121(a). Thereafter, Charter proceeded to tell the Takeover Group and JPMorgan that CIH and CCH were unable to pay their debts coming due in January and April 2009. ¶ 122. Consistent with those admissions, Charter did not make CIH's and CCH's interest payments on January 15, 2009 due to the lack of surplus or any alternatives for accessing the necessary funds.

- Smit admitted during this trial that "the company did not make it's [sic] January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure." ¶ 123(e).

- In a presentation to Charter's audit committee, management stated "the company did not make it's [sic] January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure." ¶ 123(f).

- Charter management told KPMG that "[m]anagement and the Board of Directors decided not to make the interest payments on January 15, 2009 at CCH and CIH due to the estimated lack of surplus at CCH I that would not permit the distribution of money up to CIH and CCH." ¶ 123(i).

- By February 3, 2009, Charter's counsel had advised JPMorgan's counsel that Charter was going to file for bankruptcy, and Charter and JPMorgan engaged in negotiations over a cash collateral agreement. On February 11, 2009, counsel for Charter furnished first day papers to be filed the next day, including a draft declaration of Gregory Doody, Charter's Chief Restructuring Officer, acknowledging that "Charter determined, in exercising its fiduciary duties and in compliance with applicable law, that it could not make two interest payments for junior entities in its capital structure which were due on January 15, 2009 in the amount of approximately $74 million." ¶ 123(k).

**G.      KPMG Determines That It Cannot Give An Unqualified Audit Opinion Because Of The Lack Of Surplus And Charter Announces It Will File For Bankruptcy**

By February 8, 2009, in the course of its audit of Charter's 2008 financial statements, KPMG determined that it could not give Charter an unqualified audit opinion. KPMG explained:

This conclusion is based on the projected lack of adequate surplus at certain Charter subsidiaries during 2009. This lack of adequate surplus limits the Company's ability to distribute cash to certain entities within the structure such that those entities will not be able to meet their principal and interest obligations when due.

¶ 125(a). The KPMG "Final Going Concern Analysis" was memorialized in an exhaustive memorandum dated February 8, 2009. As the Court recognized, this memorandum and other KPMG work papers that Charter tried so hard to keep out of evidence bear the indicia of reliability because they "were prepared by professionals . . . with a view toward getting the information contained in these documents right." ¶ 124(b). KPMG reported in its work papers that it had had discussions with Charter management regarding the surplus issue and "[m]anagement does not project the surplus estimate to improve during the course of 2009 such that CCH or CIH would have adequate surplus to make distributions during the course of 2009." ¶ 125(d). KPMG's analysis also confirmed that CIH and CCH had insufficient alternative sources of liquidity and, thus, without access to distributions they were unable to pay their debts as they become due. ¶ 126.

On February 9, 2009, one day after KPMG determined that it could not issue an unqualified audit opinion, Charter's CFO, Schmitz, sent a letter to JPMorgan urging it to honor a lending request made on February 3, 2009. ¶ 132. Remarkably, Schmitz claimed in this letter that CCO had not defaulted under the Credit Agreement and all of the DHCs were able to pay their debts as they become due. ¶ 132.

On February 12, 2009, three days after Schmitz claimed that the DHCs were able to pay their debts as they become due, Charter announced that it intended to file for bankruptcy and that it had reached an agreement in principle with the Takeover Group that would wipe out CIH and CCH's debt rather than pay it. ¶ 133. The agreement required CIH and CCH to pay

$25 million of the $72 million of interest that was due on January 15. The remaining $47 million was placed in an escrow account to be "round tripped." ¶ 133(a). Under the terms of the escrow agreement with the Takeover Group, if the Board does not receive releases to the "illegal dividend" through confirmation of the Plan, Charter gets the $47 million back. If the Plan is confirmed, the directors released and the Takeover Group gets the $47 million. ¶ 133(a). According to Franklin's Villaluz, the interest that was due from CIH for the January 15 interest payments has not been paid. ¶ 133(b).

CCH and CIH filed for bankruptcy on March 27, 2009. ¶ 134. Their bankruptcy filings resulted in a default under each of their indentures and automatically accelerated the full amount due. ¶ 168-170. Both CCH and CIH had more than $200 million of debt under these indentures that was accelerated. ¶ 170(b). The acceleration of this debt resulted in a default by CCO under Section 8(f) of the Credit Agreement. ¶ 168.

**H.  Charter Hires An Expert—Den Uyl—To Rebut Its Own Expert—Lazard**

As discussed above, Lazard's Valuation shows that the fair market value of Charter is $15.4 billion. In an attempt to rebut the Lazard Valuation (and the Lenders' objections), Charter later retained Bruce Den Uyl to contradict Lazard's methodologies and opinion. Den Uyl disagrees with how Lazard calculated its discount rate. When asked about Den Uyl's discount rate calculation, Lazard's Steven Goldstein said that Den Uyl needed "a little beta lesson." ¶ 163(a). Taylor, the Lender's expert, also agreed that Den Uyl's discount rate calculation suffered from fundamental errors:

- Den Uyl erroneously included Mediacom in his discount rate calculation. ¶ 163. As Goldstein explained, Mediacom's small market capitalization and illiquid stock required its exclusion. ¶¶ 163(c).

- Den Uyl erroneously used the coupon rate instead of the yield-to-maturity rate to calculate the cost of Charter's bank debt. For highly leveraged companies, the cost of debt is properly calculated using market rates of interest. ¶ 164.

Correcting either one of these errors in Den Uyl's DCF analyses shows no surplus. ¶¶ 163(f), 164(a).

Unlike Den Uyl, Taylor and Goldstein also agree that the market is the reliable indicator of the value of Charter. ¶¶ 139(b)-(g). It is undisputed that there is no surplus at CCH I based on market values. Indeed, Den Uyl's comparable companies analysis confirms CCH I had no surplus in November 2008. ¶ 152. In an attempt to elude this inconvenient truth, Den Uyl takes issue with the methodologies underlying Lazard's precedent transactions analysis. He thinks Lazard was wrong to exclude transactions with fewer than 1 million subscribers even though Charter has over 5 million subscribers. ¶ 157. Den Uyl inappropriately included these smaller transactions in his analysis, inflating the results. ¶ 157. Unlike Lazard, Den Uyl did not adjust his analysis to account for declines in the S&P 500 that occurred in the years since the only available precedent transactions had closed. This had the effect of further inflating his results. ¶ 156.

Den Uyl also over weighted his precedent transactions analysis. ¶ 158. He did not testify that he actually believed it was appropriate to overweight precedent transactions. He did so based on a misunderstanding of what Millstein told the Board during the special meeting on November 14, 2008. ¶ 158(a). Millstein testified that precedent transactions would be a reliable indicator of the value of Charter *only if* the credit markets recovered. ¶¶ 112(d)-(f). The record is clear as to what methodologies relating to precedent transactions Millstein would use in valuing Lazard. As Goldstein testified "just to be clear we did use Jim Millstein's methodology with respect to the bankruptcy valuation in March of 2009." ¶ 158(b). Lazard and Taylor agree

that only *minimal* weight can be given to precedent transactions in the valuation of Charter because the only available comparable transactions were "executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace." ¶ 139(a).

During his testimony, Goldstein bluntly countered Den Uyl's testimony. When told about Den Uyl's statements relating to control premiums, Goldstein exclaimed: "I'd like to discuss that with him. I've never seen a control premium apply to the debt portion of a capital structure." ¶ 154. Similarly, when Goldstein was told that Den Uyl relied on analyst reports to support his conclusions that CCI's NOLs were worth far more than the value Lazard ascribed to them, Goldstein replied, "we relied on the companies tax experts, [Ernst & Young], who I can only imagine have far, far more information than JPMorgan or Citigroup research analysts." ¶ 166.

In contrast, the testimony of the Lenders' expert, Taylor, stands unrebutted and matches Lazard's Vluation. Taylor is a valuation professional with expertise both in the cable industry and in distressed companies in particular. ¶ 143. Her analysis showed that there was an inability to pay debts at the CCH and CIH levels because they had virtually no cash with which to pay the $224 million due from November 2008-April 2009. ¶ 145(a). She explained why CIH and CCH's parents could not fund the $224 million they owed through intercompany accounts and described the evidence demonstrating that Charter could not access the capital markets to pay CIH and CCH's debts. ¶¶ 145(b), (c). Her valuation analysis established that all reliable indicators of value confirmed that CCH I did not have surplus as of November 5, 2008. ¶ 146. Finally, she noted the obvious: there is only one current transaction for a company

comparable to Charter that is relevant for the purposes of valuing Charter—the transaction before the Court today and the Plan value shows no surplus. ¶ 140(c).

**ARGUMENT**

**I.     CHARTER HAS THE BURDEN OF PROVING THAT EACH OF THE SECTION 1129(a) REQUIREMENTS FOR CONFIRMATION HAS BEEN MET, INCLUDING THE REQUIREMENT THAT THE LENDERS ARE NOT IMPAIRED**

> **A.     Reinstatement Under Section 1124**

Section 1124 of the Bankruptcy Code "determines who has the right to vote" on a proposed plan of reorganization. *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982). Parties with "impaired" claims or interests can vote. *Id.* Section 1124 of the Bankruptcy Code defines impairment "in the broadest possible terms." *Id.* Under Section 1124(1), a creditor is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). Any alteration, even one that enhances those rights, constitutes impairment. *See In re Downtown Athletic Club of N.Y. City, Inc.*, No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) ("Because [Section 1124] focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment."); *In re 7th St. & Beardsley P'ship*, 181 B.R. 426, 431 (Bankr. D. Ariz. 1994) ("[A]ny change in creditor's rights, whether for the better or for the worse, constitutes impairment. . . .'").

Alternatively, Section 1124(2) allows a class of claims or interests to be treated as unimpaired only if *all* of the following five requirements are met:

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

36

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).

### B. Section 1129 Places The Burden Squarely On Charter To Prove The Lenders Are Unimpaired Within The Meaning Of Section 1124

The central issue the Court must decide in this matter is whether the Lenders are impaired within the meaning of Section 1124. The Lenders will be impaired under Section 1124 if CCO breached the Credit Agreement and the Plan fails to cure that breach. *See* 11 U.S.C. §§1124(1), (2)(A); *see also In re Charter Commc'ns*, No. 09-01132, 2009 WL 2460713, at *6 (Bankr. S.D.N.Y. July 7, 2009) ("determination of the existence of defaults under the Credit Agreement . . . would 'likely be dispositive' of whether or not reinstatement of the Credit Agreement is permissible as contemplated in Debtors' plan.") (citation omitted); *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984) (in order to reinstate under Section 1124 all non-*ipso facto* defaults must be cured).

The burden of proving whether or not the Lenders are impaired is on Charter. Charter, as the Plan proponent, must prove by a preponderance of the evidence that each requirement of Section 1129(a) has been met. *See In re Adelphia Commc'ns Corp.*, 368 B.R.

140, 252 (Bankr. S.D.N.Y. 2007) (citing *In re Featherworks Corp.*, 25 B.R. 634, 642 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984) ("As the proponent of the plan, the debtor had the burden of establishing that it met the requirements of the Code.")); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) (adopting preponderance of evidence standard under Section 1129 set forth by the Fifth Circuit in *In re Briscoe Enters., LTD., II*, 994 F.2d 1160, 1164-65 (5th Cir. 1993)); *see In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("absent satisfaction of each of the requirements of § 1129(a), confirmation may not be ordered. In this the plan's proponents, here the Debtors, have the burden of proof.") (citation omitted). "The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession . . . since they stand in a fiduciary relationship to the estate's creditors." *In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994) (citing *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985)). Charter's burden includes proving compliance with the reinstatement provisions of Section 1124. *In re Acequia, Inc.*, 787 F.2d 1352, 1360 n.13 (9th Cir. 1986) (debtor did not meet its burden under Section 1129(a)(1) because the plan improperly characterized an objecting creditor as unimpaired.

Specifically, a debtor that sponsors a plan reinstating a loan agreement has the burden of proving that the Plan "leaves unaltered the legal, equitable, and contractual rights" of the lenders under the loan agreement or cures all defaults that are not excluded from cure under Section 365(b)(2). Section 1129(a)(8) also requires Charter to prove that "[w]ith respect to each class of claims or interests" either "(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). To meet this requirement Charter must prove that the Lenders are not impaired within the meaning of Section 1124. *See* 11 U.S.C.

§ 1129(a)(8); *In re Virginia Funk Haardt*, 65 B.R. 697, 701 (Bankr. E.D. Pa. 1986) (debtor has burden of proving impairment under Section 1129(a)(8)).

In sum, where, as here, the question of whether confirmation under Section 1129(a) is appropriate turns on whether or not a creditor is deemed impaired under Section 1124, the burden of proving impairment (or non-impairment) is on the plan proponent. *See, e.g.*, *In re Fur Creations By Varriale, Ltd.*, 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (in order to establish compliance with Section 1129(10), debtor had the burden of proving that a creditor voting for the plan was impaired within the meaning of Section 1124); *In re Virginia Funk Haardt*, 65 B.R. at 701 n.6 (denying confirmation for failure to meet the requirement of Section 1129(a)(8) because "Debtor has not met its burden of convincing the Court that a class of claims is not impaired").

Furthermore, the case law holds that, as Plan proponent, Charter bears the burden on the two primary factual issues in dispute: surplus and change-of-control. *See In re Prudential Energy Co.*, 58 B.R. at 865-66, 868 (denying confirmation because the debtor failed to offer sufficient evidence on the issue of surplus); *In re Constar Int'l*, No. 08-13432, slip op. at 8 (D. Del. May 14, 2009) (burden of proving no default under change in control provision was on the debtor seeking confirmation of plan). In *Prudential Energy*, certain debenture holders objected to confirmation because they arguably would receive more in a liquidation. *See* 58 B.R. at 864. The debtor claimed that the debenture holders were actually former equity holders who exchanged their equity for debt when the debtor lacked surplus and, thus, were not entitled to anything in a liquidation. *Id.* at 864-65. The debtor cited authority suggesting that debt holders who acquired their debt in a swap, that was consummated to achieve a preference should be subordinated. *Id.* at 865. The Court rejected the debtor's argument and denied confirmation because the debtor did not offer proof establishing that the debtor lacked surplus when the debt

for equity swap occurred.  *Id.* at 865, 868.  Similarly, in *Constar*, a case offered to this Court by Charter and the Takeover Group, the court held the burden was on the debtor to prove the objecting lenders were not impaired because there was no default under the change-of-control provision in the lenders' credit agreement.  *See In re Constar Int'l*, No. 08-13432, slip op. at 8.[13]

## C. This Court Has Already Decided That The Issues Raised In The Adversary Proceeding Are Objections To The Plan

That the Lenders filed a separate adversary proceeding asserting that there has been a default under the Credit Agreement has no bearing on Charter's burden of proof for confirmation.  Charter fought vigorously to have the issues raised by the adversary proceeding decided in the context of confirmation under Section 1129 rather than in a separate litigation. Charter argued that the Lenders' adversary proceeding was "core" because "in determining whether the credit agreement may be reinstated, the Court will need to determine whether Events of Default have occurred under the Credit Agreement—the precise issues that JPMorgan has raised in its adversary complaint."  Debtors' Mot. to Dismiss at 6 [Docket # 141].  The Court agreed, noting that "this Court will need to address the reinstatement question presented in the Complaint in deciding whether the plan may be confirmed."  *In re Charter Commc'ns*, 2009 WL 2460713 at *6.

