WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)
Dwight A. Healy (DH-9305)
Karen M. Asner (KA-5950)
Andrew Hammond (AH-0415)
Gregory M. Starner (GS-1719)

Counsel for Law Debenture Trust Company
of New York as Indenture Trustee

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, | ) Case No. 09-11435 |
| INC., <u>et</u> <u>al</u>., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| JPMORGAN CHASE BANK, N.A. | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding |
| - against - | ) No. 09-1132 (JMP) |
| | ) |
| CHARTER COMMUNICATIONS OPERATING, | ) |
| LLC and CCO HOLDINGS, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## LAW DEBENTURE TRUST COMPANY OF NEW YORK'S
## PROPOSED FINDINGS OF FACT

TO:    THE HONORABLE JAMES M. PECK,
           United States Bankruptcy Judge:

The Law Debenture Trust Company of New York (the "Trustee") respectfully submits its Proposed Findings of Fact as follows:[1]

## PROPOSED FINDINGS OF FACT

1.     The Charter enterprise consists of a complex capital structure involving multiple holding companies and operating companies that are ultimately owned by Debtor Charter Communications, Inc. ("CCI"), a public company controlled by Paul Allen, and Charter Investment, Inc ("CII"), an S Corporation that is 100% owned by Paul Allen.  JPX 266 (Disclosure Statement) at 14-16 (describing the capital structure); September 2 Tr. 155:3-4 (Conn) (testifying that CII is an S-Corp).

2.     The Law Debenture Trust Company of New York (the "Trustee"), is the Trustee with respect to the $479 million in aggregate principal amount of 6.50% Convertible Senior Notes due 2027 (the "CCI Notes") issued by CCI.  LTDX 239 (CCI's 2008 10-K) at 65.

3.     CCI's assets include a 54% equity interest in Charter Communications Holding Company, LLC ("Holdco") and certain indebtedness of Holdco that mirrors the terms of the securities issued by CCI.  JPX 266 (Disclosure Statement) at 14.  Thus, CCI's ability to recover as a creditor of Holdco in this proceeding is tied directly to Holdco's assets.  JPX (Disclosure Statement), Exhibit E at 6.

4.     Holdco's assets include direct intercompany claims against CCO.  JPX 266 (Disclosure Statement), Exhibit E at 6; July 21 Tr. 69:19-70:4 (Millstein).  These intercompany claims consist of, among other things, (1) an intercompany loan and (2) a management services receivable.  JPX 266 (Disclosure Statement), Exhibit E at 6.

---

[1] Capitalized terms not defined herein have the same meaning as set forth in the Trustee's Post-Trial Brief in Further Support of its Objection to Confirmation of the Debtors' Plan of Reorganization.

5.      CCO is a solvent entity.  August 17 Tr. 102:15-16 (Doody); August 31 Tr. 173:15-18) (Johri); see also September 2 Tr. 165:21-25 (Conn) (identifying "nuclear holocaust" as the type of circumstance under which a claim against CCO would not be paid out).

6.      In the years leading up to the filing, the Company sought to engage in large deleveraging transactions to address its liquidity issues.  August 31 Tr. 222:4-10 (Johri); July 31 Tr. 76:16-77:2 (Schmitz).

## I.      CCI Noteholder Assets Have Been Systematically Depleted to Maximize "Enterprise" Value

### A.      The April, October And November Transactions

#### 1.      The April Bond Repurchase

7.      In April 2008, in a series of private transactions, Holdco repurchased approximately $35 million of Charter Communications Holdings, LLC ("CCH") notes for approximately $35 million of cash.  LDTX 239 (CCI's 2008 10-K) at F-21; August 3 Tr. 45:14-23 (Schmitz).  Holdco's assets were used to fund the entire purchase.  August 3 Tr. 45:10-13 (Schmitz).

8.      The transaction was funded in part by having CCO repay a portion of the valid intercompany loan balance that it owed to Holdco, and Holdco then used this cash to purchase the CCH notes.  August 3 Tr. 45:14-23 (Schmitz).

9.      Holdco continues to hold the CCH notes that it purchased in April 2008.  LDTX 239 (CCI's 2008 10-K) at F-21.  Under the Plan, which calls for a .4% recovery on the CCH notes, Holdco will recoup approximately $140,000 on this $35 million investment in CCH notes.  JPX 266 (Disclosure Statement) at 6 (showing a 0.4% recovery on the CCH notes).

## 2. <u>The October Tender Offer</u>

10.     Lehman Brothers filed for bankruptcy on September 15, 2008.  July 31 Tr. 34:17-18 (Millstein).  There was a sense of panic and crisis around the stability of the banking system in September and October.  July 21 Tr. 34:13-15:2 (Millstein).

11.     Following the Lehman Brothers bankruptcy filing, the credit markets collapsed. July 21 Tr. 118:23-119:2 (Millstein).

12.     At a September 24 board meeting, CCI's management discussed the disruptions in the credit market with CCI's board of directors (the "Board").  JPX 38 (9/24/08 board minutes) at 1.

13.     At the same board meeting, Ms. Schmitz, CCI's CFO, proposed that the Company engage in a tender offer in October to purchase approximately $100 million in CCH bonds due in 2009 and 2010.  Id.  Mr. Smit, the CEO, indicated that he would proceed with the tender offer under a previous delegation of authority.  <u>Id.</u>  No board member objected to proceeding with the tender offer.  <u>Id.</u>

14.     Liquidity is the lifeline of the Company.  July 31 Tr. 103:16-24 (Schmitz). Starting on October 1, the Company started to draw down on the CCO credit facility because of liquidity concerns.  August 3 Tr. 19:10-14 (Schmitz).

15.     In mid-October, the Company received a valuation from the financial advisory firm of Duff & Phelps.  July 31 Tr. 88:18-22 (Schmitz).  Duff & Phelps concluded that as of September 30, the fair saleable value of the Company's cable assets was $21.6 billion.  July 31 Tr. 88:19-89:5 (Schmitz); CX 277 at final page.

16.     The Company then used this valuation to prepare a "waterfall" analysis showing the levels of surplus at several entities in the capital structure.  July 31 Tr. 86:13-87:17 (Schmitz).  The Company determined each entity's surplus by subtracting the value of the

entity's liabilities from the value of its assets.  July 31 Tr. 87:10-12 (Schmitz).  This waterfall analysis is shown on the last page of CX 277.  July 31 Tr. 85:19-86:5 (Schmitz).  According to this waterfall analysis, as of October 1, CCI had a negative surplus of $735 million, Holdco had a negative surplus of $727 million, and CCH had a negative surplus of $183 million.  CX 277 at last page.

17.     In its 2008 10-K, the Company stated: "Generally…an entity would be considered insolvent if: the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all its assets; the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or it could not pay its debts as they became due."  LDTX 239 (CCI's 2008 10-K) at 25 (emphasis added).

18.     On October 27, the Company raised its "access to capital risk" to an "overall high" rating.  August 31 Tr. 163:2-5 (Johri); JPX 50 (10/27/08 audit committee minutes) at 3.

19.     On October 28, the Board discussed contingency planning, including a potential bankruptcy filing.  July 22 Tr. 23:6-24:21 (Smit); JPX 58 (10/28 Board minutes) at 4.

20.     Mr. Millstein, CCI's financial advisor, advised CCI's Board at the October 28 board meeting that the prevailing economic conditions made "financing prohibitively difficult and expensive" and that "it did not appear that credit markets would improve significantly in the near future."  JPX 58 (Oct. 28 board minutes) at 4.

21.     Ms. Sturgeon is the Company's Director of Finance and Acquisitions.  August 3 Tr. 33:17-20 (Schmitz).  Before management approved the use of Holdco's funds for the tender offer,  Ms. Sturgeon warned Ms. Schmitz, the CFO, that the "[b]ottom line is that you are giving up your ability to service the [CCI Notes] if you tender for bonds when over leverage."  LDTX

34 at 1; August 3 Tr. 36:14-24 (Schmitz). Ms. Sturgeon further advised Ms. Schmitz that it would be "most prudent" to wait for fourth quarter numbers before conducting the tender offer. LDTX 34 at 1; August 3 Tr. 37:7-10 (Schmitz).

22.     The Company nevertheless completed the tender offer on October 31, paying $99 million in cash to purchase $102 million of CCH notes. JPX 266 (Disclosure Statement) at 21. The stated purpose of the tender offer was to capture a $6 million discount and improve liquidity during the audit window. July 31 Tr. 128:24-129:5; JPX 38 (9/24 board minutes) at 2. Management engaged in the tender offer to benefit the entire Charter enterprise. August 3 Tr. 41:24-42:9 (Schmitz).

23.     In conducting prior tender offers, the Company had used CCH's own funds to purchase CCH notes. JPX 266 (Disclosure Statement) at 20. In October 2008, however, the Company used Holdco's assets to fund the tender offer. August 3 Tr. 27:6-9 (Schmitz). To fund the October tender offer, management caused CCO to repay approximately $100 million on the valid intercompany loan owing from CCO to Holdco. August 3 Tr. 28:11-18 (Schmitz). Holdco then used those funds to purchase CCH notes. August 3 Tr. 30:6-8 (Schmitz).

24.     Holdco was not an obligor on the CCH notes that were purchased and had no obligation to pay principal or interest on the notes. August 3 Tr. 27:11-21 (Schmitz); LDTX 49 (CCO-Holdco electronic funds transfer); LDTX 61 (Holdco tender offer electronic funds transfer; CX 114 (11/14/08 board minutes)

25.     Holdco still holds the CCH Notes it purchased in the October 2008 tender offer. August 3 Tr. 39:6-10 (Schmitz). Under the Plan, Holdco will recover approximately $408,000 on this $99 million investment. JPX 266 (Disclosure Statement) at 6, 21.[2]

---

[2] The Disclosure Statement indicates a recovery .4% on the $102 million principal amount of CCH Notes purchased in the Octover tender offer. $102 million x .04 = $408,000.

### 3.     The November Interest Payments

26.     On November 5, the Company drew down $250 million on its credit facility.  July 22 Tr. 26:18-20 (Smit).  The Company drew down the revolving credit facility because of the uncertainty in the credit markets.  JPX 50 (10/27/08 audit committee minutes) at 3.

27.     On November 13, the Company retained Kirkland & Ellis to advise it in connection with a potential restructuring.  Debtors' Application for Order Authorizing Retention of Kirkland and Ellis [Docket No. 34], Exhibit 1 (Retention Letter) of Exhibit A, at 1.  Mr. Allen and Mr. Allen's representatives on the Board approved the retention of Kirkland & Ellis. September 2 Tr. 156:18-20 (Conn).

28.     On November 14, management convened a special meeting of the Board to discuss certain considerations surrounding payments of interest due to be paid on November 17 by CCH and CCH I Holdings, LLC ("CIH").  CX 225 (11/14/08 Telephonic Board Meeting Book) at 2.  The amount of the interest payment due from CCH was $8.4 million.  August 3 Tr. 47:19-22 (Schmitz).

29.     The Board was advised that the money that would be used to fund the CCH interest payment was actually intended to be used to pay the holders of the CCI Notes and that such funds would need to be replaced.  CX 225 (11/14/08 Telephonic Board Meeting Book) at 2-3.

30.     The Board approved a capital contribution from Holdco in the amount of $8.4 million to allow CCH to make its interest payment.  CX 114 (11/14/08 board minutes) at 3-4.

31.     To fund the transaction, management caused CCO to repay a portion of the valid intercompany loan due from CCO to Holdco.  August 3 Tr. 48:2-4 (Schmitz); LDTX 82 (Holdco capital contribution electronic funds transfer).  Management then caused Holdco to use the proceeds of that repayment and some cash to make a capital contribution to fund the CCH

interest payment.  August 3 Tr. 48:5-8 (Schmitz); LDTX 82 (Holdco capital contribution electronic funds transfer).

