WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
(212) 819-8200
Gerard Uzzi (GU-2297)
Dwight A. Healy (DH-9305)
Karen M. Asner (KA-5950)
Andrew Hammond (AH-0415)
Gregory M. Starner (GS-1719)

*Counsel for Law Debenture Trust Company*
*of New York as Indenture Trustee*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., <u>et</u> <u>al</u>., | ) | Case No. 09-11435 |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adversary Proceeding |
| - against - | ) | No. 09-1132 (JMP) |
| | ) | |
| CHARTER COMMUNICATIONS OPERATING, LLC and CCO HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LAW DEBENTURE TRUST COMPANY OF NEW YORK'S**
**PROPOSED CONCLUSIONS OF LAW**

TO:   THE HONORABLE JAMES M. PECK,
        United States Bankruptcy Judge:

# TABLE OF CONTENTS

I.    The Debtors Bear the Burden of Proving Compliance with Each of The Requirements Under § 1129(A) ................................................................................................ 1

    A.    The Debtors Bear the Burden to Demonstrate that the Plan is Proposed in Good Faith ................................................................................................ 1

    B.    The Debtors Cannot Meet Their Burden of Proof Because of Their Tactical Litigation Positions ................................................................................ 1

II.   The Debtors' Plan Gerrymanders an Artificial Impaired Accepting Class at CCI .............. 2

    A.    The Debtors have Failed to Offer a Legitimate Reason  Supported by Credible Proof for the Separate Classification  of the CCI Notes Claims from the CCI General Unsecured Claim ................................................................ 2

    B.    The Debtors Artificially Impaired the CCI General Unsecured Claims Class to Achieve a Cram Down of the CCI Notes Claims ................................... 4

III.  The Plan Unfairly Discriminates Against Holders of CCI Notes Claim ........................... 5

IV.   The Plan is Not Fair and Equitable ................................................................... 6

    A.    The CCI Settlement Compensates Paul Allen for His Equity Interests and, Thus, Violates the Absolute Priority Rule ............................................... 6

    B.    The Plan Siphons Substantial Value from CCI for the Benefit  of Junior Stakeholders and Creditors of Other Debtors ............................................ 7
          1.    CCI is Not Receiving Value for its Net Operating Losses .................... 8
          2.    CCI's Participation in the Plan is Worth No Less than $180 Million ........ 8
          3.    Holdco is Not Receiving Value for its Trademarks and Programming Contracts ................................................................. 8
          4.    The Lazard Valuation Provides a Multi-Billion-Dollar  Windfall to New Equity at the Expense of CCI ............................................... 8
          5.    The Plan Violates the Supreme Court's Ruling in LaSalle ..................... 9

V.    The Plan Fails the Best Interests of Creditors Test Under Section 1129(A)(7) of the Bankruptcy Code ..................................................................................... 10

    A.    Because of Conflicts of Interest, the Debtors' and Their Advisors Could Not Adequately Represent CCI and its Creditors With Respect to Potential Intercompany Claims ................................................................ 11

    B.    The Debtors Overstate the Value of the Consideration Flowing to the Holders of CCI Notes Claims under the Plan as Modified ................................. 12

    C.    The Debtors' Liquidation Value Fails to Account for Numerous Potential Sources of Recovery at CCI and Holdco ................................................ 12

D.    Debtors Cannot Satisfy the Best Interest of Creditors Test if CCI's Recoveries Are Properly Calculated..........................................................................................18

VI.    The Debtors' Non-Ordinary Course Votes with Respect to the Holdco Notes Claims and CCH Notes Claims Are Void ...................................................................................20

VII.    The CCH Plan Has Not Been Accepted by a Legitimate Impaired Class and is, Thus, Unconfirmable ..............................................................................................................21

VIII.    The Holdco Plan is Not Confirmable.................................................................................22

IX.    Distributions under the Plan are Based on an  Improper and Flawed Substantive Consolidation ...................................................................................................................23

X.    The Requirements of Section 1129(a)(10) Must be Satisfied  for Each Debtor's Plan Absent Substantive Consolidation ....................................................................................24

XI.    The Releases Proposed Under The Plan Are Improper .....................................................25

XII.    The Plan is Not Proposed in Good Faith As the Allen Settlement is Not Fair and Does Not Satisfy Rule 9019....................................................................................................26

A.    The Allen Settlement is Not Entirely Fair ............................................................26
1.    The Process Was Not Fair..........................................................................29
2.    The Price of the Allen Settlement Was Not Fair ......................................31
a.    The Debtors Failed to Present Sufficient Evidence To Demonstrate that the Price of the Allen Settlement Was Fair. ......32
b.    The Price Is Not Fair Because Parties Equally Necessary To Create the Value Mr. Allen is Being Compensated For Are Receiving Nothing. ........................................................................33

B.    The Allen Settlement Cannot be Approved Under Rule 9019 .............................34

C.    The Debtors Breached their Fiduciary Duties in Connection with Negotiating the Plan and Raiding Holdco/CCI's Assets .........................................................37
1.    The Board Breached its Fiduciary Duties by Failing to Negotiate for CCI's Interests .........................................................................................38
2.    The Board Breached Their Fiduciary Duties by Failing to Compensate CCI for the Full Amount of the January Interest Payment ........................39
3.    The Systematic Dissipation of Holdco's Assets .......................................41
a.    The November Capital Contribution ..............................................41
b.    The October Tender Offer .............................................................42
c.    The April Purchase of CCH Notes.................................................43

Conclusion ................................................................................................................................44

The Law Debenture Trust Company of New York (the "Trustee") respectfully submits proposed conclusions of law as follows.

## I.   THE DEBTORS BEAR THE BURDEN OF PROVING COMPLIANCE WITH EACH OF THE REQUIREMENTS UNDER § 1129(A)

### A.   The Debtors Bear the Burden to Demonstrate that the Plan is Proposed in Good Faith

1.     As the proponent of a chapter 11 plan, "[t]he Debtor bears the burden of proving compliance with each of the requirements of 11 U.S.C. § 1129(a)," In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995) (citation omitted), and must prove each of the requisite elements of section 1129(a) by a preponderance of the evidence. In re Kent Terminal Corp., 166 B.R. 555, 561 (Bankr. S.D.N.Y. 1994).

2.     The Bankruptcy Court has an independent duty to determine whether the debtor has met its evidentiary burden under sections 1129(a) and (b) prior to entering an order confirming a chapter 11 plan. See In re Ne. Dairy Coop. Fed'n, Inc., 73 B.R. 239, 248 (Bankr. N.D.N.Y. 1987).

### B.   The Debtors Cannot Meet Their Burden of Proof Because of Their Tactical Litigation Positions

3.     If a party asserts reliance on advice of counsel in connection with proving a fact in issue, yet fails to produce the underlying privileged communication, the evidence submitted by that party is entitled to no weight on the subject matter. See, e.g., S.E.C. v. Bank of Am. Corp., 09 Civ. 6829 (JSR), 2009 WL 2842940, at *2 (S.D.N.Y. Aug. 25, 2009) (noting that "[i]f the responsible officers of the Bank of America, in sworn testimony to the SEC, all stated that they 'relied entirely on counsel', this would seem to be either a flat waiver of privilege or, if privilege is maintained, then entitled to no weight whatever, since the statement cannot be tested."). See also Ashmore v. Metrica Corp., No. Civ.A. 2811-CC, 2007 WL 1464541, at *1

(Del. Ch. May 11, 2007) (stating that "defendants, having asserted privilege with respect to this advice during discovery, will not be allowed to rely at trial upon the fact that advice was given"); Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc., 259 F.3d 1186, 1196 (9th Cir. 2001) (affirming preclusion of testimony where "[a defendant] sought to argue that he continued his infringing activities based upon the advice of his attorney, while at the same time refusing to answer questions regarding relevant communications with counsel until the 'eleventh hour'").

4.     To the extent that the Debtors submitted testimony from witnesses that stated they relied on legal advice to make decisions, such as approving transfers or deciding not to appoint a special committee, or attempted to testify about such issues as the value of certain tax attributes or liabilities over which privileged had previously been asserted, such testimony is entitled to no weight in these proceedings to the extent that the content of the legal advice that they relied on has not been disclosed.

## II.     THE DEBTORS' PLAN GERRYMANDERS AN ARTIFICIAL IMPAIRED ACCEPTING CLASS AT CCI

### A.     The Debtors have Failed to Offer a Legitimate Reason Supported by Credible Proof for the Separate Classification of the CCI Notes Claims from the CCI General Unsecured Claim

5.     The Second Circuit prohibits a debtor from separately classifying similar unsecured claims without a legitimate reason supported by credible proof (apart from the need to create an assenting class).  See Boston Post Rd. Ltd. v. F.D.I.C. (In re Boston Post Rd. Ltd. P'ship), 21 F.3d 477, 482-83 (2d Cir. 1994).  It is the Debtors' burden to demonstrate credible proof that the Plan separately classifies CCI Notes Claims from General Unsecured Claims for a legitimate reason.  Id.

6.     The different nature and origin of the CCI Notes Claims and the CCI General

Unsecured Claims does not provide a legitimate reason for classifying those claims separately under the Plan. Boston Post Rd., 21 F.3d at 483 (holding that the different origins of unsecured deficiency claims and general unsecured trade claims, which enjoy similar rights and privileges within the Bankruptcy Code, do not justify separate classification).

7. The Debtors contend that the Mirror Note and the Management Agreement provide grounds for separate classification of these claims. They are incorrect.

8. The Debtors have provided no evidence that the Mirror Note provides holders of CCI Notes Claims with any legal rights against CCI. FOF ¶147. The Mirror Note is not security for the CCI Noteholders, FOF ¶148, nor are the CCI Noteholders third-party beneficiaries of the Mirror Note. FOF ¶ 149.

9. The Debtors have provided no evidence that the Management Agreement provides holders of CCI General Unsecured Claims with any legal rights against CCI. FOF ¶ 150. The Management Agreement does not make any of CCI's creditors, including the holders of CCI General Unsecured Claims, third-party beneficiaries to that Agreement. FOF ¶ 151.

