UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11435(JMP)

-----------------------------------x

In the Matter of:

  CHARTER COMMUNICATIONS, INC.,

            Debtor.


-----------------------------------x

                    U.S. Bankruptcy Court

                    One Bowling Green

                    New York, New York

                    October 15, 2009


B e f o r e:

  HON. JAMES M. PECK

  U.S. BANKRUPTCY JUDGE


(Transcription from audio file)

1              THE COURT:  Be seated, please.

2              This was my idea.  I recall that at

3     the close of the last session on October 1 that I

4     was mindful of the October 15th date and that

5     today is October 15.  I recognize that the task

6     that was before the Court was a challenge, not

7     only because of the intrinsic nature of the issues

8     that have presented here, but because, unlike some

9     of you, this is not the only thing I work on.  And

10    I want pretty much to be responsive to not only

11    the somewhat arbitrary deadline established by the

12    plan support agreements as it has been extended

13    from time to time, but also in light of the public

14    interest in the issues that are before the Court

15    to be able to provide as early an indication as I

16    can as to how I view the issues.

17             So the procedure that I have in mind

18    for today is, by my own admission, unusual.  I'm

19    going to provide what amounts to a preview of what

20    would be the written decision that would accompany

21    my rulings with respect to confirmation and also

22    the issues that are pending in connection with the

23    adversary proceeding brought by JPMorgan Chase.

24             I thought about doing this in a

25    couple of ways.  One was to just tell you how I

1   was going to rule and ask you to be patient. But

2   I decided that that was probably not a

3   particularly good approach given that people are

4   paying attention to this and are looking for

5   something more definitive.

6         So what I'm going to do, and I hope

7   you are all patient, but of course I was patient

8   for days with your openings and closings, I'm

9   going to read into the record my work product to

10   this point, and it represents I believe a fully

11   considered view of the issues that are important

12   in the case, but it does not yet reflect finality

13   in terms of the findings of fact and conclusions

14   of law. Importantly, it reflects how I have

15   deliberated with respect to the issues in dispute

16   and how I have resolved the conflicts that have

17   been present in this courtroom since before the

18   trial began.

19         As a result, no pun intended, we

20   have reached the beginning of the end. Since

21   these cases were filed on March 27, 2009, Charter

22   Communications, Inc., I define that as CCI, and

23   together with its affiliates, Charter, has been

24   engaged in one of the most hotly contested

25   confirmation battles ever conducted. The conflict

1    certainly is one of the longest and no doubt also

2    among the most costly.

3              The Court heard extensive testimony

4    and argument for 19 days, during the period from

5    July 20 through October 1, 2009.  At stake was the

6    reorganization and recapitalization of the

7    country's fourth largest cable television company,

8    a leading provider of broadband and cable

9    television services, now under the control of Paul

10   Allen, co-founder of Microsoft and a public figure

11   due to his personal wealth and accomplishments.

12             Partly due to the importance of the

13   issues and partly due to Mr. Allen's prominence

14   and the billions that he has invested in Charter,

15   these cases are highly visible and have generated

16   considerable public interest.  These are perhaps

17   the largest and most complex prearranged

18   bankruptcies ever attempted and in all likelihood

19   rank among the most ambitious and contentious as

20   well.

21             The business proposition presented

22   aims high, particularly at a time of great

23   dislocation, uncertainty and volatility in the

24   economy.  Charter seeks to remove more than $8

25   billion from its highly leveraged capital

1     structure, to secure the investment of

2     approximately $1.6 billion in new capital through

3     a rights offering backstopped by a group of

4     bondholders that will be appointing members at

5     CCI's reconstituted board, and to reinstate a

6     senior secured credit facility and certain junior

7     secured debt with the objective of preserving

8     favorable existing credit terms and saving

9     hundreds of millions of dollars in incremental

10    annual interest expense but otherwise would be

11    payable if this senior secured debt had to be

12    replaced at current market pricing.

13            JPMorgan Chase, as agent for the

14    syndicate of senior lenders, forcefully and

15    skillfully asserts that reinstatement is not an

16    available option here due both to existing events

17    of default relating to the pre-petition financial

18    condition of certain holding companies within the

19    Charter corporate structure and to a change of

20    control default that they claim will occur on the

21    effective date of the plan in violation of

22    covenants in the senior secured credit agreement

23    mandating that Mr. Allen retain a stipulated

24    minimum percentage of voting control.  The

25    restructuring premise depends upon Mr. Allen's

1    holding not less than 35 percent in voting power

2    over the management of Charter Communications

3    Operating LLC, the operating company borrower

4    named in the senior credit agreement.

5            This aspect of the transaction

6    requires approval of a settlement between

7    Mr. Allen and Charter in which Mr. Allen agrees to

8    maintain his voting percentage at 35 percent as a

9    means to avoid triggering the applicable change of

10   control covenants and to preserve valuable tax

11   attributes.  This nominal retention of voting

12   power has been attacked as a gimmick fashioned by

13   corporate lawyers to obscure takeover of the

14   company by bondholders that are well known for

15   their use of so-called loan to own strategies.

16   The restructuring effectively wipes out

17   Mr. Allen's $8 billion investment in Charter and

18   strips him of any meaningful ongoing economic

19   interest in the company.

