FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------
                                  :    Chapter 11
In re                             :
                                  :    Case No. 09-11435 (JMP)
CHARTER COMMUNICATIONS, et. al.,  :
                                  :    (Jointly Administered)
             Debtors.             :
                                  :
-----------------------------------------------------------
                                  :
JPMORGAN CHASE BANK, N.A.         :
as Administrative Agent,          :    Adversary Proceeding
                   Plaintiff,     :
-against-                         :    Case No. 09-01132 (JMP)
                                  :
CHARTER COMMUNICATIONS            :
OPERATING, LLC and CCO HOLDINGS, LLC, :
             Defendants.          :
-----------------------------------------------------------
```

## OPINION ON CONFIRMATION OF PLAN OF REORGANIZATION AND ADJUDICATION OF RELATED ADVERSARY PROCEEDING

KIRKLAND & ELLIS, LLP
*Attorneys for Debtors*
601 Lexington Avenue
New York, New York 10022

    Paul Basta, Esq.
    Stephen E. Hessler, Esq.

KIRKLAND & ELLIS, LLP
*Attorneys for Debtors*
555 California Street
San Francisco, California 94104

    Mark E. McKane, Esq.

KIRKLAND & ELLIS, LLP
*Attorneys for Debtors*
655 Fifteenth Street, N.W.
Washington, D.C. 20005

> Jonathan D. Brightbill, Esq.
> Daniel T. Donovan, Esq.
> Jeffrey S. Powell, Esq.

KIRKLAND & ELLIS, LLP
*Attorneys for Debtors*
300 North LaSalle Street
Chicago, Illinois 60654

> Ray Schrock, Esq.
> Mathew Regan, Esq.

TOGUT SEGAL & SEGAL LLP
*Attorneys for Debtors*
One Penn Plaza
New York, New York 10019

> Albert Togut, Esq.
> Richard K. Milin, Esq.

SIMPSON THACHER & BARTLETT, LLP
*Attorneys for JPMorgan Chase Bank*
425 Lexington Avenue
New York, New York 10017

> Peter Pantaleo, Esq.
> George Wang, Esq.
> Bryce Friedman, Esq.
> Bruce Angiolillo, Esq.
> Susannah Geltman, Esq.
> Mary Elizabeth McGarry, Esq.
> Stephen Fitzgerald, Esq.

ROPES & GRAY, LLP
*Attorneys for Creditors' Committee*
1211 Avenue of the Americas
New York, New York 10036

    David S. Elkind, Esq.
    Russell Lippman, Esq.
    Mark R. Somerstein, Esq.
    Nila Williams, Esq.

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
*Attorneys for the Unofficial Committee of Holders*
*of CCH I, LLC and CCH II, LLC notes*
1285 Avenue of the Americas
New York, New York 10019

    Alan Kornberg, Esq.
    Andrew J. Ehrlich, Esq.
    Daniel Leffell, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Paul G. Allen*
300 South Grand Avenue
Los Angeles, California 90071

    Kurt Ramlo, Esq.
    Andrew Garelick, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Paul G. Allen*
Four Times Square
New York, New York 10036

    Jay Goffman, Esq.
    Robert E. Zimet, Esq.
    Susan Saltzstein, Esq.
    Jeremy Berman, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for the First Lien Lender Group*
1177 Avenue of the Americas
New York, New York 10036

 Kenneth H. Eckstein, Esq.
 Phillip Kaufman, Esq.
 Joel Taylor, Esq.

BROWN RUDNICK LLP
*Attorneys for Wells Fargo Bank, as Agent*
*for the Third Lien Secured Lenders*
Seven Times Square
New York, New York 10036

 David Molton, Esq.
 Daniel Saval, Esq.

WHITE & CASE, LLP
*Attorneys for the Law Debenture Trust Company*
*of New York*
1155 Avenue of the Americas
New York, New York 10036

 Dwight Healy, Esq.
 Gerard Uzzi, Esq.
 Andrew Hammond, Esq.
 Greg Starner, Esq.
 Fernando Menendez, Esq.
 Karen M. Asner, Esq.

COVINGTON & BURLING LLP
*Attorneys for Wilmington Trust Company*
The New York Times Building
620 Eight Avenue
New York, New York 10018

 Susan Power Johnston, Esq.
 David Haller, Esq.

US SECURITIES AND EXCHANGE COMMISSION
*Attorneys for the U.S. Securities and Exchange Commission*
3 World Financial Center
New York, New York 10281

    Alan S. Maza, Esq.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
*Attorneys for Creditor, Comcast Communications*
919 North Market Street
12th Floor
Wilmington, Delaware 19801

    Leslie C. Heilman, Esq.

BALLARD SPAHR ANDREWS & INGERSOLL, LLP
*Attorneys for Creditor, Comcast Communications*
1735 Market Street
51st Floor
Philadelphia, PA 19103

    Benjamin M. Schmidt, Esq.

FOLEY & LARDNER, LLP
*Attorneys for Creditor, UMBA NA*
321 North Clark
Suite 2800
Chicago, Illinois 60654

    Mark Hebbeln, Esq.

FOX ROTHSCHILD, LLP
*Attorneys for R Squared Communications*
919 North Market Street
Suite 1300
Wilmington, Delaware 19899

    Jeffrey M. Schlerf, Esq.
    Sheldon Rennie, Esq.

GOODWIN & GOODWIN, LLP
*Attorneys for Community Antenna Services*
300 Summers Street
Charleston, West Virginia 25301

      Suzanne Trowbridge, Esq.

FRIDAY, ELDREDGE & CLARK, LLP
*Attorneys for Creditor, Key Colony Fund LP*
3425 North Futrall Drive
Suite 103
Fayetteville, Arkansas 72703

      Jason Bramlett, Esq.


**JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE**

### *Introduction*

Since these cases were filed on March 27, 2009, Charter Communications, Inc.

("CCI" and, together with its affiliated debtors, "Charter" or the "Debtors") has been

engaged in one of the most hotly contested confirmation battles ever conducted. The

conflict certainly is one of the longest and no doubt also among the most costly. The

Court heard extensive testimony and argument for nineteen days during the period from

July 20 through October 1, 2009. At stake is the reorganization and recapitalization of

the country's fourth largest cable television company, a leading provider of broadband

and cable television services now under the control of Paul Allen, co-founder of

Microsoft and a public figure due to his personal wealth and accomplishments. Partly

due to the importance of the issues and partly due to Mr. Allen's prominence and the

billions that he has invested in Charter, these cases are highly visible and have generated

considerable public interest.

These are perhaps the largest and most complex prearranged bankruptcies ever attempted, and in all likelihood rank among the most ambitious and contentious as well. The business proposition presented aims high, particularly at a time of great dislocation, uncertainty and volatility in the economy.  Charter seeks to remove more than eight billion dollars from its highly leveraged capital structure, to secure the investment of approximately $1.6 billion in new capital through a rights offering back-stopped by a group of bondholders that will be appointing members of CCI's reconstituted board and to reinstate a senior secured credit facility and certain junior secured debt with the objective of preserving favorable existing credit terms and saving hundreds of millions of dollars in incremental annual interest expense that otherwise would be payable if this senior secured debt had to be replaced at current market pricing.

JPMorgan Chase Bank, N.A.[1] ("JPMorgan"), as agent for a syndicate of senior lenders, forcefully and skillfully asserts that reinstatement is not an available option here due both to existing events of default relating to the prepetition financial condition of certain holding companies within the Charter corporate structure and to a change of control default that they claim will occur on the effective date of the Debtors' proposed plan of reorganization (the "Plan") in violation of covenants in the senior secured credit agreement mandating that Mr. Allen retain a stipulated minimum percentage of voting control.

The restructuring premise depends upon Mr. Allen's holding not less than thirty-five percent in voting power over the management of Charter Communications Operating, LLC ("CCO" or the "Borrower"), the operating company borrower named in

---

[1] JPMorgan is supported in its objections by a group of separately represented senior lenders from the bank syndicate and by second and third lien lenders that also oppose reinstatement.

the senior credit agreement. This aspect of the transaction requires approval of a settlement between Mr. Allen and Charter (the "CII Settlement" or "Settlement") in which Mr. Allen agrees to maintain his voting percentage at thirty-five percent as a means to avoid triggering the applicable change of control covenants and to preserve valuable tax attributes.

This nominal retention of voting power has been attacked as a gimmick fashioned by corporate lawyers to obscure a takeover of the company by bondholders that are well known for their use of so-called "loan to own" strategies. The restructuring effectively wipes out Mr. Allen's eight billion dollar investment in Charter and strips him of any meaningful ongoing economic interest in the company. Regardless of the residual voting power to be held by Mr. Allen, no one seriously disputes that Mr. Allen is walking away from his investment in Charter and is agreeing to maintain his voting power as a structuring device that benefits Charter and its stakeholders. In practical terms, Charter will cease to be a Paul Allen company assuming that the Plan is consummated. His exit clears the way for new investors to influence the management of a restructured Charter.

While this creative arrangement to preserve value clearly benefits Mr. Allen, it was not his idea. Lazard Frères & Co. LLC ("Lazard"), as restructuring advisor to Charter, was the chief architect. Lazard recognized the vital importance to the reorganization of avoiding a change of control by means of a structure in which Mr. Allen would agree to retain the requisite voting power. As a consequence and despite the fact that all CCI shareholders will lose everything as their equity is cancelled, Mr. Allen as controlling shareholder occupies a position of strength in these cases.

His willingness to participate in the structure is pivotal to two sources of value for the Charter estates – the ability to hold on to attractively priced financing and to preserve net operating losses to shelter future income.  Mr. Allen, acting through his representatives, has demanded and has secured the right to receive substantial compensation in exchange for his cooperation.  These bargained-for "gives" and "gets" relating to the settlement with Mr. Allen[2] have been challenged by Law Debenture Trust Company, the indenture trustee for the holders (the "CCI Noteholders") of $479 million in aggregate principal amount of 6.50% Convertible Senior Notes due 2027 issued by CCI (the "CCI Notes").  The CCI Noteholders also complain at length that they have been shortchanged and that the Plan has not treated them fairly and is not confirmable.

As expected in cases involving billions of dollars and unusually complex legal issues that are both fact-intensive and subject to differing interpretations and characterizations, tremendous resources have been dedicated to this litigation.  The issues presented are important ones – whether the restructuring arrangements negotiated prepetition with an informal committee of bondholders known as the "Crossover Committee" are appropriate and should be confirmed, whether defaults exist that preclude reinstatement of senior secured indebtedness, whether the most junior creditors in the capital structure are receiving more value than they would receive in a liquidation and whether the so-called linchpin settlement between Charter and Mr. Allen is reasonable and should be approved.

Notably, the issues presented arise in an uncommonly complicated setting – a large operationally sound business saddled with almost twenty-two billion dollars in debt

---

[2] Mr. Allen is to receive aggregate compensation that totals approximately $375 million.  Charter will benefit to the extent of interest savings and preserved tax attributes estimated to be in the billions of dollars.

at various levels of a capital structure stacked with multiple intermediate limited liability holding companies. This complex enterprise is endeavoring with singular creativity and determination to reduce its heavy debt load and recapitalize itself during perhaps the most challenging period in the modern era of global corporate finance.  Given the state of the capital markets, the restructuring proposed here by Charter represents an extraordinary achievement provided that the resulting Plan is confirmable as a matter of bankruptcy law.  And that is the task for the Court – to determine based on the evidence whether this Plan designed in the midst of an historic financial crisis succeeds in reaching its lofty goals.

This subject matter – reinstatement, the CII Settlement and fairness of treatment proposed under the Plan – is addressed generally in this introduction and in greater depth in later sections of this opinion.  Following careful deliberation, the Court finds that Charter has met its burden and that the Plan should be confirmed.

*Prepetition Negotiations At A Time of Crisis*

Following the bankruptcy of Lehman Brothers Holdings, Inc. on September 15, 2008, the global credit markets went into the financial equivalent of cardiac arrest. Commercial lending came to a virtual halt.  Smart, sophisticated and otherwise confident business people panicked.  No one who lived through the period will ever forget the fear engendered by a worldwide crisis of confidence and the inability to obtain credit by conventional means.

This was the context for much of the evidence presented during the trial of this matter[3].  Charter was a highly leveraged company under the control of a prominent man with enormous personal wealth.  The company had a patron with deep pockets and a variety of financing and refinancing options available to it during normal market conditions.  Those options became far more limited in the immediate aftermath of the upheaval of last fall[4].

The board, senior management and Charter's advisors certainly were aware that the company was in serious trouble due to the dislocation of the credit markets, lower valuation multiples applicable to peer companies in the cable sector and its own excessive leverage.  Charter needed to restructure promptly to avoid a potentially catastrophic free-fall bankruptcy, and it did so in what may be record time.

The principal architect of Charter's strategy during the period from November 2008 through February 2009 was Jim Millstein, who at the time was co-head of the restructuring practice at Lazard and who now works as the senior restructuring officer for the U.S. Treasury.  Mr. Millstein had been an advisor to Charter for a number of years and had worked on the design of Charter's many-layered, tax-driven holding company structure.  His advice helped to guide Charter's board throughout this critical period.  Mr.

---

[3] The trial consisted of Charter's contested confirmation hearing and JPMorgan's adversary proceeding seeking a determination that reinstatement is not permitted due to prepetition defaults under the senior credit agreement.  This opinion relates to both the adversary proceeding and to plan confirmation.

[4] The Court notes that global economic conditions have improved and stabilized greatly in the last year.  In the quarter just ended, the Dow and S&P 500 experienced their best gains in a decade.  The credit markets also are in better shape than they were last year, but reportedly are still not functioning normally.  Thus, timing of the negotiations is a factor that cannot be ignored.  The crisis mentality of last fall spawned this restructuring, but it is being evaluated from the perspective of a now more stable and stronger financial sector.  The Court recognizes that given the positive turn in the markets, the valuation of Charter by Lazard for purposes of this restructuring may have been performed at a trough in the market for peer companies in the cable industry.  That does not alter the facts, however.  No expert has given a credible opinion as to value that contradicts the Plan value, and the expert called by JPMorgan with regard to surplus calculations indicated that the absence of a competing transaction at a higher value tends to confirm the reliability of the value of the transaction described in Charter's Plan.

Millstein was behind the decision to engage in a high velocity negotiation with the bondholders while leaving the senior debt in place to take full advantage of favorable pricing applicable to the existing senior indebtedness. Given the uncertainty in the credit markets at the time, it was also unclear whether a senior credit facility this large could be replaced at all on any terms[5].

His strategy was to prevent a change of control by motivating Mr. Allen to retain his voting power over management, to encourage the bondholders to organize an ad hoc committee (i.e., the "Crossover Committee") that would retain experienced restructuring professionals at Charter's expense, and to trim debt and raise new equity by having holders of fulcrum[6] debt securities convert their bonds to equity interests and agree to invest in the reorganized capital structure. Mr. Millstein and his colleagues at Lazard started to implement this strategy in December. On December 12, 2008, the Company issued a press release announcing the commencement of discussions with bondholders about potential restructuring options and through Lazard urged the bondholders to get organized[7]. The negotiations were given an added sense of urgency when Charter elected not to make an interest installment due in the middle of January and took advantage of the thirty-day grace period applicable to this interest payment. That decision not to pay

---

[5] It is unknown whether the credit markets have improved to the point that a financing of this size could be replaced today (and, if so, on what terms), and the relative difficulty or ease of obtaining such replacement financing has played no part in this decision.

[6] This is the term used to describe those debt securities within a given capital structure that, based on the assumed enterprise value, would not be entitled to receive a full recovery in cash, thereby making it rational for holders to consider other forms of consideration such as a debt for equity exchange. In effect, holders of fulcrum securities are at the tipping point of the capital structure (neither entirely in nor entirely out of the money) and given their impairment and entitlement to vote for or against a chapter 11 plan are in a position to have considerable influence over the outcome of a restructuring.

[7] An ad hoc committee was formed shortly thereafter consisting of unaffiliated holders of 11% senior secured notes due 2015 issued by CCHI, LLC and CCH I Capital Corporation and the 10.25% Senior Notes due 2010 of CCH II, LLC and CCH II Capital Corporation. This ad hoc committee calls itself the "Crossover Committee."

interest energized the discussions among Charter, the Crossover Committee and Mr.

Allen relating to a so-called "strawman" proposal for restructuring the enterprise.

