**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) Chapter 11 |
| CHARTER COMMUNICATIONS, INC., et al., | ) ) Case No. 09-11435 (JMP) |
| Debtors. | ) ) Jointly Administered ) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**
**CONFIRMING DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT**
**TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Charter Communications, Inc., its direct and indirect subsidiaries and debtor affiliate, as

debtors and debtors in possession (collectively, the "Debtors"), having:[1]

    a.  on March 27, 2009 (the "Petition Date"), commenced these chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code");

    b.  continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

    c.  filed, on the Petition Date, the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 36] and the Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the Debtors' Joint Plan of Reorganization [Docket No. 38], which Plan and related documents were subsequently amended;

    d.  filed, on the Petition Date, the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 37] (as amended, the "Plan Supplement"), and with amendments to exhibits to the Plan Supplement filed thereafter;

    e.  filed, on the Petition Date, the Debtors' Memorandum on Reinstatement in Support of Approval of Disclosure Statement [Docket No. 3] (the "Reinstatement Brief");

---

[1] Unless otherwise noted, capitalized terms not defined in the Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Confirmation Order"), shall have the meanings ascribed to them in the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, dated July 15, 2009 [Docket No. 615] (as the same may have been subsequently modified, supplemented, and amended, the "Plan"). The rules of interpretation set forth in Article I.B of the Plan shall apply to the Confirmation Order.

f.  filed, on the Petition Date, the Debtors' Motion for an Order (I) Approving the Disclosure Statement, (II) Establishing a Record Date for Voting on the Plan of Reorganization and the Rights Offering, (III) Approving Solicitation Packages and Procedures for the Distribution Thereof, (IV) Approving the Rights Offering Procedures and Rights Exercise Form, (V) Approving the Forms of Ballots and Manner of Notice, (VI) Approving the Commitment Agreements, (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan [Docket No. 30] (the "Disclosure Statement Motion");

g.  filed, on May 4, 2009, the Notice of Amended and Restated Exhibit 19 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 298];

h.  filed, on May 7, 2009, the amended Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 320] and the amended Debtors' Disclosure Statement Pursuant to Chapter 11 of the Bankruptcy Code with Respect to the Debtors' Joint Plan of Reorganization (the "Disclosure Statement") [Docket No. 319];

i.  distributed solicitation materials beginning on or about May 12, 2009 (the "Solicitation Date"), consistent with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Order (I) Approving the Disclosure Statement, (II) Establishing a Record Date for Voting on the Plan of Reorganization and the Rights Offering, (III) Approving Solicitation Packages and Procedures for the Distribution Thereof, (IV) Approving the Rights Offering Procedures and Rights Exercise Form, (V) Approving the Forms of Ballots and Manner of Notice, (VI) Approving the Commitment Agreements, (VII) Approving the Commitment Fees, (VIII) Establishing Procedures for Voting on the Plan and (IX) Establishing Notice and Objection Procedures for Confirmation of the Plan entered on May 7, 2009 [Docket No. 323] (the "Disclosure Statement Order"), which Disclosure Statement Order also approved, among other things, solicitation procedures (the "Solicitation Procedures") and related notices, forms, Ballots, and Master Ballots (collectively, the "Solicitation Packages"), as evidenced by the Affidavit of Service of Leanne V. Rehder Scott re: Solicitation Packages [Docket No. 396] (the "KCC Affidavit") and the Affidavit of Service of Financial Balloting Group LLC of Solicitation Packages and Related Documents on Holders of Publicly Held Notes and Common Stock, and Certain Other Parties [Docket No. 393] (the "FBG Affidavit");

j.  filed, on May 19, 2009, the Notice of Amended and Restated Exhibits 1 and 12 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 385];

k.  published, on or about June 15, 2009, notice of the Confirmation Hearing (the "Confirmation Hearing Notice") in The Wall Street Journal, USA Today, and The St-Louis Post-Dispatch, consistent with the Disclosure Statement Order, as evidenced by the Affidavit of Publication in The Wall Street Journal of Erin Ostenson, the Affidavit of Publication in USA Today National Edition of Antoinette Chase, and the Affidavit of Publication in The St-Louis Post-Dispatch of Tanya L. Lemons [Docket No.626] (collectively, the "Publication Affidavits");

l.  filed, on July 15, 2009, Notice of Immaterial Modifications to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Code [Docket No. 615],

to which the most recent version of the Plan, dated July 15, 2009, was attached as Exhibit A thereto;

m.  filed, on July 16, 2009, the Certification of Jane Sullivan with respect to the Tabulation of Votes on the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 621], and the Affidavit of Christopher R. Schepper Regarding Votes Accepting or Rejecting the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 622] (collectively, the "Voting Certifications") each detailing the results of the Plan voting process;

n.  filed, on July 16, 2009, the Reorganizing Debtors' Memorandum of Law (A) In Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code and (B) In Response to Objections Thereto [Docket No. 634] (the "Plan Confirmation Brief"), the Affidavit of Gregory L. Doody in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 636] (the "Doody Affidavit"), the Declaration of Thomas Degnan in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 635] (the "Degnan Declaration"), and the Declaration of Christopher Temple in Support of the Debtors' Joint Plan of Reorganization [Docket No. 639] (the "Temple Declaration");

o.  filed, on July 16, 2009, the Notice of Exhibits 23 and 25 and Amended and Restated Exhibits 3 and 24 to the Supplement to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 632];

p.  filed, on July 18, 2009, the Debtors' Trial Brief on Reinstatement in Support of Plan Confirmation [Docket No. 664] (the "Reinstatement Trial Brief"),

q.  filed, on August 18, 2009, the Amended Certificate of Service of James Sean McGuire [Docket No. 756] (the "McGuire Certificate");

r.  submitted, on August 18, 2009, the Declaration of Barry Folse (the "Folse Declaration");

s.  submitted, on August 22, 2009, the Declaration of Stephen Goldstein (the "Goldstein Declaration"); and

t.  filed, on September 18, 2009, Reorganizing Debtors' Post-Trial Brief in Support of Confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code [Docket No. 841], and Debtors' Post-Trial Brief on Reinstatement in Support of Plan Confirmation [Docket No. 848] (together, the "Post-Trial Briefs").

This Court having:

u.  entered the Disclosure Statement Order on May 7, 2009 [Docket No. 323];

v.  set July 20, 2009, at 9:30 a.m., prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing pursuant to Bankruptcy Rules 3017 and 3018 and sections 1126, 1128, and 1129 of the Bankruptcy Code;

w.  reviewed the Plan, the Disclosure Statement, the Plan Confirmation Brief, the Reinstatement Brief, the Reinstatement Trial Brief, the Doody Affidavit, the Degnan Declaration, the Temple Declaration, the Voting Certifications, the McGuire Certification, the Folse Declaration, the Goldstein Declaration, the Post-Trial Briefs, and all pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties in interest on the docket of these Chapter 11 Cases and on the docket of the adversary proceeding captioned JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC and CCO Holdings, LLC, Adv. Proc. No. 09-01132 (JMP) (the "Adversary Proceeding");

x.  heard the statements, arguments, and objections made by counsel in respect of Confirmation;

y.  considered all oral representations, testimony, documents, filings, and other evidence regarding Confirmation;

z.  overruled any and all objections to the Plan and to Confirmation and all statements and reservations of rights not consensually resolved or withdrawn, unless otherwise indicated; and

aa. taken judicial notice of the papers and pleadings filed in the Chapter 11 Cases and Adversary Proceeding.

NOW, THEREFORE, it appearing to the Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all parties affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor, the Court hereby makes and issues the following Findings of Fact, Conclusions of Law, and Order:[2]

---

[2]  The findings of fact and the conclusions of law set forth herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation and to judgment in the Adversary Proceeding are hereby incorporated herein to the extent not inconsistent herewith. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

## I.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY DETERMINED, FOUND, ADJUDGED, DECREED, AND ORDERED THAT:

### A.    Jurisdiction and Venue.

1.      Beginning on the Petition Date, the Debtors commenced the Chapter 11 Cases. Venue in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") was proper as of the Petition Date pursuant to 28 U.S.C. §§ 1408 and 1409. Confirmation of the Plan and adjudication of the Adversary Proceeding are core proceedings under 28 U.S.C. § 157(b)(2).  The Bankruptcy Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  The Bankruptcy Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed.

### B.    Eligibility for Relief.

2.      The Debtors were and are entities eligible for relief under section 109 of the Bankruptcy Code.

### C.    Commencement and Joint Administration of the Chapter 11 Cases.

3.      On the Petition Date, the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  By prior order of the Bankruptcy Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 [Docket No. 64].  The Debtors have operated their businesses and managed their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

D.    **Plan Supplement.**

4.      On the Petition Date, the Debtors filed the Plan Supplement.  On May 4, 2009, May 19, 2009 and July 16, 2009, the Debtors filed certain amendments to the Plan Supplement. The Plan Supplement complies with the terms of the Plan, and the filing and notice of such documents was good and proper in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement Order, and no other or further notice is or shall be required.  The Debtors are authorized to modify the Plan Supplement following entry of the Confirmation Order in accordance with the terms of the Plan.

E.    **Modifications to the Plan.**

5.      Any modifications to the Plan described or set forth herein constitute technical changes or changes with respect to particular Claims by agreement with Holders of such Claims, and do not materially or adversely affect or change the treatment of any other Claims or Interests.  Pursuant to Bankruptcy Rule 3019, these modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the resolicitation of votes under section 1126 of the Bankruptcy Code, nor do they require that the Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

F.    **Judicial Notice.**

6.      The Bankruptcy Court takes judicial notice of (and deems admitted into evidence for Confirmation) the docket of the Chapter 11 Cases and all related adversary proceedings and appeals maintained by the clerk of the applicable court or its duly appointed agent, including all pleadings and other documents on file, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the applicable court during the pendency of the Chapter 11 Cases.  Any resolutions of objections to Confirmation

explained on the record at the Confirmation Hearing are hereby incorporated by reference.  All

unresolved objections, statements, and reservations of rights are hereby overruled on the merits.

**G.    Disclosure Statement Order.**

7.    On May 7, 2009, the Bankruptcy Court entered the Disclosure Statement Order,

which, among other things: (a) approved the Disclosure Statement as containing adequate

information within the meaning of section 1125 of the Bankruptcy Code and Bankruptcy Rule

3017; (b) fixed April 17, 2009, as the Record Date (as defined in the Disclosure Statement

Order); (c) fixed June 15, 2009 at 5:00 p.m. prevailing Eastern Time, as the deadline for voting

to accept or reject the Plan (the "Voting Deadline"); (d) fixed July 13, 2009 at 4:00 p.m.

prevailing Eastern Time, as the deadline for objecting to the Plan; (e) fixed July 20, 2009, at

10:00 a.m. prevailing Eastern Time, as the date and time for the commencement of the

Confirmation Hearing; (e) approved the Solicitation Procedures and the Solicitation Package;

(f) approved the form and method of notice of the Confirmation Hearing Notice set forth therein;

(g) approved the procedures associated with the Rights Offering, including approval of the

Rights Exercise Form (as defined in the Disclosure Statement Order); and (h) approved the

Commitment Agreements (as defined in the Disclosure Statement Order) and the Commitment

Fees.

**H.    Transmittal and Mailing of Materials; Notice.**

8.    As evidenced by the KCC Affidavit, the McGuire Certification, and the FBG

Affidavit, due, adequate, and sufficient notice of the Disclosure Statement, Plan, Plan

Supplement, and Confirmation Hearing, together with all deadlines for voting on or objecting to

the Plan, has been given to: (a) all known Holders of Claims and Interests; (b) parties that

requested notice in accordance with Bankruptcy Rule 2002; (c) all counterparties to unexpired

leases and executory contracts with the Debtors; and (d) all taxing authorities listed on the

Debtors' Schedules or Claims Register, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rules 2002(b), 3017, and 3020(b), and no other or further notice is or shall be required. Adequate and sufficient notice of the Confirmation Hearing, as may be continued from time to time, and any applicable bar dates and hearings described in the Disclosure Statement Order was given in compliance with the Bankruptcy Rules and Disclosure Statement Order, and no other or further notice is or shall be required.

9.      The Debtors published the Confirmation Hearing Notice once each in The Wall Street Journal, USA Today, and The St. Louis Post-Dispatch, in substantial compliance with the Disclosure Statement Order and Bankruptcy Rule 2002(l), as evidenced by the Publication Affidavits.

## I.      Solicitation.

10.     Votes for acceptance and rejection of the Plan were solicited in good faith and in compliance with sections 1125 and 1126 of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, the Disclosure Statement, the Disclosure Statement Order, all other applicable provisions of the Bankruptcy Code and all other applicable rules, laws, and regulations. Specifically, the Solicitation Packages approved by the Bankruptcy Court in the Disclosure Statement Order (including the Disclosure Statement, the Plan, the Ballots, the Master Ballots, and the related notices) were transmitted to and served on all Holders of Claims or Interests in Classes that were entitled to vote to accept or reject the Plan and relevant portions of the Solicitation Packages were transmitted to and served on other parties in interest in the Chapter 11 Cases, all in compliance with section 1125 of the Bankruptcy Code, the Disclosure Statement Order, the Solicitation Procedures and the Bankruptcy Rules. The Rights Exercise Form and related notices were transmitted to and served on CCH I Note Holders that certified they were eligible to participate in the Rights Offering. Transmittal and service were adequate and sufficient, and no

further notice is or shall be required.  In addition, Holders of Claims or Interests in Classes that

were not entitled to vote to accept or reject the Plan were provided with certain non-voting

materials approved by the Bankruptcy Court in compliance with the Disclosure Statement Order.

Pursuant to the Disclosure Statement Order, the Debtors were excused from distributing

Solicitation Packages to those entities at addresses from which Disclosure Statement Hearing

notices were returned as undeliverable by the United States Postal Service unless the Debtors

were able, using reasonable efforts, to obtain an accurate address for such entities before the

Solicitation Date, and failure to distribute Solicitation Packages to such entities does not

constitute inadequate notice of the Confirmation Hearing, the Voting Deadline, or a violation of

Bankruptcy Rule 3017(d).  All procedures used to distribute Solicitation Packages to Holders of

Claims and Interests were fair, and conducted in accordance with the Bankruptcy Code, the

Bankruptcy Rules, the Local Bankruptcy Rules, and all other applicable rules, laws, and

regulations.

**J.      Voting Certifications.**

       11.     Prior to the Confirmation Hearing, the Debtors filed the Voting Certifications.  On

August 18, 2009, the Debtors filed the McGuire Certification.  All procedures used to tabulate

the Ballots, the Master Ballots, and the Rights Exercise Form were fair and conducted in

accordance with the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules,

the Local Bankruptcy Rules, and all other applicable rules, laws, and regulations.

       12.     As set forth in the Plan and Disclosure Statement, Holders of Claims in Classes

A-3, A-4, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6

(collectively, the "Voting Classes") are eligible to vote on the Plan pursuant to the Solicitation

Procedures.  In addition, Holders of Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2,

E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of

Equity Interests in Classes I-6 and J-7 are Unimpaired and deemed to accept the Plan and, therefore, are not entitled to vote to accept or reject the Plan.  Holders of Claims in Classes A-5, C-5, D-4, E-5, F-5, G-5, and H-5 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6 (collectively, the "Deemed Rejecting Classes") are deemed to reject the Plan and, therefore, are not entitled to vote to accept or reject the Plan.

13.    As evidenced by the Voting Certifications, the McGuire Certification, or otherwise, Holders of Claims in Class A-4 (together with the Deemed Rejecting Classes, the "Rejecting Classes") voted to reject the Plan.  As further evidenced by the Voting Certifications and McGuire Certification, all other Voting Classes, specifically Holders of Claims in Classes A-3, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan (the "Impaired Accepting Classes").

**K.    Bankruptcy Rule 3016.**

14.    The Plan is dated and identifies the Entities submitting it, thereby satisfying Bankruptcy Rule 3016(a).  The filing of the Disclosure Statement with the clerk of the Bankruptcy Court satisfied Bankruptcy Rule 3016(b).

**L.    Burden of Proof.**

15.    The Debtors, as proponents of the Plan, have met their burden of proving the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation.  Further, the Debtors have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code.  Each of the witnesses who testified on behalf of the Debtors, the Crossover Committee and the CII Settlement Parties was credible, reliable and qualified to testify as to the topics addressed in his or her testimony.

09-11435-jmp    Doc 921    Filed 11/17/09    Entered 11/17/09 15:15:05    Main Document
Pg 11 of 150

**M.**    **Compliance with the Requirements of Section 1129 of the Bankruptcy Code.**

16.    The Plan complies with all applicable provisions of section 1129 of the Bankruptcy Code as follows:

**1.**    **Section 1129(a)(1)—Compliance of the Plan with Applicable Provisions of the Bankruptcy Code.**

17.    The Plan complies with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(1) of the Bankruptcy Code, including sections 1122 and 1123.

**(i)**    **Sections 1122 and 1123(a)(1)—Proper Classification.**

18.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, Articles III, IV, and V of the Plan provide for the separate classification of Claims and Interests into 58 Classes, based on differences in the legal nature or priority of such Claims and Interests (other than Administrative Expense Claims and Priority Tax Claims, which are addressed in Article II of the Plan, and which are required not to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code).  Valid business, factual, and legal reasons exist for the separate classification of the various Classes of Claims and Interests created under the Plan, the classifications were not done for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests.

19.    In accordance with section 1122(a) of the Bankruptcy Code, each Class of Claims and Interests contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.  Accordingly, the requirements of sections 1122(a), 1122(b), and 1123(a)(1) of the Bankruptcy Code have been satisfied.

**(ii)     Section 1123(a)(2)—Specification of Unimpaired Classes.**

20.     Article IV of the Plan specifies that Claims in Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 and Holders of Equity Interests in Classes I-6 and J-7 are Unimpaired under the Plan.  Additionally, Article II of the Plan specifies that Administrative Expense Claims and Priority Tax Claims are Unimpaired, although these Claims are not classified under the Plan.   Accordingly, the requirements of section 1123(a)(2) of the Bankruptcy Code have been satisfied.

**(iii)     Section 1123(a)(3)—Specification of Treatment of Impaired Classes.**

21.     Article IV of the Plan specifies the treatment of each Impaired Class under the Plan, including Classes A-3, A-4, A-5, B-3, B-4, C-3, C-4, C-5, D-3, D-4, E-3, E-4, E-5, F-3, F-4, F-5, G-3, G-4, G-5, H-3, H-4, H-5, I-5, J-2, and J-6 and Holders of Equity Interests in Classes A-6, C-6, D-5, E-6, F-6, G-6 and H-6.   Accordingly, the requirements of section 1123(a)(3) of the Bankruptcy Code have been satisfied.

**(iv)     Section 1123(a)(4)—No Discrimination.**

22.     Pursuant to section 1123(a)(4) of the Bankruptcy Code, Article IV of the Plan uniformly provides for the same treatment of each Claim or Interest in a particular Class, as the case may be, unless the Holder of a particular Claim or Interest has agreed to a less favorable treatment with respect to such Claim or Interest.   Accordingly, the requirements of section 1123(a)(4) of the Bankruptcy Code have been satisfied.

**(v)     Section 1123(a)(5)—Adequate Means for Plan Implementation.**

23.     Pursuant to section 1123(a)(5) of the Bankruptcy Code, Article VI and various other provisions of the Plan specifically provide in detail adequate and proper means for the Plan's implementation, including but not limited to:    (a) the sources of consideration for distributions under the Plan, including the Net Proceeds, and for the payment of Specified Fees

and Expenses; (b) the authorization and issuance of new equity in the Reorganized Company consisting of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants, and the execution of related documents; (c) the satisfaction of the CII Settlement Claim; (d) the issuance of new debt; (e) the issuance of 100,000 shares of Class A Voting Stock in CII; (f) the reinstatement of certain prepetition debt; (g) the continuation of the corporate existence of the Debtors and the vesting of assets in the each of the Reorganized Debtors; (h) the discharge of the Debtors; (i) the consummation of certain restructuring transactions; (j) the authority of the Reorganized Debtors to enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan; (k) the adoption and filing of the Amended and Restated Certificate of Incorporation of the Reorganized Company, the adoption of the Amended and Restated Bylaws of the Reorganized Company, and the entry into the Reorganized Holdco LLC Agreement and the Reorganized Holdco Exchange Agreement; (l) the appointment of officers and directors of the Reorganized Company; (m) the adoption, implementation, and amendment of the Management Incentive Plan and the granting of awards thereunder; (n) the creation of the Professional Fee Escrow Account to reserve an amount necessary to pay all of the Accrued Professional Compensation; (o) the maintenance of Causes of Action and the preservation of all Causes of Action not expressly settled or released; (p) the grant of the Third Party Releases; and (q) the general authority for all corporate action necessary to effectuate the Plan.   Moreover, the Reorganized Debtors will have, immediately upon the Effective Date, sufficient Cash to make all payments required to be made on the Effective Date pursuant to the terms of the Plan.   Accordingly, the requirements of section 1123(a)(5) of the Bankruptcy Code have been satisfied.

### (vi)    Section 1123(a)(6)—Voting Power of Equity Securities.

24.    Article IV(a)(iv) of the Amended and Restated Certificate of Incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement, prohibits the issuance of non-voting equity securities to the extent prohibited by section 1123(a)(6) of the Bankruptcy Code, thereby satisfying section 1123(a)(6) of the Bankruptcy Code.

### (vii)    Section 1123(a)(7)—Selection of Officers and Directors.

25.    The identity and affiliations of the members of the initial Board of Directors of the Reorganized Company, to the extent known, are listed in Exhibit 23 to the Plan Supplement. The Amended and Restated Certificate of Incorporation of the Reorganized Company describes the manner of the selection of the remaining members of the initial Board of Directors of the Reorganized Company. Pursuant to Article VI.O of the Plan, the CEO and the COO of the Reorganized Company shall be the same as the CEO and COO of CCI on the Petition Date. Article VI.O of the Plan further describes the manner of selection of additional officers of the Reorganized Company.  The selection of the initial directors and officers of the Reorganized Company was, is, and will be consistent with the interests of Holders of Claims and Interests and public policy.  Accordingly, the requirements of section 1123(a)(7) of the Bankruptcy Code have been satisfied.

### (viii)    Section 1123(b)—Discretionary Contents of the Plan.

26.    The Plan contains various provisions that may be construed as discretionary, but are not required for Confirmation under the Bankruptcy Code.  As set forth below, such discretionary provisions comply with section 1123(b) of the Bankruptcy Code and are not inconsistent with the applicable provisions of the Bankruptcy Code.  Thus, section 1123(b) of the Bankruptcy Code is satisfied.

(a)    **Section 1123(b)(1)-(2)—Claims and Executory Contracts.**

27.    Pursuant to sections 1123(b)(1) and 1123(b)(2) of the Bankruptcy Code, Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims and Interests, and Article VII of the Plan provides for the assumption, assumption and assignment, or rejection of the Executory Contracts of the Debtors not previously assumed, assumed and assigned, or rejected pursuant to section 365 of the Bankruptcy Code and appropriate authorizing orders of the Bankruptcy Court.

(b)    **Section 1123(b)(3)—Settlement, Releases, Exculpation, Injunction, and Preservation of Claims and Causes of Action.**

28.    **Compromise and Settlement**.    Pursuant to Bankruptcy Rule 9019 and section 363 of the Bankruptcy Code and in consideration for the distributions and other benefits provided under the Plan, the payment and provision of other consideration in satisfaction of the CII Settlement Claim, and any other compromise and settlement provisions of the Plan constitute a good faith compromise of all Claims, Interests, or Causes of Action relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such an Allowed Claim or Interest.    The compromise and settlement of such Claims, Interests, or Causes of Action embodied in the Plan is in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests, and is fair, equitable, and reasonable.

29.    In reaching an ultimate decision on substantive fairness, the Court considered the following factors: (a) the balance between the litigation's possibility of success and the settlement's future benefits; (b) the likelihood of complex and protracted litigation and risk and difficulty of collecting on the judgment; (c) the proportion of creditors and parties in interest that

support the settlement; (d) the competency of counsel reviewing the settlement; (e) the nature and breadth of releases to be obtained by officers and directors; and (f) the extent to which the settlement is the product of arm's-length bargaining.

30.    **CII Settlement**.    The Plan is premised upon the CII Settlement, which has facilitated the implementation of the Debtors' primary restructuring goals including: (a) reinstatement of the Debtors' Senior Debt (as defined below); (b) preservation and enhanced utilization of the Debtors' net operating losses ("<u>NOLs</u>") and other tax attributes; (c) discharge of roughly $8 billion of holding company debt; (d) reduction of more than $800 million in annual interest expense; (e) raising of approximately $1.6 billion in equity investments through a rights offering and up to $267 million in new notes; and (f) exchange of approximately $1.5 billion of CCH II Notes for New CCH II Notes, with extended maturities.

31.    The CII Settlement is a cornerstone of the Debtors' Plan, as it directly accomplishes three of the key goals briefly described above.  First, under the CII Settlement, Paul G. Allen ("<u>Mr. Allen</u>") makes  possible—by remaining a CCI stockholder with the requisite voting power specified in the Senior Debt and agreeing to appoint 4 of 11 board members—the Debtors' reinstatement of nearly $12 billion of Senior Debt, saving the Debtors substantial annual interest expense.   Second, the CII Settlement—through forbearance of prepetition exchange rights and maintenance of a 1% interest in Holdco—allows the Debtors to preserve approximately $2.85 billion of NOLs that will qualify for substantially enhanced utilization (with resulting benefits expected by the Debtors of approximately $1.14 billion in future cash savings). Third, the Debtors will enjoy a stepped-up basis in a significant portion of their assets when CII's interest in Holdco is diluted and if and to the extent of any taxable exchange of CII's Holdco interest for CCI common stock after the Debtors emerge from bankruptcy.  That stepped-

up basis will provide tax benefits over the life of the Holdco assets equal to approximately 35% of the amount of the step up.

32.    Nothing explicitly requires Mr. Allen to remain a stockholder with 35% voting power in CCI to preserve the Debtors' reinstatement rights or to cause CII to remain a member of Holdco to preserve the Debtors' tax benefits.   Any endeavors by the Debtors to compel Mr. Allen to do so have limited chances of success.   Given that the consideration for the CII Settlement includes the CII Settlement Parties' voluntary assumption of duties they are not required to assume and the forbearance from actions they are legally entitled to take, there is little chance of success in litigation.   Accordingly, even if there is a low likelihood of protracted litigation, there is little chance of success in litigation.   Thus, absent the CII Settlement, the Debtors would be unable to reinstate the Senior Debt, preserve the NOLs and other tax attributes to the extent permitted by the CII Settlement, or benefit from the stepped-up basis to the extent CII exercises its exchange rights after the Effective Date.

