| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | ) | |
| | ) | 09-11435(JMP) |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |
| In re: | ) | |
| | ) | Chapter 11 |
| CHARTER COMMUNICATIONS OPERATING, LLC, | ) | |
| | ) | 09-11449 (JMP) |
| | ) | |
| Debtor. | ) | |
| | ) | |

**MOTION OF JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT, FOR (I) A STAY PENDING APPEAL OF THE ORDER CONFIRMING CHARTER COMMUNICATION OPERATING, LLC'S PLAN OF REORGANIZATION AND (II) CERTIFICATION OF ITS APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT PURSUANT TO 28 U.S.C. 158(d)(2)**

Peter V. Pantaleo
Bruce D. Angiolillo
Mary Elizabeth McGarry
Bryce L. Friedman
George S. Wang
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
(212) 455-2000
(212) 455-2502 (fax)
*Attorneys for JPMorgan Chase Bank, N.A.*

**Table of Contents**

Page

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ..........................................................................................................9

I.    Charter Was A Paul Allen Company With A Complex Capital
      Structure..........................................................................................................9

II.   Charter Borrows $250 Million From The Lenders Based On A
      Misrepresentation...........................................................................................10

III.  The Fall 2008 Credit Crisis Led Charter To Give Control To
      Bondholders ....................................................................................................11

IV.   The Bankruptcy Filings And Acceleration Of Designated Holding
      Companies' Debt .............................................................................................13

ARGUMENT.............................................................................................................13

I.    The Court Should Stay The Confirmation Order Pending Appeal ...........................13

      A.   There Is A Substantial Likelihood That The Lenders Will
           Prevail On Appeal By Showing That The Court Misconstrued
           The Credit Agreement As A Matter Of Law .............................................14

           1.   The Lenders Will Succeed On Their Argument That
                There Is A Change Of Control Default And No
                "Restructuring Exception" To Section 13(d) Of The
                Exchange Act ..............................................................................15

           2.   The Lenders Will Prevail Because The Plan Does Not
                Cure Cross-Acceleration Defaults ....................................................19

           3.   The Lenders Will Prevail Because The Plan
                Disregards Incurable Defaults Resulting From
                Misrepresentations That CCO Made To The Lenders......................21

                a.   The Credit Agreement Requires CCO To
                     Represent And Warrant That The Designated
                     Holding Companies Are Able To Pay Their
                     Upcoming Debt Obligations .................................................21

                b.   The Business Judgment Rule Cannot Negate
                     CCO's Breach Of The Credit Agreement.............................24

|  | c. | There Is No Evidence In The Record To Suggest CIH And CCH Could Pay Their Debts Through April 2009 ................................................................25 |
|---|---|---|
|  | B. | The Possibility Of Irreparable Harm To The Lenders Through Loss Of Its Appellate Rights Weighs In Favor Of A Stay.............................27 |
|  | C. | Any Harm To Other Parties Caused By A Stay Will Be Minimal...............................................................................................29 |
|  | D. | Public Interests Overwhelmingly Favor Issuance Of A Stay ........................30 |
|  | E. | No Bond Is Required ...............................................................................30 |
| II. |  | The Lenders' Appeal Should Be Certified To The Second Circuit ............................32 |
|  | A. | There Is No Controlling Authority ................................................................33 |
|  | B. | The Lenders' Appeal Implicates Matters Of Public Importance ..................34 |
|  | C. | A Direct Appeal To The Second Circuit Will Materially Advance The Progress Of The Case ............................................................34 |

CONCLUSION........................................................................................................................35

# Table of Authorities

## Cases

*ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337 (S.D.N.Y. 2007) ...................................................... passim

*Aetna Cas. & Sur. Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772 (2d Cir. 1996) ................................................................................. 28

*Allianz Ins. Co. v. Cavagnuolo*, No. 03 Civ. 1636, 2004 WL 1048243, (S.D.N.Y. May 7, 2004) .......................................................................................... 32

*Bank of N.Y. Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009) ...................................... passim

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) .............................................................................................................. 4

*Citibank, N.A. v. Outdoor Resorts of Am., Inc.*, No. 91 CIV. 1407 (MBM), 1992 WL 162926 (S.D.N.Y. June 29, 1992) ......................................................... 24

*Clarke v. Parkinson*, 225 F. Supp. 2d 345 (S.D.N.Y. 2002) ........................................... 24

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136 (2d Cir. 2005) .......................................... 13

*Downtown Athletic Club of N.Y. City, Inc. v. Caspi Dev. Corp. (In re Downtown Athletic Club of N.Y. City, Inc.)*, No. 98 B 41419 JLG, 1998 WL 898226 (Bankr. S.D.N.Y. Dec. 21, 1998) ................................................ 15

*Drexel Burnham Lambert Prod. Corp. v. MCorp.*, No. 88C-NO-80, 1989 Del. Super. LEXIS 69 (Del. Super. Ct. Feb. 23, 1989) ......................................... 23

*EEOC v. McLean Trucking Co.*, 834 F.2d 398 (4th Cir. 1987) ...................................... 29

*Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1999 WL 4892 (S.D.N.Y Jan. 5, 1999) ............................................................................................ 25

*Frito Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944 (2d Cir. 1993) ................................................................................................... 28, 29

*Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1 (1st Cir. 2007) ......................... 7, 20

*Great Sw. Corp.*, SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972) ............................................................... 4, 17, 18

*Hickey v. City of New York (In re World Trade Center Disaster Site Litig.),*
503 F.3d 167 (2d Cir. 2007)..........................................................................13, 14, 27

*Hirschfeld v. Board of Elections in the City of N.Y.*, 984 F.2d 35 (2d Cir.
1993) ........................................................................................................................ 14

*In re "Agent Orange" Prod. Liab. Litig.*, 804 F.2d 19 (2d Cir. 1986)............................ 28

*In re 7th St. & Beardsley P'ship*, 181 B.R. 426 (Bankr. D. Ariz. 1994) ................... 15, 20

*In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524 (7th Cir.
1986) ......................................................................................................................... 7

*In re City of Bridgeport*, 129 B.R. 332 (Bankr. D. Conn. 1991) ...................................... 23

*In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182 (B.A.P. 2d
Cir. 1996) ................................................................................................................ 27

*In re Grandview Estates Assocs., Ltd.*, 89 B.R. 42 (Bankr. W.D.Mo. 1988) ................. 28

*In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381 (10th Cir. 1998)............................... 22

*In re Liljeberg Enterprises, Inc.*, 304 F.3d 410 (5th Cir. 2002)...................................... 21

*In re Sphere Holding Corp.*, 162 B.R. 639 (E.D.N.Y. 1994) ........................................... 31

*In re Town of Westlake, Tex.*, 211 B.R. 860 (Bankr. N.D. Tex. 1997)............................ 22

*In re United Merchs. & Mfrs., Inc.*, 138 B.R. 426 (D. Del. 1992).................................... 31

*In re WorldCom, Inc.*, 546 F.3d 211 (2d Cir. 2008) ....................................................... 15

*Mohammed v. Reno*, 309 F.3d 95 (2d Cir. 2002)............................................................. 14

*Nichols v. Am. Risk Mgmt.*, No. 89 CIV. 2999 (JSM), 1998 WL 655526
(S.D.N.Y. Sept. 24, 1998) ...................................................................................... 25

*Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow
Corning Corp.)*, 456 F.3d 668 (6th Cir. 2006)................................................ 5, 7, 20

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007)......................................................3, 16, 18

*Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir. 1959) ..................................................... 7, 20

*Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA. (In re Suprema
Specialties, Inc.)*, 330 B.R. 93 (S.D.N.Y. 2005).................................................... 14

*St. Johnsbury Trucking*, 185 B.R. 687 (S.D.N.Y. 1995) ................................... 28, 29, 30

*Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300 (2d Cir. 1996)................................................ 19

*U.S. v. City of Fulton,* 475 U.S. 657, 106 S.Ct. 1422 (1986)............................................ 19

*Weaver v. Mobile Diagnostic*, Civ. No. 02-1719, 2009 WL 1230297 (W.D. Pa. Apr. 30, 2009)........................................................................................................ 25

*Weber v. U.S. Trustee*, 484 F.3d 154 (2d Cir. 2007) ........................................... 32, 33, 34

## Statutes

11 U.S.C. § 1124..................................................................................... 14, 19, 20, 32

11 U.S.C. § 1129(a)(8)................................................................................... 33

11 U.S.C. § 365(b)(2) ................................................................................. 20, 33

15 U.S.C. § 78m(d)(3) .................................................................................... 15

28 U.S.C. § 158(d)(2) ............................................................................. 1, 32, 34

Federal Rule of Bankruptcy Procedure 3020(e) ............................................. 27

Federal Rule of Bankruptcy Procedure 8005................................................ 1, 34

## Other Authorities

*Oxford English Dictionary* (2d ed. 1989) .................................................... 14

JPMorgan Chase Bank, N.A. ("JPMorgan"), as Administrative Agent for

prepetition secured lenders (the "Lenders") to Charter Communications Operating, LLC ("CCO"

or the "Borrower") hereby moves for an order (i) staying the Court's Confirmation Order[1] to the

extent it provides for approval of CCO's Plan of Reorganization (the "Plan") pending appeal

pursuant to Federal Rule of Bankruptcy Procedure 8005 and (ii) certifying JPMorgan's appeal to

the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2). In

support of its motion, JPMorgan respectfully states as follows:

## PRELIMINARY STATEMENT

The Confirmation Order is the first of its kind. It compels financial institutions to

lend a post-bankruptcy reorganized company $8.4 billion, on pre-bankruptcy terms, over the

Lenders' objection. Before the Confirmation Order, no court in this Circuit has ever ordered a

financial institution to lend any money to a reorganized company on the purported authority of

Section 1124 of the Bankruptcy Code, let alone the billions at issue here. By forcing unwilling

lenders to provide cheap acquisition financing to a group of investors on pre-bankruptcy terms—to

a Borrower that was solvent when it filed for bankruptcy—the Confirmation Order is truly

extraordinary and represents the culmination of what the Court described as a "calculated gamble."