Having chosen to litigate these claims in an expedited proceeding in the confirmation context in which it indisputably has the burden of proof, Charter cannot now disclaim  the burden of proving that the Lenders are unimpaired.  It would be inconsistent with policies underlying the Code to shift the burden to the Lenders on their objections.  The

---

[13]  A few courts outside this district have noted that "[s]ome evidence in support of the objection must be adduced" by the objector.  *In re Future Energy Corp.*, 83 B.R. 470, 482 n.21 (S.D. Oh. 1988).  Over the 16 trial days, JPMorgan has plainly met this "some evidence" standard. And, more importantly, these cases do not shift the burden of proof to the objecting party.

confirmation of a plan has preclusive effect that can have far reaching impacts. *See Sure-Snap Corp. v. State St. Bank and Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (confirmed plan has *res judicata* effect binding creditors). In order to protect creditors' rights, even where no objection to confirmation has been raised, a bankruptcy court has an independent duty to determine whether a plan proponent has satisfied its burden under Section 1129(a). *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 284 (Bankr. S.D.N.Y. 1990) (citing *In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988)); *see also In re Prudential*, 58 B.R. at 862 ("Regardless of whether a valid objection to confirmation has been asserted, however, the Code imposes upon the Court the responsibility to determine whether the requirements of § 1129(a) of the Code have been met."). The fact that courts recognize that the preclusive effect of confirmation should not be taken lightly is further evidenced by the fact that some courts find that a debtor needs to offer evidence proving by *clear and convincing* evidence—rather than by a preponderance—before confirmation can be granted. *See In re Midland Plaza Assocs.*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000) ("The appropriate standard of proof at a hearing on confirmation is the clear and convincing evidence standard, rather than the preponderance of the evidence standard."). To say that a debtor need not withstand the scrutiny required under Section 1129(a) merely because creditors filed an adversary proceeding has no basis in the Code or the policies underlying the Code.[14]

---

[14] While there are cases in the Section 365 context holding that the burden is on the party seeking to avoid assumption of an executory contract to offer evidence of a default, these cases are entirely inapplicable here. Charter expressly denies that the Credit Agreement is an executory contract. If the Credit Agreement was an executory contract, it could not be assumed because it is a financial accommodation. 11 U.S.C. § 365 (e)(2)(B). A debtor bears the burden under Sections 1129(a) and 1124 in order to reinstate a credit agreement and receive plan confirmation. Nothing in Section 365 dictates a different result.

Charter was first in the order of proof during the confirmation hearing and was granted the right to put on a rebuttal case, as well. Clearly, Charter understood it has the burden of proof. It has not carried that burden. To the contrary, the Lenders proved that: (i) CCO will be in breach of the Credit Agreement's change-of-control provision on consummation of the Plan because a group will have greater voting power for management of CCO than Paul Allen; (ii) CCO will be in breach of the change in control provision because Paul Allen will not have 35% of the voting power for the management of CCO; (iii) on November 5, 2008, CCO breached the Credit Agreement by borrowing $250 million when CCH and CIH did not have the ability to pay their debts as they came due; and (iv) CCO's breach of Section 8(f) of the Credit Agreement is not an *ipso facto* default.[15]

## II. THE PLAN RESULTS IN A CHANGE-OF-CONTROL DEFAULT UNDER SECTIONS 8k(i) AND 8(k)(ii) OF THE CREDIT AGREEMENT, THEREBY IMPAIRING THE LENDERS' CONTRACTUAL RIGHTS

Section 8(k) of the Credit Agreement provides, in relevant part, that the following constitute Events of Default:

(i)     Paul Allen group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a

---

[15] Here, the Plan does not cure CCO's Section 8(k) defaults and by arguing they are *ipso facto* Charter concedes that such nonmonetary defaults are incapable of cure. Material, nonmonetary defaults must be cured before a lender can be considered unimpaired. *See In re New Breed Realty Enters.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) (material non-curable default precludes assumption of executory contract). CCO could not retract or cure its prior misrepresentations because they are "historical facts" that cannot be undone. *See, e.g., In re New Breed Realty Enters.*, 278 B.R. at 320 (holding that the debtor's failure to close the sale on the contractually specified date "constitutes a nonmonetary default which cannot be cured because it is a historical fact"); *In re Toyota of Yonkers*, *Inc.*, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992) (recognizing that if default of provision requiring continuous operation of dealership occurred, "it is incapable of cure or remedy because the debtor cannot undo this historical fact"); *see also In re Allen*, 300 B.R. 105, 110 (Bankr. D.C. 2003) ("a material misrepresentation arguably cannot be cured: once made, it remains a material misrepresentation."). Thus, the Lenders' claims are impaired and the Plan cannot be confirmed.

fully diluted basis) of the ordinary voting power for the management of the Borrower; or

(ii)     the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group."

¶ 12,14.

It is indisputable that upon the consummation of the Plan transactions, Allen's role with respect to CCO will change dramatically. Through the restructuring, the Takeover Group is executing a loan-to-own strategy to take control of CCI by converting their CCH I Notes and committing $1.6 billion of new money to acquire equity securities of CCI. Upon consummation of the Plan transactions, (1) the Takeover Group will have acquired equity interests having greater voting power for the management of Borrower than Allen, and (2) Allen will have ceased to have *any* direct or indirect voting power for the management of the Borrower. Because the Plan will trigger change-of-control Events of Default under Sections 8(k)(i) and 8(k)(ii) of the Credit Agreement without giving the Lenders a seat at the negotiating table to adjust the terms of the loan to market terms, the Plan deprives the Lenders of significant legal, equitable and contractual rights for which they specifically bargained. Accordingly, Charter cannot satisfy its burden of proving that the Lenders are unimpaired under Section 1124(1) of the Bankruptcy Code and the Plan cannot be confirmed.

**A.** **The Plan Triggers A Change-Of-Control Default Under Section 8(k)(ii) Of The Credit Agreement Because The Takeover Group Will Acquire Greater Voting Power For The Management Of The Borrower Than Allen**

Under Section 8(k)(ii) of the Credit Agreement, a change-of-control occurs if any "group"—as defined in Section 13(d) and 14(d) of the Securities Exchange Act of 1934 ("Exchange Act")—obtains the power "directly or indirectly, to vote or direct the voting of Equity Interests" having "greater voting power for the management of the Borrower" than Allen. ¶ 12. Section 13(d) of the Exchange Act provides that a group exists when "two or more persons act as a partnership, limited partnership, syndicate or other group for the purpose of *acquiring*, holding, or *disposing* of securities." 15 U.S.C. § 78m(d)(3) (emphasis added).

"[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982). There is "no requirement . . . that the members [of a 13(d) group] be committed to acquisition, holding, or disposition on any specific set of terms." *Id.* "[T]he concerted action of the group's members need not be expressly memorialized in writing." *Id.* To constitute a "group," there need be simply a showing that the group members "acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer." *Roth v. Jennings*, 489 F.3d 499, 504 (2d Cir. 2007) (internal citations omitted). "The existence of a group turns on whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between members for the purpose of acquiring, holding, or disposing of securities." *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 552 (S.D.N.Y. 2008) (internal quotations omitted). Evidence that members "went to considerable lengths to cover their tracks" is circumstantial evidence of the existence of a group. *Id.* at 553.

Thus, the question for the Court regarding Section 8(k)(ii) is: As a result of the consummation of the Plan, will a group that acted together to pursue a common objective of acquiring CCI equity have greater "voting power for the management of the Borrower" than Allen? The totality of the direct and circumstantial evidence adduced at the confirmation hearing demonstrates that the answer is unequivocally, "Yes."[16]

### 1. The Takeover Group Agreed To Act Together For The Common Objective Of Acquiring Equity Securities

The undisputed evidence introduced at trial demonstrates that Apollo, Oaktree, Crestview and Franklin worked and are working in concert to acquire equity securities of CCI. The Takeover Group collectively held over $2 billion in CCH I Notes. ¶¶ 29-48. Its members recognized that there was a risk either of a free fall bankruptcy or a restructuring in which the CCH II Notes were deemed to be the fulcrum security and both of those scenarios would result in their CCH I debt being wiped out. ¶ 26. Accordingly, the members of the Takeover Group agreed to work together with the common objective of ensuring that the CCH I Notes would be the fulcrum security and would be converted into equity. ¶ 35. Apollo, Oaktree, Crestview and Franklin all negotiated and agreed on a restructuring plan pursuant to which their CCH I Notes

---

[16] The argument by the Official Committee in its pre-hearing brief that the Takeover Group cannot be a Section 13(d) group because the members are not presently beneficial owners of Charter stock is without merit. *See* Official Committee Pre-Hr'g. Br. at 39. The cases cited by the Official Committee relate to the filing requirement under Section 13(d) for beneficial owners of 5% of a company's stock. The Official Committee offers no authority that investors who agree to work in concert with a common objective of acquiring equity are not a group when the agreement to acquire the equity is consummated, nor would such a reading of the words of Section 13(d) make sense as they are used in the Credit Agreement.

would be converted to equity and they would commit to invest together almost $1.6 billion to acquire new equity of CCI. ¶ 29-48.[17]

The members of the Takeover Group did not make independent, parallel investments in $1.6 billion of new Charter equity; they specifically negotiated and agreed amongst themselves on the amount of their respective commitments. ¶ 35. The members of the Takeover Group negotiated and agreed to the same Term Sheet that, among other things, recited the following new-money commitments to the rights offering:

- Apollo—$701.9 million;

- Oaktree—$300 million;

- Crestview—$225 million;

- Franklin—$336.4 million.

¶ 34.[18]

The Takeover Group's agreement to acquire CCI equity is memorialized in Commitment Letters and Restructuring Agreements, which incorporate the Term Sheet. ¶ 30-39. For transparently optical reasons, each member of the Takeover Group executed separate, but substantially identical agreements with Charter. Paul Weiss, on behalf of the Takeover Group, negotiated and drafted a single form of Restructuring Agreement and Commitment Letter for all

---

[17] One component of their strategy was to use the proceeds of the rights offering to pay off a portion of the CCH II debt to satisfy the CCH II bondholders so they would not make a play to be the fulcrum security. ¶ 35(b).

[18] Franklin subsequently negotiated with Apollo to reduce its commitment by $88 million to $248 million with Apollo agreeing to increase its commitment by the corresponding amount. ¶ 34.

members of the Takeover Group to sign. ¶ 30.[19]  Each of the Takeover Group's agreements is identical, incorporates the same Term Sheet, and is expressly conditioned on other members of the Takeover Group signing identical agreements. ¶ 30-31.  Moreover, none of the agreements can be amended without the consent of the other members of the Takeover Group. ¶ 32.  The use of separate agreements is simply a charade.  Indeed, Villaluz admitted on cross-examination that the Takeover Group signed "the same agreement."   ¶ 30(b).

Not only did the members of the Takeover Group sign the "same agreement" to acquire their equity interests, but that agreement binds them together in myriad ways that demonstrate the Takeover Group's concerted action:[20]

---

[19]  *See Schaffer ex rel. Lasersight, Inc. v. CC Invs., LDC,* No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *5 (S.D.N.Y. Dec. 20, 2002) (retention of common counsel is evidence of a group).

[20]  The concerted activities of the Takeover Group are far more significant than the mere "parallel investments" by members of the alleged group in *Litzler v. CC Invs., L.D.C.*, 411 F. Supp. 2d 411 (S.D.N.Y. 2006).  In *Litzler*, unlike here, the members of the alleged group were all represented by different counsel, they performed their due diligence and analysis separately, and none of their respective agreements were conditioned on the others.  *Id.*  The plaintiff in *Litzler* established "nothing more than the use of a lead draftsman, at the behest of [the Company], by the investors."  *Id.* at 416  That is far from the case here.  Charter's reliance on *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, No. 00 CV 1115 (LAK), 2001 WL 46978 (S.D.N.Y. Feb. 23, 2001), *Schaffer ex rel. Lasersight, Inc. v. CC Inv. LDC,* No. 99 Civ. 2821(VM), 2002 WL 31869391 (S.D.N.Y. Dec. 20, 2002) and *Hubco, Inc. v. Rappaport*, 628 F. Supp. 345 (D.N.J. 1985) is similarly misplaced.  *Hallwood* was a very fact specific case in which the court acknowledged circumstantial evidence of concerted group activity but concluded that it did not "get me to 50 + 1."  Significantly, unlike the present case, there was no direct evidence of an agreement to acquire equity.  *Hubco* bears no resemblance to the current case.  There, the plaintiff alleged a group existed based solely on the facts that defendants received the same private placement memorandum and entered into a confidentiality agreement.  The court held that the plaintiff offered "no factual support for their claim that . . . a group exists."  628 F. Supp. at 38.  And *Schaeffer*, in which the court denied defendants' motion for summary judgment, affirmatively supports the Lenders' position.  The court held that retention of common counsel to negotiate the acquisition, mutual agreement by the group members to deal documents that provide group members with a shared right to purchase additional equity, and coordination by the group members, all of which are present here, were evidence of the existence of a group.  2002 WL 31869391 at *5-9.

- Providing that the members of the Takeover Group, as the "Requisite Holders" of the majority face amount of CCH I bonds, would have the power to approve or reject the Plan and Disclosure Statement on behalf of all CCH I bondholders. ¶ 32.

- Providing that a breach by one member of the Takeover Group would release all other members of the Group from their obligations under their respective Agreements. ¶ 31(c).

- Requiring that everyone in the Takeover Group vote in favor of the Plan, support confirmation of the Plan, and refrain from assigning its Charter Notes (other than to an assignee who agrees to join the group). ¶ 31(a).[21]

- Requiring Charter obtains the Takeover Group's consent to any amendment of the Plan. ¶ 32.