32.     The Company caused Holdco to fund this November 14 CCH interest payment for the benefit of the entire Charter enterprise.  August 31 Tr. 172:23-173:1 (Johri).  In return for its capital contribution, Holdco received nothing, other than the "benefit of the enterprise making its interest payment."  August 3 Tr. 48:9-25 (Schmitz).  As the Company's General Counsel and CRO described it, the money "came out of Holdco's pocket."  August 17 Tr. 121: 15-16 (Doody).

33.     This was not the normal method of making interest payments on behalf of the designated holding companies, and, going back at least to the beginning of 2008, all designated holding companies' interest payments were made through distributions up the chain to their respective corporate entities.  July 22 Tr. 18:1-13 (Smit).

34.     At the November 14 board meeting, the Board also considered whether, under Delaware law, CCH I had financial surplus (net market saleable value in excess of its liabilities) sufficient to make a distribution to CIH, its parent, so that CIH could make its interest payment in the amount of $63 million.  CX 114 (11/14/08 board minutes) at 1-2; CX 225 (11/14/08 Telephonic Board Meeting Book) at 3.

35.     At the November 14 meeting, the Company determined that it had sufficient surplus at the CCH I level to upstream funds to CIH so that CIH could make its interest payment. LDTX 80 at 2-3.  In making this determination, the Company relied upon the Duff & Phelps valuation discussed above.  August 3 Tr. 53:12-17 (Schmitz).

36.     At the November 14 board meeting, Mr. Millstein advised the Board that neither the current trading price of the bonds nor the multiples reflected in peers' share prices were

necessarily reflective of the value of the Company, and that multiples reflected in previous private market transactions were more appropriate indicators of value.  CX 114 (11/14/08 board minutes) at 2.

37.     The minutes reflect that Mr. Millstein only spoke at the December 10 Board meeting.  CF. JPX 86 with JPX 113.

38.     The Board relied on Mr. Millstein's advice in finding that CCH I had adequate surplus to make a distribution in the amount of $63 million to CIH.  August 31 Tr. 168:25-169:20 (Johri).

**B.     The Beginning Of The Restructuring Negotiations**

39.     Mr. Allen is CCI's controlling shareholder and the chairman of the Board.  LDTX 239 (CCI's 2008 10-K) at 31.  CCI disclosed in its Form 10-K that Mr. Allen's control over CCI's management and affairs could create conflicts of interest if he is faced with decisions that could have different implications for him and CCI.  Id. at 31.  The 10-K specifically states, as an example, that such a conflict would arise if Mr. Allen elected to exercise his rights under the exchange agreement.  Id. at 31.

40.     The only two board meetings in December were the December 10 Board meeting and the December 22 Board meeting.

41.     At the December 10 board meeting, the Board discussed a proposed restructuring. JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 8.

42.     At this meeting, Mr. Millstein of Lazard advised the Board, including Mr. Allen and his representative, Mr. Conn, that Mr. Allen's participation was essential to a restructuring and that the Company should be prepared to pay him for his participation.  September 2 Tr. 174:5-20 (Conn).  Upon receiving this advice from Mr. Millstein at the December 10 Board meeting, while sitting in his capacity as a CCI director, it "crystallized" in Mr. Conn's mind that

Mr. Allen should seek compensation for participating in a consensual restructuring. September 2 Tr. 174:5-20 (Conn).

43.     At the December 10 meeting, after Mr. Millstein of Lazard advised the Board that Mr. Allen should be compensated, the full Board, including Mr. Allen and Mr. Conn, approved the retention of Lazard as the company's financial advisor in connection with the proposed restructuring. JPX 86 (12/9/2008 – 12/10/2008 board minutes) at 7-8.

44.     After Mr. Millstein provided this advice to the Board, it was clear that the Company would have to negotiate with Mr. Allen with respect to the amount of compensation Mr. Allen should receive for his participation, if any. September 10 Tr. 60:11-16 (Millstein).

45.     In the past, when CCI had to negotiate a dispute with Mr. Allen, the Company appointed a special committee of independent directors. July 22 Tr. 245:14-22, 246:7-9 (Merritt). That special committee retained its own independent legal counsel, separate and apart from the Company's counsel. July 22 Tr. 246:18-20 (Merritt).

46.     In addition, for a period of about seven to eight months in 2007, the independent directors would meet separately to discuss potential deleveraging transactions involving strategic partnerships. August 31 Tr. 222:4-10 (Johri). In connection with pursuing these potential transactions, the independent directors believed that there could be potential conflicts between CCI and Mr. Allen's entity, Vulcan, if the Company found a strategic partner with which to engage in a deleveraging transaction. August 31 Tr. 222:10-14 (Johri). At that time, the independent directors retained independent counsel. August 31 Tr. 222:20-223:4 (Johri). Mr. Tory, one of the independent directors, was appointed to chair the independent directors in connection with these discussions. August 31 Tr. 223:12-16 (Johri).

47.     In connection with the restructuring, the Company never appointed a special committee of independent directors to negotiate with Mr. Allen.  July 22 Tr. 248:16-19 (Merritt). Instead, the independent directors caucused informally following board meetings to discuss the restructuring process.  July 21 Tr. 65:7-18 (Millstein).  The Debtors have produced no documentation showing the content of these discussions.  The board minutes that have been produced do not reflect the content of any of these discussions.  See JPX 86 (12/9/08 – 12/10/08 board minutes); JPX 129 (1/6/09 board minutes); JPX 133 (1/9/09 board minutes); JPX 141 (1/14/09 board minutes); JPX 155 (1/23/09 board minutes); CX 250 (1/30/09 board minutes); CX 254A (2/6/09 board minutes); CX 255 (2/10/09 – 2/11/09 board minutes).   No one was appointed to chair the independent directors in connection with the restructuring and the negotiations with Mr. Allen.  August 31 Tr. 223:20-224:4 (Johri).

48.     The independent directors did not retain their own financial advisors to counsel them in connection with the restructuring process.  July 22 Tr. 148:24-249:1 (Merritt).  Rather the independent directors consulted with Lazard.  July 22 Tr. 248:20-23 (Merritt).  Lazard was retained by, and owed duties to, virtually all the entities in the Debtors' capital structure.  July 21 Tr. 157:14-158:2 (Millstein).

49.     The independent directors did not retain independent legal advisors to advise them in connection with the restructuring process.  July 22 Tr. 249:2-4 (Merritt); August 31 Tr. 192:7-13 (Johri).  Rather, the independent directors consulted with Kirkland & Ellis. July 22 Tr. 248:20-23 (Merritt).  In connection with the restructuring, Kirkland & Ellis was representing the Charter enterprise, which was controlled by Mr. Allen.  July 22 Tr. 124:21-23 (Smit).  The independent directors asked at nearly every board meeting whether they should have independent counsel, but they were advised that they did not.   August 31 Tr. 191:20-192:13 (Johri).

50.     The advisors in connection with the restructuring reported directly to management.  July 22 Tr. 173:3-5 (Smit).

51.     There was no resolution of the Board authorizing the independent directors to take any action with respect to the negotiations with Mr. Allen.  See JPX 86 (12/9/08 – 12/10/08 board minutes); JPX 129 (1/6/09 board minutes); JPX 133 (1/9/09 board minutes); JPX 141 (1/14/09 board minutes); JPX 155 (1/23/09 board minutes);  CX 250 (1/30/09 board minutes); CX 254A (2/6/09 board minutes); CX 255 (2/10/09 – 2/11/09 board minutes).

52.     The independent directors did not participate in any of the negotiations concerning the restructuring.  July 22 Tr. 244: 7 (Merritt); August 31 Tr. 192:14-17 (Johri).

53.     Instead, management negotiated directly with Vulcan, Mr. Allen's entity.  August 31 Tr. 196:19-21 (Johri).

54.     After retaining Lazard on December 10, the Company and Lazard attempted to marshal who they perceived to be the fulcrum security holders at the CCH I and CCH II levels.  August 17 Tr. 25:13-18 (Doody).  The CCH I and CCH II bondholders formed a committee referred to as the cross-over committee (the "Crossover Committee").  August 17 Tr. 25:13-24 (Doody); JPX 266 (Disclosure Statement) at 21.  A three way negotiation ensued between the Company, Mr. Allen's interests, and the Crossover Committee.  July 21 Tr. 52:14-53:21 (Millstein) (describing the formation of the Crossover Committee); July 21 Tr. 210:5-10 (Merritt) (describing a "three-way negotiation").

55.     The Debtors' primary objectives in the restructuring negotiations included reducing debt to a level that could be sustained with operating income and obtaining a significant levered positive free cash flow.  July 21 Tr. 163:12-16 (Millstein).

56.     As a starting point for the negotiations, the Debtors prepared a "straw man" proposal which outlined, among other things, the debt capacity that the Debtors thought they could sustain.  July 21 Tr. 53:22-54:15 (Millstein).  The "straw man" was an attempt to "draw [Mr. Allen and the Crossover Committee] a picture and just start the negotiations."  August 24 Tr. 54:12-13 (Goldstein).

57.     CCH and CIH had interest payments due on January 15.  JPX 141 (Jan. 14 board minutes) at 1.  Shortly after the negotiations with the Crossover Committee commenced, CCI determined, in exercising its fiduciary duties, that it should not make the $74 million of interest payments (the "January Interest Payment") due on the CCH and CIH notes at the time.  JPX 266 (Disclosure Statement) at 21.

58.     CCH and CIH had a 30-day grace period available to them under the applicable indentures, and CCI's Board and management decided to take advantage of that grace period.  JPX (Disclosure Statement) 266 at 21.  As a result, if CCH and CIH did not make the January Interest Payment by February 13, the bonds' trustee would be able to accelerate the Debtors' obligations under the notes and this would trigger cross-defaults under the credit facility.  Id.

## C.     The Exchange Agreement

59.     Mr. Allen had certain rights under an exchange agreement with the Company pursuant to which he could exchange his equity interests in Holdco for equity interests in CCI.  LDTX 355 (Smit email to Board re Exchange); CX 137 (Exchange Agreement).

60.      On or about January 20, Mr. Allen demanded that the Company agree to honor his exchange rights immediately.  LDTX 128 (1/20 email from Kornberg).  Management, the Board and Mr. Allen understood that if such an exchange were consummated, it would destroy CCI's net operating losses ("NOLs").  July 21 Tr. 224:9-16 (Smit); September 2 Tr. 35:19-36:9

(Conn); LDTX 355 (Smit email to Board re Exchange) (email from Smit to Board noting that the exchange would have a significant negative tax consequence to the Company).

61.     The exchange agreement contained a notice provision providing that the closing of the exchange could not be consummated until ten business days after Mr. Allen delivered a notice of exchange.  CX 137 (Exchange Agreement) at 12; July 21 Tr. 173:6-9 (Millstein). Accordingly, it was recognized by those involved that Mr. Allen would not be able to consummate the exchange because the Company would file for bankruptcy before the exchange was consummated to avoid the destruction of its NOLs.  JPX 194 (Draft Doody Declaration) at 4; see also July 22 Tr. 208:1-12 (Merritt) (stating that there would be no choice but to take all appropriate measures to mitigate the impact).  Alternatively, the Company could have refused to take the ministerial acts necessary to consummate the exchange.  September 10 Tr. 51:22-52:4 (Millstein); September 2 Tr. 43:8-20 (Conn) (recognizing that the Company could have prevented the consummation of the exchange either by filing for bankruptcy or simply not honoring the right).

62.     Nevertheless, the Debtors agreed to shorten the notice provision in the Exchange Agreement.  September 10 Tr. 48:5-9 (Millstein).  On January 28, the Debtors agreed that the closing of the exchange would be set for February 12.  CX 119 (2/5/09 letter re "Exercise of Exchange Option"); September 10 Tr. 47:25-48:16 (Millstein).

63.     February 12 was the day before the grace period would expire with respect to the January Interest Payment.  LDTX 239 (CCI's 2008 10-K) at 21.