10. Thus, neither the Mirror Note nor the Management Agreement provide a legitimate reason for the separate classification of the CCI Notes Claims and the CCI General Unsecured Claims. Further, the Debtors have provided no other evidence nor justification for their proposed separate classification of these Claims. Based on the foregoing, the approval of this Plan would "disenfranchise the overwhelmingly largest creditor [of CCI] through artificial classification," in direct contravention of Second Circuit law. Boston Post Rd., 21 F.3d at 483.

11. The Debtors' separate classification of CCI Notes Claims and CCI General Unsecured Claims is improper and renders the Plan unconfirmable.

**B.  The Debtors Artificially Impaired the CCI General Unsecured Claims Class to Achieve a Cram Down of the CCI Notes Claims**

12.     The Debtors have the burden of showing that impairment was "necessary for economical or other justifiable reasons and not just to achieve a 'cram down.'"  In re Fur Creations by Varriale, Ltd., 188 B.R. 754, 760 (Bankr. S.D.N.Y. 1995).  Here, the Debtors have failed to meet their burden.

13.     CCI is not prohibited from paying postpetition interest on the CCI General Unsecured Claims that it chooses to pay in cash under the Plan.  FOF ¶¶ 157-59.  Further, the Debtors have provided no evidence regarding the amount of interest, if any, that they intend to withhold in connection with their cash distributions to holders of CCI General Unsecured Claims.  FOF ¶ 160.

14.     The Debtors failed to present any evidence at the confirmation hearing that they ever considered whether CCI is capable of making the interest payment or should make the interest payment with respect to those CCI General Unsecured Claims that they choose to impair.  FOF ¶ 161.  Indeed, the Debtors' General Counsel and Chief Restructuring Officer was unable to explain the basis for withholding interest to such creditors, noting only that, "they're not getting it, that's what makes them impaired."  FOF ¶ 162.

15.     CCI's estate is capable of paying any postpetition interest that may be owed to holders of CCI General Unsecured Claims.  FOF ¶ 163.

16.     The Debtors' mere option to withhold payment of postpetition interest, moreover, cannot create an impaired class because the withholding of interest arises solely from the debtor's exercise of discretion.  See Windsor on the River Assocs., Ltd. v. Balcor Real Estate Fin., Inc. (In re Windsor on the River Assocs., Ltd.) 7 F.3d at 132 ("[W]e hold that, for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises

4

solely from the debtor's exercise of discretion."). Further, there is no basis for the Debtors to pay CCI General Unsecured Claims in full, yet withhold payments of postpetition interest because all such expenses are subject to reimbursement under the Management Agreement.

17.     The record here is devoid of any evidence that the Debtors are withholding interest with respect to the CII General Unsecured Claims for an economic or other justifiable reason.     Rather, the evidence suggests that the CCI General Unsecured Claims Class has been artificially impaired for the sole purpose of obtaining at least one impaired accepting class of creditors at CCI.     Based on the foregoing, the CCI General Unsecured Claims Class is not a legitimate accepting class and cannot be used to satisfy section 1129(a)(10).     Given that no impaired class has thus voted to accept the Plan at CCI, the Plan is unconfirmable.

## III.     THE PLAN UNFAIRLY DISCRIMINATES AGAINST HOLDERS OF CCI NOTES CLAIM

18.     Section 1129(b)(1) permits confirmation of a plan notwithstanding its rejection by an impaired class only if, inter alia, "the plan does not discriminate unfairly." 11 U.S.C. § 1129(b)(1).     The Debtors have the burden of demonstrating that the plan does not unfairly discriminate against the holders of CCI Notes Claims by a preponderance of the evidence. In re Armstrong World Indus., Inc., 348 B.R. 111, 120 n.15 (D. Del. 2006).     The Debtors have failed to meet their burden to demonstrate that the Plan does not discriminate unfairly against holders of CCI Notes Claims by providing them with a mere 32.7% recovery (at the Debtors' valuation) while reinstating or paying CCI General Unsecured Claims in full.

19.     Specifically, the Debtors have failed to show—as they are required—that: "(i) there is a reasonable basis for discrimination, (ii) the debtor cannot consummate the plan without the discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale." In re Buttonwood Partners, Ltd., 111 B.R.

57, 63 (Bankr. S.D.N.Y. 1990) (applying the above "four-factor" test); see also In re Dow Corning Corp., 244 B.R. 696, 703 (E.D. Mich. 1999) (applying the "Markell test").

20.     The Plan proposes to reinstate or pay CCI General Unsecured Claims in full on the Effective Date while providing holders of CCI Notes Claims with a mere 32.7% recovery (at the Debtors' valuation). FOF ¶ 164.

21.     The Debtors have not presented any evidence that the disparate treatment is supported by a reasonable basis and was necessary to consummate the plan. FOF ¶ 165. The CCI General Unsecured Claims class is entirely composed of non-essential creditors, such as former employees, litigation claimants, and rejection damages claimants. FOF ¶ 166. Further, the Debtors have paid all essential creditors pursuant to their first-day critical trade vendor order. FOF ¶ 167.

22.     There is also no evidence in the record that the proposed discrimination with respect to the CCI Notes was proposed in good faith or that the degree of discrimination is proportional to its rationale. FOF ¶ 168.

23.     Based on the foregoing, the Plan unfairly discriminates against holders of CCI Notes and, thus, is not confirmable under section 1129(b)(1) of the Bankruptcy Code.

## IV.     THE PLAN IS NOT FAIR AND EQUITABLE

### A.     The CCI Settlement Compensates Paul Allen for His Equity Interests and, Thus, Violates the Absolute Priority Rule

24.     The CII Settlement violates the absolute priority rule by transferring substantial consideration to Mr. Allen on account of his junior interests while dissenting senior creditors are paid less than full. Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 463 (2d Cir. 2007) ("a settlement presented for approval as part of a plan of reorganization . . . may only be approved if it, too, is 'fair and equitable' in the sense

of conforming to the absolute priority rule") (citing <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.</u> v. <u>Anderson</u>, 390 U.S. 414, 424 (1968)).

25.     The Debtors have admitted that distributions to Mr. Allen and/or his affiliates under the CCI Settlement are on account of his equity interests, including (i) his shares of Class A Common Stock of CCI; (ii) his vested options to acquire shares of Class A Common Stock of CCI; and (iii) his shares of Class B Common Stock of CCI.  FOF ¶ 169.

26.     Testimony in these cases suggests that the main sources of consideration provided by Mr. Allen in exchange for the New Class B Stock (and other consideration he is receiving under the Plan) are his agreements to participate in a plan that will (i) preserve existing NOLs and (ii) facilitate the reinstatement of the Debtors' existing bank debt.  FOF ¶ 170.

27.     Mr. Allen's ability to preserve existing NOLs and facilitate the reinstatement of the Debtors' existing bank debt, however, derives from the volume of equity in CCI and Holdco that Mr. Allen owns.  FOF ¶ 171.  As such, Mr. Allen is receiving compensation on account of his controlling equity interest and the damage he could cause to the estates as a result thereof. Given that senior creditors have rejected the Plan, distributions to Mr. Allen on account of his equity interests violate the absolute priority rule and render the Plan unconfirmable.  <u>See</u> 11 U.S.C. § 1129(b)(2)(B)(ii).

**B.     The Plan Siphons Substantial Value from CCI for the Benefit of Junior Stakeholders and Creditors of Other Debtors**

28.     The Plan also is neither fair nor equitable because it (i) fails to account for CCI's value as a going concern, including the value of the Company's NOLs; (ii) fails to account for Holdco's value as a going concern, including the Company's trademarks and programming contracts, (iii) provides Mr. Allen with $180 million of consideration for his participation in the Plan while failing to compensate CCI for its participation in the Plan, which was just as

necessary, and (iv) provides a multi-billion dollar windfall to the Crossover Committee and Mr. Allen by relying on a deficient valuation report.

### 1. CCI is Not Receiving Value for its Net Operating Losses

29.     The NOLs allocated to CCI pursuant to the Holdco LLC Agreement belong to CCI and not the Charter enterprise.  See FOF ¶¶ 172-80.  It is uncontroverted that the NOLs have significant value to CCI.  See, e.g. FOF ¶ 179.  Nevertheless, the current creditors of CCI are not receiving any benefit under the current Plan from the NOLs.  Such a result is not fair and equitable.

### 2. CCI's Participation in the Plan is Worth No Less than $180 Million

30.     The evidence adduced at trial demonstrated that CCI's participation in the Plan is just as necessary as the participation of Paul Allen to preserve the NOLs and existing bank financing.  FOF ¶ 181.  It is simply not fair and equitable to compensate Mr. Allen $180 million for his participation in the Plan (FOF ¶ 182), and not make any corresponding distribution to CCI's creditors for the preservation of this value.

### 3. Holdco is Not Receiving Value for its Trademarks and Programming Contracts

31.     Holdco owns the Company's trademarks and programming contracts. FOF ¶ 183. These assets are valuable and part and parcel of Holdco's going concern value.  FOF ¶ 1684-85. Similar to the value of CCI's NOLs, the value of Holdco's programming contracts and trademarks is being transferred to non-stakeholders of Holdco.  Yet Holdco's creditors are not being paid in full in violation of the absolute priority rule.

### 4. The Lazard Valuation Provides a Multi-Billion-Dollar Windfall to New Equity at the Expense of CCI

32.     It is the Debtors' burden to produce a valuation of the reorganized Debtors as of the Effective Date.  See S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373,

392 (E.D. Tex. 2000) ("Because such matters as asset valuation and the estimation of liquidation recoveries can be drastically affected by the timing of one's calculations, a court must ensure that all financial projections incorporated into its analysis reflect the resources that are likely to be available to a debtor on a plan's effective date.")

33.     The Debtors have failed to meet this burden.  Rather, the Debtors have relied on the out-dated Lazard valuation, which by its express terms was as of March 23, 2009 and premised on public market multiples that have since risen as much as 30%. FOF ¶ 124.  Indeed, even the Debtors' former financial advisor, Mr. Millstein, suggested that the valuations should be updated.  FOF ¶¶ 125-38.  Moreover, testimony of the Debtors' own expert witness, Mr. Den Uyl, demonstrates that the Lazard valuation is not credible.  [FOF ____].  If Mr. Den Uyl's testimony is to be credited, Lazard undervalued the Company by billions of dollars.  The record is thus insufficient to permit confirmation of the Plan because Lazard's valuation would provide the new owners of CCI with a multi-billion dollar windfall, which is not fair and equitable.