20           Regardless of the residual voting

21   power to be held by Mr. Allen, no one seriously

22   disputes that Mr. Allen is walking away from his

23   investment in Charter and is agreeing to maintain

24   his voting power as a structuring device that

25   benefits Charter and its stakeholders.  In

1   practical terms, Charter will cease to be a Paul

2   Allen company assuming that the plan is

3   consummated.  His exit clears the way for new

4   investors to influence the management of a

5   restructuring Charter.

6          While this creative arrangement to

7   preserve value clearly benefits Mr. Allen, it was

8   not his idea.  Lazard Freres, as restructuring

9   advisor to Charter, was the chief architect.

10  Lazard recognized the vital importance to the

11  reorganization of avoiding a change of control by

12  means of a structure in which Mr. Allen would

13  agree to retain the requisite voting power.

14         As a consequence, and despite the

15  fact that all CCI shareholders will lose

16  everything as their equity is cancelled, Mr. Allen

17  as controlling shareholder occupies a position of

18  strength in these cases.  His willingness to

19  participate in the structure is pivotal to two

20  sources of value for the Charter estates, the

21  ability to hold on to attractively priced

22  financing and to preserve net operating losses to

23  shelter future income.

24         Mr. Allen, acting through his

25  representatives, has demanded and has secured the

1   right to receive substantial compensation in

2   exchange for his cooperation.  These bargained-for

3   gives and gets relating to the settlement with

4   Mr. Allen have been challenged by Law Debenture

5   Trust Company, the indenture trustee for the CCI

6   noteholders.  The noteholders also complain at

7   length that they have been shortchanged and that

8   the plan proposed by Charter has not treated them

9   fairly and is not confirmable.

10              As expected in cases involving

11  billions of dollars and unusually complex legal

12  issues that are both fact intensive and subject to

13  differing interpretations and characterizations,

14  tremendous resources have been dedicated to this

15  litigation.  The issues presented are important

16  ones, whether the restructuring arrangements

17  negotiated pre-petition with an informal committee

18  of bondholders known as the Crossover Committee

19  are appropriate and should be confirmed, whether

20  defaults exist that preclude reinstatement of

21  senior secured indebtedness, whether the most

22  junior creditors in the capital structure are

23  receiving more value than they would receive in a

24  liquidation, and whether the so-called linchpin

25  settlement between Charter and Mr. Allen is

1    reasonable and should be approved.

2              Notably, the issues arise in an

3    uncommonly complicated setting, a large,

4    operationally sound business saddled with almost

5    $22 billion in debt at various levels of a capital

6    structure stacked with multiple intermediate

7    limited liability holding companies.  This complex

8    enterprise is endeavoring with singular creativity

9    and determination to reduce its heavy debt load

10   and recapitalize itself during perhaps the most

11   challenging period in the modern era of global

12   corporate finance.

13             Given the state of the capital

14   markets, the restructuring proposed here by

15   Charter represents an extraordinary achievement,

16   provided that the resulting plan of reorganization

17   is confirmable as a matter of bankruptcy law, and

18   that is the task for the Court, to determine based

19   on the evidence whether this plan designed in the

20   midst of an historic financial crisis succeeds in

21   reaching its lofty goals.  This subject matter,

22   reinstatement, the Allen settlement, and fairness

23   of treatment proposed under the plan, is addressed

24   generally in this opinion.

25             Following careful deliberation, the

1    Court finds that Charter has met its burden and

2    that the plan should be confirmed.

3              I will start with a review of

4    pre-petition negotiations.

5              Following the bankruptcy of Lehman

6    Brothers Holdings Incorporated on September 15,

7    2008, the global credit markets went into the

8    financial equivalent of cardiac arrest.

9    Commercial lending came to a virtual halt.  Smart,

10   sophisticated and otherwise confident

11   businesspeople panicked.  No one who went through

12   the period will ever forget the fear engendered by

13   a worldwide crisis of confidence and the inability

14   to obtain credit by conventional means.  This was

15   the context for much of the evidence presented

16   during the trial of this matter.

17             Charter was a highly leveraged

18   company under the control of a prominent man with

19   enormous personal wealth.  The company had a

20   patron with deep pockets and a variety of

21   financing and refinancing options available to it

22   during normal credit market conditions.  Those

23   options became far more limited in the immediate

24   aftermath of the upheaval of last fall.

25             I'm going to make what's really a

1  footnote aside.  The Court notes that global

2  economic conditions have improved and stabilized

3  greatly in the last year.  In the quarter just

4  ended, the Dow and S&P 500 experienced their best

5  gains in a decade and yesterday the Dow reached

6  10,000.

7          The credit markets are also in

8  better shape than they were last year but

9  reportedly are still not functioning normally.

10  Thus, timing of the negotiations is a factor that

11  cannot be ignored.  The crisis mentality of last

12  fall spawned this restructuring but it is being

13  evaluated from the perspective of a now more

14  stable and stronger financial sector.  The Court

15  recognizes that given the positive turn in the

16  markets, the valuation of Charter by Lazard for

17  purposes of this restructuring may have been

18  performed at a trough in the market for peer

19  companies in the cable industry.  That does not

20  alter the facts, however.