All parties who participated in this process confirm that the negotiations were

pursued aggressively, at arms length and in good faith, resulting in an agreement among

Mr. Allen and certain members of the Crossover Committee that has become the

foundation of Charter's pre-negotiated Plan.  This agreement succeeded in eliminating

the risks of a "free fall" bankruptcy while providing for new investment, debt

forgiveness, preservation of intangible assets and a stripping down of Mr. Allen's

economic stake.

The resulting Plan, however, has attracted quite a lot of criticism.  Parties who

were not at the table during this process have become the main objectors to confirmation.

The senior lenders complain that their secured claims are impaired and that their debt

may not be reinstated.  They allege a series of non-monetary defaults under the senior

credit agreement, but they openly admit that their goal here is to obtain an increased

interest rate that reflects what would be charged for a new loan in the current market for

syndicated commercial loans.  The senior lenders have been paid everything that they are

owed under the existing facility and have even received default interest during the

bankruptcy cases.

The claimed defaults are the means by which the lenders hope to improve their

return by obtaining a premium over amounts payable under the existing loan

documentation.  JPMorgan and other members of the lending syndicate are troubled that

they are being denied the chance to renegotiate the terms of the loan and that bondholders

who invested at a junior level of the capital structure are poised to greatly improve their

own internal rate of return at the lenders' expense.  Viewed simplistically, the litigation

over confirmation amounts to an inter-creditor dispute over which class of creditors

should receive enhanced returns.  Viewed more theoretically, the litigation is a test of the

chapter 11 process itself.  The parties who negotiated the Plan did so knowing that this

major struggle with the lenders would follow.  Accordingly, this contest is the

culmination of calculated pre-bankruptcy planning (that might even be called a gamble)

designed to obtain significant restructuring benefits over the foreseeable strenuous

objections of formidable adversaries.

*Surplus And The Ability To Pay Debts As They Come Due*

JPMorgan contends that Charter had reason to know that it was in serious

financial trouble on November 5, 2008 when it elected to draw down $250 million on its

senior credit facility at a time that its enterprise value was depressed to the point that

financial disaster was likely.  The case against reinstatement really starts here at a board

meeting convened in November 2008 to consider whether there was adequate surplus to

move cash from one level of the capital structure to another by means of dividends from

CCO to those Designated Holding Companies (as defined in the senior credit agreement)[8]

that needed to make upcoming scheduled interest payments.

JPMorgan contends that Charter recognized the gravity of the situation and knew

that it was in the midst of a genuine crisis at this point.  The Court heard a great deal of

testimony from a number of witnesses regarding Charter's corporate state of mind in

November 2008 and its self-awareness as to the fair value of the enterprise.  JPMorgan's

thesis is that there is a connection between the determination of surplus for purposes of

---

[8] The Designated Holding Companies are CCO Holdings, LLC ("CCOH"), CCH II, LLC (CCH II),
CCH I, LLC ("CCH I"), CCH I Holdings, LLC ("CIH") and Charter Communications Holdings, LLC ("CCH").

being able to make a permissible cash distribution under Delaware corporate law and the occurrence of a default under the senior credit agreement. Expert witnesses offered conflicting opinions during the trial on the question of whether certain of Charter's Designated Holding Companies had adequate surplus as of the date that Charter drew down $250 million under its senior credit facility. A finding of surplus would require a total enterprise value of not less than $18.7 billion. Notably, the enterprise value for purposes of Charter's Plan is well below that figure at $15.4 billion[9].

The surplus calculation relates to the contention of JPMorgan that certain Designated Holding Companies at the time could not prospectively pay their debts as they came due in violation of section 8(g)(v) of the credit agreement. This alleged default is central to JPMorgan's adversary complaint seeking a determination that the default precludes reinstatement of the indebtedness evidenced by the senior credit facility. The Court is satisfied that the Charter board acted reasonably when it relied on its advisors in determining that there was adequate surplus at the Designated Holding Company level even though in hindsight other plausible alternative valuation scenarios might place Charter's enterprise value below the minimum amount needed for finding surplus. The Court does not believe that sufficient evidence has been presented to establish that Designated Holding Companies were unable to meet their obligations as they came due.

---

[9] The $3.3 billion negative variance in enterprise value is hard to ignore. The Court considers the Plan valuation to be credible but understands that valuation judgments include multiple subjective elements and that opinions as to value are given for particular purposes, are highly dependent on assumptions and speak only as of specified dates. The lower Plan value when compared to the number needed for surplus, however, does lead the Court to question the reliability of higher values ascribed to the business during the period leading up to the restructuring negotiations.

Valuing a business such as Charter's is neither simple nor objective, and no single generally accepted standard exists for measuring value. Valuation of an enterprise as complex as this one calls for using multiple approaches to value, comparing the business to be valued with others having similar characteristics, making appropriate adjustments and reasoning by analogy. The art of valuing a business requires the exercise of well-informed judgment. Experts in corporate valuation are often required to weigh multiple valuation methodologies that are not always congruent or consistent. These methodologies include comparable companies, precedent transactions, publicly available market data (including the views of Wall Street analysts) and the use of a discounted cash flow analysis that depends on projections of future free cash flows and mathematical calculations. In the case of Charter, other factors to be considered include the treatment of tax attributes and the possible addition of a so-called control premium.

In part due to the complexity of the valuation process and in part due to the frequent role of the valuation expert as an advocate for a particular value proposition, bankruptcy courts commonly confront conflicting opinions as to value offered by qualified professionals. This case is no exception. Witnesses testified regarding valuation issues from Lazard, FTI Consulting, Alix Partners, Alvarez & Marsal, and Duff & Phelps. Not surprisingly, these witnesses focused on different considerations and did not agree with each other. Depending on the weight given to the testimony of these witnesses, the Court could conclude that Charter's business was worth more than $21 billion in November 2008 or as little as $15.4 billion in September 2009. The swing in

value is major and hard to reconcile.  The challenge in fairly valuing Charter is also illustrated by the fact that conflicting indications of value were offered by Charter itself[10].

With respect to the subject of Charter's provable enterprise value at different points in time, the Court finds itself in the quandary of wondering what happened to all that money and questioning the dependability of much of the valuation evidence that has been presented.  Billions of notional dollars have disappeared during a period when the markets have stabilized and when no corporate event has taken place that would explain any sharp decline in value.  Conveniently, Charter asserts that its business was worth more during the turbulent markets of last fall when it needed surplus to move funds through its capital structure than it is deemed to be worth in the fall of 2009.

What this demonstrates is that valuation is a malleable concept, tough to measure and tougher to pin down without a host of explanations, sensitivities and qualifiers. Because point of view is an important part of the process, outcomes are also highly dependent on the perspectives and biases of those doing the measuring.  When it comes to valuation, there is no revealed, objectively verifiable truth.  Values can and do vary, and consistency among valuation experts is rare, especially in the context of high stakes litigation[11].

It is the considerable challenge of proving a reliable value for Charter as of November 2008 coupled with Charter's well-understood ability to move funds throughout its highly leveraged capital structure by means of inter-company transfers that

---

[10] Charter called witnesses from Lazard and from Alix Partners.  The Lazard witnesses supported the $15.4 billion Plan value while the witness from Alix Partners testified that Charter was worth in excess of the $18.7 billion needed for a finding of surplus.

[11] The Court's decision in *Iridium* recognized the importance of unbiased data derived from the public markets and commented on the tendency of valuation litigation to become a battle of the experts in which the "hired guns" for each side function as advocates for a parochial value proposition.  *See Official Comm. of Unsecured Creditors v. Motorola, Inc. (In re Iridium Operating LLC),* 373 B.R. 283 (Bankr. S.D.N.Y. 2007).

defeats JPMorgan's very skillfully presented arguments against reinstatement,

particularly in relation to an awkwardly constructed loan covenant referencing the ability

of structurally subordinated companies in the capital structure to pay debts as they come

due.  That covenant is painfully hard to apply and cannot reasonably be interpreted as

having prospective application.

Much has been said and written throughout this litigation concerning the meaning

of Section 8(g)(v) of the loan agreement.  JPMorgan contends that the provision is

forward-looking and designed to address the ability of Designated Holding Companies to

meet identifiable obligations as they shall come due in the future.  That interpretation is

not practical, especially for a company like Charter that has a variety of options to fund

or defer future obligations.

The language used in the loan agreement is not a model of clarity, leaving open

the prospective gloss urged by JPMorgan as one of the possible interpretations of the

provision[12].  Nonetheless, the Court is convinced that the language is not prospective and

that, fairly read, the covenant deals with a present inability to pay debts as they come due,

not one that may occur at some point in the future.  A covenant tied to events that might

or might not come to pass lacks specificity and is virtually impossible to apply in

practice.

The forward-looking reading suggested by JPMorgan is not the best way to

construe the language.  Looking into a future filled with payables that are coming due is

speculative and unworkable exercise for an enterprise such as this.  Given the inherent

unpredictability of future events and Charter's multiple strategies for moving cash within

---

[12] JPMorgan cites cases prospectively construing similar language in the context of chapter 9 of the
Bankruptcy Code.  These cases are inapposite to the present situation but do demonstrate that the words are
capable of being read in the manner urged by JPMorgan.

the corporate family, it is not practical for a lender to declare a default based on what may seem to be well-founded presumptions as to the ability of a holding company to pay debts in the future. Those presumptions could well be wrong. Additionally, rational loan administration requires measurable and verifiable events of default not based on speculation. The provision is most logically read as addressing the actual as opposed to the possible future inability to pay a debt that shall come due.

The evidence demonstrates that Charter had concerns during relevant periods prior the restructuring about available surplus and the ability to transfer funds between companies within its capital structure, but such concerns did not rise to the level of establishing lack of surplus and are not the stuff of which covenant defaults are made. A number of witnesses employed by the lenders testified that an event of default such as the one set forth in Section 8(g)(v) had never been called before in their experience. This adds credence to the notion that in the context of Charter's publicly announced restructuring discussions with its bondholders, JPMorgan issued a notice of default on February 5, 2009 as a strategy to gain leverage and as a means to get a seat at the table with the objective of increasing the pricing of the senior debt.

Even if Section 8(g)(v) were to be read as applying to a provable prospective inability of a holding company to pay its debts as they shall come due, the evidence is still inconclusive in demonstrating a future inability to pay such debts. JPMorgan did prove that Charter had doubts as to the adequacy of surplus and changed its public disclosures on the issue. JPMorgan's expert witness, Carlyn Taylor, offered credible testimony that the value of Charter was less than the $18.7 billion threshold needed for there to be surplus at the level of CCH I (one of the Designated Holding Companies), but

that testimony was not by itself sufficient given the contradictory evidence presented by
Charter concerning surplus and the ability to move funds regardless of surplus.

The surplus question is a close call, but the answer is not decisive in determining
whether Charter had the ability to pay holding company debts when due.  Charter knew
that it needed to restructure itself and was running out of time to do so, but Charter's
board relied on its advisors to conclude that the enterprise had adequate surplus and also
had various other permissible means to move funds to levels where cash was needed.
Despite a very well-presented case, JPMorgan failed to show convincingly that any
Designated Holding Company was unable to pay debts within the meaning of Section
8(g)(v) of the credit agreement.

*Consummation Of The Plan Will Not Result In A "Change Of Control" Because Paul
Allen Will Retain Sufficient Voting Power And The Bondholders Have Not Acted as a
Group*

The change of control inquiry requires an examination of the relevant covenants
of the credit agreement between JPMorgan and CCO dealing with the percentage of
voting power that must be held by the Paul Allen Group (as defined in the senior credit
agreement).  These are provisions that have evolved over time to make it easier for
Charter to enter into transactions that dilute Mr. Allen's influence as measured by voting
power.

Under the 2002 version of the credit agreement, the Paul Allen Group was
required to have the power to vote or direct the voting of equity interests having at least
51% of the ordinary voting power for the management of the borrower and to own at
least 25% of Charter's economic interests.  That ownership requirement has been watered

down to a point that Mr. Allen no longer needs to be in "control" in the traditional sense of the word.

Sections 8(k)(i) and 8(k)(ii) under the currently applicable form of the credit agreement reduce the minimum voting percentage from 51% to 35% and eliminate the requirement that Mr. Allen hold any economic interests in Charter. The changes appear to have been intended to make it easier for Charter to reduce its dependence on Mr. Allen and to attract equity investments from persons other than Mr. Allen while at the same time continuing to impose a minimum level of voting control. These provisions appear designed to allow for a formalistic retention of control but for the economic reality to shift in the very manner proposed by Charter in its Plan. Section 8(k), as it has changed over time, almost invites smart lawyers to come up with a transaction or series of transactions to restructure Charter without tripping the covenant. Charter's advisors have managed to accomplish that objective.

Section 8(k)(i) makes it an event of default if the Paul Allen Group ceases to have at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower. Section 8(k)(ii) complicates the analysis by also mandating against "the consummation of any transaction ... the result of which is that any `person' or `group' (as such terms are used in Section 13(d)[13] and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% . . . of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of

---

[13] The term "group" is defined in § 13(d) as having members who "agree to act together for the purpose of acquiring, holding, or disposing of securities." 15 U.S.C. §78m(d)(3).

Equity Interests having a greater percentage ... of the ordinary voting power for the management of the Borrower than such `person' or `group' ... ." JPX 2, at JPM-CH00006003 (emphasis added).  Thus, a default can occur only on consummation of a transaction that results in a change of control as described in these two sections.

The change of control issue presented in the above language is the most challenging problem for Charter in seeking reinstatement.  Finding a change of control would defeat reinstatement and result in denial of confirmation.  The analysis calls for a determination of what is meant by the phrase "ordinary voting power for the management of the borrower" and whether certain members of the Crossover Committee should be considered a group as that term is used in Section 13(d).

Both subsections of section 8(k) deal with Mr. Allen's retained power to control Charter following hypothetical corporate transactions that would have the effect of reducing the ordinary voting power for the management of the borrower.  Because the Borrower is a limited liability company with membership interests that are 100% owned by one of a number of intermediate holding companies within the organizational structure, the measurement of voting power must occur at the CCI level.  CCI, the public company, directs activity within each of the business units through its board of directors.  Thus, it is from this vantage point, removed from the operating assets, that the ordinary voting power for the management of the Borrower is exercised by means of shareholder votes for directors who in turn govern the management of CCI and its subsidiaries, including CCO.

Section 8(k)(i) imposes the requirement that Mr. Allen have not less than 35% of the ordinary voting power for the management of CCO.  The restructuring satisfies that

requirement by granting Mr. Allen equity that on a fully diluted basis has the right to appoint four out of eleven directors to the board of reorganized CCI, but the analysis does not end there.  Section 8(k)(ii) adds the element of relative voting power in situations where any group may end up with more that 35% of the ordinary voting power unless Mr. Allen has a greater percentage.  This additional measurement comes into play only if a group formed for the purpose of acquiring, holding, or disposing of Charter's securities holds more than 35% of the ordinary voting power for the management of CCO.

Section 8(k)(ii) calls for a mathematical balancing of relative voting percentages in those instances where a person or group acquires more than 35% of ordinary voting power.  The provision is something of a mystery, however.  Throughout the trial, all parties assumed that the formula, if applicable and if out of balance, had the potential of derailing the Plan, but no one offered a cogent explanation as to the practical importance of the covenant that went beyond its mere existence and mandated technical requirements.

The business rationale for the formula is unstated.  Presumably, the provision is intended to serve as a proxy for ongoing control by Mr. Allen despite material new investment by another investor or group of investors.  But given the modification over time to the change of control covenants in the loan agreement, it is difficult to discern how a slight variation in the percentages, one way or the other, could have any impact on the credit risk of the borrower.  It is simply part of the bargain that Charter struck with its lenders, a corporate land mine to be avoided if reinstatement is to be achieved.

The Court has deliberated at length regarding the conduct of the bondholder members of the Crossover Committee in relation to Section 8(k)(ii) and has concluded

that these bondholders do not constitute a group.  Just because parties are similarly situated and perhaps also similarly motivated does not necessarily lead to the conclusion that they constitute a group as that term is used in Section 8(k)(ii).  Accordingly, this loan covenant does not apply to the restructuring transactions set forth in the Plan.