33.    The consideration received by the CII Settlement Parties under the CII Settlement is in exchange for, among other things, Mr. Allen's cooperation and participation to facilitate the reinstatement of the Senior Debt and the preservation and enhancement of the Debtors' tax attributes.   The CII Settlement does not provide any CII Settlement Party with any consideration or distribution on account of its existing equity interests in CCI or Holdco.

34.    The releases required by the CII Settlement are appropriate and justified because, among other reasons set forth below, they were essential to the formulation of the Plan and supported by substantial consideration.

35.    In the fall of 2008, the Debtors engaged financial and legal advisors with respect to a potential restructuring.   After internal analysis and discussions with their advisors, the

independent directors of the Debtors together with the management of the Debtors formulated and proposed a restructuring transaction that ultimately became the basis of the Plan and the CII Settlement.

36.    During the negotiations of the Plan and CII Settlement, the Debtors' legal and financial advisors reported to the independent directors of CCI and its management—and not to Mr. Allen or his affiliated directors.  CCI's independent directors, who constitute a majority of the Board of Directors, met at least nine times with respect to the Debtors' restructuring, and at least four times with respect to the CII Settlement.  The independent directors regularly met with the legal and financial advisors.  Mr. Allen and his affiliated directors did not exert any undue influence over or hinder any efforts by CCI's Board of Directors or management to independently review the Plan and CII Settlement or to pursue alternative restructuring transactions, and Mr. Allen and his affiliated directors regularly recused themselves from key decisions during the restructuring process and later with respect to the CII Settlement negotiations.  Accordingly, CCI's Board of Directors was not required to form a special committee with respect to the CII Settlement.  Although CCI's Board of Directors and management considered alternative transactions, none were viable.

37.    The CII Settlement Parties and the Debtors arrived at the CII Settlement after weeks of intensive arm's-length and good-faith negotiations during which the parties were separately represented by sophisticated legal and financial advisors.  The Crossover Committee, which also retained its own financial and legal advisors, consented to the terms of the CII Settlement only after intensive arm's-length and good-faith negotiations with the Debtors and advisors to Mr. Allen.  The final decision of CCI's Board of Directors on the Plan and on the CII Settlement was a unanimous decision.

38.      The CII Settlement is supported by other parties in interest.  Specifically, the Creditors' Committee independently reviewed the Plan, including the CII Settlement, and has pledged its support thereof.  Moreover, the CII Settlement was negotiated between the Debtors, CII, Mr. Allen and certain of his affiliates, and the Crossover Committee.

39.      Law Debenture Trust Company of New York, as Indenture Trustee (the "<u>CCI Indenture Trustee</u>") for the 6.50% Convertible Senior Notes due 2027 (the "<u>CCI Notes</u>") issued by CCI, has alleged that CCI's Board of Directors has breached its fiduciary duties in proposing, negotiating, and seeking to confirm the Plan with respect to the CII Settlement.  The CII Settlement, however, is fair and equitable, a necessary component to the feasibility of the Plan, falls well above the lowest point in the range of reasonableness, is in the best interests of the Debtors, their Estates, and their Creditors, does not violate the absolute priority rule, and is an essential element of the Plan.  Neither the Board of Directors of CCI nor Mr. Allen has breached any duty to the Debtors or their stakeholders.  The CII Settlement is not subject to an "entire fairness" standard.

40.      Pursuant to Bankruptcy Rule 9019, the Debtors are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating to the CII Settlement and to perform their obligations thereunder.

41.      **Releases by the Debtors**.  The releases and discharges of Claims and Causes of Action by the Debtors described in Article X.D of the Plan (the "<u>Debtor Releases</u>") pursuant to section 1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business judgment.  Pursuing any such claims against the Debtor Releasees (as defined herein) is not in

the best interest of the Debtors' estates' various constituencies as the costs involved likely would outweigh any potential benefit from pursuing such claims.

42.    **Third Party Releases**.  The circumstances of these Chapter 11 Cases are unique and truly unusual and they render the releases of Claims and Causes of Action by Holders of Claims and Interests described in Article X.E of the Plan (the "Third Party Release") important to the success of the Plan.

43.    As part of the Plan and CII Settlement, the CII Settlement Claim Parties have agreed to forbear with respect to certain exchange rights agreed to by the Debtors 10 years ago, the exercise of which would have resulted in the CII Settlement Claim Parties bearing no tax liability for any proposed restructuring.  Nevertheless, the CII Settlement Claims Parties agreed to forbear from exercising their historic right and agreed to maintain the existing Holdco structure to facilitate the Debtors' preservation of approximately $2.85 billion of tax attributes with enhanced utilization (with resulting benefits expected by the Debtors of approximately $1.14 billion in future cash savings).  In addition, the CII Settlement Claim Parties agreed to retain 35% voting power of CCI and appoint 4 of 11 board members to facilitate savings of several hundred million dollars annually in interest expense through reinstatement of the CCO Credit Facility Claims and other Senior Debt.  As described above, the CII Settlement will also provide the Debtors with the ability to achieve a step up in the tax basis on a significant portion of their assets when CII's interest in Holdco is diluted and to the extent CII exercises its exchange rights after the Effective Date, thus providing greater flexibility for any future asset sales.  Significantly, Mr. Allen is the only individual in existence whose continued participation as a CCI stockholder enables the Debtors to reinstate the Senior Debt.

44.     In consideration for entry into the CII Settlement, the CII Settlement Claim

Parties required that the Third Party Releases be included in the Plan.

45.     The CII Settlement is a linchpin of the Debtors' Plan, without which the Debtors'

restructuring goals would have been unobtainable, the Plan would not be confirmable or feasible,

and the substantial recoveries by the many parties in interest in these cases, including the fulcrum

creditors and trade creditors, would fail to exist.  These facts are unprecedented and justify the

approval of the Third Party Releases.

46.     There is an identity of interest between the Debtors and the beneficiaries of the

Third Party Releases (other than the Crossover Committee members).  These beneficiaries have

the right to seek indemnity, contribution or other reimbursement from the Debtors with respect to

certain activities relating to the negotiation and consummation of the Plan.  The Third Party

Releases appropriately relieve the Debtors from these potential expenses.  They also preserve the

priority scheme of the Bankruptcy Code by preventing the assertion of general unsecured claims

by the Debtors' officers and directors, which claims would be the direct result of claims by

parties in interest whose direct claims against the Debtors based on the same facts and

circumstances would be subject to subordination under section 510(b) of the Bankruptcy Code.

47.     In summary, the Third Party Releases are:  (a) in exchange for the good and

valuable consideration provided by the Debtor Releasees, a good faith settlement and

compromise of the claims released by the Third Party Release; (b) in the best interests of the

Debtors and all Holders of Claims; (c) fair, equitable and reasonable; (d) given and made after

due notice and opportunity for hearing; (e) being exchanged for substantial consideration by the

CII Settlement Claim Parties in the form of preservation of valuable tax attributes and the ability

to reinstate indebtedness at markedly favorable interest rates, with such consideration conferring

well in excess of $1 billion in value on the Debtors and their estates; (f) being exchanged for substantial consideration by the Crossover Committee in the form of significant financing commitments to the Debtors, including through the Exchange and the Rights Offering; (g) necessary to the Plan because the enjoined claims would indirectly impact the Debtors' reorganization as many of the Debtor Releasees are beneficiaries of indemnity obligations (including, significantly Mr. Allen, in his capacity as a director of Debtor CCI) such that there is an identity of interest between the Debtors and other Debtor Releasees; (h) is required under the CII Settlement, an essential component of the Plan, which was negotiated at arm's-length and in good faith with multiple creditor constituencies and which has been accepted by nearly all Classes of Claims entitled to vote; and (i) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Releases against any of the Debtor Releasees.

48.    **Injunction**.  The injunction provisions set forth in Article X.F of the Plan are essential to the Plan and are necessary to preserve and enforce the Debtor Releases, the Third Party Releases, and the exculpation provisions in Article X of the Plan, and are narrowly tailored to achieve that purpose.

49.    **Exculpation**.  The exculpation provisions set forth in Article X.G of the Plan are essential to the Plan.  The record in the Chapter 11 Cases fully supports the Exculpation and the Exculpation provisions set forth in Article X.G of the Plan are appropriately tailored to protect the Exculpated Parties from inappropriate litigation.  The Exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; <u>provided</u>, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; <u>provided further</u>, that the Exculpation shall not apply to any

acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

50.     Each of the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates, and their Creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law.  The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions contained in Article X of the Plan.

51.     **Preservation of Claims and Causes of Action**.  Article VI.S of the Plan appropriately provides for the preservation by the Debtors of the Causes of Action in accordance with section 1123(b)(3)(B) of the Bankruptcy Code.  The provisions regarding Causes of Action in the Plan are appropriate and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

**2.     Section 1129(a)(2)—Compliance of the Debtors and Others With the Applicable Provisions of the Bankruptcy Code.**

52.     The Debtors, as proponents of the Plan, have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code,

including sections 1122, 1123, 1124, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018, and 3019.

53.    Votes to accept or reject the Plan were solicited by the Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents after the Court approved the adequacy of the Disclosure Statement pursuant to section 1125(a) of the Bankruptcy Code.

54.    The Debtors and their respective present and former members, partners, representatives, officers, directors, employees, advisors, attorneys, and agents have solicited and tabulated votes on the Plan and have participated in the activities described in section 1125 of the Bankruptcy Code fairly, in good faith within the meaning of section 1125(e) of the Bankruptcy Code, and in a manner consistent with the applicable provisions of the Disclosure Statement Order, the Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, and all other applicable rules, laws, and regulations, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article X.G of the Plan.

55.    The Debtors and their respective present and former members, officers, directors, employees, advisors, attorneys, and agents have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the offering, issuance, and distribution of recoveries under the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or distributions made pursuant to the Plan, so long as such distributions are made consistent with and pursuant to the Plan.

**3.       Section 1129(a)(3)—Proposal of Plan in Good Faith.**

56.      The Debtors have proposed the Plan in good faith and not by any means forbidden by law.  This is demonstrated by the reasons set forth above under the heading "CII Settlement," in addition to the following.  In determining that the Plan has been proposed in good faith, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing of the Chapter 11 Cases, the Plan itself, and the process leading to its formulation.  The Debtors' good faith is evident from the facts and records of the Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Chapter 11 Cases.

57.      The Plan is the product of arm's-length negotiations between, among other Entities, the Debtors, and each party who signed a Plan Support Agreement.  The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests.  Consistent with the overriding purpose of chapter 11, the Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to reorganize and emerge from bankruptcy with a capital structure that will allow them to satisfy their obligations with sufficient liquidity and capital resources.  Accordingly, the requirements of section 1129(a)(3) of the Bankruptcy Code are satisfied.

**4.       Section 1129(a)(4)—Bankruptcy Court Approval of Certain Payments as Reasonable.**

58.      The procedures set forth in the Plan for the Bankruptcy Court's review and ultimate determination of the fees and expenses to be paid by the Debtors in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, satisfy

the objectives of and are in compliance with section 1129(a)(4) of the Bankruptcy Code.

Accordingly, the requirements of section 1129(a)(4) of the Bankruptcy Code are satisfied.

5.    **Section 1129(a)(5)—Disclosure of Identity of Proposed Management, Compensation of Insiders and Consistency of Management Proposals with the Interests of Creditors and Public Policy.**

59.    The Plan complies with the requirements of section 1129(a)(5) of the Bankruptcy

Code because, in the Disclosure Statement, the Plan, and the Plan Supplement, the Debtors have

disclosed (a) the identity and affiliations of each proposed director, the CEO, the COO, and the

CFO and the manner in which additional officers and directors of the Reorganized Company will

be chosen following Confirmation and (b) the identity of and nature of any compensation for any

insider who will be employed or retained by the Reorganized Company.   The method of

appointment of directors and officers of the Debtors was, is, and will be consistent with the

interests of Holders of Claims and Interests and public policy.   Accordingly, the requirements of

section 1129(a)(5) of the Bankruptcy Code are satisfied.

6.    **Section 1129(a)(6)—Approval of Rate Changes.**

60.    The Plan does not contain any rate changes subject to the jurisdiction of any

governmental regulatory commission and therefore will not require governmental regulatory

approval.   Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Chapter

11 Cases.

7.    **Section 1129(a)(7)—Best Interests of Holders of Claims and Interests.**

61.    The liquidation analysis attached as Exhibit E to the Disclosure Statement (as

amended and restated, the "Liquidation Analysis") and the other evidence related thereto in

support of the Plan that was proffered or adduced at or prior to, or in affidavits in connection

with, the Confirmation Hearing: (a) are reasonable, persuasive, credible, and accurate as of the

dates such analysis or evidence was prepared, presented, or proffered; (b) utilize reasonable and

-26-

appropriate methodologies and assumptions; (c) have not been controverted by other evidence; and (d) establish that, Holders of Allowed Claims in every Class will recover as much or more under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, than the amount such Holder would receive if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.

62.    Specifically, the Liquidation Analysis properly:  (a) utilized a distressed sale ("Distressed Sale") assumption; (b) excluded preference recoveries against trade vendors under the foregoing assumption; (c) concluded that executory contracts would likely be assumed in a Distressed Sale; (d) accounted for CCI's and Holdco's entitlement to a portion of the Litigation Settlement Fund Proceeds; (e) ascribed no value to CCI or Holdco for contracts held at CCI and Holdco, including programming, media and sales contracts; (f) excluded value for worthless stock options issued by CCI for CCO's benefit; (g) excluded the (i) $74 million interest payment made by Holdco, (ii) $8.4 million capital contribution by Holdco to CCH, (iii) $9 million of assets listed on Holdco's schedules in the form of cash, security deposits and accounts receivable, and (iv) $176 million of Holdco's repurchase of affiliates' notes; and (h) accounted for the Debtors' intercompany payables and receivables at all times.   Accordingly, the requirements of section 1129(a)(7) of the Bankruptcy Code are satisfied.

**8.    Section 1129(a)(8)—Conclusive Presumption of Acceptance by Unimpaired Classes; Acceptance of the Plan by Each Impaired Class.**

63.    Classes A-1, A-2, B-1, B-2, C-1, C-2, D-1, D-2, E-1, E-2, F-1, F-2, G-1, G-2, H-1, H-2, I-1, I-2, I-3, I-4, J-1, J-3, J-4, and J-5 (Classes of Claims) and Classes I-6 and J-7 (Classes of Interests) are each Classes of Unimpaired Claims or Interests that are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.

64.     Because the Plan has not been accepted by the Rejecting Classes, the Debtors seek Confirmation under section 1129(b), rather than section 1129(a)(8), of the Bankruptcy Code.  Thus, although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Rejecting Classes, the Plan is confirmable because the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes and thus satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes as described further below.  As a result, the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

**9.      Section 1129(a)(9)—Treatment of Claims Entitled to Priority Pursuant to Section 507(a) of the Bankruptcy Code.**

65.     The treatment of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims under Articles II and IV of the Plan satisfies the requirements of, and complies in all respects with, section 1129(a)(9) of the Bankruptcy Code. Accordingly, the requirements of section 1129(a)(9) of the Bankruptcy Code are satisfied.

**10.     Section 1129(a)(10)—Acceptance By At Least One Impaired Class.**

66.     As set forth in the Voting Certifications, the Impaired Accepting Classes have voted to accept the Plan.  Specifically, Holders of Claims in Classes A-3, B-3, B-4, C-3, C-4, D-3, E-3, E-4, F-3, F-4, G-3, G-4, H-3, H-4, I-5, J-2, and J-6 voted to accept the Plan. (Schepper Decl.¶¶ 15, 16; Sullivan Decl., Ex. A).  Excluding Insider votes, 9 Impaired Classes (A-3, B-3, B-4, C-3, F-4, G-4, H-4, J-2, and J-6) voted to accept the Plan.  See id.  Pursuant to the Disclosure Statement Order, Classes for which no votes were cast were deemed to accept the Plan.  See Disclosure Statement, Ex. E 7(h).  As such, there is at least one Class of Claims that is Impaired under the Plan and has accepted the Plan, determined without including any acceptance of the Plan by any insider (as defined by the Bankruptcy Code).  Accordingly, the requirements of section 1129(a)(10) of the Bankruptcy Code have been satisfied.

### 11.    Section 1129(a)(11)—Feasibility of the Plan.

67.    The Plan satisfies section 1129(a)(11) of the Bankruptcy Code.  The evidence supporting the Plan proffered or adduced by the Debtors at, or prior to, or in affidavits filed in connection with, the Confirmation Hearing: (a) is reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (b) utilizes reasonable and appropriate methodologies and assumptions; (c) has not been controverted by other evidence; (d) establishes that the Plan is feasible and Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors or any successor to the Reorganized Debtors under the Plan except as provided in the Plan; and (e) establishes that the Reorganized Debtors will have sufficient funds available to meet their obligations under the Plan.  Accordingly, the requirements of section 1129(a)(11) of the Bankruptcy Code have been satisfied.

### 12.    Section 1129(a)(12)—Payment of Bankruptcy Fees.

68.    Article XV.C of the Plan provides that all fees payable pursuant to section 1930 of the United States Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. Accordingly, the requirements of section 1129(a)(12) of the Bankruptcy Code have been satisfied.

### 13.    Section 1129(a)(13)—Retiree Benefits.

69.    Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for "retiree benefits" (as defined in section 1114 of the Bankruptcy Code) at levels established pursuant to section 1114 of the Bankruptcy Code.  Article VI.Q of the Plan provides that, on and after the Effective Date, all retiree benefits, if any, shall continue to be paid in accordance with applicable

law.  Accordingly, the requirements of section 1129(a)(13) of the Bankruptcy Code have been satisfied.

### 14.    Section 1129(b)—Confirmation of Plan Over Nonacceptance of Impaired Class.

70.    Notwithstanding the fact that the Rejecting Classes have voted not to accept the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code because: (a) the Impaired Accepting Classes have voted to accept the Plan; and (b) the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes. Accordingly, the Plan is fair and equitable towards all Holders of Claims in the Rejecting Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.  Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy Code is not satisfied.  After entry of the Confirmation Order and upon the occurrence of the Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

### 15.    Section 1129(c)—Only One Plan.

71.    Other than the Plan (including previous versions thereof), no other plan has been filed in the Chapter 11 Cases.  Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

### 16.    Section 1129(d)—Principal Purpose of the Plan Is Not Avoidance of Taxes.

72.    No governmental unit has requested that the Bankruptcy Court refuse to confirm the Plan on the grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act.  As evidenced by its terms, the principal purpose of the Plan is not such avoidance.  Accordingly, the requirements of section 1129(d) of the Bankruptcy Code have been satisfied.

**N.**    **Satisfaction of Confirmation Requirements.**

73.    Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

**O.**    **Good Faith.**

74.    The Debtors have proposed the Plan in good faith, with the legitimate and honest purposes of reorganizing the Debtors' ongoing business and maximizing the value of each of the Debtors and the recovery to stakeholders.  The Plan gives effect to many of the Debtors' restructuring initiatives, including debt reinstatement, debt reduction, and the CII Settlement. Accordingly, the Debtors, the Creditors' Committee, and each party who signed a Plan Support Agreement (and all of their respective members, officers, directors, agents, financial advisers, attorneys, employees, partners, Affiliates, and representatives) have been, are, and will continue to act in good faith if they proceed to: (a) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby (including, without limitation, the entry into and performance under the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants); and (b) take the actions authorized and directed or contemplated by the Confirmation Order.  Therefore, the Plan has been proposed in good faith to achieve a result consistent with the objectives and purposes of the Bankruptcy Code.

**P.**    **Disclosure: Agreements and Other Documents.**

75.    The Debtors have disclosed all material facts regarding: (a) the adoption of the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws of Reorganized CCI or similar constituent documents; (b) the selection of directors and officers for the Reorganized Debtors; (c) the distribution of Cash; (d) the issuance of new equity in the

Reorganized Company consisting of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants; (e) the issuance of the New CCH II Notes; (f) the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Reorganized Debtors; (g) the Management Incentive Plan; (h) the Rights Offering; (i) securities registration exemptions; (j) the exemption under section 1146(a) of the Bankruptcy Code; (k) the adoption of the Reorganized Holdco LLC Agreement and the entry into the Reorganized Holdco Exchange Agreement; and (l) the adoption, execution, and delivery of all contracts, leases, instruments, securities, releases, indentures, and other agreements related to any of the foregoing.

**Q.    Transfers by Debtors; Vesting of Assets.**

76.    Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness that is Unimpaired by the Plan). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**R.    Conditions to Effective Date.**

77.    Entry of the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Requisite Holders and Mr. Allen, shall satisfy the conditions to the Effective Date as set forth in Article XII.A.1-3 of the Plan, subject to the condition in Article XII.A.1-3 of

the Plan that the Confirmation Order shall not have been stayed or modified or vacated on appeal.

**S.     Likelihood of Satisfaction of Conditions Precedent to Consummation.**

78.     Each of the conditions precedent to the Effective Date, as set forth in Article XII.A of the Plan, has been satisfied or waived in accordance with the provisions of the Plan, or is reasonably likely to be satisfied, provided, however, that no waiver of the conditions precedent to the Effective Date shall have occurred without the consent of the Requisite Holders and Mr. Allen.

**T.     Implementation.**

79.     All documents and agreements necessary to implement the Plan, including those contained in the Plan Supplement, and all other relevant and necessary documents (including, without limitation, the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws of Reorganized CCI, the entry into and performance under the Equity Registration Rights Agreement, the New CCH II Notes, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco LLC Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants), have been negotiated in good faith, at arm's length, and are in the best interests of the Debtors and the Reorganized Debtors and shall, upon completion of documentation and execution be valid, binding, and enforceable documents and agreements not in conflict with any federal or state law.

**U.     Issuance of New Common Stock, Preferred Stock, and Warrants.**

80.     The issuance of New Common Stock, Preferred Stock, and Warrants is an essential element of the Plan, and is in the best interests of the Debtors, their Estates, and their

Creditors.  The Reorganized Company's equity interests shall consist of New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants.

## V.    The CCI Notes Claim.

81.    Notwithstanding any other provision to the contrary, the distributions provided in Article IV.A.4 of the Plan to the Holders of CCI Notes Claim shall constitute the sole recovery that such Holders shall receive under the Plan on account of their Claims.

## W.    Reorganized Holdco.

82.    The retention of the current partnership structure in the form of Reorganized Holdco is an essential element of the Plan, and is in the best interests of the Debtors, their Estates, and their Creditors.  The Debtors are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, and certificates relating thereto and perform their obligations thereunder.

## X.    Reinstatement.

83.    The CCO Credit Facility Claims, the CCO Notes Claims, the CCOH Credit Facility Claims, and the CCOH Notes Claims are Unimpaired in accordance with section 1124 of the Bankruptcy Code.

### 1.    No Event of Default Under the CCO Credit Facility.

84.    Section 8(k)(i) of the CCO Credit Facility provides that it shall be an Event of Default if "the Paul Allen Group[3] shall cease to have the power, directly or indirectly, to vote or

---

[3]    Under the CCO Credit Facility, the "Paul Allen Group" includes (a) Mr. Allen, (b) his estate, spouse, immediate family members and heirs and (c) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist entirely of Mr. Allen or such other persons referred to in clause (b) above or a combination thereof.

direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO] . . . ."

85.     The Paul Allen Group will not, at any time before, or upon consummation of, the Plan, cease to have the requisite voting power required by section 8(k)(i) of the CCO Credit Facility.   Accordingly, there is no Event of Default under section 8(k)(i) of the CCO Credit Facility, and if the Debtors perform in accordance with the terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8(k)(i) of the CCO Credit Facility.

86.     Section 8(k)(ii) of the CCO Credit Facility provides that it shall be an Event of Default under the following additional circumstances:   "the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Exchange Act), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO], unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of [CCO] than such 'person' or 'group.'"

87.     The consummation of the Plan constitutes a "consummation of a transaction" for purposes of section 8(k)(ii) of the CCO Credit Facility.

88.     Upon consummation of the Plan, no member of the Crossover Committee will have the power, directly or indirectly, to vote or direct the voting of Equity Interests having more

than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of CCO.

89.     Upon consummation of the Plan, no member of the Crossover Committee will have an agreement with any other member of the Crossover Committee or any other party to a Plan Support Agreement to act together for the purpose of acquiring, holding, voting or disposing of equity securities of the Debtors or the Reorganized Debtors, and no such persons, or any combination thereof, will constitute a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of such equity securities, or otherwise constitute a "group" as such term is used in Section 13(d) or 14(d) of the Exchange Act, as provided in the CCO Credit Facility. No such agreement, partnership, limited partnership, syndicate, other group, or "group" exists or will exist upon consummation of the Plan.

90.     Accordingly, there is no Event of Default under section 8(k)(ii) of the CCO Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8(k)(ii) of the CCO Credit Facility.

## 2.     No Change of Control Under the Other Senior Debt Instruments.

91.     The indentures for the CCO and CCOH Notes and the CCOH Credit Facility define a "Change of Control" in relevant part as:

"* * *

(3)     the consummation of any transaction . . . the result of which is that any "person" [(as such term is used in Section 13(d)(3) of the Exchange Act)] other than Paul G. Allen or any of the Related Parties[4] becomes the Beneficial Owner[5],

---

4     A "Related Party" of Mr. Allen includes (i) the spouse or an immediate family member, estate or heir of Mr. Allen, or (ii) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners

(Continued…)

directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than number of shares, unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Company or such Parent, as the case may be, measured by voting power rather than number of shares, than such person;[6]

(4)   after the Issue Date, the first day on which a majority of the members of the Board of Directors of CCI are not Continuing Directors[7] . . . ."

92.   The consummation of the Plan constitutes a "consummation of a transaction" for purposes of the indentures' Change of Control provisions quoted above.

93.   Upon consummation of the Plan, no member of the Crossover Committee will be the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than number of shares.

94.   Paragraph 90 above is hereby incorporated by reference.

95.   Thus, the occurrence of any or all of the following: (a) the commencement of the Chapter 11 Cases; (b) the filing, prosecution and confirmation of the Plan; (c) the consummation of the Plan; (d) the transactions contemplated by or resulting from the Plan, including, without limitation, the issuance of the New Common Stock and the appointment of the initial Board of

---

or Persons beneficially holding an 80% or more controlling interest of which consist of Mr. Allen and/or such other Persons referred to in the immediately preceding clause (i).

[5]   "Beneficial Owner" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as such term is used in Section 13d(3) of the Exchange Act) such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

[6]   "Voting Stock" of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors or comparable governing body of such Person.

[7]   A "Continuing Director" is any member of the Board of Directors of CCI who:  (1) was a member of such Board of Directors on the [applicable] Issue Date; or (2) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Directors who were members of such Board of Directors at the time of such nomination or election or whose election or appointment was previously so approved.