This highly controversial exercise of the Court's power should be stayed pending appellate review.

A stay is appropriate because there is a very substantial likelihood of success on the

Lenders' appeal. The Confirmation Order does not cite and eschews controlling precedent. It

effectively creates bankruptcy/restructuring exceptions to basic principles of New York contract

---

[1]  References to the "Confirmation Order" are to the Court's Opinion On Confirmation Of
Plan Of Reorganization And Adjudication Of Related Adversary Proceeding [Dkt. No.
920] and related Findings Of Facts, Conclusions of Law, And Order Confirming Debtors'
Joint Plan Of Reorganization Pursuant To Chapter 11 Of The United States Bankruptcy
Code [Dkt. No. 921].

law and Section 13 of the Securities and Exchange Act of 1934 (the "Exchange Act"). It embodies the false notion that the current difficult economic times have granted the Court new powers. A stay will cause harm to no one. Charter's business will continue to exceed its pre-bankruptcy performance and its operations will proceed as usual.[2] On the other hand, the absence of a stay will raise the possibility that Charter will take steps to attempt to render the Lenders' appeal moot to avoid a full appellate hearing on these highly significant legal issues. This case is important enough to the parties and the public—and the likelihood of success on appeal is so great—that even a very small chance that the Lenders will suffer the irreparable harm of a loss of their appellate rights on mootness grounds warrants a stay.

### Legal Error 1: Change of Control

First, the Confirmation Order effectively established that change of control defaults in multi-billion dollar credit agreements will not be enforced in restructurings. Prior to the bankruptcy, Charter was controlled by "Paul Allen, co-founder of Microsoft and a public figure due to his personal wealth and accomplishments." *See* Opinion On Confirmation Of Plan Of Reorganization And Adjudication Of Related Adversary Proceeding ("Op.") at 6. The Court found that after bankruptcy "no one seriously disputes that Mr. Allen is walking away from his investment in Charter. . . . In practical terms, Charter will cease to be a Paul Allen company. . . . His exit clears the way for new investors to influence the management of a restructured Charter." Op. at 8. The change of control provisions of the Credit Agreement[3] do not require the Lenders to

---

[2]     References to "Charter" are to the Debtors in these jointly administered cases including Charter Communications, Inc. ("CCI") and its affiliates.

[3]     References to the "Credit Agreement" are to the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated as of March 6, 2007, among CCO, CCO Holdings, LLC ("CCO Holdings" or "CCOH"), the several lenders from time to time party thereto, the Administrative Agent and certain other parties.

loan CCO a dime if a "group" (as defined in Section 13(d) of the Exchange Act) controls more of Charter than does Mr. Allen. The Confirmation Order's finding that the new controlling shareholders of Charter—bondholders Apollo Management L.P., Crestview Partners L.P., Oaktree Capital Management L.P. and Franklin Advisors, Inc. (the "Bondholders")—are not a 13(d) group because they formed a group that acquired and divided among themselves more than $1.6 billion of new Charter equity *in the context of restructuring* is plain legal error and contrary to the United States Securities and Exchange Commission's (the "SEC's") position on the issue for the last 37 years.

The Confirmation Order does not cite to the controlling Second Circuit precedent on how to apply Section 13(d). To constitute a "group," there need be simply a showing that the group members "acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer." *Roth v. Jennings*, 489 F.3d 499, 504 (2d Cir. 2007) (internal citations omitted). All that is required is that the group members "reached an understanding to act in concert." *See Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982), *cert. denied*, 460 U.S. 1069 (1983). Applying the Court's own factual findings to the correct legal standard yields only one conclusion—the Bondholders are a "group" within the meaning of Section 13(d) of the Exchange Act. The Court found the Bondholders were "working together to maximize their investments in Charter and to achieve common economic goals." Op. at 24. With their debt about to be wiped out, the Bondholders were "working cooperatively," Op. at 25, and "collectively . . . in a coordinated fashion," Op. at 26, to achieve the goal of converting their debt holdings to equity and investing and dividing up among themselves $1.6 billion of new equity, thus working together to acquire equity securities of Charter.

The Confirmation Order buries these plain facts that establish a "group" under a non-existent "restructuring exception." The Confirmation Order asserts that because the Bondholders are working together for the beneficial purpose of restructuring a distressed company, they are not a "group." Op. at 25-26. This judicial invention not only is unsupported by any authority, but also flatly contradicts the SEC's 37-year-old pronouncement in *Great Southwest. Corporation,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972), that creditors acting together in a restructuring that end up with equity are a "group" within the meaning of Section 13(d). By declining to find a group here because the group consists of bondholders converting their debt to equity in a restructuring, the Confirmation Order effectively overrules the SEC's interpretation of Section 13(d). *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). This action must be subject to appellate review and ought not be allowed to take effect until that review is complete.

## Legal Error 2: Cross-Acceleration Default

The second legal issue that warrants a stay is the Confirmation Order's refusal to enforce the cross-acceleration default in the Credit Agreement against a solvent debtor and force the Lenders to extend credit notwithstanding a default; specifically, it is a default by CCO under the Credit Agreement if more than $200 million of debt of certain "Designated Holding Companies" (certain affiliates of the solvent Borrower) is accelerated. The Court found that four different Designated Holding Companies each had over $200 million in debt accelerate on March 27, 2009 when they each filed for bankruptcy. The Court reasoned that the default of the Designated Holding Companies under their debt was a default that is "conditioned on . . . the

insolvency or financial condition of the debtor [*i.e.* CCO]." Op. at 45. There is no reading of the contract or the law that allows the conclusion that a default conditioned on the financial condition of a Designated Holding Company is, in fact, a default conditioned on the financial condition of CCO. CCO is not a Designated Holding Company. CCO is solvent. A default based on a Designated Holding Company's financial condition cannot be one conditioned on CCO's financial condition when CCO is not a Designated Holding Company. And because CCO is solvent, "the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties." *Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 679 (6th Cir. 2006).

### Legal Error 3: Misrepresentation Default

When CCO borrowed $250 million prior to but knowing it was going to file for bankruptcy, CCO represented that the Designated Holding Companies were able to pay their debts as they become due. Until the Confirmation Order, courts uniformly concluded that the language of this representation (in the Bankruptcy Code and contracts) means that CCO represented that the Designated Holding Companies would be able to pay debts as they come due in the future. The Confirmation Order decided otherwise, holding that the representation refers to the ability to pay debts that had already become due because it is "too hard" to make a judgment about ability to pay in the future—even though that is what accountants and courts do every day. This is a plainly erroneous contract interpretation on which the Confirmation Order is forcing the Lenders to make $8.4 billion available to CCO on below market terms to benefit a group of bondholders who are taking control of the post-reorganized Company. Tellingly, the Confirmation Order also tried to apply the provision as written and sought to determine whether the Designated Holding Companies were able to pay their debts due in the future. The Court concluded that the Designated Holding

Companies could pay in the future because they could have used "inter-company transfers." Op. at 38. However, the record is devoid of any support for this proposition. There is no evidence—none—to support this proposition. All the testimony from witnesses on both sides was that intercompany transfers were absolutely not available to pay the Designated Holding Companies' debts due in April 2009. That is why the Designated Holding Companies filed for bankruptcy at the end of March 2009. That is why Charter's auditor, KPMG LLP, provided a going concern qualification in connection with its audit of Charter's 2008 financials. The representation that the Designated Holding Companies could pay their debts when due, which the Borrower made when it borrowed $250 million, and made again when it attempted to borrow more funds in February 2009, a month before the Designated Holding Companies' bankruptcy filings, was false when made. Further, contrary to the Court's holding, it is well-settled law that the business judgment rule does not negate CCO's false representation. Under the terms of the Credit Agreement, the issue is whether the Designated Holding Companies had adequate sources of liquidity to pay their debts as they become due when the representation was made, not whether Charter's Board believed they could pay. The Court should have enforced the Credit Agreement as written.