- Requiring that the Takeover Group will participate in the "equity backstop" and reflects their mutually agreed financial commitment to the rights offering. ¶ 33.

- Allowing that Apollo, Oaktree and Crestview will be "excess backstop parties" that acquire equity securities beyond their pro rata shares of the CCH I Notes being converted to equity. ¶ 36.

- Providing Apollo, Oaktree and Crestview with a right of first refusal with respect to the transfer of any rights in the rights offering and an "over-allotment option" that would allow them to buy extra equity if they were unable to buy as much as they wanted in the rights offering. ¶ 36(a). These provisions effectively guarantee that the Takeover Group would acquire a controlling stake in CCI equity upon the consummation of the Plan.[22]

Significantly, *none* of the Takeover Group witnesses denied that there was an agreement among the four firms to *acquire* equity securities. Counsel for the Takeover Group asked them each a series of leading questions as to whether there were any post-confirmation voting agreements or governance agreements but, tellingly, never asked them to deny there was

---

[21] S*ee Great Sw. Corp.,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972) (because "[a]cceptance of the plan of refinancing by each individual creditor is dependent upon its acceptance by all other creditors . . . the recipients of the warrants are acting in concert for the purpose of the refinancing transaction" and "constitute a group and a person within the purview of Section 13(d)(3) of the Act.").

[22] *See Morales v. New Valley*, 999 F. Supp. 470, 475 (S.D.N.Y. 1998) (holding that mutual agreement to a "right of first refusal" is evidence of a group's existence).

an agreement and common objective to acquire Charter equity.[23]  The overwhelming evidence and express admissions of an agreement among the Takeover Group to acquire CCI equity securities stands undisputed.

Recognizing that they cannot dispute the existence of an agreement among the Takeover Group to acquire equity, Charter attempts to write the "acquire" element out of the Section 13(d) definition.[24]  Charter argues that even if Apollo, Crestview, Oaktree and Franklin, acted as a group to acquire equity, they purportedly have no specific agreement to "hold," "vote" or "dispose" of that equity post-confirmation and, therefore, the Takeover Group simply disappears on the Effective Date.  The Credit Agreement, however, requires a common objective in "acquiring, voting, holding, *or* disposing of equity interests"—concerted action with respect to any one of the four elements is sufficient to establish the existence of a group.  Charter cannot simply read "acquire" out of the contract.  Whether there are agreements to vote, hold or dispose of equity interests that will be consummated post-acquisition is not a question that must be answered by the Court.

---

[23]  In its opening statement, Charter's counsel misstated deposition testimony of Professor Gompers, promising that he would testify "that there is no agreement to hold, *acquire* or dispose of Charter securities at exit."  7/20/09 Hr. Tr. at 66:5-11 (emphasis added).  That promise went unfulfilled.  Professor Gompers explained this deposition testimony was about post-bankruptcy shareholders agreements and voting agreements.  And based on his 15 years of research into and practical experience with private equity firms, Professor Gompers testified that "[w]hat's clear here is that there is an agreement and that agreement is the acquisition of equity, acquisition of a control[] position in equity through the process of restructuring, through the debt-for-equity swap and, in particular, the agreement of all four parties to participate in the rights offering."  ¶ 29(g); 8/24/09 Hr. Tr. at 254:1-9 (Gompers).

[24]  The Debtors also point to the undisputed, but irrelevant, fact that the members of the Takeover Group acquired their *debt* securities independently.  The question under the Credit Agreement and the Exchange Act is whether they acted with a common purpose to acquire *equity* securities, which they clearly did.

A simple example underscores the lack of merit in Charter's argument. Suppose the Takeover Group entered into an agreement with each other outside the context of bankruptcy to acquire a controlling stake in CCI equity by buying out Allen in a traditional LBO (as is typical of syndicated private equity deals). See ¶ 23 (post-acquisition governance agreements not typical). Under Charter's interpretation of the Credit Agreement, this would not constitute a change-of-control under Section 8(k)(ii) because the group would "disappear" after the acquisition was consummated. Nothing in the Credit Agreement allows such an absurd result. There never could be a change-of-control.[25]

That members of the Takeover Group may not have started working together to acquire CCI equity until contacted by Lazard, which Charter and the Takeover Group argue is significant, is in fact irrelevant. Concerted action to acquire, hold, or dispose of securities is sufficient to form a Section 13(d) group even if initiated by a third party. *Schaffer v. CC Invs., LDC*, No. 99 Civ. 2821(VM), 2002 WL 31869391, at *9-10 (S.D.N.Y. Dec. 20, 2002) (preferred shareholders that agreed to terms of stock agreement effecting ultimate disposition of their preferred shares constituted a § 13(d) group despite initiation of refinancing discussions by issuer); *Morales*, 249 F.3d at 127 (parties' agreement to lockup provision insisted upon by issuer that governed holding and disposing of securities was sufficient basis to find existence of § 13(d) group).

Nor is there any exception in the Credit Agreement or legal "safe harbor" for concerted action to acquire equity in the context of a Chapter 11 restructuring. Indeed, the SEC

---

[25] Although Charter has sponsored a declaration from Stephen Goldstein of Lazard that says requiring Charter to pay market interest may potentially jeopardize the feasibility of the Plan, on examination Goldstein admitted that market conditions have changed and that Lazard is no longer offering the opinion that failure to grant reinstatement here is going to jeopardize the feasibility of the Plan. ¶ 172(b)-(d).

has opined that debt holders who act in concert to acquire stock in the context of a restructuring "constitute a group and a person within the purview of Section 13(d)(3) of the Act." *Great Sw. Corp.,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972). In *Great Southwest*, the SEC concluded that because "[a]cceptance of the plan of refinancing by each individual creditor is dependent upon its acceptance by all other creditors . . . the recipients of the warrants are acting in concert for the purpose of the refinancing transaction." *Id.* The SEC went on to state that "[a]ny transaction in which such group acquires common stock . . . would require compliance with Section 13(d)(1)." *Id.*

Like the creditors in *Great Southwest*, acceptance of the Plan by each member of the Takeover Group is dependent on its acceptance by the other Group members. And the Takeover Group is undisputably acquiring common stock upon consummation of the restructuring transaction. Accordingly, the members of the Takeover Group are "acting in concert" and "constitute a group and a person within the purview of Section 13(d)." *Id.* Neither Charter nor the debtors and the Takeover Group cites any contrary authority.[26]

Notably, the creditors in *Great Southwest* did not receive stock in connection with the restructuring, but rather warrants that were not exercisable for more than a year after the consummation of the plan. Because the warrants were not immediately exercisable they did not

---

[26] The Takeover Group's reliance on the Delaware Bankruptcy Court's recent confirmation of the restructuring plan of Constar International is misplaced. *In re Constar International Inc.*, No. 08-13432, slip op. (Bankr. D. Del. May 14, 2009). In *Constar*, the court specifically found that "[t]here was no agreement of any kind between the members of the Ad Hoc Committee . . . there was never any agreement . . . to act together for the purpose of acquiring, holding, voting or disposing of any equity securities." *Id.* at 28. Such a holding is not possible on the current record. In *Constar* there were no lock-up agreements requiring the group members to support or vote for the restructuring plan and no restrictions on their ability to sell their debt securities. *Id.* The opposite is true here and in *Great Southwest*. *See Great Sw. Corp.*, SEC No-Action Letter, Fed Sec. L. Rep. (71-72 CCH Dec.) ¶ 73, 714 (Mar. 3, 1972). The members of the Takeover Group concede that they negotiated and signed on to the "same agreement" to invest up to $1.6 billion in new money to acquire CCI equity.

constitute "equity securities" for purposes of the Exchange Act, *id.* at 5, and, therefore, the SEC concluded that the relevant time for determining whether a group existed was not the consummation of the refinancing transaction but a year later when the warrants were exercisable and the equity would be acquired. For purposes of the no action letter, the SEC accepted the creditors' representation that they would not be acting as a group a year down the road. It is clear, however, that if the creditors had received stock at the consummation of the refinancing transaction (like the Takeover Group here) rather than warrants, they would have had a duty to file as a group under Section 13(d). *Id.* ("***Any transaction*** in which such group acquires common stock . . . would require compliance with Section 13(d)(1).") (emphasis added).

Finally, contrary to the dramatic pronouncements in Charter and the Takeover Group's pre-hearing briefs, upholding the Lenders' unambiguous contract rights and declining to confirm the Plan is not contrary to Bankruptcy Code policy and will not change how future restructurings are to be handled. The Bankruptcy Code encourages creditors to cooperate and form committees to negotiate restructuring terms with the debtor. And the Lenders do not contend that there is anything nefarious about the conduct of the Takeover Group working together to acquire control of Charter through the restructuring—it simply triggers a change-of-control under the Credit Agreement. Nothing in the Code or other law requires the Court to deprive senior creditors of their bargained-for change-of-control rights because the change-of-control occurs as a result of a Chapter 11 restructuring.[27]

---

[27] Upholding the Lenders' unambiguous change-of-control contract rights here could be relevant only in the unusual circumstances where a debtor seeks to reinstate a senior credit agreement containing a change-of-control clause. Ken Liang, who heads the distressed debt group at Oaktree and is a veteran of upwards of 50 restructurings, could not recall a single restructuring in which senior debt was reinstated. ¶ 175.

## 2.   The Takeover Group Is Executing A Loan-To-Own Strategy To Take Control Of Charter And Its Agreement Extends Post-Bankruptcy

Apollo, Oaktree, Crestview and Franklin's agreement to acquire CCI equity through the restructuring is sufficient to make them a Section 13(d) "group" and trigger a change-of-control default under the Credit Agreement. But the Takeover Group's agreement also extends beyond the effective date of the Plan. The record demonstrates that the Group is executing a loan-to-own strategy as part of a syndicated deal to take control of Charter by acquiring a controlling stake in CCI equity through the restructuring. ¶ 19-48 .[28] As Charter repeats ad nauseam, the Takeover Group will not receive their equity and will not be able to exercise control until after the effective date. What that underscores is that the Takeover Group's agreement to work together with the common objective of controlling Charter necessarily extends beyond the bankruptcy. [29]

---

[28]   A "syndicated' private equity transaction is a transaction in which a number of private equity firms come together to execute a particular investment. ¶ 21. A "loan-to-own" strategy is a particular investment strategy that private equity firms employ to gain control of a company by purchasing the debt. Under this strategy, private equity firms purchase the debt security that they anticipate will convert to equity, which is known as the "fulcrum" security. ¶ 24.

[29]   Charter relies heavily on the absence of particular shareholder agreements, voting agreements or governance agreements as purported evidence that the Takeover Group is not seeking control of Charter. However, counsel for the Takeover Agreement admitted that the only reason the Group decided not to enter into such an agreement was to avoid triggering a change-of-control. Takeover Group Pre-Hr'g Br. at 7. That kind of collective agreement to avoid creating a paper trail is circumstantial evidence of the existence of a group. *CSX*, 562 F. Supp. 2d at 553 n. 220. In any event, as Professor Gompers explained that private equity firms typically do not enter into post-transaction shareholders agreements, voting agreements or other governance agreements in syndicated deals. ¶ 23. Private equity firms' interests are typically aligned with respect to post-transaction governance, and they rely on stable relationships formed over time and the reputational incentives of repeat players within a small industry to ensure cooperation. ¶ 23. Private equity firms, however, do typically enter into agreements with respect to the acquisition of a target, and these agreements may contain provisions allocating Board representation. ¶ 22.

The Takeover Group also agreed on significant aspects of the governance of Charter post-emergence from bankruptcy and made sure that this agreement would continue post-confirmation. In particular, the Takeover Group negotiated and agreed on a Plan that would give Apollo, Oaktree and Franklin seats on the new CCI Board of Directors. ¶ 52(a). In addition, all the contemporaneous evidence reflects that the Takeover Group agreed to appoint Marcus to the Board even though Crestview does not own 10% of the voting power in CCI. ¶ 37. At trial, Zinterhofer and Villaluz all admitted they would support his candidacy, if asked. ¶ 37(e). Marcus clearly believed he had a firm agreement to be put on the Board—his March 9 memorandum to the Crestview Investment Committee says four separate times that he would "most likely" be the Chairman of the Board. ¶ 37(f).

The Takeover Group also agreed to retain key members of management—Chief Executive Officer, Smit, and Chief Operating Officer, Michael Lovett—post-bankruptcy. ¶ 38. And they agreed on the so-called Restructuring Value Plan that would provide management incentives going forward. ¶ 38.

Finally, the members of the Takeover Group have a common objective with respect to exiting their respective equity positions in CCI. They have discussed exiting their investments through a sale of CCI to a strategic acquiror such as Comcast or Time Warner. ¶ 42. Both Apollo's and Crestview's Investment Committee memos identify a sale to a strategic acquiror as the most likely exit. ¶ 42. And Villaluz acknowledged that sale to a strategic acquiror would be Franklin's "ideal" exit strategy. ¶ 42. In light of this common objective, it would be even more economically irrational for the Takeover Group to cede control to Paul Allen. If the Takeover Group did not control CCI, if an opportunity to sell to a strategic acquiror arose, they might find themselves in the same position they found themselves in this

restructuring–forced to provide a centi-million payoff to Paul Allen to buy his cooperation in the deal.

### 3. Members Of The Takeover Group Admit They Are Partners And Part Of A Group That Will Jointly Control Charter Post-Bankruptcy

The members of the Takeover Group created numerous contemporaneous documents evidencing their agreement to act together as a "group,"[30] or as "partners" to jointly control Charter post-bankruptcy, and even made similar admissions on the witness stand:

- Zinterhofer admitted on *direct* examination that he views the other members of the Takeover Group as "partners" who are "in the same boat" and will "work well together going forward." ¶ 41(a).

- At a meeting of the Apollo Investment Committee on April 14, 2009, Rowan and Zelter explained that "*[c]ontrol of the company was given to investors who invested new money in the company via a rights offering.*" Zinterhofer acknowledged that the investors who invested new money in the company via the rights offering were Apollo, Oaktree, Crestview and Franklin. ¶ 40(a).

- Marcus admitted on cross-examination that Crestview is "part of a group that together has seventy-two percent holders of this CCH I bond, as the plan anticipates, will own a majority control of the equity . . . . *By teaming up, what we meant was that we would be part of a group.*" ¶ 40(e).

- Liang testified "the bondholders would be the new owners of the company." ¶ 29(c).