64.     On February 5, Mr. Allen delivered notice that he intended to exercise his exchange rights and that, pursuant to the January 28 agreement, the closing would be set for February 12.  CX 119 (2/5/09 letter re "Exercise of Exchange Option").  Mr. Smit sent an email

to the full Board, including Mr. Allen and his Vulcan representatives, Mr. Conn and Ms. Patton, calling a board meeting on February 6 to discuss the "implications of the exchange notice and the steps we might take in response on a board call later today."  LDTX 355 (Smit email to board re "Exchange"); July 22 Tr. 116:10-24 (Smit). Mr. Allen and Mr. Conn both attended this board meeting.  CX 254 (2/6/09 board minutes) at 1.

65.     Management recognized that a conflict of interest had materialized when Mr. Allen delivered his exchange notice on February 5.  July 22 Tr. 116:3-6 (Smit).

66.     Mr. Allen presided over the February 6 Board meeting.  CX 254 (2/6/09 board minutes) at 1.  Mr. Allen and Mr. Conn were present when the Board discussed the exchange notice and its implications to the Company.  September 10 Tr. 29:20-31:13 (Millstein).  Mr. Conn and Mr. Allen were present for "privileged" communications regarding this subject.  CX 254.

67.     Representatives of both Vulcan and Charter testified that the exchange notice was a means of putting additional pressure on the bondholders.  September 2 Tr. 36:18-17:7 (Conn); September 10 Tr. 52:-10-53:3 (Millstein).  On February 10, the "ask" Mr. Allen sent to the Crossover Committee was higher than it had been the day prior to the delivery of the notice of exchange.  LDTX 201 (2/10/09 email from Van Duzer to Soviero).

68.     The Board took the threat of an exchange seriously.  September 10 Tr. 50:24-51:1 (Millstein).  Mr. Allen never waived his rights under the Exchange Agreement and indicated that he was ready to pursue those rights to protect his interests.  September 10 Tr. 50:24-51:10 (Millstein).

**D.      The Debtors Adopt The Role Of Mediator And Fail To Negotiate For CCI**

69.     The Company's primary objectives in connection with the restructuring, as set forth in the straw man proposal, included achieving a certain leverage profile and generating

positive free cash flow.  CX Declaration 6 (Goldstein Declaration) Ex. A ("straw man" proposal) at 1.

70.    Once the Company had reached its objectives of a plan that would leave the Debtors with a levered free cash flow, the rest of the deal was about "mediating between [Mr. Allen and the Crossover Committee] to try to get them to closure…."  July 21 Tr. 168:12-169:2 (Millstein).

71.    On February 5, Mr. Smith, one of the Crossover Committee's representatives, reported to Mr. Millstein, "We are down to one issue (and it is a big one) what do we give Paul for [change of control]? We are a ways apart ($90mm) but I feel it will likely narrow over the weekend.  Eric Z[interhofer] from Apollo negotiating directly with Lance [Conn]."  JPX 323 (2/5 email from Smith to Millstein)   Mr. Millstein then forwarded the email to Mr. Smit, and wrote, "Looking good."  JPX 323 (2/5/09 email from Millstein to Smit).

72.    After Mr. Allen delivered his exchange notice on February 5, the Debtors' advisors attempted to broker a deal between Mr. Allen and the Crossover Committee. September 10 Tr. 53:9-17 (Millstein); July 21 Tr. 168:4-11 (Millstein).

73.    Ms. Villaluz, a member of the Crossover Committee, explained that on "the substance or the basic tenets of the [Crossover Committee's] term sheet seemed to meet the Company's needs.  But then the Company wanted us to-or wanted our committee to also get a deal with Vulcan in the same amount of time."  July 23 Tr. 29:6-11 (Villaluz).  Management's attitude was that it was important that the bondholders and Mr. Allen just "make a deal and move on."  August 24 Tr. 160:9-10 (Goldstein).

74.    The negotiations, and ultimately the settlement, with Mr. Allen were designed to address Mr. Allen's ability to deprive the estate of substantial value.  CX Declaration 3 (Doody

July 16th Affidavit in Support of Confirmation) at ¶ 33.  Mr. Allen's participation in the restructuring was necessary to reinstate the Company's credit facility and to preserve the NOLs, and he could thus deprive the estate of value if he refused to participate in the restructuring.  July 21 Tr. 172:9-14 (Millstein).

75.     Like Mr. Allen, CCI's participation in the restructuring process was equally necessary to reinstate the credit facility and to preserve NOLs.  July 21 Tr. 164:16-165:17 (Millstein).  Accordingly, CCI had as much bargaining power as Mr. Allen to negotiate with the Crossover Committee.

76.     Mr. Allen would suffer "a large tax liability" in connection with a free fall restructuring.  August 31 Tr. 217:12-17 (Johri); see also September 2 Tr. 186:13-17 (Temple). Indeed, the large tax liability that Mr. Allen would suffer in a free fall bankruptcy was his "biggest weakness" in the negotiations.  August 31 Tr. 217:12-17 (Johri).  The Crossover Committee was advised by its financial advisors that "a worst case free fall bankruptcy of Charter could lead to a tax liability of greater than $1 billion."  July 29 Tr. 124:5-17 (Marcus); July 23 Tr. 155:8-21 (Villaluz); see also LDTX 132 (01/27/09 Email from McCafferty to Calavritinos re CHTR); LDTX 133 (01/28/09 Email from Glatt to Zinterhofer re points of leverage with Allen), LDTX 169 (02/08/09 Email from Powers to Glatt re Allen tax issues). According to Ms. Villaluz, this was the financial advisors' best estimate of Mr. Allen's potential tax liability, but it could have been even higher.  July 23 Tr. 155:17-25 (Villaluz).

77.     Yet CCI's fiduciaries did not focus on Mr. Allen's downside to obtain value for CCI.  August 17 Tr. 243:1-6 (Doody).  CCI's CEO claimed that no one at Charter had a clear understanding of Mr. Allen's tax position.  July 22 Tr. 105:7-10 (Smit).

78.     The recovery CCI would receive in a liquidation would be primarily based on claims that Holdco held against CCO.  JPX 266 (Disclosure Statement), Ex. E at 6; see also July 21 Tr. 70:22-71:3 (Millstein) (recognizing the validity of the intercompany claims).  CCO is solvent.  August 17 Tr. 102:15-16 (Doody).  Therefore, CCI would suffer virtually no downside in a liquidation.

79.     In the negotiations, the Company's financial advisors did not seek to obtain for CCI and its stakeholders any of the value that was created from the preservation of NOLs and the reinstatement of the credit facility.  July 21 Tr. 175:19-176:2 (Millstein).  The Company left the allocation of "excess value, over and above the reinstated debt" to the Crossover Committee and Mr. Allen to divide between themselves.  July 21 Tr. 72:16-19 (Millstein).

80.     Mr. Allen's representatives bargained aggressively in the negotiations on Mr. Allen's behalf.  July 21 Tr. 169:5-16 (Millstein).  Mr. Allen's representatives told the Crossover Committee that Mr. Allen would fire the Board if the Board did not act in accordance with his wishes.  July 29 Tr. 121:5-15 (Marcus); LDTX 156 (2/4/09 email from Cassidy to Crestview re Allen negotiations); LDTX 186 (2/9/09 email from McCafferty to MFC re CHTR Update).  At one meeting, Mr. Allen's representatives threatened that Mr. Allen would fire the Board, exercise his exchange rights, and make the January Interest Payment.  LDTX 156 (2/4/09 Crestview email).

81.     Mr. Millstein did not seek to obtain for CCI's stakeholders any value created through CCI's participation in the Plan.  Mr. Allen was seeking to extract value from the bondholders for participating in the Plan.  July 21 Tr. 175:18-25 (Millstein).

82.     No one participating in the negotiation on behalf of the Company was solely representing CCI.  Management and the Board were representing all of the entities in the Charter

organization during restructuring negotiations. July 22 Tr. at 86 (Smit) at 222 (Merritt). Instead management and the Board directors were all seeking to maximize enterprise value. July 21 Tr. 218:11-15 (Smit) (stating that his overall goal in the context of the restructuring was maximizing enterprise value); July 22 Tr. 242:12-16 (Merritt) (stating that, in connection with the restructuring, he was focused on maximizing value for the entire enterprise and was not independently focused on maximizing value for CCI); August 31 Tr. 157:21-24 (Johri) (stating that in connection with the restructuring, he was representing the interests of all the Charter entities-"the whole enterprise").

> **E. Management Threatens To Leave Company If They Don't Receive An Executive Compensation Package**

83.     As set forth in Lazard's straw man proposal, one of the Company's primary goals of the restructuring was to obtain a management compensation package. CX Declaration (Goldstein Declaration), Ex. A ("straw man" proposal) at 1. In the days leading up to the execution of the term sheet, Mr. Smit threatened to leave the Company if the Crossover Committee would not agree to a $44 million executive compensation package for senior management. July 29 Tr. 136:20-137:2 (Marcus); LDTX 201 (2/10 email from Van Duzer to Soveiro). Ultimately, management agreed to discuss a new compensation package during the 30 days that the Crossover Committee was provided to conduct due diligence. CX 255 (2/10/09-2/11/09 board minutes) at 8.

84.     The Board protected management in its compensation negotiations with the Crossover Committee. The Board reserved "the right to terminate the restructuring agreement if an RVP [Restructuring Value Plan] agreement [that would compensate management] were not reached" within the thirty day due diligence window that was made available to the Crossover Committee. CX 255 (2/10/09 – 2/11/09 board minutes) at 8.

85.     Under the RVP that was ultimately agreed to with the Crossover Committee, Mr. Smit will receive $6 million for a successful restructuring with an annual target award under the Cash Incentive Program of $2.5 million per year for each of the three years following emergence from bankruptcy.  JPX 266 (Disclosure Statement) at 22; July 22 Tr. 106:22-107:10 (Smit).

**F.     Making the January Interest Payment**

86.     By February 11, the amount of the January Interest Payment was $75 million, including accrued interest. CX 255 (2/10/09 – 2/11/09 board minutes) at 9.  The Crossover Committee agreed that the $48 million of interest that was due to its members would be deposited into an escrow account, to be returned to Holdco if the Plan is not approved.  JPX 266 (Disclosure Statement ) at 21-22.  CCI approached Mr. Allen about contributing the $27 million balance.  LDTX 179 (2/8/09 emails re "Charter-Issues List"); September 2 Tr. 45:23-46:1 (Conn).  Mr. Allen refused.  September 2 Tr. 45:25-46:3 (Conn).

87.     At the February 11 board meeting, with Mr. Allen present for all board discussions and presiding over the Board's vote, the Board caused Holdco to make the full $75 million payment.  CX 255 (2/10/09 – 2/11/09 board minutes) 9-10.  To carry out the January Interest Payment, management caused Holdco to repay a portion of the valid intercompany receivable owing from CCO to Holdco.  August 3 Tr. 54:16-18 (Schmitz).  Holdco then made a capital contribution down to allow CCH and CIH to make their interest payments.  August 3 Tr. 55:1-4 (Schmitz).

88.     Holdco was insolvent at the time the Board authorized Holdco to make the January Interest Payment.  CX 225 (11/14/08 Telephonic Board Meeting Book) at 4.

89.     At the time Holdco made this $75 million capital contribution, senior management knew that the Company would be filing for bankruptcy.  August 3 Tr. 55:21-24 (Schmitz).

90.     At the time he authorized the transfer, Mr. Smit was focused on maximizing enterprise value, and he did not understand whether or how the CCI noteholders were going to receive a distribution under the Plan.  July 22 Tr. 97:5-21 (Smit).  In approving the transfer, Mr. Smit did not consider CCI's interests separate and apart from the enterprise.  July 22 Tr. 242:5-19 (Smit).

91.     Pursuant to an agreement with the Crossover Committee, $48 million of the January Interest Payment was deposited in an escrow account, to be returned to Holdco if the Plan is not approved.  JPX 266 (Disclosure Statement) at 21-22.  This was purportedly done to protect CCI's creditors.  August 17 Tr. 129:22-25 (Doody); July 20 Tr. 38:6-10 (Basta).   No such provision was made for the remaining $27 million of the January Interest Payment.  August 17 Tr. 129:18-130:7 (Doody).