**5.     The Plan Violates the Supreme Court's Ruling in LaSalle**

34.     In LaSalle, the Supreme Court addresses the issue of the improper use of exclusivity to propose a plan that impairs senior creditors for the benefit of an insider.  As the Court noted, that exclusive opportunity should "be treated as an item of property in its own right . . . . Hence it is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the partners' right a property interests extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection."  Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 455-56 (1999).  It is the maintenance of exclusivity and, in the case of CCI, the inability of the CCI Noteholders to compete for the control or ownership of the CCI estate that implicates LaSalle.

35.     Mr. Allen and parties acting on his behalf exercised extensive control over this negotiation process leading to the Allen Settlement and, ultimately, sought out and set a price for the consideration he and his affiliates are receiving under the Plan.  FOF ¶ 186-87.

36.     Mr. Allen has used his control to propose a plan wherein his control was exercised to retain a controlling equity stake in the reorganized Debtors while objecting senior creditors are scheduled to receive less than payment in full.  Based on the foregoing, the Plan violates the absolute priority rule and the Supreme Court's holding in <u>LaSalle</u> and, as such, cannot be confirmed.

## V.     THE PLAN FAILS THE BEST INTERESTS OF CREDITORS TEST UNDER SECTION 1129(A)(7) OF THE BANKRUPTCY CODE

37.     The Debtors bear the burden of establishing that the best interests of creditors test has been satisfied and the holders of CCI Notes Claims are receiving property under the Plan that has a present value equal to what such creditors would recover in a chapter 7 liquidation.  <u>See, e.g.</u>, <u>ACC Bondholder Group</u> v. <u>Adelphia Commc'ns Corp.</u> (<u>In re Adelphia Commc'ns Corp.</u>), 361 B.R. 337, 364 (S.D.N.Y. 2007), <u>order aff'd</u>, 544 F.3d 420 (2d Cir. 2008).

38.     To carry their burden, the Debtors need to present plausible, complete evidence as to the current value of their assets.  <u>See, e.g.</u>, <u>In re Rusty Jones, Inc.</u>, 110 B.R. 362, 373-74 (Bankr. N.D. Ill. 1990).  The Debtors must also present evidence and assign recovery values to any potential causes of action, including actions to avoid preferences or fraudulent transfers.  <u>In re Zaleha</u>, 162 B.R. 309, 316 (Bankr. D. Idaho 1993); <u>In re Future Energy Corp.</u>, 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988).

39.     A current valuation is required to allow the Court to accurately assess the value of assets available to the creditors of CCI in a liquidation.  <u>See, e.g.</u>, <u>S. Pac. Transp. Co.</u> v. <u>Voluntary Purchasing Groups, Inc.</u>, 252 B.R. 373, 392 (E.D. Tex. 2000); <u>Te-Two Real Estate</u>

Ltd. P'ship v. Creekstone Apartments Assocs., L.P. (In re Creekstone Apartments Assocs., L.P.), No. 3:94-0382, 1995 WL 588904, *18 (M.D. Tenn. Sept. 18, 1995).

40.    The evidence submitted in support of the Debtors Liquidation Analysis is not credible.   The Debtors have presented no expert testimony in support of their Liquidation Analysis, which was neither sworn to nor signed.  FOF ¶ 197.  At the confirmation hearing, the only evidence that the Debtors put on in support of their Liquidation Analysis was from the Debtors' CRO and General Counsel Greg Doody.  FOF ¶ 198.  Mr. Doody's testimony was not credible and is entitled to no weight because he did not have personal knowledge regarding how recoveries to CCI's creditors were calculated.

41.    Specifically, Mr. Doody had no personal knowledge regarding the intercompany loans and receivables included in the Liquidation Analysis, which represent the majority of the recoveries flowing to the holders of CCI Notes Claims.  FOF ¶ 199.  Moreover, Mr. Doody could not distinguish between a receivable owing to Holdco from CCO and a payable owing from Holdco to CCO and did not have an understanding regarding how subordination works in bankruptcy.  FOF ¶ 199.  Mr. Doody's testimony regarding how recoveries to CCI's creditors were calculated cannot be credited.

### A.    Because of Conflicts of Interest, the Debtors' and Their Advisors Could Not Adequately Represent CCI and its Creditors With Respect to Potential Intercompany Claims

42.    The Debtors' advisors cannot adequately represent the interests of CCI stakeholders in pursuing potential inter-debtor claims and/or causes of action as against other debtors to the extent they also represent those other debtors.  11 U.S.C. § 327 (professionals must be "disinterested" and not hold or represent any interest adverse to the estate); See, e.g., Bank Brussels Lambert v. Coan (In re Arochem Corp.), 176 F.3d 610, 620-21 (2d Cir. 1999); In re Vebeliunas, 231 B.R. 181, 187 (Bankr. S.D.N.Y. 1999).  Consequently, even if the Debtors had

presented evidence that their advisors assessed potential recoveries on the intercompany claims and other sources of recovery available to CCI's creditors (which they have not), any assessment prepared by such conflicted advisors would be entitled to no weight.

**B.** **The Debtors Overstate the Value of the Consideration Flowing to the Holders of CCI Notes Claims under the Plan as Modified**

43.     The Plan as modified provides for the distribution of $138 million in New Preferred Stock and $24.5 in cash to the holders of CCI Notes Claims.  FOF ¶ 204.  While the Debtors value the New Preferred Stock at its face value without offering any expert testimony or other analysis to support such valuation, a discount rate for its minority position should be applied to determine the stock's actual value.  FOF ¶ 204.  Applying a 20% discount to the New Preferred Stock to account for its minority position, the holders of CCI Notes will receive approximately $134.9 million under the Plan, i.e., $110.4 million on account of the New Preferred Stock (face value of $138 million discounted by 20%) and $24.5 million in cash.  FOF ¶ 204.

**C.** **The Debtors' Liquidation Value Fails to Account for Numerous Potential Sources of Recovery at CCI and Holdco**

44.     The Law Debenture has identified a number of potential sources of value that could be recovered by holders of CCI Notes Claims in the event of a liquidation.

45.     Holders of CCI Notes have direct claims against CCI, whose assets include (i) a 54% equity interest in Holdco and (ii) approximately $500 million in indebtedness owed by Holdco to CCI under the Holdco Notes, which mirror the terms of the CCI Notes.  FOF ¶¶ 3-4. CCI's ability to recover as a creditor of Holdco in this proceeding is tied directly to Holdco's intercompany accounts.  FOF ¶ 3.

**Charter Holdco Other Assets ($9 Million)**

46.     The Debtors' Liquidation Analysis does not account for the approximately $9 million in Holdco Other Assets identified in Holdco's schedules.  FOF ¶ 206.  The Debtors have acknowledged that these assets are property of Holdco's estate (FoF ¶ 207), and any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include this $9 million amount.

**January Interest Payment ($27 Million)**

47.     On or about February 11, 2009, Holdco made a capital contribution of approximately $75 million to CCH and CIH to satisfy outstanding interest payments on certain of their notes.  FOF ¶ 206.  Holdco did not receive reasonably equivalent value in exchange for making the January Interest Payment.  FOF ¶ 8.

48.     While $48 million of the January Interest Payment was placed in escrow for the protection of CCI's creditors and was also included in the Debtors' Liquidation Analysis, the Debtors have not accounted for the remaining $27 million.  FOF ¶ 91.  The Debtors have not presented any evidence or analysis regarding whether the outstanding $27 million would be recoverable under a theory of avoidance action, breach of fiduciary duty, unjust enrichment or otherwise.  Accordingly, the Debtors have not met their burden to present evidence and assign a recovery value for the $27 million.

49.     Any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include the unaccounted-for $27 million from the January Interest Payment.

**The April, October and November Transactions ($142 Million)**

50.     As discussed supra __, the Company effected three transactions between April and November of 2008 that drew down on valid intercompany receivables and reduced the assets of Holdco by approximately $142 million.

51.     Holdco did not receive reasonably equivalent value in connection with these transactions.  FOF ¶¶ 16, 22, 23, 25, 31, 32, 87, 89, 92.  The Debtors have not presented any evidence or analysis regarding whether these transfers would be recoverable pursuant to an avoidance action, breach of fiduciary duty, unjust enrichment or otherwise.  Accordingly, the Debtors have not met their burden to present evidence and assign a recovery value to the transfers of Holdco assets made in April, October and November 2008.

52.     The Debtors' claim that section 546(e) of the Bankruptcy Code would bar recoveries on such transfers.  However, Section 546(e) only applies to avoidance actions arising under Sections 544, 545, 547, or 548 of the code.  Section 546(e) of the Bankruptcy Code does not bar recovery on breach of fiduciary claims or claims premised on a theory of collapsing the transaction explain.  11 U.S.C. § 546(e); See, e.g., HBE Leasing Corp. v. Frank, 48 F.3d 623, 635 (2d Cir. 1995).

53.     Any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include amounts for potential recoveries on $142 million of transfers made in April, October and November.

**Preference Payments ($3.4 to $18.9 Million)**

54.     While the Debtors projected recoveries from preference payments in the range of $3.4 million to $18.9 million (FOF ¶ 212), they did not include any recoveries from preference payments in their Liquidation Analysis.

55.     Any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include, at a minimum, the midpoint of the Debtors' projected recoveries from preference payments of between $3.4 million and $18.9 million (i.e., $1.1 million).

56.     A chapter 7 trustee is required to maximize the recoveries of creditors in a liquidation.  In re Balco Equities Ltd., 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005); In re WorldCom, Inc., 401 B.R. 637, 640, 650 (Bankr. S.D.N.Y. 2009).  Thus, there is no basis to suggest that a chapter 7 trustee would not pursue preference payments to maximize the recoveries to CCI and Holdco.  Sept. 1 Tr. 187:14-18 (McDonough) (noting that CCI and Holdco are not being sold and therefore a chapter 7 trustee would pursue claims on their behalf).