21          No expert has given a credible

22  opinion as to value that contradicts the plan

23  value, and the expert called by JPMorgan Chase

24  with regard to surplus calculations indicated that

25  the absence of a competing transaction at a higher

1  value tends to confirm the reliability of the

2  value of the transaction described in Charter's

3  plan.

4           The board, senior management and

5  Charter's advisors certainly were aware that the

6  company was in serious trouble due to the

7  dislocation of the credit markets, lower valuation

8  multiples applicable to peer companies in the

9  cable sector and its own excessive leverage.

10 Charter needed to restructure promptly to avoid a

11 potentially catastrophic freefall bankruptcy and

12 it did so in what may be record time.

13          The principal architect of Charter's

14 strategy during the period of 2008 through

15 February of 2009 was Jim Milstein who at the time

16 was co-head of the restructuring practice at

17 Lazard and who now works as the senior

18 restructuring officer for the U.S. Treasury.

19 Mr. Milstein had been an advisor to Charter for a

20 number of years and had worked on the design of

21 Charter's many layered tax-driven holding company

22 structure.  His advice helped to guide Charter's

23 board throughout this critical period.

24 Mr. Milstein was behind the decision to engage in

25 a high velocity negotiation with the bondholders

1   while leaving the senior debt in place to take

2   full advantage of favorable pricing applicable to

3   the existing senior indebtedness.  Given the

4   uncertainty in the credit markets at the time, it

5   was also unclear whether a senior credit facility

6   this large could be replaced at all on any terms.

7          His strategy was to prevent a change

8   of control by motivating Mr. Allen to retain his

9   voting power over management, to encourage the

10  bondholders to organize an ad hoc committee, the

11  so-called Crossover Committee, that would retain

12  experienced restructuring professionals at

13  Charter's expense, and to trim debt and raise new

14  equity by having holders of Fulcrum debt

15  securities convert their bonds to equity interests

16  and agree to invest in the reorganized capital

17  structure.

18          Mr. Milstein and his colleagues at

19  Lazard started to implement this strategy in

20  December.  On December 12, 2008 the company issued

21  a press release announcing the commencement of

22  discussions with bondholders about potential

23  restructuring options and through Lazard urged the

24  bondholders to get organized.  The negotiations

25  were given an added sense of urgency when Charter

1    elected not to make an interest installment due in

2    the middle of January and took advantage of the

3    30-day grace period.  That decision not to pay

4    interest energized the discussions among Charter,

5    the Crossover Committee and Mr. Allen related to a

6    so-called straw man proposal for restructuring the

7    enterprise.  All parties who participated in this

8    process confirm that the negotiations were pursued

9    aggressively, at arm's length, and in good faith,

10    resulting in an agreement among Mr. Allen and

11    certain members of the Crossover Committee that

12    has become the foundation of Charter's

13    prenegotiated plan.

14          This agreement succeeded in

15    eliminating the risks of the freefall bankruptcy

16    while providing for new investment, debt

17    forgiveness, preservation of intangible assets,

18    and a stripping down of Mr. Allen's economic

19    stake.  The resulting plan, however, has attracted

20    quite a lot of criticism.  Parties who are not at

21    the table during this process have become the main

22    objectors to confirmation.  The senior lenders

23    complain that they are impaired and that their

24    debt may not be reinstated.  They allege a series

25    of nonmonetary defaults under the senior credit

1    agreement but they openly admit that their goal

2    here is to obtain an interest rate that reflects

3    what will be charged for a new loan in the current

4    market for syndicated commercial loans.

5            The senior lenders have been paid

6    everything that they are due under the existing

7    facility and they have even received default

8    interest during the bankruptcy cases.  The claim

9    to defaults are the means by which the lenders

10   hope to improve their return by obtaining a

11   premium over amounts payable over the existing

12   loan documentation.

13           JPMorgan and other members of the

14   lending syndicate are troubled that they are being

15   denied the chance to renegotiate the terms of the

16   loan and that bondholders who invested at a junior

17   level of the capital structure are poised to

18   greatly improve their own internal rate of return

19   at the lender's expense.

20           Viewed simplistically, the

21   litigation over confirmation amounts to an

22   intercreditor dispute over which class of

23   creditors should receive enhanced returns.  Viewed

24   more theoretically, the litigation is a test of

25   the Chapter 11 process itself.  The parties who

1    negotiated the plan did so knowing that this major

2    struggle with the lenders would follow.

3    Accordingly, this contest is the culmination of

4    calculated pre-bankruptcy planning that might even

5    be called a gamble designed to obtain significant

6    restructuring benefits over the foreseeable,

7    strenuous objections of formidable adversaries.

8                    The next section of this is surplus

9    and the ability to pay debts as they come due.

10                   JPMorgan contends that Charter had

11   reason to know that it was in serious financial

12   trouble on November 5, 2008 when it elected to

13   draw down $250 million on its senior credit

14   facility even though its enterprise value was

15   depressed to the point that financial disaster was

16   foreseeable.  The case against reinstatement

17   really starts here at a board meeting convened in

18   November to consider whether there was adequate

19   surplus to move cash from one level of the capital

20   structure to another by means of dividends from

21   CCO to those designated holding companies that

22   needed to make upcoming scheduled interest

23   payments.