The term "group" for purposes of Section 8(k)(ii) is given a meaning that is borrowed from the definition that appears in Section 13(d) of the Securities Exchange Act, but the application of the defined term is different.  Section 13(d) is a regulatory provision that speaks to disclosure obligations and, as a result, should be liberally construed to achieve the statutory objectives of increased reporting and transparency while Section 8(k)(ii) is a loan covenant that prohibits only a limited category of change of control transactions as such transactions are described and shaped by the language of that covenant.  Because the covenant functions as a trigger to a potential default under a credit facility, it should be construed narrowly so as to enable the Borrower to engage in permissible corporate engineering.  With that perspective in mind, the most active members of the Crossover Committee (i.e., Apollo Management L.P. ("Apollo"), Oaktree Capital Management, L.P. ("Oaktree") and Crestview Partners, L.P. ("Crestview")) do not constitute a group for purposes of Section 8(k)(ii)[14].

Apollo, Oaktree and Crestview certainly are members of a group in the sense that they are working together to maximize their investments in Charter and to achieve common economic goals, but they do not fit the definition of a group as used in Section 13(d).  Separate investors would be considered a group and would have reporting obligations under the securities laws when two or more parties have agreed to acquire,

---

[14] JPMorgan includes Franklin Advisers, Inc. ("Franklin"), another member of the Crossover Committee, as a "supporting player" in its alleged 13(d) group.  The Court finds that there is no 13(d) group with or without the support of Franklin.

hold, or dispose of shares of an issuer. Here, members of the purported group clearly are working cooperatively and have done so in the past in other comparable transactions, but they are not connected by any formal or informal agreement to act jointly with respect to Charter's securities.

There are, however, certain informal indications of cooperative behavior and overlapping business objectives to be achieved collectively. JPMorgan has focused on a number of statements made in internal e-mails (particularly those at Crestview) commenting about controlling a reorganized Charter and the willingness of Apollo and Oaktree to appoint Jeff Marcus of Crestview to the board even though Crestview's ownership percentage was below the minimum needed for board representation. Crestview also prepared internal memoranda describing the arrangements among the bondholders as a joint effort to control Charter. These statements, in the Court's view, candidly reflect how the business people involved in the transaction felt at the time and viewed their parallel interests – the theme is one of "we are in this together" with coordination being in everyone's best interest.

The Court simply is not convinced that these bondholders that found themselves by happenstance conscripted into the same restructuring were acting as a partnership, syndicate or other group for purposes of acquiring, holding or disposing of securities. No agreements, express or implied, have been shown to exist, and the testimony of the bondholders makes this point emphatically clear. The Court also does not find the expert testimony of JPMorgan's expert on this issue to be persuasive. Certain of the bondholders may be private equity firms with "loan to own" investment strategies, but their prime objective in these cases based on the testimony is a combination of loss

mitigation and opportunism in their capacity as holders of Charter debt.  Wanting to

maximize a recovery by means of joining an ad hoc committee of bondholders is not

equivalent to forming a group to acquire securities in the sense that 13(d) uses that term.

The Court concludes that the bondholders worked collectively and in a

coordinated fashion but never formed a 13(d) group; they are independent actors who

were brought together in this transaction by the unwanted circumstances of a

restructuring initiated by Charter.  Consequently, regardless of the aggregate equity or

relative board power held by the so-called "takeover group," Section 8(k)(ii) does not

apply to the transaction, and Mr. Allen's board representation satisfies the requirement of

Section 8(k)(i) that he hold not less than 35% of the ordinary voting power for the

management of CCO.

### *Following Careful Scrutiny, The Settlement With Paul Allen Should Be Approved*

The agreement with Paul Allen is a central but controversial feature of the

proposed restructuring of Charter.  The Court has focused considerable attention on this

aspect of the Plan and has concluded that it represents an appropriate compromise of

conflicting positions, negotiated vigorously and in good faith and otherwise satisfies the

*Iridium* factors for approval of a settlement.  It is uniquely valuable to the Charter estate

by establishing the grounds for reinstatement of the senior debt and for realizing potential

tax savings that aggregate billions of dollars.

Nonetheless, given Mr. Allen's position as chairman of Charter's board and

controlling shareholder, the Court has viewed the CII Settlement with heightened scrutiny

and some skepticism.  The Court has even questioned why Mr. Allen should be receiving

any valuable consideration at all for cooperating with Charter and doing things for the

benefit of Charter that seem to fall into the category of the proper thing to do.  After all,

Mr. Allen has been closely associated with Charter for years and the involvement of such

a well-heeled sponsor no doubt has been, until recently, an ongoing source of comfort to

shareholders and creditors alike.  Although the Hippocratic Oath does not apply, it is not

unreasonable to expect someone in Mr. Allen's position to do no harm to those

stakeholders.

Skepticism notwithstanding, the Court recognizes that Mr. Allen is a businessman

and that Charter is not and never was a philanthropic venture.  As explained by Mr.

Milstein in his rebuttal testimony, the restructuring premise from the outset assumed that

Mr. Allen would be entitled to compensation for his cooperation in preventing a change

of control that, depending on one's perspective, either created or avoided the destruction

of substantial value for other stakeholders.  The CII Settlement also indisputably is the

product of a spirited negotiation in which sophisticated adversaries and their expert

advisors bargained with each other aggressively and in good faith at a time when the

prospect of a free-fall bankruptcy loomed large in the minds of the negotiators.  The give

and take of that process helps to validate the fairness of the result.

Additionally, the numbers themselves are undeniably powerful.  Mr. Allen is to

receive $375 million including approximately $180 million classified as pure settlement

consideration[15] while the benefits to the estate from reinstatement, future tax savings and

proceeds of the rights offering are estimated to total well over $3 billion.  The amounts to

---

[15] The argument of the CCI Noteholders that the CII Settlement is on account of his equity in CCI and, therefore, the Plan impermissibly diverts value from CCI to Mr. Allen is unfounded.  The Court is convinced, based on the evidence in the record, that the consideration to be paid to Mr. Allen is to be paid entirely on account of his concessions under the CII Settlement, including his agreements to cooperate to enable the senior debt to be reinstated and to enable the Debtors' NOLs (defined below) to be preserved, his transfer of his interests in CC VIII, LLC and his compromise of various contract claims.

be paid to Mr. Allen, while significant in absolute dollars, are not excessive in comparison to what Charter is to receive.  And that is the main economic reason for approving the CII Settlement.  The direct and indirect value to the estate and its creditors outweighs by a high multiple the amounts allocated to Mr. Allen.

Importantly, the CII Settlement was reviewed and approved by independent directors of Charter's board of directors who, while not members of a formal special committee, functioned as an independent group within the board.  The independent directors, some of whom testified during the trial, are highly qualified individuals who had a regular practice during board meetings of convening separately from Mr. Allen and his designated directors to consider what was in Charter's best interest.  These independent directors considered and approved the CII Settlement and concluded unanimously that approval was in the best interest of Charter.  Given the role played by the independent directors and the evidence indicating that Mr. Allen did not exert any undue influence over Charter in negotiating the CII Settlement, the CII Settlement should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the "entire fairness" standard of Delaware law applicable to transactions with controlling insiders.

After giving this subject considerable thought, the Court is satisfied that the CII Settlement is fair, in the best interests of the estate, and should be approved.  The releases relating to the CII Settlement are also appropriate under the circumstances presented and are enforceable.

*The CCI Noteholders Have Failed To Show That They Are Not Being Treated Fairly*

Under the provisions of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), the CCI Noteholders are entitled to receive distributions "of a value, as of the effective date of the [P]lan, that is not less than the amount that [they] would so receive … if the [Debtors] were liquidated under chapter 7".  11 U.S.C. § 1129(a)(7).  The CCI Noteholders are, contrary to their argument, receiving in excess of that.  The Debtors' liquidation analysis shows that in a liquidation under chapter 7, the CCI Noteholders would receive recoveries in the range of approximately 18.4% of their claims.  Their recoveries under the Plan far exceed that range, providing an estimated recovery of 32.7%.  Indeed, the CCI Noteholders are receiving the highest recovery under the Plan among all of the Debtors' unsecured noteholders.

The CCI Noteholders base their unfair treatment argument in large part on a series of "add-ons," including recoveries from alleged preference and avoidance actions, programming contracts, stock options and other intercompany receivables, that their expert witness, Edward McDonough, identified as sources from which the Debtors and, thereby, the CCI Noteholders, may receive additional recoveries in a liquidation.  The CCI Noteholders failed, however, to present any evidence as to the likelihood that there will be any actual or meaningful recoveries on account of the "add-ons."  Indeed, Mr. McDonough admitted during cross examination that the CCI Noteholders' potential recovery from the additional sources he identified could be lower than as stated in his expert report – he even admitted that the potential recovery from any or all of the additional sources could be zero.  As such, his testimony is largely speculative.

The CCI Noteholders also claim that net operating losses ("NOLs") generated through losses of the operating companies "belong" to CCI and that the CCI Noteholders therefore should receive additional distributions under the Plan to compensate them for the NOLs.  Notably, every witness who testified during the trial with respect to the NOLs claimed not to be a tax expert.  Furthermore, there is no evidence in the record that establishes CCI's right to independently exploit and derive value from the NOLs, regardless of which Charter entity actually "owns" them.

Finally, the CCI Noteholders also failed to produce any evidence (or rebut the Debtors' evidence via Mr. Doody's testimony to the contrary) that their claims were improperly classified separately from Class A-3 CCI General Unsecured Claims.

The various challenges to confirmation of the Plan presented by the CCI Noteholders are long on rhetoric but short on proof.  These creditors have been unable to show that they will not be receiving under the Plan more value than they would receive in a liquidation nor have they succeeded in proving that the Plan fails to satisfy all applicable standards for confirmation.

In the following sections of this Opinion the Court will address, in turn, issues related to reinstatement of the credit agreement, the settlement with Paul Allen (including releases to be given in connection with that settlement) and those confirmation requirements that have been contested by the CCI Noteholders.

### *Reinstatement*

Under the Plan, the Debtors propose to reinstate the claims of their senior secured lenders pursuant to Section 1124(2) of the Bankruptcy Code.  The Debtors maintain that reinstatement will leave the senior lenders unimpaired and entitle them to payment in full

in accordance with the credit agreement.  JPMorgan, as agent, objects to confirmation of

the Plan, asserting the existence of various defaults that preclude reinstatement.

Anticipating the reinstatement issue, on the petition date, JPMorgan for itself and as

agent, filed an adversary complaint, docketed at Adversary Proceeding No. 09-01132

(JMP)[16], (i) asserting the occurrence of a prepetition default identical to the alleged

default identified in JPMorgan's objection to Plan confirmation, (ii) asserting that the

adversary proceeding is not a core proceeding and (iii) refusing to consent to entry of

final orders or a judgment by this Court.  *See generally*, *JPMorgan Chase Bank, N.A. v.

Charter Comm'ns Operating, LLC (In re Charter Comm'ns)*, 409 B.R. 649, 651-53

(Bankr. S.D.N.Y. 2009) (providing procedural and factual background of Adversary

Proceeding No. 09-01132 (JMP)).

        The Debtors moved to dismiss the adversary complaint and also sought a

determination as to whether the litigation brought by JPMorgan is a core proceeding

under 28 U.S.C. § 157.  (Adv. Proc. Mot. Dismiss.)  At a hearing held on May 5, 2009,

the Court issued an oral ruling on the record holding that the dispute is core.  Adv. Proc.

Tr. 58: 14-23 (May 5, 2009).  In a Memorandum Decision dated July 7, 2009, the Court

further explained its ruling but declined to make a determination with respect to the

alleged prepetition default, which determination would likely be dispositive of whether or

not reinstatement is permissible as contemplated in the Plan.  *In re Charter Comm'ns*,

409 B.R. at 657 (internal quotation marks and citations omitted).

        Given the extensive trial record, it is now appropriate for the Court to address all

alleged defaults in the context of both JPMorgan's objection to Plan confirmation and the

---

[16] Pleadings to which the Court cites herein which are designated with the prefix "Adv. Proc." refer to
pleadings filed in Adversary Proceeding No. 09-01132 (JMP).

adversary proceeding.  As explained in the introduction and for the reasons that follow,

JPMorgan's objections to the Plan on the grounds of reinstatement are overruled, and

judgment will be entered for Charter with respect to the adversary proceeding.

The basis for JPMorgan's Plan objection comprises three alleged defaults under

the credit agreement.  Specifically, JPMorgan asserts that (i) the Designated Holding

Companies were unable to pay their debts as they become due in violation of section

8(g)(v) of the credit agreement; (ii) the consummation of the Plan will cause a change of

control to occur in violation of section 8(k) of the credit agreement; and (iii) an

acceleration of debt of the Designated Holding Companies due to the filing of the

bankruptcy cases has caused a cross-acceleration default under the credit agreement.

JPMorgan Br. Opp'n at 42, 66, 84.  In the adversary proceeding, JPMorgan confines its

arguments to those related to section 8(g)(v) of the credit agreement.

*Burden of Proof*

As Plan proponent, Charter bears the burden of establishing compliance with the

factors set forth in Bankruptcy Code section 1129.  *See*, *e.g.*¸ *Heartland Fed. Sav. &*

*Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)

(stating that "[t]he combination of legislative silence,  Supreme Court holdings, and the

structure of the Code leads this Court to conclude that preponderance of the evidence is

the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown"); *In*

*re World Com, Inc.* 2003 Bankr. LEXIS 1401 at *136 (Bankr. S.D.N.Y. 2003) (citing

*Briscoe*).

However, as the party objecting to reinstatement under the Plan and as plaintiff in

the adversary proceeding, JPMorgan has the burden of producing evidence to support the

occurrence of defaults under the credit agreement.  This finding that JPMorgan has the

burden to prove a default under the credit agreement is based on a long line of cases

addressing the issue of burden of proof with respect to contract assumption in the

bankruptcy context.  *See*, *e.g.*, *In re Cellnet Data Systems, Inc.*, 313 B.R. 604, 608

(Bankr. D. Del. 2004) (stating that "the nonbankrupt party [to an executory contract]

bears [the] burden to assert any defaults prior to" assumption of such contract) (internal

quotation marks and citations omitted); *Kings Terrace Nursing Home v. New York State

Dep't of Soc. Servs. (In re Kings Terrace)*, 1995 WL 65531 at *9 (explaining that a party

opposing contract assumption "has the burden of coming forward with all alleged

defaults and demonstrating that those defaults have been properly noticed on the debtor")

(citations omitted).

The Debtors and JPMorgan each has the independent concurrent burden to

persuade the Court by a preponderance of the evidence that, in the case of the Debtors,

reinstatement is appropriate because no defaults have occurred or will occur under the

credit agreement and, in the case of JPMorgan, that such defaults have occurred or will

occur.  It is a curious posture that could create a dilemma if neither party had succeeded

in carrying its burden.  The Court is satisfied, however, that the Debtors have met their

burden in establishing the grounds for reinstatement and that JPMorgan has failed to

prove the occurrence of defaults under the credit agreement.

*Standard for Reinstatement*

It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated

to a better position than their pre-petition legal entitlements.  *Butner v. United States*, 440

U.S. 48, 55 (1979).  To that end, Bankruptcy Code sections 1123 and 1129 provide that a

chapter 11 plan of reorganization may in appropriate circumstances treat certain obligations as unimpaired and reinstate the terms of a pre-petition debt obligation. 11 U.S.C. §§ 1123(b)(1), 1123(b)(5), 1129(a)(1). *See also* 7 Collier on Bankruptcy ¶ 1124.03 (15th ed. Rev.) (explaining that the Bankruptcy Code "permits the plan to reinstate the original maturity of the claim or interest as it existed before the default without impairing the claim or interest").

To reinstate a pre-petition obligation, a plan must de-accelerate any acceleration of such debt, reinstate the original maturity applicable to the debt, and provide for the cure of certain defaults that my have occurred. 11 U.S.C. § 1124(2). Bankruptcy Code section 1124 allows a debtor to cure any defaults, nullifying any consequences of such defaults, and returning the parties to pre-default conditions. *See Southland Corp. v. Toronto Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1058 (5th Cir. 1998). When a debt obligation is reinstated, a creditor is "thereby given the full benefit of his original bargain." *In re Gillette Assocs., Ltd.*, 101 B.R. 866, 875 (Bankr. N.D. Ohio 1989). "The holder of a claim or interest who under the plan is restored to his original position, when others receive less or nothing at all, is fortunate indeed and has no cause to complain." S. Rep. 95-598, at 120 (1978).