Directors of Reorganized CCI; (e) any other effect of the Chapter 11 Cases; and (f) the emergence of the Debtors from the Chapter 11 Cases, will not constitute a "change of control" under, and within the meaning of, the indenture for the CCO Notes or the CCOH Notes or the CCOH Credit Facility.

96.     Accordingly, there is no Change of Control under the indentures for the CCO and CCOH Notes and the CCOH Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Change of Control under the CCO and CCOH Notes and the CCOH Credit Facility.

**3.      No Misrepresentation Regarding Ability to Pay Debts As They Become Due.**

97.     None of the Debtors' "Designated Holding Companies" (as defined in the CCO Credit Facility) were unable to pay their debts as they become due at any time before the Petition Date.  Accordingly, there was no Event of Default under section 8(g)(v) of the CCO Credit Facility.  In any event, any default arising from a breach of section 8(g)(v) of the CCO Credit Facility would relate to the financial condition of CCO or of a Debtor and thus would constitute an ipso facto default that need not be cured under section 1124 of the Bankruptcy Code.

98.     Because no Event of Default had occurred under section 8(g)(v) of the CCO Credit Facility, there was no Event of Default under section 8(b) of the CCO Credit Facility in connection with the borrowing requests made by the Debtors in October and November of 2008 and in February 2009.  In any event, any default arising from a breach of section 8(b) with respect to section 8(g)(v) of the CCO Credit Facility would relate to the financial condition of CCO or of a Debtor and thus would constitute an ipso facto default that need not be cured under section 1124 of the Bankruptcy Code.

**4.      No Cross-Acceleration.**

99.     The alleged default caused by the commencement of these Chapter 11 Cases by the Debtors that constitute Designated Holding Companies relates to the commencement of a case under the Bankruptcy Code or relates to the financial condition of CCO and therefore constitutes an ipso facto default of CCO that need not be cured under section 1124 of the Bankruptcy Code.  Accordingly, there is no Event of Default under section 8 of the CCO Credit Facility, including (but not limited to) section 8(f) or 8(g) of the CCO Credit Facility, and if the Debtors perform in accordance with terms of the Plan and this Order, upon consummation of the Plan there will be no Event of Default under section 8 of the CCO Credit Facility.

**5.      No Other Event of Default.**

100.    Upon emergence, no Event of Default shall have occurred and be continuing under any of the debt instruments being reinstated by the Debtors.

**Y.      Retention of Jurisdiction.**

101.    The Bankruptcy Court properly may retain jurisdiction over the matters set forth in Article XIV and other applicable provisions of the Plan.

102.    The Plan shall neither confer nor deny jurisdiction for determining any disputes relating to or arising from Class J-2:  CCO Swap Agreements Claims.

*   *   *   *   *

## II.  **ORDER**

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED THAT:**

**A.    Order.**

103.    This Confirmation Order shall confirm the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.

**B.    Objections.**

104.    To the extent that any objections, reservations of rights, statements, or joinders to Confirmation have not been withdrawn, waived, or settled prior to entry of the Confirmation Order or otherwise resolved as stated on the record of the Confirmation Hearing, they are hereby overruled on the merits.

**C.    Findings of Fact and Conclusions of Law.**

105.    The findings of fact and the conclusions of law set forth herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy Rule 9014.   All findings of fact and conclusions of law announced by the Court at the Confirmation Hearing in relation to Confirmation and to judgment in the Adversary Proceeding are hereby incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following constitute findings of fact or conclusions of law, they are adopted as such.  To the extent any of the prior findings of fact or conclusions of law constitutes an order of this Court, they are adopted as such.

**D.    Confirmation of the Plan.**

106.    The Plan and Plan Supplement (as such may be amended by the Confirmation Order or in accordance with the Plan) and each of their provisions are confirmed in each and every respect pursuant to section 1129 of the Bankruptcy Code.  The documents contained in the

Plan Supplement, and any amendments, modifications, and supplements thereto, and all documents and agreements related thereto (including all exhibits and attachments thereto and documents referred to in such papers), and the execution, delivery, and performance thereof by the Reorganized Debtors, are authorized and approved as finalized, executed, and delivered. Without further order or authorization of the Bankruptcy Court, the Debtors, Reorganized Debtors, and their successors are authorized and empowered to make all modifications to all documents included as part of the Plan Supplement that are consistent with the Plan (including increasing the number of shares of New Preferred Stock and lowering the liquidation preference for each share of New Preferred Stock, provided that the liquidation preference per share of New Preferred Stock shall not be lower than $5.00 per share and (i) the aggregate initial liquidation preference shall remain at $72,000,000 and (ii) the aggregate voting rights for all preferred taken together shall remain unchanged).  As set forth in the Plan, once finalized and executed, the documents comprising the Plan Supplement and all other documents contemplated by the Plan shall constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and, to the extent applicable, shall create, as of the Effective Date, all Liens and other security interests purported to be created thereby.

107.    The terms of the Plan, the Plan Supplement, and exhibits thereto are incorporated by reference into, and are an integral part of, the Confirmation Order.  The terms of the Plan, the Plan Supplement, all exhibits thereto, and all other relevant and necessary documents, shall be effective and binding as of the Effective Date of the Plan.

**E.    Plan Classification Controlling.**

108.    The terms of the Plan shall solely govern the classification of Claims and Interests for purposes of the distributions to be made thereunder.  The classifications set forth on the Ballots tendered to or returned by the Holders of Claims or Interests in connection with voting on

the Plan: (a) were set forth on the Ballots solely for purposes of voting to accept or reject the

Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise

affect, the actual classification of such Claims and Interests under the Plan for distribution

purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the

actual classification of such Claim or Interest under the Plan for distribution purposes; and

(d) shall not be binding on the Debtors and Reorganized Debtors except for voting purposes.

**F.    Compromise and Settlement.**

109.    On or after the Effective Date, the Reorganized Debtors are authorized and

directed to make all distributions on account of the CII Settlement Claim. The Debtors may

compromise and settle Claims against them and Causes of Action against other Entities in

accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and

Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the

Bankruptcy Court.

**G.    The Releases, Injunction, Exculpation, and Related Provisions Under the Plan.**

110.    The following releases, injunctions, exculpations, and related provisions set forth

in Article X of the Plan are hereby approved and authorized in their entirety:

**1.    Releases by the Debtors.**

**On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including: (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the obligations of the Holders of Claims party to Plan Support Agreements to provide the support necessary for the Effective Date of the Plan; and (3) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "Debtor Releasees" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort,**

fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Releasing Party from any causes of action expressly set forth in and preserved by the Plan.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

2.      Third Party Releases.

On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, and provided further that the foregoing "Third Party Release" shall not impair the rights (a) to which an Allowed Unimpaired Claim entitles the Holder of such Allowed Unimpaired Claim or (b) of a Holder of a General Unsecured Claim as to any General Unsecured Claim. Notwithstanding anything in the Plan to the contrary, the Releasing Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other

proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.   This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

3.    **Injunction.**

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

4.    **Exculpation.**

The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided further, that the foregoing "Exculpation" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

H.    **Release of Liens.**

111.    Except as otherwise provided in the Plan (including as to reinstated debt) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other

security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

**I.    Maintenance of Causes of Action.**

112.    The provisions of Article VI.S of the Plan are hereby approved in their entirety. Subject to the releases set forth in Article X.D and Article X.E of the Plan, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.

113.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

**J.    Post-Confirmation Notices, Professional Compensation, and Bar Dates.**

**1.    Notice of Entry of the Confirmation Order.**

114.    In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no

notice or service of any kind shall be required to be mailed or made upon any Entity to whom the

Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked

"undeliverable as addressed," "moved, left no forwarding address" or "forwarding order

expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or

are otherwise aware, of that Entity's new address. To supplement the notice described in the

preceding sentence, within twenty (20) days of the date of the Confirmation Order the Debtors

shall publish the Notice of Confirmation once in The Wall Street Journal (National Edition).

Mailing and publication of the Notice of Confirmation in the time and manner set forth in the

this paragraph shall be good and sufficient notice under the particular circumstances and in

accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice

is necessary.

115.    The Notice of Confirmation shall have the effect of an order of the Bankruptcy

Court, shall constitute sufficient notice of the entry of the Confirmation Order to such filing and

recording officers, and shall be a recordable instrument notwithstanding any contrary provision

of applicable non-bankruptcy law.

**2.    Professional Compensation.**

116.    All final requests for Professional Compensation and Reimbursement Claims

shall be Filed no later than 45 days after the Effective Date.  After notice and a hearing in

accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court

orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims

shall be determined by the Bankruptcy Court.

117.    On the Effective Date, the Reorganized Debtors (other than Reorganized CII)

shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional

Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be

maintained in trust for the Professionals with respect to whom fees or expenses have been held

back pursuant to the Interim Compensation Order.  Such funds shall not be considered property

of the Reorganized Debtors.    The remaining amount of Professional Compensation and

Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by

the Reorganized Debtors (other than Reorganized CII) from the Professional Fee Escrow

Account, without interest or other earnings therefrom, when such Claims are Allowed by a

Bankruptcy Court order.  When all Claims by Professional have been paid in full, amounts

remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized

Debtors (other than Reorganized CII).

118.    To receive payment for unbilled fees and expenses incurred through the Effective

Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional

Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors

(other than CII).  If a Professional does not provide an estimate, the Reorganized Debtors (other

than Reorganized CII) may estimate the unbilled fees and expenses of such Professional;

provided, however, that such estimate shall not be considered an admission with respect to the

fees and expenses of such Professional.  The total amount so estimated as of the Effective Date

shall comprise the Professional Fee Reserve Amount.

119.    Except as otherwise specifically provided in the Plan, from and after the Effective

Date, each Reorganized Debtor shall, in the ordinary course of business and without any further

notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal,

Professional or other fees and expenses incurred by that Reorganized Debtor after the Effective

Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply

with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or

compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

120.    Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

121.    The Debtors (other than CII) shall promptly pay the unpaid, reasonable, documented out-of-pocket fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC, the legal and financial advisors engaged by the Crossover Committee, without Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., or UBS Securities LLC having to file fee applications to receive payment for such fees and expenses.

122.    The Debtors (other than CII) shall pay the unpaid, reasonable, documented out-of-pocket fees and expenses incurred by the members of the Crossover Committee in connection with the negotiation of the Plan, as well as their due diligence review and the approval and consummation of the transactions contemplated by the Plan, without such members of the Crossover Committee having to file fee applications to receive payment for such fees and expenses.

123.    The Debtors (other than CII) shall pay the unpaid reasonable, documented out-of-pocket fees incurred by the members of the Creditors' Committee.

### 3.    Other Administrative Expense Claims.

124.    All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable.    The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.    In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim.    Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

### K.    <u>Exemption from Securities Laws.</u>

125.    The solicitation of acceptances and rejections of the Plan was exempt from the registration requirements of the Securities Act of 1933 (as amended, and including the rules and regulations promulgated thereunder) and applicable state securities laws, and no other non-bankruptcy law applies to the solicitation.

126.    Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan (including any Securities issued or issuable pursuant to the terms of the Warrants or any other Securities distributed pursuant to the Plan) and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.    In addition, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan (including any Securities issued or issuable pursuant to the terms of the Warrants or any other Securities contemplated by the Plan) and any and all settlement agreements incorporated therein

will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act and (b) applicable regulatory approval.

127.    Notwithstanding the foregoing, (a) shares of New Class A Stock issued to Eligible CCH I Notes Claim Holders pursuant to the Rights Offering, (b) New CCH II Notes issued to Rollover Commitment Parties, and (c) Securities issued to CII Settlement Claim Parties in connection with the CII Settlement shall be issued pursuant to the exemption provided under section 4(2) of the Securities Act.  The holders of such equity and debt securities and certain other affiliates of the Reorganized Company shall receive registration rights as set forth in the Equity Registration Rights Agreement and the Debt Registration Rights Agreement, respectively.

**L.    Exemptions from Taxation.**

128.    Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment, or recording of any lease or sublease; or (d) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment,

and the appropriate federal, state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## M.    <u>Retention of Jurisdiction.</u>

129.    Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

aa. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

bb. Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

cc. Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

dd. Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

ee. Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

ff. Adjudicate, decide or resolve any and all matters related to Causes of Action;

gg. Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

hh. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments,

releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

ii. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

jj. Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

kk. Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

ll. Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

mm.   Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

nn. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

oo. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

pp. Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

qq. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

rr. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

ss. Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

tt. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

uu. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

vv. Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit

program, regardless of whether such termination occurred prior to or after the Effective Date;

ww.    Hear and determine all disputes arising from or relating to the causes of action raised in, could have been raised in, or derived from the Adversary Proceeding;

xx. Enforce all orders previously entered by the Bankruptcy Court; and

yy. Hear any other matter not inconsistent with the Bankruptcy Code.

**N.    References to Plan Provisions.**

130.    The failure specifically to include or to refer to any particular article, section, or provision of the Plan, Plan Supplement, or any related document in the Confirmation Order shall not diminish or impair the effectiveness of such article, section, or provision, it being the intent of the Bankruptcy Court that the Plan and any related documents be confirmed in their entirety.

**O.    Treatment of Executory Contracts.**

131.    The Executory Contract provisions of Article VIII of the Plan shall be, and hereby are, approved in their entirety.

**P.    Procedures for Resolving Claims and Disputes.**

132.    The Claims resolution procedures contained in Article VIII of the Plan shall be, and hereby are, approved in their entirety.

**Q.    Provisions Governing Distributions.**

133.    The distribution provisions of Article IX of the Plan shall be, and hereby are, approved in their entirety.  Except as otherwise set forth in the Plan, the Reorganized Debtors shall make all distributions required under the Plan.

**R.    Reinstatement of Certain Credit Facilities and Indentures.**

134.    Except to the extent that a Holder of an Allowed Claim against the applicable Debtors and the applicable Debtors agree to less favorable treatment to such Holder, each Allowed Claim against the Debtors for each of the credit facilities and indentures listed below

(the "Senior Debt") shall be reinstated in accordance with section 1124 of the Bankruptcy Code

and is therefore Unimpaired:

| Senior Debt | Principal Amount Outstanding |
|---|---:|
| First Lien Credit Facility | |
|    Term Loan Facility maturing 2014 | $6.9 billion |
|    Revolving Credit Facility maturing 2013[8] | $1.3 billion |
| 8.00% senior second lien notes due 2012 | $1.1 billion |
| 8⅜% senior second lien notes due 2014 | $770 million |
| 10.875% senior second lien notes due 2014 | $546 million |
| Junior Credit Facility maturing 2014 | $350 million |
| 8¾% senior notes due 2013 | $800 million |
| **Total** | **$11.8 billion** |

S.    **New Common Stock, Preferred Stock, and Warrants and New CCH II Notes.**

135.    In accordance with the terms of Article VI.B of the Plan, the Reorganized Debtors shall issue, deliver or execute, as the case may be, all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, including, without limitation, the New Class A Stock, New Class B Stock, New Preferred Stock, and Warrants, and New CCH II Notes each of which shall be distributed as provided in the Plan.  Upon issuance, (a) all shares of New Class A Stock, New Class B Stock, New Preferred Stock and any such securities delivered upon the exercise of the Warrants and upon the exchange of equity interests in Reorganized Holdco under the Reorganized Holdco Exchange Agreement are deemed validly issued, fully paid, and non-assessable, and (b) all of the New CCH II Notes shall be deemed duly authorized and validly issued in exchange for CCH I Notes and CCH II Notes.

---

[8]    Excluding letter of credit obligations, which do not need to be collateralized with cash.

T.    **CII Settlement Claim.**

136.    Notwithstanding anything to the contrary in the Plan or this Confirmation Order, on the Effective Date, the following consideration shall be transferred by the Debtors (other than CII) to Mr. Allen (or his designees which, in the case of New Class B Stock, shall be limited to Authorized Class B Holders) on account of the CII Settlement Claim:  (a) shares of New Class B Stock representing, as of the Effective Date, (i) 2% of the equity value of the Reorganized Company, after giving effect to the Rights Offering and one half of the overallotment option, but prior to the issuance of the other half of the overallotment option, the Warrants and equity-based awards under the Management Incentive Plan, and (ii) 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of Reorganized CCI; (b) the CII Settlement Claim Warrants; (c) $85 million principal amount of New CCH II Notes, which shall be refinancing indebtedness of the CCH I Notes and deemed transferred from Holders of CCH I Notes Claims automatically and without further action by any party; (d) Cash in the amount of $25 million on account of the Allen Management Receivable; (e) $150 million in Cash; and (f) Cash of up to $20 million on account of the Allen Fee Reimbursement under the terms set forth in the Plan.  In addition, on the Effective Date, CII shall retain a 1% direct equity interest in Reorganized Holdco, including the right to exchange such interest into New Class A Stock representing 1% of the equity value of the Reorganized Company, after giving effect to the Rights Offering and one half of the overallotment option, but prior to the issuance of the other half of the overallotment option, the Warrants and equity-based awards under the Management Incentive Plan, pursuant to the Reorganized Holdco Exchange Agreement, and Mr. Allen shall retain all of the Interests in Reorganized CII.  Furthermore, on the Effective Date, the 7,282,183 CC VIII Preferred Units held by the CII shall be deemed transferred, automatically and without

further action by any party, to Reorganized CCI.  CCH I Claims and CIH Claims held by CII

shall be treated identically to similar Claims held by Persons other than CII.

**U.**      **Retention of Partnership Structure in Form of Reorganized Holdco.**

137.    The Holdco LLC Agreement shall be in effect and govern Holdco for the period

up to and including the Effective Date.  At the Effective Date, the Holdco LLC Agreement shall

be amended and restated and the Reorganized Holdco LLC Agreement shall be in effect as of the

day immediately following the Effective Date for federal, state, local and foreign income tax

purposes.  Reorganized Holdco shall effect a "closing of the books" as of the Effective Date, and

the provisions of the Holdco LLC Agreement, taking into account each member's Percentage

Interest (as defined in the Holdco LLC Agreement) immediately before the transactions

contemplated by this Plan, shall govern with respect to allocations of items of income, gain, loss,

credit and deduction for the period up to and including the Effective Date, including any items of

income, gain, loss, credit and deduction arising on the Effective Date and/or arising as a result of

the transactions effective as of the Effective Date as contemplated by this Plan.  Reorganized

Holdco shall not make the election under section 108(i) of the U.S. Internal Revenue Code of

1986, as amended (or any similar election under state or local law), with respect to any

cancellation of indebtedness income relating to the consummation of the Plan.  Notwithstanding

anything to the contrary in the Reorganized Holdco LLC Agreement, in the event of any dispute,

challenge, audit or examination of Holdco's tax affairs for any period prior to or including the

Effective Date, the consent of Mr. Allen shall be required to settle any such dispute and Mr.

Allen and CII shall be entitled to participate alongside Reorganized CCI in any such

examinations, judicial determinations, and administrative proceedings, with respect to any

portion of the dispute relating to the period prior to and including the Effective Date.

## V.    Management Incentive Plan and VCP.

138.    The Reorganized Company shall be deemed to have adopted the Management Incentive Plan and VCP on the Effective Date.

## W.    Other Essential Documents and Agreements.

139.    The Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of the Reorganized Company, the Reorganized Holdco LLC Agreement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants and the transactions contemplated by each of the foregoing are approved in their entirety and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, the Amended and Restated Certificate of Incorporation and Amended and Restated Bylaws of the Reorganized Company, the Reorganized Holdco LLC Agreement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Rights Offering Documents, and the Warrants shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of the Bankruptcy Court, or other act or action under applicable law, regulation, order or rule.  The Debtors, and after the Effective Date, the Reorganized Debtors, are authorized, without further approval of the Bankruptcy Court or any other party, to execute and deliver all agreements, documents, instruments, securities and certificates relating to such agreements and perform their obligations thereunder, including, without limitation, pay all fees due thereunder or in connection therewith.

140.    On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## X.    Return of Deposits.

141.    All utilities, including any Person who received a deposit or other form of adequate assurance of performance pursuant to section 366 of the Bankruptcy Code during these Chapter 11 Cases (collectively, the "Deposits"), including, without limitation, gas, electric, telephone, trash and sewer services, shall return such Deposits to the Debtors and/or the Reorganized Debtors, as applicable, either by setoff against postpetition indebtedness or by cash refund, within 45 days following the Effective Date and as of the Effective Date, such utilities are not entitled to make requests for or receive Deposits.

## Y.    Governing Law.

142.    Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York

shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

**Z.**     **Effectiveness of All Actions.**

143.    Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Confirmation Order, without further application to, or order of the Bankruptcy Court, or further action by the respective officers, directors, members, or stockholders of Reorganized Debtors or the other Reorganized Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, members, or stockholders.

**AA.**     **Approval of Consents and Authorization to Take Acts Necessary to Implement Plan.**

144.    Pursuant to section 1142(b) of the Bankruptcy Code, section 303 of the Delaware General Corporation Law and any comparable provision of the business corporation laws of any other state, each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions and to perform such acts as may be necessary, desirable or appropriate to comply with or implement the Plan, the Plan Supplement, the Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Holdco LLC Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants, any other Plan documents, including the election or appointment, as the case may be, of directors and officers of the Reorganized Company as contemplated in the Plan, and all documents, instruments, securities and agreements related thereto and all annexes, exhibits, and schedules appended thereto, and the obligations thereunder shall constitute legal, valid, binding and authorized obligations of each of the respective parties thereto, enforceable in accordance with their terms without the need for any stockholder or board of directors' approval.

Each of the Debtors and the Reorganized Debtors hereby is authorized and empowered to take such actions, to perform all acts, to make, execute, and deliver all instruments and documents, and to pay all fees and expenses as set forth in the documents relating to the Plan and including without limitation, Equity Registration Rights Agreement, the Commitment Letters, the Debt Registration Rights Agreement, the Lock-Up Agreement, the Excess Backstop Agreement, the Reorganized Holdco Exchange Agreement, the Holdco LLC Agreement, the Reorganized Holdco LLC Agreement, the Rights Offering Documents, and the Warrants, and that may be required or necessary for its performance thereunder without the need for any stockholder or board of directors' approval.  On the Effective Date, the appropriate officers of the Reorganized Company and members of the Board of Directors of the Reorganized Company are authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtors. Subject to the terms of this Confirmation Order, each of the Debtors, the Reorganized Debtors, and the officers and directors thereof are authorized to take any such actions without further corporate action or action of the directors or stockholders of the Debtors or the Reorganized Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Reorganized Debtors shall file their amended certificates of incorporation with the Secretary of State of the state in which each such entity is (or will be) organized, in accordance with the applicable general business law of each such jurisdiction.

145.    This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts and transactions

referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, or agreements, and any amendments or modifications thereto.

**BB.    Modifications or Amendments.**

146.    Except as otherwise specifically provided in the Plan, and subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.    Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.    Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIII.A of the Plan.    Entry of the Confirmation Order means that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127 of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**CC.    Ownership and Control.**

147.    The Consummation of the Plan shall not constitute a change of ownership or change in control, as such terms are used in any statute, regulation, contract, or agreement, including, but not limited to, any credit agreement, indenture or other evidence of indebtedness, employment, severance, or termination, or insurance agreements, in effect on the Effective Date

and to which either of the Debtors is a party or under any applicable law of any applicable governmental unit, other than a change of control for purposes of section 382 of the U.S. Internal Revenue Code of 1986, as amended, on the Effective Date.  Notwithstanding the foregoing, the Debtors and Reorganized Debtors reserve the right to selectively waive this provision of the Plan.

**DD.    Effect of Conflict Between Plan and Confirmation Order.**

148.    If there is any direct conflict between the terms of the Plan or the Plan Supplement and the terms of the Confirmation Order, the terms of the Confirmation Order shall control.

**EE.    Payment of Statutory Fees.**

149.    All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

**FF.    Reservation of Rights.**

150.    Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

**GG.    Injunctions and Automatic Stay.**

151.    Unless otherwise provided in the Plan or herein, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105, 362, or 525 of the Bankruptcy Code or

otherwise, or any order of the Court, and extant on the date of this Confirmation Order (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or herein shall remain in full force and effect in accordance with their terms. This Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, Interests, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, or liabilities released pursuant to the Plan.

**HH.**   **Nonseverability of Plan Provisions upon Confirmation.**

152.   Each term and provision of the Plan, and the transactions related thereto as it heretofore may have been altered or interpreted by the Bankruptcy Court is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and the transactions related thereto and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) nonseverable and mutually dependent. It is further acknowledged that the participants in the Rights Offering, among others, will be advancing substantial sums to the Reorganized Company or taking other action contemplated by the Plan in reliance upon each term and condition of the Plan and this Order, including the reinstatement of the Senior Debt, which monies or other action will enable the Reorganized Company to make the distributions and other payments contemplated by the Plan and to reorganize as contemplated by the Plan.

**II.**   **Waiver or Estoppel.**

153.   Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the

Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

**JJ.    Authorization to Consummate.**

154.    The Debtors are authorized to consummate the Plan at any time after the entry of the Confirmation Order subject to satisfaction or waiver (by the required parties) of the conditions precedent to Consummation set forth in Article XII.B of the Plan.

**KK.    Compliance with Other Laws.**

155.    No provision in the Plan or this Order relieves the Reorganized Debtors from their obligations to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission (the "FCC").   No transfer of control to the Reorganized Debtors of any federal license or authorization issued by the FCC shall take place prior to the issuance of FCC regulatory approval for such transfer of control pursuant to applicable FCC regulations.   The FCC's rights and powers to take any action pursuant to its regulatory authority over the transfer of control to the Reorganized Debtors, including, but not limited to, imposing any regulatory conditions on such transfer, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

**LL.    Resolution of Certain of JPMorgan Chase Bank, N.A.'s Objection.**

156.    Notwithstanding any language in the Plan to the contrary, this Confirmation Order shall not create rights of setoff in violation of section 2.15(d) the CCO Credit Facility.

157.    Notwithstanding any language in the Plan to the contrary, this Confirmation Order shall not alter the choice of law and choice of forum provisions contained in section 10.12 of the CCO Credit Facility.

158.    The Plan and this Confirmation Order shall not be deemed to alter any rights and obligations set forth in section 560 of the Bankruptcy Code.

**MM.    Resolution of Calyon New York Branch Objection.**

159.    On July 13, 2009, Calyon New York Branch ("<u>Calyon</u>") filed its Limited Objection of Calyon New York Branch to Confirmation of Debtors' Joint Plan of Reorganization (the "<u>Calyon Objection</u>") [Docket No. 569].  The Debtors and Calyon have resolved the Calyon Objection as follows: (a) Calyon is allowed a claim as a CCO Swap Agreements Claim (as defined in the Plan) in the amount of $22,754,646.00, plus amounts accrued since March 30, 2009, including interest, costs, expenses and fees; (b) Calyon is allowed a claim as a CCO Credit Facility Claim (as defined in the Plan) in the amount of $32,625,750.47, plus amounts accrued since April 30, 2009, including interest, costs, expenses and fees; and (c) Allowance of Calyon's claims does not prejudice any other claims or defenses Calyon may have against the Debtors.