*     *     *

The Court simply lost sight of the fact that CCO, the Borrower under the Credit Agreement, was solvent and able to pay all its creditors in full. Indeed, the only reported case with a fact pattern similar to the one here reached the opposite conclusion and refused to require the lenders to reinstate their loan on pre-bankruptcy terms under the pre-Code bankruptcy law. In an opinion drafted by Judge Posner, the Seventh Circuit concluded that the bank debt must be paid back in full and not reinstated at pre-bankruptcy terms because, where—as here—all other creditors of the solvent debtor at issue are being paid in full, a creditor's contractual rights

6

(including the right to acceleration and to not lend on pre-petition terms) must be enforced. *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986). Judge Posner's analysis is equally applicable here:

> [The debtor] has offered to give the debenture holders an ironclad guarantee that they will get 5 percent a year until 2055 and the full principal then; and given [the debtor's] net worth, such a guarantee should not be hard to arrange. So the debenture holders will do no worse than if there had been no default.
>
> Nevertheless, the district judge did not err in allowing acceleration. *The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full.* All of the [debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. The only competing equities are those of [the debtor's] shareholders, and are weak.

*Id.* at 527 (emphasis added). Consistent with Judge Posner's decision, the law in every Circuit is that where, as here, the debtor is solvent, a bankruptcy court's role is simply to enforce creditors' rights according to the terms of the contracts that created those rights.[4] Here, the Court specifically found that CCO is a solvent entity, but it nonetheless deprived the Lenders the benefit of their bargain by declining to enforce defaults of the Credit Agreement that entitle the Lenders to immediate repayment under the Credit Agreement, and instead required the lenders to extend credit on pre-bankruptcy terms as if the defaults never happened. *See* Op. at 44-47.

\*     \*     \*

---

[4] *Gencarelli v. UPS Capital Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) (when a debtor is solvent "the bankruptcy rule is that where there is a *contractual* provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision"); *Official Comm. Of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties . . . ."); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (where the debtor is solvent, "it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act").

In addition to a stay of the Confirmation Order, the Lenders' appeal should be certified for direct appeal to the Second Circuit pursuant to 28 U.S.C. § 158(d)(2) because (i) it involves a question of law as to which there is no controlling decision; (ii) involves a matter of public importance; and (iii) an immediate appeal may materially advance the progress of the case. First, the Court described the legal issues presented in this case as "unusually complex." Op. at 9. But the Confirmation Order does not cite to a single published opinion, much less Second Circuit authority, allowing reinstatement of a first-lien senior secured credit facility under Section 1124. No such case exists. Nor is there any case that supports the Court's subsidiary legal determinations that:

- A group of bondholders, working in concert for the pursuit of a common objective, who enter restructuring agreements to acquire the equity securities of a public company, are not a "group" within the meaning of Section 13(d) of the Exchange Act.

- A credit agreement default triggered by the acceleration of debt of a non-party to the agreement is *ipso facto* and excused from cure under Sections 365(b)(2) and 1124 of the Bankruptcy Code.

- The language "ability to pay debts as they become due" in the Credit Agreement sets forth a backwards looking/retrospective test.

These are each recurring legal questions for which an immediate Second Circuit decision would be helpful to the bar and financial community.

Second, "[t]he issues presented are important ones." Op. at 9. This case presents "perhaps the largest and most complex prearranged bankruptc[y] ever attempted." Op. at 7. It is "highly visible" and has "generated considerable public interest." Op. at 6. Whether there is an exemption from change of control covenants in bank loan agreements for restructurings (as the Court effectively held) is an important issue to financial institutions and their commercial borrowers. It is the kind of decision affecting senior lenders that, as the Fifth Circuit noted in comparable circumstances, can "destabilize[] the credit market for financially troubled

companies." *Bank of N.Y. Trust Co., N.A. v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 245 n.19 (5th Cir. 2009). Thus, it clearly involves a matter of public importance.

Lastly, a direct appeal to the Second Circuit would materially advance the progress of this case. This "has been . . . one of the most hotly contested confirmation battles ever conducted." Op. at 6. There were 29 witnesses over 19 trial days, 321 pages of pre-trial briefs, 658 pages of post-trial briefs and an 82-page opinion from the Court. The dollar amounts involved are significant and the resources devoted to this reorganization and litigation are extraordinary. The issues are of such importance to the parties and the public that this matter will inevitably reach the Second Circuit. That day should not wait, especially in light of Charter's purported desire to move through the litigation process as quickly as possible to emerge from bankruptcy and the Lenders' willingness to participate in an expedited appeal process.

## BACKGROUND

### I.     Charter Was A Paul Allen Company With A Complex Capital Structure

Charter, the nation's fourth largest cable company, is an amalgam of cable providers cobbled together through an investment by its controlling shareholder Paul Allen, co-founder of Microsoft. It is a "large operationally sound business." Op. at 9. Pre-bankruptcy, Mr. Allen controlled approximately 91% of the equity votes of the public holding company, Charter Communications, Inc. ("CCI"), and had the power to elect all of Charter's Board. *See* Angiolillo Aff. Ex. A (Disclosure Statement) at 15.

JPMorgan is agent for the first-lien secured lenders to Charter subsidiary, CCO, of an $8.4 billion credit facility. CCO has, at all times, been solvent.[5] Nonetheless, the Charter enterprise is highly leveraged and the credit market dislocation in the fall of 2008 was a shock.

> Charter was a highly leveraged company under the control of a prominent man with enormous personal wealth. The Company had a patron with deep pockets and a variety of financing and refinancing options available to it during normal market conditions. Those options became far more limited in the immediate aftermath of the upheaval of last fall.

Op. at 11. As a result, "[t]he board, senior management and Charter's advisers . . . were aware that the company was in serious trouble due to the dislocation in the credit markets, lower valuation multiples applicable to peer companies in the cable sector and its own excessive leverage." Op. at 11. They knew Charter needed to restructure promptly.

## II. Charter Borrows $250 Million From The Lenders Based On A Misrepresentation

Notwithstanding its dire financial condition, on November 5, 2008, CCO drew down $250 million from the Lenders under the Credit Facility. Op. at 35. CCO obtained additional credit based on its representation that "[n]o Default or Event of Default shall have occurred and be continuing on such date." Angiolillo Aff. Ex. B (Credit Agreement) at 47. However, this representation was false at the time it was made because, at the time of such borrowing, two Designated Holding Companies—namely, Charter Communications Holdings, LLC ("CCH") and CCH I Holdings, LLC ("CIH")—were unable to pay their debts as they become due over the next six months. These Designated Holding Companies were unable to pay their debts as they become due because they (i) had no cash or liquid assets, *see* Angiolillo Aff. Ex. H

---

[5] CCO owns all the operating assets of Charter and before and during the bankruptcy paid its creditors in full. In fact, there is no reason for CCO to be in bankruptcy other than to attempt to procure the free pass on its Credit Agreement defaults through reinstatement that is embodied in the Confirmation Order.

(balance sheet for Charter affiliates including CIH and CCH as of October 30, 2008 showing that these two entities had only $2 million of cash or liquid assets combined); (ii) were cut off from their ordinary source of funds—distributions from subsidiaries; *see* Op. at 15 (noting that the value of Charter for the purpose of the Plan was $15.4 billion, which amount, it is undisputed, is well below the level that would be required for CIH and CCH to rely on dividend distributions); and (iii) had no capital markets or other alternative sources of funding. *See* Op. at 11 ("The board, senior management and Charter's advisors certainly were aware that the company was in serious trouble due to the dislocation of the credit markets, lower valuation multiples applicable to peer companies in the cable sector and its own excessive leverage. Charter needed to restructure promptly to avoid a potentially catastrophic free-fall bankruptcy . . . ."); *see also* Op. at 10 ("the global credit markets went into the financial equivalent of cardiac arrest."). As a result, there were defaults under Section 8(g)(v) of the Credit Agreement, which provides that a default occurs if "any Designated Holding Company . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." Angiolillo Aff. Ex. B (Credit Agreement) at 65 (Section 8(g)(v)).[6]

## III. The Fall 2008 Credit Crisis Led Charter To Give Control To Bondholders

After the credit markets froze in the fall of 2008, Charter's financial advisor, Lazard, approached the Bondholders in December to negotiate a restructuring whereby the Bondholders would convert their debt into equity of Charter and acquire an additional $1.6 billion of Charter equity through a cash investment. *See* Op. at 12. The restructuring could only succeed, however, if the Bondholders worked together both to convert their debt to equity and to divvy up

---

[6]     CCO repeated this misrepresentation on February 3, 2009, when it attempted to borrow additional funds under the Credit Agreement just weeks before it and the Designated Holding Companies filed for bankruptcy and two months before CIH and CCH had scheduled debt payments due totaling $81 million.

equity that would be issued in a rights offering. The restructuring process was one in which the Bondholders were, according to the Court, "working cooperatively." Op. at 25. The Court found that the documentary evidence showed that "the theme [was] one of 'we are in this together' with coordination being in everyone's best interest." Op. at 25. The documents referenced by the Court include, for example, a memo prepared by Crestview stating that it viewed Charter's bankruptcy as "an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest U.S. cable company." Angiolillo Aff. Ex. F at Charter-e 00114533. The Bondholders "were working together to maximize their investments in Charter and to achieve common economic goals." Op. at 24. This concerted action included written agreements memorialized in commitment letters, restructuring agreements, and a term sheet to acquire equity securities of Charter. *See* Angiolillo Aff. Ex. G (Form 8-K filed Feb. 13, 2009 describing agreement with the Bondholders and attaching the term sheet, restructuring agreements and commitment letters.). This was no accident, of course. These Bondholders, particularly the private equity firms, invest in the bonds of distressed companies with the expectation that those bonds will be converted to equity when the distressed company is forced to restructure. *See* Op. at 25; *see also* Angiolillo Aff. Ex. C at 77:2-15 (7/28/2009 Hr. Tr. (Zinterhofer)) (testimony of Apollo's agent admitting that private equity firms, including Apollo, invest in debt of distressed companies with the expectation of later acquiring equity in a restructuring). This investment strategy is commonly referred to as a "loan-to-own" strategy. *See* Op. at 8 and 25.