- At the conclusion of the Plan negotiations, Marcus sent an email acknowledging that Zinterhofer was his "partner" and that post-bankruptcy they will be "working together to make this company the best it can be":

  I am proud to be your friend and partner. At this moment another Churchill quote comes to mind, this from a speech to Parliament following the Battle of Britain. He said (something like): "This is not the end, it is not even the beginning of the end, it is perhaps the end of the beginning." So here's to a new beginning for Charter and to working together to make this company/investment all that it can be. ¶ 41(b).

---

[30] Tellingly, even the Takeover Group's law firm defined its clients as the "Group" in its retention letter with Charter. ¶ 30.

- Zinterhofer responded that he also "look[ed] forward to being your partner on this one." ¶ 41(c).

- Before Zinterhofer obtained approval from his bosses to proceed with the deal, Apollo senior partner Harris, sought reassurance that the deal was not like a "PIPE"—a private investment in public equity—in which the investor has a minority stake with no ability to control the company. Zinterhofer told Harris unequivocally that the proposed investment was *not* a PIPE, *i.e.* Apollo will not be just a minority investor. Zinterhofer said that Apollo usually "shares control in these loan to own situations" and that he "expect[s] to control ¼ of the equity and, *with Crestview, Oaktree and Franklin, control about 40% of the vote*." He added, "it is already clear in management's mind that Apollo is the lead here…[Allen]'s main designee on the board, Lance Conn, understands the dynamic very well . . . I feel good from a relationship standpoint with the various parties." ¶ 40(b).

- Similarly, Zinterhofer's lieutenant, Darren Glatt, told Apollo's tax advisors at PricewaterhouseCoopers in response to their inquiry about who would control the company post-bankruptcy that "[A]llen will have the right to 35% of the vote [of CCI], *therefore the bondholders will control the other 65%* and have the right to nominate directors commensurate with their voting control." ¶ 40(c).

- Marcus and the Crestview deal team stated in their March 9 memorandum to the Investment Committee that the restructuring was "an attractive opportunity to *team up with Apollo and Oaktree to buy a controlling interest* in the fourth largest cable company" and that "together with Apollo and Oaktree (with whom we have very good relationships) we will control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control. However, given the change-of-control provisions in the Company's bank agreements, we would not be able to enter into a shareholders agreement." ¶ 40(d).

### 4. The Takeover Group Will Have The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of The Borrower Than Paul Allen, Triggering A Change-of-Control Under Section 8(k)(ii) Of The Credit Agreement

The Plan will result in a change-of-control under Section 8(k)(ii) of the Credit Agreement in three ways:[31]

---

[31] This change of control is a breach of the Credit Agreement, and thereby impairs the Lenders' claims. Furthermore, even if it were not a breach, this change in control fundamentally alters the nature of the risk of the loan and thereby impairs the Lenders' claims. *See In re Barrington Oaks Gen. P'ship*, 15 B.R. 952, 956 (Bankr. D. Utah 1981) ("The bank is impaired because the sale to [another buyer] . . . changes obligors and therefore alters rights under the instruments memorializing the loan."). As Judge Mabey explained:

- *First*, Charter contends that "voting power for the management of the Borrower" in Section 8(k)(ii) refers to voting interests in the new Class A and B equity of CCI. Based on Charter's own calculations, the Plan will result in the Takeover Group having a greater voting interest in the new Class A and B equity than Allen.

- *Second*, the Plan will result in the Takeover Group having greater "voting power for the management of the Borrower" than Paul Allen because the Takeover Group will own the majority of new Class A equity and have the power to elect all 7 Class A directors. Thus, the Takeover Group will control a majority of the Board and have 64% voting power for all management selected by CCI.

- *Third*, Apollo, Oaktree and Crestview—even without Franklin—will own a majority of the new Class A equity. Even if Franklin were deemed not to be part of the group, which would be wrong to do, the Plan will still result in a change-of-control under Section 8(k)(ii).

### a. The Takeover Group Will Have A Greater Voting Interest In CCI Equity Than Paul Allen

If the Plan is confirmed, CCI will have two classes of common equity—Class A and Class B—and a classified Board of Directors with 11 members. ¶ 51(a). Seven of the 11 directors will be Class A directors and will be elected by majority vote of the Class A equity. ¶ 51(a). The remaining 4 directors will be Class B directors and will be elected by Paul Allen based on his 100% ownership of the Class B equity. ¶¶ 51(a), (e). According to Charter's own calculations, if the Plan is confirmed the Takeover Group will have approximately a 45% voting interest in the combined Class A and B equity. Paul Allen will have approximately a 38% voting

---

> [O]ne element of present value [of the lender's claim is], whether or not it is calculated on the basis of a market rate, is risk. One element of risk is the identity of the obligor and his ability to perform the conditions of a plan. By changing obligors, debtors may have altered the complexion of risk and hence of present value. The bank therefore is impaired because it needs the protection of Section 1129(b).

*Id.* at 966. The Lenders lent money to an Allen company. CCO will no longer be an Allen company if the Plan transactions are consummated. This impairs the Lenders.

interest in the combined Class A and B equity.   ¶ 50.  The Takeover Group will therefore have greater voting interest in CCI equity than Paul Allen.

> **b.** **Because The Restructured CCI Will Have A Classified Board Of Directors, The Takeover Group Will Have The Voting Power, Independent Of Voting Percentages, To Elect A Majority Of The CCI Board And More Than Paul Allen**

A change-of-control under Section 8(k)(ii) of the Credit Agreement is not based on percentage of stock ownership or percentage voting interest in CCI stock.  It is based on "ordinary voting power for the management of the Borrower."  As a matter of both general corporate law and common sense, the board of directors of a company selects the management. DEL. CODE ANN. tit. 8, § 142(b) (2009) ("Officers shall be chosen in such manner and shall hold their offices for such terms as are prescribed by the bylaws or determined by the board of directors.").  Thus, the appropriate measure of a shareholder's "ordinary voting power" for management is the power to elect directors.  Voting interest in the new Class A and B equity is therefore irrelevant to "voting power for the management of the Borrower" because CCI will have a classified Board and the Class A and B directors will be elected, respectively, by the Class A and Class B equity voting as separate classes.   ¶ 51(a).

As explained by Professor Gompers (whose testimony stands un-rebutted), when a company has a classified board of directors, voting power is calculated based on the fraction of the Board that a class of shareholders has the power to elect.   ¶ 51(g).  Professor Gompers' opinion is consistent with Delaware law and IRS rules.  *See, e.g., Savin Bus. Machines Corp. v. Rapifax Corp.*, No. 5331, 1978 WL 2498, at *581 (Del. Ch. Feb. 15, 1978) (holding that "voting power" is reflected in shareholders' ability to elect directors of a classified board); *In re Dairy Mart Convenience Stores, Inc.*, No. C.A. 14716, 1999 WL 350473, at *14 (Del. Ch. May 24, 1999) (describing "voting power" of classified stock in terms of number of directors each class

was entitled to elect); Rev. Rul. 84-6, 1984-1 C.B. 178 ("The voting power held by a shareholder of any class of stock is the shareholder's proportionate share of the percentage of the total number of directors that that class of stock is entitled to elect as a class."); Rev. Rul. 69-126, 1969-1 C.B. 218 (providing that for purposes of determining "control" under the Internal Revenue Code, "voting power" of classified stock is determined based on the number of directors the class of stock is entitled to elect). Lazard's Goldstein also agreed with this general principle. He acknowledged that if a person (or, by extension, a group) has the power to pick 7 of 11 directors, that person has 64% of the voting power for management, and that a person who can elect 7 of 11 directors has greater voting power than a person who can elect 4 of 11 directors. ¶ 51(g).

If the Plan is confirmed, the new CCI Class A equity will elect 7 of the 11 directors—a clear majority. It is undisputed that the Takeover Group will own a majority of the Class A equity and will therefore have the power to elect all 7 Class A directors. ¶ 51(b). Accordingly, the Takeover Group will have 64% of the voting power for management. ¶ 51(g). Allen has the power to pick only 4 of 11 directors and therefore has 36% of the voting power for management. ¶ 51(e), (g). The Takeover Group's voting power is therefore greater than Allen's.[32] Seven is greater than 4. It is that simple.

Furthermore, even focusing solely on CCI immediately after emergence from bankruptcy, the Takeover Group will have the voting power, independent of voting percentages,

---

[32] The Takeover Group argued in its pre-hearing brief that this method of calculating voting power is too speculative because the possible members of the Takeover Group may sell their equity before the first annual meeting. This is, respectfully, nonsense. When the Takeover Group is issued its majority stake in Class A equity on the Effective Date, it will have power to elect 7 directors. That power is inherent in its equity holdings. The Takeover Group could hypothetically give up some of that power down the road, by selling equity or otherwise, but that possibility does not change the Takeover Group's voting power on the day the equity is issued.

to appoint an equal or greater number of the CCI Board than Allen. ¶ 52. This too is an Event of Default under Section 8(k)(ii), which requires Allen to have the power to direct the voting of equity interests with *greater* voting power for the management of the Borrower than any other person or group. ¶ 12. Equal voting power will not suffice.

Specifically, the Plan gives the Takeover Group the immediate right to appoint 4 of the Class A directors. ¶ 52(a). The Takeover Group, as the Requisite Holders under the Term Sheet and Reorganization Agreement, agreed to appoint Smit as the fifth member of the initial Board of Directors. ¶ 52(b).[33] Thus, collectively, the Takeover Group will have the power to appoint either 4 or 5 (counting Smit) of the Class A directors immediately after the Plan is confirmed. Allen will have the power to appoint the 4 Class B directors. Whether the Takeover Group is viewed as appointing 4 or 5 directors, it will have the power to appoint *at least as many* directors as Allen.[34] That is an Event of Default under Section 8(k)(ii) because

---

[33] Smit will be a Class A director, sitting at the pleasure of the Takeover Group, as holders of a majority of Class A equity. ¶ 52(b).

[34] In any event, the Takeover Group will likely control at least 6 of the 7 members of the initial CCI Board. There will be 2 vacant Class A director seats on the Effective Date of the Plan. Under the initial Plan filed with the Court, those 2 vacant seats would be filled by majority vote of the Class A directors already on the Board on or after the Effective Date. ¶ 53 (testimony of Charter's Chief Restructuring Officer, citing Section (b)(i)(B)(3) of the Amended and Restated Certificate of Incorporation (the "Vacancy Provision")). Because the Takeover Group directly appoints 4 of those Class A directors, the Takeover Group would control the selection of directors to fill the 2 vacant seats, giving them control of at least 6 and arguably 7 (counting Smit) of the eleven directors. On the eve of the confirmation hearing, Charter and the Takeover Group agreed to amend the Plan and the Certificate of Incorporation to add a new clause providing that "on the 31st day after the Effective Date" any vacancies would be filled by majority vote of the *entire* Board. ¶ 53. However, the Vacancy Provision remains in the new Certificate of Incorporation. ¶ 54(d). Accordingly, there is nothing to prevent the Takeover Group's appointees on the Board from voting pursuant to the Vacancy Provision to fill the 2 vacant seats at any time up to the 31st day after the Effective Date. ¶ 54(d).

Paul Allen will not have *greater* voting power than the Takeover Group upon the consummation of the Reorganization Plan.

Finally, Apollo, Oaktree and Crestview—even without Franklin—will own a majority of the Class A equity.  ¶¶ 49(c), 51(b).  So even if Franklin were somehow excluded from the Takeover Group, Apollo, Oaktree and Crestview would control 7 board seats and have greater voting power than Allen.

### c. The So-Called Savings/Dilution Clause Is A Gimmick That Does Not Work

The so-called dilution or savings clause in the Amended and Restated Certificate of Incorporation, which Charter contends will prevent a change-of-control by reducing the Takeover Group's voting interest in Class A and B equity to 34.9%, is a purely cosmetic gimmick that will have no impact on the actual voting power of the Takeover Group.  ¶ 57.

First, the dilution clause will have no effect on the makeup of the initial Board of CCI post-emergence from bankruptcy.  As discussed above, on the Effective Date, the Takeover Group will have, at the least, the same voting power for the management of the Borrower as Allen because they both will appoint 4 members of the Board and have 36% of the voting power for management.  Unless Allen has *greater* voting power, the change-of-control default under Section 8(k)(ii) is triggered.

Second, the Takeover Group's voting interest in the combined Class A and Class B equity is irrelevant to its "voting power for the management of the Borrower" because of the classified structure of the Board.  The two classes of directors will be selected independently by the two classes of equity.  Reducing the Takeover Group's voting interest in the combined capital stock from 45% to 34.9% will have no effect on its actual voting power.  Even if the dilution clause is triggered, the Takeover Group will still own a majority of the Class A equity

and will still have the power to select all 7 Class A directors, constituting 64% of voting power

for management of the Borrower.  In other words, the dilution clause has no practical effect on

voting power for management of the Borrower.

Third, if the dilution clause were to have any practical effect on the Takeover

Group's voting power (which it does not), the Board (the majority of which will be appointed by

the Takeover Group) has the power to waive it.   ¶ 57.

### 4. The Takeover Group Tried To Cover Its Tracks And Obscure The Change-Of-Control With Gimmicks

The Plan includes numerous gimmicks to create the appearance that each member

of the Takeover Group was acting independently of the other members and to cover up the

Takeover Group's acquisition of control.  The Takeover Group also took steps to cover their

tracks and conceal that they were acting in concert to take control of Charter.

- Despite the fact that all the members of the Takeover Group were, in reality, signing the "same agreement," Charter's and Takeover Group's counsel structured the plan support agreements so that each member of the Takeover Group entered into separate, but substantially identical, agreements with Charter.  ¶ 30(a).

- The Takeover Group agreed to give Allen Class B equity representing less than a 2% economic interest in CCI, but a cosmetic 35% voting interest in the combined Class A and Class B equity of CCI.  This was the central component of the Plan designed to obscure the fact that the Takeover Group would control all 7 Class A Board seats and, accordingly, would control CCI.  ¶ 51.

- The Takeover Group agreed to include the "dilution clause" gimmick so that it would appear as if the Takeover Group's voting power would be reduced below that of Allen when, in reality, the Takeover Group would control all 7 Class A Board seats and, accordingly, would control CCI.  ¶ 57.

- On the eve of the hearing, the Takeover Group and Charter agreed to amend the Plan to provide that "on the 31st day after the Effective Date" the entire Board, rather than the Class A directors, would appoint the empty Class A Board seats to create the appearance that the Takeover Group would not control CCI post-bankruptcy.  For the reasons discussed above, this gimmick also does not work.  ¶ 54.