92.     Holdco is not receiving any distribution under the Plan on account of the January Interest Payment.  JPX 266 (Disclosure Statement) at 5.

93.     The Debtors' Liquidation Analysis assumes that Holdco will recover the $48 million of the January Interest Payment that was placed in escrow.  JPX 266 (Disclosure Statement), Ex. E at 6.  There is no provision in the Debtors' Liquidation Analysis for the recovery of the $27 million balance of the January Interest Payment.  JPX 266 (Disclosure Statement), Ex. E.

**G.     Approving the Allen Settlement**

94.     At the February 11 board meeting, the Board approved the Plan, including the Allen Settlement.  CX 255 (2/10/09 – 2/11/09 board minutes) at 10-11.  The minutes of this meeting do not reference any discussions concerning the fairness of the transaction, or even its basic terms.  Id.; August 31 Tr. 201:1-202:5 (Johri).

95.     At the time they approved the Allen Settlement, board members had neither sought nor received a valuation of the consideration that Mr. Allen would receive under the Allen Settlement.  July 22 Tr. 251:1-5 (Merritt); August 31 Tr. 206:8-15 (Johri).  Nor did the Board receive any analysis of the value of the potential claims against Mr. Allen and others being released under the settlement.  July 22 Tr. 127:13-19 (Smit); August 21 Tr. 203:14-19 (Johri).

96.     In voting to approve the Plan, Mr. Smit did not base his decision on whether the Plan was in the best interests of CCI.  July 22 Tr. 124:24-125:7 (Smit).  Instead, he based his decision on whether it was in the best interests of the entire Charter enterprise.  July 22 Tr. 124:24-125:7 (Smit).

97.     With respect to approving the compensation given to Mr. Allen, the independent directors relied upon their legal and financial advisors' assurances that the settlement was "the best they could get."  August 31 Tr. 224:11-19 (Johri).  Before approving the Allen Settlement, Mr. Smit never had any discussions with his financial advisors, or anyone else, about what the Company should pay Mr. Allen for maintaining a 35% voting interest to prevent a change of control.  July 22 Tr. 110:9-111:1 (Smit).

98.     Vulcan and the Crossover Committee had a clear understanding of how much Mr. Allen was being paid for his CCVIII interests, and how much he was being paid for not depriving the estate of value.  LDTX 217 (2/12/09 Email from Chem to Temple re Summary Vulcan Terms).  The Board was never given this breakdown.  Aug. 31 Tr. 205:5-7 (Johri); Aug. 24 Tr. 158:21-159:10 (Goldstein) (stating that the Company was looking at the settlement as a "package" rather than with a tally sheet).

99.     The Debtors have not presented any contemporaneous documentary evidence reflecting what the Board considered in approving the Allen Settlement. All the documentary evidence the Debtors have presented to justify the price of the Allen Settlement was generated for the purposes of trial. CX Declaration 6 (Goldstein Declaration), Ex. B.

100.    In approving the Allen Settlement, Mr. Smit analyzed the transaction from a business judgment perspective. July 22 Tr. 127:25-128:4 (Smit). The Board never asked for, and did not obtain, a fairness opinion from any financial advisor assessing the terms of the Allen Settlement. July 22 Tr. 254:6-10 (Merritt).

**H.     Everyone Benefits From The Settlement Except The CCI Noteholders**

101.    If the Plan is approved, Mr. Allen will receive more than $404 million in connection with the Allen Settlement. September 2 Tr. 85:11-86:4 (Conn); LDTX 215 (Vulcan negotiation tracker). The compensation being paid to Mr. Allen under the Allen Settlement is primarily designed to prevent Mr. Allen from depriving the estate of value. CX Declaration 3 (Doody July 16th Affidavit in Support of Confirmation) at ¶ 33.

102.    In this regard, Vulcan estimates that Mr. Allen is receiving $209 million to maintain an ownership interest in CCI and Holdco so that there is no change in control. LDTX 215 (2/11/09 Vulcan negotiation tracker). The Debtors estimate this figure to be $180 million. CX Declaration 6 (Goldstein Declaration) Ex. B. Mr. Conn testified that a distribution of $180 million is "at the low end of fair for Paul." September 2, Tr. 176:11-14 (Conn).

103.    Mr. Allen is also receiving $150 million for giving up his interests in CCVIII. LDTX 215 (2/11/09 Vulcan negotiation tracker). According to the Company, Mr. Allen obtained his interests in CCVIII due to a scrivener's error. LDTX 488 (11/4/05 CCI 8-K), Item 1.01 at 1.

104. The $404 million of value received by Mr. Allen does not include the value of tax mitigation. LDTX 218 (02/12/09 Email from Bojmel to Allen). Mr. Allen's potential tax liability in a restructuring was large. August 31 Tr. 217:12-17 (Johri). Mr. Allen asserted privilege with respect to questions concerning the amount of his potential tax exposure in alternative restructuring scenarios. September 2 Tr. 34:2-35:3 (Conn). Mr. Allen has presented no evidence regarding the amount of his potential liability under alternative restructuring scenarios.

105. The $404 million does not account for the substantial value that Mr. Allen will receive as a result of the releases that he and the Vulcan directors will receive under the Plan. JPX 266 (Disclosure Statement) at 96-97. September 2 Tr. 88:13-16 (Conn) (testifying that Vulcan never fixed a value on the release).

106. The Crossover Committee will also receive substantial value in connection with the settlement that led to the Plan of Reorganization. The Crossover Committee agreed to invest $1.6 billion in funds in a rights offering that the Debtors made available to them based on Lazard's valuation. JPX 266 (Disclosure Statement) at 8. By the Crossover Committee's members' own calculations back in March, they will receive substantial returns on their investments. Crestview projected a 52% internal rate of return on its investment in the rights offering. JPX 158 (Crestview Investment Memo) at 6 (assuming a 5.5% EBITDA CAGR and 7.0x LTM exit multiple). Apollo projected that a new money investment of $400 million would earn an internal rate of return of 40.3%. JPX 154 (Apollo Investment Memo) at 12.

107. The stock prices of peer companies have substantially increased since March. The average stock price for comparable companies has increased by approximately 32% as of August 28. Sept. 1 Tr. 85:15-86:2 (McDonough); LDT Demo 9. As of August 28, the S&P 500

Index was up approximately 26% since March. Sept. 1 Tr. 77:21-23 (McDonough). Common sense dictates that the value of the Crossover Committee's investment has substantially increased since the deal was agreed to given the improvements in market conditions.

## II.  THE NOLS ARE THE PROPERTY OF CCI'S ESTATE

108.    CCI holds a 54% equity interest in Holdco. LDTX 249 (04/06/09 Letter to IRS) at 2. CII Holds a 46% equity interest in Holdco. JPX 266 (Disclosure Statement) at 16.

109.    Holdco owns a chain of entities that are largely disregarded for tax purposes. LDTX 249 (04/06/09 Letter to IRS) at 6. The tax losses and gains of Holdco are passed through to its members CCI, CII and Vulcan Cable. LDTX 239 (CCI's 2008 10-K) at F-36. The tax losses and gains of Holdco are allocated to CCI, CII and Vulcan Cable pursuant to the Holdco Limited Liability Company Agreement. Id.

110.    The net tax losses of Holdco are allocated to CCI, Vulcan Cable, and CII based generally on their respective percentage ownership of outstanding common units of Holdco to the extent of their respective capital account balances. Id.

111.    The cumulative amount of losses of Holdco allocated to Vulcan Cable and CII is in excess of the amount that would have been allocated to such entities if the losses of Holdco had been allocated among its members in proportion to their respective percentage ownership of Holdco common membership units. Id. at F-36-37. The cumulative amount of these excess losses allocated to Vulcan Cable and CII was approximately $1 billion through December 31, 2008. Id. at F-37.

112.    As of December 31, 2007, the cumulative amount of tax losses allocated to CII and Vulcan Cable from Holdco was $8,341,676,549. LDTX 417 (Analysis of Tax Loss Allocation) at 1.

113.     CCH and its subsidiaries filed a 10-K on March 21, 2008 (the "CCH 10-K"). LDTX 444.  The subsidiaries included Charter Communications Holdings Capital Corporation, CCH II, LLC, CCH II Capital Corp., CCO Holdings LLC and CCO Holdings Capital Corp.  Id.

114.     The CCH 10-K defined "Charter" as Charter Communications, Inc.  Id. at 1.  By contrast, uses of "we" "us" or "our" refer to CCH and its subsidiaries. Id. at i.  The CCH 10-K provides that "as of December 31, 2007, Charter had approximately $7.9 billion of federal tax net operating losses, resulting in gross deferred tax asset of approximately $2.8 billion, expiring in the years 2008 through 2027." id. at 13.

115.     As of December 31, 2008, CCI held $8.7 billion of NOLs which arose from allocations of tax losses from Holdco.  LDTX 249 (04/06/09 Letter to IRS) at 3.   CCI expects to be able to retain the ability to use $4 billion or more of its existing NOLs after emerging from bankruptcy. LDTX 233 (03/03/09 PricewaterhouseCoopers, "Project Missouri M&A Tax Due Diligence" dated March 3, 2009) at 7.  The Crossover Committee recognized that CCI's NOLs were one of the "key sources of value in this transaction." JPX 234 (Crestview Investment Memorandum) at 40 ; see also July 29 Tr. 129:12-14 (Marcus).

116.     There was nothing inappropriate about the allocation of NOLs to CCI under the Holdco LLC Agreement.  Sept. 2 Tr. at 154:17-19 (Conn).  The NOLs are property of CCI's estate.

117.     CCI's participation in the Plan was necessary to preserve the NOLs.  July 21 Tr. 164:19-165:17 (Millstein).

118.     CCI's advisors negotiated to ensure that valid intercompany accounts were respected in connection the Plan.  July 21 Tr. 174:2-9 (Millstein).

119.    During the course of the restructuring negotiations, CCI's advisors did not seek to obtain consideration for CCI for the preservation of NOLs which resulted from CCI's participation in the Plan.  July 21 Tr. 174:17-176:1 (Millstein).

120.    Under the Plan, CCI has not received any value on account of the preservation of NOLs.  See July 21 Tr. 174:2-176:1 (Millstein) (stating that he did not negotiate for value over and above the amount of the intercompany account).

121.    Because CII, as a subchapter S corporation, is a flow through entity for tax purposes, the losses allocated to CII were available to Mr. Allen to offset his personal income. September 2 Tr. 31:22-32:13 (Conn) (recognizing that CII is an S corporation and the NOLs allocated to CII passed through to Mr. Allen).

122.    No one has suggested that Mr. Allen's use of the NOLs was improper, nor have the Debtors ever asked Mr. Allen to return those NOLs to CCO or to compensate Charter for his use of such NOLs.  Id. at  31:22-32:13, 154:5-155:9 (Conn).

III.    **The Debtors' Valuation is Not Credible**

123.    The Debtors have submitted two valuations, one prepared by Lazard and one prepared by Mr. Den Uyl of AlixPartners.  JPX 266 (Disclosure Statement), Ex. D at 1; CX 292 (Expert Report of Bruce R. Den Uyl).

124.    The Lazard valuation does not present an accurate valuation of the Company as of the Effective Date.  Lazard's valuation was prepared at a trough in the market.  September 1 Tr. 83:9-20 (McDonough).  There have been substantial improvements in the market which would have a material impact on Lazard's valuation.  The average stock price of comparable companies has improved more than 32% and the S&P 500 is up almost 26% since Lazard prepared its valuation.  Id. 77:21-23; 85:15-86:9 (McDonough).  The Debtors have made no attempt to

update the valuation or present this Court with a valuation that takes into account the improvement in the market since March.

125. Lazard's valuation is predicated on assumptions that are inconsistent with the assumptions relied on by Mr. Den Uyl, the Debtors' own expert, and advice Lazard has previously provided to the Company. In preparing its valuation, Lazard relied predominantly on a comparable companies and discounted cash flow analysis, and gave only minimal weight to precedent transactions "as a result of the significant limitations as to the usefulness of this methodology." JPX 266 (Disclosure Statement), Ex. D at 3; CX 144 (04/09/09 Project Gateway Valuation) at 18.