### Insider Payments ($22.4 Million)

57.     While the Debtors identified approximately $11.7 million of annual bonuses and payments to insiders that were potentially recoverable as insider payments (Folse Decl. ¶ 23; Aug. 18 Tr. 135:1-136:8 (Folse)), and ultimately projected potential recoveries from insider transactions which would likely not exceed $9 million (FoF ¶ 215), they did not include any recovery for insider payments in their Liquidation Analysis.

58.     Any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include, at a minimum, the Debtors' projected recoveries from insider payments of $9 million.

59.     As noted above, a chapter 7 trustee is required to maximize the recoveries of creditors in a liquidation (Balco Equities, 323 B.R. at 98; WorldCom, 401 B.R. at 640, 650), and there is no basis in the record to suggest that a chapter 7 trustee would not pursue insider payments to maximize the recoveries to CCI and Holdco.

### CCVIII Settlement ($28 Million)

60.     The Plan provides that the distribution to the CCI Notes Claims includes the "Litigation Settlement Fund Proceeds," in an amount, if any, that the Bankruptcy Court determines is owned by CCI and Holdco.  FOF ¶ 218.  The net settlement proceeds from the CCVIII Settlement are $54 million (FoF ¶ 216) yet the Debtors have capped the Litigation Settlement Fund Proceeds at $26,428,089.  FOF ¶ 218.  The Debtors have not presented any evidence to account for the remaining $28 million of the $54 million net settlement amount.

61.     The CCI Noteholders assert that they are entitled to recover the entire amount of the CCVIII settlement.  The Debtors have not presented any evidence to the contrary, and therefore the net CCVIII settlement amount of $54 million should be included in the distribution to the holders of CCI Notes Claims.

62.     Mr. Doody was not competent to testify regarding the settlement proceeds available for distribution because he was not involved with the settlement and did not have any personal knowledge regarding the fees and expenses associated with the settlement.  FOF ¶ 219.  As such, his testimony regarding the CCVIII Settlement is not credible.  Accordingly, the $28 million of funds that are unaccounted for in the Litigation Settlement Fund proceeds should be included as funds potentially recoverable by CCI in the Liquidation Analysis.

### Intercompany Receivable from CCO ($119 Million)

63.     While Holdco and CCI had an intercompany balance due from CCO in the amount of $132 million that was valid and owing (FoF ¶ 220) the Debtors only included $13 million of this amount in their Liquidation Analysis (consisting of an "intercompany loan from CCO" in the amount of $13 million).  FOF ¶ 221.  The Debtors have not presented any credible evidence to account for the remaining $119 million in a liquidation.

64.     The Debtors presented testimony that the $132 million receivable was reduced by $74.9 million for payments made under the first and second day motion relief granted in this action.  FOF ¶ 223.  However, the Debtors have not presented any evidence that any portion of the $74.9 million of expenditures made in connection with the first and second day orders would have been made in a chapter 7 liquidation (FoF ¶ 223), and therefore such a reduction in the intercompany receivable was not justified.

65.     Additionally, the document which forms the basis for Mr. Doody's testimony regarding the reductions made to the intercompany receivable is not reliable on its face.  FOF ¶ 224.  That document is designated as a "draft" and contains a total intercompany balance that cannot be reconciled with the numbers contained in the Debtors' Liquidation Analysis.  FOF ¶ 224.  The Debtors have presented no other evidence establishing the reliability of the 5/7/09 Supplement to the Joint Plan of Reorganization or supporting the information contained therein.  Accordingly, Mr. Doody's testimony concerning how the intercompany loan balance was reduced to arrive at the figure in the liquidation analysis is not entitled to any weight.

66.     Similarly, the Debtors have not presented any evidence establishing a legitimate basis to suggest that there would be no recovery in a liquidation on the $48.2 million of the intercompany receivable that is related to stock options.  The Debtors have not submitted any evidence or analysis supporting this assumption other than Mr. Doody's conclusory testimony which does not suffice.  Moreover, under GAAP accounting standards, it would not be appropriate to eliminate the portion of Holdco and CCI's intercompany receivable relating to stock options merely because such stock options have been forfeited or become worthless.  FOF ¶ 225.

67.     Any calculation of what the holders of CCI Notes Claims will recover in a liquidation should include, at a minimum, the Debtors' projected recoveries from the intercompany receivable in the amount of $112 million.

**Other Assets Which Have Not Been Properly Valued by the Debtors**

68.     <u>Programming Contracts</u>.   Holdco and CCI hold a number of programming contracts.  FOF ¶ 229.  The Debtors have acknowledged that having a contract with locked-in programming rates for several years could be valuable.  FOF ¶ 230.  To the extent programming contracts held by CCI and Holdco include below-market rates or have long terms, such contracts would have value which should be analyzed and potentially included in a liquidation analysis. FOF ¶ 230.  The Debtors have not satisfied their burden because they have failed to present any evidence that they properly assessed or accounted for the value of Holdco and CCI's programming contracts in their Liquidation Analysis.  FOF ¶ 231.

69.     <u>Intellectual Property</u>.  The Debtors have not satisfied their burden because they have failed to present any evidence that they properly assessed or accounted for the value of Holdco and CCI's intellectual property in their liquidation analysis.  FOF ¶ 232.

70.     <u>Litigation Claims</u>.  The Debtors have not satisfied their burden because they have not included any value in their Liquidation Analysis for any potential causes of action that are being released under the Plan but have presented no evidence that they analyzed these potential assets.  FOF ¶ 235.

**D.      Debtors Cannot Satisfy the Best Interest of Creditors Test if CCI's Recoveries Are Properly Calculated**

71.     The Trustee's expert identified approximately $388 million in recoveries that the Debtors have not properly analyzed in connection with their liquidation analysis.  (McDonough). Of that amount, the Debtors now acknowledge that the CCI Noteholders would, at a minimum,

be entitled to recover on (i) the $9 million in other Holdco assets that the Debtors acknowledge belong to Holdco, (ii) certain preference payments to non-insiders, which the Debtors have projected to be between $3.4 million and $18.9 million (taking the midpoint of the Debtors' projected recoveries would be approximately $11 million), and (iii) certain insider payments, which the Debtors have projected to be no more than $9 million. Including these recoveries with the $82 million already included in the Debtors liquidation analysis, the starting point in calculating the recovery of the CCI Noteholders in a liquidation should be at least $111 million.

72. The holders of CCI Notes Claims are receiving approximately $134.9 million in consideration under the Plan, after properly accounting for the actual value of the New Preferred Stock. Assuming a starting recovery of $111 million as set forth above, there would only need to be a 6% recovery from the remaining sources of recovery for the CCI Noteholders to receive more in a liquidation than they would under the Plan. See, e.g., Sept. 1 Tr. 146:15-147:7 (McDonough). Even using the Debtors' valuation of the consideration going to CCI Notes Claims under the Plan (i.e., $162.5 million), there would only need to be a recovery of approximately 14% to obtain more for holders of CCI Notes Claims in a liquidation.

73. The Debtors have the burden to prove that the holders of CCI Notes Claims are receiving more under the Plan than they would recover in a chapter 7 liquidation. See, e.g., ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 364 (S.D.N.Y. 2007), order aff'd, 544 F.3d 420 (2d Cir. 2008).

74. The Debtors have effectively risk adjusted the potential recoveries at 100%, concluding that there will be $0 additional recoveries. However, this determination is not credible, as the Debtors have not presented any analysis or evidence that they properly evaluated the claims and potential sources of recovery identified by the Trustee.

75.     Given the numerous potential sources of recovery identified by the Trustee, and the Debtors' failure to present sufficient evidence and assign recovery values to the potential causes of action, the Debtors have not met their burden of showing that the holders of CCI Notes Claims are receiving more under the Plan than they would recover in a chapter 7 liquidation.  In re Zaleha, 162 B.R. 309, 316 (Bankr. D. Idaho 1993); In re Future Energy Corp., 83 B.R. 470, 489 n.33 (Bankr. S.D. Ohio 1988).

## VI.     THE DEBTORS' NON-ORDINARY COURSE VOTES WITH RESPECT TO THE HOLDCO NOTES CLAIMS AND CCH NOTES CLAIMS ARE VOID

76.     CCI voted its claims on the Mirror Note under the Plan.  CCI's vote with respect to the Mirror Note was outside the ordinary course of the Debtors' business, and requires Court approval under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 to be given any effect.  See, e.g., In re Remsen Partners, Ltd., 294 B.R. 557, 564 (Bankr. S.D.N.Y. 2003) (noting that a proposed compromise of a breach of contract claim held by the estate must receive "the informed independent judgment of the bankruptcy court", and finding that proposed settlement was not in the best interest of the estate where the settlement would likely not result in any distribution to unsecured creditors).

77.     Given the inherent conflict raised in compromising the intercompany Holdco Notes Claims and CCH Notes Claims, any such compromise must be shown to be entirely fair. See, e.g., Adelphia Commc'ns Corp. v. Rigas (In re Adelphia Commc'ns Corp.), 323 B.R. 345, 384-85 (Bankr. S.D.N.Y. 2005) ("The requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts") (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983)).

78.     The Debtors did not request authority to vote CCI's Holdco Notes Claims or

Holdco's CCH Notes Claims and did not provide any evidence at trial that any corporate oversight was exercised or official authorization provided for the casting of such vote. [FOF ____]. As a consequence, those votes must be disregarded as, among other things, an *ultra vires* act rendering the Plan unconfirmable. **[cite?]**

79. Moreover, the Debtors failure to fully disclose to this Court that they voted the CCH Notes after the voting deadline to avoid a cram down of the CCH Notes Claims class is further evidence of the Debtors' lack of good faith and warrants [designation] of such vote. [See FOF ___].

## VII. THE CCH PLAN HAS NOT BEEN ACCEPTED BY A LEGITIMATE IMPAIRED CLASS AND IS, THUS, UNCONFIRMABLE

80. Even if Holdco's vote with respect to its CCH Notes Claims is not disregarded, it is an insider vote that cannot be counted for purposes of delivering an impaired accepting class at CCH. 11 U.S.C. § 1129(a)(10). Absent Holdco's vote, the non-insider holders of CCH Notes Claims voted to reject the Plan. FOF ¶ 247. Accordingly, the Debtors' only option for satisfying section 1129(a)(10) at CCH was to obtain the acceptance of holders of CCH General Unsecured Claims, which is the only other impaired class that is entitled to vote at that Debtor. However, the CCH General Unsecured Claims is not a legitimate accepting Class.