24                   JPMorgan contends that Charter

25   recognized the gravity of the situation and now

1   that it was in the midst of a genuine crisis at

2   this point.  The Court heard a great deal of

3   testimony from a number of witnesses regarding

4   Charter's corporate state of mind in November and

5   its self-awareness as to the fair value of the

6   enterprise.  JPMorgan's thesis is that there is a

7   connection between the determination of surplus

8   for purposes of being able to make a permissible

9   cash distribution under Delaware corporate law and

10  the occurrence of a default under the senior

11  credit agreement.

12          Expert witnesses offer conflicting

13  opinions during the trial on the question of

14  whether certain of Charter's designated holding

15  companies as defined in the senior credit

16  agreement had adequate surplus as of the date

17  Charter began $250 million under that facility.  A

18  finding of surplus would require a total

19  enterprise value of not less than $18.7 billion.

20  Notably, the enterprise value for purposes of

21  Charter's plan is well below that figure at $15.4

22  billion.

23          The surplus calculation relates to

24  the contention of JP Morgan that certain

25  designated holding companies at the time could not

1  prospectively pay their debts as they came due in

2  violation of Section 8(G)(5) of the credit

3  agreement.  This alleged default is central to

4  JPMorgan's adversary complaint seeking a

5  determination that the default precludes

6  reinstatement of the indebtedness evidenced by the

7  senior credit facility.

8  The Court is satisfied that the

9  Charter board acted reasonably when it relied on

10  its advisors in determining that there was

11  adequate surplus at the designated holding company

12  level even though in hindsight other plausible

13  alternative valuation scenarios might place

14  Charter's enterprise value below the minimum

15  amount needed for finding surplus.  The Court does

16  not believe that sufficient evidence was presented

17  to establish the designated holding companies were

18  unable to meet their obligations as they came due.

19  Valuing a business such as Charter's

20  is neither simple nor objective and no single

21  generally accepted standard exists for measuring

22  value.  Valuation of an enterprise as complex as

23  this one calls for using multiple approaches to

24  value, comparing the business with others having

25  similar characteristics, making appropriate

1    adjustments, and reasoning by analogy.  The art of

2    valuing a business requires the exercise of

3    well-informed judgment.  Experts in corporate

4    valuation are often required to do multiple

5    valuation methodologies that are not always

6    congruent and consistent.  These methodologies

7    include comparable companies, precedent

8    transactions, publicly-available market data,

9    including the views of Wall Street analysts, and

10   the use of a discounted cash flow analysis that

11   depends on projections of future free cash flows

12   and mathematical calculations.

13                In the case of Charter, other

14   factors to be considered include the treatment of

15   tax attributes and the possible addition of a

16   so-called control premium.  In part due to the

17   complexity of the valuation process and in part

18   due to the frequent role of the valuation expert

19   as an advocate for a particular value proposition,

20   bankruptcy courts commonly confront conflicting

21   opinions as to value offered by qualified

22   professionals.  This case is no exception.

23   Witnesses testified regarding valuation issues

24   from Lazard, FTI Consulting, Alix Partners,

25   Alvarez & Marsal, and Duff & Phelps.  Not

1    surprisingly, these witnesses focused on different

2    considerations and did not agree with each other.

3            Depending on the weight given to the

4    testimony of these witnesses, the Court can

5    conclude that Charter's business was worth more

6    than $21 billion in November of 2008 or as little

7    as $15.4 billion in September of 2009.  The swing

8    in value is major and hard to reconcile.  The

9    challenge in fairly valuing Charter is also

10   illustrated by the fact that conflicting

11   indications of value were offered by Charter

12   itself.

13           With respect to the subject of

14   Charter's provable enterprise value at different

15   points in time, the Court finds itself in a

16   quandary of wondering what happened to all that

17   money and questioning the dependability of much of

18   the valuation evidence that has been presented.

19   Billions of notional dollars have disappeared

20   during a period when the markets have stabilized

21   and when no corporate event has taken place that

22   would explain any sharp decline in value.

23   Conveniently, Charter asserts that its business

24   was worth more during the turbulent markets of

25   last fall when it needed surplus funds through its

1  capital structure than it is deemed to be worth in

2  the fall of 2009.

3            What this demonstrates is that

4  valuation is a malleable concept, tough to measure

5  and tougher to pin down without a host of

6  explanations, sensitivities and qualifiers.

7  Because point of view is an important part of the

8  process, outcomes are also highly dependent on the

9  perspectives and biases of those doing the

10  measuring.  When it comes to valuation, there is

11  no revealed objectively verifiable truth.  Values

12  can and do vary and consistency among valuation

13  experts is rare, especially in the context of high

14  stakes litigation.

15            It is the considerable challenge of

16  proving reliable value for Charter as of November

17  2008 coupled with Charter's well understood

18  ability to move funds throughout its highly

19  leveraged capital structure by means of

20  intercompany transfers that ultimately defeats

21  JPMorgan's very skillfully presented arguments

22  against reinstatement, particularly in relation to

23  an awkwardly constructed loan covenant referencing

24  the ability of structurally subordinated companies

25  in the capital structure to pay debts as they come

due.  That covenant is painfully hard to apply and
cannot reasonably be interpreted as having
prospective application.