Applying this standard to the present controversy leads to a determination of whether defaults have occurred or will occur under the credit agreement and whether it is appropriate to treat JPMorgan and the other senior lenders as unimpaired creditors who are not entitled to vote for or against the Plan. This determination calls for a careful examination of the credit agreement itself and the disputed facts regarding Charter's value and sources of liquidity.

*Surplus*

JPMorgan alleges various defaults under the credit agreement pursuant to section 8(g)(v) thereof. JPMorgan argues that (i) when CCO drew down $250 million under the credit agreement on November 5, 2008, such borrowing was based on a misrepresentation that CIH and CCH were able to pay their debts as they become due, and (ii) when CCO requested additional funds on February 3, 2009, such request also was based on a misrepresentation that CIH and CCH were able to pay their debts as they become due. JPMorgan Br. Opp'n at 66. JPMorgan further asserts that, at a November 14, 2008 meeting, the Debtors' board of directors improperly determined that CCH I had a surplus sufficient to make a dividend to CIH, which dividend enabled CIH to make an interest payment on its debt. (The distribution to CCH enabling it to make its interest payment was made through payment of an intercompany account.)

JPMorgan bases its assertions on the claim that in November 2008, CIH and CCH had $224 million of interest payments due between November 2008 and April 2009 and no available source of cash to make those interest payments. JPMorgan Br. Opp'n at 66. Further, as of February 3, 2009, CIH and CCH had not made their $72 million January 2009 interest payments, had $81 million of debt due in April 2009, and no available source of cash to make those payments. JPMorgan Br. Opp'n at 66. JPMorgan asserts that CCO's alleged misrepresentations that CCH and CIH had the ability to pay their debts as they become due were contractual defaults that preclude reinstatement of the credit agreement. JPMorgan Br. Opp'n at 66.

Section 8(g)(v) of the credit agreement provides that it shall be an event of default if any of the Designated Holding Companies "shall generally not, or shall be

unable to, or shall admit in writing its inability to, pay its debts as they become due."
JPX 2 § 8(g)(v). JPMorgan asserts that section 8(g)(v) is prospective in nature leading to
the conclusion that a prepetition default has occurred that is not curable and that
precludes reinstatement. The Court disagrees.

Representatives from various participants in the lender syndicate testified at trial –
none could identify an instance where a lender had declared an event of default based on
a prospective assessment of what *may* occur at an unspecified time in the future.
Notably, JPMorgan's own witness, who has 29 years of banking experience, had never
called a default based on a prospective reading of a clause like 8(g)(v), nor is she
generally aware of JPMorgan's ever having called such a default. 8/25/09 Tr. 116:14-25
(Kurinskas). Moreover, no witness from any of the lenders under the credit agreement
who testified with respect to 8(g)(v) could describe definitively how far into the future
such a prospective obligation should extend. 7/31/09 Tr. 49:5–50:8 (Hooker) (unsure as
to how far in the future); 8/18/09 Tr. 14:25 (Kurinskas) (4-5 quarters into the future);
8/18/09 Tr. 13:24 (Ojea-Quintana) (no specific period of time applies); 8/18/09 Tr. 75:12
(Morris) (6-12 months into the future).

These varying estimates of the forward looking time period covered by the
covenant support the Court's conclusion that the provision is simply too uncertain as a
financial benchmark if it were interpreted as having prospective application. Despite the
varying views expressed as to the period covered by the test of the ability to pay debts, it
is JPMorgan's position that section 8(g)(v) is intentionally vague. 8/25/09 Tr. 30:9
(Kurinskas). But vagueness is hardly a desirable characteristic for identifying a potential
default under a multi-billion dollar credit facility. Making a covenant such as this

intentionally vague as to future events would naturally invite disputes as to the proper

way to apply the provision.  Given the disagreement among the lenders as to how long

the prospective period of 8(g)(v) should be construed and the obvious problem in

applying an "intentionally vague" covenant, the Court finds that a prospective reading of

8(g)(v) is so speculative, so impractical and so potentially problematic in its application

as to be unworkable and implausible.  .

As argued by the Debtors, such a forward-looking interpretation "would leave the

borrower in the dark as to whether or when to report that a default has occurred."

Debtors' Br. Supp. at 14.  Accordingly, the most logical and commercially realistic

reading of 8(g)(v) is that it relates to the *actual* inability to pay a debt that shall become

due.  Such a reading of the language of section 8(g)(v) from a linguistic perspective is

also fully consistent with other triggering events within the same section of the credit

agreement that use the word "shall" in terms of the present tense, not the future ("shall

generally not" … "shall admit in writing").

Even if the Court were to agree with JPMorgan and interpret section 8(g)(v)

prospectively, the evidence is inconclusive in demonstrating that CCH and CIH would be

unable to pay their debts as of any future date.  JPMorgan has proven that there was

doubt on the part of the Debtors as to the adequacy of surplus – indeed, the Debtors

deleted the representation from their traditional public disclosure that "we believe that

our relevant subsidiaries currently have surplus and are not insolvent" just after the

November 5, 2008 draw-down.  JPX 69 at 38 (stating that "[p]rimarily in light of the

economic environment, it is uncertain whether we will have, at the relevant times,

sufficient surplus at CIH and its parents, or potentially its subsidiaries, to make

distributions"). Additionally, JPMorgan's expert credibly testified that the valuation of the Debtors as of November 5, 2008 was less than the $18.7 billion threshold needed for surplus. *See* 8/31/09 Tr. 27:4-30:10 (Taylor). The credit agreement, however, does not require that the Designated Holding Companies have surplus or even be solvent. *See* 8/25/09 Tr. 84:7-8, 119:22-120:1 (Kurinskas). Rather, surplus is a requirement under Delaware law, to be measured at the time a dividend is declared. Del. Code Ann. Tit. 8, § 170(a).

The Court finds persuasive the record evidence regarding various other methods that the Debtors had available to enable the Designated Holding Companies to pay scheduled future debts. The declaration of a dividend (requiring surplus) is not the only means by which the Designated Holding Companies may make and have made interest payments. *See* 8/25/09 Tr. 120:15-124:12 (Kurinskas). The Debtors have, for example, used intercompany notes and intercompany transfers to make interest payments from the Designated Holding Companies. *See* CX101, §§ 7.6, 7.8; CX 110 at JPM-CH 00029446; CX 305; 7/31/09 Tr. 81:22-82:21 (Schmitz). These alternative payment methods do not require surplus. *See* 7/21/09 Tr. 205:14-16 (Smit); 8/25/09 Tr. 121 (Kurinskas). Here, it is significant that the Designated Holding Companies in fact paid all of their debts as they became due prior the filing of these chapter 11 cases. The Debtors have shown that they had the flexibility and ingenuity to access capital and distribute funds throughout their corporate structure in order to make interest payments such that there has been no pre-petition violation of section 8(g)(v).

Given that flexibility in moving funds and the role played by Charter's legal and financial advisors, the Debtors' board of directors did not act improperly in evaluating the

38

surplus question.  Under Delaware law, a determination of surplus is subject to the

business judgment standard and may be set aside only on a finding of bad faith or fraud

on the part of the board.  *See Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150,

156 (Del. 1997) (explaining that, in determining a claim based upon a section of the

Delaware General Corporation Law (Del. Code Ann., tit. 8) requiring surplus, the "court

may defer to the board's measurement of surplus" and that "[i]n the absence of bad faith

or fraud on the part of the board, courts will not substitute [their] concepts of wisdom for

that of the directors") (internal quotation marks and citations omitted).

There are sufficient facts presented here for the Court to defer to the Charter

board.  At its November 14, 2008 meeting, the Charter board of directors decided with

input from its advisors that there was sufficient surplus to make a distribution to CIH

through the payment of a dividend.  7/31/09 Tr. 85-100 (Schmitz); 7/21/09 Tr. 206:13-

215:4 (Smit); 7/22/09 Tr. 186-95 (Merritt); 7/21/09 Tr. 36-42 (Millstein).  Specifically,

the board considered a draft Duff & Phelps analysis prepared in connection with the

Debtors' annual franchise impairment valuation on October 1, 2008.  The analysis

showed a total enterprise value of $21.6 billion and a surplus at the relevant Designated

Holding Company of $2.839 billion.  *See* CX 225 at 4; 7/21/09 Tr. 208:23-209:18,

211:14-212:25 (Smit).

The board also reviewed information that sensitized the financial projections,

utilizing substantially lower levels of assumed EBITDA growth, and still concluded that

there would be sufficient surplus for a dividend of $62,812,000 to CIH.  CX 225 at 5;

7/21/09 Tr. 209:18-210:4, 213:1-214:21 (Smit).  Finally, the board sought and obtained

the advice of its financial advisor, who confirmed the reasonableness of the Duff &

Phelps analysis.  7/21/09 Tr. 37:9-42:9 (Millstein).  While not determinative, it is worth

noting that the estimates of value used by the board were either lower than, or equivalent

to, contemporaneous enterprise valuations prepared by JPMorgan itself and various other

market analysts.  CX 33; 8/3/09 Tr. 122:8-125:10 (DenUyl).  This contemporaneous

corroboration by informed market participants supports a finding that the board acted

reasonably in its deliberations regarding surplus.

Given the foregoing, there is no showing of bad faith or fraud, and the Court will

not substitute its judgment for that of the board.  Importantly, regardless of whether the

ability to pay debts as they become due is to be measured under section 8(g)(v) as of the

present or as of an unspecified future date, JPMorgan has not established that there has

been a pre-petition breach of this section of the credit agreement.  JPMorgan's Plan

objection based on section 8(g)(v) is, therefore, overruled and its adversary proceeding

for a declaratory judgment as to the occurrence of a pre-petition default under this section

is dismissed.

*Change of Control*

JPMorgan next argues that implementation of the Plan will result in a change of

control under sections 8(k)(i) and 8(k)(ii) of the credit agreement, thereby triggering a

default under the credit agreement that impairs JPMorgan's contractual rights and

prevents reinstatement.  JPMorgan Br. Opp'n at 42.

Section 8(k) of the credit agreement provides, in relevant part, that it shall be an

event of default for certain specified changes to occur in the ordinary voting power for

the management of the Borrower, as noted below:

> (i) the Paul Allen Group shall cease to have the power, directly or
> indirectly, to vote or direct the voting of Equity Interests having at least

35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, [or]

(ii) the consummation of any transaction . . . the result of which is that any 'person' or 'group' (as such terms are used in section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such 'person' or 'group' ….

JPX 2 §§ 8(k)(i), (ii).

Although the phrase "ordinary voting power for the management of the Borrower" is undefined, based on the record and a fair reading of the language, given Charter's holding company structure that voting power only can be exercised at the CCI level. Voting power at the parent necessarily extends to the management of all Debtor entities, including the Borrower (CCO). Because CCO is a limited liability company with membership interests that are 100% owned by an intermediate holding company within the organizational structure of the Debtors, the measurement of the percentage of voting power must occur at CCI. Indeed, CCO and its immediate parent entities have no separate boards of directors or other management - the board and management of CCI manage all Debtor entities, including CCO. 7/21/09 Tr. 191:16-193:11 (Smit). In addition, there is a Management Agreement between CCO and CCI (the "Management Agreement"), pursuant to which CCO appoints CCI as its manager and CCI agrees to provide all "management services" for CCO. *See* CX 305.

The board of CCI, which governs the management of CCI and its subsidiaries, including CCO, is elected by the shareholders of CCI. Under the Plan and Certificate of

Incorporation for reorganized CCI, the Paul Allen Group will have more than 38.4% of the voting power of the shares of CCI on a fully-diluted basis and will also control four of the eleven board seats (36.36%) at CCI.  8/24/09 Tr. 20-21 (Goldstein); CX 406 at 4. Therefore, the restructuring proposed in the Plan easily satisfies the requirements of section 8(k)(i) of the credit agreement.

The more complicated question involves the balancing of relative percentages of ownership to the extent that section 8(k)(ii) is deemed to apply due to the existence of a section 13(d) group, consisting of Apollo, Oaktree, Crestview and Franklin (these members of the Crossover Committee are referred to collectively as the "Bondholders"). Upon Plan consummation, the shareholdings of these Bondholders will aggregate in excess of 35% of the voting rights of the equity of the reorganized debtors.  JPMorgan alleges that the Bondholders – colorfully dubbed the "Takeover Group" – have acted and are acting together in a concerted effort to acquire equity securities of the Debtors. Accordingly, if the Bondholders really are a "Takeover Group," the restructuring will violate section 8(k)(ii) of the credit agreement.

The Securities Exchange Act of 1934 characterizes a 13(d) "group" as two or more persons who "agree" to "act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer … ."  15 U.S.C. § 78m(d)(3); Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1).  The evidence in the record does not support a finding that the Bondholders constitute a 13(d) group.  The Bondholders came together only after each made an independent decision to purchase Charter debt.  *See* 8/24/09 Tr. 233:12-234:18 (Gompers).  In fact, it was Charter's financial advisor that suggested the Bondholders form an *ad hoc* committee.

7/21/09 Tr. 50:25-53:21 (Millstein).  While each of them may be similarly motivated to

make the best of a currently distressed investment, there are no binding agreements of

any kind that tie the Bondholders together as a group for purposes of dealing with

Charter's equity securities.

To be sure, the record reflects indications of cooperative behavior among the

Bondholders, and that is not surprising.  *See, e.g.,* 7/28/09 Tr. 73:5-11 (Zinterhofer)

(Apollo representative testifying that he considers Oaktree, Crestview and Franklin as

"partners" in the Charter investment.)  However, the case law makes clear that the

existence of a group must be established by proof of an actual agreement.  *See, e.g.,*

*Quigley Corp. v. Karkus*, 2009 U.S. Dist. LEXIS 41296, *9-*10 (E.D. Pa. 2009) (stating

that a "[m]ere relationship, among persons or entities, whether family, personal or

business, is insufficient to create a group … [and] [t]here must be agreement to act in

concert") (citation omitted); *Litzler v. CC Invs., L.D.C.,* 411 F. Supp. 2d 411, 415

(S.D.N.Y. 2006) (explaining that "[g]eneral allegations of parallel investments by

institutional investors do not suffice to plead a 'group'").  Even JPMorgan's own expert

concedes that there is no express agreement or understanding among the Bondholders.

8/24/09 Tr. 243:25-245:21 (Gompers).  To the extent that this expert concludes that an

agreement can be inferred based on the observed behavior of private equity funds in other

transactions, the Court rejects such opinion testimony as speculative, unreliable and of no

probative value.

Although the Bondholders worked collectively, they never formed a 13(d) group;

they are independent actors who were brought together in this transaction by the

restructuring initiated by the Debtors.  Consequently, regardless of the aggregate equity

or relative board power that the Bondholders hold as a group, Section 8(k)(ii) does not

apply to the transaction, and no impermissible change of control will occur under this

section upon consummation of the Plan.  Accordingly, JPMorgan's[17] Plan objection

based on section 8(k) is overruled.

*Cross-Acceleration*

JPMorgan's final argument against reinstatement relates to cross acceleration

resulting from alleged defaults of the Designated Holding Companies under section 8(f)

of the agreement that it claims are not *ipso facto* defaults and for which no cure is

provided under the Plan.  JPMorgan Br. Opp'n at 84.

 Section 8(f) provides, in pertinent part, that it shall be an event of default under

the credit agreement if any Designated Holding Company other than CCOH shall (i) fail

to pay any installment of principal on any indebtedness exceeding $200 million, or (ii)

fail to make an interest payment or cause any other event of default with respect to such

indebtedness, provided that the failure to make such interest payment or such other event

of default results in the acceleration of such indebtedness.  JPX 2 § 8(f).

When CCH, CIH, CCH I and CCH II (each a Designated Holding Company) filed

bankruptcy petitions, each had over $200 million in debt governed by indentures which

contain identical or nearly identical provisions providing that (i) a bankruptcy filing is a

default and (ii) all outstanding notes shall be accelerated upon a bankruptcy default.  JPX

369 (CCH Indenture) at 6.01 and 6.02; JPX 370 (CCH Indenture) at 6.01 and 6.02; JPX

371 (CCH Indenture) 6.01 and 6.02; JPX 372 (CCH Indenture) 6.01 and 6.02; JPX 373

---

[17] The Court notes that each of the First Lien Lender Group, Wilmington Trust Company, as Indenture Trustee for the Second Lien Notes and Wells Fargo Bank, N.A. as Successor Administrative Agent and Successor Collateral Agent for the Third Lien Lenders has objected to confirmation of the Plan pursuant to section 8(k)(ii) of the credit agreement.  For the reasons set forth herein, each such objection is overruled.