**NN.    Resolution of Tax Claimants Objections.**

160.    Notwithstanding any language in the Plan to the contrary or any finding of fact contained hereunder that the terms of the Plan comply with the required provisions of the Bankruptcy Code, the rights of any Priority Tax Claimant and/or Administrative Tax Claimant (collectively, "<u>Tax Claimant</u>") under the Plan shall be as provided for under the Bankruptcy Code, or as subsequently agreed to by the Reorganized Debtors and any Tax Claimant in writing, and the Plan shall not be interpreted or construed to impair or abrogate the rights of any Tax Claimant in any manner.

**OO.    Resolution of Rembrandt Technologies, L.P. and Rembrandt Technologies, LLC Objection.**

161.    Notwithstanding any provision to the contrary in the Plan or otherwise, the multi-district litigation proceeding in the United States District Court for the District of Delaware

commenced by Rembrandt Technologies, L.P. and Rembrandt Technologies, LLC against the Debtors CCI and CCO shall not be barred from resuming after the Effective Date of the Plan.

**PP.    Resolution of Verizon Communications Inc. Objection.**

162.    Prior to the Petition Date, Verizon Communications Inc.; Verizon Business Global LLC; Verizon Services Corp.; Verizon South Inc.; Verizon Virginia, Inc.; and MCI Communications Corporation (collectively, "Verizon") and certain of the Debtors were adversaries in three lawsuits related to certain patents filed in the Eastern District of Texas, the Eastern District of Virginia, and the Southern District of New York, in which Verizon claims that the Debtors infringed upon, beginning prior to the Petition Date and continuing unabated to the present date, certain patents held by Verizon (collectively, the "Verizon Patent Cases"); and Verizon has asserted contingent prepetition claims against the Debtors for damages (the "Verizon Prepetition Claims"), postpetition claims against the Debtors for damages related to alleged continued infringement on Verizon's patents (the "Verizon Postpetition Claims," and collectively, the "Verizon Claims"), and post-Effective Date claims against the Debtors for damages related to any continued infringement on Verizon's patents (the "Verizon Post Effective Date Claims").    The Verizon Claims shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code upon confirmation of the Plan.    The Verizon Post Effective Date Claims are not subject to the Plan and payments on account thereof, if any, shall be made in the ordinary course of business.    In addition, certain of the Debtors brought (1) counterclaims against Verizon or certain of its entities in the Eastern District of Texas for declarations of non-infringement and invalidity of certain patents owned by Verizon or certain of its entities; (2) claims against Verizon or certain of its entities in the Eastern District of Virginia for infringement of certain patents owned by certain of the Debtors; and (3) claims against Verizon or certain of its entities in the Southern District of New York for

declarations of non-infringement of certain patents owned by Verizon or certain of its entities (collectively, the "Debtor Patent Claims").  Verizon and the Debtors maintain and do not waive any rights regarding the prosecution or defense of the Verizon Claims, the Verizon Post Effective Date Claims, or the Debtor Patent Claims.

**QQ.   Resolution of HSBC Objection.**

163.   On July 10, 2009, HSBC Bank, USA, National Association ("HSBC") filed its Limited Objection of HSBC Bank USA, National Association, as Indenture Trustee to Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code Dated May 7, 2009 (the "HSBC Objection") [Docket No. 558].  The Debtors and HSBC have resolved the HSBC Objection as follows:  (a) HSBC, in its capacity as indenture trustee shall be paid default interest from May 15, 2009 until the date of actual payment as Post-Petition Interest pursuant to Article I.A.152(e) of the Plan; (b) HSBC's reasonable indenture trustee fees and expenses, as provided for under the governing indenture, shall be paid pursuant to Article XI.7 of the Plan; and (c) if HSBC and the Debtors cannot agree on the requisite cure amount to reinstate the CCOH Notes pursuant to Article IV.I.2 of the Plan, such disagreement will be determined by the Court, with notice and objection rights to applicable parties.

**RR.   Resolution of Travelers Casualty and Surety Company of America Issue**

164.   Nothing contained within the Plan or any other document or order shall release, compromise, impair or otherwise prejudice or alter the rights and remedies of Travelers Casualty and Surety Company of America under its bonds, indemnity agreements, that certain Final Order Authorizing Debtors to Enter into the DIP Surety Program dated April 15, 2009, and with regard to the collateral or letters of credit which secures such claims.

**SS.**    **Assumption of the Chartis Insurance Program**

165.    Various affiliates of Chartis Inc. provided workers compensation, automobile liability and general liability coverages, among others to the Debtors from November 1, 2003 to present pursuant to various policies which are governed by certain payment agreements or similar agreements, the schedules and addenda thereto, and any other related documents (collectively, the "Chartis Insurance Program").  Pursuant to the terms of Article VII. A. of the Plan, the Debtors shall assume the Chartis Insurance Program and any renewals thereof which are Executory Contracts, and the Reorganized Debtors shall pay and satisfy all obligations due to any Chartis Inc. affiliated entity under the Chartis Insurance Program any renewal thereof in the ordinary course of business.  Accordingly, no administrative expense claim need be filed in connection with the Chartis Insurance Program or any renewal thereof.  The Debtors' rights against all collateral held by Insurer, in whatever form, shall be governed by the terms of the Chartis Insurance Program and the related security documentation, and the Debtors shall not take any action against any Chartis Inc. affiliated company in the Bankruptcy Court that is inconsistent with the terms of such documentation, including, without limitation, actions for turnover or estimation.

**TT.**    **Secured Tax Claims.**

166.    Interest on Secured Claims shall accrue from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such Claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date, or to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law.

**UU.**   <u>No Fractional Shares; No Fractional Notes.</u>

167.   No fractional shares of New Common Stock, New CCH II Notes, New Preferred Stock and Warrants ("<u>New Securities</u>") shall be issued or distributed under the Plan.   Each Person entitled to receive New Common Stock, New CCH II Notes, New Preferred Stock and Warrants shall receive the total number of whole shares of New Common Stock, New Preferred Stock or Warrants or their *pro rata* share in principal amount of New CCH II Notes, whichever is relevant, to which such Person is entitled.   New CCH II Notes shall be issued in increments of $1.00.   Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of New Securities, the actual distribution of such New Securities shall be rounded to the next higher or lower whole number as follows: (a) fractions one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number. Notwithstanding the foregoing, (a) if the Person is entitled to New Common Stock and rounding to the next lower whole number would result in such Person receiving zero shares of New Common Stock, New Preferred Stock or Warrants such Person shall receive one (1) share of New Common Stock, New Preferred Stock or Warrants, as applicable; and (b) if the Person is entitled to a *pro rata* share in principal amount of New CCH II Notes and rounding to the next lower whole number would result in such Person receiving zero dollars worth of New CCH II Notes, such Person shall receive a New CCH II Note in the principal amount of $1.00 (One Dollar).   If two or more Persons are entitled to fractional entitlements and the aggregate amount of New Securities that would otherwise be issued to such Persons with respect to such fractional entitlements as a result of such rounding exceeds the number of whole New Securities which remain to be allocated, the Disbursing Agent shall allocate the remaining whole New Securities to such holders by random lot or such other impartial method as the Disbursing Agent deems fair.   Upon the allocation of all of the whole

New Securities authorized under the Plan, all remaining fractional portions of the entitlements shall be cancelled and shall be of no further force and effect.  The Disbursing Agent shall have the right to carry forward to subsequent distributions any applicable credits or debits arising from the rounding described in this paragraph.  Distributions of New Securities on account of other securities shall be made to the record owner of such securities.  For purposes of this paragraph, "<u>Person</u>" shall mean such record owner.

**VV.**     <u>**Effect of Non-Occurrence of Conditions to the Effective Date.**</u>

      168.    Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 180 days after Confirmation, or by such later date established by Bankruptcy Court order.  If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

**WW.**   **Adversary Proceeding.**

169.   For the reasons stated above to the extent relevant to the Adversary Proceeding,

judgment for CCO and CCOH shall be entered in the Adversary Proceeding.

IT IS SO ORDERED.

Dated: New York, New York
         November 17, 2009

                                             _____s/ James M. Peck_____
                                             Honorable James M. Peck
                                             United States Bankruptcy Judge

<u>**Exhibit A**</u>

**Debtors' Joint Plan of Reorganization Pursuant to
Chapter 11 of the United States Bankruptcy Code**

Richard M. Cieri
Paul M. Basta
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

   - and -

Ray C. Schrock
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Counsel to the Debtors and Debtors in Possession

(other than Charter Investment, Inc.)

   - and -

Albert Togut
Frank A. Oswald
TOGUT, SEGAL & SEGAL LLP
One Penn Plaza
New York, New York  10119
Telephone:        (212) 594-5000
Facsimile:        (212) 967-4258

Counsel to the Debtor and Debtor in Possession
Charter Investment, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., et al., | ) Case No. 09-11435 (JMP) |
| | ) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Dated:  July 15, 2009

K&E: 15083729

0911435090715000000000011

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARTICLE I.    DEFINITIONS AND INTERPRETATION .............................................1
    A.    Defined Terms ...............................................................................................1
    B.    Rules of Interpretation .................................................................................17
    C.    Computation of Time ...................................................................................18

ARTICLE II.    ADMINISTRATIVE AND PRIORITY CLAIMS ....................................19
    A.    Administrative Expense Claims ...................................................................19
    B.    Professional Compensation and Reimbursement Claims.............................19
    C.    Priority Tax Claims ......................................................................................19

ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS .............................20
    **A.**    **CCI** ..............................................................................................................20
    **B.**    **CII** ..............................................................................................................20
    **C.**    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC** ..........20
    **D.**    **CCHC** .........................................................................................................21
    **E.**    **CCH and Charter Communications Holdings Capital Corp.** .................21
    **F.**    **CIH and CCH I Holdings Capital Corp.** .................................................21
    **G.**    **CCH I and CCH I Capital Corp.** ............................................................21
    **H.**    **CCH II and CCH II Capital Corp.** .........................................................22
    **I.**    **CCOH and CCO Holdings Capital Corp.** ...............................................22
    **J.**    **CCO (and its direct and indirect subsidiaries)** ......................................23

ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS .....................................24
    **A.**    **CCI** ..............................................................................................................24
    **B.**    **CII** ..............................................................................................................25
    **C.**    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC** ..........27
    **D.**    **CCHC** .........................................................................................................28
    **E.**    **CCH and Charter Communications Holdings Capital Corp.** .................30
    **F.**    **CIH and CCH I Holdings Capital Corp.** .................................................31
    **G.**    **CCH I and CCH I Capital Corp.** ............................................................33
    **H.**    **CCH II and CCH II Capital Corp.** .........................................................35
    **I.**    **CCOH and CCO Holdings Capital Corp.** ...............................................38
    **J.**    **CCO (and its direct and indirect subsidiaries)** ......................................39

ARTICLE V.    IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS;
    ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION ...................42
    A.    Classes Entitled to Vote ...............................................................................42
    B.    Classes Not Entitled to Vote; Deemed to Accept.........................................42
    C.    Classes Not Entitled to Vote; Deemed to Reject .........................................43
    D.    Nonconsensual Confirmation .......................................................................44

ARTICLE VI.    PROVISIONS FOR IMPLEMENTATION OF THE PLAN .....................45
    A.    Sources of Consideration for Plan Distributions ..........................................45
    B.    Reorganized Company Equity Interests .......................................................46
    C.    CII Settlement Claim ....................................................................................47
    D.    Section 1145 Exemption ...............................................................................48
    E.    Corporate Existence .....................................................................................48
    F.    Vesting of Assets in the Reorganized Debtors .............................................48
    G.    Discharge of Debtors ....................................................................................48
    H.    Restructuring Transactions ...........................................................................49
    I.    Corporate Action ..........................................................................................49

i

|       | J. | Post-Effective Date Governance | 49 |
|       | K. | Limited Liability Company Agreement | 49 |
|       | L. | Effectuating Documents; Further Transactions | 49 |
|       | M. | Exemption from Certain Transfer Taxes and Recording Fees | 49 |
|       | N. | Board Representation | 50 |
|       | O. | Senior Management | 50 |
|       | P. | Management Incentive Plan and VCP | 50 |
|       | Q. | Employee and Retiree Benefits | 51 |
|       | R. | Creation of Professional Fee Escrow Account | 51 |
|       | S. | Preservation of Rights of Action | 51 |

**ARTICLE VII.    TREATMENT OF EXECUTORY CONTRACTS** .................................................**52**

|       | A. | Assumption and Rejection of Executory Contracts | 52 |
|       | B. | Indemnification Obligations | 52 |
|       | C. | Cure of Defaults for Assumed Executory Contracts | 53 |
|       | D. | Claims Based on Rejection or Repudiation of Executory Contracts | 54 |
|       | E. | Reservation of Rights | 54 |
|       | F. | Nonoccurrence of Effective Date | 54 |

**ARTICLE VIII.    PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES** .........................**55**

|       | A. | Allowance of Claims and Interests | 55 |
|       | B. | Claims and Interests Administration Responsibilities | 55 |
|       | C. | Estimation of Claims and Interests | 55 |
|       | D. | Adjustment to Claims and Interests Without Objection | 55 |
|       | E. | Disallowance of Claims or Interests | 55 |
|       | F. | Offer of Judgment | 55 |
|       | G. | Amendments to Claims | 56 |

**ARTICLE IX.    PROVISIONS GOVERNING DISTRIBUTIONS** ...............................................**57**

|       | A. | Distributions on Account of Claims and Interests Allowed As of the Effective Date | 57 |
|       | B. | Distributions on Account of Claims and Interests Allowed After the Effective Date | 57 |
|       | C. | Delivery of Distributions | 57 |
|       | D. | Claims Paid or Payable by Third Parties | 59 |
|       | E. | Allocation Between Principal and Accrued Interest | 59 |

**ARTICLE X.    EFFECT OF PLAN CONFIRMATION** ...............................................................**60**

|       | A. | Discharge of Claims and Termination of Interests | 60 |
|       | B. | Compromise and Settlement of Claims and Controversies | 60 |
|       | C. | CCO Credit Facility | 60 |
|       | **D.** | **Releases by the Debtors** | 60 |
|       | **E.** | **Third Party Releases** | 61 |
|       | **F.** | **Injunction** | 61 |
|       | **G.** | **Exculpation** | 61 |
|       | H. | Protection Against Discriminatory Treatment | 62 |
|       | **I.** | **Setoffs and Recoupment** | 62 |
|       | **J.** | **Release of Liens** | 62 |
|       | K. | Document Retention | 62 |
|       | L. | Reimbursement or Contribution | 62 |

**ARTICLE XI.    ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS** ..................................................................................................................**63**

|       | A. | Professional Claims | 63 |
|       | B. | Other Administrative Expense Claims | 64 |

**ARTICLE XII.    CONDITIONS PRECEDENT TO EFFECTIVE DATE** .......................................**65**

|       | A. | Conditions Precedent to Effective Date | 65 |

ii

B.      Waiver of Conditions Precedent ........................................................................65
C.      Effect of Non-Occurrence of Conditions to the Effective Date ........................65

**ARTICLE XIII.    MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........67**
A.      Modification or Amendments ............................................................................67
B.      Effect of Confirmation on Modifications ..........................................................67
C.      Revocation or Withdrawal of Plan ....................................................................67

**ARTICLE XIV.    RETENTION OF JURISDICTION ........................................................68**

**ARTICLE XV.    MISCELLANEOUS PROVISIONS........................................................70**
A.      Immediate Binding Effect .................................................................................70
B.      Additional Documents .......................................................................................70
C.      Payment of Statutory Fees ................................................................................70
D.      Reservation of Rights........................................................................................70
E.      Successors and Assigns .....................................................................................70
F.      Service of Documents ........................................................................................70
G.      Term of Injunctions or Stays.............................................................................71
H.      Entire Agreement ...............................................................................................72
I.      Governing Law ..................................................................................................72
J.      Exhibits ..............................................................................................................72
K.      Nonseverability of Plan Provisions upon Confirmation...................................72
L.      Closing of Chapter 11 Cases .............................................................................72
M.      Waiver or Estoppel............................................................................................72
N.      Conflicts.............................................................................................................72

iii

## INTRODUCTION

Charter Communications, Inc. and the other debtors in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>")[1] propose the following joint plan of reorganization (the "<u>Plan</u>") for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101–1532.  Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in ARTICLE I.A of the Plan.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

A.    <u>Defined Terms</u>.  As used in the Plan, the capitalized terms below have the following meanings, except as expressly provided or unless the context otherwise requires.  Any term used but not defined in the Plan, but that is used in the Bankruptcy Code or the Bankruptcy Rules, has the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules.

1.    "<u>Accrued Professional Compensation</u>" means, at any given moment, all accrued fees and expenses (including success fees) for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

2.    "<u>Administrative Expense Claim</u>" means a Claim for costs and expenses of administration of the Estates under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Claims of retained Professionals in the Chapter 11 Cases; and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

3.    "<u>Affiliate</u>" is as defined in section 101(2) of the Bankruptcy Code.

4.    "<u>Allen Entities</u>" means (a) Mr. Allen, (b) any Entity controlled by Mr. Allen, (c) any trust in which Mr. Allen is the grantor, (d) the estate, spouse, immediate family members and heirs of Mr. Allen, and (e) any trust created as a result of the death of Mr. Allen; <u>provided</u>, <u>however</u>, the Debtors (other than CII) shall not be Allen Entities.  For the purpose of this definition, "controlled" means the direct or indirect ownership of at least fifty percent (50%) of the voting power and economic interest of such Entity.

5.    "<u>Allen Fee Reimbursement</u>" means up to $20 million for the actual out-of-pocket fees and expenses of the CII Settlement Claim Parties in connection with the proposed restructuring, without further Bankruptcy Court approval and after submission of documentation by Mr. Allen to the Reorganized Debtors (other than Reorganized CII).

6.    "<u>Allen Management Receivable</u>" means $25 million for amounts owing to CII under the Management Agreement and predecessor agreements, which shall constitute payment in full thereunder.

---

[1]    A full list of the Debtors in these Chapter 11 Cases is attached as Exhibit 1 to the Plan Supplement.

1

7.    "<u>Allowed</u>" means, with respect to any Claim against any Debtor, except as otherwise provided herein, any Claim listed by such Debtor in its books and records as liquidated in amount and not disputed or contingent; <u>provided</u>, that to the extent that a Claim is a Disputed Claim, the determination of whether such Claim shall be allowed and/or the amount of any such Claim shall be determined, resolved or adjudicated, as the case may be, in the manner in which such Claim would have been determined, resolved or adjudicated, as the case may be, if the Chapter 11 Cases had not been commenced; and <u>provided</u>, <u>further</u>, the Debtors or Reorganized Debtors in their discretion may bring any objection or other motion with respect to a Disputed Claim for resolution.  For the purpose of determining the amount in which a Claim is Allowed, the Debtors or Reorganized Debtors may, at their option, deduct therefrom an amount equal to the amount of any claim which the Debtors or Reorganized Debtors may hold against the Holder thereof, to the extent such claim may be set off pursuant to applicable law.

8.    "<u>Amended and Restated Bylaws</u>" means the bylaws of the Reorganized Company, attached as Exhibit 2 to the Plan Supplement.

9.    "<u>Amended and Restated Certificate of Incorporation</u>" means the certificate of incorporation of the Reorganized Company, attached as Exhibit 3 to the Plan Supplement.

10.   "<u>Annex C</u>" means the list of Rollover Commitment Parties and related aggregate commitment amounts set forth in Annex C to the Term Sheet (and attached as Exhibit 4 to the Plan Supplement).

11.   "<u>Annex D</u>" means the list of New CCH II Notes Commitment Parties and aggregate commitment amounts set forth in Annex D to the Term Sheet (and attached as Exhibit 5 to the Plan Supplement).

12.   "<u>Annex E</u>" means the list of Equity Backstop Parties and aggregate commitment amounts set forth in Annex E to the Term Sheet (and attached as Exhibit 6 to the Plan Supplement).

13.   "<u>Authorized Class B Holders</u>" means any of:  (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; and (c) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners or other owners of which consist exclusively of Mr. Allen or such other Persons referred to in clause (b) above or a combination thereof.

14.   "<u>Available Cash</u>" means, as of any date of determination, all Cash and cash equivalents on the consolidated balance sheet of the Reorganized Company and its consolidated subsidiaries, excluding any Cash collateral securing letters of credit and segregated Cash that may be used only as required by contract, statute or regulation (other than funds set aside to satisfy Specified Fees and Expenses), after giving effect to the use of proceeds described in clauses (a) through (e) of ARTICLE VI.A.1, minus the Fee Payment Threshold; <u>provided</u>, that if the Overallotment Option is exercised, the Cash proceeds of the Overallotment Option shall be deemed to be included on the balance sheet of the Reorganized Company as of the Effective Date, regardless of the actual date of funding thereof.

15.   "<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

16.   "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of New York.

17.   "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075.

18.   "<u>Board of Directors</u>" means the Reorganized Company's board of directors.

19.   "<u>Business Day</u>" means any day other than a Saturday, Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

20.   "<u>Cash</u>" means legal tender of the United States of America.

2

21.    "<u>Causes of Action</u>" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third party claims, indemnity claims, contribution claims or any other claims disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

22.    "<u>CC VIII</u>" means CC VIII, LLC.

23.    "<u>CC VIII Preferred Units</u>" means the Class A preferred units of CC VIII.

24.    "<u>CCH</u>" means Charter Communications Holdings, LLC.

25.    "<u>CCH Notes</u>" means:

(a)    the 9.625% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due November 15, 2009 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp, as issuers, and BNY Midwest Trust Company, as trustee;

(b)    the 9.92% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2011 issued pursuant to the Indenture, dated as of March 17, 1999, among CCH and Charter Communications Holdings Capital Corp., as issuers, Marcus Cable Holdings, LLC, as guarantor, and Harris Trust and Savings Bank, as trustee;

(c)    the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due April 1, 2009 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(d)    the 10.00% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(e)    the 10.25% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(f)    the 10.75% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due October 1, 2009 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(g)    the 11.125% Senior Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

(h)    the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2010 issued pursuant to the Indenture, dated as of January 12, 2000, among CCH and Charter Communications Holdings Capital Corp., as issuers, and Harris Trust and Savings Bank, as trustee;

(i)    the 11.75% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due May 15, 2011 issued pursuant to the Indenture, dated as of May 15, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee;

3

(j)      the 12.125% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2012 issued pursuant to the Indenture, dated as of January 14, 2002, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee; and

(k)      the 13.50% Senior Discount Notes of CCH and Charter Communications Holdings Capital Corp. due January 15, 2011 issued pursuant to the Indenture, dated as of January 10, 2001, among CCH and Charter Communications Holdings Capital Corp., as issuers, and BNY Midwest Trust Company, as trustee.

26.      "CCH Notes Claim" means any Claim against CCH and/or Charter Communications Holdings Capital Corp. by Holders of CCH Notes on account of CCH Notes.

27.      "CCH Warrants" means those Warrants to be issued to Holders of CCH Notes Claims, which shall be in the form set forth in Exhibit 7 to the Plan Supplement.

28.      "CCH I" means CCH I, LLC.

29.      "CCH I Notes" means the 11.00% Senior Secured Notes of CCH I and CCH I Capital Corp. due 2015 issued pursuant to the Indenture, dated as of September 28, 2005, among CCH I and CCH I Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee.

30.      "CCH I Notes Claim" means any Claim against a Debtor by Holders of CCH I Notes on account of CCH I Notes.

31.      "CCH II" means CCH II, LLC.

32.      "CCH II Notes" means:

(a)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Indenture, dated as of September 23, 2003, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(b)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the First Supplemental Indenture, dated as of January 30, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(c)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2010 issued pursuant to the Second Supplemental Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee;

(d)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the Indenture, dated as of September 14, 2006, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee; and

(e)      the 10.25% Senior Notes of CCH II, LLC and CCH II Capital Corp. due 2013 issued pursuant to the First Supplemental Indenture, dated as of July 2, 2008, among CCH II, LLC and CCH II Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee.

33.      "CCH II Notes Claim" means any Claim against a Debtor by Holders of CCH II Notes on account of CCH II Notes.

34.      "CCHC" means CCHC, LLC.

4

35.    "CCHC Note" means the 14% Subordinated Accreting Note, dated as of October 31, 2005, issued by CCHC in favor of CII.

36.    "CCI" means Charter Communications, Inc.

37.    "CCI-CII Exchange Agreement" means the exchange agreement, dated as of November 12, 1999, by and among CCI, CII, Vulcan Cable III Inc. and Mr. Allen.

38.    "CCI Notes" means:

(a)    the 5.875% Convertible Senior Notes of CCI due 2009 issued pursuant to the Indenture, dated as of November 22, 2004, among CCI and Wells Fargo Bank, N.A., as trustee; and

(b)    the 6.50% Convertible Senior Notes of CCI due 2027 issued pursuant to the Indenture, dated as of October 2, 2007, among CCI and The Bank of New York Trust Company, N.A., as trustee.

39.    "CCI Notes Claim" means any Claim against CCI by Holders of CCI Notes on account of CCI Notes.

40.    "CCO" means Charter Communications Operating, LLC.

41.    "CCO Credit Facility" means the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated on March 6, 2007, among CCO, CCOH, the several banks and other financial institutions or entities from time to time parties thereto, J.P. Morgan Chase Bank, N.A., as administrative agent, J.P. Morgan Chase Bank, N.A. and Bank of America, N.A., as syndication agents, Citicorp North America, Inc., Deutsche Bank Securities Inc., General Electric Capital Corporation and Credit Suisse Securities (USA) LLC, as revolving facility co-documentation agents, and Citicorp North America, Inc., Credit Suisse Securities (USA) LLC, General Electric Capital Corporation and Deutsche Bank Securities Inc., as term facility co-documentation agents.

42.    "CCO Credit Facility Claim" means any Claim against CCO and any other obligors under the CCO Credit Facility by Holders of the obligations under the CCO Credit Facility.

43.    "CCO Notes" means:

(a)    the 8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2012 and the 8 3/8% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due April 30, 2014 issued pursuant to the Indenture, dated as of April 27, 2004, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wells Fargo Bank, N.A., as trustee; and

(b)    the 10.875% Senior Second Lien Notes of CCO and Charter Communications Operating Capital Corp. due September 15, 2014 issued pursuant to the Indenture, dated as of March 19, 2008, among CCO and Charter Communications Operating Capital Corp., as issuers, each of the guarantors from time to time party thereto, as guarantors, and Wilmington Trust Company, as trustee.