The Confirmation Order will allow the strategy to be successful. Post-reorganization, the Bondholders will have 45% voting control of a reorganized Charter's public stock and will be able to elect the majority of the members on Charter's Board by virtue of the fact that they will own more than 50% of "Class A" common stock. *See* Op. at 42; *see also* Angiolillo

Aff. Ex. D (letter from counsel for the Debtors setting forth the percentage of equity each of the Bondholders will acquire if the Plan is consummated); Angiolillo Aff. Ex. E at 2 (Amended and Restated Certificate of Incorporation, Article IV, Section (b)(i)(B)(1)-(2) provides that the holders of the majority of Class A stock (*i.e.* the Bondholders) have the right to elect a majority of the Board.). The Bondholders will control Charter and CCO. They will have more voting power than Mr. Allen. And because the Bondholders are a "group," there will be a change of control default under the Credit Agreement.

## IV.  The Bankruptcy Filings And Acceleration Of Designated Holding Companies' Debt

To effect the Bondholders' agreement, on March 27, 2009, Charter and all 127 of its affiliates including CCO filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. *See* Op. at 6. Each Designated Holding Company's debt in excess of $200 million accelerated that day, rendering CCO in default under the Credit Agreement.

## ARGUMENT

## I.  The Court Should Stay The Confirmation Order Pending Appeal

On appeal of a confirmation order, the Second Circuit has "insist[ed] that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one." *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136, 145 (2d Cir. 2005). This Court has the authority to stay the Confirmation Order in CCO's bankruptcy case pending appeal. Fed. R. Bankr. P. 8005.

Whether to grant a stay requires a balancing of whether (1) the movant has demonstrated a substantial possibility of success on appeal; (2) the movant will suffer irreparable injury without a stay; (3) other parties will suffer substantial injury if a stay is issued; and (4) public interests may be affected. *See, e.g., Hickey v. City of New York (In re World Trade Center Disaster Site Litig.),* 503 F.3d 167, 170 (2d Cir. 2007); *Mohammed v. Reno,* 309 F.3d 95, 100 (2d

Cir. 2002); *Hirschfeld v. Board of Elections in the City of N.Y.*, 984 F.2d 35, 39 (2d Cir. 1993) (noting that a "substantial possibility" of success is less than a "likelihood" of success). The Court must balance these four factors to assess whether a movant has satisfied its burden of showing that a stay pending appeal is warranted. *See ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 347 (S.D.N.Y. 2007) ("[T]he Second Circuit has consistently treated the inquiry of whether to grant a stay pending appeal as a balancing of factors that must be weighed.").

Failure to make a showing on any one of these prongs is not necessarily fatal to an application for a stay. "[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'" *In re World Trade Center Disaster Site Litig.*, 503 F.3d at 170 (citation omitted); *see also Mohammed*, 309 F.3d at 101 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other stay factors.") (citation omitted); *Silverman v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA. (In re Suprema Specialties, Inc.)*, 330 B.R. 93, 95-96 (S.D.N.Y. 2005) (finding that a high possibility of success on appeal is not required where public interest and competing harms favor movant). A balancing of the relevant factors weighs strongly in favor of a stay in the present case.

### A. There Is A Substantial Likelihood That The Lenders Will Prevail On Appeal By Showing That The Court Misconstrued The Credit Agreement As A Matter Of Law

For the Lenders to be "unimpaired," the Credit Agreement reinstated and the Plan confirmed, the Plan must cure *all* defaults (other than *ipso facto*[7] defaults). *See* 11 U.S.C. § 1124. Any alteration of a creditor's legal or equitable rights, even one that enhances those rights,

---

[7] Literally, "*ipso facto*" defaults arise "from the thing itself," *Oxford English Dictionary* (2d ed. 1989)—*i.e.* the debtor's bankruptcy or financial distress.

constitutes impairment. *See Downtown Athletic Club of N.Y. City, Inc. v. Caspi Dev. Corp. (In re Downtown Athletic Club of N.Y. City, Inc.)*, No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) ("Because [Section 1124] focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment."); *In re 7th St. & Beardsley P'ship*, 181 B.R. 426, 431 (Bankr. D. Ariz. 1994) ("[A]ny change of a creditor's rights, whether for the better or for the worse, constitutes impairment."). The Plan fails to cure three separate defaults under the Credit Agreement. These defaults render the Lenders' claims impaired. Therefore, the Plan should not have been confirmed.[8]

> 1. **The Lenders Will Succeed On Their Argument That There Is A Change Of Control Default And No "Restructuring Exception" To Section 13(d) Of The Exchange Act**

Section 8(k)(ii) of the Credit Agreement provides that a breach of the Credit Agreement occurs upon:

> the **consummation of any transaction** (including, without limitation, any merger or consolidation) **the result of which is that any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934**, as amended) **other than the Paul Allen Group has the power,** directly or indirectly, **to vote** or direct the voting of **Equity Interests having more than 35%** (determined on a fully diluted basis) **of the ordinary voting power for the management of the Borrower,** unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group."

---

[8] On appeal, the Bankruptcy Court's conclusions of law will be reviewed *de novo*. *See In re WorldCom, Inc.*, 546 F.3d 211, 216 (2d Cir. 2008). Not all appellate issues are addressed herein.

Angiolillo Aff. Ex. B (Credit Agreement) at 66 (emphasis added). Therefore when a "group," as defined in Sections 13(d) of the Exchange Act, has more voting power for the management of CCO than Paul Allen, there is a change of control and breach of the Credit Agreement. A "group" is "two or more persons [that] act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer." 15 U.S.C. § 78m(d)(3) (Exchange Act Section 13(d)(2)).

To constitute a "group," there need be simply a showing that the group members "acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer." *Roth*, 489 F.3d at 504 (internal citations omitted). The Second Circuit has explained that "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman*, 682 F.2d at 363. There is "no requirement . . . that the members [of a 13(d) group] be committed to acquisition, holding, or disposition on any specific set of terms." *Id.* "[T]he concerted action of the group's members need not be expressly memorialized in writing." *Id.* Here, the undisputed facts are that Apollo, Oaktree, Crestview and Franklin are a group within the meaning of the Credit Agreement.

The Court found that the Bondholders are "working together to maximize their investments in Charter and to achieve common economic goals." Op. at 24; *see also* Op. at 25 (the "members of the purported group are clearly working cooperatively" and expressed the view that they were "in this together" and "coordination" was "in everyone's best interest"). Their agreement to acquire securities is memorialized in commitment letters, restructuring agreements, and a term sheet to acquire equity securities by converting debt to equity. They divvied up $1.6 billion of new equity among themselves; there can be no more concerted action to acquire equity than that. *See* Angiolillo Aff. Ex. G (Form 8-K filed Feb. 13, 2009 describing agreement with the

Bondholders and attaching the term sheet, restructuring agreements and commitment letters.).

Unable to reconcile its factual findings with the Second Circuit's test, the Confirmation Order does not even cite *Roth*. Instead, the Confirmation Order relies without citation to any authority on a bankruptcy exception to Section 13(d) noting that the Bondholders' "prime objective . . . is a combination of loss mitigation and opportunism" and that "[w]anting to maximize a recovery by means of joining an ad hoc committee of bondholders is not equivalent to forming a group." Op. at 25-26. The bankruptcy exception relied upon by the Court does not exist. The SEC has opined that debt holders, like the Bondholders, who act in concert to acquire stock in the context of a bankruptcy restructuring "constitute a group and a person within the purview of Section 13(d)(3) of the Act." *Great Sw. Corp.*, SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972). In *Great Southwest*, the SEC concluded that because "[a]cceptance of the plan of refinancing by each individual creditor is dependent upon its acceptance by all other creditors . . . the recipients of the warrants are acting in concert for the purpose of the refinancing transaction." *Id.* The SEC went on to state that "[a]ny transaction in which such group acquires common stock . . . would require compliance with Section 13(d)(1)." *Id.* Like the creditors in *Great Southwest*, acceptance of the Plan by each Bondholder is dependent on acceptance of the Plan by the other group members. And the Bondholders are indisputably acquiring common stock upon consummation of the restructuring transaction. Accordingly, the Bondholders are "acting in concert" and "constitute a group and a person within the purview of Section 13(d)." *Id.*

The Confirmation Order similarly misapplied binding precedent holding that no Section 13(d) "group" exists absent "binding agreements . . . that tie the Bondholders together as a group for purposes of dealing with Charter's equity securities." Op. at 43. This rigid interpretation of Section 13(d) was rejected by the Second Circuit in *Wellman*, where the court

held that no binding agreement is required. *Wellman*, 682 F.2d at 363; *see also Roth*, 489 F.3d at 508 ("An agreement to act together for the purpose of acquiring, holding, or disposing of shares need not be unconditional in order to support a finding that the actors constituted a group within the meaning of those provisions."). All that is required is that the group members "reached an understanding to act in concert" to acquire equity securities. *Wellman*, 682 F.2d at 363. As this Court noted, "To be sure, the record reflects indications of cooperative behavior among" the Bondholders, Op. at 43, and there were "indications of cooperative behavior and overlapping business objectives to be achieved collectively." Op. at 26. This is enough. *See Wellman*, 682 F.2d at 363. However, even if more were required, the Confirmation Order did not, and cannot explain away the formal binding agreements evidenced by the term sheet, restructuring agreements and commitment letters that bind the Bondholders to act together to support the Plan under which they are to acquire the equity securities of Charter. *See* Angiolillo Aff. Ex. G.