- The Takeover Group's counsel stated in its pre-hearing brief that "the Noteholders affirmatively decided to forego [shareholder agreements, voting agreements, etc.] . . . out of a desire not to cause Charter to breach its change-of-control covenants." Takeover Group Pre-Hr'g Br. at 7 [Docket #645]. That the Takeover Group even considered such post-bankruptcy agreements puts the lie to the Group's position that they are merely independent investors with no interest or intent to act together post-bankruptcy. If the members of the Group were not intending to work in concert post-bankruptcy, why would the issue even come up? Consciously avoiding a paper trail with respect to conduct that "approached the line between non-group and group behavior as [they] viewed it" is exactly the type of "covering their tracks" activity that Judge Kaplan noted in *CSX*. *CSX*, 562 F. Supp. 2d. at 553 n. 220.

- Zinterhofer wrote: "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything is [sic] writing, just like we didn't in Spectrasite, but we have known each other a long time." ¶ 48.

- Crestview scrubbed all references to taking joint control of Charter with Apollo and Oaktree from external versions of its Investment Committee memoranda that it made available outside the firm to its limited partners. Crestview scrubbed three memos, dated February 4, 2009, February 20, 2009 and March 9, 2009, and altered or deleted nine different references to Crestview taking joint control of Charter with Apollo and Oaktree. ¶ 44. For example, Crestview deleted the following *bold italicized* language from its March 9 Investment Committee memorandum:

  o "We view this as an attractive investment opportunity *to team up with Apollo and Oaktree to buy a controlling stake* in the fourth largest US cable company, with underpenetrated advanced services, an attractive capital structure and significant tax attributes at a trough multiple for the industry."

  o "Crestview has a very good relationship with the senior leadership of both Apollo and Oaktree and the firms also recognize the value that Jeff Marcus brings to this transaction. *Together with Apollo and Oaktree, we would control approximately 68 % of Charter's equity post-restructuring and have approximately 44% voting control. However, given the change-of-control provisions in the Company's bank agreements, we would not be able to enter into a shareholder agreement*." ¶ 44.[35]

- Apollo sought to avoid leaving "an email trail" on sensitive issues such as Apollo and Oaktree's relative investments in Charter, which were the subject of negotiation and agreement in the Plan. ¶ 45.

---

[35] A chart that identifies all of the advisors that Crestview deleted from these memos appears at ¶ 44.

- Oaktree created no internal memoranda or other document memorializing or reflecting its analysis of the transaction or its reasons for entering into the transaction. ¶ 47.

**B.** **The Plan Leaves Allen With Zero Votes For CCO's Management In Breach Of Section 8(k)(i) Of The Credit Agreement**

It is a breach of the Credit Agreement if "the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower." ¶ 14. CCO, the Borrower, is a limited liability company. ¶ 59. Upon consummation of the Plan transactions, CCOH will be the sole member of CCO. ¶ 59(a). As such, CCOH will have 100% of the member votes. ¶ 59(b). Thus, CCOH will have 100% of the ordinary voting power for the management of CCO. ¶ 59(c). Allen will have none. ¶ 58. Under the plain language of the Credit Agreement, there will be a default under Section 8(k)(i) on consummation of the Plan transactions, rendering the Lenders impaired and the Plan unconfirmable.

The only way around the plain language of the contract is to ignore it and Charter tries to do that by offering three arguments that do not work. First, Charter pretends that nothing has really changed. But pre-petition, Allen had majority control over CCI's Board, which gave him the power to direct CCI's subsidiaries, including CCOH, to do what he wants. It gave Allen indirect voting power for the management of CCO as the Credit Agreement requires. If the Plan is confirmed, Allen will no longer have majority control of the Board of CCI. ¶ 58. Allen will cease to have *any* power to direct CCI's subsidiaries to do anything. He will have no power to direct CCOH how to vote for management of CCO. Allen will have *no* "voting power for the management of the Borrower" in breach of the Credit Agreement.

Charter argues that the actual language of the contract does not matter.  Because Allen will have 35% of the combined voting power for CCI (currently CCO's "Manager"), it means that Allen has 35% of the voting power for "management" of CCO, as the Credit Agreement requires.  Charter is wrong.  Being the appointed "Manager" and having "voting power for management" are not the same thing.  Voting power at "the Manager of the Borrower" is not the equivalent of voting power "for the management of the Borrower."[36]  The latter refers to the power to *select* the management of the Borrower.  As explained above, Paul Allen's 35% voting interest in CCI if the Plan is confirmed leaves him with no power whatsoever over the selection of CCO's management.

Third, Charter insinuates that the plain language of Section 8(k)(i) is impossible to comply with and some kind of unfair trap, or it is somehow inconsistent with the negotiating history of the Credit Agreement by mandating that Paul Allen retain control of CCI.  Charter is again wrong.  Section 8(k)(i) allows Allen to retain the power over management of Charter "directly or indirectly."  Historically, as explained above, Allen has held 35% of the voting power for management of the Borrower *indirectly* through his control of CCI.  There are numerous ways in which Allen could acquire the right to exercise CCOH's voting power for management of CCO directly and in compliance with the Credit Agreement, even while reducing

---

[36] Plan proponents have also suggested that equity interests with "voting power for the management of the Borrower" must refer to a voting interest in CCI because the Credit Agreement used the term "Equity Interests in the Borrower" in another subsection of 8(k) and would not have used a different term in § 8(k)(i) if it was intended to refer to equity interests in CCO.  But voting power in a company and economic equity interests in a company need not be the same thing.  Moreover, Charter's argument that equity interests with "voting power for the management of the Borrower" refers to voting interest in CCI is belied by covenants in other CCO debt instruments that refer to "Voting Stock of [CCO] *or a Parent*." § 12(b) (emphasis added).  Obviously, when Charter wanted to focus on voting power in a *parent* of the Borrower (such as CCI), it knew how to do so.

his investment in CCI.[37]  However, upon consummation of the Plan transactions, Allen will not have control of CCI and therefore he will no longer have neither direct nor indirect power over management of the Borrower.  But, that would be by design of the Plan, not a trap hidden in the Credit Agreement.

III.    **THE CREDIT AGREEMENT CANNOT BE REINSTATED BECAUSE ON NOVEMBER 5, 2008, CCO BREACHED THE AGREEMENT BY BORROWING $250 MILLION BASED ON THE FALSE REPRESENTATION THAT CIH AND CCH WERE ABLE TO PAY THEIR DEBTS AS THEY BECOME DUE**

On November 5, 2008, CCO borrowed $250 million from the Lenders based on the misrepresentation that CIH and CCH were able to pay their debts as they become due.  At that time, CIH and CCH had $224 million of interest payments due between November 2008 and April 2009 and no available source of cash to make those interest payments.  Then, on February 3, 2009, CCO requested additional funds from the Lenders based on the misrepresentation that CIH and CCH were able to pay their debts as they become due.  At that time, CIH and CCH had not made their $72 million January 2009 interest payments, had $81 million of debt due in April 2009, and no available source of cash to make those payments.  CCO's misrepresentations that CCH and CIH had the ability to pay their debts as they become due were contractual defaults that go to the very core of the lender-borrower relationship.  They preclude reinstatement of the Credit Agreement.

---

[37]    For example, CCOH could be spun off in an IPO, conditioned on Allen retaining the power to vote 35% of CCOH's member interests in CCO.  In other words, as long as Allen retain 35% voting power at the level of the Borrower, either directly or indirectly, Section 8(k)(i) would not be breached.  The Plan, however, simply eliminates Allen's control at the CCI level without providing any other mechanism to afford him voting power at the level of the Borrower and thereby breaches Section 8(k)(i).

## A. Section 8(g)(v) Of The Credit Agreement Sets Forth A Forward/Looking Test

CCO defaults under the Credit Agreement if, on the day it borrows funds, any DHC "shall be unable to . . . pay its debts as they become due." ¶¶ 66-70. The testimony at trial demonstrates that compliance with Section 8(g)(v) is measured by comparing available liquidity to upcoming debt obligations. ¶ 76(c). Schmitz and Kurinskas testified that the language tracks the forward/looking cash flow test for solvency. ¶¶ 73(c), (d). Kurinskas also testified that "the language 'shall be unable to' is a prospective look at whether the designated holding companies . . . won't be able to, at some point in the future, pay their debts as they are coming due (emphasis added)." ¶ 73(c). Each of the Lenders witnesses testified the same. ¶¶ 73(b).

The case law is equally clear that the test is forward/looking. *See, e.g., Drexel Burnham Lambert Prod. Corp.* v. *MCorp.,* No. 88C-NO-80, 1989 Del. Super. LEXIS 69, at *3-4, *13 (Del. Super. Ct. Feb. 23, 1989) (holding that the phrase "unable to pay its debts generally as they become due" dictates a prospective test of ability to pay); *In re Hamilton Creek Metro. Dist.,* 143 F.3d 1381, 1386-87 (l0th Cir. 1998) (holding that "unable to pay . . . debts as they become due" under the Bankruptcy Code is a forward/looking test and that a debtor need not actually miss any payments to be deemed "unable to pay . . . debts as they become due"); *In re Town of Westlake, Tex.,* 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997) (same); *In re City of Bridgeport,* 129 B.R. 332, 336-37 (Bankr. D. Conn. 1991) (same).

In *In re City of Bridgeport,* the court flatly rejected the same claim that Charter is making here—*i.e.* that because the borrower had never missed any debt payments, it was "able" to pay debts as they become due. 129 B.R. at 336-37. The court held that the test for "unable to pay its debts as they become due" is prospective. *Id.* In *Drexel Burnham Lambert Production Corp. v. MCorp.,* the court addressed contractual language similar to that of Section 8(g)(v) and

held that the language dictated a prospective test, in part because, "it is clear that the purpose of [this provision] was to afford one party the opportunity to get out of this Agreement before the other party goes bankrupt." 1989 Del. Super. LEXIS 69 at *13. As in *MCorp.*, the second clause of Section 8(g)(v) must be applied prospectively in order to protect the original contractual purpose of including this clause, which was to give the Lenders an early warning signal of financial distress at Charter and an early indication of any change of risk at CCO, as well as the ability to get out of the Credit Agreement to negotiate stronger covenants and other terms. ¶ 73(c). There is no basis in the plain language of the Credit Agreement, the trial evidence, or the case law for the Court to apply anything but a forward/looking test.

### B. Charter's Attempt To Read The Section 8(g)(v) Cash Flow Insolvency Test Out Of The Contract Should Be Rejected

Charter's assertion that "unable to pay debts as they become due" is a retrospective test—*i.e.* a payment default—is wrong. Whether a DHC has missed a payment that had come due—a so-called payment default—is addressed in other provisions of the Credit Agreement. For example, the first clause of Section 8(g)(v) provides that it is an Event of Default if any DHC "shall generally not . . . pay its debts as they become due." ¶ 72. This asks the backward looking question of whether the DHCs are current on their obligations. It is different than the forward/looking question of whether the DHCs shall be "unable to pay debts as they become due." The *In re Town of Westlake* court recognized this distinction, stating that "unable to pay debts as they become due" is a different test than "generally not paying its debts as they become due." 211 B.R. at 865. The latter merely tests whether the debtor is "current on all its obligations." *Id.*; *see also* 11 U.S.C. §101(32)(c); *In re City of Bridgeport*, 129 B.R. at 336-37. Charter is attempting to read Section 8(g)(v)'s cash flow test out of the Credit Agreement by interpreting it as a payment default. The Court should reject this impermissible

contract interpretation *See, e.g., LaSalle Bank Nat. Ass'n* v. *Nomura Asset Cap. Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.").

1. **Section 7.6 And The Cash Flow Insolvency Test Of Section 8(g)(v) Are Consistent**

Charter has argued that application of the cash flow insolvency test pursuant to Section 8(g)(v) conflicts with Section 7.6 of the Credit Agreement. Charter is wrong. Section 7.6 allows CCO to make a distribution to a DHC to pay interest within 15 days when due so that DHCs will not "warehouse" the Borrower's money. ¶¶ 74(a), (b). This does not conflict with Section 8(g)(v). Section 8(g)(v) does not require the DHCs to have cash in hand. It simply requires that the DHCs have access to sources of liquidity (such as distributions) so they have the ability to pay debts as they become due. ¶ 74(c). Here, as explained in detail at trial, the DHCs were unable to pay debts on November 5, 2008 because CIH and CCH lacked access to liquidity, including distributions, due to CCH I's inability to make distributions to them.[38]

2. **Charter's Argument That The Lenders Are Trying To Impose A New Solvency Representation Requirement Is Wrong**

Charter spent significant time at trial repeating the undisputed proposition that Section 4.21 of the Credit Agreement does not require CCO to represent that each of the DHCs are solvent when borrowing money. Charter makes much of this, but it is irrelevant to the issues before the Court. The words of Section 8(g)(v) track the cash flow test for insolvency. Section

---

[38] Charter similarly complains that because the DHCs have had liabilities in excess of their projected income streams for many years, the parties could not have intended the ability to pay test under Section 8(g)(v) to be prospective. This argument ignores the fact that the 8(g)(v) cash flow test for solvency allows for the consideration of alternative sources of liquidity if there are viable alternative sources available. As is discussed below, by November 5, 2008, CIH and CCH did not have access to any sources of liquidity sufficient to pay their debts due in January and April 2009.

8(g)(v) requires CCO to represent at each borrowing that each DHC meets the Section 8(g)(v). CCO need not represent that each DHC is, in fact solvent, but must represent that each DHC meets the cash flow test for solvency. On November 5, 2008, CCH and CIH did not meet the test under Section 8(g)(v) and CCO defaulted when it nonetheless borrowed $250 million from the Lenders, representing that they did.

### 3. Charter's Argument That the Cash Flow Test Is Too "Amorphous" To Be Enforced Should Be Rejected

Charter has called Section 8(g)(v) "amorphous" and unenforceable because it does not include a bright line for how far into the future DHCs must be able to pay their debts. Charter's concerns about an undefined time period are irrelevant. The overwhelming evidence is that as of November 5, 2008, CIH and CCH were unable to pay debts due in January and April 2009—just a few short months before their debts were due. In addition, courts routinely apply cash flow insolvency tests using language similar to that in Section 8(g)(v) that also does not specify the length of the forward/looking timeframe. *See, e.g., Blackmore Partners, L.P. v. Link Energy LLC*, No. Civ. A 454-N, 2005 WL 2709639, at *3 (Del. Ch. Oct. 14, 2005) (applying ability to pay or cash flow test); *MCorp.,* 1989 Del. Super. LEXIS 69 at *3-4, *13. Indeed, virtually identical words to those at issue here appear in the Bankruptcy Code and are applied by bankruptcy courts when necessary. *See, e.g., In re Hamilton Creek Metro. Dist.,* 143 F.3d at 1386-87; *In re City of Bridgeport,* 129 B.R. at 336-37. The record is also clear that Charter is experienced with the cash flow insolvency test. The test is discussed in Charter's SEC filings, ¶ 78, Charter has sought and received professional opinions regarding cash flow insolvency, ¶ 102(b), and Charter's auditors routinely applied and Charter's management focused on the cash flow insolvency test in connection with Charter's annual audit. ¶¶ 76(d)-(e), 129.