126. However, at the November 14 board meeting, for purposes of determining whether CCH I had sufficient surplus to pay a dividend, Lazard advised the Board that neither current trading prices nor multiples reflected in peers' share prices were reflective of the Company's value and instead precedent transactions were more appropriate indicators of value. LDTX 80 (11/14/08 board minutes) at 2.

127. Mr. Den Uyl opined that "those knowledgeable in the cable industry rely more heavily on precedent transactions and DCF analysis" in assessing the Company's value. CX 292 (Expert Report of Bruce R. Den Uyl) at 19.

128. Placing minimal weight on precedent transactions significantly decreased Lazard's valuation because the range of values on the precedent transactions is significantly higher than the comparable companies and DCF analysis given that they include control premiums. September 1 Tr. 75:8-22 (McDonough).

129.    In addition to giving precedent transactions only minimal weight, Lazard normalized the transactions for the drop in the S&P 500 index.  JPX 266 (Disclosure Statement), Ex. D at 6.

130.    Mr. Den Uyl did not normalize the transactions in his precedent transactions analysis (nor did Lazard suggest that precedent transactions needed to be normalized in their previous advice to the Board).  September 1 Tr. 87:6-10 (McDonough).

131.    Adjusting Lazard's precedent transaction analysis to use actual multiples similar to how Mr. Den Uyl did his analysis increases the Lazard valuation by approximately $5 billion. Id. at 87:16-19, 89:2-18 (McDonough); LDT Demo 10.

132.    The Lazard valuation relies on a comparable companies analysis that does not include a control premium and uses multiples that were calculated at historic lows in the market. September 1 Tr. 83:8-23 (McDonough).   In contrast, the Debtors' expert Mr. Den Uyl applied a control premium of 40% in his comparable companies analysis.  CX 292 (Expert Report of Bruce R. Den Uyl) at 18; September 1 Tr. 84:9-10 (McDonough).  Applying Mr. Den Uyl's control premium to Lazard's comparable companies analysis would increase Lazard's valuation by more than $5 billion.  LDT Demo 9; September 1 Tr. 84:22-85:10 (McDonough). Accounting for the 32% increase in the stock price of comparable companies since the Lazard valuation was prepared would further increase Lazard's valuation.  Id. 85:11-86:9 (McDonough).

133.    Lazard's DCF analysis did not use the Company's actual cost of debt under the proposed Plan.  Id. at  91:15-22 (McDonough). Adjusting Lazard's valuation to incorporate the below-market cost of debt would increase Lazard's valuation by approximately $7 billion.  Id. at (McDonough); LDT Demo 11.  Under the Plan, Mr. Allen has the ability to compel the

Company to obtain an independent appraisal of the Company's value taking into account all below-market financing arrangements.  JPX 266 (Disclosure Statement) at 32.

134.    The assumptions underlying Lazard's DCF analysis are also inconsistent with the DCF analysis prepared by Mr. Den Uyl.  Sept. 1 Tr. 95:18-20 (McDonough).  Lazard used a lower EBITDA growth rate and perpetuity growth rate.  Id. at 95:21-96:6 (McDonough).  Mr. Den Uyl's EBITDA growth rate of 10.75% was much closer to the Company's actual performance than Lazard's 7% rate.  July 31 Tr. 99:17-25 (Schmitz); July 21 Tr. 200:7-11, 214:11-14 (Smit).

135.    Lazard also excluded Mediacom from its weighted average cost of capital ("WACC") calculation, while Mr. Den Uyl included Mediacom in his WACC calculations. Sept. 1 Tr. 96:7-8 (McDonough).

136.    Adjusting Lazard's DCF analysis to include Mr. Den Uyl's assumptions would increase Lazard's DCF valuation by approximately $7 billion.  Id. at 98:18-23 (McDonough); LDT Demo 12.

137.    The Debtors presented evidence that the value of the enterprise was approximately $21 billion on November 14 (excluding additional value sufficient to put public equity in the money) but only $15.4 billion on September 30, after the company eliminates more than $8 million in debt service obligations.  CX 292 (Expert Report of Bruce R. Den Uyl) at 19; JPX 266 (Disclosure Statement), Ex. D at 1; LDTX 247 (04/09/09 Project Gateway Valuation) at 2.

138.    In presenting his valuation, Mr. Den Uyl concluded that Charter's stock had positive value as of November 2008.  August 3 Tr. 124:6-23 (Den Uyl).

139. The Debtors' CFO testified that there were no changes in the Debtors' financial condition between November 2008 and March 2009. July 31 Tr. 159:20-160:10 (Schmitz).

140. As of July 2009, Charter exceeded its July long-run plan forecast for 2008, which provided for EBITDA of approximately $2.3 billion. Aug. 3 Tr. 109:9-17 (Den Uyl); July 22 Tr. 200:8-13 (Smit). In 2009, the Company had first quarter growth of 13.2 % over the first quarter of 2008. July 22 Tr. 214:13-16 (Smit).

141. Year to date as of July 31, 2009, Charter is exceeding what it was proposing in the July long-range plan for EBITDA for 2009. July 31 Tr. 100:15-19 (Schmitz).

## IV. By Participating in the Plan, Mr. Allen Avoids a LARGE Tax Liability

142. The proposed Plan shields Mr. Allen from significant potential tax liability. Alternative plan structures could expose Mr. Allen to more than $1 billion in additional tax liability.

143. A liquidation involving the sale of Holdco's operating subsidiaries or of their assets would likely result in a taxable gain to Holdco (which gain would be passed through to its members CCI and CII and then to CII's owner, Mr. Allen) of approximately $10.2 billion.[3] After taking account of the special tax allocations provided for in the Holdco Limited Liability Company Agreement, $7.6 billion of the $10.2 billion would be allocated to CII, a Subchapter S corporation owned 100 percent by Mr. Allen. JPX 4 (Amended and Restated Limited Liability

_____

[3] This calculation is done on the basis that the debt of the subsidiaries of Holdco that are disregarded for U.S. federal income tax purposes would be treated as non-recourse debt of Holdco for U.S. federal income tax purposes. Assuming that Holdco's basis in its assets was originally equal to at least the amount of its outstanding $21.7 billion of debt and the original capital of CCI and CII (calculated at $7.1 billion under the Capital Account Analysis in LDTX 411) which implies a tax basis remaining after depreciation of approximately $12.8 billion at the end of 2007 and $11.5 billion estimated for year-end 2008 ($28.8 billion minus $17.3 of allocated losses through 2008 (per LDTX 417) equals $11.5 billion). The $11.5 billion of basis would be subtracted from the $21.7 billion of deemed sale proceeds resulting in a gain of $10.2 billion.

Company Agreement for Charter Communications Holding Company, LLC) at §§ 6.4.2 and 6.7.1; JPX 266 (Disclosure Statement) at 16.

144.    Of the $7.6 billion allocated to CII, approximately $4.9 billion would flow through to Mr. Allen after accounting for CII's suspended losses.  LDTX 110 (Charter Investment Inc./Vulcan Cable III Inc., Estimated Tax Attributes As of Dec. 31, 2008).  Applying a 35 percent tax rate, the $4.9 billion of income to Mr. Allen would result in a federal tax liability of approximately $1.7 billion.

145.    This calculation is consistent with the testimony at trial that Mr. Allen would suffer "a large tax liability" in connection with a free fall restructuring.  August 31 Tr. 217:12-17 (Johri); September 2 Tr. 186:13-17 (Temple).  The Crossover Committee also recognized that Mr. Allen had a significant potential tax liability.  LDTX 132 (01/27/09 Email from McCafferty) (recognizing that Mr. Allen would get a tax bill for about $1.5 billion if Charter files for bankruptcy but Vulcan does not); LDTX 133 (01/28/09 Email from Glatt to Zinterhofer) (recognizing that Mr. Allen had a potential negative tax liability of more than $1 billion); LDTX 169 (02/04/09 Email from Powers to Glatt) (noting in the course of negotiations that Vulcan's tax ask was roughly $1 billion and if you took into consideration the tax liability he was avoiding it was over $2 billion ask).

146.    No Plan proponent presented any analysis of how Mr. Allen could avoid this liability.

## V. THE DEBTORS' PLAN GERRYMANDERS AN ARTIFICIAL IMPAIRED ACCEPTING CLASS AT CCI

### A. The Debtors have Failed to Offer a Legitimate Reason Supported by Credible Proof for the Separate Classification of the CCI Notes Claims from the CCI General Unsecured Claim

147. The Debtors have provided no evidence that the Mirror Note provides holders of CCI Notes Claims with any legal rights against CCI.

148. The Mirror Note is not security for the CCI Noteholders. LDT 444, Ex 10.37.

149. Nor are the CCI Noteholders third-party beneficiaries of the Mirror Note. Id.

150. The Debtors have provided no evidence that the Management Agreement provides holders of CCI General Unsecured Claims with any legal rights against CCI.

151. CCI's creditors, including the holders of CCI General Unsecured Claims, are not third-party beneficiaries of the Management Agreement. LDTX 332 (6/19/2003 Amended and Restated Management Agreement) at 1; see Aug. 17 Tr. 209:21-23 (Doody) ("Q. But they're [CCI's general unsecured creditors] not third-party beneficiaries under the management agreement either, right? A. No, they aren't.").

### B. The Debtors Artificially Impaired the CCI General Unsecured Claims Class to Achieve a Cram Down of the CCI Notes Claims

152. The Debtors' prior filings demonstrate that CCI General Unsecured Claims are not truly impaired under the Plan. On March 27, 2009, the Debtors filed their initial plan of reorganization, which —like their current Plan—provided that holders of CCI General Unsecured Claims would be reinstated or paid in full in cash at the Debtors' option. CX 707 (Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States' Bankruptcy Code dated 3/27/09) ("Original Joint Plan of Reorganization"); Aug. 17 Tr. 189:3-18 (Doody).

153. Under the terms of that initial plan, the Debtors classified holders of CCI General Unsecured Claims as unimpaired and, thus, non-voting. Id.

154.     Had the Debtors maintained this initial voting designation the Plan would not be confirmable.  <u>See</u> CX Declaration 4 (Sullivan Declaration), Ex. A (reflecting CCI Notes Claims, CCI's largest creditors, overwhelmingly rejected Plan).

155.     On May 1, 2009—four days prior to the Disclosure Statement hearing and only after the Trustee appeared in these cases and voiced initial concerns with the Plan—the Debtors modified the voting designation of all General Unsecured Claims to designate them as impaired and authorized to vote for or against the Plan.  See Amended Joint Plan of Reorganization at 24-25 [Docket No. 273]; compare with Original Joint Plan of Reorganization at 25; see also Aug. 17 Tr. 189:3-18 (Doody).

156.     Holders of CCI General Unsecured Claims are receiving payment in full under the Plan.  Amended Plan of Reorganization at 25.  Holders of CCI General Unsecured Claims voted unanimously to accept the Plan.  Debtors' Pretrial Brief at 25.

157.     The Management Agreement provides for CCI to be reimbursed for all costs, including interest obligations it incurs in fulfilling its obligations as Manager to CCO.  LDTX 332 (6/19/2003 Amended and Restated Management Agreement) Section 3(a) (stating that the "Reimbursement Management Fee" "shall be equal to all expenses, costs, losses, liabilities, taxes, imposts, charges or damages incurred, paid or accrued by the Manager [CCI] . . . .").4

158.     CCI is not entitled to make a profit on the reimbursement it receives from CCO, LDTX 332 (6/19/2003 Amended and Restated Management Agreement) Section 3, and likewise, is not required to bear any loss (whether relating to interest, taxes, or any other liability). See July 20 Tr. 40:14-19 (Basta) (classifying the Management Agreement as an "essentially pass-through mechanism").