81. No holder of CCH General Unsecured Claims cast a vote to accept or reject the Plan. FOF ¶ 248. Rather, the Debtors relied on a provision in the Voting Procedures Order to contend that, in the absence of any votes with respect to any CCH General Unsecured Claim, that class would be deemed to accept the Plan. FOF ¶ 249.

82. CCH's Schedules demonstrate that only one creditor was scheduled as holding a general unsecured claim (other than a CCH Notes Claim) at that Debtor. FOF ¶ 250. That creditor's claim against CCH, however, is based on a surety bond that is being assumed under

the Plan. FOF ¶ 250-51. Further, the surety bond claim has been afforded super-priority administrative claim status (FOF ¶ 252) and, consequently, is not properly classified as "impaired."

83. The Debtors have (i) created a class with no claimants, (ii) used procedural voting rules to ensure that an absence of votes in that class qualifies as deemed acceptance of the Plan and (iii) used that deemed affirmative vote to cram down hundreds of millions in claims that voted to reject the Plan. The Bankruptcy Code does not permit such gerrymandering, and therefore the Plan at CCH is unconfirmable.

## VIII. THE HOLDCO PLAN IS NOT CONFIRMABLE

84. .As explained above, CCI's vote of the Holdco Notes is improper and void. Accordingly, the Plan at Holdco cannot be enforced with respect to the Holdco Notes absent satisfaction of the cram down requirements. For all of the reasons set forth below, the Debtors cannot meet this burden.

85. Mr. Allen's wholly-owned subsidiary, CII, is retaining a direct equity interest in Holdco while CCI is receiving less than payment in full (i.e., a 3.9% recovery) on its Holdco Notes Claims, which are senior to CCI's equity. FOF ¶ 254. This is a violation of the absolute priority rule. To date, the Debtors have failed to provide any evidence or legal argument in support of this distribution to an existing equity holder while dissenting, impaired creditors are paid less than the full amount of their claims. See 11 U.S.C. § 1129(b)(2)(B)(ii).

86. The record is devoid of any evidence that the Debtors are withholding interest with respect to the Holdco General Unsecured Claims for an economic or other justifiable reason. FOF ¶ 256. Specifically, the Debtors have provided no evidence regarding the amount of interest, if any, that they intend to withhold in connection with their cash distributions to holders of Holdco General Unsecured Claims. FOF ¶ 256. Further, the Debtors have failed to

present any evidence that they ever considered whether Holdco is capable of making the interest payment with respect to those CCI General Unsecured Claims that they choose to impair. FOF ¶ 257.

87.     The record also does not support the separate classification of the Holdco General Unsecured Claims from Holdco Notes Claims.  FOF ¶ 258.  Moreover, the Debtors have not presented any evidence to suggest that the disparate treatment between the separately classified Holdco Notes Claims (which are receiving approximately 3.9% under the Plan) and the Holdco General Unsecured Claims (which are receiving approximately 100% under the Plan) (i) is supported by a reasonable basis, (ii) was necessary to consummate the plan, (iii) was proposed in good faith or (iv) that the degree of discrimination is proportional to its rationale.  FOF ¶ 259. See In re Buttonwood Partners, Ltd., 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) (applying the above four-factor test in determining whether a plan's proposed treatment unfairly discriminates).

88.     Based on the foregoing, the Holdco Plan (i) artificially impairs Holdco General Unsecured Claims and (ii) unfairly discriminates in favor of such claims by reinstating or paying them in full while Holdco Notes Claims are scheduled to receive distributions of merely 3.9%. Accordingly, the Debtors have failed to meet their burden to demonstrate that the Holdco Plan satisfies the requirements of section 1129(b) and section 1129(a)(10), and therefore the Holdco Plan cannot be confirmed.

## IX.     DISTRIBUTIONS UNDER THE PLAN ARE BASED ON AN IMPROPER AND FLAWED SUBSTANTIVE CONSOLIDATION

89.     The value of each of the Debtors' assets must be scrutinized on a stand-alone basis to determine appropriate distributions under the Plan.  See, e.g., ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.), 361 B.R. 337, 360 (S.D.N.Y.

2007) ("there is a substantial possibility that a reviewing court would find that the Bankruptcy Court erred as a matter of law in confirming the Plan without making a determination of what assets are subject to the payment of the respective claims.  Thus, a reviewing court would likely find that the Bankruptcy Court's confirmation of the Plan violated Appellants' constitutional right to a fair distribution . . . ."), <u>order aff'd</u>, 544 F.3d 420 (2d Cir. 2008).

90.     Here, however, the Debtors only performed an enterprise valuation of their assets. FOF ¶ 260.  The Debtors failed to value the assets held directly by CCI and/or Holdco on a stand-alone basis.  FOF ¶ 261.  Notwithstanding this consolidated approach to asset valuation, the Debtors adhere to corporate separateness when determining how and in what priority assets are to be distributed.  FOF ¶ 262.  This one-sided substantive consolidation of only the asset side of the equation is flawed.  The Debtors simply cannot effectuate a *de facto* consolidation of the assets of all of the Debtors under the Plan, while providing holders of CCI Notes Claims with less than they would receive in an express consolidation.  The *de facto*, partial substantive consolidation on which the Debtors' Liquidation Analysis is premised renders the Plan unconfirmable.

## X.      THE REQUIREMENTS OF SECTION 1129(A)(10) MUST BE SATISFIED FOR EACH DEBTOR'S PLAN ABSENT SUBSTANTIVE CONSOLIDATION

91.     Absent substantive consolidation (which the Debtors have not sought here), each Debtor's plan must satisfy the requirements of section 1129(a), including the requirement that each plan be accepted by an impaired class.

92.     The Debtors' argument that 1129(a)(10) is "a per-plan requirement, not a per-debtor requirement" ignores the reality that a jointly-administration plan of reorganization is a purely procedural tool that cannot affect the substantive rights of the stakeholders.  <u>See</u> <u>In re Leslie Fay Cos.</u>, 207 B.R. 764, 779 (Bankr. S.D.N.Y. 1997); <u>In re I.R.C.C., Inc.</u>, 105 B.R. 237,

238 (Bankr. S.D.N.Y. 1989) ("Joint administration is distinguished from substantive consolidation because it is simply a procedural consolidation designed for administrative convenience and does not affect the substantive rights of the creditors of the different estates.").

93.     The Debtors are attempting to subordinate the wishes of a dissenting creditor of one debtor to those of a creditor of another debtor.  The Second Circuit's decision in <u>Union Sav. Bank</u> v. <u>Augie/Restivo Baking Co.</u> (<u>Augie/Restivo Baking Co.</u>) expressly prohibits this very action.  860 F.2d 515, 520 (2d Cir. 1988).   In disagreeing with the bankruptcy court's rationale for consolidation of the estates, the Second Circuit in <u>Augie/Resitvo Baking</u> held:

> a creditor cannot be made to sacrifice the priority of its claims against *its* debtor by fiat based on the bankruptcy court's speculation that it knows the creditor's interests better than does the creditor itself. The rationale of the bankruptcy judge in the instant case would allow consolidation of two completely unrelated companies upon a finding that the creditors would be better off under some proposed plan involving the joint sale of their assets. The plan would then be **approved under "cram-down" provisions that would subordinate the wishes of the creditors of one debtor to those of the other. We do not read the bankruptcy code to allow such a result.**

<u>Id.</u> (emphasis added).

94.     Accordingly, the requirements of section 1129(a)(10) must be satisfied by each Debtor's plan.  The Debtors' failure to obtain an impaired, accepting class at CCI, Holdco, and CCH render their Plan unconfirmable.

## XI.     THE RELEASES PROPOSED UNDER THE PLAN ARE IMPROPER

95.     The Plan provides numerous non-debtors, including Paul Allen, with blanket releases, which are improper under governing Second Circuit law.[1]  The Second Circuit has held

---

[1] Article X.E of the Plan provides a "full discharge and release to the Debtor Releasees [defined to include the Allen Entities and the Crossover Committee] and their respective property from any and all Causes of Action . . . arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or Plan." Amended Joint Plan of Reorganization at 60.  Pursuant to Article X.D of the Plan, "Debtor Releases" is defined to include "each Releasing Party, including each other Debtor, and each of their respective members, officers,

that such releases are barred under the Bankruptcy Code.  See Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 143 (2d Cir. 2005) ("A nondebtor release in a plan of reorganization should not be approved absent the finding that *truly unusual circumstances render the release terms important to success of the plan.*" (emphasis added)).

96.     There is no evidence of truly unusual circumstances here.  To the contrary, the Debtors' abdication of fiduciary responsibilities in connection with the negotiation process in these cases has been well-documented.  FOF ¶¶ 69-82.

97.     Given the lack of unusual circumstances warranting the extraordinary relief requested, the Plan's release of non-debtors runs contrary to Metromedia and renders the Plan unconfirmable.

## XII.     THE PLAN IS NOT PROPOSED IN GOOD FAITH AS THE ALLEN SETTLEMENT IS NOT FAIR AND DOES NOT SATISFY RULE 9019

### A.     The Allen Settlement is Not Entirely Fair

98.     Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).

99.     A breach of fiduciary duty by a plan proponent mandates a finding that section 1129(a)(3) is not satisfied.  See, e.g., In re Bush Indus., Inc., 315 B.R. 292, 305-06 (Bankr. W.D.N.Y. 2004); In re Coram Healthcare Corp., 271 B.R. 228, 235-40 (Bankr. D. Del. 2001).

100.     A central element of the proposed plan is a settlement between the Debtors and Mr. Allen, the controlling shareholder of CCI and Chairman of CCI's Board of Directors.  [FoF]

---

directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives." "Releasing Parties," in turn, is defined as "(a) the Debtors, (b) the parties who singed Plan Support Agreements with a Debtor, and (c) any statutory committee appointed in the Chapter 11 Cases."  Id. at 15.  Similarly, Article X.G of the Plan provides for the "Exculpation" of those non-debtor parties in connection with their actions in these Cases.