Much has been said and written
throughout this litigation concerning the meaning
of Section 8(G)(5) of the loan agreement.
JPMorgan contends that this provision is forward
looking and is designed to address the ability of
designated holding companies to meet identifiable
obligations as they shall come due in the future.
That interpretation is not practical especially
for a company like Charter that has a variety of
options to fund or defer future obligations.  The
language used in the loan agreement is not a model
of clarity.

Leaving open the prospective gloss
urged by JPMorgan as one of the possible
interpretations of the provision, JPMorgan cites
cases prospectively construing similar language in
the context of Chapter 9.  These cases are in
opposite to the present situation but do
demonstrate that the words are capable of being
read in the manner urged by JPMorgan.
Nonetheless, the Court is convinced that the
language is not prospective and that, fairly read,

1    the covenant deals with a present inability to pay

2    debts as they come due, not one that may occur at

3    some point in the future.  A covenant tied to

4    events that might or might not come to pass lacks

5    specificity and is virtually impossible to apply

6    in practice

7           The forward-looking reading

8    suggested by JPMorgan is not the best way to

9    construe the language.  Looking into a future

10   filled with payables that are coming due is a

11   speculative and unworkable exercise.  Given the

12   inherent unpredictability of future events and

13   Charter's multiple strategies for moving cash

14   within the corporate family, it is not practical

15   for a lender to declare a default based on what

16   may seem to be well-pended presumptions as to the

17   ability of a holding company to pay debts in the

18   future.  Those presumptions could well be wrong.

19           Additionally, rational loan

20   administration requires measurable and verifiable

21   events of default, not based on speculation.  The

22   provision is most logically read as addressing the

23   actual as opposed to the possible future inability

24   to pay a debt as such debts come due.

25           The evidence demonstrates that

1　Charter had concerns during relevant periods prior

2　to the restructuring about available surplus and

3　the ability to transfer funds between companies

4　within its capital structure, but such concerns

5　did not rise to the level of establishing lack of

6　surplus and are not the stuff of which covenant

7　defaults are made. A number of witnesses employed

8　by the lenders testified that an event of default

9　such as the ones set forth in Section 8(G)(5) had

10　never been called before in their experience.

11　This adds credence to the notion that in the

12　context of Charter's publicly announced

13　restructuring discussions with its bondholders,

14　JPMorgan issued a notice of default on February 5,

15　2009 as a strategy to gain leverage and as a means

16　to get a seat at the table with the objective of

17　increasing the pricing of the senior debt.

18　　　　　Even if Section 8(G)(5) were to be

19　read as applying to a provable prospective

20　inability of a holding company to pay its debts as

21　they shall come due, the evidence is still

22　inconclusive in demonstrating a future inability

23　to pay such debts. JPMorgan did prove that

24　Charter had doubts as to the adequacy of surplus

25　and changed its public disclosures on the issue.

1  JPMorgan's expert witness, Carlene Taylor, offered

2  credible testimony that the value of Charter was

3  less than $18.7 billion, the threshold needed for

4  there to be surplus at the CCH1 level.  But that

5  testimony was not by itself sufficient given the

6  contradictory evidence presented by Charter

7  concerning both surplus and the ability to move

8  funds regardless of surplus.

9         The surplus question is a close call

10  but the answer is not decisive in determining

11  whether Charter had the ability to pay holding

12  company debts when due.  Charter knew that it

13  needed to restructure itself and was running out

14  of time to do so, but Charter's board relied on

15  its advisors to conclude that the inert price had

16  adequate surplus and also had various other

17  permissible means to move funds to levels where

18  cash was needed.

19         Despite a very well-presented case,

20  JPMorgan failed to show convincingly that any

21  designated holding company was unable to pay debts

22  within the meaning of Section 8(G)(5) of the

23  credit agreement.

24         I next move on to change of control.

25         The change of control inquiry

1  requires an examination of the relevant covenants

2  of the credit agreement between JPMorgan and CCO

3  dealing with the percentage of voting power that

4  must be held by the Paul Allen group.  These are

5  provisions that have evolved over time to make it

6  easier for Charter to enter into transactions that

7  dilute Mr. Allen's influence as measured by voting

8  power.

9              Under the 2002 version of the credit

10  agreement, the Paul Allen group was required to

11  have the power to vote or direct the voting of

12  equity interests having at least 51 percent of the

13  ordinary voting power for the management of the

14  borrower and to own at least 25 percent of

15  Charter's economic interests.  That ownership

16  requirement has been watered down to a point that

17  Mr. Allen no longer needs to be in control in the

18  traditional sense of the word.

19              Sections 8(K)(1) and 8(K)(2) under

20  the currently applicable form of credit agreement

21  reduce the minimum voting percentage from 51

22  percent to 35 percent and eliminate the

23  requirement that Mr. Allen hold any economic

24  interest in Charter.  The changes appear to have

25  been intended to make it easier for Charter to

1    reduce its dependence on Mr. Allen and to attract

2    equity investments from persons other than

3    Mr. Allen while at the same time continuing to

4    impose a minimum level of voting control.  These

5    provisions appear designed to allow for a

6    formalistic retention of control, but for the

7    economic reality to shift in the very manner

8    proposed by Charter in its plan.