(CIH Indenture) at 6.01 and 6.02; JPX 374 (CCH I Indenture) at 6.01 and 6.02; and JPX

375 (CCH II Indenture) at 6.01 and 6.02.

JPMorgan argues that such acceleration constitutes an event of default under

section 8(f) of the credit agreement and that this default is not an *ipso facto* default

because its Borrower under the credit agreement, CCO, is solvent.  JPMorgan Br. Opp'n

at 84.  JPMorgan bases its acceleration argument on the fact that section 8(f) does not

speak to CCO's financial condition or bankruptcy but rather to the financial condition of

affiliated, non-obligor Designated Holding Companies.  JPMorgan Br. Opp'n at 87.

JPMorgan contends that where a debtor is solvent, a court's role is to enforce creditors'

rights pursuant to contract terms, including those terms set forth in section 8(f).

Bankruptcy Code section 365(e) prohibits termination or modification of a

contract "solely because of a provision in such contract … that is conditioned on [*inter

alia*] the insolvency or financial condition of the debtor [or] the commencement of a case

under this title."  11 U.S.C. § 365(e).  In addition, Bankruptcy Code section 1124(2)(A)

carves out of its cure requirements "a default of a kind specified in section 365(b)(2) …

or of a kind that section 365(b)(2) expressly does not require to be cured." 11 U.S.C. §

1124(2)(A). Section 365(b)(2), in turn, specifies that those same two relevant categories

of default need not be cured – i.e., those relating to "the insolvency or financial condition

of the debtor at any time before the closing of the case" and "the commencement of a

case under this title." 11 U.S.C. § 365(b)(2)(A),(B).

Under relevant case law, because "cross-default provisions are inherently suspect,

… [b]efore enforcing them, a court should carefully scrutinize the facts and

circumstances surrounding the particular transaction to determine whether enforcement

of the provision would contravene an overriding federal bankruptcy policy and thus impermissibly hamper the debtor's reorganization." *Kopel v. Campanile, (In re Kopel)*, 232 B.R. 57, 64 (E.D.N.Y. 1999) (citations omitted); *see also Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),* 303 F.3d 410, 445 (5th Cir. 2002) (quoting *In re Kopel)*.  Thus, a determination to enforce a cross-default provision necessarily is fact-specific.  The question presented is whether the enforcement of section 8(f) urged by JPMorgan would contravene the overriding federal bankruptcy policy that *ipso facto* clauses are, as a general matter, unenforceable.  *See, e.g., In re Chateaugay Corp.*, 1993 U.S. Dist. LEXIS 6130, *15-*16 (S.D.N.Y. 1993) (explaining that Bankruptcy Code section 365 "abrogates the power of *ipso facto* clauses" and, therefore, "[n]o default may occur pursuant to an *ipso facto* clause").

The section 8(f) default is one relating to the insolvency or financial condition of a debtor and therefore need not be cured under Bankruptcy Code section 1124.  Charter is an integrated enterprise, and the financial condition of one affiliate affects the others.  Debtors' Br. Supp. at 69; 7/22/2009 Tr. 209–11 (Merritt).  JPMorgan itself has long linked the financial condition of the Designated Holding Companies to that of CCO.[18]  Indeed, JPMorgan's own witness testified that "[t]o the extent that there's a default at one of [CCO's] affiliates, that could have an impact on CCO."  8/25/2009 Tr. 64 (Kurinskas).  The record also shows that JPMorgan was the lead underwriter in a March 2008 issuance of CCO notes in which the offering memorandum provided that, because CCI "is [CCO's] sole manager, and because [CCO is] wholly owned by Charter Holdings, CIH, CCH I, CCH II, and CCO Holdings, their financial liquidity problems could cause serious

---

[18] The argument concerning the inability to pay debts as they become due under section 8(g)(v) of the credit agreement further demonstrates the relationship between JPMorgan's borrower and affiliates within Charter's capital structure.

disruption of [CCO's] business and could have a material adverse affect on [CCO's] operations and results." CX 134; 8/25/2009 Tr. 67 (Kurinskas).

The JPMorgan witness further testified that "because of the relationship between CCO at the bottom and the holding companies, including designated holding companies above, JPMorgan specifically negotiated defaults and events of defaults specifically linking the financial condition of the designated holding companies and the financial condition of CCO." 8/25/2009 Tr. 64:23-65:4 (Kurinskas); *see also* Adv. Proc. Compl. ¶¶ 5, 34, *In re Charter Comm'ns*, 409 B.R. at 658 (stating that "[c]oncentrating attention on a single solvent entity within the corporate structure disregards relationships within the integrated corporate enterprise," and noting that in drafting the adversary complaint, "JPMorgan acknowledged the close relationship between CCI and its affiliates") (internal quotation marks omitted).

Given the foregoing, an event of default based on the financial condition of a Designated Holding Company is necessarily connected both factually and contractually to the financial condition of CCO. Thus, any such cross acceleration event of default is an *ipso facto* default that either is ineffective and unenforceable or does not need not to be cured. Accordingly, section 8(f) of the credit agreement is not a bar to reinstatement.

*Motion to Dismiss the JPMorgan Adversary Proceeding Now Moot*

The motion to dismiss filed by Charter remains outstanding with respect to the adversary proceeding filed by JPMorgan on the first day of these bankruptcy cases. The Court ruled on the core versus noncore aspect of that motion but held in abeyance any ruling on the adequacy of the complaint. In light of the trial on the merits of JPMorgan's complaint, the motion to dismiss has been rendered moot.

Dismissal on the pleadings is not appropriate because there has been a full

evidentiary hearing in which JPMorgan was unable to prove the existence of any

prepetition defaults under the credit agreement.  As noted above, the Court has concluded

that Section 8(g)(v) of the credit agreement should not be read prospectively, and even if

it were to be so interpreted, the facts do not support a finding that any of the Designated

Holding Companies was unable to pay its debts as they become due.  Accordingly,

judgment in the adversary proceeding is granted in favor of Charter.

### *Settlement With Paul Allen*

#### *Standard*

The CII Settlement is a key component of the Plan that, for reasons noted in those

sections of this opinion dealing with reinstatement, is a necessary condition for Charter to

reinstate its senior secured debt.  To the extent that a Plan includes a settlement, the

settlement is to be judged in accordance with the law applicable to the approval of a

settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure.  *Motorola,*

*Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d

452, 462 (2d Cir. 2007).

A bankruptcy court may approve a settlement under *Rule 9019* if it is fair and

equitable and in the best interests of the estate.  *Protective Committee for Independent*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425, (1968).  In

order to determine if a settlement meets these standards a court must be apprised of all

"factors relevant to a full and fair assessment of the wisdom of the proposed

compromise."  *Id.*  And while the "approval of a settlement rests in the Court's sound

discretion, the debtor's business judgment should not be ignored." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y 2009) (internal citations omitted).

Courts in the Second Circuit evaluate whether a proposed settlement is in the best interests of the estate and fair and equitable by applying the factors set forth in *In re Iridium Operating LLC.*[19]  478 F.3d at 462.  The standard does not require that the settlement be the best the debtor could have obtained nor does it require the court to conduct a mini-trial of the questions of law and fact.  *In re Adelphia Comm'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y 2005), *and aff'd*, 337 B.R. 475 (S.D.N.Y.) *aff'd*, 224 F. App'x 14 (2d Cir. 2006).  Rather, the Court must "canvass the issues raised by the parties" and determine whether the settlement is reasonable.  *In re Stone Barn Manhattan,* 405 B.R. at 75; *In re Teltronics Servs., Inc.*, 762 F.2d. 185, 189 (2d Cir. 1985).

*The CII Settlement*

The CII Settlement is the cornerstone of the Plan and the means by which the Debtors avoid a change of control.  Reinstatement (made possible by the CII Settlement) will save the Debtors and their estates hundreds of millions of dollars in annual interest expense.  8/24/09 Tr. 16:18-17:3 (Goldstein); VDX 3 (CII Settlement: "Gives" and "Gets").  The Settlement also provides for Mr. Allen's forbearance from exercising his prepetition exchange rights and maintenance of a one percent interest in Charter

---

[19] The Iridium factors are:  "(1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'"  *Id.* (quoting *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006)).

Communications Holding Company, LLC ("Holdco").  This forbearance results in the
Debtors' preservation of approximately $2.85 billion of NOLs, with an estimated cash
value of over one billion dollars. *See* Degnan Aff. ¶ 9; 8/24/09 Tr. 16:18-17:3
(Goldstein); VDX 3 (CII Settlement: "Gives" and "Gets").  Additional aspects of the CII
Settlement include the $1.6 billion rights offering, a stepped-up tax basis in a significant
portion of the Debtors' assets, and the purchase of Mr. Allen's CC VIII Preferred Units.
*See* VDX 3 (CII Settlement: "Gives" and "Gets").  The Debtors are receiving in excess of
$3 billion in the CII Settlement.  In exchange for this value, the Debtors are providing
Mr. Allen with approximately $375 million.[20]  *Id.*  The breakdown of the "gives" and
"gets" is as follows:

---

[20] Even without the CII Settlement, the Debtors would have been obligated to pay the $25 million Allen
Management Receivable, and, to the extent they wished to purchase the remainder of Mr. Allen's CC VIII
preferred units, approximately $150 million.  CX 211, Debtors' Disclosure Statement at 27; Goldstein
Decl. ¶ 26.

| Terms of CII Settlement[21] | |
|---|---|
| **Key Settlement Benefits** | **Key Settlement Costs** |
| • $1.14 billion cash tax savings associated with preservation of $2.8 billion of NOLs<br><br>• Hundreds of millions of dollars for preservation of reinstatement ability[22]<br><br>• $135-165 million to purchase the CC VIII Preferred Units<br><br>• $1.6 billion infusion of new capital through the rights offering[23]<br><br>• Step-up in tax basis | <u>Claim and Sale Consideration</u><br>• $150 million to sell the CC VIII Preferred Units<br>• $25 million Allen Management Receivable[24]<br><br>**Total Claim and Sale:    $175 mm**<br><hr>• <u>Settlement Consideration</u><br>• $85 million New CCH II Notes<br>• $60 million 3% Common Equity<br>• $35 million 4% Warrants<br>• $20 million capped fee reimbursement<br><br>**Total Settlement:    $180 mm** |
| **Grand Total: ~          $3.5 billion +** | **Grand Total:          $375 million** |

*The CII Settlement Meets the 9019 Standard*

The CII Settlement is a controversial feature of the Plan not because of the

manifest benefits to the estate but because of the agreement to transfer substantial

consideration to Mr. Allen.  The Court has carefully considered the relative benefits and

costs summarized in the above chart and is convinced for the reasons noted in the

following sections that this essential component of the Plan complies in all respects with

---

[21] This chart is based on VDX 3 (CII Settlement: "Gives" and "Gets") and accurately summarizes the CII Settlement; *See also* Debtors' Disclosure Statement at 27-28.

[22] "On the preservation of the ability to reinstate the debt, this -- I think we've been conservative in putting hundreds of millions of dollars, frankly at the time we were negotiating this when there was even more severe dislocation of the credit markets, that was up to billions of dollars.  Every hundred basis points of increase in the debt would be a 500 million dollar expense to the company.  And so once you start talking about potentially several hundred basis points, you very quickly get into the billions of dollars."  8/24/09 Tr. 16:18-17:3 (Goldstein).

[23] "[W]ithout the CII Settlement, this plan would not be possible at all and therefore the rights offering couldn't happen. . . . the CII Settlement is one of the bases for the plan and which allows the rights offering to happen, allows the debtors to raise this money."  8/17/09 Tr. 34:7 – 34:12 (Doody).

[24] The "Allen Management Receivable" is a "$25 million [payment] for amounts owing to CII under the Management Agreement and predecessor agreements."  CX 407, Plan at Article I.A.6; *see also id* at Article VI.A.2(a), (d).

the *Iridium* standards, is in the best interests of the Debtors' estates and is fair and equitable.

*Best Interests of the Estate*

The CII Settlement is in the best interests of the Debtors estates because it (i) renders the Debtors' Plan feasible and (ii) is a reasonable settlement. The Debtors' Plan is premised on the twin goals of debt reinstatement and preservation of tax attributes. Achieving these goals required an agreement with Mr. Allen to take certain actions that he had no legal duty to perform, and to refrain from taking certain actions he was legally permitted to perform.[25]  8/24/09 Tr. 13:20-14:14, 155:5-156:13 (Goldstein); 7/21/09 Tr. 61:5-62:6 (Millstein). Mr. Allen's agreement to hold a controlling position in Charter within the meaning of the credit agreement was necessary for the reinstatement of the Debtors' senior secured debt. *Id.* at 62:1-6. Likewise, his agreement not to exercise his exchange rights leaves the Debtors' corporate structure in place and preserves an estimated $1.14 billion in NOLs. *Id. See also* 8/24/09 Tr. 155:5-23 (Goldstein).

Fundamental to the Plan is the Debtors' reinstatement of $11.4 billion in senior secured debt at favorable interest rates. Reinstating this credit facility saves the Debtors hundreds of millions of dollars in annual interest expense thereby greatly benefiting the Debtors' estates. 8/24/09 Tr. 16:18-17:3 (Goldstein). Critically, as discussed above, reinstatement depends on the agreement of Mr. Allen to maintain 35% of the voting power of CCI to avoid a change of control default. *See* Goldstein Decl. ¶ 24-25; 9/2/09 Tr. 68:17-23, 148:15-23 (Conn). The CII Settlement, thus, is central to the mechanism by which the Debtors are able to reinstate their senior bank debt.

---

[25] The CII Settlement does not compensate Mr. Allen for his equity interests in the Debtors. The settlement compensation is for the prospective duties and obligations Mr. Allen agreed to assume in exchange for consideration.

The CII Settlement will also enable the Debtors to achieve significant tax savings by preserving $2.8 billion of NOLs. Degnan Decl. ¶¶ 8-9; 8/24/09 Tr. 16:9–17 (Goldstein). These potential tax savings are available because the Debtors have had "substantial operating losses as a tax matter for many years." 7/21/09 Tr. 48:2-3 (Millstein). The NOLs are valuable now, because upon emergence from bankruptcy the Debtors project having positive income against which to apply their NOLs. *Id.* 48:4-15. The ability to utilize these valuable tax attributes in the future is purely a function of Mr. Allen's cooperation. 8/31/09 Tr. 184:21–24 (Johri); 7/22/09 Tr. 202:24-203:18 (Merritt); 7/21/09 Tr. 222:19-223:4, 224:2-18 (Smit); 8/17/09 Tr. 239:4-8 (Doody).

The adverse impact to the Debtors if the CII Settlement is not approved is real and significant. The Debtors will remain in bankruptcy, inevitably face materially higher borrowing costs, and potentially forfeit billions of dollars in tax savings. The benefits of the CII Settlement far outweigh its costs. Accordingly, despite the significant consideration being paid to Mr. Allen, the CII Settlement is in the best interests of the estate.

*The Benefits of the CII Settlement Outweigh the Likelihood of Success on the Merits*

The first factor of the *Iridium* test calls for comparing the likelihood of success in litigation with a settlement's future benefits for the estate. This factor is hard to apply because approval or denial of the settlement will not necessarily result in litigation but rather the inability to confirm a prenegotiated Plan for Charter with resulting incremental administrative expenses and risks to the Debtors' estates of a potentially prolonged and uncertain bankruptcy process. The settlement has been proposed because of the extreme difficulty in obtaining the benefits of the CII Settlement through litigation. *See* Doody

Decl. ¶ 33.  The benefits of the CII Settlement are substantial and obvious.  The Settlement permits reinstatement by "avoiding a change of control that could trigger the acceleration of the bank debt" and "optimizing the tax structure so as to preserve as much of the NOL[s] as possible."  7/21/09 Tr. 61:24-62:6 (Millstein); 7/22/09 Tr. 202:24 – 203:18 (Merritt).

### The Likelihood of Complex and Protracted Litigation

The Plan has already generated complex and protracted litigation relating in part to the proposed Settlement.  While it is foreseeable that disapproval of the settlement will defeat the Plan and lead to alternative proposals for restructuring Charter that could involve future litigation among the parties, that adverse outcome will not necessarily be followed by complex and protracted litigation as to the subject matter of the settlement itself.  Accordingly, this factor is not relevant to the Court's consideration of the proposed settlement terms.