44.    "CCO Notes Claim" means any Claim against CCO, Charter Communications Operating Capital Corp., and any other obligors under the CCO Notes by Holders of CCO Notes on account of the CCO Notes.

45.    "CCO Swap Agreements" means interest rate swaps entered into under ISDA Master Agreements with counterparties who were at the time of the relevant transaction lenders or affiliates of lenders under the CCO Credit Facility and which constitute Specified Hedge Agreements under the CCO Credit Facility and that share in the collateral pledged to the CCO Credit Facility lenders.

46.    "CCO Swap Agreements Claim" means any Claim against CCO by counterparties to CCO Swap Agreements on account of CCO Swap Agreements.

5

47.    "CCOH" means CCO Holdings, LLC.

48.    "CCOH Credit Facility" means the Credit Agreement, dated as of March 6, 2007, among CCOH, the several banks and other financial institutions or entities from time to time parties thereto, Bank of America, N.A., as administrative agent, Banc of America Securities LLC and J.P. Morgan Securities Inc., as co-syndication agents, and Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC and Deutsche Bank Securities Inc., as co-documentation agents.

49.    "CCOH Credit Facility Claim" means any Claim against CCOH and any other obligors under the CCOH Credit Facility by Holders of the obligations under the CCOH Credit Facility.

50.    "CCOH Notes" means the 8.75% Senior Notes of CCOH and CCO Holdings Capital Corp. due November 15, 2013 issued pursuant to the Indenture, dated as of November 10, 2003, among CCOH and CCO Holdings Capital Corp., as issuers, and Wells Fargo Bank, N.A., as trustee.

51.    "CCOH Notes Claim" means any Claim against CCOH and/or CCO Holdings Capital Corp. by Holders of CCOH Notes on account of CCOH Notes Claims.

52.    "CEO" means the Reorganized Company's Chief Executive Officer.

53.    "Certificate" means any instrument evidencing a Claim or an Interest.

54.    "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases for all of the Debtors.

55.    "CIH" means CCH I Holdings, LLC.

56.    "CIH Notes" means the following notes issued pursuant to the Indenture, dated as of September 28, 2005, among CIH and CCH I Holdings Capital Corp., as issuers, CCH, as parent guarantor, and The Bank of New York Trust Company, N.A., as trustee:

(a)    9.920% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due April 1, 2014;

(b)    10.00% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

(c)    11.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014;

(d)    11.75% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due May 15, 2014;

(e)    12.125% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2015; and

(f)    13.50% Senior Accreting Notes of CIH and CCH I Holdings Capital Corp. due January 15, 2014.

57.    "CIH Notes Claim" means any Claim against a Debtor by Holders of CIH Notes on account of CIH Notes.

58.    "CIH Warrants" means those Warrants issued to Holders of CIH Notes Claims, the terms of which shall be set forth on Exhibit 8 to the Plan Supplement.

6

59.    "CII" means Charter Investment, Inc.

60.    "CII Settlement Claim" means any Claim or Interest held by a CII Settlement Claim Party on the Effective Date against or in a Debtor (other than CII), which

(a)    includes:

(i)    28,467,421 shares of Class A Common Stock of CCI (unless disposed of prior to the Effective Date, subject to the restrictions on transfer in any order of the Bankruptcy Court);

(ii)    10,000 vested options to acquire shares of Class A Common Stock of CCI;

(iii)    50,000 shares of Class B Common Stock of CCI;

(iv)    324,300,479 Class A Common Units of Holdco;

(v)    14,831,552 Class C Common Units of Holdco;

(vi)    rights under the CCI-CII Exchange Agreement;

(vii)    all Interests with respect to 7,282,183 CC VIII Preferred Units;

(viii)    the CCHC Note;

(ix)    accrued and unpaid management fees owing to CII under the Management Agreement;

(x)    rights under a letter agreement, dated as of September 21, 1999, by and among Vulcan Ventures Inc. (an entity controlled by Mr. Allen), CCI, CII, and Holdco, which would have granted Vulcan Ventures Inc. exclusive rights for carriage of up to eight digital channels of each of the Debtors' (other than CII) cable systems ;

(xi)    rights under that certain consulting agreement, dated as of March 10, 1999, by and among Vulcan Inc. (an entity controlled by Mr. Allen), CCI, and CCH, which provides for payment of a fee to Vulcan Inc. for assistance with acquisitions made by CCI or CCH; and

(xii)    any other Claim or Interest held by a CII Settlement Claim Party, including any rejection damages Claims, other than Claims and Executory Contracts specifically or categorically listed in clause (b) of this definition; but

(b)    excludes:

(i)    $70,650,000 principal amount of 9.920% Senior Discount Notes due 2014 (CUSIP No. 12501BAP9), $25,982,000 principal amount of 10.000% Senior Discount Notes due 2014 (CUSIP No. 12501BAQ7), and $55,140,000 principal amount of 11.750% Senior Discount Notes due 2014 (CUSIP No. 12501BAR5), issued by CIH and CCH I Holdings Capital Corp.;

(ii)    $47,278,000 principal amount of 11.000% Senior Notes due 2015 (CUSIP No. 12502BAE3), issued by CCH I and CCH I Capital Corp.;

(iii)    any Executory Contract to which Digeo, Inc., Digeo Interactive, LLC, or any of their subsidiaries is a party;

(iv)    the Indemnification Agreement by and between Mr. Allen and CCI, dated as of September 15, 2008; the Indemnification Agreement by and between Jo Allen Patton and CCI, dated as of

7

September 15, 2008; and the Indemnification Agreement by and between W. Lance Conn and CCI, dated as of September 15, 2008;

(v)    any Executory Contract between the Debtors (other than CII) and a CII Settlement Party that the Debtors assume, in consultation the Requisite Holders, which assumed Executory Contracts (if any) shall be listed on an Exhibit to the Plan Supplement; and

(vi)    any payment due for goods or services provided by a CII Settlement Party to the Debtors (other than CII) between February 11, 2009 and the Effective Date.

61.    "CII Settlement Claim Party" means:  (a) Mr. Allen; (b) his estate, spouse, immediate family members and heirs; (c) any trust in which Mr. Allen is the grantor or which is created as a result of his death; (d) CII; and (e) any other Allen Entity which Mr. Allen or any of the other persons or Entities identified in clauses (a) through (d) of this definition, unilaterally or together with any other Allen Entity (directly or through agents), can legally bind to a settlement, compromise and release of Claims and Interests against the applicable Debtors under the Plan without authorization, consent or approval of any other person or Entity; provided, however, that in no event shall "CII Settlement Claim Party" include any public company, including without limitation, any Entity that has securities listed, quoted or traded on any securities exchange.

62.    "CII Settlement Claim Warrants" means those warrants issued to Mr. Allen (or his designees) to purchase shares of New Class A Stock in an aggregate amount equal to 4% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of warrants and equity-based awards provided for by the Plan, the remaining terms of which are set forth on Exhibit 9 to the Plan Supplement.

63.    "CII Shareholder Claim" means any Claim against CII held by Mr. Allen.

64.    "Claim" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

65.    "Claims Register" means the official register of Claims and Interests maintained by the Notice, Claims and Solicitation Agent.

66.    "Class" means any group of substantially similar Claims or Interests classified by the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

67.    "Collateral" means any property or interest in property of the estates of the Debtors subject to a Lien, charge, or other encumbrance to secure the payment or performance of a Claim, which Lien, charge or other encumbrance is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

68.    "Commitment Fees" means the aggregate of the Equity Backstop Fee, the Rollover Fee, and the New CCH II Notes Commitment Fee.

69.    "Commitment Letters" means the letters executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the New CCH II Notes Commitment Parties, on the other hand (attached as Exhibit 10 to the Plan Supplement).

70.    "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

71.    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

72.    "Confirmation Hearing" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

73.     "Confirmation Hearing Notice" means the notice of the Confirmation Hearing that sets forth in detail the voting and objection deadlines with respect to the Plan.

74.     "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code.

75.     "COO" means the Reorganized Company's Chief Operating Officer.

76.     "Creditor" means any Holder of a Claim.

77.     "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the United States Trustee for the Southern District of New York on April 10, 2009 [Docket No. 136], with such additions and changes as may occur from time to time.

78.     "Crossover Committee" means the members of the unofficial committee of unaffiliated holders of CCH I Notes and CCH II Notes.

79.     "Cure" means the payment of Cash by the Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the applicable Executory Contract may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract of the Debtors and (b) permit the Debtors to assume such Executory Contract under section 365(a) of the Bankruptcy Code.

80.     "Cure Bar Date" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption of the applicable Executory Contract, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract.

81.     "D&O Liability Insurance Policies" means all insurance policies for directors and officers' liability maintained by the Debtors as of the Petition Date.

82.     "Debt Registration Rights Agreement" means the registration rights agreement between Reorganized CCH II, on the one hand, and certain holders of New CCH II Notes, on the other hand, attached as Exhibit 11 to the Plan Supplement.

83.     "Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases.

84.     "Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

85.     "Disputed Claim" means any Claim against or Interest in any Reorganized Debtor which such Reorganized Debtor believes is unliquidated, disputed or contingent, and which has not been allowed by Final Order of a court of competent jurisdiction or by agreement with such Reorganized Debtor.

86.     "Distribution Agent" means the Reorganized Debtors, or the Entity or Entities chosen by the Reorganized Debtors to make or to facilitate distributions pursuant to the Plan.

87.     "Distribution Date" means the date occurring as soon as reasonably practicable after the Effective Date when distributions under the Plan shall commence, but not later than ten days after the Effective Date, without further Bankruptcy Court order.

88.     "Effective Date" means the date that all conditions to the effectiveness of the Plan have been satisfied or waived.

9

89.    "<u>Eligible CCH I Notes Claim Holder</u>" means each Holder of a CCH I Notes Claim on the Rights Offering Record Date and any transferee of such Holder's Rights as permitted under the Rights Offering Documents, in each case that is a qualified institutional buyer as defined in Rule 144A under the Securities Act or an accredited investor as defined in Rule 501 under the Securities Act and who has timely delivered an investor certificate certifying to that effect.

90.    "<u>Employment Agreements</u>" means the employment agreements attached as Exhibit 12 to the Plan Supplement.

91.    "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

92.    "<u>Equity Backstop</u>" means the obligations, several and not joint, of the Equity Backstop Parties (in the respective amounts set forth on Annex E), as described in ARTICLE IV.G.4(c)(iii) of the Plan and the Commitment Letters.

93.    "<u>Equity Backstop Fee</u>" means the aggregate Equity Backstop commitment fee for the use of capital set forth in the Commitment Letters.

94.    "<u>Equity Backstop Parties</u>" means the members of the Crossover Committee who have agreed, pursuant to their respective Commitment Letters, to provide the Equity Backstop.

95.    "<u>Equity Registration Rights Agreement</u>" means the registration rights agreement between Reorganized CCI, on the one hand, and certain holders of New Common Stock, on the other hand, attached as Exhibit 13 to the Plan Supplement.

96.    "<u>Estate</u>" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

97.    "<u>Excess Backstop</u>" means the obligations, several and not joint, of the Excess Backstop Parties, as described in ARTICLE IV.G.4(c)(iv) of the Plan, the Commitment Letters, and the Excess Backstop Agreement.

98.    "<u>Excess Backstop Agreement</u>" means the excess backstop agreement executed between CCI, CCH I, CCH II and CCO, on the one hand, and each of the Excess Backstop Parties, on the other hand (attached as Exhibit 14 to the Plan Supplement).

99.    "<u>Excess Backstop Party</u>" means each Equity Backstop Party who committed to an Equity Backstop in excess of the dollar amount corresponding to its Pro Rata Participation Amount, the aggregate of which is set forth on Annex E.

100.    "<u>Exchange</u>" means the exchange by existing Holders of CCH II Notes for New CCH II Notes, as described in ARTICLE IV.A.4(c)(i).

101.    "<u>Exchange Cutback</u>" means, with respect to any existing Holder of CCH II Notes electing to participate in the Exchange, the potential reduction of such Holder's participation in the Exchange, as described in the treatment section for Class H-4 of the Plan.

102.    "<u>Executory Contract</u>" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

103.    "<u>Exculpated Parties</u>" means the Debtors, each party who signed a Plan Support Agreement, and the Creditors' Committee, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, Affiliates and representatives.

104.    "<u>Federal Judgment Rate</u>" means the federal judgment rate in effect on the Petition Date.

10

105.     "<u>Fees</u>" means the reasonable fees, costs or charges provided for under the applicable agreement.

106.     "<u>Fee Payment Threshold</u>" means $600 million minus the sum of (i) any Cash payment of interest made during the Chapter 11 Cases on the CCH II Notes that are exchanged for New CCH II Notes pursuant to the Exchange and (ii) any prepayment of indebtedness for borrowed money or Cash redemption payment for New Preferred Stock after the Effective Date.

107.     "<u>File</u>" means to file with the Bankruptcy Court in the Chapter 11 Cases, or in the case of a Proof of Claim or Interest, to file with the Notice, Claims and Solicitation Agent.

108.     "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

109.     "<u>General Unsecured Claim</u>" means any and all Claims against any of the Debtors that are not a/an (a) Administrative Expense Claim; (b) Professional Compensation and Reimbursement Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; (e) Secured Claim; (f) Section 510(b) Claim; (g) CCI Notes Claim; (h) CII Settlement Claim; (i) CII Shareholder Claim; (j) Holdco Notes Claim; (k) CCH Notes Claim; (l) CIH Notes Claim; (m) CCH I Notes Claim; (n) CCH II Notes Claim; (o) CCOH Credit Facility Claim; (p) CCOH Notes Claim; (q) CCO Credit Facility Claim; (r) CCO Swap Agreements Claim; (s) CCO Notes Claim; or (t) Interest.

110.     "<u>Holdco</u>" means Charter Communications Holding Company, LLC.

111.     "<u>Holdco LLC Agreement</u>" means the Amended and Restated Limited Liability Company Agreement for Holdco, a Delaware limited liability company, made and entered into effective as of August 31, 2001.

112.     "<u>Holdco Notes</u>" means:

    (a)     the 5.875% Mirror Convertible Senior Note of Holdco due November 16, 2009 issued pursuant to the Holdco Mirror Notes Agreement, dated as of November 22, 2004, between CCI and Holdco; and

    (b)     the 6.50% Mirror Convertible Senior Note of Holdco due October 1, 2027 issued pursuant to the Holdco Mirror Notes Agreement, dated as of October 2, 2007, between CCI and Holdco.

113.     "<u>Holdco Notes Claim</u>" means any Claim against Holdco by the Holder of Holdco Notes on account of Holdco Notes.

114.     "<u>Holder</u>" means an Entity holding a Claim or Interest, as applicable.

115.     "<u>Impaired</u>" means Claims in an Impaired Class.

116.     "<u>Impaired Class</u>" means an Impaired Class within the meaning of section 1124 of the Bankruptcy Code.

117.     "<u>Incentive Program</u>" means the Charter Communications, Inc. Incentive Program under the 2001 Stock Incentive Plan to provide incentives to certain management employees.

K&E: 15083729

118.     "Indemnification Obligation" means a Debtor's obligation under an Executory Contract or otherwise to indemnify directors, officers, or employees of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's respective articles of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

119.     "Interest" means any (a) equity Security in a Debtor, including all issued, unissued, authorized or outstanding shares of stock together with any Warrants, equity-based awards or contractual rights to purchase or acquire such equity Securities at any time and all rights arising with respect thereto or (b) partnership, limited liability company or similar interest in a Debtor.

120.     "Interim Compensation Order" means the order entered pursuant to the Debtors' Motion for an Order Under 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals, Filed on or about the Petition Date.

121.     "Key Executives" means the Chief Financial Officer, Chief Marketing Officer, Chief Technology Officer, General Counsel & Corporate Secretary, Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division.

122.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

123.     "Litigation Settlement Fund Proceeds" means the $26,428,089 in litigation settlement proceeds (after fees and expenses) being held in escrow pursuant to the February 10, 2009 Escrow Agreement by and among CCI, Holdco, CCH, CC V Holdings, LLC, CCO, and Wilmington Trust FSB (as escrow agent).

124.     "Local Bankruptcy Rules" means the Local Bankruptcy Rules for the Southern District of New York.

125.     "Lock-Up Agreement" means the lock-up agreement between the Reorganized Company and Mr. Allen (attached as Exhibit 15 to the Plan Supplement).

126.     "Management Agreement" means the Amended and Restated Management Agreement, dated as of June 19, 2003, between CCO and CCI.

127.     "Management Incentive Plan" means the stock incentive plan, attached as Exhibit 25 to the Plan Supplement, adopted by the CCI Board of Directors in 2009, that provides for grants of various awards, including but not limited to: nonqualified stock options, incentive stock options, stock appreciation rights, dividend equivalent rights, performance units and performance shares, share awards, phantom stock, restricted stock units and restricted stock, cash payments or any combination of the above.  The Management Incentive Plan will include, among other things, an allocation of equity-based awards representing no less than 3% of the fully diluted New Common Stock outstanding on the Effective Date, after giving effect to the Rights Offering and the issuance of warrants, 50% of which will be distributed as determined by the Board of Directors no later than one month after the Effective Date.

128.     "Mr. Allen" means Paul G. Allen.

129.     "Mutual Services Agreement" means the Second Amended and Restated Mutual Services Agreement, dated as of June 19, 2003, between CCI and Holdco.

130.     "Net Proceeds" means the aggregate total Cash proceeds from the issuance of New CCH II Notes pursuant to the New CCH II Notes Commitment (if any), the Rights Offering and the Overallotment Option (if exercised).

131.     "New CCH II Notes" means the new 13.5% Senior Notes of CCH II and CCH II Capital Corp. to be issued pursuant to a new indenture in the form of Exhibit 16 to the Plan Supplement.

12

132.    "New CCH II Notes Commitment" means the agreement by a New CCH II Notes Commitment Party in its Commitment Letter.

133.    "New CCH II Notes Commitment Fee" means the Fee payable to the New CCH II Commitment Parties with respect to the New CCH II Notes Commitment, as set forth in the Commitment Letters.

134.    "New CCH II Notes Commitment Parties" means the members of the Crossover Committee listed on Annex D.

135.    "New Class A Stock" means the new Class A common stock, par value $.001 per share, of the Reorganized Company.

136.    "New Class B Stock" means the new Class B common stock, par value $.001 per share, of the Reorganized Company.

137.    "New Common Stock" means, collectively, the New Class A Stock and New Class B Stock.

138.    "New Preferred Stock" means the Reorganized Company's Series A 15% Pay-in-Kind Preferred Stock, the terms of which are set forth on Exhibit A to the Amended and Restated Certificate of Incorporation.

139.    "New Value Consideration" means consideration contributed (directly or indirectly) by CCI in exchange for Interests in certain Debtors remaining in place.

140.    "New Value Interest" means interests in certain Reorganized Debtors purchased for Cash or other consideration, as provided for in the Plan.

141.    "Non-Released Parties" means those Entities (other than Releasing Parties) identified in the Plan Supplement as Non-Released Parties.

142.    "Notice, Claims and Solicitation Agent" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' notice, claims and solicitation agent.

143.    "Overallotment Option" means the option offered to the Excess Backstop Parties to purchase additional shares of New Class A Stock pursuant to the Excess Backstop Agreement in an aggregate amount equal to $400 million less the aggregate dollar amount of shares purchased pursuant to the Excess Backstop.

144.    "Per Share Purchase Price" means the Cash payment per share, reflecting a discount of 25% to the Plan Value minus the Warrant Value per share, to be paid by each participant in the Rights Offering and the Overallotment Option.

145.    "Periodic Distribution Date" means the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the Distribution Date, and thereafter, the first Business Day that is as soon as reasonably practicable occurring approximately ninety (90) days after the immediately preceding Periodic Distribution Date.

146.    "Person" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

147.    "Petition Date" means the date on which the Debtors Filed their voluntary petitions commencing these Chapter 11 Cases in the Bankruptcy Court.

148.    "Plan" means this joint plan of reorganization, including the exhibits hereto or contained in the Plan Supplement.

K&E: 15083729

149.    "Plan Support Agreement" means restructuring agreements, dated as of February 11, 2009, between certain Debtors (other than CII), on the one hand, and certain Holders of Claims, on the other hand.

150.    "Plan Supplement" means the compilation of documents and forms of documents and exhibits to the Plan Filed herewith, as supplemented or modified from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

151.    "Plan Value" means $665 million.

152.    "Post-Petition Interest" means with respect to:

(a)    the CCO Credit Facility, accrued and unpaid interest pursuant to the CCO Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(b)    the CCO Swap Agreements, accrued and unpaid interest pursuant to the applicable ISDA Master Agreements from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

(c)    the CCO Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(d)    the CCOH Credit Facility, accrued and unpaid interest pursuant to the CCOH Credit Facility from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(e)    the CCOH Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required by section 1124 of the Bankruptcy Code;

(f)    the CCH II Notes, accrued and unpaid interest pursuant to the applicable indenture from the Petition Date through the Effective Date, as determined by the Bankruptcy Court to be required;

(g)    Secured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the rate set forth in the contracts or other applicable documents giving rise to such Claims (to the extent lawful) or, if the applicable instruments do not specify a rate of interest, at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date; and

(h)    General Unsecured Claims, interest accruing on such Claims from the Petition Date through the Effective Date at the Federal Judgment Rate as provided for in 28 U.S.C. § 1961 as in effect on the Petition Date, to the extent entitled thereto.

153.    "Priority Non-Tax Claims" means any and all Claims entitled to priority in payment as specified in section 507(a)(4), (5), (6), or (7) of the Bankruptcy Code.

154.    "Priority Tax Claims" mean any and all Claims of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

155.    "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in that particular Class and in other Classes entitled to share in the same recovery as such Allowed Claims under the Plan.

14

156.    "Pro Rata Participation Amount" means, with respect to each Eligible CCH I Notes Claim Holder, an amount expressed in shares of New Class A Stock equal to the product of (a) the aggregate number of shares of New Class A Stock underlying Rights offered to all Eligible CCH I Notes Claim Holders multiplied by (b) a fraction, the numerator of which is the principal amount of CCH I Notes Claims held by such Eligible CCH I Notes Claim Holder, and the denominator of which is the principal amount of CCH I Notes Claims held by all Eligible CCH I Notes Claim Holders.

157.    "Professional" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363 or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363 or 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

158.    "Professional Compensation and Reimbursement Claim" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

159.    "Professional Fee Escrow Account" means an interest-bearing account in an amount equal to any Professional fee reserve amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Professionals in the Chapter 11 Cases.

160.    "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

161.    "Rejection Damages Claim" means any Claim on account of the rejection of an Executory Contract pursuant to section 365 of the Bankruptcy Code or the repudiation of such contract.

162.    "Releasing Parties" means (a) the Debtors, (b) the parties who signed Plan Support Agreements with a Debtor, and (c) any statutory committees appointed in the Chapter 11 Cases.

163.    "Reorganized CCH I" means CCH I after the Effective Date.

164.    "Reorganized CCH II" means CCH II after the Effective Date.

165.    "Reorganized CCO" means CCO after the Effective Date.

166.    "Reorganized CII" means CII after the Effective Date.

167.    "Reorganized Company" or "Reorganized CCI" means CCI after the Effective Date.

168.    "Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

169.    "Reorganized Holdco" means Holdco after the Effective Date.

170.    "Reorganized Holdco Exchange Agreement" means the exchange agreement among CCI, CII, Holdco and Mr. Allen, attached as Exhibit 17 to the Plan Supplement.

171.    "Reorganized Holdco LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of Reorganized Holdco, attached as Exhibit 18 to the Plan Supplement.

172.    "Requisite Holders" means the members of the Crossover Committee holding a majority in principal amount of the CCH I Notes held by all members of the Crossover Committee.

173.    "Rights" means the rights to purchase New Class A Stock, as described in ARTICLE G.4(c)(ii).

15

174.     "Rights Offering" means the transaction described in ARTICLE IV.G.4(c), the terms of which are set forth in the Rights Offering Documents, including without limitation the issuance of shares to certain Holders of CCH I Notes Claims who are not Eligible CCH I Notes Claim Holders.

175.     "Rights Offering Amount" means an amount equal to (a) $1.623 billion minus (b) the excess, if any, of $450 million over the amount of the CCO Swap Agreements Claims.

176.     "Rights Offering Documents" means the documents evidencing the offer and procedures for the Rights Offering, which procedures shall be approved in connection with the Bankruptcy Court's approval of the Disclosure Statement and are attached as Exhibit 19 to the Plan Supplement.

177.     "Rights Offering Record Date" means April 17, 2009, 12 days prior to the date for which the Disclosure Statement hearing was originally scheduled.

178.     "Rollover Commitment" means the commitment of the Rollover Commitment Parties.

179.     "Rollover Commitment Parties" means the members of the Crossover Committee listed on Annex C.

180.     "Rollover Fee" means an aggregate commitment fee for the use of capital, payable in Cash, in an amount equal to 1.5% of the principal amount plus interest on CCH II Notes exchanged by such Holder pursuant to the Exchange, as consideration for participating in the Exchange.

181.     "Schedules" means the schedules of assets and liabilities, schedules of Executory Contracts, and statement of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the official bankruptcy forms, and the Bankruptcy Rules.

182.     "Section 510(b) Claims" means any Claim arising from rescission of a purchase or sale of a Security (including any Interest) of the Debtors, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

183.     "Secured Claim" means, with respect to any Claim against any Debtor—other than CCO Credit Facility Claims, CCO Swap Agreements Claims, CCO Notes Claims, CCOH Credit Facility Claims, and CCH I Notes Claims—that portion, which, pursuant to section 506 of the Bankruptcy Code is (a) secured by a valid, perfected, and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).

184.     "Securities Act" means the Securities Act of 1933, as amended.

185.     "Security" means any instrument that qualifies under section 2(a)(1) of the Securities Act.

186.     "Servicer" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

187.     "Specified Fees and Expenses" means the Allen Management Receivable, the Allen Fee Reimbursement, the Commitment Fees, and payments due under the VCP.

188.     "Target Amount" means $1.477 billion, plus accrued but unpaid interest to the Petition Date plus Post-Petition Interest on exchanged CCH II Notes, but excluding any call premiums or any prepayment penalties.

189.     "Term Sheet" means the term sheet attached to the Plan Support Agreements and the Commitment Letters, to which CCI, among others, is a party, dated as of February 11, 2009.

16

190.    "<u>Unclaimed Distribution</u>" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

191.    "<u>Unimpaired</u>" has the meaning set forth in section 1124 of the Bankruptcy Code.

192.    "<u>VCP</u>" means the Value Creation Plan adopted by CCI on March 12, 2009 and attached as Exhibit 20 to the Plan Supplement.

193.    "<u>Warrant Value</u>" means $53 million, subject to update upon Confirmation and with the consent of the Requisite Holders.