The Confirmation Order held, contrary to binding Second Circuit authorities and the SEC's pronouncement in *Great Southwest*, the term "group" should be interpreted differently—and far more narrowly—in the Credit Agreement than under Section 13(d) because borrowers should be allowed to engage in "corporate engineering" stating:

> The term "group" for purposes of Section 8(k)(ii) is given a meaning that is borrowed from the definition that appears in Section 13(d) of the Securities Exchange Act, but the application of the defined term is different. Section 13(d) is a regulatory provision that speaks to disclosure obligations and, as a result, should be **liberally construed** to achieve the statutory objectives of increased reporting and transparency while Section 8(k)(ii) is a loan covenant that prohibits only a limited category of change of control transactions as such transactions are described and shaped by the language of that covenant. Because the covenant functions as a trigger to a potential default under a credit facility, it should be **construed narrowly** so as to enable the Borrower to engage in permissible corporate engineering.

Op. at 24 (emphasis added). This holding directly contradicts Supreme Court and Second Circuit authority that when a contract incorporates statutory language, the incorporated language must be interpreted in a manner consistent with its statutory meaning. *See U.S. v. City of Fulton,* 475 U.S. 657, 672, 106 S.Ct. 1422, 1430 (1986) (holding that where language from statute is incorporated into a contract a court cannot give that language a meaning that is inconsistent with its meaning in the statutory context); *Tourangeau v. Uniroyal, Inc.,* 101 F.3d 300, 309 (2d Cir. 1996) (reversing lower court because it failed to interpret contractual language incorporating a statute by reference in a manner consistent with its statutory interpretation). As the Supreme Court noted in *Fulton,* incorporation of statutory language establishes that the parties intended that their obligations would track those of the incorporated statutory provision. *See Fulton,* 475 U.S. at 672. Here, as in *Fulton,* "[i]f the [Lenders'] had meant by that contractual language to bind [themselves] with restrictions [or obligations] going beyond those contained in the statute, . . . such restrictions [or obligations] would have been set out more explicitly." *Id.*

## 2. The Lenders Will Prevail Because The Plan Does Not Cure Cross-Acceleration Defaults

CCO breaches the Credit Agreement when $200 million of any non-obligor[9] Designated Holding Company's debt is accelerated for reasons including a bankruptcy filing of the Designated Holding Company. *See* Angiolillo Aff. Ex. B (Credit Agreement) at 64-65. On March 27, 2009, several billion dollars of debt of CCO's affiliates was accelerated. When each of the non-obligor Designated Holding Companies filed a petition for bankruptcy, that accelerated more than $200 million dollars of debt of each entity. *See* Op. at 44. Therefore, under the plain language of the Credit Agreement, CCO is in breach. The Plan does not purport to cure the

---

[9]     CCO Holdings, LLC is the only Designated Holding Company that is an obligor under the Credit Agreement. Angiolillo Aff. Ex. B (Credit Agreement).

breach.[10] Accordingly, the Credit Agreement cannot be reinstated. The Court incorrectly held that the defaults under Section 8(f) did not need to be cured in order to reinstate the Credit Agreement because these defaults are *ipso facto* defaults under Section 365(b)(2) of the Code.

Section 1124(2)(A) carves out of its cure requirements "a default of a kind specified in Section 365(b)(2) of this title or of a kind that Section 365(b)(2) expressly does not require to be cured" in order to reinstate a contract. 11 U.S.C. § 1124(2)(A). Section 365(b)(2) sets forth two relevant categories of defaults that need not be cured: those relating to "(A) the insolvency or financial condition of the debtor at any time before the closing of the case" and "(B) the commencement of a case under this title." 11 U.S.C. § 365(b)(2)(A)-(B). These defaults that need not be cured are ones that flow unavoidably from the *debtor's* financial condition or bankruptcy. Here, the defaults at issue were *not* triggered in any way by the bankruptcy filing or financial condition of the debtor, CCO. CCO is solvent. *See Ruskin*, 269 F.2d at 832 (where the debtor is solvent, "it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act"); *see also Gencarelli*, 501 F.3d at 7 when a debtor is solvent "the bankruptcy rule is that where there is a *contractual* provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision"); *In re Dow Corning Corp.*, 456 F.3d at 679 (same). The Section 8(f) cross-acceleration defaults arise from the financial condition of entities that are non-obligors in CCO's bankruptcy case and non-obligors under the Credit

---

[10]    CCO argues that the Lenders should be grateful that they have been denied their contractual rights because Charter will be allowed to shed $8 billion of existing debt under the Plan. They argue that, as a result, CCO will potentially become a better credit risk. This argument ignores the fact that the Plan would require the Lenders to finance a leveraged buyout of the Company by the Bondholders. It also ignores the fact that a creditor is deemed impaired under Section 1124 regardless of whether or not the denial of contractual rights renders some type of benefit upon the creditor. *In re 7th St. & Beardsley P'ship*, 181 B.R. 426, 431 (Bankr. D. Ariz. 1994) ("[A]ny change of a creditor's rights, whether for the better or for the worse, constitutes impairment and creates the possibility of a 'consenting impaired class.'").

Agreement. Thus, these cross-acceleration defaults are not *ipso facto* defaults that are excused from cure. This is the first case to hold cross-acceleration defaults *ipso facto* in these circumstances. *Cf. In re Liljeberg Enterprises, Inc.*, 304 F.3d 410, 446 (5th Cir. 2002) (cross-default tied to the obligation of a non-debtor affiliate was not an *ipso facto* default under Section 365(b)(2)).

**3.    The Lenders Will Prevail Because The Plan Disregards Incurable Defaults Resulting From Misrepresentations That CCO Made To The Lenders**

The Court erred by holding that Section 8(g)(v) of the Credit Agreement cannot be breached unless a Designated Holding Company missed a debt payment in the past and, alternatively, even if the Court were to interpret the provision prospectively, as all other courts interpreting the same language have done, the business judgment rule somehow insulates CCO from breaches of Section 8(g)(v).

**a.    The Credit Agreement Requires CCO To Represent And Warrant That The Designated Holding Companies Are Able To Pay Their Upcoming Debt Obligations**

The Credit Agreement requires CCO to make truthful representations to the Lenders that it is not in default when borrowing money. It is a breach of the Credit Agreement if CCO makes a representation that later turns out to be untruthful when made, whether or not the misrepresentation was intentional. *See* Angiolillo Aff. Ex. B (Credit Agreement) at 63-64 (Section 8(b) specifies an Event of Default where "any representation or warranty made or deemed made by any Loan Party herein . . . shall prove to have been inaccurate in any material respect on or as of the date made or deemed made."); *see* Angiolillo Aff. Ex. K at 184:15-18 (7/31/2009 Hr. Tr. (Schmitz)) (testimony by Charter's CFO admitting that a false representation results in a default "regardless of whether or not CCO knew or should have known the representation was false"). The reasonableness of the representation or the Borrower's state of mind is irrelevant.

In November 2008, CCO made a borrowing request to the Lenders for $250 million. *See* Op. at 35. Each time CCO submitted a borrowing request, it represented that there were no defaults under Section 8(g)(v) of the Credit Agreement. *See* Op. at 35; *see also* Angiolillo Aff. Ex. B (Credit Agreement) at 63-65. Section 8(g)(v) provides that an Event of Default occurs when "any Designated Holding Company . . . shall be unable to . . . pay its debts as they become due." Angiolillo Aff. Exhibit B (Credit Agreement) at 65. CCO's representations were false because two Designated Holding Companies, CIH and CCH, were "unable to . . . pay its debts as they become due" when the representations were made.

The Court disregarded the plain language of the Credit Agreement and well-established case law holding that whether an entity is "unable to pay its debts as they become due" is a *prospective* test: Instead, the Confirmation Order interpreted the provision as a payment default applicable only if the Designated Holding Company has already missed a debt payment *in the past*. *See* Op. at 36-37. That holding is contrary to how all federal courts have interpreted identical language in the Bankruptcy Code.