**C. Charter Has Not Carried Its Burden To Prove That CCH And CIH Passed The Cash Flow Insolvency Test On November 5, 2008**

Charter has failed to carry its burden to prove that, as of November 5, 2008, CCH and CIH were able to make their interest payments in November 2008, January 2009 and April 2009. No witness testified that, as of November 5, 2008, CIH and CCH had the ability to pay those debts. Indeed, Charter's expert disclaimed any opinion that CIH and CCH were able to pay their debts when due through April 2009. ¶¶ 148-51. Den Uyl's only opinion is that CCH I had enough surplus in November 2008 to make a $63 million distribution. ¶ 148. Den Uyl conceded that CCI and Holdco's intercompany receivables were insufficient to pay CIH and CCH's debts through April 2009. ¶ 91(d). As a result, this Court cannot conclude from Den Uyl's testimony that CIH and CCH had access to distributions from CCH I or other sources of liquidity that would have allowed them to pay their debts due in January and April 2009.

Not surprisingly, given that CCH and CIH filed for bankruptcy, the only evidence in the record demonstrates that by November 5, 2008 (at the latest) CIH and CCH were unable to pay their debts as they become due.

**1. CIH And CCH Had Virtually No Cash Or Liquid Assets**

On November 5, 2008, CIH and CCH had $224 million of debts due between November 2008 and April 2009. ¶ 90(b). CIH and CCH had only a meager $2 million of cash on their balance sheets at the time and no other liquid assets. ¶ 90(a). Clearly, they could not rely on their own cash to pay these debts.

**2. CCI And Holdco Had Insufficient Resources To Pay CIH And CCH's Debts And Had Obligations To CCI's Creditors**

On November 5, 2008, even assuming that CIH and CCH could rely on donations from its insolvent parents to pay their debts, their parents had only had a $133 million receivable from CCO that they could divert to CIH and CCH to the detriment of their own creditors.

71

¶¶ 91(a)-(c). This source was insufficient for CIH and CCH to make the $224 million of interest payments due between November 2008 and January 2009 in any event. ¶ 90(b).

### 3. Charter Did Not Have Access To Any Viable Strategic Or Capital Markets Transactions To Allow It To Pay CIH and CCH's Debts

By November 5, 2008, Charter could not access alternative strategic or capital market transactions to address CIH and CCH's debts due in January and April 2009. Charter had sought out private equity investments without success. ¶ 81. No one wanted to buy Charter. ¶ 81(d). Refinancing was out of the question given Charter's distressed financial condition, the the economic downturn and dislocation in the credit markets. Millstein confirmed that the credit markets were frozen, showed no signs that they would improve in the near future, and financing simply was not available. ¶¶ 87(d), (f). Schmitz acknowledged that Charter knew it could not rely on the credit markets improving in the near future and that Charter did not pursue alternative transactions once it began planning for bankruptcy, at the end of October 2008. ¶¶ 87(c), (g). Gregory Doody (Charter's Chief Restructuring Officer) confirmed that none of the options that Charter had previously relied on to extend maturities and improve liquidity were available. ¶ 92(d). Indeed, none of the "sales pitches" to Charter by Lazard or other various financial institutions in the fall 2008 addressed or would have allowed CIH and CCH to pay their debts due between November 2008 and April 2009.[39]

---

[39] These presentations addressed Charter's upcoming 2010 maturities. In addition, to the extent these presentations relied on debt-for-debt exchanges, no such exchanges were possible because, as is discussed below, CCH I did not have surplus. Without surplus, CCH I could not transfer any value to its parents to allow them to retire debt. ¶ 92.

### 4. As Of November 5, 2008, CCH And CIH Could Not Rely On Distributions From Subsidiaries Because Subsidiary CCH I Did Not Have Surplus

Without cash or viable alternatives, CIH and CCH were entirely reliant on distributions from subsidiaries to pay debts when due through April 2009. Such distributions were dependent on CCH I having a financial surplus in November 2008. If the fair market value[40] of Charter were at least $18.7 billion or 7.4x management's projected 2009 EBITDA,[41] CCH I would have had surplus. ¶ 94. However, the overwhelming weight of the evidence is that by November 5, 2008 the fair market value of Charter was, in fact, considerably less than $18.7 billion.

### a. Lazard's Valuation Demonstrates CCH I Did Not Have Surplus On November 5, 2008 And Thereafter

Charter has sponsored Lazard's Valuation indicating that Charter is worth $15.4 billion (the "Lazard Valuation"). ¶ 135(a). This implies a valuation multiple equal to approximately 6.25 times Charter's projected EBITDA for 2009— more than $3 billion below the level required for CCH I to have surplus. ¶¶ 94, 135(c). Charter needs the Court to accept this valuation to confirm its Plan, but this valuation shows no surplus at CCH I.

---

[40] Smit agreed that fair market value in excess of liabilities is the appropriate basis for measuring surplus. ¶ 7(e). Charter acknowledged in its board materials that "Delaware law requires that [the DHCs] have a financial surplus (*fair market value* of its assets in excess of its liabilities) equal to or exceeding the amount of the proposed distribution." ¶ 77(e). (emphasis added). While Delaware law uses the term fair value in connection with surplus, DEL. CODE ANN. tit. 6 § 18-607(a) (2009), there is no meaningful distinction between the term fair market value and fair value. *See* Fair Value Measurements, Statement of Fin. Accounting Standards No. 157, ¶ C50 (Fin. Accounting Standards Bd. 2006) ("the measurement objective encompassed in the definition of fair value used for financial reporting purposes is generally consistent with similar definitions of fair market value used for valuation purposes.").

[41] As projected in management's July Long Range Plan. ¶ 94.

Charter shamelessly urges the Court to disregard for purpose of Section 8(g)(v)'s cash flow solvency test the Lazard Valuation it is sponsoring because it was prepared based on information available as of March 27, 2009. But there is no evidence that any event occurring between November 5, 2008 and March 27, 2009 materially impacted the value of Charter. Nor has Charter offered any evidence that explains how Charter could be worth over $18.7 billion in November, but only $15.4 billion four months later. ¶136. Where did $3.3 billion of value go? Schmitz confirmed the absurdity of Charter's current position by stating there was no material change in the financial condition of the company during this period. ¶¶ 136(b)-(c). In fact, all the evidence indicates that Charter was in better shape in March 2009 than in November 2008. ¶ 136. Indeed, Schmitz admitted that Charter's financial condition in February 2009, if anything, was slightly *better* than it was in November 2008. ¶ 136(c). Yet Charter wants the Court to believe it inexplicably lost over $3 billion of value in a period of less than five months, rather than accept market data demonstrating that the value was the same in November and March—at a level less than what is required for surplus.[42] As this Court held in *In re Iridium Operating LLC*, "[T]o justify disregarding values placed on these securities in an efficient public trading market, the Court needs a substantial reason to depart from that standard and find that the value implied by an efficient market is not a trustworthy benchmark." *In re Iridium Operating LLC*, 373 B.R. 283, 303 (Bankr. S.D.N.Y. 2007). Charter has not made the required showing here.

---

[42] With no evidentiary support, Charter submits that a valuation prepared in the re-structuring context is somehow different than a valuation prepared in other contexts. To the contrary, the evidence from Charter's own witnesses establishes: (i) Lazard's $15.4 billion Valuation is the fair market value of Charter; (ii) Lazard followed standard valuation techniques including a discounted cash flow analysis; and (iii) Lazard's valuation is not a distressed sale valuation and assumes that Charter will remain a going concern. ¶ 135-38.

### b. The Public Market-Based Evidence Points To No Surplus

It is undisputed that from late October 2008 to March 2009, Charter and its peers were valued in the public markets within a range of 5-6 times projected 2009 EBITDA. ¶ 95. At a 5-6 times EBITDA multiple, CCH I was billions of dollars short of the $18.7 billion required to have surplus and give CCH and CIH the ability to pay their debts through April 2009. ¶ 95. Based on the public market value of Charter and its peers from late October 2008 to March 2009, Charter cannot carry its burden of showing that CCH I had surplus. Taylor testified:

> [Y]ou can't look at this market data and come to the conclusion that there is surplus. It just defies logic. You basically have to set this aside for some reason and just say that you're not going to look at the market to decide whether there is surplus or not. And that's just entirely inappropriate.

¶ 99(a); *see also Iridium*, 373 B.R. at 293 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007))("the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation"). In this case, the public markets indicate no surplus.

### c. Charter's And The Lenders' Experts Agree That Precedent Transactions Should Be Given Only Minimal Weight In Valuing Charter

Prior to the proposed Plan, there had been no transactions of significant scale in the cable industry since May 2007. ¶ 139(d). Lazard determined that it could only give minimal weight to precedent transactions because they were "executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace." ¶ 139(a). Taylor agrees with Lazard. ¶ 139(g).

Charter's litigation expert Den Uyl argues for giving greater weight to precedent transactions, ¶ 139(f), but that rests on a misunderstanding of what Millstein said at the

November 14, 2008 Board meeting. Millstein did not provide any opinion with respect to valuation, solvency or surplus. ¶ 112. He did not opine that Charter could be sold or valued at that time in excess of 5-6 times 2009 projected EBITDA. Rather, Millstein told the Board that *if—and only if*—the credit markets recovered in the future, precedent transactions would be a useful indicator of the value of Charter. ¶ 112(d), (e). Indeed, the record evidence is that Charter was aware that Millstein's discussion in November 14, 2008 Board meeting, of selling Charter at multiples of 8 times projected EBIDTA was hypothetical, contingent upon financing that was not available at that time or in the forseeable future. ¶ 112(e). The Plan value is based on Lazard's opinion that precedent transactions should be given minimal weight. Taylor concurs. Charter cannot have it both ways by suggesting that precedent transactions should be given more or different weight in a surplus analysis for purposes of reinstating a contract than in a Plan valuation for purposes of getting compensation.

### d. Discounted Cash Flow Analyses Indicate No Surplus

The DCFs submitted by Charter in support of the Plan indicate no surplus at CCH I. Taylor's DCF analysis indicates no surplus at CCH I. Charter points to the Duff & Phelps draft DCF and Den Uyl's "sensitivies" to that draft as supporting surplus. The Court should look to Lazard and Taylor, not Duff & Phelps' draft or Den Uyl in determining the value of Charter using the DCF approach.

The Duff & Phelps draft October DCF cited by Charter was not a reliable indicator of the value of Charter because, among other reasons, it was prepared using management's July Long Range Plan—projections the Company knew were outdated and not reliable. ¶¶ 87(i), 106(c)-(e). Charter's argument that its reliance on outdated projections in November 2008 was reasonable because it had not yet finished its revision of those projections until December 2008 is flatly contradicted by case law. In *Gholl v. Emachines*, the Delaware

Chancery court held that where a company is in the process of revising its long range projections, it cannot rely on management's prior projections for the purpose of a valuation analysis. No. Civ. A. 19444-NC, 2004 WL 2847865, at *8 (Del. Ch. Nov. 24, 2004). *Emachines* was an appraisal proceeding in which the plaintiff sought a valuation of the company as of December 31, 2008. *Id.* at *1. Emachines had two sets of projections. One was prepared in November 2001 and the other was finalized in February 2002. *Id.* at *7-8. The DCF analyses using the two sets of projections resulted in materially different valuations of the company. Emachines argued that the court should rely on the analysis done using the November 2001 projections because the February 2002 projections had not been finalized by the valuation date, December 31, 2001. *Id.* at *8. According to Emachines, the February 2002 projections were a "work in progress" and, thus, did not constitute information that was "known or knowable" on the appraisal date. *Id.* The court rejected Emachines argument, noting that because the company had already started its budgeting process before the appraisal date, "unless there were material changes in the business during the weeks after the merger, all of the information underlying the 2002 Budget would have been known or knowable by the" valuation date. *Id.* at 8. As a result, the court used the more reliable projections, even though they were not available at of the valuation date at issue in the litigation. *Id.*; *see also Cede & Co. v. Technicolor, Inc.*, No. Civ. A. 7129, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2003) (adopting valuation based on management projections finalized more than a month after the valuation date because the information was known or knowable as of the valuation date); *cf. In re Nellson Nutraceutical, Inc.*, No. 06-10072 (CSS), 2007 WL 201134, at *12-13, 19 (Bankr. D. Del. Jan. 18, 2007) (rejecting valuation based on management projections because evidence demonstrated that management had reason to believe they were unreliable).

The facts of the present case are even starker than those in *Emachines*.  In October 2008, the Board of Charter had asked management to revise the July Long Range Plan to "appropriately account for the worsening economy."  ¶ 87(i).   Charter management declined to sign a representation letter for Duff & Phelps confirming the reasonableness of the July projections.  ¶ 106(f).[43]  Charter's management told Duff & Phelps to stop working on its October 1, 2008 SFAS 142 appraisal because it intended to revise the July Long Range Plan.  ¶ 106(d).  Schmitz conceded that Charter could not have obtained any type of cash flow solvency opinion in November 2008 because "[w]e did not have an updated five-year plan or an updated budget to do that."  ¶ 104.  Just weeks after CCO borrowed $250 million in December 2008, Management finally completed projections that it deemed reliable (the January 2009 Long Range Plan), which contained lower EBITDA projection for 2009 than the July projections.  ¶ 141(a).[44]

---

[43]  Contrary to Charter's attempts to distort the record, KPMG did not opine that it was appropriate to rely on the July Long Range plan in November 2008.  Indeed, the memo Charter points to expressly acknowledges that management was revising the July Long Range Plan to reflect the unprecedented economic events of the fall 2008.  KPMG noted "The budget and reforecast will take into consideration recent economic events such as the recent foreclosure rates, recent events surrounding the lending and banking markets, and the overall downturn in the economy." ¶ 106(e)(i.