---

4 LDTX 332 (6/19/2003 Amended and Restated Management Agreement) Section 3(a) (emphasis added).

159.    Nothing inside or outside the Management Agreement prevents CCI from paying postpetition interest if it otherwise elects to do so.  LDTX 332

160.    The Debtors have provided no evidence whatsoever regarding the amount of interest, if any, that they intend to withhold in connection with their cash distributions to holders of CCI General Unsecured Claims.

161.    The Debtors failed to present any evidence at the confirmation hearing that they ever considered whether CCI is capable of making the interest payment or should make the interest payment with respect to those CCI General Unsecured Claims that they choose to impair.

162.    The Debtors' General Counsel and Chief Restructuring Officer was unable to explain the basis for withholding interest to such creditors, noting only that, "they're not getting it, that's what makes them impaired."  See Aug. 17 Tr. 192:8-25, 193:1-22 (Doody); see also id. at 195:22-25 (Doody).

163.    The record is clear that CCI's estate is capable of paying any postpetition interest that may be owed to holders of CCI General Unsecured Claims.  See CX 407 (Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization) at 3 (describing unilateral increase of $66 million in additional New Preferred Stock to be distributed to holders of CCI Notes as an "immaterial modification"); see also Aug. 17 Tr. 192:8-193:22 (Doody).

## VI.    THE PLAN UNFAIRLY DISCRIMINATES AGAINST HOLDERS OF CCI NOTES CLAIM

164.    The Plan proposes to reinstate or pay CCI General Unsecured Claims in full on the Effective Date while providing holders of CCI Notes Claims with a mere 32.7% recovery (at the Debtors' valuation). Debtors' Pretrial Brief at 25; Amended Plan of Reorganization at 25.

165.    The Debtors have not presented any evidence that the disparate treatment is supported by a reasonable basis and was necessary to consummate the plan.

166. The CCI General Unsecured Claims class is composed entirely of non-essential creditors, such as former employees, litigation claimants, and rejection damages claimants. <u>See</u> LDTX 480 (4/10/2009 Charter Communications Inc. Summary of Schedules), at F-1, F-2.

167. The Debtors have paid all essential creditors pursuant to their first-day critical trade vendor order. Order Authorizing Payment of Prepetition Claims of Trade Creditors in the Ordinary Course [Docket No. 172].

168. There is no evidence in the record that the proposed discrimination with respect to the CCI Notes was proposed in good faith or that the degree of discrimination is proportional to its rationale.

## VII. THE PLAN IS NOT FAIR AND EQUITABLE

### A. The CCI Settlement Compensates Paul Allen for His Equity Interests and, Thus, Violates the Absolute Priority Rule

169. The Debtors admit that distributions to Mr. Allen and/or his affiliates under the CCI Settlement are on account of his equity interests, including (i) his shares of Class A Common Stock of CCI; (ii) his vested options to acquire shares of Class A Common Stock of CCI; and (iii) his shares of Class B Common Stock of CCI. <u>See</u> JPX 266 (Disclosure Statement) at 26-27.

170. The two main sources of consideration provided by Mr. Allen in exchange for the New Class B Stock (and other consideration he is receiving under the Plan) are his agreements to (i) preserve existing NOLs and (ii) facilitate the reinstatement of the Debtors' existing bank debt. July 21 Tr. 172:9-14 (Millstein).

171. Mr. Allen's ability to preserve exiting NOLs and facilitate the reinstatement of the Debtors' existing bank debt is on account of the volume of equity that Mr. Allen owns. <u>Id.</u>; LDTX 355 (Smit email to Board re Exchange); CX 137 (Exchange Agreement)

### B. The Plan Siphons Substantial Value from CCI for the Benefit of Junior Stakeholders and Creditors of Other Debtors

#### 1. CCI is Not Receiving Value for its Net Operating Losses

172. The testimony elicited in the trial demonstrates that CCI owns the NOLs. July 21 Tr. 167:15-18 (Millstein); Sept. 2 Tr. 154:3-19 (Conn).

173. CCI sought and received a ruling from the Internal Revenue Service concerning the favorable treatment of the NOLs under the Internal Revenue Code based on the representation that CCI was a "loss corporation" that held the NOLs. JPX 345 (4/6/09 Letter Request to the IRS); CX 415 (7/21/09 IRS Letter Ruling). A "loss corporation" is defined as "a corporation entitled to use a net operating loss carryover or having a net operating loss for the taxable year in which the ownership change occurs." 26 U.S.C. § 382(k)(1).

174. In contrast, the Debtors have not produced any credible evidence that the NOLs belong to any party other than CCI. The Debtors' CRO and General Counsel, Gregory Doody, testimony that the Debtors' 10-K says that CCI owns the NOLs but that is not what they meant to say, is not credible. Aug. 17 Tr. 40:5-41:14 (Doody).

175. NOLs were appropriately "passed through" to CII and CCI as partners of Holdco, resulting in more than $8 billion of losses being allocated to each of CCI and CII as of December 31, 2007. LDTX 417 (Analysis of Book and Tax Losses Allocated to Allen Entities and CCI); LDTX 239 (CCI's 2008 10-K) at F-36 (discussing how taxable income, gains and losses are passed through to CCI and CII).

176. Because CII, as a subchapter S corporation, is a flow through entity for tax purposes, the losses allocated to CII were available to Mr. Allen to offset his personal income. 26 U.S.C. § 1366; Sept. 2 Tr. 31:24-32:15 (Conn) (recognizing that CII is an S corporation and the NOLs allocated to CII passed through to Mr. Allen).

177.   No one has suggested that Mr. Allen's use of the NOLs was improper, nor have the Debtors ever asked Mr. Allen to give those NOLs back to Charter or to compensate Charter for his use of such NOLs.  Sept. 2 Tr. 31:22-32:13, 154:13-155:17 (Conn).

178.   The Charter operating companies that generated the NOLs are disregarded entities for tax purposes and the NOLs, therefore, flow through to the operating companies' owner Charter Holdco.  This is consistent with the consolidated financial statements filed for the operating companies with the Securities Exchange Commission which reflect deferred tax assets of only $119 million (not the $8 billion the Debtors now claim) as of December 31, 2007, primarily relating to state-level NOL carryforwards. LDTX 444 (CCH's 2007 10-K) at F-44.  Charter Holdco is a partnership for U.S. tax purposes which is neither subject to taxation nor allowed to deduct NOLs for purposes of computing its partnership taxable income for allocation to its partners.  JPX 13 (10/31/2005 Limited Liability Company Agreement of CCHC, LLC).

179.   CCI expects to be able to retain the ability to use $4 billion or more of its existing NOLs after emerging from bankruptcy.  LDTX 233 (3/3/2009 PricewaterhouseCoopers, "Project Missouri M&A Tax Due Diligence" Report) at 7.  The Debtors' advisors have estimated the value of preserving the NOLs at approximately $1.14 billion.  CX Declaration 6 (Goldstein Declaration), Ex. B.

180.   Holders of CCI Notes are not receiving any distribution under the Plan on account of CCI's NOLs.

### 2.   CCI's Participation in the Plan is Worth No Less than $180 Million

181.   In describing the value being distributed to Mr. Allen in connection with the Allen Settlement, Mr. Conn testified that a distribution of $180 million is "at the low end of fair for Paul."  Sept. 2 Tr. 176:18-21 (Conn).

182.     The testimony reflects that the participation of CCI is just as necessary as Paul

Allen to preserve the NOLs and existing bank financing. July 21 Tr. 164:16-165:17 (Millstein).

### 3.     Holdco is Not Receiving Value for its Trademarks and Programming Contracts

183.     Holdco owns the Company's trademarks and the Company's programming

contracts.  See LDTX 252 (4/10/2009 Charter Communications Holding Company, LLC

Summary of Schedules), Exs. B-27 and G-1 through G-11.

184.     Without the benefit of Holdco's trademarks, the Debtors would be forced to

establish a new mark at a considerable expense.  See infra ¶ 232

185.      The Charter enterprise could not deliver cable programming to its customers

without Holdco's programming contracts.  See infra ¶¶ 229-231.

### 4.     The Plan Violates the Supreme Court's Ruling in LaSalle

186.     Mr. Allen and parties acting on his behalf exercised extensive control over the

process leading to the Allen Settlement and, ultimately, sought out and set a price for the

consideration he and his affiliates will receive under the Plan. See supra ¶¶ 39, 50, 101-105.

187.     Mr. Allen used his control position to leverage during negotiations when he told

the Crossover Committee that he would fire the board if he did not get his way.  LDTX 186

(2/9/2009 email from McCafferty re CHTR Update).

**VIII.   The Debtors Cannot Meet Their Burden to Show that The Plan Is Proposed In Good Faith Because Of Tactical Litigation Positions They Have Taken In These Proceedings**

188.     The Debtors made broad privilege assertions during discovery, precluding the

Trustee's efforts to obtain information concerning, among other things, (i) negotiations that

transpired between Mr. Allen on the one hand, and the Debtors on the other, (ii) Mr. Allen's tax

position, and (iii) advice that was presented to the Board.  See, e.g., Sept. 10 Tr. 52:5-9

(Millstein); Law Debenture Trust Company of New York's Motion in Limine to Preclude

Testimony on Subjects Over Which The Debtors Asserted Attorney-Client and Common Interest

Privilege During Fact Discovery, filed July 17, 2009 [Docket # 648] (filed under seal).

189.    In this action, the Debtors repeatedly attempted to support their actions by

reference to advice received from counsel, but they have neither waived privilege with respect to

such advice, nor endeavored to produce any of the underlying privileged materials.

190.    For example, Mr. Smit, Mr. Doody and Mr. Johri all testified that the Board relied

on advice of counsel in deciding not to appoint a special committee.  July 22 Tr. 122:2-15

(Smit); Aug. 17 Tr. 220:18-221:21 (Doody); Aug. 31 Tr. 191:16-192:13 (Johri).  Yet the Debtors

have never waived privilege with respect to such advice, and indeed, objected at trial when any

inquiry was made into the substance of the advice that was provided to the board.  July 22 Tr.

122:16-20 (Smit); Aug. 17 Tr. 221:6-14 (Doody).

191.    Mr. Johri testified that the board relied on counsel regarding the fairness of the

Allen Settlement, but the Debtors have never waived privilege regarding such advice, nor have

they produced any materials related to such advice.  August 31 Tr. 202:6-20 (Johri).

192.    Mr. Doody also submitted a declaration to the Court stating that he relied on

advice of counsel with respect to information contained in his declaration.  CX Declaration 3

(Doody July 16th Affidavit in Support of Confirmation) at 2 ("All matters set forth in this

affidavit are based on…as to matters involving United States bankruptcy law or rules or other

applicable laws, my reliance on the advice of counsel to the Debtors").   That advice has never

been produced.

193.     Mr. Doody also testified that the value of intellectual property not included in the Liquidation Analysis was determined based on the advice of counsel.  Aug. 17 Tr. 160:20-161:18 (Doody). Yet when questioned, counsel asserted privilege.  Id. at 161:19- 163:2 (Doody).

194.     Mr. Millstein offered testimony at trial that similarly was based on advice that he received from the Debtors' tax counsel.  Sept. 10 Tr. at 63:15-64:8 (Millstein).  The Debtors shielded that advice under a claim of privilege.

195.     Board members testified that they relied on advice of counsel in making decisions to approve certain transfers.  See e.g., July 22 Tr. 191:3-22 (Merritt).  The Debtors have failed to produce such advice.

196.     Mr. Allen's representative, Mr. Conn, was asked to testify as to matters concerning potential tax liability that Mr. Allen could face in connection with the restructuring even though Vulcan has asserted privilege with respect to that advice.  Sept. 2 Tr. 34:2-35:3; 159:2-5 (Conn).

## IX.     The Plan Fails the Best Interests of the Creditors Test Under Section 1129(A)(7) of the Bankruptcy Code

197.     The Debtors presented no expert testimony in support of their Liquidation Analysis.  The Debtors' Liquidation Analysis was neither sworn to nor signed.  JPX 266 (Disclosure Statement), Ex. E.