101.     As CCI is incorporated in Delaware, Delaware law governs the analysis of the legality of the settlement between the Debtors and Mr. Allen.  See, e.g., Allied Irish Banks, P.L.C. v. Bank of Am., N.A., No. 03 Civ. 3748(DAB), 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) ("New York law generally applies the law of the state of incorporation to decide claims pertaining to the 'internal affairs' of a corporation") (citations omitted); BBS Norwalk One, Inc. v. Raccolta, Inc., 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999) (applying law of state of incorporation under internal affairs doctrine, which "recognizes that the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations") (citation omitted); Solow v. Stone, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (applying Delaware law to breach of fiduciary duty claims under internal affairs doctrine); see also Edgar v. MITE Corp., 457 U.S. 624, 645 (1982) ("The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders . . . .") (citation omitted).

102.     As the Allen Settlement is a transaction between the Debtors and their controlling shareholder, it is an interested transaction that is subject to the entire fairness standard of review. In re Bush Indus., Inc., 315 B.R. 292, 305-06 (Bankr. W.D.N.Y. 2004); Kahn v. Lynch Commc'n Sys., Inc., 638 A.2d 1110, 1117 (Del. 1994).

103.     In order to meet their burden of demonstrating that the Plan was proposed in good faith, the Debtors must prove that the Allen Settlement, which is the cornerstone of the Plan, is entirely fair.  See, e.g., Bush Indus., 315 B.R. at 305-06; Lynch Commc'n Sys., 638 A.2d at 1117 (Del. 1994); Kahn v. Tremont Corp., 694 A.2d 422, 428 (Del. 1997).

104.     The entire fairness standard has two aspects: fair process and fair price. <u>Tremont</u> <u>Corp.</u>, 694 A.2d at 430; <u>Weinberger</u> v. <u>UOP, Inc.</u>, 457 A.2d 701, 711 (Del. 1983); <u>Gesoff</u> v. <u>IIC</u> <u>Indus. Inc.</u>, 902 A.2d 1130, 1144 (Del. Ch. 2006).

105.     "Fair dealing" or "fair process" focuses on the conduct of the corporate representatives in entering into the transaction, including how it was initiated, negotiated, and structured, and how director approval was obtained.  <u>Tremont</u>, 694 A.2d at 430-31; <u>Int'l</u> <u>Telecharge, Inc.</u> v. <u>Bomarko, Inc.</u>, 766 A.2d 437, 440 (Del. 2000); <u>Weinberger</u>, 457 A.2d at 711. The question is whether the process that took place was an "effective proxy for arm's-length bargaining."  <u>GPX XLI L.L.C.</u> v. <u>Loral Space & Commc'ns Inc.</u> (<u>In re Loral Space & Commc'ns</u> <u>Inc.</u>), C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008); <u>see</u> <u>also</u> <u>Valeant Pharms. Int'l</u> v. <u>Jerney</u>, 921 A.2d 732, 748-49 (Del. Ch. 2007) (finding unfair dealing where "it simply cannot be said that an independent board advised by independent experts would have employed a similar process").

106.     The "fair price" component of entire fairness review "assures the transaction was substantively fair."  <u>Rhodes</u> v. <u>SilkRoad Equity, LLC</u>, C.A. No. 2133-VCN, 2009 WL 1124476, at *2 (Del. Ch. Apr. 15, 2009).  "Fair price" engages all relevant factors of the transaction's economics and requires an examination of the financial metrics the corporate representatives relied upon when valuing the proposed transaction.  <u>See</u> <u>Tremont</u>, 694 A.2d at 431, <u>Weinberger</u>, 457 A.2d at 711, 713.

107.     In order to demonstrate that the Allen Settlement was entirely fair, the Debtors bear the burden of presenting evidence "which demonstrates that the cumulative manner by which it discharged all of its fiduciary duties produced a fair transaction."  <u>Tremont</u>, 694 A.2d at 432.

1. **The Process Was Not Fair**

108.    Whether an agreement was the product of robust arm's-length negotiations is a key indicator of fair process.  Int'l Telecharge, Inc. v. Bomarko, Inc., 766 A.2d 437, 440 (Del. 2000) (lack of meaningful negotiations in a transaction with a CEO and controlling shareholder supported finding of unfair dealing); Valeant, 921 A.2d at 748 (fact that structure was not negotiated supported unfair dealing).

109.    At the start of the restructuring negotiations in December 2008, the Debtors' financial advisor Jim Millstein advised the full board, including Mr. Allen and his representatives, that Mr. Allen was a central element of the restructuring process and that the company should compensate him to obtain his participation.  FOF ¶ 42.  Sept. 2 Tr. 174:5-20 (Conn); Sept. 10 Tr. 60:6-16 (Millstein).  At this point in time the Company should have appointed a Special Committee or developed formal processes to ensure that the negotiation that that would transpire with Mr. Allen to discuss the price that he would be paid for his participation was conducted at arms-length.

110.    The Company's failure to delegate authority to independent directors, equipped with their own financial and legal advisors, to negotiate with Mr. Allen in connection with the restructuring tainted the process that resulted in the Allen Settlement.  See, e.g., Kosseff v. Ciocia, No. Civ.A. 188-N, 2006 WL 2337593, at *8 (Del. Ch. Aug. 3, 2006) (finding a "reasonable possibility" that agreement was reached "at the expense of the corporation" where board "failed to appoint a special committee or independent directors to evaluate the [a]greement").  July 22 Tr. 123:25-124:2 (Smit); July 22 Tr. 248:16-19 (Merritt); Aug. 17 Tr. 219:21-220:17 (Doody); Aug. 31 Tr. 191:12-15 (Johri).

111.    In addition, neither management nor management's advisors negotiated the terms of the consideration that would be provided to Mr. Allen in connection with the Allen

Settlement, notwithstanding the fact that the consideration that is being delivered to Mr. Allen will be paid by the Debtors.  FOF ¶ 79.  Instead, the Debtors' financial advisors saw themselves as mediators between the Crossover Committee and Mr. Allen.  FOF ¶¶ 70-73, 79.  The failure of management and its financial advisors to actively participate in the negotiations that determined the amount of compensation that Mr. Allen would receive from the Debtors further highlights the flaws in the process.  See, e.g., In re Ply Gem Indus., Inc. S'holders Litig., No. Civ. A. 15779-NC, 2001 WL 1192206, at *1 (Del. Ch. Oct. 3, 2001) (finding breach of duty of care claim was stated where directors abdicated responsibility for negotiation of transaction); Nagy v. Bistricer, 770 A.2d 43, 61-62, 65 (Del. Ch. 2000) (granting summary judgment to plaintiffs on claim that directors abdicated their duties to negotiate firm and fair transaction for the benefit of shareholders).

112.    During the course of the negotiation of the Allen Settlement, Mr. Allen's representatives advised the Crossover Committee that Mr. Allen would fire the Board, make the January Interest Payment and then give effect to Mr. Allen's exchange rights if the parties did not reach an agreement, thereby destroying value for the Company.  FOF ¶ 80.  The threats made by Mr. Allen's representatives were credible given that Mr. Allen is the controlling shareholder of CCI.  FOF ¶¶ 39, 68.  The threat to fire the Board was an abuse of Mr. Allen's position as a controlling shareholder and further demonstrates that the process was not fair.

113.    The Board did not properly inform itself with respect to the Allen Settlement. The Board did not receive a valuation of the consideration that Mr. Allen, the controlling shareholder, would receive in connection with the settlement.  FOF ¶ 95.  The Board was not presented with an analysis of the potential legal claims that could be asserted against Mr. Allen that were being released in connection with the settlement.  FOF ¶ 95.  Furthermore, the Board

was not informed of the amount of potential tax exposure that Mr. Allen avoided by entering into the settlement.  FOF ¶ 77.

114.    The Board did not ask for, and did not receive, a fairness opinion from any financial advisor assessing the fairness of the terms of the Allen Settlement.  FOF ¶ 100.

115.    Management, who was responsible for negotiating the settlement with Mr. Allen, also did not explore the downside that Mr. Allen could face if he did not enter into a settlement with the company.  For example, management did not have any understanding of Mr. Allen's tax position.  FOF ¶ 77.  Accordingly, management was not in a position to negotiate effectively with Mr. Allen during the settlement discussions further compromising the process.

116.    The Board and management's failure to inform themselves demonstrates that the process that led to the Allen Settlement was not fair and, in and of itself, constitutes a breach of fiduciary duty under Delaware law.  See, e.g., Bridgeport Holdings Inc. Liquidating Trust v. Boyer (In re Bridgeport Holdings, Inc.), 388 B.R. 548, 565, 569 (Bankr. D. Del. 2008) (allegation that board had not fully and diligently informed itself before approving transaction adequately pleaded breach of fiduciary duties of care and good faith; allegation that officers and directors abdicated negotiations by delegating to restructuring advisor adequately pleaded breach of fiduciary duty of loyalty).

## 2.    The Price of the Allen Settlement Was Not Fair

117.    The "fair price" aspect of entire fairness review "assures the transaction was substantively fair."  Rhodes v. SilkRoad Equity, LLC, C.A. No. 2133-VCN, 2009 WL 1124476, at *2 (Del. Ch. Apr. 15, 2009).  "Fair price" engages all relevant factors of the transaction's economics.  See Kahn v. Tremont Corp., 694 A.2d 422, 431 (Del. 1997), Weinberger v. UOP, Inc., 457 A.2d 701, 711, 713 (Del. 1983).

118.    As this transaction was the product of an unfair process and the price cannot be

analyzed by reference to a reliable market or by comparison to precedent transactions, "the

burden of persuading the court of the fairness of the terms will be exceptionally difficult."

Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 748 (Del. Ch. 2007).  In particular, the absence of

arm's-length negotiations severely undermines the Debtors' ability to argue that the price was

fair.  See HMG/Courtland Props., Inc. v. Gray, 749 A.2d 94, 118 (Del. Ch. 1999) (finding the

absence of a proper negotiator undercut Defendants' assertion that the price was fair); Oliver v.

Boston Univ., No. Civ.A. 16570-NC, 2006 WL 1064169, at *27 (Del. Ch. Apr. 14, 2006) (failure

to establish entire fairness where there was no representative negotiating on behalf of the

minority shareholders).