9              Section 8(K), as it has changed over

10    time, almost invites smart lawyers to come up with

11    a transaction or series of transactions to

12    restructure Charter without tripping the covenant.

13    Charter's advisors have managed to accomplish that

14    objective.  Section 8(K)(1) makes it an event of

15    default if the Paul Allen group ceases to have at

16    least 35 percent determined on a fully diluted

17    basis of the ordinary voting power for the

18    management of the borrower.  Section 8(K)(2)

19    complicates the analysis by also mandating against

20    the consummation of any transaction, the result of

21    which is that any person or group has such terms

22    as are used in Section 13(d) and 14(d) of the

23    Securities and Exchange Act of 1934 as amended,

24    other than the Paul Allen group has the power

25    directly or indirectly to vote or direct the

voting of equity interests having more than 35

percent of the ordinary voting power for the

management of the borrower unless the Paul Allen

group has the power directly or indirectly to vote

or direct the voting of equity interests having a

greater percentage of the ordinary voting power

for the management of the borrower than such

person or group.  Thus, a default can occur only

on consummation of a transaction that results in a

change of control as described in these two

sections.

The change of control issue

presented in the above language is the most

challenging problem for Charter in seeking

reinstatement.  Finding a change of control would

defeat reinstatement and result in denial of

confirmation.  The analysis calls for a

determination of what is meant by the phrase

"ordinary voting power for the management of the

borrower" and whether certain members of the

Crossover Committee should be considered a group

as that term is used in Section 13(d) of the

securities laws.

Both subsections of Section 8(K)

deal with Mr. Allen's retained power to control

1    Charter following hypothetical corporate

2    transactions that would have the effect of

3    reducing the ordinary voting power for the

4    management of the borrower.  Because the borrower,

5    here CCO, is a limited liability company, with

6    membership interests that are 100 percent owned by

7    one of a number of the intermediate holding

8    companies within the organizational structure, the

9    measurement of voting power must occur at the CCI

10   level.  CCI, the public company, directs activity

11   within each of the business units through its

12   board of directors.  Thus, it is from this vantage

13   point removed from the operating assets that the

14   ordinary voting power for the management of the

15   borrower is exercised by means of shareholder

16   votes for directors who in turn govern the

17   management of CCI and its subsidiaries, including

18   CCO.

19          Section 8(K)(1) imposes the

20   requirement that Mr. Allen have not less than 35

21   percent of the ordinary voting power for the

22   management of CCO.  The restructuring satisfies

23   that requirement by granting Mr. Allen equity that

24   on a fully diluted basis has the right to appoint

25   four out of eleven directors to the board of

1    reorganized CCI.  That would be more than 35

2    percent.  But the analysis does not end there.

3    Section 8(K)(2) adds the element of relative

4    voting power in situations where any group may end

5    up with more than 35 percent of the ordinary

6    voting power unless Mr. Allen has a greater

7    percentage.  This additional measurement comes

8    into play only if a group formed for the purpose

9    of acquiring, holding or disposing of Charter

10   securities holds more than 35 percent of the

11   ordinary voting power for the management of CCO.

12            Section 8(K)(2) calls for a

13   mathematical balancing of relative voting

14   percentages in those instances where a person or

15   group acquires more than 35 percent of ordinary

16   voting power.  The provision is something of a

17   mystery, however.  Throughout the trial, all

18   parties assumed that the formula, if applicable,

19   and if out of balance, had the potential of

20   derailing the plan, but no one offered a cogent

21   explanation as to the practical importance of the

22   covenant that went beyond its mere existence and

23   mandated technical requirements.  The business

24   rationale for the formula is unstated.  Presumably

25   the provision is intended to serve as a proxy for

ongoing control by Mr. Allen despite material new
investment by another investor or group of
investors.  But given the modification over time
to the change of control covenant in the loan
agreement, it is difficult to discern how a slight
variation in the percentages one way or the other
could have any impact on the credit risk of the
borrower.  It is simply part of the bargain that
Charter struck with its lenders, a corporate
landmine to be avoided if reinstatement is to be
achieved.

The Court has deliberated at length
regarding the conduct of the bondholder members of
the Crossover Committee in relation to Section
8(K)(2) and has concluded that these bondholders
do not constitute a group.  Just because parties
are similarly situated and perhaps also similarly
motivated does not make them a group.
Accordingly, this loan covenant does not apply to
the restructuring transaction set forth in the
plan.  The term "group," for purposes of Section
8(K)(2), was given a meaning that was borrowed
from the definition that appears in Section 13(d)
of the Securities and Exchange Act, but the
application of the defined term is different.

1    Section 13(d) is a regulatory provision that

2    speaks to disclosure obligations and, as a result,

3    should be liberally construed to achieve the

4    statutory objectives of increased reporting and

5    transparency, while Section 8(K)(2) is a loan

6    covenant that prohibits only a limited category of

7    change of control transactions as such

8    transactions are described and shaped by the

9    language of that covenant.