### The Interest of Creditors

The CII Settlement is fundamental to the Debtors' Plan and has the enthusiastic support of the Official Committee for Unsecured Creditors.  *See* 7/20/09 Tr. 88:11-89:1 (Elkind); *See also* Comm. Br. Supp.  The Settlement brings enormous value to the estate and increases the recoveries for creditors generally.  *See* 9/2/09 Tr. 148:15-23 (Conn); 9/10/09 Tr. 25:10-13 (Millstein).   Notably, the compromise reached regarding the amounts to be received by Mr. Allen was the product of intense discussions with Charter's bondholders (who served as a proxy for the interests of other creditors), and reflects agreed payments that creditors themselves recognized were for the good of the enterprise.

*Other Parties in Interest*

As discussed above, the Crossover Committee and the Creditor's Committee support the Settlement and recognize its central importance to the Plan. The CCI Noteholders, on the other hand, have been vocal in their opposition to the Settlement and have complained that Mr. Allen is receiving too much and that CCI (as opposed to the entire Charter enterprise) is receiving too little (particularly in respect of NOLs allegedly attributable to CCI that are being preserved under the Settlement). *See* Law Debenture Trust Br. Opp'n at 83-90. As discussed below in the section of this opinion dealing with confirmation standards, the CCI Noteholders have not proven that the Settlement as a whole is not beneficial nor have they demonstrated any particularized entitlement to share separately in any portion of the value associated with the NOLs. Charter's many stakeholders, including thousands of employees, are benefited by a Settlement that adds so much value to the enterprise, and so this factor favors approval of the CII Settlement.

*The Competency and Experience of Counsel*

All parties to the CII Settlement were represented by highly regarded law firms and financial advisors with ample relevant experience in the restructuring field. *See* Doody Decl. ¶ 32; *see also* 8/17/09 Tr. 25:25-26:11 (Doody). The Court also notes that the parties to the Settlement themselves are sophisticated and experienced in high-stakes negotiations. This factor favors approving the settlement.

The Law Debenture Trust Company alleges that no fiduciary or advisor to CCI played a meaningful role during the Settlement negotiations and that this factor detracts from the fairness of the CII Settlement. Law Debenture Trust Br. Opp'n at 68-69. The evidence is otherwise and supports a finding that the Board, in conjunction with its

advisors, fulfilled its fiduciary duties and, following independent review, approved a settlement that maximized value for all stakeholders, including the CCI Noteholders. 7/22/09 Tr. 241:2-2:43:11 (Merritt); 8/31/09 Tr. 156:23-157:20 (Johri).

<em>The Nature and Breadth of Releases for Officers and Directors</em>

The CII Settlement does not independently release directors and officers, but it does require that the Plan provide for such releases. 7/16/09 Doody Decl. ¶ 39; *See* CX 407, Plan at Art. X.D, X.E. These releases, discussed in more detail below, are appropriate and justified as essential to the structure of the CII Settlement and are provided in return for substantial and unique consideration from Mr. Allen. *See* 9/2/09 Tr. 86:10-88:20 (Conn); 8/17/09 Tr. 62:18-63-18 (Doody). Indeed, as measured by the difference between the benefits of the CII Settlement and its costs, the resulting net consideration easily amounts to billions of dollars. *See* Goldstein Affidavit ¶ 22-30; 9/2/09 Tr. 176:7-177:13 (Conn). Accordingly, substantial consideration supports the releases.

<em>The Extent to which the CII Settlement is the Result of Arm's-Length Bargaining</em>

The unrebutted testimony proves that the CII Settlement is the product of vigorous and hard-fought three-way negotiations involving the Debtors, Mr. Allen, and the Crossover Committee. *See* 7/21/09 Tr. 55:9-12, 73:4-9 (Millstein); 7/21/09 Tr. 222:19-21, 224:1 (Smit); 8/17/09 Tr. 26:12-19 (Doody); 7/22/09 Tr. 172:19-173-5 (Merritt). These negotiations spanned more than a month, included multiple proposals and counter-proposals, and yielded concessions and modifications from all parties. *See* 8/17/09 Tr. 28:24 – 29:9 (Doody); 7/29/09 Tr. 210:18-211:18 (Liang)

Because these discussions involved parties with clearly divergent economic
interests, the negotiations were well suited to develop a practical and fair result. *See*
7/29/09 Tr. 209:24-210:8 (Liang). The outcome is thus market tested in the sense that the
Crossover Committee was negotiating as an adversary with its own dollars at stake
against Mr. Allen. Any value flowing to Mr. Allen from the CII Settlement came directly
from the Crossover Committee's pocket. *Id.* The Court is satisfied that the CII
Settlement represents the considered judgment of economically motivated parties who
were negotiating at arm's-length to reach the best settlement that could be achieved under
the circumstances.

### The CII Settlement is Fair, Equitable, and Reasonable

The Court's role in deciding whether to approve a settlement is to canvass the
record and ensure that the settlement is (i) fair and equitable and (ii) does not "fall below
the lowest point in the range of reasonableness." *In re Teltronics Servs.*, 762 F.2d. at
189. The extensive record establishes that the CII Settlement is fair and equitable. It
unquestionably falls above the lowest point in the range of reasonableness and satisfies
the standards required for approval of settlements in this Circuit.

### Debtors' Releases

Article X.D of the Debtors' Plan provides that the Debtors shall fully discharge
and release all claims and causes of action against the Debtor Releasees[26] arising from or
related in any way to the Debtors (the "Debtor Releases"). Debtors are authorized to
settle or release their claims in a chapter 11 plan. *See* 11 U.S.C. 1123(b)(3)(A)

---

[26] The Debtor Releasees include (a) the Debtors; (b) the parties who signed Plan Support Agreements with
a Debtor; (c) any statutory committees appointed in the chapter 11 Cases ((a)-(c), collectively, the
"Releasing Parties"); and (d) for each of the Releasing Parties, their respective members, officers, directors,
agents, financial advisors, attorneys, employees, partners, Affiliates, and representatives. Plan at X.D at 60.

(permitting a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."); *see also In re Adelphia Comm'ns Corp.*, 368 at 264 n.289.  When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.  *See generally, In re Bally Total Fitness of Greater New York, Inc.,* 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. 2007).  Here, the Debtor Releases are an integral part of a comprehensive Plan that provides substantial value to the estates.  Doody Decl. ¶ 36*; see also* 7/22/09 Tr. 268:15-269:19 (Merritt).  These releases have limited value and are procedurally efficient, in view of the fact that most of the Debtor Releasees have indemnification rights such that any claims by the Debtors against them would ultimately lead to claims being asserted against the Debtors.  *See* Doody Decl. ¶ 36.

### Third Party Releases

In addition to the Debtor Releases, Article X.E of the Plan, in conjunction with the CII Settlement, provides for certain third party releases (the "Third Party Releases"). Certain parties (collectively, the "Release Objectors") object to confirmation on the grounds that these Third Party Releases are improper.[27]  The Third Party Releases, under the circumstances presented, satisfy the requirements for such releases in the Second Circuit, and are accordingly approved.

Non-debtor releases are permissible in the Second Circuit where "truly unusual circumstances render the release terms important to success of the plan."  *Deutsche Bank*

---

[27]    *See* CCI Noteholder Objection at 98-100 [Docket No. 581]; JP Morgan Objection at 32-34 [Docket No. 600] (Filed Under Seal); Objection of Wells Fargo Bank, N.A., as Successor Administrative Agent and Collateral Agent, to Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (Filed Under Seal) [Docket No. 584] at 41-46; Objection of Key Colony Fund, LP to Joint Plan of Reorganization [Docket No. 574] at 1-10; Objection of the United States Trustee to the Debtors' Joint Plan of Reorganization [Docket No. 475] at 1-15; Objection of the U.S. Securities and Exchange Commission to the Confirmation of the Debtors' Joint Plan of Reorganization [Docket No. 576] at 1-12.

*AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d

136, 142-43 (2d Cir. 2005); S*EC v. Drexel Burnham Lambert Group, Inc. (In re Drexel*

*Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases,

a court may enjoin a creditor from suing a third party, provided the injunction plays an

important part in the debtor's reorganization plan.").  Courts will only tolerate non-debtor

releases, however, in "circumstances that may be characterized as unique."  *In re*

*Metromedia*, 416 F.3d at 142.  Adhering to the Second Circuit's indication that non-

debtor releases should be rare, courts have found that "the mere fact of financial

contribution by a non-debtor cannot be enough to trigger the right to a

*Metromedia/Drexel* release."  *Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45,

55 (S.D.N.Y. 2006).  The non-debtor contribution must do more.

Given the unusual features of the Plan, the non-debtor contributions extend well

beyond the level required for a release.  The *Metromedia* Court noted that this

determination is "not a matter of factors and prongs," but did provide guidance as to the

settings where non-debtor releases may be appropriate.  *In re Metromedia*, 416 F.3d at

142.[28]  The record establishes that the Third Party Releases are permissible here - the

Debtors are to receive substantial financial and non-financial consideration in exchange

for the non-debtor releases, there is an identity of interest between the debtors and the

non-debtor releasees by indemnification agreements, and this case involves truly unusual

circumstances that render the Third Party Releases important to the success of the Plan.

---

[28] These include "whether the estate received substantial consideration; the enjoined claims were 'channeled' to a settlement fund rather than extinguished; the enjoined claims would indirectly impact the debtor's reorganization 'by way of indemnity or contribution'; and the plan otherwise provided for the full payment of the enjoined claims.  Nondebtor releases may also be tolerated if the affected creditors consent."  *In re Metromedia*, 416 F.3d at 142 (citations omitted).

*Substantial Consideration*

The Debtors' estates will be receiving substantial consideration in exchange for the Third Party Releases. The CII Settlement Claim Parties[29] agreed to undertake actions to permit the reinstatement of senior secured debt at favorable interest rates and refrain from taking action that would degrade the value of the Debtors' potentially valuable NOLs. 8/17/09 Tr. 34:4-24 (Doody). Notably, while the result of the CII Settlement confers billions of dollars in value on the Debtors, these are not mere financial exchanges. *See* 8/17/09 Tr. 238:9-239:8 (Doody); *see also* 7/22/09 Tr. 202:24-203:18 (Merritt). The value of the CII Settlement is driven by the identity of and binding promises by the CII Settlement Claim Parties. Due to these uniquely personal structuring benefits, no other party could stand in their shoes and achieve the same result. The Third Party Releases, therefore, are being granted in exchange for very substantial consideration in a rare restructuring context.

*Identity of Interest*

The indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest between the Debtors and the CII Settlement Claim Parties. *See* 8/17/09 Tr. 62:25-63:9 (Doody); *see also* Doody Decl. ¶ 40. This identity of interest supports approving the Third Party Releases.

---

[29] A "CII Settlement Claim Party" is defined as "(a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; (c) any trust in which Mr. Allen is the grantor or which is created as a result of his death; (d) CII; and (e) any other Allen Entity which Mr. Allen or any of the other persons or Entities identified in clauses (a) through (d) of this definition, unilaterally or together with any other Allen Entity (directly or through agents), can legally bind to a settlement, compromise and release of Claims and Interests against the applicable Debtors under the Plan without authorization, consent or approval of any other person or Entity; provided, however, that in no event shall "CII Settlement Claim Party" include any public company, including without limitation, any Entity that has securities listed, quoted or traded on any securities exchange. CX 407, Plan at Article X.E.

*Unusual Circumstances*

The CII Settlement would be a notable and innovative restructuring at any time, but is especially remarkable having been negotiated at the height of the so-called "Great Recession."  It is unusual in a number of important respects.  First, Mr. Allen and individuals associated with him, the CII Settlement Claim Parties, were uniquely able to support the structure of the Plan.  *See* 9/2/09 Tr. 152:11-153:2 (Conn).  Second, Charter's structure is complex, its debt load is enormous, and its bankruptcy is one of the largest prearranged cases ever filed.  *See* 8/17/09 Tr. 63:10-18 (Doody).  Third, by means of the rights offering Charter has succeeded in raising substantial capital during an exceptionally difficult and uncertain time in the credit markets.  *Id.*  Fourth, the Plan is only possible if the senior secured debt is reinstated and the company's NOLs are preserved, and both of these goals require voluntary participation in the Plan by the CII Settlement Claim Parties.  *See* Goldstein Decl. ¶ 28.  Fifth, Mr. Allen is an individual well known for his wealth; such a conspicuously public figure may be expected to attract litigation relating to Charter without the protection of releases.  Overall, the unique manner in which value is being created, the sheer magnitude of the cases, and the once-in-a-lifetime market conditions in which this creative restructuring took place, in combination, justify approval of the Third Party Releases.

*Essential to the Plan Process*

The Third Party Releases also are an integral part of the Plan.  Third Party Releases were included by the CII Settlement Parties in their first response to the strawman restructuring proposal, remained a part of the transaction, and were never negotiated away.  *See* 8/17/09 Tr. 62:18-63:2 (Doody).  These Third Party Releases are

essential to the CII Settlement.  9/2/09 Tr. 86:10-88:1 (Conn).  As a requirement of the

CII Settlement, the Third Party Releases are thus an essential component of the Plan that

has been accepted by nearly all creditor classes entitled to vote.  *See* Doody Decl. ¶ 39.

The CII settlement and the Third Party Releases are vital to the Plan and are approved.

### *Plan Satisfies Confirmation Standards*

Bankruptcy Code section 1129(a) delineates the requirements that chapter 11

plans must satisfy to be confirmed by a bankruptcy court.  <u>See</u> 11 U.S.C. § 1129(a) ("The

court shall confirm a plan only if all of the following requirements are met:  (1) … (16)").

It is undisputed[30] that the Plan satisfies a majority of the applicable[31] confirmation

requirements.  The Court has determined that the Plan satisfies each of the remaining

contested confirmation requirements and overrules the objections of the CCI

Noteholders.    For administrative ease, the Court addresses these confirmation

requirements contested by the CCI Noteholders in sequence below.

---

[30] No parties dispute that the Plan satisfies the following applicable confirmation requirements:  Bankruptcy Code sections 1129(a)(2), 1129(a)(4)-(5), 1129(a)(8)-(9), 1129(a)(11)-(13).    To the extent the Plan's satisfaction of 11 USC § 1129(a)(5) remains at issue, the Court concludes that this confirmation standard is satisfied.  It is undisputed that two out of the eleven seats on the Debtors' board of directors remain vacant.  <u>See</u> JP Morgan Post-Trial Brief at pp. 57 – 61.  Although section 1129(a)(5) requires the plan to identify <u>all</u> directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the <u>known</u> directors.  *See In re Am. Solar King. Corp.*, 90 B.R. 808, 815 (Bankr. W.D.Tex. 1988) ("The debtor's inability to specifically identify future board members does not mean that the debtor has fallen short of the requirement imposed by [1129(a)(5)] because the debtor *at this point*" disclosed all known directors).  The testimony of Ms. Villaluz of Franklin also explained the ongoing internal process for identifying the director to be selected by Franklin and made clear that this director would be independent and have no connection to Franklin.

[31] The confirmation requirements set forth in subsections (a)(6), (14), (15), and (16) of section 1129 are not applicable to the Plan.  11 U.S.C. § 1129(a)(6) concerns the need for government approval of rate changes subject to government regulatory jurisdiction; § 1129(a)(14) concerns debtors required by order or statute to pay domestic support obligations; § 1129(a)(15) applies to individual debtors; and § 1129(a)(16) is only relevant to the mechanism by which certain property is transferred.

*Plan Was Proposed In "Good Faith" In Satisfaction Of 11 U.S.C. §1129(a)(3)*

Bankruptcy Code section 1129(a)(3) requires that a chapter 11 plan of reorganization be "proposed in good faith and not by any means forbidden by law."  As used in this context, "good faith" requires that a plan be "proposed with 'honesty and good intentions' and with 'a basis for expecting that reorganization can be effected.'" *Kane v. Johns Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (quoting *Koelbl v. Glessing (In re Koelbl)*, 751 F.2d 137, 139 (2d Cir. 1984)).