194.    "<u>Warrants</u>" means, collectively, the CIH Warrants, the CCH Warrants and the CII Settlement Claim Warrants.

B.    <u>Rules of Interpretation</u>.  For purposes of the Plan:

1.    whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and the neuter gender;

2.    unless otherwise specified, any reference in the Plan or Plan Supplement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, except that any contract, instrument, release, indenture, or other agreement or document attached as an exhibit to the Plan Supplement shall be in the form attached, subject to technical amendments prior to the Effective Date to correct ambiguities, inconsistencies or errors, as applicable;

3.    unless otherwise specified, any reference in the Plan to an existing document or exhibit, whether or not filed with the Bankruptcy Court, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented in accordance with its terms;

4.    any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns;

5.    unless otherwise specified, all references in the Plan to ARTICLES are references to ARTICLES of the Plan;

6.    unless otherwise specified, all references in the Plan to exhibits are references to exhibits in the Plan Supplement;

7.    the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan;

8.    subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and Bankruptcy Rules;

9.    captions and headings of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan;

17

10.     unless otherwise set forth in the Plan, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply;

11.     any term used in capitalized form in the Plan that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable;

12.     all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system;

13.     all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Chapter 11 Cases, unless otherwise stated; and

14.     any immaterial effectuating provisions may be interpreted by the Reorganized Debtors after the Effective Date in such a manner that is consistent with the overall purpose and intent of the Plan, all without further Bankruptcy Court order.

C.      Computation of Time:  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

18

## ARTICLE II.

### ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in ARTICLE III.  Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim designated in this ARTICLE II.

A.    Administrative Expense Claims.    Except with respect to Administrative Expense Claims that are Professional Compensation and Reimbursement Claims and except to the extent that a Holder of an Allowed Administrative Expense Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the later of the Distribution Date under the Plan, the date such Administrative Expense Claim is Allowed, and the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

B.    Professional Compensation and Reimbursement Claims.    Except as provided in ARTICLE II.A hereof, all Entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (1) File, on or before the date that is ninety (90) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (2) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Administrative Expense Claim. The Reorganized Debtors are authorized to pay compensation for Professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

C.    Priority Tax Claims.    Each Holder of an Allowed Priority Tax Claim shall receive, on the Distribution Date or such later date as such Allowed Priority Tax Claim becomes due and payable, at the option of the Debtors, one of the following treatments on account of such Claim:  (1) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, plus, to the extent provided for by section 511 of the Bankruptcy Code, interest at the rate determined under applicable nonbankruptcy law; or (2) such other treatment as may be agreed to by such Holder and the applicable Debtors or otherwise determined upon an order of the Bankruptcy Court.

K&E: 15083729

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors. A Claim or Interest is placed in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date. Notwithstanding anything to the contrary herein, the CII Settlement Claim shall not be a Claim or Interest designated in this ARTICLE III.

A.      **CCI**

1.      **Class A-1** shall consist of all Priority Non-Tax Claims that may exist against CCI.

2.      **Class A-2** shall consist of all Secured Claims that may exist against CCI.

3.      **Class A-3** shall consist of all General Unsecured Claims that may exist against CCI.

4.      **Class A-4** shall consist of CCI Notes Claims.

5.      **Class A-5** shall consist of all Section 510(b) Claims that may exist against CCI other than all 510(b) Claims against CCI held by any CII Settlement Claim Party.

6.      **Class A-6** shall consist of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

B.      **CII**

1.      **Class B-1** shall consist of all Priority Non-Tax Claims that may exist against CII.

2.      **Class B-2** shall consist of all Secured Claims that may exist against CII.

3.      **Class B-3** shall consist of all General Unsecured Claims that may exist against CII.

4.      **Class B-4** shall consist of CII Shareholder Claims.

C.      **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**

1.      **Class C-1** shall consist of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

2.      **Class C-2** shall consist of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

3.      **Class C-3** shall consist of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

4.      **Class C-4** shall consist of Holdco Notes Claims.

5.      **Class C-5** shall consist of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

6.      **Class C-6** shall consist of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

20

**D.** **CCHC**

    1.    **Class D-1** shall consist of all Priority Non-Tax Claims that may exist against CCHC.

    2.    **Class D-2** shall consist of all Secured Claims that may exist against CCHC.

    3.    **Class D-3** shall consist of all General Unsecured Claims that may exist against CCHC.

    4.    **Class D-4** shall consist of all Section 510(b) Claims that may exist against CCHC.

    5.    **Class D-5** shall consist of all Interests in CCHC.

**E.** **CCH and Charter Communications Holdings Capital Corp.**

    1.    **Class E-1** shall consist of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    2.    **Class E-2** shall consist of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    3.    **Class E-3** shall consist of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    4.    **Class E-4** shall consist of CCH Notes Claims.

    5.    **Class E-5** shall consist of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

    6.    **Class E-6** shall consist of all Interests in CCH and Charter Communications Holdings Capital Corp.

**F.** **CIH and CCH I Holdings Capital Corp.**

    1.    **Class F-1** shall consist of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

    2.    **Class F-2** shall consist of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    3.    **Class F-3** shall consist of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

    4.    **Class F-4** shall consist of CIH Notes Claims.

    5.    **Class F-5** shall consist of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

    6.    **Class F-6** shall consist of all Interests in CIH and CCH I Holdings Capital Corp.

**G.** **CCH I and CCH I Capital Corp.**

    1.    **Class G-1** shall consist of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

21

2.        **Class G-2** shall consist of all Secured Claims that may exist against CCH I and CCH I Capital Corp.

3.        **Class G-3** shall consist of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

4.        **Class G-4** shall consist of CCH I Notes Claims.

5.        **Class G-5** shall consist of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

6.        **Class G-6** shall consist of all Interests in CCH I and CCH I Capital Corp.

**H.        CCH II and CCH II Capital Corp.**

1.        **Class H-1** shall consist of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

2.        **Class H-2** shall consist of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

3.        **Class H-3** shall consist of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

4.        **Class H-4** shall consist of CCH II Notes Claims.

5.        **Class H-5** shall consist of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

6.        **Class H-6** shall consist of all Interests in CCH II and CCH II Capital Corp.

**I.        CCOH and CCO Holdings Capital Corp.**

1.        **Class I-1** shall consist of CCOH Credit Facility Claims.

2.        **Class I-2** shall consist of CCOH Notes Claims.

3.        **Class I-3** shall consist of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

4.        **Class I-4** shall consist of all Secured Claims that may exist against CCOH and CCO Holdings Capital Corp.

5.        **Class I-5** shall consist of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

6.        **Class I-6** shall consist of all Interests in CCOH and CCO Holdings Capital Corp.

K&E: 15083729

**J.**      **CCO (and its direct and indirect subsidiaries)**

The classifications set forth in Classes J-4 to J-9 shall be deemed to apply to CCO and each of its direct and indirect subsidiaries.[2]

      1.      **Class J-1** shall consist of CCO Credit Facility Claims.

      2.      **Class J-2** shall consist of CCO Swap Agreements Claims.

      3.      **Class J-3** shall consist of CCO Notes Claims.

      4.      **Class J-4** shall consist of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

      5.      **Class J-5** shall consist of all Secured Claims that may exist against CCO and its direct and indirect subsidiaries.

      6.      **Class J-6** shall consist of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries.

      7.      **Class J-7** shall consist of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

---

[2]    For the avoidance of doubt, Classes J-4 to J-7 shall apply to the Debtors listed on Exhibit 21 to the Plan Supplement.

K&E: 15083729

## ARTICLE IV.

### TREATMENT OF CLAIMS AND INTERESTS

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below. For the avoidance of doubt, notwithstanding any other provision of the Plan, (a) CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan and (b) the Debtors other than CII shall not be liable for any payment or distributions on account of Claims, Interest of amounts to be paid or owing by or other obligations of any kind of CII under or in connection with the Plan (other than the CII Settlement Claim).

A.    **CCI**

1.    **Class A-1:  Priority Non-Tax Claims**

(a)    <u>Classification</u>.  Class A-1 consists of all Priority Non-Tax Claims that may exist against CCI.

(b)    <u>Impairment and Voting</u>.  Class A-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.    **Class A-2:  Secured Claims**

(a)    <u>Classification</u>.  Class A-2 consists of all Secured Claims that may exist against CCI.

(b)    <u>Impairment and Voting</u>.  Class A-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCI shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCI shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.    **Class A-3:  General Unsecured Claims**

(a)    <u>Classification</u>.  Class A-3 consists of all General Unsecured Claims that may exist against CCI other than all General Unsecured Claims against CCI held by any CII Settlement Claim Party.

(b)    <u>Impairment and Voting</u>.  Class A-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCI is entitled to vote to accept or reject the Plan.

24

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCI and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCI shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCI shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.    Class A-4:  CCI Notes Claims**

(a)    <u>Classification</u>.  Class A-4 consists of all CCI Notes Claims.

(b)    <u>Impairment and Voting</u>.  Class A-4 is Impaired by the Plan.  Each Holder of an Allowed CCI Notes Claim is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  The CCI Notes Claims shall be deemed Allowed in the aggregate amount of $497,489,463.  On the Distribution Date, each Holder of an Allowed CCI Notes Claim shall receive its Pro Rata share of (i) New Preferred Stock and (ii) Cash in an aggregate amount equal to (A) $24,549,331 and (B) Litigation Settlement Fund Proceeds in an aggregate amount, if any, that the Bankruptcy Court determines is owned by CCI and Holdco.

**5.    Class A-5:  Section 510(b) Claims**

(a)    <u>Classification</u>.  Class A-5 consists of all Section 510(b) Claims that may exist against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party.

(b)    <u>Impairment and Voting</u>.  Class A-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

**6.    Class A-6:  Interests**

(a)    <u>Classification</u>.  Class A-6 consists of all Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party.

(b)    <u>Impairment and Voting</u>.  Class A-6 is Impaired by the Plan.  Each Holder of an Interest in CCI is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Interests in CCI, whether represented by stock, preferred share purchase rights or otherwise, shall be cancelled, released, and extinguished and the Holders of such Interests shall receive no distribution under the Plan on account thereof.

**B.    <u>CII</u>**

**1.    Class B-1:  Priority Non-Tax Claims**

(a)    <u>Classification</u>.  Class B-1 consists of all Priority Non-Tax Claims that may exist against CII.

(b)    <u>Impairment and Voting</u>.  Class B-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

25

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date under the Plan, the date such Priority Non-Tax Claim is Allowed, and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.    **Class B-2:  Secured Claims**

(a)    <u>Classification</u>.  Class B-2 consists of all Secured Claims that may exist against CII.

(b)    <u>Impairment and Voting</u>.  Class B-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CII is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of CII, (i) each Allowed Secured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CII shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CII shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date under the Plan and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.    **Class B-3:  General Unsecured Claims**

(a)    <u>Classification</u>.  Class B-3 consists of all General Unsecured Claims that may exist against CII.

(b)    <u>Impairment and Voting</u>.  Class B-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CII is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CII and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the applicable Debtors, (i) each Allowed General Unsecured Claim against CII shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CII shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.    **Class B-4:  CII Shareholder Claims**

(a)    <u>Classification</u>.  Class B-4 consists of CII Shareholder Claims.

(b)    <u>Impairment and Voting</u>.  Class B-4 is Impaired by the Plan.  The Holder of an Allowed CII Shareholder Claim is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  The Holder of Allowed CII Shareholder Claims shall receive 100,000 newly issued shares of Class A Voting Common Stock of Reorganized CII on the Effective Date.

26

C.    **Holdco, Enstar Communications Corporation, and Charter Gateway, LLC**

1.    **Class C-1:  Priority Non-Tax Claims**

(a)    Classification.  Class C-1 consists of all Priority Non-Tax Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.    **Class C-2:  Secured Claims**

(a)    Classification.  Class C-2 consists of all Secured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.    **Class C-3:  General Unsecured Claims**

(a)    Classification.  Class C-3 consists of all General Unsecured Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

(b)    Impairment and Voting.  Class C-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is entitled to vote to accept or reject the Plan.

(c)    Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of

27

an Allowed General Unsecured Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

      **4.**       **Class C-4: Holdco Notes Claims**

      (a)       <u>Classification</u>. Class C-4 consists of Holdco Notes Claims.

      (b)       <u>Impairment and Voting</u>. Class C-4 is Impaired by the Plan. Each Holder of an Allowed Holdco Notes Claim is entitled to vote to accept or reject the Plan.

      (c)       <u>Distributions</u>. The Holdco Notes Claims shall be Allowed in the aggregate amount of $497,489,463. The aggregate amount distributed under the Plan on account of Class C-4 Allowed Holdco Notes Claims shall be Cash in an amount equal to (i) $19,549,331 and (ii) Litigation Settlement Fund Proceeds in an aggregate amount, if any, that the Bankruptcy Court determines is owned by Holdco, which consideration shall be distributed as set forth in Class A-4 as CCI is the sole Holder of Holdco Notes Claims.

      **5.**       **Class C-5: Section 510(b) Claims**

      (a)       <u>Classification</u>. Class C-5 consists of all Section 510(b) Claims that may exist against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC.

      (b)       <u>Impairment and Voting</u>. Class C-5 is Impaired by the Plan. Each Holder of a Section 510(b) Claim against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

      (c)       <u>Distributions</u>. Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

      **6.**       **Class C-6: Interests**

      (a)       <u>Classification</u>. Class C-6 consists of all Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC other than all Interests in Holdco held by any CII Settlement Claim Party.

      (b)       <u>Impairment and Voting</u>. Class C-6 is Impaired by the Plan. Each Holder of an Allowed Interest against Holdco, Enstar Communications Corporation, and Charter Gateway, LLC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

      (c)       <u>Distributions</u>. Interests in Holdco, Enstar Communications Corporation, and Charter Gateway, LLC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

**D.**       <u>**CCHC**</u>

      **1.**       **Class D-1: Priority Non-Tax Claims**

      (a)       <u>Classification</u>. Class D-1 consists of all Priority Non-Tax Claims that may exist against CCHC.

      (b)       <u>Impairment and Voting</u>. Class D-1 is Unimpaired by the Plan. Each Holder of an Allowed Priority Non-Tax Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

      (c)       <u>Distributions</u>. Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the

28

Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

> **2.      Class D-2:  Secured Claims**

> (a)      <u>Classification</u>.  Class D-2 consists of all Secured Claims that may exist against CCHC.

> (b)      <u>Impairment and Voting</u>.  Class D-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

> (c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCHC shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCHC shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

> **3.      Class D-3:  General Unsecured Claims**

> (a)      <u>Classification</u>. Class D-3 consists of all General Unsecured Claims that may exist against CCHC other than all General Unsecured Claims against CCHC held by any CII Settlement Claim Party.

> (b)      <u>Impairment and Voting</u>.  Class D-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCHC is entitled to vote to accept or reject the Plan.

> (c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCHC and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCHC shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCHC shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

> **4.      Class D-4:  Section 510(b) Claims**

> (a)      <u>Classification</u>.  Class D-4 consists of all Section 510(b) Claims that may exist against CCHC.

> (b)      <u>Impairment and Voting</u>.  Class D-4 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

> (c)      <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

> **5.      Class D-5:  Interests**

> (a)      <u>Classification</u>.  Class D-5 consists of all Interests in CCHC.

K&E: 15083729

(b)      Impairment and Voting.  Class D-5 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCHC is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)      Distributions.  Interests in CCHC shall remain in place in exchange for New Value Consideration in the amount of $2,000,000 to be contributed by CCI from the Rights Offering.

**E.      CCH and Charter Communications Holdings Capital Corp.**

**1.      Class E-1:  Priority Non-Tax Claims**

(a)      Classification.  Class E-1 consists of all Priority Non-Tax Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)      Impairment and Voting.  Class E-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.      Class E-2:  Secured Claims**

(a)      Classification.  Class E-2 consists of all Secured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)      Impairment and Voting.  Class E-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH and Charter Communications Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.      Class E-3:  General Unsecured Claims**

(a)      Classification.  Class E-3 consists of all General Unsecured Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

30

(b)     Impairment and Voting.  Class E-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)     Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCH and Charter Communications Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

### 4.     Class E-4:  CCH Notes Claims

(a)     Classification.  Class E-4 consists of CCH Notes Claims.

(b)     Impairment and Voting.  Class E-4 is Impaired by the Plan.  Each Holder of an Allowed CCH Notes Claim is entitled to vote to accept or reject the Plan.

(c)     Distributions.  CCH Notes Claims shall be Allowed in the aggregate amount of $599,379,759.  On the Distribution Date, each Holder of an Allowed CCH Notes Claim shall receive its Pro Rata share of the CCH Warrants.

### 5.     Class E-5:  Section 510(b) Claims

(a)     Classification.  Class E-5 consists of all Section 510(b) Claims that may exist against CCH and Charter Communications Holdings Capital Corp.

(b)     Impairment and Voting.  Class E-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

### 6.     Class E-6:  Interests

(a)     Classification.  Class E-6 consists of all Interests in CCH and Charter Communications Holdings Capital Corp.

(b)     Impairment and Voting.  Class E-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCH and Charter Communications Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)     Distributions.  Interests in CCH and Charter Communications Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $1,533,180 to be contributed by CCI from the Rights Offering.

## F.     CIH and CCH I Holdings Capital Corp.

### 1.     Class F-1:  Priority Non-Tax Claims

(a)     Classification.  Class F-1 consists of all Priority Non-Tax Claims that may exist against CIH and CCH I Holdings Capital Corp.

K&E: 15083729

(b)      _Impairment and Voting_.  Class F-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      _Distributions_.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; _provided_, _however_, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

## 2.      Class F-2:  Secured Claims

(a)      _Classification_.  Class F-2 consists of all Secured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)      _Impairment and Voting_.  Class F-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      _Distributions_.  Except to the extent that a Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CIH and CCH I Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

## 3.      Class F-3:  General Unsecured Claims

(a)      _Classification_.  Class F-3 consists of all General Unsecured Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b)      _Impairment and Voting_.  Class F-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)      _Distributions_.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CIH and CCH I Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

## 4.      Class F-4:  CIH Notes Claims

(a)      _Classification_.  Class F-4 consists of CIH Notes Claims.

(b)      _Impairment and Voting_.  Class F-4 is Impaired by the Plan.  Each Holder of an Allowed CIH Notes Claim is entitled to vote to accept or reject the Plan.

32

(c) <u>Distributions</u>.  CIH Notes Claims shall be Allowed in the aggregate amount of $2,625,060,226.  On the Distribution Date, each Holder of CIH Notes Claim shall receive its Pro Rata share of the CIH Warrants.

5.  **Class F-5:  Section 510(b) Claims**

(a) <u>Classification</u>.  Class F-5 consists of all Section 510(b) Claims that may exist against CIH and CCH I Holdings Capital Corp.

(b) <u>Impairment and Voting</u>.  Class F-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.  **Class F-6:  Interests**

(a) <u>Classification</u>.  Class F-6 consists of all Interests in CIH and CCH I Holdings Capital Corp.

(b) <u>Impairment and Voting</u>.  Class F-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CIH and CCH I Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c) <u>Distributions</u>.  Interests in CIH and CCH I Holdings Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $8,932,440 to be contributed by CCI from the Rights Offering.

G.  <u>**CCH I and CCH I Capital Corp.**</u>

1.  **Class G-1:  Priority Non-Tax Claims**

(a) <u>Classification</u>.  Class G-1 consists of all Priority Non-Tax Claims that may exist against CCH I and CCH I Capital Corp.

(b) <u>Impairment and Voting</u>.  Class G-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c) <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.  **Class G-2:  Secured Claims**

(a) <u>Classification</u>.  Class G-2 consists of all Secured Claims that may exist against CCH I and CCH I Capital Corp. (but excluding any Secured Claim that is also a CCH I Notes Claim).

(b)      Impairment and Voting.  Class G-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCH I and CCH I Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

3.      **Class G-3:  General Unsecured Claims**

(a)      Classification.  Class G-3 consists of all General Unsecured Claims that may exist against CCH I and CCH I Capital Corp.

(b)      Impairment and Voting.  Class G-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH I and CCH I Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

4.      **Class G-4:  CCH I Notes Claims**

(a)      Classification.  Class G-4 consists of CCH I Notes Claims.

(b)      Impairment and Voting.  Class G-4 is Impaired by the Plan.  Each Holder of an Allowed CCH I Notes Claim is entitled to vote to accept or reject the Plan.

(c)      Distributions.

(i)      The CCH I Notes Claims shall be Allowed in the aggregate amount of $4,170,040,378.  On the Distribution Date, each Holder of a CCH I Notes Claim shall receive its Pro Rata share of New Class A Stock in an aggregate amount to all such Holders equal to 100% of the New Class A Stock outstanding as of the Effective Date, prior to giving effect to the Rights Offering, the issuance of Warrants and any other distributions of New Class A Stock contemplated by the Plan, which New Class A Stock (prior to such effects) shall be deemed to have an aggregate value equal to the Plan Value minus the Warrant Value minus 3% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of Warrants and equity-based awards provided for by the Plan.

Each Eligible CCH I Notes Claim Holder shall also receive Rights pursuant to the Rights Offering, as set forth below.

(ii)      Rights Offering. Each Eligible CCH I Notes Claim Holder shall be offered pursuant to the Rights Offering Documents the right to purchase shares of New Class A Stock, according to that Holder's Pro Rata Participation Amount, for a Cash payment of the product of the Per Share Purchase Price multiplied by such Pro Rata Participation Amount.

34

(iii)    <u>Equity Backstop by Members of the Crossover Committee</u>.  Pursuant to the Commitment Letters, the Equity Backstop Parties have, severally and not jointly, committed to purchase their respective Pro Rata Participation Amount in the Rights Offering.

(iv)    <u>Excess Backstop by the Excess Backstop Parties</u>.  Pursuant to the Commitment Letters and the Excess Backstop Agreements, the Excess Backstop Parties have, severally and not jointly, committed to purchase shares of New Class A Stock underlying Rights not exercised by Eligible CCH I Notes Claim Holders other than the Equity Backstop Parties.

(v)    <u>Overallotment Option</u>.  Pursuant to the Commitment Letters and Excess Backstop Agreements, each Excess Backstop Party shall be offered the Overallotment Option.

Each Holder of CCH I Notes Claims that affirmatively represents it is not an Eligible CCH I Notes Claim Holder on a timely submitted investor certification shall receive an amount of New Class A Stock equal to the value of the Rights that such Holder would have been offered if it were an accredited investor or qualified institutional buyer participating in the Rights Offering.

**5.    Class G-5:  Section 510(b) Claims**

(a)    <u>Classification</u>.  Class G-5 consists of all Section 510(b) Claims that may exist against CCH I and CCH I Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class G-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

**6.    Class G-6:  Interests**

(a)    <u>Classification</u>.  Class G-6 consists of all Interests in CCH I and CCH I Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class G-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCH I and CCH I Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Interests in CCH I and CCH I Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $12,000,000 to be contributed by CCI from the Rights Offering.

**H.    <u>CCH II and CCH II Capital Corp.</u>**

**1.    Class H-1:  Priority Non-Tax Claims**

(a)    <u>Classification</u>.  Class H-1 consists of all Priority Non-Tax Claims that may exist against CCH II and CCH II Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class H-1 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition

35

Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; provided, however, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**2.      Class H-2:  Secured Claims**

(a)      Classification.  Class H-2 consists of all Secured Claims that may exist against CCH II and CCH II Capital Corp.

(b)      Impairment and Voting.  Class H-2 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable, or (iii) each Holder of an Allowed Secured Claim against CCH II and CCH II Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**3.      Class H-3:  General Unsecured Claims**

(a)      Classification.  Class H-3 consists of all General Unsecured Claims that may exist against CCH II and CCH II Capital Corp.

(b)      Impairment and Voting.  Class H-3 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCH II and CCH II Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**4.      Class H-4:  CCH II Notes Claims**

(a)      Classification.  Class H-4 consists of CCH II Notes Claims.

(b)      Impairment and Voting.  Class H-4 is Impaired by the Plan.  Each Holder of an Allowed CCH II Notes Claim is entitled to vote to accept or reject the Plan.

(c)      Distributions.  The CCH II Notes Claims shall be Allowed in the aggregate amount of $2,586,033,908, plus Post-Petition Interest.  Each Holder of CCH II Notes Claims shall be paid in full in Cash in an amount equal to the Allowed amount of its Claim plus Post-Petition Interest, on the Distribution Date, unless such Holder is a Rollover Commitment Party or elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange by noting such election on such Holder's ballot.  Each Holder of an Allowed CCH II Notes Claim that elects to exchange as set forth above or is a Rollover Commitment Party, shall receive the New CCH II Notes as set forth below in a principal amount equal to the Allowed amount of its CCH II Notes Claim plus Post-Petition

36

Interest, subject to the Exchange Cutback set forth below; provided that the applicable Debtors may pay Post-Petition Interest in Cash if the applicable Debtors elect such option on or before the Effective Date by filing a notice of such election with the Court on or before the Effective Date.  No partial Exchange of CCH II Notes shall be allowed.

(i)    <u>Exchange</u>.  CCH II shall effectuate the Exchange pursuant to the Plan.  The aggregate principal amount of the New CCH II Notes shall be equal to the sum of (x) the Target Amount and (y) $85 million.  Each Holder of an Allowed CCH II Notes Claim that elects to exchange CCH II Notes for New CCH II Notes pursuant to the Exchange, and each Rollover Commitment Party, in each case subject to the Exchange Cutback, shall be entitled to receive (A) New CCH II Notes with a principal amount equal to the Allowed principal amount of the CCH II Notes held by such Holder or Rollover Commitment Party, (B) New CCH II Notes with a principal amount equal to the accrued but unpaid interest on such CCH II Notes held by such Holder or Rollover Commitment Party to the Petition Date, and (C) New CCH II Notes with a principal amount equal to Post-Petition Interest on such CCH II Notes.  No Holder or Rollover Commitment Party shall be entitled to receive any amounts for any call premiums or prepayment penalty with respect to the CCH II Notes.

<u>Rollover Commitment</u>.  Pursuant to the Commitment Letters, the Rollover Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex C), committed to exchange on the Effective Date an aggregate of $1.21 billion in principal amount of CCH II Notes, plus accrued but unpaid interest to the Petition Date, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties, for New CCH II Notes pursuant to the Exchange, subject to the Exchange Cutback.

<u>Exchange Cutback</u>.  Notwithstanding the foregoing, if the aggregate principal amount of New CCH II Notes to be issued to  Holders of CCH II Notes Claims (including the Rollover Commitment Parties) electing to participate in the Exchange would exceed the Target Amount, then each participating Holder (including the Rollover Commitment Parties) shall receive its pro rata portion of the Target Amount of New CCH II Notes in the same proportion that the Allowed amount of CCH II Notes sought to be exchanged by such Holder bears to the total Allowed amount of CCH II Notes sought to be exchanged, and the remainder of such Holder's Allowed CCH II Notes Claims shall be paid in full in Cash on the Distribution Date.