The Court acknowledged as much noting that these cases "demonstrate that the words are capable of being read in the manner urged by JPMorgan." Op. at 18 n.12. Indeed, several courts have interpreted this statutory test—"unable to pay its debts as they become due"—and addressed the specific question of whether it is retrospective or prospective. Each has held the test to be prospective. *See, e.g., In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1386-87 (10th Cir. 1998) (holding that "unable to pay . . . debts as they become due" under the Bankruptcy Code is a forward looking test and that a debtor need not actually miss any payments to be deemed "unable to pay . . . debts as they become due"); *In re Town of Westlake, Tex.*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997) (same); *In re City of Bridgeport*, 129 B.R. 332, 336-37 (Bankr. D. Conn.

1991) (same). The only court to have considered a default in a contract based on a party being "unable to pay its debts generally as they become due" likewise applied that test prospectively. *Drexel Burnham Lambert Prod. Corp.* v. *MCorp.*, No. 88C-NO-80, 1989 Del. Super. LEXIS 69, at *3-4, *13 (Del. Super. Ct. Feb. 23, 1989) (explaining that the language dictated a prospective test, in part because, "it is clear that the purpose of [this provision] was to afford one party the opportunity to get out of this Agreement before the other party goes bankrupt"). And the Credit Agreement uses substantially the same words Congress chose to create a prospective test in chapter 9 of the Bankruptcy Code.

The Confirmation Order asserts that a prospective interpretation would be too difficult to apply and hence unreasonable. This ignores the undisputed testimony about the provision's purpose. *See* Angiolillo Aff. Ex. J at 28:25-29:5 (8/25/2009 Hr. Tr. (Kurinskas)) ("The intention of this paragraph is to capture situations where the company is not going to be able to get the money to where it needs to be, or won't be able to raise money from external sources in order to satisfy obligations. So there has to be an impediment to the company's ability to pay their debts in the future."). It also ignores that the virtually identical "inability to pay debts" test is used in three other contexts—to determine cash flow insolvency, to determine whether a going concern qualification is needed in audits, and to determine insolvency under the statutory text discussed above. *See* Angiolillo Aff. Ex. K at 149:9-19, 150:5-14 (7/31/2009 Hr. Tr. (Schmitz)) (testimony of Charter's CFO admitting that the "ability to pay debts as they become due" is a forward looking solvency test that considers whether Charter can pay upcoming debt obligations); Angiolillo Aff. Ex. L at 18:25-19:22 (8/31/2009 Hr. Tr. (Taylor)) (expert testimony concerning forward looking ability to pay test used by auditors). This "inability to pay debts" test has been and is applied

prospectively in all these contexts, even in the face of conflicting expert opinions,[11] without any resulting insurmountable difficulties that could render the clause unenforceable.

### b. The Business Judgment Rule Cannot Negate CCO's Breach Of The Credit Agreement

Recognizing the shaky ground on which its contract interpretation rests, the Confirmation Order holds, alternatively, that if the language is interpreted prospectively, as it is in all other contexts, the business judgment rule shields CCO from liability for breaches. *See* Op. at 38-40. The Confirmation Order reasons that if in November 2008 the Board of Charter mistakenly, but in good faith, believed that CIH and CCH were able to pay their debts as they become due, that erroneous conclusion would excuse CCO's false representation. *See* Op. at 37-40. This reasoning, however, ignores fundamental principles of contract and corporate law. The language of the Credit Agreement governs whether there was a breach of the Credit Agreement. *See Clarke v. Parkinson*, 225 F. Supp. 2d 345, 349 (S.D.N.Y. 2002) (upholding the lower court's interpretation because it flows from the plain language of the Loan Agreement); *Citibank, N.A. v. Outdoor Resorts of Am., Inc.*, No. 91 CIV. 1407 (MBM), 1992 WL 162926, at *4 (S.D.N.Y. June 29, 1992) (applying the plain language of Loan Agreements). And the language of the Credit Agreement says there is a breach when a representation turns out to have been false when made. There is no exception for false statements made in good faith. *See* Angiolillo Aff. Ex. B (Credit Agreement) at 63-64.

---

[11]  As the Court noted, Charter offers conflicting expert opinions as to enterprise value and was unable to persuasively reconcile the vastly disparate numbers or explain "what happened to all that money." Op. at 17; *see also id.* at 11 n.4 (holding that no expert offered a credible opinion that contradicted the $15.4 billion valuation of Charter offered by Lazard, which was billions of dollars less than what was required to allow CIH and CCH to access dividend distributions).

Moreover, there is simply no exception in the law for contractual breaches based on "business judgment." The "business judgment rule" has no application outside the context of derivative suits for breach of fiduciary duty. *See Frater v. Tigerpack Capital, Ltd.*, No. 98 Civ. 3306, 1999 WL 4892, at *4 (S.D.N.Y Jan. 5, 1999) ("the Business Judgment Rule does not pertain to third party disputes, but only to cases in which a director is sued 'in an action by the corporation on its own behalf, by shareholders acting derivatively on behalf of the corporation, by shareholders suing individually on their own behalf or as a class, or by a regulatory body that has assumed control of the corporation.'") (quoting BLOCK, BARTIN & RADIN, THE BUSINESS JUDGMENT RULE (5th ed. Vol. I) at 5.). This is not a derivative case. Nor is this a case against directors for breach of fiduciary duty. No court has relied on the business judgment rule as a defense to a breach of contract claim by a third party precisely because the law is squarely to the contrary. *See Nichols v. Am. Risk Mgmt.*, No. 89 CIV. 2999 (JSM), 1998 WL 655526, at *4 (S.D.N.Y. Sept. 24, 1998) (holding that business judgment rule is not a defense in a breach of contract action); *see also Weaver v. Mobile Diagnostic*, Civ. No. 02-1719, 2009 WL 1230297, at *3 (W.D. Pa. Apr. 30, 2009) (same).

### c. There Is No Evidence In The Record To Suggest CIH And CCH Could Pay Their Debts Through April 2009

The Confirmation Order referenced options historically available to the Designated Holding Companies to pay debts as they become due to support the Court's conclusion that Charter's Board acted reasonably when it approved dividends in November 2008. While the Board's state of mind is entirely irrelevant to the question of whether or not CCO breached the Credit Agreement, the Court's assertion that the Designated Holding Companies had alternative sources of funds is entirely unsupported by the record. The only evidence of alternatives cited by the Court were the "intercompany transfers" from CCI to CIH and CCH. Op. at 38. However, the

unrebutted evidence demonstrate that the "intercompany transfers" cited by the Court were not sufficient to pay the $224 million of debt CIH and CCH had due between November 2008 and April 2009. *See* Angiolillo Aff. Ex. N at 23 (summary of balance sheet indicating that the intercompany payable available to CCI was only $133 million); Angiolillo Aff. Ex. L at 25:8-18 (8/31/2009 Hr. Tr. (Taylor)) (testimony of the lenders expert establishing that intercompany transfers were insufficient to allow CIH and CCH to pay the $224 million due); Angiolillo Aff. Ex. I at 238:19-21, 239:1-8 (8/3/2009 Hr. Tr. (Den Uyl)) (testimony of Charter's expert admitting that intercompany transfers were insufficient to allow CIH and CCH to pay the $224 million they owed.). Charter's auditors concluded that sufficient intercompany accounts did not exist. *See* Angiolillo Aff. Ex. O at 8 ("The remaining balance on the intercompany payable is not sufficient to allow for future 2009 interest payments to be made. . . . Therefore, the intercompany payable cannot solve the lack of surplus, and management does not have any other sufficient alternatives to make future distributions for interest and principal payments when due in 2009."). No witness testified that such alternatives existed.

The Court's reference to the possibility of alternatives cannot even be squared with the Court's own factual findings. The Court found that after Lehman's bankruptcy in September 2008, "the global credit markets went into the financial equivalent of cardiac arrest." *See* Op. at 10. This directly impacted the Designated Holding Companies, cutting them off from sources of funding that were historically available to them. *See* Op. at 11 ("The company had a patron with deep pockets and a variety of financing and refinancing options available to it during normal market conditions. Those options became far more limited in the immediate aftermath of the upheaval of last fall."). The problem was so severe that is was apparent Charter would need to file for bankruptcy protection. According to the Court,

> The board, senior management and Charter's advisors certainly were aware that the company was in serious trouble due to the dislocation of the credit markets, lower valuation multiples applicable to peer companies in the cable sector and its own excessive leverage. Charter needed to restructure promptly to avoid a potentially catastrophic free-fall bankruptcy.

Op. at 11. Having made these factual findings, the unsupported assertion in the Confirmation Order that because Charter had "shown that they had the flexibility and ingenuity to access capital and distribute funds throughout their corporate structure in order to make interest payments" *before the 2007 financial crisis* does not provide any basis, let alone a reasonable basis, to conclude that it would be able to do so in the future.