[44]  In 2009, Charter's revenues have continued to underperform management projections. ¶ 141. While no witness has testified that management believes the July Long Range Plan accurately reflects Charter's prospects, Charter misleadingly implies that apparent positive EBITDA growth in the first and second quarter of 2009 is relevant.  First, Charter conveniently ignores the fact that Charter started missing EBITDA targets again in July 2009. Second, Taylor demonstrated that the only way Charter has been able to increase EBITDA in the first and second quarters of 2009 in light of lower than expected revenues is by cutting back on capital expenditures to a lower absolute number than budgeted but to a higher percentage of revenue.  ¶ 141.  When cable companies like Charter cut back on capital expenditures future earnings suffer.  ¶ 141.  Taylor further testified that the July Long Range Plan needed revisions because the projections for years after 2010 were too aggressive.  ¶ 141(a).  Charter management acknowledged this fact and replaced their projections with the more conservative January 2009 Long Range Plan.  ¶ 141(a).  There is no evidence in the record suggesting that Charter intends to revive the July Long Range Plan and throw out the more conservative projections that Lazard used. The Lazard Valuation using the revised projections showed no surplus.

A valuation using the more reliable January 2009 Long Range Plan is in evidence in the present case and it conflicts with the Duff & Phelps draft DCF that used the July Long Range Plan. The Lazard Valuation using the January 2009 Long Range Plan shows that the fair market value of Charter is $15.4 billion—more than $3 billion below what is required for Charter to have surplus. ¶ 135. Charter is arguing that it was allowed to keep its head in the sand in November 2008 because it had not completed its revised projections. Just as the *Emachines* court did, this Court should reject Charter's willful blindness defense and disregard the Duff & Phelps draft DCF that used the July Long Range Plan. *See Emachines*, 2004 WL 2847865 at *8; *see also Technicolor, Inc.*, 2003 WL 23700218 at *7. Indeed, accepting Charter's willful blindness defense would render the cash flow test for solvency virtually meaningless. Parties could avoid its operation by simply choosing to remain in the dark.[45]

Aside from the fact that the draft DCF is unreliable because management knew it was based on outdated projections, the Duff & Phelps draft DCF also contained multiple errors relating to the treatment of depreciation and amortization and projected capital expenditures. ¶ 107. Correcting only two indisputably erroneous assumptions within the Duff & Phelps October DCF (errors that Lazard did not make in its DCF) results in a value indicating that there was no surplus at CCH I. ¶ 107.[46]

---

[45] The so called "sensitivity" that management presented to the Board on November 14, 2008 is also of no help to Charter. Conveniently, management stopped at the lowest increment to show surplus — one more step down the analysis would have demonstrated that CCH I did not have surplus. ¶ 108. Even more conveniently, the range of multiples selected for the analysis (7.75x - 8.5x) was far above those of the public market values of Charter and its peers, which were in the 5-6x range. ¶ 108. An analysis selecting multiples more in line with the market multiples of Charter and Charter's peers would have demonstrated conclusively that CCH I had no surplus. ¶ 108(e).

[46] Den Uyl's "sensitivities" of Duff & Phelps' DCF are made-for-litigation confections manipulated to achieve a desired result. It has been demonstrated that if Den Uyl followed the same basic and widely accepted methodologies that Lazard followed, all of his

Finally, Fred Bliss of Duff & Phelps expressly denied providing the company with any analysis indicating "that CCH I had a financial surplus in excess of $2.8 billion," as Charter's management's presentation says. ¶ 106(h). Nothing about a proper use of the draft Duff & Phelps DCF reliably suggested CCH I had surplus in November 2008.

### e. The Plan Process And Charter's Admissions Point To No Surplus And Are Directly Contrary To The Litigation Position Charter Is Taking Here

CCH I is the fulcrum security under the Plan. ¶ 121(b). From the beginning of the restructuring negotiations, Charter recognized the fulcrum security to be either CCH I or CCH II. ¶ 121(a). This fact undermines Charter's assertion that it had an actual good faith belief that the value of Charter exceeded $18.7 billion a month earlier. ¶ 121(b). The fact that the debate over whether the fulcrum was at CCH I or its subsidiary is strong evidence that the value of Charter was near the roughly $14.8 billion value of CCH II, and in any event far below the $18.7 billion needed for surplus at CCH I. ¶ 121(b).

Moreover, the terms of the proposed Plan were announced publicly on February 12, 2009, and in the months since no one has come forward with a better offer than the Takeover Group's proposal. ¶ 140(b). This is powerful evidence that the value of Charter is the Plan value of $15.4 billion, billions of dollars short of surplus. As Taylor explained:

---

sensitivities would show no surplus. First, while Lazard and Taylor agree that Mediacom should be excluded from the DCF's discount rate calculation because of its small market cap and illiquid stock, Den Uyl strategically included it in order to keep the discount rate artificially low and inflate his valuation results. ¶ 163. If this error is corrected for all of his sensitivities, they show no surplus. ¶ 163(f). Second, Den Uyl used the coupon value of Charter's debt, rather than market value, in calculating his discount rate. ¶164. This was an error. ¶ 164. If just this error is corrected for, each of Den Uyl's sensitivities also shows no surplus. ¶¶ 163(f), 164(a). CCO simply cannot have it both ways. Lazard and Taylor agree as to the appropriate methodologies to apply in valuing highly leveraged companies such as Charter and the results of applying those methodologies to Charter. Charter cannot argue that it is appropriate to use certain methods in March 2009 but that an entirely contradictory methodology should be used in November 2008.

> I believe the transaction we're here about, Your Honor, the value
> of the transaction where the bondholders are putting in a billion six
> behind an explicit number is the best evidence of what the value
> really was in November. . . . The 1.6 billion dollars is coming in at
> a value of 15.4 billion. That—it's not just the valuation Lazard
> came up with. That's actually the transaction value implied by the
> price that they're investing at for the 1.6 billion. . . . And this isn't
> just a reorg where folks are doing a debt for equity exchange. This
> is a new money investment of a very material amount. And that's
> extremely good evidence of what the values really were.

¶ 140(c); *see also, e.g., Dempster v. Dempster*, 613 N.Y.S.2d 78, 79 (N.Y. App. Div., 4th Dep't.

1994) (in valuation analysis "parties may rely on the bankruptcy reorganization plan confirmed

in 1989 as some evidence of value, notwithstanding the fact that that plan did not exist as of the"

valuation date at issue in the litigation); *Union Illinois Ill. 1995 Inv. Ltd. P'ship. v. Union Fin.

Gr., Ltd.*, 847 A.2d 340, 357 (Del. Ch. 2004) ("our case law recognizes that when there is an

open opportunity to buy a company, the resulting market price is reliable evidence of fair

value.").

The admissions that Plan supporters made on their way to this bankruptcy filing

based on the same information that was available to the company in November confirm no

surplus at CCH I and directly contradict the position Charter is taking here. They are too

numerous for Charter to explain away or the Court to overlook:

- Vulcan prepared a DCF analysis as a check on Charter management. The result was billions short of the $18.7 billion required for CCH I to have surplus. ¶ 144.

- Vulcan did a surplus analysis using updated projections. It showed that CCH I did not have a surplus as of November 15, 2008. ¶ 115.

- Vulcan advised Lazard that it was valuing Charter at a multiple of approximately 5-6 times projected EBITDA. ¶ 116. This is billions of dollars below the threshold for surplus.

- Schmitz told Federman of Credit Suisse that all of the entities above CCH II, including the relevant DHCs, were insolvent, and that they could not make their

interest payments under Delaware law. ¶ 118.  CCH I is one of the entities above CCH II that Schmitz admitted were insolvent and lacked surplus.

- Lazard told Franklin that members of Charter's Board of Directors were concerned about their personal liability if the Board agreed to make the January 15, 2009 interest payment because Charter lacked sufficient surplus.  ¶ 122(a).

- Charter told Apollo that it would not be making the January 15 interest payment because of a lack of surplus.  Apollo recognized that even if CIH and CCH could make the January 15 interest payments, April 1 was "the inevitable default date." ¶ 123(l).

- Lazard told Oaktree that there was concern about making the January interest payment that would potentially require an "illegal dividend" due to the fact that there was no surplus at the Charter relevant entities.  ¶ 122(c).

- Management told KPMG that the reasons the Board decided to make the interest payments on January 15 was "due to lack of surplus."  ¶ 123(g).

- On January 14, the day before Charter's January interest payments were due, Charter's CFO spoke with JPMorgan representatives, Peter Hooker and Mark Van Lith, and told them that Charter "will not be making their scheduled interest payment tomorrow."  ¶ 123(b).  Schmitz "cited a combination of reasons" for why Charter would not be making its interest payments, including that "it can't."  ¶ 123(b).

- By February 8, 2009, KPMG determined that it would need to provide a going concern qualification in its opinion relating to its audit of Charter's 2008 financials because of lack of surplus.  KPMG explained:  "This conclusion is based on the projected lack of adequate surplus at certain Charter subsidiaries during 2009.  This lack of adequate surplus limits the Company's ability to distribute cash to certain entities within the structure such that those entities will not be able to meet their principal and interest obligations when due."  ¶ 125(a).

- On February 11, 2009, Charter proposed first day papers to be filed the next day acknowledged that, "Charter determined, in exercising its fiduciary duties and in compliance with applicable law, that it could not make two interest payments for junior entities in its capital structure which were due on January 15, 2009 in the amount of approximately $74 million." ¶ 123(k).

- On March 16, 2009, KPMG provided its final audit opinion with a going concern qualification noting one of the reasons it was providing such a qualification was "the potential inability of the Company's subsidiaries to make distributions for payments of interest and principal on the debts of the parents of such subsidiaries due in 2009 based on the availability of funds and restrictions under the Company's applicable debt instruments and under applicable law."  ¶ 127.

- Temple, President of Vulcan, testified that Charter filed for bankruptcy because it was unable to make the January 15 interest payments. ¶ 123(d).

In light of these numerous concessions and outright admissions, Charter's claim that CIH and CCH were able to pay their debts as they become due when CCO borrowed on November 5, 2008 and February 3, 2009, falls flat. It is also noteworthy that CIH and CCH still have not paid the entire amount of their interest payments due on January 15, 2009. Pursuant to Charter's agreement with the Takeover Group, Charter paid only $25 million of the $72 million of the January 15 interest payments and placed the remainder into an escrow account. If the Plan is not confirmed, the funds will be returned to Charter. ¶ 133(a). Franklin acknowledged that it is treating the escrow funds as if no payment had been made. ¶ 133(b).

### f. The "Business Judgment Rule" Is A Red Herring; Business Judgment Is Not A Defense To A Breach of Contract

The "business judgment rule" does not insulate CCO from the consequences of its defaults under the Credit Agreement. The language of the Credit Agreement governs whether there was a breach of the Credit Agreement. *See Clarke v. Parkinson*, 225 F. Supp. 2d 345, 349 (S.D.N.Y. 2002) (upholding the lower court's interpretation because it flows from the plain language of the Loan Agreement); *Citibank, N.A. v. Outdoor Resorts of Am., Inc.*, No. 91 CIV. 1407 (MBM), 1992 WL 162926, at *4 (S.D.N.Y. June 29, 1992) (applying the plain language of Loan Agreements). There is no exception for contractual breaches based on a good faith "business judgment." *See Nichols v. Am. Risk Mgmt.*, No. 89 CIV. 2999 (JSM), 1998 WL 655526, at *4 (S.D.N.Y. Sept. 24, 1998) (holding that business judgment rule is not a defense in a breach of contract action); *see also Weaver v. Mobile Diagnostic*, Civ. No. 02-1719, 2009 WL 1230297, at *3 (W.D. Pa. Apr. 30, 2009) (same). A breach is a breach.

When Charter borrows funds under the Credit Agreement, it makes certain representations and warranties, including a representation and warranty that CCH and CIH are

able to pay their debts as they become due.  Section 8(b) of the Credit Agreement provides for an

Event of Default where "any representation or warranty made or deemed made by any Loan

Party herein . . . *shall prove to have been inaccurate* in any material respect on or as of the date

made or deemed made."  ¶ 66.  As Schmitz admitted at trial, a false representation results in a

default "regardless of whether or not CCO knew or should have known the representation was

false."  ¶ 67.  There is no exception for breaches that result from the good faith exercise of

"business judgment."  It makes no difference whether the Board was conscientious, negligent or

worse.  Compliance with Section 8(b) is, by its plain language, determined based on the true

state of the facts as can best be determined with all available information and with the benefit of

hindsight.  Fraudulent intent or scienter is not required.  A breach has been established because

CCO's representation was not true at the time made.

## IV.     THE CREDIT AGREEMENT CANNOT BE REINSTATED BECAUSE THE PLAN DOES NOT CURE DEFAULTS UNDER SECTION 8(f) OF THE CREDIT AGREEMENT AS REQUIRED BY SECTION 1124(2)(A)

CCO has defaulted under Section 8(f) of the Credit Agreement due to changes in

the financial condition of the DHCs.  This is not an *ipso facto* default of CCO.  The Section 8(f)

default does not relate to CCO's financial condition.  CCO is indisputably solvent.  ¶ 171.  It

relates solely to the financial condition of affiliated, non-obligor DHCs.  The default arises

because the DHCs' debt has been accelerated following a payment default and due to the

agreement among the Plan proponents to use bankruptcy to effect a Charter takeover.

Federal policy requires that all of the Lenders' contractual rights, including the

right to acceleration under the Credit Agreement, be enforced because the debtor CCO is solvent.

In *In re Chicago, Milwaukee, St. Paul & Pac. Railroad Co*., Judge Posner addressed the very

question before this Court:  whether bank debt of a solvent debtor that accelerated should be paid

in full or reinstated.  791 F.2d 524 (7th Cir. 1986).  He concluded that the accelerated bank debt

must be paid in full because, where—as here—all other creditors of the solvent debtor at issue

are being paid in full, a creditor's contractual rights (including the right to acceleration) must be

enforced.  *Id.* at 528.  Judge Posner's analysis is applicable here:

> [The debtor] has offered to give the debenture holders an ironclad
> guarantee that they will get 5 percent a year until 2055 and the full
> principal then; and given [the debtor]'s net worth, such a guarantee
> should not be hard to arrange.  So the debenture holders will do no
> worse than if there had been no default.
>
> Nevertheless, the district judge did not err in allowing acceleration.
> *The only good reason for refusing to give a creditor in*
> *reorganization all that he bargained for when he extended credit is*
> *to help other creditors, the debtor's assets being insufficient to pay*
> *all creditors in full.*  All of the [debtor's] creditors will be paid in
> full, even if the debenture holders are paid out at the highest
> valuation of their claim.  The only competing equities are those of
> [the debtor]'s shareholders, and are weak . . . .

*Id.* at 527 (emphasis added).  The law in every Circuit is that where, as here, the debtor is

solvent, a bankruptcy court's role is simply to enforce creditors' rights according to the terms of

the contracts that created those rights.[47]  That is what the Court should do here by denying

reinstatement.  The Credit Agreement should stay accelerated pending a restructuring governed

by the cram-down provisions of Section 1129 (which would permit CCO to term out the debt

over time, but only upon market terms including a market rate).