198.     The Liquidation Analysis was prepared by the Debtors' management with their advisors Kirkland & Ellis, Lazard and AlixPartners.  August 17 Tr. 63:25-64:5 (Doody).  The Debtors did not present any witness from Kirkland & Ellis, Lazard or AlixPartners to testify regarding the funds available for distribution under Liquidation Analysis.  The only witness called by the Debtors to testify in support of the Debtors' Liquidation Analysis was the Debtors' CRO and General Counsel Mr. Greg Doody.

199.     Mr. Doody did not have personal knowledge regarding significant parts of the Liquidation Analysis.  Mr. Doody had no personal knowledge regarding the intercompany loans and receivables included in the Liquidation Analysis.  August 17 Tr. 110:22-111:5 (Doody) ("…I relied on Ms. Schmitz, who is the CFO, to provide the intercompany -- analysis of the intercompany loans and receivable.").  Moreover, Mr. Doody could not distinguish between a receivable owing to Holdco from CCO and a payable owing from Holdco to CCO.  Id. at 105:7-108:5.  Mr. Doody also did not have an understanding regarding how subordination works in bankruptcy.  Id. at 102:20-104:21.

200.     CCI did not have independent, unconflicted advisors evaluate the intercompany claims and other potential sources of recovery available to CCI's creditors.  Kirkland & Ellis (K&E), the Debtors' counsel, was retained by and represents all the Debtor entities except CII. Debtors' Application for Order Authorizing Retention of Kirkland and Ellis [Docket No. 34], Exhibit 1 (Retention Letter) of Exhibit A, at 1.  Similarly, Lazard was retained as a financial advisor to represent all the Debtor entities.  JPX 344 (Debtors' Application for Retention of Lazard), Ex. B at 1.

A.     **The Debtors Overvalue the Consideration the Holders of CCI Notes Claims Will Receive Under the Plan**

201.     The New Preferred Stock that will be issued to the holders of CCI Notes Claims under the Plan will be in a minority position.  Holders of New Preferred Stock will not vote as a separate class, they will vote together with common stock as a single class.  September 1 Tr. 106:20-107:10 (McDonough).  The holders of CCI Notes Claims will receive approximately 138,000 shares of New Preferred Stock, as compared to the approximately 100 million shares of common stock that will be issued under the Plan.  Id. at 112:20-113:12 (McDonough).  As such,

even if voting in a block, the holders of New Preferred Stock will always be in a minority to the holders of common stock. Id. at 112:20-113:12 (McDonough).

202.    It is widely accepted that a discount rate should be applied in valuing securities that are in a minority position. Id. at 112:6-24 (McDonough). A proper valuation of the New Preferred Stock would require a discount of at least 20% to account for its minority position, prior to accounting for, among other things, the New Preferred Stock's dividend rate and liquidation preference, all of which would require additional downward adjustments to reflect the actual value being provided under the Plan. id. at 106:20-109:21 (McDonough); LDT Demo 19.

203.    The Debtors have valued the New Preferred Stock at its face value without offering any expert testimony or other analysis to support their valuation. August 24 Tr. 134:10-13 (Goldstein). Neither Mr. Allen nor the Crossover Committee opted to receive New Preferred Stock under the Plan.

204.    It is appropriate to apply a 20% discount to the face value of the New Preferred Stock to account for its minority position. The holders of CCI Notes would receive approximately $134.9 million of consideration under the Plan, i.e., $110.4 million on account of the New Preferred Stock (face value of $138 million discounted by 20%) and $24.5 million in cash. September 1 Tr. 113:11-114:2 (McDonough); LDT Demo 23.

**B.      The Debtors' Liquidation Value Fails to Account for Numerous Potential Sources of Recovery at CCI and Holdco**

205.    The Debtors' Liquidation Analysis fails to ascribe value to numerous sources of value that have been identified by the Trustee.

### 1.      Charter Holdco Other Assets ($9 Million)

206.    The Debtors' Liquidation Analysis does not account for approximately $9 million, comprised of cash and cash equivalents, security deposits and accounts receivable,

which the Debtors identified on their schedules as Holdco assets. <u>See</u> LDTX 252 (Holdco Schedules) at Schedules B-1 and B-2 (listing $2,594,579 in cash and cash equivalents), B-3 (listing $2,841,865 in security deposits), and B-16 (listing $3,549,752 in accounts receivables).

207. The Debtors have acknowledged that these assets are property of Holdco. Debtors' Pretrial Brief at 42. However, the Debtors' Liquidation Analysis does not include these funds as assets of Holdco. JPX 266 (Disclosure Statement), Ex. E at 6.

### 2. January Interest Payment ($27 Million)

208. The Debtors' Board and management authorized a capital contribution from Holdco to CCH and CIH in the amount of $75 million on February 11, 2009 so that CCH and CIH could pay interest on certain of their notes. CX 255 (02/10/09-02/11/09 board minutes) at 9-10; July 22 Tr. 92:8-93:15 (Smit); <u>see</u> <u>supra</u> ¶¶ 86-93.

209. The Board and Management understood at the time the transfer was approved that CCH and CIH would be filing for bankruptcy. CX 255 (02/10/09-02/11/09 board minutes) at 10.

### 3. Preference Payments ($3.4 to $18.9 Million)

210. The Debtors identified approximately $200.3 million in payments made by Holdco and CCI within the 90 day preference period prior to filing for bankruptcy. <u>See</u> Statement of Financial Affairs for CCI [Docket No. 139] at Attachment 3b and 3c; Statement of Financial Affairs for Holdco [Docket No. 5 in Case No. 09-11442] at Attachment 3b and 3c.

211. The Debtors did not include any recoveries from preference payments in their Liquidation Analysis.

212. The Debtors have projected Holdco and CCO would recover between $3.4 million and $18.9 million from preference payments to non-insiders. CX Declaration 5 (Folse Declaration) at ¶ 17-18. The range of projected recoveries depends in part on whether certain executory contracts were assumed. Id. at ¶ 17-18.

213.    The Debtors' Liquidation Analysis assumes the sale of only the Company's operating assets and not CCI or Holdco.  JPX 266 (Disclosure Statement), Ex. E at 7.

### 4.    Insider Payments ($22.4 Million)

214.    The Debtors identified approximately $22.4 million in payments made by CCI to insiders within one year immediately preceding the Debtors' bankruptcy filing.  See Statement of Financial Affairs for CCI [Docket No. 139] at Attachment 3c.  However, the Debtors did not include any recoveries related to insider payments in their Liquidation Analysis.

215.    Without providing any underlying analysis, the Debtors have projected recoveries not to exceed $9 million from insider payments.  CX Declaration 5 (Folse Declaration) a

### 5.    CCVIII Settlement ($28 Million)

216.    In February 2009, a litigation settlement agreement was executed between a certain law firm and four Charter entities: Holdco, CCI, CC V Holdings, LLC and Charter Communications Holding Company, LLC.  LDTX 481 (Holdco's Statement of Financial Affairs), Attachment 2; LDTX 429 (Settlement Agreement) at 1.  The settlement agreement required the law firm to pay approximately $54 million to the four Charter entities, after accounting for the payment of approximately $5 million in attorneys fees.  LDTX 429 (Settlement Agreement) at 3.

217.    The Debtors' Liquidation Analysis does not provide for any recovery related to the CCVIII Settlement.

218.    In connection with modifying the Plan on or about July 15, 2009, the Debtors modified the treatment of the CCI Notes Claims to include a distribution from the "Litigation Settlement Fund Proceeds," in an amount, if any, that the Bankruptcy Court determines is owned by CCI and Holdco.  CX 407A (Notice of Immaterial Modifications to Plan) at 3.  The Plan defines "Litigation Settlement Fund Proceeds" as "the $26,428,089 in litigation settlement

proceeds (after fees and expenses) being held in escrow pursuant to the February 10, 2009

Escrow Agreement by and among CCI, Holdco, CCH, CC V Holdings, CCO, and Wilmington

Trust (as escrow agent)." id. at 12. In the escrow agreement, CCI and Holdco expressly

reserved the right to seek to recover the remainder of the total net settlement amount. LDTX 198

(Escrow Agreement) at 3-4.

219.    Mr. Doody admitted that he was not involved with the CCVIII settlement and did

not have any personal knowledge regarding the fees and expenses associated with the CCVIII

settlement. Aug. 17 Tr. 146:24-147:8, 151:17-25 (Doody).

### 6.    Intercompany Receivable from CCO ($119 Million)

220.    As of March 26, 2009, Holdco and CCI had an intercompany balance due from

CCO in the amount of $132 million that was valid and owing. LDTX 273 (06/18/09 Analysis of

Intercompany Accounts); August 3 Tr. 67:12-18 (Schmitz); September 1 Tr. 136:4-137:10

(McDonough).

221.    The Debtors only included $13 million of this intercompany balance in their

Liquidation Analysis (consisting of an "intercompany loan from CCO" in the amount of $13

million). JPX 266 (Disclosure Statement), Ex. E at 6, Note G.

222.    The Debtors have acknowledged that the Liquidation Analysis is not accurate

where it states in Note L that "the Management Services Agreement Receivable is offset or

reduced by payments made on account of the Trade Claims…." JPX 266 (Disclosure Statement,

Ex. E at 10-11, Note L; August 17 Tr. 68:24-69:5 (Doody).

223.    Mr. Doody testified that the Debtors reduced the intercompany receivables owing

to Holdco and CCI by $74.9 million to account for payments authorized under the first and

second day orders entered in this action. August 17 Tr. 71:1-74:16 (Doody). However, the

Debtors have not presented any evidence that the $74.9 million of expenditures made in

connection with the first and second day orders would have been made in a chapter 7 liquidation. September 1 Tr. 205:3-206:3 (McDonough).

224.    In his testimony regarding the intercompany receivable, Mr. Doody relied on LDTX 267, but that document is designated as a "draft" and contains a total intercompany balance that cannot be reconciled with the numbers contained in the Debtors' Liquidation Analysis.  LDTX 267 (06/09/09 Analysis of Intercompany Accounts); September 1 Tr. 205:3-207:12 (McDonough).

225.    Under GAAP accounting standards, it would not be appropriate to eliminate the portion of Holdco and CCI's intercompany receivable relating to stock options merely because such stock options have been forfeited or become worthless.   September 1 Tr. 139:14-40:16 (McDonough).  The Debtors' Chief Accounting Officer Kevin Howard acknowledged that the portion of the intercompany account balance related to the forfeited stock options was a valid obligation owing from CCO to either Holdco or CCI.  September 1 Tr. 226:16-24 (Howard).  Mr. Howard also confirmed that the portion of the intercompany account balance related to the stock options had been expensed when the options were granted and that the option compensation has accrued.  September 1 Tr. 225:14-226:5 (Howard).  Mr. Howard further testified that the Debtors had recorded a payable in their financial statements related to the stock options and that if the Debtors did not believe they were going to have to pay such payable the financial statements would be erroneous.  September 1 Tr. 227:23-228:7 (Howard).

### 7.    Management Services Agreement Receivable ($37 Million)

226.    The Debtors' Liquidation Analysis reflects a $7 million receivable from CCO to Holdco on account of outstanding obligations under the Management Services Agreement.  JPX 266 (Disclosure Statement), Ex. E at 6.

227.    Note K to the Debtors' original Liquidation Analysis listed a "Management Services Agreement Receivable" in the amount of $44 million owing from CCO to Holdco, which had been "offset by $38 million from the voluntary forfeiture of stock options by various Charter employees…."  See LDTX 428 (Original Disclosure Statement), Ex. E, Note K.  The Debtors ultimately deleted this disclosure from the Liquidation Analysis.  Compare LDTX 428 (Settlement Agreement) at Exhibit E, Note K (listing $44 million payable) with JPX 266 (Disclosure Statement), Ex. E, Note K.  There is no reference to a $44 million Management Services Agreement Receivable in the current version of the Debtors' Liquidation Analysis.  JPX 266 (Disclosure Statement), Ex. E.  The Debtors have not offered any explanation regarding how the $44 million payable from CCO to Holdco is now accounted for in their Liquidation Analysis.