> a.    The Debtors Failed to Present Sufficient Evidence To Demonstrate
> that the Price of the Allen Settlement Was Fair.

119.    In calculating the value of the Allen Settlement, the Debtors focused on value that

Mr. Allen could deprive the estate of receiving, i.e., value derived from the preservation of NOLs

and the reinstatement of the credit facility.  FOF ¶ 74.  The Debtors ignored the value that the

CCI estate could deprive Mr. Allen of receiving if alternative forms of restructuring were

pursued in analyzing the fairness of the Allen Settlement.  FOF ¶ 77.

120.    According to Mr. Allen's representatives, alternative forms of restructuring could

result in a "large tax liability" for Mr. Allen.  FOF ¶¶ 76, 143-146.  There has been no contrary

evidence presented.   Furthermore, Mr. Allen's counsel has asserted privilege precluding

disclosure of the precise amount of the potential tax liability that Mr. Allen avoided in

connection with agreeing to participate in the Plan that is being proposed, and therefore any

testimony by Mr. Conn regarding Mr. Allen's potential tax liability is entitled to no weight.  FOF

¶¶ 188, 196.

121.    In order to assess the fairness of the transaction, it is appropriate to consider all relevant factors of the transaction's economics.  See Kahn v. Tremont Corp., 694 A.2d 422, 431 (Del. 1997), Weinberger v. UOP, Inc., 457 A.2d 701, 711, 713 (Del. 1983).  The amount of the tax liability that Mr. Allen avoided by agreeing to participate in the restructuring is a relevant factor to consider in assessing the fairness of the Allen Settlement.  See In re Tele-Commc'ns, Inc., S'holders Litig., No. Civ.A. 16470, 2005 WL 3642727, at *14 (Del. Ch. Jan. 10, 2006) (emphasizing the importance of examining price in light of the premium received by the insider, even though price received by the company was higher than market price and within the range of valuations); Oliver, 2006 WL 1064169, at *22 (fair price inquiry must examine the broader consequences of the transaction, not just the actual consideration received).

122.    As the Debtors have failed to present evidence regarding the amount of the tax liability that Mr. Allen avoided, the Court cannot adequately assess whether the price of the Allen Settlement is fair.  Accordingly, the Debtors failed to meet their burden of demonstrating that the Allen Settlement is entirely fair.

   b.  The Price Is Not Fair Because Parties Equally Necessary To Create the Value Mr. Allen is Being Compensated For Are Receiving Nothing.

123.    Courts have consistently stressed that the entire fairness standard requires the Court to examine all aspects of the challenged transaction.  Tremont, 694 A.2d at 432-33; see also Weinberger, 457 A.2d at 711 ("[a]ll aspects of the issue must be examined as a whole"), In re Digex, Inc. S'holders Litig., 789 A.2d 1176, 1207 (Del. Ch. 2000) (examining fair process, fair price, and "any other relevant considerations" in analyzing entire fairness as a whole).  In evaluating the Allen Settlement, the Court must also consider the value that all relevant constituencies will receive.

124. The value that Mr. Allen is being compensated for in connection with the Allen Settlement is the value created from the reinstatement of the bank debt and the preservation of NOLs. Like Mr. Allen, the participation of CCI and Holdco was also necessary to preserve NOLs and reinstate the bank debt. FOF ¶¶ 74-75.

125. Mr. Allen received $209 million to participate in the Plan. FOF ¶ 102. By contrast, CCI and Holdco are receiving no value for their participation in the Plan. FOF ¶ 79.

126. The price that Mr. Allen will be paid in connection with the Allen Settlement is not fair because CCI and Holdco, whose participation is equally necessary to reinstate the bank debt and preserve NOLs, are receiving no value for their participation in the Plan while Mr. Allen is receiving $209 million.

127. As the Allen Settlement, which is the cornerstone of the Plan, is not fair, the Plan proponent has breached its fiduciary duty. See, e.g., Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 736 (Del. Ch. 2007) (finding defendants who approved transaction that was not entirely fair liable for breach of duty of loyalty); Del. Open MRI Radiology Assocs., P.A. v. Kessler, 898 A.2d 290, 312-13, 344 (Del. Ch. 2004) (same). Accordingly, the Court cannot find that the Plan has been proposed in good faith. See, e.g., In re Bush Indus., Inc., 315 B.R. 292, 305-06 (Bankr. W.D.N.Y. 2004); In re Coram Healthcare Corp., 271 B.R. 228, 235-40 (Bankr. D. Del. 2001).

**B.      The Allen Settlement Cannot be Approved Under Rule 9019**

128. The Debtors request this Court to approve the Allen Settlement under Bankruptcy Rule 9019.

129. A bankruptcy court may only approve a compromise and settlement if it is fair, reasonable and adequately based on the facts and circumstances before the court. See, e.g., Plaza Equities LLC v. Pauker (In re Copperfield Invs., LLC), 401 B.R. 87, 91 (Bankr. E.D.N.Y. 2009) (citing Fed. R. Bankr. P. 9019); see also Motorola, Inc. v. Official Comm. of Unsecured

Creditors (In re Iridium Operating LLC), 478 F.3d 452, 461-62 (2d Cir. 2007) (Bankruptcy Rule 9019 has a "'clear purpose . . . to prevent the making of concealed agreements which are unknown to creditors and unevaluated by the court.'" (quoting In re Masters, Inc., 141 B.R. 13, 16 (Bankr. E.D.N.Y.), order aff'd, 149 B.R. 289 (E.D.N.Y. 1992)).

130.    Courts in the Second Circuit have set forth factors for approval of settlements based on the original framework announced by the Supreme Court in Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968).  See, e.g., Iridium Operating, 478 F.3d at 462.  Those factors are as follows:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting , and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement; (6) "the nature and breadth of releases to be obtained by officers and directors"; and (7) "the extent to which the settlement is the product of arm's length bargaining."

Id. (emphasis added) (citing In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); TMT Trailer Ferry, 390 U.S. at 424; S.E.C. v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 960 F.2d 285, 292 (2d Cir. 1992)).

131.    Courts subject settlements with insiders to closer scrutiny than agreements between the debtor and unrelated entities.  In re Drexel Burnham Lambert, Inc., 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991); see also In re Dalen, 259 B.R. 586, 613 (Bankr. W.D. Mich. 2001) ("the debtor-in-possession's discretionary request for the court to approve the proposed settlement imposes upon the court the obligation to ensure that the court itself will not be later embarrassed by improvidently approving a proposed settlement when it was clear that the

settlement unfairly favored the interests of an insolvent debtor's shareholders or third parties over the interests of the debtor's creditors.").

132. The Allen Settlement cannot be approved under Rule 9109 for the following reasons:

- <u>First</u>, the Allen Settlement is not the product of arms-length bargaining.

- <u>Second</u>, the Allen Settlement was not reviewed and approved by unconflicted counsel. Given that CCI's counsel in these chapter 11 cases serves as counsel to all of the Debtors, including CCHC, CC VIII and CCO—all which stand to benefit greatly from the Allen Settlement—the presence of such conflicted counsel weighs against the fairness of the settlement.

- <u>Third</u>, holders of CCI Notes Claims have voted overwhelmingly to reject the Plan and, by extension, the Allen Settlement.

- <u>Fourth</u>, the Allen Settlement significantly injures CCI's creditors by distributing value to Mr. Allen that would otherwise be available for the satisfaction of their Claims in violation of the absolute priority rule.

- <u>Fifth</u>, the Allen Settlement is additionally improper in that it fails to confer any benefit whatsoever upon CCI or its creditors. As set forth in <u>Iridium Operating</u>, the Court is required to assess the overall benefits conferred by a settlement as compared to litigation between the Debtors and Mr. Allen. Here, neither Mr. Allen nor his affiliates have provided CCI or its existing creditors with anything of value in exchange for the consideration they are receiving under the settlement.

- <u>Sixth</u>, the Allen Settlement is not entirely fair.

**C.    The Debtors Breached their Fiduciary Duties in Connection with Negotiating the Plan and Raiding Holdco/CCI's Assets**

133.    As of September 2008, CCI's liabilities exceeded its assets rendering CCI insolvent.  FOF ¶¶ 15-17.  Because CCI was insolvent by September 2008, CCI's directors and management owed fiduciary duties to CCI's creditors at least as of that date.  See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 101-02 (Del. 2007).  Accordingly, CCI's board and management had an obligation to protect the interests of CCI's creditors during this time and take action to preserve the assets of CCI's estate.  Official Comm. of Unsecured Creditors of High Strength Steel, Inc. v. Lozanski (In re High Strength Steel, Inc.), 269 B.R. 560, 569 (Bankr. D. Del. 2001).

134.    Under Delaware law, corporate waste is "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."  In re Nat'l Auto Credit, Inc. S'holders Litig., No. Civ.A. 19028, 2003 WL 139768, at *13 (Del. Ch. Jan. 10, 2003); Rothenberg v. Santa Fe Pac. Corp., Civ. A. No. 11749, 1995 WL 523599, at *5-6 (Del. Ch. Sept. 5, 1995).  In reviewing suspect transactions, courts examine whether, under all of the circumstances, the transaction was actually worthwhile.  See Nat'l Auto Credit, 2003 WL 139768, at *13.

135.    Actions taken for the benefit of multiple affiliated debtors do not relieve the officers and directors of individual debtors from their fiduciary duty to maximize the value of their individual debtor estates.  See Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 520 (2d Cir. 1988); Gans v. MDR Liquidating Corp., No. 9630, 1998 WL 294006, at *3 (Del. Ch. May 22, 1998).

136.    CCI's board and management breached their fiduciary duties when they abdicated their responsibilities to represent the interests of CCI's stakeholders in the restructuring

negotiations, essentially allowing Mr. Allen and the Crossover Committee to apportion between themselves the "excess value" from the preservation of the Company's tax attributes and ability to reinstate the bank debt.  FOF ¶¶ 79-80.

137.     CCI's Board and management also breached their fiduciary duties by dissipating Holdco and CCI's assets in a series of transactions that benefitted other entities in the capital structure to the detriment of CCI's stakeholders.  FOF ¶¶ 7-38, 86-91.