10            Because the covenant functions as a

11    trigger to a potential default under a credit

12    facility, it should be construed narrowly so as to

13    enable the borrower to engage in permissible

14    corporate engineering.  With that perspective in

15    mind, the most active members of the Crossover

16    Committee, Apollo, Oak Tree and Crestview, do not

17    constitute a group for purposes of Section

18    8(K)(2).  Apollo, Oak Tree and Crestview are

19    certainly members of a group in the sense that

20    they are working together to maximize their

21    investments in Charter and to achieve common

22    economic goals.  But they do not fit the

23    definition of a group as used in Section 13(d).

24            Separate investors would be

25    considered a group and would have reporting

1    obligations under the securities laws when two or

2    more parties have agreed to acquire, hold, or

3    dispose of shares of an issuer.  Here, members of

4    the purported group are clearly working

5    cooperatively and have done so in the past in

6    other comparable transactions, but they are not

7    connected by any formal or informal agreement to

8    act jointly with respect to Charter's securities.

9    There are, however, certain informal indications

10   of cooperative behavior and overlapping business

11   objectives to be achieved collectively.

12            JPMorgan has focused on a number of

13   statements made in internal e-mails, particularly

14   those at Crestview, commenting about controlling a

15   reorganized Charter and the willingness of Apollo

16   and Oak Tree to appoint Jeff Marcus of Crestview

17   to the board, even though Crestview's ownership

18   percentage is below the minimum needed for board

19   representation.

20            Crestview also prepared internal

21   memoranda describing the arrangements among the

22   bondholders as a joint effort to control Charter.

23   These statements in the Court's view candidly

24   reflect how the businesspeople involved in the

25   transaction felt at the time and viewed their

1  parallel interests.  The theme is one of we are in

2  this together with coordination being in

3  everyone's best interest.  The Court simply is not

4  convinced that these bondholders that found

5  themselves by happenstance conscripted into the

6  same restructuring were acting as a partnership,

7  syndicate or other group for purposes of

8  acquiring, holding or disposing of securities.  No

9  agreements, express or implied, have been shown to

10  exist and the testimony of the bondholders makes

11  this point emphatically clear.  The Court also

12  does not find the expert testimony of Mr. Gomperts

13  to be persuasive.

14          Certain of the bondholders may be

15  private equity firms with loan to own investment

16  strategies, but their prime objective in these

17  cases based on the testimony is a combination of

18  loss mitigation and opportunism in their capacity

19  as holders of Charter debt.  Wanting to maximize

20  the recovery by means of joining an ad hoc

21  committee of bondholders is not equivalent to

22  forming a group to acquire securities in the sense

23  that 13(d) uses that term.

24          The Court concludes that the

25  bondholders worked collectively and in a

1    coordinated fashion but did not form a 13(d)

2    group.  They are each independent actors who were

3    brought together in this transaction by the

4    unwanted circumstance of the restructuring

5    initiated by Charter.  Consequently, regardless of

6    the aggregate equity or relative board power held

7    by the so-called takeover group, Section 8(K)(2)

8    does not apply to the transaction and Mr. Allen's

9    board representation satisfies the requirement of

10    Section 8(K)(1) that he hold not less than 35

11    percent of the ordinary voting power for the

12    management of CCO.

13                I next the address the settlement

14    with Paul Allen.

15                The agreement with Paul Allen is a

16    central but somewhat controversial feature of the

17    proposed restructuring of Charter.  The Court has

18    focused considerable attention on this aspect of

19    the plan and has concluded that it represents an

20    appropriate compromise of conflicting positions

21    negotiated vigorously and in good faith and

22    otherwise satisfies the Iridium factors for

23    approval of a settlement it is uniquely valuable

24    to the Charter estate by establishing the grounds

25    for reinstatement of the Charter debt and for

1  realizing potential tax savings that aggregate

2  billions of dollars.

3             Nonetheless, given Mr. Allen's

4  position as chairman of Charter's board and

5  controlling shareholder, the Court has viewed the

6  settlement with heightened scrutiny and frankly

7  also with some skepticism.  The Court has even

8  questioned why Mr. Allen should be receiving any

9  valuable consideration at all for cooperating with

10  Charter and doing things for the benefit of

11  Charter that seem to fall under the category of

12  the right and proper thing to do.  After all,

13  Mr. Allen has been closely associated with Charter

14  for years and the involvement of such a

15  well-heeled sponsor no doubt has been, until

16  recently, an ongoing source of comfort to

17  shareholders and creditors alike.

18             Although the Hippocratic oath does

19  not apply, it is not unreasonable to expect

20  someone in Mr. Allen's position to do no harm to

21  those stakeholders.  Skepticism notwithstanding,

22  the Court recognizes that Mr. Allen is a

23  businessman and that Charter is not and never was

24  a philanthropic venture.  As explained by

25  Mr. Nelson in his rebuttal testimony the

1    restructuring premise from the outset assumed that

2    Mr. Allen would be entitled to compensation for

3    his cooperation in preventing a change of control

4    that, depending on your perspective, either

5    created or avoided the destruction of substantial

6    value for other stakeholders.

7            The settlement with Mr. Allen also

8    indisputably is the product of a spirited

9    negotiation in which sophisticated adversaries and

10   their expert advisors bargained with each other

11   aggressively and in good faith at a time when the

12   prospect of a freefall bankruptcy loomed large in

13   the minds of the negotiators.  The give and take

14   of that process helps to validate the fairness of

15   the result.