The Plan has been proposed in good faith in compliance with section 1129(a)(3). Several of the Debtors' directors testified that they supported the Plan because they believed it maximized value.  *See* 7/21/09 Tr. at 46:24-47:4 (Smit) ("maximiz[ing] value to the extent possible so it could provide a greater recovery to the creditors' losses … was … the goal of these exercises, generally"); 7/22/09 Tr. at 243:6-11 (Merritt) ("The objective of the board was to maximize the overall enterprise value").[32]  Moreover, the record includes extensive testimony that the Plan resulted from arms-length negotiations, which is indicative of good faith.  *In re Enron Corp.*, 2004 Bankr. LEXIS 2549 at *80 (Bankr. S.D.N.Y. July 15, 2004) (confirming plan and finding good faith requirement satisfied in part because plan resulted from "extensive arm's-length discussions").  *See*, *e.g.*, 7/21/09 Tr. at 73:4-9:10 (Millstein) (negotiations were at arms length); 7/21/09 Tr. at 223:10-224:12 (Smit) (the settlement parties had separate counsel and advisors and conducted arms length negotiations).

The Plan further complies with Bankruptcy Code section 1129(a)(3) because it was not proposed "by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The CCI

---

[32] Moreover, as discussed herein, the CII Settlement embedded in the Plan was proposed in good faith.

Noteholders contend that the Plan fails to satisfy section 1129(a)(3) because this provision requires the Plan, and the embedded CII Settlement, to satisfy the "entire fairness" standard under Delaware corporate law.  Law Debenture Trust Br. Opp'n at 86-87. ("A central element of the proposed plan is a transaction between the Debtors and Mr. Allen … the Debtors must prove that the Allen Settlement and the Plan are entirely fair" in satisfaction of Delaware fiduciary duty standard).

This argument fails for two reasons.  First, the "entire fairness" standard does not apply in light of the record showing that the negotiations that resulted in the settlement were initiated by Lazard for the benefit of the enterprise, not by Mr. Allen for his benefit, and that the settlement was approved by independent members of Charter's board. Second, even if the "entire fairness" standard were applicable, the plain language of section 1129(a)(3) does not require that the Plan's contents comply "in all respects with the provisions of all nonbankruptcy laws and regulations" because it "speaks only to the proposal of a plan ..." *In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 59 (Bankr. S.D.N.Y. 1990), quoting 5 Collier on Bankruptcy, ¶ 1129.02, 129-23 (15th ed.); *In re General Dev. Corp.*, 135 B.R. 1002, 1007 (Bankr. S.D. Fla. 1991) (holding that proposed plan satisfied Bankruptcy Code section 1129(a)(3) even if its distribution of stock to the objecting municipalities could be construed to violate the Florida Constitution).

*CCI Noteholders Will Receive More Under The Plan Than They Would Receive Under Hypothetical Chapter 7 Liquidation*

Notwithstanding the CCI Noteholders' objection, the Plan satisfies section 1129(a)(7) because it proposes a recovery that exceeds by a substantial percentage what they would receive under a liquidation in chapter 7.  11 U.S.C. § 1129(a)(7) ("with respect to each impaired class of claims or interests – (A) each holder of a claim or

interest of such class … (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that [they] would so receive … if the [Debtors] were liquidated under chapter 7").

In the event of liquidation under chapter 7, the CCI Noteholders' recovery would amount to approximately 18.4% of their claims that are structurally subordinated to the claims of all other creditors of the Debtors, including more than $19 billion in other debt. *See* 8/17/09 Tr. at 55-57 (Doody); Cmte. Br. Supp. at 45.  The Plan is demonstrably more favorable and is structured to provide the CCI Noteholders with a recovery well in excess of that amount -- approximately 32.7%.  Indeed, despite their subordinated rank in the capital structure, the CCI Noteholders are being offered the highest percentage recovery under the Plan among all of the Debtors' unsecured noteholders.

The CCI Noteholders object to the Debtors' valuation and rely heavily on the testimony of their retained expert, Edward McDonough whose opinions are based on limited independent analysis.  The Court did not find Mr. McDonough's testimony to be persuasive or to rebut the reliability of Debtors' liquidation analysis.  Perhaps most critically, Mr. McDonough engaged in a largely speculative exercise of listing possible incremental recoveries and offered no reliable opinions as to the likelihood that any of these identified sources of possible extra value would ever materialize.  He also did not create his own liquidation analysis.  9/1/09 Tr. at 153:1-2 (McDonough) ("Q:  Did you do a ground-up analysis of what the liquidation value of the Debtors would be?  A:  No.  I started with what was Exhibit E and added to that").

Mr. McDonough's analysis does not take into account the sizeable gap between the CCI Noteholders' projected recovery under the Plan (32.7%) and the CCI Noteholders' hypothetical recovery under the Debtors' liquidation analysis (18.4%). McDonough insisted that the existence of only a few flaws in the Debtors' liquidation analysis would suffice to prevent confirmation of the Plan under section 1129(a)(7). *See* 9/1/09 Tr. at 147:5-8 (McDonough) ("my point is, [the] hurdle is fairly low. … you don't have to hit a, you know, grand slam here … it's a bunt single basically"); Law Debenture Trust Br. Opp'n at 72 ("It would only require a very small recovery from the other identified sources to allow the holders of CCI Notes Claims to obtain more in a liquidation than under the Plan").

But given the 14.3% gap in distribution percentages between recoveries under the Plan and those to be realized in a hypothetical liquidation, Mr. McDonough's speculation as to the relative ease of obtaining more value at the CCI level through possible add-ons does nothing to prove that any additional value can ever be realized or to undermine the reliability of the liquidation analysis itself. Because his testimony is based more on conjecture than hard analysis, the Court gives little weight to his opinion regarding the possibility of higher recoveries at CCI in a hypothetical liquidation.

The CCI Noteholders argue that the Debtors overlooked a series of possible incremental recoveries from alleged preference and avoidance actions, programming contracts, stock options and other intercompany receivables. Mr. McDonough identified these "add-ons" as sources from which the Debtors and, thereby, the CCI Noteholders, may receive additional recoveries in a hypothetical chapter 7 liquidation. *See* McDonough Report. The CCI Noteholders failed, however, to present any evidence that

there would or could be any actual or significant recoveries on account of the "add-ons."[33]

Tellingly, Mr. McDonough acknowledged during cross examination that the potential recovery from the additional sources he identified could be lower than as stated in his expert report or even worth nothing at all – he even admitted that the potential recovery from any or all of the additional sources could be zero. *See*, *e.g.*, 9/1/09 Tr. at 186:22-24, 190:9-16 (McDonough) ("Q: You agree that that 22.4 recovery [for insider payments] – potential recovery could be between a range of zero to 22.4 million, correct? A: It could be between zero and 22.4, that's correct").

Mr. McDonough's criticism of the Debtors' valuation of the new preferred stock to be distributed to the CCI Noteholders under the Plan is also questionable. The Debtors value the stock according to its face value in the amount of $138 million. Debtors' Br. Supp. at 42. Mr. McDonough, however, argues that the Debtors overestimate the projected recovery under the Plan by overvaluing these shares by 20% due to the fact that it is a minority interest. 9/1/09 Tr. at 112:6-24 (McDonough). Mr. McDonough's opinion is suspect, however, because his previous reports utilized the same 20% discount based on other justifications. Initially, Mr. McDonough discounted the Debtors' valuation of the new preferred stock by 20% because of the lack of a public market for

---

[33] For the sake of brevity, the Court does not delve into the flaws of each of the purported "add-on" recoveries discussed in the McDonough Report. For example, the McDonough Report suggested that the Debtors' liquidation analysis underestimated the value to be recovered from preference actions by $25.8 million. The Debtors' projected recovery of zero is more persuasive, however, given the fact that in a distressed sale scenario a purchaser likely would insist on a waiver of preference actions against trade vendors and employees to protect the ongoing value of the business going forward. The Debtors' expert, Mr. Folse, testified that these assumptions are reasonable. 8/18/09 Tr. at 35:7-36:2 (Folse). But even if preference recoveries were to be included, the Debtors' post-trial brief and testimony from Folse shows that the size of preference recoveries from insiders and non-insiders would be *de minimis*. *See* Debtors' Br. Supp. at 50-51; 8/18/09 Tr. at 63:18-20, 65:3-10 (Folse).

the shares.  At that time, Mr. McDonough noted the minority nature of the stock but presumably did not deem such minority status by itself as sufficient cause to justify a 20% discount.  Then, after the Debtors increased the marketability of the new preferred stock, Mr. McDonough appears to have simply kept the same 20% discount but modified its rationale.  Such an ends-oriented analysis is not persuasive.

The Debtors' liquidation analysis, on the other hand, appears to have relied on reasonable assumptions. For example, the liquidation analysis properly assumes that, in a hypothetical chapter 7 liquidation, the Debtors' businesses would likely be sold by means of a distressed going concern sale, as opposed to a piecemeal liquidation of assets. Debtors' Br. Supp. at 42.  This assumption, which values the Debtors' businesses at a discount of 10-20% of the midpoint of the Plan value, is a conservative assumption expected to result in a higher liquidation value than a piecemeal liquidation.  8/24/09 Tr. at 18:4-19:13 (Goldstein); 8/24/09 Tr. at 18:4-19:13, 128:11 – 14 (Goldstein) (piecemeal asset sale would have yielded much less value to creditors than distressed sale).  Indeed, piecemeal liquidation would likely generate a particularly low recovery for CCI because CCI has no significant assets, aside from some intercompany claims and its equity stake in its subsidiary.  *See* 7/31/09 Tr. at 134:11-15 (Schmitz) ("Q:  Are there any cable customers or telephone or HSI customers at the CCI level? A:  No.").

The Debtors' liquidation analysis also properly reflects the fact that, in a hypothetical chapter 7 liquidation of CCI, the NOLs would have no value and thus not be a source of potential added recovery for the CCI Noteholders.  *See* 8/17/09 Tr. at 37-41 (Doody).  This is so because CCI is not an operating company and does not produce any income of its own against which the NOLs could be utilized.  *Official Comm. of*

*Unsecured Creditors v. PSS Steamship Co., Inc. (In re Prudential Lines, Inc.)*, 107 B.R. 832, 841 (Bankr. S.D.N.Y. 1989), *aff'd*, 928 F.2d 565 (2d Cir. 1991). *See also Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 518-19 (8th Cir. 2004) (affirming bankruptcy court's conversion of case from chapter 11 to chapter 7 despite the fact that the debtor's NOLs may have value in a chapter 11 but would have no value in a chapter 7 liquidation); *Maytag Corp. v. Navistar Int'l Transp. Corp.*, 219 F.3d 587, 590-91 (7th Cir. 2000) ("Tax attributes cannot be sold or given away; only the company that generated the losses may use them. When the bankruptcy wrapped up, accumulated tax losses were a major asset of the estate. It would have been folly to throw them away, as a liquidation would have done").

Moreover, while the CCI Noteholders focused considerable attention during the trial on the potential value of the NOLs, no tax expert testified for any party, and the record is devoid of any reliable evidence relating to the actual value to CCI of the NOLs even if CCI were considered to be the owner the NOLs. Generally, NOLs are deemed to belong to the operating entity that generated them. Under the circumstances of this case, that would be CCO, not CCI. *See, e.g., Nisselson v. Drew Indus. Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. SDNY 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss corporation that generated them"). However, regardless of which Charter entity generated the NOLs, because of the lack of any convincing proof of ownership or the ability to convert the NOLs into measurable proceeds, the Court is unable to find that CCI has been deprived of any value associated with Charter's tax attributes.

*Plan Satisfies 11 U.S.C. § 1129(a)(10)*

The CCI Noteholders argue that the Plan does not satisfy the requirement of section 1129(a)(10) that at least one impaired class of claims accept the plan.  *See* 11 U.S.C. § 1129(a)(10) ("If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan…").  Although the Plan has been accepted by ten different impaired classes of claims,[34] including Class A-3 General Unsecured Creditors (CCI General Unsecured Creditors) and Class C-3 General Unsecured Creditors (Holdco General Unsecured Creditors), the CCI Noteholders argue that these classes should not be counted for purposes of Bankruptcy Code section 1129(a)(10) because they were "artificially gerrymandered" solely for purposes of obtaining the approval of an impaired class of creditors.  *See* Law Debenture Trust Br. Opp'n at 36-37; *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) ("separate classification of unsecured claims solely to create an impaired assenting class will not be permitted; the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims").  Specifically, the CCI Noteholders contend that the Plan should not separately classify CCI and Holdco's noteholders from their other general unsecured creditors.

The Debtors, however, have provided a reasonable explanation for the Plan's classification scheme.[35]  The Plan's separate classification appears appropriate given the disparate legal rights and payment expectations of the CCI Noteholders and the CCI

---

[34] Excluding insider votes, 9 impaired classes (A-3, B-3, B-4, C-3, F-4, G-4, H-4, J-2, and J-6) voted to accept the Plan.  <u>See</u> Schepper Decl. at ¶¶ 15, 16.

[35] The Debtors enjoy considerable discretion when classifying similar claims in different classes.  *See In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 714, 715 (Bankr. SDNY 1992) (separate classification of similar classes was rational where members of each class "own[ed] distinct securities and possess[ed] different legal rights").

General Unsecured Creditors. *See* 8/17/09 Tr. at 53:10-54:16 (Doody) (distinguishing the Class A-3 CCI General Unsecured Claims from the Class A-4 CCI Notes Claims). First, the claims of the CCI General Unsecured Creditors arise from litigation, employment, or operational relationships, while claims of the CCI Noteholders arise from the holding of CCI Notes. *Id.* Significantly, the CCI Notes are convertible into equity and structurally subordinated to the debt at all other Charter subsidiaries. *See* 6.5% Convertible Senior Notes due 2027 Indenture, dated October 2, 2007 between CCI and The Bank of New York Trust Company, N.A., CX 287, Ex. 4.7; 9/1/09 Tr. at 157:23-159:7 (McDonough) (CCI Notes were convertible and subordinated).

CCI and its noteholders also are entitled to an alternate source of recovery against Holdco that is unavailable to the CCI General Unsecured Creditors because the CCI Notes were issued in conjunction with that certain 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco (the "Mirror Note"). See 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco, attached as Ex. 10.3 to the CCI SEC Form 8-K, dated as of October 5, 2007, CX 306. Additionally, unlike claims of the CCI Noteholders, CCI general unsecured claims for expenses associated with CCI's duties as manager to CCO are reimbursable in full under the Management Agreement. *See* CX 305 at §§ 3(a)(i)-(ii) (including for costs to pay employees and third party providers such as vendors, attorneys, consultants, and other advisors, as well as related litigation claims). Thus, multiple material distinctions exist in

the relative legal rights of the CCI Noteholders and the rights of holders of CCI general unsecured claims to justify separate classification.

The CCI Noteholders complain about classification but have failed to produce any evidence (or rebut the Debtors' evidence) to support their allegation of gerrymandering. Lacking any evidence of actual intent to gerrymander, the CCI Noteholders instead assert that gerrymandering is the only possible explanation for the separate classification scheme given the fact that the claims of both the noteholders and the general unsecured creditors are of "identical priority and character."  *See* Law Debenture Trust Br. Opp'n at 37.

But that assertion by the CCI Noteholders is wrong.  As discussed above, the Debtors have offered several legitimate justifications for the separate classification scheme – most persuasively, that the legal rights of each class are not identical.  Nor is the CCI Noteholders' reliance on *Boston Post Road* in its opposition to this issue[36] helpful given the different rights and privileges available to the CCI Noteholders under applicable nonbankruptcy law.  For one thing, the opinion's language cited by the CCI Noteholders indicates that the court considered the different legal origins of claims to be a relevant factor in the separate classification, albeit not a dispositive one:  "The different origins of the FDIC's unsecured deficiency claim and general unsecured trade claims, claims which enjoy similar rights and privileges within the Bankruptcy Code, do not

---

[36] *See* Law Debenture Trust Br. Opp'n at 37 ("The Second Circuit, however, has held that the existence of different origins or different rights outside of bankruptcy is not a legitimate reason to classify non-priority unsecured claims separately.  *Boston Post Road*, 21 F.3d at 483 (holding that the different origins of "unsecured deficiency claim[s] and general unsecured trade claims … which enjoy similar rights and privileges within the Bankruptcy Code, do not alone justify separate segregation").

**alone** justify separate segregation". *Id.* (emphasis added).[37] Here, however, the different legal origins of the two classes of claims is one of several reasons for separate classification offered by the Debtors.

Indeed, far from being an anomaly indicative of an intent to gerrymander, bankruptcy courts administering other large chapter 11 cases have accepted separate classification of convertible note claims from general unsecured claims. *See, e.g., In re Calpine*, No.05-60200 (Bankr. SDNY Dec. 19, 2007) (order confirming chapter 11 plan separately classifying convertible unsecured notes claims from general unsecured claims); *In re Coram Healthcare Corp.*, 315 B.R. 321, 350-51 (Bankr. D. Del. 2004) (finding noteholders represented "a voting interest that is sufficiently distinct from the trade creditors to merit a separate voice in this reorganization case").