(ii)    <u>New CCH II Notes Commitment</u>.  Pursuant to the Commitment Letters, the New CCH II Notes Commitment Parties have, severally and not jointly (in the respective amounts set forth on Annex D), committed to purchase additional New CCH II Notes in an aggregate principal amount of $267 million.  If the aggregate principal amount of New CCH II Notes to be issued to Holders (including the Rollover Commitment Parties) electing to participate in the Exchange is less than the Target Amount, then the New CCH II Notes Commitment shall be funded up to the extent of such shortfall.

5.    **Class H-5:  Section 510(b) Claims**

(a)    <u>Classification</u>.  Class H-5 consists of all Section 510(b) Claims that may exist against CCH II and CCH II Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class H-5 is Impaired by the Plan.  Each Holder of a Section 510(b) Claim against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Section 510(b) Claims shall be cancelled, released, and extinguished and the Holders of Section 510(b) Claims shall receive no distribution under the Plan on account of such Claims.

6.    **Class H-6:  Interests**

(a)    <u>Classification</u>.  Class H-6 consists of all Interests in CCH II and CCH II Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class H-6 is Impaired by the Plan.  Each Holder of an Allowed Interest against CCH II and CCH II Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have rejected the Plan.

(c)    <u>Distributions</u>.  Interests in CCH II and CCH II Capital Corp. shall remain in place in exchange for New Value Consideration in the amount of $15,000,000 to be contributed by CCI from the Rights Offering.

## I.    <u>CCOH and CCO Holdings Capital Corp.</u>

**1.    Class I-1:  CCOH Credit Facility Claims**

(a)    <u>Classification</u>.  Class I-1 consists of CCOH Credit Facility Claims.

(b)    <u>Impairment and Voting</u>.  Class I-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Each Allowed CCOH Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**2.    Class I-2:  CCOH Notes Claims**

(a)    <u>Classification</u>.  Class I-2 consists of CCOH Notes Claims.

(b)    <u>Impairment and Voting</u>.  Class I-2 is Unimpaired by the Plan.  Each Holder of an Allowed CCOH Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Each Allowed CCOH Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**3.    Class I-3:  Priority Non-Tax Claims**

(a)    <u>Classification</u>.  Class I-3 consists of all Priority Non-Tax Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)    <u>Impairment and Voting</u>.  Class I-3 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**4.    Class I-4:  Secured Claims**

(a)    <u>Classification</u>.  Class I-4 consists of all Secured Claims (but excluding CCOH Credit Facility Claims) that may exist against CCOH and CCO Holdings Capital Corp.

38

(b)      Impairment and Voting.  Class I-4 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCOH and CCO Holdings Capital Corp. shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

**5.      Class I-5:  General Unsecured Claims**

(a)      Classification.  Class I-5 consists of all General Unsecured Claims that may exist against CCOH and CCO Holdings Capital Corp.

(b)      Impairment and Voting.  Class I-5 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. is entitled to vote to accept or reject the Plan.

(c)      Distributions.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, or (ii) each Holder of an Allowed General Unsecured Claim against CCOH and CCO Holdings Capital Corp. shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

**6.      Class I-6:  Interests**

(a)      Classification.  Class I-6 consists of all Interests in CCOH and CCO Holdings Capital Corp.

(b)      Impairment and Voting.  Class I-6 is Unimpaired by the Plan.  Each Holder of an Allowed Interest against CCOH and CCO Holdings Capital Corp. is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Interests in CCOH and CCO Holdings Capital Corp. shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**J.      CCO (and its direct and indirect subsidiaries)**

**1.      Class J-1:  CCO Credit Facility Claims**

(a)      Classification.  Class J-1 consists of CCO Credit Facility Claims.

(b)      Impairment and Voting.  Class J-1 is Unimpaired by the Plan.  Each Holder of an Allowed CCO Credit Facility Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      Distributions.  Each Allowed CCO Credit Facility Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.  The Debtors shall waive and/or abjure any

39

right to require any lender to make loans (whether term, incremental term, revolving, or swingline loans) under the CCO Credit Facility, other than loans outstanding as of the Effective Date.

**2.      Class J-2:  CCO Swap Agreements Claims**

(a)      <u>Classification</u>.  Class J-2 consists of CCO Swap Agreements Claims.

(b)      <u>Impairment and Voting</u>.  Class J-2 is Impaired by the Plan.  Each Holder of an Allowed CCO Swap Agreements Claim against CCO is entitled to vote to accept or reject the Plan; <u>provided</u>, <u>however</u>, the Debtors reserve their right to argue the proposed distribution to each Holder of an Allowed CCO Swap Agreements Claim renders Class J-2 Unimpaired, not entitled to vote to accept or reject the Plan, and deemed conclusively to have accepted the Plan.

(c)      <u>Distributions</u>.  CCO Swap Agreements Claims shall be Allowed in the aggregate amount determined by the Bankruptcy Court, plus Post-Petition Interest, but excluding any call premiums or any prepayment penalties.  Each Holder of an Allowed CCO Swap Agreements Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such CCO Swap Agreements Claim becomes an Allowed CCO Swap Agreements Claim, or as soon thereafter as is practicable.

**3.      Class J-3:  CCO Notes Claims**

(a)      <u>Classification</u>.  Class J-3 consists of CCO Notes Claims.

(b)      <u>Impairment and Voting</u>.  Class J-3 is Unimpaired by the Plan.  Each Holder of an Allowed CCO Notes Claim is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      <u>Distributions</u>.  Each Allowed CCO Notes Claim shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

**4.      Class J-4:  Priority Non-Tax Claims**

(a)      <u>Classification</u>.  Class J-4 consists of all Priority Non-Tax Claims that may exist against CCO and its direct and indirect subsidiaries.

(b)      <u>Impairment and Voting</u>.  Class J-4 is Unimpaired by the Plan.  Each Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)      <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Priority Non-Tax Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of such Allowed Priority Non-Tax Claim shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date, the date such Priority Non-Tax Claim is Allowed and the date such Allowed Priority Non-Tax Claim becomes due and payable, or as soon thereafter as is practicable; <u>provided</u>, <u>however</u>, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

**5.      Class J-5:  Secured Claims**

(a)      <u>Classification</u>.  Class J-5 consists of all Secured Claims (but excluding CCO Credit Facility Claims, CCO Notes Claims and CCO Swap Agreements Claims) that may exist against CCO and its direct and indirect subsidiaries.

40

(b)    <u>Impairment and Voting</u>.  Class J-5 is Unimpaired by the Plan.  Each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, (ii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable or (iii) each Holder of an Allowed Secured Claim against CCO and its direct and indirect subsidiaries shall receive the collateral securing its Allowed Secured Claim, plus Post-Petition Interest, on the later of the Distribution Date and the date such Secured Claim becomes an Allowed Secured Claim, or as soon thereafter as is practicable.

6.    **Class J-6:  General Unsecured Claims**

(a)    <u>Classification</u>.  Class J-6 consists of all General Unsecured Claims that may exist against CCO and its direct and indirect subsidiaries other than all General Unsecured Claims against CCO and its direct and indirect subsidiaries held by any CII Settlement Claim Party.

(b)    <u>Impairment and Voting</u>.  Class J-6 is Impaired by the Plan.  Each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries is entitled to vote to accept or reject the Plan.

(c)    <u>Distributions</u>.  Except to the extent that a Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries and the applicable Debtors agree to less favorable treatment to such Holder, at the sole option of the Debtors, (i) each Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) each Holder of an Allowed General Unsecured Claim against CCO and its direct and indirect subsidiaries shall be paid in full in Cash on the Distribution Date or as soon thereafter as is practicable.

7.    **Class J-7:  Interests (other than CC VIII Preferred Units held by a CII Settlement Claim Party)**

(a)    <u>Classification</u>.  Class J-7 consists of all Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party).

(b)    <u>Impairment and Voting</u>.  Class J-7 is Unimpaired by the Plan.  Each Holder of an Allowed Interest against CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) is not entitled to vote to accept or reject the Plan and shall be deemed conclusively to have accepted the Plan.

(c)    <u>Distributions</u>.  Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party) shall be reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

K&E: 15083729

## ARTICLE V.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND INTERESTS; ACCEPTANCE OR REJECTION OF THIS PLAN OF REORGANIZATION

A.     <u>Classes Entitled to Vote</u>.  The following Classes are Impaired by the Plan and thus are entitled to vote to accept or reject the Plan.

**Class A-3** (General Unsecured Claims against CCI)
**Class A-4** (CCI Notes Claims)

**Class B-3** (General Unsecured Claims against CII)
**Class B-4** (CII Shareholder Claims)

**Class C-3** (General Unsecured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-4** (Holdco Notes Claims)

**Class D-3** (General Unsecured Claims against CCHC)

**Class E-3** (General Unsecured Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-4** (CCH Notes Claims)

**Class F-3** (General Unsecured Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-4** (CIH Notes Claims)

**Class G-3** (General Unsecured Claims against CCH I and CCH I Capital Corp.)
**Class G-4** (CCH I Notes Claims)

**Class H-3** (General Unsecured Claims against CCH II and CCH II Capital Corp.)
**Class H-4** (CCH II Notes Claims)

**Class I-5** (General Unsecured Claims against CCOH and CCO Holdings Capital Corp.)

**Class J-2** (CCO Swap Agreements Claims)
**Class J-6** (General Unsecured Claims against CCO and its direct and indirect subsidiaries)


B.     <u>Classes Not Entitled to Vote; Deemed to Accept</u>.  The following Classes are Unimpaired by the Plan—and thus not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have accepted the Plan.

**Class A-1** (Priority Non-Tax Claims against CCI)
**Class A-2** (Secured Claims against CCI)

**Class B-1** (Priority Non-Tax Claims against CII)
**Class B-2** (Secured Claims against CII)

**Class C-1** (Priority Non-Tax Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-2** (Secured Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)

**Class D-1** (Priority Non-Tax Claims against CCHC)
**Class D-2** (Secured Claims against CCHC)

42

**Class E-1** (Priority Non-Tax Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-2** (Secured Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class F-1** (Priority Non-Tax Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-2** (Secured Claims against CIH and CCH I Holdings Capital Corp.

**Class G-1** (Priority Non-Tax Claims against CCH I and CCH I Capital Corp.)
**Class G-2** (Secured Claims against CCH I and CCH I Capital Corp.)

**Class H-1** (Priority Non-Tax Claims against CCH II and CCH II Capital Corp.)
**Class H-2** (Secured Claims against CCH II and CCH II Capital Corp.)

**Class I-1** (CCOH Credit Facility Claims)
**Class I-2** (CCOH Notes Claims)
**Class I-3** (Priority Non-Tax Claims against CCOH and CCO Holdings Capital Corp.)
**Class I-4** (Secured Claims against CCOH and CCO Holdings Capital Corp.)
**Class I-6** (Interests in CCOH and CCO Holdings Capital Corp.)

**Class J-1** (CCO Credit Facility Claims)
**Class J-3** (CCO Notes Claims)
**Class J-4** (Priority Non-Tax Claims against CCO and its direct and indirect subsidiaries)
**Class J-5** (Secured Claims against CCO and its direct and indirect subsidiaries)
**Class J-7** (Interests in CCO and its direct and indirect subsidiaries (other than CC VIII Preferred Units held by a CII Settlement Claim Party))

C.    <u>Classes Not Entitled to Vote; Deemed to Reject</u>.  The following Classes are Impaired by the Plan—but not entitled to vote to accept or reject the Plan—and shall be deemed conclusively to have rejected the Plan.

**Class A-5** (Section 510(b) Claims against CCI other than all Section 510(b) Claims against CCI held by any CII Settlement Claim Party)
**Class A-6** (Interests in CCI other than all Interests in CCI held by any CII Settlement Claim Party)

**Class C-5** (Section 510(b) Claims against Holdco, Enstar Communications Corporation, and Charter Gateway LLC)
**Class C-6** (Interests in Holdco, Enstar Communications Corporation, and Charter Gateway LLC other than all Interests in Holdco held by any CII Settlement Claim Party)

**Class D-4** (Section 510(b) Claims against CCHC)
**Class D-5** (Interests in CCHC)

**Class E-5** (Section 510(b) Claims against CCH and Charter Communications Holdings Capital Corp.)

**Class E-6** (Interests in CCH and Charter Communications Holdings Capital Corp.)

**Class F-5** (Section 510(b) Claims against CIH and CCH I Holdings Capital Corp.)
**Class F-6** (Interests in CIH and CCH I Holdings Capital Corp.)

**Class G-5** (Section 510(b) Claims against CCH I and CCH I Capital Corp.)
**Class G-6** (Interests in CCH I and CCH I Capital Corp.)

**Class H-5** (Section 510(b) Claims against CCH II and CCH II Capital Corp.)
**Class H-6** (Interests in CCH II and CCH II Capital Corp.)

43

D.        Nonconsensual Confirmation.  Except as otherwise specifically provided in the Plan, if any Impaired Class shall not accept the Plan by the requisite statutory majority provided in section 1126(c) or (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan (subject to the Plan Support Agreements and conditions to the Effective Date set forth below) or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

K&E: 15083729

## ARTICLE VI.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.      Sources of Consideration for Plan Distributions.  Cash Distributions under the Plan shall be funded from: (1) operations, (2) the New CCH II Notes Commitment (as described in ARTICLE IV.H.4 above), and (3) the Rights Offering (as described in ARTICLE IV.G.4 above).

1.      Use of Net Proceeds.  CCI shall utilize the Net Proceeds as follows:  (a) to pay the expenses of the Rights Offering; (b) to contribute to CCH II an amount sufficient to fund the Cash payments due on the CCH II Notes Claims; (c) to contribute to CCO to pay the CCO Swap Agreements Claims; (d) to contribute, as necessary, to Holdco, CCHC, CCH, CIH, CCH I, and CCH II in consideration for New Value Interests; (e) to pay Administrative Expense Claims and to make other payments as needed to confirm the Plan and to cause the Effective Date to occur; and (f) to pay the fees and expenses described in ARTICLE VI.A.2 below in the manner and order provided therein. Subject to ARTICLE VI.A.2 below, plus Professional Fees, the remaining Net Proceeds, if any, will be contributed to CCO on the Effective Date to fund CCO's working capital requirements following the Effective Date.

2.      Specified Fees and Expenses.

(a)      Allen Management Receivable.  As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Management Receivable, in Cash, as provided in clause (d) below.

(b)      Allen Fee Reimbursement.  As partial consideration for the settlement and compromise of the CII Settlement Claim, the Debtors (other than CII) shall pay to Mr. Allen (or his designees) the Allen Fee Reimbursement, in Cash, as provided in clause (d) below.

(c)      Other Fees and Expenses.

Each participating Holder (including the Rollover Commitment Parties) shall receive from the Debtors (other than CII) the Rollover Fee for the use of capital, in Cash, as provided in clause (d) below.

Each New CCH II Notes Commitment Party shall receive from the Debtors (other than CII) the New CCH II Notes Commitment Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such New CCH II Notes Commitment Party shall not have terminated its Commitment Letter with respect to the New CCH II Notes Commitment on or prior to the Effective Date.

Each Equity Backstop Party shall receive from the Debtors (other than CII) the Equity Backstop Fee (if such fee is payable), for the use of capital, in Cash, as provided in clause (d) below; provided, that such Equity Backstop Party shall not have terminated its Commitment Letter with respect to the Equity Backstop on or prior to the Effective Date.

(d)      Priority of Payments.  On the Effective Date, the Allen Management Receivable shall be paid in Cash to the extent of Available Cash.  If the Allen Management Receivable is not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 30 days after the end of the first calendar quarter following the Effective Date to the extent of Available Cash on the last day of such calendar quarter, and within 20 days after the end of each following calendar quarter to the extent of Available Cash on the last day of each such following calendar quarter, until the Allen Management Receivable is paid in full.

On the Effective Date (or when the Overallotment Option is received by the Reorganized Company), following payment of the Allen Management Receivable in full, the Commitment Fees, the Allen Fee Reimbursement, and the VCP shall be paid in Cash to the extent of any remaining Available Cash; provided, however, that, if there is not sufficient Available Cash for payment of the Commitment Fees, the Allen Fee Reimbursement, and the VCP in full on the Effective Date, then payment of such fees on such date shall be reduced pro rata based on the amount of each such fee in proportion to the total amount of the Commitment Fees, the Allen

45

Fee Reimbursement, and the VCP.  If the Commitment Fees, the Allen Fee Reimbursement, and the VCP are not paid in full on the Effective Date, then any unpaid portion thereof shall be paid in Cash within 20 days after the end of the first calendar quarter following the Effective Date in which the Allen Management Receivable is paid in full in Cash if there is Available Cash on the last day of such calendar quarter; provided, however, that, in the discretion of the Board of Directors, the Allen Fee Reimbursement, the Commitment Fees, and the VCP on a pari passu basis may be paid regardless of sufficient Available Cash.  For the avoidance of doubt, in no event shall the Commitment Fees (or any portion thereof), the Allen Fee Reimbursement (or any portion thereof) or the VCP (or any portion thereof) be paid unless and until the Allen Management Receivable has been paid in full.

If all Specified Fees and Expenses have not been paid in full on the Effective Date, Cash in the full amount of the unpaid portion of the Specified Fees and Expenses shall be retained by CCI pending payment, subject to the good faith determination of the Reorganized Company to contribute all or any portion of such retained amount to direct or indirect subsidiaries.  If such amounts are contributed, alternative arrangements for actual funding by the Reorganized Company shall be made by the Reorganized Company.

B.      Reorganized Company Equity Interests.  The Reorganized Company's equity interests shall consist of New Class A Stock, New Class B Stock, New Preferred Stock and Warrants.

1.      New Class A Stock.  Shares of New Class A Stock shall be issued to (a) participants in the Rights Offering, (b) Equity Backstop Parties upon the exercise of the Overallotment Option (if exercised), (c) Holders of Claims with respect to CCH I Notes, (d) the Allen Entities upon exchange of their Reorganized Holdco equity pursuant to the Reorganized Holdco Exchange Agreement, (e) holders of Warrants upon exercise of such Warrants, and (f) holders of equity-based awards issued under the Management Incentive Plan.

CCI shall cause the New Class A Stock to be listed on the NASDAQ Global Select Market as promptly as practicable but in no event prior to the later of (x) the 46th day following the Effective Date, and (y) October 15, 2009 (unless Mr. Allen and the Reorganized Company agree to an earlier date), and the Reorganized Company shall maintain such listing thereafter.

2.      New Class B Stock.  The New Class B Stock issued to Mr. Allen or other Authorized Class B Holders shall be identical to the New Class A Stock except with respect to certain voting, transfer and conversion rights.  Each share of New Class B Stock shall be entitled to a number of votes such that the aggregate number of votes attributable to the shares of New Class B Stock held by the Authorized Class B Holders shall equal 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of the Reorganized Company.  Subject to the Lock-Up Agreement, each holder of New Class B Stock shall have the right to convert its shares of New Class B Stock into shares of New Class A Stock on a one-for-one basis.  In addition, on or after January 1, 2011, Reorganized CCI shall have the right to cause shares of New Class B Stock to convert into shares of New Class A Stock on a one-for-one basis pursuant to and in accordance with the provisions of the Amended and Restated Certificate of Incorporation.  New Class B Stock shall be subject to restrictions on conversion and transfer pursuant to the Lock-Up Agreement.

3.      New Preferred Stock.  Shares of New Preferred Stock shall be issued to Holders of CCI Notes Claims.  The New Preferred Stock shall be listed on an exchange contemporaneously with the New Class A Stock.

4.      Warrants.  Warrants to be issued pursuant to the Plan consist solely of CIH Warrants, CCH Warrants and CII Settlement Claim Warrants.

5.      Registration Rights.  Holders of New Common Stock shall be entitled to registration rights pursuant to the Equity Registration Rights Agreement.

6.      Post-Confirmation Restrictions.  For a period of at least six (6) months following the Effective Date, the Reorganized Company, Reorganized Holdco, Reorganized CCO and each of their respective direct and indirect subsidiaries shall not negotiate, enter into agreements, understandings or arrangements or consummate transactions in the aggregate in excess of $500 million in total value to the extent that such transactions shall occur at a price in excess of 110% of either the value implied by the Plan or the appraised values, if any such appraisal is

46

obtained pursuant to ARTICLE VI.C.2.  Any transactions occurring at a price that implies a value of 110% or lower than both of such value implied by the Plan and such appraised values (if obtained) shall not be subject to restriction and shall not be taken into account in determining whether the $500 million limitation has been exceeded.

C.    CII Settlement Claim.  Notwithstanding anything to the contrary herein, on the Effective Date, the following consideration shall be transferred by the Debtors (other than CII) to Mr. Allen (or his designees which, in the case of New Class B Stock, shall be limited to Authorized Class B Holders) on account of the CII Settlement Claim:  (a) shares of New Class B Stock representing, as of the Effective Date, (i) 2% of the equity value of the Reorganized Company, after giving effect to the Rights Offering, but prior to the issuance of the Warrants and equity-based awards under the Management Incentive Plan, and (ii) 35% (determined on a fully diluted basis) of the combined voting power of the capital stock of Reorganized CCI; (b) the CII Settlement Claim Warrants; (c) $85 million principal amount of New CCH II Notes, which shall be deemed transferred from Holders of CCH I Notes Claims automatically and without further action by any party; (d) Cash in the amount of $25 million on account of the Allen Management Receivable; (e) $150 million in Cash; and (f) Cash of up to $20 million on account of the Allen Fee Reimbursement.  In addition, on the Effective Date, CII shall retain a 1% direct equity interest in Reorganized Holdco, including the right to exchange such interest into New Class A Stock, pursuant to the Reorganized Holdco Exchange Agreement, and Mr. Allen shall retain all of the Interests in Reorganized CII.  Furthermore, on the Effective Date, the 7,282,183 CC VIII Preferred Units held by the CII shall be deemed transferred, automatically and without further action by any party, to Reorganized CCI.

1.    Bankruptcy Rule 9019.  The treatment set forth above and the rights and obligations accorded elsewhere in this Plan on account of the CII Settlement Claim shall constitute the compromise and settlement under Bankruptcy Rule 9019 by and among the Debtors (other than CII), on the one hand, and the CII Settlement Claim Parties, on the other hand, that fully resolves any and all legal, contractual and equitable rights, claims and remedies between such parties in exchange for the consideration to be given to such parties.  For the avoidance of doubt, CCH I Claims and CIH Claims held by CII shall be treated identically to similar Claims held by Persons other than CII.

2.    Independent Appraisal.  Within 30 days after the Effective Date, at Mr. Allen's request, Reorganized CCI, Reorganized Holdco and Reorganized CCO shall obtain (at their expense) an independent appraisal of the fair market value of Reorganized Holdco's and Reorganized CCO's (and their respective subsidiaries') tangible and intangible assets as of the Effective Date that will include a reasonable allocation of value on an asset-by-asset basis, including any and all below market financing arrangements as may be appropriate.  The appraisal firm and scope of the appraisal shall be reasonably acceptable to Mr. Allen and Reorganized CCI, Reorganized Holdco and Reorganized CCO, but shall at all times be retained by and act under the direction of Reorganized CCI, Reorganized Holdco and Reorganized CCO, consulting with Mr. Allen.

3.    Retained Interest; Preservation of Exchange Right.  As partial consideration for the settlement and compromise of the CII Settlement Claim, CII will retain a 1% equity interest in Reorganized Holdco and shall hold such interest pursuant to and in accordance with the Reorganized Holdco LLC Agreement.  After the Effective Date, CII or its transferee that is an Allen Entity shall have the right to exchange all or a portion of their Reorganized Holdco equity for New Class A Stock pursuant to the terms of the Reorganized Holdco Exchange Agreement.

There shall be no restrictions on the Allen Entities' ability to liquidate or sell CII following consummation of the Plan; provided, that CII shall have transferred all interests in Reorganized Holdco to one or more Allen Entities (or to Reorganized CCI pursuant to the Reorganized Holdco Exchange Agreement) prior to or as part of such liquidation or sale as provided in the Reorganized Holdco LLC Agreement.

4.    Other Matters.  The Parties agree to use reasonable best efforts to ensure that Plan Confirmation and the Effective Date occur in the same calendar year.  The Debtors shall not seek to schedule, and shall use all commercially reasonable efforts to avoid scheduling the hearing to confirm the Plan during the month of December.

5.    Post-Effective Date Lock-Up Agreement.  Shares of New Class B Stock received by Mr. Allen under the Plan shall be subject to restrictions on transfer and conversion as set forth in the Lock-Up Agreement.

K&E: 15083729

For the avoidance of doubt, notwithstanding any other provision of the Plan, CII shall not be liable for any payment or distributions on account of Claims, Interests or amounts to be paid or owing by or other obligations of any kind of the Debtors (other than CII) under or in connection with the Plan.

D.        Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities.  In addition, except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such Securities and instruments; and (c) applicable regulatory approval.  Notwithstanding the foregoing, shares of New Class A Stock issued to Eligible CCH I Notes Claim Holders pursuant to the Rights Offering and New CCH II Notes issued to Rollover Commitment Parties and New CCH II Note Commitment Parties shall be issued pursuant to the exemption provided under section 4(2) of the Securities Act.  The holders of such equity and debt securities and certain other affiliates of the Reorganized Company shall receive registration rights as set forth in the Equity Registration Rights Agreement and the Debt Registration Rights Agreement, respectively.

E.        Corporate Existence.  Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

F.        Vesting of Assets in the Reorganized Debtors.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances (except for Liens, if any, granted to secure any indebtedness that is Unimpaired by the Plan).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.        Discharge of Debtors.  Except as otherwise provided in the Plan, on the Effective Date and effective as of the Effective Date:  (1) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors, or any of their assets, property or Estates; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to accept or reject the Plan or voted to reject the Plan; (3) all Claims against and Interests in the Debtors shall be satisfied, discharged and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (4) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.  All debt under the Plan that shall be surrendered, redeemed, exchanged or cancelled shall be deemed for all purposes, including income tax purposes, to be outstanding until the Effective Date, and such debt shall not be deemed surrendered, redeemed, exchanged or cancelled on any date earlier than the Effective Date.

K&E: 15083729

H.      Restructuring Transactions.  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) certain transactions in conjunction with the Effective Date in accordance with Exhibit 22 to the Plan Supplement; (2) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (3) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (4) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (5) all other actions that the Reorganized Debtors determine are necessary or appropriate.

I.      Corporate Action.  Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or any other Entity.  Without limiting the foregoing, such actions may include:  the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws; the adoption of the Reorganized Holdco LLC Agreement; the appointment of officers and (as applicable) directors for the Reorganized Debtors; and the adoption, implementation, and amendment of the Management Incentive Plan.