### B. The Possibility Of Irreparable Harm To The Lenders Through Loss Of Its Appellate Rights Weighs In Favor Of A Stay

The particularly strong possibility that the Lenders will succeed on the merits of their appeal, requires them to make only a minimal showing that failure to grant a stay would cause irreparable harm. *See In re World Trade Center Disaster Site Litig.*, 503 F.3d at 170 ("[T]he degree to which a factor must be present varies with the strength of the other factors, meaning that 'more of one [factor] excuses less of the other.'") (citations omitted). Here, there is a risk that Charter and the Bondholders will continue to argue that the Lenders' appeal is barred by the doctrine of equitable mootness if this Court denies a stay. This is sufficient to warrant a stay.[12]

"[L]oss of appellate rights is a 'quintessential form of prejudice.'" *In re Adelphia Commc'ns Corp.*, 361 B.R. at 347-48 (quoting *In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182, 183 (B.A.P. 2d Cir. 1996)). "[F]or any Court to foreclose effective reversal of its errors, by refusing stay, is not only contrary to the spirit of the bankruptcy system but subverts the

---

[12]  Pursuant to Federal Rule of Bankruptcy Procedure 3020(e), the Confirmation Order is automatically stayed for 10 days from entry of the order. The Plan will become effective upon expiration of the 10 day period.

entire legal process." *In re Grandview Estates Assocs., Ltd.*, 89 B.R. 42, 42-43 (Bankr. W.D.Mo. 1988); *see also In re "Agent Orange" Prod. Liab. Litig.*, 804 F.2d 19, 20 (2d Cir. 1986) (stay should be maintained to protect rights to appeal); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 348 ("[W]here the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied."); *St. Johnsbury Trucking*, 185 B.R. 687, 690 n.1 (S.D.N.Y. 1995) (holding that the "threatened loss rather than the loss of the right to appeal *vel non* [ ] gives rise to the Court's irreparable injury finding").

Charter and the Bondholders have argued that without a stay the Lenders will have no appellate rights because their appeal will be barred by the doctrine of equitable mootness. They contend that it would be inequitable to hear the Lenders' appeal of a confirmation order after substantial consummation of the Plan. *See Aetna Cas. & Sur. Co. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 94 F.3d 772, 776 (2d Cir. 1996) (reviewing courts "presume that it will be inequitable or impractical to grant relief after substantial consummation," unless, among other things, "the entity seeking relief has diligently pursued a stay of execution of the plan throughout the proceedings"). The risk that Charter attempts to render the Lenders' appeal moot warrants a stay pending appeal. *In re Adelphia Commc'ns Corp.*, 361 B.R. at 348.[13]

---

[13] The Lenders' appeal will not in fact be equitably moot because the Plan itself purports to preserve all of the Lenders' "legal, equitable and contractual rights" in accordance with Section 1124 of the Bankruptcy Code. Moreover, because CCO is solvent, the appellate Court will be able to fashion appropriate relief merely by providing the Lenders a market rate of interest on any outstanding loan that they will be forced to make and requiring CCO to repay amounts it wrongfully borrowed based on its prepetition misrepresentations. Where an appellant's claims can be remedied by a grant of money damages, an appeal is not equitably moot. *Frito Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 954 (2d Cir. 1993) (appeal of amount of allowable claim was not equitably moot because the court could render an award of money damages); *see also In re Pacific Lumber Co.*, 584 F.3d at 242-43 (appeal of the valuation of certain collateral was not moot). Equitable mootness would not apply even if Charter were unable to pay the full amount of the Lenders' potential monetary recovery. A court can award a "fractional recovery." *In re*

**C. Any Harm To Other Parties Caused By A Stay Will Be Minimal**

The Lenders' interest in ensuring that their rights to appeal are preserved outweighs any theoretical losses that Charter may incur during litigation of an appeal. *EEOC v. McLean Trucking Co.*, 834 F.2d 398, 403 n.9 (4th Cir. 1987) (holding that public interest in "protecting the status of creditors' rights" weighs against the public interest in "avoiding long delays in the distribution of assets"). Any purported monetary losses are subordinate to those "that cannot be rectified by financial compensation," like the potential risk of loss of the Lenders' appellate rights. *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 354 n.76 (quoting *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991)); *In re St. Johnsbury Trucking Co.*, 185 B.R. at 691 (potential loss of appellate rights outweighs monetary loss). Further, the Lenders are willing to proceed with their appeal on an expedited basis if a stay is granted.

A delay of consummation of CCO's Plan to allow for an appeal will not have an unreasonable impact on CCO's creditors. From the first day of CCO's bankruptcy case, CCO's creditors have been paid pursuant to Court order as if the bankruptcy case were never filed. Consequently, those creditors will suffer no economic harm from a short delay in the consummation of CCO's Plan.

The Plan supporters have regularly created artificial deadlines for consummation of the Plan in an effort to pressure the Court into granting confirmation on their schedule, insinuating that the Bondholders' commitments behind the Plan would evaporate. Yet, the drop-dead date has been routinely extended at each deadline to accommodate the needs of the litigation. The Court

---

*Chateaugay Corp.*, 10 F.3d at 954 (finding that appellants "would readily accept some fractional recovery that does not impair feasibility or affect parties not before this Court, rather than suffer the mootness of [their] appeal as a whole").

has described these deadlines as "arbitrary" in nature. Angiolillo Aff. Ex. M at 2:11 (10/15/09 Hr. Tr.). Further extensions can be granted if a stay is entered.

Finally, any potential harm to the Bondholders is simply not cognizable. Creditors or third parties who receive equity in a reorganized entity cannot argue that their reliance on a confirmation order cuts off a secured creditor's rights to appeal. The "adverse appellate consequences were foreseeable to them as sophisticated investors who opted to press the limits of bankruptcy confirmation." *See In re Pacific Lumber Co.*, 584 F.3d at 244. As this Court has already recognized, "[t]he parties who negotiated the Plan did so knowing that this major struggle with the lenders would follow." Op. at 14.

### D. Public Interests Overwhelmingly Favor Issuance Of A Stay

This is among "the largest and most complex prearranged bankruptcies ever attempted, and in all likelihood rank[s] among the most ambitious and contentious as well." Op. at 7; *see also* Op. at 6 ("[T]hese cases are highly visible and have generated considerable public interest."). The preservation of the Lenders' appellate rights in these circumstances is a legitimate matter of public concern. *See In re St. Johnsbury Trucking Co., Inc.*, 185 B.R. at 691 ("[T]here is a strong public interest in appellate review . . ."). Furthermore, the application of Section 1124 to a first-lien secured lender of $8.2 billion is of significant concern to the financial markets. As the Fifth Circuit recognized in *Pacific*, decisions like the Confirmation Order, impacting secured creditors rights in bankruptcy can "destabilize[] the credit market for financially troubled companies." *In re Pacific Lumber Co.*, 584 F.3d at 244 n.19. Whether it was appropriately decided should be subject to review.

### E. No Bond Is Required

A bond is unnecessary in the present case because a stay pending appeal will not cause any harm. Courts requiring bonds when a stay of a confirmation order is granted typically

do so because of the risk that the debtor will lose financing and will incur increased interest costs if forced to wait for an appeal, *see In re Calpine Corp.,* No. 05-60200(BRL), 2008 WL 2078414, at *7 (S.D.N.Y. Jan. 24, 2008) (noting that a large bond would be appropriate to cover potential increased interest expense if the debtor was required to seek new financing), or where there is a substantial likelihood that the debtor will need to enter into costly transactions as a direct result of the stay, *see In re Adelphia,* 361 B.R. at 353, 368 (requiring a bond where it was undisputed that the stay would result in an IPO that would cost the debtor over $700 million). Of course, these holdings are entirely inapplicable here. The increased interest CCO will have to pay should the Lenders prevail on appeal are the Lenders' damages—not harm caused to CCO. Courts will relieve appellants of the obligation to post security for a stay where, as here, little or no injury or prejudice to appellees will occur. *See In re Sphere Holding Corp.,* 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (holding that bond was not required as a condition to an injunction restraining creditors from collection pending appeal when there was no evidence that the creditor's collateral was diminishing in value and little damage would occur); *In re United Merchs. & Mfrs., Inc.,* 138 B.R. 426, 427 (D. Del. 1992) (stay of further distributions pursuant to confirmed chapter 11 plan would not be conditioned upon filing of a bond because the debtor would not suffer any loss as a result of the stay pending appeal).

Further, requiring a bond here would be meaningless in the circumstances of this case because CCO, the debtor, would be required to pay the cost of posting the bond itself. The premise of the Plan is that the Lenders receive all of their contract rights. Their contract provides that CCO will pay all costs, expenses and disbursements of any kind with respect to the enforcement of the Credit Agreement. Specifically, the Credit Agreement provides in relevant part:

> Payment of Expenses and Taxes. The Borrower agrees . . . (e) to pay, indemnify, and hold each Lender, each Agent, their advisors and affiliates and their respective officers, directors, trustees, employees, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement.

*See* Angiolillo Aff. Ex. B (Credit Agreement) at 73-74. Here a bond would be a cost associated with enforcement of the Credit Agreement, a cost CCO is required to bear itself. "This indemnification provision must be read against the . . . firmly established principle that contracts are enforced as they are written." *Allianz Ins. Co. v. Cavagnuolo*, No. 03 Civ. 1636, 2004 WL 1048243, *4 (S.D.N.Y. May 7, 2004). Thus, requiring the Lenders to post a bond would actually cause CCO to suffer unnecessary expense rather than protect CCO's interest. Therefore, no bond should be required for the stay pending appeal.