---

[47] *Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) (when a debtor is solvent
"the bankruptcy rule is that where there is a *contractual provision*, valid under state law, . . .
the bankruptcy court will enforce the contractual provision"); *Ruskin v. Griffiths*, 269 F.2d
827, 832 (2d Cir. 1959) (where the debtor is solvent, "it seems to us the opposite of equity to
allow the debtor to escape the expressly-bargained-for result of its act"); *In re Dow Corning
Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is
that a bankruptcy court's role is merely to enforce the contractual rights of the parties….").

### A.    CCO Is In Breach Of Section 8(f) Of The Credit Agreement Because The DHCs' Debt Has Been Accelerated

CCO breaches the Credit Agreement when $200 million of any non-obligor DHC's debt is accelerated for reasons including a bankruptcy filing of the DHC. ¶ 168.  On March 27, 2009, several billion dollars of debt of CCO's affiliates was accelerated.  When each of CCH, CIH, CCH I and CCH II filed a petition for bankruptcy that accelerated more than $200 million dollars of debt of each entity.  ¶ 170.    Therefore, under the plain language of the Credit Agreement, CCO is in breach.  The Plan does not purport to cure the breach.[48]  Accordingly, the Credit Agreement cannot be reinstated.

### B.    Schmitz's Contention That The DHCs' Debt Has Not Been Accelerated Is Simply Wrong

Without any explanation, Schmitz claims that none of the debt of the DHCs has been accelerated.  ¶ 170(c).  The plain language of the indentures demonstrates that Schimtz's unsupportable assertion is wrong.  ¶ 170(d).  For example, under 6.01 of CCH's indentures an Event of Default "occurs if. . . (g) the Company, the Guarantor or any of their Significant Subsidiaries pursuant to or within the meaning of Bankruptcy Law . . . commences a voluntary case."  ¶ 107(d).  Section 6.02 of CCH's indentures provides: "In the case of an Event of Default arising from clause (g) or (h) of Section 6.01, with respect to the Company or the Guarantor, all outstanding Notes shall become due and payable immediately without further action or notice."

---

[48]    CCO argues that the Lenders should be grateful that they have been denied their contractual rights because Charter will be allowed to walk away from $8 billion of existing debt.  This argument ignores the fact that the Plan would require the Lenders to finance a leveraged buyout of the Company by the Takeover Group.  It also ignores the fact that a creditor is deemed impaired under Section 1124 regardless of whether or not the denial of contractual rights renders some type of benefit upon the creditor.  *In re 7th St. & Beardsley P'ship,* 181 B.R. 426, 431 (Bankr. D. Ariz. 1994) ("[A]ny change of a creditor's rights, whether for the better or for the worse, constitutes impairment and creates the possibility of a 'consenting impaired class.'").

¶ 107(d).  CIH, CCH I and CCH II's indentures contain substantially identical provisions.  ¶ 107(d).  They all had more than $200 million worth of debt under their indentures that was automatically accelerated when they filed voluntary bankruptcy petitions.  ¶ 107(b), (d).  CCO cannot escape the plain meaning of the DHC's indentures and Section 8(f) of the Credit Agreement.

### C.  The Cross-Acceleration Defaults Are Not *Ipso Facto* Defaults

Section 1124(2)(A) carves out of its cure requirements "a default of a kind specified in Section 365(b)(2) of this title or of a kind that Section 365(b)(2) expressly does not require to be cured."  11 U.S.C. § 1124(2)(A).  Section 365(b)(2) sets forth two relevant categories of defaults that need not be cured:  those relating to "(A) the insolvency or financial condition of the debtor at any time before the closing of the case" and "(B) the commencement of a case under this title."  11 U.S.C. § 365(b)(2)(A)-(B).  These "*ipso facto* defaults"[49] flow unavoidably from the debtor's financial condition or bankruptcy.  Here, the DHC cross-acceleration defaults were *not* triggered in any way by the bankruptcy filing or financial condition of CCO.  The Section 8(f) cross-acceleration defaults arise from the financial condition of entities that are non-obligors in CCO's case and the takeover of Charter.  Thus, these cross-acceleration defaults are not *ipso facto* defaults that are excused from cure.

Courts enforce cross-defaults under Section 365(b)(2).  In *In re Liljeberg Enterprises, Inc.*, the Fifth Circuit held that a cross-default tied to the obligation of a non-debtor affiliate was not an *ipso facto* default under Section 365(b)(2).  304 F.3d 410, 446 (5th Cir. 2002).  In *In re East Hampton Sand & Gravel Co.*, the court rejected the argument that a cross-default provision was an *ipso facto* default, explaining that "equity will not countenance the

---

[49]  Literally, "*ipso facto*" defaults arise "from the thing itself," *Oxford English Dictionary* (2d ed. 1989) – *i.e.* the debtor's bankruptcy or financial distress.

debtor's exercise of Section 365 to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy." 25 B.R. 193, 198 (Bankr. E.D.N.Y. 1982).

It has been recognized that "[f]ederal bankruptcy policy is offended where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement." *In re Kopel*, 232 B.R. 57, 65-67 (Bankr. E.D.N.Y. 1999) (enforcing the cross-default in a lease under Section 365 where a default occurred under a note). But that is not happening here. Rather, the cross-acceleration defaults in the CCO Credit Agreement are an important part of the bargain and do not offend federal bankruptcy policy. They are unique in Charter's capital structure; they do not exist in any other Charter credit agreement or indenture. The testimony of witnesses on both sides confirms that Section 8(f) was a negotiated provision, important to the bargain and designed to give the Lenders a seat at the table in the event of acceleration of the DHCs' debt—a seat they have now been denied. ¶ 169(c). Moreover, the Lenders are not trying to gain a priority. Enforcing the cross-default would simply require the Court to apply the "fair and equitable" standard of Section 1129. This may result in increasing the cost to the Takeover Group of acquiring Charter, but the Lenders have priority over the Takeover Group that was bargained for and for which the Takeover Group was compensated in the interest rates on the bonds they hold. The failure to enforce the cross-defaults would offend, rather than be consistent with, federal bankruptcy policy.

D.    **The Plan Does Not Cure The DHC Cross-Defaults**

"Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *In re Taddeo*, 685 F.2d 24, 26-27 (2d Cir. 1982). The Plan does not remedy the triggering events—the bankruptcy filings of the DHCs or the

missed principal payments of CCH—and therefore does not return the parties to the pre-default conditions. The Plan does not nullify the consequences of the cross-acceleration defaults.

Far from returning the parties to the pre-default conditions, the Plan permanently alters the parties' rights and obligations under the Credit Agreement. The cross-acceleration defaults were included precisely to vest the Lenders with the option in such event to: (i) accelerate CCO's outstanding obligations, or alternatively, (ii) negotiate a waiver or amendment with CCO and remain as lenders on the credit. In each case, the Lenders would have the right to make their decision based on their sense of the risks that led to the cross-defaults and the impact the proposed "fix" of the defaults would have on them as CCO's creditors. The Plan, however, would deprive the Lenders of exactly that bargained-for right by forcing upon them a fundamental change in the corporate structure, ownership and capitalization of the DHCs. This is the opposite of cure.

Charter is essentially asking the Court not to require these cross-defaults to be cured because otherwise its Plan would be not feasible. This argument has been rejected elsewhere and should be rejected here because Section 1124 expressly requires CCO to cure the DHC cross-defaults in order to reinstate the Credit Agreement. *In re East Hampton*, 25 B.R at 199 (rejecting argument that cross-default should not be enforced because it makes a debtor's reorganization more feasible). Here, CCO bargained for a credit facility that would be in default if a DHC filed for bankruptcy. That is what happened here. CCO should not be relieved of that obligation in order to enable Apollo, Oaktree, Crestview and Franklin to acquire Charter on the cheap at the expense of the Lenders' bargained-for contract rights.

## CONCLUSION

For the reasons set forth above, the Lenders' claims are impaired, and the Plan cannot be confirmed.

Dated: New York, New York
September 18, 2009

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: */s/ Peter V.Pantaleo*
Peter V. Pantaleo
Bruce D. Angiolillo
Mary Elizabeth McGarry
Bryce L. Friedman
George S. Wang

425 Lexington Avenue
New York, New York  10017
(212) 455-2000
(212) 455-2502 (fax)

*Attorneys for JPMorgan Chase Bank, N.A.*

**APPENDIX A: WITNESS INFORMATION LIST**

| WITNESS | DESCRIPTION | DATE OF TESTIMONY | TRANSCRIPT CITE FOR TESTIMONY |
|---|---|---|---|
| Frederick Bliss | Managing Director at Duff & Phelps. | 9/1/2009 | 10:1-29:17 |
| Lance Conn | Former President of Vulcan Capital and Former Executive Vice President of Investment Management for Vulcan Inc. (until May 2009); Member, Charter Communications, Inc. Board of Directors. Mr. Conn was personally involved in negotiating the restructuring plan with Charter and its bondholders. | 9/2/2009 | 10:14-178:13 |
| Thomas Degnan | Vice President for Finance and Corporate Treasurer, Charter Communications, Inc. | 9/1/2009 | 229:6-231:14 |
| Bruce Den Uyl | Expert witness for Charter on valuation. | 8/3/2009 | 79:17-240:21 |
| Matthew Derdeyn | Vice President for Finance and Planning, Charter Communications, Inc. | 9/1/2009 | 231:18-235:12 |
| Gregory Doody | Chief Restructuring Officer and General Counsel, Charter Communications, Inc. | 8/17/2009; 9/1/2009 | 12:10-291:11; 35:8-37:25 |
| Eric Federman | Designated Corporate Witness for Credit Suisse, member of syndicate of first-lien lenders to Charter. | 8/18/2009 | 26:2-35:23 |
| Barry Folse | Managing Director, Information Management Services Group at AlixPartners LLC, financial restructuring and bankruptcy reorganization advisory firm retained by Charter. | 8/18/2009 | 110:15-162:13 |
| Stephen Goldstein | Managing Director of the restructuring group at Lazard, which served as chief restructuring advisor to Charter. | 8/24/2009 | 10:13-188:21 |
| Paul Gompers | Expert witness for JPMorgan on the investment practices and strategies of private equity firms. | 8/24/2009 | 192:1-285:21 |
| Peter Hooker | Managing Director, Syndications and Leverage Financing at JPMorgan. | 7/31/2009 | 30:24-55:15 |
| Kevin Howard | Vice President, Chief Accounting Officer and Controller, Charter Communications, Inc. | 9/1/2009 | 222:6-228:22 |
| Rajive Johri | Independent Director and Member of Audit Committee, Charter Communications, Inc. | 8/31/2009 | 155:25-225:17 |
| Ann Kurinskas | Managing Director, Special Credits Group, Credit Risk Management at JPMorgan. | 8/18/2009; 8/25/2009 | 62:5-90:5; 5:23-135:15 |

| WITNESS | DESCRIPTION | DATE OF TESTIMONY | TRANSCRIPT CITE FOR TESTIMONY |
|---|---|---|---|
| Kenneth Liang | Managing Director at private equity firm Oaktree Capital Management, LLC, which is part of a "takeover group" of Charter bondholders with right to appoint one director to the Charter Board upon confirmation. | 7/29/2009 | 193:12-222:10 |
| Jeffrey Marcus | Managing Director at private equity firm Crestview Partners, which is part of a "takeover group" of Charter bondholders with right to appoint one director to the Charter Board upon confirmation. Mr. Marcus was also the founder, Chairman and CEO of Marcus Cable, which was sold to Paul Allen in 1998 and was merged into Charter Communications, Inc. | 7/29/2009 | 13:13-158:23 |
| Edward McDonough | Expert witness for Law Debenture Trust on the valuation undertaken by Lazard for Charter, which was attached as Exhibit D to the Disclosure Statement. | 9/1/2009 | 63:14-212:7 |
| David Merritt | Member and Chair of Audit Committee, Charter Communications, Inc. Board of Directors. | 7/22/2009 | 165:1-269:25 |
| James Millstein | Former Managing Director and Global Co-Head of Restructuring at Lazard, which served as chief restructuring advisor to Charter. | 7/21/2009; 9/10/2009 | 29:10-184:2; 8:5-70:21 |
| Malcolm Morris | Designated Corporate Witness for Deutsche Bank, member of syndicate of first-lien lenders to Charter. | 8/18/2009 | 163:11-190:9 |
| Marc Nathanson | Former Independent Director, Charter Communications, Inc.; resigned 12/9/2008. | 9/1/2009 | 236:8-238:24 |
| Julio Ojea-Quintana | Designated Corporate Witness for Citi, member of syndicate of first-lien lenders to Charter | 8/18/2009 | 36:24-61:4 |
| Michael Pace | Managing Director, Credit Research Group at JPMorgan. | 8/18/2009 | 90:17-103:10 |
| Christine (Tina) Ruyter | Vice President, Technology, Media, and Telecom Team, Credit Risk Management at JPMorgan Chase Bank, N.A ("JPMorgan"). | 7/31/2009 | 11:12-29:17 |
| Eloise Schmitz | Executive Vice President and Chief Financial Officer, Charter Communications, Inc. | 7/31/2009; 8/3/2009 | 58:11-214:17; 5:24-78:3 |
| Neil Smit | President and Chief Executive Officer, Charter Communications, Inc. | 7/21/2009; 7/22/2009 | 187:2-239:12; 13:3-147:16 |

| WITNESS | DESCRIPTION | DATE OF TESTIMONY | TRANSCRIPT CITE FOR TESTIMONY |
|---|---|---|---|
| Carlyn Taylor | Expert witness for JPMorgan on Charter's inability to pay debts as they become due as rebuttal to testimony and report of Mr. Den Uyl. | 8/31/2009 | 15:24-153:12 |
| Christopher Temple | President of Vulcan Capital, the investment portfolio division of Vulcan Inc., which is owned entirely by Paul Allen and manages Mr. Allen's business activities. | 9/1/2009 | 40:6-52:22 |
| Christine Villaluz | Analyst at Franklin Templeton Investments division of Franklin Advisors, Inc., the largest single holder of Charter debt securities. | 7/23/2009 | 9:19-175:6 |
| Fred Zagar | Designated Corporate Witness for Bank of America, member of syndicate of first-lien lenders to Charter. | 8/18/2009 | 12:12-25:16 |
| Eric Zinterhofer | Senior Partner at private equity firm Apollo Management, L.P., which is part of a "takeover group" of Charter bondholders with right to appoint two directors to the Charter Board upon confirmation. | 7/28/2009 | 26:7-255:10 |