## 8.    Other Assets Which Have Not Been Properly Valued by the Debtors

228.    The Debtors have ascribed no value to the programming contracts and intellectual property held by Holdco and CCI in their Liquidation Analysis.

229.    Programming Contracts.  CCI and Holdco hold a number of programming contracts.  See LDTX 252 (Holdco Schedules), Ex. G-1; LDTX 480 *(CCI Schedules) Ex. G-1; LDTX 466 (ESPN Term Sheet); LDTX 483 (Turner Agreement); LDTX 484 (NBCU Agreement); LDTX 485 (Showtime Agreement).   Programming costs are the Debtors' largest operating expense.  JPX 266 (Disclosure Statement) at 84.  The Debtors expect programming costs to continue to increase and caution that there is no assurance that expiring programming contracts will be renewed on favorable or comparable terms.  JPX 266 (Disclosure Statement) at 84.

230.    To the extent programming contracts held by CCI and Holdco include below-market rates or have long terms, such contracts would have value which should be analyzed and potentially included in a Liquidation Analysis.  September 1 Tr. at 140:24-143:16 (McDonough);

LDT Demo 28.  Mr. Doody acknowledged that having a contract with locked-in programming rates for several years could be valuable.  August 17 Tr. 165:22-166:4 (Doody).

231.    The Debtors have not rejected a single programming contract to date.  August 17 Tr. 172:15-17 (Doody).  Additionally, the Debtors have not presented any evidence that they properly assessed or accounted for the value of Holdco and CCI's programming contracts in their Liquidation Analysis.

232.    <u>Intellectual Property</u>.  The Debtors have not presented any evidence that they analyzed the potential value of intellectual property held by Holdco and CCI in connection with preparing their Liquidation Analysis.  The Plan provides Mr. Allen with the option to have the reorganized Company obtain an independent appraisal of the fair market value of Holdco's tangible and intangible assets, including intellectual property.  JPX 266 (Disclosure Statement) at 32.

233.    <u>Real Estate</u>.  The Debtors' Liquidation Analysis assumes the sale of the Company's headquarters building, which belongs to Holdco, would generate $15 million in liquidation value.  JPX 266 (Disclosure Statement), Ex. E at 11, Note M (stating that the $15 million estimate is based on an "informal indication of estimated market value").  Evidence in the record reflects that the value of Holdco's headquarters is between $30 and $45 million.  September 1 Tr. 230:4-231:13 (Debtors' Vice President of Finance and Treasurer Tom Degnan testified that the building was worth between $40 and $45 million); September 1 Tr. 234:17-235:5 (Debtors' Vice President of Corporate Finance Matt Derdeyn testified that the building was worth $30 million); LDTX 252 (Holdco Schedules), Ex. A-1.  The Debtors offer no explanation for these inconsistencies.

234.     Nor does the evidence suggest that the Debtors' real estate holdings would have to be sold in a distressed sale.  To the contrary, the Debtors are generating ample revenue to allow them to sell assets such as Holdco's headquarters building in an orderly fashion.  July 31 Tr. 99:17-25 (Schmitz); July 21 Tr. 200:7-11; 214:11-14 (Smit); August 24 Tr. 133:12-15 (Goldstein).

235.     Litigation Claims.  The Plan includes broad releases pursuant to which the Company is giving up substantial claims and potential causes of action which would otherwise be available to Holdco and CCI in a liquidation.  JPX 266 (Disclosure Statement) at 96-97.  The Debtors have not included any value in their Liquidation Analysis for any potential causes of action that are being released under the Plan.  JPX 266 (Disclosure Statement), Ex E.  Nor have the Debtors presented any evidence that they analyzed the value of potential causes of action that are being released under the Plan.

### C.     Debtors Cannot Satisfy the Best Interest of Creditors Test if CCI's Recoveries Are Properly Calculated

236.     The Trustee's expert identified approximately $388 million in recoveries that the Debtors have not included in their Liquidation Analysis.  LDT Demo 24; September 1 Tr. 146:15-147:7 (McDonough).

237.     Of that amount, the Debtors now acknowledge that the CCI Noteholders would, at a minimum, be entitled to recover on (i) the $9 million in other Holdco assets that the Debtors acknowledge belong to Holdco, (ii) certain preference payments to non-insiders, which the Debtors have projected to be between $3.4 million and $18.9 million (taking the midpoint of the Debtors' projected recoveries would be approximately $11 million), and (iii) certain insider payments, which the Debtors have projected to be no more than $9 million.  See supra ¶¶ 206, 212, 215.

238.     Including these recoveries with the $82 million already included in the Debtors'

Liquidation Analysis (JPX 266 (Disclosure Statement), Ex. E at 6), the starting point in

calculating the recovery of the CCI Noteholders in a liquidation should be at least $111 million.

239.     The holders of CCI Notes Claims are receiving approximately $134.9 million in

consideration under the Plan, after accounting for the actual value of the New Preferred Stock.

See supra ¶¶ 201-204.

240.     Assuming a starting recovery of $111 million as set forth above, there would only

need to be approximately a 6% recovery from the remaining sources of recovery for the CCI

Noteholders to receive more in a liquidation than they would under the Plan.  See, e.g.,

September 1 Tr. 146:15-147:7 (McDonough).  Even using the Debtors' valuation of the

consideration going to CCI Notes Claims under the Plan (i.e., $162.5 million), there would only

need to be a recovery of approximately 14% to obtain more for holders of CCI Notes Claims in a

liquidation.

## X.     THE DEBTORS' NON-ORDINARY COURSE VOTES WITH RESPECT TO THE HOLDCO NOTES CLAIMS AND CCH NOTES CLAIMS ARE VOID

241.     CCI voted its Holdco Notes Claims (which are scheduled to receive a distribution

of less than 3.9% under the Plan) in favor of the Plan.

242.     Holdco voted its CCH Notes Claims (which are scheduled to receive a

distribution of less than 0.4% under the Plan) in favor of the Plan.

243.     The Debtors did not seek judicial approval to cast these votes.

244.     The votes were not cast pursuant to board or other official authorization.  Aug. 17

Tr. 207:24-209:2 (Doody); CX 255 (2/10/09-2/11/10 board minutes).

245.     The Debtors disclosed the fact that the CCH Notes Claims class did not approve the Plan absent insider votes in a footnote in its Pretrial confirmation brief. Debtors' Pretrial Brief at 25. Such disclosure was not contained in any of the evidentiary submissions.

246.     In determining how to vote the CCH Notes, the Debtors relied on the fact they were Plan proponents.  For example, Mr. Doody testified that "the board approved the plan of which we are proponents, so we assumed that, you know, we would be voting all interests that we could vote in favor of the plan."  Aug. 17 Tr. 207:24-209:2 (Doody); CX 255 (2/10/09-2/11/10 board minutes).

## XI.     THE CCH PLAN HAS NOT BEEN ACCEPTED BY A LEGITIMATE IMPAIRED CLASS AND IS, THUS, UNCONFIRMABLE

247.     Holdco's vote with respect to its CCH Notes Claims is an insider vote that cannot be counted for purposes of delivering an impaired accepting class at CCH.  Absent Holdco's vote, the non-insider holders of CCH Notes Claims voted to reject the Plan.  Debtors' Pretrial Br. at 8, 25.

248.     No holder of CCH General Unsecured Claims cast a vote to accept or reject the Plan.  See Debtors' Pretrial Brief at 25, n.66 (designating Class E-3 (the CCH General Unsecured Claims).  Although no votes were cast, the Debtors contend that CCH General Unsecured Claims are deemed to have accepted the Plan pursuant to Exhibit E ¶ 7(h) of the Disclosure Statement Order).

249.     The Debtors relied on a provision in the "Voting Procedures Order" to contend that, in the absence of any votes with respect to any CCH General Unsecured Claim, that class would be deemed to accept the Plan.  Id.

250.     CCH's Schedules demonstrate that only one creditor was scheduled as holding a general unsecured claim (other than a CCH Notes Claim) at that Debtor.  See LDTX 479

(4/10/2009 Charter Communications Holdings, LLC Schedules of Assets and Liabilities) at Ex. F. That creditor's claim against CCH, however, is based on a surety bond ("Surety Bond Claim"). Id. (listing contingent, unliquidated claim held by Travelers Casualty and Surety Company of America as being based on surety bonds).

251.     The Surety Bond Claim is being assumed under the Plan.  See Amended Joint Plan of Reorganization at Article VII.A. (providing for deemed assumption of such executory contracts, unless listed on Exhibit 24 of the Debtors' Plan Supplement) and Plan Supplement at Exhibit 24 (not listing surety bonds held by Travelers Casualty and Surety Company of America as being rejected under the Plan).

252.     Further, the Surety Bond Claim has been afforded super-priority administrative claim status  and, consequently, is not properly classified as "impaired." See Final Order Authorizing Debtors to Enter Into the Dip Surety Bond Program at ¶ 7 [Docket No. 194].

253.     Accordingly, there are no creditors properly classified in the CCH General Unsecured Claims Class.

## XII.     THE HOLDCO PLAN IS NOT CONFIRMABLE

254.     Mr. Allen's wholly-owned subsidiary, CII, is retaining a direct equity interest in Holdco while CCI is receiving less than payment in full (i.e., a 3.9% recovery) on its Holdco Notes Claims, which are senior to CCI's equity.  See JPX 266 (Disclosure Statement) at 27.

255.     Similar to the Plan at CCI, the Holdco Plan proposes to reinstate or pay in full all Holdco General Unsecured Claims.  Id.

256.     The record is devoid of any evidence that the Debtors are withholding interest with respect to the Holdco General Unsecured Claims for an economic or other justifiable reason.  Specifically, the Debtors have provided no evidence whatsoever regarding the amount of

interest, if any, that they intend to withhold in connection with their cash distributions to holders of Holdco General Unsecured Claims.

257.    Further, the Debtors have failed to present any evidence that they ever considered whether Holdco is capable of making the interest payment with respect to those CCI General Unsecured Claims that they choose to impair.

258.    The Debtors have not presented any evidence of a justification, much less a legitimate reason supported by credible proof, for the separate classification of the Holdco General Unsecured Claims from Holdco Notes Claims

259.    The Debtors have not presented any evidence to suggest that the disparate treatment between the separately classified Holdco Notes Claims (which are receiving approximately 3.9% under the Plan) and the Holdco General Unsecured Claims (which are receiving approximately 100% under the Plan) (i) is supported by a reasonable basis, (ii) was necessary to consummate the plan, (iii) was proposed in good faith or (iv) that the degree of discrimination is proportional to its rationale.

## XIII.    DISTRIBUTIONS UNDER THE PLAN ARE BASED ON AN IMPROPER AND FLAWED SUBSTANTIVE CONSOLIDATION

260.    The Debtors only performed an enterprise valuation of their assets.  See Sept. 1 Tr. 101:11-24 (McDonough).

261.    Having never performed an entity by entity valuation, the Debtors ignored the value of assets held directly by CCI and/or Holdco on a stand-alone basis.  Id.

262.    Notwithstanding this consolidated approach to asset valuation, the Debtors adhere to corporate separateness when determining how and in what priority value is to be distributed. Sept. 1 Tr. 101:11-24 (McDonough).

263.     The record is clear that the Debtors' failure to value independently the assets of CCI has harmed the CCI Noteholders.  Under full consolidation, aggregate recoveries on account of CCI Notes Claims would increase by an estimated $85 million on the low end of the Debtors' valuation to $214 million on the high end.  LDT Demo 29 (9/2/2009 CCI Noteholders' Recovery if Debt Consolidated).

Dated: New York, New York
September 18, 2009

WHITE & CASE LLP

By:  /s/ Gerard Uzzi
Gerard Uzzi (GU-2297)
Dwight A. Healy (DH-9305)
Karen M. Asner (KA-5950)
Andrew Hammond (AH-0415)
Gregory M. Starner (GS-1719)
1155 Avenue of the Americas
New York, NY 11036-2787
(212) 819-8200

Counsel for Law Debenture Trust
Company of New York as Indenture
Trustee for the CCI Notes