138.     The Debtors' explanation that such transfers benefited the enterprise as a whole does not justify the transfers, as actions taken for the benefit of multiple affiliated debtors do not relieve the officers and directors of individual debtors from their fiduciary duty to maximize the value of their individual debtor estates.  Augie/Restivo Baking, 860 F.2d at 520; Gans, 1998 WL 294006, at *3.

### 1.     The Board Breached its Fiduciary Duties by Failing to Negotiate for CCI's Interests

139.     The Plan cannot be proposed in good faith to the extent Mr. Allen, as the controlling shareholder of the Company, was able to extract substantial compensation from the Crossover Committee when at the same time none of the fiduciaries of CCI, which had equal leverage, sought any compensation for CCI and its stakeholders.  See Oliver v. Boston Univ., No. Civ.A. 16570-NC, 2006 WL 1064169, at *29 (Del. Ch. Apr. 14, 2006) (fact that no party negotiated on behalf of minority common stockholders created "fundamental failures" of fair process).

140.     Mr. Allen bargained aggressively with the Crossover Committee to obtain value from the Crossover Committee for his participation in the Plan which allowed for the reinstatement of the credit facility and preservation of NOLs and received more than $200 million of consideration.  CCI's participation in the Plan was also necessary to reinstate the

credit facility and to preserve NOLs. Yet CCI's management and its advisors did not negotiate on CCI's behalf and CCI did not receive any consideration for its participation in the Plan. Instead, CCI's management and advisors served as mediators in the negotiation between Mr. Allen and the Crossover Committee. FOF ¶¶ 70-73, 79.

141. The failure of management and its advisors to negotiate to maximize the value of CCI's recovery during the restructuring negotiations constitutes a breach of fiduciary. See Oliver, 2006 WL 1064169, at *29 (fact that no party negotiated on behalf of minority common stockholders created "fundamental failure" of fair process).

142. A breach of fiduciary duty by a plan proponent mandates a finding that section 1129(a)(3) is not satisfied. See, e.g., In re Bush Indus., Inc., 315 B.R. 292, 305-06 (Bankr. W.D.N.Y. 2004); In re Coram Healthcare Corp., 271 B.R. 228, 235-40 (Bankr. D. Del. 2001).

143. The Plan was not proposed in good faith because Mr. Allen, the controlling shareholder of the Company, negotiated with the Crossover Committee and obtained substantial consideration for his participation in the Plan. On the other hand, the Plan proponents, the fiduciaries of CCI, which had the same leverage as Mr. Allen, failed to negotiate on behalf of CCI and its stakeholders, and as a result CCI and its stakeholders will receive no consideration for its participation in the Plan.

## 2. The Board Breached Their Fiduciary Duties by Failing to Compensate CCI for the Full Amount of the January Interest Payment

144. In connection with entering into the Term Sheet which led to the Plan, the CCI's Board and management authorized a capital contribution from Holdco to CCH and CIH in the amount of $75 million on February 11, 2009 so that CCH and CIH could pay interest on certain of their notes. FOF ¶ 87.

145. It was clear at the time the transfer was approved that Holdco would not receive reasonably equivalent value in return for this transfer. Indeed, the Board and Management understood at the time the transfer was approved that CCH and CIH would be filing for bankruptcy, and, in fact, Holdco is not receiving any distribution under the Plan on account of such capital contribution. JPX 266 (Disclosure Statement) at 5.

146. In addition to failing to provide Holdco any distribution under the Plan for making the $75 million capital contribution on February 11, 2009, the Debtors have failed to account for the full amount of this transfer in their liquidation analysis. FOF ¶ 93. Indeed, the Debtors have only accounted for the $48 million of the January Interest Payment that was paid to the Crossover Committee and placed in escrow.

147. The Debtors' failure to compensate Holdco for the full amount of the January Interest Payment under the Plan or to account for the full amount of such transfer in the liquidation analysis evidences a lack of good faith in the proposal of the Plan. See, e.g., Bush Indus., 315 B.R. at 305-06; Coram Healthcare, 271 B.R. at 235-40.

148. The transfer of Holdco's assets pursuant to the January Interest Payment amounts to corporate waste because it was not for proportionate consideration and was not worthwhile at the time the transfer was made. Nat'l Auto Credit, 2003 WL 139768, at *13; Rothenberg, 1995 WL 523599 at *5-6. The board and management knew that CCH and CIH were insolvent and a restructuring was imminent when the Company used Holdco's assets to pay interest owing from CCH and CIH. CX 225 (11/14/08 Telephonic Board Meeting Book) at 4. By not obtaining proportionate consideration for the full amount of the January Interest Payment, CCI's board effectively gifted $27 million of Holdco's cash to other creditors without receiving any value in return.

### 3. The Systematic Dissipation of Holdco's Assets

149. The transfers of Holdco assets in April, October and November 2008 also constituted breaches of fiduciary duty and corporate waste. FOF ¶¶ 7-38.

#### a. The November Capital Contribution

150. On or about November 17, Holdco made a capital contribution in the amount of $8.4 million to CCH to allow CCH to make interest payments on certain of its notes. For ¶ 30.

151. At the time of the November capital contribution, Holdco and CCH were both insolvent. The material that was presented to the Board, including a valuation from Duff & Phelps, indicated that CCH had a negative surplus of $187 million at the time. FOF ¶¶ 15, 16, 35. At the time that management and the Board approved this transfer, they knew that a restructuring was imminent as the Company had retained Kirkland & Ellis as restructuring advisors just days before. FOF ¶ 27.

152. Holdco received nothing in exchange for this capital contribution. FOF ¶ 32. As the Company's General Counsel and CRO described it, the money simply "came out of Holdco's pocket." FOF ¶ 32.

153. The Debtors' failure to compensate Holdco for the November Capital Contribution under the Plan or to account for such transfer in their liquidation analysis evidences a lack of good faith in the proposal of the Plan. See, e.g., Bush Indus., 315 B.R. at 305-06; Coram Healthcare, 271 B.R. at 235-40.

154. CCI's Board and management breached their fiduciary duties by permitting Holdco to make a capital contribution to CCH on or about November 17 without receiving reasonably equivalent value in exchange. FOF ¶ 32.

155. The transfer of Holdco's assets pursuant to the November capital contribution to CCH amounts to corporate waste as it was not for proportionate consideration and was not

worthwhile at the time the transfer was made. The board and management knew or should have known that CCH was insolvent and a restructuring was imminent when the Company dissipated Holdco's assets. FOF ¶ 34. CCI's board effectively gifted $8.4 million of Holdco's cash to other creditors without receiving any value in return.

b.    The October Tender Offer

156.    The Company completed a tender offer in October 2008 pursuant to which Holdco paid $99 million in cash to purchase $102 million of CCH notes. FOF ¶ 22.

157.    At the time management authorized and executed the tender offer in October, Holdco and CCH were both insolvent. According to a valuation and waterfall analysis prepared by Duff & Phelps, as of October 1, CCI had a negative surplus of $735 million, Holdco had a negative surplus of $727 million, and CCH had a negative surplus of $183 million. FOF ¶¶ 15, 16. The Board had also began discussing contingency planning in this time period, including a potential bankruptcy filing. FOF ¶ 19.

158.    Holdco did not receive reasonably equivalent value in return for its purchase of CCH notes in the October tender offer. Holdco will only recover 0.4% on the face value of the CCH notes it purchased in October for a total recovery of $408,000 on investments of $99 million. FOF ¶ 25.

159.    CCI's Board and management breached their fiduciary duties by permitting Holdco to tender for CCH notes in October 2008 without receiving reasonably equivalent value in exchange.

160.    The Debtors' failure to account for the October Tender Offer in their liquidation analysis evidences a lack of good faith in the proposal of the Plan.    See, e.g., Bush Indus., 315 B.R. at 305-06; Coram Healthcare, 271 B.R. at 235-40.

161.    The transfer of Holdco's assets pursuant to the October tender offer amounts to corporate waste as it was not for proportionate consideration and was not worthwhile at the time the transfer was made.  The board and management knew or should have known that CCH was insolvent and a restructuring was imminent when the Company dissipated Holdco's assets.  FOF ¶¶ 15, 16, 19.  CCI's board effectively gifted $99 million of Holdco's cash to other creditors in exchange for the inadequate sum of $400,000 that Holdco will receive under the Plan.  FOF ¶ 25.

### c.    The April Purchase of CCH Notes

162.    In April 2008, in a series of private transactions, Holdco repurchased approximately $35 million of various CCH notes for approximately $35 million of cash.  FOF ¶ 7.

163.    Holdco continues to hold the CCH notes that it purchased in April 2008.  FOF ¶ 9.  Under the Plan, which calls for .4% recovery on the CCH notes, Holdco will recoup approximately $140,000 on this $35 million investment in CCH notes.  FOF ¶ 9.  As such, Holdco did not receive reasonably equivalent value for its purchase of  the CCH Notes in April.

164.    CCI's Board and management breached their fiduciary duties by using Holdco funds to purchase CCH notes in April 2008 without receiving reasonably equivalent value in exchange.  FOF ¶¶ 8, 9.

165.    The Debtors' failure to account for the April Purchase of CCH Notes in their liquidation analysis evidences a lack of good faith in the proposal of the Plan.  See, e.g., Bush Indus., 315 B.R. at 305-06; Coram Healthcare, 271 B.R. at 235-40.

## CONCLUSION

166.    The Debtors have failed to meet their burden of proving compliance with each of

the requirements of 11 U.S.C. § 1129 therefore the proposed Plan cannot be confirmed.

Dated:  New York, New York
        September 18, 2009

                                    WHITE & CASE LLP

                            By:   /s/ Gerard Uzzi
                                  Gerard Uzzi (GU-2297)
                                  Dwight A. Healy (DH-9305)
                                  Karen M. Asner (KA-5950)
                                  Andrew Hammond (AH-0415)
                                  Gregory M. Starner (GS-1719)
                                  1155 Avenue of the Americas
                                  New York, NY 11036-2787
                                  (212) 819-8200

                                  *Counsel for Law Debenture Trust
                                  Company of New York as Indenture
                                  Trustee for the CCI Notes*