16           Additionally, the numbers themselves

17   are undeniably powerful.  Mr. Allen is to receive

18   $375 million, including approximately $180 million

19   classified as pure settlement consideration.  The

20   benefits from reinstatement, future tax savings,

21   and proceeds of the rights offering are estimated

22   to total well over $3 billion.  The amounts to be

23   paid to Mr. Allen, while significant in absolute

24   dollars, are not excessive in comparison to what

25   Charter is to receive.  And that is the main

1  economic reason for approving the settlement. The

2  direct and indirect value to the estate and its

3  creditors outweighs by a high multiple the amounts

4  allocated to Mr. Allen.

5            Importantly, the settlement with

6  Mr. Allen was reviewed and approved by independent

7  directors of Charter's board of directors who,

8  while not members of a formal special committee,

9  functioned as an independent group within the

10  board. The independent directors, some of whom

11  testified during the trial, are highly qualified

12  individuals who had a regular practice during

13  board meetings of convening separately for

14  Mr. Allen and his designated directors to consider

15  what was in Charter's best interest. These

16  independent directors considered and approved the

17  settlement with Mr. Allen and concluded

18  unanimously that approval was in the best

19  interests of Charter. Given the role played by

20  the independent directors and the evidence

21  indicating that Mr. Allen did not exert any undue

22  influence over Charter in negotiating the

23  settlement, the settlement should be evaluated

24  under the standards applicable to approval of

25  bankruptcy settlements in this circuit and not

1    under the entire fairness standard of Delaware law

2    applicable to transactions with controlling

3    insiders.

4           After giving this subject

5    considerable thought, the Court is satisfied that

6    the settlement with Mr. Allen is fair, in the best

7    interests of the estate, and should be approved.

8    The releases related to the settlement are also

9    appropriate under the special circumstances

10    presented and are enforceable.

11           The last section of this long

12    reading relates to the objections of the CCI

13    noteholders.

14           Under the Bankruptcy Code, the CCI

15    noteholders are entitled to receive distributions

16    of a value as of the effective date of the plan

17    not less than the amount they would so receive if

18    the debtors were liquidated under Chapter 7.  The

19    CCI noteholders are, contrary to their argument,

20    receiving in excess of that.  The debtor's

21    liquidation analysis shows that in a liquidation

22    under Chapter 7 the CCI noteholders would receive

23    recoveries in the range of approximately 18.4

24    percent of their claims.  The recoveries under the

25    plan far exceed that range, providing an estimated

1    recovery of 32.7 percent.

2            Indeed, the CCI noteholders are

3    receiving the highest recovery under the plan

4    among all of the debtor's unsecured noteholders.

5    The CCI noteholders base their unfair treatment

6    argument in large part on a series of add-ons

7    including recoveries from alleged preference and

8    avoidance actions, programming contracts, stock

9    options, other intercompany receivables, etc., but

10   their expert witness, Edward McDonough,

11   testified -- excuse me -- identified as sources

12   from which the debtors and thereby the CCI

13   noteholders may receive additional recoveries in a

14   liquidation.  The CCI noteholders failed, however,

15   to present any evidence that there would or could

16   be any actual or meaningful recoveries on account

17   of these add-ons.  Indeed, Mr. McDonough admitted

18   during cross-examination that the CCI noteholders'

19   potential recovery from the additional sources he

20   identified could be lower than as stated in his

21   expert report and even admitted that the potential

22   recovery from any or all of the additional sources

23   could turn out to be zero.  As such, his testimony

24   is largely speculative.

25            The CCI noteholders also claim that

1   net operating losses generated through losses of

2   the operating companies belong to CCI and that the

3   CCI noteholders therefore should receive

4   additional distributions under the plan to

5   compensate him for these NOLs.  Notably, every

6   witness who testified during the trial with

7   respect to NOLs claimed not to be a tax expert.

8   Furthermore, there is no evidence of the record of

9   CCI's right independently to exploit and derive

10  value from the NOLs regardless of which Charter

11  entity actually owns them.

12          Finally, the CCI noteholders failed

13  to produce any evidence or rebut the debtor's

14  evidence via Mr. Dede's testimony that their

15  claims were improperly classified separately from

16  class A3, CCI general unsecured claims.

17          Based on all of the foregoing, the

18  Court overrules all objections to confirmation of

19  the plan and is prepared, reasonably promptly, to

20  enter a confirmation order and a memorandum

21  decision consistent with this bench ruling.  The

22  Court requests that parties in interest review the

23  form of order submitted to the Court by the

24  debtors and provide comments within the next week.

25  The Court hopes to be in a position to enter the

1    order in a written decision consistent with this

2    bench ruling within the next two to three weeks.

3    That's all I have to say.  We are adjourned.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T I O N

2

3

4

5      I, TODD DeSIMONE, a Registered Professional

6    Reporter and a Notary Public, do hereby certify

7    that the foregoing is a true and accurate

8    transcription of my stenographic notes from the

9    audio file provided to the best of my ability.

10        I further certify that I am not employed by

11    nor related to any party to this action.

12

13

14

15

16               TODD DeSIMONE, RPR

17

18

19

20

21

22

23

24

25