The Debtors also produced substantial evidence that the separately classified classes of general unsecured claims are legitimately impaired[38] because members of such classes will not receive post-petition interest. *See* 8/17/09 Tr. at 59:20-60:4 (Doody) (noting that Classes A-3 and C-3 are legitimately impaired because they are to be reinstated or paid without post-petition interest). The fact that the Plan's nonpayment of

---

[37] Moreover, although not dispositive to the Court's analysis of this issue, the debtors in *Boston Post Road*, unlike the Debtors in these cases, apparently admitted that the unsecured deficiency claim and the unsecured trade claims were "substantially similar." *Boston Post Road*, 21 F.3d at 481 ("Debtor first cites two recent opinions by bankruptcy judges holding that separate classification of similar claims is in fact mandated … Debtor contends that [the wording of section 1122] reflects Congress' intent to dispense with the requirement that similar claims be classified together").

[38] The CCI Noteholders' argument that the classes of general unsecured claims are not legitimately impaired appears to rest in significant part on the Debtors' May 1, 2009 revisions to the Plan four days prior to the Disclosure Statement hearing. *See* Law Debenture Trust Br. Opp'n at 42-43 ("The Debtors' prior filings reflect their understanding that CCI General Unsecured Claims are not truly impaired under the Plan"). Prior to the disclosure statement hearing the Debtors revised the Plan to reflect that these classes were impaired rather than unimpaired. But the Debtors' correction of the legal description of the treatment of these classes is not a basis to infer any intent to artificially impair a class.

post-petition interest reflects the terms of the Management Agreement further evidences a justification for classification other than intent to gerrymander.[39] *See* CX 305 ¶ 3.

Notably, given the Plan's structure, the requirement of section 1129(a)(10) would be satisfied even if Classes A-3 and C-3 were not deemed to be legitimately impaired. This is so because it is appropriate to test compliance with section 1129(a)(10) on a per-plan basis, not, as the CCI Noteholders argue, on a per-debtor basis. *See In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. July 15, 2004) (confirming joint chapter 11 plan where each debtor did not have an impaired accepting class); *In re SGPA, Inc.*, No. 01-02609 (Bankr. M.D. Pa. Sept. 28, 2001) (same). Here, the evidence supports a finding that the business of Charter is managed by CCI on an integrated basis making it reasonable and administratively convenient to propose a joint plan. That joint Plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10).

### Plan Satisfies "Cramdown" Requirements Of 11 U.S.C. 1129(b)

Section 1129(b)(1)of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of 1129(a) are satisfied, then the Court may only confirm the plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. 1129(b)(1). The Plan satisfies the requirements for "cram down" under Bankruptcy Code section 1129(b) because it (i) does not unfairly

---

[39] The CCI Noteholders' interpretation of the Management Agreement to provide for the reimbursement of interest costs is not persuasive in light of the testimony of Mr. Doody to the contrary. *Compare* 8/17/09 Tr. at 194:14-195:17 (Doody) (noting that Management Agreement only provides for payment at cost without interest), *with* Law Debenture Br. Opp'n at 44-45 ("The Management Agreement provides for CCI to be reimbursed for all costs, including interest obligations … CCI is therefore clearly entitled to reimbursement for any liability CCI incurs as Manager .. including any interest…").

discriminate against the CCI Noteholders and (ii) is fair and equitable in that it does not violate the absolute priority rule.

### Plan Does Not Unfairly Discriminate Against CCI Noteholders In Violation Of 1129(b)(1)

The CCI Noteholders object on the grounds that the Plan unfairly discriminates against them by awarding their class a 32.7% recovery, while awarding the Class A-3 General Unsecured Creditors a 100% recovery. Noting that discrimination occurs when a plan treats similarly situated creditors differently,[40] the CCI Noteholders insist that they are "similarly situated" to the CCI General Unsecured Creditors. The CCI Noteholders, for reasons noted above in the section dealing with classification, are not similarly situated to CCI's general unsecured creditors and thus the Plan's divergent treatment of the two classes does not constitute discrimination.[41]

The argument of the CCI Noteholders regarding unfair discrimination is weak to the point of being meritless. The CCI Notes (i) are convertible into equity and structurally subordinated to debt at other Charter subsidiaries, (ii) enjoy an alternate source of recovery against Holdco that is unavailable to its general unsecured creditors because the CCI Notes were issued in conjunction with the Mirror Note, and (iii) are not entitled to reimbursement for expenses associated with CCI's management of CCO.

---

[40] *See In re Worldcom, Inc.*, 2003 WL 23861928 at *59 (Bankr. SDNY Oct. 31, 2003).

[41] Even if the CCI Noteholders and the CCI General Unsecured Creditors are similarly situated, the Debtors have nonetheless proven that any discrimination was justified. The disparate legal rights of each class, including the Management Agreement's provision which requires CCO to reimburse certain CCI general unsecured claims, constitute reasonable bases for awarding the CCI General Unsecured Creditors a higher recovery than the CCI Noteholders. The Debtors also have demonstrated that they cannot confirm and consummate the Plan without the purported discrimination. Debtors' Br. Supp. at 76 n.112 (claiming to be "unable to consummate the plan if it provided for a par recovery to the CCI Noteholders"); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003) ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination"), *order aff'd* 308 B.R. 672 (D. Del. 2004); *Buttonwood Partners,* 111 B.R. at 63 (Bankr. SDNY 1990).

There is no support whatsoever to the strained argument that claims arising under the notes should receive the same treatment as CCI's General Unsecured Creditors.

The CCI Noteholders attempt without success to gloss over obvious differences in legal entitlement by noting that "[t]he holders of CCI Notes and the holders of CCI General Unsecured Claims may only recover against CCI's estate and thus are similarly situated."  Law Debenture Trust Br. Opp'n at 49.  Such an analysis distorts the facts and elevates superficial form over substance.  For example, the CCI Noteholders overlook the fact that CCI General Unsecured Claims for reimbursement of certain expenses are passed through CCI to CCO for eventual payment in full. Debtors' Br. Supp. at 78.  Thus, although CCI's general unsecured creditors and noteholders both have unsecured claims against CCI, creditors other than the CCI Noteholders have what amounts to recourse against CCO.  The Plan respects this legitimate distinction in legal rights by providing the CCI General Unsecured Creditors with a higher recovery than the CCI Noteholders.  In light of this very meaningful difference in the right to be paid, the CCI Noteholders' formalistic insistence that the two classes are similarly situated because they are of "the same priority level" is plainly wrong and appears to willfully disregard the rights of other CCI creditors.[42]

*Plan Is Fair And Equitable In Satisfaction Of 11 U.S.C. § 1129(b)(2)(B)(ii)*

The CCI Noteholders further object on the grounds that the Plan is not "fair and equitable" as required by Bankruptcy Code section 1129(b)(1).  Section 1129(b)(2)(B)

---

[42] *See* Law Debenture Trust Br. Opp'n at 49 ([A] debtor must show that its plan does not unfairly discriminate whenever a dissenting class is receiving a materially less favorable recovery than another class of creditors that is entitled to the ***same priority level*** under the Bankruptcy Code") (emphasis added); *In re Dow Corning Corp.*, 244 B.R. 696, 702 (Bankr. E.D. Mich. 1999) (confirming plan because it did not discriminate, but noting that the test for discrimination examines whether the plan "provides for equal treatment for all creditors holding the ***same priority level***") (emphasis added);

sets forth the test for whether a plan is "fair and equitable": "the condition that a plan be fair and equitable with respect to a class includes the following requirements: … (B) [w]ith respect to a class of unsecured claims – … (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property…" Courts commonly refer to this test as the absolute priority rule. Contrary to the arguments of the CCI Noteholders, the Plan does not violate the absolute priority rule. In fact, no holder of a CCI claim or interest junior to the CCI Noteholders is receiving a recovery.

The argument of the CCI Noteholders with respect to the absolute priority rule focuses attention again on Charter's NOLs. They argue that the NOLs generated through losses of the operating companies "belong" to CCI and that the Plan therefore improperly siphons recovery traceable to this value away from CCI for the benefit of creditors of the operating Debtors. This is an argument made in a vacuum.

As discussed above, the CCI Noteholders have argued about the existence and possible value of NOLs without offering any evidence that CCI actually had any rights to separately profit from or harvest the value of these tax attributes that may actually belong to CCO.[43]  *See In re Prudential Lines, Inc.*, 928 F.2d 565, 569-70 (2d Cir. 1991) (affirming order enjoining parent corporation from taking action that would affect debtor subsidiary's use of NOLs generated as a result of subsidiary operations on the basis that the debtor subsidiary owned the NOLs); *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling and Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. SDNY 1998) ("It is beyond peradventure that NOL carrybacks and carryovers are property of the estate of the loss

---

[43]In any event, regardless of which Charter entity "owns" the NOLs, there is no evidence in the record that establishes CCI's right to independently exploit them.

corporation that generated them").  Regardless of which legal entity in fact owns the

NOLs, the CCI Noteholders have not established that their treatment under the Plan

deprives them of anything to which they have any provable entitlement.

Nor does the Plan's CII Settlement violate the absolute priority rule.  Case law

makes clear that the absolute priority rule is violated when an equity interest holder

"leapfrogs" unsecured creditors and receives property on account of a junior interest.  *See*

*Bank of America Nat'l Trust & Savings Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434

(1999) (denying confirmation when proposed plan would have compensated debtor's pre-

bankruptcy equity holders without paying its pre-petition lender's unsecured deficiency

claim).

Contrary to the CCI Noteholders' repeated insistence and despite the

misperceptions of many equity holders[44] whose interests are being cancelled under the

Plan, Mr. Allen is not obtaining a recovery "on account of" his equity interest in CCI.

*See* Law Debenture Trust Br. Opp'n at 80 ("Mr. Allen's wholly owned subsidiary, CII, is

retaining a direct equity interest in Holdco (although on a diluted basis) while CCI is

receiving a mere 3.9% recovery on its Holdco Note Claims"); at p. 50 ("The CCI

settlement compensates Paul Allen for his equity interests and, thus, violates the absolute

priority rule").

As discussed earlier in this opinion, the CII Settlement grants consideration to Mr.

Allen on account of his cooperation with respect to maintaining requisite voting power

within CCI, his transferring of valuable interests in solvent Debtor CC VIII, LLC, and his

---

[44] A number of individual equity holders, acting *pro se,* improperly communicated with the Court during
the trial by e-mail complaining about what appeared to them to be favorable treatment of Mr. Allen at their
expense.  This e-mail campaign did not influence the Court's deliberations or decision in any respect and
appears to have been based on a fundamental misunderstanding of the settlement with Mr. Allen.

compromising of certain contract claims. *See also* 7/22/09 Tr. at 2 66:21-267:16 (Merritt); 8/17/09 Tr. At 33:23-34:18, 281:3-17, 283:14-284:2 (Doody); 8/14/09 Tr. at 14:25-16:5 (Goldstein); 9/2/09 Tr. at 78:16-22, 148:21-23 (Conn). Courts have not prohibited parties such as Mr. Allen who happen to hold equity from recovering other consideration. *See In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (equity holder's recovery cannot be deemed to be "on account of" the equity interest "without some evidence of a causal relationship"). Accordingly, the objection of the CCI Noteholders based on the absolute priority rule mischaracterizes the settlement with Mr. Allen and is without merit.

### Remaining CCI Noteholder Objections

The CCI Noteholders' other objections are equally lacking in substance and are all overruled.[45] First, the CCI Noteholders attempt to undermine the Plan by labeling it as the functional equivalent of substantive consolidation, in that "[although] the Debtors ignored the value of assets held directly by CCI and/or Holdco on a stand-alone basis… the Debtors adhere to corporate separateness when determining how to and in what priority value is to be distributed." Law Debenture Trust Br. Opp'n at 81-2. These chapter 11 cases, however, have not been substantively consolidated[46] and such consolidation may not be inferred. The CCI Noteholders are unable to rely on their expert in light of his refusal to recommend (or otherwise opine on) substantive consolidation of these cases. 9/1/09 Tr. at 178:22-179:7 (McDonough) ("Q: So you do not have an opinion that the Court should actually treat the debt in this consolidated

---

[45] Similarly, as discussed herein, the releases proposed by the Plan are valid under Second Circuit law.

[46] Indeed, no motion seeking substantive consolidation of these chapter 11 cases was ever presented to this Court.

fashion, correct? A: I have no opinion … I've provided no testimony as to substantive consolidation").

Moreover, the votes in favor of the Plan by CCI and Holdco with respect to the Mirror Note and the CCH Notes (i.e., all series of notes issued by CCH and Charter Communications Holdings Capital Corp.), respectively, should not be voided as actions taken outside the ordinary course of the Debtors' business without proper court approval. In their objection to confirmation, the CCI Noteholders argue that these votes constituted "compromises of valid intercompany claims" outside the ordinary course of business that should properly have been submitted to the Court for prior approval. *See* Law Debenture Trust Br. Opp'n at 74-75; 11 U.S.C. § 363(b) ("The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate ...").   But the cases relied on by the CCI Noteholders are inapposite because they involved post-petition agreements entered into by debtors outside of the context of a reorganization plan. *See In re Remsen Partners, Ltd.*, 294 B.R. 557 (Bankr. SDNY 2003) (denying chapter 7 trustee's motion for approval of settlement of state court litigation when proposed settlement did not serve "the paramount interest of creditors" when settlement proceeds would be paid entirely to chapter 7 professionals); *In re Leslie Fay Cos.*, 168 B.R. 294 (Bankr. SDNY 1994) (granting debtors' motion to vacate arbitration award compelling debtors to comply with post-petition collective bargaining agreement when agreement was "outside the ordinary course" of debtor's business and should have been submitted to notice and a hearing).

The Debtors' votes on the Mirror Note and the Holdco Notes, on the other hand, are essential components of a proposed plan of reorganization and are thus substantially

different from private agreements between a debtor and a third-party. This fundamental difference is not altered by the practical result that these votes, when viewed in the context of the entire Plan, will resolve claims belonging to the Debtors in a way similar to a court-approved private agreement.

Nor are the votes by CCI and Holdco *ultra vires* acts outside "the interests of the corporation." Law Debenture Trust Br. Opp'n at 74 n. 323 ("Void acts include ultra vires acts," including "acts contrary to basic principles of fiduciary duty law"); *Solomon v. Armstrong*, 747 A.2d 1098, 1114 (Del. Ch. 1999). The decision by the Debtors' board of directors to vote in favor of the Plan without considering each Debtor's individual interests does not suffice to establish an *ultra vires* act. Law Debenture Trust Br. Opp'n at 75-77. The Debtors' board of directors appropriately evaluated the Plan on a company-wide basis rather than a debtor by debtor basis. *See In re Enron Corp.*, No. 01-16034 (Bankr. SDNY July 15, 2004) (confirming joint chapter 11 plan where each debtor did not have an impaired accepting class).

The various and sundry objections by the CCI Noteholders reflect a conscientious attempt to extract greater value for these creditors. But these creditors are unable to escape the fact that they are members of a structurally subordinated constituency that is receiving significant consideration under the Plan that is greater than what such creditors would receive if Charter were liquidated. These efforts, while diligent and determined, have failed to persuade the Court that the Plan is anything other than fair as this class. All of their objections are overruled.

### *Conclusion*

This opinion supplements and expands on the Court's bench ruling of October 15, 2009.  Charter has overcome robust, forcefully presented objections and has succeeded in convincing the Court that its Plan satisfies all of the confirmation requirements of section 1129 of the Bankruptcy Code and is confirmable.  This represents a major achievement for the Debtors and its stakeholders that should enable a deleveraged Charter to flourish as a restructured and recapitalized enterprise.

In addition to this opinion, the Court promptly will enter a separate confirmation order setting forth in greater detail findings of fact and conclusions of law that are consistent with and should be read in conjunction with this opinion.  This opinion and the confirmation order constitute the Court's findings and conclusions with respect to confirmation of Charter's Plan and JPMorgan's adversary proceeding.  As stated on the record of the hearing held on October 15, all objections to confirmation are overruled.

SO ORDERED.

Dated: New York, New York         *s/ James M. Peck*
       November 17, 2009         Honorable James M. Peck
                                    United States Bankruptcy Judge