J.      Post-Effective Date Governance.  The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized CCI shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.  On and as of the Effective Date, the Rights Agreement between CCI and Mellon Investor Services LLC, dated as of August 14, 2007, as amended thereafter, shall be automatically terminated.

K.      Limited Liability Company Agreement.  The Holdco LLC Agreement shall be in effect and govern Holdco for the period up to and including the Effective Date.  At the Effective Date, the Holdco LLC Agreement shall be amended and restated and the Reorganized Holdco LLC Agreement shall be in effect as of the day immediately following the Effective Date for federal, state, local and foreign income tax purposes.  Reorganized Holdco shall effect a "closing of the books" as of the Effective Date, and the provisions of the Holdco LLC Agreement, taking into account each member's Percentage Interest (as defined in the Holdco LLC Agreement) immediately before the transactions contemplated by this Plan, shall govern with respect to allocations of items of income, gain, loss, credit and deduction for the period up to and including the Effective Date, including any items of income, gain, loss, credit and deduction arising on the Effective Date and/or arising as a result of the transactions effective as of the Effective Date as contemplated by this Plan.  Reorganized Holdco shall not make the election under section 108(i) of the U.S. Internal Revenue Code of 1986, as amended (or any similar election under state or local law), with respect to any cancellation of indebtedness income relating to the consummation of the Plan.  Notwithstanding anything to the contrary in the Reorganized Holdco LLC Agreement, in the event of any dispute, challenge, audit or examination of Holdco's tax affairs for any period prior to or including the Effective Date, the consent of Mr. Allen shall be required to settle any such dispute and Mr. Allen and CII shall be entitled to participate alongside Reorganized CCI in any such examinations, judicial determinations, and administrative proceedings, with respect to any portion of the dispute relating to the period prior to and including the Effective Date.

L.      Effectuating Documents; Further Transactions.  On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors or managers, as applicable, thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

M.      Exemption from Certain Transfer Taxes and Recording Fees.  Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation

49

of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

N.      Board Representation.   The Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws shall provide that the Board of Directors shall be fixed at 11 members.  Each projected holder of 10% or more of the voting power of the Reorganized Company on the Effective Date (determined on an undiluted basis and giving effect to the Overallotment Option) based on such holder's pro rata share of New Class A Stock (i) to be received in respect of its CCH I Notes Claims, (ii) to be purchased pursuant to its exercise of Rights and (iii) to be purchased pursuant to the exercise by such holder of its Overallotment Option, if any, on or prior to the date that is five business days prior to the commencement of the Confirmation Hearing, shall have the right to appoint one member of the initial Board of Directors upon emergence for each 10% of the voting power attributable to such holder's New Class A Stock.  Mr. Allen shall have the right to appoint four (4) of the eleven (11) members of the initial Board of Directors, and  Neil Smit, the President and Chief Executive Officer of the Reorganized Company, will also serve on the Reorganized Company's Board of Directors.  The identity of these members will be disclosed on Exhibit 23 to the Plan Supplement prior to the hearing on Confirmation of the Plan.  Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.  Starting at such first annual meeting of stockholders and so long as shares of New Class B Stock are outstanding, holders of New Class B Stock shall have the right to elect 35% of the members of the Board of Directors (rounded up to the next whole number), and all other members of the Board of Directors shall be elected by majority vote of New Class A Stock and New Preferred Stock, voting together as a single class.

        The members of the Board of Directors elected by holders of New Class B Stock shall have no less than proportionate representation on each committee of the Board of Directors, except for any committee (1) required by applicable stock exchange rules to be comprised solely of independent directors or (2) formed solely for the purpose of reviewing, recommending and/or authorizing any transaction in which holders of Class B Stock or their affiliates (other than Reorganized CCI or its subsidiaries) are interested parties.  In addition, CCI's current Chief Executive Officer and Chief Operating Officer will continue in their same positions.

O.      Senior Management.   The CEO and the COO of the Reorganized Company shall be the same as the CEO and COO of CCI on the date hereof.  The CEO and COO shall receive Cash and bonus compensation and benefits on substantially the same terms as (but not less economically favorable than) those contained in their respective employment agreements in effect on the date hereof.  The CEO shall receive (1) long-term incentive compensation having substantially the same value as the long-term incentive compensation contained in his employment agreement in effect on the date hereof, and (2) a waiver with respect to the retention bonus clawback provision contained in his employment agreement in effect on the date hereof.

        Key Executives of the Reorganized Debtors shall be determined by the Board of Directors in consultation with the CEO.  The Reorganized Debtors shall provide Key Executives with Cash and bonus compensation and benefits consistent with (but not less economically favorable than) such Key Executives' respective employment agreements in effect on the date hereof.

P.      Management Incentive Plan and VCP.   The Reorganized Company shall be deemed to have adopted the Management Incentive Plan and VCP on the Effective Date.

K&E: 15083729

Q.    Employee and Retiree Benefits.  Except with respect to any rejected employment agreements, on and after the Effective Date, the Reorganized Debtors may: (1) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation (including equity based and bonus compensation), health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity at any time; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date; provided, however, that the Debtors' or Reorganized Debtors' performance of any employment agreement that is not a rejected employment agreement will not entitle any Person to any benefit or alleged entitlement under any policy, program or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

R.    Creation of Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors shall establish the Professional Fee Escrow Account and reserve an amount necessary to pay all of the Accrued Professional Compensation.

S.    Preservation of Rights of Action.  Subject to the releases set forth in ARTICLE X.D and ARTICLE X.E below, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Further, subject to the releases set forth in ARTICLE X.D and ARTICLE X.D below, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection or repudiation of any Executory Contract during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order or approval of the Bankruptcy Court.

K&E: 15083729

## ARTICLE VII.

### TREATMENT OF EXECUTORY CONTRACTS

A.      <u>Assumption and Rejection of Executory Contracts</u>.  With the exception of Executory Contracts between a Debtor (other than CII) and a CII Settlement Claim Party, which shall be deemed rejected unless set forth in clause (b) of the definition of "CII Settlement Claim," each of the Debtors' Executory Contracts, including the Management Agreement, the Mutual Services Agreement, and the Employment Agreements (subject to the conditions in ARTICLES VI.O and VII.A), shall be deemed assumed as of the Effective Date, unless listed on Exhibit 24 to the Plan Supplement and mutually agreed to by the Debtors, the Requisite Holders, and Mr. Allen.

The Employment Agreements of the CEO and COO shall be modified as set forth in ARTICLE VI.O and be deemed assumed as of the Effective Date.

The Employment Agreements of the Chief Financial Officer, Chief Restructuring Officer, General Counsel and Corporate Secretary, Chief Marketing Officer, and Chief Technology Officer as of the Petition Date shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements, to the extent applicable, to:  (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan; and (iii) include an acknowledgement that, contingent upon the VCP becoming effective as set forth in the Plan, no awards will be granted in 2009 under the Incentive Program in place as of the Petition Date.

The Employment Agreements of the Chief Accounting Officer, Treasurer, SVP–IT, SVP–Business Development, SVP–Customer Operations, SVP–Media, President–West Division and President–East Division shall be deemed assumed as of the Effective Date, contingent upon amending such Employment Agreements to: (i) conform the definition of "Change in Control" to the corresponding definition in the VCP; and (ii) provide that "Good Reason" shall not exist under the Employment Agreements by virtue of the filing of the Chapter 11 Cases or the implementation of the Plan.

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such Executory Contracts in the Plan are effective as of the Effective Date.  Each such Executory Contract assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party prior to the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by such order.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, to alter, amend, modify or supplement the Exhibit of Executory Contracts identified in the Plan Supplement.

B.      <u>Indemnification Obligations</u>.  Notwithstanding anything to the contrary herein, the obligations of the Debtors as provided in the Debtors' respective certificates of incorporation, bylaws, applicable law or other applicable agreements as of the Petition Date to indemnify, defend, reimburse, exculpate, advance fees and expenses to, or limit the liability of directors or officers who were directors or officers of such Debtor at any time prior to the Effective Date, respectively, against any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, shall survive confirmation of the Plan, remain unaffected thereby after the Effective Date and not be discharged, irrespective of whether such indemnification, defense, advancement, reimbursement, exculpation or limitation is owed in connection with an event occurring before or after the Petition Date.  Any Claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

52

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors and officers who were directors or officers of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the Respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors' or officers' rights.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and/or officers' insurance policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

C.      Cure of Defaults for Assumed Executory Contracts.  With respect to each of the Debtors' Executory Contracts to be assumed, the Debtors shall have designated a proposed Cure, and the assumption of such Executory Contract may be conditioned upon the disposition of all issues with respect to Cure.  Any provisions or terms of the Debtors' Executory Contracts to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  Except with respect to Executory Contracts in which the Debtors and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure that differ from the amounts proposed by the Debtors must be Filed with the Notice, Claims and Solicitation Agent on or before the Cure Bar Date.  The Cure Bar Date shall not apply to any franchise or Executory Contract with a state or local franchise authority.  Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged upon payment by the applicable Debtor of the amount listed on the Debtors' proposed Cure schedule, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure.  The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues.  If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract.  Any counterparty to an Executory Contract that fails to object timely to the proposed assumption of any Executory Contract will be deemed to have consented to such assumption.  The Debtors or Reorganized Debtors, as applicable, reserve the right, with the consent of the Requisite Holders and Mr. Allen, either to reject or nullify the assumption of any Executory Contract no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract.

Assumption of any Executory Contract pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time prior to the effective date of assumption.  Any Proof of Claim Filed with respect to an Executory Contract that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

D.      Claims Based on Rejection or Repudiation of Executory Contracts.    Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection or repudiation of the Debtors' Executory Contracts pursuant to the Plan or otherwise must be Filed with the Notice, Claims and Solicitation Agent no later than thirty days after the later of the Effective Date or the effective date of rejection or repudiation.  Any Proofs of Claim arising from the rejection or repudiation of the Debtors' Executory Contracts that are not timely Filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against any Reorganized Debtor without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection or repudiation of the Executory Contract shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

E.      Reservation of Rights.    Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.      Nonoccurrence of Effective Date.    In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

54

## ARTICLE VIII.

### PROCEDURES FOR RESOLVING CLAIMS AND DISPUTES

A.      <u>Allowance of Claims and Interests</u>.  After the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

B.      <u>Claims and Interests Administration Responsibilities</u>.  Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.      <u>Estimation of Claims and Interests</u>.  Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      <u>Adjustment to Claims and Interests Without Objection</u>.  Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  Beginning on the end of the first full calendar quarter that is at least 90 days after the Effective Date, the Reorganized Debtors shall publish every calendar quarter a list of all Claims or Interests that have been paid, satisfied, amended or superseded during such prior calendar quarter.

E.      <u>Disallowance of Claims or Interests</u>.  Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors.  All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order or approval of the Bankruptcy Court.  All Claims Filed on account of an employee benefit shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent the Reorganized Debtors elect to honor such employee benefit, without any further notice to or action, order or approval of the Bankruptcy Court.

F.      <u>Offer of Judgment</u>.  The Reorganized Debtors are authorized to serve upon a Holder of a Claim an offer to allow judgment to be taken on account of such Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment.  To the extent the Holder of a Claim or Interest must pay the costs incurred by the Reorganized Debtors after the making of such offer, the Reorganized Debtors are entitled to setoff such amounts against the amount of any distribution to be paid to such Holder without any further notice to or action, order, or approval of the Bankruptcy Court.

G.      <u>Amendments to Claims</u>.  On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

56

**ARTICLE IX.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      Distributions on Account of Claims and Interests Allowed As of the Effective Date.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Claims and Interests Allowed on or before the Effective Date shall be made on the Distribution Date; provided, however, that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice, and (2) Allowed Priority Tax Claims, unless otherwise agreed, shall be paid in full in Cash on the Distribution Date.

B.      Distributions on Account of Claims and Interests Allowed After the Effective Date.

        1.      Payments and Distributions on Disputed Claims.  Except as otherwise provided in the Plan, a Final Order, or as agreed to by the relevant parties, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim or Interest; provided, however, that (a) Disputed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in full in Cash on the Periodic Distribution Date that is at least thirty (30) days after the Disputed Claim becomes an Allowed Claim.

        2.      Special Rules for Distributions to Holders of Disputed Claims.  Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

C.      Delivery of Distributions.

        1.      Record Date for Distributions.  On the Effective Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded Certificate is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

        2.      Distribution Agent.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer shall be deposited with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement.

        3.      Delivery of Distributions in General.  Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the

57

Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf.  Distributions under the Plan on account of Allowed Claims and Interests shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim or Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.      <u>Compliance Matters</u>.  In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.      <u>Undeliverable Distributions</u>.  If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder on the next Periodic Distribution Date.  Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

6.      <u>Reversion</u>.  Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors.  Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary.  The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

7.      <u>Manner of Payment Pursuant to the Plan</u>.  Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer.  Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

8.      <u>Surrender of Cancelled Instruments or Securities</u>.  On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer).  Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate.  Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

D.      Claims Paid or Payable by Third Parties.

1.      Claims Paid by Third Parties.  The Notice, Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties.  No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged to the extent of any agreed upon satisfaction on the Claims Register by the Notice, Claims and Solicitation Agent without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court.

E.      Allocation Between Principal and Accrued Interest.  Except as otherwise provided in the Plan (e.g., in Class H-4), the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

K&E: 15083729

# ARTICLE X.

## EFFECT OF PLAN CONFIRMATION

A.      <u>Discharge of Claims and Termination of Interests</u>.  Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such debt, right or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed Cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

B.      <u>Compromise and Settlement of Claims and Controversies</u>.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such an Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

C.      <u>CCO Credit Facility</u>.  Without reservation or qualification, the Debtors (1) irrevocably waive and abjure any right to engage in any additional borrowing under the reinstated CCO Credit Facility, and (2) commit to Cash collateralize, if required by section 1124 of the Bankruptcy Code, by the Effective Date, any letters of credit issued pursuant to the CCO Credit Facility that remain outstanding as of the Effective Date.

**D.      <u>Releases by the Debtors</u>.  On the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees (as defined below), including:  (1) the discharge of debt and all other good and valuable consideration paid pursuant to the Plan; (2) the obligations of the Holders of Claims party to Plan Support Agreements to provide the support necessary for the Effective Date of the Plan; and (3) the services of the Debtors' present and former officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to each Releasing Party, including each other Debtor, and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates and representatives (collectively, the "<u>Debtor Releasees</u>" (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Debtor Releasee in their own right (whether individually or collectively) or that any Holder of a Claim or Interest or other Entity, would**

60

have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law; provided, however, that the foregoing "Debtor Release" shall not operate to waive or release any person or Entity other than a Releasing Party from any causes of action expressly set forth in and preserved by the Plan.  Notwithstanding anything in the Plan to the contrary, the Debtors or the Reorganized Debtors will not release any Causes of Action that they may have now or in the future against the Non-Released Parties.

E.      Third Party Releases.  On the Effective Date and effective as of the Effective Date, the Holders of Claims and Interests shall be deemed to provide a full discharge and release to the Debtor Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtors, including those in any way related to the Chapter 11 Cases or the Plan; provided, that the foregoing "Third Party Release" shall not operate to waive or release any person or Entity (other than a Debtor Releasee) from any Causes of Action expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, and provided further that the foregoing "Third Party Release" shall not impair the rights (a) to which an Allowed Unimpaired Claim entitles the Holder of such Allowed Unimpaired Claim or (b) of a Holder of a General Unsecured Claim as to any General Unsecured Claim.  Notwithstanding anything in the Plan to the contrary, the Releasing Parties will not release any Causes of Action that they, the Debtors or the Reorganized Debtors may have now or in the future against the Non-Released Parties.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third Party Release, and further, shall constitute its finding that the Third Party Release is:  (1) in exchange for the good and valuable consideration provided by the Debtor Releasees, a good faith settlement and compromise of the claims released by the Third Party Release; (2) in the best interests of the Debtors and all Holders of Claims; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Holders of Claims and Interests asserting any claim released by the Third Party Release against any of the Debtor Releasees.

Nothing in the Confirmation Order or the Plan shall affect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including any claim arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States or any state and local authority against the Released Parties, nor shall anything in the Confirmation Order or the Plan enjoin the United States Government or any of its agencies or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state or local authority, nor shall anything in the Confirmation Order or the Plan exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, federal securities laws, the environmental laws or any criminal laws of the United States Government or any of its agencies or any state and local authority against the Released Parties.    This paragraph, however, shall in no way affect or limit the discharge granted to the Debtors under sections 524 and 1141 of the Bankruptcy Code.

F.      Injunction.  From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order.

G.      Exculpation.  The Exculpated Parties shall neither have, nor incur any liability to any Entity for any pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Effective Date of the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon

61

the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; **provided further,** that the foregoing "**Exculpation**" shall not apply to any acts or omissions expressly set forth in and preserved by the Plan, the Plan Supplement or related documents, except for acts or omissions of Releasing Parties.

H.      Protection Against Discriminatory Treatment.  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend or refuse to renew a license, permit, charter, franchise or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom such Reorganized Debtors have been associated, solely because one of the Debtors has been a debtor under chapter 11, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtor is granted or denied a discharge) or has not paid a debt that is dischargeable in the Chapter 11 Cases.

I.      **Setoffs and Recoupment.  The Debtors may setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against such claimant.**

**In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.**

**In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.**

J.      **Release of Liens.  Except as otherwise provided in the Plan (including as to reinstated debt) or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.**

K.      Document Retention.  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their current document retention policy, as may be altered, amended, modified or supplemented by the Reorganized Debtors in the ordinary course of business.

L.      Reimbursement or Contribution.  If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date:  (1) such Claim has been adjudicated as noncontingent or (2) the relevant Holder of a Claim has Filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

K&E: 15083729

## ARTICLE XI.

### ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE EXPENSE CLAIMS

A.    Professional Claims.

1.    Final Fee Applications.  All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.    Payment of Interim Amounts.  Except as otherwise provided in the Plan, Professionals shall be paid pursuant to the Interim Compensation Order.

3.    Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors (other than Reorganized CII) shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.  Such funds shall not be considered property of the Reorganized Debtors.  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than Reorganized CII) from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Claims by Professional have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors (other than Reorganized CII).

4.    Professional Fee Reserve Amount.  To receive payment for unbilled fees and expenses incurred through the Effective Date, on or before the Effective Date, the Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors (other than CII).  If a Professional does not provide an estimate, the Reorganized Debtors (other than Reorganized CII) may estimate the unbilled fees and expenses of such Professional; provided, however, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.    Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall, in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court, pay in Cash the reasonable legal, Professional or other fees and expenses incurred by that Reorganized Debtor after the Effective Date pursuant to the Plan.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.    Substantial Contribution Compensation and Expenses.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, and as otherwise required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

7.    Indenture Trustee, Administrative Agent, and Collateral Trustee Fees, and Indemnification Obligations.  Unless otherwise ordered by the Bankruptcy Court or specifically provided for in the Plan, all reasonable fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) that are provided for under the respective indentures or credit agreements shall be paid in full in Cash without a reduction to the recoveries of applicable Holders of Allowed Claims as soon as reasonably practicable after the Effective Date.  Notwithstanding the foregoing, to the extent any fees or expenses of the indenture trustees, the administrative agents, and the collateral trustees are not paid (including, without limitation, any fees or expenses incurred in connection with any unresolved litigation relating to Disputed Claims),

63

the indenture trustees, the administrative agents, and the collateral trustees may assert their charging liens against any recoveries received on behalf of their respective Holders for payment of such unpaid amounts. The contractual indemnification obligations of the Debtors (other than CII) to these Professionals shall be reinstated as unsecured obligations of the Reorganized Debtors (other than Reorganized CII). All disputes related to the fees and expenses of the indenture trustees, administrative agents, and collateral trustees (and their counsel, agents, and advisors) shall be subject to the jurisdiction of and decided by the Bankruptcy Court. Notwithstanding anything to the contrary herein, this Article XI.A.7 will not apply to Claims rendered Unimpaired by the Plan.

8.    <u>Other Fees</u>. The Debtors (other than CII) shall promptly pay the reasonable, documented out-of-pocket fees and expenses of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., and UBS Securities LLC, the legal and financial advisors engaged by the Crossover Committee, without Paul, Weiss, Rifkind, Wharton & Garrison LLP, Houlihan Lokey Howard & Zukin Capital, Inc., or UBS Securities LLC having to file fee applications to receive payment for such fees and expenses.

The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees and expenses incurred by the members of the Crossover Committee in connection with the negotiation of the Plan, as well as their due diligence review and the approval and consummation of the transactions contemplated by the Plan, without such members of the Crossover Committee having to file fee applications to receive payment for such fees and expenses.

The Debtors (other than CII) shall pay the reasonable, documented out-of-pocket fees incurred by the members of the Creditors' Committee.

B.    <u>Other Administrative Expense Claims</u>. All requests for payment of an Administrative Expense Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable. The Reorganized Debtors may settle and pay any Administrative Expense Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court. In the event that any party with standing objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed by Final Order.

K&E: 15083729

# ARTICLE XII.

## CONDITIONS PRECEDENT TO EFFECTIVE DATE

A.      <u>Conditions Precedent to Effective Date</u>.  The following shall be satisfied or waived as conditions precedent to the Effective Date.

1.      The Bankruptcy Court shall have approved the Disclosure Statement, in a manner acceptable to the Debtors, the Requisite Holders and Mr. Allen, as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.      The final version of the Plan, the Plan Supplement and all of the documents and exhibits contained therein shall have been Filed and approved in form and substance reasonably acceptable to the Debtors, the Requisite Holders and Mr. Allen.

3.      The Bankruptcy Court shall enter the Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Requisite Holders and Mr. Allen, and such order shall not have been stayed or modified or vacated on appeal.

4.      All governmental, regulatory, and material third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated herein shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions.

5.      All consents, approvals and waivers necessary in connection with the transactions contemplated herein with respect to Franchises (as defined in the Communications Act of 1934, as amended, 47 U.S.C. Sections 151 et seq.) or similar authorizations for the provision of cable television service in areas serving no less than 80% of CCI's individual basic subscribers in the aggregate at such time shall have been obtained, unless the condition set forth in this clause shall have been waived by the Requisite Holders and Mr. Allen.

6.      The Confirmation Date shall have occurred.

7.      The Debtors shall have received the funds contemplated by the Commitment Letters and the New CCH II Notes Commitment Parties shall have fulfilled all of the obligations under the Commitment Letters.

B.      <u>Waiver of Conditions Precedent</u>.  The Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite Holders and Mr. Allen, may waive any of the conditions to the Effective Date set forth above at any time, without any notice to parties in interest and without any further notice to or action, order or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm the Plan.  The failure of the Debtors or Reorganized Debtors, as applicable, the Requisite Holders or Mr. Allen to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right, which may be asserted at any time.

C.      <u>Effect of Non-Occurrence of Conditions to the Effective Date</u>.  Each of the conditions to the Effective Date must be satisfied or duly waived, and the Effective Date must occur within 180 days after Confirmation, or by such later date established by Bankruptcy Court order.  If the Effective Date has not occurred within 180 days of Confirmation, then upon motion by a party-in-interest made before the Effective Date and a hearing, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, the Confirmation Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion.  If the Confirmation Order is vacated, then except as provided in any order of the Bankruptcy Court vacating the Confirmation Order, the Plan will be null and void in all respects, including the discharge of Claims and termination of Interests pursuant to the Plan and section 1141 of the Bankruptcy Code and the assumptions, assignments or rejections of Executory Contracts, and nothing contained in the Plan or Disclosure Statement shall:  (1) constitute a waiver or release of any Claims, Interests or Causes of

65

Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

K&E: 15083729

## ARTICLE XIII.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      <u>Modification or Amendments</u>.  Except as otherwise specifically provided in the Plan, and subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw or to alter, amend or modify materially the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, subject to the terms of the Plan Support Agreement and conditions to the Effective Date.  Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the Debtors' private website at http://www.kccllc.net/charter. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.      <u>Effect of Confirmation on Modifications</u>.  Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      <u>Revocation or Withdrawal of Plan</u>.  Subject to the Plan Support Agreements and conditions to the Effective Date, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void with the exception of the Plan Support Agreements; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

67

## ARTICLE XIV.

### RETENTION OF JURISDICTION

A.      Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.      Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

68

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

69

**ARTICLE XV.**

**MISCELLANEOUS PROVISIONS**

A.        Immediate Binding Effect.  Notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtors.

B.        Additional Documents.  On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.        Payment of Statutory Fees.   All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.        Reservation of Rights.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.        Successors and Assigns.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

F.        Service of Documents.

        1.        After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

70

| Debtors | Counsel to Debtors |
|---|---|
| Charter Communications, Inc.<br>12405 Powerscourt Drive, Suite 100<br>St. Louis, Missouri 63131-3660<br>Attn.:    Gregory L. Doody, Esq. | Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn.:    Richard M. Cieri, Esq.<br>            Paul M. Basta, Esq.<br>            Stephen E. Hessler, Esq.<br><br>- and -<br><br>Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn.:    Ray C. Schrock, Esq. |
| **Counsel to CII** | **United States Trustee** |
| Togut, Segal & Segal, LLP<br>One Penn Plaza<br>New York, New York 10119<br>Attn.:    Albert Togut, Esq.<br>            Frank Oswald, Esq. | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.:    Paul K. Schwartzberg, Esq. |
| **Counsel to the Agent for the Debtors' Prepetition First Lien Facility** | **Counsel to the Crossover Committee** |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.:    Peter V. Pantaleo, Esq. | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, New York 10019-6064<br>Attn.:    Alan W. Kornberg, Esq.<br>            Kenneth M. Schneider, Esq. |
| **Counsel to the Creditors' Committee** | |
| Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, New York 10036-8704<br>Attn.:    Mark R. Somerstein, Esq.<br>            Keith H. Wofford, Esq. | |

2.    After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

3.    In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition). Mailing and publication of the Notice of Confirmation in the time and manner set forth in this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

G.    <u>Term of Injunctions or Stays</u>. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in

K&E: 15083729

the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.        Entire Agreement.  On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.         Governing Law.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

J.         Exhibits.  All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/charter or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.        Nonseverability of Plan Provisions upon Confirmation.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Crossover Committee, and Mr. Allen; and (3) nonseverable and mutually dependent.

L.        Closing of Chapter 11 Cases.  The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

M.        Waiver or Estoppel.  **Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

N.        Conflicts.  Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

K&E: 15083729

New York, New York
Dated:  July 15, 2009

CHARTER COMMUNICATIONS, INC. (for itself and all other Debtors, except CII)

By: _/s/ Neil Smit_____
Name:_ Neil Smit_____
Title:_ Chief Executive Officer, President and Director


CHARTER INVESTMENT, INC.

By: _/s/ William L. McGrath_____
Name:_ William L. McGrath_____
Title: _ Vice President_____

73