## II.    The Lenders' Appeal Should Be Certified To The Second Circuit

A bankruptcy court may certify "on its own motion" an order for immediate appeal to a federal court of appeals where the order: (i) "involves a question of law as to which there is no controlling decision" or "involves a matter of public importance"; (ii) "involves a question of law requiring resolution of conflicting decisions"; *or* where (iii) "an immediate appeal . . . may materially advance the progress of the case." 28 U.S.C. § 158(d)(2). "The twin purposes of [this] provision [are] to expedite appeals in significant cases and to generate binding appellate precedent in bankruptcy, whose case law has been plagued by indeterminacy." *See In re Pacific Lumber Co.*, 584 F.3d at 241-42; *see also Weber v. U.S. Trustee*, 484 F.3d 154, 158 (2d Cir. 2007) ("Among the reasons for the direct appeal amendment was widespread unhappiness at the paucity of settled bankruptcy-law precedent.").

The present appeal satisfies the test for certification under Section 158(d)(2) for three independent reasons: (i) there is no controlling decision addressing the issue on appeal regarding reinstatement of first-lien secured debt under Section 1124 of the Bankruptcy Code; (ii) this case involves matters of significant public importance; and (iii) a direct appeal will materially advance this case by eliminating the delay that would be caused by an extra level of appellate review at the district court level.

### A.    There Is No Controlling Authority

There is no controlling case law addressing the reinstatement issues raised in this case. The Court's decision did not cite to a single Second Circuit opinion decided under Section 1124 addressing the issues the Lenders raise. No such case exists. The Confirmation Order also creates new law in the Section 13(d) context by holding, without citation, that a group of bondholders, working in concert for the pursuit of a common objective, who agree to support a chapter 11 plan in exchange for the equity securities of a debtor are not a "group" within the meaning of Section 13(d) of the Exchange Act.

The Court also addressed two questions of bankruptcy law that appear to be issues of first impression: (i) whether cross-acceleration defaults, similar to the defaults found by the Court under Section 8(f) of the Credit Agreement, can be considered *ipso facto* defaults excused from cure under Section 365(b)(2); and (ii) whether a creditor has the burden of proving impairment or non-impairment under Section 1129(a)(8). Finally, the Confirmation Order departs from the courts that have previously held that the language "ability to pay debts as they become due" sets forth a prospective test.

A ruling by the Second Circuit could bring more certainty to these areas of the law. As a result, the Court should certify the questions presented by this appeal to address this lack of Second Circuit authority in these areas. *See Weber*, 484 F.3d at 158 ("Among the reasons for the

[2005] direct appeal amendment was widespread unhappiness at the paucity of settled bankruptcy-law precedent.").

**B.      The Lenders' Appeal Implicates Matters Of Public Importance**

This case should also be certified for direct appeal because the questions presented by the Lenders' appeal implicate matters of public importance. As the Fifth Circuit recently noted in *Pacific*, bankruptcy court rulings impacting secured debtors can "destabilize[] the credit market for financially troubled companies" and, thus, implicate important public interests. *In re Pacific Lumber Co.*, 584 F.3d at 224 n.19. Similarly, this Court noted that "[t]he issues presented are important ones – whether the restructuring arrangements negotiated prepetition with an informal committee of bondholders known as the 'Crossover Committee' are appropriate and should be confirmed, whether defaults exist that preclude reinstatement of senior secured indebtedness." Op. at 9. The enforceability of the contract rights of creditors whose debt is reinstated in a reorganization is of vital importance to creditors and debtors, especially in today's economic climate. And due to the state of the credit markets and increasing prevalence of "loan-to-own" strategies, these issues are likely to recur frequently in the near future.

**C.      A Direct Appeal To The Second Circuit Will Materially Advance The Progress Of The Case**

Finally, certifying the Court's Confirmation Order will "materially advance the progress of the case." *See* 28 U.S.C. § 158(d)(2). Although "[t]he parties who negotiated the Plan did so knowing that this major struggle with the lenders would follow," Op. at 14, Charter has repeatedly expressed its desire to expedite these bankruptcy cases. This application for certification will accommodate Charter's desire by eliminating an additional layer of appellate review. The Second Circuit has recognized that certification under Section 158(d)(2) is proper if a case can be expedited in this manner. *See Weber*, 484 F.3d at 158 ("[T]he parties adversely

affected by the [bankruptcy court's] ruling might very well fold up their tent if convinced that the ruling has the approval of the court of appeals, but will not give up until that becomes clear.").

## CONCLUSION

For the reasons set forth above, The Lenders respectfully requests that the Court enter (i) an order pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure for a stay pending the Lenders' appeal in the form attached hereto as Exhibit 1; and (ii) an order certifying the Lenders' appeal directly to the Second Circuit pursuant to 28 U.S.C. § 158(d)(2) in the form attached hereto as Exhibit 2.

Dated: New York, New York
      November 20, 2009

                     Respectfully submitted,

                     SIMPSON THACHER & BARTLETT LLP

                     By: */s/ Peter V.Pantaleo*
                         Peter V. Pantaleo
                         Bruce D. Angiolillo
                         Mary Elizabeth McGarry
                         Bryce L. Friedman
                         George S. Wang

                     425 Lexington Avenue
                     New York, New York 10017
                     (212) 455-2000
                     (212) 455-2502 (fax)

                     *Attorneys for JPMorgan Chase Bank, N.A.*

**EXHIBIT 1**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | ) | 09-11435(JMP) |
| Debtors. | ) | (Jointly Administered) |
| In re: | ) | Chapter 11 |
| CHARTER COMMUNICATIONS OPERATING, LLC, | ) | 09-11449 (JMP) |
| Debtor. | ) |  |

## ORDER FOR A STAY PENDING APPEAL OF THE ORDER CONFIRMING CHARTER COMMUNICATION OPERATING, LLC'S PLAN OF REORGANIZATION

This matter coming before the Court on JPMorgan Chase Bank, N.A.'s

motion for an order (I) staying the Court's Confirmation Order[1] to the extent it provides

for approval of Charter Communication Operating, LLC's Plan of Reorganization

pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8005 and (II)

certifying JPMorgan's appeal to the United States Court of Appeals for the Second

Circuit pursuant to 28 U.S.C. § 158(d)(2) (the "Motion"). The Court having reviewed the

Motion and the prior proceedings herein; and the Court having found that (i) the Court

has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, (ii) this is a core

---

[1] References to the "Confirmation Order" are to the Court's Opinion On Confirmation Of Plan Of Reorganization And Adjudication Of Related Adversary Proceeding [Dkt. No. 920] and related Findings Of Facts, Conclusions of Law, And Order Confirming Debtors' Joint Plan Of Reorganization Pursuant To Chapter 11 Of The United States Bankruptcy Code [Dkt. No. 921].

proceeding pursuant to 28.U.S.C. § 157(b) and (iii) notice of the Motion was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

The Motion is GRANTED.

The Court therefore stays the Confirmation Order pending appeal pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure. The Confirmation Order shall be stayed and have no effect until the appeal is decided.

Dated: New York, New York

_____, 2009

_____

UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 2

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| CHARTER COMMUNICATIONS, INC., | 09-11435(JMP) |
| Debtors. | (Jointly Administered) |
| In re: | Chapter 11 |
| CHARTER COMMUNICATIONS OPERATING, LLC, | 09-11449 (JMP) |
| Debtor. | |

## ORDER CERTIFYING CONFIRMATION ORDER FOR IMMEDIATE APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT PURSUANT TO 28 U.S.C. § 158(d)(2)

This matter coming before the Court on JPMorgan Chase Bank, N.A.'s motion for an order (I) staying the Court's Confirmation Order[1] to the extent it provides for approval of Charter Communications Operating, LLC's Plan of Reorganization pending appeal pursuant to Federal Rule of Bankruptcy Procedure 8006 and (II) certifying JPMorgan's appeal to the United States Court of Appeals for the Second Circuit pursuant to 28 U.S.C. § 158(d)(2) (the "Motion"). The Court having reviewed the Motion and the prior proceedings herein; and the Court having found that (i) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157, (ii) this is a core proceeding pursuant

---

[1]     References to the "Confirmation Order" are to the Court's Opinion On Confirmation Of Plan Of Reorganization And Adjudication Of Related Adversary Proceeding [Dkt. No. 920] and related Findings Of Facts, Conclusions of Law, And Order Confirming Debtors' Joint Plan Of Reorganization Pursuant To Chapter 11 Of The United States Bankruptcy Code [Dkt. No. 921].

to 28.U.S.C. § 157(b) and (iii) notice of the Motion was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

The Motion is GRANTED as set forth herein.

The Court certifies that an immediate appeal of the Confirmation Order is appropriate because this case "involves a question of law as to which there is no controlling decision," "involves a matter of public importance" and because "an immediate appeal may materially advance the progress of the case." 28 U.S.C. § 158(d)(2).

This Court therefore certifies the Confirmation Order for immediate appeal, pursuant to 28 U.S.C. § 158(d)(2).

Dated: New York, New York

_____, 2009

_____

UNITED STATES BANKRUPTCY JUDGE